1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
   croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
   acaridis@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
5  The Orrick Building
   405 Howard Street
6  San Francisco, CA  94105-2669
   Telephone:     +1 415 773 5700
7  Facsimile:      +1 415 773 5759

8
9  *Attorneys for Defendant Sonos, Inc.*

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12 GOOGLE LLC,                          | Case No. 3:20-cv-6754

13             Plaintiff,               | **DECLARATION OF ALYSSA CARIDIS IN SUPPORT OF SONOS, INC.'S MOTION TO DISMISS OR TRANSFER TO THE WESTERN DISTRICT OF TEXAS**
14      v.
15 SONOS, INC.,
16             Defendant.              | Date:          November 17, 2020
                                         Time:          9:30 a.m.
17                                       Location:    Courtroom B, 15th Floor
                                         Judge:        Hon. Laurel Beeler
18
19                                       Complaint Filed: September 28, 2020
                                         Trial Date: None Set
20

21

22

23

24

25

26

27

28

4144-7929-8088

1.     I am an attorney at the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for Defendant Sonos, Inc. ("Sonos") in the above-captioned matter. I am a member in good standing of the Bar of the State of California. I make this declaration based on my personal knowledge, unless otherwise noted. If called, I can and will testify competently to the matter set forth herein. I submit this declaration in support of Sonos, Inc.'s Motion to Dismiss or Transfer to the Western District of Texas.

2.     Attached hereto as **Exhibit A** is a true and correct copy of an email from Alaina Kwasizur of Sonos to Bradley Riel and Tim Kowalski of Google, attaching a drafted complaint, dated September 28, 2020.

3.     Attached hereto as **Exhibit B** is a true and correct copy of an article by Michael Allison, titled *Google Nest speakers are one step closer to replacing your Sonos system*, published in Android Central, dated Aug. 18, 2020.

4.     Attached hereto as **Exhibit C** is a true and correct copy of an article by Aaron Brown, titled *Google Home upgrade brings some of the best Sonos features to your speakers,* published in Express, dated Aug. 23, 2020.

5.     Attached hereto as **Exhibit D** is a true and correct copy of an article by Olivia Tambini, titled *New Google Nest release date, price, and rumors,* published in TechRadar, dated Sept. 21, 2020.

6.     Attached hereto as **Exhibit E** is a true and correct copy of a Google blog by Chris Chan, titled *House music: New multi-room audio control from Nest,* (Aug. 18, 2020), available at https://blog.google/products/google-nestnew-multi-room-audio-control-nest/.

7.     Attached hereto as **Exhibit F** is a true and correct copy of Sonos' Complaint for Patent Infringement, filed in the Western District of Texas, in the *Sonos, Inc. v. Google LLC*, No. 6:20-cv-00881-ADA (W.D. Tex. Sept. 29, 2020) case.

8.     Attached hereto as **Exhibit G** is a true and correct copy of Google Inc.'s Opposition to Eolas Techs. Inc.'s Motion to Dismiss, filed in the Northern District of California, in the *Google Inc. v. Eolas Techs. Inc.*, No. 3:15-cv-05446-JST (N.D. Cal. Mar. 4, 2016) case, ECF No. 53-3.

CARIDIS DECL. IN SUPPORT OF MOT. TO
DISMISS OR TRANSFER
Case No. 3:20-CV-6754

4144-7929-8088

9.      Attached hereto as **Exhibit H** is a true and correct copy of Google's Motion to Dismiss Under Federal Rule 12(B)(6) for Failure to State a Claim for Relief, filed in the Western District of Texas, in the *Gabriel De La Vega, v. Google LLC*, No. 6:19-cv-00617-ADA (W.D. Tex. Dec. 12, 2019) case, ECF No. 15.

10.     Attached hereto as **Exhibit I** is a true and correct copy of Google LLC's Notice of Motion and Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(B)(6), filed in the Northern District of California, in the *Hypermedia Navigation LLC v. Google LLC*, No. 4:18-cv-06137-HSG (N.D. Cal. Jan. 4, 2019) case, ECF No. 30.

11.     Attached hereto as **Exhibit J** is a true and correct copy of the Google Careers Page for Austin Texas, available at https://careers.google.com/locations/austin/ (last visited Oct. 11, 2020).

12.     Attached hereto as **Exhibit K** is a report from Docket Navigator of pending patent cases in the Western District of Texas involving Google.   The report shows 31 results.  I have reviewed these results, and if one removes duplication and Sonos' case filed against Google the day after the present case was filed, these results indicate that Google is currently litigating 14 patent cases in the Western District of Texas.

13.     Attached hereto as **Exhibit L** is a report from Docket Navigator of pending patent cases in the Northern District of California involving Google.   The report shows 20 results.  I have reviewed these results, and if one removes duplication and the present case, these results indicate that Google is currently litigating 9 patent cases in this district.

14.     Attached hereto as **Exhibit M** is true and correct copy of a Scheduling Order, filed in the Western District of Texas, in the *Solas Oled Ltd., v. Dell Inc.*, No. 6:19-cv-631-ADA (W.D. Tex. June 22, 2020) case, ECF No. 50.

15.     Attached hereto as **Exhibit N** is true and correct copy of a Scheduling Order, filed in the Western District of Texas, in the *Intellectual Tech LLC v. Zebra Techs. Corp.*, No. 6:19-cv-628-ADA (W.D. Tex. Feb. 2, 2020) case, ECF No. 24.

16.     Attached hereto as **Exhibit O** is true and correct copy of a Case Management

1    Order, filed in the Northern District of California, *USB Techs., LLC v. Sunvalleytek Int'l, Inc.*,

2    No. 17-cv-3869 (N.D. Cal. Oct. 11, 2017) case, ECF No. 25.

3           17.     Attached hereto as **Exhibit P** is true and correct copy of a Stipulation and

4    Scheduling Order (as Modified by the Court), filed in the Northern District of California, in the

5    *Amgen Inc. v. Sandoz Inc.*, No. 16-cv-2581 (N.D. Cal. Nov. 22, 2017) case, ECF No. 160.

6           18.     Attached hereto as **Exhibit Q** is true and correct copy of Northern District of

7    California's General Order No. 72, issued on March 16, 2020.

8           19.     Attached hereto as **Exhibit R** is true and correct copy of Northern District of

9    California's General Order No. 72-6, issued on September 16, 2020.

10          20.     Attached hereto as **Exhibit S** is true and correct copy of Northern District of

11   California's General Order No. 72-2, issued on April 30, 2020.

12          21.     Attached hereto as **Exhibit T** is true and correct copy of Northern District of

13   California's General Order No. 72-3, issued on May 21, 2020.

14          22.     Attached hereto as **Exhibit U** is true and correct copy of Northern District of

15   California's General Order No. 72-4, issued on June 24, 2020.

16          23.     Attached hereto as **Exhibit V** is true and correct copy of Northern District of

17   California's General Order No. 72-5, issued on July 23, 2020.

18          24.     Attached hereto as **Exhibit W** is true and correct copy of Western District of

19   Texas' Standing Order Regarding Coronavirus (COVID-19) and Court Proceedings, issued on

20   Mar. 12, 2020.

21          25.     Attached hereto as **Exhibit X** is true and correct copy of excerpts from ECF

22   docket entries nos. 170, 271, 350 and the May 13, 2020 Minute Entry for *MV3 Partners LLC v.*

23   *Roku, Inc.*, No. 18-cv-00308-ADA (W.D. Tex. 2020).

24          26.     Attached hereto as **Exhibit Y** is true and correct copy of Western District of

25   Texas' Waco Division Standing Order Regarding Trials in Waco, issued on August 18, 2020.

26          27.     Attached hereto as **Exhibit Z** is a true and correct copy of an email from Paige

27   Amstutz to Jeffrey Johnson, dated September 28, 2020.

28          I declare under penalty of perjury that the foregoing is true and correct to the best of my

CARIDIS DECL. IN SUPPORT OF MOT. TO
DISMISS OR TRANSFER
Case No. 3:20-CV-6754

1    knowledge. Executed this 12th day of October, 2020 in Los Angeles, California.

2

3

4                               ALYSSA CARIDIS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4144-7929-8088

# Exhibit A

REDACTED

---------- Forwarded message ---------
From: **Alaina Kwasizur** ██████████████████
Date: Mon, Sep 28, 2020 at 12:52 PM
Subject: Sonos Notice
To: Bradley Riel ████████████████, Tim Kowalski █████████████████
Cc: <████████████████

Dear Tim and Brad,

As you know, Sonos spent years trying patiently and in good faith to resolve Google's infringement of Sonos's intellectual property.  Despite Sonos's efforts, our discussions have never meaningfully progressed. Even since we filed in the ITC, Google has increased the scope of its infringement and brought a multiplicity of retaliatory lawsuits in countries around the world. These lawsuits will not have their intended effect.

Attached please find a courtesy copy of the complaint that we will file Tuesday, September 29th in the United States District Court.  In this lawsuit, Sonos will focus on Google's infringement of U.S. Patents  9,967,615;

10,779,033; 9,344,206; 10,469,966; and 9,219,460 although, as we have discussed, Google infringes many more of Sonos's patents.

We continue to be hopeful that Google will reconsider its infringement and its refusal to engage in a meaningful discussion.

Best,

--
**Alaina Kwasizur**
Sonos, Inc. | General Counsel, AMPAC | ███████████

--
**Alaina Kwasizur**
Sonos, Inc. | General Counsel, AMPAC & Chief Diversity & Inclusion Officer | ███████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| SONOS, INC., | § | Case No. |
| | § | |
| Plaintiff, | § | **COMPLAINT FOR PATENT** |
| | § | **INFRINGEMENT** |
| v. | § | |
| | § | **Jury Trial Demanded** |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Sonos, Inc. ("Sonos" or "Plaintiff") hereby asserts claims for infringement of United States Patent Nos. 9,967,615; 10,779,033; 9,344,206; 10,469,966; and 9,219,460 (the "patents-in-suit"; attached hereto as Exhibits 1-5 respectively) against Defendant Google LLC ("Google" or "Defendant"), and alleges as follows:

### INTRODUCTION

1.      Sonos is an American success story.  It was founded in 2002 in Santa Barbara, California by a handful of engineers and entrepreneurs with a vision to invent the world's first wireless, whole-home audio system.  At the time, popular audio systems were dependent on a centralized receiver hard-wired to each individual passive speaker throughout a home.  Further, most homes with Internet access had dial-up connections, the iPhone was still five years away, and there were no streaming music services.  The technological barriers confronting Sonos were enormous.

2.      To deliver on its vision, the Sonos team completely reimagined the in-home music system as a decentralized network of smart playback devices, and it developed a platform that

1

could seamlessly and wirelessly distribute audio room by room or throughout the home at the user's discretion.  Sonos created a "choose what to play, where to play it, and how loud" wireless audio system that could not only perform without lag (*e.g.* buffering, or network interruptions), but that was also so simple and intuitive that customers would make it part of their daily lives.

3.      Commercial success did not come easy for Sonos as its vision was in many ways ahead of its time.  But year by year, consumers – and the entire industry – came to appreciate that wireless multi-room audio devices and systems could not only work, but could become an essential part of the listening experience.  Success required staying true to Sonos's disruptive vision, continuing to innovate while adjacent industries caught up and customers became more and more enamored with the idea of Sonos as they had the chance to encounter and use its products.  Once Sonos had taken all the risks and placed enormous bets on research and development, the "first followers" began to copy Sonos's innovations.

4.      To this day, Sonos remains focused on innovations that further enhance the listening experience.  Sonos invests heavily in research and development and, as a result, frequently invents new systems with new technologies, enhanced functionality, improved sound quality, and an enriched user experience.

5.      As a result, Sonos has become one of the world's leading providers of innovative audio products.  In recognition of its wide-ranging innovations, the U.S. Patent & Trademark Office has granted or allowed Sonos more than 940 U.S. patents, including the patents-in-suit, with hundreds more patents in other countries.  The innovations captured by these patents cover many important aspects of wireless multi-room audio devices/systems, including, for example, how to manage and control groups of playback devices, how to facilitate seamless control and transfer of audio playback among devices, and how to output amazing sound quality.

6.      The industry has recognized the importance of Sonos's patents.  For example, Sonos earned a spot on the IPO list of "Top 300 Organizations Granted U.S. Patents" and the

IEEE recognized Sonos as having one of "[t]he technology world's most valuable patent portfolios." *See* Exs. 6 and 7.

7.     Sonos launched its first commercial products in 2005 and has since released a wide variety of critically acclaimed, patented, wireless multi-room audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move, Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, Amp, Five, and Arc.  *See, e.g.*, Ex.  8.  Sonos's products can be set up and controlled by the Sonos app.  *Id.*

8.     Sonos's efforts have made it incredibly popular with its customers.  Sonos estimates that in fiscal year 2019, Sonos's customers listened to 7.7 billion hours of audio content using its products.  And, as of September, 2019, almost two thirds of Sonos households had purchased and installed more than one Sonos product.

9.     Sonos's record of innovation has made it the undisputed leader in what has come to be called the "multiroom audio" field.  *See, e.g.*, Ex. 9 (2018 Digital Trends: "Sonos is the king of multiroom audio…."); Ex. 10 (2019 What Hi-Fi: "[N]o multi-room offering is as complete or as pleasurable to live with as Sonos.").

10.     Sonos has already sued Google for infringing patents on its first group of inventions involving the set-up, control, playback, and synchronization of wireless playback devices.  This case involves a second group of inventions which, as described more extensively below, tackle the novel technological challenges of how to stream music from a cloud-based service, how to create, manage, and invoke "zone scenes" to configure how multiple playback devices work together, and how to dynamically adjust the equalization of a playback device based on the environment in which the playback device is operating.

**GOOGLE BEGINS INFRINGING**

11.     Almost a decade after Sonos created the smart-speaker market, Google entered the space.  Initially, Google sought to work with Sonos and, through those efforts, gained access to

Sonos's engineers, products, and technology.  All too quickly, however, Google shifted focus and began to develop and sell products that copied Sonos's technology and infringed Sonos's patents.

12.     Part of what makes Sonos so successful is that, through its application, Sonos is compatible with many different third-party music streaming services.  When Google publicly launched its own streaming music service – Google Play Music – in late 2011, Sonos worked with Google to integrate the Google Play Music service into the Sonos ecosystem.  As a result, Google Play Music launched on the Sonos platform in 2014.  *See, e.g.*, Ex. 11.

13.     This should have benefited everyone: Sonos's customers gained access to another streaming service and Google Play Music users gained access to Sonos's devices.  But as the press recognized at the time, Sonos's integration work with Google was especially "deep" and therefore gave Google a wide aperture through which to view Sonos's proprietary technology.  *Id.* (2014 Wired: "This is the first time this sort of deep integration has happened between a third party music service and Sonos.").  The copying soon followed.

14.     Just eighteen months later, in 2015, Google began willfully infringing Sonos's patents.  On information and belief, Google used the knowledge it had gleaned from Sonos to build and launch its first wireless multi-room audio product – Chromecast Audio.

15.     Google's Chromecast Audio began what has turned into Google's relentless effort to copy Sonos and use Sonos's patented technology.  For example, although Google's original Chromecast Audio did not yet include Sonos's patented multi-room audio functionality, even when it was launched Google was working to add that Sonos-patented feature.  *See* Ex. 12 (2015 The Guardian: "Google is also working on multi-room audio streaming using the Chromecast Audio, but it will not support the popular feature out of the box.").  And, when Google added the infringing feature, the press immediately noted how this "major feature update" made Google's product even more "like the ones made by Sonos:"

> Google's recently-launched Chromecast Audio adapter is getting a major feature update this week: Consumers will now be able to group multiple Chromecast audio adapters to stream their favorite music simultaneously in more than one room,

similar to the multi-room support available for internet-connected loudspeakers like the ones made by Sonos.

Ex. 13 (2015 *Variety* article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos"); *see also* Ex. 14 (2015 *Pocket-Lint*) ("You control your Sonos experience with one app. Well, thanks to a new software rollout, Chromecast Audio can pretty much do the same thing.").

16.     This has become a consistent pattern. Time and again, Google has added features to its products that first appeared in Sonos's products and which make use of Sonos's patented technology.

## GOOGLE'S INFRINGEMENT ACCELERATES

17.     Since 2015, Google's misappropriation of Sonos's patented technology has proliferated. Google has expanded its wireless multi-room audio system to more than a dozen infringing products, including the Google Home Mini, Google Home, Google Home Max, and Pixel phones, tablets, and laptops. And Google has persisted in infringing even though Sonos has warned Google of its infringement on at least four separate occasions dating back to 2016.

18.     For example, in 2016 (a year after Google launched the Chromecast Audio wireless adapter), Google released the Google Home multi-room audio player (which was controlled by Google's rebranded multi-room controller app – the Google Home app). Unlike the Chromecast Audio, the Google Home added an internal speaker driver making it an "all-in-one" audio player akin to Sonos's prior Play:1, Play:3, and Play:5 products.

19.     Sonos raised the issue of infringement as to these products with Google as early as August 2016. Sonos hoped that Google would respect Sonos's intellectual property and the extensive work Sonos had put into inventing and developing its products. But Google did no such thing.

20.     In October 2016, Sonos put Google on notice of infringement of 28 Sonos patents, including asserted United States Patent No. 9,344,206. Google, however, did not stop infringing.

Instead, it doubled down and introduced new infringing products, making use of *even more* patented technology from Sonos.

21.     For example, in 2017, eight years after Sonos introduced its first all-in-one audio player – the Play:5 – Google released its first all-in-one audio players – the Google Home Max and the Google Home Mini.  Google's Home Max in particular was seen as a "Sonos Clone" and a "not-so-subtle copy of the [Sonos] Play:5 speaker…."  Ex. 15.  As explained by Gizmodo, "[i]t's also hard not to see the [Google Home Max] device as something of a jab at Sonos."  *Id.*; *see also, e.g.*, Ex. 16 (2017 Android Central: "You can't help but look at Google Home Max… and come to the conclusion that Google is sticking its nose where Sonos has been for years.").

22.     Therefore, in January 2018, and then again in July 2018, Sonos put Google on notice that it was infringing even more Sonos patents, including asserted United States Patent No. 9,219,460.  Then again, in February 2019, Sonos put Google on notice of infringement of 100 Sonos patents, including asserted United States Patent No. 9,967,615.

23.     Nothing Sonos did, however, deterred Google from expanding its infringement. Google's infringing product line now includes at least the Chromecast, Chromecast Ultra, Chromecast Audio, Chromecast with Google TV, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Audio, and Nest Wifi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the YouTube Music app, the Google Play Music app, the YouTube app, and the Google Home app (individually or collectively, "Google App(s)").  *See, e.g.*, Exs. 17-27.

24.     In addition to providing the Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controllers that are pre-installed with the Google Play Music app, YouTube app, and/or YouTube Music app (and capable of downloading and executing the Google Apps that are not pre-installed).  These infringing hardware controllers include, for example, Google's "Pixel" phones, tablets, and laptops (e.g., the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones, the Pixel Slate tablet, and the

Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel Device(s)").
*See, e.g.*, Exs. 28-32.

25.     Herein, "Google Wireless Audio System" refers to one or more Google Audio Players, one or more Google Pixel Devices, and/or one or more Google Apps.

26.     In order to hold Google accountable for its willful infringement of Sonos's patents, Sonos filed a complaint in January 2020 asking the United States International Trade Commission ("ITC") to institute an investigation into Google's unlawful importation into and sale in the United States of infringing products.  The ITC instituted an investigation, *In re Certain Audio Players and Controllers, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1191 to determine whether Google's audio players and controllers infringe five Sonos patents directed to fundamental features such as playing music on multiple speakers in synchrony, playing music in stereo over two or more players, a controller that can easily setup a player on a wireless network, and playback-control features such as controlling both the volume of individual speakers and a group of speakers.

27.     While the ITC Investigation has been pending, Google has continued to increase its infringement.  For example, press reports indicate that Google is introducing new products and changes that mean Google is "one step closer to replacing your Sonos system."  Ex. 33; *see also* Ex. 44 ("The new functionality appears to be the most direct challenge to the likes of Sonos, which has enjoyed enormous success by creating a series of connected speakers and soundbars that can play music simultaneously – or individually.").  The press has similarly noted that Google's new speaker "could be a new rival for the likes of the Sonos One, the best smart speaker you can buy in 2020."  Ex. 34; *see also* Ex. 44 ("Just like Sonos, you can also change the volume on each speaker individually from the main interface.").  And press reports indicate that Google has expanded its use of Sonos's stereo pair technology into the new smart-speakers even though Google is *currently* being sued for infringing a Sonos patent on this technology.  Exs. 35, 44.

28.     Google itself has also highlighted the importance of its use of Sonos's technology. For example, Google' Chris Chan publicly stated that "[c]ontrolling the audio throughout my

home, no matter who's listening, has been incredibly helpful" and that "[t]oday, we're expanding that control. You can already manually group Nest devices in order to play the same music on various speakers at the same time, and now we're launching multi-room control so you can dynamically group multiple cast-enabled Nest devices (speakers, Smart Displays, Chromecasts) in real-time to fill multiple rooms with music."   Ex. 35; *see also* Ex. 44.  Again, Google has expanded its use of this technology *while* it is being sued for infringing Sonos's patents on this precise technology.

29.     Google's aggressive and deliberate expansion of its use of Sonos's patented technology has led observers to conclude that "[n]o market is safe from [the] search engine monster" and that Google was specifically "offering new products to compete with Sonos in the music streaming market."  *See* Ex. 36.

### GOOGLE'S CONTINUED INFRINGEMENT FORCES THIS SUIT

30.     In the face of Google's unrelenting infringement, Sonos has no choice but to bring this suit.  In this action, Sonos asserts patents that are not at issue in the ITC or the related district court action.  Sonos is also accusing Google's Wireless Audio System of infringing different patented features than are at issue in either of those actions.

31.     Sonos's ITC suit addressed Google's infringement of Sonos patents covering fundamental aspects of wireless, whole-home audio systems.   While groundbreaking, those patents represent only some of Sonos's ongoing innovation from its inception to today.  Through its foresight, substantial investment, and relentless pursuit of excellence, Sonos built on its previous success and invented a number of key features consumer have grown to expect and demand in streaming music listening.

32.     For example, as explained more fully below, Sonos's U.S. Patent Nos. 9,967,615 and 10,779,033 (the "'615 Patent" and the "'033 Patent," respectively) cover key aspects of Sonos's inventive approach for streaming music from a cloud-based service to a media playback system, including technology for transferring playback responsibility for a cloud-based stream of

media content from a user's device, such as a smart phone, to a media playback system that is then configured to retrieve and play back the cloud-based media content.

33.    Sonos was well ahead of the field when it began to develop these inventions in 2011.  At that time, Sonos's audio system, including its smart-phone app controller, was in a category all its own.  Moreover, streaming content from cloud-based media services for playback by computers – let alone other types of networked devices like smart phones and smart speakers – was in its infancy.  Nonetheless, at a time years before Google released its first Chromecast product, Sonos envisioned a novel experience of continuous and intuitive control of a user's entire streaming listening experience, across multiple networked devices, including smart phones and/or smart speakers.  That vision gave rise to the innovation of technology for enabling seamless transition of playback responsibility for cloud-based media content between different networked devices, such as a smart phone and a smart speaker.  This paradigm is now fundamental across the entire streaming industry as user expectations of continuous listening experiences have continued to converge with Sonos's vision.

34.    Similarly, Sonos's U.S. Patent Nos. 9,344,206 and 10,469,966 (the "'206 Patent" and the "'966 Patent," respectively) cover some of Sonos's inventions related to creating, managing, and invoking "zone scenes" to configure how multiple players work together.  With these patents, Sonos once again anticipated what consumers would want and invented a new feature for its system.  Using the inventions of the '206 and '966 Patents, playback devices can be grouped together for synchronous playback in an easy and intuitive manner using "zone scenes."  Advantageously, such a "zone scene" can be accessed and invoked by multiple devices and in various ways (*e.g.*, by voice) even when the particular controller that created the "zone scene" is not on the network.

35.    In addition, Sonos's U.S. Patent No. 9,219,460 (the "'460 Patent") covers a Sonos invention related to dynamically adjusting the equalization of a playback device based on its environment.  Naturally, consumers want their speakers to sound great, regardless of the environment in which the playback device is operating, but changes in the playback device's

9

listening environment could impact sound quality. For example, a playback device may be configured to perform advantageously in a small room, but nonetheless may come to be positioned outdoors.  When operating outdoors, boosting the bass levels of the playback may result in an improved listening experience for some consumers.  However, previous technology for setting the equalization parameters for a playback device made it very difficult to optimize the playback device's equalization parameters for its listening environment.  The '460 Patent provides technology that enables a playback device to adjust its own equalization settings based on one or more reflection characteristics of an audio signal in order to optimally match the playback device's listening environment.

36.    Sonos provided a pre-filing copy of this Complaint to Google, thereby providing clear pre-suit notice of infringement of the patents-in-suit.  Google, however, has never given any indication that it is willing to stop infringing, and did not do so in response to receiving a draft of this complaint.

37.    On information and belief, Google is unwilling to stop infringing because its infringement of Sonos's patented inventions has paved the way for Google to generate billions of dollars in revenue.  A December 2018 market report by Royal Bank of Canada ("RBC"), for example, concluded that Google sold over 40 million Google Home devices in the U.S. and that Google generated $3.4 billion in Google Home revenue in 2018 alone.  Ex. 37 at pp. 1, 4, 14-15.  RBC also found that, as of August 2017, Google had sold more than 55 million Chromecast devices and that Google generated almost $1 billion in Chromecast revenue in 2018.  *Id.* at pp. 4, 16, 18.  Further, RBC estimated that, in 2018, Google generated $3.4 billion in Pixel device revenue.  *Id.* at pp. 4, 8.

38.    By 2021, RBC estimates that Google will be annually selling over 100 million Google Home devices in the U.S. and generating over $8 billion in Google Home revenue.  *Id.* at pp. 4, 14-15.  In addition, by 2021, RBC estimates that Google will annually generate $2.4 billion in Chromecast revenue and nearly $7 billion in Pixel device revenue.  *Id.* at pp. 4, 8, 18.

39.     The revenue obtained from the sale of Google's hardware devices vastly understates the value to Google of infringing Sonos's patents.  On information and belief, Google is intentionally selling the infringing products at a discount and/or as a "loss leader" with the expectation that this will allow Google to generate even more revenue in the future – *e.g.*, by powering Google's continued dominance of the market for search advertising.  In particular, Google's infringement of Sonos's patented inventions has helped and/or will help Google generate significant revenue from the use of Google's hardware devices including advertising, data collection, and search via the Google Wireless Audio Systems.  As the *New York Post* explained, "Amazon and Google both discounted their home speakers so deeply over the holidays that they likely lost a few dollars per unit … hoping to lock in customers and profit from later sales of goods and data about buying habits." Ex. 38.  Similarly, *News Without Borders* explained that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support advertising or e-commerce." Ex. 39.

40.     On information and belief, Google's copying of Sonos's patented inventions has also helped and/or will help Google generate significant revenue from driving its users to make purchases such as streaming music subscriptions and retail purchases via the Google Wireless Audio Systems.  For example, an NPR "smart speaker" survey found that 28% of survey respondents agreed that "[g]etting [a] Smart Speaker led [them] to pay for a music service subscription," and Google offers two such subscriptions – Google Play Music and YouTube Music. Ex. 40 at p. 20.  Likewise, the NPR survey also found that 26% of respondents use their smart speakers "regularly" to "add [items] to shopping list." *Id*. at p. 14; *see also, e.g.*, Ex. 39 (stating that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support… e-commerce.").

41.     On information and belief, Google is willfully infringing Sonos's patents as part of Google's calculated strategy to vacuum up invaluable consumer data from users and, thus, further entrench the Google platform among its users and fuel its dominant advertising and search platforms.

42.     Google's infringement – and its strategy to sell its infringing products at a loss to develop alternative revenue streams – has caused significant damage to Sonos.  For example, the Google Home Mini predatorily implemented Sonos's valuable patented technology into an all-in-one wireless multi-room product that Google sells at a highly subsidized price point or even gives away for free.  Ex. 41 ("At $49, Google Home Mini works on its own or you can have a few around the house, giving you the power of Google anywhere in your home."); Ex. 39 ("Google partnered with Spotify to offer Home Minis as a free promotion for Spotify Premium customers. Spotify's premium userbase is nearly 90 million, so if even a fraction of users take the free offer, a massive influx of Google smart speakers will enter the market.").

### THE PARTIES

43.     Plaintiff Sonos, Inc. is a Delaware corporation with its principal place of business at 614 Chapala Street, Santa Barbara, California 93101.  Sonos is the owner of the patents-in-suit. Sonos holds all substantial rights, title and interest in and to the Asserted Patents.

44.     Defendant Google LLC is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA  94043.  Google maintains a physical address in this district at 500 West 2nd Street, Austin, Texas, 78701.  Google may be served with process through its registered agent, the Corporation Service Company, at 211 East 7th Street, Suite 620, Austin Texas 78701.  Google is registered to do business in the State of Texas and has been since at least November 17, 2006.

45.     Google LLC is one of the largest technology companies in the world and conducts product development, engineering, sales, and online retail, search, and advertising operations in this District.

46.     Google LLC directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, sells, and/or imports the infringing Google Wireless Audio System at issue in this litigation in/into the United States, including in the Western District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its Google Wireless Audio System.

## JURISDICTION AND VENUE

47.     This action for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. § 1 et. seq.  This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338.

48.     This Court has personal jurisdiction over Google because, pursuant to Fed. R. Civ. P. 11(b)(3), Google has: (1) availed itself of the rights and benefits of the laws of the State of Texas, (2) transacted, conducted, and/or solicited business and engaged in a persistent course of conduct in the State of Texas (and in this District), (3) derived substantial revenue from the sales and/or use of products, such as the infringing Google Wireless Audio System, in the State of Texas (and in this District), (4) purposefully directed activities (directly and/or through intermediaries), such as shipping, distributing, offering for sale, selling, and/or advertising its infringing Google Wireless Audio System, at residents of the State of Texas (and residents in this District), (5) delivered its infringing Google Wireless Audio System into the stream of commerce with the expectation that the Google Wireless Audio System will be used and/or purchased by consumers, and (6) committed acts of patent infringement in the State of Texas (and in this District).

49.     This Court also has personal jurisdiction over Google because it is registered to do business in the State of Texas and has one or more regular and established places of business in the Western District of Texas.

50.     Venue is proper in this District under the provisions of 28 U.S.C. § 1400(b) because, as noted above, Google has committed acts of infringement in this district and has one or more regular and established places of business in this district.  Google has also repeatedly admitted that venue is proper in this District for various patent cases.  *See e.g., Solas OLED Ltd. v. Google, Inc.* (WDTX Case No. 6-19-cv-00515) and *VideoShare, LLC v. Google LLC et al* (WDTX Case No. 6-19-cv-00663).

## THE PATENTS-IN-SUIT

## U.S. Patent No. 9,967,615

51.     Sonos is the owner of U.S. Patent No. 9,967,615 (the "'615 Patent"), entitled "Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on May 8, 2018.  A copy of the '615 Patent, is attached hereto as Exhibit 1.

52.     The '615 Patent relates generally to technology for facilitating transfer of playback responsibility from a user's device to a media playback system.

53.     The '615 Patent recognized that "[t]echnological advancements have increased the accessibility of music content, as well as other types of media…."  '615 Patent at 1:19-20.  This allowed users to access audio and video content over the Internet.  *Id.* at 1:21-26.

54.     But, the '615 Patent identified a particular problem and provided an unconventional technological solution.  Specifically, the patent recognized that "[w]ired or wireless networks can be used to connect one or more multimedia playback devices for a home or other location playback network (*e.g.*, a home music system)."  '615 Patent at 1:66-2:2.  This means that "[m]usic and/or other multimedia content can be shared among devices and/or groups of devices (also referred to herein as zones) associated with a playback network."  *Id.* at 2:6-9.  The '615 Patent is directed to a method, tangible media, and controller that "facilitate streaming or otherwise providing music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application, and so on) to a multimedia content playback (*e.g.*, Sonos™) system."  *Id.* at 2:10-14.

55.     The '615 Patent provides an unconventional technological solution to this problem.  For example, the '615 Patent describes an "Example Controller" that "can be used to facilitate the control of multi-media applications…."  '615 Patent at 9:8-14.  "In particular, the controller 500 is configured to facilitate a selection of a plurality of audio sources available on the network and enable control of one or more zone players … through a wireless network interface 508."  *Id.* at 9:14-18.  Further, the '615 Patent describes embodiments that "enable a user to stream

music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application and so on) to a local multimedia content playback (*e.g.*, Sonos™) system." '615 Patent at 12:8-12.  More specifically, the '615 Patent teaches that while "a user listens to a third party music application (*e.g.*, Pandora™ Rhapsody™, Spotify™, and so on)" on a user device, such as the user's "smart phone," the user can "select[] an option to continue playing [the current] channel on her household music playback system (*e.g.*, Sonos™)," which will cause the user's "playback system" to "pick[] up from the same spot on the selected channel that was on her phone and output[] that content (*e.g.*, that song) on speakers and/or other playback devices connected to the household playback system." *Id.* at 12:44-53; *see also id.* at 13:1-53.

56.     The '615 Patent goes on to teach specific technology for facilitating this transfer of playback responsibility from the user's device to the user's playback system.  For instance, the '615 Patent teaches that one aspect of this technology involves causing data for retrieving network-based media content (such as a uniform resource locator (URI)) to be passed to a playback device in the playback system so that the playback device can "run on its own to fetch the content" from a networked audio source, such as a "cloud" server that is accessible over the Internet.  *Id.* at 12:53-63; *see also id.* at 12:63-67 (describing that "[a] third party application can open or utilize an application programming interface (API) to pass music to the household playback system without tight coupling to that household playback system"); 15:47-16:19 (describing a "throw it over the wall" approach in which "a third party application provides a multimedia playback device (*e.g.*, a Sonos™ zone player (ZP)) with enough information about content (*e.g.*, an audio track) so that . . . the local playback system (*e.g.*, SonosNet™) can directly access a source of the content and . . . play the content directly off the network (*e.g.*, the Internet) or cloud," where the "connection between the third-party application and the local playback device (*e.g.*, Sonos ZonePlayer™) can be direct over a local area network (LAN)" or "remote through a proxy server in the cloud"); 16:53-17:4 (describing various embodiments for "queue management" associated with the transfer of playback from a control device to a playback system, including an embodiment where a "shared queue is provided between the local playback system

15

and the third party application to keep the local system and the application synchronized"). Further, the '615 Patent teaches that another aspect of this technology involves transitioning the user's device into a mode in which it functions to control the playback of the media content by the user's playback system after the transfer. *Id.* at 16:20-42, 17:5-20. In this way, the technology taught by the '615 Patent provides for intuitive and seamless transfer of playback responsibility from a user's device to a media playback system.

57.   In line with these teachings, the '615 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system.

58.   For example, claim 13 of the '615 Patent recites a non-transitory computer readable storage medium including instructions for execution by a processor that, when executed, cause a control device to perform various functions that facilitate transfer of playback responsibility from the device to a media playback system. *See* '615 Patent, claim 13. When the instructions are executed, the control device is initially operable to (i) cause a graphical interface to display a control interface including one or more transport controls to control playback by the control device, (ii) identify playback devices connected to a local area network, (iii) cause the graphical interface to display a selectable option for transferring playback from the control device, and (iv) detect a set of inputs to transfer playback from the control device to a particular playback device. *Id.* Additionally, the instructions configure the control device so that, after detecting the set of inputs to transfer playback from the control device to the particular playback device, the control device is operable to cause playback to be transferred from the control device to the particular playback device by (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service, (b) causing playback at the control device to be stopped, and (c) modifying the one or

16

more transport controls of the control interface to control playback by the playback device.  *Id.*  Additionally yet, the instructions configure the control device so that the control device is operable to cause the particular playback device to play back the multimedia content, which involves the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.  *Id.*

### U.S. Patent No. 10,779,033

59.    Sonos is the owner of U.S. Patent No. 10,779,033 (the "'033 Patent"), entitled "Systems And Methods For Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on September 15, 2020.  A copy of the '966 Patent, is attached hereto as Exhibit 2.

60.    The '033 Patent is related to the '615 Patent in that they are both continuations of application No. 13/341,237, filed on December 30, 2011, now U.S. Patent No. 9,654,821.  Thus, the '033 and '615 Patents share essentially the same specification.  Sonos incorporates by reference and re-alleges paragraphs 52-58 of this Complaint as if fully set forth herein.

61.    Like the '615 Patent, the '033 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system, which provide an unconventional solution to the technological problem described in the '615 Patent.

62.    For example, claim 1 of the '033 Patent recites a computing device with specific hardware configurations, including a non-transitory computer-readable medium that stores program instruction that can be executed by the device's processor(s).  *See* '033 Patent, claim 1.  When the instructions are executed, the computing device can initially operate in a first mode in which it is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.  *Id.*  In that mode, the computing device is operable to (i) display a representation of one or more playback devices in a media playback system that are communicatively coupled to the computing device over a data network and available to accept playback responsibility for the remote playback queue, and (ii) while

displaying the representation of the one or more playback devices, receive user input indicating a selection of at least one given playback device from the one or more playback devices.  *Id.* Additionally, the instructions configure the computing device so that, based on receiving the user input, the computing device is operable to transmit an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item.  *Id.*  Additionally yet, the instructions configure the computing device so that the computing device is operable to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device, and then after detecting the indication, transition from (a) the first mode in which the computing device is configured for playback of the remote playback queue to (b) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue.  *Id.*

### U.S. Patent No. 9,344,206

63.     Sonos is the owner of U.S. Patent No. 9,344,206 (the "'206 Patent"), entitled "Method And Apparatus For Updating Zone Configurations In A Multi-Zone System," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on May 17, 2016.  A copy of the '206 Patent, is attached hereto as Exhibit 3.

64.     The '206 Patent relates generally to consumer electronics and human-computer interaction and, more specifically, to controlling or manipulating a plurality of multimedia players in a multi-zone system.  *See, e.g.*, '206 Patent at 1:25-29.

65.     The '206 Patent recognized that users demand not only quality audio reproduction but also a system that allows multiple players to access music from different sources.  '206 Patent at 1:30-40.  Before the '206 Patent, a conventional multi-zone audio system might include a number of audio sources, but each audio source had to be connected to its own amplifier and a set of speakers and was typically installed in one place.  *Id.* at 1:40-44.  This had inherent limitations.  "In order to play an audio source at one location, the audio source must be provided locally or from a centralized location.  When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult.  When the audio source is provided centrally, the centralized location may include a juke box, many compact discs, an AM or FM radio, tapes, or others.  To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources."  *Id.* at 1:44-44.

66.     Moreover, as the '206 Patent recognized, "[i]n order to achieve playing different audio sources in different audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-configured and pre-programmed controller."  '206 Patent at 1:56-59.  Such a system created problems.  "While the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation.  For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning.  The same person may wish to listen in the den and the living room to music from a compact disc in the evening.  In order to satisfy such requirements, two groups of audio players must be established.  In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news.  In the evening, the audio players in the den and the living room are grouped for the music.  Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music.  Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups."  *Id.* at 1:59-2:10.

67.     Thus, the '206 Patent recognized "a need for dynamic control of the audio players as a group" and a system in which "the audio players may be readily grouped." '206 Patent at 2:11-13.  The invention of the '206 Patent would, thus, overcome the problems "in a traditional multi-zone audio system [where] the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment." *Id.* at 2:13-16.

68.     The '206 Patent provided an unconventional solution to this technological problem.  "In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups." '206 Patent at 2:28-29.  One specific aspect of the grouping technology that is taught by the '206 Patent involves a controller with a user interface that permits a user to configure and save a "zone scene," which may comprise a "predefined" grouping of zone players that can later be "activated" (or "invoked") in order to group the zone players in the "zone scene" together for synchronous playback. *Id.* at 2:30-53, 2:60-3:4, 8:19-10:45.  The '206 Patent explains that this "zone scene" technology for grouping zone players together for synchronous playback provides improvements over the existing technology for grouping zone players together for synchronous playback, which involved defining the group membership at the time that the group was to be invoked – particularly in situations where a larger number of zone players are to be grouped together for synchronous playback. *Id.* at 8:19-55.  For instance, the benefits highlighted by the '206 Patent include (i) allowing a group of zone players to be "predefined" as part of a "zone scene" so that the group's membership need not be defined at the time that the group is to be invoked, (ii) allowing a predefined group to be invoked without requiring the zone players in the group to be separated from other groups beforehand, and (iii) allowing zone players to exist as part of multiple different predefined groups that can be invoked in order to dynamically group the zone players for synchronous playback. *Id.* at 8:19-10:45.

69.     In line with these teachings, the '206 Patent claims devices, computer-readable media, and methods for managing and using "zone scenes" to facilitate grouping of zone players. For example, claim 1 of the '206 Patent recites a "multimedia controller including a processor" that is configured to (i) receive, via a network interface, a zone configuration from a first

independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device, and wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices, and (ii) cause a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices. *See* '206 Patent, claim 1.

### U.S. Patent No. 10,469,966

70.     Sonos is the owner of U.S. Patent No. 10,469,966 (the "'966 Patent"), entitled "Zone Scene Management," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on November 5, 2019.  A copy of the '966 Patent, is attached hereto as Exhibit 4.

71.     The '966 Patent is related to the '206 Patent in that they are both continuations of application No. 13/896,829, filed on May 17, 2013, now U.S. Patent No. 8,843,228.  Thus, the '966 and '206 Patents share essentially the same specification.  Sonos incorporates by reference and re-alleges paragraphs 64-69 of this Complaint as if fully set forth herein.

72.     The '906 Patent claims devices, computer-readable media, and methods for managing and using "zone scenes" to facilitate grouping of zone players, which provides an unconventional solution to the technological problems related to grouping zone players that are described in the '906 Patent.

73.     For example, claim 1 of the '966 Patent describes a computing device with a processor that can execute instructions stored in the controllers non-transitory, computer-readable medium.  Those instructions, when executed, cause the computing device to be operable to (i) receive a first request to create a first zone scene comprising a first predetermined grouping of zone players that are to be configured for synchronous playback when the first zone scene is invoked, and (ii) based on the first request, cause creation of the first zone scene, cause an

indication of the first zone scene to be transmitted to a first zone player in the first zone scene, and cause storage of the first zone scene. *See, e.g.*, '966 Patent, claim 1. Additionally, the instructions, when executed, cause the computing device to be operable to (i) receive a second request to create a second zone scene comprising the first zone player and at least one other zone player that is not in the first zone scene, and (ii) based on the second request, cause creation of the second zone scene, cause an indication of the second zone scene to be transmitted to the first zone player, and cause storage of the second zone scene. *Id.* Additionally yet, the instructions, when executed, cause the computing device to be operable to (i) display representations of the first and second zone scenes, (ii) while displaying the representations, receive a third request to invoke the first zone scene, and (iii) based on the third request, cause the first zone player to transition from operating in a standalone mode to operating in accordance with the first predefined grouping of zone players so that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player. *Id.*

## U.S. Patent No. 9,219,460

74.     Sonos is the owner of U.S. Patent No. 9,219,460 (the "'460 Patent"), entitled "Audio Settings Based on Environment," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on December 22, 2015. A copy of the '460 Patent, is attached hereto as Exhibit 5.

75.     The '460 Patent relates generally to "consumer goods and, more particularly, to methods, systems, products, features, services, and other elements directed to media playback or some aspect thereof." '460 Patent at 1:6-9. More specifically, the '460 Patent is directed to dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating. *See, e.g.*, *id*. at 1:64-66.

76.     The '460 Patent recognized that "[w]hile a playback device may be factory configured to perform advantageously in a typical operating environment, the factory configuration may not be ideal for all environments." '460 Patent at 1:66-2:2. According to the

'460 Patent, "adjusting the equalization of the playback device based on the current operating environment may improve the listening experience for some listeners." *Id*. at 2:3-5.

77.     The '460 Patent recognized that there are several problems with existing technology for adjusting an audio player's equalization. '460 Patent at 2:12-14.  For instance:

> First, the adjustment process is often overlooked by the user because, for example, the user may be required to initiate the adjustment and position the microphone. Second, the adjustment process requires a separate microphone, which may not be included with any of the components of the audio system. Third, the manual approach does not lend itself to frequent adjustment when one or more of the speakers may be re-positioned in different locations throughout a home or outdoors.

*Id*. at 2:23-32.

78.     The '460 Patent provides an unconventional technological solution to these problems.  For example, the '460 Patent discloses a playback device that "emit[s] an audio signal, such as a pulse, . . . [which] may encounter various objects, such as walls and furniture, throughout the environment." '460 Patent at 2:37-42.  The ''460 Patent further discloses that "[w]hen an object is encountered, the object may variably reflect or absorb portions of the audio signal," and "[a]t some point, a portion of the reflected audio signal may reflect back toward the playback device from which the audio signal was emitted." *Id*. at 2:42-50.  According to the '460 Patent, "[t]he microphone of the playback device may then detect at least a portion of the reflected audio signal," and "[i]n response to detecting the reflected audio signal, the playback device may determine one or more reflection characteristics based on the reflected audio signal." *Id*. at 2:50-55.  Moreover, the '460 Patent discloses that "[t]he playback device may then adjust an equalization setting of the playback device based on the one or more reflection characteristics," and "[o]nce the equalization setting is adjusted, the playback device may then play an audio track according to the equalization setting." *Id*. at 3:6-26.

79.     In line with these teachings, the '460 Patent claims devices, systems, and methods for dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating, which provide an unconventional solution to the technological problems described in the '460 Patent.  For example, claim 15 of the '460 Patent

describes a playback device with a speaker, a microphone that is physically coupled to the speaker, a processor, a network interface, a data storage, and a program logic stored in the data storage and executable by the processor.  The program logic, when executed, causes the playback device to be operable to (i) emit a first audio signal from the speaker, and (ii) detect a second audio signal via the microphone that is physically coupled to the speaker, where at least a portion of the second audio signal is a reflection of the first audio signal.  *See* '460 Patent, claim 15.  Additionally, the program logic, when executed, causes the playback device to be operable to (i) in response to detecting the second audio signal, determine a first reflection characteristic based on at least the second audio signal, (ii) adjust an equalization setting of the playback device based on at least the first reflection characteristic, and (iii) play, via the speaker, an audio track according to the adjusted equalization setting.  *Id.*

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,967,615

80.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

81.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

82.     As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 13 of the '615 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| A tangible, non-transitory computer readable storage | At least each smartphone, tablet, and computer running the YouTube Music app, the Google Play Music app, the YouTube app and/or other native or web-based Chromecast-enabled apps (where a computing |

| | |
|---|---|
| medium including instructions for execution by a processor, the instructions, when executed, cause a control device to implement a method comprising: | device installed with at least one of these Chromecast-enabled apps is referred to herein as a "Chromecast-enabled computing device"[1,2]) comprises a "control device," as recited in claim 13.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "playback device" as recited in claim 13.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://store.google.com/product/chromecast_apps?utm_source=chromecast.com.<br><br>In addition to being a "playback device" as recited in claim 13, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller software such that the given Hub media player also comprises a "control device," as recited in claim 13.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084.<br><br>Each Chromecast-enabled computing device includes a tangible, non-transitory computer-readable storage medium comprising instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs.  Likewise, each |

---

[1] Any reference to a "Chromecast-enabled computing device" or "Chromecast-enabled media player" includes each version and generation of such device/player unless otherwise noted.

[2] Each Google "Pixel" smartphone, tablet, and computer (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) running the YouTube Music app, the Google Play Music app, the YouTube app, the Google Home app, and/or other native or web-based Chromecast-enabled app is an example of a "Chromecast-enabled computing device."

| | |
|---|---|
| | Hub media player includes a tangible, non-transitory computer-readable storage medium comprising instructions that, when executed by a Hub media player's processor, cause that Hub media player to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/product/google_home_max?hl=en-US. |
| causing a graphical interface to display a control interface including one or more transport controls to control playback by the control device; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause its graphical interface to display a control interface including one or more transport controls to control playback by the Chromecast-enabled computing device.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to cause its graphical interface to display a control interface having one or more transport controls that, at times, are configured to control the Chromecast-enabled computing device's playback of multimedia content from a streaming content service, among other media sources.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("You can even use your mobile device or tablet as a remote and control everything from playback to volume."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Using your phone or tablet: [ ] You can use the playback controls on the Google Play Music app . . . Using your computer: [ ] You can use the playback controls on Google Play Music, near the bottom of the screen."); https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |

  

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause its graphical interface to display a control interface including one or more transport controls to control playback by the Hub media player.

For instance, each Hub media player is programmed with the capability to cause its graphical interface to display a control interface having one or more transport controls that, at times, are configured to control the Hub media player's playback of multimedia content from a streaming content service, among other media sources.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music ("YouTube Music on demand. . . . Stream top music services."); https://store.google.com/us/product/google_nest_hub_max?hl=en-US ("jam out with YouTube Music."); https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 ("With YouTube built-in to your Google Nest display, you can watch YouTube Originals, how-to videos and much more, seamlessly on your screen.").  Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:

 



| after connecting to a local area network via a network interface, identifying playback devices connected to the local area network; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to, after connecting to a local area network ("LAN") via a network interface, identify Chromecast-enabled media players connected to the LAN.

For instance, each Chromecast-enabled computing device is programmed such that, after connecting to a LAN, the Chromecast-enabled computing device is configured to identify one or more Chromecast-enabled media players connected to that same LAN.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Make sure that your mobile device or tablet is connected to the same Wi-Fi network or linked to the same account as your Google Nest or Home speaker or display. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Connect your phone or tablet and Chromecast to the same wireless network. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Make sure that your mobile device or computer is connected to the same Wi-Fi network as Chromecast. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1 (" To show Chrome on your TV, you'll need . . . [t]o connect your computer and Chromecast device to the same Wi-Fi network."); |

| | |
|---|---|
| | https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to, after connecting to a LAN via a network interface, identify Chromecast-enabled media players connected to the LAN.

For instance, each Hub media player is programmed such that, after connecting to a LAN, the Hub media player is configured to identify one or more Chromecast-enabled media players connected to that same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices ⊡ to see the list of available devices and speaker groups."). |
| causing the graphical interface to display a selectable option for transferring playback from the control device; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause its graphical interface to display a selectable option for transferring playback from the Chromecast-enabled computing device.

For instance, each Chromecast-enabled computing device is programmed with the capability to cause its graphical interface to display a selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another device (e.g., a Chromecast-enabled media player). *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button ⊡. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button ⊡. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button ⊡. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1 (" 2. At the top right, click More ⋮ ⌄ Cast. 3. Choose the Chromecast device where you want to watch the content."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |

  

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause its graphical interface to display a selectable option for transferring playback from the Hub media player to another Chromecast-enabled media player.

For instance, each Hub media player is programmed with the capability to cause its graphical interface to display a selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device (e.g., a Chromecast-enabled media player). *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices 🔲 to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:

 



| | |
|---|---|
| detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network: | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to detect a set of inputs to transfer playback from the Chromecast-enabled computing device to a particular Chromecast-enabled media player, where the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the Chromecast-enabled computing device and (ii) a selection of the particular Chromecast-enabled media player from the identified Chromecast-enabled media players connected to the LAN.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to (i) detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another device, which triggers the Chromecast-enabled computing device to display a list of available devices for transferring playback that includes one or more identified Chromecast-enabled media players on the same LAN, and then (ii) detect a selection of at least one particular Chromecast-enabled media player connected to the same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button ⬓. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button ⬓. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button ⬓. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&co=4602553&co=GENIE.Platform%3DDesktop&oco=1(" 2. At the top right, click More ⋮ ⟩ Cast. 3. Choose the Chromecast device where you want to watch the content."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled |

computing device running at least the YouTube Music, Google Play Music, and YouTube apps:



Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to detect a set of inputs to transfer playback from the Hub media player to a particular Chromecast-enabled media player, where the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the Hub media player and (ii) a selection of the particular Chromecast-enabled media player from the identified Chromecast-enabled media players connected to the LAN.

For instance, each Hub media player is programmed with the capability to (i) detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device, which triggers the Hub media player to display a list of available devices for transferring playback that includes one or more identified Chromecast-enabled media players on the same LAN, and then (ii) detect a selection of at least one particular Chromecast-enabled media player connected to the same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices 🖵 to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:





| after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to, after detecting the set of inputs to transfer playback from the Chromecast-enabled computing device to the particular Chromecast-enabled media player, cause playback to be transferred from the Chromecast-enabled computing device to the particular Chromecast-enabled media player.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, after detecting a set of inputs to transfer the Chromecast-enabled computing device's playback of multimedia content to at least one particular Chromecast-enabled media player, the Chromecast-enabled computing device causes the playback of the multimedia content to be transferred to the at least one particular Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("When you're connected, the Cast button will turn from light to dark grey, letting you know that you're connected."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" To the right of the address bar, next to your extensions, you'll see Active cast ⌐."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.<br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to, after detecting the set of inputs to transfer playback from the Hub media player to the particular Chromecast-enabled media player, cause playback to be transferred from the Hub media player to the particular Chromecast-enabled media player.<br><br>For instance, each Hub media player is programmed such that, after detecting a set of inputs to transfer the Hub media player's playback |

| | |
|---|---|
| | of multimedia content to at least one particular Chromecast-enabled media player, the Hub media player causes the playback of the multimedia content to be transferred to the at least one particular Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084. |
| wherein transferring playback from the control device to the particular playback device comprises: (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service; (b) causing playback at the control device to be stopped; and (c) modifying the one or more transport controls of the control interface to control playback by the playback device; and | Each Chromecast-enabled computing device and each Hub media player is programmed such that transferring playback to the particular Chromecast-enabled media player comprises: (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular Chromecast-enabled media player, where adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service, (b) causing playback at the Chromecast-enabled computing device (or Hub media player) to be stopped, and (c) modifying the one or more transport controls of the control interface to control playback by the Chromecast-enabled media player.

For instance, on information and belief, each Chromecast-enabled computing device and each Hub media player is programmed such that, after detecting a set of inputs to transfer playback of multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to at least one particular Chromecast-enabled media player, the respective control device functions to (a) cause a first cloud server associated with the streaming content service (e.g., a first Google cloud server) to add resource locators for such multimedia content to a local playback queue of the particular Chromecast-enabled media player, where the resource locators correspond to locations of the multimedia content at a second cloud server associated with the streaming content service (e.g., a second Google cloud server), (b) stop its own playback of the multimedia content from the streaming content service, and (c) modify one or more transport controls of its control interface such that the one or more transport controls function to control playback by the at least one particular Chromecast-enabled media player rather than playback by the Chromecast-enabled computing device. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084; |

| | |
|---|---|
| | https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. |
| causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content. | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the particular Chromecast-enabled media player to play back the multimedia content, where the particular Chromecast-enabled media player playing back the multimedia content comprises the particular Chromecast-enabled media player retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

For instance, on information and belief, each Chromecast-enabled computing device is programmed such that, after causing the Chromecast-enabled computing device's playback of multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to be transferred to at least one particular Chromecast-enabled media player, the Chromecast-enabled computing device causes the at least one particular Chromecast-enabled media player to play back the multimedia content from the streaming content service, which involves the particular Chromecast-enabled media player retrieving the multimedia content from the second cloud server associated with the streaming music service (e.g., the Google cloud server) and then playing back the retrieved multimedia content.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |



Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the particular Chromecast-enabled media player to play back the multimedia content, where the particular Chromecast-enabled media player playing back the multimedia content comprises the particular Chromecast-enabled media player retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

For instance, on information and belief, each Hub media player is programmed such that, after causing the Hub media player's playback of multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to be transferred to at least one particular Chromecast-enabled media player, the Hub media player causes the at least oen particular Chromecast-enabled media player to play back the multimedia content from the streaming content service, which involves the particular Chromecast-enabled media player retrieving the multimedia content from the second cloud server associated with the streaming music service (e.g., the second Google cloud server) and then playing back the retrieved multimedia content. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084. Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:





83.     On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '615 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '615 Patent prior to Sonos filing the complaint in this action.

84.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '615 Patent.  In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29, above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '615 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System

(including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-27; *see also* citations above in the exemplary infringement claim chart for claim 13 of the '615 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '615 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '615 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '615 Patent, and that Google's customers then directly infringe one or more claims of the '615 Patent by installing and/or using one or more of the these apps in accordance with Google's product literature.  *See*, *e.g.*, *id*.

85.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '615 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '615 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '615 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '615 Patent.  For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music, Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and

computers) that meet one or more claims of the '615 Patent. *See, e.g.*, Exs. 22-27. These apps are a material component of the devices that meet the one or more claims of the '615 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '615 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '615 Patent by installing and/or using these apps on the customers' devices.

86.     Google's infringement of the '615 Patent is also willful because Google (a) had actual knowledge of the '615 Patent no later than February 2019 and actual notice of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '615 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

87.     Additional allegations regarding Google's pre-suit knowledge of the '615 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

88.     Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '615 Patent, including, without limitation, a reasonable royalty and lost profits.

89.     Google's infringement of the '615 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

90.     Google's infringement of the '615 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

91.     Google's infringement of the '615 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,779,033

92.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

93.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

94.     As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '033 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A computing device comprising: | At least each smartphone, tablet, and computer running the YouTube Music app, the Google Play Music app, the YouTube app, and/or other native or web-based Chromecast-enabled apps (where a computing device installed with at least one of these Chromecast-enabled apps is referred to herein as a "Chromecast-enabled computing device") comprises a "computing device," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "playback device" as recited in claim 13.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://store.google.com/product/chromecast_apps?utm_source=chromecast.com.<br><br>In addition to being a "playback device" as recited in claim 1, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller |

| | software such that the given Hub media player also comprises a "computing device," as recited in claim 1.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084. |
|---|---|
| at least one processor; | Each Chromecast-enabled computing device and each Hub media player includes at least one processor.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| a non-transitory computer-readable medium; and | Each Chromecast-enabled computing device and each Hub media player includes a non-transitory computer-readable medium.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: | Each Chromecast-enabled computing device and each Hub media player includes program instructions stored on the non-transitory computer-readable medium that enable the respective device to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to operate in a first mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.

For instance, each Chromecast-enabled computing device is programmed with the capability to operate in a mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.).  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.P |

latform%3DAndroid&hl=en;
https://support.google.com/chromecast/answer/2995235?hl=en-AU;
https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084;
https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1;
https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:



Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to operate in a first mode in which the Hub media player is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.

For instance, each Hub media player is programmed with the capability to operate in a mode in which the Hub media player is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.).  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music ("YouTube Music on demand. . . . Stream top music services.");
https://store.google.com/us/product/google_nest_hub_max?hl=en-US ("jam out with YouTube Music.");
https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 ("With YouTube built-in to your Google Nest display, you can watch YouTube Originals, how-to videos and

|  | much more, seamlessly on your screen."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:    |
| --- | --- |
| while operating in the first mode, displaying a representation of one or more playback devices in a media playback system that are each i) communicatively coupled to the computing device over a data network and ii) available to accept playback responsibility for the remote playback queue; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, while operating in the first mode, display a representation of one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Chromecast-enabled computing device over a data network and (ii) available to accept playback responsibility for the remote playback queue.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while operating in a mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.), the Chromecast-enabled computing device is operable to detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another device, which triggers the Chromecast-enabled computing device to display a list of available devices for transferring playback that includes one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Chromecast-enabled computing device over a local area network ("LAN") and (ii) available to accept |

playback responsibility for the remote playback queue.  *See, e.g.,*
https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button ⬚. . . . Tap the speaker or display for which you'd like to cast.");
https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button ⬚. . . . Select your Chromecast device from the device list.");
https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button ⬚. . . . Tap the Chromecast device to which you want to cast.");
https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1("" 2. At the top right, click More ⋮ › Cast. 3. Choose the Chromecast device where you want to watch the content.");
https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:

  

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, while operating in the first mode, display a representation of one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Hub media player over a data network and (ii) available to accept playback responsibility for the remote playback queue.

For instance, each Hub media player is programmed such that, while operating in a mode in which the Hub media player is configured for playback of a remote playback queue provided by a Google cloud-based computing system associated with a cloud-based media service

46

| | |
|---|---|
| | (e.g., Google Play Music, YouTube Music, YouTube, etc.), the Hub media player is operable to detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device, which triggers the Hub media player to display a list of available devices for transferring playback that includes one or more other Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Hub media player over a LAN and (ii) available to accept playback responsibility for the remote playback queue. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices 🔲 to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:    |
| while displaying the representation of the one or more playback devices, receiving user input indicating a selection of at least one given playback device from the one or more playback devices; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, while displaying the representation of the one or more Chromecast-enabled media players, receive user input indicating a selection of at least one given Chromecast-enabled media player from the one or more Chromecast-enabled media players. |
| | For instance, each Chromecast-enabled computing device is programmed such that, while displaying the representation of the one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each on the same LAN as the Chromecast- |

enabled computing device and available to accept playback responsibility for the remote playback queue, the Chromecast-enabled computing device is configured to receive user input indicating a selection of at least one Chromecast-enabled media player in the Chromecast-enabled playback system.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1("Choose the Chromecast device where you want to watch the content.").  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:

  

Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, while displaying the representation of the one or more Chromecast-enabled media players, receive user input indicating a selection of at least one given Chromecast-enabled media player from the one or more Chromecast-enabled media players.

For instance, each Hub media player is programmed such that, while displaying the representation of the one or more other Chromecast-enabled media players in a Chromecast-enabled playback system that are each on the same LAN as the Hub media player and available to

<table>
<tr>
<td></td>
<td>accept playback responsibility for the remote playback queue, the Hub media player is configured to receive user input indicating a selection of at least one other Chromecast-enabled media player in the Chromecast-enabled playback system.  *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("Select the device for which you want to move your media.").   Examples of this functionality are illustrated in the following screenshots from a Hub media player:





</td>
</tr>
<tr>
<td>based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the</td>
<td>Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, based on receiving the user input, transmit an instruction for the at least one given Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Chromecast-enabled computing device, wherein the instruction configures the at least one given Chromecast-enabled media player to (i) communicate with the Google cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one</td>
</tr>
</table>

49

| | |
|---|---|
| computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item; | media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item.<br><br>For instance, on information and belief, each Chromecast-enabled computing device is programmed such that, based on receiving the user input indicating a selection of at least one Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Chromecast-enabled computing device and available to accept playback responsibility for the remote playback queue, the Chromecast-enabled computing device is configured to transmit an instruction for the Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Chromecast-enabled computing device, where the instruction configures the Chromecast-enabled media player to (i) communicate with a Google cloud server associated with a Google cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.) in order to obtain data identifying a next one or more media items that are in the remote playback queue (e.g., resource locators for such media items), (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1.<br><br>Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, based on receiving the user input, transmit an instruction for the at least one given Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Hub media player, wherein the instruction configures the at least one given Chromecast-enabled media player to (i) communicate with the Google cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item. |

| | |
|---|---|
| | For instance, on information and belief, each Hub media player is programmed such that, based on receiving the user input indicating a selection of at least one other Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Hub media player and available to accept playback responsibility for the remote playback queue, the Hub media player is configured to transmit an instruction for the other Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Hub media player, where the instruction configures the other Chromecast-enabled media player to (i) communicate with a Google cloud server associated with a Google cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.) in order to obtain data identifying a next one or more media items that are in the remote playback queue (e.g., resource locators for such media items), (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item.  *See, e.g., id.* |
| detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device; and | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to the at least one given Chromecast-enabled media player.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least one Chromecast-enabled media player, which is demonstrated by the fact that the Chromecast-enabled computing device displays an indicator that playback responsibility for the remote playback queue has been successfully transferred to the at least one Chromecast-enabled media player that takes the form of a "Cast button" that is "filled in" and/or "dark grey."  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("When you're connected, the Cast button will turn from light to dark grey, letting you know that you're connected."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" To the right of the address bar, next to your extensions, you'll see Active cast ⬚."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; |

https://support.google.com/chromecast/answer/2995235?hl=en-AU;
https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of a Chromecast-enabled computing device detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least one Chromecast-enabled media player are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:

  

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Hub media player to the at least one given Chromecast-enabled media player.

For instance, each Hub media player is programmed with the capability to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Hub media player to at least one other Chromecast-enabled media player, which is demonstrated by the fact that the Chromecast-enabled computing device displays an indicator that playback responsibility for the remote playback queue has been successfully transferred to the at least one other Chromecast-enabled media player that takes the form of a "Cast button" that is "filled in" and/or has a "dark grey" color along with a display of the other Chromecast-enabled media player's name.  *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084.  Examples of a selectable "Cast button" having this second visual appearance are illustrated in the following

| | screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps: |
|---|---|
| | <br><br><br><br> |
| after detecting the indication, transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, after detecting the indication, transition from (i) the first mode in which the Chromecast-enabled computing device is configured for playback of the remote playback queue to (ii) a second mode in which the Chromecast-enabled computing device is configured to control the at least one given Chromecast audio player's playback of the remote playback queue and the Chromecast-enabled computing device is no longer configured for playback of the remote playback queue.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, after detecting the indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least |

| remote playback queue and the computing device is no longer configured for playback of the remote playback queue. | one Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Chromecast-enabled computing device, the Chromecast-enabled computing device is configured to transition from (i) the first mode in which the Chromecast-enabled computing device was configured for playback of the remote playback queue to (ii) a second mode in which the Chromecast-enabled computing device is configured to control the at least one Chromecast-enabled media player's playback of the remote playback queue (while the Chromecast-enabled computing device itself is no longer configured for playback of the remote playback queue). *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553. Examples of a Chromecast-enabled computing device in this second mode are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:  |

 

 

Each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, after detecting the indication, transition from (i) the first mode in which the Hub media player is configured for playback of the remote playback queue to (ii) a second mode in which the Hub media player is configured to control the at least one given Chromecast audio player's playback of the remote playback queue and the Hub media player is no longer configured for playback of the remote playback queue.

For instance, each Hub media player is programmed such that, after detecting the indication that playback responsibility for the remote playback queue has been successfully transferred from the Hub media player to at least one other Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Hub media player, the Hub media player is configured to transition from (i) the first mode in which the Hub media player was configured for playback of the remote playback queue to (ii) a second mode in which the Hub media player is configured to control the at least one

other Chromecast-enabled media player's playback of the remote playback queue (while the Hub media player itself is no longer configured for playback of the remote playback queue).  *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084.  Examples of a Hub media player in this second mode are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:







95.    On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '033 Patent and described how Google's products

infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '033 Patent prior to Sonos filing the complaint in this action.

96.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '033 Patent.  In particular, (a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '033 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-27; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '033 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '033 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '033 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '033 Patent, and that Google's customers then directly infringe one or more claims of the '033 Patent by installing and/or using one or more of these apps in accordance with Google's product literature.  *See*, e.g., *id.*

97.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '033 Patent by users of the Google Wireless Audio System.  In particular,

(a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '033 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '033 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '033 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music, Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '033 Patent. *See, e.g.*, Exs. 22-27. These apps are a material component of the devices that meet the one or more claims of the '033 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '033 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '033 Patent by installing and/or using these apps on the customers' devices.

98.     Google's infringement of the '033 Patent is also willful because Google (a) had actual knowledge of the '033 Patent and Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '033 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

99.     Additional allegations regarding Google's pre-suit knowledge of the '033 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

100.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '033 Patent, including, without limitation, a reasonable royalty and lost profits.

101.    Google's infringement of the '033 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

102.    Google's infringement of the '033 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

103.    Google's infringement of the '033 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 9,344,206

104.    Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

105.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

106.    As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '206 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A multimedia controller including a processor, the controller configured to: | At least each smartphone, tablet, and computer installed with at least the Google Home app (where a computing device installed with at least the Google Home app is referred to herein as a "Chromecast-enabled computing device") comprises a "multimedia controller including a processor," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub |

| | |
|---|---|
| | Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio that is capable of playing multimedia separately from other Chromecast-enabled media players, and thus, comprises an "independent playback device" as recited in claim 1. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://play.google.com/store/apps/details?id=com.google.android.apps.chromecast.app&hl=en_US.<br><br>In addition to being a "independent playback device" as recited in claim 1, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller software such that the given Hub media player also comprises a "multimedia controller including a processor," as recited in claim 1.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 |
| receive, via a network interface, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device, and wherein the zone configuration characterizes one or more zone scenes, each zone scene | Each Chromecast-enabled computing device is configured to receive, via a network interface, a zone configuration from a first Chromecast-enabled media player of a plurality of Chromecast-enabled media players, where the zone configuration is configured via the Chromecast-enabled computing device, maintained at the first Chromecast-enabled media player, and characterizes one or more zone scenes that each identify a group configuration associated with two or more of the plurality of Chromecast-enabled media players.<br><br>For instance, each Chromecast-enabled computing device on a local area network ("LAN") is configured to facilitate creation of predefined "speaker group" comprising two or more Chromecast-enabled media players on the same LAN as the Chromecast-enabled computing device, which is "a zone scene identifying a particular group configuration."  *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups")  One example of this functionality is illustrated by the following screenshots, which shows the creation of a predefined |

| identifying a group configuration associated with two or more of the plurality of independent playback devices; and | "Downstairs" "speaker group" that identifies a particular group configuration comprising the "Nest Mini" and "Home Mini" players:<br><br><br><br>Once the predefined "speaker group" identifying the particular group configuration has been created, a zone configuration characterizing this "speaker group" is maintained at one or more of the plurality Chromecast-enabled media players on the same LAN as the Chromecast-enabled computing device (e.g., one or more of the Chromecast-enabled media players included in the predefined "speaker group").  *See, e.g., id.*<br><br>Thereafter, each Chromecast-enabled computing device and each Hub media player on the same LAN as the plurality of Chromecast-enabled media players is operable to receive the zone configuration characterizing the predefined "speaker group" from one or more of the plurality of Chromecast-enabled media players at various times – including in advance of a Chromecast-enabled computing device or Hub media player displaying the predefined "speaker group" as an available option for playback.  *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE. |

Platform%3DAndroid&hl=en;
https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB;
https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084;
https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1.
Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music and YouTube Music apps, which show a Chromecast-enabled computing device that has received a zone configuration characterizing a "Downstairs" "speaker group" and a "Upstairs" "speaker group":



 

Notably, each Chromecast-enabled computing device and each Hub media player is programmed with the capability to display a predefined "speaker group" as an available option for playback regardless of whether the Chromecast-enabled computing device or

<table>
<tr>
<td></td>
<td>Hub media player was used to create the predefined "speaker group" (and in fact, regardless of whether the Chromecast-enabled computing device or Hub media player was even powered up or on the same LAN as the plurality of Chromecast-enabled media players at the time that the "speaker group" was created), which demonstrates that each Chromecast-enabled computing device and each Hub media player receives a zone configuration characterizing a predefined "speaker group" from one or more of the Chromecast-enabled media players selected for inclusion in the "speaker group." *See e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en.

In this regard, to facilitate the above functionality, each Chromecast-enabled computing device and each Hub media player is programmed with the capability to receive, from one of the plurality of Chromecast-enabled media players, a zone configuration characterizing one or more zone scenes that each identify a respective group configuration comprising two or more of the plurality of Chromecast-enabled media players.</td>
</tr>
<tr>
<td>cause a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices.</td>
<td>Each Chromecast-enabled computing device is configured to cause a selectable indication of the received zone configuration to be displayed, where the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of Chromecast-enabled media players.

For instance, as noted above, each Chromecast-enabled computing device is programmed with the capability to (i) receive a zone configuration characterizing one or more zone scenes that each identify a respective group configuration comprising two or more of the plurality of Chromecast-enabled media players (*e.g.*, one or more "speaker groups"), and (ii) cause an indication of the received zone configuration to be displayed that is selectable to cause a particular zone scene (*e.g.*, a "speaker group") to be invoked by two or more of the plurality of Chromecast-enabled media players. *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device running at</td>
</tr>
</table>

least the Google Home, Google Play Music and YouTube Music apps, which show an indication of a received zone configuration characterizing a "Downstairs" "speaker group" that is selectable to cause the "Downstairs" "speaker group" to be invoked by the Chromecast-enabled media players included in the "Downstairs" "speaker group":

107.    On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '206 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '206 Patent prior to Sonos filing the complaint in this action.

108.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(b),

by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '206 Patent.  In particular, (a) Google had actual knowledge of the '206 Patent or was willfully blind to its existence prior to, and no later than, October 2016 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint(*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '206 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-23; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '206 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '206 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '206 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home app to customers while knowing that installation and/or use of this app will infringe one or more claims of the '206 Patent, and that Google's customers then directly infringe one or more claims of the '206 Patent by installing and/or using this app in accordance with Google's product literature.  *See*, e.g., *id*.

109.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '206 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '206 Patent or was willfully blind to its existence prior to, and no later than, October 2016 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in

connection with the Google Wireless Audio System, one or more material components of the invention of the '206 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '206 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '206 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the Google Home app for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '206 Patent. *See, e.g.*, Exs. 22-23. This app is a material component of the devices that meet the one or more claims of the '206 Patent. Further, Google especially made and/or adapted this app for installation and use on devices that meet the one or more claims of the '206 Patent, and this app is not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '206 Patent by installing and/or using the Google Home app on the customers' devices.

110.    Google's infringement of the '206 Patent is also willful because Google (a) had actual knowledge of the '206 Patent no later than October 2016 and actual knowledge of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '206 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

111.    Additional allegations regarding Google's pre-suit knowledge of the '206 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

112.    Sonos is in compliance with any applicable marking and/or notice provisions of 35 U.S.C. § 287 with respect to the '206 Patent.

113.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '206 Patent, including, without limitation, a reasonable royalty and lost profits.

114.     Google's infringement of the '206 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

115.     Google's infringement of the '206 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

116.     Google's infringement of the '206 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,469,966

117.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

118.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

119.     As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '966 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A computing device comprising: | At least each smartphone, tablet, and computer installed with at least the Google Home app (where a computing device installed with at least the Google Home app is referred to herein as a "Chromecast-enabled computing device") comprises a "computing device," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "zone player" as recited in claim 1.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; |

| | |
|---|---|
| | https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://play.google.com/store/apps/details?id=com.google.android.apps.chromecast.app&hl=en_US. |
| one or more processors; | Each Chromecast-enabled computing device includes one or more processors.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |
| a non-transitory computer-readable medium; and | Each Chromecast-enabled computing device includes a non-transitory computer-readable medium.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |
| program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising: | Each Chromecast-enabled computing device includes program instructions stored on the non-transitory computer-readable medium that enable the Chromecast-enabled computing device to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |
| while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually: | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, while serving as a controller for a Chromecast-enabled playback system comprising a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, where the first Chromecast-enabled media player is operating in a standalone mode in which the first Chromecast-enabled media player is configured to play back media individually, perform the functions identified below. For instance, each Chromecast-enabled computing device is programmed with the capability to serve as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, where at least the first Chromecast-enabled |

| | |
|---|---|
| | media player is operating in a standalone mode (*i.e.*, the first Chromecast-enabled media player is not operating part of an established "cast session" with a "speaker group"). *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. |
| receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to receive a first request to create a first zone scene comprising a first predefined grouping of Chromecast-enabled media players including at least the first Chromecast-enabled media player and a second Chromecast-enabled media player that are to be configured for synchronous playback of media when the first zone scene is invoked.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a first predefined "speaker group" that includes the first Chromecast-enabled media player and a second Chromecast-enabled media player in the Chromecast-enabled playback system that are to be configured for synchronous playback of media when the first "speaker group" is launched, which is a "a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked." *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups" for "synchronous music throughout the home"). One example of this functionality is illustrated by the following screenshots, which shows the creation of an "Upstairs" "speaker group" that includes the "Nest Mini" and "Hub Speaker" players: |



| based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene; | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the first request, (i) cause creation of the first zone scene, (ii) cause an indication of the first zone scene to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the first zone scene.

For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player in the Chromecast-enabled playback system (which is the claimed "first zone scene") and then based on the request, (i) cause creation of the first "speaker group," |

<table>
<tr>
<td></td>
<td>(ii) cause an indication of the first "speaker group" to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the first "speaker group" at one or more Chromecast-enabled media players.  <em>See e.g.,</em> https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups").</td>
</tr>
<tr>
<td>receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;</td>
<td>Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to receive a second request to create a second zone scene comprising a second predefined grouping of Chromecast-enabled media players including at least the first Chromecast-enabled media player and a third Chromecast-enabled media player that are to be configured for synchronous playback of media when the second zone scene is invoked, where the third Chromecast-enabled media player is different than the second Chromecast-enabled media player.

For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is configured to receive a request to create a first predefined "speaker group" that includes the first Chromecast-enabled media player and a third Chromecast-enabled media player that are to be configured for synchronous playback of media when the second "speaker group" is launched, which is a "a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked."  <em>See, e.g.,</em> https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups" for "synchronous music throughout the home"). One example of this functionality is illustrated by the following screenshots, which shows the creation of a "Party" "speaker group" that includes the "Nest Mini" and "Home Mini" players:</td>
</tr>
</table>



| | |
|---|---|
| based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene; | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the second request, (i) cause creation of the second zone scene, (ii) cause an indication of the second zone scene to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the second zone scene.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player in the Chromecast-enabled playback system (which is the claimed "second zone scene") and then |

| | |
|---|---|
| | based on the request, (i) cause creation of the second "speaker group," (ii) cause an indication of the second "speaker group" to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the second "speaker group" at one or more Chromecast-enabled media players.  *See e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups"). |
| displaying a representation of the first zone scene and a representation of the second zone scene; and | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to display a representation of the first zone scene and a representation of the second zone scene.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players that are each, the Chromecast-enabled computing device is operable to display (i) a representation of a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player (which is the claimed "first zone scene"), and (ii) a representation of a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player (which is the claimed second zone scene").  *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube Music apps, which show a displayed representation of the "Upstairs" "speaker group" that includes the "Nest Mini" and "Hub Speaker" players, and a displayed representation of the "Party" "speaker group" that includes the "Nest Mini" and "Home Mini" players: |



| while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, while displaying the representation of the first zone scene and the representation of the second zone scene, receive a third request to invoke the first zone scene.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while displaying (i) a representation of a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player (which is the claimed "first zone scene"), and (ii) a representation of a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player (which is the claimed second zone scene"), the Chromecast-enabled computing device is operable to receive a request to launch the first |

"speaker group," which is a "request to invoke the first zone scene." *See, e.g.,*
https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en;
https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en;
https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB;
https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084;
https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1.

Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube Music apps, which show receipt of a request to launch the "Upstairs" "speaker pair":





| based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player. | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the third request, cause the first Chromecast-enabled media player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of Chromecast-enabled media players such that the first Chromecast-enabled media player is configured to coordinate with at least the second Chromecast-enabled media player to output media in synchrony with output of media by at least the second Chromecast-enabled media player.

For instance, each Chromecast-enabled computing device is programmed such that, based on a request to launch a first "speaker group" (which is the claimed "third request to invoke the first zone scene"), the Chromecast-enabled computing device is operable to cause the first Chromecast-enabled media player to transition from operating in a standalone mode to operating in accordance with the first "speaker group" such that the first Chromecast-enabled media player is configured to coordinate with at least the second Chromecast-enabled media player to output audio in synchrony with the output of audio by the second Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en ("Group any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home.").  Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube Music apps, which show the "Upstairs" "speaker group" being launched such that the |

"Nest Mini" and "Hub Speaker" players are configured to coordinate with one another to play audio in synchrony:





120.     On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '966 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '966 Patent prior to Sonos filing the complaint in this action.

121.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '966 Patent.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '966 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-23; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '966 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe

one or more claims the '966 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '966 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home app to customers while knowing that installation and/or use of this app will infringe one or more claims of the '966 Patent, and that Google's customers then directly infringe one or more claims of the '966 Patent by installing and/or using this app in accordance with Google's product literature.  *See*, e.g., *id*.

122.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '966 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '966 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '966 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '966 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the Google Home app for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '966 Patent.  *See, e.g.*, Exs. 22-23.  This app is a material component of the devices that meet the one or more claims of the '966 Patent.  Further, Google especially made and/or adapted this app for installation and use on devices that meet the one or more claims of the '966 Patent, and this app is not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '966 Patent by installing and/or using the Google Home app on the customers' devices.

123.     Google's infringement of the '966 Patent is also willful because Google (a) had actual knowledge of the '966 Patent and actual knowledge of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '966 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

124.     Additional allegations regarding Google's pre-suit knowledge of the '966 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

125.     Sonos is in compliance with any applicable marking and/or notice provisions of 35 U.S.C. § 287 with respect to the '966 Patent.

126.     Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '966 Patent, including, without limitation, a reasonable royalty and lost profits.

127.     Google's infringement of the '966 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

128.     Google's infringement of the '966 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

129.     Google's infringement of the '966 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 9,219,460**

130.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

131.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for

sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

132.    As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 15 of the '460 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 15 | Chromecast-Enabled Media Players |
|---|---|
| A playback device, comprising: | At least each Google Home Max and Nest Audio player (referred to herein as a "Chromecast-enabled media player") comprises a "playback device," as recited in claim 15. |
| a speaker; | Each of the foregoing Chromecast-enabled media players includes a speaker.  *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a microphone that is physically coupled to the speaker; | Each of the foregoing Chromecast-enabled media players includes a microphone that is physically coupled to the speaker.  *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a processor; | Each of the foregoing Chromecast-enabled media players includes a processor.  *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a network interface; | Each of the foregoing Chromecast-enabled media players includes a network interface, such as a WiFi interface.  *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a data storage; and a program logic stored in the data storage and executable by the processor to: | Each of the foregoing Chromecast-enabled media players includes a data storage and executable program logic stored in the data storage that enable each Chromecast-enabled media player to perform the functions identified below.  *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |

| emit a first audio signal from the speaker; | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to emit a first audio signal from the speaker.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to emit a first audio signal from one of its speakers to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Once you set up Max, Room EQ measures the acoustics of your space."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |
|---|---|
| detect, via the microphone, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal; | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to detect, via its microphone, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to detect, via its microphone, a second audio signal, where at least a portion of the second audio signal is a reflection of the first audio signal that was emitted to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Once you set up Max, Room EQ measures the acoustics of your space. . . . Note: The microphone must be on for Room EQ to work."); https://www.youtube.com/watch?v=UiBhshQ0FQA (disclosing that the Google Home Max "uses six internal microphones to measure the acoustics of your room."). |
| in response to the detecting, determine a first reflection characteristic based on at least the second audio signal; | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to, in response to the detecting, determine a first reflection characteristic based on at least the second audio signal.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed such that, in response to detecting a second audio signal comprising a reflection of a first audio signal that was emitted to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player, the Chromecast-enabled media player is configured to determine one or more reflection characteristics based on at least the detected second audio signal. *See,* |

| | |
|---|---|
| | *e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Walls in a room can amplify the bass, leading to a muddled sound in which the bass overpowers the vocals of your music. Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA. |
| adjust an equalization setting of the playback device based on at least the first reflection characteristic; and | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to adjust the equalization setting of the Chromecast-enabled media player based on at least the first reflection characteristic.

For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to adjust its equalization setting (e.g., a "bass" setting) based on one or more reflection characteristics. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |
| play, via the speaker, an audio track according to the equalization setting. | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to play, via its speaker, an audio track according to the equalization setting.

For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to play, via one of its speakers, audio according to the equalization setting (e.g., "bass" setting) that was adjusted as described above. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |

133.   On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '460 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '460 Patent prior to Sonos filing the complaint in this action.

134.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '460 Patent.  In particular, (a) Google had actual knowledge of the '460 Patent or was willfully blind to its existence prior to, and no later than, January 2018 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '460 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* citations above in the exemplary infringement claim chart for claim 15 of the '460 Patent; *see also* Ex. 42), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '460 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '460 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home Max and Nest Audio to customers while knowing that use of these products will infringe one or more claims of the '460 Patent and that Google's customers then directly infringe one or more claims of the '460 Patent by using the Google Home Max and Nest Audio in accordance with Google's product literature.  *See, e.g.*, *id*.

135.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '460 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '460 Patent or was willfully blind to its existence prior to, and no later than, January 2018 and had actual knowledge or was willfully blind to Sonos's

infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '460 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '460 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '460 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports software updates for the Google Home Max and Nest Audio that meet one or more claims of the '460 Patent. *See, e.g.*, Ex. 43. These software updates are material components of the Google Home Max and Nest Audio that meet the one or more claims of the '460 Patent. Further, Google especially made and/or adapted these software updates for installation and use on the Google Home Max and Nest Audio that meet the one or more claims of the '460 Patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '460 Patent by installing and using software updates on the Google Home Max and Nest Audio.

136.    Google's infringement of the '460 Patent is also willful because Google (a) had actual knowledge of the '460 Patent no later than January 2018 and actual notice of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '460 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

137.    Additional allegations regarding Google's pre-suit knowledge of the '460 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

138.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '460 Patent, including, without limitation, a reasonable royalty and lost profits.

139.    Google's infringement of the '460 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

140.    Google's infringement of the '460 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  Google's infringement of the '460 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Sonos respectfully requests:

A.    That Judgment be entered that Google has infringed at least one or more claims of the patents-in-suit, directly and/or indirectly, literally and/or under the doctrine of equivalents, and that such infringement is willful;

B.    An injunction enjoining Google, its officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Google, and its parents, subsidiaries, divisions, successors and assigns, from further infringement of the patents-in-suit.

C.    An award of damages sufficient to compensate Sonos for Google's infringement under 35 U.S.C. § 284, including an enhancement of damages on account of Google's willful infringement;

D.    That the case be found exceptional under 35 U.S.C. § 285 and that Sonos be awarded its reasonable attorneys' fees;

E.    Costs and expenses in this action;

F.    An award of prejudgment and post-judgment interest; and

G.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sonos respectfully demands a trial by jury on all issues triable by jury.

Dated:  September 29, 2020                    Respectfully submitted,

                                             By:  _/s/_____

                                             Attorneys for Plaintiff Sonos, Inc.

# EXHIBIT 1

US009967615B2

(12) **United States Patent**
Coburn, IV et al.

(10) Patent No.: **US 9,967,615 B2**
(45) Date of Patent: ***May 8, 2018**

(54) **NETWORKED MUSIC PLAYBACK**

(71) Applicant: **Sonos, Inc**, Santa Barbara, CA (US)

(72) Inventors: **Arthur Coburn, IV**, Cambridge, MA (US); **Joni Hoadley**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/628,952**

(22) Filed: **Feb. 23, 2015**

(65) **Prior Publication Data**

US 2015/0172756 A1      Jun. 18, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/341,237, filed on Dec. 30, 2011, now Pat. No. 9,654,821.

(51) **Int. Cl.**
*H04N 7/18*          (2006.01)
*H04N 21/436*        (2011.01)
         (Continued)

(52) **U.S. Cl.**
CPC ...  *H04N 21/43615* (2013.01); *H04L 65/4084* (2013.01); *H04N 21/4307* (2013.01);
         (Continued)

(58) **Field of Classification Search**
CPC ......... H04N 21/43615; H04N 21/6581; H04N 21/439; H04N 21/6125; H04N 21/64322;
         (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,406,634 A | 4/1995 | Anderson et al. |
| 5,440,644 A | 8/1995 | Farinelli et al. |
|  | (Continued) | |

FOREIGN PATENT DOCUMENTS

| CA | 2832542 A1 | 10/2012 |
| CN | 101212823 A | 7/2008 |
|  | (Continued) | |

OTHER PUBLICATIONS

International Bureau, "International Preliminary Report on Patentability", issued in connection with PCT application No. PCT/US2012/071212, dated Jul. 10, 2014, pp. 8.
         (Continued)

*Primary Examiner* — Oschat Montoya
(74) *Attorney, Agent, or Firm* — McDonnell Boehnen Hulbert & Berghoff LLP

(57)          **ABSTRACT**

Systems, methods, apparatus, and articles of manufacture to facilitate connection to a multimedia playback network are disclosed. An example method includes detecting a first input including an identification of a playback device; detecting a second input including an identification of an item on a controller, wherein multimedia content associated with the item is retrievable from a content provider; detecting a trigger, wherein the trigger is not the first input or the second input; and sending, in response to detecting the trigger, information regarding the multimedia content from the controller to the playback device, wherein the information includes an identification of the multimedia content for playback by the playback device, and wherein the information causes (a) the playback device to retrieve, independent of the controller, the multimedia content from the content provider and (b) playback of the retrieved multimedia content.

**29 Claims, 11 Drawing Sheets**



## US 9,967,615 B2

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 21/658* | (2011.01) |
| *H04L 29/06* | (2006.01) |
| *H04N 21/439* | (2011.01) |
| *H04N 21/61* | (2011.01) |
| *H04N 21/643* | (2011.01) |
| *H04N 21/6587* | (2011.01) |
| *H04N 21/472* | (2011.01) |
| *H04N 21/485* | (2011.01) |
| *H04N 21/81* | (2011.01) |
| *H04N 21/43* | (2011.01) |
| *H04N 21/433* | (2011.01) |
| *H04N 21/858* | (2011.01) |

(52) **U.S. Cl.**
CPC ....... *H04N 21/439* (2013.01); *H04N 21/4333* (2013.01); *H04N 21/47202* (2013.01); *H04N 21/4852* (2013.01); *H04N 21/6125* (2013.01); *H04N 21/64322* (2013.01); *H04N 21/6581* (2013.01); *H04N 21/6587* (2013.01); *H04N 21/8113* (2013.01); *H04N 21/8586* (2013.01)

(58) **Field of Classification Search**
CPC ......... H04N 21/6587; H04N 21/47202; H04N 21/4852; H04N 21/8113; H04N 21/4307; H04N 21/4333; H04N 21/8586; H04L 65/4084
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,761,320 A | 6/1998 | Farinelli et al. |
| 5,856,827 A | 1/1999 | Sudo |
| 5,923,902 A | 7/1999 | Inagaki |
| 6,002,862 A | 12/1999 | Takaike |
| 6,032,202 A | 2/2000 | Lea et al. |
| 6,181,316 B1 | 1/2001 | Little et al. |
| 6,255,961 B1 | 7/2001 | Van et al. |
| 6,256,554 B1 | 7/2001 | Dilorenzo |
| 6,404,811 B1 | 6/2002 | Cvetko et al. |
| 6,469,633 B1 | 10/2002 | Wachter |
| 6,522,886 B1 | 2/2003 | Youngs et al. |
| 6,587,127 B1 | 7/2003 | Leeke et al. |
| 6,611,537 B1 | 8/2003 | Edens et al. |
| 6,631,410 B1 | 10/2003 | Kowalski et al. |
| 6,728,531 B1 | 4/2004 | Lee et al. |
| 6,732,155 B2 | 5/2004 | Meek |
| 6,757,517 B2 | 6/2004 | Chang |
| 6,778,869 B2 | 8/2004 | Champion |
| 6,826,283 H1 | 11/2004 | Wheeler et al. |
| 6,985,694 B1 | 1/2006 | De et al. |
| 7,017,118 B1 | 3/2006 | Carroll |
| 7,020,048 B2 | 3/2006 | McComas |
| 7,113,833 B1 | 9/2006 | Brown et al. |
| 7,117,451 B2 | 10/2006 | Sielken |
| 7,130,608 B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 B2 | 10/2006 | Janik |
| 7,143,939 B2 | 12/2006 | Henzerling |
| 7,178,106 B2 | 2/2007 | Lamkin et al. |
| 7,187,947 B1 | 3/2007 | White et al. |
| 7,236,773 B2 | 6/2007 | Thomas |
| 7,295,548 B2 | 11/2007 | Blank et al. |
| 7,312,785 B2 | 12/2007 | Tsuk et al. |
| 7,358,960 B2 | 4/2008 | Mak |
| 7,391,791 B2 | 6/2008 | Balassanian et al. |
| 7,483,538 B2 | 1/2009 | McCarty et al. |
| 7,509,181 B2 | 3/2009 | Champion |
| 7,571,014 B1 | 8/2009 | Lambourne et al. |
| 7,630,501 B2 | 12/2009 | Blank et al. |
| 7,643,894 B2 | 1/2010 | Braithwaite et al. |
| 7,657,910 B1 | 2/2010 | McAulay et al. |
| 7,689,304 B2 | 3/2010 | Sasaki |
| 7,725,533 B2 | 5/2010 | Szeto et al. |

| | | | | |
|---|---|---|---|---|
| 7,725,551 B2 | 5/2010 | Szeto et al. |
| 7,742,740 B2 | 6/2010 | Goldberg et al. |
| 7,797,446 B2 | 9/2010 | Heller et al. |
| 7,805,682 B1 | 9/2010 | Lambourne |
| 7,827,259 B2 | 11/2010 | Heller et al. |
| 7,853,341 B2 | 12/2010 | McCarty et al. |
| 7,958,441 B2 | 6/2011 | Heller et al. |
| 7,987,294 B2 | 7/2011 | Bryce et al. |
| 8,014,423 B2 | 9/2011 | Thaler et al. |
| 8,045,952 B2 | 10/2011 | Qureshey et al. |
| 8,050,652 B2 | 11/2011 | Qureshey et al. |
| 8,055,364 B2 | 11/2011 | Champion |
| 8,060,407 B1 | 11/2011 | Delker et al. |
| 8,072,905 B2 | 12/2011 | Haff et al. |
| 8,074,253 B1 | 12/2011 | Nathan |
| 8,099,313 B2 | 1/2012 | Messer et al. |
| 8,103,009 B2 | 1/2012 | McCarty et al. |
| 8,111,132 B2 | 2/2012 | Allen et al. |
| 8,131,390 B2 | 3/2012 | Braithwaite et al. |
| 8,140,974 B2 | 3/2012 | Hayter et al. |
| 8,148,622 B2 | 4/2012 | Rothkopf et al. |
| 8,156,435 B2 | 4/2012 | Wohlert |
| 8,204,890 B1 | 6/2012 | Gogan |
| 8,214,740 B2 | 7/2012 | Johnson |
| 8,234,395 B2 | 7/2012 | Millington |
| 8,290,603 B1 | 10/2012 | Lambourne |
| 8,316,154 B2 | 11/2012 | Yoneda |
| 8,364,296 B2 * | 1/2013 | Wilhelm ............... G11B 27/10 |
| | | | 455/502 |
| 8,407,623 B2 | 3/2013 | Kerr et al. |
| 8,483,853 B1 | 7/2013 | Lambourne |
| 8,544,046 B2 | 9/2013 | Gran et al. |
| 8,588,949 B2 | 11/2013 | Lambourne et al. |
| 8,799,395 B2 | 8/2014 | Seidel et al. |
| 8,818,538 B2 | 8/2014 | Sakata |
| 8,843,586 B2 | 9/2014 | Pantos et al. |
| 8,880,648 B1 | 11/2014 | Arora et al. |
| 8,942,252 B2 | 1/2015 | Balassanian et al. |
| 8,954,177 B2 | 2/2015 | Sanders |
| 8,966,394 B2 | 2/2015 | Gates et al. |
| 9,137,602 B2 | 9/2015 | Mayman et al. |
| 9,338,206 B2 | 5/2016 | Keum et al. |
| 9,507,780 B2 | 11/2016 | Rothkopf et al. |
| 9,609,448 B2 | 3/2017 | Bentley et al. |
| 9,635,068 B2 | 4/2017 | Garmark et al. |
| 2001/0042107 A1 | 11/2001 | Palm |
| 2002/0002039 A1 | 1/2002 | Qureshey et al. |
| 2002/0022453 A1 | 2/2002 | Balog et al. |
| 2002/0026442 A1 | 2/2002 | Lipscomb et al. |
| 2002/0124097 A1 | 9/2002 | Isely et al. |
| 2002/0165921 A1 | 11/2002 | Sapieyevski |
| 2002/0178191 A1 | 11/2002 | Sielken |
| 2002/0194309 A1 | 12/2002 | Carter et al. |
| 2003/0023741 A1 | 1/2003 | Tomassetti et al. |
| 2003/0079038 A1 | 4/2003 | Robbin et al. |
| 2003/0157951 A1 | 8/2003 | Hasty |
| 2003/0198257 A1 * | 10/2003 | Sullivan et al. .............. 370/516 |
| 2003/0210796 A1 | 11/2003 | McCarty et al. |
| 2004/0024478 A1 | 2/2004 | Hans et al. |
| 2004/0025185 A1 | 2/2004 | Goci et al. |
| 2004/0078383 A1 | 4/2004 | Mercer et al. |
| 2004/0078812 A1 | 4/2004 | Calvert |
| 2004/0215611 A1 | 10/2004 | Jawa et al. |
| 2004/0261040 A1 | 12/2004 | Radcliffe et al. |
| 2005/0028225 A1 | 2/2005 | Dawson et al. |
| 2005/0108320 A1 | 5/2005 | Lord et al. |
| 2005/0138193 A1 | 6/2005 | Encarnacion et al. |
| 2005/0155072 A1 | 7/2005 | Kaczowka et al. |
| 2005/0166157 A1 | 7/2005 | Ollis et al. |
| 2005/0235334 A1 * | 10/2005 | Togashi .............. H04L 12/2807 |
| | | | 725/117 |
| 2005/0240494 A1 | 10/2005 | Cue et al. |
| 2005/0262253 A1 | 11/2005 | Li et al. |
| 2006/0002681 A1 | 1/2006 | Spilo et al. |
| 2006/0041639 A1 | 2/2006 | Lamkin et al. |
| 2006/0062094 A1 | 3/2006 | Nathan et al. |
| 2006/0107237 A1 | 5/2006 | Kim |
| 2006/0156236 A1 | 7/2006 | Heller et al. |
| 2006/0168340 A1 | 7/2006 | Heller et al. |

US 9,967,615 B2

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2006/0195480 A1 | 8/2006 | Spiegelman et al. |
| 2006/0195521 A1 | 8/2006 | New et al. |
| 2006/0195864 A1 | 8/2006 | New et al. |
| 2006/0218294 A1 | 9/2006 | Rosenberg |
| 2006/0253782 A1 | 11/2006 | Stark et al. |
| 2006/0258289 A1* | 11/2006 | Dua .................. G06F 17/30058 |
| | | 455/41.3 |
| 2006/0263048 A1 | 11/2006 | Sato et al. |
| 2007/0038999 A1 | 2/2007 | Millington et al. |
| 2007/0061725 A1 | 3/2007 | Isaac et al. |
| 2007/0067808 A1 | 3/2007 | Dacosta |
| 2007/0083897 A1 | 4/2007 | Brownell |
| 2007/0106672 A1 | 5/2007 | Sighart et al. |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0169087 A1 | 7/2007 | Fadell |
| 2007/0266065 A1 | 11/2007 | Rosenberg |
| 2007/0288470 A1 | 12/2007 | Kauniskangas et al. |
| 2008/0005690 A1 | 1/2008 | Van |
| 2008/0016465 A1 | 1/2008 | Foxenland |
| 2008/0018625 A1 | 1/2008 | Ijichi et al. |
| 2008/0025535 A1 | 1/2008 | Rajapakse |
| 2008/0059567 A1 | 3/2008 | Williams et al. |
| 2008/0086379 A1 | 4/2008 | Dion et al. |
| 2008/0133715 A1 | 6/2008 | Yoneda et al. |
| 2008/0134256 A1* | 6/2008 | DaCosta ............ H04N 7/17318 |
| | | 725/62 |
| 2008/0177822 A1 | 7/2008 | Yoneda |
| 2008/0209487 A1 | 8/2008 | Osann et al. |
| 2008/0242222 A1 | 10/2008 | Bryce et al. |
| 2008/0292120 A1 | 11/2008 | Wilson |
| 2009/0006542 A1 | 1/2009 | Feldman et al. |
| 2009/0059512 A1 | 3/2009 | Lydon et al. |
| 2009/0097818 A1 | 4/2009 | Hirata |
| 2009/0132712 A1 | 5/2009 | P et al. |
| 2009/0171487 A1 | 7/2009 | Wilhelm |
| 2009/0172542 A1 | 7/2009 | Girish et al. |
| 2009/0197524 A1 | 8/2009 | Haff et al. |
| 2009/0222392 A1 | 9/2009 | Martin et al. |
| 2009/0228919 A1* | 9/2009 | Zott .................. H04N 7/17318 |
| | | 725/34 |
| 2009/0248702 A1 | 10/2009 | Schwartz et al. |
| 2009/0249222 A1 | 10/2009 | Schmidt et al. |
| 2009/0259765 A1 | 10/2009 | Karlsson et al. |
| 2009/0275285 A1 | 11/2009 | Maricevic et al. |
| 2010/0005496 A1* | 1/2010 | Ellis et al. ...................... 725/87 |
| 2010/0009674 A1 | 1/2010 | Sapkota et al. |
| 2010/0031366 A1 | 2/2010 | Knight et al. |
| 2010/0042235 A1 | 2/2010 | Basso et al. |
| 2010/0082725 A1 | 4/2010 | Onishi |
| 2010/0082731 A1 | 4/2010 | Haughay et al. |
| 2010/0087214 A1 | 4/2010 | Boumel et al. |
| 2010/0094833 A1 | 4/2010 | Svendsen |
| 2010/0095332 A1 | 4/2010 | Gran et al. |
| 2010/0206815 A1 | 8/2010 | Garusi et al. |
| 2010/0211438 A1 | 8/2010 | Lutnick et al. |
| 2010/0250669 A1 | 9/2010 | Pan |
| 2010/0299402 A1 | 11/2010 | Korman et al. |
| 2010/0299639 A1 | 11/2010 | Ramsay et al. |
| 2010/0303244 A1 | 12/2010 | Kim et al. |
| 2010/0306815 A1* | 12/2010 | Emerson .............. G11B 27/034 |
| | | 725/134 |
| 2011/0004330 A1 | 1/2011 | Rothkopf et al. |
| 2011/0047574 A1 | 2/2011 | Tecot et al. |
| 2011/0054641 A1 | 3/2011 | Hur |
| 2011/0055901 A1 | 3/2011 | Karaoguz et al. |
| 2011/0060998 A1 | 3/2011 | Schwartz et al. |
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2011/0131272 A1 | 6/2011 | Littlejohn et al. |
| 2011/0131518 A1 | 6/2011 | Ohashi |
| 2011/0131520 A1 | 6/2011 | Al-Shaykh et al. |
| 2011/0179455 A1 | 7/2011 | Thompson |
| 2011/0218656 A1 | 9/2011 | Bishop et al. |
| 2011/0225496 A1 | 9/2011 | Jeffe et al. |
| 2011/0252118 A1 | 10/2011 | Pantos et al. |
| 2011/0265003 A1 | 10/2011 | Schubert et al. |
| 2011/0295974 A1 | 12/2011 | Kashef et al. |
| 2012/0029672 A1 | 2/2012 | Hamilton et al. |
| 2012/0038541 A1 | 2/2012 | Song et al. |
| 2012/0040720 A1 | 2/2012 | Zhang et al. |
| 2012/0050012 A1 | 3/2012 | Alsina et al. |
| 2012/0054808 A1 | 3/2012 | Nijim |
| 2012/0057853 A1 | 3/2012 | Huber et al. |
| 2012/0089910 A1 | 4/2012 | Cassidy |
| 2012/0113964 A1 | 5/2012 | Petersen et al. |
| 2012/0117026 A1 | 5/2012 | Cassidy |
| 2012/0117193 A1 | 5/2012 | Phillips et al. |
| 2012/0117586 A1* | 5/2012 | McCoy et al. .................. 725/25 |
| 2012/0147825 A1 | 6/2012 | Hassan et al. |
| 2012/0159372 A1 | 6/2012 | Stallings et al. |
| 2012/0174204 A1 | 7/2012 | Sturm et al. |
| 2012/0185770 A1 | 7/2012 | Hwang et al. |
| 2012/0192071 A1* | 7/2012 | Millington ............ H04J 3/0664 |
| | | 715/716 |
| 2012/0202485 A1 | 8/2012 | Mirbaha et al. |
| 2012/0227076 A1 | 9/2012 | McCoy et al. |
| 2012/0233067 A1 | 9/2012 | Matthew et al. |
| 2012/0272062 A1 | 10/2012 | Lee et al. |
| 2012/0284423 A1 | 11/2012 | Weel |
| 2012/0304233 A1* | 11/2012 | Roberts ............ H04N 21/23113 |
| | | 725/82 |
| 2012/0311094 A1 | 12/2012 | Biderman et al. |
| 2012/0311618 A1 | 12/2012 | Blaxland |
| 2013/0014015 A1 | 1/2013 | Lambourne et al. |
| 2013/0024018 A1 | 1/2013 | Chang et al. |
| 2013/0028263 A1 | 1/2013 | Rajapakse |
| 2013/0047084 A1 | 2/2013 | Sanders et al. |
| 2013/0054742 A1 | 2/2013 | Tsuji et al. |
| 2013/0073584 A1 | 3/2013 | Kuper et al. |
| 2013/0086003 A1 | 4/2013 | Alsina et al. |
| 2013/0111529 A1 | 5/2013 | Yao et al. |
| 2013/0117299 A1 | 5/2013 | Kraatz |
| 2013/0151728 A1 | 6/2013 | Currier |
| 2013/0157566 A1 | 6/2013 | Oguchi |
| 2013/0165164 A1 | 6/2013 | Rowe |
| 2013/0167029 A1 | 6/2013 | Friesen et al. |
| 2013/0173034 A1 | 7/2013 | Reimann et al. |
| 2013/0246916 A1 | 9/2013 | Reimann et al. |
| 2013/0254207 A1 | 9/2013 | Coburn, IV et al. |
| 2013/0300546 A1 | 11/2013 | Kim et al. |
| 2013/0326041 A1 | 12/2013 | Bellet et al. |
| 2013/0346559 A1 | 12/2013 | Van et al. |
| 2013/0346859 A1 | 12/2013 | Bates et al. |
| 2013/0347117 A1 | 12/2013 | Parks et al. |
| 2014/0006483 A1 | 1/2014 | Garmark et al. |
| 2014/0006947 A1 | 1/2014 | Garmark et al. |
| 2014/0052770 A1 | 2/2014 | Gran et al. |
| 2014/0075308 A1 | 3/2014 | Sanders et al. |
| 2014/0075314 A1 | 3/2014 | Bachman et al. |
| 2014/0080479 A1 | 3/2014 | Vangala et al. |
| 2014/0096166 A1 | 4/2014 | Gordon et al. |
| 2014/0108929 A1 | 4/2014 | Garmark et al. |
| 2014/0115462 A1 | 4/2014 | Reznor et al. |
| 2014/0122737 A1 | 5/2014 | Silberstein et al. |
| 2014/0123005 A1 | 5/2014 | Forstall et al. |
| 2014/0140530 A1 | 5/2014 | Gomes-Casseres et al. |
| 2014/0169569 A1 | 6/2014 | Toivanen et al. |
| 2014/0195587 A1 | 7/2014 | Sukoff et al. |
| 2014/0195925 A1 | 7/2014 | Wikander |
| 2014/0215009 A1 | 7/2014 | Zhang |
| 2014/0229959 A1 | 8/2014 | Beckhardt et al. |
| 2014/0378056 A1 | 12/2014 | Liu |
| 2015/0026613 A1 | 1/2015 | Kwon et al. |
| 2015/0074527 A1 | 3/2015 | Sevigny et al. |
| 2015/0074528 A1 | 3/2015 | Sakalowsky et al. |
| 2015/0256954 A1 | 9/2015 | Carlsson et al. |
| 2015/0286360 A1 | 10/2015 | Wachter |
| 2015/0304476 A1 | 10/2015 | Katada |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101212823 A | 7/2008 |
| EP | 1389853 A1 | 2/2004 |
| JP | 2007060123 A | 3/2007 |
| JP | 2007512718 A | 5/2007 |

(56)                **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2007199220 A | 8/2007 |
| JP | 2008027537 A | 2/2008 |
| JP | 2009044410 | 2/2009 |
| JP | 2010067097 A | 3/2010 |
| JP | 2010510696 | 4/2010 |
| JP | 2012248199 A | 12/2012 |
| JP | 2013101631 A | 5/2013 |
| KR | 20090017795 | 2/2009 |
| WO | 0153994 | 7/2001 |
| WO | 2003093950 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |
| WO | 2008047184 A1 | 4/2008 |
| WO | 2009086599 A1 | 7/2009 |
| WO | 2011049497 A1 | 4/2011 |
| WO | 2013049346 A1 | 4/2013 |
| WO | 2013055661 A1 | 4/2013 |
| WO | 2013101727 | 7/2013 |
| WO | 2014149533 A2 | 9/2014 |
| WO | 2014172462 A1 | 10/2014 |

OTHER PUBLICATIONS

"Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 <http://manuals.info.apple.com/MANU-ALS/0/MA403/en_US/AppleTV_SetupGuide.pdf> Retrieved Oct. 14, 2014, 40 pages.

"Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 <http://manuals.info.apple.com/MANUALS/1000/MA1555/en_US/

Apple_TV_2nd_gen_Setup_Guide.pdf> Retrieved Oct. 16, 2014, 36 pages.

The United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 14/520,566, dated Dec. 30, 2014,10 pages.

Sonos, Inc.,"Sonos Multi-Room Music System User Guide," Version 090401, Apr. 1, 2009, 256 pages.

Sonos, Inc., "Sonos Wireless Dock Product Guide," Version 100101, Oct. 10, 2001, 196 pages.

Australian Intellectual Property Office, "Patent Examination Report No. 1", issued in connection with Australian patent application No. 2012362573, dated Jan. 16, 2015, 3 pages.

The United States Patent and Trademark Office, "Non-Final Office action", issued in connection with U.S. Appl. No. 13/341,237, dated Jan. 25, 2013, 9 pages.

The United States Patent and Trademark Office, "Final Office action", issued in connection with U.S. Appl. No. 13/341,237, dated Aug. 6, 2013, 14 pages.

The United States Patent and Trademark Office, "Advisory action", issued in connection with U.S. Appl. No. 13/341,237, dated Oct. 16, 2013, 3 pages.

The United States Patent and Trademark Office, "Non-Final Office action", issued in connection with U.S. Appl. No. 13/341,237, dated Nov. 26, 2013, 15 pages.

The United States Patent and Trademark Office, "Final Office action", issued in connection with U.S. Appl. No. 13/341,237, dated Apr. 14, 2014, 12 pages.

The United States Patent and Trademark Office, "Non-Final Office action", issued in connection with U.S. Appl. No. 13/341,237, dated Oct. 8, 2014, 18 pages.

Advisory Action dated Dec. 16, 2015, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 11 pages.

Advisory Action dated Dec. 2, 2015, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 4 pages.

Canadian Office Action dated Nov. 12, 2015, issued in connection with Canadian Application No. 2,861,790, 3 pages.

Final Office Action dated Dec. 7, 2015, issued in connection with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 16 pages.

Non-Final Office Action dated Nov. 18, 2015, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 18 pages.

Non-Final Office Action dated Nov. 18, 2015, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 12 pages.

Non-Final Office Action dated Dec. 28, 2015, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 10 pages.

Pre-Interview First Office Action dated Dec. 22, 2015, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 9 pages.

Voyetra Turtle Beach, Inc, "AudioTron Quick Start Guide, Version 1.0", Mar. 2001, 24 pages.

Voyetra Turtle Beach, Inc, "AudioTron Reference Manual, Version 3.0", May 2002, 70 pages.

Voyetra Turtle Beach, Inc. "AudioTron Setup Guide, Version 3.0", , May 2002, 38 pages.

Bluetooth, "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity" Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.

Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy" Core, Version 1.0 B, Dec. 1, 1999, 1081 pages.

Dell, Inc., "Dell Digital Audio Receiver: Reference Guide" Jun. 2000, 70 pages.

Dell, Inc, "Start Here" Jun. 2000, 2 pages.

United States Patent and Trademark Office, "Final Office Action", issued in connection with U.S. Appl. No. 13/341,237, dated Apr. 22, 2015, 11 pages.

International Searching Authority, "International Search Report", issued in connection with PCT Application No. PCT/US2014/039669, dated Sep. 22, 2014, 3 pages.

International Searching Authority, "International Search Report", issued in connection with PCT Application No. PCT/US2014/034290, dated Aug. 21, 2014, 3 pages.

International Searching Authority, "International Search Report", issued in connection with PCT Application No. PCT/US2014/034292, dated Aug. 14, 2014, 3 pages.

International Searching Authority, "International Search Report", issued in connection with PCT Application No. PCT/US2014/034372, dated Aug. 20, 2014, 3 pages.

Jo J., et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, vol. 4861, pp. 71-82.

Jones, Stephen. "Dell Digital Audio Receiver: Digital upgrade for your analog stereo" Analog Stereo. Jun. 24, 2000 < http://www.reviewsonline.com/articles/961906864.htm> retrieved Jun. 18, 2014, 2 pages.

Louderback, Jim. "Affordable Audio Receiver Furnishes Homes With MP3" TechTV Vault. Jun. 28, 2000 <http://www.g4tb.com/articles/17923/affordable-audio-receiver-furnishes-homes-with-mp3/> retrieved Jul. 10, 2014, 2 pages.

Motorola., "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide", Dec. 31, 2001, 111 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/864,081, dated Mar. 10, 2015, 13 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/904,949, dated Mar. 13, 2015, 20 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/904,896, dated Mar. 2, 2015, 15 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/904,944, dated Apr. 23, 2015, 12 pages.

Sonos, "SonosTM Digital Music System User Guide", Version: 070101, Sonos, Inc., Jan. 2007, 179 pages.

Palm, Inc. "Handbook for the Palm VII Handheld" May 2000, 311 pages.

Higgins et al., "Presentations at WinHEC 2000" May 2000, 138 pages.

PRISMIQ, Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.

UPnP; "Universal Plug and Play Device Architecture"; Jun. 8, 2000; version 1.0; Microsoft Corporation, 54 pages.

Apple, Inc, "Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 <http://manuals.info.apple.

## US 9,967,615 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

com/MANUALS/1000/MA1607/en_US/apple_tv_3rd_gen_setup.
pdf> Retrieved Oct. 16, 2014, 36 pages.
International Searching Authority, "Written Opinion", issued in
connection with PCT Application No. PCT/US2014/039669, dated
Sep. 22, 2014, 5 pages.
International Searching Authority, "Written Opinion", issued in
connection with PCT Application No. PCT/US2014/034290, dated
Aug. 21, 2014, 5 pages.
International Searching Authority, "Written Opinion", issued in
connection with PCT Application No. PCT/US2014/034292, dated
Aug. 14, 2014, 4 pages.
International Searching Authority, "Written Opinion", issued in
connection with PCT Application No. PCT/US2014/034372, dated
Aug. 20, 2014, 6 pages.
European Patent Office, "The Extended European Search Report",
issued in connection with European patent application No.
12861517.6, dated Jun. 9, 2015, 11 pages.
"Final Office Action dated Aug. 25, 2015, issued in connection with
U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 15 pages."
"Non-Final Office Action dated Aug. 19, 2015, issued in connection
with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 18 pages."
Final Office Action dated Aug. 28, 2015, issued in connection with
U.S. Appl. No. 13/904,936, filed May 29, 2013, 10 pages.
Non-Final Office Action dated Feb. 13, 2015, issued in connection
with U.S. Appl. No. 13/904,936, filed May 29, 2013, 10 pages.
Non-Final Office Action dated Mar. 24, 2015, issued in connection
with U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 14 pages.
"Advisory Action dated Sep. 17, 2015, issued in connection with
U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 4 pages."
"Final Office Action dated Sep. 25, 2015, issued in connection with
U.S. Appl. No. 13/904,949, filed May 29, 2013, 14 pages."
"Advisory Action dated Oct. 29, 2015, issued in connection with
U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 3 pages."
"Final Office Action dated Oct. 23, 2015, issued in connection with
U.S. Appl. No. 13/904,944, filed May 29, 2013, 13 pages."
International Bureau, International Preliminary Report on Patent-
ability, dated Oct. 29, 2015, issued in connection with International
Application No. PCT/US2014/034290, filed on Apr. 16, 2014, 7
pages.
International Bureau, International Preliminary Report on Patent-
ability, dated Oct. 29, 2015, issued in connection with International
Application No. PCT/US2014/034292, filed on Apr. 16, 2014, 6
pages.
International Bureau, International Preliminary Report on Patent-
ability, dated Oct. 29, 2015, issued in connection with International
Application No. PCT/US2014/034372, filed on Apr. 16, 2014, 8
pages.
Notice of Allowance dated Oct. 9, 2015, issued in connection with
U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 14 pages.
Supplemental Notice of Allowability dated Nov. 4, 2015, issued in
connection with U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 2
pages.
Japanese Office Action dated Oct. 20, 2015, issued in connection
with Japanese Application No. 2014-550400, 8 pages.
Final Office Action dated Jul. 8, 2015, issued in connection with
U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 8 pages.
Final Office Action dated Jun. 23, 2015, issued in connection with
U.S. Appl. No. 13/904,896, filed May 29, 2013, 16 pages.
Advisory Action dated Jun. 16, 2016, issued in connection with U.S.
Appl. No. 13/904,896, filed May 29, 2013, 5 pages.
Advisory Action dated Apr. 29, 2016, issued in connection with U.S.
Appl. No. 13/864,075, filed Apr. 16, 2013, 3 pages.
Anonymous, "Sonos Controller for Mac or PC Product Guide",
Retrieved from the Internet, XP055254086, 2013, 108 pages.
European Patent Office, Exam Report dated Apr. 28, 2016, issued in
connection with European Patent Application No. 12861517.6, 6
pages.

European Patent Office, Extended European Search Report dated
Jun. 7, 2016, issued in connection with European patent application
No. 14803651.0, 10 pages.
Final Office Action dated Jun. 2, 2016, issued in connection with
U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 12 pages.
Final Office Action dated May 19, 2016, issued in connection with
U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 12 pages.
First Action Interview Office Action dated Jun. 20, 2016, issued in
connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 5
pages.
Non-Final Office Action dated Jun. 16, 2016, issued in connection
with U.S. Appl. No. 13/904,932, filed May 29, 2013, 15 pages.
Notice of Allowance dated Jun. 6, 2016, issued in connection with
U.S. Appl. No. 13/904,944, filed May 29, 2013, 5 pages.
Notice of Allowance dated Jun. 13, 2016, issued in connection with
U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 11 pages.
Non-Final Office Action dated Feb. 2, 2016, issued in connection
with U.S. Appl. No. 13/904,936, filed May 29, 2013, 14 pages.
Non-Final Office Action dated Jan. 19, 2016, issued in connection
with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 10 pages.
Advisory Action dated Feb. 25, 2016, issued in connection with
U.S. Appl. No. 13/904944, filed May 29, 2013, 4 pages.
"Final Office Action dated Mar. 10, 2016, issued in connection with
U.S. Appl. No. 13/904,932, filed May 29, 2013, 16 pages".
Notice of Allowance dated Feb. 26, 2016, issued in connection with
U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 13 pages.
Final Office Action dated Mar. 21, 2016, issued in connection with
U.S. Appl. No. 13/904,896, filed May 29, 2013, 19 pages.
Non-Final Office Action dated Mar. 17, 2016, issued in connection
with U.S. Appl. No. 13/904,923, filed May 29, 2013, 15 pages.
Non-Final Office Action dated Mar. 25, 2016, issued in connection
with U.S. Appl. No. 13/904,949, filed May 29, 2013, 13 pages.
Chen et al., "What a Juke! A Collaborative Music Sharing System,"
World of Wireless, Mobile and Multimedia Networks
(WOWMOM), 2012 IEEE International Symposium, 2012, 6
pages.
Corrected Notice of Allowance dated Oct. 6, 2016, issued in
connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 9
pages.
European Patent Office, Extended European Search Report dated
Sep. 9, 2016, issued in connection with European patent application
No. 14785247.9, 10 pages.
European Patent Office, Extended European Search Report dated
Oct. 18, 2016, issued in connection with European patent applica-
tion No. 14785806.2, 9 pages.
Final Office Action dated Sep. 21, 2016, issued in connection with
U.S. Appl. No. 13/904,923, filed May 29, 2013, 19 pages.
Notice of Allowance dated Nov. 7, 2016, issued in connection with
U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 14 pages.
Notice of Allowance dated Sep. 20, 2016, issued in connection with
U.S. Appl. No. 13/904,949, filed May 29, 2013, 12 pages.
European Patent Office, Extended European Search Report dated
Aug. 1, 2016, issued in connection with European patent application
No. 16160758.5, 11 pages.
Final Office Action dated Aug. 24, 2016, issued in connection with
U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 12 pages.
Final Office Action dated Aug. 29, 2016, issued in connection U.S.
Appl. No. 13/904,936, filed May 29, 2013, 21 pages.
International Searching Authority, International Report on Patent-
ability dated Dec. 10, 2015, issued in connection with International
Application No. PCT/US2014/039669, filed May 28, 2014, 7 pages.
Japanese Patent Office, Japanese Office Action dated Jul. 12, 2016,
issued in connection with Japanese Application No. 2014-550400,
10 pages.
Non-Final Office Action dated Aug. 12, 2016, issued in connection
with U.S. Appl. No. 13/904,909, filed May 29, 2013, 21 pages.
Notice of Allowance dated Aug. 31, 2016, issued in connection with
U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 7 pages.
Ritchie et al., "UPnP AV Architecture:2 for UPnP Version 1.0",
2010, XP055032201, retrieved from the internet: URL:http://upnp.
org/specs/av/UPnP-av_AVArchitecture-v2.pdf, 11 pages.
Advisory Action dated Dec. 5, 2016, issued in connection with U.S.
Appl. No. 13/904,923, filed May 29, 2013, 5 pages.

**US 9,967,615 B2**

Page 6

(56)                **References Cited**

OTHER PUBLICATIONS

Canadian Patent Office, Canadian Office Action dated Nov. 3, 2016, issued in connection with Canadian Application No. 2,861,790, 4 pages.
European Patent Office, Extended European Search Report dated Nov. 21, 2016, issued in connection with European Application No. 14784965.7-1870, 6 pages.
European Patent Office, Summons to Attend Oral Proceedings dated Dec. 1, 2016, issued in connection with European Application No. 12861517.6-1905, 11 pages.
Japanese Patent Office, Notice of Rejection dated Dec. 20, 2016, issued in connection with Japanese Application No. 2016-509069, 4 pages.
"Denon 2003-2004 Product Catalog," Denon, 2003-2004, 44 pages.
Mate et al., "Movable-Multimedia: Session Mobility in Ubiquitous Computing Ecosystem", XP055019030, 2006, 6 pages.
Non-Final Office Action dated Dec. 14, 2016, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 5 pages.
Notice of Allowance dated Nov. 17, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 12 pages.
Notice of Allowance dated Nov. 23, 2016, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 18 pages.
Notice of Allowance dated Nov. 23, 2016, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 5 pages.
Notification of Reopening of Prosecution Due to Consideration of an Information Disclosure Statement Filed after Mailing of a Notice of Allowance dated Jan. 20, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 2 pages.
Supplemental Notice of Allowance dated Dec. 21, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 2 pages.
United States Patent and Trademark Office, U.S. Appl. No. 60/490,768, filed Jul. 28, 2003, entitled "Method for synchronizing audio playback between multiple networked devices," 13 pages.
United States Patent and Trademark Office, U.S. Appl. No. 60/825,407, filed Sep. 12, 2003, entitled "Controlling and manipulating groupings in a multi-zone music or media system," 82 pages.
Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages.
Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages.
Yamaha DME Designer 3.5 User Manual; Copyright 2004, 507 pages.
Australian Patent Office, Examination Report dated Mar. 22, 2017, issued in connection with Australian Application No. 2016202175, 3 pages.

Chen, Zhaofei et al. "What a Juke! A Collaborative Music Sharing System", World of Wireless, Mobile and Multimedia Networks (WOWMOM), 2012 IEEE International Symposium on A, IEEE, Jun. 25, 2012 6 pages.
Chinese Patent Office, Chinese Office Action dated Jan. 5, 2017, issued in connection with Chinese Application No. 201280069674.6, 14 pages.
European Patent Office, European Extended Search Report dated Aug. 16, 2017, issued in connection with EP Application No. 16160758.5, 9 pages.
European Patent Office, Office Action dated Apr. 7, 2017, issued in connection with European Application No. 14803651.0, 4 pages.
European Patent Office, Office Action dated May 11, 2017, issued in connection with European Application No. 14785247.9, 9 pages.
Final Office Action dated May 15, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 12 pages.
Final Office Action dated Sep. 20, 2017, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 22 pages.
Japanese Patent Office, Non-Final Office Action dated Mar. 28, 2017, issued in connection with Japanese Patent Application No. 2016-516750, 5 pages.
Japanese Patent Office, Office Action dated Jan. 10, 2017, issued in connection with Japanese Patent Application No. 2016-509046, 7 pages.
Japanese Patent Office, Office Action dated Feb. 14, 2017, issued in connection with Japanese Patent Application No. 2016-509047, 9 pages.
Non-Final Office Action dated Feb. 23, 2017, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 21 pages.
Non-Final Office Action dated Feb. 7, 2017, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 5 pages.
Non-Final Office Action dated Mar. 9, 2017, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 20 pages.
Non-Final Office Action dated Feb. 22, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 14 pages.
Non-Final Office Action dated Jul. 26, 2017, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 10 pages.
Notice of Allowance dated Apr. 4, 2017, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 5 pages.
Notice of Allowance dated Mar. 9, 2017, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 13 pages.
Notice of Allowance dated Aug. 17, 2017, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 23 pages.
Notice of Allowance dated Aug. 21, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 7 pages.
Notice of Allowance dated Jan. 25, 2017, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 7 pages.
Notice of Allowance dated Jun. 28, 2017, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 17 pages.

* cited by examiner



FIGURE 1

200

208



FIGURE 2A

210          202          210



FIGURE 2B



**FIGURE 2C**



**FIGURE 3**



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



800

Start

Trigger streaming of content to local playback system. —— 810

Stream content from third party application to local playback network. —— 820

Provide stream directly to local playback network. —— 830

Consumption and playback of content via local playback network. —— 840

Add timing information to content via local playback device. —— 850

FIGURE 8



900



Start

Embed a link in a third party application. — 910

Launch local playback controller upon selection of link. — 920

Pass resource indicator for associated content to local playback system. — 930

Output associated content via local controller and resource indicator. — 940

FIGURE 9



1000

Start

Embed a link in a third party application. — 1010

Contact server and provide information regarding selected content for playback. — 1020

Identify and provide content via server to a local playback system. — 1030

FIGURE 10



1100



Start

Provide information about content to local playback device. ⎯ 1110

Directly access content source from local playback system. ⎯ 1120

Play content directly from network or cloud to local playback system. ⎯ 1130

FIGURE 11

US 9,967,615 B2

**1**

# NETWORKED MUSIC PLAYBACK

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims the benefit of priority to U.S. Non-Provisional application Ser. No. 13/341,237, filed on Dec. 30, 2011, entitled "Systems and Methods for Networked Music Playback", which is hereby incorporated by reference in its entirety for all purposes.

## FIELD OF THE DISCLOSURE

The disclosure is related to consumer electronics and, more particularly, to providing music for playback via one or more devices on a playback data network.

## BACKGROUND

Technological advancements have increased the accessibility of music content, as well as other types of media, such as television content, movies, and interactive content. For example, a user can access audio, video, or both audio and video content over the Internet through an online store, an Internet radio station, an online music service, an online movie service, and the like, in addition to the more traditional avenues of accessing audio and video content. Demand for such audio and video content continues to surge. Given the high demand, technology used to access and play such content has likewise improved.

## BRIEF DESCRIPTION OF THE DRAWINGS

Features, aspects, and advantages of the presently disclosed technology are better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an illustration of an example system in which embodiments of the methods and apparatus disclosed herein can be implemented;

FIG. **2**A shows an illustration of an example zone player having a built-in amplifier and speakers;

FIG. **2**B shows an illustration of an example zone player having a built-in amplifier and connected to external speakers;

FIG. **2**C shows an illustration of an example zone player connected to an A/V receiver and speakers;

FIG. **3** shows an illustration of an example controller;

FIG. **4** shows an internal functional block diagram of an example zone player;

FIG. **5** shows an internal functional block diagram of an example controller;

FIG. **6** shows an example ad-hoc playback network;

FIG. **7** shows a system including a plurality of networks including a cloud-based network and at least one local playback network; and

FIGS. **8-11** show flow diagrams for methods to provide audio content to a local playback system.

In addition, the drawings are for the purpose of illustrating example embodiments, but it is understood that the present disclosure is not limited to the arrangements and instrumentality shown in the drawings.

## DETAILED DESCRIPTION

### I. Overview

Wired or wireless networks can be used to connect one or more multimedia playback devices for a home or other location playback network (e.g., a home music system). Certain examples provide automatic configuration of parameters of a playback device to be coupled to a network with reduced or minimum human intervention. For example, a wired and/or wireless ad-hoc network is established to facilitate communications among a group of devices. Music and/or other multimedia content can be shared among devices and/or groups of devices (also referred to herein as zones) associated with a playback network.

Certain embodiments facilitate streaming or otherwise providing music from a music-playing application (e.g., browser-based application, native music player, other multimedia application, and so on) to a multimedia content playback (e.g., Sonos™) system. Certain embodiments provide simple, easy-to-use and secure systems and methods for multimedia content playback across a plurality of systems and locations. Certain embodiments facilitate integration between content partners and a playback system as well as supporting maintenance of such content and system.

Although the following discloses example systems, methods, apparatus, and articles of manufacture including, among other components, firmware and/or software executed on hardware, it should be noted that such systems, methods, apparatus, and/or articles of manufacture are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these firmware, hardware, and/or software components could be embodied exclusively in hardware, exclusively in software, exclusively in firmware, or in any combination of hardware, software, and/or firmware. Accordingly, while the following describes example systems, methods, apparatus, and/or articles of manufacture, the examples provided are not the only way(s) to implement such systems, methods, apparatus, and/or articles of manufacture.

When any of the appended claims are read to cover a purely software and/or firmware implementation, at least one of the elements in at least one example is hereby expressly defined to include a tangible medium such as a memory, DVD, CD, Blu-ray, and so on, storing the software and/or firmware.

Reference herein to "embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one example embodiment of the invention. The appearances of this phrase in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. As such, the embodiments described herein, explicitly and implicitly understood by one skilled in the art, can be combined with other embodiments.

Certain embodiments provide a method to provide content to a local playback network. The example method includes identifying multimedia content from a content provider. The example method includes passing information regarding the multimedia content to a local playback system including one or more multimedia playback devices in response to a trigger. The example method includes facilitating play of the multimedia content via a local playback network associated with the local playback system.

Certain embodiments provide a computer readable storage medium including instructions for execution by a processor, the instructions, when executed, cause the processor to implement a method to provide content to a local playback network. The example method includes identifying multimedia content from a content provider. The example method includes passing information regarding the multimedia content to a local playback system including one or

US 9,967,615 B2

**3**

more multimedia playback devices in response to a trigger. The example method includes facilitating play of the multimedia content via a local playback network associated with the local playback system.

Certain embodiments provide a multimedia playback device including a wireless communication interface to communicate with a local playback network and a multimedia content source and a processor. The process is to identify multimedia content from the multimedia content source; pass information regarding the multimedia content to device on the local playback network in response to a trigger; and facilitate play of the multimedia content via the devices on the local playback network.

## II. Example Environment

Referring now to the drawings, in which like numerals can refer to like parts throughout the figures, FIG. 1 shows an example system configuration 100 in which one or more of the method or apparatus disclosed herein can be practiced or implemented. By way of illustration, the system configuration 100 represents a home with multiple zones. Each zone, for example, represents a different room or space, such as an office, bathroom, bedroom, kitchen, dining room, family room, home theater room, utility or laundry room, and patio. While not shown here, a single zone can cover more than one room or space. One or more of zone players 102-124 are shown in each respective zone. A zone player 102-124, also referred to as a playback device, multimedia unit, speaker, and so on, provides audio, video, and/or audiovisual output. A controller 130 (e.g., shown in the kitchen for purposes of illustration) provides control to the system configuration 100. The system configuration 100 illustrates an example whole house audio system, though it is understood that the technology described herein is not limited to its particular place of application or to an expansive system like a whole house audio system 100 of FIG. 1.

FIGS. 2A, 2B, and 2C show example illustrations of zone players 200-204. The zone players 200-204 of FIGS. 2A, 2B, and 2C, respectively, can correspond to any of the zone players 102-124 of FIG. 1. While certain embodiments provide multiple zone players, an audio output can be generated using only a single zone player. FIG. 2A illustrates a zone player 200 including sound producing equipment 208 capable of generating sound or an audio output corresponding to a signal received (e.g., wirelessly and/or via a wired interface). The sound producing equipment 208 of the zone player 200 of FIG. 2A includes a built-in amplifier (not shown in this illustration) and speakers (e.g., a tweeter, a mid-range driver, and/or a subwoofer). In certain embodiments, the zone player 200 of FIG. 2A can be configured to play stereophonic audio or monaural audio. In some embodiments, the zone player 200 of FIG. 2A can be configured as a component in a combination of zone players to play stereophonic audio, monaural audio, and/or surround audio. As described in greater detail below, in some embodiments, the example zone player 200 of FIG. 2A can also transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiver(s), and so on. Transmission of the second signal can be part of, for example, a system in which multiple zone players, speakers, receivers, and so on, form a network to, for example, present media content in a synchronization or distributed manner.

The example zone player 202 of FIG. 2B includes a built-in amplifier (not shown in this illustration) to power a set of detached speakers 210. The speakers 210 of FIG. 2B

**4**

can include, for example, any type of loudspeaker. The zone player 202 of FIG. 2B can communicate a signal corresponding to audio content to the detached speakers 210 via wired and/or wireless channels. Instead of receiving and generating audio content as in FIG. 2A, the zone player 202 of FIG. 2B receives the audio content and transmits the same (e.g., after processing the received signal) to the detached speakers 210. Similar to the example zone player 200 of FIG. 2A, in some embodiments the zone player 202 can transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiver(s), and so on.

The example zone player 204 of FIG. 2C does not include an amplifier, but allows a receiver 214, or another audio and/or video type device with built-in amplification, to connect to a data network 128 of FIG. 1 and to play audio received over the data network 128 via the receiver 214 and a set of detached speakers 216. In addition to the wired couplings shown in FIG. 2C, the detached speakers 216 can receive audio content via a wireless communication channel between the detached speakers 216 and, for example, the zone player 204 and/or the receiver 214. In some embodiments the zone player 202 can transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiver(s), and so on.

Example zone players include a "Sonos S5," "Sonos Play:5," "Sonos Play:3," "ZonePlayer 120," and "Zone-Player 90," which are offered by Sonos, Inc. of Santa Barbara, Calif. Any other past, present, and/or future zone players can additionally or alternatively be used to implement the zone players of example embodiments disclosed herein. A zone player can also be referred to herein as a playback device, and a zone player is not limited to the particular examples illustrated in FIGS. 2A, 2B, and 2C. For example, a zone player can include a wired or wireless headphone. In other examples, a zone player might include a subwoofer. In yet other examples, a zone player can include a sound bar. In an example, a zone player can include or interact with a docking station for an Apple iPod™ or similar device. In some embodiments, a zone player can relay one or more signals received from, for example, a first zone player to another playback device. In some embodiments, a zone player can receive a first signal and generate an output corresponding to the first signal and, simultaneously or separately, can receive a second signal and transmit or relay the second signal to another zone player(s), speaker(s), receiver(s), and so on. Thus, an example zone player described herein can act as a playback device and, at the same time, operate as a hub in a network of zone players. In such instances, media content corresponding to the first signal can be different from the media content corresponding to the second signal.

FIG. 3 shows an example illustration of a wireless controller 300 in a docking station 302. The controller 300 can correspond to the controlling device 130 of FIG. 1. The controller 300 is provided with a touch screen 304 that allows a user to interact with the controller 300, for example, to retrieve and navigate a playlist of audio items, control operations of one or more zone players, and provide overall control of the system configuration 100. In certain embodiments, any number of controllers can be used to control the system configuration 100. In certain embodiments, there can be a limit on the number of controllers that can control the system configuration 100. The controllers might be wireless like wireless controller 300 or wired to the data network 128. Furthermore, an application running on any network-enabled portable devices, such as an iPhone™ iPad™

US 9,967,615 B2

**5**

Android™ powered phone, or any other smart phone or network-enabled device can be used as a controller by connecting to the data network **128**. An application running on a laptop or desktop PC or Mac can also be used as a controller. Example controllers include a "Sonos® Controller 200," "Sonos® Controller for iPhone," "Sonos® Controller for iPad," "Sonos® Controller for Android, "Sonos® Controller for Mac or PC," which are offered by Sonos, Inc. of Santa Barbara, Calif. The flexibility of such an application and its ability to be ported to a new type of portable device is advantageous.

Referring back to the system configuration **100** of FIG. **1**, a particular zone can contain one or more zone players. For example, the family room of FIG. **1** contains two zone players **106** and **108**, while the kitchen is shown with one zone player **102**. Zones can be dynamically configured by positioning a zone player in a room or space and assigning via the controller **130** the zone player to a new or existing zone. As such, zones can be created, combined with another zone, removed, and given a specific name (e.g., "Kitchen"), if so programmed. The zone players **102** to **124** are coupled directly or indirectly to a data network, such as the data network **128** shown in FIG. **1**. The data network **128** is represented by an octagon in the figure to stand out from other components shown in the figure. While the data network **128** is shown in a single location, it is understood that such a network can be distributed in and around the system configuration **100**.

Particularly, the data network **128** can be a wired network, a wireless network, or a combination of both. In some embodiments, one or more of the zone players **102-124** are wirelessly coupled to the data network **128** based on a proprietary mesh network. In some embodiments, one or more of the zone players **102-124** are wirelessly coupled to the data network **128** using a non-mesh topology. In some embodiments, one or more of the zone players **102-124** are coupled via a wire to the data network **128** using Ethernet or similar technology. In addition to the one or more zone players **102-124** connecting to the data network **128**, the data network **128** can further allow access to a wide area network, such as the Internet.

In certain embodiments, the data network **128** can be created by connecting any of the zone players **102-124**, or some other connecting device, to a broadband router. Other zone players **102-124** can then be added wired or wirelessly to the data network **128**. For example, a zone player (e.g., any of zone players **102-124**) can be added to the system configuration **100** by simply pressing a button on the zone player itself, which enables a connection to be made to the data network **128**. The broadband router can be connected to an Internet Service Provider (ISP), for example. The broadband router can be used to form another data network within the system configuration **100**, which can be used in other applications (e.g., web surfing). The data network **128** can also be used in other applications, if so programmed. Further, in certain embodiments, the data network **128** is the same network used for other applications in the household.

In certain embodiments, each zone can play from the same audio source as another zone or each zone can play from a different audio source. For example, someone can be grilling on the patio and listening to jazz music via zone player **124**, while someone is preparing food in the kitchen and listening to classical music via zone player **102**. Further, someone can be in the office listening to the same jazz music via zone player **110** that is playing on the patio via zone player **124**. In some embodiments, the jazz music played via zone players **110** and **124** is played in synchrony. Synchro-

**6**

nizing playback amongst zones allows for someone to pass through zones while seamlessly listening to the audio. Further, zones can be put into a "party mode" such that all associated zones will play audio in synchrony.

In certain embodiments, a zone contains two or more zone players. For example, the family room contains two zone players **106** and **108**, and the home theater room contains at least four zone players **116**, **118**, and **120**. A zone can be configured to contain as many zone players as desired, and for example, the home theater room might contain additional zone players to play audio from a 5.1 channel or greater audio source (e.g., a movie encoded with 5.1 or greater audio channels). If a zone contains two or more zone players, such as the two zone players **106** and **108** in the family room, then the two zone players **106** and **108** can be configured to play the same audio source in synchrony, or the two zone players **106** and **108** can be paired to play two separate sounds in left and right channels, for example. In other words, the stereo effects of a sound can be reproduced or enhanced through the two zone players **106** and **108**, one for the left sound and the other for the right sound. In certain embodiments, paired zone players can play audio in synchrony with other zone players.

In certain embodiments, three or more zone players can be configured to play various channels of audio that is encoded with three channels or more sound. For example, the home theater room shows zone players **116**, **118**, and **120**. If the sound is encoded as 2.1 channel audio, then the zone player **116** can be configured to play left channel audio, the zone player **118** can be configured to play right channel audio, and the zone player **120** can be configured to play bass frequencies. Other configurations are possible and depend on the number of zone players and the type of audio. Further, a particular zone can be configured to play a 5.1 channel audio in one instance, such as when playing audio from a movie, and then dynamically switch to play stereo, such as when playing audio from a two channel source.

In certain embodiments, two or more zone players can be sonically consolidated to form a single, consolidated zone player. A consolidated zone player (though made up of multiple, separate devices) can be configured to process and reproduce sound differently than an unconsolidated zone player or zone players that are paired, because a consolidated zone player will have additional speaker drivers from which sound can be passed. The consolidated zone player can further be paired with a single zone player or yet another consolidated zone player. Each playback device of a consolidated playback device is preferably set in a consolidated mode.

According to some embodiments, one can continue to do any of: group, consolidate, and pair zone players, for example, until a desired configuration is complete. The actions of grouping, consolidation, and pairing are preferably performed through a control interface, such as using controller **130**, and not by physically connecting and reconnecting speaker wire, for example, to individual, discrete speakers to create different configurations. As such, certain embodiments described herein provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user.

Sources of audio content to be played by zone players **102-124** are numerous. Music from a personal library stored on a computer or networked-attached storage (NAS) can be accessed via the data network **128** and played. Internet radio stations, shows, and podcasts can be accessed via the data network **128**. Music services that let a user stream and download music and audio content can be accessed via the

US 9,967,615 B2

7

data network **128**. Further, music can be obtained from traditional sources, such as a turntable or CD player, via a line-in connection to a zone player, for example. Audio content can also be accessed through AirPlay™ wireless technology by Apple, Inc., for example. Audio content received from one or more sources can be shared amongst the zone players **102** to **124** via the data network **128** and/or the controller **130**. The above-disclosed sources of audio content are referred to herein as network-based audio information sources. However, network-based audio information sources are not limited thereto.

The example home theater zone players **116**, **118**, **120** are coupled to an audio information source such as a television **132**. In some examples, the television **132** is used as a source of audio for the home theater zone players **116**, **118**, **120**, while in other examples audio information from the television **132** can be shared with any of the zone players **102**-124 in the audio system **100**.

III. Example Playback Device

Referring now to FIG. **4**, there is shown an example functional block diagram of a zone player **400** in accordance with an embodiment. The zone player **400** of FIG. **4** includes a network interface **402**, a processor **408**, a memory **410**, an audio processing component **412**, a module **414**, an audio amplifier **416**, and a speaker unit **418** coupled to the audio amplifier **416**. FIG. **2A** shows an example illustration of such a zone player. Other types of zone players can not include the speaker unit **418** (e.g., such as shown in FIG. **2B**) or the audio amplifier **416** (e.g., such as shown in FIG. **2C**). Further, it is contemplated that the zone player **400** can be integrated into another component. For example, the zone player **400** could be constructed as part of a lamp for indoor or outdoor use.

Referring back to FIG. **4**, the network interface **402** facilitates a data flow between zone players and other devices on a data network (e.g., the data network **128** of FIG. **1**) and the zone player **400**. In some embodiments, the network interface **402** can manage the assembling of an audio source or file into smaller packets that are to be transmitted over the data network or reassembles received packets into the original source or file. In some embodiments, the network interface **402** can further handle the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **400**. Accordingly, in certain embodiments, each of the packets includes an Internet Protocol (IP)-based source address as well as an IP-based destination address.

In some embodiments, the network interface **402** can include one or both of a wireless interface **404** and a wired interface **406**. The wireless interface **404**, also referred to as an RF interface, provides network interface functions for the zone player **400** to wirelessly communicate with other devices (e.g., other zone player(s), speaker(s), receiver(s), component(s) associated with the data network **128**, and so on) in accordance with a communication protocol (e.g., any of the wireless standards IEEE 802.11a, 802.11b, 802.11g, 802.11n, or 802.15). To receive wireless signals and to provide the wireless signals to the wireless interface **404** and to transmit wireless signals, the zone player **400** of FIG. **4** includes one or more antennas **420**. The wired interface **406** provides network interface functions for the zone player **400** to communicate over a wire with other devices in accordance with a communication protocol (e.g., IEEE 802.3). In some embodiments, a zone player includes both of the

8

interfaces **404** and **406**. In some embodiments, a zone player **400** includes only the wireless interface **404** or the wired interface **406**.

In some embodiments, the processor **408** is a clock-driven electronic device that is configured to process input data according to instructions stored in memory **410**. The memory **410** is data storage that can be loaded with one or more software modules **414**, which can be executed by the processor **408** to achieve certain tasks. In the illustrated embodiment, the memory **410** is a tangible machine readable medium storing instructions that can be executed by the processor **408**. In some embodiments, a task might be for the zone player **400** to retrieve audio data from another zone player or a device on a network. In some embodiments, a task might be for the zone player **400** to send audio data to another zone player or device on a network. In some embodiments, a task might be for the zone player **400** to synchronize playback of audio with one or more additional zone players. In some embodiments, a task might be to pair the zone player **400** with one or more zone players to create a multi-channel audio environment. Additional or alternative tasks can be achieved via the one or more software modules **414** and the processor **408**.

The audio processing component **412** can include one or more digital-to-analog converters (DAC), an audio preprocessing component, an audio enhancement component or a digital signal processor, and so on. In certain embodiments, the audio that is retrieved via the network interface **402** is processed and/or intentionally altered by the audio processing component **412**. Further, the audio processing component **412** can produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier **416** for play back through speakers **418**. In addition, the audio processing component **412** can include necessary circuitry to process analog or digital signals as inputs to play from zone player **400**, send to another zone player on a network, or both play and send to another zone player on the network. An example input includes a line-in connection (e.g., an auto-detecting 3.5 mm audio line-in connection).

The audio amplifier **416** is a device that amplifies audio signals to a level for driving one or more speakers **418**. The one or more speakers **418** can include an individual transducer (e.g., a "driver") or a complete speaker system that includes an enclosure including one or more drivers. A particular driver can be a subwoofer (for low frequencies), a mid-range driver (middle frequencies), and a tweeter (high frequencies), for example. An enclosure can be sealed or ported, for example.

A zone player **400** can also be referred to herein as a playback device. An example playback device includes a Sonos® Play:5, which is manufactured by Sonos, Inc. of Santa Barbara, Calif. The Play:5 is an example zone player with a built-in amplifier and speakers. In particular, the Play:5 is a five-driver speaker system that includes two tweeters, two mid-range drivers, and one subwoofer. When playing audio content via the Play:5, the left audio data of a track is sent out of the left tweeter and left mid-range driver, the right audio data of a track is sent out of the right tweeter and the right mid-range driver, and mono bass is sent out of the subwoofer. Further, both mid-range drivers and both tweeters have the same equalization (or substantially the same equalization). That is, they are both sent the same frequencies, just from different channels of audio. Audio from Internet radio stations, online music and video services, downloaded music, analog audio inputs, television, DVD, and so on, can be played from a Sonos® Play:5. While the Play:5 is an example of a zone player with

US 9,967,615 B2

**9**

speakers, it is understood that a zone player with speakers is not limited to one with a certain number of speakers (e.g., five speakers as in the Play:5), but rather can contain one or more speakers. Further, a zone player can be part of another device, which might even serve a purpose different than audio (e.g., a lamp).

### IV. Example Controller

Referring now to FIG. **5**, there is shown an example controller **500**, which can correspond to the controlling device **130** in FIG. **1**. The controller **500** can be used to facilitate the control of multi-media applications, automation and others in a system. In particular, the controller **500** is configured to facilitate a selection of a plurality of audio sources available on the network and enable control of one or more zone players (e.g., the zone players **102-124** in FIG. **1**) through a wireless network interface **508**. According to one embodiment, the wireless communications is based on an industry standard (e.g., infrared, radio, wireless standards IEEE 802.11a, 802.11b 802.11g, 802.11n, or 802.15). Further, when a particular audio is being accessed via the controller **500** or being played via a zone player, a picture (e.g., album art) or any other data, associated with the audio source can be transmitted from a zone player or other electronic device to the controller **500** for display.

The controller **500** is provided with a screen **502** and an input interface **514** that allows a user to interact with the controller **500**, for example, to navigate a playlist of many multimedia items and to control operations of one or more zone players. The screen **502** on the controller **500** can be an LCD screen, for example. The screen **500** communicates with and is commanded by a screen driver **504** that is controlled by a microcontroller (e.g., a processor) **506**. The memory **510** can be loaded with one or more application modules **512** that can be executed by the microcontroller **506** with or without a user input via the user interface **514** to achieve certain tasks. In some embodiments, an application module **512** is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for audio play back. In some embodiments, an application module **512** is configured to control the audio sounds (e.g., volume) of the zone players in a zone group. In operation, when the microcontroller **506** executes one or more of the application modules **512**, the screen driver **504** generates control signals to drive the screen **502** to display an application specific user interface accordingly.

The controller **500** includes a network interface **508** that facilitates wireless communication with a zone player. In some embodiments, the commands such as volume control and audio playback synchronization are sent via the network interface **508**. In some embodiments, a saved zone group configuration is transmitted between a zone player and a controller via the network interface **508**. The controller **500** can control one or more zone players, such as **102-124** of FIG. **1**. There can be more than one controller for a particular system. Further, a controller can be integrated into a zone player.

It should be noted that other network-enabled devices such as an iPhone®, iPad® or any other smart phone or network-enabled device (e.g., a networked computer such as a PC or Mac®) can also be used as a controller to interact or control zone players in a particular environment. In some embodiments, a software application or upgrade can be downloaded onto a network enabled device to perform the functions described herein.

**10**

In certain embodiments, a user can create a zone group including at least two zone players in the controller **500**. The zone players in the zone group can play audio in a synchronized fashion, such that all of the zone players in the zone group play back an identical audio source or a list of identical audio sources in a synchronized manner such that no (or substantially no) audible delays or hiccups could be heard. Similarly, in some embodiments, when a user increases the audio volume of the group from the controller **500**, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume.

A user via the controller **500** can group zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. For example, one mechanism for 'joining' zone players together for audio play back is to link a number of zone players together to form a group. To link a number of zone players together, a user can manually link each zone player or room one after the other. For example, assume that there is a multi-zone system that includes the following zones: Bathroom, Bedroom, Den, Dining Room, Family Room, and Foyer.

In certain embodiments, a user can link any number of the six zone players, for example, by starting with a single zone and then manually linking each zone to that zone.

In certain embodiments, a set of zones can be dynamically linked together using a command to create a zone scene or theme (subsequent to first creating the zone scene). For instance, a "Morning" zone scene command can link the Bedroom, Office, and Kitchen zones together in one action. Without this single command, the user would need to manually and individually link each zone. The single command might include a mouse click, a double mouse click, a button press, a gesture, or some other programmed action. Other kinds of zone scenes can be programmed.

In certain embodiments, a zone scene can be triggered based on time (e.g., an alarm clock function). For instance, a zone scene can be set to apply at 8:00 am. The system can link appropriate zones automatically, set specific music to play, and then stop the music after a defined duration. Although any particular zone can be triggered to an "On" or "Off" state based on time, for example, a zone scene enables any zone(s) linked to the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time and/or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed Universal Plug and Play (UPnP), no Internet connection for an Internet Radio station, and so on), a backup buzzer can be programmed to sound. The buzzer can include a sound file that is stored in a zone player, for example.

### V. Example Ad-Hoc Network

Certain particular examples will now be provided in connection with FIGS. **6-8**B to describe, for purposes of illustration only, certain base systems and methods to provide and facilitate connection to a playback network. FIG. **6** shows that there are three zone players **602**, **604** and **606** and a controller **608** that form a network branch that is also referred to as an Ad-Hoc network **610**. The network **610** may be wireless, wired, or a combination of wired and wireless. In general, an Ad-Hoc (or "spontaneous") network is a local area network or other small network in which there is no one access point for all traffic. With an established Ad-Hoc network **610**, the devices **602**, **604**, **606** and **608** can all

US 9,967,615 B2

11

communicate with each other in a "peer-to-peer" style of communication, for example. Furthermore, devices may come/and go from the network **610**, and the network **610** will automatically reconfigure itself without needing the user to reconfigure the network **610**.

Using the Ad-Hoc network **610**, the devices **602**, **604**, **606**, and **608** can share or exchange one or more audio sources and be grouped to play the same or different audio sources. For example, the devices **602** and **604** are grouped to playback one piece of music, and at the same time, the device **606** plays back another piece of music. In other words, the devices **602**, **604**, **606** and **608**, as shown in FIG. **6**, form a HOUSEHOLD that distributes audio and/or reproduces sound. As used herein, the term HOUSEHOLD (provided in uppercase letters to disambiguate from the user's domicile) is used to represent a collection of networked devices that are cooperating to provide an application or service. An instance of a HOUSEHOLD is identified with a household **10** (or household identifier).

In certain embodiments, a household identifier (HHID) is a short string or an identifier that is computer-generated to help ensure that it is unique. Accordingly, the network **610** can be characterized by a unique HHID and a unique set of configuration variables or parameters, such as channels (e.g., respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy or other security keys). In certain embodiments, SSID is set to be the same as HHID.

In certain embodiments, each HOUSEHOLD includes two types of network nodes: a control point (CP) and a zone player (ZP). The control point controls an overall network setup process and sequencing, including an automatic generation of required network parameters (e.g., WEP keys). In an embodiment, the CP also provides the user with a HOUSEHOLD configuration user interface. The CP function can be provided by a computer running a CP application module, or by a handheld controller (e.g., the controller **308**) also running a CP application module, for example. The zone player is any other device on the network that is placed to participate in the automatic configuration process. The ZP, as a notation used herein, includes the controller **308** or a computing device, for example.

In certain embodiments, configuration of a HOUSE-HOLD involves multiple CPs and ZPs that rendezvous and establish a known configuration such that they can use a standard networking protocol (e.g., IP over Wired or Wireless Ethernet) for communication. In an embodiment, two types of networks/protocols are employed: Ethernet 802.3 and Wireless 802.11g. Interconnections between a CP and a ZP can use either of the networks/protocols. A device in the system as a member of a HOUSEHOLD can connect to both networks simultaneously. In an environment that has both networks in use, it is assumed that at least one device in a system is connected to both as a bridging device, thus providing bridging services between wired/wireless networks for others. The zone player **606** in FIG. **6** is shown to be connected to both networks, for example. The connectivity to the network **612** is based on Ethernet while the connectivity to other devices **602**, **604** and **608** is based on Wireless. It is understood, however, that in some embodiments each zone player **606**, **604**, **602** may access the Internet when retrieving media from the cloud (e.g., Internet) via the bridging device. For example, zone player **602** may contain a uniform resource locator (URL) that specifies an address to a particular audio track in the cloud. Using the

12

URL, the zone player **602** may retrieve the audio track from the cloud, and ultimately play the audio out of one or more zone players.

VI. Example Music Sharing and Playback
Configuration

Certain embodiments enable a user to stream music from a music-playing application (e.g., browser-based application, native music player, other multimedia application, and so on) to a local multimedia content playback (e.g., Sonos™) system. Certain embodiments provide secure systems and methods for multimedia content playback across a plurality of systems and locations. Certain embodiments facilitate integration between content partners and a playback system as well as supporting maintenance of such content and system.

FIG. **7** shows a system including a plurality of networks including a cloud-based network and at least one local playback network. The network includes a plurality of playback devices or players, though it is understood that the network may contain only one playback device. In certain embodiments, each player has an ability to retrieve its content for playback. Control and content retrieval can be distributed or centralized, for example. Input can include streaming content provider input, third party application input, mobile device input, user input, and/or other playback network input into the cloud for local distribution and playback.

As illustrated by the example system **700** of FIG. **7**, a plurality of content providers **720**-**750** can be connected to one or more local playback networks **760**-**770** via a cloud and/or other network **710**. Using the cloud **710**, a multimedia playback system **720** (e.g., Sonos™), a mobile device **730**, a third party application **740**, a retail location **750**, and so on can provide multimedia content (requested or otherwise) to local playback networks **760**, **770**. Within each local network **760**, **770**, a controller **762**, **772** and/or playback device **764**, **774** can provide a song identifier, song name, playlist identifier, playlist name, genre, preference, and so on, and/or simply receive content from a connected system via the cloud.

For example, a user listens to a third party music application (e.g., Pandora™ Rhapsody™, Spotify™, and so on) on her smart phone while commuting. She's enjoying the current channel and, as she walks in the door to her home, selects an option to continue playing that channel on her household music playback system (e.g., Sonos™). The playback system picks up from the same spot on the selected channel that was on her phone and outputs that content (e.g., that song) on speakers and/or other playback devices connected to the household playback system. A uniform resource indicator (URI) (e.g., a uniform resource locator (URL)) can be passed to a playback device to fetch content from a cloud and/or other networked source, for example. A playback device, such as a zone player, can fetch content on its own without use of a controller, for example. Once the zone player has a URL (or some other identification or address) for a song and/or playlist, the zone player can run on its own to fetch the content. Songs and/or other multimedia content can be retrieved from the Internet rather than a local device (e.g., a compact disc (CD)), for example. A third party application can open or utilize an application programming interface (API) to pass music to the household playback system without tight coupling to that household playback system.

US 9,967,615 B2

13

In another example of an application determining a playlist and/or other content for playback, a user enjoys listening to music on an online music service (e.g., turntable.fm or other virtual room that a user can enter to choose from a plurality of online disc jockeys (DJs) deciding what to play next) using his Mac Book Pro™ at home. He likes the unique user experience the service offers, and he frequently hops from room to room discovering new music. To maximize sound quality, he plays the music on his household playback system (e.g., Sonos™). A button or other indicator can be added to the turntable.fm Web application to switch the content being played to the playback system for output (e.g., to the Sonos™ system rather than or in addition to the Mac Book™). While Web-based applications typically do not have access to items on a local network, certain embodiments enable a third-party Web-based application (e.g., Turntable.fm) to talk to a playback system (e.g., Sonos™) in a certain way (e.g., may have to log in with a username and password), and the identified user has the website send audio or audio and video down to a playback device (e.g., a zone player) on the playback system local network to play music there (or some other media).

In another example, a first user creates a playlist (e.g., a Spotify™ playlist). The first user visits a second user's house, pulls out her smart phone and shares her playlist by playing it on the second user's household playback (e.g., Sonos™) system using her third party (e.g., Spotify™) application. The first user may also go to the third party content provider's (e.g., Spotify's™) website and share her playlist on the second user's playback system.

Thus, certain embodiments provide cross-service linking such that a song identifier can be passed from one user and/or service to another to be fetched and played. A user having a playlist on his or her phone can visit a friend and, using her account on her friend's system, play a song to which she has an access right. A retrieved song can streamed locally to a user's phone, or an application can pass a song identifier to a local playback system which looks up the song identifier and finds an available audio stream to which the user has a right to play and then plays that song.

In another example, a user is staying in a hotel room or other facility including a local playback network. For example, a speaker and/or other playback device (e.g., a Sonos™ Play:3, Play: 5 and so on) in a hotel room can be utilized to play multimedia content to which the user has access from his or her playback network account, streaming audio source, third party application, and so on. Content can be output to one or more devices based on availability, access, configuration, priority, preference, and so on. In certain embodiments, a playback network includes a plurality of nodes, and each node has a capability to play sound in response to an input. Requested output is provided to a most logical connection, for example.

In certain embodiments, a phone device, a television device, and so on can be used to play music, audio, video and/or other multimedia content. In an example, a push button on a microphone or household intercom system to tell the kids dinner is ready is provided over the local playback network.

FIG. **8** shows a flow diagram for a method **800** to provide audio content to a local playback system. In the example method **800** of FIG. **8**, a third party application acts as a "virtual line-in" to the local playback system. At block **810**, streaming of music or other content from a third party application to a local content playback system is triggered. For example, a "Play to Sonos" button is pressed on a Rhapsody™ application. At block **820**, content is streamed

14

to one or more components in a household playback network. The music may be streamed to predetermined zones or players in a household, for example. The music may be further directed to be played in different zones or players throughout the household. Playback on the local network can be facilitated to one or more zones/players based on a configuration (e.g., a zone scene, theme, and so on). Thus, certain embodiments allow a large degree of flexibility in where the music is actually played. For example, the music can be played in the kitchen, the family room, the patio, and so on. Further, the music may be redirected to different zones.

At block **830**, the incoming content (e.g., audio) stream is provided directly from a third party application or other external source to the local playback network for playback. For example, rather than passing track identifiers, an audio stream is provided to a Sonos household system for playback to one or more configured zones. At block **840**, the local playback system consumes the stream and plays it as it would other content on the local playback (e.g., Sonos™) network (e.g., via zones and so on). At block **850**, a playback device (e.g., a zone player, Play:3™, Play:5™, and so on) adds timing information to the streaming content signal (e.g., the device takes the streaming audio signal and repackages it for local synchronized playback). In some embodiments, timing information is not added to the signal unless two or more playback devices are configured to play the audio in synchrony.

FIG. **9** shows a flow diagram for a method **900** to provide audio content to a local playback system. In the example method **900** of FIG. **9**, a uniform resource indicator (URI) handler approach is provided for content output. At block **910**, a link or other reference is embedded in a third party application (e.g., Facebook™ or Twitter). At block **920**, when the link is selected (e.g., clicked), a local playback (e.g., Sonos™) controller, if available, is launched. At block **930**, the application (e.g., accessed on a phone, tablet, computer, and so on) passes a URI for associated content (e.g., an audio track and so on) to a local playback system (e.g., Sonos™) controller. At block **940**, the local controller outputs the associated content (e.g., plays the music) via the URI. For example, music is streamed from the cloud to one or more playback devices on the local playback network.

In certain embodiments, an application associated with the operating system can register to handle all URIs (URLs) that start with a certain prefix and can define how data is encoded into those URLs so a local playback system application can generate a link (e.g., "sonos:") and put that link into a message (e.g., email, text message, instant message (IM), etc.). The local playback application registered to handle such URLs can parse the URLs to determine what song, playlist, streaming radio station, etc., to play. This launches the controller application. For example, if a first listener likes a song and tweets that song, Twitter™ can include a clickable link which launches a playback application and starts the music playing on a local playback system if the local system can find the song (e.g., if have the application, if have rights/access to the song, etc.). In certain embodiments, the system knows to trigger the receiving user's system rather than the sending user's system to play associated content based on the transmitted link/identifier.

For example, an application can register with the system to handle all URLs that start with a custom prefix (e.g., an HTTP "scheme"). For instance, Sonos controller apps can register to handle any URL that begins with "sonos:" or "x-sonos:". In certain embodiments, a playback system provider can define and publish the format of its URLs so

US 9,967,615 B2

15

that any third party application can create a link or reference to content. A large amount of data can be encoded into a URL using query parameters, for example.

In an example, when an application tries to "open" or "browse" to a URL, the system checks to see if the scheme of the URL matches the "sonos:" scheme that has been registered with the application. If a URL handler application is found, the system launches that application (e.g., the application can but does not need to be running in the background) and passes the URL to the application. The application then parses the URL and executes functionality based on the data in the URL. For example, the URL can contain the name of a music service and a playlist identifier from that service, plus the name of a Sonos™ Zone Player, causing the Sonos controller to start that playlist playing on that zone.

FIG. 10 shows a flow diagram for a method 1000 to provide audio content to a local playback system. In the example method 1000 of FIG. 10, at block 1010, a link or other reference is embedded in a third party application (e.g., Facebook™). At block 1020, when the link is selected, a playback system (e.g., Sonos™) server is contacted and provided with information regarding selected content for playback. For example, rather than launching a local controller application, a server is contacted regarding music for playback on a local network. At block 1030, using the provided information, the server identifies and provides the content locally on a user's local playback system. For example, the server can then start playing the music directly on the user's Sonos™ system (e.g., without going through a Sonos™ controller application).

In certain embodiments, a "single sign-on" technology is provided so that the user does not need to re-enter a username and password in order to authenticate to the playback server. Example single sign-on technologies include Facebook Connect™, Windows Live ID™, etc.

In certain embodiments, instead of using a specialized link, such as a "sonos:" link, a normal URL can be used to point to a playback system (e.g., Sonos™) webserver, which generates links with special data embedded in the link. A playback system is identified, and content identified by the URL can be playing at via the local playback network (e.g., mesh network configured for home, hotel room, etc.). Parameters such as authentication, security, location, and so on can be configured for local playback of remote content.

FIG. 11 shows a flow diagram for a method 1100 to provide audio content to a local playback system. The example method 1100 of FIG. 11 provides a "throw it over the wall" approach to content delivery to a local playback system. At block 1110, a third party application provides a multimedia playback device (e.g., a Sonos™ zone player (ZP)) with enough information about content (e.g., an audio track) so that, at block 1120, the local playback system (e.g., SonosNet™) can directly access a source of the content and, at block 1130, play the content directly off the network (e.g., the Internet) or cloud.

In certain embodiments, a local playback controller application is not involved. Information passed over to the local playback device may include an identifier for a single track, a playlist, a streaming radio station, a programmed radio station, and so on. This information can also include a current play position within a list to enable near-seamless "handoff" of music from a portable device to a local playback system. Once the music information is handed from the third-party application to the local playback system, there is no further synchronization between the two systems.

16

A connection between the third-party application and the local playback device (e.g., Sonos ZonePlayer™) can be direct over a local area network (LAN), remote through a proxy server in the cloud, and so on. A LAN delivery approach may be easier to integrate into "native" applications (e.g., applications written for iOS or Android), and a proxy server approach may be easier for third party applications that are browser-based, for example.

In certain embodiments, information is provided from a third party application to a local playback system without being routed through or by a controller application. Here, the third party application is communicating with the multimedia playback device (e.g., a Sonos ZonePlayer™). Information can be passed locally, rather than through the Internet, for example. The local playback device accesses the Internet to find content to stream, and the third party application takes the place of the controller application (e.g., throw it over the wall—the application passes information and the local playback system runs it).

Certain embodiments provide an approach similar to the "throw it over the wall" or one way communication approach of FIG. 11 except that the third party application not only tells the local playback system what to play, but also maintains two-way communication with the local playback (e.g., Sonos™) system. Two-way communication helps enable features such as keeping a local playback queue synchronized with a queue that the user is editing/managing in the third party application; allow the third party application to know what is currently playing on the local playback system; allow integrated transport control between the third party application and the local playback system; and so on.

In certain embodiments, a local playback system can pass information back to a third party application to indicate a current point of playback (e.g., now playing a third song in a playlist, fourth song in the playlist, and so on). The local playback system can pass parameter information, such as a change in volume, from a local multimedia playback device to the third party application so the application can reflect the change in volume to the user via its graphical user interface. The third party application can instruct the local playback system to skip a song, go to a certain location, and so on.

Certain embodiments provide a third party mode that allows users to select from any local playback network (e.g., Sonos™) controller to listen to audio from one or more third party applications on their smartphones or tablets (e.g., Android™ devices). For example, a user may be using a local playback network controller application and now wants a third party application to appear as an audio source within the controller application. The user can then select the controller application that he or she wishes to play audio from the third party application, for example.

Certain embodiments provide queue management to allow a third party application to control a local playback queue. That is, the local playback system has a queue, but the third party application allows users to add, delete and so on from the queue, for example. Rather than switch from content that the user is currently playing, the local playback system allows a user to create a playlist on the fly. For example, if last.fm users vote that they do not like a song and it should be skipped, then the local playback system will skip it.

Certain embodiments allow a third party application to override a local playback queue with its own application-specific queue. The local playback system periodically fetches a short list of tracks to play next. The list of tracks to play is determined by the third-party application, for

US 9,967,615 B2

17

example. In certain embodiments, a shared queue is provided between the local playback system and the third party application to keep the local system and application synchronized.

Certain embodiments allow control of playback system functions and/or settings via an external (e.g., third party) application. For example, a local playback system can allow volume control, play/pause, and so on and can interact with an application running on a given platform/operating system (OS). Certain embodiments provide a Web API that can be used to access functionality.

Certain embodiments facilitate control of a local playback system from outside a household or other location at which the local playback network is configured. For example, a user can queue up music while away from his or her house. The application can facilitate setup and/or configuration. For example, a third party application may ask the user to enter a Sonos customer email address and password. The application can then make a request to a Sonos server in the cloud to determine the zone groups on which music can be played.

Various inventions have been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts can be resorted without departing from the spirit and scope of the present disclosure as claimed. While the embodiments discussed herein can appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the embodiments have applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present disclosure is defined by the appended claims rather than the forgoing description of embodiments.

The invention claimed is:

1. A method comprising:

causing, via a control device, a graphical interface to display a control interface including one or more transport controls to control playback by the control device;

after connecting to a local area network via a network interface, identifying, via the control device, playback devices connected to the local area network;

causing, via the control device, the graphical interface to display a selectable option for transferring playback from the control device;

detecting, via the control device, a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network;

after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, wherein transferring playback from the control device to the particular playback device comprises:

(a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service;

18

(b) causing playback at the control device to be stopped; and

(c) modifying the one or more transport controls of the control interface to control playback by the playback device; and

causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

2. The method of claim 1, wherein detecting the set of inputs to transfer playback from the control device to the particular playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone of a media playback system that includes the particular playback device as a first channel of a stereo pair and an additional playback device as a second channel of the stereo pair, wherein modifying the one or more transport controls of the control interface to control playback by the particular playback device comprises causing the one or more transport controls of the control interface to control playback by the particular playback device and the additional playback device, and wherein the particular playback device playing back the retrieved multimedia content comprises the particular playback device and the additional playback device playing back the multimedia content as the stereo pair.

3. The method of claim 1, wherein detecting the set of inputs to transfer playback from the control device to the particular playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone group of a media particular playback system that includes a first zone and a second zone, wherein the first zone includes the particular playback device and the second zone includes at least one additional playback device, wherein modifying the one or more transport controls of the control interface to control playback by the playback device comprises causing the one or more transport controls of the control interface to control playback by the particular playback device and the at least one additional playback device in synchrony, and wherein the particular playback device playing back the retrieved multimedia content comprises the particular playback device and the at least one additional playback device playing back the multimedia content in synchrony.

4. The method of claim 1, wherein the control interface is displayed by an application associated with the streaming content service, and wherein the set of inputs further comprises detecting an input to select a link in the application associated with the streaming content service and wherein selection of the link launches a second application to facilitate retrieving the multimedia content by the particular playback device from a particular source indicated by a resource locator.

5. The method of claim 1, wherein the control interface is displayed by an application associated with the streaming content service, and wherein the set of inputs further comprises detecting an input to select a link in the application associated with the streaming content service and wherein selection of the link causes the control device to transmit information to the one or more first cloud servers to add multimedia content to the local playback queue on the particular playback device.

6. The method of claim 1, further comprising detecting, via the control device, a set of inputs to transfer playback

US 9,967,615 B2

19

from the playback device back to the control device, wherein transferring playback from the playback device back to the control device comprises:

    causing playback at the playback device to be stopped; and

    modifying the one or more transport controls of the control interface to control playback by the control device.

**7**. The method of claim **1**, wherein causing the graphical interface to display the control interface including one or more transport controls to control playback by the control device comprises causing the graphical interface to display a control interface that includes the one or more transport controls in a particular arrangement on the graphical interface, and wherein modifying the one or more transport controls of the control interface to control playback by the particular playback device comprises causing the graphical interface to display the one or more transport controls to control playback by the particular playback device in the particular arrangement.

**8**. The method of claim **1**, wherein causing the one or more first cloud servers to add multimedia content to the local playback queue comprises causing an identifier of the multimedia content to be added to the local playback queue, wherein the identifier indicates a particular source of the multimedia content at the one or more second cloud servers of the streaming content service, wherein the particular playback device receives the multimedia content from the particular source at the one or more second cloud servers of the streaming content service.

**9**. The method of claim **1**, wherein causing one or more first cloud servers to add the multimedia content to the local playback queue on the particular playback device comprises sending a message to the streaming content service that causes the one or more first cloud servers to add the multimedia content to the local playback queue on the particular playback device.

**10**. The method of claim **1**, wherein detecting the set of inputs comprises detecting a selection of the multimedia content.

**11**. The method of claim **1**, wherein detecting the set of inputs comprises detecting an input that causes playback at the control device to be stopped.

**12**. The method of claim **1**, wherein detecting the set of inputs comprises detecting selection of a button on the control interface.

**13**. A tangible, non-transitory computer readable storage medium including instructions for execution by a processor, the instructions, when executed, cause a control device to implement a method comprising:

    causing a graphical interface to display a control interface including one or more transport controls to control playback by the control device;

    after connecting to a local area network via a network interface, identifying playback devices connected to the local area network;

    causing the graphical interface to display a selectable option for transferring playback from the control device;

    detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network:

20

after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, wherein transferring playback from the control device to the particular playback device comprises:

    (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service;

    (b) causing playback at the control device to be stopped; and

    (c) modifying the one or more transport controls of the control interface to control playback by the playback device; and

causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

**14**. The tangible, non-transitory computer readable medium of claim **13**, wherein detecting the set of inputs to transfer playback from the control device to the particular playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone of a media playback system that includes the particular playback device as a first channel of a stereo pair and an additional playback device as a second channel of the stereo pair, wherein modifying the one or more transport controls of the control interface to control playback by the particular playback device comprises causing the one or more transport controls of the control interface to control playback by the particular playback device and the additional playback device, and wherein the particular playback device playing back the retrieved multimedia content comprises the particular playback device and the additional playback device playing back the multimedia content as the stereo pair.

**15**. The tangible, non-transitory computer readable medium of claim **13**, wherein detecting the set of inputs to transfer playback from the control device to the particular playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone group of a media particular playback system that includes a first zone and a second zone, wherein the first zone includes the particular playback device and the second zone includes at least one additional playback device, wherein modifying the one or more transport controls of the control interface to control playback by the playback device comprises causing the one or more transport controls of the control interface to control playback by the particular playback device and the at least one additional playback device in synchrony, and wherein the particular playback device playing back the retrieved multimedia content comprises the particular playback device and the at least one additional playback device playing back the multimedia content in synchrony.

**16**. The tangible, non-transitory computer readable medium of claim **13**, wherein the control interface is displayed by an application associated with the streaming content service, and wherein the set of inputs further com-

US 9,967,615 B2

21

prises detecting an input to select a link in the application associated with the streaming content service and wherein selection of the link launches a second application to facilitate retrieving the multimedia content by the particular playback device from a particular source indicated by a resource locator.

**17**. The tangible, non-transitory computer readable medium of claim **13**, wherein the control interface is displayed by an application associated with the streaming content service, and wherein the set of inputs further comprises detecting an input to select a link in the application associated with the streaming content service and wherein selection of the link causes the control device to transmit information to the one or more first cloud servers to add multimedia content to the local playback queue on the particular playback device.

**18**. The tangible, non-transitory computer readable medium of claim **13**, wherein the method further comprises detecting a set of inputs to transfer playback from the playback device back to the control device, wherein transferring playback from the playback device back to the control device comprises:

    causing playback at the playback device to be stopped; and

    modifying the one or more transport controls of the control interface to control playback by the control device.

**19**. The tangible, non-transitory computer readable medium of claim **13**, wherein causing the graphical interface to display the control interface including one or more transport controls to control playback by the control device comprises causing the graphical interface to display a control interface that includes the one or more transport controls in a particular arrangement on the graphical interface, and wherein modifying the one or more transport controls of the control interface to control playback by the playback device comprises causing the graphical interface to display the one or more transport controls to control playback by the playback device in the particular arrangement.

**20**. The tangible, non-transitory computer readable medium of claim **13**, wherein causing the one or more first cloud servers to add multimedia content to the local playback queue on the particular playback device comprises causing an identifier of the multimedia content to be added to the local playback queue, wherein the identifier indicates a particular source of the multimedia content at the one or more second cloud servers of the streaming content service, wherein the particular playback device receives the multimedia content from the particular source at the one or more second cloud servers of the streaming content service.

**21**. The tangible, non-transitory computer readable medium of claim **13**, wherein causing one or more first cloud servers to add the multimedia content to the local playback queue on the particular playback device comprises sending a message to the streaming content service that causes the one or more first cloud servers to add the multimedia content to the local playback queue on the particular playback device.

**22**. The tangible, non-transitory computer readable medium of claim **13**, wherein detecting the set of inputs comprises detecting a selection of the multimedia content.

**23**. The tangible, non-transitory computer readable medium of claim **13**, wherein detecting the set of inputs comprises detecting an input that causes playback at the control device to be stopped.

22

**24**. The tangible, non-transitory computer readable medium of claim **13**, wherein detecting the set of inputs comprises detecting selection of a button on the control interface.

**25**. A control device comprising:

    a graphical interface;

    a wireless communication interface to communicate with a playback device;

    one or more processors;

    tangible non-transitory computer-readable media having instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the control device to perform functions comprising:

        causing the graphical interface to display a control interface including one or more transport controls to control playback by the control device;

        after connecting to a local area network via the wireless communication interface, identifying playback devices connected to the local area network;

        causing the graphical interface to display a selectable option for transferring playback from the control device;

        detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network:

        after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, wherein transferring playback from the control device to the particular playback device comprises:

            (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service;

            (b) causing playback at the control device to be stopped; and

            (c) modifying the one or more transport controls of the control interface to control playback by the playback device; and

            causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

**26**. The control device of claim **25**, wherein detecting the set of inputs to transfer playback from the control device to the particular playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone group of a media particular playback system that includes a first zone and a second zone, wherein the first zone includes the particular playback device and the second zone includes at least one additional playback device, wherein modifying the one or more transport controls of the

US 9,967,615 B2

23

24

control interface to control playback by the playback device comprises causing the one or more transport controls of the control interface to control playback by the particular playback device and the at least one additional playback device in synchrony, and wherein the particular playback device playing back the retrieved multimedia content comprises the particular playback device and the at least one additional playback device playing back the multimedia content in synchrony.

**27**. The control device of claim **25**, wherein detecting the set of inputs comprises detecting a selection of the multimedia content.

**28**. The control device of claim **25**, wherein detecting the set of inputs comprises detecting an input that causes playback at the control device to be stopped.

**29**. The control device of claim **25**, wherein detecting the set of inputs comprises detecting selection of a button on the control interface.

* * * * *

# EXHIBIT 2

US010779033B2

(12) **United States Patent**　　　(10) Patent No.: **US 10,779,033 B2**

Coburn, IV et al.　　　(45) Date of Patent: **Sep. 15, 2020**

(54) **SYSTEMS AND METHODS FOR NETWORKED MUSIC PLAYBACK**

(71) Applicant: **SONOS, INC.**, Santa Barbara, CA (US)

(72) Inventors: **Arthur Coburn, IV**, Lexington, MA (US); **Joni Rafalski Hoadley**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/389,906**

(22) Filed: **Apr. 19, 2019**

(65) **Prior Publication Data**

US 2019/0332349 A1　　Oct. 31, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/872,500, filed on Jan. 16, 2018, now Pat. No. 10,567,831, which is a
(Continued)

(51) **Int. Cl.**
**H04N 21/436**　　　(2011.01)
**H04N 21/472**　　　(2011.01)
(Continued)

(52) **U.S. Cl.**
CPC ..... **H04N 21/43615** (2013.01); **G06F 3/0481** (2013.01); **G06F 3/04842** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... H04R 3/12; H04R 27/00; H04R 2227/003; H04R 2227/005; H04R 2420/07;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,406,634 A　4/1995　Anderson et al.
5,440,644 A　8/1995　Farinelli et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA　　2832542 A1　10/2012
CA　　2947275 A1　10/2012
(Continued)

OTHER PUBLICATIONS

Chinese Patent Office, Second Office Action dated Nov. 13, 2018, issued in connection with Chinese Application No. 201480042472. 1, 7 pages.

(Continued)

*Primary Examiner* — Jesse A Elbin

(57)　　　**ABSTRACT**

An example computing device in a first mode is configured for playback of given audio content. While in the first mode, the computing device displays a representation of one or more playback devices in a media playback system that are available to accept playback responsibility for the given audio content and receives user input indicating a selection of a given playback device. The computing device transmits an instruction for playback responsibility to be transferred to the given playback device such that i) an identifier of the given audio content and a playback position for the given audio content are provided to the given playback device and ii) the given playback device becomes configured for playback of the given audio content. The computing device transitions from the first mode to a second mode in which the computing device is configured to control the given playback device's playback of the given audio content.

**16 Claims, 11 Drawing Sheets**

900



**US 10,779,033 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/520,578, filed on Oct. 22, 2014, now Pat. No. 9,883,234, which is a continuation of application No. 13/341,237, filed on Dec. 30, 2011, now Pat. No. 9,654,821.

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 21/485* | (2011.01) |
| *H04N 21/81* | (2011.01) |
| *H04N 21/658* | (2011.01) |
| *G06F 3/0481* | (2013.01) |
| *G06F 3/0484* | (2013.01) |
| *G06F 3/16* | (2006.01) |
| *G11B 19/02* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *H04R 3/12* | (2006.01) |
| *H04N 21/439* | (2011.01) |
| *H04N 21/61* | (2011.01) |
| *H04N 21/643* | (2011.01) |
| *H04N 21/6587* | (2011.01) |
| *H04N 21/43* | (2011.01) |
| *H04N 21/433* | (2011.01) |
| *H04N 21/858* | (2011.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/04847* (2013.01); *G06F 3/165* (2013.01); *G11B 19/025* (2013.01); *H04L 29/06027* (2013.01); *H04L 65/4084* (2013.01); *H04N 21/4307* (2013.01); *H04N 21/439* (2013.01); *H04N 21/4333* (2013.01); *H04N 21/47202* (2013.01); *H04N 21/4852* (2013.01); *H04N 21/6125* (2013.01); *H04N 21/64322* (2013.01); *H04N 21/6581* (2013.01); *H04N 21/6587* (2013.01); *H04N 21/8113* (2013.01); *H04N 21/8586* (2013.01); *H04R 3/12* (2013.01); *G06F 3/04817* (2013.01); *H04R 2227/005* (2013.01); *H04R 2420/07* (2013.01)

(58) **Field of Classification Search**
CPC .... G06F 3/048; G06F 3/0481; G06F 3/04817; G06F 3/0484; G06F 3/08442; G06F 3/04247; G06F 3/165; H04L 29/06027; H04L 65/4084; G11B 19/025
USPC .................... 700/94; 715/716, 727, 765, 771
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,642,171 A | 6/1997 | Baumgartner et al. |
| 5,761,320 A | 6/1998 | Farinelli et al. |
| 5,856,827 A | 1/1999 | Sudo |
| 5,923,902 A | 7/1999 | Inagaki |
| 6,002,862 A | 12/1999 | Takaike |
| 6,032,202 A | 2/2000 | Lea et al. |
| 6,119,239 A | 9/2000 | Fujii |
| 6,122,749 A | 9/2000 | Gulick |
| 6,181,316 B1 | 1/2001 | Little et al. |
| 6,255,961 B1 | 7/2001 | Van Ryzin et al. |
| 6,256,554 B1 | 7/2001 | DiLorenzo |
| 6,404,811 B1 | 6/2002 | Cvetko et al. |
| 6,469,633 B1 | 10/2002 | Wachter et al. |
| 6,522,886 B1 | 2/2003 | Youngs et al. |
| 6,587,127 B1 | 7/2003 | Leeke et al. |
| 6,611,537 B1 | 8/2003 | Edens et al. |
| 6,631,410 B1 | 10/2003 | Kowalski et al. |
| 6,703,940 B1 | 3/2004 | Allen et al. |
| 6,721,489 B1 | 4/2004 | Benyamin et al. |
| 6,728,531 B1 | 4/2004 | Lee et al. |
| 6,732,155 B2 | 5/2004 | Meek |
| 6,757,517 B2 | 6/2004 | Chang et al. |
| 6,778,869 B2 | 8/2004 | Champion |
| 6,826,283 B1 | 11/2004 | Wheeler et al. |
| 6,832,293 B1 | 12/2004 | Tagawa et al. |
| 6,910,078 B1 | 6/2005 | Raman et al. |
| 6,985,694 B1 | 1/2006 | De Bonet et al. |
| 7,017,118 B1 | 3/2006 | Carroll |
| 7,020,048 B2 | 3/2006 | McComas |
| 7,113,833 B1 | 9/2006 | Brown et al. |
| 7,117,451 B2 | 10/2006 | Sielken |
| 7,130,608 B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 B2 | 10/2006 | Janik |
| 7,143,939 B2 | 12/2006 | Henzerling |
| 7,178,106 B2 | 2/2007 | Lamkin et al. |
| 7,187,947 B1 | 3/2007 | White et al. |
| 7,236,773 B2 | 6/2007 | Thomas |
| 7,269,338 B2 | 9/2007 | Janevski |
| 7,295,548 B2 | 11/2007 | Blank et al. |
| 7,312,785 B2 | 12/2007 | Tsuk et al. |
| 7,313,384 B1 | 12/2007 | Meenan et al. |
| 7,358,960 B2 | 4/2008 | Mak |
| 7,391,791 B2 | 6/2008 | Balassanian et al. |
| 7,430,181 B1 | 9/2008 | Hong |
| 7,483,538 B2 | 1/2009 | McCarty et al. |
| 7,509,181 B2 | 3/2009 | Champion |
| 7,571,014 B1 | 8/2009 | Lambourne et al. |
| 7,583,886 B2 | 9/2009 | Komi et al. |
| 7,630,501 B2 | 12/2009 | Blank et al. |
| 7,643,894 B2 | 1/2010 | Braithwaite et al. |
| 7,647,613 B2 | 1/2010 | Drakoulis et al. |
| 7,657,910 B1 | 2/2010 | McAulay et al. |
| 7,689,304 B2 | 3/2010 | Sasaki |
| 7,716,699 B2 | 5/2010 | Evans et al. |
| 7,725,533 B2 | 5/2010 | Szeto et al. |
| 7,725,551 B2 | 5/2010 | Szeto et al. |
| 7,742,740 B2 | 6/2010 | Goldberg et al. |
| 7,770,314 B2 | 8/2010 | Dean |
| 7,792,920 B2 | 9/2010 | Istvan et al. |
| 7,797,446 B2 | 9/2010 | Heller et al. |
| 7,797,719 B2 | 9/2010 | Drakoulis et al. |
| 7,805,682 B1 | 9/2010 | Lambourne et al. |
| 7,827,259 B2 | 11/2010 | Heller et al. |
| 7,853,341 B2 | 12/2010 | McCarty et al. |
| 7,895,633 B2 | 2/2011 | Van Hoff et al. |
| 7,958,441 B2 | 6/2011 | Heller et al. |
| 7,987,294 B2 | 7/2011 | Bryce et al. |
| 8,014,423 B2 | 9/2011 | Thaler et al. |
| 8,045,952 B2 | 10/2011 | Qureshey et al. |
| 8,050,652 B2 | 11/2011 | Qureshey et al. |
| 8,055,364 B2 | 11/2011 | Champion |
| 8,060,407 B1 | 11/2011 | Delker et al. |
| 8,072,905 B2 | 12/2011 | Haff et al. |
| 8,074,253 B1 | 12/2011 | Nathan |
| 8,099,313 B2 | 1/2012 | Messer et al. |
| 8,103,009 B2 | 1/2012 | McCarty et al. |
| 8,111,132 B2 | 2/2012 | Allen et al. |
| 8,131,390 B2 | 3/2012 | Braithwaite et al. |
| 8,140,974 B2 | 3/2012 | Hayter et al. |
| 8,148,622 B2 | 4/2012 | Rothkopf et al. |
| 8,156,435 B2 | 4/2012 | Wohlert |
| 8,204,890 B1 | 6/2012 | Gogan et al. |
| 8,214,740 B2 | 7/2012 | Johnson |
| 8,234,395 B2 | 7/2012 | Millington et al. |
| 8,290,603 B1 | 10/2012 | Lambourne et al. |
| 8,316,154 B2 | 11/2012 | Yoneda et al. |
| 8,364,296 B2 | 1/2013 | Wilhelm |
| 8,407,623 B2 | 3/2013 | Kerr et al. |
| 8,483,853 B1 | 7/2013 | Lambourne et al. |
| 8,544,046 B2 | 9/2013 | Gran et al. |
| 8,588,949 B2 | 11/2013 | Lambourne et al. |
| 8,601,394 B2 | 12/2013 | Sheehan et al. |
| 8,688,431 B2 | 4/2014 | Lyons et al. |
| 8,688,991 B1 | 4/2014 | Sunil |
| 8,750,677 B2 | 6/2014 | Brown et al. |
| 8,799,395 B2 | 8/2014 | Seidel et al. |
| 8,818,538 B2 | 8/2014 | Sakata |
| 8,843,586 B2 | 9/2014 | Pantos et al. |
| 8,880,648 B1 | 11/2014 | Arora et al. |
| 8,942,252 B2 | 1/2015 | Balassanian et al. |

**US 10,779,033 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 8,954,177 B2 | 2/2015 | Sanders |
| 8,965,544 B2 | 2/2015 | Ramsay |
| 8,966,394 B2 | 2/2015 | Gates et al. |
| 9,137,602 B2 | 9/2015 | Mayman et al. |
| 9,179,199 B2 | 11/2015 | Alsina et al. |
| 9,195,775 B2 | 11/2015 | Al-Shaykh et al. |
| 9,232,279 B2 | 1/2016 | Beeson et al. |
| 9,241,355 B2 | 1/2016 | Schulert et al. |
| 9,286,384 B2 | 3/2016 | Kuper et al. |
| 9,338,206 B2 | 5/2016 | Keum et al. |
| 9,374,607 B2 | 6/2016 | Bates et al. |
| 9,507,780 B2 | 11/2016 | Rothkopf et al. |
| 9,563,703 B2 | 2/2017 | Nijim et al. |
| 9,609,448 B2 | 3/2017 | Bentley et al. |
| 9,635,068 B2 | 4/2017 | Garmark et al. |
| 9,665,339 B2 | 5/2017 | Reimann et al. |
| 9,735,978 B2 | 8/2017 | Kumar et al. |
| 9,977,561 B2 | 5/2018 | Bates et al. |
| 2001/0042107 A1 | 11/2001 | Palm |
| 2002/0002039 A1 | 1/2002 | Qureshey et al. |
| 2002/0022453 A1 | 2/2002 | Balog et al. |
| 2002/0026442 A1 | 2/2002 | Lipscomb et al. |
| 2002/0124097 A1 | 9/2002 | Isely et al. |
| 2002/0165921 A1 | 11/2002 | Sapieyevski |
| 2002/0174269 A1 | 11/2002 | Spurgat et al. |
| 2002/0178191 A1 | 11/2002 | Sielken |
| 2002/0194309 A1 | 12/2002 | Carter et al. |
| 2003/0023741 A1 | 1/2003 | Tomassetti et al. |
| 2003/0079038 A1 | 4/2003 | Robbin et al. |
| 2003/0157951 A1 | 8/2003 | Hasty |
| 2003/0198257 A1 | 10/2003 | Sullivan et al. |
| 2003/0210796 A1 | 11/2003 | McCarty et al. |
| 2004/0024478 A1 | 2/2004 | Hans et al. |
| 2004/0025185 A1 | 2/2004 | Goci et al. |
| 2004/0078383 A1 | 4/2004 | Mercer et al. |
| 2004/0078812 A1 | 4/2004 | Calvert |
| 2004/0138948 A1 | 7/2004 | Loomis |
| 2004/0215611 A1 | 10/2004 | Jawa et al. |
| 2004/0261040 A1 | 12/2004 | Radcliffe et al. |
| 2005/0028225 A1 | 2/2005 | Dawson et al. |
| 2005/0108320 A1 | 5/2005 | Lord et al. |
| 2005/0138193 A1 | 6/2005 | Encarnacion et al. |
| 2005/0155072 A1 | 7/2005 | Kaczowka et al. |
| 2005/0166157 A1 | 7/2005 | Ollis et al. |
| 2005/0177624 A1 | 8/2005 | Oswald et al. |
| 2005/0216855 A1 | 9/2005 | Kopra et al. |
| 2005/0235334 A1 | 10/2005 | Togashi et al. |
| 2005/0240494 A1 | 10/2005 | Cue et al. |
| 2005/0262253 A1 | 11/2005 | Li et al. |
| 2006/0002681 A1 | 1/2006 | Spilo et al. |
| 2006/0041577 A1 | 2/2006 | Ellicott et al. |
| 2006/0041639 A1 | 2/2006 | Lamkin et al. |
| 2006/0062094 A1 | 3/2006 | Nathan et al. |
| 2006/0107237 A1 | 5/2006 | Kim |
| 2006/0153040 A1 | 7/2006 | Girish et al. |
| 2006/0156236 A1 | 7/2006 | Heller et al. |
| 2006/0168340 A1 | 7/2006 | Heller et al. |
| 2006/0195480 A1 | 8/2006 | Spiegelman et al. |
| 2006/0195521 A1 | 8/2006 | New et al. |
| 2006/0195864 A1 | 8/2006 | New et al. |
| 2006/0218294 A1 | 9/2006 | Rosenberg |
| 2006/0253782 A1 | 11/2006 | Stark et al. |
| 2006/0258289 A1 | 11/2006 | Dua |
| 2006/0263048 A1 | 11/2006 | Sato et al. |
| 2006/0294201 A1 | 12/2006 | Kito et al. |
| 2007/0038999 A1 | 2/2007 | Millington et al. |
| 2007/0053514 A1 | 3/2007 | Imai et al. |
| 2007/0061725 A1 | 3/2007 | Isaac et al. |
| 2007/0067808 A1 | 3/2007 | DaCosta |
| 2007/0083897 A1 | 4/2007 | Brownell |
| 2007/0086724 A1 | 4/2007 | Grady et al. |
| 2007/0106672 A1 | 5/2007 | Sighart et al. |
| 2007/0106726 A1 | 5/2007 | Rosenberg |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0169087 A1 | 7/2007 | Fadell |
| 2007/0220150 A1 | 9/2007 | Garg |
| 2007/0266065 A1 | 11/2007 | Rosenberg et al. |
| 2007/0288470 A1 | 12/2007 | Kauniskangas et al. |
| 2008/0005690 A1 | 1/2008 | Van Vugt |
| 2008/0010372 A1 | 1/2008 | Khedouri et al. |
| 2008/0016465 A1 | 1/2008 | Foxenland |
| 2008/0018625 A1 | 1/2008 | Ijichi et al. |
| 2008/0025535 A1 | 1/2008 | Rajapakse |
| 2008/0059567 A1 | 3/2008 | Williams et al. |
| 2008/0085098 A1 | 4/2008 | Ullmann |
| 2008/0086379 A1 | 4/2008 | Dion et al. |
| 2008/0109852 A1 | 5/2008 | Kretz et al. |
| 2008/0133715 A1 | 6/2008 | Yoneda et al. |
| 2008/0133763 A1 | 6/2008 | Clark et al. |
| 2008/0134256 A1 | 6/2008 | DaCosta |
| 2008/0157991 A1 | 7/2008 | Raghunath et al. |
| 2008/0162668 A1 | 7/2008 | Miller |
| 2008/0177822 A1 | 7/2008 | Yoneda et al. |
| 2008/0183840 A1 | 7/2008 | Khedouri et al. |
| 2008/0209487 A1 | 8/2008 | Osann et al. |
| 2008/0215169 A1 | 9/2008 | Debettencourt et al. |
| 2008/0221715 A1 | 9/2008 | Krzyzanowski et al. |
| 2008/0242222 A1 | 10/2008 | Bryce et al. |
| 2008/0243278 A1 | 10/2008 | Dalton et al. |
| 2008/0292120 A1 | 11/2008 | Wilson |
| 2009/0006542 A1 | 1/2009 | Feldman et al. |
| 2009/0006968 A1 | 1/2009 | Trask et al. |
| 2009/0059512 A1 | 3/2009 | Lydon et al. |
| 2009/0097818 A1 | 4/2009 | Hirata |
| 2009/0099919 A1 | 4/2009 | Schultheiss et al. |
| 2009/0132712 A1 | 5/2009 | P et al. |
| 2009/0150491 A1 | 6/2009 | Yamamoto |
| 2009/0171487 A1 | 7/2009 | Wilhelm et al. |
| 2009/0172542 A1 | 7/2009 | Girish et al. |
| 2009/0197524 A1 | 8/2009 | Haff et al. |
| 2009/0222392 A1 | 9/2009 | Martin et al. |
| 2009/0228123 A1 | 9/2009 | Fontijn |
| 2009/0228919 A1 | 9/2009 | Zott et al. |
| 2009/0248702 A1 | 10/2009 | Schwartz et al. |
| 2009/0249222 A1 | 10/2009 | Schmidt et al. |
| 2009/0259765 A1 | 10/2009 | Karlsson et al. |
| 2009/0275285 A1 | 11/2009 | Maricevic et al. |
| 2010/0005496 A1 | 1/2010 | Ellis et al. |
| 2010/0009674 A1 | 1/2010 | Sapkota et al. |
| 2010/0027966 A1 | 2/2010 | Harrang et al. |
| 2010/0031366 A1 | 2/2010 | Knight et al. |
| 2010/0042235 A1 | 2/2010 | Basso et al. |
| 2010/0082567 A1 | 4/2010 | Rosenblatt et al. |
| 2010/0082725 A1 | 4/2010 | Onishi et al. |
| 2010/0082731 A1 | 4/2010 | Haughay et al. |
| 2010/0087214 A1 | 4/2010 | Bournel et al. |
| 2010/0094833 A1 | 4/2010 | Svendsen et al. |
| 2010/0095332 A1 | 4/2010 | Gran et al. |
| 2010/0114979 A1 | 5/2010 | Petersen et al. |
| 2010/0121891 A1 | 5/2010 | Zampiello |
| 2010/0131978 A1 | 5/2010 | Friedlander et al. |
| 2010/0198767 A1 | 8/2010 | Farrelly |
| 2010/0206815 A1 | 8/2010 | Garusi et al. |
| 2010/0211438 A1 | 8/2010 | Lutnick et al. |
| 2010/0250669 A1 | 9/2010 | Pan et al. |
| 2010/0268360 A1 | 10/2010 | Ingrassia et al. |
| 2010/0299402 A1 | 11/2010 | Korman et al. |
| 2010/0299639 A1 | 11/2010 | Ramsay et al. |
| 2010/0303244 A1 | 12/2010 | Kim et al. |
| 2010/0306815 A1 | 12/2010 | Emerson et al. |
| 2010/0318917 A1 | 12/2010 | Holladay et al. |
| 2010/0332565 A1 | 12/2010 | Al-Shaykh et al. |
| 2011/0004330 A1 | 1/2011 | Rothkopf et al. |
| 2011/0047574 A1 | 2/2011 | Tecot et al. |
| 2011/0054641 A1 | 3/2011 | Hur et al. |
| 2011/0055901 A1 | 3/2011 | Karaoguz et al. |
| 2011/0060998 A1 | 3/2011 | Schwartz et al. |
| 2011/0063317 A1 | 3/2011 | Gharaat et al. |
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2011/0125809 A1 | 5/2011 | Woods et al. |
| 2011/0126115 A1 | 5/2011 | Woods et al. |
| 2011/0131272 A1 | 6/2011 | Littlejohn et al. |
| 2011/0131518 A1 | 6/2011 | Ohashi et al. |
| 2011/0131520 A1 | 6/2011 | Al-Shaykh et al. |

US 10,779,033 B2

Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2011/0173666 | A1 | 7/2011 | Yu et al. |
| 2011/0179455 | A1 | 7/2011 | Thompson et al. |
| 2011/0218656 | A1 | 9/2011 | Bishop et al. |
| 2011/0225496 | A1 | 9/2011 | Jeffe et al. |
| 2011/0231660 | A1 | 9/2011 | Kanungo |
| 2011/0252118 | A1 | 10/2011 | Pantos et al. |
| 2011/0265003 | A1 | 10/2011 | Schubert et al. |
| 2011/0295974 | A1 | 12/2011 | Kashef et al. |
| 2012/0029672 | A1 | 2/2012 | Hamilton et al. |
| 2012/0038541 | A1 | 2/2012 | Song et al. |
| 2012/0040720 | A1 | 2/2012 | Zhang et al. |
| 2012/0050012 | A1 | 3/2012 | Alsina et al. |
| 2012/0054808 | A1 | 3/2012 | Nijim et al. |
| 2012/0057853 | A1 | 3/2012 | Huber et al. |
| 2012/0088477 | A1 | 4/2012 | Cassidy et al. |
| 2012/0089910 | A1 | 4/2012 | Cassidy et al. |
| 2012/0113964 | A1 | 5/2012 | Petersen et al. |
| 2012/0116883 | A1 | 5/2012 | Asam et al. |
| 2012/0117026 | A1 | 5/2012 | Cassidy et al. |
| 2012/0117193 | A1 | 5/2012 | Phillips et al. |
| 2012/0117586 | A1 | 5/2012 | McCoy et al. |
| 2012/0131125 | A1 | 5/2012 | Seidel et al. |
| 2012/0147825 | A1 | 6/2012 | Hassan et al. |
| 2012/0159372 | A1 | 6/2012 | Stallings et al. |
| 2012/0174204 | A1 | 7/2012 | Sturm et al. |
| 2012/0185770 | A1 | 7/2012 | Hwang et al. |
| 2012/0190398 | A1 | 7/2012 | Leukkunen et al. |
| 2012/0192071 | A1 | 7/2012 | Millington |
| 2012/0202485 | A1 | 8/2012 | Mirbaha et al. |
| 2012/0227076 | A1 | 9/2012 | McCoy et al. |
| 2012/0233067 | A1 | 9/2012 | Matthew et al. |
| 2012/0272062 | A1 | 10/2012 | Lee et al. |
| 2012/0284423 | A1 | 11/2012 | Weel et al. |
| 2012/0304233 | A1 | 11/2012 | Roberts et al. |
| 2012/0311094 | A1 | 12/2012 | Biderman et al. |
| 2012/0311618 | A1 | 12/2012 | Blaxland et al. |
| 2013/0014015 | A1 | 1/2013 | Lambourne et al. |
| 2013/0024018 | A1 | 1/2013 | Chang et al. |
| 2013/0028263 | A1 | 1/2013 | Rajapakse et al. |
| 2013/0047084 | A1 | 2/2013 | Sanders et al. |
| 2013/0054742 | A1 | 2/2013 | Tsuji et al. |
| 2013/0086003 | A1 | 4/2013 | Alsina et al. |
| 2013/0111529 | A1 | 5/2013 | Yao et al. |
| 2013/0117299 | A1 | 5/2013 | Kraatz et al. |
| 2013/0151728 | A1 | 6/2013 | Currier et al. |
| 2013/0157566 | A1 | 6/2013 | Oguchi et al. |
| 2013/0165164 | A1 | 6/2013 | Rowe et al. |
| 2013/0167029 | A1 | 6/2013 | Friesen et al. |
| 2013/0198264 | A1 | 8/2013 | Hellman et al. |
| 2013/0246916 | A1 | 9/2013 | Reimann et al. |
| 2013/0254207 | A1 | 9/2013 | Coburn, IV et al. |
| 2013/0290419 | A1 | 10/2013 | Spencer et al. |
| 2013/0300546 | A1 | 11/2013 | Kim et al. |
| 2013/0326041 | A1 | 12/2013 | Bellet et al. |
| 2013/0346559 | A1 | 12/2013 | Van Erven et al. |
| 2013/0347117 | A1 | 12/2013 | Parks et al. |
| 2014/0006483 | A1 | 1/2014 | Garmark et al. |
| 2014/0006947 | A1 | 1/2014 | Garmark et al. |
| 2014/0052770 | A1 | 2/2014 | Gran et al. |
| 2014/0074959 | A1 | 3/2014 | Alsina et al. |
| 2014/0075308 | A1 | 3/2014 | Sanders et al. |
| 2014/0075314 | A1 | 3/2014 | Bachman et al. |
| 2014/0080479 | A1 | 3/2014 | Vangala et al. |
| 2014/0096166 | A1 | 4/2014 | Gordon et al. |
| 2014/0108929 | A1 | 4/2014 | Garmark et al. |
| 2014/0115462 | A1 | 4/2014 | Reznor et al. |
| 2014/0122589 | A1 | 5/2014 | Fyke et al. |
| 2014/0122737 | A1 | 5/2014 | Silberstein et al. |
| 2014/0123005 | A1 | 5/2014 | Forstall et al. |
| 2014/0140530 | A1 | 5/2014 | Gomes-Casseres et al. |
| 2014/0169569 | A1 | 6/2014 | Toivanen et al. |
| 2014/0181655 | A1* | 6/2014 | Kumar .................. G06F 3/0488 715/716 |
| 2014/0195587 | A1 | 7/2014 | Sukoff et al. |
| 2014/0195925 | A1 | 7/2014 | Wikander et al. |

| | | | |
|---|---|---|---|
| 2014/0215009 | A1 | 7/2014 | Zhang et al. |
| 2014/0229959 | A1 | 8/2014 | Beckhardt et al. |
| 2014/0277651 | A1 | 9/2014 | Gomes-Casseres et al. |
| 2014/0282882 | A1 | 9/2014 | Tsui et al. |
| 2014/0378056 | A1 | 12/2014 | Liu et al. |
| 2015/0026613 | A1 | 1/2015 | Kwon et al. |
| 2015/0074527 | A1 | 3/2015 | Sevigny et al. |
| 2015/0074528 | A1 | 3/2015 | Sakalowsky et al. |
| 2015/0256954 | A1 | 9/2015 | Carlsson et al. |
| 2015/0286360 | A1 | 10/2015 | Wachter et al. |
| 2015/0296268 | A1 | 10/2015 | Lee et al. |
| 2015/0304476 | A1 | 10/2015 | Katada et al. |
| 2016/0048485 | A1 | 2/2016 | Sherwood et al. |
| 2017/0068507 | A1* | 3/2017 | Kim ..................... G06F 3/04817 |
| 2017/0251314 | A1* | 8/2017 | Pye, Jr. ............... G06F 3/04817 |
| 2017/0293688 | A1 | 10/2017 | Kumar et al. |
| 2018/0088901 | A1* | 3/2018 | Drinkwater ............ G06F 3/165 |
| 2018/0121158 | A1* | 5/2018 | Hinokio ............. G06F 3/04817 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1684423 A | 10/2005 |
| CN | 1906604 A | 1/2007 |
| CN | 101009127 A | 8/2007 |
| CN | 101212823 A | 7/2008 |
| CN | 101222493 A | 7/2008 |
| CN | 101268473 A | 9/2008 |
| CN | 101410773 A | 4/2009 |
| CN | 101595711 A | 12/2009 |
| CN | 102098538 A | 6/2011 |
| CN | 102171687 A | 8/2011 |
| CN | 102281294 A | 12/2011 |
| EP | 1389853 A1 | 2/2004 |
| EP | 2023578 A1 | 2/2009 |
| JP | 2007060123 A | 3/2007 |
| JP | 2007512718 A | 5/2007 |
| JP | 2007199220 A | 8/2007 |
| JP | 2008027537 A | 2/2008 |
| JP | 2009044410 | 2/2009 |
| JP | 2010067097 A | 3/2010 |
| JP | 2010510696 | 4/2010 |
| JP | 4752793 B2 | 8/2011 |
| JP | 4929520 B2 | 5/2012 |
| JP | 2012248199 A | 12/2012 |
| JP | 2013101631 A | 5/2013 |
| KR | 20090017795 | 2/2009 |
| WO | 9709756 A2 | 3/1997 |
| WO | 200153994 | 7/2001 |
| WO | 2003093950 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |
| WO | 2006101635 A3 | 12/2007 |
| WO | 2008047184 A1 | 4/2008 |
| WO | 2009086599 A1 | 7/2009 |
| WO | 2011049497 A1 | 4/2011 |
| WO | 2013049346 A1 | 4/2013 |
| WO | 2013055661 A1 | 4/2013 |
| WO | 2013101727 | 7/2013 |
| WO | 2014149533 A2 | 9/2014 |
| WO | 2014172462 A1 | 10/2014 |

OTHER PUBLICATIONS

Chinese Patent Office, Second Office Action dated Oct. 18, 2018, issued in connection with Chinese Application No. 201480034098.0, 7 pages.

Chinese Patent Office, Second Office Action dated Nov. 28, 2018, issued in connection with Chinese Application No. 201480033788.4, 8 pages.

Chinese Patent Office, Second Office Action dated Nov. 28, 2018, issued in connection with Chinese Application No. 201480034088.7, 9 pages.

Chinese Patent Office, Third Office Action dated Mar. 12, 2019, issued in connection with Chinese Application No. 201480034088.7, 7 pages.

Corrected Notice of Allowance dated Oct. 6, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 9 pages.

(56)     **References Cited**

OTHER PUBLICATIONS

Dell, Inc. "Dell Digital Audio Receiver: Reference Guide," Jun. 2000, 70 pages.

Dell, Inc. "Start Here," Jun. 2000, 2 pages.

"Denon 2003-2004 Product Catalog," Denon, 2003-2004, 44 pages.

European Patent Office, European Extended Search Report dated Aug. 16, 2017, issued in connection with EP Application No. 16160758.5, 9 pages.

European Patent Office, European Office Action dated Aug. 10, 2018, issued in connection with European Application No. 16160758.5, 4 pages.

European Patent Office, European Office Action dated Nov. 14, 2017, issued in connection with EP Application No. 14803651.0, 4 pages.

European Patent Office, European Office Action dated Oct. 6, 2017, issued in connection with EP Application No. 14784965.7, 5 pages.

European Patent Office, Exam Report dated Apr. 28, 2016, issued in connection with European Patent Application No. 12861517.6, 6 pages.

European Patent Office, Extended European Search Report dated Aug. 1, 2016, issued in connection with European patent application No. 16160758.5, 11 pages.

European Patent Office, Extended European Search Report dated Jun. 7, 2016, issued in connection with European patent application No. 14803651.0, 10 pages.

European Patent Office, Extended European Search Report dated Jun. 9, 2015, issued in connection with European patent application No. 12861517.6, 11 pages.

European Patent Office, Extended European Search Report dated Sep. 9, 2016, issued in connection with European patent application No. 14785247.9, 10 pages.

European Patent Office, Office Action dated Apr. 7, 2017, issued in connection with European Application No. 14803651.0, 4 pages.

European Patent Office, Office Action dated May 11, 2017, issued in connection with European Application No. 14785247.9, 9 pages.

European Patent Office, Summons to Attend Oral Proceedings mailed on Dec. 1, 2016, issued in connection with European Application No. 12861517.6-1905, 11 pages.

Final Office Action dated Jun. 2, 2016, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 12 pages.

Final Office Action dated Aug. 6, 2013, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 14 pages.

Final Office Action dated Dec. 7, 2015, issued in connection with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 16 pages.

Final Office Action dated Feb. 7, 2017, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 15 pages.

Japanese Patent Office, Office Action dated Jan. 10, 2017, issued in connection with Japanese Patent Application No. 2016-509046, 7 pages.

Final Office Action dated Jul. 8, 2015, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 8 pages.

Final Office Action dated Mar. 10, 2016, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 16 pages.

Final Office Action dated Apr. 14, 2014, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 12 pages.

Final Office Action dated Dec. 15, 2017, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 12 pages.

Final Office Action dated May 15, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 12 pages.

Final Office Action dated Mar. 18, 2019, issued in connection with U.S. Appl. No. 14/956,640, filed Dec. 2, 2015, 12 pages.

Final Office Action dated May 19, 2016, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 12 pages.

Final Office Action dated Jan. 20, 2016, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 10 pages.

Final Office Action dated Sep. 20, 2017, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 22 pages.

Final Office Action dated Mar. 21, 2016, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 19 pages.

Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 19 pages.

Final Office Action dated Apr. 22, 2015, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 11 pages.

Final Office Action dated Jun. 23, 2015, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 16 pages.

Final Office Action dated Oct. 23, 2015, issued in connection with U.S. Appl. No. 13/904,944, filed May 29, 2013, 13 pages.

Final Office Action dated Aug. 24, 2016, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 12 pages.

Final Office Action dated Aug. 25, 2015, issued in connection with U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 15 pages.

Final Office Action dated Sep. 25, 2015, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 14 pages.

Final Office Action dated Aug. 28, 2015, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 10 pages.

Final Office Action dated Aug. 29, 2016, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 21 pages.

Final Office Action dated Jan. 7, 2019, issued in connection with U.S. Appl. No. 15/872,500, filed Jan. 16, 2018, 7 pages.

Final Office Action dated Feb. 8, 2019, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 16 pages.

First Action Interview Office Action dated Jun. 20, 2016, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 5 pages.

International Bureau, International Preliminary Report on Patentability, dated Jul. 10, 2014, issued in connection with International Application No. PCT/US2012/071212, filed Dec. 21, 2012, 8 pages.

International Bureau, International Preliminary Report on Patentability dated Feb. 8, 2018, issued in connection with International Application No. PCT/US2016/043840, filed Jul. 25, 2016, 10 pages.

International Bureau, International Preliminary Report on Patentability, dated Oct. 29, 2015, issued in connection with International Application No. PCT/US2014/034290, filed Apr. 16, 2014, 7 pages.

International Bureau, International Preliminary Report on Patentability, dated Oct. 29, 2015, issued in connection with International Application No. PCT/US2014/034372, filed Apr. 16, 2014, 8 pages.

International Bureau, International Preliminary Report on Patentibility, dated Oct. 29, 2015, issued in connection with International Application No. PCT/US2014/034292, filed Apr. 16, 2014, 6 pages.

International Searching Authority, International Report on Patentability dated Dec. 10, 2015, issued in connection with International Application No. PCT/US2014/039669, filed May 28, 2014, 6 pages.

International Searching Authority, International Search Report dated Aug. 14, 2014, issued in connection with International Application No. PCT/US2014/034292, 3 pages.

International Searching Authority, International Search Report dated Aug. 20, 2014, issued in connection with International Application No. PCT/US2014/034372, filed Apr. 16, 2014, 3 pages.

International Searching Authority, International Search Report dated Aug. 21, 2014, issued in connection with International Application No. PCT/US2014/034290, filed Apr. 16, 2014, 3 pages.

International Searching Authority, International Search Report dated Sep. 22, 2014, issued in connection with International Application No. PCT/US2014/039669, filed May 28, 2014, 3 pages.

International Searching Authority, Written Opinion dated Aug. 14, 2014, issued in connection with International Application No. PCT/US2014/034292, filed Apr. 16, 2014, 4 pages.

International Searching Authority, Written Opinion dated Aug. 20, 2014, issued in connection with International Application No. PCT/US2014/034372, filed Apr. 16, 2014, 6 pages.

International Searching Authority, Written Opinion dated Aug. 21, 2014, issued in connection with International Application No. PCT/US2014/034290, filed Apr. 16, 2014, 5 pages.

International Searching Authority, Written Opinion dated Sep. 22, 2014, issued in connection with International Application No. PCT/US2014/039669, filed May 28, 2014, 5 pages.

Japanese Patent Office, Final Office Action dated Sep. 19, 2017, issued in connection with Japanese Patent Application No. 2016-509047, 1 page.

Japanese Patent Office, Japanese Office Action dated Jul. 12, 2016, issued in connection with Japanese Application No. 2014-550400, 10 pages.

# US 10,779,033 B2

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

Japanese Patent Office, Japanese Office Action dated Oct. 20, 2015, issued in connection with Japanese Application No. 2014-550043, 8 pages.

Japanese Patent Office, Non-Final Office Action dated Mar. 28, 2017, issued in connection with Japanese Patent Application No. 2016-516750, 5 pages.

Japanese Patent Office, Notice of Rejection dated Dec. 20, 2016, issued in connection with Japanese Application No. 2016-509069, 6 pages.

Notice of Allowance dated Nov. 16, 2018, issued in connection with U.S. Appl. No. 15/626,793, filed Jun. 19, 2017, 13 pages.

Notice of Allowance dated Aug. 17, 2017, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 23 pages.

Notice of Allowance dated Nov. 17, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 12 pages.

Notice of Allowance dated Oct. 17, 2017, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 8 pages.

Notice of Allowance dated Sep. 20, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 12 pages.

Notice of Allowance dated Aug. 21, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 7 pages.

Notice of Allowance dated Nov. 21, 2018, issued in connection with U.S. Appl. No. 16/107,025, filed Aug. 21, 2018, 14 pages.

Notice of Allowance dated Dec. 22, 2017, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 10 pages.

Notice of Allowance dated Nov. 23, 2016, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 18 pages.

Notice of Allowance dated Nov. 23, 2016, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 5 pages.

Notice of Allowance dated Jan. 25, 2017, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 7 pages.

Notice of Allowance dated Feb. 26, 2016, issued in connection with U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 13 pages.

Notice of Allowance dated Feb. 26, 2019, issued in connection with U.S. Appl. No. 15/263,628, filed Sep. 13, 2016, 11 pages.

Notice of Allowance dated Jun. 28, 2017, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 17 pages.

Notice of Allowance dated Jun. 28, 2019, issued in connection with U.S. Appl. No. 14/956,640, filed Dec. 2, 2015, 8 pages.

Notice of Allowance dated Apr. 3, 2019, issued in connection with U.S. Appl. No. 15/135,423, filed Apr. 21, 2016, 9 pages.

Notice of Allowance dated Oct. 3, 2018, issued in connection with U.S. Appl. No. 16/107,053, filed Aug. 21, 2018, 17 pages.

Notice of Allowance dated Oct. 30, 2017, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 8 pages.

Notice of Allowance dated Aug. 31, 2016, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 7 pages.

Notice of Allowance dated Apr. 4, 2017, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 5 pages.

Notice of Allowance dated Jan. 7, 2019, issued in connection with U.S. Appl. No. 16/107,092, filed Aug. 21, 2018, 13 pages.

Notification of Reopening of Prosecution Due to Consideration of an Information Disclosure Statement Filed After Mailing of a Notice Allowance dated Jan. 20, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 2 pages.

"Sonos Multi-Room Music System User Guide," Version 090401, Sonos, Inc. Apr. 1, 2009, 256 pages.

"Sonos Wireless Dock Product Guide," Version 100101, Sonos, Inc. Oct. 10, 2001, 196 pages.

"Sonos™Digital Music System User Guide", Version: 070101, Sonos, Inc., Jan. 2007, 179 pages.

Palm, Inc., "Handbook for the Palm VII Handheld," May 2000, 311 pages.

Pre-Interview First Office Action dated Dec. 22, 2015, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 9 pages.

Presentations at WinHEC 2000, May 2000, 138 pages.

PRISMIQ, Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.

Ritchie et al., "UPnP AV Architecture:2 for UPnP Version 1.0", 2010, XP055032201, retrieved from the internet: URL:http://upnp.org/specs/av/UPnP-av_AVArchitecture-v2.pdf, 35 pages.

Supplemental Notice of Allowability dated Nov. 4, 2015, issued in connection with U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 2 pages.

Supplemental Notice of Allowance dated Dec. 21, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 2 pages.

U.S. Appl. No. 60/490,768, filed Jul. 28, 2003, entitled "Method for synchronizing audio playback between multiple networked devices," 13 pages.

U.S. Appl. No. 60/825,407, filed Sep.12, 2006, entitled "Controlling and manipulating groupings in a multi-zone music or media system," 82 pages.

UPnP; "Universal Plug and Play Device Architecture," Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54.

"Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 Retrieved Oct. 14, 2014, 40 pages.

"Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 Retrieved Oct. 16, 2014, 36 pages.

"Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 Retrieved Oct. 16, 2014, 36 pages.

Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages.

Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages.

Yamaha DME Designer 3.5 User Manual; Copyright 2004, 507 pages.

Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity," Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.

Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy," Core, Version 1.0 B, Dec. 1, 1999, 1076 pages.

Advisory Action dated Dec. 2, 2015, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 4 pages.

Advisory Action dated Dec. 5, 2016, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 5 pages.

Advisory Action dated May 1, 2019, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 3 pages.

Advisory Action dated Mar. 13, 2018, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 3 pages.

Advisory Action dated Apr. 14, 2017, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 3 pages.

Advisory Action dated Dec. 16, 2015, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 11 pages.

Advisory Action dated Jun. 16, 2016, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 5 pages.

Advisory Action dated Oct. 16, 2013, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 3 pages.

Advisory Action dated Sep. 17, 2015, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 4 pages.

Advisory Action dated Feb. 25, 2016, issued in connection with U.S. Appl. No. 13/904,944, filed May 29, 2013, 4 pages.

Advisory Action dated Apr. 29, 2016, issued in connection with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 3 pages.

Advisory Action dated Oct. 29, 2015, issued in connection with U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 3 pages.

Anonymous, "Sonos Controller for Mac or PC Product Guide", Retrieved from the Internet, XP055254086, 2013, 108 pages.

AudioTron Quick Start Guide, Version 1.0, Mar. 2001, 24 pages.

AudioTron Reference Manual, Version 3.0, May 2002, 70 pages.

AudioTron Setup Guide, Version 3.0, May 2002, 38 pages.

Australian Intellectual Property Office, Patent Examination Report No. 1 dated Jan. 16, 2015, issued in connection with Australian Patent Application No. 2012362573, 3 pages.

Australian Patent Office, Examination Report dated Mar. 22, 2017, issued in connection with Australian Application No. 2016202175, 3 pages.

European Patent Office, Extended European Search Report dated Nov. 21, 2016, issued in connection with European Application No. 14784965.7-1870, 6 pages.

# US 10,779,033 B2

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

European Patent Office, Extended European Search Report dated Oct. 18, 2016, issued in connection with European patent application No. 14785806.2, 9 pages.

Canadian Patent Office, Canadian Office Action dated Nov. 3, 2016, issued in connection with Canadian Application No. 2,861,790, 4 pages.

Canadian Patent Office, Canadian Office Action dated Nov. 12, 2015, issued in connection with Canadian Application No. 2,861,790, 3 pages.

Canadian Patent Office, Canadian Office Action dated Nov. 22, 2017, issued in connection with CA Application No. 2861790, 4 pages.

Canadian Patent Office, Office Action dated Sep. 13, 2018, issued in connection with Canadian Application No. 2861790, 4 pages.

Chen et al., "What a Juke! A Collaborative Music Sharing System," World of Wireless, Mobile and Multimedia Networks (WOWMOM), 2012 IEEE International Symposium, 2012, 6 pages.

Chinese Patent Office, Chinese Office Action dated Jan. 5, 2017, issued in connection with Chinese Application No. 201280069674.6, 14 pages.

Chinese Patent Office, First Office Action dated Mar. 5, 2018, issued in connection with Chinese Application No. 2014800424721, 10 pages.

Chinese Patent Office, First Office Action dated Feb. 2, 2018, issued in connection with Chinese Application No. 2014800340980, 11 pages.

Chinese Patent Office, First Office Action dated Jan. 2, 2018, issued in connection with Chinese Application No. 201480033788.4, 16 pages.

Chinese Patent Office, First Office Action dated Jan. 4, 2018, issued in connection with Chinese Application No. 201480034088.7, 15 pages.

Japanese Patent Office, Office Action dated Feb. 14, 2017, issued in connection with Japanese Patent Application No. 2016-509047, 9 pages.

Jo et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, pp. 71-82, vol. 4861.

Jones, Stephen, "Dell Digital Audio Receiver: Digital upgrade for your analog stereo," Analog Stereo, Jun. 24, 2000 retrieved Jun. 18, 2014, 2 pages.

Louderback, Jim, "Affordable Audio Receiver Furnishes Homes With MP3," TechTV Vault. Jun. 28, 2000 retrieved Jul. 10, 2014, 2 pages.

Mate et al., "Movable-Multimedia: Session Mobility in Ubiquitous Computing Ecosystem", XP055019030, 2006, 6 pages.

Motorola, "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide," Dec. 31, 2001, 111 pages.

Non-Final Office Action dated Feb. 23, 2017, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 21 pages.

Non-Final Office Action dated Feb. 2, 2016, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 14 pages.

Non-Final Office Action dated Mar. 2, 2015, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 15 pages.

Non-Final Office Action dated Feb. 7, 2017, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 5 pages.

Non-Final Office Action dated Oct. 8, 2014, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 12 pages.

Non-Final Office Action dated Mar. 9, 2017, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 20 pages.

Non-Final Office Action dated May 9, 2017, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 12 pages.

Non-Final Office Action dated Mar. 10, 2015, issued in connection with U.S. Appl. No. 13/864,081, filed Apr. 16, 2013, 13 pages.

Non-Final Office Action dated Aug. 12, 2016, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 21 pages.

Non-Final Office Action dated Feb. 13, 2015, issued in connection with U.S. Appl. No. 13/904,936, filed May 29, 2013, 10 pages.

Non-Final Office Action dated Mar. 13, 2015, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 20 pages.

Non-Final Office Action dated Dec. 14, 2016, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 5 pages.

Non-Final Office Action dated Jun. 16, 2016, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 15 pages.

Non-Final Office Action dated Oct. 16, 2018, issued in connection with U.S. Appl. No. 15/263,628, filed Sep. 13, 2016, 7 pages.

Non-Final Office Action dated Apr. 17, 2018, issued in connection with U.S. Appl. No. 14/956,640, filed Dec. 2, 2015, 15 pages.

Non-Final Office Action dated Mar. 17, 2016, issued in connection with U.S. Appl. No. 13/904,923, filed May 29, 2013, 15 pages.

Non-Final Office Action dated Oct. 17, 2018, issued in connection with U.S. Appl. No. 15/135,423, filed Apr. 21, 2016, 13 pages.

Non-Final Office Action dated Nov. 18, 2015, issued in connection with U.S. Appl. No. 13/904,896, filed May 29, 2013, 18 pages.

Non-Final Office Action dated Nov. 18, 2015, issued in connection with U.S. Appl. No. 13/904,932, filed May 29, 2013, 12 pages.

Non-Final Office Action dated Aug. 19, 2015, issued in connection with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 18 pages.

Non-Final Office Action dated Jan. 19, 2016, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 10 pages.

Non-Final Office Action dated Apr. 20, 2018, issued in connection with U.S. Appl. No. 15/872,500, filed Jan. 16, 2018, 7 pages.

Non-Final Office Action dated Feb. 22, 2017, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 14 pages.

Non-Final Office Action dated Apr. 23, 2015, issued in connection with U.S. Appl. No. 13/904,944, filed May 29, 2013, 12 pages.

Non-final Office Action dated Mar. 24, 2015, issued in connection with U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 14 pages.

Non-Final Office Action dated Jan. 25, 2013, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 9 pages.

Non-Final Office Action dated Jul. 25, 2016, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 12 pages.

Non-Final Office Action dated Mar. 25, 2016, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 13 pages.

Non-Final Office Action dated Jul. 26, 2017, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 10 pages.

Non-Final Office Action dated Nov. 26, 2013, issued in connection with U.S. Appl. No. 13/341,237, filed Dec. 30, 2011, 15 pages.

Non-Final Office Action dated Dec. 28, 2015, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 10 pages.

Non-Final Office Action dated May 28, 2015, issued in connection with U.S. Appl. No. 14/628,952, filed Feb. 23, 2015, 9 pages.

Non-Final Office Action dated Jun. 29, 2018, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 18 pages.

Non-Final Office Action dated Jan. 3, 2019, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 16 pages.

Non-Final Office Action dated Dec. 30, 2014, issued in connection with U.S. Appl. No. 14/520,566, filed Oct. 22, 2014, 10 pages.

Non-Final Office Action dated Oct. 30, 2018, issued in connection with U.S. Appl. No. 14/956,640, filed Dec. 2, 2015, 11 pages.

Non-Final Office Action dated Mar. 7, 2019, issued in connection with U.S. Appl. No. 15/872,500, filed Jan. 16, 2018, 12 pages.

Notice of Allowance dated Oct. 9, 2015, issued in connection with U.S. Appl. No. 13/864,086, filed Apr. 16, 2013, 14 pages.

Notice of Allowance dated Nov. 6, 2016, issued in connection with U.S. Appl. No. 14/520,578, filed Oct. 22, 2014, 14 pages.

Notice of Allowance dated Nov. 7, 2016, issued in connection with U.S. Appl. No. 13/904,944, filed May 29, 2013, 5 pages.

Notice of Allowance dated Mar. 9, 2017, issued in connection with U.S. Appl. No. 13/904,949, filed May 29, 2013, 13 pages.

Notice of Allowance dated Jun. 13, 2016, issued in connection with U.S. Appl. No. 13/864,075, filed Apr. 16, 2013, 11 pages.

Notice of Allowance dated May 16, 2018, issued in connection with U.S. Appl. No. 15/263,069, filed Sep. 12, 2016, 5 pages.

Notice of Allowance dated Oct. 28, 2019, issued in connection with U.S. Appl. No. 16/551,070, filed Aug. 26, 2019, 8 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' First Amended Answer and Counterclaims to Plaintiff's Complaint, filed Nov. 14, 2019, 66 pages.

**US 10,779,033 B2**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Australian Patent Office, Australian Examination Report Action dated Jul. 3, 2019, issued in connection with Australian Application No. 2018203185, 3 pages.

European Patent Office, European Search Report dated Jul. 22, 2019, issued in connection with European Application No. 19178151.7, 7 pages.

European Patent Office, Summons to Attend Oral Proceedings mailed on Jul. 12, 2019, issued in connection with European Application No. 14785247.9, 12 pages.

Notice of Allowance dated Sep. 20, 2019, issued in connection with U.S. Appl. No. 15/872,500, filed Jan. 16, 2018, 7 pages.

*Sonos, Inc.* v. *Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 7,391,791 dated Mar. 9, 2018, 92 pages.

*Sonos, Inc.* v. *Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 8,942,252 dated Mar. 9, 2018, 81 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit A, filed Oct. 14, 2019, 3 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit C, filed Oct. 14, 2019, 16 pages.

*Sofas, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit D, filed Oct. 14, 2019, 36 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit E, filed Oct. 14, 2019, 21 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint, filed Oct. 14, 2019, 66 pages.

Chinese Patent Office, First Office Action and Translation dated Nov. 25, 2019, issued in connection with Chinese Application No. 201810042292.3, 13 pages.

Final Office Action dated Dec. 12, 2019, issued in connection with U.S. Appl. No. 13/904,909, filed May 29, 2013, 21 pages.

Notice of Allowance dated Dec. 16, 2019, issued in connection with U.S. Appl. No. 15/872,500, filed Jan. 16, 2018, 7 pages.

Australian Patent Office, Australian Examination Report Action dated Jan. 31, 2020, issued in connection with Australian Application No. 2018203185, 4 pages.

Barix Download Exstreamer Software. Accessed via WayBack Machine, Apr. 6, 2003. http://www.barix.com/estreamer/software. download.html. 2 pages.

Barix. Exstreamer Datasheet. Accessed via WayBack Machine, Apr. 2, 2003. http://www.barix.com/exstreamer/, 1 page.

Canadian Patent Office, Canadian Office Action dated Dec. 10, 2019, issued in connection with Canadian Application No. 2861790, 5 pages.

European Patent Office, Decision to Refuse European Patent Application dated Dec. 20, 2019, issued in connection with European Application No. 14785247.9, 25 pages.

European Patent Office, European Extended Search Report dated May 7, 2020, issued in connection with European Application No. 20159841.4, 16 pages.

European Patent Office, European Office Action dated May 25, 2020, issued in connection with European Application No. 19178151.7, 4 pages.

Exstreamer. Network MP3 player for digital audio streaming in a consumer, home installation and commercial applications. Barix Think Further. Sep. 2002, 2 pages.

Exstreamer. The Exstreamer Instruction Manual. Barix Think Further. Version 1.5 , Oct. 2002, 21 pages.

Exstreamer. The Exstreamer Technical Description: Version 1.5. Barix Think Further. Oct. 2002, 36 pages.

Non-Final Office Action dated Dec. 26, 2019, issued in connection with U.S. Appl. No. 16/550,148, filed on Aug. 23, 2019, 20 pages.

Notice of Allowance dated May 21, 2020, issued in connection with U.S. Appl. No. 16/550,148, filed on Aug. 23, 2019, 7 pages.

Notice of Allowance dated Mar. 3, 2020, issued in connection with U.S. Appl. No. 13/904,909, filed on May 29, 2013, 11 pages.

Yahoo Groups. Exstreamer. Barix Exstreamer. Access via Wayback Machine http://groups.yahoo.com/group/exstreamer/ Dec. 22, 2013, 1 page.

Yamaha DME Designer 3.0 Owner's Manual; Copyright 2008, 501 pages.

\* cited by examiner



FIGURE 1



FIGURE 2A



FIGURE 2B



## FIGURE 2C



## FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



900



Start

Embed a link in a third party application. — 910

Launch local playback controller upon selection of link. — 920

Pass resource indicator for associated content to local playback system. — 930

Output associated content via local controller and resource indicator. — 940

FIGURE 9



FIGURE 10





FIGURE 11

US 10,779,033 B2

1

# SYSTEMS AND METHODS FOR NETWORKED MUSIC PLAYBACK

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. non-provisional patent application Ser. No. 15/872,500, filed on Jan. 16, 2018, entitled "Systems and Methods for Networked Music Playback," which is a continuation of U.S. non-provisional patent application Ser. No. 14/520,578, filed on Oct. 22, 2014, entitled "Systems and Methods for Networked Music Playback," which is a continuation of U.S. non-provisional patent application Ser. No. 13/341,237, filed on Dec. 30, 2011, entitled "Systems and Methods for Networked Music Playback," all of which are incorporated herein by reference in their entirety.

## FIELD OF THE DISCLOSURE

The disclosure is related to consumer electronics, and more particularly, to providing music for playback via one or more devices on a playback data network.

## BACKGROUND

Technological advancements have increased the accessibility of music content, as well as other types of media, such as television content, movies, and interactive content. For example, a user can access audio, video, or both audio and video content over the Internet through an online store, an Internet radio station, an online music service, an online movie service, and the like, in addition to the more traditional avenues of accessing audio and video content. Demand for such audio and video content continues to surge. Given the high demand, technology used to access and play such content has likewise improved.

## BRIEF DESCRIPTION OF THE DRAWINGS

Features, aspects, and advantages of the presently disclosed technology are better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. 1 shows an illustration of an example system in which embodiments of the methods and apparatus disclosed herein can be implemented;

FIG. 2A shows an illustration of an example zone player having a built-in amplifier and speakers;

FIG. 2B shows an illustration of an example zone player having a built-in amplifier and connected to external speakers;

FIG. 2C shows an illustration of an example zone player connected to an A/V receiver and speakers;

FIG. 3 shows an illustration of an example controller;

FIG. 4 shows an internal functional block diagram of an example zone player;

FIG. 5 shows an internal functional block diagram of an example controller;

FIG. 6 shows an example ad-hoc playback network;

FIG. 7 shows a system including a plurality of networks including a cloud-based network and at least one local playback network; and

FIGS. 8-11 show flow diagrams for methods to provide audio content to a local playback system.

2

In addition, the drawings are for the purpose of illustrating example embodiments, but it is understood that the present disclosure is not limited to the arrangements and instrumentality shown in the drawings.

## DETAILED DESCRIPTION

### I. Overview

Wired or wireless networks can be used to connect one or more multimedia playback devices for a home or other location playback network (e.g., a home music system). Certain examples provide automatic configuration of parameters of a playback device to be coupled to a network with reduced or minimum human intervention. For example, a wired and/or wireless ad-hoc network is established to facilitate communications among a group of devices. Music and/or other multimedia content can be shared among devices and/or groups of devices (also referred to herein as zones) associated with a playback network.

Certain embodiments facilitate streaming or otherwise providing music from a music-playing application (e.g., browser-based application, native music player, other multimedia application, and so on) to a multimedia content playback (e.g., Sonos™) system. Certain embodiments provide simple, easy-to-use and secure systems and methods for multimedia content playback across a plurality of systems and locations. Certain embodiments facilitate integration between content partners and a playback system as well as supporting maintenance of such content and system.

Although the following discloses example systems, methods, apparatus, and articles of manufacture including, among other components, firmware and/or software executed on hardware, it should be noted that such systems, methods, apparatus, and/or articles of manufacture are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these firmware, hardware, and/or software components could be embodied exclusively in hardware, exclusively in software, exclusively in firmware, or in any combination of hardware, software, and/or firmware. Accordingly, while the following describes example systems, methods, apparatus, and/or articles of manufacture, the examples provided are not the only way(s) to implement such systems, methods, apparatus, and/or articles of manufacture.

When any of the appended claims are read to cover a purely software and/or firmware implementation, at least one of the elements in at least one example is hereby expressly defined to include a tangible medium such as a memory, DVD, CD, Blu-ray, and so on, storing the software and/or firmware.

Reference herein to "embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one example embodiment of the invention. The appearances of this phrase in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. As such, the embodiments described herein, explicitly and implicitly understood by one skilled in the art, can be combined with other embodiments.

Certain embodiments provide a method to provide content to a local playback network. The example method includes identifying multimedia content from a content provider. The example method includes passing information regarding the multimedia content to a local playback system including one or more multimedia playback devices in response to a trigger. The example method includes facilitating play of the

US 10,779,033 B2

**3**

multimedia content via a local playback network associated with the local playback system.

Certain embodiments provide a computer readable storage medium including instructions for execution by a processor, the instructions, when executed, cause the processor to implement a method to provide content to a local playback network. The example method includes identifying multimedia content from a content provider. The example method includes passing information regarding the multimedia content to a local playback system including one or more multimedia playback devices in response to a trigger. The example method includes facilitating play of the multimedia content via a local playback network associated with the local playback system.

Certain embodiments provide a multimedia playback device including a wireless communication interface to communicate with a local playback network and a multimedia content source and a processor. The process is to identify multimedia content from the multimedia content source; pass information regarding the multimedia content to device on the local playback network in response to a trigger; and facilitate play of the multimedia content via the devices on the local playback network.

II. Example Environment

Referring now to the drawings, in which like numerals can refer to like parts throughout the figures, FIG. **1** shows an example system configuration **100** in which one or more of the method and/or apparatus disclosed herein can be practiced or implemented. By way of illustration, the system configuration **100** represents a home with multiple zones. Each zone, for example, represents a different room or space, such as an office, bathroom, bedroom, kitchen, dining room, family room, home theater room, utility or laundry room, and patio. While not shown here, a single zone can cover more than one room or space. One or more of zone players **102-124** are shown in each respective zone. A zone player **102-124**, also referred to as a playback device, multimedia unit, speaker, and so on, provides audio, video, and/or audiovisual output. A controller **130** (e.g., shown in the kitchen for purposes of illustration) provides control to the system configuration **100**. The system configuration **100** illustrates an example whole house audio system, though it is understood that the technology described herein is not limited to its particular place of application or to an expansive system like a whole house audio system **100** of FIG. **1**.

FIGS. **2**A, **2**B, and **2**C show example illustrations of zone players **200-204**. The zone players **200-204** of FIGS. **2**A, **2**B, and **2**C, respectively, can correspond to any of the zone players **102-124** of FIG. **1**. While certain embodiments provide multiple zone players, an audio output can be generated using only a single zone player. FIG. **2**A illustrates a zone player **200** including sound producing equipment **208** capable of generating sound or an audio output corresponding to a signal received (e.g., wirelessly and/or via a wired interface). The sound producing equipment **208** of the zone player **200** of FIG. **2**A includes a built-in amplifier (not shown in this illustration) and speakers (e.g., a tweeter, a mid-range driver, and/or a subwoofer). In certain embodiments, the zone player **200** of FIG. **2**A can be configured to play stereophonic audio or monaural audio. In some embodiments, the zone player **200** of FIG. **2**A can be configured as a component in a combination of zone players to play stereophonic audio, monaural audio, and/or surround audio. As described in greater detail below, in some embodiments, the example zone player **200** of FIG. **2**A can also transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiv-

**4**

er(s), and so on. Transmission of the second signal can be part of, for example, a system in which multiple zone players, speakers, receivers, and so on, form a network to, for example, present media content in a synchronization or distributed manner.

The example zone player **202** of FIG. **2**B includes a built-in amplifier (not shown in this illustration) to power a set of detached speakers **210**. The speakers **210** of FIG. **2**B can include, for example, any type of loudspeaker. The zone player **202** of FIG. **2**B can communicate a signal corresponding to audio content to the detached speakers **210** via wired and/or wireless channels. Instead of receiving and generating audio content as in FIG. **2**A, the zone player **202** of FIG. **2**B receives the audio content and transmits the same (e.g., after processing the received signal) to the detached speakers **210**. Similar to the example zone player **200** of FIG. **2**A, in some embodiments the zone player **202** can transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiver(s), and so on.

The example zone player **204** of FIG. **2**C does not include an amplifier, but allows a receiver **214**, or another audio and/or video type device with built-in amplification, to connect to a data network **128** of FIG. **1** and to play audio received over the data network **128** via the receiver **214** and a set of detached speakers **216**. In addition to the wired couplings shown in FIG. **2**C, the detached speakers **216** can receive audio content via a wireless communication channel between the detached speakers **216** and, for example, the zone player **204** and/or the receiver **214**. In some embodiments the zone player **202** can transmit a second signal to, for example, other zone player(s) in the same or different zone(s), speaker(s), receiver(s), and so on.

Example zone players include a "Sonos® S5," "Sonos Play:5," "Sonos Play:3," "ZonePlayer 120," and "Zone-Player 90," which are offered by Sonos, Inc. of Santa Barbara, Calif. Any other past, present, and/or future zone players can additionally or alternatively be used to implement the zone players of example embodiments disclosed herein. A zone player can also be referred to herein as a playback device, and a zone player is not limited to the particular examples illustrated in FIGS. **2**A, **2**B, and **2**C. For example, a zone player can include a wired or wireless headphone. In other examples, a zone player might include a subwoofer. In yet other examples, a zone player can include a sound bar. In an example, a zone player can include or interact with a docking station for an Apple iPod™ or similar device. In some embodiments, a zone player can relay one or more signals received from, for example, a first zone player to another playback device. In some embodiments, a zone player can receive a first signal and generate an output corresponding to the first signal and, simultaneously or separately, can receive a second signal and transmit or relay the second signal to another zone player(s), speaker(s), receiver(s), and so on. Thus, an example zone player described herein can act as a playback device and, at the same time, operate as a hub in a network of zone players. In such instances, media content corresponding to the first signal can be different from the media content corresponding to the second signal.

FIG. **3** shows an example illustration of a wireless controller **300** in a docking station **302**. The controller **300** can correspond to the controlling device **130** of FIG. **1**. The controller **300** is provided with a touch screen **304** that allows a user to interact with the controller **300**, for example, to retrieve and navigate a playlist of audio items, control operations of one or more zone players, and provide overall

US 10,779,033 B2

5                                                                                  6

control of the system configuration **100**. In certain embodi-
ments, any number of controllers can be used to control the
system configuration **100**. In certain embodiments, there can
be a limit on the number of controllers that can control the
system configuration **100**. The controllers might be wireless
like wireless controller **300** or wired to the data network **128**.
Furthermore, an application running on any network-en-
abled portable devices, such as an iPhone™, iPad™,
Android™ powered phone, or any other smart phone or
network-enabled device can be used as a controller by
connecting to the data network **128**. An application running
on a laptop or desktop PC or Mac can also be used as a
controller. Example controllers include a "Sonos® Control-
ler **200**," "Sonos® Controller for iPhone," "Sonos® Con-
troller for iPad," "Sonos® Controller for Android, "Sonos®
Controller for Mac or PC," which are offered by Sonos, Inc.
of Santa Barbara, Calif. The flexibility of such an application
and its ability to be ported to a new type of portable device
is advantageous.

Referring back to the system configuration **100** of FIG. **1**,
a particular zone can contain one or more zone players. For
example, the family room of FIG. **1** contains two zone
players **106** and **108**, while the kitchen is shown with one
zone player **102**. Zones can be dynamically configured by
positioning a zone player in a room or space and assigning
via the controller **130** the zone player to a new or existing
zone. As such, zones can be created, combined with another
zone, removed, and given a specific name (e.g., "Kitchen"),
if so programmed. The zone players **102** to **124** are coupled
directly or indirectly to a data network, such as the data
network **128** shown in FIG. **1**. The data network **128** is
represented by an octagon in the figure to stand out from
other components shown in the figure. While the data
network **128** is shown in a single location, it is understood
that such a network can be distributed in and around the
system configuration **100**.

Particularly, the data network **128** can be a wired network,
a wireless network, or a combination of both. In some
embodiments, one or more of the zone players **102-124** are
wirelessly coupled to the data network **128** based on a
proprietary mesh network. In some embodiments, one or
more of the zone players **102-124** are wirelessly coupled to
the data network **128** using a non-mesh topology. In some
embodiments, one or more of the zone players **102-124** are
coupled via a wire to the data network **128** using Ethernet or
similar technology. In addition to the one or more zone
players **102-124** connecting to the data network **128**, the data
network **128** can further allow access to a wide area net-
work, such as the Internet.

In certain embodiments, the data network **128** can be
created by connecting any of the zone players **102-124**, or
some other connecting device, to a broadband router. Other
zone players **102-124** can then be added wired or wirelessly
to the data network **128**. For example, a zone player (e.g.,
any of zone players **102-124**) can be added to the system
configuration **100** by simply pressing a button on the zone
player itself, which enables a connection to be made to the
data network **128**. The broadband router can be connected to
an Internet Service Provider (ISP), for example. The broad-
band router can be used to form another data network within
the system configuration **100**, which can be used in other
applications (e.g., web surfing). The data network **128** can
also be used in other applications, if so programmed. Fur-
ther, in certain embodiments, the data network **128** is the
same network used for other applications in the household.

In certain embodiments, each zone can play from the
same audio source as another zone or each zone can play

from a different audio source. For example, someone can be
grilling on the patio and listening to jazz music via zone
player **124**, while someone is preparing food in the kitchen
and listening to classical music via zone player **102**. Further,
someone can be in the office listening to the same jazz music
via zone player **110** that is playing on the patio via zone
player **124**. In some embodiments, the jazz music played via
zone players **110** and **124** is played in synchrony. Synchro-
nizing playback amongst zones allows for someone to pass
through zones while seamlessly listening to the audio.
Further, zones can be put into a "party mode" such that all
associated zones will play audio in synchrony.

In certain embodiments, a zone contains two or more zone
players. For example, the family room contains two zone
players **106** and **108**, and the home theater room contains at
least zone players **116**, **118**, and **120**. A zone can be
configured to contain as many zone players as desired, and
for example, the home theater room might contain additional
zone players to play audio from a 5.1 channel or greater
audio source (e.g., a movie encoded with 5.1 or greater audio
channels). If a zone contains two or more zone players, such
as the two zone players **106** and **108** in the family room, then
the two zone players **106** and **108** can be configured to play
the same audio source in synchrony, or the two zone players
**106** and **108** can be paired to play two separate sounds in left
and right channels, for example. In other words, the stereo
effects of a sound can be reproduced or enhanced through
the two zone players **106** and **108**, one for the left sound and
the other for the right sound. In certain embodiments, paired
zone players can play audio in synchrony with other zone
players.

In certain embodiments, three or more zone players can be
configured to play various channels of audio that is encoded
with three channels or more sound. For example, the home
theater room shows zone players **116**, **118**, and **120**. If the
sound is encoded as 2.1 channel audio, then the zone player
**116** can be configured to play left channel audio, the zone
player **118** can be configured to play right channel audio, and
the zone player **120** can be configured to play bass frequen-
cies. Other configurations are possible and depend on the
number of zone players and the type of audio. Further, a
particular zone can be configured to play a 5.1 channel audio
in one instance, such as when playing audio from a movie,
and then dynamically switch to play stereo, such as when
playing audio from a two channel source.

In certain embodiments, two or more zone players can be
sonically consolidated to form a single, consolidated zone
player. A consolidated zone player (though made up of
multiple, separate devices) can be configured to process and
reproduce sound differently than an unconsolidated zone
player or zone players that are paired, because a consoli-
dated zone player will have additional speaker drivers from
which sound can be passed. The consolidated zone player
can further be paired with a single zone player or yet another
consolidated zone player. Each playback device of a con-
solidated playback device is preferably set in a consolidated
mode.

According to some embodiments, one can continue to do
any of: group, consolidate, and pair zone players, for
example, until a desired configuration is complete. The
actions of grouping, consolidation, and pairing are prefer-
ably performed through a control interface, such as using
controller **130**, and not by physically connecting and re-
connecting speaker wire, for example, to individual, discrete
speakers to create different configurations. As such, certain

7

embodiments described herein provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user.

Sources of audio content to be played by zone players 102-124 are numerous. Music from a personal library stored on a computer or networked-attached storage (NAS) can be accessed via the data network 128 and played. Internet radio stations, shows, and podcasts can be accessed via the data network 128. Music services that let a user stream and download music and audio content can be accessed via the data network 128. Further, music can be obtained from traditional sources, such as a turntable or CD player, via a line-in connection to a zone player, for example. Audio content can also be accessed through AirPlay™ wireless technology by Apple, Inc., for example. Audio content received from one or more sources can be shared amongst the zone players 102 to 124 via the data network 128 and/or the controller 130. The above-disclosed sources of audio content are referred to herein as network-based audio information sources. However, network-based audio information sources are not limited thereto.

The example home theater zone players 116, 118, 120 are coupled to an audio information source such as a television 132. In some examples, the television 132 is used as a source of audio for the home theater zone players 116, 118, 120, while in other examples audio information from the television 132 can be shared with any of the zone players 102-124 in the audio system 100.

III. Example Playback Device

Referring now to FIG. 4, there is shown an example functional block diagram of a zone player 400 in accordance with an embodiment. The zone player 400 of FIG. 4 includes a network interface 402, a processor 408, a memory 410, an audio processing component 412, a module 414, an audio amplifier 416, and a speaker unit 418 coupled to the audio amplifier 416. FIG. 2A shows an example illustration of such a zone player. Other types of zone players can not include the speaker unit 418 (e.g., such as shown in FIG. 2B) or the audio amplifier 416 (e.g., such as shown in FIG. 2C). Further, it is contemplated that the zone player 400 can be integrated into another component. For example, the zone player 400 could be constructed as part of a lamp for indoor or outdoor use.

Referring back to FIG. 4, the network interface 402 facilitates a data flow between zone players and other devices on a data network (e.g., the data network 128 of FIG. 1) and the zone player 400. In some embodiments, the network interface 402 can manage the assembling of an audio source or file into smaller packets that are to be transmitted over the data network or reassembles received packets into the original source or file. In some embodiments, the network interface 402 can further handle the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player 400. Accordingly, in certain embodiments, each of the packets includes an Internet Protocol (IP)-based source address as well as an IP-based destination address.

In some embodiments, the network interface 402 can include one or both of a wireless interface 404 and a wired interface 406. The wireless interface 404, also referred to as an RF interface, provides network interface functions for the zone player 400 to wirelessly communicate with other devices (e.g., other zone player(s), speaker(s), receiver(s), component(s) associated with the data network 128, and so on) in accordance with a communication protocol (e.g., any of the wireless standards IEEE 802.11a, 802.11b, 802.11g, 802.11n, or 802.15). To receive wireless signals and to

8

provide the wireless signals to the wireless interface 404 and to transmit wireless signals, the zone player 400 of FIG. 4 includes one or more antennas 420. The wired interface 406 provides network interface functions for the zone player 400 to communicate over a wire with other devices in accordance with a communication protocol (e.g., IEEE 802.3). In some embodiments, a zone player includes both of the interfaces 404 and 406. In some embodiments, a zone player 400 includes only the wireless interface 404 or the wired interface 406.

In some embodiments, the processor 408 is a clock-driven electronic device that is configured to process input data according to instructions stored in memory 410. The memory 410 is data storage that can be loaded with one or more software modules 414, which can be executed by the processor 408 to achieve certain tasks. In the illustrated embodiment, the memory 410 is a tangible machine readable medium storing instructions that can be executed by the processor 408. In some embodiments, a task might be for the zone player 400 to retrieve audio data from another zone player or a device on a network. In some embodiments, a task might be for the zone player 400 to send audio data to another zone player or device on a network. In some embodiments, a task might be for the zone player 400 to synchronize playback of audio with one or more additional zone players. In some embodiments, a task might be to pair the zone player 400 with one or more zone players to create a multi-channel audio environment. Additional or alternative tasks can be achieved via the one or more software modules 414 and the processor 408.

The audio processing component 412 can include one or more digital-to-analog converters (DAC), an audio preprocessing component, an audio enhancement component or a digital signal processor, and so on. In certain embodiments, the audio that is retrieved via the network interface 402 is processed and/or intentionally altered by the audio processing component 412. Further, the audio processing component 412 can produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier 416 for play back through speakers 418. In addition, the audio processing component 412 can include necessary circuitry to process analog or digital signals as inputs to play from zone player 400, send to another zone player on a network, or both play and send to another zone player on the network. An example input includes a line-in connection (e.g., an auto-detecting 3.5 mm audio line-in connection).

The audio amplifier 416 is a device that amplifies audio signals to a level for driving one or more speakers 418. The one or more speakers 418 can include an individual transducer (e.g., a "driver") or a complete speaker system that includes an enclosure including one or more drivers. A particular driver can be a subwoofer (for low frequencies), a mid-range driver (middle frequencies), and a tweeter (high frequencies), for example. An enclosure can be sealed or ported, for example.

A zone player 400 can also be referred to herein as a playback device. An example playback device includes a Sonos® Play:5, which is manufactured by Sonos, Inc. of Santa Barbara, Calif. The Play:5 is an example zone player with a built-in amplifier and speakers. In particular, the Play:5 is a five-driver speaker system that includes two tweeters, two mid-range drivers, and one subwoofer. When playing audio content via the Play:5, the left audio data of a track is sent out of the left tweeter and left mid-range driver, the right audio data of a track is sent out of the right tweeter and the right mid-range driver, and mono bass is sent out of the subwoofer. Further, both mid-range drivers and

US 10,779,033 B2

9

both tweeters have the same equalization (or substantially the same equalization). That is, they are both sent the same frequencies, just from different channels of audio. Audio from Internet radio stations, online music and video services, downloaded music, analog audio inputs, television, DVD, and so on, can be played from a Sonos® Play:5. While the Play:5 is an example of a zone player with speakers, it is understood that a zone player with speakers is not limited to one with a certain number of speakers (e.g., five speakers as in the Play:5), but rather can contain one or more speakers. Further, a zone player can be part of another device, which might even serve a purpose different than audio (e.g., a lamp).

IV. Example Controller

Referring now to FIG. **5**, there is shown an example controller **500**, which can correspond to the controlling device **130** in FIG. **1**. The controller **500** can be used to facilitate the control of multi-media applications, automation and others in a system. In particular, the controller **500** is configured to facilitate a selection of a plurality of audio sources available on the network and enable control of one or more zone players (e.g., the zone players **102-124** in FIG. **1**) through a wireless network interface **508**. According to one embodiment, the wireless communications is based on an industry standard (e.g., infrared, radio, wireless standards IEEE 802.11a, 802.11b 802.11g, 802.11n, or 802.15). Further, when a particular audio is being accessed via the controller **500** or being played via a zone player, a picture (e.g., album art) or any other data, associated with the audio source can be transmitted from a zone player or other electronic device to the controller **500** for display.

The controller **500** is provided with a screen **502** and an input interface **514** that allows a user to interact with the controller **500**, for example, to navigate a playlist of many multimedia items and to control operations of one or more zone players. The screen **502** on the controller **500** can be an LCD screen, for example. The screen **500** communicates with and is commanded by a screen driver **504** that is controlled by a microcontroller (e.g., a processor) **506**. The memory **510** can be loaded with one or more application modules **512** that can be executed by the microcontroller **506** with or without a user input via the user interface **514** to achieve certain tasks. In some embodiments, an application module **512** is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for audio play back. In some embodiments, an application module **512** is configured to control the audio sounds (e.g., volume) of the zone players in a zone group. In operation, when the microcontroller **506** executes one or more ofthe application modules **512**, the screen driver **504** generates control signals to drive the screen **502** to display an application specific user interface accordingly.

The controller **500** includes a network interface **508** that facilitates wireless communication with a zone player. In some embodiments, the commands such as volume control and audio playback synchronization are sent via the network interface **508**. In some embodiments, a saved zone group configuration is transmitted between a zone player and a controller via the network interface **508**. The controller **500** can control one or more zone players, such as **102-124** of FIG. **1**. There can be more than one controller for a particular system. Further, a controller can be integrated into a zone player.

It should be noted that other network-enabled devices such as an iPhone®, iPad® or any other smart phone or network-enabled device (e.g., a networked computer such as

10

a PC or Mac®) can also be used as a controller to interact or control zone players in a particular environment. In some embodiments, a software application or upgrade can be downloaded onto a network enabled device to perform the functions described herein.

In certain embodiments, a user can create a zone group including at least two zone players from the controller **500**. The zone players in the zone group can play audio in a synchronized fashion, such that all of the zone players in the zone group play back an identical audio source or a list of identical audio sources in a synchronized manner such that no (or substantially no) audible delays or hiccups could be heard. Similarly, in some embodiments, when a user increases the audio volume of the group from the controller **500**, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume.

A user via the controller **500** can group zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. For example, one mechanism for 'joining' zone players together for audio play back is to link a number of zone players together to form a group. To link a number of zone players together, a user can manually link each zone player or room one after the other. For example, assume that there is a multi-zone system that includes the following zones: Bathroom, Bedroom, Den, Dining Room, Family Room, and Foyer.

In certain embodiments, a user can link any number of the six zone players, for example, by starting with a single zone and then manually linking each zone to that zone.

In certain embodiments, a set of zones can be dynamically linked together using a command to create a zone scene or theme (subsequent to first creating the zone scene). For instance, a "Morning" zone scene command can link the Bedroom, Office, and Kitchen zones together in one action. Without this single command, the user would need to manually and individually link each zone. The single command might include a mouse click, a double mouse click, a button press, a gesture, or some other programmed action. Other kinds of zone scenes can be programmed.

In certain embodiments, a zone scene can be triggered based on time (e.g., an alarm clock function). For instance, a zone scene can be set to apply at 8:00 am. The system can link appropriate zones automatically, set specific music to play, and then stop the music after a defined duration. Although any particular zone can be triggered to an "On" or "Off" state based on time, for example, a zone scene enables any zone(s) linked to the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time and/or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed Universal Plug and Play (UPnP), no Internet connection for an Internet Radio station, and so on), a backup buzzer can be programmed to sound. The buzzer can include a sound file that is stored in a zone player, for example.

V. Example Ad-Hoc Network

Certain particular examples will now be provided in connection with FIGS. **6-8**B to describe, for purposes of illustration only, certain base systems and methods to provide and facilitate connection to a playback network. FIG. **6** shows that there are three zone players **602**, **604** and **606** and a controller **608** that form a network branch that is also referred to as an Ad-Hoc network **610**. The network **610** may be wireless, wired, or a combination of wired and wireless. In general, an Ad-Hoc (or "spontaneous") network is a local

US 10,779,033 B2

**11**

area network or other small network in which there is no one access point for all traffic. With an established Ad-Hoc network **610**, the devices **602**, **604**, **606** and **608** can all communicate with each other in a "peer-to-peer" style of communication, for example. Furthermore, devices may come/and go from the network **610**, and the network **610** will automatically reconfigure itself without needing the user to reconfigure the network **610**.

Using the Ad-Hoc network **610**, the devices **602**, **604**, **606**, and **608** can share or exchange one or more audio sources and be grouped to play the same or different audio sources. For example, the devices **602** and **604** are grouped to playback one piece of music, and at the same time, the device **606** plays back another piece of music. In other words, the devices **602**, **604**, **606** and **608**, as shown in FIG. **6**, form a HOUSEHOLD that distributes audio and/or reproduces sound. As used herein, the term HOUSEHOLD (provided in uppercase letters to disambiguate from the user's domicile) is used to represent a collection of networked devices that are cooperating to provide an application or service. An instance of a HOUSEHOLD is identified with a household **10** (or household identifier).

In certain embodiments, a household identifier (HHID) is a short string or an identifier that is computer-generated to help ensure that it is unique. Accordingly, the network **610** can be characterized by a unique HHID and a unique set of configuration variables or parameters, such as channels (e.g., respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy or other security keys). In certain embodiments, SSID is set to be the same as HHID.

In certain embodiments, each HOUSEHOLD includes two types of network nodes: a control point (CP) and a zone player (ZP). The control point controls an overall network setup process and sequencing, including an automatic generation of required network parameters (e.g., WEP keys). In an embodiment, the CP also provides the user with a HOUSEHOLD configuration user interface. The CP function can be provided by a computer running a CP application module, or by a handheld controller (e.g., the controller **308**) also running a CP application module, for example. The zone player is any other device on the network that is placed to participate in the automatic configuration process. The ZP, as a notation used herein, includes the controller **308** or a computing device, for example.

In certain embodiments, configuration of a HOUSEHOLD involves multiple CPs and ZPs that rendezvous and establish a known configuration such that they can use a standard networking protocol (e.g., IP over Wired or Wireless Ethernet) for communication. In an embodiment, two types of networks/protocols are employed: Ethernet 802.3 and Wireless 802.11g. Interconnections between a CP and a ZP can use either of the networks/protocols. A device in the system as a member of a HOUSEHOLD can connect to both networks simultaneously. In an environment that has both networks in use, it is assumed that at least one device in a system is connected to both as a bridging device, thus providing bridging services between wired/wireless networks for others. The zone player **606** in FIG. **6** is shown to be connected to both networks, for example. The connectivity to the network **612** is based on Ethernet while the connectivity to other devices **602**, **604** and **608** is based on Wireless. It is understood, however, that in some embodiments each zone player **606**, **604**, **602** may access the Internet when retrieving media from the cloud (e.g., Internet) via the bridging device. For example, zone player **602** may contain a uniform resource locator (URL) that specifies

**12**

an address to a particular audio track in the cloud. Using the URL, the zone player **602** may retrieve the audio track from the cloud, and ultimately play the audio out of one or more zone players.

VI. Example Music Sharing and Playback Configuration

Certain embodiments enable a user to stream music from a music-playing application (e.g., browser-based application, native music player, other multimedia application, and so on) to a local multimedia content playback (e.g., Sonos™) system. Certain embodiments provide secure systems and methods for multimedia content playback across a plurality of systems and locations. Certain embodiments facilitate integration between content partners and a playback system as well as supporting maintenance of such content and system.

FIG. **7** shows a system including a plurality of networks including a cloud-based network and at least one local playback network. The network includes a plurality of playback devices or players, though it is understood that the network may contain only one playback device. In certain embodiments, each player has an ability to retrieve its content for playback. Control and content retrieval can be distributed or centralized, for example. Input can include streaming content provider input, third party application input, mobile device input, user input, and/or other playback network input into the cloud for local distribution and playback.

As illustrated by the example system **700** of FIG. **7**, a plurality of content providers **720-750** can be connected to one or more local playback networks **760-770** via a cloud and/or other network **710**. Using the cloud **710**, a multimedia playback system **720** (e.g., Sonos™) a mobile device **730**, a third party application **740**, a retail location **750**, and so on can provide multimedia content (requested or otherwise) to local playback networks **760**, **770**. Within each local network **760**, **770**, a controller **762**, **772** and/or playback device **764**, **774** can provide a song identifier, song name, playlist identifier, playlist name, genre, preference, and so on, and/or simply receive content from a connected system via the cloud.

For example, a user listens to a third party music application (e.g., Pandora™ Rhapsody™, Spotify™, and so on) on her smart phone while commuting. She's enjoying the current channel and, as she walks in the door to her home, selects an option to continue playing that channel on her household music playback system (e.g., Sonos™). The playback system picks up from the same spot on the selected channel that was on her phone and outputs that content (e.g., that song) on speakers and/or other playback devices connected to the household playback system. A uniform resource indicator (URI) (e.g., a uniform resource locator (URL)) can be passed to a playback device to fetch content from a cloud and/or other networked source, for example. A playback device, such as a zone player, can fetch content on its own without use of a controller, for example. Once the zone player has a URL (or some other identification or address) for a song and/or playlist, the zone player can run on its own to fetch the content. Songs and/or other multimedia content can be retrieved from the Internet rather than a local device (e.g., a compact disc (CD)), for example. A third party application can open or utilize an application programming interface (API) to pass music to the household playback system without tight coupling to that household playback system.

In another example of an application determining a playlist and/or other content for playback, a user enjoys listening to music on an online music service (e.g., turntable.fm or

**13**

other virtual room that a user can enter to choose from a plurality of online disc jockeys (DJs) deciding what to play next) using his Mac Book Pro™ at home. He likes the unique user experience the service offers, and he frequently hops from room to room discovering new music. To maximize sound quality, he plays the music on his household playback system (e.g., Sonos™). A button or other indicator can be added to the turntable.fm Web application to switch the content being played to the playback system for output (e.g., to the Sonos™ system rather than or in addition to the Mac Book™). While Web-based applications typically do not have access to items on a local network, certain embodiments enable a third-party Web-based application (e.g., Turntable.fm) to talk to a playback system (e.g., Sonos™) in a certain way (e.g., may have to log in with a username and password), and the identified user has the website send audio or audio and video down to a playback device (e.g., a zone player) on the playback system local network to play music there (or some other media).

In another example, a first user creates a playlist (e.g., a Spotify™ playlist). The first user visits a second user's house, pulls out her smart phone and shares her playlist by playing it on the second user's household playback (e.g., Sonos™) system using her third party (e.g., Spotify™) application. The first user may also go to the third party content provider's (e.g., Spotify's™) website and share her playlist on the second user's playback system.

Thus, certain embodiments provide cross-service linking such that a song identifier can be passed from one user and/or service to another to be fetched and played. A user having a playlist on his or her phone can visit a friend and, using her account on her friend's system, play a song to which she has an access right. A retrieved song can streamed locally to a user's phone, or an application can pass a song identifier to a local playback system which looks up the song identifier and finds an available audio stream to which the user has a right to play and then plays that song.

In another example, a user is staying in a hotel room or other facility including a local playback network. For example, a speaker and/or other playback device (e.g., a Sonos™ Play:3, Play:5 and so on) in a hotel room can be utilized to play multimedia content to which the user has access from his or her playback network account, streaming audio source, third party application, and so on. Content can be output to one or more devices based on availability, access, configuration, priority, preference, and so on. In certain embodiments, a playback network includes a plurality of nodes, and each node has a capability to play sound in response to an input. Requested output is provided to a most logical connection, for example.

In certain embodiments, a phone device, a television device, and so on can be used to play music, audio, video and/or other multimedia content. In an example, a push button on a microphone or household intercom system to tell the kids dinner is ready is provided over the local playback network.

FIG. **8** shows a flow diagram for a method **800** to provide audio content to a local playback system. In the example method **800** of FIG. **8**, a third party application acts as a "virtual line-in" to the local playback system. At block **810**, streaming of music or other content from a third party application to a local content playback system is triggered. For example, a "Play to Sonos" button is pressed on a Rhapsody™ application. At block **820**, content is streamed to one or more components in a household playback network. The music may be streamed to predetermined zones or players in a household, for example. The music may be

**14**

further directed to be played in different zones or players throughout the household. Playback on the local network can be facilitated to one or more zones/players based on a configuration (e.g., a zone scene, theme, and so on). Thus, certain embodiments allow a large degree of flexibility in where the music is actually played. For example, the music can be played in the kitchen, the family room, the patio, and so on. Further, the music may be redirected to different zones.

At block **830**, the incoming content (e.g., audio) stream is provided directly from a third party application or other external source to the local playback network for playback. For example, rather than passing track identifiers, an audio stream is provided to a Sonos household system for playback to one or more configured zones. At block **840**, the local playback system consumes the stream and plays it as it would other content on the local playback (e.g., Sonos™) network (e.g., via zones and so on). At block **850**, a playback device (e.g., a zone player, Play:3™, Play:5™, and so on) adds timing information to the streaming content signal (e.g., the device takes the streaming audio signal and repackages it for local synchronized playback). In some embodiments, timing information is not added to the signal unless two or more playback devices are configured to play the audio in synchrony.

FIG. **9** shows a flow diagram for a method **900** to provide audio content to a local playback system. In the example method **900** of FIG. **9**, a uniform resource indicator (URI) handler approach is provided for content output. At block **910**, a link or other reference is embedded in a third party application (e.g., Facebook™ or Twitter). At block **920**, when the link is selected (e.g., clicked), a local playback (e.g., Sonos™) controller, if available, is launched. At block **930**, the application (e.g., accessed on a phone, tablet, computer, and so on) passes a URI for associated content (e.g., an audio track and so on) to a local playback system (e.g., Sonos™) controller. At block **940**, the local controller outputs the associated content (e.g., plays the music) via the URI. For example, music is streamed from the cloud to one or more playback devices on the local playback network.

In certain embodiments, an application associated with the operating system can register to handle all URIs (URLs) that start with a certain prefix and can define how data is encoded into those URLs so a local playback system application can generate a link (e.g., "sonos:") and put that link into a message (e.g., email, text message, instant message (IM), etc.). The local playback application registered to handle such URLs can parse the URLs to determine what song, playlist, streaming radio station, etc., to play. This launches the controller application. For example, if a first listener likes a song and tweets that song, Twitter™ can include a clickable link which launches a playback application and starts the music playing on a local playback system if the local system can find the song (e.g., if have the application, if have rights/access to the song, etc.). In certain embodiments, the system knows to trigger the receiving user's system rather than the sending user's system to play associated content based on the transmitted link/identifier.

For example, an application can register with the system to handle all URLs that start with a custom prefix (e.g., an HTTP "scheme"). For instance, Sonos controller apps can register to handle any URL that begins with "sonos:" or "x-sonos:". In certain embodiments, a playback system provider can define and publish the format of its URLs so that any third party application can create a link or reference to content. A large amount of data can be encoded into a URL using query parameters, for example.

US 10,779,033 B2

15                                                                16

In an example, when an application tries to "open" or "browse" to a URL, the system checks to see if the scheme of the URL matches the "sonos:" scheme that has been registered with the application. If a URL handler application is found, the system launches that application (e.g., the application can but does not need to be running in the background) and passes the URL to the application. The application then parses the URL and executes functionality based on the data in the URL. For example, the URL can contain the name of a music service and a playlist identifier from that service, plus the name of a Sonos™ Zone Player, causing the Sonos controller to start that playlist playing on that zone.

FIG. **10** shows a flow diagram for a method **1000** to provide audio content to a local playback system. In the example method **1000** of FIG. **10**, at block **1010**, a link or other reference is embedded in a third party application (e.g., Facebook™). At block **1020**, when the link is selected, a playback system (e.g., Sonos™) server is contacted and provided with information regarding selected content for playback. For example, rather than launching a local controller application, a server is contacted regarding music for playback on a local network. At block **1030**, using the provided information, the server identifies and provides the content locally on a user's local playback system. For example, the server can then start playing the music directly on the user's Sonos™ system (e.g., without going through a Sonos™ controller application).

In certain embodiments, a "single sign-on" technology is provided so that the user does not need to re-enter a username and password in order to authenticate to the playback server. Example single sign-on technologies include Facebook Connect™, Windows Live ID™, etc.

In certain embodiments, instead of using a specialized link, such as a "sonos:" link, a normal URL can be used to point to a playback system (e.g., Sonos™) webserver, which generates links with special data embedded in the link. A playback system is identified, and content identified by the URL can be playing at via the local playback network (e.g., mesh network configured for home, hotel room, etc.). Parameters such as authentication, security, location, and so on can be configured for local playback of remote content.

FIG. **11** shows a flow diagram for a method **1100** to provide audio content to a local playback system. The example method **1100** of FIG. **11** provides a "throw it over the wall" approach to content delivery to a local playback system. At block **1110**, a third party application provides a multimedia playback device (e.g., a Sonos™ zone player (ZP)) with enough information about content (e.g., an audio track) so that, at block **1120**, the local playback system (e.g., SonosNet™) can directly access a source of the content and, at block **1130**, play the content directly off the network (e.g., the Internet) or cloud.

In certain embodiments, a local playback controller application is not involved. Information passed over to the local playback device may include an identifier for a single track, a playlist, a streaming radio station, a programmed radio station, and so on. This information can also include a current play position within a list to enable near-seamless "handoff" of music from a portable device to a local playback system. Once the music information is handed from the third-party application to the local playback system, there is no further synchronization between the two systems.

A connection between the third-party application and the local playback device (e.g., Sonos ZonePlayer™) can be direct over a local area network (LAN), remote through a proxy server in the cloud, and so on. A LAN delivery approach may be easier to integrate into "native" applications (e.g., applications written for iOS or Android), and a proxy server approach may be easier for third party applications that are browser-based, for example.

In certain embodiments, information is provided from a third party application to a local playback system without being routed through or by a controller application. Here, the third party application is communicating with the multimedia playback device (e.g., a Sonos ZonePlayer™). Information can be passed locally, rather than through the Internet, for example. The local playback device accesses the Internet to find content to stream, and the third party application takes the place of the controller application (e.g., throw it over the wall—the application passes information and the local playback system runs it).

Certain embodiments provide an approach similar to the "throw it over the wall" or one way communication approach of FIG. **11** except that the third party application not only tells the local playback system what to play, but also maintains two-way communication with the local playback (e.g., Sonos™) system. Two-way communication helps enable features such as keeping a local playback queue synchronized with a queue that the user is editing/managing in the third party application; allow the third party application to know what is currently playing on the local playback system; allow integrated transport control between the third party application and the local playback system; and so on.

In certain embodiments, a local playback system can pass information back to a third party application to indicate a current point of playback (e.g., now playing a third song in a playlist, fourth song in the playlist, and so on). The local playback system can pass parameter information, such as a change in volume, from a local multimedia playback device to the third party application so the application can reflect the change in volume to the user via its graphical user interface. The third party application can instruct the local playback system to skip a song, go to a certain location, and so on.

Certain embodiments provide a third party mode that allows users to select from any local playback network (e.g., Sonos™) controller to listen to audio from one or more third party applications on their smartphones or tablets (e.g., Android™ devices). For example, a user may be using a local playback network controller application and now wants a third party application to appear as an audio source within the controller application. The user can then select the controller application that he or she wishes to play audio from the third party application, for example.

Certain embodiments provide queue management to allow a third party application to control a local playback queue. That is, the local playback system has a queue, but the third party application allows users to add, delete and so on from the queue, for example. Rather than switch from content that the user is currently playing, the local playback system allows a user to create a playlist on the fly. For example, if last.fm users vote that they do not like a song and it should be skipped, then the local playback system will skip it.

Certain embodiments allow a third party application to override a local playback queue with its own application-specific queue. The local playback system periodically fetches a short list of tracks to play next. The list of tracks to play is determined by the third-party application, for example. In certain embodiments, a shared queue is provided between the local playback system and the third party application to keep the local system and application synchronized.

17                                          18

Certain embodiments allow control of playback system functions and/or settings via an external (e.g., third party) application. For example, a local playback system can allow volume control, play/pause, and so on and can interact with an application running on a given platform/operating system (OS). Certain embodiments provide a Web API that can be used to access functionality.

Certain embodiments facilitate control of a local playback system from outside a household or other location at which the local playback network is configured. For example, a user can queue up music while away from his or her house. The application can facilitate setup and/or configuration. For example, a third party application may ask the user to enter a Sonos customer email address and password. The application can then make a request to a Sonos server in the cloud to determine the zone groups on which music can be played.

Various inventions have been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts can be resorted without departing from the spirit and scope of the present disclosure as claimed. While the embodiments discussed herein can appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the embodiments have applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present disclosure is defined by the appended claims rather than the forgoing description of embodiments.

The invention claimed is:

**1**. A computing device comprising:

at least one processor;

a non-transitory computer-readable medium; and

program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service;

while operating in the first mode, displaying a representation of one or more playback devices in a media playback system that are each i) communicatively coupled to the computing device over a data network and ii) available to accept playback responsibility for the remote playback queue;

while displaying the representation of the one or more playback devices, receiving user input indicating a selection of at least one given playback device from the one or more playback devices;

based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item;

detecting an indication that playback responsibility for the remote playback queue has been successfully

transferred from the computing device to the at least one given playback device; and

after detecting the indication, transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue.

**2**. The computing device of claim **1**, wherein the instruction comprises an instruction for the cloud-based computing system associated with the media service to provide the data identifying the next one or more media items to the given playback device for use in retrieving the at least one media item from the cloud-based computing system associated with the cloud-based media service.

**3**. The computing device of claim **1**, wherein the instruction comprises an instruction for the cloud-based computing system associated with the cloud-based media service to provide the at least one media item to the given playback device.

**4**. The computing device of claim **1**, wherein the representation of the one or more playback devices comprises at least one selectable indicator for a group of playback devices that includes the given playback device and one or more other playback devices that are to be configured for synchronous playback of the remote playback queue, and wherein the user input indicating the selection of at least one given playback device from the one or more playback devices comprises user input indicating a selection of the group of playback devices.

**5**. The computing device of claim **1**, wherein operating in a first mode in which the computing device is configured for playback of the remote playback queue comprises operating in the first mode in which the computing device has received user input indicating a selection of the remote playback queue for playback by the computing device but the computing device has not yet begun playback of the remote playback queue.

**6**. The computing device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

beginning to operate in the first mode after i) launching a media application associated with the cloud-based media service and ii) receiving user input indicating a selection of the remote playback queue.

**7**. The computing device of claim **1**, wherein:

operating in the first mode further involves providing a control interface comprising one or more selectable control icons that are configured to control playback of the remote playback queue by the computing device;

transitioning from the first mode to the second mode further involves modifying the control interface such that the one or more selectable control icons are configured to control playback of the remote playback queue by the at least one playback device instead of the computing device.

**8**. The computing device of claim **7**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

after transitioning to the second mode, receiving user input indicating a selection of a given control icon of

US 10,779,033 B2

19

the one or more selectable control icons, wherein the given control icon corresponds to a given transport control operation; and

based on receiving the user input indicating the selection of the given control icon, causing the corresponding transport control operation to be executed by the given playback device.

9. The computing device of claim 8, wherein the transport control operation comprises one of a play operation, a pause operation, a skip forward operation, or a skip back operation.

10. The computing device of claim 1, wherein the cloud-based computing system associated with the cloud-based media service includes one or more cloud servers.

11. The computing device of claim 1, wherein displaying the representation of the one or more playback devices comprises:

displaying the representation of the one or more playback devices in response to receiving a selection of a displayed icon indicating that playback responsibility for the remote playback queue can be transferred.

12. A non-transitory computer-readable medium having stored thereon program instructions that, when executed by at least one processor, cause a computing device to perform functions comprising:

operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service;

while operating in the first mode, displaying a representation of one or more playback devices in a media playback system that are each i) communicatively coupled to the computing device over a data network and ii) available to accept playback responsibility for the remote playback queue;

while displaying the representation of the one or more playback devices, receiving user input indicating a selection of at least one given playback device from the one or more playback devices;

based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item;

detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device; and

after detecting the indication, transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue.

13. The non-transitory computer-readable medium of claim 12, wherein the instruction comprises an instruction

20

for the cloud-based computing system associated with the cloud-based media service to provide the data identifying the next one or more media items to the given playback device for use in obtaining the at least one media item from the cloud-based computing system associated with the cloud-based media service.

14. The non-transitory computer-readable medium of claim 12, wherein the instruction comprises an instruction for the cloud-based computing system associated with the media service to provide the at least one media item to the given playback device.

15. A method carried out by a computing device, the method comprising:

operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service;

while operating in the first mode, displaying a representation of one or more playback devices in a media playback system that are each i) communicatively coupled to the computing device over a data network and ii) available to accept playback responsibility for the remote playback queue;

while displaying the representation of the one or more playback devices, receiving user input indicating a selection of at least one given playback device from the one or more playback devices;

based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item;

detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device; and

after detecting the indication, transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue.

16. The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising:

before displaying the representation of the one or more playback devices, receiving an indication that the one or more playback devices in the media playback system are available to accept playback responsibility for the remote playback queue.

* * * * *

# EXHIBIT 3

US009344206B2

(12) **United States Patent**
Lambourne

(10) **Patent No.:** **US 9,344,206 B2**
(45) **Date of Patent:** **May 17, 2016**

(54) **METHOD AND APPARATUS FOR UPDATING ZONE CONFIGURATIONS IN A MULTI-ZONE SYSTEM**

(71) Applicant: **Sonos, Inc**, Santa Barbara, CA (US)

(72) Inventor: **Robert A. Lambourne**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/465,457**

(22) Filed: **Aug. 21, 2014**

(65) **Prior Publication Data**

US 2014/0361867 A1     Dec. 11, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/896,829, filed on May 17, 2013, which is a continuation of application No. 11/853,790, filed on Sep. 11, 2007, now Pat. No. 8,483,853.

(60) Provisional application No. 60/825,407, filed on Sep. 12, 2006.

(51) **Int. Cl.**
*G06F 17/00*        (2006.01)
*H04H 60/80*       (2008.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... *H04H 60/80* (2013.01); *G05B 15/02* (2013.01); *G06F 3/0482* (2013.01); *G06F 3/04842* (2013.01); *G06F 3/16* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... H04H 60/80; H05B 15/02; H04R 3/12;

H04R 27/00; H04R 2227/005; H04R 2430/01; H03G 7/00; H03G 1/02; G06F 3/16; G06F 3/165; G06F 3/0482; G06F 3/04842; H04N 21/43615
USPC ................ 700/94; 381/120, 80; 715/716, 727
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,182,552 A     1/1993   Paynting
5,406,634 A     4/1995   Anderson et al.
(Continued)

FOREIGN PATENT DOCUMENTS

JP        2009218888        9/2009
JP        2011176581        9/2011
(Continued)

OTHER PUBLICATIONS

Dynaudio Air series speakers; copyright and available for sale at least 2002.*

(Continued)

*Primary Examiner* — Paul McCord
(74) *Attorney, Agent, or Firm* — McDonnell, Boehnen, Hulbert & Berghoff LLP

(57)        **ABSTRACT**

In general, techniques of controlling a plurality of multimedia players in groups are disclosed. According to one aspect of the present invention, a mechanism is provided to allow a user to group some of the players according to a theme or scene, where each of the players is located in a zone. When the scene is activated, the players in the scene react in a synchronized manner. For example, the players in the scene are all caused to play a multimedia source or music in a playlist, wherein the multimedia source may be located anywhere on a network.

**20 Claims, 11 Drawing Sheets**



Zone Configuration/Scene

# US 9,344,206 B2
Page 2

## (51) Int. Cl.

| | |
|---|---|
| G05B 15/02 | (2006.01) |
| H04R 3/12 | (2006.01) |
| G06F 3/16 | (2006.01) |
| H03G 7/00 | (2006.01) |
| H04N 21/436 | (2011.01) |
| G06F 3/0482 | (2013.01) |
| G06F 3/0484 | (2013.01) |
| H03G 1/02 | (2006.01) |
| H04R 27/00 | (2006.01) |

## (52) U.S. Cl.

CPC ................. **G06F 3/165** (2013.01); **H03G 1/02** (2013.01); **H03G 7/00** (2013.01); **H04N 21/43615** (2013.01); **H04R 3/12** (2013.01); **H04R 27/00** (2013.01); **H04R 2227/005** (2013.01); **H04R 2430/01** (2013.01)

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,519,641 | A | 5/1996 | Beers et al. |
| 5,923,902 | A | 7/1999 | Inagaki |
| 5,946,343 | A | 8/1999 | Schotz et al. |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,604,023 | B1 | 8/2003 | Brown et al. |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,889,207 | B2 | 5/2005 | Slemmer et al. |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,187,947 | B1 | 3/2007 | White et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,302,468 | B2 | 11/2007 | Wijeratne |
| 7,346,332 | B2 * | 3/2008 | McCarty et al. .............. 455/402 |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |
| 7,539,551 | B2 | 5/2009 | Komura et al. |
| 7,558,224 | B1 | 7/2009 | Surazski et al. |
| 7,561,932 | B1 * | 7/2009 | Holmes et al. .................. 700/94 |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,626,952 | B2 | 12/2009 | Slemmer et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |
| 7,668,990 | B2 | 2/2010 | Krizyzanowski et al. |
| 7,689,305 | B2 | 3/2010 | Kreifeldt et al. |
| 7,742,832 | B1 | 6/2010 | Feldman et al. |
| 7,761,176 | B2 | 7/2010 | Ben-Yaacov et al. |
| 7,804,972 | B2 | 9/2010 | Melanson |
| 7,805,210 | B2 | 9/2010 | Cucos et al. |
| 7,817,960 | B2 | 10/2010 | Tan et al. |
| 7,849,181 | B2 | 12/2010 | Slemmer et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,962,482 | B2 | 6/2011 | Handman et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,054,987 | B2 | 11/2011 | Seydoux |
| 8,086,287 | B2 | 12/2011 | Mooney et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,135,141 | B2 | 3/2012 | Shiba |
| 8,189,824 | B2 | 5/2012 | Strauss et al. |
| 8,233,635 | B2 | 7/2012 | Shiba |
| 8,234,395 | B2 | 7/2012 | Millington |
| 8,239,559 | B2 | 8/2012 | Rajapakse |
| 8,290,603 | B1 | 10/2012 | Lambourne |
| 8,423,893 | B2 | 4/2013 | Ramsay et al. |
| 8,483,853 | B1 | 7/2013 | Lambourne |
| 8,498,726 | B2 | 7/2013 | Kim et al. |

| | | | |
|---|---|---|---|
| 8,588,432 | B1 | 11/2013 | Simon |
| 8,700,730 | B2 | 4/2014 | Rowe |
| 8,762,565 | B2 | 6/2014 | Togashi et al. |
| 8,788,080 | B1 | 7/2014 | Kallai et al. |
| 8,965,544 | B2 | 2/2015 | Ramsay |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2002/0002039 | A1 | 1/2002 | Qureshey et al. |
| 2002/0003548 | A1 | 1/2002 | Krusche et al. |
| 2002/0022453 | A1 | 2/2002 | Balog |
| 2002/0026442 | A1 | 2/2002 | Lipscomb |
| 2002/0072816 | A1 | 6/2002 | Shdema et al. |
| 2002/0098878 | A1 | 7/2002 | Mooney et al. |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2002/0143547 | A1 * | 10/2002 | Fay et al. ....................... 704/270 |
| 2003/0020763 | A1 | 1/2003 | Mayer et al. |
| 2003/0157951 | A1 | 8/2003 | Hasty, Jr. |
| 2003/0167335 | A1 | 9/2003 | Alexander |
| 2003/0177889 | A1 | 9/2003 | Koseki et al. |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2004/0010727 | A1 | 1/2004 | Fujinami |
| 2004/0015252 | A1 | 1/2004 | Aiso et al. |
| 2004/0024478 | A1 | 2/2004 | Hans |
| 2004/0117044 | A1 | 6/2004 | Konetski |
| 2004/0131192 | A1 | 7/2004 | Metcalf |
| 2004/0147224 | A1 * | 7/2004 | Lee ............................... 455/41.3 |
| 2004/0220687 | A1 * | 11/2004 | Klotz et al. .................... 700/94 |
| 2004/0223622 | A1 | 11/2004 | Lindemann et al. |
| 2004/0225389 | A1 | 11/2004 | Ledoux et al. |
| 2005/0002535 | A1 | 1/2005 | Liu et al. |
| 2005/0021470 | A1 | 1/2005 | Martin et al. |
| 2005/0100174 | A1 | 5/2005 | Howard et al. |
| 2005/0131558 | A1 | 6/2005 | Braithwaite et al. |
| 2005/0144284 | A1 | 6/2005 | Ludwig et al. |
| 2005/0177256 | A1 | 8/2005 | Shintani et al. |
| 2005/0254505 | A1 | 11/2005 | Chang et al. |
| 2005/0289244 | A1 | 12/2005 | Sahu et al. |
| 2006/0041616 | A1 | 2/2006 | Ludwig et al. |
| 2006/0149402 | A1 | 7/2006 | Chung |
| 2006/0179160 | A1 | 8/2006 | Uehara et al. |
| 2006/0205349 | A1 | 9/2006 | Passier et al. |
| 2006/0229752 | A1 | 10/2006 | Chung |
| 2007/0142022 | A1 | 6/2007 | Madonna et al. |
| 2007/0142944 | A1 | 6/2007 | Goldberg et al. |
| 2007/0189544 | A1 | 8/2007 | Rosenberg |
| 2007/0223725 | A1 | 9/2007 | Neumann et al. |
| 2007/0288610 | A1 | 12/2007 | Saint Clair et al. |
| 2008/0025535 | A1 | 1/2008 | Rajapakse |
| 2008/0045140 | A1 | 2/2008 | Korhonen |
| 2008/0066094 | A1 | 3/2008 | Igoe |
| 2008/0066120 | A1 | 3/2008 | Igoe |
| 2008/0077261 | A1 | 3/2008 | Baudino et al. |
| 2008/0092204 | A1 * | 4/2008 | Bryce et al. ................... 725/143 |
| 2008/0144861 | A1 | 6/2008 | Melanson et al. |
| 2008/0152165 | A1 | 6/2008 | Zacchi |
| 2008/0159545 | A1 | 7/2008 | Takumai et al. |
| 2008/0162668 | A1 | 7/2008 | Miller |
| 2009/0097672 | A1 | 4/2009 | Buil et al. |
| 2009/0238919 | A1 | 9/2009 | Zott et al. |
| 2009/0232326 | A1 | 9/2009 | Gordon et al. |
| 2010/0010651 | A1 | 1/2010 | Kirkeby et al. |
| 2010/0052843 | A1 | 3/2010 | Cannistraro |
| 2010/0153097 | A1 | 6/2010 | Hotho et al. |
| 2010/0284389 | A1 | 11/2010 | Ramsay et al. |
| 2010/0299639 | A1 | 11/2010 | Ramsay et al. |
| 2012/0047435 | A1 | 2/2012 | Holladay et al. |
| 2013/0253679 | A1 | 9/2013 | Lambourne |
| 2013/0293345 | A1 | 11/2013 | Lambourne |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 0153994 | 7/2001 |
| WO | 2005013047 | 2/2005 |
| WO | 2012137190 | 10/2012 |

### OTHER PUBLICATIONS

Bluetooth, "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity" Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.(Document

# US 9,344,206 B2

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

uploaded in 7 different files: NPL1__part1 pp. 1 to 150, NPL1__part2 pp. 151 to 300, NPL1__part3 pp. 301 to 450, NPL1__part4 pp. 451 to 600,NPL1__part5 pp. 601 to 750, NPL1__part6 pp. 751 to 900 and NPL1__part7 pp. 901 to 1068).

Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy" Core, Version 1.0 B, Dec. 1, 1999, 1081 pages. (Document uploaded in 8 different files: NPL2__part1 pp. 1 to 150, NPL2__part2 pp. 151 to 303, NPL2__part3 pp. 304 to 453, NPL2__part4 pp. 454 to 603,NPL2__part5 pp. 604 to 703, NPL2__part6 pp. 704 to 854 and NPL2__part7 pp. 855 to 1005, NPL2__part8 pp. 1006 to 1081).

Dell, Inc., "Dell Digital Audio Receiver: Reference Guide", Jun. 2000, 70 pages.

Dell, Inc., "Start Here", Jun. 2000, 2 pages.

Jones, Stephen, "Dell Digital Audio Receiver: Digital upgrade for your analog stereo" Analog Stereo, Jun. 24, 2000 < http://www.reviewsonline.com/articles/961906864.htm> retrieved Jun. 18, 2014, 2 pages.

Louderback, Jim, "Affordable Audio Receiver Furnishes Homes With MP3",TechTV Vault, Jun. 28, 2000 <http://www.g4tv.com/articles/17923/affordable-audio-receiver-furnishes-homes-with-mp3/> retrieved Jul. 10, 2014, 2 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/896,037, mailed on Feb. 13, 2014, 10 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/892,230, mailed on May 9, 2014, 10 pages.

United States Patent and Trademark Office, "Notice of Allowance", issued in connection with U.S. Appl. No. 13/896,037, mailed on Oct. 28, 2014, 7 pages.

Palm, Inc., "Handbook for the Palm VII Handheld", May 2000, 311 pages.

Higgins et al., "Presentations at WinHEC 2000" May 2000, 138 pages.

The United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/013,740, mailed on Feb. 10, 2014, 13 pages.

Rane: DragNet software; available for sale at least 2006, 8 pages.

Yamaha DME Designer software manual: Copyright 2004, 482 pages.

Co-pending U.S. Appl. No. 13/083,499, filed Apr. 8, 2011, 69 pages.

The United States Patent and Trademark Office, "Final Office Action", issued in connection with U.S. Appl. No. 13/013,740, mailed on Feb. 10, 2014, 13 pages.

International Bureau, "International preliminary report on patentability," issued in connection with International Patent Application No. PCT/182012/052071, mailed Oct. 17, 2013, 7 pages.

The United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/013,740, mailed on Sep. 27, 2013, 12 pages.

International Bureau, "Search Report", issued in connection with PCT Application No. PCT/IB2012/052071, mailed on Aug. 23, 2012, 3 pages.

Jo J., et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, vol. 4861, pp. 71-82.

Mills D.L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, <http://www.ietf.org/rfc/rfc1305.txt>, 7 pages.

"Polycom Conference Composer manual: copyright 2001", 29 pages.

International Bureau, "Written Opinion", issued in connection with PCT Application No. PCT/IB2012/052071, mailed on Aug. 23, 2012, 6 pages.

The United States Patent and Trademark Office, "Advisory Action", issued in connection with U.S. Appl. No. 11/853,790, mailed Dec. 22, 2011, 3 pages.

The United States Patent and Trademark Office, "Final Office Action", issued in connection with U.S. Appl. No. 11/853,790, mailed Oct. 13, 2011, 9 pages.

The United States Patent and Trademark Office, "Notice of Allowance", issued in connection with U.S. Appl. No. 11/853,790, mailed Apr. 18, 2013, 8 pages.

The United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 11/853,790, mailed Mar. 8, 2011, 12 pages.

"UPnP; "Universal Plug and Play Device Architecture"; Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54".

Voyetra; Turtle Beach Inc., "Audio Tron Quick Start Guide, Version 1.0", Mar. 2001, 24 pages.

Voyetra; Turtle Beach Inc., "Audio Tron Reference Manual, Version 3.0", May 2002, 70 pages.

Voyetra; Turtle Beach Inc., "Audio Tron Setup Guide, Version 3.0", May 2002, 38 pages.

"Yamaha DME 32 manual": copyright 2000, pp. 296.

The United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 13/896,829, mailed on Jun. 12, 2014, 54 pages.

The United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 13/896,829, mailed on Jan. 7, 2014, 9 pages.

The United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 14/256,434, mailed on Jul. 23, 2014, 12 pages.

The United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 13/083,499, mailed on Jun. 2, 2014, 5 pages.

"Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages".

"Yamaha DME Designer 3.5 set-up manual guide; copyright 2004, 16 pages"

Yamaha, "DME Designer 3.5 User Manual", Copyright 2004, 507 pages. (Document uploaded in 5 different files:—. NPL28__part1 pp. 1 to 128,—. NPL28__part2 pp. 129 to 263—. NPL28__part3 pp. 264 to 378—. NPL28__part4 pp. 379 to 471—. NPL28__part5 pp. 472 to 507).

The United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 13/896,037, mailed on Jul. 23, 2014, 12 pages.

The United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 13/892,230, mailed on Sep. 10, 2014, 5 pages.

Canadian Patent Office "Office Action", issued in connection with Canadian Patent Application No. 2,832,542, mailed on Apr. 10, 2015, 3 pages.

Dorwaldt Carl, "EASE 4.1 Tutorial", Renkus-Heinz, Inc., 2004, 417 pages.(NPL uploaded in 3 parts).

United States Patent and Trademark Office, "Non-Final Office Action" issued in connection with U.S. Appl. No. 14/299,847, mailed on Mar. 23, 2015, 14 pages.

Notice of Allowance mailed on Jul. 10, 2015, issued in connection with U.S. Appl. No. 13/013740, filed Jan. 25, 2011, 9 pages.

"Corrected Notice of Allowance mailed on Oct. 30, 2015, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 2 pages."

"Notice of Allowance mailed on May 13, 2015, issued in connection with U.S. Appl. No. 14/299,847, filed Jun. 9, 2014, 10 pages."

Notice of Allowance mailed on Oct. 27, 2015, issued in connection with U.S. Appl. No. 14/299,847, filed Jun. 9, 2014, 5 pages.

United States Patent and Trademark Office, "Non-Final Office Action", issued in connection with U.S. Appl. No. 13/013,740, mailed on Feb. 13, 2015, 14 pages.

United States Patent and Trademark Office, "Notice of Allowance", issued in connection with U.S. Appl. No. 14/256,434, mailed on Dec. 5, 2014, 7 pages.

Intellectual Property Office of Japan, "Office action", issued in connection with Japanese patent application No. 2014-503273, issue on Jan. 6, 2015, 5 pages.

* cited by examiner



**FIG. 1**



**FIG. 2A**



*FIG. 2B*



FIG. 2C



*FIG. 3A*



*FIG. 3B*



*FIG. 4*



*FIG. 5A*

520



*FIG. 5B*



**FIG. 5C**



*FIG. 6*

US 9,344,206 B2

**1**

# METHOD AND APPARATUS FOR UPDATING ZONE CONFIGURATIONS IN A MULTI-ZONE SYSTEM

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of and claims priority to U.S. patent application Ser. No. 13/896,829, filed on May 17, 2013, entitled "METHOD AND APPARATUS FOR UPDAT- 10 ING ZONE CONFIGURATIONS IN A MULTI-ZONE SYSTEM" and to U.S. patent application Ser. No. 11/853,790, filed Sep. 11, 2007, entitled "CONTROLLING AND MANIPULATING GROUPINGS IN A MULTI-ZONE MEDIA SYSTEM," and U.S. Provisional Application No. 15 60/825,407 filed on Sep. 12, 2006, entitled "CONTROL- LING AND MANIPULATING GROUPINGS IN A MULTI- ZONE MEDIA SYSTEM," each of which is hereby incorpo- rated by reference in its entirety for all purposes.

20

### BACKGROUND OF THE INVENTION

#### Field of the Invention

The invention is generally related to the area of consumer 25 electronics and human-computer interaction. In particular, the invention is related to method and apparatus for control- ling or manipulating a plurality of multimedia players in a multi-zone system.

An enduring passion for quality audio reproduction or 30 system is continuing to drive demands from users. One of the demands includes an audio system in a house in which, for example, one could grill to classic rock on a patio while another one may cook up his/her own music selections in a kitchen. This is all at the same time while a teenager catches 35 a ballgame in a family room, and another one blasts pop in a bedroom. And the best part of such audio system is that each family member does not need his or her own stereo system— one system gives everyone access to all the music sources.

Currently, one of the systems that can meet part of such 40 demand is a conventional multi-zone audio system that usu- ally includes a number of audio players. Each of the audio players has its own amplifier(s) and a set of speakers and typically installed in one place (e.g., a room). In order to play an audio source at one location, the audio source must be 45 provided locally or from a centralized location. When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult. When the audio source is provided centrally, the centralized location may include a juke box, 50 many compact discs, an AM or FM radio, tapes, or others. To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources. 55

In order to achieve playing different audio sources in dif- ferent audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-config- ured and pre-programmed controller. While the pre-pro- grammed configuration may be satisfactory in one situation, 60 it may not be suitable for another situation. For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning. The same person may wish to listen in the den and the living room to 65 music from a compact disc in the evening. In order to satisfy such requirements, two groups of audio players must be

**2**

established. In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news. In the evening, the audio players in the den and the living room are grouped for the music. Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music. Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups.

There is a need for dynamic control of the audio players as a group. With a minimum manipulation, the audio players may be readily grouped. In a traditional multi-zone audio system, the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment. Further, there is a need to individually or sys- tematically adjust the audio volume of the audio players.

### SUMMARY OF THE INVENTION

This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups. According to one aspect of the present invention, a mecha- nism is provided to allow a user to group some of the players according to a theme or scene, where each of the players is located in a zone. When the scene is activated, the players in the scene react in a synchronized manner. For example, the players in the scene are all caused to play an audio source or music in a playlist, wherein the audio source may be located anywhere on a network.

According to another aspect of the present invention, the scene may be activated at any time or a specific time. A user may activate the scene at any time so that only some selected zones in an entertainment system facilitate a playback of an audio source. When the scene is activated at a specific time, the scene may be used as an alarm or buzzer.

According to still another aspect of the present invention, a controlling device (also referred to herein as controller) is provided to facilitate a user to select any of the players in the system to form respective groups each of which is set up per a scene. Although various scenes may be saved in any of the members in a group, commands are preferably sent from the controller to the rest of the members when one of the scenes is executed. Depending on implementation, the commands include parameters pertaining to identifiers of the players, volumes settings, audio source and etc.

According to yet another aspect of the present invention, a configurable module is implemented in the controlling device that provides interactive graphic user interface for forming, managing and controlling groups in the system, de-grouping a group or adjusting audio volume of individual players or a group of players.

The present invention may be implemented in many forms including software, hardware or a combination of both. According to one embodiment, the present invention is directed to a method for groupings in a multi-zone media system, the method comprises providing a mechanism to allow a user to determine which players in the system to be associated with a theme representing a group; and configur- ing the theme with parameters pertaining to the players,

**3**

wherein the theme is activated at anytime or a specific time so that the players react in a synchronized manner. The players in a scene are synchronized to play a multimedia file when the scene is activated.

According to another embodiment, the present invention is directed to an entertainment system for grouping players, the system comprises: a plurality of players, each located in one zone; and a controller providing a mechanism to allow a user to select which of the players to be associated with a theme representing a group; and configure the theme with parameters pertaining to the selected players, wherein the theme is activated at anytime or a specific time so that the selected players react in a synchronized manner. As a result, the selected players are synchronized to play a multimedia that is in a digital format and retrieved from a source over a network.

One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other.

Other objects, features, and advantages of the present invention will become apparent upon examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an exemplary configuration in which the present invention may be practiced;

FIG. **2A** shows an exemplary functional block diagram of a player in accordance with the present invention;

FIG. **2B** shows an example of a controller that may be used to remotely control one or more players of FIG. **2A**;

FIG. **2C** shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

FIG. **3A** provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning";

FIG. **3B** shows that a user defines multiple groups to be gathered at the same time;

FIG. **4** shows an exemplary user interface that may be displayed on a controller or a computer of FIG. **1**;

FIG. **5A** shows a user interface to allow a user to form a scene;

FIG. **5B** shows another user interface **520** to allow a user to form a scene;

FIG. **5C** shows a user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively; and

FIG. **6** shows a flowchart or process of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The detailed description of the invention is presented largely in terms of procedures in terms of procedures, steps, logic blocks, processing, and other symbolic representations

**4**

that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. **1** shows an exemplary configuration **100** in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a complex with multiple zones. There are a number of multimedia players of which three examples **102**, **104** and **106** are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

As used herein, unless explicitly stated otherwise, an audio source or audio sources are in digital format and can be transported or streamed over a data network. To facilitate the understanding of the present invention, it is assumed that the configuration **100** represents a home. Thus, the zone player **102** and **104** may be located in two of the bedrooms respectively while the zone player **106** may be installed in a living room. All of the zone players **102**, **104** and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102**, **104** and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102**, **104** and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet).

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** or any of the zone players can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be

**5**

converted to digital audio sources. In accordance with the present invention, the audio source may be shared among the devices on the network **108**.

Two or more zone players may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group.

Referring now to FIG. **2**A, there is shown an exemplary functional block diagram of a zone player **200** in accordance with the present invention. The zone player **200** includes a network interface **202**, a processor **204**, a memory **206**, an audio processing circuit **210**, a module **212**, and optionally, an audio amplifier **214** that may be internal or external. The network interface **202** facilitates a data flow between a data network (i.e., the data network **108** of FIG. **1**) and the zone player **200** and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols used in the Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general, a network interface manages the assembling of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface **202** handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **200**.

The network interface **202** may include one or both of a wireless interface **216** and a wired interface **217**. The wireless interface **216**, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player **200** to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g). The wired interface **217** provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player **200** includes both of the interfaces **216** and **217**, and other zone players include only a RF or wired interface. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the zone player. The processor **204** is configured to control the operation of other parts in the zone player **200**. The memory **206** may be loaded with one or more software modules that can be executed by the processor **204** to achieve desired tasks. According to one aspect of the present invention, a software module implementing one embodiment of the present invention is executed, the processor **204** operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player **200** is caused to retrieve an audio source from another zone player or a device on the network.

According to one embodiment of the present invention, the memory **206** is used to save one or more saved zone configuration files that may be retrieved for modification at any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device **140** or **142** of FIG. **1**, a computer, a portable device, or a TV) when a user operates the controlling device. The zone group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

The audio processing circuit **210** resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface **202**, the audio source is processed in the audio processing circuit **210** to produce analog audio signals. The processed analog audio signals are

**6**

then provided to the audio amplifier **214** for playback on speakers. In addition, the audio processing circuit **210** may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the module **212** may be implemented as a combination of hardware and software. In one embodiment, the module **212** is used to save a scene. The audio amplifier **214** is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

Referring now to FIG. **2**B, there is shown an exemplary controller **240**, which may correspond to the controlling device **140** or **142** of FIG. **1**. The controller **240** may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller **240** is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player **200**) through a RF interface corresponding to the RF interface **216** of FIG. **2**A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b or 802.11g). When a particular audio source is being played in the zone player **200**, a picture, if there is any, associated with the audio source may be transmitted from the zone player **200** to the controller **240** for display. In one embodiment, the controller **240** is used to synchronize more than one zone players by grouping the zone players in a group. In another embodiment, the controller **240** is used to control the volume of each of the zone players in a zone group individually or together.

The user interface for the controller **240** includes a screen **242** (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button **244**, a "back" button **246**, a "music" button **248**, a scroll wheel **250**, "ok" button **252**, a set of transport control buttons **254**, a mute button **262**, a volume up/down button **264**, a set of soft buttons **266** corresponding to the labels **268** displayed on the screen **242**.

The screen **242** displays various screen menus in response to a user's selection. In one embodiment, the "zones" button **244** activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button **246** may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the 'back' button negates the user's erroneous selection. The "music" button **248** activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

The scroll wheel **250** is used for selecting an item within a list, whenever a list is presented on the screen **242**. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel **250** to either choose a displayed item or display a hidden item in the list. The "ok" button **252** is used to confirm the user selection on the screen **242**.

There are three transport buttons **254**, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button **262** or the volume up/down button **264** activates a volume panel. In addition, there are three soft buttons **266** that can be activated in accordance with the labels

7

268 on the screen 242. It can be understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone player. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. 2C illustrates an internal functional block diagram of an exemplary controller 270, which may correspond to the controller 240 of FIG. 2B. The screen 272 on the controller 270 may be a LCD screen. The screen 272 communicates with and is commanded by a screen driver 274 that is controlled by a microcontroller (e.g., a processor) 276. The memory 282 may be loaded with one or more application modules 284 that can be executed by the microcontroller 276 with or without a user input via the user interface 278 to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio volumes of the zone players in a zone group. In operation, when the microcontroller 276 executes one of the application modules 284, the screen driver 274 generates control signals to drive the screen 272 to display an application specific user interface accordingly, more of which will be described below.

The controller 270 includes a network interface 280 referred to as a RF interface 280 that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller 270 may control one or more zone players, such as 102, 104 and 106 of FIG. 1. Nevertheless, there may be more than one controllers, each preferably in a zone (e.g., a room) and configured to control any one and all of the zone players.

In one embodiment, a user creates a zone group including at least two zone players from the controller 240 that sends signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group play-back an identical audio source or a list of identical audio sources in a timely synchronized manner. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in scale.

According to one implementation, an application module is loaded in memory 282 for zone group management. When a predetermined key (e.g. the "zones" button 244) is activated on the controller 240, the application module is executed in the microcontroller 276. The input interface 278 coupled to and controlled by the microcontroller 276 receives inputs from a user. A "Zone Menu" is then displayed on the screen 272. The user may start grouping zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. The detail of the zone group manipulation will be further discussed below.

As described above, the input interface 278 includes a number of function buttons as well as a screen graphical user interface. It should be pointed out that the controller 240 in FIG. 2B is not the only controlling device that may practice the present invention. Other devices that provide the equiva-

8

lent control functions (e.g., a computing device, a hand-held device) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

One mechanism for 'joining' zone players together for music playback is to link a number of zone players together to form a group. To link a number of zone players together, a user may manually link each zone player or room one after the other. For example, there is a multi-zone system that includes the following zones.
Bathroom
Bedroom
Den
Dining Room
Family Room
Foyer

If the user wishes to link 5 of the 6 zone players using the current mechanism, he/she must start with a single zone and then manually link each zone to that zone. This mechanism may be sometimes quite time consuming. According to one embodiment, a set of zones can be dynamically linked together using one command. Using what is referred to herein as a theme or a zone scene, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated.

For instance, a "Morning" zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action. Without this single command, the user would need to manually and individually link each zone. FIG. 3A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning".

Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

In one embodiment as shown in FIG. 3B, a user defines multiple groups to be gathered at the same time. For example: an "Evening Scene" is desired to link the following zones:
Group 1
Bedroom
Den
Dining Room
Group 2
Garage
Garden
where Bathroom, Family Room and Foyer should be separated from any group if they were part of a group before the Zone Scene was invoked.

One important of the features, benefits and objects in the present invention is that that zones do not need to be separated before a zone scene is invoked. In one embodiment, a command is provided and links all zones in one step, if invoked. The command is in a form of a zone scene. After linking the appropriate zones, a zone scene command could apply the following attributes:
Set volumes levels in each zones (each zone can have a different volume) Mute/Unmute zones.
Select and play specific music in the zones.
Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)

US 9,344,206 B2

**9**

Set the music playback equalization of each zone (e.g., bass treble).

A further extension of this embodiment is to trigger a zone scene command as an alarm clock function. For instance the zone scene is set to apply at 8:00 am. It could link appropriate zones automatically, set specific music to play and then stop the music after a defined duration. Although a single zone may be assigned to an alarm, a scene set as an alarm clock provides a synchronized alarm, allowing any zones linked in the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed UPnP, no Internet connection for an Internet Radio station), a backup buzzer will sound. This buzzer will be a sound file that is stored in a zone player.

FIG. **4** shows an exemplary user interface **400** that may be displayed on a controller **142** or a computer **110** of FIG. **1**. The interface **400** shows a list of items that may be set up by a user to cause a scene to function at a specific time. In the embodiment shown in FIG. **4**, the list of items includes "Alarm", "Time", "Zone", "Music", "Frequency" and "Alarm length". "Alarm" can be set on or off. When "Alarm" is set on, "Time" is a specific time to set off the alarm. "Zone" shows which zone players are being set to play a specified audio at the specific time. "Music" shows what to be played when the specific time arrives. "Frequency" allows the user to define a frequency of the alarm. "Alarm length" defines how long the audio is to be played. It should be noted that the user interface **400** is provided herein to show some of the functions associated with setting up an alarm. Depending on an exact implementation, other functions, such as time zone, daylight savings, time synchronization, and time/date format for display may also be provided without departing from the present invention.

According to one embodiment, each zone player in a scene may be set up for different alarms. For example, a "Morning" scene includes three zone players, each in a bedroom, a den, and a dining room. After selecting the scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.

FIG. **5A** shows a user interface **500** to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and be grouped as part of this scene. Depending on an exact implementation of a user interface, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.

FIG. **5B** shows another user interface **520** to allow a user to form a scene. The user interface **520** that may be displayed on a controller or a computing device, lists available zones in a system. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

FIG. **5C** shows a user interface **510** to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. As shown in the user interface **510**, the 'Volumes . . . ' button (shown as sliders, other forms are possible) allows the user to affect the volumes of the associated zone players when a zone scene is invoked. In one embodiment, the zone players can be set to retain whatever volume that they currently have when the scene is invoked. Additionally the user can decide if the volumes should be unmuted or muted when the scene is invoked.

FIG. **6** shows a flowchart or process **600** of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone. The process

**10**

**600** is presented in accordance with one embodiment of the present invention and may be implemented in a module to be located in the memory **282** of FIG. **2C**.

The process **600** is initiated only when a user decides to proceed with a zone scene at **602**. The process **600** then moves to **604** where it allows a user to decide which zone players to be associated with the scene. For example, there are ten players in a household, and the scene is named after "Morning". The user may be given an interface to select four of the ten players to be associated with the scene. At **606**, the scene is saved. The scene may be saved in any one of the members in the scene. In the example of FIG. **1**, the scene is saved in one of the zone players and displayed on the controller **142**. In operation, a set of data pertaining to the scene includes a plurality of parameters. In one embodiment, the parameters include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist. The parameters may also include volume/tone settings for the associated players in the scene. The user may go back to **602** to configure another scene if desired.

Given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at **610**. The process **600** can continue when a saved scene is activated at **610**. At **612**, upon the activation of a saved scene, the process **600** checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. In one embodiment, the interconnections of the players are checked to make sure that the players communicate among themselves and/or with a controller if there is such a controller in the scene.

It is assumed that all players associated with the scene are in good condition. At **614**, commands are executed with the parameters (e.g., pertaining to a playlist and volumes). In one embodiment, data including the parameters is transported from a member (e.g., a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene. The operation may cause all players to play back a song in identical or different volumes or to play back a pre-stored file.

One of the features, benefits and advantages in the present invention is to allow sets of related devices (controllers and operating components) to exist as a group without interfering with other components that are potentially visible on the same wired or wireless network. Each of the sets is configured to a theme or a scene.

The present invention has been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. While the embodiments discussed herein may appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the invention has applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

The invention claimed is:

**1**. A multimedia controller including a processor, the controller configured to:

receive, via a network interface, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device, and

US 9,344,206 B2

**11**

wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices; and

cause a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices.

**2**. The multimedia controller of claim **1**, wherein causing the selectable indication of the received zone configuration to be displayed comprises causing an indication of at least one of the one or more zone scenes to be displayed.

**3**. The multimedia controller of claim **2**, wherein causing the selectable indication of the at least one of the one or more zone scenes to be displayed comprises displaying an indication of the group configuration identified by the at least one of the one or more zone scenes to be displayed.

**4**. The multimedia controller of claim **3**, wherein the indication of the group configuration identified by the at least one of the one or more zone scenes comprises one group of independent playback devices.

**5**. The multimedia controller of claim **4**, further configured to:

after causing the indication of the received zone configuration to be displayed, cause one of the at least one of the one or more zone scenes to be activated.

**6**. The multimedia controller of claim **3**, wherein the indication of the group configuration identified by the at least one of the one or more zone scenes comprises two or more groups of independent playback devices.

**7**. The multimedia controller claim **1**, further configured to:
before receiving the zone configuration, send, to one of the plurality of independent playback devices, a command to save at least one of the one or more zone scenes.

**8**. The multimedia controller of claim **7**, wherein the command to save at least one of the one or more zone scenes includes, for each of the at least one or more zone scenes, (a) an indication of the two or more of the plurality of independent playback devices identified by the zone scene and (b) at least one other parameter pertaining to the scene.

**9**. The multimedia controller of claim **8**, wherein the at least one other parameter pertaining to the scene is one or more of (i) a volume level, (ii) a specific music, (iii) a play mode, or (iv) an equalization.

**10**. The multimedia controller of claim **1**, further configured to:

after causing the selectable indication of the received zone configuration to be displayed, cause at least one of the one or more zone scenes to be activated.

**11**. The multimedia controller of claim **1**, wherein each of the one or more zone scenes is associated with a name.

**12**. In a network comprising a plurality of independent playback devices, a method comprising:

receiving, via the network by a controller device, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device,

**12**

and wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices; and

causing, by the controller device, a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices.

**13**. The method of claim **12**, wherein causing the selectable indication of the received zone configuration to be displayed comprises causing an indication of at least one of the one or more zone scenes to be displayed.

**14**. The method of claim **13**, wherein causing the selectable indication of the at least one of the one or more zone scenes to be displayed comprises displaying an indication of the group configuration identified by the at least one of the one or more zone scenes to be displayed.

**15**. The method of claim **12**, further comprising:

before receiving the zone configuration, sending, to one of the plurality of independent playback devices, a command to save at least one of the one or more zone scenes.

**16**. The method of claim **12**, further comprising:

after causing the selectable indication of the received zone configuration to be displayed, causing, by the controller device, at least one of the one or more zone scenes to be activated.

**17**. A non-transitory computer-readable storage medium including a set of instructions for execution by a processor, the set of instructions, when executed, implement a controller configured to:

receive, via a network interface, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device, and wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices; and

cause a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices.

**18**. The computer-readable medium of claim **17**, wherein causing the selectable indication of the received zone configuration to be displayed comprises causing an indication of at least one of the one or more zone scenes to be displayed.

**19**. The computer readable medium of claim **17**, wherein causing the selectable indication of the at least one of the one or more zone scenes to be displayed comprises displaying an indication of the group configuration identified by the at least one of the one or more zone scenes to be displayed.

**20**. The computer readable medium of claim **19**, wherein the indication of the group configuration identified by the at least one of the one or more zone scenes comprises two or more groups of independent playback devices.

\* \* \* \* \*

# EXHIBIT 4

US010469966B2

(12) **United States Patent**
Lambourne

(10) Patent No.: **US 10,469,966 B2**
(45) Date of Patent: **Nov. 5, 2019**

(54) **ZONE SCENE MANAGEMENT**

(71) Applicant: **SONOS, INC.**, Santa Barbara, CA (US)

(72) Inventor: **Robert A. Lambourne**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/383,565**

(22) Filed: **Apr. 12, 2019**

(65) **Prior Publication Data**

US 2019/0239009 A1     Aug. 1, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/130,919, filed on Apr. 15, 2016, which is a continuation of application
(Continued)

(51) **Int. Cl.**
**G06F 17/00**          (2019.01)
**H04R 27/00**          (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. **H04R 27/00** (2013.01); **G05B 15/02** (2013.01); **G06F 3/0482** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... H04R 27/00; H04R 3/12; H04R 2227/005; H04R 2430/01; G05B 15/02;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,956,591 A | 5/1976 | Gates, Jr. |
| 4,105,974 A | 8/1978 | Rogers |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2320451 A1 | 3/2001 |
| CN | 1598767 A | 3/2005 |

(Continued)

OTHER PUBLICATIONS

Yamaha DME Designer 3.5 user manual (Year: 2004).*
(Continued)

*Primary Examiner* — Paul C McCord

(57) **ABSTRACT**

An example computing device in a media playback system receives a first request to create a first zone scene including a first preconfigured grouping of zones including a first zone and a second zone, and based on the first request, causes creation and storage of the first zone scene. The computing device receives a second request to create a second zone scene including a second preconfigured grouping of zones including the first zone and a third zone, and based on the second request, causes creation and storage of the second zone scene. While displaying a representation of the first zone scene and a representation of the second zone scene, the computing device receives a third request to invoke the first zone scene, and based on the third request, causes the first zone scene to be invoked such that the first zone and the second zone become configured for synchronous playback of media.

**20 Claims, 13 Drawing Sheets**



**US 10,469,966 B2**

Page 2

### Related U.S. Application Data

No. 14/465,457, filed on Aug. 21, 2014, now Pat. No. 9,344,206, which is a continuation of application No. 13/896,829, filed on May 17, 2013, now Pat. No. 8,843,228, which is a continuation of application No. 11/853,790, filed on Sep. 11, 2007, now Pat. No. 8,483,853.

(60) Provisional application No. 60/825,407, filed on Sep. 12, 2006.

(51) **Int. Cl.**
| | |
|---|---|
| *G05B 15/02* | (2006.01) |
| *H04N 21/436* | (2011.01) |
| *H04R 3/12* | (2006.01) |
| *G06F 3/16* | (2006.01) |
| *H03G 7/00* | (2006.01) |
| *G06F 3/0482* | (2013.01) |
| *G06F 3/0484* | (2013.01) |
| *H03G 1/02* | (2006.01) |
| *H04H 60/80* | (2008.01) |

(52) **U.S. Cl.**
CPC ............ *G06F 3/04842* (2013.01); *G06F 3/16* (2013.01); *G06F 3/165* (2013.01); *H03G 1/02* (2013.01); *H03G 7/00* (2013.01); *H04H 60/80* (2013.01); *H04N 21/43615* (2013.01); *H04R 3/12* (2013.01); *H04R 2227/005* (2013.01); *H04R 2430/01* (2013.01)

(58) **Field of Classification Search**
CPC ...... G06F 3/0482; G06F 3/04842; G06F 3/16; G06F 3/165; H03G 1/02; H03G 7/00; H04H 60/80; H04N 21/43615
USPC .......................................................... 700/94
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D260,764 | S | 9/1981 | Castagna et al. |
| 4,296,278 | A | 10/1981 | Cullison et al. |
| 4,306,114 | A | 12/1981 | Callahan |
| 4,382,158 | A | 5/1983 | Ohshita et al. |
| 4,509,211 | A | 4/1985 | Robbins |
| D279,779 | S | 7/1985 | Taylor |
| 4,530,091 | A | 7/1985 | Crockett |
| 4,696,037 | A | 9/1987 | Fierens |
| 4,701,629 | A | 10/1987 | Citroen |
| 4,712,105 | A | 12/1987 | Kohler |
| D293,671 | S | 1/1988 | Beaumont |
| 4,731,814 | A | 3/1988 | Becker et al. |
| 4,816,989 | A | 3/1989 | Finn et al. |
| 4,824,059 | A | 4/1989 | Butler |
| D301,037 | S | 5/1989 | Matsuda |
| 4,845,751 | A | 7/1989 | Schwab |
| D304,443 | S | 11/1989 | Grinyer et al. |
| D313,023 | S | 12/1990 | Kolenda et al. |
| D313,398 | S | 1/1991 | Gilchrist |
| D313,600 | S | 1/1991 | Weber |
| 4,994,908 | A | 2/1991 | Kuban et al. |
| 4,995,778 | A | 2/1991 | Bruessel |
| D320,598 | S | 10/1991 | Auerbach et al. |
| D322,609 | S | 12/1991 | Patton |
| 5,086,385 | A | 2/1992 | Launey et al. |
| D326,450 | S | 5/1992 | Watanabe |
| D327,060 | S | 6/1992 | Wachob et al. |
| 5,151,922 | A | 9/1992 | Weiss |
| 5,153,579 | A | 10/1992 | Fisch et al. |
| D331,388 | S | 12/1992 | Dahnert et al. |
| 5,182,552 | A | 1/1993 | Paynting |
| D333,135 | S | 2/1993 | Wachob et al. |
| 5,185,680 | A | 2/1993 | Kakubo |
| 5,237,327 | A | 8/1993 | Saitoh et al. |
| 5,239,458 | A | 8/1993 | Suzuki |
| 5,272,757 | A | 12/1993 | Scofield et al. |
| 5,299,266 | A | 3/1994 | Lumsden |
| D350,531 | S | 9/1994 | Tsuji |
| D350,962 | S | 9/1994 | Reardon et al. |
| 5,361,381 | A | 11/1994 | Short |
| 5,372,441 | A | 12/1994 | Louis |
| D354,059 | S | 1/1995 | Hendricks |
| D354,751 | S | 1/1995 | Hersh et al. |
| D356,093 | S | 3/1995 | McCauley et al. |
| D356,312 | S | 3/1995 | Althans |
| D357,024 | S | 4/1995 | Tokiyama et al. |
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,430,485 | A | 7/1995 | Lankford et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| D362,446 | S | 9/1995 | Gasiorek et al. |
| 5,457,448 | A | 10/1995 | Totsuka et al. |
| D363,933 | S | 11/1995 | Starck |
| 5,467,342 | A | 11/1995 | Logston et al. |
| D364,877 | S | 12/1995 | Tokiyama et al. |
| D364,878 | S | 12/1995 | Green et al. |
| D365,102 | S | 12/1995 | Gioscia |
| D366,044 | S | 1/1996 | Hara et al. |
| 5,481,251 | A | 1/1996 | Buys et al. |
| 5,491,839 | A | 2/1996 | Schotz |
| 5,515,345 | A | 5/1996 | Barreira et al. |
| 5,519,641 | A | 5/1996 | Beers et al. |
| 5,533,021 | A | 7/1996 | Branstad et al. |
| D372,716 | S | 8/1996 | Thorne |
| 5,553,147 | A | 9/1996 | Pineau |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,553,314 | A | 9/1996 | Grube et al. |
| D377,651 | S | 1/1997 | Biasotti et al. |
| 5,596,696 | A | 1/1997 | Tindell et al. |
| 5,602,992 | A | 2/1997 | Danneels |
| 5,623,483 | A | 4/1997 | Agrawal et al. |
| 5,625,350 | A | 4/1997 | Fukatsu et al. |
| D379,816 | S | 6/1997 | Laituri et al. |
| 5,640,388 | A | 6/1997 | Woodhead et al. |
| D380,752 | S | 7/1997 | Hanson |
| 5,652,749 | A | 7/1997 | Davenport et al. |
| D382,271 | S | 8/1997 | Akwiwu |
| 5,661,665 | A | 8/1997 | Glass et al. |
| 5,668,884 | A | 9/1997 | Clair, Jr. et al. |
| 5,673,323 | A | 9/1997 | Schotz et al. |
| D384,940 | S | 10/1997 | Kono et al. |
| D387,352 | S | 12/1997 | Kaneko et al. |
| 5,696,896 | A | 12/1997 | Badovinatz et al. |
| D388,792 | S | 1/1998 | Nykerk |
| D389,143 | S | 1/1998 | Wicks |
| D392,641 | S | 3/1998 | Fenner |
| 5,726,989 | A | 3/1998 | Dokic |
| D393,628 | S | 4/1998 | Ledbetter et al. |
| 5,740,235 | A | 4/1998 | Lester et al. |
| 5,742,623 | A | 4/1998 | Nuber et al. |
| D394,659 | S | 5/1998 | Biasotti et al. |
| 5,751,819 | A | 5/1998 | Dorrough |
| 5,761,320 | A | 6/1998 | Farinelli et al. |
| 5,774,016 | A | 6/1998 | Ketterer |
| D395,889 | S | 7/1998 | Gerba et al. |
| 5,787,249 | A | 7/1998 | Badovinatz et al. |
| 5,790,543 | A | 8/1998 | Cloutier |
| D397,996 | S | 9/1998 | Smith |
| 5,808,662 | A | 9/1998 | Kinney et al. |
| 5,812,201 | A | 9/1998 | Yoo |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,818,948 | A | 10/1998 | Gulick |
| D401,587 | S | 11/1998 | Rudolph |
| 5,832,024 | A | 11/1998 | Schotz et al. |
| 5,848,152 | A | 12/1998 | Slipy et al. |
| 5,852,722 | A | 12/1998 | Hamilton |
| D404,741 | S | 1/1999 | Schumaker et al. |
| D405,071 | S | 2/1999 | Gambaro |
| 5,867,691 | A | 2/1999 | Shiraishi |
| 5,875,233 | A | 2/1999 | Cox |
| 5,875,354 | A | 2/1999 | Charlton et al. |
| D406,847 | S | 3/1999 | Gerba et al. |

**US 10,469,966 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D407,071 S | 3/1999 | Keating |
| 5,887,143 A | 3/1999 | Saito et al. |
| 5,905,768 A | 5/1999 | Maturi et al. |
| D410,927 S | 6/1999 | Yamagishi |
| 5,910,991 A | 6/1999 | Farrar |
| D412,337 S | 7/1999 | Hamano |
| 5,923,869 A | 7/1999 | Kashiwagi et al. |
| 5,923,902 A | 7/1999 | Inagaki |
| 5,946,343 A | 8/1999 | Schotz et al. |
| 5,956,025 A | 9/1999 | Goulden et al. |
| 5,956,088 A | 9/1999 | Shen et al. |
| 5,960,006 A | 9/1999 | Maturi et al. |
| D415,496 S | 10/1999 | Gerba et al. |
| D416,021 S | 11/1999 | Godette et al. |
| 5,984,512 A | 11/1999 | Jones et al. |
| 5,987,611 A | 11/1999 | Freund |
| 5,990,884 A | 11/1999 | Douma et al. |
| 5,991,307 A | 11/1999 | Komuro et al. |
| 5,999,906 A | 12/1999 | Mercs et al. |
| 6,009,457 A | 12/1999 | Moller |
| 6,018,376 A | 1/2000 | Nakatani |
| D420,006 S | 2/2000 | Tonino |
| 6,026,150 A | 2/2000 | Frank et al. |
| 6,029,196 A | 2/2000 | Lenz |
| 6,031,818 A | 2/2000 | Lo et al. |
| 6,032,202 A | 2/2000 | Lea et al. |
| 6,038,614 A | 3/2000 | Chan et al. |
| 6,046,550 A | 4/2000 | Ference et al. |
| 6,061,457 A | 5/2000 | Stockhamer |
| 6,078,725 A | 6/2000 | Tanaka |
| 6,081,266 A | 6/2000 | Sciammarella |
| 6,088,063 A | 7/2000 | Shiba |
| D429,246 S | 8/2000 | Holma |
| D430,143 S | 8/2000 | Renk |
| 6,101,195 A | 8/2000 | Lyons et al. |
| 6,108,485 A | 8/2000 | Kim |
| 6,108,686 A | 8/2000 | Williams, Jr. |
| 6,122,668 A | 9/2000 | Teng et al. |
| D431,552 S | 10/2000 | Backs et al. |
| D432,525 S | 10/2000 | Beecroft |
| 6,127,941 A | 10/2000 | Van Ryzin |
| 6,128,318 A | 10/2000 | Sato |
| 6,148,205 A | 11/2000 | Cotton |
| 6,157,957 A | 12/2000 | Berthaud |
| 6,163,647 A | 12/2000 | Terashima et al. |
| 6,169,725 B1 | 1/2001 | Gibbs et al. |
| 6,175,872 B1 | 1/2001 | Neumann et al. |
| 6,181,383 B1 | 1/2001 | Fox et al. |
| 6,185,737 B1 | 2/2001 | Northcutt et al. |
| 6,195,435 B1 | 2/2001 | Kitamura |
| 6,195,436 B1 | 2/2001 | Scibora et al. |
| 6,199,169 B1 | 3/2001 | Voth |
| 6,212,282 B1 | 4/2001 | Mershon |
| 6,246,701 B1 | 6/2001 | Slattery |
| 6,253,293 B1 | 6/2001 | Rao et al. |
| D444,475 S | 7/2001 | Levey et al. |
| 6,255,961 B1 | 7/2001 | Van et al. |
| 6,256,554 B1 | 7/2001 | Dilorenzo |
| 6,269,406 B1 | 7/2001 | Dutcher et al. |
| 6,301,012 B1 | 10/2001 | White et al. |
| 6,308,207 B1 | 10/2001 | Tseng et al. |
| 6,310,652 B1 | 10/2001 | Li et al. |
| 6,313,879 B1 | 11/2001 | Kubo et al. |
| 6,321,252 B1 | 11/2001 | Bhola et al. |
| 6,324,586 B1 | 11/2001 | Johnson |
| D452,520 S | 12/2001 | Gotham et al. |
| 6,332,147 B1 | 12/2001 | Moran et al. |
| 6,343,028 B1 | 1/2002 | Kuwaoka |
| 6,349,285 B1 | 2/2002 | Liu et al. |
| 6,349,339 B1 | 2/2002 | Williams |
| 6,351,821 B1 | 2/2002 | Voth |
| 6,353,172 B1 | 3/2002 | Fay et al. |
| 6,356,871 B1 | 3/2002 | Hemkumar et al. |
| 6,404,811 B1 | 6/2002 | Cvetko et al. |
| 6,418,150 B1 | 7/2002 | Staats |
| 6,430,353 B1 | 8/2002 | Honda et al. |
| 6,442,443 B1 | 8/2002 | Fujii et al. |
| D462,339 S | 9/2002 | Allen et al. |
| D462,340 S | 9/2002 | Allen et al. |
| D462,945 S | 9/2002 | Skulley |
| 6,449,642 B2 | 9/2002 | Bourke-Dunphy et al. |
| 6,449,653 B2 | 9/2002 | Klemets et al. |
| 6,456,783 B1 | 9/2002 | Ando et al. |
| 6,463,474 B1 | 10/2002 | Fuh et al. |
| 6,466,832 B1 | 10/2002 | Zuqert et al. |
| 6,469,633 B1 | 10/2002 | Wachter et al. |
| D466,108 S | 11/2002 | Glodava et al. |
| 6,487,296 B1 | 11/2002 | Allen et al. |
| 6,493,832 B1 | 12/2002 | Itakura et al. |
| D468,297 S | 1/2003 | Ikeda |
| 6,522,886 B1 | 2/2003 | Youngs et al. |
| 6,526,325 B1 | 2/2003 | Sussman et al. |
| 6,535,121 B2 | 3/2003 | Matheny et al. |
| D474,763 S | 5/2003 | Tozaki et al. |
| D475,993 S | 6/2003 | Meyer |
| D476,643 S | 7/2003 | Yamagishi |
| D477,310 S | 7/2003 | Moransais |
| 6,587,127 B1 | 7/2003 | Leeke et al. |
| 6,598,172 B1 | 7/2003 | Vandeusen et al. |
| D478,051 S | 8/2003 | Sagawa |
| D478,069 S | 8/2003 | Beck et al. |
| D478,896 S | 8/2003 | Summers |
| 6,604,023 B1 | 8/2003 | Brown et al. |
| 6,611,537 B1 | 8/2003 | Edens et al. |
| D479,520 S | 9/2003 | De |
| D481,056 S | 10/2003 | Kawasaki et al. |
| 6,631,410 B1 | 10/2003 | Kowalski et al. |
| 6,636,269 B1 | 10/2003 | Baldwin |
| 6,653,899 B2 | 11/2003 | Organvidez et al. |
| 6,654,720 B1 | 11/2003 | Graham et al. |
| 6,654,956 B1 | 11/2003 | Trinh et al. |
| 6,658,091 B1 | 12/2003 | Naidoo et al. |
| 6,674,803 B1 | 1/2004 | Kesselring |
| 6,684,060 B1 | 1/2004 | Curtin |
| D486,145 S | 2/2004 | Kaminski et al. |
| 6,687,664 B1 | 2/2004 | Sussman et al. |
| 6,704,421 B1 | 3/2004 | Kitamura |
| 6,741,961 B2 | 5/2004 | Lim |
| D491,925 S | 6/2004 | Griesau et al. |
| 6,757,517 B2 | 6/2004 | Chang et al. |
| D493,148 S | 7/2004 | Shibata et al. |
| 6,763,274 B1 | 7/2004 | Gilbert |
| D495,333 S | 8/2004 | Borsboom |
| 6,778,073 B2 | 8/2004 | Lutter et al. |
| 6,778,493 B1 | 8/2004 | Ishii |
| 6,778,869 B2 | 8/2004 | Champion |
| D496,003 S | 9/2004 | Spira |
| D496,005 S | 9/2004 | Wang |
| D496,335 S | 9/2004 | Spira |
| D497,363 S | 10/2004 | Olson et al. |
| 6,803,964 B1 | 10/2004 | Post et al. |
| 6,809,635 B1 | 10/2004 | Kaaresoja |
| D499,086 S | 11/2004 | Polito |
| 6,816,510 B1 | 11/2004 | Banerjee |
| 6,816,818 B2 | 11/2004 | Wolf et al. |
| 6,823,225 B1 | 11/2004 | Sass |
| 6,826,283 B1 | 11/2004 | Wheeler et al. |
| D499,395 S | 12/2004 | Hsu |
| D499,718 S | 12/2004 | Chen |
| D500,015 S | 12/2004 | Gubbe |
| 6,836,788 B2 | 12/2004 | Kim et al. |
| 6,839,752 B1 | 1/2005 | Miller et al. |
| D501,477 S | 2/2005 | Hall |
| 6,859,460 B1 | 2/2005 | Chen |
| 6,859,538 B1 | 2/2005 | Voltz |
| 6,873,862 B2 | 3/2005 | Reshefsky |
| 6,882,335 B2 | 4/2005 | Saarinen |
| D504,872 S | 5/2005 | Uehara et al. |
| D504,885 S | 5/2005 | Zhang et al. |
| 6,889,207 B2 | 5/2005 | Slemmer et al. |
| 6,898,642 B2 | 5/2005 | Chafle et al. |
| 6,901,439 B1 | 5/2005 | Bonasia et al. |
| D506,463 S | 6/2005 | Daniels |
| 6,907,458 B2 | 6/2005 | Tomassetti et al. |

US 10,469,966 B2

Page 4

(56)　　　　References Cited

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,912,610 B2 | 6/2005 | Spencer |
| 6,915,347 B2 | 7/2005 | Hanko et al. |
| 6,916,980 B2 | 7/2005 | Ishida et al. |
| 6,917,592 B1 | 7/2005 | Ramankutty et al. |
| 6,919,771 B2 | 7/2005 | Nakajima |
| 6,920,373 B2 | 7/2005 | Xi et al. |
| 6,931,134 B1 | 8/2005 | Waller, Jr. et al. |
| 6,931,557 B2 | 8/2005 | Togawa |
| 6,934,766 B1 | 8/2005 | Russell |
| 6,937,988 B1 | 8/2005 | Hemkumar et al. |
| 6,970,482 B2 | 11/2005 | Kim |
| 6,985,694 B1 | 1/2006 | De Bonet et al. |
| 6,987,767 B2 | 1/2006 | Saito |
| 6,987,947 B2 | 1/2006 | Richenstein et al. |
| D515,072 S | 2/2006 | Lee |
| D515,557 S | 2/2006 | Okuley |
| 7,007,106 B1 | 2/2006 | Flood et al. |
| 7,020,791 B1 | 3/2006 | Aweya et al. |
| D518,475 S | 4/2006 | Yang et al. |
| 7,043,477 B2 | 5/2006 | Mercer et al. |
| 7,043,651 B2 | 5/2006 | Aweya et al. |
| 7,046,677 B2 | 5/2006 | Monta et al. |
| 7,047,308 B2 | 5/2006 | Deshpande |
| 7,054,888 B2 | 5/2006 | Lachapelle et al. |
| 7,058,889 B2 | 6/2006 | Trovato et al. |
| 7,068,596 B1 | 6/2006 | Mou |
| D524,296 S | 7/2006 | Kita |
| 7,072,477 B1 | 7/2006 | Kincaid |
| D527,375 S | 8/2006 | Flora et al. |
| 7,092,528 B2 | 8/2006 | Patrick et al. |
| 7,092,694 B2 | 8/2006 | Griep et al. |
| 7,096,169 B2 | 8/2006 | Crutchfield et al. |
| 7,113,999 B2 | 9/2006 | Pestoni et al. |
| 7,115,017 B1 | 10/2006 | Laursen et al. |
| 7,120,168 B2 | 10/2006 | Zimmermann |
| 7,130,316 B2 | 10/2006 | Kovacevic |
| 7,130,368 B1 | 10/2006 | Aweya et al. |
| 7,130,608 B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 B2 | 10/2006 | Janik |
| 7,136,934 B2 | 11/2006 | Carter et al. |
| 7,139,981 B2 | 11/2006 | Mayer et al. |
| 7,143,141 B1 | 11/2006 | Morgan et al. |
| 7,143,939 B2 | 12/2006 | Henzerling |
| 7,146,260 B2 | 12/2006 | Preston et al. |
| 7,158,488 B2 | 1/2007 | Fujimori |
| 7,161,939 B2 | 1/2007 | Israel et al. |
| 7,162,315 B2 | 1/2007 | Gilbert |
| 7,171,010 B2 | 1/2007 | Martin et al. |
| 7,185,090 B2 | 2/2007 | Kowalski et al. |
| 7,187,947 B1 | 3/2007 | White et al. |
| 7,197,148 B2 | 3/2007 | Nourse et al. |
| 7,206,367 B2 | 4/2007 | Moore et al. |
| 7,206,618 B2 | 4/2007 | Latto et al. |
| 7,206,967 B1 | 4/2007 | Marti et al. |
| 7,209,795 B2 | 4/2007 | Sullivan et al. |
| 7,218,708 B2 | 5/2007 | Berezowski |
| 7,236,739 B2 | 6/2007 | Chang et al. |
| 7,236,773 B2 | 6/2007 | Thomas |
| 7,257,398 B1 | 8/2007 | Ukita et al. |
| 7,260,616 B1 | 8/2007 | Cook |
| 7,263,110 B2 | 8/2007 | Fujishiro |
| 7,277,547 B1 | 10/2007 | Delker et al. |
| 7,286,652 B1 | 10/2007 | Azriel et al. |
| 7,289,631 B2 | 10/2007 | Ishidoshiro |
| 7,293,060 B2 | 11/2007 | Komsi |
| 7,295,548 B2 | 11/2007 | Blank et al. |
| 7,302,468 B2 | 11/2007 | Wijeratne |
| 7,305,694 B2 | 12/2007 | Commons et al. |
| 7,308,188 B2 | 12/2007 | Namatame |
| 7,310,334 B2 | 12/2007 | Fitzgerald et al. |
| 7,312,785 B2 | 12/2007 | Tsuk et al. |
| 7,313,593 B1 | 12/2007 | Pulito et al. |
| 7,319,764 B1 | 1/2008 | Reid et al. |
| 7,324,857 B2 | 1/2008 | Goddard |
| 7,330,875 B1 | 2/2008 | Parasnis et al. |
| 7,333,519 B2 | 2/2008 | Sullivan et al. |
| 7,346,332 B2 | 3/2008 | McCarty et al. |
| 7,356,011 B1 | 4/2008 | Waters et al. |
| 7,359,006 B1 | 4/2008 | Xiang et al. |
| 7,366,206 B2 | 4/2008 | Lockridge et al. |
| 7,372,846 B2 | 5/2008 | Zwack |
| 7,391,791 B2 | 6/2008 | Balassanian et al. |
| 7,392,102 B2 | 6/2008 | Sullivan et al. |
| 7,392,481 B2 | 6/2008 | Gewickey et al. |
| 7,400,644 B2 | 7/2008 | Sakamoto et al. |
| 7,412,499 B2 | 8/2008 | Chang et al. |
| 7,424,267 B2 | 9/2008 | Eisenbach |
| 7,428,310 B2 | 9/2008 | Park |
| 7,430,181 B1 | 9/2008 | Hong |
| 7,457,948 B1 | 11/2008 | Bilicksa et al. |
| 7,472,058 B2 | 12/2008 | Tseng et al. |
| 7,474,677 B2 | 1/2009 | Trott |
| 7,483,538 B2 | 1/2009 | McCarty et al. |
| 7,483,540 B2 | 1/2009 | Rabinowitz et al. |
| 7,483,958 B1 | 1/2009 | Elabbady et al. |
| 7,490,044 B2 | 2/2009 | Kulkarni |
| 7,492,912 B2 | 2/2009 | Chung et al. |
| 7,505,889 B2 | 3/2009 | Salmonsen et al. |
| 7,509,181 B2 | 3/2009 | Champion |
| 7,519,188 B2 | 4/2009 | Berardi et al. |
| 7,519,667 B1 | 4/2009 | Capps |
| 7,539,551 B2 | 5/2009 | Komura et al. |
| 7,548,744 B2 | 6/2009 | Oesterling et al. |
| 7,548,851 B1 | 6/2009 | Lau et al. |
| 7,558,224 B1 | 7/2009 | Surazski et al. |
| 7,558,635 B1 | 7/2009 | Thiel et al. |
| 7,561,932 B1 | 7/2009 | Holmes et al. |
| 7,571,014 B1 | 8/2009 | Lambourne et al. |
| 7,574,274 B2 | 8/2009 | Holmes |
| 7,599,685 B2 | 10/2009 | Goldberg et al. |
| 7,606,174 B2 | 10/2009 | Ochi et al. |
| 7,620,468 B2 | 11/2009 | Shimizu |
| 7,626,952 B2 | 12/2009 | Slemmer et al. |
| 7,627,825 B2 | 12/2009 | Kakuda |
| 7,630,500 B1 | 12/2009 | Beckman et al. |
| 7,630,501 B2 | 12/2009 | Blank et al. |
| 7,631,119 B2 | 12/2009 | Moore et al. |
| 7,643,894 B2 | 1/2010 | Braithwaite et al. |
| 7,653,344 B1 | 1/2010 | Feldman et al. |
| 7,657,224 B2 | 2/2010 | Goldberg et al. |
| 7,657,644 B1 | 2/2010 | Zheng |
| 7,657,910 B1 | 2/2010 | McAulay et al. |
| 7,665,115 B2 | 2/2010 | Gallo et al. |
| 7,668,990 B2 | 2/2010 | Krzyzanowski et al. |
| 7,669,113 B1 | 2/2010 | Moore et al. |
| 7,669,219 B2 | 2/2010 | Scott, III |
| 7,672,470 B2 | 3/2010 | Lee |
| 7,675,943 B2 | 3/2010 | Mosig et al. |
| 7,676,044 B2 | 3/2010 | Sasaki et al. |
| 7,676,142 B1 | 3/2010 | Hung |
| 7,688,306 B2 | 3/2010 | Wehrenberg et al. |
| 7,689,304 B2 | 3/2010 | Sasaki |
| 7,689,305 B2 | 3/2010 | Kreifeldt et al. |
| 7,702,279 B2 | 4/2010 | Ko et al. |
| 7,702,403 B1 | 4/2010 | Gladwin et al. |
| 7,710,941 B2 | 5/2010 | Rietschel et al. |
| 7,711,774 B1 | 5/2010 | Rothschild |
| 7,720,096 B2 | 5/2010 | Klemets |
| 7,721,032 B2 | 5/2010 | Bushell et al. |
| 7,742,740 B2 | 6/2010 | Goldberg et al. |
| 7,742,832 B1 | 6/2010 | Feldman et al. |
| 7,743,009 B2 | 6/2010 | Hangartner et al. |
| 7,746,906 B2 | 6/2010 | Jinzaki et al. |
| 7,761,176 B2 | 7/2010 | Ben-Yaacov et al. |
| 7,765,315 B2 | 7/2010 | Batson et al. |
| RE41,608 E | 8/2010 | Blair et al. |
| 7,792,311 B1 | 9/2010 | Holmgren et al. |
| 7,793,206 B2 | 9/2010 | Lim et al. |
| 7,804,972 B2 | 9/2010 | Melanson |
| 7,805,210 B2 | 9/2010 | Cucos et al. |
| 7,817,960 B2 | 10/2010 | Tan et al. |
| 7,827,259 B2 | 11/2010 | Heller et al. |
| 7,831,054 B2 | 11/2010 | Ball et al. |
| 7,835,689 B2 | 11/2010 | Goldberg et al. |

**US 10,469,966 B2**

Page 5

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,849,181 | B2 | 12/2010 | Slemmer et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,865,137 | B2 | 1/2011 | Goldberg et al. |
| 7,882,234 | B2 | 2/2011 | Watanabe et al. |
| 7,885,622 | B2 | 2/2011 | Krampf et al. |
| 7,907,819 | B2 | 3/2011 | Ando et al. |
| 7,916,877 | B2 | 3/2011 | Goldberg et al. |
| 7,917,082 | B2 | 3/2011 | Goldberg et al. |
| 7,933,418 | B2 | 4/2011 | Morishima |
| 7,934,239 | B1 | 4/2011 | Dagman |
| 7,945,636 | B2 | 5/2011 | Nelson et al. |
| 7,945,708 | B2 | 5/2011 | Ohkita |
| 7,958,441 | B2 | 6/2011 | Heller et al. |
| 7,962,482 | B2 | 6/2011 | Handman et al. |
| 7,966,388 | B1 | 6/2011 | Pugaczewski et al. |
| 7,987,294 | B2 | 7/2011 | Bryce et al. |
| 7,995,732 | B2 | 8/2011 | Koch et al. |
| 7,996,566 | B1 | 8/2011 | Sylvain et al. |
| 7,996,588 | B2 | 8/2011 | Subbiah et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,015,306 | B2 | 9/2011 | Bowman |
| 8,020,023 | B2 | 9/2011 | Millington et al. |
| 8,023,663 | B2 | 9/2011 | Goldberg |
| 8,028,038 | B2 | 9/2011 | Weel |
| 8,028,323 | B2 | 9/2011 | Weel |
| 8,041,062 | B2 | 10/2011 | Cohen et al. |
| 8,045,721 | B2 | 10/2011 | Burgan et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,203 | B2 | 11/2011 | Jacobsen et al. |
| 8,050,652 | B2 | 11/2011 | Qureshey et al. |
| 8,054,987 | B2 | 11/2011 | Seydoux |
| 8,055,364 | B2 | 11/2011 | Champion |
| 8,063,698 | B2 | 11/2011 | Howard |
| 8,074,253 | B1 | 12/2011 | Nathan |
| 8,086,287 | B2 | 12/2011 | Mooney et al. |
| 8,086,752 | B2 | 12/2011 | Millington et al. |
| 8,090,317 | B2 | 1/2012 | Burge et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,111,132 | B2 | 2/2012 | Allen et al. |
| 8,112,032 | B2 | 2/2012 | Ko et al. |
| 8,116,476 | B2 | 2/2012 | Inohara |
| 8,126,172 | B2 | 2/2012 | Horbach et al. |
| 8,131,389 | B1 | 3/2012 | Hardwick et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,135,141 | B2 | 3/2012 | Shiba |
| 8,139,774 | B2 | 3/2012 | Berardi et al. |
| 8,144,883 | B2 | 3/2012 | Pdersen et al. |
| 8,148,622 | B2 | 4/2012 | Rothkopf et al. |
| 8,150,079 | B2 | 4/2012 | Maeda et al. |
| 8,160,281 | B2 | 4/2012 | Kim et al. |
| 8,169,938 | B2 | 5/2012 | Duchscher et al. |
| 8,170,222 | B2 | 5/2012 | Dunko |
| 8,170,260 | B2 | 5/2012 | Reining et al. |
| 8,175,292 | B2 | 5/2012 | Aylward et al. |
| 8,175,297 | B1 | 5/2012 | Ho et al. |
| 8,185,674 | B2 | 5/2012 | Moore et al. |
| 8,189,824 | B2 | 5/2012 | Strauss et al. |
| 8,194,874 | B2 | 6/2012 | Starobin et al. |
| 8,204,890 | B1 | 6/2012 | Gogan et al. |
| 8,208,653 | B2 | 6/2012 | Eo et al. |
| 8,214,447 | B2 | 7/2012 | Deslippe et al. |
| 8,214,740 | B2 | 7/2012 | Johnson |
| 8,214,873 | B2 | 7/2012 | Weel |
| 8,218,790 | B2 | 7/2012 | Bull et al. |
| 8,229,125 | B2 | 7/2012 | Short |
| 8,230,099 | B2 | 7/2012 | Weel |
| 8,233,029 | B2 | 7/2012 | Yoshida et al. |
| 8,233,632 | B1 | 7/2012 | MacDonald et al. |
| 8,233,635 | B2 | 7/2012 | Shiba |
| 8,233,648 | B2 | 7/2012 | Sorek et al. |
| 8,234,395 | B2 | 7/2012 | Millington et al. |
| 8,238,578 | B2 | 8/2012 | Aylward |
| 8,239,559 | B2 | 8/2012 | Rajapakse |
| 8,239,748 | B1 | 8/2012 | Moore et al. |
| 8,243,961 | B1 | 8/2012 | Morrill |
| 8,265,310 | B2 | 9/2012 | Berardi et al. |
| 8,279,709 | B2 | 10/2012 | Choisel et al. |
| 8,281,001 | B2 | 10/2012 | Busam et al. |
| 8,285,404 | B1 | 10/2012 | Kekki |
| 8,290,185 | B2 | 10/2012 | Kim |
| 8,290,603 | B1 | 10/2012 | Lambourne et al. |
| 8,300,845 | B2 | 10/2012 | Zurek et al. |
| 8,306,235 | B2 | 11/2012 | Mahowald |
| 8,311,226 | B2 | 11/2012 | Lorgeoux et al. |
| 8,315,555 | B2 | 11/2012 | Ko et al. |
| 8,316,147 | B2 | 11/2012 | Batson et al. |
| 8,325,931 | B2 | 12/2012 | Howard et al. |
| 8,325,935 | B2 | 12/2012 | Rutschman |
| 8,331,585 | B2 | 12/2012 | Hagen et al. |
| 8,340,330 | B2 | 12/2012 | Yoon et al. |
| 8,345,709 | B2 | 1/2013 | Nitzpon et al. |
| 8,364,295 | B2 | 1/2013 | Beckmann et al. |
| 8,370,678 | B2 | 2/2013 | Millington et al. |
| 8,374,595 | B2 | 2/2013 | Chien et al. |
| 8,391,501 | B2 | 3/2013 | Khawand et al. |
| 8,407,623 | B2 | 3/2013 | Kerr et al. |
| 8,411,883 | B2 | 4/2013 | Matsumoto |
| 8,423,659 | B2 | 4/2013 | Millington |
| 8,423,893 | B2 | 4/2013 | Ramsay et al. |
| 8,432,851 | B2 | 4/2013 | Xu et al. |
| 8,433,076 | B2 | 4/2013 | Zurek et al. |
| 8,442,239 | B2 | 5/2013 | Bruelle-Drews et al. |
| 8,452,020 | B2 | 5/2013 | Gregg et al. |
| 8,457,334 | B2 | 6/2013 | Yoon et al. |
| 8,463,184 | B2 | 6/2013 | Dua |
| 8,463,875 | B2 | 6/2013 | Katz et al. |
| 8,473,844 | B2 | 6/2013 | Kreifeldt et al. |
| 8,477,958 | B2 | 7/2013 | Moeller et al. |
| 8,483,853 | B1 | 7/2013 | Lambourne et al. |
| 8,498,726 | B2 | 7/2013 | Kim et al. |
| 8,509,211 | B2 | 8/2013 | Trotter et al. |
| 8,520,870 | B2 | 8/2013 | Sato et al. |
| 8,565,455 | B2 | 10/2013 | Worrell et al. |
| 8,577,045 | B2 | 11/2013 | Gibbs |
| 8,577,048 | B2 | 11/2013 | Chaikin et al. |
| 8,588,432 | B1 | 11/2013 | Simon |
| 8,588,949 | B2 | 11/2013 | Lambourne et al. |
| 8,600,075 | B2 | 12/2013 | Lim |
| 8,600,084 | B1 | 12/2013 | Garrett |
| 8,611,559 | B2 | 12/2013 | Sanders |
| 8,615,091 | B2 | 12/2013 | Terwal |
| 8,620,006 | B2 | 12/2013 | Berardi et al. |
| 8,639,830 | B2 | 1/2014 | Bowman |
| 8,654,995 | B2 | 2/2014 | Silber et al. |
| 8,672,744 | B1 | 3/2014 | Gronkowski et al. |
| 8,683,009 | B2 | 3/2014 | Ng et al. |
| 8,700,730 | B2 | 4/2014 | Rowe |
| 8,731,206 | B1 | 5/2014 | Park |
| 8,750,282 | B2 | 6/2014 | Gelter et al. |
| 8,751,026 | B2 | 6/2014 | Sato et al. |
| 8,762,565 | B2 | 6/2014 | Togashi et al. |
| 8,775,546 | B2 | 7/2014 | Millington |
| 8,788,080 | B1 | 7/2014 | Kallai et al. |
| 8,818,538 | B2 | 8/2014 | Sakata |
| 8,819,554 | B2 | 8/2014 | Basso et al. |
| 8,843,224 | B2 | 9/2014 | Holmgren et al. |
| 8,843,228 | B2 | 9/2014 | Lambourne |
| 8,843,586 | B2 | 9/2014 | Pantos et al. |
| 8,855,319 | B2 | 10/2014 | Liu et al. |
| 8,861,739 | B2 | 10/2014 | Ojanpera |
| 8,879,761 | B2 | 11/2014 | Johnson et al. |
| 8,885,851 | B2 | 11/2014 | Westenbroek |
| 8,886,347 | B2 | 11/2014 | Lambourne |
| 8,904,066 | B2 | 12/2014 | Moore et al. |
| 8,914,559 | B2 | 12/2014 | Kalayjian et al. |
| 8,917,877 | B2 | 12/2014 | Haaff et al. |
| 8,923,997 | B2 | 12/2014 | Kallai et al. |
| 8,930,006 | B2 | 1/2015 | Haatainen |
| 8,934,647 | B2 | 1/2015 | Joyce et al. |
| 8,934,655 | B2 | 1/2015 | Breen et al. |
| 8,942,252 | B2 | 1/2015 | Balassanian et al. |
| 8,942,395 | B2 | 1/2015 | Lissaman et al. |
| 8,954,177 | B2 | 2/2015 | Sanders |
| 8,965,544 | B2 | 2/2015 | Ramsay |

**US 10,469,966 B2**

Page 6

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,965,546 B2 | 2/2015 | Visser et al. |
| 8,966,394 B2 | 2/2015 | Gates et al. |
| 8,977,974 B2 | 3/2015 | Kraut |
| 8,984,442 B2 | 3/2015 | Pirnack et al. |
| 9,020,153 B2 | 4/2015 | Britt, Jr. |
| 9,042,556 B2 | 5/2015 | Kallai et al. |
| 9,112,622 B2 | 8/2015 | Miyata et al. |
| 9,137,602 B2 | 9/2015 | Mayman et al. |
| 9,160,965 B2 | 10/2015 | Redmann et al. |
| 9,195,258 B2 | 11/2015 | Millington |
| 9,219,959 B2 | 12/2015 | Kallai et al. |
| 9,226,073 B2 | 12/2015 | Ramos et al. |
| 9,245,514 B2 | 1/2016 | Donaldson |
| 9,325,286 B1 | 4/2016 | Yang |
| 9,524,098 B2 | 12/2016 | Griffiths et al. |
| 2001/0001160 A1 | 5/2001 | Shoff et al. |
| 2001/0009604 A1 | 7/2001 | Ando et al. |
| 2001/0022823 A1 | 9/2001 | Renaud |
| 2001/0027498 A1 | 10/2001 | Van De Meulenhof et al. |
| 2001/0032188 A1 | 10/2001 | Miyabe et al. |
| 2001/0042107 A1 | 11/2001 | Palm |
| 2001/0043456 A1 | 11/2001 | Atkinson |
| 2001/0046235 A1 | 11/2001 | Trevitt et al. |
| 2001/0047377 A1 | 11/2001 | Sincaglia et al. |
| 2001/0050991 A1 | 12/2001 | Eves |
| 2002/0002039 A1 | 1/2002 | Qureshey et al. |
| 2002/0002562 A1 | 1/2002 | Moran et al. |
| 2002/0002565 A1 | 1/2002 | Ohyama |
| 2002/0003548 A1 | 1/2002 | Krusche et al. |
| 2002/0022453 A1 | 2/2002 | Balog et al. |
| 2002/0026442 A1 | 2/2002 | Lipscomb et al. |
| 2002/0034374 A1 | 3/2002 | Barton |
| 2002/0042844 A1 | 4/2002 | Chiazzese |
| 2002/0049843 A1 | 4/2002 | Barone et al. |
| 2002/0062406 A1 | 5/2002 | Chang et al. |
| 2002/0065926 A1 | 5/2002 | Hackney et al. |
| 2002/0067909 A1 | 6/2002 | Iivonen |
| 2002/0072816 A1 | 6/2002 | Shdema et al. |
| 2002/0072817 A1 | 6/2002 | Champion |
| 2002/0073228 A1 | 6/2002 | Cognet et al. |
| 2002/0078161 A1 | 6/2002 | Cheng |
| 2002/0078293 A1 | 6/2002 | Kou et al. |
| 2002/0080783 A1 | 6/2002 | Fujimori et al. |
| 2002/0090914 A1 | 7/2002 | Kang et al. |
| 2002/0093478 A1 | 7/2002 | Yeh |
| 2002/0095460 A1 | 7/2002 | Benson |
| 2002/0098878 A1 | 7/2002 | Mooney et al. |
| 2002/0101357 A1 | 8/2002 | Gharapetian |
| 2002/0103635 A1 | 8/2002 | Mesarovic |
| 2002/0109710 A1 | 8/2002 | Holtz et al. |
| 2002/0112244 A1 | 8/2002 | Liou et al. |
| 2002/0114354 A1 | 8/2002 | Sinha et al. |
| 2002/0114359 A1 | 8/2002 | Ibaraki et al. |
| 2002/0124097 A1 | 9/2002 | Isely et al. |
| 2002/0129156 A1 | 9/2002 | Yoshikawa |
| 2002/0131398 A1 | 9/2002 | Taylor |
| 2002/0131761 A1 | 9/2002 | Kawasaki et al. |
| 2002/0136335 A1 | 9/2002 | Liou et al. |
| 2002/0137505 A1 | 9/2002 | Eiche et al. |
| 2002/0143547 A1 | 10/2002 | Fay et al. |
| 2002/0143998 A1 | 10/2002 | Rajagopal et al. |
| 2002/0150053 A1 | 10/2002 | Gray et al. |
| 2002/0159596 A1 | 10/2002 | Durand et al. |
| 2002/0163361 A1 | 11/2002 | Parkin |
| 2002/0165721 A1 | 11/2002 | Chang et al. |
| 2002/0165921 A1 | 11/2002 | Sapieyevski |
| 2002/0168938 A1 | 11/2002 | Chang |
| 2002/0173273 A1 | 11/2002 | Spurgat et al. |
| 2002/0177411 A1 | 11/2002 | Yajima et al. |
| 2002/0181355 A1 | 12/2002 | Shikunami et al. |
| 2002/0184310 A1 | 12/2002 | Traversat et al. |
| 2002/0188762 A1 | 12/2002 | Tomassetti et al. |
| 2002/0194309 A1 | 12/2002 | Carter et al. |
| 2002/0196951 A1 | 12/2002 | Tsai |
| 2003/0002609 A1 | 1/2003 | Faller et al. |
| 2003/0002689 A1 | 1/2003 | Folio |
| 2003/0008616 A1 | 1/2003 | Anderson |
| 2003/0014486 A1 | 1/2003 | May |
| 2003/0018797 A1 | 1/2003 | Dunning et al. |
| 2003/0020763 A1 | 1/2003 | Mayer et al. |
| 2003/0023741 A1 | 1/2003 | Tomassetti et al. |
| 2003/0031333 A1 | 2/2003 | Cohen et al. |
| 2003/0035072 A1 | 2/2003 | Hagg |
| 2003/0035444 A1 | 2/2003 | Zwack |
| 2003/0041173 A1 | 2/2003 | Hoyle |
| 2003/0041174 A1 | 2/2003 | Wen et al. |
| 2003/0043856 A1 | 3/2003 | Lakaniemi et al. |
| 2003/0043924 A1 | 3/2003 | Haddad et al. |
| 2003/0055892 A1 | 3/2003 | Huitema et al. |
| 2003/0061428 A1 | 3/2003 | Garney et al. |
| 2003/0063755 A1 | 4/2003 | Nourse et al. |
| 2003/0066094 A1 | 4/2003 | Van Der Schaar et al. |
| 2003/0067437 A1 | 4/2003 | McClintock et al. |
| 2003/0073432 A1 | 4/2003 | Meade |
| 2003/0091322 A1 | 5/2003 | Van |
| 2003/0097478 A1 | 5/2003 | King |
| 2003/0099212 A1 | 5/2003 | Anjum et al. |
| 2003/0099221 A1 | 5/2003 | Rhee |
| 2003/0101253 A1 | 5/2003 | Saito et al. |
| 2003/0103088 A1 | 6/2003 | Dresti et al. |
| 2003/0110329 A1 | 6/2003 | Higaki et al. |
| 2003/0126211 A1 | 7/2003 | Anttila et al. |
| 2003/0135822 A1 | 7/2003 | Evans |
| 2003/0157951 A1 | 8/2003 | Hasty |
| 2003/0161479 A1 | 8/2003 | Yang et al. |
| 2003/0167335 A1 | 9/2003 | Alexander |
| 2003/0172123 A1 | 9/2003 | Polan et al. |
| 2003/0177889 A1 | 9/2003 | Koseki et al. |
| 2003/0179780 A1 | 9/2003 | Walker et al. |
| 2003/0185400 A1 | 10/2003 | Yoshizawa et al. |
| 2003/0195964 A1 | 10/2003 | Mane |
| 2003/0198254 A1 | 10/2003 | Sullivan et al. |
| 2003/0198255 A1 | 10/2003 | Sullivan et al. |
| 2003/0198257 A1 | 10/2003 | Sullivan et al. |
| 2003/0200001 A1 | 10/2003 | Goddard et al. |
| 2003/0204273 A1 | 10/2003 | Dinker et al. |
| 2003/0204509 A1 | 10/2003 | Dinker et al. |
| 2003/0210796 A1 | 11/2003 | McCarty et al. |
| 2003/0212802 A1 | 11/2003 | Rector et al. |
| 2003/0219007 A1 | 11/2003 | Barrack et al. |
| 2003/0227478 A1 | 12/2003 | Chatfield |
| 2003/0229900 A1 | 12/2003 | Reisman |
| 2003/0231208 A1 | 12/2003 | Hanon et al. |
| 2003/0231871 A1 | 12/2003 | Ushimaru |
| 2003/0235304 A1 | 12/2003 | Evans et al. |
| 2004/0001106 A1 | 1/2004 | Deutscher et al. |
| 2004/0001484 A1 | 1/2004 | Ozguner |
| 2004/0001591 A1 | 1/2004 | Mani et al. |
| 2004/0008852 A1 | 1/2004 | Also et al. |
| 2004/0010727 A1 | 1/2004 | Fujinami |
| 2004/0012620 A1 | 1/2004 | Buhler et al. |
| 2004/0014426 A1 | 1/2004 | Moore |
| 2004/0015252 A1 | 1/2004 | Aiso et al. |
| 2004/0019497 A1 | 1/2004 | Volk et al. |
| 2004/0019807 A1 | 1/2004 | Freund et al. |
| 2004/0019911 A1 | 1/2004 | Gates et al. |
| 2004/0023697 A1 | 2/2004 | Komura |
| 2004/0024478 A1 | 2/2004 | Hans et al. |
| 2004/0024925 A1 | 2/2004 | Cypher et al. |
| 2004/0027166 A1 | 2/2004 | Mangum et al. |
| 2004/0032348 A1 | 2/2004 | Lai et al. |
| 2004/0032421 A1 | 2/2004 | Williamson et al. |
| 2004/0037433 A1 | 2/2004 | Chen |
| 2004/0041836 A1 | 3/2004 | Zaner et al. |
| 2004/0042629 A1 | 3/2004 | Mellone et al. |
| 2004/0044742 A1 | 3/2004 | Evron et al. |
| 2004/0048569 A1 | 3/2004 | Kawamura |
| 2004/0059842 A1 | 3/2004 | Hanson et al. |
| 2004/0059965 A1 | 3/2004 | Marshall et al. |
| 2004/0066736 A1 | 4/2004 | Kroeger |
| 2004/0071299 A1 | 4/2004 | Yoshino |
| 2004/0075767 A1 | 4/2004 | Neuman et al. |
| 2004/0078383 A1 | 4/2004 | Mercer et al. |
| 2004/0080671 A1 | 4/2004 | Siemens et al. |

**US 10,469,966 B2**

Page 7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2004/0093096 A1 | 5/2004 | Huang et al. |
| 2004/0098754 A1 | 5/2004 | Vella et al. |
| 2004/0111473 A1 | 6/2004 | Lysenko et al. |
| 2004/0114771 A1 | 6/2004 | Vaughan et al. |
| 2004/0117044 A1 | 6/2004 | Konetski |
| 2004/0117462 A1 | 6/2004 | Bodin et al. |
| 2004/0128701 A1 | 7/2004 | Kaneko et al. |
| 2004/0131192 A1 | 7/2004 | Metcalf |
| 2004/0133689 A1 | 7/2004 | Vasisht |
| 2004/0143368 A1 | 7/2004 | May et al. |
| 2004/0143852 A1 | 7/2004 | Meyers |
| 2004/0147224 A1 | 7/2004 | Lee |
| 2004/0148237 A1 | 7/2004 | Bittmann et al. |
| 2004/0168081 A1 | 8/2004 | Ladas et al. |
| 2004/0170383 A1 | 9/2004 | Mazur |
| 2004/0171346 A1 | 9/2004 | Lin |
| 2004/0177167 A1 | 9/2004 | Iwamura et al. |
| 2004/0179554 A1 | 9/2004 | Tsao |
| 2004/0183827 A1 | 9/2004 | Putterman et al. |
| 2004/0185773 A1 | 9/2004 | Gerber et al. |
| 2004/0203354 A1 | 10/2004 | Yue |
| 2004/0203378 A1 | 10/2004 | Powers |
| 2004/0203590 A1 | 10/2004 | Shteyn |
| 2004/0208158 A1 | 10/2004 | Fellman et al. |
| 2004/0213230 A1 | 10/2004 | Douskalis et al. |
| 2004/0220687 A1 | 11/2004 | Klotz et al. |
| 2004/0223622 A1 | 11/2004 | Lindemann et al. |
| 2004/0224638 A1 | 11/2004 | Fadell et al. |
| 2004/0225389 A1 | 11/2004 | Ledoux et al. |
| 2004/0228367 A1 | 11/2004 | Mosig et al. |
| 2004/0248601 A1 | 12/2004 | Chang |
| 2004/0249490 A1 | 12/2004 | Sakai |
| 2004/0249965 A1 | 12/2004 | Huggins et al. |
| 2004/0249982 A1 | 12/2004 | Arnold et al. |
| 2004/0252400 A1 | 12/2004 | Blank et al. |
| 2004/0253969 A1 | 12/2004 | Nguyen et al. |
| 2004/0264717 A1 | 12/2004 | Fujita et al. |
| 2005/0002535 A1 | 1/2005 | Liu et al. |
| 2005/0010691 A1 | 1/2005 | Oyadomari et al. |
| 2005/0011388 A1 | 1/2005 | Kouznetsov |
| 2005/0013394 A1 | 1/2005 | Rausch et al. |
| 2005/0015551 A1 | 1/2005 | Eames et al. |
| 2005/0021470 A1 | 1/2005 | Martin et al. |
| 2005/0021590 A1 | 1/2005 | Debique et al. |
| 2005/0027821 A1 | 2/2005 | Alexander et al. |
| 2005/0031135 A1 | 2/2005 | Devantier et al. |
| 2005/0047605 A1 | 3/2005 | Lee et al. |
| 2005/0058149 A1 | 3/2005 | Howe |
| 2005/0060435 A1 | 3/2005 | Xue et al. |
| 2005/0062637 A1 | 3/2005 | El Zabadani et al. |
| 2005/0069153 A1 | 3/2005 | Hall et al. |
| 2005/0081213 A1 | 4/2005 | Suzuoki et al. |
| 2005/0100174 A1 | 5/2005 | Howard et al. |
| 2005/0105052 A1 | 5/2005 | McCormick et al. |
| 2005/0114538 A1 | 5/2005 | Rose |
| 2005/0120128 A1 | 6/2005 | Willes et al. |
| 2005/0125222 A1 | 6/2005 | Brown et al. |
| 2005/0125357 A1 | 6/2005 | Saadat et al. |
| 2005/0131558 A1 | 6/2005 | Braithwaite et al. |
| 2005/0144284 A1 | 6/2005 | Ludwig et al. |
| 2005/0147261 A1 | 7/2005 | Yeh |
| 2005/0154766 A1 | 7/2005 | Huang et al. |
| 2005/0159833 A1 | 7/2005 | Giaimo et al. |
| 2005/0160270 A1 | 7/2005 | Goldberg et al. |
| 2005/0166135 A1 | 7/2005 | Burke et al. |
| 2005/0168630 A1 | 8/2005 | Yamada et al. |
| 2005/0177256 A1 | 8/2005 | Shintani et al. |
| 2005/0177643 A1 | 8/2005 | Xu |
| 2005/0181348 A1 | 8/2005 | Carey et al. |
| 2005/0195205 A1 | 9/2005 | Abrams, Jr. |
| 2005/0195823 A1 | 9/2005 | Chen et al. |
| 2005/0195999 A1 | 9/2005 | Takemura et al. |
| 2005/0197725 A1 | 9/2005 | Alexander et al. |
| 2005/0198574 A1 | 9/2005 | Lamkin et al. |
| 2005/0201549 A1 | 9/2005 | Dedieu et al. |
| 2005/0216556 A1 | 9/2005 | Manion et al. |
| 2005/0254505 A1 | 11/2005 | Chang et al. |
| 2005/0262217 A1 | 11/2005 | Nonaka et al. |
| 2005/0266798 A1 | 12/2005 | Moloney et al. |
| 2005/0266826 A1 | 12/2005 | Vlad |
| 2005/0281255 A1 | 12/2005 | Davies et al. |
| 2005/0283820 A1 | 12/2005 | Richards et al. |
| 2005/0288805 A1 | 12/2005 | Moore et al. |
| 2005/0289224 A1 | 12/2005 | Deslippe et al. |
| 2005/0289244 A1 | 12/2005 | Sahu et al. |
| 2006/0041616 A1 | 2/2006 | Ludwig et al. |
| 2006/0045281 A1 | 2/2006 | Lamkin et al. |
| 2006/0045281 A1 | 3/2006 | Kornelson et al. |
| 2006/0072489 A1 | 4/2006 | Toyoshima |
| 2006/0095516 A1 | 5/2006 | Wijeratne |
| 2006/0098936 A1 | 5/2006 | Ikeda et al. |
| 2006/0119497 A1 | 6/2006 | Miller et al. |
| 2006/0143236 A1 | 6/2006 | Wu |
| 2006/0149402 A1 | 7/2006 | Chung |
| 2006/0155721 A1 | 7/2006 | Grunwald et al. |
| 2006/0173844 A1 | 8/2006 | Zhang et al. |
| 2006/0179160 A1 | 8/2006 | Uehara et al. |
| 2006/0193454 A1 | 8/2006 | Abou-Chakra et al. |
| 2006/0193482 A1 | 8/2006 | Harvey et al. |
| 2006/0199538 A1 | 9/2006 | Eisenbach |
| 2006/0205349 A1 | 9/2006 | Passier et al. |
| 2006/0222186 A1 | 10/2006 | Paige et al. |
| 2006/0227985 A1 | 10/2006 | Kawanami |
| 2006/0229752 A1 | 10/2006 | Chung |
| 2006/0259649 A1 | 11/2006 | Hsieh et al. |
| 2006/0270395 A1 | 11/2006 | Dhawan et al. |
| 2006/0294569 A1 | 12/2006 | Chung |
| 2007/0003067 A1 | 1/2007 | Gierl et al. |
| 2007/0003075 A1 | 1/2007 | Cooper et al. |
| 2007/0022207 A1 | 1/2007 | Millington et al. |
| 2007/0038999 A1 | 2/2007 | Millington et al. |
| 2007/0043847 A1 | 2/2007 | Carter et al. |
| 2007/0047712 A1 | 3/2007 | Gross et al. |
| 2007/0048713 A1 | 3/2007 | Plastina et al. |
| 2007/0054680 A1 | 3/2007 | Mo et al. |
| 2007/0071255 A1 | 3/2007 | Schobben |
| 2007/0087686 A1 | 4/2007 | Holm et al. |
| 2007/0142022 A1 | 6/2007 | Madonna et al. |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0143493 A1 | 6/2007 | Mullig et al. |
| 2007/0169115 A1 | 7/2007 | Ko et al. |
| 2007/0180137 A1 | 8/2007 | Rajapakse |
| 2007/0189544 A1 | 8/2007 | Rosenberg |
| 2007/0192156 A1 | 8/2007 | Gauger |
| 2007/0206829 A1 | 9/2007 | Weinans et al. |
| 2007/0223725 A1 | 9/2007 | Neumann et al. |
| 2007/0249295 A1 | 10/2007 | Ukita et al. |
| 2007/0265031 A1 | 11/2007 | Koizumi et al. |
| 2007/0271388 A1 | 11/2007 | Bowra et al. |
| 2007/0288610 A1 | 12/2007 | Saint et al. |
| 2007/0299778 A1 | 12/2007 | Haveson et al. |
| 2008/0002836 A1 | 1/2008 | Moeller et al. |
| 2008/0007649 A1 | 1/2008 | Bennett |
| 2008/0007650 A1 | 1/2008 | Bennett |
| 2008/0007651 A1 | 1/2008 | Bennett |
| 2008/0018785 A1 | 1/2008 | Bennett |
| 2008/0022320 A1 | 1/2008 | Ver Steeg |
| 2008/0025535 A1 | 1/2008 | Rajapakse |
| 2008/0045140 A1 | 2/2008 | Korhonen et al. |
| 2008/0065232 A1 | 3/2008 | Igoe |
| 2008/0066094 A1 | 3/2008 | Igoe |
| 2008/0066120 A1 | 3/2008 | Igoe |
| 2008/0072816 A1 | 3/2008 | Riess et al. |
| 2008/0075295 A1 | 3/2008 | Mayman et al. |
| 2008/0077261 A1 | 3/2008 | Baudino et al. |
| 2008/0077619 A1 | 3/2008 | Gilley et al. |
| 2008/0077620 A1 | 3/2008 | Gilley et al. |
| 2008/0086318 A1 | 4/2008 | Gilley et al. |
| 2008/0091771 A1 | 4/2008 | Allen et al. |
| 2008/0092204 A1 | 4/2008 | Bryce et al. |
| 2008/0120429 A1 | 5/2008 | Millington et al. |
| 2008/0126943 A1 | 5/2008 | Parasnis et al. |
| 2008/0144861 A1 | 6/2008 | Melanson et al. |
| 2008/0144864 A1 | 6/2008 | Huon et al. |

**US 10,469,966 B2**

Page 8

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2008/0146289 A1 | 6/2008 | Korneluk et al. |
| 2008/0152165 A1 | 6/2008 | Zacchi |
| 2008/0159545 A1 | 7/2008 | Takumai et al. |
| 2008/0162668 A1 | 7/2008 | Miller |
| 2008/0189272 A1 | 8/2008 | Powers et al. |
| 2008/0205070 A1 | 8/2008 | Osada |
| 2008/0212786 A1 | 9/2008 | Park |
| 2008/0215169 A1 | 9/2008 | Debettencourt et al. |
| 2008/0242222 A1 | 10/2008 | Bryce et al. |
| 2008/0247554 A1 | 10/2008 | Caffrey |
| 2008/0263010 A1 | 10/2008 | Roychoudhuri et al. |
| 2008/0291863 A1 | 11/2008 | Agren |
| 2008/0303947 A1 | 12/2008 | Ohnishi et al. |
| 2009/0011798 A1 | 1/2009 | Yamada |
| 2009/0017868 A1 | 1/2009 | Ueda et al. |
| 2009/0031336 A1 | 1/2009 | Chavez et al. |
| 2009/0060219 A1 | 3/2009 | Inohara |
| 2009/0070434 A1 | 3/2009 | Himmelstein |
| 2009/0089327 A1 | 4/2009 | Kalaboukis et al. |
| 2009/0097672 A1 | 4/2009 | Buil et al. |
| 2009/0100189 A1 | 4/2009 | Bahren et al. |
| 2009/0124289 A1 | 5/2009 | Nishida |
| 2009/0157905 A1 | 6/2009 | Davis |
| 2009/0164655 A1 | 6/2009 | Pettersson et al. |
| 2009/0169030 A1 | 7/2009 | Inohara |
| 2009/0180632 A1 | 7/2009 | Goldberg et al. |
| 2009/0193345 A1 | 7/2009 | Wensley et al. |
| 2009/0222115 A1 | 9/2009 | Malcolm et al. |
| 2009/0228919 A1 | 9/2009 | Zott et al. |
| 2009/0232326 A1 | 9/2009 | Gordon et al. |
| 2009/0251604 A1 | 10/2009 | Iyer |
| 2010/0004983 A1 | 1/2010 | Dickerson et al. |
| 2010/0010651 A1 | 1/2010 | Kirkeby et al. |
| 2010/0031366 A1 | 2/2010 | Knight et al. |
| 2010/0049835 A1 | 2/2010 | Ko et al. |
| 2010/0052843 A1 | 3/2010 | Cannistraro |
| 2010/0067716 A1 | 3/2010 | Katayama |
| 2010/0087089 A1 | 4/2010 | Struthers et al. |
| 2010/0142735 A1 | 6/2010 | Yoon et al. |
| 2010/0153097 A1 | 6/2010 | Hotho et al. |
| 2010/0228740 A1 | 9/2010 | Cannistraro et al. |
| 2010/0272270 A1 | 10/2010 | Chaikin et al. |
| 2010/0284389 A1 | 11/2010 | Ramsay et al. |
| 2010/0290643 A1 | 11/2010 | Mihelich et al. |
| 2010/0299639 A1 | 11/2010 | Ramsay et al. |
| 2011/0001632 A1 | 1/2011 | Hohorst |
| 2011/0002487 A1 | 1/2011 | Panther et al. |
| 2011/0044476 A1 | 2/2011 | Burlingame et al. |
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2011/0110533 A1 | 5/2011 | Choi et al. |
| 2011/0170710 A1 | 7/2011 | Son |
| 2011/0228944 A1 | 9/2011 | Croghan et al. |
| 2011/0299696 A1 | 12/2011 | Holmgren et al. |
| 2011/0316768 A1 | 12/2011 | McRae |
| 2012/0029671 A1 | 2/2012 | Millington et al. |
| 2012/0030366 A1 | 2/2012 | Collart et al. |
| 2012/0047435 A1 | 2/2012 | Holladay et al. |
| 2012/0051558 A1 | 3/2012 | Kim et al. |
| 2012/0051567 A1 | 3/2012 | Castor-Perry |
| 2012/0060046 A1 | 3/2012 | Millington |
| 2012/0127831 A1 | 5/2012 | Gicklhorn et al. |
| 2012/0129446 A1 | 5/2012 | Ko et al. |
| 2012/0148075 A1 | 6/2012 | Goh et al. |
| 2012/0185771 A1 | 7/2012 | Rothkopf et al. |
| 2012/0192071 A1 | 7/2012 | Millington |
| 2012/0207290 A1 | 8/2012 | Moyers et al. |
| 2012/0237054 A1 | 9/2012 | Eo et al. |
| 2012/0263325 A1 | 10/2012 | Freeman et al. |
| 2012/0281058 A1 | 11/2012 | Laney et al. |
| 2012/0290621 A1 | 11/2012 | Heitz, III et al. |
| 2013/0010970 A1 | 1/2013 | Hegarty et al. |
| 2013/0018960 A1 | 1/2013 | Knysz et al. |
| 2013/0028443 A1 | 1/2013 | Pance et al. |
| 2013/0031475 A1 | 1/2013 | Maor et al. |
| 2013/0038726 A1 | 2/2013 | Kim |
| 2013/0041954 A1 | 2/2013 | Kim et al. |
| 2013/0047084 A1 | 2/2013 | Sanders et al. |
| 2013/0051572 A1 | 2/2013 | Goh et al. |
| 2013/0052940 A1 | 2/2013 | Brillhart et al. |
| 2013/0070093 A1 | 3/2013 | Rivera et al. |
| 2013/0080599 A1 | 3/2013 | Ko et al. |
| 2013/0094670 A1 | 4/2013 | Millington |
| 2013/0124664 A1 | 5/2013 | Fonseca, Jr. et al. |
| 2013/0129122 A1 | 5/2013 | Johnson et al. |
| 2013/0132837 A1 | 5/2013 | Mead et al. |
| 2013/0159126 A1 | 6/2013 | Elkady |
| 2013/0167029 A1 | 6/2013 | Friesen et al. |
| 2013/0174100 A1 | 7/2013 | Seymour et al. |
| 2013/0174223 A1 | 7/2013 | Dykeman et al. |
| 2013/0179163 A1 | 7/2013 | Herbig et al. |
| 2013/0191454 A1 | 7/2013 | Oliver et al. |
| 2013/0197682 A1 | 8/2013 | Millington |
| 2013/0208911 A1 | 8/2013 | Millington |
| 2013/0208921 A1 | 8/2013 | Millington |
| 2013/0226323 A1 | 8/2013 | Millington |
| 2013/0230175 A1 | 9/2013 | Bech et al. |
| 2013/0232416 A1 | 9/2013 | Millington |
| 2013/0236029 A1 | 9/2013 | Millington |
| 2013/0243199 A1 | 9/2013 | Kallai et al. |
| 2013/0253679 A1 | 9/2013 | Lambourne |
| 2013/0253934 A1 | 9/2013 | Parekh et al. |
| 2013/0259254 A1 | 10/2013 | Xiang et al. |
| 2013/0279706 A1 | 10/2013 | Marti et al. |
| 2013/0287186 A1 | 10/2013 | Quady |
| 2013/0290504 A1 | 10/2013 | Quady |
| 2013/0293345 A1 | 11/2013 | Lambourne |
| 2014/0006483 A1 | 1/2014 | Garmark et al. |
| 2014/0016784 A1 | 1/2014 | Sen et al. |
| 2014/0016786 A1 | 1/2014 | Sen |
| 2014/0016802 A1 | 1/2014 | Sen |
| 2014/0023196 A1 | 1/2014 | Xiang et al. |
| 2014/0037097 A1 | 2/2014 | Labosco |
| 2014/0064501 A1 | 3/2014 | Olsen et al. |
| 2014/0075308 A1 | 3/2014 | Sanders et al. |
| 2014/0075311 A1 | 3/2014 | Boettcher et al. |
| 2014/0079242 A1 | 3/2014 | Nguyen et al. |
| 2014/0108929 A1 | 4/2014 | Garmark et al. |
| 2014/0112481 A1 | 4/2014 | Li et al. |
| 2014/0123005 A1 | 5/2014 | Forstall et al. |
| 2014/0140530 A1 | 5/2014 | Gomes-Casseres et al. |
| 2014/0161265 A1 | 6/2014 | Chaikin et al. |
| 2014/0181569 A1 | 6/2014 | Millington et al. |
| 2014/0219456 A1 | 8/2014 | Morrell et al. |
| 2014/0226823 A1 | 8/2014 | Sen et al. |
| 2014/0242913 A1 | 8/2014 | Pang |
| 2014/0256260 A1 | 9/2014 | Ueda et al. |
| 2014/0267148 A1 | 9/2014 | Luna et al. |
| 2014/0270202 A1 | 9/2014 | Ivanov et al. |
| 2014/0273859 A1 | 9/2014 | Luna et al. |
| 2014/0279889 A1 | 9/2014 | Luna et al. |
| 2014/0285313 A1 | 9/2014 | Luna et al. |
| 2014/0286496 A1 | 9/2014 | Luna et al. |
| 2014/0294200 A1 | 10/2014 | Baumgarte et al. |
| 2014/0298174 A1 | 10/2014 | Ikonomov |
| 2014/0323036 A1 | 10/2014 | Daley et al. |
| 2014/0344689 A1 | 11/2014 | Scott et al. |
| 2014/0355768 A1 | 12/2014 | Sen et al. |
| 2014/0355794 A1 | 12/2014 | Morrell et al. |
| 2014/0378056 A1 | 12/2014 | Liu et al. |
| 2015/0019670 A1 | 1/2015 | Redmann |
| 2015/0026613 A1 | 1/2015 | Kwon et al. |
| 2015/0032844 A1 | 1/2015 | Tarr et al. |
| 2015/0043736 A1 | 2/2015 | Olsen et al. |
| 2015/0049248 A1 | 2/2015 | Wang et al. |
| 2015/0063610 A1 | 3/2015 | Mossner |
| 2015/0074527 A1 | 3/2015 | Sevigny et al. |
| 2015/0074528 A1 | 3/2015 | Sakalowsky et al. |
| 2015/0098576 A1 | 4/2015 | Sundaresan et al. |
| 2015/0139210 A1 | 5/2015 | Marin et al. |
| 2015/0146886 A1 | 5/2015 | Baumgarte |
| 2015/0201274 A1 | 7/2015 | Ellner et al. |
| 2015/0256954 A1 | 9/2015 | Carlsson et al. |
| 2015/0281866 A1 | 10/2015 | Williams et al. |
| 2015/0286360 A1 | 10/2015 | Wachter et al. |

**US 10,469,966 B2**

Page 9

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| 2015/0304288 A1 | 10/2015 | Balasaygun et al. |
| 2015/0365987 A1 | 12/2015 | Weel |
| 2017/0188152 A1 | 6/2017 | Watson et al. |

FOREIGN PATENT DOCUMENTS

| CN | 101095372 A | 12/2007 |
| CN | 101292500 A | 10/2008 |
| CN | 101785182 A | 7/2010 |
| EP | 0251584 A2 | 1/1988 |
| EP | 0672985 A1 | 9/1995 |
| EP | 0772374 A2 | 5/1997 |
| EP | 1111527 A2 | 6/2001 |
| EP | 1122931 A2 | 8/2001 |
| EP | 1133896 B1 | 8/2002 |
| EP | 1312188 A1 | 5/2003 |
| EP | 1389853 A1 | 2/2004 |
| EP | 2713281 | 4/2004 |
| EP | 1517464 A2 | 3/2005 |
| EP | 0895427 A3 | 1/2006 |
| EP | 1416687 B1 | 8/2006 |
| EP | 1410686 | 3/2008 |
| EP | 2043381 A2 | 4/2009 |
| EP | 2161950 A2 | 3/2010 |
| EP | 1825713 B1 | 10/2012 |
| EP | 0742674 B1 | 4/2014 |
| EP | 2591617 B1 | 6/2014 |
| EP | 2860992 A1 | 4/2015 |
| GB | 2284327 A | 5/1995 |
| GB | 2338374 | 12/1999 |
| GB | 2379533 A | 3/2003 |
| GB | 2486183 | 6/2012 |
| JP | 63269633 | 11/1988 |
| JP | 07-210129 | 8/1995 |
| JP | 2000149391 A | 5/2000 |
| JP | 2001034951 | 2/2001 |
| JP | 2002111817 | 4/2002 |
| JP | 2002123267 A | 4/2002 |
| JP | 2002358241 A | 12/2002 |
| JP | 2003037585 | 2/2003 |
| JP | 2003506765 A | 2/2003 |
| JP | 2003101958 | 4/2003 |
| JP | 2003169089 A | 6/2003 |
| JP | 2004193868 A | 7/2004 |
| JP | 2005108427 | 4/2005 |
| JP | 2005136457 | 5/2005 |
| JP | 2007241652 A | 9/2007 |
| JP | 2007288405 A | 11/2007 |
| JP | 2009506603 A | 2/2009 |
| JP | 2009135750 | 6/2009 |
| JP | 2009218888 | 9/2009 |
| JP | 2009535708 | 10/2009 |
| JP | 2009538006 A | 10/2009 |
| JP | 2011010183 A | 1/2011 |
| JP | 2011130496 | 6/2011 |
| JP | 2011176581 | 9/2011 |
| TW | 439027 | 6/2001 |
| WO | 199525313 | 9/1995 |
| WO | 1999023560 | 5/1999 |
| WO | 199961985 | 12/1999 |
| WO | 0019693 A1 | 4/2000 |
| WO | 2000019693 A1 | 4/2000 |
| WO | 0110125 A1 | 2/2001 |
| WO | 200153994 | 7/2001 |
| WO | 02073851 | 9/2002 |
| WO | 03093590 A2 | 11/2003 |
| WO | 2003093590 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |
| WO | 2007023120 A1 | 3/2007 |
| WO | 2007127485 | 11/2007 |
| WO | 2007131555 | 11/2007 |
| WO | 2007135581 A2 | 11/2007 |
| WO | 2008082350 A1 | 7/2008 |
| WO | 2008114389 A1 | 9/2008 |
| WO | 2012050927 | 4/2012 |
| WO | 2012137190 A1 | 10/2012 |
| WO | 2013012582 | 1/2013 |
| WO | 2014004182 | 1/2014 |
| WO | 2014149533 A2 | 9/2014 |
| WO | 2015024881 A1 | 2/2015 |

OTHER PUBLICATIONS

Non-Final Office Action dated Nov. 19, 2014, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 9 pages.
Non-Final Office Action dated Aug. 20, 2009, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 27 pages.
Non-Final Office Action dated Oct. 20, 2016, issued in connection with U.S. Appl. No. 14/563,515, filed Dec. 8, 2014, 10 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/080,591, filed Mar. 25, 2016, 9 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/080,716, filed Mar. 25, 2016, 8 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/088,283, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/088,532, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Aug. 22, 2018, issued in connection with U.S. Appl. No. 15/487,686, filed Apr. 14, 2017, 13 pages.
Non-Final Office Action dated Dec. 22, 2014, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 11 pages.
Non-Final Office Action dated Sep. 22, 2016, issued in connection with U.S. Appl. No. 15/088,906, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Sep. 22, 2016, issued in connection with U.S. Appl. No. 15/155,149, filed May 16, 2016, 7 pages.
Non-Final Office Action dated Jun. 23, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 30 pages.
Non-Final Office Action dated Mar. 23, 2015, issued in connection with U.S. Appl. No. 14/299,847, filed Jun. 9, 2014, 14 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 11 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Sep. 23, 2014, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 9 pages.
Non-Final Office Action dated Sep. 23, 2014, issued in connection with U.S. Appl. No. 13/630,565, filed Sep. 28, 2012, 7 pages.
Non-Final Office Action dated Feb. 24, 2017, issued in connection with U.S. Appl. No. 14/619,813, filed Feb. 11, 2015, 9 pages.
Non-Final Office Action dated May 24, 2016, issued in connection with U.S. Appl. No. 15/134,767, filed Apr. 21, 2016, 12 pages.
Non-Final Office Action dated Oct. 24, 2014, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 14 pages.
Non-Final Office Action dated Apr. 25, 2018, issued in connection with U.S. Appl. No. 15/130,919, filed Apr. 15, 2016, 13 pages.
Non-Final Office Action dated Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 25 pages.
Non-Final Office Action dated Mar. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 18 pages.
Non-Final Office Action dated Jan. 27, 2015, issued in connection with U.S. Appl. No. 14/465,457, filed Aug. 21, 2014, 11 pages.
Non-Final Office Action dated Jun. 27, 2008, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 19 pages.
Non-Final Office Action dated Mar. 27, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 14 pages.
Non-Final Office Action dated Sep. 27, 2013, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 12 pages.
Non-Final Office Action dated Sep. 27, 2016, issued in connection with U.S. Appl. No. 15/228,685, filed Aug. 4, 2016, 8 pages.
Non-Final Office Action dated Dec. 28, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 29 pages.
Non-Final Office Action dated Dec. 28, 2016, issued in connection with U.S. Appl. No. 15/343,000, filed Nov. 3, 2016, 11 pages.
Non-Final Office Action dated Jan. 29, 2016, issued in connection with U.S. Appl. No. 14/937,523, filed Nov. 10, 2015, 10 pages.
Non-Final Office Action dated Jun. 29, 2016, issued in connection with U.S. Appl. No. 14/629,937, filed Feb. 24, 2015, 12 pages.

**US 10,469,966 B2**

Page 10

(56)                **References Cited**

OTHER PUBLICATIONS

Non-Final Office Action dated Apr. 30, 2012, issued in connection with U.S. Appl. No. 13/204,511, filed Aug. 5, 2011, 16 pages.
Non-Final Office Action dated Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 29 pages.
Non-Final Office Action dated Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 13 pages.
Non-Final Office Action dated Nov. 30, 2016, issued in connection with U.S. Appl. No. 15/243,186, filed Aug. 22, 2016, 12 pages.
Non-Final Office Action dated Oct. 30, 2018, issued in connection with U.S. Appl. No. 16/128,443, filed Sep. 11, 2018, 21 pages
Non-Final Office Action dated Sep. 30, 2016, issued in connection with U.S. Appl. No. 13/864,249, filed Apr. 17, 2013, 12 pages.
Non-Final Office Action dated Oct. 31, 2013, issued in connection with U.S. Appl. No. 14/806,070, filed Jul. 22, 2015, 11 pages.
North American MPEG-2 Information, "The MPEG-2 Transport Stream," Retrieved from the Internet: URL: http://www.coolstf. mpeg/#ts, 2006, pp. 1-5.
Notice of Allowability dated Apr. 18, 2013, issued in connection with U.S. Appl. No. 11/853,790, filed Sep. 11, 2007, 4 pages.
Notice of Allowance dated Jan. 31, 2013, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 19 pages.
Notice of Allowance dated Dec. 1, 2016, issued in connection with U.S. Appl. No. 15/088,283, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Jun. 1, 2017, issued in connection with U.S. Appl. No. 14/808,397, filed Jul. 24, 2015, 5 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/088,532, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/088,678, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/089,758, filed Apr. 4, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/155,149, filed May 16, 2016, 9 pages.
Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 17 pages.
Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 19 pages.
"ZR-8630AV MultiZone Audio/Video Receiver, Installation and Operation Guide," Niles Audio Corporation, 2003, 86 pages.
ZX135: Installation Manual,LA Audio, Apr. 2003, 44 pages.
*Sonos, Inc.* v. *D&M Holdings, Inc.*, Defendants' Final Invalidity Contentions (Jan. 18, 2017) (106 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 226, Opinion Denying Inequitable Conduct Defenses, Feb. 6, 2017, updated, 5 pages.
*Sonos, Inc.* v. *D&M Holdings*, DI 242, US District Judge Andrews 101 Opinion, Mar. 2017, 16 pages.
*Sonos, Inc.* v *D&M Holdings*, Sonos Supp Opening Markman Brief including Exhibits, Mar. 3, 2017, 17 pages.
*Sonos, Inc.* v. *D&M Holdings*, Sonos Supp Reply Markman Brief including Exhibits, Mar. 29, 2017, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Declaration of Steven C. Visser, executed Sep. 9, 2016, 40 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 1: Defendants' Invalidity Contentions for U.S. Pat. No. 7,571,014 filed Sep. 16, 2016, 270 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Sep. 27, 2016, 236 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for Design U.S. Pat. No. D. 559,197 filed Sep. 27, 2016, 52 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 2: Defendants' Invalidity Contentions for U.S. Pat. No. 8,588,949 filed Sep. 27, 2016, 224 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Sep. 27, 2016, 147 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Sep. 27, 2016, 229 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Sep. 27, 2016, 213 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Sep. 27, 2016, 162 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,195,258 filed Sep. 27, 2016, 418 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 8: Defendants' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Sep. 27, 2016, 331 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 9: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Sep. 27, 2016, 251 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 1: Defendants' Invalidity Contentions for U.S. Pat. No. 7,571,014 filed Apr. 15, 2016, 161 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Apr. 15, 2016, 244 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Apr. 15, 2016, 172 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 12: Defendants' Invalidity Contentions for Design U.S. Pat. No. D. 559,197 filed Apr. 15, 2016, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 2: Defendants' Invalidity Contentions for U.S. Pat. No. 8,588,949 filed Apr. 15, 2016, 112 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Apr. 15, 2016, 118 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Apr. 15, 2016, 217 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Apr. 15, 2016, 177 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Apr. 15, 2016, 86 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,130,771 filed Apr. 15, 2016, 203 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 8: Defendants' Invalidity Contentions for U.S. Pat. No. 9,195,258 filed Apr. 15, 2016, 400 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 9: Defebddats' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Apr. 15, 2016, 163 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Preliminary Identification of Prior Art References, provided Jul. 29, 2016, 5 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Brief in Support of their Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 12, 2016, 24 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Opposition to Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply, provided Oct. 3, 2016, 13 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended complaint, provided Oct. 12, 2016, 43 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit B: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Oct. 12, 2016, 43 pages.

**US 10,469,966 B2**

Page 11

(56)                **References Cited**

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Opening Brief in Support of Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 1, 2016, 11 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Order, provided Oct. 7, 2016, 2 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff's Opposition to Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 26, 2016, 25 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Redlined Exhibit B: Defendants' First Amendend Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 27 pages.
*Sonos, Inc.* v. *D&M Holdings*, DI 206-1, Transcript of 101 Hearing (Nov. 28, 2016) (28 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 207, Public Joint Claim Construction Brief (Nov. 30, 2016) (88 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 214, D&M Post-Markman Letter (Dec. 22, 2016) (13 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 215, Sonos Post-Markman Letter (Dec. 22, 2016) (15 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 219, Claim Construction Opinion (Jan. 12, 2017) (24 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 221, Claim Construction Order (Jan. 18, 2017) (2 pages).
*Sonos, Inc.* v. *D&M Holdings*, Markman Hearing Transcript (Dec. 14, 2016) (69 pages).
Sonos Multi-Room Music System User Guide, Version: 091001, 2009, 299 pages.
Sonos Play:3 Product Guide; copyright 2004-2011; 2 pages.
Sonos Play:3 Product Guide; copyright 2004-2012; 14 pages.
Sonos Play:3 Product Guide; copyright 2004-2013; 15 pages.
Sonos Play:3 Teardown; https://www.ifixit.com/Teardown/Sonos+Play%3A3+Teardown/12475; 11 pages.
Non-Final Office Action dated May 27, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 13 pages.
Non-Final Office Action dated Feb. 29, 2012, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 10 pages.
Non-Final Office Action dated Nov. 29, 2010, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 17 pages.
Non-Final Office Action dated Jul. 30, 2013 issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 7 pages.
Non-Final Office Action dated Jul. 31, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 31 pages.
Non-Final Office Action dated Dec. 1, 2014, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages.
Non-Final Office Action dated Jun. 1, 2016, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 21 pages.
Non-Final Office Action dated Jan. 3, 2017, issued in connection with U.S. Appl. No. 14/808,397, filed Jul. 24, 2015, 11 pages.
Non-Final Office Action dated Jan. 3, 2015, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 7 pages.
Non-Final Office Action dated Nov. 3, 2016, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 17 pages.
Non-Final Office Action dated Jan. 4, 2017, issued in connection with U.S. Appl. No. 14/825,961, filed Aug. 13, 2015, 11 pages.
Non-Final Office Action dated Jun. 4, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 16 pages.
Non-Final Office Action dated Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 16 pages.
Non-Final Office Action dated Oct. 4, 2016, issued in connection with U.S. Appl. No. 15/089,758, filed Apr. 4, 2016, 9 pages.
Non-Final Office Action dated Oct. 5, 2016, issued in connection with U.S. Appl. No. 13/864,250, filed Apr. 17, 2013, 10 pages.
Non-Final Office Action dated Oct. 5, 2016, issued in connection with U.S. Appl. No. 13/864,252, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Oct. 6, 2016, issued in connection with U.S. Appl. No. 15/088,678, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Jul. 7, 2015, issued in connection with U.S. Appl. No. 14/174,244, filed Feb. 6, 2014, 9 pages.

Non-Final Office Action dated Oct. 7, 2016, issued in connection with U.S. Appl. No. 15/156,392, filed May 17, 2016, 8 pages.
Non-Final Office Action dated Mar. 8, 2011, issued in connection with U.S. Appl. No. 11/853,790, filed Sep. 11, 2007, 10 pages.
Non-Final Office Action dated Mar. 8, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages.
Non-Final Office Action dated Aug. 9, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 31 pages.
Non-Final Office Action dated May 9, 2014, issued in connection with U.S. Appl. No. 13/892,230, filed May 10, 2013, 10 pages.
Non-Final Office Action dated Nov. 1, 2018, issued in connection with U.S. Appl. No. 16/129,758, filed Sep. 12, 2018, 23 pages.
Non-Final Office Action dated Feb. 10, 2016, issued in connection with U.S. Appl. No. 14/937,571, filed Nov. 10, 2015, 9 pages.
Non-Final Office Action dated Mar. 10, 2011, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 12 pages.
Non-Final Office Action dated May 10, 2016, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 22 pages.
Non-Final Office Action dated Nov. 10, 2016, issued in connection with U.S. Appl. No. 15/243,355, filed Aug. 22, 2016, 11 pages.
Non-Final Office Action dated Jun. 11, 2018, issued in connection with U.S. Appl. No. 15/405,931, filed Jan. 13, 2017, 14 pages.
Non-Final Office Action dated Dec. 12, 2016, issued in connection with U.S. Appl. No. 15/343,019, filed Nov. 3, 2016, 8 pages.
Non-Final Office Action dated Jun. 12, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 16 pages.
Non-Final Office Action dated Mar. 12, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 13 pages.
Non-Final Office Action dated Oct. 12, 2016, issued in connection with U.S. Appl. No. 14/505,966, filed Oct. 3, 2014, 10 pages.
Non-Final Office Action dated Feb. 13, 2014, issued in connection with U.S. Appl. No. 13/896,037, filed May 16, 2013, 10 pages.
Non-Final Office Action dated Feb. 13, 2015, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 14 pages.
Non-Final Office Action dated Jun. 13, 2016, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 14 pages.
Non-Final Office Action dated Jun. 13, 2016, issued in connection with U.S. Appl. No. 14/620,937, filed Feb. 12, 2015, 12 pages.
Non-Final Office Action dated Jun. 13, 2016, issued in connection with U.S. Appl. No. 15/134,761, filed Apr. 21, 2016, 10 pages.
Non-Final Office Action dated Mar. 13, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 15 pages.
Non-Final Office Action dated May 14, 2018, issued in connection with U.S. Appl. No. 15/228,812, filed Aug. 4, 2016, 15 pages.
Non-Final Office Action dated Dec. 15, 2016, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 12 pages.
Non-Final Office Action dated Jul. 15, 2015, issued in connection with U.S. Appl. No. 14/174,253, filed Feb. 6, 2014, 9 pages.
Non-Final Office Action dated Nov. 16, 2016, issued in connection with U.S. Appl. No. 15/228,639, filed Aug. 4, 2016, 15 pages.
Non-Final Office Action dated Dec. 17, 2015, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 10 pages.
Non-Final Office Action dated Nov. 17, 2014, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Nov. 17, 2016, issued in connection with U.S. Appl. No. 14/620,937, filed Feb. 12, 2015, 14 pages.
Non-Final Office Action dated Feb. 18, 2009, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 18 pages.
Non-Final Office Action dated Nov. 18, 2014, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 10 pages.
Non-Final Office Action dated Jan. 19, 2018, issued in connection with U.S. Appl. No. 14/629,937, filed Feb. 24, 2015, 14 pages.
Non-Final Office Action dated Jun. 19, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 38 pages.
Notice of Allowance dated Oct. 24, 2016, issued in connection with U.S. Appl. No. 15/134,767, filed Apr. 21, 2016, 7 pages.
Notice of Allowance dated Sep. 24, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 7 pages.
Notice of Allowance dated Sep. 24, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 7 pages.
Notice of Allowance dated Aug. 25, 2017, issued in connection with U.S. Appl. No. 14/505,966, filed Oct. 3, 2014, 5 pages.

**US 10,469,966 B2**

Page 12

(56)       **References Cited**

OTHER PUBLICATIONS

Notice of Allowance dated Sep. 25, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 5 pages.
Notice of Allowance dated Aug. 27, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 34 pages.
Notice of Allowance dated Aug. 27, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 18 pages.
Notice of Allowance dated Dec. 27, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 15 pages.
Notice of Allowance dated Oct. 27, 2015, issued in connection with U.S. Appl. No. 14/299,847, filed Jun. 9, 2014, 5 pages.
Notice of Allowance dated Oct. 28, 2014, issued in connection with U.S. Appl. No. 13/896,037, filed May 16, 2013, 7 pages.
Notice of Allowance dated Jul. 29, 2015, issued in connection with U.S. Appl. No. 13/359,976, filed Jan. 27, 2012, 28 pages.
Notice of Allowance dated Jul. 29, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages.
Notice of Allowance dated Aug. 30, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 7 pages.
Notice of Allowance dated Jul. 30, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 18 pages.
Notice of Allowance dated May 30, 2019, issued in connection with U.S. Appl. No. 16/129,758, filed Sep. 12, 2018, 7 pages.
Notice of Allowance dated Aug. 5, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 26 pages.
Notice of Allowance dated Jul. 6, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 24 pages.
Notice of Allowance dated Apr. 7, 2017, issued in connection with U.S. Appl. No. 14/629,937, filed Feb. 24, 2015, 8 pages.
Notice of Allowance dated Dec. 7, 2018, issued in connection with U.S. Appl. No. 15/228,812, filed Aug. 4, 2016, 7 pages.
Notice of Incomplete Re-Exam Request dated May 25, 2017, issued in connection with U.S. Appl. No. 90/013,959 , filed Apr. 1, 2016, 10 pages.
Notice of Intent to Issue Re-Examination Certificate dated Mar. 24, 2017, issued in connection with U.S. Appl. No. 90/013,859, filed Nov. 4, 2016, 10 pages.
Nutzel et al., "Sharing Systems for Future HiFi Systems," IEEE, 2004, 9 pages.
Office Action in Ex Parte Reexamination dated Oct. 20, 2017, issued in connection with Reexamination U.S. Appl. No. 90/013,959, filed Jun. 16, 2017, 50 pages.
Palm, Inc., "Handbook for the Palm VII Handheld," May 2000, 31 pages.
Parasound Zpre2 Zone Preamplifier with PTZI Remote Control, 2005, 16 pages.
Park et al., "Group Synchronization in MultiCast Media Communications," Proceedings of the 5th Research on Multicast Technology Workshop, 2003, 5 pages.
Pillai et al., "A Method to Improve the Robustness of MPEG Video Applications over Wireless Networks," Kent Ridge Digital Labs, 2000, 15 pages.
Polycom Conference Composer User Guide, copyright 2001, 29 pages.
Postel, J., "User Datagram Protocol," RFC: 768, USC/Information Sciences Institute, Aug. 1980, 3 pages.
Preinterview First Office Action dated Jun. 8, 2016, issued in connection with U.S. Appl. No. 14/619,813, filed Feb. 11, 2015, 4 pages.
Pre-Interview First Office Action dated Mar. 10, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 4 pages.
Presentations at WinHEC 2000, May 2000, 138 pages.
PRISMIQ, Inc., "PRISMIQ Media Player User Guide," 2003, 44 pages.
Proficient Audio Systems M6 Quick Start Guide, 2011, 5 pages.
Proficient Audio Systems: Proficient Editor Advanced Programming Guide, 2007, 40 pages.
Programming Interface for WL54040 Dual-Band Wireless Transceiver, AVAGO0066, Agere Systems, May 2004, 16 pages.

Radio Shack, "Auto-Sensing 4-Way Audio/Video Selector Switch," 2004, 1 page.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 1, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 2, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 3, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 4, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 5, 46 pages.
Rane: DragNet software; available for sale at least 2006.
Rangan et al., "Feedback Techniques for Continuity and Synchronization in Multimedia Information Retrieval," ACM Transactions on Information Systems, 1995, pp. 145-176, vol. 13, No. 2.
Real Time Control Protocol (RTCP) and Realtime Transfer Protocol (RTP), RFC 1889 (Jan. 1996) (D+M_0397810-84) (75 pages).
Realtime Streaming Protocol (RTSP), RFC 2326 (Apr. 1998) (D+M_0397945-8036) (92 pages).
Realtime Transport Protocol (RTP), RFC 3550 (Jul. 2003) (D+M_0398235-323) (89 pages).
Re-Exam Final Office Action dated Aug. 5, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 25 pages.
Reexam Non-Final Office Action dated Oct. 17, 2016, issued in connection with U.S. Appl. No. 90/013,756, filed May 25, 2016, 31 pages.
Re-Exam Non-Final Office Action dated Apr. 22, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 16 pages.
Levergood et al., "AudioFile: A Network-Transparent System for Distributed Audio Applications," Digital Equipment Corporation, 1993, 109 pages.
LG: RJP-201M Remote Jack Pack Installation and Setup Guide, 2010, 24 pages.
Lienhart et al., "On the Importance of Exact Synchronization for Distributed Audio Signal Processing," Session L: Poster Session II—ICASSP'03 Papers, 2002, 1 page.
LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 Datasheet, Copyright 2008, 2 pages.
LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 User Guide, Copyright 2008, 64 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 Quick Installation Guide, Copyright 2009, 32 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 User Guide, Copyright 2008, 65 pages.
Linux SDK for UPnP Devices v. 1.2 (Sep. 6, 2002) (101 pages).
Liu et al., "A synchronization control scheme for real-time streaming multimedia applications," Packet Video, 2003, 10 pages, vol. 2003.
Liu et al., "Adaptive Delay Concealment for Internet Voice Applications with Packet-Based Time-Scale Modification," Information Technologies 2000, pp. 91-102.
Louderback, Jim, "Affordable Audio Receiver Furnishes Homes With MP3," TechTV Vault. Jun. 28, 2000 retrieved Jul. 10, 2014, 2 pages.
Machine Translation of JP2004-193868A Wireless Transmission and Reception System and Wireless Transmission and Reception Method, 2 pages.
Machine Translation of JP2007-2888405A Video Sound Output System, Video Sound Processing Method, and Program, 64 pages.
Maniactools, "Identify Duplicate Files by Sound," Sep. 28, 2010, http://www.maniactools.com/soft/music-duplicate-remover/identify-duplicate-files-by-sound.shtml.
MediaRenderer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
MediaServer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
Microsoft, Universal Plug and Play (UPnP) Client Support ("Microsoft UPnP") (Aug. 2001) (D+M_0402007-24) (18 pages).
Microsoft Window's XP Reviewer's Guide (Aug. 2001) (D+M_0402225-85) (61 pages).

# US 10,469,966 B2

Page 13

(56) **References Cited**

OTHER PUBLICATIONS

"Microsoft Windows XP File and Printer Share with Microsoft Windows" Microsoft Windows XP Technical Article, 2003, 65 pages.

Mills David L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, 7 pages.

Mills, David L., "Precision Synchronization of Computer Network Clocks," ACM SIGCOMM Computer Communication Review, 1994, pp. 28-43, vol. 24, No. 2.

"Model MRC44 Four Zone—Four Source Audio/Video Controller/ Amplifier System," Xantech Corporation, 2002, 52 pages.

Motorola, "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide," Dec. 31, 2001, 111 pages.

"SMPTE Made Simple: A Time Code Tutor by Timeline," 1996, 46 pages.

Network Time Protocol (NTP), RFC 1305 (Mar. 1992) (D+M_ 0397417-536) (120 pages).

"NexSys Software v.3 Manual," Crest Audio, Inc., 1997, 76 pages.

Niederst, Jennifer "O'Reilly Web Design in a Nutshell," Second Edition, Sep. 2001, 678 pages.

Nilsson, M., "ID3 Tag Version 2," Mar. 26, 1998, 28 pages.

Non-Final Office Action dated May 1, 2014, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 31 pages.

Non-Final Office Action dated Dec. 5, 2013, issued in connection with U.S. Appl. No. 13/827,653, filed Mar. 14, 2013, 28 pages.

Non-Final Office Action dated Jan. 5, 2012, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 40 pages.

Non-Final Office Action dated May 6, 2014, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages.

Non-Final Office Action dated Jan. 7, 2014, issued in connection with U.S. Appl. No. 13/896,829, filed May 17, 2013, 11 pages.

Non-Final Office Action dated Sep. 7, 2016, issued in connection with U.S. Appl. No. 13/864,248, filed Apr. 17, 2013, 12 pages.

Non-final Office Action dated Apr. 10, 2013, issued in connection with U.S. Appl. No. 13/619,237, filed Sep. 14, 2012, 10 pages.

Non-Final Office Action dated Feb. 10, 2014, issued in connection with U.S. Appl. No. 13/083,499, filed Apr. 8, 2011, 12 pages.

Non-Final Office Action dated May 12, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 23 pages.

Non-Final Office Action dated May 14, 2014, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages.

Non-Final Office Action dated Jun. 17, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 6 pages.

Non-Final Office Action dated Dec. 18, 2013, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 12 pages.

Non-Final Office Action dated Jan. 18, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 38 pages.

Non-Final Office Action dated Apr. 19, 2010, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 16 pages.

Non-Final Office Action dated Mar. 19, 2013, issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 9 pages.

Non-Final Office Action dated Jun. 21, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 13 pages.

Non-Final Office Action dated Jun. 22, 2009, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 18 pages.

Non-Final Office Action dated Jul. 23, 2014, issued in connection with U.S. Appl. No. 14/256,434, filed Apr. 18, 2014, 12 pages.

Non-Final Office Action dated Jul. 25, 2014, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages.

Non-Final Office Action dated Jul. 25, 2014, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 11 pages.

Non-Final Office Action dated Jun. 25, 2010, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 17 pages.

Non-Final Office Action dated Nov. 25, 2013, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 19 pages.

Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 23 pages.

Notice of Allowance dated Jun. 2, 2014, issued in connection with U.S. Appl. No. 13/083,499, filed Apr. 8, 2011, 5 pages.

Notice of Allowance dated Sep. 3, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 4 pages.

Notice of Allowance dated Aug. 4, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 13 pages.

Notice of Allowance dated Dec. 5, 2014, issued in connection with U.S. Appl. No. 14/256,434, filed Apr. 18, 2014, 7 pages.

Notice of Allowance dated Oct. 5, 2012, issued in connection with U.S. Appl. No. 13/204,511, filed Aug. 5, 2011, 11 pages.

Notice of Allowance dated Mar. 6, 2014, issued in connection with U.S. Appl. No. 13/827,653, filed Mar. 14, 2013, 17 pages.

Notice of Allowance dated May 6, 2011, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 10 pages.

Notice of Allowance dated Sep. 6, 2013, issued in connection with U.S. Appl. No. 13/619,237, filed Sep. 14, 2012, 10 pages.

Notice of Allowance dated Sep. 6, 2016, issued in connection with U.S. Appl. No. 15/134,767, filed Apr. 21, 2016, 7 pages.

Notice of Allowance dated Apr. 7, 2016, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 40 pages.

Notice of Allowance dated Oct. 7, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 7 pages.

Notice of Allowance dated Sep. 9, 2015, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 4 pages.

Notice of Allowance dated Sep. 9, 2016, issued in connection with U.S. Appl. No. 15/134,761, filed Apr. 21, 2016, 7 pages.

Notice of Allowance dated Mar. 1, 2018, issued in connection with U.S. Appl. No. 14/619,813, filed Feb. 11, 2015, 7 pages.

Notice of Allowance dated Aug. 10, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 9 pages.

Notice of Allowance dated Jul. 10, 2015, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 7 pages.

Notice of Allowance dated Jun. 10, 2019, issued in connection with U.S. Appl. No. 16/128,443, filed Sep. 11, 2018, 10 pages.

Notice of Allowance dated Mar. 10, 2016, issued in connection with U.S. Appl. No. 14/937,523, filed Nov. 10, 2015, 5 pages.

Notice of Allowance dated Nov. 10, 2011, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 17 pages.

Notice of Allowance dated Sep. 10, 2014, issued in connection with U.S. Appl. No. 13/892,230, filed May 10, 2013, 5 pages.

Notice of Allowance dated Sep. 10, 2018, issued in connection with U.S. Appl. No. 14/629,937, filed Feb. 24, 2015, 7 pages.

Notice of Allowance dated Apr. 11, 2016, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 21 pages.

Notice of Allowance dated Jan. 11, 2016, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 5 pages.

Notice of Allowance dated Jul. 11, 2017, issued in connection with U.S. Appl. No. 14/825,961, filed Aug. 13, 2015, 5 pages.

Notice of Allowance dated Aug. 12, 2015, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 27 pages.

Notice of Allowance dated Jun. 12, 2014, issued in connection with U.S. Appl. No. 13/896,829, filed May 17, 2013, 5 pages.

Notice of Allowance dated Jul. 13, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 22 pages.

Notice of Allowance dated May 13, 2015, issued in connection with U.S. Appl. No. 14/299,847, filed Jun. 9, 2014, 10 pages.

Notice of Allowance dated Nov. 13, 2013, issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 7 pages.

Notice of Allowance dated Nov. 13, 2017, issued in connection with U.S. Appl. No. 14/563,515, filed Dec. 8, 2014, 11 pages.

Notice of Allowance dated Oct. 13, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 7 pages.

Notice of Allowance dated Jun. 14, 2012, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 9 pages.

Notice of Allowance dated Jan. 15, 2019, issued in connection with U.S. Appl. No. 15/487,686, filed Apr. 14, 2017, 8 pages.

Notice of Allowance dated Jul. 15, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 18 pages.

Notice of Allowance dated Mar. 15, 2016, issued in connection with U.S. Appl. No. 14/937,571, filed Nov. 10, 2015, 5 pages.

Notice of Allowance dated Jun. 16, 2009, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 11 pages.

Notice of Allowance dated May 16, 2017, issued in connection with U.S. Appl. No. 15/228,685, filed Aug. 4, 2016, 10 pages.

**US 10,469,966 B2**

Page 14

(56)     **References Cited**

OTHER PUBLICATIONS

Notice of Allowance dated Jul. 17, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 20 pages.
Notice of Allowance dated Aug. 19, 2016, issued in connection with U.S. Appl. No. 14/619,813, filed Feb. 11, 2015, 9 pages.
Notice of Allowance dated May 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 7 pages.
Notice of Allowance dated Oct. 19, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 14 pages.
Notice of Allowance dated Jan. 20, 2016, issued in connection with U.S. Appl. No. 14/465,457, filed Aug. 21, 2014, 10 pages.
Notice of Allowance dated Oct. 21, 2015, issued in connection with U.S. Appl. No. 14/174,244, filed Feb. 6, 2014, 5 pages.
Notice of Allowance dated Oct. 21, 2015, issued in connection with U.S. Appl. No. 14/174,253, filed Feb. 6, 2014, 6 pages.
Notice of Allowance dated Sep. 21, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 11 pages.
Notice of Allowance dated Jan. 22, 2015, issued in connection with U.S. Appl. No. 13/630,565, filed Sep. 28, 2012, 7 pages.
Notice of Allowance dated Sep. 22, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 7 pages.
Notice of Allowance dated May 24, 2017, issued in connection with U.S. Appl. No. 14/806,070, filed Jul. 22, 2015, 5 pages.
Notice of Allowance dated Oct. 24, 2016, issued in connection with U.S. Appl. No. 15/134,761, filed Apr. 21, 2016, 7 pages.
Hans et al., "Interacting with Audio Streams for Entertainment and Communication," Proceedings of the Eleventh ACM International Conference on Multimedia, ACM, 2003, 7 pages.
Herre et al., "The Reference Model Architecture for MPEG Spatial Audio Coding," Audio Engineering Society Convention Paper (Presented at the 118th Convention), May 28-31, 2005, 13 pages.
Home Networking with Universal Plug and Play, IEEE Communications Magazine, vol. 39 No. 12 (Dec. 2001) (D+M_0402025-40) (16 pages).
"Home Theater Control Systems," Cinema Source, 2002, 19 pages.
Horwitz, Jeremy, "Logic3 i-Station25," retrieved from the internet: http://www.ilounge.com/index.php/reviews/entry/logic3-i-station25/, last visited Dec. 17, 2013, 5 pages.
Huang C.M., et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," IEEE Transactions on Consumer Electronics, 1997, pp. 370-380, vol. 43, No. 3.
IBM Home Director Installation and Service Manual, Copyright1998, 124 pages.
IBM Home Director Owner's Manual, Copyright 1999, 67 pages.
ID3 tag version 2.4.0—Native Frames, Draft Specification, copyright 2000, 41 pages.
Implicit, LLC v. Sonos, Inc., Defendant's Original Complaint (Mar. 3, 2017) (15 pages).
Integra Audio Network Receiver NAC 2.3 Instruction Manual, 68 pages.
Integra Audio Network Server NAS 2.3 Instruction Manual, pp. 1-32.
Integra Service Manual, Audio Network Receiver Model NAC-2.3, Dec. 2002, 44 pages.
Intel Designing a UPnP AV Media Renderer, v. 1.0 ("Intel AV Media Renderer") (May 20, 2003) (SONDM000115117-62) (46 pages).
Intel Media Renderer Device Interface ("Intel Media Renderer") (Sep. 6, 2002) (62 pages).
Intel SDK for UPnP Devices Programming Guide, Version 1.2.1, (Nov. 2002) (30 pages).
International Bureau, International Preliminary Report on Patentability dated Jan. 8, 2015, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 6 pages.
International Bureau, International Preliminary Report on Patentability, dated Jan. 8, 2015, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 8 pages.

International Bureau, International Preliminary Report on Patentability, dated Oct. 17, 2013, issued in connection with International Application No. PCT/IB2012/052071, filed on Apr. 26, 2012, 7 pages.
International Bureau, International Preliminary Report on Patentability dated Jan. 30, 2014, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 6 pages.
International Searching Authority, International Search Report dated Aug. 1, 2008, in connection with International Application No. PCT/US2004/023102, 5 pages.
International Searching Authority, International Search Report dated Aug. 23, 2012, issued in connection with International Application No. PCT/IB2012/052071, filed on Apr. 26, 2012, 3 pages.
International Searching Authority, International Search Report dated Aug. 26, 2013, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 3 pages.
International Searching Authority, International Search Report dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 3 pages.
International Searching Authority, International Search Report dated Sep. 30, 2013, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 3 pages.
International Searching Authority, Written Opinion dated Aug. 23, 2012, issued in connection with International Application No. PCT/IB2012/052071, filed on Apr. 26, 2012, 6 pages.
International Searching Authority, Written Opinion dated Aug. 26, 2013, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 4 pages.
International Searching Authority, Written Opinion dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 4 pages.
International Searching Authority, Written Opinion dated Sep. 30, 2013, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 6 pages.
Ishibashi et al., "A Comparison of Media Synchronization Quality Among Reactive Control Schemes," IEEE Infocom, 2001, pp. 77-84.
Ishibashi et al., "A Group Synchronization Mechanism for Live Media in Multicast Communications," IEEE Global Telecommunications Conference, 1997, pp. 746-752, vol. 2.
Ishibashi et al., "A Group Synchronization Mechanism for Stored Media in Multicast Communications," IEEE Information Revolution and Communications, 1997, pp. 692-700, vol. 2.
Issues with Mixed IEEE 802.b/802.11g Networks, AVAGO0058, Agere Systems, Feb. 2004, 5 pages.
Japanese Patent Office, Decision of Rejection dated Jul. 8, 2014, issued in connection with Japanese Patent Application No. 2012-178711, 3 pages.
Japanese Patent Office, Final Office Action dated Jun. 4, 2019, issued in connection with Japanese Patent Application No. 2017-211958, 8 pages.
Japanese Patent Office, Notice of Rejection, dated Feb. 3, 2015, issued in connection with Japanese Patent Application No. 2014-521648, 7 pages.
Japanese Patent Office, Notice of Rejection dated Sep. 15, 2015, issued in connection with Japanese Patent Application No. 2014-220704, 7 pages.
Japanese Patent Office, Office Action dated Nov. 1, 2016, issued in connection with Japanese Patent Application No. 2015-238682, 7 pages.
Japanese Patent Office, Office Action dated Jan. 6, 2015, issued in connection with Japanese Patent Application No. 2014-503273, 5 pages.
Japanese Patent Office, Office Action Dec. 18, 2018, issued in connection with Japanese Patent Application No. 2017-211958, 8 pages.
Japanese Patent Office, Office Action dated May 24, 2016, issued in connection with Japanese Patent Application No. 2014-220704, 7 pages.
Japanese Patent Office, Office Action dated Mar. 29, 2016, issued in connection with Japanese Patent Application No. JP2015-520288, 12 pages.

# US 10,469,966 B2

Page 15

(56)        **References Cited**

OTHER PUBLICATIONS

Japanese Patent Office, Office Action Summary dated Feb. 2, 2016, issued in connection with Japanese Patent Application No. 2015-520286, 6 pages.
Japanese Patent Office, Office Action Summary dated Sep. 8, 2015, issued in connection with Japanese Patent Application No. 2014-503273, 4 pages.
Japanese Patent Office, Office Action Summary dated Nov. 2013, issued in connection with Japanese Patent Application No. 2012-178711, 5 pages.
Japanese Patent Office, Translation of Office Action dated Dec. 18, 2018, issued in connection with Japanese Application No. 2017-211958, 6 pages.
Jo et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, pp. 71-82, vol. 4861.
Jones, Stephen, "Dell Digital Audio Receiver: Digital upgrade for your analog stereo," Analog Stereo, Jun. 24, 2000 retrieved Jun. 18, 2014, 2 pages.
Kou et al., "RenderingControl:1 Service Template Verion 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 63 pages.
Lake Processors: Lake® LM Series Digital Audio Processors Operation Manual, 2011, 71 pages.
Reid, Mark, "Multimedia conferencing over ISDN and IP networks using ITU-T H-series recommendations: architecture, control and coordination," Computer Networks, 1999, pp. 225-235, vol. 31.
RenderingControl:1 Service Template Version 1.01 for UPnP, Version 1.0, (Jun. 25, 2002) (SONDM000115187-249) (63 pages).
Renewed Request for Ex Parte Re-Examination, U.S. Appl. No. 90/013,959 filed Jun. 16, 2017, 126 pages.
Renkus Heinz Manual; available for sale at least 2004, 6 pages.
Request for Ex Parte Reexamination submitted in U.S. Pat. No. 9,213,357 on May 22, 2017, 85 pages.
"Residential Distributed Audio Wiring Practices," Leviton Network Solutions, 2001, 13 pages.
Ritchie et al., "MediaServer:1 Device Template Version 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 12 pages.
Ritchie et al., "UPnP AV Architecture:1, Version 1.0," Contributing Members of the UPnP Forum, Jun. 25, 2002, 22 pages.
Ritchie, John, "MediaRenderer:1 Device Template Version 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 12 pages.
Roland Corporation, "Roland announces BA-55 Portable PA System," press release, Apr. 6, 2011, 2 pages.
Rothermel et al., "An Adaptive Protocol for Synchronizing Media Streams," Institute of Parallel and Distributed High-Performance Systems (IPVR), 1997, 26 pages.
Rothermel et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, 13 pages.
Rothermel et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, Apr. 18-21, 1995, 12 pages.
Rothermel et al., "Clock Hierarchies—An Abstraction for Grouping and Controlling Media Streams," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, Jan. 1996, 23 pages.
Rothermel et al., "Synchronization in Joint-Viewing Environments," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, 1992, 13 pages.
Rothermel, Kurt, "State-of-the-Art and Future Research in Stream Synchronization," University of Stuttgart, 3 pages.
"RVL-6 Modular Multi-Room Controller, Installation & Operation Guide," Nile Audio Corporations, 1999, 46 pages.
Schmandt et al., "Impromptu: Managing Networked Audio Applications for Mobile Users," 2004, 11 pages.
Schulzrinne et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, RFC: 3550, Standards Track, Jul. 2003, 104 pages.
Schulzrinne H., et al., "RTP: A Transport Protocol for Real-Time Applications, RFC 3550," Network Working Group, 2003, pp. 1-89.

Simple Network Time Protocol (SNTPI), RFC 1361 (Aug. 1992) (D+M_0397537-46) (10 pages).
Simple Network Time Protocol (SNTPII), RFC 1769 (Mar. 1995) (D+M_0397663-76) (14 pages).
Simple Service Discovery Protocol/1.0 Operating without an Arbiter (Oct. 28, 1999) (24 pages).
Sonos Controller for iPad Product Guide; copyright 2004-2013; 47 pages.
Sonos Digital Music System User Guide, Version: 050801, Aug. 2005, 114 pages.
*Sonos, Inc.* v *D&M Holdings*, D&M Supp Opposition Brief including Exhibits, Mar. 17, 2017, 23 pages.
*Sonos, Inc.* v. *D&M Holdings*, Expert Report of Jay P. Kesan including Appendices A-P, Feb. 20, 2017, 776 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Complaint for Patent Infringement, filed Oct. 21, 2014, 20 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions, filed Sep. 14, 2016, 100 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions, filed Apr. 15, 2016, 97 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Preliminary Indentification of Indefinite Terms, provided Jul. 29, 2016, 8 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' 35 U.S.C. § 282 Notice filed Nov. 2, 2017, 31 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Answer, Defenses, and Counterclaims for Patent Infringement, filed Nov. 30, 2015, 47 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Answer to Plaintiff's Second Amended Complaint, filed Apr. 30, 2015, 19 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' First Amended Answer to Plaintiff's Third Amended Complaint, filed Sep. 7, 2016, 23 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Reply in Support of Partial Motion for Judgement on the Pleadings, filed Jun. 10, 2016, 15 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, filed Sep. 9, 2016, 43 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Sep. 9, 2016, 88 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, First Amended Compaint for Patent Infringement, filed Dec. 17, 2014, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Joint Claim Construction Chart, vol. 1 of 3 with Exhibits A-O, filed Aug. 17, 2016, 30 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Opening Brief in Support of Defendants' Partial Motion for Judgement on the Pleadings for Lack of Patent-Eligible Subject Matter, filed May 6, 2016, 27 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff Sonos, Inc.'s Opening Claim Construction Brief, filed Sep. 9, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff Sonos, Inc.'s Response in Opposition to Defendants' Partial Motion for Judgment on the Pleadings, filed May 27, 2016, 24 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Nov. 10, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Sep. 9, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Second Amended Complaint for Patent Infringement, filed Feb. 27, 2015, 49 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply Brief, provided Sep. 15, 2016, 10 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Opposition to Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 31, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Third Amended Complaint for Patent Infringement, filed Jan. 29, 2016, 47 pages.

# US 10,469,966 B2

Page 16

(56)         **References Cited**

OTHER PUBLICATIONS

Final Office Action dated Mar. 27, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 29 pages.
Final Office Action dated Jan. 28, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 21 pages.
Final Office Action dated Jun. 30, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 30 pages.
Final Office Action dated Jul. 1, 2016, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 11 pages.
Final Office Action dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 11 pages.
Final Office Action dated Aug. 3, 2015, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages.
Final Office Action dated Dec. 3, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 12 pages.
Final Office Action dated Jul. 3, 2012, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 46 pages.
Final Office Action dated Jun. 3, 2016, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 24 pages.
Final Office Action dated Mar. 3, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 13 pages.
Final Office Action dated Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 16 pages.
Final Office Action dated Mar. 5, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 13 pages.
Final Office Action dated Jan. 7, 2017, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages.
Final Office Action dated Mar. 9, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 14 pages.
Final Office Action dated Aug. 10, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 26 pages.
Final Office Action dated Feb. 10, 2014, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 13 pages.
Final Office Action dated Aug. 11, 2015, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 15 pages.
Final Office Action dated Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 13 pages.
Final Office Action dated Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 17 pages.
Final Office Action dated Feb. 12, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 17, 2014, 20 pages.
Final Office Action dated Apr. 13, 2017, issued in connection with U.S. Appl. No. 14/563,515, filed Dec. 8, 2014, 13 pages.
Final Office Action dated Dec. 13, 2016, issued in connection with U.S. Appl. No. 14/629,937, filed Feb. 24, 2015, 14 pages.
Final Office Action dated Oct. 13, 2011, issued in connection with U.S. Appl. No. 11/853,790, filed Sep. 11, 2007, 10 pages.
Final Office Action dated Oct. 13, 2011, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 10 pages.
Final Office Action dated Nov. 14, 2018, issued in connection with U.S. Appl. No. 15/130,919, filed Apr. 15, 2016, 12 pages.
Final Office Action dated Jul. 15, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 18 pages.
Final Office Action dated Jun. 15, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 25 pages.
Final Office Action dated Dec. 17, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 36 pages.
Final Office Action dated Oct. 19, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 14 pages.
Final Office Action dated Jan. 21, 2010, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 27 pages.
Final Office Action dated Oct. 22, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 12 pages.
Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages.
Final Office Action dated Feb. 24, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 28 pages.
Final Office Action dated May 25, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 33 pages.
Final Office Action dated Apr. 28, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 20 pages.
Final Office Action dated Jun. 29, 2015, issued in connection with U.S. Appl. No. 14/465,457, filed Aug. 21, 2014, 13 pages.
Final Office Action dated Jan. 3, 2019, issued in connection with U.S. Appl. No. 15/405,931, filed Jan. 13, 2017, 16 pages.
Final Office Action dated Nov. 30, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 26 pages.
Final Office Action dated Apr. 6, 2017, issued in connection with U.S. Appl. No. 14/620,937, filed Feb. 12, 2015, 15 pages.
Final Office Action dated Dec. 7, 2017, issued in connection with U.S. Appl. No. 14/619,813, filed Feb. 11, 2015, 11 pages.
Fireball DVD and Music Manager DVDM-100 Installation and User's Guide, Copyright 2003, 185 pages.
Fireball MP-200 User's Manual, Copyright 2006, 93 pages.
Fireball Remote Control Guide WD006-1-1, Copyright 2003, 19 pages.
Fireball SE-D1 User's Manual, Copyright 2005, 90 pages.
First Action Interview Office Action Summary dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 6 pages.
Fober et al., "Clock Skew Compensation over a High Latency Network," Proceedings of the ICMC, 2002, pp. 548-552.
Fries et al. "The MP3 and Internet Audio Handbook: Your Guide to the Digital Music Revolution." 2000, 320 pages.
Fulton et al., "The Network Audio System: Make Your Application Sing (as Well as Dance)!" The X Resource, 1994, 14 pages.
Gaston et al., "Methods for Sharing Stereo and Multichannel Recordings Among Planetariums," Audio Engineering Society Convention Paper 7474, 2008, 15 pages.
General Event Notification Architecture Base: Client to Arbiter (Apr. 2000) (23 pages).
Sony: AIR-SA 50R Wireless Speaker, Copyright 2009, 2 pages.
Sony: Altus Quick Setup Guide ALT-SA32PC, Copyright 2009, 2 pages.
Sony: BD/DVD Home Theatre System Instruction for BDV-E300, E301 and E801, Copyright 2009, 115 pages.
Sony: BD/DVD Home Theatre System Operating Instructions for BDV-IT1000/BDV-IS1000, Copyright 2008, 159 pages.
Sony: Blu-ray Disc/DVD Home Theatre System Operating Instructions for BDV-IZ1000W, Copyright 2010, 88 pages.
Sony: DVD Home Theatre System Operating Instructions for DAV-DZ380W/DZ680W/DZ880W, Copyright 2009, 136 pages.
Sony: DVD Home Theatre System Operating Instructions for DAV-DZ870W, Copyright 2008, 128 pages.
Sony Ericsson MS500 User Guide, Copyright 2009, 2 pages.
Sony: Home Theatre System Operating Instructions for HT-IS100, Copyright 2008, 168 pages.
Sony HT-IS100, 5.1 Channel Audio System, last updated Nov. 2009, 2 pages.
Sony: Multi Channel AV Receiver Operating Instructions, 2007, 80 pages.
Sony: Multi Channel AV Receiver Operating Instructions for STR-DN1000, Copyright 2009, 136 pages.
Sony: STR-DN1000, Audio Video Receiver, last updated Aug. 2009, 2 pages.
Sony: Wireless Surround Kit Operating Instructions for WHAT-SA2, Copyright 2010, 56 pages.
Taylor, Marilou, "Long Island Sound," Audio Video Interiors, Apr. 2000, 8 pages.
Third Party Request for Ex Parte Re-Examination, U.S. Appl. No. 90/013,859 filed Nov. 7, 2016, 424 pages.
TOA Corporation, Digital Processor DP-0206 DACsys2000 Version 2.00 Software Instruction Manual, Copyright 2001, 67 pages.
Understanding Universal Plug and Play, Microsoft White Paper (Jun. 2000) (D+M_0402074-118) (45 pages).
United States Patent and Trademark Office, U.S. Appl. No. 60/490,768, filed Jul. 28, 2003, entitled "Method for synchronizing audio playback between multiple networked devices," 13 pages.
United States Patent and Trademark Office, U.S. Appl. No. 60/825,407, filed Sep. 12, 2006, entitled "Controlling and manipulating groupings in a multi-zone music or media system," 82 pages.

**US 10,469,966 B2**

Page 17

(56)        **References Cited**

OTHER PUBLICATIONS

Universal Plug and Play Device Architecture V. 1.0, (Jun. 8, 2000) (54 pages).
Universal Plug and Play in Windows XP, Tom Fout. Microsoft Corporation (Jul. 2001) (D+M_0402041-73) (33 pages).
Universal Plug and Play ("UPnP") AV Architecture:1 for UPnP, Version 1.0, (Jun. 25, 2002) (D+M_0298151-72) (22 pages).
Universal Plug and Play Vendor's Implementation Guide (Jan. 5, 2000) (7 pages).
UPnP AV Architecture:0.83 (Jun. 12, 2002) (SONDM000115483-504) (22 pages).
UPnP Design by Example, A Software Developers Guide to Universal Plug and Play Michael Jeronimo and JackWeast, Intel Press (D+M_0401307-818) (Apr. 2003) (511 pages).
UPnP; "Universal Plug and Play Device Architecture," Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54.
U.S. Appl. No. 13/083,499, filed Apr. 8, 2011, "Multi-Channel Pairing in a Media System.".
WANCommonInterfaceConfig:1 Service Template Version 1.01 for UPnP, Ver. 1.0 (Nov. 12, 2001) (D+M_0401820-43) (24 pages).
WANIPConnection:1 Service Template Version 1.01 for UPnP Ver. 1.0 (Nov. 12, 2001) (D+M_0401844-917) (74 pages).
WANPPPConnection:1 Service Template Version 1.01 for UPnP, Version 1.0 (Nov. 12, 2001) (D+M_0401918-2006) (89 pages).
WaveLan High-Speed Multimode Chip Set, AVAGO0003, Agere Systems, Feb. 2003, 4 pages.
WaveLan High-Speed Multimode Chip Set, AVAGO0005, Agere Systems, Feb. 2003, 4 pages.
WaveLAN Wireless Integration Developer Kit (WI-DK) for Access Point Developers, AVAGO0054, Agere Systems, Jul. 2003, 2 pages.
WaveLAN Wireless Integration-Developer Kit (WI-DK) Hardware Control Function (HCF), AVAGO0052, Agere Systems, Jul. 2003, 2 pages.
"Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 Retrieved Oct. 14, 2014, 40 pages.
"Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 Retrieved Oct. 16, 2014, 36 pages.
"Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 Retrieved Oct. 16, 2014, 36 pages.
WI-DK Release 2 WaveLan Embedded Drivers for VxWorks and Linux, AVAGO0056, Agere Systems, Jul. 2003, 2 pages.
WI-DK Release 2 WaveLan END Reference Driver for VxWorks, AVAGO0044, Agere Systems, Jul. 2003, 4 pages.
WI-DK Release 2 WaveLan LKM Reference Drivers for Linux, AVAGO0048, Agere Systems, Jul. 2003, 4 pages.
Windows Media Connect Device Compatibility Specification (Apr. 12, 2004) (16 pages).
WPA Reauthentication Rates, AVAGO0063, Agere Systems, Feb. 2004, 3 pages.
Yamaha DME 32 manual: copyright 2001.
Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages.
Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages.
Yamaha DME Designer 3.5 User Manual; Copyright 2004, 507 pages.
Yamaha DME Designer software manual: Copyright 2004, 482 pages.
"Symantec pcAnywhere User's Guide," v 10.5.1, 1995-2002, 154 pages.
"Systemline Modular Installation Guide, Multiroom System," Systemline, 2003, pp. 1-22.
"884+ Automatic Matrix Mixer Control System," Ivie Technologies, Inc., 2000, pp. 1-4.
Advanced Driver Tab User Interface WaveLan GUI Guide, AVAGO0009, Agere Systems, Feb. 2004, 4 pages.
Advisory Action dated Feb. 2, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 8 pages.
Advisory Action dated Sep. 18, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 8 pages.

Advisory Action dated Feb. 1, 2016, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 6 pages.
Advisory Action dated Jun. 1, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages.
Advisory Action dated Mar. 2, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 3 pages.
Advisory Action dated Jan. 5, 2012, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 3 pages.
Advisory Action dated Oct. 5, 2015, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 4 pages.
Advisory Action dated Sep. 5, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 3 pages.
Advisory Action dated Oct. 6, 2016, issued in connection with U.S. Appl. No. 13/458,558, filed Apr. 27, 2012, 4 pages.
Advisory Action dated Jan. 8, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 4 pages.
Advisory Action dated Jun. 9, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 25, 2013, 3 pages.
Advisory Action dated Feb. 10, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 3 pages.
Advisory Action dated Nov. 12, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 6 pages.
Advisory Action dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages.
Advisory Action dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 9 pages.
Advisory Action dated Dec. 22, 2011, issued in connection with U.S. Appl. No. 11/853,790, filed Sep. 11, 2007, 2 pages.
Advisory Action dated Mar. 25, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 5 pages.
Advisory Action dated Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 3 pages.
Advisory Action dated Nov. 26, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages.
Advisory Action dated Jul. 28, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 7 pages.
Advisory Action dated Sep. 28, 2009, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 4 pages.
Agere Systems' Voice-over-Wireless LAN (VoWLAN) Station Quality of Service, AVAGO0015, Agere Systems, Jan. 2005, 5 pages.
Akyildiz et al., "Multimedia Group Synchronization Protocols for Integrated Services Networks," IEEE Journal on Selected Areas in Communications, 1996 pp. 162-173, vol. 14, No. 1.
Anonymous, "Information technology—Generic coding of moving pictures and associated audio information—Part 3: Audio," ISO/IEC 13818-3, Apr. 1998, pp. 11.
Anonymous, "Transmission Control Protocol," RFC: 793, USC/Information Sciences Institute, Sep. 1981, 91 pages.
Audio Authority: How to Install and Use the Model 1154 Signal Sensing Auto Selector, 2002, 4 pages.
Audio Authority: Model 1154B High Definition AV Auto Selector, 2008, 8 pages.
AudioSource: AMP 100 User Manual, 2003, 4 pages.
AudioTron Quick Start Guide, Version 1.0, Mar. 2001, 24 pages.
AudioTron Reference Manual, Version 3.0, May 2002, 70 pages.
AudioTron Setup Guide, Version 3.0, May 2002, 38 pages.
Automatic Profile Hunting Functional Description, AVAGO0013, Agere Systems, Feb. 2004, 2 pages.
"A/V Surround Receiver AVR-5800," Denon Electronics, 2000, 2 pages.
"A/V System Controleer, Owner's Manual," B&K Compontents, Ltd., 1998, 52 pages.
AVTransport:1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (66 pages).
AXIS Communication: AXIS P8221 Network I/O Audio Module, 2009, 41 pages.
Baldwin, Roberto. "How-To: Setup iTunes DJ on Your Max and iPhone", available at http://www.maclife.com/article/howtos/howto_setup_itunes_dj_your_mac_and_iphone, archived on Mar. 3, 2009, 4 pages.
Balfanz et al., "Network-in-a-Box: How to Set Up a Secure Wireless Network in Under a Minute," 13th USENIX Security Symposium—Technical Paper, 2002, 23 pages.

(56)        **References Cited**

OTHER PUBLICATIONS

Balfanz et al., "Talking to Strangers: Authentication in Ad-Hoc Wireless Networks," Xerox Palo Alto Research Center, 2002, 13 pages.
Barham et al., "Wide Area Audio Synchronisation," University of Cambridge Computer Laboratory, 1995, 5 pages.
Baudisch et al., "Flat Volume Control: Improving Usability by Hiding the Volume Control Hierarchy in the User Interface," 2004, 8 pages.
Benslimane Abderrahim, "A Multimedia Synchronization Protocol for Multicast Groups," Proceedings of the 26th Euromicro Conference, 2000, pp. 456-463, vol. 1.
Biersack et al., "Intra- and Inter-Stream Synchronization for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing and Systems, 1996, pp. 372-381.
Blakowski G. et al., "A Media Synchronization Survey: Reference Model, Specification, and Case Studies," Jan. 1996, pp. 5-35, vol. 14, No. 1.
Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity," Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.
Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy," Core, Version 1.0 B, Dec. 1, 1999, 1076 pages.
Bogen Communications, Inc., ProMatrix Digitally Matrixed Amplifier Model PM3180, Copyright1996, 2 pages.
Brassil et al., "Enhancing Internet Streaming Media with Cueing Protocols," 2000, 9 pages.
Breebaart et al., "Multi-Channel Goes Mobile: MPEG Surround Binaural Rendering," AES 29th International Conference, Sep. 2-4, 2006, pp. 1-13.
Bretl W.E., et al., MPEG2 Tutorial [online], 2000 [retrieved on Jan. 13, 2009] Retrieved from the Internet:(http://www.bretl.com/mpeghtml/MPEGindex.htm), pp. 1-23.
Buerk et al., "AVTransport:1 Service Template Version 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 67 pages.
Canadian Intellectual Property Office, Canadian Office Action dated Apr. 4, 2016, issued in connection with Canadian Patent Application No. 2,842,342, 5 pages.
Canadian Intellectual Property Office, Canadian Office Action dated Sep. 14, 2015, issued in connection with Canadian Patent Application No. 2,842,342, 2 pages.
Canadian Patent Office, Canadian Office Action dated Aug. 30, 2017, issued in connection with CA Application No. 2947275, 5 pages.
Canadian Patent Office, Office Action dated Apr. 10, 2015, issued in connection with Canadian Patent Application No. 2,832,542, 3 pages.
Cen et al., "A Distributed Real-Time MPEG Video Audio Player," Department of Computer Science and Engineering, Oregon Graduate Institute of Science and Technology, 1995, 12 pages.
Chakrabarti et al., "A Remotely Controlled Bluetooth Enabled Environment," IEEE, 2004, pp. 77-81.
Change Notification: Agere Systems WaveLan Multimode Reference Design (D2 to D3), AVAGO0042, Agere Systems, Nov. 2004, 2 pages.
Chinese Patent Office, First Office Action dated Oct. 12, 2018, issued in connection with Chinese Application No. 201610804134.8, 10 pages.
Chinese Patent Office, Office Action dated Jul. 5, 2016, issued in connection with Chinese Patent Application No. 201380044380.2, 25 pages.
Chinese Patent Office, Office Action dated Nov. 27, 2015, issued in connection with Chinese Patent Application No. 201280028038.9, 26 pages.
Connection Manager: 1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (25 pages).
ContentDirectory:1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (89 pages).

Corrected Notice of Allowance dated Mar. 12, 2015, issued in connection with U.S. Appl. No. 13/630,565, filed Sep. 28, 2012, 4 pages.
Corrected Notice of Allowance dated Aug. 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 2 pages.
Corrected Notice of Allowance dated Oct. 30, 2015, issued in connection with U.S. Appl. No. 13/013,740, filed Jan. 25, 2011, 2 pages.
Corrected Notice of Allowance dated Dec. 6, 2017, issued in connection with U.S. Appl. No. 15/228,685, filed Aug. 4, 2016, 5 pages.
Creative, "Connecting Bluetooth Devices with Creative D200," http://support.creative.com/kb/ShowArticle.aspx? url=http://ask.creative.com:80/SRVS/CGI-BIN/WEBCGI.EXE/,/?St=106,E=0000000000396859016,K=9377,Sxi=8, VARSET=ws:http://us.creative.com,case=63350>, available on Nov. 28, 2011, 2 pages.
Crown PIP Manual available for sale at least 2004, 68 pages.
Dannenberg et al., "A. System Supporting Flexible Distributed Real-Time Music Processing," Proceedings of the 2001 International Computer Music Conference, 2001, 4 pages.
Dannenberg, Roger B., "Remote Access to Interactive Media," Proceedings of the SPIE 1785, 1993, pp. 230-237.
Day, Rebecca, "Going Elan!" Primedia Inc., 2003, 4 pages.
Deep-Sleep Implementation in WL60011 for IEEE 802.11b Applications, AVAGO0020, Agere Systems, Jul. 2004, 22 pages.
Dell, Inc. "Dell Digital Audio Receiver: Reference Guide," Jun. 2000, 70 pages.
Dell, Inc. "Start Here," Jun. 2000, 2 pages.
"Denon 2003-2004 Product Catalog," Denon, 2003-2004, 44 pages.
Denon AV Surround Receiver AVR-1604/684 User's Manual, 2004, 128 pages.
Denon AV Surround Receiver AVR-5800 Operating Instructions, Copyright 2000, 67 pages.
Designing a UPnP AV MediaServer, Nelson Kidd (2003) (SONDM00011062-116) (55 pages).
Dorwaldt, Carl, "EASE 4.1 Tutorial," Renkus-Heinz, Inc., 2004, 417 pages.
"DP-0206 Digital Signal Processor," TOA Electronics, Inc., 2001, pp. 1-12.
Dynaudio Acoustics Air Series, http://www.soundonsound.com/sos/sep02/articles/dynaudioair.asp, 2002, 4 pages.
European Patent Office, European Extended Search Report dated Mar. 7, 2016, issued in connection with EP Application No. 13810340.3, 9 pages.
European Patent Office, European Extended Search Report dated Feb. 28, 2014, issued in connection with EP Application No. 13184747.7, 8 pages.
European Patent Office, European Extended Search Report dated Mar. 31, 2015, issued in connection with EP Application No. 14181454.1, 9 pages.
European Patent Office, European Search Report dated Jul. 5, 2016, issued in connection with European Patent Application No. 16156935.5, 9 pages.
European Patent Office, Examination Report dated Mar. 22, 2016, issued in connection with European Patent Application No. EP14181454.1, 6 pages.
European Patent Office, Examination Report dated Oct. 24, 2016, issued in connection with European Patent Application No. 13808623.6, 4 pages.
European Patent Office, Extended European Search Report dated Jul. 5, 2016, issued in connection with European Patent Application No. 16156940.5, 7 pages.
Falcone, John, "Sonos BU150 Digital Music System review," CNET, CNET [online] Jul. 27, 2009 [retrieved on Mar. 16, 2016], 11 pages Retrieved from the Internet: URL:http://www.cnet.com/products/sonos-bu150-digital-music-system/.
Faller, Christof, "Coding of Spatial Audio Compatible with Different Playback Formats," Audio Engineering Society Convention Paper (Presented at the 117th Convention), Oct. 28-31, 2004, 12 pages.
File History of Re-Examination Application No. 90/013,423.

US 10,469,966 B2

Page 19

(56)          **References Cited**

OTHER PUBLICATIONS

Final Office Action dated Jun. 5, 2014, issued in connection with
U.S. Appl. No. 13/907,666, filed May 31, 2013, 12 pages.
Final Office Action dated Jul. 13, 2009, issued in connection with
U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 16 pages.
Final Office Action dated Sep. 13, 2012, issued in connection with
U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 17 pages.
Final Office Action dated Nov. 18, 2015, issued in connection with
U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 56 pages.
Final Office Action dated Oct. 21, 2011, issued in connection with
U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 19 pages.
Final Office Action dated Jul. 23, 2014, issued in connection with
U.S. Appl. No. 13/896,037, filed May 16, 2013, 12 pages.
AuviTran AVB32-ES User's Manual, 2005, 25 pages.
AuviTran AVKIT-ES for AD8HR User's Manual, 2005, 15 pages.
CobraNet Manager, Direct control over your audio network. www.
peakaudio.com/CobraNet/FAQ.html, 2005 [retrieved online Jul. 12,
2019 at web.archive.org/web/20050403214230/http://www.peakaudio.
com/CobraNet/FAQ] 13 pages.
Non-Final Office Action dated Jul. 17, 2019, issued in connection
with U.S. Appl. No. 15/130,919, filed Apr. 15, 2016, 15 pages.
Non-Final Office Action dated Aug. 28, 2019, issued in connection
with U.S. Appl. No. 16/422,160, filed May 24, 2019, 14 pages.
Non-Final Office Action dated Jul. 5, 2019, issued in connection
with U.S. Appl. No. 16/383,561, filed Apr. 12, 2019, 12 pages.

\* cited by examiner



FIG. 1



**200**

202

Network Interface
Wireless 216
Wired 217

Processor 204

Memory 206

Audio Processing Circuit 210

Module 212

Audio Amplifier 214

**FIG. 2A**



*FIG. 2B*



*FIG. 2C*



*FIG. 3A*



FIG. 3B



*FIG. 4*



*FIG. 5A*

520

Zone Menu

Select the zones in this group

Bedroom

✔ Kitchen

Dining Room

✔ Living Room

Office

✔ Patio

Check          Uncheck          Done

FIG. 5B



**FIG. 5C**



FIG. 6

600

Start

602
configure a
zone scene

604
decide which zone players to be
associated with the scene

606
save the scene with parameters

610
invoke a
zone scene

612
check status of zone players in the scene

614
execute commands to synchronize
the zone players



*FIG. 7*



*FIG. 8*

US 10,469,966 B2

**1**

## ZONE SCENE MANAGEMENT

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of and claims priority to U.S. patent application Ser. No. 15/130,919, filed on Apr. 15, 2016, entitled "ZONE SCENE ACTIVATION," which is a continuation of U.S. patent application Ser. No. 14/465,457, filed on Aug. 21, 2014, entitled "METHOD AND APPA-RATUS FOR UPDATING ZONE CONFIGURATIONS IN A MULTI-ZONE SYSTEM," which is a continuation of U.S. patent application Ser. No. 13/896,829, filed on May 17, 2013, entitled "METHOD AND APPARATUS FOR UPDATING ZONE CONFIGURATIONS IN A MULTI-ZONE SYSTEM," which is a continuation of U.S. patent application Ser. No. 11/853,790, filed Sep. 11, 2007, entitled "CONTROLLING AND MANIPULATING GROUPINGS IN A MULTI-ZONE MEDIA SYSTEM," which claims priority to U.S. Provisional Application No. 60/825,407 filed on Sep. 12, 2006, entitled "CONTROLLING AND MANIPULATING GROUPINGS IN A MULTI-ZONE MEDIA SYSTEM," each of which is hereby incorporated by reference in its entirety for all purposes.

### BACKGROUND OF THE INVENTION

#### Field of the Invention

The invention is generally related to the area of consumer electronics and human-computer interaction. In particular, the invention is related to method and apparatus for controlling or manipulating a plurality of multimedia players in a multi-zone system.

An enduring passion for quality audio reproduction or system is continuing to drive demands from users. One of the demands includes an audio system in a house in which, for example, one could grill to classic rock on a patio while another one may cook up his/her own music selections in a kitchen. This is all at the same time while a teenager catches a ballgame in a family room, and another one blasts pop in a bedroom. And the best part of such audio system is that each family member does not need his or her own stereo system—one system gives everyone access to all the music sources.

Currently, one of the systems that can meet part of such demand is a conventional multi-zone audio system that usually includes a number of audio players. Each of the audio players has its own amplifier(s) and a set of speakers and typically installed in one place (e.g., a room). In order to play an audio source at one location, the audio source must be provided locally or from a centralized location. When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult. When the audio source is provided centrally, the centralized location may include a juke box, many compact discs, an AM or FM radio, tapes, or others. To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources.

In order to achieve playing different audio sources in different audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-configured and pre-programmed controller. While the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation. For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning. The same person may wish to listen in the den and the living room to music from a compact disc in the evening. In order to satisfy such requirements, two groups of audio players must be established. In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news. In the evening, the audio players in the den and the living room are grouped for the music. Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music. Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups.

There is a need for dynamic control of the audio players as a group. With a minimum manipulation, the audio players may be readily grouped. In a traditional multi-zone audio system, the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment. Further, there is a need to individually or systematically adjust the audio volume of the audio players.

### SUMMARY OF THE INVENTION

This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups. According to one aspect of the present invention, a mechanism is provided to allow a user to group some of the players according to a theme or scene, where each of the players is located in a zone. When the scene is activated, the players in the scene react in a synchronized manner. For example, the players in the scene are all caused to play an audio source or music in a playlist, wherein the audio source may be located anywhere on a network.

According to another aspect of the present invention, the scene may be activated at any time or a specific time. A user may activate the scene at any time so that only some selected zones in an entertainment system facilitate a playback of an audio source. When the scene is activated at a specific time, the scene may be used as an alarm or buzzer.

According to still another aspect of the present invention, a controlling device (also referred to herein as controller) is provided to facilitate a user to select any of the players in the system to form respective groups each of which is set up per a scene. Although various scenes may be saved in any of the members in a group, commands are preferably sent from the controller to the rest of the members when one of the scenes is executed. Depending on implementation, the commands include parameters pertaining to identifiers of the players, volumes settings, audio source and etc.

According to yet another aspect of the present invention, a configurable module is implemented in the controlling device that provides interactive graphic user interface for forming, managing and controlling groups in the system, de-grouping a group or adjusting audio volume of individual players or a group of players.

US 10,469,966 B2

3

4

The present invention may be implemented in many forms including software, hardware or a combination of both. According to one embodiment, the present invention is directed to a method for groupings in a multi-zone media system, the method comprises providing a mechanism to allow a user to determine which players in the system to be associated with a theme representing a group; and configuring the theme with parameters pertaining to the players, wherein the theme is activated at anytime or a specific time so that the players react in a synchronized manner. The players in a scene are synchronized to play a multimedia file when the scene is activated.

According to another embodiment, the present invention is directed to an entertainment system for grouping players, the system comprises: a plurality of players, each located in one zone; and a controller providing a mechanism to allow a user to select which of the players to be associated with a theme representing a group; and configure the theme with parameters pertaining to the selected players, wherein the theme is activated at anytime or a specific time so that the selected players react in a synchronized manner. As a result, the selected players are synchronized to play a multimedia that is in a digital format and retrieved from a source over a network.

One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other.

Other objects, features, and advantages of the present invention will become apparent from examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. 1 shows an exemplary configuration in which the present invention may be practiced;

FIG. 2A shows an exemplary functional block diagram of a player in accordance with the present invention;

FIG. 2B shows an example of a controller that may be used to remotely control one of more players of FIG. 2A;

FIG. 2C shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

FIG. 3A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning";

FIG. 3B shows that a user defines multiple groups to be gathered at the same time;

FIG. 4 shows an exemplary user interface that may be displayed on a controller or a computer of FIG. 1;

FIG. 5A shows a user interface to allow a user to form a scene;

FIG. 5B shows another user interface 520 to allow a user to form a scene;

FIG. 5C shows a user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively;

FIG. 6 shows a flowchart or process of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone; and

FIG. 7 shows an example user interface for invoking a zone scene; and

FIG. 8 shows another example user interface for invoking a zone scene.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The detailed description of the invention is presented largely in terms of procedures in terms of procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. 1 shows an exemplary configuration 100 in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a complex with multiple zones. There are a number of multimedia players of which three examples 102, 104 and 106 are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

As used herein, unless explicitly stated otherwise, an audio source or audio sources are in digital format and can be transported or streamed over a data network. To facilitate the understanding of the present invention, it is assumed that the configuration 100 represents a home. Thus, the zone player 102 and 104 may be located in two of the bedrooms respectively while the zone player 106 may be installed in a living room. All of the zone players 102, 104 and 106 are coupled directly or indirectly to a data network 108. In addition, a computing device 110 is shown to be coupled on the network 108. In reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network 108 as well.

The network 108 may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players 102, 104 and 106 are coupled to the network 108 by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players 102, 104 and

**5**

106 are part of a local area network that communicates with a wide area network (e.g., the Internet).

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** or any of the zone players can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be converted to digital audio sources. In accordance with the present invention, the audio sources may be shared among the devices on the network **108**.

Two or more zone players may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group.

Referring now to FIG. **2**A, there is shown an exemplary functional block diagram of a zone player **200** in accordance with the present invention. The zone player **200** includes a network interface **202**, a processor **204**, a memory **206**, an audio processing circuit **210**, a module **212**, and optionally, an audio amplifier **214** that may be internal or external. The network interface **202** facilitates a data flow between a data network (i.e., the data network **108** of FIG. **1**) and the zone player **200** and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols used in the Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general, a network interface manages the assembling of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface **202** handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **200**.

The network interface **202** may include one or both of a wireless interface **216** and a wired interface **217**. The wireless interface **216**, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player **200** to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g). The wired interface **217** provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player includes both of the interfaces **216** and **217**, and other zone players include only a RF or wired interface. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the zone player. The processor **204** is configured to control the operation of other parts in the zone player **200**. The memory **206** may be loaded with one or more software modules that can be executed by the processor **204** to achieve desired tasks. According to one aspect of the present invention, a software module implementing one embodiment of the present invention is executed, the processor **204** operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player **200** is caused to retrieve an audio source from another zone player or a device on the network.

According to one embodiment of the present invention, the memory **206** is used to save one or more saved zone configuration files that may be retrieved for modification at

**6**

any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device **140** or **142** of FIG. **1**, a computer, a portable device, or a TV) when a user operates the controlling device. The zone group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

The audio processing circuit **210** resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface **202**, the audio source is processed in the audio processing circuit **210** to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier **214** for playback on speakers. In addition, the audio processing circuit **210** may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the module **212** may be implemented as a combination of hardware and software. In one embodiment, the module **212** is used to save a scene. The audio amplifier **214** is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

Referring now to FIG. **2**B, there is shown an exemplary controller **240**, which may correspond to the controlling device **140** or **142** of FIG. **1**. The controller **240** may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller **240** is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player **200**) through a RF interface corresponding to the RF interface **216** of FIG. **2**A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b or 802.11g). When a particular audio source is being played in the zone player **200**, a picture, if there is any, associated with the audio source may be transmitted from the zone player **200** to the controller **240** for display. In one embodiment, the controller **240** is used to synchronize more than one zone players by grouping the zone players in a group. In another embodiment, the controller **240** is used to control the volume of each of the zone players in a zone group individually or together.

The user interface for the controller **240** includes a screen **242** (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button **244**, a "back" button **246**, a "music" button **248**, a scroll wheel **250**, "ok" button **252**, a set of transport control buttons **254**, a mute button **262**, a volume up/down button **264**, a set of soft buttons **266** corresponding to the labels **268** displayed on the screen **242**.

The screen **242** displays various screen menus in response to a user's selection. In one embodiment, the "zones" button **244** activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button **246** may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the 'back" button negates the user's erroneous selection. The "music" button **248** activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

US 10,469,966 B2

7

The scroll wheel **250** is used for selecting an item within a list, whenever a list is presented on the screen **242**. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel **250** to either choose a displayed item or display a hidden item in the list. The "ok" button **252** is used to confirm the user selection on the screen **242**.

There are three transport buttons **254**, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button **262** or the volume up/down button **264** activates a volume panel. In addition, there are three soft buttons **266** that can be activated in accordance with the labels **268** on the screen **242**. It can be understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. **2**C illustrates an internal functional block diagram of an exemplary controller **270**, which may correspond to the controller **240** of FIG. **2**B. The screen **272** on the controller **270** may be a LCD screen. The screen **272** communicates with and is commanded by a screen driver **274** that is controlled by a microcontroller (e.g., a processor) **276**. The memory **282** may be loaded with one or more application modules **284** that can be executed by the microcontroller **276** with or without a user input via the user interface **278** to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio volumes of the zone players in a zone group. In operation, when the microcontroller **276** executes one of the application modules **284**, the screen driver **274** generates control signals to drive the screen **272** to display an application specific user interface accordingly, more of which will be described below.

The controller **270** includes a network interface **280** referred to as a RF interface **280** that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller **270** may control one or more zone players, such as **102**, **104** and **106** of FIG. **1**. Nevertheless, there may be more than one controllers, each preferably in a zone (e.g., a room) and configured to control any one and all of the zone players.

In one embodiment, a user creates a zone group including at least two zone players from the controller **240** that sends signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group playback an identical audio source or a list of identical audio sources in a timely synchronized manner. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume

8

for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in scale.

According to one implementation, an application module is loaded in memory **282** for zone group management. When a predetermined key (e.g. the "zones" button **244**) is activated on the controller **240**, the application module is executed in the microcontroller **276**. The input interface **278** coupled to and controlled by the microcontroller **276** receives inputs from a user. A "Zone Menu" is then displayed on the screen **272**. The user may start grouping zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. The detail of the zone group manipulation will be further discussed below.

As described above, the input interface **278** includes a number of function buttons as well as a screen graphical user interface. It should be pointed out that the controller **240** in FIG. **2**B is not the only controlling device that may practice the present invention. Other devices that provide the equivalent control functions (e.g., a computing device, a hand-held device) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

One mechanism for 'joining' zone players together for music playback is to link a number of zone players together to form a group. To link a number of zone players together, a user may manually link each zone player or room one after the other. For example, there is a multi-zone system that includes the following zones.

Bathroom
Bedroom
Den
Dining Room
Family Room
Foyer

If the user wishes to link **5** of the **6** zone players using the current mechanism, he/she must start with a single zone and then manually link each zone to that zone. This mechanism may be sometimes quite time consuming. According to one embodiment, a set of zones can be dynamically linked together using one command. Using what is referred to herein as a theme or a zone scene, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated.

For instance, a "Morning" zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action. Without this single command, the user would need to manually and individually link each zone. FIG. **3**A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning".

Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates **3** separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

US 10,469,966 B2

**9**

In one embodiment as shown in FIG. **3**B, a user defines multiple groups to be gathered at the same time. For example: an "Evening Scene" is desired to link the following zones:

Group 1
Bedroom
Den
Dining Room
Group 2
Garage
Garden

where Bathroom, Family Room and Foyer should be separated from any group if they were part of a group before the Zone Scene was invoked.

One important of the features, benefits and objects in the present invention is that zones do not need to be separated before a zone scene is invoked. In one embodiment, a command is provided and links all zones in one step, if invoked. The command is in a form of a zone scene. After linking the appropriate zones, a zone scene command could apply the following attributes:

Set volumes levels in each zones (each zone can have a different volume)

Mute/Unmute zones.

Select and play specific music in the zones.

Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)

Set the music playback equalization of each zone (e.g., bass treble).

A further extension of this embodiment is to trigger a zone scene command as an alarm clock function. For instance the zone scene is set to apply at 8:00 am. It could link appropriate zones automatically, set specific music to play and then stop the music after a defined duration. Although a single zone may be assigned to an alarm, a scene set as an alarm clock provides a synchronized alarm, allowing any zones linked in the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed UPnP, no Internet connection for an Internet Radio station), a backup buzzer will sound. This buzzer will be a sound file that is stored in a zone player.

FIG. **4** shows an exemplary user interface **400** that may be displayed on a controller **142** or a computer **110** of FIG. **1**. The interface **400** shows a list of items that may be set up by a user to cause a scene to function at a specific time. In the embodiment shown in FIG. **4**, the list of items includes "Alarm", "Time", "Zone", "Music", "Frequency" and "Alarm length". "Alarm" can be set on or off. When "Alarm" is set on, "Time" is a specific time to set off the alarm. "Zone" shows which zone players are being set to play a specified audio at the specific time. "Music" shows what to be played when the specific time arrives. "Frequency" allows the user to define a frequency of the alarm. "Alarm length" defines how long the audio is to be played. It should be noted that the user interface **400** is provided herein to show some of the functions associated with setting up an alarm. Depending on an exact implementation, other functions, such as time zone, daylight savings, time synchronization, and time/date format for display may also be provided without departing from the present invention.

According to one embodiment, each zone player in a scene may be set up for different alarms. For example, a "Morning" scene includes three zone players, each in a bedroom, a den, and a dining room. After selecting the

**10**

scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.

FIG. **5**A shows a user interface **500** to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and be grouped as part of this scene. Depending on an exact implementation of a user interface, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.

FIG. **5**B shows another user interface **520** to allow a user to form a scene. The user interface **520** that may be displayed on a controller or a computing device, lists available zones in a system. The list of zones in the user interface **520** includes ALL the zones in the system, including the zones that are already grouped. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

FIG. **5**C shows a user interface **510** to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. As shown in the user interface **510**, the 'Volumes . . . ' button (shown as sliders, other forms are possible) allows the user to affect the volumes of the associated zone players when a zone scene is invoked. In one embodiment, the zone players can be set to retain whatever volume that they currently have when the scene is invoked. Additionally the user can decide if the volumes should be unmuted or muted when the scene is invoked.

FIG. **6** shows a flowchart or process **600** of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone. The process **600** is presented in accordance with one embodiment of the present invention and may be implemented in a module to be located in the memory **282** of FIG. **2**C.

The process **600** is initiated only when a user decides to proceed with a zone scene at **602**. The process **600** then moves to **604** where it allows a user to decide which zone players to be associated with the scene. For example, there are ten players in a household, and the scene is named after "Morning". The user may be given an interface to select four of the ten players to be associated with the scene. At **606**, the scene is saved. The scene may be saved in any one of the members in the scene. In the example of FIG. **1**, the scene is saved in one of the zone players and displayed on the controller **142**. In operation, a set of data pertaining to the scene includes a plurality of parameters. In one embodiment, the parameters include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist. The parameters may also include volume/tone settings for the associated players in the scene. The user may go back to **602** to configure another scene if desired.

Given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at **610**. The process **600** can continue when a saved scene is activated at **610**. At **612**, upon the activation of a saved scene, the process **600** checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. In one embodiment, the interconnections of the players are checked to make sure that the players communicate among themselves and/or with a controller if there is such a controller in the scene.

It is assumed that all players associated with the scene are in good condition. At **614**, commands are executed with the parameters (e.g., pertaining to a playlist and volumes). In one embodiment, data including the parameters is trans-

US 10,469,966 B2

11

ported from a member (e.g., a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene. The operation may cause all players to play back a song in identical or different volumes or to play back a pre-stored file.

One of the features, benefits and advantages in the present invention is to allow sets of related devices (controllers and operating components) to exist as a group without interfering with other components that are potentially visible on the same wired or wireless network. Each of the sets is configured to a theme or a scene.

FIG. **7** shows an example user interface for invoking a zone scene. The user interface of FIG. **7** shows a Zone Menu that includes selectable indications of zone scenes.

FIG. **8** shows another example user interface for invoking a zone scene. FIG. **8** shows a Zone Menu that includes a softkey indicating a Scenes menu. Pressing the Scenes softkey will show the Scenes menu where all the available zone scenes are shown as selectable indications.

The present invention has been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. While the embodiments discussed herein may appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the invention has applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

I claim:

**1**. A computing device comprising: one or more processors;

a non-transitory computer-readable medium; and program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone

12

scene; displaying a representation of the first zone scene and a representation of the second zone scene; and while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

**2**. The computing device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

**3**. The computing device of claim **1**, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

**4**. The computing device of claim **3**, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

**5**. The computing device of claim **1**, wherein the first zone scene further comprises an indication of predetermined media to be played when the first zone scene is invoked, and wherein the computing device further comprises program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

based on the third request, causing the first zone player to coordinate with at least the second zone player to output the predetermined media in synchrony with output of the predetermined media by at least the second zone player.

**6**. The computing device of claim **1**, wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

**7**. The computing device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

US 10,469,966 B2

**13**

before displaying the representation of the first zone scene and the representation of the second zone scene, receiving, from another device over a data network, data defining the first zone scene and data defining the second zone scene.

**8**. The computing device of claim **1**, wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

**9**. A non-transitory computer-readable medium, wherein the non-transitory computer-readable medium is provisioned with program instructions that are executable to cause a computing device to perform functions comprising:

while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

displaying a representation of the first zone scene and a representation of the second zone scene; and

while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

**10**. The non-transitory computer-readable medium of claim **9**, wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

**14**

based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

**11**. The non-transitory computer-readable medium of claim **9**, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

**12**. The non-transitory computer-readable medium of claim **11**, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

**13**. The non-transitory computer-readable medium of claim **9**, wherein the first zone scene further comprises an indication of predetermined media to be played when the first zone scene is invoked, and wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

based on the third request, causing the first zone player to coordinate with at least the second zone player to output the predetermined media in synchrony with output of the predetermined media by at least the second zone player.

**14**. The non-transitory computer-readable medium of claim **9**, wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

**15**. The non-transitory computer-readable medium of claim **9**, wherein the non-transitory computer-readable medium further comprises program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

before displaying the representation of the first zone scene and the representation of the second zone scene, receiving, from another device over a data network, data defining the first zone scene and data defining the second zone scene.

**16**. The non-transitory computer-readable medium of claim **9**, wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

**17**. A method executed by a computing device, the method comprising:

while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone

US 10,469,966 B2

15

player is operating in a standalone mode in which the first zone player is configured to play back media individually:

receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

displaying a representation of the first zone scene and a representation of the second zone scene; and

while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined group-

16

ing of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

**18**. The method of claim **17**, further comprising:

while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

**19**. The method of claim **17**, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

**20**. The method of claim **19**, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

* * * * *

# EXHIBIT 5

US009219460B2

(12) **United States Patent**

Bush

(10) **Patent No.: US 9,219,460 B2**

(45) **Date of Patent: Dec. 22, 2015**

(54) **AUDIO SETTINGS BASED ON ENVIRONMENT**

(71) Applicant: **Sonos, Inc.**, Santa Barbara, CA (US)

(72) Inventor: **William H. Bush**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 143 days.

(21) Appl. No.: **14/216,306**

(22) Filed: **Mar. 17, 2014**

(65) **Prior Publication Data**

US 2015/0263692 A1      Sep. 17, 2015

(51) **Int. Cl.**
| | |
|---|---|
| **H03G 5/16** | (2006.01) |
| **H04R 3/00** | (2006.01) |
| **H04R 29/00** | (2006.01) |

(52) **U.S. Cl.**
CPC ................. **H03G 5/165** (2013.01); **H04R 3/00** (2013.01); **H04R 29/00** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,306,113 | A | 12/1981 | Morton |
| 4,592,088 | A | 5/1986 | Shimada |
| 5,218,710 | A | 6/1993 | Yamaki et al. |
| 5,386,478 | A | 1/1995 | Plunkett |
| 5,553,147 | A | 9/1996 | Pineau |
| 5,923,902 | A | 7/1999 | Inagaki |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,704,421 | B1 | 3/2004 | Kitamura |
| 6,721,428 | B1 | 4/2004 | Allred et al. |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,766,025 | B1 | 7/2004 | Levy et al. |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,916,980 | B2 | 7/2005 | Ishida et al. |
| 6,931,134 | B1 | 8/2005 | Waller, Jr. et al. |
| 7,058,186 | B2 | 6/2006 | Tanaka |
| 7,103,187 | B1 | 9/2006 | Neuman |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 0153994 | 7/2001 |

OTHER PUBLICATIONS

Written Opinion of the International Searching Authority for PCT/US2015/021000, dated Jun. 5, 2015.*

(Continued)

*Primary Examiner* — Brenda Bernardi

(74) *Attorney, Agent, or Firm* — McDonnell Boehnen Hulbert & Berghoff LLP

(57) **ABSTRACT**

Embodiments described herein may involve dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating. One embodiment may involve emitting a first audio signal from a playback device, detecting, by the playback device, a second audio signal, where at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determining one or more reflection characteristics, where each of the one or more reflection characteristics are based on at least the second audio signal, adjusting an equalization setting of the playback device based on the one or more reflection characteristics, and causing an audio track to play according to the adjusted equalization setting.

**20 Claims, 9 Drawing Sheets**



US 9,219,460 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |
| 7,489,784 | B2 | 2/2009 | Yoshino |
| 7,492,909 | B2 | 2/2009 | Carter |
| 7,529,377 | B2 | 5/2009 | Nackvi et al. |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,630,501 | B2 | 12/2009 | Blank et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |
| 7,676,044 | B2 | 3/2010 | Sasaki et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,949,140 | B2 | 5/2011 | Kino |
| 7,961,893 | B2 | 6/2011 | Kino |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,103,009 | B2 | 1/2012 | Mccarty et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,194,874 | B2 | 6/2012 | Starobin et al. |
| 8,234,395 | B2 | 7/2012 | Millington |
| 8,270,620 | B2 | 9/2012 | Christensen |
| 8,325,931 | B2 * | 12/2012 | Howard ............... H04R 29/003 |
| | | | 324/525 |
| 8,401,202 | B2 | 3/2013 | Brooking |
| 8,577,048 | B2 | 11/2013 | Chaikin et al. |
| 8,819,554 | B2 | 8/2014 | Basso et al. |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2002/0022453 | A1 | 2/2002 | Balog et al. |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0078161 | A1 | 6/2002 | Cheng |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2003/0002689 | A1 | 1/2003 | Folio |
| 2003/0157951 | A1 | 8/2003 | Hasty |
| 2003/0161479 | A1 | 8/2003 | Yang et al. |
| 2004/0024478 | A1 | 2/2004 | Hans et al. |
| 2004/0237750 | A1 | 12/2004 | Smith et al. |
| 2005/0147261 | A1 | 7/2005 | Yeh |
| 2005/0157885 | A1 | 7/2005 | Olney et al. |
| 2007/0003067 | A1 | 1/2007 | Gierl et al. |
| 2007/0142944 | A1 | 6/2007 | Goldberg et al. |
| 2008/0002839 | A1 | 1/2008 | Eng |
| 2008/0098027 | A1 | 4/2008 | Aarts |
| 2008/0144864 | A1 | 6/2008 | Huon |
| 2008/0175411 | A1 | 7/2008 | Greve |
| 2009/0024662 | A1 | 1/2009 | Park et al. |
| 2009/0047993 | A1 | 2/2009 | Vasa |
| 2009/0110218 | A1 * | 4/2009 | Swain ................... H03G 5/165 |
| | | | 381/300 |
| 2010/0195846 | A1 * | 8/2010 | Yokoyama ............. H03G 7/007 |
| | | | 381/102 |
| 2011/0091055 | A1 | 4/2011 | LeBlanc |

| | | | |
|---|---|---|---|
| 2013/0129122 | A1 | 5/2013 | Johnson et al. |
| 2013/0216071 | A1 * | 8/2013 | Maher ....................... H04R 3/04 |
| | | | 381/303 |
| 2014/0037097 | A1 | 1/2014 | Labosco |

OTHER PUBLICATIONS

AudioTron Setup Guide, Version 3.0, Voyetra Turtle Beach, Inc., May 2002, 38 pages.

"Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity" Core, Version 1.0 A, Jul. 26, 1999, 1068 pages)".

"Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy" Core, Version 1.0 B, Dec. 1, 1999, 1076 pages)".

"Dell, Inc. "Dell Digital Audio Receiver: Reference Guide" Jun. 2000, 70 pages)".

"Dell, Inc. "Start Here" Jun. 2000, 2 pages)".

"Jones, Stephen. "Dell Digital Audio Receiver: Digital upgrade for your analog stereo" Analog Stereo. Jun. 24, 2000 <http://www.reviewsonline.com/articles/961906864.htm> retrieved Jun. 18, 2014, 2 pages)".

"Louderback, Jim. "Affordable Audio Receiver Furnishes Homes With MP3" TechTV Vault. Jun. 28, 2000 <http://www.g4tv.com/articles/17923/affordable-audio-receiver-furnishes-homes-with-mp3/> retrieved Jul. 10, 2014, 2 pages)".

"Palm, Inc. "Handbook for the Palm VII Handheld" May 2000, 311 pages)".

"Presentations at WinHEC 2000" May 2000, 138 pages.

"AudioTron Quick Start Guide, Version 1.0", Voyetra Turtle Beach, Inc., Mar. 2001, 24 pages.

"AudioTron Reference Manual, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 70 pages.

"AudioTron Setup Guide, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 38 pages.

Jo J., et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, vol. 4861, pp. 71-82.

"UPnP; "Universal Plug and Play Device Architecture"; Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54".

""Constellation Acoustic System: a revolutionary breakthrough in acoustical design" Meyer Sound Laboratories, Inc., <http://www.meyersound.com/pdf/brochures/constellation_brochure_c.pdf> 2012, 32 pages)".

""Constellation Microphones," Meyer Sound Laboratories, Inc., <http://www.meyersound.com/sites/default/files/constellation_microphones.pdf> 2013, 2 pages)".

"Ross, Alex. "Wizards of Sound: Retouching acoustics, from the restaurant to the concert hall" The New Yorker, Feb. 23, 2015. Web. Feb. 26, 2015)".

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5





FIGURE 6

Case 3:20-cv-06754-WHA   Document 11-1   Filed 10/12/20   Page 226 of 492



FIGURE 7



FIGURE 8A

**U.S. Patent**     Dec. 22, 2015     Sheet 8 of 9     US 9,219,460 B2



FIGURE 8B



FIGURE 8C

US 9,219,460 B2

**1**

## AUDIO SETTINGS BASED ON ENVIRONMENT

### FIELD OF THE DISCLOSURE

The disclosure is related to consumer goods and, more particularly, to methods, systems, products, features, services, and other elements directed to media playback or some aspect thereof.

### BACKGROUND

Options for accessing and listening to digital audio in an out-loud setting were limited until in 2003, when SONOS, Inc. filed for one of its first patent applications, entitled "Method for Synchronizing Audio Playback between Multiple Networked Devices," and began offering a media playback system for sale in 2005. The Sonos Wireless HiFi System enables people to experience music from many sources via one or more networked playback devices. Through a software control application installed on a smartphone, tablet, or computer, one can play what he or she wants in any room that has a networked playback device. Additionally, using the controller, for example, different songs can be streamed to each room with a playback device, rooms can be grouped together for synchronous playback, or the same song can be heard in all rooms synchronously.

Given the ever growing interest in digital media, there continues to be a need to develop consumer-accessible technologies to further enhance the listening experience.

### BRIEF DESCRIPTION OF THE DRAWINGS

Features, aspects, and advantages of the presently disclosed technology may be better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an example media playback system configuration in which certain embodiments may be practiced;

FIG. **2** shows a functional block diagram of an example playback device;

FIG. **3** shows a functional block diagram of an example control device;

FIG. **4** shows an example controller interface;

FIG. **5** shows an example flow diagram for dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating;

FIG. **6** shows another example media playback system configuration in which certain embodiments may be practiced; and

FIG. **7** shows illustrative frequency responses of the playback device.

FIGS. **8**A-**8**C show example impulse responses of a playback device.

The drawings are for the purpose of illustrating example embodiments, but it is understood that the inventions are not limited to the arrangements and instrumentality shown in the drawings.

### DETAILED DESCRIPTION

#### I. Overview

Embodiments described herein involve dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating. While a playback device may be factory configured to perform

**2**

advantageously in a typical operating environment, the factory configuration may not be ideal for all environments. Therefore, adjusting the equalization of the playback device based on the current operating environment may improve the listening experience for some listeners.

Consider that, as one example, a playback device may be configured to perform advantageously in a small room, but nonetheless may come to be positioned outdoors. When operating outdoors, boosting the bass levels of the playback may result in an improved listening experience for some users. Other such examples may exist as well.

Some audio playback systems implement a manual approach for adjustment of equalization based on environment. Under this approach, a microphone is cabled to a given component of an audio system, such as an amplifier or an audio-video receiver. A user is then expected to position the microphone in a position in which the user would typically listen to the audio system. The given component of the audio system then drives audio output to one or more speakers. Then, the speaker output is detected by the microphone. Playback of the audio component is then adjusted based on the speaker output detected by the microphone.

Such a manual approach has several disadvantages. First, the adjustment process is often overlooked by the user because, for example, the user may be required to initiate the adjustment and position the microphone. Second, the adjustment process requires a separate microphone, which may not be included with any of the components of the audio system. Third, the manual approach does not lend itself to frequent adjustment when one or more of the speakers may be re-positioned in different locations throughout a home or outdoors. Therefore, an improved, dynamic approach to adjustment based on environment is desired.

Described herein are example methods and systems for dynamically adjusting equalization of a playback device based on the environment in which the playback device is operating. An example playback device may include a speaker, a microphone, and a processor. The playback device may emit an audio signal, such as a pulse, from the speaker. As the audio signal propagates, the signal may encounter various objects, such as walls and furniture, throughout the environment. When an object is encountered, the object may variably reflect or absorb portions of the audio signal. For instance, when the audio signal encounters an interior wall, a portion of the audio signal may be reflected by the interior wall. The portion of the audio signal may then encounter other objects that variably reflect or absorb some of the portion in turn. At some point, a portion of the reflected audio signal may reflect back toward the playback device from which the audio signal was emitted. The microphone of the playback device may then detect at least a portion of the reflected audio signal.

In response to detecting the reflected audio signal, the playback device may determine one or more reflection characteristics based on the reflected audio signal. For example, the playback device may determine an amount of time from when the playback device emitted the first audio signal to when the playback device detected the reflected audio signal. The amount of time may indicate the nature of the environment. For instance, a relatively short amount of time may indicate that the playback device is in a small room while a relatively amount of time may indicate that the playback device is in a large room. Alternatively, the playback device may determine the sound pressure level of the second audio signal. A relatively low sound pressure level may indicate that there is relatively more absorptive material in the environment as compared with a relatively higher sound pressure

US 9,219,460 B2

3

level. Or the relatively low sound pressure level may indicate that the first audio signal travelled a relatively longer distance before reflecting. Other reflection characteristics may exist, as may many other examples of indications regarding the nature of the environment.

The playback device may then adjust an equalization setting of the playback device based on the one or more reflection characteristics. Further, two or more reflection characteristics may be used in combination. For instance, a relatively long amount of time and a relatively low sound pressure level may indicate that the playback device is either presumed to be outside or in a very large room. In either case, the playback device may adjust the equalization setting based on that environment. In the above instance, where the playback device is either outside or in a very large room, the bass frequencies of the playback device may be increased, which may, to some listeners, improve enjoyment of the audio played by the playback device in the more spacious environment. In contrast, where the reflection characteristics indicate that the playback device is in a small room, the bass frequencies of the playback device may be decreased, which may improve enjoyment of the audio played by the playback device in the small room. Once the equalization setting is adjusted, the playback device may then play an audio track according to the equalization setting.

As indicated above, the present application involves dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating. In one aspect, a method is provided. The method involves emitting, by a playback device, a first audio signal, detecting, by the playback device, a second audio signal, where at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determining one or more reflection characteristics, where each of the one or more reflection characteristics are based on at least the second audio signal, adjusting an equalization setting of the playback device based on the one or more reflection characteristics; and causing an audio track to play according to the adjusted equalization setting.

In another aspect, a second method is provided. The second method is operable in a media playback system comprising a plurality of playback devices, where each playback device comprises a respective microphone and a respective speaker. The second method involves receiving an indication of a first audio signal, detecting, by a microphone of the first playback device, a second audio signal, where at least a portion of the second audio signal is indicative of the first audio signal, in response to the detecting, determining a first reflection characteristic based on the second audio signal, adjusting an equalization setting of the first playback device based on at least the first reflection characteristic, and sending to a second media playback device an indication of the first reflection characteristic.

In another aspect, a device is provided. The device includes a speaker, a microphone that is physically coupled to the speaker, a processor, a network interface, a data storage, and a program logic stored in the data storage. The program logic is executable by the processor to emit a first audio signal from the speaker, detect, via the microphone, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determine a first reflection characteristic based on at least the second audio signal, adjust an equalization setting of the playback device based on at least the first reflection characteristic, and play, via the speaker, an audio track according to the equalization setting.

4

In yet another aspect, a non-transitory computer readable memory is provided. The non-transitory computer readable memory has stored thereon instructions executable by a computing device to cause the computing device to perform functions. The functions include emitting, by a playback device, a first audio signal, detecting, by the playback device, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determining one or more reflection characteristics, wherein each of the one or more reflection characteristics are based on at least the second audio signal, adjusting an equalization setting of the playback device based on the one or more reflection characteristics; and causing an audio track to play according to the adjusted equalization setting.

It will be understood by one of ordinary skill in the art that this disclosure includes numerous other embodiments.

II. Example Operating Environment

FIG. 1 shows an example configuration of a media playback system 100 in which one or more embodiments disclosed herein may be practiced or implemented. The media playback system 100 as shown is associated with an example home environment having several rooms and spaces, such as for example, a master bedroom, an office, a dining room, and a living room. As shown in the example of FIG. 1, the media playback system 100 includes playback devices 102-124, control devices 126 and 128, and a wired or wireless network router 130.

Further discussions relating to the different components of the example media playback system 100 and how the different components may interact to provide a user with a media experience may be found in the following sections. While discussions herein may generally refer to the example media playback system 100, technologies described herein are not limited to applications within, among other things, the home environment as shown in FIG. 1. For instance, the technologies described herein may be useful in environments where multi-zone audio may be desired, such as, for example, a commercial setting like a restaurant, mall or airport, a vehicle like a sports utility vehicle (SUV), bus or car, a ship or boat, an airplane, and so on.

a. Example Playback Devices

FIG. 2 shows a functional block diagram of an example playback device 200 that may be configured to be one or more of the playback devices 102-124 of the media playback system 100 of FIG. 1. The playback device 200 may include a processor 202, software components 204, memory 206, audio processing components 208, audio amplifier(s) 210, speaker (s) 212, a network interface 214 including wireless interface (s) 216 and wired interface(s) 218 and a microphone 220. In one case, the playback device 200 may not include the speaker(s) 212, but rather a speaker interface for connecting the playback device 200 to external speakers. In another case, the playback device 200 may include neither the speaker(s) 212 nor the audio amplifier(s) 210, but rather an audio interface for connecting the playback device 200 to an external audio amplifier or audio-visual receiver.

In one example, the processor 202 may be a clock-driven computing component configured to process input data according to instructions stored in the memory 206. The memory 206 may be a tangible computer-readable medium configured to store instructions executable by the processor 202. For instance, the memory 206 may be data storage that can be loaded with one or more of the software components 204 executable by the processor 202 to achieve certain functions. In one example, the functions may involve the playback

US 9,219,460 B2

5

device **200** retrieving audio data from an audio source or another playback device. In another example, the functions may involve the playback device **200** sending audio data to another device or playback device on a network. In yet another example, the functions may involve pairing of the playback device **200** with one or more playback devices to create a multi-channel audio environment.

Certain functions may involve the playback device **200** synchronizing playback of audio content with one or more other playback devices. During synchronous playback, a listener will preferably not be able to perceive time-delay differences between playback of the audio content by the playback device **200** and the one or more other playback devices. U.S. Pat. No. 8,234,395 entitled, "System and method for synchronizing operations among a plurality of independently clocked digital data processing devices," which is hereby incorporated by reference, provides in more detail some examples for audio playback synchronization among playback devices.

The memory **206** may further be configured to store data associated with the playback device **200**, such as one or more zones and/or zone groups the playback device **200** is a part of, audio sources accessible by the playback device **200**, or a playback queue that the playback device **200** (or some other playback device) may be associated with. The data may be stored as one or more state variables that are periodically updated and used to describe the state of the playback device **200**. The memory **206** may also include the data associated with the state of the other devices of the media system, and shared from time to time among the devices so that one or more of the devices have the most recent data associated with the system. Other embodiments are also possible.

The audio processing components **208** may include one or more digital-to-analog converters (DAC), an audio preprocessing component, an audio enhancement component or a digital signal processor (DSP), and so on. In one embodiment, one or more of the audio processing components **208** may be a subcomponent of the processor **202**. In one example, audio content may be processed and/or intentionally altered by the audio processing components **208** to produce audio signals. The produced audio signals may then be provided to the audio amplifier(s) **210** for amplification and playback through speaker(s) **212**. Particularly, the audio amplifier(s) **210** may include devices configured to amplify audio signals to a level for driving one or more of the speakers **212**. The speaker(s) **212** may include an individual transducer (e.g., a "driver") or a complete speaker system involving an enclosure with one or more drivers. A particular driver of the speaker(s) **212** may include, for example, a subwoofer (e.g., for low frequencies), a mid-range driver (e.g., for middle frequencies), and/or a tweeter (e.g., for high frequencies). In some cases, each transducer in the one or more speakers **212** may be driven by an individual corresponding audio amplifier of the audio amplifier(s) **210**. In addition to producing analog signals for playback by the playback device **200**, the audio processing components **208** may be configured to process audio content to be sent to one or more other playback devices for playback.

Audio content to be processed and/or played back by the playback device **200** may be received from an external source, such as via an audio line-in input connection (e.g., an auto-detecting 3.5 mm audio line-in connection) or the network interface **214**.

The network interface **214** may be configured to facilitate a data flow between the playback device **200** and one or more other devices on a data network. As such, the playback device **200** may be configured to receive audio content over the data network from one or more other playback devices in commu-

6

nication with the playback device **200**, network devices within a local area network, or audio content sources over a wide area network such as the Internet. In one example, the audio content and other signals transmitted and received by the playback device **200** may be transmitted in the form of digital packet data containing an Internet Protocol (IP)-based source address and IP-based destination addresses. In such a case, the network interface **214** may be configured to parse the digital packet data such that the data destined for the playback device **200** is properly received and processed by the playback device **200**.

As shown, the network interface **214** may include wireless interface(s) **216** and wired interface(s) **218**. The wireless interface(s) **216** may provide network interface functions for the playback device **200** to wirelessly communicate with other devices (e.g., other playback device(s), speaker(s), receiver(s), network device(s), control device(s) within a data network the playback device **200** is associated with) in accordance with a communication protocol (e.g., any wireless standard including IEEE 802.11a, 802.11b, 802.11g, 802.11n, 802.11 ac, 802.15, 4G mobile communication standard, and so on). The wired interface(s) **218** may provide network interface functions for the playback device **200** to communicate over a wired connection with other devices in accordance with a communication protocol (e.g., IEEE 802.3). While the network interface **214** shown in FIG. **2** includes both wireless interface(s) **216** and wired interface(s) **218**, the network interface **214** may in some embodiments include only wireless interface(s) or only wired interface(s).

The microphone **220** may be arranged to detect sound in the environment of the playback device **200**. For instance, the microphone may be mounted on an exterior wall of a housing of the playback device. The microphone may be any type of microphone now known or later developed such as a condenser microphone, electret condenser microphone, or a dynamic microphone. The microphone may be sensitive to a portion of the frequency range of the speaker(s) **220**. One or more of the speaker(s) **220** may operate in reverse as the microphone **220**.

In one example, the playback device **200** and one other playback device may be paired to play two separate audio components of audio content. For instance, playback device **200** may be configured to play a left channel audio component, while the other playback device may be configured to play a right channel audio component, thereby producing or enhancing a stereo effect of the audio content. The paired playback devices (also referred to as "bonded playback devices") may further play audio content in synchrony with other playback devices.

In another example, the playback device **200** may be sonically consolidated with one or more other playback devices to form a single, consolidated playback device. A consolidated playback device may be configured to process and reproduce sound differently than an unconsolidated playback device or playback devices that are paired, because a consolidated playback device may have additional speaker drivers through which audio content may be rendered. For instance, if the playback device **200** is a playback device designed to render low frequency range audio content (i.e. a subwoofer), the playback device **200** may be consolidated with a playback device designed to render full frequency range audio content. In such a case, the full frequency range playback device, when consolidated with the low frequency playback device **200**, may be configured to render only the mid and high frequency components of audio content, while the low frequency range playback device **200** renders the low frequency component of the audio content. The consolidated playback

US 9,219,460 B2

7

device may further be paired with a single playback device or yet another consolidated playback device.

By way of illustration, SONOS, Inc. presently offers (or has offered) for sale certain playback devices including a "PLAY:1," "PLAY:3," "PLAY:5," "PLAYBAR," "CON-NECT:AMP," "CONNECT," and "SUB." Any other past, present, and/or future playback devices may additionally or alternatively be used to implement the playback devices of example embodiments disclosed herein. Additionally, it is understood that a playback device is not limited to the example illustrated in FIG. 2 or to the SONOS product offerings. For example, a playback device may include a wired or wireless headphone. In another example, a playback device may include or interact with a docking station for personal mobile media playback devices. In yet another example, a playback device may be integral to another device or component such as a television, a lighting fixture, or some other device for indoor or outdoor use.

b. Example Playback Zone Configurations

Referring back to the media playback system 100 of FIG. 1, the environment may have one or more playback zones, each with one or more playback devices. The media playback system 100 may be established with one or more playback zones, after which one or more zones may be added, or removed to arrive at the example configuration shown in FIG. 1. Each zone may be given a name according to a different room or space such as an office, bathroom, master bedroom, bedroom, kitchen, dining room, living room, and/or balcony. In one case, a single playback zone may include multiple rooms or spaces. In another case, a single room or space may include multiple playback zones.

As shown in FIG. 1, the balcony, dining room, kitchen, bathroom, office, and bedroom zones each have one playback device, while the living room and master bedroom zones each have multiple playback devices. In the living room zone, playback devices 104, 106, 108, and 110 may be configured to play audio content in synchrony as individual playback devices, as one or more bonded playback devices, as one or more consolidated playback devices, or any combination thereof. Similarly, in the case of the master bedroom, playback devices 122 and 124 may be configured to play audio content in synchrony as individual playback devices, as a bonded playback device, or as a consolidated playback device.

In one example, one or more playback zones in the environment of FIG. 1 may each be playing different audio content. For instance, the user may be grilling in the balcony zone and listening to hip hop music being played by the playback device 102 while another user may be preparing food in the kitchen zone and listening to classical music being played by the playback device 114. In another example, a playback zone may play the same audio content in synchrony with another playback zone. For instance, the user may be in the office zone where the playback device 118 is playing the same rock music that is being playing by playback device 102 in the balcony zone. In such a case, playback devices 102 and 118 may be playing the rock music in synchrony such that the user may seamlessly (or at least substantially seamlessly) enjoy the audio content that is being played out-loud while moving between different playback zones. Synchronization among playback zones may be achieved in a manner similar to that of synchronization among playback devices, as described in previously referenced U.S. Pat. No. 8,234,395.

As suggested above, the zone configurations of the media playback system 100 may be dynamically modified, and in some embodiments, the media playback system 100 supports numerous configurations. For instance, if a user physically

8

moves one or more playback devices to or from a zone, the media playback system 100 may be reconfigured to accommodate the change(s). For instance, if the user physically moves the playback device 102 from the balcony zone to the office zone, the office zone may now include both the playback device 118 and the playback device 102. The playback device 102 may be paired or grouped with the office zone and/or renamed if so desired via a control device such as the control devices 126 and 128. On the other hand, if the one or more playback devices are moved to a particular area in the home environment that is not already a playback zone, a new playback zone may be created for the particular area.

Further, different playback zones of the media playback system 100 may be dynamically combined into zone groups or split up into individual playback zones. For instance, the dining room zone and the kitchen zone 114 may be combined into a zone group for a dinner party such that playback devices 112 and 114 may render audio content in synchrony. On the other hand, the living room zone may be split into a television zone including playback device 104, and a listening zone including playback devices 106, 108, and 110, if the user wishes to listen to music in the living room space while another user wishes to watch television.

c. Example Control Devices

FIG. 3 shows a functional block diagram of an example control device 300 that may be configured to be one or both of the control devices 126 and 128 of the media playback system 100. As shown, the control device 300 may include a processor 302, memory 304, a network interface 306, and a user interface 308. In one example, the control device 300 may be a dedicated controller for the media playback system 100. In another example, the control device 300 may be a network device on which media playback system controller application software may be installed, such as for example, an iPhone™ iPad™ or any other smart phone, tablet or network device (e.g., a networked computer such as a PC or Mac™).

The processor 302 may be configured to perform functions relevant to facilitating user access, control, and configuration of the media playback system 100. The memory 304 may be configured to store instructions executable by the processor 302 to perform those functions. The memory 304 may also be configured to store the media playback system controller application software and other data associated with the media playback system 100 and the user.

In one example, the network interface 306 may be based on an industry standard (e.g., infrared, radio, wired standards including IEEE 802.3, wireless standards including IEEE 802.11a, 802.11b, 802.11g, 802.11n, 802.11ac, 802.15, 4G mobile communication standard, and so on). The network interface 306 may provide a means for the control device 300 to communicate with other devices in the media playback system 100. In one example, data and information (e.g., such as a state variable) may be communicated between control device 300 and other devices via the network interface 306. For instance, playback zone and zone group configurations in the media playback system 100 may be received by the control device 300 from a playback device or another network device, or transmitted by the control device 300 to another playback device or network device via the network interface 306. In some cases, the other network device may be another control device.

Playback device control commands such as volume control and audio playback control may also be communicated from the control device 300 to a playback device via the network interface 306. As suggested above, changes to configurations of the media playback system 100 may also be performed by a user using the control device 300. The configuration

9

changes may include adding/removing one or more playback devices to/from a zone, adding/removing one or more zones to/from a zone group, forming a bonded or consolidated player, separating one or more playback devices from a bonded or consolidated player, among others. Accordingly, the control device **300** may sometimes be referred to as a controller, whether the control device **300** is a dedicated controller or a network device on which media playback system controller application software is installed.

The user interface **308** of the control device **300** may be configured to facilitate user access and control of the media playback system **100**, by providing a controller interface such as the controller interface **400** shown in FIG. **4**. The controller interface **400** includes a playback control region **410**, a playback zone region **420**, a playback status region **430**, a playback queue region **440**, and an audio content sources region **450**. The user interface **400** as shown is just one example of a user interface that may be provided on a network device such as the control device **300** of FIG. **3** (and/or the control devices **126** and **128** of FIG. **1**) and accessed by users to control a media playback system such as the media playback system **100**. Other user interfaces of varying formats, styles, and interactive sequences may alternatively be implemented on one or more network devices to provide comparable control access to a media playback system.

The playback control region **410** may include selectable (e.g., by way of touch or by using a cursor) icons to cause playback devices in a selected playback zone or zone group to play or pause, fast forward, rewind, skip to next, skip to previous, enter/exit shuffle mode, enter/exit repeat mode, enter/exit cross fade mode. The playback control region **410** may also include selectable icons to modify equalization settings, and playback volume, among other possibilities.

The playback zone region **420** may include representations of playback zones within the media playback system **100**. In some embodiments, the graphical representations of playback zones may be selectable to bring up additional selectable icons to manage or configure the playback zones in the media playback system, such as a creation of bonded zones, creation of zone groups, separation of zone groups, and renaming of zone groups, among other possibilities.

For example, as shown, a "group" icon may be provided within each of the graphical representations of playback zones. The "group" icon provided within a graphical representation of a particular zone may be selectable to bring up options to select one or more other zones in the media playback system to be grouped with the particular zone. Once grouped, playback devices in the zones that have been grouped with the particular zone will be configured to play audio content in synchrony with the playback device(s) in the particular zone. Analogously, a "group" icon may be provided within a graphical representation of a zone group. In this case, the "group" icon may be selectable to bring up options to deselect one or more zones in the zone group to be removed from the zone group. Other interactions and implementations for grouping and ungrouping zones via a user interface such as the user interface **400** are also possible. The representations of playback zones in the playback zone region **420** may be dynamically updated as playback zone or zone group configurations are modified.

The playback status region **430** may include graphical representations of audio content that is presently being played, previously played, or scheduled to play next in the selected playback zone or zone group. The selected playback zone or zone group may be visually distinguished on the user interface, such as within the playback zone region **420** and/or the playback status region **430**. The graphical representations

10

may include track title, artist name, album name, album year, track length, and other relevant information that may be useful for the user to know when controlling the media playback system via the user interface **400**.

The playback queue region **440** may include graphical representations of audio content in a playback queue associated with the selected playback zone or zone group. In some embodiments, each playback zone or zone group may be associated with a playback queue containing information corresponding to zero or more audio items for playback by the playback zone or zone group. For instance, each audio item in the playback queue may comprise a uniform resource identifier (URI), a uniform resource locator (URL) or some other identifier that may be used by a playback device in the playback zone or zone group to find and/or retrieve the audio item from a local audio content source or a networked audio content source, possibly for playback by the playback device.

In one example, a playlist may be added to a playback queue, in which case information corresponding to each audio item in the playlist may be added to the playback queue. In another example, audio items in a playback queue may be saved as a playlist. In a further example, a playback queue may be empty, or populated but "not in use" when the playback zone or zone group is playing continuously streaming audio content, such as Internet radio that may continue to play until otherwise stopped, rather than discrete audio items that have playback durations. In an alternative embodiment, a playback queue can include Internet radio and/or other streaming audio content items and be "in use" when the playback zone or zone group is playing those items. Other examples are also possible.

When playback zones or zone groups are "grouped" or "ungrouped," playback queues associated with the affected playback zones or zone groups may be cleared or re-associated. For example, if a first playback zone including a first playback queue is grouped with a second playback zone including a second playback queue, the established zone group may have an associated playback queue that is initially empty, that contains audio items from the first playback queue (such as if the second playback zone was added to the first playback zone), that contains audio items from the second playback queue (such as if the first playback zone was added to the second playback zone), or a combination of audio items from both the first and second playback queues. Subsequently, if the established zone group is ungrouped, the resulting first playback zone may be re-associated with the previous first playback queue, or be associated with a new playback queue that is empty or contains audio items from the playback queue associated with the established zone group before the established zone group was ungrouped. Similarly, the resulting second playback zone may be re-associated with the previous second playback queue, or be associated with a new playback queue that is empty, or contains audio items from the playback queue associated with the established zone group before the established zone group was ungrouped. Other examples are also possible.

Referring back to the user interface **400** of FIG. **4**, the graphical representations of audio content in the playback queue region **440** may include track titles, artist names, track lengths, and other relevant information associated with the audio content in the playback queue. In one example, graphical representations of audio content may be selectable to bring up additional selectable icons to manage and/or manipulate the playback queue and/or audio content represented in the playback queue. For instance, a represented audio content may be removed from the playback queue, moved to a different position within the playback queue, or

US 9,219,460 B2

**11**

selected to be played immediately, or after any currently playing audio content, among other possibilities. A playback queue associated with a playback zone or zone group may be stored in a memory on one or more playback devices in the playback zone or zone group, on a playback device that is not in the playback zone or zone group, and/or some other designated device.

The audio content sources region **450** may include graphical representations of selectable audio content sources from which audio content may be retrieved and played by the selected playback zone or zone group. Discussions pertaining to audio content sources may be found in the following section.

d. Example Audio Content Sources

As indicated previously, one or more playback devices in a zone or zone group may be configured to retrieve for playback audio content (e.g. according to a corresponding URI or URL for the audio content) from a variety of available audio content sources. In one example, audio content may be retrieved by a playback device directly from a corresponding audio content source (e.g., a line-in connection). In another example, audio content may be provided to a playback device over a network via one or more other playback devices or network devices.

Example audio content sources may include a memory of one or more playback devices in a media playback system such as the media playback system **100** of FIG. **1**, local music libraries on one or more network devices (such as a control device, a network-enabled personal computer, or a networked-attached storage (NAS), for example), streaming audio services providing audio content via the Internet (e.g., the cloud), or audio sources connected to the media playback system via a line-in input connection on a playback device or network devise, among other possibilities.

In some embodiments, audio content sources may be regularly added or removed from a media playback system such as the media playback system **100** of FIG. **1**. In one example, an indexing of audio items may be performed whenever one or more audio content sources are added, removed or updated. Indexing of audio items may involve scanning for identifiable audio items in all folders/directory shared over a network accessible by playback devices in the media playback system, and generating or updating an audio content database containing metadata (e.g., title, artist, album, track length, among others) and other associated information, such as a URI or URL for each identifiable audio item found. Other examples for managing and maintaining audio content sources may also be possible.

The above discussions relating to playback devices, controller devices, playback zone configurations, and media content sources provide only some examples of operating environments within which functions and methods described below may be implemented. Other operating environments and configurations of media playback systems, playback devices, and network devices not explicitly described herein may also be applicable and suitable for implementation of the functions and methods.

III. Example Method for Adjusting Equalization Based on Environment

As discussed above, embodiments described herein may involve dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating.

Method **500** shown in FIG. **5** presents an embodiment of a method that can be implemented within an operating envi-

**12**

ronment involving, for example, the media playback system **100** of FIG. **1**, one or more of the playback device **200** of FIG. **2**, and one or more of the control device **300** of FIG. **3**. Method **500** may include one or more operations, functions, or actions as illustrated by one or more of blocks **502-510**. Although the blocks are illustrated in sequential order, these blocks may also be performed in parallel, and/or in a different order than those described herein. Also, the various blocks may be combined into fewer blocks, divided into additional blocks, and/or removed based upon the desired implementation.

In addition, for the method **500** and other processes and methods disclosed herein, the flowchart shows functionality and operation of one possible implementation of present embodiments. In this regard, each block may represent a module, a segment, or a portion of program code, which includes one or more instructions executable by a processor for implementing the specific logical functions or steps in the process. The program code may be stored on any type of computer readable medium, for example, such as a storage device including a disk or hard drive. The computer readable medium may include non-transitory computer readable medium, for example, such as computer-readable media that stores data for short periods of time like register memory, processor cache and Random Access Memory (RAM). The computer readable medium may also include non-transitory media, such as secondary or persistent long term storage, like read only memory (ROM), optical or magnetic disks, compact-disc read only memory (CD-ROM), for example. The computer readable media may also be any other volatile or non-volatile storage systems. The computer readable medium may be considered a computer readable storage medium, for example, or a tangible storage device. In addition, for the method **500** and other processes and methods disclosed herein, each block in FIG. **5** may represent circuitry that is wired to perform the specific logical functions in the process.

a. Emitting a First Audio Signal from a Playback Device.

At block **502**, the playback device emits a first audio signal from the playback device. For instance, playback device **200** of FIG. **2** may output the first audio signal from speaker(s) **212**.

The first audio signal may take a variety of different forms. For instance, the first audio signal may include a pulse. Such a pulse may be a recording of a brief audio pulse that approximates an audio impulse signal. Some examples include recordings of an electric spark, a starter pistol shot, or the bursting of a balloon. In some examples, the first audio signal may include a signal that varies over frequency, such as a logarithmic chirp, a sine sweep, a pink noise signal, or a maximum length sequence. Such signals may be chosen for relatively broader-range coverage of the frequency spectrum or for other reasons. The first audio signal may involve other types of audio signals as well.

The first audio signal may have a particular waveform. For instance, the waveform may correspond to any of these example audio signals described above, such as, an electric spark, a starter pistol shot, or the bursting of a balloon. Such a waveform may be represented digitally, such as in an array of data points (i.e. samples) representing the changes in sound pressure over time. The waveform of the first audio signal may be referred to as the first waveform.

The playback device may store the first audio signal as a recording. Then, when emitting the first audio signal, the playback device may playback the recording. The recording may take a variety of audio file formats, such as a waveform audio file format (WAV) or an MPEG-2 audio layer III (MP3), among other examples.

US 9,219,460 B2

13

Alternatively, the playback device may dynamically generate the first audio signal. For instance, the playback device may generate a signal that varies over frequency according to a mathematical equation. Other examples are possible as well.

The playback device may emit the first audio signal at a particular sound pressure level (i.e. magnitude). The particular sound pressure level may reflect the peak magnitude of the first audio signal. For instance, the playback device may emit a pulse signal having a peak magnitude of 60 dB (with reference to 20 µPa). The sound pressure level may be configurable. For instance, user input to playback device **200** (or a controller thereof, such as network device **300**) may configure the sound pressure of the first audio signal at a particular sound pressure level. Alternatively, the sound pressure level may be pre-determined.

The playback device may emit the first audio signal in response to a trigger. Further, the trigger may cause the playback device to carry out additional functions of the present method. For instance, user input to playback device **200** (or a controller thereof, such as network device **300**) may trigger playback device **200** to carry out the present method to adjust the equalization of the playback device. As another example, movement of the playback device (i.e. a change of positioning or in location) may trigger the playback device **200** to carry out the present method. The playback device may detect such a movement via an accelerometer. Other types of triggers are possible as well.

As described above, the playback device may be arranged as part of a media playback system that may include a plurality of playback devices. Each playback device of the media playback system may emit a respective first audio signal. Further, each playback device may perform one or more of the functions described below. For instance, each playback device may emit a respective first audio signal, detect a respective second audio signal, determine one or more respective reflection characteristics, adjust an equalization setting, and cause an audio track to play.

In one instance, a media playback system may include a first playback device and a second playback device. The first playback device may emit the first audio signal and then detect the second audio signal (as discussed below). In addition, the second playback device may emit a third audio signal. The third audio signal may take a variety of forms, including, for instance, any of the example audio signals described above in relation to the first audio signal. In some embodiments, the second playback device may emit the third audio signal in response to receiving an instruction, from the first playback device, to emit the third audio signal. Alternatively, the second playback device may receive the instruction from a controller. Other examples are possible as well.

b. Detecting, by the Playback Device, a Second Audio Signal.

At block **504**, the playback device detects, by a microphone, a second audio signal. A portion of the second audio signal may be a reflection of the first audio signal. For instance, playback device **200** may emit the first audio signal, the first audio signal may reflect off of one or more objects (collectively these reflections may be referred to as reverberation), and microphone **220** may detect these reflections as the second audio signal. Another portion of the second audio signal may be a direct propagation of the first audio signal.

The microphone may be communicatively coupled to the processor. For instance, microphone **220** may be coupled to an analog input of processor **202** of playback device **200**. Alternatively, microphone **220** may be coupled to an analog-to-digital converter that is coupled, in turn, to processor **202**. Other arrangements are possible as well.

14

Detecting the second audio signal may involve recording the second audio signal. For instance, processor **202** may record the second audio signal and then store the second audio signal in memory **206**. Processor **202** may begin recording when the speaker emits the first audio signal. Alternatively, processor **202** may begin recording before or after the speaker emits the first audio signal such that reflections of the first audio signal may be detected by the microphone. The recording may be represented digitally, such as in an array of data points (i.e. samples) representing the changes in sound pressure over time. Further, the second audio signal may have a waveform that may be referred to as the second waveform.

In some circumstances, the second audio signal may include environmental noise. In some circumstances, significant environmental noise within the second audio signal may interfere with or otherwise affect determining the one or more reflection characteristics. For instance, environmental noise may mask or degrade the first audio signal, which may cause the playback device to determine one or more reflection characteristics that may not accurately reflect the environment because of the degradation caused by the environmental noise. Further, in some circumstances, an aspect of the environmental noise may be incorrectly detected as the first audio signal. While the second audio signal may include, as one portion, some background noise, the intention is that at least a portion of the second audio signal is the reflection of the first audio signal.

Accordingly, to reduce the possible effects of environmental noise, detecting the second audio signal may involve determining that the portion of the second audio signal is the reflection of the first audio signal based on the first waveform and the second waveform. For instance, the processor **202** may determine a difference between the first waveform and the second waveform by comparing the two waveforms. The playback device may then determine that the difference is less than a threshold which may indicate that the portion of the second audio signal is the reflection of the first audio signal. The threshold may be set such that a particular degree of similarity between the first waveform and the second waveform indicates that the portion of the second audio signal is a reflection of the first audio signal. Alternatively, several characteristics of the first waveform, such as the magnitude and duration, may be predetermined. The playback device may determine the same characteristics of the second waveform and compare the characteristics to determine that the portion of the second audio signal is the reflection of the first audio signal. As another example, the playback device may perform a deconvolution determination using the first audio signal and the second audio signal. Some embodiments may involve repeating the process described herein to reduce any effect caused by noise in a particular iteration.

The processor may determine the sound pressure level (i.e. magnitude) of the second audio signal. The sound pressure level of the second audio signal may be determined at each point along the waveform of the second audio signal or the sound pressure level may be determined at a subset of points, such as at the point having peak magnitude. For instance, the processor may determine that the second audio signal has a peak magnitude of 50 dB.

In some embodiments, the speaker and microphone may be physically coupled. For instance, a housing may contain both the speaker and the microphone. Further, the housing may additionally contain one or more other components of the playback device, such as a processor, a memory, a network interface, an audio amplifier(s), and/or various audio processing components. Therefore, in one embodiment, playback device **200** may include, within the same housing, processor

**15**

**202**, software components **204**, memory **206**, audio processing components **208**, audio amplifier(s) **210**, speaker(s) **212**, a network interface **214** including wireless interface(s) **216** and wired interface(s) **218** and a microphone **220**. The housing may be a speaker cabinet. Other arrangements are possible as well.

As noted above, in some embodiments, the playback device may be arranged as part of a media playback system that includes two or more playback devices. In such embodiments, the playback device may detect audio signals emitted by other playback devices (as an alternative to or in addition to detecting the second audio signal). Referring to the example media playback system above that includes the first playback device and the second playback device, after the second playback device emits a third audio signal, the first playback device may detect the third audio signal and/or reflections thereof as a fourth audio signal. In some embodiments, the first playback device may then determine that at least a portion of the fourth audio signal is the third audio signal (or a reflection thereof) using, for example, any of the techniques described above.

Detecting audio signals emitted by other playback devices may include functions similar to those of detecting the second audio signal. Further, devices within the media playback system may exchange messages to coordinate the functions described herein. For instance, as noted above, a first playback device may trigger a second playback device to emit a third audio signal. As another example, the second playback device may send an indication of the third audio signal to the first playback device. The indication may assist the first playback device in determining that a portion of the fourth audio signal is the third audio signal (or a reflection thereof), for example. Alternatively, receiving the indication may trigger the first playback device to start listening for an audio signal from the second playback device.

In some embodiments, the first media playback may detect a plurality of audio signals. For instance, the plurality of audio signals may include a reflection of a signal emitted by the first playback device. The plurality of audio signals may also include signals (or reflections thereof) emitted by other playback devices within the media playback system. Other examples are possible as well.

c. Determining One or More Reflection Characteristics.

At block **506**, the playback device determines one or more reflection characteristics. Each of the one or more reflection characteristics may indicate an aspect of the environment surrounding the playback device. For instance, one reflection characteristic may indicate that the playback device is inside, or that the playback device is outside. The reflection characteristic may also indicate a relative size of the room that the playback device is currently located within. Another reflection characteristic may indicate the amount of sound absorbing material in the environment. A third reflection characteristic may indicate one or more resonant frequencies of the environment. Many examples are possible.

In some embodiments, each of the one or more reflection characteristics may be based on at least the second audio signal. For instance, the processor **202** may determine one or more reflection characteristics based on the recording of the second audio signal. The one or more reflection characteristics may be further based on the first audio signal such as in a comparison of the second audio signal to the first audio signal.

One of the one or more reflection characteristics may be an amount of time elapsed from emitting the first audio signal to detecting the second audio signal. For instance, the processor **202** may assign to the first audio signal a first timestamp at the

**16**

time of emitting the first audio signal and may further assign to the second audio signal a second time stamp at the time of detecting the second audio signal. The processor **202** may then determine a difference between the second time stamp and the first time stamp. Since each of the first audio signal and the second audio signal may be emitted and detected, respectively, over a duration of time, the time stamp may be assigned to a particular point in each of the first audio signal and the second audio signal. For instance, the time stamp may be assigned to the respective peaks of the first and second audio signals.

The reflection characteristic may be a qualitative characteristic. For instance, the qualitative characteristic may describe different types of operating environments, such as a "small room," a "large room," or "outdoors." The qualitative characteristic may be based upon a quantitative value, such as an amount of time elapsed from emitting the first signal to detecting the second audio signal. For example, the playback device may determine the qualitative characteristic (e.g. "small room," "large room," or "outdoors") based on a range of values for the amount of time elapsed from emitting the first signal. For example, an amount of time elapsed from emitting the first signal to detecting the second audio signal of 15-20 milliseconds (ms) may indicate a "small room," 20-30 ms may indicate a "large room," and an amount of time greater than 30 ms may indicate "outdoors."

The qualitative characteristics may describe additional features of the room. For instance, the qualitative characteristic may describe a number of objects within the room. Alternatively, the qualitative characteristic may further describe the shape of the room. For example, a qualitative characteristic may indicate "high ceilings" in a "small room" or that the room is relatively much longer than it is wide (i.e. the room is long and narrow).

One or more of the reflection characteristics may relate to a frequency response of a system that includes the playback device and the environment surrounding the playback device. Such a frequency response may be determined based on the emitted first audio signal and detected second audio signal. In particular, the first audio signal (i.e. the stimulus) may excite the system. The detected second audio signal then represents the response of the system in the time domain. The playback device may then determine the frequency response by transforming the time domain response to the frequency domain, such as by determining a Laplace transform on the second audio signal, or the portion thereof that is a reflection of the first audio signal. In some embodiments, determining the Laplace transform may involve determining, by the processor **202**, a fast Fourier transform (FFT), such as when the second audio signal is represented as discrete data points. While the FFT is provided by way of example, alternative transformations, such as a Hilbert transform, may be determined as well.

The determined frequency response of the system may indicate aspects of the environment. For instance, the processor **202** may determine that the bass frequencies within the frequency response are attenuated relative to the mid and/or treble frequencies, which may indicate that the playback device is outdoors. As another example, the processor **202** may determine that the frequency response has one or more resonant frequencies (which may be caused by the room or objects therein), which may be indicated by one or more peaks and/or one or more valleys. In addition, the number of peaks and valleys may indicate a degree of irregularity of the environment (i.e. a number of objects within the environment and/or an irregularity of the arrangement of the walls).

Within examples, one of the one or more reflection characteristics may relate to a variance between the frequency

**17**

response of the system and an "ideal" frequency response of the playback device. For instance, the reflection characteristic may be a difference between the "ideal" frequency response and the frequency response of the system. In some embodiments, the reflection characteristic may be a difference between the ideal frequency response and the current frequency response at a particular frequency range, such as bass, mid, or treble frequencies.

Determining the difference between the "ideal" frequency response and the current frequency response may involve, for each frequency response, integrating the respective frequency response over frequency for a portion of the frequency range. For instance, the processor **202** may integrate each frequency response over bass frequencies (e.g. 16 to 512 Hz). The processor **202** may then determine a difference between the integrated frequencies.

The "ideal" frequency response may be a frequency response of the playback device in a particular configuration. Further, the ideal frequency response may not be truly ideal, but rather an approximation of a playback device that is operating as designed. For instance, the "ideal" frequency response may be a frequency response of the playback device as determined in open space. Alternatively, the "ideal" frequency response may be a frequency response determined in an anechoic chamber. Further, the "ideal" frequency response of the playback device may be an approximation of a factory configured frequency response. For instance, the "ideal" frequency response may be a typical or average frequency response of playback devices of a particular type produced by a manufacturer.

In another embodiment, the playback device may determine the "ideal" frequency response as an aspect of a set-up procedure. For example, during the set-up procedure, a user of the playback device may be instructed to place the playback device in a particular arrangement so that the playback device may determine a frequency response. The particular arrangement may be, for instance, in the center of a room, among other examples.

FIG. **7** shows an illustrative plot of a frequency response of a playback device in a small room. Frequency response **702** shows the frequency response without an adjusted equalization setting. In a small room, the frequency response tends to have more peaks and valleys at bass frequencies, as shown, because bass frequencies may resonate more in a smaller room. Frequency response **704** shows the frequency response after an equalization setting for the small room has been applied. Compared to frequency response **702**, the peaks and valleys are attenuated in frequency response **704**, as shown.

One or more of the reflection characteristics may relate to an impulse response. For instance, an impulse response may indicate one or more reflections of the first audio signal. The impulse response may also indicate characteristics of the reflections, such as an amount of time elapsed between two reflections.

FIGS. **8**A-**8**C show example impulse responses of a playback device. FIG. **8**A shows an example impulse response of a playback device in (relatively) open space. After the initial excitation, the impulse response does not show a reflection, which may indicate that the playback device is outdoors, for example. FIG. **8**B shows another example impulse response of a playback device that is near a wall. As shown in FIG. **8**B, this impulse response includes a reflection of the impulse (near 8.6 ms), which may indicate the presence of a wall. FIG. **8**C shows yet another example impulse response of a playback device. As shown in FIG. **8**C, the impulse response includes two similar reflections of the impulse (near 8.6 ms

**18**

and 12 ms). Such similarity may indicate that the two similar reflections are each off of the same wall.

As noted above, in some examples, the first media playback may detect a plurality of audio signals including audio signals emitted by the first media playback and/or audio signals emitted by other playback devices within the media playback system. In some embodiments, the playback device may determine one or more reflection characteristics for each of the detected audio signals (or a portion thereof). Alternatively, a reflection characteristic may be based on two or more audio signals in the plurality of detected audio signals. Other examples are possible as well.

Referring back to the example media playback system that include the first playback device and the second playback device, after detecting the fourth audio signal, the first playback device may then determine one or more reflection characteristics based on the fourth audio signal. Determining the one or more reflection characteristics based on the fourth audio signal may involve, for instance, any of the techniques described above for determining one or more reflection characteristics based on the second audio signal as discussed above.

While characteristics of detected audio signals have been referred to herein as reflection characteristics, in some embodiments, the audio signals may be detected before a reflection occurs. For instance, as noted above, an audio signal may propagate directly, such as from a first playback device to a second playback device.

d. Adjusting an Equalization Setting of the Playback Device Based on the One or More Reflection Characteristics.

At block **508**, the playback device adjusts an equalization setting of the playback device based on the one or more reflection characteristics. For instance, one or more of the audio processing components **208** may be configured to alter the frequency response of the playback device. Specifically, the one or more audio components **208** may include one or more filters. When audio content passes through the one or more filters, the amplitude of certain frequencies (or frequency ranges) may be increased. The amplitude of other frequencies (or frequency ranges) may be decreased. Alternatively, the processor **202** may be configured to alter the frequency response of the playback device. The processor **202** may, for example, apply digital signal processing, such as a digital filter, to audio content.

As noted above, one of the one or more reflections characteristics may indicate a frequency or frequency range. The playback device may adjust an equalization setting based on the frequency or frequency range. For instance, if the reflection characteristic indicates bass frequencies are attenuated, the equalization setting may boost bass frequencies (as noted above, 16-512 Hz). Alternatively, if a particular frequency, such as (2 kHz) is a peak or a valley, the equalization may responsively attenuate or boost that frequency.

Adjusting the equalization setting may involve disabling a speaker of the playback device. For instance, the processor **202** may disable the a speaker **212** when the one or more reflection characteristics indicate that the listening experience may be improved by disabling the speaker. For example, an object in close proximity to the front of the speaker may cause distortion, such as muffling, of audio outputted by the speaker. Due to the distortion, the listening experience may be improved by disabling the speaker. In such a circumstance, one or more particular reflection characteristics may indicate that the first audio signal reflected off a close object, such as an object within 10 centimeters of the playback device. Alternatively, the one or more particular reflection characteristics

**19**

may indicate that the frequency response of the playback device is distorted by the object.

Within examples, adjusting the equalization setting may involve selecting a particular equalization preset from a plurality of equalization presets based on at least one of the one or more reflection characteristics. Some of the equalization presets may be pre-determined. For example, each of the plurality of equalization presets may be a respective bass gain setting. For instance, a "small room" equalization preset may be pre-determined to attenuate bass frequencies. As another example, an "outdoors" equalization preset may be pre-determined to boost bass frequencies. The playback device may then adjust the equalization setting according to the selected particular equalization preset.

e. Causing an Audio Track to Play According to the Adjusted Equalization Setting.

In some embodiments, the playback device may perform block **510**. At block **510**, the playback device may cause an audio track to play according to the adjusted equalization setting. For instance, the playback device may provide the audio track to the audio processing components **208**, which may be adjusted based on the equalization setting. The audio processing components **208** may alter frequency components of the audio track according to the equalization setting. The audio amplifier **210** may then amplify the signal which may cause the speaker(s) **212** to emit the audio track.

f. Sending to a Second Media Playback Device an Indication of the Reflection Characteristic

In some embodiments, the playback device may perform block **512**. At block **512**, the playback device may send to a second media playback device an indication of the reflection characteristic.

Playback devices of the media playback system may share their one or more respective reflection characteristics with the other playback devices in the media playback system. In some configurations, a particular playback device may share its one or more reflection characteristics with all of the playback devices in the media playback system. In other configurations, the particular playback device may share with a subset of playback devices. For example, the particular playback device may be grouped into a zone with three other playback devices, and the particular playback device may share its one or more reflection characteristics with the three other playback devices in its zone.

For instance, referring to FIG. **1**, playback device **104** may send a particular reflection characteristic to playback devices **106**, **108**, and **110** that are grouped with playback device **104** into a zone. In turn, each of playback devices **106**, **108**, and **110** may receive the particular reflection characteristic. Playback devices **106**, **108**, and **110** may then send a respective particular reflection characteristic to playback device **104** and to each of the other playback devices in the zone. Each of the playback devices may send and/or receive reflection characteristics via a respective network interface, such as network interface **214** in FIG. **2**.

In some circumstances, the playback device may adjust the equalization setting based on determined reflection characteristics from other playback devices within the media playback system. For instance, a particular playback device may adjust its equalization setting based on reflection characteristics from other playback devices grouped with the particular playback device in a zone. Basing the equalization setting on reflection characteristics from other playback devices may result in an equalization setting that is more appropriate for the environment.

For example, FIG. **6** shows an example configuration of a media playback system **100** that includes playback devices

**20**

**602** and **604** that are grouped into a zone. Playback devices **602** and **604** may each emit a respective first audio signal, detect a respective second audio signal, and then determine a respective reflection characteristic that indicates the size of the room. Further, playback devices **602** and **604** may exchange respective reflection characteristics by sending and receiving the reflection characteristics over respective network interfaces.

The reflection characteristic determined by playback device **602** may indicate a smaller room than the reflection characteristic determined by playback device **604** because of the relative difference in how far the each emitted first audio signal travels before coming into contact with a respective wall that reflects the first audio signal, as shown. If playback devices **602** and **604** each base their respective equalization setting on their own respective reflection characteristic, then playback device **602** may adjust the equalization to a setting that is appropriate for a small room, while playback device **604** may adjust the equalization to a setting that is appropriate for a large room. In some circumstances, this difference in relative configurations may result in a mismatch in the frequency responses between playback device **602** and **604**, which may worsen the listening experience for some users (yet, in other circumstances, this difference may be minor and may not have a significant impact on the listening experiences of users). However, as noted above, playback devices **602** and **604** may adjust the equalization setting based on determined reflection characteristics from one another. For instance, playback devices **602** and **604** may each average their determined reflection characteristic with the determined reflection characteristic of the other playback device. In this manner, the resulting adjusted equalization setting for each of playback devices **602** and **604** may be somewhere between that of a large room and a small room.

Within examples, each playback device of a media playback system may share its adjusted equalization setting with the other playback devices in the media playback system, such as by sending the adjusted equalization setting to other playback devices in the media playback system. In turn, one or more of the other playback devices may adjust their equalization setting based on the received equalization settings.

For instance, a first playback device and a second playback device that are grouped into a zone may each send to one another their respective adjusted equalization setting. Then, each of the first and second playback devices may adjust their respective equalization setting based on the received equalization setting. For example, the first playback device may determine that a particular one of the two adjusted equalization settings from either the first playback device or the second playback device is preferable for the environment. The first playback device may then (i) adjust its equalization setting based on the particular one of the two adjusted equalization settings and/or (ii) instruct the second playback device to adjust its equalization setting based on the particular one of the two adjusted equalization settings.

IV. Conclusion

The description above discloses, among other things, various example systems, methods, apparatus, and articles of manufacture including, among other components, firmware and/or software executed on hardware. It is understood that such examples are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of the firmware, hardware, and/or software aspects or components can be embodied exclusively in hardware, exclusively in software, exclusively in firmware, or in any combi-

US 9,219,460 B2

**21**

nation of hardware, software, and/or firmware. Accordingly, the examples provided are not the only way(s) to implement such systems, methods, apparatus, and/or articles of manufacture.

As indicated above, the present application involves dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating. In one aspect, a method is provided. The method involves emitting, by a playback device, a first audio signal, detecting, by the playback device, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determining one or more reflection characteristics, wherein each of the one or more reflection characteristics are based on at least the second audio signal, adjusting an equalization setting of the playback device based on the one or more reflection characteristics; and causing an audio track to play according to the adjusted equalization setting.

In another aspect, a second method is provided. The second method is operable in a media playback system comprising a plurality of playback devices, wherein each playback device comprises a respective microphone and a respective speaker. The second method involves receiving an indication of a first audio signal, detecting, by a microphone of the first playback device, a second audio signal, wherein at least a portion of the second audio signal is indicative of the first audio signal, in response to the detecting, determining a first reflection characteristic based on the second audio signal, adjusting an equalization setting of the first playback device based on at least the first reflection characteristic, and sending to a second media playback device an indication of the first reflection characteristic.

In another aspect, a device is provided. The device includes a speaker, a microphone that is physically coupled to the speaker, a processor, a network interface, a data storage, and a program logic stored in the data storage. The program logic is executable by the processor to emit a first audio signal from the speaker, detect, via the microphone, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determine a first reflection characteristic based on at least the second audio signal, adjust an equalization setting of the playback device based on at least the first reflection characteristic, and play, via the speaker, an audio track according to the equalization setting.

In yet another aspect, a non-transitory computer readable memory is provided. The non-transitory computer readable memory has stored thereon instructions executable by a computing device to cause the computing device to perform functions. The functions include emitting, by a playback device, a first audio signal, detecting, by the playback device, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal, in response to the detecting, determining one or more reflection characteristics, wherein each of the one or more reflection characteristics are based on at least the second audio signal, adjusting an equalization setting of the playback device based on the one or more reflection characteristics; and causing an audio track to play according to the adjusted equalization setting.

Additionally, references herein to "embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one example embodiment of an invention. The appearances of this phrase in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. As such, the embodiments described

**22**

herein, explicitly and implicitly understood by one skilled in the art, can be combined with other embodiments.

The specification is presented largely in terms of illustrative environments, systems, procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth to provide a thorough understanding of the present disclosure. However, it is understood to those skilled in the art that certain embodiments of the present disclosure can be practiced without certain, specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the embodiments. Accordingly, the scope of the present disclosure is defined by the appended claims rather than the forgoing description of embodiments.

When any of the appended claims are read to cover a purely software and/or firmware implementation, at least one of the elements in at least one example is hereby expressly defined to include a tangible, non-transitory medium such as a memory, DVD, CD, Blu-ray, and so on, storing the software and/or firmware.

I claim:

**1**. A method comprising:

emitting, by a playback device, a first audio signal;

detecting, by the playback device, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal;

in response to the detecting, determining one or more reflection characteristics, wherein each of the one or more reflection characteristics are based on at least the second audio signal;

adjusting an equalization setting of the playback device based on the one or more reflection characteristics; and

causing an audio track to play according to the adjusted equalization setting.

**2**. The method of claim **1**, wherein the playback device comprises a microphone and a speaker, and wherein the microphone is physically coupled to the speaker.

**3**. The method of claim **1**, wherein the first audio signal has a first waveform, wherein the second audio signal has a second waveform, and wherein detecting the second audio signal comprises:

determining, based on the first waveform and the second waveform, that the portion of the second audio signal is the reflection of the first audio signal.

**4**. The method of claim **1**, wherein adjusting the equalization setting of the playback device based on the one or more reflection characteristics comprises

disabling a speaker of the playback device.

**5**. The method of claim **1**, wherein at least one of the one or more reflection characteristics comprises an amount of time elapsed from emitting the first audio signal and detecting the second audio signal.

**6**. The method of claim **1**, wherein the first audio signal is emitted at a first sound pressure level, wherein the second audio signal is detected at a second sound pressure level, and wherein at least one of the one or more reflection characteristics comprises a difference between the first sound pressure level and the second sound pressure level.

**7**. The method of claim **1**, wherein adjusting an equalization setting of the playback device based on the one or more reflection characteristics comprises:

US 9,219,460 B2

23

selecting a particular equalization preset from a plurality of equalization presets based on at least one of the one or more reflection characteristics; and

adjusting the equalization setting of the playback device according to the selected particular equalization preset.

**8**. The method of claim **7**, wherein each of the plurality of equalization presets comprises a respective bass gain setting.

**9**. The method of claim **7**, wherein at least one of the one or more reflection characteristics comprises an amount of time elapsed since emitting the first audio signal until detecting the second audio signal, wherein each of the plurality of equalization presets is matched to a respective time range, and wherein selecting one from a plurality of equalization presets based on the at least one reflection characteristic comprises:

determining a particular time range that corresponds to the amount of time; and

selecting the equalization preset matched to the determined particular time range.

**10**. The method of claim **1**, wherein the first audio signal is an impulse signal.

**11**. In a media playback system comprising a plurality of playback devices, wherein each playback device comprises a respective microphone and a respective speaker, a method comprising:

receiving an indication of a first audio signal;

detecting, by a microphone of the first playback device, a second audio signal, wherein at least a portion of the second audio signal is indicative of the first audio signal;

in response to the detecting, determining a first reflection characteristic based on the second audio signal;

adjusting an equalization setting of the first playback device based on at least the first reflection characteristic; and

sending to a second playback device an indication of the first reflection characteristic.

**12**. The method of claim **11**, wherein adjusting the equalization setting is further based on at least a second reflection characteristic, the method further comprising:

receiving, via a network interface of the playback device, an indication of the second reflection characteristic from the second playback device.

**13**. The method of claim **11**, wherein the equalization setting is further based on at least a second reflection characteristic, the method further comprising:

detecting, via a microphone of the first playback device, a fourth audio signal, wherein at least a portion of the fourth audio signal is a reflection of a third audio signal emitted by the second playback device; and

determining the second reflection characteristic based on the fourth audio signal.

**14**. The method of claim **11**, further comprising:

sending an indication of the adjusted equalization setting to the second media playback device.

24

**15**. A playback device, comprising:

a speaker;

a microphone that is physically coupled to the speaker;

a processor;

a network interface;

a data storage; and

a program logic stored in the data storage and executable by the processor to:

emit a first audio signal from the speaker;

detect, via the microphone, a second audio signal, wherein at least a portion of the second audio signal is a reflection of the first audio signal;

in response to the detecting, determine a first reflection characteristic based on at least the second audio signal;

adjust an equalization setting of the playback device based on at least the first reflection characteristic; and

play, via the speaker, an audio track according to the equalization setting.

**16**. The playback device of claim **15**, wherein the equalization setting is further based on at least a second reflection characteristic, and wherein the program logic is further executable by the processor to:

receive, via the network interface, an indication of the second reflection characteristic from a second playback device.

**17**. The playback device of claim **15**, wherein the equalization setting is further based on at least a second reflection characteristic, and wherein the program logic is further executable by the processor to:

detect, by the microphone, a fourth audio signal, wherein at least a portion of the fourth audio signal is indicative of a reflection of a third audio signal emitted by a second playback device; and

determine the second reflection characteristic based on the fourth audio signal.

**18**. The playback device of claim **15**, wherein detecting the second audio signal comprises:

determining that the portion of the second audio signal is a reflection of the first audio signal.

**19**. The playback device of claim **15**, wherein the first reflection characteristic comprises an amount of time elapsed from emitting the first audio signal to detecting the second audio signal.

**20**. The playback device of claim **15**, wherein adjusting an equalization setting of the playback device based on at least the first reflection characteristic comprises:

selecting a particular equalization preset from a plurality of equalization presets based on the first reflection characteristic; and

adjusting the equalization setting of the playback device according to the selected particular equalization preset.

\* \* \* \* \*

# Exhibit B

9/27/2020
Google Nest speakers are one step closer to replacing your Sonos system | Android Central
Case 3:20-cv-06754-WHA  Document 1-1  Filed 10/12/20  Page 243 of 492

Verizon customers:  Upgrade to a Galaxy S20 and save $150



androidcentral

We may earn a commission for purchases using our links. Learn more.

POWERFUL AUDIO CAPABILITIES

# Google Nest speakers are one step closer to replacing your Sonos system

All those free Nest Minis are coming in handy.

MICHAEL ALLISON          18 Aug 2020                                        💬 7



Source: Android Central

## What you need to know

- Google is making it more convenient to own multiple Nest speakers.
- A new update rolling out today will offer more powerful multi-room audio.
- Nest Hubs and other Google Assistant smart-displays will get the new multi-room control today, while the Google Home app will get it in a fall update.

**G**oogle is updating Nest smart home devices with more powerful and dynamic multi-room support. Previously, users could pair Nest devices for stereo audio or manually create a multi-room speaker home grouping. Going forward, it'll be able to be done dynamically. If you have a Google Assistant-powered smart display like the Nest Hub, you'll be able to tap the icon at the bottom of the screen to open up the multi-room control interface and add/remove devices as you move through your home.

Google Nest speakers are one step closer to replacing your Sonos system | Android Central

❯ Verizon is offering the Pixel 4a for just $10/mo on new Unlimited lines

Here's how Google suggests users can use the new capabilities:

> **Move music from one room to another:** Stream transfer lets you easily move music, videos, podcasts, and more between compatible devices in your home using your voice, the Google Home app, or the touchscreen on your Nest smart display.
>
> **Experience stereo sound:** Stereo pair two Nest Mini or Google Home Max devices in the Google Home app for room-filling sound and even more immersive left and right channel separation.
>
> **Get new music recommendations:** YouTube Music and Spotify Premium subscribers can ask, "Hey Google, recommend some music" and Google Assistant will offer multiple choices from artists and genres that they like, and others like them to choose from.

The new multi-room interface will roll out to Google Nest Hub devices today as well as other Assistant-enabled smart displays. An update to the Google Home app in the fall will let Android phones, tablets, and Play Store-compatible Chromebooks control them.



**Google Nest Hub Max**

The Nest Hub Max remains one of Google's nicest smart home devices. With a nice roomy display and great sound, it's a decent addition to your living room.

**$229 at Best Buy**

**$229 at Walmart**

We may earn a commission for purchases using our links. Learn more.

**From the Editor's Desk**
### Google's giving up too much ground in the smart home fight

We're in the thick of our fall launches, but after the tidal wave of new products from Amazon last week, Google's Launch Night In looks like it'll barely make a splash. That's not good, because Alexa and Ring are rapidly gaining on Assistant and Nest.



**Au clair de la lune**
### Luna is both a safe bet and Amazon's best idea in years

Is "rolling your own" Netflix-style game library what we really want? Amazon thinks so.



**Now we're getting somewhere**
### Google's parent company settles shareholder lawsuit over sexual misconduct

Following sexual misconduct reports from 2018, Google has settled a shareholder lawsuit and announced major changes to how the company operates in these regards — including no severance packages for employees



Keep the big, beautiful OnePlus 8 Pro big and beautiful with a case

The OnePlus 8 Pro is a big, glass-backed phone, and big glass-backed phones get cases. These are the best options for protecting your new flagship in style.



🏷 News    Google Nest Hub

## Google Nest speakers are one step closer to replacing your Sonos system

🔑 Log in or 👤 Register to Comment

**fuzzylumpkin**

I hardly think so.

Tue Aug 18, 2020 3:28pm      ↩ Reply

**pgg101**

Sonos has been dead for a few years now in my house. I unplugged my Sonos shortly after I started getting Google Home speakers throughout my house.

Tue Aug 18, 2020 3:46pm      ↩ Reply

**rob damiani**

I am sorry for your loss

Tue Aug 18, 2020 3:59pm      ↩ Reply

**real0395**

I think Sonos is very overpriced, but are the Google speakers better quality than the Sonos?

Tue Aug 18, 2020 7:29pm      ↩ Reply

**medianemesis**

Seeing as Google Nest speakers do not have the audio quality of the Sonos speakers (except maybe the Max), they have nothing close to the integration with roughly 70+ music services like Sonos has, and the Google Home app is nowhere as fluid as the S2 app regarding media playback/controls on multiple devices simultaneously, I daresay Google has a long way to go.

Even YouTube and podcasts streams cast to the Google Home still drop out and sometimes resume on the phone, so no...

Tue Aug 18, 2020 3:59pm      ↩ Reply

**Lone Wolf2**

Yeah, right. For all those lovers of transistor radio quality sound, great news.

Wed Aug 19, 2020 10:49am      ↩ Reply

**RSage67**

There are a few of us who will never buy into Google/Nest.

Wed Aug 19, 2020 3:00pm      ↩ Reply

**Only A Few People Know These Airplane Hacks**
amomedia.com

**One Thing All Liars Have In Common (Brace Yourself)**
TruthFinder

**If You Like to Play, this Strategy Game is a Must-Have. No Install.**
Forge Of Empires

**Look Closer, The Photographer Was Not Expecting This Photo**
Scientific Mirror

CCPA Notice

© Future US, Inc. • Terms & Conditions • Privacy Policy • Cookie Policy • Careers • Licensing • External Links Disclosure • Accessibility Statement



# Exhibit C



The upgraded multi-room control works inside a number of your favourite music apps, like Spotify, Apple Music, YouTube Music, and more. If the app already supports the ability to Cast your audio to a Google Assistant-enabled speaker or a Chromecast, then you'll be able to bundle a few speakers together to create a haphazard grouping. Tapping on the Cast icon in the corner of the screen when any audio content is playing will let you add or remove your other devices throughout your home.

If you have a Google Nest Hub, or another smart display, in your home, you don't even need to pull out your smartphone. Instead you'll be able to use a new interface included in the clever gadget to quickly tick or untick speakers on your network. Just like Sonos, you can also change the volume on each speaker individually from the main interface.

PROMOTED STORY



Dr. Ron Paul: "Why They're Keeping Americans Home"
(Stansberry Research)     Outbrain |>

**MORE LIKE THIS**
Google Chromecast just got a feature you'll wish you had months ago



 

As pictured above, the new interface lets you toggle speakers, Chromecasts, and smart displays
(Image: GOOGLE)

ATHLETA   MAKE MOVES   SHOP NOW
FREE SHIPPING ON $50+ · FREE RETURNS

Of course, if you find yourself adding the same speakers again and again, it might be worth putting in the time to create a dedicated group. That allows you to beam audio from these speakers with a single tap – or ask Google Assistant to do it for you.

Chris Chan, Product Manager for Google Nest, says coupling the new feature with stereo pairing for two Nest Mini or Home Max devices will bring left and right channel support and room-filling audio for your favourite track.

**TRENDING**

  

Your next Virgin Media bill could be a shock, but not in the way you might expect

WhatsApp will soon let you do something it's never allowed before

Microsoft has removed security features from your Windows 10 PC, but there's a good reason

The latest upgrade to Google Home audio gadgets comes after the Mountain View-based company introduced a new feature, dubbed Stream Transfer, that lets you move music, videos, podcasts and more between compatible devices in your home using your voice, the Google Home app or the touchscreen on your Nest smart display. So, you can be listening to a podcast in the kitchen while preparing dinner – and throw the episode to the speaker in your dining room to continue listening while you munch.

As Google Home becomes a more fully-fledged multi-room audio app, Sonos recently overhauled its entire app. The next-generation Sonos app includes support for high resolution

READ MORE

Google guarantees you the best deal on Pixel 4a, Google Home, more


Universal Credit claimants could receive up to £10k extra this year - are you eligible?


Brexit LIVE: Irish leader Micheál Martin drops major hint EU heading for no deal Brexit


Craig Revel Horwood: Strictly judge says 'curse' will be 'more intense' in 2020 series


Vrbo
Search homes

Sponsored   Smartfeed |>


How to order DoorDash without paying DoorDash prices
Sponsored · Wikibuy


The genius trick every Amazon shopper should know
Sponsored · Wikibuy


This genius checkout trick can drop your JOANN total instantly
Sponsored · Wikibuy


Urologist: This May Shrink An Enlarged Prostate - Try It Tonight
Sponsored · World Health Wellness


The Actual Cost Of One Day Full Mouth Dental Implants Might Surprise you
Sponsored · Dental Implants | Sponsored listing


Don't Over Pay For Roof Replacement. Actual Cost In Chicago Might...
Sponsored · Roofing Contractors | Sponsored Listings


The Richest Songwriters of All Time Ranked
Sponsored · Investing.com


Read This Before You Renew Amazon Prime Again
Sponsored · Wikibuy


How to shop at Best Buy without paying Best Buy prices
Sponsored · Wikibuy


Jay Leno's Million-Dollar Collection
Sponsored · Investing.com

Comments

Google's last update patches three critical vulnerabilities for a number of connected speakers. | ...
audio including Dolby Atmos, as well as delivering new security updates. With the arrival of the
new app, Sonos had to drop support for a number of connected speakers.

RELATED ARTICLES

›  Microsoft confirms Internet Explorer is finally dead on Windows 10

›  Google Maps gets its most impressive update yet ...but there's a catch

›  Your Facebook will change forever from next month

Google

Sponsored  Smartfeed ▸



The New Volvo XC90 Is Dropping Jaws!

Auto Life | Sponsored Listings



1 Important Trick Most Mac Users Are Unaware of

MacKeeper



Many Chicago, Illinois Drivers Don't Even Know This Genius Tip

US Auto Insurance Now



Warning: Kirkland Brand Are Identical To These Products And Cost



Healthy Eaters: "Goodbye Meal Kits, Hello Hungryroot"

Comments



WhatsApp will soon let you do something it's never allowed before


Amazon Prime Day deals 2020 revealed: The date all Amazon customers need to know


Why your next Android smartphone will soon be much faster and cheaper


BT, Virgin and Sky's broadband eclipsed on price but only if you make a drastic change


Apple Watch Series 6 review: the best smartwatch just got even better


Your next Virgin Media bill could be a shock, but not in the way you might expect


macOS 11 Big Sur release date may have just been revealed early


Your Amazon Echo is getting a free upgrade that WILL save you money


iPhone 12 release date: why Apple fans don't have long left to wait


Galaxy S20 FE has a big advantage over the Galaxy S20 and it's not the price


New Chromecast and redesigned Google Home smart speaker unmasked, will YOU upgrade?


This Google code cuts the cost of Google Nest Mini, Chromecast, Nest WiFi for today only


Microsoft has removed security features from your Windows 10 PC, but there's a good reason

Way Less!
BetterBe

Hungryroot



sponsored by Doggykingdom
NO PULL Harness

  

Dog Owners Watch Out. This Is The Best Dog

Dog Owners Watch Out. This Is The Best Dog

Why This Harness Will Make Your Dog Feel Mo


Amazon Prime Day is almost here, here's one thing you need to do before it arrives


WhatsApp tests new photo feature that could cause its biggest controversy in years


Google Maps' crucial new update is essential viewing before your next trip


New Amazon Echo Show 10 has a screen that follows you around the room


All-new Amazon Echo revealed with ball-shaped design and much better sound


Microsoft gives Windows 10 fans another really good reason to ditch Google Chrome


iPhone 6 users fury as NHS track and trace Covid-19 app will NOT work on their phone

Shaquille Oneal's new $50 million yacht is unreal.
Investing.com

[Gallery] Famous Septuplets 20 Years Later. Look What Happened To Them
Herald Weekly

Comments

If you're going to buy Bath and Body Works, read this
Wikibuy



Sponsored


25 Vinyl Records Worth a Fortune Today
Sponsored - Investing.com


[Pics] Ryan Reynolds Helped Rescue This Young Woman's Most Treasured Memento
Sponsored - Zen Herald


Here Are The Highest Paid News Anchors At Each Network.
Sponsored - Investing.com


Born Into Billions: Kevin Bacon's Wife is one of the Richest Heiresses in America
Sponsored - Investing.com


[Pics] Heidi Klum's Daughter Looks Just Like Her Famous Dad
Sponsored - PawsZilla


Illinois Surgeon: Easy Method Relieves Tinnitus (Ear Ringing)
Sponsored - healthbenefits.vip

Claim These 8 Senior

Blake Shelton And Gwen Stefani Make Exciting Announcement
Credit Media

Comments

**Popular in the Community**



Rishi Sunak warned 'you will NEVER be...

Brex as E



# Exhibit D

**techradar**

THE SOURCE FOR TECH BUYING ADVICE

Subscribe

TRENDING | Xbox Series X pre-order | iPhone 12 | PS5 | Xbox Series S | Apple Watch 6 | Best Laptop | Best Phone | VPN

TechRadar is supported by its audience. When you purchase through links on our site, we may earn an affiliate commission. Learn more

Home > News > Smart Home

# New Google Nest release date, price, and rumors

By Olivia Tambini 21 September 2020

The next Google Nest speaker has been revealed





(Image credit: Google)

Nearly four years after the Google Home was launched, the tech giant has just confirmed  a new version of its first Google Assistant smart speaker, the so-called Google Nest Audio.

After the new Google speaker was leaked by Android TV Guide on Twitter, the company responded by sharing a photo of the Google Nest Audio, alongside a video via 9to5Mac of the smart speaker in action:

We initially heard that the new Google Nest speaker would hit shelves in late August, as reputable leaker Roland Quandt alleged in a tweet.

According to Quandt, Google's latest smart speaker would be available from "the end of August", and will cost 100€ – that works out at around $120 / £90 / AU$160. That's a little pricier than the original Google Home, which cost ($89 / £89 / AU$128) at launch.

## Cut to the chase

**What is it?** A new Google Assistant smart speaker.
**When will it be released?** We think on September 30 at the next Google event.
**How much will it cost?** It's rumored it will cost around $120 / £90 / AU$160.
Despite the slight delay, it looks like the Nest smart speaker will actually launch on September 30, alongside the Pixel 5 and a new Chromecast. We've been invited to join Google for its '#LaunchNightIn' on Wednesday, September 30, with the event kicking off at 11am PT / 2pm ET / 7pm BST (that's 4am, October 1 in Australia).

The invite reads: "We invite you to learn all about our new Chromecast, our latest smart speaker and our new Pixel phones."

Previously, the new Google speaker was apparently revealed to 9to5Google by 'sources familiar to the matter', and it's poised to sit somewhere in between the Google Home and Google Home Max, the brand's largest and best-sounding wireless speaker.

According to that source, the Google Nest Audio has been going by the codename Prince at Google HQ – like the musician – suggesting that it could have a stronger focus on audio quality than its predecessor. That means it could be a new rival for the likes of the Sonos One, the best smart speaker you can buy in 2020.

> Get your popcorn ready for #LaunchNightIn.Click below to know when to tune in. 🍿 pic.twitter.com/RpKOinCDHj September 14, 2020

## What will the new Google Nest speaker be called?

What the new speaker will be called officially remains a mystery – though a recent leak by WinFuture suggests that it will be known as the Google Nest Audio.

 A few years ago, Google placed the vast majority of its smart devices under the Google Nest umbrella, implying that the products were all interconnected and compatible with the Nest series of smart thermostats, alarms, and security cameras.

While we've seen a few Google speakers that fall under this umbrella, including the Google Nest Hub, Google Nest Mini, and Google Nest Hub Max, the original Google Home and Google Home Max were never renamed.

Hopefully we'll find out for sure on September 30, but in the meantime, here's everything we know about the rumored Google Nest Audio, as well as all the features we'd like to see from a new Google speaker.

## New Google Nest release date

Now that Google has unveiled the Google Nest Audio via a video and an image, a release date for the new smart speaker is imminent; and an invitation to the next Google event suggests that it will launch on September 30.

We initially thought the new Google speaker would arrive sooner, as reputable leaker Roland Quandt alleged in a tweet, saying that the smart speaker would hit shelves at "the end of August", coming in two colors, Chalk and Charcoal.

Whether the September 30 release date is a result of delays is unclear, but it makes sense that Google would show off its latest smart speaker alongside the Pixel 5 and a new Chromecast model.

The launch will be live streamed on Wednesday, September 30, with the event kicking off at 11am PT / 2pm ET / 7pm BST (that's 4am, October 1 in Australia). We'll be there to live blog all the news as it comes in, so make sure you check back in for the latest from Google.

What is Google Assistant?

## New Google Nest price

We initially thought that the Google Nest Audio would probably be priced similarly to the original Google Home, which cost ($89 / £89 / AU$128) at launch.

However, Roland Quandt has claimed that the new speaker will cost 100€ – that works out at around $120 / £90 / AU$160. That's a little pricier than the original Google Home, though it's still relatively cheap for a smart speaker.

That would corroborate previous claims that it will be priced somewhere between the Google Home and the Google Home Max, which was fairly expensive at $399 / £399 / AU$549.

If you can't wait for the new Google speaker, check out the best Google Nest deals we've found today:

## New Google Nest design

Google has now officially lifted the veil on its new and improved Nest smart speaker by releasing the image seen at the top of this article.

It will apparently be available "in Charcoal and Chalk as usual", in keeping with previous Google Assistant speakers like the Google Nest Hub Max and the Google Home Max.

As you can see from that photo, the redesigned Nest speaker has adopted the mesh fabric styling of the Google Nest Mini. The device, which stands upright, once again features hidden LED lights under the aforementioned fabric.

The image was released after photos of the new speaker were leaked by Android TV Guide:

> Recently certified by the FCC, here is our first look at GXCA6, the new @Google Nest Speaker, replacing the original Google Home. 😄 pic.twitter.com/Ltp1quPFqcJuly 9, 2020

In keeping with the Nest Mini, the new Nest appears to retain the smaller device's mic mute switch, which should provide comfort to those who value their privacy.

We can also see that Google has opted to place a hole on the unit where users will be able to plug in the device's power adapter (also pictured).

We can't imagine that Google would choose to make the hole so blatantly visible on the top of the device, and combined with the rubberized portion of the speaker in the tweet's second image, we have to assume the device will stand upright.

That upright design has been backed up by further images of the Google Nest Audio that have recently emerged, thanks to a leak by WinFuture.

According to WinFuture, as well as Charcoal and Chalk, the new speaker will be available in Sage, Sand and Sky colors – though they might not all be available in all of the different markets that the Nest Audio launches in.

The speaker is expected to stand around 7 inches or 18 cm high, and will have a notification light on the front to represent volume levels and to tell you when the Google Assistant is waiting for your input.

## New Google Nest specs

It sounds as though the Google Nest Home will represent a happy medium between the Google Home and the Google Home Max in terms of sound, design, and price.

According to the 9to5Google report, the new smart speaker will use Google Assistant like its predecessors, and it won't be a smart display with a screen like the Nest Hub and Nest Hub Max.

That voice-only control makes sense if the Google Nest Home is set to replace the original Google Home or Google Home Max speakers.

The new Google speaker will apparently sport larger drivers than the first Google Home, which should give it a more powerful sound and a better bass response – however, the source suggested that it won't be quite as sonically powerful as the Google Home Max, which boasts two woofers and two tweeters.

Looks-wise, it's set to be kitted out with the same mesh fabric design we've seen with the Google Nest Mini – and it could possibly come in a range of colors, like the diminutive speaker.

The Google Nest Mini (pictured) sports a sleek fabric casing. (Image credit: Google)

## New Google Nest speaker: what we want to see

When the original Google Home launched in 2016, we were really impressed – but a lot has changed in the world of smart speakers in the last four years, and Google itself has released superior models in that time.

So, we know that Google – and its biggest competitors, including Sonos, Amazon, and Apple – is capable of great things when it comes to building smart speakers. With that in mind, here are some of the things we want to see from the Google Home 2.

**Better sound**

While the original Google Home didn't sound bad per se, it didn't exactly blow us away with its audio prowess. Compared to the likes of the Sonos One – which is admittedly, more expensive – it lacks robustness in the low end and clarity in the mid and high frequencies.

If the Google Nest Home can take a few cues from its more musically-inclined sibling, the Google Home Max, the company could be onto a real winner, combining audio fidelity with a conveniently compact build and a (hopefully) budget-friendly price.

**An AUX port**

The audio drivers in the Google Home aren't anything to shout about, and more sound-focused buyers should probably be angling for the Google Home Max, anyway. But it's a shame such a vast range of artists are being funneled through inferior speakers.

Google Assistant has managed to cobble together the biggest music library of any smart assistant, thanks to Google Play Music as well as the Google-owned Youtube Music – if you sign up for the service, at least. The current model can already connect to external amps and speakers over Bluetooth, but getting a physical AUX port would do a lot to win over listeners concerned about losing audio quality over the air.

**More microphones**

The ability of a smart speaker to detect your voice accurately is crucial to its success, and Google didn't exactly push out the boat with the original Home speaker.

According to a teardown by iFixit, the Google Home has just two microphones compared to the Amazon Echo's seven-microphone array, which is designed to pick up your voice from every angle.

The Echo's substantial microphone array was cited as a reason for its ability to pick up your voice in noisy environments – and if Google wants to beat its biggest competitors, it'll need to make sure its microphone array is watertight.

**Portability**

Right now, no Google Home or Google Nest speakers are portable, but we'd love to see a model that can double up as a Bluetooth speaker like the Sonos Move – especially if it retains the compact design of the original Google Home.

If the Google Home 2 is portable, it would be great to see an IPX4 waterproof rating too; after all, you'd want to be able to take it into your garden on a sunny day.

**Competitive pricing**

Isn't this what we always want? The Google Home retailed at £129 / $129 / AU$199 at launch, so we imagine the new model would seem a good deal by bringing in upgraded features for the same price. However, getting an enhanced model that matched more closely to the Amazon Echo's £89 / $99 / AU$119, would do a lot to lower the price barrier for new adopters.

Amazon Echo vs Google Home: which smart speakers are best?
Apple HomePod 2 release date, news, and rumors

---

SEE MORE SMART HOME NEWS

---

 **TECHRADAR NEWSLETTER**

Sign up to get breaking news, reviews, opinion, analysis and more, plus the hottest tech deals!

Your Email Address

Receive news and offers from our other brands?
○ Yes
○ No

Receive mail from us on behalf of our trusted partners or sponsors?
○ Yes
○ No

**SIGN ME UP**

**Thank you for signing up to TechRadar. You will receive a verification email shortly.**

**There was a problem. Please refresh the page and try again.**

No spam, we promise. You can unsubscribe at any time and we'll never share your details without your permission.

## FIND A PRODUCT

Laptop
TV
Headphones
Bluetooth Speakers
Smartphones
Camera
Webcam
VPN

## Most Popular

TechRadar is part of Future US Inc, an international media group and leading digital publisher. Visit our corporate site.
About Us
Terms and conditions
Privacy policy
Cookies policy
Advertise with us
Web notifications
© Future US, Inc. 11 West 42nd Street, 15th Floor, New York, NY 10036.

# Exhibit E

Case 3:20-cv-06754-WHA   Document 11-1   Filed 10/12/20   Page 261 of 492

☰   **Google** The Keyword                                                        🔍

GOOGLE NEST

# House music: New multi-room audio control from Nest



Chris Chan
Product Manager, Google Nest

Published Aug 18, 2020

    🔗

As a new parent, my Nest home audio system has become a go-to, whether it's to keep my daughter entertained during bathtime with some music...or keep myself entertained with a podcast while I'm making a bottle at 3 a.m. Controlling the audio throughout my home, no matter who's listening, has been incredibly helpful.

Today, we're expanding that control. You can already manually group Nest devices in order to play the same music on various speakers at the same time, and now we're launching multi-room control so you can dynamically group multiple cast-enabled Nest devices (speakers, Smart Displays, Chromecasts) in real-time to fill multiple rooms with music. Multi-room control works with your favorite audio apps, including YouTube Music, Spotify, Pandora and more. If you have more than one Google Assistant-enabled smart speaker or Smart Display, tap the icon in the bottom left corner of the screen when any audio content is playing, and you'll easily be able to add or remove your other devices throughout your home.

 The Keyword



This update helps Nest devices come together as a whole-home audio system. Here are a few other ways I take advantage of mine:

Move music from one room to another: Stream transfer lets you easily move music, videos, podcasts and more between compatible devices in your home using your voice, the Google Home app or the touchscreen on your Nest smart display.

Experience stereo sound: Stereo pair two Nest Mini or Google Home Max devices in the Google Home app for room-filling sound and even more immersive left and right channel separation.

Get new music recommendations: YouTube Music and Spotify Premium subscribers can ask, "Hey Google, recommend some music" and Google Assistant will offer multiple choices from artists and genres that they like, and others like them to choose from.

The multi-room control interface will start rolling out to all Nest Hub, Nest Hub Max and other compatible Assistant-enabled Smart Displays today, and the same functionality will be coming to the Google Home app later this fall.

**POSTED IN:**
GOOGLE NEST —
GOOGLE ASSISTANT

---

## Related stories



**GOOGLE ASSISTANT**

Get a better handle on the work day at home with Google

Sep 23, 2020 →



**GOOGLE NEST**

Need a dose of Disney+? Just ask!

Sep 22, 2020 →



**NEWS**

Playlists that news home

Sep 2, 2020

● ○ ○ ○ ○ ○

OK

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SONOS, INC., | § | |
| | § | |
| Plaintiff, | § | C.A. 6:20-cv-881 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Sonos, Inc. ("Sonos" or "Plaintiff") hereby asserts claims for infringement of United States Patent Nos. 9,967,615; 10,779,033; 9,344,206; 10,469,966; and 9,219,460 (the "patents-in-suit"; attached hereto as Exhibits 1-5 respectively) against Defendant Google LLC ("Google" or "Defendant"), and alleges as follows:

**INTRODUCTION**

1.     Sonos is an American success story.  It was founded in 2002 in Santa Barbara, California by a handful of engineers and entrepreneurs with a vision to invent the world's first wireless, whole-home audio system.  At the time, popular audio systems were dependent on a centralized receiver hard-wired to each individual passive speaker throughout a home.  Further, most homes with Internet access had dial-up connections, the iPhone was still five years away, and there were no streaming music services.  The technological barriers confronting Sonos were enormous.

2.     To deliver on its vision, the Sonos team completely reimagined the in-home music system as a decentralized network of smart playback devices, and it developed a platform that could seamlessly and wirelessly distribute audio room by room or throughout the home at the user's discretion.  Sonos created a "choose what to play, where to play it, and how loud" wireless audio system that could not only perform without lag (*e.g.* buffering, or network interruptions), but that was also so simple and intuitive that customers would make it part of their daily lives.

3.      Commercial success did not come easy for Sonos as its vision was in many ways ahead of its time.  But year by year, consumers – and the entire industry – came to appreciate that wireless multi-room audio devices and systems could not only work, but could become an essential part of the listening experience.  Success required staying true to Sonos's disruptive vision, continuing to innovate while adjacent industries caught up and customers became more and more enamored with the idea of Sonos as they had the chance to encounter and use its products.  Once Sonos had taken all the risks and placed enormous bets on research and development, the "first followers" began to copy Sonos's innovations.

4.      To this day, Sonos remains focused on innovations that further enhance the listening experience.  Sonos invests heavily in research and development and, as a result, frequently invents new systems with new technologies, enhanced functionality, improved sound quality, and an enriched user experience.

5.      As a result, Sonos has become one of the world's leading providers of innovative audio products.  In recognition of its wide-ranging innovations, the U.S. Patent & Trademark Office has granted or allowed Sonos more than 940 U.S. patents, including the patents-in-suit, with hundreds more patents in other countries.  The innovations captured by these patents cover many important aspects of wireless multi-room audio devices/systems, including, for example, how to manage and control groups of playback devices, how to facilitate seamless control and transfer of audio playback among devices, and how to output amazing sound quality.

6.      The industry has recognized the importance of Sonos's patents.  For example, Sonos earned a spot on the IPO list of "Top 300 Organizations Granted U.S. Patents" and the IEEE recognized Sonos as having one of "[t]he technology world's most valuable patent portfolios."  *See* Exs. 6 and 7.

7.      Sonos launched its first commercial products in 2005 and has since released a wide variety of critically acclaimed, patented, wireless multi-room audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move,

Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, Amp, Five, and Arc.  *See, e.g.*, Ex. 8.  Sonos's products can be set up and controlled by the Sonos app.  *Id.*

8.     Sonos's efforts have made it incredibly popular with its customers.  Sonos estimates that in fiscal year 2019, Sonos's customers listened to 7.7 billion hours of audio content using its products.  And, as of September, 2019, almost two thirds of Sonos households had purchased and installed more than one Sonos product.

9.     Sonos's record of innovation has made it the undisputed leader in what has come to be called the "multiroom audio" field.  *See, e.g*., Ex. 9 (2018 Digital Trends: "Sonos is the king of multiroom audio…."); Ex. 10 (2019 What Hi-Fi: "[N]o multi-room offering is as complete or as pleasurable to live with as Sonos.").

10.    Sonos has already sued Google for infringing patents on its first group of inventions involving the set-up, control, playback, and synchronization of wireless playback devices.  This case involves a second group of inventions which, as described more extensively below, tackle the novel technological challenges of how to stream music from a cloud-based service, how to create, manage, and invoke "zone scenes" to configure how multiple playback devices work together, and how to dynamically adjust the equalization of a playback device based on the environment in which the playback device is operating.

## GOOGLE BEGINS INFRINGING

11.    Almost a decade after Sonos created the smart-speaker market, Google entered the space.  Initially, Google sought to work with Sonos and, through those efforts, gained access to Sonos's engineers, products, and technology.  All too quickly, however, Google shifted focus and began to develop and sell products that copied Sonos's technology and infringed Sonos's patents.

12.    Part of what makes Sonos so successful is that, through its application, Sonos is compatible with many different third-party music streaming services.  When Google publicly launched its own streaming music service – Google Play Music – in late 2011, Sonos worked with

Google to integrate the Google Play Music service into the Sonos ecosystem.  As a result, Google Play Music launched on the Sonos platform in 2014.  *See, e.g.*, Ex. 11.

13.    This should have benefited everyone: Sonos's customers gained access to another streaming service and Google Play Music users gained access to Sonos's devices.  But as the press recognized at the time, Sonos's integration work with Google was especially "deep" and therefore gave Google a wide aperture through which to view Sonos's proprietary technology.  *Id*. (2014 Wired: "This is the first time this sort of deep integration has happened between a third party music service and Sonos.").  The copying soon followed.

14.    Just eighteen months later, in 2015, Google began willfully infringing Sonos's patents.  On information and belief, Google used the knowledge it had gleaned from Sonos to build and launch its first wireless multi-room audio product – Chromecast Audio.

15.    Google's Chromecast Audio began what has turned into Google's relentless effort to copy Sonos and use Sonos's patented technology.  For example, although Google's original Chromecast Audio did not yet include Sonos's patented multi-room audio functionality, even when it was launched Google was working to add that Sonos-patented feature.  *See* Ex. 12 (2015 The Guardian: "Google is also working on multi-room audio streaming using the Chromecast Audio, but it will not support the popular feature out of the box.").  And, when Google added the infringing feature, the press immediately noted how this "major feature update" made Google's product even more "like the ones made by Sonos:"

> Google's recently-launched Chromecast Audio adapter is getting a major feature update this week: Consumers will now be able to group multiple Chromecast audio adapters to stream their favorite music simultaneously in more than one room, similar to the multi-room support available for internet-connected loudspeakers like the ones made by Sonos.

Ex. 13 (2015 *Variety* article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos"); *see also* Ex. 14 (2015 *Pocket-Lint*) ("You control your Sonos experience with one app.  Well, thanks to a new software rollout, Chromecast Audio can pretty much do the same thing.").

4

16.     This has become a consistent pattern.  Time and again, Google has added features to its products that first appeared in Sonos's products and which make use of Sonos's patented technology.

**GOOGLE'S INFRINGEMENT ACCELERATES**

17.     Since 2015, Google's misappropriation of Sonos's patented technology has proliferated.  Google has expanded its wireless multi-room audio system to more than a dozen infringing products, including the Google Home Mini, Google Home, Google Home Max, and Pixel phones, tablets, and laptops.  And Google has persisted in infringing even though Sonos has warned Google of its infringement on at least four separate occasions dating back to 2016.

18.     For example, in 2016 (a year after Google launched the Chromecast Audio wireless adapter), Google released the Google Home multi-room audio player (which was controlled by Google's rebranded multi-room controller app – the Google Home app).  Unlike the Chromecast Audio, the Google Home added an internal speaker driver making it an "all-in-one" audio player akin to Sonos's prior Play:1, Play:3, and Play:5 products.

19.     Sonos raised the issue of infringement as to these products with Google as early as August 2016.  Sonos hoped that Google would respect Sonos's intellectual property and the extensive work Sonos had put into inventing and developing its products.  But Google did no such thing.

20.     In October 2016, Sonos put Google on notice of infringement of 28 Sonos patents, including asserted United States Patent No. 9,344,206.  Google, however, did not stop infringing.  Instead, it doubled down and introduced new infringing products, making use of *even more* patented technology from Sonos.

21.     For example, in 2017, eight years after Sonos introduced its first all-in-one audio player – the Play:5 – Google released its first all-in-one audio players – the Google Home Max and the Google Home Mini.  Google's Home Max in particular was seen as a "Sonos Clone" and a "not-so-subtle copy of the [Sonos] Play:5 speaker…."  Ex. 15.  As explained by Gizmodo, "[i]t's

also hard not to see the [Google Home Max] device as something of a jab at Sonos." *Id.*; *see also, e.g.*, Ex. 16 (2017 Android Central: "You can't help but look at Google Home Max… and come to the conclusion that Google is sticking its nose where Sonos has been for years.").

22.     Therefore, in January 2018, and then again in July 2018, Sonos put Google on notice that it was infringing even more Sonos patents, including asserted United States Patent No. 9,219,460.  Then again, in February 2019, Sonos put Google on notice of infringement of 100 Sonos patents, including asserted United States Patent No. 9,967,615.

23.     Nothing Sonos did, however, deterred Google from expanding its infringement. Google's infringing product line now includes at least the Chromecast, Chromecast Ultra, Chromecast Audio, Chromecast with Google TV, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Audio, and Nest Wifi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the YouTube Music app, the Google Play Music app, the YouTube app, and the Google Home app (individually or collectively, "Google App(s)").  *See, e.g.*, Exs. 17-27.

24.     In addition to providing the Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controllers that are pre-installed with the Google Play Music app, YouTube app, and/or YouTube Music app (and capable of downloading and executing the Google Apps that are not pre-installed).  These infringing hardware controllers include, for example, Google's "Pixel" phones, tablets, and laptops (e.g., the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel Device(s)"). *See, e.g.*, Exs. 28-32.

25.     Herein, "Google Wireless Audio System" refers to one or more Google Audio Players, one or more Google Pixel Devices, and/or one or more Google Apps.

26.     In order to hold Google accountable for its willful infringement of Sonos's patents, Sonos filed a complaint in January 2020 asking the United States International Trade Commission ("ITC") to institute an investigation into Google's unlawful importation into and sale

in the United States of infringing products.  The ITC instituted an investigation, *In re Certain Audio Players and Controllers, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1191 to determine whether Google's audio players and controllers infringe five Sonos patents directed to fundamental features such as playing music on multiple speakers in synchrony, playing music in stereo over two or more players, a controller that can easily setup a player on a wireless network, and playback-control features such as controlling both the volume of individual speakers and a group of speakers.

27.     While the ITC Investigation has been pending, Google has continued to increase its infringement.  For example, press reports indicate that Google is introducing new products and changes that mean Google is "one step closer to replacing your Sonos system."  Ex. 33; *see also* Ex. 44 ("The new functionality appears to be the most direct challenge to the likes of Sonos, which has enjoyed enormous success by creating a series of connected speakers and soundbars that can play music simultaneously – or individually.").  The press has similarly noted that Google's new speaker "could be a new rival for the likes of the Sonos One, the best smart speaker you can buy in 2020."  Ex. 34; *see also* Ex. 44 ("Just like Sonos, you can also change the volume on each speaker individually from the main interface.").  And press reports indicate that Google has expanded its use of Sonos's stereo pair technology into the new smart-speakers even though Google is *currently* being sued for infringing a Sonos patent on this technology.  Exs. 35, 44.

28.     Google itself has also highlighted the importance of its use of Sonos's technology.  For example, Google' Chris Chan publicly stated that "[c]ontrolling the audio throughout my home, no matter who's listening, has been incredibly helpful" and that "[t]oday, we're expanding that control. You can already manually group Nest devices in order to play the same music on various speakers at the same time, and now we're launching multi-room control so you can dynamically group multiple cast-enabled Nest devices (speakers, Smart Displays, Chromecasts) in real-time to fill multiple rooms with music."   Ex. 35; *see also* Ex. 44.  Again, Google has expanded its use of this technology *while* it is being sued for infringing Sonos's patents on this precise technology.

29.     Google's aggressive and deliberate expansion of its use of Sonos's patented technology has led observers to conclude that "[n]o market is safe from [the] search engine monster" and that Google was specifically "offering new products to compete with Sonos in the music streaming market."  *See* Ex. 36.

**GOOGLE'S CONTINUED INFRINGEMENT FORCES THIS SUIT**

30.     In the face of Google's unrelenting infringement, Sonos has no choice but to bring this suit.  In this action, Sonos asserts patents that are not at issue in the ITC or the related district court action.  Sonos is also accusing Google's Wireless Audio System of infringing different patented features than are at issue in either of those actions.

31.     Sonos's ITC suit addressed Google's infringement of Sonos patents covering fundamental aspects of wireless, whole-home audio systems.   While groundbreaking, those patents represent only some of Sonos's ongoing innovation from its inception to today.  Through its foresight, substantial investment, and relentless pursuit of excellence, Sonos built on its previous success and invented a number of key features consumer have grown to expect and demand in streaming music listening.

32.     For example, as explained more fully below, Sonos's U.S. Patent Nos. 9,967,615 and 10,779,033 (the "'615 Patent" and the "'033 Patent," respectively) cover key aspects of Sonos's inventive approach for streaming music from a cloud-based service to a media playback system, including technology for transferring playback responsibility for a cloud-based stream of media content from a user's device, such as a smart phone, to a media playback system that is then configured to retrieve and play back the cloud-based media content.

33.     Sonos was well ahead of the field when it began to develop these inventions in 2011.  At that time, Sonos's audio system, including its smart-phone app controller, was in a category all its own.  Moreover, streaming content from cloud-based media services for playback by computers – let alone other types of networked devices like smart phones and smart speakers – was in its infancy.  Nonetheless, at a time years before Google released its first Chromecast

product, Sonos envisioned a novel experience of continuous and intuitive control of a user's entire streaming listening experience, across multiple networked devices, including smart phones and/or smart speakers. That vision gave rise to the innovation of technology for enabling seamless transition of playback responsibility for cloud-based media content between different networked devices, such as a smart phone and a smart speaker. This paradigm is now fundamental across the entire streaming industry as user expectations of continuous listening experiences have continued to converge with Sonos's vision.

34.     Similarly, Sonos's U.S. Patent Nos. 9,344,206 and 10,469,966 (the "'206 Patent" and the "'966 Patent," respectively) cover some of Sonos's inventions related to creating, managing, and invoking "zone scenes" to configure how multiple players work together. With these patents, Sonos once again anticipated what consumers would want and invented a new feature for its system. Using the inventions of the '206 and '966 Patents, playback devices can be grouped together for synchronous playback in an easy and intuitive manner using "zone scenes." Advantageously, such a "zone scene" can be accessed and invoked by multiple devices and in various ways (*e.g.*, by voice) even when the particular controller that created the "zone scene" is not on the network.

35.     In addition, Sonos's U.S. Patent No. 9,219,460 (the "'460 Patent") covers a Sonos invention related to dynamically adjusting the equalization of a playback device based on its environment. Naturally, consumers want their speakers to sound great, regardless of the environment in which the playback device is operating, but changes in the playback device's listening environment could impact sound quality. For example, a playback device may be configured to perform advantageously in a small room, but nonetheless may come to be positioned outdoors. When operating outdoors, boosting the bass levels of the playback may result in an improved listening experience for some consumers. However, previous technology for setting the equalization parameters for a playback device made it very difficult to optimize the playback device's equalization parameters for its listening environment. The '460 Patent provides technology that enables a playback device to adjust its own equalization settings based on one or

more reflection characteristics of an audio signal in order to optimally match the playback device's listening environment.

36.     Sonos provided a pre-filing copy of this Complaint to Google, thereby providing clear pre-suit notice of infringement of the patents-in-suit.  Google, however, has never given any indication that it is willing to stop infringing, and did not do so in response to receiving a draft of this complaint.

37.     On information and belief, Google is unwilling to stop infringing because its infringement of Sonos's patented inventions has paved the way for Google to generate billions of dollars in revenue.  A December 2018 market report by Royal Bank of Canada ("RBC"), for example, concluded that Google sold over 40 million Google Home devices in the U.S. and that Google generated $3.4 billion in Google Home revenue in 2018 alone.  Ex. 37 at pp. 1, 4, 14-15.  RBC also found that, as of August 2017, Google had sold more than 55 million Chromecast devices and that Google generated almost $1 billion in Chromecast revenue in 2018.  *Id*. at pp. 4, 16, 18.  Further, RBC estimated that, in 2018, Google generated $3.4 billion in Pixel device revenue.  *Id*. at pp. 4, 8.

38.     By 2021, RBC estimates that Google will be annually selling over 100 million Google Home devices in the U.S. and generating over $8 billion in Google Home revenue.  *Id*. at pp. 4, 14-15.  In addition, by 2021, RBC estimates that Google will annually generate $2.4 billion in Chromecast revenue and nearly $7 billion in Pixel device revenue.  *Id*. at pp. 4, 8, 18.

39.     The revenue obtained from the sale of Google's hardware devices vastly understates the value to Google of infringing Sonos's patents.  On information and belief, Google is intentionally selling the infringing products at a discount and/or as a "loss leader" with the expectation that this will allow Google to generate even more revenue in the future – *e.g.*, by powering Google's continued dominance of the market for search advertising.  In particular, Google's infringement of Sonos's patented inventions has helped and/or will help Google generate significant revenue from the use of Google's hardware devices including advertising, data collection, and search via the Google Wireless Audio Systems.  As the *New York Post*

explained, "Amazon and Google both discounted their home speakers so deeply over the holidays that they likely lost a few dollars per unit … hoping to lock in customers and profit from later sales of goods and data about buying habits."  Ex. 38.  Similarly, *News Without Borders* explained that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support advertising or e-commerce."  Ex. 39.

40.     On information and belief, Google's copying of Sonos's patented inventions has also helped and/or will help Google generate significant revenue from driving its users to make purchases such as streaming music subscriptions and retail purchases via the Google Wireless Audio Systems.  For example, an NPR "smart speaker" survey found that 28% of survey respondents agreed that "[g]etting [a] Smart Speaker led [them] to pay for a music service subscription," and Google offers two such subscriptions – Google Play Music and YouTube Music.  Ex. 40 at p. 20.  Likewise, the NPR survey also found that 26% of respondents use their smart speakers "regularly" to "add [items] to shopping list."  *Id.* at p. 14; *see also, e.g.*, Ex. 39 (stating that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support… e-commerce.").

41.     On information and belief, Google is willfully infringing Sonos's patents as part of Google's calculated strategy to vacuum up invaluable consumer data from users and, thus, further entrench the Google platform among its users and fuel its dominant advertising and search platforms.

42.     Google's infringement – and its strategy to sell its infringing products at a loss to develop alternative revenue streams – has caused significant damage to Sonos.  For example, the Google Home Mini predatorily implemented Sonos's valuable patented technology into an all-in-one wireless multi-room product that Google sells at a highly subsidized price point or even gives away for free.  Ex. 41 ("At $49, Google Home Mini works on its own or you can have a few around the house, giving you the power of Google anywhere in your home."); Ex. 39 ("Google partnered with Spotify to offer Home Minis as a free promotion for Spotify Premium customers.

Spotify's premium userbase is nearly 90 million, so if even a fraction of users take the free offer, a massive influx of Google smart speakers will enter the market.").

## THE PARTIES

43.     Plaintiff Sonos, Inc. is a Delaware corporation with its principal place of business at 614 Chapala Street, Santa Barbara, California 93101.  Sonos is the owner of the patents-in-suit. Sonos holds all substantial rights, title and interest in and to the Asserted Patents.

44.     Defendant Google LLC is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA  94043.  Google maintains a physical address in this district at 500 West 2nd Street, Austin, Texas, 78701.  Google may be served with process through its registered agent, the Corporation Service Company, at 211 East 7th Street, Suite 620, Austin Texas 78701.  Google is registered to do business in the State of Texas and has been since at least November 17, 2006.

45.     Google LLC is one of the largest technology companies in the world and conducts product development, engineering, sales, and online retail, search, and advertising operations in this District.

46.     Google LLC directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, sells, and/or imports the infringing Google Wireless Audio System at issue in this litigation in/into the United States, including in the Western District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its Google Wireless Audio System.

## JURISDICTION AND VENUE

47.     This action for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. § 1 et. seq.  This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338.

48.     This Court has personal jurisdiction over Google because, pursuant to Fed. R. Civ. P. 11(b)(3), Google has: (1) availed itself of the rights and benefits of the laws of the State of Texas, (2) transacted, conducted, and/or solicited business and engaged in a persistent course of

conduct in the State of Texas (and in this District), (3) derived substantial revenue from the sales and/or use of products, such as the infringing Google Wireless Audio System, in the State of Texas (and in this District), (4) purposefully directed activities (directly and/or through intermediaries), such as shipping, distributing, offering for sale, selling, and/or advertising its infringing Google Wireless Audio System, at residents of the State of Texas (and residents in this District), (5) delivered its infringing Google Wireless Audio System into the stream of commerce with the expectation that the Google Wireless Audio System will be used and/or purchased by consumers, and (6) committed acts of patent infringement in the State of Texas (and in this District).

49.     This Court also has personal jurisdiction over Google because it is registered to do business in the State of Texas and has one or more regular and established places of business in the Western District of Texas.

50.     Venue is proper in this District under the provisions of 28 U.S.C. § 1400(b) because, as noted above, Google has committed acts of infringement in this district and has one or more regular and established places of business in this district.  Google has also repeatedly admitted that venue is proper in this District for various patent cases.  *See e.g., Solas OLED Ltd. v. Google, Inc.* (WDTX Case No. 6-19-cv-00515) and *VideoShare, LLC v. Google LLC et al* (WDTX Case No. 6-19-cv-00663).

**THE PATENTS-IN-SUIT**

**U.S. Patent No. 9,967,615**

51.     Sonos is the owner of U.S. Patent No. 9,967,615 (the "'615 Patent"), entitled "Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on May 8, 2018.  A copy of the '615 Patent, is attached hereto as Exhibit 1.

52.     The '615 Patent relates generally to technology for facilitating transfer of playback responsibility from a user's device to a media playback system.

13

53.     The '615 Patent recognized that "[t]echnological advancements have increased the accessibility of music content, as well as other types of media…." '615 Patent at 1:19-20. This allowed users to access audio and video content over the Internet. *Id.* at 1:21-26.

54.     But, the '615 Patent identified a particular problem and provided an unconventional technological solution. Specifically, the patent recognized that "[w]ired or wireless networks can be used to connect one or more multimedia playback devices for a home or other location playback network (*e.g.*, a home music system)." '615 Patent at 1:66-2:2. This means that "[m]usic and/or other multimedia content can be shared among devices and/or groups of devices (also referred to herein as zones) associated with a playback network." *Id.* at 2:6-9. The '615 Patent is directed to a method, tangible media, and controller that "facilitate streaming or otherwise providing music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application, and so on) to a multimedia content playback (*e.g.*, Sonos$^{TM}$) system." *Id.* at 2:10-14.

55.     The '615 Patent provides an unconventional technological solution to this problem. For example, the '615 Patent describes an "Example Controller" that "can be used to facilitate the control of multi-media applications…." '615 Patent at 9:8-14. "In particular, the controller 500 is configured to facilitate a selection of a plurality of audio sources available on the network and enable control of one or more zone players … through a wireless network interface 508." *Id.* at 9:14-18. Further, the '615 Patent describes embodiments that "enable a user to stream music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application and so on) to a local multimedia content playback (*e.g.*, Sonos$^{TM}$) system." '615 Patent at 12:8-12. More specifically, the '615 Patent teaches that while "a user listens to a third party music application (*e.g.*, Pandora™ Rhapsody™, Spotify™, and so on)" on a user device, such as the user's "smart phone," the user can "select[] an option to continue playing [the current] channel on her household music playback system (*e.g.*, Sonos$^{TM}$)," which will cause the user's "playback system" to "pick[] up from the same spot on the selected channel that was

14

on her phone and output[] that content (*e.g.*, that song) on speakers and/or other playback devices connected to the household playback system." *Id.* at 12:44-53; *see also id.* at 13:1-53.

56.     The '615 Patent goes on to teach specific technology for facilitating this transfer of playback responsibility from the user's device to the user's playback system.  For instance, the '615 Patent teaches that one aspect of this technology involves causing data for retrieving network-based media content (such as a uniform resource locator (URI)) to be passed to a playback device in the playback system so that the playback device can "run on its own to fetch the content" from a networked audio source, such as a "cloud" server that is accessible over the Internet.  *Id.* at 12:53-63; *see also id.* at 12:63-67 (describing that "[a] third party application can open or utilize an application programming interface (API) to pass music to the household playback system without tight coupling to that household playback system"); 15:47-16:19 (describing a "throw it over the wall" approach in which "a third party application provides a multimedia playback device (*e.g.*, a Sonos™ zone player (ZP)) with enough information about content (*e.g.*, an audio track) so that . . . the local playback system (*e.g.*, SonosNet™) can directly access a source of the content and . . . play the content directly off the network *(e.g.*, the Internet) or cloud," where the "connection between the third-party application and the local playback device (*e.g.*, Sonos ZonePlayer™) can be direct over a local area network (LAN)" or "remote through a proxy server in the cloud"); 16:53-17:4 (describing various embodiments for "queue management" associated with the transfer of playback from a control device to a playback system, including an embodiment where a "shared queue is provided between the local playback system and the third party application to keep the local system and the application synchronized"). Further, the '615 Patent teaches that another aspect of this technology involves transitioning the user's device into a mode in which it functions to control the playback of the media content by the user's playback system after the transfer.  *Id.* at 16:20-42, 17:5-20.  In this way, the technology taught by the '615 Patent provides for intuitive and seamless transfer of playback responsibility from a user's device to a media playback system.

57.     In line with these teachings, the '615 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system.

58.     For example, claim 13 of the '615 Patent recites a non-transitory computer readable storage medium including instructions for execution by a processor that, when executed, cause a control device to perform various functions that facilitate transfer of playback responsibility from the device to a media playback system. *See* '615 Patent, claim 13. When the instructions are executed, the control device is initially operable to (i) cause a graphical interface to display a control interface including one or more transport controls to control playback by the control device, (ii) identify playback devices connected to a local area network, (iii) cause the graphical interface to display a selectable option for transferring playback from the control device, and (iv) detect a set of inputs to transfer playback from the control device to a particular playback device. *Id.*  Additionally, the instructions configure the control device so that, after detecting the set of inputs to transfer playback from the control device to the particular playback device, the control device is operable to cause playback to be transferred from the control device to the particular playback device by (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service, (b) causing playback at the control device to be stopped, and (c) modifying the one or more transport controls of the control interface to control playback by the playback device. *Id.* Additionally yet, the instructions configure the control device so that the control device is operable to cause the particular playback device to play back the multimedia content, which involves the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content. *Id.*

## U.S. Patent No. 10,779,033

59.     Sonos is the owner of U.S. Patent No. 10,779,033 (the "'033 Patent"), entitled "Systems And Methods For Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on September 15, 2020.  A copy of the '966 Patent, is attached hereto as Exhibit 2.

60.     The '033 Patent is related to the '615 Patent in that they are both continuations of application No. 13/341,237, filed on December 30, 2011, now U.S. Patent No. 9,654,821.  Thus, the '033 and '615 Patents share essentially the same specification.  Sonos incorporates by reference and re-alleges paragraphs 52-58 of this Complaint as if fully set forth herein.

61.     Like the '615 Patent, the '033 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system, which provide an unconventional solution to the technological problem described in the '615 Patent.

62.     For example, claim 1 of the '033 Patent recites a computing device with specific hardware configurations, including a non-transitory computer-readable medium that stores program instruction that can be executed by the device's processor(s).  *See* '033 Patent, claim 1. When the instructions are executed, the computing device can initially operate in a first mode in which it is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.  *Id.*  In that mode, the computing device is operable to (i) display a representation of one or more playback devices in a media playback system that are communicatively coupled to the computing device over a data network and available to accept playback responsibility for the remote playback queue, and (ii) while displaying the representation of the one or more playback devices, receive user input indicating a selection of at least one given playback device from the one or more playback devices.  *Id.* Additionally, the instructions configure the computing device so that, based on receiving the user input, the computing device is operable to transmit an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the

computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item. *Id.* Additionally yet, the instructions configure the computing device so that the computing device is operable to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device, and then after detecting the indication, transition from (a) the first mode in which the computing device is configured for playback of the remote playback queue to (b) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue. *Id.*

## U.S. Patent No. 9,344,206

63.    Sonos is the owner of U.S. Patent No. 9,344,206 (the "'206 Patent"), entitled "Method And Apparatus For Updating Zone Configurations In A Multi-Zone System," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on May 17, 2016.  A copy of the '206 Patent, is attached hereto as Exhibit 3.

64.    The '206 Patent relates generally to consumer electronics and human-computer interaction and, more specifically, to controlling or manipulating a plurality of multimedia players in a multi-zone system. *See, e.g.*, '206 Patent at 1:25-29.

65.    The '206 Patent recognized that users demand not only quality audio reproduction but also a system that allows multiple players to access music from different sources.  '206 Patent at 1:30-40.  Before the '206 Patent, a conventional multi-zone audio system might include a number of audio sources, but each audio source had to be connected to its own amplifier and a set of speakers and was typically installed in one place. *Id.* at 1:40-44.  This had inherent limitations. "In order to play an audio source at one location, the audio source must be provided locally or

from a centralized location.  When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult.  When the audio source is provided centrally, the centralized location may include a juke box, many compact discs, an AM or FM radio, tapes, or others.  To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources." *Id.* at 1:44-44.

66.     Moreover, as the '206 Patent recognized, "[i]n order to achieve playing different audio sources in different audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-configured and pre-programmed controller." '206 Patent at 1:56-59.  Such a system created problems.  "While the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation.  For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning.  The same person may wish to listen in the den and the living room to music from a compact disc in the evening.  In order to satisfy such requirements, two groups of audio players must be established.  In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news.  In the evening, the audio players in the den and the living room are grouped for the music.  Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music.  Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups." *Id.* at 1:59-2:10.

67.     Thus, the '206 Patent recognized "a need for dynamic control of the audio players as a group" and a system in which "the audio players may be readily grouped." '206 Patent at 2:11-13.  The invention of the '206 Patent would, thus, overcome the problems "in a traditional multi-zone audio system [where] the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment." *Id.* at 2:13-16.

19

68.     The '206 Patent provided an unconventional solution to this technological problem.  "In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups."  '206 Patent at 2:28-29.  One specific aspect of the grouping technology that is taught by the '206 Patent involves a controller with a user interface that permits a user to configure and save a "zone scene," which may comprise a "predefined" grouping of zone players that can later be "activated" (or "invoked") in order to group the zone players in the "zone scene" together for synchronous playback.  *Id.* at 2:30-53, 2:60-3:4, 8:19-10:45.  The '206 Patent explains that this "zone scene" technology for grouping zone players together for synchronous playback provides improvements over the existing technology for grouping zone players together for synchronous playback, which involved defining the group membership at the time that the group was to be invoked – particularly in situations where a larger number of zone players are to be grouped together for synchronous playback.  *Id.* at 8:19-55.  For instance, the benefits highlighted by the '206 Patent include (i) allowing a group of zone players to be "predefined" as part of a "zone scene" so that the group's membership need not be defined at the time that the group is to be invoked, (ii) allowing a predefined group to be invoked without requiring the zone players in the group to be separated from other groups beforehand, and (iii) allowing zone players to exist as part of multiple different predefined groups that can be invoked in order to dynamically group the zone players for synchronous playback.  *Id.* at 8:19-10:45.

69.     In line with these teachings, the '206 Patent claims devices, computer-readable media, and methods for managing and using "zone scenes" to facilitate grouping of zone players.  For example, claim 1 of the '206 Patent recites a "multimedia controller including a processor" that is configured to (i) receive, via a network interface, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone configuration is configured via the controller and maintained at the first independent playback device, and wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices, and (ii) cause a selectable indication of the received zone

configuration to be displayed, wherein the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices. *See* '206 Patent, claim 1.

**U.S. Patent No. 10,469,966**

70. Sonos is the owner of U.S. Patent No. 10,469,966 (the "'966 Patent"), entitled "Zone Scene Management," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on November 5, 2019. A copy of the '966 Patent, is attached hereto as Exhibit 4.

71. The '966 Patent is related to the '206 Patent in that they are both continuations of application No. 13/896,829, filed on May 17, 2013, now U.S. Patent No. 8,843,228. Thus, the '966 and '206 Patents share essentially the same specification. Sonos incorporates by reference and re-alleges paragraphs 64-69 of this Complaint as if fully set forth herein.

72. The '906 Patent claims devices, computer-readable media, and methods for managing and using "zone scenes" to facilitate grouping of zone players, which provides an unconventional solution to the technological problems related to grouping zone players that are described in the '906 Patent.

73. For example, claim 1 of the '966 Patent describes a computing device with a processor that can execute instructions stored in the controllers non-transitory, computer-readable medium. Those instructions, when executed, cause the computing device to be operable to (i) receive a first request to create a first zone scene comprising a first predetermined grouping of zone players that are to be configured for synchronous playback when the first zone scene is invoked, and (ii) based on the first request, cause creation of the first zone scene, cause an indication of the first zone scene to be transmitted to a first zone player in the first zone scene, and cause storage of the first zone scene. *See, e.g.*, '966 Patent, claim 1. Additionally, the instructions, when executed, cause the computing device to be operable to (i) receive a second request to create a second zone scene comprising the first zone player and at least one other zone player that is not in the first zone scene, and (ii) based on the second request, cause creation of

the second zone scene, cause an indication of the second zone scene to be transmitted to the first zone player, and cause storage of the second zone scene. *Id.* Additionally yet, the instructions, when executed, cause the computing device to be operable to (i) display representations of the first and second zone scenes, (ii) while displaying the representations, receive a third request to invoke the first zone scene, and (iii) based on the third request, cause the first zone player to transition from operating in a standalone mode to operating in accordance with the first predefined grouping of zone players so that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player. *Id.*

**U.S. Patent No. 9,219,460**

74.     Sonos is the owner of U.S. Patent No. 9,219,460 (the "'460 Patent"), entitled "Audio Settings Based on Environment," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on December 22, 2015.  A copy of the '460 Patent, is attached hereto as Exhibit 5.

75.     The '460 Patent relates generally to "consumer goods and, more particularly, to methods, systems, products, features, services, and other elements directed to media playback or some aspect thereof."  '460 Patent at 1:6-9.  More specifically, the '460 Patent is directed to dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating.  *See, e.g.*, *id*. at 1:64-66.

76.     The '460 Patent recognized that "[w]hile a playback device may be factory configured to perform advantageously in a typical operating environment, the factory configuration may not be ideal for all environments."  '460 Patent at 1:66-2:2.  According to the '460 Patent, "adjusting the equalization of the playback device based on the current operating environment may improve the listening experience for some listeners."  *Id*. at 2:3-5.

77.     The '460 Patent recognized that there are several problems with existing technology for adjusting an audio player's equalization.  '460 Patent at 2:12-14.  For instance:

First, the adjustment process is often overlooked by the user because, for example, the user may be required to initiate the adjustment and position the microphone. Second, the adjustment process requires a separate microphone, which may not be included with any of the components of the audio system. Third, the manual approach does not lend itself to frequent adjustment when one or more of the speakers may be re-positioned in different locations throughout a home or outdoors.

*Id*. at 2:23-32.

78.     The '460 Patent provides an unconventional technological solution to these problems.  For example, the '460 Patent discloses a playback device that "emit[s] an audio signal, such as a pulse, . . . [which] may encounter various objects, such as walls and furniture, throughout the environment."  '460 Patent at 2:37-42.  The ''460 Patent further discloses that "[w]hen an object is encountered, the object may variably reflect or absorb portions of the audio signal," and "[a]t some point, a portion of the reflected audio signal may reflect back toward the playback device from which the audio signal was emitted."  *Id*. at 2:42-50.  According to the '460 Patent, "[t]he microphone of the playback device may then detect at least a portion of the reflected audio signal," and "[i]n response to detecting the reflected audio signal, the playback device may determine one or more reflection characteristics based on the reflected audio signal."  *Id*. at 2:50-55.  Moreover, the '460 Patent discloses that "[t]he playback device may then adjust an equalization setting of the playback device based on the one or more reflection characteristics," and "[o]nce the equalization setting is adjusted, the playback device may then play an audio track according to the equalization setting."  *Id*. at 3:6-26.

79.     In line with these teachings, the '460 Patent claims devices, systems, and methods for dynamically adjusting the equalization of a playback device based on the environment in which the playback device is operating, which provide an unconventional solution to the technological problems described in the '460 Patent.  For example, claim 15 of the '460 Patent describes a playback device with a speaker, a microphone that is physically coupled to the speaker, a processor, a network interface, a data storage, and a program logic stored in the data storage and executable by the processor.  The program logic, when executed, causes the playback device to be operable to (i) emit a first audio signal from the speaker, and (ii) detect a second audio signal via the microphone that is physically coupled to the speaker, where at least a portion of the second

audio signal is a reflection of the first audio signal.  *See* '460 Patent, claim 15.  Additionally, the program logic, when executed, causes the playback device to be operable to (i) in response to detecting the second audio signal, determine a first reflection characteristic based on at least the second audio signal, (ii) adjust an equalization setting of the playback device based on at least the first reflection characteristic, and (iii) play, via the speaker, an audio track according to the adjusted equalization setting.  *Id.*

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,967,615

80.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

81.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

82.     As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 13 of the '615 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| A tangible, non-transitory computer readable storage medium including instructions for | At least each smartphone, tablet, and computer running the YouTube Music app, the Google Play Music app, the YouTube app and/or other native or web-based Chromecast-enabled apps (where a computing device installed with at least one of these Chromecast-enabled apps is referred to herein as a "Chromecast-enabled computing device"[1,2]) |

---

[1] Any reference to a "Chromecast-enabled computing device" or "Chromecast-enabled media player" includes each version and generation of such device/player unless otherwise noted.

[2] Each Google "Pixel" smartphone, tablet, and computer (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones, the Pixel Slate tablet, and the Pixelbook

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| execution by a processor, the instructions, when executed, cause a control device to implement a method comprising: | comprises a "control device," as recited in claim 13.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "playback device" as recited in claim 13.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://store.google.com/product/chromecast_apps?utm_source=chromecast.com. <br><br> In addition to being a "playback device" as recited in claim 13, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller software such that the given Hub media player also comprises a "control device," as recited in claim 13.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084. <br><br> Each Chromecast-enabled computing device includes a tangible, non-transitory computer-readable storage medium comprising instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs.  Likewise, each Hub media player includes a tangible, non-transitory computer-readable storage medium comprising instructions that, when executed by a Hub media player's processor, cause that Hub media player to perform the functions identified below.  *See, e.g.,* https://store.google.com/us/product/google_home_max?hl=en-US. |

and Pixelbook Go laptops) running the YouTube Music app, the Google Play Music app, the YouTube app, the Google Home app, and/or other native or web-based Chromecast-enabled app is an example of a "Chromecast-enabled computing device."

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| causing a graphical interface to display a control interface including one or more transport controls to control playback by the control device; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause its graphical interface to display a control interface including one or more transport controls to control playback by the Chromecast-enabled computing device.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to cause its graphical interface to display a control interface having one or more transport controls that, at times, are configured to control the Chromecast-enabled computing device's playback of multimedia content from a streaming content service, among other media sources. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("You can even use your mobile device or tablet as a remote and control everything from playback to volume."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Using your phone or tablet: [ ] You can use the playback controls on the Google Play Music app . . . Using your computer: [ ] You can use the playback controls on Google Play Music, near the bottom of the screen."); https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br>  <br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause its graphical |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| | interface to display a control interface including one or more transport controls to control playback by the Hub media player.<br><br>For instance, each Hub media player is programmed with the capability to cause its graphical interface to display a control interface having one or more transport controls that, at times, are configured to control the Hub media player's playback of multimedia content from a streaming content service, among other media sources. *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music ("YouTube Music on demand. . . . Stream top music services."); https://store.google.com/us/product/google_nest_hub_max?hl=en-US ("jam out with YouTube Music."); https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 ("With YouTube built-in to your Google Nest display, you can watch YouTube Originals, how-to videos and much more, seamlessly on your screen.").  Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br> |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| |   |
| after connecting to a local area network via a network interface, identifying playback devices connected to the local area network; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to, after connecting to a local area network ("LAN") via a network interface, identify Chromecast-enabled media players connected to the LAN.

For instance, each Chromecast-enabled computing device is programmed such that, after connecting to a LAN, the Chromecast-enabled computing device is configured to identify one or more Chromecast-enabled media players connected to that same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Make sure that your mobile device or tablet is connected to the same Wi-Fi network or linked to the same account as your Google Nest or Home speaker or display. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Connect your phone or tablet and Chromecast to the same wireless network. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Make sure that your mobile device or computer is connected to the same Wi-Fi network as Chromecast. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1("To show Chrome on your TV, you'll need . . . [t]o connect your computer and Chromecast device to the same Wi-Fi network."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.

Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to, after connecting to a LAN via a network interface, identify Chromecast-enabled media players connected to the LAN.

For instance, each Hub media player is programmed such that, after connecting to a LAN, the Hub media player is configured to identify |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| | one or more Chromecast-enabled media players connected to that same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices ⤶ to see the list of available devices and speaker groups."). |
| causing the graphical interface to display a selectable option for transferring playback from the control device; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause its graphical interface to display a selectable option for transferring playback from the Chromecast-enabled computing device.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to cause its graphical interface to display a selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another device (e.g., a Chromecast-enabled media player). *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button ⤶. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button ⤶. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button ⤶. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1 (" 2. At the top right, click More ⋮ ⟩ Cast. 3. Choose the Chromecast device where you want to watch the content."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| |   <br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause its graphical interface to display a selectable option for transferring playback from the Hub media player to another Chromecast-enabled media player.<br><br>For instance, each Hub media player is programmed with the capability to cause its graphical interface to display a selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device (e.g., a Chromecast-enabled media player). *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices 🔲 to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br>  |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
|  | |
| detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network: | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to detect a set of inputs to transfer playback from the Chromecast-enabled computing device to a particular Chromecast-enabled media player, where the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the Chromecast-enabled computing device and (ii) a selection of the particular Chromecast-enabled media player from the identified Chromecast-enabled media players connected to the LAN.

For instance, each Chromecast-enabled computing device is programmed with the capability to (i) detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another device, which triggers the Chromecast-enabled computing device to display a list of available devices for transferring playback that includes one or more identified Chromecast-enabled media players on the same LAN, and then (ii) detect a selection of at least one particular Chromecast-enabled media player connected to the same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button ⬚. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button ⬚. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button ⬚. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" 2. At the top right, click More ⋮ ⟩ Cast. 3. Choose the Chromecast device where you want to watch the content."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
|  | computing device running at least the YouTube Music, Google Play Music, and YouTube apps:  |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| | Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to detect a set of inputs to transfer playback from the Hub media player to a particular Chromecast-enabled media player, where the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the Hub media player and (ii) a selection of the particular Chromecast-enabled media player from the identified Chromecast-enabled media players connected to the LAN. |

For instance, each Hub media player is programmed with the capability to (i) detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device, which triggers the Hub media player to display a list of available devices for transferring playback that includes one or more identified Chromecast-enabled media players on the same LAN, and then (ii) detect a selection of at least one particular Chromecast-enabled media player connected to the same LAN. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices ▧ to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:

33

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| | |
| after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause that Chromecast-enabled computing device to, after detecting the set of inputs to transfer playback from the Chromecast-enabled computing device to the particular Chromecast-enabled media player, cause playback to be transferred from the Chromecast-enabled computing device to the particular Chromecast-enabled media player.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, after detecting a set of inputs to transfer the Chromecast-enabled computing device's playback of multimedia content to at least one particular Chromecast-enabled media player, the Chromecast-enabled computing device causes the playback of the multimedia content to be transferred to the at least one particular Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("When you're connected, the Cast button will turn from light to dark grey, letting you know that you're connected."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" To the right of the address bar, next to your extensions, you'll see Active cast ⬚."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.<br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause that Hub media player to, after detecting the set of inputs to transfer playback from the Hub media player to the particular Chromecast-enabled media player, cause playback to be transferred from the Hub media player to the particular Chromecast-enabled media player. |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
|  | For instance, each Hub media player is programmed such that, after detecting a set of inputs to transfer the Hub media player's playback of multimedia content to at least one particular Chromecast-enabled media player, the Hub media player causes the playback of the multimedia content to be transferred to the at least one particular Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084. |
| wherein transferring playback from the control device to the particular playback device comprises: (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service; (b) causing playback at the control device to be stopped; and (c) modifying the one or more transport controls of the control interface to control playback by | Each Chromecast-enabled computing device and each Hub media player is programmed such that transferring playback to the particular Chromecast-enabled media player comprises: (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular Chromecast-enabled media player, where adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service, (b) causing playback at the Chromecast-enabled computing device (or Hub media player) to be stopped, and (c) modifying the one or more transport controls of the control interface to control playback by the Chromecast-enabled media player.

For instance, on information and belief, each Chromecast-enabled computing device and each Hub media player is programmed such that, **after detecting a set of inputs to transfer playback of** multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to at least one particular Chromecast-enabled media player, the respective control device functions to (a) cause a first cloud server associated with the streaming content service (e.g., a first Google cloud server) to add resource locators for such multimedia content to a local playback queue of the particular Chromecast-enabled media player, where the resource locators correspond to locations of the multimedia content at a second cloud server associated with the streaming content service (e.g., a second Google cloud server), (b) stop its own playback of the multimedia content from the streaming content service, and (c) **modify one or more transport controls of its control interface such that the one or more transport controls function** to control playback by the at least one particular Chromecast-enabled media player rather than playback by the **Chromecast-enabled computing device.** *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| the playback device; and | https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084; <br><br> https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. |
| causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content. | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the particular Chromecast-enabled media player to play back the multimedia content, where the particular Chromecast-enabled media player playing back the multimedia content comprises the particular Chromecast-enabled media player retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content. <br><br> For instance, on information and belief, each Chromecast-enabled computing device is programmed such that, after causing the Chromecast-enabled computing device's playback of multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to be transferred to at least one particular Chromecast-enabled media player, the Chromecast-enabled computing device causes the at least one particular Chromecast-enabled media player to play back the multimedia content from the streaming content service, which involves the particular Chromecast-enabled media player retrieving the multimedia content from the second cloud server associated with the streaming music service (e.g., the Google cloud server) and then playing back the retrieved multimedia content. *See, e.g.,* <br> https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; <br> https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; <br> https://support.google.com/chromecast/answer/2995235?hl=en-AU; <br> https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1; <br> https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|



| Claim: 13 | Chromecast-Enabled Computing Devices |
|-----------|--------------------------------------|
| | Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the particular Chromecast-enabled media player to play back the multimedia content, where the particular Chromecast-enabled media player playing back the multimedia content comprises the particular Chromecast-enabled media player retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.<br><br>For instance, on information and belief, each Hub media player is programmed such that, after causing the Hub media player's playback of multimedia content from a streaming content service (e.g., Google Play Music, YouTube Music, YouTube, etc.) to be transferred to at least one particular Chromecast-enabled media player, the Hub media player causes the at least oen particular Chromecast-enabled media player to play back the multimedia content from the streaming content service, which involves the particular Chromecast-enabled media player retrieving the multimedia content from the second cloud server associated with the streaming music service (e.g., the second Google cloud server) and then playing back the retrieved multimedia content. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084.  Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br> |

| Claim: 13 | Chromecast-Enabled Computing Devices |
|---|---|
| |  |

83. On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing. That draft identified the '615 Patent and described how Google's products infringed. Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '615 Patent prior to Sonos filing the complaint in this action.

84. Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '615 Patent. In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29, above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '615 Patent by promoting, advertising, and

instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-27; *see also* citations above in the exemplary infringement claim chart for claim 13 of the '615 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '615 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '615 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '615 Patent, and that Google's customers then directly infringe one or more claims of the '615 Patent by installing and/or using one or more of the these apps in accordance with Google's product literature.  *See*, *e.g.*, *id*.

85.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '615 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '615 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '615 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '615 Patent.  For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music,

Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '615 Patent.  *See, e.g.*, Exs. 22-27.  These apps are a material component of the devices that meet the one or more claims of the '615 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '615 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use.  Google's customers then directly infringe the one or more claims of the '615 Patent by installing and/or using these apps on the customers' devices.

86.     Google's infringement of the '615 Patent is also willful because Google (a) had actual knowledge of the '615 Patent no later than February 2019 and actual notice of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '615 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

87.     Additional allegations regarding Google's pre-suit knowledge of the '615 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

88.     Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '615 Patent, including, without limitation, a reasonable royalty and lost profits.

89.     Google's infringement of the '615 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

90.     Google's infringement of the '615 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

91.     Google's infringement of the '615 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,779,033

92.     Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

93.     Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

94.     As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '033 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A computing device comprising: | At least each smartphone, tablet, and computer running the YouTube Music app, the Google Play Music app, the YouTube app, and/or other native or web-based Chromecast-enabled apps (where a computing device installed with at least one of these Chromecast-enabled apps is referred to herein as a "Chromecast-enabled computing device") comprises a "computing device," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "playback device" as recited in claim 13.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://store.google.com/product/chromecast_apps?utm_source=chromecast.com. |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|----------|--------------------------------------|
| | In addition to being a "playback device" as recited in claim 1, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller software such that the given Hub media player also comprises a "computing device," as recited in claim 1. *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084. |
| at least one processor; | Each Chromecast-enabled computing device and each Hub media player includes at least one processor. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| a non-transitory computer-readable medium; and | Each Chromecast-enabled computing device and each Hub media player includes a non-transitory computer-readable medium. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising: | Each Chromecast-enabled computing device and each Hub media player includes program instructions stored on the non-transitory computer-readable medium that enable the respective device to perform the functions identified below. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US. |
| operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to operate in a first mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to operate in a mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | Music, YouTube, etc.).  *See, e.g.,*  https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br>  <br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to operate in a first mode in which the Hub media player is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.<br><br>For instance, each Hub media player is programmed with the capability to operate in a mode in which the Hub media player is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.).  *See, e.g.,*  https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music ("YouTube Music on demand. . . . Stream top music services."); |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | https://store.google.com/us/product/google_nest_hub_max?hl=en-US ("jam out with YouTube Music."); https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 ("With YouTube built-in to your Google Nest display, you can watch YouTube Originals, how-to videos and much more, seamlessly on your screen.").  Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br><br><br><br><br> |
| while operating in the first mode, displaying a representation of one or more playback devices in a media playback system that are each i) communicatively coupled to the computing device over a data network and ii) available to accept playback responsibility for the remote playback queue; | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, while operating in the first mode, display a representation of one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Chromecast-enabled computing device over a data network and (ii) available to accept playback responsibility for the remote playback queue.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while operating in a mode in which the Chromecast-enabled computing device is configured for playback of a remote playback queue provided by a Google cloud server associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.), the Chromecast-enabled computing device is operable to detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Chromecast-enabled computing device to another |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | device, which triggers the Chromecast-enabled computing device to display a list of available devices for transferring playback that includes one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Chromecast-enabled computing device over a local area network ("LAN") and (ii) available to accept playback responsibility for the remote playback queue.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the Cast button 🖥. . . . Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Tap the Cast button 🖥. . . . Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Cast button 🖥. . . . Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" 2. At the top right, click More ⋮ ⌐ Cast. 3. Choose the Chromecast device where you want to watch the content."); https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br>  <br><br>Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, while operating in the first mode, display a representation of one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | the Hub media player over a data network and (ii) available to accept playback responsibility for the remote playback queue.<br><br>For instance, each Hub media player is programmed such that, while operating in a mode in which the Hub media player is configured for playback of a remote playback queue provided by a Google cloud-based computing system associated with a cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.), the Hub media player is operable to detect a selection of a displayed selectable option (e.g., a selectable "Cast button") for transferring playback of multimedia content from the Hub media player to another device, which triggers the Hub media player to display a list of available devices for transferring playback that includes one or more other Chromecast-enabled media players in a Chromecast-enabled playback system that are each (i) communicatively coupled to the Hub media player over a LAN and (ii) available to accept playback responsibility for the remote playback queue. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("At the bottom-left corner of the screen, tap Devices ⬚ to see the list of available devices and speaker groups. . . . Select the device for which you want to move your media."). Examples of this functionality are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br> <br><br> |
| while displaying the representation of the one or more playback devices, receiving | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to, while displaying the representation of the one or more Chromecast-enabled |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| user input indicating a selection of at least one given playback device from the one or more playback devices; | media players, receive user input indicating a selection of at least one given Chromecast-enabled media player from the one or more Chromecast-enabled media players.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while displaying the representation of the one or more Chromecast-enabled media players in a Chromecast-enabled playback system that are each on the same LAN as the Chromecast-enabled computing device and available to accept playback responsibility for the remote playback queue, the Chromecast-enabled computing device is configured to receive user input indicating a selection of at least one Chromecast-enabled media player in the Chromecast-enabled playback system.  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("Tap the speaker or display for which you'd like to cast."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en ("Select your Chromecast device from the device list."); https://support.google.com/chromecast/answer/2995235?hl=en-AU ("Tap the Chromecast device to which you want to cast."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" Choose the Chromecast device where you want to watch the content.").  Examples of this functionality are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br>  <br><br>Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | player to, while displaying the representation of the one or more Chromecast-enabled media players, receive user input indicating a selection of at least one given Chromecast-enabled media player from the one or more Chromecast-enabled media players.<br><br>For instance, each Hub media player is programmed such that, while displaying the representation of the one or more other Chromecast-enabled media players in a Chromecast-enabled playback system that are each on the same LAN as the Hub media player and available to accept playback responsibility for the remote playback queue, the Hub media player is configured to receive user input indicating a selection of at least one other Chromecast-enabled media player in the Chromecast-enabled playback system. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084 ("Select the device for which you want to move your media.").   Examples of this functionality are illustrated in the following screenshots from a Hub media player:<br><br><br><br><br><br> |
| based on receiving the user input, | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item; | processor, cause the Chromecast-enabled computing device to, based on receiving the user input, transmit an instruction for the at least one given Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Chromecast-enabled computing device, wherein the instruction configures the at least one given Chromecast-enabled media player to (i) communicate with the Google cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item.<br><br>For instance, on information and belief, each Chromecast-enabled computing device is programmed such that, based on receiving the user input indicating a selection of at least one Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Chromecast-enabled computing device and available to accept playback responsibility for the remote playback queue, the Chromecast-enabled computing device is configured to transmit an instruction for the Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Chromecast-enabled computing device, where the instruction configures the Chromecast-enabled media player to (i) communicate with a Google cloud server associated with a Google cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.) in order to obtain data identifying a next one or more media items that are in the remote playback queue (e.g., resource locators for such media items), (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item. *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1.<br><br>Likewise each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, based on receiving the user input, transmit an instruction for |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
|  | the at least one given Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Hub media player, wherein the instruction configures the at least one given Chromecast-enabled media player to (i) communicate with the Google cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item. <br><br> For instance, on information and belief, each Hub media player is programmed such that, based on receiving the user input indicating a selection of at least one other Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Hub media player and available to accept playback responsibility for the remote playback queue, the Hub media player is configured to transmit an instruction for the other Chromecast-enabled media player to take over responsibility for playback of the remote playback queue from the Hub media player, where the instruction configures the other Chromecast-enabled media player to (i) communicate with a Google cloud server associated with a Google cloud-based media service (e.g., Google Play Music, YouTube Music, YouTube, etc.) in order to obtain data identifying a next one or more media items that are in the remote playback queue (e.g., resource locators for such media items), (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the Google cloud-based media service; and (iii) play back the retrieved at least one media item. *See, e.g., id.* |
| detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device; and | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's processor, cause the Chromecast-enabled computing device to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to the at least one given Chromecast-enabled media player. <br><br> For instance, each Chromecast-enabled computing device is programmed with the capability to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least one Chromecast-enabled media player, which is demonstrated by the fact that the Chromecast-enabled computing device displays an indicator that playback responsibility for the remote playback queue has been successfully transferred to the at least one Chromecast-enabled media player that takes the form of a "Cast button" that is |

| Claim: 1 | Chromecast-Enabled Computing Devices |
| --- | --- |
| | "filled in" and/or "dark grey."  *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084 ("When you're connected, the Cast button will turn from light to dark grey, letting you know that you're connected."); https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1(" To the right of the address bar, next to your extensions, you'll see Active cast ▱."); https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553.  Examples of a Chromecast-enabled computing device detecting an indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least one Chromecast-enabled media player are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps:    Likewise, each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the Hub media player to the at least one given Chromecast-enabled media player. For instance, each Hub media player is programmed with the capability to detect an indication that playback responsibility for the |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | remote playback queue has been successfully transferred from the Hub media player to at least one other Chromecast-enabled media player, which is demonstrated by the fact that the Chromecast-enabled computing device displays an indicator that playback responsibility for the remote playback queue has been successfully transferred to the at least one other Chromecast-enabled media player that takes the form of a "Cast button" that is "filled in" and/or has a "dark grey" color along with a display of the other Chromecast-enabled media player's name. *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084.  Examples of a selectable "Cast button" having this second visual appearance are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br><br><br><br><br> |
| after detecting the indication, | Each Chromecast-enabled computing device comprises instructions that, when executed by a Chromecast-enabled computing device's |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue. | processor, cause the Chromecast-enabled computing device to, after detecting the indication, transition from (i) the first mode in which the Chromecast-enabled computing device is configured for playback of the remote playback queue to (ii) a second mode in which the Chromecast-enabled computing device is configured to control the at least one given Chromecast audio player's playback of the remote playback queue and the Chromecast-enabled computing device is no longer configured for playback of the remote playback queue.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, after detecting the indication that playback responsibility for the remote playback queue has been successfully transferred from the Chromecast-enabled computing device to at least one Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Chromecast-enabled computing device, the Chromecast-enabled computing device is configured to transition from (i) the first mode in which the Chromecast-enabled computing device was configured for playback of the remote playback queue to (ii) a second mode in which the Chromecast-enabled computing device is configured to control the at least one Chromecast-enabled media player's playback of the remote playback queue (while the Chromecast-enabled computing device itself is no longer configured for playback of the remote playback queue). *See, e.g.,* https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/2995235?hl=en-AU; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1; https://support.google.com/chromecast/answer/3265953?hl=en-GB&ref_topic=4602553. Examples of a Chromecast-enabled computing device in this second mode are illustrated in the following screenshots from a Chromecast-enabled computing device running at least the YouTube Music, Google Play Music, and YouTube apps: |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|----------|--------------------------------------|
|          |  |
|          | Each Hub media player comprises instructions that, when executed by a Hub media player's processor, cause the Hub media player to, after detecting the indication, transition from (i) the first mode in which the |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
|  | Hub media player is configured for playback of the remote playback queue to (ii) a second mode in which the Hub media player is configured to control the at least one given Chromecast audio player's playback of the remote playback queue and the Hub media player is no longer configured for playback of the remote playback queue.<br><br>For instance, each Hub media player is programmed such that, after detecting the indication that playback responsibility for the remote playback queue has been successfully transferred from the Hub media player to at least one other Chromecast-enabled media player in the Chromecast-enabled playback system that is on the same LAN as the Hub media player, the Hub media player is configured to transition from (i) the first mode in which the Hub media player was configured for playback of the remote playback queue to (ii) a second mode in which the Hub media player is configured to control the at least one other Chromecast-enabled media player's playback of the remote playback queue (while the Hub media player itself is no longer configured for playback of the remote playback queue). *See, e.g.,* https://support.google.com/googlenest/answer/9563059?hl=en-GB&ref_topic=7030084.  Examples of a Hub media player in this second mode are illustrated in the following screenshots from a Hub media player running at least the YouTube Music, Google Play Music, and YouTube apps:<br><br><br><br> |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| |  |

95.     On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '033 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '033 Patent prior to Sonos filing the complaint in this action.

96.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '033 Patent.  In particular, (a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '033 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-27; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '033 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '033 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '033 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers

while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '033 Patent, and that Google's customers then directly infringe one or more claims of the '033 Patent by installing and/or using one or more of these apps in accordance with Google's product literature.  *See*, e.g., *id.*

97.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '033 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '033 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '033 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '033 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music, Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '033 Patent.  *See, e.g.*, Exs. 22-27.  These apps are a material component of the devices that meet the one or more claims of the '033 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '033 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use.  Google's customers then directly infringe the one or more claims of the '033 Patent by installing and/or using these apps on the customers' devices.

98.     Google's infringement of the '033 Patent is also willful because Google (a) had actual knowledge of the '033 Patent and Sonos's infringement contentions no later than

September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '033 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

99.     Additional allegations regarding Google's pre-suit knowledge of the '033 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

100.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '033 Patent, including, without limitation, a reasonable royalty and lost profits.

101.    Google's infringement of the '033 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

102.    Google's infringement of the '033 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

103.    Google's infringement of the '033 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 9,344,206

104.    Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

105.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

106.    As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '206 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify

this claim chart, including, for example, on the basis of information about the Google Wireless

Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A multimedia controller including a processor, the controller configured to: | At least each smartphone, tablet, and computer installed with at least the Google Home app (where a computing device installed with at least the Google Home app is referred to herein as a "Chromecast-enabled computing device") comprises a "multimedia controller including a processor," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio that is capable of playing multimedia separately from other Chromecast-enabled media players, and thus, comprises an "independent playback device" as recited in claim 1. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://play.google.com/store/apps/details?id=com.google.android.apps.chromecast.app&hl=en_US.<br><br>In addition to being a "independent playback device" as recited in claim 1, each Home Hub, Nest Hub, and Nest Hub Max (referred to herein as a "Hub media player") is installed with Home/Nest Hub controller software such that the given Hub media player also comprises a "multimedia controller including a processor," as recited in claim 1.  *See, e.g.,* https://store.google.com/us/product/google_nest_hub?hl=en-US#overview-modal-music; https://store.google.com/us/product/google_nest_hub_max?hl=en-US; https://support.google.com/googlenest/answer/9165738?hl=en-GB&ref_topic=7030084 |
| receive, via a network interface, a zone configuration from a first independent playback device of a plurality of independent playback devices, wherein the zone | Each Chromecast-enabled computing device is configured to receive, via a network interface, a zone configuration from a first Chromecast-enabled media player of a plurality of Chromecast-enabled media players, where the zone configuration is configured via the Chromecast-enabled computing device, maintained at the first Chromecast-enabled media player, and characterizes one or more zone scenes that each identify a group configuration associated with two or more of the plurality of Chromecast-enabled media players. |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| configuration is configured via the controller and maintained at the first independent playback device, and wherein the zone configuration characterizes one or more zone scenes, each zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices; and | For instance, each Chromecast-enabled computing device on a local area network ("LAN") is configured to facilitate creation of predefined "speaker group" comprising two or more Chromecast-enabled media players on the same LAN as the Chromecast-enabled computing device, which is "a zone scene identifying a particular group configuration." *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups").  One example of this functionality is illustrated by the following screenshots, which shows the creation of a predefined "Downstairs" "speaker group" that identifies a particular group configuration comprising the "Nest Mini" and "Home Mini" players:<br><br><br><br>Once the predefined "speaker group" identifying the particular group configuration has been created, a zone configuration characterizing this "speaker group" is maintained at one or more of the plurality Chromecast-enabled media players on the same LAN as the Chromecast-enabled computing device (e.g., one or more of the Chromecast-enabled media players included in the predefined "speaker group").  *See, e.g., id.* |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | Thereafter, each Chromecast-enabled computing device and each Hub media player on the same LAN as the plurality of Chromecast-enabled media players is operable to receive the zone configuration characterizing the predefined "speaker group" from one or more of the plurality of Chromecast-enabled media players at various times – including in advance of a Chromecast-enabled computing device or Hub media player displaying the predefined "speaker group" as an available option for playback.  *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music and YouTube Music apps, which show a Chromecast-enabled computing device that has received a zone configuration characterizing a "Downstairs" "speaker group" and a "Upstairs" "speaker group": |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | |
| | Notably, each Chromecast-enabled computing device and each Hub media player is programmed with the capability to display a predefined "speaker group" as an available option for playback regardless of whether the Chromecast-enabled computing device or Hub media player was used to create the predefined "speaker group" (and in fact, regardless of whether the Chromecast-enabled computing device or Hub media player was even powered up or on the same LAN as the plurality of Chromecast-enabled media players at the time that the "speaker group" was created), which demonstrates that each Chromecast-enabled computing device and each Hub media player receives a zone configuration characterizing a predefined "speaker group" from one or more of the Chromecast-enabled media players selected for inclusion in the "speaker group." *See e.g.*, https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en.<br><br>In this regard, to facilitate the above functionality, each Chromecast-enabled computing device and each Hub media player is programmed with the capability to receive, from one of the plurality of Chromecast-enabled media players, a zone configuration characterizing one or more zone scenes that each identify a respective group configuration comprising two or more of the plurality of Chromecast-enabled media players. |
| cause a selectable indication of the received zone configuration to be displayed, wherein the displayed selectable indication is selectable to cause | Each Chromecast-enabled computing device is configured to cause a selectable indication of the received zone configuration to be displayed, where the displayed selectable indication is selectable to cause one or more of the zone scenes to be invoked by two or more of the plurality of Chromecast-enabled media players.<br><br>For instance, as noted above, each Chromecast-enabled computing device is programmed with the capability to (i) receive a zone |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| one or more of the zone scenes to be invoked by two or more of the plurality of independent playback devices. | configuration characterizing one or more zone scenes that each identify a respective group configuration comprising two or more of the plurality of Chromecast-enabled media players (*e.g.*, one or more "speaker groups"), and (ii) cause an indication of the received zone configuration to be displayed that is selectable to cause a particular zone scene (*e.g.*, a "speaker group") to be invoked by two or more of the plurality of Chromecast-enabled media players. *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device running at least the Google Home, Google Play Music and YouTube Music apps, which show an indication of a received zone configuration characterizing a "Downstairs" "speaker group" that is selectable to cause the "Downstairs" "speaker group" to be invoked by the Chromecast-enabled media players included in the "Downstairs" "speaker group": |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| |  |

107.    On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '206 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '206 Patent prior to Sonos filing the complaint in this action.

108.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '206 Patent.  In particular, (a) Google had actual knowledge of the '206 Patent or was willfully blind to its existence prior to, and no later than, October 2016 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint(*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '206 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-23; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '206 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe

65

one or more claims the '206 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '206 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home app to customers while knowing that installation and/or use of this app will infringe one or more claims of the '206 Patent, and that Google's customers then directly infringe one or more claims of the '206 Patent by installing and/or using this app in accordance with Google's product literature.  *See*, e.g., *id*.

109.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '206 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '206 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '206 Patent or was willfully blind to its existence prior to, and no later than, October 2016 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '206 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '206 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '206 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the Google Home app for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '206 Patent.  *See, e.g.*, Exs. 22-23.  This app is a material component of the devices that meet the one or more claims of the '206 Patent.  Further, Google especially made and/or adapted this app for installation and use on devices that meet the one or more claims of the '206 Patent, and this app is not a staple article of commerce suitable for substantial noninfringing use.

Google's customers then directly infringe the one or more claims of the '206 Patent by installing and/or using the Google Home app on the customers' devices.

110.    Google's infringement of the '206 Patent is also willful because Google (a) had actual knowledge of the '206 Patent no later than October 2016 and actual knowledge of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '206 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

111.    Additional allegations regarding Google's pre-suit knowledge of the '206 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

112.    Sonos is in compliance with any applicable marking and/or notice provisions of 35 U.S.C. § 287 with respect to the '206 Patent.

113.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '206 Patent, including, without limitation, a reasonable royalty and lost profits.

114.    Google's infringement of the '206 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

115.    Google's infringement of the '206 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

116.    Google's infringement of the '206 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,469,966

117.    Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

118.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more

of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

119.   As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 1 of the '966 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| A computing device comprising: | At least each smartphone, tablet, and computer installed with at least the Google Home app (where a computing device installed with at least the Google Home app is referred to herein as a "Chromecast-enabled computing device") comprises a "computing device," as recited in claim 1.  At least each Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio ("Chromecast-enabled media player") is a data network device configured to process and output audio, and thus, comprises a "zone player" as recited in claim 1.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs; https://store.google.com/us/product/google_home_max?hl=en-US; https://store.google.com/us/product/google_home_max_partners?hl=en-US; https://play.google.com/store/apps/details?id=com.google.android.apps.chromecast.app&hl=en_US. |
| one or more processors; | Each Chromecast-enabled computing device includes one or more processors.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |
| a non-transitory computer-readable medium; and | Each Chromecast-enabled computing device includes a non-transitory computer-readable medium.  *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising: | Each Chromecast-enabled computing device includes program instructions stored on the non-transitory computer-readable medium that enable the Chromecast-enabled computing device to perform the functions identified below. *See, e.g.,* https://store.google.com/us/magazine/compare_pixel; https://store.google.com/us/product/google_pixelbook_specs; https://store.google.com/us/product/pixel_slate_specs. |
| while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually: | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, while serving as a Chromecast-enabled computing device for a Chromecast-enabled playback system comprising a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, where the first Chromecast-enabled media player is operating in a standalone mode in which the first Chromecast-enabled media player is configured to play back media individually, perform the functions identified below.<br><br>For instance, each Chromecast-enabled computing device is programmed with the capability to serve as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, where at least the first Chromecast-enabled media player is operating in a standalone mode (*i.e.*, the first Chromecast-enabled media player is not operating part of an established "cast session" with a "speaker group"). *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. |
| receiving a first request to create a first zone scene comprising a first predefined grouping of zone players | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to receive a first request to create a first zone scene comprising a first predefined grouping of Chromecast-enabled media players including at least the first Chromecast-enabled media player |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; | and a second Chromecast-enabled media player that are to be configured for synchronous playback of media when the first zone scene is invoked.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a first predefined "speaker group" that includes the first Chromecast-enabled media player and a second Chromecast-enabled media player in the Chromecast-enabled playback system that are to be configured for synchronous playback of media when the first "speaker group" is launched, which is a "a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked." *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups" for "synchronous music throughout the home"). One example of this functionality is illustrated by the following screenshots, which shows the creation of an "Upstairs" "speaker group" that includes the "Nest Mini" and "Hub Speaker" players:<br><br> |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | |
| based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene; | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the first request, (i) cause creation of the first zone scene, (ii) cause an indication of the first zone scene to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the first zone scene.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player in the Chromecast-enabled playback system (which is the claimed "first zone scene") and then based on the request, (i) cause creation of the first "speaker group," (ii) cause an indication of the first "speaker group" to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the first "speaker group" at one or more Chromecast-enabled media players. *See e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups"). |
| receiving a second request to create a second zone scene comprising a second predefined grouping of zone players | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to receive a second request to create a second zone scene comprising a second predefined grouping of Chromecast-enabled media players including at least the first Chromecast-enabled |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player; | media player and a third Chromecast-enabled media player that are to be configured for synchronous playback of media when the second zone scene is invoked, where the third Chromecast-enabled media player is different than the second Chromecast-enabled media player.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is configured to receive a request to create a first predefined "speaker group" that includes the first Chromecast-enabled media player and a third Chromecast-enabled media player that are to be configured for synchronous playback of media when the second "speaker group" is launched, which is a "a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked." *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups" for "synchronous music throughout the home"). One example of this functionality is illustrated by the following screenshots, which shows the creation of a "Party" "speaker group" that includes the "Nest Mini" and "Home Mini" players:<br><br> |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | |
| based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene; | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the second request, (i) cause creation of the second zone scene, (ii) cause an indication of the second zone scene to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the second zone scene.<br><br>For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players, the Chromecast-enabled computing device is operable to receive a request to create a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player in the Chromecast-enabled playback system (which is the claimed "second zone scene") and then based on the request, (i) cause creation of the second "speaker group," (ii) cause an indication of the second "speaker group" to be transmitted to the first Chromecast-enabled media player, and (iii) cause storage of the second "speaker group" at one or more Chromecast-enabled media players.  *See e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en (providing instructions on how to create "speaker groups"). |
| displaying a representation of the first zone scene and a representation of the second zone scene; and | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to display a representation of the first zone scene and a representation of the second zone scene. |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | For instance, each Chromecast-enabled computing device is programmed such that, while serving as a controller for a Chromecast-enabled playback system that includes a first Chromecast-enabled media player and at least two other Chromecast-enabled media players that are each, the Chromecast-enabled computing device is operable to display (i) a representation of a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player (which is the claimed "first zone scene"), and (ii) a representation of a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player (which is the claimed second zone scene").  *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube Music apps, which show a displayed representation of the "Upstairs" "speaker group" that includes the "Nest Mini" and "Hub Speaker" players, and a displayed representation of the "Party" "speaker group" that includes the "Nest Mini" and "Home Mini" players: |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| | |
| while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, while displaying the representation of the first zone scene and the representation of the second zone scene, receive a third request to invoke the first zone scene.

For instance, each Chromecast-enabled computing device is programmed such that, while displaying (i) a representation of a first predefined "speaker group" including the first Chromecast-enabled media player and a second Chromecast-enabled media player (which is the claimed "first zone scene"), and (ii) a representation of a second predefined "speaker group" including the first Chromecast-enabled media player and a third Chromecast-enabled media player (which is the claimed second zone scene"), the Chromecast-enabled computing device is operable to receive a request to launch the first "speaker group," which is a "request to invoke the first zone scene." *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/chromecast/answer/6178107?co=GENIE.Platform%3DAndroid&hl=en; https://support.google.com/googlenest/answer/7030379?co=GENIE.Platform%3DAndroid&hl=en-GB; https://support.google.com/googlenest/answer/7181830?hl=en-GB&ref_topic=7030084; https://support.google.com/chromecast/answer/3228332?hl=en-GB&ref_topic=4602553&co=GENIE.Platform%3DDesktop&oco=1. Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
|  | Music apps, which show receipt of a request to launch the "Upstairs" "speaker pair": |
| based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to | Each Chromecast-enabled computing device comprises program instructions that, when executed by a Chromecast-enabled computing device's one or more processors, cause that Chromecast-enabled computing device to, based on the third request, cause the first Chromecast-enabled media player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of Chromecast-enabled media players such that the first Chromecast-enabled media player is configured to coordinate with at least the second Chromecast-enabled media player to output media in synchrony with output of media by at least the second Chromecast-enabled media player. |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|
| coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player. | For instance, each Chromecast-enabled computing device is programmed such that, based on a request to launch a first "speaker group" (which is the claimed "third request to invoke the first zone scene"), the Chromecast-enabled computing device is operable to cause the first Chromecast-enabled media player to transition from operating in a standalone mode to operating in accordance with the first "speaker group" such that the first Chromecast-enabled media player is configured to coordinate with at least the second Chromecast-enabled media player to output audio in synchrony with the output of audio by the second Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7174267?co=GENIE.Platform%3DAndroid&hl=en ("Group any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home.").  Examples of this functionality are illustrated by the following screenshots from a Chromecast-enabled computing device installed with at least the Google Home, Google Play Music, and YouTube Music apps, which show the "Upstairs" "speaker group" being launched such that the "Nest Mini" and "Hub Speaker" players are configured to coordinate with one another to play audio in synchrony:<br><br> |

| Claim: 1 | Chromecast-Enabled Computing Devices |
|---|---|



120.    On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing.  That draft identified the '966 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '966 Patent prior to Sonos filing the complaint in this action.

121.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '966 Patent.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '966 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* Exs. 22-23; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '966 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '966 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '966 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home app to customers while knowing that installation and/or use of this app will infringe one or more claims of the '966 Patent, and that Google's customers then directly infringe one or more claims of the '966 Patent by installing and/or using this app in accordance with Google's product literature.  *See*, e.g., *id.*

122.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct

infringement of the '966 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '966 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '966 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '966 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the Google Home app for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '966 Patent.  *See, e.g.*, Exs. 22-23.  This app is a material component of the devices that meet the one or more claims of the '966 Patent.  Further, Google especially made and/or adapted this app for installation and use on devices that meet the one or more claims of the '966 Patent, and this app is not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '966 Patent by installing and/or using the Google Home app on the customers' devices.

123.    Google's infringement of the '966 Patent is also willful because Google (a) had actual knowledge of the '966 Patent and actual knowledge of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '966 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

124.    Additional allegations regarding Google's pre-suit knowledge of the '966 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

125.    Sonos is in compliance with any applicable marking and/or notice provisions of 35 U.S.C. § 287 with respect to the '966 Patent.

126.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '966 Patent, including, without limitation, a reasonable royalty and lost profits.

127.    Google's infringement of the '966 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

128.    Google's infringement of the '966 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

129.    Google's infringement of the '966 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 9,219,460

130.    Sonos incorporates by reference and re-alleges paragraphs 1-79 of this Complaint as if fully set forth herein.

131.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

132.    As just one non-limiting example, set forth below is an exemplary infringement claim chart for claim 15 of the '460 Patent in connection with the Google Wireless Audio System. This claim chart is based on publicly available information.  Sonos reserves the right to modify this claim chart, including, for example, on the basis of information about the Google Wireless Audio System that it obtains during discovery.

| Claim: 15 | Chromecast-Enabled Media Players |
|---|---|
| A playback device, comprising: | At least each Google Home Max and Nest Audio player (referred to herein as a "Chromecast-enabled media player") comprises a "playback device," as recited in claim 15. |

| Claim: 15 | Chromecast-Enabled Media Players |
|---|---|
| a speaker; | Each of the foregoing Chromecast-enabled media players includes a speaker. *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a microphone that is physically coupled to the speaker; | Each of the foregoing Chromecast-enabled media players includes a microphone that is physically coupled to the speaker. *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a processor; | Each of the foregoing Chromecast-enabled media players includes a processor. *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a network interface; | Each of the foregoing Chromecast-enabled media players includes a network interface, such as a WiFi interface. *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| a data storage; and a program logic stored in the data storage and executable by the processor to: | Each of the foregoing Chromecast-enabled media players includes a data storage and executable program logic stored in the data storage that enable each Chromecast-enabled media player to perform the functions identified below. *See, e.g.,* https://support.google.com/googlenest/answer/7072284?hl=en; https://store.google.com/us/product/google_home_max_specs_speaker?hl=en-US. |
| emit a first audio signal from the speaker; | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to emit a first audio signal from the speaker. For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to emit a first audio signal from one of its speakers to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Once you set up Max, Room EQ measures the acoustics of your space."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |
| detect, via the microphone, a second audio signal, wherein at least a portion of | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to detect, via its microphone, a second audio signal, wherein at least a |

| Claim: 15 | Chromecast-Enabled Media Players |
|---|---|
| the second audio signal is a reflection of the first audio signal; | portion of the second audio signal is a reflection of the first audio signal.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to detect, via its microphone, a second audio signal, where at least a portion of the second audio signal is a reflection of the first audio signal that was emitted to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Once you set up Max, Room EQ measures the acoustics of your space. . . . Note: The microphone must be on for Room EQ to work."); https://www.youtube.com/watch?v=UiBhshQ0FQA (disclosing that the Google Home Max "uses six internal microphones to measure the acoustics of your room."). |
| in response to the detecting, determine a first reflection characteristic based on at least the second audio signal; | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to, in response to the detecting, determine a first reflection characteristic based on at least the second audio signal.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed such that, in response to detecting a second audio signal comprising a reflection of a first audio signal that was emitted to facilitate measuring the acoustics of a space surrounding the Chromecast-enabled media player, the Chromecast-enabled media player is configured to determine one or more reflection characteristics based on at least the detected second audio signal. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Walls in a room can amplify the bass, leading to a muddled sound in which the bass overpowers the vocals of your music. Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA. |
| adjust an equalization setting of the playback device based on at least the first reflection characteristic; and | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to adjust the equalization setting of the Chromecast-enabled media player based on at least the first reflection characteristic.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to adjust its equalization setting (e.g., a "bass" setting) based on one or more reflection characteristics. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en |

| Claim: 15 | Chromecast-Enabled Media Players |
|---|---|
| | ("Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |
| play, via the speaker, an audio track according to the equalization setting. | Each of the foregoing Chromecast-enabled media players comprises program logic that, when executed by the Chromecast-enabled media player's processor, causes that Chromecast-enabled media player to play, via its speaker, an audio track according to the equalization setting.<br><br>For instance, each of the foregoing Chromecast-enabled media players is programmed with the capability to play, via one of its speakers, audio according to the equalization setting (e.g., "bass" setting) that was adjusted as described above. *See, e.g.,* https://support.google.com/googlenest/answer/7585574?hl=en ("Room EQ automatically corrects for this excess bass. This leads to a more balanced sound."); https://www.youtube.com/watch?v=UiBhshQ0FQA ("With Smart Sound, Google Home Max uses machine learning to automatically adjust the equalizer settings to match the acoustics of your room."). |

133. On September 28, 2020, Sonos provided Google with a draft of this complaint prior to its filing. That draft identified the '460 Patent and described how Google's products infringed. Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '460 Patent prior to Sonos filing the complaint in this action.

134. Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '460 Patent. In particular, (a) Google had actual knowledge of the '460 Patent or was willfully blind to its existence prior to, and no later than, January 2018 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '460 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System

(including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement (*see* citations above in the exemplary infringement claim chart for claim 15 of the '460 Patent; *see also* Ex. 42), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '460 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '460 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home Max and Nest Audio to customers while knowing that use of these products will infringe one or more claims of the '460 Patent and that Google's customers then directly infringe one or more claims of the '460 Patent by using the Google Home Max and Nest Audio in accordance with Google's product literature.  *See, e.g.*, *id.*

135.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '460 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '460 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '460 Patent or was willfully blind to its existence prior to, and no later than, January 2018 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '460 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '460 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '460 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports software updates for the Google Home Max and Nest Audio that meet one or more claims of the '460 Patent.  *See, e.g.*, Ex. 43.  These software updates are material components of the Google Home Max and Nest

Audio that meet the one or more claims of the '460 Patent.  Further, Google especially made and/or adapted these software updates for installation and use on the Google Home Max and Nest Audio that meet the one or more claims of the '460 Patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use.  Google's customers then directly infringe the one or more claims of the '460 Patent by installing and using software updates on the Google Home Max and Nest Audio.

136.    Google's infringement of the '460 Patent is also willful because Google (a) had actual knowledge of the '460 Patent no later than January 2018 and actual notice of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '460 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

137.    Additional allegations regarding Google's pre-suit knowledge of the '460 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

138.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '460 Patent, including, without limitation, a reasonable royalty and lost profits.

139.    Google's infringement of the '460 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

140.    Google's infringement of the '460 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  Google's infringement of the '460 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Sonos respectfully requests:

A.     That Judgment be entered that Google has infringed at least one or more claims of the patents-in-suit, directly and/or indirectly, literally and/or under the doctrine of equivalents, and that such infringement is willful;

B.     An injunction enjoining Google, its officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Google, and its parents, subsidiaries, divisions, successors and assigns, from further infringement of the patents-in-suit.

C.     An award of damages sufficient to compensate Sonos for Google's infringement under 35 U.S.C. § 284, including an enhancement of damages on account of Google's willful infringement;

D.     That the case be found exceptional under 35 U.S.C. § 285 and that Sonos be awarded its reasonable attorneys' fees;

E.     Costs and expenses in this action;

F.     An award of prejudgment and post-judgment interest; and

G.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sonos respectfully demands a trial by jury on all issues triable by jury.

Respectfully submitted,

*/s/ Jeffrey L. Johnson*
Jeffrey L. Johnson
Texas Bar No. 24029638
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
609 Main Street, 40th Floor
Houston, TX 77002
Telephone:  713.658.6400
Facsimile:  713.658.6401
jj@orrick.com

Clement Seth Roberts (*pro hac vice* pending)
California Bar No. 209203
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
405 Howard St.
San Francisco, CA 94105
Telephone:  415.773.5484
Facsimile:  415.773.5759
croberts@orrick.com

Bas de Blank (*pro hac vice* pending)
California Bar No. 191487
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1000 Marsh Blvd.
Menlo Park, CA 94205
Telephone:  650.614.7343
Facsimile:  650.614.7401
bdeblank@orrick.com

Alyssa Caridis (*pro hac vice* pending)
California Bar No. 260103
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
777 South Figueroa St., Suite 3200
Los Angeles, CA 90017
Telephone:  213.612.2372
Facsimile:  213.612.2499
acaridis@orrick.com

George I. Lee (*pro hac vice* pending)
Illinois Bar No. 6225430
Sean M. Sullivan (*pro hac vice* pending)
Illinois Bar No. 6230605
Rory P. Shea (*pro hac vice* pending)
Illinois Bar No. 6290745
J. Dan. Smith (*pro hac vice* pending)
Illinois Bar No. 6300912
**LEE SULLIVAN SHEA & SMITH LLP**
656 W. Randolph St., Floor 5W
Chicago, IL 60661
Telephone:  312.754.9602
Facsimile:  312.754.9603
lee@ls3ip.com
sullivan@ls3ip.com
shea@ls3ip.com
smith@ls3ip.com

ATTORNEYS FOR PLAINTIFF SONOS, INC.

# Exhibit G

QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Cal. Bar No. 170151)
    David A. Perlson (Cal. Bar No. 209502)
    Michael D. Powell (Cal. Bar No. 202850)
    Derek J. Tang (Cal. Bar No. 4540514)
    Lindsay M. Cooper (Cal. Bar No. 287125)
    Felipe Corredor (Cal. Bar No. 295692)
    qe-eolas@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
(415) 875-6700 facsimile

Attorneys for Plaintiff Google Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE INC., | Case No. 3:15-cv-05446-JST |
|         Plaintiff, | **GOOGLE INC.'S OPPOSITION TO EOLAS TECHNOLOGIES INCORPORATED'S MOTION TO DISMISS** |
|     v. | |
| EOLAS TECHNOLOGIES INCORPORATED, | **Hearing:**<br>Date: April 21, 2016<br>Time: 2:00 PM<br>Place: Courtroom 9<br>Judge: Hon. Jon S. Tigar |
|         Defendant. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

**Page**

I.     EOLAS HAS EXTENSIVE CONTACTS WITH CALIFORNIA AND FEW
CONTACTS WITH TEXAS ........................................................................................ 2

    A.     Eolas Was Founded in California to Help Commercialize an Alleged
Invention Conceived at the University of California, San Francisco ..................... 2

    B.     Throughout Its Existence, Eolas Has Been Subject to Numerous Continuing
Obligations Imposed on It by Agreements with the Regents ................................. 3

    C.     Eolas Has Directed Numerous Patent Enforcement Activities into California ....... 5

    D.     Eolas Has Few Meaningful Contacts with Texas .................................................... 7

II.    GOOGLE'S HOME IS IN THE NORTHERN DISTRICT OF CALIFORNIA,
AND LIKELY WITNESSES IN THIS CASE ARE LOCATED HERE ........................... 8

III.   NUMEROUS THIRD PARTIES RELEVANT TO THIS CASE RESIDE IN THE
NORTHERN DISTRICT OF CALIFORNIA, WHILE NONE RESIDE IN THE
EASTERN DISTRICT OF TEXAS .................................................................................. 9

I.     THIS COURT HAS PERSONAL JURISDICTION OVER EOLAS .............................. 10

    A.     Legal Standard ...................................................................................................... 10

    B.     Eolas Has the Minimum Contacts with California Required for This Court's
Exercise of Specific Jurisdiction .......................................................................... 11

         1.     Eolas' Affiliation with the Regents Supports Personal Jurisdiction ......... 11

         2.     Eolas' Activities, Independent of Its Longstanding Relationship to
the Regents, Are Purposefully Directed Toward This Forum and
Further Support This Court's Exercise of Personal Jurisdiction ............... 16

         3.     Eolas Seeks to Elevate Irrelevant Differences Above Its Actual and
Substantial Contacts with the Regents, a California Resident .................. 17

    C.     The Exercise of Personal Jurisdiction Over Eolas Is Reasonable and Fair ........... 19

II.    THIS COURT SHOULD NOT DECLINE TO EXERCISE DECLARATORY
JUDGMENT JURISDICTION ........................................................................................ 20

    A.     Legal Standard ...................................................................................................... 20

    B.     The Threshold Requirements of the First-to-File Rule Are Not Satisfied ............ 21

    C.     The Forum-Shopping Exception to the First-to-File Rule Applies ....................... 21

CONCLUSION ................................................................................................................ 25

GOOGLE INC.'S OPPOSITION TO EOLAS TECHNOLOGIES INCORPORATED'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page**

## Cases

*Akro Corp. v. Luker*,
  45 F.3d 1541 (Fed. Cir. 1995) ..............................................................................13, 19

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
  946 F.2d 622 (9th Cir. 1991) ............................................................................................21

*Asarco, Inc. v. Glenara, Ltd.*,
  912 F.2d 784 (5th Cir. 1990) ............................................................................................14

*ASUSTeK Computer Inc. v. AFTG-TG LLC*,
  No. 5:CV11-0192, 2011 WL 6845791 (N.D. Cal. Dec. 29, 2011) ...............................10

*Avocent Huntsville Corp. v. Aten Int'l Co.*,
  552 F.3d 1324 (Fed. Cir. 2008) ..............................................................................11, 18, 19

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*,
  444 F.3d 1356 (Fed. Cir. 2006) ..............................................................................13, 19

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ...........................................................................................10, 13

*Calder v. Jones*,
  465 U.S. 783 (1984) ........................................................................................................18

*Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H.*,
  295 F.3d 59 (1st Cir. 2002) ..............................................................................................14

*Celguard, LLC v. SK Innovation Co.*,
  792 F.3d 1373 (Fed. Cir. 2015) .......................................................................................10

*Center for Biological Diversity v. McCarthy*,
  No. 14-cv-5138, 2015 WL 1535594 (N.D. Cal. Apr. 6, 2015) .....................................24

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ......................................................................................................10

*EMC Corp. v. Bright Response, LLC*,
  No. C-12-2841, 2012 WL 4097707 (N.D. Cal. Sept. 17, 2012) ..........................21, 25

*Elecs. for Imaging, Inc. v. Coyle*,
  340 F.3d 1344 (Fed. Cir. 2003) .......................................................................................11

*Elecs. for Imaging, Inc. v. Coyle*,
  394 F.3d 1341 (Fed. Cir. 2005) .......................................................................................20

*Eolas Techs. Inc. v. Microsoft Corp.* ("*Eolas v. Microsoft*"),
  399 F.3d 1325 (Fed. Cir. 2005) ...........................................................................5, 6, 9, 17

*Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*,
   907 F.2d 911 (9th Cir. 1990) ................................................................................................14

*In re Genentech, Inc.*,
   566 F.3d 1338 (Fed. Cir. 2009) ....................................................................................22, 23

*Google, Inc. v. Eolas Techs. Inc. ("Eolas II DJ")*,
   No. 13-cv-5997, 2014 WL 2916621 (N.D. Cal. June 24, 2014) ...................................... passim

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
   541 U.S. 567 (2004) ...........................................................................................................14

*In re Hoffman-La Roche*,
   587 F.3d 1333 (Fed. Cir. 2009) ........................................................................................24

*Inamed Corp. v. Kuzmak*,
   249 F.3d 1356 (Fed. Cir. 2001) ...................................................................................11, 19

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ...........................................................................................................10

*Jones v. GNC Franchising, Inc.*,
   211 F.3d 495 (9th Cir. 2000) ............................................................................................22

*Life360, Inc. v. Advanced Ground Information Sys., Inc.*,
   No. 15-cv-151, 2015 WL 5612008 (N.D. Cal. Sept. 21, 2015) ......................................14

*Lonza Inc. v. Rohm & Haas, Inc.*,
   951 F. Supp. 46 (S.D.N.Y. 1997) .....................................................................................21

*Lou v. Belzberg*,
   834 F.2d 730 (9th Cir. 1987) ............................................................................................24

*Merial Ltd. v. Cipla Ltd.*,
   681 F.3d 1283 (Fed. Cir. 2012) ........................................................................................20

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
   518 F.3d 897 (Fed. Cir. 2008) ..........................................................................20, 21, 22, 25

*In re Microsoft Corp.*,
   630 F.3d 1361 (Fed. Cir. 2011) ........................................................................................25

*Mollan v. Torrance*,
   9 U.S. (Wheat.) 537 (1824) ..............................................................................................14

*Radio Sys. Corp. v. Accession, Inc.*,
   638 F.3d 785 (Fed. Cir. 2011) ..........................................................................................16

*Recoton Corp. v. Allsop, Inc.*,
   999 F. Supp. 574 (S.D.N.Y. 1998) ...................................................................................21

*Silent Drive, Inc. v. Strong Indus., Inc.*,
   326 F.3d 1194 (Fed. Cir. 2003) ...................................................................................11, 13, 19

*Steel v. United States*,
   813 F.2d 1545 (9th Cir. 1987) ..................................................................................15

*In re Toyota Motor Corp.*,
   747 F.3d 1338 (Fed. Cir. 2014) ...............................................................................23

*Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*,
   395 F.3d 1275 (Fed. Cir. 2005) ...............................................................................10

*In re Verizon Bus. Network Servs. Inc.*,
   635 F.3d 559 (Fed. Cir. 2011) .................................................................................25

*Xilinx, Inc. v. Papst Licensing GMBH*,
   113 F. Supp. 3d 1027 (N.D. Cal. 2015) ...................................................................17

## <u>Statutes and Rules</u>

28 U.S.C. § 1400 ...........................................................................................................22

28 U.S.C. § 1404(a) .............................................................................2, 20, 21, 22, 23, 25

Cal. Civ. Proc. Code § 410.10 .......................................................................................10

Fed. R. Civ. P. 4(k)(1)(A) .............................................................................................10

Fed. R. Civ. P. 45(c)(1) .................................................................................................23

## <u>Other Authorities</u>

Restatement (Second) of Conflict of Laws § 188 ..........................................................16

GOOGLE INC.'S OPPOSITION TO EOLAS TECHNOLOGIES INCORPORATED'S MOTION TO DISMISS

## INTRODUCTION

Defendant Eolas Technologies Inc.'s motion to dismiss Plaintiff Google's complaint for declaratory judgment of non-infringement of U.S. Patent No. 9,195,507 ("the '507 patent") should be denied. Eolas fails to show that this Court does not have personal jurisdiction over Eolas and this Court should exercise its discretion to decline jurisdiction under the first-to-file rule.

Initially, Eolas fails to rebut Google's prima facie showing that Eolas has sufficient minimum contacts with California to justify personal jurisdiction. Rather, just as they did less than two years ago when this Court denied a similar motion to dismiss, the facts demonstrate the opposite. The '507 patent is the latest patent to issue from continuation applications claiming priority to U.S. Patent Application No. 08/324,443 ("the '443 application"). It concerns an alleged invention for providing interactive content embedded in web pages conceived at the University of California, San Francisco by three inventors, two of whom still reside in this district. Since being created in California in 1994, Eolas has maintained a relationship with the Regents of the University of California ("the Regents"), embodied in a longstanding exclusive license agreement covering patents deriving from the '443 application (collectively, "the '443 patent family"). This agreement was recently terminated in favor of a patent assignment agreement through which the Regents get 5% of Eolas' net revenues from licensing the '443 patent family. Eolas and the Regents then amended that patent assignment agreement one business day before filing the motion to dismiss. Eolas argues that this amendment avoids this Court's exercise of personal jurisdiction by changing some of the parties' duties. As a matter of law, however, the amendment is irrelevant because contacts are judged when the cause of action arose, here the day the case was filed. But even if considered, the amendment only further shows that Eolas' relationship with the Regents, which has lasted for over twenty years and has long subjected Eolas to significant continuing obligations to the Regents to further their joint enforcement of the '443 patent family, is ongoing. Eolas has also continued patent prosecution activities conducted by its patent counsel from California to facilitate its enforcement of the '443 patent family, including the '507 patent. In light of all these substantial contacts, Google's prima facie burden to show the existence of

1  minimum contacts is satisfied. Eolas also fails to carry its heavy burden to show that the exercise

2  of personal jurisdiction would not be reasonable and fair.

3       Alternatively, Eolas requests that the Court decline jurisdiction under the first-to-file rule

4  because its infringement action in the Eastern District of Texas accusing Google of infringing the

5  '507 patent (filed just after midnight the same day the '507 patent issued) was filed one day before

6  Google brought this declaratory judgment action. But, contrary to Eolas' suggestion in its motion,

7  the first-to-file rule is not mechanically applied and has many exceptions. The Court should, as it

8  is permitted to do in its discretion, keep this case and not decline jurisdiction based on the first-to-

9  file rule. Initially, the Eastern District case's status as the "first-filed" is questionable given that

10  the cases were filed only a day apart. But even if the Texas case was first-filed, the close

11  connection of this case to this district, compared to the absence of any meaningful connection to

12  the Eastern District of Texas, makes this case one in which application of the first-to-file rule is

13  unwarranted under the convenience factors of 28 U.S.C. § 1404(a).

14  **ISSUES TO BE DECIDED**

15       (1) Whether the threshold requirement that this Court have personal jurisdiction over Eolas

16  is satisfied; and

17       (2) If so, whether this Court should nevertheless decline to exercise that jurisdiction and

18  dismiss this action on the basis of the first-to-file rule.[1]

19  **SUMMARY OF RELEVANT FACTS**

20  **I.    EOLAS HAS EXTENSIVE CONTACTS WITH CALIFORNIA AND FEW CONTACTS WITH TEXAS**

21
22      **A.    Eolas Was Founded in California to Help Commercialize an Alleged Invention Conceived at the University of California, San Francisco**

23       Eolas began as a California company in 1994 to help commercialize an alleged invention

24  by Michael Doyle, David Martin, and Cheong Ang related to providing interactive content

25

26

---

27     [1] Eolas' statement of the issues posits whether the Court should "dismiss, stay, or transfer this

28  action" under the first-to-file rule (Dkt. 37, 1), but Eolas' motion focuses solely on dismissal and provides no argument or support for a transfer or stay.

embedded in web pages, as described in the '443 application.  (Exs. 1-2.[2])  The inventors allegedly conceived this invention while working at the University of California, San Francisco.  (Dkt. 37-3 ¶¶ 1-6.)  Thus, the '443 patent application was originally assigned to the Regents, the legal entity domiciled in Oakland, California in charge of the University of California system.  (Ex. 7.)  Two of three inventors, Martin and Ang, still reside in this district.  (Exs. 3-6.)  Even today, Eolas' patent enforcement activities, including the infringement action it brought against Google in the Eastern District of Texas, *Eolas Technologies Incorporated v. Google Inc.*, No. 6:15-cv-1039 (E.D. Tex.) ("the Texas action"), place the California invention story front and center.  (*See, e.g.*, Dkt. 37-3 ¶¶ 1-6.)

### B.  Throughout Its Existence, Eolas Has Been Subject to Numerous Continuing Obligations Imposed on It by Agreements with the Regents

In 1995, then California-based Eolas entered into an exclusive patent license agreement whereby the Regents granted an exclusive license to Eolas to the '443 application and "any reissues, extensions, substitutions, continuations, divisions and continuations-in-part" related to that application (*i.e.*, to the '443 patent family).  (Ex. 8, 6.)  The exclusive patent license agreement between Eolas and continuous California resident the Regents remained in force, as amended and restated over time, for over 20 years, until one month before Google's filing of this case.  (Dkt. 37-5; Ex. 8 (referred to as the "Exclusive License Agreement").)  The Exclusive License Agreement imposed many continuing obligations on Eolas, some of which survive the termination of that agreement.  (*Id.*, 16 (Articles 7, 11, 12, 13, 16, and 25 survive termination of the agreement).)  These obligations include:

- Payment of a "minimum annual royalty" to the Regents in "further consideration for all the rights and licenses granted" and quarterly payments of royalties from any sub-license Eolas obtains (*id.*, 11-13 (Article 4));

- Due diligence obligations, including obligations for Eolas to obtain net receipts and to maintain its license with the Regents, with the Regents retaining the right to terminate the license if Eolas does not sufficiently meet its obligations under the license agreement (*id.*, 14 (Article 5));

- Providing the Regents "with quarterly royalty reports" (*id.*, 14-15 (Article 6));

---

[2]  Exhibit citations refer to the exhibits attached to the concurrently filed declaration of Felipe Corredor in Support of Google's Opposition to Eolas' Motion to Dismiss.

- Keeping accurate books and records accounting for "all royalties that are due" and maintaining "sufficient supporting documentation to substantiate the accuracy" of the royalties due to the Regents, and making these books and records available for inspection by the Regents in order for the Regents to assess and determine Eolas' compliance with the license agreement (*id.*, 15 (Article 7));

- Diligent prosecution and maintenance of the '443 patent family at Eolas' own expense, selecting prosecution counsel only with the Regents' consent (*id.*, 18-19 (Article 12));

- Assuming the defense of the Regents, including all costs and expenses, in the event that "any action" by Eolas causes the Regents to be named as a defendant in a declaratory judgment action; keeping the Regents "reasonably apprised" of the status of any litigation involving the '443 patent family; payment of 24% of any monetary damages and 50% of any enhanced damages awarded for a finding of infringement of the '443 patent family; notifying the Regents of an intent to sue before filing any suit against any alleged infringer (*id.*, 21-22 (Article 15)); and

- Indemnification obligations (*id.*, 22-24 (Article 16)).

Additionally, the Exclusive License Agreement includes a choice-of-law provision selecting California law. (*Id.*, 26.)

On October 9, 2015, just over a month prior to the issuance of the '507 patent and this lawsuit, Eolas entered into a patent assignment agreement with the Regents (the "Patent Assignment Agreement") that assigned the '443 patent family to Eolas and terminated the Exclusive License Agreement. (Dkt. 37-5, 1, 3-4, 16-17.) Like the Exclusive License Agreement, however, the Patent Assignment Agreement imposed numerous continuing obligations on Eolas:

- Payment of the Regents' expenses incurred in collaborating with Eolas with respect to patent enforcement, patent prosecution, and perfecting the patent assignment (*id.*, 5-6 (Article 4));

- Paying the Regents a 5% ongoing royalty as the "purchase price" for the '443 patent family (*id.*, 6-7 (Article 5));

- Due diligence obligations, specifically including an obligation to "use reasonable efforts to enter into License Agreements" (*id.*, 7 (Article 6));

- Providing quarterly reports of amounts payable to the Regents (*id.*, 7 (Article 7); *see id.*, 6);

- The same bookkeeping and recordkeeping obligations as under Article 7 of the Exclusive License Agreement (*id.*, 7 (Article 8); *see* Ex. 8, 15);

- Many of the same Eolas obligations with respect to joint enforcement or defense of patent infringement actions as under Article 15 of the Exclusive License Agreement, including an obligation to pay the Regents' costs and expenses and to notify the Regents prior to filing any infringement action (Dkt. 37-5, 10-11 (Article 12); *see* Ex. 8, 21-22); and

- Some of the same indemnification obligations outlined in the Exclusive License Agreement (Dkt. 37-5, 11 (Article 13); *see* Ex. 8, 22-24).

Finally, like the Exclusive License Agreement, the Patent Assignment Agreement selects California law as the governing law. (Dkt. 37-5, 12.)

On February 5, 2016, one business day before Eolas filed the instant motion to dismiss, over two months after Google filed this action, Eolas and the Regents executed an amendment to the Patent Assignment Agreement, which purports to delete several provisions in the Patent Assignment Agreement, including the due diligence provisions in Article 6 and the reporting requirements in Article 7, as well as the choice-of-law provision. (Dkt. 37-6; *see* Dkt. 37-5, 7, 12.) It also amends Article 4 by rephrasing the cooperation and expense repayment obligation provisions from mandatory to conditional. (Dkt. 37-6; *see* Dkt. 37-5, 5-6.) The amendment did not affect the remaining obligations imposed under the Patent Assignment Agreement outlined above.

## C.   Eolas Has Directed Numerous Patent Enforcement Activities into California

As contemplated by the longstanding contractual relationship between Eolas and the Regents, Eolas has used the '443 patent family in a patent enforcement campaign, which began in the 1990s when it was still incorporated in California. These extensive enforcement efforts have included both threats of litigation as well as litigation against numerous California-based companies. All of these efforts stem from patents prosecuted by Eolas' California-based patent prosecution counsel, Charles E. Krueger. Mr. Krueger started prosecuting the '433 patent application (which became U.S. Patent No. 5,838,906 ("the '906 patent")) in 1996 (Ex. 9, 20) and prosecuted continuation applications thereto continuously through the issuance of the asserted '507 patent (Ex. 10).

In 1999, Eolas sued Microsoft Corp. in the Northern District of Illinois for infringement of the '906 patent. *Eolas Techs. Inc. v. Microsoft Corp.* ("*Eolas v. Microsoft*"), 399 F.3d 1325, 1328

1   (Fed. Cir. 2005). During the pendency of that case, Eolas availed itself of the benefit of this forum

2   by bringing, in this Court, a motion to compel discovery from a third-party prior artist resident in

3   this district, Pei-Yuan Wei. (Ex. 11.) Mr. Wei figured prominently at the 2003 trial in that case

4   and his live testimony formed the basis for the Federal Circuit's reversal of the district court's

5   judgment that the '906 patent was not invalid. *Eolas v. Microsoft*, 399 F.3d at 1328-29, 1332-35.

6           Beginning in 2009, Eolas shifted its litigation efforts to the Eastern District of Texas,

7   accusing multiple California-based companies of infringing patents in the '443 patent family,

8   including the '906 patent and related patents issued from continuation applications claiming

9   priority to the same '443 application as the '906 patent—U.S. Patent Nos. 7,599,985 ("the '985

10  patent"), 8,082,293 ("the '293 patent"), and 8,086,662 ("the '662 patent"). Companies sued for

11  infringement of the '443 patent family include California-based companies such as Google itself

12  and Adobe Systems Inc., Apple Inc., eBay Inc., Facebook Inc., Sun Microsystems Inc., The Walt

13  Disney Company, and Yahoo! Inc. (Dkt. 27 ¶ 11.) Many of these California companies settled

14  and entered into license agreements with Eolas, including Adobe Systems, Apple, eBay, and

15  Oracle/Sun Microsystems. (*Id.*)

16          Google and a few other defendants litigated the 2009 case, *Eolas Technologies Inc. v.*

17  *Google Inc. et al.* ("*Eolas I*"), No. 6:09-cv-446 (E.D. Tex.), through a 2012 trial to a final

18  judgment of invalidity of many of the claims of the '906 and '985 patents. (Ex. 12.) Eolas

19  received assistance from many California residents during that 2012 trial, especially from the two

20  '443 patent family inventors who still reside in this district, are shareholders in Eolas, and were

21  (and may still be) Eolas' consultants. (Ex. 13.) Eolas also received the benefit of testimony from

22  California resident William Tucker, an employee of the Regents who testified at the 2012 trial.

23  (Ex. 14.) Moreover, Eolas engaged a California-based damages expert, Roy Weinstein, who

24  would have testified had the trial proceeded to damages. (Exs. 15-16.)

25          In December 2013, Eolas accused Google of infringing the '293 and '662 patents in a letter

26  sent to Google in California. (Dkt. 37, 12.) In response, Google brought a declaratory judgment

27  action in this district. Eolas moved to dismiss that action for lack of personal jurisdiction. This

28  Court denied Eolas' motion, finding that Eolas was properly subject to the personal jurisdiction of

1  this Court.  *Google, Inc. v. Eolas Techs. Inc.* ("*Eolas II DJ*"), No. 13-cv-5997, 2014 WL 2916621

2  (N.D. Cal. June 24, 2014).  The Court reasoned that Eolas maintained minimum contacts with

3  California in the form of its "continuing obligations to the Regents under the licensing

4  agreement," the 2013 letter sent to Google in California, Eolas' selection of California law in its

5  agreement with the Regents, Eolas' creation and initial incorporation in California, and the length

6  of time Eolas had been subject to its agreement with the Regents.  *Id.* at *3.  The Court also found

7  that those contacts made "the exercise of specific jurisdiction reasonable and fair."  *Id.* at *4.

8  Eolas then affirmatively availed itself of the jurisdiction of this Court by asserting infringement

9  counterclaims in *Eolas II DJ*.  (Ex. 17.)

10        The latest chapter in Eolas' litigation campaign are the infringement allegations that gave

11  rise to this lawsuit.  Just after midnight on November 24, 2015, the same day the '507 patent

12  issued, Eolas brought the Texas action against Google.[3]  On November 25, 2015, Google brought

13  the instant action, its second declaratory judgment action against members of the '443 patent

14  family, seeking a declaratory judgment of non-infringement of the '507 patent.

15        **D.        Eolas Has Few Meaningful Contacts with Texas**

16        Eolas embraces Texas as its home, claiming that its "Texas roots are extensive, substantial

17  and long-lasting."  (Dkt. 37, 3.)  But Eolas' California roots, outlined above, tell a different story.

18  (Dkt. 37-3 ¶¶ 1-6.)  Eolas has been a Texas corporation only since 2009, a mere three months

19  before it sued over 20 companies for infringement of the '443 patent family in the Eastern District

20  of Texas.  (Dkt. 37-1 ¶ 3.)  Eolas' two officers, Chief Technology Officer (and inventor) Michael

21  Doyle and Chief Executive Officer and General Counsel Mark Swords, are longtime Illinois

22  residents.  (*Id.* ¶ 2.)  Mr. Swords only relocated to Tyler, Texas in November 2015.  Then, in

23  December 2015, Assistant General Counsel James Stetson, who had moved to Tyler just three

24  months prior to *Eolas I,* relocated out of Texas.  (*Id.*; Ex. 18 ¶¶ 2, 9.)  Neither Swords nor Stetson

25  testified at the 2012 trial in *Eolas I*.  (Corredor Decl. ¶ 4.)

26

27

28        [3]  In companion cases filed the same day, Eolas also sued Amazon.com, Inc. and Wal-Mart
     Stores, Inc. for infringement of the '507 patent.

Moreover, when asked in January 2016 whether "Eolas Technologies had an office in the building," an occupant of the house in which Eolas' Tyler office is located stated that "Jim Stetson leases an office here—but he doesn't come in very often by any stretch of the imagination."[4] (Ex. 19 ¶¶ 3-4.)

## II.    GOOGLE'S HOME IS IN THE NORTHERN DISTRICT OF CALIFORNIA, AND LIKELY WITNESSES IN THIS CASE ARE LOCATED HERE

Google's headquarters have been continuously located in this district since Google's founding in 1998. (Ex. 21 ¶ 7.) Google seeks a declaratory judgment that its "search results and suggestions" products, accused by Eolas of infringement in the Texas action, do not infringe the '507 patent. (Dkt. 27 ¶¶ 38, 40.) Google develops and operates Google Search predominantly at its headquarters in Mountain View, California. (Ex. 21 ¶ 10.) Key employees who work on Google's accused products work there, including key engineers involved in developing the accused features. (*Id.* ¶¶ 11-12.) These employees include: Searchbox team manager ███████ and product manager ███████; members of the Chrome UI team, including Senior Software Engineer ███████; and members of the Search UI Team, including Software Engineer ███████. (*Id.*) Most employees with knowledge of the accused products' marketing, including ███████, Group Product Marketing Manager for Search, also work in Mountain View. (*Id.* ¶ 13.) In contrast, Google has no offices in the Eastern District of Texas and is not aware of any employees with relevant knowledge working there or in Texas.[5] (*Id.* ¶¶ 15-16.)

Similarly, the vast majority of Google's documents and records related to its search suggestion and filtering products are hosted in secure servers managed from its Mountain View

---

[4]  In opposing transfer, Eolas argued that its office neighbor's response should be disregarded "because Stetson had moved to Wisconsin, and Swords now runs the office." (Ex. 20, 3.) But, as made clear in Google's declaration, the question asked of the occupant was simply whether "Eolas Technologies had an office in the building." (Dkt. 21-2 ¶ 4.) It was the occupant who equated Eolas with Mr. Stetson, without mentioning anyone else. It therefore stands to reason that Mr. Swords similarly didn't "come in [to Eolas' office] very often by any stretch of the imagination," during the period between November 2015 and January 2016.

[5]  In Eolas' opposition to Google's motion to transfer the Texas action to this district, Eolas contends its Eastern District complaint also implicates unspecified functionality in "Docs, Drive, Maps, Mail, and Ads." (Ex. 20, 5.) But none of these products are mentioned in the complaint. And, since Google has its headquarters in this district and has no facilities in the Eastern District, more witnesses will be here no matter what products are accused. (Ex. 21 ¶¶ 7, 16.)

1    offices.  (*Id.* ¶ 17.)  Further, given that most of the employees with relevant knowledge of the

2    accused Google search products are based in Mountain View, any hard copies of documents and

3    employee notebooks that might exist would likely be located there.  (*Id.*)

4    **III.    NUMEROUS THIRD PARTIES RELEVANT TO THIS CASE RESIDE IN THE**
     **NORTHERN DISTRICT OF CALIFORNIA, WHILE NONE RESIDE IN THE**

5    **EASTERN DISTRICT OF TEXAS**

6          Given the common specification and similarities between the different patents in the '443

7    patent family, including the '507 patent, the 2012 trial in *Eolas I* provides a good idea of third-

8    party prior artists likely to be relevant in this case, if Eolas counterclaims for infringement, as it

9    said it would do if its motion is denied (Dkt. 47, 3-4), and Google asserts a defense of invalidity as

10   it successfully did in the 2012 trial.  Several prior art web browsers were designed, developed, or

11   commercialized in this district and, accordingly, key sources of proof are likely located here.

12         For example, the ViolaWWW web browser was developed by Northern District resident

13   Pei-Yuan Wei in this district and was critical to the question of validity of related patents in the

14   prior trials in *Eolas I* and *Eolas v. Microsoft*.  *See, e.g.*, *Eolas v. Microsoft*, 399 F.3d at 1329,

15   1334-35.  Mr. Wei testified at both trials.  *Id.*  (*See also* Ex. 23.)  Mr. Wei demonstrated the

16   browser's capability of embedding interactive objects on multiple occasions in 1993, including to

17   two engineers from Sun Microsystems, Karl Jacob and James Kempf (*id.*, 13:24-14:6, 76:11-

18   77:14, 78:8-79:4, 102:21-103:15), and to Tim Berners-Lee and Dale Dougherty (who hired Wei to

19   work on ViolaWWW, *id.*, 72:6-13) and others at the July 1993 "World-Wide Web Wizards

20   Workshop" (Ex. 24.)  Mssrs. Jacob, Kempf, and Dougherty are all residents of this district.  (Exs.

21   25-30.)  Marc Andreessen, the co-developer of NCSA Mosaic, a key prior art web browser

22   discussed in the '507 patent (Exs. 10, 31), also attended the World-Wide Web Wizards Workshop

23   (Ex. 23, 82:5-25).  Mr. Andreessen resides in Palo Alto, California.  (Exs. 32-33.)  No Texas-

24   based prior artist testified at the 2012 trial in *Eolas I*.  (Corredor Decl. ¶ 4.)

25

26

27

28

Case No. 3:15-cv-05446-JST

GOOGLE INC.'S OPPOSITION TO EOLAS TECHNOLOGIES INCORPORATED'S MOTION TO DISMISS

# ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER EOLAS

### A.    Legal Standard

There are two requirements for a Court's exercise of personal jurisdiction: a statute must authorize that exercise and such an exercise must comport with due process. *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Federal Rule of Civil Procedure 4(k)(1)(A) instructs federal courts to follow the forum state's long-arm statute. In California, courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Civ. Proc. Code § 410.10. Accordingly, the personal jurisdiction analysis collapses into the due process inquiry.

Under the Due Process Clause, the "constitutional touchstone" for personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). There are two types of personal jurisdiction: general and specific. *Daimler*, 134 S. Ct. at 754. General jurisdiction requires "continuous and systematic" contacts that render the defendant essentially at home in the forum state. *Id.* Specific jurisdiction, however, "exists where the cause of action arises out of or relates to a defendant's contacts with the forum state, even if those contacts are isolated and sporadic." *ASUSTeK Computer Inc. v. AFTG-TG LLC*, No. 5:CV11-0192, 2011 WL 6845791, at *5 (N.D. Cal. Dec. 29, 2011) (citing *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005)). Federal Circuit law applies to a district court's determination of personal jurisdiction where a patent question exists. *Celguard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1377 (Fed. Cir. 2015). The Federal Circuit applies the following three-part test to determine if specific jurisdiction exists: "(1) whether the defendant purposefully directed its activities at residents of the forum state, (2) whether the claim arises out of or relates to the defendant's activities with the forum state, and (3) whether assertion of personal jurisdiction is reasonable and fair." *Id.* "The first two factors correspond with the 'minimum contacts' prong of *International Shoe*, and the

1 third factor corresponds with the 'fair play and substantial justice' prong of the analysis." *Id.* at

2 1378 (quoting *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001)).

3      District courts must construe all pleadings and affidavits "in the light most favorable to

4 [plaintiff]" and "must accept the uncontroverted allegations in the plaintiff's complaint as true and

5 resolve any factual conflicts in the affidavits in the plaintiff's favor." *Avocent Huntsville Corp. v.*

6 *Aten Int'l Co.*, 552 F.3d 1324, 1329 (Fed. Cir. 2008) (quoting *Silent Drive, Inc. v. Strong Indus.,*

7 *Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003); *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349

8 (Fed. Cir. 2003)).  While the plaintiff bears the burden of demonstrating the first two prongs (i.e.,

9 that minimum contacts exist), a plaintiff's burden with respect to the first two prongs is only a

10 prima facie burden.  *Avocent*, 552 F.3d at 1329.  The defendant then bears the burden of

11 disproving that the exercise of jurisdiction is reasonable and fair.  *See id.* at 1331.  This burden is a

12 heavy one.  *Inamed*, 249 F.3d at 1363-64.

     **B.**      **Eolas Has the Minimum Contacts with California Required for This Court's**
13            **Exercise of Specific Jurisdiction**
14
                      **1.**      **Eolas' Affiliation with the Regents Supports Personal Jurisdiction**
15
16      This litigation stems from Eolas' contacts with California dating back to 1994, when the

17 invention that led to the '507 patent was conceived in California, which ultimately led rise to the

   cause of action asserted by Google here.  Whether one considers the longstanding, but recently
18
   terminated Exclusive License Agreement, the newly minted Patent Assignment Agreement, or the
19
   post-filing amendment to the Patent Assignment Agreement, these contacts are more than
20
   sufficient to provide this Court with specific jurisdiction over Eolas.
21
                            (a)      Eolas' Contacts with the Regents in California Are Longstanding
22                                and Predate the Filing of This Action

23      This Court found, less than two years ago, that it could exercise personal jurisdiction over

24 Eolas consistent with constitutional due process.  *Eolas II DJ*, 2014 WL 2916621.  Though Eolas

25 now relies on a change in the nature of Eolas' agreement with the Regents to try and distinguish

26 this Court's prior reasoned opinion, in actuality, not much has changed since then.

27      Eolas is still the same company, a company with a long history of directing patent

28 enforcement activities toward California based on its longstanding contacts in California.  Eolas

1    was founded in California in 1994 and was incorporated here until 1999.  (Dkt. 37-1 ¶ 3.)  Since

2    then, it has relocated twice, reincorporating in its current form as a Texas corporation in 2009 (*id.*),

3    shortly before bringing suit against Google and other defendants in Texas.  (Dkt. 37-7).

4    Notwithstanding Eolas' alleged Texas ties, Eolas' own complaint in the co-pending infringement

5    case against Google in Texas places front and center Eolas and its founder Michael Doyle's roots

6    at the University of California, San Francisco.  (Dkt. 37-3 ¶¶ 1-6.)

7            At the center of Eolas' California-based story is the alleged invention that resulted in the

8    '443 patent family.  Since 1994, Eolas and the Regents, a California resident, have had a close

9    relationship centered around enforcement of the '443 patent family.  Indeed, Eolas' own website

10   acknowledges that Eolas was founded "[t]o assist the University of California in commercializing

11   the '906 patent" (the first of the '443 patent family).  (Ex. 2.)  In 1995, shortly after the alleged

12   invention, Eolas and the Regents negotiated and entered into an exclusive license agreement,

13   which remained in effect in amended and restated form until just one month prior to the filing of

14   this lawsuit.  (Ex. 8.)  The agreement covered the '443 patent family.  (*Id.*, 3.)  Both Eolas and the

15   Regents benefitted from the partnership embodied by the Exclusive License Agreement.  For

16   twenty years, Eolas maintained its license with the Regents, complying with numerous obligations

17   and sharing licensing revenues with the Regents.  Extending and reinforcing Eolas' longstanding

18   affiliation with the Regents in California, Eolas also purposefully chose to enter into the Patent

19   Assignment Agreement (which terminated the Exclusive License Agreement) just one month

20   before the filing of this lawsuit.  (Dkt. 37-5.)

21           Eolas' affiliation with the Regents, as embodied in these agreements, reflects the minimum

22   contacts this Court previously found Eolas had with California.  *Eolas II DJ*, 2014 WL 2916621,

23   at *2-4.  First, as described above in Summary of Relevant Facts Section I.B, the Exclusive

24   License Agreement created numerous obligations between Eolas and the Regents, and thus,

25   contacts with this forum, including: joint prosecution and defense of patent-related actions;

26   indemnification of the Regents; regular recordkeeping, bookkeeping, accounting, and reporting to

27   the Regents for patent-related activities; the payment of patent royalties to the Regents; and a duty

28   of due diligence in all patent-related activities.  *Eolas II DJ*, 2014 WL 2916621, at *2-3 (citing

1  *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356 (Fed. Cir. 2006); *Silent Drive,*

2  *Inc. v. Strong Indus., Inc.*, 326 F.3d 1194 (Fed. Cir. 2003); *Akro Corp. v. Luker*, 45 F.3d 1541

3  (Fed. Cir. 1995)).  (*See* Ex. 8, 8, 11-15, 18-19, 21-24.)  Second, the agreement specified California

4  law in its choice-of-law provision, further cementing Eolas' 20-year-long affiliation with a

5  California resident (the Regents), and thus creating a reasonable possibility of litigation arising out

6  of the patent enforcement activities, including activities purposefully directed at California

7  companies, at the center of that affiliation.  *Id.* at *3 (citing *Burger King*, 471 U.S. at 481-82).

8  (*See* Ex. 8, 26.)  Third, Eolas was created and incorporated in California for five years.  *Eolas II*

9  *DJ*, 2014 WL 2916621, at *3.  Fourth, Eolas entered into the Exclusive License Agreement with

10  the Regents in California.  *Id.* Fifth, Eolas engaged in patent-related activities in California before

11  relocating to Texas.  *Id.* Sixth, Eolas and the Regents have been subject to the Exclusive License

12  Agreement for a long period of time—over 20 years.  *Id.*

13  Though not all of these findings squarely apply to the Patent Assignment Agreement, they

14  are still relevant, as the '507 patent and the '443 patent family were largely prosecuted while the

15  Exclusive License Agreement was still in effect.  Without those efforts, the patent could not have

16  issued.  Also, several of the provisions of the Exclusive License Agreement survive termination of

17  that agreement (Ex. 8, 16), including provisions crucial to this Court's prior holding that Eolas

18  maintains sufficient contacts with California, *Eolas II DJ*, 2014 WL 2916621, at *3.  This includes

19  Article 7, imposing an obligation on Eolas to keep accurate books and records for royalties due to

20  the Regents (*id.*, 15), Article 12, imposing patent prosecution and maintenance obligations on

21  Eolas (*id.*, 18-19), and Article 16, imposing indemnification obligations on Eolas (*id.*, 22-24).

22  In addition, the Patent Assignment Agreement contains, in nearly identical form, several of

23  the provisions previously relied on by this Court to find personal jurisdiction.  *See Eolas II DJ*,

24  2014 WL 2916621, at *3.  Obligations related to payment of ongoing royalties subsist, as the

25  "purchase price" for the '443 patent family is an ongoing royalty of 5% of net revenues earned by

26  Eolas from the '443 patent family.  (Dkt. 37-5, 6.)  Due diligence obligations also subsist.  (*Id.*, 7.)

27  Eolas is also still required to provide reports to the Regents on a quarterly basis.  (*Id.*)  The

28  agreement restates and reimposes obligations related to the joint defense or assertion of patent-

1   related actions. (*Id.*, 10-11; *see also id.*, 5 (requiring cooperation between Eolas and the Regents

2   with respect to, among others, document discovery–related activities, to be paid for by Eolas).)

3   Finally, the agreement selects California law as the governing law. (*Id.*, 12.)

4        In brief, the Patent Assignment Agreement reflects essentially the same substantive

5   contacts with California on which the Court previously relied to determine that personal

6   jurisdiction over Eolas exists. *Eolas II DJ*, 2014 WL 2916621, at *2-4. Accordingly, the Court's

7   inquiry could end here: for the same reasons as in the prior case, the minimum contacts analysis is

8   satisfied.

9        (b)   The Post-Filing Amendment to the Patent Assignment Agreement
          Shows Eolas and the Regents' Relationship Is Ongoing

10

11        One business day before the filing of its motion to dismiss, Eolas executed a first

12   amendment to its Patent Assignment Agreement with the Regents. (Dkt. 37-6.) This apparent

     effort to avoid this Court's exercise of personal jurisdiction fails.

13        As a matter of law, the amendment has no effect on the minimum contacts analysis. It is

14   widely accepted by federal courts that, "for purposes of specific jurisdiction, contacts should be

15   judged when the cause of action arose, regardless of a later lessening or withdrawal." *Cambridge*

16   *Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H.*, 295 F.3d 59, 66 (1st Cir. 2002); *see*

17   *also, e.g.*, *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir.

18   1990) ("Only contacts occurring prior to the event causing litigation may be considered.");

19   *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 n.1 (5th Cir. 1990) (holding, with respect to

20   specific jurisdiction, that "the relevant time for determining jurisdiction is the filing of the

21   complaint"); *cf. Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004) ("It has

22   long been the case that 'the jurisdiction of the court depends upon the state of things at the time of

23   the action brought.' This time-of-filing rule is hornbook law (quite literally) taught to first-year

24   law students in any basic course on federal civil procedure." (quoting *Mollan v. Torrance*, 9 U.S.

25   (Wheat.) 537, 539 (1824))). Indeed, because a Court's jurisdiction is its power to hear a case filed

26   against a defendant, a jurisdictional analysis cannot take account of facts arising after the filing of

27   the case-initiating complaint. *Life360, Inc. v. Advanced Ground Information Sys., Inc.*, No. 15-cv-

28

151, 2015 WL 5612008, at *4 n.8 (N.D. Cal. Sept. 21, 2015) ("[T]he Court must disregard evidence relating to HoundDog for purposes of the personal jurisdiction analysis because HoundDog was released after the events giving rise to this action and after the filing of the original complaint and operative FAC. '[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction.'" (quoting *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987)))  Under this well-established case law, the purported amendment to Eolas' Patent Assignment Agreement with the Regents is irrelevant and need not be considered.

Even considering the belated amendment to the Patent Assignment Agreement, it further supports personal jurisdiction as it demonstrates the ongoing relationship with the Regents.  First, it shows that Eolas and the Regents continue to negotiate new agreements related to the enforcement of the patent at issue.  Eolas also still has significant obligations to California resident the Regents under the amendments, and thereby maintains contacts with California sufficient to support this Court's exercise of personal jurisdiction.  The prosecution and maintenance obligations outlined in the longstanding Exclusive License Agreement survived the termination of that agreement and are unaffected by the amendment to the Patent Assignment Agreement.  (Ex. 8, 16, 18-19.)  The "Books and Records" provision is also unaffected by the amendment and imposes obligations on Eolas to "keep books and records accurately showing all amounts that are due to The Regents," among others.  (Dkt. 37-5, 7; *see* Dkt. 37-6.)  And the indemnification obligations imposed on Eolas in the original Patent Assignment Agreement also remain in full force, unaffected by the amendment.  (Dkt. 37-5, 11; *see* Dkt. 37-6.)  The royalty payment obligations remain untouched as well.  (Dkt. 37-5, 6; *see*  Dkt. 37-6.)  Further, despite the amendment of the document discovery–related paragraph 4.1 to make its language conditional instead of mandatory, Eolas remains subject to significant joint defense and enforcement obligations with respect to the '443 patent family, including paying for the Regents' counsel in litigation-related activities.  (Dkt. 37-5, 5, 10-11; *see* Dkt. 37-6.)  Finally, though the amendment purports to strike the choice-of-law provision selecting California law, given the Regents' undisputed residence in California and Eolas' ample contacts with California (Dkt. 37-5, 12, *see* Dkt. 37-6), it is likely that California law

is the default for the resolution of any contractual disputes between Eolas and the Regents, *see, e.g.*, Restatement (Second) of Conflict of Laws § 188.

### 2. Eolas' Activities, Independent of Its Longstanding Relationship to the Regents, Are Purposefully Directed Toward This Forum and Further Support This Court's Exercise of Personal Jurisdiction

Even beyond Eolas' extensive contacts with the Regents, Eolas has purposefully directed additional activities at this forum over the past several years. Eolas was founded and incorporated in California to "license the patents to companies who were making money" using its alleged invention. (Ex. 34, 38:17-21.) Further, Eolas' lawsuits have been directed against numerous California-based companies, several of whom have taken licenses to the '443 patent family. (Dkt. 27 ¶ 11.) These enforcement activities all benefit California resident the Regents through Eolas' agreements with the Regents. (Ex. 8, 11-13; Dkt. 37-5, 6.)

Additionally, Eolas uses Charles E. Krueger, a California attorney (Ex. 35), to prosecute the '443 patent family. Mr. Krueger has been involved in prosecuting patents on behalf of Eolas for nearly 20 years. (Exs. 9-10.) Mr. Krueger's prosecution activities on behalf of Eolas in California accordingly further Eolas' patent enforcement objectives in this forum, a contact from which this litigation directly arises.

Moreover, the two inventors who remain California residents to this day, Mr. Martin and Mr. Ang, previously assisted Eolas in its patent litigations as consultants, and they maintain a connection to Eolas as shareholders (and potentially still as consultants) with a financial interest in Eolas' enforcement of its patent rights. (Ex. 13.) Indeed, they both recently submitted declarations in support of Eolas' current opposition to Google's motion to transfer the Texas action. (*See* Ex. 20, 11.) Eolas also engaged the services of California resident Roy Weinstein as its damages expert in *Eolas I*. (Exs. 15-16.) The Federal Circuit has upheld personal jurisdiction over patentees who "retained agents in the forum state to assist in the enforcement of its patent rights." *Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 791 (Fed. Cir. 2011).

Eolas has also availed itself of this Court as a forum for litigation. In both Google's and J.C. Penney's prior declaratory judgment cases against patents in the '443 patent family, Eolas purposefully availed itself of the jurisdiction of this Court by asserting counterclaims against

1    Google and J.C. Penney.  (Exs. 17, 36.)  Eolas also availed itself of this Court by seeking judicial

2    relief to enforce a subpoena to prior artist Pei-Yuan Wei in *Eolas v. Microsoft*.  (Ex. 11.)

3          In its motion, Eolas tries to leave the impression that the '507 patent is unrelated to Eolas'

4    extensive prior enforcement efforts.  As detailed above, that is incorrect.  (Dkt. 37-3 ¶¶ 1-6.)

5    Indeed, in opposing Google's motion to transfer the Texas action, Eolas emphasized the '507

6    patent's relationship with earlier members of the '443 patent family asserted against Google.  (Ex.

7    20, 3-4.)  This relationship between the '507 patent and other members of the '443 patent family

8    reinforces this case's connection to Eolas' "patent-related activities in California before relocating

9    to Texas."  *Eolas II DJ*, 2014 WL 2916621, at *3.  This also distinguishes Eolas' cited case of

10   *Xilinx, Inc. v. Papst Licensing GMBH*, 113 F. Supp. 3d 1027 (N.D. Cal. 2015).  In *Xilinx*, the

11   defendant's prior enforcement activities involved <u>un</u>related patents.  *Id.* at 1044-45.  Here, as

12   shown by Eolas' own complaint and the face of the '507 patent, the "relevant patents" that Eolas

13   has a long history of enforcing in California are the patents in the '443 patent family—not just the

14   '507 patent.  Eolas' direct and longstanding relationship with the Regents further distinguishes

15   *Xilinx*, where patentee Papst never actually entered into any agreement with any California

16   resident.  Rather, it purchased the patents from FTE, a Texas entity who had purchased the patents

17   from the original patent assignee Rambus.  *Id.* at 1032.  Nor did Papst ever agree to a California

18   choice-of-law provision, opting instead for Texas law.  *Id.* at 1042-43.  In addition, in *Xilinx*, there

19   was no evidence that Papst had previously enforced the patents-in-suit or any related patents

20   against California entities, as Eolas has done multiple times with the '443 patent family, including

21   against Google.

22                    **3.    Eolas Seeks to Elevate Irrelevant Differences Above Its Actual and
                             Substantial Contacts with the Regents, a California Resident**

23

24          For the reasons discussed above, Eolas maintains minimum contacts with California

25   sufficient to justify this Court's exercise of personal jurisdiction.  Nowhere does Eolas' motion

26   demonstrate a lack of such minimum contacts, instead attempting to chip away at the extensive

27   contacts previously relied on by this Court and those outlined in Google's complaint.  (Dkt. 37,

28

1   10-17.)  But none of Eolas' arguments detract from the existence of <u>minimum</u> contacts with

2   California—contacts from which this action arose.

3          Eolas provides a table that purports to illustrate differences between this case and the prior

4   declaratory judgment action but highlights only <u>irrelevant</u> differences.  (Dkt. 37, 10-11.)  For

5   example, Eolas highlights the absence of the Regents as a defendant notwithstanding the fact that

6   "[e]ach defendant's contacts with the forum State must be assessed individually."  *Avocent*, 552

7   F.3d at 1329 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)).  Thus, as Eolas has previously

8   argued, the presence or absence of the Regents as a separate defendant is irrelevant to the analysis

9   of whether this Court has personal jurisdiction over Eolas.  (Ex. 37, 9.)  And, though it is true that

10  the patent at issue in this case (the '507 patent) is different than the patents at issue in *Eolas II DJ*

11  (the '293 and '662 patents), the Exclusive License Agreement and Patent Assignment Agreement

12  make no distinction between sister patents in the '443 patent family: all patents deriving from the

13  '443 patent application are treated the same.  (Ex. 8 ¶ 1.10; Dkt. 37-5 ¶ 1.8.)

14         Eolas also focuses on the fact that Eolas—and not the Regents—now owns the '443 patent

15  family and on the formal distinction between the Patent Assignment Agreement and the prior

16  Exclusive License Agreement between Eolas and the Regents.  This focus is misplaced.  The

17  relevance of the Exclusive License Agreement was in its creation of "continuing obligations"

18  between the parties to the agreement, not in which party owned and which party licensed the '443

19  patent family.  *Eolas II DJ*, 2014 WL 2916621, at *2.  Many of those continuing obligations still

20  exist under the current Patent Assignment Agreement.  Moreover, Eolas' attempts to characterize

21  the Regents as a mere non-exclusive licensee, as if the Regents were in the same position as

22  Adobe Systems or any of the other numerous licensees to the '443 patent family, are

23  unconvincing.  It is usually the licensee who pays the licensor under a license agreement; yet,

24  under Eolas' agreement with the Regents, it is the licensor Eolas who pays its "non-exclusive

25  licensee" the Regents.  The Regents are much more than just Eolas' non-exclusive licensee.  Eolas

26  also selects and distinguishes cases that focused on exclusive license agreements between a

27  defendant and a forum resident, ignoring the fact that, unlike here, the exclusive license was the

28

1    only agreement at issue in those cases.  (Dkt 37, 11 (citing *Breckenridge*, 444 F.3d; *Akro*, 45 F.3d

2    1541).)

3           Eolas also conspicuously fails to address cases this Court previously relied on in finding

4    that Eolas had sufficient minimum contacts with California.  *Eolas II DJ*, 2014 WL 2916621, at

5    *2.  For example, *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194 (Fed. Cir. 2003),

6    makes clear that contacts sufficient to justify an exercise of personal jurisdiction include <u>any</u>

7    "'other activities' directed at the forum and related to the cause of action."  *Id.* at 1202; *Avocent*,

8    552 F.3d at 1334 ("Examples of these 'other activities' include . . . entering into an exclusive

9    license agreement <u>or other undertaking which imposes enforcement obligations with a party</u>

10   <u>residing or regularly doing business in the forum</u>." (emphasis added)).  The Patent Assignment

11   Agreement, though different in nature from the Exclusive License Agreement previously relied on

12   by this Court to find personal jurisdiction, is precisely such an activity directed at California—an

13   "undertaking which imposes enforcement obligations with a party residing or regularly doing

14   business in the forum."  *Id.*

15          Finally, the 2013 letter, though focused on other members of the '443 patent family,

16   remains one of Eolas' many relevant contacts with California.  In any event, this Court has already

17   found that this letter is "not dispositive."  *Eolas II DJ*, 2014 WL 2916621, at *3 n.2.  No such

18   letter had been directed to California with respect to J.C. Penney, the other declaratory judgment

19   plaintiff in the prior litigation, but the Court nevertheless found sufficient contacts to justify

20   exercise of personal jurisdiction with respect to J.C. Penney's lawsuit.  *Id.*

21          **C.**      <u>**The Exercise of Personal Jurisdiction Over Eolas Is Reasonable and Fair**</u>

22          The last prong of personal jurisdiction asks "whether assertion of personal jurisdiction is

23   'reasonable and fair.'"  *E.g.*, *Inamed*, 249 F.3d at 1360.  Eolas devotes its discussion of personal

24   jurisdiction in its motion to explaining how general jurisdiction is lacking and how "Eolas' limited

25   contacts with California are insufficient to confer specific jurisdiction in this case."  (Dkt. 37, 6-

26   17.)  By failing to carry its heavy burden, Eolas appears to concede that, if this Court concludes

27   that Eolas has the requisite minimum contacts with California (as it did less than two years ago),

28   the Court's exercise of personal jurisdiction over Eolas would be "reasonable and fair."  *Inamed*,

1    249 F.3d at 1363 ("Where a defendant who purposefully has directed his activities at forum

2    residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some

3    other considerations would render jurisdiction unreasonable.").

4           In light of the ample contacts Eolas has with California, as described above and as

5    discussed in the Court's prior opinion on the issue, it is "reasonable and fair" for this Court to

6    exercise personal jurisdiction over Eolas.  *Eolas II DJ*, 2014 WL 2916621, at *4.  Eolas'

7    longstanding relationship with and significant obligations to the Regents (a California resident), its

8    patent commercialization, licensing, and enforcement efforts purposefully directed at California,

9    its prosecution activities conducted from California, the centrality of its California invention story

10   to its infringement allegations, and its continuing relationship with two inventors who are still

11   California residents all make the exercise of specific personal jurisdiction reasonable and fair.

12   Eolas' failure to carry this heavy burden by failing to present any argument with respect to this

13   prong of the jurisdictional analysis means that the exercise of personal jurisdiction turns only on

14   the minimum contacts analysis.

15   **II.    THIS COURT SHOULD NOT DECLINE TO EXERCISE DECLARATORY
16            JUDGMENT JURISDICTION**

17       **A.    Legal Standard**

18          Eolas' motion assumes that dismissal of this case is automatic once the threshold

19   requirements of the first-to-file rule—the chronology of the two actions, the similarity of the

20   parties, and the similarity of the issues—are satisfied.  But that is incorrect.  The Federal Circuit,

21   whose law applies to the application of this doctrine, has repeatedly stated that "there are

22   exceptions and the rule is not rigidly or mechanically applied."  *Merial Ltd. v. Cipla Ltd.*, 681 F.3d

23   1283, 1299 (Fed. Cir. 2012); *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345-47 (Fed. Cir.

24   2005).  Indeed, "[t]he trial courts have discretion to make exceptions to this general [first-to-file]

25   rule in the interest of justice or expediency, as in any issue of choice of forum."  *Micron Tech.,

26   Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008).  Such "exceptions are not rare"

27   and are guided by the convenience factors under 28 U.S.C. § 1404(a).  *Id.*  "[R]obust consideration

28   of these factors will reduce the incentives for a race to the courthouse because both parties will

1   realize that the case will be heard or transferred to the most convenient or suitable forum." *Id.* at

2   905. Accordingly, "circumstances under which an exception to the first-to-file rule typically will

3   be made include . . . forum shopping." *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628

4   (9th Cir. 1991).

5   **B.   The Threshold Requirements of the First-to-File Rule Are Not Satisfied**

6   Though the parties and the issues are similar here and in the Texas action, courts may

7   decline "to apply the [first-to-file] rule where the time between the actions is relatively short,"

8   such as one or two days. *EMC Corp. v. Bright Response, LLC*, No. C-12-2841, 2012 WL

9   4097707, at *2 & n.1 (N.D. Cal. Sept. 17, 2012); *see also, e.g.*, *Recoton Corp. v. Allsop, Inc.*, 999

10  F. Supp. 574, 576-77 (S.D.N.Y. 1998) (declining to apply first-to-file rule in light of "the minimal

11  difference in time between the filing of the two actions [two days]," holding that "[t]he importance

12  of the earlier date of filing is diminished where, as here, the competing actions are filed within a

13  short period of time of each other"). This case was filed on November 25, 2016—a single day

14  after Eolas initiated the Texas action by filing its complaint soon after midnight the day the '507

15  patent issued. This fact distinguishes this case from, for example, *EMC*, where 27 days separated

16  the infringement action from the declaratory judgment action and the first-to-file rule therefore

17  applied. 2012 WL 4097707, at *2. It also reinforces that Eolas' filing of its complaint in the

18  Texas action is the type of disfavored race to the courthouse that should not be accepted. *Lonza*

19  *Inc. v. Rohm & Haas, Inc.*, 951 F. Supp. 46, 50 (S.D.N.Y. 1997) (dismissing the first-filed suit in

20  favor of a suit filed shortly thereafter in a more convenient forum based in part on "the unseemly

21  race to the court house").

22  **C.   The Forum-Shopping Exception to the First-to-File Rule Applies**

23  Even if the threshold requirements to the first-to-file were satisfied, the Court should

24  exercise discretion, considering the convenience factors derived from § 1404(a), to retain this case

25  under the forum-shopping exception. The convenience factors are: (1) the location where the

26  relevant agreements were negotiated and executed, (2) the state that is most familiar with the

27  governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the

28  forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the

1    differences in the costs of litigation in the two forums, (7) the availability of compulsory process

2    to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of

3    proof. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).[6]  An application of

4    these factors, which weigh heavily in favor of keeping this case in this Court, reveals that this is a

5    case in which declining to apply the first-to-file rule is justified, in order to reduce the incentives

6    for a race to the courthouse. *E.g.*, *Micron*, 518 F.3d at 905.

7          As is true in most patent infringement cases, the majority of the sources of proof in this

8    case will come from the defendant, Google.  *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir.

9    2009).  The fact that Google is headquartered in this district and conducts numerous activities

10   relevant to this litigation out of its headquarters here shows the convenience of keeping this case in

11   this Court at least under factors 4 (the parties' contacts with the forum), 5 (the contacts relating to

12   Google's cause of action in this district), 6 (the differences in the costs of litigation in the two

13   forums), and 8 (the ease of access to sources of proof).  Google develops and maintains its accused

14   search services in large part at its headquarters in the Northern District, and Google employee

15   witnesses (including ███████████████████) with knowledge of technical aspects of

16   Google's search products predominantly work and reside in the Northern District.  (Ex. 21 ¶¶ 11-

17   12.)  Similarly, Google employee witnesses with knowledge of marketing concerning these

18   services (including █████) are also primarily based in the Northern District.  (*Id.* ¶ 13.)  By

19   contrast, Google is aware of no employee having potentially relevant knowledge in Texas.  (*Id.*

20   ¶ 15.)  And Google has no facilities in the Eastern District.  (*Id.* ¶ 16.)  A trial in this district would

21   be far more convenient for Google's witnesses, who would face a real and avoidable burden

22   should they be required to travel away from this district for a trial in the Texas action.

23          Eolas may argue, as it did in opposing transfer in the Texas action (Ex. 20, 4-6, 8), that

24   Google has left out information about where *all* potential witnesses and documents are located.

25   However, binding Federal Circuit precedent holds that the presence of witnesses and evidence

26   _____

27        [6]  Google's motion to transfer the Texas action to this district, filed on February 9, 2016 in the
     Eastern District of Texas, provides a more detailed analysis of the § 1404(a) factors.  (Ex. 39.)
     Google further contends that, under the proper interpretation of 28 U.S.C. § 1400 as outlined in

28   the mandamus petition in *In re TC Heartland, LLC*, No. 16-105 (Fed. Cir.), scheduled for oral
     argument next week, venue in the Eastern District of Texas is improper.

outside the two competing forums does not factor into the analysis under § 1404(a). *In re Toyota Motor Corp.*, 747 F.3d 1338, 1340 (Fed. Cir. 2014). Moreover, Google did establish that the majority of potentially relevant employees are located in this district. (Ex. 39, 3.)

Further, the presence of numerous likely third-party witnesses in this district and none in Texas results in at least factors 6 (the differences in the costs of litigation in the two forums), 7 (the availability of compulsory process to compel attendance of third-party witnesses), and 8 (the ease of access to sources of proof) weighing heavily in favor of keeping this case here. *Genentech*, 566 F.3d at 1343 ("The convenience of the witnesses is probably the single most important factor in transfer analysis."); *id.* at 1345 ("The fact that the transferee venue is a venue with usable subpoena power . . . weighs in favor of transfer, and not only slightly."). Numerous witnesses reside in this district: two of three named inventors, the prosecuting attorney for the '507 patent and the '443 patent family, and employees of the Regents with relevant knowledge of the '507 patent, the '443 patent family, and the agreements related thereto. *Supra*, Summary of Relevant Facts § I. Numerous prior artists such as Wei (whose knowledge was so important that Eolas previously moved to compel him to respond to discovery requests (Ex. 11)), Dougherty, Jacob, Kempf, and Andreessen also reside in the Northern District. *Id.* § III. By contrast, Google is not aware of any non-party witness who resides or works in the Eastern District of Texas. Whether third-party witnesses end up being willing or unwilling witnesses, it will be more convenient and less costly for the witnesses and for the parties to litigate any alleged infringement of the '507 patent in this Court: If the witnesses are willing, it is more convenient for them to attend trial here, as there is no need for significant travel away from home. If the witnesses are unwilling, only this Court may compel them to attend a trial. Fed. R. Civ. P. 45(c)(1).

As with Google's witnesses, Eolas may point to prior artists outside both forums as it did in its opposition to Google's motion to transfer the Texas action. But that is an irrelevant fact as a matter of law. *Toyota*, 747 F.3d at 1340. And notably, Eolas has not identified any prior art witnesses in the Eastern District.

Additionally, because the invention was allegedly conceived here and Eolas' allegations call into question the work and reputation of engineers responsible for work related to these

1    products as well as Google's own reputation, this district's interest in this case (factor 4) is

2    significant.  *In re Hoffman-La Roche*, 587 F.3d 1333, 1336 (Fed. Cir. 2009) (holding that "local

3    interest in this case remains strong because the cause of action calls into question the work and

4    reputation of several individuals residing in or near th[e] district and who presumably conduct

5    business in that community").  In light of Google's significant connections to its home district, its

6    choice of bringing this declaratory judgment action in this district—i.e., factor 3—should also

7    weigh heavily in favor of keeping the case in this district.  *E.g.*, *Center for Biological Diversity v.*

8    *McCarthy*, No. 14-cv-5138, 2015 WL 1535594, at *3 (N.D. Cal. Apr. 6, 2015) ("Ordinarily, a

9    plaintiff's choice of forum receives substantial deference, especially when the forum is within the

10   plaintiff's home district or state." (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987))).

11        Moreover, factors 1 (location of the relevant agreements) and 4 (the parties' contacts with

12   the forum) also favor this Court's exercise of jurisdiction in light of Eolas' extensive contacts with

13   California as previously discussed, including: Eolas' longstanding relationship with and

14   significant obligations to the Regents (a California resident) pursuant to agreements executed by

15   agents of the Regents in California; Eolas' patent commercialization, licensing, and enforcement

16   efforts purposefully directed at California and this forum; Eolas' prosecution activities conducted

17   from California; Eolas' invention story centered in this district; and Eolas' continuing relationship

18   with two inventors who are still California residents.  (*Supra*, Argument § I.B.)

19        By contrast, Eolas has few connections to Texas: its formal incorporation there began only

20   in 2009, shortly prior to its bringing infringement claims against Google and other defendants in

21   Texas; its only Texas-based officer's purported residence in Texas began in December of last year,

22   after Google filed this action and shortly before the only other Eolas employee in Texas moved

23   away; and development activities allegedly taking place in Texas remain completely unspecified.

24   (*See* Dkt. 37-1.)  Indeed, judging from Eolas' prior litigation against Google, at which Eolas' only

25   Texas-based employee (Mr. Swords), did not testify (Corredor Decl. ¶ 4), the only Eolas employee

26   likely to testify in this case on behalf of Eolas is inventor Michael Doyle, who resides in the

27   Chicago area.  (Ex. 40.)  Eolas may point to its office in Tyler, Texas, but that office was

28   established in anticipation of *Eolas I*, and it therefore carries no weight in the analysis of the

GOOGLE INC.'S OPPOSITION TO EOLAS TECHNOLOGIES INCORPORATED'S MOTION TO DISMISS

1  convenience factors.  *E.g.*, *In re Microsoft Corp.*, 630 F.3d 1361, 1364 (Fed. Cir. 2011)

2  (dismissing plaintiff's "fallacious assumption[] that this court must honor connections to a

3  preferred forum made in anticipation of litigation and for the likely purpose of making that forum

4  appear convenient"); *In re Verizon Bus. Network Servs. Inc.*, 635 F.3d 559, 562 (Fed. Cir. 2011)

5  (declining to give weight to documents located in the Eastern District only as "artifacts of

6  [plaintiff's] prior litigation" in the § 1404(a) analysis).

7       Coupled with the one-sided balance of witnesses, documentary sources of proof related to

8  the conception and reduction to practice of the invention claimed by the '507 patent and to the

9  transfer of that patent to Eolas are likely to be found in the records of the Regents in this district.

10  Similarly, prosecution history–related files held by patent prosecutor Krueger are also likely

11  located in this district.  Key documentary evidence regarding prior art, including evidence relating

12  to early web browsers central to Eolas' prior litigations, including ViolaWWW and NCSA

13  Mosaic, is also likely located in the Northern District of California given the connection of these

14  systems to this district discussed above.

15       Courts may exercise their discretion to stay the case pending the competing forum's

16  determination of the § 1404(a) factors in the context of a motion to transfer.  *E.g.*, *EMC*, 2012 WL

17  4097707, at *5.  Generally, however, the Eastern District of Texas has not granted stays pending

18  resolution of transfer, allowing cases to proceed through discovery and to the merits with a

19  transfer motion pending.  Indeed, the Eastern District has already set a schedule through trial in the

20  Texas action.  (Ex. 41.)  Thus, if this Court is inclined to grant a stay to permit that court to rule on

21  transfer, Google respectfully requests that the stay should be for a reasonable period of time (for

22  example, for 45 days) so that the Texas case does not proceed to an advanced stage before the

23  determination of the § 1404(a) factors is made.  Under *Micron*, and as discussed above, the

24  Federal Circuit requires a judicial analysis of the convenience factors and a determination of

25  which one of the two competing forums is the proper one under § 1404(a).

26                              **CONCLUSION**

27       For the foregoing reasons, Google respectfully requests that this Court deny Eolas' motion

28  to dismiss Google's complaint.

1

2 DATED: March 4, 2016                    Respectfully submitted,

3                                         QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
4
                                          */s/  David A. Perlson*
5                                         ─────────────────────────────────
                                          Charles K. Verhoeven (Cal.  Bar No. 170151)
                                          David A. Perlson (Cal.  Bar No. 209502)
6                                         Michael D. Powell (Cal.  Bar No. 202850)
                                          Derek J. Tang (Cal.  Bar No. 4540514)
7                                         Lindsay M. Cooper (Cal.  Bar No. 287125)
                                          Felipe Corredor (Cal.  Bar No. 295692)
8                                         qe-eolas@quinnemanuel.com
                                          50 California Street, 22nd Floor
9                                         San Francisco, California 94111
                                          (415) 875-6600
10                                        (415) 875-6700 facsimile

11                                        Attorneys for Plaintiff Google Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION**

GABRIEL DE LA VEGA,

                Plaintiff,

    v.

GOOGLE LLC,

                Defendant.

Case No. 6:19-cv-00617-ADA

**GOOGLE'S MOTION TO DISMISS UNDER FEDERAL RULE 12(B)(6)
FOR FAILURE TO STATE A CLAIM FOR RELIEF**

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................1

II.   Background .........................................................................................................2

      A.    Nature and Stage of the Proceedings .......................................................2

      B.    The '986 Patent and Asserted Claims ......................................................2

III.  Legal Standards for Motions to Dismiss............................................................4

IV.   Argument ............................................................................................................4

      A.    The Patent Office Decision to Revive the Application Issuing as the '986 Patent
            Was Arbitrary and Capricious, and Should be Overturned.....................4

      B.    The Complaint Fails to Set Forth a Plausible Claim for Direct Infringement .........7

            1.    The Complaint Fails to Allege How the Coupling Step or Means Is Met ...7

            2.    The Complaint Relies Upon Activities of Multiple Actors Without
                  Allegations that Support Joint Infringement.................................9

            a.    The Allegations of the Complaint Show That No Single Actor Performs
                  the Steps of Claim 1 and There Are No Allegations to Support Joint
                  Infringement..........................................................................10

            b.    The Complaint Fails to Address Any Limitation of Claim 9, And There
                  Are No Allegations to Support Joint Infringement....................13

            3.    The Complaint Fails to State a Plausible Claim for Direct Infringement..15

      C.    The Complaint's Allegations of Indirect Infringement Fail to Set Forth a Plausible
            Claim and Should Be Dismissed...........................................................15

            1.    Without Direct Infringement, There Can Be No Indirect Infringement ....15

            2.    Any Claim of Pre-Suit Indirect Infringement is Unsupported for Failure
                  to Plead Pre-Suit Knowledge of the '986 Patent .......................16

            3.    The Complaint Fails to Allege the Requisite Specific Intent and Action
                  to Support a Plausible Claim for Induced Infringement ...........16

            4.    The Complaint Alleges Facts Foreclosing a Plausible Claim for
                  Contributory Infringement ....................................................18

V.    Conclusion ........................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. Toyota Motor North America, Inc.*,
No. 13-365-WSS, 2014 WL 2892285 (W.D. Tex. May 12, 2014)....................................16, 17

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) (en banc).........................................................................7, 10

*Aristocrat Techs. Australia PTY Ltd. v. International Game-Technology*,
543 F.3d 657 (Fed. Cir. 2008)...........................................................................................6, 7

*Artrip v. Ball Corp.*,
735 Fed. Appx. 708 (Fed. Cir. 2018).................................................................................7, 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................4, 9, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................4, 9, 16

*In re Bill of Lading*,
681 F.3d 1323 (Fed. Cir. 2012)..............................................................................15, 17, 18

*Camp v. Pitts*,
411 U.S. 138 (1973).......................................................................................................5

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*,
631 F.3d 1279 (Fed. Cir. 2011).....................................................................................14, 15

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017)....................................................................................17, 18

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920 (2015)...................................................................................................16

*Dickinson v. Zurko*,
527 U.S. 150 (1999)........................................................................................................4

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004).......................................................................................15

*Fields Hybrids, LLC v. Toyota Motor Corp.*,
No. Civ. 03-4121, 2005 WL 189710 (D. Minn. Jan. 27, 2005)............................................5, 6

# TABLE OF AUTHORITIES

*Page(s):*

*Grecia v. McDonald's Corp.*,
    724 Fed. Appx. 942 (Fed. Cir. 2018) ...................................................................................14

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
    870 F.3d 1302 (Fed. Cir. 2017) ..........................................................................................14

*Iron Oak Techs., LLC v. Dell, Inc.*,
    No. 17-999-RP, 2018 WL 1631396 (W.D. Tex. Apr. 4, 2018) ............................................18

*Lawman Armor Corp. v. Simon*,
    74 U.S.P.Q.2d 1633, 2005 WL 1176973 (E.D. Mich. Mar. 29, 2005) ................................5, 6

*Lee v. Verizon Communs., Inc.*,
    837 F.3d 523 (5th Cir. 2016) ...............................................................................................4

*Lyda v. CBS Corp.*,
    838 F.3d 1331 (Fed. Cir. 2017)...........................................................................8, 10, 12, 13

*Meetrix IP, LLC v. Cisco Sys., Inc.*,
    No. 18-309-LY, 2018 WL 8261315 (W.D. Tex. Nov. 30, 2018) ..........................................16

*New York University v. Autodesk, Inc.*,
    495 F. Supp.2d 369 (S.D.N.Y. 2007) ..................................................................................5, 6

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)........................................................................................2, 4, 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................................2, 5

## Statutes

37 C.F.R. § 1.137(b) .................................................................................................................4, 6

5 U.S.C. § 706(2)(A)....................................................................................................................4

35 U.S.C. § 271(c) ......................................................................................................................18

35 U.S.C. § 282 ............................................................................................................................6

## TABLE OF AUTHORITIES

*Page(s):*

**Other Authorities**

Federal Rule of Civil Procedure 8(a)(2) ..........................................................................................4

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................1, 5

## I.   INTRODUCTION

Plaintiff brings the present case after abandoning his patent application for more than eight years (from 2008-2017), and petitioning to revive it a year and a half after the Complaint admits the accused instrumentality, YouTube Live, was launched, claiming the delay that led to the abandonment was unintentional.  The undisputed administrative record, which is properly considered on a motion to dismiss, shows that the Patent Office's decision to revive the application violated the Patent Office's own rules regarding unintentional delay.  The Patent Office's grant of the petition to revive was therefore arbitrary, capricious, and an abuse of discretion that must be set aside under the Administrative Procedure Act ("APA").  When that improper agency action is set aside under the APA, the asserted patent is invalid because any alleged invention was abandoned.

Further, the Complaint fails to adequately plead a claim under *Iqbal/Twombly* because it merely recites or rephrases the asserted claims while alleging legal conclusions of infringement. The sparse facts alleged fail to state a claim for direct infringement because: (a) they ignore claim limitations altogether; or (b) at best, they suggest the acts of multiple parties are involved, but lack any allegations to support a viable claim of joint infringement.

The Complaint also fails to state a claim for indirect infringement.  There are no allegations that would support a plausible claim for direct infringement, which is a prerequisite to an indirect infringement claim.  Further, the Complaint (a) fails to provide any factual allegations to support the specific intent required for inducement; (b) fails to identify any basis for pre-suit indirect infringement; and (c) identifies substantial noninfringing uses of the accused functionality, which foreclose a claim for contributory infringement.

Google hereby moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

## II.    BACKGROUND

### A.  Nature and Stage of the Proceedings

Plaintiff filed its Complaint (Dkt. 1) against Google LLC on October 16, 2019, alleging infringement of U.S. Patent No. 10,205,986 (the "'986 patent") (Dkt. 1-1) by YouTube Live. The Complaint asserts direct infringement (¶¶ 21, 25) and indirect infringement (¶ 21), including both induced infringement (¶¶ 24, 26-30) and contributory infringement (¶¶ 31-35).

### B.  The '986 Patent and Asserted Claims

U.S. Patent Application No. 10/911,144, which issued as the '986 patent, was filed August 4, 2004.  '986 patent at Cover.  The Patent Office issued a final rejection on December 11, 2008.  Ex. A (Prosecution History Excerpts) at 2008-12-11 Final Rejection.  Applicant did not respond to the Patent Office's final rejection.  After confirming with the Applicant's attorney — "Mr. Lubecki confirmed that no response to the Office Action mailed on 12/11/2008 has been filed" — the Examiner issued a Notice of Abandonment no later than June 15, 2009.  Ex. A, 2009-06-15 Abandonment at 2.[1]  Although the application had been abandoned for more than eight years, in December 2017 Plaintiff sought revival, a year and a half *after* the Complaint alleges the accused YouTube Live was launched.  *See* Ex. A, 2017-12-19 Petition; Complaint ¶ 25 (citing June 2016 alleged launch of YouTube Live app).  The Applicant's statement of alleged unintentional delay admitted that the delay was caused by an "inability to provide payment to Applicant's attorney for legal fees" and "lack of funds."  Ex. A, 2017-12-19 Statement of Unintentional Delay at 2.  There is no indication that the Applicant or his attorney

---

[1] The patent and its prosecution are properly considered by a court in ruling on a 12(b)(6) motion.  *See e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (must consider entire complaint including documents incorporated into it and may take judicial notice of other matters); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (considering prosecution in affirming § 101 judgment on pleadings).

were unaware that the failure to respond in 2008 would abandon the application.

During the extensive prosecution of its claims, Applicant was required to substantially amend its claims to introduce several limitations that he does not and cannot show are performed by or at the direction of Google. Claim 1, with the language that the applicant added to gain allowance underlined, recites:

> A method for selecting <u>streaming</u> image content from a network comprising:
>
> providing <u>real-time streaming</u> image content <u>output by a camera</u> from at least one mobile content provider;
>
> coupling said <u>real-time streaming</u> image content from said mobile content provider <u>camera</u> to the network <u>using a networked computer in conjunction with cellular telephony, wherein said real-time streaming image content provided by said mobile content provider is acquired while in motion within the cellular telephony coverage area;</u>
>
> presenting said <u>real-time streaming</u> image content from said mobile content provider <u>on a server homepage</u> for selection; and
>
> selecting said <u>real-time streaming</u> image content from said <u>at least one</u> mobile content provider <u>presented on said homepage for viewing in real-time over the Internet, wherein a viewer filters the real-time streaming image content by selection criteria comprising at least one of a location, a name, a type, and an audio commentary.</u>

*See* '986 patent at 9:20-41 (emphasis added); Ex. A, 2007-02-06 Amend. to the Claims at 3, 2007-08-08 Amend. to the Claims at 2, 2007-12-14 Amend. to the Claims at 2, 2008-07-23 Amend. to the Claims at 2, 2017-12-19 Amend. to the Claims at 2. System claim 9, the only other claim mentioned in the Complaint recites similar elements as "means for" performing the steps of claim 1 and was similarly heavily amended. '986 patent at 10:0-32; Ex. A at 2007-02-06 Amend. to the Claims at 4, 2007-08-08 Amend. to the Claims at 3, 2007-12-14 Amend. to the Claims at 3, 2008-07-23 Amend. to the Claims at 3, 2017-12-19 Amend. to the Claims at 3-4. As further discussed herein, Google refers to these limitations by the recited step (e.g., the "providing step," the "coupling step," the "presenting step," and the "selecting step").

3

## III.   LEGAL STANDARDS FOR MOTIONS TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient *factual* matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide a defendant fair notice of the plaintiff's claim and the grounds relied upon.  This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…." *Id.* at 555 (citations omitted).  "On a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted); *see also Iqbal*, 556 U.S. at 678-79.  Regional circuit law applies when reviewing a Rule 12 motion to dismiss. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).  In the Fifth Circuit, "the court applies the *Twombly*-plausibility standard." *Lee v. Verizon Communs., Inc.*, 837 F.3d 523, 533 (5th Cir. 2016).

## IV.   ARGUMENT

### A.  The Patent Office Decision to Revive the Application Issuing as the '986 Patent Was Arbitrary and Capricious, and Should be Overturned

The Patent Office's decision to allow revival of the application leading to the '986 patent should be set aside as unlawful under the Administrative Procedure Act ("APA").

The Patent Office's revival of the application under 37 C.F.R. § 1.137(b)(4), which only allows for revival if the "entire delay" was unintentional, was arbitrary and capricious, as well as an abuse of discretion, subject to this Court's review under the APA, 5 U.S.C. § 706(2)(A).[2]  Under the APA, a court "must 'hold unlawful and set aside' PTO actions found to

---

[2] The APA applies to decisions of the Patent Office.  *See Dickinson v. Zurko*, 527 U.S. 150, 164 (1999).

be 'arbitrary, capricious, an abuse of discretion, or others not in accordance with the law." *New York University v. Autodesk, Inc.*, 495 F. Supp.2d 369, 373 (S.D.N.Y. 2007) ("NYU"); *see also Lawman Armor Corp. v. Simon*, 74 U.S.P.Q.2d 1633, 2005 WL 1176973, at \*5 (E.D. Mich. Mar. 29, 2005). "In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138 (1973). Here, that record is clear from the prosecution history itself, which is properly considered by the Court in ruling on a motion to dismiss. *See e.g., Tellabs,* 551 U.S. at 308; *OIP Techs.*, 788 F.3d at 1363. There are no disputed facts and dismissal is warranted under Rule 12(b)(6).

The Examiner sent a Notice of Abandonment in 2009, but only after confirming with the prosecuting attorney (Mr. Lubecki) that the Applicant had not sent a response. Ex. A, 2009-06-15 Abandonment at 2. The record thus reflects that Applicant's attorney was aware of the need to respond and this knowledge is properly imputed to the Applicant. *See e.g., Fields Hybrids, LLC v. Toyota Motor Corp.,* No. Civ. 03-4121, 2005 WL 189710, \*7 (D. Minn. Jan. 27, 2005). Under quite similar facts, where an Examiner confirmed with the Applicant's representative that no action had been taken to respond, several courts have found that the delay could not be considered unintentional. *See e.g., Lawman*, 2005 WL 1176973, at \*5; *NYU*, 495 F. Supp. 2d at 374.

Moreover, in the petition to revive the abandoned application, the Applicant asserted that the basis for contending that the delay was unintentional was that "Applicant was unable to provide a response due to inability to provide payment to Applicant's attorney for legal fees." Ex. A, 2017-12-19 Statement of Unintentional Delay at 2. Under the Patent Office's own rules, however, the very reason the Applicant offered as the basis for unintentional delay is expressly

called out as showing the delay was deliberate and ***not*** unintentional. "A delay resulting from a deliberately chosen course of action on the part of the applicant does not become an 'unintentional' delay within the meaning of 37 CFR 1.137(b) because: . . . (E) the applicant remains interested in eventually obtaining a patent, ***but simply seeks to defer patent fees and patent prosecution expenses***." Ex. B – Manual of Patent Examining Procedure ("MPEP") § 711.03(c) (9th Ed. Rev. 7) at II.C. (II. Petitions to Revive an Abandoned Application or Accept Late Payment of Issue Fee, subsection C. Unintentional Delay) (available at http://mpep.uspto.gov/RDMS/MPEP/current#/current/d0e81012.html) (emphasis added).[3] Under the Patent Office's own interpretation of its regulations, the inquiry is whether the course of action that resulted in the delay was unintentional, not whether the abandonment was unintentional. *Fields Hybrids*, 2005 WL 189710, *7; *Lawman*, 2005 WL 1176973, at *6-7. Based on the undisputed administrative record, the delay was not unintentional and the Patent Office acted in disregard of its own rules in reviving the abandoned application. Such failure to follow its own rules and disregard of the Examiner's confirmation with Applicant's attorney, who knew of the deadline and affirmed that no action had been taken, is clearly arbitrary and capricious, as well as an abuse of discretion, renders the Patent Office's actions in reviving the application illegal and it must be set aside. *See e.g., NYU*, 495F. Supp. 2d at 374-75.[4]

---

[3] This same text appeared in the MPEP in 2008 when the application was abandoned. Ex. C – MPEP (8th Ed. Rev. 6) § 711.03(c) at 700-192.

[4] Google is mindful of the decision in *Aristocrat Techs. Australia PTY Ltd. v. International Game-Technology*, 543 F.3d 657 (Fed. Cir. 2008), but that case is inapplicable here as Google is not asserting improper revival as a defense under 35 U.S.C. § 282 in the present motion. In addition, the present case with an eight-year delay is not an instance of mere procedural irregularities where a deadline may have been missed by as little as one day. *Id.* at 658 (noting filing fee was received January 11, 2000 when it was due January 10, 2000) & 663 (referring to procedural irregularities and minor transgressions). Moreover, *Aristocrat* only mentions the APA in passing and limits its inapplicability to the facts of the case (including the very short and

Accordingly, Google respectfully requests that the Court dismiss Plaintiff's Complaint for failure to state a claim for relief.

### B. The Complaint Fails to Set Forth a Plausible Claim for Direct Infringement

Plaintiff's Complaint should also be dismissed because it fails to plead factual allegations that are sufficient to support a plausible claim for direct infringement. The *Iqbal*/*Twombly* plausibility standard applies to claims of direct infringement of a patent. *See Artrip v. Ball Corp.*, 735 Fed. Appx. 708, 714 n.4 (Fed. Cir. 2018). Moreover, direct infringement only "occurs where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).

Apart from reciting the claim language and pure legal conclusions (Complaint ¶¶ 20-21), Plaintiff's conclusory allegations regarding direct infringement are set forth in the Complaint at paragraphs 23 and 25. Even when read in the light most favorable to Plaintiff, these allegations fail to state a plausible claim for direct infringement for several reasons.

### 1. The Complaint Fails to Allege How the Coupling Step or Means Is Met

Plaintiff's Complaint should be dismissed because it fails to include any allegations that would support a plausible claim that anyone meets the "coupling step" of claim 1 (or the "means for coupling" in claim 9),[5] which are the only claims identified in the Complaint.

The "coupling step" of claim 1 requires that a "mobile content provider" (content providing user) couple "real-time streaming image content" and that:

---

unintentional delay). *Id.* at 664. Nothing in *Aristocrat* resembles the lengthy delay here and the Patent Office's disregard of its own rules.

[5] Claim 9 recites a "means for coupling" that includes these same functions that are recited in the "coupling step" of claim 1 ('986 patent at 10:14-20), yet the Complaint makes no allegations regarding how those functions are met or how any of the other means recited in claim 9 are met. As the Complaint fails to identify who or what is performing the steps in claim 1, it likewise fails to address the functions of claim 9, much less the corresponding structure.

- the coupling is done "*using a networked computer in conjunction with cellular telephony*" and

- the content that is coupled "*is acquired while said mobile content provider is in motion within the cellular telephony coverage area*."

*See* Complaint ¶ 11; '986 patent at 9:25-31 (emphasis added). As noted above, these additional limitations were added to overcome rejections based on the prior art. *See* Section II.B. The Complaint fails to allege that the coupling limitation is ever met, simply asserting that Google provides a YouTube application "to allow users to take live streaming video and upload them…." *See id.* ¶¶ 23, 25 (at p. 10-13). None of the web page excerpts included in the Complaint indicate how coupling is done "in conjunction with cellular telephony" or that the content is "acquired while in motion within the cellular telephony coverage area." *See, e.g.*, Complaint ¶ 25 (at p. 8-9) (failing to identify any content provided via the YouTube app, much less using cellular telephony, and showing no live streams provided while in motion within cell areas). The Complaint also fails to make any mention of who or what is performing the coupling step. Without any identification of the required "cellular telephony," "cellular telephony coverage area," "acquisition while in motion," or who allegedly performs the multi-part coupling step, Google is not "on notice as to what [it] must defend." *Artrip*, 735 Fed. Appx. at 714. Thus, dismissal for failure to state a claim of direct infringement is proper for this reason alone.

The complaint vaguely asserts that Google "owns, uses, operates, advertises, controls, sells, tests, and/or otherwise provides" infringing systems and methods, but as explained below fails to provide any evidence or assertion that Google practices each limitation of claims 1 or 9. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1337 (Fed. Cir. 2017) (citing

*Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 555). Even if Google were to use or test

portions of functionality that allegedly met these limitations, which the Complaint fails to allege,

the Complaint fails to provide any factual allegation that Google or any other single actor uses or

tests such claim features in concert with the other claim limitations such that the entire claim is

practiced by a single actor. As explained above, there is no allegation that Google performs the

"coupling step" at all, much less that it does so along with performing the other claim steps. For

example, the Complaint fails to allege that Google or any other single actor performs the

selecting step, which would require, at a minimum, that the actor carrying out the coupling step

also acts as a viewer to filter content to select the same real-time streaming content acquired in

the coupling step (both limitations require the "said real-time streaming image content").

Because the Complaint fails to include any factual allegations to support that the coupling

step or coupling means are met, Google respectfully requests that Plaintiff's Complaint be

dismissed for failure to state a claim for direct infringement of any claim of the '986 patent.

### 2. The Complaint Relies Upon Activities of Multiple Actors Without Allegations that Support Joint Infringement

Plaintiff's Complaint should also be dismissed because it fails to include any allegations

that would support a plausible claim that any single actor performs the steps of claim 1 or

provides the means for performing the same recited functions in clam 9, or any basis for a

finding of joint infringement.

To meet the *Twombly/Iqbal* pleading standard for joint infringement by the combined

acts of multiple parties, the Complaint must plead "facts sufficient to allow a reasonable

inference that all steps of the claimed method are performed and either (1) one party exercises

the requisite 'direction and control' over the other's performance or (2) the actors form a joint

enterprise such that performance of every step is attributable to the controlling party." *Lyda*, 838

F.3d at 1339 (applying *Akamai* to affirm 12(b)(6) dismissal). In *Lyda*, the Federal Circuit

dismissed a complaint that failed to set forth ***factual allegations*** to support assertions in the

complaint that one entity directed or controlled others. *Id.* Dismissal was proper because there

were no allegations that could "form the basis of a reasonable inference that each claim step was

performed by or attributable to Defendants." *Id.*

        a. **The Allegations of the Complaint Show That No Single Actor Performs the Steps of Claim 1 and There Are No Allegations to Support Joint Infringement**

For those limitations of claim 1 that the Complaint even purports to address, the only

allegedly infringing activity identified for most of them refers to actions by two distinct groups

of YouTube users. For example, the Complaint makes the broad conclusory allegation that the

YouTube application that it alleges is provided by Google allows "***[content provider] users*** to

take live streaming video and upload" it. Complaint ¶ 23 (emphasis added). Then it relies on

other "users" to "***view and filter***" the content uploaded by the content provider users. Complaint

¶ 25 at p. 15 (emphasis added).

On its face, therefore, the Complaint relies upon the acts of multiple users (as shown in

the table below that includes the purported explanation in the Complaint that follows each claim

element).

| Claim Element | Allegation in Complaint | Actors Identified |
|---|---|---|
| A method for selecting streaming image content from a network comprising: | Not addressed in Complaint | None |
| providing real-time streaming image content output by a camera from at least one mobile content provider; | "Description: **Google** provides an application called YouTube App which **users may download and stream live video** from their mobile device using the camera native to their mobile device." (¶ 25 at 11) | Google and content providing user |

| Claim Element | Allegation in Complaint | Actors Identified |
|---|---|---|
| | (emphasis added) | |
| coupling said real-time streaming image content from said mobile content provider camera to the network using a networked computer in conjunction with cellular telephony, wherein said real-time streaming image content provided by said mobile content provider is acquired while in motion within the cellular telephony coverage area; | Not addressed in Complaint | None |
| presenting said real-time streaming image content from said mobile content provider on a server homepage for selection; and | "Description: **Google** provides an application for **users' mobile devices to view and filter** live streaming videos on the www.youtube.com/live homepage." (¶ 25 at 15) | Google and viewing user |
| selecting said real-time streaming image content from said at least one mobile content provider presented on said homepage for viewing in real-time over the Internet, wherein a viewer filters the real-time streaming image content by selection criteria comprising at least one of a location, a name, a type, and an audio commentary. | Description: **Users** of YouTube can search live streaming videos on the www.youtube.com/live homepage by typing in the name, keyword or type of the video they want to watch. (¶ 25 at 17) | Viewing user |

Therefore, as set forth in the Complaint (and plainly indicated by the claim language), multiple actors are required to meet the limitations of claim 1. For example, content provider users are required to couple their content to the network using cellular telephony and acquire video content while in motion within a cellular coverage area. Meanwhile, the viewing user must filter and select content from web pages. Given that the patent describes streaming "live" content, Plaintiff has failed to provide any reasonable allegation to support that the same user

would be viewing their own live content.

The allegations of the Complaint, even if accepted as true, do not come close to providing factual allegations to support an inference of joint infringement because they do not even suggest that one party exercises direction or control over another or that the actors formed a joint enterprise as required to properly plead joint infringement. *Lyda*, 838 F.3d at 1339 (joint infringement requires pleading "facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction and control' over the other's performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party."). In fact, nothing in the Complaint would meet the *Iqbal/Twombly* standard as explained in *Lyda*.

For the "providing step," the Complaint simply alleges that "Google provides an application called YouTube App which users may download and stream live video from their mobile device using the camera native to their mobile device." *Id.* ¶ 25 (at pp. 10-11). The "providing step," however, requires providing content output from a camera from at least one mobile content provider. Thus, the limitation plainly requires the activities of a third party – i.e., content providing user — and there are no allegations that come close to supporting the inferences *Lyda* explains are required to support joint infringement.

Moreover, the Complaint fails to make any factual allegations to support that anyone performs the requirements of the "coupling step" (*see* Section IV.B), much less that the requirements for joint infringement are met. The Complaint is silent on the acts or the actor involved. There is no allegation (or basis for alleging) that Google provides content using a camera and couples the content using a cellular network, particularly where the content must be acquired while in motion within a cellular coverage area. Once again there are no allegations

12

that would support a plausible inference of joint infringement as required by *Lyda*.

The selecting step requires "wherein a viewer filters the real-time streaming image content by selection criteria comprising at least one of a location, a name, a type, and an audio commentary." Complaint ¶ 25 at pp. 15-17. For the "selecting step," the Complaint only alleges that "*[viewing] [u]sers* of YouTube can search live streaming videos on the www.youtube.com/live homepage by typing in the name, keyword or type of the video they want to watch." Complaint ¶ 25 (at p. 17) (emphasis added). Again, the allegedly infringing activity requires the acts of different third parties – this time a viewing user — and there are no allegations that come close to supporting the inferences required to support joint infringement.

Despite apparently relying on the acts of multiple entities as allegedly performing the steps of the claimed method (and for some no actor is identified), the Complaint alleges no facts to support a claim for joint infringement. The Complaint fails to make even conclusory allegations of such direction, control, or joint enterprise, much less allege any facts in support of the same. Thus, the present case is even more appropriate for dismissal than in *Lyda*, where the court held that dismissal was proper where the complaint "allege[d] conclusively and without factual support that [defendant] directed or controlled the independent contractors who then directed or controlled the unnamed third parties." *See Lyda*, 838 F.3d at 1340.

### b. The Complaint Fails to Address Any Limitation of Claim 9, And There Are No Allegations to Support Joint Infringement

The Complaint fails to address if or how the limitations of system claim 9, which recites "means for" limitations analogous to the steps of claim 1, are met. In that respect, the Complaint's flaws with respect to claim 9 are even more troubling because the Complaint never identifies who provides the means to perform any of the recited functions.

"In order to 'make' a system under § 271(a), [a party] would need to combine all of the

claim elements." *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011). As indicated above, the Complaint does not allege the system is combined by a single party. At least the acts of YouTube content providing users and YouTube viewing users are required for, *inter alia*, the functions of the providing, coupling, and selecting steps. Thus, the Complaint does not plead facts sufficient to support an inference that anyone "makes" the accused system.

Nor does a single party use the alleged system. To "use" a system, like claim 9, a party must "put the claimed invention into service, i.e., control the system and obtain benefit from it." *Id.* at 1286. Vicarious liability for use of a system requires that the party allegedly using the system be directed by or act as an agent of the other party. *See Centillion*, 631 F.3d at 1287. A Complaint must also plausibly allege facts that the accused infringer "benefits from each element of the claimed system necessary to allege 'use' under § 271," not just some general benefit from the use as a whole. *Grecia v. McDonald's Corp.*, 724 Fed. Appx. 942, 946 (Fed. Cir. 2018) (applying *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1302, 1329 (Fed. Cir. 2017) to affirm 12(b)(6) dismissal)). The Complaint here meets neither of these requirements. It neither alleges who controls or puts the system into use nor who benefits from each element of the claimed system.

In the context of claim 9, even if Google supplies the YouTube app, the claimed system cannot be "put into use" until a content providing user couples the content using cellular telephony and acquires the content while in motion in the cellular coverage area, and another viewing user filters and selects that video. There is no allegation that Google directs or controls those users to perform such functions, nor are those users acting as agents on Google's behalf. Therefore, Google does not "use" system claim 9. *See Centillion*, 641 F.3d at 1287.

### 3. The Complaint Fails to State a Plausible Claim for Direct Infringement

Since no single party meets or supplies all the limitations of claims 1 or 9, and the Complaint provides no basis to even infer that YouTube content providing users or YouTube viewing users are directed by, controlled by, in a joint enterprise with, or agents of Google, there is no direct infringement of claims 1 or 9.

### C. The Complaint's Allegations of Indirect Infringement Fail to Set Forth a Plausible Claim and Should Be Dismissed

The Complaint fails to set forth plausible claims of direct infringement and, in the absence of such claims, there can be no indirect infringement. Also, any claim of pre-suit indirect infringement should be dismissed because there is no allegation that Google had pre-suit knowledge of the '986 patent. In addition, the Complaint vaguely asserts that Google induced users to infringe (¶¶ 24, 26-30), but provides no evidence that Google induces users to acquire video content while in motion through cellular coverage areas as required by the claims. Finally, the Complaint establishes substantial noninfringing uses that preclude the claims of contributory infringement (¶¶ 31-35).

### 1. Without Direct Infringement, There Can Be No Indirect Infringement

The Complaint cannot set forth a plausible claim for indirect infringement because it fails to set forth a plausible claim for direct infringement.

To support a claim for indirect infringement, a plaintiff needs to plead "facts sufficient to allow an inference that at least one direct infringer exists." *In re Bill of Lading*, 681 F.3d 1323, 1336 (Fed. Cir. 2012); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement….").

The Complaint's unsupported claims that Google's customers directly infringe are legal

conclusions that need not be accepted as true in the face of a motion to dismiss. *See Twombly*, 550 U.S. at 555 (citation omitted); *see also Iqbal*, 556 U.S. at 678-79. As shown above, the Complaint provides no basis to even infer that a single user directly infringes or that there is a basis for a claim for joint infringement. For that reason alone, Plaintiff cannot state a claim for indirect infringement.

### 2. Any Claim of Pre-Suit Indirect Infringement is Unsupported for Failure to Plead Pre-Suit Knowledge of the '986 Patent

Indirect infringement (whether contributory or induced), requires knowledge of the patent in suit. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015). Therefore, a claim of pre-suit indirect infringement requires pre-suit knowledge of the '986 patent. *See Meetrix IP, LLC v. Cisco Sys., Inc.*, No. 18-309-LY, 2018 WL 8261315, at *3 (W.D. Tex. Nov. 30, 2018) ("because the complaint fails to sufficiently allege pre-suit knowledge, the pre-suit portion of the indirect-infringement claims should be dismissed"). The Complaint fails to plead any facts that plausibly support any allegation that Google had knowledge of the '986 patent prior to the filing of the Complaint, and only asserts that Google had knowledge of the '986 patent "[s]ince at least the filing of the Original Complaint." Complaint ¶¶ 26, 28, 35. Any claim of pre-suit indirect infringement should be dismissed. *See Affinity Labs of Tex., LLC v. Toyota Motor North America, Inc.*, No. 13-365-WSS, 2014 WL 2892285, at *4 (W.D. Tex. May 12, 2014) (allegations insufficient where the "complaint does not express whether the induced infringement claim is limited to patent violations that occurred after the lawsuit was filed, or if the induced infringement claim includes Toyota's conduct or knowledge pre-lawsuit. Here, Toyota and the Court must speculate as to the extent and scope of Plaintiff's induced infringement claim.").

### 3. The Complaint Fails to Allege the Requisite Specific Intent and Action to Support a Plausible Claim for Induced Infringement

The Complaint fails to set forth a plausible claim for induced infringement because it

does not allege facts to support an inference of the intent required for induced infringement. For claims of induced infringement, the complaint must plead facts that plausibly show the defendant had specific intent to cause another to directly infringe and knew the other's act constituted infringement. *In re Bill of Lading*, 681 F.3d at 1339.

One example is sufficient to show that the Complaint fails to state a claim for induced infringement. For example, the coupling step/function requires a third party direct infringer of claim 1 or 9 to acquire video content "while in motion within the cellular telephony coverage area"; simply using the YouTube App or even streaming video live from the YouTube App does not infringe. "The mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1364 (Fed. Cir. 2017); *see also Affinity*, No. 13-365-WSS, 2014 WL 2892285, at *7 (dismissing induced infringement claims where "Plaintiff does not specify how the marketing and selling activities of Toyota actually induced third-parties to infringe the Asserted Patents. The complaint generally alleges that Toyota induced its customers to purchase its vehicles, but fails to allege how Toyota induced its customers to use the vehicles in a manner that would violate the Asserted Patents."). The Complaint alleges no facts that suggest any connection between Google and content providing users to encourage them to acquire content while in motion within a cellular coverage area, much less an intent to have them do so. *See* Complaint ¶ 29 (citing a website that does not discuss motion or cellular coverage areas). In fact, as explained above, the Complaint fails to allege anyone is performing the coupling step or coupling means functions. In order to plausibly plead induced infringement, the law requires a showing that Google induced someone to perform all of the steps that constitute infringement. The Complaint fails to do so, and therefore "falls short of

showing 'specific intent and action' on behalf" of Google to induce anonymous third-party

infringement of the '986 patent. *See Cleveland Clinic*, 859 F.3d at 1364.

### 4. The Complaint Alleges Facts Foreclosing a Plausible Claim for Contributory Infringement

Aside from failing to state a plausible claim for direct infringement, the Complaint

alleges facts that preclude a plausible inference of contributory infringement.

Contributory infringement requires that a defendant sell, offer to sell or import "a

component of a patented machine, manufacture, combination or composition, or a material or

apparatus for use in practicing a patented process, constituting a material part of the

invention, knowing the same to be especially made or especially adapted for use in an

infringement of such patent, and not a staple article or commodity of commerce suitable for

substantial noninfringing use." 35 U.S.C. § 271(c). Thus, to properly plead a claim for

contributory infringement, the Complaint must allege facts sufficient to infer that any

"component" alleged to provide the basis for contributory infringement has no substantial

noninfringing use. *In re Bill of Lading*, 681 F.3d at 1337; *see also Iron Oak Techs., LLC v. Dell,

Inc.*, No. 17-999-RP, 2018 WL 1631396, at *2 (W.D. Tex. Apr. 4, 2018) (dismissing

contributory infringement claim because "conclusory allegation that '[t]he components provided

by [Dell] are not staple articles of commerce suitable for substantial non-fringing use,' (id.), is no

more than a 'threadbare recital' of one of the elements of a contributory infringement claim").

The Complaint demonstrates that the accused service has substantial noninfringing uses.

The YouTube Live service does not require a user to use a cellular connection or be in motion as

required by the coupling step in claim 1 (and the coupling means in claim 9). *See e.g.*,

Complaint ¶ 25 (p. 13) (screenshot showing that users can livestream in a variety of

circumstances, like a classroom or while playing a videogame, that have no motion or cellular

connection requirement).  Moreover, that same screenshot notes that to stream live on a mobile device a user must have 1,000 subscribers, which means many users of the YouTube App (with less than 1,000 subscribers) are using the App without live streaming, demonstrating substantial noninfringing use.  *Id.*

## V.  CONCLUSION

Google respectfully requests that Plaintiff's Complaint be dismissed with prejudice for the foregoing reasons.

Dated: December 12, 2019                    Respectfully submitted,

                                            */s/ Michael E. Jones*

*Of Counsel:*                               Michael E. Jones
Kevin X. McGann (NYSB No. 2842425)          SBN:  10929400
Email:  kmcgann@fenwick.com                 Email:  mikejones@potterminton.com
Eric A. Krause (CSB No. 257925)             Patrick C. Clutter
Email:  ekrause@fenwick.com                 SBN:  24036374
Scott D. Baker (NYSB No. 5690292)           Email:  patrickclutter@potterminton.com
Email:  sbaker@fenwick.com                  POTTER MINTON, PC
**FENWICK & WEST LLP**                      110 North College, Suite 500
902 Broadway, Suite 14                      Tyler, TX  75702
New York, NY  10010                         Tel:  (903) 597-8311
Tel:  (212) 430-2600                        Fax:  (903) 593-0846
Fax:  (650) 938-5200

Silicon Valley Center
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500
Fax:  (650) 938-5200

                                            *Counsel for Defendant*
                                            GOOGLE LLC

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on December 12, 2019, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/ Michael E. Jones*
Michael E. Jones

# Exhibit I

DARIN W. SNYDER (S.B. #136003)
dsnyder@omm.com
LUANN L. SIMMONS (S.B. #203526)
lsimmons@omm.com
DAVID ALMELING (S.B. #235449)
dalmeling@omm.com
MELODY DRUMMOND HANSEN (S.B. #278786)
mdrummondhansen@omm.com
MARK LIANG (S.B. #278487)
mliang@omm.com
BILL TRAC (S.B. #281437)
btrac@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Tel: (415) 984-8700  Fax: (415) 984-8701

Attorneys for Defendant
GOOGLE LLC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| HYPERMEDIA NAVIGATION LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>GOOGLE LLC,<br><br>       Defendant. | Case No. 4:18-cv-06137-HSG<br><br>**GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Date:     April 11, 2019<br>Time:    2:00 p.m.<br>Judge:   Honorable Haywood S. Gilliam, Jr.<br>Courtroom: 2, 4th Floor |

# NOTICE OF MOTION AND MOTION

Defendant Google LLC ("Google") gives notice that on April 11, 2019, at 2:00 p.m., in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, before the Honorable Haywood S. Gilliam, Jr., Google will and hereby does move under Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing with prejudice the claims of induced and willful infringement in the December 9, 2018 Amended Complaint filed by Hypermedia Navigation LLC ("Plaintiff" or "Hypermedia") (ECF 16).  This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, all documents in the Court's file, and such other written or oral argument as may be presented at or before the time this motion is heard by the Court.

# RELIEF SOUGHT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Google moves to dismiss with prejudice Hypermedia's induced and willful infringement claims for failure to state a claim upon which relief can be granted.

Dated:  January 4, 2019

Respectfully submitted,

By:  /s/ *Melody Drummond Hansen*

Darin W. Snyder (SB #136003)
dsnyder@omm.com
Luann L. Simmons (SB #203526)
lsimmons@omm.com
David S. Almeling (SB #235449)
dalmeling@omm.com
Melody Drummond Hansen (SB #278786)
mdrummondhansen@omm.com
Mark Liang (S.B. #278487)
mliang@omm.com
Bill Trac (SB #281437)
btrac@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701

Attorneys for Defendant
Google LLC

i

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.      INTRODUCTION ................................................................................. 1

II.     ISSUES TO BE DECIDED ................................................................. 2

III.    FACTUAL BACKGROUND ............................................................... 3

IV.     LEGAL STANDARDS ........................................................................ 5

        A.      Motion To Dismiss ................................................................ 5

        B.      Willful Infringement ............................................................. 5

        C.      Induced Infringement ........................................................... 6

V.      ARGUMENT ....................................................................................... 6

        A.      Hypermedia Fails To Adequately Plead Willful
                Infringement ......................................................................... 6

                1.      Hypermedia Fails To Plead Facts That Could
                        Plausibly Support Pre-Suit Knowledge Of
                        Infringement ............................................................. 7

                2.      Hypermedia Fails To Plead Facts That Could
                        Plausibly Support That Google Engaged In
                        "Egregious" Conduct ................................................ 9

        B.      Hypermedia Fails To Adequately Plead Induced
                Infringement ....................................................................... 10

                1.      Hypermedia Fails To Plead Facts Plausibly
                        Supporting Pre-Suit Knowledge Of The '814 Patent
                        Or Of Infringement For Any Patent. ...................... 10

                2.      Hypermedia Fails To Plead Facts Plausibly
                        Supporting That Google Had Specific Intent To
                        Encourage Others' Infringement. ............................ 11

VI.     DISMISSAL SHOULD BE WITH PREJUDICE AS
        AMENDMENT WOULD BE FUTILE .............................................. 12

VII.    CONCLUSION .................................................................................. 14

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................... 5

5

*Babbage Holdings, LLC v. Activision Blizzard, Inc.,*
    No. 2:13-CV-750, 2014 WL 2115616 (E.D. Tex. May 15, 2014) ......................... 13

6

7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................... 5

8

9

*Bill of Lading Transmission & Processing Sys. Patent Litig.,*
    681 F.3d 1323 (Fed. Cir. 2012) ......................................................................... 6

10

*Boundaries Solutions Inc. v. CoreLogic, Inc.,*
    No. 5:14–cv–00761–PSG, 2014 WL 7463708 (N.D. Cal. Dec. 30, 2014) ............ 13

11

12

*CAP Co. v. McAfee, Inc.,*
    No. 14-CV-05068-JD, 2015 WL 3945875 (N.D. Cal. June 26, 2015) ............... 6, 12

13

*Carvalho v. Equifax Info. Servs., LLC,*
    629 F.3d 876 (9th Cir. 2010) ............................................................................ 13

14

15

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
    295 F.3d 1277 (Fed. Cir. 2002) ......................................................................... 8

16

*Clinicomp Int'l, Inc. v. Cerner Corp.,*
    No.: 17cv2479-GPC(BLM), 2018 WL 2229364 (S.D. Cal. May 16, 2018) ......... 13

17

18

*Commil USA, LLC v. Cisco Sys., Inc.,*
    135 S. Ct. 1920 (2015) ...................................................................................... 6

19

20

*Finjan, Inc. v. Cisco Sys. Inc.,*
    No. 17-CV-00072-BLF, 2017 WL 2462423 (N.D. Cal. June 7, 2017) ............ 9, 10

21

*Finjan, Inc. v. Juniper Networks, Inc.,*
    No. 17-05659-WHA, 2018 WL 905909 (N.D. Cal. Feb. 14, 2018) ............... 6, 8, 9

22

23

*France Telecom S.A. v. Marvell Semiconductor Inc.,*
    No. 12-CV-04967-WHO, 2014 WL 4272771 (N.D. Cal. Aug. 28, 2014) ............. 8

24

*Global–Tech Appliances, Inc. v. SEB S.A.,*
    131 S. Ct. 2060 (2011) ...................................................................................... 6

25

26

*Grobler v. Sony Computer Entm't Am. LLC,*
    No. 5:12-CV-01526-LHK, 2013 WL 308937 (N.D. Cal. Jan. 25, 2013) ....... 6, 11, 12

27

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
    136 S. Ct. 1923 (2016) .............................................................................. 1, 6, 7

28

iii

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012) .............................................................................................. 11

*Longitude Licensing v. Apple Inc.*,
    No. 14-CV-04275-EDL, 2015 WL 1143071 (N.D. Cal. Mar. 13, 2015) .............................. 6, 7

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    No. 5:18-CV-02352-EJD, 2018 WL 4510737 (N.D. Cal. Sept. 18, 2018) ........................... 6, 7

*Pinnacle Brokers Ins. Sols. LLC v. Sentinel Ins. Co., Ltd.*,
    No. 15-CV-02976-JST, 2015 WL 5159532 (N.D. Cal. Sept. 2, 2015) ............................. 12, 13

*VIA Techs., Inc. v. ASUS Computer Int'l*,
    No. 14-CV-03586-BLF, 2015 WL 3809382 (N.D. Cal. June 18, 2015) ................................ 11

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 5

Fed. R. Civ. P. 15(a) .................................................................................................................. 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Hypermedia Navigation LLC's ("Hypermedia") claims of willful and induced infringement should be dismissed because they fail to plead facts to plausibly support that Defendant Google LLC ("Google") had pre-suit knowledge of its alleged infringement or to show the requisite "egregious" behavior or "specific intent" (respectively) to support such claims. Instead, Hypermedia relies only on a vague, insufficient pre-suit letter and conclusory assertions that parrot legal elements without alleging specific facts that might plausibly support willful or induced infringement.

Hypermedia alleges that Google willfully infringes seven of the eleven asserted patents, relying on a pre-suit letter that it claims to have sent to Google on August 18, 2017.  Hypermedia does not describe or attach the letter to its Amended Complaint, alleging only that it made Google aware that "Plaintiff alleged" that various products "infringed one or more of" these seven patents.  This is unsurprising because the contents of the letter reveal that it did not make Google aware of any alleged infringement.  To the contrary, the letter merely lists Hypermedia's entire patent portfolio; points to three figures from one patent as showing what Hypermedia's technology allegedly "covers;" then includes a chart listing seven patents and five products with various boxes marked, without explaining how Google allegedly infringes any of Hypermedia's patent claims.  Pointing to three patent figures from one patent cannot put Google on notice of why Google's products allegedly infringe any claim of any patent.  Hypermedia also fails to plead facts plausibly supporting that Google's conduct was "egregious," as required to establish willfulness under *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).  Hypermedia alleges only that Google's failure to respond to Hypermedia's letter with evidence of non-infringement or invalidity was egregious.  But the law is clear that plausibly alleging "egregious" conduct requires more than making conclusory allegations of knowledge and infringement.

Hypermedia's inducement claims likewise fail.  Hypermedia again relies on its August 2017 letter to support Google's alleged pre-suit knowledge that its actions would induce infringement of the same seven patents—but, for the same reasons, the contents of the letter belie

GOOGLE'S MOTION TO DISMISS<br>4:18-CV-06137-HSG

1

that assertion.  And for the one additional patent that Hypermedia adds to the inducement claim, the letter did not even identify the patent because it had not yet issued when the letter was sent; the letter instead only included the pending application number in its listing of Hypermedia's entire portfolio.  In addition, Hypermedia fails to plead facts plausibly supporting that Google had "specific intent" to induce infringement—either pre-suit or post-suit.  Hypermedia alleges induced infringement for five of the accused products, based on two paragraphs that string-cite Google's user support webpages for only one of those accused products (YouTube).  And, with respect to YouTube, the string citations do not show or explain how those webpages could cause or encourage users to infringe any of the 117 asserted claims of eight patents, much less how Google specifically intended to induce such infringement.

Granting leave to amend, moreover, would be futile because (1) Hypermedia was on notice of the deficiencies in its claims before filing its First Amended Complaint and was unable to revise them to sufficiently plead the claims and (2) the patents for which Hypermedia asserts willful and induced infringement expired the day after its original complaint was filed, so Hypermedia cannot cure its post-suit claims for willful or induced infringement.

Hypermedia's willful and induced infringement claims should therefore be dismissed with prejudice.

## II.	ISSUES TO BE DECIDED

Whether the Amended Complaint fails to state claims for willful infringement because Hypermedia does not plead facts sufficient to plausibly support allegations that Google (1) had pre-suit knowledge of alleged infringement of the relevant patents, or (2) has engaged in "egregious" conduct that would warrant enhanced damages.

Whether the Amended Complaint fails to state claims for induced infringement because Hypermedia does not plead facts sufficient to plausibly support allegations that Google (1) had pre-suit knowledge of the existence of the relevant patents, (2) had pre-suit knowledge that its actions would induce infringement of any of the relevant patents, or (3) has the "specific intent" to induce its customers to infringe.

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

### III. FACTUAL BACKGROUND

On October 5, 2018, Hypermedia filed a complaint alleging that Google infringes 158 claims of eleven patents related to "linear" navigation of different "elements," such as webpages, video, or audio on the Internet: U.S. Patent Nos. 7,383,323 ("'323 Patent"), 7,383,324 ("'324 Patent"), 7,424,523 ("'523 Patent"), 7,478,144 ("'144 Patent"), 7,769,830 ("'830 Patent"), 8,250,173 ("'173 Patent"), 9,083,672 ("'672 Patent"), 9,772,814 ("'814 Patent"), 9,864,575 ("'575 Patent"), 6,779,026 ("'026 Patent"), and 9,990,174 ("'174 Patent") (collectively, the "Asserted Patents"). ECF 1. That Complaint alleged willful infringement of seven patents and induced infringement of all eleven patents. *Id.* ¶¶ 24, 227, 219. After Google identified deficiencies in the Complaint, Hypermedia filed an Amended Complaint alleging infringement of the same eleven patents, willful infringement of seven patents, and induced infringement of eight patents. *See* ECF 16 ¶¶ 229, 219; Declaration of Melody Drummond Hansen ("Drummond Hansen Decl.") ¶ 2. Hypermedia accuses Google of infringement based on its YouTube, Google Play Music, Google Video, Google Play Movies, Android TV, Google Images, and Google App products. *See, e.g., id.* ¶¶ 24, 169, 191, 221, 229.

Hypermedia alleges willful and induced infringement beginning in August 21, 2017, over a year before Hypermedia filed suit. *Id.* ¶ 25. Hypermedia relies on a letter that it alleges was sent to Google on August 18, 2017, and received at Google on August 21, 2017, ("the Letter"). *Id.* ¶ 25. While Hypermedia did not attach the Letter to its Complaint or Amended Complaint, it provided an unsigned copy to Google's counsel after the Complaint was filed. *See* Drummond Hansen Decl. Ex. A. The Letter does not describe the patented technology, excerpt any claim language, or even identify any claims allegedly infringed by any Google product. *Id.* Instead, the Letter (1) lists Hypermedia's entire patent and application portfolio without providing any description of what Hypermedia's patents claim (*id.* at 1); (2) asserts that Hypermedia's "technology covers" three figures from the '672 Patent, again without any explanation (*id.* at 2.); and (3) includes a table listing seven patents — the '323, '324, '523, '672, '830, '173, and '144 Patents—and five Google products (YouTube, Google Play Music, Google Video, Google Play Movies, and Android TV), with various boxes marked to allegedly indicate which of Google's

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1    offerings "provides this technology" (*id*.). The Letter closes with an invitation to have a "non-

2    litigation business discussion." *Id.*

3        Relying solely on this Letter, Hypermedia alleges that Google willfully infringes the '323,

4    '324, '523, '672, '830, '173, and '144 Patents (the "Willfulness Patents") based on the five

5    products identified in the Letter. *See* ECF 16 ¶¶ 229-231. Hypermedia, however, pleads no facts

6    to plausibly support that Google knew that its products infringed any of these patents or acted in

7    an "egregious" manner. Instead, Hypermedia asserts that Google "failed to provide any material,

8    description, reasoning, or evidence of non-infringement or invalidity" of the seven patents. *Id.*¶

9    232. Hypermedia then parrots the legal elements of willfulness, alleging that "Defendant's

10    conduct is egregious as it continued offering, selling, making and using the Accused

11    Instrumentalities despite knowledge of the infringement" and "Defendant's infringement is and

12    has been willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, and fragrant

13    [*sic*]." *Id.*

14        Hypermedia relies on the same August 2017 Letter for its induced infringement claims,

15    alleging that Google induced users of the five accused products identified in its Letter to infringe

16    the same seven Willfulness Patents, plus the '814 Patent (collectively, the "Inducement Patents").

17    *Id.* ¶ 219. As with its willfulness claims, however, Hypermedia does not plead allegations to

18    support Google's knowledge of infringement for any of these eight patents. For the '814 Patent,

19    Hypermedia cannot even support knowledge of the patent, because its alleged notice was

20    provided before the '814 Patent issued. And Hypermedia fails to plead any facts to plausibly

21    support that Google acted with "specific intent" for its users to infringe any of the Inducement

22    Patents. *See id.* ¶¶ 219-220. Hypermedia instead vaguely refers to "instructions and support" and

23    string-cites three webpages, alleging: "Defendant provides instructions on using YouTube which

24    leads to infringement by end-users. *See e.g., https://support.google.com/youtube/answer/*

25    *2398242?hl=en&ref_topic=4489102; https://support.google.com/youtube/answer/92651?hl=en*

26    *("Up Next" Videos); https://support.google.com/youtube/answer/6327615?hl=en&co=*

27    *GENIE.Platform=Desktop ("Autoplay Videos")*." *Id.* ¶¶ 226-227. But the three cited webpages

28    are support sites for just *one* accused product, YouTube, and Hypermedia cites no basis for its

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1   induced infringement allegations for the other four products included in Hypermedia's

2   inducement allegations: Google Play Music, Google Video, Google Play Movies, and Android

3   TV.  And with respect to YouTube, it is unclear how the cited websites relate to accused features

4   or could induce end users to infringe any Hypermedia patents.  For example, the first website,

5   titled "Find your way around YouTube," provides introductory instructions for using YouTube,

6   such as its various menu options (*e.g.* Guide, Home, Subscriptions, etc.), none of which are

7   accused in this action.  The second and third links are titled "'Up Next' videos" and "'Autoplay'

8   videos," respectively, and describe how YouTube automatically plays another video after the

9   current one ends.  Hypermedia does not identify any statements from these websites that either

10  instruct users to infringe or advertise features accused of infringing.

11       The Willfulness Patents and the '814 Patent all expired on October 6, 2018—the day after

12  Hypermedia filed its lawsuit.  *See, e.g.,* Drummond Hansen Decl. Ex. A.[1]

13  **IV.     LEGAL STANDARDS**

14       **A.     Motion To Dismiss**

15       Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

16  if it fails to state a claim upon which relief can be granted.  To survive a motion to dismiss, a

17  complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell*

18  *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when the party

19  asserting it pleads factual content that allows the court to draw the reasonable inference that the

20  defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see*

21  *Twombly*, 550 U.S. at 555 ("factual allegations must be enough to raise a right to relief above the

22  speculative level.").  Conclusory allegations or "formulaic recitation of the elements of a cause of

23  action will not do."  *Iqbal*, 556 U.S. at 681.

24       **B.     Willful Infringement**

25       Willful infringement is reserved for "egregious infringement behavior," which is typically

26  described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or

27  ───────────────

28  [1] Although the Letter identifies a later expiration date for the '830 Patent, i.e., November 15, 2018
    (*see* Ex. A), it is unclear on what that assertion is based.

                                                      GOOGLE'S MOTION TO DISMISS
                                                      4:18-CV-06137-HSG

— indeed — characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). To state a claim for willful infringement, a plaintiff must plead that (1) a defendant had knowledge of the asserted patents at the time of alleged wrongdoing, and (2) the defendant's conduct rises to the level of egregiousness described in *Halo*. *See, e.g., Finjan, Inc. v. Juniper Networks, Inc.*, No. 17-05659-WHA, 2018 WL 905909, at *4-5 (N.D. Cal. Feb. 14, 2018) (dismissing complaint for failing to show pre-suit knowledge and egregious conduct). Willful infringement also requires showing that the defendant knew that it was allegedly infringing the asserted patents at the time the defendant's conduct is alleged to have been willful. *See, e.g., NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2018 WL 4510737, at *3 (N.D. Cal. Sept. 18, 2018) (This district has recognized that "there can be no infringement of a patent, willful or otherwise, until the patent issues and the defendant learns of its existence ***and alleged infringement***.") (emphasis added); *Longitude Licensing v. Apple Inc.*, No. 14-CV-04275-EDL, 2015 WL 1143071, at *2 (N.D. Cal. Mar. 13, 2015).

### C. Induced Infringement

To support a claim for induced infringement, a plaintiff must plead facts plausibly supporting that (1) a defendant knew its actions would induce actual infringement; and (2) the defendant had the specific intent to encourage another's infringement. *See CAP Co. v. McAfee, Inc.*, No. 14-CV-05068-JD, 2015 WL 3945875, at *3 (N.D. Cal. June 26, 2015) (dismissing inducement claims, *citing cases including Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926–28 (2015) (quoting *Global–Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011)); *see also Grobler v. Sony Computer Entm't Am. LLC*, No. 5:12-CV-01526-LHK, 2013 WL 308937, at *3 (N.D. Cal. Jan. 25, 2013) (*quoting In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012))).

## V. ARGUMENT

### A. Hypermedia Fails To Adequately Plead Willful Infringement

Hypermedia's willful infringement claims should be dismissed for two independent reasons: (1) Hypermedia fails to plead facts plausibly supporting Google's pre-suit knowledge of

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

alleged infringement; and (2) Hypermedia fails to plead facts plausibly supporting that Google's

conduct is "egregious," as required by *Halo*.

### 1. Hypermedia Fails To Plead Facts That Could Plausibly Support Pre-Suit Knowledge Of Infringement

The Supreme Court explained in *Halo* that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Halo Elecs.*, 136 S. Ct. at 1933. Courts in this District have held that claims of willful patent infringement require an allegation not only that the defendant knew of the asserted patents, but also that the defendant knew of its alleged infringement during the relevant time period. *See, e.g., NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2018 WL 4510737, at *3 (N.D. Cal. Sept. 18, 2018) ("This district has recognized that 'there can be no infringement of a patent, willful or otherwise, until the patent issues *and the defendant learns of its existence and alleged infringement*." (emphasis added)); *see also Longitude Licensing v. Apple Inc.*, No. 14-CV-04275-EDL, 2015 WL 1143071, at *2 (N.D. Cal. Mar. 13, 2015) (holding that pre-suit willful infringement allegations require knowledge of *alleged infringement* before the lawsuit was filed). Hypermedia's Amended Complaint, however, does not allege any facts that would support that Google had pre-suit knowledge that it infringed any claim of the seven Willfulness Patents.

Here, Hypermedia relies solely on the August 2017 Letter to support Google's pre-suit knowledge of alleged infringement. But the Letter does not actually allege that Google infringes any claim of any Hypermedia patent, much less explain how Google allegedly infringes. Drummond Hansen Decl. Ex. A. Instead, the Letter lists all patents and pending applications in Hypermedia's portfolio; states "[t]he technology covers:" and copies three figures from one of the patents; and then asserts that Google "provides this technology," followed by a table purporting to illustrate that assertion. *See id.* Nowhere does the Letter attach any claim charts or even assert that Google infringes any claim of any patent — to the contrary, the Letter ends by inviting Google to engage in a "non-litigation business discussion." *Id.*

To the extent Hypermedia argues the Letter sufficiently alleges infringement because it identifies three patent figures and then includes a table purporting to show that Google's products

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1   provide technology related to certain Hypermedia patents, this argument fails.  The letter's

2   excerpt of three figures and a table listing seven patents and five products cannot plausibly

3   support Google's pre-suit knowledge of infringement.  First, infringement cannot be asserted by

4   comparing an accused product to a patent **figure**.  *See, e.g., France Telecom S.A. v. Marvell*

5   *Semiconductor Inc.*, No. 12-CV-04967-WHO, 2014 WL 4272771, at *4 (N.D. Cal. Aug. 28,

6   2014); *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002)

7   ("infringement is to be determined by comparing the asserted claim to the accused device, not by

8   comparing the accused device to the figures of the asserted patent.").  Here, Hypermedia's Letter

9   does even less—it does not even compare any product to any specific figure.  Rather, it excerpts

10  three figures from one patent without any analysis or explanation, and generically refers to these

11  figures as "technology" that belongs to Hypermedia.  Second, the table isn't sufficiently clear

12  about what it purports to illustrate to provide notice of anything.  Specifically, the Letter asserts

13  that the table shows that Google provides "this technology," which refers to the three patent

14  figures copied from one patent, but the "Y" marks in the table appears to be asserting that each

15  Google product provides technology in some or all of seven patents, apparently suggesting that

16  certain products use technology from some patents but not others.  Hypermedia provides no

17  explanation about what the "Y" marks actually mean or how they relate to the three figures

18  copied from one patent.  Thus, the Letter cannot plausibly support that Google had pre-suit

19  knowledge that it infringed any claim of any Asserted Patent.[2]

20         Indeed, courts in this District have found more detailed assertions of infringement to be

21  insufficient to survive a Rule 12 motion to dismiss.  For example, in *Finjan v. Juniper Networks*,

22  plaintiff Finjan provided pre-suit correspondence to defendant with a claim chart for a related

23  patent.  2018 WL 905909, at *1.  The court held that the claim chart, which mapped the claims of

24  a related but un-asserted patent, was insufficient to demonstrate that the defendant had pre-suit

25  knowledge of infringement of an asserted patent.  *Id.* at *3.  By comparison, Hypermedia relies

26

27

---

28  [2] The Letter's failure to identify any claims is especially relevant here because the seven
    Willfulness Patents include a combined total of 220 claims.

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

on less: merely three figures of one asserted patent without any explanation of how Google's products allegedly infringe any claim of any Hypermedia patent.

Because Hypermedia fails to plead sufficient facts to plausibly support that Google had knowledge of its alleged infringement of any Hypermedia patent, the Court should dismiss Hypermedia's claims for willful infringement.

### 2. Hypermedia Fails To Plead Facts That Could Plausibly Support That Google Engaged In "Egregious" Conduct

Hypermedia's willful infringement claims fail for a separate, independent reason. After the Supreme Court's *Halo* decision, courts in this District have required plaintiffs to plead facts sufficient to demonstrate "egregious" conduct to sustain a willful infringement claim. *See, e.g., Finjan*, 2018 WL 905909, at *3; *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072-BLF, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017). In *Finjan v. Cisco*, for example, Finjan made conclusory assertions that "[d]espite knowledge of Finjan's patent portfolio, Defendant has sold and continues to sell the accused products and services." 2017 WL 2462423, at *5. The court dismissed Finjan's willful infringement claims, explaining that "simply ma[king] conclusory allegations of knowledge and infringement" is "not enough to plausibly allege egregiousness." *Id.* (internal quotes and brackets omitted). Because the complaint included "no specific factual allegations about Cisco's subjective intent, or any other aspects of Cisco's behavior that would suggest its behavior was 'egregious.,'" the court held that the willfulness claims failed. *Id.*

Hypermedia's allegations likewise fail to suggest any alleged "egregious" conduct. Hypermedia's Letter at most mentions asserted patents and accused products but fails to give notice of how the products allegedly infringed. Now, Hypermedia alleges that Google's conduct was egregious because Google allegedly "failed to provide any material, description, reasoning, or evidence of non-infringement or invalidity of the Presented Patents" in response to Hypermedia's Letter and continued selling the named products. ECF 16 ¶ 232. Hypermedia also includes a conclusory allegation that "Defendant's infringement is and has been willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, and fragrant [*sic*]." *Id.* But as *Finjan v.*

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1  *Cisco* held, "conclusory allegations of knowledge and infringement" are "not enough to plausibly

2  allege egregiousness."  2017 WL 2462423, at *5.

3        The Court should therefore dismiss Hypermedia's claims of willful infringement for

4  failing to plead facts plausibly supporting Google's pre-suit knowledge of alleged infringement

5  and failing to plead facts supporting that Google's behavior was "egregious" pre-suit or post-suit.

6        **B.    Hypermedia Fails To Adequately Plead Induced Infringement**

7        Hypermedia's inducement claims fail for reasons similar to its willfulness allegations.

8  First, Hypermedia's pre-suit Letter is insufficient to plausibly support that Google had pre-suit

9  knowledge of the existence of the '814 Patent or of its alleged infringement of any of the eight

10  Inducement Patents.  Second, Hypermedia fails to plead facts plausibly supporting that Google

11  had the required "specific intent" to induce infringement because:  (a) for four of the products

12  accused for inducement, Hypermedia provides no supporting facts, and (b) for the fifth accused

13  product (YouTube), the cited web pages do not relate to the accused infringement.

14        **1.    Hypermedia Fails To Plead Facts Plausibly Supporting Pre-Suit**
         **Knowledge Of The '814 Patent Or Of Infringement For Any Patent.**
15

16        For the reasons discussed above, Hypermedia's Letter is insufficient to support Google's

17  knowledge of alleged infringement.  The Letter does not assert that any Google product infringes

18  any claim of any Hypermedia patent, instead generically referring to Hypermedia "technology"

19  and Google products that may use that "technology" and inviting a "non-litigation business

20  discussion."  *See supra* and Drummond Hansen Decl. Ex. A.  Nor does Hypermedia plead any

21  facts supporting that Google knew any of its actions would allegedly induce actual infringement

22  by others.  This flaw is fatal for all eight Inducement Patents.

23        Hypermedia's inducement claims for the '814 Patent fail for additional reasons.

24  Hypermedia fails to allege that Google even knew of the existence of the '814 Patent.  As

25  Hypermedia's Amended Complaint acknowledges, its Letter did not identify the '814 Patent;

26  rather, it identified a pending patent application that later issued as the '814 Patent.  ECF 16 ¶¶

27  25, 220.  And Hypermedia does not allege that it provided any notice to Google of the '814 Patent

28  after issuance.  As courts in this District hold, knowledge of a patent application alone is

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1    insufficient to meet the knowledge requirement of a patent for induced infringement.  *See, e.g.,*

2    *VIA Techs., Inc. v. ASUS Computer Int'l,* No. 14-CV-03586-BLF, 2015 WL 3809382, at *3 (N.D.

3    Cal. June 18, 2015) ("The general rule in this district is that knowledge of a patent *application*

4    alone is insufficient to meet the knowledge requirement for either a willful or induced

5    infringement claim.") (collecting cases).  Hypermedia's Letter, moreover, did not even include

6    the '814 Patent application in its table listing patents and Google's five products that purportedly

7    provided Hypermedia's "technology."  *See* Drummond Hansen Decl. Ex. A.

8         Because Hypermedia fails to adequately plead that Google had pre-suit knowledge of

9    alleged infringement, its claims for pre-suit induced infringement should be dismissed.

10              **2.     Hypermedia Fails To Plead Facts Plausibly Supporting That Google
                        Had Specific Intent To Encourage Others' Infringement.**
11

12        Hypermedia's inducement claims also fail to plead any facts supporting that Google had

13   specific intent to encourage its customers to infringe, providing an independent basis to dismiss

14   these claims.  *See, e.g., Grobler v. Sony Computer Entm't Am. LLC*, No. 5:12-CV-01526-LHK,

15   2013 WL 308937, at *3 (N.D. Cal. Jan. 25, 2013) (*quoting In re Bill of Lading Transmission &*

16   *Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012)).

17        First, Hypermedia alleges that "Defendant provides instructions and support to resellers

18   and end-use customers" and then string-cites three webpages relating to only one of the five

19   accused products included in Hypermedia's inducement allegations, YouTube.  ECF 16 ¶¶225-

20   226.  Hypermedia makes no allegations supporting alleged inducement for the other four accused

21   products:  Google Play Music, Google Video, Google Play Movies, and Android TV.

22   Hypermedia's induced infringement allegations for those products should therefore be dismissed.

23        Second, Hypermedia's inducement allegations for YouTube also fail.  Hypermedia cites

24   to:  (1) a Google support page for YouTube that provides guidance on the most basic YouTube

25   menu options (*e.g.* Guide, Home, Subscriptions, Trending, History, etc.), and (2) to pages titled

26   "'Up Next' videos" and "'Autoplay' videos," each describing how YouTube automatically plays

27   another video after the current one ends.  Hypermedia provides no explanation for how these

28   webpages instruct end-users to infringe or advertise the benefits of the eight Inducement Patents.

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

Courts in this District hold that such passing references to user support documents are "wholly inadequate for an inference of specific intent" to induce infringement. *CAP*, 2015 WL 3945875, at *5. In *CAP*, for example, the court dismissed claims for induced infringement because the complaint failed to allege any statement" that could encourage users to infringe, instead making only "passing references" to "'user manuals guides, and support articles,' without ever saying what those materials contain[ed]." *Id.* The court held that these allegations were "wholly inadequate for an inference of specific intent" to induce infringement and therefore dismissed the induced infringement claims. *Id.* Similarly, in *Grobler v. Sony Computer Entertainment America LLC*, the court dismissed induced infringement claims where the plaintiff alleged only that defendant Sony "through its website at http://www.us.playstation.com/" "advertises the feature in the Playstation Network" and "provides instructions on how to use the Playstation Network system." 2013 WL 308937, at *2. Merely pointing to a web address and making conclusory assertions that a defendant "advertises" or "provides instructions" is insufficient to "plausibly show[]" that a defendant "specifically intended" customers to infringe and "knew that the customer's act constituted infringement." *Id.*

Similarly, here, Hypermedia's mere listing of three Google webpages for one accused product, YouTube, is insufficient to allege that Google specifically intended its users to infringe or knew that such acts constituted infringement. Hypermedia's inducement claims therefore should be dismissed.

## VI.    DISMISSAL SHOULD BE WITH PREJUDICE AS AMENDMENT WOULD BE FUTILE

Dismissal in this case should be with prejudice. Under Federal Rule of Civil Procedure 15(a), a court need not grant leave to amend where such amendment would be futile. *See, e.g., Pinnacle Brokers Ins. Sols. LLC v. Sentinel Ins. Co., Ltd.,* No. 15-CV-02976-JST, 2015 WL 5159532, at *5 (N.D. Cal. Sept. 2, 2015) (granting motion to dismiss with prejudice where amendment would be futile).

Hypermedia cannot amend its allegations to support claims for willful or induced infringement. First, Hypermedia's Amended Complaint was filed in response to Google

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

1    identifying deficiencies regarding these claims in the original Complaint. Hypermedia therefore

2    had the opportunity to address those deficiencies and plead all available facts to try to support

3    pre-suit willful or induced infringement for any of the patents for which it asserts these claims.

4    But the Amended Complaint still fails to support these claims. Because Hypermedia has already

5    had the chance to amend and still could not plead sufficient facts, this Court should deny leave to

6    amend. *See, e.g., Pinnacle Brokers*, 2015 WL 5159532, at *5 (a court may deny leave to amend

7    considering "repeated failure to cure deficiencies by amendments previously allowed") (quoting

8    *Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 892 (9th Cir. 2010)); *Boundaries Solutions*

9    *Inc. v. CoreLogic, Inc.*, No. 5:14–cv–00761-PSG, 2014 WL 7463708, at *3 (N.D. Cal. Dec. 30,

10   2014) ("Because [plaintiff] has already had the opportunity to amend and was unable to cure the

11   deficiencies in its pre-suit indirect infringement claim . . . the court finds that further amendment

12   would be futile [and] the claim is dismissed with prejudice").

13          Second, because all of the patents for which Hypermedia asserts willful and induced

14   infringement expired the day after Hypermedia filed its complaint, Hypermedia cannot plead

15   claims for post-suit willful or induced infringement. *See Clinicomp Int'l, Inc. v. Cerner Corp.*,

16   No.: 17cv2479-GPC(BLM), 2018 WL 2229364, at *2-6 (S.D. Cal. May 16, 2018) (dismissing

17   willful and indirect infringement allegations because the plaintiff pled no facts to support

18   defendant's knowledge of the asserted patent before it expired two weeks prior to the complaint

19   filing). In *Babbage Holdings, LLC v. Activision Blizzard, Inc.*, for example, a district court

20   dismissed plaintiff's indirect infringement claims where the plaintiff alleged that defendant had

21   knowledge of the asserted patent based on the complaint, but the complaint was not served until

22   after the patent expired. No. 2:13-CV-750, 2014 WL 2115616, at *2 (E.D. Tex. May 15, 2014).

23   Although the plaintiff contended in briefing that defendant received notice letters less than a week

24   before the patent's expiration, the court dismissed the action because "[plaintiff] is asking this

25   Court to sustain a claim of damages for alleged indirect infringement which lasted three to six

26   days at the maximum. Such damages, if any, are *de minimis* on their face . . . which do not

27   justify or support the use of this Court's limited resources." *Id*. Here, Hypermedia cannot even

28   support its willful or indirect infringement claims for a *de minimis* period because its pre-suit

13

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

letter fails to support such claims for the reasons above, and the Willfulness Patents and Inducement Patents are now expired.  In addition, for the '814 Patent, Hypermedia cannot establish even knowledge of the patent for more than a single day before expiration to support its inducement claim.

The Court, therefore, should dismiss Hypermedia's willful and induced infringement claims with prejudice.

**VII.    CONCLUSION**

Google respectfully requests that the Court dismiss with prejudice Hypermedia's willful and induced infringement claims because Hypermedia's Amended Complaint fails to plead facts that could plausibly support Google's pre-suit knowledge of alleged infringement, or that Google's alleged conduct was "egregious" to constitute willful infringement or done with "specific intent" to induce infringement.

Dated:  January 4, 2019

Respectfully submitted,

By:  /s/ *Melody Drummond Hansen*

DARIN W. SNYDER (S.B. #136003)
dsnyder@omm.com
LUANN L. SIMMONS (S.B. #203526)
lsimmons@omm.com
DAVID ALMELING (S.B. #235449)
dalmeling@omm.com
MELODY DRUMMOND HANSEN (S.B. #278786)
mdrummondhansen@omm.com
MARK LIANG (S.B. #278487)
mliang@omm.com
BILL TRAC (S.B. #281437)
btrac@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Tel: (415) 984-8700  Fax: (415) 984-8701

Attorneys for Defendant
Google LLC

GOOGLE'S MOTION TO DISMISS
4:18-CV-06137-HSG

# Exhibit J

 Careers



 Find a job          Saved jobs      Job alerts

# Austin

**83** jobs available

**View all jobs**

Each one of our locations has its own flavor of Googleyness, featuring unique architecture and design, office traditions, and of course, snacks. But no matter which office you step into, you'll find Googlers building products that help create opportunities for everyone, whether down the street or across the globe. Every day these teams bring their insight, imagination, and a healthy disregard

 Careers

　Find a job　　　　　　　　　　Saved jobs　　Job alerts

# Jobs

### Business Strategy

See 12 jobs

### Design

See 1 jobs

### Engineering & Technology

See 63 jobs

### Finance

See 2 jobs

### Legal

See 1 jobs

### Marketing & Communications

See 1 jobs

 Austin - Google Careers

☰   

🔍   Find a job                  Saved jobs       Job alerts

See 24 jobs

View All

# Locations

Austin - Google Careers

 Careers



🔍 Find a job                                          Saved jobs        Job alerts

## Leading by example: Growing into management by helping others grow

Read more

 Google Careers



Search  Find a job                                    Saved jobs      Job alerts



## What's it like to work at Google?

Watch the video

 Careers



🔍  Find a job                                    Saved jobs        Job alerts

Meet the Googlers who are enabling us to hire great people

Read more

Follow Life at Google on

 Careers



🔍 Find a job                              Saved jobs        Job alerts

Related information                                              ⌄

Equal Opportunity                                               ⌄

Google                    Privacy      Terms

❓ Help

# Exhibit K

DocketNavigator

## Cases Search

31 Results

Parties: begins google    Courts: Texas Western District (all districts)    Case Status: Active

| Case | Case Filing Date ▼ |
|---|---|
| Sonos, Inc. v. Google LLC f/k/a Google Inc.<br>6-20-cv-00881 (WDTX) | Sep. 29, 2020 |
| Express Mobile, Inc. v. Google LLC<br>6-20-cv-00804 (WDTX) | Sep. 01, 2020 |
| Richman Technology Corporation v. Google LLC f/k/a Google Inc.<br>6-20-cv-00769 (WDTX) | Aug. 25, 2020 |
| Alert Signal Intellectual Property, LLC v. Google LLC f/k/a Google Inc.<br>6-20-cv-00644 (WDTX) | Jul. 16, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00571 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00572 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00573 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00574 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00575 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00576 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00577 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00578 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00579 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00580 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00581 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00582 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00583 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00584 (WDTX) | Jun. 29, 2020 |
| WSOU Investments LLC d/b/a Brazos Licensing and Development v. Google LLC f/k/a Google Inc.<br>6-20-cv-00585 (WDTX) | Jun. 29, 2020 |
| Jenam Tech, LLC v. Google LLC<br>6-20-cv-00453 (WDTX) | Jun. 01, 2020 |
| InfoGation Corporation v. Google LLC f/k/a Google Inc.<br>6-20-cv-00366 (WDTX) | May. 05, 2020 |
| VoIP-Pal.com, Inc. v. Google LLC f/k/a Google Inc.<br>6-20-cv-00269 (WDTX) | Apr. 03, 2020 |
| Multipop LLC v. Google LLC f/k/a Google Inc.<br>6-20-cv-00147 (WDTX) | Feb. 25, 2020 |
| Profectus Technology LLC v. Google LLC f/k/a Google Inc.<br>6-20-cv-00101 (WDTX) | Feb. 10, 2020 |
| EcoFactor, Inc. v. Google LLC f/k/a Google Inc.<br>6-20-cv-00075 (WDTX) | Jan. 31, 2020 |
| VideoShare, LLC v. Google LLC et al<br>6-19-cv-00663 (WDTX) | Nov. 15, 2019 |
| Solas OLED Ltd. v. Google, Inc.<br>6-19-cv-00515 (WDTX) | Aug. 30, 2019 |

DocketNavigator

Cases Search

| | |
|---|---|
| Parus Holdings Inc. v. Apple Inc.<br>6-19-cv-00432 (WDTX) | Jul. 22, 2019 |
| Parus Holdings Inc. v. Google LLC<br>6-19-cv-00433 (WDTX) | Jul. 22, 2019 |
| Hammond Development International, Inc. v. Amazon.Com, Inc. et al<br>1-20-cv-00342 (WDTX) | Jun. 06, 2019 |
| Hammond Development International, Inc. v. Google LLC<br>6-19-cv-00356 (WDTX) | Jun. 06, 2019 |

# Exhibit L

Cases Search

Cases Search

DocketNavigator

## Cases Search

20 Results

Parties: begins google    **Courts:** California Northern District (all districts)    **Case Status:** Active

| Case | Case Filing Date ▼ |
|---|---|
| Google LLC v. Sonos, Inc.<br>3-20-cv-06754 (NDCA) | Sep. 28, 2020 |
| Parus Holdings Inc. v. LG Electronics Inc et al.<br>3-20-cv-05896 (NDCA) | Aug. 21, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-05330 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-05333 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-05334 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-05339 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-05341 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC v. Google LLC<br>4-20-cv-05342 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC v. Google LLC<br>4-20-cv-05343 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC v. Google LLC<br>4-20-cv-05344 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC v. Google LLC<br>4-20-cv-05345 (NDCA) | Aug. 03, 2020 |
| Uniloc 2017 LLC v. Google LLC<br>4-20-cv-05346 (NDCA) | Aug. 03, 2020 |
| KlausTech LLC v. Google LLC f/k/a Google Inc.<br>4-20-cv-04459 (NDCA) | Jul. 06, 2020 |
| Uniloc 2017 LLC et al v. Google LLC<br>4-20-cv-04355 (NDCA) | Jun. 30, 2020 |
| Google LLC f/k/a Google Inc. v. Sonos, Inc.<br>3-20-cv-03845 (NDCA) | Jun. 11, 2020 |
| In Re Koninklijke Philips Patent Litigation<br>4-18-cv-01885 (NDCA) | Apr. 03, 2018 |
| Eolas Technologies Incorporated v. Amazon.com, Inc.<br>4-17-cv-03022 (NDCA) | May. 26, 2017 |
| Eolas Technologies Incorporated v. Google LLC<br>4-17-cv-01138 (NDCA) | Mar. 06, 2017 |
| Google LLC v. Eolas Technologies Incorporated et al<br>4-15-cv-05446 (NDCA) | Nov. 25, 2015 |
| Droplets, Inc. v. Amazon.com, Inc., et. al.<br>4-12-cv-03733 (NDCA) | Jul. 17, 2012 |

# Exhibit M

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| SOLAS OLED LTD., | | |
| | *Plaintiff,* | Case No. 6:19-cv-00514-ADA |
| v. | | |
| DELL INC., | | |
| | *Defendant.* | |

| | | |
|---|---|---|
| SOLAS OLED LTD., | | |
| | *Plaintiff,* | Case No. 6:19-cv-00515-ADA |
| v. | | |
| GOOGLE LLC, | | |
| | *Defendant.* | |

| | | |
|---|---|---|
| SOLAS OLED LTD., | | |
| | *Plaintiff,* | Case No. 6:19-cv-00537-ADA |
| v. | | |
| APPLE INC., | | |
| | *Defendant.* | |

| | | |
|---|---|---|
| SOLAS OLED LTD., | | |
| | *Plaintiff,* | Case No. 6:19-cv-00631-ADA |
| v. | | |
| HP INC., | | |
| | *Defendant.* | |

# SCHEDULING ORDER

In response to the Court orders in the above-captioned cases resetting setting jury selection and trial for April 5, 2021, the Court **ORDERS** that the following schedule will govern deadlines up to and including the trial of these matters:

| Proposed Deadline | Item |
|---|---|
| Thursday, June 25, 2020 | Parties file Opening claim construction briefs, including any arguments that any claim terms are indefinite. |
| Thursday, July 16, 2020 | Parties file Responsive claim construction briefs. |
| Thursday, July 30, 2020 | Parties file Reply claim construction briefs. |
| Friday, July 31, 2020 | Parties submit Joint Claim Construction Statement and consolidated briefing collated by Opening, Response, and Reply. Absent agreement of the parties, the Plaintiff shall be responsible for the timely submission of this and other Joint filings.<br><br>Parties may begin exchanging written discovery and serving third-party subpoenas |
| Friday, August 14, 2020 | Markman Hearing at 9:00 a.m. |
| Friday, August 21, 2020 | Fact Discovery opens; deadline to serve Initial Disclosures per Rule 26(a). |
| Friday, September 11, 2020 | Deadline to add parties. |
| Friday, September 18, 2020 | Deadline to serve Final Infringement and Invalidity Contentions. |
| Friday, September 25, 2020 | Deadline to amend pleadings. A motion is not required unless the amendment adds patents or claims. |
| Friday, November 20, 2020 | Close of Fact Discovery. |
| Tuesday, November 24, 2020 | Opening Expert Reports. |
| Wednesday, December 23, 2020 | Rebuttal Expert Reports. |
| Wednesday, January 20, 2021 | Close of Expert Discovery. |

| Proposed Deadline | Item |
|---|---|
| Friday, January 22, 2021 | Deadline to meet and confer to discuss narrowing the number of claims asserted and prior art references at issue. The parties shall file a report within 5 business days regarding the results of the meet and confer. |
| Friday, January 29, 2021 | Dispositive motion deadline and *Daubert* motion deadline. |
| Wednesday, February 17, 2021 | Serve Pretrial Disclosures (jury instructions, exhibits lists, witness lists, discovery and deposition designations). |
| Wednesday, February 24, 2021 | Serve objections to pretrial disclosures/rebuttal disclosures. |
| Wednesday, March 3, 2021 | Serve objections to rebuttal disclosures and **File** Motions *in limine*. |
| Wednesday, March 10, 2021 | File Joint Pretrial Order and Pretrial Submissions (jury instructions, exhibits lists, witness lists, discovery and deposition designations); file oppositions to motions *in limine*. |
| Friday, March 12, 2021 | Deadline to meet and confer regarding remaining objections and disputes on motions *in limine*. |
| Monday, March 15, 2021 | File joint notice identifying remaining objections to pretrial disclosures and disputes on motions *in limine*. |
| Wednesday, March 17, 2021 | Final Pretrial Conference. The Court expects to set the Pretrial Conference within 2-4 weeks of the trial date. |
| Monday, April 5, 2021 | Jury Selection/Trial. |

SIGNED this day of ___June 21_____, 2020.


_____
ALAN D A LBRIGHT
UNITED STATES DISTRICT JUDGE

# Exhibit N

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| INTELLECTUAL TECH LLC, | § |
| | § |
| Plaintiff. | § |
| | § |
| v. | § CIVIL ACTION NO. 6:19-cv-00628-ADA |
| | § **JURY TRIAL DEMANDED** |
| ZEBRA TECHNOLOGIES | § |
| CORPORATION, | § |
| | § |
| Defendant. | § |
| | § |

## SCHEDULING ORDER

| DEADLINE | ITEM |
|---|---|
| By party agreement<br><br>**January 20, 2020** | Plaintiff serves preliminary[1] infringement contentions in the form of a chart setting forth where in the accused product(s) each element of the asserted claim(s) are found. Plaintiff shall also identify the earliest priority date (*i.e.* the earliest date of invention) for each asserted claim and produce: (1) all documents evidencing conception and reduction to practice for each claimed invention, and (2) a copy of the file history for each patent in suit. |
| 2 weeks after CMC<br><br>**January 29, 2020** | Deadline for Motions to Transfer |
| By party agreement<br><br>**March 18, 2020** | Defendant serves preliminary invalidity contentions in the form of (1) a chart setting forth where in the prior art references each element of the asserted claim(s) are found, (2) an identification of any limitations the Defendant contends are indefinite or lack written description under section 112, and (3) an identification of any claims the Defendant contends are directed to ineligible subject matter under section 101. Defendant shall also produce |

---

[1] The parties may amend preliminary infringement contentions and preliminary invalidity contentions without leave of court so long as counsel certifies that it undertook reasonable efforts to prepare its preliminary contentions and the amendment is based on material identified after those preliminary contentions were served and should do so seasonably upon identifying any such material. Any amendment to add claims requires leave of court so that the Court can address any scheduling issues.

| DEADLINE | ITEM |
|---|---|
| | (1) all prior art referenced in the invalidity contentions, (2) technical documents, including software where applicable, sufficient to show the operation of the accused product(s), and (3) summary, annual sales information for the accused product(s) for the prior two years, unless the parties agree to some other timeframe. |
| 9 weeks after CMC<br><br>**March 18, 2020** | Parties exchange claim terms for construction. |
| 11 weeks after CMC<br><br>**April 01, 2020** | Parties exchange proposed claim constructions. |
| 12 weeks after CMC<br><br>**April 08, 2020** | Parties disclose extrinsic evidence. The parties shall disclose any extrinsic evidence, including the identity of any expert witness they may rely upon with respect to claim construction or indefiniteness. With respect to any expert identified, the parties shall also provide a summary of the witness's expected testimony including the opinions to be expressed and a general description of the basis and reasons therefore. A failure to summarize the potential expert testimony in a good faith, informative fashion may result in the exclusion of the proffered testimony. With respect to items of extrinsic evidence, the parties shall identify each such item by production number or produce a copy of any such item if not previously produced. |
| 13 weeks after CMC<br><br>**April 15, 2020** | Deadline to meet and confer to narrow terms in dispute and exchange revised list of terms/constructions. |
| 14 weeks after CMC<br><br>**April 22, 2020** | Parties file Opening claim construction briefs, including any arguments that any claim terms are indefinite. |
| 17 weeks after CMC<br><br>**May 13, 2020** | Parties file Responsive claim construction briefs. |
| 19 weeks after CMC<br><br>**May 27, 2020** | Parties file Reply claim construction briefs. |

| DEADLINE | ITEM |
|---|---|
| 20 weeks after CMC<br><br>**June 03, 2020** | Parties submit Joint Claim Construction Statement and consolidated briefing collated by Opening, Response, and Reply in Microsoft Word format. Absent agreement of the parties, the Plaintiff shall be responsible for the timely submission of this and other Joint filings. |
| 23 weeks after CMC (or as soon as practicable)<br><br>**June 12, 2020** | Markman Hearing at [9:00 a.m. or 1:00 p.m.] |
| 1 week after Markman hearing<br><br>**June 19, 2020** | Fact Discovery opens; deadline to serve Initial Disclosures per Rule 26(a). |
| 6 weeks after Markman hearing<br><br>**July 24, 2020** | Deadline to add parties. |
| 8 weeks after Markman hearing<br><br>**August 7, 2020** | Deadline to serve Final Infringement and Invalidity Contentions. |
| 12 weeks after Markman hearing<br><br>**September 4, 2020** | Deadline to amend pleadings. A motion is not required unless the amendment adds patents or claims. |
| 24 weeks after Markman hearing<br><br>**November 25, 2020** | Close of Fact Discovery. |
| 25 weeks after Markman hearing<br><br>**December 4, 2020** | Opening Expert Reports. |
| 29 weeks after Markman hearing<br><br>**January 8, 2021** | Rebuttal Expert Reports. |

| DEADLINE | ITEM |
|---|---|
| 32 weeks after Markman hearing<br><br>**January 22, 2021** | Close of Expert Discovery. |
| 33 weeks after Markman hearing<br><br>**January 29, 2021** | Deadline to meet and confer to discuss narrowing the number of claims asserted and prior art references at issue. The parties shall file a report within 5 business days regarding the results of the meet and confer. |
| 34 weeks after Markman hearing<br><br>**February 5, 2021** | Dispositive motion deadline and *Daubert* motion deadline. |
| 36 weeks after Markman hearing<br><br>**February 19, 2021** | Serve Pretrial Disclosures (jury instructions, exhibits lists, witness lists, discovery and deposition designations). |
| 38 weeks after Markman hearing<br><br>**March 5, 2021** | Serve objections to pretrial disclosures/rebuttal disclosures. |
| 39 weeks after Markman hearing<br><br>**March 12, 2021** | Serve objections to rebuttal disclosures and **File** Motions *in limine*. |
| 40 weeks after Markman hearing<br><br>**March 19, 2021** | File Joint Pretrial Order and Pretrial Submissions (jury instructions, exhibits lists, witness lists, discovery and deposition designations); file oppositions to motions *in limine* |
| 41 weeks after Markman hearing<br><br>**March 26, 2021** | Deadline to meet and confer regarding remaining objections and disputes on motions *in limine*. |
| 7 business days before Final Pretrial Conference, by party agreement.<br><br>**April 2, 2021** | File joint notice identifying remaining objections to pretrial disclosures and disputes on motions *in limine*. |

| DEADLINE | ITEM |
|---|---|
| 43 weeks after Markman hearing (or as soon as practicable)<br><br>**April 9, 2021** | Final Pretrial Conference. The Court expects to set the Pretrial Conference within 2-4 weeks of the trial date. |
| 44-47 weeks after Markman hearing (or as soon as practicable)<br><br>**April 19, 2021 – May 10, 2021** | Jury Selection/Trial. The Court expects to set this date at the conclusion of the *Markman* Hearing. |

SIGNED this __2nd__ day of __February__, 2020.

_____
Alan D. Albright
United States District Judge

# Exhibit O

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USB TECHNOLOGIES, LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>SUNVALLEYTEK INTERNATIONAL, INC., et al.,<br><br>         Defendants. | Case No. 17-CV-03869-LHK<br><br>**CASE MANAGEMENT ORDER** |

Plaintiff's Attorney(s): Jayson Sohi
Defendants' Attorney(s): Kimberly Donovan

An initial case management conference was held on October 11, 2017.  A further case management conference is set for January 17, 2018, at 2:00 p.m.  The parties shall file their joint case management statement by January 10, 2018.

The Court GRANTS Plaintiff's motion to voluntarily dismiss without prejudice Defendant Hootoo.com, Inc.

The parties shall exchange initial disclosures by October 16, 2017.

The parties shall file a stipulation and proposed order regarding e-discovery by October 25, 2017.

The parties' stipulation that "each of the parties shall be entitled to up to three (3) expert witnesses" (ECF No. 23 at 6) is GRANTED.

1

The parties shall contact the Court's ADR program on October 11, 2017 to request a mediator.  The parties shall file a joint settlement status report by January 2, 2018.

The Court set the following case schedule:

| Scheduled Event | Date |
|---|---|
| Deadline to Serve Infringement Contentions and Accompanying Production | November 8, 2017 |
| Last Day to Amend the Pleadings/Add Parties | December 11, 2017 |
| Deadline to Complete Mediation | December 22, 2017 |
| Deadline to Serve Invalidity Contentions and Accompanying Production | January 5, 2018 |
| Deadline to Exchange Terms for Construction | January 19, 2018 |
| Deadline to Exchange Preliminary Constructions and Extrinsic Evidence | February 9, 2018 |
| Deadline to Serve Damages Contentions | February 16, 2018 |
| Deadline to File a Joint Claim Construction and Prehearing Statement | March 2, 2018 |
| Deadline to serve Responsive Damages Contentions | March 16, 2018 |
| Deadline to Complete Claim Construction Discovery | March 30, 2018 |
| Claim Construction Briefing | **Pl.'s Op.**: April 16, 2018<br>**Def's Resp.**: April 30, 2018<br>**Pl's Reply**: May 7, 2018 |
| Claim Construction Hearing | May 24, 2018 |
| Close of Fact Discovery | August 31, 2018 |
| Opening Expert Reports | September 21, 2018 |
| Rebuttal Expert Reports | October 12, 2018 |
| Close of Expert Discovery | November 2, 2018 |
| Last Day to File Dispositive Motions (one per side in the entire case) | November 16, 2018 |
| Hearing on Dispositive Motions | January 17, 2019, at 1:30 p.m. |
| Final Pretrial Conference | April 25, 2019, at 1:30 p.m. |

United States District Court
Northern District of California

2

| Jury Trial | May 20, 2019, at 9:00 a.m. |
|---|---|
| Length of Trial | 4 days |

**IT IS SO ORDERED.**

Dated: October 11, 2017

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No. 17-CV-03869-LHK
CASE MANAGEMENT ORDER

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit P

1    Vernon M. Winters (SBN 130128)          Erik J. Olson (SBN 175815)
     SIDLEY AUSTIN LLP                        MORRISON & FOERSTER LLP
2    555 California Street, Suite 2000        425 Market Street
     San Francisco, CA 94104-1503            San Francisco, CA 94105-2482
3    Telephone: (415) 772-1200               Telephone: (415) 268-7000
     Facsimile: (415) 772-7400               Facsimile: (415) 268-7522
4    vwinters@sidley.com                     ejolson@mofo.com

5    Nicholas Groombridge (*pro hac vice*)
     1285 Avenue of the Americas             *Attorneys for Defendants Sandoz Inc., Sandoz*
6    New York, NY 10019-6064                 *GmbH, Sandoz International GmbH, and Lek*
     Telephone:  (212) 373-3000              *Pharmaceuticals, d.d.*
7    Facsimile: (212) 757-3990
     ngroombridge@paulweiss.com

8

9    *Attorneys for Plaintiffs Amgen Inc.*
     *and Amgen Manufacturing, Limited*

10
                    **UNITED STATES DISTRICT COURT**
11                  **NORTHERN DISTRICT OF CALIFORNIA**

12   AMGEN INC. and                          Case No. 3:14-cv-04741-RS
     AMGEN MANUFACTURING, LIMITED,           Case No. 3:16-cv-02581-RS
13
14                            Plaintiffs,    **STIPULATION AND SCHEDULING**
            v.                               **ORDER (AS MODIFIED BY THE**
15                                           **COURT)**
     SANDOZ INC.,  SANDOZ
16   INTERNATIONAL GMBH, and
     SANDOZ GMBH,
17
                              Defendants.
18   AMGEN INC. and AMGEN
     MANUFACTURING, LIMITED,
19
20                            Plaintiffs,
21          v.
22   SANDOZ INC. SANDOZ
     INTERNATIONAL GMBH, SANDOZ
23   GMBH, and LEK PHARMACEUTICALS,
     D.D.,
24
                              Defendants.
25

26

27

28

Pursuant to Civil Local Rule 7-12, Plaintiffs Amgen Inc. and Amgen Manufacturing, Limited ("Amgen") and Defendants Sandoz Inc., Sandoz International GmbH, Sandoz GmbH, and Lek Pharmaceuticals, d.d. through their undersigned counsel, hereby stipulate as follows:

WHEREAS, the Court entered an order setting the schedule through trial (-04741 Dkt. No. 253, -02581 Dkt. No. 87);

WHEREAS, the Court entered an order that modified certain expert discovery dates but otherwise did not modify the schedule through trial (-04741 Dkt. No. 259, -02581 Dkt. No. 90);

WHEREAS, the Court issued a notice rescheduling the hearing date for dispositive motions but otherwise did not modify the schedule through trial (-04741 Dkt. No. 285, -02581 Dkt. No. 123);

WHEREAS, there have been no other scheduling modifications since the Court entered the order setting the schedule through trial (-04741 Dkt. No. 253, -02581 Dkt. No. 87);

WHEREAS, the Parties desire to move certain pre-trial deadlines closer to the scheduled trial date while still tracking the schedule set forth in the document entitled "Guidelines for Final Pretrial Conference in Jury Cases Before District Judge Richard Seeborg";

WHEREAS, the Parties desire to add deadlines for *Daubert* motions to the case schedule;

NOW, THEREFORE, the parties hereby jointly request the modified schedule as set forth below.

### Proposed Revised Schedule

**Amgen v. Sandoz, Case No. 3:14-cv-04741-RS (N.D. Cal.)**
**Amgen v. Sandoz, Case No. 3:16-cv-02581-RS (N.D. Cal.)**

| Description | Current Date from Court's Scheduling Order | Parties' Proposed Date |
|---|---|---|
| Dispositive Motion Responsive Briefs | 11/13/2017 | 11/13/2017 (Unchanged) |
| Dispositive Motion Reply Briefs | 11/21/2017 | 11/21/2017 (Unchanged) |

1

STIPULATION AND [PROPOSED]                    Case No. 3:14-cv-04741-RS
SCHEDULING ORDER                              Case No. 3:16-cv-02581-RS
sd-708862

| Description | Current Date from Court's Scheduling Order | Parties' Proposed Date |
|---|---|---|
| Dispositive Motion Hearing | 12/18/2017 | 12/18/2017 (Unchanged) |
| *Daubert* Motion Opening Briefs | N/A | 1/19/2018 |
| *Daubert* Motion Responsive Briefs | N/A | 2/2/2018 |
| *Daubert* Motion Reply Briefs | N/A | 2/9/2018 |
| Pretrial Meet and Confer [21 Days prior to the final Pretrial Conference; Judge Seeborg Guidelines, ¶ A] | 12/20/2017 | 2/8/2018 |
| Joint Pretrial Statement and Order, Pretrial Exchanges, and Motions in Limine [10 days prior to the final Pretrial Conference; Judge Seeborg Guidelines, ¶¶ B, D] | 1/16/2018 | 2/19/2018 |
| Jury Voir Dire Questions, Proposed Jury Instructions, and Proposed Jury Verdict Forms [5 days prior to the final Pretrial Conference; Judge Seeborg Guidelines, ¶ D] | 1/23/2018 | 2/24/2018 |
| Oppositions to Motions in Limine [3 days prior to final Pretrial Conference; Judge Seeborg Guidelines, ¶¶ B, D] | 1/25/2018 | 2/26/2018 |
| Pretrial Conference and *Daubert* Motion Hearing | 1/30/2018 | 3/1/2018 |
| Optional Trial Briefs, Deposition and Discovery Designations [5 days prior to Trial; Judge Seeborg Guidelines, ¶ D] | 1/31/2018 | 3/21/2018 |
| Trial | 3/26/2018 | 3/26/2018 (Unchanged) |

2

STIPULATION AND [PROPOSED]                        Case No. 3:14-cv-04741-RS
SCHEDULING ORDER                                  Case No. 3:16-cv-02581-RS
sd-708862

Respectfully submitted,

Dated: November 22, 2017          By: */s/ Nicholas Groombridge*
                                  Nicholas Groombridge
                                  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                                  1285 Avenue of the Americas
                                  New York, NY 10019-6064
                                  Telephone:  (212) 373-3000
                                  Facsimile: (212) 757-3990
                                  Email:      ngroombridge@paulweiss.com

                                  Vernon M. Winters (SBN 130128)
                                  SIDLEY AUSTIN LLP
                                  555 California Street, Suite 2000
                                  San Francisco, CA 94104-1503
                                  Telephone: (415) 772-1200
                                  Facsimile: (415) 772-7400
                                  Email:      vwinters@sidley.com

                                  *Attorneys for Amgen Inc. and Amgen Manufacturing, Ltd.*

Dated: November 22, 2017          By: */s/ Erik J. Olson*
                                  Erik J. Olson (SBN 175815)
                                  MORRISON & FOERSTER
                                  425 Market Street
                                  San Francisco, CA 94105-2482
                                  Telephone: (415) 268-7000
                                  Facsimile: (415) 268-7522
                                  Email:      ejolson@mofo.com

                                  *Attorneys for Defendants Sandoz Inc., Sandoz GmbH, Sandoz
                                  International GmbH, and Lek Pharmaceuticals, d.d.*

3

**STIPULATION AND [PROPOSED]**          **Case No. 3:14-cv-04741-RS**
**SCHEDULING ORDER**                    **Case No. 3:16-cv-02581-RS**
sd-708862

## SIGNATURE ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I hereby certify that concurrence in the filing of this document has been obtained from each of the other Signatories shown above.

Dated: November 22, 2017

*By: /s/ Erik J. Olson*
Erik J. Olson

**STIPULATION AND [PROPOSED]**
**SCHEDULING ORDER**
sd-708862

**Case No. 3:14-cv-04741-RS**
**Case No. 3:16-cv-02581-RS**

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

Dated: 11/22/2017

_____
THE HONORABLE RICHARD SEEBORG
UNITED STATES DISTRICT COURT JUDGE

5

## ADDITIONAL COUNSEL

**SIDLEY AUSTIN LLP**
Sue Wang (SBN 286247)
555 California Street, Suite 2000
San Francisco, CA 94104-1503
Telephone: (415) 772-1200
Facsimile: (415) 772-7400
Email:     abaxter@sidley.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Eric Alan Stone (*pro hac vice*)
Jennifer H. Wu (*pro hac vice*)
Jennifer Gordon
Peter Sandel (*pro hac vice*)
Arielle K. Linsey (*pro hac vice*)
Stephen A. Maniscalco (*pro hac vice*)
Jacob T. Whitt (*pro hac vice*)
Golda Lai (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile: (212) 757-3990
Email:     estone@paulweiss.com
           jwu@paulweiss.com
           psandel@paulweiss.com
           jgordon@paulweiss.com
           alinsey@paulweiss.com
           smaniscalco@paulweiss.com
           jwhitt@paulweiss.com
           glai@paulweiss.com

**AMGEN INC.**
Wendy A. Whiteford (SBN 150283)
Lois M. Kwasigroch (SBN 130159)
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
Telephone: (805) 447-1000
Facsimile: (805) 447-1010
Email:     wendy@amgen.com

*Attorneys for Plaintiffs Amgen Inc.
and Amgen Manufacturing Limited*

**MORRISON & FOERSTER LLP**
Eric C. Pai (SBN 247604)
755 Page Mill Road
Palo Alto, California 94304
Telephone: 650.813.5600
Facsimile: 650.494.0792
Email:     epai@mofo.com

Stephen David Keane (SBN 247588)
12531 High Bluff Drive, Ste. 100
San Diego, California 92130
Telephone: (858) 720-5100
Facsimile: (858) 720-5125
Email:     skeane@mofo.com

*Attorneys for Defendants Sandoz Inc., Sandoz
GmbH, Sandoz International GmbH, and Lek
Pharmaceuticals, d.d.*

6

**STIPULATION AND [PROPOSED]
SCHEDULING ORDER**
sd-708862

**Case No. 3:14-cv-04741-RS
Case No. 3:16-cv-02581-RS**

# Exhibit Q

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the President of the United States has declared a National Emergency in response to the COVID-19 (Coronavirus Disease) outbreak;

WHEREAS, the Governor of the State of California has declared a State of Emergency in response to the COVID-19 outbreak;

WHEREAS, the Centers for Disease Control and Prevention (CDC) has recommended that throughout the United States of America, for an eight-week period, organizations cancel or postpone in-person events consisting of 50 people or more;

WHEREAS, local public health departments have recommended that large gatherings be avoided, that elderly and other vulnerable populations avoid person-to-person contact, and that employers allow employees to telework to the extent practical;

WHEREAS, the six Bay Area counties have announced a shelter in place order directing everyone to stay inside their homes and away from others as much as possible for the next three weeks as public health officials try to curb the rapid spread of coronavirus across the region;

WHEREAS, the Judges of the United States District Court, Northern District of California, have considered and extensively discussed the various interests implicated by the COVID-19 (Coronavirus Disease) outbreak and any court response to the outbreak, including: the health of jurors, witnesses, parties, attorneys, the public, court staff, Probation and Pretrial Services staff, chambers staff, and judges; the constitutional rights of criminal defendants and other parties; and the public's interest in, and the court's duty to ensure, the effective and expeditious administration of justice;

NOW THEREFORE, the United States District Court, Northern District of California, hereby issues the following Order, effective immediately:

**Civil Cases:**

1. No jury trial will be commenced before May 1, 2020. Any trial dates currently scheduled during that period are vacated.
2. All civil matters will be decided on the papers, or if the assigned judge believes a hearing is necessary, the hearing will be by telephone or videoconference. This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences and Alternative Dispute Resolution ("ADR") proceedings. See the assigned judge's scheduling notes for specific instructions on telephone/video appearances, or the ADR webpage.

1

**Criminal Cases:**

Due to the Court's reduced ability to obtain an adequate spectrum of jurors and the effect of the above public health recommendations on the availability of counsel and court staff to be present in the courtroom, the time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act, as the Court specifically finds that the ends of justice served by ordering the continuances outweigh the interest of the public and any defendant's right to a speedy trial pursuant to 18 U.S.C. section 3161(h)(7)(A).  Accordingly,

1. No jury trial will be commenced before May 1, 2020.  Any trial dates currently scheduled during that period are vacated.
2. Initial appearances and other proceedings before the magistrate judges, will continue, but will be consolidated and such proceedings for all divisions will be conducted in San Francisco, and where possible, will be conducted by telephone or by videoconference.  New arrestees shall be booked at Santa Rita Jail and produced for court the following day instead of being presented for booking at the U.S. Marshals Service lockup.
3. Appearances before the district judges may be waived or postponed, if required by law, with the defendant's consent.
4. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence report has been prepared.
5. All grand jury proceedings in this district are suspended until May 1, 2020.
6. Case-by-case exceptions to any of these procedures may be ordered for non-jury matters at the discretion of the Court after consultation with counsel.

**Other:**

1. The Civil Local Rule 5-1 requirement for provision of a courtesy copy of all filings to the chambers of the assigned judge, applicable to both civil and criminal cases, is suspended pending further notice.
2. This General Order supersedes any previous information included in standing orders or scheduling notes related to COVID-19.
3. The courthouse and law library are closed for public events, tours, and visits.

ADOPTED:     March 16, 2020              FOR THE COURT:

_____

PHYLLIS J. HAMILTON
CHIEF JUDGE

# Exhibit R

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72-6

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the COVID-19 (Coronavirus Disease) outbreak remains a national public health emergency;

WHEREAS, the Judges of the United States District Court for the Northern District of California continue to balance the various interests implicated by the COVID-19 public health emergency; and

WHEREAS, the Judges of the United States District Court for the Northern District of California have determined that the public safety will be best served by limiting the permissible in-court proceedings in accordance with the logistical considerations necessitated by the Court's safety protocols;

NOW THEREFORE, the United States District Court, Northern District of California, hereby Orders as follows, effective immediately:

**Civil Cases:**
1. Jury trials and bench trials may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols.
2. Each judge will determine whether to hold a hearing or decide a civil matter on the papers. Hearings will be held via telephone or videoconference. This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences, and Alternative Dispute Resolution ("ADR") proceedings. For specific instructions on telephone or video appearances, see the docket on PACER, the assigned judge's schedule of upcoming proceedings (located on each judge's web page at cand.uscourts.gov/judges), or the ADR webpage.

**Criminal Cases:**
1. Jury trials may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols.
2. Initial appearances and other proceedings before the magistrate judges will be conducted by telephone or by videoconference. New arrestees shall be booked at Santa Rita Jail and produced for court appearance the following day instead of being presented for booking at the U.S. Marshals Service lockup.
3. Other court appearances may be waived or postponed, or may be conducted by telephone or videoconference. See General Order 74 for procedures pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). A limited number of in-court proceedings are permitted.
4. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence report has been prepared.

**Other:**

1.  All local rules requiring that a courtesy copy be provided to the chambers of the assigned judge are suspended pending further notice, unless a judge orders otherwise in a specific case.

2.  The requirement under Civil Local Rule 5-1(b) that a pro se party must request permission from the assigned judge to use the court's Electronic Case Filing (ECF) system is suspended pending further notice.

3.  Pending further notice, the courthouses and law libraries are closed for public events, tours, and visits.

4.  Effective immediately, this General Order supersedes General Order 72-5.

ADOPTED:        September 16, 2020            FOR THE COURT:

_____

Phyllis J. Hamilton
Chief Judge

2

# Exhibit S

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72-2

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the President of the United States has declared a National Emergency in response to the COVID-19 (Coronavirus Disease) outbreak;

WHEREAS, the Governor of the State of California has declared a State of Emergency and ordered a state-wide shelter-in-place;

WHEREAS, the Centers for Disease Control and Prevention (CDC) has recommended nationwide that people work or study from home to the extent possible and avoid gatherings;

WHEREAS, local public health departments have issued shelter-in-place orders; and

WHEREAS, the Judges of the United States District Court for the Northern District of California find that the current guidance of local and national public health officials requires that courthouses remain closed in order to protect the public health and reduce the size of public gatherings and unnecessary travel;

NOW THEREFORE, the United States District Court, Northern District of California, hereby issues the following Order, effective immediately:

**Civil Cases:**

1. No jury trial will be conducted before June 1, 2020.  Any trial dates currently scheduled during that period will be postponed or vacated.
2. All civil matters will be decided on the papers, or if the assigned judge believes a hearing is necessary, the hearing will be by telephone or videoconference.  This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences, and Alternative Dispute Resolution ("ADR") proceedings.  For specific instructions on telephone or video appearances, see the docket on PACER, the assigned judge's schedule of upcoming proceedings (located on each judge's web page at cand.uscourts.gov/judges), or the ADR webpage.

**Criminal Cases:**

Due to the Court's reduced ability to obtain an adequate spectrum of jurors and the effect of the above public health recommendations on the availability of counsel and court staff to be present in the courtroom:

1. No jury trial will be conducted before June 1, 2020. Any jury trials currently scheduled to commence during that period will be postponed or vacated.
2. Each judge assigned to a criminal trial scheduled before June 1, 2020 will make appropriate findings and enter an order tolling time under the Speedy Trial Act.
3. Initial appearances and other proceedings before the magistrate judges will continue and will be conducted by telephone or by videoconference. New arrestees shall be booked at Santa Rita Jail and produced for court appearance the following day instead of being presented for booking at the U.S. Marshals Service lockup.
4. Appearances before the district judges may be waived or postponed, or may be conducted by telephone or videoconference. See General Order 74 for procedures pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").
5. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence report has been prepared.
6. All grand jury proceedings in this district are suspended until June 1, 2020.
7. Case-by-case exceptions to any of these procedures may be ordered for non-jury matters at the discretion of the assigned judge.

**Other:**

1. All local rules requiring that a courtesy copy be provided to the chambers of the assigned judge are suspended pending further notice.
2. The requirement under Civil Local Rule 5-1(b) that a pro se party must request permission from the assigned judge to use the court's Electronic Case Filing (ECF) system is suspended pending further notice.
3. To the extent that any standing orders or scheduling notes conflict with this General Order, this General Order shall control.
4. Pending further notice, the courthouses and law libraries are closed for public events, tours, and visits.
5. Effective May 1, 2020, this General Order supersedes General Order 72.

ADOPTED:     April 30, 2020             FOR THE COURT:


_____

Phyllis J. Hamilton
Chief Judge

# Exhibit T

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72-3

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the COVID-19 (Coronavirus Disease) outbreak remains a national public health emergency; and the Judges of the United States District Court for the Northern District of California continue to balance the various interests implicated by the COVID-19 public health emergency, and find that the current guidance of public health officials allows for a modification in court operations to permit the resumption of limited in-court proceedings;

NOW THEREFORE, the United States District Court, Northern District of California, hereby issues the following Order, effective immediately:

**Civil Cases:**
1. No new jury trial will be conducted through September 30, 2020.  Any jury trial dates currently scheduled to commence during that period will be postponed or vacated.  However, individual judges may offer bench trials by videoconference in lieu of postponement.
2. Through September 30, 2020, all civil matters will be decided on the papers, or if the assigned judge believes a hearing is necessary, the hearing will be by telephone or videoconference.  This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences, Alternative Dispute Resolution ("ADR") proceedings, and bench trials.  For specific instructions on telephone or video appearances, see the docket on PACER, the assigned judge's schedule of upcoming proceedings (located on each judge's web page at cand.uscourts.gov/judges), or the ADR webpage.

**Criminal Cases:**
1. No new jury trial will be conducted through June 30, 2020.  Any jury trials currently scheduled to commence during that period will be postponed or vacated.
2. Each judge assigned to a criminal trial scheduled before July 1, 2020 will make appropriate findings and enter an order tolling time under the Speedy Trial Act.
3. Initial appearances and other proceedings before the magistrate judges will continue and will be conducted by telephone or by videoconference.  New arrestees shall be booked at Santa Rita Jail and produced for court appearance the following day instead of being presented for booking at the U.S. Marshals Service lockup.
4. Appearances before the district judges may be waived or postponed, or may be conducted by telephone or videoconference.  See General Order 74 for procedures pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  For the month of June, in-court proceedings are permitted only for 1) guilty pleas, 2) sentencings, and 3) evidentiary hearings requiring witness testimony (such as motions to suppress or supervised release evidentiary hearings). This applies to both in-custody and out-of-custody defendants.
5. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence report has been prepared.
6. Grand jury proceedings in this district will resume in June on a date and in a manner to be determined.

1

**Other:**

1.  All local rules requiring that a courtesy copy be provided to the chambers of the assigned judge are suspended pending further notice, unless a judge orders otherwise in a specific case.

2.  The requirement under Civil Local Rule 5-1(b) that a pro se party must request permission from the assigned judge to use the court's Electronic Case Filing (ECF) system is suspended pending further notice.

3.  Pending further notice, the courthouses and law libraries are closed for public events, tours, and visits.

4.  Effective immediately, this General Order supersedes General Order 72-2.

ADOPTED:     May 21, 2020                 FOR THE COURT:


_____

Phyllis J. Hamilton
Chief Judge

# Exhibit U

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72-4

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the COVID-19 (Coronavirus Disease) outbreak remains a national public health emergency; and the Judges of the United States District Court for the Northern District of California continue to balance the various interests implicated by the COVID-19 public health emergency, and find that the current guidance of public health officials allows for a modification in court operations to permit the resumption of limited in-court proceedings;

NOW THEREFORE, the United States District Court, Northern District of California, hereby issues the following Order, effective immediately:

**Civil Cases:**
1. No new jury trial will be conducted through September 30, 2020.  Any jury trial dates currently scheduled to commence during that period will be postponed or vacated.  However, individual judges may offer bench trials by videoconference in lieu of postponement.
2. Through September 30, 2020, all civil matters will be decided on the papers, or if the assigned judge believes a hearing is necessary, the hearing will be by telephone or videoconference.  This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences, Alternative Dispute Resolution ("ADR") proceedings, and bench trials.  For specific instructions on telephone or video appearances, see the docket on PACER, the assigned judge's schedule of upcoming proceedings (located on each judge's web page at cand.uscourts.gov/judges), or the ADR webpage.

**Criminal Cases:**
1. Commencing July 1, 2020, a limited number of jury trials are permitted at the court's discretion.
2. Initial appearances and other proceedings before the magistrate judges will continue and will be conducted by telephone or by videoconference.  New arrestees shall be booked at Santa Rita Jail and produced for court appearance the following day instead of being presented for booking at the U.S. Marshals Service lockup.
3. Appearances before the district judges may be waived or postponed, or may be conducted by telephone or videoconference.  See General Order 74 for procedures pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  Commencing July 1, 2020, a limited number of in-court proceedings, other than status conferences, are permitted. This applies to both in-custody and out-of-custody defendants.
4. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence report has been prepared.

**Other:**
1. All local rules requiring that a courtesy copy be provided to the chambers of the assigned judge are suspended pending further notice, unless a judge orders otherwise in a specific case.
2. The requirement under Civil Local Rule 5-1(b) that a pro se party must request permission from

the assigned judge to use the court's Electronic Case Filing (ECF) system is suspended pending further notice.

3. Pending further notice, the courthouses and law libraries are closed for public events, tours, and visits.

4. Effective immediately, this General Order supersedes General Order 72-3.


ADOPTED:    June 24, 2020        FOR THE COURT:


_____

Phyllis J. Hamilton
Chief Judge

2

# Exhibit V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENERAL ORDER No. 72-5

IN RE: Coronavirus Disease Public Health Emergency

WHEREAS, the COVID-19 (Coronavirus Disease) outbreak remains a national public health emergency;

WHEREAS, the Judges of the United States District Court for the Northern District of California continue to balance the various interests implicated by the COVID-19 public health emergency; and

WHEREAS, the Judges of the United States District Court for the Northern District of California have determined that, due to a recent increase in COVID-19 cases and in light of the current guidance of public health agencies, the public safety will be best served by limiting the permissible in-court criminal proceedings to ten people, which necessarily precludes jury trials;

NOW THEREFORE, the United States District Court, Northern District of California, hereby issues the following Order, effective immediately:

**Civil Cases:**
1. No new jury trial will be conducted through September 30, 2020.  Any jury trial currently scheduled to commence before October 1, 2020, will be postponed or vacated.  However, individual judges may offer bench trials by videoconference in lieu of postponement.
2. Through September 30, 2020, all civil matters will be decided on the papers, or if the assigned judge believes a hearing is necessary, the hearing will be by telephone or videoconference.  This applies to motion hearings, case management conferences, pretrial conferences, settlement conferences, Alternative Dispute Resolution ("ADR") proceedings, and bench trials.  For specific instructions on telephone or video appearances, see the docket on PACER, the assigned judge's schedule of upcoming proceedings (located on each judge's web page at cand.uscourts.gov/judges), or the ADR webpage.

**Criminal Cases:**
1. No new jury trial will be conducted through September 30, 2020.  Any jury trial currently scheduled to commence before October 1, 2020, will be postponed or vacated.
2. Initial appearances and other proceedings before the magistrate judges will be conducted by telephone or by videoconference.  New arrestees shall be booked at Santa Rita Jail and produced for court appearance the following day instead of being presented for booking at the U.S. Marshals Service lockup.
3. Other court appearances may be waived or postponed, or may be conducted by telephone or videoconference.  See General Order 74 for procedures pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  A limited number of in-court proceedings are permitted, with a limit of 10 people present in the courtroom at one time.
4. To the extent possible, after lodging/filing an application to enter an open guilty plea or a plea agreement, guilty pleas and sentencing shall be consolidated for a date after the presentence

report has been prepared.

**Other:**

1. All local rules requiring that a courtesy copy be provided to the chambers of the assigned judge are suspended pending further notice, unless a judge orders otherwise in a specific case.

2. The requirement under Civil Local Rule 5-1(b) that a pro se party must request permission from the assigned judge to use the court's Electronic Case Filing (ECF) system is suspended pending further notice.

3. Pending further notice, the courthouses and law libraries are closed for public events, tours, and visits.

4. Effective immediately, this General Order supersedes General Order 72-4.


ADOPTED:     July 23, 2020                FOR THE COURT:


_____

Phyllis J. Hamilton
Chief Judge

2

# Exhibit W



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

### STANDING ORDER REGARDING CORONAVIRUS (COVID-19) AND COURT PROCEEDINGS

If any party or counsel finds that a hearing, deposition, mediation, or trial may cause a person to travel or act contrary to official guidance or precautions regarding the COVID-19 virus, the party or counsel shall timely request to postpone the relevant hearing, deposition, mediation, or trial or allow it by teleconference, videoconference, or other method. If the parties cannot reach an agreement, any party may bring their request to the Court by phone or written request.

The Court plans, as of now, to proceed with in-person Markman hearings as previously scheduled. If any party or counsel believes an alternative arrangement is necessary, the party or counsel shall confer with the opposing party or parties regarding the appropriate means to accommodate the request. For example, a client restricted from traveling may be able to participate in the Markman via videoconference. If the parties cannot reach an agreement, they may bring to the Court a timely request for accommodation. The Court will consider postponing the Markman hearing only if it is convinced that no other alternative arrangement is satisfactory.

This Order shall immediately apply to all cases assigned to the undersigned and Magistrate Judge Jeffrey C. Manske, and shall remain in effect until further order of the Court.

SIGNED this 12th day of March, 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

# Exhibit X

**U.S. District Court [LIVE]**
**Western District of Texas (Waco)**
**CIVIL DOCKET FOR CASE #: 6:18-cv-00308-ADA**

MV3 Partners LLC v. Roku, Inc.                                    Date Filed: 10/16/2018
Assigned to: Judge Alan D Albright                                Jury Demand: Plaintiff
Cause: 35:271 Patent Infringement                                 Nature of Suit: 830 Patent
                                                                  Jurisdiction: Federal Question

| | | |
|---|---|---|
| 04/02/2020 | 170 | Opposed MOTION to Continue *Due to the Covid-19 Pandemic* by Roku, Inc.. (Attachments: # 1 Proposed Order re: motion for continuance, # 2 Exhibit Ex. 1 - Virginia Order, # 3 Exhibit Ex. 2 - Maryland Order, # 4 Exhibit Ex. 3 - California Order)(Mandrusiak, Lisa) (Entered: 04/02/2020) |
| 04/08/2020 | | Text Order DENYING 170 Motion to Continue entered by Judge Alan D Albright. Before the Court is Roku's motion to continue the trial. Because trial is still several weeks away, it is premature to continue the case at this time. Accordingly, the Court DENIES the motion. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/08/2020) |
| 05/13/2020 | 271 | Minute Entry for proceedings held before Judge Alan D Albright: Case called for telephonic status conference. Court explained trial was continued to June 29 and that the date was unavoidable. The Court plans to have Mon - Wednesday and then the next week have Mon -Thursday. The Court was asked about when the jury should be selected. The Court feels that maybe the jury will be chosen the Thursday or Friday before. Judge plans to have 8 people on the jury. The Defendant has a conflict with one expert witness who is to be expert in EDTX trial from 7/6 - 7/10. The Court says trial must go when set - we will have to work around conflicts. The Court states that at the Pretrial conference the amount of time limits will be discussed. The Court asks the parties to confer and discuss with the law clerk about the final pretrial conference. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(am) (Entered: 05/13/2020) |
| 10/05/2020 | 350 | Minute Entry for proceedings held before Judge Alan D Albright: Jury Trial begun on 10/5/2020. TRIAL BEGINS 9:12, OPENING STATEMENTS OF COUNSEL FOR PLA/DEFT HEARD EVIDENCE PRESENTED ON BEHALF OF PLA - Exhibits 1, 2, 24, 40, 108, 129, 204, 206, 237, 274, 316 Admitted Demonstratives: (not admitted) 81 and 82, TRIAL CONT./RECESSED TO: 10/6 at 9:00 a.m. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(lad) (Entered: 10/06/2020) |

# Exhibit Y

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

**FILED**

AUG 1 8 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| IN RE: | § |
| WACO DIVISION | § |
| TRIALS | § |
| | § |

## DIVISIONAL STANDING ORDER REGARDING TRIALS IN WACO

The Waco Division, in accordance with the Western District of Texas's Seventh Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, enters the following order finding this Division may safely conduct trials:

1. The Waco Division serves Bell, Bosque, Coryell, Falls, Freestone, Hamilton, Hill, Leon, Limestone, McLennan, Milam, Robertson, and Somervell counties.

2. Since the beginning of July 2020, the county in which the Waco Division sits and those from which it pulls jurors have seen a meaningful decline in new reported COVID-19 cases. For example, McLennan County—one of the densest and most populated in the Division—has seen a 70% drop in rolling 7-day average of daily positives. *See* https://covidwaco.com/county/.

3. According to the Center for Disease Control as of the date of this order, the Waco Division's counties have approximately just 2.3% of all cases in Texas. *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html. Indeed, the Waco Division counties collectively have fewer cases than do a single county in Austin (Travis County), San Antonio (Bexar County), and El Paso (El Paso County). *Id.*

4. The Division has undertaken great efforts to ensure trials can be conducted safely. Among other things, the Court is prepared to mandate appropriate distancing in the courtroom and around the courthouse, limit the number of individuals in the courtroom, provide masks to jurors, supply hand sanitizer, and install plexiglass shields where beneficial and appropriate.

5. The Division has also sought feedback from other judges and lawyers who have conducted in-person trials since the outbreak of the pandemic. That feedback has informed the Division's procedures for trials.

6. Therefore, the Division is confident that, as things stand today, it can conduct fair trials in a safe manner. Accordingly, bench and jury trials in the Waco Division will resume as early as September 1, 2020.

7. The Chief Judge was notified of this Order on August 18, 2020.

It is further **ORDERED**, effective August 19, 2020, at 12:01 a.m., for the protection of court staff, litigants, attorneys, and observers, the following persons shall not enter the Waco Division Courthouse absent a specific order from the Court:

1

1. Any person who has traveled to any of the following countries within the preceding 14 days: People's Republic of China, South Korea, Japan, Iran, Brazil, or Western Europe;

2. Any person who has resided with, or has had close contact with, someone who has traveled to one of the countries listed above within the preceding 14 days;

3. Any person who is currently under the direction of a licensed healthcare professional or public health agency to self-quarantine;

4. Any person who has been diagnosed by a licensed healthcare provider as having COVID-19 or has tested positive for COVID-19 by a source authorized by any State, and who has not obtained written verification from a licensed medical doctor, doctor of osteopathy, hospital, or public health agency professional that he or she is currently not contagious;

5. Any person who lives with, or cares for, a person described in category 3 or 4 above; or

6. Any person who presents currently having a fever, chills, persistent cough, shortness of breath, persistent pain or pressure in the chest, nausea, or loss of the sense of taste or smell.

It is further **ORDERED** that any person seeking entry to the Waco Division Courthouse at any time may be asked by a Court Security Officer (CSO) or a member of the court staff to confirm that none of the exclusions listed above applies to that person.

It is further **ORDERED** that each person, except a witness while testifying, and an attorney while examining a witness or making a statement to a jury, must wear an appropriate face mask or covering while inside the Waco Division Courthouse, unless excused from this requirement by a judge, CSO, or a member of the court staff. Witnesses shall testify unmasked, and attorneys may speak unmasked, while maintaining social distance. Persons other than jurors must supply their own mask or face covering. Each person in the courthouse must follow the instructions of the court staff and CSOs to aid in maintaining distance in the courthouse.

It is further **ORDERED** that all CSOs, following substantive guidance provided by this Order and administrative guidance from the United States Marshal for the Western District of Texas, shall deny entry to anyone attempting to enter, or remain in, the Waco Division Courthouse in violation of these protocols. In the event of any uncertainty as to whether a person should be denied entrance to the courthouse, the CSOs shall immediately contact the U.S. Marshal or the designated Deputy Marshal for a determination, which shall control.

It is finally **ORDERED** that, unless extended by subsequent order, these restrictions shall remain in place until September 30, 2020, at 11:59 p.m., when they shall automatically expire.

SIGNED this 18th day of August, 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

2

# Exhibit Z

## Caridis, Alyssa

| | |
|---|---|
| **From:** | Paige Amstutz <pamstutz@scottdoug.com> |
| **Sent:** | Monday, October 12, 2020 2:16 PM |
| **To:** | Johnson, Jeffrey |
| **Cc:** | Roberts, Clement; de Blank, Bas; Caridis, Alyssa |
| **Subject:** | Civil Action 6:20-cv-881; Sonos v. Google--Request for Extension of Time |
| **Importance:** | High |

Good afternoon:

I was very recently hired to assist Google in connection with the above-referenced case.

It is my understanding that Google was served on September 29, 2020 and, currently, the deadline to answer or otherwise respond to the Complaint is October 20, 2020.

In order for Google to fully assemble its legal team and assess the allegations, I would really appreciate a 45-day extension of time for Google to answer or otherwise respond.  As I know you are aware, this is the extension of time that Judge Albright has found to be reasonable.

Please let me know as soon as practicable.

And, if you would like to visit by phone, don't hesitate to let me know and we can pick a good day and time soon.

As always, I look forward to hearing from you.

All my best,

Paige Arnette Amstutz
Scott, Douglass & McConnico, LLP

---

IMPORTANT - SCOTT DOUGLASS & McCONNICO DISCLAIMER: This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination or copying of this communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone at (512) 495-6300 and/or email and delete the original message. Thank you.