# Appendix A

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2    charlesverhoeven@quinnemanuel.com
     Melissa Baily (Bar No. 237649)
3    melissabaily@quinnemanuel.com
     Jordan Jaffe (Bar No. 254886)
4    jordanjaffe@quinnemanuel.com
     Lindsay Cooper (Bar No. 287125)
5    lindsaycooper@quinnemanuel.com
   50 California Street, 22nd Floor
6  San Francisco, California 94111-4788
   Telephone: (415) 875-6600
7  Facsimile: (415) 875-6700

8  Attorneys for GOOGLE LLC

9

                      UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN FRANCISCO DIVISION
12

13
                                          CASE NO. 3:20-cv-06754-WHA
14  GOOGLE LLC,
                                          **LETTER OF REQUEST: REQUEST FOR**
15                                        **INTERNATIONAL JUDICIAL**
                         Plaintiff        **ASSISTANCE PURSUANT TO THE**
16                                        **HAGUE CONVENTION OF 18 MARCH**
                                          **1970 ON THE TAKING OF EVIDENCE**
17       v.                               **ABROAD IN  CIVIL OR COMMERCIAL**
                                          **MATTERS**
18  SONOS, INC.,

19

20

21

22

23

24

25

26

27

28

LETTER OF REQUEST: REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18
MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

**GREETINGS:**

The United State District Court, Northern District of California ("Requesting Court") respectfully requests international judicial assistance to documentary and testimony evidence from a non-party entity, Spotify AB ("Spotify"), located in Stockholm, Sweden, on the topics set forth in **Schedule B**, and to obtain the production of documents from Spotify set forth in **Schedule A**. The requested testimony and documents are to be used in a civil action proceeding before the Requesting Court.  The Requesting Court requests the assistance described herein as necessary in the interests of justice.

| | |
|---|---|
| Sender | The Honorable Judge William Alsup, District Judge United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 12 – 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102 USA. |
| Central Authority of the Requested State | Länsstyrelsen i Stockholms län (County Administrative Board of Stockholm) Centralmyndigheten för internationell delgivning

(The central authority for international service of documents)

Box 22067 SE-104 22 Stockholm Sweden Tel:     + 46 (0)10 223 10 00 Fax: + 46 (0)10 223 11 10 E-mail: stockholm@lansstyrelsen.se |
| Person to whom the executed request is to be returned | This Court; representatives of the parties as indicated below; the witnesses from whom evidence is requested as indicated below; such other person(s) that you deem proper; and Google LLC's representative in Sweden:

Henrik Bengtsson Advokatfirman Delphi Mäster Samuelsgatan 17, P.O. Box 1432 SE-111 84 Stockholm, Sweden Henrik.Bengtsson@delphi.se Phone direct +46 8 677 54 89 Mobile +46 709 25 25 16 Fax +46 8 20 18 84 |

| Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request | To allow the parties sufficient time to analyze the requested documents and testimony for their use at trial and in pretrial filings, a response to the Letter Rogatory is requested by January 31, 2021, or as soon thereafter as is reasonably possible. |
|---|---|
| In conformity with Article 3 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), Federal Rule of Civil Procedure 28(b), and 28 U.S.C.A. 1781(b), the undersigned authority respectfully has the honor to submit the following request:<br><br>Requesting Judicial Authority (Article 3, a) | The Honorable Judge William Alsup, District Judge United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 12 – 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102 USA. |
| To the competent Authority of (Article 3, a) | Sweden |
| Names of the case and any identifying number | *Google LLC v. Sonos, Inc.*, Case No. 3:20-cv-06754-WHA (N.D. Cal.) |
| Name and address of the parties and their representatives (including representatives in the requested State) (Article 3, b) ||
| Plaintiff | Sonos, Inc. |
| Representatives | Sonos, Inc. is represented by:<br><br>Alyssa Caridis<br>Orrick Herrinton & Sutcliffe Llp<br>777 South Figueroa St., Suite 3200<br>Los Angeles, CA 90017<br>213.612.2372<br>Fax: 213.612.2499<br>Email: acaridis@orrick.com<br><br>Bas de Blank<br>Orrick, Herrington & Sutcliffe LLP<br>1000 Marsh Rd.<br>Menlo Park, CA 94205<br>(650) 614-7343<br>Fax: (650) 614-7401<br>Email: bdeblank@orrick.com<br><br>Clement Seth Roberts<br>Orrick Herrington & Sutcliffe Llp<br>405 Howard Street<br>San Francisco, CA 90071<br>(415) 773-5700<br>Fax: (415) 773-5701<br>Email: croberts@orrick.com |

| | |
|---|---|
| Defendant | Google LLC |
| Representatives | Google LLC is represented by:<br><br>Charles K. Verhoeven<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>(415) 875-6600<br>Fax: (415) 875-6700<br>Email: charlesverhoeven@quinnemanuel.com<br><br>Lindsay M. Cooper<br>Quinn Emanuel & Sullivan LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94105<br>(415) 875-6449<br>Fax: (415) 875-6700<br>Email: lindsaycooper@quinnemanuel.com<br><br>Marc L. Kaplan<br>Quinn Emanuel Urquhart & Sullivan LLP<br>191 N. Wacker Drive, Suite 2700<br>Chicago, IL 60606<br>(312) 705-7400<br>Fax: (312) 705-7401<br>Email: marckaplan@quinnemanuel.com<br><br>Henrik Bengtsson<br>Advokatfirman Delphi<br>Mäster Samuelsgatan 17, P.O. Box 1432<br>SE-111 84 Stockholm, Sweden<br>Henrik.Bengtsson@delphi.se<br>Phone direct +46 8 677 54 89<br>Mobile +46 709 25 25 16<br>Fax +46 8 20 18 84 |
| Other parties | None. |
| Nature of the proceedings (divorce, paternity, breach of contract, product liability, etc.) (Article 3, c) | Civil action alleging patent infringement under the patent laws of the United States. |
| Summary of complaint | This case is styled *Google LLC v. Sonos, Inc., Case No. 3:20-cv-06754-WHA (N.D. Cal.)* ("U.S. Action").<br><br>After Sonos, Inc. ("Sonos") accused Google LLC ("Google") of infringing several patents that are purportedly owned by Sonos,  Google filed the U.S. Action seeking a declaration from the Requesting Court that the patents |

| | |
|---|---|
| | Sonos is accusing Google of infringing are invalid and not infringed. |
| | Two of the patents at issue are U.S. Patent Nos. 9,967,615 ("'615 patent") and 10,779,033 ("'033 patent"). Sonos refers to the '615 patent and '033 patent as its "cloud queue" patents, and contends that they disclose methods and system for queueing of media items that are to be played on a playback device, including playback queues that are provided to a playback device via a cloud-based computing system. |
| Summary of defense and counterclaim | In defense against Sonos's claims of patent infringement of the '615 and '033 patents (the alleged "cloud queue" patents), Google asserts, *inter alia*, that the claims of these patents are invalid. For instance, the "cloud queue" patents have a priority date of December 30, 2011, and Google contends that prior to this priority date the cloud queue functionality claimed in the patents was known or obvious to those of ordinary skill in the art, and disclosed by systems and services that were publicly available. For example, Google contends that products and services provided by Spotify AB, alone or in conjunction with third party integration partners, render the claims of the '615 and '033 patents invalid. |
| Other necessary information or documents | A Protective Order governing the production and disclosure of confidential information in connection with this legal proceeding is attached to Schedules A and B as **Attachment 5**. Thus, any confidential documents or testimony provided in this proceeding would be protected from disclosure to the public pursuant to the terms of the Protective Order. |
| Evidence to be obtained or other judicial act to be performed (Article 3d) | In order to present its defenses that the '615 and '033 patents are invalid, Google LLC seeks certain documents and testimony from Spotify that are described fully in the attached **Schedules A** and **B.** |
| | Google attempted to obtain this information by serving a subpoena on a related Spotify entity in the United States ("Spotify USA"). Spotify USA, however, contends that Spotify AB is a separate entity, and that Spotify AB |

| | |
|---|---|
| | may not be in possession, custody or control of all the requested documents and testimony. |
| | This Court has determined that there are sufficient grounds to obtain testimonial and documentary evidence sought through this Letter of Request, as the evidence sought is directly relevant to the issues to be determined by this Court, and such evidence cannot be secured elsewhere or otherwise without the intervention of the appropriate judicial authorities in Sweden. |
| Purpose of the evidence or judicial act sought | As Spotify AB is outside the subpoena power of this Court and cannot be subpoenaed to appear as a witness in this case, the testimony and documents sought in this Letter of Request will be used in this case, including at any trial. |
| | The requested documents and testimony described in detail in **Schedules A** and **B** are relevant to Google LLC's defenses.  Spotify AB has knowledge of the facts relevant to Google's invalidity defenses.  For instance, prior to the December 30, 2011 priority date, Spotify offered streaming of music and functionality that Google LLC contends is prior art to Sonos's '615 and '033 patents.  In fact, Spotify worked with Sonos to integrate its service into the Sonos speaker system on or around 2010.  Spotify also worked with other providers to integrate cloud streaming and related functionality on playback devices, such as Logitech's Squeezebox, and Onkoy's receivers.  The documents and testimony in **Schedules A** and **B** are directed to these narrowly tailored issues. |
| Identity and address of any person to be examined (Article 3, e) | Spotify AB<br>Regeringsgatan 19<br>SE-111 53 Stockholm<br>Sweden<br>Reg no: 556703-7485<br>office@spotify.com |
| Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3, f) | *See* **Schedule B** |
| Documents or other property to be inspected (Article 3, g) | *See* **Schedule A** |
| Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3, h) | This Court respectfully requests that the examination be conducted under oath. |

| Special methods or procedure to be followed (*e.g.*, oral or in writing, verbatim, transcript or summary, cross-examination, etc.) (Article 3, i) and 9) | This Court respectfully requests that Central Authority direct a representative of Spotify AB to appear on or before January 31, 2021. |
|---|---|
| | This Court further respectfully requests that: (1) the examination be taken orally; (2) the examination be taken before a stenographer and videographer selected by Google LLC; (3) the videographer be permitted to record the examination by audiovisual means; (4) the stenographer be allowed to record a verbatim transcript of the examination; (5) the examination be conducted in English, or, if necessary, with the assistance of an interpreter selected by Google LLC; (6) if the examination is conducted through an interpreter, verbatim transcripts of the proceeding in both English and Swedish may be permitted; (7) the witness be examined for no more than seven hours of testimony; (8) the witness be examined as soon as possible; and (9) the above-mentioned U.S. counsel for Google and Sonos, and Swedish counsel retained by the parties, be permitted to participate in the examinations, by attending the testimony of the witnesses either in person or by videolink and be permitted to examine and cross-examine the witnesses. In the event that the evidence cannot be taken according to some or all of the procedures described above, this Court requests that it be taken in such manner as provided by the laws of Sweden for the formal taking of testimonial evidence.  Costs incurred in relation to the deposition examination (court reporter, video recorder, simultaneous translation) shall be at Google LLC's expense. |
| | This Court also requests that Spotify AB produce the documents listed in **Schedule A** to this Letter of Request at least fifteen days prior to the Spotify examination. |
| Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (Article 7) | This Court respectfully requests that you notify this Court; the representatives of the parties as indicated above; the witness from whom evidence is requested as indicated above; and such other person(s) that you deem proper. |
| Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (Article 8) | No judicial personnel of the requesting authority will attend or participate. |

| | |
|---|---|
| Specification of privilege or duty to refuse to give evidence under the law of the State of origin (Article 11, b) | Under the laws of the United States, a witness has a privilege to refuse to give evidence if to do so would disclose a confidential communication between the witness and his or her attorney that was communicated specifically for the purpose of obtaining legal advice and which privilege has not been waived. United States law also recognizes a privilege against criminal self-incrimination. Other limited privileges on grounds not applicable here also exist, such as communications between doctors and patients, husband and wife, and clergy and penitent. Certain limited immunities are also recognized outside the strict definition of privilege, such as the limited protection of work product created by attorneys during or in anticipation of litigation. |
| The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by | Google LLC will bear the reimbursable costs associated with this request in accordance with the provisions of the Hague Convention. |

Date of Request:                              Ocobter ___, 2021.


Signature and Seal of Requesting
Authority:

_____

Hon. William Alsup
Judge of the United States District Court
Northern District of California

# Schedules
# A and B

**DEFINITIONS**

1.      Schedules A and B below are subject to and incorporate the following definitions and instructions, regardless of whether upper or lower case letters are used:

2.      "Spotify" "You," or "Your" means Spotify AB, including its agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Spotify, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Spotify as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.   To the extent Spotify AB is in control of, or acts as the agent of these entities, Spotify includes, but is not limited to, Spotify Belgium, Spotify GmbH, Spotify Denmark ApS, Spotify Spain SL, Spotify France SaS, Spotify Finland Oy, Spotify Italy S.r.l., Spotify Netherlands, Spotify Poland Sp. z o.o., and Spotify Ltd.

3.      "Sonos" means Sonos Inc., including its agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Sonos, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Sonos as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.

4.      "Google" means Google LLC.

5.      "'033 Patent" shall mean United States Patent No. 10,779,033 and any related patents or applications.

6.      "'615 Patent" shall mean United States Patent No. 9,967,615 and any related patents or applications.

7.      "Playback Queue Functionality" shall refer to a queue of media items that are to be played on one or more playback devices, including playback queues provided to a playback device or system by a cloud-based computing system.  This includes both a Device Playback Queue and a  Cloud Playback Queue as defined below.

8.      "Device Playback Queue" shall refer to  a queue of media items  located on a playback device for playback on that device.

9.      "Cloud Playback Queue" shall refer to a queue of media items that are to be played on one or more playback devices, where the queue is located in a cloud-based computing system.

10.      "Spotify for Sonos" shall refer to any software or hardware that is used for playing Spotify on a Sonos speaker or system, including, but not limited to, the Spotify integration described in **Attachment 1**.

11.      "Spotify for Squeezebox" shall refer to any software or hardware that is used for playing Spotify on a Logitech Squeezbox, including, but not limited to, the Spotify integration described in **Attachment 2**.

12.      "Spotify for Onkyo" shall refer to any software or hardware that is used for playing Spotify on a Onkyo receiver, including, but not limited, to, the Onkyo integration described in **Attachment 3.**

13.      "Spotify for Western Digital" shall refer to any software or hardware that is used for playing Spotify on a Western Digital device, including, but not limited, to the Spotify integration described in **Attachment 4**.

14.     "Document" shall be construed to include any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including originals, drafts, and all non-identical copies of each document (which, by reason of any variation, such as the presence of absence of hand-written notes or underlining, represents a distinct version). By way of example, the term "document" as used herein shall include: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; emails; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; patents and patent application materials; patent appraisals; printed publications; trademark applications, certificates of registration, opinions of counsel; memoranda of agreements, assignments, licenses; reports of or summaries of either negotiations within or without the corporation or preparations for such; and all other tangible items of readable, recorded, or visual material of any kind.

15.     "Communication" means any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, document, instruction, information, demand, question or other

information by any medium, whether by written, oral or other means, including electronic communications and electronic mail.

16.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

17.     The terms "any," "all," "every," and "each" each means and includes the other.

18.     The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

19.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

20.     "Include" and "Including" mean including without limitation.

21.     The provision of definitions set forth herein shall not be construed to be an admission that identical or similar terms in the claims of the Patent-in-Suit should receive such construction and shall have no binding effect on Google in this or any other proceeding.

## **INSTRUCTIONS**

1.     Produce all responsive Documents, electronically stored information, and things in Your possession, custody, or control, wherever located, in the manner in which they are maintained.

2.     State, for each request, whether or not there exist any Documents within the scope of the request and whether any such Documents are in Your possession, custody, or control.

3.     If any Document is withheld from production on the basis of privilege, immunity, or any similar claim, please specify: (i) the date of the Document; (ii) the subject matter of the Document; (iii) the type of Document (memorandum, pamphlet, report, etc.); (iv) such other information as is sufficient to identify the Document, Including, where appropriate, the author,

addressee, and any other recipient of the Document, and where not apparent, the relationship of the author, addressee, and any other recipient to each other; and (v) an explanation of the basis for withholding the Document.

4.      If You object to the scope or breadth of any request, respond within the scope or breadth of production that You contend is proper, and define the scope or breadth in which You have responded.

5.      Please include a unique production number with each document produced by you in response to these requests. You may designate documents confidential pursuant to the Protective Order of the Order Governing Proceedings attached as **Attachment 5**.

## SCHEDULE A

## REQUESTED DOCUMENTS

1.      Documents relating to the conception, design, development, operation, and configuration of any Playback Queue Functionality in Spotify prior to December 30, 2011, including but not limited to any functionality for transferring ongoing playback of a queue from one device to another.  (These Documents are requested because Spotify offered streaming music functionality with Playback Queue Functionality that is prior art to Sonos' '615 and '033 patent and evidences the invalidity of these patents).

2.      Documents sufficient to identify third-party devices that supported Spotify prior to December 30, 2011.  (These Documents are requested because Spotify integrated its streaming music functionality into third-party devices and these integrated offerings constitute prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

3.      Documents from before December 30, 2011 that relate to Spotify for Sonos or Spotify's integration with Sonos, including but not limited to documents sufficient to show the conception, design, development, operation, and configuration of Spotify for Sonos.  (These Documents are requested because Spotify integrated its service into the Sonos speaker system prior to December 30, 2011 and the integrated offering constitutes prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

4.      Documents from before December 30, 2011 that relate to Spotify for Squeezebox, including documents sufficient to show the conception, design, development, operation, and configuration of Spotify for Squeezebox. (These Documents are requested because Spotify integrated its service into a Squeezebox device prior to December 30, 2011 and the integrated

offering constitutes prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

5.      Documents from before December 30, 2011 that relate to Spotify for Onkyo, including documents sufficient to show the conception, design, development, operation, and configuration of Spotify for Onkyo.  (These Documents are requested because Spotify integrated its service into an Onkyo device prior to December 30, 2011 and the integrated offering constitutes prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

6.      Documents from before December 30, 2011 that relate to Spotify for Western Digital, including documents sufficient to show the conception, design, development, operation, and configuration of Spotify for Western Digital.  (These Documents are requested because Spotify integrated its service into a Western Digital device prior to December 30, 2011 and the integrated offering constitutes prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

7.      Any API or SDK offered by Spotify on or before December 30, 2011, including documents relating to any such API or SDK.  (These Documents are requested because Spotify offered an API and SDK for its streaming music functionality with Playback Queue Functionality that is prior art to Sonos' '615 and '033 patent that evidences the invalidity of these patents).

8.      Documents showing the earliest date (1) Spotify for Sonos, (2) Spotify for Squeezebox, (3) Spotify for Onkyo, and (4) Spotify for Western Digital was demonstrated publicly, marketed, offered for sale, sold, or used in the United States with the Playback Queue Functionality.  (These Documents are requested to show that the Spotify offerings that are the subject of the above requests are valid prior art).

9.      Source code sufficient to show the operation of the Playback Queue Functionality within Spotify, including source code for the Playback Queue Functionality within (1) Spotify for Sonos, (2) Spotify for Squeezebox, (3) Spotify for Onkyo, and (4) Spotify for Western Digital. (This source code is requested to show the functionality of the Spotify offerings that are the subject of the prior requests and that may not be described at the same level of detail in the Documents).

## SCHEDULE B

## TOPICS OF EXAMINATION

1.      The conception, design, development, operation, and configuration of any Playback Queue Functionality in Spotify prior to December 30, 2011, including but not limited to any functionality for transferring ongoing playback of a queue from one device to another.

2.      All third-party devices that supported Spotify prior to December 30, 2011.

3.      The conception, design, development, operation, and configuration of Spotify for Sonos or Spotify's integration with Sonos prior to December 30, 2011.

4.      The conception, design, development, operation, and configuration of  Spotify for Squeezebox prior to December 30, 2011

5.      The conception, design, development, operation, and configuration of  Spotify for Onkyo prior to December 30, 2011.

6.      The conception, design, development, operation, and configuration of  Spotify for Western Digital prior to December 30, 2011.

7.      Any API or SDK offered by Spotify on or before December 30, 2011.

8.      The earliest date (1) Spotify for Sonos, (2) Spotify for Squeezebox, (3) Spotify for Onkyo, and (4) Spotify for Western Digital was demonstrated publicly, marketed, offered for sale, sold, or used in the United States with the Playback Queue Functionality.

9.      The source code that implements the Playback Queue Functionality within Spotify, including for the Playback Queue Functionality within (1) Spotify for Sonos, (2) Spotify for Squeezebox, (3) Spotify for Onkyo, and (4) Spotify for Western Digital.

10.      The authenticity of any Documents produced by Spotify in response to Google's document requests in Schedule A.

11.     The search for and collection of Documents  in response to Google's document

requests in Schedule A.

# ATTACHMENT 1



Sign in

**News** | **Opinion** | **Sport** | **Culture** | **Lifestyle**

US   World   Environment   Soccer   US Politics   Business   **Tech**   Science   Newsletters   Green light

**Technology blog**
Spotify

# Sonos and Spotify offer new streaming service to European users

**IFA 2010: premium customers can use music streaming service through home music service from end of this month. Meanwhile Sonos is replacing a number of faulty controllers for its systems.**





Spotify: coming to Sonos systems in Europe later in September. Photograph: Public Domain

## Josh Halliday

Thu 2 Sep 2010 06.23 EDT

Internet music service Spotify has joined forces with Sonos, adding to the multi-room player's roster of web-based music partnerships as part of an industry-wide drive to get more people to pay for music.

Spotify's 500,000 paying customers - those on its £10-per-month "premium" service - will now be able to stream their digital library through a Sonos home entertainment system, provided they live in Finland, France, the Netherlands, Norway, Spain, Sweden or the UK. Because Spotify is still not available in the US, due to licensing issues with record labels there, Sonos customers there - one of its biggest markets won't be able to get it yet.

Sonos already has similar tieups with the international music service Napster, as well as Last.fm, Audble.com and Deezer.

John MacFarlane, chief executive of the California-based company, says the latest move is a "complete reinvention of the home stereo system", adding that "Spotify on Sonos has been the number one request from our European customers and we're thrilled to deliver it."

"It's great that people will be able to listen to Spotify whenever they want, wherever they

want in their home," said Daniel Ek, Founder and CEO Spotify.

Sonos and Spotify customers with a ZonePlayer, Sonos S5 music player and a Sonos Controller – available either as a separate controller, or as a free iPhone app and soon-to-be-launched iPad app – will be able to use the service from late September.

"No money changes hands in this deal," MacFarlane told the Guardian. "We have a very good business in all areas Spotify sells in so it makes sense for both companies to make each other better. Spotify do a nice job on focusing on user experience and it streams really well."

He added: "The labels are putting more and more pressure on Spotify to move members to a paying service so that made more sense from their perspective. What's happening in the digital music landscape...the traditional players are now starting to embrace it and part of that is users paying for music. That's a trend that's only going to increase."

Spotify has garnered momentum in Europe, despite still not launching in the US after four years. Although it has forged licensing deals with labels including Sony and EMI, some songwriters still appear disenchanted with the service's ability to generate income for artists.

Patrick Rackow, chairman of the British Academy of Songwriters, Composers and Authors, told the BBC earlier this year: "At the moment, the amounts of money that are actually being received are tiny. That might be because there is no money there."

The streaming space is looking increasingly complicated. Sony yesterday announced its own move into the music streaming space with a subscription-based service centred around its Playstation 3 console.

Speaking at Berlin's IFA fair, the electronics manufacturer said the new "cloud-based" service would allow customers to download songs and HD movies over the internet and watch them on other web-enabled Sony devices, including TVs, laptops and music players.

🔴 Sonos is offering a free replacement to owners of its newer CR200 touch-screen controllers affected by manufacturing defects. Some owners of the CR200 have found that parts of the screen become unresponsive. The CR200 uses a capacitive touchscreen.

In an email sent to owners, Sonos says:

> *"We have recently discovered a potential issue with a small number of Sonos*

*Controller 200s (CR200) manufactured within a specific period. As a registered owner of one of these controllers, we wanted to let you know right away and inform you of our decision to extend your warranty."*

*"Specifically, a single area or areas of the touch screen may be unresponsive to normal touch usage. The reported failure rate, while low, does not meet Sonos quality standards. Therefore, Sonos is extending the product warranty for your Sonos Controller 200 for an additional year at no cost, in the event it fails in this manner."*

Customers who have had problems with the CR200 should contact Sonos's support pages to organise the replacement.

Topics

Spotify / Technology blog

IFA 2010 / blogposts

Reuse this content

## comments (…)

Commenting has been disabled at this time but you can still sign in or create your Guardian account to join the discussion when it's back

US   World   Environment   Soccer   US Politics   Business   **Tech**   Science   Newsletters   Green light

**News** | **Opinion** | **Sport** | **Culture** | **Lifestyle**

**Sign up for the Guardian Today email**

All the day's headlines and highlights from the Guardian, direct to you every morning

Email address

About us

Contact us

Complaints & corrections

SecureDrop

Work for us

Privacy policy

Cookie policy

Terms & conditions

Help

All topics

All writers

Digital newspaper
archive

Facebook

YouTube

Instagram

LinkedIn

Twitter

Newsletters

Advertise with us

Guardian Labs

Search jobs

Back to top ⌃

© 2021 Guardian News & Media Limited or its affiliated companies. All rights reserved. (modern)

# ATTACHMENT 2

## logitech

# BLOG

   

LOGITECH    LOGITECH G    ULTIMATE EARS    VIDEO COLLABORATION

You are here: Home › Product › Logitech UE › Spotify Arrives on Logitech Squeezebox in Europe

# Spotify Arrives on Logitech Squeezebox in Europe

*posted on* JANUARY 10, 2011 *by* LAURA SCORZA *in* LOGITECH UE *with* 29 COMMENTS

Big news music lovers in Europe – Logitech has joined forces with Spotify® to support the popular music service on the Logitech® Squeezebox™ Touch or Squeezebox™ Radio Wi-Fi music players! This means that you can now access Spotify's comprehensive catalogue of more than ten million songs, including your Spotify playlists, anywhere in the home.



Logitech Squeezebox Radio



Logitech Squeezebox Touch

To enjoy Spotify on your Squeezebox, all you'll need is a Spotify Premium subscription, which in addition will give you CD-quality 320 kbps sound, offline and mobile access, as well as exclusive music content. Spotify is currently available in Finland, France, the Netherlands, Norway, Spain, Sweden and the U.K. A test version of the Spotify app for Squeezebox Touch and Squeezebox Radio owners is available today in Beta form now at mysqueezebox.com.

*Tags: spotify, squeezebox, squeezebox radio, squeezebox touch*

SHARE THIS POST

       

« My Logitech Revue Giveaway!

Logitech Wins Two Stereophile Magazine Awards for Squeezebox Touch »

- POLICIES + TERMS

## Comment Policy

We're glad you're here. We want to hear from you and encourage comments, critiques, questions and suggestions. Please understand that we reserve the right to edit or delete comments for any reason we deem appropriate. This is a moderated blog and comments and postings will be reviewed for relevance and topicality. We will review the queue several times daily, so please don't resubmit if your comment doesn't appear immediately. At this time, we are only able to post and respond to comments written in English.

## Author



**Laura Scorza**

View all posts by Laura Scorza →

Public Relations Manager, EMEA

## Related Posts



International Eight Track Tape Day

🕓 APRIL 11, 2013



Highlights from SXSW Interactive

🕓 MARCH 15, 2013

- Music Just Got Smarter with Logitech UE

  🕓 DECEMBER 17, 2012

- Squeeze More Music Out of Your Logitech Squeezebox

  🕓 APRIL 6, 2012

- Happy St. Patrick's Day from Logitech

  🕓 MARCH 16, 2012

## 29 comments



**Arnstein**  January 11, 2011 at 04:38

Great news! Any information an whether it will be available for the Duet?



**Ha Thai**  January 24, 2011 at 17:26

Hi Arnstein,

We're currently focusing on the experience provided on our Squeezebox Radio and Squeezebox Touch. We appreciate the importance of our installed base of previous players including Squeezebox Duet, but can't currently offer a satisfactory solution due to the strict regulations on music file streaming.

Best,
Ha

**robert**  January 12, 2011 at 12:23

Why not Squeezebox Duet?

**Ha Thai**  January 24, 2011 at 17:27

Hi Robert,

Please see my response to Arnstein, above.

Best,
Ha

**Sarkari Naukri**  January 21, 2011 at 06:02

Wow ..... When it will arrive in India ?

**Ha Thai**  January 24, 2011 at 17:31

Hi Sarkari,

As currently Spotify is only available in Europe, we can't tell you when this might be availble in India.

Best,
Ha

**Kevin**  January 25, 2011 at 09:15

I have been running a 3rd Party Spotify plug-in on my four Booms and two Duets, it is fantastic. Very disappointing that the official Squeezebox / Spotify release that was downloaded this morning stopped the 3rd party working and I had to revert. Why download it for Booms and Duets if it is not going to operate?

**Ha Thai**  January 26, 2011 at 13:48

Hi Kevin,

You are right that at this time, the Spotify exprience is only available on Squeezebox and Squeezebox Radio.

Best,
Ha

**Frippe**  January 29, 2011 at 13:46

Hi
I am running both official Spotify program (for my Squeezebox radio) and also the third party plug-in on a server so when I connect my receiver to my server I can use the official spotify as normal with my Controller

**Mr G**  January 31, 2011 at 12:31



I undersand this is currently not available on the Duet due to the strict regulations but could one assume that this will be overcome or is it something that is unlikely to ever happen, it would be good to know for closure and whether or not its time to upgrade.

Cheers.



**Amund Ose-Johansen** January 31, 2011 at 13:49

Does the Spotify client for Squeezebox support offline and local files?

Best, Amund



**Ha Thai** February 4, 2011 at 15:50

Hi Amund,

I directed your question to a member of the Logitech Squeezebox engineering team, and here's what I learned: Squeezebox does not support offline mode. Squeezebox systems are streaming music players for the home — so typically they are within the range of a home WiFi network. You can however, play your local files stored on your computer, or from a USB hard drive, a memory stick or SD card on the Squeezebox Touch.

Best,
Ha



**robert** February 1, 2011 at 21:32

[quote] Hi Arnstein,

We're currently focusing on the experience provided on our Squeezebox Radio and Squeezebox Touch. We appreciate the importance of our installed base of previous players including Squeezebox Duet, but can't currently offer a satisfactory solution due to the strict regulations on music file streaming.

Best,
Ha

[/quote]

This really says very little, please be more specific, eg are you working on it? – what specifically is the regulatory problem? Surely if the duet has a radio capability there should be a software solution, or is it a matter of whether Logitech is prepared to invest in developing the right software as obviously third parties will if you don't? If you are working on it what realistic timetable do you have?



**Ha Thai** February 2, 2011 at 10:01

Hi Arnstein,

Because this matter is dependent on multiple parties in addition to legal regulations, we unfortunately can not provide more details at this time.

-Ha



**t0-2** February 2, 2011 at 13:48

I wonder when it comes to Turkey. A great device



**EJ** February 6, 2011 at 04:28

I agree with Arnstein, no real reason has been given why I can't get Spotify onto a SB Duet if it's already supported on SB Radio. If the two devices are subject to different legal regulations then I would very much like to know why, I have one of each and none of this is explained in the documentation?

I am also interested in your answers to all of Arnstein's questions of 2nd Feb. Finally you can tell Spotify from me that they are loosing business while this situation prevails.

EJ



**matthew faull** February 12, 2011 at 13:40

I currently subscrive to spotify premiun – but cannot access on my squeezebox touch. I used to be able to – but now squeezebox say 'I need to be a spotify premium' subscriber' – which I am! I recntly accepted a download of new queezebox software.

Please can you suggest what the problems is/ how to get going again?



**NJ Clemmensen** February 15, 2011 at 11:22

I must say that I find it extremely disappinting that Spotify will not work with the Duet. It has taken quite long for Logitech to officially support Spotify as it is, and with this announcement I must confess that I am tempted to buy a Sonos.



**AJ** February 21, 2011 at 02:42

I find it even stranger that the Spotify app is available on my Duet handset. I can install it and run it and it appears fine. Only when I attempt to play a song do I get an error...

When it hasn't been released for Duet, why is it available to install?

When it is available to install, why isn't it functional?

---



**Thomas** February 24, 2011 at 11:53

I was just wondering if the spotify plugin is coming to the DUET at all?? If this is not in your release roadmap, please give me a feedback, so i can send it back to where I bought it.

T

---



**Stefan** February 27, 2011 at 09:10

Hello,

Two weeks I bought a Squeezebox Duet, wondering if I did the correct thing, since this device is allready two/three years on the market (and didn't support DLNA/UPnP..found out after ordering).

But the remote which gives the possibility to play all your music from the lazy chair, was the point of buying for me. And there are not much (or no) alternatives with this concept.

Sofar it works nice streaming my own music from my Netgear Nas (luckily there is a plugin for this device since no DLNA/UPnP support is build in).

But now I found out Spotify cannot be used....

It installs nicely... too bad, that I had to pay for a premium account for beeing able to try it out. Music can be found, but when playing a song I get the message on the display (of the remote): "Problem: unable to play file type for: URL:spotify://"

Album picture is showing and time is counting.. but no sound.

I cancelled the Spotify account because of technical problems, and asked for returning my money.

If it doesn't work it shouldn't be possible to install it at all. Or a free trying possibility.

Logitech: Please also support this functionality for this device. Otherwise I regret buying this device. The things I read in this thread don't make sense to me. Why is it allowed on other squeezebox models and not on the duet? Even on the mobile it's allowed. So I'd like to understand the problem!

What's the status? Is there something planned to solve this issue?

Thanks for the answer,

Stefan

---

**Firefox** March 1, 2011 at 05:00



Its a shame that we've waited so long for some clarity on when Spotify will be officially supported and now me sitting with two Duets and a Boom feels like a real idiot for thinking Logitech actually cared about their customers who supported their products for so long.

Reading between the lines above, its clear that they (Logitech) won't be supporting legacy products, only pushing their newer systems, thus attempting a forced upgrade.

We'll, you should learn from your mistakes and won't catch me being caught again.

So, ebaying 2 x Duets and a Boom, going real cheap and found this GREAT product called Sonos (sarcasm abounds) and they even support their old, loyal customers when upgrading to support Spotify.

http://www.expertreviews.co.uk/gadgets/1279993/spotify-for-sonos

We should all approach them from this forum, I'm sure Sonos would do us a great deal!

http://www.sonos.com/music/partners/spotify/Default.aspx?rdr=true&LangType=2060

---



**Tor-Arne**  March 1, 2011 at 05:42

I see that many people have gotten an answer, but isnt it strange that Sonos can have Spotify available? And I dont understand the problem. I have had Premium subscription since Spotify released, and Squeezebox Duet I've also had since release, and the price on it is the same today as what I paid for it back years ago.

But, when the team arent going to make Spotify work, as we have been waiting for ages on Duet, I feel its better to sell the Duet and get me a Sonos instead. Real shame as I have high regards for Logitech.

---



**Wille**  March 1, 2011 at 09:11

Spotify tell us we can use our existing playlist bu t I can't find them on my Logitech Radio device. can you please advice how to access them.
Regards Wille

---



**Matthew Atkinson**  March 2, 2011 at 12:26

you'd have thought that a forward thinking company like Logitech would work out a solution for the vast array of customers who have spent lots of money like me on duet, and in the hope that it would be like most devices forward compatible, well it looks like

that's not the case, and frankly thats a disgrace.

I don't buy for a minute that its a legal issue, that's a deflection, if you can stream to a touch, what legal reason can't you do it to a duet, be honest, and say that you want to make the duet defunct, and want everyone to move to the touch – and we can understand that you just like the rest of the world who offer no commitment to loyalty, i have a house full of your kit, web cams, four squeezebox recievers, remote controls – this is beyond poor its a disgrace . I'll set up some twitter hastags for those of you who want to follow up on this to make our point across the world of social media – @mattieatkinson

---



**RichH**  March 16, 2011 at 14:54

All you need to do to listen to Spotify on your Duet, Radio, Touch (any Squeezebox device, even the older models) is install the 3rd party Spotify plugin by Triode. It's there to install in the 'plugins' tab in your squeezebox server. As long as you have your premium subscription it works perfectly and enabes Spotify playback on any squeezebox device, you can even sync it between players as you can with any other music source and it works fine.

I agree with the other commenter's that it's unlikely to be a legal issue, it's more likely Logitech is just focusing their resources elsewhere.

Triode's plugin has been around for a long time now and I've even seen it referenced by various members of Spotify's staff (in comments to other blog posts etc and on forums) as a good way of getting Spotify onto your squeezeboxes – and that was way before the official logitech/spotify plugin was released. I don't believe for a minute Triode's plugin would still be available and in active development if there were any legal issues.

---



**Johan Erikstad**  March 21, 2011 at 06:17

I just bought Logitech Touch and installed the Spotify app. It works fine, but I keep getting an errormessage from time to time that says that the music I am trying to play is "not available in my region" (Norway). This must be a bug, or what?

---



**Hans**  March 27, 2011 at 04:50

I just installed the spotify app on my squeezebox radio and it works very well. Thanks! is there a way/tool/app available so that I can select spotify songs on my ipad and play them directly on my squeezebox radio (just like the sonos music system does)? Thanks!

---



**PéPé**  April 5, 2011 at 08:05

First time so disapointed by logitech… why not for the Duet ??!!! All is possible in computing, make some effort, it is not an usual to give up for you.

Comments are closed.

About | Contact | Investors | Press | Terms of Use | Privacy + Security

Copyright ©2021 | Logitech. All rights reserved

# ATTACHMENT 3

 Asia and Oceania Website   



## Spotify and Onkyo

Get instant access to Spotify's massive music library—including the popular playlist feature, "What's New" section, and "Starred" lists—on selected Onkyo network components. With a Spotify Premium subscription, you can access the music you want anywhere, anytime on your smart phone, computer, or Onkyo home entertainment system. Best of all, you can listen to premium quality audio files—up to 320kbps—almost immediately, without waiting for downloads or using valuable disk space.

## Compatible Onkyo Components

### 2012 Models:



| TX-NR5010 | TX-NR3010 | TX-NR1010 | TX-NR818 | TX-NR717 |
|-----------|-----------|-----------|----------|----------|
| TX-NR616  | TX-NR616AE| TX-NR515  | TX-NR515AE| TX-NR414 |
| T-4070    | HT-S6505  | CS-N755   |          |          |



## 2011 Models:

PR-SC5509      TX-NR5009      TX-NR3009      TX-NR1009      TX-NR809

TX-NR709      TX-NR609      TX-NR579      TX-NR509      TX-8050



HT-S6405



This list will be updated periodically. New products are added as they become available.

## Spotify is available in the following countries:

### Australia, New Zealand

## Watch the Spotify and Onkyo Video ▶

For more information regarding setup, please refer to this FAQ.

To learn more about Spotify, check out http://www.spotify.com/about/what/

Spotify Premium account required, additional costs may apply.

Copyright© Onkyo Home Entertainment Corporation. All rights reserved.

CLOSE

# ATTACHMENT 4



## Thursday, October 6th 2011



# Western Digital Announces WD TV Live Streaming Media Player With Spotify Capability

PRESS RELEASE | by **btarunr** | Oct 6th, 2011 11:38 | **Discuss (4 Comments)**

Western Digital, the world's leader in external storage solutions and maker of the popular WD TV media player family, today introduced the next generation of its WD TV Live streaming media player, an easy to use Wi-Fi enabled media player that is the first in its category to deliver the Spotify music service.

WD TV Live features WD's newest intuitive user interface that delivers the latest hit movies, TV shows, music and online services from companies like Netflix, Hulu Plus and Blockbuster directly to your TV. The new streaming media player connects to the Internet wirelessly or through an Ethernet connection, with the high performance 802.11n wireless connectivity supporting Full-HD 1080p video resolution.

  

In addition to premium Internet content, WD TV Live allows users to enjoy personal media such as photos, video and music on their home entertainment systems by supporting a wide range of file formats for streaming content from any connected USB drive, digital camcorder or camera, network drive such as the My Book Live personal cloud storage, and any networked PC or Mac computer in the home.

Adding to the WD TV family's current content offerings from Netflix, Hulu Plus, Blockbuster, CinemaNow, Pandora, YouTube, Facebook and many others, WD TV Live and WD TV Live Hub are the first streaming media players to deliver Spotify's acclaimed music service. Premium Spotify subscribers can now enjoy unlimited on-demand access to Spotify's catalog of over 15 million songs in excellent sound quality (available in up to 320kbps) on their home entertainment system.

WD incorporates Spotify's popular features in the new service, including the ability to create and manage Spotify playlists, share songs to Spotify friends, and see and subscribe to friends' playlists via their Spotify profiles. Users can also share tracks by sending songs directly to other Spotify users' inboxes. Spotify for WD TV Live and WD TV Live Hub delivers an exciting new way to enjoy and share music on the best sound system in your home.

"WD is committed to providing our customers with a premium entertainment experience that includes seamless streaming of personal media and the best of the Internet directly to the highest quality screen and sound system in the home," said Jim Welsh, executive vice president and general manager for WD's Branded Products and Consumer Electronics groups. "By marrying advanced features of the new wireless WD TV Live with quality content from service providers, including a first of its kind service with Spotify, we are excited to deliver on that commitment."

Pascal de Mul, Global Head of Hardware Partnerships, Spotify, commented: "We're really excited to make further steps into the living room with the streaming media players from Western Digital, which from today offer the full Spotify streaming catalog in a truly innovative TV-focused user experience."

MSRP for the WD TV Live streaming media player is $99.99 USD. Spotify is now available on the new WD TV Live players, as well as the WD TV Live Hub streaming media player, which features a built-in 1 TB hard drive to store personal content locally for TV streaming. The Spotify service is available in eight countries: USA, UK, Sweden, Finland, Norway, France, the Netherlands and Spain.

   

### Related News

Tags: #1080p  #802.11n  #Facebook  #Media Player  #My Book  #Netflix  #USB  #WD  #Western Digital  #Wi-Fi

| | | |
|---|---|---|
| ▣ Aug 4th 2021 | Western Digital Reports Fourth Quarter and Fiscal Year 2021 Financial Results | (1) |
| ▣ Jun 23rd 2021 | Western Digital Readies WD Black SN850 Firmware Update Restoring AMD X570 Performance | (9) |
| ▣ Jun 8th 2021 | Western Digital, Percona Join Forces to Extend The Zoned Storage Ecosystem | (1) |
| ▣ Jun 25th 2021 | Western Digital: Disconnect WD My Book Live External HDDs From the Internet Immediately | (37) |
| ▣ Jun 14th 2021 | Western Digital May Introduce Penta Layer Cell (PLC) NAND by 2025 | (30) |
| ▣ Apr 29th 2021 | Western Digital Reports Fiscal Third Quarter 2021 Financial Results | (1) |
| ▣ May 26th 2021 | Western Digital Unveils WD Black 750 SE NVMe SSD: Budget PCIe 4.0 | (25) |
| ▣ Jun 23rd 2021 | Western Digital Launches iNAND MC EU551 Storage for 5G Smartphones | (1) |
| ▣ Jun 15th 2021 | Western Digital Fuels Faster Decision Making at the Edge and in Harsh Remote Environments | (1) |
| ▣ May 26th 2021 | Western Digital Also Announces WD_Black D30 Game Drive SSDs for Xbox Series and PS5 | (2) |

# 4 Comments on Western Digital Announces WD…

**Add your own comment**

---

**[H]@RD5TUFF**                                                                                           #1

Looking for a replacement for my roku player perhaps this is it.

Posted on Oct 6th 2011, 13:14

---

**Sasqui**                                                                                                #2

What is the difference between this and the "Hub" version, just the 1TB drive?

Can you plug a USB drive enclosure into the USB port on the non-"Hub" version and play video content?

Price is certainly right. Reviews of the Hub version are decent, but it supposedly has no WiFi (or perhaps that is a previous version).

Posted on Oct 6th 2011, 13:17

---

**Aevum**                                                                                                 #3

I think that this is the best player when it comes to compatability and features.

But it always lagged in 3rd party apps where delevopers like popcorn hour or boxee had a upper hand.

I truly think that if western digital either opened its plug in development to 3rd parties. adding the ability to add new apps. and opening it software developers like indie game developers. Imagen Sega or nintendo selling copies of sonic the hedge hog or Super mario bros for it at 3 bucks a pop.
im sure that a few snes or genesis games could make the WD HD Live a VERY popular

**timta2**                                                                                    #4

I love my older WD Live Plus. It plays just about any format without any problems. The WDLXTV (B-Rad's) custom firmware makes it even better.

> Sasqui
> Can you plug a USB drive enclosure into the USB port on the non-"Hub" version and play video content?

Yes, and USB flash drives work great too.

Posted on Oct 6th 2011, 17:25

Copyright © 2004-2021 www.techpowerup.com. All rights reserved.

All trademarks used are properties of their respective owners.

# ATTACHMENT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SONOS, INC. <br><br>        Plaintiff, <br><br>    v. <br><br> GOOGLE LLC, <br><br>        Defendant. | Case No. 6:20-cv-00881-ADA <br><br> JURY TRIAL DEMANDED |

## STIPULATED PROTECTIVE ORDER

1.   <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

2.   <u>DEFINITIONS</u>

2.1   <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2   <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3     Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designated House Counsel: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.

2.5     Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

2.6     Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7     Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9     "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and

associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10    House Counsel: attorneys who are members in good standing of at least one state bar, who are employees of a Party, and who have responsibility for managing this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a Party and have appeared in this action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.13    Party: any party to this action.

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium, and professional jury or trial consultants) and their employees and subcontractors, who (1) have been retained by a Party or its counsel to provide litigation support services with respect to this action, (2) are (including any employees and subcontractors) not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, are not anticipated to become an employee of a Party or of a Party's competitor.

3

2.16 <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17 <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material.

3.     <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.     <u>DURATION</u>

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a Court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) entry of a final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews

of this action, including the time limits for filing any motions or applications for extension of
time pursuant to applicable law.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party
or Non-Party that designates information or items for protection under this Order must take care
to limit any such designation to specific material that qualifies under the appropriate standards.
Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to
be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily
encumber or retard the case development process or to impose unnecessary expenses and
burdens on other Parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated
for protection do not qualify for protection at all or do not qualify for the level of protection
initially asserted, that Designating Party must promptly notify all other Parties that it is
withdrawing the mistaken designation.

5.2    Manner and Timing of Designations. Except as otherwise provided in this Order
(see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered,
Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so
designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but
excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing
Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains

5

protected material.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE") to each page that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party when practical identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY

6

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE."

Parties shall give the other Parties reasonable notice (a minimum of two business days) if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other Parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

5.3    Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Timing of Challenges. Any Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The Parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next

stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without Court intervention, the Challenging Party shall file and serve a motion to re-designate or de-designate under Local Rule CV-7 and in accordance with the Order Governing Proceeds ("OGP") within 21 days of the initial notice of challenge or within 14 days of the Parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other Parties) may expose the Challenging Party to sanctions. All Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court rules on the challenge.

7. <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation, and such Protected Material shall not be used for any business purpose, in connection with any other legal proceeding, or directly or indirectly for any other purpose whatsoever. Such Protected Material may be disclosed only to

9

the categories of persons and under the conditions described in this Order.[1] When the litigation

has been terminated, a Receiving Party must comply with the provisions of section 15 below

(FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and

in a secure manner that ensures that access is limited to the persons authorized under this Order.

Protected Material shall not be reproduced by a Receiving party, except for transmission to

qualified recipients, without the written permission of the Producing Party or by further order of

the Court.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise

ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may

disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as

employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the

information for this litigation and who have signed the "Acknowledgment and Agreement to Be

Bound" that is attached hereto as Exhibit A;

(b) Up to one House Counsel of the Receiving Party to whom disclosure is

reasonably necessary for this litigation, provided however that such House Counsel do not have

responsibility for business decisions and are not otherwise in a position to unfairly benefit from

---

[1] In the event a Non-Party witness is authorized to receive Protected Material that is to be used during his/her deposition but is represented by an attorney not authorized under this Order to receive such Protected Material, the attorney must provide prior to commencement of the deposition an executed "Acknowledgment and Agreement to Be Bound" in the form attached hereto as Exhibit A. In the event such attorney declines to sign the "Acknowledgment and Agreement to Be Bound" prior to the examination, the Parties, by their attorneys, shall jointly seek a protective order from the Court prohibiting the attorney from disclosing Protected Material in order for the deposition to proceed.

accessing the other side's confidential information or using it for purposes beyond this this case, and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel;

(e) stenographic reporters, videographers and/or their staff, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless the Designating Party objects to such disclosure or except as otherwise ordered by the Court. Before making such a disclosure, Receiving Party must provide notice sufficient to allow the Designating Party to object. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or personally knows the information.

(h) professional jury or trial consultants, provided they sign onto the protective order and agree to be bound by its terms.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items. Unless otherwise ordered by the Court or permitted in writing by the

Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

> (a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

> (b) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below, have been followed;

> (c) the Court and its personnel;

> (d) stenographic reporters, videographers and their respective staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

> (e) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or personally knows the information, unless the Designating Party objects to the disclosure.

7.4     <u>Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) up to five Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below and specifically identified as eligible to access "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items, have been followed;

(c) the Court and its personnel;

(d) stenographic reporters, videographers and their respective staff who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and are transcribing or videotaping a deposition wherein "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items are being discussed, provided that such reporters and videographers shall not retain or be given copies of any portions of the source code, which if used during a deposition, will not be attached as an exhibit to the transcript but instead shall be identified only by its production numbers.

(e) while testifying at deposition or trial in this action only: any person who authored, previously received (other than in connection with this litigation), or was directly involved in creating, modifying, or editing the "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items, as evident from its face or reasonably certain in view of other testimony or evidence. Persons authorized to view "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items pursuant to this sub-paragraph shall not retain or be given copies of the

"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items except while so testifying.  Only printed copies of the Source Code will be provided to testifying witnesses during their testimony.

7.5 <u>Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Experts.</u>

(a)(1) Purposefully left blank.

(a)(2) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to paragraphs 7.3(b) or 7.4(b) first must make a written request to the Designating Party[2] that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks permission to disclose to the Expert, (2) sets forth the full name of the Expert and the city and state of his or her primary residence, (3) attaches a copy of the Expert's current resume, (4) identifies the Expert's current employer(s), (5) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at

---

[2] For a Designating Party that is a Non-Party, experts previously disclosed and approved prior to the Non-Party's production of any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" need not be disclosed to said Non-Party unless such Non-Party requests such information prior to the production of any Protected Material. Moreover, unless otherwise requested by the Non-Party, subsequently disclosed experts need not be disclosed to the Non-Party before that Non-Party's Protected Material may be disclosed thereto.

14

any time during the preceding five years,[3] and (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.[4]

      (b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the identified Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

      (c) A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Expert may file a motion as provided in Local Rule CV-7 and in accordance with the OGP seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer

---

[3] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

[4] It may be appropriate in certain circumstances to restrict the Expert from undertaking certain limited work prior to the termination of the litigation that could foreseeably result in an improper use of the Designating Party's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information.

discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

(d) In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

(e) A party who has not previously objected to disclosure of Protected Material to an Expert or whose objection has been resolved with respect to previously produced Protected Material shall not be precluded from raising an objection to an Expert at a later time with respect to Protected Material that is produced after the time for objecting to such Expert has expired or if new information about that Expert is disclosed or discovered. Any such objection shall be handled in accordance with the provisions set forth above.

8.      <u>PROSECUTION AND ACQUISITION BAR</u>

(a) Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information designated by the Producing Party shall not engage in the prosecution of patents or patent applications relating to (a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). For purposes of this paragraph, "prosecution" includes any activity related to (i) the preparation or prosecution (for any person or entity) of patent applications, including among others reexamination and reissue applications or

(ii) directly or indirectly participating, drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.[5] To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging or defending a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, post grant review or covered business method review), provided that there is no participation or assistance with any claim drafting or amendment of claims in such proceedings. This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years following the earlier of the date on which the person withdraws his Acknowledgement to be Bound by the Protective Order or the absolute final termination of this action. Nothing in this provision shall prohibit any attorney of record in this action from discussing any aspect of this case that is reasonably necessary for the prosecution or defense of any claim or counterclaim in this action with his/her client. Nothing in this paragraph shall prevent any attorney from sending non-confidential prior art to an attorney involved in patent prosecution for purposes of ensuring that such prior art is submitted to the U.S. Patent and Trademark Office (or any similar agency of a foreign government) to assist a patent applicant in complying with its duty of candor. The parties expressly agree that the Prosecution Bar set forth herein shall be personal to any attorney, expert or other individual who reviews materials subject to the Prosecution Bar under this section and shall not be imputed to any other persons at that person's firm or organization. To ensure compliance with the purpose of this provision, each

---

[5] Prosecution includes, for example, original prosecution, reissue, *inter partes* review, post grant review, covered business method review and reexamination proceedings.

17

Party shall create an "Ethical Wall" between those persons with access to materials subject to the Prosecution Bar and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the Field of Invention.

(b) Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information designated by the Producing Party shall not be involved in activity related to: (i) the acquisition of patents or patent applications (for any person or entity) relating to (a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials, or (ii) advising or counseling clients regarding the same. This Acquisition Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final disposition of this action as provided herein. The Receiving Party retains its right to challenge whether "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" material is properly subject to the Acquisition Bar described in this section. Such a challenge will be governed by the procedures set forth in Section 6 of this Protective Order except that the Challenging Party will bear the burden of persuasion with respect to whether the challenged material should be subject to the Acquisition Bar.  This Acquisition Bar shall not prevent an individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information from advising on contract terms (such as indemnification or cooperation provisions in an acquisition

18

agreement) in any proposed patent acquisition agreement.  It does, however, prevent an

individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

or "HIGHLY CONFIDENTIAL – SOURCE CODE" information from advising on which

patents or applications to acquire, or from advising on validity of a patent whose acquisition is

being considered.

9.    SOURCE CODE

(a)    To the extent production of source code becomes necessary in this case, a

Producing Party may designate material as "HIGHLY CONFIDENTIAL - SOURCE CODE" if

it comprises, includes, or substantially discloses confidential, proprietary or trade secret source

code or algorithms.  This material may include, among things, technical design documentation

that comprises, includes, or substantially discloses source code or algorithms.

(b)    Protected Material designated as "HIGHLY CONFIDENTIAL –

SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar

set forth in Paragraph 8 and the Acquisition Bar set forth in Paragraph 8, and may be disclosed

only as set forth in Paragraph 7.4.

(c)    Any source code produced in discovery shall only be made available for

inspection, not produced except as set forth below, in a format allowing it to be reasonably

reviewed and searched, during normal business hours or at other mutually agreeable times, at (1)

an office of the Producing Party or the Producing Party's primary outside counsel of record or

(2) another mutually agreed upon location. Any location under (1) or (2) shall be within the

United States. The source code shall be made available for inspection on a secured computer (the

"Source Code Computer") in a secured, locked room without Internet access or network access

to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The secured computer shall have disk encryption and be password protected.  Use or possession of any input/output device (e.g., USB memory stick, mobile phone or tablet, camera or any camera-enabled device, CD, floppy disk, portable hard drive, laptop, or any device that can access the Internet or any other network or external system, etc.) is prohibited while accessing the computer containing the source code. All persons entering the locked room containing the source code must agree to submit to reasonable security measures to ensure they are not carrying any prohibited items before they will be given access to the locked room. The computer containing source code will be made available for inspection during regular business hours, upon reasonable notice to the producing party, which shall not be less than 3 business days in advance of the requested inspection. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)      No person shall copy, e-mail, transmit, upload, download, print, photograph or otherwise duplicate any portion of the designated "HIGHLY CONFIDENTIAL - SOURCE CODE" material, except that the Receiving Party may request paper copies of limited portions of source code, but only if and to the extent reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial. In no event may the Receiving Party print more than 25 consecutive pages, or an aggregate total of more than 500 pages, of source code during the duration of the case without prior written approval by the Producing Party.  If a request for printing reasonable portions of the Source Code exceeds these limitations, the producing party shall not unreasonably withhold approval to exceed these limits,

20

and the parties shall meet and confer in good faith to resolve any disputes. The Receiving Party shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. Within 5 business days or such additional time as necessary due to volume requested, the Producing Party will provide the requested material on watermarked or colored paper bearing Bates numbers and the legend "HIGHLY CONFIDENTIAL - SOURCE CODE" unless objected to as discussed below.  At the inspecting Party's request, up to two additional sets (or subsets) of printed source code may be requested and provided by the Producing Party in a timely fashion. Even if within the limits described, the Producing Party may challenge the amount of source code requested in hard copy form or whether the source code requested in hard copy form is reasonably necessary to any case preparation activity pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution. Contested printouts do not need to be produced to the Receiving Party until the matter is resolved by the Court.

(e)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all printed portions of the source code in a secured, locked area under the direct control of counsel responsible for maintaining the security and confidentiality of the designated materials or individuals authorized to receive "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this protective order. Any paper copies designated "HIGHLY CONFIDENTIAL - SOURCE CODE" shall be stored or viewed only at (i) the offices of outside counsel for the Receiving Party, (ii) the offices of outside experts or consultants who have been approved to access source code; (iii) the site where any deposition is taken (iv) the Court; or (v) any

21

intermediate location necessary to transport the information to a hearing, trial or deposition. Except as provided in subsection (i) of this section, the Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. Any printed pages of source code, and any other documents or things reflecting source code that have been designated by the producing party as "HIGHLY CONFIDENTIAL - SOURCE CODE" may not be copied, digitally imaged or otherwise duplicated, except in limited excerpts necessary to attach as exhibits to depositions, expert reports, or court filings as discussed below.  Any paper copies used during a deposition shall be retrieved by the Receiving Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

(f)     The Receiving Party's outside counsel and/or expert shall be entitled to take notes relating to the source code but may not copy any portion of the source code into the notes.  No copies of all or any portion of the source code may leave the room in which the source code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the source code is permitted except as otherwise provided herein.

(g)     A list of names of persons who will view the source code will be provided to the producing party in conjunction with any written (including email) notice requesting inspection.  The Receiving Party shall maintain a daily log of the names of persons who enter the locked room to view the source code and when they enter and depart.  The Producing Party shall be entitled to a copy of the log.

(h)     The Receiving Party's outside counsel shall maintain a log of all copies of the source code (received from a Producing Party) that are delivered by the Receiving Party to any person.  The log shall include the names of the recipients and reviewers of copies and

22

locations where the copies are stored.  Upon request by the Producing Party, the Receiving Party shall provide reasonable assurances and/or descriptions of the security measures employed by the Receiving Party and/or person that receives a copy of any portion of the source code.

(i)      Except as provided in this paragraph, the Receiving Party may not create electronic images, or any other images, of the source code from the paper copy for use on a computer (e.g., may not scan the source code to a PDF, or photograph the code).  The Receiving Party may create an electronic copy or image of limited excerpts of source code only to the extent necessary for use in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, or any drafts of these documents[6] ("SOURCE CODE DOCUMENTS").  The Receiving Party shall only include such excerpts as are reasonably necessary for the purposes for which such part of the Source Code is used.  Images or copies of Source Code shall not be included in correspondence between the parties (references to production numbers shall be used instead) and shall be omitted from pleadings and other papers except to the extent permitted herein.  The Receiving Party may create an electronic image of a selected portion of the Source Code only when the electronic file containing such image has been encrypted using commercially reasonable encryption software including password protection.  The communication and/or disclosure of electronic files containing any portion of source code shall at all times be limited to individuals who are authorized to see source code under the provisions of this Protective Order.    Additionally, all electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE."

(j) To the extent portions of source code are quoted in a SOURCE CODE DOCUMENT, either (1) the entire document will be stamped and treated as HIGHLY

---

[6] Drafts shall only include those excerpts the Receiving Party believes will be included in the final version.

CONFIDENTIAL- SOURCE CODE or (2) those pages containing quoted Source Code will be separately bound, and stamped and treated as HIGHLY CONFIDENTIAL - SOURCE CODE.

(k) The Receiving Party shall maintain a log of (1) source code printouts or (2) documents with more than one consecutive page of source code in its possession or in the possession of its retained consultants, including the names of the recipients and reviewers of any electronic or paper copies and the locations where the copies are stored.

10.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena issued by a court, arbitral, administrative, or legislative body, or with a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the person who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[7]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)   The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE". Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

---

[7] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

(b)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.   promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.   promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.   make the information requested available for inspection by the Non-Party.

(c)     If the Non-Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely objects or seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court.[8] Absent a Court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

---

[8] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

12.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

             If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

Protected Material to any person or in any circumstance not authorized under this Stipulated

Protective Order, the Receiving Party must immediately (a) notify in writing the Designating

Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of

the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were

made of all the terms of this Order, and (d) request such person or persons to execute the

"Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.     PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

             When a Producing Party gives notice to Receiving Parties that certain produced

material is subject to a claim of privilege or other protection, the obligations of the Receiving

Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not

intended to modify whatever procedure may be established in an e-discovery order that provides

for production without prior privilege review. A Producing Party may assert privilege or

protection over produced documents at any time by notifying the Receiving Party in writing of

the assertion of privilege or protection. In addition, information that contains privileged matter or

attorney work product shall be immediately returned if such information appears on its face to

have been inadvertently produced. Pursuant to Federal Rule of Evidence 502(d) and (e), the

production of a privileged or work-product-protected document is not a waiver of privilege or

protection from discovery in this case or in any other federal or state proceeding. For example,

the mere production of privileged or work-product-protected documents in this case as part of a

mass production is not itself a waiver in this case or any other federal or state proceeding.

14.    MISCELLANEOUS

14.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by agreement with other Parties or by applying to the Court if such agreement cannot be reached.  Furthermore, without application to the Court, any party that is a beneficiary of the protections of this Order may enter a written agreement releasing any other party hereto from one or more requirements of this Order even if the conduct subject to the release would otherwise violate the terms herein.

14.2    Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

14.3    No Agreement Concerning Discoverability. The identification or agreed upon treatment of certain types of Disclosure and Discovery Material does not reflect agreement by the Parties that the disclosure of such categories of Disclosure and Discovery Material is required or appropriate in this action. The Parties reserve the right to argue that any particular category of Disclosure and Discovery Material should not be produced.

14.4    Export Control. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. Each party receiving Protected Information shall comply with all applicable export control statutes and regulations.  *See, e.g.,* 15 CFR 734.2(b).  No Protected Information may leave the territorial boundaries of the United States of America or be made available to any

foreign national who is not (i) lawfully admitted for permanent residence in the United States or (ii) identified as a protected individual under the Immigration and Naturalization Act (8 U.S.C. 1324b(a)(3)).  Without limitation, this prohibition extends to Protected Information (including copies) in physical and electronic form.  The viewing of Protected Information through electronic means outside the territorial limits of the United States of America is similarly prohibited.  Notwithstanding this prohibition, Protected Information, exclusive of material designated RESTRICTED CONFIDENTIAL - SOURCE CODE, and to the extent otherwise permitted by law, may be taken outside the territorial limits of the United States if it is reasonably necessary for a deposition taken in a foreign country.  The restrictions contained within this paragraph may be amended through the consent of the producing Party to the extent that such agreed to procedures conform with applicable export control laws and regulations.

14.5    Filing Protected Material. Without written permission from the Designating Party or a Court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must file such information under seal with the court consistent with the sealing requirements of the Court and the Standing Order Regarding Filing Documents Under Seal in Patent Cases and Redacted Pleadings. The Clerk of the Court is directed to maintain under seal all documents, transcripts of deposition testimony, answers to interrogatories, admissions, and other papers filed under seal in this litigation that have been designated, in whole or in part, as Classified Information by any party to this litigation consistent with the sealing requirements of the Court and until further Order from the Court.

14.6 Use of Protected Material at Hearing or Trial. A Party shall provide a minimum of two business days' notice to the Producing Party in the event that a Party intends to use any

Protected Information during trial. Subject to any challenges under Section 6, the Parties will

not oppose any reasonable request by the Producing Party that the courtroom be sealed, if

allowed by the Court, during the presentation of any testimony, evidence, or argument relating to

or involving the use of any Protected Material.

14.7 <u>No Limitation on Legal Representation</u>. Nothing in this Order shall preclude or

impede Outside Counsel of Record's ability to communicate with or advise their client in

connection with this litigation based on such counsel's review and evaluation of Protected

Material, provided however that such communications or advice shall not disclose or reveal the

substance or content of any Protected Material other than as permitted under this Order.

14.8 <u>Violations</u>. If any Party violates the limitations on the use of Protected Material as

described above, the Party violating this Order shall be subject to sanctions, or any other

remedies as appropriate, as ordered by the Court. In the event motion practice is required to

enforce the terms of this Order, the prevailing party on such a motion shall be awarded costs,

expenses, and fees, including attorney or other professional fees, incurred in connection with the

discovery of the violation and the preparation, filing, and arguing of the motion or any other

proceedings resulting from the violation.

14.9 <u>Agreement Upon Execution</u>. Each of the Parties agrees to be bound by the terms of

this Stipulated Protective Order as of the date counsel for such party executes this Stipulated

Protective Order, even if prior to entry of this Order by the Court.

15. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4,

each Receiving Party must return all Protected Material to the Producing Party or destroy such

material. As used in this subdivision, "all Protected Material" includes all copies, abstracts,

30

compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto), hearing transcripts, legal memoranda, correspondence, trial transcripts, and exhibits offered or introduced into evidence at any hearing or trial, and their attorney work product which refers or is related to any CONFIDENTIAL and CONFIDENTIAL OUTSIDE COUNSEL ONLY information for archival purposes only. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

16.     INTERPRETATION, ENFORCEMENT, AND CONTINUING JURISDICTION

        The United States District Court for the Western District of Texas is responsible for the interpretation and enforcement of this Order. After final disposition of this litigation, the provisions of this Order shall continue to be binding except with respect to that Disclosure or Discovery Material that become a matter of public record. This Court retains and shall have continuing jurisdiction over the Parties and recipients of the Protected Material for enforcement of the provision of this Order following final disposition of this litigation. All disputes concerning Protected Material produced under the protection of this Order shall be resolved by

31

the United States District Court for the Western District of Texas..

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.


DATED: September 15, 2021

Attorneys for Plaintiff



DATED:          September 15, 2021

Attorneys for Defendant

PURSUANT TO STIPULATION, IT IS SO ORDERED.


DATED:          September 16, 2021

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

32

### EXHIBIT A
### ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury that I have

read in its entirety and understand the Stipulated Protective Order that was issued by the United

States District Court for the Western District of Texas on [date] in the case of Sonos v. Google

LLC, Case No. 6:20-cv-00881-ADA.. I agree to comply with and to be bound by all the terms of

this Stipulated Protective Order and I understand and acknowledge that failure to so comply

could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that

I will not disclose in any manner any information or item that is subject to this Stipulated

Protective Order to any person or entity except in strict compliance with the provisions of this

Order.

I further agree to submit to the jurisdiction of the United States District Court for

the Western District of Texas for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

Date: _____
City and State where sworn and signed: _____
Printed name: _____
       [printed name]

Signature: _____
       [signature]