# **APPENDIX A**

1  Cole B. Richter (*admitted pro hac*)
   *richter@ls3ip.com*
2  LEE SULLIVAN SHEA & SMITH LLP
   656 W Randolph St, Floor 5W
3  Chicago, IL 60661
   Tel: (312) 754-0002 -- Fax: (312) 754-0003
4

5  *Attorney for Sonos, Inc.*

6              **UNITED STATES DISTRICT COURT**
         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
7

8  GOOGLE LLC,                           Case No. 3:20-cv-6754

9              *Plaintiff*,              **LETTER OF REQUEST FOR
                                         INTERNATIONAL JUDICIAL
10     v.                                ASSISTANCE PURSUANT TO THE
                                         HAGUE CONVENTION OF 18
11 SONOS, INC.,                          MARCH 1970 ON THE TAKING OF
                                         EVIDENCE ABROAD IN CIVIL OR
12          *Defendant*.                 COMMERCIAL MATTERS IN
                                         REGARD TO SPOTIFY AB
13                                       (SWEDEN)**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREETINGS:

In conformity with Article 3 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), Federal Rule of Civil Procedure 28(b), and 28 U.S.C.A. 1781(b), the undersigned authority respectfully has the honor to submit the following:

| 1. | Sender | The Honorable Judge William H. Alsup for the Northern District of California, San Francisco Division<br>San Francisco Courthouse<br>Courtroom 12 – 19th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |
|---|---|---|
| 2. | Central Authority of the Requested State | In compliance with provisions of the Code of Civil Procedure of the requested state, the letter of request may be addressed to:<br><br>Länsstyrelsen i Stockholms län<br>(County Administrative Board of Stockholm)<br>Centralmyndigheten för internationell delgivning<br>(The central authority for international service of documents)<br>Box 22067<br>SE-104 22 STOCKHOLM<br>Sweden |
| 3. | Person to whom the executed request is to be returned | The executed request Court; representatives of the parties as indicated below; the witnesses from whom evidence is requested as indicated below; such other person(s) that you deem proper. |
| 4. | Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request | January 15, 2022 |
| 5. | a. Requesting Judicial Authority (Article 3, a) | The Honorable Judge William H. Alsup for the Northern District of California, San Francisco Division<br>San Francisco Courthouse<br>Courtroom 12 – 19th Floor |

| | 450 Golden Gate Avenue<br>San Francisco, CA 94102 |
|---|---|
| b. To the competent Authority of (Article 3, a) | Sweden |
| c. Names of the case and any identifying number | *Google LLC v. Sonos, Inc.*<br><br>Case No. 3:20-cv-6754, United States District Court for the Northern District of California |

6.  Names and addresses of the parties and their representative (including representatives in the requested State) (Article 3, b)

| a. Plaintiff | Sonos, Inc. |
|---|---|
| Representatives | Sonos, Inc. is represented by:<br><br>George I. Lee<br>Illinois Bar No. 6225430<br>LEE SULLIVAN SHEA & SMITH LLP<br>656 W. Randolph St., Floor 5W<br>Chicago, IL 60661<br>Telephone:  312.754.9602<br>Facsimile:  312.754.9603<br>lee@ls3ip.com<br><br>Sean M. Sullivan<br>Illinois Bar No. 6230605<br>LEE SULLIVAN SHEA & SMITH LLP<br>656 W. Randolph St., Floor 5W<br>Chicago, IL 60661<br>Telephone:  312.754.9602<br>Facsimile:  312.754.9603<br>sullivan@ls3ip.com<br><br>Rory P. Shea<br>Illinois Bar No. 6290745<br>LEE SULLIVAN SHEA & SMITH LLP<br>656 W. Randolph St., Floor 5W<br>Chicago, IL 60661<br>Telephone:  312.754.9602<br>Facsimile:  312.754.9603<br>shea@ls3ip.com<br><br>J. Dan Smith<br>Illinois Bar No. 6300912 |

| | |
|---|---|
| | LEE SULLIVAN SHEA & SMITH LLP<br>656 W. Randolph St., Floor 5W<br>Chicago, IL 60661<br>Telephone:  312.754.9602<br>Facsimile:  312.754.9603<br>smith@ls3ip.com<br><br>Cole B. Richter<br>Illinois Bar No. 6315686<br>LEE SULLIVAN SHEA & SMITH LLP<br>656 W. Randolph St., Floor 5W<br>Chicago, IL 60661<br>Telephone:  312.754.9602<br>Facsimile:  312.754.9603<br>richter@ls3ip.com |
| b.  Defendant | Google LLC |
| Representatives | Google LLC is represented by:<br><br>Charles K. Verhoeven<br>charlesvverhoeven@quinnemanuel.com<br>Melissa Baily<br>melissabaily@quinnemanuel.com<br>Jordan Jaffe<br>jordanjaffe@quinnemanuel.com<br>Lindsay Cooper<br>lindsaycooper@quinnemanuel.com<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>50 California Street, 22nd Floor<br>San Francisco, California 94111-4788<br>Telephone: (415) 875 6600<br>Facsimile: (415) 875 6700 |
| c.  Other parties | N/A |
| Representatives | N/A |
| 7.  a. Nature of the proceedings (Article 3, c) | Civil action alleging patent infringement under the patent laws of the United States |
| b. Summary of complaint | Discovery sought in this Letter of Request is relevant in Case No. Case No. 3:20-cv-6754. Sonos, Inc. contends that Google LLC, infringes, *inter alia*, U.S. Patent Nos. |

| | 9,967,615 (the "'615 Patent") and 10,779,033 (the "'033 Patent"). |
|---|---|
| c. Summary of defense and counterclaim | In defense against Sonos, Inc.'s claims of patent infringement of the Asserted Patents, Google LLC asserts, *inter alia*, that it does not infringe any of the claims of the Asserted Patents and that the Asserted Patents are invalid. |
| d. Other necessary information or documents | Spotify AB's current address is: Regeringsgatan 19 SE-111 53 Stockholm Sweden

A Protective Order governing the production and disclosure of confidential information in connection with this legal proceeding is attached as **Exhibit A3**.  Confidential documents or testimony provided in this proceeding would be protected pursuant to the terms of the Protective Order. |
| 8.   a. Evidence to be obtained or other judicial act to be performed (Article 3, d) | In order to present that the '033 and '615 Patents are infringed, valid, and enforceable, and to determine any alleged damages, Sonos, Inc. seeks certain documents and source code from Spotify AB relevant to the Spotify mobile app.

Attached as **Exhibit A1** is a request of production of certain documents that Sonos, Inc. believes are likely to be in the possession, custody, or control of Spotify AB.

To further clarify the evidence sought, attached as **Exhibit A2** is an outline of the topics and issues about which counsel for Sonos, Inc. intend to inquire of Spotify AB. |
| b. Purpose of the evidence or judicial act sought | With respect to the Asserted Patents, Spotify AB has information and knowledge relating to, among other things: how the Spotify app works with Google media players to play back Spotify media content on a computing device (such as a mobile phone); transfer playback of Spotify media content from a computing device (such as a mobile phone) |

| | |
|---|---|
| | to a Google media player; how the Spotify service enables a Google product to receive and then play back a sequence of Spotify media items; and the extent to which Spotify users and employees have downloaded, used, and operated the Spotify app to move or transfer playback of Spotify content to a Google product. |
| 9. Identity and address of any person to be examined (Article 3, e) | Spotify AB<br><br>Regeringsgatan 19<br>SE-111 53 Stockholm<br>Sweden |
| 10. Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Article 3, f) | *See* **Exhibit A2** |
| 11. Documents or other property to be inspected (Article 3, g) | *See* **Exhibit A1** |
| 12. Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3, h) | We respectfully request that the testimony be taken under oath. |
| 13. Special methods or procedure to be followed (e.g., oral or in writing, verbatim, transcript or summary, cross-examination, etc.) (Article 3, i and 9) | This Court respectfully requests that Spotify AB be directed to produce the documents identified in **Exhibit A1**.<br><br>This Court respectfully requests that the Central Authority direct a representative of Spotify AB to appear on or before January 15, 2022.<br><br>This Court respectfully requests that attorneys of Sonos, Inc. be permitted to examine and cross-examine a representative of Spotify AB, and that the witness be directed to answer such questions, relating to matters outlined in attached **Exhibit A2**.<br><br>This Court respectfully requests that the examination be permitted to be conducted in accordance with the Federal Rules of Evidence and the Federal Rules of Civil Procedure to prevail in the event of a conflict. |

| | |
|---|---|
| | This Court respectfully requests that the examination be (partially) conducted via video conference to allow U.S. counsel to join the hearing. |
| | This Court respectfully requests that the testimony be video recorded and also transcribed verbatim. |
| | This Court respectfully requests that the testimony be taken in English language if the examined person(s) agree, and that, if need be, simultaneous translation be provided. |
| | Costs incurred in relation to the deposition examination (court reporter, video recorder, simultaneous translation) shall be at Sonos Inc.'s expense. |
| 14. Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (Article 7) | This Court respectfully requests that you notify this Court; the representatives of the parties as indicated above; the witness from whom evidence is requested as indicated above; and such other person(s) that you deem proper. |
| 15. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (Article 8) | No judicial personnel of the requesting authority will attend or participate. |
| 16. Specification of privilege or duty to refuse to give evidence under the law of the State of origin (Article 11, b) | Sonos, Inc. believes that Spotify AB does not benefit from any privilege and does not endorse the assertion of any such privilege or duty. |
| 17. The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by | Sonos, Inc. will bear the reasonable reimbursable costs associated with this request in accordance with the provisions of the Hague Convention. |

Date of Request: _____

Signature and Seal of Requesting Authority:

_____
Hon. William Alsup
Judge of the United States District Court
Northern District of California

**EXHIBIT A1**

**DEFINITIONS AND INSTRUCTIONS**

For purposes of responding to these requests, the following definitions and instructions shall apply:

1.      The term "Spotify" shall mean Spotify USA Inc., any company name under which Spotify is doing business; and its predecessors, parents, subsidiaries, divisions, licensees, franchisees, assigns or other related business entities, as well as directors, officers, employees, agents, distributors, jobbers, salespersons, sales representatives, and each person acting or purporting to act on its or their behalf or under its or their control, including but not limited to any observers, stringers, and/or reporters working for or with Spotify.

2.      The term and "Sonos" shall mean Sonos, Inc., any predecessor, successor, parent, subsidiary, or affiliate, and where applicable, Sonos's officers, directors, employees, partners, agents, attorneys, or any other person or business entity acting or purporting to act on Sonos's behalf.

3.      The term "Google," shall mean Google LLC, and any other name under which Google LLC is doing or has done business, any predecessor, successor, parent, subsidiary, or affiliate, and where applicable, Google's officers, directors, employees, partners, agents, attorneys, or any other person or business entity acting or purporting to act on Google's behalf.

4.      The terms "document," "documents," and "information" each incorporates all

1

documents, electronically stored information (ESI), and things as broadly defined in Rule 34 of the Federal Rules of Civil Procedure and related case law.

5.     The terms "communication" and "communications" shall mean all exchanges or transmittals, whether in paper, electronic, oral or any other form or medium, of information (including but not limited to transmittals of facts, ideas, inquiries, analyses, assertions, concerns, instructions, opinions, reservations, thoughts or otherwise) by any mode of transmission, including e-mail, facsimile, telex, courier, U.S. mail, in person, telephone, cell phone and other internet-based, wireless-based, and satellite-based modes of transmission, between or among two or more persons and includes all documents and things constituting, relating to, incorporating, including, summarizing, describing or identifying the contents, subject matter, date, place and time of or participants in an exchange or transmittal.

6.     The terms "person" and "persons" shall mean any natural person.

7.     The terms "entity" and "entities" shall mean any business, legal or governmental entity or association.

8.     The terms "and," "or," and "and/or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

9.     The terms "all," "any," "each," and "every" shall be construed as encompassing any and all.

10.     The terms "including" and "include" shall be construed in such a way as to suggest or provide an example or examples.  The terms "including" and "include" shall not be construed in such a way as to limit or confine the broader term or concept for which a suggestion or example is being given.

11.     Each of "relating to," "relate to," "referring to," "refer to," "regarding," "with regard to," "concern," "concerning" and derivatives thereof shall be construed broadly so as to encompass the liberal scope of discovery set forth in Rule 26(b) of the Federal Rules of Civil Procedure and shall mean directly or indirectly affecting, alluding to, analyzing, bearing upon, commenting on, comparing, complementing, comprising, concerning, constituting, containing, contemplating, contradicting, criticizing, critiquing, dealing with, depicting, describing, discussing, embodying, evaluating, evidencing, identifying, incorporating, involving, mentioning, negating, noting, pertaining to, providing a basis for, referencing, referring to, reflecting, refuting, regarding, relating to, respecting, responding to, reviewing, stating, summarizing, supporting, with respect to or otherwise in any manner pertaining to or being connected to, whether logically, circumstantially, factually, legally, directly or indirectly, the document, thing, information, matter, topic, issue, fact, assertion, allegation or circumstance being stated, discussed or referenced.

12.     The use of the singular form of any word includes the plural and *vice versa* to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

13.     The term "how" shall be construed as how, what, why, when, who, and/or where as necessary to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

14.     The term "date" shall mean the exact day, month, and year (to the degree ascertainable) or if not ascertainable, the best approximation (including relationship to other events).

15.     The term "the '206 Patent" shall mean U.S. Patent No. 9,344,206, as well as its application and any publications thereof.

16.     The term "the '615 Patent" shall mean U.S. Patent No. 9,967,615, as well as its application and any publications thereof.

17.     The term "the '966 Patent" shall mean U.S. Patent No. 10,469,966, as well as its application and any publications thereof.

18.     The term "the '033 Patent" shall mean U.S. Patent No. 10,779,033, as well as its application and any publications thereof.

19.     The term "the '885 Patent" shall mean U.S. Patent No. 10,848,885, as well as its application and any publications thereof.

20.     The term "Patent(s)-in-Suit" shall mean the '206 Patent, the '615 Patent, the '966 Patent, the '033 Patent, and the '885 Patent, either collectively or individually.

21.     The term "customer(s)" shall mean any purchaser, reseller, distributor, dealer, retailor, wholesaler, user, and/or recipient.

22.     The term "knowledge" shall include firsthand information and information derived from any source, including hearsay knowledge.

23.     The term "Google Media Player(s)" shall mean the following products, including any and all versions thereof, either collectively or individually: CHROMECAST, CHROMECAST ULTRA, CHROMECAST AUDIO, CHROMECAST WITH GOOGLE TV, HOME MINI, NEST MINI, HOME, HOME MAX, NEST AUDIO, HOME HUB, NEST HUB, NEST HUB MAX, and NEST WIFI POINT.

24.     The term "Google Display(s)" shall mean the following products, including any and all versions thereof, either collectively or individually: HOME HUB, NEST HUB, and NEST HUB MAX.

25.     The term "Pixel Device(s)" shall mean the following products, including any and

4

all versions thereof, either collectively or individually: PIXEL, PIXEL XL, PIXEL 2, PIXEL 2

XL, PIXEL  3, PIXEL 3 XL, PIXEL 3A, PIXEL 3A XL, PIXEL 4, PIXEL 4 XL, PIXEL 4A,

PIXEL 4A (5G), PIXEL 5, PIXEL SLATE, PIXELBOOK, PIXELBOOK GO.

26.     The term "Google Product(s)" shall mean any Google Media Player(s), Pixel

Device(s), and/or Google Display(s).

27.     The term "Google Server(s)" shall mean any Google server that hosts the Spotify

app for download, any Google server that facilitates moving or transferring playback of Spotify

from a computing device running the Spotify app to a Google Media Player (e.g., by virtue of the

"Spotify Connect"[1] or Google "Cast"[2] feature), and any Google server that, in response to user

input at the Spotify app, facilitates delivering Spotify media to a Google Media Player (including

but not limited to any Cloud Content Delivery Network (CDN) server), either collectively or

individually.

28.     The term "Spotify Server(s)" shall mean any server that facilitates playback of

Spotify by a computing device or Google Media Player, any server that facilitates moving or

transferring playback of Spotify from a computing device running the Spotify app to a Google

Media Player (e.g., by virtue of the "Spotify Connect"[3] or Google "Cast"[4] feature), and any server

that, in response to user input at the Spotify app, facilitates delivering Spotify media to a computing

device or Google Media Player, either collectively or individually.

29.     No request or subpart hereof shall be construed as a limitation on any other

---

[1] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[2] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[3] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[4] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

request or subpart hereof.

30.     Please produce all documents and things responsive to these requests that are within Spotify's possession, custody, or control, whether directly or indirectly.

31.     If, after exercising due diligence, Spotify is unable to determine the existence of any documents or things falling within a document request, please state so in Spotify's written response as required by Rule 34 of the Federal Rules of Civil Procedure.

32.     Please produce all documents responsive to these requests as they are kept in the ordinary course of business.  In this respect, please produce all responsive documents in their entirety, including all attachments or affixations thereto.

33.     Please produce documents from any single file in the same order as they were found in such file.   If copies of documents are produced, such copies should be legible and bound or stapled in the same manner as the original.

34.     When objecting to any request, please state with specificity the grounds for each objection and the request(s) to which each objection applies.  Any request to which an objection is made should be responded to insofar as it is not deemed objectionable.

35.     For each responsive document withheld on a claim of privilege, including but not limited to the attorney-client privilege and/or work product immunity, please identify the nature of the privilege being claimed, state the basis for the claim of privilege, and provide the following information:

    a.   the type of document (e.g., letter, email, memorandum, etc.);
    b.   the date of the document;
    c.   the general subject matter of the document; and
    d.   other information sufficient to identify the document for a subpoena *duces tecum*, including but not limited to, where appropriate, the identity of the author and any other person involved in the preparation of the document, the identity of the addressees and any other recipients of the document, the identity of the custodian of the document, and where not apparent, the relationship of the such persons to one

other.

36.     Further, if a claim of privilege applies to only a portion of a responsive document, please produce the portion(s) of the document not subject to the claim of privilege.

37.     For each responsive document withheld on a claim of third-party confidentiality, please state the basis for the claim of third-party confidentiality and provide the following information:

    a.  the type of document (e.g., letter, email, memorandum, etc.);
    b.  the date of the document;
    c.  the general subject matter of the document; and
    d.  other information sufficient to identify the document for a subpoena duces tecum, including but not limited to, where appropriate, the identity of the author and any other person involved in the preparation of the document, the identity of the addressees and any other recipients of the document, the identity of the custodian of the document, and where not apparent, the relationship of the such persons to one other.

38.     Further, if a claim of third-party confidentiality applies to only a portion of a responsive document, please produce the portion(s) of the document not subject to the claim of third-party confidentiality.

39.     For each responsive document of which Spotify is aware that has been destroyed, lost, or is otherwise unavailable for production, please state so and provide the following information:

    a.  the type of document (e.g., letter, email, memorandum, etc.);
    b.  the date of the document;
    c.  the contents of the document;
    d.  other information sufficient to identify the document for a subpoena duces tecum, including but not limited to, where appropriate, the identity of the author and any other person involved in the preparation of the document, the identity of the addressees and any other recipients of the document, the identity of the custodian of the document, and where not apparent, the relationship of the such persons to one other;
    e.  the date of the unavailability;
    f.  the identity of the person who authorized the destruction (if any); and
    g.  the identity of the person known to have last had possession, custody, or control of

the document.

40.     These requests for production shall be deemed continuing so as to require further and supplemental production in accordance with the Federal Rules of Civil Procedure.

## PRODUCTION REQUESTS

### REQUEST NO. 1

Documents sufficient to show the process by which a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app plays back media items from Spotify, as that functionality existed on and/or after September 29, 2014, including but not limited to (i) the computing device receiving user input selecting one or more media items for playback, (ii) the computing device and/or any server "queueing"[5] the one or more media items for playback, (iii) the computing device obtaining a first of the media items for playback, (iv) the computing device playing back the first media item, (v) the computing device facilitating play back of a next media item after playback of the first media item, and (vi) the circumstances surrounding how and when the Spotify app was modified to facilitate the aforementioned functionality.

### REQUEST NO. 2

Documents sufficient to show the process by which a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app facilitates causing a Google Media Player to play back Spotify media items, including but not limited to (i) the Spotify GUI elements and/or screens displayed on the computing device that facilitate such functionality, (ii) message and/or signal flow between the computing device, Google Media Player, and any

---

[5] *See, e.g.*, https://support.spotify.com/us/article/play-queue/.

Spotify and/or third-party server (e.g., Google Server, such as the Google Cloud Platform[6]) that facilitates such functionality, and (iii) any server-side operations that facilitate such functionality.

**REQUEST NO. 3**

Documents sufficient to show the process by which a Google Display running the Spotify app facilitates causing a Google Media player to play back Spotify media items from Spotify, including but not limited to (i) the Spotify GUI elements and/or screens displayed on the Google Display that facilitate such functionality, (ii) message and/or signal flow between the Google Display, Google Media Player, and any Spotify and/or third-party server (e.g., Google Server, such as the Google Cloud Platform[7]) that facilitates such functionality, and (iii) any server-side operations that facilitate such functionality.

**REQUEST NO. 4**

Documents sufficient to show the process by which a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app that is connected to a Wi-Fi network discovers any Google Media Player that is also connected to the Wi-Fi network.

**REQUEST NO. 5**

Documents sufficient to show the process by which a Google Display running the Spotify app that is connected to a Wi-Fi network discovers any Google Media Player that is also connected to the Wi-Fi network.

---

[6] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[7] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

**REQUEST NO. 6**

Documents sufficient to show how a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app moves or transfers media playback from the computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[8] or Google "Cast"[9] feature), including but not limited to (i) any information that is exchanged between the computing device, the Google Media Player, any Spotify Server, and/or any third-party server (e.g., Google Server, such as the Google Cloud Platform[10]) to facilitate the aforementioned functionality and (ii) any creation, existence, modification, or deletion of any "queue" of one or more media items to facilitate the aforementioned functionality.

**REQUEST NO. 7**

Documents sufficient to show how a Google Display running the Spotify app moves or transfers media playback from the Google Display to a Google Media Player(e.g., by virtue of the "Spotify Connect"[11] or Google "Cast"[12] feature), including but not limited to (i) any information that is exchanged between the computing device, the Google Media Player, any Spotify Server, and/or any third-party server (e.g., Google Server, such as the Google Cloud Platform[13]) to facilitate the aforementioned functionality and (ii) any creation, existence, modification, or

---

[8] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[9] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[10] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[11] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[12] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[13] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

deletion of any "queue" of one or more media items to facilitate the aforementioned functionality.

## REQUEST NO. 8

Documents sufficient to show how a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app transitions from locally playing back Spotify content to controlling[14] playback of the Spotify content by a Google Media Player after moving or transferring playback of the Spotify content from the computing device to the Google Media Player (e.g., by virtue of the "Spotify Connect"[15] or Google "Cast"[16] feature), including but not limited to any determination made by the computing device to make such a transition.

## REQUEST NO. 9

Documents sufficient to show how a Google Display running the Spotify app transitions from locally playing back Spotify content to controlling[17] playback of the Spotify content by one or more other Google Media Players after moving or transferring playback of the Spotify content from the Google Display to the one or more other Google Media Players (e.g., by virtue of the "Spotify Connect"[18] or Google "Cast"[19] feature), including but not limited to any determination made by the Google Display to make such a transition.

---

[14] *See, e.g.*, https://www.spotify.com/us/connect/ ("Listen on your speakers or TV, using the Spotify app as a remote").
[15] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[16] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[17] *See, e.g.*, https://www.spotify.com/us/connect/ ("Listen on your speakers or TV, using the Spotify app as a remote").
[18] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[19] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

**REQUEST NO. 10**

Documents sufficient to show how a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app controls or otherwise manages playback of media by a Google Media Player after moving or transferring media playback from the computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[20] or Google "Cast"[21] feature), including but not limited to (i) displaying icons representing any transport controls (e.g., play, pause, skip forward, skip back, etc.) and invoking such controls and (ii) stopping media playback at the Google Media Player and returning media playback to the computing device.

**REQUEST NO. 11**

Documents sufficient to show how a Google Display running the Spotify app controls or otherwise manages playback of media by a Google Media Player after moving or transferring media playback from the Google Display to a Google Media Player (e.g., by virtue of the "Spotify Connect"[22] or Google "Cast"[23] feature) including but not limited to (i) displaying icons representing any transport controls (e.g., play, pause, skip forward, skip back, etc.) and invoking such controls and (ii) stopping media playback at the Google Media Player and returning media playback to the Google Display.

---

[20] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[21] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[22] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[23] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

**REQUEST NO. 12**

Documents sufficient to show how any Spotify Server and/or third-party server (e.g., Google Server, such as the Google Cloud Platform[24]), in response to user input at the Spotify app, facilitates playback of one or more media items by a Google Media Player, including but not limited to any such server generating, populating, updating, extending, recommending, managing, or hosting a set of one or more media items that are scheduled for playback.

**REQUEST NO. 13**

Documents sufficient to show how any Spotify Server and/or third-party server (e.g., Google Server, such as the Google Cloud Platform[25]), in response to user input at the Spotify app, facilitates playback of one or more media items by a computing device (e.g., a Pixel Device or other mobile phone, tablet, laptop, etc.) running the Spotify app, as that functionality existed on and/or after September 29, 2014, including but not limited to any such server generating, populating, updating, extending, recommending, managing, or hosting a set of one or more media items that are scheduled for playback.

**REQUEST NO. 14**

Documents sufficient to show the extent to which Spotify employees have used (e.g., by testing or demonstrating) the Spotify app running on a computing device (e.g., Pixel Device or other mobile phone, tablet, laptop, etc.) to move or transfer playback of Spotify content from the

---

[24] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

[25] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[26] or Google

"Cast"[27] feature), including the approximate date(s) such activity took place and who conducted

or was present during such activity.

**REQUEST NO. 15**

Documents sufficient to show the extent to which Spotify users have engaged in one or

more of the following:  (i) downloading the Spotify app onto a computing device (e.g., Pixel

Device or other mobile phone, tablet, laptop, etc.); or (ii) operating the Spotify app to move or

transfer playback of Spotify content from the computing device to a Google Media Player (e.g.,

by virtue of the "Spotify Connect"[28] or Google "Cast"[29] feature).

**REQUEST NO. 16**

Documents sufficient to show the monetary value to Spotify, in the aggregate and on a

per-user basis, of the Spotify app incorporating functionality that enables a user to move or

transfer playback of Spotify content from a computing device to a Google Media Player (e.g., by

virtue of the "Spotify Connect"[30] or Google "Cast"[31] feature).

---

[26] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[27] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[28] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[29] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[30] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[31] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

## EXHIBIT A2

## DEFINITIONS AND INSTRUCTIONS

For purposes of responding to this deposition request, the following definitions and instructions shall apply:

1.      The term "Spotify" shall mean Spotify USA Inc., any company name under which Spotify is doing business; and its predecessors, parents, subsidiaries, divisions, licensees, franchisees, assigns or other related business entities, as well as directors, officers, employees, agents, distributors, jobbers, salespersons, sales representatives, and each person acting or purporting to act on its or their behalf or under its or their control, including but not limited to any observers, stringers, and/or reporters working for or with Spotify.

2.      The term and "Sonos" shall mean Sonos, Inc., any predecessor, successor, parent, subsidiary, or affiliate, and where applicable, Sonos's officers, directors, employees, partners, agents, attorneys, or any other person or business entity acting or purporting to act on Sonos's behalf.

3.      The term "Google," shall mean Google LLC, and any other name under which Google LLC is doing or has done business, any predecessor, successor, parent, subsidiary, or

affiliate, and where applicable, Google's officers, directors, employees, partners, agents, attorneys, or any other person or business entity acting or purporting to act on Google's behalf.

4.      The terms "document," "documents," and "information" each incorporates all documents, electronically stored information (ESI), and things as broadly defined in Rule 34 of the Federal Rules of Civil Procedure and related case law.

5.      The terms "communication" and "communications" shall mean all exchanges or transmittals, whether in paper, electronic, oral or any other form or medium, of information (including but not limited to transmittals of facts, ideas, inquiries, analyses, assertions, concerns, instructions, opinions, reservations, thoughts or otherwise) by any mode of transmission, including e-mail, facsimile, telex, courier, U.S. mail, in person, telephone, cell phone and other internet-based, wireless-based, and satellite-based modes of transmission, between or among two or more persons and includes all documents and things constituting, relating to, incorporating, including, summarizing, describing or identifying the contents, subject matter, date, place and time of or participants in an exchange or transmittal.

6.      The terms "person" and "persons" shall mean any natural person.

7.      The terms "entity" and "entities" shall mean any business, legal or governmental entity or association.

8.      The terms "and," "or," and "and/or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

9.      The terms "all," "any," "each," and "every" shall be construed as encompassing any and all.

10.      The terms "including" and "include" shall be construed in such a way as to suggest

or provide an example or examples.  The terms "including" and "include" shall not be construed in such a way as to limit or confine the broader term or concept for which a suggestion or example is being given.

11.     Each of "relating to," "relate to," "referring to," "refer to," "regarding," "with regard to,"  "concern," "concerning" and derivatives thereof shall be construed broadly so as to encompass the liberal scope of discovery set forth in Rule 26(b) of the Federal Rules of Civil Procedure and shall mean directly or indirectly affecting, alluding to, analyzing, bearing upon, commenting on, comparing, complementing, comprising, concerning, constituting, containing, contemplating, contradicting, criticizing, critiquing, dealing with, depicting, describing, discussing, embodying, evaluating, evidencing, identifying, incorporating, involving, mentioning, negating, noting, pertaining to, providing a basis for, referencing, referring to, reflecting, refuting, regarding, relating to, respecting, responding to, reviewing, stating, summarizing, supporting, with respect to or otherwise in any manner pertaining to or being connected to, whether logically, circumstantially, factually, legally, directly or indirectly, the document, thing, information, matter, topic, issue, fact, assertion, allegation or circumstance being stated, discussed or referenced.

12.     The use of the singular form of any word includes the plural and *vice versa* to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

13.     The term "how" shall be construed as how, what, why, when, who, and/or where as necessary to bring within the scope of the request all responses that otherwise might be construed to be outside its scope.

14.     The term "date" shall mean the exact day, month, and year (to the degree ascertainable) or if not ascertainable, the best approximation (including relationship to other

events).

15.     The term "the '206 Patent" shall mean U.S. Patent No. 9,344,206, as well as its application and any publications thereof.

16.     The term "the '615 Patent" shall mean U.S. Patent No. 9,967,615, as well as its application and any publications thereof.

17.     The term "the '966 Patent" shall mean U.S. Patent No. 10,469,966, as well as its application and any publications thereof.

18.     The term "the '033 Patent" shall mean U.S. Patent No. 10,779,033, as well as its application and any publications thereof.

19.     The term "the '885 Patent" shall mean U.S. Patent No. 10,848,885, as well as its application and any publications thereof.

20.     The term "Patent(s)-in-Suit" shall mean the '206 Patent, the '615 Patent, the '966 Patent, the '033 Patent, and the '885 Patent, either collectively or individually.

21.     The term "customer(s)" shall mean any purchaser, reseller, distributor, dealer, retailor, wholesaler, user, and/or recipient.

22.     The term "knowledge" shall include firsthand information and information derived from any source, including hearsay knowledge.

23.     The term "Google Media Player(s)" shall mean the following products, including any and all versions thereof, either collectively or individually: CHROMECAST, CHROMECAST ULTRA, CHROMECAST AUDIO, CHROMECAST WITH GOOGLE TV, HOME MINI, NEST MINI, HOME, HOME MAX, NEST AUDIO, HOME HUB, NEST HUB, NEST HUB MAX, and NEST WIFI POINT.

24.     The term "Google Display(s)" shall mean the following products, including any

and all versions thereof, either collectively or individually: HOME HUB, NEST HUB, and NEST HUB MAX.

25.    The term "Pixel Device(s)" shall mean the following products, including any and all versions thereof, either collectively or individually: PIXEL, PIXEL XL, PIXEL 2, PIXEL 2 XL, PIXEL  3, PIXEL 3 XL, PIXEL 3A, PIXEL 3A XL, PIXEL 4, PIXEL 4 XL, PIXEL 4A, PIXEL 4A (5G), PIXEL 5, PIXEL SLATE, PIXELBOOK, PIXELBOOK GO.

26.    The term "Google Product(s)" shall mean any Google Media Player(s), Pixel Device(s), and/or Google Display(s).

27.    The term "Google Server(s)" shall mean any Google server that hosts the Spotify app for download, any Google server that facilitates moving or transferring playback of Spotify from a computing device running the Spotify app to a Google Media Player (e.g., by virtue of the "Spotify Connect"[1] or Google "Cast"[2] feature), and any Google server that, in response to user input at the Spotify app, facilitates delivering Spotify media to a Google Media Player (including but not limited to any Cloud Content Delivery Network (CDN) server), either collectively or individually.

28.    The term "Spotify Server(s)" shall mean any server that facilitates playback of Spotify by a computing device or Google Media Player, any server that facilitates moving or transferring playback of Spotify from a computing device running the Spotify app to a Google Media Player (e.g., by virtue of the "Spotify Connect"[3] or Google "Cast"[4] feature), and any server

---

[1] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[2] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[3] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[4] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

that, in response to user input at the Spotify app, facilitates delivering Spotify media to a computing device or Google Media Player, either collectively or individually.

29.     No topic or subpart hereof shall be construed as a limitation on any other topic or subpart hereof.

30.     When objecting to any topic, please state with specificity the grounds for each objection and the topic or subpart to which each objection applies.

## **DEPOSITION TOPICS**

## **TOPIC NO. 1**

How the Spotify app, running on a computing device (e.g., Pixel Device or other mobile phone, tablet, laptop, etc.), independently or working with other software on the computing device, enables a user to move or transfer playback of Spotify content from the computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[5] or Google "Cast"[6] feature), including but not limited to (i) describing in detail any information that is exchanged between the computing device, the Google Media Player, any Spotify Server, and/or any third-party server (e.g., Google Server, such as the Google Cloud Platform[7]) to facilitate the aforementioned functionality and how such exchange takes place, (ii) describing in detail any creation, existence, modification, or deletion of any "queue"[8] of one or more media items to facilitate the aforementioned functionality and how such creation, existence, modification, or deletion takes

---

[5] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[6] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[7] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[8] *See, e.g.*, https://support.spotify.com/us/article/play-queue/.

place, and (iii) the circumstances surrounding how and when the Spotify app was modified to facilitate the aforementioned functionality.

## TOPIC NO. 2

How the Spotify app, running on a Google Display, independently or working with other software on the Google Display, enables a user to move or transfer playback of Spotify content from the Google Display to one or more other Google Media Players (e.g., by virtue of the "Spotify Connect"[9] or Google "Cast"[10] feature), including but not limited to (i) describing in detail any information that is exchanged between the Google Display, the Google Media Player(s), any Spotify Server, and/or any third-party server (e.g., a Google Server, such as the Google Cloud Platform[11]) to facilitate the aforementioned functionality and how such exchange takes place, (ii) describing in detail any creation, existence, modification, or deletion of any "queue"[12] of one or more media items to facilitate the aforementioned functionality and how such creation, existence, modification, or deletion takes place, and (iii) the circumstances surrounding how and when the Spotify app was modified to facilitate the aforementioned functionality.

## TOPIC NO. 3

How the Spotify app, running on a computing device (e.g., Pixel Device or other mobile phone, tablet, laptop, etc.), independently or working with other software on the computing device,

---

[9] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.

[10] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

[11] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

[12] *See, e.g.*, https://support.spotify.com/us/article/play-queue/.

transitions the computing device from locally playing Spotify content to controlling[13] playback of the Spotify content by a Google Media Player after moving or transferring playback of the Spotify content from the computing device to the Google Media Player (e.g., by virtue of the "Spotify Connect"[14] or Google "Cast"[15] feature), including but not limited to describing in detail how the computing device determines to make such a transition and how such determination takes place.

**TOPIC NO. 4**

How the Spotify app, running on a Google Display, independently or working with other software on the Google Display, transitions the Google Display from locally playing Spotify content to controlling[16] playback of the Spotify content by one or more other Google Media Players after moving or transferring playback of the Spotify content from the computing device to the one or more other Google Media Players (e.g., by virtue of the "Spotify Connect"[17] or Google "Cast"[18] feature), including but not limited to describing in detail how the Google Display determines to make such a transition and how such determination takes place.

**TOPIC NO. 5**

How the Spotify service enables a Google Product (e.g., a Google Media Player or Pixel

---

[13] *See, e.g.*, https://www.spotify.com/us/connect/ ("Listen on your speakers or TV, using the Spotify app as a remote").
[14] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[15] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[16] *See, e.g.*, https://www.spotify.com/us/connect/ ("Listen on your speakers or TV, using the Spotify app as a remote").
[17] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[18] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

Device) to receive and then play back a sequence of media items (e.g., songs, podcast episodes, etc.), including but not limited to (i) describing in detail any communications between the Google Product and any web server (e.g., a Google Server, such as the Google Cloud Platform[19], or a Spotify Server) and how such communications take place, (ii) describing in detail any communications between one or more web servers (e.g., a Google Server, such as the Google Cloud Platform[20], or a Spotify Server) and how such communications take place, and (iii) describing in detail how any web server (e.g., Google and/or Spotify Servers) creates, updates, manages, or hosts a set of one or more media items that are scheduled for playback by the Google Product and how such creating, updating, managing, or hosting occurs.

**TOPIC NO. 6**

How the Spotify service enables a Google Display to receive and then play back a sequence of media items (e.g., songs, podcast episodes, etc.), including but not limited to (i) describing in detail any communications between the Google Display and any web server (e.g., a Google Server, such as the Google Cloud Platform[21], or a Spotify Server) and how such communications take place, (ii) describing in detail any communications between one or more web servers (e.g., a Google Server, such as the Google Cloud Platform[22], or a Spotify Server) and how such communications take place, and (iii) describing in detail how any web server (e.g., Google and/or

---

[19] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[20] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[21] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.
[22] *See, e.g.*, https://engineering.atspotify.com/2019/12/09/views-from-the-cloud-a-history-of-spotifys-journey-to-the-cloud-part-1-2/.

Spotify Servers) creates, updates, manages, or hosts a set of one or more media items that are scheduled for playback by the Google Product and how such creating, updating, managing, or hosting occurs.

## TOPIC NO. 5

The extent to which Spotify employees have used (e.g., by testing or demonstrating) the Spotify app running on a computing device (e.g., Pixel Device or other mobile phone, tablet, laptop, etc.) to move or transfer playback of Spotify content from the computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[23] or Google "Cast"[24] feature), including the approximate date(s) such activity took place and who conducted or was present during such activity.

## TOPIC NO. 6

The extent to which Spotify users have engaged in one or more of the following:  (i) downloading the Spotify app onto a computing device (e.g., Pixel Device or other mobile phone, tablet, laptop, etc.); or (ii) operating the Spotify app to move or transfer playback of Spotify content from the computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[25] or Google "Cast"[26] feature).

---

[23] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[24] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.
[25] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[26] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

**TOPIC NO. 7**

The monetary value to Spotify, in the aggregate and on a per-user basis, of the Spotify app incorporating functionality that enables a user to move or transfer playback of Spotify content from a computing device to a Google Media Player (e.g., by virtue of the "Spotify Connect"[27] or Google "Cast"[28] feature).

---

[27] *See, e.g.*, https://developer.spotify.com/use-cases/hardware/home-audio/.
[28] *See, e.g.*, https://techcrunch.com/2015/09/29/spotify-comes-to-google-chromecast-and-chromecast-audio/.

# EXHIBIT A3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SONOS, INC. | Case No. 6:20-cv-00881-ADA |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| GOOGLE LLC, | |
| Defendant. | |

## STIPULATED PROTECTIVE ORDER

1.  <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

2.  <u>DEFINITIONS</u>

2.1  <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2  <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3 <u>Counsel (without qualifier)</u>: Outside Counsel of Record and House Counsel (as well as their support staff).

2.4 <u>Designated House Counsel</u>: House Counsel who seek access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this matter.

2.5 <u>Designating Party</u>: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

2.6 <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.8 <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9 <u>"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: extremely sensitive "Confidential Information or Items" representing computer code and

associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.10    House Counsel: attorneys who are members in good standing of at least one state bar, who are employees of a Party, and who have responsibility for managing this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a Party and have appeared in this action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.13    Party: any party to this action.

2.14    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium, and professional jury or trial consultants) and their employees and subcontractors, who (1) have been retained by a Party or its counsel to provide litigation support services with respect to this action, (2) are (including any employees and subcontractors) not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, are not anticipated to become an employee of a Party or of a Party's competitor.

2.16    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.17    Receiving Party: a Party that receives Disclosure or Discovery Material.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a Court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) entry of a final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews

of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.     DESIGNATING PROTECTED MATERIAL

5.1     Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other Parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains

5

protected material.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE") to each page that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party when practical identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY

6

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE."

Parties shall give the other Parties reasonable notice (a minimum of two business days) if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other Parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE".

7

5.3 <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6. <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1 <u>Timing of Challenges</u>. Any Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The Parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next

8

stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without Court intervention, the Challenging Party shall file and serve a motion to re-designate or de-designate under Local Rule CV-7 and in accordance with the Order Governing Proceeds ("OGP") within 21 days of the initial notice of challenge or within 14 days of the Parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other Parties) may expose the Challenging Party to sanctions. All Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Court rules on the challenge.

7. <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation, and such Protected Material shall not be used for any business purpose, in connection with any other legal proceeding, or directly or indirectly for any other purpose whatsoever. Such Protected Material may be disclosed only to

the categories of persons and under the conditions described in this Order.[1] When the litigation

has been terminated, a Receiving Party must comply with the provisions of section 15 below

(FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and

in a secure manner that ensures that access is limited to the persons authorized under this Order.

Protected Material shall not be reproduced by a Receiving party, except for transmission to

qualified recipients, without the written permission of the Producing Party or by further order of

the Court.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise

ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may

disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as

employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the

information for this litigation and who have signed the "Acknowledgment and Agreement to Be

Bound" that is attached hereto as Exhibit A;

(b) Up to one House Counsel of the Receiving Party to whom disclosure is

reasonably necessary for this litigation, provided however that such House Counsel do not have

responsibility for business decisions and are not otherwise in a position to unfairly benefit from

---

[1] In the event a Non-Party witness is authorized to receive Protected Material that is to be used during his/her deposition but is represented by an attorney not authorized under this Order to receive such Protected Material, the attorney must provide prior to commencement of the deposition an executed "Acknowledgment and Agreement to Be Bound" in the form attached hereto as Exhibit A. In the event such attorney declines to sign the "Acknowledgment and Agreement to Be Bound" prior to the examination, the Parties, by their attorneys, shall jointly seek a protective order from the Court prohibiting the attorney from disclosing Protected Material in order for the deposition to proceed.

accessing the other side's confidential information or using it for purposes beyond this this case, and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Court and its personnel;

(e) stenographic reporters, videographers and/or their staff, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless the Designating Party objects to such disclosure or except as otherwise ordered by the Court. Before making such a disclosure, Receiving Party must provide notice sufficient to allow the Designating Party to object. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or personally knows the information.

(h) professional jury or trial consultants, provided they sign onto the protective order and agree to be bound by its terms.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items. Unless otherwise ordered by the Court or permitted in writing by the

11

Designating Party, a Receiving Party may disclose any information or item designated

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as

employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the

information for this litigation and who have signed the "Acknowledgment and Agreement to Be

Bound" that is attached hereto as Exhibit A;

(b) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary

for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound"

(Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below, have been

followed;

(c) the Court and its personnel;

(d) stenographic reporters, videographers and their respective staff, professional

jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary

for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound"

(Exhibit A); and

(e) the author or recipient of a document containing the information or a custodian

or other person who otherwise possessed or personally knows the information, unless the

Designating Party objects to the disclosure.

7.4      Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or

Items. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a

Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL

– SOURCE CODE" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) up to five Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.5(a)(2), below and specifically identified as eligible to access "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items, have been followed;

(c) the Court and its personnel;

(d) stenographic reporters, videographers and their respective staff who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) and are transcribing or videotaping a deposition wherein "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items are being discussed, provided that such reporters and videographers shall not retain or be given copies of any portions of the source code, which if used during a deposition, will not be attached as an exhibit to the transcript but instead shall be identified only by its production numbers.

(e) while testifying at deposition or trial in this action only: any person who authored, previously received (other than in connection with this litigation), or was directly involved in creating, modifying, or editing the "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items, as evident from its face or reasonably certain in view of other testimony or evidence. Persons authorized to view "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items pursuant to this sub-paragraph shall not retain or be given copies of the

"HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items except while so

testifying.  Only printed copies of the Source Code will be provided to testifying witnesses

during their testimony.

     7.5 <u>Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL</u>

<u>– ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE"</u>

<u>Information or Items to Experts.</u>

     (a)(1) Purposefully left blank.

     (a)(2) Unless otherwise ordered by the court or agreed to in writing by the

Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any

information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS'

EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to paragraphs

7.3(b) or 7.4(b) first must make a written request to the Designating Party[2] that (1) identifies the

general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or

"HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks

permission to disclose to the Expert, (2) sets forth the full name of the Expert and the city and

state of his or her primary residence, (3) attaches a copy of the Expert's current resume, (4)

identifies the Expert's current employer(s), (5) identifies each person or entity from whom the

Expert has received compensation or funding for work in his or her areas of expertise or to

whom the expert has provided professional services, including in connection with a litigation, at

---

[2] For a Designating Party that is a Non-Party, experts previously disclosed and approved prior to the Non-Party's production of any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" need not be disclosed to said Non-Party unless such Non-Party requests such information prior to the production of any Protected Material. Moreover, unless otherwise requested by the Non-Party, subsequently disclosed experts need not be disclosed to the Non-Party before that Non-Party's Protected Material may be disclosed thereto.

any time during the preceding five years,[3] and (6) identifies (by name and number of the case,

filing date, and location of court) any litigation in connection with which the Expert has offered

expert testimony, including through a declaration, report, or testimony at a deposition or trial,

during the preceding five years.[4]

      (b) A Party that makes a request and provides the information specified in the

preceding respective paragraphs may disclose the subject Protected Material to the identified

Expert unless, within 14 days of delivering the request, the Party receives a written objection

from the Designating Party. Any such objection must set forth in detail the grounds on which it is

based.

      (c) A Party that receives a timely written objection must meet and confer with the

Designating Party (through direct voice to voice dialogue) to try to resolve the matter by

agreement within seven days of the written objection. If no agreement is reached, the Party

seeking to make the disclosure to the Expert may file a motion as provided in Local Rule CV-7

and in accordance with the OGP seeking permission from the court to do so. Any such motion

must describe the circumstances with specificity, set forth in detail the reasons why the

disclosure to the Expert is reasonably necessary, assess the risk of harm that the disclosure would

entail, and suggest any additional means that could be used to reduce that risk. In addition, any

such motion must be accompanied by a competent declaration describing the parties' efforts to

resolve the matter by agreement (i.e., the extent and the content of the meet and confer

---

[3] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

[4] It may be appropriate in certain circumstances to restrict the Expert from undertaking certain limited work prior to the termination of the litigation that could foreseeably result in an improper use of the Designating Party's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information.

discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

(d) In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

(e) A party who has not previously objected to disclosure of Protected Material to an Expert or whose objection has been resolved with respect to previously produced Protected Material shall not be precluded from raising an objection to an Expert at a later time with respect to Protected Material that is produced after the time for objecting to such Expert has expired or if new information about that Expert is disclosed or discovered. Any such objection shall be handled in accordance with the provisions set forth above.

8.      PROSECUTION AND ACQUISITION BAR

(a) Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information designated by the Producing Party shall not engage in the prosecution of patents or patent applications relating to (a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). For purposes of this paragraph, "prosecution" includes any activity related to (i) the preparation or prosecution (for any person or entity) of patent applications, including among others reexamination and reissue applications or

(ii) directly or indirectly participating, drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.[5] To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging or defending a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination, *inter partes* reexamination, *inter partes* review, post grant review or covered business method review), provided that there is no participation or assistance with any claim drafting or amendment of claims in such proceedings. This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years following the earlier of the date on which the person withdraws his Acknowledgement to be Bound by the Protective Order or the absolute final termination of this action. Nothing in this provision shall prohibit any attorney of record in this action from discussing any aspect of this case that is reasonably necessary for the prosecution or defense of any claim or counterclaim in this action with his/her client. Nothing in this paragraph shall prevent any attorney from sending non-confidential prior art to an attorney involved in patent prosecution for purposes of ensuring that such prior art is submitted to the U.S. Patent and Trademark Office (or any similar agency of a foreign government) to assist a patent applicant in complying with its duty of candor. The parties expressly agree that the Prosecution Bar set forth herein shall be personal to any attorney, expert or other individual who reviews materials subject to the Prosecution Bar under this section and shall not be imputed to any other persons at that person's firm or organization. To ensure compliance with the purpose of this provision, each

---

[5] Prosecution includes, for example, original prosecution, reissue, *inter partes* review, post grant review, covered business method review and reexamination proceedings.

17

Party shall create an "Ethical Wall" between those persons with access to materials subject to the Prosecution Bar and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the Field of Invention.

(b) Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information designated by the Producing Party shall not be involved in activity related to: (i) the acquisition of patents or patent applications (for any person or entity) relating to (a) networked media playback devices or technologies for controlling such devices, or (b) the particular information disclosed in a producing party's confidential business materials, or (ii) advising or counseling clients regarding the same. This Acquisition Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final disposition of this action as provided herein. The Receiving Party retains its right to challenge whether "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" material is properly subject to the Acquisition Bar described in this section. Such a challenge will be governed by the procedures set forth in Section 6 of this Protective Order except that the Challenging Party will bear the burden of persuasion with respect to whether the challenged material should be subject to the Acquisition Bar.  This Acquisition Bar shall not prevent an individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information from advising on contract terms (such as indemnification or cooperation provisions in an acquisition

18

agreement) in any proposed patent acquisition agreement.  It does, however, prevent an individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information from advising on which patents or applications to acquire, or from advising on validity of a patent whose acquisition is being considered.

9.    SOURCE CODE

(a)    To the extent production of source code becomes necessary in this case, a Producing Party may designate material as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises, includes, or substantially discloses confidential, proprietary or trade secret source code or algorithms.  This material may include, among things, technical design documentation that comprises, includes, or substantially discloses source code or algorithms.

(b)    Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information including the Prosecution Bar set forth in Paragraph 8 and the Acquisition Bar set forth in Paragraph 8, and may be disclosed only as set forth in Paragraph 7.4.

(c)    Any source code produced in discovery shall only be made available for inspection, not produced except as set forth below, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at (1) an office of the Producing Party or the Producing Party's primary outside counsel of record or (2) another mutually agreed upon location. Any location under (1) or (2) shall be within the United States. The source code shall be made available for inspection on a secured computer (the "Source Code Computer") in a secured, locked room without Internet access or network access

19

to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any

portion of the source code onto any recordable media or recordable device. The secured

computer shall have disk encryption and be password protected.  Use or possession of any

input/output device (e.g., USB memory stick, mobile phone or tablet, camera or any camera-

enabled device, CD, floppy disk, portable hard drive, laptop, or any device that can access the

Internet or any other network or external system, etc.) is prohibited while accessing the computer

containing the source code. All persons entering the locked room containing the source code

must agree to submit to reasonable security measures to ensure they are not carrying any

prohibited items before they will be given access to the locked room. The computer containing

source code will be made available for inspection during regular business hours, upon reasonable

notice to the producing party, which shall not be less than 3 business days in advance of the

requested inspection. The Producing Party may visually monitor the activities of the Receiving

Party's representatives during any source code review, but only to ensure that there is no

unauthorized recording, copying, or transmission of the source code.

      (d)     No person shall copy, e-mail, transmit, upload, download, print,

photograph or otherwise duplicate any portion of the designated "HIGHLY CONFIDENTIAL -

SOURCE CODE" material, except that the Receiving Party may request paper copies of limited

portions of source code, but only if and to the extent reasonably necessary for the preparation of

court filings, pleadings, expert reports, or other papers, or for deposition or trial. In no event may

the Receiving Party print more than 25 consecutive pages, or an aggregate total of more than 500

pages, of source code during the duration of the case without prior written approval by the

Producing Party.  If a request for printing reasonable portions of the Source Code exceeds these

limitations, the producing party shall not unreasonably withhold approval to exceed these limits,

and the parties shall meet and confer in good faith to resolve any disputes. The Receiving Party shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. Within 5 business days or such additional time as necessary due to volume requested, the Producing Party will provide the requested material on watermarked or colored paper bearing Bates numbers and the legend "HIGHLY CONFIDENTIAL - SOURCE CODE" unless objected to as discussed below.  At the inspecting Party's request, up to two additional sets (or subsets) of printed source code may be requested and provided by the Producing Party in a timely fashion. Even if within the limits described, the Producing Party may challenge the amount of source code requested in hard copy form or whether the source code requested in hard copy form is reasonably necessary to any case preparation activity pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution. Contested printouts do not need to be produced to the Receiving Party until the matter is resolved by the Court.

(e)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all printed portions of the source code in a secured, locked area under the direct control of counsel responsible for maintaining the security and confidentiality of the designated materials or individuals authorized to receive "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this protective order. Any paper copies designated "HIGHLY CONFIDENTIAL - SOURCE CODE" shall be stored or viewed only at (i) the offices of outside counsel for the Receiving Party, (ii) the offices of outside experts or consultants who have been approved to access source code; (iii) the site where any deposition is taken (iv) the Court; or (v) any

21

intermediate location necessary to transport the information to a hearing, trial or deposition. Except as provided in subsection (i) of this section, the Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. Any printed pages of source code, and any other documents or things reflecting source code that have been designated by the producing party as "HIGHLY CONFIDENTIAL - SOURCE CODE" may not be copied, digitally imaged or otherwise duplicated, except in limited excerpts necessary to attach as exhibits to depositions, expert reports, or court filings as discussed below.  Any paper copies used during a deposition shall be retrieved by the Receiving Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

(f)	The Receiving Party's outside counsel and/or expert shall be entitled to take notes relating to the source code but may not copy any portion of the source code into the notes.  No copies of all or any portion of the source code may leave the room in which the source code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the source code is permitted except as otherwise provided herein.

(g)	A list of names of persons who will view the source code will be provided to the producing party in conjunction with any written (including email) notice requesting inspection.  The Receiving Party shall maintain a daily log of the names of persons who enter the locked room to view the source code and when they enter and depart.  The Producing Party shall be entitled to a copy of the log.

(h)	The Receiving Party's outside counsel shall maintain a log of all copies of the source code (received from a Producing Party) that are delivered by the Receiving Party to any person.  The log shall include the names of the recipients and reviewers of copies and

22

locations where the copies are stored.  Upon request by the Producing Party, the Receiving Party shall provide reasonable assurances and/or descriptions of the security measures employed by the Receiving Party and/or person that receives a copy of any portion of the source code.

(i)        Except as provided in this paragraph, the Receiving Party may not create electronic images, or any other images, of the source code from the paper copy for use on a computer (e.g., may not scan the source code to a PDF, or photograph the code).  The Receiving Party may create an electronic copy or image of limited excerpts of source code only to the extent necessary for use in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, or any drafts of these documents[6] ("SOURCE CODE DOCUMENTS").  The Receiving Party shall only include such excerpts as are reasonably necessary for the purposes for which such part of the Source Code is used.  Images or copies of Source Code shall not be included in correspondence between the parties (references to production numbers shall be used instead) and shall be omitted from pleadings and other papers except to the extent permitted herein.  The Receiving Party may create an electronic image of a selected portion of the Source Code only when the electronic file containing such image has been encrypted using commercially reasonable encryption software including password protection.  The communication and/or disclosure of electronic files containing any portion of source code shall at all times be limited to individuals who are authorized to see source code under the provisions of this Protective Order.    Additionally, all electronic copies must be labeled "HIGHLY CONFIDENTIAL - SOURCE CODE."

(j) To the extent portions of source code are quoted in a SOURCE CODE DOCUMENT, either (1) the entire document will be stamped and treated as HIGHLY

---

[6] Drafts shall only include those excerpts the Receiving Party believes will be included in the final version.

23

CONFIDENTIAL- SOURCE CODE or (2) those pages containing quoted Source Code will be separately bound, and stamped and treated as HIGHLY CONFIDENTIAL - SOURCE CODE.

(k) The Receiving Party shall maintain a log of (1) source code printouts or (2) documents with more than one consecutive page of source code in its possession or in the possession of its retained consultants, including the names of the recipients and reviewers of any electronic or paper copies and the locations where the copies are stored.

10.     PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena issued by a court, arbitral, administrative, or legislative body, or with a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the person who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[7]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

## 11.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)   The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE". Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

---

[7] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

25

(b)    In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.    promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.    make the information requested available for inspection by the Non-Party.

(c)    If the Non-Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely objects or seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Court.[8] Absent a Court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

---

[8] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

12.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

Protected Material to any person or in any circumstance not authorized under this Stipulated

Protective Order, the Receiving Party must immediately (a) notify in writing the Designating

Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of

the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were

made of all the terms of this Order, and (d) request such person or persons to execute the

"Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.    PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain produced

material is subject to a claim of privilege or other protection, the obligations of the Receiving

Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not

intended to modify whatever procedure may be established in an e-discovery order that provides

for production without prior privilege review. A Producing Party may assert privilege or

protection over produced documents at any time by notifying the Receiving Party in writing of

the assertion of privilege or protection. In addition, information that contains privileged matter or

attorney work product shall be immediately returned if such information appears on its face to

have been inadvertently produced. Pursuant to Federal Rule of Evidence 502(d) and (e), the

production of a privileged or work-product-protected document is not a waiver of privilege or

protection from discovery in this case or in any other federal or state proceeding. For example,

the mere production of privileged or work-product-protected documents in this case as part of a

mass production is not itself a waiver in this case or any other federal or state proceeding.

27

14.      MISCELLANEOUS

14.1     Right to Further Relief. Nothing in this Order abridges the right of any person to

seek its modification by agreement with other Parties or by applying to the Court if such

agreement cannot be reached.  Furthermore, without application to the Court, any party that is a

beneficiary of the protections of this Order may enter a written agreement releasing any other

party hereto from one or more requirements of this Order even if the conduct subject to the

release would otherwise violate the terms herein.

14.2     Right to Assert Other Objections. By stipulating to the entry of this Protective

Order no Party waives any right it otherwise would have to object to disclosing or producing any

information or item on any ground not addressed in this Stipulated Protective Order. Similarly,

no Party waives any right to object on any ground to use in evidence of any of the material

covered by this Protective Order.

14.3     No Agreement Concerning Discoverability. The identification or agreed upon

treatment of certain types of Disclosure and Discovery Material does not reflect agreement by

the Parties that the disclosure of such categories of Disclosure and Discovery Material is required

or appropriate in this action. The Parties reserve the right to argue that any particular category of

Disclosure and Discovery Material should not be produced.

14.4     Export Control. Disclosure of Protected Material shall be subject to all applicable

laws and regulations relating to the export of technical data contained in such Protected Material,

including the release of such technical data to foreign persons or nationals in the United States or

elsewhere. Each party receiving Protected Information shall comply with all applicable export

control statutes and regulations.  *See, e.g.,* 15 CFR 734.2(b).  No Protected Information may

leave the territorial boundaries of the United States of America or be made available to any

28

foreign national who is not (i) lawfully admitted for permanent residence in the United States or (ii) identified as a protected individual under the Immigration and Naturalization Act (8 U.S.C. 1324b(a)(3)). Without limitation, this prohibition extends to Protected Information (including copies) in physical and electronic form. The viewing of Protected Information through electronic means outside the territorial limits of the United States of America is similarly prohibited. Notwithstanding this prohibition, Protected Information, exclusive of material designated RESTRICTED CONFIDENTIAL - SOURCE CODE, and to the extent otherwise permitted by law, may be taken outside the territorial limits of the United States if it is reasonably necessary for a deposition taken in a foreign country. The restrictions contained within this paragraph may be amended through the consent of the producing Party to the extent that such agreed to procedures conform with applicable export control laws and regulations.

14.5     Filing Protected Material. Without written permission from the Designating Party or a Court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must file such information under seal with the court consistent with the sealing requirements of the Court and the Standing Order Regarding Filing Documents Under Seal in Patent Cases and Redacted Pleadings. The Clerk of the Court is directed to maintain under seal all documents, transcripts of deposition testimony, answers to interrogatories, admissions, and other papers filed under seal in this litigation that have been designated, in whole or in part, as Classified Information by any party to this litigation consistent with the sealing requirements of the Court and until further Order from the Court.

14.6 Use of Protected Material at Hearing or Trial. A Party shall provide a minimum of two business days' notice to the Producing Party in the event that a Party intends to use any

Protected Information during trial. Subject to any challenges under Section 6, the Parties will not oppose any reasonable request by the Producing Party that the courtroom be sealed, if allowed by the Court, during the presentation of any testimony, evidence, or argument relating to or involving the use of any Protected Material.

14.7 <u>No Limitation on Legal Representation</u>. Nothing in this Order shall preclude or impede Outside Counsel of Record's ability to communicate with or advise their client in connection with this litigation based on such counsel's review and evaluation of Protected Material, provided however that such communications or advice shall not disclose or reveal the substance or content of any Protected Material other than as permitted under this Order.

14.8 <u>Violations</u>. If any Party violates the limitations on the use of Protected Material as described above, the Party violating this Order shall be subject to sanctions, or any other remedies as appropriate, as ordered by the Court. In the event motion practice is required to enforce the terms of this Order, the prevailing party on such a motion shall be awarded costs, expenses, and fees, including attorney or other professional fees, incurred in connection with the discovery of the violation and the preparation, filing, and arguing of the motion or any other proceedings resulting from the violation.

14.9 <u>Agreement Upon Execution</u>. Each of the Parties agrees to be bound by the terms of this Stipulated Protective Order as of the date counsel for such party executes this Stipulated Protective Order, even if prior to entry of this Order by the Court.

15.    <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts,

compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto), hearing transcripts, legal memoranda, correspondence, trial transcripts, and exhibits offered or introduced into evidence at any hearing or trial, and their attorney work product which refers or is related to any CONFIDENTIAL and CONFIDENTIAL OUTSIDE COUNSEL ONLY information for archival purposes only. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

16.     INTERPRETATION, ENFORCEMENT, AND CONTINUING JURISDICTION

The United States District Court for the Western District of Texas is responsible for the interpretation and enforcement of this Order. After final disposition of this litigation, the provisions of this Order shall continue to be binding except with respect to that Disclosure or Discovery Material that become a matter of public record. This Court retains and shall have continuing jurisdiction over the Parties and recipients of the Protected Material for enforcement of the provision of this Order following final disposition of this litigation. All disputes concerning Protected Material produced under the protection of this Order shall be resolved by

31

the United States District Court for the Western District of Texas..

      IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.


DATED: September 15, 2021 _____

                   Attorneys for Plaintiff



DATED: _____ September 15, 2021 _____

                   Attorneys for Defendant

PURSUANT TO STIPULATION, IT IS SO ORDERED.


DATED: _____ September 16, 2021 _____

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

## EXHIBIT A
## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury that I have

read in its entirety and understand the Stipulated Protective Order that was issued by the United

States District Court for the Western District of Texas on [date] in the case of Sonos v. Google

LLC, Case No. 6:20-cv-00881-ADA.. I agree to comply with and to be bound by all the terms of

this Stipulated Protective Order and I understand and acknowledge that failure to so comply

could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that

I will not disclose in any manner any information or item that is subject to this Stipulated

Protective Order to any person or entity except in strict compliance with the provisions of this

Order.

I further agree to submit to the jurisdiction of the United States District Court for

the Western District of Texas for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

Date: _____
City and State where sworn and signed: _____
Printed name: _____
      [printed name]

Signature: _____
      [signature]