1   CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
    croberts@orrick.com
2   BAS DE BLANK (STATE BAR NO. 191487)
    basdeblank@orrick.com
3   ALYSSA CARIDIS (STATE BAR NO. 260103)
    acaridis@orrick.com
4   EVAN D. BREWER (STATE BAR NO. 304411)
    ebrewer@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
6   405 Howard Street
    San Francisco, CA 94105-2669
7   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
8
    SEAN M. SULLIVAN (admitted *pro hac vice*)
9   sullivan@ls3ip.com
    COLE B. RICHTER (admitted *pro hac vice*)
10  richter@ls3ip.com
    LEE SULLIVAN SHEA & SMITH LLP
11  656 W Randolph St., Floor 5W
    Chicago, IL 60661
12  Telephone:    +1 312 754 0002
    Facsimile:    +1 312 754 0003
13
    *Attorneys for Defendant Sonos, Inc.*
14

15                  UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                     SAN FRANCISCO DIVISION

18  GOOGLE LLC,                         | Case No. 3:20-cv-06754-WHA

19              Plaintiff,              | **SONOS, INC.'S OPENING CLAIM
                                        | CONSTRUCTION BRIEF**
20       v.
                                        | Judge: Hon. William Alsup
21  SONOS, INC.,                        | Complaint Filed: September 28, 2020

22              Defendant.

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.    THE PRELIMINARY TEXAS *MARKMAN* PROCEEDINGS .................................................. 1

II.   FACTUAL BACKGROUND ....................................................................................... 3

III.  CLAIM CONSTRUCTION DISPUTES ......................................................................... 5

   A.   "ZONE PLAYER" / "PLAYBACK DEVICE" .......................................................... 5

   B.   "PLAYBACK QUEUE" ........................................................................................ 9

      1.   Google's Construction Adds Ambiguous Phrases ........................................ 9

      2.   "Playback Queue" Does Not Require Plural "Multimedia Items" ............... 10

      3.   A "Playback Queue" Does Not Require "An Ordered List" ......................... 12

      4.   A "Playback Queue" Does Not Require User-Selected Media ...................... 14

   C.   "RESOURCE LOCATOR" ................................................................................. 16

   D.   "A MEDIA PARTICULAR PLAYBACK SYSTEM" ................................................ 20

CONCLUSION ........................................................................................................ 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ................................................................. 6, 8

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ................................................................. 18

*Augustine v. Principi*,
   343 F.3d 1334 (Fed. Cir. 2003) ................................................................. 1

*Aylus Networks, Inc. v. Apple, Inc.*,
   No. 13-CV-4700, 2015 WL 355174 (N.D. Cal. Jan. 27, 2015) ............................ 17

*Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*,
   No. 07-CV-1359, 2009 WL 330950 (N.D. Cal. Feb. 10, 2009), *aff'd*, 465 F.
   App'x 955 (Fed. Cir. 2012) ................................................................. 22, 23

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
   224 F.3d 1308 (Fed. Cir. 2000) ................................................................. 18

*CBT Flint Partners, LLC v. Return Path, Inc.*,
   654 F.3d 1353 (Fed. Cir. 2011) ................................................................. 23

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) ................................................................. 1

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,
   998 F.3d 917 (Fed. Cir. 2021) ................................................................. 12, 13, 15

*Finjan, Inc. v. Sonicwall, Inc.*,
   No. 17-CV-04467, 2019 WL 1369938 (N.D. Cal. Mar. 26, 2019) ........................ 23

*Fitbit, Inc. v. AliphCom*,
   No. 15-CV-04073-EJD, 2017 WL 386257 (N.D. Cal. Jan. 27, 2017) ..................... 8

*Fujitsu Ltd. v. Tellabs Operations, Inc.*,
   No. 08-CV-3379, 2011 WL 1303358 (N.D. Ill. Mar. 31, 2011) ........................... 24

*GPNE Corp. v. Apple Inc.*,
   830 F.3d 1365 (Fed. Cir. 2016) ................................................................. 7

*Groove Digital, Inc. v. United Bank*,
   825 F. App'x 852 (Fed. Cir. 2020) ................................................................. 8

*Halo Elecs., Inc. v. Bel Fuse Inc.*,
    No. C-07-06222 RMW, 2010 WL 4774774 (N.D. Cal. Nov. 16, 2010) ............................... 18

*Hoffer v. Microsoft Corp.*,
    405 F.3d 1326 (Fed. Cir. 2005)........................................................................................... 23

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009)............................................................................................. 7

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
    790 F.3d 1298 (Fed. Cir. 2015)................................................................................... 15, 19

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
    No. 09-CV-355-WHA, 2011 WL 1659867 (N.D. Cal. May 3, 2011) ...................................... 2

*Leveraged Innovations, LLC v. NASDAQ OMX Grp., Inc.*,
    No. 11-CV-3203, 2012 WL 4062100 (S.D.N.Y. Sept. 14, 2012).......................................... 23

*Medtronic Sofamor Danek USA, Inc. v. Nuvasive, Inc.*,
    No. 08CV1512-MMA(AJB), 2010 WL 11452343 (S.D. Cal. Apr. 1, 2010) ........................ 2

*Netflix, Inc. v. Blockbuster, Inc.*,
    No. C 06-02361 WHA, 2007 WL 5747095 (N.D. Cal. Feb. 9, 2007) ................................... 2

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003)........................................................................................... 24

*Open Text S.A. v Box, Inc.*,
    No. 13-CV-04910, 2015 WL 400348 (N.D. Cal. Jan. 28, 2015) ......................................... 12

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
    701 F.3d 698 (Fed. Cir. 2012)............................................................................................... 3

*Outside Box Innovations, LLC v. Travel Caddy, Inc.*,
    260 F. App'x 316 (Fed. Cir. 2008) ..................................................................................... 18

*Profectus Tech. LLC v. Huawei Techs. Co.*,
    823 F.3d 1375 (Fed. Cir. 2016)............................................................................................. 8

*Quad Env't Techs. Corp. v. Union Sanitary Dist.*,
    946 F.2d 870 (Fed. Cir. 1991)............................................................................................. 24

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    No. 05-CV-334, 2008 WL 2955125 (N.D. Cal. July 25, 2008)...................................... 15, 19

*Realtime Data LLC v. Reduxio Sys., Inc.*,
    831 F. App'x 492 (Fed. Cir. 2020) ....................................................................................... 3

*Sonos, Inc. v. Google LLC*,
    Case No. 6:20-cv-881-ADA, W.D. Tex., Dkt. Nos. 105-06.................................................. 1

iii

SONOS' OPENING CLAIM CONSTRUCTION BRIEF
3:20-cv-06754-WHA

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009) .......................................................................................... 21, 23

1  The Asserted Patents, Nos. 9,967,615 ("'615 Patent"), 10,469,966 ("'966 Patent"),

2  10,779,033 ("'033 Patent"), and 10,848,885 ("'885 Patent"), are attached as Exs. 1, 2, 3, 4.

3  **I.  THE PRELIMINARY TEXAS *MARKMAN* PROCEEDINGS**

4  Prior to this case moving forward in this district, the Western District of Texas held a

5  *Markman* hearing on the Asserted Patents.  *See Sonos, Inc. v. Google LLC*, Case No. 6:20-cv-881-

6  ADA, W.D. Tex., Dkt. Nos. 105-06 ("Texas Case").  The day before that hearing, the Texas Court

7  e-mailed the parties "preliminary constructions" for the terms briefed by the parties, while noting

8  that these constructions were "not final."  Ex. 5 at 1.  The next day, the Texas Court heard argument

9  on ***some*** of the disputed terms and, for each of them, expressed an intent either to maintain its

10 "preliminary construction" or to modify it.  However, before the Texas Court issued an order, the

11 Federal Circuit (at Google's request) ordered the court to transfer the case to the Northern District

12 of California.

13 After the case was transferred here, the parties followed the schedule set forth by this

14 District's Patent Local Rules ("PLR").  Among other things, the parties followed the schedule in

15 PLR 4 for exchanging claim terms and proposed constructions, and for creating a joint chart for the

16 Court.  As identified in that chart and in its PLR 4-3 filing, Sonos is asking this Court to construe

17 (i) "zone player"/"playback device" and (ii) "a media particular playback system," and Google is

18 asking this Court to construe (iii) "playback queue" and (iv) "resource locators."  Dkt. 126 at 6.

19 These are the terms that Sonos anticipates will be covered in the parties' claim construction

20 briefing.  Sonos's arguments and evidence concerning these terms are below.

21 However, in the parties' PLR 4-3 filing, Google also took the position that the "prior

22 constructions and indefiniteness rulings provided by the Texas court continue to apply to Sonos."

23 *Id.* at 1.  Put differently, Google appears to ask this Court to adopt the Texas Court's "preliminary

24 constructions" (or the modifications it suggested at the *Markman* hearing).  The Court should reject

25 Google's request.

26 ***First***, the preliminary constructions of the Texas Court are not law of the case.

27 The law of the case doctrine applies "when a court *decides* upon a rule of law."  *Christianson v.*

28 *Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *Augustine v. Principi*, 343 F.3d 1334, 1339

1    (Fed. Cir. 2003) ("A necessary predicate to application of law of the case is, therefore, that the legal

2    issue in question has actually been decided."). An expressly preliminary claim construction (that

3    was emailed to counsel and never filed) is not a *decision* to which the law of the case could apply.

4    Indeed, it is not a decision at all; it is a tool to guide the parties' presentations. *See* Ex. 5 at 1 ("The

5    purpose of preliminary constructions is to streamline the hearing by providing the parties an

6    indication of the Court's current position for each term…. The preliminary constructions are not

7    final as the Court may change some [of] those constructions based on the arguments at the

8    hearing."); *Netflix, Inc. v. Blockbuster, Inc.*, No. C 06-02361 WHA, 2007 WL 5747095 (N.D. Cal.

9    Feb. 9, 2007) (issuing Tentative Claim Construction Order and inviting further briefing from the

10   parties). And judges regularly change their views between their tentative claim constructions and

11   issuing an actual order. *See, e.g.*, *Medtronic Sofamor Danek USA, Inc. v. Nuvasive, Inc.*, No.

12   08CV1512-MMA(AJB), 2010 WL 11452343, at *3, *4, *7, *10 (S.D. Cal. Apr. 1, 2010) (rejecting

13   tentative claim constructions following argument). Until an actual order is issued, there is no

14   decision or ruling to which the law of the case doctrine could apply.

15      **Second**, because the Texas Court did not issue an order, there is no *reasoning* for this Court

16   to review and with which to agree or disagree. Put differently, assuming the Court agrees that the

17   Texas Court's preliminary constructions are not law of the case, they also should not have any

18   **persuasive** weight because there is no reasoning for this Court to be persuaded by. In *Karl Storz*,

19   for example, this Court was faced with an analogous situation. *See Karl Storz Endoscopy-Am., Inc.*

20   *v. Stryker Corp.*, No. 09-CV-355-WHA, 2011 WL 1659867, at *2 (N.D. Cal. May 3, 2011). In that

21   case a plaintiff had asserted patents against a first defendant in a Tennessee court, which construed

22   certain claim terms. *Id.* When the plaintiff asserted the same patents against a second defendant

23   in the Northern District of California, the second defendant "lean[ed] heavily" on the Tennessee

24   court's constructions of the disputed phrases. *Id.* But this Court rejected any attempt to simply

25   adopt the Tennessee court's constructions as its own, particularly where the Tennessee court's

26   constructions were only "tentative." *Id.* The court explained that it has an "independent obligation

27   to construe the claims in dispute, and to render its own independent claim construction" based on

28   the record before it. *Id.* *Karl Storz* is different from this case insofar as the law of the case did not

SONOS' OPENING CLAIM CONSTRUCTION BRIEF
3:20-cv-06754-WHA

apply for a different reason (i.e., because the prior action involved a different counterparty) but the principle – that the Court should conduct its own analysis and not simply defer to the tentative decision of another court – is the same.

*Third*, "adopting" the "preliminary constructions" of the Texas Court would be contrary to the consistent holdings of the Federal Circuit that district courts must provide a *reasoned* order to facilitate appellate review.  *See OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc*., 701 F.3d 698, 707 (Fed. Cir. 2012) ("Whether dealing with an issue of law like claim construction or an issue of fact such as infringement, this court must be furnished sufficient findings and reasoning to permit meaningful appellate scrutiny.  Where, as here, the record is devoid of meaningful analysis, we will not conduct such an analysis in the first instance.") (internal citation and quotations omitted).  For this reason, simply adopting the prior tentative constructions (with or without the modifications the court articulated at the hearing) would not provide the Federal Circuit with a record it could meaningfully review.  *See also Realtime Data LLC v. Reduxio Sys., Inc*., 831 F. App'x 492, 496 (Fed. Cir. 2020) (remanding for a written order where the district court indicated that the argument transcript would stand in place of a written order on a §101 dispute).

*Fourth*, the Court should reject Google's request on the grounds of gamesmanship – because Google is trying to both treat the prior tentative order as if it is law of the case and as if it isn't.  For instance, Google would have this Court treat the Texas *Markman* hearing (and that entire claim construction process) as "final," while at the same time it asks this Court to re-construe a term that was already the subject of *Markman* in Texas.  Google cannot have it both ways – it cannot take the position that the prior tentative order was a final binding order *and* ask this Court for do-overs of the parts it doesn't like.

Instead of adopting the tentative decisions of another court without the benefit of a reasoned order, this Court should decide the disputes that have been briefed and argued to it.

## II.   FACTUAL BACKGROUND

Sonos began in 2002 as an American consumer-electronics company with a goal of reinventing home audio for the digital age.  Sonos pioneered what is known as wireless multi-room audio, bringing its first commercial products to market in 2005.  Sonos's wireless multi-

room audio system was based on new audio players called "zone players" (or "playback devices")

in the Asserted Patents, which are "smart" devices that connect to a local "data network" and can

be placed in any room throughout a user's home.  Once connected to the local data network, each

zone player can independently access any audio source that is available on either the local data

network or on the Internet.  As a result, each zone player can (i) play different music (or other

audio files) independently from other zone players or (ii) be grouped with other zone players to

play the same music in synchrony.  Each zone player also can be controlled from anywhere in the

user's home via a controller connected to the local data network.

Figure 1 (reproduced below) provides a simplified diagram of an exemplary Sonos system

with zone players 102-106 and controllers 140-142 coupled to one another and the Internet by a

local data network 108.  *See* Ex. 2, '966 Patent at FIG 1; Ex. 4, '885 Patent at FIG. 1.



The Asserted Patents are directed to aspects of Sonos's networked audio system.  For

example, Sonos's '966 and '885 Patents (the "Zone Scene Patents")[1] describe technology for

grouping zone players so that they can play the same audio in synchrony.  More specifically,

instead of having to identify every zone player for a group "on the fly" at the time a user wishes

to hear synchronous playback, the user can create and save one or more groups of different (or

overlapping) players that can later be activated when the user wishes to hear synchronous

playback.  These player groupings are referred to in the Zone Scene Patents as "zone scenes" –

and they allow users to take advantage of Sonos's networked audio system by seamlessly

---

[1] The Zone Scene Patents share a nearly-identical specification.  Sonos refers to the column and
line numbers of the '966 Patent when discussing their common specification.

1  switching between different, previously-saved configurations of *synchronous* playback to suit
2  different activities and moods.

3      Sonos's '615 and '033 Patents (the "Direct Control Patents")[2] cover key aspects of
4  Sonos's cloud-based approach for seamlessly transferring the playback of an Internet stream of
5  media content from, for example, a user's smart phone, to a user's home playback system even
6  when the user's device has not previously been set up as a dedicated controller for the playback
7  system.  This allows, for example, someone who is using their iPhone to listen to a song on their
8  way home and to seamlessly transfer it to their home speakers as they walk in the door.

9  **III.   CLAIM CONSTRUCTION DISPUTES**

10     There are four disputes at issue in this motion.  ***First***, while the parties agree that the terms
11  "zone player" and "playback device" are used synonymously in the Asserted Patents, Google
12  contends that the terms encompass any device that can playback media, despite the contrary
13  intrinsic evidence and the fact that Google previously agreed to Sonos's more narrow proposed
14  construction.  ***Second***, Google is proposing a highly restrictive construction for the term
15  "playback queue" based almost exclusively on extrinsic evidence and despite the fact that
16  Google's own expert disagrees with aspects of its proposed construction.  ***Third***, Google attempts
17  to narrow the meaning of the term "resource locator" based on extrinsic definitions of a *different*
18  term of art: "uniform/universal resource locator."  ***Fourth***, Sonos requests that the Court exercise
19  its authority to correct a clear typographical error in the phrase "a media ***particular*** playback
20  system" such that the language reads "a media playback system" while Google contends that
21  clear typographical error cannot be corrected.

22     **A.   "ZONE PLAYER" / "PLAYBACK DEVICE"**

| Claim Term | Sonos's Construction | Google's Construction |
|---|---|---|
| "zone player" ['966 & '885 Patents]<br>"playback device" ['615 & '033 Patents] | A data network device configured to process and output audio | Plain and ordinary meaning; no construction necessary at this time |

---
[2] The Direct Control Patents share a common specification.  Sonos refers to the column and line numbers of the '615 Patent when discussing the common specification herein.

1    As explained above, Sonos's networked audio system is built around intelligent "zone

2   players," which are also referred to as "playback devices" in Sonos's patents.[3]  These terms

3   appear in all of the Asserted Patents.

4    Sonos's proposed construction for these terms is consistent with the term's consistent

5   usage in the specifications of the Asserted Patents and the *way* those specifications distinguished

6   Sonos's zone players from conventional hard-wired speakers.  For this reason, these terms have

7   previously been construed by other tribunals to mean "*a data network device configured to*

8   *process and output audio*" – which is Sonos's proposed construction here.  Indeed, in Sonos's

9   ITC action against Google, Google itself agreed that Sonos's proposal was the proper

10   construction of the terms "zone player" and "playback device" in Sonos's patents, and the ITC

11   adopted that construction.  Ex. 7 at 15.  *See also* Ex. 6 at 8-12 (Judge Andrews explaining why

12   "zone player" and "playback device" should be given the construction Sonos proposes here).

13    Despite previously agreeing to Sonos's proposed construction, Google is now taking the

14   contrary position that the terms "zone player" and "playback device" should not be construed as

15   ***data network*** devices that ***process*** audio and that the Court should instead adopt a "plain and

16   ordinary meaning" construction.  Presumably, Google is doing this to advance its prior-art

17   invalidity arguments – i.e., so it can include as prior art the very kind of hardwired systems

18   (which lack speakers that connect to a data network or process audio) that the Zone Scenes

19   patents *expressly* call out as the prior-art systems over which they improve.  *See, e.g.*, Ex. 4, '885

20   Patent at 1:62-65.  But, in addition to contradicting itself, Google's *current* position contradicts

21   the intrinsic evidence.

22    That intrinsic evidence makes clear that, in the context of Sonos's patents, the terms "zone

23   player" and "playback device" refer to a ***data network*** device that is configured to ***process and***

24   ***output*** audio.  *See, e.g.*, *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012)

25   ("[E]ven when guidance is not provided in explicit definitional format, the specification may

26

27

28   ───────────────
[3] *See, e.g.*, Ex. 1, '615 Patent at 3:28-29, 4:32-33, 8:49-50 (explaining that "playback device" is
another term for "zone player").

1  define claim terms by implication such that the meaning may be found in or ascertained by a

2  reading of the patent documents." (internal quotations omitted)).

3    More specifically, the "zone players" and "playback devices" of the Asserted Patents are

4  always described in the context of a ***networked*** audio system, which the Asserted Patents

5  distinguish from "conventional multi-zone audio system[s]" where passive speakers were "hard-

6  wired" back to a "centralized" device via dedicated speaker wiring.  *See, e.g.*, Ex. 2, '966 Patent

7  at 1:46-67; Ex. 1, '615 Patent at 6:50-60.  Moreover, the "zone players" and "playback devices"

8  of the Asserted Patents are repeatedly and consistently[4] described as audio players that connect to

9  a "***data network***" and that have audio processing intelligence.

10    For instance, the Asserted Patents uniformly describe the "zone players" as devices that

11  include a "network interface" that connects to a "data network."  *See, e.g.*, Ex. 2, '966 Patent at

12  4:56-57 ("***All*** of the ***zone players*** … are coupled directly or indirectly to a ***data network*** 108."[5]),

13  4:62-5:15, 5:21-64, 7:46-65, FIG. 1, FIG. 2A; Ex. 1, '615 Patent at 5:21-23 ("The ***zone players*** …

14  are coupled directly or indirectly to a ***data network***, such as the data network 128 shown in

15  FIG. 1."), 4:13-18, 5:29-46, 7:5-8:23, 10:59-11:11, 11:45-12:3, 16:1-4, FIG. 4.

16    Similarly, the Asserted Patents uniformly describe the "zone player" as having internal

17  components for "processing" and then outputting audio.  *See, e.g.*, Ex. 2, '966 Patent at 6:8-21

18  (disclosing that "zone player 200" includes "audio processing circuit 210" that processes "an

19  audio source [] retrieved via the network interface 202" to produce "analog audio signals" that are

20  then "provided to the audio amplifier 214 for playback on speakers"), 5:53-64, 7:60-65, FIG. 2A;

21  Ex. 1, '615 Patent at 8:4-48 (disclosing that "zone player 400" includes "processor 408 …

22  configured to process input data" and "audio processing component 412" that processes "audio

23  that is retrieved via the network interface 402" to produce "analog audio signals" that are then

24

25  _____

26  [4] *See, e.g.*, *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) ("We have recognized
that when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is
proper to construe the claim term in accordance with that characterization."); *ICU Med., Inc. v.*

27  *Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009) (construing term to include features
because the specification "repeatedly and uniformly" described the term to include such features).

28  [5] All emphasis herein has been added unless otherwise noted.

1    "provided to the audio amplifier 416 for play back through speakers 418"), 3:38-4:25, FIGs. 2A-

2    2C, 4.[6]

3         The specifications' "repeated[], consistent[], and exclusive[]" description of a zone player

4    or playback device as (i) being a ***data network*** device and (ii) being configured to ***process*** and

5    output audio confirms that Sonos's construction is correct.  For example, in *Abbott*, the Federal

6    Circuit reversed a claim construction that ran counter to "all descriptions of the claimed" sensor

7    and ignored the specification's explanation of how the accused sensor improved on the prior art.

8    *In re Abbott*, 696 F.3d at 1148-50.  This was true even though "the specification does not contain

9    an explicit statement disclaiming" features of the sensor, *id.* at 1149, *and* the Court was applying

10   a broadest reasonable interpretation standard, *id.* at 1150.  Here too, Google's construction seeks

11   to impermissibly broaden the meaning of zone player and playback device in a manner

12   "unreasonable and inconsistent with the language of the claims and the specification."  *Id.* at

13   1149.

14        Ultimately Sonos's construction should be adopted because (as Google has previously

15   admitted, and other tribunals have found) the Asserted Patents repeatedly and consistently

16   describe a "zone player" and "playback device" with the fundamental features of (i) being a ***data***

17   ***network*** device and (ii) being configured to ***process and output*** audio.  *See also Groove Digital,*

18   *Inc. v. United Bank*, 825 F. App'x 852, 856-57 (Fed. Cir. 2020) (upholding construction requiring

19   certain feature where "every pertinent embodiment disclosed in the specification" involved that

20   feature); *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1381 (Fed. Cir. 2016)

21   (upholding construction requiring certain features where opposing party "fail[ed] to pinpoint in

22   the intrinsic record where the patent contemplates a situation where" the features did not exist);

23   *Fitbit, Inc. v. AliphCom*, No. 15-CV-04073-EJD, 2017 WL 386257, at *7 (N.D. Cal. Jan. 27,

24   2017) (reasoning "nowhere in the specification does it disclose that the 'server' is a mere software

25   application" and the patents "repeatedly characterize the 'server' as a physical computing device,

26   so its construction should reflect as much.").

27

28   _____

[6] Ex. 6 at 15-16; Ex. 8 at 25-27.

1

### B.    "PLAYBACK QUEUE"

2

| Claim Term | Sonos's Construction | Google's Construction |
|---|---|---|
| "playback queue" ['615 & '033 Patents] | Plain and ordinary meaning; no construction necessary at this time | "an ordered list of multimedia items that is selected by the user for playback" |

3

4

5      The term "playback queue" appears only in the Direct Control Patents.  For example,

6  independent claim 13 of the '615 Patent recites "causing one or more first cloud servers to add

7  multimedia content to a ***local playback queue***" while independent claim 1 of the '033 Patent

8  recites "operating in a first mode in which the computing device is configured for playback of a

9  ***remote playback queue*** provided by a cloud-based computing system …."

10      Google improperly attempts to limit this term to a single embodiment found in the Direct

11  Control Patents and ignores the contrary intrinsic evidence.  Ex. 9 at ¶¶44-54.  Not even Google's

12  expert agrees with Google's proposed construction.

13

### 1.    Google's Construction Adds Ambiguous Phrases

14      Neither the '615 nor '033 independent claims use the phrase "multimedia item," and it is

15  not clear what that term is supposed to mean in Google's construction.  This situation is made

16  worse by the fact that the patents *do* use terms that are linguistically similar.  For instance,

17  independent claim 13 of the '615 Patent calls for "multimedia content," while independent claim

18  1 of the '033 Patent recites "one or more media items that are in the remote playback queue."  It

19  is not clear what Google is attempting to accomplish by combining the first half of the former

20  phrase with the back half of the latter – or why it contends that a "playback queue" must possess

21  the specific (but undisclosed) "thing" to which that concatenation is intended to refer.

22      In his testimony, Google's expert said that the use of the phrase "multimedia item" in

23  Google's proposal is ***not*** intended to require the "playback queue" to contain the media itself but

24  instead also encompasses, e.g., a list of corresponding "resource locators."[7]  But this hardly clears

25  up the confusion.  "Multimedia item" is not a term that lay jurors are likely to have familiarity

26  with, and Google isn't even purporting to use it in some sort of lay capacity – but to create (some

27  unknown and unstated) argument about what kind of data must be in the queue for it to qualify as

28

---

[7] *See, e.g.*, Ex. 10 at 22:25-23:16, 24:2-19.

SONOS' OPENING CLAIM CONSTRUCTION BRIEF
3:20-cv-06754-WHA

1    a "playback queue" within the scope of the invention.  In short, by including this phrase, Google

2    is both creating a potential source of juror confusion and attempting to read in a structural

3    limitation that it will not identify, which is not required by the *functional* descriptor (i.e.,

4    "playback") that is actually found in the relevant phrase.

5         Likewise, neither the '615 nor '033 independent claims use the phrase "a user" or "the

6    user."  It is unclear both (a) what Google's basis is for seeking to include that term in Google's

7    proposed construction and (b) *which* "user" must select the "ordered list" to meet Google's

8    construction.  This topic is discussed in more detail below, but it is worth noting here that nothing

9    about the term "playback queue" speaks to *how* the items in the queue are selected or *by whom.*

10   In addition to causing confusion and ambiguity, Google's proposal therefore potentially reads out

11   multiple embodiments described in the specification which use an automated mechanism to select

12   the songs that will be queued for playback.

13        **2.    "Playback Queue" Does Not Require Plural "Multimedia Items"**

14        Neither the intrinsic nor extrinsic evidence mandates that a "playback queue" have plural

15   "multimedia items," as Google's construction requires.  In fact, not even Google's expert believes

16   that a "playback queue" must have plural "multimedia items":

17        Q     Does a playback queue have to have *a plurality* of multimedia items?
          A     *I don't think that there's any requirement* for the number of items in the
18        playback queue.
          Q     So is it your opinion that the playback queue can include *a single individual*
19        multimedia item?
20        A     *It could*. It would not be a very exciting queue, but it could.

21   Ex. 10 at 42:2-10; *see also id.* at 51:10-14, 51:19-52:10 (Q: "Does this mean that a playback

22   queue can be *empty* as well?"  A: "*It can*.  As I said before, it's not a very interesting queue until

23   you add something to it."), 52:11-18, 54:12-19.  Google's expert's admissions are not surprising

24   given the evidence.

25        *First*, the plain language of the independent claims says that a "playback queue" need not

26   have plural "multimedia items."  For example, claim 13 of the '615 Patent requires that the "local

27   playback queue" contain "*one* or more resource locators":

28        (a) causing one or more first cloud servers to add multimedia content to a *local
          playback queue* on the particular playback device, wherein adding the multimedia

                                                        10              SONOS' OPENING CLAIM CONSTRUCTION BRIEF

content to the ***local playback queue*** comprises the one or more first cloud servers adding, to the ***local playback queue***, <u>***one***</u> or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service ….

Similarly, claim 1 of the '033 Patent merely requires the "remote playback queue" to include "a next ***one*** or more media items":

based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the ***remote playback queue*** from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next <u>***one***</u> or more media items that are in the ***remote playback queue*** ….

From these claims we can deduce that both elements of this portion of Google's construction are wrong; (i) the claims do not require multiples of *anything* to be in the queue and (ii) the queues need not contain whatever "multimedia item" is supposed to mean, because the claims instead speak to the use of "one or more resource locators" and "data identifying … one or more media items."

***Second***, consistent with the plain language of the '615 and '033 independent claims, the Direct Control Patents' specification repeatedly describes embodiments involving queueing a single media item. Ex. 9 at ¶¶48, 81. For example, the '615 Patent repeatedly discloses queuing a single audio track/song:

[E]ach zone player 606, 604, 602 may access the Internet when retrieving media from the cloud (e.g., Internet) via the bridging device. For example, zone player 602 may ***contain a*** uniform resource locator (URL) that specifies an address to ***a particular audio track*** in the cloud. Using the URL, the zone player 602 may retrieve ***the audio track*** from the cloud, and ultimately ***play the audio*** out of one or more zone players.

Ex. 1, '615 Patent at 11:62-12:3; *see also, e.g.*, *id.* at 10:42-46 ("[A] zone scene enables any zone(s) linked to the scene to play ***a predefined audio*** (e.g., ***a favorable song***, a predefined playlist) at a specific time and/or for a specific duration."), 12:49-63 ("Once the zone player has ***a*** URL (or some other identification or address) for ***a song*** …, the zone player can run on its own to fetch the content."), 13:36-40 ("[A]n application can pass ***a song identifier*** to a local playback system which looks up ***the song identifier*** and finds an available audio stream to which the user has a right to

1   play and then plays *that song*."), 15:59-62 ("Information passed over to the local playback device

2   may include *an* identifier for *a single track* … and so on.").

3       ***Third***, several publications cited on the face[8] of the patents also confirm that a "playback

4   queue" does not require plural "multimedia items."  Ex. 9 at ¶¶83-85.  As just one example, US

5   Patent App. Publ. 2012/0089910 explains that a "playback queue" (or "play queue") can have

6   "***zero***, ***one***, or multiple media items at any given time."  Ex. 11 at ¶47; *see also id.* at ¶¶45, 48.

7   Thus, Google's proposed construction of "playback queue" is clearly at odds with the intrinsic

8   evidence and should be rejected.  *See, e.g.*, *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,

9   998 F.3d 917, 922 (Fed. Cir. 2021) (reversing district court's construction that imposed "a

10  requirement … at odds with many of the disclosed embodiments and [] simply not required by the

11  claims").

12      Consequently, the Court should reject Google's construction on the basis that it

13  improperly requires a "playback queue" to have plural "multimedia items."

14              **3.    A "Playback Queue" Does Not Require "An Ordered List"**

15      Even in example embodiments found in the '615 Patent where a "playback queue"

16  includes plural "multimedia items," there is no mandate that the queue be implemented in the

17  form of "an ordered list," as Google's construction requires.

18      The '615 Patent expressly discloses queuing multiple media items for playback without

19  requiring the "playback queue" to contain a "list."  Ex. 9 at ¶89.  For instance, the '615 Patent

20  teaches embodiments where a "playback device" queues a ***single*** resource locator, such as a URL,

21  which (in turn) corresponds to a playlist of multiple media items:

22      A playback device, such as a zone player, can fetch content on its own without use
23      of a controller, for example. Once the zone player has ***a*** URL (or some other
        identification or address) for ***a*** … ***playlist***, the zone player can run on its own to
24      fetch the content.

25  Ex. 1, '615 Patent at 12:56-61; *see also id.* at 15:59-62 ("Information passed over to the local

26  playback device may include ***an identifier for*** … ***a playlist*** … and so on.").

27  _____

28  [8] *E.g.*, *Open Text S.A. v Box, Inc.*, No. 13-CV-04910, 2015 WL 400348, at *2 (N.D. Cal. Jan. 28,
        2015) (a publication "listed on the face of the patent … constitutes intrinsic evidence").

As Sonos's expert Dr. Schmidt, explained, a POSITA would also have known that a "playback device" could store in its memory plural "multimedia items" across multiple data variables – in other words it could implement the queue without storing the items in a ***list*** – and still playback the media in a specified order.  Ex. 9 at ¶¶87-88.  As but one example, Dr. Schmidt explained that a "playback device" could have a data variable called "play_now" that gets populated by a first "multimedia item" and another data variable called "play_next" that gets populated by a second "multimedia item" along with logic to play the media corresponding to the "play_now" data variable before the media corresponding to the "play_next" data variable.  *Id.*  According to Dr. Schmidt, a POSITA would have considered the collection of the "play_now" and "play_next" data variables in this example as a "local playback queue on the particular playback device," despite these variables not constituting "an ordered ***list***."  *Id.*

The extrinsic evidence is also consistent with the notion that queues can be implemented through a variety of methods and not only via a list.[9]  Indeed, even a supermarket queue or a queue for tickets outside a theater isn't implemented via a list, but via a physical arrangement of people.  Note that you *could* implement either of these queues via a list (e.g., by writing down all the names of the people waiting in line and then calling on them as they stood around in a crowd).  But the point is that the idea of a queue (even outside the computer context) is not *restricted* to a list.

Despite this, Google's proposed construction for "playback queue" attempts to narrow the playback queue to one specific kind of data structure for implementation.  But there is no basis in the intrinsic or extrinsic evidence to limit a "playback queue" in this way.  *See, e.g.*, *Edgewell*, 998 F.3d at 921 (reversing district court's construction because, "absent an express limitation to the contrary, the term [at issue] should be construed as covering all uses" discussed in the specification).  As Dr. Schmidt explained, "an ordered list of multimedia items" is merely one example of a collection of media that can be added to a "playback queue" and the intrinsic evidence makes clear that a "playback queue" is not limited to this specific example.  Ex. 9 at ¶¶46-54.

---

[9] *See, e.g.*, Ex. 14 at 88:14-25.

1  Lastly, it is not even clear what Google intends by the phrase "ordered list."  In this

2  respect, Google's expert opined that the "ordered list" aspect of Google's construction refers to "a

3  list of items that needs to *appear* in the order … that it was created." Ex. 10 at 30:8-17; *id.* at

4  31:11-25 ("[I]t is an ordered list that still *appears* in that form *to the user*.").  In other words,

5  Google appears to believe that its construction necessitates that the "local playback queue on the

6  particular playback device" and the "remote playback queue provided by a cloud-based

7  computing system" each must somehow provide an *appearance* of the respective "list of items"

8  to the user in the order that the list was created.  But there is nothing in the claims or specification

9  that requires either the "playback device" or "cloud-based computing system" to cause the items

10  to *appear* to a user in any way whatsoever.  Thus, it appears that Google intends to argue that its

11  proposed construction reads in even more limitations than it would appear – and that it adds some

12  sort of visibility requirement to the user that is completely absent from the claims, and which is

13  not required by the intrinsic or extrinsic evidence.  The Court should reject Google's proposal.

14  **4.**    **A "Playback Queue" Does Not Require User-Selected Media**

15  The intrinsic evidence also does not support limiting a "playback queue" to queues that

16  contain media "selected by the user for playback."

17  For starters, Google's proposed requirement that the "ordered list of multimedia items"

18  must be "selected by the user for playback" is ambiguous and prone to cause jury confusion.

19  Ex. 9 at ¶¶47, 92-93.  For example, it is unclear if Google's proposed construction is intended to

20  exclude scenarios where (i) a user selects a single song from an album and the remainder of the

21  album is automatically queued for playback or (ii) a user selects an artist or genre and an

22  automated engine identifies and queues one or more media items based on that selection.  This

23  lack of clarity is, itself, a reason to reject Google's proposed construction.  But the Court should

24  also reject Google's construction because it is inconsistent with the claims and evidence.  Ex. 9 at

25  ¶¶92-95.

26  *First*, neither the '615 nor '033 claims recite "a user" (or "the user"), much less limit any

27  "playback queue" to media that is "selected by the user for playback."

28

SONOS' OPENING CLAIM CONSTRUCTION BRIEF
3:20-cv-06754-WHA

*Second*, Google's proposed construction would exclude preferred embodiments disclosed in the specification, which is the type of proposed construction that is "rarely, if ever, correct." *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015); *see also Rambus Inc. v. Hynix Semiconductor Inc.*, No. 05-CV-334, 2008 WL 2955125, at *8 (N.D. Cal. July 25, 2008) ("Proper claim construction rarely results in construing a claim such that it does not cover a preferred embodiment.").

In particular, the '615 Patent discloses a preferred embodiment in which a music service – as opposed to the user– dictates what media is included in a playlist that is queued for playback:

> In another example of ***an application determining a playlist*** and/or other content for playback, a user enjoys listening to music on ***an online music service*** (e.g., turntable.fm or other virtual room that a user can enter to choose from ***a plurality of online disc jockeys (DJs) deciding what to play next***) using his Mac Book Pro™ at home. He likes the unique user experience the service offers, and he frequently hops from room to room discovering new music. To maximize sound quality, he plays the music on his household playback system (e.g., Sonos™).

Ex. 1, '615 Patent at 13:1-10.

As other examples, the '615 Patent repeatedly discloses preferred embodiments where an Internet radio station is queued for playback, which involves a media service (rather than the user) selecting both the songs and the order in which those songs are queued for playback. *See, e.g.*, *id.* at 15:59-62 ("Information passed over to the local playback device may include an identifier for … ***a streaming radio station***, ***a programmed radio station***, and so on."); *see also id.* at 6:64-66, 8:63-66, 14:50-52.

*Third*, several publications cited on the face of the patents confirm that a "playback queue" is not limited to containing media that is "selected by the user for playback."  Ex. 9 at ¶¶51-53, 94.  As just one example, US Patent App. Publ. 2014/0075308 describes a variety of scenarios in which a song or playlist is "automatically entered into [a] queue," as opposed to being "manually entered" by a user.  *See, e.g.*, Ex. 12 at ¶¶30, 32, 35.

Thus, the intrinsic evidence confirms that a "playback queue" is not limited to a queue in which the media is "selected by the user for playback."  Google's proposed construction is, therefore, incorrect.  *See, e.g.*, *Edgewell*, 998 F.3d at 922 (reversing district court's construction

1  that imposed "a requirement … at odds with many of the disclosed embodiments and [] simply

2  not required by the claims").

3       Tellingly, not even Google's expert agrees that a "playback queue" should be limited to

4  media that is "selected by the user for playback."  In fact, when asked whether a "playback queue

5  can contain a single song selected by a user," Google's expert went out of his way to clarify that

6  the "single song" in a "playback queue" could be "automatically selected" *or* selected by a user:

7      Q     And like we said earlier, a playback queue can contain a single song selected
                  by a user; correct?

8      A     Contain a single song in general, whether it's ***automatically selected*** or not

9                 by a user, yes.

10  Ex. 10 at 51:10-14; *see also id.* at 54:20-56:24 (conceding that extrinsic evidence cited by Google

11  explains that a music service can select and add music tracks to a "music queue" based on a

12  user's selection of a particular artist).

13       Consequently, the court should reject Google's construction on the basis that it improperly

14  requires a "playback queue" to require media that is "selected by the user for playback."

15      **C.**     **"RESOURCE LOCATOR"**

16

| Claim Term | Sonos's Construction | Google's Construction |
|---|---|---|
| "resource locator" ['615 Patent] | Plain and ordinary meaning; no construction necessary at this time | address of a resource on the Internet" |

19       The term "resource locator" appears in the '615 claims.  For example, independent claim

20  13 recites "wherein adding the multimedia content to the local playback queue comprises the one

21  or more first cloud servers adding, to the local playback queue, one or more ***resource locators***

22  corresponding to respective locations of the multimedia content at one or more second cloud

23  servers of a streaming content service."

24       Google contends that a "resource locator" is limited to an "address of a resource on the

25  Internet," but that narrow construction finds no support in the intrinsic or extrinsic record.

26       Google's construction rests on reading the phrase used in the claims—"resource

27  locator[]"—as if it were the ***different*** term of art "uniform (or universal) resource locator" (often

28  abbreviated as "URL").  Indeed, to support Google's construction for the phrase "resource

locator," Google relies exclusively on exemplary disclosures from the '615 Patent regarding, and dictionary definitions for, the phrase URL.  Google's expert even confirmed that he was treating the claimed "resource locator" as a synonym for URL.  Ex. 10 at 61:20-62:5.  But by treating those semantically distinct terms as synonyms, Google is attempting to rewrite the claims.  *See, e.g.*, *Aylus Networks, Inc. v. Apple, Inc.*, No. 13-CV-4700, 2015 WL 355174, at *3 (N.D. Cal. Jan. 27, 2015) (refusing to read in limitation that effectively sought to replace the term "handset" with "cell-phone" because "the term 'handset' is semantically distinct from the term 'cell-phone'").

Contrary to Google's assertions, a POSITA would have known that, when the phrase "resource locator" was used without the modifier "uniform" (or "universal"), the phrase was referring to a broader category of locators, of which URLs are but one type.  Ex. 9 at ¶¶101-02. Consistent with this taxonomy, the '615 Patent does (in some examples) refer to URLs, but it also provides examples that make clear that the invention can use other resource locators.

For example, the '615 Patent describes the use of a URL or "some other identification" that enables a "playback device" to access a song or playlist from the Internet:

> A playback device, such as a zone player, can fetch content on its own without use of a controller, for example. Once the zone player has a URL (***or some other identification*** or address) for a song and/or playlist, the zone player can run on its own to fetch the content. Songs and/or other multimedia content can be retrieved from the Internet ….

Ex. 1, '615 Patent at 12:53-63.  By limiting "resource locators" to URLs, Google is seeking to ignore and omit this express teaching from the specification that *other* locators may be used.

As another example, the '615 Patent describes the use of "a song identifier" that enables a "playback device" to access an Internet stream for that song:

> [A]n application can pass ***a song identifier*** to a local playback system which looks up the song identifier and finds an available audio stream to which the user has a right to play and then plays that song.

17

1   *Id.* at 13:36-40; *see also id.* at 13:31-33 ("Thus, certain embodiments provide cross-service

2   linking such that a song identifier can be passed from one user and/or service to another to be

3   fetched and played.").  As these passages explain, a song identifier is a resource locator (i.e., it is

4   something that facilitates locating a resource, namely a song) and the specification uses that term

5   *alongside* the term URL without any indication that the terms are synonyms.  "In the absence of

6   any evidence to the contrary, we must presume that the use of these different terms" URLs and

7   song identifiers "connotes different meanings."  *CAE Screenplates Inc. v. Heinrich Fiedler GmbH*

8   *& Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *see also Outside Box Innovations, LLC v.*

9   *Travel Caddy, Inc.*, 260 F. App'x 316, 320 (Fed. Cir. 2008) (terms "flexible fabric panels" and

10  "fabric covered panels" should be construed to have different meanings); *Halo Elecs., Inc. v. Bel*

11  *Fuse Inc.*, No. C-07-06222 RMW, 2010 WL 4774774, at *6 (N.D. Cal. Nov. 16, 2010) (claim

12  terms "carried within" and "encapsulate" presumed to have different meanings).

13      As another example, the '615 Patent describes the use of "information," such as "an

14  identifier," that enables a "playback device" to access music on the Internet:

15      Information passed over to the local playback device may include ***an identifier*** for
        a single track, a playlist, a streaming radio station, a programmed radio station, and
16      so on…. Once the ***music information*** is handed from the third-party application to
        the local playback system, there is no further synchronization between the two
17      systems.

18

19      Ex. 1, '615 Patent at 15:59-67; *see also, e.g.*, *id.* at 16:9-19 ("***Information*** can be passed

20  locally, rather than through the Internet, for example.").  Again, the patent is clear that URLs are

21  *one way* to locate resources, but clearly did not intend to restrict the invention to the use of URLs.

22  The patent's varied examples of resource locators "in the written description attests to the breadth

23  of [the] term rather than providing a limiting definition."  *Anchor Wall Sys., Inc. v. Rockwood*

24  *Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (reversing construction of

25  "protrusion" that limited the claims to one example of a protrusion and excluded others).

26      Sonos's position is also supported by dependent claim 20, which talks of adding "an

27  identifier of the multimedia content … to the local playback queue" but says nothing about the

28  "identifier" being limited to a URL for this purpose.  As an initial matter, claim 13 says that the

18

way you "add[] the multimedia content to the local playback queue" is done by adding a "resource locator."  Claim 20 depends from claim 13 and expressly says that this same function (i.e., "add[ing] multimedia content to the local playback queue") is performed by causing an "identifier" to be added to the local playback queue.  Thus, claim 20 provides *one example* of how to add multimedia content to a local playback queue and specifies that it is done by adding an "identifier" that "indicates a particular source of the multimedia content at the one or more second cloud servers of the streaming content service" in place of the "resource locator" in claim 13.  Thus, if anything, "resource locator" is a *broader* term than "identifier" that "indicates a particular source of the multimedia content at the one or more second cloud servers of the streaming content service."  And, because as Sonos's expert has testified, there are a variety of identifiers (other than URLs) which can perform this function, it would be improper to limit even the "identifier" of claim 20 (much less the "resource locator" of claim 13) to a URL.  *See* Ex. 14 at 41:2-42:13, 107:2-109:21.

Google's proposed construction would read out the embodiments in the specification (including those discussed above) which use resource locators that point to something *other than* a particular location on the Internet.  That makes Google's proposed construction incorrect.  *See, e.g.*, *Kaneka*, 790 F.3d at 1304 ("A claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'"); *Rambus*, 2008 WL 2955125, at *8 ("Proper claim construction rarely results in construing a claim such that it does not cover a preferred embodiment.").

The extrinsic evidence also does not support Google's construction.  As noted at the outset, Google's argument relies exclusively on dictionary definitions for the phrase URL and ignores the fact that the phrase in the claims is "resource locator."  In contrast, Sonos has identified extrinsic evidence demonstrating that the phrase "resource locator" was used in the art more broadly than Google's proposed construction.  Ex. 9 at ¶¶105-08.  For example, U.S. Patent 8,533,469 explains that a "resource locator may be a reference associated with [an] electronic document that would allow user 106 to locate or request access to the electronic document," where the "electronic document" is the "resource," and provides an example where a "'doc_id'" serves as the "resource locator" of a "desired electronic document."  Ex. 13 at 3:32-34, 3:65-67.

1   Thus, Google's construction is contrary to both the intrinsic and extrinsic evidence about how a

2   POSITA would understand the disputed term.

3        Google's proposed construction is too restrictive even if "resource locator" is a synonym

4   for URL.  As explained by Dr. Schmidt, a URL need not include an "***address of a resource*** on the

5   Internet."  Ex. 9 at ¶100; Ex. 14 at 41:2-42:13, 103:14-104:20, 106:21-107:1, 108:20-109:21.

6   Instead, at the time of the invention, a POSITA would have known that certain types of URLs

7   (e.g., PURLs) did not specify an "address of a resource" and instead, involved a device relying on

8   an intermediate service that translated the particular URL into an "address of a resource" that the

9   device then used to access the resource.  *Id.*; Ex. 15 ("[A] PURL is a URL.  However, instead of

10  pointing directly to the location of an Internet resource, a PURL points to an intermediate

11  resolution service … [that] associates the PURL with the actual URL and returns that URL to the

12  client.").

13       And Google's expert conceded during his deposition that Google's proposed construction

14  *would* exclude certain types of URLs, even though the whole basis for that proposal is the

15  assertion that "resource locator" is a synonym for URL.  *See, e.g.*, Ex. 10 at 68:2-8 (Q: "So it is

16  your opinion that the term resource locator exclude[s] certain types of URLs such as a PURL."

17  A: "In the context of what we're talking about in the patent, yes, it is my opinion that a PURL is

18  not a resource locator.  It wouldn't point directly to a multimedia content item.").

19       Thus, not only is Google attempting to rewrite the '615 claim language to read in

20  "uniform (or universal) resource locators" (URLs) instead of "resource locators," but Google is

21  also attempting to limit the claims to certain types of URLs that "point ***directly*** to a multimedia

22  content item."  *Id.*  Neither of Google's attempts to read these concepts into the claims find

23  support in the intrinsic or extrinsic record.  The Court should reject them.

24       **D.    "A MEDIA PARTICULAR PLAYBACK SYSTEM"**

25

| Claim Term | Sonos's Construction | Google's Construction |
|---|---|---|
| "a media particular playback system" ['615 Patent] | "a media playback system" | Indefinite |

26

27

28

Asserted '615 dependent claims 15 and 26 (as well as unasserted claim 3) each contains the phrase "a media *particular* playback system," which includes a typographical error that is evident from the face of the patent and thus is correctable by this Court.  *See, e.g.*, *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352-53 (Fed. Cir. 2009).  By simply reading the claim language, a POSITA would readily understand that the inclusion of the word "particular" in this phrase was a typographical error.  Ex. 16 at ¶¶100-02.

Sonos is proposing a construction of the phrase "a media particular playback system" that corrects the typographical error by removing the word "particular."  This construction is not subject to reasonable debate by a POSITA when considering the intrinsic evidence.  *Id*. at ¶¶107-09.  First, the conclusion that the phrase "a media *particular* playback system" in dependent claims 3, 15, and 26 includes a typographical error is supported by dependent claims 2 and 14, which include a similar structure to dependent claims 3 and 15 but use the correct phrase "a media playback system" rather than the erroneous phrase "a media *particular* playback system."  *Id.* at ¶¶103-05.  Given the parallelisms between dependent claims 2 and 14 and dependent claims 3 and 15, a POSITA would understand that the inclusion of "particular" in the phrase "a media particular playback system" is a typographical error.  *Id.* at ¶106.

Second, the '615 specification describes the inventions using phrases such as "multimedia playback system," "multimedia playback network," and "multimedia playback network," but *never* uses the phrase "media particular playback."  *See, e.g.*, Ex. 1, '615 Patent at Abstract, 1:66-2:1, 2:51-3:13, 12:34-35, 15:51-57.

Third, there is nothing in the prosecution history suggesting to a POSITA that any other correction would be reasonable.  Ex. 16 at ¶¶110-12.  To the contrary, as illustrated below, the prosecution history highlights that the erroneous inclusion of the word "particular" in the phrase "a media particular playback system" was introduced when Sonos amended the independent claims (the amendment to claim 1 is shown below) to recite a "*particular* playback device" and propagated the word "particular" in front of "*playback* device" in various dependent claims but in so doing, also erroneously inserted the word "particular" in front of "*playback* system" in dependent claims 3, 15, and 26 (the erroneous amendment to claim 3 is highlighted in red below):

SONOS' OPENING CLAIM CONSTRUCTION BRIEF
3:20-cv-06754-WHA

**AMENDMENTS TO THE CLAIMS**

1.      (Currently amended) A method comprising:

* * *

detecting, via the control device, a set of inputs to transfer playback from the control device to a ~~particular~~ playback device, wherein ~~detecting~~ the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network;

3.      (Currently amended) The method of claim 1, wherein detecting the set of inputs to transfer playback from the control device to the ~~particular~~ playback device comprises detecting a set of inputs to transfer playback from the control device to a particular zone group of a media ~~particular~~ playback system that includes a first zone and a second zone, wherein the first zone includes the ~~particular~~ playback device and the second zone includes at least one additional playback device, wherein modifying the one or more transport controls of the control interface to control playback by the playback device comprises causing the one or more transport controls of the control interface to control playback by the ~~particular~~ playback device and the at least one additional playback device in synchrony, and wherein ~~initiating playback of~~ the particular playback device playing back the retrieved multimedia content comprises ~~initiating playback by~~ the ~~particular~~ playback device and the at least one additional playback device playing back the multimedia content in synchrony.

*Id.*, App'x N at 2-4.

While Google manufactured other interpretations of the phrase "a media particular playback system" during the preliminary Texas proceedings, none of these other interpretations is ***reasonable*** since each is inconsistent with how a POSITA would interpret the phrase in view of the claims and specification.  Ex. 17 at ¶¶81-99; *Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, No. 07-CV-1359, 2009 WL 330950, at *9-10 (N.D. Cal. Feb. 10, 2009), *aff'd*, 465 F. App'x 955 (Fed. Cir. 2012) (correcting claims by deleting an extraneous word where nothing in the intrinsic evidence indicated the patentee intended defendant's proposed, alternative interpretation).

In particular, a POSITA having read the '615 Patent would not reasonably interpret the phrase as a "playback system that can only play particular media formats" (e.g., only MP3 formats) because the '615 Patent provides no support for such a system.  Ex. 17 at ¶¶83-85. Likewise, a POSITA having read claims 3, 15, or 26 would not reasonably interpret this phrase as a "playback system that can only play … particular media types" or "a playback system specific to a particular type of media" given that each claim continues to recite "playing back ***the***

22

1    ***multimedia content***" instead of reciting "playing back the content of the particular media types or

2    type of media," which would be required under Google's interpretation.  *Id.* at ¶¶83-84, 86-90.

3         Google's only other argument is that "media particular" was meant to distinguish a

4    "playback system" that can playback media from one that cannot.  Even assuming a POSITA

5    would interpret "media particular playback system" in this manner, which Dr. Schmidt disputes

6    (Ex. 17 at ¶¶91-93), that would leave two options: the phrase (i) refers to a playback system that

7    can playback media or (ii) has an error that the Court can correct to recite "media playback

8    system."  Both options have the same meaning and result in the phrase being definite.[10]

9         While the Texas Court did not believe it had the power to correct the typographical error

10   at issue here, the Federal Circuit is unequivocal that a district court does in fact have such power.

11   *See, e.g.*, *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) ("The district court

12   held that it has no authority to correct or ignore even a typographical error in a patent.  That is

13   inaccurate."); *CBT*, 654 F.3d at 1358-59 (reversing ruling of indefiniteness and inserting the word

14   "and" to the claims); *Ultimax*, 587 F.3d at 1352-53 (reversing ruling of indefiniteness and adding

15   a missing comma to claims).

16        In fact, this Court has exercised such power by removing extraneous words from claims,

17   as Sonos requests the Court to do here.  *See, e.g.*, *Finjan, Inc. v. Sonicwall, Inc.*, No. 17-CV-

18   04467, 2019 WL 1369938, at *6 (N.D. Cal. Mar. 26, 2019) (rejecting defendant's argument of

19   other allegedly reasonable corrections and correcting claims by deleting extraneous phrase);

20   *Baxter*, 2009 WL 330950, at *9-10 (correcting claims by deleting an extraneous word).  Other

21   district courts have done so as well.  *See, e.g.*, *Leveraged Innovations, LLC v. NASDAQ OMX

22   Grp., Inc.*, No. 11-CV-3203, 2012 WL 4062100, at *10 (S.D.N.Y. Sept. 14, 2012) (correcting

23   claimed "leveraged exchange traded portfolio" to "leveraged portfolio" and claimed "leveraged

24   exchange traded computer" to "exchange computer," where these original phrases appeared

25   nowhere else in the patents-in-suit).

26

27   _____

[10] *Cf. CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011) (finding
28   claim not indefinite when each reasonable interpretation would result in the same claim scope
     and thus, there was no reason to avoid correcting it).

1    After the Texas Court tentatively declined to exercise its authority to correct the

2    typographical error in dependent claims 3, 15, and 26 of the '615 Patent, Sonos requested a

3    certificate of correction from the USPTO on September 10, 2021 to correct the error contained in

4    these claims.  Ex. 18.  On February 2, 2022, the USPTO summarily denied Sonos's request with

5    nothing more than a bald assertion that "[t]he changes requested would materially change the

6    scope of meaning of the patent."  Ex. 19.

7    The USPTO was wrong to deny Sonos's request for the reasons explained above.

8    Regardless, the USPTO's standard for issuing a certificate of correction is different than the

9    standard applied by a district court for correcting a typographical error.  *See, e.g.*, *Novo Indus.,*

10   *L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356-57 (Fed. Cir. 2003).  And this Court is not

11   bound by the USPTO's decision.  *See, e.g.*, *Quad Env't Techs. Corp. v. Union Sanitary Dist.*, 946

12   F.2d 870, 876 (Fed. Cir. 1991) ("The courts are the final arbiter of patent validity and, although

13   courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the

14   question is ultimately for the courts to decide, without deference to the rulings of the patent

15   examiner."); *cf. Fujitsu Ltd. v. Tellabs Operations, Inc.*, No. 08-CV-3379, 2011 WL 1303358, at

16   *11 (N.D. Ill. Mar. 31, 2011) (reasoning that a court's authority to correct a patent is not

17   constrained by the USPTO's decision on a certificate of correction).

18   Accordingly, Sonos requests that the Court exercise its power and correct the

19   typographical error in the term "a media particular playback system."

20   **CONCLUSION**

21   For the foregoing reasons, the Court should accept Sonos's claim construction positions.

22   Dated:  March 21, 2022                    ORRICK HERRINGTON & SUTCLIFFE LLP

23                                             *and*
                                               LEE SULLIVAN SHEA & SMITH LLP

24
                                               By: */s/ Cole B. Richter*
25                                                  Cole B. Richter (admitted *pro hac*)

26                                                  *Attorneys for Sonos, Inc.*

27

28