1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
3     melissabaily@quinnemanuel.com
      Lindsay Cooper (Bar No. 287125)
4     lindsaycooper@quinnemanuel.com
    50 California Street, 22nd Floor
5   San Francisco, California 94111-4788
    Telephone: (415) 875-6600
6   Facsimile: (415) 875-6700

7   Attorneys for GOOGLE LLC

8                 UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11  GOOGLE LLC,                          Case No. 3:20-cv-06754-WHA

12            Plaintiff,                 **GOOGLE LLC'S RESPONSIVE CLAIM
                                         CONSTRUCTION BRIEF**
13       vs.

14  SONOS INC,

15            Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## TABLE OF CONTENTS

**Page**

3 I.    THE PRIOR CLAIM CONSTRUCTION ORDER ....................................................1

4 II.   TECHNICAL BACKGROUND .......................................................................................5

5       A.    Speaker Grouping And Zone Scenes ...............................................................5

6       B.    Playback Queues and "Direct Play" ................................................................6

7 III.  CLAIM TERMS ............................................................................................................7

8       A.    "zone player" ('966 and '885 patents) / "playback device" ('615 and '033
              patents)...........................................................................................................7

9       B.    "playback queue" ('615 and '033 patents)......................................................11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003)................................................................ 7

*Augustine v. Principi*,
  343 F.3d 1334 (Fed. Cir. 2003)................................................................ 3

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004)................................................................ 7

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
  749 F.3d 1349 (Fed. Cir. 2014).............................................................9, 10

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988)..............................................................................3, 4

*Cont'l Cirs. LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ................................................................. 9

*Emerson Elec. Co. v. SIPCO, LLC*,
  826 Fed. App'x 904 (Fed. Cir. 2020)...................................................... 11

*Exmark Manufacturing Company Inc. v. Briggs & Stratton Corp.*,
  2020 WL 5904445 (Fed. Cir. 2020) ....................................................... 13

*Finjan, Inc. v. Sonicwall, Inc.*,
  No. 17-CV-04467, 2019 WL 1369938 (N.D. Cal. Mar. 26, 2019)........... 24

*FitBit, Inc. v. AliphCom*,
  2017 WL 386257 (N.D. Cal. Jan. 27, 2017) ........................................... 14

*Goldenberg v. Cytogen, Inc.*,
  373 F.3d 1158 (Fed. Cir. 2004)............................................................21, 22

*Henry v. Sneiders*,
  490 F.2d 315 (9th Cir. 1974) ................................................................... 4

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)............................................................... 16

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
  No. 09-CV-355-WHA, 2011 WL 1659867 (N.D. Cal. May 3, 2011)........ 4

*Leveraged Innovations, LLC v. Nasdaq OMX Group, Inc.*,
  2012 WL 4062100 (S.D.N.Y.).................................................................. 24

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ................................................................. 9

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed.Cir. 2005) ............................................................... 13

*Nike Inc. v. Wolverine World Wide, Inc.*,
  43 F.3d 644 (Fed. Cir. 1994) ................................................................... 4

*Noli v. Comm'r*,
  860 F.2d 1521 (9th Cir. 1988) ................................................................. 4

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 138 (Fed. Cir. 2003) ................................................................. 22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)................................................................ 18

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..........................................................12, 16

*Realtime Data LLC v. Reduxio Sys., Inc.*,
   831 F. App'x 492 (Fed. Cir. 2020).......................................................4, 5

*Rothschild Connected Devices Innovations, LLC v. Coca-Cola Company*,
   2020 WL 2517116 (Fed. Cir. 2020)........................................................ 13

*SIPCO, LLC v. Emerson Electric Co.*,
   Fed. App'x 2019 WL 6998644 (Fed. Cir. 2019)...................................... 19

*Snyders Heart Valve LLC v. St. Jude Medical*,
   2020 WL 1445835 (D. Minn. 2020).......................................................3, 5

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)................................................................ 8

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009).............................................................. 23

*Unwired Planet, LLC v. Apple Inc.*,
   829 F.3d 1353 (Fed. Cir. 2016)..........................................................9, 10

*Wright Medical Technology, Inc. v. Osteonics Corp.*,
   122 F.3d 1440 (Fed. Cir. 1997).............................................................. 20

GOOGLE LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

Google LLC ("Google") hereby submits its responsive claim construction brief for U.S. Patent Nos. 10,469,966 ("the '966 Patent") and 10,848,885 ("the '885 Patent")[1] and U.S. Patent Nos. 9,067,615 ("the '615 Patent") and 10,779,033 ("the '033 Patent") Patents.[2]  Google provides constructions that follow the plain meaning reflected in the patent specification and the claims. Sonos, Inc.'s ("Sonos") proposals are inconsistent with the intrinsic record, providing unduly narrow and lengthy definitions for well-understood terms like "playback device," based solely on exemplary disclosed embodiments.  For "playback queue" and "resource locator," Sonos hides behind a "plain meaning" construction while its expert explicitly reads both terms far more broadly, eviscerating the plain meaning.  Finally, the term "a media particular playback system" was already found indefinite by Judge Albright as part of the claim construction proceedings that occurred prior to the case being transferred from Texas to California, and the PTO also subsequently found that it could not "correct" the patent as Sonos requested to save its validity. Not only does Sonos urge the Court to ignore Judge Albright's order and the PTO's ruling, it also asks the Court to rewrite the claim language to save it from indefiniteness, which is neither proper nor the purpose of claim construction.

## I.   THE PRIOR CLAIM CONSTRUCTION ORDER

Sonos previously sought and ultimately received a claim construction from the Western District of Texas Court.  Sonos had filed suit in the Western District of Texas, rather than in California where both Sonos and Google are located, because it assumed doing so would be favorable to its case.  However, when Judge Albright ruled against Sonos's claim constructions, Sonos began angling to ignore Judge Albright's rulings and argue that they were merely "tentative" or "preliminary" constructions.  This is baseless.  Judge Albright issued a tentative ruling *prior* to the hearing, and then clearly ruled on the record as to the disputed constructions. Judge Albright's rulings on the record were not mere "suggestions."  Nor did Sonos ask for

---

[1]  These patents are related, sharing substantively the same specification and both claim priority to a single provisional application filed on September 12, 2006.

[2]  These two patents are continuations, both claim priority to an application filed on Dec. 30, 2011.

1   reconsideration of Judge Albright's rulings in the Western District, and Sonos has not asked for

2   reconsideration of those rulings here.  Sonos is instead attempting to shortcut the reconsideration

3   process, which would have required Sonos to meet the high bar of proving a "material difference

4   in fact or law" from the time of the order or a "manifest failure" by the court to consider material

5   facts or dispositive legal arguments.  LR 7-9(b).  Sonos could not have met that standard here and

6   its efforts to bypass these requirements are improper.

7           On August 10, 2021, Judge Albright held a claim construction hearing on 17 claim terms

8   that were fully briefed by Google and Sonos.[3]  Ex. 1.  Sonos re-raises for construction only two of

9   those terms here—the "zone player"/"playback device" term and the "media particular playback"

10  term.  For the "zone player"/"playback device" term, Judge Albright explained that because his

11  tentative ruling was "plain and ordinary meaning," the parties could re-raise the dispute after

12  expert reports, and therefore the parties agreed not to argue those terms.  Ex. 1 at 5-13.  However,

13  with respect to the non-plain and ordinary meaning terms, Judge Albright's ruling was definitive,

14  including for the "media particular playback" term that Sonos re-argues here:  "But I don't think

15  this is a scrivener's error.  It may have been a mistake during the prosecution and maybe the

16  Patent Office can address it through some manner they have, but I don't believe I can.  I'm going

17  to maintain the construction of it being indefinite."  *Id.* at 66-67.  Judge Albright's ruling with

18  respect to the other non-plain meaning terms was equally definitive and final.  For example, for

19  the "zone scene" term, Judge Albright held that "The construction for that claim term is going to

20  be: A previously-saved group of zone players according to a common theme."  *Id.* at 38.  Judge

21  Albright made this ruling after announcing a new tentative ruling during the hearing and giving

22  the parties a chance to extensively argue over that new tentative ruling before finalizing it.  *Id.* at

23  23-38.  There can be no reasonable belief that Judge Albright was doing anything other than

24  making a final, binding ruling.  *Contra* Br. at 2 (Sonos arguing that Judge Albright's rulings were

25  an "expressly preliminary claim construction").

26

27

28  [3]  As discussed below, Judge Albright construed 13 of these terms as their plain meaning, which
    Sonos proposed the parties would not address at oral argument, and Google agreed.

1    Thus, in the instant case and in view of Sonos's litigation positions, the prior constructions

2    and indefiniteness rulings provided by the Texas court continue to apply, and Sonos's approach in

3    attempting to re-litigate these constructions is improper. *Snyders Heart Valve LLC v. St. Jude*

4    *Medical*, 2020 WL 1445835, *4 & *6-*7 (D. Minn. 2020) (adopting "the Texas court's prior

5    constructions" because "under law-of-the-case/reconsideration principles, 'as a rule,' courts

6    should be 'loathe' to revisit prior decisions of its own or of a coordinate court in the same case"

7    unless the decisions were "clearly erroneous" or the parties "present new evidence.").

8    Sonos makes four arguments in support of ignoring Judge Albright's order—all are

9    unavailing.  First, Sonos argues that because Judge Albright did not "decide" the claim

10   construction issues, his rulings are not "law of the case."  Br. at 1-2 (citing *Christianson v. Colt*

11   *Indus. Operating Corp*., 486 U.S. 800, 816 (1988) and *Augustine v. Principi*, 343 F.3d 1334, 1339

12   (Fed. Cir. 2003)).  But as shown above, Judge Albright clearly ***did*** decide the disputed claim

13   construction issues (except for perhaps his plain and ordinary meaning rulings).  Although

14   *Christianson* involved a very different jurisdictional dispute between the Circuit Courts,

15   *Christianson*'s discussion of "law of the case" actually ***supports*** Google's position.  *Id.*  The

16   Supreme Court noted that "[t]his rule of practice promotes the finality and efficiency of the

17   judicial process by 'protecting against the agitation of settled issues.'"  *Id.*  And further, "the

18   doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own

19   decisions."  *Id.*  The same principles apply here because Sonos requested that the Western District

20   of Texas court decide the claim construction issues while Google's venue challenge was still

21   pending, yet now seeks to void those rulings and ask for a second bite at the apple.  *Augustine* is

22   inapposite because there "[t]he Court specifically stated that the Board had not addressed that

23   question and remanded to allow the Board to do so."  *Augustine*, 343 F.3d at 1339.  Accordingly,

24   unlike here, there truly was no decision by the court in *Augustine* to apply "law of the case."

25   Second, Sonos argues that Judge Albright's oral order cannot be binding because it does

26   not provide his reasoning.  Br. at 2.  This is factually incorrect because Judge Albright *did* provide

27   his reasoning.  As described above for his ruling on the indefiniteness of the "media particular

28   playback term," for example, Judge Albright described that the applicant did not merely make a

"scrivener's error," that Judge Albright could not correct any error, and therefore that the claim term was indefinite. *Supra.* Further, the *Christianson* case explained that even if Judge Albright did not provide his rationale, that would be "irrelevant, for the law of the case turns on whether a court previously 'decide[d] upon a rule of law'—which the Federal Circuit necessarily did—not on whether, or how well, it explained the decision." *Christianson*, 486 U.S. at 816. Accordingly, regardless of whether Judge Albright explained his decision or issued a written order, Judge Albright's ruling was final. Sonos also argues that under *Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, this Court need not adopt or rely upon the Western District court's ruling. No. 09-CV-355-WHA, 2011 WL 1659867, at *2 (N.D. Cal. May 3, 2011). But *Karl Storz* involved ***different*** parties, and those parties were not involved in the same litigation that was merely transferred. *Id.* Further, the constructions in *Karl Storz* were actually tentative, as compared to Judge Albright's rulings here, which were final. *Id.* ("the parties reported at the April 27 hearing that the claim construction rulings from the Tennessee court are only tentative"). Sonos's underlying argument seems to be that any oral order would be legally insufficient. That position is meritless. *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644 (Fed. Cir. 1994) (applying Ninth Circuit law) (observing that an "oral order can provide the requisite basis for a Rule 37 sanction" and concluding that the district court's oral discovery order constituted a discovery order). Oral orders are just as binding and effective as written orders. *Noli v. Comm'r*, 860 F.2d 1521 (9th Cir. 1988) (holding that oral order of judgment was sufficient); *Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974) (upholding default judgment based upon an oral order to produce documents).

Third, Sonos argues that Judge Albright's rulings cannot be followed because without a written order they would not facilitate appellate review. Br. at 3 (citing *Realtime Data LLC v. Reduxio Sys., Inc.*, 831 F. App'x 492, 493 (Fed. Cir. 2020)). Sonos's legal support for this argument is threadbare, and *Realtime Data* is inapposite. *Realtime Data* involved a yes or no decision by the district court on the issue of abstract subject matter. *Id.* Noting that the issue of abstract subject matter was likely "the most baffling concept in all of patent law," this created one of the "rare circumstances in which a district court's treatment of a complex and close legal issue is too cursory to allow for meaningful appellate review." *Id.* The Federal Circuit also found four

clear shortcomings in that court's oral rulings—that the court focused improperly on factual issues at the motion to dismiss stage, its "questionable" process of determining *Alice* step 1, the failure to address lengthy Magistrate opinions on the same 101 issue, which had been adopted by two different district courts, and a failure to analyze the most directly applicable Federal Circuit cases, which were briefed as such. *Id.* at 496. The issues presented here are far simpler, and Sonos has raised no specific flaws in Judge Albright's analysis. Further, the Federal Circuit ordered transfer of the case to this Court before Judge Albright could issue a written ruling, which further distinguishes the *Realtime Data* court's decision to avoid a written ruling.

Finally, Sonos is incorrect that Google is asking for reconstruction of any of Judge Albright's rulings. While it is true that Google proposed that "remote playback queue" be construed as a "remote playback queue provided by a third party application" in the Western District, neither party proposed a construction of the term "playback queue" itself. It later became necessary to construe "playback queue" alone because Sonos amended its infringement contentions more than five times ***after*** the *Markman* hearing in the Texas action that took place on August 10, 2021. In fact, Sonos did not reveal its specific infringement theories and the source code it was accusing of infringement until September 9, 2021, more than a month after the *Markman* hearing in the Texas action. It was through these amendments that Google determined that a claim construction was necessary because Sonos was seeking to interpret the term "playback queue" so broadly as to eliminate the requirement of a "queue" entirely. Sonos cannot be heard to complain about an issue that ***it*** created by adding myriad new infringement theories to this case. Further, there is no inconsistency with the law of the case doctrine, because Sonos's new infringement theories constitute new evidence. *See Snyders Heart Valve LLC*, 2020 WL 1445835, *4 & *6-*7 ("courts should be 'loathe' to revisit prior decisions" unless the parties "present new evidence").

## II.    TECHNICAL BACKGROUND

### A.    Speaker Grouping And Zone Scenes

Sonos refers to its '966 and '885 patents as its "Zone Scene Patents." The Zone Scene Patents do not purport to invent grouping speakers together for music playback. Such speaker

groupings have long been known in the art.  Patents filed years before the Zone Scene Patents described "remote unit[s] for selectively controlling . . . music *from the at least one group of speakers*."  U.S. Patent No. 7,339,492 at 1:10-12.  The Zone Scene Patents likewise admit that "multi-zone audio system[s] that usually includes a number of audio players" were "conventional" at the time.  '885 Pat. at 1:46-61.  Home audio systems from companies such as Bose and Crestron provided home theater enthusiasts the ability to set up multiple speaker zones in their house and dynamically select music to play from each.  Ex. 2 at pp 15-20 (Bose System describing Preset Groups).  Indeed, even Sonos's own prior art products describe grouping speakers into "zones," combining zones into "zone groups," and including preset groups such as "Party Mode."  Ex. 3 at 11.

### B.      Playback Queues and "Direct Play"

Sonos refers to its '615 and '033 patents as its "Direct Play" patents.  The so-called "Direct Play" patents describe transferring playback of a "playback queue" of multimedia items from a "control device" (such as a Sonos controller) to a "playback device" (such as a Sonos speaker).  The '615 Patent claims recite that the "playback queue" is a "local playback queue" that is stored "on the playback device," while the '033 Patent claims recite a "remote playback queue."

The "Direct Play" Patents claim priority to an application filed Dec. 30, 2011—six years after Sonos released its first products.  By that time all the elements of Sonos's alleged invention were well known, including playlist or queue management to transfer playback from one device to another.  *See e.g.*, Exs. 4-6.  And there is no need to take Google's word for it.  According to Sonos itself, "as of 1999-2000, implementing playlists on a network-enabled audio device to select, manage, and manipulate audio content was well known in the art."  Ex. 7 at 14.  For example, the "RioPort Audio Manager provided a graphical user interface (GUIs) for users to select and play music transmitted from a central database in a network.  Consumer products with playlist functions had become common by the year 2000."  *Id.* at 13.  Before the filing date of these patents, Google itself had already developed its "YouTube Remote," which permitted users to create a queue of videos on their phone and transfer playback to a playback device, such as a

1   television.  *See e.g.*, Ex. 8 (YouTube Remote); *see also*

2   *https://www.youtube.com/watch?v=EGdsOslqG2s* (YouTube Remote video, uploaded 11/14/10).

3   **III.    CLAIM TERMS**

4       **A.    "zone player" ('966 and '885 patents) / "playback device" ('615 and '033 patents)**

| Sonos Construction | Google Construction |
|---|---|
| A data network device configured to process and output audio | Plain and ordinary meaning; no construction necessary at this time |

9         The plain and ordinary meaning should apply to the "zone player" and "playback device"

10   terms.  These terms are easily understood by the jury without construction, and there is no reason

11   to depart from the plain meaning and artificially narrow the definition as Sonos requests.  The

12   specification explains why "zone players" are called zone players—it is because they are audio

13   players within a zone:  "Each of the audio devices may be installed or provided in one particular

14   area or zone and ***hence referred to*** as a zone player herein."  '966 Pat. at 4:46-48; '615 Pat. at

15   3:28-31 ("A zone player 102-124, also referred to as a playback device, multimedia unit, speaker,

16   and so on, provides audio, video, and/or audiovisual output.").  This is an archetype of plain and

17   ordinary meaning, because the specification describes "zone player" as simply the plain meaning

18   of both terms put together.  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003)

19   ("[S]imply because a phrase as a whole lacks a common meaning does not compel a court to

20   abandon its quest for a common meaning and disregard the established meanings of the individual

21   words."); *Bancorp Services, L.L.C. v. Hartford Life Ins. Co*., 359 F.3d 1367, 1372 (Fed. Cir. 2004)

22   ("It is true that the entire term 'surrender value protected investment credits' is not defined in the

23   patent, . . . . Nonetheless, the components of the term have well-recognized meanings, which allow

24   the reader to infer the meaning of the entire phrase with reasonable confidence.").  There is

25   certainly no "clear and unmistakable" disclaimer or lexicography that would require the Court to

26   exclude from these terms players and devices that are not connected to a "data network" or

27   configured to "process audio."

28

Sonos's history of proposed constructions for this term is enlightening.  In the Western District of Texas, Sonos proposed construing "data network" as "a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other," and then proposed including the term "data network" in ***three*** other terms including both terms at issue here.  Ex. 9.  Judge Albright rejected Sonos's attempt to import these limitations into any of the claim terms.  Ex. 1 at 7:7-14.  Now Sonos is making its same bid to import "data network" and "processing" limitations into these terms with only a bit more subtlety.

Sonos's attempt at subtlety–by leaving its proposed "data network" and "process audio" terms undefined–results in a construction that ***adds*** ambiguity to the term, rather than reducing it. *Tessenderlo Kerley, Inc. v. Or-Cal, Inc.*, 2012 WL 3116059,*2-*3 (N.D. Cal. 2012) (rejecting proposed construction and holding that "[a] purpose of claim construction is to remove ambiguity.") (Alsup, J.).  First, it is not clear if Sonos is actually dropping its attempt to import a "digital" requirement into the claims as it did in the Western District or not.  Because Sonos never mentions the words "digital" or "analog" in its argument, however, Sonos has waived any such argument and Google does not discuss it further.  Similarly, Sonos offers no identification of what types of "audio processing" fall within the scope of the claims (amplification? equalization?) and therefore Google is left to guess at what Sonos is attempting to either include or exclude with its ambiguous construction.

Regardless, nothing in the specification or the prosecution history supports limiting the scope of the invention to exclude all non-data networking and audio processing embodiments. Sonos repeatedly states that every embodiment in the specification includes these requirements, but as discussed below this is not true, and it is legally insufficient regardless.  "It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation.  We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that.  To constitute disclaimer, there must be a clear and unmistakable disclaimer." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012).  "A disclaimer or disavowal of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record." *Unwired Planet, LLC v.*

*Apple Inc*., 829 F.3d 1353, 1358 (Fed. Cir. 2016); *Cont'l Cirs. LLC v. Intel Corp*., 915 F.3d 788, 797 (Fed. Cir. 2019) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'") (quoting *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 906 (Fed. Cir. 2004)")).

Sonos argues that its construction is required because the specifications distinguished "conventional multi-zone audio systems," with hard-wired speakers, citing the '966 Patent at 1:46-67 and the '615 Patent at 6:50-60.  Br. at 7.  But the closest this portion of the '966 Patent gets to disclaimer is the statement that "[w]hile the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation."  And the cited portion of the '615 Patent discloses that "[a]s such, certain embodiments described herein provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user."  These statements are nowhere close to the level of "words or expressions of manifest exclusion or restriction" required to affect a disclaimer.  *Cont'l Cirs. LLC*, 915 F.3d at 797.  To the contrary, they are merely describing that the conventional systems *are* satisfactory in particular "situations" and that "certain embodiments" benefit from a more dynamic platform.  Sonos also attempts to distinguish "hard-wired" audio systems as "conventional" and disclaimed, but the patent explicitly states that preferred embodiments "may be a ***wired network***, a wireless network or a combination of both."  '966 Pat. at 4:62-63, 5:40-41 ("The network interface 202 may include one or both of a wireless interface 216 and a wired interface 217.");  *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc*., 749 F.3d 1349, 1356 (Fed. Cir. 2014) ("[a] claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'").

Indeed, Sonos's proposed constructions would exclude ***its own*** preferred embodiments.  In the '615 Patent, "[e]xample zone players include a . . . 'Zone Player 90,' which [was] offered by Sonos, Inc."  '615 Pat. at 4:26-28.  But the Zone Player 90 "is designed to be used with an external amplifier" and "contains both analog and digital outputs so that you can easily connect it to your existing audio equipment," which may be "driven from an amplifier in one central location with

speaker wires home-run to this central location."  Sonos ZonePlayer 90 Setup Guide at 3.  In other words, the preferred embodiment *was* hard wired to conventional powered speakers, and took analog audio input and output analog audio as well.  *Id.* at 17.

Sonos's reasoning (and support) to now import the "data network" term into the claims is therefore flawed.  Although Sonos states that "data network" is "uniformly" required by "all" of the zone players, Br. at 7, that is not accurate as just discussed, and in any event the cited portion of the specification clearly states that this description is nonlimiting because it merely "shows an exemplary configuration 100 in which the present invention may be practiced."  '966 Pat. at 4:39-41.  Indeed, the specification discloses that the audio signals "*can* be transported or streamed over a data network," but it does not *limit* such transportation to a data network.  '966 Pat. at 4:49-51.

Sonos's citations in support of importing "audio processing" limitations in the claims fail for the same reason.  None of them evidence a "clear and unmistakable" disclaimer or lexicography by the inventor.  *Unwired Planet, LLC*, 829 F.3d at 1358.  Instead, in each case they are simply describing a preferred embodiment, with no words of exclusion at all.  Br. at 7-8.  Further, the asserted claims already recite multiple "processors."  *E.g.*, '885 Pat. Cl. 1 ("1. A computing device comprising: one or more processors; a non-transitory computer-readable medium; and program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors . . .").  If the inventors wished to require the "zone players" to include processors for audio, they could have and should have done so.

Sonos also argues that its construction was adopted in *Sonos, Inc. v. D&M Holdings, Inc. et al.*, Case No. 14-cv-01330 (D. Del.) ("*D&M*").  Ex. 10.  The D&M case, however, involved patents that have different claim language and which are *not* asserted here.  *Id.*  Google did not object to the *D&M* construction in the ITC case because the same *D&M* patents *were* at issue in the ITC.[4]  The same is not true here, and for that reason Google argues that the intrinsic and extrinsic evidence in *this* case should be applied.  The Direct Play Patents were filed more than six

---

[4]   In the ITC case, Google also agreed to constructions for two other patents, which also have no family relationship to the patents asserted in this case.

years after the ITC and *D&M* patents.  It would be error to rely on constructions for different patents that are not at issue here, which are from a different time, and Sonos cites no authority justifying such an approach.  *Emerson Elec. Co. v. SIPCO, LLC*, 826 Fed. App'x 904, 914 (Fed. Cir. 2020) ("construction of a particular term in one patent will not necessarily bear on the interpretation of the same term in a subsequent patent because the factual context is different. The term may be identical, but the intrinsic evidence is not.").

   **B.**   **"playback queue" ('615 and '033 patents)**

| Sonos Construction | Google Construction |
|---|---|
| Plain and ordinary meaning; no construction necessary at this time | "an ordered list of multimedia items that is selected by the user for playback" |

   Consistent with its ordinary and customary meaning, the specifications of the '615 and '033 patents teach that a "playback queue" is an ordered list of multimedia items selected by the user for playback.  For example, the specification explains that a user can create a queue of songs or videos and continue to add to or edit the queue.  *See, e.g.*, '615 Patent at 16:25-28 ("Two-way communication helps enable features such as keeping a local playback queue synchronized with a queue that the user is editing/managing in the third party application."), 16:52-59 ("the third party application allows users to add, delete and so on from the queue, for example."), 17:12-16 ("a user can queue up music while away from his or her house.").  The patents further teach that the multimedia items added to the queue are an ordered list having a position in the queue.  *See, e.g.,* '615 Patent at 9:29-31 ("The controller 500 is provided with a screen 502 and an input interface 514 that allows a user to interact with the controller 500, for example, to navigate a playlist of many multimedia items."), 15:57-67 (local playback system can transmit information about the "current play position within a list"), 16:32-35 ("In certain embodiments, a local playback system can pass information back to a third party application to indicate a current point of playback (*e.g.*, now playing a third song in a playlist, fourth song in the playlist, and so on).").

   As Google's expert, Dr. Kyriakakis, explains in his declaration, with support from technical dictionaries, industry materials (including those describing the playback queue in Sonos's own products), and his experience in the field, Google's proposed construction reflects

1  the plain and ordinary meaning of "playback queue" to a POSITA.  *See* Ex. 11 (Kyriakakis Decl.)

2  ¶¶ 46-47; *Phillips*, 415 F.3d at 1318 (explaining that expert testimony can be useful "to establish

3  that a particular term in the patent or the prior art has a particular meaning in the pertinent field").

4  For instance, Google's construction tracks the definition of a playback queue provided in Sonos's

5  own manuals from the relevant time period: "**What is a music queue? When you make music**

6  **selections, they are added to a list of tracks called a music queue**…. When the current track

7  ends, the next track in the queue starts to play, and play continues down through the list until the

8  queue is completed."  Ex. 12

9  (Sonos User Manual) at 4-2

10  (emphasis added).  Sonos's

11  manuals also provide a

12  graphical representation of the

13  playback queue (image on the

14  right), wherein the playback

15  "queue" includes an ordered

16  list of music (green box), and is

17  created by having users add

18  (purple box) and remove (red

19  box) items from the queue. Ex.

20  11 ¶¶ 21-22.  Other textbooks,



21  manuals, and dictionaries are in accord and confirm that Google's proposed construction reflects

22  the ordinary and customary meaning of the term "playback queue."  Ex. 13 (Windows Vista: The

23  Missing Manual) at Section 16.4.7 ("**a queue is** a waiting line, whether it's the one at the

24  Department of Motor Vehicles or **the list of songs you've lined up to play**") (emphasis added),

25  Ex. 14 ("**The 'Play Queue' is a list of all tracks currently selected to be played**.") (emphasis

26  added); Ex. 11, ¶23 (illustrating a Spotify "Play Queue," which is an ordered list of multimedia

27  items); Ex. 15 (defining a "queue" as "a list of items waiting for attention in a computer system,

28

generally ordered according to some criteria."). Sonos's opening brief ignores Google's evidence, and does not offer evidence that "playback queue" has any other meaning.

While Sonos nominally proposes that the term "playback queue" should be given its plain and ordinary meaning, Sonos's expert confusingly opines that a "playback queue" refers to "a 'container' that can hold multimedia for playback." Schmidt Decl., ¶47. Sonos's expert does not identify any attributes that the "container" must have and goes so far as to claim that the "container" may simply be "memory" that can play back multiple media. Schmidt Decl., ¶88; *see also* Ex. 16 (3-3-2022 Schmidt Tr.) at 82:12-20 (testifying playback queue may be a "single data variable" in memory that stores a media item for playback). Not surprisingly, Sonos has not cited to any evidence (intrinsic or extrinsic) that would support such a vague and expansive reading of the term "playback queue," and Sonos's implicit proposed construction is erroneous as a matter of law because it gives the word "queue" no meaning. *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed.Cir. 2005) ("A claim construction that gives meaning to all the terms of the claims is preferred over one that does not do so."). Sonos's proposed construction of a queue as merely memory, holding *zero* or more multimedia items, implies that a playback queue always exists in a computer, because the "memory" in that computer always at least holds some non-populated data.[5] This situation has nothing to do with a queue, proving that Sonos has completely eviscerated the term "queue" from its construction. *Exmark Manufacturing Company Inc. v. Briggs & Stratton Corp.*, 2020 WL 5904445, *3-*4 (Fed. Cir. 2020) (rejecting construction that "would render the word 'discharge' meaningless."); *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Company*, 2020 WL 2517116, *4 (Fed. Cir. 2020) (rejecting construction that "reads out the term 'interface' in 'user interface module.'"). In fact, Google asked Sonos's expert at his deposition if there were *any* examples of memory that store multimedia for playback that would not satisfy his definition of "playback queue." Ex. 16 at 82:21-84:1. He could not identify

---

[5] Google's construction includes a structural "ordered list" and therefore even a zero-element queue under Google's construction does not suffer the same defect.

any, *id*., exemplifying the extraordinary breadth of Sonos's proposed construction.  *Id*.  For all these reasons, Sonos's proposal must be rejected.

In addition, Sonos's complaints about Google's construction all miss the mark.  First, Sonos argues that "not even Google's expert believes that a 'playback queue' must have plurality 'multimedia items.'"  Br. at 10-12.  Sonos's argument is a strawman because Google has never disputed (and, in fact, agrees) that a playback queue may be empty before the user selects items to add to the queue, or that the queue may include a single item at a given time.  Google's construction does not foreclose an empty queue or a queue with a single item.  A list of multimedia items can be an empty list, a list with one item, or a list with many items, as the references Sonos cites in its motion confirm.  *See* US Publication No. 2012/0089910A1, ¶52 ("media *listing can include zero, one or more additional items of media* content") (emphasis added); *see also FitBit, Inc. v. AliphCom*, 2017 WL 386257, *14 (N.D. Cal. Jan. 27, 2017) ("The ordinary meaning of 'list' also supports the idea that the 'list' at issue can contain one or no items. Lists often can be empty or contain only one item…. *lists do not cease to become lists as soon as they contain one or no items—they are simply empty lists*.  The same principles apply to the list of eligible devices.") (emphasis added).  This is a moot point, though, because the claims are not directed to an empty or single item queue.  For instance, the '033 Patent recites a "remote playback queue provided by a cloud-based computing system."  It further recites a "first mode" in which a "computing device is configured for playback of [the] remote playback queue," and a "second mode" in which a "playback device" must "take over responsibility for playback of the remote playback queue from the computing device," including by obtaining and playing "a *next* one or more media items that are in the remote playback queue."  By reciting that the playback queue includes a "next" media item, the claim language indicates that (1) media items in the queue have an order, and (2) that the queue has multiple items.  In other words, although Google's construction of "playback queue" does not preclude a list from having zero or one items, other language in the claims imposes additional restrictions that do require multiple items, rendering Sonos's arguments about the size of the list moot.  Google's construction makes clear that a "playback queue" refers to the ordered list of multimedia items selected by the user for playback

1   on the playback device—whether that be an empty list or a list with multiple items—not any

2   vague "container" that stores an individual multimedia item (e.g., the next song) that is in a

3   remotely stored playback queue.

4           Second, Sonos argues that the specification discloses embodiments that queue a "single

5   audio track/song."  Br. at 11-12.  Sonos's citations to the specification do not support its position.

6   For instance, Sonos cites to various disclosures teaching that a playback device "may contain a

7   uniform resource locator (URL) that specifies an address to a particular audio track" or "a song

8   identifier."  Br. at 11-12 (citing '615 Patent at 11:62-12:3, 10:42-46, 12:49-63, 13:36-40, 15:59-

9   62).  None of these disclosures, however, purport to describe the complete set of items in the

10  queue or suggest that *only* a single URL or song identifier is in the queue.  *Id*.  Regardless, the

11  ability to create a queue with just a single item is consistent with Google's proposed construction

12  as explained above.

13          Third, Sonos argues that a queue need not be a "list" because the specification discloses

14  embodiments having "multiple media items without requiring the 'playback queue' to contain a

15  list."  Br. at 12.  But again, the disclosures Sonos cites to do not support its position; in fact, they

16  support Google's position.  For instance, Sonos cites to the following disclosure which expressly

17  discloses an ordered list of multimedia items:  "Information passed over to the local playback

18  device may include an identifier for a single track, a playlist, a streaming radio station, a

19  programmed radio station, and so on.  This information can also include a ***current play position***

20  ***within a list***."  '615 Patent at 15:57-65 (emphasis added); Br. at 12 (citing 15:59-62).  Moreover,

21  the assertion of Sonos's expert that a "playback queue" may merely be a memory that is capable

22  of storing media items ("play_now" and "play_next") conflicts with the description of a queue in

23  Sonos's patents and documents.  For instance, both sources explain that a user may make changes

24  to the queue, for instance by adding items to the queue such that the queue includes more than two

25  media items, or moving tracks around within the queue, whereas by contrast Sonos's expert is

26  opining that two static identifiers (now and next) constitute the queue.  '615 Patent at 16:52-63;

27

28

Ex. 12 (Sonos Guide) at 4-29 to 4-31.[6]  Sonos also provides "real world" examples that Sonos

claims show that a queue is not an ordered "list," like supermarket queues and a queue for tickets

outside a theater.  Br. at 13.  These examples actually illustrate how far Sonos has strayed from the

plain and ordinary meaning of the term "queue."  Under Sonos's construction of "queue," the

supermarket and ticket-line queues wouldn't need to be ordered at all—in other words, any user

could check out immediately regardless of where they stood, and users would have no idea how

close they were to getting a ticket because that line had no order either.  This result is obviously

illogical and incorrect.  *Interactive Gift Exp., Inc. v. Compuserve Inc*., 256 F.3d 1323, 1336 (Fed.

Cir. 2001) (vacating judgment based on a construction that was "illogical and [did] not accord

with the plain import of the claim language").  The argument that neither of these real world

queues are "lists" is facile, because in the context of a playlist, it makes sense that the items in a

queue can be listed, whereas in a ticket line, it makes sense that the items in the queue are humans,

and can't be listed (although their names could be).  Indeed, the Federal Circuit instructs that claim

constructions should take the context of the claim into account when fashioning an appropriate

construction.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("the

context in which a term is used in the asserted claim can be highly instructive.").  Regardless, the

key point is that even Sonos's real world examples must have an order, as Google's construction

(but not Sonos's) requires.

Fourth, Sonos argues that "a 'playback queue' is not limited to a queue in which the media

is 'selected by the user for playback.'"  Br. at 14-16.  Sonos points to disclosures in the patent

teaching that a user may stream a playlist from an online music service or a streaming radio

station.  Br. at 15 (citing '615 Patent at 13:1-10, 15:59-62, 6:64-66, 8:63-66, 14:50-52).  But these

disclosures are consistent with Google's construction.  Playlists from online music services and

streaming radio stations can be added to a playback queue ("Add to Queue") or can be played

without being added to a playback queue ("Play Now").  Ex. 12 (Sonos user manual) at 4-2 (with

---

[6]  Sonos also argues that the meaning of the term "ordered list" is unclear.  Br. at 14.  But Sonos's
attorney argument is undercut by its own expert who understands the term well enough to identify
examples that are and are not an ordered list.  Schmidt Decl., ¶¶48-54.

1    "Napster Automix [y]ou can create an instant playlist based on artist or a track selection" and then

2    "Play Now" or "Add to Queue"), 4-34 ("Select a radio station, and click "Play Now" or "Add to

3    Queue."); *see also id*. at 4-10 ("To play all songs by an artist, on an album, or in a genre, select

4    what you'd like to play, and then select "Play Now to play the music now, or Add to Queue to add

5    it to your music queue.").  Consistent with this, the '615 and '033 patents explain that the

6    multimedia content is added to the queue by the user.  *See, e.g.,* '615 Patent at 16:25-28 ("a queue

7    that the user is editing/managing"), 16:52-59 ("application allows users to add, delete and so on

8    from the queue, for example."), 17:12-16 ("a user can queue up music.").

9         Sonos also wrongly claims that Dr. Kyriakakis, Google's expert, disagrees that the media

10    in a "playback queue" is "selected by the user."  Br. at 16.  But in fact, Dr. Kyriakakis testified

11    that a playlist comprising a single song or multiple songs may be automatically generated and

12    thereafter a user may add the playlist to the queue by, for instance, clicking "Add to Queue."  Ex.

13    17 (Kyriakakis Tr.) at 51:6-9 ("Q. Likewise, *a user can add* an entire album to a playback queue

14    without manually selecting each track in the album; correct? A. Correct."), 56:1-24 (testifying that

15    the user can select an artist to create a "Napster Automix" playlist and then add that playlist to the

16    queue by selecting the button "Add to Queue."); Ex. 12 at 4-24 (describing Automix feature).

17         Finally, Sonos contends that Google's construction introduces ambiguity.  Br. at 9-10.

18    Sonos first argues that the term "multimedia item" is unclear, but this term comes from the patent

19    itself and reflects the type of items being queued for playback:  "The controller 500 is provided

20    with a screen… to navigate a playlist of many multimedia items."  '615 Patent at 9:29-31.[7]  Sonos

21    also argues that the phrase "selected by the user" is unclear because it does not identify "which

22    'user' must select the 'ordered list.'"  Far from being ambiguous, Google's construction merely

23    distinguishes between a queue which requires the user to select and add items and other

24    multimedia streams such as a radio in which the user does not create any such queue.

25

26

---

27    [7]  As Google's expert explained during deposition, Google's construction of "playback queue"
acknowledges that not all playback queues must contain the "multimedia content" itself. Ex. 17.

28    Whether "resource locators," "identifiers," or the "multimedia content" must be added to the
playback queue will be dictated by the claim language.

Google draws its proposed construction directly from the intrinsic evidence.  Sonos, on the other hand, seeks to hide behind a "plain meaning" proposal while its expert attempts to read the concept of a "queue" out of the claims, purportedly under that plain meaning.  The parties have a clear dispute regarding the scope of the claim, which the Court should resolve.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

## C.  "resource locator" ['615 Patent]

| Sonos Construction | Google Construction |
|---|---|
| Plain and ordinary meaning; no construction necessary at this time | "an address of a resource on the Internet" |

Claim 13 of the '615 Patent recites "one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service."  The parties dispute whether a "resource locator" must "locate" a resource via an address or whether a "resource locator" refers to a broader category that includes resource identifiers.  Having deliberately chosen to use the term "resource locator" when it drafted the claims, Sonos now tries to back away from the plain meaning of that term and sweep in anything that could be considered a mere "identifier."  This is contrary to both the plain meaning of a "resource locator" as well as the intrinsic and extrinsic evidence.

Starting with the claim language, the phrase "resource locator" itself indicates that a "resource locator" locates a resource, *i.e.*, provides a location for a resource. Ex. 11, ¶58. In the Internet context, locations of resources are provided as addresses, such as URLs. *Id*. Dr. Kyriakakis testified that "the term 'resource locator' is often used in the art as shorthand for the phrase "Uniform Resource Locator" or URL." Ex. 11, ¶57, Ex. 17 (Kyriakakis 03.01.2022 Dep. Tr.) at 60:16-61:13. The language of the claim also indicates that the resource locators "correspond[] to respective locations of the multimedia content," and that this content is "at one or more second cloud servers." '615 Patent Claim 13.  Because resource **locators** correspond to

respective **locations** of the multimedia content at one or more internet servers, and **locations** of resources on the Internet are given by addresses, the claim language itself indicates resource **locators** must be an address for the resource on the Internet. Ex. 11, ¶59.

The language of dependent Claim 20 also supports Google's construction. In particular, Sonos would have its "plain and ordinary meaning" of "resource locator" encompass not only resource locators, but also any mere "identifier" of the multimedia content. But Claim 20 shows that a "resource locator" and an "identifier of the multimedia content" are different things. Whereas independent Claim 13 recites that "causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device" comprises "adding, to the local playback queue, one or more resource locators," dependent Claim 20 recites "wherein causing the one or more first cloud servers to add multimedia content to the local playback queue on the particular playback device comprises causing an identifier of the multimedia content to be added to the local playback queue." *See SIPCO, LLC v. Emerson Electric Co.*, Fed. App'x 2019 WL 6998644, *3 (Fed. Cir. 2019) ("Because the patentee chose to use different terms to define the 'receiver address' and the 'scalable address,' we presume that those two terms have different meanings."). Sonos responds that dependent claim 20 broadens the meaning of "resource locator" because that claim uses the term "identifier," and therefore Sonos argues that "resource locator" must necessarily include an "identifier." Br. at 18-20. This argument fails because claim 20 never even mentions the term "resource locator," and therefore it is not narrowing or broadening that term. *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) (claim differentiation avoids interpreting "an independent claim in a way that is inconsistent with a claim which depends from it"). Instead, claim 20 narrows the independent claim by adding a ***new*** "identifier" to the local playback queue, but that new identifier is separately claimed and distinct from the claimed "resource locator."

The specification also supports Google's construction. The only instance where the '615 Patent specification discloses "resource locators" is as part of the larger phrase "uniform resource locator (URL)," which specifies an address. For example, the specification discloses that "zone player 602 may contain a uniform resource locator (URL) that specifies an address to a particular

1   audio track in the cloud. Using the URL, the zone player 602 may retrieve the audio track from the

2   cloud, and ultimately play the audio out of one or more zone players." '615 Patent, 11:65-12:3.

3   Similarly, the specification discloses that "a uniform resource locator (URL)" can be used to

4   locate and "fetch content from a cloud and/or other networked source, for example." '615 Patent,

5   12:53-56. Thus, the specification indicates a "resource locator" in the claims is shorthand for a

6   "uniform resource locator."

7       In addition, the '615 Patent distinguishes between a resource locator, and a mere identifier.

8   For example, the '615 Patent discloses that "[o]nce the zone player has a URL (or some other

9   identification or address) for a song and/or playlist, the zone player can run on its own to fetch the

10  content." '615 Patent, 12:57-61. The '615 Patent also indicates that "certain embodiments

11  provide cross-service linking such that a song identifier can be passed from one user and/or

12  service to another to be fetched and played."). *Id.,* 13:31-33.

13      Sonos points to certain portions of the specification as allegedly disclosing "the use of a

14  URL or 'some other identification'" as evidence that a resource locator can be an identifier. Br. at

15  17. But none of these "identifiers" are "locators" as required by the claim. For example, the '615

16  specification discloses "some other identification ***or*** address." '615 Patent at 12:53-63. A "song

17  identifier," such as the name of the song or its artist, can be used to look up a song but is not

18  necessarily a "locator." *Id.* at 13:36-40. Nor is "music information," which could simply be the

19  length of the track, a resource "locator." *Id.* at 15:59-67, 16:9-19. A POSITA would understand,

20  as Dr. Kyriakakis opined, that a "locator" must do more than identify or provide generic music

21  information about a multimedia item, it must ***provide a location***. Ex. 11, ¶58. And a POSITA

22  would understand, as Dr. Kyriakakis opined, that here a "resource locator" is not distinct and

23  different from a URL, it is simply shorthand for a URL. Ex. 11, ¶57.

24      Sonos also argues Google's proposed construction is too restrictive, and Google is

25  improperly reading out embodiments in the specification. Google's construction does no such

26  thing, at least because, as discussed above, there are no "resource locators" which are not URLs.

27  Sonos argues that "a POSITA would have known that certain types of URLs (*e.g.*, PURLs) did not

28  specify an 'address of a resource.'" Br. at 25. What a PURL is or is not is irrelevant here. The

specification of the '615 Patent is silent with respect to PURLs, and the PURLs have no bearing on whether the "identifiers" Sonos accuses are URLs.   Sonos also mischaracterizes Dr. Kyriakakis's testimony on this point.  Dr. Kyriakakis testified that "it is my opinion that a PURL is not a resource locator.  It wouldn't point directly to a multimedia content item."  Ex. 17 (Kyriakakis Dep. Tr.) at 68:2-8.  But a PURL would still point, indirectly, to the location of a resource.  Ex. 17 (Kyriakakis Dep. Tr.) at 65:7-66:7 (explaining that a "PURL does not stand on its own" and that "a PURL points to an intermediate resolution service.  The PURL Resolution Service associates the PURL with the actual URL and returns that URL to the client. The client can then complete the URL transaction in a normal fashion… for example, when you type in Lakers.com, it might take you to Lakers.MBA.com, which is the original URL.  The PURL would be the Lakers.com").

The extrinsic evidence further supports Google's proposed construction.  For example, the Merriam-Webster dictionary does not include a separate entry for "resource locator."  Instead, searching for "resource locator" in the online version of the dictionary redirects to "URL," which is defined in relevant part, as "the address of a resource (such as a document or website on the Internet."  In fact, to the extent that the term "resource locator" is not shorthand for a "uniform resource locator," the term has no universal meaning and cannot be construed broader than the specification's disclosure of "universal resource locators."  *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence . . . to obtain the meaning of that term.").

Sonos relies on U.S. Patent No. 8,533,469, titled "Method and Apparatus for Sharing Documents," as allegedly supporting its argument that "resource locator" was used separately from URL.  But Sonos's cited disclosure states that a "resource locator may be a reference associated with the electronic document that would allow user 106 *to locate* or request access to the electronic document," and goes on to describe the resource locator as a "URL."  U.S. Patent No. 8,533,469 column 3 line 32 to 37.  This disclosure is thus entirely consistent with Google's construction.

### D.  "a media particular playback system" ['615 Patent]

| Sonos Construction | Google Construction |
| --- | --- |
| "a media playback system" | Indefinite |

There is no dispute that claims 3, 15 and 26 of the '615 Patent as written are indefinite. Rather, Sonos is solely—and improperly—asking this Court to save these claims by rewriting them.  As the Western District of Texas court already found, however, this was not a scrivener's error that the court can correct.  Ex. 1 (Hearing Tr.) at 66:21-67:2.  As such, that court held claims 3, 15, and 26 indefinite as a matter of law.  *Id.*  For the reasons discussed above, it is improper for Sonos to seek a do-over of that decision here.  Dissatisfied with the district court's ruling, and perhaps spurred on by that court's statement that "I just don't think I have the power to do this. . . . I think maybe the Patent Office does," Sonos then petitioned the USPTO to have the claim corrected.  *Id.*; Br. Ex. 18.  The USPTO, however, agreed with Judge Albright that this was not a typographical error and that changing the claims as Sonos requested "would materially change the scope of meaning of the patent."  Br. Ex. 19.  Sonos has therefore now argued this issue twice, before two different bodies, and lost both times.  Sonos makes no persuasive argument that this Court should hold differently.

"A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).  "Those determinations must be made from the point of view of one skilled in the art."  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009).  Here, the proposed correction *is* subject to reasonable debate and therefore the claim is indefinite.  Ex. 11, ¶¶56-59.

Claims 3, 15 and 26 of the '615 Patent recite "detecting a set of inputs to transfer playback from the control device to a particular zone group of a media particular playback system."  In contrast, claims 1-2, 13-14 and 25 recite a "particular playback device," and claims 2 and 14 recite a "media playback system" separate and distinct from the "particular playback device."  Contrary to what Sonos asserts, a POSITA would not readily understand that the inclusion of the word

1    "particular" in the phrase "media particular playback system" was a typographical error to be

2    corrected by omitting "particular." Ex. 11, ¶56.

3         There is no indication to a POSITA whether the "media particular playback system" of

4    claims 3, 15, 26 corresponds to a playback system that can only play particular media formats,

5    particular media types, or whether the inclusion of the word "particular" or the word "media" is a

6    typographical error. *Id*. Although Dr. Schmidt opines that Sonos made a typographical error (Br.

7    Ex. 9 at ¶¶100-104), Dr. Kyriakakis explains a POSITA could nonetheless understand "media

8    particular" as intended to differentiate from "multimedia," *i.e.* a playback system specific to a

9    particular type of media – such as audio. Ex. 11, ¶56. As Dr. Kyriakakis opines, certain playback

10   systems also do not play back media. Ex. 11, ¶57. For example, an RF spectrum analyzer records

11   and plays back RF data, not audio or video media. Accordingly, a POSITA could also understand

12   "media particular playback system" as a subset of "playback systems." *Id*. Evidently, Dr.

13   Kyriakakis and Dr. Schmidt do not understand dependent claims 3, 15 or 26 in the same way,

14   underscoring the indefiniteness of this claim term. Ex. 11, ¶103.

15        The prosecution history also does not resolve the reasonable debate relating to the use of

16   the term "particular." Sonos argues that the phrase "a media particular playback system" was

17   introduced during prosecution when Sonos amended the independent claims to recite a "***particular***

18   playback device" by propagating the word "particular" in front of "***playback*** device" in various

19   dependent claims. Br. at 22. However, there is no indication in the prosecution history that the

20   "media particular playback system" was in error in claims 3, 15 and 26. Sonos paid the issue fee

21   without any amendments after allowance, and Sonos did not submit any certificates of correction.

22   At best, the prosecution history is inconclusive.

23        Sonos argues that a POSITA would not "reasonably interpret the phrase as a 'playback

24   system that can only play particular media formats (*e.g.*, only MP3 formats)" because allegedly

25   the '615 Patent "provides no support for such a system." Br. at 22-23. But contrary to Sonos's

26   assertion, the '615 Patent does disclose playback systems that are configured to playback specific

27   types of format–e.g., a playback system whose source is a "CD player" or "turntable." '615 Patent

28   at 6:61-7:12. CD players may play back certain audio formats MP3 or WAV formats.

1    Sonos also wrongly claims that "Google's only other argument is that 'media particular'

2   was meant to distinguish a 'playback system' that can playback media from one that cannot."  Br.

3   at 23.  Not so.  Rather, Google explained that a POSITA could reasonably interpret the claim to

4   identify a system that is not restricted to a particular type of media versus one that has restrictions

5   on the particular type of media that can be played–in other words, a playback system that can only

6   play back "particular" media.  Ex. 11, ¶56.

7    Finally, Sonos's case law is inapposite.  In *Finjan, Inc. v. Sonicwall, Inc.*, No. 17-CV-

8   04467, 2019 WL 1369938, at *6 (N.D. Cal. Mar. 26, 2019) the court concluded that the correction

9   was not subject to reasonable dispute, including because a prior court had concluded the same and

10   should be given "deference."  Here, in contrast, Google has shown that the meaning of the claim

11   language at issue is subject to reasonable dispute and a prior court as well as an administrative

12   body have concluded the same.  Sonos's reliance on *Leveraged Innovations, LLC v. Nasdaq OMX*

13   *Group, Inc.*, 2012 WL 4062100, *16 (S.D.N.Y.) is similarly misplaced.  *Leveraged* concluded that

14   a claim included a typographical error and relied upon the fact that the language with the

15   typographical error was "nowhere present" in the patent.  The opposite is true here, because the

16   ***correction*** that Sonos is proposing–"a media playback system"–is nowhere present in the

17   specification.  Finally, none of Sonos's cases involve a situation where, as here, a prior court (the

18   Western District of Texas) ***and the USPTO*** already found correction was

19   inappropriate.   Accordingly, the term "media particular playback system" is indefinite.

20

21   DATED:  April 4, 2022                      Respectfully submitted,

22                                             QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
23

24

25   By     */s/ Charles K. Verhoeven*
           CHARLES K. VERHOEVEN
26
           Attorneys for Defendant
27         Google LLC, Inc.

28

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 4, 2022, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system.


*/s/ Charles K. Verhoeven*
Charles K. Verhoeven