# EXHIBIT 1

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                             WACO DIVISION

3   SONOS, INC.                    *    August 10, 2021
                                    *
4   VS.                            * CIVIL ACTION NO. W-20-CV-881
                                    *
5   GOOGLE LLC                     *

6              BEFORE THE HONORABLE ALAN D ALBRIGHT
                    DISCOVERY HEARING (via Zoom)
7
    APPEARANCES:
8
    For the Plaintiff:        Cole Richter, Esq.
9                             Rory P. Shea, Esq.
                              David R. Grosby, Esq.
10                            Jae Y. Pak, Esq.
                              Michael P. Boyea, Esq.
11                            John Dan Smith, III, Esq.
                              Lee Sullivan Shea & Smith LLP
12                            656 W. Randolph Street, Floor 5w
                              Chicago, IL 60661
13
                              Mark D. Siegmund, Esq.
14                            Law Firm of Walt Fair, PLLC
                              1508 N. Valley Mills Drive
15                            Waco, TX 76710

16  For the Defendant:       Charles K. Verhoeven, Esq.
                              Jordan R. Jaffe, Esq.
17                            Lindsay M. Cooper, Esq.
                              Quinn Emanuel Urquhart &
18                              Sullivan, LLP
                              50 California St., 22nd Floor
19                            San Francisco, CA 94111

20                            Marc L. Kaplan, Esq.
                              Quinn Emanuel Urquhart & Sullivan LLP
21                            191 N. Wacker Drive, Suite 2700
                              Chicago, IL 60606
22
                              Stephen Burbank, Esq.
23                            Scott, Douglass & McConnico, LLP
                              303 Colorado Street, Suite 2400
24                            Austin, TX 78701

25
```

1    Court Reporter:          Kristie M. Davis, CRR, RMR
                              PO Box 20994
2                             Waco, Texas 76702-0994
                              (254) 340-6114
3

4         Proceedings recorded by mechanical stenography, transcript

5    produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (August 10, 2021, 9:38 a.m.)

2          DEPUTY CLERK:  Court calls Waco 6:20-CV-881, styled Sonos,

3    Inc. versus Google LLC for a Markman hearing.

4          THE COURT:  If I could have announcements from counsel,

5    please.

6          MR. SIEGMUND:  Good morning, Your Honor.  This is Mark

7    Siegmund for plaintiff Sonos, Inc.  With me today is Cole

8    Richter, Rory Shea, Dan Smith, Sean Sullivan, Michael Boyea and

9    Jae Pak with the law firm of Lee Sullivan Shea & Smith LLP.

10          Mr. Richter, Shea, Smith and Boyea will be the main

11    speakers today, Your Honor.

12          THE COURT:  Okay.

13          MR. BURBANK:  Good morning, Your Honor.  Stephen Burbank

14    with Scott Douglass & McConnico for Google.  With me are

15    co-counsel Charles Verhoeven, Jordan Jaffe and Marc Kaplan, all

16    from Quinn Emanuel.

17          Also with us is our in-house counsel, Patrick Weston.

18    Mr. Verhoeven, Mr. Jaffe and Mr. Kaplan will be handling the

19    arguments for Google.

20          THE COURT:  Well, it sounds like we have an all-star cast,

21    and I appreciate in-house counsel and clients for attending.  I

22    also always enjoy having law clerks on competing sides.  Always

23    good to see former law clerks attend these hearings.

24          So let me pull up -- give me one second.  The first claim

25    term that we have is "multimedia."

4

1        Who will be taking this one up?

2        MR. RICHTER:  I believe that will be me, Your Honor.  Cole

3   Richter on behalf of Sonos.

4        THE COURT:  Yes, sir.

5        MR. RICHTER:  And actually, you know, Your Honor, before

6   we jump into some of the constructions, I was hoping to cover a

7   couple of preliminary issues that apply to all the claim terms,

8   if you'll permit me.

9        First, in reviewing some of the Markman transcripts from

10  your other cases, Your Honor, we understand and we want to

11  confirm on the record that our decision to argue certain things

12  but not other things will not be held against us and that Sonos

13  is preserving all the arguments made in the briefs and are not

14  waiving any arguments on appeal regarding claim construction.

15       Did I get that right, Your Honor?

16       THE COURT:  Well, let me just say this.  I don't know what

17  you mean by "be held against you."  As far as I'm concerned,

18  it's perfectly okay with me to -- for the parties to select

19  which ones -- you've taken your position in all the papers, and

20  I think those, on appeal, that -- but I'm not the Federal

21  Circuit, and they wouldn't have ever let me appear in front of

22  the Federal Circuit, but my sense is you all have those

23  arguments.

24       What we do at the Markman hearing is, you all simply

25  decide which ones you think are worthy of having additional

5

1    advocacy and have me decide.

2         But, for example, if there was a preliminary construction

3    I gave with which your client disagreed with, as far as I'm

4    concerned, the fact that you didn't argue it today doesn't

5    mean -- doesn't mean it's not preserved.  It just means you

6    felt like it would be better -- the way I see it is, you

7    thought your client would be better served by arguing other

8    claim terms.

9         That's the way I see it.  And I think that's -- you're

10   absolutely right.  I think that whatever you've argued in your

11   papers, you've taken that position for purposes of appeal.

12        MR. RICHTER:  Thank you, Your Honor.

13        Second, in the hopes of reducing some of the disputes

14   before the Court today, I want to raise just a quick point of

15   clarification on Your Honor's preliminary constructions.

16        So for the terms where, for example, Sonos proposed the

17   construction and the Court, in its preliminary construction,

18   said plain and ordinary meaning and those terms, for example,

19   are "multimedia," "network interface," "playback device/zone

20   player," "local area network," "data network," we understand --

21        THE COURT:  All words that have plain and ordinary meaning

22   that anyone would -- that anyone, even my 19 and 20-year-old

23   would know.  And I was going to get into that, but you go

24   first, then I'm going to have some comments.

25        MR. RICHTER:  Okay.  No problem.  No problem.

1          Yeah.  I just wanted to seek this clarification.

2          So we understand that the Court's preliminary construction

3    of plain and ordinary meaning is an indication that the Court

4    believes that no construction is necessary at this time and

5    that Sonos would not be precluded from asserting at a later

6    time, for example, in a summary judgment motion or pretrial

7    proceeding, that the plain and ordinary meaning of these terms

8    as understood in the context of the patents-in-suit is the

9    construction that Sonos is now proposing.

10          And if that understanding is correct, then Sonos will not

11   present any argument at the hearing today against the Court's

12   preliminary construction of plain and ordinary meaning for

13   those terms and instead would reserve arguments.

14          THE COURT:  You're absolutely right.  But let me -- you're

15   right, and I'm not -- but here's the way I see the world.

16   My -- in none of these situations was I saying that the

17   proposed construction was incorrect and rejecting it.

18          And typically -- not typically, always when I -- if I'm

19   making that determination where someone has said, it's got to

20   be X, and I think that that's not right, I put that on the

21   record.  That's not the situation here.

22          But here, let me frame it a little differently, and I was

23   going to tell you all this anyway.  The way I see the world,

24   for better or worse for you all, is, when someone's drafting a

25   patent and they use the word "zone," now, if the patent has to

1   do with zones and they are patenting something that has to do

2   with zones and saying, my zone is different than an ordinary

3   zone and here's why, and they claim something or they say

4   something in the spec or they say something during the

5   prosecution history to get the word "zone" allowed and they

6   give up something, that's a different deal.

7        But in situations like this, where, you know, all the

8   words, all the terms that you said, "multimedia," "network

9   interface," "zone," "group configuration," especially "local

10  area network," "data network," where when the person is writing

11  the patent and he's just acting as one skilled in the art to

12  interface with the Patent Office and he uses those claim terms,

13  then it's plain and ordinary meaning and I don't swerve from

14  that.

15       However, if for -- here's -- it's not a perfect analogy,

16  but here's what I try and get across to people.  Let's say that

17  you have invented a way of -- a method of installing Astroturf

18  in a baseball field and the magic of the patent is that a

19  baseball outfield is curved, and you come up with a method

20  that -- part of which is on a field that is curved.  And that's

21  all you -- you used the word "curved," which everyone knows

22  what the word "curved" means.

23       If someone comes in and wants to apply it to, let's say, a

24  soccer field or a football field, the word "curved," that's not

25  the plain and ordinary meaning.  Those are 90-degree angles.

1    But if someone wants to come in and say, well, it's --

2 there's only a 2 percent degree curve, that's not enough curve.

3 That's not curved.  To me, curved then has a plain and ordinary

4 meaning.

5    And again, assuming nothing was given up and nothing was

6 claimed and nothing in the specification, curved means curved.

7 And when we get to the jury in this case and your person is

8 saying that defendant's products have plain and ordinary

9 meaning for "local area network," the only way either side is

10 in trouble is if the expert takes such a greedy interpretation

11 of local area network that I can decide as a matter of law that

12 it either is or isn't a local area network.

13    And you can bring that to me after the final infringement

14 contentions, you can bring it to me after the expert reports,

15 or someone -- or you can come in and say, the other side's --

16 the other side or their expert is not applying the ordinary

17 meaning of this word.

18    Again, I use the word "curved" because I think a jury can

19 understand, and as a factual matter, what is or is not curved.

20    But if you all have a fight, that's a true fight, over

21 what the plain and ordinary meaning is of claim terms like

22 "zone," then I want you to -- I want the parties to be in

23 concrete on the positions they're -- legal positions they're

24 taking with regard to infringement and invalidity, bring them

25 to me -- motions -- I'm talking to you, but I'm talking to both

1   sides -- bring them to me as a preliminary summary judgment

2   matter, and I will determine whether or not that's appropriate.

3        MR. RICHTER:  Okay.  Thank you very much for that, Your

4   Honor.

5        And with that, Sonos can forego argument on many of the

6   terms.  Actually, the terms that were given the plain and

7   ordinary indication in the Court's e-mail.  And Sonos would

8   then instead argue the two terms that had a preliminary

9   construction of indefinite, and that would be "cause a

10  selectable indication" -- sorry.  Go ahead, Your Honor.

11       THE COURT:  Let me just interrupt you for a second.  I'll

12  ask Mr. Burbank or Mr. Verhoeven, or whoever it is:  Having

13  heard what counsel just said, does the defendant wish, on any

14  of the claim terms -- we're going to get to the ones about

15  whether or not it's indefinite, but with regard to the claim

16  terms that Sonos is not going to take up with respect to plain

17  and ordinary meaning, does the defendant have any desire to be

18  heard on any of those claim terms?  If not, we'll move forward

19  to the ones that -- where the argument is that they're

20  indefinite.

21       MR. VERHOEVEN:  Well, Your Honor, this is Mr. Verhoeven.

22  Let's just take an example of the phrase "network interface."

23  Your Honor construed that to have its plain and ordinary

24  meaning.

25       We have a dispute right now because the plaintiff in this

1   case, Sonos, wants to limit network interface to only digital

2   networks and not all networks.  And we've said that we disagree

3   with that construction and the plain and ordinary meaning

4   should apply, which is all networks, digital or analog.

5        Your Honor said plain and ordinary meaning in the

6   construction.  So here's an example of one where we know we

7   disagree with what they're proposing.

8        THE COURT:  Well, you actually have -- you've actually

9   made my point.  Right now I have -- right now I've said it's

10  plain and ordinary meaning.  If when you get their final

11  infringement contentions or when you get -- when you get --

12  when they are in concrete -- when either they have taken a

13  position on infringement contentions or in their expert report

14  where they attempt to limit it in the manner that you say, you

15  are free to file a motion for summary judgment and say to me,

16  Judge, that's not -- they are not applying the plain and

17  ordinary meaning as a matter of law, and I will take that up

18  and I will decide it.

19       MR. VERHOEVEN:  Okay.  Well, with that, that's great, Your

20  Honor.  And it's good to know.  I appreciate your telling us

21  that in the beginning.

22       THE COURT:  Because right now your concern is -- I've had

23  a couple Markmans now.  And by the way --

24       (Laughter.)

25       THE COURT:  By the way, it's wonderful.  I haven't seen

1    you, I don't think, since we were standing in Judge Sparks'

2    courtroom a very long time ago.

3         But here's the problem I have -- I encounter a lot.  You

4    come in here -- not you you.  But a party comes in here and

5    says, we know from their preliminary infringement contentions

6    they're going to say this.  That doesn't matter either to me at

7    this point.  They're preliminary.

8         And also, I choose to remain ignorant with regard to a

9    position they're taking about whether or not it's plain and

10   ordinary meaning.

11        Now, once you have their final contentions and once you

12   have an expert saying you guys infringe -- Google infringes, it

13   has X term, and you can come in and say, as a matter of law,

14   they're wrong, that's not the plain and ordinary meaning of

15   this term, now you're stuck and they're stuck.

16        And then I'm actually going to look at the -- at what

17   their expert says.  But again, my only wiggle room here is,

18   again, on a word, for example, like "circular," where I think a

19   jury could determine whether or not the plain and ordinary

20   meaning is a very slight curvature of the fence or if it has to

21   be an ice cream cone-looking thing, I think a jury can handle

22   that because I think it's a pretty normal word.

23        But on something where you think -- not you you.  But

24   where a party thinks that if they take this position on

25   infringement as a matter of law that cannot be the plain and

1   ordinary meaning, you're welcome to file a motion for summary

2   judgment.

3        And let me add this to it for the lawyers.  We have a few

4   things going on here.  If you file something like that, just --

5   it doesn't offend me at all.  In fact, I encourage it.  Let us

6   know that you have filed something that is kind of a gating

7   issue like that, that needs to be resolved sooner rather than

8   later, and ask for a hearing and -- as quickly as it's briefed,

9   and we can take it up -- I'll take it up, because I want -- I

10  don't want you all to get to trial and say, Judge, you know, we

11  filed this motion eight months ago and we're here at trial.

12       I mean, if you think you've got a -- either side has a

13  motion for summary judgment that something is not plain and

14  ordinary meaning, then bring it and I will take that up in

15  advance.  And the jury -- if I think that's right, the jury's

16  not going to take that up.

17       MR. VERHOEVEN:  Thank you very much, Your Honor.  That's

18  very helpful.

19       THE COURT:  I mean, I don't know if any other judge does

20  it that way.  But I've found that that's the best way, with the

21  cases I'm dealing with, to do it.

22       So if there's a better way, you all are free to tell me.

23  But so far, this has worked pretty well for me.

24       And by the way, I mean, I have -- you know, it gets no

25  press, and maybe it shouldn't, but I don't think I've had a

1    trial yet, a patent trial, go where I haven't granted either a

2    summary judgment or a Daubert on something.

3         So, I mean, I take -- I'm just saying, I take these

4    motions very seriously.  You're not going to get here and I'm

5    going to say, oh, they take too long to do, just go to trial.

6         I think it's very important, the way I do things at this

7    stage, to actually rule if you all bring me a motion that is as

8    a matter of law.  But just let us know when it's filed so we

9    can get it taken up in due course.

10        MR. VERHOEVEN:  Thank you very much, Your Honor.  That's

11   really helpful information.

12        THE COURT:  So now that -- so having heard that, is there

13   anything specifically on any of the claim terms that are plain

14   and ordinary meaning that you'd like to take up before we

15   move -- and you're welcome to -- before we move to the issues

16   of indefiniteness at least with "zone configuration" and "group

17   configuration" and also "causing a selectable indication"?

18        MR. VERHOEVEN:  So, Your Honor, the one term that comes to

19   mind for me is "zone scene," which Your Honor did provide a

20   construction for.

21        THE COURT:  Okay.

22        MR. VERHOEVEN:  So we would want to argue that one.

23        THE COURT:  Let me -- so if you think that you have an

24   argument and the other side doesn't, you can go ahead and go

25   now.

1       Well, I'll just do that anyway.  You can go ahead and

2   let's take up "zone scene," which is s-c-e-n-e, for the court

3   reporter.  And you take it up, and then I'll hear from

4   plaintiff's counsel after you finish.

5       But if you'll give me just two seconds, I'm out-of-pocket

6   here, I need to grab a pen real quick.  I'll be right back.

7       MR. VERHOEVEN:  Sure.  And can we get the slides up while

8   His Honor's doing that?

9       THE COURT:  I'm ready when you are, sir.

10      MR. VERHOEVEN:  Thank you, Your Honor.

11      THE COURT:  Can you all see me still?

12      (Clarification by the reporter.)

13      (Off-the-record discussion.)

14      MR. VERHOEVEN:  Your Honor, this is Mr. Verhoeven.  So is

15  it correct that you cannot see the slides?

16      THE COURT:  I can see the slides.

17      MR. VERHOEVEN:  Oh, you can see the slides.

18      THE COURT:  Yes, sir.  I can.

19      MR. VERHOEVEN:  Then may I go ahead and proceed?

20      THE COURT:  Yes, sir.  Absolutely.

21      MR. VERHOEVEN:  Can we go to Slide 6, please?

22      So this "zone scene" I want to argue, Your Honor.  So I'm

23  putting up just an illustration of a zone first.  Your Honor

24  said the phrase "zone" doesn't need to be construed, it should

25  be given its plain and ordinary meaning.

1    And here's just an illustration of a zone.  We all know,

2  it's an area.  It's a zone where you have these speakers.

3  That's not what the invention is in these three patents in this

4  case.  That's in the prior art.  So this patent doesn't claim

5  to have invented zones for the purpose of listening to music

6  that was already in the art.

7    So let's go to zone scene, Slide 9, please.

8    So here, Your Honor, is the competing constructions, at

9  least as initially set out in the process where we had the

10  disclosure of constructions.  And Google felt that a

11  construction was necessary, Sonos initially said a construction

12  is not necessary.

13    The reason we propose a construction, Your Honor, is

14  because we need to give -- this patent adds as an innovation,

15  as the claimed innovation, the notion of a zone scene being

16  something different from a zone.

17    And the dispute here, Your Honor, is:  Does a zone scene

18  require something more than just a zone; and if so, what?

19    And our argument is a zone scene, they've added the word

20  "scene," and that has to be given meaning.  And if you look

21  through the intrinsic evidence, it's very clear that the

22  patentee meant scene to mean the same thing as a theme, a scene

23  or a theme.

24    And maybe we just go with plain and ordinary meaning, Your

25  Honor, but it has to be a scene or a theme.  If you read that

1    out of the phrase "zone scene," then, in our view, that's error

2    because scene is not given any meaning.  It's just the same as

3    zone.  So that's the dispute here.

4         If you go to the next slide, please.

5         Now, importantly, the parties agree that zone scene is a

6    coined term, which means we don't -- we have to look at the

7    specification, and the specification is what's going to tell us

8    what does zone scene mean with a coined term?

9         It's not just plain and ordinary meaning -- you look at

10   the specification -- because they've made it up.  They've made

11   up a term.  In this case, they've made up a term called "zone

12   scene," and we have to look to the spec to see what it means.

13        Next slide.

14        Could we go to the next slide, please?

15        So here, Your Honor, I just want to underline the

16   importance of this.  This is the abstract for the '206 patent,

17   which is the earliest patent they're asserting in this group.

18   And here you see the discussion of -- in the abstract of what

19   the invention is is essentially this thing, this theme or

20   scene.

21        So it says:  According to -- according to one aspect of

22   the present invention, a mechanism is allowed -- is provided to

23   allow a user to group some of the players according to a theme

24   or scene, wherein each of the players is located in a zone.

25        So you have multiple zones that are grouped into a single

1  theme or scene, then it continues:  When the scene is

2  activated, the players in the scene react in a synchronized

3  manner.

4       And it goes on to talk about how the scene works.  So this

5  word "scene" that's been coined and added to the claims here is

6  the heart of what they're saying is new and unique in this

7  patent.  And in our view the proposed construction that --

8  well, let's continue.

9       Next slide.

10       The specification provides an example of what a zone scene

11  is.  And so here -- this is Slide 13, Column -- the '206

12  patent, Column 9, Lines 36 through 41:  For example, a

13  "Morning" scene includes three zones, each in a bedroom, a den

14  and a dining room.  After selecting the scene, the user may set

15  up an alarm for the scene as a whole.

16       So here --

17       THE COURT:  Mr. Verhoeven, let me ask you this:  If -- you

18  know, number one, it's kind of cautioned, as every good writer

19  would do, by saying "according to one embodiment," and I'm sure

20  I'll hear from the plaintiff in a second.

21       But if this is the way the specification -- what the

22  specification says about it, why do I need to add that to the

23  claim construction?

24       MR. VERHOEVEN:  Well, in your tentative, Your Honor,

25  the -- in your tentative, you've adopted the plaintiff's

1   proposed construction, which I'm going to get to -- I can go

2   right there right now, if you would like, Your Honor -- and in

3   our view that does not require a scene or a theme.  It's the

4   same thing as a definition of a zone.

5        And so we think that, at a minimum, it should just be

6   plain and ordinary meaning of what a scene or theme is.  But we

7   can't have a construction that reads out that there has to be a

8   scene or a theme and the word "zone scene" because that's what

9   the innovation is in this patent.

10        And if we construe it -- could we go to the slide -- just

11   one second, Your Honor.  Let's go to Slide 14.

12        So actually, Your Honor, in the lead up to this Markman,

13   Sonos told us that they didn't want a construction and no

14   construction was necessary for zone scene.  This is just an

15   excerpt of the chart that was provided.

16        But in their brief for the first time --

17        Go to the next slide.

18        -- they provided a definition.  And this is an excerpt

19   from their brief -- I'm on Slide 15, Your Honor -- Sonos' reply

20   brief at Page 12.  This is the first time they provided a

21   proposed construction in the reply brief.

22        And as you see in the proposed construction, there is no

23   definition or construction of what a scene is.  And so what

24   they proposed is a previously-saved group of zone players.

25   Okay.  Well, that's a zone.  A previously-saved group of zone

1  players that are configured for synchronous playback of the

2  media when the zone scene is invoked.  But there's no

3  construction of what a zone scene actually is in this proposed

4  definition, Your Honor.  It's just recursive.

5      And so --

6      THE COURT:  Which slide are you on?

7      MR. VERHOEVEN:  I'm on Slide 15, Your Honor.

8      THE COURT:  Okay.

9      MR. VERHOEVEN:  And if you look at --

10     THE COURT:  This --

11     MR. VERHOEVEN:  This is just an excerpt.

12     THE COURT:  No.  I got this.  I'm going to ask the

13 plaintiff to put a pin in this one and I'll ask -- I mean, it's

14 pretty obvious the point you're making, and I get it, but it

15 seems to me this is probably at the heart of what you're

16 arguing here.

17     So whenever it is you're -- in fact, then let me go ahead

18 and hear from plaintiff's counsel why it is that saying "for

19 synchronous playback of media when the zone scene is invoked"

20 is sufficient articulation of what a zone scene is.

21     MR. SHEA:  Yes, Your Honor.  Rory Shea on behalf of Sonos

22 to address this issue.  And good to see you again, Your Honor.

23     THE COURT:  Good to see you, my friend.

24     MR. SHEA:  It's been a little while.

25     Yes.  So zone scene.  What -- I think there's been a

1   couple things here, Your Honor, that have been a little

2   misleading.

3          First of all, let me address the point that's on the

4   screen first, then I can circle back to a couple things.  But

5   the critical thing here about a zone scene is that it is a

6   previously-saved group of players that will be configured for

7   synchronous playback when invoked.  That's the key here, Your

8   Honor.

9          And if you look at the specification and you look at the

10  background leading into this technology, this makes total

11  sense.  Sonos' original grouping technology -- for starters,

12  it's a foundational aspect of Sonos' system to have the ability

13  to group zone players together for synchronous playback.

14  That's one of the foundational things.  It's been in -- it was

15  originally disclosed in patents as early as 2004.  It's been in

16  Sonos' commercial product since 2005.

17         The original mechanism, the original way that groups were

18  formed was in a more ad hoc manner.  So what you had to do --

19  and, Your Honor, I don't know if you've ever used this Sonos

20  system, but the way you generally group players is, you go --

21  at the time you decide you want to hear synchronous playback in

22  multiple -- on multiple players, you go in on a one-by-one

23  basis, you say, I want to hear it on this player and this

24  player and this player.  And it's something I do at my house,

25  for instance, often.

1          What the invention of this patent is, is it realized --

2     the inventors recognized that having to go through that process

3     every time you want to hear synchronous playback in a given set

4     of players can start to get a little cumbersome if you're often

5     using the same group.

6          So to give an example, let's say that every evening I like

7     to listen to my three players that are in my upstairs level.

8     But then during the daytime, I break those apart, maybe I

9     listen to something else in a different place in my home.  And

10    then I want to go back and listen to those same three players

11    in my upstairs level again the next night.

12         What this invention realized is, okay, in order to make

13    that process more efficient, what we can do is we can allow a

14    user to previously save a predefined grouping -- and that's the

15    phrase right out of the specification, "predefined grouping" --

16    of players that can then later be invoked when the user wants

17    to hear audio synchronously in that group.

18         And prior to that time, prior to invocation of that group,

19    what the specification teaches is that those players would not

20    be grouped together.  They would be individual, in which case

21    you could listen to one piece of media on one player and

22    another piece of media on another player.

23         But when you were to a point where you wanted to listen to

24    audio synchronously across those multiple players, you would

25    then be able to invoke this previously-saved group, which could

1   be as simple as a single selection by a user.  You pick the

2   previously-saved group, you select it.  And in one selection,

3   as an example, it would then kick off the grouping process as

4   opposed to having to go and select each individual player you

5   want to put into that group.

6        That is what a zone scene is, and that's what the

7   specification teaches.  It's taught both in the non-provisional

8   disclosure as well as the provisional disclosure, which you'll

9   notice, defendant does not provide any analysis or address at

10  all in their briefing.

11       But that is what a zone scene is, and that's what our

12  construction here is saying, is that unlike a group that's

13  created in an ad hoc manner, what a zone scene is is it's a

14  previously saved so that when it's later invoked the players

15  will be configured for synchronous playback.  And that's what

16  the construction says here.

17       Now, the use of the term "zone scene" in this was just by

18  nature of the fact that what causes the invocation is a later

19  selection of that zone scene.  But you could -- in theory, you

20  could use a different term there if there was any sort of

21  concern with recursiveness.

22       You could, for instance, say that it's -- it's a

23  previously-saved group that are configured for synchronous

24  playback of media when that grouping is invoked, if there's

25  some concern.  Although, I do think that saying that it's a

1    grouping that will be configured for synchronous playback when

2    the zone scene is invoked is probably the most precise and

3    accurate way to say it in view of the specification, Your

4    Honor, but that is why that term appears within the

5    construction.

6         MR. VERHOEVEN:  Your Honor, may I respond briefly?

7         THE COURT:  No.  No.  I'm kidding.

8         (Laughter.)

9         THE COURT:  But if you all would be kind enough --

10        MR. VERHOEVEN:  You're on the screen now, Your Honor.

11   Just giving you some warning.

12        THE COURT:  -- to give me -- if you'll give me just a

13   minute or two, my computer's working, I'm told, and I'm going

14   to switch back to my computer, which is a little better.

15        But while I'm doing that, if you'll both be thinking --

16   I'm thinking of editing my preliminary construction.  If you

17   guys want to write it down to being this.  And then,

18   Mr. Verhoeven, you can start.  But this is -- I know

19   occasionally lawyers or clients must be wondering what I'm

20   doing here, am I listening to you guys.  I'm usually doing what

21   I was doing here, which is communicating with my law clerk, and

22   I had addressed an issue I had with an -- on our preliminary

23   construction.

24        This is the -- this is going to be the more likely

25   construction:  A previously-saved group of zone players

24

1    according to a common theme.

2        Let me say that again:  A previously-saved group of zone

3    players according to a common theme.

4        If you all will give me just a minute or two, I'm going to

5    try and get on my computer.  I'll be right back with you guys.

6        (Pause in proceedings.)

7        THE COURT:  Can you all see me now?

8        MR. VERHOEVEN:  Yes, Your Honor.

9        THE COURT:  Okay.  Very good.  And I have Slide 15 back

10   up.

11       Mr. Verhoeven, the floor is yours.

12       MR. VERHOEVEN:  Thank you, Your Honor.

13       The proposed construction that you read before switching

14   to your computer is acceptable to my client, Your Honor.  I

15   just -- but just to underline the point -- and I hate to speak

16   after you've given me what I'm asking for, but just because I

17   know the other side's going to say something.

18       Can we go to Slide 17?

19       I just wanted to illustrate, Your Honor, because what

20   they've -- on the left here is their construction, what they're

21   proposing.  On the right is the picture of the zone without a

22   zone scene that we looked at.

23       Now, if you read their construction, it reads on zone

24   without even a zone scene.  So zone is a previously-saved group

25   of zone players.  Okay.  And so without a theme, just saying

1  it's previously saved is reading out the way -- the word scene

2  or theme.  And with that, I'll sit down.

3       THE COURT:  Any -- woops.

4       Anything else from plaintiff's counsel with regard to the

5  Court's proposed construction?

6       MR. SHEA:  Yes, Your Honor.  A couple points.

7       First of all, again, I just want to -- I want to just

8  address this last point that Mr. Verhoeven made because I just

9  don't think it's accurate or correct.

10      There is a critical distinction there in the portion of

11 the construction, our original proposed construction, that

12 defendant is not highlighting or giving credence to, which is

13 this concept of "when invoked."

14      The big difference between a zone scene and a zone is a

15 zone is effectively just a logical way to identify players in a

16 multiplayer system.  That's what a zone is.

17      A zone scene is the concept that you have a predefined

18 previously-saved group that can live in an uninvoked state as

19 well as an invoked state.

20      And so I think that that is a key distinction between that

21 and a zone.

22      Now, the other thing, Your Honor, I want to address.  And

23 if you don't mind, I'm going to pull up my slide deck.

24      THE COURT:  What I'm not following is whether or not you

25 agree with what I just proposed or not, because it seems I've

1  taken into consideration what you just said, which is it has to

2  be a previously-saved group of zone players.

3      MR. SHEA:  Yes, Your Honor.  And I agree, and the

4  previously-saved group part, certainly we are in agreement

5  with.

6      The common theme raises a couple concerns that I wanted to

7  address from our perspective, Your Honor.  One thing that we

8  have a concern about is that we believe that common theme can

9  introduce and may introduce ambiguity into this construction in

10  terms of what that phrase and that term means.  And so just a

11  little history about the term "theme" in the context of these

12  patents.

13      First of all, the phrase "common theme" is actually not a

14  phrase that you see anywhere in the intrinsic evidence at all.

15  The only term that is in there is "theme."  And one of the

16  things to be aware of is, theme is actually a word that was

17  never used one time in the provisional application that serves

18  as the priority application here at all.  So theme was a word

19  that was added afterwards in the non-provisional application.

20      If we look at what the provisional says about what a zone

21  scene is, it does not use the word "theme" at all.  And what it

22  talks about is that it's -- again, it's a previously-saved

23  group that allows you to pre-create this group so that it can

24  be invoked later.

25      And just a couple of samplings of things, Your Honor.  I'm

1    looking at Slide 50 of our PowerPoint here, which is one of the

2    excerpts from the provisional application.

3        You can see here that it talks about the zone scene

4    feature allowing the user to arrange zones into groups using a

5    single command, and it contrasts that with linking zones one at

6    a time, which is that concept I touched on earlier.

7        Moving to the next slide.  This is Slide 51 of our

8    presentation.

9        That -- this is another excerpt from that same page of the

10   provisional, and you'll see that it says that "the simple scene

11   allows a user to set up a single zone group per scene."

12       It talks about a "morning scene," which would group three

13   different sets of zone players together but would leave all

14   other zones in the household untouched.

15       THE COURT:  Well, let me interrupt you here and ask you

16   this:  I mean, here's the problem, because it --

17   Mr. Verhoeven's right, this is a coined phrase, which is

18   certainly acceptable.  But if we don't have something to tether

19   how the previously-saved group was put together, then how does

20   anyone know what a zone -- what -- I get that it is a

21   previously-saved group of zone players.  I get that last night

22   I went and listened to, you know, a grouping that I wanted to

23   have saved.

24       But for the claim term to mean anything, a "zone scene" to

25   mean anything, that's without -- what would you propose instead

1  of what we have here, which is "to a common theme"?

2       What you had in your proposal that we went with on the

3  preliminary was just kicking the can down the road a little bit

4  by saying "when the zone scene is invoked."

5       What -- how is the previously-saved group of zone players

6  done to form a zone scene?

7       MR. SHEA:  Well, Your Honor, what I think we -- with the

8  zone scene, the -- what it really is is it's -- it is a

9  previously-saved group, but it's -- that previously-saved group

10  is defined in that it is -- it enables players to be become

11  configured for synchronous playback when it is later invoked.

12       So the characteristic of it is that it's -- not only is it

13  previously saved, but it's previously saved in a way that

14  allows it to exist in an uninvoked state and then to be later

15  activated or invoked in order to then put these players into a

16  configuration in which they would play back in synchrony.

17       And exactly, you know, what -- how it is that the players

18  are grouped together, I think the specification would teach

19  that.  In fact, the provisional walks through various different

20  mechanisms you can use to actually put the players into that

21  saved group.

22       But the key is that once you've created that saved group,

23  it's a thing that exists in this dormant state until it gets

24  invoked, at which time it then triggers the players to become

25  configured for synchronous playback.  And so that really is

 1  what the zone scene is described.

 2       So in our view, you know, when we talk about a common

 3  theme, really it's -- the theme here -- I think, in some ways,

 4  we're looking at it in a more specific way.  The theme here is

 5  that the players are to be grouped for synchronous playback

 6  when they are ultimately invoked.

 7       THE COURT:  Is there anything else you wanted to add

 8  before I turn to Mr. Verhoeven?

 9       MR. SHEA:  I think I can pause at that point, Your Honor.

10  You know, depending on what Mr. Verhoeven says, I may reserve

11  the right to respond, if you'll allow me.

12       THE COURT:  You guys, no one enjoys listening to good

13  lawyers more than I do.  This has been a delightful morning.

14  So just -- I'll hear from Mr. Verhoeven, then, Mr. Shea, you

15  can say anything you care to.

16       MR. VERHOEVEN:  I'll merely add, Your Honor, that if you

17  look at this provisional, it says, for example, morning scene.

18  That's exactly what's in the specification that I showed you,

19  what I was reading:  For example, a "Morning" scene includes

20  three zone players, each in a bedroom, den and dining room.

21       This is showing the exact same thing, and it's giving it a

22  theme.  It's called "morning scene."  So --

23       THE COURT:  Well, Mr. Verhoeven, let me ask you this --

24  and, you know, back when we met 15 years ago, I don't know

25  whether I would've had the courage to ask someone of your

1    caliber or Mr. Shea this question, but I get to now, I guess

2    because I have this job.

3          But it seems to me what you're tying to do -- and I

4    understand why -- is limit the construction of the claim to

5    include that which is in the specification here.

6          That being said, if the -- again, if the plaintiff takes a

7    position that Google infringes and that they have a zone scene

8    and they don't -- and Google doesn't do what's supported in the

9    specification, then why wouldn't you have a good

10   noninfringement claim that is divorced from what the Markman

11   construction is of zone scene?

12         MR. VERHOEVEN:  Your Honor, the issue is, the way that the

13   other side is proposing to construe this, it takes out the

14   notion of a scene or theme out of the construction and merely

15   requires it to be a predefined grouping.

16         I'm not sure I understand all this business about invoking

17   it in the future and saving.  It's -- what we're talking about

18   is what the patent says.  It says "zone scene," and the

19   specification -- the abstract says the -- which we covered,

20   says:  The invention is grouping it according to a scene or a

21   theme.

22         So we've proposed a common theme because that's what the

23   specification says is an alternative way of describing scene.

24   And the theme would be, for example, grouping three areas as a

25   morning scene or a morning theme because you get up in the

1    morning and these are the three areas you want to have music

2    in.

3           You could do the same thing -- and the patent provides

4    examples -- for other types of zone scenes for different times

5    of day or different types of events, Your Honor.

6           That's what they have alleged, the patentee has alleged,

7    is the innovation over just grouping zones.

8           THE COURT:  Can you -- could one of you, either of you,

9    pull up the claim itself so I can see the use of the words

10   "zone scene" in the context of the claim?

11          MR. VERHOEVEN:  Sure.

12          MR. SHEA:  Yes, Your Honor.  Let me -- so, Your Honor,

13   here is a -- an example.  This is one of -- oh, sorry about

14   that.  This is one of the three patents that the term appears.

15          THE COURT:  Okay.  Just give me a second to review this.

16          Mr. Verhoeven, I interrupted you, I'm sorry, to ask that.

17   You can say whatever else you want, and then I'll switch back

18   to Mr. Shea.

19          MR. VERHOEVEN:  Sure.  So the point I'm making, Your

20   Honor --

21          Switch back to our slides real briefly.  It's Slide 16.

22          On the left here, Your Honor, this is Slide 16.  It's just

23   an illustration.  This is what the patent says is new and

24   unique, that you can group zones, two or three zones together,

25   according to a theme.

32

1        Now, if you take out the theme, the morning, and all you

2   say is it's a predefined grouping, then you've just got the

3   thing on the right, which is simply a zone.  And the zone is

4   not new or unique.

5        And, you know, we can go into the reasons why we're making

6   certain arguments, if you want.  I mean, Google doesn't do

7   themes like this, but that's not really appropriate for claim

8   construction.  We're just looking at the intrinsic evidence.

9        In the intrinsic evidence it's very clear that this is the

10  big thing they're saying is new or unique, that they've created

11  this idea of having a scene or theme.  And they give examples

12  of a morning one, and they talk about grouping more than one

13  zones (sic) together according to the theme.  And that's

14  exactly what Your Honor, in your latest proposed construction,

15  has encompassed.

16       So we think you should go with what you proposed in your

17  latest proposal, Your Honor.  Otherwise, if you're just talking

18  about a predefined grouping that can be invoked, you're just

19  talking about zones.  You're not talking about putting zones

20  together in a theme.

21       THE COURT:  Mr. Shea?

22       MR. SHEA:  Yes, Your Honor.

23       So again, I have to address this because it's just -- it's

24  absolutely just incorrect and, I think, intentionally

25  misleading about the difference between these things.

1        A zone is a fixed, static thing, and that's what it's

2   described as.  So to the extent that there could be -- in most

3   cases, a zone is a single player.  There are some examples

4   where a zone -- what Mr. Verhoeven is referring to as a zone

5   could refer to multiple players.  But in that case, that is a

6   fixed concept, and it's a way to logically identify players in

7   the system.

8        This concept of previously saving to then later be

9   invoked, zone has nothing do with that, Your Honor.  A zone is

10  always invoked.  It is fixed.  It is constant.  Once you form a

11  zone, that zone is not -- is active perpetually.

12       The zone scene, the critical thing here is that that's not

13  what a zone scene is and, from a user functionality standpoint,

14  is a critical distinction.  Because with a zone, once you put a

15  player into a zone, it's fixed.  You can't play individually on

16  that player.  It is now part of this static, fixed concept of a

17  zone.

18       A zone scene, you add a player to a zone scene unless and

19  until you invoke that zone scene in order to bring those

20  players together for synchronous playback, you continue to have

21  the ability to individually play on that player.

22       So if I could give you an example, let's say I have a

23  player in my kitchen and a player in my bathroom.  I can put

24  those two players in a zone scene -- and this is shown in our

25  tutorial as well, Your Honor.  But I can put those two players

1   into a zone scene, kitchen and bathroom, and then name it

2   something.

3        And whether I name it "morning" or -- "downstairs" is a

4   very common name I use in my zone scenes, but whatever name I

5   give it so that I remember what it is later, I've created that

6   zone scene.  But I can continue to play individually just in my

7   kitchen, continue to play individually just in my bathroom.

8   And only when I desire to put those things together, link them

9   and play synchronously across both of them, do I then actually

10  take the step of invoking and using this scene.

11       And so that is a critical distinction.  That is what a

12  zone scene is, Your Honor.

13       A couple other things I want to address.  I mean, there's

14  a lot of focus being placed on this notion of the zone scene

15  having a morning name or an afternoon name or whatever it is.

16  To be clear, these are just user-entered names for a zone

17  scene.  And the spec tells us that, right?

18       It says here, right here that, for instance, the

19  Figure 3A, it says -- shows the effects of grouping the zones

20  to make a group of three zones named after "morning."

21       So yeah.  You can give it a name like morning, but you can

22  name a zone scene whatever you'd like.  You know, really at the

23  end of the day, whether it's morning or whatnot, it's a way for

24  the user to create some sort of association, predefined

25  grouping of those players, and give it a name that you can then

1    use later to invoke it.

2         So if -- I struggle a little bit with the word "common

3    theme" for a couple of reasons, Your Honor.

4         One, this term "common" in front of "theme," that's

5    something that -- the term "common" doesn't appear in the

6    specification even where it does use "theme."  So we have some

7    concerns about that creating some additional ambiguity.

8         Secondly, the word "theme" in the specification is used

9    directly as a synonym for a zone scene.  I mean, what the

10   specification tells us is that a -- they repeatedly use those

11   as alternatives in a way that says that -- that's all a theme

12   is.  It's just a different shorthand word for a zone scene.

13        So defining zone scene to include the phrase "common

14   theme" I think presents a concern of -- it's just -- it's as

15   circular, if not more, than what we have proposed.  And it then

16   interjects this confusion, and I think Mr. Verhoeven kind of

17   highlighted it for you, Your Honor.

18        I mean, what defendants plan to do is to ask for this

19   common theme construction and then turn around and use that and

20   read in limitations into that phrase to try to distinguish

21   technology that otherwise is exactly what these zone scenes are

22   that are described in the specification.

23        THE COURT:  Mr. Verhoeven?

24        MR. SHEA:  So -- sorry, Your Honor.

25        THE COURT:  I'm sorry.  Were you done, Mr. Shea?

36

1          MR. SHEA:  Yeah.  I didn't know if you were going to have

2    any comments.

3          I mean, the last thing, you know, maybe, Your Honor, just

4    before I pass things back, what I wanted to do is just --

5    sorry.  Let me go to here.

6          To just underpin my point about the theme, these are both

7    examples right from the specification where you can see it says

8    "using what is referred to as a theme or a zone scene."  Excuse

9    me.  And then here again, you say, "Providing a player theme or

10   a zone scene."

11         So these -- my apologies.  Hold on one second, Your Honor.

12   I was informed that I wasn't showing that.

13         But these two paths, just from the specification, which

14   are shown on Slide 56 of our presentation, show that really a

15   theme is just -- it's just a different term for a zone scene.

16   It's not a requirement or a limitation of what a zone scene is.

17         What that is is this previously-saved group of players for

18   later invocation in order to enable them to play back in

19   synchrony.

20         So I guess, Your Honor, maybe my final point was, if by

21   common theme, if what that term means is that there's some name

22   assigned to this previously-saved predefined grouping of

23   players that allows them to be called up and invoked later, if

24   that's what common theme means, I think that's certainly

25   something that we would be amenable to.

1      But if common theme is intended to mean something more or

2  something that -- I don't quite know what it means if it's not

3  a name, then we do believe that that presents more ambiguity

4  than anything else.

5      THE COURT:  Well, right now what I have is:  A

6  previously-saved group of zone players according to a common

7  theme.

8      That's what the construction is and sounds to me like

9  you're okay with that.

10     MR. SHEA:  Yeah.  With the caveat that as long as the

11 common theme in that context refers to having some name that's

12 assigned to that grouping of players, then we are amenable to

13 that construction.

14     THE COURT:  Well, you're going to have a construction,

15 Mr. Verhoeven's going to have a construction, and you can have

16 your people determine, based on that construction, whether or

17 not you think there's infringement or not, and he can say there

18 is or isn't.

19     So is there anything else you wanted to add?

20     MR. SHEA:  No, Your Honor.

21     THE COURT:  Mr. Verhoeven?

22     MR. VERHOEVEN:  Nothing more, Your Honor.

23     THE COURT:  I'll be back in a few seconds.

24     (Pause in proceedings.)

25     THE COURT:  Okay.  We're going back on the record.

1      The construction for that claim term is going to be:  A

2  previously-saved group of zone players according to a common

3  theme.

4      Since I have jumped around here a bit, Mr. Verhoeven, you

5  happen to be on screen, so I'll start with you.  Other than the

6  indefinite -- the claim terms where there are issues and

7  arguments over whether or not they're indefinite, are there any

8  other claim terms that we need to take up, just so I don't

9  accidentally miss any of them?

10     MR. VERHOEVEN:  No.  I'm arguing, Your Honor, the "zone"

11  terms.  And the answer to the zone -- on the "zone" term claims

12  is no.  There aren't any others.

13     There's two indefiniteness claims that are related to

14  zones, one of which, I assume, the other side would like to

15  argue, but I'm not sure.

16     THE COURT:  Right.

17     MR. VERHOEVEN:  One of which we would like to argue.

18     THE COURT:  Okay.  So which one did you want to argue?  We

19  can take that one up first, and then --

20     MR. VERHOEVEN:  Sure.

21     THE COURT:  Then we'll take up "causing the selectable

22  indication" second.

23     So which one did you want?

24     MR. VERHOEVEN:  So there's -- this gets a little

25  confusing, Your Honor.  There's competing -- unfortunately, we

1  were unable to agree on how to separate out the terms for

2  construction.  So you see -- if you could look at our -- I

3  think it's simplest to just look at our proposed groupings, and

4  so we have a "group configuration" term --

5      THE COURT:  Yes, sir.

6      MR. VERHOEVEN:  -- and a "zone configuration" term, Your

7  Honor.

8      THE COURT:  Right.

9      MR. VERHOEVEN:  And we said both of those are indefinite.

10  If it -- if I may, I'd like to address those both together

11  because they're indefinite vis-à-vis each other.

12      THE COURT:  Okay.  Sure.

13      MR. VERHOEVEN:  Okay.  So if we could go to Slide 22.

14      So the issue here is, we've got two terms, "zone

15  configuration" and "group configuration."  And we've argued

16  they're indefinite because in -- a person of ordinary skill,

17  Your Honor, would not be able to determine when one begins and

18  when another begins and ends.

19      And so the issue is, does the intrinsic evidence provide

20  enough guidance to a person of ordinary skill to know if

21  they've met or not met the group configuration and zone

22  configuration elements.

23      If you go to the next slide, please.

24      So basically, pictorially, Your Honor, this is our

25  argument, which is on Slide 23, which is, this -- we don't know

1   where one begins, one ends, whether one's included in the other

2   or not, to what extent.

3       And so that's the indefiniteness.  I mean, phrase "group

4   configuration" itself is not indefinite by itself, neither is

5   zone configuration, if they were just next to each other -- or

6   excuse me, if they were just stated in isolation.

7       But if you look at the way the claims talk about them,

8   it's very -- it's just impossible to tell the difference.

9       If you go to Slide 25.

10      Here it is in the claim for Your Honor.  I know you'd like

11  to look at the claim.  So here -- this is Claim 1 of the '206

12  patent.  I've highlighted the portion where it talks about

13  these things.

14      And it says:  The zone configuration characterizes one or

15  more zone scenes, each zone scene identifying a group

16  configuration.

17      So it says both zone configuration and group configuration

18  in the same sentence.  And it's what I refer to as a

19  syntactical ambiguity.  It's -- we don't know, is group

20  configuration meant to be a synonym for zone configuration?  Is

21  it something different?  If it's different, what is it?

22      That's the problem we have with these two terms, Your

23  Honor.

24      Now, there's no dispute that both sides agree that these

25  terms can't be construed to mean the same thing because they

1  have different words.  One's zone configuration and one's group

2  configuration.  So that's undisputed, Your Honor.  They must

3  have different meanings.

4      But when you look at the specification, the claim doesn't

5  provide any clarity.  When you look at the specification, it

6  makes things worse, Your Honor.

7      So if we can go to the next slide.

8      If you look in the specification -- this is Slide 26, and

9  I'm highlighting the common spec from the '206 patent,

10  Column 5, 43 through 50 and 54 through 59.  And as you'll see

11  here, Your Honor, this is what the spec says:  Zone group

12  configuration characterizing a zone group.

13      And then it repeats it:  Typically, a saved zone group

14  configuration file is transmitted.

15      And so again, the specification doesn't provide any

16  clarity on when you have a zone configuration versus a group

17  configuration, even though both parties agree that these two

18  phrases must have separate meanings.

19      Next slide.

20      We provided an expert witness who's stated he's gone

21  through this and can't tell the distinction.  I know -- I'm not

22  going to rely on my own expert.  I'll rely on the other side's

23  expert, Your Honor.

24      So if we can go to the next slide.

25      One of the reasons that's glaringly obvious as to why this

1   is a problem is even their own expert can't distinguish zone

2   configuration from group configuration.  So he was asked at his

3   deposition -- this is Mr. Almeroth:  Can you provide an example

4   of a zone configuration?

5        And this is his transcript at Page 53, Lines 15 through

6   54, Line 2.  And his answer eventually is:  I don't have an

7   example.

8        And then the next slide, please.

9        We asked him the same thing about group configuration.

10  This is from the transcript at Page 58, Line 22 through 59,

11  Line 18:

12       "Can you give me example of a group configuration?

13       "Answer:  That's not something I tried to do.

14       "Question:  You can't provide me a single example of a

15  group configuration?

16       "Answer:  I would need to give it some thought."

17       So even the other side's expert, when we've -- we've teed

18  this up as an indefiniteness problem, was unable at his

19  deposition, knowing that in advance, to provide any examples of

20  how to distinguish one from the other.  I think that's telling.

21       In addition, the evidence that the expert relies -- their

22  expert relies on to provide a distinction is the same evidence

23  we just looked at.

24       Can we go to the next slide?

25       So here's his declaration, and I just highlighted in green

43

1   where the cites are.  And we put those cites up on the next

2   slide, please.

3       This is Slide 31.  These are the same excerpts we've been

4   looking at.  So this is Column 5, Line 43 through 57, and

5   Column 7, Line 31 through 33.  And again, as I showed you

6   before, it just says "zone group configuration" here, Your

7   Honor.  So their expert points to the same thing I just pointed

8   to, which provides no guidance whatsoever.

9       Next slide.

10      In its opposition brief, Sonos provides an attempted

11  distinction between two, Your Honor.  They say that a zone

12  configuration is different because it "comprises a data

13  representation of a zone scene."

14      And then they continue and they say:  Group configuration

15  provides a previously-saved grouping.

16      So apparently, from reading this, Your Honor, the best I

17  can tell is the distinction they're drawing is they say that a

18  zone grouping is the saved grouping -- or excuse me -- a zone

19  configuration is a saved grouping and a zone configuration is

20  simply a data representation of that same saved grouping, which

21  doesn't make any sense and is inconsistent with the actual

22  claims of the patent.

23      Go to the next slide.

24      Next slide.

25      This is Slide 34, Your Honor, and I put up Dependent

1    Claim 7.  And it's talking about this "further configured to."

2    And this is Dependent Claim 7, dependent on Claim 1.

3         And it says:  Further configured to:  Before receiving the

4    zone configuration, send, to one of plurality of independent

5    playback devices, a command to save at least one of the one or

6    more zone scenes.

7         Well, then zone scene is already saved before the zone

8    configuration is received.  So it can't be true that a zone

9    configuration is simply a later-created data representation of

10   a zone scene.  It's inconsistent with the dependent claims of

11   the patent.

12        So long story -- in sum, Your Honor, this is -- the reason

13   we've argued for this is because we want -- we should be able

14   to -- be able to determine what is a zone configuration, what

15   is a group configuration, and are we doing one or not?

16        And here, if you look at the intrinsic evidence, there's

17   no guidance for us.  And as a result, we can't distinguish

18   between the two.

19        That's all I have to say on that one, Your Honor.

20        THE COURT:  Thank you, sir.  Can -- I'm not sure who will

21   be representing Sonos on this.

22        MR. SHEA:  Your Honor, it's going to be Rory Shea again on

23   behalf of Sonos.

24        THE COURT:  Mr. Shea?

25        MR. SHEA:  Okay.  Great.

45

1        I'm going to share some slides, Your Honor, here.  One

2   moment.

3        So, Your Honor, I think -- with respect to these phrases,

4   I think we want to start right with the claim language and look

5   at what that claim language actually says.  And the discussion

6   we just had a bit ago about zone scenes and what a zone scene

7   is and Your Honor's construction of that term now, I think,

8   sheds a lot of light on this.

9        What the claim element at issue says and the terminology

10  that defendant is objecting to says is that you have a zone

11  configuration that characterizes one or more zone scenes where

12  each zone scene is identifying a group configuration associated

13  with zone player -- with two or more of a plurality of

14  independent playback devices.

15       So when we take this phrase and we look at this language

16  step by step, just on the face of the language alone, Your

17  Honor, it's clear what the differences are here.

18       So starting with group configuration, what that is, it's a

19  configuration of a group.  It's a grouping of zone players for

20  synchronous playback and, effectively, it's some makeup or

21  arrangement of zone players that are linked together into a

22  (inaudible).  That's what the phrase "group configuration"

23  means in the context of this claim.

24       And what the claim says is that you have a zone scene that

25  identifies such a group configuration, which makes sense.  It's

1    in fact, exactly what we just talked about and what Your Honor

2    has rendered as his construction for zone scene.  A zone scene

3    is a previously-saved grouping, or in other words, a

4    previously-saved group configuration of zone players that,

5    according to Your Honor's construction, would be according to a

6    common theme.

7         So that's what a zone scene is.  A zone scene identifies

8    this group configuration, this arrangement or makeup of

9    players.

10        So that phrase, looking at that phrase in context of the

11   claim, is clear.  You have a zone scene, it identifies a group

12   configuration.

13        The preceding clause then says that you have a zone

14   configuration that characterizes one or more zone scenes.  And

15   when you look at what zone configuration is, both there and

16   elsewhere in the context of this claim, it's clear that what

17   zone configuration here is, is it's some configuration data,

18   some form of data that characterizes or provides information

19   about one or more zone scenes, where each of those zone scenes

20   identifies a group configuration.

21        And so that was -- that is what our construction of zone

22   configuration was, Your Honor.  But again, there is a clear

23   distinction here between the two.  Group configuration is --

24   it's just a configuration of a group.  It's a makeup or

25   arrangement of players that are within a group.  In this case,

1  it's going to be a previously-saved group that's according to a

2  common theme because of the zone scene language.

3      But that's what the group configuration is.  It's that

4  component of the zone scene that tells you which zone players

5  are in that -- have been selected for inclusion in that zone

6  scene.

7      And then zone configuration is something that

8  characterizes one or more zone scenes.  It's some sort of data

9  that provides information or characterizes about those zone

10 scenes.

11     And if we look at the other aspects of the claim with

12 respect to the zone configuration, it just confirms that's what

13 the term "zone configuration" means.  It's this configuration

14 data.

15     Specifically, it talks about the fact that it is something

16 that's configured via a controller.  It's maintained at the

17 playback device.  So after the group is saved, the zone scene

18 is saved, it would be maintained at the playback device.  It's

19 received by the multimedia controller via a network interface

20 and then is subsequently used to display the selectable

21 indication.

22     So when you look at zone configuration in the context of

23 that claim, that's what it's talking about.  It's talking about

24 some data set that gets passed back and forth between the

25 controller and one or more of the players that serves to

48

1    characterize or provide some information about the zone scenes

2    that have been saved in the -- in this system.

3         And not only do the claims tell you that's what zone

4    configuration is, but that's -- the specification is consistent

5    there as well, Your Honor.  It says here that -- first of all,

6    it's in the '206 patent at 5:51 through 57.  This is on our

7    Slide 36 -- that:  According to one embodiment of the

8    invention, the memory is used to save one or more saved zone

9    configuration files that may be retrieved for modification.

10        So that's telling us that zone configuration in this

11   context refers to configuration data.

12        Later on in the specification at 10:10 through 17, it also

13   tells us that when a scene is saved, a set of data pertaining

14   to that scene is stored.  And those -- that's what this zone

15   configuration is talking about.  It's talking about this data

16   that characterizes the zone scenes that have been saved in

17   the -- in the system.

18        Now, you know, Your Honor, one other thing I wanted to

19   address, defendants have actually raised a new argument for the

20   first time now regarding this dependent claim as supposedly

21   providing some sort of ambiguity or supporting their position

22   on this.  I want to address that as well.  I'm going to pull it

23   up in the context of the specification here.

24        I actually don't fully understand the argument, Your

25   Honor, but what this claim says is that before the controller

1   receives zone configuration, so before the controller receives

2   that data, it sends a command to save a scene.  And so -- but

3   how that supports any sort of concern about the meaning or

4   difference between these terms doesn't make any sense to me.

5       What we're talking about here is, the zone configuration

6   data is something that comes into existence when the zone scene

7   is saved and would be initially maintained at the player.  It's

8   maintained at the player, and it's configured via the

9   controller and maintained at the player and then subsequently

10  received at the controller.

11      So there's no issue there -- or there's no temporal

12  problem in what these -- this claim is saying.  It all fits

13  together perfectly.

14      You have a zone scene that identifies that group

15  configuration.  Once you save that zone scene, which could take

16  place in the context of this claim via a command from the

17  controller to save it, that's going to create some data --

18  configuration data -- "zone configuration" is the term used in

19  the claim -- that's going to be maintained at the player.  And

20  then when the controller subsequently wants to present that

21  information to a user so that they can select one of those zone

22  scenes to listen to player -- audio on the players, the

23  controller would then retrieve and receive that data, that

24  configuration data, and use it to render this selectable

25  indication on the screen.

1       So there's no ambiguity here in terms of what this -- the

2  Claim 7, Dependent Claim 7 says.

3       Now, maybe, Your Honor, the last thing I just want to

4  address is, with respect to the expert testimony, I mean,

5  what -- our expert was not asked if he could distinguish

6  between zone configuration and group configuration or provide

7  examples of how to distinguish between them.

8       He was asked, in isolation, on the fly, whether he could

9  provide examples of what a zone configuration is or what a

10  group configuration is.

11       The fact that he was unwilling to do that on the fly

12  during the deposition is not the test for indefiniteness, of

13  course.  The test is whether the language would be reasonably

14  understood by a person of ordinary skill in the art in the

15  context of the intrinsic evidence and the claim language.

16       And again, we believe that, really, based on the claim

17  language alone, that is the case and in view of how this claim

18  language is phrased and what a person of ordinary skill in the

19  art would understand the term zone scene to mean in the context

20  of this specification along with the other two terms.

21       THE COURT:  Mr. Verhoeven?

22       MR. VERHOEVEN:  Yes, Your Honor.  Really briefly.  I'll

23  just use this slide that they have up here, Slide 34.

24       Counsel spoke for a long time, but I couldn't distinguish

25  what a group configuration or a zone configuration was based on

1    what he said.  I mean, he said a group -- a zone scene

2    identifies a group configuration.  I wrote that down, that's

3    what he said.

4         And then he said a zone configuration is any data --

5    that's any information, and they have it right here -- that

6    provides an indication of one or more zone scenes.

7         Well, isn't that -- that's what they just said a group

8    configuration was.  So if they mean -- what do they mean by

9    "provides an indication of," Your Honor?

10        I mean, the group configuration is the configuration of

11   the players within a zone scene, is what they say.  So what's a

12   zone configuration?  Is it the same thing?  Is it different?

13        All they can come up with, Your Honor, is configuration

14   data that provides an indication of one or more zone scenes.

15        And first of all, none of this is -- this is all attorney

16   argument.  None of it's in the specification.

17        And secondly, even with this attorney argument, the

18   distinctions break down when you start looking at them.

19        That's all I have to say, Your Honor.

20        THE COURT:  Mr. Shea, anything else?

21        MR. SHEA:  Your Honor, unless you have any specific

22   questions -- I mean, I could address further -- I think it's

23   laid out in our brief.  So to keep it brief for you, I would

24   say, unless you have other questions, I don't have anything to

25   add.

1       THE COURT:  I'll be back.

2       (Pause in proceedings.)

3       THE COURT:  If we can go back on the record.

4       If you'll give me one second.

5       For the claim terms "zone configuration" and "group

6   configuration," the Court is going to amend its construction

7   and find that both these claim terms are indefinite.

8       What is the next claim term that we need to take up?

9       MR. SHEA:  Your Honor, do I have any ability to respond to

10  that?

11      THE COURT:  Not much.  I mean, I've found that the -- I've

12  made my decision.  I'm ready to move on.

13      What is the next claim term?

14      MR. VERHOEVEN:  Your Honor, the next term in the zone --

15  if we want to stick with "zone," which I think is most

16  efficient, with the "zone" terms, the next term is one you've

17  ruled in your tentative is indefinite.  It's the "causing the

18  selectable indication."

19      THE COURT:  Right.

20      MR. VERHOEVEN:  It's a dependent claim.  We are -- we're

21  perfectly happy with the tentative, Your Honor, but I suspect

22  the other side may want to argue, but I'm not sure.

23      THE COURT:  No.  I'm sure they do.

24      Mr. Shea, is that you taking up causing --

25      MR. RICHTER:  No.  I think -- I apologize, Your Honor.  I

1    think that'll be me.  Cole Richter for plaintiff Sonos.

2         THE COURT:  Mr. Richter.

3         MR. RICHTER:  Yes.  Thank you, Your Honor.  And if I can

4    share my screen, I can bring my slides up here.

5         Okay.  I'd like to go starting with Slide -- or starting

6    with Slide 12 and then on to 13 and 14.

7         "Causing the selectable indication" is a phrase that

8    appears in Claim 19 of the '206 patent.  And, Your Honor, both

9    sides agree that this -- well, actually, no.

10        Sonos --

11        THE COURT:  Mr. Richter, I'm having a hard time hearing

12   you.  You might want to lean a little closer to the microphone,

13   perhaps.

14        MR. RICHTER:  Yes.  How's this, Your Honor?  I'm using an

15   earpiece, so it may be --

16        THE COURT:  That's good.

17        MR. RICHTER:  Thank you.

18        This claim and one other claim that I can get to later,

19   these claims, Sonos contends, have typographical errors.  And

20   the preliminary indication from this Court is that these claims

21   should be indefinite, but, you know, Sonos requests that the

22   Court correct these typographical errors.  And with such a

23   correction, the indefiniteness problem falls away.

24        So as you can see here on the screen, Claim 19 presently

25   depends from Claim 17.  This should -- Claim 19 should actually

1   depend from Claim 18.  And when it does, the antecedent problem

2   falls away, and there's no more indefiniteness.  And I can show

3   you why this should be the case with two more slides.

4        So first, on Slide 14, we know that Claim 19 should depend

5   from Claim 18 because we can look at a mirror image set of

6   claims with Independent Claim 12, Dependent Claim 13 and

7   Dependent Claim 14.

8        In this set of claims, actually, Claim 13 depends from

9   Claim 12, and then Claim 14 depends from Claim 13.  These are

10  mirror image claims to Claim 17, 18 and 19 in all respects

11  except for this error.  Claim 12 is a method, and Claim 17 is a

12  CRM.

13       And so, like Claim 14, which depends from Dependent

14  Claim 13, that's what Claim 19 should do.  It should depend

15  from Claim 18 instead.  And you can see here -- here's the

16  language -- "at least one of the one or more zone scenes"

17  provides the antecedent for the "at least one of the one or

18  more zone scenes."

19       So Sonos just respectfully requests that the Court correct

20  the error, and the indefiniteness problem would fall away.

21       So if Your Honor has any questions, I'm happy to entertain

22  those.  Otherwise, I would pass the mic.

23       THE COURT:  Mr. Verhoeven?

24       MR. VERHOEVEN:  Really briefly.  Can we put up our slides,

25  please, and go to Slide 35?

1          So this is the one about antecedent basis, Your Honor, and

2     we're talking about a dependent claim.  And the issue is

3     whether or not the lack of the antecedent basis renders it

4     indefinite.  Your Honor's tentative finds that it does.

5          Let's go to the next slide.

6          If you look at the claims themselves, Claim 19 says:  The

7     computer readable medium of Claim 17, wherein causing the

8     selectable indication of the at least one of the one or more

9     zone scenes to be displayed comprises...

10         And then it goes on.  If you look at the antecedent, Claim

11     17, there is no antecedent basis for this highlighted phrase.

12     Instead, the antecedent is selectable indication of the

13     received zone configuration, not the at least one or more zone

14     scenes.  So we pointed this out and said that this renders it

15     indefinite.  In response --

16         Next slide.

17         -- we were told that this is an obvious error, "an obvious

18     scrivener's error."

19         Next slide.

20         As Your Honor knows, undoubtedly, the standard here, if

21     someone says there's an error and asks the Court to correct it,

22     is this test of Novo Industries, 350 F.3d 1348, and I'm citing

23     to 1357, where it says:  A district court can correct a patent

24     only if the correction is not subject to reasonable debate

25     based on a consideration of the claim language and the

1   specification.

2        Next slide.

3        There's no debate here, Your Honor.  Claim 19 says:  The

4   computer readable medium of Claim 17.  There's no ambiguity.

5   There's no debate that this is referring the person of ordinary

6   skill to Claim 17, not Claim 18.

7        And as Your Honor knows, patentees freely write dependent

8   claims on -- that depend from various other earlier claims.

9   And there's absolutely no reason why a person of ordinary skill

10  in the art would look at this and say, aha, I can tell they

11  must have meant Claim 18, not Claim 17.

12       It's unambiguous.  It directs the reader to Claim 17, and

13  now we have an admission, through the briefing process, that

14  there is no antecedent basis.

15       Next slide.

16       The argument you heard was that you should substitute the

17  reference to Claim 17, delete that and replace it with Claim

18  18, but -- and we think that's inappropriate because of the

19  argument we just made.

20       THE COURT:  Mr. Verhoeven, can you hold on for just one

21  second?

22       MR. VERHOEVEN:  Yes, Your Honor.

23       (Pause in the proceedings.)

24       THE COURT:  If we can go back on the record.

25       Let me go back to counsel for the plaintiff.  I am -- my

1    concern is on Slide 40, which is up, if the -- if I could hear

2    from plaintiff as to why the difference between in 18 -- Claim

3    18, it saying "of the received zone configuration" and, in 19,

4    it says "of the at least one of the one or more zone scenes,"

5    why that doesn't make your argument harder, that it's obvious

6    that it should have been 18 instead of -- it should have been

7    Claim 18 from which Claim 19 depended rather than Claim 17,

8    which is contained in Claim 19.

9         MR. RICHTER:  Sure.

10        THE COURT:  I said all that to try and make clear on the

11   record what I was asking, but I think you got my point.

12        MR. RICHTER:  Yes, indeed, Your Honor.

13        So the antecedent for "the at least one of the one or more

14   zone scenes" actually comes from the phrase that is not

15   highlighted by the defendant on the screen.

16        So we see:  Comprises causing an indication of the at

17   least one of the one or more zone scenes to be displayed.  And

18   so that's the antecedent.  And when I showed it on my slide,

19   actually I had bolded the text.  And that came from plaintiff's

20   Slide 13 and 14.  But that provides antecedent of at least one

21   of the one or more zone scenes to be displayed.

22        And if -- I'm hoping that answers your question, Your

23   Honor, but I'm happy to clarify it more.

24        THE COURT:  It did.

25        Mr. Verhoeven, if you want to -- if you'd like to respond

1   to that.  And then I'll come back to you, Mr. Richter, in just

2   a second.

3       MR. RICHTER:  Okay.  No problem.

4       MR. VERHOEVEN:  Yes, Your Honor.

5       So first of all, the biggest hurdle would be, how on Earth

6   would we know that when they say Claim 17 they meant Claim 18

7   when it expressly says Claim 17?

8       And that's --

9       THE COURT:  I'm over -- I mean, you and I might disagree

10  on that.  I can handle that one.

11      MR. VERHOEVEN:  Okay.  And then on this one --

12      THE COURT:  You and I might disagree about how in the

13  world someone would know that, and this is actually one where I

14  don't think I would be completely wrong if I said that, if you

15  were on the other side having to make this argument, you could

16  probably do so with a straight face.

17      Certainly the argument that it should have been 18 and not

18  17 is a colorable one.  And so I understand why you're saying

19  it isn't, I understand why they are.  But I'm concerned now

20  about whether or not 18 actually provides --

21      MR. VERHOEVEN:  I'm sorry, Your Honor.

22      Yes.  To answer your direct question directly, no.

23  Because I'm a person of ordinary skill in the art and I'm

24  looking, saying, I didn't find the antecedent in 17, maybe they

25  meant 18, which I doubt they would do, but if they did that,

59

1   when you're looking at 18, the phrase is -- in 19 is "causing

2   the selectable indication of the at least one or more zone

3   scenes."

4       Here in 18, it says:  Wherein causing the selectable

5   indication of the received zone configuration to be displayed.

6       So what they're talking about, the selectable indication

7   that's to be displayed, are different things, Your Honor.  And

8   so that further clouds any argument that a person of ordinary

9   skill in the art would know to go to 18, and that's why we put

10  this up here.

11      I have nothing further, Your Honor, unless you have

12  questions.

13      THE COURT:  I don't.  If y'all will give me just one

14  second.

15      (Pause in proceedings.)

16      THE COURT:  So here's what I'm going to do, and I'm trying

17  to do my best to protect everyone's record here on appeal.  My

18  sense is, given my prior ruling with regard to indefiniteness,

19  this claim term would have issues anyway.

20      That being said, I don't know that I'm correct or not

21  correct once this appellate court were to review my earlier

22  claim construction.

23      And so I'm going to go ahead and rule on this anyway.  And

24  I'm going to -- were -- had I not ruled earlier with regard to

25  the invalidity of some of the claim terms that are involved

1   here, I would find that this was a mistake and that it should

2   have been 18 rather than 17 and that there would be antecedent

3   basis and it would not be indefinite.  But I think -- my sense

4   is that that's probably a pyrrhic victory for the moment at

5   least.

6        So let's move then to the final -- I think there's just

7   one indefinite claim term to take up left, correct?

8        MR. RICHTER:  Yes.  I think that's right, Your Honor.  And

9   I think that's "a media particular playback system," which is

10  in the '615 patent.

11       THE COURT:  I'm having a hard time -- I don't know why,

12  maybe it's just me and I'm old, but I'm -- if you'll make sure

13  your sound's turned up.  I want to make sure I can hear you.

14       MR. RICHTER:  No problem.  I apologize for that.

15       THE COURT:  No apology needed.

16       MR. RICHTER:  And so let me share my screen again, if

17  you'll permit me.

18       And this is a dependent claim in the '615 patent, Your

19  Honor, actually three dependent claims.  And they -- this one

20  also contains a stray word, and I'll show you how that

21  occurred.

22       But here's the phrase in red in Claim 3.  It says:  A

23  media particular playback system that includes a first zone and

24  a second zone.

25       And so Sonos, again, is asking the Court to strike the

1   word "particular."  That doesn't belong there.  It doesn't make

2   any sense.  It was a type -- woops.  I'm sorry about that.  It

3   was a typographical error that was introduced during the

4   prosecution history, and I'll show you why that's the case.

5        Again, this is the same -- woops.  This is the same case

6   that -- actually, let me shrink this down a little bit.

7        This is the same case that -- well, not the same case, but

8   the same test that defendants have shown.  The Court allowed to

9   correct errors in the claim when two conditions are met:  The

10  correction is not subject to reasonable debate based on the

11  consideration of the claim language and the specification -- I

12  think that phrase is important -- and, two, the prosecution

13  history does not suggest an alternative interpretation of the

14  claims.

15       And both of those conditions are met here.

16       If we take a look at the prosecution history, in an Office

17  Action Response filed in 2016, Your Honor, the applicant needed

18  to identify -- needed to add a tag to identify playback device.

19  And the word they chose was "particular."  We see that in here

20  Claim 1, underlined.

21       And in order to provide this antecedent in the rest of the

22  claims, the applicant added the word "particular" in front of

23  all the instances of playback device.  And I've highlighted

24  those in yellow in Claim 3 here on Slide 19.

25       But in doing so, it must have been a find-and-replace

1    error.  They added particular playback -- they added the word

2    "particular" in front of playback, but this was playback system

3    and not playback device.  There's -- that's clearly an error.

4          Again, "media particular playback system" is a phrase that

5    doesn't make sense.  You won't find that phrase in the

6    specification, Your Honor.

7          There was no reason to distinguish -- or to provide any of

8    the reasons that Google says -- or do any of the work that

9    Google says this word does.  There was no prior art reason that

10   the applicant needed to do that.  And actually, it's a

11   little -- it's a little curious -- and again, apologies for the

12   screen there.

13         It's a little curious that the applicant would need to do

14   that for Claim 3 but not the other claims.  I mean, this just

15   further illustrates why this was a typo.

16         Dependent Claim 2, that you can see here, includes a very

17   similar phrase, a very similar limitation here, "detecting a

18   set of inputs to transfer playback from the control device to a

19   zone of a media playback system," but here, the applicant did

20   not insert the word "particular."

21         And so again, this is a claim that should -- these should

22   be mirror images except for some other limitations that aren't

23   really important.  Particular here is just a stray word that

24   was added accidentally.

25         And so again, we would request, rather than, you know, an

1   extreme holding of indefiniteness, that the Court exercise its

2   discretion to just strike this word that's clearly a typo.

3       And I'm happy to answer any questions Your Honor might

4   have, but also happy to pass the mic over to Mr. Jaffe.

5       THE COURT:  Mr. Verhoeven, if you'll give me just one

6   second.  And it may be someone else, I know, but if y'all will

7   give me just one second.

8       MR. VERHOEVEN:  Yes, Your Honor.

9       (Pause in the proceedings.)

10      THE COURT:  Let me ask plaintiff's counsel, before I turn

11  to counsel for Google:  I -- as I just showed, I'm -- frankly,

12  even though I was not a patent prosecutor and could never have

13  qualified to be one, I am still somewhat sympathetic to that

14  mistakes can be made; and if they really are just scrivener

15  errors, they can be addressed by the Court, which is an

16  efficient way of dealing with it.

17      But I'm having a hard time with this one, with the way

18  this -- the way the amendments were made, how I could meet the

19  standard I'm supposed to meet, that this was -- that this was a

20  scrivener error.

21      I'm having a hard time with that.  If you could help me

22  one more time with that before I turn it over to Google's

23  folks.

24      MR. RICHTER:  Yeah.  No.  I'm happy to address that, Your

25  Honor.

1          The scrivener's error comes actually from the way that we

2    look at how the amendments were made and the fact that the

3    amendments being made on October 25th, 2016 were to insert the

4    word "particular" before playback.  And the fact that the

5    applicant carried that through, you know, perhaps with a less

6    than attentive, you know, attention to detail than we would've

7    liked, they carried that through.

8          And that explains how you find the word "particular" in

9    the wrong place, where it doesn't make any sense, and why, for

10   instance, the applicant didn't add the word "particular" in

11   response to the examiner saying, hey, you know, you've got a

12   prior art problem here, applicant.  You've got to add the word

13   "particular" because that will distinguish from media systems

14   that don't play MP3s, for example.

15         None of that is -- was in the record.  None of that was in

16   the file history.  There was no reason -- no prior art reason

17   to do this.  And I think if you compare it to the other claims,

18   that's why you see that this word is just a stray word.

19         And let me address just one more time the standard, and

20   it's -- one, the correction's not subject to --

21         THE COURT:  Well, I'm having a hard time following how

22   that could be a stray word in this situation.  I mean, it's --

23   I don't get that.  I'm not -- when I say "I don't get it," I

24   mean, it's not like when you speak in Mandarin, I don't get

25   Mandarin.  I mean, I'm saying here, I'm hearing your argument

1   and your argument doesn't make sense to me.

2        MR. RICHTER:  Okay.  No problem.  Let me just take --

3   maybe we can walk through the amendment here and -- to show how

4   it was erroneously inserted.

5        So the relevant portion of Claim 1 being amended in this

6   Office Action Response was directed to this "detecting a set of

7   inputs to transfer playback from the control device to a

8   playback device."  And what the applicant needed to do was

9   insert a label here to identify the given -- or the individual

10  playback device that it would reference throughout the

11  remainder of Claim 1 and the rest of the amendments.

12       So the applicant had to add the word "particular" in front

13  of playback device.  And so the applicant did that.

14       Here you find another recitation of it.

15       And then in Claim 3, you see here every instance you've

16  added the word "particular" to provide the antecedent that the

17  applicant introduced in Claim 1.

18       So we have particular playback device, particular playback

19  device, particular playback device, and finally particular

20  playback device.  But in red right here, it doesn't say

21  particular playback device.  They added the word "particular"

22  in front of playback, but they forgot that it says "system"

23  instead.

24       So adding the word "particular" here seems to be a result

25  of attempting to provide antecedent basis back to what the

1   applicant introduced here but just adding it in a place that it

2   didn't need antecedent basis.  And that -- and by doing so,

3   kind of created this scrivener's error.  Like, there was no

4   reason to put the word "particular" in the phrase "media

5   particular playback system."  No prior art reason and, in fact,

6   no specification reason because the specification doesn't use

7   that phrase.

8       And, you know, (inaudible) that phrase doesn't even make

9   any sense.  That's not how you would refer to a -- "media

10  particular playback system," that just doesn't make sense.

11      And so I think, you know, looking at the -- this

12  amendment, the insertion of the word "particular" in this

13  October 25th, 2016 response and then also comparing it here to

14  other claims that recite virtually identical limitations that

15  don't contain the word "particular" kind of demonstrates that

16  this "particular" is a stray word.  It should not have been

17  Control V-d or pasted into that response, and we would

18  respectfully request the Court to correct that.

19      THE COURT:  If you guys will give me a few seconds.

20      (Pause in proceedings.)

21      THE COURT:  I think -- I just don't think I have the power

22  to do this.  I think maybe the Patent Office does.  But I don't

23  think this is a scrivener's error.  It may have been a mistake

24  during the prosecution and maybe the Patent Office can address

25  it through some manner they have, but I don't believe I can.

67

1      I'm going to maintain the construction of it being

2  indefinite.

3      I think that's all the claim terms we have, isn't it?

4      MR. JAFFE:  Your Honor, this is Jordan Jaffe on behalf of

5  Google.  We had one additional term that we wanted to raise,

6  which was the "instruction" phrase for the '033 patent.

7      THE COURT:  Give me one second to find it.  Oh, I got it.

8  I'm sorry I just -- that was my bad.  I just missed it.  I

9  apologize.

10     MR. JAFFE:  No problem.

11     Mr. Vaughan, if you don't mind putting up Slide 49 of our

12  presentation.

13     So this is in the '033 patent, which is part of the two

14  patents that Sonos refers to as the "direct-play patents."  And

15  it's actually a longer phrase, and we've only excerpted here.

16  But it's an instruction for at least one given playback device,

17  and then it continues.

18     And there's only one issue that Google is disputing here,

19  which is whether the instruction, as written, has to be one

20  instruction that performs the limitations of the claim or,

21  according to Sonos, whether then it can have multiple

22  instructions each performing part of the instruction that's

23  claimed.  And so let me explain what I mean by that.

24     If we can go to Slide 50, please.

25     So I've excerpted here Claim 1 of the '033 patent.  And

68

1    what I've highlighted in yellow here, which is again Claim 1,

2    is the longer phrase that we're asking for the construction.

3    And speaking broadly about what the claim is talking about

4    here, just to set the context, is we're talking about a system

5    in which you are, you know, let's say, listening to music on

6    your phone or other sort of computing device and then you want

7    to transfer playback from your phone to a remote device, let's

8    say, a TV or a speaker of some kind.

9        And what the '033 patent talks about, again, broadly

10   speaking here, is "transmitting an instruction for the at least

11   one given playback device to take over responsibility for

12   playback of what it refers to as the remote playback queue."

13       So you're transferring playback responsibility from, let's

14   say, the device you're holding in your hand to a remote

15   speaker.

16       And then further, it talks about this instruction

17   performing these next few additional items.

18       So if we can go to the next slide, please.

19       So I've highlighted in blue here the two requirements that

20   are laid out for this instruction.  The first requirement is

21   what I was just referring to, to "take over responsibility for

22   playback of the remote playback queue."

23       But the claim continues, and this was also language that

24   was added during prosecution, where it talks about:  Wherein

25   the instruction -- the instruction configures the at least one

69

1    given playback device to perform what we refer to as three

2    subsets -- these three items listed here -- communicate, use

3    the obtained data, and play back the retrieved at least one

4    media item.

5         So again, what the claim is talking about here is

6    transmitting an instruction that does, one, what the first red

7    box here does, take over responsibility for playback of remote

8    playback queue and, two, where the instruction, that

9    instruction, configures the playback devices to perform these

10   three substeps here.

11        And so our position is that "the instruction," there has

12   to be one instruction that performs what's in these two boxes.

13   Again, this is not to say that you can't have several other

14   instructions in a system.  We're not trying to read out the

15   comprising and the preamble.  We're not saying that there can't

16   be more instructions.

17        All we're saying is that there has to be one instruction

18   that's transmitted, that takes over responsibility for

19   playback, and configures the playback device to perform these

20   three substeps.  And we think there's Federal Circuit case law

21   that's directly on point here.

22        If we can go to the next slide, please.

23        This is the Varma decision from 2016, which we cite in our

24   briefing.  In our briefing, we explained that this case was

25   directly on point.  And in the reply brief, Sonos didn't

1   mention it at all.  So we think, at this point, it's undisputed

2   that this is directly on point.

3        And just to compare what we're talking about in terms of

4   this Varma decision to the claim language here, the decision in

5   Varma is -- and I'm just going to read a bit here for context.

6   It says:  Here the question is not whether there can be more

7   than one request in a claim-covered system:  There can.

8   Rather, the question is whether "a" can serve to negate what is

9   required by the claim language following "a":  A "request"

10  (singular term) that "correspond[s]" to "two or more selected

11  investments."  It cannot.  For a dog owner to have "a dog that

12  rolls over and fetches sticks," it does not suffice that he

13  have two dogs, each able to perform one of the tasks.

14       And so we think that this is directly on point for our

15  situation.  And just to underline that point --

16       If we can go to the next slide, please.

17       -- what I've done here on this slide is taken the quote

18  from Varma that we just went through, and we can just plug in

19  the specific parts of the construction that we're talking

20  about -- or excuse me -- the specific parts of the claim that

21  we're talking about from the '033 patent.

22       Again, the language that I just read on the left-hand

23  side, we can just plug it in on the right-hand side, and it's

24  directly analogous to our position.  And I'm just going to read

25  that here:  The question is whether "a" can serve to negate

1    what is required by the language following "a":  A

2    ["instruction"] (singular term) that ["takes over

3    responsibility"] and ["configures" "the at least one playback

4    device" to perform these three substeps"].  It cannot.

5        If we can go to the next slide.

6        So here, we -- there has to be -- there can be a lot of

7    instructions, but there has to be an instruction that takes

8    over responsibility and performs these three substeps.  So that

9    is the main point.

10       So to use the more colloquial analogy, that the --

11       THE COURT:  If you'll give me just one second.  I'm going

12   to look at your...

13       Okay.  I'm good.  Thank you.

14       MR. JAFFE:  Sure.  So I was just going to go through the

15   more colloquial example here from the Federal Circuit.  We've

16   got to have a dog that rolls over and fetches sticks.  We can't

17   have one dog that fetches sticks and one dog that rolls over.

18       And that's the same thing that we're talking about here in

19   our claim language.  There has to been an instruction that

20   takes over responsibility and configures the at least one

21   playback device to perform these three substeps.

22       And so that's -- this is directly on point to what we're

23   talking about.  We think it's clearly required by the claim

24   language.

25       If we can go to the next slide.

72

1          If there was any doubt that this was the right

2    construction, we think that that doubt is removed by the

3    prosecution history here.  And in particular, the applicant,

4    during prosecution, expressly distinguished prior art that used

5    multiple messages or instructions here.

6          And I've excerpted here -- and this is Google's response

7    brief, Exhibit 17 -- where they -- where the applicants

8    distinguish the Gran reference.  And they said, the problem

9    with this Gran reference is it "must continuously direct the

10   media-rendering device."  That is, it must continually send

11   these messages, as compared to them, which only transmitted an

12   instruction.

13         But the applicant actually went even further and said, the

14   problem with Gran is it doesn't transmit that instruction.  It

15   continuously directs the media device.  But it also does not

16   transmit such an instruction, singular, that configures the

17   media-rendering device to perform these three substeps as

18   recited in applicant's independent claims.

19         So we think that under the Varma decision and the plain

20   language itself, it's clear that we have to have an instruction

21   that does both of these tricks, so to speak, but we also think

22   that to the extent that there's any doubt about that, it's

23   removed by the express distinguishing of the Gran reference

24   during prosecution.

25         And with that, Your Honor, I can conclude, unless Your

1   Honor has any questions.

2       THE COURT:  I don't.  I'll hear from plaintiff.

3       MR. SMITH:  Good morning, Your Honor.  This is Dan Smith

4   on behalf of Sonos.  Let me just share my screen here.

5       Jordan, would you mind unsharing?

6       Okay.  Your Honor, can you see my presentation here?

7       THE COURT:  I can.

8       MR. SMITH:  Okay.  Great.  And just, you know, I'm having

9   a hard time seeing it.  Is it -- oh, you know what?  Sorry.

10      It looks like -- is that better now, the one that doesn't

11  show the notes?

12      THE COURT:  Yes.  That's fine by me.

13      MR. SMITH:  Okay.  Okay.  Great.  Sorry about that.

14      Okay, Your Honor.  Yeah.  So I would like to comment on a

15  number of things that Mr. Jaffe just raised.  And, you know,

16  let's just jump in.  I won't go through the whole claim term

17  here, as he's already done that.  I don't want to waste the

18  Court's time.

19      But, you know, I do want to start with the general rule

20  here.  I don't think there's any dispute here that the general

21  rule in claim construction is that an indefinite article "a" or

22  "an" in an open-ended patent claim, such as we have here, means

23  one or more.

24      And while there are exceptions to this rule, the Federal

25  Circuit has made clear that those exceptions are extremely

74

1   limited.

2       And here you can see I have an excerpt from the Baldwin

3   Graphic case, and it states exactly that.  And then at the end

4   of that excerpt, it goes on to say, you know:  An exception to

5   the general rule means that -- or excuse me -- only arises

6   where the language of the claims, the specification, or the

7   prosecution history necessitate a departure from the rule.

8       As I'm going to walk you through here in a few moments,

9   that's just not the case here with the '033 patent.

10      So first, Your Honor, I just want to -- what Google

11  appears to be doing is, right, they're kind of conflating two

12  separate, you know, limitations in this claim term.  The first

13  is what I've highlighted here in red.

14      And this is the portion of the claim that recites what the

15  instruction is, right?  It's "an instruction for the at least

16  one given playback device to take over responsibility for

17  playback of the remote playback queue from the computing

18  device."  And that is what the instruction is.

19      And notably, this instruction does not specify the exact

20  number of instructions that can be transmitted, right?  It

21  doesn't say a single instruction, it doesn't say one

22  instruction.  It doesn't state what the exact contents of that

23  instruction is, and I'll get to that in a moment because I

24  think that's really what Google wants to do, is they want to

25  import kind of what's in the next "wherein" clause into what

1   the instruction is.  It doesn't do that.

2        Also, Your Honor, you know, it just doesn't say exactly

3   how that instruction is transmitted.  It doesn't say it's

4   transmitted directly to, you know, the playback device or any

5   other device.

6        So when you look at that, Your Honor, and you apply the

7   general rule, we think it's very clear here that "an

8   instruction" means one or more instructions.

9        But let's look at the "wherein" clause, which is really

10  where Google has focused a lot of its intention here.  And here

11  the "wherein" clause states:  Wherein the instruction

12  configures the at least one given playback device to do three

13  different functions.

14       And so again, just to be clear, that's talking about

15  functions that the playback device is to perform after the

16  instruction is transmitted.  That's not talking about functions

17  that are three separate elements or directions that must be

18  included in the instruction itself, let alone a single

19  instruction.

20       And that's really -- Google appears to be kind of blurring

21  those two lines together and saying, well, these three

22  functions and the "wherein" clause really need to be part of

23  the instruction itself, and that's just not the case.

24       And, Your Honor, what I find ironic here is, Google has

25  been -- you know, harped about, well, they didn't directly

1    address this case that's on point.  But Sonos, in fact, cited

2    a case -- a Federal Circuit case in its brief that's just as

3    relevant and, in fact, we believe more relevant than the case

4    that Google cited, and that's the Convolve case.  And we would

5    encourage the Court to look at that case.

6        But in the Convolve case, the term at issue was "a

7    processor" that executes certain process steps, and then it

8    lists three steps, believe it or not, with Roman Numerals I, II

9    and III.  In that case the Federal Circuit found that this term

10   was not limited to a single processor despite the plurality of

11   required "process steps" executed "a processor."

12       So, Your Honor, we believe that this case, again, supports

13   Sonos' construction.  And not only that, Your Honor, here

14   again, as I just mentioned, it's not the instruction of Claim 1

15   that even performs or executes those three functions, instead

16   it's playback device.  The instruction configures the playback

17   device to do that.

18       So again, Your Honor, we believe that this Convolve case

19   is on point.  Google hasn't addressed this case.

20       Just to be clear, I just want to make sure it's clear to

21   everybody, I mean, this is exactly what the claim says.  This

22   is Claim 9, one of the claims at issue in Convolve, talks about

23   a processor which executes the process steps so as Roman

24   Numeral I, II and III.  And again, the Court found that that

25   wasn't limited to a single processor, could have one or more

1    processors to execute those three functions.

2         So, Your Honor, let's next -- if we go back to the Baldwin

3    case, it says there are exceptions, they're rare.  You got to

4    look for whether the claims, the spec or the prosecution

5    history necessitate a departure from the rule.  And we just

6    went through the claims.  Clearly they don't necessitate a

7    departure from the rule.

8         Let's turn to the spec.  Google fails to identify any

9    disclosure in the specification that supports its attempt to

10   limit an instruction to a single instruction.  And, in fact,

11   the specification does not limit -- does not place a limit,

12   excuse me, on the number of instructions.

13        So now I want to turn to the prosecution history here,

14   which Google, you know, addressed.  And we believe that Google

15   has mischaracterized the prosecution history, and we would

16   encourage the Court to take a look at that Sonos response

17   that's been cited in full.

18        But in sum here, as you heard Google just argue, and they

19   did the same thing in their response brief, Google argued that

20   Sonos distinguished the Gran reference because it required

21   transmitting multiple continuous instructions rather than a

22   single instruction to take over playback responsibility.  And

23   we believe that that's a mischaracterization.

24        Instead, as we explained in our brief, and I think what

25   you'll see if you look at the response in full, while Sonos did

1    identify some teachings of Gran, including this continuous

2    instruction, at the end of that, Sonos concluded that -- and,

3    excuse me, distinguished Gran because the media-rendering

4    device in Gran never takes over responsibility for playback of

5    a remote playback queue from the control Element 100 regardless

6    of the number of instructions.

7         Sonos never said that our claims require a single

8    instruction to take over responsibility and Gran required

9    multiple instruction.  That just -- that's just not there, and

10   that's just a mischaracterization that we believe Google is

11   asserting here.

12        And this is the -- you know, the majority of the argument

13   here.  It goes through some teachings of Gran at the top.  And

14   then, again, these teachings confirm that Gran never takes over

15   responsibility, not about whether it's one instruction or

16   multiple instructions.

17        And, Your Honor, what I think is telling here is Google's

18   argument is kind of based on this false premise that Gran

19   discloses multiple instructions for taking over playback

20   responsibility and that, again, Sonos distinguished those

21   multiple instructions based on the claims requiring a single.

22   And that, again, is just not the case.

23        And if you look at what Sonos -- how Sonos described Gran

24   and if you were to read that reference and the portion cited in

25   the response here, you'll see that the continuous instructions

1   in Gran direct the media-rendering device of Gran to continue

2   playing subsequent files in the device queue that the

3   media-rendering device itself is already playing.

4       So there's nothing disclosed here in Sonos' response that

5   would tell you Gran -- in Gran that the control point, which is

6   the controller here, that that is playing audio from the queue

7   and then these instructions are causing the media-rendering

8   device, which is the playback device, to take over

9   responsibility.  That's just not there.

10      I mean, there's nothing to take over.  All this discloses

11  here is that the controller manages the queue, not that it's

12  playing the queue, and that it directs the media-rendering

13  device to continue playing that queue.  Keep playing the next

14  song.  You're already playing the queue, play the next song and

15  the next song and so forth.

16      So, you know, one last thing, Your Honor, I'd just like to

17  point out.  And, you know, this is about, you know, Google's

18  lead case which you heard about, the in re Varma case.  You

19  know, the claim language is a lot different from, for example,

20  the Convolve case and the claims that are at issue here.

21      In Varma the term at issue was "a statistical analysis

22  request corresponding to two or more selected investments."

23  Obviously the claims here don't have that corresponding

24  language.  You may have seen Google tried to cut

25  "corresponding" out and (inaudible) some language from the '033

—80—

1    patent claims.  But at the end of the day the '033 patent

2    claims do not use this term "corresponding."

3        In this Varma case the Federal Circuit obviously construed

4    this term to mean "a single request that must correspond to at

5    least two investments."  But, again, it did so in part based on

6    the claims which we believe the language is significantly

7    different here.  But also the prosecution history was very

8    clear there.  The patentee had amended the claims to include

9    this limitation, and then distinguish the art based on the fact

10   that the claims required a single analysis request

11   corresponding to multiple selected investments.

12       So, Your Honor, I'll stop there unless you have questions.

13   I can pass it back to Mr. Jaffe.

14       THE COURT:  No.  I'll hear from defendant.

15       MR. JAFFE:  Thank you.  If we can get our slides back up.

16       And if we can go back TO Slide 52, please.

17       So the first issue that I want to address is to really

18   clarify what Google is asking for and what it's not asking for

19   here.  Google is not asking where we have claim language that

20   says "an instruction."  There can be more than one instruction.

21   We are not trying to override the "an instruction" that is

22   listed there.  That's not what we're doing.  And that's, again,

23   expressly parallel to what we're talking about in the Varma

24   case.

25       What we are arguing is that Sonos cannot negate what is

1   required by the language following it.  Again, expressly

2   parallel to what we were talking about in the Varma decision

3   here.

4        If we can go to Slide 51, please.

5        So mapping this to the claim language where, in the yellow

6   here which is Claim 1 of the '033, it says "an instruction."

7   We're not saying there can't be lots of instructions.  What we

8   are saying is that Sonos cannot override the language that

9   follows the instruction and describes what the instruction is.

10  That they cannot override that language, that the language

11  itself says there must be an instruction for the at least one

12  given playback device -- excuse me -- to take over

13  responsibility, and then further where it says "wherein the

14  instruction configures the at least one given playback device

15  to."

16       Now, counsel for Sonos was suggesting that these three

17  substeps were capabilities of the playback device.  But I think

18  just reading the plain language, we can see this is a further

19  limitation on the instruction it expressly says -- and this is

20  in between the two red blocks here in Claim 1 of the '033 on my

21  slide -- "wherein the instruction configures the at least one

22  given playback device."

23       So, again, we are not asking for anything other than what

24  the claim language itself provides.  While Sonos, on the other

25  hand, is asking to override the claim language and make it so

1    that they can read out the requirements on what the

2    instructions are here.  And we think that that's improper under

3    the Federal Circuit cases that we've cited to.

4        Counsel for Sonos mentioned the Convolve decision as on

5    point.  I think if Your Honor looks at that decision, you'll

6    see that there are actually two findings in that decision.  One

7    is the Court finds that "a processor" not limited, and that's

8    what counsel for Sonos mentioned.

9        But if you actually read on in the decision, they -- the

10   Federal Circuit in that case looked at a different set of

11   claims, and they found that it was limited.

12       And if you look at the difference between the two

13   language -- the claim language in those two cases or -- excuse

14   me -- those two claims within the same case, you can see that

15   in our situation the '033 patent is actually parallel to the

16   situation in Convolve, where the Federal Circuit did find it

17   was limited to a single processor.

18       And I'm just going to read from the relevant part of the

19   Convolve decision, which is 812 F.3d 1313.  And it says:  Given

20   this claim language, which contrasts with the claims described

21   above that allow for multiple processors, we conclude that

22   Claims 1, 3 and 5 require the user interface to work with a

23   single processor in performing all the claimed steps.

24       And so here we have the same situation, where the claim

25   language does not allow for multiple instructions that perform

1   these steps.  It expressly requires that there -- the

2   instruction configures the three substeps and that same

3   instruction takes over responsibility.

4       So even under the decision that they're kind of

5   championing now, this Convolve decision, it supports Google's

6   position that they cannot read out the express requirements of

7   the instruction by using the kind of modifier "an" at the

8   beginning.

9       And then on the last item, counsel went through the

10  prosecution history in some detail.  I think, you know, I went

11  through that before, basically that they aren't addressing the

12  specific parts of the file history that I quoted.  They're only

13  quoting the end part and not the specific parts I quoted above.

14      But unless Your Honor has any additional questions, that's

15  it for me.

16      THE COURT:  I don't.

17      Any response?

18      MR. SMITH:  Yeah, Your Honor.  Just two points.

19      On the most recent point Mr. Jaffe just raised about Sonos

20  not addressing the prosecution history he pointed to, I think

21  that's incorrect.  We -- again, I can direct you to the slide

22  if you'd like, but we expressly address the language where

23  Sonos talked about the continuous instructions in Gran.  So I

24  think that was a mischaracterization.

25      Second, you know, he pointed you to some other portion of

84

1   Convolve that he says is more on point.  I would encourage you

2   to look at that.  You'll see that the claims and the issue that

3   I addressed with the Court, those are the ones that are most

4   analogous to the claim at issue here, and there were other

5   reasons why the Court limited the different claims in the way

6   that they did.

7        That's all I have, Your Honor.

8        THE COURT:  I'll be back in a few seconds.

9        (Pause in proceedings.)

10       THE COURT:  If we can go back on the record.

11       The Court is going to maintain its construction of plain

12   and ordinary meaning.

13       I'll ask -- anyone can answer this:  Have we set a trial

14   date for this case?

15       MR. SIEGMUND:  Yes, Your Honor.  I believe we have.  I'm

16   looking right now at the scheduling order.

17       Your Honor, it's June 6th.

18       THE COURT:  Very good.  Okay.  Is there anything else we

19   need to take up?

20       MR. SIEGMUND:  Nothing from plaintiff, Your Honor.

21       THE COURT:  Very good.  I've got two more -- I have two

22   more Markmans today.  I doubt they'll be of this stellar

23   quality, but this was a great way to start the morning.  Maybe

24   I'll figure out how to do these, you know, by the end of the

25   year.

1      So I very much appreciate the quality of the lawyers

2  today, and I look forward to having you in trial next June.

3  Hopefully I'll see some of you soon.  Take care.

4      (Hearing adjourned at 12:06 p.m.)

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS     )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 11th day of August 2021.

12
                           */s/ Kristie M. Davis*
13                         KRISTIE M. DAVIS
                           Official Court Reporter
14                         800 Franklin Avenue
                           Waco, Texas 76701
15                         (254) 340-6114
                           kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25