QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for GOOGLE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>                Plaintiff,<br><br>   vs.<br><br>GOOGLE LLC,<br><br>                Defendant. | CASE NO. 3:20-cv-06754-WHA<br>Related to CASE NO. 3:21-cv-07559-WHA<br><br>**GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE**<br><br>The Hon. William H. Alsup<br>Date:     June 9, 2022<br>Time:     8:00 a.m.<br>Location:  Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................1

II.   LEGAL STANDARD ................................................................................................2

III.  ARGUMENT ............................................................................................................2

      A.   The Accused Products Do Not Include the Claimed "Zone Scene" .........................2

           1.   Sonos Ignores the Existing Construction of the Term "Zone Scene"
                and Improperly Raises New Claim Construction Arguments in its
                Summary Judgment Brief.................................................................................3

           2.   The Accused Products Do Not Group Speakers According to a
                Common Theme .................................................................................................4

                (a)   The Construction of "Zone Scene" ...................................................4

                (b)   There is No Infringement Under the Proper Construction of
                      "Zone Scene"......................................................................................5

      B.   The Accused Products Do Not Receive an Indication That the "Zone Player
           Has Been Added to" a Zone Scene ..............................................................................7

      C.   The Accused Products Do Not Receive An Indication "Including At Least
           the First Zone Player and a Second Zone Player".....................................................9

      D.   Google Cannot Infringe Claim 1 of the '885 Patent Because It Is Invalid for
           Covering Unpatentable Subject Matter ....................................................................11

           1.   *Alice* Step 1: Claim 1 Is Directed to an Abstract Idea.................................12

           2.   *Alice* Step 2: Claim 1 Does Not Contain An Inventive Concept .................16

      E.   There Can Be No Infringement of '885 Patent Claim 1 Because It Lacks
           Written Description Support ......................................................................................18

IV.   CONCLUSION ........................................................................................................25

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

## **CASES**

4

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016)................................................................................... 12, 15

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ..................................................................................... 12, 16, 17

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 12-CV-00630-LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014)................................ 4

*August Tech. Corp. v. Camtek, Ltd*.,
    655 F.3d 1278 (Fed. Cir. 2011) .................................................................................. 5

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012) ................................................................................ 13

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*,
    59 F. Supp. 3d 974 (C.D. Cal. 2014)........................................................................ 12

*Chamberlain Grp., Inc.*, NEEDS FULL CITATION
    935 F.3d at 1349 ...................................................................................................... 16

*Cisco Sys., Inc. v. Uniloc 2017 LLC*,
    813 F. App'x 495 (Fed. Cir. 2020)........................................................................... 18

*Cisco Sys., Inc. v. Uniloc USA, Inc.*,
    386 F. Supp. 3d 1185 (N.D. Cal. 2019) ................................................................... 18

*Commil USA, LLC v. Cisco Sys., Inc.*,
    575 U.S. 632 (2015) ................................................................................................ 11

*CyberSource Corporation v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ................................................................................ 16

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ................................................................................ 15

*Enco Sys., Inc. v. DaVincia, LLC*,
    845 Fed. App'x. 953 (Fed. Cir. 2021) ...................................................................... 14

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d at 612 .................................................................................................. 15, 17

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018)................................................................................ 15

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997)................................................................................ 24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
566 U.S. 66 (2012) ................................................................................................ 14, 16

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
2013 WL 3779376 (Fed. Cir. 2013) ..................................................................... 22

*Patent Category Corp. v. Target Corp.*,
567 F. Supp. 2d 1171 (C.D. Cal. 2008) .................................................................. 2

*People.ai, Inc. v. SetSail Techs., Inc.*,
No. C 20-09148 WHA, 2021 WL 5882069 (N.D. Cal. Dec. 13, 2021) ............................ 17

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ............................................................................... 7

*Quake v. Lo*,
928 F.3d 1365 (Fed. Cir. 2019) ............................................................................. 19

*Radio Sys. Corp. v. Lalor*,
709 F.3d 1124 (Fed. Cir. 2013) ............................................................................. 11

*Realtime Data, LLC v. Morgan Stanley*,
554 F. App'x 923 (Fed. Cir. 2014) ......................................................................... 23

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ............................................................................. 16

*Sensormatic Elecs., LLC v. Wyze Labs, Inc.*,
No. 2020-2320, 2021 WL 2944838 (Fed. Cir. July 14, 2021) ............................... 14, 18

*Sliding Door Co. v. KLS Doors, LLC*,
No. EDCV130196JGBDTBX, 2014 WL 12591675 (C.D. Cal. Mar. 21, 2014) ................ 5

*Snyders Heart Valve LLC v. St. Jude Medical*,
Case No. 18-cv-2030, 2020 WL 1445835 (D. Minn. March 25, 2020) ............................. 3

*Sonos, Inc. v. D&M Holdings Inc.*,
No. CV 14-1330-RGA, 2017 WL 971700 (D. Del. Mar. 13, 2017) ................................ 13

*Sonos, Inc. v. Google LLC*,
No. 3:20-cv-03845-EMC (N.D. Cal. Sept. 10, 2019) .......................................... 15

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ................................................................................. 2

*Synkloud Technologies, LLC v. Adobe, Inc.*,
3:20-cv-07760-WHA, Dkt. 146 ............................................................................. 12

*Synopsys, Inc. v. Mentor Graphics Corp.*,
78 F. Supp. 3d 958 (N.D. Cal. 2015),
*aff'd*, 839 F.3d 1138 (Fed. Cir. 2016) ................................................................... 16

*Univ. of Rochester v. G.D. Searle & Co.*,
358 F.3d 916 (Fed. Cir. 2004) ............................................................................... 24

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE

**U.S. Patent No. 10,848,885 Claim 1**

**[1.pre]**  A first zone player comprising:

  **[1.1]**  a network interface that is configured to communicatively couple the first zone player to at least one data network;

  **[1.2]**  one or more processors;

  **[1.3]**  a non-transitory computer-readable medium; and

  **[1.4]**   program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

  **[1.5]**   while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

    (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

    (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

  **[1.6]**  after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

  **[1.7]**  after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

  **[1.8]**   based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player

in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE

1

## I.    INTRODUCTION

Sonos's Motion fails because numerous limitations of claim 1 of the '885 patent are not met in the accused Google products.  First, the critical term "zone scene" has already been construed to require a "common theme."  As explained in Google's opening brief, there is no such "common theme" in the accused products, which instead only implement conventional speaker grouping. Sonos argues that merely "naming" a speaker group constitutes a "zone scene," but this argument fails because the patent specification describes the common theme differently from merely naming the scene and because giving groups names was well known in the art.  As such, simply naming groups would not have distinguished the claimed invention over the prior art as the specification claims, nor was speaker group naming ever referred to as a "scene" rather than what it is—"naming" or identifying a group.

Second, the accused products cannot infringe because the claims require the accused speakers to receive an "indication" that the accused product "has been added" to a zone scene. Google's speakers, on the other hand, never receive such a confirmatory message showing that a speaker "has been added" to a zone scene.  The message that Sonos identifies as this indication is instead a command that orders a speaker to join a group, which happens before any "has been added" confirmation signal could or would be sent.

Third, the claims require that when the accused speaker receives an "indication" that the speaker has been added to the zone scene, that indication must "comprise" at least two other zone players.  Even assuming that the message Sonos accuses of providing the claimed zone scene addition was the claimed "indication," that message does ***not*** identify at least two other zone players as claimed.  Instead, the message only identifies the group identifier and the name of that group.  In other words, Sonos's theories require that the speaker is sent the membership of each speaker group, but Google's speakers neither receive nor store that information, and therefore cannot infringe.

Sonos's Motion also fails because no liability can result from infringement of an invalid claim, and here the asserted claim is invalid for at least two reasons.  First, claim 1 is directed to unpatentable subject matter because it attempts to claim the abstract idea of speaker grouping and management.  Sonos's position that the claims are not abstract because they are limited to digital or

wireless systems is not supported by the claim language and would be unavailing even if it was. Sonos has admitted that conventional speaker systems could be manually configured to group speakers in any combination.  The purported invention of computerizing this process by making the configurations "ad hoc" or "dynamic" is insufficient to escape invalidity under Section 101.

Second, Sonos may argue that the claims do require a specific algorithm and method for combining a multitude of speakers to escape invalidity under Section 101, but this would render the patent invalid under Section 112 because that specific algorithm and method was not described in the original patent disclosure.  Instead, Sonos added claims directed to this specific algorithm nearly 13 years after the original filing and *after* Google confidentially disclosed its "speaker override" algorithm to Sonos in 2014, which Sonos now apparently tries to claim as its own.

Because Google's products do not infringe the asserted claim, summary judgment should be denied.  Further, because the asserted claim is invalid, and no liability can result from infringement of an invalid claim, summary judgment should be denied for that reason as well.

## II.     LEGAL STANDARD

"To establish literal infringement, every limitation set forth in a claim must be found in the accused product, exactly."  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).  "The patentee bears the burden of establishing infringement by the accused product by a preponderance of the evidence. . . . If even one element, or limitation, is not present, the accused product does not literally infringe as a matter of law."  *Patent Category Corp. v. Target Corp.*, 567 F. Supp. 2d 1171, 1178-79 (C.D. Cal. 2008) (internal citations omitted).

## III.    ARGUMENT

### A.     The Accused Products Do Not Include the Claimed "Zone Scene"

As Google explained in its opening brief (Dkt. 222 at 21-25), Google does not implement the claimed "zone scenes," which require a common theme among the speakers.  Rather, Google merely implements conventional speaker grouping technology that allows users to group sets of speakers together.  This technology was well known in the art prior to the claimed invention, was well known by Sonos's inventors long before they filed the parent application to the '885 Patent, and is simply not the claimed invention.

1    **1.    Sonos Ignores the Existing Construction of the Term "Zone Scene" and**
        **Improperly Raises New Claim Construction Arguments in its**
2        **Summary Judgment Brief**

3        Sonos completely ignores the claim construction order already issued in this case and instead

4    asks this Court to rule *de novo* on the construction of the term "zone scene."  Indeed, Sonos does

5    not mention that prior to transferring this case to the Northern District of California, the Western

6    District of Texas court resolved the dispute between the parties as to the construction of the term

7    "zone scene."  In the Western District, Sonos had argued for the same construction it proposes here,

8    which is "a previously-saved grouping of zone players that are to be configured for synchronous

9    playback of media when the zone scene is invoked."[1]  *Sonos, Inc. v. Google LLC*, No. 4:21-cv-

10   07559 (N.D. Cal.) ("Transferred Action"), Dkt. 64 at 14.  Google argued that the term meant "a

11   group of two or more zones that are grouped according to a common theme by configuring the zones

12   in a particular scene (e.g., morning, afternoon or garden)," *id.* at 12, and the Court split the difference

13   between the two parties' constructions, ruling that a zone scene meant "[a] previously-saved group

14   of zone players according to a common theme."  Transferred Action, Dkt. 106 at 38.  Sonos did not

15   request reconsideration of that construction in the Western District and has not requested

16   reconsideration of that construction before this Court.  As such, it is now the law of the case.  *See*

17   Dkt. 200 at 3-5 (Google Resp. Claim Constr. Br.) (discussing application of law of the case); *Snyders*

18   *Heart Valve LLC v. St. Jude Medical*, Case No. 18-cv-2030, 2020 WL 1445835, *4, 6-7 (D. Minn.

19   March 25, 2020) (adopting "the Texas court's prior constructions" because "under law-of-the-

20   case/reconsideration principles, 'as a rule,' courts should be 'loathe' to revisit prior decisions of its

21   own or of a coordinate court in the same case" unless the decisions were "clearly erroneous" or the

22   parties "present new evidence.").  Sonos has neither raised any "new evidence" to overturn the

23   existing claim construction nor presented any reasons that the claim construction was "clearly

24   erroneous."  As such, the proper and current construction of the term "zone scene" is "[a] previously-

25   saved group of zone players according to a common theme."

26

27   ─────────────────────

28   [1]   Sonos nominally proposed "no separate construction necessary" for the term, but effectively
     argued for this construction in its briefing.  Transfer Action, Dkt. 64 at 14.

Sonos chose not to brief the term "zone scene" in its claim construction brief here, ignored the existing claim construction order from the Western District of Texas, yet now argues in its summary judgment motion for a claim construction that it contends might be patent-dispositive.[2] Attempting to argue claim construction at this late stage is prejudicial to Google and improper under this Court's rules, which only state that the Court will *consider* claim construction issues at the summary judgment phase, not that they should be *raised* for the first time at the summary judgment phase.  Dkt. 67 ⁋ 25 ("Claim construction briefs must still be filed under the schedule provided by Rule 4-5 but on summary judgment, the pertinent parts of the claim construction briefs shall be extracted out and/or cited as relevant."); *see Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014) ("Sound practical reasons counsel against construing additional terms based on claim construction arguments raised for the first time in summary judgment briefs.").

### 2. The Accused Products Do Not Group Speakers According to a Common Theme

### (a) The Construction of "Zone Scene"

The Western District court accurately construed the claims to require a "common theme."  Indeed, the specification defines the term "zone scene" as follows:  "[u]sing **what is referred to herein as a theme or a zone scene**, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated."  Dkt. 208-2 ('885 Pat.) at 8:47-51.  The specification discloses that a "zone scene command could apply the following attributes:

- Set volumes levels in each zones (each zone can have a different volume)

- Mute/Unmute zones.

- Select and play specific music in the zones.

- Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)

---

[2]  Sonos did identify its proposed construction for "zone scene" in the joint claim construction statement, Dkt. 126 at 35, but it did not identify this as a top term for construction pursuant to this Court's standing order or brief that term.  Dkt. 184.

1    • Set the music playback equalization of each zone (e.g., bass treble)."

2    *Id.* at 9:20-30 (bullets added for clarity). A zone scene or theme, therefore, is not simply a group of

3    speakers as Sonos alleges. It must include the "theme" attributes described above, which

4    differentiates "zone scenes" from the admittedly conventional and well-known speaker groups.

5    Indeed, the specification of the '885 patent repeatedly discusses "conventional multi-zone audio

6    systems" and improvements to those audio systems using zone scenes. *Id.* at 1:46-2:24.

7    Sonos's construction is also flawed because it improperly seeks to read the term "zone

8    scene" out of the claim. Sonos proposes essentially two restrictions on "zone scene": (1) that a

9    zone scene be predefined or previously saved, and (2) that it allow the zone players in the zone scene

10   to play back media synchronously. But claim 1 of the '885 patent already requires (1) that the zone

11   scene comprise a "predefined grouping of zone players" and (2) that the players "are to be

12   configured for synchronous playback of media." As such, Sonos's proposed construction gives the

13   term "zone scene" no meaning and effectively reads it out of the claim, which is improper. *See*

14   *Sliding Door Co. v. KLS Doors, LLC*, No. EDCV130196JGBDTBX, 2014 WL 12591675, at *8

15   (C.D. Cal. Mar. 21, 2014) ("Plaintiff's proposed definition improperly reads out the term portion.");

16   *August Tech. Corp. v. Camtek, Ltd*., 655 F.3d 1278, 1283 (Fed. Cir. 2011) (rejecting plaintiff's

17   "proposed construction of a plurality of wafers" because it "read[] out 'a plurality of' from the

18   claims"). Indeed, Sonos and its expert admit that Sonos's proposed construction for "zone scene"

19   merely imports the surrounding claim language rather than defining the individual term. Almeroth

20   Decl. Paragraph 74 ("I note that Sonos's proposed construction is very similar to the definition of a

21   'zone scene' that is set forth in the express claim language . . ."); Br. at 9 (arguing that the proposed

22   construction "merely tracks the express claim language").

23   **(b)   There is No Infringement Under the Proper Construction of "Zone Scene"**

24   Applying the proper construction of "zone scene," Google's accused products cannot

25   infringe because they do not form groups with a "common theme."

26   Sonos's sole support for its argument that Google's products contain a common theme is a

27   citation to Google's claim construction brief from the Transferred Action. Sonos Br. at 10:9-16

28

-5-                              Case No. 3:20-cv-06754-WHA

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE

(citing Transferred Action, Dkt. 64 at 12-15).  Sonos claims Google admitted that "names reflecting a specific area of a user's home (e.g., 'garden')" is the "'theme' information that would satisfy the 'according to a common theme' aspect of Google's proposed construction."  *Id*.  This is a disingenuous and faulty recitation of Google's brief.  First, Sonos could not genuinely believe Google admitted that simply naming a speaker group would constitute a "zone scene";  Google served interrogatory responses disputing this infringement theory before Sonos filed its brief:

> "Finally, Sonos argues that a group name 'serves as the user's shorthand label of the common theme that led the user to create the previously-saved group,' and therefore appears to conflate group names with the claimed 'zone scene.'  ***This is contrary to the specification, which uses group naming and zone scenes separately and distinguishes between them***."

Ex. 1 (Google Rog 12 Resp.) at 57-58.  Second, Google's brief does not state that simply naming a speaker group constitutes a "zone scene," which explains why Sonos did not actually quote from Google's brief in support of this argument.  Google's brief noted that the specification identifies zone scenes by particular names such as "morning" and "evening," but Google never argued that the name ***was*** the zone scene.  Transferred Action, Dkt. 64 at 12-15.  This would be like arguing that Sonos the company is ***just*** the name "Sonos" because that is how it refers to itself, while ignoring that Sonos the company of course has characteristics such as a place of incorporation, or that it creates products.  Sonos's reliance on Google's alleged "admission" regarding the meaning of "zone scene" is baseless and the Court should reject it.

That is the only argument Sonos raises as to why the ability to name a speaker group constitutes a "common theme," and as discussed above and in Google's opening summary judgment brief (Dkt. 222 at 21-25), it fails because the specification does not contemplate that simply naming a group is a "zone scene" and because it would leave no distinction between the allegedly novel "zone scenes" and the prior art.  Many prior art systems allowed a user to name a speaker group.  Declaration of Dr. Dan Schonfeld ("Schonfeld Decl.") ¶¶ 41-42; Ex. 2 (SONOS-SVG2-00032312) at 407 (showing "Den" and "Kitchen" clients and noting that a user may "assign names to client MusicCAST clients based on their location"); Ex. 3 (SONOS-SVG2-00042661) at 670 ("███████ ██████████████████████████████████████████████████████████████████████").  Even the admitted prior art in the patent describes zones named morning, evening, and weekend.  Dkt. 208-2 at 2:9-

14; *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee[.]").  Merely naming a group of speakers was not the invention and could not have been Sonos's point of novelty at the time.

Further, a user may name speaker groups in the Google Home app whatever he or she wants. Those names could be descriptive, or they could be completely abstract or random and not refer to a theme—for example, "A," "B," and "C" or "first," "second," "third."  In either case, there is no reason to believe that a name of a speaker group is a "common theme."  *See* Schonfeld Decl. ¶¶ 41-43.  The specification confirms that "naming" groups is different from the claimed "zone scenes." "Zone scenes" are described as configuring zones "in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated."  Dkt. 208-2 at 8:47-51.  Because Sonos has not identified any characteristics that could constitute a common theme beyond "naming" a speaker group, its infringement theories fail and the Court should deny summary judgment.  At the very least, there is a genuine dispute of fact as to whether a name is a "common theme," and given the expert disagreement over this issue the Court should deny summary judgment.

**B.**   **The Accused Products Do Not Receive an Indication That the "Zone Player Has Been Added to" a Zone Scene**

Elements [1.5(i)] and [1.5(ii)] require that the claimed zone player receive "a first/second indication that the first zone player has been added to a first/second zone scene."  The accused systems do not receive an indication that the zone player has been added to a zone scene.  Sonos points only to the ███████████████ as meeting this element, but Sonos mischaracterizes the content and function of this ██████  Sonos argued in its brief that the ████████████████ serves to 'add[] the target device to a multizone group' . . . ."  Br. at 17 (deletion in original) (quoting GOOG-SONOSWDTX-00048962) (citing Almeroth Decl. ¶ 121-127).  In other words, Sonos admits that even under its understanding of the accused products, ████████████████ *adds* the speaker to the group; it does not indicate that the speaker *has been added* to the group.  The distinction is critical: adding the speaker to the group requires a command that directs the speaker

to join the group, whereas an indication that the speaker "has been added" to the group requires that the speaker later, after it has already been added to the group, receive a message regarding its grouping status.  The latter is claimed, but Sonos has only identified evidence supporting the former. Accordingly, the Court should deny Sonos's motion for summary judgment of infringement.

It is clear that ████████████ is a ████████████ and not an indication that the speaker has already been joined to a group because Sonos's own experts have opined to this effect repeatedly and consistently.  Sonos's experts relied on Google employees' and corporate designees' own testimony stating that ████████████████████████████████ ████████████ Ex. 4 (SONOS-SVG2-00027981) at 200 (Almeroth Witness Statement). According to Sonos's experts, Google's ████████████████████████████████ ████████████████████████████████████████ *Id.* at 200.  Sonos's experts opined that the ████████████████████████████████ ████████████ *Id.*; *see also id.* at 211 ████████████████████████████████ ████████████████████████████████████████ Sonos's experts testified that the ████████████████████████████████ ████████████████████████████████████████████ *Id.* at 400-401.[3]  In sum, Sonos clearly and consistently testified that the ████████████████ ████████████████████████—***not*** an indication to the speaker that it has already been added to a group, as the claims require.

Sonos's own brief is instructive on this point.   While Sonos states before and after summarizing its evidence that ████████████ is an indication that the speaker "has been added" to a speaker group, all of the evidence Sonos cites in between shows that ████████ ████████ is actually a command ***adding*** the speaker to a group (present tense), rather than

---

[3] *See also* Ex. 4 at 401 (Sonos expert testifying that the ████████████████████████████ ████████████████████████████████████████████ ); *id* at 514 (Sonos experts testifying that the accused speakers ████████████████████████████████████████████ ████████ .

memorializing that the speaker ***has been added*** to the group (past tense).  Sonos Br. at 16:19-17:8.

Sonos first cites to Exhibit B, which is one of Google's interrogatory responses.  This response is

clear that ███████████████████████████████████████████████."  Sonos Br. Ex. B. at 9.

This shows that ██████████████████████████████████████████████████████████████

████████████████████████████.  Google's interrogatory response also makes clear that

a Google speaker device ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.*  In other words,

Google's system is architected in the ***reverse*** configuration of what has been claimed.  ████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.  Schonfeld

Decl. ¶¶ 35-40.  Next, Sonos cites to Exhibit G, which is an internal Google document ████████

████████████████████████████.  Sonos Br. Ex. G at 1.  Once again, this document states that

████████████████████████████████████████████████████████████████████████

████████████████████████████ ***not*** that it provides an indication to the speaker that

it has already been added to a group as required by the claims.  *Id.*  Sonos next cites to Dr. Almeroth's

declaration, but he cites to the same technical documents referencing ████████ discussed above

and also generally references Google's source code without any specific analysis of any file or

function.  Dr. Schonfeld has confirmed that none of the source code cited by Dr. Almeroth changes

the fact that ██████████████████████████, and is not a broadcast message

reporting that the speaker "has been added" to the group.  Schonfeld Decl. ¶¶ 35-40.

The evidence discussed above clearly shows that the accused Google products do not include

an indication that the speaker "has been added" to a group.  Therefore, at a minimum, there is a

genuine dispute of fact as to whether this claim element has been met, and Sonos's motion for

summary judgment should be denied.

### C.  The Accused Products Do Not Receive An Indication "Including At Least the First Zone Player and a Second Zone Player"

There is another fatal flaw in Sonos's argument with respect to the "indication" elements

[1.5(i)] and [1.5(ii)].  Those elements require that the speaker receive "a first/second **indication** that the first zone player has been added to a first/second zone scene **comprising** a first/second predefined grouping of zone players **including at least the first zone player and a second/third zone player** . . . ."  Thus, the "indication" that the speaker receives must comprise "at least the first zone player and a second zone player."  The accused products do not receive an identification of the first and second accused "zone players," and this is a █████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████  Regardless, and setting aside the beneficial aspects of Google's system, it is clear that the "indication" Sonos has accused does not include "the at least first zone player and a second zone player," but instead includes only a group identifier and a name.

Sonos again relies solely upon the ███████████████████ to support its argument that the claimed indication "include[es] at least the first zone player and a second zone player."  Sonos Br. at 17:12-22.  However, ████████████████████████████████████████████████████████████

████████ according to the documents cited in Sonos's brief:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Sonos Br. Ex. G at 1.  Sonos's experts have also opined that the ████████████████
████████████████████████████████████.  Dr. Almeroth identified a ████████████
███████████████████████████████████████.  Almeroth Decl. ¶121.
Dr. Weissman, another one of Sonos's experts, similarly opined that the ████████████

1    ████████████████████████████████████████████

2    ████████████████████ Ex. 9 (SONOS-SVG2-00028893) at 323; Ex. 10

3    (GOOG-SONOSWDTX-00040384) at 386.  Dr. Almeroth further opined that the ██████

4    ████████████████████████████████████████████

5    ███████████████████████████████████████

6    ████████████”  Ex. 4 (SONOS-SVG2-00027981) at 265, 51.  None of these elements of

7    the ████████████ identify the "first zone player and a second zone player" because they

8    merely describe the group as a whole and ***not*** its constituent members, as required by the claim.

9        Indeed, Google's system is architected such that it does not "████████████████

10    ████████████████ Ex. 5 (Mackay ITC Dep. Tr.) at 118:15-19. ████████████

11    ████████████████████████████████████████████

12    ████████████████████████████ *Id.* at 118:7-14.[4]

13    There is therefore no ***need*** to send an indication of each member of the group to each speaker as the

14    claims require.  Accordingly, the accused Google products do not receive an "indication . . .

15    comprising a first[/second] predefined grouping of players ***including*** at least the first zone player

16    and a second zone player," and there is at least a genuine dispute of fact as to whether this claim

17    element has been met.  Sonos's motion for summary judgment should be denied.

18        **D.**    **<u>Google Cannot Infringe Claim 1 of the '885 Patent Because It Is Invalid for</u>**
                **<u>Covering Unpatentable Subject Matter</u>**

19

20        It is fundamental that an invalid patent cannot be infringed.  *Commil USA, LLC v. Cisco Sys.,*

21    *Inc.*, 575 U.S. 632, 644 (2015) ("Invalidity is an affirmative defense that can preclude enforcement

22    of a patent against otherwise infringing conduct.") (internal quotes omitted).  "[I]nvalidity operates

23    as a complete defense to infringement for any product, forever."  *Radio Sys. Corp. v. Lalor*, 709

24    F.3d 1124, 1132 (Fed. Cir. 2013).[5]  As discussed below, the '885 Patent is directed to unpatentable

25

26    [4]  The leader does have "████████████████████████████" (Ex. 5. at
    118:20-119:3), but this is not relevant to Sonos's infringement theory as it is not a part of the

27    accused ████████████ and instead only relates to playback runtime.

28    [5]  This Court has held that raising invalidity arguments as a defense to infringement claims is
    proper in the patent showdown context.  *Synkloud Technologies, LLC v. Adobe, Inc.*, 3:20-cv-

subject matter under 35 U.S.C. 101, which is a complete defense to Sonos's motion for summary judgment of infringement.

Claim 1 of the '885 patent fails to meet either step of the Supreme Court's two-step framework in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014): "(1) whether the claim is directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract idea, and if so, (2) whether the elements of the claim, considered both individually and as an ordered combination, add enough to transfer the nature of the claim into a patent-eligible application." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (citing *Alice*, 574 U.S. 208) (internal quotations omitted).

### 1.    *Alice* Step 1: Claim 1 Is Directed to an Abstract Idea

Claim 1 fails the first step of *Alice* because it is directed to the abstract idea of grouping and controlling speakers through "zone scenes" that are created using the subjective mental processes of human users.  When addressing this step, courts "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract." *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) ("*Cal Tech*"). "Stripped of excess verbiage," claim 1 essentially describes three functional steps: (1) receiving notice of being added to a first "zone scene" with a second player, (2) receiving notice of being added to a second "zone scene" with a third player, and (3) once one of the "zone scenes" has been selected, "transitioning" from operating as a standalone player to playing media in synchrony with at least one of the other players.  *Id.*; Dkt. 208-2 at Abstract.  At base, the apparent invention— according to the patent itself—is grouping speakers for simultaneous playback of the same media. '885 Patent at 2:36-37 ("[T]he present invention pertains to controlling a plurality of multimedia players, or simply players, in groups.").

But the claim covers a process "that humans engaged in . . . long before the invention of computers." *Cal Tech*, 59 F. Supp. 3d at 995.  As the patent itself recognizes, "conventional multi-zone audio system[s] that usually include[] a number of audio players" were already known art that

---

07760-WHA, Dkt. 146 at 2.

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE

1  could "play[] different audio sources in different audio players" by being "either hard-wired or

2  controlled by a pre-configured and pre-programmed controller." Dkt. 208-2 at 1:62-65.  In fact, the

3  specification expressly discusses how a person could already manually group speakers in her

4  bedroom, bathroom, and den to listen to the news via radio while preparing for work in the morning,

5  change the group to the speakers in her den and living room to listen to music in the evening, and

6  then manually change the group once again to the speakers in the den, living room, and kitchen for

7  party music on the weekends.  *Id.* at 1:67-2:17.[6]

8         The alleged "invention" is thus nothing more than computerizing the age-old process of

9  manually plugging speakers in to create speaker groups.  *See Bancorp Servs., L.L.C. v. Sun Life*

10  *Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) (holding claims abstract where

11  "the computer simply performs more efficiently what could otherwise be accomplished manually").

12  The focus of claim 1 is not any specific improvement to computer technology for grouping speakers,

13  but rather the use of computers to conserve human resources by automating work otherwise

14  performed through human labor.  According to the specification's repeated discussion of the issue,

15  the inconvenience of manually changing speaker groups was the very problem the patent was

16  intended to address.  *See, e.g.*, Dkt. 208-2 at 2:20-24 ("In a traditional multi-zone audio system, the

17  audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous

18  audio environment."); *id.* at 2:13-17 ("Because the morning group, the evening group and the

19  weekend group contain the den, it can be difficult for the traditional system to accommodate the

20

---

21  [6]  To the extent Sonos relies on *Sonos, Inc. v. D&M Holdings Inc*., No. CV 14-1330-RGA, 2017
WL 971700, at *6 (D. Del. Mar. 13, 2017), that out-of-district holding on a different set of patents

22  is distinguishable since the Court found humans could not have performed the actions.  In that case,
the court found that hardwiring speakers to the desired configuration "would not be within the scope

23  of the claims because it does not involving [*sic*] using a controller with a user interface to view lists
of available devices on the data network that are then grouped and controlled synchronously."  *Id.*

24  (cleaned up).  Here, claim 1 does not recite any limitations regarding a controller or user interface.
In addition, the *D&M Holdings* court rejected the defendant's Section 101 argument in part because

25  the claims were based not on "audio devices generally," but only on specific "players" that were
construed by the court to mean "data network device configured to process and output audio."  Id.

26  at *5.  Although Sonos argued for the same construction of the "zone player" and "playback device"
terms of claim 1 (Dkt. 60 at 4-6), Judge Albright held those terms should be given their plain and

27  ordinary meaning (see Dkt. 200-1 at 5:16-24) and thus were not "specific devices that are described
and claimed in the patents."  *D&M Holdings*, 2017 WL 971700 at *6.

28

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE

1  requirement of dynamically managing the ad hoc creation and deletion of groups."). The Federal

2  Circuit has held, however, that the mere automation of manual processes using generic computer

3  components is directed to an abstract idea. *Enco Sys., Inc. v. DaVincia, LLC*, 845 Fed. App'x. 953,

4  957 (Fed. Cir. 2021) (holding claims directed at automating the AV-captioning process were an

5  abstract idea).

6      To show improvement over conventional speaker grouping, Sonos also claimed in its

7  technology tutorial that the invention included the addition of wireless technology (as shown below).

8

9

10

11

12

13

14

15

16      But notably, the '885 patent is not even limited to wireless systems. *See* Dkt. 208-2 at 4:62-

17  63 ("The network may be a ***wired network***, a wireless network or a combination of both."); *id.* at

18  5:40-41 ("The network interface may include one or both of a wireless interface and a ***wired***

19  ***interface*** . . . . The wired interface provides network interface functions by a ***wired means*** (e.g., an

20  Ethernet cable)."). Sonos' assertion thus adds "nothing specific" to the prior art "other than what is

21  well-understood, routine, conventional activity, previously engaged by those in the field" and does

22  not render the claim non-abstract. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S.

23  66, 82 (2012). Regardless, the Federal Circuit has held that "the broad concept of communicating

24  information wirelessly, without more, is an abstract idea." *Sensormatic Elecs., LLC v. Wyze Labs,*

25  *Inc.*, No. 2020-2320, 2021 WL 2944838, at *3 (Fed. Cir. July 14, 2021).

26      Sonos itself has taken the same position that automating manual processes such as the one

27  described by claim 1 is abstract and unpatentable. In a separate action in this District, Sonos

28  previously argued that one of the asserted claims "is an attempt to automate a process that could be

1  (and previously was) performed entirely by a human without a computer." *Sonos, Inc. v. Google*

2  *LLC*, No. 3:20-cv-03845-EMC, Dkt. 39 at 5 (N.D. Cal. Sept. 10, 2019). Sonos further argued that

3  "the Federal Circuit has been clear that the specific benefits [] identifie[d] do not weigh in favor of

4  eligibility [because] the Federal Circuit has held that automating human processes or performing

5  those processes 'more efficiently via a computer does not alter the patentability of the claimed

6  subject matter.'" *Id.* at 10. But this is exactly the benefit that Sonos seeks to claim in this case—

7  the improved efficiency of speaker grouping using existing and conventional computer and wireless

8  technology. *See id.* ("Because the benefits Google claims in the Amended Complaint are **expressly**

9  directed to computer automation (i.e., 'without repeated user involvement') and the resulting

10  'efficiency,' they cannot constitute the kind of technological improvement that might render the

11  '489 Patent eligible under § 101.").

12    Claim 1 is also abstract because it is devoid of any description for making a "new" zoning

13  system. It merely recites an apparatus and method in the form of "*receiving*" a first indication of

14  being added to a first zone scene, "*receiving*" a second indication of being added to a second zone

15  scene, "*continuing* to operate in the standalone mode," "*receiving*" an instruction to operate in

16  accordance with the first or second zone scene, and "*transitioning* from operating in the standalone

17  mode to operating in accordance with" either the first or second predefined zone scene groupings.

18  The claim "predominantly describe[s] [the claimed system] in purely functional terms based on what

19  they perform and not **how** those functions are performed." *In re TLI Commc'ns LLC Pat. Litig.*, 823

20  F.3d at 612. The "essentially result-focused, functional character of claim language" establishes

21  that the asserted claims do not propose a specific solution to a technical problem. *Elec. Power Grp.,*

22  *LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). There is no limitation as to how the

23  claimed invention achieves the desired result, and this wide-open space leaves room for "a claim

24  that encompasse[s] all solutions for achieving a desired result." *Interval Licensing LLC v. AOL,*

25  *Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018). The "purely functional nature of the claim confirms it

26  is directed to an abstract idea, not to a concrete embodiment of that idea." *Affinity Labs of Tex., LLC*

27  *v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

28    Finally, Sonos asserts in its claim construction briefing that the "new" technology and

"unconventional solution" is found in the "zone scenes."  *See Sonos Inc. v. Google LLC*, No. 4:21-cv-07559, *Second Amended Compl., Dkt.* 51 ¶ 75 (N.D. Cal. Feb. 23, 2021) ("The '885 Patent claims devices, computer-readable media, and methods for managing and operating in accordance with different "zone scenes," which provides an unconventional solution to the technological problems related to grouping zone players that are described in the '885 Patent.").  But according to Sonos's infringement contentions, these "zone scenes" are dependent on the ***subjective intent of the user*** at the time of grouping: "[E]very 'speaker group' that a user seeks to create in a Cast-enabled playback system has some common theme, which in this context amounts to whatever common topic, subject, etc. led the user to decide that these particular Cast-enabled media players should be placed into a previously-saved group that allows for synchronous playback when invoked."  Dkt. 175-28 at 6.  The fact that Sonos accuses *subjective mental* processes of meeting the alleged "zone scene" point of novelty only highlights the abstractness of the claims.  *CyberSource Corporation v. Retail Decisions, Inc*., 654 F.3d 1366, 1371 (Fed. Cir. 2011); *Synopsys, Inc. v. Mentor Graphics Corp*., 78 F. Supp. 3d 958, 965 (N.D. Cal. 2015), *aff'd*, 839 F.3d 1138 (Fed. Cir. 2016) ("The asserted claims, like those in *Alice* and *Mayo*, add nothing other than a way to implement that mental process on a computer.").

In short, the asserted claims are devoid of any patent-eligible improvement to technology and fail to achieve "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

### 2.     *Alice* Step 2: Claim 1 Does Not Contain An Inventive Concept

Claim 1 also fails step two of the *Alice* test because it lacks an inventive concept that would "transform the nature of the claim into a patent-eligible application."  *Alice*, 573 U.S. at 217 (internal quotations and citations omitted).  Under Step 2, the Court asks whether a claim "that recites an abstract idea" includes "additional features" to "ensure that the claim is more than a drafting effort designed to monopolize the abstract idea."  *Id.* at 221.  In other words, the Step 2 inquiry asks whether any elements in the claim, beyond the abstract idea, may be regarded as an "inventive concept."  *Chamberlain Grp., Inc.*, 935 F.3d at 1349.  Here, the asserted claims contain no inventive

concept apart from the abstract idea.

As discussed above, the asserted claims are directed to an abstract idea at Step 1 of the *Alice* inquiry, and what is left only supports Google's position that Sonos's summary judgment must be denied.  The remainder of claim 1 recites only generic computer components—including processors, a "non-transitory computer-readable medium," program instructions, and "players"—performing their routine and conventional functions. Claims that "merely require generic computer implementation[] fail to transform [an] abstract idea into a patent-eligible invention."  *Alice*, 573 U.S. 208, 221 (2014); *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components merely perform their "well-understood, routine, conventional" functions.").

Sonos may argue that the "player" is a component able to perform unconventional functions in a way that supplies an inventive concept, but this does not save claim 1.  Sonos focuses on the specification's discussion of adding standalone speakers to existing speaker groups, "dynamically" changing those groupings (Dkt. 208-2 at 2:14-19) and "sav[ing]" "predefined groupings" of speakers (*id.* at 10:36-45).  At the outset, these concepts are not found in the language of claim 1, which is fatal given that "an inventive concept cannot be concocted from the pleadings or the specification, it must be firmly rooted in the language of the claim."  *People.ai, Inc. v. SetSail Techs., Inc.*, No. C 20-09148 WHA, 2021 WL 5882069, *6 (N.D. Cal. Dec. 13, 2021).  But more importantly, these are merely natural and fundamental consequences of adding computerized and wireless technology to conventional speaker groupings.  Computers are inherently "dynamic," and saving information digitally means that any data on a computer may be modified "ad hoc."  This is insufficient given that the "highlighted improvements amount to mere efficiency gains," and "improvements that come with the incorporation of a computer fail to qualify as an inventive concept."  *Id.* at *10.  Adding wireless connectivity, another well-known concept at the time of the invention, leads to the precisely the same result.  Whereas conventional speaker systems would need to be plugged in to a different arrangement to change the composition of speaker groups, it is generic wireless communications that allow re-arranging to happen "dynamically" and "ad hoc."  *Cisco*

*Sys., Inc. v. Uniloc USA, Inc.*, 386 F. Supp. 3d 1185, 1200 (N.D. Cal. 2019), *aff'd sub nom. Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 F. App'x 495 (Fed. Cir. 2020) (rejecting argument based on the specification because "the claim and the specification as a whole simply use existing Bluetooth technology and existing hardware as the generic environment for implementing the abstract idea").

Sonos did not contribute any inventive concept beyond adding wireless communications and generic computer functionality to conventional speaker systems.  The claims "fail to set forth any particular physical configuration" that could satisfy step two, and even if Sonos could identify such a physical configuration, "[p]roviding generic devices that communicate with each other []. . . is a conventional application of an abstract idea."  *Sensormatic Elecs*., 2021 WL 2944838, at *3. Sonos's own documents reflect that by as early as 2003, it was already ██████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████  Ex. 3 (SONOS-SVG2-00042661) at 677.  Much like Sonos's supposed invention, these systems could ████████████████████████████████████████████████████ ████████████████████████████████████  *Id.*  Those conventional systems ███████████████ ███████████████████████████████████████████████████████████.  *Id.* at 678.  The identified missing feature from these "conventional" systems was wireless capability and ████████████ ████████████████████████████████  *Id.* at 679.  But wireless capability is not required by the claims and the conversion of conventional analog systems to digital is not sufficiently inventive to take an abstract idea outside the realm of unpatentable subject matter.  *Cisco Sys*, 813 F. App'x at 499.

Because claim 1 does not add any concrete application that alters its abstract nature, it does not contain an inventive concept and is thus ineligible for patenting.

**E.    There Can Be No Infringement of '885 Patent Claim 1 Because It Lacks Written Description Support**

The Court should also deny Sonos's Motion because the asserted claim is invalid under 35 U.S.C. § 112, and therefore no liability can result from any infringement.  The specification of the '885 patent fails to "convey[] with reasonable clarity to those skilled in the art that, as of the filing date sought, [the applicant] was in possession of the invention" for the simple reason that the

1   patentee inappropriately added new matter much later during the claim amendment process. *Quake*

2   *v. Lo*, 928 F.3d 1365, 1373 (Fed. Cir. 2019). Sonos filed the application that led to the '885 Patent

3   on April 12, 2019, but that patent application claims priority through a long chain of continuation

4   applications all the way back to a provisional application filed on September 12, 2006. In the

5   intervening **13 years** of patent prosecution, Sonos "inappropriately added new matter during the

6   claim amendment process," rendering the '885 Patent invalid. *See id*.

7       As compared to the original application, where the claims simply related to configuring the

8   zone scene, the claims from the 2019 patent cover an intricate set of instructions for putting

9   particular "zone players" into particular "scenes" in a particular order. Claim 1 is set out below:

10       1. A first zone player comprising:

11       a network interface that is configured to communicatively couple the first zone player
    to at least one data network;

12       one or more processors;

13       a non-transitory computer-readable medium; and

14       program instructions stored on the non-transitory computer-readable medium that,
15       when executed by the one or more processors, cause the first zone player to perform
    functions comprising:

16       while operating in a standalone mode in which the first zone player is configured to
17   play back media individually in a networked media playback system comprising the
    first zone player and at least two other zone players:

18       (i) receiving, from a network device over a data network, a first indication that the
19   first zone player has been added to a first zone scene comprising a first predefined
    grouping of zone players including at least the first zone player and a second zone
20   player that are to be configured for synchronous playback of media when the first
    zone scene is invoked; and

21       (ii) receiving, from the network device over the data network, a second indication
22   that the first zone player has been added to a second zone scene comprising a second
    predefined grouping of zone players including at least the first zone player and a third
23   zone player that are to be configured for synchronous playback of media when the
    second zone scene is invoked, wherein the second zone player is different than the
24       third zone player;

25       after receiving the first and second indications, continuing to operate in the
    standalone mode until a given one of the first and second zone scenes has been
26   selected for invocation;

27       after the given one of the first and second zone scenes has been selected for
    invocation, receiving, from the network device over the data network, an instruction
28       to operate in accordance with a given one of the first and second zone scenes

respectively comprising a given one of the first and second predefined groupings of zone players; and

based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

Generally, the claim requires a first zone player to be operating in "standalone mode" to play back media "individually" (green text). Then the first zone player is added to a zone scene including the first zone player and a second zone player (blue text). Then the first zone player is added to another zone scene, including the first zone player and a third zone player (pink text). Adding the first zone player to the two scenes does not change the first zone player from continuing to play back media individually until one of the zone scenes is "invoked," which causes the first zone player to "transition" from individually playing back media to playing back media as part of the invoked zone scene (cyan text).

The specification never describes this specific set of operations or anything resembling it. Instead, the specification discloses a home audio system including "zone configurations," speaker groups, and "zone scenes." It does not describe how those elements are combined, what happens when they are combined as set forth in the claim, or even whether zone scenes can include a shared zone player. A person of skill in the art reading the patent specification would not understand the patent to disclose this particular claimed set of operations. Schonfeld Decl. ¶ 35-40.

First, the specification does not provide support for the claim limitation "a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players" because the specification never discloses that a zone player may be added to two zone scenes at the same time. The claims require that the first zone player is added to both a first and a second zone scene, but there is no description, or even an illustration, of adding a first zone player to two different scenes of zone players. Indeed, in the figures showing which zones can be added to a "zone configuration" or "scene," there is no disclosure of adding the same zone (e.g., bathroom) to multiple zone configurations or scenes. As shown below, in Figure 3A (from the

-20-

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE

original '206 Patent), the "zone configuration / scene" includes the bedroom, den, and dining room. The bedroom, den, and dining room are not included in any other zone configurations or scenes.



**FIG. 3A**

**FIG. 3B**

There are no preferred embodiments or embodiments of any kind that describe a zone player included in more than one scene or even more than one group. While the figures above show including particular zones in a scene, there is only a single scene and as a result no overlap of zone players within multiple scenes. Nor would a person of ordinary skill in the art have understood the specification to contain an equivalent description. Schonfeld Decl. ¶ 43-52.

The closest the specification comes to disclosing scenes with overlapping zone players is the following portion of the specification:

> In order to satisfy such requirements, two groups of audio players must be established. In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news. In the evening, the audio players in the den and the living room are grouped for the music. Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music. Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups. Dkt. 208-2 at 2:5-12.

But this disclosure actually teaches away from having scenes *existing* at the same time with overlapping zone players. Rather, the specification teaches that the three groups exist at different times—one in the morning, one in the evening, and one over the weekend. The specification offers

-21-

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE

the anodyne solution that "[w]ith a minimum manipulation, the audio players may be readily grouped," but this does not disclose that speakers may belong to more than one group at any given time, and neither does the specification's generic recital that "there is a need to individually or systematically adjust the audio volume of the audio players." *Id.* at 2:18-20. The specification cannot merely "describe a roadmap" for getting to a solution and "leave it to the industry to complete an unfinished invention." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 2013 WL 3779376, *13-14 (Fed. Cir. 2013) (cleaned up).

Second, the specification does not provide support for the claim limitations "continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation" and "transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players." The specification provides no description or figures describing what happens when a speaker in "standalone mode" (a term never used in the specification) is added to multiple zone scenes and then one of those zone scenes is later invoked. Because the inventors did not contemplate having speakers in overlapping zone scenes, the specification does not disclose what might happen when a speaker playing back music individually is added to a zone scene. For example, the specification could have disclosed that the speaker begins playing back whatever music the zone scene requires when added to that scene, or it could have recited that the speaker discontinue playing any music when it is added to the zone scene, or it could have recited asking the user for guidance as to continue playing music or transitioning to whatever music is playing in the zone scene. Instead, the specification is completely barren on this issue. The closest disclosure in the specification is the following:

> upon the activation of a saved scene, the process 600 checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. Dkt. 208-2 at 10:56-58.

But this portion only discloses that upon "activation" of a scene, the players are in condition to react in a synchronized manner. It does not describe the behavior of players when added to multiple scenes, and in particular it does not describe that players in "standalone" mode (which is never mentioned in the specification) continue as if they had not been added to any zone scene at all.

1        To the extent Sonos seeks to rely on the provisional application (Ex. 6 (SONOS-SVG2-

2  00033730)) for written description support, that too is insufficient.  Although an "appendix" to the

3  provisional application includes a section titled "What happens to the Music that's already playing

4  when a Zone Scene is started," that section does **not** disclose the claimed method.  Ex. 7 (SONOS-

5  SVG2-00167534) at 537.  Rather, the provisional appendix teaches that "if music is playing in one

6  or more zones there are several possibilities (TBD)," showing that this was an issue the inventors

7  **considered** but was still "to be determined" at the time of filing the application.  *Id*.  The three

8  options discussed in that section for how to handle what happens to a player that is already playing

9  music when a zone scene is started are different from what Sonos claimed some 16 years later when

10  the '885 patent was modified during prosecution.

11        The first option given in the provisional appendix is that "the music will stop in any room

12  that is part of the Zone Scene."  *Id*.  This is irrelevant because Sonos did not claim this option.  The

13  second option is that the "user gets to choose from which of the ;joining' [*sic*] Queues the new zone

14  group should play."  *Id*.  Sonos did not claim this option either; in the claims, the user is not given

15  any option as to what the zone scene should play.  The third option given in the provisional appendix

16  is that "[i]n the case where only one of the zones in the new group was playing music, the new group

17  should take the music (and Queue) of that zone."  *Id*.  That too is different from what is claimed in

18  the '885 Patent.  The claims describe a situation where the newly-added zone player will continue

19  playing music in standalone mode until it is overridden by an "invocation" of the zone scene.  The

20  claims do not cover the situation where only one of the zone players is playing media and upon

21  invocation of the zone scene all players start playing that same media.

22        Sonos's failure to describe these two critical limitations reveals a fatal problem with the

23  patents-in-suit: by stretching its claims to cover technologies far removed from the original

24  disclosure, Sonos has fundamentally failed to "convey[] to those skilled in the art that the inventor

25  had possession of the claimed subject matter as of the filing date."  *Realtime Data, LLC v. Morgan

26  Stanley*, 554 F. App'x 923, 937 (Fed. Cir. 2014) (affirming summary judgment of invalidity for lack

27  of written description where patent "contain[ed] limited language and no descriptive content and

28  hence fail[ed] to show that Realtime invented or had possession of content-based or content-

dependent data decompression"); *see also Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 917 (Fed. Cir. 2004) (affirming summary judgment of no written description and noting that a "patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification," because "[a]fter all, it is in the patent specification where the written description requirement must be met."). Here, the specification and provisional appendix at best disclose generic speaker grouping or how to handle particular (unclaimed) situations upon invoking a zone scene. The specification does not disclose "the same" solution that is claimed, and merely rendering the claimed solution obvious is insufficient. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious."). Because the inventors were not in possession of the specific implementation claimed at the time of patenting, the Court should hold the claims invalid for failing the written description requirement.

The reason Sonos's claim lacks written description support may be because Sonos drafted its new claim, thirteen years after the claimed priority date, to read on Google's products. In June 2014, Google engineers made a confidential presentation to Sonos that revealed their work supporting overlapping speaker groups. As shown in this presentation below,



This is the overlapping player functionality that Sonos belatedly claimed without disclosing in its 2006 patent application:

Ex. 8 (GOOG-SONOSNDCA-00056732) at 756.  In fact, Google even revealed to Sonos during that same confidential meeting that ███████████████████████████████████████ ██████████████████████████████████████████████:

███████████████████████████████████████████████████████████████████████████████████

*Id.* at 761 (highlighted).  In Google's illustration, ████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ████████████████████  *Id.*  Sonos clearly attempted to mimic Google's proposal in its claims with its belated addition of "transitioning" the "standalone" first zone player to one of the zone scenes.  In fact, Sonos cites to this very same presentation to allege that Google infringes Sonos's patent.  Sonos Br. at 17-18; Ex. I.  As described *supra*, although there is no infringement of the asserted claims for other reasons, this is yet another feature Sonos took from Google and improperly tried to use against it.  *See* Dkt. 210-15 at 4 (describing violations of the collaboration agreement).

Sonos has moved, over the course of 13 years, from attempting to claim the general usage of zone scenes in a speaker system to claiming a very specific process for combining speaker groups, but the inventors were never in possession of that specific process, as the specification reveals. Indeed, as shown above, it was Google that possessed the particular ideas of multizone groups and overriding a previous cast, not Sonos.  The Court should find that the asserted claim lacks an adequate written description and deny Sonos's motion on that basis.

## IV.   CONCLUSION

For the foregoing reasons, the accused products do not infringe the asserted claim, and that claim is invalid which precludes a finding of liability on infringement.  Accordingly, the Court should deny Sonos's motion.

1

2

DATED:  May 5, 2022

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

4

By _____/s/ Charles K. Verhoeven_____

5

Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
Lindsay Cooper (Bar No. 287125)
lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

6

7

8

9

10

11

*Attorneys for GOOGLE, LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE

1

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on May 5, 2022, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system and email.


                                            */s/ Charles K. Verhoeven*
                                            Charles K. Verhoeven

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE
COURT'S PATENT SHOWDOWN PROCEDURE