1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
   croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
   acaridis@orrick.com
4  EVAN D. BREWER (STATE BAR NO. 304411)
   ebrewer@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
6  405 Howard Street
   San Francisco, CA 94105-2669
7  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
8
   SEAN M. SULLIVAN (*pro hac* vice)
9  sullivan@ls3ip.com
   MICHAEL P. BOYEA (*pro hac* vice)
10 boyea@ls3ip.com
   COLE B. RICHTER (*pro hac* vice)
11 richter@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
12 656 W Randolph St., Floor 5W
   Chicago, IL 60661
13 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
14
   *Attorneys for Sonos, Inc.*
15

16                  UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18                    SAN FRANCISCO DIVISION

19 GOOGLE LLC,                          | Case No. 3:20-cv-06754-WHA
                                         | Related to Case No. 3:21-cv-07559-WHA
20         Plaintiff and Counter-defendant,
                                         | **SONOS, INC.'S OPPOSITION TO**
21 v.                                    | **GOOGLE'S MOTION FOR SUMMARY**
                                         | **JUDGMENT PURSUANT TO THE**
22 SONOS, INC.,                          | **COURT'S PATENT SHOWDOWN**
                                         | **PROCEDURE**
23         Defendant and Counter-claimant.
                                         | Date: June 9, 2022
24                                       | Time: 8:00 a.m.
25                                       | Place: Courtroom 12, 19th Floor
                                         | Judge: Hon. William Alsup
26
                                         | Complaint Filed: September 28, 2020
27

28              **PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ............................................................................................................ 1

II.  LEGAL STANDARD .................................................................................................... 1

III.  ARGUMENT ................................................................................................................. 2

    A.  Google Infringes Claim 13 of the '615 Patent ................................................... 2

        1.  Casting Involves a "Local Playback Queue" on the Receiver ................. 2

            a.  Casting YouTube Involves a "Local Playback Queue" ................... 3

            b.  Casting GPM Involved a "Local Playback Queue" ........................... 7

            c.  Google's "Queue" Arguments Fail ................................................. 8

        2.  "Multimedia Files" Need Not Be Added to a "Playback Queue" .......... 10

        3.  Casting YouTube Adds "Resource Locators" .................................... 11

    B.  Claim 13 of the '615 Patent Is Not Invalid Over the Alleged Prior Art ...................... 13

        1.  Overview of Google's YTR App ....................................................... 14

         2.  The YTR App Does Not Anticipate Claim 13 ...................................... 15

            a.  The YTR App Does Not Disclose Limitation 13.2.......................... 15

            b.  The YTR App Does Not Disclose Limitation 13.4.......................... 16

            c.  Google Failed to Prove YTR Discloses Limitations 13.5-13.6 ...................... 18

        3.  The YTR App Does Not Render Obvious Claim 13........................... 18

    C.  Google Infringes Claim 1 of the '885 Patent ............................................... 23

IV.  CONCLUSION ........................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
5    694 F.3d 1312 (Fed. Cir. 2012) .......................................................................................... 22

6

*ACTV, Inc. v. Walt Disney Co.*,
7    346 F.3d 1082 (Fed. Cir. 2003) .......................................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
8    477 U.S. 242 (1986) .............................................................................................................. 1

9

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
10    967 F.3d 1353 (Fed. Cir. 2020) ............................................................................................ 6

11

*Callaway Golf Co. v. Acushnet Co.*,
     Case No. 06-CV-091, 2007 WL 4326776 (D. Del. Dec. 4, 2007) ...................................... 23

12

*Eko Brands, LLC v. Adrian Rivera Maynez Enter., Inc.*,
13    946 F.3d 1367 (Fed. Cir. 2020) .......................................................................................... 24

14

*EMC Corp. v. Pure Storage, Inc.*,
15    154 F. Supp. 3d 81 (D. Del. 2016) ...................................................................................... 13

16

*EMI Grp. N. Am., Inc. v. Intel Corp.*,
17    157 F.3d 887 (Fed. Cir. 1998) ............................................................................................ 13

*Finjan, Inc. v. Secure Computing Corp.*,
18    626 F.3d 1197 (Fed. Cir. 2010) .................................................................................... 23, 24

19

*Griffin v. Bertina*,
20    285 F.3d 1029 (Fed. Cir. 2002) .......................................................................................... 10

21

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
     385 F.3d 1360 (Fed. Cir. 2004) ............................................................................................ 6

22

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
23    946 F.2d 821 (Fed. Cir. 1991) .............................................................................................. 6

24

*Juicy Whip, Inc., v. Orange Bang, Inc.*,
25    292 F.3d 728 (Fed. Cir. 2002) ............................................................................................ 18

26

*Miles Labs., Inc. v. Shandon Inc.*,
     997 F.2d 870 (Fed. Cir. 1993) .............................................................................................. 6

27

*In re Robertson*,
28    169 F.3d 743 (Fed. Cir. 1999) ............................................................................................ 17

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
    727 F.2d 1540 (Fed. Cir. 1984) ................................................................................. 25

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ...................................................................................... 1

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002) ................................................................................. 18

**Other Authorities**

MPEP § 2111.03 ................................................................................................................ 10

## I.    **INTRODUCTION**

Google's motion for summary judgment should be denied because Google infringes claim 13 of the '615 Patent and claim 1 of the '885 Patent and Google has not met its burden to demonstrate that claim 13 of the '615 Patent is invalid or because, at a minimum, there are material issues of fact in dispute regarding infringement and validity.

Google's summary of the parties' collaboration is irrelevant to summary judgment and inaccurate.  Google reached out to Sonos in 2011 inquiring about Sonos's technology.  Google reached out to Sonos again in June 2013 inquiring as to Sonos's willingness to collaborate on a set of projects.  Prior to collaborating with Sonos, Google had not considered using a cloud to maintain a playback queue and did not have an implementation of such a feature.  But this was not a new idea to Sonos.  Years before, Sonos had already conceived of using the cloud to maintain a playback queue and had already described the idea in independent patent filings in 2011, 2012, and 2013 (all prior to the collaboration with Google), including the very filing from which the '615 and '033 Patents claim priority.  Thus, it is inconceivable for Google to argue that Sonos misappropriated anything from Google in June 2013.  To the contrary, while Sonos and Google collaborated, Google secretly worked to undermine this collaboration by incorporating features (including Sonos-patented features) into new products that would compete with the very product on which the parties were collaborating.

Threaded throughout Google's motion is the false premise that a multi-device system can have either a "cloud queue" or a "local playback queue" but not both.  This is not true, as demonstrated by Google's own admissions.  In truth, Google has invented this false dichotomy to distract from its infringing functionality and push its false misappropriation tale.

## II.    **LEGAL STANDARD**

Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, "the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

1    **III.    ARGUMENT**

2        **A.    Google Infringes Claim 13 of the '615 Patent**

3        Claim 13 of the '615 Patent is directed to a computer-readable storage medium with

4   executable instructions that enable a "control device"[1] to perform recited functions for transferring

5   media playback from the "control device" to a "playback device."   Sonos accuses Google of

6   infringement for providing "control devices" (e.g., smart phones, tablets, etc.) provisioned with any

7   of (i) the YouTube, YouTube Music, YouTube Kids, or YouTube TV apps (collectively, "the

8   YouTube apps") or (ii) the GPM app.   Google often refers to these devices as "Senders." Ex. 1,

9   ¶¶48-49. Each Sender is provisioned with the accused "Cast" technology that enables it to transfer

10  media playback responsibility from itself to a Cast-enabled media player (i.e., "playback device"),

11  which Google typically refers to as a "Receiver" or "Cast Device." *Id.*

12       Google argues that it does not infringe '615 claim 13 because its YouTube and GPM apps

13  fail to satisfy limitation 13.5(a), which recites "causing one or more first cloud servers to add

14  multimedia content to a local playback queue on the particular playback device" by adding "one or

15  more resource locators corresponding to respective locations of the multimedia content at one or

16  more second cloud servers of a streaming content service."   In short, Google argues that its

17  Receivers do not have a "local playback queue" and do not have a queue with "multimedia content"

18  or "resource locators."   As explained below, Google's arguments are without merit, and at the very

19  least, there are genuine issues of fact regarding these arguments that precludes summary judgment.

20           **1.    Casting Involves a "Local Playback Queue" on the Receiver**

21       Contrary to its attorneys' arguments here, Google has routinely admitted that a Receiver

22  has a local queue that dictates its playback when in a Cast session.   For example,

23

24

25

26

27

---

28

[1] Sonos refers to the claim limitations herein according to Google's labeling.
[2] All emphasis has been added herein unless otherwise noted.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1

2

3          Consistent with Google's internal recognition, Google publicly describes a

4  Receiver as maintaining a playback queue. *See, e.g.*, Ex. 5, 66 ("The ***Receiver SDK maintains the***

5  ***queue*** and responds to operations on the queue as long as the queue has at least one item currently

6  active (playing or paused)."); Ex. 6, 82 ("Cast utilizes … ***receiver-implemented queueing***.").

7          As noted in the above admissions, the Receiver's local queue is kept in sync with a "remote

8  queue" stored in the cloud (or "cloud queue") by virtue of the Receiver retrieving or loading

9  segments of the remote queue into its local queue.

10

11          Ex. 5, 66 ("The ***receiver maintains a session for queue items*** until the last item

12  completes playback … or until a sender ***loads a new queue on the receiver***."); Ex. 8, 74 (explaining

13  that Cast's "[q]ueuing" functionality provides "[s]upport of Google's … cloud queue

14  implementation so externally stored and created ***queue*** can be ***directly loaded into Cast devices***.").

15

16

17

18

19

20

21

22          **a.     Casting YouTube Involves a "Local Playback Queue"**

23      To initiate a Cast session with a Receiver,

24

25

26

27

28

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA



More specifically, according to its plain and ordinary meaning, a "local playback queue" is a data

construct on the playback device that can contain one or more resource locators (e.g., ,

each corresponding to multimedia content (e.g., a particular song or video) that the playback device

1   is to playback. *Id*. ███████████████████████████████████

2   ███████████████████████████████████████████████████████

3   ███████████████████████████████. As such, Google itself recognizing that its

4   Receiver has a local queue, as discussed above, is not surprising. *Supra* §III.A.1.

5   To avoid this conclusion, Google argues that a "playback queue" is limited to an "ordered

6   list of multimedia items selected by the user for playback."[3]  Yet, even under this erroneous

7   construction, the "playback queue" of limitation 13.5(a) is still satisfied.

8   ███████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ██████████████████████████████████████████████

23  ███████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████

26  ████████████████████  As an initial matter, Google incorrectly contends that Sonos

27  surrendered any right to equivalents of the "playback queue" merely by virtue of adding the term

28  [3] The evidence demonstrates that Google's proposed construction for "playback queue" is contrary to how Google itself refers to the concept of a playback queue.  Ex. 1, ¶¶73-74.

1    during prosecution.  G.Br., 10-11.  **First**, the amendment had nothing to do with the particular ***form***

2    of the "local playback queue," which is the equivalent in question here.  At most, the surrendered

3    subject matter is any equivalent ***broader*** than the amendment – namely, "causing one or more cloud

4    servers to add multimedia content to a local playback queue on the particular playback device."

5    *See Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed. Cir. 2004) (holding

6    that "plaintiffs have rebutted the Festo presumption that a narrowing amendment made for a reason

7    of patentability surrenders the entire territory between the original claim limitation and the amended

8    claim limitation.").  **Second**, the rationale underlying the amendment bears no more than tangential

9    relation to the equivalent in question here, which relates only to the particular ***form*** of the "playback

10   queue."  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1365-66 (Fed. Cir. 2020)

11   (affirming finding of no prosecution history estoppel because the claim amendment bears no more

12   than tangential relation to the alleged equivalent).  In fact, in making the amendment, Sonos made

13   no statement or prior-art distinction regarding the "playback queue."



18   Indeed, "[t]o allow [Google] to escape infringement

19   simply because it used separate [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮], as opposed to a single

20   [▮▮▮▮▮▮▮▮▮▮], is the exact type of injustice the doctrine of equivalents prevents."  *See*

21   *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed. Cir. 1993); *see also Intel Corp. v. U.S.*

22   *Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("[W]e held that infringement under [DoE]

23   may be established even though the accused device requires a number of components to perform

24   functions which the patented invention achieves by use of one component.").



### b.   Casting GPM Involved a "Local Playback Queue"

Because the details of how a Sender Casts YouTube to a Receiver differ from how a Sender Casts GPM to a Receiver, Google makes a similar, but not identical, argument for non-infringement with respect to GPM.  Google's GPM argument fares no better than its YouTube argument.

To initiate a Cast session with a Receiver,



### c. Google's "Queue" Arguments Fail

Despite the clear recognition by Google itself, Google's attorneys throw out a variety of arguments as to why Casting does not involve a queue on the Receiver, all of which fail or at least demonstrate genuine issues of material facts, thereby precluding summary judgment.

**First**, at the core of Google's argument is the false premise that a "local playback queue" and a "cloud queue" are mutually exclusive.  G.Br., 1, 3-7, 13-15.  In other words, Google incorrectly contends that a "playback queue" can only exist at one device in a multi-device system. The flaw in this premise is clear from the '615 Patent and Google's own words. Ex. 1, ¶88.

There is nothing in claim 13 that precludes the possibility that some other queue might exist in the system beyond the claimed "local playback queue." *Id.*, ¶89.  In fact, the '615 Patent makes it clear that multiple devices in a system can share a queue such that each of multiple devices can maintain a respective copy of the queue (or some portion thereof). *Id.*, ¶¶90-92.  For instance, the '615 Patent describes embodiments where (i) a playback device's "local playback queue" is kept "synchronized" with an "application-specific queue" maintained at a control device ('615 Pat., 16:20-31), (ii) a playback device "periodically fetches a short list of tracks to play next" from an "application-specific queue" that are then loaded into the playback device's "local playback queue" (*id.*, 16:63-17:1), and (iii) a playback device's "local playback queue" and a control device's "application-specific queue" are synchronized to a "shared queue [ ] provided between" the two (e.g., a queue in the cloud). *Id.*, 16:63-17:4.

As discussed before, despite Google's YouTube and GPM implementations utilizing a "cloud queue," Google itself describes multiple devices within its system as sharing a queue much like the '615 Patent's teachings. *Supra* §III.A.1.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1   **Second**, for YouTube, Google asserts that a Receiver only ███████████████

2   ██████████ and thus, does not have a local queue.  G.Br., 5; *id.*, 1, 7.  This assertion is contradicted

3   by the evidence. ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████████

7   ██████████████████████████████████

8   **Third**, for both YouTube and GPM, Google argues that, by virtue of there being a cloud

9   queue, the Receiver does not locally store the "**complete**" set of the media items that the Receiver

10  is scheduled to playback and thus, cannot have a "local playback queue."  *See* G.Br., 8-9, 15.  But

11  this implied requirement is contrary to the '615 Patent that, for example, explains that a playback

12  device "periodically fetches a short list of tracks" from a queue maintained at another device that

13  are then loaded into the playback device's "local playback queue."  Ex. 1, ¶¶97-98.  Google's

14  "complete" requirement is also contrary to how Google itself describes the different queues that

15  exist alongside the cloud queue in its own system.  *Id.*, ¶¶54-57, 99.

16  **Fourth**, Google argues that the claimed "playback queue" must be able to be "managed and

17  edited by the user" and "[t]he local variables that Sonos accuses cannot" (G.Br., 8-9).  This is

18  another limitation Google is reading into "playback queue" (no such requirement is found in the

19  claims or patents), and also a red herring.  While Casting, a user can indisputably "manage" the

20  queue via the Sender in various ways, including modifying what media item the Receiver is to play

21  next. Ex. 1, ¶¶103-107. ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████   At least in this

23  way, the Receiver's "local playback queue" can be managed by the user.

24  **Fifth**, for YouTube, Google argues that the ████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████

26  ███████████████████████   Neither point is correct.   ███████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████████



*Sixth*, for YouTube, Google incorrectly suggests that

### 2.    "Multimedia Files" Need Not Be Added to a "Playback Queue"

Google uses another false premise to support its non-infringement position by contending that "add[ing] multimedia content to a local playback queue" must involve adding a "multimedia file." G.Br., 4, 11-12, 15.  To make this argument, Google distorts the plain language of limitation 13.5(a) – "causing one or more first cloud servers to add multimedia content to a local playback queue … , **wherein** adding the multimedia content to the local playback queue **comprises** the one or more first cloud servers adding, to the local playback queue, one or more resource locators" – in a manner contrary to how any POSITA would interpret it.  Ex. 1, ¶¶111-17.

Limitation 13.5(a) follows a standard claim-drafting convention in which the "wherein" clause specifies ***how*** the "one or more first cloud servers" are to "add multimedia content to a local playback queue."  *Id.*, ¶113.  The "wherein" clause explains that "add[ing] multimedia content to a local playback queue" means, and is characterized by, "adding, to the local playback queue, one or more *resource locators*."  *See, e.g.*, *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) ("Each 'wherein' clause … giv[es] meaning and purpose to the [claimed functions].");  MPEP § 2111.03

---

[4] Google's suggestion that a recommended media item is not "selected by the user" (G.Br., 9) is misplaced because such a media item is identified by Google's service based on the user's selection and thus, is indirectly "selected by the user." Ex. 1, ¶79.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    ("[T]ransitional term 'comprising' … is synonymous with … 'characterized by[.]'").

2    Moreover, when viewing claim 13 as a whole, no POSITA would interpret limitation

3    13.5(a) as Google does because it would result in non-sensical redundancy.  Ex. 1, ¶114.  In this

4    regard, limitation 13.6 later recites "the particular playback device ***retrieving the multimedia***

5    ***content from one or more second cloud servers*** of a streaming content service and playing back

6    the retrieved multimedia content."  A POSITA would readily appreciate that, if "adding the

7    multimedia content to the local playback queue" of limitation 13.5(a) was interpreted to require

8    adding one or more multimedia files to the "local playback queue on the particular playback device"

9    as Google claims, there would be no need for the "playback device" to "retriev[e] the multimedia

10   content ***from one or more second cloud servers***," as required by limitation 13.6, because it would

11   already have the multimedia content locally in its "playback queue."  *Id*.  Thus, Google's

12   interpretation is contrary to the plain meaning that a POSITA would ascribe to limitation 13.5(a).[5]

13   The '615 specification and file history also demonstrate that Google's interpretation is

14   contrary to the plain and ordinary meaning.  *Id.*, ¶¶115-16.  In this regard, the '615 Patent

15   demonstrates to a POSITA that a "resource locator," such as a URL or other identification, is first

16   added to the playback device's "playback queue" before it retrieves the music corresponding to the

17   "resource locator," which is exactly what limitations 13.5(a) and 13.6 recite.  *See, e.g.*, '615 Pat.,

18   11:62-12:3, 12:53-63.  In fact, in the '615 file history, Sonos explained to the USPTO that limitation

19   13.5(a) "recite[s] 'causing one or more first cloud servers to add the multimedia content to a local

20   playback queue on the particular playback device' ***by 'adding***, to the local playback queue, one or

21   more resource locators ….'"  D.I. 185-8, App'x B, 4 (original emphasis omitted).

22   Thus, Google's non-infringement argument for both the YouTube apps and the GPM app

23   premised on the assertion that limitation 13.5(a) requires adding a "multimedia file" to the "*local*

24   *playback queue*" is contrary to the intrinsic evidence and thus, fails.

**3.    Casting YouTube Adds "Resource Locators"**

26   Limitation 13.5(a) specifies that "adding the multimedia content to the local playback

27   queue" is accomplished by adding "one or more resource locators …."  Google raises a specific

28   ───────────────

[5] Google's discussion of claim 20 is a red herring as that claim merely recites a specific type of
"resource locator" that is added to the "local playback queue." D.I. 184, 18-19; D.I. 202, 13.

1  argument for YouTube: a videoId does not amount to a "resource locator." Google is wrong.



10  *cf. ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1092-

11  93 (Fed. Cir. 2003) (explaining the term "URL" is met "so long as it provides sufficient information

12  for the system to identify a [resource]" and finding "file names that identify specific information

13  stored on … servers" amounted to URLs).  In fact, in its *Markman* brief, Google conceded that

14  information that "point[s], ***indirectly***, to the location of a resource" amounts to a "resource locator"

15  (*see* D.I. 200, 21), which is ***exactly*** what a videoId does.

18  Moreover, the "resource locator" element is satisfied literally, and under DoE, even under

19  Google's overly-narrow construction: an address of a resource on the Internet.



*See EMI Grp. N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 896 (Fed. Cir. 1998) ("Equivalency is not defeated by using an additional step to achieve what the patentee does in one step.").

*See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 96 (D. Del. 2016) (denying non-infringement MSJ because "jury could reasonably conclude that ***returning an index representing the identifier*** either literally satisfies the claim language '***returning the identifier***' or satisfies it under [DoE].").

**B.    Claim 13 of the '615 Patent Is Not Invalid Over the Alleged Prior Art**

To continue the false narrative that it was Google (and not Sonos) who was the innovator, Google concocts an anticipation theory based on an alleged November 9, 2010 version of its own product—the YouTube Remote ("YTR") software app—by blatantly ignoring and/or misinterpreting limitations of claim 13 of the '615 Patent.  When all the limitations are properly considered, it is clear that the YTR app is missing multiple features of the claim.

Recognizing the deficiencies of its anticipation theory, Google then asserts that claim 13 would have nevertheless been obvious over the YTR application in view of an allegedly related Google patent—U.S. Patent No. 9,490,998 (the "'998 Patent")—and various other secondary references that allegedly evidence the "general knowledge" of a POSITA.  But Google's conclusory

and overly simplistic obviousness theories also fail because the secondary references do not disclose many of the features Google relies on them for, and Google's YTR app teaches away from making any such combinations or modifications in the manner Google proposes.

What's more, Google's own development story for the YTR app confirms that there is no anticipation and that claim 13 would not have been obvious at the time of the invention because Google did not allegedly *add* the missing features of claim 13 to a version of the YTR app until *after* the July 15, 2011 invention date.[6]  Moreover, in order to address multiple complex and distinct issues in its motion, Google attempts to circumvent the Court's strict page limits and prove invalidity by focusing on only some, but not all, of the limitations of claim 13, and by not attaching evidence upon which it relies as exhibits.  To prove invalidity, however, Google is required to prove by clear and convincing evidence that *each and every* limitation is disclosed by or rendered obvious over the prior art.  Thus, the Court should deny Google's motion for this reason alone.

Finally, as explained below, there are, at the very least, genuine issues of material fact regarding the validity of '615 claim 13 that preclude the granting of Google's motion.

### 1.    Overview of Google's YTR App

The first version of Google's YTR app was allegedly released on November 9, 2010.  *See* G.Br., 16.  This "beta" version of the YTR app could allegedly be installed on an Android mobile phone and "paired" in a "session" with a TV or computer so that the YTR app could be used to control the playback of videos on such a device.  *See id.*, 18; G.Ex. 1, ¶132; Ex. 1, ¶125-27.

Herein, Sonos refers to a paired TV or computer as a "Leanback Screen."  *Id.*

---

[6] For purposes of summary judgment, Google is not challenging the invention date.  *See* G.Br., 19 n.7; G.Ex. 1, ¶124.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA



**2.     The YTR App Does Not Anticipate Claim 13**

**a.     The YTR App Does Not Disclose Limitation 13.2**

Limitation 13.2 requires "after connecting to a [LAN] via a network interface, identifying playback devices connected to the [LAN]."  The plain language requires the "control device" to not only ***identify*** playback devices, but also to identify playback devices that are connected to the ***same LAN*** as the control device. Ex. 1, ¶146.  Moreover, when read in light of limitation 13.4, limitation 13.2's "identifying" must allow a particular playback device (from the identified playback devices) to be selected via the control device to transfer playback of multimedia from the control device to the particular playback device.  *See id.*  The YTR app does not teach this limitation.



Google is wrong.



does not enable the YTR app to ***identify*** the Leanback Screen in the session, let alone identify the Leanback Screen as being connected to the ***same LAN*** that the YTR device is connected to, as required by limitation 13.2.  *See id.*; Ex. 1, ¶147.

### b.    The YTR App Does Not Disclose Limitation 13.4

The plain language of limitation 13.4 requires at least ***two separate and distinct inputs*** to transfer playback from the control device to a particular playback device, where each input must meet the specific requirements set forth in limitation 13.4's subparts (i) and (ii).  Ex. 1, ¶150.  The YTR app does not teach the two required inputs of this limitation.

According to Google, the YTR app detects the inputs of limitation 13.4 via selection of the "menu" and/or "Connect" buttons shown in the image here.  *See* G.Br., 19.  Again, Google is wrong.



---
[7]

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    Selection of the "menu" button does not meet either of the required inputs at least because

2    it is not a button for transferring playback from the YTR app or a button for selecting a particular

3    playback device to transfer playback to.  Ex. 1, ¶152.  Instead, as shown in the image above, the

4    "menu" button does exactly what its name describes, it simply activates a "menu" on the YTR app,

5    where the "menu" includes a "Refresh," "Switch User," "Search," and "Connect" button.  *Id.*

6    The only other input identified by Google is the input received via selection of the

7    "Connect" button.  *See* G.Br., 19.  However, a ***single*** input via the "Connect" button cannot satisfy

8    the ***two*** separate and distinct inputs of limitation 13.4.  *See In re Robertson*, 169 F.3d 743, 745 (Fed.

9    Cir. 1999) (reversing finding of anticipation because the cited reference only disclosed two of the

10   claimed fastening elements and did not disclose the third claimed fastening element, which "is

11   separate from and in addition to the other mechanical fastening means and performs a different

12   function than they do."); Ex. 1, ¶153.  Thus, the YTR app fails to teach limitation 13.4.

13   Even if a single input could satisfy the two separate and distinct inputs of limitation 13.4 (it

14   cannot), a selection of "Connect" is not "a selection of ***the particular playback device*** from the

15   identified playback devices connected to the [LAN]."  Ex. 1, ¶154.  For instance, as shown in the

16   image above, the "Connect" button does ***not*** provide any indication of ***the particular Leanback***

17   ***Screen*** to transfer multimedia to.

18

19

20

21   Moreover, Google's expert confirms that a selection of the "Connect" button is ***not*** "a

22   selection of ***the particular*** ***playback device*** from the identified playback devices connected to the

23   [LAN]."

24

25

26

27

28

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1  Further, Google's own product development story confirms that the alleged November 9,

2  2010 prior art version of the YTR app is missing features of limitation 13.4.  Specifically, Google

3  acknowledges that it was not until a later ***non-prior art foreign*** version of the YTR app that Google

4  first "released" the ability to "select and control" "individual" Leanback Screens.  *See* G.Br., 20.[8]

5  **c.**     **Google Failed to Prove YTR Discloses Limitations 13.5-13.6**

6  Google fails to meet its burden to prove by clear and convincing evidence that the YTR app

7  discloses limitations 13.5-13.6.

21  Moreover, limitation 13.5 requires the "transferring playback" to include "causing the

22  playback at the control device to be ***stopped***."  However, the November 14, 2010 video relied on

23  by Google does not establish that the media on the YTR device was "stopped."  *See* G.Ex. 1, ¶182.

24  To the contrary, the media on the phone's screen appears to still be in a playback state (albeit

25  paused) after the alleged "transfer" of playback.

26  **3.**     **The YTR App Does Not Render Obvious Claim 13**

27  Google's conclusory and overly simplistic obviousness theories fail for numerous reasons.

28  _____

[8]

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

For instance, contrary to Google's assertions (*see* G.Br., 19-21), the limited evidence Google cites for the '998 Patent, the Tungsten system, the Al-Shaykh Publication, and Sonos's alleged prior art products does not disclose any "inputs to ***transfer playback*** from the control device to a particular playback device," let alone an input in the form of "a selection of the particular playback device from the identified playback devices connected to the [LAN]," as required by limitation 13.4.  *See* Ex. 1, ¶160.  Instead, Google's evidence for these references merely shows that a control device could be used to ***control playback*** on one or more playback devices (e.g., starting or stopping playback) or for ***streaming media content*** from the control device to a playback device.  *Id.*[9]  Thus, a POSITA would not have been motivated to consider the teachings of these alleged prior art references in order to modify the YTR app to include the "inputs to ***transfer playback***" required by limitation 13.4.  *Id.*.  These references do not include such teachings.

Take for example Google's lead obviousness argument based upon the '998 Patent's disclosure at 10:62-11:6.  G.Br., 20.  That disclosure does not mention or suggest "***transferring*** playback" from a "remote control" to a "controlled device."  Ex. 1, ¶171-72.  Consequently, this disclosure does not teach the selection of a particular "controlled device" to ***transfer*** playback to.

Moreover, it is not clear that this disclosure even teaches the ability of a "remote control" to present "controlled devices" in a manner that would allow a user to select a particular "controlled device" for individual control, as Google asserts.  Ex. 1, ¶173;

[redacted]

As another exemplary failure of Google's lead obviousness argument, the '998 Patent does

---

[9] "Transferring playback" from a "control device" to a "particular playback device" as recited in claim 13 is not met by merely streaming media content from a control device to a playback device and/or initiating playback on one or both devices. *See* limitations 13.4-13.6; Ex. 1, ¶160. The control device has to be capable of being in a playback state when it "detect[s] a set of inputs to transfer playback" and thereafter "caus[e] playback to be transferred from the control device to the particular playback device," which includes "causing playback at the control device to be stopped" and "causing the particular playback device to play back the multimedia content." *Id.*

1  not disclose a "control device" "identifying playback devices connected to the [LAN]," as required

2  by limitation 13.2, and thus, cannot make up for the lack of this functionality in the YTR app. *Id.*,

3  ¶175.  While the '998 Patent discloses a ***cloud server*** maintaining and using "unique identifiers"

4  for the "remote control" and "controlled devices" that are paired in a session ('998 Pat., 4:4-58,

5  8:1-10, 17:44-57), the '998 Patent does not disclose anything about the "***remote control***" receiving

6  the "unique identifiers" of the "controlled devices" or otherwise identifying the "controlled

7  devices" based on the "unique identifiers," let alone identifying the "controlled devices" as being

8  connected to the same LAN as the "remote control."  Ex. 1, ¶175.  In fact, the '998 Patent shuns

9  such a disclosure and instead touts a reliance on an intermediary cloud/WAN server—including its

10  maintenance and use of the "unique identifiers"—as enabling the "remote control" and "controlled

11  device[s]" to be paired in a session while "***not need[ing] to be connected to the same [LAN]***, nor

12  in physical proximity to each other."  '998 Pat., 4:51-55; Ex. 1, ¶176.

13       As part of Google's backup obviousness theory, Google points to an alleged 2010 version

14  of Apple AirPlay.  G.Br., 21.  Google's reliance on Apple AirPlay is also misplaced.



26       In addition to the above-described deficiencies based on the teachings (or lack thereof) in

27  Google's secondary references, Google's obviousness theories also fail for many other reasons.

28  For example, the system architecture for the alleged prior art version of the YTR app teaches away

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

from modifying the YTR app in the manner proposed by Google.  Ex. 1, ¶164.  Moreover, at the

very least, the architecture makes such modification more difficult than Google asserts and would

require changes that Google and Dr. Bhattacharjee fail to address in their conclusory analysis.  *Id*.

In this regard, the YTR app taught against detecting

the claimed "selection" required by subpart (ii) of limitation 13.4.  *Id*.

Moreover, in a scenario where a YTR app and multiple Leanback Screens were paired

together in a session (the scenario Google relies on),

Nevertheless, Google asserts that limitation 13.4 was obvious because a POSITA would

have modified the YTR app to allow a user to select and control a particular Leanback Screen in a

session (G.Br., 19-21), but Google has not adequately explained how a POSITA would have

modified the system architecture such that, after multiple Leanback Screens have been paired

together in a session by the WAN-based Lounge Server, the YTR application and/or Lounge Server

would be configured to only control a particular Leanback Screen.  *Id*.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

As yet another exemplary deficiency in Google's obviousness theories, despite the YTR app not disclosing limitation 13.2's "identifying playback devices connected to the local area network" (*supra* III.B.2.a.), Google fails to adequately explain how a POSITA would modify the YTR app to include the missing features of this claim limitation. Ex. 1, ¶168. Instead, Google declares that it would have been obvious without any analysis or support. G.Br., 18-21 (concluding that "[t]he YTR prior art satisfies these limitations [13.2 and 13.4], or they are obvious" but only analyzing obviousness for limitation 13.4); *see also* G.Ex. 1, ¶¶165-166, 173 (concluding it would have been obvious to modify the YTR application to "identify playback devices … on the [LAN]" because this was well known). The mere conclusion that it would have been obvious to modify the YTR app to include the features of limitation 13.2 is insufficient to prove invalidity. *See ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (affirming JMOL overturning obviousness verdict because "the expert's testimony on obviousness was essentially a conclusory statement that a [POSITA] would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions," which "is not sufficient and is fraught with hindsight bias.").

Further, Google's conclusory assertion that modifying the November 9, 2010 version of the YTR app to include the features of limitations 13.2 and 13.4 would have provided an obvious "improve[ment]" that was "straightforward" to implement in the YTR app (G.Br., 21) ignores the YTR system architecture, which, as explained above, both teaches away from Google's proposed modifications and also renders such modifications more complicated than Google posits. Ex. 1, ¶167. This assertion is also contradicted by Google's own development story for the YTR app. *Id.*. Indeed, it took Google **more than a year** – and **after** the '615 Patent's invention date – to modify the YTR app to allegedly allow a user to select a particular Leanback Screen for playback/control. G.Br., 20 (asserting that version of YTR with feature was released by 1/25/2012).

- 22 -                    SONOS'S OPPOSITION TO GOOGLE'S MSJ
                         3:20-CV-06754-WHA

1    Clearly this was not a straightforward improvement. ███████████████████

2    ████████████████████████████████████████████████████

3            Lastly, secondary considerations of non-obviousness for the claimed invention exist (or at

4    a minimum, there is a genuine issue of fact regarding their existence) that undercuts Google's

5    conclusory obviousness argument. Ex. 1, ¶177-79.  Indeed, because Google infringes '615 claim

6    13, evidence such as praise of a Sender that is provisioned with the accused Cast technology has a

7    sufficient nexus to the invention.  *See, e.g., Callaway Golf Co. v. Acushnet Co.*, Case No. 06-CV-

8    091, 2007 WL 4326776, at *1 (D. Del. Dec. 4, 2007) (holding evidence of praise of accused

9    products is admissible where accused products infringed asserted claims).

10           **C.      Google Infringes Claim 1 of the '885 Patent**

11           Google disputes only whether its speaker groups are "zone scenes" under Google's

12   construction of the term.  G.Br., 21-25.  Google raises no noninfringement argument under the

13   proper construction of "zone scene," which tracks the plain claim language: "a previously-saved

14   grouping of zone players that are to be configured for synchronous playback of media when the

15   zone scene is invoked."  *See* D.I. 209.02, 8; *see also* D.I. 126, App. A, 27.

16           As an initial matter, Google's proposed construction, which adopts Judge Albright's prior

17   preliminary oral construction, is not law of the case.  Dkt. 184, 1-3.  It is also incorrect.  *See, e.g.*,

18   *Sonos, Inc. v. Google LLC*, No. 3:21-cv-07559-WHA, D.I. 60, 11-16; *id.*, D.I. 66, 7-8.

19           Regardless, under Google's proposed construction, the Accused Google Players infringe

20   because they are capable of being included in "a previously saved grouping of zone players

21   according to a common theme." ██████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████ A user can name the speaker

24   group according to anything the user desires, including, for example, names that specify a theme

25   like a time of day ("Morning") or an area of the user's home ("Garden").  *See* G.Br. 24; D.I. 209.02,

26   10-11.  These are the ***exact*** types of "themes" contemplated by the '885 Patent.  *Id.*; '885 Pat., 8:47-

27   61, 10:36-41, Fig. 5A.  The Accused Google Players' undisputed capability to be included in

28   previously-saved groups "according to a common theme" establishes infringement.  *See Finjan,*

1  *Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).

2      Because Google cannot prevail under the plain language of the construction it has adopted,

3  Google tries to further limit "according to a common theme" to require an "option to add or change

4  'scene' or 'theme' information" other than a group name, such as "a particular playlist, volume,

5  equalization, or other 'attributes' described in the specification that are consistent with the common

6  theme."  G.Br. 22-23; *see also id.* at 24 (referring to zone scene "settings").  However, such

7  "attributes" (or "'theme' information") – let alone the capability to "add or change" them – are not

8  required by claim 1, even under Google's construction, and cannot be used to avoid infringement.

9  Google's primary support for its new limitation is a passage in the specification explaining that

10  devices "***can*** be configured in a particular scene … where … attributes for the grouping are

11  automatically effectuated."  *Id.*, 24 (emphasis changed); *see also* '885 Pat., 9:20-30 ("[A] zone

12  scene command ***could*** apply [] attributes").  But this is plainly just one example embodiment of a

13  "zone scene," and when describing other "zone scene" embodiments, the specification makes no

14  mention of these other "attributes." *See e.g.*, *id.*, 8:53-67, 10:12-19, Figs. 3A, 5B.  Thus, importing

15  such a requirement into the claims is improper as a matter of law.  *See Eko Brands, LLC v. Adrian*

16  *Rivera Maynez Enter., Inc.*, 946 F.3d 1367, 1372-73 (Fed. Cir. 2020).

17      Google is also wrong to argue that "the specification confirms that 'naming' groups is

18  different from the claimed 'zone scenes.'"  G.Br., 24.  To the contrary, the '885 Patent discloses

19  that a name is one attribute of a "zone scene" that is established during creation of the "zone scene."

20  '885 Pat., 8:52-61, 10:36-43, Figs. 5A, 7-8.  This confirms that naming is a part of "zone scenes,"

21  and that a thematic name satisfies the "according to a common theme" aspect of Google's

22  construction.  Google's related suggestion that a zone scene's name cannot amount to a "common

23  theme" because the '885 Patent discloses thematic names for "conventional" speaker groups (G.Br.,

24  24) is based on a misreading of the patent.  The disclosure Google points to describes the need in

25  the prior art for a better way to group speakers so that a user can listen to audio on a first group in

26  the "morning," a second group in the "evening," and a third group on the "weekend," where those

27  groups have one or more overlapping speakers.  *See* '885 Pat., 2:9-15.  Nothing in that passage

28  discloses if or how the prior art enabled such groups to be named.  Regardless, whether the prior

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1   art allowed a "conventional" group to be named is irrelevant to the question of whether a Google

2   speaker group having a thematic name is "according to a common theme" – which it clearly is.

3       Google's other noninfringement arguments fail as well.  Google contends that Sonos's

4   interpretation of "common theme" is improper because it allegedly depends on what the user is

5   "thinking" during creation of a "zone scene."  G.Br., 23.  This is not true.  As explained, each

6   Accused Google Player infringes under Google's proposed construction because each is capable of

7   being included in previously saved groupings of players that are undisputedly "according to a

8   common theme," such as a speaker group named "Morning" or "Garden."  This infringement is not

9   based on what the user is "thinking" – it is based on the functional capability of the Accused Google

10  Players.  No inquiry into the user's state of mind is needed.

11      Google also argues that it does not infringe because its speaker groups are "merely generic

12  speaker groups, which were well known in speaker systems at the time."  G.Br., 22.  Of course,

13  using "generic" technology is not an infringement defense, but regardless, Google is wrong – "zone

14  scenes" such as Google's speaker groups are far from being "generic" or "well known."[10]  Indeed,

15  Google ignores the key aspects of a Google speaker group that make it a "zone scene" and

16  distinguish it from a "generic speaker group" – namely, that it is a "***previously saved***" grouping of

17  "zone players" that are "to be configured for synchronous playback of media ***when the [Google***

18  ***speaker group] is invoked***."  '885 Pat., cl. 1; D.I. 126, App. A, 27.  This allows an Accused Google

19  Player to be included in a pre-saved speaker group that can be invoked at any future time, and also

20  allows an Accused Google Player to be included in multiple different speaker groups—both of

21  which are features that distinguish "zone scenes" such as Google's speaker groups from "generic

22  speaker groups."  *See, e.g.,* '885 Pat., 1:61-2:17, 8:42-45, 11:51-67; D.I. 209.03, ¶22-25.

23  **IV.    CONCLUSION**

24      For the foregoing reasons, the Court should deny Google's motion for summary judgment.

25

26

27  ───────────────

    [10] Nor would it show that '885 Patent claim 1 is invalid because there are other elements in the

28  claim; a patent claim may have both old and new elements.  *See, e.g., Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed. Cir. 1984) ("[A] combination may be patentable whether it be composed of elements all new, partly new, or all old").

Dated:  May 5, 2022

By:  _/s/ Michael P. Boyea_

CLEMENT SETH ROBERTS
BAS DE BLANK
ALYSSA CARIDIS
EVAN D. BREWER

ORRICK, HERRINGTON & SUTCLIFFE LLP

SEAN M. SULLIVAN (*pro hac* vice)
MICHAEL P. BOYEA (*pro hac* vice)
COLE B. RICHTER (*pro hac* vice)

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Sonos, Inc.*

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA