# EXHIBIT 1

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
COLE RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003

*Attorneys for Defendant Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>      Plaintiff and Counter-defendant,<br><br>      v.<br><br>SONOS, INC.,<br><br>      Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**DECLARATION OF DR. DOUGLAS C. SCHMIDT IN SUPPORT OF SONOS, INC.'S OPPOSITION TO GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE**<br><br>Date: June 9, 2022<br>Time: 8:00 a.m.<br>Place: Courtroom 12, 19th Floor<br>Judge: Hon. William Alsup |

**FILED UNDER SEAL**

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

I, Douglas C. Schmidt, hereby declare as follows:

## I.    INTRODUCTION

1.    I am the Cornelius Vanderbilt Professor of Engineering in the Department of Electrical Engineering and Computer Science at Vanderbilt University in Nashville, TN, where I also serve as the Associate Provost for Research Development and Technologies and the co-Director of the Data Science Institute.  My research spans a broad range of software systems, including distributed object computing, middleware platforms, real-time operating systems, and distributed real-time and embedded systems.  I became a Full Professor with tenure in 2003.

2.    I received my Ph.D. degree in Computer Science from the University of California (UC) Irvine in Irvine, CA in 1994.  I also earned a Master's Degree in Computer Science from UC Irvine in 1990.  I first started programming in 1983 when I was an undergraduate student taking statistics courses.  From 1985 through 1994 I learned how to program in Pascal, C, C++, Ada, Prolog, and Lisp, both at the College of William and Mary and at UC Irvine.

3.    I have been a full-time university professor since 1994.  I was previously a tenured professor at UC Irvine in the Electrical and Computer Engineering department, from 2000 to 2003, and before that at Wash. University in St. Louis, MO in the Computer Science and Engineering department and the Mallinckrodt Institute of Radiology, from 1994 to 1999.  In addition, I served as the Chief Technology Officer and Deputy Director for the Software Engineering Institute (SEI) at Carnegie Mellon University from 2010 to 2012, where I led the SEI's research, development, and operational efforts related to software engineering and cyber-security.

4.    For the past three decades, my research has focused on distributed real-time and embedded (DRE) systems, which has yielded the ACE, Java ACE, TAO, and CIAO middleware frameworks.  The millions of lines of object-oriented code in these frameworks provide layers of infrastructure and distribution middleware that simplify the development of concurrent and networked software apps and services.

5.    Besides my academic and research experience, from 2010 to 2014, I served as a member of the United States Air Force Scientific Advisory Board (SAB), where I was the Vice Chair of the SAB's Cyber Situational Awareness study, which conducted a comprehensive review

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  of the U.S. Air Force's tactics, techniques, and procedures related to secure network-centric

2  mission operations. I also served on the Advisory Board for the U.S. Naval Air Systems Command

3  Future Airborne Capability Environment and was a co-lead of a task force on "Published Open

4  Interfaces and Standards" for the U.S. Navy's Open Systems Architecture initiative.

5      6.    For over 30 years, I have conducted and supervised research projects involving a

6  wide range of software-related topics, including patterns, optimization techniques, and empirical

7  analyses of communication protocol stacks, web servers, and object-oriented middleware

8  frameworks for distributed real-time embedded systems and mobile-/web-based cloud computing

9  applications. I have published 650+ scholarly articles and technical papers, and I am the co-

10 author/editor of 10+ books or book-length manuscripts on topics including software architecture,

11 network programming, object-oriented frameworks, distributed and real-time systems, open-

12 source middleware platforms, and web-/mobile-based cloud computing applications.

13     7.    On top of my research experience, I have decades of hands-on programming

14 experience with a variety of different programming languages. Starting in 1991, I led the

15 development of one of the first C++ object-oriented frameworks for concurrent and networked

16 middleware and applications (ACE). Starting in 1996, I developed one of the first Java object-

17 oriented frameworks for concurrent and networked middleware and applications (Java ACE).

18     8.    Since 1990, I have taught more than 2,500 students in dozens of face-to-face

19 courses on network programming to both undergraduate and graduate students. Since 2013, I have

20 taught mobile cloud computing to more than 400,000 students in online courses, which have

21 focused on technologies like mobile app programming with Android, Java, and JavaScript, as well

22 as programming cloud computing platforms using various web services frameworks.

23     9.    Together with my regular course offerings, over the past 30 years I have also taught

24 600+ short-courses and tutorials on many subjects, including: software design patterns, object-

25 oriented and functional programming; systems programming and network programming for UNIX

26 and Windows; multi-threading and synchronization; concurrent and parallel programming; and

27 various courses on distributed systems, real-time and embedded systems, TCP/IP, web apps and

28 services, compiler construction, algorithms, and data structures.

## II.   SCOPE OF ASSIGNMENT AND INFORMATION CONSIDERED

10.   I have been asked by Sonos, Inc. ("Sonos") to provide my opinions in response to certain non-infringement and invalidity arguments and opinions set forth by Google LLC ("Google") in its motion for summary judgment and by Google's expert Dr. Bhattacharjee in his supporting declaration regarding claim 13 of U.S. Patent 9,967,615 (the "'615 Patent"). I submit this Declaration in support of Sonos's opposition to Google's motion for summary judgment that is scheduled to be filed on May 5, 2022. The hourly rate for my services related to this matter is $550 per hour. My compensation is in no way contingent on the outcome of this action.

11.   The language of claim 13 of the '615 Patent is set forth below with brackets containing Google's labeling of the claim limitations:

[13.0] A tangible, non-transitory computer readable storage medium including instructions for execution by a processor, the instructions, when executed, cause a control device to implement a method comprising:

[13.1] causing a graphical interface to display a control interface including one or more transport controls to control playback by the control device;

[13.2] after connecting to a local area network via a network interface, identifying playback devices connected to the local area network;

[13.3] causing the graphical interface to display a selectable option for transferring playback from the control device;

[13.4] detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network:

[13.5] after detecting the set of inputs to transfer playback from the control device to the particular playback device, causing playback to be transferred from the control device to the particular playback device, wherein transferring playback from the control device to the particular playback device comprises:

(a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service;

3

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

(b) causing playback at the control device to be stopped; and

(c) modifying the one or more transport controls of the control interface to control playback by the playback device; and

**[13.6]** causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content.

12.     I understand that Sonos has accused Google of infringing claim 13 of the '615 Patent by virtue of, for example, making, using, offering to sell, selling, and/or importing in/into the United States computer devices (e.g., smart phones, tablets, smart displays, etc.) provisioned with any of the YouTube, YouTube Kids, YouTube TV, or YouTube Music apps (which I will refer to collectively as the "YouTube apps") or the Google Play Music ("GPM") app.

13.     With respect to infringement, I understand that Google has only disputed limitation 13.5(a).  Thus, the infringement opinions in this Declaration are limited to my evaluation of that specific claim limitation.

14.     In performing my infringement analysis, I started by reviewing (i) the '615 Patent and its file history, (ii) Google's summary judgment motion and Dr. Bhattacharjee's supporting declaration and the other materials cited therein, and (iii) my expert report on claim construction for certain terms found in the '615 Patent that I submitted on February 11, 2022 (Dkt. 185-8; herein my "Claim Construction Report").  I followed that by evaluating the structure and operation of the YouTube apps and the GPM app, which involved a review of Google's source code (both on Google's source code inspection machine and in printed form), internal and publicly available materials, certain of Google's discovery responses in the present case (e.g., Google's Responses to Sonos's Interrogatory Nos. 14-15), and deposition transcripts from this case.  I have also used a Pixel device provisioned with the YouTube apps to Cast to a variety of Google devices and have overseen and directed testing of the YouTube apps within an exemplary Google system (discussed below) to gain a further understanding of the structure and operation of the YouTube apps. Moreover, I reviewed the parties' contentions related to infringement of claim 13 of the '615 Patent, including Sonos's Infringement Contentions relating to '615 claim 13 and Google's

Response to Sonos's Interrogatory No. 12, as it relates to claim 13. After I completed my evaluation of the YouTube apps and the GPM app, I then compared the respective functionality of the YouTube apps and the GPM app to '615 claim 13 to determine whether a computer device provisioned with any of the YouTube apps or the GPM app satisfies the limitations of '615 claim 13 that Google is challenging in its motion for summary judgment.

15. With respect to validity, I understand that Google has asserted that claim 13 of the '615 Patent is anticipated by the YouTube Remote ("YTR") software application (installed on a computer device, such as a mobile phone) or, alternatively, obvious based on the YTR application in view of (i) the general knowledge of a POSITA and/or (ii) U.S. Patent No. 9,490,998 (the "'998 Patent"). Thus, the validity opinions in this Declaration are limited to my evaluation of those specific invalidity contentions.

16. In performing my validity analysis, I started by reviewing (i) the '615 Patent and its file history, (ii) Google's summary judgment motion and Dr. Bhattacharjee's supporting declaration and the other materials cited therein, and (iii) my Claim Construction Report. I followed that by evaluating the alleged prior art references, which involved a review of publicly available materials, as well as internal Google materials. Moreover, I reviewed the parties' contentions related to validity of '615 claim 13, including Google's Invalidity Contentions relating to '615 claim 13 and Sonos's Response to Google's Interrogatory No. 3, as it relates to claim 13.

17. A more detailed identification of the materials that I reviewed while evaluating Google's non-infringement and invalidity positions and formulating my opinions regarding the same can be found in the paragraphs that follow, as well as in Exhibit 1.

III. **SUMMARY OF OPINIONS**

18. Based on my infringement analysis, it is my opinion that each computer device provisioned with any of the YouTube apps or the GPM app literally satisfies limitation 13.5(a) of the '615 Patent. It is also my opinion that, even if either or both of Google's proposed constructions for "*playback queue*" and/or "*resource locator*" was adopted, each computer device provisioned with any of the YouTube apps or the GPM app would still satisfy limitation 13.5(a) literally and under the Doctrine of Equivalents ("DoE").

19.     Based on my invalidity analysis, it is my opinion that Google and its expert Dr. Bhattacharjee have failed to prove that '615 claim 13 is anticipated or rendered obvious by any of the references and/or "general knowledge" of a POSITA identified in Google's motion and Dr. Bhattacharjee's supporting declaration – either considered alone or in combination.

## IV.     LEGAL STANDARDS

### A.     Infringement

20.     I understand that a party directly infringes a patent whenever the party makes, uses, offers to sell, or sells a patented invention in the United States, or imports a patented invention into the United States, without authorization to do so from the patent holder.

21.     I understand that, as the patent holder, it is Sonos's burden to prove direct infringement of '615 claim 13 by a preponderance of evidence.  To do so, Sonos must show that it is more likely than not that a computer device provisioned with one of the YouTube apps or GPM app meets each and every limitation of '615 claim 13 literally or under DoE after being properly construed.  Under DoE, I understand that an aspect of an accused product is equivalent to a limitation of an asserted claim if a POSITA would find the difference between the aspect of the accused product and the limitation of the claim to be insubstantial.  Differences are often considered to be insubstantial if they perform substantially the same function, in substantially the same way, to achieve substantially the same result.

22.     As shown above, '615 claim 13 is directed to a "tangible, non-transitory computer readable storage medium" (i.e., data storage) having "instructions for execution by a processor, the instructions, when executed, cause a control device to implement [the claimed] method" that follows.  I understand that an accused device will meet the functional limitations of an "apparatus" claim structured in this way as long as the accused device is installed with software that makes it *capable* of performing the claimed functions.  In this respect, the accused device need not be connected to a network, placed into a system with other devices, or actually used in a manner that causes the device to perform the claimed functions to meet the functional limitations of the "apparatus" claim.  Thus, it is my understanding that '615 claim 13 is met by a computer device with data storage that is installed with software that is executable by the device's processor and

1  provides the computer device the capability to perform the functional limitations of the claim.

2  **B.    Validity**

3  23.    I understand that a patent claim is presumed valid until proven invalid by clear and

4  convincing evidence.  I understand that the '615 Patent is governed by pre-AIA 35 U.S.C. §§ 102-

5  103 since the '615 Patent's priority date is before March 16, 2013.

6  **a.    Invention and Priority Dates**

7  24.    I understand that a party asserting invalidity based on prior art has the burden of

8  proving by clear and convincing evidence that the material being relied upon by the party qualifies

9  as prior art to a patent at issue.  In assessing whether material qualifies as prior art, I understand

10  that there are two dates with respect to the patent at issue that are important.  The first is the

11  "invention date," which is normally the date on which the inventor first conceived of the invention

12  claimed in the patent at issue (assuming that the inventor was diligent in reducing the invention to

13  practice).  The second is the "priority date" (or "effective filing date"), which is the filing date of

14  the earliest patent application to which the patent at issue is entitled to claim priority.

15  **b.    Qualification as Prior Art**

16  25.    I understand that a reference qualifies as prior art to a patent at issue under 35

17  U.S.C. § 102(a) only if the reference (1) "was known or used by others" in the U.S. before the

18  invention date of the patent at issue, (2) is a patent that issued in the U.S. or a foreign country

19  before the invention date of the patent at issue, or (3) is a printed publication that published in the

20  U.S. or a foreign country before the invention date of the patent at issue.

21  26.    I understand that a reference qualifies as prior art to a patent at issue under 35

22  U.S.C. § 102(b) only if the reference (1) is a patent that issued in the U.S. or a foreign country

23  more than one year before the priority date of the patent at issue, (2) is a printed publication that

24  published more than one year before the priority date of the patent at issue, or (3) was "in public

25  use or on sale" in the U.S. more than one year before the priority date of the patent at issue.

26  27.    I understand that a reference qualifies as prior art to a patent at issue under 35

27  U.S.C. § 102(g) only if the reference was made by another inventor who (1) either (a) reduced the

28  invention to practice in the U.S. before the invention date of the patent at issue or (b) conceived of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the invention in the U.S. before the invention date of the patent at issue and exercised reasonable diligence in reducing the invention to practice after the invention date of the patent at issue and (2) did not abandon, suppress, or conceal the invention.

### c. Anticipation

28.     I understand that a patent claim is "anticipated" and therefore invalid only if a single prior art reference (e.g., published document, publicly available product/system, etc.) disclosed or embodied, either expressly or inherently, each and every element recited in the claim.  I further understand that, to be considered anticipatory, a written prior art reference must be enabling and describe the invention of the claim sufficiently to have placed it in possession of a person of ordinary skill in the art ("POSITA") of the invention.

### d. Obviousness

29.     I understand that a patent claim is "obvious" and thus invalid under 35 U.S.C. §103 only if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious to a POSITA at the time of the invention.

30.     I understand that when a prior art reference is listed on the face of a patent, the prior art reference is presumed to have been considered during prosecution of the patent.  I also understand that when a prior art reference was considered during prosecution of the patent, the party asserting invalidity has an added burden of overcoming the deference that is due to a government agency, such as the United States Patent and Trademark Office ("USPTO"), presumed to have properly done its job in evaluating the prior art reference.

31.     In making an obviousness determination, I understand that there are several factors to consider: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art at the time of the invention; (3) the differences between the claimed invention and the prior art, (4) whether there is a motivation to combine prior art references, and (5) objective evidence of non-obviousness (which is often referred to as "secondary considerations"), such as any commercial success, praise, copying, failure by others, licenses, longstanding need, and unexpected results.

32.     I understand that prior art used to show that a claimed invention is obvious must be "analogous art."  Prior art is analogous art to the claimed invention if (1) it is from the same field

8

of endeavor as the claimed invention or (2) it is reasonably pertinent to the problem faced by the inventor.

33.     I understand that a patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art, whether those references were set forth in a single reference or in a combination of references. Instead, it must have been obvious to combine those elements in the same way as the claimed invention does.

34.     I understand that a single reference may be the basis for finding that a claim is obvious.   When the obviousness determination relies on the combination of two or more references, however, the patent challenger must show that there is a reason, suggestion, or motivation that would lead a POSITA to combine prior art references.

35.     I understand that, when relying on a combination of prior art references, the party asserting invalidity must submit objective evidence as to how and why the prior art references would have been combined to produce the claimed invention.  This analysis typically includes evidence that a POSITA would have had an apparent reason or motivation to combine or modify the prior art in a manner that yields the claimed invention (e.g., a teaching or suggestion in the prior art), as well as evidence that a POSITA would have had a reasonable expectation that the combination would have succeeded.

36.     I also understand that obviousness concerns whether a POSITA not only "could" have made but "would" have been motivated to make a combination or modification of prior art to arrive at the claimed invention.

37.     I understand that when prior art teaches away from the claimed invention, that prior art ordinarily cannot be used to render the claimed invention obvious.  In this regard, I understand that prior art teaches away from the claimed invention when a POSITA would be discouraged from following the path leading to the invention because of the prior art.

38.     I understand that when separate prior art references teach away from one another or present conflicting teachings, these separate prior art references ordinarily cannot be combined to render the claimed invention obvious.  In this respect, I understand that separate prior art

9

references teach away from one another when their combination would negate the original intent of the prior art or would produce a seemingly inoperative device.

39.     I understand that it is improper to rely on hindsight when assessing obviousness. Many true inventions might seem obvious with the benefit of hindsight.  I understand that the obviousness inquiry must be conducted from the standpoint of a POSITA at the time the claimed invention was made.  In this regard, I understand that defining a problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.  What is known today, and what is learned from the teachings and disclosures of the patent itself containing the claim under analysis, should not be considered.  Nor should one use the patent claim as a roadmap to picking out elements of the prior art for combination.

40.     I understand that various secondary considerations (sometimes referred to as objective indicia of non-obviousness) may support a determination of non-obviousness and that such secondary considerations must be considered as part of an obviousness analysis.  I understand that secondary considerations of non-obviousness may include factors such as praise of the invention.

41.     I understand that the evidence of any secondary consideration must have a "nexus" to the claimed invention for the secondary consideration of non-obviousness to be given substantial weight, which means there must be a sufficient connection between the evidence and the claimed invention.

42.     I understand that evidence that the industry or those skilled in the art praised the claimed invention or a product that embodies the claimed invention weighs in favor of non-obviousness.  I understand that one rationale for this principle is that industry participants, especially competitors, are unlikely to praise an obvious advance over the prior art.

## V.      LEVEL OF ORDINARY SKILL IN THE ART

43.     In my Claim Construction Report, I concluded that a POSITA for purposes of the '615 Patent is a person having the equivalent of a four-year degree from an accredited institution (typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience. In forming the opinions set forth herein, I applied this level of ordinary skill in the art, but, my opinions would remain the same even if the level of ordinary skill were slightly different.

## VI.    OVERVIEW OF THE '615 PATENT

44.    The '615 Patent stems from a filing on December 30, 2011 and generally describes a "local playback system" comprising one or more "playback devices" (or "zone players") that connect to a local "data network" (e.g., a home Wi-Fi network) and are capable of playing back multimedia content, such as audio. *See, e.g.*, '615 Patent, 1:13-15, 1:66-2:9, 2:51-3:13, 3:28-31, 5:21-54, 10:64-66, 12:44-67, 16:1-8. In this respect, the '615 Patent discloses that a "playback device" has a "local playback queue" for multimedia that the "playback device" is to playback. *See, e.g., id.*, 16:20-31, 16:53-57, 16:63-17:4. The '615 Patent teaches that the "playback device" contains a resource locator (e.g., a URL, an identifier, or other reference) corresponding to a piece of multimedia content that facilitates the "playback device" accessing that multimedia content for playback, such as from the cloud. *See, e.g., id.*, 11:62-12:3, 12:53-63, 13:31-40, 15:59-67. The '615 Patent also explains that a "playback device" can queue a single piece of multimedia content or multiple pieces of multimedia content for playback, which a POSITA would understand means that the "local playback queue" could contain a single resource locator corresponding to a piece of multimedia content or multiple resource locators corresponding to respective pieces of multimedia content. *See, e.g., id.*, 9:27-31, 10:42-46, 11:65-12:3, 12:49-63, 13:33-40, 15:59-62, 16:63-17:4.

45.    The '615 Patent further describes control devices (e.g., "network-enabled portable devices," such as smart phones) that also connect to the same local "data network" as the "playback devices" and are capable of controlling the operation of the "local playback system" (such a control device is sometimes referred to as a "controller"). *See, e.g., id.*, 3:17-37, 4:53-5:28, FIG. 1.

46.    Each "playback device" and control device can also communicate over a wide-area network, such as to retrieve audio from an Internet-based audio source. *See, e.g., id.*, 5:38-41, 6:64-7:12, 12:44-67, FIG. 6. An illustrative example is shown in Figure 7 of a system architecture including a cloud-based "data network" (e.g., the Internet) and multiple "local playback systems"

11

1   on respective local "data networks" (760, 770).  *See, e.g.*, *id.*, 12:19-43, 16:1-8, FIG. 7.

2   47.   The '615 Patent discloses that control devices and "playback devices" may

3   communicate with one another over a cloud-based "data network" to facilitate transferring

4   playback from one device to another.  For instance, the '615 Patent discloses a variety of situations

5   where a user is listening on his/her personal computing device to music from an Internet-based,

6   music application (e.g., Pandora, Rhapsody, Spotify, etc.) and decides to instead have that

7   playback be transferred to one or more "playback devices" in his/her "local playback system."

8   *See, e.g.*, *id.*, 12:44-13:30.  The example system architecture shown in Figure 7 enables the user's

9   personal computing device to communicate with one or more cloud-based servers to facilitate the

10  transfer of playback from the personal computing device to one or more "playback devices" in a

11  "local playback system."  *See, e.g.*, *id.*, 12:19-43, 15:18-46, 16:1-8, 17:12-20.  The '615 Patent

12  further informs a POSITA that, in some embodiments, a "remote playback queue" may be involved

13  in such a transfer of playback.  *See, e.g.*, *id.*, 13:1-22, 16:63-17:4, 17:12-15, FIG. 7.

14  **VII.   INFRINGEMENT ANALYSIS**

15        **A.   Brief Overview of the Accused Google Instrumentalities**

16  48.   As noted above, Sonos has accused Google of infringing '615 claim 13 in

17  connection with computer devices (e.g., smart phones, tablets, smart displays, etc.) provisioned

18  with (i) any of the YouTube apps or (ii) the Google Play Music (GPM) app.  Google generally

19
20
21
22
23
24
25
26
27

28  49.   In general, a user may be experiencing multimedia playback (e.g., playback of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   videos or songs) at a ███████████ via one of the YouTube apps or the GPM app.  The user can

2   provide inputs at the ██████ that initiate a Cast session with a selected ██████ that is on the same

3   Wi-Fi network as the ███████████████████████████████████████████████████████████████

4

5

6

7

8

9   ███████████████████████████████████████████████████████ Later, I discuss more specific details

10  regarding Casting from one of the YouTube apps versus Casting from the GPM app.

11         **B.     Testing of the YouTube Apps**

12         50.    As noted above, part of my infringement analysis involved overseeing and directing

13  certain testing of the YouTube apps within an exemplary Google system to further understand the

14  structure and operation of the YouTube apps.  In particular, the Google system, which I refer to as

15  the "YouTube Test System," included the following devices that were all communicatively

16  coupled via a Wi-Fi network: (i) a Pixel 6 running Android version 12 provisioned with the

17  YouTube app (version 17.14.35), the YouTube Music app (version 5.02.50), the YouTube Kids

18  app (version 7.12.1), and the YouTube TV app (version 6.14.0); (ii) a Nest Hub Max player

19  running Cast firmware version 1.56.295071, which was named "Nest Hub Max"; and (iii) a Nest

20

21  _____

    [1] In the context of the '615 Patent, the phrase "multimedia item" is synonymous with "media item,"

22  so I may use these phrases interchangeably. *See, e.g.*, '615 Patent, 1:19-21 ("Technological
    advancements have increased the accessibility of music content, as well as other types of media,

23  such as television content, movies, and interactive content."), 2:6-8 ("Music and/or other
    multimedia content can be shared among devices and/or groups of devices ...."), 12:61-63 ("Songs

24  and/or multimedia content can be retrieved from the Internet ...")

25

26

27

28

13

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Audio player running Cast firmware version 1.54.279716, which was named "Nest Audio 1."

51.     Unless I specify otherwise below, the screenshots included herein were captured by the Pixel 6 while operating within the YouTube Test System.  I reserve my right to conduct a demonstration of the functionality of the YouTube Test System and/or to present additional screenshots illustrating the use and testing of the YouTube Test System.

## C.     Response to Dr. Bhattacharjee's Non-Infringement Analysis

52.     The following section sets forth a detailed discussion of my analysis of Dr. Bhattacharjee's non-infringement opinions with regard to '615 claim 13, my own infringement analysis, and the opinions I have reached based on that analysis.

53.     As explained in detail below, it is my opinion that each computer device provisioned with any of the YouTube apps or the GPM app (i) literally satisfies limitation 13.5(a) of the '615 Patent, which is the only limitation that Dr. Bhattacharjee contested, and (ii) satisfies limitation 13.5(a) literally and under DoE even if either or both of Google's proposed constructions for "playback queue" and/or "resource locator" was adopted.

### 1.     Casting Involves a "Local Playback Queue" on the ▮▮▮▮▮▮

54.     Limitation 13.5(a) of the '615 Patent recites "*causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device ....*"[3]  I have seen considerable evidence where Google ▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] For readability and context, I have italicized claim language throughout this Declaration.

[5] Emphasis has been added herein unless I specify otherwise.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

a.   Casting YouTube Involves a "Local Playback Queue"



---

[8] YouTube uses a ▮▮▮▮▮ regardless of whether the multimedia item is a song or video.

16



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

66.     I will provide an example to help describe what this means in practice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

69.     Returning to '615 claim 13, limitation 13.5(a) recites "*causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device ....*" In evaluating whether this element is satisfied, I applied the plain and ordinary meaning to the term "*local playback queue*" in the context of the '615 Patent: a data construct[17] on the playback device that can contain one or more resource locators (e.g., ▮▮▮▮▮ URLs, or other resource locators), where each resource locator corresponds to multimedia content (e.g., a particular song or video) that the playback device is to playback. *See* Dkt. 185-8, ¶59.

70.     It is my opinion that the "*local playback queue*" element is satisfied because, when

71.     It is also my opinion that the "*local playback queue*" element is satisfied because,

---

[17] As I explained in my Claim Construction Report, a data construct can take the form of a single data variable, multiple data variables, a data array, or other data structure. *See* Dkt. 185-8, ¶58.

21

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

72.     To avoid this conclusion, Dr. Bhattacharjee agrees with the construction that Google advanced for "*playback queue*" – an ordered list of multimedia items that is selected by the user for playback – and contends that YouTube fails to meet this construction. *See, e.g.*, Bhatta. Decl., ¶68. Yet, even under this erroneous construction, it is my opinion that the "*playback queue*" of limitation 13.5(a) is still satisfied.

73.     As an initial matter, I set forth in detail in my Claim Construction Report why I disagree with Google's proposed construction for "*playback queue*" (Dkt. 185-8, ¶¶41-95), but it is notable that I have seen plenty of evidence that Google's proposed construction is contrary to how Google itself refers to the concept of a playback queue.  For example, despite Google's construction requiring plural "multimedia items,"

74.     As another example, despite Google's construction limiting a queue to items "selected by the user for playback," I have seen

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

In fact, a POSITA would recognize the difference to be nothing more than an implementation detail of how to achieve a playback queue rather than a functional difference.

23

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

78. Returning to Google's proposed construction, it is also my opinion that (i) the █████████████████████████████████████████ both satisfy the "selected by the user for playback" aspect of Google's construction.

80. As another example, as I explained before, the YouTube, YouTube Music, and YouTube Kids apps allow a user to select a collection of media items for playback. *Supra* ¶59. In such a scenario, ███████████████████████████████████████████████████████████ ██████████████████ Thus, each █████ installed with any of the YouTube, YouTube Music,

---

[20] Dr. Bhattacharjee did not dispute that ███████████████████████████████████ ███████████████████████████████ amounts to being "selected by the user for playback" in Google's construction, which makes sense given Google's own words describing a queue in its system. *Supra* ¶¶73-74.

or YouTube Kids apps literally satisfies the "*local playback queue*" element under Google's construction for this additional reason.

81.     For at least the above reasons, it is my opinion that YouTube satisfies the "*local playback queue*" element even under Google's proposed construction.

### b.  Casting GPM Involved a "Local Playback Queue"

82.     GPM was discontinued, but I understand that a

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

86.     It is my opinion that GPM satisfied the "*local playback queue*" element under the plain and ordinary meaning of that term and under Google's construction because, when

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

thereby amounting to a "*local playback queue*."

### 2.     Dr. Bhattacharjee's "Queue" Arguments Fail

87.     Dr. Bhattacharjee provides a host of arguments to support his opinion that neither Casting YouTube nor Casting GPM involves a "*local playback queue*," but each argument fails.

#### a.     A "Local Playback Queue" & "Cloud Queue" Are Not Mutually Exclusive

88.     For both YouTube and GPM, at the core of Dr. Bhattacharjee's opinions is the faulty premise that a "*local playback queue*" and a "Cloud Queue" are mutually exclusive. *See, e.g.*, Bhatta. Decl., ¶¶63-66, 83, 113-20.  In other words, Dr. Bhattacharjee contends that a queue can only exist at one device in a multi-device system, such as Google's system and the system disclosed in the '615 Patent.  I disagree for several reasons.

89.     *First*, I see nothing in claim 13 that precludes the possibility that some other queue (e.g., a cloud queue) might exist in the system beyond the claimed "*local playback queue*."

90.     *Second*, the '615 Patent contradicts Dr. Bhattacharjee's position and explains that multiple devices within the system can maintain a respective copy of a queue, where each respective queue copy contains all (or some portion) of the resource locators that correspond to what content is to be played back by at least one device within the system.  In this way, multiple devices can share a playback queue.  For example, the '615 Patent discloses that a playback device's "local playback queue" is kept "synchronized" with an "application-specific queue" maintained at a control device.  '615 Patent, 16:20-31:

> [T]he third party application not only tells the local playback system what to play, but also maintains two-way communication with the local playback (e.g., Sonos™) system. Two-way communication helps enable features such as keeping a *local playback queue* synchronized with a *queue* that the user is editing/managing *in the third party application*[.]

27

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

91.     As another example, the '615 Patent describes how a playback device "periodically fetches a short list of tracks" from an "application-specific queue" that are then loaded into the playback device's "local playback queue." *See id.*, 16:63-17:1:

> Certain embodiments allow a third party application to *override* a *local playback queue* with its own *application-specific queue*. The local playback system periodically fetches a short list of tracks to play next. The list of tracks to play is determined by the third-party application, for example.

92.     As yet another example, the '615 Patent describes implementations in which a playback device's "local playback queue" and a control device's "application-specific queue" are synchronized to a "shared queue [ ] provided between" the two (e.g., a queue in the cloud). *See id.*, 16:63-17:4:

> Certain embodiments allow a third party application to override a *local playback queue* with its own *application-specific queue*…. In certain embodiments, a *shared queue* is provided between the local playback system and the third party application to keep the local system and application synchronized.

93.     ***Third***, as I explained before, Google's own documents describe multiple devices within Google's system sharing a queue much like the '615 Patent's teachings. *Supra* ¶¶54-57. In this way, Google's own words confirm that, although Casting involves cloud servers maintaining a queue (what Google is referring to as a "Cloud Queue"), the ███████████████ each maintains its own copy of the queue with at least some portion of the Cloud Queue's contents.

94.     For at least these reasons, I disagree with Dr. Bhattacharjee's starting premise that a "Cloud Queue" and "*local playback queue*" are mutually exclusive and therefore, find Dr. Bhattacharjee's opinions to be fatally flawed.

        **b.**   ██████████████████████████████████

95.     For both YouTube and GPM, Dr. Bhattacharjee argues that a ██████████████████ ████████████████████████████████████████████████████████████████ Bhatta. Decl., ¶¶83, 120.  He is wrong.

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

### c. A "Playback Queue" Need Not Include "All" Items

97.     For both YouTube and GPM, Dr. Bhattacharjee argues that a Receiver must store ████████████████████████████████████████ to have the claimed "*playback queue*." *See, e.g.*, Bhatta. Decl., ¶¶68, 72, 74, 115, 118. His position is another false premise contradicted by the '615 Patent itself and Google's own words.

98.     As noted before, the '615 Patent teaches that, for example, a playback device "periodically fetches a short list of tracks" from a queue maintained at another device that are then loaded into the playback device's "local playback queue." *Supra* ¶¶90-92; '615 Patent, 16:63-17:1.   In this way, a POSITA would readily appreciate that the '615 Patent expressly rejects Dr. Bhattacharjee's premise.

100.     Relatedly, Dr. Bhattacharjee makes an "offline" argument to support his assertion that the ██████████████████████████████████ (Bhatta. Decl., ¶¶74, 89), but this argument is premised again on the false assumption that ████████████████████ ████████████████████████████ to have the claimed "*local playback queue*."   Regardless, even in Dr. Bhattacharjee's hypothetical, ████████████████████████████████████

#### d.   Media Items Need Not Be "Linked Together"

101.   For both YouTube and GPM, Dr. Bhattacharjee argues that none of the accused data constructs amounts to a "*playback queue*" because a "*playback queue*" allegedly has to ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Bhatta. Decl., ¶¶70, 82, 117.

102.   But for the reasons I explained in my Claim Construction Report, I disagree that the '615 Patent limits a "*playback queue*" to any particular data construct, much less one that "link[s] … items in a particular order." *See* Dkt. 185-8, ¶¶74-90.   In my opinion, such a requirement would be immaterial here ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as I explained above – confirms what I articulated in my Claim Construction Report:

> [A] POSITA would have appreciated that a "playback queue" is more about the general concept of defining what is to played back than a singularly defined type of data structure, and thus, a POSITA would have understood that a "playback queue" could be implemented in different ways and take different forms.

Dkt. 185-8, ¶87.

#### e.   A User Can "Manage" a ▮▮▮▮ "Playback Queue"

103.   For both YouTube and GPM, Dr. Bhattacharjee argues that none of the accused data constructs amount to a "*playback queue*" because they are ▮▮▮▮ and a "*playback queue*" allegedly must be able to be "managed" by a user. *See* Bhatta. Decl., ¶¶65, 70, 73, 84, 119.  Dr. Bhattacharjee's argument is flawed for several reasons.

104.   For starters, Dr. Bhattacharjee is reading into the claim term "*playback queue*" yet another limitation that is not required by '615 claim 13 or Google's narrow construction. Regardless, Dr. Bhattacharjee's argument is incorrect for the YouTube and GPM implementations.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY





#### f.  Dr. Bhattacharjee's "Next" ▮▮▮▮▮ Arguments Fail

108.    Lastly, Dr. Bhattacharjee offers several specific arguments with respect to the ▮▮▮▮▮▮▮▮▮▮▮ used in the YouTube context, but none of them are convincing.



**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

### g. "Multimedia File" Need Not Be Added to "Local Playback Queue"

111.    Claim 13 of the '615 Patent more fully recites:

*causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device,* **wherein adding** *the multimedia content to the local playback queue* **comprises** *the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service[.]*

112.    Dr. Bhattacharjee argues that "*adding the multimedia content to the local playback queue*" requires adding "the actual multimedia file or information that is played back" to the "*local playback queue*." Bhatta. Decl., ¶¶90-94. I disagree that a POSITA would interpret claim 13 in this manner for several reasons.

113.    ***First***, it is my opinion that a POSITA reading the plain language of claim 13 would understand that the "wherein" clause specifies ***how*** the "*one or more first cloud servers*" are to "*add multimedia content to a local playback queue*." In this respect, I have been informed that, in patent claims, (i) a "wherein" clause can provide meaning and purpose to a function that the clause modifies and (ii) the transitional phrase "comprising" or "comprises" is synonymous with "including," "containing," or "characterized by." This meaning is exactly what the "wherein" clause does here; it explains to a POSITA the meaning and characteristics of the function of the "*one or more first cloud servers [] add[ing] multimedia content to a local playback queue ....*" Specifically, the "wherein" clause explains that the claimed "*add[ing] multimedia content to a local playback queue*" means, and is characterized by, "*adding, to the local playback queue, one or more resource locators*" (as opposed to adding one or more multimedia files).

114.    ***Second***, it is my opinion that the full context of claim 13 would also lead a POSITA to the inescapable conclusion that the "*one or more first cloud servers [] add multimedia content to a local playback queue*" **by** "*adding … one or more resource locators*" as opposed to adding one or more multimedia files. In particular, after "*causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device,*" claim 13 recites:

*causing the particular playback device to play back the multimedia content, wherein the particular playback device playing back the multimedia content comprises the particular playback device* **retrieving the multimedia content from**

34

**one or more second cloud servers** *of a streaming content service and playing back the retrieved multimedia content*.

A POSITA would readily appreciate that, if "*adding the multimedia content to the local playback queue*" was interpreted as Dr. Bhattacharjee views it to require adding one or more multimedia files to the "*local playback queue on the particular playback device*," there would be no need for the "*playback device*" to "*retriev[e] the multimedia content from one or more second cloud servers of a streaming content service*" because it would already have the multimedia content stored locally in its "*playback queue*." In my opinion, a POSITA would understand that such redundancy is not what the plain language of claim 13 requires.

115.    ***Third***, a POSITA having read the '615 Specification would likewise understand that the claimed "*adding the multimedia content to the local playback queue*" refers to adding one or more "*resource locators*" (such as a URL or some other identification) to the "*local playback queue*," as opposed to adding one or more multimedia files. For instance, the '615 Patent states:

> [E]ach zone player 606, 604, 602 may access the Internet when retrieving media from the cloud (e.g., Internet) via the bridging device. For example, ***zone player 602 may contain a uniform resource locator (URL)*** that specifies an address to a particular audio track in the cloud. ***Using the URL, the zone player 602 may retrieve the audio track from the cloud***, and ultimately play the audio out of one or more zone players.

'615 Patent at 11:62-12:3. Likewise, the '615 Patent states:

> A uniform resource indicator (URI) (e.g., a uniform resource locator (URL)) can be passed to a playback device to fetch content from a cloud and/or other networked source, for example. A playback device, such as a zone player, can fetch content on its own without use of a controller, for example. Once the zone player has ***a URL (or some other identification or address) for a song*** and/or playlist, the zone player can run on its own to ***fetch the content***. Songs and/or other multimedia content can be retrieved from the Internet rather than a local device ….

*Id.* at 12:53-63. These exemplary passages demonstrate to a POSITA that a "*resource locator*" is first added to the playback device's "*playback queue*" before it retrieves the music corresponding to the "*resource locator*," which is what claim 13 recites.

116.    ***Fourth***, the prosecution history confirms that Dr. Bhattacharjee's interpretation is inconsistent with a POSITA's understanding. In this regard, in its August 28, 2017 Office Action Response, Sonos distinguished the Togashi reference's disclosures by arguing that the "wherein"

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

clause modifying "*causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device*" specifies ***how*** the "*one or more first cloud servers*" are to "*add multimedia content to a local playback queue*":

> Instead of requesting a content server to change the destination of the audio content [as in Togashi], Applicant's claims recite a different technique for transferring playback of multimedia content between devices. In particular, Applicant's claims recite "causing one or more first cloud servers to **add the multimedia content** to a local playback queue on the particular playback device" **by "adding,** to the local playback queue, **one or more resource locators** corresponding to respective locations of the multimedia content at the one or more second cloud servers of a streaming content service."

Dkt. 185-8, App'x B at 4 (original emphases omitted).

117.    For at least these reasons, I disagree with Dr. Bhattacharjee's opinion that claim 13 requires adding a multimedia file to the "*local playback queue*." Thus, this cannot serve as a basis for non-infringement. Instead, the claims require "*one or more resource locators*" to be added to the "*local playback queue*," which is met by the accused instrumentalities, as explained below.[25]

**h. Casting YouTube Involves Adding "Resource Locators"**

118.    As noted above, '615 claim 13 specifies that "*adding the multimedia content to the local playback queue*" is accomplished by adding "*one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service*." In evaluating whether this element is satisfied, I applied the plain and ordinary meaning to "*resource locator*" in the context of the '615 Patent: information that enables a device to access a resource. *See* Dkt. 185-8, ¶101. I also applied the plain and ordinary meaning of "*corresponding to*": associated with or related to.

███████████████████████████████████████████████████████████

---

[25] I note that Dr. Bhattacharjee did not make this "multimedia file" argument for GPM, yet I understand that Google did present this argument for GPM in Google's summary judgment motion. Regardless, for the same reasons as I explained in the YouTube context, this "multimedia file" argument cannot serve as a basis for non-infringement in the GPM context.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

120.     Moreover, it is my opinion that the "*resource locator*" element is satisfied even under Google's narrow construction: an address of a resource on the Internet.  For instance, as noted before,

121.     It is my opinion that this functionality would literally satisfy the "*resource locator*" element under Google's construction because

122.     It is also my opinion that this functionality would satisfy the "*resource locator*" element under Google's construction under DoE because there is merely an insubstantial

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1    difference between a

16   **VIII.   VALIDITY ANALYSIS**

17       **A.    Google's Invalidity Theories**

18       123.    As set forth in Dr. Bhattacharjee's declaration, Google asserts that '615 claim 13 is

19   anticipated by the YouTube Remote ("YTR") software application installed on a mobile phone,

20   which Google asserts as "system" prior art. *See* Bhatta. Decl., ¶¶121-23.  Alternatively, Google

21   asserts that '615 claim 13 is obvious based on the YTR application in view of (i) the general

22   knowledge of a POSITA and/or (ii) U.S. Patent No. 9,490,998 (the "'998 Patent").  *Id.*

23       **B.    Invention Date**

24       124.    I have been informed that Sonos has asserted an invention date for the '615 Patent

25   of July 15, 2011.  I note that, for purposes of summary judgment, Google is not challenging the

26   July 15, 2011 invention date. *See id.*, ¶124.

27       **C.    Alleged Prior Art References and State of the Art**

28           **1.    Overview of the YouTube Remote Application**

38

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

125. According to a YouTube press release, a "beta" version of the YTR application for mobile phones running the Android operating system appears to have been released on November 9, 2010. GOOG-SONOS-WDTX-INV-00015413, 13. As explained in the title of the press release, the YTR application could be used to "[c]ontrol YouTube on the desktop, or the TV." *Id.* To enable this functionality, the YTR application "create[d] a virtual connection between your phone and YouTube Leanback" on a "Google TV or computer." *Id.* The connected TV or desktop device was referred to as a "Leanback screen" or just "screen." *Id.* Herein I refer to such as device as a "Leanback Screen."

126. As explained in the press release: "To 'pair' your phone with your Leanback screen, simply sign into YouTube Remote on your Android phone, and to YouTube Leanback on your Google TV or computer with the same YouTube account. Just like that, you've connected your powerful multi-touch Android screen with the biggest screen in your home." *Id.* I understand that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Bhatta.

Decl., ¶¶128, 132.

127. After a "virtual connection" (or "pairing") was established, I understand that a user could then use the YTR application to control playback of videos on the Leanback Screen. GOOG-SONOS-WDTX-INV-00015413, 13-14. To the extent the YTR application could be paired with multiple Leanback Screens in a session, it is my understanding that the same media would be played on ***all*** the Leanback Screens and that the YTR application and/or ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████ *See* Bhatta. Decl., ¶¶140, 144, 158, 160-62; GOOG-

SONOS-WDTX-INV-00015423, 24.

128. As discussed in Video #2 cited by Dr. Bhattacharjee, the connection between a YTR application and a Leanback Screen could be established when a mobile phone installed with the YTR application was connected to a local area network (LAN), such as a home Wi-Fi network, or when it was only connected to a wide area network (WAN), such as a 3G cellular network. *See*

1  Levai Dep. Tr. at 94:2-21; https://www.youtube.com/watch?v=5VFIuR9pJdo (GOOG-

2  SONOSNDCA-00071320), 2:51-3:20 (explaining that a mobile phone running YTR application

3  can connect to and control a Leanback Screen "*over 3G and Wi-Fi*"); *see also* Bhatta. Decl., ¶157

4  ("In order to pair with one another a mobile device running the YTR application and a Screen both

5  had to be connected to the ***Internet***—which ***could be*** done by connecting to a user's home network

6  [a 'local area network'] through Wi-Fi."). I understand that the ability to establish the connection

7  regardless of what type of network the mobile phone was connected to was facilitated by the ▮▮▮

8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  '998 Patent, 4:51-55 ("[B]y using the network service as an intermediary, the remote control and

11  the controlled device … may ***not need to be connected to the same local area network***, nor in

12  physical proximity to each other.").

13      129.  In his declaration, Dr. Bhattacharjee attempts to explain various aspects of the YTR

14  application. However, as explained below in connection with my anticipation and/or obviousness

15  analysis, I disagree with many of Dr. Bhattacharjee's characterizations.

16      130.  I also disagree with many of Dr. Bhattacharjee's assertions that various

17  materials/references he relies on evidence the ***same*** November 9, 2010 version of the YTR

18  application and/or are actually prior art to the '615 Patent. For example, Dr. Bhattacharjee initially

19  points to what he calls "Version 1.0" of the YTR application that was allegedly released on

20  November 9, 2010 and allegedly shown in various videos that were allegedly published between

21  November 9, 2010 and February 14, 2011. *See* Bhatta. Decl., ¶¶124-25. However, Dr.

22  Bhattacharjee then goes on to rely on various source code for the YTR application, including

23  source code that allegedly "reflects the operation of the YTR system that was released on

24  November 9, 2010," as well as "YTR system source code as it existed on July 12, 2011" and "YTR

25  system source code as it existed on December 1, 2011." *Id.*, ¶126. By Dr. Bhattacharjee's own

26  admission, the 2011 source code "is for subsequent releases of the YTR application." *Id.* Thus,

27  the 2011 source code is not evidence of the operation of Version 1.0 of the YTR application that

28  was allegedly released on November 9, 2010, which is the version that Google is relying on for

1    invalidity in its summary judgment motion. *Id.*

2        131.    Moreover, contrary to Dr. Bhattacharjee's suggestion, the December 1, 2011 source

3    code is not even prior art to the '615 Patent because it is dated ***after*** the July 15, 2011 invention

4    date asserted by Sonos and unchallenged by Google in its summary judgment motion. And while

5    Dr. Bhattacharjee asserted that some of the source code he reviewed "reflects the operation of the

6    YTR system that was released on November 9, 2010," I have seen no evidence substantiating that

7    date. Instead, Dr. Bhattacharjee appears to rely solely on the uncorroborated Declaration of Janos

8    Levai. *See* Bhatta. Decl., ¶126 (citing Levai Decl., ¶6). However, Mr. Levai did not start working

9    at Google until he joined as an intern in July 2011. Levai Decl., ¶2. Thus, it is unclear how Mr.

10   Levai can definitively establish that certain source code reviewed by Dr. Bhattacharjee

11   corresponds to Version 1.0 of the YTR application that was allegedly released on November 9,

12   2010. Notably, another one of Google's declarants, Ramona Bobohalma, did ***not*** verify that any

13   of the source code reviewed by Dr. Bhattacharjee corresponds to Version 1.0 of the YTR

14   application that was allegedly released on November 9, 2010. This lack of verification is despite

15   the fact that Ms. Bobohalma actually worked at Google in 2010 at the time Version 1.0 of the YTR

16   application was allegedly released and "was responsible for the development of Versions 1 through

17   3 of Google's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including writing source code for

18   ▮▮▮▮' Bobohalma Decl., ¶¶2-3. I also understand that the source code Dr. Bhattacharjee relies

19   on for the operation of the YTR system on November 9, 2010 is actually an alleged "capture of

20   the code that existed on November 11, 2010" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Levai Decl., ¶6; Levai Dep. Tr., 64:21-

22   65:2. Mr. Levai also stated that he didn't know whether any changes were made to the code

23   between November 9, 2010 and November 11, 2010. *Id.* at 66:4-13.

24       132.    Moreover, I have not seen any evidence definitively establishing that each of the

25   six different videos Dr. Bhattacharjee cites to shows the operation of Version 1.0 of the YTR

26   application. *See* GOOG-SONOS-WDTX-INV-00015101 ("Video #1" uploaded November 14,

27   2010); GOOG-SONOSNDCA-00071320 ("Video #2" uploaded November 11, 2010); GOOG-

28   SONOSNDCA-00071319 ("Video #3" uploaded November 9, 2010); GOOG-SONOSNDCA-

00015102 ("Video #4" uploaded November 9, 2010); GOOG-SONOSNDCA-00071317 ("Video #5" uploaded November 15, 2010); GOOG-SONOSNDCA-00071318 ("Video #6" uploaded February 14, 2011). Likewise, I have also not seen any evidence definitively establishing that the YTR applications allegedly shown in these six different videos are all the same version of the YTR application. In that regard, both Mr. Levai and Ms. Bobohalma appear to implicitly recognize that Video #6 does not accurately show the capabilities of Version 1.0 of the YTR application that was allegedly released on November 9, 2010, as Video #6 was not addressed by either declarant. *See* Levai Decl., ¶5; Bobohalma Decl., ¶5.

133.    As another example, Dr. Bhattacharjee relies on screenshots in a February 26, 2012 Wayback Machine capture of a version of the YTR application that appears to have been released on January 25, 2012. *See* Bhatta. Decl., ¶170 (citing Google MSJ Ex. 14). This version of the YTR application is not prior art to the '615 Patent because it is dated ***after*** the July 15, 2011 invention date asserted by Sonos and unchallenged by Google in its summary judgment motion. Additionally, it is unclear if the version of the YTR application that Google relies on was actually available in the United States because the webpage captured by the Wayback Machine includes non-English language. *Id.*

134.    As yet another example, Dr. Bhattacharjee relies on an ▮▮▮▮ document that is dated July 12, 2010. *See* Bhatta. Decl., ¶137 (citing GOOG-SONOSNDCA-00056724). However, Dr. Bhattacharjee has not established that this ▮▮▮▮▮▮ (or the specific disclosure that he relies on) reflects the operation of Version 1.0 of the YTR application that was released some four months later on November 9, 2010. Instead, the only evidence relied on by Dr. Bhattacharjee appears to be the uncorroborated declaration of Mr. Levai stating that "[t]he document generally ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Levai Decl., ¶9. Again, Mr. Levai did not even work at Google in 2010.

### 2.    Overview of the '998 Patent

135.    Google relies on the '998 Patent to support both of its obviousness theories, namely, (i) to establish the state of the art and the "general knowledge" that a POSITA would have used to modify the YTR application and (ii) as a secondary reference to combine with the YTR application.

136.   The '998 Patent is entitled "Network-Based Remote Control" and issued from an application filed on March 7, 2011, which claims priority to November 8, 2010.  The '998 Patent lists Google as the assignee.  One of the named inventors of the '998 Patent is Ms. Bobohalma, who stated that "[t]his patent discloses *some* of the work that I did on the YouTube Remote application."  Bobohalma Decl., ¶4.

137.   Consistent with the above-described November 2010 YouTube press release for the YTR application, the '998 Patent discloses a "remote control" that can be "paired" with a "controlled device" having a screen and thereafter used to control playback of media content on the "controlled device," "such as stopping playback of media content playing on the controlled devices or changing the media content playing on the controlled devices."  *See, e.g.*, '998 Patent, 1:39-46, 3:34-55, Fig. 1.  The '998 Patent does *not* disclose initiating playback



FIG. 1

of media on the "remote control" and then transferring playback from the "remote control" to a "controlled device."  The general architecture of the '998 Patent's system is shown in Fig. 1 here.

138.   Like the November 2010 YouTube press release for the YTR application, the '998 Patent discloses a "pairing" technique that utilizes a "network service" (also referred to as a "cloud service") provided by a server(s) that acts as an "intermediary" between the "remote control" and "controlled device."  *See, e.g., id.*, 3:13-45, Fig. 1.  For example, the '998 Patent discloses that "a user may log in to a user account maintained by the servers 24 using remote control 14" and that the "[r]emote control 14 may … transmit a message to servers 24 of network 22 that identifies remote control 14, which can be used by servers 24 to pair remote control 14 with controlled device 18."  *Id.*, 5:19-26.  Similarly, the '998 Patent discloses that "a user may log in to a user account maintained by the servers 24 using controlled device 18" and that "[c]ontrolled device 18 can … transmit a message to servers 24 of network 22 that identifies controlled device 18, which can be used by servers 24 to pair controlled device 18 with remote control 14."  *Id.*, 5:53-60.

139.    This intermediary "cloud service" architecture allows the "remote control" and "controlled device" to be paired together and communicate with each other when, for example, the two devices are not on the same local area network. *Id.*, 4:51-55 ("[B]y using the network service as an intermediary, the remote control and the controlled device … may ***not need to be connected to the same local area network***, nor in physical proximity to each other.").

140.    Notably, the '998 Patent appears to distinguish its system architecture where the "cloud service" serves as an intermediary for both pairing and subsequent communication between a "remote control" and "controlled device" from prior art systems where remote controls communicate directly with the devices being controlled. *Id.*, 1:14-35.

141.    In his declaration, Dr. Bhattacharjee attempts to explain various aspects of the system disclosed in the '998 Patent.  However, as explained below in connection with my anticipation and/or obviousness analysis, I disagree with many of Dr. Bhattacharjee's characterizations of the '998 Patent.

### 3.    Overview of the Tungsten System, the Apple Airplay System, U.S. Publication No. 2011/0131520 ("Al-Shaykh Publication"), & Sonos's Products

142.    Dr. Bhattacharjee relies on the Tungsten system, the Apple Airplay system, the Al-Shaykh Publication, and Sonos's products to support his obviousness assertions regarding the state of the art and the "general knowledge" that a POSITA would have used to modify the YTR application.  In sum, Dr. Bhattacharjee relies on these systems/references for alleged teachings of "the ability to select individual playback devices for transfer from the user interface of a mobile phone or tablet." Bhatta. Decl., ¶¶25-28, 30-34, 166-167, 173.  However, Dr. Bhattacharjee cites very little evidence regarding these systems/references and does not describe the specific system architecture used or disclosed by these systems/references or explain if or how the control devices of such systems identify playback devices connected to the same local area network as the control devices. *Id.*

143.    As explained below in connection with my anticipation and/or obviousness analysis, I disagree with many of Dr. Bhattacharjee's characterizations of these systems/references.

144.    I also understand that Apple TV manuals that describe Apple's Airplay functionality and Sonos User Guides were thoroughly reviewed and considered by the USPTO during prosecution of the '615 Patent, and the UPSTO allowed the '615 Patent (including the asserted claims) to issue over those Apple TV manuals.  As a result, I understand that with respect to Dr. Bhattacharjee's invalidity arguments based on the functionality of Apple's Airplay and/or Sonos's products,  Dr. Bhattacharjee has the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.

### D.    Anticipation Analysis

145.    In my opinion, the YTR application does not anticipate claim 13 of the '615 Patent because it fails to disclose at least claim limitations 13.2 and 13.4.

### 1.    The YTR Application Does Not Disclose Limitation 13.2

146.    Limitation 13.2 requires "*after connecting to a local area network via a network interface, identifying playback devices connected to the local area network*."  The plain language of this limitation requires the claimed "*control device*" to not only *identify* playback devices, but also to identify playback devices that are connected to the *same local area network* as the control device.   Moreover, when properly interpreted in view of the surrounding claim language, especially limitation 13.4, it is clear that the "*identifying*" required by limitation 13.2 must allow a particular playback device from the identified playback devices to be subsequently selected via the control device to transfer playback of multimedia from the control device to the particular playback device. *See* limitation 13.4 ("*detecting a set of inputs to transfer playback from the control device to a particular playback device, wherein the set of inputs comprises: ... (ii) a selection of the particular playback device from the identified playback devices connected to the local area network*").  The YTR application does not teach these requirements.

147.    According to Dr. Bhattacharjee, the YTR application performs the required "*identifying*" of limitation 13.2 because

1                          Bhatta.Decl., ¶158; GOOG-SONOSWDTX-00041837, 37.

2 I disagree. As explained in the primary document relied upon by Dr. Bhattacharjee, the

3                                merely

4                         [27] *Id.* Merely notifying the YTR application that there is

5

6

7

8

9 Likewise, as explained more below with respect to limitation 13.4, this inability of the YTR

10 application to identify

11

12

13         148. Moreover, even if the                   did include information

14 from which the YTR application

15                        I have seen no such evidence), this would still not

16 satisfy limitation 13.2 because the YTR application could still not identify the Leanback Screen as

17 being connected to the ***same local area network*** that the mobile phone running the YTR

18 application is connected to. This failure to satisfy limitation 13.2 makes sense because the YTR

19 application receives the

20

21

22

23

24

25

26

27

28

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1      ███████████████████████████████ *See* GOOG-SONOSWDTX-00041837, 37; *see*

2      *also* Levai Dep. Tr. at 94:2-21; GOOG-SONOSNDCA-00071320, 2:51-3:20 ████████

3

4      ███████ Bhatta. Decl., ¶157 ("In order to pair with one another a mobile device running the

5      YTR application and a Screen both had to be connected to the ***Internet***—which ***could be*** done by

6      connecting to a user's home network … through Wi-Fi."); '998 Patent, 4:51-55 ("[B]y using the

7      network service as an intermediary, the remote control and the controlled device, in various

8      instances, may not ***need to be connected to the same local area network***, nor in physical proximity

9      to each other.").

10      149.    Thus, because the YTR application fails to teach limitation 13.2, it does not

11      anticipate claim 13 of the '615 Patent.

12      **2.**     <u>The YTR Application Does Not Disclose Limitation 13.4</u>

13      150.    Limitation 13.4 requires:

14      *detecting a set of inputs to transfer playback from the control device to a particular*
*playback device, wherein the set of inputs comprises: (i) a selection of the*

15      *selectable option for transferring playback from the control device and (ii) a*
*selection of the particular playback device from the identified playback devices*

16      *connected to the local area network.*

17      The plain language of this limitation requires at least ***two separate and distinct inputs*** to transfer

18      playback from the control device to a particular playback device, where each input must meet the

19      specific requirements set forth in limitation 13.4, subparts (i) and (ii). The YTR application does

20      not teach the two required inputs of this limitation.

21      151.    According to Dr. Bhattacharjee,

22      the YTR application detects the required inputs

23      of limitation 13.4 via selection of the "menu"

24      and/or "Connect" buttons shown in the image

25      here. *See* Bhatta. Decl., ¶¶159-63 (citing GOOG-

26      SONOS-WDTX-INV-00015101 ("Video #1"))

27      (annotations in original). I disagree.



28      152.    Selection of the "menu" button does not meet either of the required inputs because,

for example, it is not a button for transferring playback from the YTR application or a button for selecting a particular playback device to transfer playback to. Instead, the "menu" button does exactly what its name describes, it simply activates a "menu" on the YTR application, where the "menu" includes four different selectable buttons: a "Refresh" button, a "Switch User" button, a "Search" button, and a "Connect" button.

153. The only other input identified by Dr. Bhattacharjee is the input received via selection of the "Connect" button. *See* Bhatta. Decl., ¶¶159-63.[28] However, contrary to Dr. Bhattacharjee's assertion, a ***single*** input via the "Connect" button cannot satisfy the ***two*** separate and distinct inputs required by limitation 13.4. *Id.*, ¶¶161-62. Thus, the YTR application fails to teach limitation 13.4.

154. Moreover, even if a single input could somehow satisfy the two separate and distinct inputs of claim 13 (it cannot), I disagree with Dr. Bhattacharjee that a selection of the "Connect" button is "*a selection of **the particular playback device** from the identified playback devices connected to the local area network*," as required by limitation 13.4. *See* Bhatta. Decl., ¶162. For instance, as shown in the image above, the "Connect" button presented by the YTR application does ***not*** provide any indication of ***the particular Leanback Screen*** to transfer multimedia to. This makes sense because, as discussed for limitation 13.2, the YTR application does not even identify the specific Leanback Screens that are paired in a session with the YTR application. Without such an identification, the YTR application cannot present a particular Leanback Screen for selection or detect its selection.

155. Further, Dr. Bhattacharjee's own argument confirms that a selection of the "Connect" button is ***not*** "*a selection of **the particular playback device** from the identified playback devices connected to the local area network*," as required by limitation 13.4. According to Dr.

---

[28] Notably, limitation 13.5 requires the "*transferring playback*" to include "*causing the playback at the control device to be **stopped**.*" However, the November 14, 2010 video relied on by Dr. Bhattacharjee does not establish that the media on the YTR device was "*stopped*" after the "Connect" button was selected. *See* GOOG-SONOS-WDTX-INV-00015101 ("Video #1"). Although unclear in the video, the media on the phone's screen appears to still be in a playback state (albeit paused) after the selection of the "Connect" button and the alleged "*transfer*" of playback.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Bhattacharjee, in a scenario where multiple Leanback Screens are paired in a session with a YTR application, "[p]ressing the Connect button transfers playback to ***all the Screens*** that have been paired with the YTR application in a session …." *Id.* In other words, from the perspective of the YTR application, a selection of the "Connect" button merely indicates a selection of ***all*** Leanback Screens in a session. A selection of a button divorced from any particular Leanback Screen is ***not*** a selection of "***the particular***" Leanback Screen to transfer playback to.[29]

156.   Further still, Dr. Bhattacharjee's own allegations regarding the development of the YTR application confirm that the alleged November 9, 2010 prior art version of the YTR application is missing features of limitation 13.4. Specifically, Dr. Bhattacharjee asserts that Google "released" a later ***non-prior art*** version of the YTR application on January 25, 2012 that, unlike the alleged prior art version, included the ability to "select and control" "individual" Leanback Screens for playback/control. *See* Bhatta. Decl., ¶¶169-70.[30]

157.   Thus, because the YTR application fails to teach limitation 13.4, it does not anticipate claim 13 of the of the '615 Patent.

**E.   Obviousness Analysis**

158.   As noted above, Google is also asserting that '615 claim 13 is obvious based on the YTR application in view of (i) the "general knowledge" of a POSITA and/or (ii) the '998 Patent. *See* Bhatta. Decl., ¶¶121-23. While Dr. Bhattacharjee provides an analysis of obviousness in the section of his declaration for limitation 13.4, he appears to also be asserting that limitation 13.2 is obvious. Regardless, below I address Dr. Bhattacharjee's obviousness assertions and explain why neither limitation 13.2 nor limitation 13.4 would have been obvious.

**1.   The YTR Application + General Knowledge of a POSITA**

---

[29] Consistent with Dr. Bhattacharjee's assertion, my understanding is that, to the extent multiple

[30] Dr. Bhattacharjee also asserts that this added functionality was included in a December 1, 2011 capture of source code (*see* Bhatta. Decl., ¶170) but that is irrelevant because it is also after Sonos's uncontested July 15, 2011 invention date.

159.    Dr. Bhattacharjee appears to be arguing that it would have been obvious to modify the YTR application to include the requirements of limitations 13.2 and 13.4 because "[a] POSITA would have understood that … the YTR application[] would benefit from being able to (1) identify playback devices available for transfer on the local area network and (2) display them on the user interface of the mobile device for selection by the user." Bhatta. Decl., ¶165. Dr. Bhattacharjee further asserts that such identification and display were allegedly "well-known" to a POSITA prior to the July 15, 2011 invention date (e.g., by virtue of the Tungsten system, the Apple AirPlay system, the Al-Shaykh Publication, the '998 Patent, and Sonos's products) and that these features would have been "straightforward" to implement in the YTR application that allegedly existed prior to the July 15, 2011 invention date. *Id.*, ¶¶166-71, 173-74. I disagree.[31]

160.    For instance, as an initial matter, Dr. Bhattacharjee has not cited any evidence showing that the Tungsten system, the Al-Shaykh Publication, the '998 Patent, or Sonos's alleged prior art products (all of which allegedly represent the "general knowledge" of a POSITA) enabled or disclosed "***transferring playback***" of media from a control device to a playback device as that term is used in claim 13 of the '615 Patent, let alone any "*inputs to **transfer playback** from the control device to a particular playback device*," including "*a selection of the particular playback device from the identified playback devices connected to the local area network*," as required by limitation 13.4. *Id.*, ¶¶26-34. Instead, the cited evidence merely shows that a control device could be used for ***controlling playback*** on one or more playback devices (e.g., starting or stopping playback) or for ***streaming media content*** from the control device to a playback device. *Id.* In the context of claim 13, "*transferring playback*" from a "*control device*" to a "*particular playback device*" is not met by merely streaming media content from a control device to a playback device and/or initiating playback on one or both devices. *See* limitations 13.5-13.6. The control device has to be capable of being in a playback state when it "*detect[s] a set of inputs to transfer playback*" and after such detecting, "*caus[e] playback to be transferred from the control device to the*

---

[31] I address specific failures with respect to the '998 Patent below in connection with Dr. Bhattacharjee's obviousness theory based on the combination of the YTR application and the '998 Patent. However, those failures also apply here to Dr. Bhattacharjee's theory based on the "general knowledge" of a POSITA.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

*particular playback device*," which includes "*causing playback at the control device to be stopped*" and "*causing the particular playback device to play back the multimedia content*." *Id.* Thus, contrary to Dr. Bhattacharjee's assertion, a POSITA would not have been motivated to seek out or draw upon their "general knowledge" about these alleged prior art references to modify the YTR application to include the features of limitation 13.4, which are specifically directed to "*inputs to* ***transfer playback*** *from the control device to a particular playback device*."

161.    Likewise, I disagree with Dr. Bhattacharjee's assertion that a POSITA would have been motivated to seek out or draw upon their "general knowledge" about the alleged Apple AirPlay prior art system to modify the YTR application to include the features of limitations 13.2 and/or 13.4.  Based on the limited Apple AirPlay evidence cited by Dr. Bhattacharjee, it appears that Apple AirPlay utilized a fundamentally different system architecture than the YTR application that did not rely on an intermediary cloud server to, for example, "pair" control devices with playback devices or facilitate communications between the devices even when the devices were not on the same local area network.  Instead, as explained in the "Airplay Video #1" cited by Dr. Bhattacharjee, Apple AirPlay "works automatically, through your Wi‑Fi network, with no setup needed." *See* https://www.youtube.com/watch?v=fGMdg13YWB8, 0:25 ‑ 0:29.  In this regard, I understand that an AirPlay control device was only able to control an AirPlay playback device if both devices were on the ***same*** Wi‑Fi network.  *Id.*  However, as explained above, the YTR

¶128.  Thus, contrary to Dr. Bhattacharjee's assertion, a POSITA would not have been motivated to modify the YTR application, which allowed the YTR application to be paired with and control Leanback Screens on different networks, with a system like AirPlay, which required the control device and players to be on the same network.  Likewise, Dr. Bhattacharjee has not explained how a POSITA would have modified the YTR application in a manner that would have allowed for the YTR application to identify and present for selection Leanback Screens on the same local area network as the mobile phone while maintaining the touted ability for the YTR application to be

1     paired with and control a Leanback Screen via the mobile phone's 3G cellular network connection.

2          162.     Moreover, in the '998 Patent, which I understand to disclose "some" features of the

3   YTR application (*see* Bobohalma Decl., ¶4; Bhatta. Decl., ¶29), Google teaches away from

4   modifying the YTR application to incorporate features of a system like Apple AirPlay when it

5   distinguished ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from system architectures of other prior art systems that enabled remote

7   controls to communicate directly with playback devices via, for example, a home Wi-Fi network.

8   *See* '998 Patent, 1:14-50; GOOG-SONOSNDCA-00075593, 96 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10          163.     Due to these fundamental differences between the system architecture of the YTR

11   application and the architecture of a system like Apple AirPlay, which Google itself has

12   acknowledged, it is my opinion that a POSITA would not have been motivated to modify the YTR

13   application in view of Apple AirPlay.

14          164.     As another example, the system architecture supporting the functionality of the

15   alleged prior art version of the YTR application teaches away from modifying the YTR application

16   in the manner proposed by Dr. Bhattacharjee. Moreover, at the very least, the architecture makes

17   such modification harder than Dr. Bhattacharjee asserts and would require changes that Dr.

18   Bhattacharjee fails to address in his conclusory analysis. As explained by Dr. Bhattacharjee, "[a]

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮ Bhatta. Decl., ¶132; *see also* GOOG-SONOS-WDTX-INV-00015413, 13 ("To

22   'pair' your phone with your Leanback screen, simply sign into YouTube Remote on your Android

23   phone, and to YouTube Leanback on your Google TV or computer with the same YouTube

24   account."). In other words, when the user wished to control media playback on a particular

25   Leanback Screen using the YTR application, the user identified the particular Leanback Screen

26   they desired to control (without caring whether the Leanback Screen and YTR application were

27   connected to the same local area network) and used the ***user interface of that particular Leanback***

28   ***Screen*** to log the Leanback Screen into the same YouTube account that the YTR application was

1    logged into (or subsequently would be logged into).  This capability is what caused

2    ███████████████████████████████████████  *See* Bhatta. Decl., ¶¶128, 132.  Given this

3    architecture, there was no need for the YTR application to identify the Leanback Screen, let alone

4    identify it as a Leanback Screen on the same local area network as the YTR application, and then

5    present the Leanback Screen for selection via ***the user interface of the YTR application*** because

6    the user had already identified and selected the particular Leanback Screen that the user wished to

7    control.  In this regard, the YTR application taught against detecting the claimed "selection"

8    required by limitation 13.4, subpart (ii).  Thus, a POSITA would not have been motivated to

9    modify the YTR application in this manner, as proposed by Dr. Bhattacharjee.

10        165.    Moreover, my understanding is that, in the event ████████████████████

11   ████████████████████████████████████████████████(which is the scenario

12   Dr. Bhattacharjee primarily relies on for invalidity), the YTR application and/or ███████

13   ████████████████████████████████████████████████████████

14   ██████████  *See* Bhatta. Decl., ¶¶140, 144, 158, 160-162;  GOOG-SONOS-WDTX-INV-

15   00015423, 24.  When multiple Leanback Screens are in a session, I am not aware of any disclosure

16   in the materials cited by Dr. Bhattacharjee of the YTR application and/or ███████████ having

17   the capability to control ***a particular*** paired Leanback Screen.  While Dr. Bhattacharjee asserts

18   that one would modify the YTR application to allow a user to select and control a particular

19   Leanback Screen in a session with other Leanback Screens (*see* Bhatta. Decl., ¶170), he has not

20   explained how a POSITA would modify the system architecture such that, ███████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23        166.    Further, a POSITA would not have been motivated to modify the YTR app to allow

24   for a selection of a particular Leanback Screen because using multiple Leanback Screens was not

25   even a prominent feature for the YTR app.  Indeed, Google's own declarant, Janos Levai, testified

26   that: ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

167. As another example, I disagree with Dr. Bhattacharjee's conclusory assertions that modifying the November 9, 2010 version of the YTR application to include the features of limitations 13.2 and 13.4 would have provided an obvious "benefit" that was "straightforward" to implement in the YTR application. Bhatta. Decl., ¶¶165, 174. First, this assertion ignores the system architecture of the YTR application, which, as explained herein, both teaches away from Google's proposed modifications and also renders such modifications more complicated than Google posits. *See* GOOG-SONOSNDCA-00075593, 94-95 (Google acknowledging that

█████████████████████████████████████████████████████████████████.

Additionally, the fact that Google did *not* include such functionality in the YTR application that was released on November 9, 2010 and that it took Google *more than a year* – and *after* the '615 Patent's invention date – to modify the YTR application to allegedly allow a user to select a particular Leanback Screen for playback/control suggests that Dr. Bhattacharjee's proposed modification was not such an obvious "benefit" that was "straightforward" to implement. *See* Bhatta. Decl., ¶170 (asserting that the ability to select a particular Leanback Screen for playback was first introduced in December 1, 2011 source code and subsequently included in a January 2012 version of the YTR application).

168. As yet another example, besides simply asserting without any explanation that it would have been obvious to modify the YTR application to "identify playback devices … on the local area network" because this was well known (*see* Bhatta. Decl., ¶¶165-66, 173), none of Dr. Bhattacharjee's obviousness arguments address specifically how the YTR application would have been modified to identify a Leanback Screen as one that is connected to *the same local area network* that the mobile phone running the YTR application is connected to, which is required by claim limitation 13.2, and a prerequisite to limitation 13.4(ii)'s requirement of an input that comprises "*a selection of the particular playback device from the identified playback devices connected to the local area network*." For instance, Dr. Bhattacharjee does not even allege, much less analyze, what type of discovery mechanism the YTR application would use to identify Leanback Screens connected to the same local area network as the mobile phone running the YTR application or if such discovery mechanism would be a supplement to or a replacement of the

manual pairing mechanism used by the YTR application that relied on the intermediary Lounge Server and both devices being logged into the same YouTube account.  Similarly, Dr. Bhattacharjee does not explain what type of discovery mechanisms that enabled a control device to identify playback devices connected to the same local area network as the control device were allegedly well-known at the time of Sonos's invention of the '998 Patent.  Thus, Dr. Bhattacharjee's obviousness arguments fail for these reasons as well.

169.    Finally, Dr. Bhattacharjee's theory for modifying the YTR application based on the "general knowledge" of a POSITA appears to rely on an assertion that "the YouTube Remote system ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████' *See* Bhatta. Decl., ¶174.  However, Dr. Bhattacharjee fails to cite a single document to support this assertion.[32]  Thus, for this reason alone, Dr. Bhattacharjee's obviousness allegation based on the general knowledge of a POSITA fails.

## 2.    The YTR Application + '998 Patent

170.    Dr. Bhattacharjee's apparent assertion that limitations 13.2 and 13.4 are obvious over the combination of the YTR application and the '998 Patent fails for many of the same reasons that his theory based on the YTR application and the "general knowledge" of a POSITA fails. Thus, my opinions and analysis above apply here.  In addition, I also disagree with various of the specific arguments and characterizations that Dr. Bhattacharjee made with respect to the '998 Patent.

171.    For instance, contrary to Dr. Bhattacharjee's suggestion, the '998 Patent does *not* disclose "***transferring playback***" of media from a control device to a playback device.  Instead, the '998 Patent is directed to a "remote control" for ***controlling playback*** of media content on a "controlled device," "such as stopping playback of media content playing on the controlled devices or changing the media content playing on the controlled devices." *See, e.g.*, '998 Patent, 1:39-46; 3:34-55, Fig. 1.  Thus, a POSITA would not have been motivated to seek out the '998 Patent for

---

[32] To the extent Dr. Bhattacharjee is relying on disclosure in the '998 Patent of "unique identifiers," he has not established that such identifiers were actually used or maintained in the alleged YTR application prior art system.

teachings related to the requirements of limitation 13.4, which are specifically directed to "*inputs to **transfer** **playback** from the control device to a particular playback device*." The '998 Patent does not include such teachings.

172.    Take for example the primary disclosure in the '998 Patent that Dr. Bhattacharjee relies upon:

> In some examples, the user may also utilize the remote control application of remote control 75 to select one or more previously paired controlled devices, and to send control messages to one or more paired controlled devices. For example, the user may interact with user interface 84 and/or display 88 to interact with and control any available controlled devices.

'998 Patent, 10:63-11:6; *see also* Bhatta. Decl., ¶169. Nothing in this passage mentions or even suggests *transferring* playback from a "remote control" to a "controlled device." Accordingly, I disagree with Dr. Bhattacharjee that this passage teaches a selection of a particular "controlled device" to *transfer* playback to.

173.    Moreover, in my opinion, this passage is ambiguous. For example, setting aside the fact that this disclosure does not teach transferring playback from a remote control to a controlled device, it is not clear to me that this disclosure in the '998 Patent teaches the ability of a "remote control" to present for selection multiple "controlled devices" that have already been paired in a session in a manner that would allow the user to select a particular "controlled device" for playback, as asserted by Dr. Bhattacharjee. *See* Bhatta. Decl., ¶169. Instead, consistent with my understanding of how the alleged prior art YTR application actually operated (*supra* ¶¶125-127), it appears that this passage may be referring to the ability to control one "controlled device," if that is the only "previously paired" "controlled device," or the ability to control all "controlled devices" collectively, if multiple "controlled devices" have been "previously paired" with a "remote control" in a session. Notably, Ramona Bobohalma, one of the named inventors of the '998 Patent and current employee of Google, stated that she couldn't explain what the "plain language" of this passage means. *See* Bobohalma Rough Dep. Tr., 104:21-105:3 (after testifying about what she allegedly was "thinking" about at the time, when pressed to explain what the "plain language" of the patent actually disclosed, she could not do so).

174.    Further, in the context of the '998 Patent, and based on my understanding of the

operation of the alleged prior art YTR application, to the extent this disclosure in the '998 Patent does refer to the ability to select and control a specific one of multiple previously paired "controlled devices" (which is not clear as explained above), it would seem to me that this disclosure would be referring to the ability to use the "remote control application" to select and control one or more of the "controlled devices" that were "*previously* paired" in a session and ***already all playing*** the same media. *See* Bhatta. Decl., ¶¶140, 144, 158, 160-162; GOOG-SONOS-WDTX-INV-00015423, 24. In other words, a user could, for example, select one of the "controlled devices" that was ***already playing*** media and then control the volume of that device. However, this has nothing to do with selecting a particular "controlled device" ***to transfer media playback*** from the "remote control" to the particular "controlled device," as required by limitation 13.4.

175. As another exemplary failure of Google's obviousness argument, the '998 Patent does not disclose a "*control device*" "*identifying playback devices connected to the local area network*," as required by limitation 13.2, and therefore, cannot make up for the lack of this functionality in the YTR application. While Dr. Bhattacharjee points to the '998 Patent's disclosure of "unique identifiers" for the "remote control" and "controlled devices" (*see* Bhatta. Decl., ¶168), Dr. Bhattacharjee acknowledges that the "unique identifiers" are maintained and used by the ***intermediary cloud server*** (sometimes referred to in the '998 Patent as the "intermediary" "network server" for providing a "network service" or "cloud service"). *Id.* The '998 Patent does *not* disclose the "***remote control***" receiving the "unique identifiers" of the paired "controlled devices" or otherwise identifying the "controlled devices" based on the "unique identifiers," let alone identifying the "controlled devices" as "controlled devices" connected to the same local area network as the "remote control." Dr. Bhattacharjee appears to agree with this; however, he nevertheless asserts that it would have been obvious to modify the alleged prior art YTR application to receive the "unique identifiers" described in the '998 Patent and thereby, identify the Leanback Screens as being connected to the same local area network as the mobile phone running the YTR application. *See* Bhatta. Decl., ¶¶165, 171-74. I disagree.

176. The '998 Patent teaches away from modifying the alleged prior art YTR application and/or '998 Patent in a manner that provides the "unique identifiers" of the "controlled

devices"/Leanback Screens to the "remote control"/YTR application and enables the "remote control"/YTR application to identify the "controlled devices"/Leanback Screens as being connected to the same local area network as the "remote control"/YTR application.  For instance, the '998 Patent touts the system's reliance on the intermediary cloud-based "network service," including the maintenance and use of the "unique identifiers" by the "network service," as enabling the "remote control" and "controlled device[s]" to be paired in a session and "***not need[ing] to be connected to the same local area network***, nor in physical proximity to each other."  *See* '998 Patent, 4:51-55 ("[B]y using the network service as an intermediary, the remote control and the controlled device, in various instances, may ***not need to be connected to the same local area network***, nor in physical proximity to each other.").

### 3.  <u>Secondary Considerations of Non-Obviousness</u>

177.  Assuming that I am correct that Google's Cast technology found in the YouTube apps and/or GPM app infringes '615 claim 13, it is my opinion that there exists secondary considerations evidence demonstrating that a POSITA would not have found '615 claim 13 obvious.  For instance, I have seen evidence of Google receiving praise for its Cast technology that enables a Sender to transfer media playback responsibility from itself to a Receiver, which supports my opinion that '615 claim 13 would not have been obvious to a POSITA at the time of the invention.

178.  As one example, ███████████████████████████ highlights various quotes from prominent news sources touting Google's Cast technology for its "ease of use" and "heavy lifting from the cloud," among other reasons.  *See* GOOG-SONOSNDCA-00073988, 88-89.  I have reproduced some of these quotes below:

- "'I expect fans of Chromecast to appreciate the fact that ***Google is now casting a wider net***.' - <u>USA Today</u>"

- "'The tech giant wants to do for music streaming what it did for movie streaming -- ***make it simple to access entertainment from the Internet*** with your mobile device and play it on your living room gear.' – <u>CNET</u>"

- "'The audio device itself handles the streaming, so ***you don't have to leave your mobile gear turned on while you enjoy an hours-long playlist.***' – <u>Engadget</u>"

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

- "'Getting your audio to stream will work the same way it does for video - just hit the Cast button - but for audio, *the stream will come directly from the cloud for improved sound quality.*' – Verge"

- "'While it *sounds similar to what Apple has attempted to do with AirPlay* speakers (which never really caught on), *there's a key difference*: Instead of using your phone, tablet or computer as the source of the music or video, the *Google Cast device pulls it down from the cloud. You get the best available quality and can still use your hand held device for other apps.*' - Wall Street Journal"

- "'Bluetooth speakers have taken off because they're a relatively simple solution for listening to music out loud-no cable required-but their simplicity can also be limiting for bigger sound systems. *Google Cast for audio aims to provide listeners with a higher-fidelity option for connecting their mobile devices to new Internet-enabled speakers*.' – Fast Company"

- "'This is but a small piece of the overall ecosystem puzzle the company is trying to put together. With Chromecast becoming popular very quickly, *Google is now looking to bring Cast into even more devices around the home ... At first glance it seems the company has taken the right first software and hardware steps to give it a strong start*.' – VentureBeat"

*Id.* The positive news coverage was well-received by Google's employees. ███████████

███████████████████████████████

179.     Accordingly, it is my opinion that there exists secondary considerations evidence demonstrating that a POSITA would not have found '615 claim 13 obvious.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: May 5, 2022                         By: _____
                                                    Douglas C. Schmidt

59

## EXHIBIT 1 – MATERIALS CONSIDERED BY DOUGLAS C. SCHMIDT

- U.S. Patent No. 9,967,615 ("the '615 Patent") and its prosecution history
- Google's Motion for Summary Judgment Pursuant to the Court's Patent Showdown Procedure and exhibits thereto, including the declarations of Dr. Bhattacharjee, Ms. Bobohalma, and Mr. Levai
- Sonos's Supp. Infringement Contention Chart for the '615 Patent, dated March 18, 2022
- Google's Invalidity Contentions w/r/t the '615 Patent, dated December 6, 2021
- Claim Construction materials, including Sonos, Inc.'s Opening Claim Construction Brief and exhibits thereto (Dkt. Nos. 184-185), such as the Expert Report of Dr. Schmidt on Claim Construction (Dkt. No. 185-8), Google LLC's Responsive Claim Construction Brief and exhibits thereto (Dkt. No. 200), Sonos, Inc.'s Reply Claim Construction Brief and exhibits thereto (Dkt. No. 202),
- Google's source code made available for inspection, including printouts of certain portions
- Final Deposition Transcripts of Vincent Mo, Umesh Patil, David Nicholson, and Janos Levai, and Rough Deposition Transcript of Ramona Bobohalma
- Examples of Accused Google Players and Google Pixel devices
- Sonos's Response to Google's Interrogatory No. 3, including Attachment A (dated Feb. 4, 2022)
- Google's Third Supp Objs & Resps to Sonos's Interrogatory Nos. 14-15 (dated Feb. 4, 2022)
- Google's Fifth Supp. Objs & Resps to Sonos's Interrogatory No. 12 (dated Apr. 7, 2022)
- Internal and publicly-available documents, including the following:

| | |
|---|---|
| GOOG-SONOSWDTX-00006780 | GOOG-SONOSNDCA-00073394 |
| GOOG-SONOSWDTX-00006865 | GOOG-SONOSNDCA-00071320 |
| GOOG-SONOSWDTX-00006873 | GOOG-SONOSNDCA-00056724 |
| GOOG-SONOSWDTX-00039480 | GOOG-SONOSNDCA-00071320 |
| GOOG-SONOSWDTX-00039491 | GOOG-SONOSNDCA-00072008 |
| GOOG-SONOSWDTX-00039785 | GOOG-SONOSNDCA-00071319 |
| GOOG-SONOSWDTX-00039798 | GOOG-SONOSNDCA-00071317 |
| GOOG-SONOSWDTX-00039916 | GOOG-SONOSNDCA-00071318 |
| GOOG-SONOSWDTX-00041837 | SONOS-SVG2-00067554 |
| GOOG-SONOSWDTX-00043467 | GOOG-SONOS-WDTX-INV-00015413 |
| GOOG-SONOSWDTX-00051490 | GOOG-SONOS-WDTX-INV-00015101 |
| GOOG-SONOSWDTX-00052121 | GOOG-SONOS-WDTX-INV-00015102 |
| GOOG-SONOSWDTX-00053053 | GOOG-SONOS-WDTX-INV-00015423 |
| GOOG-SONOSNDCA-00073352 | GOOG-SONOS-WDTX-INV-00001358 |
| GOOG-SONOSNDCA-00073988 | https://www.youtube.com/watch?v=fGMdg13YWB8 |
| GOOG-SONOSNDCA-00075593 | |