Pages 1 - 114

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

| | | |
|---|---|---|
| GOOGLE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 20-06754-WHA** |
| | ) | |
| SONOS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| AND RELATED CASES. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, July 13, 2022

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff Google, Inc.:
                QUINN, EMANUEL, URQUHART
                    & SULLIVAN LLP
                50 California Street - 22nd Floor
                San Francisco, California 94111
      BY:  **LINDSAY COOPER, ATTORNEY AT LAW**
           **CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
           **MELISSA J. BAILY, ATTORNEY AT LAW**

                QUINN, EMANUEL, URQUHART
                    & SULLIVAN LLP
                865 South Figueroa Street - 10th Floor
                Los Angeles, California 90017
      BY:  **NIMA HEFAZI, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
                Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

                              QUINN EMANUEL URQUHART
3                             & SULLIVAN, LLP
                              191 N. Upper Wacker Drive - Suite 2700
4                             Chicago, Illinois 60606
                    BY:   **MARC L. KAPLAN, ATTORNEY AT LAW**
5
     For Defendant:
6                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                              The Orrick Building
7                             405 Howard Street
                              San Francisco, California 94105
8                   BY:   **CLEMENT S. ROBERTS, ATTORNEY AT LAW**

9                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                              777 South Figueroa Street - Suite 3200
10                            Los Angeles, California 90017
                    BY:   **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
11
                              LEE SULLIVAN SHEA SMITH LLP
12                            656 W Randolph Street - Floor 5W
                              Chicago, Illinois 60661
13                  BY:   **COLE B.RICHTER, ATTORNEY AT LAW**
                          **SEAN M. SULLIVAN, ATTORNEY AT LAW**
14                        **MICHAEL P. BOYEA, ATTORNEY AT LAW**

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Wednesday - July 13, 2022**</u>                                          <u>**8:00 a.m.**</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  All rise.  Court is now in session.  The |
| 5 | Honorable William Alsup is presiding. |
| 6 | **THE COURT:**  Good morning. |
| 7 | **ALL:**  Good morning, Your Honor. |
| 8 | **THE COURT:**  You may be seated, please. |
| 9 | **THE CLERK:**  Calling Civil Action 20-6754, Google LLC |
| 10 | versus Sonos, Inc., and related case, 21-7559. |
| 11 | Counsel, please state your appearances for the record, |
| 12 | beginning with counsel for plaintiff. |
| 13 | Please approach the podium. |
| 14 | **MR. VERHOEVEN:**  Good morning, Your Honor.  Would you |
| 15 | prefer I take the mask down when I speak? |
| 16 | **THE COURT:**  It's up to you.  As long as I can hear |
| 17 | you, but you're free to take it off if you're fully vaccinated |
| 18 | and boosted. |
| 19 | **MR. VERHOEVEN:**  I have three vaccinations -- two |
| 20 | vaccinations -- or boosters. |
| 21 | **THE COURT:**  Two-plus-one will work. |
| 22 | **MR. VERHOEVEN:**  Okay.  Great.  Thank you, Your Honor. |
| 23 | **THE COURT:**  Two plus one? |
| 24 | **MR. ROBERTS:**  Two plus two, Your Honor. |
| 25 | **THE COURT:**  Two plus two.  Great. |

1              **MR. ROBERTS:**  I apologize.  Clem Roberts from Orrick

2     Herrington.  Thank you.

3              **MR. VERHOEVEN:**  Thank you, Your Honor.

4              **THE COURT:**  Make your appearance.

5              **MR. VERHOEVEN:**  Thank you, Your Honor.  Charles

6     Verhoeven on behalf of Google.  And with me is Melissa Baily,

7     Lindsay Cooper, Nima -- how do you pronounce your last name,

8     Nima?

9              **MR. HEFAZI:**  Hefazi.

10             **MR. VERHOEVEN:**  -- and Mark Kaplan.

11             **MR. ROBERTS:**  Good morning, Your Honor.  Clem Roberts

12    from Orrick Herrington.  And with me is Aletha Caridis, Michael

13    Boyea, Sean Sullivan, and Cole Richter.

14       And we also in the back, Your Honor, have the summer

15    associates from our San Francisco office, but I assure you,

16    they're not here to see me.  They're here to see Mr. Verhoeven.

17     He asked that I make that representation.

18             **THE COURT:**  Okay.  These are all summer associates

19    back there?

20             **MR. VERHOEVEN:**  I should also mention, we have Patrick

21    Weston, who's in-house counsel.

22             **THE COURT:**  Who are all those people over there?

23             **MR. ROBERTS:**  We have Bas de Blank and Libby Moulton

24    from my office.  And I do not know the others, Your Honor.

25             **THE COURT:**  Those people are the usual suspects from

PROCEEDINGS

1   my office.  Okay.  All right.  Yeah.  Okay.  Good.

2        Well, I want to hear what law schools they all go to, so

3   shout out what law school.

4        You don't have to put this on the record, because I know

5   the court reporter will scream about it.  Just shout out what

6   your law school is so I can...

7                    (Discussion off the record.)

8        **THE COURT:**  Okay.  Nationwide representation.  Well,

9   welcome to the court.  Hope you learn something today.

10       We're going to start with the '615 patent.  Overall, I've

11  got about two hours, so -- slightly more, maybe, but not much

12  more.  And I have to give the court reporter a break at some

13  point.

14       I want to start with the '615 patent, and we're going to

15  have one of the -- I'm going to select right now one of those

16  summer associates to argue the matter.

17                    (Laughter.)

18       **THE COURT:**  Just teasing.  Just teasing.

19       '615, I had this question:  On invalidity, is it true that

20  under our local rules, you have waived any objection to the

21  date of invention, Mr. Verhoeven?

22       **MR. VERHOEVEN:**  Actually, I'm not arguing that.

23       **THE COURT:**  Okay.  Who is going to argue that?  I want

24  to start with '615.

25       **MR. ROBERTS:**  Your Honor, Mr. Verhoeven and I had one

```
 1  preliminary matter, if you don't mind, for one moment, which is
 2  just --
 3           THE COURT:  Okay.
 4           MR. ROBERTS:  -- that this is likely to talk about
 5  source code quite a bit and various terms.  And Mr. Verhoeven
 6  wanted to request -- and we have no objection to the Court
 7  sealing the courtroom if it wanted to do that, so that we could
 8  discuss the terms and the source code freely.
 9       But it's really at the Court's option.  We just wanted to
10  raise the issue.
11           THE COURT:  I don't know about that.
12           MR. VERHOEVEN:  This is discussion of the --
13           THE COURT:  If we get there, we will possibly do that,
14  but we're not there now.
15       Answer the question.
16           MR. HEFAZI:  I can answer the question.
17           THE COURT:  We've got limited time.  Come up here and
18  answer.  Give me your name.
19           MR. HEFAZI:  My name is Nima Hefazi, Your Honor.
20       And the answer to your question is, the YouTube Remote is
21  prior art under 102(a).  It was released on November 9th, 2010,
22  and the filing date of this patent is December of 2011.
23       Now, they've alleged -- it's not in the summary judgment
24  papers, but they've alleged a July 2011 invention date as their
25  earliest invention date, so it predates that.  So it's --
```

PROCEEDINGS

```
 1          THE COURT:  No, that's not what my law clerk told me.

 2     He gave me a lineup, and he said that the earliest date in this

 3     whole sequence was their alleged invention date.

 4          MR. HEFAZI:  Okay.  So their alleged invention date is

 5     July 15th, 2011, and it's undisputed that the YouTube Remote

 6     was released in November of 2010.  So it's at least 102(a) art.

 7           What might be referred to is there was a later update with

 8     what's called the "device picker," so the real --

 9          THE COURT:  It's a selector where you can select.

10          MR. HEFAZI:  The selector.

11          THE COURT:  Uh-huh.

12          MR. HEFAZI:  So the selector was released -- I think

13     the selector argument is that it would be obvious, so there's a

14     YouTube Remote --

15          THE COURT:  No, no, no.  See --

16          MR. HEFAZI:  Yeah.

17          THE COURT:  -- if you don't answer my question, I'm

18     going to order you to sit down.

19          MR. HEFAZI:  So the answer to your question is, the

20     selector in the YouTube Remote system -- we are not arguing

21     that that's 102(g).  Instead, we have a YouTube Remote patent

22     that is undisputedly 102(a) art and 102(b) art that discloses

23     that.  There's no dispute about the prior art.

24          THE COURT:  Does the patent disclose the selector?

25          MR. HEFAZI:  The patent disclosed the selector, yes.
```

 1          **THE COURT:**  What's the date of that patent?

 2          **MR. HEFAZI:**  The date of the patent, it was -- it has

 3   a provisional of November 8th, 2010, and then it was filed

 4   March 2011.

 5       So there's no dispute that the patent is prior art.

 6          **THE COURT:**  All right.  So on your side, on the Sonos

 7   side, you --

 8          **MR. SULLIVAN:**  Sean Sullivan on behalf of Sonos, Your

 9   Honor.

10          **THE COURT:**  Thank you.  You are -- you allege what

11   invention date?

12          **MR. SULLIVAN:**  July 15th, 2011, Your Honor.

13          **THE COURT:**  All right.  And you concede that?

14          **MR. HEFAZI:**  So I don't know if we concede it.  I

15   don't think --

16          **THE COURT:**  Wait.  I'm going to give you one chance.

17       Under our local rules, do you have to object to that date?

18          **MR. HEFAZI:**  I don't believe so.

19          **THE COURT:**  What is the answer to that?

20          **MR. SULLIVAN:**  Well, I believe they do, Your Honor.

21   They did not --

22          **THE COURT:**  Cite to me where it says they have to

23   object.

24          **MR. SULLIVAN:**  I don't know about the local rules,

25   Your Honor.  I'm just saying, for purposes of summary judgment,

**PROCEEDINGS**

```
1   they have not contested that date.

2        It's not in their motion, Your Honor.  It's their burden.

3   It's their motion.  They have not contested that date for

4   purposes of their motion.

5            THE COURT:  It's your burden to prove -- if you're

6   going to go behind the patent, the date of the patent

7   application -- which was what?

8            MR. SULLIVAN:  December 30th, 2011.

9            THE COURT:  It's your burden.  You can't shift the

10  burden to them by picking a number out of thin air.  You're

11  stuck with December 30, 2011; stuck with it, unless you've got

12  proof in this record of a prior invention date that's sworn to

13  and is sufficient to show anticipation and reduction to

14  practice.

15           MR. SULLIVAN:  I understand, Your Honor.  We do have

16  that.  We have provided those contentions to the other side in

17  response to Interrogatories Number 1 and 2.

18           THE COURT:  No, no, no.

19           MR. SULLIVAN:  They just didn't raise this in the

20  motion.

21           THE COURT:  Did you put into proof in this motion for

22  a prior date?

23           MR. SULLIVAN:  No, it wasn't contested.

24           THE COURT:  No.  It's your burden, though.  They don't

25  have to contest it, if you're stuck with December 30, unless
```

**PROCEEDINGS**

1  you prove an earlier date.

2         MR. SULLIVAN:  Your Honor, we responded to their

3  motion for summary judgment.  In their motion for summary

4  judgment, they use the date -- the invention date of July 15th,

5  2011.

6         THE COURT:  Oh, I didn't understand that.

7         MR. SULLIVAN:  Yes.

8         THE COURT:  All right.  So they, themselves -- when I

9  say "they," Google, itself, said the invention date was

10  July 15th, 2011?

11         MR. SULLIVAN:  That is correct, Your Honor.

12         THE COURT:  Is that true?

13         MR. HEFAZI:  I don't think we ever conceded --

14         THE COURT:  Is that true or not?  Did your motion

15  papers say that or not?

16         MR. HEFAZI:  I'm not aware of our motion papers.

17         THE COURT:  All right.  Show it to me, Counsel, and

18  I'm hoping, for your sake, he can't prove it.  Show me where --

19  I don't want to see a slide.  I want to see the actual brief.

20         MR. SULLIVAN:  I have the cites here, Your Honor.

21  Would you like me to actually put the brief on?

22         THE COURT:  Yeah.  Bring me the brief.  Bring me the

23  brief where Google says July 15th, 2011, is the invention date.

24         MR. HEFAZI:  And, for the record, Your Honor, we

25  understand they've alleged it, but I don't think we've conceded

PROCEEDINGS

1    that that is the invention date.

2         THE COURT:  But in your motion papers, where you have

3    the burden of proof, since you're moving for summary judgment,

4    did you say that you are taking it as a presumption that the

5    invention date is July 15th, 2011?

6         MR. HEFAZI:  So I don't -- I don't think it was an

7    issue because the prior art predates both the invention date

8    and the effective filing date, Your Honor.

9         MS. BAILY:  There's a footnote, Your Honor.

10        THE CLERK:  I'm sorry.  Your name?

11        MS. BAILY:  I apologize.  Melissa Baily for Google.

12    On page 19 of Google's brief, Footnote 8, we say that --

13    we're basically saying that no matter what prior art date is

14    relevant, our prior art predates it.

15    So, on Footnote 8, we say that there's an allegation of

16    July 15th, 2011.

17        THE COURT:  The copy you handed me says Footnote 7.

18    Is what you're referring to or do you really mean 8?

19        MS. BAILY:  I'm looking at Footnote 8.  Let me take a

20    look at Footnote 7.

21        THE COURT:  I don't think there is a Footnote 8.

22        MS. BAILY:  The corrected copy.  Do you have the

23    corrected motion, Your Honor?  I apologize.

24        MR. SULLIVAN:  That's not the corrected.  I'm sorry.

25    That's the original motion.

1      **THE COURT:**  Then I'm handing you -- you gave me a

2   bogus document.

3      **MS. BAILY:**  Again, this is Melissa Baily.

4      **THE COURT:**  Yes.  Sorry.  This is what I was looking

5   at, but the number changed.

6      Okay.  Thank you.

7      **MS. BAILY:**  So, Your Honor, I think what's happened

8   is, we made a motion, obviously, for -- on invalidity.  We

9   argued against, you know, every allegation.  It was Sonos's

10  burden to come back -- it's their burden to establish an

11  earlier conception date.

12     They didn't do that.  They didn't put a single piece of

13  evidence in the record to even support it at all.

14     **THE COURT:**  Well, did your opening brief lay out this

15  patent that was November 8th, 2010?  Was that the YouTube

16  patent?  What was that?

17     **MS. BAILY:**  The YouTube patent is November 8th, 2010.

18  That's prior art regardless of whatever priority date --

19     **THE COURT:**  Yeah.  But did your motion paper lay out

20  every single element of Claim 13 and show that it resided in

21  that patent?

22     **MS. BAILY:**  Not in the patent.  Our primary reference,

23  Your Honor, is the YouTube Remote system.  So we have the

24  YouTube Remote system, which is also prior art no matter what

25  priority date they allege.

PROCEEDINGS

```
 1              THE COURT:  What is the date of that system?  The
 2   patent and the system are two different things.
 3              MS. BAILY:  They are two different things, but you --
 4              THE COURT:  All right.  So what is the date of the
 5   system?
 6              MS. BAILY:  The first -- we rely on the first release
 7   of the system, which was November -- let me just pull my
 8   notes -- November 9, 2010.
 9              THE COURT:  Is the system?
10              MS. BAILY:  Is the first release of the YouTube Remote
11   system.
12              THE COURT:  Yeah.  But it didn't -- that system did
13   not have the selectability.
14              MS. BAILY:  So we argue that it did, but we also argue
15   that, as of that date, it's obvious.  We cite --
16              THE COURT:  Don't do that to me.
17              MS. BAILY:  Okay.  All right.  I apologize, Your
18   Honor.
19              THE COURT:  I'm trying to stick with anticipation.
20   See, that's the way these -- I want you young people back there
21   to see, they never answer the question.
22              MS. BAILY:  Your Honor, I didn't --
23              THE COURT:  Because they know they are going to lose,
24   so they slide off to something else.
25        Stick with anticipation.
```

PROCEEDINGS

1          MS. BAILY:  I apologize, Your Honor.  I didn't

2    realize --

3          THE COURT:  As of November 9, did the system have

4    every single element of the Claim 13?

5          MS. BAILY:  We contend that it did.

6          THE COURT:  All right.  The way you say that, it

7    sounds like you really don't believe it.

8          MS. BAILY:  We believe that it did -- it did.  The

9    YouTube Remote prior art system had --

10          THE COURT:  All right.  How about selectability --

11    all right.  Stay.

12      What is it that was missing from -- on -- as of

13    November 9, from the system, what was missing from Claim 13?

14          MR. SULLIVAN:  Several things, Your Honor.  In

15    particular, elements -- Limitations 13.2 and 13.4 as well as

16    potentially 13.5.

17          THE COURT:  All right.  Well, let's stick with 2 and 4

18    for a minute.

19      What was number 2?  What's missing from 2?

20          MR. SULLIVAN:  Yeah.  So Limitation 13.2 is

21    identifying the particular playback devices that are available

22    on the same LAN network, the local area network, that the

23    remote control device is on.

24          THE COURT:  Just a minute.

25      13.2, I'm reading the exact language (as read):

**PROCEEDINGS**

1        "Identifying playback devices connected to the

2      local area network."

3      And -- all right.  So give me a sentence or two on the --

4  from your point of view of why you say that that was not

5  resident in the YouTube system as of November 9, 2010.

6        **MR. SULLIVAN:**  Yeah.  The YouTube system, Your Honor,

7  relies on an account-based or a pairing mechanism that looks at

8  whether or not you're logged into your YouTube account.  It has

9  nothing to do with whether or not you're on the LAN.  The

10  system doesn't identify any of the devices on the LAN.

11      It has a simple -- YouTube Remote has a simple "connect"

12  button.  You hit it.  It automatically connects you to all the

13  devices that you're logged into, whether they're on a different

14  network; you're doing it over 3G; it doesn't matter if you're

15  on the LAN or not.  It can't identify and detect or discover

16  any playback devices that are on the LAN.

17      That's 13.2, Your Honor.

18        **THE COURT:**  Okay.  We'll come to the others.

19      What do you say to that comment?

20        **MS. BAILY:**  Your Honor, so this is basically reading

21  in limitations to the claim that aren't there.  All that's

22  required is that after connecting to a local area network,

23  playback devices connected to the local area network --

24        **THE COURT:**  It says, "identified."

25        **MS. BAILY:**  It says, "are identified."

PROCEEDINGS

1          **THE COURT:**  You left that word out.

2          **MS. BAILY:**  No, no, no.  I was coming back to it.

3          **THE COURT:**  What is the identification that says

4     "identifying playback devices connected to the local area

5     network"?

6          **MS. BAILY:**  That's right.  So, if you -- I don't know

7     if Your Honor has watched the video that we submitted.

8          **THE COURT:**  No, I did not.  I have read a lot of

9     stuff, but I have not seen the video.

10          **MS. BAILY:**  Okay.  Well, we can play it here today

11     or --

12          **THE COURT:**  Play it if it's important to this

13     argument.  This could be the winning argument for you.  You

14     could get a home run and go to the federal circuit if you're

15     convincing.

16          **MS. BAILY:**  Excellent.  It's a lot of pressure.

17          **THE COURT:**  I'm not saying that yet, but -- I'm not

18     convinced yet, but why even bother with this if the thing isn't

19     valid from the get-go?  All right.

20          **MS. BAILY:**  I agree.

21          **THE COURT:**  So playback, the thing -- whatever you

22     want to show me that's going to help me see that it's

23     identifying playback devices connected to the local area

24     network.

25          **MS. BAILY:**  Yes.

PROCEEDINGS

1          **THE COURT:**  You've got to meet that entire language.

2          **MS. BAILY:**  Understood, Your Honor.  So I'm going to

3     describe what is in the video.  And then, if we can load it up,

4     I'll show it to you.

5          **THE COURT:**  Okay.  Fine.

6          **MS. BAILY:**  In the video, there's a guy using the

7     YouTube Remote system.  It's -- the video is clearly prior art.

8     It's dated from a few days after the YouTube Remote system was

9     released.  He says -- he's holding his phone, and there's a TV

10    that he's going to transfer playback to.

11         And he says, "Make sure you are both on the same Wi-Fi."

12    Okay?

13         So that's a local area network system.  So the

14    demonstration is of two -- two devices on the same local area

15    network system, and he expressly says in the video -- and then

16    the video -- in the video, there is the operation of the system

17    where the video is sent to the TV, and the TV is identified by

18    the controller to play the video, because it then plays the

19    video on the TV.

20         So the remote control gets a notification that the TV is

21    connected.  It doesn't say -- the notification doesn't tell the

22    controller that it's on the same local area network, but you

23    know from the video that it is.

24         So a TV is identified to the controller.  It's on the same

25    local area network, and the playback gets played onto that

**PROCEEDINGS**

1    other device.

2         THE COURT:  Okay.  Wait a minute.  Now, the language

3    is "identifying," the present participle, I-N-G (as read):

4              "Identifying after connecting to a local area

5         network via a network interface," comma, "identifying

6         playback devices connected to the local area

7         network."

8         MS. BAILY:  That's right.

9         THE COURT:  So tell me -- you went by it too fast.  I

10   want to understand it again.

11        MS. BAILY:  Okay.

12        THE COURT:  How did the YouTube system do exactly

13   that?

14        MS. BAILY:  To start with, the controller and the TV

15   and the video are, as a factual matter, on the same local area

16   network.

17        THE COURT:  All right.  Let's assume that for the sake

18   of argument.  But even so, identifying -- how does it -- where

19   does that come in?

20        MS. BAILY:  So the controller receives a

21   notification --

22        THE COURT:  Controller is the phone; right?

23        MS. BAILY:  That's right, that the TV is available to

24   transfer playback to.

25        THE COURT:  So that's the identifying --

PROCEEDINGS

 1          MS. BAILY:  That's the identification.

 2      Now, it doesn't -- what Sonos's quibble, I think, is is

 3   that notification doesn't expressly say that the TV is on the

 4   same local area network.

 5      But I don't read this limitation as requiring that.  What

 6   it requires is identifying playback devices, like the TV and

 7   the video, that are connected to the local area network, which

 8   the TV and the video clearly is.

 9      And the controller receives an identification of the TV to

10   playback onto.  So it doesn't --

11          THE COURT:  Does it -- in the video, is it going to

12   identify multiple devices or is it only going to identify one?

13          MS. BAILY:  In the video -- there is only, I believe,

14   one TV in the video.

15          THE COURT:  How long will it take to play the video?

16          MS. BAILY:  I think the video in its entirety is two

17   and a half minutes.

18          THE COURT:  All right.  Roll the tape if you've got it

19   ready.

20      Am I connected here?  Am I going to be able to see this?

21          THE CLERK:  Yes.  Yes.

22      That will go out in five seconds.

23          THE COURT:  I see it now, but it -- yes.  Go ahead and

24   play it.

25                      (Pause in proceedings.)

PROCEEDINGS

1          **THE COURT:**  You should have practiced this.  This is

2   not coming through.

3          **MS. BAILY:**  Do you see it, Your Honor?

4          **THE COURT:**  It's an advertisement for up to 30 percent

5   off.

6          **MR. HEFAZI:**  Here is the video, Your Honor.

7          **THE COURT:**  Right.  I don't have any sound.  No sound.

8       What's the problem, Angie?

9          **THE CLERK:**  It's on their end.

10         **MR. VERHOEVEN:**  We figured it out, your Honor.

11                (Video played but not reported.)

12         **THE COURT:**  Okay.  All right.  So, Ms. Baily, make

13   your point about the video.

14         **MS. BAILY:**  So the point about the video -- you might

15   have heard it at the end, he says, "Make sure all the devices

16   are on the same Wi-Fi network" -- the guy says.

17       A Wi-Fi network is a local area network.  So we know that

18   the controller, the phone, and the playback device, the TV,

19   were both connected to the same local area network.

20       Now, to playback -- to play content from your phone to

21   transfer it to the device, the controller, the phone, had to be

22   notified that the device was there.  And this happens, and we

23   have other documentation of this, through certain messages.

24       The controller gets a notification that the device is

25   available, otherwise it wouldn't be able to cast; it wouldn't

1    be able to transfer the playback.

2         And there is no other requirement; right?  So the playback

3    device is on the local area network; the controller is notified

4    that it's available; and the controller is able to transfer the

5    playback to it.

6         Now, the controller is not notified specifically that the

7    TV is on the same local area network.  That part is true, and

8    that's because the YouTube Remote system can -- can -- work

9    with other playback devices that are not on the same local area

10   network.

11        And Sonos focuses on that, and it is true that YouTube

12   Remote can work both with the devices on the same local area

13   network and with devices that are not.  But the patent doesn't

14   say that that's prohibited.  It just says that the

15   controller -- well, let me look exactly at the claim language,

16   Your Honor, so that I don't get it wrong.

17        It says (as read):

18             "After connecting to a local area network via a

19        network interface" -- which the controller does, and

20        there's no dispute about that -- "identifying

21        playback devices connect to the local area network."

22        It doesn't say that there is -- you can't have other ways

23   to operate.  And, in the example that we just saw, the

24   controller casted to the TV -- transferred playback to the

25   TV -- which was on the same local area network.

**PROCEEDINGS**

1      And, after connecting to the local area network,

2   identifying playback devices, the TV connected to the local

3   area network.  And it was.  It was connected to the same Wi-Fi

4   network.

5      So, the video -- the example in the video meets this

6   limitation.

7          THE COURT:  Well, it -- but, in the video example,

8   there is only one TV.  The language is plural, "identifying

9   playback devices."  And then, later on in the claim, it -- the

10  plural is important because then you get the choice of

11  selecting one of those.

12          MS. BAILY:  I think at the end --

13          THE COURT:  But, in your video, there was no selection

14  process, and there was just one device.  It was connected to

15  the local area network, but it wasn't identifying more than

16  one.

17          MS. BAILY:  I believe at the end of the device [sic],

18  the guy says that it can done with multiple devices.

19      And, in fact, there's --

20          THE COURT:  Does it say that you can select which of

21  the multiple devices that you want to show the content on?

22          MS. BAILY:  No.  And that's a different element in the

23  claims, and he doesn't speak to that.

24      But it's undisputed that YouTube -- the YouTube Remote

25  system works with multiple devices.  That piece is undisputed.

PROCEEDINGS

1      THE COURT:  But does the multiple devices -- at the

2  time of the video, did the multiple devices -- would the

3  content be shown on all of them?

4      MS. BAILY:  Yes.

5      THE COURT:  All right.  So when did the selectability

6  come in?

7      MS. BAILY:  So -- give me just a second, Your Honor.

8                  (Pause in proceedings.)

9      MS. BAILY:  So, Google updated YouTube Remote to add a

10  traditional device picker.

11      I don't know if it's possible to show Slide 24.

12      And we produced evidence of that, the availability of a

13  traditional-looking device picker screen, from December 1,

14  2011.  So this was not at the time of the video.  It was later.

15  It was December 1, 2011.  We produced source code that

16  demonstrates the operation of the screen, the device picker

17  screen.

18      THE COURT:  Okay.  Let me see what you've got.  Have

19  you got --

20      MS. BAILY:  So, actually, I apologize.  There was some

21  source code mentioned, so I'll hand up, if it's --

22      THE COURT:  All right.

23      MS. BAILY:  -- if it's all right.

24      THE COURT:  Which slide, please?

25      MS. BAILY:  So if you turn to Slide 24, and we

**PROCEEDINGS**

1   actually cite to our expert's declaration.

2           THE COURT:  24?

3           MS. BAILY:  24.

4           THE COURT:  Is this in your original motion?

5           MS. BAILY:  It is.  It's in the opening brief on

6   Exhibit 1 at paragraph 170.

7       And so we have a capture of the source code from

8   December 1, 2011, that implemented a traditional-looking screen

9   picker device.

10          THE COURT:  I don't see the source code.  Where is any

11  source code?

12          MS. BAILY:  I'm sorry.  It's the name of the file

13  where the source code resides, and this is his interpretation

14  or his description of the source code.

15          THE COURT:  You're telling me that that's a trade

16  secret that -- the name of the file?

17          MS. BAILY:  Well, it's just -- so I think it's a

18  cumulative thing, Your Honor.  So if we start talking about all

19  the names of files and the various aspects of this case and the

20  functions of those names, it just starts to get to a place that

21  I think make Google uncomfortable.

22          THE COURT:  We're not up to that point yet.  The name

23  of the file -- I don't see how that can be deemed to be a trade

24  secret.

25          MS. BAILY:  I don't know that it's a trade secret,

 1    Your Honor.  I know that Google -- Google keeps all aspects of

 2    its source code confidential in some parts --

 3              THE COURT:  You're the one that's suing in this case.

 4    Why didn't you go to arbitration or something?  If you want the

 5    United States District Court, which belongs to the people of

 6    the United States, you want me to come in, swoop down, and

 7    knock out their patent, and yet you want to do it in secrecy so

 8    the public can't see what's going on.

 9              MS. BAILY:  That's not the intent, Your Honor.

10              THE COURT:  That is your intent.  There is no way that

11    the name of the file should be kept secret.

12              MS. BAILY:  Understood.

13              THE COURT:  The source code, I would agree with, but

14    not the name of the file.

15        Now you got me so upset, I've forgotten where I was.  What

16    were we talking about?

17              MS. BAILY:  So the traditional --

18              THE COURT:  Oh, yeah, the selector.

19              MS. BAILY:  -- device picker.

20              THE COURT:  All right.  But that's comes after

21    their -- that's the December 1, 2011, but that's after

22    July 15th, 2011.

23              MS. BAILY:  That is.  Now, there is no evidence in the

24    summary judgment record that they're entitled to that date at

25    all.

PROCEEDINGS

1    **THE COURT:**  Your own footnote said that that was the
2    date you were working with.
3    **MS. BAILY:**  No.  No, it didn't, Your Honor.
4       That footnote said that the YouTube Remote patent was --
5    is dated before both asserted dates.  And --
6    **THE COURT:**  What?
7    **MS. BAILY:**  That footnote that we looked at,
8    Footnote 8 --
9    **THE COURT:**  Yeah.
10   **MS. BAILY:**  -- I believe said -- let me look to make
11   sure.
12   **THE COURT:**  Read it out loud.  Read that Footnote
13   Number 8 out loud again.
14   **MS. BAILY:**  Yeah.  It says, "The Y2R patent" -- so the
15   patent that relates to the system --
16   **THE COURT:**  Is that our patent here?
17   **MS. BAILY:**  No.  This is the system.  We're relying
18   primarily on the system.  But we also -- because we do have
19   obviousness arguments, we do talk about the patent that relates
20   to the system.
21   **THE COURT:**  All right.  Okay.
22   **MS. BAILY:**  And so, the footnote just says the Y2R
23   patent was filed before Sonos's alleged intervention date and
24   is prior art.
25   **THE COURT:**  And what date did you say?

1        **MS. BAILY:**  July 15, 2011.  But we've never --

2        **THE COURT:**  Does the patent call out selectability?

3        **MS. BAILY:**  It does.

4        **THE COURT:**  Is that true?

5        **MR. SULLIVAN:**  No, Your Honor.

6        **THE COURT:**  All right.  Show me where in the patent it

7   calls out selectability, the YouTube patent.

8        **MS. BAILY:**  If we could go to Slide 18.

9        **THE COURT:**  Do you have a set of these for my law

10  clerk to follow along with?

11       **MS. BAILY:**  Yes, Your Honor.

12       **THE COURT:**  Would you give him one, please?

13     Okay.

14       **MS. BAILY:**  So I'll just focus your attention.  I'm

15  just using this as a demonstrative to try to answer your

16  question.  So you should look at the left part of this slide,

17  which is the YouTube Remote patent.

18     And, just for clarity, because I don't want to be

19  misleading, the right part of the slide is how we eventually

20  implemented it later.

21     So that's something -- that's what we just talked about.

22       **THE COURT:**  That's not in the patent?

23       **MS. BAILY:**  This picture is not in the patent.

24       **THE COURT:**  But the language is in the patent?

25       **MS. BAILY:**  That's right.

**PROCEEDINGS**

 1          **THE COURT:**  What was the date?  What was the

 2   application date of this patent?

 3          **MS. BAILY:**  Let me just make sure I get it right,

 4   Your Honor.

 5      There is no dispute about it.  Let me find the date.

 6          **THE COURT:**  They always say that, but there always is

 7   a dispute.

 8      So what is the date of the patent?  Filed when?

 9          **MR. HEFAZI:**  March of 2011, Your Honor, and it claims

10   priority to provisional in November of 2010.

11          **THE COURT:**  Okay.  So selectability -- show me --

12          **MS. BAILY:**  So in the bottom box, it says (as read):

13          "The user may also utilize the remote control

14      application of remote control 75" -- that's the

15      phone -- "to select one or more previously-paired

16      control devices."

17      That's a description of a device picker.  The user selects

18   one or more of the devices that are available -- the paired

19   devices -- and that's an exact description of what we

20   ultimately implemented and what lots of people had at the time.

21          **THE COURT:**  All right.  Okay.  What -- let me go to

22   the other side.  Why doesn't that call out selectability?

23          **MR. SULLIVAN:**  Yeah, Your Honor.  I think -- and I may

24   have to hand you up the actual patent because they've kind of

25   cut off the previous sentence that starts at the bottom of

**PROCEEDINGS**

1  column 10, which explains the pairing.

2      But this -- this is a reference to, once they're paired,

3  you can select for your transport controls; and those are

4  "play," "stop," "fast forward," "rewind."  The remote control

5  aspect of that, you can select that to use with one of the TVs.

6      But the pairing mechanism -- and I'll just read it into

7  the record here -- is talked about in the preceding sentence of

8  that paragraph, where it says (as read):

9          "A user may use the remote control

10     application" --

11         **THE COURT:**  Go slower, please.

12         **MR. SULLIVAN:**  Yeah.

13         **THE COURT:**  Start over and go slower.

14         **MR. SULLIVAN:**  My bad.  (as read):

15          "A user may use the remote control application

16     of Remote Control 75, for example, to initiate

17     contact with a server, such as Server 24, for pairing

18     Remote Control 75 to one or more control devices,

19     such as Control Device 18, shown in Figure 1."

20     Again, that's referring to the same pairing mechanism.

21  And it's throughout this entire patent application -- or

22  patent, I should say.

23     It's the same as YouTube Remote application in November of

24  2010.  It's based on whether or not you're logged in, and

25  however many devices are logged in, that is who gets paired.

1    There is no option to pick which device you want to be

2    paired.  You're forced to be paired with every device that's

3    logged into the same YouTube account.

4    And that's what you heard in that video too.  You have to

5    be logged into the same YouTube account, otherwise this doesn't

6    work.

7    **THE COURT:**  All right.  Wait.  So your point is --

8    your point is that the remote control can select to transfer to

9    whoever is logged in, whichever devices are logged in, but it

10   cannot select between or among those devices that are logged

11   in?

12   **MR. SULLIVAN:**  Correct, Your Honor.

13   **THE COURT:**  Okay.  Hold that thought.  Is that --

14   **MS. BAILY:**  I mean, that's not my understanding,

15   because, Your Honor, the patent goes on to say -- so what I

16   think I understand Sonos is saying is, you can't pick the

17   devices that are paired to the -- to the phone.  But then the

18   patent says, once all the devices are paired, the user can use

19   the application on the phone to select one.

20   **THE COURT:**  Well, it says, for example, the user

21   may -- no.  It says (as read):

22        "And to send control messages to one or more

23        paired control devices."

24   Now, that's ambiguous.  It could mean if you've got one

25   that's logged in, you send it to one.  If you've got more than

1    one that's logged in, you send it to all of them.  That's --

2         **MS. BAILY:**  So I'm sorry, Your Honor.  I'm not sure

3    that I understand that.  I just want to understand what you're

4    saying so that I can respond.

5         **THE COURT:**  Well, it doesn't say -- let's say you have

6    two TVs that are hooked up and to the same -- logged in.  I'm

7    talking about the 2010 technology, prior art.  And they are

8    logged into the same account.

9         One way to read this language that you've given me is that

10   you have the option to either play the content on the two TVs,

11   but you have -- if you're going to do it, it has to be both of

12   them, or you can play it on your smartphone; but what you

13   cannot do is -- it doesn't call out, at least -- is deciding to

14   play it on TV1 instead of TV2, even though both of them are

15   logged in.

16        **MS. BAILY:**  So, Your Honor, I think it does, because

17   after the highlighted part of the language in the slide -- so,

18   it says (as read):

19            "And to send control messages" -- so, you know,

20        play -- "to one or more" -- one or more -- "paired

21        control devices."

22        **THE COURT:**  Yeah, I see that.

23        **MS. BAILY:**  So if you have --

24        **THE COURT:**  But that's parroting the language in the

25   prior sentence or prior phrase that says "to select one or more

1   previously" . . .

2          **MS. BAILY:**  I think that supports this too.  I guess

3   I'm missing it.  Let me maybe just say one --

4          **THE COURT:**  What did the examples give that -- was

5   there an example in this YTR patent that gave an embodiment

6   where it said:  Okay.  You select two -- you connect up two

7   TVs, and you might decide just to play it on TV2 and not -- and

8   so something else would play on TV1.

9          **MS. BAILY:**  I don't think the patent goes into that

10  detail on this point, Your Honor.

11      I guess I'm still missing the issue.  This language seems

12  clear to me, so I apologize if I'm not responding directly to

13  your question.

14      Is it -- is my confusion about the paired?  Right?  So the

15  paired -- the paired is the identification of the devices;

16  right?  So the paired devices is the larger set of devices.

17      And then this is saying you can select one or more of

18  them, and you can hit "play" on one.  So this says you can

19  select one of the paired control devices and hit "play," send a

20  play message to one of the control devices.

21      So I guess I'm not seeing the ambiguity in the language,

22  and I apologize that I'm missing it.

23          **THE COURT:**  Well, maybe it's not ambiguous, but I

24  feel -- I don't know.

25          **MS. BAILY:**  I'm sorry, Your Honor.  Can you just ask

PROCEEDINGS

1  me --

2      **THE COURT:**  This is why -- this is why the world is

3  crazy.  Millions of dollars would be spent on something this --

4  this is not even in the patent in suit.  This is one you came

5  up with.  You should have written it more clearly.

6      **MS. BAILY:**  I apologize, Your Honor, to --

7      **THE COURT:**  It doesn't use the word "select."  It says

8  "select," but it doesn't say select between the two.  It

9  says -- or the group.  It says (as read):

10      "To send control messages to one or more paired

11      control devices."

12  Which could mean what you're saying.  I agree it could

13  mean that.  But it also could mean:  Look, if you've got 14

14  paired control devices, you've got the option to send it to all

15  14 or to none.  But you don't have the option to send it to 12

16  and 12 or -- 12 and 2.

17      It doesn't say -- address that.

18      So it's one of those two.  It's called ambiguity.

19      **MS. BAILY:**  So, Your Honor, if I could just say one

20  thing:  I don't think there is an ambiguity for me, the two

21  clauses together, because the word "select" is in the prior

22  clause; right?

23      So first, you select one or more of the devices.  So there

24  is a group of paired devices, and it says you can select one of

25  them.  So there's three --

PROCEEDINGS

1          **THE COURT:**  That's a good point.  I hadn't focused on

2    that.  What do you say to that, that the word "select" -- on

3    the plaintiff, Sonos's, side, the word "select" is in there.

4    It's just in the prior phrase.  So it says (as read):

5               "Select one or more previously-paired control

6          devices."

7          So they have been previously paired.  So you select one of

8    them -- or more -- so you could select -- if you've got 14

9    connected, you could select six -- and to send control messages

10   to one or more paired control devices, meaning that the ones

11   you select.

12         What's wrong with that?

13         **MR. SULLIVAN:**  Yeah, Your Honor, I think some of the

14   confusion here -- I think you just actually made a great point.

15   It's to select one or more previously paired.  They're already

16   paired.  They're already talking to each other.  They're

17   already in the transfer of playback mode.

18         What this is talking about is you can select one for your

19   transport controls.  And, again, you have to go back to the

20   previous sentence, not in this phrase.  You've got to go back

21   to the previous sentence.

22         **THE COURT:**  Read me the previous sentence so that I

23   can have that in mind.

24         **MR. SULLIVAN:**  Your Honor, would you like me to just

25   hand you up the patent?

PROCEEDINGS

1          THE COURT:  Yeah, that's probably -- somewhere, I've

2     got it here, but I don't think --

3          MR. SULLIVAN:  It's at the bottom of column 10, Your

4     Honor.

5          THE COURT:  I don't think they gave it to me -- or did

6     they?  Wait a minute.  Wait a minute.  I want to see if I've

7     got it first.

8        Claim -- '615.  '615, I do have.  Okay.  Where do I look?

9          MR. SULLIVAN:  No.  We need the '998 patent, which is

10    their YouTube Remote patent.

11         THE COURT:  Yes, you're right.  I don't have that one.

12       Okay.  '998, what column?

13         MR. SULLIVAN:  It's line 62 at the bottom of

14    column 10.

15       Yeah.  I'm sorry, Your Honor.  It's small.

16         THE COURT:  62.  My line 62 is -- only has one word.

17    You mean 63?

18         MR. SULLIVAN:  Perhaps.  It's the last paragraph in

19    column 10.

20         THE COURT:  All right.  (as read):

21          "The user may use the remote control application

22       of Remote Control 75, for example, to initiate

23       contact with a server, such as Server 24, for pairing

24       remote control to one or more control devices, such

25       as Control Device 18, shown in Figure 1."

 1        **MR. SULLIVAN:**  Your Honor, 24 is their MDX server.

 2   It's the server that accounts for whether or not you're logged

 3   into your YouTube account; right?  And that's what's used,

 4   again, to pair and connect these devices for playback.

 5        And so, again, you're connected -- and we can read the

 6   entire patent top to bottom, Your Honor, but it's the same as

 7   their YouTube application in the same time frame of November

 8   2010.  It's how it worked.  You had to be logged into the

 9   YouTube account on all your devices, and then you got

10   connection with all those devices.

11        There was no selection of one of those devices and not the

12   other ones.  You got whatever was logged in.  The system had no

13   way of identifying which devices were on the LAN network and

14   then allowing you to select one of devices.

15        **THE COURT:**  So we're talking about the patent right

16   now, not the system?

17        **MR. SULLIVAN:**  Right.

18        **THE COURT:**  So what -- what in -- what in the language

19   that you read to me in that paragraph says what you just told

20   me?

21        **MR. SULLIVAN:**  Well, that -- the sentence that you

22   read in that paragraph, which precedes the sentence that

23   Google's counsel is referring to --

24        **THE COURT:**  Correct.

25        **MR. SULLIVAN:**  -- that's talking about the pairing.

**PROCEEDINGS**

1  That's talking about pairing to all of the devices you're

2  logged into.  Maybe it's only one.  Maybe it's more.  But you

3  can't select from that list.

4      The selection they talk about in the next sentence is

5  about transport controls after you've already paired.

6  "Previously paired devices."

7          **THE COURT:**  I need to spend a moment on -- explain to

8  me what the issue is on the source code, when it was available,

9  and where it fits on the timeline.

10     So the -- let's start with Sonos.

11     **MR. SULLIVAN:**  Yeah.  So the source code that they

12 refer to, the December 1st, 2011 source code, as Your Honor

13 noted, is after our July 15th, 2011, invention date.

14     Their expert, the same expert that they referred to on --

15 what was it -- Slide 24, the Dr. Bhattacharjee in his

16 declaration, about four or five spots -- I can give you those

17 cites, Your Honor.  They're paragraphs 19, 23, 124, 126, and

18 170.  He, again, confirms that he's using the July 15th, 2011,

19 invention date that Sonos has contended.

20     So, again, I think it's really clear here again.  That's

21 the invention date we're dealing with for purposes of the

22 summary judgment motion, he used that date.

23     This source code, December 1st, 2011, where they have

24 allegedly added the device picker, that comes after that

25 invention date.

**PROCEEDINGS**

1    Even if they had the device picker at that point in time,

2  again, you have to remember that this YouTube Remote

3  application, even as of that later time, with the device

4  picker, still relied on an account-based pairing mechanism,

5  which means you had to be logged into your account.

6    So that system, again, did not identify devices that were

7  on the LAN, because if you're on the LAN and not logged into

8  the account, you weren't getting connected.  So, again, it

9  didn't identify devices on the LAN that then would be available

10  for transferring playback, even if you had the device picker.

11          **THE COURT:**  Okay.  What do you say to that, Ms. Baily?

12       **MS. BAILY:**  Sure.  Well, I think there were a lot --

13  there was a lot of different things going on there.

14    I'll say that, with respect to the briefing, we wanted to

15  just convey to Your Honor what was before the filing date of

16  the patent at issue and acknowledge an allegation that had been

17  made regarding a prior date.  And we never accepted the prior

18  date, and they never said that the prior -- offered any

19  evidence that there was a prior conception date.

20    Okay.  Putting that aside --

21          **THE COURT:**  But it's your motion, and your opening

22  brief took July 15th, 2011, as the date you were dealing with

23  for purposes of your motion.

24          **MS. BAILY:**  We did want to provide you --

25          **THE COURT:**  So they don't have to prove it up.  It's

**PROCEEDINGS**

1  your burden.  You said that's the date you were starting with.

2  Even if you're later contesting it, it's the way you pitched

3  your motion.

4      **MS. BAILY:**  Your Honor, I guess we were expecting -- I

5  understand your point, Your Honor.  We wanted to provide you

6  with all of the information.

7      **THE COURT:**  All right.

8      **MS. BAILY:**  With respect to the source code and the

9  device picker, so there is no dispute that the source code for

10  the device picker was prior art to the December filing date.

11  The December 2000 -- I'm sorry.  Let me just start again and be

12  clear.

13      There is no dispute that the source code for the device

14  picker was implemented prior to the filing date of the Sonos

15  patent.  There is no dispute about that.  I didn't hear a

16  dispute about that.

17      And there is no dispute that that source code results in

18  something that looks like the right-hand side of Slide 24,

19  which shows a list of devices and a selection of one.

20      Now, I heard that -- all kinds of other elements that were

21  being added to what the patent actually says.  All that's

22  required by this limitation is that you have a list of devices

23  to choose from and that you can select one.

24      And there's no dispute that that's what happens, and

25  actually, Sonos's expert does not dispute that the

1    December 2011 source code discloses a device picker.  So

2    there's no evidence that it doesn't, and it clearly -- it

3    clearly does.

4        Now, the issue of a local area network is separate.  As I

5    described earlier, the early versions of the YouTube Remote

6    system -- I'm only talking about the system right now --

7    operates to identify devices that are on the same local area

8    network.  It can also operate to identify devices that are on

9    different kinds of networks, but, again, that's not precluded

10   by the patent.

11       So the LAN issue, I think, is a red herring.  You know, we

12   went through the video, and it -- it -- the YouTube Remote

13   system works with devices that are on the same local area

14   network.

15       Now, I don't want to shy away from that, but I -- if Your

16   Honor will entertain an additional argument with respect to the

17   YouTube Remote patent on that LAN issue -- on the LAN issue

18   that was raised, the patent also clearly discloses --

19            **THE COURT:**  The YTR patent?

20            **MS. BAILY:**  Yes.

21            **THE COURT:**  It clearly what?

22            **MS. BAILY:**  It clearly discloses that LAN limitation

23   that keeps coming up.  I can show that to you.

24       So if, for example, you look at Slide 13, you can see that

25   the remote control, the phone, and the control device, the TV,

 1  are on a network:  22.  And the patent expressly says that

 2  Network 22 may be a local area network.

 3      And so, again, to me, this is not a device picker issue,

 4  which I thought was the subject of your question to Sonos's

 5  counsel with respect to the source code and our limitation of a

 6  device picker.  This, to me, has nothing to do with that.

 7          **THE COURT:**  All right.  I've got to move to -- we only

 8  have a few minutes left on this patent, so I want you to

 9  summarize your best noninfringement argument.

10      And then we've got to take a break and go to the next

11  patent.  So, again, I want to give you a chance to make your

12  best pitch on noninfringement because you've only got about

13  five or six minutes.  So stick with your best point.

14          **MR. VERHOEVEN:**  Good morning, Your Honor.

15  Mr. Verhoeven for Google.

16      In light of your instruction, I'm going to realtime edit

17  this and get to the point.

18          **THE COURT:**  Fine.  Please.

19          **MR. VERHOEVEN:**  Okay.  If we could go -- I have a set

20  of slides.  Can you hand those up, please?

21          **THE COURT:**  All right.  I've got some slides.  How

22  many booklets of slides do you have?

23          **MR. VERHOEVEN:**  Noninfringement booklet.

24          **THE COURT:**  Huh?  This is the other side's booklet?

25          **MR. VERHOEVEN:**  I think that was for invalidity,

**PROCEEDINGS**

```
 1    Your Honor.
 2            THE COURT:  It says Google on here.
 3            MR. VERHOEVEN:  I'd -- rather than use the screen, if
 4    it's okay with Your Honor, I'll just use the hard copy.
 5            THE COURT:  Yeah, that's fine.
 6            MR. VERHOEVEN:  Okay.  So if you turn to Slide 10, the
 7    strongest argument is YouTube receivers do not store a local
 8    playback queue.  This is -- the name of the patent is the local
 9    queue.
10        And, if you look at the next slide, Slide 11, Your Honor,
11    here is the claim language (as read):
12            "Causing one or more first Cloud servers to add
13        multimedia content to a local playback queue on a
14        particular playback device."
15        So we don't have one of those.  We do not have -- Google
16    does not have a local playback queue.  We don't infringe.
17            THE COURT:  Well, don't -- all right.  Now, as I read
18    the paperwork, what you do have is the last played, the current
19    one, and the next one?
20            MR. VERHOEVEN:  Right.
21            THE COURT:  Why isn't that enough to satisfy the
22    queue?
23            MR. VERHOEVEN:  Because that's not a queue.
24            THE COURT:  Why isn't it?
25            MR. VERHOEVEN:  That's the processing of the queue
```

**PROCEEDINGS**

1  that's resident on the Cloud.  So we need to get to:  What is a

2  queue?

3      So, if we could go to Slide 13, please.  So let me just

4  talk about claim construction for a second, Your Honor.  Our

5  position -- that a queue is an ordered list of multimedia items

6  that is selected by the user for playback.

7      And the dispute here, Your Honor, on claim construction is

8  whether a queue is an ordered list or whether it's just an

9  identifier, an identification.  A queue is something different.

10  A queue is a specific logic structure, Your Honor.  It's an

11  ordered list that's created and maintained.

12      And where that list is maintained is in the Cloud for

13  Google, and that ordered list is maintained locally for the

14  patent.  There is no infringement.

15      The processing of the queue is a completely different

16  thing.  So if I draw a picture -- I'm going to just draw a

17  picture on this and hold it up for Your Honor, if that's okay.

18      You've got the Cloud, and you've got your ordered queue in

19  the Cloud, and then you've got the speaker playback device.

20      **THE COURT:**  Do this:  Go -- roll that easel.  I can't

21  see that far.

22      **MR. VERHOEVEN:**  Okay.

23      **THE COURT:**  I need magic markers or something.  Use

24  the easel.

25      **MR. VERHOEVEN:**  Thank you, Your Honor.

```
 1              THE COURT:  And don't use a highlighter.  That is a

 2   common mistake.  Use a dark color.  And, if we don't have one

 3   there, I'll go get you one; but don't use a highlighter.  And

 4   draw your diagram again.

 5              MR. VERHOEVEN:  So here is the Cloud.

 6              THE COURT:  Okay.  I see that.

 7              MR. VERHOEVEN:  And the ordered list is the queue.

 8   The ordered list --

 9              THE COURT:  Give me an example of "ordered list."

10   What would that be?

11              MR. VERHOEVEN:  A playlist.  Do you ever have a

12   playlist, Your Honor, on your phone or anything?

13              THE COURT:  No, I don't.  I hardly ever use this

14   thing.

15              MR. VERHOEVEN:  You can.

16              THE COURT:  I want to hear -- I do one song.  I don't

17   have a -- I don't look that far ahead.  I do one song:  Johnny

18   Cash, Linda Ronstadt.

19              MR. VERHOEVEN:  Love Johnny Cash.

20              THE COURT:  That's good.  That's good.  Linda

21   Ronstadt.  I just pick one song.

22              MR. VERHOEVEN:  Okay.  You don't need a queue.

23              THE COURT:  I don't need a queue.

24         So I was going to ask:  How I would work on this patent?

25         All right.  But let's say you have 10 songs.  Let's say,
```

```
 1   you have the entire Linda Ronstadt album, her best hits.

 2            MR. VERHOEVEN:  Okay.  So --

 3            THE COURT:  Let's say that there are 16 of those.

 4            MR. VERHOEVEN:  All right.  So I create this list.  I

 5   want to -- I use my phone, and I create a list.  Okay?

 6        That list, in the Google system, does not go to the

 7   playback device, the speaker.  Okay.  This is a speaker.  I'm

 8   just going to call it "speaker," to use normal language.

 9        And the list that the user created is up in the Cloud.

10   Okay?  This is the way the Google system works.  And what the

11   speaker does is those three things.

12            THE COURT:  What things?

13            MR. VERHOEVEN:  What's next?

14            THE COURT:  Last?

15            MR. VERHOEVEN:  Yes.

16            THE COURT:  Last?

17        All right.  Okay.  So, you're saying that the thing up in

18   the Cloud is the queue?

19            MR. VERHOEVEN:  Right.

20            THE COURT:  And, therefore, it never gets to the

21   speaker?

22            MR. VERHOEVEN:  Right.

23            THE COURT:  Well, take my example.  Let's say you just

24   have one song.

25            MR. VERHOEVEN:  Uh-huh.
```

PROCEEDINGS

1          THE COURT:  How does it work there?

2          MR. VERHOEVEN:  It's not an ordered list.

3          THE COURT:  What if you have three?

4          MR. VERHOEVEN:  A queue has to have meaning.

5          THE COURT:  What if you have three?  Let's take three.

6    That's the toughest case, I think.  Let's say you have three.

7    I've got three Linda Ronstadt songs that are in the Cloud.

8          MR. VERHOEVEN:  Okay.

9          THE COURT:  And what's going to be down -- isn't

10   there -- aren't they going to be down there in the speaker, all

11   three?

12         MR. VERHOEVEN:  One at a time, they're going to be

13   played.

14         THE COURT:  Yeah.

15         MR. SULLIVAN:  One at a time.

16         THE COURT:  And then, when you're on the middle one,

17   all three will be --

18         MR. VERHOEVEN:  If you have a short list, it doesn't

19   mean it changes its location, Your Honor.  The list is located

20   in the Cloud.  The speaker calls for each song next, next,

21   next.  It has no idea beyond this -- you know, what you just

22   mentioned.

23      It does not maintain the list.  There's tons of analogies

24   you can come up with, Your Honor.

25         THE COURT:  Give me one.

**PROCEEDINGS**

1          **MR. VERHOEVEN:**  It's like, if I'm waiting to get into

2    court and I'm in the queue, I'm waiting to get into the

3    building, and I have to go through security one at a time.  The

4    queue is outside the courtroom.  It's not the -- it's not the

5    security processing the people one at a time.  It's the queue.

6    It's the line.

7          And, here, in computer -- in computer -- in computer use,

8    I guess I'll say, the queue is an ordered list.  It's not one

9    at a time.  You have the queue -- the maintenance of the queue

10   is done and saved in the Cloud.

11         **THE COURT:**  All right.  Now, let's go back to the

12   claim language.

13         **MR. VERHOEVEN:**  Okay.

14         **THE COURT:**  Let's make sure we're reading it -- now,

15   you both are fond of sticking words in there that are not

16   actually in there.  So read the real language, and tell me

17   what's missing.

18         **MR. VERHOEVEN:**  So the real language is not

19   particularly helpful within the patent because it's using plain

20   and ordinary meaning.  So it says "local playback queue."

21         So, for example, the claim language on Slide 11 -- if we

22   can go back to that, Your Honor.

23         **THE COURT:**  Yes.

24         **MR. SULLIVAN:**  It just says, "A local playback queue."

25         Now, if you go to the specification --

PROCEEDINGS

1          THE COURT:  Wait.  It says "A local playback queue on

2     the particular playback device."

3          MR. VERHOEVEN:  Right.

4          THE COURT:  So let me --

5          MR. VERHOEVEN:  This is the playback device.

6          THE COURT:  All right.  So, pause for a second.

7          MR. VERHOEVEN:  Yeah.

8          THE COURT:  I'm trying to understand your argument.

9     Your argument is that the speaker -- the speaker has to have

10    memory, a smart -- it's got to be a smart speaker.  It's got to

11    have memory that is organized in a way to know the entire queue

12    and to be able to call it up?

13         MR. VERHOEVEN:  No, no, no.

14         THE COURT:  Okay.  What has to be resident --

15         MR. VERHOEVEN:  This does not know the queue beyond

16    those three --

17         THE COURT:  No.  I'm sorry.  I'm talking about the

18    patent, what the patent requires.

19         MR. VERHOEVEN:  Right.

20         THE COURT:  Not what the --

21         MR. VERHOEVEN:  I'm sorry.  Your Honor, yes.

22         THE COURT:  Not what your system does.  Not the

23    accused system, but the patent.

24         MR. VERHOEVEN:  Right.  If I can just --

25         THE COURT:  No.  Let me -- let me -- I'm trying to

1  find out, are you saying that the speaker -- according to this

2  language of the claim, the speaker itself must have knowledge

3  and -- resident in the speaker of what the queue is?

4       MR. VERHOEVEN:  The queue must reside in the playback

5  device.

6       THE COURT:  The speaker?

7       MR. VERHOEVEN:  So if you have a phone -- I have a

8  phone, Your Honor.  I create this playlist, this beautiful

9  playlist.  Okay?  There's two ways you can deal with storing

10  this playlist.  You can store it on the speaker or you could

11  store it in the Cloud.

12       THE COURT:  Why not store it on your own phone?

13       MR. VERHOEVEN:  Or you can store it locally on your

14  phone, which it doesn't -- isn't even alleged to do.

15     So what the choice was -- and I can go through these

16  slides in detail, but we don't have time.

17       THE COURT:  We don't have time.

18       MR. VERHOEVEN:  It used to be local, Your Honor.  So

19  the choice used to be, we've got to populate it here.  Sonos --

20       THE COURT:  Please, Angie, during the next break, get

21  us some magic markers that work.  These are dried up.  Poor

22  Mr. Verhoeven, he's having to push down on it so hard.  I don't

23  want to use a highlighter.  I want to use a magic marker that's

24  dark.

25     All right.  But you're evading my point, and I don't think

**PROCEEDINGS**

1    you're doing it on purpose; but focus just on the speaker.

2            **MR. VERHOEVEN:**  Right.

3            **THE COURT:**  Does the patent claim -- not the accused

4    product.  Does the patent claim require that the entire queue

5    be on the speaker?

6            **MR. VERHOEVEN:**  Yes.

7            **THE COURT:**  Okay.  You said -- that's good.

8            **MR. VERHOEVEN:**  A local playback --

9            **THE COURT:**  You're saying you don't do that?

10           **MR. VERHOEVEN:**  Right.

11           **THE COURT:**  Okay.  Stop that point.  What is your

12   response to that?  And I understand his point.  His -- the

13   accused device never has more than three.  It has past --

14   immediately past and the next one coming up and the one that's

15   being played, but it does not have the entire playlist.

16       So, I can see that.  I can see that point.  So, what is

17   your response to that?

18           **MR. BOYEA:**  Yeah.  First, Your Honor, Mike Boyea from

19   Lee Sullivan Shea & Smith for Sonos.

20       As you noted, there are embodiments where a queue could

21   have one, two, or three -- the entire queue that's up in the

22   Cloud could have one, two, or three.  This speaker would have

23   that entire queue.

24       What Google is advancing is this false premise that there

25   can only be one copy of a queue in a system, and that's simply

**PROCEEDINGS**

 1    not the case.  We see that in Google's own documentation, and

 2    we see it in the patent.  The only thing that the patent is

 3    requiring in 13.5A is that the local playback queue has one or

 4    more resource locators added to it.  That's it.

 5        And it's indisputable that Google speakers have one or

 6    more resource locators added by the MDX session server.  There

 7    is no debate.

 8        So this false premise that there can only be one copy of a

 9    queue in a system like what's described in the '615 patent and

10    what is accused is just absolutely not true.

11        And I can walk through some evidence for you, Your Honor,

12    where Google's own engineers are saying what is on the queue --

13    what is on their playback devices is a queue.  They admit it.

14            **THE COURT:**  Read me one.

15            **MR. BOYEA:**  Absolutely, Your Honor.

16        I'm not going to publish it because it's confidential, but

17    I'll flip to the --

18            **THE COURT:**  How can this be confidential?  You just

19    got through telling me.  How could it be --

20            **MR. BOYEA:**  Sure.

21            **THE COURT:**  Are you really going to insist that this

22    be --

23            **MR. VERHOEVEN:**  I don't know what he's going to show,

24    Your Honor.

25            **MR. BOYEA:**  Your Honor, this one is comments from

**PROCEEDINGS**

 1   source code.  So, I want to respect Google's confidentiality,

 2   so I will just --

 3        THE COURT:  All right.  Maybe you can just hand it to

 4   up me.

 5        MR. BOYEA:  Okay.  Absolutely.  So, actually, this is

 6   a first example.  And then, if you flip the page, there are two

 7   additional examples.

 8        MR. VERHOEVEN:  What page is it?

 9        MR. BOYEA:  58.

10        THE COURT:  Well, this is not engineers in a

11   deposition.  This is source code.

12        MR. BOYEA:  This is source code, Your Honor.

13        THE COURT:  This is comments.

14        MR. BOYEA:  These are the comments in source code.

15        THE COURT:  Yeah.

16        MR. BOYEA:  And it explains in -- you see it

17   highlighted.

18        THE COURT:  All right.  So, tell me --

19        MR. BOYEA:  Google is admitting here that a receiver

20   has a queue.  It refreshes it, and it gets a portion of that

21   queue from the Cloud.

22        THE COURT:  Just a minute.  Let me look at it.

23        MR. VERHOEVEN:  Can I interpose one thing here before

24   we go too far into this, Your Honor?  This is not even on the

25   playback device.  This is on the phone.

1      **MR. BOYEA:**  Your Honor, that's misleading.  This is --

2      **THE COURT:**  What is the receiver that's referred to

3  here?

4      **MR. BOYEA:**  Yeah.  Exactly.  This receiver, that is

5  the playback device.  Yes, this is a snapshot of code from the

6  sender database of source code, but it's talking about how the

7  sender communicates with the receiver, which is the playback

8  device in the claims.

9      And it's saying right here, Your Honor:  The receiver

10  refreshes its queue.

11     **THE COURT:**  All right.  I see that part.

12     **MR. VERHOEVEN:**  Your Honor?

13     **THE COURT:**  Yes.

14     **MR. VERHOEVEN:**  If I can just point something out, so

15  this is highly confusing and misleading.  We're talking about

16  software on the phone.  That's what they're pointing to here.

17  Not software on the playback device.  And the phone does

18  display the queue so the user can see it, but it's not the

19  playback device.

20     So, what they're doing now is they're pointing to the

21  phone and its display of the queue and saying that that's

22  meeting the speaker -- that's in the speaker device somehow and

23  the queue is --

24     **THE COURT:**  But the words "receiver" -- what does it

25  mean as used here?

PROCEEDINGS

```
 1              MR. VERHOEVEN:  It may mean that the phone is talking
 2    to the speaker because the phone can use control --
 3              THE COURT:  I see above there, it's referring to the
 4    sender and referring to the receiver.
 5              MR. VERHOEVEN:  Where does it refer to --
 6              THE COURT:  At line 31, it looks like.  It says,
 7    "This" --
 8              MR. VERHOEVEN:  "About any local changes to the
 9    Cloud" --
10              THE CLERK:  Please don't talk over the judge.
11              MR. VERHOEVEN:  I apologize, Your Honor.
12              THE COURT:  Okay.  Let me just read it out loud.
13         I'll read from the very top.  (as read):
14              "Responsible for syncing Cloud queue between the
15         remote device and the sender."
16         Now, let's just pause there.  What is the remote device,
17    and what is the sender?
18              MR. BOYEA:  Would you like me to answer?
19              MR. VERHOEVEN:  The sender is the phone.
20              THE COURT:  The what?
21              MR. VERHOEVEN:  The sender is the cell phone.
22              THE COURT:  What is remote device?  Is that the
23    speaker?
24              MR. BOYEA:  That's the receiver, Your Honor.
25              MR. VERHOEVEN:  Let me just check with my source code
```

**PROCEEDINGS**

1  person.

2      So, what I'm being told is that this is not even source

3  code.  This is a comment to source code, and it's not clear

4  what it's commenting on, even.

5      So we're not entirely sure, in the context -- I'm not

6  entirely sure, in the context, what this is saying, but --

7          **THE COURT:**  But wait.  The commentary is put in there

8  by the engineers at Google --

9          **MR. VERHOEVEN:**  Correct.

10         **THE COURT:**  -- to explain what the source code does.

11     So, this is written by Google.

12         **MR. VERHOEVEN:**  So, it's talking about syncing, Your

13  Honor.

14         **THE COURT:**  Yeah.

15         **MR. VERHOEVEN:**  And so the phone syncs with the Cloud.

16         **THE COURT:**  Once again, you have a marker --

17         **MR. VERHOEVEN:**  Yeah.  I'm sorry, Your Honor.

18         **THE COURT:**  You have one of those that does not work.

19  During the break, we're going to get you some that work.

20         **MR. VERHOEVEN:**  There is a sync that goes on here.

21  Okay.  So, the user -- the user can interface using the phone.

22  Do you see, Your Honor?

23     And so, I'm not 100 percent sure what this is commenting

24  on too, but the user can change the queue, and then that will

25  go in sync.

**PROCEEDINGS**

1    And the user can also make commands directly to the

2  playback device, like "stop," "play," you know, do these

3  different things.  But that's not the issue.

4          **THE COURT:**  All right.

5          **MR. VERHOEVEN:**  The issue is --

6          **THE COURT:**  I want to read this language here.

7          **MR. VERHOEVEN:**  -- where is the queue --

8          **THE COURT:**  Wait.  You hijacked his argument.  Hang on

9  a minute.  I want -- you interrupted me.  I'm going to read

10 this.

11     I don't think this deserves to be under seal or --

12 "Responsible for syncing Cloud queue between the remote and the

13 sender."

14     All right.  Now, that's a question what those two terms

15 mean, "remote device," "sender."  Okay.  Blah, blah, blah,

16 blah, blah, blah.  Here's one called "remote playback client."

17     All right.  "It also notifies remote device about any

18 changes in Cloud queue triggering from app."

19          **MR. VERHOEVEN:**  Cloud queue.

20          **THE COURT:**  Yeah, I see the word "Cloud queue." (as

21 read):

22          "This handles following interaction between the

23      sender and the receiver which are needed for

24      synchronization.  Notifies the receiver about any

25      local changes to the Cloud queue and asks the

PROCEEDINGS

```
 1        receiver to refresh its queue.  These changes can

 2        include setting, shuffle mode, or repeat mode."

 3             MR. VERHOEVEN:  So, Your Honor, can I explain that?

 4             THE COURT:  All right.  I'd like for you to tell me

 5   what you -- what the phrase "remote device" means, "sender"

 6   means -- just a minute -- "receiver."

 7        What are those -- what do those mean?

 8             MR. BOYEA:  Your Honor, can I illustrate it for you on

 9   the whiteboard here?

10             THE COURT:  All right.  I'll going to let you go

11   first.

12             MR. BOYEA:  Thank you.

13             THE COURT:  Use a marker that is dark.

14             THE CLERK:  I gave him one.

15                       (Pause in proceedings.)

16             MR. BOYEA:  So, Your Honor, as best as we can tell

17   from these source code comments, the remote device is a

18   reference to the receiver.  It's the only thing that makes

19   sense in this context.  We're talking about the sender and the

20   receiver.  The sender -- that's Google's -- that's the

21   smartphone running the app.  The receiver, that's the smart

22   speaker that receives the content, the transfer of playback.

23        In the comments, it's talking about the Cloud queue.

24   There's no dispute.  Google -- Sonos does not dispute that

25   there is a Cloud queue in the system.  But just because you
```

1   have a Cloud queue does not mean you don't also have a local

2   playback queue on the receiver.  In fact, you also have a queue

3   on the sender.

4        In these systems, Your Honor, there are multiple copies of

5   the queue, and they get synced.  That's exactly what the

6   specification --

7             THE COURT:  Well, it's only if -- but it's only if --

8   it's only the last, the next, and the current?

9             MR. BOYEA:  Correct, Your Honor.  It's not that every

10  device necessarily has the whole contents of the Cloud queue,

11  but that's not what's required by the claims, and that does not

12  negate the fact that the receiver has a data construct that

13  stores one or more resource locators that dictate what --

14            THE COURT:  Here's the problem, I think, with your

15  argument.

16            MR. BOYEA:  Sure.

17            THE COURT:  It says, "causing" -- I'll read the

18  language (as read):

19             "Causing one or more first Cloud servers to add

20        multimedia content to a local playback queue on the

21        particular playback device."

22        So let's pause there.  And I'll give -- the scenario that

23  I feel you're not dealing with is this:  Let's say that you

24  have 16 songs in the Cloud, and you do nothing; you make no

25  changes, you do nothing.  You just let it -- so the receiver or

**PROCEEDINGS**

1   the -- as you said, or the speaker, the smart speaker, if you

2   do nothing but let it move forward, in order for the speaker to

3   know what song to play next, it has to consult the queue.

4           **MR. VERHOEVEN:**  Correct.

5           **THE COURT:**  So, how is it going to get that?

6       Well, it does know what the next one is.

7           **MR. BOYEA:**  And the previous, Your Honor.

8           **THE COURT:**  And the previous one.

9       All right.  And I guess your argument is because it knows

10  the next one, it can -- I guess it has a URL?  Is that what it

11  has?

12          **MR. BOYEA:**  A video ID, Your Honor.

13          **THE COURT:**  That it sends off the URL and tees that

14  up?

15          **MR. BOYEA:**  Exactly.

16          **THE COURT:**  All right.  So, Mr. Verhoeven, the

17  argument against you here is that -- there are two queues:

18  There is one in the Cloud, and there is another one on the

19  speaker.  The local playback queue is on the speaker, and all

20  it needs to know is what is the next one.

21      And so that's good enough for its purposes and just calls

22  the next one.

23          **MR. VERHOEVEN:**  You know, this is --

24          **THE COURT:**  What do you say to that?

25          **MR. VERHOEVEN:**  I say that that's unpersuasive in the

PROCEEDINGS

 1   extreme.

 2           THE COURT:  Okay.

 3           MR. VERHOEVEN:  We're talking about a queue.  Somebody

 4   has to own that queue.  Somebody has to maintain that queue.

 5   Somebody has to be in charge of that queue.  Who is it?

 6       It's the Cloud.  That's why it's called the Cloud queue.

 7   The queue is maintained in the Cloud.  If you want to know --

 8   if you're the speaker and you want to know the next item in the

 9   queue, you ask the Cloud because the Cloud maintains the queue.

10       Everybody -- well, let me just go through the evidence.

11   If we could go to Slide 30.

12       Your Honor, just let me know if you get there.

13           THE COURT:  I think I --

14           MR. VERHOEVEN:  30.

15       So the evidence clearly shows that the playback queue is

16   maintained and controlled in the Cloud.  It's a Cloud queue,

17   not a local queue.

18       These are Google documents.  They are contained within the

19   opposition papers.  You'll see it says (as read):  "

20           "Legacy Support:  Since the queue is now

21       maintained in the MDX server and not the TV" -- so

22       the MDX server is the Cloud -- "we only need to

23       listen to video changes," and it goes on.

24       Another document (as read):

25           "When casting, the queue is persisted as a

**PROCEEDINGS**

1        server-side remote queue."  Google's documents.

2        Another document.  This is 39799, control number (as

3   read):

4            "Casting use case stores the queue in YouTube's

5        servers as a remote queue playlist," Your Honor.

6        And another document, 39800 (as read):

7            "The MDX session servers manages the remote

8        queue playlist.  Clients make queue edit operations,

9        add to queue, reorder, remove from queue, et cetera,

10        through the MDX session server."

11        That's the stuff he's pointing to.  It's right here.

12        I'm sorry.

13          **THE COURT:**  Does the claim language require Cloud

14   queue?  Does it use that phrase?

15          **MR. VERHOEVEN:**  The claim language requires a local

16   queue.  And anyone in computer science would understand that

17   "local" versus "remote" is talking about "client" versus

18   "server."

19        So a local queue is on your local device, as opposed to

20   being on a Cloud device.

21        And we don't have -- we don't -- the queue is not in

22   memory, resident, maintained, controlled by anything other than

23   the Cloud.  The Cloud is in charge of it.  Of course it talks

24   to other devices, Your Honor.  In order to be able to play a

25   queue from the Cloud, you have to have some communication, like

**PROCEEDINGS**

1    a turnstile, going in.  But it's not the queue itself.

2        And the user can change the queue and do different things

3    with the queue, and then that goes up here.

4        **THE COURT:**  But, to answer my question, does the

5    phrase "Cloud queue" show up in this claim?

6        **MR. VERHOEVEN:**  No.  They have a different patent for

7    a Cloud queue, Your Honor.  It's one that wasn't selected.

8    It's in this case.  So they're accusing us of both using a

9    local queue and a Cloud queue, which is the whole different

10   story.

11       But, yes, there is a total distinction between --

12       **THE COURT:**  You could have set up your system -- I'm

13   putting on my hat as an engineer.  You could have set up your

14   system where you didn't tell the receiver what the next and the

15   last was.  You could -- that information could be resident on

16   the smartphone.

17       There is no magic in putting it in the receiver, is there?

18       **MR. VERHOEVEN:**  Yeah, I'm sure there is.  I mean, I

19   could just think, off the top of my head, that there may be

20   efficiencies in knowing what the next one coming in is for

21   processing purposes.  Not for queue maintenance purposes.  For

22   processing purposes, Your Honor.

23       **THE COURT:**  Why couldn't that also be done by the

24   smartphone?

25       **MR. VERHOEVEN:**  The smartphone isn't involved in this

**PROCEEDINGS**

1  exchange of playing back.  The smartphone doesn't play back.

2      THE COURT:  I know it doesn't on here, but you could

3  have designed it so that it was involved.

4      MR. VERHOEVEN:  But we didn't.

5      THE COURT:  I know, but you could have, and then you

6  wouldn't have this problem.

7      MR. VERHOEVEN:  We have the queue locally.  Okay?  So

8  did Sonos.

9      THE COURT:  Let me ask you this:  If you turned your

10  system -- if you turned your phone off altogether, would it

11  still be playing music?

12      MR. VERHOEVEN:  No.

13      THE COURT:  So it has to be on?

14      MR. VERHOEVEN:  Oh, no.  If you turn the phone off

15  after you hit play and everything, yeah.

16      THE COURT:  It still continues to play?

17      MR. VERHOEVEN:  Yeah.  And that just shows, the phone

18  is not involved in the processing of the queue or maintenance

19  of the queue.  The queue is maintained up here, the phone gives

20  the instruction, and the receiver calls for the first item in

21  the queue.

22      But the queue is up here in the Cloud.  It used to be down

23  here in the device, and for a variety of technical reasons, it

24  moved to the Cloud, just like so many other things have moved

25  to the Cloud.

**PROCEEDINGS**

1      And so the queue used to be maintained in the remote

2  device or the speaker playback device.  Sonos did it that way.

3  Google did it that way.  And then, long ago, Google moved to

4  Cloud and actually showed how to do -- how to move it to the

5  Cloud to Sonos.

6      **THE COURT:**  All right.  We've got to take a break.  I

7  want to give, though, the patent owner a few minutes to respond

8  to this.  And then we'll take a break, and then we've got to

9  start on the other patent.

10     Go ahead.

11     **MR. BOYEA:**  Thank you, Your Honor.

12     Again, Google is pushing this false premise that the

13  claims say that there can only be the local playback queue on

14  the particular playback device.  The claims do not say that.

15  And in the system described in the specification in Google's

16  system, there are multiple copies of a queue.

17     This one only holds a portion of the entirety, but there

18  is no debate, as you mentioned, that you could have one, two,

19  or three in the queue here.  That entire one, two, or three

20  items will be here.  That's the first point.

21     The second, your Honor, Mr. Verhoeven is pointing to

22  select statements from Google's documents that apparently

23  support his position, but Sonos has pointed out the exact

24  opposite.  I showed you one, the source code; but there are

25  other examples where Google's engineers are considering what's

 1   on the receiver to be a queue.

 2       That's not proper for summary judgment.  Weighing

 3   conflicting evidence -- Your Honor, we can't be doing that

 4   here.

 5       And I'll leave it at that, Your Honor.

 6       THE COURT:  All right.  We're going to take a 10- to

 7   20- -- no, 10- to 15-minute break and come back, and we're

 8   going to start on the other patent.

 9       Thank you.

10       THE CLERK:  Court is in recess.

11                  (Recess taken at 9:26 a.m.)

12                  (Proceedings resumed at 9:48 a.m.)

13       THE CLERK:  Call to order.  Please stay seated.

14       THE COURT:  Okay.  Back to work.  Let's go to the next

15   patent.  And let me get my paperwork.

16       THE CLERK:  Court is back in session.

17       THE COURT:  I'm sorry.  What's the number?  '998?

18       MR. ROBERTS:  I think you mean the '885 patent.

19       THE COURT:  '885.  Okay.  '885.  Right.  Okay.

20       All right.  I'm going to go in a slightly different way.

21       You're the plaintiff.  I want to give each side an

22   opportunity to make one point -- important point.  Whatever it

23   is, I'm not going to ask you.  I want to know your most

24   important point.  Then I'll give the other side a chance to

25   respond to that.  Then you get a rebuttal.

**PROCEEDINGS**

 1      Then we'll do it the other way, and the other side gets to

 2   make their most important point; you get to respond.  That will

 3   probably take an hour, and that's about all the time that I

 4   have left this morning.

 5      So let's start with Plaintiff on the '885, Claim 1.

 6          **MR. VERHOEVEN:**  Okay, your Honor.  The most

 7   important --

 8          **THE COURT:**  No.  He's the plaintiff; right?  Not you.

 9   I mean the patent owner.  The patent owner.

10          **MR. VERHOEVEN:**  Okay.

11          **THE COURT:**  So please, go ahead.

12          **MR. ROBERTS:**  Thank you, Your Honor.

13      Google offers these noninfringement arguments.  I'm going

14   to address, for the most important point, one of those

15   arguments.

16          **THE COURT:**  Okay.

17          **MR. ROBERTS:**  The first argument that they make is

18   about the meaning of the term "zone scene."

19      And this is Slide 5.  We have the two constructions.  We

20   argued in our motion under both constructions.  They offered no

21   response under our construction.  And under their construction,

22   they made an argument.  So I'm only going to address the

23   argument they made under their construction.

24          **MR. VERHOEVEN:**  Your Honor, I don't have a copy of

25   these slides that you're looking at.

PROCEEDINGS

```
 1              MR. ROBERTS:  We gave you the entire book,

 2    Mr. Verhoeven, so you do have them.

 3              THE COURT:  Okay.  So let me get that out as well.

 4              MR. ROBERTS:  It's the big, meaty one, Your Honor.

 5    I'm sorry.  We put them all together in one binder.

 6              THE COURT:  What slide do I look at?

 7              MR. ROBERTS:  Slide 5, Your Honor.

 8              THE COURT:  All right.  Hang on.  6 -- 5, Zone Scene.

 9    All right.  This one right here?

10              MR. ROBERTS:  Yes.  Thank you, Your Honor.  That's

11    where I am.

12              THE COURT:  All right.  Great.  I'm there, too.

13              MR. ROBERTS:  Okay.  We offered arguments under both

14    of these two constructions in our opening brief.  They, in

15    their opposition, only argued under their proposed

16    construction, so that's the only one I'm going to address in

17    this argument because there wasn't a responsive argument under

18    our construction.

19         Their argument under their construction was that that

20    construction was required as a result of the application of law

21    of the case.

22         If you turn to page -- the Slide 6, I have an excerpt from

23    their briefs.  And this is their brief where they argued about

24    their construction.  And they said, "As such, it is now law of

25    the case."
```

 1          And that was based upon the judge in Western Texas -- what

 2    he said from the bench.

 3          I want to take that as the premise of their argument.

 4          What they said is (as read):

 5              "Courts should be loath to revisit prior

 6          decisions of its own or coordinate court in the same

 7          case unless they were clearly erroneous or the

 8          parties present new evidence."

 9          But their entire argument on this term is based on

10    rearguing claim construction, because the claim construction

11    given by the court in Texas is the one shown on page 5, and

12    their entire argument is that "zone scene" requires not just a

13    previously saved groupings according to a common theme but that

14    it also requires you to save a certain specific set of

15    attributes as part of a zone scene.

16          So their entire argument is based upon arguing that the

17    construction requires an additional construction.

18          And, if you look, Your Honor, at page 7, Slide 7, this is

19    their brief where they make this argument, and what they say at

20    the top is (as read):

21              "The specification discloses that a zone scene

22          command could apply the following attributes."

23          And then, down below, they say (as read):

24              "A zone scene, therefore, must include the theme

25          attributes described above."

**PROCEEDINGS**

1   There are several problems with this.  The first, a zone

2   scene command is not a zone scene.  A zone scene command is a

3   command to implement a zone scene or control a zone scene.

4   And, if you look at the difference, Your Honor -- this

5   is -- just to move to Slide 9, this is an example.  This is

6   Figure 6 from the patent.  And one of the key ideas in this

7   patent is you separate out the creation or the definition of

8   the zone scene from the invocation and synchronization of the

9   players in the zone scene.

10   And the zone scene command is a command that comes after

11   invocation.  It is not the definition of zone scene.

12   So going back to Slide 7, the first problem with their

13   reliance on this passage is that it's not talking about the

14   definition of zone scene.  It's talking about a zone scene

15   command.

16   The second problem is that, as I've underlined, it said

17   the command "could" apply the following attributes.  And then

18   down -- what I've dropped it in red, it says they say it,

19   therefore, must include those attributes.  And "could" and

20   "must" are not the same.

21   If you'd turn the next slide, to Slide 8, Your Honor,

22   Slide 8 is intrinsic evidence from the patent itself.  And what

23   it says is (as read):

24   "A morning zone scene command would link the

25   bedroom, den, and dining room together in one

1      action."

2          Nothing about parameters.

3              "Without this single command, the user would

4      need to manually and individually link each zone."

5          Figure 3A, which I've reproduced below, provides an

6      illustration of one zone scene where the left column showed the

7      starting zone groupings.  All the zones are separate.  The

8      column on the right shows the effect of grouping the zones to

9      make a group of three zones named after morning.  And that's

10     what's shown here.

11         There is nothing about needing to save configurations,

12     much less the specific configurations they have.

13         Indeed, Your Honor, if you turn back to Slide 9, which I

14     showed you previously -- this is Figure 6 -- you'll see in this

15     the flow chart where we talk about configuring a scene.  At

16     Box 606, they say you save the scene -- that's the zone

17     scene -- with parameters.

18         So in this embodiment, you save the scene with parameters,

19     but that does not mean the scene and the parameters are the

20     same.  "With" implies they're different, and you save them

21     together.  So "zone scene" does not necessarily require the

22     existence of parameters.

23         If I could ask you to turn to Slide 10.  And this is

24     another example, Your Honor, from the specification.

25         It says -- and I'm starting about halfway down, (as read):

1              "Although various scenes may be saved in any of

2         the members in a group, commands are preferably sent

3         from the controller to the rest of the members when

4         one of the scenes is executed."

5         And this is what I'm telling you.  Their passage was about

6    commands after you invoke the scene, not the definition of the

7    scene itself.

8         And then it says (as read):

9              "Depending on implementation, the commands

10         include parameters pertaining to identifiers of the

11         players, volume, audio, et cetera."

12         So my point here is threefold:  Number one, they say it's

13    law of the case and so they should not be permitted to

14    relitigate the definition.

15         Number two, the actual passage on which they rely is

16    talking about a command, not the zone scene itself, and it

17    talks about what it could include, not what it must include.

18         And, number three, the intrinsic evidence from the patent

19    clearly treats zone scenes and parameters as distinct; and

20    while they can be used together and the commands to manipulate

21    a zone scene can create parameters, it does not require as an

22    inherent part of the zone scene, that you save parameters.

23         **THE COURT:**  Okay.  So, let me -- this -- on your

24    Slide 7, that quotation -- it's not a quotation, but where it

25    says, "The specification discloses that a zone scene

PROCEEDINGS

1  command" --

2         MR. ROBERTS:  That is a -- that quote that they have

3  there is from the spec.  And what they are -- what this whole

4  passage in this paragraph said is a photocopy of a page of

5  their opposition brief at 4 and 5.

6      So what this is showing is the fact that they quote the

7  specification as saying "could," and then after they finish

8  that quote, they redescribe that could as a "must."

9         THE COURT:  All right.  But what was it that the judge

10  said in Texas that is the law of the case that -- allegedly the

11  law of the case?

12         MR. ROBERTS:  Page 5.

13         THE COURT:  Uh-huh.

14         MR. ROBERTS:  That the zone scene is a previously

15  saved grouping of zone players according to a common theme.

16      Nothing about parameters.  Nothing about specific

17  parameters.  And what Mr. Verhoeven, I believe, is going to

18  tell you is:  Well, Judge, we need to know what a theme is, and

19  a theme is something that has these parameters.

20      But that's where I would ask you, Your Honor, to turn to

21  Slide 14.

22         MR. VERHOEVEN:  At this point, he's replying to my

23  arguments without me even speaking.

24         THE COURT:  Wait, wait.  No, you don't get to hijack

25  his argument.

**PROCEEDINGS**

1          Okay.  Let me get to 14.  All right.  14.

2               **MR. ROBERTS:**  Slide 14.

3               **THE COURT:**  Yes.

4               **MR. ROBERTS:**  And this is what Mr. Verhoeven said in

5     the previous claim construction hearing about the meaning of

6     zone scene.  And he says, Your Honor, in your tentative, you've

7     adopted the plaintiff's proposed construction, which I'm going

8     to get to; and in our view, that does not require a scene or a

9     theme.  It's the same thing as a definition of a zone.

10         And so we think that, at a minimum, it should just be

11    plain and ordinary meaning of what a scene or theme is.  So

12    they advocated for plain and ordinary meaning of "scene" or

13    "theme," and now, in their papers, they're advocating that

14    "themes" requires the existence of these parameters.

15         I will also point out, Your Honor, that they have taken

16    the position previously that the name of the group can be the

17    kind of thematic information that they say is required.

18         And, if you turn to Slide 12, when we pointed that out,

19    they said in response that's not true.

20         So, page 12 is from their brief, and they say, (as read):

21              "Sonos claims Google admitted that names

22         reflecting a specific area of the user's home, e.g.,

23         'garden,' is the theme information that would satisfy

24         the 'according to a common theme' aspect of Google's

25         proposed constructions."

PROCEEDINGS

```
 1        This is a disingenuous and faulty recitation of Google's

 2   brief.  But what I would ask you to do is turn to page 13,

 3   where I actually have the citations from their brief.

 4        And what you can see in the first citation is they say it

 5   requires that the zone scene be comprised of two or more zones;

 6   that those zones are grouped together according to a common

 7   theme, and provides examples of the thematic information, such

 8   as "morning, afternoon, or garden."

 9        So right there in their brief, they said that the

10   specification provides examples of the thematic information,

11   and that includes morning, afternoon, or garden.  Down below,

12   they said a similar thing, and these are both from the claim

13   construction brief.  Google also provided examples of scene

14   information, paren, morning, afternoon, or garden.

15        If you compare that to what they say on page 12, where

16   they say that Sonos claims Google admitted that names is theme

17   information, and he says that's false -- in both these

18   passages, they call "morning, afternoon, and garden," quote,

19   "thematic information."

20        And they didn't just do it in their brief, Your Honor.

21        THE COURT:  Okay.  All right.  Okay.  Now, we're

22   repeating ourselves.  All right.

23        MR. ROBERTS:  I was going to show one more piece of

24   evidence, Your Honor.

25        THE COURT:  All right.  Please do.
```

PROCEEDINGS

1          **MR. ROBERTS:**  Yes.  And this is Slide 16.  And then,

2    again, this is Mr. Verhoeven from the claim construction

3    hearing, where he says the theme would be, for example,

4    grouping three areas as a morning scene or a morning theme,

5    because you get up in the morning, and these are the three

6    areas you want to have music in.

7          Now, he's saying, this is not a theme, grouping them as

8    "morning" is not a theme, and you instead need to have all of

9    these various parameters.

10         I'll let him respond.

11         **THE COURT:**  All right.  Go ahead.

12         **MR. VERHOEVEN:**  Thank you, Your Honor.  So the first

13   issue is claim construction, and this is essentially what --

14   counsel's characterizing my arguments on the subject.

15         I'd like you to -- I have a deck myself.  I apologize in

16   advance.  I know you're going to say it's too much paper, Your

17   Honor; but here is their noninfringement and invalidity, so I

18   don't have to do it twice.

19         Noninfringement brief is on top -- or slide deck is on

20   top.

21         **MR. ROBERTS:**  Do you have a set for me, Mr. Verhoeven?

22         **MR. VERHOEVEN:**  Yes.  Hold on.  That was one of their

23   copies.

24         **THE COURT:**  All right.  I'm getting too many.

25         **MR. VERHOEVEN:**  I see I gave you too many, Your Honor.

**PROCEEDINGS**

```
 1          THE COURT:  Here.  Give these two to the law clerk and

 2   give these two to the law clerk.

 3        All right.  Okay.  Go ahead.

 4          MR. VERHOEVEN:  On the noninfringement slide deck,

 5   Your Honor, page 6 is where I'd like to begin.

 6          THE COURT:  Okay.

 7          MR. VERHOEVEN:  Okay.  So in the Texas case, they

 8   had -- the judge held claim construction and concluded that

 9   zone scene should be construed as following (as read):

10             "A previously saved group of zone players

11          according to a common theme."

12        Sonos vigorously opposed this construction and said a

13   common theme was not a requirement in their patent, and they

14   lost that.  They have not challenged that construction.

15        And what counsel is saying -- is characterizing as

16   attributes and whatnot is evidence that we used to show that

17   this is -- that this term, "zone scene," must be construed more

18   than just a grouping of zones.

19        So I'm going to repeat that again so that Your Honor has

20   the benefit of that argument; but before I do so, can we turn

21   to Slide 8?  These are the constructions proposed, Your Honor.

22        Now, the one on the left is the one that the Court adopted

23   in Texas, our construction.  The one on the right is what Sonos

24   is proposing.

25        And you notice, there's absolutely no description of what
```

PROCEEDINGS

1   a zone scene is.  It merely refers to zone scene as when the

2   zone scene is invoked, but doesn't describe what it is.  And,

3   in fact, when they apply this term, Your Honor, they apply it

4   to merely grouping speakers.

5        Now, that cannot be what a zone scene means, and I'm going

6   to walk through that with you, Your Honor.

7        So if you go to the next slide, the '885 patent,

8   Your Honor, the reason the patentee alleged they had an

9   innovation was the creation of zone scenes.  As you can see,

10  the zone scene appears throughout Claim 1.

11       Now, the patent does not define zone scenes.  But the

12  patent does define zone, Your Honor.  So, if you could go to

13  Slide 10.

14       You'll see -- this is column 4, 44 through 48, column 2, 4

15  through 41, of the '885 patent.  It says (as read):

16            "Each the audio devices may be installed or

17       provided in one particular area or zone, and hence

18       referred to as a 'zone player.'  Each of the players

19       is located in the zone."

20       This is the prior art.  Grouping of speakers into a zone

21  is not claimed as the new invention.  The zone scene is claimed

22  as the new invention.

23       Go to Slide 11, please, Your Honor.

24       Here is an illustration of a zone.  It could be a room.

25  It could be any area you define, and the speakers are all

**PROCEEDINGS**

 1   within that zone.  This is not innovative.  This is in the

 2   prior art.  They don't claim this is their invention.  They

 3   claim zone scenes is their intervention.

 4        Go to the next slide -- oh.  Next slide, Your Honor.

 5        Importantly, there is no dispute here -- the parties

 6   agree -- that they made this term up.

 7        "Zone scene" is a coined term from Slide 12, from Sonos'

 8   reply brief in the Western District of Texas at page 7, where

 9   they say, quote (as read):

10             "The parties agree that a zone scene is a

11        coined term."

12        And as Your Honor knows -- the next slide -- I cite some

13   case law I won't walk through, but as Your Honor knows, when

14   you coin a term, you don't use plain and ordinary meaning.  You

15   go to the spec and ask what it means in the spec.

16        Go to the next slide.  14, please, Your Honor.

17        It can't -- zone scene cannot be just a zone.  The zone is

18   in the prior art.

19        And so we pointed out to Judge Albright -- and I'm

20   pointing out here -- that it has to be more.  There has to be a

21   theme associated with the zone scene.  This is something they

22   wrote, they made up.  It's not just a zone.  It has to be more.

23        And so we have to look at the patent to see what it is.

24   Now, the construction -- if you go to Slide 15, Your Honor.  On

25   the left, Sonos's motion at page 8, that is their proposed

1    construction.  (as read):

2              "A previously saved grouping of zone players

3         that are to be configured for synchronous playback of

4         media when the zone scene is invoked."

5         Same phrase on the earlier slide; right, Your Honor?  But

6    that reads directly on just a zone.  They've taken out the word

7    "scene," which is construed by the Court to require a common

8    theme.

9         So having gone into the patent office, made up a term,

10   said it was new and unique -- but, of course, it's made up; you

11   can't find it in the prior art -- made up a term and got a

12   patent.

13        And now they're coming back to the Court and saying no,

14   no, no, no, this made-up term just means "zone" after they've

15   got their patent.  That is not the way to litigate a patent.

16             **THE COURT:**  Well, all right.  I agree with the large

17   part of what you just said except that in Texas, didn't you,

18   yourself, say that it would be enough to call it "morning"?

19             **MR. VERHOEVEN:**  No, no.

20             **THE COURT:**  I just read --

21             **MR. VERHOEVEN:**  It -- you know, this is -- this is --

22   you know, here, this is the brief they cited, Your Honor.

23        And what he fails to state is then we go on to cite our

24   interrogatory response, which states, quote (as read):

25             "Finally, Sonos argues that a group name serves

**PROCEEDINGS**

1      as a user's shorthand label of the common theme that

2      led the user to create the previously saved group

3      and, therefore, appears to conflate group names with

4      the claimed zone scene.  This is contrary to the

5      specification, which uses group naming and zone scene

6      separately and distinguishes between them."

7      This is the next part of our brief that he just didn't

8  show you.

9          THE COURT:  All right.  I have missed that.

10     Hand it to the clerk so I can read it.

11         MR. VERHOEVEN:  I apologize.  There might be some

12 highlighting on that, Your Honor.

13         THE COURT:  I'll give it back.  You should never

14 highlight in blue.  I can't read through the blue.

15         MR. VERHOEVEN:  It's that block and indent quote,

16 right at the top there.

17         THE COURT:  Where?

18         MR. VERHOEVEN:  The block and indent quote toward the

19 top.

20         THE COURT:  Oh, I see.

21         MR. VERHOEVEN:  The quote was -- that you saw from

22 counsel was at the top of the page.  And what he didn't show

23 you is --

24         THE COURT:  All right.  Let me just read it.  "First,

25 Sonos could not" -- is this your brief?  Yes.  Okay.

 1        Is this your brief in Texas or here?

 2        Here, I guess.  All right.  (As read):

 3            "First, Sonos could not genuinely believe Google

 4        admitted that simply naming a speaker group would

 5        constitute a zone scene.  Google served interrogatory

 6        responses disputing this infringement theory before

 7        Sonos filed its brief.

 8            "Quote, Finally, Sonos argues that a group name

 9        serves as the user's shorthand label of the common

10        theme that led the user to create the previously

11        saved group and, therefore, appears to conflate group

12        names with the claimed zone scene.  This is contrary

13        to the specification, which uses group naming and

14        zone scenes separately, and distinguishes between

15        them."

16        Hang on a minute.  I want to go back to -- I want to go

17        back to the other side's quotes.  One moment.

18            **MR. ROBERTS:**  And I think, Your Honor, you want

19        Slide 13 from us -- has those quotes -- and then the most --

20            **THE COURT:**  Yes.

21            **MR. ROBERTS:**  -- relevant quote is Slide 15 from the

22        hearing.

23            **THE COURT:**  Well, I'm looking at Slide 13, which is a

24        brief Google filed.  You say (as read):

25            "Accordingly, Google's construction is the

1      correct one.  It requires that the 'zone scene' be

2      comprised of two or more zones; that those zone

3      scenes are grouped together according to a common

4      theme and provides examples of the thematic

5      information, such as morning, afternoon, or garden."

6          Now, that's language from your own brief, isn't it?

7          **MR. VERHOEVEN:**  I think this is -- yes, it's a brief.

8   But can I explain, Your Honor?  Thematic --

9          **THE COURT:**  Wait.  Let me finish, and then I'll let

10  you explain.

11      Further down, it says, "Google" -- on a different page,

12  (as read):

13          "Google also provided examples of scene

14      information:  morning, afternoon, or garden."

15      Then on page --

16          **MR. ROBERTS:**  15, Your Honor, would be the next one.

17          **THE COURT:**  -- 15.

18      This is Mr. Verhoeven.  This is talking to the judge in

19  Texas. (As read):

20          "I'll merely add, Your Honor, that if you look

21      at this provisional, it says, for example, morning

22      scene.  That's exactly what's in the specification

23      that I showed you.  What I was reading, for example,

24      a, quote, morning, closed quote, scene, includes

25      three zone players, each in a bedroom, den, and

1          dining room.  This is showing the exact same thing,

2          and it's giving it a theme.  It's called 'morning

3          scene.'"

4          And put that -- quotes in morning scene.

5          So, all right.  Now you can explain.  Go ahead.

6               MR. VERHOEVEN:  Yes.  Naming a group can be according

7     to a theme.  It can be evidence that you have a theme.  But

8     what the plaintiff is arguing is that naming a group is always

9     a theme.  That every single name you give to a group is a

10    theme, and therefore, "zone scene" is "zone" if you name it.

11               MR. ROBERTS:  No.

12               MR. VERHOEVEN:  That -- please.

13               MR. ROBERTS:  I apologize.

14               MR. VERHOEVEN:  They say that infringes, Your Honor.

15         And they've written out the whole common theme attribute.

16    And what they've done is they've taken some examples where from

17    -- that I recite from the specification that talks about

18    attributes of the theme, which could be a name -- if you give

19    it -- but it has to be a theme.  It has to have a common -- the

20    zone has to have a common theme.

21         What does that mean?  Ask the plaintiff; they coined the

22    term.

23         The judge has said "common theme."  Google doesn't group

24    zones according to themes; period, full stop.  We group zones

25    in the old-fashioned way that's in the prior art, just

**PROCEEDINGS**

1  grouping.

2      We don't group according to themes.  We don't have

3  capabilities where you can set up a whole bunch of themes with

4  different attributes and do different things.  That's the whole

5  invention here, Your Honor -- at least that's what they claim

6  their invention is.  And we don't do it.

7          **MR. ROBERTS:**  May I respond to that, Your Honor?

8          **MR. VERHOEVEN:**  I'm not done.

9          **THE COURT:**  Wait, wait.  Not yet.

10     Please finish, Mr. Verhoeven.

11         **MR. VERHOEVEN:**  So if I could get back to the analysis

12  you do in claim construction, instead of gotcha admissions from

13  transcripts, let's look at the extrinsic evidence.

14     On Slide 17, Your Honor, here I've cited to portions of

15  the specification that describe zone scene.  It's provided to

16  allow a user to group some of the players according to a theme

17  or scene.

18     In general, the present invention is talking about the

19  present invention allows the user to group some of the players

20  according to a theme or scene.

21     When the scene is activated, the players in the scene

22  react in a synchronized manner.  For example, the players in

23  the scene are all caused to play an audio source or music in a

24  playlist.  That's one example.

25     It goes on.  It's column 3, lines 1 through 12.

PROCEEDINGS

```
 1        (As read):

 2             "Associated with the theme representing the

 3        group, the configuring -- and configuring the theme

 4        with parameters pertaining to the players where the

 5        theme is activated at any time or a specific time so

 6        that the players react in a synchronized manner, the

 7        players in the scene are synchronized to play a

 8        multimedia file when the scene is activated" -- in

 9        that example.

10        And many more examples.  Just one second.

11        THE COURT:  So what is your basic point?  I am a

12   little lost.

13        MR. VERHOEVEN:  My basic point is, he's saying:  Look

14   at these details.

15        And I'm saying, the judge says, rightly so -- and we urge

16   this Court to adopt -- they coined a term; it has to have some

17   meaning; they described it as a common theme, zones

18   establishing --

19        THE COURT:  You're saying a zone scene has to be

20   something different than a zone?

21        MR. VERHOEVEN:  Right.

22        THE COURT:  All right.  What is a zone, then, under

23   the --

24        MR. VERHOEVEN:  A zone is as, I showed you in

25   Figure 1 -- or -- Figure 1.  I'm sorry.
```

PROCEEDINGS

1      Slide --

2              THE COURT:  Is a zone a grouping --

3              MR. VERHOEVEN:  Yeah, that's all it is.

4              THE COURT:  -- of speakers?

5              MR. VERHOEVEN:  Yeah.

6              THE COURT:  But could it be --

7              MR. VERHOEVEN:  It's Slide 11.

8              THE COURT:  But could it be a single, like living

9      room?

10             MR. VERHOEVEN:  That's not really an issue that's at

11     issue here.  The issue is whether or not the zone is a zone

12     scene or not.  But, generally, you would think of a zone as

13     having more than one speaker, Your Honor, because otherwise you

14     just have a speaker.  You don't -- I guess, technically, you

15     might argue that.

16         That's not relevant to this motion, I guess, is what I'm

17     saying.

18             THE COURT:  You're saying, look, zone scene is an --

19     is an -- their own lexicographer, whatever, they made up the

20     term so that we have to look to the extrinsic evidence rather

21     than plain and ordinary meaning to see what it means.

22         And, therefore, you're saying the judge down in Texas said

23     it's a selection of zones based on a theme?

24             MR. VERHOEVEN:  Right.

25             THE COURT:  But -- and you're saying you don't have --

**PROCEEDINGS**

 1  the Google system does not have a theme.  Is that --

 2       **MR. VERHOEVEN:**  We don't -- all we do is allow users

 3  to form groups.  Now, what they're saying is the fact that we

 4  can let a group -- a user name a group means it's a theme.

 5       And they've stated the giving a name to a grouping is

 6  always a zone scene.  I can show you where they say it, if you

 7  want, Your Honor.

 8       **THE COURT:**  Okay.  Wait a minute.  Let me finish your

 9  thought, and I want to understand it.

10       **MR. VERHOEVEN:**  Okay.

11       **THE COURT:**  All right.  So, according to a theme --

12  and you say:  Look, the Google accused system allows you to

13  select, let's say, three speakers.

14       And you have to give it a name, don't you?

15       **MR. VERHOEVEN:**  Right.

16       **THE COURT:**  Call it up.  So let's say you call it ABC.

17       And you're saying Google doesn't care why you want A, B,

18  and C.  It just turns out you've selected A, B, and C.  And so

19  you say that's not a theme.

20       The other side comes back and says:  Well, it's -- the

21  theme is "ABC."

22       Right?

23       **MR. ROBERTS:**  I don't think we have to even go that

24  far.

25       **THE COURT:**  Well, wait a second.  Okay.  I want to

PROCEEDINGS

```
 1   stick with Verhoeven.

 2           MR. VERHOEVEN:  If we could go to Slide 13, I have

 3   their brief -- or their infringement contentions.  Even better.

 4           THE COURT:  Okay.

 5           MR. VERHOEVEN:  This is their infringement

 6   contentions.  (As read):

 7               "Every speaker group that a user creates in a

 8         cast-enabled playback system has some common theme."

 9           THE COURT:  Well, continue on.

10           MR. VERHOEVEN:  That's the first sentence.

11           THE COURT:  Wait.

12           MR. VERHOEVEN:  I mean, just let that resonate.

13           THE COURT:  The whole sentence --

14           MR. VERHOEVEN:  Let that resonate (as read):

15               "Every single speaker group that a user creates

16         has a common theme."

17       So they're saying, every zone grouping in the prior art is

18   a zone scene, even though they told the patent office that zone

19   scenes are different from grouping, that zone -- their

20   invention here is setting up groups with a common theme or

21   scene.

22       But now they're saying, just grouping.  If you give it a

23   name, it is a common theme.

24       And then they go on -- if you go to Slide 32, the next

25   part of their quote, I have the same quote up there,
```

1    Your Honor.  (As read):

2          "Which, in this context, amounts to whatever

3       common topic, subject, et cetera, led the user to

4       decide that they should be placed into a previously

5       saved group that allows for synchronous playback."

6       So they're now saying the user -- whether it's a theme or

7    not depends on what the user decides to name a group.

8          **THE COURT:**  No, not even --

9          **MR. VERHOEVEN:**  It's subjective.

10         **THE COURT:**  It's not even going that far.  It's saying

11   that whatever was in the mind of the user -- whether it's in

12   the name or not, but whatever -- whatever reason provoked the

13   user to invent the speaker group is the theme.

14         **MR. VERHOEVEN:**  Right.

15         **MR. ROBERTS:**  Not quite, Your Honor.  Let me --

16         **THE COURT:**  All right.  Okay.  Go ahead.

17         **MR. ROBERTS:**  All right.

18         **THE COURT:**  This is -- I want to let you fairly answer

19   that point, but I still want to stick with Verhoeven for a

20   moment.

21         **MR. ROBERTS:**  Yes, Your Honor.

22      I'm trying to think of how to say this most succinctly.

23   We are not contending that every group name is necessarily

24   thematic, and we don't have to.

25      If you look at the patent claim, the claim is to a speaker

**PROCEEDINGS**

1   or it's to a zone player with a network interface, a processor,

2   and a memory that has software that is operable to group things

3   according to a common theme when invoked if we adopt their

4   definition of zone scene.

5        So the speaker must be -- have software that is operable

6   to create a zone scene.  So let's assume, for a moment, we're

7   working under Judge Albright's construction and the zone scene

8   must, therefore, have a common theme.  Mr. Verhoeven said that

9   an attribute could be a name.  That's in the transcript from

10  this hearing.

11       And, if you look, Your Honor, at the command we are

12  accusing in this case, which is on Slide 17 of my

13  presentation --

14            **THE COURT:**  From yours?  Okay.

15            **MR. ROBERTS:**  Yes.

16       And, Mr. Verhoeven, in this context, will you let me say

17  the name of the command?

18            **THE COURT:**  Seven- -- I'm sorry.  Give me the --

19            **MR. ROBERTS:**  Slide 17, Your Honor.

20            **THE COURT:**  All right.  Is that it?  Look at this.

21            **MR. ROBERTS:**  Yes.  That's correct, Your Honor.

22            **THE COURT:**  All right.

23            **MR. ROBERTS:**  So this is from their brief.

24            **THE COURT:**  Uh-huh.

25            **MR. ROBERTS:**  And this is their discussion of the

**PROCEEDINGS**

1   command that we have accused.

2       And, if you look in that command, Your Honor, this is the

3   command that tells an individual speaker to join a group, and

4   it has the group UUID, and the name of the group that's right

5   under "Data."

6       So you can see that, according to their own description of

7   this command, the command that goes to a speaker and tells it

8   to join a group, includes the name of the command.  And what

9   that means is the software is operable to create a zone scene

10  if -- even if you say the zone scene must have a theme, given

11  Mr. Verhoeven's concession, that a name can be an attribute.

12  It can be thematic.

13      I don't dispute, Your Honor, that you could have a name

14  that's not thematic.  Let say one chosen at random,

15  stochastically.  The name wouldn't reflect a theme.  But the

16  point is, the device is operable to create thematic groups,

17  even if not all groups that are created are thematic.

18      So even if you interpret the words "zone scene" as

19  requiring a common theme, given the fact that they have said

20  that the names are examples of thematic information and

21  Mr. Verhoeven said -- and I'm quoting from here -- "an

22  attribute could be a name".  "An attribute could be a name".

23      The fact that they include names; the fact that those

24  names can be thematic -- for example, morning, which is the

25  exact example given in the specification -- shows that they

PROCEEDINGS

```
 1   meet this limitation even under Judge Albright's construction.

 2           MR. VERHOEVEN:  May I respond?

 3           THE COURT:  Yes.  I've got a question for you that's

 4   different, but go ahead.

 5           MR. VERHOEVEN:  Just really briefly.

 6           THE COURT:  Please.

 7           MR. VERHOEVEN:  If you could go to Slide 33, Your

 8   Honor.

 9           THE COURT:  Your Slide 33?

10           MR. VERHOEVEN:  Yes, please.

11           THE COURT:  33.  32.  Okay.

12           MR. VERHOEVEN:  This is an element little i from

13   Claim 1 on the bottom there.  Do you see it?

14           THE COURT:  Hm-hmm.

15           MR. VERHOEVEN:  All right.  So it already claims a

16   first predefined grouping of zone players different from a zone

17   scene, number one.

18       Number two, if you could turn to Slide 34.

19           MR. ROBERTS:  Sorry, Your Honor.  That's --

20           MR. VERHOEVEN:  Excuse me.  Can we turn to 34, please?

21   I'd like to cite to column 2, lines 9 through 16, Your Honor.

22   It's on that slide, illustrated.

23           THE COURT:  Okay.

24           MR. VERHOEVEN:  It says (as read):

25               "In the evening, the audio players in the den
```

**PROCEEDINGS**

1       and the living room are grouped for the music.  Over

2       the weekend, the audio players in the den, living

3       room, and kitchen are grouped for party music.

4       Because the morning group, the evening group, the

5       weekend group contain the den, it can be difficult

6       for a traditional system to accommodate the

7       requirement for dynamically managing."

8           Now, this is the description of the prior art, and they

9    already gave it those names.  That's the prior art.

10          And here you have counsel standing up before you and

11   saying, these names in and of themselves are zone scenes.

12   That's just not accurate.

13          Speaker group naming has been around forever, Your Honor.

14          And you said you had a question, so I'll stop there, if

15   you still have that question.  Or should I continue?

16          **THE COURT:**  It has to do with the -- it's a question,

17   and it's not a statement yet, and it may not ever be a

18   statement.  And I know you have a written description

19   argument --

20          **MR. VERHOEVEN:**  We do.

21          **THE COURT:**  -- but I -- and it somewhat relates to

22   that.

23          I have learned enough in these cases, and I'm asking to

24   what extent this applies in the present case.

25          Sometimes an inventor gets a patent, let's say, in the

**PROCEEDINGS**

1    year 2005.  Time goes on, and then, as time goes on, a new

2    competitor comes out with a product; and the patent owner

3    thinks, well, does this cover -- does our patent cover what the

4    competitor does?

5        And then they think about it and say, Well, not really.

6    The specification might be construed to cover it, but the

7    specification, of course, is not the claims.  The claims are

8    what is the invention, at least as allowed by the PTO.

9        But the law allows the inventor to go to the PTO and file

10   for additional claims and to try to use the -- in order to --

11   what's the word? -- get behind earlier than the new product, to

12   use the original specification, and say:  Look, PTO, we

13   disclosed that way back in 2005, and here is an additional

14   claim that we want.

15       And the intent by the patent owner is to read on the new

16   product.  I'm sure you are both familiar with this scenario.

17           **MR. VERHOEVEN:**  Yes.  Sonos is --

18           **THE COURT:**  Wait, wait.  But I'm not done with my

19   thing.

20       Sometimes it's clear cut, and the specification actually

21   does read right on it, and it's an easy project, and the PTO

22   grants the new claim.

23       Sometimes, though, there are two problems -- one or both

24   of two problems.  One is, the specification doesn't quite get

25   there; it gets part of the way there.  And sometimes the

1   examiner is smart enough to -- or on the ball enough -- they're

2   always smart enough; it's a question of whether they have

3   time -- is the examiner will say:  Wait a minute.  Your

4   specification doesn't really get there.

5        Now, in that scenario, the patent prosecution lawyer will

6   say -- or agent will say, well, we see your point, but we can

7   settle; we can live with the following language.

8        And they revise and amend, and the language does not

9   really quite get to the new product, but language is selected

10  that is loosey-goosey enough to be stretched to the new

11  product, and the examiner goes along with that, so -- then

12  leaving to the courts the problem of:  Does the new language

13  actually get to new product?

14       All right.  So, that's one scenario.

15       Another scenario in that problem is prior art.  The prior

16  art -- there may be good reasons why the new -- the language

17  selected for the new claim is in conflict with the prior art.

18  So the examiner may point that out.

19       Now, I asked my law clerk here, what about the prior art

20  in the prosecution history?  Okay.  What can we learn from

21  that?  And we haven't had time to get into that.

22       So I am asking you all:  Have you looked at that issue?

23  Because this -- the reason I bring it up is, this is an old

24  patent; it's not a new patent.  It's an old patent.  And does

25  it -- if this was such an obvious great invention, how come it

**PROCEEDINGS**

1  wasn't requested the first time?  Well, the law doesn't require

2  it to be requested; it can be requested after the fact.

3      But I know how it works.  I know that this gimmick goes

4  on -- which is lawful -- to try to get another brand-new claim

5  through the PTO based on an old specification.

6      All right.  I want to give you each a minute or two.  I

7  may give you even more time than that in the future, or more

8  opportunity to brief it; but let me, again, hear from Verhoeven

9  on that.

10         **MR. VERHOEVEN:**  Okay.  Well, this relates to our

11  Section 112 motion, Your Honor, so --

12         **THE COURT:**  Written description?  All right.  So --

13  but --

14         **MR. VERHOEVEN:**  Do you mind if I argue that?

15         **THE COURT:**  Your brief is only two or three pages long

16  on that point, and I don't know much from your brief on the

17  prosecution history of what the examiner said.  So.~.~.~

18         **MR. VERHOEVEN:**  I have it right here.

19         **THE COURT:**  All right.  Tell me.

20         **MR. VERHOEVEN:**  Okay.

21         **THE COURT:**  Tell me what point you can make on that.

22         **MR. VERHOEVEN:**  If you'd switch decks to the

23  invalidity deck.

24         **THE COURT:**  I'm sorry.  I need a moment.

25      Here we go.  Okay.

**PROCEEDINGS**

1    MR. VERHOEVEN:  And then please turn to page 37.  This

2  is on written description, Your Honor.

3    THE COURT:  All those law students back there, there

4  will be a test at the end of the proceedings, and I'm going to

5  send the grades to your schools.  Just teasing.

6    MR. VERHOEVEN:  Do you see a timeline?  Is that --

7    THE COURT:  I do, yes.

8    MR. VERHOEVEN:  Okay.  So on the left is the

9  September 2006 filing date, original filing date.  All right?

10    This patent with continuation patent wasn't filed until

11  2019.  What is that?  13 years later?

12    THE COURT:  About, yeah.

13    MR. VERHOEVEN:  So, yeah.  What they did -- and then

14  they further amended --

15    THE COURT:  But that's not, in and of itself --

16    MR. VERHOEVEN:  No.  I'm just starting --

17    THE COURT:  -- proof that it's invalid.

18    MR. VERHOEVEN:  I'm just starting, Your Honor.

19    THE COURT:  Okay.

20    MR. VERHOEVEN:  I'm just setting the stage here.

21    THE COURT:  Okay.

22    MR. VERHOEVEN:  So we've got a 13-year period that has

23  gone by since the original filing date and when the amendment

24  at issue, which is this August 2019 claim amendment, was filed.

25    Next slide, 38.  Here is an excerpt from the actual claim

 1  amendment, and it's got a citation at the bottom of Slide 38

 2  for this.  And you'll see that the amendment added, "While

 3  operating in standalone mode, players configured the playback

 4  media individually."

 5          THE COURT:  Is this the original --

 6          MR. VERHOEVEN:  This is their amendment.

 7          THE COURT:  The amendment as first proposed?

 8          MR. VERHOEVEN:  This is the amendment.  It was filed

 9  in August of 2019.

10          THE COURT:  Is this the one that it came out exactly

11  this way or is this --

12          MR. VERHOEVEN:  No.  This is what -- this is what

13  they -- yes.  This is what they amended in the underlining.

14  You know, those underlinings is helpful to show what's amended

15  and what's not.

16          THE COURT:  Okay.

17          MR. VERHOEVEN:  So I highlighted in yellow the

18  amendments that are pertinent to this argument.

19      So standalone mode -- they added that, which the

20  players -- so it starts out -- they added -- it starts with

21  standalone mode, and it's configured to play back individually.

22      And then they added some new procedures.  So on the

23  right-hand side, you'll see they've added (as read):

24          "After receiving the first and second

25      indications, continuing to operate in standalone mode

**PROCEEDINGS**

1          until a given one of the first and second zone scenes

2          has been selected for invocation."

3          And then, once there's that selection, transitioning from

4    operating in standalone mode.

5          So what they added is significant.  They said -- so,

6    before then, it wasn't clear what would happen.  You create

7    this zone.  Does it start playing all of a sudden or what?

8          So they've added these steps in here, 13 years later, to

9    try and cover that.  And there's nothing in the spec about it,

10   Your Honor.

11         And so, the next slide, I've just got a big X because

12   there is nothing in the spec.

13         But, if you go to Slide 40, this is, I think, telling.

14   This is the provisional application in the box there on

15   Slide 40, Your Honor.  And, you know, the question here is:

16   Were they in possession of the invention?

17         Right?

18         So they actually asked the question:  What happens to the

19   music that's already playing when the zone scene is started?

20         That's the question that those amendments deal with.

21         And they provide three possibilities, and they don't list

22   the amendment.  They did not have the amendment in their

23   possession at that time to answer the question:  What happens

24   to the music that's already playing when the zone scene is

25   started?

PROCEEDINGS

1    They didn't have that answer until 13 years later, when

2    they filed an amendment that added new subject matter that's

3    not in the specification, Your Honor.

4        **THE COURT:**  All right.  I want to give the other side

5    a chance to respond to that.

6        **MR. VERHOEVEN:**  Okay.  I just want to -- I just want

7    to show you one thing to answer your question earlier, Your

8    Honor, if I may --

9        **THE COURT:**  Yes.

10       **MR. VERHOEVEN:**  -- when you were discussing the

11   activities of patentees.

12       If you go to Slide 45 --

13       **THE COURT:**  Yes.

14       **MR. VERHOEVEN:**  -- another timeline.

15       **THE COURT:**  Yes.

16       **MR. VERHOEVEN:**  So this one adds something:  In

17   June 2014, Google made a presentation to Sonos teaching them

18   this amendment.

19       Next slide.  This is Slide 46.

20       Google made this presentation about how to deal with

21   overlapping groups to Sonos five years before Sonos filed the

22   '885 patent amendment.  And here on the -- this presentation

23   that was made to Sonos by Google, Google talks about how you

24   have overlapping groups.

25       Do you see there in the picture, there is first floor

PROCEEDINGS

1    overlapping with home?  Do you see that, Your Honor?

2              THE COURT:  46?

3              MR. VERHOEVEN:  Yeah.  Do you see in the box -- the

4    illustration within the box?

5              THE COURT:  I see the two overlapping --

6              MR. VERHOEVEN:  Yeah.  What happens if you have these

7    overlapping zones?

8              THE COURT:  Is this a picture from what happened in

9    2014?

10             MR. VERHOEVEN:  This is a presentation that was

11   presented from Google to Sonos in June 5th, 2014, and Google's

12   teaching Sonos because they had a collaboration.

13        And then the next slide, 47, from the same presentation,

14   google taught Sonos its technology for overwriting the previous

15   cast, the very thing that they're now claiming is their

16   invention, the procedure from how you go from one to the other.

17             THE COURT:  But, see, that's the thing about going

18   back to the original specification is that they're probably

19   willing to admit, yeah, you told us this in 2014, but we

20   already claim -- we already -- not claimed it -- we already

21   disclosed it in the specification in 2006.

22        That's -- so that will be their response.

23             MR. VERHOEVEN:  Right.  Well, "Show me where it's

24   disclosed" is my response to that response.

25             MR. ROBERTS:  I would love to.

PROCEEDINGS

 1          THE COURT:  All right.

 2          MR. ROBERTS:  So which one would you like me to start

 3   with?  Shall I start with standalone mode or shall I start with

 4   overlap?

 5          THE COURT:  I don't -- I don't -- well, I have one

 6   more question for Verhoeven.

 7       Did the examiner ever say it was not supported -- at any

 8   point say it was not supported by the spec?  The argument

 9   that -- did the examiner --

10          MR. VERHOEVEN:  I don't think there was, but I'll

11   double-check, Your Honor.

12          THE COURT:  All right.  Okay.

13       Please, now, your turn.

14          MR. ROBERTS:  Thank you, Your Honor.

15       The first thing I want to point out is that we had a shift

16   here.  The question Your Honor asked was really about the

17   definition of zones, and now we're in written description.

18       And I want to start with the question Your Honor asked.

19   There's no --

20          THE COURT:  Wait.  Wait.  That's not quite fair.

21       Here is the reason I -- if I were to make the argument,

22   the thing that got me to thinking about this was,

23   Mr. Verhoeven's point was that zones were already in the art.

24   That would -- no one would have thought you could claim a zone.

25          So in order to get around that problem, you invented a

1   term called "zone scene," and zone scene is something you could

2   claim because it's not in the art, but -- and you used that

3   term to try to read on what Google had disclosed in 2014.

4         MR. ROBERTS:  That's exactly right, Your Honor.

5         THE COURT:  All right.

6         MR. ROBERTS:  And then he showed you no evidence of

7   that from the file history at all because it's not true.

8         This -- it's true that we created the term "zone scene,"

9   and it's true that speakers and groups of speakers existed, but

10  that's not the invention.  The invention here makes use of zone

11  scenes, but if you look at the invention as a whole, it's got

12  several important components.

13        One is the marrying of a wireless network interface to a

14  speaker, which is, at that time, an unconventional device.

15        The second is that we separate out the synchronization,

16  the instantiation of the zone, from its definition.  And this

17  is what I was showing you earlier in Figure 6, where you define

18  the zones, and then later you invoke them, and only after you

19  invoke them do you do the synchronization.  And that

20  architectural change, separating out the act of defining the

21  zones and invoking them, is repeatedly called out as being one

22  of the primary inventions of the patent.

23        And I can show you that, for example, in the patent

24  specification at --

25        THE COURT:  But isn't it inherent in the whole idea of

 1  zones that you would have to invoke them?  What's the point

 2  of --

 3          **MR. ROBERTS:**  No.

 4          **THE COURT:**  What's the point of having a zone if you

 5  aren't going to say:  Okay.  I want the A, B, and C -- you've

 6  got to hit a button that says A, B, and C or -- and then,

 7  later, you have D, E, and F, or C, D, and E.

 8      Don't you have to invoke them inherently?

 9          **MR. ROBERTS:**  You do have to invoke them.  The

10  question, Your Honor, is whether or not you do the

11  synchronization before or after invocation, whether the act of

12  synchronizing the members of the zone is done in realtime after

13  invocation or is done beforehand.

14      In traditional systems, you had to hardwire the speakers

15  or set up the groups in advance.  This is what it's talking

16  about in column 2.

17      And if you -- in the passage Mr. Verhoeven read about the

18  fact, hey, you can't really do this, because the members

19  overlap, so it can be difficult -- and precisely because you

20  had to set up the synchronicity groups and synchronize them

21  beforehand, it was hard to deal with overlapping members.

22      But if you look at what the patent itself says -- and this

23  is from column 9, starting at line 16 (as read):

24          "One important of the features, benefits, and

25      objects in the present invention is that the zones do

1      not need to be separated before a zone scene is

2      invoked."

3      Before you invoke it, you don't need to do it.

4      It says it again in column 11 (as read):

5          "One of the features, benefits, and advantages

6      in the present invention is allow a set of related

7      devices, controllers, and operating components to

8      exist as a group without interfering with other

9      components that are potentially visible on the same

10     wired or wireless network."

11     And, again, the reason you can do that is because, as I

12     showed you in Figure 6, you define the groups, and then they're

13     latent or dormant.  They've been defined, but you don't

14     configure the zone players to synchronize them until realtime

15     after you invoke it.

16     That's all in the claims.  If you look at the claim

17     language themselves, we call that out on a message-by-message

18     basis.  First, you tell it what group to join, then you invoke

19     it, then you send it a command, then you synchronize it.

20     That's literally what the claim limitations actually say.

21     And so, for them to say the invention is just grouping

22     stuff, we've never said it's just creating a group.  And

23     Mr. Verhoeven -- he said:  Oh, Sonos, you know, added zone

24     scene to distinguish it from the prior art.  They didn't argue

25     file history estoppel.  They didn't say anything like that.

1    There's no argument even about that in their noninfringement

2    brief.  They didn't talk about the file history at all.

3        And there is nothing that supports the notion that this

4    was --

5            **THE COURT:**  But what I'd like to know -- I'm asking a

6    question.  I said already, the briefs were not helpful on the

7    prior art -- not prior art -- the prosecution history.

8        And I'm asking:  What can we learn from the prosecution

9    history?  What is there?

10           **MR. ROBERTS:**  Yes, Your Honor.

11       What I would say is, there is nothing on this point.

12   There -- I don't know -- I'm not aware of anything in the file

13   history that is dispositive on this point.

14           **THE COURT:**  Well, is there anything that sheds some

15   light on it?

16           **MR. ROBERTS:**  So there are things that shed light on

17   various aspects of -- that were all in the claim construction

18   briefing.  I -- I honestly don't have all of those aspects in

19   the way in which we argued them in mind, sitting here today.

20       But the point I would make, Your Honor, is:  Mr. Verhoeven

21   is mischaracterizing our argument.  And he's mischaracterizing

22   the patent when he claims that the point of novelty -- that's

23   not even such a thing anymore, but the point of novelty is zone

24   grouping, and that, therefore, it needs to be different from

25   the prior art.

PROCEEDINGS

1      I would even say, zone scenes could exist in the prior

2   art.  The patent would still be valid.  They haven't even moved

3   under 102/103 on this patent.  There is literally no argument

4   about that.

5      If they want to try to do that at trial, let them get up

6   and try.  It's not in front of the Court on this motion.

7      With your permission, I'd like to address the specific

8   points that Mr. Verhoeven made about --

9           THE COURT:  Yeah.  I've got about five more minutes,

10  so you go ahead.

11          MR. ROBERTS:  Thank you, Your Honor.

12     So first of all, I'm going to use my slides here.

13  Starting at Slide 33.

14          THE COURT:  Is this one yours, the big one?

15          MR. ROBERTS:  Yes, Your Honor.  That's ours.

16     And if you'd turn to Slide 33.

17          THE COURT:  Okay.  Okay.  Go ahead.

18          MR. ROBERTS:  Okay.  This is from the file -- this is

19  from the specification, and it's talking about the music button

20  activates a music menu.

21     And then, down below, it says (as read):

22          "The music transport functions described herein

23      shall apply selectively to one of the sources when a

24      corresponding one of these zone players or zone

25      groups is selected."

**PROCEEDINGS**

1        It clearly there is disclosing playing music in a single

2    zone player.

3        Next, Slide 34.

4        **THE COURT:**  Is that what is meant by "standalone," is

5    just one speaker?

6        **MR. ROBERTS:**  That's correct.  Not grouped.  Not

7    synchronized is what's meant by "standalone."  It is not

8    synchronized for playback with other speakers.

9        If you look at Slide 34, this is also a picture, Figure 7,

10   from the '885.  And you can see there are some zones scenes at

11   the bottom, Party Mode, and Morning Wake Up, and then there are

12   individual zones, Living Room, and Patio.

13       This is disclosing individual playback of living room and

14   patio and the songs.  It clearly disclosed an individual

15   playback.

16       Next slide, Slide 35.  This is, again, Figure 6.  And you

17   can see again, Your Honor, 602, you decide to configure a

18   scene; you decide which zone players are associated with the

19   scene; and you save the scene with parameters.

20       Then, at a later time -- and, by the way, you see the

21   arrow right below 606?  It goes back up to the top.  It goes

22   back up to the top because you can configure more than one

23   scene.  And, when you configure more than one scene, later in

24   time, you can decide to invoke a scene, at 610.

25       And, dropping down, only after you invoke a scene do you

PROCEEDINGS

 1   execute commands to synchronize the zone players.

 2        So the synchronization happens after invocation.

 3        And, Your Honor --

 4        **THE COURT:**  Wait.  What does the specification -- what

 5   examples using exactly the word "parameter" or "parameters"?

 6   Does the specification give us examples of parameters?

 7        **MR. ROBERTS:**  Yes, Your Honor.  So this was the

 8   argument we were having earlier.  Mr. Verhoeven acknowledged

 9   that a name could be a parameter.

10        **THE COURT:**  No, no.  See, you're doing the old trick

11   of what they -- I'm asking about the specification.

12        **MR. ROBERTS:**  Yes, Your Honor.

13        **THE COURT:**  Does the specification say an example of a

14   parameter is the volume, say?

15        **MR. ROBERTS:**  Yes, it does.  It has volume, IP

16   address, mute or unmute.  It's got a variety of them.

17        **THE COURT:**  But does it use the name as an example of

18   a parameter?

19        **MR. ROBERTS:**  I'm not aware of it using name as an

20   example of parameter because, in the specification, the way it

21   describes it is that the parameters are a set of information

22   that is set to the thematic group, and the thematic group is a

23   group, like, of the den, living room, such as "morning."

24        So it doesn't use the word "morning" as an example of a

25   parameter, but it uses "morning" as an example of a theme for

PROCEEDINGS

1   the group.

2       Does that make sense, Your Honor?  The parameters are how

3   you want to configure the particularities you want to apply to

4   the zone scene.

5       The zone scene is the thematic group.  It's the group of

6   players organized according to a common theme, in

7   Judge Albright's lexicon.

8       **THE COURT:**  All right.  I'll give you a couple more

9   minutes, and then I really -- I've got to dash off.

10      **MR. ROBERTS:**  Thank you, Your Honor.

11      So just to address this point about:  Did we disclose

12  staying in an individualized group until it synced?

13      That is what Figure 6 is showing you.

14      Imagine, Your Honor, you decide to have a late change of

15  careers and become a synchronized swimming coach.  You go to

16  the pool.  There's a bunch of players treading water in the

17  pool.  You say, you five are Group A; five are Group B; and,

18  when I blow my whistle, I want each of you to do your

19  synchronized routine.  You blow your whistle.

20      What were they doing before you blew your whistle?  They

21  were treading water individually.  They were not synchronized.

22      And that's exactly what we have here in Figure 6:  A

23  speaker is added to a group, and nothing happens.  And, later

24  on, you invoke a scene, and then it's synchronized.

25      So it expressly teaches you, right here, that you have

 1   them, and you only synchronize them after invocation.

 2        What does that mean?  Before invocation, they're not

 3   synchronized.  That's what that is disclosing, quite expressly.

 4        To deal with the other argument, Your Honor, which is

 5   about overlap, the thing I would point you to -- because I know

 6   time is short, I will just show you one slide.  I'll show you

 7   my very best slide.

 8        And that is Slide 27.  Slide 27 is a quote from the

 9   specification and Figure 5B.  And what it says is -- so, just

10   to orient you, Your Honor, Figure 5B is the menu on the

11   controller for picking the individual zones, like kitchen,

12   dining room, or living room, that you want to be part of a zone

13   scene.  Okay?  This is how you define the zone scene.

14        And, by the way, there is nothing about parameters here,

15   but leave that to one side.

16        What the text says is that (as read):

17             "Figure 5B shows another user interface to allow

18        a user to form a scene.  The User Interface, 520,

19        that may be displayed on a controller or a computing

20        device, lists available zones in a system.  The list

21        of zones in the User Interface, 520, include all the

22        zones in the system, including the zones that are

23        already grouped."

24        So what does that mean?  It means that "kitchen," "dining

25   room," or "living room" can already be part of one group, and

**PROCEEDINGS**

1  then you can assign them to another.  That is a teaching of

2  overlapping groups, because you can have a group that includes

3  kitchen, living room, and patio; and even if it's already part

4  of a group, you can then get it as a selection and add it to a

5  different zone scene with a different membership.

6      That's exactly what this is saying right here.

7      My colleague also really wanted me to point you to

8  column 10, and this is --

9          **THE COURT:**  Hold on.  Page 27, is the picture there

10 from the accused product or is that from the patent?

11         **MR. ROBERTS:**  It's the patent specification.

12         **THE COURT:**  So that's 5B.  Okay.

13         **MR. ROBERTS:**  5B --

14         **THE COURT:**  All right.

15         **MR. ROBERTS:**  -- as in "boy," from the patent spec.

16     And what we're talking here is, was this disclosed, and

17 was there written description in the patent spec for this?

18     You could also look, Your Honor, at Slide 28, which says

19 that various scenes -- plural -- may be saved at any of the

20 members in a group.

21     And, if you're saving -- if a zone player could only be a

22 member of one unique group, why would you want to save multiple

23 groups at the zone player?

24     The very fact that it discloses saving multiple groups,

25 various scenes at any member, is a teaching that each player

1  can be part of multiple groups.  Otherwise you'd say the scene.

2  You wouldn't say multiple scenes.

3      And again, Your Honor, because I can't help myself,

4  turning one more, to Slide 29.

5          **THE COURT:**  This is it.  I've got to go.

6          **MR. ROBERTS:**  Yup.

7          **THE COURT:**  All right.

8          **MR. ROBERTS:**  Slide 29.

9      This is also from the '885 patent specification.  And

10  these are from column 8, moving onto column 9.  It teaches a

11  morning zone scene with bedroom, den, and dining room; and an

12  evening scene that not only has bedroom, den, and dining room,

13  but also has garage and garden.

14      And, again, if you look at the patent, the claim says that

15  you have to have a first zone scene with the first and the

16  second; and a second zone scene with the first and a third

17  where the second and the third are different.

18      Well, the one up top has a first, bedroom, and den,

19  second; and the one below has a first, bedroom, and a third,

20  garden, where the first -- where the second and the third are

21  different.

22      So just this disclosure on its own also expressly teaches

23  the claim language.

24          **THE COURT:**  All right.  I need to go.

25      There is a small chance that I would ask you to come back

**PROCEEDINGS**

1   on Friday morning.  Is that possible?

2          MR. ROBERTS:  Yes.

3          MR. VERHOEVEN:  I believe so, Your Honor.

4          THE COURT:  All right.

5          MR. VERHOEVEN:  Can I just -- two sentences?  No?

6   Okay.

7          THE COURT:  No.  I'm late already.

8       And there is a small chance it might be next week, and

9   it's a big chance that we won't come back at all, but I need to

10  think about it.

11      So we've spent -- I don't know -- almost three hours on

12  this.

13         MR. VERHOEVEN:  Thank you, Your Honor.  We'll be happy

14  to come back if you --

15         THE COURT:  All right.  I appreciate it.

16      And welcome, again, to the law students from all over the

17  country.  It was good to have you here today.

18      All right.  Bye-bye.

19         MR. VERHOEVEN:  Thank you.

20         THE CLERK:  Court is adjourned.

21             (Proceedings adjourned at 10:58 a.m.)

22                     ---o0o---

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Thursday, July 21, 2022




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court