UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOOGLE LLC,

        Plaintiff,

   v.

SONOS, INC.,

        Defendant.

No. C 20-06754 WHA

**ORDER RE CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT AS TO CLAIM 1 OF '885 PATENT**

**INTRODUCTION**

In this patent infringement action, the patent owner moves for summary judgment of infringement of claim 1 of United States Patent No. 10,848,885. The alleged infringer cross moves for summary judgment of noninfringement and invalidity. For the reasons that follow, the patent owner's motion is **GRANTED**.

**STATEMENT**

Patent owner Sonos, Inc. asserts that Google LLC infringes its patents, including United States Patent Nos. 10,848,885 and 9,967,615. Pursuant to our "patent showdown" procedure (Dkt. Nos. 68, 206), Sonos moves for summary judgment of infringement of claim 1 of the '885 patent. Google, meanwhile, cross moves for summary judgment of noninfringement as to that claim and separately moves for summary judgment of noninfringement of claim 13 of the '615 patent. Google also raises a variety of invalidity theories as to both claims. This order

considers the motions related to the '885 patent. A separate order will follow as to Google's motion on the '615 patent.

The technology at issue in this case broadly relates to wireless multi-room audio systems. These wireless audio systems include "networked audio players" now commonly referred to as "smart" speakers. Smart speakers can communicate with each other and with other "networked devices" over the internet. This ability to communicate with other networked devices allows smart speakers to be controlled using a smart phone or other computer, which makes it easier to play music or other audio.

The accused products provide a helpful example. Imagine someone has a smart phone, a networked device connected to the internet. On the smart phone is the Google Play Music app, which offers a library of songs. Smart phone speakers generally produce lesser-quality sound, so listeners may prefer to listen to songs on an external, higher-quality speaker. Prior to the arrival of smart speakers, the external, better speaker would have to be connected to the phone through wires. Smart speakers, however, can connect to the smart phone over the internet, without wires. Using the Google Play Music app, the user can tap a button to connect the phone to the smart speaker. After the devices are connected, the audio that would have otherwise played through the phone's speaker will play through the smart speaker instead. Google calls such connecting "casting," and the parties herein refer to this feature as "cast" technology.

Now, imagine our user has smart speakers in several rooms, *e.g.*, one in each of the living room, kitchen, and bedroom. Sometimes the user may want to play music in only the living room. At other times, the user may want to play music in only the living room and kitchen. And at yet other times, the user may want to play music in all three rooms. The '885 patent broadly relates to managing and organizing these groups of smart speakers and other "multimedia players."

In particular, the patent is directed toward a "method and apparatus for controlling or manipulating a plurality of multimedia players in a multi-zone system" ('885 patent at 1:32–34). A player is a speaker or television or other similar device that can play content. The patent refers to the player's location, such as a bedroom or kitchen, as a "zone" and the player therein as a "zone player" (*see, e.g., id.* at 2:36–41; 3:13–23). Figure 1 of the patent illustrates what this system looks like:



Sonos filed the application that led to the '885 patent in April 2019, but the patent application claims priority through a long chain of continuation applications dating back to a provisional application filed in September 2006. The patent's specification recounts that, prior to 2006, it was difficult for users to dynamically control speaker groups. In a "traditional multi-zone audio system," the specification explains, audio sources are "hard-wired" or "controlled by a pre-configured and pre-programmed controller," which makes it cumbersome to "dynamically manag[e] the ad hoc creation and deletion of groups," particularly when desired groups overlap (*id.* at 1:62–2:2:25). As an illustrative example, the specification laments that someone who enjoys "listen[ing] to broadcast news from his/her favorite radio station in a bedroom, a bathroom, and a den while preparing to go to work in the morning" but also prefers to "listen in the den and the living room to music . . . in the evening" would not easily be able to configure a

traditional audio system to accommodate those preferences (*ibid*.). The specification describes both technological and physical hurdles that made such dynamic grouping "difficult" (*ibid*.).

The '885 patent announced that it solved this problem by providing a "mechanism" to "allow a user to group" multimedia players "according to a theme or scene, where each of the players is located in a zone" (*id*. at 2:36–41). Then, "[w]hen the scene is activated, the players in the scene react in a synchronized manner" (*id*. at 2:41–42). In other words, the '885 patent allows a user to customize and save multiple groups of smart speakers or other players, each according to a "theme or scene," and then later "activate" a customized group, called a "zone scene," on demand (*id*. at 2:46–51). For example, the person described above who enjoys listening to broadcast news in the morning can form a "zone scene" called "Morning" that is composed of speakers in the bedroom, bathroom, and den. Figure 5A illustrates a user forming a zone scene called "Morning":



**FIG. 5A**

After saving the "Morning" zone scene, the user can "invoke" the group on demand through an app on the "controller" device (*e.g.*, a smart phone).

Claim 1 of the '885 patent was written from the perspective of a "zone player" that connects to other "zone players" to form a "zone scene." Using Google's paragraph numbering, claim 1 recites:

> **[1.pre]** A first zone player comprising:
>
> **[1.1]** a network interface that is configured to communicatively couple the first zone player to at least one data network;
>
> **[1.2]** one or more processors;
>
> **[1.3]** a non-transitory computer-readable medium; and
>
> **[1.4]** program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:
>
> **[1.5]** while operating *in a standalone mode* in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:
>
> (i) receiving, from a network device over a data network, *a first indication* that the first zone player *has been added* to a *first zone scene* comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and
>
> (ii) receiving, from the network device over the data network, a *second indication* that the first zone player *has been added* to a *second zone scene* comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;
>
> **[1.6]** after receiving the first and second indications, *continuing to operate in the standalone mode* until a given one of the first and second zone scenes has been selected for invocation;
>
> **[1.7]** after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

5

**[1.8]** based on the instruction, *transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players* such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

The most contested terms are italicized. Note that the parties concentrate their fire on limitation 1.5.

Sonos contends that Google's products that employ cast technology infringe claim 1 because they allow users to "create, save, and name as many speaker groups as desired" (Br. 6). Accused products include Google's "Cast-enabled apps" such as the Google Home app, Google Play Music app, and YouTube Music app (Br. 3–7). Google opposes, arguing that the accused products do not infringe under its proposed construction of the term "zone scene." Google further argues that its accused products do not receive the "indications" it asserts is required by limitation 1.5. In addition to its noninfringement arguments, Google raises two invalidity theories.

This order follows full briefing and oral argument.

**ANALYSIS**

Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56(a). A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must accept the non-movant's non-conclusory evidence and draw all justifiable inferences in its favor. *Id.* at 255.

1. **INFRINGEMENT.**

Analysis of patent infringement requires a claim to be properly construed to determine its scope and meaning, which is then compared to the accused device or process. *See Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1364 (Fed. Cir. 2011); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). To prove infringement, Sonos must

show that Google's accused products meet each properly construed limitation of claim 1 either literally or under the doctrine of equivalents. *See Deering Precision Instruments, LLC v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Here, Sonos asserts that Google's products literally infringe. To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused products. *TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).

Sonos has provided evidence that the accused products practice each element of claim 1 (*see* Br. 11–24). In reply, Google raises three noninfringement arguments. This order addresses each in turn.

*First*, Google argues that the accused products do not allow users to form a "zone scene," which it proposes defining as "a previously-saved grouping of zone players according to a common theme" (Opp. 4–7). Even assuming, *arguendo*, that this is the proper construction of "zone scene," this order concludes that the accused products meet this limitation.

It may be helpful to step back. Using Google's taxonomy laid out above, limitation 1.5(i) requires that the claimed zone player receive "a first indication that the first zone player has been added to a first *zone scene* comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first *zone scene* is invoked" (emphasis added). Limitation 1.5(ii) then repeats this requirement as to a second indication and second zone scene.

As briefly explained, the specification states that users can form groups of speakers "according to a theme or scene" ('885 patent at 2:39–40). Thus, as the specification explains, a user who prefers to listen to broadcast news in the morning in certain rooms can form a "zone scene" called "Morning" that only includes speakers in those rooms (*id*. at 1:67–2:17; 8:53–61). In addition to "Morning," the specification's examples of names of zone scenes include "Afternoon," "Garden," "Garden Party," "Wakeup," and "Party Mode" (*see* '885 patent at fig. 8; 8:52–9:15).

Google vigorously argues that its products do not allow users to form such zone scenes. Google admits that its users can form speaker groups and name the groups anything (Opp. 7).

7

Google contends, however, that a user merely naming a group something does not supply the kind of a thematic "characteristics" the claim requires (*ibid*.). Specifically, Google argues that the claim requires zone scenes to be accompanied by "theme attributes" such as the ability to "[s]et volume levels in each zone" and "[s]elect and play specific music in the zones" (*id*. at 4–5). In support, Google points to the specification describing a "zone scene" embodiment as allowing "zones" to be "configured to a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping *and setting of attributes* for the grouping are automatically effectuated" ('885 patent at 8:47–51 (emphasis added)).

The specification, however, then goes on to state that "a zone scene command *could* apply" such "attributes," not that zone scenes *must* apply them (*id*. at 9:20–30 (emphasis added)). Moreover, nothing in the specification links such attributes to the "common theme" of a zone scene (Reply Br. 3). Instead, the specification suggests themes based on location (*e.g.*, "Garden"), time of day (*e.g.*, "Morning" or "Evening"), or purpose (*e.g.*, "Party Mode") (*see* '885 patent at fig. 8; 8:52–9:15).

The question, then, is simply whether a user's ability to name speaker groups means that the user can group speakers according to a common theme. The answer is yes. While the specification is largely barren on this point, it expressly states that a user can make a zone scene by "mak[ing] a group of 3 zones *named after* 'Morning'" ('885 patent at 8:53–61 (emphasis added)). The specification does not suggest anything else is necessary. This conclusion also aligns with the basic purpose of the invention, which is to allow users to pre-save customized speaker groups and later "invoke" the named group on demand (*see, e.g., id.* at 9:15–20; fig. 6). The name serves to allow the user to remember the theme that binds a particular set of speakers.

Google briefly objects that its users can name speaker groups something "completely abstract or random" such as "A," "B," and "C" (Opp. 7). In other words, Google argues that it should escape infringement because the accused products allow users to make speaker groups that are not bound by a thematic name. This only shows, however, that Google's products have capabilities in addition to those recited by the claim. This does not avoid infringement. *See Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) (infringement is

1  not avoided "if a claimed feature performs not only as shown in the patent, but also performs an
2  additional function"). Moreover, as Sonos points out, the accused products only need to be
3  reasonably capable of satisfying the limitation (*see* Reply Br. 3). The Court of Appeals for the
4  Federal Circuit has explained that

> to infringe a claim that recites capability and not actual operation, an accused device need only be *capable of* operating in the described mode. Thus, depending on the claims, an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation.

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (citations omitted and emphasis added). This reasoning applies to our claim, which recites "a non-transitory computer-readable medium that, *when executed by* the one or more processors, *cause* the first zone player to perform functions comprising. . . ." ('885 patent at 11:43–45 (emphasis added)). *See NetFuel, Inc. v. Cisco Sys. Inc.*, 438 F. Supp. 3d 1031, 1035 (N.D. Cal. 2020) (Judge Edward J. Davila) (applying the "reasonably capable" test to a claim similarly employing "when executed" language). Google admits that its accused products are readily capable of allowing users to pre-save groups of speakers and give them thematic names. Consequently, the accused products allow users to form zone scenes.

*Second*, Google argues that its accused products do not receive an "indication" that the "zone player has been added to" a first or second zone scene. To recap, limitations 1.5(i) and 1.5(ii) require that the "zone player" receive "from a network device over a data network, a[n] . . . *indication* that the . . . zone player has been added to . . . a zone scene" (emphasis added). Sonos asserts that the accused Google players satisfy this limitation by receiving a "join_group message," which includes "a unique ID identifying the group" and a "name" (Br. 16; Reply Br. 4 (citing Dkt. No. 203-3, Ex. B)). The message is sent to the accused Google player after a user adds the player to a group on the Google Home app (*ibid.*).

Google replies that, even if the "join_group message" *adds* a speaker to the group, it does not indicate that the speaker "*has been added*" to the group (Opp. 8–9). This distinction between past and present tense is critical, Google argues, because the "has been added"

9

language requires the speaker to receive a message regarding its grouping status *later*, after it has already been added to the group by some prior command. Google accordingly acknowledges that its "join_group" message instructs a speaker to join a group, but nonetheless maintains that it does not "memorializ[e] that the speaker has been added to the group" (*ibid.*; *see also* Schonfeld Decl. ¶ 37).

Sonos disagrees with Google's reading of the claim. It insists that the past-tense phrase "has been added" refers only to "some 'add[]' action' that previously took place at the network device prior to the 'indication' being sent and received" (Reply Br. 4). In other words, Sonos contends that the phrase "has been added" refers to the *user's action* that adds a speaker to a zone scene. After the user takes such action — by, as a hypothetical example, tapping "add" on the Google Home app — the network device subsequently sends the "join_group message" to the accused player. This sequence of events, Sonos argues, satisfies the "has been added" limitation.

This order again sides with Sonos. The plain language of the claim does not require a follow-up indication memorializing that the zone player has already been added to the group by an initial command so that the zone player can use that information later. Rather, the claim simply requires the zone player to receive an indication from the network device that it has been added to a zone scene. Because the accused players only receive the "join_group message" after some action has been taken to add them to a group, they meet this limitation.

*Third*, Google argues that its accused players do not receive an "indication" identifying "at least the first zone player and second zone player" (Opp. 10). Put differently, Google's view is that the claim requires a speaker that has been added to a zone scene to know what other speakers are in the group. Google's argument is based on limitation 1.5(i) requirement that a the "first zone player" receive a "first *indication* that the first zone player has been added to a first zone scene *comprising* a first predefined grouping of zone players including at least the first zone player and a second/third zone player. . . ." (emphasis added). Limitation 1.5(ii) then repeats this requirement as to a second zone player and second zone scene.

10

Google's argument, however, requires reading the word "comprising" to modify "indication." A more natural reading of the claim is that "comprising" modifies "zone scene." This reading also makes more sense in the context of the invention. The "comprising" phrase serves to clarify that a zone scene is required to be comprised of a group of zone players, not that the indication is required to be comprised of a group of zone players. Limitation 1.7 further supports this conclusion by stating, without referring to any required indication, that the "first and second zone scenes respectively compris[e] a given one of the first and second predefined groupings of zone players."

In sum, Google's noninfringement arguments as to limitation 1.5 fail to present triable questions and lack merit. Further, Sonos has adequately shown that the accused products practice the remaining elements of the claim (*see* Br. 11–24). Google did not dispute these contentions in its briefing. Accordingly, Sonos's motion for summary judgment of infringement is **GRANTED**.

2.  **VALIDITY.**

Google supplements its infringement arguments with two invalidity theories. *First*, Google argues that claim 1 of the '885 patent is directed toward unpatentable subject-matter. *Second*, Google contends that the patent lacks written description support. As explained below, both theories also fail to convince.

A.  *PATENTABLE SUBJECT-MATTER.*

Google argues that claim 1 is invalid under 35 U.S.C. § 101 for failing to meet the two-part *Alice* test. Under well-established Supreme Court precedent, laws of nature, natural phenomena, and abstract ideas remain patent-ineligible under Section 101. *See, e.g., Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (citations and quotations omitted). The Supreme Court has set forth a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)). Under this framework, a court must first "determine whether the claims at issue

11

are directed to one of those patent-ineligible concepts." *Ibid.* If so, then the court must further "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Ibid.*

At step one, courts must first examine the "patent's 'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). "[T]he first step in the *Alice* inquiry . . . asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016).

This order finds that claim 1 of the '885 patent survives step one. The thrust of Google's argument is that the claim is directed toward the abstract idea of "grouping and controlling speakers" because the invention merely automates the "age-old process of manually plugging speakers in to create speaker groups" (Opp. 13). This is not convincing. True, the Court of Appeals for the Federal Circuit has held that merely "'claiming the improved speed or efficiency inherent with applying the abstract idea on a computer' is insufficient to render the claims patent eligible." *Enco Sys., Inc. v. DaVincia*, LLC, 845 F. App'x 953, 957 (Fed. Cir. 2021) (citations omitted). Claim 1, however, does not merely automate the process of plugging in speakers, nor does it merely employ computer software as a blunt tool. Rather, claim 1 recites a specific kind of device — a "zone player" — that can be readily placed in pre-saved groups with other zone players to allow synchronous playback on demand. The claimed ability to customize and save overlapping speaker groups and easily control group playback represents a clear technological improvement over the "conventional multi-zone audio system," which, as the specification explained, presents significant technological and physical obstacles to forming speaker groups. *See, e.g., CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369 (Fed. Cir. 2020) (finding claims non-abstract where they were sufficiently "directed to technological improvements"); *MicroPairing Techs. LLC v. Am. Honda Motor Co.*, No. C 21-4034, 2021 WL 6618817, at *7 (C.D. Cal. Dec. 9, 2021) (Judge James V. Selna) (idea "does not become

conventional simply because it improves on a more rudimentary version of a task previously done by humans").

Google briefly presents two additional step one arguments. *First*, Google argues that the claims are vague and "purely functional" (Opp. 15). This order disagrees. The specification adequately details how the claimed set of functions is employed. *Cf. Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) (finding claim abstract in part because "neither the claim nor the specification reveals any concrete way of employing a customized user interface"). Moreover, as Sonos points out, the cases that Google relies on to support this argument are directed to the generally abstract idea of collecting, organizing, and storing information (*see* Reply Br. 15 n.10). These cases are inapposite, and Google has not adequately explained how they would translate to the technology at issue here.

*Second*, Google contends that the claim is directed to an abstract idea because forming zone scenes necessarily relies on the "subjective intent of the user at the time of grouping" (Opp. 16). The cases Google cites to support this proposition, however, relate to computers implementing human mental processes through, for example, an algorithm. *See, e.g., Synopsys, Inc. v. Mentor Graphics Corp.*, 78 F. Supp. 3d 958, 965 (N.D. Cal. 2015), *aff'd*, 839 F.3d 1138 (Fed. Cir. 2016) (finding asserted claims invalid where they "add nothing other than a way to implement [a] mental process on a computer"). Google again fails to adequately explain how these cases are relevant. Moreover, the act of naming zone scenes is just one aspect of the claim. Taken as a whole, the idea of the claim — to allow users to pre-save customized speaker groups and invoke them on demand for synchronized playback — is not directed toward a subjective mental process. *See CardioNet,* 955 F.3d at 1367 ("At step one, we consider the claims *in their entirety* to ascertain whether their character *as a whole* is directed to excluded subject matter") (cleaned up and emphasis added); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (finding subject matter of a claim unpatentable where *all* of the claimed method steps could be performed in the human mind).

This order is also not convinced that the idea of naming zone scenes depends on a subjective mental process. The kinds of "scenes or themes" suggested by the patent are

13

1    sufficiently tethered to the technology to render them non-abstract.  The patent does not suggest

2    that a user can form a zone scene based on any arbitrary theme.  Rather, the patent describes

3    themes logically connected to the utility of speakers such as time of day, location, and purpose.

4    Even Google acknowledges that there is a distinction between the claimed zone scenes and

5    speaker group themes that are "completely abstract and random" such as those named "A," "B,"

6    and "C" (Opp. 7).

7        This order accordingly finds that claim 1 is not directed toward an abstract idea.  Having

8    found that the claim survives step one, it is unnecessary to proceed to step two.

### B.   WRITTEN DESCRIPTION.

This order now considers Google's written description challenge.  Written description requires the specification to "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed."  *Ariad Pharmas., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Put differently, the disclosure in the patent must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ibid*.  Determining whether the patent satisfies written description is a question of fact. *Ibid*.

Google asserts that two limitations of the '885 patent are not sufficiently described.  *First*, Google argues that the specification "never discloses that a zone player may be added to two zone scenes at the same time" (Opp. 20).  Not so.  Figure 5B shows a "user interface to allow a user to form a zone scene" ('885 patent at 10:12–19):



**FIG. 5B**

The specification clarifies that "[t]he list of zones in the user interface" shown in Figure 5B "includes ALL the zones in the system, *including the zones that are already grouped*" (*ibid.* (emphasis added)). Sonos additionally points to the specification's disclosure that "*various scenes* may be saved in any of the members in a group" (*id.* at 2:56–59 (emphasis added)). These disclosures adequately convey that a zone player can be added to multiple zone scenes.

*Second*, Google contends that the specification does not provide support for the zone player "continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation" and "transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players" (*see* limitations 1.6; 1.8). In plain English, these limitations explain that an individual smart speaker that has been added to a speaker group will continue to operate individually — *i.e.*, in "standalone mode" — until the speaker group of which it is a member is activated by the user, at which point the individual speaker will transition to being controlled as part of the group. Google asserts that the specification never describes this claimed sequence of operations.

15

True, as Google repeatedly points out, the specification never expressly refers to the term "standalone mode." However, the specification does not have to use the term verbatim to provide sufficient disclosure. *See Ariad Pharms., Inc.*, 598 F.3d at 1352 (specification does not need to "recite the claimed invention *in haec verba*"); *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370 (Fed. Cir. 2022) ("literal description of every limitation" is not required). The disclosure need only "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharms., Inc.*, 598 F.3d at 1351.

The disclosure does so here. Figure 6 illustrates the process of forming and "invok[ing]" a zone scene:



FIG. 6

The figure demonstrates that the process of forming a zone scene occurs in a specific order. The user "decide[s] which zone players to be associated with the scene" and then the scene is "[s]aved." Once a scene is saved, it can then be "invoke[d]" later. The specification further clarifies that zone players can be played "synchronously if the players are grouped together," or

16

"individually if the players are disassociated with each other" (*see* '885 patent at 3:26–31; *see also* 9:16–20; 10:53–63). Taken together, these disclosures adequately inform a person of ordinary skill in the art that the zone player operates on its own before a zone scene is invoked, at which point it acts "in accordance with" the group.

In sum, this order rejects Google's arguments that the patent does not disclose the claim.

## CONCLUSION

For the foregoing reasons, Sonos's motion for summary judgment is **GRANTED** and Google's corresponding motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 21, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE