1   CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
    croberts@orrick.com
2   BAS DE BLANK (STATE BAR NO. 191487)
    basdeblank@orrick.com
3   ALYSSA CARIDIS (STATE BAR NO. 260103)
    acaridis@orrick.com
4   EVAN D. BREWER (STATE BAR NO. 304411)
    ebrewer@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
6   405 Howard Street
    San Francisco, CA 94105-2669
7   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
8
    SEAN M. SULLIVAN (*pro hac vice*)
9   sullivan@ls3ip.com
    COLE RICHTER (*pro hac vice*)
10  richter@ls3ip.com
    LEE SULLIVAN SHEA & SMITH LLP
11  656 W Randolph St., Floor 5W
    Chicago, IL 60661
12  Telephone:    +1 312 754 0002
    Facsimile:    +1 312 754 0003
13
    *Attorneys for Defendant Sonos, Inc.*
14

15

16                  UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18  GOOGLE LLC,                          Case No. 3:20-cv-06754-WHA

19              Plaintiff,               **SONOS, INC.'S ANSWER TO GOOGLE
                                         LLC'S SECOND AMENDED
20       v.                              COMPLAINT AND SONOS, INC'S
                                         COUNTERCLAIMS**
21  SONOS, INC.,
                                         **DEMAND FOR JURY TRIAL**
22              Defendant.
                                         Judge: Honorable William Alsup
23

24

25

26                       **REDACTED PUBLIC VERSION**

27

28

**SONOS'S ANSWER**

1.      Sonos admits that Google purports to seek a declaratory judgment regarding alleged non-infringement and alleged invalidity of the '615, '033, '966, and '885 patents.  Sonos denies any remaining allegations of this paragraph.

**NATURE OF THE ACTION**

2.      Sonos admits that Google's Second Amended Complaint purports to be an action for declaratory judgment and invalidity.  Sonos admits that Google infringes the '615, '033, '966, and '885 patents at least as a result of the activities identified in Sonos's infringement contentions served in this case.  Sonos denies any remaining allegations of this paragraph.

3.      Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '615, '033, '966, and '885 patents.  Sonos denies any remaining allegations of this paragraph.

4.      Sonos admits that Sonos filed an action against Google for infringement of the '615, '033, '966, and '885 patents on September 29, 2020.  Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to allegations concerning Google's apprehension and therefore denies them. Sonos denies any remaining allegations of this paragraph.

5.      Sonos admits that Google's Second Amended Complaint purports to be an action for breach of contract and conversion.  Sonos denies any remaining allegations of this paragraph.

**THE PARTIES**

6.      Admitted.

7.      Admitted.

**JURISDICTIONAL STATEMENT**

8.      Sonos admits that Google's claims purport to arise under the 28 U.S.C. § 2201 and 35 U.S.C. § 1 *et seq.*  Sonos admits that the Court has subject matter jurisdiction concerning the '615, '033, '966, and '885 patents under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).  Sonos denies any remaining allegations of this paragraph.

9.      Sonos does not dispute that the Court can exercise supplemental jurisdiction over the state-law claims articulated in Google's Second Amended Complaint.  Sonos denies, however,

1    that Google's state-law claims are related to Google's claims of non-infringement or that they form

2    part of the same case or controversy.  Sonos denies any remaining allegations of this paragraph.

3         10.    Sonos does not dispute that the Court may exercise personal jurisdiction over Sonos

4    for purposes of this action.  Sonos denies any remaining allegations of this paragraph.

5         11.    Sonos does not dispute that venue is proper for purposes of this particular action.

6    Sonos admits that on September 28, 2020, Sonos sent an email to a Google employee who works

7    in this District indicating that Sonos will be initiating a case against Google asserting infringement

8    of the '615, '033, and '966 patents as well as U.S. Patent Nos. 9,344,206 and 9,219,460.  Sonos

9    admits that Sonos filed an action for patent infringement against Google on September 29, 2020 in

10   the Western District of Texas ("Texas Action").  Sonos admits that this Texas Action was

11   transferred to the Northern District of California on September 28, 2021.  Sonos admits that the

12   Content Integration Agreement includes a forum selection clause.  Sonos denies any remaining

13   allegations of this paragraph.

14        12.    Sonos admits that there is a justiciable controversy between Sonos and Google

15   concerning the '615, '033, '966, and '885 patents.  Sonos denies any remaining allegations of this

16   paragraph.

17   ### INTRADISTRICT ASSIGNMENT

18        13.    Admitted.

19   ### ALLEGATIONS CONCERNING

20   ### SONOS'S COLLABORATION WITH GOOGLE

21        14.    Sonos currently lacks knowledge or information sufficient to form a belief as to the

22   truth or falsity as to the allegations in this paragraph and therefore denies them.

23        15.    Sonos currently lacks knowledge or information sufficient to form a belief as to the

24   truth or falsity as to the allegations in this paragraph and therefore denies them.

25        16.    Sonos currently lacks knowledge or information sufficient to form a belief as to the

26   truth or falsity as to the allegations in this paragraph and therefore denies them.

27        17.    Sonos admits that Sonos and Google have collaborated in the past.  Sonos denies

28   any remaining allegations of this paragraph.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

18.     Denied.

19.     Sonos admits that the parties collaborated in 2016 concerning a solution to provide the Google Assistant feature on Sonos's devices.  Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the remaining allegations in this paragraph and therefore denies them.

20.     Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the allegations in this paragraph and therefore denies them.

### ALLEGATIONS CONCERNING

### SONOS AND GOOGLE ENTER INTO COLLABORATION AGREEMENTS

21.     Sonos admits that Google and Sonos executed documents in connection with the collaboration concerning Google Play Music and the Sonos Music System, including what Google alleges is a 2013 "Non-Disclosure Agreement" and a 2013 "Content Integration Agreement" ("Content Integration Agreement").  Sonos admits that this paragraph quotes, in part, language from these documents.  Sonos denies that these quotations fully and fairly summarize these documents and therefore denies any remaining allegations in this paragraph concerning these documents.  Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the remaining allegations in this paragraph and therefore denies them.

22.     Sonos admits that this paragraph quotes, in part, language from the Content Integration Agreement.  Sonos denies that these quotations fully and fairly summarize the Content Integration Agreement and therefore denies any allegations in this paragraph.

23.     Sonos admits that this paragraph quotes, in part, language from the Content Integration Agreement.  Sonos denies that these quotations fully and fairly summarize the Content Integration Agreement and therefore denies any allegations in this paragraph.

### ALLEGATIONS CONCERNING

### SONOS AND GOOGLE COLLABORATE ON CLOUD QUEUE

24.     Sonos admits that the parties collaborated to deliver product features concerning Google Play Music, including between 2013 and 2015 ("Sonos-Google Collaboration").  Sonos denies any remaining allegations of this paragraph.

25.    Sonos admits that this paragraph quotes, in part, from what purports to be an email exchange between a Sonos employee and a Google employee.  Sonos further admits that Tad Coburn is a named inventor of the '615 and '033 Patents.  However, Sonos denies that these quotations fully and fairly summarize the parties' collaboration and therefore denies any remaining allegations in this paragraph.

26.    Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the allegations in this paragraph and therefore denies them.

27.    Sonos admits that this paragraph quotes, in part, from what purports to be an email exchange between a Sonos employee and a Google employee.  Sonos denies that these quotations fully and fairly summarize the parties' collaboration and therefore denies any allegations in this paragraph.

28.    Sonos admits that this paragraph quotes, in part, from what purports to be an email exchange between a Sonos employee and a Google employee.  Sonos denies that these quotations fully and fairly summarize the parties' collaboration and therefore denies any allegations in this paragraph.

29.    Sonos admits that Mr. Coburn was involved in meetings and discussions with Google employees concerning the Sonos-Google Collaboration.  Sonos denies any remaining allegations of this paragraph.

30.    Denied.

## ALLEGATIONS CONCERNING

## SONOS WRONGFULLY CLAIMS RIGHTS IN THE CLOUD QUEUE TECHNOLOGY

31.    Sonos admits that this paragraph quotes, in part, from a hearing transcript.  Sonos denies that these quotations fully and fairly characterize the content and scope of the '615 and '033 Patents.  Sonos denies any remaining allegations in this paragraph.

32.    Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the allegations in this paragraph and therefore denies them.

33.    Sonos admits that it has accused Google of infringing the '615 and '033 Patents, at least via Google Play Music on iOS and Android devices being capable of carrying out certain

functionality in connection with Google media players.  Sonos denies any remaining allegations of this paragraph.

34.     Denied.

**ALLEGATIONS CONCERNING**

**GOOGLE DOES NOT INFRINGE THE PATENTS-IN-SUIT**

35.     Denied.

36.     Denied.

**FIRST COUNT**

**(Declaration of Noninfringement of 9,967,615)**

37.     Sonos reasserts and incorporates its responses to paragraphs 1 through 36 of the Second Amended Complaint.

38.     Sonos admits that it owns all rights, title, and interest in and under the '615 Patent. Sonos admits that Exhibit 7 purports to be a true and correct copy of the '615 Patent.

39.     Denied.

40.     Sonos admits that this paragraph purports to quote, in part, from the claims of the '615 Patent.  Sonos denies any remaining allegations of this paragraph.

41.     Denied.

42.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '615 Patent.  Sonos denies any remaining allegations of this paragraph.

43.     Sonos admits that Google purports to seek a judgment declaring that it does not infringe the '615 Patent.  Sonos denies any remaining allegations of this paragraph.

**SECOND COUNT**

**(Declaration of Invalidity of 9,967,615)**

44.     Sonos reasserts and incorporates its responses to paragraphs 1 through 43 of the Second Amended Complaint.

45.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '615 Patent.  Sonos denies any remaining allegations of this paragraph.

46.     Denied.

47.    Denied.

48.    Sonos admits that Google purports to seek a judgment declaring that the '615 Patent is invalid.  Sonos denies any remaining allegations of this paragraph.

### THIRD COUNT

### (Declaration of Noninfringement of 10,779,033)

49.    Sonos reasserts and incorporates its responses to paragraphs 1 through 48 of the Second Amended Complaint.

50.    Sonos admits that it owns all rights, title, and interest in and under the '033 Patent. Sonos admits that Exhibit 8 purports to be a true and correct copy of the '033 Patent.

51.    Denied.

52.    Sonos admits that this paragraph purports to quote, in part, from the claims of the '033 Patent.  Sonos denies any remaining allegations of this paragraph.

53.    Denied.

54.    Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '033 Patent.  Sonos denies any remaining allegations of this paragraph.

55.    Sonos admits that Google purports to seek a judgment declaring that it does not infringe the '033 Patent.  Sonos denies any remaining allegations of this paragraph.

### FOURTH COUNT

### (Declaration of Invalidity of 10,779,033)

56.    Sonos reasserts and incorporates its responses to paragraphs 1 through 55 of the Second Amended Complaint.

57.    Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '033 Patent.  Sonos denies any remaining allegations of this paragraph.

58.    Denied.

59.    Denied.

60.    Sonos admits that Google purports to seek a judgment declaring that the '033 Patent is invalid.  Sonos denies any remaining allegations of this paragraph.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

## FIFTH COUNT

### (Declaration of Noninfringement of 10,469,966)

61.     Sonos notes that Google's incorporation of "paragraphs 1 through 72" into paragraph 61 of the Second Amended Complaint is inappropriate, improper, and makes no sense. As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-60, then Sonos reasserts and incorporates its responses to paragraphs 1 through 60 of the Second Amended Complaint.

62.     Sonos admits that it owns all rights, title, and interest in and under the '966 Patent. Sonos admits that Exhibit 9 purports to be a true and correct copy of the '966 Patent.

63.     Denied.

64.     Sonos admits that this paragraph purports to quote, in part, from the '966 Patent. Sonos denies any remaining allegations of this paragraph.

65.     Denied.

66.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '966 Patent.  Sonos denies any remaining allegations of this paragraph.

67.     Sonos admits that Google purports to seek a judgment declaring that it does not infringe the '966 Patent.  Sonos denies any remaining allegations of this paragraph.

## SIXTH COUNT

### (Declaration of Invalidity of 10,469,966)

68.     Sonos notes that Google's incorporation of "paragraphs 1 through 79" into paragraph 68 of the Second Amended Complaint is inappropriate, improper, and makes no sense. As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-67, then Sonos reasserts and incorporates its responses to paragraphs 1 through 67 of the Second Amended Complaint.

69.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '966 Patent.  Sonos denies any remaining allegations of this paragraph.

70.     Denied.

71.     Denied.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

72.     Sonos admits that Google purports to seek a judgment declaring that the '966 Patent is invalid.  Sonos denies any remaining allegations of this paragraph.

### SEVENTH COUNT

### (Declaration of Noninfringement of 10,848,885)

73.     Sonos notes that Google's incorporation of "paragraphs 1 through 84" into paragraph 73 of the Second Amended Complaint is inappropriate, improper, and makes no sense.  As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-72, then Sonos reasserts and incorporates its responses to paragraphs 1 through 72 of the Second Amended Complaint.

74.     Sonos admits that it owns all rights, title, and interest in and under the '885 Patent.  Sonos admits that Exhibit 10 purports to be a true and correct copy of the '885 Patent.

75.     Denied.

76.     Sonos admits that this paragraph purports to quote, in part, from the '885 Patent.  Sonos denies any remaining allegations of this paragraph.

77.     Denied.

78.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '885 Patent.  Sonos denies any remaining allegations of this paragraph.

79.     Sonos admits that Google purports to seek a judgment declaring that it does not infringe the '885 Patent.  Sonos denies any remaining allegations of this paragraph.

### EIGHTH COUNT

### (Declaration of Invalidity of 10,848,885)

80.     Sonos notes that Google's incorporation of "paragraphs 1 through 91" into paragraph 80 of the Second Amended Complaint is inappropriate, improper, and makes no sense.  As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-79, then Sonos reasserts and incorporates its responses to paragraphs 1 through 79 of the Second Amended Complaint.

81.     Sonos admits that there is a justiciable controversy between Sonos and Google concerning the '885 Patent.  Sonos denies any remaining allegations of this paragraph.

82.    Denied.

83.    Denied.

84.    Sonos admits that Google purports to seek a judgment declaring that the '885 Patent is invalid.  Sonos denies any remaining allegations of this paragraph.

## NINTH COUNT

### (Breach of Contract)

85.    Sonos notes that Google's incorporation of "paragraphs 1 through 94" into paragraph 85 of the Second Amended Complaint is inappropriate, improper, and makes no sense.  As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-84, then Sonos reasserts and incorporates its responses to paragraphs 1 through 84 of the Second Amended Complaint.

86.    Sonos agrees that Google and Sonos executed a document referred to by Google as the Content Integration Agreement.  The remainder of this paragraph contains legal conclusions and arguments to which no response is required.  But to the extent a response is required, Sonos denies the allegations in this paragraph.

87.    This paragraph contains legal conclusions and arguments to which no response is required.  But to the extent a response is required, Sonos denies the allegations in this paragraph.

88.    Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the allegations in this paragraph and therefore denies them.

89.    Denied.

90.    Denied.

91.    Denied.

92.    Sonos denies that it has breached.  Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the remaining allegations in this paragraph and therefore denies them.

93.    Denied.

## **TENTH COUNT**

### **(Conversion)**

94.    Sonos notes that Google's incorporation of "paragraphs 1 through 108" into paragraph 85 of the Second Amended Complaint is inappropriate, improper, and makes no sense. Indeed, there are no paragraphs numbered 98-108 in the Second Amended Complaint.  As such, Sonos denies the allegations of this paragraph.  To the extent that this is a typographical error and Google meant to incorporate paragraphs 1-93, then Sonos reasserts and incorporates its responses to paragraphs 1 through 93 of the Second Amended Complaint.

95.    Denied.

96.    Sonos admits that it is the owner of the '033 Patent.  Sonos denies the remaining allegations of this paragraph.

97.    Sonos denies that it has converted anything.  Sonos currently lacks knowledge or information sufficient to form a belief as to the truth or falsity as to the remaining allegations in this paragraph and therefore denies them.

## **PRAYER FOR RELIEF**

The paragraphs under the "Prayer for Relief" heading sets forth the statement of relief requested by Google, to which no response is required. Sonos denies that Google is entitled to any of its requested relief, and denies any allegations in these paragraphs.

## **DEMAND FOR JURY TRIAL**

Sonos acknowledges Google's demand for a trial by jury and likewise demands a trial by jury on all issues so triable.

## **AFFIRMATIVE DEFENSES**

Subject to the responses above, Sonos alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the affirmative defenses described below, subject to its responses above, Sonos reserves all rights to allege additional affirmative defenses, at law or in equity, that may exist now or may be available in the future based on discovery and further investigation in this action.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

**FIRST DEFENSE: UNCLEAN HANDS**

1.      To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds of unclean hands because Google engaged in unconscionable, bad faith, and inequitable conduct at the time the Content Integration Agreement was executed and during the time that Google alleges the Content Integration Agreement was allegedly in force.

2.      Google executed the Content Integration Agreement and participated in the collaboration with Sonos while intending to introduce products that would directly compete with Sonos, including a line of all-in-one wireless multi-room audio players and apps that implement Sonos's patented functionality.  At no point prior to executing the Content Integration Agreement or during this integration work did Google inform Sonos of this intention.

3.      Google used the information that Sonos shared with Google during the collaboration to develop products that would directly compete with Sonos, including a line of all-in-one wireless multi-room audio players and apps that implement Sonos's patented functionality.  At no point prior to executing the Content Integration Agreement or during this integration work did Google inform Sonos that it would use or was using the information that Sonos shared with Google in this way.

4.      According to Google's own allegations, the technology developed in the course of the parties' collaboration "is in relevant respects, analogous to technology that Sonos now accuses of infringing its patents."  SAC at ¶ 32.  Under Google's own interpretation and allegation, Google used technology developed in furtherance of the Content Integration Agreement's "Integrated Service Offering" (i.e., technology developed that allows users of the Google Play Music service to play music on or though the Sonos Music System) in a context outside the scope of the "Integrated Service Offering," namely in products that would directly compete with Sonos, including a line of all-in-one wireless multi-room audio players and apps that implement Sonos's patented functionality.  At no point prior to executing the Content Integration Agreement or during this integration work did Google inform Sonos that it was using or intended to use the developed technology in this way.

5.      Sonos launched its first commercial products in 2005 and has since released a wide variety of critically acclaimed, patented, wireless multi-room audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move, Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, Amp, Five, and Arc.  *See, e.g.*, Ex.  G.

6.      By the 2010s, Google had taken notice of Sonos's success and sought to emulate it for itself.  Indeed, in 2011, Google engineer Debajit Ghosh reached out to then Sonos employee Joni Hoadley – a named inventor for the '615 and '033 Patents – inquiring as to many facets of the Sonos system, including how to push track URLs to devices, how device authentication takes place, how a server can send track metadata to devices, how client caching works, and further requesting to review Sonos APIs and any Sonos whitepapers that further explain how the system works.  Ex. AR (SONOS-SVG2-00040234-235).

7.      Then, in June 2012, Google unveiled a product called the "Nexus Q" – a networked music streaming device.  Google purportedly distributed samples of this device at the 2012 Google I/O developer conference.  But in January 2013, the Nexus Q was quietly shelved and support for the device was phased out beginning in May 2013.  While the Nexus Q was available for pre-order, the Nexus Q was never commercially sold.  *See, e.g.*, Ex. CF (https://www.theverge.com/2012/6/29/3125551/google-nexus-q-review).

8.      Meanwhile, Google was having mixed success with its free music streaming app, originally called "Google Music" (since rebranded as "Google Play Music").  *See* Ex. CG (https://www.cnet.com/news/google-music-not-living-up-to-expectations-exclusive/).          In May 2013, Google announced "Google Play Music All Access" – a paid version of the Google Play Music streaming service.

9.      At this time, several of Google's engineers and executives were owners of Sonos products and had repeatedly marveled at Sonos's technology implemented in its products.  *See, e.g.*, Ex. AQ (SONOS-SVG2-00040220) (Google engineer, Chris Yerga, exclaiming that "[w]hen I moved [to Japan] I brought clothes, toothpaste and a Play:5.  I see those as the bare necessities :)").  And the press was questioning Google as to whether Google's music service would be available on Sonos's music system.  Ex. AQ (SONOS-SVG2-00040220) (acknowledging that one

1  of the "most popular questions" Google received at the Google Play Music All Access

2  announcement was about whether Google Play Music and Google Play Music All Access would

3  support Sonos products). All of this further fueled Google's desire to emulate Sonos and release

4  its own wireless multi-room audio players.

5         10.    In furtherance of this, Google sought to integrate with Sonos and learn more about

6  Sonos's music system. For instance, Google engineer, Chris Yerga, noted that around the time of

7  Google Play Music All Access's launch in 2013, Google was "talking [] internally" about "Sonos

8  integration," and acknowledged that Sonos shared its "vision" with him "a couple years ago." Ex.

9  AQ (SONOS-SVG2-00040220). Not long after this, Google engineer Hugo Barra reached out to

10  then Sonos CEO, Jon MacFarlane, to schedule a meeting to "do a product and technical deep dive

11  on Sonos/Google integration." Ex. AS (SONOS-SVG2-00040228-229).

12         11.    In July 2013, Google executive Hugo Barra and Google engineers Dave Burke and

13  Debajit Ghosh met with Sonos engineers and executives, Nick Millington, Tom Cullen, Andrew

14  Schulert, and Ron Kuper to discuss a Sonos – Google integration through which Google Play Music

15  would be added as a music service to the Sonos system and the Google Play Music app would be

16  able to play music directly to Sonos players. *See, e.g.*, Ex. AT (SONOS-SVG2-00040230-233).

17  For playing music directly to Sonos players using the Google Play Music app, the intent was to

18  utilize an implementation referred to as ███████████████.

19         12.    To facilitate this integration, beginning in July 2013, Sonos provided Google with

20  unique insight into how the Sonos wireless multi-room products functioned. Among other things,

21  Sonos provided Google with samples of Sonos products to test, access to Sonos API code, API

22  documentation, and detailed descriptions on how to implement zone group functionality, discovery

23  of zone groups, and group volume functionality, among others. *See, e.g.* Ex. AU (SONOS-SVG2-

24  00040199) (attachment at Ex. AV (SONOS-SVG2-00042466-469)); Ex. AW (SONOS-SVG2-

25  00040198) (attachment at Ex. AX (SONOS-SVG2-00042462-465)); Ex. AY (SONOS-SVG2-

26  00040195-197) (attachments at Ex. AZ (SONOS-SVG2-00042454-457), Ex. BA (SONOS-SVG2-

27  00042458-461)); Ex. BB (SONOS-SVG2-00040194) (attachments at Ex. BC (SONOS-SVG2-

28  00042451-452), Ex. BD (SONOS-SVG2-00042453)); Ex. AT (SONOS-SVG2-00040230-233);

1    Ex. BF (SONOS-SVG2-00040227); Ex. BG (SONOS-SVG2-00040238-241) (attachment at Ex.

2    BH (SONOS-SVG2-00042476)); Ex. BI (SONOS-SVG2-00040236-237) (attachment at Ex. BJ

3    (SONOS-SVG2-00042471-475)).

4         13.    Amidst this integration partnership, Google launched its first-generation

5    Chromecast product in July 2013 – a wireless video streaming device utilizing Google's "cast"

6    technology.  Armed with the knowledge of Sonos's success with wireless multi-room audio

7    products, Google set its sights on extending the Chromecast product to wireless multi-room audio

8    and eventually to stand-alone all-in-one playback devices.  To achieve this, Google set out to

9    develop "Cast For Audio."  Ex. BK (SONOS-SVG2-00040226) (Google engineer, Micah Collins,

10   reaching out to inform Sonos that ████████████████████████████████████

11        14.    But Google knew that it could not deliver a successful wireless multiroom audio

12   product without utilizing Sonos's technology for, among other things, grouping networked audio

13   devices and synchronizing playback of streaming media content.  Ex. BE (SONOS-SVG2-

14   00040219) (memorializing conversation with Sundar Pichai, in which (i) Sundar explained that "he

15   is confident Cast is good for video and less confident they have thought though Audio and was

16   hoping that's where [Sonos] could help.").  Indeed, Google's engineers lacked experience with

17   wireless multiroom audio, and it was simply too tempting at this point to copy this technology from

18   Sonos, rather than start from scratch.  *Id.*

19        15.    Google thus entered into the collaboration and continued to work with Sonos under

20   the guise that Sonos products would be the beneficiary of a "Cast For Audio" platform that would

21   allow users to play audio from Android applications on Sonos devices.  But instead, Google used

22   what it was learning from Sonos to implement its own version of Sonos's products – without

23   Sonos's knowledge.  *See, e.g.*, Ex. BK (SONOS-SVG2-00040226) (Google engineer, Micah

24   Collins, noting "████████████████████████████████████████████████

25   ████████████████████████████████████████████"; Ex. BL (SONOS-

26   SVG2-00040224) (memorializing conversation with Jamie Rosenberg indicating that Sundar

27   Pichai decided that Dave Burke – who previously was overseeing the Sonos implementation with

28   MRP – would now be "heavily involved in development of Cast"; Ex. BE (SONOS-SVG2-

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

00040219) (memorializing conversation with Sundar Pichai, in which (i) Sundar explained that the Cast team needed help in audio, and Sonos should find a good reception there, (ii) Sundar wants Sonos "to help the Cast team nail the right audio solution and [] is interested in [Sonos's] commitment[,]" (iii) "Sundar is a Sonos user. Relatively recently but very happy and was just in the process of adding a SUB.  His pet missing feature is Grouping Players . . . in Google play," (iv) "[Sundar] is a music fan and his family is very happy with the Sonos [system]," and (v) "[Sundar] is confident Cast is good for video and less confident they have thought though Audio and was hoping that's where [Sonos] could help.").

16.     Leading up to a June 2014 meeting between Sonos and Google, Sonos even shipped the Google executive in charge of Google Home, Mario Queiroz, several Sonos Play:1 devices to test out.  *See* Ex. BN (SONOS-SVG2-00040218).  And at the June 2014 meeting between Sonos (Nick Millington, Marc Whitten, Tad Coburn, Andy Schulert, and Ben Smith) and Google (Mario Queiroz, Majd Bakar, Rishi Chandra, Michael Sundermeyer, Tomer Shekel, Suveer Kothari, Adrienns McCallister, Matt Stuart), Sonos openly shared its vision for the "modern audio platform," which included among other concepts, Sonos's multiroom grouping architecture.  Ex. BM (SONOS-SVG2-00040200-217).

17.     To Sonos's surprise and disappointment, Google, in 2015, released its Chromecast Audio product and shortly thereafter added a major feature update to include wireless multiroom functionality to this product.  This was designed to directly compete with Sonos and to undermine the very product that the parties were collaborating on pursuant to the Content Integration Agreement.

18.     The press immediately noted how this "major feature update" made Google's product even more "like the ones made by Sonos:"

> Google's recently-launched Chromecast Audio adapter is getting a major feature update this week: Consumers will now be able to group multiple Chromecast audio adapters to stream their favorite music simultaneously in more than one room, similar to the multi-room support available for internet-connected loudspeakers like the ones made by Sonos.

Ex. L (2015 *Variety* article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos"); *see also* Ex. M (2015 Pocket-Lint) ("You control your Sonos experience with one app.  Well, thanks to a new software rollout, Chromecast Audio can pretty much do the same thing.").

19.     Since 2015, Google has expanded its wireless multi-room audio product line to more than a dozen infringing products, including the Google Home Mini, Google Home, Google Home Max, and Pixel phones, tablets, and laptops.  For example, in 2016 (a year after Google launched Chromecast Audio), Google released the Google Home multi-room audio player (which was controlled by Google's rebranded multi-room controller app – the Google Home app).  Unlike the Chromecast Audio, the Google Home added an internal speaker driver making it an "all-in-one" audio player akin to Sonos's prior Play:1, Play:3, and Play:5 products.

20.     Accordingly, Google had executed the Content Integration Agreement and continued its collaboration with Sonos while intending to introduce a competitive wireless multi-room product, including a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos.  Neither prior to executing the Content Integration Agreement, nor at any point during this integration work did Google inform Sonos of this intention.

21.     Google used the information that Sonos shared with Google during the collaboration to develop a competitive wireless multi-room product, including a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos. Neither prior to executing the Content Integration Agreement, nor at any point during this integration work, did Google inform Sonos that it was using the information that Sonos shared with Google in this way.

22.     The Content Integration Agreement states that:

SAC, Ex. 3 at 1.  According to Google's own allegations, the technology developed in the course of the parties' collaboration "is in relevant respects, analogous to technology that Sonos now accuses of infringing its patents."  SAC at ¶ 32.  Under Google's own interpretation and allegation, Google used technology developed in furtherance of the Integrated Service Offering (i.e., technology developed that allows users of the Google Play Music service to play music on or though the Sonos Music System) in a context outside of the Integrated Service Offering, namely in competitive wireless multi-room products, including a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos.  Neither prior to executing the Content Integration Agreement, nor at any point during this integration work did Google inform Sonos that it was using or intended to use the developed technology in this way.

23.     In view of at least the foregoing, Google engaged in unconscionable, bad faith, and inequitable conduct both at the time the Content Integration Agreement was executed and during the time that Google alleges the Content Integration Agreement was allegedly in force.  Google's relief is thus precluded on grounds of unclean hands.

## SECOND DEFENSE: FRUSTRATION OF PURPOSE

24.     Sonos reasserts and incorporates its paragraphs 1 through 23 above.

25.     To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds that Google's actions set forth above have frustrated the purpose of the Content Integration Agreement.

26.     At the time the Content Integration Agreement was executed, Google understood that Sonos's purpose for executing the Content Integration Agreement and sharing information with Google concerning Sonos's Music System over the course of the collaboration was that this information and the parties' work would be used to produce the "Integrated Service Offering" – which the Content Integration Agreement defines as "an application that allows consumers of the Sonos MMS to directly access, control and play content provided by the Music Service on or through the Sonos MMS" – and not to assist Google in developing a competitive wireless multi-

room product, let alone a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos.

27.     Due to these actions, Sonos failed to receive the benefit of its bargain and indeed was severely harmed as a result of Google's actions.

28.     Google's actions were not foreseeable at the time the parties executed the Content Integration Agreement, could not have been guarded against by the Content Integration Agreement, and were not caused by Sonos.

## THIRD DEFENSE: BREACH OF GOOD FAITH AND FAIR DEALING

29.     Sonos reasserts and incorporates its paragraphs 1 through 29 above.

30.     To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds that Google breached the implied covenant of good faith and fair dealing as a result of Google's actions set forth above.

31.     At a minimum, Google breached the implied covenant of good faith and fair dealing by executing the Content Integration Agreement and continuing its collaboration with Sonos while intending to introduce a competitive wireless multi-room product, including a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos.  This breach was exacerbated by Google failing to inform Sonos of this intention.

32.     At a minimum, Google breached the implied covenant of good faith and fair dealing by using the information that Sonos shared with Google during the collaboration to develop a competitive wireless multi-room product, including a line of all-in-one players and apps that implement Sonos's patented functionality intended to directly compete with Sonos.  This breach was exacerbated by Google failing to inform Sonos it was using the information that Sonos shared with Google in this way.

33.     At a minimum, Google breached the implied covenant of good faith and fair dealing under Google's own allegations that the technology developed in the course of the parties' collaboration "is in relevant respects, analogous to technology that Sonos now accuses of infringing its patents."  SAC at ¶ 32.  Under Google's own interpretation and allegations, Google used

1   technology developed in furtherance of the Integrated Service Offering (i.e., technology developed
2   that allows users of the Google Play Music service to play music on or though the Sonos Music
3   System) in a context outside of the Integrated Service Offering, namely in competitive wireless
4   multi-room products, including a line of all-in-one players and apps that implement Sonos's
5   patented functionality intended to directly compete with Sonos.  This breach was exacerbated by
6   Google failing to inform Sonos that it was using or intended to use the developed technology in
7   this way.

8   **FOURTH DEFENSE: NOVATION ONE**

9   34.   Sonos reasserts and incorporates its paragraphs 1 through 34 above.

10   35.   To the extent that Google succeeds in establishing that the Content Integration
11   Agreement was at any time an enforceable agreement, Google's relief is precluded at least on
12   grounds of novation.

13   36.   On December 14, 2015, Google executed an "API EVALUATION AND
14   DEVELOPMENT LICENSE AGREEMENT" (hereinafter "API Eval Agreement").  Ex. BO.

15   37.   The Recitals of the API Eval Agreement state, in part:



26   Ex. BO at 1.

27   38.   Section 7.2 of the API Eval Agreement states:

28

[REDACTED]

*Id.* at 3.

39.     The subject matter of the API Eval Agreement and the subject matter of the Content Integration Agreement are, for the relevant purposes, substantially the same insofar as the purpose of the Content Integration Agreement was to develop an app that "[REDACTED]" and the purpose of the API Eval Agreement was "[REDACTED]."  *Compare* SAC, Ex. 3 at 1 *with* Ex. BO at 1.

40.     The API Eval Agreement supersedes the Content Integration Agreement and extinguished Sonos's obligations, if any, under the Content Integration Agreement.  Therefore, at least as of December 14, 2015, the Content Integration Agreement was unenforceable.

## FIFTH DEFENSE: NOVATION TWO

41.     Sonos reasserts and incorporates its paragraphs 1 through 40 above.

42.     To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds of novation.

43.     On December 12, 2018, Google executed a "Service Integration Agreement." Ex. BP.

44.     The Recitals of the Service Integration Agreement state, in part:

[REDACTED]

*Id.* at 1.

45.     Section 12.8 of the Service Integration Agreement states:

████████████████████████████████████████████████████████████████████████████████████████████████████

*Id.* at 11.

46.     The subject matter of the Service Integration Agreement and the subject matter of the Content Integration Agreement are, for the relevant purposes, substantially the same insofar as the purpose of the Content Integration Agreement was to develop an app that "█████████████ ███████████████████████████████████████████████████████████" and the purpose of the Service Integration Agreement was "███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████" *Compare* SAC, Ex. 3 at 1 *with* Ex. BP at 1.

47.     The Service Integration Agreement supersedes the Content Integration Agreement and extinguished Sonos's obligations, if any, under the Content Integration Agreement.  Therefore, at least as of December 12, 2018, the Content Integration Agreement was unenforceable.

**SIXTH DEFENSE: WAIVER**

48.     Sonos reasserts and incorporates its paragraphs 1 through 47 above.

49.     To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds that Google waived any right to relief.

50.     Google alleges that Sonos breached the Content Integration Agreement by "'claim[ing] for itself or for any third party any right, title, interest or licenses to the' cloud queue technology."  SAC at ¶¶ 30-31.  Google alleges that Sonos so claimed for itself this technology as a result of Sonos, on November 1, 2019 introducing a claim amendment into the '033 Patent application that recited "remote playback queue."

51.     However, several years before this amendment and during the time that Google alleges the Content Integration Agreement to have been enforceable, Sonos brought to the attention

of Google that Sonos had filed patent applications, and received patent grants, directed to "cloud queue" technology.  Additionally, several years before this amendment and during the time that Google alleges the Content Integration Agreement to have been enforceable, Sonos brought to the attention of Google that Sonos had filed patent applications, and received patent grants, that share a specification with the '033 Patent.

52.     For instance, on September 2, 2016, Sonos sent John LaBarre and Allen Lo at Google a document identifying 24 issued Sonos patents and 4 allowed Sonos patent applications, including U.S. Pat. No. 9,363,255, titled "Cloud Queue Playhead" and U.S. Pat. App. No. 14/520,566, which shares a common specification with the '033 Patent.  Ex. BY.

53.     Additionally, on October 13, 2016, Sonos sent John LaBarre, Allen Lo, and Louis Sorell at Google a document identifying 22 issued Sonos patents and 6 allowed Sonos patent applications, including U.S. Pat. No. 9,363,255, titled "Cloud Queue Playhead" and U.S. Pat. App. No. 14/520,566, which shares a common specification with the '033 Patent.  Ex. BZ.  In the document, Sonos articulated that it believed Google products practiced certain Sonos patents because they included "[v]arious selected 'vertical' playback system features including . . . cloud-based queues."  *Id.* at 3.

54.     Additionally, on October 26, 2016, Sonos sent John LaBarre at Google a PowerPoint presentation identifying 29 issued Sonos patents and 3 allowed Sonos patent applications including U.S. Pat. No. 9,363,255, titled "Cloud Queue Playhead" and U.S. Pat. App. No. 14/520,566, which shares a common specification with the '033 Patent.  Ex. CA.  In the presentation, Sonos specifically articulated that Sonos's U.S. Pat. No. 9,363,255 was a "Cloud Queue" patent.

1

2

3

4

5

6

7

8

9

10

11

12



13        55.        Additionally, On January 31, 2018, Sonos sent Matthew Gubiotti at Google a

14   PowerPoint presentation identifying 16 issued Sonos patents and 1 allowed Sonos patent

15   application. Ex. CB.  In the presentation, Sonos specifically identified that there was "Sonos patent

     subject matter relevant to Google Home" that included "Cloud queue."  *Id.* at 11.

16
          56.        Additionally, on July 12, 2018, Sonos sent John LaBarre and Matthew Gubiotti at
17
     Google a document identifying 58 issued Sonos patents, including U.S. Pat. Nos. 9,654,459 and
18
     9,942,215, titled "Cloud Queue Synchronization Protocol," U.S. Pat. Nos. 9,363,255 and
19
     9,648,071, titled "Cloud Queue Playhead," and U.S. Pat. No. 9,860,589, which shares a common
20
     specification with the '033 Patent.  Ex. CC.
21
          57.        On February 22, 2019, Sonos sent Matthew Gubiotti, Bradley Riel, and Tim
22
     Kowalski at Google a letter enclosing a link to an electronic repository containing 100 claim charts
23
     detailing Google's infringement of 92 issued Sonos patents and 8 allowed Sonos patent
24
     applications.  Ex. CD.  Among these 100 claim charts were charts detailing Google's infringement
25
     of Sonos's U.S. Pat. Nos. 9,363,255 (Ex. BS) and 9,648,071 (Ex. BT) (each of which were titled
26
     "Cloud Queue Playhead"); and 9,654,459 (Ex. BU) and 9,942,215 (Ex. BV) (each of which were
27
     titled "Cloud Queue synchronization Protocol"); 10,116,641 (Ex. BW) (titled "Cloud Queue
28

Playback Policies on a Graphical User Interface"); and 10,158,619 (Ex. BX) (titled "Cloud Queue Access Control").

58.     On June 13, 2019, Sonos sent Bradley Riel and Tim Kowalski at Google a PowerPoint presentation reiterating the 100 claim charts detailing Google's infringement of 92 issued Sonos patents and 8 allowed Sonos patent applications sent on February 22, 2019.  Ex. CE. In the presentation, Sonos specifically articulated that several Google products infringe Sonos's "Cloud Queue" patents.  Sonos's "Cloud Queue" patents.

1
2
3
4
5
6
7
8
9
10
11



12    59.    Thus, on no fewer than seven individual instances – three times in 2016, twice in

13  2018, and twice in 2019 – Sonos brought to Google's attention the fact that Sonos owned patents

14  directed to "Cloud Queue" technology and that Sonos believed Google infringed these patents.  Not

15  once prior to Google presenting a draft of its Second Amended Complaint in late 2021 did Google

16  raise the Content Integration Agreement with Sonos and claim, as a result of these Sonos patents,

17  which are indisputably directed to "Cloud Queue" technology and which Google was indisputably

18  aware of, that Sonos had breached the Content Integration Agreement by "'claim[ing] for itself or

19  for any third party any right, title, interest or licenses to the' cloud queue technology."  SAC at

20  ¶¶ 30-31.

21    60.    By failing to raise this with Sonos or otherwise take any action that would

22  demonstrate that Google considered the acquisition of these patents to have breached the Content

23  Integration Agreement, Google intentionally and voluntarily relinquished any right to claim that

24  Sonos's acquisition or attempted acquisition of patents purportedly directed to "cloud queue

25  technology" was a breach of the Content Integration Agreement.  By so failing, for instance, Google

26  demonstrated an intent not to avail itself of any contract remedies associated with Sonos's

27  acquisition or attempted acquisition of patents purportedly directed to "cloud queue technology."

28

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

## **SEVENTH DEFENSE: STATUTE OF LIMITATIONS (BREACH)**

61.     Sonos reasserts and incorporates its paragraphs 1 through 60 above.

62.     To the extent that Google succeeds in establishing that the Content Integration Agreement was an enforceable agreement at the time of the alleged breach, Google's relief is precluded at least on grounds that the statute of limitations bars Google's relief.

63.     The statute of limitations in California for breach of a written contract is four years. *Di Wen v. Greenpoint Mortgage Funding, Inc.*, No. 21-cv-7142, 2021 WL 5449048, at *2 (N.D. Cal. Nov. 22, 2021) ("[The statute of limitations for] [b]reach of written contract and breach of the implied covenant of good faith and fair dealing [is] four years.") (citing Cal. Civ. Proc. Code § 337(1)).

64.     As laid out above, and to the extent that Sonos's acquisition or attempted acquisition of patents purportedly directed to "cloud queue technology" could be considered a breach of the Content Integration Agreement (as Google alleges), Google was put on notice by Sonos that Sonos had acquired or attempted to acquire patents purportedly directed to "cloud queue technology" at least as early as early as September 2, 2016 and at least by October 26, 2016.

65.     Google filed its original declaratory judgment action on September 28, 2020. Dkt. 1.  In this action, Google claimed non-infringement of several Sonos patents.  In this action, Google did not mention the Content Integration Agreement and did not raise any claim for breach of contract or any factual allegations that would allegedly support a breach of contract claim.

66.     Google's Second Amended Complaint was the first time that Google claimed that Sonos breached the Content Integration Agreement as a result of Sonos allegedly "'claim[ing] for itself or for any third party any right, title, interest or licenses to the' cloud queue technology" by way of Sonos's acquisition or attempted acquisition of patents purportedly directed to "cloud queue technology."  SAC at ¶¶ 30-31.

67.     Google provided a draft of this Second Amended Complaint, for the first time, to Sonos on November 4, 2021.

68.     Google moved the Court for leave to file the Second Amended Complaint on November 16, 2021.

69.     The Court granted in-part Google's motion for leave to file the Second Amended Complaint on January 21, 2022.

70.     Google filed a revised Second Amended Complaint on February 4, 2022.

71.     The Ninth Count (Breach of Contract) set out in Google's Second Amended Complaint and the factual allegations provided in support thereof are not part of the conduct, transaction, or occurrence set out, or attempted to be set out, in Google's original complaint.

72.     As such, Google's Ninth Count (Breach of Contract) does not relate back to the date of Google's original complaint and should be considered as if filed on the day that the Second Amended Complaint was filed – February 4, 2022.

73.     Under Google's interpretation of what constitutes a breach of the Content Integration Agreement, Google's claim for breach of contract ripened at least as early as September 2, 2016.

74.     Alternatively, and assuming Google's claim for breach of contract did not ripen at least as early as September 2, 2016, under Google's interpretation of what constitutes a breach of the Content Integration Agreement, Google's claim for breach of contract ripened at least by October 13, 2016 or at least by October 26, 2016.

75.     Because Google did not bring its action for breach of contract prior to September 2, 2020, prior to October 13, 2020, or even prior to October 26, 2020, the statute of limitations bars Google's relief.

76.     Even assuming that Google's Ninth Count (Breach of Contract) relates back to the date of Google's original complaint and can be considered as if filed on the day of that original complaint – September 28, 2020, Google's relief is still barred under the statute of limitations because under Google's interpretation of what constitutes a breach of the Content Integration Agreement, Google's claim for breach of contract ripened at least as early as September 2, 2016 and Google failed to bring its action for breach of contract prior to September 2, 2020.

**EIGHTH DEFENSE: STATUTE OF LIMITATIONS (CONVERSION)**

77.     Sonos reasserts and incorporates its paragraphs 1 through 76 above.

78.     To the extent that Google succeeds in establishing the elements of conversion, Google's relief is precluded at least on grounds that the statute of limitations bars Google's relief.

79.     The statute of limitations in California for conversion is three years. *Kyko Glob., Inc. v. Bhongir*, No. 20-cv-4136, 2020 WL 7319360, at *2 (N.D. Cal. Dec. 11, 2020), *aff'd*, No. 20-17526, 2021 WL 4958989 (9th Cir. Oct. 26, 2021) ("Under California law, . . . conversion claims are subject to a three-year statute of limitations, see Cal. Civ. Proc. Code § 338(c) . . . .").

80.     As laid out above, and to the extent that Sonos's acquisition or attempted acquisition of patents purportedly directed to "cloud queue technology" could be considered a conversion of Google's property (as Google alleges), Google was put on notice by Sonos that Sonos had acquired or attempted to acquire patents purportedly directed to "cloud queue technology" at least as early as early as September 2, 2016 and at least by July 12, 2018.

81.     Google filed its original declaratory judgment action on September 28, 2020. Dkt. 1.  In this action, Google claimed non-infringement of several Sonos patents.  In this action, Google did not mention Google's purported "cloud queue technology" and did not raise any claim for conversion or any factual allegations that would allegedly support a conversion claim.

82.     Google's Second Amended Complaint was the first time that Google claimed that Sonos converted Google's property as a result of Sonos's alleged acquisition or attempted acquisition of patents purportedly directed to "cloud queue technology."  SAC at ¶¶ 95-96.

83.     Google provided a draft of this Second Amended Complaint, for the first time, to Sonos on November 4, 2021.

84.     Google moved the Court for leave to file the Second Amended Complaint on November 16, 2021.

85.     The Court granted in-part Google's motion for leave to file the Second Amended Complaint on January 21, 2022.

86.     Google filed a revised Second Amended Complaint on February 4, 2022.

87.     The Tenth Count (Conversion) set out in Google's Second Amended Complaint and the factual allegations provided in support thereof are not part of the conduct, transaction, or occurrence set out, or attempted to be set out, in Google's original complaint.

88.     As such, Google's Tenth Count (Conversion) does not relate back to the date of Google's original complaint and should be considered as if filed on the day that the Second Amended Complaint was filed – February 4, 2022.

89.     Under Google's interpretation of what constitutes conversion, Google's claim for conversion ripened at least as early as September 2, 2016.

90.     Alternatively, and assuming Google's claim for conversion did not ripen at least as early as September 2, 2016, under Google's interpretation of what constitutes conversion, Google's claim for conversion ripened at least by October 13, 2016, at least by October 26, 2016, at least by January 31, 2018, or at least by July 12, 2018.

91.     Because Google did not bring its action for conversion prior to September 2, 2019, prior to October 13, 2019, prior to October 26, 2019, prior to January 31, 2021, or even prior to July 12, 2021, the statute of limitations bars Google's relief.

92.     Even assuming that Google's Tenth Count (Conversion) relates back to the date of Google's original complaint and can be considered as if filed on the day of that original complaint – September 28, 2020, Google's relief is still barred under the statute of limitations because under Google's interpretation of what constitutes conversion, Google's claim for conversion ripened at least as early as September 2, 2016, October 13, 2016, or by October 26, 2016, and Google failed to bring its action for breach of contract prior to September 2, 2019, prior to October 13, 2019, or even prior to October 26, 2019.

**TENTH DEFENSE: RIGHT TO POSSESSION (CONVERSION)**

93.     Sonos reasserts and incorporates its paragraphs 1 through 92 above.

94.     Google's relief is precluded at least on grounds that Sonos had a right to possession of the '033 Patent application and the subject matter described and claimed therein at the time of the alleged conversion.

95.     For one or more of the reasons set forth above, neither the Content Integration Agreement nor the collaboration established that Google had a right to possession of patents purportedly directed to "cloud queue technology."

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

96.     The '033 Patent application is entitled to a priority date of December 30, 2011.  The subject matter described in the specification of the '033 Patent was invented at least as early as December 30, 2011.  Sonos was therefore entitled to claim subject matter contained within this December 30, 2011 filing in accordance with 35 U.S.C. § 120, including at the time of the alleged conversion.

97.     Google did not invent the "cloud queue idea" and was not the first to conceive of the "cloud queue idea" or the concept of a queue of one or more media items being stored in a cloud-based location or being provided by a cloud-based service.  SAC at ¶¶ 25, 95-96.

98.     The earliest date that Google has pointed to as evidence that it invented the "cloud queue idea" or that it had communicated this "cloud queue idea" to Sonos was 2013.  *Id.*

99.     But by this time, Sonos had already conceived of the concept of a queue of one or more media items being stored in a cloud-based location or being provided by a cloud-based service.

100.    For instance, at least as early as December 30, 2011, Sonos had conceived of the idea of a "remote playback queue provided by a cloud-based computing system," as demonstrated by the '033 Patent filing.

101.    Moreover, Sonos had disclosed the concept of a "cloud queue" in several other earlier patent filings.  For instance, Sonos's U.S. Pat. No. 9,232,277 ("the '277 Patent"), filed on July 17, 2013 (four months prior to the Content Integration Agreement), expressly references this "cloud queue" concept.  *See, e.g.*, Ex. BQ ('277 Patent) at col. 15, ll. 47-50 ("In other embodiments, playback ***queues***, including the first playback ***queue***, are stored ***remotely*** relative to the playback device.  For example, the first playback queue may be stored in a ***cloud-based*** network or on a second playback device for access by the playback device.") (emphasis added).

102.    As another example, Sonos's U.S. Pat. No. 9,674,587 ("the '587 Patent"), filed on June 26, 2012 (17 months prior to the Content Integration Agreement), expressly references this concept as well.  *See, e.g.*, Ex. BR ('587 Patent) at col. 14, ll. 36-41 ("a playback ***queue*** may be stored ***remotely*** over the Internet in memory on a '***cloud*** server' or network storage device.  For

1    example, the SONOS™ server 720 in FIG.7 may be used to store one or more playback queues for

2    SONOS™ systems 760 and 770.").

3    **ELEVENTH DEFENSE: CONSENT (CONVERSION)**

4        103.    Sonos reasserts and incorporates its paragraphs 1 through 102 above.

5        104.    Google's relief is precluded at least on grounds that Google consented to Sonos's

6    purported possession of patents directed to "cloud queue technology."

7        105.    As laid out above, on several occasions, beginning in 2016 and extending through

8    2019, Sonos informed Google that Sonos had acquired patents purportedly directed to "cloud queue

9    technology."  Indeed, Sonos had even alleged that Google infringed these patents and has provided

10   claim charts detailing Google's infringement of these patents.  At no point prior to Google's Second

11   Amended Complaint in late 2021 did Google object to Sonos's possession of these patents.

12       106.    Moreover, as explained above, on December 12, 2018, Google executed the Service

13   Integration Agreement.  Section 5.3 of the Service Integration Agreement states in part:

14   ████████████████████████████████████████████████

15   ████████████████████████████████

16   Ex. BP at 6.

17       107.    At least as of December 12, 2018, Sonos had been putting Google on notice for

18   years that Sonos had acquired patents purportedly directed to "cloud queue technology" and that

19   Google infringed these patents.  Google's acknowledgement in the Service Integration Agreement

20   that "certain features of either Parties' Materials, the Service Provider App and the Sonos System

21   may be protected by patent law," was express recognition and acknowledgement that the

22   technology and aspects of Sonos's system that were disclosed and claimed in the patents that had

23   been shown to Google by this date were rightfully owned by Sonos.

24       108.    By failing to raise a claim of conversion or otherwise object to Sonos's ownership

25   of patents directed to "cloud queue technology," Google consented to such ownership and

26   possession.

27   **TWELFTH DEFENSE: UNCLEAN HANDS (CONVERSION)**

28       109.    Sonos reasserts and incorporates its paragraphs 1 through 108 above.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

110.    Google's relief under its conversion claim is precluded at least on grounds that Google engaged in unconscionable, bad faith, and inequitable conduct at least by the time of the alleged conversion.

111.    For at least the same reasons discussed above in connection with Sonos's Unclean Hands defense to Google's breach claim, Google's relief under its conversion claim is barred.

## THIRTEENTH DEFENSE: WAIVER (CONVERSION)

112.    Sonos reasserts and incorporates its paragraphs 1 through 111 above.

113.    Google's relief under its conversion claim is precluded at least on grounds that Google waived any right to relief.

114.    For at least the same reasons discussed above in connection with Sonos's Waiver defense to Google's breach claim, Google's relief under its conversion claim is barred.

## REQUEST FOR RELIEF

Sonos respectfully requests that the Court enter judgment in its favor and against Google as follows:

1.      Dismissing, with prejudice, Google's claims against Sonos;

2.      Denying all relief that Google seeks;

3.      Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Sonos its costs and attorney fees; and

4.      Awarding any other relief the Court deems just and equitable.

## COUNTERCLAIMS

In accordance with Rule 13 of the Federal Rules of Civil Procedure, Sonos hereby alleges and asserts the following Counterclaims against Google.

## INTRODUCTION

1.      Sonos is an American success story.  It was founded in 2002 in Santa Barbara, California by a handful of engineers and entrepreneurs with a vision to invent the world's first wireless, whole-home audio system.  At the time, popular audio systems were dependent on a centralized receiver hard-wired to each individual passive speaker throughout a home.  Further, most homes with Internet access had dial-up connections, the iPhone was still five years away, and

there were no streaming music services.  The technological barriers confronting Sonos were enormous.

2.     To deliver on its vision, the Sonos team completely reimagined the in-home music system as a decentralized network of smart playback devices, and it developed a platform that could seamlessly and wirelessly distribute audio room by room or throughout the home at the user's discretion.  Sonos created a "choose what to play, where to play it, and how loud" wireless audio system that could not only perform without lag (*e.g.* buffering, or network interruptions), but that was also so simple and intuitive that customers would make it part of their daily lives.

3.     Commercial success did not come easy for Sonos as its vision was in many ways ahead of its time.  But year by year, consumers – and the entire industry – came to appreciate that wireless multi-room audio devices and systems could not only work, but could become an essential part of the listening experience.  Success required staying true to Sonos's disruptive vision, continuing to innovate while adjacent industries caught up and customers became more and more enamored with the idea of Sonos as they had the chance to encounter and use its products.  Once Sonos had taken all the risks and placed enormous bets on research and development, the "first followers" began to copy Sonos's innovations.

4.     To this day, Sonos remains focused on innovations that further enhance the listening experience.  Sonos invests heavily in research and development and, as a result, frequently invents new systems with new technologies, enhanced functionality, improved sound quality, and an enriched user experience.

5.     As a result, Sonos has become one of the world's leading providers of innovative audio products.  In recognition of its wide-ranging innovations, the U.S. Patent & Trademark Office has granted or allowed Sonos more than 940 U.S. patents, including the patents-in-suit, with hundreds more patents in other countries.  The innovations captured by these patents cover many important aspects of wireless multi-room audio devices/systems, including, for example, how to manage and control groups of playback devices, how to facilitate seamless control and transfer of audio playback among devices, and how to output amazing sound quality.

6.      The industry has recognized the importance of Sonos's patents.  For example, Sonos earned a spot on the IPO list of "Top 300 Organizations Granted U.S. Patents" and the IEEE recognized Sonos as having one of "[t]he technology world's most valuable patent portfolios."  *See* Exs. E and F.

7.      Sonos launched its first commercial products in 2005 and has since released a wide variety of critically acclaimed, patented, wireless multi-room audio products, including, for example, the Play:1, Play:3, Play:5 (Gen 1 and Gen 2), One (Gen 1 and Gen 2), One SL, Move, Playbar, Playbase, Beam, Sub, Connect, Port, Connect:Amp, Amp, Five, and Arc.  *See, e.g.*, Ex.  G.  Sonos's products can be set up and controlled by the Sonos app.  *Id.*

8.      Sonos's efforts have made it incredibly popular with its customers.  Sonos estimates that in fiscal year 2019 Sonos's customers listened to 7.7 billion hours of audio content using its products.  And, as of September, 2019, almost two thirds of Sonos households had purchased and installed more than one Sonos product.

9.      Sonos's record of innovation has made it the undisputed leader in what has come to be called the "multiroom audio" field.  *See, e.g.*, Ex. H (2018 Digital Trends: "Sonos is the king of multiroom audio…."); Ex. I (2019 What Hi-Fi: "[N]o multi-room offering is as complete or as pleasurable to live with as Sonos.").

10.     Sonos has already sued Google for infringing patents on its first group of inventions involving the set-up, control, playback, and synchronization of wireless playback devices.  This case involves a second group of inventions which, as described more extensively below, tackle the novel technological challenges of how to stream music from a cloud-based service, how to create, manage, and invoke "zone scenes" to configure how multiple playback devices work together, and how to dynamically adjust the equalization of a playback device based on the environment in which the playback device is operating.

**GOOGLE BEGINS INFRINGING**

11.     Almost a decade after Sonos created the smart-speaker market, Google entered the space.  Initially, Google sought to work with Sonos and, through those efforts, gained access to

Sonos's engineers, products, and technology.  All too quickly, however, Google shifted focus and began to develop and sell products that copied Sonos's technology and infringed Sonos's patents.

12.     Part of what makes Sonos so successful is that, through its application, Sonos is compatible with many different third-party music streaming services.  When Google publicly launched its own streaming music service – Google Play Music – in late 2011, Sonos worked with Google to integrate the Google Play Music service into the Sonos ecosystem.  As a result, Google Play Music launched on the Sonos platform in 2014.  *See, e.g.*, Ex. J.

13.     This should have benefited everyone: Sonos's customers gained access to another streaming service and Google Play Music users gained access to Sonos's devices.  But as the press recognized at the time, Sonos's integration work with Google was especially "deep" and therefore gave Google a wide aperture through which to view Sonos's proprietary technology.  *Id.* (2014 Wired: "This is the first time this sort of deep integration has happened between a third party music service and Sonos.").  The copying soon followed.

14.     Just eighteen months later, in 2015, Google began willfully infringing Sonos's patents.  On information and belief, Google used the knowledge it had gleaned from Sonos to build and launch its first wireless multi-room audio product – Chromecast Audio.

15.     Google's Chromecast Audio began what has turned into Google's relentless effort to copy Sonos and use Sonos's patented technology.  For example, although Google's original Chromecast Audio did not yet include Sonos's patented multi-room audio functionality, even when it was launched Google was working to add that Sonos-patented feature.  *See* Ex. K (2015 The Guardian: "Google is also working on multi-room audio streaming using the Chromecast Audio, but it will not support the popular feature out of the box.").  And, when Google added the infringing feature, the press immediately noted how this "major feature update" made Google's product even more "like the ones made by Sonos:"

> Google's recently-launched Chromecast Audio adapter is getting a
> major feature update this week: Consumers will now be able to group
> multiple Chromecast audio adapters to stream their favorite music
> simultaneously in more than one room, similar to the multi-room
> support available for internet-connected loudspeakers like the ones
> made by Sonos.

Ex. L (2015 *Variety* article entitled "Google's Chromecast Audio Adapter Gets Multi-Room Support Similar to Sonos"); *see also* Ex. M (2015 Pocket-Lint) ("You control your Sonos experience with one app.  Well, thanks to a new software rollout, Chromecast Audio can pretty much do the same thing.").

16.     This has become a consistent pattern.  Time and again, Google has added features to its products that first appeared in Sonos's products and which make use of Sonos's patented technology.

**GOOGLE'S INFRINGEMENT ACCELERATES DESPITE CONTINUED NOTICE OF INFRINGEMENT**

17.     Since 2015, Google's misappropriation of Sonos's patented technology has proliferated.  Google has expanded its wireless multi-room audio system to more than a dozen infringing products, including the Google Home Mini, Google Home, Google Home Max, and Pixel phones, tablets, and laptops.  And Google has persisted in infringing even though Sonos has warned Google of its infringement on at least four separate occasions dating back to 2016.

18.     For example, in 2016 (a year after Google launched the Chromecast Audio wireless adapter), Google released the Google Home multi-room audio player (which was controlled by Google's rebranded multi-room controller app – the Google Home app).  Unlike the Chromecast Audio, the Google Home added an internal speaker driver making it an "all-in-one" audio player akin to Sonos's prior Play:1, Play:3, and Play:5 products.

19.     Sonos raised the issue of infringement as to these products with Google as early as August 2016.  Sonos hoped that Google would respect Sonos's intellectual property and the extensive work Sonos had put into inventing and developing its products.  But Google did no such thing.

20.     On September 2, 2016, Sonos sent John LaBarre and Allen Lo at Google a document identifying 24 issued Sonos patents and 4 allowed Sonos patent applications, including ones that share a common specification with the '615 Patent, the '966 Patent, '033 Patent, and '885 Patent. Ex. BY.

21.     On October 13, 2016, Sonos sent John LaBarre, Allen Lo, and Louis Sorell at Google a document identifying 22 issued Sonos patents and 6 allowed Sonos patent applications (including ones that share a common specification with the '615 Patent, the '966 Patent, '033 Patent, and '885 Patent) and identifying relevant Google products for each.  Ex. BZ.

22.     On October 26, 2016, Sonos sent John LaBarre at Google a PowerPoint presentation identifying 29 issued Sonos patents and 3 allowed Sonos patent applications (including ones that share a common specification with the '615 Patent, the '966 Patent, '033 Patent, and '885 Patent). Ex. CA.

23.     On January 31, 2018, Sonos sent Matthew Gubiotti at Google a PowerPoint presentation identifying 16 issued Sonos patents and 1 allowed Sonos patent application (including ones that share a common specification with the '966 Patent and '885 Patent), and identifying relevant Google products for each, including products accused in this case.  Ex. CB.

24.     On July 12, 2018, Sonos sent John LaBarre and Matthew Gubiotti at Google a document identifying 58 issued Sonos patents (including ones that share a common specification with the '615 Patent, the '966 Patent, '033 Patent, and '885 Patent) and identifying relevant Google products for each, including products accused in this case.  Ex. CC.

25.     On February 22, 2019, Sonos sent Matthew Gubiotti , Bradley Riel, and Tim Kowalski at Google a letter enclosing a link to an electronic repository containing 100 claim charts detailing Google's infringement of 92 issued Sonos patents and 8 allowed Sonos patent applications (including the '615 Patent and others that share a common specification with the '615 Patent, the '966 Patent, '033 Patent, and '885 Patent).  Ex. CD.

26.     On June 13, 2019, Sonos sent Bradley Riel and Tim Kowalski at Google a PowerPoint presentation reiterating the 100 claim charts detailing Google's infringement of 92 issued Sonos patents and 8 allowed Sonos patent applications sent on February 22, 2019 and identifying 6 issued Sonos patents (including one that shares a common specification with the '966 Patent and '885 Patent) and identifying relevant Google products for each.  Ex. CE.

27.     On January 6, 2020, Sonos sent Bradley Riel and Tim Kowalski at Google a pre-filing copy of an International Trade Commission Complaint, a U.S. District Court complaint, and

claim charts detailing Google's infringement of 5 issued Sonos patents via products that are also accused in this case.

28.     On September 28, 2021 Sonos sent Bradley Riel and Tim Kowalski at Google a pre-filing copy of Sonos's complaint detailing Google's infringement of, inter alia, the '615, '033, and '966 Patents.

29.     On January 8, 2021, Sonos's counsel sent Google's counsel a copy of an amended complaint and supplemental infringement contentions detailing Google's infringement of the '885 Patent.

30.     These instances establish that Google was, over a five-year period, put on repeated notice of Sonos's patents and the breadth of Sonos's patent portfolio concerning specifically the products accused in this case.  At a minimum, this knowledge and repeated and persistent disclosure establishes that Google was, for some time periods, at least willfully blind to the fact that the asserted patents existed and, for other time periods, had actual knowledge of the existence of the asserted patents.  Further, this knowledge and repeated and persistent disclosure establishes that Google, for some time periods, had at least failed to investigate whether it infringed the asserted patents despite the existence of a high risk of infringement and, for other time periods, had actual knowledge of a credible and specific allegation of infringement of the asserted patents.

31.     Despite this consistent and repeated notice, Google did not stop infringing.  Instead, it doubled down and introduced new infringing products, making use of even more patented technology from Sonos.

32.     For example, in 2017, eight years after Sonos introduced its first all-in-one audio player – the Play:5 – Google released its first all-in-one audio players – the Google Home Max and the Google Home Mini.  Google's Home Max in particular was seen as a "Sonos Clone" and a "not-so-subtle copy of the [Sonos] Play:5 speaker…"  Ex. N.  As explained by Gizmodo, "[i]t's also hard not to see the [Google Home Max] device as something of a jab at Sonos."  *Id.*; *see also*, *e.g.*, Ex. O (2017 Android Central: "You can't help but look at Google Home Max… and come to the conclusion that Google is sticking its nose where Sonos has been for years.").

33.     Then again, in February 2019, Sonos put Google on notice of infringement of 100 Sonos patents, including asserted United States Patent No. 9,967,615.

34.     Nothing Sonos did, however, deterred Google from expanding its infringement. Google's infringing product line now includes at least the Chromecast, Chromecast Ultra, Chromecast Audio, Chromecast with Google TV, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Audio, and Nest Wifi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the YouTube Music app, the Google Play Music app, the YouTube app, and the Google Home app (individually or collectively, "Google App(s)").  *See, e.g.*, Exs. P-Z.

35.     In addition to providing the Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controllers that are pre-installed with the Google Play Music app, YouTube app, and/or YouTube Music app (and capable of downloading and executing the Google Apps that are not pre-installed).   These infringing hardware controllers include, for example, Google's "Pixel" phones, tablets, and laptops (*e.g.*, the Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, and Pixel 4a phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel Device(s)"). *See, e.g.*, Exs. AA-AE.

36.     Herein, "Google Wireless Audio System" refers to one or more Google Audio Players, one or more Google Pixel Devices, and/or one or more Google Apps.

37.     In order to hold Google accountable for its willful infringement of Sonos's patents, Sonos filed a complaint in January 2020 asking the United States International Trade Commission ("ITC") to institute an investigation into Google's unlawful importation into and sale in the United States of infringing products.  The ITC instituted an investigation, In re Certain Audio Players and Controllers, Components Thereof, and Products Containing Same, Inv. No. 337-TA-1191 to determine whether Google's audio players and controllers infringe five Sonos patents directed to fundamental features such as playing music on multiple speakers in synchrony, playing music in stereo over two or more players, a controller that can easily setup a player on a wireless network,

and playback-control features such as controlling both the volume of individual speakers and a group of speakers.

38.    While the ITC Investigation has been pending, Google has continued to increase its infringement.  For example, press reports indicate that Google is introducing new products and changes that mean Google is "one step closer to replacing your Sonos system."  Ex. AF; *see also* Ex. AP ("The new functionality appears to be the most direct challenge to the likes of Sonos, which has enjoyed enormous success by creating a series of connected speakers and soundbars that can play music simultaneously – or individually.").  The press has similarly noted that Google's new speaker "could be a new rival for the likes of the Sonos One, the best smart speaker you can buy in 2020." Ex. AG; *see also* Ex. AP ("Just like Sonos, you can also change the volume on each speaker individually from the main interface.").  And press reports indicate that Google has expanded its use of Sonos's stereo pair technology into the new smart-speakers even though Google is currently being sued for infringing a Sonos patent on this technology. Exs. AH, AP.

39.    Google itself has also highlighted the importance of its use of Sonos's technology. For example, Google's Chris Chan publicly stated that "[c]ontrolling the audio throughout my home, no matter who's listening, has been incredibly helpful" and that "[t]oday, we're expanding that control. You can already manually group Nest devices in order to play the same music on various speakers at the same time, and now we're launching multi-room control so you can dynamically group multiple cast-enabled Nest devices (speakers, Smart Displays, Chromecasts) in real-time to fill multiple rooms with music."  Ex. AH; *see also* Ex. AP.  Again, Google has expanded its use of this technology while it is being sued for infringing Sonos's patents on this precise technology.

40.    Google's aggressive and deliberate expansion of its use of Sonos's patented technology has led observers to conclude that "[n]o market is safe from [the] search engine monster" and that Google was specifically "offering new products to compete with Sonos in the music streaming market." *See* Ex. AI.

## GOOGLE'S CONTINUED INFRINGEMENT FORCES THIS SUIT

41. In the face of Google's unrelenting infringement, Sonos has no choice but to bring this suit. In this action, Sonos asserts patents that are not at issue in the ITC or the related district court action. Sonos is also accusing Google's Wireless Audio System of infringing different patented features than are at issue in either of those actions.

42. Sonos's ITC suit addressed Google's infringement of Sonos patents covering fundamental aspects of wireless, whole-home audio systems. While groundbreaking, those patents represent only some of Sonos's ongoing innovation from its inception to today. Through its foresight, substantial investment, and relentless pursuit of excellence, Sonos built on its previous success and invented a number of key features consumer have grown to expect and demand in streaming music listening.

43. For example, as explained more fully below, Sonos's U.S. Patent Nos. 9,967,615 and 10,779,033 (the "'615 Patent" and the "'033 Patent," respectively) cover key aspects of Sonos's inventive approach for streaming music from a cloud-based service to a media playback system, including technology for transferring playback responsibility for a cloud-based stream of media content from a user's device, such as a smart phone, to a media playback system that is then configured to retrieve and play back the cloud-based media content.

44. Sonos was well ahead of the field when it began to develop these inventions in 2011. At that time, Sonos's audio system, including its smart-phone app controller, was in a category all its own. Moreover, streaming content from cloud-based media services for playback by computers – let alone other types of networked devices like smart phones and smart speakers – was in its infancy. Nonetheless, at a time years before Google released its first Chromecast product, Sonos envisioned a novel experience of continuous and intuitive control of a user's entire streaming listening experience, across multiple networked devices, including smart phones and/or smart speakers. That vision gave rise to the innovation of technology for enabling seamless transition of playback responsibility for cloud-based media content between different networked devices, such as a smart phone and a smart speaker. This paradigm is now fundamental across the entire

streaming industry as user expectations of continuous listening experiences have continued to converge with Sonos's vision.

45.     Similarly, Sonos's U.S. Patent Nos. 9,344,206, 10,469,966, and 10,848,885 (the "'206 Patent," the "'966 Patent," and "the '885 Patent," respectively) cover some of Sonos's inventions related to creating, managing, and invoking "zone scenes" to configure how multiple players work together.  With these patents, Sonos once again anticipated what consumers would want and invented a new feature for its system.  Using the inventions of the '206,'966, and '885 Patents, playback devices can be grouped together for synchronous playback in an easy and intuitive manner using "zone scenes."  Advantageously, such a "zone scene" can be accessed and invoked by multiple devices and in various ways (*e.g.*, by voice) even when the particular controller that created the "zone scene" is not on the network.

46.     Sonos provided a pre-filing copy of both the original complaint and this Amended Complaint to Google, thereby providing clear pre-suit notice of infringement of the patents-in-suit. Google, however, has never given any indication that it is willing to stop infringing, and did not do so in response to receiving a draft of either the original complaint or this Amended Complaint.

47.     On information and belief, Google is unwilling to stop infringing because its infringement of Sonos's patented inventions has paved the way for Google to generate billions of dollars in revenue.  A December 2018 market report by Royal Bank of Canada ("RBC"), for example, concluded that Google sold over 40 million Google Home devices in the U.S. and that Google generated $3.4 billion in Google Home revenue in 2018 alone.  Ex. AJ at pp. 1, 4, 14-15. RBC also found that, as of August 2017, Google had sold more than 55 million Chromecast devices and that Google generated almost $1 billion in Chromecast revenue in 2018.  *Id.* at 4,16, 18. Further, RBC estimated that, in 2018, Google generated $3.4 billion in Pixel device revenue.  *Id.* at 4, 8.

48.     By 2021, RBC estimates that Google will be annually selling over 100 million Google Home devices in the U.S. and generating over $8 billion in Google Home revenue.  *Id.* at 4, 14-15.  In addition, by 2021, RBC estimates that Google will annually generate $2.4 billion in Chromecast revenue and nearly $7 billion in Pixel device revenue.  *Id.* at 4, 8, 18.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

49.     The revenue obtained from the sale of Google's hardware devices vastly understates the value to Google of infringing Sonos's patents.   On information and belief, Google is intentionally selling the infringing products at a discount and/or as a "loss leader" with the expectation that this will allow Google to generate even more revenue in the future – *e.g.*, by powering Google's continued dominance of the market for search advertising.   In particular, Google's infringement of Sonos's patented inventions has helped and/or will help Google generate significant revenue from the use of Google's hardware devices including advertising, data collection, and search via the Google Wireless Audio Systems.   As the *New York Post* explained, "Amazon and Google both discounted their home speakers so deeply over the holidays that they likely lost a few dollars per unit … hoping to lock in customers and profit from later sales of goods and data about buying habits."   Ex. AK.   Similarly, *News Without Borders* explained that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support advertising or e-commerce."  Ex. AL.

50.     On information and belief, Google's copying of Sonos's patented inventions has also helped and/or will help Google generate significant revenue from driving its users to make purchases such as streaming music subscriptions and retail purchases via the Google Wireless Audio Systems.   For example, an NPR "smart speaker" survey found that 28% of survey respondents agreed that "[g]etting [a] Smart Speaker led [them] to pay for a music service subscription," and Google offers two such subscriptions – Google Play Music and YouTube Music. Ex. AM at p. 20.  Likewise, the NPR survey also found that 26% of respondents use their smart speakers "regularly" to "add [items] to shopping list."  *Id.* at 14; *see also*, *e.g.*, Ex. AL (stating that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support… e-commerce.").

51.     On information and belief, Google is willfully infringing Sonos's patents as part of Google's calculated strategy to vacuum up invaluable consumer data from users and, thus, further entrench the Google platform among its users and fuel its dominant advertising and search platforms.

52.     Google's infringement – and its strategy to sell its infringing products at a loss to develop alternative revenue streams – has caused significant damage to Sonos.  For example, the Google Home Mini predatorily implemented Sonos's valuable patented technology into an all-in-one wireless multi-room product that Google sells at a highly subsidized price point or even gives away for free.  Ex. AN ("At $49, Google Home Mini works on its own or you can have a few around the house, giving you the power of Google anywhere in your home."); Ex. AL ("Google partnered with Spotify to offer Home Minis as a free promotion for Spotify Premium customers. Spotify's premium userbase is nearly 90 million, so if even a fraction of users take the free offer, a massive influx of Google smart speakers will enter the market.").

## THE PARTIES

53.     Sonos, Inc. is a Delaware corporation with its principal place of business at 614 Chapala Street, Santa Barbara, California 93101.  Sonos is the owner of the patents-in-suit.  Sonos holds all substantial rights, title and interest in and to the Asserted Patents.

54.     Google LLC is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA  94043.

55.     Google LLC is one of the largest technology companies in the world and conducts product development, engineering, sales, and online retail, search, and advertising operations in this District.

56.     Google LLC directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, sells, and/or imports the infringing Google Wireless Audio System at issue in this litigation in/into the United States, including in this judicial district, and otherwise purposefully directs infringing activities to this District in connection with its Google Wireless Audio System.

## JURISDICTION AND VENUE

57.     This counterclaim for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. § 1 et. seq.  This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338.

58.     This Court has personal jurisdiction over Google because, pursuant to Fed. R. Civ. P. 11(b)(3), Google has: (1) availed itself of the rights and benefits of the laws of the State of California, (2) transacted, conducted, and/or solicited business and engaged in a persistent course of conduct in the State of California (and in this District), (3) derived substantial revenue from the sales and/or use of products, such as the infringing Google Wireless Audio System, in the State of California (and in this District), (4) purposefully directed activities (directly and/or through intermediaries), such as shipping, distributing, offering for sale, selling, and/or advertising its infringing Google Wireless Audio System, at residents of the State of California (and residents in this District), (5) delivered its infringing Google Wireless Audio System into the stream of commerce with the expectation that the Google Wireless Audio System will be used and/or purchased by consumers, and (6) committed acts of patent infringement in the State of California (and in this District).

59.     This Court also has personal jurisdiction over Google because it is registered to do business in the State of California and has one or more regular and established places of business in this judicial district.

60.     Venue is proper in this District under the provisions of 28 U.S.C. § 1400(b) because, as noted above, Google has committed acts of infringement in this district and has one or more regular and established places of business in this district.

## **THE PATENTS-IN-SUIT**

## **U.S. Patent No. 9,967,615**

61.     Sonos is the owner of U.S. Patent No. 9,967,615 (the "'615 Patent"), entitled "Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on May 8, 2018.  A copy of the '615 Patent, is attached hereto as Exhibit A.

62.     The '615 Patent relates generally to technology for facilitating transfer of playback responsibility from a user's device to a media playback system.

63.     The '615 Patent recognized that "[t]echnological advancements have increased the accessibility of music content, as well as other types of media…." '615 Patent at 1:19-20.  This allowed users to access audio and video content over the Internet. *Id.* at 1:21-26.

64.     But, the '615 Patent identified a particular problem and provided an unconventional technological solution.  Specifically, the patent recognized that "[w]ired or wireless networks can be used to connect one or more multimedia playback devices for a home or other location playback network (*e.g.*, a home music system)." '615 Patent at 1:66-2:2.  This means that "[m]usic and/or other multimedia content can be shared among devices and/or groups of devices (also referred to herein as zones) associated with a playback network." *Id.* at 2:6-9.  The '615 Patent is directed to a method, tangible media, and controller that "facilitate streaming or otherwise providing music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application, and so on) to a multimedia content playback (*e.g.*, Sonos™) system." *Id.* at 2:10-14.

65.     The '615 Patent provides an unconventional technological solution to this problem.  For example, the '615 Patent describes an "Example Controller" that "can be used to facilitate the control of multi-media applications…." '615 Patent at 9:8-14.  "In particular, the controller 500 is configured to facilitate a selection of a plurality of audio sources available on the network and enable control of one or more zone players … through a wireless network interface 508." *Id.* at 9:14-18.  Further, the '615 Patent describes embodiments that "enable a user to stream music from a music-playing application (*e.g.*, browser-based application, native music player, other multimedia application and so on) to a local multimedia content playback (*e.g.*, Sonos™) system." '615 Patent at 12:8-12.  More specifically, the '615 Patent teaches that while "a user listens to a third party music application (*e.g.*, Pandora™ Rhapsody™, Spotify™, and so on)" on a user device, such as the user's "smart phone," the user can "select[] an option to continue playing [the current] channel on her household music playback system (*e.g.*, Sonos™)," which will cause the user's "playback system" to "pick[] up from the same spot on the selected channel that was on her phone and output[] that content (*e.g.*, that song) on speakers and/or other playback devices connected to the household playback system." *Id.* at 12:44-53; *see also id.* at 13:1-53.

66.     The '615 Patent goes on to teach specific technology for facilitating this transfer of playback responsibility from the user's device to the user's playback system.  For instance, the '615 Patent teaches that one aspect of this technology involves causing data for retrieving network-based media content (such as a uniform resource locator (URI)) to be passed to a playback device in the playback system so that the playback device can "run on its own to fetch the content" from a networked audio source, such as a "cloud" server that is accessible over the Internet.  *Id.* at 12:53-63; *see also id.* at 12:63-67 (describing that "[a] third party application can open or utilize an application programming interface (API) to pass music to the household playback system without tight coupling to that household playback system"); 15:47-16:19 (describing a "throw it over the wall" approach in which "a third party application provides a multimedia playback device (*e.g.*, a Sonos™ zone player (ZP)) with enough information about content (*e.g.*, an audio track) so that . . . the local playback system (*e.g.*, SonosNet™) can directly access a source of the content and . . . play the content directly off the network (*e.g.*, the Internet) or cloud," where the "connection between the third-party application and the local playback device (*e.g.*, Sonos ZonePlayer™) can be direct over a local area network (LAN)" or "remote through a proxy server in the cloud"); 16:53-17:4 (describing various embodiments for "queue management" associated with the transfer of playback from a control device to a playback system, including an embodiment where a "shared queue is provided between the local playback system and the third party application to keep the local system and the application synchronized").  Further, the '615 Patent teaches that another aspect of this technology involves transitioning the user's device into a mode in which it functions to control the playback of the media content by the user's playback system after the transfer.  *Id.* at 16:20-42, 17:5-20.  In this way, the technology taught by the '615 Patent provides for intuitive and seamless transfer of playback responsibility from a user's device to a media playback system.

67.     In line with these teachings, the '615 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system.

68.     For example, claim 13 of the '615 Patent recites a non-transitory computer readable storage medium including instructions for execution by a processor that, when executed, cause a

control device to perform various functions that facilitate transfer of playback responsibility from the device to a media playback system. *See* '615 Patent, claim 13. When the instructions are executed, the control device is initially operable to (i) cause a graphical interface to display a control interface including one or more transport controls to control playback by the control device, (ii) identify playback devices connected to a local area network, (iii) cause the graphical interface to display a selectable option for transferring playback from the control device, and (iv) detect a set of inputs to transfer playback from the control device to a particular playback device. *Id.* Additionally, the instructions configure the control device so that, after detecting the set of inputs to transfer playback from the control device to the particular playback device, the control device is operable to cause playback to be transferred from the control device to the particular playback device by (a) causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device, wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service, (b) causing playback at the control device to be stopped, and (c) modifying the one or more transport controls of the control interface to control playback by the playback device. *Id.* Additionally yet, the instructions configure the control device so that the control device is operable to cause the particular playback device to play back the multimedia content, which involves the particular playback device retrieving the multimedia content from one or more second cloud servers of a streaming content service and playing back the retrieved multimedia content. *Id.*

### U.S. Patent No. 10,779,033

69.     Sonos is the owner of U.S. Patent No. 10,779,033 (the "'033 Patent"), entitled "Systems And Methods For Networked Music Playback," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on September 15, 2020. A copy of the '966 Patent, is attached hereto as Exhibit B.

70.     The '033 Patent is related to the '615 Patent in that they are both continuations of application No. 13/341,237, filed on December 30, 2011, now U.S. Patent No. 9,654,821. Thus,

the '033 and '615 Patents share essentially the same specification.  Sonos incorporates by reference and re-alleges paragraphs 52-58 of this Amended Complaint as if fully set forth herein.

71.    Like the '615 Patent, the '033 Patent claims devices, computer-readable media, and methods for facilitating transfer of playback responsibility from a user's device to a media playback system, which provide an unconventional solution to the technological problem described in the '615 Patent.

72.    For example, claim 1 of the '033 Patent recites a computing device with specific hardware configurations, including a non-transitory computer-readable medium that stores program instruction that can be executed by the device's processor(s).  *See* '033 Patent, claim 1. When the instructions are executed, the computing device can initially operate in a first mode in which it is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.  *Id.*  In that mode, the computing device is operable to (i) display a representation of one or more playback devices in a media playback system that are communicatively coupled to the computing device over a data network and available to accept playback responsibility for the remote playback queue, and (ii) while displaying the representation of the one or more playback devices, receive user input indicating a selection of at least one given playback device from the one or more playback devices.  *Id.* Additionally, the instructions configure the computing device so that, based on receiving the user input, the computing device is operable to transmit an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item.  *Id.*  Additionally yet, the instructions configure the computing device so that the computing device is operable to detect an indication that playback responsibility for the remote playback queue has been successfully transferred from the computing device to the at least one given playback device, and then after detecting the indication, transition from (a) the

first mode in which the computing device is configured for playback of the remote playback queue to (b) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue. *Id.*

**U.S. Patent No. 10,469,966**

73.     Sonos is the owner of U.S. Patent No. 10,469,966 (the "'966 Patent"), entitled "Zone Scene Management," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on November 5, 2019.   A copy of the '966 Patent, is attached hereto as Exhibit C.

74.     The '966 Patent is related to the '206 Patent in that they are both continuations of application No. 13/896,829, filed on May 17, 2013, now U.S. Patent No. 8,843,228.  Thus, the '966 and '206 Patents share essentially the same specification.  Sonos incorporates by reference and re-alleges paragraphs 64-69 of this Amended Complaint as if fully set forth herein.

75.     The '906 Patent claims devices, computer-readable media, and methods for managing and using "zone scenes" to facilitate grouping of zone players, which provides an unconventional solution to the technological problems related to grouping zone players that are described in the '906 Patent.

76.     For example, claim 1 of the '966 Patent describes a computing device with a processor that can execute instructions stored in the computing device's non-transitory, computer readable medium.  Those instructions, when executed, cause the computing device to be operable to (i) receive a first request to create a first zone scene comprising a first predetermined grouping of zone players that are to be configured for synchronous playback when the first zone scene is invoked, and (ii) based on the first request, cause creation of the first zone scene, cause an indication of the first zone scene to be transmitted to a first zone player in the first zone scene, and cause storage of the first zone scene.  *See, e.g.*, '966 Patent, claim 1.  Additionally, the instructions, when executed, cause the computing device to be operable to (i) receive a second request to create a second zone scene comprising the first zone player and at least one other zone player that is not in the first zone scene, and (ii) based on the second request, cause creation of the second zone scene,

1   cause an indication of the second zone scene to be transmitted to the first zone player, and cause

2   storage of the second zone scene.  *Id.*  Additionally yet, the instructions, when executed, cause the

3   computing device to be operable to (i) display representations of the first and second zone scenes,

4   (ii) while displaying the representations, receive a third request to invoke the first zone scene, and

5   (iii) based on the third request, cause the first zone player to transition from operating in a

6   standalone mode to operating in accordance with the first predefined grouping of zone players so

7   that the first zone player is configured to coordinate with at least the second zone player to output

8   media in synchrony with output of media by at least the second zone player.  *Id.*

9                                     **U.S. Patent No. 10,848,885**

10        77.    Sonos is the owner of U.S. Patent No. 10,848,885 (the "'885 Patent"), entitled "Zone

11   Scene Management," which was duly and legally issued by the United States Patent and Trademark

12   Office ("USPTO") on November 24, 2020.  A copy of the '885 Patent, is attached hereto as

13   Exhibit D.

14        78.    The '885 Patent is related to the '206 and '966 Patents in that they are all

15   continuations of application No. 13/896,829, filed on May 17, 2013, now U.S. Patent

16   No. 8,843,228.  Thus, the '885, '966 and '206 Patents share essentially the same specification.

17   Sonos incorporates by reference and re-alleges paragraphs 64-73 of this Amended Complaint as if

18   fully set forth herein.

19        79.    The '885 Patent claims devices, computer-readable media, and methods for

20   managing and operating in accordance with different "zone scenes," which provides an

21   unconventional solution to the technological problems related to grouping zone players that are

22   described in the '885 Patent.

23        80.    For example, claim 1 of the '885 Patent describes a first zone player with one or

24   more processors that can execute instructions stored in the first zone player's non-transitory,

25   computer-readable medium.  Those instructions, when executed, cause the first zone player to be

26   operable to, while operating in a standalone mode, (i) receive a first indication that the first zone

27   player has been added to a first zone scene comprising a first predetermined grouping of zone

28   players that are to be configured for synchronous playback when the first zone scene is invoked,

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

1   and (ii) receive a second indication that the first zone player has been added to a second zone scene

2   comprising the first zone player and at least one other zone player that is not in the first zone scene

3   that are to be configured for synchronous playback when the second zone scene is invoked.  *Id.*

4   Additionally, the instructions, when executed, cause the first zone player to continue to operate in

5   a standalone mode until one of the first and second zone scenes has been selected for invocation.

6   *Id.*  Additionally yet, the instructions, when executed, cause the first zone player to be operable to,

7   (i) after one of the first or second zone scenes has been selected for invocation, receive an

8   instruction to operate in accordance with the given first or second zone scene comprising a

9   predefined grouping of zone player and (ii) based on the instruction, transition from operating in a

10  standalone mode to operating in accordance with the predefined grouping of zone players so that

11  the first zone player is configured to output media in synchrony with output of media by at least

12  one other zone player in the predefined grouping.  *Id.*

13  ### COUNTERCLAIM I: INFRINGEMENT OF U.S. PATENT NO. 9,967,615

14       81.    Sonos incorporates by reference and re-alleges paragraphs 1-80 of this Amended

15  Complaint as if fully set forth herein.

16       82.    Google and/or users of the Google Wireless Audio System have directly infringed

17  (either literally or under the doctrine of equivalents) and continue to directly infringe one or more

18  of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for

19  sale, and/or selling the Google Wireless Audio System within the United States and/or importing

20  the Google Wireless Audio System into the United States without authority or license.

21       83.    In the course of this litigation, Sonos has served Google with infringement

22  contentions detailing Google's infringement of the '615 Patent.  *See* Ex. CH; Ex. CI.

23       84.    In addition to providing Google with a claim chart detailing Google's infringement

24  of the '615 Patent on February 22, 2019, on September 28, 2020, Sonos provided Google with a

25  draft of the original complaint prior to its filing.  That draft identified the '615 Patent and described

26  how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that

27  Google infringed claims of the '615 Patent prior to Sonos filing this action.

28

85.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '615 Patent.  In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint *(see* ¶¶ 19-29, above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '615 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement *(see* Exs. U-Z; *see also* citations above in the exemplary infringement claim chart for claim 13 of the '615 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '615 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '615 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '615 Patent, and that Google's customers then directly infringe one or more claims of the '615 Patent by installing and/or using one or more of these apps in accordance with Google's product literature. *See, e.g.*, *id.*

86.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '615 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '615 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '615 Patent or was willfully blind to its existence prior to, and no later than, February 2019 and had actual knowledge or was willfully blind to Sonos's

infringement allegations at least as early as September 28, 2020 when Sonos provided Google a copy of the complaint (*see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '615 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '615 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '615 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music, Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '615 Patent. *See, e.g.*, Exs. U-Z. These apps are a material component of the devices that meet the one or more claims of the '615 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '615 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '615 Patent by installing and/or using these apps on the customers' devices.

87. Google's infringement of the '615 Patent is also willful because Google (a) had actual knowledge of the '615 Patent no later than February 2019 and actual notice of Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '615 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

88. Given the five-year period over which Sonos put Google on consistent and repeated notice of Sonos's patents and the breadth of Sonos's patent portfolio concerning specifically the products accused in this case, detailed above, this knowledge establishes that Google was, for some time periods, at least willfully blind to the fact that the '615 Patent existed and, for other time periods, had actual knowledge of the '615 Patent. Further, this knowledge and repeated and persistent disclosure establishes that Google, for some time periods, had at least failed to investigate whether it infringed the '615 Patent despite the existence of a high risk of infringement and, for

1   other time periods, had actual knowledge of a credible and specific allegation of infringement of

2   the '615 Patent.

3        89.     Additional allegations regarding Google's pre-suit knowledge of the '615 Patent and

4   willful infringement will likely have evidentiary support after a reasonable opportunity for

5   discovery.

6        90.     Sonos is entitled to recover from Google all damages that Sonos has sustained as a

7   result of Google's infringement of the '615 Patent, including, without limitation, a reasonable

8   royalty and lost profits.

9        91.     Google's infringement of the '615 Patent was and continues to be willful and

10  deliberate, entitling Sonos to enhanced damages.

11       92.     Google's infringement of the '615 Patent is exceptional and entitles Sonos to

12  attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

13       93.     Google's infringement of the '615 Patent has caused irreparable harm (including the

14  loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

15  ## COUNTERCLAIM II: INFRINGEMENT OF U.S. PATENT NO. 10,779,033

16       94.     Sonos incorporates by reference and re-alleges paragraphs 1-93 of this Amended

17  Complaint as if fully set forth herein.

18       95.     Google and/or users of the Google Wireless Audio System have directly infringed

19  (either literally or under the doctrine of equivalents) and continue to directly infringe one or more

20  of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for

21  sale, and/or selling the Google Wireless Audio System within the United States and/or importing

22  the Google Wireless Audio System into the United States without authority or license.

23       96.     In the course of this litigation, Sonos has served Google with infringement

24  contentions detailing Google's infringement of the '033 Patent.  *See* Ex. CH; Ex. CJ.

25       97.     On September 28, 2020, Sonos provided Google with a draft of the original

26  complaint prior to its filing.  That draft identified the '033 Patent and described how Google's

27  products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed

28  claims of the '033 Patent prior to Sonos filing this action.

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

98.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '033 Patent.  In particular, (a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint *(see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '033 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement *(see* Exs. U-Z; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '033 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '033 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '033 Patent.  For instance, at a minimum, Google has supplied and continues to supply the YouTube Music, Google Play Music, and YouTube apps to customers while knowing that installation and/or use of one or more of these apps will infringe one or more claims of the '033 Patent, and that Google's customers then directly infringe one or more claims of the '033 Patent by installing and/or using one or more of these apps in accordance with Google's product literature. *See, e.g.*, *id.*

99.     Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '033 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '033 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '033 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint *(see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports,

in connection with the Google Wireless Audio System, one or more material components of the invention of the '033 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '033 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '033 Patent. For instance, at a minimum, Google offers for sale, sells, and/or imports the YouTube Music, Google Play Music, and YouTube apps for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '033 Patent. *See, e.g.*, Exs. U-Z. These apps are a material component of the devices that meet the one or more claims of the '033 Patent. Further, Google especially made and/or adapted these apps for installation and use on devices that meet the one or more claims of the '033 Patent, and these apps are not a staple article of commerce suitable for substantial noninfringing use. Google's customers then directly infringe the one or more claims of the '033 Patent by installing and/or using these apps on the customers' devices.

100.    Google's infringement of the '033 Patent is also willful because Google (a) had actual knowledge of the '033 Patent and Sonos's infringement contentions no later than September 28, 2020 (*see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '033 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

101.    Given the five-year period over which Sonos put Google on consistent and repeated notice of Sonos's patents and the breadth of Sonos's patent portfolio concerning specifically the products accused in this case, detailed above, this knowledge establishes that Google was, for some time periods, at least willfully blind to the fact that the '033 Patent existed and, for other time periods, had actual knowledge of the '033 Patent. Further, this knowledge and repeated and persistent disclosure establishes that Google, for some time periods, had at least failed to investigate whether it infringed the '033 Patent despite the existence of a high risk of infringement and, for other time periods, had actual knowledge of a credible and specific allegation of infringement of the '033 Patent.

102.    Additional allegations regarding Google's pre-suit knowledge of the '033 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

103.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '033 Patent, including, without limitation, a reasonable royalty and lost profits.

104.    Google's infringement of the '033 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

105.    Google's infringement of the '033 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

106.    Google's infringement of the '033 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

**COUNTERCLAIM III: INFRINGEMENT OF U.S. PATENT NO. 10,469,966**

107.    Sonos incorporates by reference and re-alleges paragraphs 1-106 of this Amended Complaint as if fully set forth herein.

108.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

109.    In the course of this litigation, Sonos has served Google with infringement contentions detailing Google's infringement of the '966 Patent.  *See* Ex. CH; Ex. CK.

110.    On September 28, 2020, Sonos provided Google with a draft of the original complaint prior to its filing.  That draft identified the '966 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '966 Patent prior to Sonos filing this action.

111.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(b),

SONOS'S ANSWER TO GOOGLE'S SECOND
AMENDED COMPLAINT AND
SONOS'S COUNTERCLAIMS

by actively inducing users of the Google Wireless Audio System to directly infringe the one or more claims of the '966 Patent.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint *(see* ¶¶ 19-29 above), (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '966 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement *(see* Exs. U-V; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '966 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '966 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '966 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Google Home app to customers while knowing that installation and/or use of this app will infringe one or more claims of the '966 Patent, and that Google's customers then directly infringe one or more claims of the '966 Patent by installing and/or using this app in accordance with Google's product literature.  *See, e.g.*, *id.*

112.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '966 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '966 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '966 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than September 28, 2020 when Sonos provided Google with a copy of the complaint *(see* ¶¶ 19-29 above), (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '966 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially

made or especially adapted for use in an infringement of the '966 Patent, and (d) users of devices that comprise such material component(s) directly infringe one or more claims of the '966 Patent.

113.    For instance, at a minimum, Google offers for sale, sells, and/or imports the Google Home app for installation on devices (*e.g.*, smartphones, tablets, and computers) that meet one or more claims of the '966 Patent.  *See, e.g.*, Exs. U-V.  This app is a material component of the devices that meet the one or more claims of the '966 Patent.  Further, Google especially made and/or adapted this app for installation and use on devices that meet the one or more claims of the '966 Patent, and this app is not a staple article of commerce suitable for substantial noninfringing use.  Google's customers then directly infringe the one or more claims of the '966 Patent by installing and/or using the Google Home app on the customers' devices.

114.    Google's infringement of the '966 Patent is also willful because Google (a) had actual knowledge of the '966 Patent and actual knowledge of Sonos's infringement contentions no later than September 28, 2020 *(see* ¶¶ 19-29 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '966 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

115.    Given the five-year period over which Sonos put Google on consistent and repeated notice of Sonos's patents and the breadth of Sonos's patent portfolio concerning specifically the products accused in this case, detailed above, this knowledge establishes that Google was, for some time periods, at least willfully blind to the fact that the '966 Patent existed and, for other time periods, had actual knowledge of the '966 Patent.  Further, this knowledge and repeated and persistent disclosure establishes that Google, for some time periods, had at least failed to investigate whether it infringed the '966 Patent despite the existence of a high risk of infringement and, for other time periods, had actual knowledge of a credible and specific allegation of infringement of the '966 Patent.

116.    Additional allegations regarding Google's pre-suit knowledge of the '966 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

117.    Sonos is in compliance with any applicable marking and/or notice provisions of 35 U.S.C. § 287 with respect to the '966 Patent.

118.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '966 Patent, including, without limitation, a reasonable royalty and lost profits.

119.    Google's infringement of the '966 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

120.    Google's infringement of the '966 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

121.    Google's infringement of the '966 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## COUNTERCLAIM IV: INFRINGEMENT OF U.S. PATENT NO. 10,848,885

122.    Sonos incorporates by reference and re-alleges paragraphs 1-121 of this Amended Complaint as if fully set forth herein.

123.    Google and/or users of the Google Wireless Audio System have directly infringed (either literally or under the doctrine of equivalents) and continue to directly infringe one or more of the claims of the '885 Patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the Google Wireless Audio System within the United States and/or importing the Google Wireless Audio System into the United States without authority or license.

124.    In the course of this litigation, Sonos has served Google with infringement contentions detailing Google's infringement of the '885 Patent.  *See* Ex. CH; Ex. CL.

125.    On January 8, 2021, Sonos provided Google with a draft of this Amended Complaint prior to its filing.  That draft identified the '885 Patent and described how Google's products infringed.  Thus, Google had actual knowledge of Sonos's allegation that Google infringed claims of the '885 Patent prior to Sonos filing the amended complaint in this action.

126.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '885 Patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the Google Wireless Audio System to directly infringe the one or

more claims of the '885 Patent.  In particular, (a) Google had actual knowledge of the '885 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than January 8, 2021 when Sonos provided Google with a copy of the Amended Complaint, (b) Google intentionally causes, urges, or encourages users of the Google Wireless Audio System to directly infringe one or more claims of the '885 Patent by promoting, advertising, and instructing customers and potential customers about the Google Wireless Audio System (including uses thereof) and encouraging such customers and potential customers to engage in activity that constitutes direct infringement *(see* Exs. U-V; *see also* citations above in the exemplary infringement claim chart for claim 1 of the '885 Patent), (c) Google knows (or should know) that its actions will induce users of the Google Wireless Audio System to directly infringe one or more claims the '885 Patent, and (d) users of the Google Wireless Audio System directly infringe one or more claims of the '885 Patent.  For instance, at a minimum, Google has supplied and continues to supply the Chromecast-enabled media players to customers while knowing that use of these products will infringe one or more claims of the '885 Patent and that Google's customers then directly infringe one or more claims of the '885 Patent by using the Chromecast-enabled media players in accordance with Google's product literature. *See, e.g.*, *id.*

127.    Additionally and/or alternatively, Google has indirectly infringed and continues to indirectly infringe one or more of the claims of the '885 Patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the Google Wireless Audio System that contribute to the direct infringement of the '885 Patent by users of the Google Wireless Audio System.  In particular, (a) Google had actual knowledge of the '885 Patent and Sonos's infringement contentions, or was willfully blind to their existence, no later than January 8, 2021 when Sonos provided Google with a copy of the Amended Complaint, (b) Google offers for sale, sells, and/or imports, in connection with the Google Wireless Audio System, one or more material components of the invention of the '885 Patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Google knows (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '885 Patent, and (d) users of devices that comprise such

material component(s) directly infringe one or more claims of the '885 Patent.  For instance, at a minimum, Google offers for sale, sells, and/or imports software updates for the Chromecast-enabled media players that meet one or more claims of the '885 Patent.  *See, e.g.*, Ex. AO.  These software updates are material components of the Chromecast-enabled media players that meet the one or more claims of the '885 Patent.  Further, Google especially made and/or adapted these software updates for installation and use on the Chromecast-enabled media players that meet the one or more claims of the '885 Patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use.  Google's customers then directly infringe the one or more claims of the '885 Patent by installing and using software updates on the Chromecast-enabled media players.

128.   Google's infringement of the '885 Patent is also willful because Google (a) had actual knowledge of the '885 Patent and actual knowledge of Sonos's infringement contentions no later January 8, 2021 when Sonos provided Google with a copy of the Amended Complaint, (b) engaged in the aforementioned activity despite an objectively high likelihood that Google's actions constituted infringement of the '885 Patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Google.

129.   Given the five-year period over which Sonos put Google on consistent and repeated notice of Sonos's patents and the breadth of Sonos's patent portfolio concerning specifically the products accused in this case, detailed above, this knowledge establishes that Google was, for some time periods, at least willfully blind to the fact that the '885 Patent existed and, for other time periods, had actual knowledge of the '885 Patent.  Further, this knowledge and repeated and persistent disclosure establishes that Google, for some time periods, had at least failed to investigate whether it infringed the '885 Patent despite the existence of a high risk of infringement and, for other time periods, had actual knowledge of a credible and specific allegation of infringement of the '885 Patent.

130.   Additional allegations regarding Google's pre-suit knowledge of the '885 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

131.    Sonos is entitled to recover from Google all damages that Sonos has sustained as a result of Google's infringement of the '885 Patent, including, without limitation, a reasonable royalty and lost profits.

132.    Google's infringement of the '885 Patent was and continues to be willful and deliberate, entitling Sonos to enhanced damages.

133.    Google's infringement of the '885 Patent is exceptional and entitles Sonos to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  Google's infringement of the '885 Patent has caused irreparable harm (including the loss of market share) to Sonos and will continue to do so unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Sonos respectfully requests:

A.    That Judgment be entered that Google has infringed at least one or more claims of the patents-in-suit, directly and/or indirectly, literally and/or under the doctrine of equivalents, and that such infringement is willful;

B.    An injunction enjoining Google, its officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Google, and its parents, subsidiaries, divisions, successors and assigns, from further infringement of the patents-in-suit.

C.    An award of damages sufficient to compensate Sonos for Google's infringement under 35 U.S.C. § 284, including an enhancement of damages on account of Google's willful infringement;

D.    That the case be found exceptional under 35 U.S.C. § 285 and that Sonos be awarded its reasonable attorneys' fees;

E.    Costs and expenses in this action;

F.    An award of prejudgment and post-judgment interest; and

G.    Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sonos respectfully demands a trial by jury on all issues triable by jury.


Dated: February 18, 2022

ORRICK, HERRINGTON & SUTCLIFFE LLP
and
LEE SULLIVAN SHEA & SMITH LLP

By:  */s/ Cole B. Richter*
Cole B. Richter (admitted *pro hac*)

*Attorneys for Defendant Sonos, Inc.*

- 65 -