CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

SEAN M. SULLIVAN (*pro hac* vice)
sullivan@ls3ip.com
MICHAEL P. BOYEA (*pro hac* vice)
boyea@ls3ip.com
COLE B. RICHTER (*pro hac* vice)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone: +1 312 754 0002
Facsimile: +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>   Plaintiff and Counter-defendant,<br><br>v.<br><br>SONOS, INC.,<br><br>   Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**SONOS, INC.'S OPPOSITION TO GOOGLE LLC'S MOTION FOR SUPPLEMENTAL CLAIM CONSTRUCTION BRIEFING**<br><br>Complaint Filed: September 28, 2020 |

# **TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF RELEVANT FACTS ....................................................................... 3
    A. The Claims Of The '033 Patent .......................................................................... 3
    B. Google's Request For Supplemental Claim Construction Briefing .............................. 5

III. ARGUMENT .................................................................................................................... 6
    A. The Australian Prosecution Does Not Present Relevant, New, Or Inconsistent Evidence For The Construction Of The '033 Patent. ......................................................... 6
        1. *The Australian Application Claims A Different Invention.* ................................... 7
        2. *The Australian Statements Explain How The Specification Supports the Australian Claims.* ................................................................................................... 8
        3. *The Court Should Not Consider Extrinsic Evidence Of Foreign Prosecution In Construing The Claims* ........................................................................................ 11
        4. *Google's Proposed Construction Is Wrong.* ........................................................ 13
    B. Google Abandoned The Construction It Is Now Advancing ...................................... 15

IV. CONCLUSION ............................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Acetelion Pharms., Ltd. v. Sun Pharm. Indus., Inc.*,
   No. 3:17-cv-5015, 2019 WL 653149 (D.N.J. Feb. 15, 2019) .................................................. 12

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
   657 F.3d 1264 (Fed. Cir. 2011) ........................................................................................... 3, 11

*Alloc, Inc. v. Unilin Decor N.V.*,
   No. 02-C-1266, 2007 WL 5704047 (E.D. Wis. Mar. 6, 2007) ................................................ 12

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ................................................................................................ 12

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 12-CV-00630-LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014) .................................... 16

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*,
   133 F. Supp. 3d 692 (D.N.J. 2015) .......................................................................................... 12

*Falana v. Kent State Univ.*,
   669 F.3d 1349 (Fed. Cir. 2012) ................................................................................................ 14

*Fluidigm Corp. v. IONpath, Inc.*,
   No. C 19-05639 WHA, 2020 WL 5073938 (N.D. Cal. Aug. 25, 2020) .............................. 5, 16

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005) ................................................................................................ 12

*Helferich Patent Licensing, LLC v. New York Times Co.*,
   778 F.3d 1293 (Fed. Cir. 2015) ...................................................................................... 7, 10, 11

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
   No. 12-CV-03844, 2014 WL 1493665 (N.D. Cal. Apr. 16, 2014) ..................................... 13, 14

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*,
   991 F.2d 768 (Fed. Cir. 1993) .................................................................................................. 15

*Kyowa Hakka Bio, Co. v. Ajinomoto Co.*,
   No. 17-cv-00313, 2019 WL 5061066 (D. Del. Oct. 9, 2019) .................................................. 12

*Kyowa Hakka Bio, Co. v. Ajinomoto Co.*,
   No. 17-313, 2020 WL 3403207 (D. Del. June 19, 2020) ......................................................... 12

*Mars, Inc. v. TruRX LLC*,
   No. 6:13-CV-526, 2015 WL 11232358 (E.D. Tex. Aug. 6, 2015) ........................................... 11

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
    8 F.4th 1285 (Fed. Cir. 2021) .................................................................................... 12, 13

*Siemens Gamesa Renewable Energy v. Gen. Elec. Co.*,
    No. 21-10216, 2021 WL 5040409 (D. Mass. Oct. 28, 2021) ................................................. 12

*Silicon Lab'ys, Inc. v. Cresta Tech. Corp.*,
    No. 14-CV-3227, 2016 WL 791792 (N.D. Cal. Mar. 1, 2016) .............................................. 15

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .......................................................................................... 15

*TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*,
    375 F.3d 1126 (Fed. Cir. 2004) .......................................................................................... 11

**Statutes**

35 U.S.C. § 112(6) ...................................................................................................................... 5

**Other Authorities**

*Bradken Res Pty Ltd v Lynx Eng'g Consultants Pty Ltd*,
    [2015] FCA 1100 (Austl.) ................................................................................................... 11

Patent Local Rule 4-1 ............................................................................................................ 5, 15

Patent Local Rule 4-2 ................................................................................................... 1, 5, 6, 15

## I. INTRODUCTION

The Court should deny Google's attempt to reopen claim construction.

During claim construction in the Western District of Texas, Sonos and Google actively litigated the meaning of "remote playback queue." That court rejected the claim construction Google now seeks, and agreed with Sonos that the term should be given its plain and ordinary meaning. *See* Dkt. 185-4 at 4 (Ex. 5 to Sonos's Opening Claim Constr. Br.). When the case was transferred to this Court, Google *chose* not to seek a construction of the term and dropped the term from its Local Rule 4-2 disclosures. For that reason alone, the Court should deny Google's motion.

Google dropped its claim construction for tactical reasons – namely because it wanted to argue that the Texas Court's constructions were "law of the case," and it could not take that position while simultaneously asking this Court to change one of those constructions. Google now apparently regrets its misguided reliance on law of the case (which this Court soundly rejected, *see* Dkt. 382 at 2), and would like a double do-over. In particular, it wants to reverse its decision to drop "remote playback queue" from its L.R. 4-2 disclosures *and* another opportunity to advance the substantive claim construction that the Texas court rejected. But nothing about the ***facts*** or ***allegations*** in this case has changed since Google chose to omit "remote playback queue" from its disclosures. Put differently, this is not a situation in which, for example, Sonos has changed its infringement positions, or one in which a dispute about the meaning of the term has recently arisen.

So Google has gone looking for a hook – for a way to justify a second bite at the proverbial apple. The supposed justification it has decided on is the argument that its double do-over is warranted by statements that Sonos's Australian counsel made in connection with the prosecution of an Australian patent. But these statements do not justify undoing Google's waiver, re-opening claim construction, or overriding the intrinsic evidence to limit the scope of the claims.

As an initial matter, the Australian patent application on which Google relies relates to a ***different*** invention than the one claimed in the '033 patent. While the two patents share a specification, the claim discussed in the Australian prosecution (Australian claim 1) is directed to and claimed from the perspective of a playback device (e.g., a smart speaker), while the claims of the '033 patent are directed to and claimed from the perspective of a computing device (e.g., a

1    smartphone or laptop).  Put differently, the claims of the two patents relate to *different* components
2    of the networked systems described by their common specification.  For this reason, and other
3    differences in the claim language, what qualifies as a "remote" playback queue in the Australian
4    invention (i.e., seen from the perspective of the smart speaker) is *different* from what qualifies as a
5    "remote" playback queue in the '033 patent (e.g., seen from the perspective of a smartphone).

6    Google claims that the statements of Sonos's Australian counsel purport to define "remote
7    playback queue" for *all* embodiments described in that common specification.  Not so.  As
8    discussed below, Sonos's counsel was not attempting to define the meaning of the term "remote
9    playback queue" – much less to do so in absolute terms.  Instead, she was responding to an
10   enablement rejection and explaining how and why a person of ordinary skill in the art would
11   understand and map an exemplary embodiment in the specification to the claims at issue in the
12   Australian application.  Put differently, she was attempting to explain that *in connection with a*
13   *particular example* a person of ordinary skill in the art would understand the "remote playback
14   queue" recited in the claims to be the one that is managed by the associated computing device (e.g.,
15   the smartphone).  That is *accurate* for the Australian claims – which are directed to and claimed
16   from the perspective of the smart speaker.  But it is not true for the claims of the '033 patent which
17   are claimed from the perspective of the associated computer itself.  From that perspective, and as
18   the claims of the '033 patent otherwise make clear, the remote playback queue is located *in the*
19   *cloud* and is "remote" from the computing device itself.

20   The underlying issue here is that a relative term like "remote" does not refer to the same
21   thing in all instances: the meaning of "remote" turns on what you are remote *to*.  Google's contrary
22   position is a bit like saying that the phrase "on the opposite coast" refers to the same thing when
23   you are talking about people located in both California and in New York.  It doesn't.  Instead, the
24   phrase is both context and viewpoint dependent.  And because the claims here and in Australia are
25   directed to different system components with different viewpoints relative to the overall system,
26   what qualifies as a "remote playback queue" is different in those two contexts.

27   Google's arguments regarding the meaning of "remote" are, in any event, orthogonal to the
28   relief that Google actually seeks.  Google asks the Court to construe "remote playback queue" as a

"remote playback queue *provided by a third-party application*." The claims themselves say nothing about "third-party applications," and instead say that the remote playback queue is "provided by a cloud-based computing system associated with a cloud-based media service." Nothing about the Australian statements (which are, at best, extrinsic evidence) would justify rewriting this claim language.

The Court should also note that, under Australian law, the statements of Sonos's Australian counsel are not evidence of claim scope. Thus, even under the legal system in which the statements were made, they would not do the work that Google asks them to do here – i.e., to limit the claims to remote playback queues provided by third-party applications. For this reason, the Federal Circuit has cautioned courts that they should be very careful before they rely on statements made during foreign prosecution. *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011). Indeed, all of the cases that Google cites which *did* make use of foreign prosecution statements are cases in which the foreign and domestic claims were identical (or nearly so) or where the applicant was purporting to describe the invention as a whole. None of them are analogous to the current situation, which involves both (i) a relative term ("remote") which refers to different things depending on the context and viewpoint and (ii) statements about foreign claims that are directed to a *different* invention, context, and viewpoint than the domestic claims.

Google's construction is also wrong on the merits. The Court does not need to reopen claim construction to see, for example, that Google's proposal does not give the term its plain and ordinary meaning, conflicts with the claim language, and lacks intrinsic support. For all these reasons, the Court should deny Google's motion.

## II. STATEMENT OF RELEVANT FACTS[1]

### A. The Claims Of The '033 Patent

The '033 patent discloses techniques for transferring the playback of a list of one or more media items (a "playback queue") that is playing on a "computing device" (e.g., a smartphone) to a "playback device" (e.g., a smart speaker) without interruption. *See, e.g.*, Dkt. 1-3, '033 Patent, 2:20-24, 2:61-3:2, 12:6-10, 12:65-13:11.

---

[1] All emphasis herein has been added unless noted otherwise.

The '033 patent discloses a variety of embodiments which have different "playback queues" at various locations within the system. The patent is clear that these embodiments are exemplary and are not limiting. *E.g.*, *id.*, 12:5 ("Example Music Sharing and Playback Configuration); *id.*, 16:49 ("Certain embodiments …"). Some of the examples involve a user listening to music via a "music-playing application" such as a "third party application," like Pandora or Spotify. *See, e.g.*, *id.*, 12:41-50. For instance, the '033 patent discloses a "local playback queue" that resides on a "playback device" (e.g., a smart speaker) and an "application-specific queue" that resides on a computing device (e.g., a smartphone) that runs a "music-playing application" *See, e.g.*, *id.*, 16:49-53, 16:59-61.

Other embodiments disclose a queue that is remote from both the playback device and the computing device that runs the "music-playing application." For example, the '033 patent describes an embodiment in which a user listens to media on the user's MacBook Pro from "an online music service." The online music service provides "a plurality of online disc jockeys (DJs) deciding what to play next," thereby providing lists of media items for playback. The user selects one of these lists (by entering a "virtual room" and making a selection) to play on the user's computing device (e.g., MacBook Pro) and then presses "[a] button or other indicator" that "switch[es] the content being played to the [user's household] playback system for output (e.g., to the Sonos™ system rather than … the Mac Book™)." *Id.*, 12:65-13:11. In this example, the "playback queue" is located in the cloud and is remote to both the computing device (the MacBook Pro) and the "playback device" (the "Sonos™ system").

The claims of the '033 patent are directed to and drafted from the point-of-view of the "computing device" (e.g., the smartphone or MacBook). The claims recite, *inter alia*, a "computing device" capable of (a) operating in "a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service" and (b) "transitioning from i) the first mode … to ii) a second mode in which the computing device is configured to control [] at least one given playback device's playback of the remote playback queue …." In other words, the '033 patent claims recite a "playback queue" that is "remote" from **both** the claimed "computing device" and "playback

device" and expressly state that this "playback queue" is "provided by a cloud-based computing system associated with a cloud-based media service."

### B. Google's Request For Supplemental Claim Construction Briefing

While this case was in the Western District of Texas, Google sought to construe the term "remote playback queue" as a "remote playback queue provided by a third party application." *See, e.g.*, 21-cv-7559, Dkt. 64, 25-27. Sonos opposed this construction, argued that the term needed no construction and asked the court to find that it should be given its "plain and ordinary meaning." *See, e.g.*, 21-cv-7559, Dkt. 60, 26-28; Dkt. 66, 12-14. As part of this process, Sonos pointed out the flaws in Google's proposal, including that it improperly sought to limit the claims to non-limiting examples from the specification. But Sonos did not, contrary to Google's suggestion, argue that "the geographic location of the queue … was determinative of whether the queue was 'remote.'" Google's Motion For Leave ("MFL"), 12; *see also id.*, 1, 2. The Texas court sided with Sonos, rejected Google's proposed construction (the same one it advances here) and said that "remote playback queue" should be given its "plain and ordinary meaning." *See* Dkt. 185-4 at 4.

Once the case was transferred to this Court, the parties exchanged claim construction positions as required by this Court's patent local rules (PLRs). In its PLR 4-1 disclosure, Google identified the term "remote playback queue" as a term that needed construction. Ex. A[2], ii.[3] But when the parties exchanged their PLR 4-2 disclosures,[4] Google ***dropped*** the term from its disclosures—thereby abandoning its proposed construction and waiving its right to seek construction of the term. Ex. B, 4-10; *see infra* § II.B (collecting cases); *see also Fluidigm Corp. v. IONpath, Inc.*, No. C 19-05639 WHA, 2020 WL 5073938, at *4 (N.D. Cal. Aug. 25, 2020) (finding that party waived claim construction by failing to include it in Rule 4-2 disclosures). Google chose to abandon its construction for *tactical* reasons. In particular, Google decided that it

---

[2] All lettered exhibits cited in this brief are attached to the Declaration of Alyssa Caridis filed in support of this brief and concurrently herewith.

[3] Local Rule 4-1 requires that "each party shall serve on each other party a list of claim terms which that party contends should be construed by the Court, and identify any claim term which that party contends should be governed by 35 U.S.C. § 112(6)."

[4] Local Rule 4-2 requires that "Not later than 21 days after the exchange of the lists pursuant to Patent L.R. 4-1, the parties shall simultaneously exchange proposed constructions of each term identified by either party for claim construction."

1  was better off arguing (incorrectly, it turns out, *see* Dkt. 382 at 2) that the Texas court's
2  constructions were "law of the case."  And because the Texas Court had previously rejected
3  Google's proposed construction of this term in favor of "plain and ordinary meaning," Google
4  could not simultaneously re-argue its rejected construction of this term *and* tell this Court that the
5  Texas court's *other* constructions were binding.

6  Google apparently regrets that decision.  So, it has gone looking for a basis to ask for a do-
7  over *both* of the substance of the claim construction *and* of its strategic decision (made in order to
8  improve its law-of-the-case argument) to drop the term "remote playback queue" from its PLR 4-
9  2 disclosures.  Google does not point to any new intrinsic evidence, as nothing about the claims,
10 specification, or U.S. prosecution history has changed.  The argument Google has settled upon is
11 the assertion that its request is justified by "new evidence" – extrinsic evidence in the form of
12 statements made by Sonos's Australian counsel during prosecution of Australian patent application
13 2020239784 (the "Australian application").  Dkt. 375-16, 3.

14 Google first raised this issue in a meet and confer letter on September 8, 2022.  In that letter
15 Google contended that Australian counsel had "repeatedly represented that the plain meaning of
16 'remote playback queue' in the context of the patent would be understood by a person of skill in
17 the art to be 'a playback queue that the user is managing in a third-party application.'"  *Id.*  But in
18 the present motion (filed almost a month later), Google changed its mind again -- and is no longer
19 seeking to construe the term "remote playback queue" as "a playback queue that the user *is*
20 *managing in* a third-party application."  MFL, 6.  Instead, Google is seeking to resurrect the
21 construction it sought in Texas – namely a "playback queue *provided by* a third-party application."
22 *Id.*  Google's Motion offers no explanation for this change.

23 **III.   ARGUMENT**

24        **A.   The Australian Prosecution Does Not Present Relevant, New, Or Inconsistent**
25              **Evidence For The Construction Of The '033 Patent.**

26 Google's motion is based on the false premise that statements made during Australian
27 prosecution amount to relevant "new" evidence about the meaning of the term "remote playback
28 queue" in the context of the claims of the '033 patent.  *See, e.g.*, MFL, 2.  Google is wrong.  The

1    '033 patent and the Australian patent claim a *different* invention with *different* scope. And the
2    statements made by Sonos's Australian counsel were directed to explaining how a person of
3    ordinary skill in the art would understand a specific example in the specification to disclose that
4    (different) claim – *not* to defining the meaning of the term. Indeed, even under Australian law
5    those statements could not be used to limit the scope of the Australian claims.

### 1. The Australian Application Claims A Different Invention.

Although the Australian application claims priority to the same ancestor filing as the '033 patent, Google is incorrect to label it as a "foreign counterpart of the '033 patent." MFL, 8. The claims of the Australian application and the claims of the '033 patent are directed to different inventions. *Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1310 (Fed. Cir. 2015) ("All of the relevant claims in the Helferich portfolio evidently grew out of a common specification, but it is common for a single specification to describe quite distinct inventions.").

Claim 1 of the '033 patent is directed to and drafted from the point-of-view of a "computing device," whereas claim 1 of the Australian application is directed to and drafted from the point-of-view of a "zone player" (e.g., the smart speaker). *Compare* Dkt. 1-3, '033 patent, cl. 1 *with* Dkt. 375-9, cl. 1. Moreover, claim 1 of the '033 patent recites "a remote playback queue *provided by a cloud-based computing system associated with a cloud-based media service*," whereas claim 1 of the Australian application recites "a remote playback queue that is *provided by a computing system that is communicatively coupled to the zone player via at least a cloud-based network* …." *Id.*

| **Claim 1 of the '033 Patent** | **Claim 1 of the Australian Application** |
|---|---|
| 1. A computing device … configured for playback of a *remote playback queue provided by a cloud-based computing system associated with a cloud-based media service* …. | 1. A zone player … configured to[] receive … a *remote playback queue that is provided by a computing system that is communicatively coupled to the zone player via at least a cloud-based network* …. |

Put differently, the claims are directed to different devices, and call for two differently claimed remote playback queues: (i) one that is expressly recited as being *in* the cloud and *remote from the computing device*, and (ii) the other *on* a computing system that is *remote from the smart speaker* and linked to that speaker via, e.g., the internet. Because the claims are directed to different

1  inventions with different playback queues, the term "remote playback queue" does not have the
2  *same* scope in both claims.

### 2.     *The Australian Statements Explain How The Specification Supports the Australian Claims.*

The Australian statements on which Google relies were made because, during prosecution, the Australian Examiner issued an enablement objection, stating that the "remote playback queue … provided by a computing system" was not sufficiently disclosed in the application. Dkt. 375-11, 2. The Examiner believed that, "[b]y plain definition, 'remote' refers to any entity (i.e. user, machine or facility) in a different geographic location" and "[i]n contrast, 'local' refers to an entity in the same geographic location." *See* Ex. C, 3. In response, Australian counsel for Sonos used examples from the specification and the language of Australian claim 1 to explain why the examiner's understanding of the term "remote" and the inadequate disclosure objection were incorrect. *See* Dkt. 375-13, 2; Dkt. 375-12, 1-2.

*First*, Australian counsel explained that the term "remote" does not turn on whether two devices are in the same geographic location. *See* Dkt. 375-13, 1-2. For instance, counsel pointed out that Fig. 7 shows third-party applications that are "remote or separate to local content playback systems" depending on whether the third-party application and "playback device" are ***directly*** connected over a local area network or ***remotely*** connected through a proxy server in the cloud. *See* Dkt. 375-12, 1. As Australian counsel summarized the argument, "[i]n terms of playback system, [a] person skilled in the art would understand the term 'remote' to mean a system unconnected or with little relationship to an initial system." *Id.*, 2.

In the next exchange, Australian counsel elaborated on the meaning of "remote" by describing other examples of systems that could be located in the same geographic location but would still be considered remote from one another. One of those examples was a "remote application" that "allows a user device to connect to another [] computing device using networks …." Dkt, 375-13, 2. In this example, the user device with the "remote application" could be in the same physical location as "another computing device" but would still be considered "remote" insofar as the two devices were connected via an indirect network (such as cellular and/or Wi-Fi ).

***Second***, Australian counsel identified enabling disclosures to demonstrate support for the "remote playback queue" referred to in Australian claim 1. As noted above, Australian claim 1 is drafted from the point-of-view of a "zone player" and recites "a remote playback queue that is provided by a computing system that is communicatively coupled to the zone player via at least a cloud-based network …." *See, e.g.*, Dkt. 375-13, 2. To illustrate this configuration, Australian counsel chose an embodiment from the specification. As she explained in the correspondence:

> The "remote playback queue" referred to in claim 1 ***corresponds to*** the "queue that the user is editing/managing in the third party application" as described at [89] of the application as filed. This third party application is defined in the specification as having a connection with the local playback device that can be of types "direct over a local area network (LAN)" or "remote through a proxy server in the cloud". See specification as filed at [87]. Thus, the geographic location of the mobile device running the third party application is not determinative as to whether the third party application is remote with respect to the local playback system.

Dkt. 375-13, 2 (brackets in original, emphasis added); *see also* Dkt. 375-12, 1-2. As Australian counsel explained, in this example, the "zone player" and a mobile device running a third-party application could both be located at a user's home but could be connected to one another through a remote proxy server in the cloud (e.g., via a wide-area network). In this configuration, the queue being managed on the smart phone would still be considered "remote" from the "zone player," despite the fact that the smartphone and the "zone player" were in the same location. After this discussion, Australian counsel summarized the argument she had just made by concluding "[i]t is therefore submitted that, to a person skilled in the art, the meaning of the remote playback queue would clearly be the playback queue that the user is managing in the third party application." Dkt. 375-13, 2.

Contrary to Google's assertions (*see* MFL, 12-13), this was not an attempt to define the phrase "remote playback queue" for all embodiments in the specification but instead was expressly directed to how that term was used in the context of Australian claim 1. *See, e.g.*, Dkt. 375-13, 2 ("The 'remote playback queue' ***referred to in claim 1*** …."); Dkt. 375-12, 2 ("***In terms of playback system*** …. [C]learly understand a playback queue or list on a third party application on a user device to be a 'remote' playback queue ***in the context of a local [playback] or zone system***."). In particular, Australian counsel was attempting to explain how a person of ordinary skill in the art

1  would understand the *embodiment* to which she had just pointed mapped onto (and provided
2  support for) the claim.  More specifically, she was trying to clarify that a person of ordinary skill
3  in the art would understand that, relative to the smart speaker and in context of the example she had
4  just given, the term **remote** playback queue "corresponds to" to the queue that the user was
5  managing in the third-party application.

6        The reason Australian counsel did not seek to provide a universal definition for "remote
7  playback queue" is because (i) she was responding to a specific argument about the meaning of
8  remote in the context of Australian claim 1 and (ii) the scope of what qualifies as "remote" is
9  context dependent – i.e., it depends on what you are remote *from*.  For claim 1 of the Australian
10 application, the playback queue need only be remote from the "zone player" or playback device.
11 Dkt. 375-9, cl. 1.  As a result it can be located on the computing device (i.e., the one from which
12 the playlist may be managed) and still be considered "remote" from the playback device.

13       On the other hand, the claims of the '033 patent are directed to and drafted from the point
14 of view of the computing device (e.g., smartphone) and recite a "remote playback queue" that is
15 remote relative to **both** that "computing device" and the "playback device" (or "zone player").  In
16 this context, the "remote playback queue" must be in the cloud because (i) the queue must be remote
17 relative to both the "computing device" and the "playback device" and (ii) the claims expressly
18 state that the remote playback queue is "provided by a cloud-based computing system associated
19 with a cloud-based media service."

20       Because the statements made by Sonos's Australian counsel were about a *different* claim,
21 written from the perspective of a *different* device, and use different contextual language, the term
22 "remote playback queue" necessarily refers to *different* things in the two claims.  More specifically,
23 in the Australian context a queue created by a third-party application and saved on a smartphone
24 can be a "remote playback queue" but in the context of the claims of the '033 patent it cannot.  For
25 this reason – i.e., because what qualifies as "remote" depends on what you are remote *from* – the
26 statements made by Australian counsel have no relevance to what qualifies as a remote playback
27 queue in the context of the '033 patent.

28       For this same reason, the statements of Sonos's Australian counsel are not *new* evidence

*relevant to* the claims of the '033 patent. All the Australian statements do is point to the various embodiments in the specification and explain how those embodiments support the Australian claims and the idea that two devices in the same geographic location can be "remote" from one another. To the extent the statements are about the specifics of the Australian claims they are irrelevant, and to the extent they are about the embodiments in the specification they aren't ***new*** evidence, but instead point to evidence that Google has had from the beginning.

Google's assertion that Sonos's Australian statements are inconsistent with Sonos's positions in this litigation is also wrong. The context-dependent nature of the word "remote" and the differently claimed points-of-view and surrounding claim language ***requires*** the term to have different scope when used in the '033 patent and in Australian claim 1. The Court should reject Google's attempt to take the contrary position and multiply these proceedings with yet another round of claim construction.

### 3. *The Court Should Not Consider Extrinsic Evidence Of Foreign Prosecution In Construing The Claims*

Federal Circuit "precedent cautions against indiscriminate reliance on the prosecution of corresponding foreign applications in the claim construction analysis." *AIA Eng'g*, 657 F.3d at 1279. This is because "the theories and laws of patentability vary from country to country, as do examination practices." *Id.* (quoting *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994)).

Google has not shown that the relevant patent laws in Australia are sufficiently similar to the patent laws of the United States to justify the use of the Australian statements here. *See, e.g.*, *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126, 1136 (Fed. Cir. 2004); *Mars, Inc. v. TruRX LLC*, No. 6:13-CV-526, 2015 WL 11232358, at *9 (E.D. Tex. Aug. 6, 2015). Nor could Google make such a showing because, for example, exchanges between an applicant and the Australian patent office are not considered under Australian patent law when ascertaining the scope of claims.[5] This point is important because Google's position is (essentially) that this Court should

---

[5] *See, e.g.*, https://www.spruson.com/patents/file-wrapper-estoppel-still-facing-obstacles-in-australia/; *Bradken Res Pty Ltd v Lynx Eng'g Consultants Pty Ltd*, [2015] FCA 1100 (Austl.), http://www.austlii.edu.au/cgi-bin/viewdoc/au/cases/cth/FCA/2015/1100.html.

accord Sonos's statements in Australia *more* weight when considered against the (very different) claims of the '033 patent than the Australian government would give them when construing the scope of the claims about which those statements were made. Nothing about that approach is consistent with the Federal Circuit's guidance in *AIA Engineering*.

Put differently, even if the Court were to consider the Australian prosecution, the statements made during that prosecution would only be ***extrinsic*** evidence relative to the '033 patent. *See, e.g.*, *Alloc, Inc. v. Unilin Decor N.V.*, No. 02-C-1266, 2007 WL 5704047, at *17, *17 n.13 (E.D. Wis. Mar. 6, 2007) (concluding "comments in [patentee's] response to the European patent opposition proceedings are extrinsic, not intrinsic, evidence" and collecting Federal Circuit precedent treating foreign prosecution as such); *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). This means, among other things, that the Court need not consider it, and should not use it to override contrary intrinsic evidence.

The cases that Google cites are also distinguishable at least because (i) the foreign prosecution in those cases dealt with claims that were identical or equivalent to the US claims;[6] (ii) the foreign statements were with respect to the invention as a whole rather than statements about the specifics of a foreign claim;[7] and/or (iii) the foreign statements were used to bolster an indefiniteness conclusion, not to construe the claims.[8]

Because the Court need not consider extrinsic evidence, because foreign prosecution counts

---

[6] *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312-13 (Fed. Cir. 2014) ("the Japanese application contained a claim identical" to the issued U.S. patent); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("virtually identical claim"); *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 133 F. Supp. 3d 692, 702 n.18, 702-03 (D.N.J. 2015) ("European equivalent" with "substantially similar claims").

[7] *Apple*, 757 F.3d at 1312-13 (statement made in context of advantage of invention); *Siemens Gamesa Renewable Energy v. Gen. Elec. Co.*, No. 21-10216, 2021 WL 5040409, at *5-6 (D. Mass. Oct. 28, 2021) (statement "regarded the entire invention"); *Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, No. 17-313, 2020 WL 3403207, at *9 (D. Del. June 19, 2020) ("blatant admissions" made "in the context of the patent" rather than in context of specific claim); *Acetelion Pharms., Ltd. v. Sun Pharm. Indus., Inc.*, No. 3:17-cv-5015, 2019 WL 653149, at *9 (D.N.J. Feb. 15, 2019) (arguments to European Patent Office described the invention as a whole).

[8] *Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, No. 17-cv-00313, 2019 WL 5061066, at *8 (D. Del. Oct. 9, 2019) (foreign prosecution statements were "extrinsic evidence [that] underscored the fact that the claim was susceptible to different definitions and, thus, was indefinite.")

(at most) as extrinsic evidence, and because the Australian statements would not be evidence of claim scope even as to the (very different) Australian claims, these statements do not constitute the kind of new, material evidence that might justify allowing Google to undo its tactical decision to advocate for law of the case, or re-opening claim construction. *See, e.g.*, *Seabed*, 8 F.4th at 1287; *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, No. 12-CV-03844, 2014 WL 1493665, at *4 (N.D. Cal. Apr. 16, 2014) (finding "prosecution histories of [foreign] patent applications irrelevant" and declining to consider them).

### 4. *Google's Proposed Construction Is Wrong.*

If the Court reaches the merits of Google's request it should reject Google's construction and instead decide that the term "remote playback queue" is one that can be understood by the jury in accordance with its plain and ordinary meaning.

First, the claims of the '033 patent themselves tell us what provides the "remote playback queue," and it is *not* a "third party application." Instead, the claims specify the "remote playback queue" is provided by "a cloud-based computing system associated with a cloud-based media service." The claims do ***not*** require the queue to be "provided by" an application running on the computing device *nor* does it require the cloud-based media service to be provided by a *different* party from the one that made the computing device. There is, in short, nothing about the claim that speaks to what kind of software provides the queue, or which excludes integrated service offerings from companies that (like Google) sell both devices *and* cloud-based media services.

Yet Google's proposed claim construction attempts to read in both of those limitations. In particular, Google would have the Court believe that the term "remote playback queue" requires the queue to be provided by a *different* entity than the one that provides the claimed computing device (i.e., by a "third party") and to be "provided by" an application on the computing device.

None of the intrinsic evidence supports either position. As explained above, the '033 patent is directed to and discloses various techniques for transferring playback from a computing device (e.g., a smartphone) running a media-playing application to a "playback device." *Supra* § II.A. Those techniques – not the identity of the party that makes the music streaming service or application – are the invention. For this reason, the '033 patent generally refers to the media-

playing application not as a third-party application but as a "music-playing application (e.g., browser-based application, native music player, other multimedia application, and so on)." Dkt. 1-3, '033 patent, 12:6-9. True, the specification gives examples of "third party" music-playing applications, such as Pandora and Spotify. *Id.*, 2:20-24, 12:6-10, 12:41-50. But the fact that there are examples of "third-party" music applications does not *limit* the claims to those examples.[9]

This is especially true because the '033 specification provides examples of "remote playback queues" that are not labeled as or otherwise provided by "third-party" applications. *Supra* § II.A. For example, the '033 patent discloses an exemplary embodiment that uses what it calls a "shared queue" – which is a "playback queue" that is remote from both a "playback device" and a computing device. Dkt. 1-3, '033 patent, 16:64-67. The specification explains that the shared queue is "***provided between*** the local playback system and the third party application to keep the local system and application synchronized." *Id*. Put differently, the specification does not describe this "remote playback queue" as being ***provided by*** a third-party application, but instead describes it as being ***provided between*** a third-party application and a local playback system.

As another example, the '033 patent discloses embodiments that include a "playback queue" that (i) is not local to a "playback device" at a user's house and which (ii) a user can setup and/or configure via a media-playing application. *Id.*, 17:8-12 ("Certain embodiments facilitate control of a local [playback device] ***from outside*** a household or other location at which the local [playback device] is configured. For example, a user can ***queue up music while away from his or her house***. The ***application*** can facilitate setup and/or configuration."). The '033 patent goes on to provide an "example" of this kind of configuration in which the media-playing application takes the form of a third-party application. *Id.*, 17:12-14. In this context, the '033 specification uses the label "third party" to talk about an *exemplary* application that could be used to manage a remote playback queue within this larger embodiment, thereby indicating that the embodiment as a whole is not limited to "remote queues" provided by third-party applications.

And even if the only examples given by the '033 specification were third-party applications, the Court still should not limit the claim scope as Google requests. *See, e.g.*, *Falana v. Kent State*

---

[9] If Google really believed otherwise, it could have cited these examples in its PLR disclosure and made this argument in its *Markman* briefing. The specification has not changed.

1  *Univ.*, 669 F.3d 1349, 1355 (Fed. Cir. 2012) ("[The Federal Circuit] has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.") (citation omitted).  This is especially true because there is **nothing** in the '033 specification or the broader intrinsic record that remotely approaches lexicography, disclaimer, or disavowal. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Because the intrinsic record does not support Google's position, Google attempts to invoke extrinsic evidence.  In addition to the statements of Sonos's Australian counsel, Google points to Sonos's commercial efforts around the time of the invention, including Sonos's "Play to Sonos" (or "Direct Control") initiative.  MFL, 5-6.  Because Sonos did not have its own media-playing applications at the time, it frequently discussed "third-party" media-playing applications that could transfer playback to Sonos hardware.  But the fact that Sonos did not distribute its own media-playing applications at the time is irrelevant to whether the term "remote playback queue" should be limited to a "third-party" application in the context of the '033 patent.  Among other things, the Federal Circuit has cautioned against using exactly this sort of extrinsic evidence in claim construction.  *See, e.g.*, *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (finding court erred in limiting claims to require "plastic housing" where court focused on patentee's commercial embodiment that had "plastic housing" and patent's description of "plastic housing" was merely a preferred embodiment).

### B.  Google Abandoned The Construction It Is Now Advancing

Google is advancing a construction that it expressly waived during this Court's *Markman* process.  As noted above, Google included "remote playback queue" in its PLR 4-1 disclosures but dropped the term from its PLR 4-2 disclosures.  Google abandoned that construction not because it thought the parties agreed on the meaning of the term, but because it wanted to argue that the Texas Court's constructions were law of the case and could not credibly do so while asking this Court to overturn one of those constructions.  That was a deliberate, tactical decision which Google made to strengthen an (incorrect) legal argument.  Now, of course, Google would like to go back and redo both its PLR 4-2 disclosures and claim construction.

But the PLRs were intended to eliminate exactly this kind of gamesmanship. *E.g.*, *Silicon*

1  *Lab'ys, Inc. v. Cresta Tech. Corp.*, No. 14-CV-3227, 2016 WL 791792, at *3 (N.D. Cal. Mar. 1, 2016) (explaining "disclosure requirements of this district's [PLRs] are not optional" and "failure to consistently and clearly articulate" a party's position "without justification at each demarcated step dooms any effort to revive them later in the case"). Reopening claim construction is also intensely inefficient given that we are 10 months past *Markman* briefing and less than two months before opening expert reports. *See, e.g.*, Dkt. 67, ¶ 22 (Scheduling Order); *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014) (the Court did not set forth the local rules and "a particular process for resolving claim construction disputes" to allow parties to make additional arguments "untethered to those carefully structured rules").

In an effort to avoid the consequences of its waiver, Google argues that it preserved an argument that the plain meaning of "remote playback queue" is a queue provided by a third-party application in *interrogatory* responses. *See* MFL, 3, 8 (citing Google's Ex. 6), 12, 16. But this Court has made it abundantly clear that the PLR disclosures—not interrogatories—dictate what terms are preserved for construction. *See, e.g.*, *Fluidigm Corp.*, 2020 WL 5073938, at *1 ("Rather than leave it to interrogatories, our [PLRs including those for claim construction] frame an orderly exchange of information to facilitate patent litigation."); *id.*, *3 ("a mere letter, email, or disclosure other than the formal disclosure [under Rule 4-2] imposes no duty to amend (nor will it satisfy the duty to disclose)").

### IV. CONCLUSION

For the foregoing reasons, the Court should deny Google's motion.

Dated: October 25, 2022

By: */s/ Clement Seth Roberts*
CLEMENT SETH ROBERTS
BAS DE BLANK
ALYSSA CARIDIS
EVAN D. BREWER

ORRICK, HERRINGTON & SUTCLIFFE LLP

SEAN M. SULLIVAN (*pro hac* vice)
MICHAEL P. BOYEA (*pro hac* vice)
COLE B. RICHTER (*pro hac* vice)

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Sonos, Inc.*