QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

*Attorneys for GOOGLE, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>                    Plaintiff,<br><br>        vs.<br><br>SONOS, INC.,<br><br>                    Defendant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S OPPOSITION TO SONOS'S MOTION TO STRIKE PORTIONS OF GOOGLE'S NONINFRINGEMENT AND INVALIDITY EXPERT REPORTS**<br><br>Date:      March 9, 2023<br>Time:      8:00 a.m.<br>Location:  Courtroom 12, 19th Floor<br>Judge:     Hon. William Alsup |

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS .................................................................................2

III.   LEGAL STANDARD .......................................................................................3

IV.   ARGUMENT ...................................................................................................4

     A.     Google Did Not Introduce New Invalidity Theories in Its Expert Reports ...............4

          1.    Dr. Bhattacharjee Did Not Introduce New Anticipation Theories For The Tungsten/NexusQ And YTR Prior Art ...................................................4

               (a)    Google Did Not Introduce A New Theory For Tungsten/NexusQ .................................................................4

               (b)    Google Did Not Introduce A New Theory For The YTR .................5

               (c)    Sonos's Case Law Citations Are Inapposite ......................................7

          2.    Dr. Schonfeld's Bose Opinions Were Previously and Timely Disclosed ........................................................................................8

     B.     Google Did Not Introduce New Noninfringement Theories ...................................11

          1.    Dr. Bhattacharjee Non-Infringement Theories Were Previously Disclosed ......................................................................................12

               (a)    Google Timely Disclosed Its Non-Infringement Positions For Limitation 1.7 ........................................................................12

               (b)    Google Timely disclosed Its Non-Infringement Positions For The "Remote Playback Queue" Limitations. .................................15

               (c)    Google Timely Disclosed Its Non-Infringement Positions For The Hub Devices ...............................................................17

          2.    Google Timely Disclosed Its "causing storage" Noninfringement Position referenced in Dr. Schonfeld's Report ....................................19

     C.     Google's Noninfringing Alternatives are Timely ..................................................20

          1.    Dr. Bhattacharjee's Noninfringement Alternatives Were Previously Disclosed ........................................................................................20

          2.    Google's "No Identification of Groups as Zone Scenes" NIA in Dr. Schonfeld's Report is Timely ...................................................................23

     D.     Sonos Cannot Show Harm From Any Alleged Lack Of Disclosures .........................24

V.     CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc. v. Samsung Elecs. Co.*,
2012 WL 2499929 (N.D. Cal. June 27, 2012) ............................................................. 4

*BLK Enterprises, LLC v. Unix Packaging, Inc.*,
2018 WL 5993839 (C.D. Cal. Oct. 2, 2018) ............................................................. 24

*Digital Reg of Tex., LLC v. Adobe Sys. Inc.*,
2014 WL 1653131 (N.D. Cal. Apr. 24, 2014) ......................................................... 4, 10

*Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*,
2006 WL 1329997 (N.D. Cal. May 15, 2006) ............................................................. 4

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018) ..................................................................... 4

*Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*,
2014 WL 6882275 (N.D. Cal. Dec. 5, 2014) ....................................................... 7, 8, 11

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
2014 WL 690161 (N.D. Cal. Feb. 21, 2014) ............................................................. 7

*S.E.C. v. Luna*,
2014 WL 794202 (D. Nev. Feb. 26, 2014) ............................................................. 25

*Slot Speaker Techs., Inc. v. Apple, Inc.*,
2017 WL 235049 (N.D. Cal. Jan. 19, 2017) ......................................................... 4, 10

*X One, Inc. v. Uber Tech., Inc.*,
440 F.Supp.3d 1019 (2020) ................................................................................. 17

## Other Authorities

Committee Notes on Rules – 2000 Amendment ............................................................. 24

http://www.audioreview.com/product/other/mini-systems/bose/lifestyle-50.html ......................... 9

## Rules

Fed. R. Civ. P. 37(c)(1) ..................................................................................... 24

# I.      **INTRODUCTION**

Sonos's Motion to Strike (Dkt. No. 474-13, "Mot.") should be denied because Google timely disclosed its invalidity, noninfringement, and non-infringing alternatives.

Sonos moves to strike certain opinions from Dr. Bhattacharjee.  <u>First</u>, Sonos moves to Strike Dr. Bhattacharjee's invalidity opinions regarding Google's prior art Tungsten/NexusQ and YouTube Remote ("YTR") systems that show the infringing features that Sonos is accusing are found in the Google prior art.  But the theories that Sonos seeks to strike were disclosed more than a year ago in Google's invalidity contentions, and Sonos is well aware of the functionalities in these prior art systems as both were at issue during the patent showdown.  <u>Second</u>, Sonos moves to strike a large portion of Dr. Bhattacharjee's non-infringement opinions.  But Google's discovery responses disclose each of Google's non-infringement positions for the theories Sonos identified in its infringement contentions.  The only non-infringement positions not disclosed in Google's discovery responses are those that respond to an entirely new theory that ***Sonos*** recently raised with respect to Google's Hub Devices  (and which is the subject of Google's pending Motion to Strike).  Obviously Google cannot be expected to disclose during fact discovery rebuttal non-infringement positions for theories that Sonos did not introduce until opening expert reports.  <u>Third</u>, Sonos moves to strike Dr. Bhattacharjee's opinion regarding non-infringing alternatives.  But the non-infringing alternatives Sonos takes issue with were all disclosed in Google's discovery responses.  Indeed, Sonos asked Google witnesses about these alternatives during fact discovery.

Sonos also seeks to strike certain opinions from Dr. Schonfeld.  <u>First</u>, Sonos asserts that certain Bose prior art products were not adequately disclosed in Google's invalidity contentions.  But Google disclosed its theories based on the Bose Lifestyle product in its invalidity contentions, including the usage of that product with Bose's amplifiers as Dr. Schonfeld opined in his expert reports.  Further, Google disclosed the very opinions Sonos is moving to strike in Dr. Schonfeld's opening report for the patent showdown in June 2022, Sonos responded to them through its own expert's rebuttal report, deposed Dr. Schonfeld regarding these opinions more than six months ago in September 2022, and then deposed Dr. Schonfeld again on these same opinions again in February 2023.  Sonos has been aware of the explicit opinions it moves to strike for eight months and many

1   months of discovery, and therefore any alleged inadequate disclosure is harmless.  <u>Second</u>, Sonos

2   also argues that Dr. Schonfeld raises a new non-infringement theory regarding a "causing storage"

3   limitation for the independent claims of the '966 patent.  But Google's interrogatory responses

4   disclosed this theory for the independent claims, and Google then provided additional detail for this

5   argument with respect to the "storage" limitation in its interrogatory responses, albeit for dependent

6   claims.   Regardless, the level of disclosure by Google in its rebuttal contention interrogatory

7   responses matches Sonos's own disclosures and was sufficient.  <u>Third</u>, Sonos claims that Dr.

8   Schonfeld is presenting a new non-infringing alternative.  But the non-infringing alternative comes

9   directly from the construction of "zone scene" that the Court applied during the patent showdown,

10  and was disclosed in   supplemental interrogatory responses Google provided after the Court

11  provided the zone scene construction.

12  **II.    <u>STATEMENT OF FACTS</u>**

13          On October 21, 2021, Sonos served facially deficient infringement contentions that failed to

14  comply with Patent Local Rule 3-1.  Google promptly notified Sonos that—among other issues—

15  its contentions accused vague, unidentified "[s]martphones, tablets, and computer devices," "apps,"

16  "servers," and "cloud-based infrastructure" in violation of the Patent Local Rule's requirement that

17  accused products be specific by name or model number, that Sonos's singular claim chart lumping

18  numerous devices and applications did not adequately identify Sonos's infringement theory for *each*

19  of the accused instrumentalities, and that the chart had failed to provide the specific functionalities

20  it contended practiced each limitation.  *See* Dkt. 86-3.  After Google sought the Court's assistance,

21  Sonos finally served supplemental contentions that purported to (but did not) fully resolve the

22  deficiencies.  Since then, Sonos has moved to amend its infringement contentions *five* additional

23  times.  *See* Dkts. 128, 150, 177, 407, 430.  Sonos's nebulous contentions and endless amendments

24  have made its infringement theories moving targets.

25          Despite its failure to put Google on proper notice, Sonos propounded its Interrogatory No.

26  12 that demanded Google "set forth in detail the complete legal and factual basis for any assertion

27

28

GOOGLE'S OPPOSITION TO SONOS'S MOTION TO STRIKE
PORTIONS OF GOOGLE'S INVALIDITY AND NONINFRINGEMENT EXPERT REPORTS

by Google that the Accused Instrumentalities have not infringed each [] claim[.]"  Mot., Ex. J at 7.[1] The interrogatory purported to cover four different patents (the '906, '885, '615, and '033 patents), tens of claims, numerous different applications (YouTube Main, YouTube Music, YouTube Kids, YouTube TV, Podcast, Spotify, and Google Home) running different versions of the application (iOS, Android, ChromeOS, etc.), and various accused features that were ill-defined in Sonos's infringement contentions.  Google objected that this request was overly broad and burdensome, and noted in its response that "Sonos's infringement contentions are . . . incoherent, vague, and ambiguous, and it is accordingly difficult, if not impossible, for Google to understand Plaintiff's theories of infringement."  *Id.* at 21.  Nevertheless, Google did its best to identify the specific limitations that Sonos's infringement contentions had failed to demonstrate were satisfied in the first instance.   Google continued to provide supplemental responses with additional details and explanations as Sonos tacked on additional theories and amendments—most recently on November 23, 2022, after Sonos moved to amend its contentions yet again.  *See id.*; Dkt. 430.

Google served its Patent Local Rule 3-3 invalidity contentions on December 6, 2021. Declaration of Marc Kaplan ("Kaplan Decl.") ¶ 2 . Sonos exchanged communications with Google regarding these contentions throughout at least March 2022, yet never moved for any relief based on any alleged deficiencies.  *Id.*  In contrast to Google's response to Sonos's non-infringement contention interrogatory, Sonos responded to Google's request for validity contentions by merely providing boilerplate responses that Google "failed to establish" that each piece of prior art "anticipates or renders obvious" a list of limitations.  *See, e.g.* Ex. 2 (Attachment A) at 111-114.  It was not until Sonos served its rebuttal expert reports (consisting of hundreds of pages) that it revealed its true validity positions for the first time.

## III.   <u>LEGAL STANDARD</u>

Courts in this district facing requests to strike expert opinions have recognized that "the Federal Circuit strongly encourages district courts to decide issues pertaining to invalidity when those issues have been presented to the court, particularly because patent invalidity has important

---

[1] All cited exhibits are attached to the contemporaneously filed Declaration of Marc Kaplan.

public implications." *See, e.g., Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*, 2006 WL 1329997, at *7 (N.D. Cal. May 15, 2006) (denying motion to strike invalidity defenses).  While "[t]he patent local rules require disclosure of specific invalidity theories," they "do not compel disclosure of all evidence relevant to proof of those theories." *Slot Speaker Techs., Inc. v. Apple, Inc.*, 2017 WL 235049, at *2 (N.D. Cal. Jan. 19, 2017).

"District courts have 'wide discretion' in enforcing the patent local rules." *Id*. at *2. "In determining whether to strike some or all of an expert report for failure to comply with the patent local rules, courts [] have asked, 'Will striking the report result in not just a trial, but an overall litigation, that is more fair, or less?'" *Huawei Techs., Co. v. Samsung Elecs. Co*., 340 F. Supp. 3d 934, 946 (N.D. Cal. 2018) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 2499929, at *1 (N.D. Cal. June 27, 2012)). "[I]n patent litigation, expert reports are expected to provide *more* information than is contained in infringement contentions." *See Digital Reg of Tex., LLC v. Adobe Sys. Inc.*, 2014 WL 1653131, at * 5 (N.D. Cal. Apr. 24, 2014) (emphasis added).

## IV.   ARGUMENT

### A.    Google Did Not Introduce New Invalidity Theories in Its Expert Reports

#### 1.    Dr. Bhattacharjee Did Not Introduce New Anticipation Theories For The Tungsten/NexusQ And YTR Prior Art

Sonos claims that Google raises two new anticipation theories based on: [1] ███████ ████ feature of the Tungsten/Nexus Q system" (Mot. at 6) and [2] the list of service-recommended videos provided by the YouTube Cloud servers (Mot. at 7).  Sonos is mistaken – neither of these theories is "new," and Google adequately put Sonos on notice of these theories.

##### (a)    *Google Did Not Introduce A New Theory For Tungsten/NexusQ*

For purposes of infringement, Sonos identifies a cloud-hosted playlist provided by the "YouTube cloud infrastructure" of being the "remote playback queue provided by a cloud-based system" recited in the asserted claims of the '033 patent. Ex. 4 at 18 (accusing "an album, user-created playlist, service-provided playlist"), 21-23, 26-27; Dkt. No. 467-4, ¶¶ 128-129, 235. Google's expert, Dr. Bhattacharjee, showed that the prior art Tungsten/NexusQ was also "able to playback playlists that were generated and stored in the cloud, for example album playlists (*e.g.*,

AC/DC Back in Black) or a ▮▮▮▮▮▮ containing a list of recommended songs generated by a server." Mot., Ex. A ¶¶ 218-20.  Dr. Bhattacharjee thus opined that the Tungsten/NexusQ system invalidates the asserted claims based on Sonos's infringement contentions.

This theory in Dr. Bhattacharjee's report is clearly articulated in Google's Invalidity Contentions.  For example, Google disclosed that the Tungsten/NexusQ system "anticipate[s]" the asserted claims "of the '033 patent under at least the interpretation that [Sonos] appears to rely upon for its infringement theories."  Ex.  6 at 56.  Google also provided claim charts for the Tungsten/NexusQ disclosing its theory that the system played back a "remote playback queue" when a user selects playlists stored and generated on Google cloud servers for playback.  Mot., Ex. K.[2]



For example, Google's charts explain that the Tungsten/NexusQ system allowed users to "*pull the music directly from the music library in the cloud*" and pointed to illustrations (such as the one on the right) showing users selecting cloud-hosted playlists for playback.  *Id.* at 9-10, 12-13.  A ▮▮▮▮▮▮ is simply the name of a type of cloud-hosted playlist in the Tungsten/NexusQ.  Mot., Ex. A ¶¶ 218-20.

(b)     *Google Did Not Introduce A New Theory For The YTR*

Sonos does not dispute that Google disclosed that the YTR prior art receives a list of recommended videos provided by the YouTube servers, but argues that Google somehow limited its invalidity theory to playing back those videos by adding them to the Queue tab of the YTR application using a "+" icon next to each video (what Sonos refers to in its Motion as "manually-driven playback").  Mot. at 7.[3]  Sonos wrongly claims that Google did not disclose a theory in which videos are played back directly from other tabs (what Sonos calls "automatic playback"), such as

---

[2]   Google provided a demonstration of its "Tungsten" system in May of 2011, and ultimately released the Tungsten system commercially as the "NexusQ" in 2012.  Google's invalidity contentions provided a chart for the May 2011 Tungsten demonstration (Mot., Ex. K), and a separate chart for the commercially released NexusQ.

[3]   The prior art YTR application displayed tabs from which a user could playback a list of videos. For instance, a "Queue" tab displayed the user-editable queue containing the videos a user had added using the "+" icon that appears next to videos.  Other tabs, such as the "Recommended" and "Search" tabs, contained a list of service-recommended videos received by the YouTube servers.

1    the Recommended or Search tabs.  Mot. at 7.[4]  Not so.

2          Google's invalidity contentions disclosed the ability to playback videos without having to

3    add them to the Queue tab using the "+" icon.  Indeed, the image from Dr. Bhattacharjee's report

4     that Sonos takes issue with in its Motion (reproduced on the left) is in Google's

5    invalidity contentions.  Mot. at 7 (citing Mot., Ex. C ¶ 79); *Cf.* Mot., Ex. L at

6    11.[5]  This image shows a user playing the video "Nature Photography –

7    Sandhill Cranes" within the "Search" tab, as evidenced by the text "Now

8    playing from Search: nature photo…" displayed below the video and the

9    icons within the Search tab (not the Queue tab).  Mot. at 7 (citing YTR Chart

10   at 5-6); *see also* Mot., Ex. L at 11.  Sonos nevertheless points to a different portion of Google's

11   invalidity contentions that includes an excerpt from a website stating the YTR was able to "kick"

12   (*i.e.*, transfer) a queue of videos to the "big screen" (*i.e.*, a television or 

13   monitor) for playback.  *See* Mot. at 7.  Nothing in the excerpt suggests that

14   Google's theories were limited to playback of a queue of videos in the Queue

15   tab, as opposed to a queue of videos in the Recommended or Search tab.  To

16   the contrary, the image (reproduced on the right) that immediately follows the

17   excerpt in Google's invalidity contentions—which Sonos omits from its

18   Motion—shows a YTR application playing back a video ("Bobos High School Reunion (part 3)")

19   from the "Recommended" tab.  Mot., Ex. L at 7.

20          Sonos's attempt to strike this theory may be motivated by the fact that its expert provided

21   technically inaccurate opinions when trying to distinguish Sonos's accusations against playback of

22   recommended videos in the current YouTube applications from playback of recommended videos

23   _____

24   [4]  The YTR application displayed various tabs from which a user could play back a list of videos.
     For instance, a "Queue" tab displayed the user-editable queue containing the videos a user had added

25   using the "+" icon that appears next to videos.  Other tabs, such as the "Recommended" and
     "Search" tabs, contained a list of service-recommended videos received by the YouTube servers.

26   [5]  To the extent Sonos's citation to Dr. Bhattacharjee's reply report is intended to suggest that Dr.
     Bhattacharjee first introduced this image or theory in his reply report, that is inaccurate.  Indeed, the

27   image appears in Dr. Bhattacharjee's opening report, along with his discussion of playing back a
     list of recommended videos provided by the YouTube cloud servers.  Ex. 5 (Bhattacharjee Op. Rpt.)

28   ¶¶ 271, 298-299.

1   in the YTR prior art.  In particular, Sonos's expert opined that playback of recommended videos in

2   the YTR was different because users of the YTR prior art were unable to play back videos without

3   using first using the "+" icon to add them to their Queue tab.  *See e.g.*, Ex. 9 ¶ 171 ("whether a user

4   finds a video on his or her own, or that video is recommended to the user, the user must affirmatively

5   select the video for play back by choosing to add it to the local playback queue on the remote

6   control."), ¶ 328 ("In order for any recommended videos to be played back by a remote control, a

7   user would have to add such videos to the local playback queue on the remote control. This is

8   evidenced by the "+" icon that appears next to a recommended video.").  Dr. Bhattacharjee

9   conclusively showed that this opinion from Sonos's expert was inaccurate.  *See* Mot., Ex. C ¶¶ 79-

10  81.  Sonos is now trying to muddy the waters regarding Google's invalidity theories by claiming

11  that Dr. Bhattacharjee's opinion is new.

12                    *(c)    Sonos's Case Law Citations Are Inapposite*

13          Sonos's citations to *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 690161

14  (N.D. Cal. Feb. 21, 2014) and *Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*, 2014

15  WL 6882275, at *3-5 (N.D. Cal. Dec. 5, 2014) are inapposite.  In fact, both cases suggest that

16  Sonos's request should be denied.

17          In *Mediatek*, the Court struck an invalidity theory in the defendant's expert's rebuttal report

18  based on a previously undisclosed prior art reference ("Okazawa") because "[n]either [defendant's]

19  Local Rule 3–3 contentions, nor even [the expert's] Opening Report, mentioned the Okazawa

20  reference."  *Mediatek*, 2014 WL 690161, at *1-2.  But here, it is undisputed that Google disclosed

21  both the Tungsten/NexusQ system and YTR prior art in its invalidity contentions.  In fact, *Mediatek*

22  actually supports Google's position. The plaintiff in *Mediatek* also sought to strike invalidity

23  theories in the defendant's expert report that relied upon figures from a user manual, but the Court

24  denied the request because those figures were cited in the defendant's invalidity charts.  *Id*. at *3.

25  Given that Google's invalidity contentions clearly disclosed its theory [1] that the Tungsten/NexusQ

26  system played back cloud-hosted playlists and [2] that the YTR system played back a list of

27  recommended videos, the Court should similarly deny Sonos's motion to strike.

28          In *Largan*, plaintiff moved to strike an obviousness theory in the defendant's expert report

                                        -7-              Case No. 3:20-cv-06754-WHA

1    that certain claimed conditions would have been "immediately apparent to one of ordinary skill in

2    the art" based on certain disclosures in the "Park '665" reference. *Largan*, 2014 WL 6882275, at

3    *5. The Court found that Defendant's invalidity contentions did not contain "this theory, nor

4    anything like it," nor did they identify the disclosures in Park '665 that Defendants' expert attempted

5    to rely upon. *Largan*, 2014 WL 11394510 (Plaintiff's Motion to Strike) at Section IV.C.5-6. Here,

6    in contrast, Dr. Bhattacharjee is relying upon the theories that were disclosed in Google's invalidity

7    contentions. Like *Mediatek*, *Largan* also counsels against granting Sonos's motion to strike.

8    Indeed, the court denied plaintiff's request to strike evidence of a properly disclosed obviousness

9    theory because "[t]o the extent Dr. Barbastathis now presents additional explanation as to why the

10   language cited in the invalidity contentions, in his opinion, renders obvious the claimed TTL range,

11   that is consistent with the fact that ***expert reports are meant to provide more detail*** than

12   contentions." *Id.* at *7 (emphasis added). Here too, Dr. Bhattacharjee's expert report at most

13   provides additional explanation regarding how the cloud-hosted playlists in the Tungsten/NexusQ

14   and the list of recommended videos in the YTR disclose the asserted claims.

15              2.   Dr. Schonfeld's Bose Opinions Were Previously and Timely Disclosed

16              Sonos concedes that it has been on notice of Google's and Dr. Schonfeld's reliance on Bose

17   prior art speakers to show the invalidity of the asserted claims, but Sonos now complains that certain

18   Bose products were not adequately disclosed during discovery. Mot. at 9. As a preliminary matter,

19   this is incorrect. On June 6, 2022, ***nearly eight months ago***, Google served Dr. Schonfeld's opening

20   report on invalidity for the patent showdown, where he provided dozens of pages of analysis

21   regarding the Bose prior art products (Ex. 11 ¶¶ 619-722)—including the Bose Link communication

22   protocol (*e.g.*, *id.* ¶¶ 635, 653, 679, 699) and the Lifestyle SA-2 and SA-3 Stereo Amplifiers (*id.* ¶¶

23   633-635, 649, 677-78)—the very prior art references that Sonos asserts are new. Mot. at 9.

24   Moreover, Google served Sonos with all the documents produced by Bose, including the ones Sonos

25   now complains of, nearly a year and a half ago on September 30, 2021. Kaplan Decl. ¶ 3.

26              Further, Dr. Schonfeld's invalidity theories merely expanded on the theories disclosed in

27   Google's contentions. Those contentions cited to documents showing that the Lifestyle 50 system

28   may be "***connected via an SA-1 indoor amplifier***,"—*i.e.*, the direct predecessor amplifier product

1   to the SA-2 and SA-3 amplifier products that Sonos carefully claimed were "nowhere mention[ed]"

2   in Google's contentions.   http://www.audioreview.com/product/other/mini-systems/bose/lifestyle-

3   50.html (cited on page 1 of the 885-7 chart exhibit).  Sonos was aware that users could connect the

4   Lifestyle 50 audio product to Bose amplifiers, and Sonos's new argument that it would not have

5   been obvious for a person of skill in the art using the LifeStyle 50 to look to the next generation of

6   Bose's own amplifiers (which were also prior art), or at the very least to use the teachings of that

7   next generation amplifier, is meritless.  Google's invalidity theory—that a person of skill in the art

8   would be familiar with the Lifestyle 50 and its ability to connect to amplifiers—was adequately

9   disclosed in Google's contentions.

10          Nor was there ever any ambiguity regarding the theories that Dr. Schonfeld disclosed.

11   Indeed, Sonos took Dr. Schonfeld's deposition on the opinions in this report *twice*, and the parties

12   were only weeks away from the patent showdown trial, where Dr. Schonfeld would have presented

13   these theories, before it was canceled.  Dkt 339.  During his August 31, 2022 deposition, Dr.

14   Schonfeld testified regarding the different components and references he was relying upon as a part

15   of his obviousness analysis. Ex. 12 at 241:18-242:12.  If Sonos believed that certain Bose-related

16   theories disclosed in Dr. Schonfeld's report were missing from Google's invalidity contentions,

17   Sonos could have raised the issue at any time thereafter.  It presumably did not do so because Google

18   could then simply have requested leave to amend its contentions—a process Sonos took advantage

19   of five times for its infringement contentions.  *See supra* § II.  In fact, even during his second

20   deposition on February 3, 2023 (taken *after* Sonos filed its motion to strike), Sonos spent less than

21   ten minutes of a seven-hour deposition regarding Dr. Schonfeld's Bose opinions and did not

22   question him regarding any alleged discrepancies between Google's invalidity contentions and his

23   report (and in response to which he could have readily explained how they were consistent). Ex. 13

24   at 120:5-12.

25          Not only was Sonos aware of Google's contentions and Dr. Schonfeld's use of the Bose

26   references, but Sonos never previously objected despite having Google's theories of invalidity for

27   nearly a year.  Instead, Sonos chose to sit on its hands for eight months while knowing that it would

28   later seek to strike these theories.  Sonos attempted this same maneuver during the patent showdown,

1    and the Court correctly rejected it.  *See* Dkt. 315 at 9 ("the problem with Sonos's motion lies in the

2    fact that it had notice that Google did not plan to amend its contentions on this point as of March 2

3    []. Sonos then strategically chose not to initiate motion practice on this issue until April 21, fifty

4    days after Google's March 2 letter.").  The Court should do the same here.

5           Sonos's decision to delay is all the more egregious because Dr. Schonfeld's invalidity

6    theories disclosed in June 2022 are substantively and in many instances exactly identical to the

7    theories that he offered in his latest expert report.  *E.g., compare* Ex. 11 ¶¶ 149-163, 619-632 *with*

8    Ex. 14 ¶¶ 218-232, 855-862.   Google's invalidity contentions regarding Bose have never changed:

9    the Bose Lifestyle System renders the claims of the asserted patents obvious.  *See* Ex. 6; Ex. 7.  As

10   Sonos concedes, the foundation of Dr. Schonfeld's analysis is the Bose LifeStyle, and he simply

11   uses the related Bose products to bolster his analysis.  Mot. at 9.  In fact, Sonos does not contend

12   that Dr. Schonfeld ever solely relies on these secondary Bose references as the basis for any claim

13   limitation being met.  *Id.* at 9-10.  Rather, Sonos complains that Dr. Schonfeld included additional

14   ***evidence*** allegedly not contained in Google's invalidity contentions—an argument that misses the

15   mark.  *Id.*  The law is clear, that Google was not required to disclose "all evidence relevant to proof

16   of these theories" and that "expert reports are expected to provide more information" than a party's

17   contentions.  *Slot Speaker Techs*., 2017 WL 235049, at *2; *Digital Reg of Tex., LLC*, 2014 WL

18   1653131, at *5.  Regardless, Dr. Almeroth—Sonos's technical expert—already addressed these

19   Bose prior art products in both of his expert reports, rendering any purported nondisclosure

20   harmless.  *See* Ex. 15 ¶¶ 215-250, 748-964; Ex. 16 ¶¶ 348-408, 1249-1557 .

21          Sonos's motion also attempts to pivot to a ***substantive*** argument regarding the connection

22   between and amongst various Bose products.  Mot. at 9-10.  Specifically, Sonos contends that the

23   secondary Bose references should be stricken from Dr. Schonfeld's report because "there is little

24   discernible connection between the previously disclosed Bose Lifestyle system, and the newly

25   disclosed communication protocol and amplifiers[.]" *Id.* at 10.  Preliminarily, Sonos's substantive

26   arguments are irrelevant to its motion to strike, which seeks relief based on procedural issues.  If

27   Sonos believed there was no genuine issue of material fact that a person of skill in the art would

28   have combined these references, it should have moved for summary judgment.  But even if it had

1    done so, Sonos would have been unsuccessful since Dr. Schonfeld provided a robust motivation-to-

2    combine analysis in his expert reports illustrating why a person having ordinary skill in the art would

3    have combined these products.   Ex. 14 ¶¶ 910-927.   Sonos's argument is also illogical as it

4    essentially relies on the (incorrect) notion that a person of skill in the art familiar with Bose's speaker

5    products would not look to other Bose speaker products to create an obvious modification to the

6    features of that product, where doing so would show a reasonable expectation of success.

7         Sonos's repeated citation to *Largan* is again inapposite. As mentioned above, the *Largan*

8    court struck an entirely new obviousness theory in the defendant's expert report, while refusing to

9    strike a properly disclosed obviousness theory in which the defendant's expert provided more detail

10   than the invalidity contentions.  *See supra* § IV.A.I(iii).   Here, Dr. Schonfeld relies upon the same

11   theories—*e.g.*, Bose—disclosed in Google's invalidity contentions.  At most, Dr. Schonfeld's expert

12   report simply provides additional explanation regarding why Bose invalidates the asserted patents.

13        **B.     Google Did Not Introduce New Noninfringement Theories**

14        Sonos's Motion should be denied because Google's responses to Sonos's interrogatories

15   disclose its noninfringement theories for the various theories that Sonos identified in its infringement

16   contentions.  Sonos never took issue with those responses, and has no basis to do so now.

17        This Court should also deny Sonos's Motion for a second independent reason: the level of

18   disclosure that Google provided in its contention interrogatory responses, which Sonos claims are

19   deficient, was far more fulsome than what Sonos provided.  In this case, Google served Sonos with

20   its Interrogatory No. 3 seeking Sonos's validity contentions.  Sonos initially refused to provide an

21   answer because "Google has the

22   burden to prov[e] that the patents-

23   in-suit are invalid." Ex. 17. When

24   Sonos finally agreed to serve a

25   response,    it    provided   only

26   boilerplate language for the limitations that simply parroted back the claim language.  For example,

27   the image on the right is representative of Sonos's response for each prior art reference.  *See, e.g.*,

28   Ex. 2 (Attachment A) at 111-14.

For instance, Google has failed to establish that the "Nexus Q System" anticipates or renders obvious at least the following limitations of the asserted claims of the '033 Patent:

- [1.3]/[12.1] [operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service]
  - at least because Google has failed to establish that the "Nexus Q System" embodied "operating in a first mode in which the computing device is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service."

GOOGLE'S OPPOSITION TO SONOS'S MOTION TO STRIKE
PORTIONS OF GOOGLE'S INVALIDITY AND NONINFRINGEMENT EXPERT REPORTS

In contrast, when Sonos served Interrogatory No. 12—seeking non-infringement positions and other information regarding four different patents (the '906, '885, '615, and '033 patents), numerous different applications (YouTube Main, YouTube Music, YouTube Kids, YouTube TV, Podcast, Spotify, and Google Home) running different versions of the application (iOS, Android, ChromeOS, etc.) that have countless different playback paths—most of which were ill-defined in Sonos's infringement contentions (*e.g.*, user playlists, album playlists, playback with Autoplay, playback on a Hub Device, playback on a Hub Device, etc.)—Google provided Sonos with answers that went above and beyond what Sonos provided Google. Indeed, Google's initial response, like Sonos's validity contentions, identified the claim limitations for which Sonos had not met its burden to show infringement. Mot., Ex. J at 7-21. As Google learned more about Sonos's infringement theories and the manner in which it was interpreting the claims, Google continued to supplement its response to provide additional details. *Id*. at 22-63.

Discovery is a two-way street. Sonos, having provided nothing but the barest validity contentions (which Sonos then turned into hundreds of pages of expert reports containing entirely new, undisclosed opinions), should not be allowed to complain about Google's contentions–which did in fact disclose Google's non-infringement theories.

1.   <u>Dr. Bhattacharjee Non-Infringement Theories Were Previously Disclosed</u>

Sonos contends that Dr. Bhattacharjee's rebuttal report introduces five new non-infringement theories that were not disclosed during discovery. Sonos's contention is without merit.

(a)   <u>*Google Timely Disclosed Its Non-Infringement Positions For Limitation 1.7*</u>

Limitation 1.7 recites: "based on receiving the user input, transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item." Google's response to Sonos's

1   Interrogatory No. 12 states that the accused YouTube systems do not satisfy Limitation 1.7, and

2   discloses the two non-infringement theories that Sonos wrongly contends were introduced for the

3   "first time" in Dr. Bhattacharjee's rebuttal report, as discussed below.  Mot., Ex. J at 47-48.

4   **<u>First</u>**, Dr. Bhattacharjee's rebuttal report showed that the accused YouTube applications do

5   not satisfy Limitation 1.7 because what Sonos accuses of being an instruction (a "setPlaylist

6   message") that is sent from a "computing device" (*e.g.*, a mobile device running the accused

7   YouTube applications) is "not even received by the playback device," as required by Limitation 1.7.

8   Mot., Ex. B ¶¶ 213-15.  He explains that the setPlaylist message is instead "received by the MDx

9   server."  *Id*. ¶ 213.  He also explains that the MDx server sends a setPlaylist message to a playback

10  device, but that this setPlaylist message cannot be an instruction sent from the computing device, as

11  required by Limitation 1.7, because it "is not the same setPlaylist message" that was sent by

12  computing device.  *Id.* ¶ 215.  Sonos argues this theory is new.  Mot. at 11.  It is not.

13      Google's response to Sonos's Interrogatory No. 12 disclosed this theory.  Google explained

14  that the "setPlaylist message" sent from a mobile device running the accused YouTube applications

15  does not satisfy Limitation 1.7 because it is received by "one or more MDx servers," not the

16  playback device.  Mot., Ex. J at 47.  The interrogatory response also explained that "[t]he MDx

17  servers [] generate a further setPlaylist message requesting the screen to start playing the video

18  identified by the videoId from the currentTime," such that the setPlaylist message received by the

19  playback device is sent from "the MDx server, not the alleged computing device."  *Id*. at 47-48.  The

20  interrogatory response also pointed Sonos to a document entitled "████████████████████

21  ████████," which discloses ████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████]" (at -57).  *Id.*

24      Further, Google response to Sonos's Interrogatory No. 15 provided even more details in

25  support of Google's non-infringement positions.  In its response to Interrogatory No. 15 Google

26  again stated that a setPlaylist sent by the MDx server to a playback device is different from the

27  setPlaylist message sent by the mobile device running the accused YouTube applications.  *See e.g.,*

28  Ex. 20 at 16 ("The MDx server then generates ***<u>another</u>*** setPlaylist message that it sends to the

receiver device.") (emphasis added).  This interrogatory response also cited to the specific source code that the MDx server uses to process the setPlaylist message received from the mobile device and to generate a new setPlaylist message to send to the playback device, which is the code Dr. Bhattacharjee also relies upon.  *Id*. at 16-17 (citing ████████████████████████ ████████████  Mot., Ex. B ¶¶ 82-85 (same).

**Second**, Dr. Bhattacharjee explained that even if the setPlaylist message could be the claimed "instruction," it still does not satisfy Limitation 1.7 of the '033 patent because the setPlaylist message does not configure the playback device to "(i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item."  Mot., Ex. ¶¶ 222-25.  More specifically, Dr. Bhattacharjee explained that the '033 patent contemplates a simplistic two-step process in which a playback device obtains a URL, and uses it (step (ii)) to retrieve a media item for playback (step (iii)).  *Id*. ¶ 224.  Dr. Bhattacharjee showed that the accused YouTube systems use a more complex process in which a setPlaylist message causes a playback device to obtain a videoId for a song or video (not a URL).  *Id*. (Bhattacharjee Reb. Rpt.) ¶ 223.  Dr. Bhattacharjee went on to explain that the videoId is not data that can be used to retrieve a media item for playback (as required by steps (ii)-(iii)), and that the playback device must instead make additional requests to obtain one or more "Bandaid URLs" that can be used to retrieve the media item.  *Id*.

Sonos argues that this is a new theory.  Mot. at 12.  But this theory was disclosed in Google's response to Sonos's Interrogatory No. 12.  For example, this interrogatory response  explained that the setPlaylist message received by the playback device ("whether from the computing device or the MDx server") does not configure the playback device to perform steps (i)-(iii) of Limitation 1.7.  Mot., Ex. J at 48.  The response then explained the basis for this statement, namely that "there are multiple API requests and messages that occur after the setPlaylist request between the server and the cast receiver to obtain data to play back from the alleged remote playback queue."  *Id*.

Dr. Bhattacharjee's expert report simply provides additional explanation regarding the

multiple requests and messages "that occur after the setPlaylist request between the server and the cast receiver to obtain data to play back from the alleged remote playback queue." Mot., Ex. B ¶¶ 222-25.   But even this description is not new.   For example, Google's response to Sonos's Interrogatory No. 14 explains that receiving a setPlaylist message at the "receiver device" (*i.e.*, playback device) causes the receiver device to obtain a videoId.  Ex. 20 at 17.  It further explains that the videoId is not used to retrieve the next media item, and that instead a playback device must send a further request (called a "GetPlayer request") to obtain "Bandaid URLs" that can then be used to request the next "media item." *Id*.  Sonos also questioned Google witnesses at length about this process in deposition (*see, e.g.*, Ex. 8 at 85:3-94:11, 113:15-115:7) and the process was also at issue during the patent showdown (Ex. 21 ¶¶ 103-08).  In fact, certain of the paragraphs that Sonos now moves to strike are substantially the same as those found in Dr. Bhattacharjee's previous patent showdown report.  Mot. at 12 (identifying Ex. B ¶¶ 106-08); *cf.* Ex. 21 ¶¶ 96-98.

In its Motion, Sonos also identifies paragraph 296-297 of Dr. Bhattacharjee's rebuttal report in the paragraphs that it seeks to strike.  Mot. at 12 (identifying Ex. B ¶¶ 296-97).  These paragraphs relate to one of Google's non-infringing alternatives: Onesie.  Sonos claims that Interrogatory No. 12 failed to disclose the non-infringement argument for Google's non-infringing alternative that is in these paragraphs.  *Id*. (citing Ex. J).  But Interrogatory No. 12 is directed to the "Accused Instrumentalities"—it does not seek information about non-infringing alternatives.  Mot., Ex. J at 7. Google disclosed its non-infringing alternatives and the reasons they do not infringe in other interrogatory responses (*see infra* § IV.C.1), and paragraphs 296-97 of Dr. Bhattacharjee's rebuttal report responds to arguments that Sonos raised for the first time in its expert reports claiming those non-infringing alternatives still infringe.

### (b)   <u>Google Timely disclosed Its Non-Infringement Positions For The "Remote Playback Queue" Limitations.</u>

The asserted claims of the '033 patent require that the computing device (*e.g.*, a mobile device running the accused YouTube applications) be configured for playback of "<u>**a**</u> remote playback queue provided by a cloud-based computing system" (Limitation 1.4) and that playback responsibility for "<u>**the**</u> remote playback queue" be transferred to the playback device (Limitation

1.7).  This Court previously found that the accused YouTube systems play back a cloud queue (also called a "Shared Queue," "Remote Queue," or RQ) after a computing device transfers playback responsibility to a playback device.  Ex. 19 ¶¶ 182-185; *see also* Dkt. No. 210-3 (Showdown Declaration) ¶¶ 49-50, 52, 58, 65, 73, 81; Dkt. No. 316 at 9-10.  Dr. Bhattacharjee does not dispute that the accused YouTube systems play back the cloud queue after playback is transferred from a computing device to playback device, but showed that a computing device is not configured for playback of the cloud queue prior to transfer, as required by Limitation 1.4.

Sonos's claim that this is a new theory is wrong.  Mot. at 12.  For example, Google's Interrogatory No. 12 explained that "when playing back media on the alleged 'computing device,' [an] accused YouTube application plays back a local queue stored on the computing device," such that "Sonos has failed to show that the accused YouTube application infringes the 'remote playback queue' limitations that require playback of the remote playback queue on the computing device." Mot., Ex. J at 60.  Google's response to Sonos's Interrogatory No. 15—which is "incorporate[d] by reference" in Google's response to Interrogatory No. 12 (Mot., Ex. J at 60)—also provided a detailed example showing that an accused Pixel Device running a YouTube Music application is configured for playback of a playback queue that is "maintain[ed] locally" on a user's mobile phone, not a "remote playback queue."  Ex. 20 at 14 (citing ███████████████████████████████████ ████████████████████████████████████████████████████ ███████████████").  Google's response also explained that in the example "[t]here is not a 'remote playback queue" that the computing device is configured to playback.  *Id.* at 15.  Thus, this response discloses Google's theory that a computing device is not configured for playback of the cloud queue (the Shared Queue).  Ex. 10 ("The Queue") at -99 (██████████████████████████ ███████████████████████████████████████████████████████████████").

Sonos also takes issue with Dr. Bhattacharjee's interpretation of the claim language as requiring that the "remote playback queue" in Limitation 1.4 refer to the same "remote playback queue" in Limitation 1.7.  Mot. at 12.  This is not a new opinion; it is a well-settled aspect of interpreting claim language.  Where a claim introduces an element with the letter "a," the presumption is that later references to "the" element carry the same meaning.  *X One, Inc. v. Uber*

1   *Tech., Inc.*, 440 F.Supp.3d 1019, 1034-1035 (2020) (where claim first recited "a map" and then later

2   included three references to "the map," each "instance of 'map' refer to the same map,'" not

3   "different maps" because under Federal Circuit law the "antecedent basis relationship, implies that

4   the latter instances of 'map' carry the same meaning as the first instance of 'map.'")

5         In any event, Sonos's complaint is baseless.  Its identification of the alleged "remote

6   playback queue" has been a moving target and is now the subject of Google's pending Motion to

7   Strike.  *See* Dkt. No. 467-9 at 7-9.  Indeed, Sonos's infringement contentions identified the "remote

8   playback queue" as a list of media identifiers in a WatchNext message that is received by the

9   YouTube applications and playback devices from a Watch Next or MDx server.  *Id.* ███████

10  ████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████ *Id*; *see also* Mtn., Ex. B, ¶ 204

13  (citing Opening Schmidt Rpt. ¶133).  Dr. Bhattacharjee thus pointed out that the list of media items

14  "managed" by an MDx server is only created after transferring playback, such that Sonos did not

15  meet its burden to identify any actual "remote playback queue," let alone show that it is a "remote

16  playback queue" that is played back before transferring playback (Limitation 1.4) and after

17  transferring playback (Limitation 1.7) as required by the claim language.  Mtn., Ex. B ¶¶ 199-200.[6]

18        (c)   <u>Google Timely Disclosed Its Non-Infringement Positions For The Hub Devices</u>

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ███████████████████████████████████ .  *See* Dkt. No. 467-9 (Google's Motion to Strike)

23  at 9-10.  This completely different theory—in which the first Hub device is both a "playback device"

---

[6] Indeed, Sonos's identification of the "remote playback queue" continues to move. ███████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████ *Id.*  Given Sonos's shifting
positions on the meaning of "remote playback queue," it has no basis to complain about the opinion
in Dr. Bhattacharjee's report.

and a "computing device"—was not disclosed in Sonos's infringement contentions and is the subject of Google's pending Motion to Strike.  *Id*.  Nevertheless, Dr. Bhattacharjee explained in his rebuttal report that Sonos's new theory does not satisfy the asserted claims of the '033 patent because a Hub Device cannot be both a "computing device" and "playback device."  Mot., Ex. B ¶¶ 187-193.  Sonos now takes issue with Google having not disclosed this position earlier.  Mot. at 12.  But Google could not have disclosed this position earlier because Sonos did not disclose its new "phone-to-hub-to-hub" theory until it served its opening expert reports.

Sonos also takes issue with Dr. Bhattacharjee's opinion that a Hub device running the YT Main app does not satisfy limitations 1.5 of the '033 patent because it stops playback when the Cast icon is selected, such that it is not operating in a first mode where it is "configured for playback" when the Cast icon is selected (as required by limitation 1.5).[7]  Mot. at 12.  But Sonos's theories with respect to these elements were not sufficiently disclosed in Sonos's infringement contentions. For the Hub Devices, Sonos's contentions merely included a generic statement that "Cast-enabled displays installed with various of Google's own Cast-enabled apps are programmed to perform this functionality, including but not limited to the YouTube and YouTube Music apps," and then pasted two images of a Hub Device.  Dkt. 468-2 at 31, 37.  Sonos's boilerplate assertion provided no explanation or disclosure of how the Hub Devices were "configured" for playback.  *Id*.  Thus, Google's initial response to Sonos's Interrogatory No. 12 identifies Limitation 1.5 as a limitation where Sonos had not met its burden of proof.  Mot., Ex. J at 12.

Not until Sonos's opening expert report did Sonos disclose its theory on what the term "configured" means in the context of the '033 claims.  As Dr. Bhattacharjee explained, Sonos indicated that a later limitation of the claim requiring the Hub Device to be "no longer configured for playback" was met merely because the Hub Device "stops its own playback," without pointing to "any other configuration or de-configuration" steps.  Mot., Ex. B ¶ 196.  Given Sonos's new

---

[7]  Sonos's Motion states that it is moving to strike paragraphs relating to "limitations 1.5-1.6" and the "[YouTube] Main app," but Sonos includes in its Motion paragraphs relating to different limitations (limitations 1.8-1.9) and different applications (the YouTube Music app).  *See* Mot., Ex. B ¶¶ 239-41.  The Court should decline to strike these paragraphs, as Sonos has not taken issue with Google's disclosures related to limitations 1.8-1.9 or the YouTube Music application.

1   disclosure, Dr. Bhattacharjee opined that "the YouTube Main functionality that Sonos accuses on

2   Hub Devices causes the Hub Device to no longer be configured for playback when displaying

3   playback devices in much the same way that Dr. Schmidt has identified" (namely, by stopping its

4   own playback).  *Id.*

        2.   Google Timely Disclosed Its "causing storage" Noninfringement Position
             referenced in Dr. Schonfeld's Report.

6        Sonos's argument (Mot. at 13-14) regarding "causing storage" is also without merit and

7   should be rejected.  First, Google clearly disclosed that it disputed the "causing storage" claim

8   elements in its interrogatory responses for the '966 patent.  In response to Sonos's first set of

9   interrogatories, on September 7, 2021, Google disclosed its contentions that it did not meet any of

10  the "causing storage" limitations in the asserted independent claims of the '966 patent.  Ex. 18 at

11  39-42.   Nevertheless, Sonos argues that because Google later supplemented its interrogatory

12  response to provide more disclosure regarding non-infringement of claim 3, which also relates to

13  storage of a zone scene, that Google apparently did not disclose its non-infringement contentions

14  regarding the "causing storage" limitation in the independent claims of the '966 patent.  Mot. at 13-

15  14.   This argument is meritless.   Google never disclaimed its original response, and instead

16  incorporated by reference this response into each one of its supplemental responses.   Accordingly,

17  Google clearly disclosed its contention that the "causing storage" limitations of the independent

18  claims of the '966 patent are not infringed.

19       Sonos next argues that Google's original contentions interrogatory responses were

20  apparently not "specific" enough.  Sonos cites to no case holding that responses to non-infringement

21  contention interrogatories required more detail, and Sonos never moved to compel more detail

22  regarding Google's responses.  Furthermore, Sonos overlooks the fact that when Google requested

23  Sonos's contentions for why the asserted claims were valid over the prior art identified by Google

24  in its invalidity contentions, Sonos "identifie[d] dozens of claim limitations" just like Sonos

25  complains about in Google's interrogatory response:

26

27

28

For instance, Google has failed to establish that the "Bose Lifestyle" system anticipates or renders obvious at least the following limitations of the asserted claims of the '966 Patent:

- [1.1] [one or more processors]
  - at least because Google has failed to establish that the "Bose Lifestyle" system embodied a "computing device" comprising "one or more processors."

E.g., Ex. 2 (Attachment A) at 21-231.  Sonos and Google should be held to the same standard for disclosure because it would be unfair if Sonos were permitted to argue during discovery that identifying claim elements as either not infringed or not met by the prior art was sufficient, and later change positions to win the sanction of striking portions of Google's expert reports.

Finally, Sonos asserts that it "was prevented from seeking any discovery on the alleged factual bases for this new [alleged] new position" (Mot. at 14), but Sonos's motion is completely devoid of any specificity as to the "discovery" Sonos would have propounded.  Again, the "causing storage" phrase permeates other claims, as Sonos concedes, and to the extent it wanted pinpoint citations, it was free to seek clarification pursuant to the Court's previous order. Dkt. 315.

## C.   Google's Noninfringing Alternatives are Timely

### 1.   Dr. Bhattacharjee's Noninfringement Alternatives Were Previously Disclosed

Sonos also moves to strike Google's non-infringing alternatives.  Mot. at 15-16.  But these non-infringing alternatives were clearly disclosed in Google's interrogatory responses.

**First**, Limitation 1.7(i)-(iii) of the '033 patent requires that the playback device [1] first communicate with a cloud server to obtain data identifying a next one or more media items, and [2] then use the obtained data to retrieve the media data to be played back (*see supra* § IV.B.1).  Dr. Bhattacharjee opines that a non-infringing alternative available to Google would be for a playback device to simply send a request containing a playlist ID to a server (███████████"), and for the ████████ to then simply stream back the media data in the playlist.   This non-infringing alternative was disclosed in Google's response to Sonos's Interrogatory No. 18 in which Google explained that the playback device could "send a request to ████████," that the ████████ would be tasked with obtaining the media data for (i.e., audio and video content) by making "getWatchNext" and "GetPlayer" requests, and that it would then "stream the media data from the

1   ███████████ to the receiver device."  Ex. 24 at 13.  Put another way, Google disclosed that its

2   accused products could be modified so that a playback device sends a single request to the Onesie

3   agent that returns all of the requested media data in any alleged "remote playback queue."  Google

4   explained that this alternative would not satisfy Limitation 1.7 because playback devices would not

5   obtain and use data identifying a next one or more media item to retrieve a next media item (it would

6   simply receive media data).  *Id.*  Google also pointed Sonos to documents describing Google's

7   implementation of this non-infringing alternative, which disclose the different ways it can operate

8   depending on the playback scenario.  *Id.* at 13-14.  For instance, they show that when playing back

9   a list of media items, the playback device can send a request that "just include[s] a playlist ID" and

10  the Onesie agent would then "determine the starting video from the playlist ID," and obtain and

11  stream back the media content.  Ex. 25 at -913; Ex. 21 ¶¶ 293, 298.

12      Sonos nevertheless argues that because Google's response to Interrogatory No. 18

13  incorporates by reference the discussion of ████████████████ in "the opening and

14  rebuttal [showdown] reports of Dr. Bhattacharjee," those reports are "controlling" and should limit

15  Dr. Bhattacharjee's current opinions to a playback device sending a request to the server with an

16  identifier for each individual media item it is requesting (what Sonos calls an "item-by-item"

17  request), rather than a single request containing a playlist ID that returns media data for all the media

18  items in the playlist.  Mot. at 15.  This argument should be rejected.  Google incorporated Dr.

19  Bhattacharjee's showdown opinions regarding ████████████████ because they provide

20  an overview of these alternatives, the advantages these alternatives provide, their implementation

21  timelines, and identify documentation describing the alternatives.  Google's reference to the

22  showdown reports did not erase the narrative discussion Google provided earlier in its response to

23  Interrogatory No. 18.  That response explicitly explained that the alternative would allow a playback

24  device to retrieve media items in the alleged "remote playback queue" without having to obtain data

25  identifying a next media item from a server that is then used to retrieve each of the media items in

26  the remote playback queue.  Ex. 24 at 13-14.

27      Moreover, Dr. Bhattacharjee's earlier showdown reports were focused on the '615 patent

28  and addressed a limitation that does not exist in the '033 patent and thus focused on a different

aspect of the ██████████████ operation that had nothing to do with whether a playback device sends a single request or an item-by-item request.  In particular, Claim 13 of the '615 patent (that was at issue during the showdown) required that a playback device receive "resource locators" (which Sonos identified as videoIds or URLs) and multimedia content from *different* servers.  *See* Mtn., Ex. U ¶ 587.  In that context, Dr. Bhattacharjee discussed how with ████ the same server (██████████████) would send URLs and multimedia content to a playback device, and that Google also had a project called ████████████ that extends ████████ so that videoIds are also sent from the ████████  *See* Mtn., Ex. U ¶¶591-592.  In short, the showdown reports provide information about the architecture of ████████████████ and the servers that send information to a playback device—they were not discussing the '033 patent or whether a single request can be used to retrieve the media data for the media items in the request.

**Second**, Limitation 1.8 and 1.9 of the '033 patent require that a computing device [1] be configured for playback of a remote playback queue, [2] detect an indication that playback has been transferred, and [3] after detecting the indication transition into a mode where the computing device is "no longer configured for playback of the remote playback queue."  Google's response to Sonos's Interrogatory No. 18 thus proposed a non-infringing alternative in which the computing device (e.g., a mobile phone) would continue to be configured for playback of the remote playback queue, even after playback has been transferred from the computing device to a playback device.  Ex. at 14. Sonos argues that Dr. Bhattacharjee's rebuttal report includes "three additional alternatives to infringement" compared to this non-infringing alternative.  This is incorrect.

Sonos first claims that Dr. Bhattacharjee's opinion that this alternative would apply to "*all* of the YouTube applications" is new.  Mot. at 16.  But Google's interrogatory response disclosed that this alternative applied to "Google's accused products"; it was not limited to a particular application.  Ex. 24 at 14.  Indeed, while Sonos argues that Google somehow excluded YouTube Music from the scope of this non-infringing alternative, its opening expert report addressed this non-infringing alternative for YouTube Music.  Ex. 3 ¶ 520.

Next Sonos takes issue with  Dr. Bhattacharjee's allegedly new opinion that in this non-infringing alternative playback on the computing device can be "paused" upon transfer.  Mot. at 16.

1   But Dr. Bhattacharjee is merely explaining how the non-infringing alternative Google previously

2   disclosed (i.e. that the computing device would continue to be configured for playback after

3   transferring playback to a playback device) was further bolstered by Sonos's expert opinions.  Ex.

4   24 at 14.  Specifically, in its opening expert report Sonos argued for the first time that Google's non-

5   infringing alternative was not commercially acceptable because users "do not want [their] phone…

6   outputting sound at the same time" as their playback devices.  Ex. 3 ¶ 520.  At the same time, in

7   order to argue that the accused YouTube applications infringe certain limitations of the claims,

8   Sonos's expert took the position that "an accused YouTube application [is] 'configured for playback

9   of the remote playback queue' even when it is paused and not playing back the media."  Mot., Ex. B

10   ¶280.  Thus, Dr. Bhattacharjee merely explained that if Sonos's infringement position is credited

11   then the computing device in this non-infringing alternative can similarly be "paused" upon

12   transfer—such that the phone is no longer "outputting sound at the same time"—Sonos's

13   commercial acceptability arguments were no longer applicable.  Mot., Ex. B ¶ 280; *see generally*

14   Dkt. No. 406-2 (repeatedly stating that accused products are "configured for playback of the remote

15   playback" without explanation).

16        Finally, Sonos claims that Dr. Bhattacharjee presents a new opinion about "video *and* audio

17   [continuing] to play back on the mobile device after transferring playback, giving the user the option

18   to continue playback on the mobile device or pause it at a later time."  Mot. at 16 (emphasis in the

19   original).  But Google's interrogatory response explains that the non-infringing alternative being

20   proposed includes "continuing playback at the control device after playback has been transferred to

21   the playback device."  Ex. 24 at 14.  While Google provided an example in which the playback

22   continued with "only the video alone (and the audio muted)," that was but one example of the

23   disclosed NIA (i.e., "continuing playback at the control device").  Sonos was therefore on notice of

24   the non-infringing alternative and Dr. Bhattarcharjee merely provided additional details.

25        2.   <u>Google's "No Identification of Groups as Zone Scenes" NIA in Dr.
             Schonfeld's Report is Timely.</u>

26

27        Finally, Sonos's argument that Dr. Schonfeld's alleged noninfringing alternative, "No

28   Identification of Groups as Zone Scenes" is untimely (Mot. at 17) elevates form over substance.

1    During summary judgment for the patent showdown, the parties disputed the definition of the term

2    "zone scene." *See* Dkt. 211 at 21-25; Dkt. 208 at 8-11.  Subsequently, the Court ruled  that to the

3    extent a "common theme" is required by the term "zone scene," the user must be able to name a

4    group, and abstract or random names would not meet such a claim element. Dkt. 309 at 8.  Following

5    the Court's order, Google supplemented its interrogatory responses, expressly incorporating the

6    Court's order as it relates to "zone scene" and addressing the requirement that the user must be able

7    to name a group. *E.g.,* Mot., Ex. J, t 56-57 ("Sonos argues that a group name 'serves as the user's

8    shorthand label of the common theme that led the user to create the previously-saved group,' and

9    therefore appears to conflate group names with the claimed 'zone scene.' This is contrary to the

10   specification, which uses group naming and zone scenes separately and distinguishes between

11   them."); *see also* Ex. 24 at 8-11. Dr. Schonfeld's opinion regarding this requirement follows directly

12   from the Court's discussion of naming a group within the context of the claims.  Because the Court

13   ruled that the ability of a user to give a meaningful name to a speaker group could sometimes count

14   as creating a "zone scene", Dr. Schonfeld simply opined that redesigning the products to remove

15   the ability to name the groups would have been a straightforward and commercially acceptable

16   alternative to using the claimed "zone scenes."  *See* Dkt. 309 at 8 ("The question, then, is simply

17   whether a user's ability to name speaker groups means that the user can group speakers according

18   to a common theme. The answer is yes.").  Sonos's suggestion that it was not put on notice of this

19   theory months ago strains credulity. *See* Dkt. 211 at 23-24; Dkt. 309 at 7-9). Far from being

20   prejudiced, Dr. Almeroth already addressed this NIA in his reply report. Ex. 23 at ¶¶ 268-277.

21   Indeed, Sonos's counsel questioned Dr. Schonfeld about these opinions during his February 3, 2023

22   deposition, but only asked a few basic questions. Ex. 13 at 175:23-178:4.

23              **D.        Sonos Cannot Show Harm From Any Alleged Lack Of Disclosures**

24              As to Sonos's contention that certain of Dr. Bhattacharjees' and Dr. Schonfeld's opinions

25   regarding noninfringement and non-infringing alternatives opinions should be stricken because they

26   were not disclosed in Google's interrogatory responses, Federal Rule of Civil Procedure 37 states

27   that a failure to supplement does not require exclusion if "the failure . . . is harmless."  Fed. R. Civ.

28   P. 37(c)(1); *see also* Committee Notes on Rules – 2000 Amendment ("[A] party should be allowed

1    to use the material that was not disclosed if the lack of earlier notice was harmless."); *BLK*

2    *Enterprises, LLC v. Unix Packaging, Inc.*, 2018 WL 5993839, at *2 (C.D. Cal. Oct. 2, 2018)

3    (denying motion to strike expert report when "[d]efendants fail[ed] to demonstrate any prejudice").

4         Even assuming *arguendo* that Google's technical experts disclosed "new theories" in their

5    reports (they did not), Sonos notably fails to identify any legitimate prejudice that it has suffered.

6    Instead, it vaguely references its responses being "hampered" and to unspecified "fact discovery"

7    that it would have apparently taken—but tellingly provides no specifics.  Mot. at 17.   *See S.E.C. v.*

8    *Luna*, 2014 WL 794202, at *9 (D. Nev. Feb. 26, 2014) (declining to preclude late-disclosed theory

9    because moving party did not "identif[y] any discovery they would have conducted had the [non-

10   moving party] supplemented its responses sooner").

11        This is because Sonos has been afforded robust discovery—including numerous fact

12   depositions, multiple rounds of expert reports and discovery, millions of lines of source code, and

13   hundreds of thousands of documents—regarding the same accused functionalities and products

14   throughout this over-two-year litigation, such that its experts had all the necessary information to

15   respond to any purportedly "new" theories (and did in fact do so) in their rebuttal and reply reports.

16   It is also undisputed that Sonos was made aware of at least some of the noninfringement theories

17   for the zone scene patents and many of the non-infringement alternatives that apply to both the

18   showdown and non-showdown patents when the parties served expert reports for the patent

19   showdown on June 22, 2022—such that any alleged nondisclosure was harmless.  *See, e.g.*, *supra* §

20   IV.A.1(i) (theory that Bandaid URL, not a videoId, is used to retrieve the media item for playback

21   was included in Dr. Bhattacharjee's showdown report). "Rule 26(e) . . . requires supplemental or

22   corrective disclosures or responses only for 'information [that] has not otherwise been made known

23   to the other parties during the discovery process or in writing.'"). Sonos has also had the opportunity

24   to serve responsive reports addressing, and to depose Google's experts twice regarding, the very

25   issues they now move to strike.  Accordingly , Sonos cannot claim prejudice.

26   **V.      CONCLUSION**

27        For the foregoing reasons, Google respectfully requests that the Court deny Sonos's Motion.

28

1

2      DATED:  February 10, 2023              QUINN EMANUEL URQUHART & SULLIVAN,
                                              LLP
3
                                              By:   _/s/ Charles K. Verhoeven_____
4                                                  Charles K. Verhoeven (Bar No. 170151)
                                                   charlesverhoeven@quinnemanuel.com
5                                                  Melissa Baily (Bar No. 237649)
                                                   melissabaily@quinnemanuel.com
6                                                  James Judah (Bar No. 257112)
                                                   jamesjudah@quinnemanuel.com
7                                                  Lindsay Cooper (Bar No. 287125)
                                                   lindsaycooper@quinnemanuel.com
8                                              50 California Street, 22nd Floor
                                               San Francisco, California 94111-4788
9                                              Telephone: (415) 875-6600
                                               Facsimile: (415) 875-6700
10

11
                                                   Marc Kaplan (pro hac vice)
12                                                 marckaplan@quinnemanuel.com
                                               191 N. Wacker Drive, Ste 2700
13                                             Chicago, Illinois 60606
                                               Telephone:    (312) 705-7400
14                                             Facsimile:    (312) 705-7401

15                                                 Attorneys for GOOGLE LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on February 10, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system and email.


DATED:  February 10, 2023


By:   */s/ Charles K. Verhoeven*
Charles K. Verhoeven

GOOGLE'S OPPOSITION TO SONOS'S MOTION TO STRIKE
PORTIONS OF GOOGLE'S INVALIDITY AND NONINFRINGEMENT EXPERT REPORTS