QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

*Attorneys for Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SONOS, INC.,<br><br>                    Defendant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S CONTRACT-RELATED CLAIMS**<br><br>The Hon. William H. Alsup<br>Date:          March 30, 2023<br>Time:          8:00 a.m.<br>Location:    Courtroom 12, 19th Floor |

# <u>TABLE OF CONTENTS</u>

I.     BACKGROUND ................................................................................................3

    A.     Sonos's Technology Prior To Its 2013 Collaboration With Google .................3

    B.     Sonos And Google Collaborate On A Google Play Music Integration From 2013 To 2015, During Which Google Develops The Cloud Queue API.................5

       1.     Google And Sonos Enter Into The 2013 Content Integration Agreement .........................................................................................6

       2.     The Parties Utilize Cloud Queue To Achieve Direct Playback From GPM To Sonos Speakers.........................................................7

          (a)     The Parties Launch Direct Playback "1.0" Using Google's MediaRouteProvider Protocol.........................................7

          (b)     The Parties Develop The CQ API for Direct Playback "2.0" Which Launches In 2015.................................................8

    C.     Sonos Tries To Assert Ownership Over The Cloud Queue Development Work Done By Google.................................................................................9

       1.     Sonos Files A 2014 Patent Disclosure (The '906 Provisional) Entitled "Cloud Queue" And Obtains Patents Purporting To Cover The CQ API.............................................................................9

       2.     In Advance Of Litigation, Sonos Amends Its '033 Patent To Introduce Claims That Purportedly Cover The Cloud Queue API .............10

       3.     Sonos Uses The CQ API With Other Partners .............................................11

       4.     Sonos Accuses Google Of Infringing The '033 And '615 Patents .............12

    D.     Google's Second Amended Complaint Asserts Claims For Breach Of Contract And Conversion Based On Sonos's Misappropriation.............................13

II.     LEGAL STANDARD ....................................................................................13

III.     ARGUMENT ..................................................................................................14

    A.     Summary Judgment On Google's Breach Of Contract Claim Is Improper .............14

       1.     The Cloud Queue API Is Covered By The 2013 CIA...................................14

          (a)     The  CIA Plainly Encompasses Google's Work On The Cloud Queue.....................................................................14

          (b)     The Extrinsic Evidence Confirms That The CIA Encompasses Google's Cloud Queue Development Work.............16

       2.     Sonos Breached The CIA By Claiming Rights In The Cloud Queue API ......................................................................................18

3.    The 2018 SIA Does Not Supersede the 2013 CIA ........................................22

B.    Summary Judgment On Google's Conversion Claim Is Improper Because
There Are Genuine Issues Of Material Fact ..........................................................25

IV.    CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (N.D. Cal. 2019) ........................................................................................... 13

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ......................................................................................... 20

*Ash v. N. Am. Title Co.*,
223 Cal. App. 4th 1258 (2014) ........................................................................................... 18

*Britz Fertilizers, Inc. v. Bayer Corp.*,
665 F. Supp. 2d 1142 (E.D. Cal. 2009) .............................................................................. 18

*Cedars-Sinai Med. Ctr. v. Shewry*,
137 Cal. App. 4th 964 (2006) ............................................................................................. 14

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
43 Cal.4th 375 (2008) .................................................................................................. 14, 17

*CreAgri, Inc. v. Pinnaclife, Inc.*,
2013 WL 6673676 (N.D. Cal. Dec. 18, 2013) .................................................................. 20

*Fanucchi & Limi Farms v. United Agri Prod.*,
414 F.3d 1075 (9th Cir. 2005) ........................................................................................... 23

*Giles v. General Motors Acceptance Corp.*,
494 F.3d 865 (9th Cir. 2007) ............................................................................................. 13

*Glob. Trim Sales, Inc. v. Checkpoint Sys. UK Ltd.*,
2014 WL 12690629 (C.D. Cal. Sept. 17, 2014) .......................................................... 23, 25

*Harper v. Charter Commc'ns, LLC*,
2019 WL 3683706 (E.D. Cal. Aug. 6, 2019) .................................................................... 23

*Howard v. Cty. of Amador*,
220 Cal. App. 3d 962 (Ct. App. 1990) .............................................................................. 23

*Hynix Semiconductor Inc. v. Rambus Inc.*,
2011 WL 1815978 (Fed. Cir. 2011) .................................................................................. 20

*Indivior UK Limited v. Dr. Reddy's Laboratories S.A.*,
18 F.4th 1323 (Fed. Cir. 2021) ......................................................................................... 20

*Life Tech. Corp. v. Pacific Biosciences of California, Inc.*,
2012 WL 28712 (N.D. Cal. Jan. 5, 2012) ......................................................................... 20

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS

1    *LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
         424 F.3d 1336 (Fed. Cir. 2005) .................................................................................. 22

2
     *Malveda v. Experian Info. Sols., Inc.*,
3        2022 WL 94921 (N.D. Cal. Jan. 10, 2022) ................................................................ 23

4    *Marsh v. Nichols, Shepherd & Co.*,
         128 U.S. 605 (1888) .................................................................................................... 19

5
     *Miran v. Convergent Outsourcing Inc.*,
6        2016 WL 7210382 (S.D. Cal. Dec. 13, 2016) ...................................................... 23, 25

7    *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
         69 Cal. 2d 33 (1968) ................................................................................................... 14

8
     *Protego Networks, Inc. v. Daniel Zenchelsky*,
9        2005 WL 8177596 (N.D. Cal. Oct. 11, 2005) ........................................................... 25

10   *Reuland Elec. Co. v. Burgi Engineers LLC*,
         2015 WL 12683953 (C.D. Cal. Apr. 24, 2015) ......................................................... 25

11
     *Scheer v. Tollman*,
12       1996 WL 420172 (S.D.N.Y. July 25, 1996) .............................................................. 23

13   *Stonebrae, L.P. v. Toll Bros.*,
         2009 WL 1082067 (N.D. Cal. Apr. 22, 2009) ........................................................... 18

14
     *Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
15       2017 WL 3485881 (N.D. Cal. Aug. 15, 2017) ........................................................... 22

16   *Vallely Invs., L.P. v. BancAmerica Com. Corp.*,
         88 Cal. App. 4th 816 (2001) ...................................................................................... 23

17
     *Weco Supply Co. v. Sherwin-Williams Co.*,
18       2012 WL 3249552 (E.D. Cal. Aug. 7, 2012) ............................................................ 13

19   *WI-LAN Inc. v. LG Electronics, Inc.*,
         No. 18-cv-01577-H-BGS, Dkt. 278 (S.D. Cal. Oct. 24, 2019) ............................ 23, 24

20
     *Workplace Tech. Research, Inc. v. Project Management Institute, Inc.*,
21       2021 WL 4895977 (N.D. Cal. Oct. 20, 2021) ........................................................... 18

22   *Wyeth v. Abbott Lab.*,
         2012 WL 175023 (D. N.J. Jan. 19, 2012) .................................................................. 20

23
     *Young v. Wideawake Death Row Ent. LLC*, ,
24       2011 WL 12565250 (C.D. Cal. Apr. 19, 2011) ......................................................... 14

25                                                **Statutes**

26   Cal. Civ. Code § 1636 ...................................................................................................... 14

27                                                  **Rules**

28   Fed. R. Civ. P. 56(a) .......................................................................................................... 1

Case 3:20-cv-06754-WHA   Document 517   Filed 02/21/23   Page 6 of 34

**TABLE OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 1 | Transcript from the June 1, 2022 Deposition of Keith Corbin |
| 2 | Transcript from the June 29, 2022 Deposition of Nick Millington |
| 3 | Transcript from the May 31, 2022 Deposition of Keith Corbin |
| 4 | Document bearing starting bates number SONOS-SVG2-00027123 |
| 5 | Transcript from the July 12, 2022 Deposition of Tad Coburn |
| 6 | Document bearing starting bates number SONOS-SVG2-00027229 |
| 7 | Transcript from the May 13, 2022 Deposition of Adam Graham |
| 8 | Transcript from the May 18, 2022 Deposition of Adam Graham |
| 9 | Transcript from the August 23, 2022 Deposition of Kristen Bender |
| 10 | Document bearing starting bates number SONOS-SVG2-00080510 |
| 11 | Document bearing starting bates number SONOS-SVG2-00177590 |
| 12 | Document bearing starting bates number SONOS-SVG2-00060025 |
| 13 | Document bearing starting bates number SONOS-SVG2-00067858 |
| 14 | Document bearing starting bates number SONOS-SVG2-00215702 |
| 15 | Exhibit 19 to the Deposition of Alaina Kwasizur |
| 16 | Document bearing starting bates number GOOG-SONOS-NDCA-00078023 |
| 17 | Document bearing starting bates number SONOS-SVG2-0068852 |
| 18 | Document bearing starting bates number GOOG-SONOSWDTX-00053934 |
| 19 | Document bearing starting bates number SONOS-SVG2-00068939 |
| 20 | Document bearing starting bates number SONOS-SVG2-00080452 |
| 21 | Document bearing starting bates number SONOS-SVG2-00070566 |
| 22 | Transcript from the November 22, 2022 Deposition of David DesRoches |

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS

| 23 | U.S. Provisional Application No. 62/007,906 |
|----|---------------------------------------------|
| 24 | Transcript from the November 17, 2022 Deposition of Steve Beckhardt |
| 25 | November 1, 2019 Amendment and Remarks |
| 26 | Document bearing starting bates number SONOS-SVG2-00140005 |
| 27 | Document bearing starting bates number SONOS-SVG2-00182805 |
| 28 | Document bearing starting bates number SONOS-SVG2-00111339 |
| 29 | Transcript from the May 27, 2022 Deposition of Allison Elliott |
| 30 | Document bearing starting bates number SONOS-SVG2-00081530 |
| 31 | Transcript from the August 25, 2022 Deposition of Juergen Schmerder |
| 32 | Sonos's July 14, 2021 Third Supplemental Preliminary Infringement Contentions |
| 33 | Transcript from the May 10, 2022 Deposition of Christina Valente |
| 34 | Transcript from the August 11, 2022 Deposition of Jeff Torgerson |
| 35 | Transcript from the November 30, 2022 Deposition of Alaina Kwasizur |
| 36 | November 30, 2022 Opening Expert Report of Samrat Bhattacharjee Regarding Invalidity of U.S. Patent Nos. 10,779,033 and 9,967,615 and Other Issues |
| 37 | January 23, 2023 Reply Expert Report of Samrat Bhattacharjee Regarding Non-Infringement of U.S. Patent No. 10,779,033 and Other Issues |
| 38 | Document bearing starting bates number SONOS-SVG2-00195493 |
| 39 | Transcript from the January 13, 2022 Hearing on Google's Motion for Leave to File its Second Amended Complaint (Dkt. 80) |
| 40 | Document bearing starting bates number SONOS-SVG2-00080142 |
| 41 | Document bearing starting bates number SONOS-SVG2-00083495 |

The collaboration agreement between Sonos and Google prohibited Sonos from taking Google's development work during that collaboration and claiming that work for itself.  Yet that is what Sonos did—by claiming Google's work in 2019 during prosecution of the '033 patent; by filing patents after the collaboration claiming Google's development work; and by passing off Google's work as Sonos's own with Google's competitors.  Sonos breached its agreement with Google and is liable for conversion of IP resulting from Google's development work.

By 2013, Google's music service—Google Play Music ("GPM")—was growing in popularity.  Google customers could play back cloud-hosted music using a GPM application installed on their mobile device and could transfer playback to one or more Google playback devices.  Sonos sought to take advantage of GPM's popularity by allowing users of the GPM application to also transfer playback to Sonos speakers.

From 2013 through 2015, Sonos and Google collaborated on integrating Sonos speakers with GPM.  As part of the collaboration, Google proposed developing an API for the integration that would allow a playback device to play a queue of tracks that resides on a cloud server (a "cloud queue"), rather than having the queue reside locally on the playback device (*e.g.*, a Sonos device).  Google developed the cloud queue API which, with help from Sonos, launched as part of the GPM application in 2015. The parties' Content Integration Agreement ("CIA"), which governed the parties' collaboration, provides Google with ███████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████ Dkt. 479-4 ("CIA") § 3.4.  Thus, pursuant to the CIA, ██████████████████

███████████████████████████████████████████████████████████████████████

Since executing the CIA, Sonos has violated its terms multiple times by attempting to claim for itself Google's cloud queue API in at least four ways.  First, six months into the collaboration, Sonos filed an entirely new patent disclosure that Sonos witnesses have admitted was filed to cover the cloud queue API.  Those patent disclosures can be traced to documents created during the collaboration.  Sonos has obtained multiple patents from this disclosure.  Second, Sonos amended the claims of the '033 patent asserted in this case in 2019 to introduce limitations related to a "remote

playback queue," which Sonos has interpreted as covering the cloud queue technology.  Third, Sonos has attempted to exercise dominion over Google's right to commercialize the cloud queue API by filing this lawsuit and accusing the API of infringement.  Fourth, Sonos used Google's cloud queue API—including disclosures in documents Google shared with Sonos—with its other partners (removing references to Google and rebranding the API as its own).  A reasonable jury could find Sonos breached the CIA and converted Google's IP based on any one (or all) of these actions.

While Sonos does not dispute that it has filed patents and claims that it is interpreting to cover the cloud queue technology developed during the collaboration, Sonos argues that the CIA relates to other aspects of the GPM integration and not the development of the cloud queue technology.  This argument is untenable under the plain language of the agreements, and its implication that there is *no* contract that governed the parties' years-long development of the cloud queue API is illogical and unreasonable given the sophistication of these parties.  Even if the Court determines that there is ambiguity as to whether the cloud queue API falls within the ██████████ ████████████████████████████████████████████████████████████ the Court must deny summary judgment because this is a factual question for the jury.

Determined not to be held to the CIA, Sonos contorts a conventional "merger clause" in a 2018 Service Integration Agreement (Dkt. 479-3, "SIA") related to ████████████ to argue that the CIA has been superseded.  The SIA involved ████████████████████████████████ ████████████████████████████  The SIA's merger clause cannot be read as anything other than a clause excluding the use of extrinsic evidence in interpreting that contract.

Last, Sonos ignores most of its breaches of the CIA in an attempt to cabin Google's claims to a single issue: whether the '033 patent is "pre-existing intellectual property."  But even on this one issue, Sonos' argument fails.  Although the '033 patent claims priority to an application filed in 2011, the amendments Sonos added years later after the collaboration to claim the cloud queue API are not supported by that specification.  It is also black letter law that a patent right does not exist until the patent issues, such that the '033 patent—which issued long after the CIA—cannot be pre-existing IP.  In any event, the CIA prohibited Sonos from claiming as its own Google's development work from the collaboration.  Having asserted its '615 and '033 patents against this

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS

technology, Sonos breached the CIA regardless of whether the patents are "pre-existing."

## I.     BACKGROUND

### A.     Sonos's Technology Prior To Its 2013 Collaboration With Google

Prior to the parties' collaboration, Sonos customers could not use applications provided by their preferred music service[1] (such as Spotify) to play music directly on their Sonos speakers; instead, they could only use the Sonos controller application ("Sonos app") to play music on their Sonos speakers. Dkt. 200-12 (Sonos Controller Manual) at 17-18. Specifically, customers who were "subscribed to a music service that was compatible with Sonos" were required to log in to the compatible music service using the Sonos app before music could be streamed to their Sonos speakers. *Id*. at 55-56. This process—which was undesirable from a user perspective—████ ████. Ex. 2 (Millington Tr.) at 178:11-179:15;[2] Ex. 3 (Corbin Tr.) at 39:8-14, 50:17-51:2.

In July of 2011, Sonos began an initiative called "Play-to-Sonos." Ex. 4. ████ ████ ████." Ex. 2 (Millington Tr.) at 194:18-21; *see also* Dkt. 375, Ex. 5 (Coburn Tr.) at 101:3-7 ████ ████ ████ ████ ████. Ex. 36 (Bhatta. Op. Rpt.) ¶¶ 97-99, 702; *see also* Dkt. 375 at 5-6.

Just as with its SMAPI implementations, Play-to-Sonos utilized a local queue on the speaker. Specifically, Sonos took a ████ ████

[1]  "A music service is an online music store or online service that sells audio on a per-song, per audiobook, or subscription basis." Dkt. 200-12 (Sonos Controller Manual) at 44.



1    ████████████████ Dkt. 480-12 at -225.[3] ██████████████

2    ██████████████████████. *Id.* at -224; Ex. 5 (Coburn Tr.) at 231:16-19

3    ("the term 'queue state' [is] referring to a queue"). ████████████████

4    ███████████████████ Dkt. 480-12 at -228.

5         Contrary to Sonos's assertions, Dkt. 480-3 ("Mot.") at 4, "a cloud-based remote playback

6    queue" was *not* "at the center of the Play-to-Sonos technology." Rather, to facilitate communication

7    between the third-party application and the Sonos speakers, ████████████████

8    ████████████████████████████████████

9    ████████████████████████████ Ex. 36 (Bhatta Op.

10   Rpt.) ¶¶ 104-11.  Indeed, although Sonos relies on statements from Sonos employee Ron Kuper

11   (Mot. at 4 (citing Dkt. 480-12)) that refer to ███████████████████

12   ████████████████████████████████████

13   █████████████████████████████

14   ████████████████████████████████████

15-25 [redacted]

26   [3] ████████████████████████████████

27   ████████████████████████████████████

28   ████████ *Id.*

-4-                                      Case No. 3:20-cv-06754-WHA

Ex. 6 (SONOS-SVG2-00027229) (orange and green annotations added). ████████████

████████████████████████████

███████████████████ Ex. 36 (Bhatta. Op. Rpt.) ¶ 107. ██████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████████████████ Ex. 36

(Bhatta. Op. Rpt.) ¶¶ 105-10. ████████████████

█████████████████████████████████

███████████████████████

In December 2011, Sonos filed U.S. Patent App. No. 13/341,237 ("'237 application"), which Sonos states is based on Play-to-Sonos.  Consistent with Sonos's approach to Play-to-Sonos at the time, the '237 application describes two queues—a queue "in [a] third-party application" and a "local playback queue" on a speaker[4]—and discloses an approach in which the queue in a third party application is played on a Sonos speaker by relaying information from the third party application to the Sonos speaker "through a proxy server in the cloud."  *Id.* ¶¶ 688-97.  The '237 application does not include any mention of a "remote playback queue" or "cloud queue."

Thus, prior to its collaboration with Google (discussed further below), ████████████ ████████████████████████████ Ex. 7 (Graham Tr.) at 40:6-42:7; Ex. 8 (Graham Tr.) at 232:19-233:8, 234:8-235:9.

**B.      Sonos And Google Collaborate On A Google Play Music Integration From**

---

[4]   The disclosure of the '237 application also includes a single mention of a "shared queue": "In certain embodiments, a shared queue is provided between the local playback system and the third party application to keep the local system and application synchronized."  Dkt. 1-3 at 16:62-64.  The shared queue is also stored on the Sonos speaker.  Ex. 36 (Bhatta. Op. Rpt.) ¶ 690.  Sonos documents from prior to the collaboration also confirm the "shared queue" is stored on the Sonos speaker; *See, e.g.,* Ex. 11 at -595 ("████████████████████████████]").

**2013 To 2015, During Which Google Develops The Cloud Queue API**

By 2013, Google had released its GPM music service.  Users could install the GPM application on their mobile device (*e.g.*, a phone or tablet) to stream cloud-hosted music from Google's music service, and could also transfer playback to one or more playback devices, such as Google's "NexusQ" or "Chromecast" devices.  Ex. 36 (Bhatta. Op. Rpt.) ¶¶ 786, 788.  Sonos had a ███████████████████████████████████████████████████ and sought to take advantage of GPM's growing popularity by allowing users of the GPM application to play music on Sonos speakers.  Ex. 1 (Corbin Tr.) at 171:9-172:17.  Thus, from 2013 to 2015, Sonos and Google collaborated on an integration that would allow users to play music to Sonos speakers in two ways: (1) from within the Sonos app using SMAPI (the "SMAPI Integration") and (2) directly from the GPM application (the "Direct Playback Integration") (collectively, the "GPM collaboration").

      1.   <u>Google And Sonos Enter Into The 2013 Content Integration Agreement</u>

The parties' 2013 Content Integration Agreement (CIA) governed the GPM collaboration.  *See* Ex. 9 (Bender Tr.) at 208:23-209:1 ("Q. ████████████████████████████████ ███████████████████████████.  Google and Sonos began negotiating the agreement on May 29, 2013, when Sonos product manager Kristen Bender sent a form agreement—Sonos's ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████.  Ex. 9 (Bender Tr.) at 190:21-191:1.  █████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████.

Section 3.4 of the CIA discusses the intellectual property rights of the "██████████████ (Google) in the context of the collaboration:

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████████

CIA at § 3.4.  This section (i) grants Google ownership of "██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████"[5]  *Id.* § 3.4; at Recitals.

      2.      <u>The Parties Utilize Cloud Queue To Achieve Direct Playback From GPM To Sonos Speakers</u>

Although the Direct Playback Integration was part of Sonos's Play-to-Sonos initiative, Google and Sonos never utilized the technical approach Sonos theorized in 2011.  *See supra* § I.A.  Instead, as discussed below Google proposed two fundamentally different approaches for Sonos's first ever direct playback integrations with a music service application: first, an approach using Google's already-existing MediaRouteProvider ("MRP") protocol and, ultimately, an approach using a new cloud queue API in which the speaker would play back a queue stored in the cloud (rather than a queue stored on the speaker).

      (a)      *The Parties Launch Direct Playback "1.0" Using Google's MediaRouteProvider Protocol*

Google and Sonos first planned to achieve a Direct Playback Integration through Google's MRP protocol, a proprietary framework for the Android system that Google had created to allow manufacturers to enable playback on their devices through a standardized interface.  *See* Ex. 12 (SONOS-SVG2-00060025);  *cf.* Ex. 13 (SONOS-SVG2-00067858) at -858.    The parties successfully launched a GPM/Sonos direct integration based on Google's MRP in April of 2014.  *See* Ex. 14 (SONOS-SVG2-00215702).  This "version 1" of the parties' Direct Playback Integration

---

[5]   The CIA provides that ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████.

marked the first time that users could play back content on their Sonos speakers using a third-party music application.  *See* Ex. 15.

               (b)    *The Parties Develop The CQ API for Direct Playback "2.0" Which Launches In 2015*

Google first proposed to Sonos the notion of a "cloud queue" solution for the Direct Playback Integration in November 2013, while still working on the MRP version.  Specifically, when Sonos engineer Tad Coburn asked about future MRP-type models for direct integration, Google engineer Debajit Ghosh responded that Google would be moving towards "a more cloud queue centric model" and that this would "be the next area of API proposals."  Dkt. 124-5 at -826.

Because a cloud queue model had been on Google's roadmap since before its collaboration with Sonos, Ex. 16 (7-22-2013 email from Debajit Ghosh to Mark Meiss) at 1 ███████████████ ███████████████████████████████████ ), Mr. Ghosh already had—and provided Sonos with—an outline of how the cloud queue API could be implemented.  *See* Dkt. 124-5.  After hearing Google's "cloud queue" idea, Mr. Coburn responded with hesitation that "[t]he idea of moving the playlist to the cloud is very interesting, but will definitely complicate things."  *Id.* at 3.  But from that point until the launch in 2015, Google collaborated with Sonos to develop and release the cloud queue API.  Google engineers took the lead on development and sent Sonos initial drafts of the API.  *See, e.g.*, Ex. 17 (SONOS-SVG2-0068852) at -855 (Sonos checking in on progress of "the CloudQueue API design"); Ex. 18 (GOOG-SONOSWDTX-00053934).  The parties worked together through email, weekly "Google/Sonos Sync" calls, and day-long in-person meetings to achieve a Direct Playback Integration using a cloud queue.  *See, e.g.*, Ex. 19 (SONOS-SVG2-00068939); Ex. 20 (SONOS-SVG2-00080452).

Google successfully launched a version of the GPM application that utilized the cloud queue API in September 2015.  Ex. 21 (SONOS-SVG2-00070566).  This was Sonos's first direct playback integration that utilized a cloud queue implementation.  The cloud queue API that was released in 2015 operated much like the outline that Mr. Ghosh communicated to Sonos in 2013.  Upon casting (*i.e.*, transferring) playback to a playback device, the GPM application would send the playback device a "loadCloudQueue" message with a URL that pointed to the cloud queue and an identifier

1   for the current media item (*e.g.*, the contemporaneously playing song).  Ex. 36 (Bhatta. Op. Rpt.) ¶

2   793.  The playback device would then begin playing the cloud queue by (1) fetching data identifying

3   a window of media items around the current media item (*e.g.*, identifiers for the previous, current

4   and next media items in the cloud queue), (2) obtaining a URL (called a "███████ URL") for

5   retrieving the current media item, and (3) using that URL to retrieve and play back the current media

6   item on the playback device.  *Id.* ¶¶ 794-97.  When the last media item in the window would start

7   playing, the playback device would communicate with the cloud queue to fetch a new window and

8   would then repeat the process.  *Id.*; Ex. 9 (Bender Tr.) at 91:15-91:23; 168:18-169:3; 221:23-222:9.

### C.   Sonos Tries To Assert Ownership Over The Cloud Queue Development Work Done By Google

Sonos has claimed (and is currently claiming) a right in the development work arising from

the collaboration in violation of the CIA.  Specifically, and as discussed further below, after

executing the CIA, Sonos filed new patents and claims purporting to cover the cloud queue API,

used the cloud queue API with its other partners (deleting references to Google and rebranding the

API as its own), and attempted to exclude Google from using the cloud queue API by filing this

lawsuit.  In fact, at least one Sonos witness conceded that he had concerns that Sonos did not have

a right to use the cloud queue API, but that Sonos nevertheless continued to claim the cloud queue

API for itself.  *See, e.g.*, Ex. 22 (Des Roches Tr.) at 64:4-12 ("████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████").

#### 1.   Sonos Files A 2014 Patent Disclosure (The '906 Provisional) Entitled "Cloud Queue" And Obtains Patents Purporting To Cover The CQ API

After Sonos executed the CIA, and after Google disclosed its plan for a cloud queue in the

context of the collaboration, Sonos secretly sought to patent the cloud queue API.  Specifically, on

June 3, 2014, Sonos filed U.S. Provisional Application No. 62/007,906 ("the '906 Provisional"),

which is entitled "Cloud Queue" and names Tad Coburn and Steve Beckhardt as inventors (both of whom were involved in the collaboration with Google). Ex. 23. Sonos has since obtained patents from the disclosures in the '906 Provisional. *See* Ex. 36 (Bhatta. Op. Rpt.) ¶ 811.

There is no doubt that the '906 Provisional intended to patent the CloudQueue API developed by Google. The written description of the '906 Provisional refers to the "CloudQueue API," and states that that the "CloudQueue [i]s a replacement for the queue data structure stored within a Sonos player." Ex. 23 at 17. It includes a section entitled "Queues in the Cloud," which is a phrase that Sonos used to refer to the cloud queue developed during the collaboration. Ex. 36 ¶ 812. Sonos drafted the '906 Provisional by using—and even copying from—documents created during the collaboration. *Id.*; *cf. id.* ¶ 803. And named inventor Mr. Beckhardt admitted the '906 Provisional was filed to claim the cloud queue API. Ex. 24 (Beckhardt Tr.) at 93:8-14 ("█████ ████████████████████████████████████████████████████ ███████████████████████████████████████████")

> 2.   <u>In Advance Of Litigation, Sonos Amends Its '033 Patent To Introduce Claims That Purportedly Cover The Cloud Queue API</u>

Sonos filed many continuation applications from the '237 Application it filed in December of 2011, including applications that resulted in the '033 and '615 patents asserted in this case. The first continuations that Sonos filed claimed a "local playback queue" on a playback device of a media playback system. It was only 8 years after the '237 Application was filed, in connection with its intellectual property strategy vis-a-vis Google, that Sonos sought to introduce the cloud queue technology into the claims of the '033 patent.

On November 1, 2019—less than a year before this litigation commenced and nearly eight years following the relevant provisional—Sonos amended the claims of the '033 patent to recite a "remote playback queue," a term that does not appear in anywhere in the specification. For example, Sonos added a limitation reciting that a computing device (*e.g.*, a phone running the GPM application) transmit an instruction to a playback device (*e.g.*, a speaker) that configures it to playback a "remote playback queue" by performing steps (i) through (iii) below:

> based on receiving the user input, transmitting an instruction for <u>the at least one given playback device to take over</u> ~~playback~~ responsibility for <u>playback of the remote playback</u>

~~queue the given audio content to be transferred~~ from the computing device ~~to~~, wherein the instruction configures the at least one given playback device ~~such that i) an identifier of the given audio content and a playback position for the given audio content are provided to the given playback device and ii) the given playback device becomes configured for playback of the given audio content based on the identifier and the playback position~~ to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item

Ex. 25 at 3-4 (strikethrough for deletions matter and underlining for additions); Ex. 36 ¶¶ 73-74.

Sonos contends that the claimed "remote playback queue" covers a cloud queue (Dkt. 389 at 10), and interprets steps (i) through (iii) to cover the same steps for playing back a cloud queue that Google developed during the collaboration, namely a playback device: (1) fetching data identifying a window of media items around the current media item (*e.g.*, identifiers for the previous, current and next media items in the remote playback queue), (2) obtaining a URL (called a "███" URL") for retrieving the current media item, and (3) using that URL to retrieve and play back the current media item on the playback device. Ex. 36 (Bhatta. Op. Rpt.) ¶ 815; *Cf.* Section I.C.2.

### 3. Sonos Uses The CQ API With Other Partners

Unbeknownst to Google, Sonos was also using the API that Google had developed as the basis for APIs that Sonos could implement with other third-party music providers. Having never previously achieved direct playback with a music service partner, Sonos used Google's cloud queue development work to create its own "cloud queue API," which Sonos claims is a "████████ ███████████" from the "Google/Sonos" collaboration. Ex. 1 (Corbin Tr.) at 195:12-21.

Sonos engaged third-party partners with the cloud queue API, while trying to cover up Google's role in its development. For example, before sending Google's cloud queue API to Spotify, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████."

Ex. 5 (Coburn Tr.) at 145:7-146:5. As another example, the cloud queue API included a "████████

1   ████████████████████████████████████████████████████████████████

2   ███████████. Ex. 27 (SONOS-SVG2-00182805).  Google shared the commands and events

3   protocol with Sonos, which Sonos renamed it the "Muse" protocol. ██████████████

4   ████████████████████████████████████████████████████████████.

5   Ex. 5 (Coburn Tr.) at 114:7-13. ████████████████████████████████████

6   ███████████████████ Ex. 27 (SONOS-SVG2-00182805) (emphasis added).

7          Sonos's utilization of Google's development work with Google's competitors proved

8   fruitful. █████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████ Ex. 5 (Coburn Tr.) at 112:17-113:1.

14         Sonos's representation that *Sonos* had been the one to develop a cloud queue solution for

15  direct playback was not limited to direct discussions with its partners. ███████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████." Ex. 29 (Elliot Tr.) at 78:20-79:22; *see, e.g.*, Ex. 30 (SONOS-SVG2-

18  00081530) ("████████████████████████████████████████). But in reality,

19  those APIs—which Sonos eventually published on its "developer portal" for use by potential

20  partners—were based on the development work Google did during the parties' collaboration.  Ex.

21  36 (Bhatta. Op. Rpt.), ¶¶ 805-810; Ex. 31 (Schmerder Tr.) at 21:18-22:10.

22             4.    Sonos Accuses Google Of Infringing The '033 And '615 Patents

23         By granting Google ownership over IP rights arising from its development work done during

24  the collaboration *and* prohibiting Sonos from claiming rights in that work, the CIA prohibited Sonos

25  from accusing Google of infringing patents based on its use of the development work.  But just two

26  weeks after the amended claims of the '033 patent issued, Sonos accused GPM (and YouTube) of

27

28

infringing the '033 and '615 patents.[6]  Ex. 32 (7-14-2021 Infringement Contentions) at 3 (identifying "Google Play Music app" as "Accused Product" for the "'615 and '033 Patents").  Indeed, during the Patent Showdown, Sonos alleged that GPM infringed the '615 patent based on its use of the cloud queue API that Google developed during the collaboration.  Dkt. 210-3 (Bhatta. Op. Showdown Decl.) ¶¶ 99-120; Dkt. 252-3 (Schmidt Op. Showdown Decl.) ¶¶ 82-86; Dkt. 316 at 9-10.[7]  By interpreting its patents to cover the cloud queue API, Sonos clearly claimed rights in Google's development work in violation of the CIA.  And while Sonos no longer accuses GPM of infringing the '033 patent, it accuses the YouTube applications of infringing based on functionality that is the same in relevant aspects as the cloud queue API.[8]

### D.   Google's Second Amended Complaint Asserts Claims For Breach Of Contract And Conversion Based On Sonos's Misappropriation

In this case, Google is asserting claims for breach of contract and conversion.  Dkts. 1, 125. These state law claims are based on Sonos's violation of the CIA as well as Sonos's wrongful conversion of Google's development work.  Dkt. 125 at 21-22.

## II.   LEGAL STANDARD

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he opposing party need not establish a material issue of fact conclusively in its favor," rather, it is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing version of the truth at trial.'"  *Weco Supply Co. v. Sherwin-Williams Co.*, 2012 WL 3249552, at *2 (E.D. Cal. Aug. 7, 2012) (citing *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007)).  When evaluating if summary judgment is warranted, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (N.D. Cal. 2019) (citation omitted).

---

[6]  The '615 patent is a family member of the '033 patent and was at issue during the Showdown.
[7]  Sonos has also indicated it plans to appeal the Court's decision on the '615 patent, such that it is continuing to claim rights in the cloud queue API in violation of the CIA.
[8]  Sonos dropped its allegations against GPM for the '033 patent because Google discontinued GPM shortly after the '033 patent issued.

III.  **ARGUMENT**

A.    **Summary Judgment On Google's Breach Of Contract Claim Is Improper**

Sonos has breached its agreement that it would not ███████████████████ ████████████████████████████████████████" made during Google's collaboration with Sonos (CIA § 3.4) by (i) obtaining patents and claims purporting to cover Google's cloud queue API (*see supra* Sections I.B.C.1-2), (ii) using the cloud queue API to partner with third-party music services (*see supra* Section I.B.C.3); and (iii) accusing Google of infringement in this action based on its use of the cloud queue API (*see supra* Section I.B.C.4).

1.    The Cloud Queue API Is Covered By The 2013 CIA

Under California law, "[t]he trial court's goal is to give effect to the parties' mutual intent at the time of contracting."  *Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 979 (2006) (citing Cal. Civ. Code § 1636).  Where contract terms are disputed, "the trial court must provisionally consider extrinsic evidence which is relevant to show whether the contractual language is reasonably susceptible to the competing interpretations advanced by the parties."  *Young v. Wideawake Death Row Ent. LLC*, , 2011 WL 12565250, at *4 (C.D. Cal. Apr. 19, 2011) (*citing Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39 (1968)).  "Where 'ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury.'"  *Id*. (citing *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal.4th 375, 395 (2008)).

Here, an examination of the contractual language reveals that the CIA clearly and unambiguously covers the cloud queue API that Google developed as part of the collaboration.  The extrinsic evidence is in accord.  And Sonos's contention to the contrary is not only meritless but it would lead to the illogical conclusion that the parties had *no* contract governing the Direct Playback Integration, which would be inconsistent with the parties' intent.

(a)    *The CIA Plainly Encompasses Google's Work On The Cloud Queue*

The CIA between Google and Sonos governs the ownership of Google's development work on the cloud queue API that enabled a Direct Playback Integration with Sonos.  Under Section 3.4,

1   Sonos was not to "claim for itself" any "Provider Developments," as they were "to remain the sole

2   and exclusive property" of Google.  CIA § 3.4.  ███████████████" is defined in the CIA as

3   "any and all development work done by or on behalf of [Google] in creating the Integrated Service

4   Offering."  *Id.*  "███████████████" is defined to include "███████████████

5   ███████████████████████████████████████████████████████████████

6   ███████████████████"—*i.e.*, directly control content on Sonos's speakers.  *See*

7   CIA at Recitals ███████████████████████████████████████████████

8   ███████████████████████████   This is what the GPM application had the ability to

9   do as a result of Google's work on the cloud queue API during the collaboration (*see supra* § I.B.2);

10  thus, that work falls within the definition of "███████████████."   Indeed, Sonos itself has

11  described this very ability as "direct control" technology.  *See, e.g.*, Dkt. 480-3 (describing '033 as

12  "claim[ing] an aspect of Sonos's 'direct control' technology," which "allows a user to seamlessly

13  control their Sonos speakers through a music app[.]").

14      Sonos's contention that Google's cloud queue technology is not a "███████████████"

15  and is thus "outside the scope of the 2013 CIA," Mot. at 16-18, is meritless.  Sonos points to a

16  "Recital" referring to "███████████████████████████████████ to

17  conclusorily argue that ███████████████ refers only to development work by Google

18  ███████████████████████████████████████████████████████████████

19  ███████   Mot. at 17 (emphasis added).  But the ownership provisions of the agreement are not

20  limited to a Sonos controller application.  Nowhere in the definitions of Integrated Service Offering

21  or Provider Developments is a ███████████████" referenced."  *See id.* at 16.  Instead,

22  those definitions refer to the development of an application that ***directly*** controls Sonos speakers,

23  and it is undisputed that Google's work on the cloud queue API was for just such an application.[910]

24      Moreover, Sonos's interpretation of the CIA to encompass only an integration using Sonos

25  controller application, as opposed to a direct playback implementation, ignores another provision of

26  _____

27  [10]  To the extent Sonos is interpreting "Sonos MMS" to mean the "Sonos controller app," this is

28  wrong.  ███████████████████████████████████████████████████████████████
    ███████████████████████████████████████."  CIA at Recitals.

1   the agreement that states that the launch of the Integrated Service Offering ██████████

2   ████████████████████████████████████████████" CIA § 3.3.  As discussed

3   above, the parties intended for Google's MRP protocol to be used only for the *Direct Playback*

4   *Integration*.  Sonos's product manager testified that MRP was "████████████████

5   █████████████████████"—*i.e.*, direct playback from a third-party music

6   application onto Sonos speakers.   Ex. 9 (Bender Tr.) at 60:10-15.  Cloud queue was a direct follow-

7   on to the MRP implementation.  *See, e.g.*, SONOS-SVG-200099470 ("Cloud Queue" listed under

8   "Google Play Music MRP Feature Status").  And numerous Sonos ████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████. *See, e.g.*, Ex. 33 (Valente Dep Tr.) at

11  59:10-14 ████████████████████████████████████████

12  ████████████."); *see also* Ex. 3 (Corbin Tr.) at 69:23-69:25.

13        Finally, Sonos's argument that the Direct Playback Integration is outside the scope of the

14  CIA because the Recitals refer to ████████████████████████████

15  ████" is undermined by Sonos's own contention that another of its agreements, containing the same

16  language, ***does*** encompass "direct control technology."  Mot. at 8.  Indeed, the Recitals of the 2018

17  SIA state: "████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████ SIA at Recitals.

20  Reference to "████████████████████████████ does not preclude an

21  agreement from encompassing a Direct Playback Integration.

22        The definition of ████████████████" encompasses the parties' Direct Playback

23  Integration, and the definition of "████████████████" encompasses Google's work on the

24  cloud queue API.  Therefore, the ownership provisions of the CIA apply here.

25              (b)    *The Extrinsic Evidence Confirms That The CIA Encompasses*
                       *Google's Cloud Queue Development Work*
26

27        ***Sonos's own witnesses*** have testified that the CIA covered the direct playback portion of the

28  collaboration.  Notably, when asked whether the "████████████████████████

1  ███████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████.”  Ex. 9

3  (Bender Tr.) at 221:25-222:9 (emphasis added).  She further confirmed that the CIA ████████

4  █████████ of the direct playback integration using MRP and "████████████████████████

5  ████████████████████████" that leveraged cloud queue technology.  *Id.* at 224:8-14.  At

6  least one other Sonos witness confirmed the same.  *See, e.g.*, Ex. 34 (Torgerson Tr.) at 188:9-189:10

7  ("Q. ███████████████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████████

10  (emphasis added).

11       In contrast, none of the extrinsic evidence Sonos points to indicates that there no genuine

12  dispute of material fact as to whether the 2013 CIA covers the direct playback integration.  Sonos

13  references self-serving testimony cherry-picked from its own counsel's deposition (Mot. at 19), who

14  was not involved in the negotiation of the CIA and was not ████████████████████████

15  ███████████████████████████████████████████████████████████████

16  ██████████████" the CIA.  Ex. 35 (Kwasizur Tr.) at 43:7-9, 47:19-23.  But that testimony merely

17  indicates that Sonos had a "form" agreement that it entered into with other third parties during the

18  timeframe of the Google-Sonos collaboration.  Mot. at 19 (citing Dkt. 480-8).  And the evidence is

19  that the CIA between Google and Sonos was *not* a form agreement, but rather a custom one that was

20  ████████████████████████████████████████████.  *See* Ex. 10 (SONOS-SVG2-00080510)

21  at -510; Ex. 9 (Bender Tr.) at 190:21-191:1.

22       Finally, contrary to Sonos's assertion, the 2018 SIA does not support its position.  That the

23  parties decided to enter into another collaboration related to a different product has nothing to do

24  with whether the CIA governing the earlier collaboration relates to a direct playback integration.

25       Regardless, at best, Sonos's extrinsic evidence would create a dispute of fact that should be

26  resolved by a jury.  *City of Hope*, 43 Cal.4th at 395 (where "ascertaining the intent of the parties . .

27  . depends on the credibility of extrinsic evidence, that credibility determination and the interpretation

28  of the contract are questions of fact that may properly be resolved by the jury").  Summary judgment

1    that the CIA means something other than what Sonos's own witnesses testified it means—which is

2    what Sonos is asking for here—is inappropriate.

3                    2.        Sonos Breached The CIA By Claiming Rights In The Cloud Queue API

4            "Ordinarily, whether a party has performed as required under the contract is a question of

5    fact for a jury, not a judge, to decide." *See Workplace Tech. Research, Inc. v. Project Management*

6    *Institute, Inc.*, 2021 WL 4895977, *9 (N.D. Cal. Oct. 20, 2021) (citing *Stonebrae, L.P. v. Toll Bros.*,

7    2009 WL 1082067, at *5 (N.D. Cal. Apr. 22, 2009)); *Ash v. N. Am. Title Co.*, 223 Cal. App. 4th

8    1258, 1268 (2014) ("[D]eterminations of whether there was a breach of contract . . . are questions

9    of fact."); *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1161 (E.D. Cal. 2009) (same).

10           Here, there is substantial evidence from which a jury could conclude that Sonos has breached

11   the CIA by claiming rights in the cloud queue API.  Sonos's breach is not an isolated instance.  At

12   trial, the jury will be presented with evidence showing Sonos breached the CIA multiple times.

13   First, six months into the parties' collaboration Sonos filed a new patent application that Sonos

14   witnesses admitted was intended to cover the cloud queue API and that contains disclosures

15   traceable to documents created by Google during the collaboration.  Sonos has obtained multiple

16   patents from this disclosure.  *See* Section I.C.1. Second, Sonos amended the claims of the '033

17   patent in 2019 to introduce limitation purportedly covering the cloud queue technology.  *See* Section

18   I.C.2. Third, Sonos used Google's cloud queue API—including material in documents that Google

19   shared with Sonos during the collaboration—with its other partners (removing references to Google

20   and rebranding the cloud queue API as its own).  *See* Section I.C.3.  Fourth, Sonos has attempted to

21   exercise dominion over Google's right to commercialize the cloud queue API by accusing the cloud

22   queue API of infringement in this lawsuit.  *See* Section I.C.4.  In its motion, Sonos's motion

23   addresses ***only*** whether its amendment to the '033 patent breached the CIA, while ignoring every

24   other instance of breach.  Mot. at 10-15.  But a reasonable jury could find Sonos breached the CIA

25   for any one (or all) of the other reasons Google has identified.  Sonos's failure to address each

26   instance in which it breached the CIA is fatal to its motion.

27           Sonos's argument that the '033 patent claims priority to the '237 application filed in 2011

28   and is thus "pre-existing intellectual property" that could not be covered by the CIA is the same

1   flawed argument that Sonos raised previously at the pleading stage.  Dkt. 111 at 6.  The Court found

2   then that this argument was a "non-starter."  *Id*.  As the Court explained, claims "can be monkeyed

3   around with."  Ex. 39 (1-13-2022 Hearing Tr.) at 17:7-19:4.  That is what occurred here.

4          Sonos seeks to side-step this issue by arguing that the amended claims in the '033 patent are

5   supported by the written description in the "pre-existing" specification.  As a preliminary matter,

6   Sonos's attempt to turn Google's breach of contract claim into a written description dispute is a

7   strawman for at least two reasons.

8          <u>First</u>, the term "pre-existing intellectual property" does not appear anywhere in the CIA.

9   Rather, Sonos relies upon a provision in the CIA that states ████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████  Ex. 34  (Torgerson Tr.) at 57:7-

16  12.  Thus, the cloud queue API is not intellectual property that arose from or related to Sonos's

17  products ████████████ from prior to the collaboration.  And regardless of the date a patent may

18  claim priority to, "[u]ntil the patent is issued, there is no property right in it."  *Marsh v. Nichols,*

19  *Shepherd & Co.*, 128 U.S. 605, 612 (1888).  No IP right existed in the '033 patent until after 2019.

20         <u>Second</u>, the CIA prohibited Sonos from ████████████████████████████████████

21  ████████████████████████████████.  CIA § 3.4.  The asserted claims of the '033 patent were

22  amended in an attempt to cover Google's development work in 2019, years after the cloud queue

23  API launched.  Regardless of what Sonos disclosed in a specification filed in 2011, Sonos agreed in

24  2013 not to claim Google's development work as its own, whether based on some previously filed

25  specification or otherwise.  Sonos's amendment of its patent claims in 2019 in an attempt to exercise

26  ownership over the cloud queue API and to block Google from using it was a violation of the CIA.

27         Turning to the substance of Sonos's written description arguments, they are at minimum not

28  amenable to summary judgment because "[w]ritten description cases are intensively fact oriented."

1    *Indivior UK Limited v. Dr. Reddy's Laboratories S.A.*, 18 F.4th 1323, 1329 (Fed. Cir. 2021); *Hynix*

2    *Semiconductor Inc. v. Rambus Inc.*, 2011 WL 1815978, at *13 (Fed. Cir. 2011) ("Whether a claim

3    is supported by an adequate written description is a factual inquiry, and has been for some time.").

4    "The test for adequate written description is whether the disclosure of the application relied upon

5    reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject

6    matter as of the filing date." *Indivior*, 18 F.4th at 1328.  "A description that amounts 'to no more

7    than a wish or plan for obtaining [the claimed invention]' fails the written description requirement."

8    *CreAgri, Inc. v. Pinnaclife, Inc.*, 2013 WL 6673676, at *12 (N.D. Cal. Dec. 18, 2013) (citing *Ariad*

9    *Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)).  Here, Google's expert, Dr.

10   Bhattacharjee, has provided detailed opinions that the disclosure in the 2011 specification does not

11   convey to a skilled artisan that Sonos had possession of the subject matter in its amended claims,

12   including the limitations regarding playing back a "remote playback queue."  Dkt. No. 480-13

13   (Bhatta. Op. Rpt.) ¶¶689-702; Ex. 36 (Bhatta. Op. Rpt.) ¶ 715; Ex. 37 (Bhatta. Op. Rpt.) ¶¶162-173.

14   The evidence and opinions provided by Dr. Bhattacharjee at least create a triable issue of fact.

15       At trial, the jury will also be presented with substantial evidence corroborating Dr.

16   Bhattacharjee's written description opinions.  For example, prior to its collaborations with Google,

17   Sonos's collaborations with other music service partners did ***not*** implement a cloud queue—they

18   used only a local queue on the Sonos speaker.  *Supra* § I.A .  Sonos attempts to brush these facts off

19   as "irrelevant" because actual reduction to practice is not necessary for the specification to support

20   for the claims.  Mot. at 14.  "But the mere fact that examples and an actual reduction to practice are

21   neither necessary nor sufficient does not render them legally irrelevant," and evidence regarding

22   Sonos's failure to implement a working cloud queue implementation for years after its 2011 patent

23   filing will "shed light on whether possession would be understood."  *Life Tech. Corp. v. Pacific*

24   *Biosciences of California, Inc.*, 2012 WL 28712, at *2 (N.D. Cal. Jan. 5, 2012); *Wyeth v. Abbott*

25   *Lab.*, 2012 WL 175023, at *8 (D. N.J. Jan. 19, 2012) (considering testimony that neither inventor

26   "knew exactly how" to implement the claimed invention in assessing written description because

27   "[l]ogically, the inventors could not have described a knowledge that they did not possess.").

28       The lead example of purported written description that Sonos relies upon simply discloses

that a user can cause a web-based application to send audio and/or video data to a Sonos system:

> In another example of an application determining a playlist and/or other content for playback, **a user enjoys listening to music on an online music service (e.g., turntable.fm** or other virtual room that a user can enter to choose from a plurality of online disc jockeys (DJs) deciding what to play next) **using his Mac Book Pro™** at home. He likes the unique user experience the service offers, and he frequently hops from room to room discovering new music. To maximize sound quality, he plays the music on his household playback system (e.g., Sonos™). **A button or other indicator can be added to the turntable.fm Web application to switch the content being played to the playback system for output (e.g., to the Sonos™ system rather than or in addition to the Mac Book™).** While Web-based applications typically do not have access to items on a local network certain embodiments enable a third-party Web-based application (e.g., Turntable.fm) to talk to a playback system (e.g., Sonos™) in a certain way (e.g., may have to log in with a username and password), and the identified user has **the website send audio or audio and video down to a playback device** (e.g., a zone player) on the playback system local network to play music there (or some other media).

Mot. at 5 (citing '033 patent at 12:65-13:3).  In this embodiment, an individual can use their "Mac Book Pro" to navigate to a website for a music service (*e.g.*, a "Web-based application" for "turntable.fm") and then press a "button" to have the website "send audio or audio and video down to a playback device."  Ex. 37 (Bhatta. Reply Rpt.) ¶¶ 164, 172.  This embodiment fails to provide support for Sonos's interpretation of multiple limitations of the amended claims, including the remote playback queue limitations that Sonos added to the '033 patent via amendment.  *Id.*

For instance, the amended claims recite that a computing device (*e.g.*, a computer) "transmit[s] an instruction" to the playback device (*e.g.*, a Sonos speaker) for it to "take over playback responsibility of a remote playback queue" by performing the following steps: "(i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item."  *See* Section I.C.2.  Yet the embodiment cited by Sonos is devoid of any disclosure that the computing device ("MacBook Pro") transmits the claimed "instruction" to the playback device, let alone that the instruction causes the playback device to perform steps (i) to (iii), as interpreted by Sonos.  Ex. 37 ¶ 172.  Instead, in this embodiment, the user utilizes a MacBook Pro to direct the website to "send audio or audio and video down to a playback device."  In other words, the MacBook Pro sends an instruction to a website (not a

1  playback device), and the website sends audio/video to the playback device (the playback device

2  does not query (or communicate) with the website to obtain data identifying media items in a cloud

3  queue that it then uses to retrieve the audio/video).

4       Sonos's other attempts to show written description support also fail.  Opp. at 13-14.  Sonos

5  relies upon a single mention of a "shared queue."  *Id*. (citing '033 patent at 16:64-67).  The shared

6  queue is stored locally on the playback device.  *See supra*, fn. 4.  Sonos's other disclosures merely

7  state that a user can uses the third party application to queue music.  Opp. at 14 (citing '033 patent

8  at 17:8-14).  There is no mention of a "remote playback queue."  Ex. 36 (Bhatta. Op. Rpt.), ¶ 710.

9       Sonos also suggests that the written description does not need to support the full scope of

10  the claim.  Mot. at 12.  Sonos is wrong.  In fact, the case that Sonos points to held the claims invalid

11  because the specification did not demonstrate that "the patentee possessed the full scope of the

12  invention recited in [the] claim."  *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345

13  (Fed. Cir. 2005).  "[E]nough must be included" to convince a skilled artisan the inventors possessed

14  the full scope of the invention.  *Id*. at 1345.   Here, Sonos contends that the full scope encompasses

15  playing back a cloud queue, including by fetching data identifying the next one or more media items

16  in the cloud queue, and then using that data to retrieve the media items for playback.

17       In sum, Sonos's written description argument is not only wrong, it is (i) irrelevant to whether

18  Sonos breached the CIA by amending its '033 patent claims to purport to cover the cloud queue API

19  in 2019 and (ii) irrelevant to a whole host of other Sonos conduct that breached the CIA.  Sonos's

20  written description argument does not provide basis for summary judgment Google's contract claim.

21           **3.**    <u>The 2018 SIA Does Not Supersede the 2013 CIA</u>

22       Summary judgment on the ground of novation is also inappropriate because the 2018 SIA

23  does not constitute a novation of the 2013 CIA under California law.  The contracts address different

24  collaborations, and the 2018 SIA fails to reference, let alone expressly supersede, the 2013 CIA.

25       To prove the 2018 SIA novated the 2013 CIA, Sonos "must satisfy four essential requisites:

26  (1) the existence of a previous valid obligation; (2) the agreement of all the parties to a new contract;

27  (3) the extinguishment of the old contract; and (4) the validity of the new one."  *Synopsys, Inc. v.

28  *Ubiquiti Networks, Inc.*, 2017 WL 3485881, at *21 (N.D. Cal. Aug. 15, 2017) (internal marks

omitted).  Sonos must show these requirements with "clear and convincing" evidence."  *Fanucchi & Limi Farms v. United Agri Prod.*, 414 F.3d 1075, 1081-82 (9th Cir. 2005); *see also Miran v. Convergent Outsourcing Inc.*, 2016 WL 7210382, at *4 (S.D. Cal. Dec. 13, 2016).  "Essential to a novation is that it 'clearly appear' that the parties intended to extinguish rather than merely modify the original agreement."  *Malveda v. Experian Info. Sols., Inc.*, 2022 WL 94921, *2 (N.D. Cal. Jan. 10, 2022) (quoting *Howard v. Cty. of Amador*, 220 Cal. App. 3d 962, 977 (Ct. App. 1990)).

Under California law, the mere presence of a merger clause in a subsequent contract is not conclusive proof of intent to effectuate a novation.  *See, e.g.*, *Harper v. Charter Commc'ns, LLC*, 2019 WL 3683706, at *6 (E.D. Cal. Aug. 6, 2019) ("The presence of an integration clause in a contract is a factor which 'may help resolve' this issue, but it is not dispositive."); *WI-LAN*, Dkt. 278 at 56 ("An integration clause in a subsequent agreement can be evidence of a novation.  But, here, the integration clauses at issue are insufficient to establish a novation.") (internal citations omitted); *Scheer v. Tollman*, 1996 WL 420172, at *5 (S.D.N.Y. July 25, 1996) ("Although the Consulting Agreement contained what is referred to commonly as a merger or integration clause, such a clause is not dispositive under California law on the issue of whether the written contract contains the parties' entire agreement").  Courts have also consistently held that "it does not 'clearly appear that the parties intended to extinguish rather than merely modify the original agreement'" where the subsequent contract "does not reference the original [] agreement in any manner."  *Malveda v. Experian Info. Sols., Inc.*, 2022 WL 94921, at *3 (N.D. Cal. Jan. 10, 2022); *see also WI-LAN*, Dkt. 278 at 58 (finding that "the integration clauses contained in the 2006 agreement are insufficient as a matter of law to constitute a novation of the 2000 agreement" in part because "the 2006 agreements do not expressly reference the 2000 agreement and contain no express language stating that the 2000 agreement is superseded, terminated, cancelled, or modified"); *Vallely Invs., L.P. v. BancAmerica Com. Corp.*, 88 Cal. App. 4th 816, 832 (2001) ("A novation requires an express release by the party entitled to enforce a promise.").

Novation "is a highly fact-specific inquiry" that "is not generally suitable for disposition on summary judgment."  *Glob. Trim Sales, Inc. v. Checkpoint Sys. UK Ltd.*, 2014 WL 12690629, at *3 (C.D. Cal. Sept. 17, 2014) (cleaned up); *Fanucchi*, 414 F.3d at 1082 ("Determining [] parties' intent

1   is a highly fact-specific inquiry… not generally suitable for disposition on summary judgment.").

2           Sonos relies solely on a generic merger clause in the 2018 SIA to establish novation.  *See*

3   Mot. at 15-16.  But contrary to Sonos's assertions, the 2018 SIA's merger clause is not

4   "unambiguously clear" that the 2018 SIA extinguishes the 2013 CIA.  Mot. at 16.  To the contrary,

5   the merger clause in the 2018 SIA cannot be a novation of the 2013 CIA because the 2018 SIA and

6   2013 CIA are directed to different subject matter.  *See* SIA § 12.8 ███████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████ (emphasis added).

10  While the subject matter of the 2013 CIA was Google's and Sonos's collaboration on the integration

11  of GPM with Sonos products,[11] the subject matter of the 2018 SIA is Google's and Sonos's attempt

12  to ███████████████████████████████████████.  *See* Ex. 35 (Kwasizur Tr.) at

13  129:11-22 ███████████████████████████████████"); 2018 SIA Ex. B, § 12.3, § 2.2.1.

14          Indeed, Sonos's integrations with GPM and ████████████ were clearly separate projects

15  with discrete teams.  ██████████████████████████████████████████████████████

16  ██████████████████████████████████████████████.  Ex. 40 (SONOS-

17  SVG2-00080142).   The relevant ████████ technical team operated independently of the GPM team

18  that participated in the 2013 collaboration.  Ex. 41 (SONOS-SVG2-00083495) at -495.  And ████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████.  *Id.*; Ex. 42 (SONOS-SVG2-

21  00195493) at -493.  Since the 2013 CIA and 2018 SIA relate to different projects with different

22  music services at different times, "the language in the various agreements suggests that they were

23  not intended to cover the same subject matter."  *WI-LAN Inc. v. LG Electronics, Inc.*, No. 18-cv-

24  01577-H-BGS, Dkt. 278 at 57 (S.D. Cal. Oct. 24, 2019).  There could not be any novation here.

25          Under these circumstances, Sonos has not provided "clear and convincing" evidence that the

26  parties intended for the 2018 SIA to extinguish the 2013 CIA, when the SIA and its "boilerplate"

27  ─────────────────────────

28  [11] Exhibit B of the CIA defines the ████████████████████████████████████████████

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS

merger clause fail to reference, let alone expressly supersede, the CIA.[12]  *See* SIA; Ex. 35 (Kwasizur Tr.) at 161:22; *see also id.* at 32:20-33:4, 154:6-13.  Because Sonos has not presented "facts or evidence to the Court to indicate that [Google] intended to extinguish the [2013 CIA] and intended to create a new contract with new obligations," *Miran*, 2016 WL 7210382, at *4, the Court should deny Sonos's motion for summary judgment.  *See, e.g.*, *Reuland Elec. Co. v. Burgi Engineers LLC*, 2015 WL 12683953, at *8 (C.D. Cal. Apr. 24, 2015); *Glob. Trim Sales*, 2014 WL 12690629, at *4.

**B.    Summary Judgment On Google's Conversion Claim Is Improper Because There Are Genuine Issues Of Material Fact**

Sonos's request for  summary judgment on Google's conversion claim is based only on the  arguments it raises for Google's breach of contract claim.  Because these two claims are not the same, Sonos has not met its burden and the Court should deny summary judgment.

Conversion is "the wrongful exercise of dominion over another's personal property in denial or inconsistent with his rights in the property."  *Protego Networks, Inc. v. Daniel Zenchelsky*, 2005 WL 8177596, at *4 (N.D. Cal. Oct. 11, 2005).  By relying upon information shared during the cloud queue collaboration to draft patents and claims that purport to exclude Google from using it development work in the cloud queue technology, Sonos has wrongfully exercised dominion over the cloud queue API—regardless of whether [1] the 2013 CIA covers the cloud queue development or [2] the 2018 SIA supersedes the CIA.  A reasonable jury could conclude—independent of the CIA—that Sonos improperly dispossessed Google of its property and rights in its cloud queue development work, and that Google, as a result, has been deprived of the beneficial use of its property.  Thus, regardless of the Court's determination on Google's breach of contract claims, summary judgment is not warranted regarding Google's conversion claims.

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny Sonos's motion.

---

[12]   The omission of any reference to the 2013 CIA in the 2018 SIA also renders the SIA insufficient "written notice of non-renewal" of the 2013 CIA.  *See* CIA § 6.1.

1    DATED:  February 21, 2023                QUINN EMANUEL URQUHART &
2                                             SULLIVAN, LLP

3

4                                       By   *Charles K. Verhoeven*
5                                             Charles K. Verhoeven (Bar No. 170151)
                                              charlesverhoeven@quinnemanuel.com
6                                             Melissa Baily (Bar No. 237649)
                                              melissabaily@quinnemanuel.com
7                                             James Judah (Bar No. 257112)
                                              jamesjudah@quinnemanuel.com
8                                             Lindsay Cooper (Bar No. 287125)
                                              lindsaycooper@quinnemanuel.com
9                                             50 California Street, 22nd Floor
                                             San Francisco, California 94111-4788
10                                            Telephone: (415) 875-6600
                                             Facsimile: (415) 875-6700
11

12                                            Marc Kaplan *(pro hac vice)*
                                              marckaplan@quinnemanuel.com
13                                            191 N. Wacker Drive, Ste 2700
                                             Chicago, Illinois 60606
14                                            Telephone:     (312) 705-7400
                                             Facsimile:     (312) 705-7401
15

16                                            *Attorneys for Google LLC*

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on February 21, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system and email.


*Charles K. Verhoeven*
Charles K. Verhoeven

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS