Pages 1 - 110

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
GOOGLE LLC,                        )
                                   )
             Plaintiff,            )
                                   )
   VS.                             ) NO. 20-cv-06754-WHA
                                   )
SONOS, INC.,                       )
             Defendant.            )
_____   )

SONOS, INC.,                       )
                                   )
             Plaintiff,            )
                                   )
   VS.                             ) NO. 21-cv-07559-WHA
                                   )
GOOGLE LLC,                        )
                                   )
             Defendant.            )
_____   )
```

San Francisco, California
Thursday, March 30, 2023

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Google:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street
22nd Floor
San Francisco, California  94111
**BY:  SEAN S. PAK, ESQ.**
**MELISSA J. BAILY, ESQ.**
**JOCELYN MA, ESQ.**
**LANA ROBINS, ESQ.**
**LINDSAY COOPER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court
        (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Sonos, Inc.:

                      ORRICK HERRINGTON & SUTCLIFFE, LLP
                      405 Howard Street
                      San Francisco, California  94105-2669
        BY:  **CLEMENT S. ROBERTS, ESQ.**
               **ELIZABETH R. MOULTON, ESQ.**


                      ORRICK HERRINGTON & SUTCLIFFE, LLP
                      355 South Grand Avenue
                      Suite 2700
                      Los Angeles, California  90071
        BY:  **ALYSSA M. CARIDIS, ESQ.**


                      LEE SULLIVAN SHEA & SMITH LLP
                      656 West Randolph Street
                      Floor 5W
                      Chicago, Illinois  60661
        BY:  **SEAN M. SULLIVAN, ESQ.**
               **RORY PATRICK SHEA, ESQ.**
               **JOHN DAN SMITH, III, ESQ.**
               **COLE BRADLEY RICHTER, ESQ.**


Also Present:              **PATRICK WESTON, ESQ.**

| | |
|---|---|
| 1 | **Thursday, March 30, 2023**                    **8:04 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE CLERK:** Calling Civil Action 20-6754, Google, LLC |
| 4 | versus Sonos, Inc., and all related cases. |
| 5 | Counsel, please approach the podium and state your |
| 6 | appearances for the record, beginning with counsel for |
| 7 | plaintiffs. |
| 8 | **MR. ROBERTS:** Good morning, Your Honor. I think we |
| 9 | agreed to realign the parties, so that makes me officially the |
| 10 | plaintiff now. |
| 11 | **THE COURT:** Have you all stipulated to that? |
| 12 | **MR. PAK:** Yes, Your Honor. This is Sean Pak. |
| 13 | **THE COURT:** All right. Please go ahead. |
| 14 | **MR. ROBERTS:** Good morning, Your Honor. This is Clem |
| 15 | Roberts from the Orrick firm, on behalf of Sonos. And with me, |
| 16 | I have a large number of people in the courtroom. My partner |
| 17 | Alyssa Caridis, Cole Richter, Libby Moulton, Sean Sullivan, |
| 18 | Rory Shea, and Dan Smith. |
| 19 | Thank you so much. |
| 20 | **THE COURT:** Okay. And? |
| 21 | **MR. PAK:** Good morning, Your Honor. Sean Pak on |
| 22 | behalf of Google, from Quinn Emanuel. And with me today is |
| 23 | Melissa Baily, Lana Robins, Jocelyn Ma, Lindsay Cooper. And we |
| 24 | have the client, Patrick Weston. |
| 25 | **THE COURT:** Thank you for being here. |

1          Okay, there are quite a number of motions.  And what I

2     would like to do is we'll pass for the time being the motions

3     to strike, and go to the motions for summary judgment, without

4     ruling yet on the motions to strike.  I want you to assume that

5     they will all be denied, though that's not necessarily true.

6     But for purposes of analyzing the summary judgment, I don't --

7     don't presume you are going to win on your motion to strike.

8          And on the motions for summary judgment, each side will

9     get one point.  You get to make one important point.  You can't

10    make every point.  We would just be here for weeks.

11         And then I'll give the other side a chance to respond to

12    that point, and then you get a rebuttal.

13         And then we'll flip it over, and they get to make a point.

14    And that would take quite a bit of time.  But you need to be

15    thinking of:  What is my most important point?

16         There's a lot of blather in these briefs where you each

17    say "judicial estoppel" and you -- so much finger-pointing and:

18    Oh, they said this five briefs ago, so they're stuck with it.

19    No.  We're not going to -- I want to get to the merits.

20         All right.  So we will now go to the '033 patent.  And I'm

21    confused now on this.  Let's see, wait a minute.  I've already

22    ruled that the '033 patent is infringed, haven't I?  No?  Or is

23    that the '885?

24              MS. BAILY:  That was --

25              THE COURT:  What did I do?  This doesn't -- doesn't

1   help me much here.  Here we go, '885.  That's right.  All

2   right, '885 is infringed.  And, okay.  So the '033, I have not

3   yet ruled on anything, correct.

4        So let's start with that one, the '033.  And who's the

5   plaintiff here?

6        Who's moving on that?  Both of you are moving?  Just

7   Google?

8            **MS. BAILY:**  Yes, Ms. Baily for Google.  Just Google

9   has made a motion --

10           **THE COURT:**  Says here that you're -- both sides are

11  moving on summary judgment.  All right.

12           **MS. BAILY:**  That's incorrect, Your Honor.

13           **THE COURT:**  All right.  My cheat sheet is goofing me

14  up.

15       Okay.  Who's moving on the '033?

16           **MS. BAILY:**  Google, Your Honor.

17           **THE COURT:**  And you're moving on what ground?

18  Invalidity?

19           **MS. BAILY:**  I'm moving on invalidity of the '033

20  patent.

21           **THE COURT:**  Is this the one that has "boyg"?

22           **MS. BAILY:**  No.

23           **THE COURT:**  That's the other one.

24           **MS. BAILY:**  That's the other one.

25           **THE COURT:**  Okay.  You get to go first and make your

1  most important point.  And then the other side gets to -- why

2  don't you sit down, though, first.

3      (Request complied with by Mr. Sullivan)

4          **THE COURT:**  So, Ms. -- Baily, right?

5          **MS. BAILY:**  Yes.

6          **THE COURT:**  You can take your mask off too.

7      All right.  I know it sounds like -- I've actually spent a

8  lot of time trying to figure this out.  So I want you all to

9  take note, I've spent hours on this in the last few, few weeks.

10 And I still am confused.  Think about what the poor jury's

11 going to be like.

12     And you're not going to get that much time.  You can't.

13 I've got other cases left over from the pandemic.  It'll be

14 less than 20 hours, in the range of 14 to 16 hours, is what

15 you're going to get at trial.  So think about how you're going

16 to be putting -- you can't make every single possible point.

17 So think about what are your most important points.

18     All right.  Ms. Baily, I'll stop preaching, and let you go

19 ahead on the '033.

20         **MS. BAILY:**  Yes, Your Honor.  And I can pick my most

21 important point, but does Your Honor have a specific point that

22 you would prefer?

23         **THE COURT:**  I don't have any -- I don't.  I've got a

24 draft order here.  One side wins and one side loses on the

25 draft order.  I'm not going to tell you who.  But, you might

1    convince me one way or the other here.  So I want to make sure

2    that we address your most important point.

3        **MS. BAILY:**  Okay, Your Honor.  Is it all right with

4    Your Honor if I have three sentences of context?

5        **THE COURT:**  Sure.  That's great.  Please.

6        **MS. BAILY:**  So we're talking about the '033 patent

7    here.  This is the remote playback queue patent.  And Google

8    moved for invalidity of that patent in view of YouTube Remote

9    Version 2.

10        **THE COURT:**  Uh-huh.

11        **MS. BAILY:**  And one of the grounds of invalidity that

12    Google moved on was the party mode of YouTube Remote Version 2.

13    So my most important point relates to the party mode, because

14    -- go ahead.

15        **THE COURT:**  Yes, I'm sort of up to speed on that.  But

16    I must tell you, even as I get into it and think I understand

17    it, the next day I don't remember it.

18        It's so -- do you have a cartoon or a chart or something?

19    A picture?  Cartoons definitely help me.  So if you've got one,

20    I --

21        **MS. BAILY:**  Sure.

22        **THE COURT:**  I would like to start with that so I can

23    keep the -- pictures help me keep it straight.

24        **MS. BAILY:**  Sure.  If we go could go to the slides,

25    I'll just --

1          **THE COURT:**  You got a -- on the screen, okay, great.

2          **MS. BAILY:**  I can hand up a copy if that's easier for

3   Your Honor.

4          **THE COURT:**  Okay, and my law clerk.

5       (Document tendered to the Court, the law clerk and the

6   court reporter)

7          **MS. BAILY:**  So Your Honor, I'll throw up the picture

8   first.  If you go to Slide 14.

9       (Document displayed)

10          **THE COURT:**  Right there.

11          **MS. BAILY:**  Just to orient ourselves in party mode, I

12   think it's -- I guess everything could be disputed, but I think

13   it's fundamentally undisputed that there is a playlist which

14   the Court construed as a list of media items to be played back

15   that is located in the cloud, which, under Sonos's

16   interpretation would be a remote playback queue would be

17   remote, because it's not on either the phone or the playback

18   device.  The phone is on the left, the playback device is this

19   screen on the right.

20          **THE COURT:**  Wait I followed you up until the last

21   sentence.  Say that last sentence again.

22          **MS. BAILY:**  So the party queue is in the cloud

23   (Indicating) and it is not on the phone on the left, which is

24   the controller device, or on the playback device pictured on

25   the right, which is the screen.

1          THE COURT:  Okay.

2          MS. BAILY:  So I think the parties -- there are

3    statements made going back and forth about whether the party

4    queue and party mode is a remote playback queue, as required by

5    limitations 1.4, and then flowing through the claims and

6    limitations 1.7, going on.

7          And then, if we could just throw up slide 13, I can just

8    orient you to the claim language.

9          (Document displayed)

10          MS. BAILY:  So limitation 1.4 requires a computing

11    device -- which in the picture is a phone -- that's configured

12    for playback of a remote playback queue provided by a

13    cloud-based computing system.

14          And so the contention is that party mode from YouTube

15    Remote prior art is such a remote playback queue that is

16    provided to the computing device in limitation 1.4.  And it is

17    also --

18          THE COURT:  Wait, okay.  So maybe I'm confused,

19    myself.  But I thought I read in the materials that even if you

20    turn the -- the cloud off so that the cloud wasn't connected up

21    to the two phones anymore, or the YouTube, it would still play.

22    Therefore, therefore, the queue doesn't necessarily come from

23    the cloud; it can -- it still comes from the telephones.

24          MS. BAILY:  So I don't believe that that is accurate.

25    But even if it was, the -- I think it's undisputed the queue

1   that runs the show, the source of truth of the queue, of what

2   to play back next, the place where edits to the queue are made

3   and saved is in the cloud.  And only once the cloud

4   disseminates that information to the playback device does the

5   playback device know what to play next.

6        And so for example, if a user edits a queue to add a

7   video, it makes that edit, and what has to happen before the

8   playback device understands what to play next with respect to

9   the added video is that the queue in the cloud has to change.

10  That's the source of truth.  And it's the information in the

11  queue in the cloud that then gets relayed back to the playback

12  device so that the playback device knows what to play next.

13           **THE COURT:**  Tell me -- let's use your Page 14.

14       (Document displayed)

15           **MS. BAILY:**  Sure.

16           **THE COURT:**  And walk us through step by step, in

17  chronological order, how the party mode worked.  And let's take

18  our time, to make sure that I grasp how the party mode worked.

19  I thought I did, but now you're making me think I did not

20  understand it.

21       All right.  So what would Step 1 be, Step 2, Step 3 and so

22  forth?

23           **MS. BAILY:**  Sure.  So a user with a phone can elect to

24  enter party mode on the phone.

25           **THE COURT:**  So which is User 1 and User 2?  Let's say

1    the one on the left is No. 1.  And then you're going to have --

2    I'm on Page 14 -- and then the second phone is -- what would we

3    call that?  The guest or --

4         **MS. BAILY:**  So Your Honor, if you want to go to

5    slide 17, I have a guest user and a host user.  Maybe that will

6    help just distinguish between the two phones.

7         (Document displayed)

8         **THE COURT:**  All right, let's go to 17.  There we go.

9    Okay, host user -- that's great.  All right.  So, let's start

10   with the host user.  What's Step 1?

11        **MS. BAILY:**  So the host user has a playlist that it

12   wants to share in a party.  So it goes into -- it selects --

13        **THE COURT:**  Give me a real example.

14        **MS. BAILY:**  Sure.

15        **THE COURT:**  Like, I don't know.  Joan Baez.  Does that

16   work?

17        **MS. BAILY:**  Sure.

18        **THE COURT:**  Okay.  So, what would that translate to?

19   Would that be her best hits?

20        Would it be -- how -- the host user puts in -- I don't --

21   I want you to know, I don't use YouTube, hardly ever.  I can't

22   say never.  I am not one of these -- I don't do all these

23   magical things very often.  So I am not like you young people

24   who understand this intuitively.  I have to learn it fresh.  I

25   do have an iPhone.  That part I do have.

 1      So let's say I'm the host user, and I want to put in a

 2  list of Joan Baez songs.  Do I put those in?  Or does the

 3  company give me a prefab list?

 4      How does that work?

 5          MS. BAILY:  Either way.  So for example --

 6          THE COURT:  Let's do it so that I put in my list of my

 7  favorite Joan Baez songs.  And there are five I want to just

 8  repeat over and over again.

 9          MS. BAILY:  Okay.

10          THE COURT:  So I put those five, and I don't have a

11  guest user yet.  So how do I -- and I'm talking about party

12  mode, what -- already -- the actual prior art.  How would I do

13  that?

14          MS. BAILY:  So you basically opt to go into party mode

15  and then a message gets sent to the queue, to the cloud, and

16  the cloud creates a party queue.

17          THE COURT:  No, I want to create it.  I want to come

18  up with my own list.

19          MS. BAILY:  It creates a party queue that is populated

20  with your list?

21          THE COURT:  I see.

22          MS. BAILY:  So say you're playing your list of five

23  songs.

24          THE COURT:  So I've got A, B, C, D, and E songs, and I

25  send that up to the cloud and it creates a party queue, and

```
 1  populates it with my five.
 2          MS. BAILY:  Right.
 3          THE COURT:  Then what?
 4          MS. BAILY:  Then the party queue tells the other
 5  devices in the party, so if you're having a party with B --
 6          THE COURT:  Just one other person.
 7          MS. BAILY:  Right, so the guest, or it could be me,
 8  right?
 9          THE COURT:  Right.
10          MS. BAILY:  So I'll get the party queue on my phone.
11          THE COURT:  You could be anywhere in the world?  Or do
12  you have to be close by where I am?  Where, where --
13          MS. BAILY:  I hadn't looked into that.  I assume I
14  could be anywhere.
15          THE COURT:  So let's say you're in a different state,
16  altogether.  Okay?  All right.  So I send -- so how do I --
17  really, I don't understand how it works that well.
18      So I'm in California, and I send my five to the queue.
19  And I say I want to share that with a guest, and somehow I name
20  you as my guest?
21          MS. BAILY:  Yes.
22          THE COURT:  Where does that message go?  Does that
23  message go to the cloud, and then the cloud tells you?  Or do I
24  somehow communicate directly to you that I'm -- how does that
25  work?
```

1          **MS. BAILY:** Well, so -- and I apologize.  I'm going to

2    try to answer your question.  From my perspective, it wasn't

3    germane to the issue of invalidity that I'm raising here, so

4    I'm going to do my best.

5          **THE COURT:** Do your best.

6          **MS. BAILY:** But I believe that it gets relayed through

7    the cloud.

8          **THE COURT:** To you.

9          **MS. BAILY:** To me.

10          **THE COURT:** And let's say you're in, I don't know,

11    Texas.  All right.  So you're in Texas.  And then, what appears

12    on your phone?

13          **MS. BAILY:** So I will have the party queue that is in

14    the cloud, that was created in the cloud when you opted to go

15    into party mode.

16          **THE COURT:** When you say you will have it, does that

17    mean that the queue is downloaded onto your machine?  Or what

18    does it mean that you have it.

19          **MS. BAILY:** Well, it's not downloaded (Indicating

20    quotation marks), because it remains in the cloud.  But my

21    phone is sent information about the list of songs or videos

22    that is in the cloud queue that was created when you went into

23    party mode.

24          **THE COURT:** All right, so that's A, B, C, D, and E

25    songs.  So you will get that list.  Is that right?

1          **MS. BAILY:**  So my phone will get information from the

2   party queue about the -- the IDs of the videos that are in that

3   cloud queue.  And so then, they could be played back on my

4   phone.

5          **THE COURT:**  Well, what if you are busy working on some

6   patent case in Texas, and you don't want to listen to it?

7   Does -- does my inviting -- does it override what you're doing,

8   and force its way into your screen?  How does that -- what

9   happens?

10      Or is it just -- there's a little header that says:

11   You're now a guest user for Judge Alsup Joan Baez list?  How

12   does it work?

13      In fact, it would be great if you had an animation here.

14   Or you could actually demonstrate it to me right now, would be

15   very useful.

16          **MS. BAILY:**  I have a video of the service recommended

17   playlist, but I don't have a mock-up of this party queue.  But

18   maybe I can try to narrate it for you, and give you a --

19          **THE COURT:**  All right, go ahead.  Do your best.

20          **MS. BAILY:**  Let me start at the highest level, and

21   then maybe we can take it where you have questions.

22      So the host user has a playlist, like you said, A, B, C,

23   D.  And they want to go into party mode.  So they're playing

24   the song.  They want to go into party mode.  They go into party

25   mode, and a queue, a party queue is created in the cloud.  And

1    the party queue has the list of videos that was in the queue

2    that you had when you launched party mode.  So now there is a

3    queue in the cloud, called "The Party Queue."

4        The party queue provides information about what is in its

5    list to the guest user on their phone, and to any playback

6    devices, like the TV.

7        So, so one example would be you're at home, and, you know,

8    I come over.  And so you're the host user.  You hit party mode.

9    You create a cloud in the queue.  Now I have access to that

10   cloud in the queue.  And the cloud -- sorry, to the queue in

11   the cloud.  And the queue in the cloud also provides

12   information related to what's in the queue to the TV that we're

13   all watching.

14       Now, then --

15           THE COURT:  So on your chart it says "Guest User," and

16   it doesn't look like a TV.  It looks like a phone.

17           MS. BAILY:  Right.  The TV's on the right.

18           THE COURT:  I see.

19           MS. BAILY:  So it goes to both.  It goes to both.  It

20   goes to the users that you invite to the party, but also to the

21   playback device that you are watching.  And maybe it's multiple

22   playback devices.  Maybe you have a playback device in the

23   kitchen and a playback device in the living room, so you have

24   two TVs, and you want to play the videos on both TVs.  So any

25   playback devices will get information from the cloud queue

1    regarding the list of videos in that queue, and any other users

2    that you have invited to party mode.

3        And the reason why it works this way is because then both

4    you and I could edit the party queue.  Because now, the party

5    queue isn't on your phone.  The party queue is in the cloud.

6    And so now I have equal access to the party queue.

7            THE COURT:  So you could delete the A, B, C, D, and E.

8            MS. BAILY:  I could.

9            THE COURT:  Why would you want to -- that would

10   sabotage my plan.

11           MS. BAILY:  And maybe that would be the intent.  I

12   don't know.

13           THE COURT:  I don't know.  What -- okay.  But maybe

14   you could just add one that maybe I forgot.

15           MS. BAILY:  Exactly.

16           THE COURT:  All right.

17           MS. BAILY:  And so if you take the example, you know,

18   you started with a list of five.  Now it's in the queue because

19   we're in party mode.  And the whole point is that now I can

20   edit the queue in the cloud, and I can say:  Add Video E.  A

21   sixth one.

22       Now, the cloud has been told to add Video E, the sixth

23   video.  The cloud makes the change in the queue, in the cloud.

24   And it is only once it does that that it tells your phone that

25   I made the change.  Not that I made the change; that's

imprecise.

It tells your phone that the sixth video has been added. And it tells the TVs in the living room and the kitchen --

**THE COURT:** This one over here (Indicating).

**MS. BAILY:** There's only one there. But to demonstrate, I -- it can be multiple TVs.

**THE COURT:** All right. It tells it what?

**MS. BAILY:** It tells it that the sixth video has been added. And so I edit the queue in the cloud, and now the queue in the cloud has the definitive version of the playlist.

And now it's going to tell all the devices in the party that: The list has been changed, and here's the information so that you know what to play next.

**THE COURT:** Okay. Now, do you think both sides agree that that's the way party mode worked?

**MS. BAILY:** I do believe that both sides agree that's the operation of the technology. Yes.

**THE COURT:** So how does that read on our 1.4 and 1.7? Explain why this renders Claim 1 invalid.

**MS. BAILY:** Sure. So the limitations in dispute, like you said, are 1.4 and 1.7. 1.4 requires: Operating in a first mode in which the computing device -- which is the phone, your phone -- is configured for playback of a remote playback queue provided by a cloud-based computing system associated with a cloud-based media service.

1          And the only dispute that there is is whether the playback

2     -- whether -- I apologize -- the party queue in the cloud is a

3     remote playback queue.  So the dispute is whether in the

4     picture on Slide 14 -- or, I guess we were on 17 -- whether the

5     party queue depicted in the cloud is a remote playback queue.

6     So that's one of the points of dispute.

7          Now, a playback queue has been construed to mean:  A list

8     of videos selected for playback.  And that is clearly what the

9     party queue in the cloud is.

10         And Sonos has interpreted "remote" to be something that is

11    not local, meaning not on the phones, and not on the TVs, which

12    would be the playback devices.  And because the queue is in the

13    cloud, it is remote.

14         And I would direct your attention, Your Honor, to Slide 17

15    -- or to Slide 18.

16         (Document displayed)

17         **MS. BAILY:**  Now, in Slide 18, we have excerpts from

18    the source code.

19         And actually, we can take it down from the monitor.

20         (Document taken off display)

21         **MS. BAILY:**  The excerpt from the source code makes

22    clear that the party queue is a playlist that lives on the

23    server.  So you see on the top box, it says "party mode."  And

24    then it says:  The definitive version of the playlist -- so

25    that's a playback queue, a list of videos for playback -- lives

```
 1   on the server.  So it is remote from the phones and the

 2   playback devices.

 3        And in the second box, you see where the source code

 4   actually says it is a remote queue.  The party queue, which is

 5   in the cloud.

 6             THE COURT:  These are comments in the source code?

 7             MS. BAILY:  These are the comments in the source code.

 8             THE COURT:  And were these fixed up recently?  Or back

 9   in 2010 or whenever?

10             MS. BAILY:  No.  These are from the source code that

11   is the prior art.

12        (Reporter clarification)

13             MS. BAILY:  These comments are in the source code that

14   is and constitutes the prior art.

15        The other thing that's important --

16             THE COURT:  What does the other side -- I'm going to

17   hear what they say in a minute.  But what is their answer to

18   you, and then what's your answer to that?

19             MS. BAILY:  Sure.  So I think -- let's see.  I think,

20   for the most part, actually, there is some agreement here, at

21   least with respect to Sonos's expert.

22        If we could look just for a minute at Slide 22, Slide 22

23   shows Your Honor's order from the showdown.

24        (Document displayed)

25             MS. BAILY:  And it talks about what you were thinking
```

 1  about when you were identifying whether there was a cloud

 2  queue.  And the things you identified are, you know:  Where is

 3  the queue that's running the show?  Where are the changes to

 4  the queue made that dictate what all the devices play back?

 5       And so those were some of the considerations that you were

 6  taking into account, in determining:  Well, where can I find

 7  the queue?

 8       And as I explained before, and I think as the parties

 9  agree, and if you look at Slide 23, this is this example where

10  you're adding a video.

11       (Document displayed)

12       **MS. BAILY:**  So one user adds a video.  The change has

13  to get made in the cloud.  You're changing the queue in the

14  cloud.  And then it's the queue in the cloud that dictates what

15  the devices will play.

16       So the queue in the cloud gets changed, and then the cloud

17  queue tells the playback device, like the TV on the right in

18  Slide 23, that it needs to change what it's playing from Video

19  1, 2 and 3 to Video 1, 2, 3 and 4.

20       And if you look at Slide 24, --

21       (Document displayed)

22       **MS. BAILY:**  -- that's Google's expert's analysis

23  supporting that.  And then on Slide 25, Sonos's expert agrees

24  that that's how it works.

25       (Document displayed)

1          **THE COURT:**  Go back to -- or to -- we were looking at.

2      (Document displayed)

3          **THE COURT:**  No, I think it was -- was it 17?  Yeah.

4  17.

5      I'm trying to figure out why your argument requires there

6  be a guest user.

7      (Document displayed)

8          **MS. BAILY:**  It doesn't require it.  It is how party

9  mode works, because it's for a, quote-unquote, party.  Right?

10 So the whole point of -- instead of you just having your own

11 queue and playing it back on a screen where you could maybe do

12 that directly without having a queue in the cloud, here,

13 because the whole point of party mode is to allow various users

14 to edit the same queue, the queue has to be remote from all the

15 devices.  And for that reason, in party mode, it is in the

16 cloud.

17         **THE COURT:**  Well, could the host user -- under party

18 mode, could the host user set up a party queue, but not invite

19 anybody else?  Just, just use the party queue, and then play it

20 on YouTube?  Or does it -- does it require the guest user to be

21 involved?

22         **MS. BAILY:**  I'm not sure I know the answer to that,

23 because a host user who doesn't want others involved would

24 typically not use party mode, because you could just cast the

25 playlist directly to your device.

```
 1        But in party mode, the point is that the cloud is in the
 2   queue.  And because it's in the queue, multiple people have
 3   access to it.  It is not local to the devices.  The queue
 4   that's running the show is in the cloud.  You can edit it; I
 5   can edit it.
 6        And then once the cloud, the master version, the cloud
 7   queue has the information, it can relay that information to the
 8   devices that are doing the playback.
 9        THE COURT:  All right.  Let me -- I'm going to let you
10   come back and say more.  But let me hear from the other side on
11   why this doesn't invalidate Claim 1 of the '033.
12        MR. SULLIVAN:  Sean Sullivan, on behalf of Sonos,
13   Your Honor.  And let me just say thank you for taking the time
14   to try to get through this.  I do understand it's complicated.
15        Let me try to explain as best I can for you.  If you have
16   any questions, let me know.
17        THE COURT:  My question is party mode.  Why doesn't
18   party mode invalidate Claim 1?
19        MR. SULLIVAN:  Yeah.
20        THE COURT:  All right.
21        MR. SULLIVAN:  Can I hand you up some slides,
22   Your Honor?
23        THE COURT:  Yes, of course.  If you've got an extra
24   set for my law clerk, that would be useful.
25        MR. SULLIVAN:  I do.  I do.  Thank you so much.
```

```
 1              THE COURTROOM DEPUTY:  Thank you.

 2         (Binders tendered to the Court and to the law clerk and

 3    the court reporter)

 4              THE COURT:  What shall I look at?

 5              MR. SULLIVAN:  Would you mind switching the screen for

 6    us, too, just in case?

 7         Let's take a look at Slide 22.  It's the first tab -- it's

 8    the '033 invalidity tab, Your Honor.  We've kind of put all the

 9    motions together today in the same binder.

10              THE COURT:  Yeah, okay.  22?

11              MR. SULLIVAN:  22.

12              THE COURT:  All right, I'm there.

13              MR. SULLIVAN:  Okay.  So this is party mode.  And what

14    you have is you have a phone.

15         And what I'm going to try to do here, Your Honor, just to

16    simplify things a little bit for you, you know, there's these

17    two limitations.  There's 1.4; there's 1.7.  1.4 talks about a

18    remote playback queue on the phones.  1.7 talks about a remote

19    playback queue on the screens.  I'm going to try to look at

20    this and help focus more on the screens in limitation 1.7, just

21    so that we're not talking about multiple phones and multiple

22    screens and it's getting too confusing.

23         So what you have here in party mode is you have your

24    phone, your five Joan Baez songs.  Right, that's in a local

25    playback queue.  You created that on your phone.  You put those
```

1   five songs in there.  You can play those songs back on your

2   phone.

3        You go into party mode, right, it sends your queue, a copy

4   of that queue, over to the Lounge MDx server, right?  The

5   Lounge MDx server keeps a copy of that playlist.  I'll show you

6   the messages in a second.  And then it sends it on to the

7   different screens.  So it transfers responsibility for playback

8   from the phone to now you're playing back those -- those same

9   five videos on your TVs or on your screens.

10       Those screens get a full copy, an entire copy, of what was

11  on your phone.  Same five Joan Baez songs.  They put it in

12  their local playback queue.  Okay, it's a local playback queue

13  on your phone.  It goes over and it's a local playback queue on

14  these screens.

15       Yes, a copy of the playlist is kept in the MDx server.

16  The reason being when you're in party mode, you have to go

17  across different YouTube accounts.  The host account, and the

18  guest account.  You need some way to synchronize across those

19  different accounts.

20       So that party playlist, the copy that's kept in the cloud,

21  it's just there to make sure to coordinate that everyone's

22  local playback queues are up to date.

23       So if we flip to slide -- I'm going to use the same

24  graphics here, Your Honor.  If you flip to Slide 14, you will

25  see what the messages look like.

1          (Document displayed)

2          **MR. SULLIVAN:**  By the way, these are the same messages

3    that are in non-party mode, which we all know is a local

4    playback queue system.

5          Okay.  So in party mode, the remote control will set the

6    set party playlist.  Again, that message is copied or sent to

7    the cloud.  All communication has to go through the cloud.  In

8    party mode or not in party mode, that's just how it works.  The

9    phones and TVs don't talk directly to each other.

10          So it goes to the cloud.  The cloud will then send a set

11    playlist message -- again, the five Joan Baez songs -- to each

12    of the TV screens.

13          Now, if we flip to Slide 17, you'll see what happens when

14    there's an update.

15          (Document displayed)

16          **MR. SULLIVAN:**  So on Slide 17, there's an update on

17    the phone.  Let's say you add a sixth Joan Baez song, or maybe

18    a Linda Ronstadt song.  You add an additional song to your

19    queue.  That is communicated to the lounge server.

20          The lounge server will then pass that along in an update

21    playlist message to both of the screens so that they can update

22    their local playback queues on those two different screens.

23    Everybody uses the local playback queue on their devices to

24    play back the media.

25          All right.  So if we turn to the next, slide 18, this is a

 1   point you raised, Your Honor.

 2        (Document displayed)

 3        **MR. SULLIVAN:**  What happens if the server goes down?

 4   Right?  Or the server's offline?  Here's what their expert

 5   said.  And in the next slide, I'll show what you the YouTube

 6   Remote engineer said.

 7        It says, bolded there:  The playback queue locally on the

 8   device, the playback queue could continue to play the queue.

 9   So when you have a local playback queue, you could continue to

10   play the queue even if there's a copy, right, whether a remote

11   copy was available or not.  So even if there's a copy on the

12   MDx server, that local playback queue can continue to keep

13   playing back.  And that's what it says at the end there.

14   Capable of playing back the playlist, even if the MDx server

15   were not available.  That's the exact same thing that happens

16   in party mode.  The screens maintain a copy of the local

17   playback queue, regardless of whether there's a remote copy on

18   the MDx server, right, and they can continue playing that local

19   playback queue which, again, contains all of the entire

20   playlist, right, even if that MDx server goes offline.

21        Their YouTube Remote engineer on Slide 19 says the exact

22   same thing.

23        (Document displayed)

24        **MR. SULLIVAN:**  This is a conversation I had with him.

25        **THE COURT:**  Wait, wait, just a minute.

1          **MR. SULLIVAN:**  Yeah, go ahead.

2      (Document displayed)

3          **THE COURT:**  You took the deposition of this guy whose

4   picture is there?  Who is he?

5      (Document displayed)

6          **MR. SULLIVAN:**  He's Janos Levia (Phonetic).  He's in

7   Switzerland.  He's their software engineer; he's one of two

8   people that they used to help explain how YouTube Remote

9   worked.  He worked on the YouTube Remote project.

10         **THE COURT:**  What did he say that's important?

11         **MR. SULLIVAN:**  So we are having a conversation here

12  about how party mode worked in YouTube Remote, okay?  We're

13  talking about what's happening on the leanback screens, so when

14  you're transferring playback.

15         **THE COURT:**  What does "leanback" mean?

16         **MR. SULLIVAN:**  The leanback, if you refer back to

17  slide 17, that's the TVs, Your Honor, that's what he called

18  calls them.

19         **THE COURT:**  What does the word "leanback" indicate?

20         **MR. SULLIVAN:**  That is a good question.  I don't know.

21  That's just how they refer to in the code and in their prior

22  art, that's how they refer to the TVs that you transfer

23  playback to, that's the leanback screen.

24         **THE COURT:**  Okay, so the guy in Switzerland, what does

25  he say?

 1          **MR. SULLIVAN:**  So I asked him (As read):

 2               "Well, now, when you're in party mode, okay,

 3               and you're now playing back on your screens,

 4               what queue are those screens using?  They're

 5               using the..."

 6       And I say here:

 7               "Plays back those videos stored locally on

 8               those screens, right?

 9       He says:

10               "Well, it -- the screens -- gets a list of

11               videos, and which one to play, and starts

12               playing that video.  And then in order to

13               know which video to play next when the

14               current one ends, it refers to that list.

15       And I says:

16               "Oh, the locally stored list on the leanback

17               screens, correct?"

18       And he says:

19               "Yes.  I do not believe that the screens are

20               asking the MDx server for which video to play

21               next when the current ended.  I believe it

22               referred to that list that it caught before."

23       So there is, on all these devices, a current up-to-date

24  entire local playback queue.  There's no dependency --

25          **THE COURT:**  It's not just the last one and the next

1    one; it's the entire list.

2          MR. SULLIVAN:   The entire list.   Not just a subset,

3    like we dealt with in the '615 patent, right?   We got into

4    whether there was a full copy in the cloud and a subset

5    locally.   You remember, the first, second, and -- or the

6    previous, the current and the next?   We're not dealing with

7    that here.

8       And YouTube Remote, it's very key, they had an entire

9    playlist and we --

10          THE COURT:   While I have it in mind what -- I want you

11    to jump to the -- how does that read on or not read on the

12    claim language?

13          MR. SULLIVAN:   Yeah.   So, again, focusing on

14    limitation 1.7, 1.7 says that you -- here, let me, let's go --

15          THE COURT:   I got it right here.

16          MR. SULLIVAN:   Okay, good.

17          THE COURT:   I got it.

18          MR. SULLIVAN:   Quicker than I am, Your Honor.   Let me

19    just flip to my copy of the claim there.

20       So 1.7 says that the playback device has to take over

21    responsibility for playback of the remote playback queue.

22       (Document displayed)

23          THE COURT:   I've got to find that language.

24          MR. SULLIVAN:   No problem.

25          THE COURT:   I'm sorry...

1          **MR. SULLIVAN:**  Right.  At the beginning it says:

2           "Based on receiving the user input..."

3        **THE COURT:**  I see.

4           "Transmitting an instruction for at least one

5           given playback device to take over

6           responsibility..."

7      Is that what you're talking about?

8          **MR. SULLIVAN:**  Exactly, Your Honor.

9          **THE COURT:**  "...for playback of the remote playback.

10        queue from the computing device..."

11          **MR. SULLIVAN:**  Right.  So in 1.4, the computing device

12  was used in a remote playback queue, for playback.  We know

13  that doesn't happen in YouTube Remote; it uses local.

14         **THE COURT:**  No, I want to focus on 1.7?

15          **MR. SULLIVAN:**  Yeah.  And then 1.7 takes over

16  responsibility for playback of the remote playback queue.

17        **THE COURT:**  Okay, just a second.  Wait, don't say

18  anything more.  I want to read it again to myself.

19    (The Court examines document)

20        **THE COURT:**  But -- all right.  Let me argue with you a

21  bit.

22    Why isn't the way you -- even you describe how the party

23  mode worked, even you were saying that the -- the local TV

24  takes over responsibility for the playback of the remote

25  playback queue from the computing device.

1          **MR. SULLIVAN:**  No, it -- well, it does not take over

2    responsibility from a remote playback queue.  The leanback

3    screens in party mode, just like they do in non-party mode,

4    they use a local playback queue.  They get the entire list

5    locally on the screens.  They're not dependent on anything in

6    the cloud, at all.

7          **THE COURT:**  Just a minute.  Well, does 1.4 somehow

8    modify and describe 1.7?  Maybe we should start with 1.4.

9          **MR. SULLIVAN:**  Yeah.

10         **THE COURT:**  All right.  Start with 1.4, and tell me

11   what your argument is there.

12         **MR. SULLIVAN:**  Yeah.  So in 1.4, what happens is again

13   you're on your phone.  You create your five Joan Baez songs in

14   a queue that's stored locally on your phone.

15      Even when you switch it to party mode, right, and that was

16   this -- let me just go back to this slide so you can see it,

17   Slide 22.

18      (Document displayed)

19         **MR. SULLIVAN:**  Even when you switch to party mode,

20   that queue, a copy of it, yes, gets sent over to the screens so

21   that the screens can play it.  Right?  But you're going to keep

22   a copy of that queue.  You're always using a copy of that

23   queue, locally.  Even when it's a party queue.  Even when you

24   have -- if you're going to play back on your phone you're using

25   a local playback queue.

1        1.4 requires you to use a remote playback queue, not a
2   local.
3            THE COURT:  Wait.  Just a minute.  1.4 -- say it
4   slowly.
5            MR. SULLIVAN:  Right.
6            THE COURT:  1.4 requires what?
7            MR. SULLIVAN:  Yeah.  Let's just read the claim first.
8   I agree with you, Your Honor.  That's a good idea.
9            THE COURT:  "...is configured for the playback of a.
10           remote playback queue..."
11           MR. SULLIVAN:  Right.
12           THE COURT:  "...provided by a cloud-based computing.
13           System..."
14      (Document displayed)
15           THE COURT:  "...associated with a cloud-based media.
16           service."
17      To me, that's saying that the remote playback queue is
18   provided by the cloud.
19           MR. SULLIVAN:  Yes, Your Honor.  It is.  And what
20   we're saying is the claim requires the computing device --
21   which is the phone, right -- to be configured to play back the
22   queue in the cloud.  Or the remote playback queue.  But that's
23   not what happens in YouTube Remote.
24           THE COURT:  Well, no, no.  We're talking about party
25   mode.

1           **MR. SULLIVAN:**  Yeah, that's in party mode.  Either

2    party mode or not party mode.

3           **THE COURT:**  But it does seem like that's what's

4    happening because you've got a cloud -- even your own picture

5    has a cloud.  A party playlist.

6           **MR. SULLIVAN:**  Yeah.

7           **THE COURT:**  And, and so it's configured for playback

8    of a remote playback queue provided.  So, all right.  I'm

9    confused on why 1.4 isn't met by your own diagrams.  So go

10   ahead and explain it again.

11          **MR. SULLIVAN:**  Yeah.

12          **THE COURT:**  This is very important.  I want to get it.

13   Please.

14          **MR. SULLIVAN:**  I think I understand your confusion,

15   Your Honor, and I apologize for that.  Okay.  Slide 22, right?

16       (Document displayed)

17          **MR. SULLIVAN:**  If you're playing back --

18          **THE COURT:**  Yeah, I'm on 22.

19          **MR. SULLIVAN:**  Okay.  If you're playing back on just

20   the phone, you can ignore the cloud and the leanback screens.

21   22 is showing you how the transfer of playback works, which, as

22   we talked about, that's more limitation 1.7.  All right?

23       So if you're talking about how the remote -- the phone is

24   playing back videos, it's using its local playback queue.  You

25   can ignore the arrows on that diagram, and just look at the

1   phone with its local playback queue.  That's what it's using to

2   play back.  It's just playing back the videos you have on your

3   phone, to yourself.  Whether you're in party mode or non-party

4   mode, that's how it works.

5       The arrows and things that I show in 22 are more for

6   limitation 1.7 when you're going to transfer playback and

7   you're going to send that local playback queue through the

8   server over to the screens.

9           THE COURT:  Yes, but -- all right.  I'm only focusing

10  on 1.4 for the moment.

11          MR. SULLIVAN:  Yeah.

12          THE COURT:  And I'm trying to understand why party

13  mode doesn't -- in which the computing device -- that's the

14  phone -- is configured for playback of a remote playback queue

15  provided in -- it's in the cloud.

16          MR. SULLIVAN:  When you're playing back on the phone,

17  Your Honor, you only use your local playback queue.  The

18  cloud's irrelevant.  Even in party mode.  It's there just to

19  coordinate other phones, for instance.

20      Maybe if you looked at Slide 48 --

21          THE COURT:  But when you're in party mode, you --

22  you're not switching -- when you're in party mode, you are

23  using the cloud, aren't you?

24          MR. SULLIVAN:  Only for coordination.  If you turn to

25  Slide 48, maybe I can do it a little bit better with this

1    slide.

2        (Document displayed)

3        **MR. SULLIVAN:**  I don't have a slide graphic for

4    Your Honor that's perfect for your question, but maybe I can

5    explain it with slide 48.

6        **THE COURT:**  Okay.

7        **MR. SULLIVAN:**  So slide 48, you see two phones on the

8    left there, right?

9        **THE COURT:**  48.

10       **MS. MYERS:**  It's underneath "Browser change."

11       **THE COURT:**  Oh, those tiny little things.

12       **MR. SULLIVAN:**  Yeah, those tiny little things, right.

13       **THE COURT:**  I see it.  Yes.

14       **MR. SULLIVAN:**  And here's another complication which I

15   really don't want to get into, but in YouTube Remote, party

16   mode or not, there is two modes.  There's a standalone mode and

17   a remote control mode.  "Standalone" means you are just playing

18   on the phones.  Forget about the screens.

19       Okay, remote control mode is you've transferred playback

20   over to the screens, and now your phones are just remote

21   controls.  Okay?

22       But let's take this standalone mode where you're just on

23   your phones.  That's limitation 1.4, only.  Okay, we haven't

24   dealt with 1.7.  So you're on your phone.  You play back in

25   non-party mode, you play back from a local playback queue on

your phone.

     In party mode, right, you do the same thing, except that you send a copy of your local playback queue to the cloud so that it's relayed over to the other phone, the guest phone.  So that they could put that, again, in their local playback queue.

     So the cloud serves as a relay.  Both in party mode and not party mode, it serves as a relay.  The only difference is in party mode, it keeps a copy so it can coordinate with all the devices.

     But that's not a queue that anyone's playing back from. That's just a copy of the playlist.  The queues are all local on the devices.  And they're filled with that copy that's being -- being used for coordination purposes.

          **THE COURT:**  All right.  I understood what you just said.  However, on, 1.4, standing alone, I'm trying to understand why 1.4, standing alone, is not satisfied by the party mode.

     Let me -- I'm going to continue talking.

               "Operating in a first mode in which the
               telephone is configured for playback" -- I'm
               going to assume playback to itself -- "of
               remote playback queue provided by a cloud
               computing system..."

     So it does seem to me that the -- in party mode, the playback is going to be -- it doesn't have to be to a TV.  It

1  could be to itself, to the phone.  Right?

2          **MR. SULLIVAN:**  Yes.

3          **THE COURT:**  So the smartphone is configured to play a

4  remote playback queue provided by the cloud.  And I think what

5  you're saying to me is:  No, the thing in the cloud is just a

6  copy, and -- but the actual queue that gives instructions for

7  playback is still resident on the smartphone.

8          **MR. SULLIVAN:**  You're correct, Your Honor.

9          **THE COURT:**  Well, I'm asking.  Is that what you're

10  saying?

11          **MR. SULLIVAN:**  Yes.  Your Honor, let me just take this

12  quick example.  You've got a phone; I've got a phone.  You

13  create five songs, Joan Baez songs, on your phone in a queue.

14  You start playing it back.  You're using a local playback

15  queue, right?

16      Now, all of a sudden, you decide --

17          **THE COURT:**  I'm asking.  Is that right?

18          **MR. SULLIVAN:**  Yeah.

19          **THE COURT:**  Okay.

20          **MR. SULLIVAN:**  You haven't entered party mode yet.

21  You're just playing it back on your phone; you're enjoying your

22  five songs on your queue.  It is locally on your phone.  Right?

23      Now let's say you want to add me to your party.  And you

24  want me to be able to watch those same videos on my phone.

25  Right?

1    You switch to party mode, right?  You send a copy of your

2 local queue to the server so that the server can then send it

3 to me, and then I can put that in my local playback queue.

4    In other words, the cloud is just a relay service.  It's

5 just helping communication between two phones or phones and

6 screens get a copy of the queue so they can add it to their

7 local playback queue.  Get a copy of the list, I should say.

8 Your playlist.  Your five songs.

9    The phone is not asking the cloud:  What should I play

10 next?  The phone knows what to play next.  It's on its device;

11 it's on its local queue.

12        **THE COURT:**  All right.  Look at 1.4.

13        **MR. SULLIVAN:**  Right.

14    (Document displayed)

15        **THE COURT:**  Forget about party mode for the moment.

16 Just one ordinary user has their smartphone, and they want to

17 listen to some songs.  And so they put in the five.

18    So you're narrowing your own patent to say that if the

19 list that is controlling the sequence is on the phone, itself,

20 then it's not covered by 1.4.

21        **MR. SULLIVAN:**  That's correct.  If there's no remote

22 playback queue that the phone is using for playback, then it's

23 not covered.  You have to have a remote playback queue at the

24 phone in 1.4, and at the playback devices in 1.7.

25        **THE COURT:**  What good is it, then?  Why -- why would

```
 1    anyone ever want to use your invention, if 1.4 is narrowed in
 2    that -- when would it ever apply?
 3            MR. SULLIVAN:  Well, for the accused YouTube system,
 4    for instance, Your Honor, which uses and relies on a remote
 5    playback queue when you're playing back on the phone.  That's
 6    called the "watch next queue."
 7        And there's more information on that, Your Honor, in the
 8    paper we filed --
 9            THE COURT:  All right.  Let's pass 1.4 for a minute.
10    Explain to me now why 1.7 isn't -- I think it -- "takes over
11    responsibility" is the key phrase.  And you're saying that the
12    thing in the cloud never has responsibility for dictating which
13    song comes next.  That comes locally from the phone, itself, or
14    the TV, itself.
15            MR. SULLIVAN:  That's correct.
16            THE COURT:  All right.  Hold that thought.  That part,
17    I understand what you are saying.  I'm not saying I agree with
18    it.
19        All right.  Ms. Baily, just address that.  Come up here,
20    please, and address that one point.
21        What counsel is saying is that the playback device,
22    according to the invention, has to take over responsibility for
23    the playback of the remote playback queue from the computing
24    device.
25        What do you say to that point?
```

1          **MS. BAILY:**  Sure.  Well, you can look at Slide 22 --

2    if we could pull that up -- in Sonos's counsel slides.  You all

3    were looking at that.

4          **THE COURT:**  I'm sorry, your 22?

5          **MS. BAILY:**  No, the ones that you guys were just

6    looking at in Sonos's presentation.

7          **THE COURT:**  Okay, 22.

8          **MS. BAILY:**  Uh-huh.  And you can see that even in

9    Sonos's depiction, the queue is in the cloud.  And the only way

10   that the playback device knows what to play next is because the

11   cloud delivers to the playback device the information from the

12   queue in the cloud.

13        (Document displayed)

14        **MS. BAILY:**  This is distinguished from if I had a

15   phone, and I was just casting to a screen, I would just send my

16   local playback queue to the screen.  It would go through the

17   cloud as a mechanism, but it wouldn't be saved in the cloud.

18   That's relay (Indicating quotation marks).  That's me taking my

19   local playback queue and sending it to the playback device.

20   That would be a local queue telling the playback device what to

21   do.

22        That's not what happens here, even under Sonos's own

23   graphics and description of the system.  What happens is when

24   you go into --

25        **THE COURT:**  What happens under party mode?  Or what

 1    happens under the patent?

 2          **MS. BAILY:**  What happens under party mode is when you

 3    go into party mode, the cloud takes over.  Even according to

 4    Sonos, you hear this notion of synchronizing?  Exactly.  The

 5    cloud takes over.  The cloud is the master queue.

 6          And when there's an update to the queue in the cloud, it

 7    is then that the cloud sends that information to the playback

 8    device, and to the phones.  To everything.

 9          The information is stored and saved in the cloud.  Even

10    under Sonos's interpretation.  And a remote playback queue is

11    simply something in a cloud that is a list of playback videos.

12    That's what this is.

13          Even listening to Sonos's presentation just now, they

14    concede, there's a queue in the cloud.  It is a remote playback

15    queue.  Look at these arrows.  It is the cloud that provides

16    the clue -- the queue --

17          **THE COURT:**  Wait, wait.  Help me on this.

18          So, 1.7.  I want to read this, and I want to think in

19    terms of party mode.

20          **MS. BAILY:**  Yes.

21          **THE COURT:**  I want you to help me explain why party

22    mode would fit 1.7.

23          **MS. BAILY:**  Okay.

24          **THE COURT:**  All right.  So based on receiving user

25    input, transmitting an instruction for the playback device to

```
 1  take over responsibility for playback of the remote playback

 2  queue from the computing device.

 3      So we have -- we've got the playback device, we've got the

 4  computing device.  And then we have the concept of

 5  responsibility for playback of the remote playback queue.  I

 6  counted three things there.

 7      How does that language fit with the party mode?

 8          MS. BAILY:  Sure.  If we could go to Slide 32 in our

 9  deck, if we could switch the decks back.

10      (Document displayed)

11          MS. BAILY:  So, here, you're in party mode.  There's

12  an instruction for the playback device to take over

13  responsibility of the remote playback queue.

14      Now, I don't think there's a dispute that there's an

15  instruction to take over responsibility for playback.  The

16  dispute is:  Is it taking over responsibility of playback of

17  the remote playback queue?

18      And the reason we know that it is, is because the only way

19  that the playback device knows what to play back is because it

20  receives the information from the queue that is in the cloud.

21      When you hit party mode, and you go into party mode, it

22  changes the way the system operates, specifically so that the

23  cloud has the queue.

24      And if the cloud has the queue, the playback device knows

25  what to play back by receiving that information from the cloud.
```

1    From the queue in the cloud that was created.  It's called a

2    "party queue."  That queue in the cloud is created when you go

3    into party mode.

4         And the whole point of it is, then, the queue is in the

5    cloud.  And so with respect to the phones, guests, hosts,

6    whoever, with respect to the playback devices, TVs, in all

7    kinds of rooms in your home, the only way, once the party queue

8    is created, that any of those devices know what to play is by

9    getting the information from the queue that's in the cloud.

10   The party queue.  That is, in fact, the whole point of party

11   mode.

12        And so I go back to the example that's in our briefing,

13   which I think is the simplest way to understand it.  You're

14   operating in party mode.  So there's a bunch of people with

15   phones; there's a bunch of playback TVs.  One person wants to

16   add something to what the whole party is watching on static

17   video.  The way that they add a video is by adding it to the

18   queue in the cloud.

19        Only then do all of those devices -- all the phones, all

20   the TVs -- know to play back that video that was added.  The

21   instruction, the information, is coming from the party queue

22   which is in the cloud.

23        The whole point of party mode is to move the controlling

24   queue into the cloud so multiple people can work on it at the

25   same time.  Can edit it at the same time.  The cloud manages

it, and then sends that information to all of the devices so that they know what to play back next.

And the way you know that the device, with respect to limitation 1.7, is taking over responsibility for the remote playback queue is because it's getting it from -- it's getting the information from the cloud. Even in Sonos's own picture. So it's taking over responsibility of playback of the remote playback queue. It's the party queue. It's the one queue that everybody is looking to, to see what to play next.

THE COURT: Counsel says that the party mode sends the playlist to each playback device, and it's that list that's resident on the playback device that controls what is played next on that playback device. Is that true?

MS. BAILY: No. And you can look at Sonos's picture (Indicating).

THE COURT: Which picture?

MS. BAILY: Slide 22, for example (Indicating).

THE COURT: All right. Explain to me your point.

MS. BAILY: So you can see on Slide 22, once you are in party mode, the queue gets moved to the cloud. So, sure. You can have a local queue, and you can play it on your phone when you're not in party mode. You can make a queue on your phone, and you can play it on your phone. When you go into party mode, the queue moves into the cloud.

Your phone does not provide information on your phone to

1    the playback device.  No.  Your phone created a queue in the

2    cloud.  Now it is in the cloud.  Now, every device receives the

3    information from the cloud.

4        So the whole point of party mode is to remove from your

5    local phone the playlist.  Because the only way multiple people

6    can make changes to a playlist is if it's located in the cloud.

7    It can't be located on your phone.  Right?

8        I can't use my phone to go into your phone and make a

9    change on a playlist.  I can't do that.  The only thing I can

10   do is if you go into party mode, you're putting the queue into

11   the cloud (Indicating).  Okay.  Well, now, now, I can access

12   that.  Now, I can make changes.  Now, all the devices can see

13   what to play, as dictated by the cloud.

14       And so this notion of, you know, having multiple people

15   edit I feel like is a helpful notion because that's the -- it's

16   kind of the whole point of party mode.  Multiple people can

17   edit the queue.  And so I couldn't edit the queue if it was

18   just on your phone.  I can't get into your phone to do that.

19       But by entering party mode, the queue moves to the cloud.

20   Now, I can edit it, too.  And so can you.  And the playback

21   devices can get the information that they need from the cloud.

22           **THE COURT:**  Looking at Claim 1, what do you think is

23   the difference between this and the prior -- the one that I

24   held was invalid?  Or didn't I?  Didn't I hold something was

25   invalid?

```
 1              MS. BAILY:  Yes.  So, yes.  So --

 2              THE COURT:  What is the -- what is the invention here,

 3    in '033, Claim 1?

 4              MS. BAILY:  Yeah.  Well, I would dispute that there's

 5    an invention.  But the other patent that we dealt with in the

 6    showdown, is that what you're asking me about?

 7              THE COURT:  Yes.

 8              MS. BAILY:  The other patent that was invalidated.

 9              THE COURT:  Yes.

10              MS. BAILY:  So what that patent dealt with was a

11    user-created playlist on your phone.  So you create your

12    playlist on your phone of the five songs.  And you want to cast

13    it to a playback device.  So, a speaker, for example.

14        And the question there was:  Is the speaker using a local

15    playback queue?

16              THE COURT:  Well, that was on before -- before and

17    after point.  Okay.

18              MS. BAILY:  But here -- so in that case, where you

19    were just casting from your phone to a speaker, you were just

20    sending what was on your phone to the speaker.  Nothing was

21    saved in the cloud, in that patent.

22        Here, Sonos is saying that there's a remote playback

23    queue, and that the remote playback queue is provided to your

24    phone and to the playback devices.  When the playback devices

25    take over the playback of that remote queue.
```

1    So before in the patent that we were dealing with, it was

2    just casting from your device -- from your phone to a speaker.

3    And literally nothing was saved in the cloud.  Here, it's

4    talking about a queue in the cloud that is being played back by

5    all these devices.

6        And party mode is the clearest example of that.  That's

7    the whole point of party mode.  It's so that there's a master

8    queue in the cloud, and that is what's dictating what gets

9    played locally on your phone or on the TVs or on your other

10   playback devices.

11       Did I answer your question?

12       **THE COURT:**  You have.  We've got more ground to cover.

13   All right.

14       **MR. SULLIVAN:**  Your Honor, may I make one more point?

15       **THE COURT:**  Yes, go ahead.

16       **MR. SULLIVAN:**  So, Your Honor, I think what we are

17   seeing here is that there's a dispute, right?  We're on summary

18   judgment.  They have a clear and convincing burden.  It's a

19   dispute whether or not the playlist, the copy of the playlist

20   that's kept on the cloud, right, is a remote playback queue or

21   not.

22       And Slide 22, I think counsel is ignoring the fact that

23   you can see, we've drawn there, that there's a local playback

24   queue on each of the screens, under the word "YouTube" on the

25   right.

1    The party playlist copy that's kept in the cloud is not

2 the one that runs the show.  A playback queue is more than just

3 a list of media items that are selected for playback.  Right?

4 We know that from this -- the non-infringement position.

5         THE COURT:  But why doesn't it run the show, if -- if

6 there's a change made to it at the speed of light, the new

7 updated party list gets transmitted to all these playback

8 devices, and so the local playback queue is changed.

9    So you could say:  Well, it does run the show, because it

10 can override and update the screens.

11         MR. SULLIVAN:  Your Honor, we can look at 16 and 17.

12 I promise, this is the last point I'm going to take with you.

13         THE COURT:  16 and 17 of what?

14         MR. SULLIVAN:  16 and 17 of Sonos's presentation.

15 Look at 16 first.

16         THE COURT:  Okay.

17         MR. SULLIVAN:  16 -- let me know when you get there.

18    (Document displayed)

19         THE COURT:  Yes, I'm there.

20         MR. SULLIVAN:  Okay.  16 is non-party mode.  The same

21 way that edits are made in non-party mode, which we know is all

22 local playback queues, is the same thing that's happening in

23 party mode.  Of course, you can make changes in either mode.

24    In non-party mode, you make a change on the phone, you add

25 a song, right?  It goes to the queue.  An update playlist

1   message is sent to the screens.  That's how the screens get it.

2   They always have to get it from the server.  There's just no

3   direct communication between the phones and the screens.

4   Everything passes through the server.

5        So in non-party mode, the screens get edits from the

6   server.  And there's no dispute in non-party mode that those

7   screens are using a local playback queue.

8        And when you turn to 17, in party mode, it's the same

9   thing.

10       (Document displayed)

11       **MR. SULLIVAN:**  You make a change on the phone.  It has

12   to go to the cloud, because that's how these devices all

13   communicate.  And then it gets disseminated down in an update

14   playlist, same exact message.  Right?  To the two leanback

15   screens.

16       So whether you're in party mode or non-party mode, if

17   you're a leanback screen, you get all your updates from the

18   cloud.  That doesn't mean that there's a cloud queue.  You

19   could take the cloud out.  That's what I said before.

20       Take the cloud out; the playback devices can continue to

21   play back on their own from their local playback queue.  They

22   are not dependent on the cloud.  And if they never get an

23   update, Your Honor, they will just play their local playback

24   queue, and then they're done.

25       **MS. BAILY:**  Your Honor, can I respond just to slides

1   16 and 17?

2          THE COURT:  Yes.

3          MS. BAILY:  So, this is exactly the point.  So in

4   non-party mode, slide 16, if you make a change on your phone it

5   goes through the cloud.  It is not saved there.  It is not

6   saved there.  It goes through the cloud to get to the local

7   playback device.  The phone is providing the queue to the local

8   playback device.  It is not saved in the cloud.  For playback

9   mode, Sonos concedes, totally different because the queue is

10  saved in the cloud.

11         So you can draw two pictures that look the same.  The

12  fundamental difference that's controlling is that in the first

13  non-party mode, nothing is saved in the cloud.  The device is

14  providing the list to the speaker.  It gets sent through the

15  cloud, because it has to be sent.  But nothing is saved in the

16  cloud.

17         In party mode, it is completely different, because the

18  queue is saved.  The party queue is saved.  And it is from that

19  cloud party queue that all of the devices get the information.

20         THE COURT:  I have a -- I've got a legal question for

21  you.  Both sides.

22         When it comes to infringement -- I know we're not talking

23  about infringement yet.  I mean, we already have passed that

24  one.  But when -- on the infringement side of the equation,

25  there's a thing called a doctrine of equivalents.  I know you

 1  know it by heart.  Is there an analog to doctrine of

 2  equivalents, on the invalidity side?

 3      In other words, can something be so close, prior art be so

 4  close that it does the same thing, same function, same -- but

 5  it's not exactly on point, that the -- that you can say: Okay,

 6  under the doctrine of invalidity equivalents, that's good

 7  enough?

 8          **MS. BAILY:**  Sure.  It's obviousness.

 9          **MR. SULLIVAN:**  Well, I disagree, Your Honor.

10  Obviousness involves motivations to combine and all kinds of

11  things that are not involved with doctrine --

12          **MS. BAILY:**  It's single reference -- I mean it's --

13      (Multiple speakers)

14      **THE COURT:**  Wait, wait, wait, wait.  All right.  But,

15  is there -- all right.  Is that your only answer, obviousness?

16          **MS. BAILY:**  Well, no.  I mean, the -- you have to --

17  look at -- I'm not sure -- maybe it would help if I had a

18  concrete example, because I just don't see where YouTube Remote

19  party mode deviates from here.  But if the disclosure would

20  have you understand what is in the claims, then it is

21  sufficient to invalidate.

22          **THE COURT:**  Is this motion based on obviousness?  Or

23  is this motion based on anticipation --

24          **MS. BAILY:**  So it's based on anticipation with respect

25  to the YouTube Remote party mode, except that with respect to

1    the device picker issue, Your Honor already found that for a

2    device picker, in your last showdown order, that the YouTube

3    Remote patent discloses that very clearly.  And you combined

4    YouTube Remote Version 1 with that patent to find the device

5    picker previously.  And so in that sense, there's a combination

6    with the YouTube Remote patent here as well, that's exactly the

7    same issue that you decided before.

8         So aside from the device picker, our position is -- and I

9    think very clear -- that the party mode of YouTube Remote

10   Version 2 discloses the remote playback queue of limitation

11   1.4, and the transfer of that same remote playback queue to the

12   playback devices in limitation 1.7.

13            THE COURT:  What is your view?

14        MR. SULLIVAN:  Yeah.  Your Honor, I disagree with that

15   completely.  And again, look at Page 18 in our slide deck.  You

16   can see right there that their expert said the fact that

17   there's a remote copy of the queue is not determinative of

18   whether it is a remote playback queue or a local playback

19   queue.

20        (Document displayed)

21        MR. SULLIVAN:  They keep saying just because there's a

22   copy in the queue means it's automatically a remote playback

23   queue.  That's not true.  And there's a fundamental difference

24   here, Your Honor.  And it's exactly what you said earlier.

25        If you take the server out, even in party mode, those

1   leanback screens or phones have a local playback queue, the

2   full playback queue that they play from.  They're not dependent

3   on the cloud.

4        We know that a remote playback queue has to be something

5   that those local devices -- I'm sorry -- the playback devices

6   or the phones are depending on.  That's what makes it -- runs

7   the show.  That's what makes it the playback queue.  It's not

8   just any old list of items.  It has to be the one that's

9   running the show.  The one that if you took it out of the

10  system, the system wouldn't work anymore.

11       But that's not what happens in remote party mode, YouTube

12  remote.  If you take the server out where the copy of that

13  playlist is, right, the devices can still play back from their

14  local playback queue.

15       And even, again, even if you don't agree with me, I think

16  again this is an issue for the jury to have to decide.  I know

17  it's complicated.  But this is exactly the kind of factual

18  issue that the jury's going to need to decide here:  Is that

19  copy of the playlist in the queue, is that a remote playback

20  queue or not?

21       Let the jury decide that.

22       **MS. BAILY:**  Your Honor, just two quick things on what

23  was just said.

24       First of all, with the device -- the argument that if you

25  take the cloud out of it, the device keeps playing.  If you

1    take the cloud out of it, the reason why you know that the

2    queue that runs the show is in the cloud, you can't make

3    changes to the party queue.  You can't do anything with the

4    party queue anymore.  The cloud has to be there so that people

5    can edit and change the party queue, and then update the

6    devices.

7        So the point that if you take the cloud out of it, the

8    speaker keeps playing the current song, that's the wrong point.

9    The point is that:  Now there is no queue that you can change

10   that you can manage; it's gone.

11       So, so the taking the server out of it does not help

12   Sonos's position.  It helps our position.

13           **THE COURT:**  Well, okay.  For the brief moment that I

14   think I understand this, which will last about a fleeting

15   moment, I see these points.

16       It seems true that in party mode, the immediate

17   instruction on what to play next and what the list is is

18   resident on the speaker or playback device.  And that that

19   instruction comes from the playback device, which then has to

20   go to the cloud to find that file.  Not the list, but the file,

21   to play it on the playback device.  So I see that point.

22       But I also see the point that the whole point of the party

23   mode is to allow each side to edit, on one point.  And so the

24   cloud has a list.  The list gets updated.  And then that list

25   gets sent to the playback device, and those playback devices

1   are updated, and the old list is now immaterial; it's got a new

2   list.

3        Have I -- is at least what I said correct?

4        **MS. BAILY:**  The second point is certainly correct.

5   I'm not sure -- I just didn't understand the first one.  I

6   apologize.

7        **MR. SULLIVAN:**  Your Honor, I think it was generally

8   correct, except the fact that -- these edits of the playlist?

9   Right?  Remember, you have to have the server there in both

10  non-party mode and party mode, because that's how communication

11  between the phones and the speakers work in that system.  So

12  there's really no difference.

13       We know in non-party mode it's all local playback queues.

14  That's what they used to invalidate the '615 patent.  Right?

15  So if you're in non-party mode and you want to make an edit to

16  your queue, you have to go through the server.  So of course,

17  if you take the server out of the equation, in non-party mode

18  or party mode, you can't do any updates.

19       **THE COURT:**  Well, as I read your Claim 1, though, the

20  whole point of it is there's a remote playback queue.  So you

21  go on your phone, and you say:  All right, I want to play a

22  YouTube selection of Joan Baez songs.  Whatever they got, I'll

23  go with.  So they come back with Joan Baez Best Hits.

24       And somehow, you transmit an instruction to the playback

25  device to take over responsibility, so you can cast it to your

```
 1   TV or your playback device, and you don't have to do it from
 2   your phone.
 3        MR. SULLIVAN:  The advantage there, Your Honor, is you
 4   don't have to have the full queue locally on the phone or on
 5   the playback devices, because you're relying on a remote
 6   playback queue.  That's the advantage of the claims.
 7      In YouTube Remote, they kept full copies of the entire
 8   playlist locally, at the phones, and at the screens.
 9        MS. BAILY:  Your Honor, the claims don't say that you
10   can't have local copies.  The claims require a remote queue.
11   That runs the show.
12        THE COURT:  Okay.  I don't know the answer to this
13   one, but we have now burned up an hour and a half, almost, on
14   this one.  And I -- I have an 11:00 calendar.  So we -- we've
15   got about an hour left, at most, to deal with other issues.
16      So which is the one that you want to deal with next?  How
17   about the -- how about the one dealing with the rooms?
18        MS. BAILY:  (Nods head)
19        MR. SULLIVAN:  Thank you again, Your Honor, for your
20   patience.  I appreciate it.
21        THE COURT:  You're welcome.  The rooms.  I'm sorry,
22   I've got so many notebooks that I can't find my cheat sheet.
23      Here it is.  All right, we have the groupings.  '885 and
24   '966.
25        MR. PAK:  That's right, Your Honor.  Sean Pak of --
```

1          **THE COURT:**  All right.  You get to make one important

2     point.

3          **MR. PAK:**  Thank Your Honor.  May I hand up some

4     slides?

5          **THE COURT:**  Huh?

6          **MR. PAK:**  Can I hand up some slides on --

7          **THE COURT:**  You mean, you've got more slides?

8          **MR. PAK:**  This is just on our motion on the '885, and

9     -- yes.

10          **THE COURTROOM DEPUTY:**  Two more copies.

11          **MR. PAK:**  Yes, thank you.

12     (Document handed up to the Court)

13     (Document tendered to court staff)

14          **THE COURT:**  Okay.

15          **THE COURT:**  Go ahead.  Whatever your important -- make

16     it in about three to five minutes.

17          **MR. PAK:**  All right.  Thank you, Your Honor.

18     All right.  Let's jump to slide 3.  As Your Honor saw from

19     the motion, --

20     (Document displayed)

21          **MR. PAK:**  -- we are making an obviousness combination.

22     The obviousness combination begins with the prior art 2005

23     system that was sold by Sonos in January of 2005.

24     So if we turn to slide 4.

25     (Document displayed)

1          **MR. PAK:**  We have two pieces of prior art that we're

2    combining.  The January 2005 system, which had all the basic

3    building blocks of the asserted claims from these patents

4    except for one key difference, which is they did not save

5    speaker groups.  That's the only difference.  And we'll walk

6    through that point.

7          That's really the key point I want to emphasize to

8    Your Honor today.  The only difference between what Sonos was

9    selling to everybody in January of 2005, more than a year

10   before the effective filing date of the patents, the only

11   difference was saving speaker groups that the users were

12   already creating.

13         So the obviousness comes in, in September of 2005.  We

14   have a series of postings by users who actually purchased the

15   Sonos 2005 system, and started using it.  And what did they

16   experience?

17         They could play music, synchronously.  They had zone

18   players; they had controllers.  They could create groups on the

19   fly.  And they could say:  I want to combine Speaker 1, Speaker

20   2, Speaker 3.

21         The one thing they couldn't do, which was frustrating to

22   all the users, is:  I couldn't save the groups I created.

23         And so what we see in September of 2005 is a series of

24   postings, public postings by the users of the same system

25   saying this is an obvious feature that is missing in your

1    product.  Why do I have to keep making the same groups every

2    time I reboot the system?  Why can't I just save the groups

3    that I have been creating?

4        So we have a very strong combination here.  It's the same

5    users who are using the same systems, saying the one thing that

6    is missing -- I love your product.  The one thing that's

7    missing is I can't save the groups that you're allowing me to

8    create.

9        And, Your Honor, that's the obviousness case.  And if you

10   turn to slide 5.

11       (Document displayed)

12       **MR. PAK:**  And I think the thing that I would take us

13   back to Your Honor is Your Honor's ruling on written

14   description.

15       If you recall, earlier in the case, there was a motion

16   that Google brought saying:  Where is it in the patent that

17   there's a written description of these claims?

18       And there were a couple of things that were at issue.  One

19   was the sequence of operation, if Your Honor remembers.  There

20   was:  Are you in standalone mode, for example, when you're

21   creating these groups?  And then, are the groups being saved

22   for later use?  That was one issue.  Where is that in the

23   claims?  Or in the specification?

24       And then the other issue was:  Where is the disclosure of

25   overlapping groups where one speaker could belong to multiple

```
 1   groups who were being saved?

 2       And Your Honor took us to Figure 6.  Your Honor said at

 3   the end of the day --

 4             THE COURT:  Figure 6?  Slide 6 or Figure 6?

 5             MR. PAK:  Figure 6, Your Honor, this is on Page 5 --

 6             THE COURT:  Oh, I see.  We're on 5, okay.

 7             MR. PAK:  Yeah.  So this is Figure 6 from the patent.

 8   And Your Honor said Figure 6 discloses all of the limitations

 9   of the claims with respect to the sequencing of the operations.

10       And we can see your language on Page 9 of the slide deck.

11       (Document displayed)

12             MR. PAK:  This is taken from Docket 309, your order on

13   the showdown MSJs and Your Honor said: True, Google repeatedly

14   points out the specification never uses the term standalone

15   "mode."  However, we don't have to use words verbatim.

16       Your Honor said:

17             "Figure 6 illustrates the process of forming

18              and 'invoking' a zone scene."

19       And if you turn to the next slide.

20       (Document displayed)

21             MR. PAK:  You specifically included this figure,

22   and you said:  Figure 6 discloses the whole process in the

23   claims of creating multiple speaker groups, saving them for

24   later use.  And the key thing is they're being saved for later

25   use.
```

```
 1        And why is that important?  Because if I don't transition
 2   immediately into the zone groups, that means I'm still
 3   operating in standalone mode.  And only later in time would I
 4   then invoke that speaker group, and I transition into the group
 5   mode.
 6        And the example Your Honor also used in finding
 7   infringement against Google was the -- if you remember, the
 8   morning mode.  Your Honor found that naming groups and saving
 9   named groups for later use is sufficient to satisfy the
10   language of the claims.
11        And Your Honor found that -- let's take you to that, which
12   is on Slide 18, Your Honor, of the deck.
13        (Document displayed)
14        MR. PAK:  Your Honor asked (As read):
15             "The question, then, is simply whether a
16             user's ability to name speaker groups means
17             that the user can group speakers according to
18             a common theme.  The answer is yes.  While
19             the specification is largely barren on this
20             point, it expressly states that a user can
21             make a zone scene by 'making a group of 3
22             zones named after "Morning."'"
23        The citation to the patent, column 8.
24        THE COURT:  Which slide are you on?
25        MR. PAK:  Your Honor, this is Slide 18.
```

1          **THE COURT:**  Oh.

2          **MR. PAK:**  This is taken from Your Honor's order.

3          **THE COURT:**  Okay.

4          **MR. SULLIVAN:**

5          **MR. PAK:**  (As read)

6           "...expressly states that a user can make a

7           zone scene by 'making a group of 3 zones

8           named after "Morning."'  The specification

9           does not suggest anything else is necessary."

10      And Your Honor concludes:

11           "...the basic purpose of this invention..."

12           -- so for both of these patents that we're

13           talking about now -- "...is to allow users to

14           pre-save customized speaker groups and later

15           'invoke' the named group on demand."

16      That was Your Honor's conclusion in finding that Google

17      practiced the claims of the patent.

18      And one thing we know, Your Honor, is what's true for

19      infringement in terms of claim language has got to be true for

20      prior art purposes.

21      So now we turn to Slide 19, which is the next slide.

22      (Document displayed)

23          **MR. PAK:**  That's exactly -- that notion, down to the

24      example of the Morning mode, that's exactly what the users of

25      the Sonos 2005 system were telling the world in public

1  postings -- including Sonos.  Those public postings, as the

2  record indicates, were created by Sonos to solicit feedback on

3  how to improve their products.

4      So these users were using the Sonos 2005 system, coming

5  back on those public forums, and saying exactly what?  The

6  basic purpose of these inventions.

7      And there are multiple postings, Your Honor.  I'll just

8  focus, in the interest of time, on the last one at the bottom.

9  And it says (As read):

10          "...I would save..."

11          "Just got the intro bundle, I'm impressed.  I

12          did a search and did not find this suggested,

13          but I would save -- save the Zone links as

14          favorites.  With only 2 zone players it's not

15          a problem yet, but when I add more it maybe."

16      So he is saying:  Look, I can create multiple speaker

17  groups, but I can't save them.  So let's go and save them.  And

18  the examples that he give are exactly the same examples that

19  are given in the patent specification:

20          "I would like to setup say Morning mode..."

21      Which is exactly the example that we saw, and that

22  Your Honor relied on.

23          THE COURT:  You mean I came up with that idea on my

24  own, and this was the same thing that the guy on -- posted?

25          MR. PAK:  Your Honor, and the Morning mode is not only

```
 1   the idea -- you're right -- Your Honor came up with; it's also
 2   in the specification.  So Your Honor was actually saying --
 3          THE COURT:  Oh, it was in the specification.
 4          MR. PAK:  The specification.  Your Honor was saying:
 5   Look, I'm not seeing a lot.  You said the specification is
 6   largely barren on exactly how you set up and save these zone
 7   scenes, according to the --
 8          THE COURT:  What in the specification specifically
 9   speaks to how you would save?
10          MR. PAK:  Oh, great question.  It literally is one
11   sentence.  And it's "saved."  So I will show you --
12          THE COURT:  The reason I ask that question is this.
13   It occurs to me what you're pointing out here would ordinarily
14   be thought of as obvious to try.
15          MR. PAK:  Yes.
16          THE COURT:  Not obvious to do.  Saying "obvious to
17   try" is not enough to make it obvious -- like we all -- it's
18   obvious to try for an anti-gravity machine.
19      Well, why don't you come up with it, and tell me how
20   you're going to do that.
21          MR. PAK:  Right.
22          THE COURT:  So that's obvious to try.  Obvious to do
23   is sometimes harder.  But, if the specification, itself,
24   doesn't tell us how to do it because it's so obvious that
25   everyone would know, then maybe -- maybe obvious to try is
```

```
 1   enough to invalidate it.

 2           MR. PAK:  That's right, Your Honor.  And --

 3           THE COURT:  I mean, is there case law that says that?

 4   Or is that just old Bill talking?

 5           MR. PAK:  No, Your Honor's absolutely right.

 6           THE COURT:  No, no.  Tell me the case law.

 7           MR. PAK:  The case law is obvious to try is also

 8   sufficient as KSR.

 9           THE COURT:  Wait, how can that be?  How can obvious to

10   try ever be enough?

11           MR. PAK:  What the Federal Circuit has said is

12   "obvious to try to those skilled in the art."  So if those

13   skilled in the art would understand that the basic tools that

14   are available in the art -- for example, saving something, if

15   that was straightforward, and the claims don't require a

16   particularly innovative way of saving, then it's obvious to try

17   and it would be obvious to do for those skilled in the art.

18       And I want to answer your --

19           THE COURT:  But on that last point, I'm asking this

20   question.  If the specification, itself, does not elaborate on

21   how to save, can we take that under the case -- does the case

22   law say we can take that as an admission against interest to

23   the patentholder that anybody skilled in the art would know how

24   to do it?

25           MR. PAK:  Yes, Your Honor.
```

            **THE COURT:** All right.  Read me that paragraph from
the Federal Circuit.

            **MR. PAK:** Well, let me take you will to the *KSR* case,
Your Honor.  Your Honor, let me --

            **THE COURT:** Go ahead.

            **MR. PAK:** If I can just come back to that, because I
can find the cite later, but I did want to just answer your
question first, and then we can get to this point.

      Your first question to me was:  What does the patent say
about the word "saved"?  What --

            **THE COURT:** What does the specification -- what does
it teach about how to save?

            **MR. PAK:** Correct.

            **THE COURT:** And if the answer is nothing --

            **MR. PAK:** Nothing.

            **THE COURT:** -- then maybe it would be obvious.  That's
an admission.

            **MR. PAK:** That's right.  So Your Honor, on Slide 20,
this is what the patent says.  It literally says:

            "At 606, the scene is saved."

      And that's it.  That's the only --

            **THE COURT:** Wait.  I'm sorry.  I'm sorry.  It says --
you've got so many things underlined here, I can't read it.

            **MR. PAK:** Yes, Your Honor.  So on Slide 20, it's the
box to the right, on the upper side.

1        (Document enlarged)

2            MR. PAK:  Column 10, Line 41 through 44.  It literally

3    says:

4            "At 606, the scene is saved."

5        And 606, Your Honor, was that flowchart that we were

6    looking at from Figure 6 that Your Honor relied on.  It

7    literally just says "saved."  That's it.

8        And if you turn to other portions --

9            THE COURT:  But, is there a paragraph later that

10   explains the complications of source code, of how to go about

11   saving --

12           MR. PAK:  None.

13           THE COURT:  -- the configuration?

14           MR. PAK:  None.  There's no -- no disclosure in the

15   patent --

16           THE COURT:  Who over there is going to answer this?

17   Okay.

18           MR. SHEA:  That'll be me, Your Honor.

19           THE COURT:  To me, I'm ready to throw this one out on

20   the ground that it's obvious because you, yourself, didn't say

21   anything in the specification as to how -- why it was so

22   inventive to save something, or how to do it.

23       No, not yet -- come on up here, yeah.

24       And then, therefore, that's an admission against interest

25   that anybody -- anybody skilled in the art would be able to --

 1  otherwise, it's not enabled.  So you've got a problem here.  I

 2  want to hear your answer to that.

 3          **MR. SHEA:**  Yes, Your Honor.  Rory Shea for Sonos,

 4  Your Honor.

 5      I think what's happened here, Your Honor, is we've gotten

 6  on a path where the one thing we haven't looked at yet today

 7  about this patent is the claim.  Google and Mr. Pak has told

 8  you that the only innovative thing about this patent and this

 9  claim is saving.  And that's just simply not true.

10      If we look at the claim, there is a number of functional

11  steps, ten of them in one, 11 of them in another, that walk

12  through the step-by-step of how this process works.  And it's

13  not just -- unlike how Google wants to oversimplify this claim,

14  it is not just merely the act of saving --

15          **THE COURT:**  But he says that the prior art did all of

16  those many steps, with the exception of saving.

17          **MR. SHEA:**  And it's simply just not true, Your Honor.

18          **THE COURT:**  Oh, okay.  Well, then, give me a good

19  example of something that is clear-cut, that was not in the

20  prior art.

21          **MR. SHEA:**  Absolutely, Your Honor.

22          **THE COURT:**  I'm looking at Claim 1 of the '885.

23          **MR. SHEA:**  Okay, Your Honor.  Yes.  Let me pull that

24  up on the screen.  If we could go to Slide 23.

25          (Document displayed)

1          **MR. SHEA:**  So Your Honor, looking at Claim 1 of the

2    '885, and what we have done in our slide here is we've

3    annotated it to kind of break it into the two stages of how

4    this process works.

5          **THE COURT:**  Which slide is that?

6          **MR. SHEA:**  This would be 23.  I'm sorry, Your Honor,

7    this is behind the tab "Validity of the '885/'966 Patent."

8          **THE COURT:**  Okay.  Which number slide?

9          **MR. SHEA:**  Slide 23.

10       (Document displayed)

11          **THE COURT:**  Okay.

12          **MR. SHEA:**  So what you can see here, Your Honor, is,

13    as I mentioned, when we talk about zone scenes, what this was

14    was a new way of grouping players together that broke that

15    process down into two discrete phases.

16       You have a setup phase, where you actually set up or

17    create the group.  And then -- and that's -- part of that is

18    saving.  That's one part of it, but it's certainly not the only

19    part of that.  And then you have a separate process for

20    invocation.

21       And one of the critical things that this claim sets

22    forth -- and the '966 has very similar characteristics -- is

23    when you are going through the setup phase -- what happens is

24    that the controller -- the network device in the context of

25    this claim, which is the controller, is going to send two

separate kinds of messages in these two separate phases.

In the first phase, the setup phase, you can see this is in 1.6 and 1.7, the claim requires two different instances of it. But there's an indication of having been added to this zone scene, this pre-saved group that gets sent from the controller device to the zone player at that point.

Just at that stage, Your Honor, that is not something that was in Sonos's 2005 system. It couldn't be, because they didn't have zone scenes. That's just not how -- which Google, itself, concedes, at least for purposes of this motion.

The messaging that gets sent there, that is new. That was invented by Sonos, by Mr. Lambourne, as the first stage of the functional process of: How are we going actually do this?

It's one thing to just say: Hey, let's just save groups. Let me write that on a user post. It's quite another matter to say: Well, how are we actually going to implement that in a system like Sonos's? And that is what this claim lays out, over step by step.

So it walks you through. And it says: Okay, when the user is setting up a first group, we're going to send a first indication that you've been added to that first group.

Then the claim also specifies you can also add a player to a second group. Now, that's another thing that couldn't have been done in Sonos's system. In Sonos's original system, groups were mutually exclusive. You could only ever be a

member of one.  Because they weren't zone scenes.  They were
automatically activated, could only exist while being
activated.

Then what the claim says is, in 1.8, it also tells you how
does the player behave after having received those messages?
What, what does the player do?  Because there's different
things the player do when it gets those messages.

In Sonos's 2005 system, when the user asked to put a
player in the group, the player automatically began operating
as part of that group.

What this claim says in 1.8 is:  No, we're not going to do
that here.  For this zone scene technology, we're going to keep
that player in standalone mode.

So we've now added it to two groups, which is 1.6 and 1.7,
but in 1.8 says:  I'm going to keep it in standalone mode.
Because I want to be able to put -- create these groups but in
the background.  I don't want to use them right now.  This is
-- this is not something we're going to use right away.  This
is something I'm setting up for our future.

And then what 1.9 and 1.10 tell you is:  Now we're on to
some later point in time after you've done all that setup work.
And what it says is that now you send, after one of these zone
scenes -- and the player's in, too, according to this claim,
gets selected for invocation -- now I'm going to send this
separate message in the Claim 1.9, referred to as an

1    instruction to operate in accordance with the group, and that

2    instruction is then going to cause the group -- the zone scene

3    to become invoked, and cause the players to react in a

4    synchronized manner by coordinating with one another.

5        That's the actual point in time where this group is

6    activated.  Put into play, and can be used by a user to then

7    play back audio in synchrony.  So that's step by step.

8        Even setting aside the fact that Sonos's 2005 system

9    didn't have the capability for a user to create presaved

10   groups, it didn't have any of these other details.

11       **THE COURT:**  All right, okay.  I get your point.

12       What do you say to that, that saving is not the only

13   difference?  Counsel is saying that the -- the prior art did

14   not allow this mixing and matching; you could only be in one

15   group.  What do you say to that?

16       **MR. PAK:**  First of all, it's absolutely not true,

17   because their own expert, Your Honor, admits the following.

18       In the Sonos 2005 system, as you spoke to Ms. Baily about,

19   the party mode that we're hearing on YouTube Remote, they had a

20   party mode as well.

21       So in Sonos 2005 it was saved in the system called "party

22   mode."  It automatically added every speaker in the house into

23   this party mode.  That was Group No. 1.  And then, as we were

24   talking about, the users can create their own user groups in

25   Sonos 2005 by selecting from any combination of the speakers.

1        So right now, in 2005, absolutely true that a single

2   speaker can belong to multiple groups.  Number one.

3        Number two -- and I'm going to use Dr. Almeroth which is

4   Sonos's own expert, Your Honor, to walk through everything

5   else.  The only thing that is missing is saving.  And this is

6   on Slide 13.

7        I'll actually start with Slide 12 of my presentation,

8   Your Honor.  So --

9        (Document displayed)

10            THE COURT:  12?

11           MR. PAK:  Yes, Your Honor.  Slide 12 of my

12   presentation.

13        And just for shorthand, I'm going to use Figure 6 on the

14   left to walk us through the same figure you were discussing

15   with counsel.

16        Well, what's the first setup?

17            "Configure a zone scene.

18            "Decide which zone players to be associated

19            with the scene."

20        Well, that's exactly how Sonos 2005 system allowed you to

21   you create speaker --

22            THE COURT:  This is Figure 6 from what?

23           MR. PAK:  Figure 6 from the patent, the '885 patent.

24        And on the right, that's a demonstrative, Your Honor, from

25   Dr. Almeroth, which is Sonos's expert.  And he's showing an

illustration of the Sonos 2005 system where you can scroll to
see which of the speakers -- remember, all the speakers are
already part of the party mode, by default.

But you could also then go through this sequence that's
shown in Dr. Almeroth's own demonstrative, where you pick your
own user customized selection of speakers, and then you add
them to speaker groups.

And this is in Dr. Almeroth's own report.  You can create
and configure speaker groups, decide which zone players to be
associated with the scene.

And then if you turn to the next slide, Slide 13, Slide 13
of my presentation.  I'm using again Dr. Almeroth's own
demonstrative, demonstration of the 2005 system.

And he shows that, in fact, you provide indications from
the controller that you are using to the two zone players,
saying:  This is the group now that you have been added to.
And that that message was:

        "SetAVTransportURI message,"

And how do we know that?  If you turn to the next slide,
Slide 14, both experts agree that the first zone player
receives this SetAVTransportURI message that identifies the
group to join.  That's Dr. Schonfeld, Google's expert.

Dr. Almeroth says that SetAVTransport message was a
direction for the zone player to enter into a new ad hoc zone
group.

1       All of this is undisputed.  That the Sonos 2005 system had

2  indication messages that were being sent to the separate zone

3  players when they were being added to user customized groups.

4       And counsel talked about how this was such a big leap.

5  Just like with saving, Your Honor, you can look through the

6  entire patent, and you won't even see any algorithms or any

7  specific messages on this indication.

8       The only time the word "indication" ever shows up is in

9  the patent claim.

10       **THE COURT:**  All right.  What do you say to that

11  rebuttal?

12       **MR. SHEA:**  So Your Honor, first of all, I just would

13  repeat again, we are looking at a comparison here between the

14  Sonos system and the Figure 6.  Not what -- what is in the

15  claims.  And again, I think what -- there's an intentional

16  reason we are doing that, is because of the Figure 6 is broader

17  in scope than what the claims actually say and what they

18  require.

19       But in terms of what Mr. Pak has walked through so far,

20  Your Honor, the SetAVTransport message, while there was a

21  single message sent in Sonos's 2005 system, which -- which both

22  parties agree, that single message did everything at once.  It

23  both -- it created the group, and it invoked the group, and

24  that group was active at that moment.  It was a single message

25  that achieved all of that at once.

1          And that really is, I think, the whole key here.  So that

2     message is not the same as the messages we cited in our claims.

3     And, again, there are two of them in the claims.

4          Which, we looked at that claim.  I think it might still be

5     on the screen on Slide 23.  There's two -- there's a total of

6     three messages here recited, but two types, Your Honor.

7          (Document displayed)

8          **MR. SHEA:**  One type in 1.6 and 1.7.  That's saying

9     here's the indication to -- that you've been added.  That's the

10    message that -- that is sent as part of the creation --

11         **THE COURT:**  What's the point of sending a message to a

12    speaker that they've been added?  It's been added?

13         **MR. SHEA:**  So that they could -- so that it could be

14    saved at the speaker, Your Honor, so then it would be available

15    for future use.  Because the whole idea here is -- and I think

16    that this is getting lost.  The whole idea --

17         **THE COURT:**  Wait, again.  Gets saved at the speaker?

18         **MR. SHEA:**  Yes.

19         **THE COURT:**  Or does it get saved somewhere else?

20         **MR. SHEA:**  It gets saved at the speaker, Your Honor.

21    And I think, so if we go --

22         **THE COURT:**  Where does it say that?

23         **MR. SHEA:**  Yeah.  Let me get us to the right -- sorry,

24    Your Honor.  So the purpose of that message is for it to be

25    saved at the speaker.  Claim 1 of the '885 does not expressly

1    recite that it is saved at the speaker.  Claim '966, the

2    other -- one of the '966, does expressly recite that.

3        But what the specification tells you on that is that the

4    message is being sent, that an indication is being sent,

5    because it's being saved at the members of the group.  And

6    that's how this technology worked.

7        And saving it at the zone players in these types of

8    systems is an important aspect of this invention.

9        **THE COURT:**  Why is that so important?  Why can't it be

10    saved somewhere else?

11        **MR. SHEA:**  Yeah.  Good question, Your Honor.  So the

12    reason for that is because if you think about these systems and

13    how they work, the players, themselves, are the things that

14    remain in your listening environment at all times.  Those are

15    the things that you put on shelves or tables or bookcases, and

16    you plug them in.

17        The controllers, which would be the other primary option

18    for saving -- there are maybe other options, like the cloud,

19    Your Honor.  But the other primary option would have been the

20    controller.  The problem with controllers is that they can come

21    and go from the system, Your Honor.

22        So if you think about, for instance, your smartphone

23    today, which is the most common implementation of a controller

24    today.  You may leave your house and take your smartphone with

25    you.  And if these zone scenes, these presaved groups, are on

1    your phone, they've now become unavailable for use by anybody

2    else in your home.

3        So one of the things that Sonos focused on doing here is

4    we want to have these -- the preferred embodiment of zone

5    scenes was to save them on the zone players.  So that as

6    different controllers came and go, and connected to the system,

7    those presaved zone scenes would always be available there, so

8    that users could then invoke them for future use.

9        And, and that's really -- and the whole --

10        THE COURT:  So, so the -- all right.  So let's say you

11    have two people who live together in a house, A and B.  And A

12    sets up the speakers morning, evening, and so forth, and the

13    configurations, and then goes on a trip to Thailand.

14        And then B is still there, but B does not have -- what

15    does B have to have on their phone, or how would B go about

16    operating the morning and the evening configurations?  What has

17    to be on B's phone?

18        MR. SHEA:  Yeah.  So B's phone would still have to

19    have an app that would allow them to interact with and control

20    the system.  For Google, that would be the Google Home app, for

21    instance.  You would have to have that app.

22        But, but the key is because the zone -- the groups were

23    not saved on the phones, your app can now still access those

24    presaved groups.  Because they're stored on the players.  And

25    that's the important piece.

1          **THE COURT:**  The players connect to the home wifi, and

2    the wifi connects to the new iPhone and tells -- updates it,

3    and populates it with what the configurations are?

4          **MR. SHEA:**  That's exactly right, Your Honor.  So the

5    way these things work is every time you connect a phone with

6    one of those apps to the systems, the -- the phone then

7    communicates with the system, pulls that system, and then pulls

8    down that information from the system that exists in the home.

9    The thing that -- you know, the players, themselves.

10         **THE COURT:**  Okay.  Hold that thought.

11         Did the prior art that you are invoking, did Sonos's own

12   speakers do that?

13         **MR. PAK:**  Absolutely, Your Honor.  And not only that,

14   he's just wrong when he says that the patent requires the zone

15   groups or scenes to be saved in a zone player.  And we can look

16   at that in Slide 11 of --

17         **THE COURT:**  But he said '966.

18         **MR. PAK:**  Yes, '966.  There's only one claim that's

19   being asserted that requires it.  Every other claim that's been

20   asserted doesn't mention anything about where you save the

21   group information.

22         **THE COURT:**  What is asserted in '966?

23         **MR. PAK:**  There's a claim, I believe Claim 4 --

24   there's a variety of claims asserted.  One of the dependent

25   claims, Claim 4, I believe, says that the zone scene

```
 1   information is saved in the zone player.  But all the other
 2   claims are silent on that issue.
 3           THE COURT:  Well, but is zone -- is Claim 4 asserted?
 4           MR. PAK:  Claim 4 is asserted.
 5           THE COURT:  Well, but you said none of them asserted
 6   were --
 7           MR. PAK:  Oh, sorry.  The vast majority of them do not
 8   mention that.  Only one --
 9           THE COURT:  All right.  So one does and the rest
10   don't.
11           MR. PAK:  The rest of them do not.  And this is why,
12   Your Honor, on Slide 11.
13       (Document displayed)
14           MR. PAK:  Your Honor found in the showdown order --
15           THE COURT:  I'm sorry, which one is yours?
16           MR. PAK:  It's the one with the blue --
17           THE COURT:  This one (Indicating).
18           MR. PAK:  Yes, Your Honor.  Slide 11.
19           THE COURT:  Okay.  What did I say?
20           MR. PAK:  Your Honor stated in the showdown order at
21   Page 15, Docket 309 (As read):
22               "Sonos additionally points to the
23               specification's disclosure that 'various
24               scenes may be saved in any of the members in
25               a group.'"
```

1    And that's significant, Your Honor, because if you turn to

2    the bottom portion of that slide at Column 10, Line 66 to

3    Column 11, Line 7, both patents being asserted here

4    specifically state that a controller is a member.  And in

5    particular, it says:

6              "In one embodiment, data including the

7              parameters" --  these are the parameters that

8              is used to set up zone scenes -- "is

9              transported from a member (e.g., a

10             controller) to other members in the scene so

11             that the players are caused to synchronize an

12             operation configured in the scene."

13    So what this is telling us explicitly, Your Honor, is the

14    invention doesn't care about where you store it, whether it's

15    in a zone player or a controller.  It could be any member of a

16    group which includes the controller.

17    And to Your Honor's question about the morning mode, it

18    would be true if your wife set up the morning mode for herself,

19    and she's traveling to Italy, that you wouldn't be able to

20    access it.  But that's okay, because these are supposed to be

21    user-defined groups, unlike the built-in party mode.  She may

22    have a different group for morning mode than the one Your Honor

23    might decide for yourself to play in the morning.

24    So these are user customizable groups.  And that's the

25    reason why the invention tells us in the specification that you

 1    can store it anywhere.  And again, we didn't hear anything from

 2    counsel about any additional disclosure of saving.  No

 3    disclosure of how to send indications.

 4        And to answer your question, Your Honor, I did find that

 5    *KSR* case; I want to read it for the record.

 6            **THE COURT:**  Go ahead.

 7            **MR. PAK:**  Yeah.  So this is *KSR Teleflex*, 550 US 398.

 8    A Supreme Court case, dealing with obviousness.  This is at

 9    403.  Quote (As read):

10            "Third, the Court erred in concluding that a

11            patent claim cannot be proved obvious merely

12            by showing that the combination of elements

13            was obvious to try.  When there is a design

14            need or market pressure to solve a problem

15            and there are a finite number of identified

16            predictable solutions, a person of ordinary

17            skill in the art has good reason to pursue

18            the known options from his or her technical

19            grasp.  If this leads to the anticipated

20            success, it is likely the product not of

21            innovation, but of ordinary skill and common

22            sense."

23            **THE COURT:**  All right.  I'm going to -- we've got to

24    break here.  We've been going two hours.

25            **MR. PAK:**  Yes.

1          **THE COURT:**  Give you ten to 12, 15 minutes; is that

2     enough, Belle?

3          **THE REPORTER:**  (Nods head)

4          **THE COURT:**  And then we'll come back, and I'm going to

5     let the other side make one important point; you get a

6     rebuttal.  And then I've got an 11:00 calendar, so I have to

7     move on to the next problem.

8          **MR. PAK:**  Yes, sir.

9          **THE COURT:**  So the Sonos side gets to make an

10    important point when we return.

11         **THE COURTROOM DEPUTY:**  Court is in recess.

12       (Recess taken from 10:06 a.m. to 10:29 a.m.)

13         **THE COURTROOM DEPUTY:**  Please remain seated.  Please

14    come to order.

15         **THE COURT:**  Wait for my law clerk for a second.

16       Okay, Sonos gets to make one important point.

17         **MR. SHEA:**  Thank you, Your Honor.

18       My one important point here, Your Honor, is that even

19    setting aside the question of whether there was motivation to

20    make the modifications that are being proposed here by Google,

21    I think really the one important point is even if you were to

22    go ahead and make that accommodation, even if a person of

23    ordinary skill in the art was to take Sonos's 2005 system as it

24    existed at that time and combine it with what little is said in

25    these Sonos forum posts, effectively -- I would say zone links

as favorites.

Even if you were to combine that all together, the key here is that combination does not disclose or suggest several elements of the claim.  And that is the key.

I mean, in almost every obviousness case that you see, you always have a situation where the combination, in one place or the other, there's disclosure of all the elements of the claim.

THE COURT:  All right.  Well, you're back on your other point, but that's fine, that's -- but -- I'm sorry, I've got so much paper up here that I -- here it is.

Without prejudice to you, give me one example.

Which patent are we on?  '885?  Yes.  Right?  '885?

Give me one example from the '885 Claim 1 that you think is not in that prior art.  Just one limitation.

MR. SHEA:  Yeah.

THE COURT:  Then I'm going to ask the other side to explain to me where it is in the limitation.  So give me your best shot on that point.

MR. SHEA:  I'm just going to start -- and I think there are several.  But limitation 1.8 of this claim requires that after you have received those first and second indications that you've been added to zone scenes, you continue to operate in standalone mode until one of those zone scenes is selected for invocation.

Your Honor, that is very clearly not disclosed in the

1    prior art.  Because, in Sonos's system, when you received an

2    indi- -- when you received a message, the AV transport message,

3    you automatically entered the group mode.  Google's opening

4    brief actually says that.  I mean, so there's really no dispute

5    on that.

6         In the -- in Sonos's system, when you received an

7    indication in the form of an AV transport message, you will

8    automatically transition into group mode at that point in time.

9    You did not remain in standalone mode.

10         **THE COURT:**  Okay, wait.

11    Is that true?

12         **MR. PAK:**  In the Sonos 2005 system?

13         **MR. SHEA:**  (Nods head)

14         **MR. PAK:**  Yes.  In the Sonos 2005 system, it was true

15    that when you created the groups, Your Honor, and you added a

16    speaker to the group, that it would take on the group behavior.

17    So I agree with that statement.

18         **THE COURT:**  All right, so 1.8 was not -- did not

19    appear in the prior art.

20         **MR. PAK:**  No.  I -- can I respond to that?

21         **THE COURT:**  Yes.

22         **MR. PAK:**  Okay.

23         **THE COURT:**  If you do it briefly.

24         **MR. PAK:**  Yes.  It wasn't in the 2005 system.  It was,

25    however, exactly the point of the Sonos forum postings.  So

 1   this is on Slide 21, Your Honor, of my presentation.

 2        So, remember what -- Your Honor already decided this issue

 3   of what, what disclosure is sufficient to show that you're

 4   transitioning from a speaker that is on its own to being added

 5   to a group while still operating in a standalone mode.

 6        And what Your Honor stated in the showdown order, and also

 7   reflecting what Sonos said in the reply, is this idea that

 8   you're creating a zone group for later use.  You're going to

 9   save it, so you don't immediately transition to group mode.

10   You're going to save it for later use.  And that's the only

11   thing that was necessary to satisfy the claim sequence of I'm

12   going to add a speaker to a group while I'm in a standalone

13   mode.

14        And as Sonos explained in their reply, this idea of just

15   saving a zone group for later use, quote (As read):

16              "...conveys to a person of ordinary skill in

17              the art that a 'zone player' operating in

18              'standalone mode' prior to being added to

19              each new zone scene will continue to operate

20              in 'standalone mode' after being added to

21              each new zone scene."

22        So Sonos was saying:  Look, if I --

23              THE COURT:  No, I said briefly, now.  You're taking up

24   his time.

25              MR. PAK:  Yes.

1              **THE COURT:**  All right.

2          **MR. PAK:**  So --

3              **THE COURT:**  No, no.  Sonos gets to make its important

4    point.

5        Go ahead.

6          **MR. SHEA:**  Yes, Your Honor.  I mean, I think this is

7    really -- if you go again, we're now back talking about

8    briefing and things.  Let's look at the evidence.  Let's look

9    at the art.

10       If you look at the posting, they're trying to -- Mr. Pak

11   just admitted, right, that wasn't in the Sonos 2005 system.  He

12   is now saying it's in the Sonos forum post.  But critically,

13   the Sonos forum post, it says nothing.  It is completely silent

14   as to what happens to a player when you would save this group.

15   (Indicating quotation marks).

16       And there's a variety of options that can happen.  First

17   and foremost, this doesn't say whether the user -- because,

18   again, there's no detail here.  So it doesn't say whether the

19   user was talking about taking a group that had already been

20   created and saving it again, in which case the player would

21   still be in group mode.

22       It doesn't say whether, well, when I create a group the

23   first time, it's going to automatically put the player into the

24   group.  In which case, it would leave standalone mode.

25       And so --

1          **THE COURT:**  Wait.  I want to focus on your 1.8.  The

2     phrase: continuing to operate in the standalone mode until

3     given one of the first or second zone scenes have been selected

4     for invocation.

5          So the phrase "continuing to operate in the standalone

6     mode."

7          **MR. SHEA:**  Yeah.

8          **THE COURT:**  Does that mean the speaker is actually

9     putting out sound?  Or what -- can you do these configurations

10    when -- under the patent, when you're not listening to

11    anything, but you're sitting there in total silence?  But you

12    are saying:  Oh, it would be nice to have the hallway and the

13    deck hooked up together.  And then can you -- or does your

14    patent not cover that?

15         **MR. SHEA:**  No, Your Honor, it does cover that.  It

16    covers that if the player is in standalone mode, if it's

17    available for individual playback, that's standalone mode.  And

18    when you add it to the group -- what 1.8 is saying is when you

19    add it to the group, it stays in standalone mode.  It does not

20    automatically enter the group at that point in time.

21         **THE COURT:**  Well, but it does -- it sounds like it's

22    operating.  And that your patent doesn't even cover it if you

23    do it in silence.

24         **MR. SHEA:**  No, Your Honor.  I'm saying it would cover

25    that.

1      THE COURT:  That's what you say, but the language says

2  "continue to operate."

3      MR. SHEA:  "Continue to operate in standalone mode."

4  And "standalone mode" is defined as a mode in which you're

5  configured for individual playback.  Not --

6      THE COURT:  That's what you say, but somebody might

7  read this to say it has to be actually operating and putting

8  out sound out of the speaker in standalone mode.  And that if

9  you do it whenever -- if you make the adjustment when it's in

10  silent, or -- or let's just say -- yeah, there are two

11  instances I can think of.  One is when it's not operating at

12  all.

13      Now, I know you're trying to fix that problem on the fly

14  by saying:  Well, it's not operating.  It's configured as

15  stand- -- I don't know.  I think that's a problem for you.

16      But even more so, what if you -- what if it's already

17  operating, and you've got -- you have it on a saved scene?

18  You've got the front porch going with the kitchen at the same

19  time from a preset -- it's not standalone.  But now you're

20  going to decide:  Okay, we're going to put in living room and

21  den.  And you punch that into your computer as a future scene

22  to be saved.

23      (Documents displayed)

24      THE COURT:  Your patent wouldn't cover that.  Because

25  it's operating in -- it's not operating in standalone mode;

1    it's operating with two speakers.

2        **MR. SHEA:** Yeah, that part is right, Your Honor. I

3    agree with that last part you're saying. Which is that if --

4    if you are adding a player to a zone scene at a time where it's

5    already part a group, that would not be -- that would not fall

6    within the scope of these claims. That's absolutely true.

7        What the claims require is that you have a player that

8    starts out in standalone mode. And what I want to point out,

9    Your Honor, is Element 1.5 does have definitional language for

10   what "standalone mode" means. And what it says is that it's a

11   mode in which the player is configured to play back media

12   individually. So, so when I was referencing that previously,

13   that was the language I was intending to reference.

14       And that language of being configured to play back

15   individually is not -- does not require active playback or

16   playing actively. It just means that you're in a mode in which

17   you are configured for individual playback.

18       And so what the claim is saying and the key point of 1.8

19   is: If I've got a player that's on its own, it stands alone.

20   It's configured for individual playback. I can add that player

21   -- whether or not it's outputting audio actively, I can add

22   that player to these presaved groups. And that act of adding

23   them to those presaved groups, it's not going to automatically

24   pull them out of standalone mode, and put it into a group mode.

25       And there's a lot of reasons why a user would not want to

do that.  Because, again, one of the main purposes of these groups is to set them up for some future use.  Which is why -- and that's the particular scenario this claim is intending to cover, is a scenario where you've got players that are in standalone mode, but you're creating groups for future use.

And that -- that idea that you're adding players to groups, you're sending them these indications but then the players are going to stay in standalone mode, that element is not disclosed.  That element, alone, is not disclosed in either of these things.  Because the Sonos forum posts don't tell you what you're going to do when you save a group.  Are you going to put the player immediately in the group?  Or are you going to keep it in standalone mode?  They don't say.  And, and that's just one example.

Again, the Sonos forum posts don't say how the messaging would work.  They don't talk about where the zone scene is going to be stored.  They don't talk about the fact that these zone groups can exist in an uninvoked state.

There's all these aspects and requirements of these claims that are not disclosed in that Sonos forum's post, and were not in Sonos's 2005 system because they didn't have presaved groups.  They had -- they only had zone groups where they would be automatically activated at the time the user created them.

THE COURT:  All right.  You get to respond.

MR. PAK:  Let's look at these posts, Your Honor.  And,

1   they say exactly that.  They say that I can create a morning

2   mode for use in the morning.  I can create a summer mode, a

3   winter mode.  These are all modes that can be used for future

4   use.  I'm not going to create a summer mode and a winter mode,

5   and then simultaneously transition to both summer and winter

6   modes.  The whole point is I'm going to create modes that can

7   be invoked at a later time.

8       And Your Honor has already found, at the urging of Sonos,

9   that, alone, means that I'm standing in standby mode -- or in

10  standalone mode, whether the music is playing or not.  I'm in

11  standalone mode when I'm creating different modes or zones,

12  groups, for future use.

13      That's exactly what these posts were all about.  It's all

14  about creating and saving groups for future use, Your Honor.

15  And I think that's sufficient.  That's the only thing that's

16  disclosed.  There's nothing else in the patent about how you

17  would do this.

18         **THE COURT:**  I have a question for both of you on this.

19         **MR. PAK:**  Sure.

20         **THE COURT:**  I had -- somehow I had the impression --

21  let's say you have a speaker in the kitchen.  I was under the

22  impression you could have it in -- under this invention, in,

23  say, group morning, and group evening.

24      But counsel is saying to me:  No, it has to be standalone,

25  and can't be assigned to a group unless it's in standalone.

1        Did I misunderstand you?

2            **MR. SHEA:**  No, Your Honor.  So the way the claim is

3    written and the way the invention would work is you would have

4    a player that was in standalone mode; it was off on its own.

5    And you could pre-add it to multiple different groups.  So you

6    could add it to morning, and you could add it to evening.  But

7    it -- but after you do that, after you add it to morning and

8    evening, the player continues to exist in standalone mode until

9    the second half of the claim.

10       And then what you would do is you would come in maybe a

11   day later, and you would say:  Okay, I want to use my evening

12   mode now.  And when you invoke that evening mode, then at that

13   point the player joins the group and does the things it needs

14   to do to play back in synchrony, as part of the group.

15       So, absolutely, it is true.  You can add these players to

16   as many of these presaved groups as you want.  The key, though,

17   is that the act of creating those presaved groups don't cause

18   the player to start operating as part of the group.  You can

19   still listen to music on that player, by itself, on its own.

20   You can still listen to it as just a kitchen speaker, until

21   some later time.

22           **THE COURT:**  That doesn't sound right.  It says

23   "continuing to operate in the standalone mode."  Does that

24   mean, you can -- you can -- once you add something to Group A,

25   it no longer is in standalone mode.

1          **MR. SHEA:**  Your Honor, I think the key here is --

2          **THE COURT:**  How can you add it to Group B?

3          **MR. SHEA:**  Well, so again, Your Honor, when you add it

4     to Group A, it is still in standalone mode.  Because they're

5     presaved.  The groups don't -- exist only in the background.

6     So the mere fact that you're a member of a presaved group

7     doesn't preclude that you are still in standalone mode.  You're

8     still operating on your own for playback purposes.

9        It's only when you later activate the group, you actually

10    go to your controller, and you select it, and you say:  Okay,

11    now I want to use this group that I created yesterday.  That's

12    when the player leaves standalone mode.

13         **THE COURT:**  I don't know.  All right.  I'm going to --

14    I got some other questions for you.  And then I've got to go to

15    my next calendar.

16       One of the issues on the -- why are we -- what is this

17    contract claim that Google has?

18         **MR. PAK:**  Yes, Your Honor.  I'm going to turn it over

19    to Ms. Baily, to address that issue.  And then also

20    Mr. Roberts.

21         **MR. ROBERTS:**  Your Honor, since this is our motion,

22    would you like me to go first?  Or would you like Google to go

23    first?

24         **THE COURT:**  First I'd like for them to explain, in two

25    minutes or less, what the claims even are.  And then I'll let

 1  you have a reply.  But we're not going to have time to go

 2  through the entire motion.

 3       Okay, go ahead.

 4       **MS. BAILY:**  Thank Your Honor.  Melissa Baily for

 5  Google.

 6       So we have two affirmative claims in the case.  One is for

 7  breach of contract, and one is for conversion.  And I'll start

 8  with the breach-of-contract claim.

 9       There was a contract that governed a collaboration between

10  Google and Sonos.  And that contract had an ownership provision

11  related to developments that Google made in the context of that

12  collaboration.  And it stated that Sonos could not claim for

13  itself those developments that Google contributed to the

14  collaboration.

15       It's undisputed that Google contributed to the

16  collaboration the notion of a cloud queue.

17       **THE COURT:**  A what?

18       **MS. BAILY:**  A cloud queue, that we were discussing

19  earlier.

20       **THE COURT:**  Uh-huh.

21       **MS. BAILY:**  And other technology related to -- to

22  playback from Google Play Music onto Sonos speakers.

23       Our assertion is that because of this ownership provision

24  that governed that collaboration, Sonos could not claim for

25  itself a patent that it purports to cover the very work that

1    Google contributed to that collaboration and then asserted

2    against us, because Google owns that technology.

3        Also what Sonos couldn't do but did do is take Google's

4    technology from the collaboration, claim it for itself, and

5    give it to its other partners.

6        So there are a variety of breaches of this ownership

7    provision, of an agreement that governed the collaboration

8    between the parties, that relates to the playback of Google

9    Play Music onto Sonos speakers.

10       **THE COURT:**  Okay.  What is your response to the motion

11   -- what is your motion?

12       **MR. ROBERTS:**  Let me make one point, which is

13   novation.

14       So Your Honor, pictures are helpful.  If you look at the

15   slide that is the first slide under Sonos's MSJ, in our tab.  I

16   have a timeline.

17       And the reason I want to talk about novation is because

18   there are two contracts here.  There's a 2013 CIA content

19   integration agreement, and a 2018 SIA.

20       (Document displayed)

21       **MR. ROBERTS:**  And it's Sonos's position that the 2018

22   SIA eliminated the 2013 CIA.  It covers the same subject

23   matter, and it contains an integration agreement that expressly

24   gets rid of all agreements, understandings, et cetera.

25       **THE COURT:**  What does "SIA" mean?

1          **MR. ROBERTS:**  The SIA -- I believe it's Services

2     Integration Agreement.  Service Integration Agreement.

3          **THE COURT:**  Read me the language that got rid of.

4          **MR. ROBERTS:**  Yes.  And Your Honor.  I have this

5     slide, it's Slide 6 behind the tab which is 12.8 of the Service

6     Integration Agreement.  And it says (As read):

7               "This Agreement, including its attachments,

8               constitutes the entire agreement between the

9               Parties Regarding its subject matter, and

10              supersedes all prior communications,

11              negotiations, understandings, agreements and

12              (sic) representations, either written and

13              oral, by or among the Parties regarding its

14              subject matter."

15     There is no dispute that it says that.  Google's only

16     response is to say it's a different subject matter.  And it

17     says it's a different subject matter, because the system

18     integration agreement they say dealt with YouTube music, and

19     the CIA dealt -- sorry.  The system dealt with YouTube, and the

20     CIA dealt with Google music.

21          So they said these were two different integration

22     projects, and therefore, it's two different subject matters.

23     That's their response.

24          **THE COURT:**  What did the original agreement say was

25     the subject matter?

1          **MR. ROBERTS:**  Thank you, Your Honor.  If we turn to

2   Slide 8, this has the subject matters of both the CIA and the

3   SIA next to one another.

4          And you can see at the top where it talks about what is

5   the project that Google is providing.  It says (As read)"

6               "Service provider" -- that's Google --

7               "operates an Internet-based music service

8               providing content to consumers..."

9          That's what was being integrated in the CIA.  Not a

10  specific, only one; it's "Internet-based music service."

11         And then if you look down at the SIA, which is immediately

12  below it, it says:

13               "...Service provider operates an

14               Internet-based service providing audio

15               content to consumers."

16         It is the exact same language with slight, wording

17  variations.

18         It's the same on Sonos's side.  What's being integrated on

19  Sonos's side?  (As read)

20               "Sonos manufactures, markets and sells

21               products comprising a wireless home music

22               system (the 'Sonos MMS')..."

23         So the CIA is about the Sonos MMS, which is products

24  comprising a wireless home music service.  And the SIA on

25  Sonos's side is about the Sonos system, which is the Sonos

1    products and the Sonos cloud service, where "Sonos products"

2    means the Sonos hardware and software comprising a wireless

3    multi-room audio system.

4    So both the language about what Google's providing from

5    their integration and the language about what Sonos is

6    providing on its integration are the same in the CIA and the

7    SIA.

8    More importantly, the SIA undoubtedly covers direct

9    control, which is what this patent is about.  And this is -- go

10    back one slide, to Slide 7.

11    (Document displayed)

12    **MR. ROBERTS:**  This is from the SIA.

13    So the subject matter of the SIA talks expressly about

14    direct control technology.  And it talks about (As read):

15    "'Direct Control Experience' means the

16    experience whereby the End User may control

17    the Sonos System from within the Service

18    Provider App."

19    This is an integration agreement about and including the

20    integration of direct control.  Which is exactly what this

21    patent is about.

22    So the language about what Sonos is providing and the

23    language about what Google's providing is the same between the

24    two.  And the SIA is expressly directed and encompasses direct

25    control technology, which is the subject matter of the patent.

1          **THE COURT:**  All right.  I'm sorry, I don't -- on Page

2  -- Slide 7, I don't see where -- you seem to be saying that it

3  says Sonos gets all the patents.  Where does it say that?

4          **MR. ROBERTS:**  Yeah.  So that's actually, Your Honor,

5  if you want that, in Slide 9.  This is from the SIA.  And this

6  is the Service Integration Agreement.

7      (Document displayed)

8          **MR. ROBERTS:**  (As read)

9              "All right, title and interest, including

10             Intellectual Property Rights to, the Sonos

11             System are retained by Sonos.  Service

12             Provider will not claim for itself or for any

13             third party any right, title, interest or

14             license" -- which is effectively what they're

15             trying to claim -- "to the Sonos System,

16             except for the limited licenses granted

17             herein.  Both parties recognize and

18             acknowledge that certain features of either

19             Parties' Materials, the Service Provider App

20             and the Sonos System may be protected by

21             patent law."

22     And the key thing about that, Your Honor, is at that time,

23  we had already told them they infringed the direct control

24  family.  We had sent them claim charts from the same family of

25  patents, saying:  You infringe.

1              **THE COURT:**  At what time?

2              **MR. ROBERTS:**  At the time the SIA was signed in 2018.

3              **THE COURT:**  Okay.

4         What do you say to that, Ms. Baily?

5              **MS. BAILY:**  So first of all, for there to be a

6    novation, the subsequent contract has to expressly and clearly

7    state that the parties intended to extinguish the original

8    agreement.

9         The SIA makes zero mention of the CIA, which was the first

10   contract that Sonos is saying was extinguished by the second.

11   So under novation law, it has to be very clear that what you're

12   doing is extinguishing the prior contract.

13        And there's case law, if we bring up Slide 28, that says

14   that in order to make that very clear, you have to actually

15   refer to the prior contract.  There's no reference here.

16        And the reason why that makes sense, the two

17   collaborations -- and we provide evidence of this in our

18   opposition -- were completely distinct.  The collaboration

19   under the CIA which was the first contract which forms the

20   basis of our breach-of-contract claim was from 2013 to 2015.

21   It ended.  Then, in 2018, there was a new collaboration.

22        With respect to the subject matter, of course, the subject

23   matter relates to speakers, because that's what Sonos does.

24   And music service.  Because that's what Google does in relation

25   to speakers.  That doesn't mean that it's the same

collaboration or the same subject matter.

And the way that you know that when looking at the evidence cited in our opposition is that all of the evidence shows that that first collaboration, which was from 2013 and ended in 2015, years before the second contract, was about Google Play Music.

THE COURT:  About what?

MS. BAILY:  Google Play Music.

THE COURT:  Google Play?

MS. BAILY:  Google Play Music was the music service that we were working on with Sonos in that collaboration to play Google Play Music on Sonos speakers.  That collaboration ended in 2015.

2018, the YouTube group, totally different people at Google.  None of the same participants from the first collaboration.  They want to enter into a collaboration with Sonos.  Sure, it's about speakers and music, because that's what the two companies do in relation to each other.  But it had nothing to do with the first collaboration.  It was a separate collaboration governed by a separate contract that made no reference to the first contract.

The notion that that contract years later would extinguish a contract that governed a completed collaboration without referencing it, is nonsensical.

The standard for novation was high.  I was actually

1   shocked when that was the important point that was chosen to be

2   argued because --

3           **THE COURT:**  Were any of your people at Google

4   inventors of these alleged inventions?

5           **MS. BAILY:**  So Google doesn't -- Google invented the

6   invention in the YouTube days, right?  So, so, so by the time

7   -- that was argument from earlier today.

8       So what we would say, you know, the inventions --

9   purported inventions are invalid, because Google invented it

10  before the collaboration even started.  And that's the argument

11  we had earlier today.

12          **THE COURT:**  Okay.

13          **MR. ROBERTS:**  Can I just respond very briefly,

14  Your Honor?

15          **THE COURT:**  Thirty seconds.

16          **MR. ROBERTS:**  Okay.  One, she said it's required that

17  you mention it expressly in writing.  That is not true.  This

18  is the *Hunt v. Smith* case, cited on Page 7 of our reply.

19      Quote (As read):

20          "It is not necessary to meet and either state

21          in writing or orally that the original

22          contract was rescinded."

23      Close quote.  Just false.

24      Second, if you look at the timeline that I provided, you

25  can see, Your Honor, that the patent, the '033, is an unbroken

 1  string of continuations from a Sonos patent filed December 30,

 2  2011.  So we have a patent filed before the first

 3  collaboration, an unbroken string of continuations with no new

 4  matter added.  And then afterwards, in 2019, the application

 5  for the '033.  So they're stuck.

 6      Either this is original Sonos IP before any collaboration

 7  that was entered into, or if they want to say:  No, the breach

 8  was filing the specific application leading in 2019 to the '033

 9  patent, that was after this agreement was replaced by the 2019

10  integration agreement.

11      It's true, Your Honor, that you move from one project to

12  another project over time, in terms of the integration, as the

13  technology grows.  But what this says, if you look -- Google

14  Play Music is referenced nowhere in the 2013 CIA.  It's not

15  there.

16      **THE COURT:**  Did the collaboration come before or after

17  the specification for the patent?

18      **MR. ROBERTS:**  After.  That's the point of the --

19  that's the point of the -- of the timeline (Indicating).

20      **THE COURT:**  What do you say to that point?  The

21  patents can't possibly have been influenced by the

22  collaboration, if the -- if the specification is locked in

23  stone earlier.

24      **MS. BAILY:**  So two things, Your Honor.  First of all,

25  there is no written description support in the specification.

1          THE COURT:  Say that again.

2          MS. BAILY:  There's no written description support in

3     the specification for the claim that came later, that claimed

4     the developments that Google contributed to the collaboration.

5     So it's not in the written description of that earlier

6     specification.

7          THE COURT:  You're saying that the specification did

8     precede the collaboration.

9          MS. BAILY:  (Nods head)

10         THE COURT:  But then, in the midst of the

11    collaboration, Sonos said:  Ha, Google has a good idea.

12         MS. BAILY:  (Nods head)

13         THE COURT:  Let's go claim that.  You're relying on

14    our earlier specification.  And since that whole process of the

15    PTO is so easy to get a patent through, they got a patent

16    through, covering your idea.

17         MS. BAILY:  That's exactly correct, Your Honor.

18         THE COURT:  What do you say see to that?  Because I've

19    seen it in other cases.

20         MR. ROBERTS:  Yes.  And this is why I have gone to --

21    so, first of all, we dispute it.  There is -- we've covered

22    this extensively in the briefing, and I won't reargue it.

23         But there is literally nothing that they can point to to

24    create a clear and convincing case --

25         THE COURT:  Is this the case where the guy was -- or

1    was that a different, where we had -- didn't this come up

2    earlier in this case?

3          **MR. ROBERTS:**  It did.  We moved to dismiss.  And you

4    said:  I'm not going to dismiss it at this point, because maybe

5    they could show it.  And if they could show it, then we will

6    deal with it on summary judgment.

7          So now we're on summary judgment.  Time's up.  Show us

8    where this -- prove that by clear and convincing evidence that

9    this is not in the spec.  And they haven't done it.

10         But the reason my point is novation, Your Honor, is

11   because it doesn't matter.  Their argument is to say: Hey,

12   look -- and again, going to the timeline -- what we think is

13   that you added this idea to the claim in 2019.  So the act of

14   wrongdoing took place in 2019, when you added this to the

15   claim.

16         And at that point, the 2013 agreement didn't exist

17   anymore.  It had been replaced by the 2019 agreement.  And they

18   don't say that we violated the 2019 agreement, at all.  The

19   only agreement they say that we violated is the 2013 agreement.

20   And they say we violated it by filing this application in 2019.

21         But when we filed that application in 2019, the 2018

22   agreement had replaced the 2013 agreement.

23         **THE COURT:**  That's a legal question that I'm not

24   prepared to answer yet, whether it did replace it.

25         Okay, I've got to get to the 11:00 calendar.  But you get

1  one more -- you were about to say something.

2        **MS. BAILY:**  I was just about to say, because it's not

3  just the '033 patent that's at issue.  Sonos filed applications

4  on -- for other patents that claim or purport to claim cloud

5  queues, right in the midst of Google sharing that information

6  with Sonos.

7        And so I say that, just so Your Honor understands when you

8  go back and review the papers, that the breach-of-contract

9  claim is not only based on the '033 patent, the breach of it.

10  It is based also on other prosecution activities and other

11  business activities by Sonos.

12        **THE COURT:**  Is this a jury issue, or what?

13        **MS. BAILY:**  It is a jury issue.

14        **THE COURT:**  Okay.  Go ahead.

15        **MR. ROBERTS:**  The last thing she just said, that

16  argument was raised for the very first time in the opposition

17  to our summary-judgment motion.

18        There is nothing in the complaint, in the discovery, or in

19  the expert reports, anywhere, saying that Sonos breached the

20  2013 contract by sharing materials with another party, or by

21  prosecuting some patent that isn't at issue here.

22        And even if there were, California statute of limitations

23  is four and a half years, and they're just out of time.

24        **THE COURT:**  Well, but maybe it still can be an

25  affirmative defense.

1          **MR. ROBERTS:**  If it were pled as an affirmative

2     defense, it could be.  It's not in the complaint.  We're not

3     moving to strike the unclean hands.  This is about their breach

4     of contract.  And that's the summary-judgment motion.

5          **MS. BAILY:**  Your Honor, we took discovery on breach of

6     contract, and we have the evidence of breach of contract

7     (Indicating).  We have evidence of Sonos deleting Google's name

8     from Google's work, and then sharing it with Pandora.

9          **MR. ROBERTS:**  And where -- where in the complaint, in

10    the discovery, or the expert report is that?

11          **MS. BAILY:**  Doesn't need to be in the complaint.  We

12    took the discovery.

13      And we have an email with a smiley face from Sonos,

14    deleting references to Google, and then sharing our work with

15    its partners.  We should be able to rely on that evidence.

16      Our breach-of-contract claim is well-pled, and novation

17    clearly does not apply.

18          **MR. ROBERTS:**  Do I get to add new theories in response

19    to their summary-judgment motions?

20          **THE COURT:**  In the course of this case, both of you've

21    added quite a number of new theories.  So, I don't know the

22    answer.

23      All right, thank you.  This discussion has helped me

24    understand that motion.  All right.  I'm going to step off the

25    bench.

1          All of the pending motions are under submission, except I

2     will agree that the parties will be realigned, so that at

3     trial, Sonos is the plaintiff, and gets to present first.

4          Okay.  That's what you've agreed to, right?

5               **MS. BAILY:**  Yes, Your Honor.

6               **MR. PAK:**  (Nods head)

7               **THE COURT:**  All right.  So I'm going to step off the

8     bench for a few minutes, and then the 11:00 calendar can come

9     forward.

10          Thank you all.  Good luck.

11               **MR. PAK:**  Thank Your Honor.

12               **THE COURTROOM DEPUTY:**  Court is in recess.

13          (Proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Friday, April 7, 2023