1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
5  405 Howard Street
San Francisco, CA 94105-2669
6  Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759
7
SEAN M. SULLIVAN (*pro hac vice*)
8  sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
9  smith@ ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
10  boyea@ ls3ip.com
COLE B. RICHTER (*pro hac vice*)
11  richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
12  656 W Randolph St., Floor 5W
Chicago, IL 60661
13  Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003
14
*Attorneys for Sonos, Inc.*
15

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA,

18                       SAN FRANCISCO DIVISION

19

20  SONOS, INC.,                          Case No. 3:20-cv-06754-WHA
                                          Related to Case No. 3:21-cv-07559-WHA
21        Plaintiff and Counter-defendant,
                                          **SONOS, INC.'S OPPOSITION TO**
22        v.                              **GOOGLE LLC'S MOTION *IN LIMINE***
                                          **NO. 1**
23  GOOGLE LLC,
                                          Judge:  Hon. William Alsup
24        Defendant and Counter-claimant.  Pretrial Conf.: May 3, 2023
                                          Time:  12:00 p.m.
25                                        Courtroom:  12, 19th Floor
                                          Trial Date: May 8, 2023
26

27

28
                                          SONOS, INC.'S OPP. TO GOOGLE'S MIL NO. 1
                                          3:20-CV-06754-WHA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Google asks the Court to exclude the expert report and testimony of Sonos's damages expert, Mr. James Malackowski, and Sonos's technical expert, Dr. Kevin Almeroth, as they relate to Sonos's damages for the '885 and '966 patents.  But Google's motion is based on a series of *factual* disputes.  The Court should not take the resolution of these factual disputes away from the jury and should instead deny Google's Motion *in Limine* No. 1.

Sonos and Google compete in the smart-speaker market.  But Google does not sell infringing products at a price sufficient to generate profit from the infringing sales themselves.  Instead, Google sells its infringing products at a loss in order to obtain market share and to lock consumers into the (highly profitable) Google ecosystem.  As a result, Sonos cannot simply rely on Google's profits from the (loss leading) infringing sales to establish a reasonable royalty.  And neither party identified any comparable licenses.  So Sonos's experts relied on a well-accepted approach to derive an apportioned value for Sonos's patented technology.  Specifically, Sonos's *technical* expert identified a software application that provides technology that is comparable to the technology claimed in the asserted patents and that is available to consumers for a measurable price.  Sonos's *damages* expert then apportioned the price of that application between the comparable technology and other features to arrive at a price consumers pay for comparable technology.  Sonos's damages expert then modified the result by, among other things, adjusting for Google's cost of capital, excluding consumers who don't own enough speakers to get the *full* benefit of the technology and apportioning the resulting income between Sonos and Google using the ratio that Google *actually uses* to share income with its partners.

Google argues that the Court should exclude the damages-related testimony of Sonos's experts on the grounds (1) that the technology they used for their analysis is not comparable and (2) that Sonos's damages expert failed to apportion.  But Google is wrong on both counts.  At best, Google identifies factual disputes that should be decided by the jury, and critiques that go to the weight of the experts' testimony, not its admissibility.

1   **II.**      **STATEMENT OF FACTS**

2        **A.**      **IFTTT's Technological Comparability**

3        "If This Then That," or "IFTTT," is a subscription service that offers consumers a "way to

4   integrate apps, devices, and services." Ex. A ¶ 798.  IFTTT does this by providing users with

5   small software applications or "Applets" that have "a combination of triggers and actions that can

6   be combined to create the automations that help [consumers] … improve your smart home." *Id.*

7   As Dr. Almeroth explains in his expert report, a first IFTTT Applet can be created with routines

8   or actions that cause it to play music on a first set of smart speakers in a home and a second

9   Applet can be created with routines or actions that cause it to play music on at least one of the

10  speakers in the first set together with at least one *other* speaker in the same home.  *Id.* ¶¶ 802-13.

11  To build an Applet, IFTTT offers pre-made triggers and actions, including a "Button press"

12  trigger and a "Resume" playback action.  *Id.* ¶¶ 799-800.  Using these pre-made triggers and

13  actions, an IFTTT user can build Applets that provide functionality that is technologically

14  comparable to the "zone scene" technology claimed in the '885 and '966 patents.  *Id.* ¶¶ 801-13.

15  While Dr. Almeroth acknowledges that the IFTTT Applets cannot perfectly replicate the zone

16  scenes technology claimed in the '885 and '966 patents, in his opinion the IFTTT Applets provide

17  *comparable* technology.  *Id.* ¶ 816.

18       Google's technical expert, Dr. Schonfeld, has acknowledged that "identity of

19  circumstances is not required for comparability" and that "the evaluation of comparability . . .

20  necessarily involves an element of approximation and uncertainty." Ex. B ¶ 21; Ex. C ¶ 281.  But

21  Dr. Schonfeld asserts that "IFTTT generally has no relationship to audio playback, speaker

22  grouping, or any of the claimed functionalities."  Ex. B ¶ 175.  However, as Dr. Almeroth

23  explains, that is inaccurate: IFTTT includes pre-built triggers and actions that can be used to

24  create and save predefined (and overlapping) groups of playback devices that can later be invoked

25  to cause those sets of devices to playback the same song, and the Sonos, Spotify, and Button

26  pages are all easy to locate on the IFTTT website and in the IFTTT app.  Ex. C ¶ 282.

27

28

SONOS, INC.'S OPP. TO GOOGLE'S MIL NO. 1
3:20-cv-06754-WHA

**B.    Mr. Malackowski's Apportionment[1]**

Mr. Malackowski relies on Dr. Almeroth's opinion on technological comparability and then applies an economic analysis to derive an apportioned damages estimate for Google's infringement.  As Mr. Malackowski notes, Google relies on the infringing zone-scenes functionality to increase the number of users and the amount of time those users interact with the Google ecosystem in an effort to generate additional subscriptions and advertising revenue.  Ex. D at 68-70, 80.  For this reason, Mr. Malackowski adopted an analytical framework for the hypothetical negotiation under which Sonos, as the technology developer, would charge Google a fee to implement the patented zone-scenes technology in its products.  More specifically, Mr. Malackowski used the subscription price of IFTTT as a starting point and then performed both an apportionment analysis and the *Georgia-Pacific* factors to determine what fee would reflect the value of the patented technology.

Mr. Malackowski began his analysis with a detailed examination of IFTTT's pricing history. *Id.* at 84-86.  From this examination Mr. Malackowski determined that, to obtain the functionality that Dr. Almeroth had opined was comparable to the claimed zone scene technology (*id.* at 86-90) an IFTTT consumer would need to purchase a "Pro" subscription.  *Id.* at 87-88.  But because the Pro subscription provides access to up to 20 multi-action applets and because the comparable technology can be obtained by using two of those applets, Mr. Malackowski apportioned the "Pro" subscription fee to reduce the per-device subscription fee by 90%.  *Id.* at 88.  In other words, Mr. Malackowski used apportionment to *exclude* from the IFTTT subscription price, the value of functions and features that do not provide comparable technology.

Mr. Malackowski then factored in the average lifetime value of a smartphone such as a Google Pixel phone—which is ten quarters—and applied the apportioned quarterly subscription fee to that ten-quarter period.  *Id.*  Mr. Malackowski then discounted the total by Google's weighted average cost of capital at the time of the hypothetical negotiation—namely 7.4% and 8.8% for the '885 and '966 patents, respectively—to calculate the net present value of those fees.

---

[1] Google purports to critique Mr. Malackowski's "Market Approach," but the IFTTT analysis that Google criticizes is actually part of Mr. Malackowski's *Income* Approach.

SONOS, INC.'S OPP. TO GOOGLE'S MIL NO. 1
3:20-cv-06754-WHA

1   *Id.* In addition, while infringement of the '885 and '966 patents does not require multiple smart

2   speakers, because someone who owns only one or two smart speakers will not be able to take full

3   advantage of zone scenes technology, Mr. Malackowski factored in survey data showing, for

4   people in the U.S. who own any smart speaker, the percentage who own *three or more*. *Id.* at 89-

5   90. Based on that survey data, Mr. Malackowski further apportioned the net present value of the

6   per device fee—for both patents—by 71%. *Id.* at 90. Then, after considering all of the *Georgia-*

7   *Pacific* factors, *id.* at 94-124, Mr. Malackowski applied factors 13 and 15 to modify the per

8   device fee, *id.* at 119-24, by applying a further 30% reduction based on Google's revenue share

9   agreement (*i.e.*, Google's "service fee") with developers who offer applications on the Google

10  Play Store. *See also* Sonos's Opp'n to Google's Mot. *in Limine* No. 2. In other words, because

11  Mr. Malackowski started with the price a *consumer* would pay for the feature, he further

12  apportioned the calculated revenue between Sonos and Google using the same percentage split

13  that Google uses for that purpose in its commercial agreements.

14          Thus, Mr. Malackowski's analysis begins by identifying a comparable technological and

15  business metric—the price paid for the IFTTT app. Ex. E at 13-14. Acknowledging that IFTTT

16  has other capabilities beyond those that provide technological comparability, Mr. Malackowski

17  apportioned the IFTTT fee income to the portion attributable to the comparable technology, and

18  then further apportioned it to account for (i) the fact that only consumers with three or more smart

19  speakers would get the full benefit of the comparable technology and (ii) both the cost of capital

20  and the proportion of fee income that Google retains in similar situations. Mr. Malackowski also

21  addressed the other critiques of Google's damages experts, including the logical flaws of Mr.

22  Bakewell's argument in favor of using "infinite" apps as the apportionment denominator,

23  IFTTT's pricing history, and Google's failure to identify any commercially acceptable non-

24  infringing alternative.

25  **III.   ARGUMENT**

26          The tasks of "weigh[ing] facts, evaluat[ing] the correctness of conclusions" and "judg[ing]

27  credibility, including the credibility of one expert over another," are "tasks … solely reserved for

28  the fact finder"; courts "must be cautious not to overstep [their] gatekeeping role" and "impose

[their] own preferred methodology." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (citation omitted)..  It is "particularly essential in the context of patent damages" "[t]hat the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods." *Id.*  And "[t]he Federal Circuit 'has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are for the jury.'" *Id.*

## A.  Google's Factual Arguments About Technological Comparability Are Questions For The Jury

Google does not dispute that "a patentee may rely on comparable technology to support a proposed royalty." Mot. at 3.  Instead, Google contends that IFTTT is not technologically comparable to the zone scenes patents at issue in this case because IFTTT is *capable* of performing other non-zone-scenes functions and lacks one specific capability of zone scenes technology.  *Id.* at 3-4.  But Google offers no legal authority requiring *perfect* overlap between the technological capabilities of the comparator and the technology embodied in the asserted patents.  Indeed, that would be impossible in most cases.  For this reason, the law requires "comparability," not identity, as Google's expert Dr. Schonfeld confirmed: "identity of circumstances is not required for comparability."  Ex. B ¶ 21; *see also* Ex. F at 121:13-17 (agreeing that something can be technologically comparable to the '885 patent without teaching each and every limitation of the claims), 141:13-142:4 (agreeing that for something to be technologically comparable, it does not need to practice the claimed invention).  That's precisely what the Federal Circuit has repeatedly held, noting that "we have never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty."  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citation omitted).  Technical (and economic) differences must be "account[ed] for," but where "all of the … differences that [a party] complains of [a]re presented to the jury," the *jury* can "fully evaluate the relevance of the licenses," and "[n]o more is required in these circumstances."  *Id.*

Google's cited legal authority rebuts Google's position.  *Digital Reg*, for example, makes clear that experts may consider "similar" software, not *identical* software.  *Digital Reg of Tex.,*

SONOS, INC.'S OPP. TO GOOGLE'S MIL NO. 1
3:20-CV-06754-WHA

*LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4090550, at *1 (N.D. Cal. Aug. 19, 2014). The expert in that case also failed to "analyze how differences in the software might affect his calculation." *Id.* But Mr. Malackowski analyzed the technological and economic differences between the IFTTT and the patented invention, *see, e.g.*, Ex. D at 83-84, 86-87, and he specifically apportioned the IFTTT license fees to *exclude* the portions of that technology which were not comparable. *Id.* at 88.

Google also cites *Apple v. Wi-LAN* for the proposition that an expert's damages methodology may be excluded if it fails to even "make[] a threshold showing of comparability." Mot. at 4 (citing *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022)). But Sonos offered far more than a "threshold showing of comparability." Instead, Dr. Almeroth explained, in detail, *how* IFTTT maps onto the technology embodied in the asserted patents, and then used it to *create* a comparable implementation. Ex. A ¶¶ 798-816. That is totally different from *Apple*, where the expert treated the asserted patents as the "key patents" in three existing licenses, despite unrebutted evidence that two of those licenses did not list one of the asserted patents at all. *See Apple*, 25 F.4th at 971-74. Google identifies nothing remotely like that here. Similarly, in *Summit 6*, another case on which Google relies, the Federal Circuit *rejected* arguments of the kind Google makes here, noting that the expert's methodology need only be "reasonable" and the "data or evidence" relied upon need only be "sufficiently tied to the facts of the case" in order to "satisf[y]" the "gatekeeping role of the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296, 1299 (Fed. Cir. 2015). Then, "the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Id.* at 1296.

**B.     Google's Arguments Against Economic Comparability Are Factual Questions For The Jury**

Google contends that "[Mr.] Malackowski fails to account for non-accused functionality in the app." Mot. at 4. But Google ignores the fact that Mr. Malackowski did exactly that when he apportioned the IFTTT fee revenue to exclude the portions of that technology which were not comparable. Mr. Malackowski performed that apportionment by reducing the per-device subscription fee by 90% for the asserted patents in order to *remove* the market price for applet

SONOS, INC.'S OPP. TO GOOGLE'S MIL NO. 1
3:20-cv-06754-WHA

1    functionality *not* required to emulate zone scene functionality.

2          Google also contends that Mr. Malackowski "fails to apportion out (or even acknowledge)

3    the additional value that one would receive from an app beyond just a bare license to practice the

4    patents." Mot. at 5.  But Google ignores Mr. Malackowski's testimony explaining that because

5    "the implementation cost of the software is de minimis, according to Mr. Bakewell, … the

6    revenue would represent the – essentially the value." Ex. G at 209:11-23.  Google may disagree

7    over whether or not this is correct – *i.e.*, it may believe that the implementation cost is substantial

8    – but that is a *factual* dispute that belongs to the jury.  Moreover, Google cannot have it both

9    ways – telling this Court (repeatedly) that the functionality at issue in these patents is easy to

10   build using alternative methods, and that the implementation costs are so substantial that Mr.

11   Malackowski should be excluded for treating them as *de minimis*.

12         At core, Google seems to suggest that Mr. Malackowski is wrong not to rely on a patent

13   license as his starting point.  But Google offers no authority for that criticism and the income-

14   based approach that Mr. Malackowski used is a generally recognized "systematic framework for

15   estimating an asset's price." Ex. D at 68; *see also, e.g.*, *Sentius Int'l, LLC v. Microsoft Corp.*, No.

16   5:13-cv-00825-PSG, 2015 WL 451950, at *1 (N.D. Cal. Jan. 27, 2015) ("Because Mills' income

17   approach theory is methodologically sound, the court DENIES Microsoft's motions to the extent

18   that it seeks to exclude Mills' testimony relating to this approach."); *Inline Connection Corp. v.

19   AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 432 n.38 (D. Del. 2007) ("The Income Approach

20   estimates an asset's price based on the value of the benefits derived from the use of that asset.").

21         Google also seems to think that Mr. Malackowski was required to establish that

22   "consumers bought IFTTT for the accused functionality," Mot. at 5, but Google offers no

23   authority for that proposition either.  The only case Google cites involved lost profits, not a

24   reasonable royalty.  In any event, the jury will hear ample evidence of the demand for Sonos's

25   products and market enthusiasm for zone scenes technology.

26   **IV.    CONCLUSION**

27         For the foregoing reasons, the Court should deny Google's Motion *in Limine* No. 1.

28

1  Dated:  April 24, 2023

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

By: */s/ Clement Seth Roberts*
    Clement Seth Roberts

*Attorneys for Sonos, Inc.*

1

## **ATTESTATION**

2

3          I, Sean Pak, am the ECF user whose ID and password are being used to file the above

4  document.  In compliance with Civil L.R. 5-1, I hereby attest that counsel for Sonos has concurred in

5  the aforementioned filing.

6

7  DATED:  April 26, 2023

8

9                                                                    */s/ Sean Pak*

10                                                                  Sean Pak

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28