CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:   +1 312 754 0002
Facsimile:   +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., <br><br> Plaintiff and Counter-defendant, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA <br> Related to Case No. 3:21-cv-07559-WHA <br><br> **SONOS, INC.'S OPPOSITION TO GOOGLE'S MOTION *IN LIMINE* NO. 2** <br><br> Judge: Hon. William Alsup <br> Pretrial Conf.: May 3, 2023 <br> Time: 12:00 p.m. <br> Courtroom: 12, 19th Floor <br> Trial Date: May 8, 2023 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.       INTRODUCTION**

Mr. Malackowski's expert damages testimony is reliable and relevant. Google's motion *in limine* asks the Court to exclude his testimony on two bases. First, Google contends that Mr. Malackowski's use of Google's own 70/30 revenue sharing split is "not sufficiently connected to the facts of the case." Mot. at 1. Not so. As Mr. Malackowski explains, in the hypothetical negotiation, Sonos's position would be analogous to an app developer offering zone scene functionality for sale on Google's app store. Google's standard terms for offering an app for sale on its store is to split the revenue from sales 70% for the developer and 30% for Google. Mr. Malackowski used this same split in his analysis of the hypothetical negotiation. Put differently, after calculating the revenue that consumers would pay for comparable technology (as adjusted by various factors including the cost of capital, and the number of consumers with at least three smart speakers in their homes) Mr. Malackowski used *the exact* revenue split that Google uses in commercial contexts to further apportion the revenue between Sonos and Google. Mr. Malackowski's opinion is therefore tied directly to the facts of this case and is admissible.

Second, Google contends that Mr. Malackowski's opinions are "not proper expert opinion" because his calculations are too simple. Mot. at 1. But Google entirely ignores Mr. Malackowski's application of the *Georgia-Pacific* factors and his apportionment analysis. It may be that the jury could do *one* math step from his analysis if considered in isolation. But that is irrelevant where, as here, Mr. Malackowski provides not just simple math, but an entire *framework* and *explanation* as to how the parties would go about discerning the value of the patented inventions and how to share the revenue from it in a hypothetical negotiation. That is proper expert testimony, and his opinion is based on more than simple calculations that a jury could understand solely from the documents themselves and attorney argument. The Court should deny Google's Motion *in Limine* No. 2.

**II.      STATEMENT OF RELEVANT FACTS**

Sonos's damages expert Mr. Jim Malackowski provides a damages opinion based on the comparable application "If This Then That," or "IFTTT." He uses the monthly subscription price

1  of IFTTT as a starting point for his income-based approach to measuring damages and then
2  makes a number of adjustments to that subscription price to arrive at an apportioned damages
3  figure of $0.87 per media player (for the '885 patent) or $0.82 per Google Home App install (for
4  the '966 patent).  Ex. A ("Rep.") at 8-10, 29.  As Mr. Malackowski explains, his adjustments are
5  based on the applicable subscription price, the number of applets needed to create comparable
6  functionality, the lifetime of a smartphone, net present value of the subscription fee, the portion of
7  households with three or more smart speakers, and profit sharing.  Rep. at 121-22; *see also*
8  Sonos's Opp. to MIL No. 1 at 1-4 (explaining Mr. Malackowski's damages analysis in additional
9  detail).

10  One adjustment that Mr. Malackowski applies to the IFTTT licensing fee is to account for
11  how Google and Sonos would share the revenue attributable to the zone scenes functionality.
12  Rep. at 120-21.  Mr. Malackowski explained that "Sonos would act similarly to an app developer
13  who wishes to provide its technology for a fee," and that "Sonos and Google would look to
14  Google's 'Services fees' which are provided on a Google Support webpage. Specifically, the
15  service fee for developers with earnings in excess of $1M per year is 30%." *Id.* at 120.  Thus,
16  because Sonos's position at the hypothetical negotiation can be analogized to an app developer
17  offering software for sale on the Google Play Store, Mr. Malackowski applied the same terms that
18  Google offers in a parallel context determine how, in a hypothetical negotiation, Sonos and
19  Google would split the revenue received from consumers by selling the patented invention.  *Id.*

20  After adjusting the IFTTT subscription price, Mr. Malackowski then applied his expertise
21  through his analysis and application of the *Georgia-Pacific* factors.  Rep. at 94-124.  He
22  ultimately arrived at his damages opinion of a $0.87 or $0.82 per-unit royalty for the '885 and
23  '996 patents, respectively.

24  **III.   ARGUMENT**
25  As the Ninth Circuit has explained, "*Daubert* held that Federal Rule of Evidence 702
26  replaces the old *Frye* gatekeeping test, 'general acceptance in the particular field,' with a different
27  test which is, in some respects, more open to opinion evidence." *Primiano v. Cook*, 598 F.3d
28  558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).  The "requirement," therefore, that

1  "opinion testimony 'assist the trier of fact' 'goes primarily to relevance.'" *Id.*  Even "[f]or

2  scientific opinion, the court must assess the reasoning or methodology … but the inquiry is a

3  flexible one." *Id.*  And "[s]haky but admissible evidence is to be attacked by cross examination,

4  contrary evidence, and attention to the burden of proof, not exclusion." *Id.*  The tasks of

5  "weigh[ing] facts, evaluat[ing] the correctness of conclusions" and "judg[ing] credibility,

6  including the credibility of one expert over another," are "tasks are solely reserved for the fact

7  finder"; courts "must be cautious not to overstep [their] gatekeeping role" and "impose [their]

8  own preferred methodology." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal.

9  2014).  It is "particularly essential in the context of patent damages" "[t]hat the gatekeeping role

10  of the judge is limited to excluding testimony based on unreliable principles and methods." *Id.*

11  And "[t]he Federal Circuit has recognized that questions regarding which facts are most relevant

12  or reliable to calculating a reasonable royalty are 'for the jury.'" *Id.*

13       **A.**    <u>**Mr. Malackowski's 70/30 revenue split is directly tied to the facts of the case.**</u>

14       Mr. Malackowski looked to the technology claimed in the '885 and '996 patents to

15  identify an application that provides "similar technological functionality as the Asserted Patents."

16  Rep. at 66, 80-90.  Dr. Almeroth confirmed the application is technologically comparable. *Id*. at

17  80-81.  The application, called IFTTT, is "offered on the Google Play Store," and "IFTTT's

18  ability to charge for the ability to create" a functionality comparable to zone scenes "provides an

19  initial indicator to the value of the Zone Scene Patents." *Id*. at 66, 84.  Thus, as Mr. Malackowski

20  explained, in the hypothetical negotiation, Sonos would be offering to Google technology that

21  Google's users can then implement on Google devices or through the Google Home App.  And

22  Google would be negotiating to buy software that users can implement on their Google devices or

23  through the Google Home App. Sonos would therefore be in a similar position to an app

24  developer offering software for sale on the Google Play Store.

25       Because IFTTT offers similar technological functionality and is provided for sale on the

26  Google Play Store, Mr. Malackowski considered how much Google would be willing to pay to

27  offer that technology to its customers.  He opined that "the revenue split between an app

28  developer who is providing an application and Google who is hosting the application on the Play

1  Store, has already been decided and appropriately compensates each party," namely that Google
2  would take 30% of the revenue and Sonos would keep 70%. Rep. at 120.  In other words, Mr.
3  Malackowski's revenue sharing was taken directly from Google's own publicly available
4  information on how it shares revenue with those selling applications on the Google Play Store.

5  Mr. Malackowski's reliance on Google's own policies distinguishes this case from *Uniloc*
6  and the other cases Google cites in its motion.  Mot. at 3-4.  In *Uniloc*, the Federal Circuit
7  rejected a damages opinion that relied on the assumption "that the licensee pay a royalty rate
8  equivalent to 25 per cent of its expected profits for the product that incorporates the IP at issue,"
9  without any basis for applying that assumption to the circumstances in that case.  *Uniloc USA,*
10 *Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011).  That is not at all what we have
11 here.

12 And even *Uniloc* explains that applying a revenue split is appropriate if the expert opines
13 that the revenue split is "tied to the relevant facts and circumstances of the particular case at issue
14 and the hypothetical negotiations that would have taken place in light of those facts and
15 circumstances at the relevant time." *Id.* at 1318.  That is exactly what Mr. Malackowski did here.
16 He was not starting from any "rule of thumb" or some sort of revenue sharing percentage that is
17 unconnected to the facts of this case.  Instead, he looked to a comparable technology, performed a
18 detailed apportionment to exclude the value of non-patented features and households who
19 wouldn't get full value of the patented technology (as a result of owning fewer than three smart
20 speakers), adjusted for net present value using Google's own cost of capital and *then* further
21 reduced the damages figure by applying the same revenue split that Google actually uses in *real*
22 negotiations.  That's nothing like the 25% rule of thumb discarded in *Uniloc*—which was a 25%
23 profit split applied *to the entire product* and which used a percent that had *nothing* to do with the
24 facts of the case.

25 In this case, Mr. Malackowski's use of the 70/30 split is supported by the fact that it is
26 what Google uses in real negotiations comparable to the hypothetical exercise Malackowski went
27 through.  It is further supported by two additional data points, including: (1) Google's 30%
28 "standard commission on apps and in-app purchases of digital goods and services" and (2) "a

1  revenue-sharing agreement with Apple in which it paid $1 billion to keep search bar on the
2  iPhone" which equated with a revenue share of approximately 34%.  Rep. at 120.
3        Google responds to these points by complaining that Mr. Malackowski's reliance on the
4  revenue-sharing agreement with Apple is unreliable because the agreement was not produced in
5  discovery.  Mot. at 4 n.2.  But it is obviously *Google's* job to produce the agreement between
6  Google and Apple, not Sonos's.  And Mr. Malackowski is entitled to rely on *unrebutted* news
7  reports of major financial transactions as a basis for his opinions.  *See Summit 6, LLC v. Samsung*
8  *Elecs. Co.*, 802 F.3d 1283, 1298-99 (Fed. Cir. 2015) (expert may testify on the basis of third-party
9  information "so long as the information is of a type reasonably relied upon by experts in the field
10 to form opinions upon the subject"); Fed. R. Evid. 703.  Indeed, if the actual terms were different,
11 Google would simply produce the agreement and show that the revenue sharing terms were
12 inaccurately described in the (multiple) news reports on which Mr. Malackowski relied.
13       Google also complains that Mr. Malackowski's opinion is not reliable because "Sonos
14 would be providing Google with only a bare patent license" and not a developed app for sale on
15 the Google Play Store, Mot. at 4.  But as Mr. Malackowski explained, the revenue split offered by
16 Google accounts for the different contributions of both parties, giving "the licensor reasonable
17 compensation for the use of its intellectual property, and the licensee reasonable compensation for
18 assuming the business risks associated with developing, manufacturing, promoting, and selling
19 the product that embodies the particular technology."  Rep. at 119.  That replicates the dynamic in
20 the hypothetical negotiation, where Sonos is providing "use of its intellectual property" and
21 Google is assuming "business risk" as well as Google's "know-how related to the Accused
22 Instrumentalities."  *Id.* at 119-20.  To the extent Google disagrees, and thinks that Mr.
23 Malackowski's fees are overstated because the costs of converting Sonos's intellectual property
24 into a saleable app would change the negotiating dynamic, that argument goes to weight and
25 should be evaluated by the jury.  *Summit 6*, 802 F.3d at 1299; *i4i Ltd. P'ship v. Microsoft Corp.*,
26 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ("When the methodology is sound,
27 and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of
28 relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not

1     its admissibility."); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1225-28 (Fed. Cir. 2014)
2     (proper to admit patentee's damages expert's testimony that relied in part on a license that
3     covered the overall end product even though the patented feature only addressed a component of
4     the end product where the damage expert had made an apportionment of the value of the patented
5     feature to the overall product to justify the use of the license agreement in the damage analysis).
6         Moreover, Mr. Malackowski applied the *Georgia-Pacific* factors to support his opinion
7     that Sonos would retain the majority of the apportioned profits. *See* Rep. at 94-96, 119; *Uniloc*,
8     632 F.3d at 1317-18 (noting that *Georgia-Pacific* "factors 1 and 2—looking at royalties paid or
9     received in licenses for the patent in suit or in comparable licenses—and factor 12—looking at
10    the portion of profit that may be customarily allowed in the particular business for the use of the
11    invention or similar inventions—remain valid and important factors in the determination of a
12    reasonable royalty rate."). Google's disagreement with how Mr. Malackowski accounted for
13    differences between IFTTT and the hypothetical negotiation is not a basis to exclude his opinion.
14        Google also complains that Mr. Malackowski's use of the Google Play Store's 70/30 split
15    might apply to other cases involving different technologies. Mot. at 4-5. But that is not a reason
16    to decide the 70/30 split does not apply here. As *Uniloc* explains, application of any revenue split
17    must be evaluated on its own merits to determine if there is "a basis in fact to associate the royalty
18    rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*,
19    632 F.3d at 1317.
20        **B.    Mr. Malackowski's Analysis Is Proper Expert Opinion.**
21        Google argues that Mr. Malackowski's "calculations are straightforward, and based on
22    evidence in the case that can speak for itself, or publicly-available data that Mr. Malackowski
23    neither derived nor calculated himself." Mot. at 5. Google entirely ignores Mr. Malackowski's
24    application of the hypothetical negotiation framework, the *Georgia-Pacific* factors, and
25    calculation of net present value. Jurors do not have everyday experience in negotiating
26    intellectual property rights, reducing past and future payment streams to present value, or the
27    economic expertise to apportion a royalty rate to the value of the patented technology. Google's
28    motion can be denied on that basis alone. Regardless, Mr. Malackowski applied his experience

1  and judgment in determining which adjustments to make in order to apportion the IFTTT

2  subscription price to the value of the patented inventions.  That is proper expert testimony and the

3  jury could not simply look at the documents to evaluate Sonos's damages.

4  None of Google's cases support excluding Mr. Malackowski's opinion here.  In *Waymo*

5  *LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 6887043, at *5 (N.D. Cal. Nov. 14,

6  2017), the "expert" essentially multiplied two numbers (cost by time) to arrive at his damages

7  figure.  Similarly, in *Kim v. Benihana, Inc.*, No. 5:19-cv-02196-JWH-KKx, 2022 WL 1601393, at

8  *8 (C.D. Cal. Mar. 25, 2022), the expert simply calculated a refund "at 25%, 50%, and 100% of

9  the sale price," without any accompanying analysis "regarding which discount value of restitution

10 should be applied to the facts of this case."  And in *DZ Rsrv. v. Meta Platforms, Inc.*, No. 18-

11 04978-JD, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022), one expert (Mr. McFarlane) simply

12 took a "price premium figure" calculated by a different expert and then "merely applied it in an

13 obvious fashion to the amount of money plaintiffs are said to have spent on advertising."  The

14 Court therefore excluded Mr. McFarlane's opinion as "any specialized or scientific expertise, or

15 anything beyond the typical knowledge and experience of a jury."  *Id.*  In other words, Google's

16 cases all involve simple arithmetic with no expert analysis involved in selecting the inputs,

17 calculations, or evaluating the outputs of the calculations.

18 Here, Mr. Malackowski applies his expertise at each stage of the process.  He applied his

19 expertise and judgment to determine how the IFTTT subscription price should be selected and

20 adjusted to account for the value of the patented invention, made calculations that are beyond the

21 scope of the average juror, and then further evaluated the output of his calculations under the

22 *Georgia-Pacific* factors.  All of that is the proper subject of expert testimony.

23 **IV.   CONCLUSION**

24 For the foregoing reasons, the Court should deny Google's Motion *in Limine* No. 2.

|   |   |
|---|---|
| Dated: April 24, 2023 | ORRICK HERRINGTON & SUTCLIFFE LLP<br>*and*<br>LEE SULLIVAN SHEA & SMITH LLP<br><br>By: */s/ Clement Seth Roberts*<br>    Clement Seth Roberts<br><br>*Attorneys for Sonos, Inc.* |

**ATTESTATION**

I, Sean Pak, am the ECF user whose ID and password are being used to file the above document. In compliance with Civil L.R. 5-1, I hereby attest that counsel for Sonos has concurred in the aforementioned filing.

DATED: April 26, 2023

                                                            */s/ Sean Pak*
                                                            Sean Pak