CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone: +1 312 754 0002
Facsimile: +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., <br><br> Plaintiff and Counter-defendant, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA <br> Related to Case No. 3:21-cv-07559-WHA <br><br> **SONOS, INC.'S OPPOSITION TO GOOGLE LLC'S MOTION *IN LIMINE* NO. 4** <br><br> Judge: Hon. William Alsup <br> Pretrial Conf.: May 3, 2023 <br> Time: 12:00 p.m. <br> Courtroom: 12, 19th Floor <br> Trial Date: May 8, 2023 |

**<u>FILED UNDER SEAL</u>**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Google's Motion *in Limine* No. 4 seeks to exclude references to Google's "strategies of selling the accused products at a loss and its alleged 'efficient infringement' of Sonos's patents." Mot. at 1.  But, contrary to Google's suggestion, these anticompetitive strategies are not "irrelevant," and Sonos is not making them just "to prejudice the jury and paint Google as a bad actor." Mot. at 2.  Rather, these anticompetitive strategies are both relevant to the issues in this case and supported by the evidence.  Specifically, Google's "loss leader" and "efficient infringement" strategies are relevant to damages and willful infringement, respectively.  The Court should not exclude them.

Google's Motion *in Limine* No. 4 also seeks to exclude "financial information unrelated to the accused products." Mot. at 1.  Sonos agrees not to reference financial information unrelated to the accused products.  However, Sonos should be permitted to reference financial information related to ***any and all*** of the accused products in this case.  To the extent that Google's motion seeks a restriction to the contrary, it should be denied.

**II.  ARGUMENT**

**A.  The Court Should Not Exclude Evidence of Google's Anticompetitive Conduct.**

There are several flaws with Google's request to exclude evidence of its anticompetitive behavior.  First, Google's anticompetitive conduct is relevant to at least the issues of damages and willful infringement.  For example, Google's "loss leader" strategy is related to the issue of damages as it helps Google obtain more sales of the accused products.  As explained by Sonos's damages expert, James Malackowski, Google uses its "loss leader strategy" to "lock" consumers into Google's multiroom audio system "such that these consumers do not purchase a similar multiroom audio product from a competitor like Sonos in the future." Ex. A (Malackowski Suppl. Report) at 92.  In contrast, "had these consumers purchased one of Sonos's products initially, then it is more likely that they would be Sonos households purchasing additional multiroom audio products from Sonos in the future." *Id.*  Google itself has acknowledged this

"lock" effect. *See, e.g.*, Ex. B (Chan 11/29/2022 Dep. Tr.) at 109-10 (Google's corporate representative on sales and marketing strategies, competition, app installs, customer usage, and data feedback, testifying that Google hopes that the purchase of one product leads to the purchase of a second product from the same company).

By selling the accused products cheaply at a loss, Google has "locked-in" additional sales of the accused products to Sonos's detriment. Thus, Google's "loss leader" strategy is highly relevant to the parties' hypothetical negotiation, particularly with respect to *Georgia Pacific* factors 5, 6, and 15. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).[1]

The same goes for Google's "efficient infringement" strategy. As explained by Mr. Malackowski, "efficient infringement occurs when a company deliberately chooses to infringe a patent given that it is cheaper than to license the patent." Ex. A (Malackowski Suppl. Report) at 20. Google's "efficient infringement" strategy is one example of the motivation behind Google's willful infringement of Sonos's patents and Google's refusal to take a license. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-06 (2016) (indicating that under the flexible standard for demonstrating willful infringement, a patentee may show that the accused infringer's "state of mind" was "consciously wrongful" or that the accused infringer engaged in "flagrant" conduct "characteristic of a pirate"). As such, like Google's "loss leader" strategy, Google's "efficient infringement" strategy is very much relevant to the issues in this case.

Second, Sonos's allegations of anticompetitive conduct by Google are not "unsubstantiated" or "unfounded." Mot. at 1. For example, with respect to its "loss leader"

---

[1] *George Pacific* factor 5 considers "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter," *Georgia Pacific* factor 6 considers "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales," and *Georgia Pacific* factor 15 considers "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Id.*

1   strategy, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮  As explained by Mr. Malackowski, "with respect to the [accused '966 Pixel devices],

3   from September 15, 2020 through Q3 2022, Google has generated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. A (Malackowski Suppl. Report) at 69.[2]

5   Similarly, "[w]ith respect to the '885 Accused Instrumentalities, from November 24, 2020, the

6   start of the damages period, through Q3 2022, Google has generated ▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id*.

8   The existence of Google's "efficient infringement" strategy is also supported by the

9   evidence. As laid out in Sonos's pleadings, Sonos has provided Google with numerous notices of

10   infringement dating back to 2016 related to over one hundred Sonos patents. Dkt. 170 at 36-44.

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   Despite having over ▮▮▮▮▮▮▮▮▮▮, Google has steadfastly refused to pay Sonos anything.

14   Ex. A (Malackowski Suppl. Report) at 21. Plainly, Google would rather willfully infringe

15   Sonos's patents and fight about it in court than pay for a license.

16   Moreover, there is nothing improper about Mr. Malackowski citing to surveys and articles

17   by industry analysts and investigative reporters recognizing Google's "loss leader" and "efficient

18   infringement" strategies. These surveys and articles merely supplement the financial information

19   and other admissible evidence that is already abundant in this case. And even if such surveys and

20   articles are considered hearsay, there is nothing wrong with Mr. Malackowski, as an expert in this

21   case, relying on hearsay to support his opinions. *MediaTek inc. v. Freescale Semiconductor, Inc.*,

22   No. 11-CV-5341, 2014 WL 971765, at *1 (N.D. Cal. Mar. 5, 2014) ("[A]s a practical matter,

23   experts may express opinions based upon hypotheticals and information which would otherwise

24   be inadmissible hearsay on its own."); *Interwoven, Inc. v. Vertical Computer Sys.*, 10-CV-04645,

25   2013 WL 3786633, at *7 (N.D. Cal. July 18, 2013) ("Experts are, however, permitted to rely on

26   hearsay evidence in coming to their conclusions, so long as an expert in the field would

27   reasonably rely on that information"); *see also Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 141

28   ---
[2] All emphasis added unless otherwise noted.

F. Supp. 3d 147, 148-49 (D. Mass. 2015) (denying motion to exclude damages expert from relying on hearsay). To the contrary, it is common for damages experts to rely on such surveys and articles. Indeed, Google's own damages expert report is replete with references to similar surveys and articles. *See, e.g.*, Ex. D (Bakewell Rebuttal Report) at 22-23 (citing "Sonos: Lost The Battle Before It Started," *SeekingAlpha.com*, March 21, 2019; "Stairway to Heaven," *BNP Paribas*, April 21, 2021; "Google CEO Still Insists AI Revolution Bigger Than Invention Of Fire," *Gizmodo*, July 14, 2021; "Overcoming The Innovation Readiness Gap," *BCG Consulting*, April 2021).

Third, Google's repeated argument that "Mr. Malackowski does not make ***any adjustments*** at all to his per-unit royalty based on his opinions regarding Google's alleged anticompetitive conduct" misses the mark. *See* Mot. at 2 (emphasis in original). Mr. Malackowski made it clear in his report that he relies on Google's anticompetitive conduct to support the reasonableness of his damages opinions and calculations. *See, e.g.*, Ex. A (Malackowski Suppl. Report) at 91-94. As stated by Mr. Malackowski:

> There are several reasons why the quantitative indicators and resulting reasonable royalties that I calculate for are conservative and why my assumptions in this report are reasonable. More specifically, Google's infringement has led to financial gains and market advantages for Google that I have not accounted for in my damages calculations.

*Id.* at 91; *see also id.* at 93 ("I have not accounted for this 'lock-in' effect in my damages calculations."). The fact that Mr. Malackowski did not adjust his royalty rate numbers upward because of Google's anticompetitive conduct does not mean that such conduct is irrelevant to his damages opinions and calculations. To the contrary, as set forth in his expert reports, Mr. Malackowski considered Google's anticompetitive conduct as part of his analysis concerning the *Georgia Pacific* factors and the parties' hypothetical negotiations.

Fourth, Google's own caselaw – which largely focuses on antitrust allegations that Sonos is not making here – supports the fact that Google's anticompetitive conduct should ***not*** be excluded from trial.[3] For example, in *Illumina, Inc. v. BGI Genomics Co., Ltd*, No. 19-CV-

---

[3] Sonos is not arguing that Google has committed any antitrust violations, and Sonos has already agreed not to refer to Google as a monopolist.

1    03770-WHO, 2021 WL 4979799 (N.D. Cal. Oct. 27, 2021), the court **granted** defendant's motion

2    *in limine* as to "***antitrust claims*** (e.g., Illumina is a monopolist) or conduct unrelated to the issues

3    in this case," but ***denied*** it "as to evidence of allegedly ***anticompetitive conduct*** that is related to

4    the issues in this case." *Id.* at *7 (emphasis added).  Thus, under Google's own caselaw, Sonos

5    should be able to provide the jury with evidence of Google's "anticompetitive conduct that is

6    related to the issues in this case." *See id.*[4]

   **B.    The Court Should Not Exclude References to Financial Information for the Accused Products.**

8    Google's Motion *in Limine* No. 4 seeks to exclude "financial information unrelated to the

9    accused products." Mot. at 1.  As noted above, Sonos will agree not to reference financial

10   information unrelated to the accused products.  In fact, Google has refused to even produce such

11   information.  But Google misrepresents what the accused products are in this case. *Id.* at 6

12   ("Google's advertising, search, and ***YouTube products are not accused*** of infringing the asserted

13   patents . . . .") (emphasis added).  The accused products for the asserted patents at trial include all

14   of the following: (1) Google's Chromecast, Chromecast Ultra, Chromecast with Google TV,

15   Home, Home Mini, Home Max, Nest Audio, Nest Mini, Nest Hub (f/k/a Home Hub), Nest Hub

16   Max, and Nest Wifi Point (collectively "Accused Google Players"); and (2) Google's "Pixel" and

17   third-party computing devices (*e.g.*, phones) that are installed with at least the Google Home app

18   and in some instances are also installed with one or more of the YouTube Music app, the Google

19   Play Music app, and the Spotify app.  Google is wrong to say that the YouTube Music app is not

20   accused for the '966 Patent.

21   Sonos should be able to reference financial information related to all these accused

22   products, including the installed apps that are relevant to infringement.  Such information is

23   important because, as discussed above, Google sells the Accused Google Players and Pixel

---

[4] Google's reliance on *Leegin Creative Leather Prod., Inc. v. Ayama Indus. Co., Ltd.*, No. CV0012708, 2008 WL 11339978 (C.D. Cal. Jan. 11, 2008) is misleading.  In that case, the court ordered that the ***accused infringer*** was prohibited "from mentioning, referring to, or introducing evidence or making any argument that ***Plaintiff [copyright holder]*** has, or seeks to obtain, a purported monopoly over certain products and/or has engaged in allegedly 'unfair,' 'anti-competitive,' or 'illicit' business practices." *Id.* at *2.  That is the opposite of what Google is asking for in this motion.  According to the *Leegin* court, ***Google*** should ***not*** portray ***Sonos*** as a monopolist or as having engaged in anticompetitive behavior.

1   devices at a loss.  It also gives away the Google Home app for free.  To recoup its investment,
2   Google makes money on the accused products in other ways, for example, through advertising
3   and subscription revenue from the YouTube Music app and the Google Play Music app.  As Mr.
4   Malackowski has explained: "[u]nder the assumption that Google is a rational actor that expects
5   to make a return on its product development and investment efforts, and the substantial evidence
6   that Google sells many of the Accused Instrumentalities at a loss, it is only rational that Google
7   also expects to recoup this investment through their larger ecosystem model, which substantially
8   relies on the subscription and advertising revenues."  Ex. E (Malackowski Reply Report) at 9.
9   Google itself admits that "'Google encourages all of [its] hardware products to be run
10  sustainably'—*i.e.*, profitably."  Mot. at 4.  Since the financial sales numbers for the hardware do
11  not show profitability, however, Google is clearly making money through other means.
12          Accordingly, in addition to the sales revenue related to the Accused Google Players and
13  Pixel devices, Sonos should be allowed to reference the advertising and subscription revenue
14  related to the accused YouTube Music app and the Google Play Music app.  This financial
15  information is relevant to at least *Georgia Pacific* factor 6, which considers "[t]he effect of selling
16  the patented specialty in promoting sales of other products of the licensee; the existing value of
17  the invention to licensor as a generator of sales of his non-patented items; and the extent of such
18  derivative or convoyed sales."  *Georgia-Pacific*, 318 F. Supp. at 1120.  Such financial
19  information is also relevant to *Georgia Pacific* factors 5 and 15, as well as more generally to the
20  parties' hypothetical negotiation.  *See id.*; *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d
21  1554, 1557 (Fed. Cir. 1986) ("The determination of a reasonable royalty, however, is based not
22  on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee
23  would have agreed at the time the infringement began."); *Panduit Corp. v. Stahlin Bros. Fibre*
24  *Works*, 575 F.2d 1152, 1159 (6th Cir. 1978) ("Among the relevant facts are: 'what plaintiff's
25  property was, to what extent defendant has taken it, its usefulness and commercial value as shown
26  by its advantages over other things and by the extent of its use,' and the commercial situation.").
27          Finally, Google argues that "YouTube-related revenue (such as advertising and
28  subscriptions)" may have been relevant to the '033 Patent, but they are not relevant to the '885

and '966 Patents because Mr. Malackowski allegedly does not rely on such revenue for his damages theories. *See* Mot. at 5 n. 5. This is misleading. While Mr. Malackowski does not include the actual numbers for Google's YouTube-related advertising and subscription revenue in his damages calculations for the '885 and '966 Patents, he includes that revenue in his report and relies on it to support his damages theories for these patents. Specifically, Mr. Malackowski notes that Google employs various ways to make money from the accused products in this case, such as through YouTube-related advertising and subscription revenues. As Mr. Malackowski explains:

> In the context of the hypothetical negotiation, Sonos and Google would recognize that the Accused Instrumentalities provide Google various means to generate revenue. Not only does Google make profits on the sale of cast-enabled devices and hardware products, but Google relies upon the subscription fees and advertising revenue generated through consumer usage of these cast-enabled devices and hardware products. In particular, the parties would consider Google's advertising revenue and profitability and Google's subscription revenue and profitability, in addition to considering the sales of Google's actual device and hardware products.

Ex. A (Malackowski Supplemental Report) at 109; *see also id*. at 68-70, 91-94, and 103-06.

The total aggregate amount of money that Google makes from the accused products in the case is undeniably relevant to how much Google would pay for a license in the hypothetical negotiation with Sonos. That is why Mr. Malackowski discussed it in connection with his *Georgia-Pacific* factor and hypothetical negotiation analysis. *Id*. Nevertheless, despite the fact that he would have been justified in doing so, Mr. Malackowski did not include any advertising, subscription, or other Google revenue in the mathematics for calculating his royalty rate for the '885 and '966 Patents. The jury should be allowed to hear what Mr. Malackowski has surrendered to demonstrate the reasonableness of his damages calculations and resulting royalty rates.

### III.  CONCLUSION

For the foregoing reasons, Google's Motion *in Limine* No. 4 should be denied.

| | |
|---|---|
| Dated:  April 24, 2023 | ORRICK HERRINGTON & SUTCLIFFE LLP<br>*and*<br>LEE SULLIVAN SHEA & SMITH LLP<br><br>By: */s/ Clement Seth Roberts*<br>     Clement Seth Roberts<br><br>*Attorneys for Sonos, Inc.* |

**ATTESTATION**

I, Sean Pak, am the ECF user whose ID and password are being used to file the above document. In compliance with Civil L.R. 5-1, I hereby attest that counsel for Sonos has concurred in the aforementioned filing.

DATED: April 26, 2023

　　　　　　　　　　　　　　　　　　　　　　/s/ Sean Pak
　　　　　　　　　　　　　　　　　　　　　　Sean Pak