# Sonos, Inc.'s Opp'n to Google LLC's Motion *In Limine* No. 4

# EXHIBIT A

# (Filed Under Seal)



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CIVIL ACTION NO. 3:20-CV-06754

**GOOGLE LLC,**
**V.**
**SONOS, INC.**

---

**SUPPLEMENTAL EXPERT REPORT OF JAMES E. MALACKOWSKI**

**December 9, 2022**

1.   Background and Qualifications ................................................................................... 4

2.   Assignment ................................................................................................................... 6

3.   Summary of Opinions ................................................................................................. 8

4.   Relevant Parties ........................................................................................................ 10
     4.1   Sonos, Inc. ......................................................................................................... 10
     4.2   Google LLC ....................................................................................................... 14
     4.3   Alphabet ............................................................................................................ 15

5.   The Dispute ................................................................................................................ 15

6.   The Asserted Patents ................................................................................................ 16
     6.1   The '033 Patent ................................................................................................. 16
     6.2   The '885 Patent ................................................................................................. 17
     6.3   The '966 Patent ................................................................................................. 18

7.   Industry Background ................................................................................................ 19
     7.1   Home Audio Player Market .............................................................................. 19
     7.2   Smart Speaker Market ....................................................................................... 19

8.   Google's Accused Instrumentalities ....................................................................... 20
     8.1   '033 Accused Instrumentalities ........................................................................ 22
     8.2   '885 Accused Instrumentalities ........................................................................ 27
     8.3   '966 Accused Instrumentalities ........................................................................ 29

9.   Sonos's Patent-Practicing Products ....................................................................... 30
     9.1   Value of the Asserted Patents Beyond Use in Products .................................... 32

10.  Timeline of Events .................................................................................................... 33

11.  Reasonable Royalty Compensation ........................................................................ 34
     11.1  Overview ........................................................................................................... 34
     11.2  Hypothetical vs. Real World Negotiations ........................................................ 35
     11.3  Nature of Rights Being Licensed ...................................................................... 35
     11.4  Comparable Licenses ........................................................................................ 35
     11.5  Summary of Approach ....................................................................................... 36
     11.6  Parties to the Negotiation .................................................................................. 37
     11.7  Hypothetical Negotiation Date .......................................................................... 37
     11.8  Compensation Period and Accused Royalty Base ............................................. 37

12.  Evaluation of Royalty ............................................................................................... 42
     12.1  The Market Approach ........................................................................................ 42
     12.2  The Income Approach ....................................................................................... 68
     12.3  Cost Approach ................................................................................................... 90

13.  These Damages Calculations Are Conservatively Based on Reasonable Assumptions .............................. 91

14.  *Georgia-Pacific* Factor Analysis ........................................................................... 94
     14.1  Factor #1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or
           tending to prove an established royalty. .......................................................... 94
     14.2  Factor #2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit. ...... 95
     14.3  Factor #3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-
           restricted in terms of territory or with respect to whom the manufactured product may be sold. .................. 96



14.4     Factor #4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. ................................................................................................................................96

14.5     Factor #5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. .......................................................................................................................................97

14.6     Factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales................................................................. 103

14.7     Factor #7: The duration of the patent and the term of the license. ................................................ 106

14.8     Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity................................................................................................................. 107

14.9     Factor #9: The utility and advantages of the patented property over old modes or devices, if any, that had been used for working out similar results........................................................................................ 110

14.10    Factor #10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.................. 110

14.11    Factor #11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use........................................................................................................................ 112

14.12    Factor #12: The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. ...................... 119

14.13    Factor #13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.................................................................................................... 119

14.14    Factor #14: The opinion testimony of qualified experts. ............................................................... 121

14.15    Factor #15: The royalty that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. ............................................. 121

**15.    Determination of Reasonable Royalties**...........................................................................................**124**

**16.    Critiques of the Bakewell Rebuttal Report**......................................................................................**126**

16.1     Competition Between Google and Sonos ....................................................................................... 127

16.2     The Cost Approach and Non-Infringing Alternatives for the Asserted Patents ............................. 127

**17.    Prejudgment Interest**........................................................................................................................**130**

**18.    Conclusion**.........................................................................................................................................**130**

**19.    Signature** ..........................................................................................................................................**131**

 INTELLECTUAL CAPITAL EQUITY

synthesize and respond to user commands in real time.[114]  These virtual assistants are provided by well-known companies such as Google (Google Assistant), Amazon (Alexa), and Apple (Siri) and have been available since May 2016, November 2014, and October 2011, respectively.[115]

The smart speaker market was estimated to be between $7 billion and $8 billion in 2020, and over $9 billion in 2021.  Third-party research firms believe the smart speaker market will sustain continued growth over the next decade, with an expected compound annual growth rate of 17 – 20%, resulting in a market size of $15.6 billion in 2025 and $34 billion in 2028.[116]

Greater integration between smart-home devices and home theater equipment helped bolster sales as customers looked for unique ways to combine audio, visual, and other features of their home speaker systems.[117]  As of 2018, audiovisual devices, such as home speakers, made up 15% of the smart home ecosystem.[118]  One of the driving forces for growth in this market was the growing capabilities of AI and their usage within these devices, and it is expected that smart speakers and devices that can connect with them will continue to grow into the future.[119]

As discussed further in Section 14.5, Google and Sonos actively compete in the smart speaker market.  Before manufacturing its own hardware, Google was not a competitor in the smart speaker market.  However, it started "moving into Sonos's space, first with a small device to stream music in 2015 and then with its Google Home speaker in 2016."[120]  The competition between Google and Sonos is described in Section 14.5 both from Sonos and Google's perspective.

## 8.   GOOGLE'S ACCUSED INSTRUMENTALITIES

Google is infringing Sonos's patents, including the Asserted Patents, as part of a calculated business strategy referred to as "efficient infringement."  I understand that "efficient infringement occurs when a company deliberately chooses to infringe a patent given that it is cheaper than to license the patent."[121]  "Efficient

---

[114] SONOS-SVG2-00056368-373 at 369.

[115] Lynley, M., "Google unveils Google Assistant, a virtual assistant that's a big upgrade to Google Now," *TechCrunch*, https://techcrunch.com/2016/05/18/google-unveils-google-assistant-a-big-upgrade-to-google-now/; Lacoma, T., "The history of Amazon Echo," *DigitalTrends*, https://www.digitaltrends.com/home/history-of-amazon-echo/; Allen, J., "10 years of Siri: the history of Apple's voice assistant," *TechRadar*, https://www.techradar.com/news/siri-10-year-anniversary.

[116] "The global smart speaker market is projected to grow from $9.04 billion in 2021 to $34.24 billion in 2028 at a CAGR of 21.0% in forecast period, 2021-2028," *Fortune Business Insights*, https://www.fortunebusinessinsights.com/smart-speaker-market-106297; "Smart Speaker Market with COVID-19 Impact Analysis by IVA (Alexa, Google Assistant, Siri, DuerOS, Ali Genie), Component (Hardware (Speaker Driver, Connectivity IC, Processor, Audio IC, Memory, Power IC, Microphone) and Software), Application, and Region - Global Forecast to 2025," *MarketsAndMarkets*, https://www.marketsandmarkets.com/Market-Reports/smart-speaker-market-44984088.html.

[117] SONOS-SVG2-00053679-853 at 689.

[118] SONOS-SVG2-00056368-373 at 368.

[119] SONOS-SVG2-00056368-373 at 369.

[120] Wakabayashi, D., "Google Infringed on Sonos Speaker Technology, Trade Court Rules," *TheNewYorkTimes.com*, https://www.nytimes.com/2022/01/06/technology/google-sonos-patents.html.

[121] SONOS-SVG2-00056408-411 at 408.



**INTELLECTUAL CAPITAL EQUITY**

infringement" has been further described as "a cold-hearted business calculation whereby businesses decide it will be cheaper to use patented technology without paying than to license it and pay a fair royalty to the patent owner. This calculus is made on the part of large entities [such as Google]."[122]  In view of the critical market "window of opportunity" surrounding the smart home, Google opted to take its chances because it was financially advantageous to refuse to take a license to Sonos's patent portfolio (despite knowing that it infringes a vast number of Sonos patents) while it continues to sell infringing products in order to build its user base, collect valuable user data, and secure multiple revenue streams.  Google is one of the largest companies in the world, and as such, has massive cash reserves with which it can comfortably withstand a nearly indefinite period of litigation against Sonos.  A recent SEC filing indicates Google's cash, cash equivalents, and marketable securities on hand to be approximately $116.3 billion.[123]  Google's "infringe now pay later" strategy has enabled it to continue to reap the many benefits of its infringing activity while viewing any costs associated with defending against Sonos's infringement claims as simply the cost of doing business.

Additionally, Google continues to use its infringing products to bring new households onto its platform where it can vacuum up invaluable consumer data from users and, thus, further entrench the Google platform among its users and fuel its dominant advertising and search platforms.  Google's infringement – and its strategy to sell its infringing products at a loss to develop alternative revenue streams – has caused significant damage to Sonos.  For example, the Google Home Mini predatorily implemented Sonos's valuable patented technology into an all-in-one wireless multi-room product that Google sells at a highly-subsidized price point or even gives away for free.[124]  While Google's reasoning for discounting the price and profitability of certain Accused Instrumentalities relate to furthering (at least in part) certain of Google's other business lines, the reasons Google's customers purchase the Accused Instrumentalities directly relates to Sonos's Asserted Patents.

I understand that in Sonos's Third Amended Complaint, Sonos identified Google's infringing product lines which includes at least the Chromecast, Chromecast Ultra, Chromecast Audio, Chromecast with Google TV, Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Audio, and Nest WiFi Point (individually or collectively, "Google Audio Player(s)"), all of which can be controlled by, for example, the YouTube Music app, the Google Play Music app, the YouTube app, and the Google Home app (individually or collectively, "Google App(s)").[125]

In addition to providing the Google Apps for controlling the Google Audio Players, Google also offers various infringing hardware controllers that are pre-installed with the Google Play Music app, YouTube app, and/or YouTube Music app (and capable of downloading and executing the Google Apps that are not pre-installed).  The infringing hardware controllers include, for example, Google's "Pixel" phones, tablets, and laptops (*e.g.*, the Pixel 1/1 XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 6, Pixel 6a, Pixel 6 Pro, Pixel 7, and Pixel 7 Pro phones, the Pixel Slate tablet, and the Pixelbook and Pixelbook Go laptops) (individually or collectively, "Google Pixel

---

[122] SONOS-SVG-00056429-438 at 430.

[123] Alphabet Form 10-Q for the period ended September 30, 2022, p. 5.

[124] SONOS-SVG2-00042384-390 at 386; SONOS-SVG2-00042337-344 at 342.

[125] Sonos, Inc.'s Third Amended Complaint, *Sonos, Inc., v. Google, LLC*, 3:21-c-07559, March 30, 2022, p. 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

*the cloud-based media service; and (iii) play back the retrieved at least one media item," as required by limitation 1.7/12.4.*

*Nevertheless, especially given that Google represents that the prior art that appears to operate in a similar manner as these apps is relevant to the '033 Patent, it is my opinion that, while they may be inferior to the '033 Patent, these apps are all technologically comparable to the Direct Control technology claimed in the '033 Patent.*[429]

I understand that Dr. Schmidt has opined that these apps are technically comparable to the technology claimed in the '033 Patent, albeit less valuable.  This is due to the fact that, like the prior art, these apps do not perform each and every limitation of the independent Asserted Claims of the '033 Patent.[430]

Since the main feature being provided by these third-party comparable casting applications is the cast feature, there is no additional meaningful apportionment to be made to the one-time subscription fees that these applications charge.  In other words, to the extent that these comparable casting applications have any additional features, they are ancillary to the core casting feature of each application and offset by the advantageous features of the '033 Patent that each application is missing.

Thus, no further apportionment is necessary.  And lastly, while the fees ranged greatly between the third-party applications, I have conservatively assumed that a $1.99 subscription fee would be the quantitative indicator that Sonos and Google would consider based upon the available third-party comparable applications.  By picking a fee in the middle of the range, I have further accounted for the secondary benefits, if any, that these casting applications may have over the '033 Patent.

## 12.2    The Income Approach

The Income Approach provides a systematic framework for estimating an asset's price based on the value of the benefits derived from the use of that asset.  As described in <u>Economic Damages in Intellectual Property</u>:

*The income approach is a method used to value intellectual property assets based on the present value of the future income stream generated by an asset.  There are three major inputs to the income approach: (1) expected future cash flows from the asset; (2) economic life of the asset; and (3) business risk associated with the realization of the cash flow stream.  The key goal is to estimate the present value of incremental profits generated by the asset over its economic life, taking into account the risk associated with generating those profits.  Once the present value of the incremental profits is determined, these profits are split in some manner between the licensor and licensee, typically in the form of a royalty.*[431]

As discussed throughout this report, I understand that the Asserted Patents provide valuable features to the Accused Instrumentalities.  While there is a lack of relevant comparable license agreements in this matter which read on the value of these specific features, I have been provided with information relevant for the Income Approach which would be considered by the parties to the hypothetical negotiation in this case.

---

[429] Opening Schmidt Report, pp. 165-166.

[430] Opening Schmidt Report, p. 166.

[431] Slottje, D., "Economic Damages in Intellectual Property," pp. 291-293.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**INTELLECTUAL CAPITAL EQUITY**

While the income approach seeks to value intellectual property based on the present value of the future income stream generated by the asset, I understand that Google has generally not garnered gross profits on the sales of the physical hardware devices which enable Google's infringement.  Over the infringement period, with respect to the '033 Accused Pixel Instrumentalities, from September 15, 2020 through Q3 2022, ████████████████████████████████████████████████.[432]  Google has not provided sufficient financial information to calculate net revenue or gross profit associated with the '033 Accused Instrumentalities more generally.

With respect to the '885 Accused Instrumentalities, from November 24, 2020, the start of the damages period, through Q3 2022, Google has generated ████████████████████████████████ ████████████████ on sales of the '885 Accused Instrumentalities.[433]  Google has not provided sufficient financial information to calculate net revenue or gross profit associated with the '966 Accused Instrumentalities.

However, Google's losses on actual hardware sales of these devices do not represent value associated with the technology in this case, because as discussed further in Sections 14.11, Google is more focused on increasing the time users spend on Google applications and services such that Google generates more revenue from additional viewed advertisements and subscriptions.  Therefore, the main value driver in Google's sales of the Accused Instrumentalities is the inclusion of a user in an ecosystem which generates added benefit beyond the initial sale of a hardware device through additional advertising and subscription revenue, which potentially could continue throughout a user's lifetime.

In fact, it is acknowledged publicly that companies like Google and Amazon are focused on getting smart speakers in front of as many consumers as possible and increasing market share, even realizing losses on the sale of the devices themselves.[434]  Particularly, Google and Amazon "are eager to give consumers a taste of their respective digital assistants, Alexa and Google Assistant, at impulse-buy prices, hoping to lock in customers and profit from later sales of goods and data about buying habits."[435]  According to *9to5Google,* a publisher focusing on Google related news, millions of Google Home devices were sold during the 2018 holiday season and it was considered "another record year."[436]  This is particularly interesting given that, according to Google's financial data, Google ████████████████████████████████ on sales of the Google Home device in Q4 2018.[437]  This reflects Google's interest in selling more units and retaining users

---

[432] Appendix 8.6. I note that the damages period starts on September 15, 2020, so I pro-rate the Q3 2020 '033 Accused Instrumentalities Gross Profit for September 15 through September 30, 2020.

[433] Appendix 8.4-S.

[434] Kinsella, B., "Amazon and Google Lost Money on Discounted Echo Dots and Google Home Minis," *Voicebot.ai*, https://voicebot.ai/2018/01/05/amazon-google-lost-money-discounted-echo-dots-google-home-minis/.

[435] Nellis, S., and Paresh, D., "Amazon and Google probably lost money on their smart speakers over Christmas," *BusinessInsider.com*, https://www.businessinsider.com/amazon-and-google-probably-lost-money-on-smart-speakers-over-christmas-2018-1.

[436] Li, A., "Google Assistant will soon be available on 1 billion devices as Google Home had 'record' 2018," *9to5Google*, https://9to5google.com/2019/01/07/google-assistant-1-billion-devices/.

[437] GOOG-SONOSNDCA-00117797.

**INTELLECTUAL CAPITAL EQUITY**

on those units for longer to generate revenue and profit from other means, such as advertising and subscriptions.

This is further corroborated by internal Google documents regarding YouTube which state that longer session times are equated with more advertising revenue.[438]  Christopher Chan corroborated this idea in his testimony, stating that "it seems to be the case that more YouTube users there are, the better it is more the YouTube service."[439]

**Figure 20:** [440]



Therefore, as a starting point for the Income Approach in this case, it is my affirmative opinion that a quantitative indicator for the value of the Asserted Patents should be based upon revenue.  As further discussed in Section 14.13, this is corroborated by Google's own revenue sharing model with developers who list applications on the Google Play Store.  Google's model is to share a certain amount of revenue with the developers, before considering its costs.  However, as a conservative measure, I have also provided alternative calculations which determine the quantitative indicator for the '033 Patent based upon Google's gross margin realized from advertising and subscriptions.

### 12.2.1   Direct Control Quantitative Indicator Based on Incremental Revenue

In certain circumstances, Google prioritizes increased time spent on Google platforms to view advertisements and interact with other Google subscriptions or services over the profitability of its hardware sales.  Given this business model, rather than attempt to apportion Pixel devices, which include countless other technologies in addition to what is claimed in the '033 Patent, I have instead considered the incremental YouTube advertising revenue and subscription revenue that Google generates based on increased time users

---

[438] GOOG-SONOSNDCA-00071716-725 at 722.

[439] Deposition of Christopher Chan, November 29, 2022, p. 93.

[440] GOOG-SONOSNDCA-00071716-725 at 722.

 INTELLECTUAL CAPITAL EQUITY

Under the Cost Approach, the licensee would pay no more in royalties than the cost of a non-infringing alternative.  Properly applied, the Cost Approach considers out-of-pocket expenditures, as well as risks, lost sales, and other adverse economic impacts connected with the alternative technology.  However, the Cost Approach may be of limited relevant if there is little correlation between the development (or replacement) cost of an asset and its value.[533]

With respect to the '033 Patent, I understand that Google has put forth five alleged non-infringing alternatives.[534]  For each alleged non-infringing alternative, Dr. Schmidt opines that they would not have been available, acceptable, non-infringing alternatives at the time of Google's first infringement.[535]

With respect to the '885 Patent and '966 Patent, I understand that Google has put forth three alleged non-infringing alternatives.[536]  For each alleged non-infringing alternative, Dr. Almeroth opines that they would not have been available, acceptable, non-infringing alternatives at the time of Google's first infringement.[537]

Thus, I am not currently aware of any commercially acceptable non-infringing alternatives to the Asserted Patent available to Defendant during the relevant periods.

## 13.  THESE DAMAGES CALCULATIONS ARE CONSERVATIVELY BASED ON REASONABLE ASSUMPTIONS

There are several reasons why the quantitative indicators and resulting reasonable royalties that I calculate for are conservative and why my assumptions in this report are reasonable.  More specifically, Google's infringement has led to financial gains and market advantages for Google that I have not accounted for in my damages calculations.

For example, despite Sonos's requests for such information, Google has not provided any financial information yet for the e-commerce revenue, search revenue, and customer data collection revenue that Google has generated from the Accused Instrumentalities.  Although such revenue is undoubtedly in the range of several billions of dollars, I have not included any of this revenue in my damages calculations.  It is also likely that Google has underrepresented its profit margins for its sales of the Accused Instrumentalities, advertisement revenue, and subscription revenue by not providing the profit made from the related ecommerce revenue, search revenue, and customer data collection revenue.

Additionally, the revenue obtained from the sale of the Accused Instrumentalities vastly understates the value to Google of infringing Sonos's patents.  For example, Google is intentionally selling its infringing Cast-enabled media players at a discount – a "loss leader" – with the expectation that this will allow Google to generate even more revenue in the future by powering Google's continued dominance of the search and

---

[533] Strand, P., "Where to Begin?...Setting Rates for Reasonable Royalty," *IpQ – Enhancing Your IP IQ*, p. 2, https://www.shb.com/newsletters/ipq.

[534] Google LLC's Eighth Supplemental Objections and Responses to Plaintiff Sonos, Inc.'s First Set of Fact Discovery Interrogatories (No. 18), November 21, 2022, pp. 12-15; Opening Schmidt Report, p. 143.

[535] Opening Schmidt Report, pp. 144-159.

[536] Google LLC's Eighth Supplemental Objections and Responses to Plaintiff Sonos, Inc.'s First Set of Fact Discovery Interrogatories (No. 18), November 21, 2022, pp. 8-12; Opening Almeroth Report, p. 312.

[537] Opening Almeroth Report, pp. 312-313.



**INTELLECTUAL CAPITAL EQUITY**

advertising markets.  Specifically, Google's infringement of Sonos's patented inventions has helped, and will continue to help, Google generate significant revenue from the use of Google's infringing Cast-enabled media players including e-commerce, data collection, and search via Google's Cast-enabled media players.  As the *New York Post* explained in January 2018, "Amazon and Google both discounted their home speakers so deeply over the holidays that they likely lost a few dollars per unit…hoping to lock in customers and profit from later sales of goods and data about buying habits…Google gave away the devices to buyers of its new Pixel 2 smartphones and offered them for $29 at Wal-Mart, Target and Best Buy."[538]  Similarly, *News Without Borders* explained that companies like Google are using their "smart speaker" devices as "'loss leader[s]' to support advertising or e-commerce."[539]  In December 2019, WBUR, Boston's NPR news station, described Google's strategy as follows: "This tactic – hardware as a loss leader – fits squarely within…Google's broader strategy of maximizing smart-speaker adoption in order to start hoovering up even more user data: search queries, musical tastes, purchases, etc."[540]  WBUR highlighted "a few recent examples" of Google's promotional tactics as follows:

(i)     "Get a free Google Home Mini just for having a Spotify Premium subscription;"
(ii)    "Buy select Tile products, get a free Google Home Mini;"
(iii)   "Bundle a Google Nest Hub and a Google Nest Mini;"
(iv)    "Bundle a copy of the 'Frozen II' book and Google Home Mini;"
(v)     "Link your utility account, get a free Google Home Mini."[541]

Again, I have not accounted for Google's additional revenue from ecommerce, search, and customer data collection in my reasonable royalty analyses.

Google's loss leader strategy also allows it to "lock" consumers into Google's multiroom audio system such that these consumers do not purchase a similar multiroom audio product from a competitor like Sonos in the future.  In contrast, had these consumers purchased one of Sonos's products initially, then it is more likely that they would be Sonos households purchasing additional multiroom audio products from Sonos in the future.  As *Fast Company* explained in March 2018: "The business motivations are clear: Tech giants like…Google…see the smart home as new territory to conquer through their respective ecosystems…As a result, the more you buy into one system, the more you become locked out of others."[542]  As Google knows all too well, "smart speakers" serve "as a gateway into the home."[543]  Once customers purchase an infringing Google product, they are far less likely to purchase a similar product from a competitor like Sonos. Christopher Chan, a Google employee and Google's corporate representative on sales and marketing strategies, competition, app installs, customer usage, and data feedback, testified that Google hopes that the purchase of one product leads to the purchase of a second product from the same company:

*Q. If someone buys a Sonos speaker, then they would be in the Sonos ecosystem; right?*

---

[538] SONOS-SVG2-00042333-336.

[539] SONOS-SVG2-00042337-344.

[540] SONOS-SVG2-00056439-444 at 440. Emphasis in original.

[541] SONOS-SVG2-00056439-444 at 440.

[542] SONOS-SVG2-00056412-428 at 415.

[543] SONOS-SVG2-00056368-373 at 369.

INTELLECTUAL CAPITAL EQUITY

*A. That sounds right.*

*Q. Does the ecosystem affect what speaker a user purchases?*

*A. I think that's the hope, but I haven't seen much data in regards to the Nest ecosystem.*

*Q. So if somebody buys a Nest speaker, they become part of the Nest ecosystem; is that right?*

*A. That's the intent, but I haven't seen strong data to support it.*

*Q. If someone buys a Sonos speaker, then they would be in the Sonos ecosystem; right?*

*A. That sounds right.*

*Q. And if they're in the Nest ecosystem, when they buy their second speaker, they'd likely purchase a Nest speaker for that second speaker; right?*

*A. That's the hope, but I haven't seen strong data that suggests the narrative that you are describing.*[544]

I have not accounted for this "lock-in" effect in my damages calculations.

Moreover, Google's infringement also benefits Google by undercutting Sonos's competitive advantage in the WMRS market. Google's own internal documents show that it directly competes with Sonos for at least certain of the Accused Instrumentalities.[545]

Sonos and Google compete against one another for the sale of WMRS products in the U.S. They target similar customers and segments of the market. For example, both Sonos and Google sell into the retail and direct market channels. In addition, the two entities also share many of the same retailers including, for example, Best Buy, Amazon, Walmart, Target, Abt, and B+H Photo. The press has also recognized such competition.[546] Google's own employee, Christopher Chan, also acknowledged Sonos and Google as competitors in both the home audio and smart speaker markets, per various reviews and Google-produced conjoint analyses.[547] Similarly, as previously mentioned, the market research company NPD Group ("NPD") provides market data showing that certain of Google's Accused Instrumentalities (specifically Google's Cast-

---

[544] Deposition of Christopher Chan, November 29, 2022, pp. 109-110. Objections omitted.

[545] GOOG-SONOSNDCA-00056235-241; GOOG-SONOSNDCA-00056242-243; GOOG-SONOSNDCA-00056244-266; GOOG-SONOSNDCA-00056267-305; GOOG-SONOSNDCA-00056306-347; GOOG-SONOSNDCA-00056348-369; GOOG-SONOSNDCA-00056370-419; GOOG-SONOSNDCA-00056420-499; GOOG-SONOSNDCA-00056500-572; GOOG-SONOSNDCA-00056573; GOOG-SONOSNDCA-00056580; GOOG-SONOSNDCA-00056601; GOOG-SONOSNDCA-00056658; GOOG-SONOSNDCA-00056659; GOOG-SONOSNDCA-00056671; GOOG-SONOSNDCA-00056672; GOOG-SONOSNDCA-00056673-721; GOOG-SONOSNDCA-00056722.

[546] SONOS-SVG2-00055628-636; SONOS-SVG2-00055637-642.

[547] Deposition of Christopher Chan, November 29, 2022, pp. 115-118.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

enabled media players) compete against Sonos's media players in the WMRS market.[548]  I have not relied on any market share lost by Sonos to Google in my analyses.

Finally, my damages calculations are conservative because I have not included all of Google's direct infringement in my analyses.  For instance, I have not included the infringing products that Google imports into the United States but does not sell in the United States (*e.g.*, they are sold in Canada and Mexico).[549] Although Google has yet to produce the financial information for such imports, there are presumably thousands of such products, if not millions.  I have also not included any of the infringing products that Google does not sell but uses internally for its employees and testing.  Google had over 185,000 employees worldwide as of September 30, 2022 with 48% of its revenue coming from the U.S. in the same quarter.[550] Consequently, Google receives a significant benefit from using these infringing products.

## 14.    *GEORGIA-PACIFIC* FACTOR ANALYSIS

The hypothetical negotiation is to be evaluated in the context of the specific business facts and circumstances faced at that time by the patentee and the prospective licensee.  *Georgia-Pacific Corp. v. United States Plywood Corp.* provides a 15-factor framework to perform such an analysis.[551]  For each of the 15 *Georgia-Pacific* factors, I have identified the relevant information and facts that may have influenced the royalty rate in the hypothetical negotiation.  I note that to some extent, certain of the *Georgia-Pacific* factors have already been addressed in connection with my analysis above.

### 14.1    Factor #1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

Factor #1 represents a quantitative valuation metric associated with the determination of a reasonable royalty. Analysis of this factor is sometimes referred to as the Market Approach in the context of intellectual property valuation, which I have addressed above in Section 12.1.  As discussed above, the Market Approach attempts to measure the value of an intangible asset by drawing inferences from actual market transactions involving that asset or similar assets.  In general, the more similar those market transactions are to the transaction in question (*i.e.*, the hypothetical negotiation), the more useful the information.  While exactly matching transactions cannot always be found, they do exist in some situations.  In the absence of an exactly matching transaction, market transactions that share some characteristics with the subject transaction can provide guidance as to the terms and conditions that may be applicable in a particular case.

I have considered the agreements produced by Sonos in this case, as discussed in the Market Approach. Notably, Sonos's licenses include ███████████████ ███ .  The royalty rates included in these ████████████ licenses are greater than the quantitative indicators I have calculated related to Direct Control and Zone Scene because of the other technologies Sonos owns.

---

[548] SONOS-SVG2-00055658; SONOS-SVG2-00055659.

[549] Deposition of Michael Maigret, May 13, 2022, pp. 51-54.

[550] Alphabet Form 10-Q for the period ending September 30, 2022, pp. 37, 40.

[551] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

INTELLECTUAL CAPITAL EQUITY

**14.6    Factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

In addition to the incremental advertising and subscription revenue which Google generates once a user is included in its ecosystem, users are more likely to purchase additional hardware products from the same manufacturer.  For instance, according to an article from 2018 in *The Verge*, Google is building an ecosystem in the smart home which "works better if you use more than one Google device."[592]  Instead of just purchasing one speaker, the goal is to encourage users to purchase additional Google hardware products to expand their selection with integrated devices.[593]  In this aspect, once a user joins the Google ecosystem by purchasing a smart speaker device, they are much more likely to purchase a second smart speaker also made by Google rather than another manufacturer, such as Sonos.

In addition, Sonos internal documents discuss the future loss associated with a user locked into a competitor's ecosystem.  Once a user or household purchases a Google hardware device, Google generates a great deal more revenue from that user or household.  That initial lost sale to Sonos then becomes a loss of additional future sales because the user or household is locked into an ecosystem effect where like-manufacturer devices are preferred for integration.  As an example, an October 2018 survey titled "Smart Speaker User Survey: Questions for Sonos" reported that 53% of Google smart speaker owners chose Google again when they purchased their second smart speaker.[594]  As *Fast Company* explained in March 2018: "The business motivations are clear: Tech giants like…Google…see the smart home as new territory to conquer through their respective ecosystems…As a result, the more you buy into one system, the more you become locked out of others."[595]  Christopher Chan, a Google employee, testified that once a consumer enters the Google ecosystem, it's Google's hope that they buy subsequent speakers from Google as well.[596]

Each hardware device added to the ecosystem also has the ability to generate even more additional revenue from Google's valuable search and data businesses.  Google's strategy to increase the number of users who interact with Google hardware devices drives further revenue generation and increases the lifetime value of users. ███████████████████████████████████████████████████████████ ██████████████████ ██████████████████████████ includes reference to an article from October 2017 in *The Verge* which states that, from a hardware strategy perspective, Google's focus "has been trying to get people connected to Google's services in the home."[598]  In addition, a *Wired* article from

---

[592] Bohn, D., "The Google Assistant smart home ecosystem is slowly starting to take shape," *TheVerge.com*, https://www.theverge.com/2018/11/14/18093872/google-assistant-smart-home-broadcast-reply-routines.

[593] Bohn, D., "The Google Assistant smart home ecosystem is slowly starting to take shape," *TheVerge.com*, https://www.theverge.com/2018/11/14/18093872/google-assistant-smart-home-broadcast-reply-routines.

[594] SONOS-SVG2-00063422-438 at 428.

[595] SONOS-SVG2-00056412-428 at 415.

[596] Deposition of Christopher Chan, November 29, 2022, pp. 109-110.

[597] SONOS-SVG2-00041807-860 at 816.

[598] Bohn, D., "Google Hardware Is No Longer a Hobby," *TheVerge.com*, https://www.theverge.com/2017/10/4/16405184/rick-osterloh-interview-new-google-hardware-vision-htc-deal.



**INTELLECTUAL CAPITAL EQUITY**

February 2018 describes how Google's hardware strategy is to "[p]ut its virtual assistant everywhere in people's lives."[599]  In an analyst report for Alphabet Inc. from December 2018, RBC Capital Markets stated that "[w]e believe that Google's growing Hardware segment has also generated significant strategic benefits for the company, including increased ad monetization opportunities, an end-to-end, controlled method of delivering software/product updates to consumers, and a platform to develop and deploy AI advancements."[600]

An October 2021 *Seattle Times* article titled "Big Tech's not-so-secret plan to monetize your home" describes how Amazon, Apple, and Google use artificial intelligence assistants inside smart speakers to "decide what information to provide you, where you can shop and how seriously to take your privacy."[601]  Google and Amazon "are eager to give consumers a taste of their respective digital assistants, Alexa and Google Assistant, at impulse-buy prices, hoping to lock in customers and profit from later sales of goods and data about buying habits."[602]  Most recently, a November 2022 article noted that while Amazon's Echo product line is among the "best-selling items on Amazon…we want to make money when people use our devices, not when they buy our devices."[603]

Google's infringement of Sonos's patented inventions has helped and will help Google generate significant revenue from driving its users to make purchases such as streaming music subscriptions and retail purchases via and for use with Google's Cast-enabled media players.  For example, an NPR "smart speaker" survey found that 28% of survey respondents agreed that "[g]etting [a] Smart Speaker led [them] to pay for a music service subscription," and Google offers two such subscriptions – Google Play Music and YouTube Music.[604]  Likewise, the NPR survey also found that 26% of respondents use their smart speakers "regularly" to "add [items] to shopping list."[605]

Google has also produced a number of 

[607]

When limited to the United States, Google ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮

---

[599] SONOS-SVG2-00041807-860 at 846.

[600] SONOS-SVG2-00055463-490 at 463.

[601] Fowler, G., "Big Tech's not-so-secret plan to monopolize your home," *SeattleTimes.com*, https://www.seattletimes.com/business/technology/big-techs-not-so-secret-plan-to-monopolize-your-home/.

[602] Nellis, S., and Paresh, D., "Amazon and Google probably lost money on their smart speakers over Christmas," *BusinessInsider.com*, https://www.businessinsider.com/amazon-and-google-probably-lost-money-on-smart-speakers-over-christmas-2018-1.

[603] Amadeo, R., "Amazon Alexa is a 'colossal failure,' on pace to lose $10 billion this year," *arstechnica*, https://arstechnica.com/gadgets/2022/11/amazon-alexa-is-a-colossal-failure-on-pace-to-lose-10-billion-this-year/.

[604] SONOS-SVG2-00042345-383 at 365.

[605] SONOS-SVG2-00042345-383 at 359; SONOS-SVG2-00042337-344 at 342.

[606] GOOG-SONOSNDCA-00115771-813; GOOG-SONOSNDCA-00115896-913; GOOG-SONOSNDCA-00115914-925.

[607] GOOG-SONOSNDCA-00115771-813 at 774.



**INTELLECTUAL CAPITAL EQUITY**

609

**Figure 47:**

610



In another

[608] GOOG-SONOSNDCA-00115771-813 at 774.

[609] GOOG-SONOSNDCA-00115771-813 at 775, 780.

[610] GOOG-SONOSNDCA-00115771-813 at 775.

[611] GOOG-SONOSNDCA-00115896-913 at 897, 911.

INTELLECTUAL CAPITAL EQUITY

**Figure 48:** [redacted] 612



In addition, this same document describes that havin [redacted]

[redacted] ”613

Therefore, I find that this consideration would tend to favor the licensor in this hypothetical negotiation.

*Impact on Hypothetical Negotiations:  Favors Licensor*

**14.7    Factor #7: The duration of the patent and the term of the license.**

Long-term, non-exclusive licenses tend to have lower rates so as not to incentivize the licensee to design around the patented technology, implement an alternative technology or otherwise discontinue sales of a licensed product.  Conversely, short-term, non-exclusive licenses tend to have higher rates.

I have assumed that the license resulting from the hypothetical negotiation would extend through the life of the '033 Patent.  Assuming a hypothetical negotiation occurring during the period leading up to September 15, 2020, and the expiration of the '033 Patent occurring on or around December 30, 2031, I consider the term of the license to be approximately 11.5 years.614  I would consider this to be a long-term license.

---

612 GOOG-SONOSNDCA-00115896-913 at 913.

613 GOOG-SONOSNDCA-00115896-913 at 898.

614 U.S. Patent No. 10,779,033, p. 1; "US10779033," *Google Patents*, https://patents.google.com/patent/US10779033B2/en?oq=10779033.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

I have similarly assumed that the license resulting from the hypothetical negotiation would extend through the life of the '885 Patent. Assuming a hypothetical negotiation occurring during the period leading up to November 24, 2020, and the expiration of the '885 Patent occurring on or around September 11, 2027, I consider the term of the license to be approximately 6.5 years.[615] I would consider this to be a mid-to-long-term license.

I have similarly assumed that the license resulting from the hypothetical negotiation would extend through the life of the '966 Patent. Assuming a hypothetical negotiation occurring during the period leading up to November 5, 2019, and the expiration of the '966 Patent occurring on or around September 11, 2027, I consider the term of the license to be approximately 7.5 years.[616] I would consider this to be a mid-to-long-term license.

Therefore, I find that this consideration would tend to favor the licensee in this hypothetical negotiation.

> *Impact on Hypothetical Negotiations:   Favors Licensee*

## 14.8     Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity.

The profitability, commercial success, and popularity of the products made under the Asserted Patents are illustrated by the profitability, commercial success, and popularity of Sonos's Patent-Practicing Products and Google's Accused Instrumentalities.

As discussed in Section 9, the Sonos devices which practice the Zone Scene Patents include the Sonos One, Sonos Play:5, and Sonos Five.[617] These products are sold in the Sonos speakers revenue category.[618] A substantial majority of Sonos revenue comes from sales of its speakers.[619]

As shown in the figure below, from fiscal year 2016 through fiscal year 2022, Sonos generated $4.1 billion in gross profit on $9.1 billion in sales, for an average gross profit margin percentage of 44.6%.[620] Sonos's gross profit margin percentage on sales increased from 44.8% in fiscal year 2016 to 45.4% in fiscal year 2022.[621]

---

[615] U.S. Patent No. 10,848,885; "US10848885," *Google Patents*, https://patents.google.com/patent/US10848885B2/en?oq=10848885.

[616] U.S. Patent No. 10,469,966, p. 1; "US10469996," *Google Patents*, https://patents.google.com/patent/US10469966B2/en?oq=10469966.

[617] Sonos, Inc.'s Preliminary Damages Disclosure Pursuant to Patent Local Rule 3-8, January 25, 2022, p. 7.

[618] Sonos, Inc. Form 10-K for the fiscal year ended October 2, 2021, p. 5.

[619] Sonos, Inc. Form 10-K for the fiscal year ended October 2, 2021, p. 40.

[620] Appendix 9.1.

[621] Appendix 9.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

**Figure 49: Sonos's Company-wide Gross Profitability**[622]

| (in thousands USD) | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ 901,284 | $ 992,526 | $1,137,008 | $1,260,823 | $1,326,328 | $1,716,744 | $1,752,336 | $ 9,087,049 |
| Cost of Revenue | 497,885 | 536,461 | 647,700 | 733,480 | 754,372 | 906,750 | 955,969 | 5,032,617 |
| **Gross Profit** | **$403,399** | **$456,065** | **$ 489,308** | **$ 527,343** | **$ 571,956** | **$ 809,994** | **$ 796,367** | **$4,054,432** |
| *Gross Profit Margin %* | *44.8%* | *45.9%* | *43.0%* | *41.8%* | *43.1%* | *47.2%* | *45.4%* | *44.6%* |

As discussed in Section 8.1, the '033 Accused Pixel Instrumentalities are composed of Google's smartphone device, tablets, and computers.  As shown in the figure below, from September 15, 2020 through Q3 2022, Google ███████████████████████████████████████████ of the '033 Accused Pixel Instrumentalities, for an ██████████████████████████████[623]

**Figure 50: Google's Gross Profitability for the '033 Accused Pixel Instrumentalities**[624]



As discussed in Section 8.2, the '885 Accused Instrumentalities are composed of Google's cast-enabled media players, such as Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Audio, Nest WiFi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Chromecast with Google TV (HD).  As shown in the figure below, from November 24, 2020 through Q3 2022, Google, ████████████████████████████████████████ in net sales of the '885 Accused Instrumentalities, ████████████████████[625]

**Figure 51-S: Google's Gross Profitability for the '885 Accused Instrumentalities**[626]



---

[622] Appendix 9.1.

[623] Appendix 8.3.

[624] Appendix 8.3.

[625] Appendix 8.4-S.

[626] Appendix 8.4-S.

 **INTELLECTUAL CAPITAL EQUITY**

As discussed in Section 8.3, the '966 Accused Instrumentalities are composed of devices that have installed the Google Home app. However, Google has not provided sufficient information to calculate net revenue or gross profit associated with such devices. I estimate that approximately ███████████████ have installed the Google Home app over the relevant infringement period.[627] Based on the above financial information, it is clear that there is strong demand for the Accused Instrumentalities which use the patented inventions.

In the context of the hypothetical negotiation, Sonos and Google would recognize that the Accused Instrumentalities provide Google various means to generate revenue. Not only does Google make profits on the sale of cast-enabled devices and hardware products, but Google relies upon the subscription fees and advertising revenue generated through consumer usage of these cast-enabled devices and hardware products. In particular, the parties would consider Google's advertising revenue and profitability and Google's subscription revenue and profitability, in addition to considering the sales of Google's actual device and hardware products.

On YouTube ads generated by the '033 Accused Pixel Instrumentalities in the U.S. from Q3 2020 through Q3 2022, Google ████████████████████████████████████████████████████████████████████ [628] Google's ███████████████████████████████████████████████████████████████████████████ [629]

**Figure 52-S: YouTube U.S. Ad Gross Profit for the '033 Accused Pixel Instrumentalities**[630]

On YouTube subscriptions generated by the '033 Accused Pixel Instrumentalities in the U.S. from Q3 2020 through Q3 2022, Google ████████████████████████████████████████████████ [631] Google's ████████████████████████████████

---

[627] Appendix 7.4.
[628] Appendix 5.2.1.1-S.
[629] Appendix 5.2.1.1-S.
[630] Appendix 5.2.1.1-S.
[631] Appendix 5.2.2.1-S.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

**19.   SIGNATURE**

Respectfully submitted,

James E. Malackowski

December 9, 2022

Date