CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
BAS DE BLANK (SBN 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., <br><br> Plaintiff and Counter-Defendant, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant and Counter-Claimant. | Case No. 3:20-cv-06754-WHA <br><br> Consolidated with <br> Case No. 3:21-cv-07559-WHA <br><br> **SONOS, INC.'S SUPPLEMENTAL BRIEF REGARDING '885 AND '966 PATENTS** <br><br> Judge: Hon. William Alsup <br> Pretrial Conf.: May 3, 2023 <br> Time: 12:00 p.m. <br> Courtroom: 12, 19th Floor <br> Trial Date: May 8, 2023 |

**PUBLIC REDACTED VERSION**

**I.     INTRODUCTION**

The Court has requested supplemental briefing on (i) the extent to which the asserted claims of the '966 patent should stand or fall with the asserted claim of the '885 patent and (ii) whether a related stipulation might conserve resources.  Dkt. 626.

The Court has already found that prior versions of Google's media player products infringe the '885 patent.  Dkt. 309.  Sonos believes that the prior versions of the Google Home App, when installed on a computing device, infringe the '966 patent in the same way and for the same reasons.  However, because the '966 patent is drafted from a different perspective (e.g., from the perspective of a phone) Sonos' infringement allegations for that patent are premised on both direct and indirect infringement.  Indirect infringement gives rise to additional defenses.  Thus, Google should stipulate that the prior version of the Google Home App, when installed on a computing device, directly infringes the '966 patent.  Google should then proceed to trial *only* on defenses specifically relating to indirect infringement (i.e. arguments that Google lacked the required knowledge and intent).

The situation is different, however, for the newer versions of Google's accused products.  For those products, the infringement theories for the '885 and '966 patents are sufficiently different that the claims of the '885 and '966 do not rise and fall together.  In addition, Google's invalidity theory and Sonos' counter-arguments are different for the '885 and '966 patents – thus invalidity does not rise or fall together.

To explain why Sonos has reached these conclusions we start by comparing the claims.

**II.     CLAIM 1 OF THE '885 VERSUS CLAIMS 1, 2, 4, 6, & 8 OF THE '966**

Both the '885 and '966 patents claim aspects of Sonos's zone scene technology.  Claim 1 of the '885 patent is drafted from the perspective of the speaker (or "zone player"), whereas claim 1 of the '966 patent is drafted from the perspective of the controller (or "computing device").  Claim 1 of each patent are the only asserted independent claims.  As Google states, the two patents "are two sides of the same coin."  Dkt. 592-5 (Google's Opp. to Sonos MIL 2) at 5.  Sonos agrees that the two independent claims align in many respects.  But the claims differ in certain ways that are material to invalidity and to infringement by Google's new products.  The

independent claims can be aligned as follows.  Setting aside the fact that the claims are written from different perspectives, red text shows claim limitations that have no corresponding limitation in the other patent:

| '966 Patent | '885 Patent |
|---|---|
| [1.0] A computing device comprising: [1.1] one or more processors; [1.2] a nontransitory computer-readable medium; [1.3] and program instructions stored on the nontransitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising: | [1.0] A first zone player comprising: [1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network; [1.2] one or more processors; [1.3] a non-transitory computer-readable medium; and [1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising: |
| [1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually: | [1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players: |
| [1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;<br><br>[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) *causing storage of the first zone scene*; | (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and |
| [1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;<br><br>[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be | (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player; |

| '966 Patent | '885 Patent |
|---|---|
| transmitted to the first zone player, and iii) causing storage of the second zone scene; | |
| [1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and | |
| | [1.6] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation; |
| [1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and | |
| [1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player. | [1.7] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and<br><br>[1.8] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players. |

In addition, claim 4 of the '966 patent requires the storage of the zone scenes to be at the zone player, which is not required by claim 1 of '885 patent.

## III. INFRINGEMENT BY THE PRIOR VERSIONS OF GOOGLE'S ACCUSED PRODUCTS RISE AND FALL TOGETHER

Google's prior versions of the accused applications infringe claims 1, 2, 4, 6, and 8 of the '966 patent when they are installed on a networked computing device (such as a smart phone) for

the same reasons the Court found infringement of claim 1 of the '885 patent. Google cannot seriously dispute this fact. Indeed, Google's "trial brief" contains no argument disputing infringement. Dkt. 621-3. Nor did Google move for summary judgment of noninfringement of the prior versions of its accused products (despite moving on five other issues). Dkt. 483.

More specifically Sonos has accused computing devices (such as a smart phone) installed with the Google Home App alone or in combination with other cast-enabled applications of infringing the '966 patent. See, e.g., Dkt. 209-4 (Google's Resp. to Interrog. No. 13) at 9-11; Ex. 1 (GOOGSONOSWDTX-00005793-802); Ex. 2 (GOOG-SONOSNDCA-00056732-77).

There is no real dispute that a smart phone installed with the Google Home App has one or more processors and computer memory that stores software. Limitations 1.0-1.3.; Ex. 3 (Almeroth Rpt.) ¶¶ 389-93. And there is no dispute that a smart phone with the Google Home Application can serve as a controller for at least three media players (i.e. speakers) while the first media player in the system is operating in a "standalone mode" in which the first media player "is configured to play back media individually." Limitation 1.4; Ex. 2 (GOOG-SONOSWDTX-000056732-77) at 56 (█████████████████████████████████████); Dkt. 209-5 (GOOG-SONOSWDTX-00048731-55) at 47 (█████████████████████████████████). The smart phone, loaded with the Google Home App can also be used to create overlapping speaker groups (the claimed "zone scenes"). Limitation 1.5; Ex. 4 (2022.05.10 MacKay Dep. Tr.) at 110:24-111:9 (Google engineer and 30(b)(6) designee testifying that an accused Google player "█████████████████ █████████").

The same "join_group" functionality that the Court found to infringe the '885 patent is at play here. Dkt. 309 at 9-10. When a user creates and saves a speaker group at an accused Google controller, the Google Home App (running on the smart phone) generates and transmits a "join_group" message (comprising an identifier called a "UUID" and name of the "speaker group") to each of the accused Google players in the "speaker group." Ex. 3 (Almeroth Rpt.) ¶ 448; Limitations 1.6-1.8. That transmission causes each of the accused Google players in the "speaker group" to store data defining the "speaker group" (e.g., by causing the media player to

store at least the UUID, the name, and membership information of the "speaker group"). *See* Ex. 3 (Almeroth Rpt.) ¶¶ 448-50; Dkt. 209-4 (Google's Third Suppl. Resp. to Interrog. No. 13) at 9. Thus, Google meets the unique "storing" requirements of limitations 1.6 and 1.8 of claim 1 of the '966 patent.

Google's accused products also meet the display requirements in limitations 1.9 and 1.10 of claim 1 of the '966 patent. And Google's own documents and witnesses confirm this functionality. For example, Google's documentation explains how a user can "[g]roup an combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home" and that the Google Home app presents previously created "speaker groups" that a user can "tap" to control. *See* Ex. 4 (2022.05.10 MacKay Dep. Tr.) at 56:15-59:6; 67:20-69:9, 184:2-20, 206:1-9; Ex. 3 (Almeroth Rpt.) ¶¶ 495-506.

Finally, Google's accused products allow a user to invoke via a "░░░░" message a zone scene for synchronous music playback. Dkt. 209-4 (Google's Third Suppl. Resp. to Interrog. No. 13) at 9-10 (referring to message sent by an Accused Controller to initiate a launch of a speaker group as a "░░░░"); Ex. 4 (2022.05.10 MacKay Dep. Tr.) at 68:12-72:20 (referring to the message sent by an Accused Controller running a Cast-enabled app to initiate a launch of a speaker group as a "░░░░").

Again, because (i) Sonos relies on the same functionality for infringement of the '885 and '966 patents, (ii) the Court has already found that functionality to infringe the '885 and (iii) Google does not seriously dispute that the *additional* language in the claims of the '966 patent is met, the combination of a smart phone and the Google Home App infringes the '966 patent.

As noted at the outset, Sonos's infringement theories for the '966 patent are premised on both direct and indirect infringement. Sonos acknowledges that indirect infringement gives rise to additional defenses which Google has asserted directed to the knowledge and intent prongs of indirect infringement. The fair and efficient thing is, therefore, for the parties to stipulate that a computing device with the prior version of the Google Home App installed thereon directly infringes the '966 patent, and then allow Google to present its knowledge and intent defenses to

the jury.

## IV. INFRINGEMENT BY THE NEW VERSIONS OF GOOGLE'S ACCUSED PRODUCTS DO NOT RISE AND FALL TOGETHER

Google contends that the new versions of its accused products do not infringe either the '885 or the '966 patent. Google's new versions add a ███████████ function to its infringing source code for its accused player products. G MSJ. at 22. Google did not change the source code for its accused controller products. Google added the ███████████ function to its accused player products in an attempt to avoid infringing one specific limitation of claim 1 of the '885 Patent, which requires that "after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation."

Sonos maintains that the addition of the ███████████ function does not cause the accused products to fall outside the scope of either asserted patent. As Sonos explained in its opposition to Google's motion for summary judgment, the ███████████ function causes a redesigned Google player to stop playing any audio it is currently playing when it is added to a *new* speaker group, but does *not* cause a redesigned player to transition from "standalone mode" to grouped mode. Dkt. 509-2 (Opp. to MSJ) at 19-23; Dkt. 509-8 (Ex. L, Almeroth Supp. Reply) ¶¶92-94.

Although Sonos thinks that the Court (at the Rule 50(a) stage) or the jury should find infringement of both patents, the differences in the claim language between the '885 and '966 patents create different *arguments* that are material to the analysis of whether Google's new products infringe. As shown above, claim 1 of the '966 patent includes *no requirement* that the zone player continue to operate in standalone mode. *See also* Ex. 3 (Almeroth Rpt.), ¶¶743-44; *SRI Int'l. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."). Instead, claim 1 of the '966 patent requires a "computing device" that is capable of adding a "first zone player" to a "first" "zone scene" at a time when the first zone player is

operating in "standalone mode" and adding a "first zone player" to "second zone scene" at a time when the first zone player is operating in "standalone mode," but they do not require the first zone player to *remain* in standalone mode throughout that process. *Id*. Because Google's attempt to design around Sonos's patent relates only to limitation 1.6 of the '885 patent, and there is no corresponding limitation in the '966 patent, Google's redesign argument should fail for the '966 *even if* it were successful for the '885 patent. For this reason, the jury should evaluate and separately decide infringement for each of the '885 and '966 patents.

## V.  INVALIDITY DOES NOT RISE AND FALL TOGETHER

The differences in claim scope between the '885 and '966 patents are material to invalidity. Google must agree; it asserts that the '885 patent is anticipated yet it offers no anticipation defense for the '966 patent. Dkt. 615 (Joint Proposed Pretrial Order) at 8.

Several differences in claim scope are relevant to invalidity. First – as noted above – claim 1 of the '885 patent requires the zone player to continue to operate in standalone mode after being added to new zone scenes, whereas claim 1 of the '966 patent does not. Sonos specifically disputes whether any of Google's purported prior art teaches or makes obvious a zone player that continues to operate in standalone mode after being added to new zone scenes. E.g., Ex. 5 (7/27/22 Almeroth Rebuttal Rpt.) ¶¶ 357-374. Second, claim 1 of the '966 patent requires the computing device to cause storage of the "zone scenes," and claim 4 of the '966 patent further such storage at the "first zone player." Causing storage of the zone scene, and the location of such storage, are not requirements of claim 1 of the '885 patent. Sonos specifically disputes whether any of Google's purported prior art teaches or makes obvious storage of the zone scene, let alone storage of the zone scene at the zone player. E.g., Ex. 6 (1/13/23 Almeroth Rebuttal Rpt.) ¶¶ 874-885. Third, the '966 patent requires displaying representations of both the first and second zone scenes at the same time and then, while displaying such representations, "receiving a third request to invoke the first zone scene," whereas the '885 patent has no such display requirements. Again, Sonos disputes whether Google's prior art teaches or makes obvious this limitation of the '966 patent. *Id.* ¶ 603. Because the differences in claim scope are material to invalidity, the '885 and '966 patents do not rise and fall together for purposes of invalidity.

|   |   |   |
|---|---|---|
| 1 | | |
| 2 | Dated: May 1, 2023 | ORRICK HERRINGTON & SUTCLIFFE LLP |
| 3 | | *and*<br>LEE SULLIVAN SHEA & SMITH LLP |
| 4 | | By: */s/ Clement Seth Roberts* |
| 5 | |     Clement Seth Roberts |
| 6 | | *Attorneys for Sonos, Inc.* |

8

SONOS, INC.'S SUPP. BRIEF RE '885 & '966 PATENTS
3:20-CV-06754-WHA