CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
BAS DE BLANK (SBN 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:   +1 312 754 0002
Facsimile:   +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>　　　Plaintiff and Counter-Defendant,<br><br>　　v.<br><br>GOOGLE LLC,<br><br>　　　Defendant and Counter-Claimant. | Case No. 3:20-cv-06754-WHA<br>Consolidated with Case No. 3:21-cv-07559-WHA<br><br>**SONOS, INC.'S SUPPLEMENTAL BRIEF ON WRITTEN DESCRIPTION**<br><br>Judge:　Hon. William Alsup<br>Courtroom:　12, 19th Floor<br>Trial Date:　May 8, 2023 |

**I.      OVERVIEW OF THE '885 AND '966 PATENTS.**

During Wednesday's hearing the Court expressed the view that, in its understanding, overlapping groups were at the "heart" of the invention and asked for supplemental briefing on when and how that concept is described in the specification. This brief will answer that question.

First, however, Sonos wishes to clarify that overlapping groups are not the "heart" of the invention. Instead, the claims are directed to a novel mechanism for grouping zone players into zone scenes which, among other things, allows for overlapping groups. What is that mechanism? Put simply, it is the combination of (i) separating the steps of having users *define* the zone scenes from the step of *configuring* the players within a scene, (ii) configuring the players within a group (so that they coordinate with each other to output media in synchrony) *only* when the group is invoked, and (iii) the messages passed from the controller to the players to implement this.

This mechanism is most easily explained by looking at Figure 6 of the patents in suit. Sonos has consistently used that figure to explain the invention. Sonos did that during the summary judgment proceeding (*see, e.g.*, Sonos's Reply in Support of Its Motion for Summary Judgment of Infringement of '885 Patent Claim 1 (Dkt 274), at 9-12; Sonos's Patent Showdown Summary Judgment Presentation (Dkt. 312-1), at 24-30; Dkt. 308 (Jul. 13, 2022 MSJ Hr'g. Tr., at 102:20-106:2)), in its opening in front of the jury (*e.g.*, 5/8 Trial Tr. at 210:8-18), in the brief summation the court allowed on Wednesday (*e.g.*, 5/10 Trial Tr. at 641:20-642:9), and with its expert technical witness, Dr. Almeroth (*e.g.*, 5/10 Trial Tr. at 680:23-683:15).

Conversely, Sonos has never said that the invention is overlapping groups, and the patents don't say that either. *See* '966 at 1:31-34 ("the invention is related to method and apparatus for controlling or manipulating a plurality of multimedia players in a multi-zone system."). Instead, Sonos has explained (and will continue to explain) that the invention ***allows for*** a single zone player to be a member of two distinct zone scenes. Put differently, the ability to add a zone player to two different groups is one of the ***features*** enabled by the invention. But we have discussed it because this feature is easy for the jury to understand, and the prior art that Google has pointed to doesn't describe a mechanism that allows it, so it's a simple way to show the jury that Google's invalidity theory is wrong.

The Court's next question might be "how does the supposedly inventive mechanism enable overlapping groups?" The answer to those questions turns on the fact that the *way* you configure the members of a group to play together is to coordinate between them so that they can output audio in synchrony. *See, e.g.*, '966 patent, Fig, 6, step 614 ("execute commands to synchronize the zone players"). Put differently, to configure a group you put the players into a mode where they pass timing messages back and forth so that they stay in lock step when playing audio together. *See, e.g.*, 5/10 Trial Tr. at 687:3-11. This means that you **cannot** have two groups with overlapping members while those groups are configured to play music in synchronicity. Why? Because if player A stays in lock step with player B, and player B stays in lock step with player C, then all of A, B and C are in lock step with each other and you *have one group, not two*. By moving to a system where you allow a user to **define** the group (specifying both its membership and theme) **without** reconfiguring the players so that they are coordinating with one another, you avoid this problem. Instead, the multiple, overlapping groups can exist simultaneously in the system in their uninvoked state. But the Court should also note that the flexibility to allow a single zone player to be assigned to two different groups is not the only advantage of Sonos' approach. As another example, because the players in a group are *not* synchronized for audio playback at the time the user defines the zone scene, a player can be added to a group without taking it out of stand-alone mode. This allows you to, for example, add a player to a group without forcing that player to start playing music being played by another member of the group. With the prior art dynamic grouping, this wasn't possible.[1]

This should also answer the Court's question about why the claims are on the longer side. Put simply, they are long because they describe the entire sequence of steps needed to implement the invention, which is more than a simple idea like "create overlapping groups." It also allows us to respond to the Court's expectation that there should "be column after column that would

---

[1] The Court should also note that Party Mode is a dynamic group and does not use the mechanism recited in the claims. With Party Mode the identity of the group members is **not** determined before the group is invoked (either by the user or by the system). Instead, Party Mode contains a mechanism that allows the system to find zone players attached to the network and to both (i) assemble them into a group and (ii) configure them to play in synchronicity as part of a **single** process. Put differently, the membership of the group formed by party mode is **indeterminate not predefined** – meaning it *isn't known* by the system until after party mode is invoked.

explain to an engineer how to implement overlapping zone scenes…." 5/10 Trial Tr., at 660:15-19. Respectfully there *is* "column after column" about how to implement the invention. For example, the specification describes the functional steps needed to decouple the group definition from invocation and configuration ('966 patent at 10:30-63, Fig. 6; *see also* '966 patent at 1:67-2:17), the user interfaces for defining and saving zone scenes ('966 patent at 10:12-19, Figs. 5A & 5B), and interfaces for invoking zone scenes ('966 patent at 11:4-19, Figs. 7 & 8).

II.     **THE SPECIFICATION PROVIDES WRITTEN SUPPORT FOR THE CREATION OF OVERLAPPING GROUPS.**

First, the specification provides extensive written description of the fact that the user defines and saves the zone scene without configuring the zone players in that group so that they start coordinating with one another. This is shown, for example, in Figure 6. The steps in that figure say to configure the zone scene (603), decide which zone players will be associated with the scene (604) and then save the scene (606). And, as shown in Figure 6, this happens before the zone scene is invoked (610) and the zone players are synchronized for audio playback (614). *See also* '855 patent at 10:30-11:5. Although this disclosure does not in itself disclose overlapping groups, we include it here because (as noted above) it provides the underlying mechanism that ***allows*** users to create overlapping thematic groups. Thus, it shows that the inventors were not only in possession of the *idea* of having a zone player be a member of more than one group but the mechanism and algorithmic sequence that allows that to happen.

Second, the specification explains the process whereby users define groups and specify that, in that creation process, multiple zone scenes can exist at the same time. *See* '885 Pat., FIG. 6, 10:51-52 (after one "zone scene" has been saved a user may "go back . . . to ***configure another [zone] scene*** if desired"); FIG. 8 (disclosing "Wakeup" and "Garden Party" scenes that are in existence at the same time); *see also id*., 8:52-9:19 (disclosing four different examples of "zone scenes" for a given system). Having multiple zone scenes is (of course) a prerequisite for having two zone scenes that share a common member.

Third, the specification explains that when a user is selecting which "zone players to add during setup of each "zone scene," the user is presented with "ALL the zones in the system,

*including the zones that are already grouped.*" See '885 Pat., 10:12-19; 10:4-6; 10:36-42. Because a second zone scene can be created using players which are already part of another zone scene, the specification supports the idea that one zone player can be part of two different zone scenes.  Importantly, ***this is exactly what the claim requires***.  More specifically, the claims do not use the term "overlapping" – that's just a term of convenience which the lawyers (on both sides) have used to describe the claim language.  So the fact that the term "overlapping" doesn't appear in the specification is irrelevant.  What matters is whether the specification teaches that a given zone player *can be* put into two different zone scenes.  And this passage teaches exactly that.

Fourth, the specification discloses that "various scenes may be saved in any of the [zone player] members in a group." '885 Pat., 2:56-59.  This necessarily means that a given zone player can be part of more than one zone scene.  Why?  Because if a zone player could be part of one and only one scene, there would be no point in saving multiple scenes on one player.  Put differently, the only reason to have multiple scenes saved on a player is because the player can be part of multiple scenes.  And again, that is *exactly* what overlapping zone scenes are – *i.e.* two different scenes that have at least one common zone player.

Fifth, in the discussion at 8:52-9:19, the '885 Patent discloses four examples of "zone scenes" in a given system that have overlapping members:

- a first "zone scene" named "Morning" that comprises a predefined group of the Bedroom, Den, and Dining Room "zone players";
- a second "zone scene" named "Evening" that also comprises one predefined group of the Bedroom, Den, and Dining Room "zone players" (as well as another predefined group of the Garage and Garden "zone players");
- a third "zone scene" comprising one predefined group of "zone players" located "upstairs" and another predefined group of "zone players" located "downstairs" and
- a fourth "zone scene" that comprises a predefined group of "all zones" in the system, including the Bedroom, Den, and Dining Room "zone players."

From these disclosures, a POSITA would understand that the inventor had possession of (i) separating the steps of allowing a user to define the zone scene (by selecting its members and theme) from the step of configuring the players to synchronize with each other, (ii) that this mechanism *allowed for* (among other things) the creation of overlapping zone scenes and (iii)

*implementing* his invention so as to allow users to define multiple zone scenes that contained one or more overlapping members. That is more than enough to provide written description for the "overlapping group" feature of the invention. *E.g.*, *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1312 (Fed. Cir. 2010) (affirming summary judgment of adequate description) (willfulness abrogated by *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016)).

The Court should also note that all of the passages cited above are fully supported by the 2006 provisional to which the asserted patents claim priority. In particular, the provisional application includes an appendix which provides support for each of these passages, and which was incorporated by reference into the original 2007 utility application and into the '885 and '966 patents. TX6611, TX6829; '885 patent at 1:23-24; s*ee* 37 C.F.R. §1.57(b). Moreover, it is permissible to move material from the provisional application incorporated by reference directly into the specification (as Sonos did here). 37 C.F.R. § 1.57(g).

Finally, the Court asked whether a POSITA would know how to configure zone players for synchronized audio playback as of the priority date and how the specification provided written description. By the time Sonos filed the provisional application, it had published its mechanism for synchronizing smart speakers in another patent family. *See* PCT/US04/23102 (published February 10, 2005). And Google has been found to infringe two patents from this patent family in the ITC. *Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1191, Commission Opinion, at 14-22 (finding infringement and validity). So yes, Sonos had told the world ***all*** the implementing details about how to synchronize smart speakers at the time it filed the provisional in this case.

With respect to written description, the specification explains (among other things) that "audio playback synchronization are sent via the RF interfaces," that "the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group playback an identical audio source or a list of identical audio sources in a timely synchronized manner," and that "data including the parameters is transported from a member (*e.g.*, a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene." '885 patent at 7:49-51, 10:65-11:3.

Dated: May 11, 2023

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

By: */s/ Clement Seth Roberts*
    Clement Seth Roberts

*Attorneys for Sonos, Inc.*