1   CLEMENT SETH ROBERTS (SBN 209203)
    croberts@orrick.com
2   BAS DE BLANK (SBN 191487)
    basdeblank@orrick.com
3   ALYSSA CARIDIS (SBN 260103)
    acaridis@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, CA 94105-2669
6   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
7
    SEAN M. SULLIVAN (*pro hac vice*)
8   sullivan@ls3ip.com
    J. DAN SMITH (*pro hac vice*)
9   smith@ ls3ip.com
    MICHAEL P. BOYEA (*pro hac vice*)
10  boyea@ ls3ip.com
    COLE B. RICHTER (*pro hac vice*)
11  richter@ls3ip.com
    LEE SULLIVAN SHEA & SMITH LLP
12  656 W Randolph St., Floor 5W
    Chicago, IL 60661
13  Telephone:    +1 312 754 0002
    Facsimile:    +1 312 754 0003
14
    *Attorneys for Sonos, Inc.*

15

16                  UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA,

18                  SAN FRANCISCO DIVISION

19

20   SONOS, INC.,                          Case No. 3:20-cv-06754-WHA

21       Plaintiff and Counter-defendant,  Consolidated with
                                           Case No. 3:21-cv-07559-WHA
22       v.
                                           **SONOS, INC.'S BRIEF REGARDING**
23   GOOGLE LLC,                           **PRIORITY DATE AND WRITTEN**
                                           **DESCRIPTION**
24       Defendant and Counter-claimant.
                                           Judge:  Hon. William Alsup
25                                         Courtroom:  12, 19th Floor
                                           Trial Date: May 8, 2023
26

27

28

## Table of Contents

I.    INTRODUCTION ............................................................................................. 2

I.    BACKGROUND AND TIMELINE ................................................................. 4

II.   ARGUMENT .................................................................................................. 17

A.    Appendices To Provisional Applications Are Filed With The PTO And Made Available To The Public At The Same Time And Together With The Rest Of The Provisional Application ............................................................... 18

B.    Sonos Properly Incorporated Material By Reference And Then Properly Amended The Specification ............................................................................. 22

C.    The Material Added Into The Four Corners Of The Specification In 2019 Was Not Essential—The 2007 Non-Provisional Contained Ample Other Support For Overlapping Groups ....................................................................................... 24

D.    Sonos Cured Any Potential "Essential Material" Issue By Formally Amending The Specification ............................................................................................. 32

E.    Sonos's Amendment Contained No New Matter ....................................... 34

F.    The Public, Including Google, Has Had Access To The Provisional Appendix Since 2013 ......................................................................................... 42

G.    Google Waived Any Challenge To Sonos's Priority Date And Abandoned Any Written Description Challenge ....................................................................... 43

III.  SONOS'S ANSWERS TO THE COURT'S SIX ADDITIONAL QUESTIONS ............ 45

A.    Sonos's Answer To The Court's First Additional Question ....................... 45

B.    Sonos's Answer To The Court's Second Additional Question ................... 46

C.    Sonos's Answer To The Court's Third Additional Question ...................... 47

D.    Sonos's Answer To The Court's Fourth Additional Question .................... 49

E.    Sonos's Answer To The Court's Fifth Additional Question ....................... 52

F.    Sonos's Answer To The Court's Sixth Additional Question ...................... 54

1   **I.      INTRODUCTION**

2           The Court has requested briefing explaining: (1) the legal significance of material

3   contained in an appendix to a provisional application—whether it is part of the specification, what

4   it means, and how it impacts the priority date, and (2) when and where each part of the 2019

5   specification of the '885 and '966 patents was first disclosed to the PTO and/or published.  The

6   Court has also asked us to address six additional and related questions.  Dkt. 719.

7           *First*, as Sonos explains below, there is no legal significance to the fact that material is

8   contained in an *appendix* of the provisional application as opposed to other parts of that

9   application.  An appendix is disclosed to the PTO and made available to the public *at the same*

10  *time and together with* the rest of a provisional application and is considered *part* of the

11  provisional.

12          *Second*, Sonos believes (and has asserted) that the patents in suit are entitled to the 2006

13  priority date of the provisional.  But, even if Google were to allege (which it has never done) and

14  the Court were to decide that the differences between the 2006 provision and the 2007 non-

15  provisional constituted "new matter" it would have no bearing on any disputed issue in this trial.

16  *At most*, it would change the priority date for the patents in suit from 2006 to 2007.   That would

17  make no difference to the alleged prior art in this case.

18          *Third*, as the Court noted on Friday, "this is the first time" Google "ever told me any of

19  this."  5/12/23 Tr. Tran. At 1034:5-6.  To the extent Google started out making a written

20  description argument, that is a motion for reconsideration.  Google does not have good cause for

21  such a motion—certainly the fact that Google's counsel (who, by the way *signed* the DJ

22  complaint at the start of this case) just found out about the file history, is not good cause.  More

23  importantly, this whole dispute has morphed from an attempt to reargue written description into

24  an attempt to (effectively) raise new arguments about the patents' priority date.  Google

25  referenced related arguments in its June 2022 expert report as part of a written description

26  argument, and then abandoned them, depriving Sonos of the opportunity to respond by

27  meaningfully developing the factual record.  And Google has long waived any related

28

Sonos's Brief Re Priority Date
and Written Description
3:20-cv-06754-WHA

challenge—or indeed *any challenge at all*—to the priority date.  Trial is not supposed to be a time for one party to ambush the other party with allegations about supposed invalidity or priority date issues that have been abandoned for almost a year or long waived.

Finally, the Court should side with Sonos if it agrees with *any* of the following arguments, all of which are presented in this brief:

1. That the 2006 provisional application (including its appendix) on its own provides written description support for overlapping groups.

2. That the 2007 non-provisional application, alone or in combination with material from the 2006 provisional application (including its appendix) provides written description support for overlapping groups.

3. That Sonos was allowed by the PTO to incorporate by reference material from the 2006 provisional application, and then amend the specification of the 2019 applications to formally include that material in the four corners of the specification, and this did not change the priority date.

4. That the material Sonos incorporated by amendment in 2019 was not "new matter" relative to the 2006 provisional or 2007 non-provisional.

5. Google has waived any priority date challenge *period*, much less one relating to alleged differences between the 2019 specification and 2006 provisional or 2007 nonprovisional.

6. That to the extent Google has ever raised a written description challenge relating to alleged differences between the 2019 specification and 2006 provisional or 2007 nonprovisional, Google has abandoned and/or waived any such challenge.

7. That Sonos has been prejudiced in its ability to resist such allegations by the fact that Google is raising such allegations during trial.

1

**I.      BACKGROUND AND TIMELINE**

2           Below is a summary of the priority chain that led to the '885 and '966 Patents, where the

3 filing date is shown for each application and the parent-child relationships between the

4 applications are reflected using different levels of indentation:

Sept. 12, 2006: U.S. App. No. 60/825,407

5           → Sept. 11, 2007: U.S. App. No. 11/853,790 [U.S. Pat. No. 8,483,853]

6                 → May 17, 2013: U.S. App. No. 13/896,829 [U.S. Pat. No. 8,843,228]

7                       → Aug. 21, 2013: U.S. App. No. 14/465,457 [U.S. Pat. No. 9,344,206]

8                             → Apr. 15, 2016: U.S. App. No. 15/130,919 [U.S. Pat. No. 11,388,532]

9                                   → Apr. 12, 2019: U.S. App. No. 16/383,561 [the '885 Patent]

10                                  → Apr. 12, 2019: U.S. App. No. 16/383,565 [the '966 Patent]

                                    → May 24, 2019: U.S. App. No. 16/422,160 [U.S. Pat. No. 10,897,679]

11                                  → July 11, 2022: U.S. App. No. 17/861,882 [pending]

12 A brief summary of relevant facts regarding each of these applications is set forth below.

13                    **U.S. App. No. 60/825,407 – The Provisional**

14          This is Sonos's provisional application directed to "zone scenes" that was filed on

15 September 12, 2006 and names Mr. Robert Lambourne as inventor.

16          This 2006 provisional application discloses that "[u]sing what is referred to as a ***zone***

17 ***scene or scene***, zones can be configured in a ***particular scene (e.g., morning, afternoon, or***

18 ***garden)***." Ex. 1 [2006 provisional] at p. 13 (emphasis added).  The 2006 provisional provides

19 additional disclosure regarding this "zone scene" technology, including several examples of

20 possible "zone scenes."  *Id.* at 13-14 (disclosing a "'Morning' zone scene/configuration" for

21 "link[ing] the Bedroom, Den and Dining Room together in one action" and a "'Morning Mode'

22 scene" for linking "downstairs zones," "upstairs zones," "outside zones," and "a zone scene" that

23 "links all zones").  Sonos contends that, on its own, this disclosure shows overlapping zone

24 scenes namely: (i) one scene including the bedroom, den and dining room; (ii) another scene

25 including all of those plus outside speakers; and (iii) another scene that includes "***all zones***" in the

26 system.  More specifically, (i) overlaps with (ii), (i) overlaps with (iii), and (ii) overlaps with (iii).

27

28

The 2006 provisional also refers to an annexed "Appendix A" that "provide[s] examples to teach and refer to various features, detailed designs, uses, advantages, configurations and characteristics in one embodiment of the present invention." *Id*. at 13. The "Appendix A" of the 2006 provisional is entitled "Sonos UI Specification: ***Zone Scenes***" and includes 20 pages of additional disclosure. Ex. 1 [2006 provisional, Appendix A] at pp. 21-40. Reproduced below are the Table of Contents and the Introduction of the "Appendix A" document:

**Table of Contents**

1   **INTRODUCTION** ............................................................. 2
    1.1   SETTING A ZONE SCENE ............................................. 2
2   **INVOKING A SCENE** ........................................................ 5
    2.1   HANDHELD CONTROLLER ........................................ 5
    2.2   DESKTOP CONTROLLERS ........................................ 8
3   **SCENE SETUP** ................................................................. 9
    3.1   HANDHELD CONTROLLER ........................................ 9
    3.2   DESKTOP CONTROLLERS ........................................ 9
    3.3   ADDITIONAL SETUP IDEAS ..................................... 16
4   **ALTERNATIVE LINKING METHODS** ............................. 17
    4.1   MULTIPLE SELECT IN LINK AND DROP ZONE PANELS ..... 17
5   **RELATED IDEAS** ............................................................ 19
    5.1   ZONE SCENES THAT PLAY MUSIC ............................. 19
    5.2   RELATIONSHIP TO THE ALARM CLOCK ....................... 19
    5.3   COMPRESS ZONES IN THE ZONE MENU ...................... 20

**1   Introduction**

The Zone Scene feature allows the user to arrange the zones into groups using one single command. However, the Zone Scene feature is much more flexible and powerful.

Currently in the Sonos UI, zone groups are created by manually linking zones one at a time until the desired zone grouping is reached.

For Example

Start with **Living Room**

➢ Link the Kitchen to the Living Room to make a group of (**Living Room + Kitchen**)
➢ Then link the Den to the (**Living Room + Kitchen**) to make a group of (**Living Room + Kitchen + Den**)

The Zone Scene feature would allow the user to create a group of (**Living Room + Kitchen + Den**) with one command.

*Id*. at pp. 21-22. Again, this "Appendix A" document was filed with the patent office in ***2006***, and the excerpts above confirm that it was describing Sonos's "***zone scene***" technology.

1

**U.S. App. No. 11/853,790**

2      This is Sonos's first non-provisional application directed to "zone scenes," and it was filed

3  on September 11, 2007.  It claims priority to Sonos's 2006 provisional and incorporates the entire

4  disclosure of the 2006 provisional (including "Appendix A") by reference, which gives Sonos the

5  legal right to rely on any and all disclosures in the 2006 provisional as additional support for

6  claims in this application and in any continuations that claim priority.  *See* Ex. 2 at p. 5 [2007

7  Application at [0001]]. The incorporation by reference of the provisional did not change the

8  priority date of the claims.  The claims are entitled to the earliest priority date in the chain, 35

9  U.S.C. §§ 119, 120, unless new matter is added, 35 U.S.C. § 132.  Because the provisional

10  application was incorporated by reference, the provisional was "effectively part of the"

11  specification as though it was "explicitly contained therein," *see* ADS, 212 F.3d at 1282.  *See also*

12  *Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. CV 17-12311-FDS, 2022 WL 4138711, at *9

13  (D. Mass. Sept. 12, 2022) ("Maquet's incorporation of the '988 application by reference appears

14  to be consistent with case law and administrative guidance.").

15      In the "Background" section, the 2007 non-provisional application explained that one of

16  the difficulties with prior-art systems is that they did not allow for multiple, overlapping groups to

17  exist at the same time.  *Id*. at p. 6 [0005] (stating that "[b]ecause the morning group, the evening

18  group and the weekend group contain the den, it can be difficult for the traditional system to

19  accommodate the requirement of dynamically managing the ad hoc creation and deletion of

20  groups").

21      In the "Summary" section, the 2007 application stated that "[a]ccording to one aspect of

22  the present invention, a mechanism is provided to allow a user to group some of the players

23  according to a ***theme or scene***," and that "[w]hen the ***scene*** is activated, the players in the scene

24  react in a synchronized manner."  *Id*. At p. 7 [0008] (emphasis added).  In turn, the "Summary" of

25  the 2007 non-provisional application disclosed the following:

26
27

> [0009] According to another aspect of the present invention, the ***scene*** may be
> activated at any time or a specific time. A user may activate the ***scene*** at any time
> so that only some selected zones in an entertainment system facilitate a playback of

28

Sonos's Brief Re Priority Date
and Written Description
3:20-cv-06754-WHA

1

2

an audio source. When the *scene* is activated at a specific time, the *scene* may be used as an alarm or buzzer.

3

4

5

6

[0010] According to still another aspect of the present invention, ==a controlling device (also referred to herein as controller) is provided to facilitate a user to select== ***any of the players in the system*** ==to form respective groups each of which is set up per a *scene*. Although various *scenes* may be saved in any of the members in a group, commands are preferably sent from the controller to the rest of the members when one of the scenes is executed==. Depending on implementation, the commands include parameters pertaining to identifiers of the players, volumes settings, audio source and etc.

7

8

*Id.* at pp. 7-8 [0009]-[0010] (emphasis added); *see also id.* at p. 8 [0012] (stating that "[t]he players in a scene are synchronized to play a multimedia file when the scene is activated").

9

10

11

12

13

Sonos believes that the passage highlighted in green teaches the ability to add a zone player to multiple, overlapping zone scenes.  In particular, it establishes that a user can "select ***any of the players in the system*** to form respective groups each of which is set up per a *scene*" and that "various *scenes* may be saved in ***any*** of the members in a group."  *Id.* at p. 8 [0010] (emphasis added).

14

15

16

17

18

The 2007 application provided further disclosure of the "zone scenes" technology at FIGs. 3A-3B, 5A-5C, and 6 and the corresponding description at [0021]-[0027], [0051]-[0066]).  Ex. 2 at pp. 10, 19-24, 33-39.  And as with the "Summary," these portions of the 2007 application convey that Mr. Lambourne's "zone scene" technology provided the ability to add a zone player to multiple, ***overlapping*** zone scenes.

19

20

21

Critically, all of the relevant disclosure summarized above carried through from the 2007 application to the '885 and '966 Patents.  The following table shows the mapping between the disclosure of the 2007 application and the '885 and '966 Patents:

22

23

24

25

| **2007 Application** | **'885 and '966 Patents** |
| --- | --- |
| [0002]-[0006] | 1:30-2:24 |
| [0007]-[0015] | 2:28-3:35 |
| [0016]-[0027] | 3:39-4:7 |
| [0028]-[0066] | 4:12-11:11[1] |
| FIG. 1 | FIG. 1 |
| FIGs. 2A-C | FIGs. 2A-C |

26

27

28

---

[1] As discussed below, the disclosure of the '885 and '966 Patents in this range does include one additional sentence related to FIG. 5B that was copied over from the 2006 provisional application.

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

| FIGs. 3A-B | FIGs. 3A-B |
|------------|------------|
| FIGs. 4 | FIGs. 4 |
| FIGs. 5A-C | FIGs. 5A-C |
| FIG. 6 | FIG. 6 |

*Compare* Ex. 2 [2007 application] *with* Ex. 3 [TX0003 ('885 patent)] or Ex. 4 [TX0004 ('966 patent)].

It is also worth noting that the 2007 application, as filed, included FIG. 5B and the corresponding description shown below:



**FIG. 5B**

FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

*See* [2007 Application] at FIG. 5B, [0060]. FIG. 5B in the 2007 application is the same FIG. 5B that is in the specifications of the issued '885 and '966 Patents. And the description of FIG. 5B in the 2007 application is the same description of FIG. 5B that is in the specifications of the issued '885 and '966 Patents with the exception of the statement "[t]he list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped," which was added by amendment to the specifications of the '885 and '966 Patents on August 23, 2019, as further explained below. FIG. 5B and corresponding description in the specifications of the '885 and '966 Patents is shown below with the added statement underlined:



520

**FIG. 5B**

FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. <u>The list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped</u>. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

'966 Patent at 10:12-19.

This 2007 application was ultimately issued by the patent office as U.S. Pat. No. 8,483,853 on July 9, 2013. Ex. 5 [TX6667 ('853 patent)]. That July 9, 2013 issue date is also when the 2006 provisional (including "Appendix A") and the 2007 non-provisional application became publicly available. *See* 37 CFR 1.14(a)(1)(iv) ("The file contents of an unpublished, abandoned application"—"including [a] provisional application"—"may be made available to the public if the application is identified in a U.S. patent … [or] a U.S. patent application publication.").

### U.S. App. No. 13/896,829

The '829 was the first continuation application in the priority chain, and was filed on May 17, 2013. It claims priority to the 2007 application and incorporates the entire disclosures of both the 2007 application and the 2006 provisional by reference. *See* Ex. 6 at p. 8 [May 2013 application] at [0001]]; 35 U.S.C. § 119(e); 35 U.S.C. § 120; 37 CFR § 1.57(c).

The disclosure of this May 2013 application was substantively identical to the 2007 application, and other than a change to the application title, there were no amendments made to

either the specification or drawings during prosecution.  Compare Ex. 2 [2007 application] with Ex. 6 [May 2013 application].

The May 2013 application was ultimately issued by the patent office as U.S. Pat. No. 8,843,228 on September 23, 2014.  Ex. 7 [TX6668 ('228 patent)].

**U.S. App. No. 14/465,457**

This was the second continuation application in the chain, and was filed on August 21, 2014.  It claims priority to the May 2013 application and incorporates the entire disclosures of the May 2013 application, the 2007 application, and the 2006 provisional by reference.  See Ex. 8 at p. 7 [2013 application at [0001]]; 35 U.S.C. § 119(e); 35 U.S.C. § 120; 37 CFR § 1.57(c).

The disclosure of this August 2014 application was substantively identical to the 2007 application and there were no amendments made to either the specification or drawings during prosecution.  Compare Ex. 2 [2007 application] with Ex. 8 [August 2014 application].

This August 2014 application was ultimately issued by the patent office as U.S. Pat. No. 9,344,206 on May 17, 2016.  Ex. 9 [TX6669 ('206 patent)].

**U.S. App. No. 15/130,919**

This was the third continuation application in the chain, and was filed on April 15, 2016. It claims priority to the August 2014 application and incorporates the entire disclosures of the August 2014 application, May 2013 application, the 2007 application, and the 2006 provisional by reference.  *See* Ex. 10 at p. 5 [April 2016 application at [0001]]; 35 U.S.C. § 119(e); 35 U.S.C. § 120; 37 CFR § 1.57(c).

When the 2016 application was filed, its disclosure was substantively identical to the 2007 application.  Compare Ex. 2 [2007 application] with Ex. 10 [April 2016 application].  However, in 2019, Sonos made a common set of amendments to the specification and figures of several pending "zone scene" applications, including the 2016 application.  Ex. 11 [2016 Application, November, 18, 2019 Response to Office Action], Ex. 12 ['885 Application, August 23, 2019 Response to Office Action], Ex. 13 ['966 Application, August 23, 2019 Response to Office

1   Action], Ex. 14 [May 2019 Application, June 4, 2019 Preliminary Amendment]. That common

2   set of amendments is discussed in detail below.

3          This 2016 application was ultimately issued by the patent office as U.S. Pat. No. U.S. Pat.

4   No. 11,388,532 on July 12, 2022.  Ex. 15 ['532 patent].

5          Notably, the issue of priority date also came up two different times during prosecution of

6   the 2016 application.

7          The first time was in 2018, when the examiner objected to Sonos's priority claim back to

8   the 2006 provisional and the other preceding applications based on the examiner's view that those

9   prior-filed applications did not provide adequate written description support for "the recited

10  display of a selectable indication of a zone scene which upon selection invokes the zone scene

11  onto the plural of playback devices."  Ex. 23 [2016 application, April 25, 2018 Office Action at

12  pp. 3-4].  In response, Sonos directed the examiner to "Appendix A" of the 2006 provisional as

13  providing written description support for this limitation and reiterated that the 2016 application

14  "should be afforded the September 12, 2006 priority date of the provisional application."  *Id.*,

15  [October 25, 2018 Response at pp. 24-25].  The Examiner agreed with Sonos, finding that

16  Sonos's "assertion of priority as resolving the subject matter in Pages 4-8 of the Appendix to the

17  Provisional Specification filed 9/12/06 is accepted and the priority date of the instant claims is

18  considered to resolve the 9/12/06."  *Id.*, [November 14, 2018 Office Action at p. 29].

19         The second time was in 2020, when the examiner objected to Sonos's priority claim back

20  to the 2006 provisional and the other preceding applications based on the examiner's view that

21  those prior-filed applications did not provide adequate written description support for "the

22  claimed causing of 'selectable indications of the two or more zone scenes to be simultaneously

23  displayed, wherein the display selectable indications are each selectable to cause a respective one

24  of the two or more zone scenes to be invoked by the first zone player.'"  Ex. 24 [2016 application,

25  August 6, 2020 Office Action at p. 3] (emphasis in original).   In response, Sonos once again

26  directed the examiner to "Appendix A" of the 2006 provisional as providing written description

27  support for this claim limitation, and specifically identified the figure from page 5 of "Appendix

28

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1  A" that shows multiple "zone scenes" being displayed. *Id.*, [January 6, 2021 Response to Office

2  Action at p. 33]. Additionally, Sonos reminded the examiner that this subject matter from the

3  2006 provisional "was previously inserted in the specification and figures of the present

4  application [as FIG. 7], in accordance with 37 CFR 1.56(g), in Applicant's prior office action

5  response filed on November 18, 2019." *Id.* The Examiner agreed with Sonos, finding that

6  Sonos's "remarks filed 1/6/21 are accepted by the Examiner and ***suffice to establish support*** for

7  the claimed subject matter in the prior filed parent case 60/825407 and ***afford the instant***

8  ***application an effective priority date of 9/12/06***." *Id.*, [February 3, 2021 Notice of Allowance at

9  p. 43] (emphasis added).

10                    **U.S. App. No. 16/383,561 – The '885 Patent**

11          This is the application for the '885 Patent, and was filed on April 12, 2019 as a

12  continuation of the April 2016 application. It incorporates the entire disclosures of the 2016

13  application, the August 2014 application, the May 2013 application, the 2007 application, and the

14  2006 provisional by reference. *See* Ex. 16 at p. 5 ['885 application] at [0001]]; 35 U.S.C. §

15  119(e); 35 U.S.C. § 120; 37 CFR § 1.57(c).

16          When the application for the '885 patent was originally filed, its disclosure was

17  substantively identical to the 2007 application. Compare Ex. 2 [2007 application] with Ex. 16

18  ['885 application]. However, the common set of amendments to the specification and figures

19  discussed below were incorporated into the application for the '885 Patent in August 2019.[2] Ex.

20  12 ['885 application, August 23, 2019 Response to Office Action].

21          The '885 patent was issued by the patent office on November 24, 2020. Ex. 3 [TX0003

22  ('885 patent)].

23                    **U.S. App. No. 16/383,565 – The '966 Patent**

24

25

_____

26  [2] At the time of this amendment, Sonos stated that it was adding FIGs. 7-8 into the application,
    but copies of FIGs. 7-8 were inadvertently omitted from the filing papers. Sonos then filed a

27  correction on Sept. 19, 2019 in order to provide the copies of FIGs. 7-8. Ex. 25 at p. 4 ['885
    application, September 19, 2019 Correction Response].

28

1   This is the application for the '966 patent, which was also filed on April 12, 2019 as a

2   continuation of the 2016 application.  It incorporates the entire disclosures of the April 2016

3   application, the August 2014 application, the May 2013 application, the 2007 application, and the

4   2006 provisional by reference.  *See* Ex. 17 at p. 5 ['885 application] at [0001]; 35 U.S.C. §

5   119(e); 35 U.S.C. § 120; 37 CFR § 1.57(c).

6   When the application for the '966 patent was originally filed, its disclosure was

7   substantively identical to the 2007 application.  Compare Ex. 2 [2007 application] with Ex. 17

8   ['885 application].  However, the common set of amendments to the specification and figures

9   discussed below were also incorporated into the application for the '966 Patent in August 2019.[3]

10  Ex. 13 ['966 application, August 23, 2019 Response to Office Action].

11  The '966 Patent was issued by the patent office on November 5, 2019.  Ex. 4 [TX0001

12  ('966 patent)].

13  **U.S. App. No. 16/422,160**

14  This is another continuation of the April 2016 application, and it was filed on May 24,

15  2019.  It incorporates the entire disclosures of the April 2016 application, the August 2014

16  application, the May 2013 application, the 2007 application, and the 2006 provisional by

17  reference.  *See* Ex. 18 at p. 5 [May 2019 application at [0001]]; 35 U.S.C. § 119(e); 35 U.S.C. §

18  120; 37 CFR § 1.57(c).

19  When the May 2019 application was originally filed, its disclosure was substantively

20  identical to the 2007 application.  Compare Ex. 2 [2007 application] with Ex. 19 [May 2019

21  application].  However, the common set of amendments to the specification and figures discussed

22  below were also incorporated into the May 2016 application in June 2019.  Ex. 14 [May 2019

23  application, June 4, 2019 Preliminary Amendment].

24

25

26  [3] At the time of this amendment, Sonos stated that it was adding FIGs. 7-8 into the application,
    but copies of FIGs. 7-8 were inadvertently omitted from the filing papers.  Sonos then filed a

27  correction on Sept. 23, 2019 in order to provide the copies of FIGs. 7-8.  Ex. 26 at p. 4 ['966
    application, September 23, 2019 Correction Response].

28

1    The May 2019 application was issued by the patent office as U.S. Pat. No. 10,897,679 on

2  January 19, 2021.  Ex. 19 ['679 patent].

3                    **2019 Amendments to Specification and Figures**

4          In 2019, Sonos prepared a common set of amendments to the specification and figures of

5  the three pending 2019 applications as well as the pending 2016 application in order to insert

6  material from the 2006 provisional into those applications.  This type of amendment is expressly

7  permitted by the rules of the U.S. patent office.  *See* 37 CFR § 1.57(g) (stating that "material

8  incorporated by reference into the specification or drawings of an application" can be inserted "by

9  way of an amendment to the specification or drawings" as long as the amendment "contains no

10  new matter").  The amendment to the specification to add material from the provisional did not

11  change the priority date of the claims.  The claims are entitled to earliest priority date in the chain,

12  35 U.S.C. §§ 119, 120, unless new matter is added, 35 U.S.C. § 132.  Because the provisional

13  application was incorporated by reference—such that the provisional was "effectively part of the"

14  specification as though it was "explicitly contained therein," *ADS*, 212 F.3d at 1282, Sonos's

15  amendment to the '885 and '966 specification did not add any new matter.  It simply made

16  explicit what was already "effectively part of the" specification.

17          Sonos's common set of amendments included the following changes:

18      •   Inserting FIGS. 7-8, which directly correspond to figures found on pages 5-6 of
19          "Appendix A" of the 2006 provisional:

| Appendix A of the 2006 provisional | Common Set of Amendments |
|---|---|
| | |



FIG. 7

FIG. 8

- Inserting brief descriptions of FIGs. 7-8 into the "Brief Description of the Drawings" section of the applications, namely:

  FIG. 7 shows an example user interface for invoking a zone scene; and

  FIG. 8 shows another example user interface for invoking a zone scene.

- Inserting descriptions of FIGs. 7-8 into the "Detailed Description" section of the applications, namely:

  FIG. 7 shows an example user interface for invoking a zone scene. The user interface of FIG. 7 shows a Zone Menu that includes selectable indications of zone scenes.

  FIG. 8 shows another example user interface for invoking a zone scene. FIG. 8 shows a Zone Menu that includes a softkey indicating a Scenes menu. Pressing the Scenes softkey will show the Scenes menu where all the available zone scenes are shown as selectable indications.

- In the description of FIG. 5B, inserting the sentence "The list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped," which directly corresponds to a sentence on page 17 of "Appendix A" of the 2006 provisional.

| Appendix A of the 2006 provisional | Common Set of Amendments |
|---|---|
| "The list of zones in the screen above includes ALL the zones in the system including the Zones that are already grouped | "The list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped." |

Ex. 11 [2016 Application, November, 18, 2019 Response to Office Action], Ex. 12 ['885 Application, August 23, 2019 Response to Office Action], Ex. 13 ['966 Application, August 23, 2019 Response to Office Action], Ex. 14 [May 2019 Application, June 4, 2019 Preliminary Amendment].

Sonos first incorporated these amendments to the May 2019 application (which is not at issue in this case), and then propagated the amendments to the applications for the '885 and '966 patents and the 2016 application after that time. Ex. 11 [2016 Application, November, 18, 2019 Response to Office Action], Ex. 12 ['885 Application, August 23, 2019 Response to Office

1    Action], Ex. 13 ['966 Application, August 23, 2019 Response to Office Action], Ex. 14 [May

2    2019 Application, June 4, 2019 Preliminary Amendment].

3         Sonos clearly and expressly laid these amendments out in the public file histories of the

4    applications along with the following statement:

> In the present response, pursuant to 37 CFR 1.57(g), Applicant inserts material into the
> specification and figures that was previously incorporated by reference in this application, and the
> amendment contains no new matter. In particular, the inserted material can be found at least at pp.
> 5-6 and 17 of Appendix A to provisional application 60/825,407, the entirety of which was
> incorporated by reference on the filing date of this application.

11        See, e.g., Ex. 12 ['885 Application, August 23, 2019 Response to Office Action] at pp. 4,

12   20.  This shows that Sonos put the examiner (and the public) on notice of the amendments, where

13   the material added by amendment could be found in the provisional, and that the examiner

14   accepted those amendments without raising any concern regarding new matter. *See, e.g.*, *Maquet*

15   *Cardiovascular LLC*, 2022 WL 4138711, at *9 ("In summary, Maquet's incorporation of the '988

16   application by reference appears to be consistent with case law and administrative guidance.

17   Furthermore, the amendment of the '238 patent to physically incorporate the '988 application was

18   approved by the PTO, and that decision is 'entitled to an especially weighty presumption of

19   correctness.'").

20   **II.    <u>ARGUMENT</u>**

21        The Court has asked Sonos to explain the legal significance of material contained in an

22   appendix to a non-provisional application—whether it is part of the specification, what it means,

23   and how that impacts the priority date.  As Sonos explains, Appendix A was filed, disclosed, and

24   made available to the public at the same times as the rest of the provisional application.

25   Appendix A was filed and disclosed to the PTO along with the rest of the provisional application

26   in 2006, incorporated by reference into the first nonprovisional application in 2007 (along with

27   the rest of the provisional application), and then made available to the public in 2013 (along with

28

1   the rest of the provisional application) when the first nonprovisional application issued as U.S.

2   Pat. No. 8,483,853.  Then, in 2019, following a well-established regulatory framework *designed*

3   *for this very purpose*, Sonos formally amended the specification so that it did not just *incorporate*

4   *by reference* the provisional application (including the appendix) but also brought some relevant

5   parts of the appendix into the four corners of the specification.  That amendment brought in *no*

6   *new matter*, and the PTO's determination on that front is entitled to even greater than normal

7   weight in this context—as a matter of binding law.  *See Commonwealth Sci. & Indus. Rsch.*

8   *Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008) ("[I]n the

9   context of a validity challenge based on new matter, the fact that the United States Patent and

10  Trademark Office ('PTO') has allowed an amendment without objection 'is entitled to an

11  ***especially weighty presumption of correctness***' in a subsequent validity challenge based on the

12  alleged introduction of new matter." (emphasis added)).  Any challenge by Google is *also* (1)

13  subject to the clear and convincing evidence burden, (2) long-since waived, and (3) highly

14  prejudicial to raise in the middle of trial after waiving and/or abandoning the issue.  And as Sonos

15  explains below, there is ample other disclosure of the same aspect of the invention in the first

16  (2007) nonprovisional application.  At most, Google might be able to argue—had it not waived

17  this issue—that Sonos should only be entitled to a 2007 priority date, rather than 2006.[4]  For that

18  reason alone, any challenge to the propriety of amendment is both (a) wrong on the merits and (b)

19  irrelevant, because Google's accused products came *eight years later*.

20  **A.    Appendices To Provisional Applications Are Filed With The PTO And Made**
    **Available To The Public At The Same Time And Together With The Rest Of The**

21  **Provisional Application**

22         There is *no difference in* the filing, disclosure, and publication times for the *appendix* to a

23  provisional application and the rest of a provisional application.

24

25  [4] It is also significant – if not controlling here – that Google has conceded and stipulated that
    Sonos's conception date of the '885 and '966 patents, which claim the "overlapping" concept, is

26  in December 2005 and is based on the business record UI specification. Tr. Tran, 643:13-25.
    Given that the 2006 provisional and 2007 nonprovisional include disclosure above and beyond

27  the business record UI specification, there ought to be no question that the provisional and
    nonprovisional adequately support the claimed invention.

28

1    By way of illustration, here is what the public sees when looking up the provisional

2    application on the USPTO's public-facing website—9 documents total, one of which is the

3    specification, one of which is the drawings, and two of which are appendices to the specification.

4    Anyone looking for the specification would see, almost directly below the specification a listing

5    for the "[a]ppendix to the specification" along with live links to view it in their browser or

6    download a PDF.



18    To be clear, *provisional* patent applications and their file contents—*including*

19    *appendices*—generally are not made public *at the time they are filed*.[5]  In this case, the inventor

20    disclosed the provisional application including Appendix A to the PTO in 2006, and then

21    incorporated the provisional application (including Appendix A) by reference into the first *non-*

22    *provisional* application filed in 2007.  Once that first non-provisional application *issued*, in 2013,

23    the contents of the 2006 provisional application, including Appendix A, became available to the

24    public on the PTO's free, public, website.  There is no distinction between the timing with respect

---

[5] These materials, instead, are generally preserved in confidence pursuant to 35 U.S.C. 122(a) for
a limited period of time.  After that period expires, the PTO may make provisional patent
applications and their file contents available to the public pursuant to 37 CFR 1.14(a)(1)(iv)-(vi)
and 1.14(i).

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

to when the 2006 provisional application and Appendix A were published on the internet—the same rules applied to both.

*Once* a provisional patent application and its file contents become available for public inspection, the public can access these materials in either of two ways.  First, the public can access these materials for free, online, using the Patent Center system (previously called Patent Application Information Retrial system, or PAIR for short) provided by the Patent Office.[6]  This system permits the public to view provisional patent applications, their file contents and other patent-related materials for free.  *See* https://www.uspto.gov/patents/apply/checking-application-status/check-filing-status-your-patent-application  Second, hard copies can be ordered from the Patent Office for a fee.

The Manual of Patent Examining Procedure provides an explanation of the manner in which provisional applications are initially restricted and then made available to the public.  To give the Court full context, Sonos includes the entire relevant paragraph below:

> VII. ACCESS TO PROVISIONAL APPLICATIONS
>
> **Provisional applications are not published** under 35 U.S.C. 122(b) and are generally preserved in confidence pursuant to 35 U.S.C. 122(a), as with any other unpublished application. Therefore, **access to or copies of all or part of a provisional application are customarily only made available to the public under the limited circumstances** provided in 37 CFR 1.14(a)(1)(iv)-(vi) and 1.14(i). See subsections III-VI above. For example, **a provisional application that is relied upon for priority in a U.S. patent and is abandoned is available under 37 CFR 1.14(a)(1)(iv) and, as a result, may be available through Patent Center**. For information on obtaining access to or copies of a provisional application using a power to inspect signed by an authorized person associated with the provisional application, see 37 CFR 1.14(c) and MPEP § 104.

MPEP § 103 (emphasis added).

*In this case*, the provisional patent application (including the appendix) stands abandoned since its one-year term expired in September 2007.  Ex. 1.  However, because the provisional patent application is relied on for priority, it is available to the public under 37 CFR

---

[6] Prior to the current Patent Center online system launched in 2017, the PTO, starting in the "early 2000s" made patent and patent applications available online.  *See, e.g.*, https://www.uspto.gov/patents/public-pair-be-retired

1.14(a)(1)(iv).  Because the *first non-provisional* application, which was filed in 2007, issued in 2013, the PTO should—as a matter of federal regulation—have made both the provisional application and its appendices available for public inspection beginning in 2013.  And we have no evidence or reason to believe that the PTO failed to do so.  Attached as Exhibit 1 is a copy of the provisional application, *including Appendix A*, that is currently available, for free, online at https://www.uspto.gov/patents/apply/checking-application-status/check-filing-status-your-patent-application.[7]

Because provisional applications are not subject to the same requirements as *non-provisional* applications, it is not unusual for material to be disclosed in an appendix to a provisional application.  For example, in *Snyders Heart Valve LLC*, a plaintiff argued that a defendant's proposed claim construction improperly imported limitations from an embodiment that was only disclosed in an appendix to a provisional application.  *Snyders Heart Valve LLC v. St. Jude Med. S.C., Inc.*, No. 4:16-cv-00812-ALM-KPJ, 2017 U.S. Dist. LEXIS 178591, at *12 (E.D. Tex. Oct. 27, 2017).  While the Court rejected the proposed construction because it sought to improperly limit the claims, the Court acknowledged that the appendix was properly part of the intrinsic record.  *See also, e.g.*, *Trustees of Columbia Univ. in City of New York v. NortonLifeLock, Inc.*, 580 F. Supp. 3d 236, 251 (E.D. Va. 2022) ("In the body of the application, the 898 Provisional Application incorporates the ideas embodied in the May 22, 2006 NICECAP Draft Proposal. … *As Appendix A, the 898 Provisional Application incorporates the ideas embodied in the earlier May 14, 2006 NICECAP Draft Proposal*." (emphasis added)); *Transcend Med., Inc. v. Glaukos Corp.*, No. CV 13-830, 2015 WL 5546988, at *4 (D. Del. Sept. 18, 2015) (based on "notes [that] were submitted to the USPTO as an attachment to Provisional Application

---

[7] Because Google—which has the burden of proving invalidity by clear and convincing evidence—has waived or abandoned any challenge to the priority date, and because the Court has raised this issue for the first time *sua sponte* in the middle of trial, Sonos has not conducted fact or expert discovery on the issue of whether *as a matter of fact* the provisional application and its appendices were available as of 2013, but based on the federal regulations and general practice, it should have been.

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1     '973" and other expert "evidence offered by Glaukos," concluding that Glaukos established a

2     genuine issue of material fact as to conception).

3          The idea that Google has not been on notice of the provisional application's use of an

4     appendix, and Sonos's reliance on that appendix, is demonstrably false.  By Sonos's count, Dr.

5     Almeroth's reports cite directly to the provisional appendix **well over 100 times**.  Google has long

6     since waived any challenge.  Sonos would be happy to provide a copy of the relevant parts of

7     these reports upon the Court's request.

8     **B.**    **Sonos Properly Incorporated Material By Reference And Then Properly Amended The Specification**

9

10          As the Federal Circuit has explained, "[i]ncorporation by reference provides a method for

11     integrating material from various documents into a host document—a patent or printed

12     publication in an anticipation determination—by citing such material in a manner that makes

13     clear that the material is effectively part of the host document as if it were explicitly contained

14     therein."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

15          Patent applicants are permitted to incorporate by reference "a previously filed

16     application," 37 CFR § 1.57(a),[8] and must "set forth" the "incorporation by reference" "in the

17     specification" by "(1) [e]xpress[ing] a clear intent to incorporate by reference by using the root

18     words 'incorporat(e)' and 'reference' (e.g., 'incorporate by reference'); and (2) [c]learly

19     identify[ing] the referenced patent, application, or publication," *id.* § 1.57(c).  The regulation also

20     permits incorporation by reference of material that was "inadvertently omitted" from the

21     specification or drawings where the material is "completely contained in [a] prior-filed

22     application" in the priority chain, including a nonprovisional application, so long as the priority

23     "was present on the filing date of the application."  37 CFR § 1.57(b).

24

25

26

27

28

---

[8] "The Director of the USPTO has the authority to issue a patent upon an application wherein the disclosure incorporates, by reference, and relies on, certain portions of a disclosure of an existing document, provided that such document is easily available to the public and to the USPTO. *General Elec. Co. v. Brenner*, 407 F.2d 1258, 1262 (D.C. Cir. 1968). In exercising that authority, the Director has promulgated 37 C.F.R. § 1.57." *Ex Parte Benjamin S. Miller*, No. APPEAL 2018-008078, 2020 WL 635619, at *15 (P.T.A.B. Feb. 5, 2020).

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1          There is nothing suspect about using incorporation by reference or 37 CFR § 1.57 to

2     satisfy § 112 requirements.  As the Federal Circuit has made clear, that is the *point* of the

3     regulation: "the focus of the incorporation by reference procedure set forth in § 1.57 is to help a

4     patent applicant satisfy the requirements of 35 U.S.C. § 112 under 37 C.F.R. § 1.57(c), and to

5     provide background for the invention or to illustrate the state of the art under 37 C.F.R. §

6     1.57(d)."  *Droplets, Inc. v. E\*TRADE Bank*, 887 F.3d 1309, 1319 (Fed. Cir. 2018).

7          The regulations provide that "essential matter"—that is, "material that is necessary to"

8     provide Section 112 support—"may be incorporated by reference, but only by way of an

9     incorporation by reference to a U.S. patent or U.S. patent application publication, which patent or

10    patent application publication does not itself incorporate such essential material by reference."  37

11    CFR § 1.57(d).  All other material—i.e. "[n]onessential material"—"may be incorporated by

12    reference to U.S. patents, U.S. patent application publications, foreign patents, foreign published

13    applications, prior and concurrently filed commonly owned U.S. applications, or non-patent

14    publications."  37 CFR § 1.57(e).

15         In order to actually *insert* material that was previously "incorporated by reference into the

16    specification or drawings of an application"—that is, into the *four corners of the specification*—

17    an application must do so "by way of an *amendment* to the specification or drawings," which

18    "must be accompanied by a statement that the material being inserted is the material previously

19    incorporated by reference and that the amendment contains no new matter."  37 CFR § 1.57(g)

20    (emphasis added).

21         Here, Sonos first incorporated by reference the 2006 provisional application (including

22    Appendix A) in the 2007 application.[9]  The claims of that application did not rely on the

---

[9] Should Google argue that Sonos should have incorporated the appendix by reference using other language, e.g., by saying "Provisional application No. 60/825,407, **and Appendix A,** filed on Sep. 12, 2006," there is no merit to this.  Chains of priority list application numbers, not all of the individual attachments and component parts of the applications.  When you look up a patent application on the PTO's website, you see a list of documents, including the specification, the drawings, and appendices.  Any argument by Google to this effect would mean, for example, that patentees must separately enumerate the incorporation of the specification, the drawings, etc.  That can't be right.  *See, e.g.*, 37 C.F.R. 1.57(c)(2) (requiring incorporations by reference to "[c]learly identify the referenced *patent*, *application*, or publication" (emphasis added)).

1    incorporated reference for Section 112 support, so at least *with respect to that* application, this

2    was "[n]onessential matter."  37 CFR § 1.57(e).  Each subsequent application in the chain of

3    priority similarly incorporated by reference the 2006 provisional application (including Appendix

4    A), but did not rely on that incorporated reference for Section 112 support *until* the applications

5    that led to the issuance of the '679, '885, and '966 patents.  Unlike the previous applications in

6    the chain of priority, the '679 arguably *did* rely on this material for written description support—

7    for claims that had a different scope and included different limitations than those required by the

8    '885 and '966 patents—so *for that application* Sonos did *not* simply incorporate by reference but

9    instead formally amended the specification so that the materials that had previously been

10   incorporated by reference became part of the four corners of the specification, pursuant to 37

11   CFR § 1.57(g).  Sonos then conformed the '885 and '966 patent specifications accordingly.

12        That is exactly what Sonos was supposed to do.  Because material that had previously

13   been *nonessential* for earlier applications in the chain became arguably *essential to the '679

14   patent*, Sonos no longer relied on incorporation by reference and instead *amended* the

15   specification for the '679, '885, and '966 patents, stating—accurately—"that the material being

16   inserted is the material previously incorporated by reference and that the amendment contains no

17   new matter."

18   **C.    The Material Added Into The Four Corners Of The Specification In 2019 Was Not
         Essential—The 2007 Non-Provisional Contained Ample Other Support For Overlapping**
19       **Groups**

20        Any argument by Google that the material pulled into the four corners of the specification

21   from the provisional appendix was "necessary to … [p]rovide a written description of the claimed

22   invention" of the ***'885 and '966 patents*** is wrong.  Instead, because the sentence added in Column

23   10 is far from the only support for "overlapping" zone scenes, it is not essential material at all.

24        Indeed, even setting aside the material added from Appendix A of the 2006 provisional to

25   the specifications of the '885 and '966 patents—including the sentence reading "[t]he list of

26   zones in the user interface 520 includes ALL the zones in the system, including the zones that are

27   already grouped"—the remainder of the specifications of the '885 and '966 patents, which is

28

substantively identical to the disclosure in the 2007 non-provisional application, provide ample written description support for "overlapping" zone scenes. In other words, the added material is not essential.

> **10**
>
> scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.
>
> FIG. **5A** shows a user interface **500** to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and be grouped as part of this scene. Depending on an exact implementation of a user interface, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.
>
> FIG. **5B** shows another user interface **520** to allow a user to form a scene. The user interface **520** that may be displayed on a controller or a computing device, lists available zones in a system. The list of zones in the user interface **520** includes ALL the zones in the system, including the zones that are already grouped. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

Google has focused on one sentence in column 10 (left)—the sentence that was moved from Appendix A of the provisional into the specifications of the '885 and '966 patents  in 2019—as being the sole disclosure supporting "overlapping" zone scenes.  '966 patent at 10:15-17.  This is one example supporting the "overlapping" feature—but it is not the only one.  As such, even if this sentence was never moved, other portions of the specifications of the '885 and '966 patents that are substantively identical to the 2007 non-provisional application provide ample support for the "overlapping" zone scenes.

1    As one example, the specifications of the '885 and '966 patents (and the specification of

2    the 2007 non-provisional) states:

> According to still another aspect of the present invention, a controlling device (also referred to herein as controller) is provided to facilitate a user to select any of the players in the
> 55   system to form respective groups each of which is set up per a scene. Although various scenes may be saved in any of the members in a group, commands are preferably sent from the controller to the rest of the members when one of the scenes is executed. Depending on implementation, the commands
> 60   include parameters pertaining to identifiers of the players, volumes settings, audio source and etc.

'966 patent at 2:52-57.

This paragraph states two important facts:

1) The controller allows a user to *select any players in the system* when setting up *respective* scenes;

2) Various **scenes** (i.e., multiple) may be saved in **any** of the members of the group.

The first statement means that the controller allows a user to set up respective scenes, and each time, the user can select *any* of the players in the system.  Said another way, this means that every time a user wants to set up a respective zone scene, the user has the option to select from *any* of the players in the system.  Logically and practically, if the user has this option, this means that a given player can be in multiple zone scenes that the user sets up.  This is a clear example of the "overlapping" zone scene concept.  The second statement reinforces this conclusion.  It means that multiple scenes can be stored any of the members of the group.  Logically and practically, if a player stores multiple scenes, that means it is a member of each of those zone scenes.  This too is a clear example of the "overlapping" zone scene concept.

Evidence already in the record also supports this conclusion.  On Wednesday, May 10, Dr. Almeroth testified that this very paragraph discloses the "overlapping" concept:

```
12        "So according to, still, another aspect of the present
13   invention, a controlling device is provided to facilitate a
14   user to select any of the players in the system to form
15   respective groups."
16        So the idea is, you have the full set of devices and then,
17   from that, multiple groups can be created across those
18   different selections of devices.
19        So that gets into the concept of being able to have
20   overlapping groups that become what the zone scenes are.
```

Tr.Tran. 5/10/23, 681:12-20.

As another example, the specifications of the '885 and '966 patents (and the specification of the 2007 non-provisional) disclose a "zone scene" that "links *all zones*."  '966 patent at 9:17-19.  This exemplary "*all zones*" zone scene *necessarily* overlaps with every other exemplary zone scene described in the specifications of the '885 and '966 patents.  E.g., '966 patent at FIG. 3A (showing a zone scene comprising the Bedroom, Den, and Dining Room zones), FIG.3B (showing a zone scene comprising the Bedroom, Den, Dining Room, Garage, and Garden zones), FIG. 5A (showing a zone scene comprising the Bedroom, Den, Dining Room, Family Room, Foyer, Garage, Garden, and Guest Room zones), 8:52-60, 8:61-67, 9:1-15.

As another example, the specifications of the '885 and '966 patents (and the specification of the 2007 non-provisional) provide an example where a "morning" scene contains a "den" player (among other players) and an "evening" scene contains that same "den" player (among other players and another grouping).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19





'966 patent at FIG. 3A, FIG.3B, 8:52-60, 9:1-15.

The specifications of the '885 and '966 patents (and the specification of the 2007 non-provisional) explains that "a 'Morning' zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action."  The specification also explains that "an 'Evening Scene' is desired to link the following zones:

Group 1

Bedroom

Den

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1    Dining Room . . . "

2    The specification goes on to contemplate that, in addition to scenes referred to as

3 "morning" and "evening," even more zone scenes can exist and would contain still different

4 groupings of the players.

5

6



> create multiple sets of linked zones. For example, a scene creates **3** separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

10 '966 patent at 8:62-67.

11    A POSITA would naturally understand (and Sonos would have so proven had Google

12 raised this issue in expert reports) that in a normal house the "den" player would be located in the

13 "downstairs" zone scene.  In this way, the specification contemplates that the "den" player would

14 be a member of *three* zone scenes: (1) the "morning" scene, (2) the "evening" scene, and (3) the

15 "downstairs" scene.  This is yet another clear example of the "overlapping" zone scene concept in

16 the specifications of the '885 and '966 patents (and the specification of the 2007 non-provisional).

17    As yet further support for the "overlapping" zone scene concept is the two-phase

18 architecture of the inventive system itself.  It was this very architecture that allows the same

19 player to be a member of multiple, saved zone scenes—i.e., the "overlapping" concept.  Figure 6,

20 and the corresponding description in the specifications of the '885 and '966 patents (both of

21 which are *also* in the 2007 non-provisional) says it best.  A key aspect of the invention was the

22 separation of the setup of the group from the invocation of the group.

23

24

25

26

27

28

1    During the setup phase, a user selects "zone players" to be included in the "zone scene,"

2  and the "zone scene" is saved for future use.  Importantly, the "zone scene" is not activated for

3  synchronous playback at this time – that will

4  happen at the invocation phase.  In fact, the

5  specification explains that after block 606 in Figure

6  6, "[t]he user may go back to **602** to configure

7  another scene if desired."  This is signified in red in

8  Figure 6 (right).  As such, the user could repeat the

9  setup phase as many times as s/he likes.  By

10  allowing the user to configure as many scenes as

11  desired and save them along with the members of

12  the groups without yet invoking a single one of



Fig. 6 (annotated).

13  those saved scenes, this allows the user to deploy the very examples described above where a

14  single player was a member of multiple of these saved scenes.  In the old paradigm, zone

15  groups/dynamic groups were invoked at the moment they were created.  That was why a given

16  player could not be in more than one zone group/dynamic group at the same time and why a prior

17  zone group/dynamic group (containing e.g., the "den" would have to be destroyed when the user

18  was ready to use a new group containing the "den").  But by inventing the two-phase

19  architecture—i.e., setup first, invocation later—this allowed for a given player to be a member of

20  as many saved zone scenes as desired.  In this respect, the two-phase architecture itself provides

21  support for the "overlapping" zone scene concept.

22    Putting it all together – the invention addressed the specific problem articulated at the

23  beginning of the specification.  When a user desires to use a given player in multiple different

24  groups, the traditional multi-zone audio system is clumsy:  a user must destroy prior groups when

25  s/he desires to create new ones.  The specification decried:

26

27

28

> example, a person would like to listen to broadcast news
> from his/her favorite radio station in a bedroom, a bathroom
> and a **den** while preparing to go to work in the morning. The
> same person may wish to listen in the **den** and the living
> 5  room to music from a compact disc in the evening. In order

The specification explained that this scenario could play out as even *three* different groups: (1) "morning," "evening," and "weekend," each containing the "den" player.

> must be established. In the morning, the audio players in the
> bedroom, the bathroom and the **den** need to be grouped for
> the broadcast news. In the evening, the audio players in the
> 10  **den** and the living room are grouped for the music. Over the
> weekend, the audio players in the **den**, the living room, and
> a kitchen are grouped for party music. Because the morning

However, because the "den" player was desired to be included in each of these three groups, the specification explained that it was "difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups."  Said another way, this means that because groups were created and destroyed on an ad hoc basis (i.e., invoked at time of creation), each time a user created a new group with the "den" player, the previous group with the "den" player would be destroyed.  The two-phase architecture of the invention solved this problem and provided a flexible ability to allow a user to put a given player into as many saved groups as desired – hence the "overlapping" zone scene concept.

The relevance of this is that all of the foregoing was in the 2007 specification.  Sonos does not need to rely on the lone sentence from column 10.  The "overlapping" zone scene concept was already well-described and supported.  Indeed, it was a key feature of the invention all along and expressly disclosed and extensively described in the 2007 non-provisional.

1   Because all of the above provides written description support for overlapping groups,

2   Sonos objects to any new or resuscitated argument by Google—which has long since waived or

3   abandoned any challenge—or *sua sponte* decision by the Court that the material formally

4   amended into the specification in 2019 constitutes "essential material" in any way.[10]

5   Separately, because there was adequate written description support at least by 2007—for

6   the reasons described above—any problem with incorporation by reference of the provisional

7   application's appendix would mean, at most, that Sonos would not be entitled to a *2006* priority

8   date, and instead only to a *2007* priority date.  That difference does not matter based on the prior

9   art that Google has relied on in this case.

10   **D.   Sonos Cured Any Potential "Essential Material" Issue By Formally Amending The Specification**

12   But even *if* the sentence in column 10 *were* deemed "essential material," Sonos still did

13   nothing wrong, because even if it were, Sonos cured any potential issue under 37 C.F.R. § 1.57(d)

14   by amending the specification under 37 C.F.R. § 1.57(g).

15   The PTO has *explicitly approved* the curing of potential issues under 37 C.F.R. § 1.57(d)

16   or other provisions of 37 C.F.R. § 1.57 by use of 37 C.F.R. § 1.57(g) to formally amend

17   previously incorporated materials into the four corners of the specification.  That is what Sonos

18   did with respect to the '679, '885, and '966 patents, and that is what the PTO has said is the *right*

19   way to do things.  For example, MPEP § 608.01(p)'s Example 2 expressly approves the sequence

20   of events at issue here:

21   Upon review of the specification, the examiner determined that ***the subject matter
     incorporated by reference from a foreign patent was "nonessential material" and
     therefore, did not object to the incorporation by reference***. In reply to a non-final
22   Office action, ***applicant filed an amendment to the claims to add a new limitation
     that was supported only by the foreign patent***. The amendment filed by the
23   applicant caused the examiner to re-determine that the incorporated subject matter

---

25   [10] Had Google or the Court ever raised this issue previously, Sonos would have conducted

26   further fact and expert discovery on this question.  Once the Court ruled on this issue at summary judgment in Sonos's favor, Google and Sonos both conducted discovery and litigated validity on

27   a host of other issues, but not this one.  Raising this question in the middle of trial is prejudicial in the extreme, and for the reasons described above, simply wrong on the merits as well.

was "essential material" under 37 CFR 1.57(d). The examiner rejected the claims that include the new limitation under 35 U.S.C. 112(a) in a final Office action.

Since the rejection under 35 U.S.C. 112(a) was necessitated by the applicant's amendment, the finality of the Office action is proper. ***If the applicant wishes to overcome the rejection under 35 U.S.C. 112(a) by filing an amendment under 37 CFR 1.57(g) to add the subject material disclosed in the foreign patent into the specification, applicant may file the amendment as an after final amendment in compliance with 37 CFR 1.116.*** Alternatively, applicant may file an RCE under 37 CFR 1.114 accompanied by the appropriate fee, and an amendment per 37 CFR 1.57(g) within the time period for reply set forth in the final Office action.

In other words, material that is *nonessential* can be incorporated by reference under 37 C.F.R. § 1.57(e). But if the material *becomes* essential—because the applicant wants to amend the claims to *rely* on that material—then the applicant must either comply with 37 C.F.R. § 1.57(d), or amend the *specification* under 37 C.F.R. § 1.57(g). In the example above, the applicant could *not* rely on 37 C.F.R. § 1.57(d), because essential material may only be incorporated "by reference to a U.S. patent or U.S. patent application publication," and the refenced material was from a *foreign* patent. But the PTO said the problem could have been cured via *amending the specification* pursuant to 37 C.F.R. § 1.57(g).

So let's *assume* that a provisional patent application does not qualify as a "U.S. patent application publication" because a provisional is disclosed to the public under different rules than a nonprovisional.[11] It doesn't make a whit of difference in this case, because Sonos did not rely on compliance with 37 C.F.R. § 1.57(d). Sonos erred on the side of caution and amended the four corners of its specification under 37 C.F.R. § 1.57(g) to avoid any potential problem—exactly

---

[11] *See, e.g.*, *Ex Parte Benjamin S. Miller*, No. APPEAL 2018-008078, 2020 WL 635619, at *16 (P.T.A.B. Feb. 5, 2020) (where applicant relied for written description support on material disclosed in a provisional application, "description of each of these claim limitations is 'essential material,' and cannot be incorporated by reference to a provisional application. 37 C.F.R. § 1.57(d)(1)"). *But see, e.g.*, *DNA Genotek Inc. v. Spectrum Sols. L.L.C.*, No. 321CV00516RSHDDL, 2022 WL 17331255, at *19 n.16 (S.D. Cal. Nov. 29, 2022) (concluding that Federal Circuit's "use of a provisional application for claim construction purposes" binds district court to reject non-binding PTAB decision holding that "incorporation by reference of a provisional application is ineffective because a provisional application is not a U.S. patent or U.S. patent application publication" for purposes of 7 C.F.R. § 1.57(d)). Moreover, provisional patent applications are available to the public upon publication of the related nonprovisional patent application, effectively publishing the provisional patent application. *See supra.*

1   what the PTO says an applicant *should* do when the applicant cannot meet 37 C.F.R. § 1.57(d)'s

2   requirements.

3          In *Ex Parte Benjamin S. Miller*, for example, the PTAB concluded that the applicant could

4   not incorporate by reference a provisional application where the applicant relied on the material

5   for written description support, because that reliance made the material "essential material."  2020

6   WL 635619, at *16.  But as the PTAB made clear, an applicant can "correct[] the incorporation"

7   by amending the *specification* so long as "the material being inserted is the material previously

8   incorporated by reference" and "the amendment contains no new matter."  *Id.* (quoting 37 C.F.R.

9   § 1.57(g)).  At least one district court has independently reached the exact same conclusion.  *See*

10  *H.W.J. Designs for Agribusiness, Inc. v. Rethceif Enterprises, LLC*, No. 1:17-CV-0272 AWI

11  SKO, 2018 WL 4657221, at *5 (E.D. Cal. Sept. 26, 2018) (concluding that "Defendants have not

12  demonstrated a Section 112 violation" where "HWC amended the 908 Application to remove the

13  reference to the 812 Provisional and instead put in the drawing of the bale sampling device

14  directly").

15         Moreover, the amendment to the specification to add a sentence from the provisional did

16  not change the priority date of the claims.  The claims are entitled to the earliest priority date in

17  the chain, 35 U.S.C. §§ 119, 120, unless new matter is added, 35 U.S.C. § 132.  Because the

18  provisional application was incorporated by reference—such that the provisional was "effectively

19  part of the" specification as though it was "explicitly contained therein," ADS, 212 F.3d at 1282,

20  Sonos's amendment to the '885 and '966 specification did not add any new matter.  It simply

21  made explicit what was already "effectively part of the" specification.  In other words, "[m]aterial

22  that was nonessential and incorporated by reference in a preceding patent can later be called upon

23  to serve as essential material for claims made in a later patent without compromising the

24  continuity of disclosure."  *Maquet Cardiovascular LLC*, 2022 WL 4138711, at *7.

25  **E.     Sonos's Amendment Contained No New Matter**

26         So the only reason Sonos's amendment could be ineffective is if it improperly contained

27  new matter.  It did not.  Sonos's statement under 37 C.F.R. § 1.57(g) that the amendment

28

1   contained no new matter, which the PTO accepted, was accurate, because every part of the 2019

2   specification that the Court has asked Sonos to account for was (1) disclosed in the 2006

3   provisional application or the appendices thereto, (2) disclosed in the 2007 non-provisional

4   application, or (3) was not a substantive change.

5        As a matter of law, material that was previously incorporated by reference *is not* new

6   matter.  *See* 37 C.F.R. 1.57(g) ("Such an amendment must be accompanied by a statement that the

7   material being inserted is the material previously incorporated by reference and that the

8   amendment contains no new matter.").  Here, the only substantive material that Sonos physically

9   brought in by amendment came from the 2006 provisional, which was properly incorporated by

10  reference.

11       "The question whether new matter has been added to an application is a question of

12  fact."[12]  *Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d

13  1363, 1380 (Fed. Cir. 2008) (citing *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d

14  1555, 1574 (Fed. Cir. 1992)).  And "in the context of a validity challenge based on new matter,

15  the fact that the United States Patent and Trademark Office ('PTO') has allowed an amendment

16  without objection 'is entitled to an ***especially weighty presumption of correctness***' in a

17  subsequent validity challenge based on the alleged introduction of new matter."  *Id.* (emphasis

18  added)  Google "therefore not only must overcome the clear error standard, but it must do so in

19  the face of a presumption of validity based on the PTO's issuance of the patent despite the

20  amendments."  *Id.*

21       "The fundamental factual inquiry is whether the specification conveys with reasonable

22  clarity to those skilled in the art that, as of the filing date sought, the inventor was in possession of

23  the invention as now claimed."  *See* MPEP § 2163 (citing *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d

24  1555, 1563-64 (Fed. Cir. 1991)).  An expert or other person of skill in the art thus would need to

25

26

---

[12] Again, if Google wanted to litigate issues of fact, it had an obligation to timely raise them so that Sonos could develop the factual record.  But this issue was not raised by Google until the last witness in Sonos's case.

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1    determine whether the figures and text added to the specification find sufficient basis in the

2    nonprovisional patent application and/or the provisional patent application with its appendices.

3         In *Commonwealth Scientific*, for example, the Federal Circuit relied on expert

4    testimony—which it characterized as "[s]ignificant[]"—regarding what "one of skill in the art

5    would understand from the original specification that the inventors of the '069 patent had

6    invented, were in possession of, and had described a digital communication technique."  542 F.3d

7    at 1382.  By springing this challenge on Sonos *sua sponte* in the middle of trial, with no

8    opportunity for expert discovery, the Court has deprived Sonos of the ability to effectively defend

9    the validity of the asserted patents and the right to a fair trial.  And Google has long waived or

10   abandoned any new matter or written description challenge to the asserted patents.  Sonos objects

11   to the prejudicial injection of this issue at this stage in the case in its entirety, and to Google

12   raising long-waived potential challenges.  Knowing the Court's "fondness" for lawyer bromides,

13   we note that this is no way to run a railroad.

14        Any argument by Google that the amendment constitutes new matter is also wrong on the

15   merits.  The only argument Google has raised regarding new matter is the following:  On May 12,

16   2023, Mr. Pak asserted that the statement "[t]he list of zones in the user interface 520 includes

17   ALL the zones in the system, including the zones that are already grouped" (the "disputed

18   statement") that was added to the specifications of the '885 and '966 patents on August 23, 2019

19   is "describing zone groups … in the prior art Sonos 2005 system" and "is describing nothing

20   about zone scenes."  Tr. Tran. at 955:16-956:7.  That is not true.

21        Mr. Pak's lead argument for why the disputed statement describes Sonos's zone groups

22   and not Sonos's zone scenes was that section 3 of Appendix A of the  2006 Provisional titled

23   "Sonos UI Specification: Zone Scenes" states that "[i]t is not expected that the Zone Scenes

24   should be set up using the Handheld Controller" and that the disputed statement in section 4 of

25   the "Sonos UI Specification: Zone Scenes" allegedly references screens from Sonos's 2005

26   Handheld Controller (i.e., the CR100).  Tr. Tran. at 951:18-952:12.  This argument is flawed.

27

28

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

First, the statement says that "it is ***not expected***" – it does not state that zone scenes ***cannot*** be set up using the Handheld Controller.  Google claims that this is "teaching away" but that is a standard that is used to evaluate whether or not there is a sufficient motivation to combine two references so as to overcome the clear and convincing evidence burden.  It has nothing to do with written description.

Second, consistent with the "not expected" language, section 3 ("Scene Setup") of the "Sonos UI Specification: ***Zone Scenes***" discloses preferred embodiments for setting up ***zone scenes*** using Sonos's Desktop Controller while section 4 ("Alternative Linking Methods") of the "Sonos UI Specification: ***Zone Scenes***" discloses "alternative" embodiments for setting up ***zone scenes*** using Sonos's Handheld Controller.  In other words, Google takes the statement out of context and ignores other disclosures in the same specification suggesting that you *would* use the hand held controller to set up zone scenes.

Third, the screens shown in section 4 "Sonos UI Specification: ***Zone Scenes***" are (contrary to Google's misrepresentation to the Court) not screens from Sonos's 2005 Handheld Controller for setting up "zone groups"/dynamic groups but are instead **<u>new</u>** screens for forming ***zone scenes***, which is consistent with the language at the beginning of subsection 4.1 states that "[t]his feature is an ***adaptation*** of the Link and Drop Zone feature."  This is confirmed by the side-by-side comparison below:

| Sonos's 2005 Handheld Controller | Appendix A - "Sonos UI Specification: *Zone Scenes*" |
|---|---|
|  |  |
| Ex. 22 [TX6991 (2005 Sonos User Guide) at Chapter 5-9 (SONOS-SVG2-00227506-7)]. | Ex. 1 [2006 provisional, Appendix A (Sonos UI Specification: Zone Scenes) at p. 37.] |

As shown in the images above, the first screen for setting up "zone groups"/dynamic groups using Sonos's 2005 Handheld Controller includes a "Link Zone" button for setting up "zone groups"/dynamic groups and "Pause All" button for pausing playback on all zone players in the system whereas the first screen for setting up zone scenes in the "Sonos UI Specification:

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1    **Zone Scenes**" includes a "Zone Linking" button for setting up **zone scenes**, a "Scenes" button for

2    invoking **zone scenes** (see Ex. 1, Appendix A, "Sonos UI Specification: Zone Scenes" at p.37

3    (section 2 titled "Invoking a Scene," 2.1 titled "Handheld Controller," subsection 2.1.2 titled

4    "Method 2: Zone Scenes as a soft button"), and a "Pause All" button for pausing playback on all

5    zone players in the system.  Turning to the second screen for selecting zones, the second screen of

6    Sonos's 2005 Handheld Controller does not include any buttons whereas the second screen in the

7    "Sonos UI Specification: **Zone Scenes**" includes "Check" and "Uncheck" buttons.

8          Next, Mr. Pak focuses on the disputed statement itself and how it was added to the

9    specifications of the '885 and '966 patents on August 23, 2019.  Tr. Tran. at 955:16-956:25.  Mr.

10   Pak's arguments in this regard are also flawed.  As an initial matter, the disputed statement is

11   based on a nearly identical statement in Appendix A of the 2006 provisional titled "Sonos UI

12   Specification: Zone Scenes."

13

| Appendix A - "Sonos UI Specification: Zone Scenes" | Specifications of the '885 and '966 Patents |
|---|---|
| "The list of zones in the screen above includes ALL the zones in the system including the Zones that are already grouped | "The list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped." |

18         More specifically, this statement is from subsection 4.1 of section 4 of the "Sonos UI

19   Specification: **Zone Scenes**," as shown below:

20

**Sonos UI Specification: Zone Scenes**

**4      Alternative Linking Methods**

**4.1      Multiple Select in Link and Drop Zone panels**

...



> – The list of zones in the screen above includes ALL the zones in the system, including the Zones that are already grouped.
>
> 17

2006 provisional, Appendix A at p. 17.

The replacement of "the screen above" with "the user interface 520" was made to reference FIG. 5B of the '885 and '966 patents, which is nearly identical to "the screen" (singular) that is "above" the relevant statement in the "Sonos UI Specification: **Zone Scenes**":

| Appendix A - "Sonos UI Specification: *Zone Scenes*" | FIG. 5B of the '885 and '966 patents |
|---|---|

Notably, FIG. 5B of the '885 and '966 patents was included in the original specification of the '853 patent, which was filed on **September 11, 2007** and issued on July 9, 2013.

Contrary to Mr. Pak's assertion, when viewed in the proper context of the "Sonos UI Specification: **Zone Scenes**," section 4 discloses "alternative" embodiments for setting up *zone scenes*. Through this lens, the statement "[t]he list of zones in the screen above includes ALL the zones in the system, including the Zones that are already grouped" discloses to a person of ordinary skill in the art that a user setting up/forming a *zone scene* would be presented with a list of all zones in the system, including zones that are already grouped together. This interpretation is also consistent with the fact that when the original specification of the '853 patent, including

1    FIG. 5B, was filed on **September 11, 2007**—eight years before Google released its infringing

2    speaker group technology and 13 years before Sonos filed its complaint asserting the '885 and

3    '966 patents—the specification expressly disclosed that FIG. 5B was a user interface for setting

4    up/forming a *zone scene*:

5           FIG. 5B shows another user interface 520 to allow a user to form a scene. The user
            interface 520 that may be displayed on a controller or a computing device, lists
6           available zones in a system. A checkbox is provide next to each of the zones so that
            a user may check in the zones to be associated with the scene.
7

8    Ex. 2, '853 patent file history, September 11, 2007 Specification at [0060].

9           Mr. Pak also suggested that Sonos did something improper by not including in the 2007

10   '853 patent specification a different screen that appeared above the FIG. 5B screen in the "Sonos

11   UI Specification: Zone Scenes." Tr. Tran. at 971:20-973:3. There is no merit to this argument.

12   First, as explained above, a person of ordinary skill in the art would have understood that section

13   4 of the "Sonos UI Specification: *Zone Scenes*," including the two screens in subsection 4.1,

14   discloses "alternative" embodiments for setting up *zone scenes*. Second, there is no requirement

15   that the specification of the '853 patent include *every* image from the "Sonos UI Specification:

16   Zone Scenes." Indeed, the vast majority of the images in the "Sonos UI Specification: Zone

17   Scenes" are not included in the '853 patent. In other words, the image that Mr. Pak complains is

18   missing is not the only image that Sonos chose not to include in the '853 patent. And, to the

19   extent this omission somehow made the remaining portion that Sonos *did* use into new matter

20   (e.g. by changing the context of the lower half of the image) that change occurred in *2007*.

21          Accordingly, Google has identified no new matter whatsoever.

22                                                  ***

23          The Court has suggested that perhaps the PTO was asleep at the wheel: "Lots of things get

24   through the PTO that -- because you know how busy they are. They're busier than even a district

25   judge, and so I'm -- and they may not have understood the significance of it and the priority dates

26   and leaving to the judge later to figure out does this sentence count for purposes of a 2005 priority

27   or for purposes of a 2018 priority." Tr. Tran. at 974:25-7. Sonos disagrees, for all of the reasons

28

                                                       Sonos's Brief Re Priority Date
                                                       and Written Description
                                                       3:20-cv-06754-WHA

1    stated above, showing that the amendment contained no new matter.  But even if the Court were

2    to conclude that this were a close question, then under the *heightened* burden of proof and the

3    *heightened* presumption of validity, Google should lose—as a matter of law.  *Compare* Tr. Tran.

4    at 976:2-6 ("The priority date – there's, in my mind, a 50-50 chance that these patents are invalid

5    because the Google system predated them because it was inadequate written description prior to

6    that date, and that's the very reason you snuck it in there.") *with Commonwealth Sci.*, 542 F.3d at

7    1380 (describing the "*especially* weighty presumption of correctness" to which the PTO's

8    allowance of the amendment is entitled in this context and noting that challenger must not only

9    "overcome the clear error standard, but it must do so in the face of a presumption of validity

10   based on the PTO's issuance of the patent despite the amendments").

11   **F.    The Public, Including Google, Has Had Access To The Provisional Appendix Since**
     **2013**

12

13       The priority date of a patent is not based on when the patent's specification was *published*

14   *to the public*.  It is instead based on a patent's *filing date*, unless the patentee can show that

15   conception was *earlier*.  *See, e.g.*, *Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*, 721 F.

16   App'x 974, 981-82 (Fed. Cir. 2018) (holding that '597 patent had enablement and written

17   description support based on patent's incorporation by reference of the '479 patent from which

18   the '597 patent claimed priority, and noting that defendant "provides no support for its argument

19   that the publication of the '479 patent after the filing date of the '597 patent disqualifies the '479

20   patent from providing § 112 support").

21       Sonos understands that the Court wants to know when the material that was formally

22   amended into the specification in 2019 actually became available to the public.  *See, e.g.*, Tr.

23   Tran. at 976:11-15 ("Now, maybe -- maybe the law is, 'Oh, no, this counts as part of the

24   appendix. It counts.' But, to my mind, the whole point of the written description is to teach the

25   world how to do it. If you have to go find something in some appendix that's online, that's crazy.

26   What a crazy way to run a system.").

27       The answer, for the reasons described above, is 2013.  That is two years before Google's

28   accused products went on the market.  And in 2013, Google was collaborating with Sonos and so

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

at a minimum aware of Sonos's existence and its innovation and so could have looked up Sonos's

patents and patent applications had it so chosen.  We don't know if Google did that or not,

because Mr. Kowalski declined to answer that question on grounds of privilege.  Ex. 20

(Kowalski 5/8/23 Dep. Tr.) at 65:09-66:19; see also Dkt. 717-1 at 4.  But had Google looked up

Sonos's patents in 2013, it would have found the first nonprovisional patent, which issued in that

year as the '853 patent.  And had Google read the '853 patent, Google would have seen that it

incorporated by reference the provisional application, and would have been able to access that

provisional (including the appendix) online.  The information was all there, available to the

public, two years before Google's products came on the market.

These facts are not relevant to the priority date, which is 2006, or at worst 2007.  But to

the extent the Court has a fairness concern that the provisional appendix was somehow not

available to the public until *after* Google's products came on the market in 2015, there is no

reason for any such concern.

### G.  Google Waived Any Challenge To Sonos's Priority Date And Abandoned Any Written Description Challenge

Google should have made this priority date argument in its:

- Amended declaratory judgment complaint or answer.  See Dkt. 125, 199. (Google's original declaratory judgment complaint did not include any invalidity arguments at all.  Dkt. 1.)

- 12/6/21 Patent Local Rule 3-3 Invalidity contentions.[13]  Google stated that "It is Sonos' burden to show entitlement to its asserted priority dates, and Sonos has failed to meet that burden. Additionally, as described below, elements of the Asserted Claims lack written description and enablement support, and those Asserted Claims therefore cannot claim priority to earlier continuation applications on the face of the Asserted Patents."  Google did not develop any challenge based on new matter or amendments to the specification.

---

[13] Sonos would be happy to provide a copy to the Court upon request.

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

- Expert reports. Dr. Schonfeld's June 22, 2022 report[14] identified that Sonos relied on the provisional application, and the appendix in particular, for written description support. E.g. ¶ 712. Dr. Schonfeld's June 22, 2022 also acknowledges that Sonos added the "ALL the zones" sentence to the specification in 2019. ¶ 37. But he did not make any argument that amendments to the specification (1) were improper or (2) changed the priority date or demonstrated lack of written description support. Instead, he treated the "ALL the zones" sentences as part of the written description and argued that it failed to provide support for the claims. ¶ 720.

- Summary judgment briefing. Dkt. 249 at 18-25. Google asked for summary judgment of invalidity for lack of written description support and did not raise this argument.

- Pretrial Order. Dkt. 615. The parties joint proposed pretrial order did not include this defense (or any 112 defense). The Final Pretrial Order governs trial, and "The court may modify the order issued after a final pretrial conference only to prevent manifest injustice." Fed. R. Civ. P. 16(e)

- Google's Response To Sonos's MIL No. 3, Dkt. 596-5, mooted part of Sonos's MIL No. 3 by representing to the Court and to Sonos that "Google Is Not Arguing to the Jury Any Written Description Support or Enablement Challenges Of the Asserted Claims of the '885 and '966 Patents." Sonos relied on that representation and did not further press that part of the motion in limine.

- Proposed jury instructions. Dkt. 617. Google did not include any instruction based on 112 defenses or lack of priority.

By failing to raise this defense at any point prior to the middle of trial, Google waived this argument and it would deeply prejudice Sonos to inject it into trial at this time. *See Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2019 U.S. Dist. LEXIS 136791, at *41-42 (N.D. Cal.

---

[14] Sonos would be happy to provide a copy to the Court upon request.

Aug. 13, 2019) ("In sum, to allow Kellogg to assert a new preemption defense based on a never before cited regulation after Kellogg had at least six opportunities to articulate its preemption defense, after Plaintiff dismissed some of the products and products claims, after the Court dismissed Kellogg's preemption defense with prejudice, after fact and expert discovery closed, and after two summary judgment motions and six motions to strike expert reports and expert testimony were fully briefed would be prejudicial to the Plaintiff.").

Google deprived Sonos of the ability to develop expert testimony and facts necessary to defend against this invalidity claim.  For example, Sonos could have had its expert opine on the written description support for overlapping groups with and without the sentence in column 10 or the adequacy of the 2007 specification versus the 2006 provisional.  Sonos also could have retained an expert on patent office procedures to opine on whether Sonos's amendment was proper.

## III.    SONOS'S ANSWERS TO THE COURT'S SIX ADDITIONAL QUESTIONS

### A.    Sonos's Answer To The Court's First Additional Question

The Court asks: "Can Sonos claim priority for the '966 patent, written from the perspective of the controller, back to a provisional application that said it was not expected that the controller could do the claimed invention?"

As an initial matter, the portion of Appendix A ("Sonos UI Specification: *Zone Scenes*") that Mr. Pak relies on does not state that was not expected that *any* controller could do the claimed invention.  Instead, as noted above, it states: "It is not expected that the Zone Scenes should be set up using the *Handheld* Controller."  Google does not dispute that Appendix discloses (i) setting up zone scenes using a different type of controller (e.g., a desktop computer) and (ii) invoking a zone scene using the Handheld Controller or a different type of controller (e.g., a desktop computer).  2006 provisional, Appendix A.

In addition, the "not expected" language is only present in Appendix A.  As explained above, the main body of the 2006 Provisional application discloses the use of a controller to set up and invoke zone scenes, including overlapping zone scenes.  2006 provisional.

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

Moreover, the Court's question is based on an incorrect premise raised by Google (as part of a new matter challenge Google has long waived).

As explained above, Google's argument is that Section 3 of Appendix A of the 2006 provisional titled "Sonos UI Specification: Zone Scenes" states that "[i]t is ***not expected*** that the Zone Scenes ***should*** be set up using the Handheld Controller" while the disputed statement in section 4 of the "Sonos UI Specification: Zone Scenes" allegedly relates to the Handheld Controller.  Ex. 2 (SONOS-SVG2-00167542, SONOS-SVG2-00167550) (emphasis added). This argument is flawed for the reasons explained above.  In sum, the Appendix says that "it is ***not expected*** that the Zone Scenes ***should*** be set up using the Handheld Controller" – it does not state that zone scenes ***cannot*** be set up using the Handheld Controller.  That is because the Appendix disclosed a *preferred embodiment* for setting up zone scenes using Sonos's Desktop Controller in section 3 ("Scene Setup").  *Id.* (SONOS-SVG2-00167542-549.  But the same document *also* discloses "alternative" embodiments for setting up zone scenes using Sonos's Handheld Controller in section 4 ("Alternative Linking Methods").

Sonos also reminds the Court that Sonos accuses smartphones, tablets, and laptops of infringing the '966 patent in this case. *Id.* at 17 (SONOS-SVG2-00167550).  And nothing in Appendix A says that phones, tablets, and laptops *cannot* be used as controllers that practice the zone scenes invention.

**B.**     **Sonos's Answer To The Court's Second Additional Question**

The Court asks: "Was the statement referenced above specifically brought to the attention of the examiner on the '966 patent?"

No.

And for the reasons explained above, Sonos disagrees that the Court's understanding of the statement is accurate.

For purposes of further context, the examiner had possession of the provisional application, including the appendix, and Sonos informed the examiner that Sonos was bringing in material from the provisional application:

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1
2
3
4
5

> In the present response, pursuant to 37 CFR 1.57(g), Applicant inserts material into the specification and figures that was previously incorporated by reference in this application, and the amendment contains no new matter.  In particular, the inserted material can be found at least at pp. 5-6 and 17 of Appendix A to provisional application 60/825,407, the entirety of which was incorporated by reference on the filing date of this application.

6
7   Ex. [885 8/23/2019 response to OA] at p. 3, 18.

8   **C.      Sonos's Answer To The Court's Third Additional Question**

9         The Court asks: "Were the appendices ever represented to the PTO to be the user manual?

10   How did they differ from the user manual for the Sonos 2005 system? What is the legal

11   significance of any discrepancy?"

12         The appendices to the provisional application were never represented to the PTO to be

13   "the user manual for the Sonos 2005 system" because they are *not* "the user manual for the Sonos

14   2005 system."

15         Google may have confused the Court by suggesting that Appendix A covered the Sonos

16   2005 system zone groups technology.  For the reasons explained above, that is inaccurate.

17         The appendices to the provisional differ in *many* respects from the user manual for the

18   Sonos 2005 system, because they are different documents.  As Mr. Lambourne, the inventor,

19   testified at trial, Ex. 21 (TX6545)—which is an earlier version of the appendix—"is a user

20   interface or UI specification that I wrote about zone scenes." Tr. Tran. at 456:5-9.  As Mr.

21   Lambourne explained, the document starts off by explaining that currently, "Zone groups are

22   created by manually linking zones one at a time until the desired zone grouping is reached," while

23   "later on I say, '[t]he zone *scene* feature would allow the user to create a group with one

24   command.'"  *Id.* at 457:3-8.  Mr. Lambourne also explained that in the document's description of

25   party mode, "what I'm saying here is that the zone scene feature has some similarities to the Party

26   Mode feature that was in the existing product. However, the zone scene feature is much more

27   flexible and powerful. So I'm describing – there's more to zone scenes than what was in the

28

47

original Party Mode feature." *Id.* at 457:14-21.  As Mr. Lambourne testified, party mode in

TX6545 was not the same as the All Zones-Party Mode in Sonos's 2005 system.  *Id.* at 458:5-7.

> It had the same name for familiarity, but it would work in a different way. So, as you might recall, Party Mode in the original system was designed so it would group all the -- all the rooms together. That was hard coded into the controller. The user couldn't configure it. Whereas, the Party Mode in this case I thought the user could configure Party Mode. For instance, Party Mode for somebody might not be: I want to play all the rooms in the house. Maybe Party Mode for somebody is: I want to play in all the rooms but not the baby's room, for instance. So I thought it would be much more powerful to have a user configurable zone scene called Party Mode that's different from the original Party Mode.

*Id.* at 458:7-20.

> Mr. Lambourne also described the rest of the document more generally:

> It's 20 or so pages long, but I'm discussing various aspects of the zone scene, the feature, how a user would find it to invoke a scene, how they would go about creating a scene, so deciding which rooms would go into the scene, which rooms that the user would want to play music when the scene was invoked.

> I'm -- it -- it defines this capability of both the CR100, which we looked at that earlier but also a desktop controller, which was an application that would run on a Windows or a Macintosh computer, which would have similar control capabilities as the CR100.  So in this spec I'm describing how zone scenes would work in that context.

*Id.* at 459:14-460:2.  As Mr. Lambourne noted, the document was created December 20th, 2005,

and modified on December 21st, 2005—long after the Sonos 2005 system was released.  *Id.* at

460:3-5.

Sonos has been clear that Appendix A and the 2005 user manual are different documents

throughout this case.  Indeed, Sonos explained the difference between these documents to the

Court in our opposition to Google's second motion for summary judgment:

> First, the Sonos 2005 system did not have any "zone scene" technology. Mr. Lambourne (the inventor of the '885 and '966 Patents who was Sonos's director of user experience design in 2005) and Nick Millington (who was Sonos's director of software development in 2005) both confirm that Sonos's 2005 system did not have any "zone scene" technology. Ex. A (Lambourne Decl.), ¶¶8-16; Ex. B (Millington Decl.), ¶¶8-10. And documents from the relevant timeframe likewise confirm that the Sonos 2005 system did not have any "zone scene" technology. ***For example, Sonos's 2005 User Guide makes no reference to any "zone scene" technology***. Ex. K (Almeroth Reb.), ¶¶503-20. ***Instead, Sonos was in the process of developing the***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***technology necessary to implement zone scenes, as confirmed by the internal "Sonos UI Specification" for "Zone Scenes" dated December 21, 2005.*** That design document describes a new "Zone Scene feature" that would provide an alternative to the "[c]urrent[]" grouping technology available in the Sonos 2005 system. Ex. R (SONOS-SVG2-00026839); *see also* Ex. K (Almeroth Reb.), ¶¶497-526 (summarizing various evidence showing that Sonos's 2005 system did not have any "zone scene" technology).

Dkt. 508 at 12-13.

The legal significance of the *difference* between "the user manual for the Sonos 2005 system" and "the appendices" is that while the user manual for the Sonos 2005 system taught users how to use Sonos's then operative system—which Google relies on as claimed prior art in this case—the *appendices* show a new invention. It's not a "discrepancy" at all.

Finally, the Court should note that it is not at all unusual for people to *use* parts of early documents in the course of writing documents to describe a new invention. This really shouldn't be surprising. Sonos' zone scenes technology didn't spring completely out of the blue. Instead it was a *development* or *improvement* upon Sonos' existing technology. The notion that there is somehow nefarious or dishonest about an inventor *using* material from older documents to describe an invention that *is intended to be used in the same context* is facially absurd.

**D.    Sonos's Answer To The Court's Fourth Additional Question**

The Court asks: "What lurks in the prosecution history of the '206 patent, and other patents in the zone scene family, that sheds light on what led to the one sentence amendment to column 10 of the specifications of the two patents-in-suit in 2019, or otherwise bears on these issues?"

Sonos has re-investigated the prosecution history of the '206 patent, and all other patents in the zone scene family to answer the Court's question.

In 2019, Sonos prepared a common set of amendments to the specification and figures of the three pending 2019 applications (the '679, '885, and '966 patents) as well as the pending 2016 application in order to insert material from the 2006 provisional into those applications. This type of amendment is expressly permitted by the rules of the U.S. patent office. *See* 37 CFR § 1.57(g) (stating that "material incorporated by reference into the specification or drawings of an

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

application" can be inserted "by way of an amendment to the specification or drawings" as long
as the amendment "contains no new matter").

As explained in more detail above, Sonos's common set of amendments included the
following changes:

- Inserting FIGs. 7-8, which directly correspond to figures found on pages 5-6 of
  "Appendix A" of the 2006 provisional;

- Inserting brief descriptions of FIGs. 7-8 into the "Brief Description of the Drawings"
  section of the applications;

- Inserting descriptions of FIGs. 7-8 into the "Detailed Description" section of the
  applications; and

- In the description of FIG. 5B, inserting the sentence "The list of zones in the user
  interface 520 includes ALL the zones in the system, including the zones that are
  already grouped," which directly corresponds to a sentence on page 17 of "Appendix
  A" of the 2006 provisional.

Ex. 11 [2016 application, November 18, 2019 Response to Office Action), Ex. 12 ['885
application, August 23, 2019 Response to Office Action], Ex. 13 ['966 application, August 23,
2019 Response to Office Action], Ex. 14 [May 2019 application, June 4, 2019 Preliminary
Amendment].

Notably, Sonos first incorporated these amendments to the May 2019 application (which
issued as the '679 patent) that is not at issue in the present case, and then propagated the
amendments to the applications for the '885 and '966 patents and the 2016 application after that
time.  Ex. 11 [2016 application, November 18, 2019 Response to Office Action), Ex. 12 ['885
application, August 23, 2019 Response to Office Action], Ex. 13 ['966 application, August 23,
2019 Response to Office Action], Ex. 14 [May 2019 application, June 4, 2019 Preliminary
Amendment].

Sonos clearly and expressly laid these amendments out in the public file histories of the
applications along with the following statement:

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1
2
3
4
5

> In the present response, pursuant to 37 CFR 1.57(g), Applicant inserts material into the specification and figures that was previously incorporated by reference in this application, and the amendment contains no new matter.  In particular, the inserted material can be found at least at pp. 5-6 and 17 of Appendix A to provisional application 60/825,407, the entirety of which was incorporated by reference on the filing date of this application.

6
7        See, e.g., Ex. 12 ('885 Application, Aug 23, 2019 Response to Office Action) at pp. 4, 20.
8    This shows that Sonos put the examiner (and the public) on notice of the amendments, and the
9    examiner accepted those amendments without raising any concern regarding new matter.
10       Notably, the issue of priority date also came up two different times during prosecution of
11   the 2016 application, which was ultimately issued by the patent office as U.S. Pat. No. U.S. Pat.
12   No. 11,388,532 on July 12, 2022.  Ex. 15 (TX7213) [532 PATENT].
13       The first time was in 2018, when the examiner objected to Sonos's priority claim back to
14   the 2006 provisional and the other preceding applications based on the examiner's view that those
15   prior-filed applications did not provide adequate written description support for "the recited
16   display of a selectable indication of a zone scene which upon selection invokes the zone scene
17   onto the plural of playback devices."  Ex. 23 [2016 application, April 25, 2018 Office Action at
18   pp. 3-4].  In response, Sonos directed the examiner to "Appendix A" of the 2006 provisional as
19   providing written description support for this limitation and reiterated that the 2016 application
20   "should be afforded the September 12, 2006 priority date of the provisional application."  *Id.*,
21   [October 25, 2018 Response at pp. 24-25].  The Examiner agreed with Sonos, finding that
22   Sonos's "assertion of priority as resolving the subject matter in Pages 4-8 of the Appendix to the
23   Provisional Specification filed 9/12/06 is accepted and the priority date of the instant claims is
24   considered to resolve the 9/12/06."  *Id.*, [November 14, 2018 Office Action at p. 29]..
25       The second time was in 2020, when the examiner objected to Sonos's priority claim back
26   to the 2006 provisional and the other preceding applications based on the examiner's view that
27   those prior-filed applications did not provide adequate written description support for "the

28

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

1   claimed causing of 'selectable indications of the two or more zone scenes to be <u>simultaneously</u>

2   displayed, wherein the display selectable indications are each selectable to cause a respective one

3   of the two or more zone scenes to be invoked by the first <u>zone player</u>.'" Ex. 24 [2016 application,

4   August 6, 2020 Office Action at p. 3] (emphasis in original).   In response, Sonos once again

5   directed the examiner to "Appendix A" of the 2006 provisional as providing written description

6   support for this claim limitation, and specifically identified the figure from page 5 of "Appendix

7   A" that shows multiple "zone scenes" being displayed. *Id.*, [January 6, 2021 Response to Office

8   Action at p. 33].. Additionally, Sonos reminded the examiner that this subject matter from the

9   2006 provisional "was previously inserted in the specification and figures of the present

10   application [as FIG. 7], in accordance with 37 CFR 1.56(g), in Applicant's prior office action

11   response filed on November 18, 2019." *Id.*  The Examiner agreed with Sonos, finding that

12   Sonos's "remarks filed 1/6/21 are accepted by the Examiner and ***suffice to establish support*** for

13   the claimed subject matter in the prior filed parent case 60/825407 and ***afford the instant***

14   ***application an effective priority date of 9/12/06*.**"  Ex. 24 [2/3/2021 NOA (emphasis added)].

15   **E.      Sonos's Answer To The Court's Fifth Additional Question**

16        The Court asks: "Does the sentence added to column 10 of these specifications go to the

17   priority date for conception or to written description only? If written description only, then the

18   Google systems would not be prior art to the two patents-in-suit, true?"

19        The sentence in question does go to written description insofar as it is *one* part of the

20   disclosure that Sonos has cited in support of written description.  The question for written

21   description (of the patents in suit) is whether the specification *of those patents* provides adequate

22   written description.  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir.

23   2010) (en banc) (written description requires "an objective inquiry into the four corners of the

24   specification from the perspective of a person of ordinary skill in the art" to determine whether

25   the specification shows that "the inventor actually invented the invention claimed.")  So *even if*

26   the Court believes that this sentence is *necessary* for written description then the patents have

27   adequate written description.

28

1   The sentence should *not* have any relevance to a priority date challenge (even if Google

2   had made one before Friday).  As Sonos has pointed out above, everything it has relied on for

3   written description can be found in *either* the 2007 non-provisional or the 2006 provisional.  In

4   addition, even without the one sentence (from the 2006 provisional) the 2007 specification

5   provides adequate written description for the current claims.  The amendment to the specification

6   to add material from the provisional did not change the priority date of the claims.  The claims are

7   entitled to the earliest priority date in the chain, 35 U.S.C. §§ 119, 120, unless new matter is

8   added, 35 U.S.C. § 132.  Because the provisional application was incorporated by reference—

9   such that the provisional was "effectively part of the" specification as though it was "explicitly

10   contained therein," *ADS*, 212 F.3d at 1282, Sonos's amendment to the '885 and '966 specification

11   did not add any new matter.  It simply made explicit what was already "effectively part of the"

12   specification.

13   As a result, under any scenario, the Google systems would not be prior art to the asserted

14   patents.  Google has waived any challenge to a priority date later than 2006, and even if it were

15   2007, it would make no difference given Google's 2015 products.  Priority date is based on filing

16   date, not issuance or publication date, but even the 2013 date on which the provisional application

17   became publicly available, when the first nonprovisional patent in the chain issued, came before

18   Google's 2015 products.  But to be clear, there would be no legal basis for a priority date based

19   on issuance or publication rather than filing date, and Google hasn't even claimed a *2007* priority

20   date in this case, much less a 2013 date.

21   Moreover, Google has conceded and stipulated that Sonos's conception date of the '885

22   and '966 patents, which claim the "overlapping" concept, is in December 2005 and is based on

23   the business record UI specification.  Tr. Tran. 643:13-25.  Given that the 2006 provisional and

24   2007 nonprovisional include disclosure above and beyond the business record UI specification,

25   there ought to be no question that the provisional and nonprovisional adequately support the

26   claimed invention.

27

28

SONOS'S BRIEF RE PRIORITY DATE
AND WRITTEN DESCRIPTION
3:20-CV-06754-WHA

**F.**     **Sonos's Answer To The Court's Sixth Additional Question**

The Court states: "Please quote each place in this case (all the way back to day one in both actions) where either side represented to a court that the specifications of the two patents-in-suit were the same as the provisional application specification or the first non-provisional application specification."

Sonos has extensively searched to find any and all such representations.  The only such representations that Sonos has been able to identify came on May 10, 2023, which Sonos describes below.

- On May 10, 2023, the Court asked Sonos "I'm reading the one that happens to be '966 -- is that the same as what was published in 2005, or is this a brand-new -- brand-new specification?"  Tr. Tran. at 656:12-14.
    - Counsel for Sonos responded: "The specification was published in 2006, I believe, Your Honor, but it's a straight continuation and so it's the nearly identical specification from the original filing, yes."  Counsel for Sonos stated "It has an initial sentence in the very first that says this application claims priority to such and such an application. Other than that, no changes."  Tr. Tran. at 656:15-22.
- On May 10, 2023, counsel for Sonos asked Dr. Almeroth the following question:
    - "How do the '885 and '966 patents relate?"  *Id.* at 676:24.
    - Dr. Almeroth responded: "They are part of what's called a 'continuation chain.'  So they date back over time where patents were filed with the same specification and they have different sets of claims at the end.  But the description of the invention, what the specification is, the columns in it, the figures, that's all the same."  *Id.* at 676:25-677:5.
- Also on May 10, 2023, Sonos filed the Proffer of Testimony of Alaina Kwasizur, including a supporting declaration.  Ms. Kwazisur's declaration states that the '853 patent "shares a substantively identical specification to the zone patents at issue in

1     this case." Dkt. 705-1 at ¶ 8.  The Proffer similarly states that all of the zone scene

2     patents "share a substantively identical specification" and refers to "patents in the

3     zone scene patent family" as "patents that have the same specification as both of

4     the asserted patents in this case." Dkt. 705 at p. 3.

5      On May 11, 2023, however, counsel for Sonos informed the Court as follows:

6
7     I need to apologize for a clarification. You and I had a discussion yesterday about
    the specification in this case and whether it's the same, and I said it was the same,
    and that's true insofar as there's an incorporation by reference in the specification
8     to the provisional.

9     However, the specification has changed in slight ways as the applicant has amended
    the specification over the years to bring in things from the provisional, which is
10     perfectly permissible under Rule 57(g). I just thought I should bring that up.

11 Tr. Tran. at 748:6-16.

12

13 Dated:  May 14, 2023              ORRICK HERRINGTON & SUTCLIFFE LLP
                                     *and*

14                                      LEE SULLIVAN SHEA & SMITH LLP

15                                      By: */s/ Clement Seth Roberts*

16                                         Clement Seth Roberts

17                                    *Attorneys for Sonos, Inc.*

18

19

20

21

22

23

24

25

26

27

28