1   CLEMENT SETH ROBERTS (SBN 209203)
    croberts@orrick.com
2   BAS DE BLANK (SBN 191487)
    basdeblank@orrick.com
3   ALYSSA CARIDIS (SBN 260103)
    acaridis@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, CA 94105-2669
6   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
7
    SEAN M. SULLIVAN (*pro hac vice*)
8   sullivan@ls3ip.com
    J. DAN SMITH (*pro hac vice*)
9   smith@ ls3ip.com
    MICHAEL P. BOYEA (*pro hac vice*)
10  boyea@ ls3ip.com
    COLE B. RICHTER (*pro hac vice*)
11  richter@ls3ip.com
    LEE SULLIVAN SHEA & SMITH LLP
12  656 W Randolph St., Floor 5W
    Chicago, IL 60661
13  Telephone:    +1 312 754 0002
    Facsimile:    +1 312 754 0003
14
    *Attorneys for Sonos, Inc.*
15

16              UNITED STATES DISTRICT COURT

17           NORTHERN DISTRICT OF CALIFORNIA,

18                  SAN FRANCISCO DIVISION

19

20  SONOS, INC.,                          Case No. 3:20-cv-06754-WHA

21        Plaintiff and Counter-defendant,    Consolidated with
                                               Case No. 3:21-cv-07559-WHA
22        v.
                                           **SONOS, INC.'S BRIEF REGARDING
23  GOOGLE LLC,                            IFTTT**

24        Defendant and Counter-claimant.  Judge: Hon. William Alsup
                                           Courtroom: 12, 19th Floor
25                                         Trial Date: May 8, 2023

26

27

28

1    The Court should not strike Mr. Malackowski's opinions related to IFTTT.

2    Mr. Malackowski's IFTTT analysis is a reliable, relevant, and well-accepted methodology for

3    estimating a reasonable royalty.  As the Federal Circuit explains:

> [T]here may be more than one reliable method for estimating a reasonable royalty.
> *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL 2303, 2013 WL
> 5593609, at *30-40 (N.D. Ill. Oct. 3, 2013) (undertaking a detailed evaluation of
> the different methods proposed by the parties of valuing the patents at issue). For
> example, a party may use the royalty rate from sufficiently comparable licenses,
> **value the infringed features based upon comparable features in the
> marketplace**, or estimate the value of the benefit provided by the infringed
> features by a comparing the accused product to non-infringing alternatives. All
> approaches have certain strengths and weaknesses and, depending upon the facts,
> one or all may produce admissible testimony in a single case. It is common for
> parties to choose different, reliable approaches in a single case and, when they do,
> the relative strengths and weaknesses may be exposed at trial or attacked during
> cross-examination. **That one approach may better account for one aspect of a
> royalty estimation does not make other approaches inadmissible**.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) (emphasis added), *overruled

on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)

(presumption regarding means-plus-function claims).  Here, Mr. Malackowski "value[d] the

infringed features based upon comparable features in the marketplace," *id.*, and used that value in

his *Georgia-Pacific* analysis alongside other data points.

As Mr. Malackowski explained in his testimony on Friday, he used the hypothetical

negotiation framework to evaluate how much Google would be willing to pay Sonos to use the

patented invention.  5/12/23 Trial Tr. 1086:16-1087:15.  Mr. Malackowski considered the

competitive relationship between Sonos and Google, the value of the technology, the value of the

patents themselves, how Sonos and Google would share that value, and whether Google has

viable noninfringing redesigns for the patents.  *Id.* 1089:7-11.

As one part of that analysis, he "looked to see if there were other technologies that would

provide a similar benefit, and I looked to see if there was a nexus between those technologies in

both the benefits and the parties here."  *Id.* 1123:21-24.  Mr. Malackowski explained that IFTTT

is a "technology that allows you to group speakers."  *Id.* 1124:25-1125:1.  Specifically, in IFTTT

you can "group your speakers, save those groups, and invoke them later."  *Id.* 1125:13-14; *see*

1    *also, e.g.*, *M2M Sols. LLC v. Sierra Wireless Am., Inc.*, No. CV 14-1102-RGA, 2020 WL

2    7767639 at *18 (D. Del. Dec. 4, 2020) (allowing testimony based on "benchmark product [that]

3    has comparable functionality to the infringing features of the accused AirVantage software

4    system because it 'provides remote device management of a programmable device' such as the

5    Accused Products.").  Mr. Malackowski took the lowest sale price of the version of IFTTT that

6    provided a technologically comparable solution to the speaker grouping problem ($1.99 for the

7    "pro plan").  5/12/23 Trial Tr. 1126:1-1128:20; *see also* 5/16/23 Trial Tr. 1208:11-22.  And Mr.

8    Malackowski explained that Google would recognize that consumers will pay a monthly $1.99

9    fee for a product that *includes* comparable technology.  *Id.* 1129:5-12.

10          He then reduced that $1.99 by 90% in order to exclude the non-comparable functions of

11   that product.  *Id.* 1131:5-19.  More specifically, Mr. Malackowski noted that a consumer would

12   need to dedicate ***at least*** two (of the 20) multi-function applets provided by the "pro plan" to

13   create a comparable technological solution.  5/12/23 Trial Tr. 1131:12-19; 5/16/23 Trial Tr.

14   1218:25-1219:8.  Thus, he apportioned the *price* of IFTTT down by 90% so that it reflects the

15   number of applets necessary to produce a comparable technological solution to the one claimed

16   by the patents.[1]

17          Google has criticized this step by pointing out that the two applets could be *redeployed* for

18   some other purpose.  5/12/23 Trial Tr. 1146:8-18.  But as soon as someone did that, the saved

19   groups would disappear and they would therefore *lose* the comparable functionality.  Put

20   differently, in order to have functionality *comparable* to the functions provided by the patent

21   (which allows you to save speaker groups and then invoke them whenever you want) you would

22   have to *dedicate* two applets to that task.  So a consumer who wanted to use the features of

23   IFTTT that *provide* comparable technology would have to dedicate at least 10% of applets

24   provided by the pro plan to "solve" the problem of saving and later invoking speaker groups.

---

[1] He also noted that his methodology *started* from a place that excluded the vast majority of IFTTT functions – i.e., all of those functions that are available *without* paying for the pro plan. 5/12/23 Trial Tr. 1125:19-1126:8.  Put differently, because the consumer does *not* need to pay $1.99 for those features, they are *not part* of what the consumer gets in exchange for his or her money.  *Id.*

SONOS'S BRIEF RE IFTTT
3:20-cv-06754-WHA

Thus the "price" a consumer would pay to solve the problem addressed by the patents (admittedly in a less-good way) would be 10% of the $1.99 price of IFTTT.

But Mr. Malackowski did not stop there.  Using the hypothetical negotiation as a framework, Mr. Malackowski figured that Google would not agree to value the comparable technology at a $1.99 per month *every month*.  *Id.* 1129:5-12; *see Via Vadis, LLC v. Blizzard Ent., Inc.,* No. 1:14-CV-00810-LY, 2021 WL 5908599 at *2, *5 (W.D. Tex. Dec. 14, 2021) (approving of opinion where expert used later-adopted fee "calculated from the market value of a 'benchmark product.'").  Instead, in the hypothetical negotiation, he noted that Google would push for a per unit fee – which is exactly how Google gets paid when applications are sold in the Google Play store.  *Id.* 1091:14-18.  For this reason, Mr. Malackowski further *limited* the monthly recurring fee to the expected 2.5-year life of a smartphone.  *Id.* 1129:17-24.  And he did this for the speakers too, even though speakers last for many years longer than that.  *Id.*

Mr. Malackowski also reduced the royalty rate by 71% to account for the percent of households that have three or more speakers.  *Id.* 1132:1-7.  Although neither patent *requires* the presence of multiple speakers to infringe (*see, e.g.*, Dkt. 720, Sonos's Trial Brief Regarding Infringement Of The '966 Patent) by apportioning the price in this way Mr. Malackowski aligned his analysis to reflect the percent of the speaker-owning population most likely to find value in the *capability* provided by the patents.  5/12/23 Trial Tr. 1132:1-7.  As he explained, this was a reasonable approach within the framework of the hypothetical negotiation because it would reflect and account for Google's desire to pay for a capability only to the extent it would create value for its users.  *Id.*; *see Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2021 WL 242672 at * 7 (S.D.N.Y. Jan. 25, 2021), aff'd, 34 F.4th 1360 (Fed. Cir. 2022) (approving of expert opinion that "estimated a rate based on comparable products and estimated the number of users the parties would have anticipated").  By using the percent of the population that *already* owns three speakers, this approach errs in favor of Google because, as Mr. Malackowski explained, consumers who *don't yet* own three speakers would be excluded, even though they gain value from the capability provided by the patents insofar as (i) it provides extensibility to

1   those consumers who own fewer than three speakers and (ii) some portion of the excluded

2   population will buy more speakers in the future and thereby *realize* value in that way as well.

3   5/12/23 Trial Tr. 1132:8-21.

4          Once he had figured out the (apportioned, adjusted) *price* that consumers would pay for

5   comparable technology in the marketplace, Mr. Malackowski then figured out how much of that

6   price would flow to Google and how much would flow to Sonos.  Here, Mr. Malackowski used

7   the same 70/30 split that Google uses with all other technology providers in the marketplace.  *Id.*

8   1135:8-17.  Google has criticized this split on the grounds that, it believes, Google should receive

9   70% because – in the hypothetical negotiation Google would take the engineering cost and risk.

10  *Id.* 1157:8-17.  But Mr. Malackowski explained that Google has asserted that the *implementation*

11  of the claimed technology is straight forward and inexpensive – so Google cannot now claim that

12  that those costs would tilt the hypothetical negotiation in its favor and away from the split it uses

13  with other technology providers.  *Id.*

14         After determining the *amount* a user would pay and the *proportion* of that amount that (in

15  the hypothetical negotiation) the parties would agree would flow to Sonos, Mr. Malackowski

16  multiplied that royalty rate by the number of accused units.  *Id.* 1136:9-1137:14.  Google does not

17  appear to challenge these aspects of Mr. Malackowski's method.

18         Mr. Malackowski's testimony is supported by Dr. Almeroth's testimony describing the

19  technological comparability of IFTTT.  5/11/23 Trial Tr. 821:18-829:22; TX442 (Screenshots

20  Related to Testing of IFTTT App).  Dr. Almeroth showed that the IFTTT app comes preloaded

21  with Sonos and Spotify functions like "start" playback and "resume" playback.  TX442 at 3-4;

22  5/11/23 Trial Tr. 826:1-7, 924:6-9.  Using those preprogrammed functions, Dr. Almeroth created

23  his own applet that would save overlapping speaker groups, and then (when invoked) cause

24  playback to start on two speakers at the same time.  TX442 at 7; 5/11/23 Trial Tr. 826:8-828:24.

25         There has been some confusion about the ability of IFTTT to "synchronize" music

26  between two zone players.  *E.g.*, 5/12/23 Trial Tr. 1144:4-23.  If a user sets up a speaker group on

27  IFTTT, the speakers will start playing the same music at the exact same time.  5/11/23 Trial Tr.

28

SONOS'S BRIEF RE IFTTT
3:20-cv-06754-WHA

921:10-923:16.  The speakers will not, however, coordinate with each other to ensure that the music stays the same over time.  *Id.*  And over time, small variations in the physical hardware (particularly in the clocks) are likely to cause the music playing on the two speakers to drift slowly out of alignment with each other.  So, the IFTTT speaker grouping is useable but in certain use cases, it is not as good of a listening experience as the claimed invention.  5/12/23 Trial Tr. 1145:10-1146:7. But it is still a comparable technology.  *Id.* 1145:24; 5/11/23 Trial Tr. 822:4-18; *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("we have never required identity of circumstances" for economic or technological comparability).  Indeed, Google's expert, Dr. Schonfeld has opined that U.S. Patent 7,603,414 (in the Outland Research Agreement) is technologically comparable even though it involves technology to "jointly listen to the collaboratively selected musical media in *approximate* synchronicity."  TX2675 at 1.

The Court has also questioned whether anyone has used IFTTT to create speaker groups. The answer is that we don't know.  5/12/23 Trial Tr. 1146:19-1148:2.  We do know that IFTTT has ***premade*** speaker controls that work with Sonos speakers and which can be ***configured*** to perform the comparable functions by pressing a small handful of buttons; nothing remotely like writing code is required.  TX442 at 3-4; 5/11/23 Trial Tr. 826:1-7, 924:6-9.  Moreover, since a comparable, but better version of speaker grouping is offered by Google and by Sonos, it would not be surprising if only a small number of people have used IFTTT to group speakers.  5/12/23 Trial Tr. 1147:1-12; 5/16/23 Trial Tr. 1215:10-17.  Moreover, as noted above, the claims are directed to a capability, not to a method in which the amount of infringement depends on usage. Where method claims are at issue, it makes sense to apportion by usage data in order to account for the amount of infringement in the royalty base.  *E.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) (approving use of "a survey designed to estimate the amount of infringing use" of a method claim)  Here the amount of infringement is not a function of usage. But even if it were:

    1.  Sonos sought "information about 'however Google tracks when there are multiple speakers that could be grouped,' Google agreed to investigate.  We [e.g., Google,]

1    have been unable to locate such data."  Caridis Decl. Ex. 1 (May 17, 2022 Email

2    from J. Ma to A. Caridis).

3       2.   Sonos sent multiple interrogatory requests requesting usage data.  *See* Caridis

4           Decl. Exs. 2-3 (Requests For Production Nos. 22, 73, 74, 85).

5       3.   The information Google provided does not allow someone to know how many

6           unique users have configured saved groups or are invoking groups during the

7           damages time period.  Caridis Decl. Ex. 4 (1/13/23 Bakewell Rebuttal Rep.

8           ¶¶ 266-70 & Ex. 4.3).

9       And Mr. Malackowski did apportion by the percent of households that are currently in

10   position to obtain immediate value from the technology  -- which is an appropriate way to

11   apportion claims directed to *capability* rather than use.  5/12/23 Trial Tr. 1132:1-21.  Indeed,

12   because this apportionment *excludes* everyone who owns fewer than three speakers, and because

13   (from a legal perspective) the plaintiff *should* be able to charge a royalty for every infringing

14   device, this apportionment method reduces the royalty *more* than Sonos should have to.  To be

15   sure, it doesn't reduce the royalty as much as Google would *like* to.  But Google's alternative

16   vision as to the best factors to use in apportionment is a proper matter for cross examination.

17   *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020).  And given that

18   Google *did* cross examine on precisely this issue, it is one the jury can fairly evaluate and not

19   something that should give rise to exclusion.  5/16/23 Trial Tr. 1212:12-1213:10.

20       Google also questions the comparability of IFTTT to the Home App because IFTTT can

21   be used to do millions of different things.  *Id.* 1141:9-1142:24.  But one of Google's main themes

22   at trial is that *the Home App* can be used to do millions of different things.  *Id.* 1153:21-1154:9;

23   5/8/23 Trial Tr. 221:19-222:12 (Google's Opening Statement).  But the problem is that (as the

24   Court has noted) Google gives the Home App away for free.  So you cannot start with the Home

25   App and apportion *its* price to the technological footprint.  Instead, if you want to "value the

26   infringed features based upon comparable features in the marketplace" you have to start with

27   another application (like IFTTT) that has both a technologically comparable feature **and** a known

28

SONOS'S BRIEF RE IFTTT
3:20-cv-06754-WHA

1    market price and apportion down from there.  That is what Sonos did here, and there is nothing –

2    from either the perspective of economic logic, or the damages law of the Federal Circuit – that

3    makes the approach unreliable.

4         Indeed, as Sonos explained in its opposition to Google's motion in *limine* No. 1, Dkt. 607-

5    11, and at the pretrial hearing on that motion, 5/3/23 Trial Tr. 33:11-34:9, numerous cases

6    approve of similar methodologies to the one Mr. Malackowski employs in this case.  For

7    example:

8    ***Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014)**

9         Apple asserted a patent (the '949 patent) covering the use of finger contacts to control a

10   touchscreen on a computer.  *Id.* at 1294-95.  To value the '949 patent, Apple's damages expert

11   looked at the value of a comparable product—the "Magic Trackpad," which is a touchpad for use

12   with a computer instead of a mouse.  *Id.* at 1316.  After a technical expert opined that the Magic

13   Trackpad "includes features comparable to the claimed features," the damages expert then offered

14   opinions on how to isolate the value of the claimed features from the price of the Magic

15   Trackpad.  *Id.*  The damages expert eliminated (1) the value attributable to the Magic Trackpad's

16   wireless functionality and (2) additional touch features that were not included in the asserted

17   claims.  *Id.*  He then compared the remaining value to rates paid in other licenses for touchscreen

18   technology and the cost and acceptability of noninfringing alternatives.  *Id.* at 1316-17.

19        The district court excluded this opinion and the Federal Circuit reversed.  The Federal

20   Circuit explained that experts may use "comparable benchmark products" to value a patented

21   invention.  *Id.* at 1318.  Specifically, the Court approved of a methodology that "began with an

22   existing product containing features he contended were similar to the asserted features (the

23   Trackpad).  Next, [the damage's expert] attempted to isolate the value of these similar features by

24   valuing other, non-claimed features of the Trackpad and subtracting this value."  *Id.*  This

25   "estimate [of] what consumers will pay for the infringed features by evaluating what consumers

26   have actually paid for comparable features" adequately supported the expert's reasonable royalty

27   opinion.  *Id.* at 1319.  And to the extent Apple's expert had not identified "an accurate

28

7

1  benchmark, Motorola is free to challenge the benchmark or argue for a more accurate benchmark.

2  But such an argument goes to evidentiary weight, not admissibility, especially when, as here, an

3  expert has applied reliable methods to demonstrate a relationship between the benchmark and the

4  infringed claims." *Id.*

5  ***i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)**

6  i4i claimed "an improved method for editing documents containing markup languages like

7  XML." *Id.* at 840.  The patentee's damages expert "chose an appropriate 'benchmark'" by

8  selecting the retail price of a product called XMetaL as his starting point for a reasonable royalty.

9  *Id.* at 853.  He then discounted the retail price by Microsoft's profit margin and a 25% profit split

10  between i4i and Microsoft.  *Id.*  (The 25% "rule of thumb" was rejected the following year in

11  *Uniloc*, but that is not relevant here.)  Finally, the expert "adjusted the baseline royalty rate of

12  ($96) using the factors set out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.

13  1116, 1120 (S.D.N.Y. 1970)." *Id.*  The Federal Circuit endorsed this methodology, as well as its

14  application to the facts of the case.

15  As relevant here, the Court approved the use of XMetaL "as a benchmark" even though

16  "XMetaL has many additional features besides custom XML editing." *Id.* at 854.  The Court

17  explained:

18  As i4i's expert explained, the facts were drawn from internal Microsoft
documents, publicly available information about other custom XML editing
19  software, and a survey designed to estimate the amount of infringing use. Thus,
these facts had a sufficient nexus to the relevant market, the parties, and the
20  alleged infringement. While the data were certainly imperfect, and more (or
different) data might have resulted in a "better" or more "accurate" estimate in the
21  absolute sense, it is not the district court's role under Daubert to evaluate the
correctness of facts underlying an expert's testimony. [citation omitted]. Questions
22  about what facts are most relevant or reliable to calculating a reasonable royalty
are for the jury. The jury was entitled to hear the expert testimony and decide for
23  itself what to accept or reject.
24

25  *Id.* at 856.  Thus, the district court properly admitted the expert testimony on damages.

26

27

28

***Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283 (Fed. Cir. 2015)**

The claimed invention in *Summit 6* was a method of uploading pictures from a smartphone to another location.  The patentee's damages expert "started by estimating that the carriers pay Samsung $14.15 to include a camera component in Samsung's phones." *Id.* at 1296.  The expert used various survey and financial data to arrive at $14.15. *Id.* at 1297.  The expert then apportioned that $14.15 based on the percentage of customers who used the infringing method (20.8%), Samsung's profit margin, and application of the Nash Bargaining Solution to split the profits attributable to the infringing use. *Id.*  This "damages methodology was based on reliable principles and was sufficiently tied to the facts of the case." *Id.* at 1298.

The Court further rejected the argument that the testimony should be excluded because it "was not peer-reviewed or published." *Id.*  Because "the fact-based nature of [the expert's] damages testimony made it impractical, if not impossible, to subject the methods to peer review and publication," and because "[p]ublication ... is not a *sine qua non* of admissibility," the Court still found the testimony admissible and appropriate for the factfinder to resolve. *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)).

***Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350 (Fed. Cir. 2017); *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, No. 14-CV-62369, 2016 WL 9402395, at \*11-13 (S.D. Fla. May 3, 2016) (district court's *Daubert* opinion)**

The Federal Circuit agreed that patentee's damages expert could look to the price difference between products with infringing braking technology (OTAS) and a later product with a more desirable braking technology (iBR).  The damages expert "properly relied on the opinion of another Arctic Cat expert, Dr. Cuzzillo, who opined that OTAS and iBR are of comparable technological and safety value." 876 F.3d at 1369.  Thus, the value of the new "iBR" product was an appropriate "benchmark" to "serve as the basis for the jury's royalty award." *Id.*  Whatever differences existed between the claimed technology and the benchmark were "appropriately addressed through cross-examination" and not exclusion. *Id.* at 1370.  The district court thus properly admitted expert testimony "that the OTAS feature carries a monetary value equivalent to the iBR brake" as a basis for the reasonable royalty.  2016 WL 9402395, at \*11.

***M2M Sols. LLC v. Sierra Wireless Am., Inc.***, No. CV 14-1102-RGA, 2020 WL 7767639 (D. Del. Dec. 4, 2020), ***report and recommendation adopted***, No. 14-CV-01102-RGA, 2021 WL 7441706 (D. Del. Mar. 31, 2021)

In *M2M*, plaintiff presented a damages methodology based on "a third-party product offering, identified as the Soracom benchmark product." *Id.* at *18. The damages expert relied on "technical opinions to establish that the Soracom benchmark product has comparable functionality to the infringing features of the accused AirVantage software system because it 'provides remote device management of a programmable device' such as the Accused Products." *Id.* The expert "also evaluated Soracom's public product information to determine that the Soracom benchmark product uses the same protocol to support remote management of devices that may also be used in the Accused Products." *Id.* He then used "public pricing information from Soracom to determine that the upfront $1.00 per device cost 'is indicative of the market pricing of benchmark products that provide similar functionalities as those described' by the '717 patent." *Id.* The court found this "sufficient to establish the comparability of the allegedly infringing features in the Accused Products and the Soracom benchmark product, and testing the merits of the comparison is more appropriately addressed through cross-examination and the presentation of contrary evidence." *Id.* Thus, the court agreed that "a royalty can be reliably determined by valuing the infringing features based on comparable features in the marketplace." *Id.*

***Via Vadis, LLC v. Blizzard Ent., Inc.***, No. 1:14-CV-00810-LY, 2021 WL 5908599 (W.D. Tex. Dec. 14, 2021)

The patentee asserted patents on the operation of peer-to-peer networks, and claimed that "Blizzard infringed the asserted claims by using the BitTorrent Protocol." *Id.* at *1. The damages expert used "a royalty rate calculated from the market value of a 'benchmark product.'" *Id.* at *2. The benchmark products, "BitTorrent and µTorrent" were free at the time of the hypothetical negotiation, but were later offered for a fee. *Id.* at *5. The expert used the later fee, adjusted it based on technological apportionment, and then adjusted it for Blizzard's operating margin. *Id.* The district court allowed this methodology to go to the jury, because it

"identif[ied] comparable BitTorrent products in the marketplace, technically apportion[ed] to the '521 Patented features, and further apportion[ed] to account for Blizzard's costs." *Id.* "[T]o the extent the defendant found the comparison problematic, 'that is a line of attack more appropriately addressed through cross-examination.'" *Id.* (citation omitted).

***Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2021 WL 242672 (S.D.N.Y. Jan. 25, 2021), *aff'd*, 34 F.4th 1360 (Fed. Cir. 2022)**

In *Kaufman*, the "Plaintiff's damages expert, Brian Dies, estimated a rate based on comparable products and estimated the number of users the parties would have anticipated based on analysis of Google Trends. *See* Trial Tr. at 669:18-677:1, 680:3-686:16 (Dr. Shasha's discussion of the comparability of products used in Dies's analysis). Dies isolated the rate that would be attributable to the infringing function. *See, e.g.*, Trial Tr. at 785:13-23. Further, in applying discount rates, he took into account that the parties might expect a decline in users over time. Trial Tr. at 794:24-795:4. Defendant may take issue with these methods of estimation, but there was sufficient grounding in the evidence to permit the jury to make reasonable inferences rather than rely on speculation." 2021 WL 242672, at *7. The district court denied Microsoft's motion for a new trial on damages because "there was sufficient grounding in the evidence to permit the jury to make reasonable inferences rather than rely on speculation." *Id.*

\*   \*   \*

As shown above, Mr. Malackowski's overall analysis, and his IFTTT analysis in particular, was a reliable, relevant, and well-accepted methodology for estimating a reasonable royalty. The Court should instruct the jury that the jury should consider Mr. Malackowski's IFTTT opinions for whatever weight the jury believes they are entitled to in light of his testimony and Google's cross examination, and that the Court has no opinion on the amount of damages that should be awarded, if the patents are found valid and infringed. Google, of course, "is free to challenge the benchmark or argue for a more accurate benchmark. But such an argument goes to evidentiary weight, not admissibility." *Apple*, 757 F.3d at 1319.

1

2   Dated:  May 16, 2023

3

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

4

By: */s/ Clement Seth Roberts*

5               Clement Seth Roberts

6             *Attorneys for Sonos, Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SONOS'S BRIEF RE IFTTT
3:20-cv-06754-WHA