1   CLEMENT SETH ROBERTS (SBN 209203)
    croberts@orrick.com
2   BAS DE BLANK (SBN 191487)
    basdeblank@orrick.com
3   ALYSSA CARIDIS (SBN 260103)
    acaridis@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, CA 94105-2669
6   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
7
    SEAN M. SULLIVAN (*pro hac vice*)
8   sullivan@ls3ip.com
    J. DAN SMITH (*pro hac vice*)
9   smith@ ls3ip.com
    MICHAEL P. BOYEA (*pro hac vice*)
10  boyea@ ls3ip.com
    COLE B. RICHTER (*pro hac vice*)
11  richter@ls3ip.com
    LEE SULLIVAN SHEA & SMITH LLP
12  656 W Randolph St., Floor 5W
    Chicago, IL 60661
13  Telephone:    +1 312 754 0002
    Facsimile:    +1 312 754 0003
14
    *Attorneys for Sonos, Inc.*
15

16                  UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA,

18                   SAN FRANCISCO DIVISION

19

20  SONOS, INC.,                          Case No. 3:20-cv-06754-WHA
                                          Consolidated with Case No. 3:21-cv-07559-
21      Plaintiff and Counter-Defendant,  WHA

22  v.                                    **SONOS, INC.'S MOTION FOR
                                          JUDGMENT AS A MATTER OF LAW
23  GOOGLE LLC,                           UNDER RULE 50(a)**

24      Defendant and Counter-Claimant.   Judge: Hon. William Alsup
                                          Courtroom: 12, 19th Floor
25                                        Trial Date: May 8, 2023

26

27

28
                                          Sonos's Motion for Judgment as a Matter of
                                          Law at the Close of Google's Case
                                          3:20-cv-06754-WHA

## I.   <u>INTRODUCTION</u>

At the close of Google's case-in-chief, Sonos is entitled to judgment as a matter of law that Google infringes Sonos's patents and Sonos's patents are not invalid.  The Court agreed that this motion would be deemed made at the appropriate time.  5/17/23 Tr. at 1537:12-22.

## II.   <u>LEGAL STANDARD</u>

This Court may grant judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50(a) when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue."  Fed. R. Civ. P. 50(a)(1).  In other words, JMOL is proper "when the evidence presented at trial permits only one reasonable conclusion."  *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017) (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008)).  The evidence must be viewed in the light most favorable to the non-moving party.  *Id.* at 1204.

## III.   <u>ARGUMENT</u>

### A.   **Sonos is entitled to judgment on all of its infringement claims.**

#### 1.   **The new versions of the accused products directly infringe the '885 patent.**

Claim 1 of the '885 patent is drawn to capability; it uses "functional language" that does "not require[e] actual performance of th[e] operative steps for infringement purposes."  *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1372-73 (Fed. Cir. 2022).  Specifically, Claim 1 recites "a first zone player" (a smart speaker) with a network interface, processor, and "program instructions stored on the non-transitory computer-readable medium that, ***when executed*** by the one or more processors, cause the first zone player to perform functions comprising … ."  TX3 (emphasis added).  So proving literal infringement of Claim 1 requires only showing that the new versions of Google's accused products are "reasonably capable of satisfying the claim limitations, even though [they] may also be capable of noninfringing modes of operation."  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).  *See also* Dkt. 309 at 9 (citing *Finjan*, explaining "[t]his reasoning applies to our claim, which recites 'a nontransitory computer-

1  readable medium that, *when executed* by the one or more processors, cause the first zone player to

2  perform functions comprising . . . .").

3  The Court previously granted summary judgment of infringement of claim 1 of the '885

4  patent.  Dtk. 309.  Google's only non-infringement argument with respect to the '885 patent is

5  that the new versions of the accused products do not continue to operate in standalone mode as

6  required by claim 1.  Google offered no evidence that would allow a reasonable jury to find non-

7  infringement on that—or any other—basis.  Google's own fact witness testimony showed that the

8  speakers in Google's "redesign" still remain in standalone mode and are configured to playback

9  music individually until receiving a launch group message.[1]

10  Google's engineer, Mr. MacKay, admitted that a newly created static speaker group is not

11  automatically launched at the time it is created; and similarly the act of tapping "save" on the

12  Google Home app does not cause a new static speaker group to launch.  5/16/23 Tr. at 1278:7-14.

13  Mr. MacKay did testify about something he referred to as idle mode, but Mr. MacKay

14  admitted that even though a speaker is in "idle mode," it is still plugged in, powered on, with code

15  running on the device, the operating system running, the speaker available for selection by a user,

16  and still in a mode where the user can even adjust the audio volume level and individually output

17  audio.  5/16/23 Tr. at 1279:7-1281:10.  This is unequivocally a mode in which the device is

18  "configured to play back media individually."  Besides, Mr. MacKay's testimony cannot support

19  noninfringement because he did not perform any comparison of "idle" mode to the claims, and

20  acknowledged that he was not offering any opinion regarding infringement.  5/16/23 Tr. at

21  1274:15-17.  Indeed, the Court precluded Google's expert, Dr. Schonfeld, from advancing a

22  noninfringement argument based on "idle mode," and told the jury to disregard that part of his

23  testimony.  5/17/23 Tr. at 1400:11-13, 1400:15-17, 1415:24-1416:6.

24  Similarly, Mr. MacKay testified that the "redesign" still allows for static speaker groups.

25  5/16/23 Tr. at 1281:17-19.  Google did not make any changes to the Google Home app that runs

26  on the controller.  5/16/23 Tr. at 1282:2-5.  Similarly, Google did not make any changes to the

27  AddGroup function.  5/16/23 Tr. at 1282:12-21.  Mr. MacKay also testified that in a scenario in

28  _____
[1] As Sonos has explained, standalone mode does not require active playback of music.  Dkt. 733.

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-CV-06754-WHA

1   which there are two Google players, neither of which is engaged in active playback, and a user

2   creates a new static speaker group that includes those two players, the StopCurrentApp function

3   will not *cause* any change to the operational behavior of the player beyond running that function

4   itself.  5/16/23 Tr. at 1285:12-24, 1287:7-15.

5        Nor did Google offer any evidence that would rebut Sonos's affirmative evidence of

6   infringement of these limitations.

7        As Dr. Almeroth explained, "the idea of the StopCurrentApp that Google is proposing is

8   that if there is an app running that's playing music, then it will be stopped as part of group

9   creation."  5/11/23 Tr. at 799:14-17.  Explaining further, Dr. Almeroth noted "[a]nd so the person

10  who's putting the speaker into the group, if it's playing in standalone mode, will stop playing.

11  Now, it still stays in standalone mode, but it will stop playing music. If it wasn't playing music

12  and it was in standalone mode, then nothing changes about how that operates."  5/11/23 Tr. at

13  799:18-22.  Dr. Almeroth confirmed that in his own testing he observed "exactly those two

14  scenarios."  5/11/23 Tr. at 799:23-24.

15       As to the '885 patent, Dr. Almeroth explained that part of the claim requires "during the

16  creation process, the speakers have to remain in standalone mode throughout the creation of the

17  first zone scene and the second zone scene."  5/11/23 Tr. at 802:9-12.  As Dr. Almeroth put it,

18  "Google ties playing music and hearing audio to being in standalone mode or not. Google says if

19  you're not hearing music, then you're in some other mode and so you're not in standalone mode.

20  But the reality is the claim talks about two modes: You're either in group mode where you're

21  synchronized to play in group mode or you're not, you're in standalone mode."  5/11/23 Tr. at

22  802:16-22.  For that reason, Dr. Almeroth explained, "the fact that you stop playing audio as part

23  of group creation does not take that speaker out of standalone mode"; instead, "[i]t just stops the

24  ability to hear audio of what's already playing."  5/11/23 Tr. at 802:23-25.  And as Mr. MacKay

25  testified, if that speaker is not already playing, then the function StopCurrentApp doesn't do

26  anything.  In Dr. Almeroth's summary, Google's new version has a "very minimal" "impact on

27  the device," with "an impact on the user interface; but with respect to what's happening in the

28  source code, it's still operating in standalone mode."  5/11/23 Tr. at 803:3-6.

A reasonable jury would accordingly have no legally sufficient basis to find the new versions of the accused products do not continue to operate in standalone mode as required by claim 1 of the '885 patent, and the Court should grant Sonos's motion for judgment as a matter of law.

### 2. The prior versions of the accused products directly infringed the '966 patent.

Like Claim 1 of the '885 patent, the asserted claims of the '966 patent are capability claims.  TX1.  No reasonable juror could find that the prior versions of Google's accused products do not infringe the '966 patent.  The only basis Google offered for non-infringement of the '966 patent by the prior versions of the accused products is the argument that the accused products (in both prior and new versions) do not "cause storage" of speaker groups.

As described below, the jury has heard evidence from Google's own engineer, Ken MacKay, that Google's accused speaker groups are "***saved persistently***."  The jury also saw Google's internal technical document describing that "the ***group*** configuration is updated and ***stored*** in the prefs file on the device,"  TX6453 at p. 1 (emphasis added), and heard testimony from Dr. Almeroth, Sonos's technical expert, further corroborating this fact based on his review of Google's source code and his testing of accused products.

**Limitations 1.0-1.3** of Claim 1 of the '966 patent require a **[1.0]** "computing device" with **[1.1]** "one or more processors" and **[1.2]** "a non-transitory computer-readable medium" having **[1.3]** "program instructions" stored thereon that, "when executed by the one or more processors, cause the computing device to perform" the functions recited in Claim 1.  **Limitation 1.4** requires (in part) that each Accused Controller is programmed, via a Cast-enabled App, with the capability that "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players …."

There is no real dispute that each Accused Controller is a computing device that includes one or more processors.  As Dr. Almeroth explained, Claim 1 of the '966 patent requires a device with a processor that has memory for storing instructions to perform certain functions of a controller.  5/11/23 Tr. at 771:6-14.  Dr. Almeroth testified that any device with the Google Home

1   app meets these requirements, because the Google Home app could not be used on a device that

2   lacked a processor or memory to store the app: "if you don't have a processor, your smartphone is

3   not going to do anything.  If you don't have the kind of memory to store the app, then you can't

4   store the app and you can't run the app.  So there are requirements for using the Google Home

5   app on a device, and those are the things that are included in the claim that are required by the

6   claim." *Id.* at 771:19-772:2.  Dr. Almeroth noted that it is his "understanding that Google is not

7   contesting that" these "limitations are met for the '966 patent." *Id.* at 772:13-17.

8        Dr. Almeroth testified that he tested the accused products to determine whether

9   installation of the Google Home app infringes claim 1 of the '966 patent and based on that testing

10  concluding that limitations "**1.0, 1.1, 1.2, 1.3**, and the first part of **1.4** – were met by the Google

11  Home app installed on the device."  5/11/23 Tr. at 770:3-19.

12       Dr. Almeroth next explained that Claim 1 of the '966 patent also requires a set of claim

13  limitations (i.e. the second half of **Limitation 1.4 through 1.9**) that "relate to setting up the

14  speaker groups, the accused speaker groups, and then being able to send a request based on the

15  request to set up the group causing creation of the zone scene or speaker group, causing an

16  indication to be sent to the player, and then also causing storage of the zone scene. You have to

17  do that twice for two different zone scenes."  5/11/23 Tr. at 772:18-25.

18       Dr. Almeroth explained Limitation 1.5's requirements in detail:

19   [I]n limitation 1.5, the zone scene that gets created includes at least a first zone
     player and a second zone player.
20
     And then in the second zone scene that gets created, it includes at least the first
21   zone player and a third zone player.

22   So what that means is you have the first zone scene that includes 1 and 2 and the
     second zone scene that includes 1 and 3.
23
     And so this is sometimes called the overlapping requirement, that the claim
24   requires the ability to have zone scenes with overlapping membership.  And this
     was a requirement both for the '966 patent claims that are asserted and also the
25   '885 patent, claim 1, that was found to infringe subject to validity.

26  5/11/23 Tr. at 773:5-774:2.

27       Dr. Almeroth testified that he tested the accused products to determine whether the

28  Google Home app infringes claim 1 of the '966 patent.  5/11/23 Tr. at 770:3-19; 774:6-10.  Dr.

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-cv-06754-WHA

Almeroth explained that "with respect to the accused products, [he] did some testing and there were a number of screenshots that were taken to memorialize the testing that [he] did, and so there's an exhibit with a bunch of these screenshots in them." 5/11/23 Tr. at 774:6-13. Dr. Almeroth confirmed that TX441 includes "about 90 pages of screenshots that show all sorts of different functionality that [he] looked at and took screenshots of" when testing the Google Home app and the speakers. 5/11/23 Tr. at 774:14-20. Dr. Almeroth explained that the screenshots of his testing show, for example, "group creation … from the testing that [he] oversaw," including "a hand being able to select from among the different speakers that are there, in this case kitchen and master bedroom.  And then the image on the right shows after that selection." 5/11/23 Tr. at 776:16-777:3.  The testing screenshots also show "[t]hen that speaker group can be named, in this case morning, and then you can -- in the lower right you can click on the 'save' button to save that speaker group." 5/11/23 Tr. at 777:4-6.  The testing screenshots further "show[] a second speaker group that's being created and saved. [They] show[] that in the accused products you can also select kitchen and living room, you can give it the name for evening, and you can also click on 'save.'" 5/11/23 Tr. at 777:8-12.  As Dr. Almeroth explained, "one of the characteristics of the testing across these two demonstratives is, in the first one -- so I'm going to go back to the previous slide -- it shows kitchen and master bedroom.  So kitchen is in zone scene 1 and then it's also in zone scene 2 for evening.  So that shows the concept within the Google accused products of having overlapping groups." 5/11/23 Tr. at 777:13-18.  Google's engineer Mr. MacKay also confirmed that a Google audio player that supports static groups can be a member of multiple static groups.  5/16/23 Tr. at 1275:22-25.

Dr. Almeroth also explained to the jury that in addition to testing the "user interface" and functionality of the accused products, "there's also some technical documents and source code that we can look at." 5/11/23 Tr. at 778:6-11.  Dr. Almeroth explained that TX78 "is some of the source code from the Google devices.  It's marked as highly confidential because it's the actual instructions that would run on the device." 5/11/23 Tr. at 781:13-16.  As Dr. Almeroth noted, one of the functions within the source code is to "'create group.'" 5/11/23 Tr. at 781:23-782:4.  *See also* TX78 at SC-GOOG-SONOSNDCA-000145.  Dr. Almeroth explained "before this create

1    group function, there is a comment that says 'creates a new multizone group' and it includes some

2    of the information that's required to create one of these groups." 5/11/23 Tr. at 782:8-11. *See*

3    *also* TX78 at SC-GOOG-SONOSNDCA-000145. In addition to "the function name here, create

4    group," and "the comment that [he] was pointing to earlier that describes that you're creating a

5    new multizone group," "this function or method calls the create or update group, and so there's a

6    second page of source code that starts to get into some of the details of that." 5/11/23 Tr. at

7    783:25-784:8. *See also* TX78 at SC-GOOG-SONOSNDCA-000145-46.

8        Going into more detail on the source code, Dr. Almeroth noted that:

9        [T]he point here is, again, there's a comment "create a new multizone group" or
10       "add new devices to an existing group." You see the "create or update group,"
         and this is … some of the functionality here. For example, here you create a
11       device connection. So that would be a connection to the device to be able to
         exchange information with it.

12       5/11/23 Tr. at 784:9-16. *See also* TX78 at SC-GOOG-SONOSNDCA-000146.

13       Dr. Almeroth also testified regarding TX6453, which is "an internal Google document

14   that starts to describe some of the detailed functionality for how the speaker group setup is to

15   work." 5/11/23 Tr. at 784:23-785:2. *See also* TX6453. As Dr. Almeroth explained, TX6453

16   shows "the mechanism for how groups are set up," "us[ing] something called cast V2

17   commands." 5/11/23 Tr. at 785:15-18. *See also* TX6453 at p. 1. As TX6453 shows, "[i]t allows

18   the Google Cast app to configure groups" and "[i]n this case the Google Cast app would be the

19   Google Home app that's running on the phone." 5/11/23 Tr. at 785:18-20. *See also* TX6453.

20   TX6453 says that "[w]henever one of these commands arrives, the group configuration is updated

21   and stored in the prefs file on the device." *Id.* at p. 1; 5/11/23 Tr. at 785:20-23. Dr. Almeroth

22   contextualized this statement, explaining "[s]o here what it's talking about is the group creation

23   … that happens as a result via the user interface, selecting the speakers, grouping them together,

24   and pressing 'save.'" 5/11/23 Tr. at 785:24-786:2. As Dr. Almeroth further explained, "[t]here is

25   a message that's sent to the player, and it stores the group configuration information in the prefs

26   file on the device," which "gets more into the specific steps beyond just the user interface of what

27   happens when you create a group, and then the messages that get sent between the controller and

28   the smart speakers." 5/11/23 Tr. at 786:3-9.

Dr. Almeroth explained that with respect to **Limitations 1.4 through 1.9**, he only understood Google to dispute that one aspect—which "shows up in two limitations"—is met by Google's accused products.  5/11/23 Tr. at 786:20-787:5.  Those limitations are "causing storage of the first zone scene and causing storage of the second zone scene."  5/11/23 Tr. at 787:6-8.

Google expert, Dr. Schonfeld, admitted that while he interprets "storage" to mean "persistent storage," the claim "just talks about storage."  5/17/23 Tr. at 1469:2-11.  Dr. Schonfeld similarly testified that the claim does ***not*** say that the zone scene is stored in nonvolatile memory, and "[n]onvolatile memory is one way you can do storage, but you don't have to to meet this claim."  5/17/23 Tr. at 1469:12-15.  Dr. Schonfeld admitted that a person of ordinary skill in the art would understand that memory can include nonvolatile memory: "That's right. As long as it[']s persistent, you can store persistently nonvolatile memory."  5/17/23 Tr. at 1472:10-13; *id.* at 1473:16-20.

Dr. Almeroth testified that he had considered Dr. Schonfeld's storage argument, but that did not "change [his] opinion" because Google was "reading additional requirements into the claims with respect to what's required of storage; and when you consider what the claims actually say, [he] believe[s] that those limitations are met."  5/11/23 Tr. at 787:9-18.

As Dr. Almeroth explained, the claims actually say, for example, "causing storage of the first zone scene"—"that's the extent of the limitation in claim 1 of the '966 patent."  5/11/23 Tr. at 787:19-22.  Dr. Almeroth opined that based on the evidence he has seen regarding the system operation, Google's products meet that requirement.  5/11/23 Tr. at 787:23-788:1. Dr. Almeroth explained the basis for that opinion.  For example, looking at TX6453, Dr. Almeroth noted that "[i]t says right here in this document [as read]: '[t]he group configuration is updated and stored in the prefs file on the device.'"  5/11/23 Tr. at 788:2-10.  *See also* TX6453 at p. 1.  As Dr. Almeroth explained, "[t]hat's pretty much it. The information about the group is stored on the players, and so that would be sufficient to meet the requirements of the claim."  5/11/23 Tr. at 788:11-13.

Dr. Almeroth further explained that this conclusion was bolstered by the testimony of Google employee Ken MacKay.  5/11/23 Tr. at 788:14-789:14.  And the jury heard Mr.

1    MacKay's testimony directly.  Mr. MacKay was asked "just to clarify, you agree that a speaker

2    group is something that is saved by a user in advance of being launched?"  Ex. 1 at 11; Ex. 2 at

3    117:17-19.  Mr. MacKay testified: "Well, again, the -- the group might never be launched.  Like

4    you might never cast to the group.  So it's -- I would characterize it as -- a static group is

5    something that the user configures and it's **saved persistently**."  Ex. 1 at 11; Ex. 2 at 117:20-24

6    (emphasis added).[2]

7           As Dr. Almeroth explained, this testimony tells us that a Google speaker group is "saved

8    persistently."  5/11/23 Tr. at 789:11-12.  In other words, "[t]he claim says that you have to cause

9    storage.  One of the ways to do that is to save it for a period of time, to save it persistently."

10   5/11/23 Tr. at 789:12-14.  Dr. Almeroth testified that he observed other Google source code that

11   shows storing as well, noting "[t]here's other source code that goes through the process of what

12   the document describes as storing the configuration in the prefs file, and so that is certainly

13   present in the source code."  5/11/23 Tr. at 789:15-20.  And Dr. Almeroth directly observed

14   storing in his testing, explaining "I mean, you can do it from the perspective of a user where you

15   click on save and that group is saved, and you can come back later and that group still exists.

16   And so you've caused storage of that group as required by the '966 patent."  5/11/23 Tr. at

17   789:21-25.

18          As Dr. Almeroth explained to the jury, **Limitations 1.10** and **1.11** are "a display

19   requirement with respect to displaying both the first and second zone scene."  5/11/23 Tr. at

20   773:1-3.  Google does not dispute that either of these limitations are met.  5/11/23 Tr. at 790:13-

21   16.  Dr. Almeroth summarized these limitations as requiring that "while you're displaying the

22   first and second zone scene, there's a third request to invoke the first zone scene; and then based

23

24   ------
     [2] For avoidance of doubt, Mr. Mackay's testimony was referring to *Google* speaker groups and
     static groups.  *See, e.g.*, Ex. 1 at 3-4; Ex. 2 at 57:4-10 (Q: "What is a 'speaker group' as Google

25   uses that term? A: I would describe it as a set of devices that appears as a castable -- as a Cast
     target.  And when casted to, they all play together – specifically -- specifically audio."); Ex. 1 at

26   4; Ex. 2 at 63:1-8 (Q: "What is a 'static group'? A: So that is a group that the user defines using
     the Google Home app, I think, is the only way. So they define a group, and then that group

27   becomes a castable target."); Ex. 1 at 4-5; Ex. 2 at 63:9-16, 63:19 (Q "And how does a 'static
     group' compare to what is referred to as a 'speaker group' in Exhibit 36?  A: Let me go back.

28   So a 'static group' is what is being referred to in -- in this document, 'Create and manage
     speaker groups,' I think. … Yeah, that's accurate.").

1    on that third request, causing the first zone player to transition from standalone mode to the

2    requirements of operating in group mode.  And I won't read all of what's in the claim, but it's

3    essentially going from standalone mode to group mode."  5/11/23 Tr. at 790:4-12.

4         Dr. Almeroth showed the jury screenshots of his testing of the accused products, and

5    explained what one screenshot showed: "And so on this last one PDX2.38, this is getting to the

6    last requirement of the blue group where you have a display showing the first and second speaker

7    groups or zone scenes.  And so the evening and morning that were just created are displayed on

8    the screen and can be selected for invocation."  5/11/23 Tr. at 777:19-24; Ex. 3 at PDX2.36-2.38.

9         Dr. Almeroth walked through his testing screenshots for the jury in further detail.

10   Showing the jury screenshots from TX441 at pp. 7, 11, Dr. Almeroth explained that "[w]hat's

11   shown on the left side is selecting morning, and what happens with morning after it's been

12   selected is it shows that now that speaker group has been activated or invoked; and so those

13   kitchen and master bedroom are operating in a mode where they can play out music

14   synchronously if that's what is desired."  5/11/23 Tr. at 790:17-791:3; Ex. 3 at PDX2.36.  At the

15   start of this functionality, he testified, the players "looked to be in standalone mode."  5/11/23 Tr.

16   at 791:4-6.

17        For all of the above reasons, Dr. Almeroth concluded that installation of the Google Home

18   app on a computing device infringes claim 1 of the '966 patent, because all of the limitations are

19   met.  5/11/23 Tr. at 791:7-20.

20        Dr. Almeroth also showed that Google's products infringe the asserted dependent claims

21   of the '966 patent.  With respect to Claim 2, Dr. Almeroth explained, it "essentially requires is

22   that while that first zone player is configured to coordinate with the second zone player that that

23   first zone scene is invoked, that there's a fourth request to invoke the second zone scene."

24   5/11/23 Tr. at 792:8-11.  Based on the testing, screenshots, source code, and other evidence that

25   Dr. Almeroth considered, he testified that he believed these limitations are all met.  5/11/23 Tr. at

26   792:23-793:3.  With respect to Claim 4, Dr. Almeroth explained that for, *e.g.*, "zone players 1 or

27   2" the zone scene "can be stored on one or more of those zone players."  5/11/23 Tr. at 793:23-

28   24.  Specifically, the "evidence that I focused on for claim 1 showed that it was actually stored on

the player." 5/11/23 Tr. at 794:3-6.  He elaborated that "that one exhibit that we looked at where it talked about storing on the prefs file, that's stored on the prefs file of the zone player that's in the group." 5/11/23 Tr. at 794:6-9.  *See* TX6453 at p. 1.  As Dr. Almeroth explained, Google disputes that this limitation is met for the same reason Google disputes that the storage limitation of claim 1 is met.  5/11/23 Tr. at 794:10-16.

With respect to Claim 6, Dr. Almeroth explained that it claims "the idea where that first zone scene, the first predefined group, does not include the third zone player and the second predefined group does not include the second zone player." 5/11/23 Tr. at 794:17-23.  Dr. Almeroth explained that "[t]his is saying that the groups can't be exactly the same" and reminded the jury that "claim 1 was group 1 was [players] 1 and 2 and group 2 was [players] 1 and 3." 5/11/23 Tr. at 794:24-795:1.

With respect to Claim 8, Dr. Almeroth explained that "Claim 8 goes more to the mechanism by which the first and second request to create the zone scenes come from, and it's based on receiving a first set of one or more inputs via a user interface on the computing device.  And then the same thing for the third request for invocation. So these come through inputs via user interface.  So it narrows the claim with respect to where those inputs can come from." 5/11/23 Tr. at 795:9-17.  Dr. Almeroth explained that "[b]ased on the screenshots and the Google Home app, when you go to create the groups, those are via one or more inputs via the user interface of the computing device," so that "evidence that I showed already shows that the additional limitations of claim 8 were met." 5/11/23 Tr. at 795:22-796:3.

As shown above, the prior versions of Google's accused products were "reasonably capable of satisfying the claim limitations" and infringe the claims.  *Finjan*, 626 F.3d at 1204.  As Sonos has explained, Dkt. 720, proving direct infringement of capability claims does not require showing "actual use" of the accused products' infringing capability.  *Tex. Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1327 (Fed. Cir. 2018).[3]

---

[3] Sonos maintains that these claims do not require a zone player networked with three speakers and are met by a computing device installed with the Google Home App.

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-cv-06754-WHA

Accordingly, a reasonable jury would have no legally sufficient basis to find that the accused products (in both prior and new versions) do not "cause storage" of speaker groups.

### 3. The prior versions of the accused products indirectly infringed the '966 patent.

Sonos showed that Google both induced infringement of the '966 patent with the prior versions of the accused product and contributorily infringed by offering the Google Home app for installation on internet-connected computing devices.

Induced infringement requires that Google: (1) "took certain affirmative acts to bring about the commission by others of acts of infringement"; and (2) "had 'knowledge that the induced acts constitute[d] patent infringement.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011)). Contributory infringement requires that: (1) Google had "knowledge of the ['966 patent]," (2) Google had "knowledge of patent infringement," and (3) the prior versions of Google's accused products were not common components suitable for non-infringing use. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). Willful blindness can satisfy the knowledge element. Willful blindness develops when the defendant "subjectively believe[s] that there is a high probability that a fact exists" and "take[s] deliberate actions to avoid learning of that fact." *Glob.-Tech*, 563 U.S. at 769.

Here, no reasonable juror could find that Google did not induce infringement of the '966 patent. Google admits that it had knowledge of the '966 patent. 5/12/23 Tr. at 996:16-998:20 (Google Resp. to Rog. 1). Ms. Kwasizur further testified to Google's knowledge and Sonos's disclosure of Google's infringement. 5/12/23 Tr. at 1025:6-22; 1042:3-10; 1044:15-1045:7.

Sonos's evidence showed that Google took active steps to induce infringement. Google encourages people to install the Home App on their computing devices—in fact, it is required to operate Google's speakers. And Google encourages people to use the accused functionality to create speaker groups. Google's senior product engineer Christopher Chan testified, for example, that "[w]hen setting up a smart speaker, there is a quick-start guide in the packaging that instructs users to set up and download the Google Home app. And then in addition to that, when they plug

1    in a speaker, the Google assistant's voice also instructs users to download the Google Home app."

2    Ex. 4 at 9-10, Ex. 5 at 90:16-18, 90:22-91:2; *see also*, *e.g.*, Ex. 4 at 10, Ex. 5 at 91:15-16, 91:19-

3    21.  Mr. Chan also confirmed that users are ***required*** to have "[a]ccess to the Home app" in order

4    "to set up a Google smart speaker" and that "[t]he Google Home app is required to create a static

5    speaker group."  Ex. 4 at 10, Ex. 5 at 91:3-5, 91:8-9, 91:10-11, 91:13-14.  Similarly, Mr. Chan

6    testified that Google provides instructions to customers on how to create multizone groups of two

7    or more speakers.  5/17/23 Tr. at 1530:7-10.  And as Mr. Chan testified, TX6353 is a blog post

8    that he wrote in approximately October 2019.  5/17/23 Tr. at 1531:7-20.  That blog post

9    encourages users to "set up a speaker group in the Home app," among other things.  TX6353 at

10   p. 1.

11          Tomer Shekel, a Google product manager for "the Google Home product," and "multi-

12   room speaker playback" also confirmed that "you needed to have the Google Home app" in order

13   to set up speaker groups.  Ex. 6 at 2, 6; Ex. 7 at 7:11-14, 14:7-13, 16:8-22, 140:3-15.

14   Similarly, the jury heard testimony and saw evidence establishing as a matter of law that the

15   Google Home app—and the specific accused programming within it—is a material component of

16   infringing devices and is not a staple article or commodity of commerce suitable for substantial

17   non-infringing use because the only possible use for this software component is to be installed

18   and run on infringing computing devices.  As the Federal Circuit explained in *Lucent*

19   *Technologies*, a software seller can be liable for contributory infringement even if the software

20   includes some noninfringing features or tools within the infringing software.  *Lucent Techs., Inc.*

21   *v. Gateway, Inc.*, 580 F.3d 1301, 1320-21 (Fed. Cir. 2009).  Instead, the "particular tool" or

22   "feature" within the software is what must be analyzed for to determine if it is "suitable only for

23   an infringing use."  *Id.*  As in *Lucent*, there is no noninfringing use of the accused feature.

24          Second, because the asserted claims are directed to capability and not actual use or

25   performance, actual execution of software functionality is not required.  *See Finjan*, 626 F.3d at

26   1204; *Tex. Advanced Optoelectronic Solutions*; 895 F.3d at 1327.  Infringement occurs as soon as

27   the software component is downloaded to and/or installed on the computing device.

28

Sonos's Motion for Judgment as a Matter of
Law at the Close of Google's Case
3:20-cv-06754-WHA

Google also had notice of the '966 patent and knowledge that its acts were causing infringement of the '966 patent.  Sonos's general counsel, Alaina Kwasizur, testified that Sonos provided notice to Google of the '966 patent on September 28, 2020, in an email "from me to some folks at Google, including Mr. [Tim] Kowalski, … on September 28th notifying them that we would be filing a complaint alleging infringement of the '966 patent on the next day."  5/12/23 Tr. at 1025:6-20; *see also id.* at 1041:6-13; TX6130.

Sonos provided Google with detailed, element by element, analysis of how Google's products infringe the '966 patent.  TX6136 ¶¶ 70-73, 117-129.  As the Court instructed the jury, this draft complaint is "proof that notice of what Sonos was alleging was given one day prior to the lawsuit."  5/12/23 Tr. at 1044:5-13.  *See also id.* at 1051:13-16 ("The only reason I'm allowing this document into evidence is to show that Google was at least aware of the patents in suit by -- at the time they filed this lawsuit."); *id.* at 1051:23 ("it goes to the issue of notice of the patents").

Ms. Kwasizur explained to the jury that "[t]his is a claim chart which is laying out the claims of the '966 patent and how they're infringed by the Google products."  5/12/23 Tr. at 1044:22-1045:1.  Ms. Kwasizur told the jury that this claim chart formed a part of the draft complaint that Sonos sent to Google on September 28, 2020, explaining "[o]n the left you can see sort of the elements of the claim mapped out, and then on the right you can see what Sonos was purporting to be the evidence of the infringement."  5/12/23 Tr. at 1045:2-7; *see also* TX6136 ¶¶ 70-73, 117-129.

Google undisputedly received notice of infringement of the '966 patent on September 28, 2020—but Google also filed the declaratory judgment action that kicked off this case on that same day.  Dkt. 1; TX8240.  Under Rule 11, by presenting its declaratory judgment complaint to the Court, Google's counsel represented that the factual contentions contained therein had evidentiary support, to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances.  Fed. R. Civ. P. 11(b).  In order to comply with Rule 11, this inquiry would have taken weeks, if not months.  5/11/23 Tr. at 720:1-10 ("There's a thing called Rule 11 of the Federal Rules of Civil Procedure. I can read it to you here, but it says

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-cv-06754-WHA

this: You can't file a lawsuit, you cannot file a lawsuit in federal court unless you are certifying

that you -- you have read it and there is a good faith basis for everything in there. Now, it takes

weeks -- it would take weeks of work for Google to have analyzed those products in those patents

in order to decide -- to be able to be in a position to say 'We don't infringe or they're invalid.'").

In Ms. Kwasizur's words, Google responded to the notice of infringement of the '966 patent by

going "to California court and fil[ing] their own declaratory judgment action saying that they did

not infringe the '966 patent that same day." 5/12/23 Tr. at 1045:12-17. Ms. Kwasizur also

explained that Sonos's draft complaint mentioned other patents, including the '206 patent, which

was "another patent relating to zone scenes." 5/12/23 Tr. at 1046:6-25. As she noted, the '206

patent involved "similar technology." 5/12/23 Tr. at 1047:7-13; *see also id.* at 1056:24-1057:9.

The jury also heard from Google's in-house Senior Counsel Timothy Kowalski. The jury

first heard generally about Mr. Kowalski's knowledge of Sonos, before hearing more specifically

from Mr. Kowalski regarding Google's receipt of Sonos's claim charts for the '966 patent. More

generally, Mr. Kowalski testified that he has used Sonos products since 2015/2016, and testified

that Sonos and Google were competitors in the "premium speaker market at one point in time."

Ex. 8 at 2-4; Ex. 9 at 18:14-15, 18:20-23, 19:4-6, 59:19-60:16. Mr. Kowalski was asked whether

Google has ever tracked Sonos's patents, whether Google has ever done any searches for Sonos

patents, whether Google ever attempted to locate family members of Sonos patents, and whether

Google made an effort to learn when Sonos filed new patents, and in response to each question

declined to answer on grounds of privilege. Ex. 8 at 4-5; Ex. 9 at 65:9, 65:16-17, 66:5-6, 66:9-11,

66:13-14, 66:17-22, 66:25, 67:1. Mr. Kowalski acknowledged that Google's declaratory

judgment complaint in this case was filed on September 28, 2020, and signed by Google

attorneys, "seeking a declaratory judgment of noninfringement of the '966 patent." Ex. 8 at 5-6;

Ex. 9 at 86:23-24, 87:4-5, 87:7-10, 87:13-15, 87:17-88:3, 88:12-19, 89:8-10, 89:12-14.

Google has presented no facts to rebut Sonos's evidence that Google knew about Sonos's

'966 patent and Google's infringement well before commencement of this lawsuit. Thus, the

Court should reject Google's noninfringement claim as a matter of law and grant JMOL to Sonos

that Google indirectly infringed the '966 patent with the prior versions of the accused products.

### 4. The new versions of the accused products directly infringe the '966 patent.

Google's only non-infringement arguments with respect to direct infringement of the '966 patent by the new versions of the accused products are (1) that the products do not "cause storage" and (2) that the products do not continue to operate in standalone mode.  For the reasons discussed above as to both the '885 and '966 patents, Google has offered no legally sufficient basis from which a reasonable jury could find in Google's favor on either of those questions.  As an initial matter, Google did not make a single change to the source code or operation of the Home App between the old and "new" versions of its product.  The only change was one line of source code on the speakers.  So there is no "redesign" at all.

Besides, Google offered no legally sufficient rebuttal to Sonos's affirmative evidence regarding standalone mode specific to the '966 patent.  For example, with respect to claim 1 of the '966 patent, Dr. Almeroth explained that Google believes that there's a requirement, based on limitation 1.4's reference to "operating in standalone mode," that *each* step of limitations 1.6 through 1.9 must happen while the device *continues* to operate in standalone mode.  5/11/23 Tr. at 803:18-25.  But while "continuing to operate in standalone mode" *is* part of the requirements of claim 1 of the '885 patent, that "language does not exist in the '966 patent."  5/11/23 Tr. at 804:1-9.  And even if it *were* a requirement of the '966 patent—which Sonos disputes—Google's new versions still infringe, because, as Dr. Almeroth explained, while Google's new version "might stop the play out of music," it "does not take the device out of standalone mode…. And just because a person stops hearing music doesn't mean that it's left standalone mode."  5/11/23 Tr. at 804:10-20.  As this change does not affect the additional requirements of claims 2, 4, 6, and 8 of the '966 patent, all of those claims are still infringed under the new version as well.

Thus, the Court should reject Google's noninfringement claim as a matter of law and grant JMOL to Sonos that the new versions of Google's accused products directly infringe the '966 patent.

5.  **The new versions of the accused products indirectly infringe the '966 patent.**

For the same reasons that Google's claim of no indirect infringement for the prior versions of its products fails, its claim of no indirect infringement for the new versions also fails.  Thus, the Court should reject Google's noninfringement claim as a matter of law and grant JMOL to Sonos that Google indirectly infringes the '966 patent with the new versions of the accused products.

6.  **Sonos established Google's willful infringement of the '966 patent.**

Willful infringement requires the jury to find that Google knew of the '966 patent and engaged in "deliberate or intentional infringement."  *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 2732 (2022).  Reckless disregard of the plaintiff's patent rights can demonstrate willfulness.  *See Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023).  And here too, willful blindness can show Google's knowledge of the patent.  *See Glob.-Tech*, 563 U.S. at 766.

Here, Sonos presented adequate proof of willfulness.  And for all of the reasons discussed above, Google had knowledge of the '966 patent and knowledge of infringement pre-suit.  Moreover, Google did not make any changes to products accused of infringing either patent until it was found to infringe the '885 patent, and has yet to make any change to the Google Home app or its products accused of infringing the '966 patent.

B.  **Sonos Is Entitled To Damages For Google's Infringement.**

35 U.S.C. § 284 mandates that, upon a finding of infringement, a "court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  *See also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327-28 (Fed. Cir. 2014) ("If a patentee's evidence fails to support its specific royalty estimate, the fact finder is still required to determine what royalty is supported by the record."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2017).

The jury heard from Ms. Alaina Kwasizur that Sonos maintains a robust patent portfolio covering its speaker technology.  5/12/23 Tr. at 1005:23-1006:11.  Sonos licensed portions of its

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-CV-06754-WHA

1   patent portfolio to three competitors, and those licenses reflect per-unit rates of $6 to $35.

2   5/12/23 Tr. at 1010:14-1019:6, 1062:2-19, 1067:2-13, 1072:1-10; TX6721 (Denon license);

3   TX6632 (Bluesound/Lenbrook license); TX6631 (Legrand/Pass & Seymour license).  Sonos also

4   introduced ample evidence explaining why Sonos prefers a per-unit royalty over a lump sum.

5   5/12/23 Tr. at 1019:7-1020:24.

6        Based on that evidence, Sonos is entitled to damages for Google's infringement.  *See*

7   *Bayer Healthcare LLC v. Baxalta Inc*., 989 F.3d 964, 985 (Fed. Cir. 2021) ("A party need not

8   present expert testimony on damages or, as a corollary, on every aspect of damages, such as a

9   single royalty rate."); *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 & n.4 (Fed. Cir.

10  2003) ("[S]ection 284 is clear that expert testimony is not necessary to the award of damages, but

11  rather 'may [be] receive[d] ... as an aid.' " (annotations in original) (quoting 35 U.S.C. § 284)).[4]

12  **C.**    **Google Failed To Present Sufficient Evidence For Any Reasonable Juror To**
13           **Find That The Asserted Patents Are Invalid.**

14       Google had the burden to overcome the asserted patents' "presumption of validity" by

15  presenting "clear and convincing evidence" to the contrary.  *SRAM Corp. v. AD-II Eng'g, Inc.*,

16  465 F.3d 1351, 1357 (Fed. Cir. 2006).  It failed to do so on the sole invalidity ground it raised--

17  obviousness.[5]

18       Google argues that both the '885 patent and the '966 patent are invalid as obvious.

19  Google's claims fail as a matter of law.

20

---

21  [4] The jury also heard from Mr. Malackowski that a hypothetical negotiation between the parties
22  would result in a royalty rate of $0.82 per unit for the '966 patent and $0.87 per unit for the '885
   patent.  5/12/23 Tr. at 1092:3-23.  Mr. Malackowski offered a detailed damages analysis under
   the *Georgia-Pacific* hypothetical negotiation framework, including on a comparison to the
23  IFTTT product.  *E.g.,* 5/12/23 Tr. at 1115:14-1122:19 (discussing factors 3 through 10).  As
   Sonos has explained, Mr. Malackowski's testimony was reliable and admissible.  *E.g.*, Dkt. 735.

24  [5] In the joint proposed pretrial order, Google identified derivation invalidity defenses to both
   patents, an anticipation defense to the '885 patent, and obviousness defenses to both patents.
25  Dkt. 615 at 8.  After Sonos objected to Google's undisclosed derivation defense, Google agreed
   to drop those claims.  See Dkt. 660 (Final Pretrial Order) at 6.  At the hearing on May 17, 2023,
26  the Court noted that Google's anticipation defense lacked legal merit, and Google agreed to
   drop that defense as well.  5/17/23 Tr. at 1405:2-17.  Counsel for Google referred to anticipation
27  in the context of "the '966" patent but must have intended to refer to anticipation with respect to
   the '885 patent because Google had no anticipation defense with respect to the '966 patent.  See
28  Dkt. 615 at 8.

1        A patent claim "is invalid as obvious if an alleged infringer proves that the differences

2    between the claimed subject matter and the prior art are such that the subject matter as a whole

3    would have been obvious at the time of invention to a person having ordinary skill in the art."

4    *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1303 (Fed. Cir. 2015) (citing 35 U.S.C. § 103(a)

5    (2006)).  Obviousness is a legal question that rests on underlying factual determinations,

6    including "the scope and content of the prior art" and "the differences between the claimed

7    invention and the prior art."  *Id.*

8        Google's obviousness challenge fails on multiple fronts.

9        First, Google did not show that the prior art teaches or makes obvious every limitation of

10   the claims.  For example, limitation 1.9 of claim 1 of the '966 patent requires display of both zone

11   scenes at the same time.  Google offered no fact or expert testimony establishing that any prior art

12   reference teaches this limitation, nor that either reference or the combination as a whole would

13   make it obvious.

14       Dr. Schonfeld testified that Sonos's 2005 prior art system satisfied limitations 1.9 and

15   1.10 of the '966 patent based on his analysis of Limitations 1.6 and 1.7 of the '885 patent.

16   5/17/23 Tr. at 1477:25-1478:11.  But as Dr. Schonfeld acknowledged, the limitations of the **'966**

17   **patent** call for **displaying a representation** of the first zone scene **and displaying a**

18   **representation** of the second zone scene, but Limitations 1.6 and 1.7 of the '885 patent do not.

19   5/17/23 Tr. at 1478:7-1479:7.  As Dr. Schonfeld further admitted "the display part is not there in

20   the claim language" of limitations 1.6 and 1.7 of the '885 patent.  5/17/23 Tr. at 1479:17-24.  So

21   Dr. Schonfeld's only "analysis" of limitation 1.9 is to cross-reference his analysis of limitations

22   1.6 and 1.7 of the '885 patent.  *Id.* at 1480:16-24; *see also* 5/16/23 Tr. at 1390:12-17 ("Q.

23   Looking at claim 1 of the '966 patent for limitations from 1.0 to 1.6 and 1.9, what is your opinion

24   on whether those limitations are disclosed in the Sonos 2005 prior art system?  A. Yeah.  As I

25   mentioned, those are all satisfied by Sonos 2005 based on the same evidence and analysis I just

26   presented for claim limitation 1.6 of the '885 patent.").  In other words, Dr. Schonfeld's only

27   "analysis" of why Sonos's 2005 prior art system satisfied limitation 1.9 is an unexplained cross-

28

1   reference to limitations of the '885 patent that he admits do not contain analogous language at all.

2   This fails as a matter of law.

3        Dr. Schonfeld's "analysis" of why Sonos's 2005 prior art system satisfied limitation 1.10

4   suffers the same fatal flaw—the only support he identifies for the proposition that limitation 1.10

5   was met came in this statement: "So based on the same evidence and analysis I just performed for

6   claim limitations 1.9 and 1.10 of the '885 patent, claim limitations 1.10 and 1.11 of the '966

7   patent are satisfied respectively."  5/17/23 Tr. at 1422:6-14.  And while limitation 1.10 of the

8   '966 patent requires ***displaying a representation*** of the first zone scene ***and displaying a***

9   ***representation*** of the second zone scene, limitations 1.9 and 1.10 of the '885 patent contain no

10   such requirement.

11        Dr. Schonfeld also failed to establish that the prior art teaches zone scenes—persistent,

12   customized, and later-invoked speaker groups—at all.  Instead, Dr. Schonfeld pointed only to

13   temporary groups or groups that are invoked immediately upon creation.

14        For these reasons alone, Google has failed to meet its burden of establishing obviousness

15   by clear and convincing evidence.

16        Second, Google did not show a motivation to combine.  The Federal Circuit has made

17   clear that motivation to combine cannot be established by conclusory expert testimony,

18   particularly expert testimony that "primarily consisted of conclusory references to [the expert's]

19   belief that one of ordinary skill in the art *could* combine these references, not that they *would*

20   have been motivated to do so."  *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359–60

21   (Fed. Cir. 2019) (emphasis in original).  Similarly, the expert cannot simply "rel[y] on the

22   [challenged] patent itself as her roadmap for putting what she referred to as pieces of a 'jig-saw

23   puzzle' together."  *Id.* at 1360.  Moreover, expert testimony must not just explain *why* a person of

24   ordinary skill in the art would have combined elements, but why they would have done so "*in the*

25   *way the claimed invention does*."  *Id.* (emphasis in original).

26        Google offers no motivation to combine evidence outside of Dr. Schonfeld's testimony,

27   and Dr. Schonfeld's testimony features each of these legal flaws.

28

1     For example, Dr. Schonfeld was asked why it would have been obvious to those skilled in

2   the art back in 2005 to combine Nourse with the Sonos 2005 prior art system.  In response, Dr.

3   Schonfeld testified that "[i]t's addressing management of speaker systems.  They're both

4   addressed to the same type of topic.  They are solving very similar problems of managing saving

5   zone groups and making them available and flexible to play individually or play later."  5/17/23

6   Tr. at 1441:4-10.  That explanation merely states that combination was ***possible*** not that a

7   POSITA in 2005 would have had ***reason*** to do so, much less a reason to do so ***in the way the***

8   ***claimed invention does***.

9     Similarly, Dr. Schonfeld was asked "would it have been obvious to those skilled in the art

10   back in 2005 when they looked at the Sonos 2005 system and also looked at the forum postings

11   about that system to make a combination in their mind?"  5/17/23 Tr. at 1431:22-25.  In response,

12   he testified "Yeah, absolutely. The Sonos forum was posting of people who were interested --

13   users, dealers who were interested in the Sonos 2005 system, and they were making suggestions

14   of how to modify the Sonos 2005 system to improve it."  5/17/23 Tr. at 1432:1-4.  Once again,

15   Dr. Schonfeld offers no explanation as to why a POSITA in 2005 would have been motivated to

16   make this combination in the way the claimed invention does.

17     As one more example, Dr. Schonfeld testified that a POSITA in 2005 would have

18   combined what was known in the Squeezebox system with the Sonos 2005 prior art system

19   because "they were competitors back then.  They were trying to do the same type of system.

20   They would have looked into each other's system and tried to see what the competitor is doing

21   and they did."  5/17/23 Tr. at 1443:5-8.  Once again, that conclusory opinion offers no

22   explanation whatsoever as to why a POSITA in 2005 would have been motivated to make this

23   combination in the way the claimed invention does.

24     Third, Google presented no evidence that there was a reasonable expectation of success in

25   arriving at the claimed invention.  There is a "clear distinction in our case law between a patent

26   challenger's burden to prove that a skilled artisan would have been motivated to combine prior art

27   references and the additional requirement that the patent challenger also prove that the skilled

28   artisan would have had a reasonable expectation of successfully achieving the claimed invention

1   from the combination." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed.

2   Cir. 2021).  Dr. Schonfeld's testimony offers no analysis beyond conclusory statements that the

3   combination would have been "trivial" or "simple."  *See, e.g.*, 5/17/23 Tr. at 1440:8-19, 1424:1,

4   18.  And to the extent Dr. Schonfeld offers anything beyond ***those*** conclusory statements, it

5   consists of equally conclusory analysis.  For example, asked how difficult it would have been to

6   store group identifiers, Dr. Schonfeld responded that it would be a "trivial operation" and "a

7   trivial thing to do" and "a trivial change" because—and this is the sum of his analysis—

8   computing devices have sufficient memory to store group identifiers.  *Id.* at 1440:8-19.  But that

9   is like saying that it would be trivial to build a library inside of a basketball stadium because

10   there's plenty of room.  Memory capacity is obviously an important requirement for storage, but

11   it is hardly the only problem to solve.

12       And in another case, Dr. Schonfeld's "trivial" conclusion is buttressed only with a

13   conclusion that the claims involve nothing more than "keep instead of discarding" a group.  In Dr.

14   Schonfeld's words:

15   Q. How difficult would it have been back in 2005 timeframe to a person of
16      ordinary skill in the art to make the modification of saving one of the extra
       groups that was provided for in that system?
17

18   A. It would be a trivial step in my view, and I can explain why.

19   Q. Can you please explain?

20   A. Sure. It's – we're talking about saving it for later and if you remember
21      yesterday, I said you need two things: One is to continue to operate as you are
       now until you need it later; and when you do need it later, you have to make
22      sure it's available.

23      So all you have to do is, if you remember yesterday, I said that there is a
24      channel that has to be shifted from the local playlist to the external playlist,
        you just move the same code in response to the play message instead of the set
        AVTransport URI message; and then the same -- the same information that
25      was saved already in persistent memory on the coordinator, the only
        difference you just keep instead of discarding it when you no longer -- when
26      you are done working with a particular zone group just like you would for the
        Party Mode.  So these are two very simple steps.
27

28

SONOS'S MOTION FOR JUDGMENT AS A MATTER OF
LAW AT THE CLOSE OF GOOGLE'S CASE
3:20-cv-06754-WHA

5/17/23 Tr. at 1423:22-1424:18.  Dr. Schonfeld nakedly asserted that the process he describes consists of "two very simple steps."  But what did he actually testify to?  He was asked how hard it would be to make the modification of saving a group, and his answer was that it was simple, because all you have to do is save it.  That hardly addresses the fundamental problem with his lack of explanation of how the prior art makes separately saving and invoking groups obvious.

Fourth, Google's obviousness evidence fails to address the substantial evidence of secondary considerations of non-obviousness.  "Obviousness is a legal conclusion based on underlying facts of four general types, all of which must be considered by the trier of fact: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness**.**"  *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

Here, Google advanced testimony from Dr. Schonfeld that a 2020 article from CNN does not give any praise to the specific claims in this case.  5/17/23 Tr. at 1455:13-1456:5.  Dr. Schonfeld similarly testified that the article fails to say anything about overlapping group scenes specifically.  *Id.*  But "there is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016).  Here it is undisputed that Sonos's 2020 system practices the claimed invention, and Google did not even attempt to rebut the presumption of nexus.  So Dr. Schonfeld offered no basis to disregard the evidence of industry praise.

Fifth, Google's expert did not apply the definition of a person of skill in the art at the time of the invention.  Dr. Schonfeld thus committed the cardinal sin of obviousness analysis— analysis based on hindsight.  As the Supreme Court has held, "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421(2007).  *See also Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966) (warning against a "temptation to read into

the prior art the teachings of the invention in issue" and instructing courts to "guard against slipping into use of hindsight").

Dr. Schonfeld engaged in hindsight-based analysis, because although he testified that he was considering obviousness at the time of the invention, he never acknowledged what a person of skill in the art would have known at the time of the invention. For example, Dr. Schonfeld's only references to what a POSITA would have known at the time comes in the form of conclusory statements that certain modifications would be "trivial" or obvious to that person without any explanation of why or how it would have been trivial to a POSITA in 2005. *See, e.g.*, 5/17/23 Tr. at 1424:19-1425:2 (Q: "[H]ow difficult would it be for that person -- would it have been for that person back in 2005 to make the simple modifications that you were just describing? A: "In my opinion, it would have been a trivial exercise to do. You are just shifting one code and not discarding the identifiers. That's a very simple operation to do in the code."); *id.* at 1425:5-12 (Q: "[A] person of ordinary skill in the art back in 2005 could make the modification -- would it have been obvious to make the modification that you talked about to save the first zone group here for later? Is that your testimony?" A: "It is my testimony. The moment you just decide that that's what you want to do, you can do it immediately.").

Sixth, to invalidate a claim as obvious, "the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention." *Raytheon Tech. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021). This principle means "that if an obviousness case is based on a non-self-enabled reference, and no other prior art reference or evidence would have enabled a skilled artisan to make the claimed invention, then the invention cannot be said to have been obvious." *Id.* at 1377.

Here, Google did not introduce sufficient evidence for any reasonable juror to conclude that its alleged prior art enabled a person of ordinary skill in the art to make and use the claimed invention of either asserted patent. Instead, once again, Dr. Schonfeld provided conclusory testimony boiling down to naked assertions that it would have been obvious how to make and use the claimed invention. *See, e.g.*, 5/17/23 Tr. at 1425:5-12 (Q: "[A] person of ordinary skill in the art back in 2005 could make the modification -- would it have been obvious to make the

1  modification that you talked about to save the first zone group here for later? Is that your

2  testimony?" A: "It is my testimony. The moment you just decide that that's what you want to do,

3  you can do it immediately.").

4         Thus, the Court should reject Google's obviousness claims as a matter of law.

## IV.    CONCLUSION

6         Sonos respectfully requests that the Court grant its motion for judgment as a matter of law

7  and reject Google's claims of noninfringement and invalidity.

Dated:  May 18, 2023                          ORRICK HERRINGTON & SUTCLIFFE LLP
                                              *and*
                                              LEE SULLIVAN SHEA & SMITH LLP

                                              By: */s/ Clement Seth Roberts*
                                                     Clement Seth Roberts

                                              *Attorneys for Sonos, Inc.*