QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>        Plaintiff and Counter-<br>        Defendant,<br><br>    vs.<br><br>GOOGLE LLC,<br><br>        Defendant and Counter-<br>        Claimant. | Case No. 3:20-cv-06754-WHA<br>Consolidated with Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Location: Courtroom 12, 19th Floor<br>Judge:    Hon. William Alsup |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 16, 2023 at the close of Plaintiff Sonos, Inc.'s ("Sonos") case-in-chief, in Courtroom 12 before the Honorable William H. Alsup, 450 Golden Gate Avenue, San Francisco, California, Defendant Google LLC ("Google") moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  Google submits its memorandum in further support of the Motion.[1]

This Motion is made on the basis that Sonos failed to provide a legally sufficient evidentiary basis for a reasonable jury to find in favor of Sonos on the following issues: (1) direct infringement; (2) willful infringement; (3) indirect infringement; and (4) recoverable damages.

This Motion is based on the testimony and evidence admitted at trial, all pleadings, exhibits, and records in this action, and such other papers, evidence, and/or argument as may be submitted to the Court in connection with this Motion or that the Court may take notice or otherwise consider.

DATED:  May 18, 2023

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____/s Sean Pak_____
Sean Pak
Melissa Baily
James D. Judah
Lindsay Cooper
Marc Kaplan
Iman Lordgooei

*Attorneys for GOOGLE LLC*

---

[1]   The current motion is brought with respect to deficiencies in Sonos's case-in-chief.  Google separately moved for judgment as a matter of law on its invalidity defenses after Sonos put in its evidence on those issues.

# ASSERTED CLAIMS

'885 Patent, Claim 1:

[1.0]. A first zone player comprising:

[1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network;

[1.2] one or more processors;

[1.3] a non-transitory computer-readable medium; and

[1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

[1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

[1.6] (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

[1.7] (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

[1.8] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

[1.9] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

[1.10] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

'966 Patent, Claim 1:

[1.0] A computing device comprising:

[1.1] one or more processors;

[1.2] a non-transitory computer-readable medium; and

[1.3] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

[1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

[1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

[1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and

[1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

[1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

# TABLE OF CONTENTS

Page

ARGUMENT .................................................................................................................1

I.  NO REASONABLE JURY COULD FIND THAT NEW VERSIONS OF THE
    ACCUSED PRODUCTS INFRINGE THE ASSERTED PATENTS ...................................1

    A.  Redesigned Versions Of Google's Accused Products Enter An "Idle" Mode
        Before Being Added To A Speaker Group .................................................................2

    B.  Sonos Failed To Establish The New Versions Of Google's Speakers
        Practice The Standalone Limitations Of Claim 1 Of The '885 Patent........................3

    C.  Sonos Has Also Failed To Show That New Versions Of The Google Home
        App Practice Claims 1, 2, 4, 6, And 8 Of The '966 Patent ......................................6

II. NO REASONABLE JURY COULD FIND THE ACCUSED PRODUCTS
    (ORIGINAL OR NEW DESIGN) DIRECTLY INFRINGE THE '966 PATENT...............7

    A.  Google Does Not Make or Sell "A Computing Device with the Google
        Home app Installed" or "Networked With at Least Three Zone Players" ................8

    B.  Sonos Has Failed To Show That Google's Accused Products Practice The
        "Causing Storage" Elements Of Claim 1 Of The '966 Patent ...................................9

    C.  Sonos Has Failed To Identify Program Instructions Within The Google
        Home App That Are Executed To Practice The Causing Storage Limitations........11

III. NO REASONABLE JURY COULD FIND THAT GOOGLE WILLFULLY
     INFRINGES THE '966 PATENT.................................................................................12

    A.  Sonos's Draft Complaint Is Not Sufficient To Establish Google's
        Knowledge And Specific Intent To Infringe ...........................................................13

    B.  Google's Declaratory Judgment Complaint Was Not Sufficient To Establish
        Knowledge And Specific Intent To Infringe ...........................................................13

IV. NO REASONABLE JURY COULD FIND THAT GOOGLE INDIRECTLY
    INFRINGES THE '966 PATENT.................................................................................15

    A.  Sonos Has Not Introduced Evidence To Establish Google's Knowledge And
        Specific Intent For Indirect Infringement................................................................16

    B.  Google Did Not Induce Infringement Of The '966 Patent......................................16

        1.  Sonos Has Not Offered Any Evidence That Third Parties Directly
            Infringe The '966 Patent ............................................................................16

        2.  Sonos Has Not Shown That Google Possessed A Specific Intent To
            Encourage Direct Infringement Of The '966 Patent ...................................17

    C.  Google Did Not Contributorily Infringe The '966 Patent.......................................19

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

V.      NO REASONABLE JURY COULD FIND FOR SONOS ON DAMAGES ......................19

        A.      Sonos Has Not Established A Willingness To Pay For Comparable
                Technology Using IFTTT ..................................................................................20

        B.      IFTTT Is Not Technologically Comparable To The Claimed Invention .................21

        A.      Sonos Failed To Apportion IFTTT's Subscription Price To The Claimed
                Invention........................................................................................................22

        C.      Sonos's Proposed 70/30 Revenue Split Is Arbitrary And Not Sufficiently
                Tied To The Facts Of The Case ......................................................................22

        D.      Sonos's Portfolio-Wide Settlement Agreements Cannot Support A
                Reasonable Royalty Award .............................................................................23

        E.      With IFTTT Excluded, Sonos Failed To Introduce Evidence That Would
                Allow the Jury To Apportion To The Claimed Invention.........................................24

        F.      Sonos Failed To Consider Use Of The Claimed Invention......................................24

CONCLUSION .........................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
 501 F.3d 1307 (Fed. Cir. 2007) ................................................................................................ 17

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ..................................................................................................................... 1

*Apple Inc. v. Motorola, Inc.*,
 757 F.3d 1286 (Fed. Cir. 2014) ............................................................................................... 21

*Apple Inc. v. Princeps Interface Techs. LLC*,
 No. 19-CV-06352-EMC, 2020 WL 1478350 (N.D. Cal. 2020) ............................................ 14

*Apple Inc. v. Wi-LAN Inc.*,
 25 F.4th 960 (Fed. Cir. 2022) .................................................................................................. 23

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
 776 F.2d 281 (Fed. Cir. 1985) ................................................................................................... 5

*AstraZeneca LP v. Apotex, Inc.*,
 633 F.3d 1042 (Fed. Cir. 2010) ............................................................................................... 18

*Avocet Sports Tech., Inc. v. Garmin Int'l, Inc.*,
 No. C 11-04049 JW, 2012 WL 1030031 (N.D. Cal. Mar. 22, 2012) ..................................... 13

*Barry v. Medtronic, Inc.*,
 914 F.3d 1310 (Fed. Cir. 2019) ............................................................................................... 18

*Bayer Healthcare LLC v. Baxalta Inc.*,
 989 F.3d 964 (Fed. Cir. 2021) ................................................................................................. 13

*Cephalon, Inc. v. Watson Pharms., Inc.*,
 707 F.3d 1330 (Fed. Cir. 2013) ................................................................................................. 5

*DSU Medical Corp. v. JMS Co.*,
 471 F.3d 1293 (Fed. Cir. 2006) ............................................................................................... 18

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
 879 F.3d 1299 (Fed. Cir. 2018) ......................................................................................... 22, 24

*Fluidigm Corp. v. IONpath, Inc.*,
 No. C 19-05639 WHA, 2020 WL 408988 (N.D. Cal. Jan. 24, 2020) ..................................... 18

*Fujitsu Ltd. v. Netgear Inc.*,
 620 F.3d 1321 (Fed. Cir. 2010) ............................................................................................... 19

*Gen. Mills, Inc. v. Hunt-Wesson, Inc.*,
 103 F.3d 978 (Fed. Cir. 1997) ................................................................................................. 15

*Gillette Co. v. Energizer Holdings, Inc.*,
  405 F.3d 1367 (Fed. Cir. 2005) ................................................................................ 6

*Google LLC v. Princeps Interface Techs. LLC*,
  No. 19-CV-06566-EMC, 2020 WL 1478352 (N.D. Cal. Mar. 26, 2020) ................................. 14

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) .............................................................................. 24

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ............................................................................... 21

*Kyocera Wireless Corp. v. ITC*,
  545 F.3d 1340 (Fed. Cir. 2008) .............................................................................. 16

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  572 U.S. 915 (2014) ........................................................................................ 16

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................. 23, 24, 25

*MLC Intellectual Property, LLC v. Micron Technology, Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) .............................................................................. 23

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) .............................................................................. 12

*NetFuel, Inc. v. Cisco Sys., Inc.*,
  No. 5-18-cv-02352, 2018 WL 4510737 (N.D. Cal. Sept. 18, 2018) .................................... 13

*Omega Patents, LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) .............................................................................. 24

*People.ai, Inc. v. SetSail Techs., Inc.*,
  No. C 20-09148 WHA, 2021 WL 2333880 (N.D. Cal. June 8, 2021) .................................... 19

*Radware, Ltd. v. F5 Networks, Inc.*,
  No. 5:13-CV-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug. 22, 2016) ............................... 13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ..................................................................................... 1, 6

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) .............................................................................. 21

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933) ........................................................................................ 24

*Sonos, Inc. v. Google LLC*,
  No. 21-cv-7559-WHA, Dkt. 156 (N.D. Cal. Mar. 16, 2022) ........................................... 13

*Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
  785 F.3d 625 (Fed. Cir. 2015) ............................................................................... 18

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

*Typhoon Touch Tech., Inc. v. Dell, Inc.*,
   659 F.3d 1376 (Fed. Cir. 2011) ................................................................ 12

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................ 22

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) ................................................................ 18

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) ................................................................ 13

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ................................................................................... 1

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ................................................................ 21

**<u>Other Authorities</u>**

Lemley, *Inducing Patent Infringement*, 39 U.C. Davis. L. Rev. 225 (2005) ................................ 14

**<u>Rules</u>**

FRCP 50(a)(2) ..................................................................................................... 1

## MEMORANDUM AND POINTS OF AUTHORITIES

Google moves for judgment as a matter of law ("JMOL") pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  For the reasons explained below, no reasonable jury could find in Sonos's favor on direct infringement, willful infringement, indirect infringement, or damages.

## ARGUMENT

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FRCP 50(a).   In making this determination, "the court should review all of the evidence in the record[.]"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Rule 50 "allows the trial court to remove . . . issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result."  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotations omitted).  The standard for granting judgment as a matter of law mirrors the standard for granting summary judgment, and "the inquiry under each is the same."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A motion for JMOL may be made at any time before the case is submitted to the jury.  FRCP 50(a)(2).

## I.   NO REASONABLE JURY COULD FIND THAT NEW VERSIONS OF THE ACCUSED PRODUCTS INFRINGE THE ASSERTED PATENTS

Limitations 1.0-1.4 of the '966 patent are directed to a "computing device" that comprises "one or more processors," a "computer readable medium," and "program instructions."  Similarly, Limitations 1.0-1.4 of the '885 patent are directed to a "zone player" with a "network interface," "one or more processors" and "program instructions."  These patents are two sides of the same coin on this issue:  claim 1 of the '966 patent claims a controller device that controls the zone player in claim 1 of the '885 patent.  Sonos has accused devices with the Google Home app installed of infringing claim 1 of the '966 patent (as well as dependent claims 2, 4, 6, and 8) and certain Google media players (or speakers) of infringing claim 1 of the '885 patent.

Google introduced a new design for the accused products after the Court held that Google's accused speakers infringed claim 1 of the '885 patent during the patent showdown.  Trial Tr. at 775:22-776:8.  Sonos has not presented any evidence from which a reasonable jury could find that

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

the new design for Google's accused products satisfies the "operating in a standalone mode" limitations of the asserted claims, which require that a "zone player" remain in a "standalone mode," *i.e.,* operating and "configured for playback of media individually," after it has been added to a "zone scene" and until the "zone scene" is invoked.  Unlike Google's prior design, in the new design before a speaker is added to a group it exits standalone mode and enters an idle mode.  In that idle mode, the speaker stops media playback and "kills" (or closes out) any application that *could* play back media—ensuring that the device is no longer "configured to" play back media (*i.e.*, the "standalone mode") when it is added to a group.

**A.     *Redesigned Versions Of Google's Accused Products Enter An "Idle" Mode Before Being Added To A Speaker Group***

Google's new design altered the way in which the accused products operate.  Trial Tr. (MacKay) at 1256:12-1261:3.  The unrebutted evidence presented at trial demonstrates that Google speakers can be in one of three modes: (i) an idle mode in which the speaker is not configured to play back any media, (ii) an individual mode in which the speaker is configured to play back media individually, or (iii) a group mode in which the speaker is configured to play back media as part of a speaker group.  Trial Tr. (MacKay) at 1254:15-1255:10.  When a Google speaker is powered up, it begins in idle mode.  Trial Tr. (MacKay) at 1258:18-24.  In idle mode there is *no* media playback application running on the speaker and, thus, the speaker is not configured to play back any media. *Id*. at 1254:21-23 ("Idle mode is when there is no app running on the speaker so it's not able to play media.").  The Google Home app can cause a speaker to enter an individual or group mode by transmitting a "launch" command to the speaker.  *Id*.  ("The launch command is a command that indicates that an app should be launched and it could be launched either on a single device or on a group.").  The launch command causes a speaker to launch a media playback application, thereby configuring the speaker for playback.  *Id*.

In Google's new design, a speaker that is operating in individual mode exits the individual mode and "returns to the idle mode" when it receives an instruction from the Google Home app to add a new speaker group (the alleged "zone scene").  Trial Tr. (MacKay) at 1256:18-1257:4.  In particular, whenever a redesigned speaker is to be added to a new speaker group, it executes a

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

"StopCurrentApp()" function that "tears down" any playback app running on the accused Google speaker and removes that playback app from memory.  Trial Tr. at 1256:23-25 (Q:  "And when it says 'StopCurrentApp,' are you just pausing the app?"  MacKay:  "No.  The app is killed.  It's torn down completely."), 1267:7-22 (MacKay:  "It [StopCurrentApp()] stops the software that's running the app… it tears down the app completely and removes it from memory.").  Indeed, not only is the playback app torn down and removed from memory, the speaker needs to "essentially download[] the app from the internet again" in order to play back later because the app is "gone" and is "not on the player anymore."  Trial Tr. (MacKay) at 1292:3-15.

Google's speakers with the new design then remain in this idle mode until they receive from the Google Home app a new launch command to (for example) the individual speaker, or a speaker group that includes the speaker.  Trial Tr. (MacKay) at 1256:18-1258:7.  Because no media application runs on the speaker in idle mode, the speaker is not configured for playback and is thus not in standalone mode.  *See* § I.A; *see also* Trial Tr. at 1267:7-22 (MacKay:  "StopCurrentApp()" "stops the software that's running the app… it tears down the app completely and removes it from memory."), 1254:24-1255:1 (Q: "Is it configured for any type of playback operation in idle mode?" MacKay:  "No.").

**B.** ***Sonos Failed To Establish The New Versions Of Google's Speakers Practice The Standalone Limitations Of Claim 1 Of The '885 Patent***

Sonos accuses Google speakers with the new design of practicing claim 1 of the '885 patent. But Sonos has not presented sufficient evidence for a reasonable jury to find that these speakers practice at least the following limitations of claim 1 of the '885 patent:

> **[1.5]** while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

> **[1.8]** after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

> **[1.10]** based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

1    and second predefined groupings of zone players.[2]

2    TX0003.  Claim 1 requires that the first zone player "operate[] in a standalone mode in which the

3    first zone player is configured to playback media individually" (Limitation 1.4).  The claims further

4    require that "while operating" in the standalone mode of Limitation 1.4, the first zone player must

5    (1) receive respective indications that it has been added to two overlapping zone scenes (Limitations

6    1.5 and 1.6), and (2) continue to operate in standalone mode until one of those zone scenes is invoked

7    (Limitations 1.8 and 1.10).  This motion refers to these limitations as the "Standalone Limitations."

8         As a preliminary matter, the parties have a fundamental dispute regarding the scope of the

9    claim term "operating in a standalone mode in which the first zone player is configured to playback

10   media individually" (Limitation 1.4), which the Court should decide before sending the case to the

11   jury.  *See* Dkt. 732 (Google LLC's Response To The Court's Request For Information Regarding

12   Claim Construction And *O2 Micro*) at 1, 3.  The claim language and prosecution history support

13   Google's position that operating in standalone mode requires that a zone player be actively playing

14   back media.  *Id*.  Such a construction would be dispositive because Sonos does not dispute that when

15   a redesigned Google speaker is added to a speaker group, it stops playback.  Trial Tr. (Almeroth) at

16   799:18-20 ("And so the person who's putting the speaker into the group, if it's playing in standalone

17   mode, will stop playing."), 802:23-25 ("So the fact that you stop playing audio as part of group

18   creation does not take that speaker out of standalone mode.  It just stops the ability to hear audio of

19   what's already playing."); *see also* Trial Tr. (MacKay) at 1256:12-1261:3.  So, if the Court finds

20   that "operating in a standalone mode in which the first zone player is configured to play back media

21   individually" requires that the speaker is operating to play back media, there is no dispute of fact

22   that the accused Google speakers running the new design do not infringe claim 1 of the '885 patent.

23        Indeed, even if the Court adopts Sonos's construction of this limitation or otherwise rejects

24   Google's proposed construction, Sonos still has not presented any evidence from which a jury could

25

26

27

28   _____

[2]   Because other claim elements must also be performed "while" operating in standalone mode, those other claim elements are likewise not infringed for the same reasons.

reasonably conclude that Google's redesigned speakers satisfy the Standalone Limitations.[3] Regardless of whether the Standalone Limitations require that a zone player be actively playing back media or not, the claim language expressly recites that when operating in a standalone mode the first zone player must be "***configured to*** play back media individually" (Limitation 1.4).  Sonos has not presented any evidence showing that a redesigned Google speaker is configured to play back media individually after it receives an indication that it has been added to a speaker group (Limitations 1.6 and 1.7) or at the time the group is invoked (Limitation 1.10), let alone evidence that would allow a jury to find that the Google speaker *continues* to operate in standalone mode.

The infringement opinions of Dr. Almeroth rest on a false premise: that any speaker that is not configured to play back media in a speaker **group** must ***necessarily*** be configured to play back media individually in a standalone mode.  *Id.* (Almeroth) at 801:21-803:6 ("But the reality is the claim talks about two modes: You're either in group mode where you're synchronized to play in group mode or you're not, you're in standalone mode."), 864:16-865:14 ("It has to either be configured for group mode or in standalone mode."); *see also id.* at 796:17-797:6; 799:23-801:4; 801:21-803:6; 863:13-20.  Yet Dr. Almeroth cites no evidence to support his *ipse dixit* assumption that only two modes exist in Google's system.  *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013) (disregarding expert's "ipse dixit" statements supporting verdict); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) ("Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value . . . .").

Indeed, Dr. Almeroth concedes that before a speaker with the new design is added to a

---

[3]  For the '885 patent, the parties agree that to practice the Standalone Limitations, a Google speaker must continuously operate in the standalone mode after receiving indications that it has been added to a first and second zone group (and thereafter until one of those zones scenes is invoked).  Trial Tr. (Almeroth) at 843:25-844:3 ("So I think in the '885 patent, there is a requirement that it continuously be in standalone mode."); *see also id.* at 842:17-23.  Indeed, Dr. Almeroth testified that to practice claim 1 of the '885 patent, Google's speakers with the new design must "remain in standalone mode throughout the creation of the first zone scene and second zone scene."  *Id.* at 802:5-12, 983:15-25.  Dr. Almeroth also conceded that if the jury were to conclude that Google's redesigned speakers are not operating in the standalone mode when a zone scene is invoked, then "there's not going to be infringement for the redesign."  *Id.* at 984:22-986:1.

1   speaker group, it executes the StopCurrentApp() function that terminates any playback application

2   that was running on the speaker.  Trial Tr. (Almeroth) at 797:21-798:24 ("Within the source code,

3   there was the addition of a function called StopCurrentApp, and that function essentially stopped an

4   app inside of the Google Player.").  Critically, Google presented ***unrebutted*** evidence that when the

5   playback application running on the speaker is terminated, the speaker is no longer able to play

6   media and is thus no longer configured to play back media.  *See* § I.A; *see also* Trial Tr. (MacKay)

7   at 1254:21-23 ("Idle mode is when there is no app running on the speaker so 'it's not able to play

8   media.").  The record is devoid of any evidence that would allow a jury to conclude that a speaker

9   is configured to play back media even though the playback application has stopped running.[4]  This

10  is the very situation that Rule 50 was meant to address: where "there is no legally sufficient

11  evidentiary basis for a reasonable jury to find for that party on [an] issue," judgment as a matter of

12  law is appropriate.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).

13      **C.    *Sonos Has Also Failed To Show That New Versions Of The Google Home App Practice Claims 1, 2, 4, 6, And 8 Of The '966 Patent***

14

15      Claims 1, 2, 4, 6 and 8 of the '966 patent are directed to a "computing device" that controls

16  "zone players," such as those of claim 1 of the '885 patent.  *See* Dkt. 703 at 1-3.  Sonos accuses any

17  and all installations of the Google Home app of infringing these claims.

18      Claim 1 of the '966 patent includes substantially the same Standalone Limitations as claim

19  1 of the '885 patent.  It expressly recites that the accused Google Home app must cause creation of

20  a first and second zone scene (Limitations 1.5-1.8) "***while*** serving as a controller for a networked

21  media playback system comprising a first zone player and at least two other zone players, wherein

22

---

23  [4]   Dr. Almeroth suggested that the redesign only changes the configuration of a speaker that is
24  currently playing music when it added to a group, because from the point of view of "the person
    who's putting the speaker into the group, if it's playing in standalone mode, will stop playing.  Now,
25  it still stays in standalone mode, but it will stop playing music.  If it wasn't playing music and it was
    in standalone mode, then nothing changes about how it operates."  Trial Tr. (Almeroth) at 799:15-
26  22.  However, as noted above it is undisputed that in redesigned speakers the StopCurrentApp()
    function is executed whenever the speaker is added to a group—including when the speaker is not
27  playing music—and therefore the operation ***does*** change, and that it changes in a way that means
    the speaker is not and cannot be "configured to play back media individually" as required by the
28  Standalone Limitations.

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

the first zone player ***is operating in*** a standalone mode in which the first zone player is configured to playback media individually" (Limitation 1.4) (emphases added).  The zone player must then continue to operate in that standalone mode until it receives a request to invoke a zone scene (Limitations 1.9-10).  Despite disagreement over whether the claims require "continuously" operating in standalone mode, Dr. Almeroth nevertheless agreed that these limitations require that the accused Google Home app perform each of the claimed steps "while" an accused Google speaker is operating in the standalone mode.  Trial Tr. (Almeroth) at 986:4-20.  Accordingly, the Google Home app (even when it is networked with at least three zone players) does not practice claim 1 of the '966 patent for the same reasons discussed above for claim 1 of the '885 patent: Google's speakers with the new design do not continue to operate in a standalone mode from the moment they are added to a group (*e.g.*, when an alleged zone scene is purported stored) until a request for invocation is received—rather, immediately before being added to the group, speakers with the new design switch to and are in an idle mode in which they are not configured to and cannot play back media.  *See* § I.B.

Sonos has suggested that under Google's new design, a computing device installed with the Google Home app nevertheless infringes claim 1 of the '966 patent because the redesign changed the source code on the accused Google speakers rather than the source code of the Google Home app.  Trial Tr. (Schonfeld) at 1463:22-25.  But as explained above, the Google Home app must perform certain steps ***while*** the accused Google speakers (the alleged "zone players") are operating in the standalone mode.  Thus, the ability of the Google Home app (the alleged "controller") to satisfy claim 1 necessarily depends on the ability of the accused Google speakers to meet the Standalone Limitations of the claim.  Because Sonos has failed to present evidence that the Google Home app can perform these steps while an accused Google speaker with the new design is practicing the Standalone Limitations, no reasonable jury could conclude that Google infringes claim 1 of the '966 patent.

Because claims 2, 4, 6, and 8 depend from claim 1 of the '966 patent, and thus include the same limitations, Sonos has also failed to prove infringement of those claims.

**II.**     **NO REASONABLE JURY COULD FIND THE ACCUSED PRODUCTS**

**(ORIGINAL OR NEW DESIGN) DIRECTLY INFRINGE THE '966 PATENT**

Independent of the Standalone Limitations, Sonos has not presented sufficient evidence for a reasonable jury to find that the accused Google Home app practices claim 1 of the '966 patent (whether networked with speakers with the prior or new design) because no reasonable jury could find that the Google Home app practices the step of "causing storage of the [first/second] zone scene" (Limitations 1.6(iii) and 1.8(iii))—for at least two reasons.  First, Google does not make, use, sell, or import any computing devices preinstalled with the Google Home app, or devices with the Google Home app that already networked with three or more Google speakers.  Second, the Google Home app does not persistently store any speaker group membership for later invocation.  Third, Sonos has not pointed to any instruction or capability within the Google Home app that, when executed, causes storage of a first or second zone scene for later invocation.  The only evidence Sonos has presented with respect to the "causing storage" limitations relates to instructions on a Google speaker.  But the claims require that the "computing device" (what Sonos alleges is the accused Google Home app running on a device) include the program instructions that, when executed, "caus[e] storage of the [first/second] zone scene."  Accordingly, Sonos's reliance on instructions ***not*** contained on the alleged computing device but contained, instead, on the alleged zone player (*i.e.*, the Google speakers) fails as a matter of law.

And because claims 2, 4, 6, and 8 depend from claim 1 of the '966 patent, Sonos has failed to prove infringement of those claims for the same reasons.

**A.    *Google Does Not Make or Sell "A Computing Device with the Google Home app Installed" or "Networked With at Least Three Zone Players"***

As the Court has recognized, while Sonos has accused "computing devices" such as phones, tablets, and laptops installed with the Google Home app of infringing the '966 patent, the mere installation or sale of such a computing device cannot itself infringe.  Rather, a computing device is not capable of serving as a "controller" unless it is networked with at least three zone players that may be added to overlapping zone scenes.  For this reason alone, Google is entitled to judgment as a matter of law as to direct infringement for the '966 patent for two reasons.

First, Sonos has not presented any record evidence that Google makes, uses, sells, or imports

devices installed with the Google Home app (which is not surprising because the Google Home App is not pre-installed on the accused Pixel devices).[5]   Second, Sonos has not presented any record evidence that Google makes, uses, sells, or imports devices networked with at least three zone players that may be added to overlapping zone scenes (*i.e.*, Google speakers).   Accordingly, no reasonable jury could find that Google directly infringes the '966 patent.

### B.   Sonos Has Failed To Show That Google's Accused Products Practice The "Causing Storage" Elements Of Claim 1 Of The '966 Patent

Neither Google's original nor newly designed products has been proved to meet at least the following elements of claim 1 of the '966 patent:

> [1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) *causing storage of the first zone scene*;

> [1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) *causing storage of the second zone scene*;

TX0001.  These limitations (the "Causing Storage Limitations") are present in the '966 claims but not the '885 claims.

Applying the parties' agreed-upon claim construction, "[c]ausing storage" of a "zone scene" requires that the "grouping of zone players" be saved persistently (*i.e.*, not temporarily) at least until later invocation.  *See* Dkt. 703 at 1-2.  Indeed, Dr. Almeroth acknowledged that unlike dynamic groups, zone scenes are persistently stored for at least a period of time.  Trial Tr. (Almeroth) at 899:18-901:11 ("the user created groups that are predefined and pre-saved as part of the zone scenes are persistent"); *id.* at 901:20-908:10.  Dr. Almeroth also agreed that the term "zone scene" is "a previously saved grouping of zone players according to a common theme."  *Id.* at 682:12-19; 925:20-24.  Thus, the previously saved grouping of zone players must be saved persistently for

---

[5]   Sonos was aware of this problem and therefore focused on indirect infringement.  *See*, *e.g.*, Trial Tr. (Almeroth) at 767:11-25 ("Q.  Does Google have to sell computing devices that are pre-installed with its Google Home app in order to be liable for infringement of this kind of claim?  A.  No.  It's not the case that Google would have to sell a phone with the app pre-installed in order for there to be infringement.  There's other ways that Google could infringe … part of this analysis is looking at whether or not Google would encourage the use of the Home app").

"storage" of a zone scene to occur.  Trial Tr. (Schonfeld) at 1367:17-1368:17.

Undisputed testimony established that Google's speakers manage groups dynamically and do not "store" zone scene member information as required by the claims.  In fact, Google considered, but rejected, a solution that would store group membership information.  Trial Tr. (MacKay) at 1239:20-1240:7; TX6454.  Google instead implemented a solution whereby "each device doesn't know – doesn't have stored information about what other members of the group exist so it doesn't know which other devices are members of that group."  Trial Tr. (MacKay) 1240:23-1241:3; *id.* (Schonfeld) at 1367:14-1373:17; TX6454.  Google's products do not store group memberships for invocation because Google's system "only care[s] about the devices that are actually online" and there is no point in tracking whether an offline device is in a group.  Trial Tr. (MacKay) at 1241:20-1242:8.  Google's system "doesn't care about . . . what things happen in the past"; it "only care[s] about the current state of the network."  Trial Tr. (MacKay) at 1242:1-8.  As a result, the "grouping" information required by the claims is not stored persistently for later invocation.  *Id.*; *see also id.* (Maclellan) at 1299:18-1301:4; *id.* (Pedro) at 1312:21-1317:11.  Indeed, the unrebutted evidence proves that, to the extent any group membership information is retained, it is done so only for purposes of display to a user and ***not*** for invocation or playback.  *Id.* (Pedro) at 1314:4-8 (explaining "the membership information in the cache is never used for playback purposes").

Regardless, Dr. Almeroth's infringement opinion for the Causing Storage Limitations rested entirely on information stored on Google's speakers, and not the alleged "computing device" with the Google Home app.  *See* Trial Tr. (Alermoth) at 787:19-789:25 ("The information about the group is stored on the players.").[6]  But it is undisputed that the group configuration information

---

[6]   Dr. Almeroth identified four pieces of evidence, but all four reflect the same theory based on the same group configuration stored in the prefs file on an individual speaker.  First, TX6453 at 1 ("Whenever one of the commands arrives, the group configuration is updated and stored in the prefs file on the device").  Trial Tr. (Almeroth) at 787:19-788:13.  Second, Ken MacKay testimony (Q: "you agree that a speaker group is something that is saved by a user in advance of being launched?" MacKay: "I would characterize it as a static group is something that the user configures and it's saved persistently.").  *See* Trial Tr. (Almeroth) at 788:14-789:14.  Third, source code ("There's other source code that goes through the process of what the document describes as storing the configuration in the prefs file, and so that is certainly present in the source code.").  *See id.* at 789:15-

stored on a speaker does *not* store the identity of the speakers that are members of the group.  *See* Trial Tr. (MacKay) at 1276:9-14 ("***The group membership we don't store persistently***.  The system does store persistently the group ID and the group name on each device.").   The "group configuration" on the speaker is limited to storing an identifier and name of the speaker group(s) that the particular speaker belongs to, not any of the other members of the group.  *Id.* at 1242:10-1245:7 (discussing TX6453, explaining that the JoinGroup message includes the Group UUID and Group Name, neither of which contains membership information for the group); *id.* (MacKay) at 1367:14-1373:17; *see also* Trial Tr. (Schonfeld) at 1373:7-17 ("[S]torage of the first zone scene would require persistent storage of the membership; and as I just mentioned, that is not done because you only store the name and the identifier of the group and, therefore, these – these limitations are not satisfied in claim 1 of the '966 patent.").   Because the group configuration that Dr. Almeroth identified does not store the group membership, it cannot show storage of a "zone scene."[7]

Accordingly, no reasonable jury could find that Google's products infringe claim 1 of the '966 patent.  Because claims 2, 4, 6, and 8 depend from claim 1 of the '966 patent, those claims are not infringed for the same reasons.

## C.   *Sonos Has Failed To Identify Program Instructions Within The Google Home App That Are Executed To Practice The Causing Storage Limitations*

Claim 1 of the '966 patent recites a "computing device" containing "program instructions" stored on a "computer-readable medium that, when executed, by the one or more processors, cause the computing device to perform functions comprising" the Causing Storage Limitations.  Sonos accuses a phone or tablet installed with the Google Home app of infringement.  The Google Home app must be configured with the accused Google speakers before it can be the claimed "computing device."  *See* Dkt. 721 at 1-3.  Sonos has also failed to present any evidence that the Google Home app can be executed to "caus[e] storage of the first zone scene" and "caus[e] storage of the second

789:20.  Fourth, Dr. Almeroth's own testing  (Q: "And have you seen storing in your own testing?" A: "Yes.  I mean, you can do it from the perspective of a user where you click on save and that group is saved, and you can come back later and that group still exists.").  *Id.* at 789:21-25.

[7]  Dr. Almeroth did not contend that the Google Home app stores either a first or second zone scene, and the evidence established that the Google Home app also does not persistently store speaker group membership information.  Trial Tr. (Pedro) at 1312:21-1317:11.

zone scene" on its own (*i.e.*, without additional hardware or software).  *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345 (Fed. Cir. 2014) (an apparatus claimed "in functional terms" is only infringed if 'the product is designed in such a way as to enable the user of that [product] to utilize the function *without having to modify the product*."); *Typhoon Touch Tech., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) ("the apparatus as provided must be 'capable' of performing the recited functions, not that it might later be modified to perform that function."); Dkt. 721 at 3-4.

For the Causing Storage Limitations, Dr. Almeroth pointed to purported storage of the first and second zone scenes on the Google speakers: "[t]he information about the group is stored on the players, and so that would be sufficient to meet the requirements of the claim."  Trial Tr. (Almeroth) at 787:20-788:13, 787:19-789:25.  Dr. Almeroth thus relied upon program instructions that exist on the accused Google *speakers*, not in the Google Home app (or the "controller" device on which the Google Home app is installed).  *Id.* (Almeroth) at 789:15-20 (Q: "Now, Dr. Almeroth, I don't want to look at in detail, but have you also seen source code that shows storing?" A: "Yes.  There's other source code that goes through the process of what the document describes as storing the configuration in the prefs file, and so that is certainly present in the source code.").  Indeed, Dr. Almeroth did not identify ***any*** program instructions within the accused Google Home app that, when executed, performs the causing storage limitations of Claim 1.  Nor could he.  The unrebutted evidence confirms the Google Home app is not capable of performing any accused causing storage operation without adding accused Google speakers.  *Id.* at 694:9-22, 785:15-786:9.  Thus, there can be no infringement as a matter of law.

## III.     NO REASONABLE JURY COULD FIND THAT GOOGLE WILLFULLY INFRINGES THE '966 PATENT

"To establish willful patent infringement, the patent owner must prove knowledge of the patent and knowledge of infringement."  *Sonos, Inc. v. Google LLC*, No. 21-cv-7559-WHA, Dkt. 156 at 4 (N.D. Cal. Mar. 16, 2022) ("MTD Order").  "[K]nowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages."  *Id.* (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016)).  And "the patentee must show the accused infringer had a specific intent to infringe at the time of the challenged conduct."  *Id.* (quoting *Bayer*

*Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987-88 (Fed. Cir. 2021)).

The only evidence Sonos introduced to support Google's knowledge of the patent and specific intent to infringe was (1) a draft complaint that its counsel, Alaina Kwasizur, shared with Google on September 28, 2020, the day before Sonos filed its complaint in the Western District of Texas, and (2) the declaratory judgment complaint Google filed on September 28, 2020.  Trial Tr. (Kwasizur) at 1041:6-1042:18, 1045:12-20, 1048:25-1049:22.  This evidence is not sufficient to establish knowledge or specific intent.

### A.   Sonos's Draft Complaint Is Not Sufficient To Establish Google's Knowledge And Specific Intent To Infringe

Courts in this District have repeatedly held that allegations of knowledge based on a complaint are not enough to state a claim for willful infringement.  *See, e.g.*, *NetFuel, Inc. v. Cisco Sys., Inc.*, 2018 WL 4510737, at *3 (N.D. Cal. Sept. 18, 2018) (dismissing willful infringement claim because the "Complaint lacks any allegation that [the defendant] had actual knowledge of the existence of the Patents-in-Suit and their issuance before the filing and service of the Complaint"); *Radware, Ltd. v. F5 Networks, Inc.*, 2016 WL 4427490, at *3 (N.D. Cal. Aug. 22, 2016) (granting JMOL on willfulness because the plaintiff did not inform the defendant of the patents-in-suit before the plaintiff filed the lawsuit); *Avocet Sports Tech., Inc. v. Garmin Int'l, Inc.*, 2012 WL 1030031, at *4 (N.D. Cal. Mar. 22, 2012) (finding willfulness allegations insufficient because the plaintiff failed to allege any facts suggesting that the defendant had knowledge of the patent "prior to the filing of the Complaint").  Thus the draft complaint Sonos provided to Google the day before it filed its case in the Western District of Texas was insufficient to establish the requisite knowledge and specific intent for willful infringement.

### B.   Google's Declaratory Judgment Complaint Was Not Sufficient To Establish Knowledge And Specific Intent To Infringe

The Court has to date permitted Sonos's willful and indirect infringement allegations for the '966 patent, noting that Google "commenced its own declaratory judgment action *before* Sonos filed its affirmative infringement action."  Dkt. 566 at 30.  But Google's declaratory judgment complaint is not sufficient to establish knowledge and specific intent to infringe.  If anything, Google's declaratory judgment complaint demonstrates that it had a good-faith belief that it did ***not*** infringe.

There is no logical basis to presume that Google's allegation of non-infringement is factual support for the exact opposite proposition. *E.g.*, *Apple Inc. v. Princeps Interface Techs. LLC*, 2020 WL 1478350, at *4 (N.D. Cal. 2020) ("Apple, in filing an action seeking a declaratory judgment of noninfringement, arguably asserts a 'reasonable, good-faith belief in noninfringement,' which 'can negate the specific intent required for induced infringement.'") (citation omitted); *Google LLC v. Princeps Interface Techs. LLC*, 2020 WL 1478352, at *4 (N.D. Cal. Mar. 26, 2020) (same); *see also* Lemley, *Inducing Patent Infringement*, 39 U.C. Davis. L. Rev. 225, 243 (2005) ("[I]t is not reasonable to assume that merely because a defendant is aware of the existence of a patent, he intended to infringe it.").[8]

The Court previously allowed Sonos's allegations to proceed based on the assumption that Google must have known about the '966 patent before Sonos shared its draft complaint on September 28, 2020, because Google could not have studied the asserted patents and put together a declaratory judgment complaint with an adequate Rule 11 basis in one day. *See* Trial Tr. at 720:1-721:4. But Sonos has never alleged that Google lacked Rule 11 basis for its declaratory judgment complaint. To the contrary, Sonos's case depends on Google having a sufficient Rule 11 basis because Sonos contends the declaratory judgment complaint is circumstantial evidence of Google's pre-suit knowledge of the '966 patent. *See* Dkt. 699 at 3.[9]

---

[8] Such a finding could turn every declaratory judgment case into a willful and/or indirect infringement case, and chill parties from filing declaratory judgment claims for fear of providing the necessary predicate for such claims. Addressing this argument at the motion to dismiss stage, the Court held that "[i]nfringers should not be allowed to immunize themselves from ongoing willfulness by forcing patent owners into litigation." MTD Order at 9. But filing a declaratory judgment complaint would not immunize a defendant from willful infringement claims in every case. If there are other plausible allegations to support such claims, a patentee can still raise them. The question is whether a patentee can use a declaratory judgment claim—by itself—as a weapon, turning a denial of infringement into factual support that supports knowledge of infringement. Google respectfully submits that such a finding would represent a novel change in law.

[9] When Sonos sent its draft complaint the parties had already been engaged in months of intense parallel litigation before the International Trade Commission. And the parties' ongoing ITC case involved the same products accused here, meaning Google and its counsel were already familiar with their design and operation. Google was thus able to identify at least one element per independent claim that it had a reasonable and good faith belief that it did not practice. *See Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997) ("Literal infringement requires that every limitation of the patent claim be found in the accused infringing device.").

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

Furthermore, Sonos has not introduced any evidence that Google had knowledge of the '966 patent before September 28, 2020.  And even if the jury accepts that Google's declaratory judgment complaint is circumstantial evidence of knowledge before that date, there is still no evidence that Google had a specific intent to infringe the '966 patent.  Without such evidence, no reasonable jury could find that a declaratory judgment complaint *of non-infringement* is evidence of a specific intent *to infringe*.  To the contrary, Google's good-faith belief in non-infringement was reasonable given the Court has already found Google did not infringe one of the asserted patents and that two of the patents were invalid.  Moreover, Sonos withdrew two other patents before the Court or jury could even consider Google's non-infringement declaratory relief claims.[10]

Because no reasonable jury could find that Sonos's draft complaint or Google's declaratory judgment complaint give rise to the knowledge or specific intent that is required for willful infringement, Google is entitled to judgment as a matter of law.

## IV. NO REASONABLE JURY COULD FIND THAT GOOGLE INDIRECTLY INFRINGES THE '966 PATENT

The Court previously granted Google's motion for summary judgment of no indirect infringement with respect to the '885 patent.  Dkt. 566 at 30-31.  That leaves Sonos with indirect infringement allegations only for the '966 patent.  *See id.* at 33.  Under Sonos's theory, indirect infringement occurs when a user downloads the Google Home App onto a computing device (*e.g.*, a phone, tablet or laptop).  Dkt. 615 at 4.  Sonos accuses not only Google first-party devices (Pixel phones, tablets and laptops), but also third-party devices.  And all of Google's alleged infringement for the '966 patent is indirect infringement, as Google does not make, sell, import or offer for sale devices that meet the elements of the claim.  *See* § II.A.[11]

---

[10] The Court has suggested that it would take weeks to assess the validity of multiple patents.  But Google's complaint sought declarations only of non-infringement, not invalidity.  Dkt. 1 at 5-11.

[11]  The Court has also indicated it plans to instruct the jury that a computing device is only capable of serving as a controller for the purposes of the '966 patent if it is "networked with at least three zone players that may be added to overlapping zone scenes." Dkt. 751 at 7.  Under this interpretation Sonos has failed to present evidence of indirect infringement for the additional reason that Google has not induced or encouraged users to configure the Google Home app with at least three zone players.

1

**A.**   ***Sonos Has Not Introduced Evidence To Establish Google's Knowledge And Specific Intent For Indirect Infringement***

2

3

"Like willful infringement, both forms of indirect infringement—induced and contributory

4

infringement—require knowledge of the patent and knowledge of infringement."  MTD Order at

5

10.  To support the knowledge element of its claim for indirect infringement, Sonos relies on the

6

same evidence as for its willful infringement claim: the draft complaint Sonos shared with Google

7

on September 28, 2020, and the declaratory judgment complaint Google filed the same day.  Trial

8

Tr. (Kowalski) at 999:5-8; *id.* (Kwasizur) at 1025:6-20; TX6130; TX6136; TX8240.  This evidence

9

of purported knowledge and intent is insufficient in the context of indirect infringement for the same

10

reasons explained above in the context of willfulness.  Because no reasonable jury could conclude

11

that Google had knowledge of the '966 patent and a specific intent as required for indirect

12

infringement, Google is entitled to judgment as a matter of law.

**B.**   ***Google Did Not Induce Infringement Of The '966 Patent***

13

14

"To prevail on inducement, the patentee must show, first that there has been direct

15

infringement, and second that the alleged infringer knowingly induced infringement and possessed

16

specific intent to encourage another's infringement."  *Kyocera Wireless Corp. v. ITC*, 545 F.3d

1340, 1353-54 (Fed. Cir. 2008).  Sonos failed to establish each of these elements.

17

**1.**   ***Sonos Has Not Offered Any Evidence That Third Parties Directly Infringe The '966 Patent***

18

19

"[I]nducement liability may arise if, but only if, there is direct infringement."  *Limelight*

20

*Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) (cleaned up).  Thus, Sonos "must

21

either point to specific instances of direct infringement or show that the accused device necessarily

22

infringes the patent in suit" to establish induced infringement.  *ACCO Brands, Inc. v. ABA Locks*

23

*Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  Sonos did neither.

24

During its case-in-chief, Sonos did not identify any specific instance of direct infringement

25

by a third party.  "[T]he record contains no evidence of actual users having operated the [accused

26

products] in an infringing manner" such as "witness testimony of actual . . . users" or "surveys of

27

[Google's] customers[.]"  *Id.*  Sonos likewise failed to present evidence that the accused products

28

necessarily infringe the '966 patent.  This is not merely a theoretical concern regarding Sonos's

1  burden of proof at trial; here, the accused products have "thousands of uses," as Sonos's own

2  technical expert admitted.  Trial Tr. (Almeroth) at 912:19-913:22.  Google's expert testified that on

3  average *less than one percent* of the accused speakers are in *any* kind of group (static, dynamic, or

4  stereo pair) on any given day.   Trial Tr. (Bakewell) at 1560:11-1561:9; TX140.   This was

5  corroborated by fact testimony.  *Id*. at 1309:7-1310:12 (Pedro: "I would not say [overlapping

6  speaker groups is] an important feature based on how little speaker groups got used in the Home

7  app").  This calls into question whether anyone has downloaded the Google Home app and used  the

8  claimed inventions, which requires creation of *two static* speaker groups, using *three* accused

9  speakers, while one of those speakers remains in "standalone mode," and then transitioning that

10  speaker from "standalone mode" to grouped playback.  Sonos certainly has not provided evidence

11  that anyone has practiced the accused functionality using a third-party computing device, for

12  example a non-Pixel phone.  And Sonos does not dispute that the accused Google speakers "can be

13  used at any given time in a noninfringing manner," such that "the accused device does not

14  necessarily infringe the ['966 patent."  *ACCO Brands*, 501 F.3d at 1313 (holding that patentee

15  failed to establish direct infringement and rejecting argument that accused device being "capable of

16  being used in an infringing matter" constituted evidence of induced infringement).

17       Accordingly, no reasonable jury could find the direct infringement that is a necessary

18  predicate to Sonos's claim for indirect infringement of the '966 patent.

19              **2.      *Sonos Has Not Shown That Google Possessed A Specific Intent To
              Encourage Direct Infringement Of The '966 Patent***

20

21       Even if Sonos had demonstrated that third parties directly infringe the '966 patent (it has

22  not), Sonos still failed to demonstrate that Google had an "intent to encourage infringement."

23  *Fluidigm Corp. v. IONpath, Inc.*, No. C 19-05639 WHA, 2020 WL 408988, at *3 (N.D. Cal. Jan.

24  24, 2020).  "[M]ere knowledge of possible infringement will not suffice."  *Vita-Mix Corp. v. Basic

25  Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).  Moreover, "[i]nducement requires more than

26  just intent to cause the acts that produce direct infringement."  *DSU Medical Corp. v. JMS Co.*, 471

27  F.3d 1293 (Fed. Cir. 2006).  Instead, Sonos was required to show that Google "knew or should have

28  known [its] actions would induce actual infringements."  *Barry v. Medtronic, Inc.*, 914 F.3d 1310,

1334 (Fed. Cir. 2019) (citation omitted).  But based on Sonos's evidence, no reasonable jury could

find that Google had any such intent.

"[A]dvertising an ***infringing use*** or instructing how to engage in an ***infringing use***" may

support specific intent if the advertisement or instruction "encourage[s], recommend[s], or

promote[s] ***infringement***." *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625,

631 (Fed. Cir. 2015) (emphases added) (citation omitted).   However, advertisements and

instructions "[m]erely describ[ing]" an infringing use fail to establish specific intent.   *Id*.   In

addition, "where a product has substantial noninfringing uses, intent to induce infringement cannot

be inferred even when the [alleged inducer] has actual knowledge that some users of its product may

be infringing the patent." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1059 (Fed. Cir. 2010)

(citation omitted).  In this case, the accused computing devices have "thousands" of non-accused

features.  Dkt. 660 at 7; Trial Tr. (Almeroth) at 912:25-913:22 (The Court: "And don't you agree

that that's true, that these phones have -- well before these patents ever came along had thousands

of uses?"  Dr. Almeroth:  "I do […] I agree; if you turn on your flashlight, that's not related to, you

know, the importance of this particular technology.").   The Google Home app likewise has a

significant number of non-accused features, including for example controlling lightbulbs,

thermostats, ovens and outdoor cameras. *Id.* (Malackowski) at 1153:21-1154:13; *id.* (Pedro) at

1306:19-1309:14.

Sonos has not offered any evidence that Google encouraged users to download the Google

Home app and buy three or more accused speakers.  In support of its indirect infringement claim,

Sonos presented two Google blog posts and one Google online help page, but these materials do not

establish specific intent. *See* TX0036; TX6292; TX6612.  First, they do not anywhere describe an

infringing use of the accused products: they only discuss creating a single, discrete speaker group.

The blog posts and help page do not reference multiple groups and even if they did, they certainly

do not suggest the use of overlapping speaker groups or maintaining a speaker in standalone mode

when adding it to a group.  Thus, they cannot be deemed to encourage, recommend, or promote such

functionalities.  As Sonos's technical expert, Dr. Almeroth, testified, these documents "describ[e]

some of the features of [] multiroom audio" but do not "say anything" about overlapping zone scenes

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

or adding a speaker in standalone mode to a group.  *See, e.g.*, Trial Tr. (Almeroth) at 768:1-8 ("That was from TX36.  That was that page that described using the functionality of the Google Home app to be able to use and control the speaker groups on some of these devices"); *id.* at 832:4-23, 833:9-834:12, 853:16-854:11 (Q:  "It doesn't say anything about overlapping zone scenes or zone groups; correct?" A: "I don't believe it does." Q: "This document says nothing about while operating in a standalone mode, you add a speaker to another group?" A: "Correct.  It doesn't go into that level of detail."), 854:12-855:7, 933:3-13 ("This was a posting by Google to its blog describing some of the features of the multiroom audio.").  Second, Sonos has not presented any evidence that these materials ever reached alleged direct infringers as the documents were not distributed with the accused products.

Even if Sonos had proven that Google had some knowledge of infringing uses, intent to induce infringement could not be inferred because Sonos admits that the accused products have a significant number of non-accused features.  Dkt. 660 at 7; Trial Tr. (Almeroth) at 912:25-913:22 *id.* (Malackowski) at 1153:21-54:13; *see also id.* (Pedro) at 1306:19-1309:5.  On this record, no reasonable jury could conclude that Google induced infringement.

### C.     *Google Did Not Contributorily Infringe The '966 Patent*

To prove contributory infringement, Sonos must prove that (1) there was direct infringement, (2) the accused infringer had knowledge of the patent, (3) the accused component has no substantial non-infringing uses, and (4) the component is a material part of the invention.  *People.ai, Inc. v. SetSail Techs., Inc.*, No. C 20-09148 WHA, 2021 WL 2333880, at *6 (N.D. Cal. June 8, 2021) (quoting *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010)).  As explained above, Sonos failed to establish both direct infringement and the requisite knowledge and specific intent. Sonos also failed to establish that there are no substantial non-infringing uses for the accused products.

## V.    <u>NO REASONABLE JURY COULD FIND FOR SONOS ON DAMAGES</u>

The Court has stated its intent to instruct the jury that it should not consider Mr. Malackowski's opinions regarding IFTTT.  *See* Trial Tr. at 1402:16-1403:2.  Google nonetheless briefly sets forth herein the reasons why Mr. Malackowski's IFTTT analysis cannot support an

award of damages—namely, (1) Sonos has not established that anyone is willing to pay IFTTT's subscription price for functionality that is comparable to the claimed invention; (2) IFTTT is not technologically comparable to the claimed invention, (3) Sonos's expert failed to apportion IFTTT's subscription price to the claimed invention, and (4) Sonos's expert's application of a 70/30 revenue split to IFTTT's subscription prices is not supported by the evidence.

The Court should enter judgment as a matter of law that no reasonable jury could award damages in excess of $2.2 million because (1) the jury should not be permitted to consider the IFTTT analysis for the reasons stated herein; (2) Sonos's portfolio-wide litigation licenses are not sufficiently tied to the patents-in-suit and Sonos failed introduce evidence that would allow the jury to apportion the payments made under those licenses to the claimed invention; and (3) Sonos and its expert failed to consider the minimal use of the claimed invention.[12]

### A.   Sonos Has Not Established A Willingness To Pay For Comparable Technology Using IFTTT

In its own words, "Sonos used IFTTT to establish the *price* that consumers are willing to pay for a comparable technological solution." Dkt. 699-2 at 1 (emphasis in original).  But the IFTTT app was free until September 2020, almost a year after the hypothetical negotiation for the '966 patent and two months before the hypothetical negotiation for the '885 patent.   Trial Tr. (Malackowski) at 1129:25-1130:9.  And there is no evidence that anyone ever paid for an IFTTT subscription for the accused functionality.  *Id.* at 1147:13-18.  In Mr. Malackowski's view, such evidence "would not be relevant" even if Sonos had presented it.  *Id.*

Because IFTTT can do millions of different things, the price users are willing to pay for IFTTT has no credible relation to Sonos's claimed speaker grouping technology.  There is no evidence that the parties would have looked to IFTTT subscription fees during the hypothetical negotiation, or that Google would have agreed to use IFTTT's fees as a starting point without

---

[12]   As discussed above, the Court has indicated it plans to instruct the jury that a computing device is only capable of serving as a controller for the purposes of the '966 patent if it is "networked with at least three zone players that may be added to overlapping zone scenes." Dkt. 751 at 7.  Under this interpretation Sonos has failed to present evidence that could support a damages award because it has not identified the number of Google Home app installations that have been networked with at least three zone players.

1   evidence that users were actually willing to pay those fees for the claimed invention.  Because Mr.

2   Malackowski failed to establish a willingness to pay for comparable technology using IFTTT,

3   Google is entitled to judgment as a matter of law on damages.  *Riles v. Shell Exploration & Prod.*

4   *Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) (vacating damages award where patentee "did not provide

5   any evidence or testimony to show that [its expert's] models reflected what the parties might have

6   agreed to, at any time, particularly at the time the infringement began").

7              **B.  IFTTT Is Not Technologically Comparable To The Claimed Invention**

8         The Federal Circuit has allowed the use of comparable, or "benchmark" products to inform

9   a reasonable royalty analysis.  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014),

10  *overruled on other grounds, Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *i4i*

11  *Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).  However, the Federal Circuit

12  requires that benchmark products contain features "similar to the asserted features."  *Id.* at 1318.

13  The party relying on a benchmark product must demonstrate that it is comparable.  *Id.* at 1315.

14        IFTTT is not technologically comparable to the claimed invention.  IFTTT is a generic

15  scripting app that allows users to create "applets," comprising sequential chains of conditional "if"

16  and "then" statements.  Trial Tr. (Almeroth) at 823:21-824:9.  According to IFTTT's website, the

17  value of the app is that it "can do anything!"  TX0115; Trial Tr. (Almeroth) at 920:7-21; 1141:9-22;

18  1142:22-24.  IFTTT  is not designed or marketed to be used for speaker grouping.  *Id.*  Sonos

19  contends that IFTTT is comparable because it is ***capable*** of grouping speakers in a way that is

20  comparable to the claimed invention.  But while IFTTT has the ability to perform "millions" of non-

21  patented functions, it cannot perform the very function that Sonos claims is the patented invention—

22  the ability to facilitate synchronous audio playback on grouped speakers.  Trial Tr. (Almeroth) at

23  328:25-329:4;  921:10-16;  922:3-6;  923:9-16; *id.* (Malackowski) 1143:24-1144:3.   As Sonos's

24  technical expert admitted, the purportedly comparable functionality that he created using IFTTT

25  only results in "two speakers playing music individually at the same time."  *Id.* (Almeroth) at

26  921:10-16.  IFTTT cannot even group speakers.  *Id.*

27

28

**A.** *Sonos Failed To Apportion IFTTT's Subscription Price To The Claimed Invention*

It is black-letter law that a patentee must apportion damages to the incremental value of the claimed invention. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1302 (Fed. Cir. 2018) (holding that "[f]urther apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements" where "DRTR is itself a multi-component software engine that includes non-infringing features [and] the percentage of web traffic handled by DRTR is not a proxy for the incremental value of the patented technology to WebPulse as a whole").

Sonos's expert purported to "apportion" from 20 applets to two to account for the fact that a user only needs two multi-action applets to create technically comparable functionality using IFTTT.  Trial Tr. (Malackowski) at 1131:3-1132:7.  But the two applets that Sonos's expert uses can still "do anything!" once a user purchases a subscription.  TX0115; Trial Tr. (Malackowski) at 1141:23-1143:11.  In addition, a user can decide to delete their applets and reprogram them to do something else an unlimited number of times.  Trial Tr. (Malackowski) at 1142:11-21.  The two applets that Mr. Malackowski "apportions" to are not tied to the claimed invention in any way.

Because Sonos failed to apportion to the claimed invention, no reasonable jury could find in Sonos's favor on damages.  Google is entitled to judgment as a matter of law.

**C.** *Sonos's Proposed 70/30 Revenue Split Is Arbitrary And Not Sufficiently Tied To The Facts Of The Case*

In *Uniloc*, the Federal Circuit found the "25 percent rule" to be inadmissible because it "fails to tie a reasonable royalty base to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).  Specifically, it "does not say anything about a particular hypothetical negotiation" and "would predict [] the same 25%/75% royalty split" every time, regardless of the parties or technology involved.  *Id.* at 1317.

Like the split at issue in *Uniloc*, Mr. Malackowski's 70/30 revenue split is not supported by the facts of this case.  A commercial arrangement for commissions on the use of infrastructure is fundamentally different than a patent license negotiation.  Trial Tr. (Malackowski) at 1154:22-1161:13.  And in the hypothetical negotiation, Sonos did not develop, and would not be providing Google with, any app for download and/or sale on the Google Play Store.  *Id.* at 1091:5-18; 1156:8-

21.  Sonos would be providing Google with only a bare patent license.  Google would be the one developing the software to actually practice the licensed invention, Google would be the one assuming the associated business risks.  *Id.* at 1155:18-23.  Mr. Malackowski did not make any adjustments to account for these important differences.  *Id.* At 1154:22-1161:13.

Further, there is no basis to assume Sonos would position itself as an app developer during the hypothetical negotiation.  *Id.* at 1140:15-18.  There is no evidence that either party has ever used Google's Play Store agreement in a patent license negotiation, or that Google has ever discussed anything resembling a 70/30 revenue split with Sonos or another licensor.  *Id.* at 1156:8-21.  All of the license or purchase agreements in the record from Google involve a one-time lump sum payment.  Trial Tr. (Bakewell) at 1587:18-1588:8.  None represent the present value of a future royalty stream divided on a 70/30 basis.  Trial Tr. (Malackowski) at 1156:8-21.

### D. Sonos's Portfolio-Wide Settlement Agreements Cannot Support A Reasonable Royalty Award

The party offering a license agreement in support of a reasonable royalty calculation has the burden of proving that the license is sufficiently comparable to the technology at issue.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009).  The Federal Circuit routinely holds that royalty rates for portfolio-wide licenses are not comparable unless there is evidence that would allow a fact-finder to apportion to the claimed invention.  *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 972-73 (Fed. Cir. 2022) (portfolio-wide license not comparable because there was no evidence that the asserted patents were the focus of the underlying negotiations, and the negotiating parties generally treated the asserted patents as "chaff, not wheat"); *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 10 F.4th 1358, 1374-75 (Fed. Cir. 2021) (portfolio-wide license not comparable).  The Federal Circuit has also been skeptical of settlement agreements, which are often "strongly influenced by a desire to avoid full litigation."  *Hanson v. Alpine Valley Ski Area, Inc*., 718 F.2d 1075, 1078–79 (Fed. Cir. 1983).

In this case, all three licenses that Sonos presented to the jury were portfolio-wide.  Trial Tr. (Kwasizur) at 1010:14-23; 1015:6-11; 1017:21-24.  Two were negotiated to settle actual litigation.  *Id.* at 1010:14-23; 1013:25-1014:8.  The third was negotiated to settle threatened litigation and thus

includes a release of claims and covenant not to sue. *Id.* at 1018:8-19; TX6631 at § 2.1, 3.2. Because of these features, both sides' experts agree that Sonos's agreements are not comparable for the purposes of the hypothetical negotiation. Trial Tr. at 1162:5-1164:13.

A reasonable jury has no way to apportion the royalty rates from these portfolio-wide agreements to the patents-in-suit. Ms. Kwasizur did not testify that the '885 or '966 patents were the focus of negotiations of the prior agreements. And neither Ms. Kwasizur nor Mr. Malackowski presented any facts that would allow a reasonable jury to conclude that the '885 and '966 patents are more valuable than any of the other 1000+ patents in Sonos's portfolio. Mr. Malackowski described Sonos's portfolio-wide licenses as a "buffet" where a licensee pays the same fee no matter how many or few patents they actually practice. Trial Tr. (Malackowski) at 1098:11-19. To the extent this testimony can be construed as apportionment, it is insufficient under Federal Circuit law. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379-81 (Fed. Cir. 2021) (rejecting a comparable license theory where the only evidence of apportionment was testimony that Omega sought the same licensing fee of five dollars per unit "whether it's one patent or 50 patents").

### E. With IFTTT Excluded, Sonos Failed To Introduce Evidence That Would Allow the Jury To Apportion To The Claimed Invention

During the pretrial conference, the Court warned that it may exclude Sonos's damages expert's reliance on IFTTT. Despite this, Sonos based its damages case on IFTTT. With IFTTT excluded, there is no evidence from which a reasonable jury could even arguably apportion to the claimed invention. *Finjan*, 879 F.3d at 1302.

### F. Sonos Failed To Consider Use Of The Claimed Invention

Evidence of use is a key consideration during the hypothetical negotiation. *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697 (1933); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009). In *Lucent*, the Federal Circuit reversed denial of an accused infringer's motion for JMOL and vacated a $360 million verdict where the accused feature was a minor component in the overall software product, and where patentee could not show that there was substantial use of the feature. *Id.* ("The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers. This is so because this is what

the parties to the hypothetical negotiation would have considered.")

In this case, Sonos's damages expert purported to apply the "Income Approach," which by his own definition attempts to "value a patent by measuring the benefits derived from *use* of the patent[.]"  Trial Tr. (Malackowski) at 1095:10-1096:1; 1138:17-1139:20 (emphasis added).  Yet Mr. Malackowski's royalty base and rate do not account for the low usage of the accused functionality.  Mr. Malackowski assumed that 29% of users have the ability to practice the patents-in-suit because public information indicates that this is the percentage of households with three or more smart speakers.  *Id.* at 1131:20-1132:7.  But this reduction speaks only to capability (at best – since there is no evidence that three or more of the speakers in one of those 29% of households are all Google speakers that can be networked with the Google Home app), not usage.  *Id.* at 1149:4-10.  It also overstates usage in several key ways, for example because it does not represent people with three or more Google speakers, does not represent people who create overlapping speaker groups with Google speakers, and does not represent people who control Google speakers with the Google Home app.  Trial Tr. (Bakewell) at 1560:11-1561:9; TX140.  Mr. Malackowski explicitly ignored evidence regarding usage of the accused Google speakers, including evidence that the accused speakers are only grouped on average between 1% and 3% of the time.  Trial Tr. at 1148:15-1150:4; 1151:2-1154:05 (Q: "And just to be clear, you did not use usage metrics for grouping functionality in your reasonable royalty calculations for the zone scene patents?"  Malackowski: "I think that's true, correct.").[13]

## CONCLUSION

Google respectfully requests that the Court grant judgment as a matter of law on direct infringement, indirect infringement, willful infringement, and damages.

---

[13]    This usage data still overrepresents the claimed invention because it includes information regarding non-accused types of grouping, namely dynamic grouping and stereo pairing.  Trial Tr. (Chan) at 1521:20-1523:10; *id.* (Bakewell) at 1560:11-1561:9.

1   DATED:  May 18, 2023                    QUINN EMANUEL URQUHART & SULLIVAN,
2                                           LLP

3                                           By    */s Sean Pak*
4                                                 Sean Pak
                                                  Melissa Baily
5                                                 James D. Judah
                                                  Lindsay Cooper
6                                                 Marc Kaplan
                                                  Iman Lordgooei
7

8                                                 *Attorneys for GOOGLE, LLC*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on May 18, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via email.

*/s Sean Pak*
Sean Pak
