CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
BAS DE BLANK (SBN 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:     +1 312 754 0002
Facsimile:     +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., | Case No. 3:20-cv-06754-WHA |
| Plaintiff and Counter-defendant, | Consolidated with<br>Case No. 3:21-cv-07559-WHA |
| v. | **SONOS, INC.'S OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| GOOGLE LLC, | |
| Defendant and Counter-claimant. | Judge:  Hon. William Alsup<br>Courtroom:  12, 19th Floor<br>Trial Date: May 8, 2023 |

1  **I.       INTRODUCTION**

2          Sonos presented ample evidence to support its claims that Google infringes the asserted

3  claims of the '885 and '966 patents, including by indirectly and willfully infringing, and to

4  support its entitlement to damages.  That evidence consisted of, among other things, testimony

5  from Google's own engineer that Google's accused speaker groups are "saved persistently"—

6  directly rebutting Google's lead non-infringement argument with respect to the '966 patent that

7  the accused products do not "cause storage" of speaker groups.  Google also argues that its new

8  version does not infringe the '966 or '885 patents because the speakers do not continue to operate

9  in "standalone" mode, but fact and expert witness testimony—confirmed by product testing and

10  source code analysis—showed that the speakers in Google's "redesign" remain in standalone

11  mode and are configured to playback music individually until receiving a launch group message.

12  Sonos also established Google did not make any changes to the Google Home app, so its

13  argument that it even has a "redesign" for the '966 patent is wrong.  And the evidence shows that

14  continuously operating in standalone mode is not even a limitation of the '966 patent, so for that

15  reason too, Google's noninfringement argument fails.  Drawing all reasonable inferences in

16  Sonos's favor, this Court should deny Google's motion for judgment as a matter of law (JMOL)

17  and send the case to the jury.

18  **II.      LEGAL STANDARD**

19          The Court must view the evidence in the light most favorable to the non-moving party,

20  *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017), and must deny JMOL unless "no

21  reasonable juror could find in the non-moving party's favor."  *Torres v. City of Los Angeles*,

22  548 F.3d 1197, 1205 (9th Cir. 2008).

23  **III.     ARGUMENT**

24          **A.       A Reasonable Juror Could Find That Google Directly And Indirectly
                      Infringed The '966 Patent Via Prior Versions Of The Accused Products.**

25                   **1.       Sonos presented sufficient evidence that Google's prior versions
                             directly infringed the '966 patent.**

26

27          Google contends that the '966 patent requires a computing device "networked with at least

28  three zone players that may be added to overlapping zone scenes."  As Sonos has explained, that

1   position is not supported by the claim language or Federal Circuit caselaw.  *E.g.*, Dkt. 720.  Even

2   accepting the view that the claims required three speakers networked with a computing device,

3   Google disputes only a single element of the '966 patent (which appears twice) as applied to

4   Google's prior versions of the accused products:  whether the accused products "caus[e] storage"

5   of the first and second "zone scene[s]."  Dkt. 756 ("JMOL") at 8-12.  Google's arguments either

6   ignore testimony from its own witnesses or import requirements into the claims well beyond the

7   plain language of the term "causing storage."

8       First, the Court has construed "zone scene" as being a "previously-saved grouping of zone

9   players according to a common theme."  Dkt. 762 at 9.  As such, claim 1 of the '885 also requires

10  *saving* zone scenes.  And the Court has previously found that Google's older speaker versions

11  infringe claim 1 of the '885 patent.  Dkt. 309.  Thus, the Court has *found* that Google's speaker

12  groups are stored and (by implication) the older product versions *necessarily* infringe the

13  limitations in the '966 patent that call for "causing storage" of the zone scenes.

14      Indeed, the evidence introduced at trial shows that a zone scene is created in the Google

15  Home app when a user defines the zone scene and then hits the "save" button.  5/11/23 Tr. at

16  776:16-777:12.  Thereafter, the user can *invoke* the zone scene which shows that the zone scene

17  has been stored within the system.  *Id*. at 777:19-24.  It is hard to image how Google can argue—

18  in the face of this evidence—that the Google Home app does not *cause storage* of the zone scene.

19  At a minimum, there is enough evidence for the jury to conclude that the Google Home app does

20  cause storage.

21      At trial, Google seemed to advance the argument that the word "storage" in the '966

22  patent was (in some unspecified way) different from the "saving" required by the definition of

23  zone scene and that this difference was encapsulated by the idea that the zone scene must be

24  "saved persistently."  JMOL at 9.  This argument turns on an (implicit) claim construction for

25  which Google has never provided any principled reasoning.  Regardless, Google's own witness

26  admitted that Google speaker groups are saved persistently:  Mr. MacKay was asked "just to

27  clarify, you agree that a speaker group is something that is saved by a user in advance of being

28  launched?"  Dkt. 755-2 (MacKay 5/10/22) at 11; Ex. 1 at 117:17-19.  Mr. MacKay testified:

SONOS'S OPP. TO GOOGLE'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
CASE NO. 3:20-CV-06754-WHA

1    "Well, again, the -- the group might never be launched. Like you might never cast to the group.

2    So it's -- I would characterize it as -- a static group is something that the user configures and it's

3    *saved persistently*."  Dkt. 755-2 (MacKay 5/10/22) at 11; Ex. 1 at 117:20-24 (emphasis added).[1]

4          Google tries to read in its "persistent" requirement by quoting Dr. Almeroth, arguing that

5    he "acknowledged that unlike dynamic groups, zone scenes are persistently stored for at least a

6    period of time," quoting a portion of Dr. Almeroth's report stating that "the user created groups

7    that are predefined and pre-saved as part of the zone scenes are *persistent*."  JMOL at 9 (emphasis

8    added).  But Dr. Almeroth made clear that he was not using the term "persistent" to "describe

9    what the claim requirement is," and that "[t]he paragraphs that you read from in the report that

10   use that term were describing the [Sonos] *system* not in the context of the claim."  5/11/23 Tr. at

11   901:21-902:3 (emphasis added).  And, indeed, the Court *knows* that the zone scene is saved

12   persistently because (as Google's witnesses admitted) after it is created the zone scene can be

13   invoked hours, days, or weeks later.  *See* 5/16/23 Tr. at 1278:15-25 (Mr. MacKay testifying that

14   as long as the group leader has been elected first and as long as one of the devices are online, then

15   after a new static speaker group has been created and saved, the user can launch that group

16   whenever they desire—whether an hour, two days, or three weeks later).

17         Moreover, the jury heard from Dr. Almeroth and saw Google's internal technical

18   document describing that "the *group* configuration is updated and *stored* in the prefs file on the

19   device."  TX6453 at p. 1 (emphasis added).  Dr. Almeroth testified regarding TX6453, which is

20   "an internal Google document that starts to describe some of the detailed functionality for how

21   the speaker group setup is to work."  5/11/23 Tr. at 784:23-785:2.  *See also* TX6453.  As Dr.

22   Almeroth explained, TX6453 shows "the mechanism for how groups are set up," "us[ing]

23

24   ---
     [1] For avoidance of doubt, Mr. Mackay's testimony was referring to static groups.  *See, e.g.*, Dkt.
     755-2 (MacKay 5/10/22) at 3-4; Ex. 1 at 57:4-8, 57:10 (Q: "What is a 'speaker group' as Google

25   uses that term? A: I would describe it as a set of devices that appears as a castable – as a Cast
     target.  And when casted to, they all play together – specifically – specifically audio."); Dkt. 755-

26   2 (MacKay 5/10/22) at 4; Ex. 1 at 63:1-8 (Q: "What is a 'static group'? A: So that is a group that
     the user defines using the Google Home app, I think, is the only way. So they define a group, and

27   then that group becomes a castable target."); Dkt. 755-2 (MacKay 5/10/22) at 4-5; Ex. 1 at 63:9-
     11, 63:13-16, 63:19 (Q "And how does a 'static group' compare to what is referred to as a
     'speaker group' in Exhibit 36? A: Let me go back. So a 'static group' is what is being referred to

28   in -- in this document, 'Create and manage speaker groups,' I think. … Yeah, that's accurate.").

something called cast V2 commands." 5/11/23 Tr. at 785:15-18.  *See also* TX6453 at p. 1.  As
TX6453 shows, "[i]t allows the Google Cast app to configure groups" and "[i]n this case the
Google Cast app would be the Google Home app that's running on the phone." 5/11/23 Tr. at
785:18-20.  *See also* TX6453.  TX6453 says that "[w]henever one of these commands arrives, the
group configuration is updated and stored in the prefs file on the device." *Id.* at p. 1; 5/11/23 Tr.
at 785:20-23.  Dr. Almeroth contextualized this statement, explaining "[s]o here what it's talking
about is the group creation … that happens as a result via the user interface, selecting the
speakers, grouping them together, and pressing 'save.'" 5/11/23 Tr. at 785:24-786:2.  As Dr.
Almeroth further explained, "[t]here is a message that's sent to the player, and it stores the group
configuration information in the prefs file on the device," which "gets more into the specific steps
beyond just the user interface of what happens when you create a group, and then the messages
that get sent between the controller and the smart speakers." *Id.* at 786:3-9.

Google's next argument is that the claims of the '966 patent require causing the storage of
"group membership information."  JMOL at 10. Again, the claims do not require storage of
membership information.  In fact, the specification identifies storage of membership information
as one non-limiting *example* of storing group information: player may save "a set of data
pertaining to the scene" and "[i]n one embodiment, the parameters include, but may not be
limited to, identifiers (e.g., IP address) of the associated players." TX0001 at 10:46-49.  That
cannot limit the claims.  *See Dow Chem. Co. v. United States*, 226 F.3d 1334, 1342 (Fed. Cir.
2000) (as a general rule claims of a patent are not limited to the preferred embodiment); *Intel
Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 836 (Fed. Cir. 1991) ("Where a
specification does not require a limitation, that limitation should not be read from the
specification into the claims.").

Setting Google's unsupported reading of the claims aside, the jury heard evidence that
Google *does* store membership information for its speaker groups.  Mr. Mackay testified that the
group leader "stores information about the followers that are currently connected to it." Dkt. 755-
2 (MacKay 5/10/22) at 8; Ex. 1 at 95:14-20.

And Dr. Almeroth directly observed storing in his testing, explaining "I mean, you can do it from the perspective of a user where you click on save and that group is saved, and you can come back later and that group still exists. And so you've caused storage of that group as required by the '966 patent." 5/11/23 Tr. at 789:21-25. And there is no dispute that the accused Google products allow for later invocation—something that necessarily requires storage. *See* 5/16/23 Tr. at 1278:15-25 (Mr. MacKay testifying that as long as the group leader has been elected first and as long as one of the devices are online, then after a new static speaker group has been created and saved, the user can launch that group whenever they desire—whether an hour, two days, or three weeks later). For these reasons too, a reasonable jury could reject Google's implausible arguments that it does not store grouping information for later invocation or play, *cf.* JMOL at 10.

Mr. Mackay provided additional testimony about how the Google Home App instructs speakers to save groups. He testified that the Home App sends a "MultizoneJoin_Group" message to the speakers, and that message contains "an identifier for the group" and the group name. 5/16/23 Tr.1243:3-1244:8; JMOL at 11 (admitting same). *See also* 5/18/23 Tr. 1642:8-1643:17 (Almeroth rebuttal testimony). This is exactly the "program instruction[]" that causes storage of the zone scene. JMOL at 11.

Google also argues that it does not infringe the '966 patent because the saving of speaker groups occurs only on the speakers, and not on the Google Home app. JMOL at 10, 11-12. But the independent claim does not require that the storage of the zone scene occur in *any* specific memory or location. And as discussed above, the Home App sends the "MultizoneJoin_Group" message, which causes the speakers to save group information. That satisfies the claims—including dependent claim 4 (requiring storage on the zone player).

Google also asserts that it does not directly infringe the '966 patent because "Google does not make or sell a computing device with the Google Home app installed or networked with at least three zone players." JMOL at 8 (capitalization and quotation marks omitted). Of course, "make" and "sell" are not the only actions that give rise to liability under 35 U.S.C. § 271(a); one who "uses" the accused instrumentality will be liable as a direct infringer. 35 U.S.C. § 271(a). Ample evidence shows that Google employees "use[d]" the Google Home App (such as through

1   internal testing) once it was installed on a computing device, including to form speaker groups.

2   Therefore, Google is a direct infringer.

3          For example, Mr. Mackay explained that Google uses "testing," including "set[ting] up

4   the group in a specific way to test in specific scenarios." 5/16/23 Tr. at 1244:12-16. *See also,*

5   *e.g.*, Dkt. 755-2 (MacKay 5/10/2022) at 18; Ex. 1 at 255:25-256:10, 256:12 ("[I]s one of the

6   things that that manual QA team does is test the speaker group functionality of those Nest

7   devices?" A: "Yes.").  Similarly, Mr. Maclellan testified that he worked on "debugging, testing,

8   making sure that it all works appropriately." 5/16/23 Tr at 1299:6-17.  And while the specific

9   testing that Mr. Maclellan described took place in in 2015, the jury also heard Mr. Pedro testify

10  that he conducted testing by installing the Google Home App on computing devices during the

11  period between October 2020 to June 2022.  Dkt. 755-2 (Pedro) at 2-3; Ex. 6 at 16:2-10, 17:18-

12  20, 17:23-:24, 18:24-19:3, 19:6-11, 19:14 ("Q. Do you recall when -- what time frame you were

13  on the Google Home app team? . . . A. Early October 2020 to late June 2022 . . . Q. Did you

14  perform any testing related to the Google Home app yourself while you were on the Google

15  Home app team? [A] I would say I did perform some testing. . . . [Q.] And so do I understand

16  correctly that for that kind of testing that -- that you engaged in, you would have installed a

17  Google Home app on [an] end user device in order to conduct that testing? [A.] Yes. Q. And then

18  once -- with that Google Home app installed on -- on it, on an end user device, would you then

19  have launched and run the Google Home app on that end user device during your testing? [A.]

20  Yes."), *id.* at 207:24-208:1, 208:4, 208:9-11, 208:14-16, 210:5-9, 210:19-21, 210:24-25 ("[Q]

21  Can you tell me in what capacity you would have used the Google Home app to create speaker

22  groups? [A.] I would have created speaker groups, A, to test issues as I needed to triage them.

23  And B, on -- as personal use.  Q. And then with respect to your personal use, I think you

24  mentioned there are -- have been times where you've used the Google Home app to create a

25  group? A. Yes. Q. Okay. And -- and once you created that all speakers group, did you then play

26  music on that all speakers group, Mr. Pedro? [A.] I may have to test it out, to see if it

27  worked.").Google's counsel elicited testimony from Dr. Almeroth confirming that typically, "you

28  would want to do testing" of a product both before releasing it, as well as after releasing it.

1    5/12/23 Tr. at 990:23-991:2 ("Q: Makes sense, right, because you would want to test a product

2    before you release it? After you release it, you want to test it to see if there are any bugs or if

3    there's opportunities for improvement? Do you agree? A: Yes, you would want to do testing.").

4    *See also, e.g.*, 5/11/23 Tr. at 769:22-770:2 ("Q. And, Dr. Almeroth, have you also seen any

5    evidence that Google internally tests all the versions of its Google Home app before releasing

6    them? A. Yes. Testing – there's evidence of testing and obviously testing these functions before

7    they're released into the marketed is absolutely critical.").  Because "[d]irect infringement can be

8    proven by circumstantial evidence," and a "finding of infringement can rest on as little as one

9    instance of [infringement] during the pertinent time period," *Toshiba Corp. v. Imation Corp.*, 681

10   F.3d 1358, 1364 (Fed. Cir. 2012), a reasonable jury could find that Google tested both the prior

11   and new versions of the accused products after the patents issued.  (And Google obviously tested

12   the redesign after both patents issued, as explained below.)

13           Thus, the Court should deny Google's motion for JMOL as to the prior versions' direct

14   infringement—or grant JMOL of infringement as explained in Sonos's motion (Dkt. 754).

15                   **2.      Sonos presented sufficient evidence that Google indirectly infringed
                               the '966 patent through the prior versions of its accused products.**

16

17           As explained above, Sonos provided more than sufficient evidence of acts of direct

18   infringement by third parties.  The jury heard evidence that 29% of households who have

19   speakers have three or more speakers, 5/12/23 Tr. at 1132:1-4, Ex. 7, PDX3.41 (citing TX6920),

20   which Google did not rebut.  *See also* 5/16/23 Tr. 1203:12-16 (Q. And the number of people who

21   own three or more Google speakers is something less than this 14 million number; correct? A.

22   [By Mr. Malackowski] We don't know the precise number but, yes, we would presume it's less

23   than that.").  The jury also heard evidence that "58 percent of survey respondents were either very

24   likely or extremely likely to purchase a bundle of three smart speakers."  5/17/23 Tr. at 1599:1-7

25   ("Google's own document from November of 2019, the same month of the hypothetical

26   negotiation of the '966, reports that 58 percent of survey respondents were either very likely or

27   extremely likely to purchase a bundle of three smart speakers; correct? A. [By Mr. Bakewell]

28   Yes, you did that. I did the math too. I think that's right."); *see also* TX158.  Under the Court's

construction, once a computing device installed with the Home App is networked to three or more speakers, that system "necessarily infringes the patent in suit" because the Home App has all required functionality. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). Contrary to Google's arguments (JMOL 16), because the asserted claims are directed to capability and not actual use or performance, actual execution of software functionality is not required. *See Finjan*, 626 F.3d at 1204; *Tex. Advanced Optoelectronic Solutions*; 895 F.3d at 1327. Infringement occurs as soon as the software component is downloaded to and/or installed on the computing device, or when the computing device is networked with three or more speakers.

Induced infringement further requires that Google: (1) "took certain affirmative acts to bring about the commission by others of acts of infringement"; and (2) "had 'knowledge that the induced acts constitute[d] patent infringement.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011)). Contributory infringement requires that: (1) Google had "knowledge of the ['966 patent]," (2) Google had "knowledge of patent infringement," and (3) the prior versions of Google's accused products were not common components suitable for non-infringing use. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). Willful blindness can satisfy the knowledge requirement for both forms of indirect infringement. *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016). Willful blindness develops when the defendant "subjectively believe[s] that there is a high probability that a fact exists" and "take[s] deliberate actions to avoid learning of that fact." *Glob.-Tech*, 563 U.S. at 769.

Sonos presented evidence that Google took active steps to induce infringement. Google encourages—and in fact, *requires*—people to install the Home App on their computing devices to set up and to operate Google's speakers. And Google encourages people to use the accused functionality to create speaker groups.

Google's senior product engineer Christopher Chan testified, for example, that "[w]hen setting up a smart speaker, there is a quick-start guide in the packaging that instructs users to set up and download the Google Home app. And then in addition to that, when they plug in a

speaker, the Google assistant's voice also instructs users to download the Google Home app." Dkt. 755-2 (Chan) at 9-10, Ex. 2 at 90:16-18, 90:22-91:2; *see also*, *e.g.*, Dkt. 755-2 (Chan) at 10, Ex. 2 at 91:15-16, 91:19-21.  Mr. Chan also confirmed that users are *required* to have "[a]ccess to the Home app" in order "to set up a Google smart speaker" and that "[t]he Google Home app is required to create a static speaker group."  Dkt. 755-2 (Chan) at 10, Ex. 2 at 91:3-5, 91:8-9, 91:10-11, 91:13-14.  Tomer Shekel, a Google product manager for "the Google Home product," and "multi-room speaker playback" also confirmed that "you needed to have the Google Home app" in order to set up speaker groups.  Dkt. 755-2 (Shekel) at 2, 6; Ex. 3 at 7:11-14, 14:7-13, 16:8-12, 16:18-22, 140:3-4, 140:7-15.  *See also, e.g.*, 5/11/23 Tr. at 769:6-21 (Dr. Almeroth noting that Mr. Shekel "provided testimony as the former product manager for the Google Home app that you needed that Google Home app installed on a device to basically use those devices.").

Mr. Chan also testified that Google provides instructions to customers on how to create multizone groups of two or more speakers, 5/17/23 Tr. at 1530:7-10, including through a blog post that he wrote in approximately October 2019.  *Id*. at 1531:7-20.  That blog post encourages users to "set up a speaker group in the Home app," among other things.  TX6353 at p. 1.  The Google help pages also discuss setting up speaker groups.  TX0036; *see also* TX6698 (video showing creation of speaker group).  Google contends that "Sonos has not presented any evidence that these materials ever reached alleged direct infringers as the documents were not distributed with the accused products," JMOL at 19, but any user who bought three or more accused speakers would be *required* to use the Google Home app to set up the speaker groups, and a reasonable jury could find that a user of Google speakers and the Google Home app would necessarily turn to Google's own support resources in order to set up the groups.

Similarly, the jury heard testimony and saw evidence sufficient to establish contributory infringement.  The jury heard evidence sufficient to find that the Google Home app—and the specific accused programming within it—is a material component of infringing devices and is not a staple article or commodity of commerce suitable for substantial non-infringing use.  The only possible use of the Home App's grouping feature is to be installed and run on infringing computing devices.  As the Federal Circuit explained in *Lucent Technologies*, a software seller

1   can be liable for contributory infringement even if the software includes noninfringing features or

2   tools within the infringing software.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320-

3   21 (Fed. Cir. 2009).  Instead, the "particular tool" or "feature" within the software is what must be

4   analyzed for to determine if it is "suitable only for an infringing use."  *Id.*  As in *Lucent*, there is

5   no noninfringing use of the accused feature.

6          Google also had notice of the '966 patent and knowledge that its acts were causing

7   infringement of the '966 patent.  Sonos's general counsel, Alaina Kwasizur, testified that Sonos

8   provided notice to Google of the '966 patent on September 28, 2020, in an email "from me to

9   some folks at Google, including Mr. [Tim] Kowalski, … on September 28th notifying them that

10  we would be filing a complaint alleging infringement of the '966 patent on the next day."

11  5/12/23 Tr. at 1025:6-20; *see also id.* at 1041:6-13; TX6130.

12         Sonos provided Google with detailed, element by element, analysis of how Google's

13  products infringe the '966 patent.  TX6136 ¶¶ 70-73, 117-129.  As the Court instructed the jury,

14  this draft complaint is "proof that notice of what Sonos was alleging was given one day prior to

15  the lawsuit."  5/12/23 Tr. at 1044:5-13.  *See also id.* at 1051:13-16 ("The only reason I'm

16  allowing this document into evidence is to show that Google was at least aware of the patents in

17  suit by -- at the time they filed this lawsuit."); *id.* at 1051:23 ("it goes to the issue of notice of the

18  patents").

19         Ms. Kwasizur explained to the jury that "[t]his is a claim chart which is laying out the

20  claims of the '966 patent and how they're infringed by the Google products."  5/12/23 Tr. at

21  1044:22-1045:1.  Ms. Kwasizur told the jury that this claim chart formed a part of the draft

22  complaint that Sonos sent to Google on September 28, 2020, explaining "[o]n the left you can see

23  sort of the elements of the claim mapped out, and then on the right you can see what Sonos was

24  purporting to be the evidence of the infringement."  *Id.* at 1045:2-7; *see also* TX6136 ¶¶ 70-73,

25  117-129.

26         Google thus undisputedly received notice of infringement of the '966 patent on September

27  28, 2020—and Google also filed the declaratory judgment action that kicked off this case on that

28  same day.  Dkt. 1; TX8240.  Under Rule 11, by presenting its declaratory judgment complaint to

SONOS'S OPP. TO GOOGLE'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
CASE NO. 3:20-CV-06754-WHA

1   the Court, Google's counsel represented that the factual contentions contained therein had

2   evidentiary support, to the best of the person's knowledge, information, and belief, formed after

3   an inquiry reasonable under the circumstances.  Fed. R. Civ. P. 11(b).  In order to comply with

4   Rule 11, this inquiry would have taken weeks, if not months.  5/11/23 Tr. at 720:1-10 ("There's a

5   thing called Rule 11 of the Federal Rules of Civil Procedure. I can read it to you here, but it says

6   this: You can't file a lawsuit, you cannot file a lawsuit in federal court unless you are certifying

7   that you -- you have read it and there is a good faith basis for everything in there. Now, it takes

8   weeks -- it would take weeks of work for Google to have analyzed those products in those patents

9   in order to decide -- to be able to be in a position to say 'We don't infringe or they're invalid.'").[2]

10      The jury also heard from Google's in-house Senior Counsel Timothy Kowalski.  The jury

11   first heard generally about Mr. Kowalski's knowledge of Sonos, before hearing more specifically

12   from Mr. Kowalski regarding Google's receipt of Sonos's claim charts for the '966 patent.  More

13   generally, Mr. Kowalski testified that he has used Sonos products since 2015/2016, and testified

14   that Sonos and Google were competitors in the "premium speaker market at one point in time."

15   Dkt. 755-2 (Kowalski) at 2-4; Ex. 4 at 18:14-15, 18:20-23, 19:4-6, 59:19-22, 59:24-60:2, 60:4-11,

16   60:13-16.  Mr. Kowalski was asked whether Google has ever tracked Sonos's patents, whether

17   Google has ever done any searches for Sonos patents, whether Google ever attempted to locate

18   family members of Sonos patents, and whether Google made an effort to learn when Sonos filed

19   new patents, and in response to each question declined to answer on grounds of privilege.  Dkt.

20   755-2 (Kowalski) at 4-5; Ex. 4 at 65:9, 65:16-17, 66:5-6, 66:9-11, 66:13-14, 66:17-22, 66:25,

21   67:1.  Mr. Kowalski acknowledged that Google's declaratory judgment complaint in this case was

22   filed on September 28, 2020, and signed by Google attorneys, "seeking a declaratory judgment of

23   noninfringement of the '966 patent."  Dkt. 755-2 (Kowalski) at 5-6; Ex. 4 at 86:23-24, 87:4-5,

24   87:7-10, 87:13-15, 87:17-88:3, 88:12-19, 89:8-10, 89:12-14.

25      Google contends that its "declaratory judgment complaint demonstrates that it had a good-

26   faith belief that it did ***not*** infringe."  JMOL at 13.  That contention is belied by Google's frivolous

27   
28   _____

[2] Google's argument that its action sought only declarations of non-infringement, not invalidity, is beside the point.  JMOL at 15 n.10.  As the Court made clear, the non-infringement analysis too would have taken weeks.  *See also, e.g.*, 5/11/23 Tr. at 718:24-719:2.

Sonos's Opp. to Google's Motion for
Judgment as a Matter of Law
Case No. 3:20-cv-06754-WHA

1  arguments regarding causing storage and failed noninfringement arguments with respect to the

2  '885 patent—which Google again describes as the other "side[] of the same coin" as the '966

3  patent, JMOL at 1.  Moreover, Google's argument would mean a legal rule that an alleged

4  infringer can defeat claims of indirect infringement and willfulness merely by racing to the

5  courthouse to file a declaratory judgment action first.  *See* Case No. 3:21-cv-7559-WHA,

6  Dkt. 156 at 9 ("Infringers should not be allowed to immunize themselves from ongoing

7  willfulness by forcing patent owners into litigation.").[3]  That cannot be a correct statement of the

8  law.

9       Next, Google argues that it lacked specific intent to infringe.  JMOL at 17.  But Google

10  fails to acknowledge that "[w]hile proof of intent is necessary, direct evidence is not required;

11  rather, circumstantial evidence may suffice."  *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7

12  F.4th 1320, 1327 (Fed. Cir. 2021), *cert. denied sub nom. Teva Pharms. USA, Inc. v.*

13  *GlaxoSmithKline LLC, et al.*, No. 22-37, 2023 WL 3440748 (U.S. May 15, 2023) (quoting *DSU*

14  *Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)).  And as Google *does*

15  acknowledge, "'advertising an infringing use or instructing how to engage in an infringing use'

16  may support specific intent if the advertisement or instruction 'encourage[s], recommend[s], or

17  promote[s] infringement.'"  JMOL at 18 (quoting *Takeda Pharms. U.S.A., Inc. v. W.-Ward*

18  *Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (Google's emphases omitted)).  Here, the jury

19  heard and saw evidence that Google instructs users on how to use the Google Home app to set up

20  speaker groups.  Google hangs its hat on those instructions "only discuss[ing] creating a single,

21  discrete speaker group."  JMOL at 18.  But because "direct evidence is not required," a

22  reasonable jury could conclude that by instructing users on how to set up speaker groups

23  generally, Google intended for users to set up more than one speaker group.  Again, if the feature

24

25

---

26  [3] Google contends that "filing a declaratory judgment complaint would not immunize a defendant from willful infringement claims ***in every case***."  JMOL at 14 n.8 (emphasis added).  But there is

27  no reason why a defendant could not do so by aggressively filing as early as possible.  And patentees are unlikely to be able to obtain discovery on a defendant's pre-suit knowledge of

28  infringement, as defendants are likely to assert privilege over what they knew prior to filing a declaratory judgment action—just as Google did here.

SONOS'S OPP. TO GOOGLE'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
CASE NO. 3:20-cv-06754-WHA

1    of overlapping, pre-defined static groups were unimportant or trivial, Google could have disabled

2    it at any time in order to avoid infringement entirely.  Google has never done so.[4]

3        All the above evidence is more than adequate for the jury to find that Google had

4    knowledge of the '966 patent and knowledge of infringement and took active steps to induce

5    infringement for purposes of indirect infringement.[5]

6        Thus, the Court should deny Google's motion for JMOL as to whether Google induced

7    infringement with the prior versions of the accused products.  *See Barry v. Medtronic, Inc.*, 914

8    F.3d 1310, 1334 (Fed. Cir. 2019).

9    **B.    Sonos Presented Sufficient Evidence For A Reasonable Juror To Find That**
         **Via Its New Versions Of The Accused Products, Google Directly Infringes**
10       **The '885 And '966 Patents And Indirectly Infringes The '966 Patent.**

11       **1.    Sonos presented sufficient evidence that Google directly infringes both**
              **the '885 and '966 patents via the new versions.**
12

13       Via its new versions, Google infringes Claim 1 of the '885 patent and the asserted claims

14   of the '966 patent.  Google contends that its "redesign" does not infringe the asserted claims

15   because speakers installed with the new software versions do not continuously operate in

16   "standalone mode" until a zone scene is invoked.  Google instead contends that its addition of the

17

18   [4] Google's reliance on two pharmaceutical cases is telling.  As *Takeda* explains, the specific
     intent "requirement of inducing acts is particularly important in the Hatch–Waxman Act context
19   because the statute was designed to enable the sale of drugs for non-patented uses even though
     this would result in some off-label infringing uses."  *Takeda Pharms. U.S.A., Inc. v. W.-Ward
20   Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015).  In the context of a *software* claim, *Lucent
     Technologies* is far more apposite—and controlling.  And in that case, as explained above, the
21   Federal Circuit held that a software seller can be liable for contributory infringement even if the
     software includes some noninfringing features or tools within the infringing software, and that the
22   "particular tool" or "feature" within the software is what must be analyzed for to determine if it is
     "suitable only for an infringing use."  580 F.3d at 1320-2.

23   [5] For the reasons previously stated on the record and in Sonos's filings, Sonos also maintains its
     objections to the Court's rulings (1) that as a matter of law, the filing of a complaint cannot
24   trigger post-suit knowledge for purposes of finding willfulness or indirect infringement, Case No.
     3:21-cv-07559-WHA, Dkt. 156 at 7-8, 11, (2) that Sonos could not introduce any evidence from
25   the parties' licensing negotiation to prove Google's state of mind (a permissible use of settlement
     communications under FRE 408) because those communications created unfair prejudice under
26   FRE 403, 5/3/23 Tr. at 59:8-22, and (3) that Sonos could not introduce any evidence (of any kind)
     that Google knew about other patents in the same family of the patents in suit to support its
27   willful blindness theory.  5/8/23 Tr. at 180:18-25.  *Cf. Suprema, Inc. v. Int'l Trade Comm'n*, 626
     F. App'x 273, 280-81 (Fed. Cir. 2015); *see also generally* Dkt. 705, Sonos Inc.'s Proffer of
28   Testimony of Alaina Kwasizur.

SONOS'S OPP. TO GOOGLE'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
CASE NO. 3:20-CV-06754-WHA

1   "StopCurrentApp()" function moves a speaker into a so-called "idle mode" after a user creates a

2   speaker group.  As the Court heard, when a speaker receives a join group message, the speaker

3   then runs the "StopCurrentApp()" function that stops any current playback on the speaker.  No

4   other changes exist.  This "redesign" does not avoid infringement for three reasons.

5          First, the '966 patent has no claim limitation requiring continuous operation in

6   "standalone mode."  Second, Google's newer versions do operate in "standalone mode"—thus

7   failing to avoid liability for infringement of *both* the '885 and '966 patents.  Third, Google did not

8   make a single change to the source code or operation of the Home App between the prior and

9   "new" versions of its product.  The only change was one line of source code on the speakers.  So

10  there is no "redesign" with respect to the '966 patent at all.[6]

11         **1.**  The '966 patent does not require continuous operation in standalone mode.  Dr.

12  Almeroth explained that Google believes that there is a requirement, based on '966 patent

13  limitation 1.4's reference to "operating in standalone mode," that *each* step of limitations 1.6

14  through 1.9 must happen while the device *continues* to operate in standalone mode.  5/11/23 Tr. at

15  803:18-25.  But while "continuing to operate in standalone mode" *is* part of the requirements of

16  claim 1 of the '885 patent, that "language does not exist in the '966 patent."  *Id*. at 804:1-9.  So

17  even if a speaker immediately transitioned out of "standalone mode" when a group is created as

18  Google contends, the user could put the speaker back into "standalone mode" before creating a

19  second speaker group and then again before launching a group—thus meeting the requirement

20  that limitations 1.7-1.10 of the '966 patent be carried out while the "first zone player" is in

21  "standalone mode."  Thus, Google's redesign means nothing for infringement of the '966 patent.

22         **2.**  Google's speakers do continue to operate in standalone mode after a new speaker

23  group is created and the "StopCurrentApp()" function runs.  With respect to Google's alleged

24  redesign, Dr. Almeroth explained to the jury that he understands that "[a]s of December 2022, so

25  just December last year, Google had a new version that they are calling the redesign."  5/11/23

26  Tr. at 796:17-20.  The redesign is limited to "the addition of a function called StopCurrentApp,

27

28  [6] As this change does not affect the additional requirements of claims 2, 4, 6, and 8 of the '966
    patent, all of those claims are still infringed under the new version as well.

1   and that function essentially stopped an app inside of the Google Player.  So if it was playing, it

2   would stop the music that a person could hear." *Id.* at 797:21-798:2.  Dr. Almeroth explained his

3   understanding that "there's really two scenarios with respect to the redesign. And the idea that

4   Google is describing is this idea of, in one instance when grouping the speakers together, if one of

5   the speakers is playing, stop playing that speaker when it – the group is created. And then the

6   other scenario is if none of the speakers that are going into the group are playing, then nothing

7   changes." *Id.* at 796:21-797:6.

8         As Dr. Almeroth explained, the speaker "***still stays in standalone mode***, but it will stop

9   playing music. If it wasn't playing music and it was in standalone mode, then nothing changes

10   about how that operates." 5/11/23 Tr. at 799:18-22 (emphasis added).  So while Google's new

11   version "might stop the play out of music," it "does not take the device out of standalone mode….

12   And just because a person stops hearing music doesn't mean that it's left standalone mode." *Id.*

13   at 804:10-20.

14         As Dr. Almeroth put it, "Google ties playing music and hearing audio to being in

15   standalone mode or not. Google says if you're not hearing music, then you're in some other mode

16   and so you're not in standalone mode. But the reality is the claim talks about two modes: You're

17   either in group mode where you're synchronized to play in group mode or you're not, you're in

18   standalone mode." 5/11/23 Tr. at 802:16-22.  For that reason, Dr. Almeroth explained, "the fact

19   that you stop playing audio as part of group creation does not take that speaker out of standalone

20   mode"; instead, "[i]t just stops the ability to hear audio of what's already playing." *Id.* at 802:23-

21   25.  And as Mr. MacKay testified, if that speaker is not already playing, then the operational

22   function StopCurrentApp() doesn't *cause* any change at all.  5/16/23 Tr. at 1285:12-24.[7]  *See also*

23   Dkt. 755-2 (MacKay 1/25/23) at 10; Ex. 5 at 54:24-55:3, 55:5-14, 55:16-22, 55:24 ("[Q.]  [W]ith

24   respect to the behavior of the player itself, I think you said that because it wasn't engaging in

25   playback before it received the join group message, it would remain in the same state after it

26   receives that message; is that right? [A.] So if there is no current app to stop, then that's -- it will -

27

28   [7] Google's argument that "the operation ***does*** change," JMOL at 6 n.4, is thus belied by the
    testimony of its own engineer.

1   - there will still be no current app after StopCurrentApp() runs. Q. So in this scenario, then, do I

2   understand correctly that the player will effectively behave in the same way that it would have

3   behaved in prior firmware versions of -- of the software? A. Prior to adding the StopCurrentApp()

4   call?  Q. Yeah. [A.] Well, it will still call StopCurrentApp(), but it -- other than that, it won't do

5   anything differently. [Q.] Right. It's not going to – the StopCurrentApp() function in this case is

6   not going to cause any change to -- to the operational behavior of the player; correct? [A.] Yes.").

7       Even Google did not advance this "active playback" theory until mid-trial.  Its technical

8   expert had already staked out the position that active playback was not required.  As Mr.

9   Bakewell confirmed, he relied on Dr. Schonfeld's opinions that standalone mode does not require

10  playing music.  *See* 5/17/23 Tr. at 1584:10-16 ("QUESTION: Is it your understanding that

11  standalone mode does not require playing music? ANSWER: Does not require playing music? ***So***

12  ***this comes from Dr. Schonfeld***, so my understanding, I think that's part of what you are implying

13  with your question, but it says the opposite here; i.e., either play music ***or not playing music***."

14  (emphasis added)).  *See also id.* at 1583:15-1584:1 (confirming Bakewell's opinion that speaker 1

15  stays in "standalone mode"—"i.e., either playing music or not playing music").

16      Google's noninfringement argument thus relies entirely on an unsupported claim

17  construction of "standalone mode" as requiring active playback.  As an initial matter, Google

18  failed to request construction at any time prior to this trial, waiting *until the close of Sonos's case*

19  *in chief* to do so.  *See* Dkt. 733 at 1.  It is too late for Google to do so now.  *See Fujifilm Corp. v.*

20  *Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *5 (N.D. Cal. Feb. 20,

21  2015); *Apple, Inc. v. Samsung Elec. Co.*, No. 12–cv–00630–LHK, 2014 WL 252045, at *3–5 (N.

22  D. Cal. Jan. 21, 2014).  Regardless, its argument fails on the merits.

23      All asserted claims (both '885 and '966) recite operating "in a standalone mode in which

24  the first zone player is configured to play back media individually."  The claim language does not

25  specify that the player must be actively playing media.  Sonos therefore submits that the plain and

26  ordinary meaning should apply, so that standalone means "*configured to* play back media

27  individually."  The structure of the claims further confirms that "standalone mode" is a mode in

28  which the player is configured for playback.  The claim language does so by, for example,

SONOS'S OPP. TO GOOGLE'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
CASE NO. 3:20-CV-06754-WHA

1    explaining that the player "transition(s)" from "operating in the standalone mode" in which the

2    player is "configured to play back media individually" to operating in group mode in which "the

3    zone player is configured to coordinate with at least [one other] zone player … to output media in

4    synchrony."  Even Dr. Schonfeld admitted that "if you just take the phrase standalone mode," a

5    player can be in standalone mode even if it's not playing audio.  5/17/23 Tr. at 1461:13-24.

6         Moreover, the claim limitations divide speakers into two modes: standalone mode

7    (configured for individual playback) and group mode (configured for group playback).  Mr.

8    MacKay *agreed* that the StopCurrentApp() function does not put speakers into group mode.  *See*

9    5/16/23 Tr. at 1283:9-11 ("Q. And the StopCurrentApp function does not cause a new static

10   speaker group to be launched; correct? A. That's correct.").  Because the StopCurrentApp()

11   function does not put speakers into group mode, a reasonable jury could find that the function

12   does not remove speakers from standalone mode.

13        By contrast, Google would rewrite "configured to play back media" to "playing back

14   media."  The only support Google relies on is a statement by the Examiner in a different

15   context—describing joining group mode, not operating in standalone mode.  Dkt. 733 at 3-4.

16   Google points to the Notice of Allowance, in which the Examiner distinguished the DME prior

17   art because it did not "allow for continuous output of media on a particular playback device and

18   joining of the continuous output," among other reasons.  TX0006 at p. 5850.

19        The immediately preceding prosecution history shows that the Examiner's statements

20   were not about standalone mode at all.  The examiner allowed the claims following an

21   amendment describing *grouped* mode:

22

23

24

25

26

27

28

based on the instruction, transitioning from operating in the standalone mode to operating in

accordance with the given one of the first and second predefined groupings of zone players such that

the first zone player is configured to coordinate with at least one other zone player in the given one of

the first and second predefined groupings of zone players over a data network in order to [play back ]

output media in synchrony with output of media by the at least one other zone player in the given one

of the first and second predefined groupings of zone players.

TX0006 at p. 4127 (underlining showing adding claim language and brackets showing
deleted claim language); *see also* TX0004 at p. 25 (same amendment).  As shown above, the
Examiner required an amendment to describe that when the players move from standalone mode
into grouped mode, the players become "configured to coordinate with" each other "in order to
output media in synchrony."  This has nothing to do with whether or not the first zone player is
required to actively output audio in standalone mode.

As Sonos has explained, Sonos did not agree with or endorse the Examiner's statement,
the Examiner's statement cannot meet the standard for clear and unmistakable disclaimer, and it
is *Google* that now seeks to adopt a new theory that is contrary to Google's prior positions on
whether standalone mode requires active playback.  Dkt. 733 at 4; *see also generally id.* at 2-4.
So there is no basis to construe standalone mode to require active playback of media.  *See also,
e.g.*, 5/18/23 Tr. at 1645:13-1648:16.

Because standalone mode does not require active playback of media, Google's trial-
created "idle mode" theory is irrelevant.  Mr. MacKay admitted that a newly created static
speaker group is not automatically launched at the time it is created, such that a speaker does not
transition to group mode at the time of creation.  5/16/23 Tr. at 1278:7-14.  *See also id.* at 1283:9-
11 ("Q. And the StopCurrentApp function does not cause a new static speaker group to be
launched; correct? A. That's correct.").  Because the claim limitations divide speakers into two
modes—standalone and group—and Google does not dispute that StopCurrentApp() does not put

speakers into group mode, a reasonable jury could, at a minimum, conclude that that describes "continuing to operate in standalone mode."

And while Mr. MacKay testified for the first time at trial that the StopCurrentApp() function closes out any application was playing back media, Mr. MacKay admitted that even when a speaker is in the newly fashioned "idle mode," it is still plugged in, powered on, with code running on the device, the operating system running, the speaker available for selection by a user, and still in a mode where the user can even adjust the audio volume level and individually output audio.  5/16/23 Tr. at 1279:7-1281:10.  As Mr. MacKay admitted in response to questions from the Court, adjusting the volume level results in "the speaker mak[ing] a little boop noise"— "[i]t goes boop."  *Id*. at 1290:19-1291:6.  This is unequivocally a mode in which the device is "configured to play back media individually," even if it isn't *actually* playing music back individually.  These admissions would allow a reasonable jury to conclude that the "idle mode" story testified to and disclosed for the first time at trial is merely Google's attempt to repackage standalone mode in order to avoid a finding of infringement.

And Mr. MacKay cannot support noninfringement because he did not perform any comparison of "idle" mode to the claims, and acknowledged that he was not offering any opinion regarding infringement.  5/16/23 Tr. at 1274:15-17.  Indeed, the Court precluded Dr. Schonfeld from advancing a noninfringement argument based on "idle mode," and told the jury to disregard that part of his testimony.  5/17/23 Tr. at 1400:11-13, 1400:15-17, 1415:24-1416:6; 5/19/23 Tr. at 1917:10-16 ("Second, with respect to the redesign and '885 and '966 products, as you may recall, I struck Dr. Schonfeld's testimony regarding idle mode from the evidence. You must disregard that testimony. Idle mode was used to refer to a mode that is neither standalone nor group with respect to noninfringement of the new version of the accused products.").  Thus, while Google (incorrectly) accuses Dr. Almeroth of erroneously *assuming* that there are only two modes, JMOL at 5, a reasonable jury could reject Google's trial-created idle mode story, which lacks any expert support.[8]

---

[8] As a last-ditch effort, Google argues that "Sonos has not presented any evidence showing that a redesigned Google speaker is configured to play back media individually after it receives an

**3.** The only change Google made was adding the one line of code to its speakers that after receiving a "Join_Group" message the *speaker* executes a "StopCurrentApp" function.  Google did not make any changes to the Google Home app that runs on the controller.  5/16/23 Tr. at 1282:2-5.  Similarly, Google did not make any changes to the AddGroup function.  *Id*. at 1282:12-21.  So the grouping functionality of the Home App is the same, and the Home App works with both new and prior versions of Google's speaker software.  Because even post-redesign Home Apps can be configured with speakers installed with Google's prior software version, *see, e.g.*, Dkt. 755-2 (MacKay 1/25/23) at 13-14, Ex. 5 at 74:10-13, 74:15-75:1, 75:3-6, 75:8, Google's infringement of the '966 patent is the same throughout the entire suit.

The Court should deny Google's motion for JMOL on direct infringement of both patents.

> **2.** **Sonos presented sufficient evidence that Google indirectly infringes the '966 patent through the new versions of its accused products.**

Induced infringement has two prongs: (1) Google "took certain affirmative acts to bring about the commission by others of acts of infringement," and (2) Google "had 'knowledge that the induced acts constitute patent infringement.'"  *TecSec*, 978 F.3d at 1286 (quoting *Glob.-Tech*, 563 U.S. at 765-66).  Willful blindness can satisfy the knowledge prong.  *See supra* 8.

Sonos offered ample evidence from which a reasonable juror could conclude that Google induces infringement of the '966 patent and contributorily infringes with the new versions of the accused products, for all the reasons explained above with respect to the prior versions.  Additionally, with respect to Google's product versions created during this litigation, there can be no reasonable question that Google was on notice of the '966 patent and of Sonos's claims of infringement, especially after the Court granted summary judgment of infringement of claim 1 of

---

indication that it has been added to a speaker group (Limitations 1.6 and 1.7) or at the time the group is invoked (Limitation 1.10), let alone evidence that would allow a jury to find that the Google speaker *continues* to operate in standalone mode."  JMOL at 5.  Google contends that this is the case "[r]egardless of whether the Standalone Limitations require that a zone player be actively playing back media or not."  *Id.*  But because the only change Google has identified is stopping playback, this merely restates Google's unsupported arguments regarding "idle mode."  The Court has already determined that Google infringes Claim 1 of the '885 patent, and Dr. Almeroth explained that the "redesign" did not change anything besides stopping playback *in certain* scenarios.  5/11/23 Tr. at 796:17-803:11.

the '885 patent, which is—as Google has said—the other side of the same coin.

Thus, the Court should deny Google's motion for JMOL as to whether Google induced infringement with the new versions of the accused products.

**3.      Sonos Presented Sufficient Evidence For A Reasonable Juror To Find That Google Willfully Infringed The '966 Patent.**

Willful infringement requires the jury to find that Google knew of the '966 patent and engaged in "deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 2732 (2022).  Reckless disregard of the plaintiff's patent rights can demonstrate willfulness. *See Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023).  And here too, willful blindness can show Google's knowledge of the patent. *See Glob.-Tech*, 563 U.S. at 766.

A reasonable juror easily could conclude that Google knew of the '966 patent before this case and recklessly disregarded Sonos's patent rights.  The jury heard evidence that Sonos and Google worked together in the 2013-2014 time frame, that Google had access to Sonos products, and that Sonos put Google on notice of specific allegations of the infringement via Sonos's draft complaint.  The jury also heard evidence that several key Google engineers, including Mr. Chan and Mr. Shekel were aware of Sonos products during the development of the accused features and products and even specifically considered and compared Sonos products during this development. Dkt. 755-2 (Shekel) at 4; Ex. 3 at 91:23-92:2 ("We looked at Sonos and other manufacturers' multi-room solution as part of our work in Cast Audio, and that -- some of those looks or trying those out happened before we launched our multi-room solution.").  Google presented no evidence in rebuttal that it had determined that it did not infringe any Sonos patents or any evidence that it made any effort to even look for Sonos patents to confirm this.  This close comparison of the accused products to Sonos's products without any evidence that Google even attempted to look for or conclude that it did not infringe Sonos's patents is more than enough evidence to support that Google willfully disregarded a high risk that it was infringing Sonos's patents. *Glob.-Tech*, 563 U.S. at 766 ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."); *Lutron Electronics Co.*,

1    *Inc. v. Crestron Electronics, Inc.*, 970 F. Supp. 2d 1229, 1237 (D. Utah 2013) [P]arties cannot

2    escape liability by deliberately shielding themselves from clear evidence of critical facts that are

3    strongly suggested by the circumstances.") (internal quotations omitted); *see also Ultratec, Inc. v.*

4    *Sorenson Communications, Inc.*, 45 F. Supp. 3d 881, 925-26 (W.D. Wis. 2014) (denying

5    summary judgment of no inducing infringement, finding record evidence sufficient to raise an

6    issue of fact as to whether the accused infringer was willfully blind to the patent and its

7    infringement where it copied portions of the patentee's product, knew that the patentee had

8    patents covering aspects of its product, but did not confirm the existence of the patents and their

9    scope).

10          For all the reasons explained above in the context of indirect infringement—regarding

11   Google's knowledge of the '966 patent and knowledge of infringement—the jury could

12   reasonably determine Google's infringement of the '966 patent to be willful.  Indeed, the Court

13   has already ruled that Google's receipt of a draft complaint and filing of a declaratory judgment

14   action on the same day "goes to the issue of notice of the patents and whether or not the Plaintiff

15   has proven there was willful infringement."  *See* 5/12/23 Tr. at 1051:23-1052:5.  Google now

16   contends that because it had a Rule 11 basis to file its declaratory judgment complaint, it had no

17   intent to infringe.  But Google refused to answer any questions about its prior knowledge of the

18   patents, the basis for its assertions in the declaratory judgment complaint, or even whether it had a

19   Rule 11 basis for filing the complaint.  *See* Dkt. 755-2 (Kowalski) at 4-5, 6-8; Ex. 4 at 65:9,

20   65:17-17, 66:5-6, 66:9-11, 66:13-14, 66:17-22, 66:25-67:1, 92:2-9, 92:11-95:21.[9]  The Rule 11

21   presumption is more than sufficient to find that Google had actual knowledge of infringement of

22   the '966 patent well prior to commencement of this lawsuit.  At a minimum, the jury should be

23   allowed to decide under all the facts presented whether Google had notice of the '966 patent and

24   knowledge of its infringement.

25          Moreover, Google's infringement continued even after the Court's finding that Google

26   infringed the '885 patent, and Google did not make *a single change* to the Google Home App

27   ---

28   [9] The Court should disregard Google's resort to the "the parties' ongoing ITC case involv[ing] the same products accused here."  JMOL at 14 n.9.  The jury did not hear evidence about the ITC case, so it could not be a basis for the jury's verdict.

after the Court found that there were no disputed facts that Google infringed the '885 patent.

Google's willingness to continue its infringement after the grant of summary judgment is another

fact that shows willfulness.  The jury also heard evidence that Google's noninfringement

arguments were not tied to the claim language, further suggesting Google had (and has) no

reasonable, good faith noninfringement arguments.

Thus, this Court should deny Google's motion for JMOL on willful infringement and

allow the jury to determine whether any infringement was willful.

C.      **Sonos Presented Sufficient Evidence For A Reasonable Juror To Find That Sonos Is Entitled To Damages.**

35 U.S.C. § 284 mandates that, upon a finding of infringement, a "court shall award the

claimant damages adequate to compensate for the infringement, but in no event less than a

reasonable royalty for the use made of the invention by the infringer."  *See also Apple Inc. v.*

*Motorola, Inc.*, 757 F.3d 1286, 1327-28 (Fed. Cir. 2014) ("If a patentee's evidence fails to

support its specific royalty estimate, the fact finder is still required to determine what royalty is

supported by the record."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792

F.3d 1339 (Fed. Cir. 2017).  Based on Sonos's evidence, a reasonable jury could find that Sonos

is entitled to a per-unit royalty for Google's infringement.  The jury heard from Ms. Alaina

Kwasizur that Sonos maintains a robust patent portfolio of over 1,000 patents covering its speaker

technology.  5/12/23 Tr. at 1005:23-1006:11.  Ms. Kwasizur explained that Sonos's patents are all

"directed to the home audio space." *Id*. 1006:2-6.  Sonos licensed portions of its patent portfolio

to three competitors, and those licenses reflect per-unit rates of $6 to $35.  *Id*. at 1010:14-1019:6,

1062:2-19, 1067:2-13, 1072:1-10; TX6721 (Denon license); TX6632 (Bluesound/Lenbrook

license); TX6631 (Legrand/Pass & Seymour license).  These licenses would serve as an

"approximate cap" on damages.  5/12/23 Tr. at 1100:1-8.

The jury heard evidence from which it could evaluate the value of Sonos's zone scenes

patents.  For example, Sonos presented evidence that 29% of households who have speakers have

multiple speakers, 5/12/23 Tr. at 1132:1-4, which Google did not rebut.  Mr. Chan confirmed that

Google sells speakers in bundles, encouraging users to group Nest Audio speakers for sound

Sonos's Opp. to Google's Motion for
Judgment as a Matter of Law
Case No. 3:20-cv-06754-WHA

1   across multiple rooms.  5/17/23 Tr. at 1525:11-1526:8.  Similarly, Ms. Kwasizur testified that "if
2   one customer buys one Sonos, we know from our data that on average they buy 2.9 or 3 more
3   products."  5/12/23 Tr. at 1019:23-24.  And Google's own data showed the 58% of people are
4   very likely or extremely likely to buy three or more speakers. 5/17/23 Tr. at 1599:1-7.  The jury
5   also heard about Google's own promotion of grouping technology.  *E.g.*, TX6612, TX6353;
6   5/17/23 Tr.1530:3-1532:10.  Google's damages expert, Mr. Bakewell, also agreed that Google's
7   November 2019 survey found that the speaker group feature of playing music in multiple rooms
8   at the same time is "actually" appealing.  5/17/23 Tr. at 1599:8-1600:22.  From that evidence, the
9   jury could reasonably place an approximate value on the '885 and '966 patents relative to Sonos's
10  overall portfolio.

11          Google's response to this evidence was to have Mr. Bakewell testify that usage data
12  showed a small percentage of "devices in a group on a daily basis," 5/17/23 Tr. at 1560:11-15,
13  *see also* JMOL at 17 (citing *id.*), but as Mr. Bakewell later admitted, that data only shows the
14  number of connected devices *on a particular date*, 5/17/23 Tr. at 1595:15-18.  That data is
15  therefore incomplete and unreliable.

16          Sonos also introduced ample evidence explaining why Sonos prefers a per-unit royalty
17  over a lump sum.  5/12/23 Tr. at 1019:7-1020:24.  From that evidence alone the jury could
18  conclude that Sonos is entitled to damages for Google's infringement, and reject Google's lump
19  sum arguments.  *See Bayer Healthcare LLC v. Baxalta Inc*., 989 F.3d 964, 985 (Fed. Cir. 2021)
20  ("A party need not present expert testimony on damages or, as a corollary, on every aspect of
21  damages, such as a single royalty rate."); *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370,
22  1382 & n.4 (Fed. Cir. 2003) ("[S]ection 284 is clear that expert testimony is not necessary to the
23  award of damages, but rather 'may [be] receive[d] ... as an aid.' " (annotations in original)
24  (quoting 35 U.S.C. § 284)).  Indeed, Sonos's prior agreements "carry considerable weight in
25  calculating a reasonable royalty rate."  *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519
26  (Fed. Cir. 1995).  The jury is entitled to credit that evidence and award Sonos damages for
27
28

1    Google's infringement. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1341-42 (Fed. Cir. 2019)

2    (amount of damages is a fact question for the jury).[10]

3            Thus, the Court should deny Google's motion for JMOL as to damages and allow the jury

4    to determine the amount Google owes to Sonos for its infringement.

5    **IV.    CONCLUSION**

6            Sonos respectfully requests that the Court deny Google's motion for judgment as a matter

7    of law.

8    Dated:  May 22, 2023                    ORRICK HERRINGTON & SUTCLIFFE LLP
                                             *and*
9                                            LEE SULLIVAN SHEA & SMITH LLP

10                                           By: */s/ Clement Seth Roberts*
11                                               Clement Seth Roberts

12                                           *Attorneys for Sonos, Inc.*

13

14

15

16

17

18

19

20

21

22

23

24   _____

     [10] The jury also heard from Mr. Malackowski that a hypothetical negotiation between the parties
25   would result in a royalty rate of $0.82 per unit for the '966 patent and $0.87 per unit for the '885
     patent.  5/12/23 Tr. at 1092:3-23.  Mr. Malackowski offered a detailed damages analysis under
26   the *Georgia-Pacific* hypothetical negotiation framework, including on a comparison to the IFTTT
     product.  *E.g., id*. at 1115:14-1122:19 (discussing factors 3 through 10).  As Sonos has explained,
27   Mr. Malackowski's testimony was reliable and admissible.  *E.g.*, Dkt. 735.  Nonetheless, the
     Court struck Mr. Malackowski's testimony over Sonos's objection.  Sonos does not respond
28   further to Google's IFTTT arguments here.  JMOL at 20-23.