QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for GOOGLE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., | CASE NO. 3:20-cv-06754-WHA |
| Plaintiff, | Related to CASE NO. 3:21-cv-07559-WHA |
| vs. | **GOOGLE'S REPLY IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE COURT'S PATENT SHOWDOWN PROCEDURE** |
| GOOGLE LLC, | |
| Defendant. | The Hon. William H. Alsup |
| | Date:      June 9, 2022 |
| | Time:      8:00 a.m. |
| | Location: Courtroom 12, 19th Floor |

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

2

3    U.S. PATENT NO. 9,967,615 CLAIM 13 ...................................................................IV

4    U.S. PATENT NO. 10,848,885 CLAIM 1 .................................................................. V

5    I.    GOOGLE DOES NOT INFRINGE CLAIM 13 OF THE '615 PATENT...........................1

6        A.    The Accused YouTube Applications Do Not Infringe Claim 13............................1

7            1.    YouTube Does Not Include A "Local Playback Queue On The
                  Particular Playback Device"........................................................................1

8
             2.    YouTube Does Not Add "Multimedia Content" To Any Alleged
9                  Local Playback Queue. ................................................................................5

10           3.    YouTube Does Not Add "Resource Locators" To Any Alleged
                  Local Playback Queue .................................................................................6

11
         B.    GPM Does Not Infringe Claim 13 ........................................................................9

12
         C.    Claim 13 of the '615 Patent Is Invalid ..................................................................9

13
             1.    YTR Discloses or Renders Obvious Limitation 13.2 ..................................9

14
             2.    YTR Discloses or Renders Obvious Limitation 13.4 ...............................11

15
             3.    YTR Discloses Limitations 13.5-13.6 .......................................................14

16
         D.    Google Does Not Infringe Claim 1 of the '885 Patent.........................................15

17
    II.    CONCLUSION...............................................................................................................15

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bioverativ Inc. v. CSL Behring LLC*,
Case No. 1:17-cv-00914-RGA, 2019 WL 1276030 (D. Del. Mar. 20, 2019)............................ 5

*Cole Kepro Int'l, LLC v. VSR Indus., Inc.*,
695 F. App'x 566 (Fed. Cir. 2017)............................................................................ 14

*Cybersettle, Inc. v. National Arbitration Forum, Inc.*,
243 Fed. App'x 603 (Fed. Cir. 2007)......................................................................... 6

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020)................................................................................ 11

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995) .................................................................................. 5

*Fox Factory, Inc. v. SRAM, LLC*,
944 F.3d 1366 (Fed. Cir. 2019)................................................................................ 14

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
523 F.3d 1304 (Fed. Cir. 2008)................................................................................ 4

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
292 F.3d 728 (Fed. Cir. 2002) ................................................................................. 14

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005)..........................................................................4, 5, 9

*Pulse Elect., Inc. v. U.D. Elect. Corp.*,
860 Fed. App'x 735, 2021 WL 2735013 (Fed. Cir. 2021)............................................ 11

*SRAM Corp. v. AD-II Engineering, Inc.*,
465 F.3d 1351 (Fed. Cir. 2006)................................................................................ 6

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,
308 F.3d 1167 (Fed. Cir. 2002)................................................................................ 14

*Vulcan Eng. Co., Inc. v. Fata Aluminium, Inc.*,
278 F.3d 1366 (Fed. Cir. 2002)................................................................................ 10

*Wisconsin Alumni Research Found. v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018)................................................................................ 5

## Rules and Regulations

Local Rule 5-1.......................................................................................................... 17

## Additional Authorities

*https://youtu.be/EGdsOslqG2s?t=56.* .......................................................................... 10

U.S. Patent No. 10,848,885 ........................................................................................................ v

U.S. Patent No. 9,967,615 ........................................................................................................ iv

GOOGLE'S REPLY IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT

1  **U.S. Patent No. 9,967,615 Claim 13**

2  **[13.pre]**  A tangible, non-transitory computer readable storage medium including instructions for

3  execution by a processor, the instructions, when executed, cause a control device to implement a

4  method comprising:

5      **[13.1]**  causing a graphical interface to display a control interface including one or more

6  transport controls to control playback by the control device;

7      **[13.2]**  after connecting to a local area network via a network interface, identifying playback

8  devices connected to the local area network;

9      **[13.3]**  causing the graphical interface to display a selectable option for transferring

10  playback from the control device;

11      **[13.4]**  detecting a set of inputs to transfer playback from the control device to a particular

12  playback device, wherein the set of inputs comprises: (i) a selection of the selectable option for

13  transferring playback from the control device and (ii) a selection of the particular playback device

14  from the identified playback devices connected to the local area network:

15      **[13.5]**  after detecting the set of inputs to transfer playback from the control device to the

16  particular playback device, causing playback to be transferred from the control device to the

17  particular playback device, wherein transferring playback from the control device to the particular

18  playback device comprises:

19      (a)  causing one or more first cloud servers to add multimedia content to a local playback
queue on the particular playback device, wherein adding the multimedia content to the local

20  playback queue comprises the one or more first cloud servers adding, to the local playback queue,
one or more resource locators corresponding to respective locations of the multimedia content at

21  one or more second cloud servers of a streaming content service;

22      (b)  causing playback at the control device to be stopped; and

23      (c)  modifying the one or more transport controls of the control interface to control
playback by the playback device; and

24
25      [13.6]  causing the particular playback device to play back the multimedia content, wherein

26  the particular playback device playing back the multimedia content comprises the particular

27  playback device retrieving the multimedia content from one or more second cloud servers of a

streaming content service and playing back the retrieved multimedia content.

28

**U.S. Patent No. 10,848,885 Claim 1**

**[1.pre]**  A first zone player comprising:

　　　**[1.1]**    a network interface that is configured to communicatively couple the first zone player to at least one data network;

　　　**[1.2]**    one or more processors;

　　　**[1.3]**    a non-transitory computer-readable medium; and

　　　**[1.4]**    program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

　　　**[1.5]**    while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

　　　　　(i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

　　　　　(ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

　　　**[1.6]**    after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

　　　**[1.7]**    after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

　　　**[1.8]**    based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player

in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

Sonos raises no triable issues of fact that should preclude summary judgment that Google's YouTube and Google Play Music ("GPM") applications do not infringe claim 13 of the '615 patent. Sonos instead relies on incorrect claim constructions, which this Court can dismiss at the summary judgment stage. Further, Google's own predecessor application—the YouTube Remote ("YTR")—included substantially the same features that Sonos now accuses of infringement, and thus summary judgment of invalidity is also warranted. Sonos's arguments regarding the YTR ignore the clear and convincing evidence—including publicly-available dated videos—showing that Google created these products first. Finally, Sonos rests its infringement case for the '885 patent on rejecting the current claim construction order and declaring that the purportedly "unconventional" feature of the "zone scenes" patents is simply naming a speaker or a group. This argument contradicts the intrinsic record, and summary judgment is warranted because Google's products do not use "zone scenes" or implement a "common theme" as that term has been construed.

## I.    GOOGLE DOES NOT INFRINGE CLAIM 13 OF THE '615 PATENT

### A.    The Accused YouTube Applications Do Not Infringe Claim 13

#### 1.    YouTube Does Not Include A "Local Playback Queue On The Particular Playback Device"

It is undisputed that in YouTube, the playback queue[1] is stored on an MDx server, and a receiver (the alleged playback device) makes WatchNextRequests one-by-one to identify the next video in the playback queue. Mot. at 6-7; Opp. at 4. If the receiver had a local copy of the playback queue, it would not need to request the identity of the next song or video in the queue one-by-one. Mot., Ex. 1 Bhattacharjee Decl. ("BB Decl."), ¶83. Because YouTube does not store the playback queue locally on the receiver, summary judgment is appropriate.

Sonos claims that the "queue" on the receiver is either (1) two different data variables which each store a single element (a current and next videoId); or (2) a WatchNextResponse ("WNR") message with the current and next videoId (and in some instances the previous videoId). Opp., Ex.

---

[1]  As proposed by Google, the "playback queue" is an "ordered list of multimedia items selected by the user for playback." Dkt. No. 200 (CC Br.) at 11-18. In YouTube, the ordered list of multimedia items selected by the user for playback is a "playlist." Schmidt Decl., ¶66 (illustrating playlist with five videos that Dr. Schmidt named "TV queue").

1, ¶¶70-71, 75.  Neither of these items is the claimed "playback queue."  At best, Sonos has shown that the receiver stores individual items from the playback queue—the previous, current, and next videoID—rather than the queue itself.  The playback queue is indisputably more than these three items.  Queues can be hundreds of media items long and can change if a user adds or removes items. BB Decl., ¶¶21, 73, 119.  Indeed, the '615 patent itself teaches that a "queue" is a variable-length structure to which users may add, edit or remove items.  '615 patent, 16:25-31 ("queue that the user is editing/managing"), 16:52-58 ("add, delete and so on from the queue.").  Sonos has previously taken this position as well.  Dkt. 184 at 12 (a "playback queue" can have "zero, one, or multiple media items at any given time").  Sonos's products identified in the '615 patent, as well as Google's accused applications, operate this way.  BB Decl., ¶¶21, 118 (parties' products allow users to "create playback queues that far exceed three items").  Despite this, the alleged "playback queue" that Sonos cobbles together (1) is three separate variables, and not a queue, and (2) could never consist of more than three items, regardless of the queue's length or whether a user has added or removed media items from it.  The Court should reject Sonos's transparently results-driven argument.

Sonos suggests that the '615 patent teaches that a local playback queue can be a "short list of tracks" from "a queue maintained at another device.'" Opp. at 9 (citing Ex. 1, ¶¶97-98); *Id*., Ex. 1, ¶¶97-98 (citing '615 patent at 16:63-17:1).  This is a mischaracterization.  The disclosure in the '615 patent Sonos relies upon teaches that a "third party application" can *override* a local playback queue" by playing a "short list of tracks" from a "application-specific queue." '615 patent at 16:63-17:1 (emphasis added).[2]  This passage supports Google, not Sonos, insofar as it distinguishes storing a "short list of tracks" in an application from the claimed "local playback queue."

Sonos's construction of "local playback queue" is inconsistent with the plain meaning. Google cited textbooks describing "queues" as "elementary data structures" that allow for the storage of multiple items in a particular order.  BB Decl., ¶70 (citing to textbook describing "Elementary Data Structures" such as a "Queues").  Sonos's expert's own lecture materials from Vanderbilt define queue the same way.  Dkt. 203, Ex. 16 at 121:25-122:24; 123:19-22 (defining

---

[2]  All emphasis has been added unless otherwise noted.

"queue" as a "first-in/first-out data structure"). Sonos disputes this plain meaning and argues instead that the local playback queue is essentially unbounded and could be any type of "'data construct on the playback device' (including a 'single data variable, multiple data variables, a data array or other data structure')." Opp., Ex. 1, ¶71. Sonos's expert goes so far as to allege that a "***single*** data variable" that stores a maximum of one item could be a queue. *Id.* (opining queue need not "allow for the storage of multiple items."). This is absurd on its face. By interpreting "queue" to encompass any data construct—including fixed name variables that store a single item—Sonos robs the word of all meaning. Dkt. 200 (Google CC Br.) at 13-14. Indeed, Sonos's position proves too much: Sonos's expert could not think of a single example of a way to store accessible songs that would ***not*** be a queue under his interpretation. Dkt. 203, Ex. 16 at 83:18-84:1. And Sonos has not pointed to a real-world instance in which a collection of fixed-named variables was referred to as a "queue."

Sonos's assertion that "Google has routinely admitted that a receiver has a local queue that dictates its playback when in a Cast session" is also incorrect. Opp. at 2-3. The exhibits that Sonos cites either (1) describe functionality that is not accused, (2) describe a queue on the ***sender*** device, rather than the receiver device as required, or (3) describe a cloud queue. Specifically:

- **Exhibit 3**: The "videoQueuer" API Sonos cites in this document is ***not*** used in connection with the accused casting functionality. Ex. 2 (Mo Decl.), ¶2.

- **Exhibit 4**: Sonos selectively quotes from an email chain—omitting the underlined portion—in which a Google engineer, Ali Mills, provides ideas about what could be causing a bug that has been discovered in YouTube: "it may have to do with the fact that receivers can retain a local version of the queue. I don't know much about this, but Chaoren told me this can happen. It sounds like the queue is intentionally retained to guard against flaky networks." Opp. at 2-3 (citing Ex. 4). In the omitted portion of the quote, Mr. Mills made clear that he didn't actually know whether a YouTube receiver maintains a local queue and was instead interpreting a statement from a fellow Google engineer. *Id.* Importantly, Mr. Mills has since unambiguously confirmed during his deposition that a YouTube receiver ***does not*** store a local version of the cloud queue. Ex. 3 (Mills Tr.), 122:24-127:5

- **Exhibits 5-6, 8**: Sonos points to three documents that describe loading a queue in a receiver. But these documents describe Cast SDK functionality. Ex. 2 (Mo Decl.), ¶3; Ex. 4 (Patil Decl.), ¶2. The accused YouTube and GPM applications do not use the Cast SDK described in these documents to implement queuing functionality. *Id.*

- **Exhibits 9**: Sonos admits (as it must) that this document relates to the "local queue" in YouTube that is stored on a "sender." Opp. at 3; *see also* Ex. 9 (showing queue on sender). The claims, however, require that a "local queue" be stored on a ***receiver***.

- **Exhibits 7, 10**: These documents refer to a YouTube receiver obtaining "metadata" or information regarding "queue *state*" for the remote queue stored on the cloud-based MDx server. Ex. 7 at 3 ("receiver device obtains renderers or metadata through GetWatchNext"), Ex. 10 at 1 ("first party clients and Cast receivers share a queue state via MDx's 'remote queue.' Any user changes to the loop mode must be reflected on connected devices."). Far from supporting Sonos, these documents conclusively establish that the accused applications have a *remote queue stored on the server*, not a local queue stored on the receiver device as the claim requires.

Sonos alternatively asserts that even if the data variables and WNR message are not a "local playback queue," they still satisfy the limitation under the doctrine of equivalents. Opp. at 6-7. But courts have made clear that the doctrine of equivalents should be used sparingly, in "exceptional" circumstances. *See, e.g., Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1313 (Fed. Cir. 2008). And regardless, Sonos's DOE argument fails for at least two reasons. First, Google's opening brief established that the "local playback queue" limitation was a narrowing amendment Sonos made to overcome the prior art, and thus that the *Festo* presumption applies and bars Sonos's equivalents argument. Mot. at 10-11. Despite bearing the burden to overcome the presumption, Sonos only conclusorily asserts that the rationale underlying the narrowing amendment "had nothing to do with the particular *form* of the 'local playback queue.'" Opp. at 6 (emphasis in original). To the extent Sonos's cryptic distinction between the "form" of the playback queue and the playback queue itself has any merit, Sonos's attorney argument fails to rebut the *Festo* presumption. Sonos amended its claims to overcome a rejection based on the DaCosta reference that included "information regarding the multimedia content," but was allegedly not in a "local playback queue," as required by the amended claims. Ex. 5, pp 1-2; *see Festo*, 344 F.3d at 1369 ("an amendment made to avoid prior art that contains the equivalent in question is not tangential.").

<u>Second</u>, Sonos has not shown that the alleged equivalents perform substantially the same function, in substantially the same way, to achieve substantially the same result. Opp. at 6-7. Google's expert provided detailed reasoning why the accused variables and WatchNextResponse message do not perform substantially the same function, in substantially the same way, to achieve substantially the same result. BB Decl., ¶¶85-89. Sonos does not address Google's arguments. Opp., Ex. 1, ¶122. And the testimony from Sonos's expert includes only high-level generalities that do not meet Sonos's burden. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359,

1364 (Fed. Cir. 2005) ("conclusory statements regarding equivalence, without any particularized

evidence and linking argument" are insufficient to "raise any genuine issues of material fact.").

### 2. YouTube Does Not Add "Multimedia Content" To Any Alleged Local Playback Queue.

Limitation 13.5(a) also requires "causing one or more first cloud servers to add multimedia

content to a local playback queue on the particular playback device" and further recites "wherein

adding the multimedia content to the local playback queue comprises the one or more first cloud

servers adding, to the local playback queue, one or more resource locators." In its opening brief

Google demonstrated that multimedia content is not added to a "local playback queue" in the

accused YouTube applications, and Sonos has not disputed this fact. Opp. at 10-11. Thus, the claim

language is not satisfied and the Court should grant summary judgment of non-infringement.

Sonos urges the Court to rewrite the claim language to eliminate the explicit claim limitation

"add *multimedia content* to a local playback queue" and instead only require adding "resource

locators" to the local playback queue. But a court "must give meaning to all the words in [the]

claims."[3] *Exxon Chem. Patents, Inc. v. Lubrizol Corp*., 64 F.3d 1553, 1557 (Fed. Cir. 1995).

Sonos's suggestion that adding "*multimedia content*" to the queue is coextensive with the separate

requirement that this step "comprises" adding *resource locators* to that queue is contrary to law

because "comprises" is used in patents to mean "includes but not limited to." *See, e.g.*, *Bioverativ*

*Inc. v. CSL Behring LLC*, Case No. 1:17-cv-00914-RGA, 2019 WL 1276030 (D. Del. Mar. 20,

2019). Thus, "adding multimedia content" may include, but is not limited to, adding resource

locators. The term "'comprising' is not a weasel word with which to abrogate claim limitations."

*See Wisconsin Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, n.8 (Fed. Cir. 2018).

Sonos argues that Google's interpretation of the claims would result in "non-sensical

redundancy." Opp. at 11. Not so. The claims require both that the playback device "retriev[es] the

multimedia content from one or more second cloud servers" (element 13.6) and that the same

multimedia content is added to the local playback queue (element 13.5(a)). That the claims recite

---

[3] The claim language and specification make clear that the "multimedia content" is the actual audio or video—not a "resource locator." Mot., Ex. 1, ¶¶90-94. Indeed, even Sonos provides "a particular song or video" as an example of "multimedia content." Opp. at 4.

"add[ing] multimedia content" before the step of "retrieving the multimedia content" is irrelevant because Claim 13 does not require that the claimed steps take place in a particular order. *Cybersettle, Inc. v. National Arbitration Forum, Inc*., 243 Fed. App'x 603, 609 (Fed. Cir. 2007) ("Absent affirmative indication to the contrary, method steps need not be performed in the order in which they are recited"). And storing a URL and multimedia content is not "non-sensical" in the context of a local playback queue. Ex. 1 ("BB Reply Decl.") ¶7 (providing reasons why playback device would store content and URLs). In any event, the Court should not rewrite Sonos's claim. *SRAM Corp. v. AD-II Engineering, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006) ("[W]e are powerless to rewrite the claims and must construe the language of the claim at issue based on the words used.").

### 3.   YouTube Does Not Add "Resource Locators" To Any Alleged Local Playback Queue

Limitation 13.5(a) requires "adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service." Sonos accuses the videoIds Google uses to identify songs or videos as the required "resource locators." Opp. at 11-12.

The accused videoIds, however, are not "resource locators" and cannot infringe for at least two reasons. First, the claims of the '615 patent explicitly distinguish "resource locators" from "identifiers." Whereas claim 13 recites the step of adding "resource locators" to the local playback queue, dependent claim 20 recites the additional step of adding "an identifier of the multimedia content" to the local playback queue. Thus, dependent Claim 13 confirms that adding a "resource locator" to a playback queue is different from adding an identifier of multimedia content. *See Dkt.* 200 (Google CC Br.) at 19. Second, under the plain language of the claims the accused videoId would need to "correspond[] to respective *locations* of the multimedia content at one or more second cloud servers of a streaming content service." But in the YouTube system, the videoId says nothing about where the media is located. BB Decl., ¶97. In fact, Sonos does not dispute: (1) that by using a videoId the receiver cannot know where the content is located (BB Decl., ¶¶95-96), (2) since the videoId does not correspond to a location of the content, the video content that corresponds to a videoId may be retrieved from different servers each time the video is played back, depending on

-6-                                   Case No. 3:20-cv-06754-WHA

1   conditions and circumstances (*id.*, ¶¶96-97), and (3) at the time the videoId is received the location

2   of the video content from which the receiver should retrieve the content is not known (*id.*).

3       Faced with this reality, Sonos pivots to argue that the videoId "enables the Receiver to access

4   a resource (e.g., a song or video) in the cloud" by contacting an "intermediate service (the Player

5   Service) that translates the videoId into at least one URL."  Opp. at 12.  Sonos's argument fails on

6   its face because the claims require a "resource locator" to be stored, not something else that merely

7   "***enables***" the playback device to begin a separate series of steps before it can determine a location

8   and access the resource; the resource locator that is stored must itself correspond to the location of

9   the resource.  Moreover, Sonos's suggestion that a videoId is "translated" into a URL is misleading

10  (at best) and unsupported by any evidence.  In truth, a videoID is just one element that is sent to the

11  Player Service in combination with other parameters.  Ex. 1, ¶6.  The Player Service then uses a

12  "Mapping Service" that employs a complex algorithm and various parameters to determine which

13  one of many content servers (called Bandaid servers) the receiver should request the content from

14  at that moment in time, and returns to the receiver a URL pointing to that Bandaid server.  *Id.*  The

15  URL is separate from the videoID, and the videoId does not itself locate any content.  *Id.*

16      Consistent with the plain meaning of this term, a "resource locator" should be construed as

17  an "address of a resource on the Internet." Dkt. 200 (Google's CC Br.) at 18-21.  The claim language

18  supports Google's construction because it requires that the "resource locator" must correspond to a

19  "location of the multimedia content" at a "cloud server" (*i.e.*, an Internet server).  *Id.* at 19.  The

20  specification also supports Google's construction because every instance of the term "resource

21  locator" refers to a "URL," which is the address of a resource on the Internet.  *Id.* at 19-20.  And the

22  extrinsic evidence further supports Google's construction because the term "resource locator"

23  appears in dictionaries as part of the term "URL."  *Id.* at 21.  The Court should adopt Google's

24  construction, and under that construction there can be no infringement.  As Google demonstrated in

25  its opening brief, a videoId is simply a string of characters (*e.g.*, "n_yx_BrdRF8") that identifies a

26  song or video; it is not an address of a resource on the Internet.  BB Decl., ¶¶95-98.

27      Perhaps realizing that its videoId theory is not viable, Sonos presents an alternative theory

28  relying on the "DashManifest."  This theory fails for two reasons.  First, the claim requires that the

-7-                          Case No. 3:20-cv-06754-WHA

"resource locator" be added to the "local playback queue," but Sonos does not even argue that the DashManifest is added to any of the data variables or the WatchNextResponse that it accuses of being a local playback queue. Opp. at 3-7. Google's expert confirmed that DashManifest is not added to any of those alleged "local playback queues." BB Decl., ¶98; *see also* Ex. 1, ¶5. Second, because DashManifest is not added to any alleged "queue," Sonos argues that DashManifest may itself be a local playback queue, which is yet another new theory that was not presented in Sonos's infringement contentions. Opp. at 12; Dkt 145-1 at 41-42 (February 25, 2022) (not identifying DashManifest as the local playback queue). Regardless, the undisputed factual record confirms a DashManifest stores information about only a *single* media item. Ex. 1, ¶5; Opp. at 12 ("that URL is added to the Receiver's memory in a 'DashManifest' that is used to retrieve *the corresponding media item* from a Bandaid server for playback"). Thus, a DashManifest cannot be a *queue* because it has no capability to store *multiple* elements.

There is also no infringement under DOE because Sonos added the "resource locator" claim element in a narrowing amendment during prosecution and thus surrendered any right to equivalents of that claim element. On April 5, 2017, Sonos amended pending claim 10 (issued as claim 13) to distinguish U.S. Patent Publication No. 2012/0304233, adding that "wherein adding the multimedia content to the local playback queue comprises the one or more first cloud servers adding, to the local playback queue, one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service." Ex. 5 at 3-4. As discussed *supra*, this narrowing amendment results in a surrender of any equivalents.

Even if Sonos were entitled to rely on DOE, it has failed to show that its claimed equivalent has "insubstantial differences" compared to a literal reading of the claim language. Although Sonos claims that a videoId is "information representing an 'address of a resource on the Internet'" that gets "resolved into" a URL "in a subsequent step," it provides no evidence supporting this assertion. *See* Opp. at 13; *see also* Opp., Ex. 1, ¶122. Instead, Sonos cites to the conclusory opinion of its expert, who does not explain how the videoId is "information representing an 'address of a resource on the Internet,'" and does not explain the alleged process by which a videoId is "resolved into" a URL. *Id.* Sonos's DoE arguments fail as a matter of law because they are conclusory and

1   unsupported by evidence.  *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359,

2   1364 (Fed. Cir. 2005) ("conclusory statements regarding equivalence, without any particularized

3   evidence and linking argument" are insufficient to "raise any genuine issues of material fact.").

4   Google's approach—using a videoId—also does not perform substantially the same function, in

5   substantially the same way, to achieve substantially the same result.  *See* Ex. 1,¶6.

### B.   GPM Does Not Infringe Claim 13

7       The undisputed facts also show that the (now long-discontinued) GPM application does not

8   infringe Claim 13.  Before it was discontinued, GPM permitted a user to use his or her phone to

9   create a playback queue containing up to thousands of songs (BB Decl., ¶¶100, 118) and stored the

10  playback queue in the cloud and not on the receiver device.  *Id.*, ¶¶102-103.  During the parties'

11  collaboration Sonos itself described GPM as implementing a "cloud queue" where the "list of tracks

12  being played lives in the cloud."  Ex. 6.  Sonos does not dispute that GPM stores the playback queue

13  in the cloud.  Opp. at 7-8.  Nor does Sonos attempt to show that a copy of the playback queue is

14  stored locally on a receiver when casting.  Opp. at 7-8.  Thus, summary judgment is appropriate.

15      Sonos claims that the "local playback queue" is an "ItemWindowResponse" that stores

16  information for the previous, current, and next media items in the cloud queue.  Opp. at 7-8.  Claim

17  13 requires storing the *entire* playback queue locally—not just three individual items from the

18  playback queue.  Sonos's argument also relies upon its overly broad construction of playback

19  "queue" as any "data construct."  *Id.*  These arguments should be rejected.  *Supra* I.a.1.

20      It is also undisputed that GPM does not store the multimedia content itself on a receiver

21  device.  Opp. at 10-11.  As discussed above, Sonos should not be allowed to read this requirement

22  out of the claims.  *Supra* I.a.1.  Thus, GPM also does not satisfy the "multimedia content" limitation.

### C.   Claim 13 of the '615 Patent Is Invalid

#### 1.   YTR Discloses or Renders Obvious Limitation 13.2

25      Sonos argues that the prior art YTR system cannot meet the requirement of "after connecting

26  to a [LAN] via a network interface, identifying playback devices connected to the [LAN]."  Opp. at

27  15.  But Sonos completely ignores video evidence that explicitly shows this happening.  The video

28  Google cited in its opening brief shows, at 0:56, the user (1) suggesting that someone using YTR

1   should "make sure you are both on the same Wi-Fi"; (2) sending the video from his Wi-Fi-connected

2   Android mobile phone to the TV; and (3) controlling the video on the TV with the YTR application

3   running on that Android mobile phone. *See* https://youtu.be/EGdsOslqG2s?t=56.   In other words,

4   the video ***shows*** the user "connecting to a LAN via a network interface" (Wi-Fi) and then not just

5   identifying a playback device connected to that LAN (Wi-Fi), but also sending video to it and

6   controlling that video.  And while the video shows a single playback device, it is undisputed that

7   the YTR application could operate with multiple playback devices.  BB Decl., ¶¶149, 158.

8       Sonos ignores this evidence and argues that ==a loungeScreenConnected message that is sent==

9   ==from the server to the YTR application== does not identify the screen "as being connected to the same

10  LAN that the YTR device is connected to" because it merely ***'informs*** the [YTR app] that there is

11  at least one screen connected in the session.'"  *Id*.  The video evidence, however, shows the YTR

12  application connected to the "same LAN" both sending video to a specific screen and controlling

13  video on that screen.  Thus, that screen had to be identified.  *See* BB Decl. ¶133.

14      Even if this were not the case, the claim language places no restrictions on ***how*** the playback

15  devices are identified; it merely requires "after connecting to a [LAN] via a network interface,

16  identifying playback devices connected to the [LAN]."  Those playback devices can be identified in

17  any way, for example as a group, which is how the YTR system worked. BB Decl. ¶140.  Nor does

18  the claim require that ***only*** playback devices connected to the same LAN be identified.  As Sonos

19  points out, Google's YTR was more flexible insofar as it could also identify other playback devices

20  that were not connected to the LAN. Opp. at 16.  That Google's system had ***additional*** functionality

21  is irrelevant. *Vulcan Eng. Co., Inc. v. Fata Aluminium, Inc*., 278 F.3d 1366, 1375 (Fed. Cir. 2002).

22      The combination of the YTR system with the YTR Patent and/or Apple Airplay also renders

23  the asserted claim obvious.  Sonos argues that the YTR Patent does not disclose "identifying the

24  'controlled devices' as being connected to the same LAN as the 'remote control.'"  Opp. at 20.  But

25  the figure on the ***face*** of the YTR Patent shows a remote control is connected to "controlled devices"

26  (e.g., TV screens) over a local area (or other) network 22. '885 Pat. Fig. 1; 6:34-36.

27      Moreover, Sonos does not dispute that Airplay discloses the allegedly missing Element 13.2

28  (as well as 13.4, addressed below), and instead argues that Airplay is "fundamentally different" than

YTR. Opp. at 20. This argument ignores that Airplay and YTR were two widely available and oft-compared products that did essentially the same thing—sending video from a mobile device to a TV—using the same technology (smart phones and Wi-Fi-enabled TVs). Opp. Ex. 16 at -596. It is true that some at Google believed YTR was superior to Airplay, Opp. at 20, but superiority is not the test for determining whether a reference may be combined. The Court must ask "whether the art is from the same field of endeavor, regardless of the problem addressed." *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020). That is the case here, where both products are directed to the same problem and confront that problem in substantially the same way. It is also not necessary that the two products be physically combinable, *see* Opp. at 20, so long as "a skilled artisan could take inspiration from [one] and apply that insight to [the other]." *Pulse Elect., Inc. v. U.D. Elect. Corp.*, 860 Fed. App'x 735, 2021 WL 2735013, *3 (Fed. Cir. 2021).

### 2. YTR Discloses or Renders Obvious Limitation 13.4

Limitation 13.4 requires a set of inputs that comprise "(i) a selection of the selectable option for transferring playback from the control device and (ii) a selection of the particular playback device from the identified playback devices connected to the local area network." Sonos argues that Google has not identified inputs for the two different specified actions, but its arguments are flawed and once again misread the claim language. For (i), Sonos argues that the "menu" button, which causes the application to display a number of options such as "connect," cannot meet the claim language because it "is not a button for transferring playback from the YTR app or a button for selecting a particular playback device to transfer playback to." Opp. at 17. But neither of those actions are required by the claim language. Instead, the claim language only requires "a selection of the selectable option for transferring playback from the control device," and that is precisely what the "menu" button does. When pressed, the "menu" button shows the option for transferring playback from the control device, which is the "connect" button. BB Decl. ¶ 136.

Sonos also argues that the "connect" button cannot meet requirement (ii) because it is not a "selection of the particular playback device from the identified playback devices connected to the local area network." Opp. at 17. But Sonos acknowledges that a "later" version of the YTR app had "the ability to 'select and control' 'individual' Leanback Screens." *Id.* at 18. Indeed, that

1    December 1, 2011 version of the source code (which is also prior art) includes the file
2    ChooseScreenHelper.java that displays available screens to the user and allows the user to choose
3    among those screens for playback.  BB Decl. ¶ 170.

4         Sonos responds to this December 1, 2011 prior art version of YTR in two ways.  First, Sonos
5    suggests that this prior art was a "foreign version" of YTR.  Opp. at 18.  This is speculative and
6    wholly without merit.   The original YTR application, and all of its subsequent versions, were
7    released on Google's publicly-available Android Marketplace app store (the predecessor to the
8    current Google Play app store), which was accessible in the United States and many other countries.
9    Mot. Ex. 11 at 1, Ex. 14.  Second, Sonos suggests that this prior art does not predate Sonos's
10   "uncontested" conception date (Opp. at 18), but Google plainly stated in its invalidity contentions
11   that it is Sonos' burden to show entitlement to its asserted priority dates, and Sonos failed to meet
12   that burden.  Sonos does not present any evidence to prove an earlier conception date, despite
13   bearing the burden of proof on that issue.

14        Even if the Court finds that Google's creation of prior art source code embodying the claimed
15   invention before the '615 patent filing date is not invalidating, at the very least it would have been
16   obvious to combine the YTR system with the numerous other earlier prior art references that
17   indisputably disclose the ability to select "the particular playback device from the identified
18   playback devices connected to the local area network."  *See* BB Decl. ¶ 27-35; *see also* Ex. 8
19   (Hoadley Tr.) at 103:2-108:18, (admission by named inventor that she was aware of Apple Airplay's
20   ability to select a speaker for playback).  Indeed, Google itself implemented the "device picker"
21   feature in YTR in only eight weeks, which is a testament to how routine and ordinary this feature
22   was at the time.  Ex. 7 (GOOG-SONOSNDCA-00075598) at -599.

23        As discussed in Google's opening brief, Apple Airplay as well as Google's Nexus Q allowed
24   users to select a playback device, such as "Con Air" or "Hot Fuzz" in the image of Airplay on the
25   left or the "Stage Left" and "Stage Right" speakers in the image of Nexus Q on the right.[4]

26

27   _____
     [4]   There is no dispute that both Airplay and Nexus Q are prior art, with Airplay having been
28   publicly released in November 2010 and Nexus Q having been publicly demonstrated live at
     Google's I/O in May of 2011.  BB Decl., ¶¶ 27-28, 30-31.



The Al-Shaykh patent (below left) and Sonos's own prior art products (below right) also clearly allowed a user to select specific playback devices as well. BB Decl., ¶¶ 27-31.

Sonos's responses to these myriad obviousness references are unpersuasive. First, Sonos argues that the YouTube Remote patent does not disclose transferring playback from the YouTube Remote application to the screen. Opp. at 19. Even if this were true, it would be irrelevant because the YTR **system** clearly discloses this function, as shown in contemporaneous videos. *Supra* at I.C.1; Mot. at 16. Sonos also half-heartedly argues that the YTR Patent only discloses "the ability to control **any and all** 'controlled devices' . . . with **no ability to choose** from amongst those 'controlled devices.'" Opp. at 19. But the YTR Patent discloses exactly the opposite: "the user may also utilize the remote control application of remote control to **select one or more** previously paired controlled devices." '998 Pat. at 10:67-11:3. Sonos also argues that the YTR Patent "shuns" having controlled devices connected to the same LAN as the remote control (Opp. at 19-20), but this setup is clearly shown in the figure on the face of the patent, which describes an embodiment in which the network connecting the remote control and controlled devices can be a LAN. *Id.* at Fig. 1, 6:34-36.

Sonos also argues that the "architecture" of YTR "teaches away" from combining YTR with any other system given that a user would log in to both the YTR application on the mobile device as well as log in to the same account on the user's screen. Opp. at 21. First, this is not "teaching away" because nothing in the YTR product disparages or discourages using Airplay or any of the

1    other prior art approaches.  *Cole Kepro Int'l, LLC v. VSR Indus., Inc.*, 695 F. App'x 566, 570 (Fed.

2    Cir. 2017).   Second, Sonos's suggestion that YTR was incompatible with the ability to select a

3    playback device, or that a person of skill in the art would not have been motivated to modify it to

4    do so (Opp. at 20-21) is contrary to the undisputed fact that Google sought to add this feature to

5    YTR and did so in only eight weeks—all before the filing date of the '615 Patent.  *See supra* I.C.2.

6         Sonos's "secondary considerations" argument (Opp. at 23) also fails because Sonos provides

7    no evidence, and cannot presume nexus because the accused products are not "coextensive" with

8    the claims.  *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019).

9                   **3.    YTR Discloses Limitations 13.5-13.6**

10        Sonos complains about the sufficiency of Google's evidence for limitations 13.5 and 13.6,

11   but not the substance of those disclosures.  Sonos's primary argument is that a sworn declaration

12   from a Google engineer with knowledge of the prior art products is "uncorroborated" and therefore

13   insufficient evidence at summary judgment.  Opp. at 18.  This argument is misplaced given that

14   Sonos is objecting to testimony regarding ***documentary evidence***.  Those documents ***are*** the

15   corroboration for his testimony.  As an engineer who worked on the prior art product and subsequent

16   iterations of those products for approximately five years, Mr. Levai is well-positioned to discuss

17   documents describing those products, whether or not he was present at the company for the initial

18   launch of the product eight months earlier.  Sonos cites to *Union Carbide* and *Juicy Whip* in support

19   of its corroboration argument, but neither is relevant here.  In *Union Carbide*, the defendant ***only***

20   offered testimony from two of its witnesses that the product was publicly available.  *Union Carbide*

21   *Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189 (Fed. Cir. 2002).  Here,

22   Google cites to multiple contemporaneous documents and only relies on testimony in support of

23   those documents.  Similarly in *Juicy Whip*, the court found that drawings made by interested

24   witnesses at their depositions were not sufficient corroboration.  *Juicy Whip, Inc. v. Orange Bang,*

25   *Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002).  Unlike *Juicy Whip,* Google has presented corroboration

26   via contemporaneous documentary evidence.  Sonos's argument also completely ignores the YTR

27   source code itself that ***also*** discloses (and corroborates) these limitations.  BB Decl., ¶¶ 178-184.

28

1    Sonos also argues that the YTR product cannot invalidate because the phone merely

2    "pauses" the playback state when it transfers video to the screen rather than "stopping" that video.

3    Opp. at 18.  Sonos does not cite any evidence drawing a distinction between "stopping" and

4    "pausing," and the '615 certainly includes no such distinction.

5    **D.    Google Does Not Infringe Claim 1 of the '885 Patent**

6    Sonos continues to rely on the flawed argument that the Western District of Texas court's

7    claim construction order does not bind Sonos and is not the law of this case.  Opp. at 23; Dkt. 202

8    at 1-5.  To the contrary, because Sonos has not sought reconsideration, the claim construction order,

9    which held that "zone scene" means "a previously saved grouping of zone players according to a

10   common theme," continues to bind Sonos, and under that construction there can be no infringement.

11   Sonos argues that merely giving a speaker group a name—a well-known concept—

12   constitutes the purportedly novel "zone scene."  Opp. at 23-24.  Sonos argues that times of day like

13   "morning" and areas of a home like "garden" are "the *exact* types of 'themes' contemplated by the

14   '885 Patent."  *Id.*  (emphasis in original).  However, the portions of the specification that Sonos cites

15   reveal that mere naming of a speaker was *not* the theme contemplated in the patent.  Sonos cites to

16   8:47-61, which states that "[u]sing what is referred to herein as a theme or a zone scene, zones can

17   be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone

18   grouping and setting of attributes for the grouping are automatically effectuated."  The specification

19   thus teaches that the name of a "scene" may be morning, afternoon, or garden, but the scene itself

20   must include the zone grouping and setting of attributes for the grouping that are automatically

21   effectuated.  Sonos also cites to 10:36-41, but this portion of the specification likewise teaches that

22   in a particular embodiment the "scene is named after 'morning.'"  The scene cannot be the name

23   itself, otherwise the specification would have instead disclosed that the "scene *is the name*

24   'morning.'"  And finally, Sonos cites to 8:52-61, which states that a "zone scene/configuration

25   command would link the Bedroom, Den and Dining Room together in one action," and notes that

26   this command could be named "morning."  Once again, the "zone scene" is not the name itself.

27   **II.    CONCLUSION**

28   For the foregoing reasons, the Court should grant Google's Motion.

1

2 DATED: May 19, 2022          QUINN     EMANUEL     URQUHART     &
                              SULLIVAN, LLP
3

4

5                             By:     /s/ Charles K. Verhoeven
                                      Charles K. Verhoeven (Bar No. 170151)
6                                     charlesverhoeven@quinnemanuel.com
                                      Melissa Baily (Bar No. 237649)
7                                     melissabaily@quinnemanuel.com
                                      Lindsay Cooper (Bar No. 287125)
8                                     lindsaycooper@quinnemanuel.com
9                               50 California Street, 22nd Floor
                                San Francisco, California 94111-4788
10                              Telephone: (415) 875-6600
                                Facsimile: (415) 875-6700
11

12                              *Attorneys for GOOGLE, LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on May 19, 2022, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system and email.


*/s/ Charles K. Verhoeven*
Charles K. Verhoeven