# ATTACHMENT 2

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
COLE RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003

*Attorneys for Defendant Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>Plaintiff and Counter-defendant,<br><br>v.<br><br>SONOS, INC.,<br><br>Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**DECLARATION OF DR. KEVIN C. ALMEROTH IN SUPPORT OF SONOS, INC.'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF '885 PATENT CLAIM 1**<br><br>Date: June 9, 2022<br>Time: 8:00 a.m.<br>Place: Courtroom 12, 19th Floor<br>Judge: Hon. William Alsup<br><br>Complaint Filed: September 28, 2020 |

**PUBLIC - REDACTED VERSION**

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

I, Kevin C. Almeroth, hereby declare as follows:

## I.    INTRODUCTION

1.    I am a Professor Emeritus in the Department of Computer Science at the University of California, Santa Barbara (UCSB), where I have been a faculty member for nearly 25 years.  I am also a founding member of the Media Arts and Technology Program, Technology Management Program, and the Computer Engineering Program, and I previously served as the Associate Director of the Center for Information Technology and Society.  During my tenure at UCSB, my research has focused on topics including data networks and protocols (including wireless data networks such as those compliant with IEEE 802.11), multimedia systems, delivery of multimedia content and other data across data networks, mobile applications, and multicast communication.

2.    In conjunction with my research at UCSB, I have been involved in academic research into available technology in the marketplace.  This includes my involvement in the Internet Engineering Task Force including many content delivery-related working groups.  I also have involvement with several other technical organizations, including the Association of Computing Machinery and the Institute of Electrical and Electronics Engineers, and I am an author or co-author of approximately 200 technical papers, published software systems, IETF Internet Drafts and IETF Request for Comments.

3.    I hold three degrees from the Georgia Institute of Technology: (1) a Bachelor of Science degree in Information and Computer Science (with minors in Economics, Technical Communication, and American Literature) earned in June, 1992; (2) a Master of Science degree in Computer Science (with specialization in Networking and Systems) earned in June, 1994; and (3) a Doctor of Philosophy (Ph.D.) degree in Computer Science (Dissertation Title: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia System, minor in Telecommunications Public Policy) earned in June, 1997.

## II.    SCOPE OF ASSIGNMENT AND INFORMATION CONSIDERED

4.    I have been asked by Sonos, Inc. ("Sonos") to provide my opinions on whether claim 1 of U.S. Patent 10,848,885 (the "'885 Patent") is directly infringed by Google LLC ("Google") in connection with Sonos's motion for summary judgment of infringement that is

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

scheduled to be filed on April 14, 2022.  The billing rate for my services related to this matter is $700 per hour.  My compensation is in no way contingent on the outcome of this action.

5.     The language of claim 1 of the '885 Patent is set forth below:

**[1.0]**    A first zone player comprising:

**[1.1]**    a network interface that is configured to communicatively couple the first zone player to at least one data network;

**[1.2]**    one or more processors;

**[1.3]**    a non-transitory computer-readable medium; and

**[1.4]**    program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

**[1.5]**    while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

**[1.6]**    (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

**[1.7]**    (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

**[1.8]**    after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

**[1.9]**    after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

**[1.10]** based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

6.     I understand that Sonos has accused Google of directly infringing claim 1 of the

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

'885 Patent by virtue of making, using, offering to sell, selling, and/or importing certain media players that incorporate Google's "Cast" technology (sometimes referred to as "Chromecast" technology) for audio receivers (sometimes referred to as "Cast receivers"), which are Google's (1) Chromecast media players, (2) Chromecast Ultra media players, (3) Chromecast with Google TV media players, (4) Home media players, (5) Home Mini media players, (6) Home Max media players, (7) Nest Audio media players, (8) Nest Mini media players, (9) Nest Hub media players (which were formerly branded as "Home Hub" media players[1]), (10) Nest Hub Max media players, and (11) Nest Wifi Point media players. I will refer to these media players as the "Accused Google Players."

7. As part of my infringement analysis, I also looked at how the Accused Google Players interact with other devices, such as smartphones, tablets, or computers, that are installed with software applications incorporating Google's Cast technology for senders (sometimes referred to as "Cast senders"). These Cast-enabled software applications, which include the Google Home app, the YouTube Music app, the Google Play Music app, and the Spotify app, among others, can be used to control the Accused Google Players. I will refer to a smartphone, tablet, or computer installed with any one or more of these Cast-enabled software applications as a "Google Controller."

8. I understand that the timeframe of Google's alleged infringement of the '885 Patent began on November 24, 2020 when the '885 Patent issued and continues until the present day, and I have focused my infringement analysis on this timeframe.

9. I have a methodology that I follow when performing this kind of infringement analysis. As part of that methodology, I started with a review of the '885 Patent and its prosecution history as well as the parties' claim construction positions that are relevant to claim 1 of the '885 Patent. These claim construction positions are reflected in the claim construction charts, the claim construction briefing, and other related materials that have been filed to date in the present case, which is Case No. 3:20-cv-6754, as well as *Sonos, Inc. v. Google LLC*, No. 3:21-cv-7559 ("N.D.

---

[1] *See, e.g.*, GOOG-SONOSWDTX-00005229 at 29 ("[W]e're bringing the Home products under the Nest brand …. Nest Hub (formerly Google Home Hub).").

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Cal. Case No. 3:21-cv-7559"), which is related to the present case and was transferred from the Western District of Texas to this Court on September 27, 2021.

10.    Next, I evaluated the structure and operation of the Accused Google Players.  That evaluation involved a review of various materials regarding the Accused Google Players, including Google's source code, internal and publicly available documents, certain of Google's discovery responses in the present case, including Google's Responses to Sonos's Interrogatory Nos. 5 and 13 and Google's Responses to Sonos's Request for Admissions (RFAs) Nos. 1-12, as well as certain deposition and trial testimony from the International Trade Commission (ITC) Investigation that was initiated by Sonos against Google in January 2020 in connection with these same Accused Google Players.  I have also used the Accused Google Players and have overseen and directed testing of the Accused Google Players to gain a further understanding of the structure and operation of the Accused Google Players.

11.    Further, I reviewed the parties' contentions related to infringement of claim 1 of the '885 Patent, including Sonos's Infringement Contentions relating to claim 1 of the '885 Patent, and Google's Response to Sonos's Interrogatory No. 12 as it relates to claim 1 of the '885 Patent.

12.    A more detailed identification of the materials that I reviewed while evaluating the Accused Google Players and formulating my opinions regarding infringement can be found in the paragraphs that follow, as well as in Exhibit 1.

13.    Once I completed my evaluation of the Accused Google Players, I then compared the Accused Google Players to claim 1 of the '885 Patent in order to determine whether the Accused Google Players meet every limitation of claim 1 of the '885 Patent.

## III.    <u>SUMMARY OF OPINIONS</u>

14.    Based on my analysis, it is my opinion that each of the Accused Google Players identified above literally satisfies every limitation of claim 1 of the '885 Patent.  Further, I have been informed that Google makes, uses, offers to sell, and/or sells each of the Accused Google Players identified above in the United States, and/or imports each of the Accused Google Players identified above into the United States.  For these reasons, it is my opinion that Google directly infringes claim 1 of the '885 Patent.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

## IV.    LEGAL STANDARDS

15.    I understand that a party directly infringes a patent whenever the party makes, uses, offers to sell, or sells a patented invention in the United States, or imports a patented invention into the United States, without authorization to do so from the patent holder.

16.    I understand that, as the patent holder, it is Sonos's burden to prove direct infringement of claim 1 of the '885 Patent by a preponderance of evidence. To do so, Sonos must show that it is more likely than not that the Accused Google Players meet each and every limitation of claim 1 of the '885 Patent. In this respect, if even one limitation of claim 1 of the '885 Patent is not met by the Accused Google Players, then I understand that Google will not be liable for direct infringement.

17.    As shown above, claim 1 of the '885 Patent is directed to a "first zone player" *(*i.e., a device) having certain hardware limitations, including "a network interface that is configured to communicatively couple the first zone player to at least one data network," "one or more processors" and "a non-transitory computer-readable medium," and then additionally requires "program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform [the claimed] functions" that follow. I understand that an accused device will meet the functional limitations of a device claim structured in this way as long as the accused device is installed with software that makes it *capable* of performing the claimed functions. In this respect, the accused device need not be plugged in, connected to a network, placed into a system with other devices, or actually be used in a manner that causes the device to perform the claimed functions in order to meet the functional limitations of the device claim. Thus, it is my understanding that claim 1 of the '885 Patent is met by an Accused Google Player as long as the Accused Google Player (i) meets the hardware limitations of the claim and (ii) is installed with software that provides the Accused Google Player with the capability to perform the functional limitations of the claim.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

18.    In my opinion, a person of ordinary skill in the art ("POSITA") for purposes of this action is a person having the equivalent of a four-year degree from an accredited institution

(typically denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or an equivalent thereof, and approximately 2-4 years of professional experience in the fields of networking and network-based systems or applications, such as consumer audio systems, or an equivalent level of skill, knowledge, and experience. Based on my personal knowledge and extensive experience in the fields of networking and multimedia systems, including the configuration and control of networked devices, I am very familiar with the level of knowledge and abilities of a POSITA at the time of the inventions.

## VI.   OVERVIEW OF THE '885 PATENT

19.    The '885 Patent is directed to Sonos's "zone scene" technology, which, at the time of the invention, provided a new way of organizing and using networked media players such as smart speakers, which are referred to in the patent as "zone players." The technology disclosed in the '885 Patent enables a user to create and save a predefined group of zone players that can *later* be invoked to cause zone players in the previously-saved, predefined group to become configured to play back audio in synchrony. The '885 Patent calls such a previously-saved, predefined group a "zone scene."

20.    Figure 1 of the '885 Patent is an example of a networked multi-zone playback system in which the "zone scene" technology can be used. As shown in Figure 1, the exemplary system incudes media players ("zone players") 102, 104, 106 and "controlling devices" 140, 142 coupled to a "data network" 108 (e.g., a home Wi-Fi network):



6

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  '885 Patent at Fig. 1, 4:39-5:2, 6:28-30.

2       21.    The '885 Patent explains that, in addition to communicating with each other and

3  with other devices on "data network" 108, each "zone player" is configured to communicate over

4  a "wide area network" (e.g., the Internet) with one or more remote audio sources (e.g., an

5  Internet-based audio source like Spotify or YouTube Music) to, for example, retrieve audio for

6  playback on one or more "zone players" in the system. *See, e.g.*, *id.* at 4:66-5:9, FIG. 1.

7       22.    Before the '885 Patent, conventional multi-speaker systems were inflexible and

8  cumbersome to use.  Some were essentially "a collection of many stereo systems" each with its

9  own local audio source, making it "difficult" to share music across different areas of the home.

10  *Id.* at 1:53-55.  Other systems offered a central source of music connected to speakers located in

11  different rooms in the home, but these components were physically "hard-wired" together using

12  conventional stereo wires.  *Id.* at 1:62-65.  That made it difficult, if not impossible, to rearrange

13  the system to suit different user preferences.

14       23.    Take, for example, a user who likes to listen to the news in the morning.  They

15  have speakers in different rooms of their house.  This person might want to listen to the morning

16  news while getting ready for work by playing the news on speakers in their bedroom, bathroom,

17  and den.  *Id.* at 1:65-2:3.  But the same person might want to listen to music (e.g., jazz) after

18  dinner in the evening by playing an album in their den and living room.  *Id.* at 2:3-5.  The two

19  desired groups in this example are different, but both include the den.  Using traditional audio

20  systems, it was "difficult … to accommodate the requirement of dynamically managing the ad

21  hoc creation and deletion of groups" because those systems were hard-wired and pre-configured.

22  *Id.* at 2:15-17.

23       24.    Sonos's '885 Patent solved this problem by allowing users to create different

24  speaker groupings that were durable in the sense that the system could remember the groups, but

25  easy to use in the sense that they could be selected for invocation by a user at any time.  *See, e.g.*,

26  *id.* at 3:14-31, 8:47-61, 10:30-11:5.  In this way, a user could use a networked controller to

27  predefine different, customized groupings of speakers called "zone scenes," and easily start

28  listening to music synchronously on any of them.

7

25.    Not only did Sonos's "zone scene" technology solve problems that existed in conventional hard-wired audio systems, the '885 Patent also explains how Sonos's "zone scene" technology was different from the grouping mechanism that was currently used by Sonos when the '885 Patent was filed, which required a user to define the group of zone players "on the fly" at the time the user wished to listen to audio playback in synchrony across multiple zone players, which "may be sometimes quite time consuming." *See, e.g.*, *id.* at 8:42-45, 8:54-56.

26.    To facilitate the use of these "zone scenes," the '885 Patent discloses a controller with a user interface via which a user can create and save a "zone scene" for future use and then later select that "zone scene" for invocation via the controller. *See, e.g.*, *id.* at 3:14-31, 8:47-61, 10:30-11:5. The '885 Patent illustrates various exemplary user interfaces that can be provided via a controller device for performing these tasks. For example, Figure 5A of the '885 Patent shows an exemplary user interface that allows a user to create and save a new "zone scene" named "Morning":



FIG. 5A

*Id.* at Fig. 5A.

27.    The ability to assign the name "Morning" to this "zone scene" allows the user to expressly indicate that this "Morning" "zone scene" includes "zone players" on which to listen to audio in synchrony in the morning. *See, e.g.*, *id.* at 8:47-61, 10:30-41; *see also id.* at 3:1-25. Other exemplary "zone scene" names contemplated in the '885 Patent include, for example,

8

afternoon, evening, and garden. *Id.* at 8:47-9:15.

28.     Figure 7 of the '885 Patent illustrates an exemplary user interface that enables a previously-saved "zone scene" to be selected for invocation. As shown in this example, the "zone scene" named "Morning Wakeup," which is represented by the "Morning Wakeup" icon, can be selected for invocation:



*Id.* at Fig. 7.

29.     As explained further below, claim 1 of the '885 Patent covers aspects of Sonos's "zone scene" technology from the perspective of a zone player.

## VII.    OVERVIEW OF ACCUSED GOOGLE PLAYERS

30.     As noted, I have been asked to consider whether certain of Google's products meet every limitation of claim 1 of the '885 Patent. In particular, I have been asked to evaluate the Accused Google Players, specifically, Google's Home Mini, Nest Mini, Home, Nest Audio, Home Max, Nest Hub (formerly known as the Home Hub), Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Ultra, and Chromecast with Google TV media players.

31.     All the Accused Google Players are wireless media players that incorporate Google's "Cast" (sometimes called "Chromecast") technology, which enables the Accused Google Players to utilize Google's "Cast Protocol" to communicate with smartphones, tablets, or other computer devices installed with Cast-enabled apps, such as Google's Google Home app,

Google's Google Play Music app[2], Google's YouTube Music app, and the Spotify app. *See, e.g.*, Google's Resp. to Sonos's Interrog. No. 13 at 9-11; GOOG-SONOSWDTX-00005793-802; GOOG-SONOSNDCA-00056732-77. As described below, these Cast-enabled apps help facilitate setup and/or control of the Accused Google Players, including the creation and use of groups of smart speakers. Herein, a computer device (e.g., smartphone, tablet, or laptop) installed with any one or more of these Cast-enabled apps is referred to as a "Google Controller."

32. The Cast technology incorporated into the Accused Google Players enables each Accused Google Player to operate in one of two mutually exclusive modes at any given time: (1) a mode in which the Accused Google Players are configured to play back audio individually (referred to internally by Google as a "standalone" or "non-group" mode) or (2) a mode in which the Accused Google Players are configured to play back media in synchrony with one or more other Accused Google Players as part of a group (referred to internally by Google as a "multizone" or "multiroom" grouped mode). *See, e.g.*, GOOG-SONOSWDTX-00048731 at 47 (referring to a "non-group" mode as a "standalone" mode); GOOG-SONOSWDTX-00005793 at 93 (describing how to listen to music on an Accused Google Player that is operating in standalone mode); GOOG-SONOSWDTX-00007068 at 68 ("Group any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home."); GOOG-SONOSWDTX-00040384 at 85 (document titled "Multizone Audio Design" stating "[t]he primary goal of multiroom audio is to play out the audio in sync across all the devices in a group"); GOOG-SONOSNDCA-00056732-77.

33. Further, the Cast technology incorporated into the Accused Google Players supports two different types of groups: (1) a "speaker group," also referred to internally by Google as a "static" group, which is a grouping of Accused Google Players for synchronous playback that is predefined by a user and saved for future use, and (2) a "dynamic" group, which is a grouping of Accused Google Players for synchronous playback that is defined by a user "on the fly" during active playback and is not saved for future use. *See, e.g.*, Google's Third Suppl.

---

[2] Google discontinued the Google Play Music app in late 2020.

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Resp. to Sonos's Interrog. No. 13 at 9-11 (explaining that "[u]nlike static groups, which may be created in the Google Home App before media starts playing; dynamic groups are formed when media is playing and an additional speaker is added to the playback group"); GOOG-SONOSWDTX-00048393.  I have focused my infringement analysis on Google's "speaker group" type of grouping functionality.

34.    To facilitate the creation and control of a speaker group, Google provides a free software application called the Google Home app, which can be installed on a user's personal computer device, typically a smartphone.  According to Google, the Google Home app allows a user to create and save speaker groups.  GOOG-SONOSWDTX-00007068; GOOG-SONOSWDTX-00048962 at 62, 64-65; SONOS-SVG2-00055660.  Then, after a speaker group is created and saved, a user can cause a previously-saved, predefined "speaker group" to be invoked (or "launched" in Google's terms) at any time by selecting the group via a Google Controller using either the Google Home app itself or other Cast-enabled media content streaming apps, such as Google's Google Play Music app, Google's YouTube Music app, and the Spotify app.  *Id.*; *see also* Section IX.

35.    As explained further below, a user can create and save as many "speaker groups" as desired, including groups that have one or more overlapping Accused Google Players.  Also, a user has the flexibility to name a "speaker group" anything.  For example, a user can name a "speaker group" according to a time of day (e.g., "morning" and "afternoon") or an area of a user's home (e.g., "garden"), among others.

36.    I have not seen any evidence that would indicate any relevant changes to the structure or operation of the Accused Google Players during the timeframe of Google's alleged infringement of claim 1 of the '885 Patent (which as noted above began on November 24, 2020 and continues until the present day).

## VIII.  OVERVIEW OF GOOGLE SOURCE CODE

37.    As noted above, part of my infringement analysis involved a review of the source code that Google has made available for inspection in this case, which includes source code corresponding to the firmware of the Accused Google Players that incorporate Google's Cast

11

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   technology, as well as certain Google apps that incorporate Google's Cast technology.

2       38.   With respect to the source code for the firmware of Accused Google Players, I

3   focused my review on the source code in the "chromecast_internal-1.50" directory, which I

4   understand corresponds to firmware version 1.50 of the Accused Google Players that was first

5   released in October 2020.  *See* Google's Resp. to Sonos's Interrog. No. 5 at 11-13.  I have also

6   reviewed printouts of certain portions of the source code in the "chromecast_internal-1.50"

7   directory that have been produced by Google in this case.

8       39.   My understanding is that the source code in the "chromecast_internal-1.50"

9   directory corresponding to firmware version 1.50 of the Accused Google Players is representative

10  of the relevant source code for the firmware of the Accused Google Players throughout the entire

11  timeframe of Google's alleged infringement of the '885 Patent (which as noted above began on

12  November 24, 2020 and continues until the present day).  Further, my understanding is that the

13  source code in the "chromecast_internal-1.50" directory is representative of the source code used

14  by Google to build the firmware that was installed onto the Accused Google Players being

15  imported and sold by Google in United States throughout this entire timeframe of Google's alleged

16  infringement of the '885 Patent.  *See, e.g.*, Google's Resp. to Sonos's Interrog. No. 5 at 11-13

17  (setting forth a chart of firmware versions for the Accused Google Players); 10/1/2020 K. MacKay

18  Dep. Tr. from ITC Inv. No. 337-TA-1191, at 67:22-71:1 (Mr. MacKay testifying that when the

19  Accused Google Players are sold, "there is already code loaded onto those players that supports

20  multiroom features").

21      40.   With respect to the source code for the Google apps, I focused my review on the

22  source code in (1) the "2020-09-08-home_app_android_2.29.2" directory, which I understand

23  corresponds to the Google Home app for Android, (2) the "2020-10-08-youtube-music_3.87.53"

24  directory, which I understand corresponds to the YouTube Music app for Android, and (3) the

25  "2020-09-01-google_play_music_android_8.27.8839-3.U" directory, which I understand

26  corresponds to the Google Play Music app for Android.  I have also reviewed printouts of certain

27  portions of the source code in the "2020-09-08-home_app_android_2.29.2" directory that have

28  been produced by Google in this case.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

41.    My understanding is that the source code in these directories for the Android versions of the Google Home, YouTube Music, and Google Play Music apps is representative of the relevant source code for the Android versions of the Google Home, YouTube Music, and Google Play Music apps throughout the entire timeframe of Google's alleged infringement of the '885 Patent.  Further, my understanding is that the source code in these directories for the Android versions of the Google Home, YouTube Music, and Google Play Music apps is representative of the source code used by Google to build the Android versions of the Google Home, YouTube Music, and Google Play Music apps that were made available for download in the United States throughout this entire timeframe of Google's alleged infringement of the '885 Patent, although I understand that the Google Play Music app was discontinued at some point during that timeframe.

## IX.    TESTING OF ACCUSED GOOGLE PLAYERS

42.    As noted above, part of my infringement analysis involved overseeing and directing certain testing of the Accused Google Players to further understand the structure and operation of the Accused Google Players.  I memorialized my observations during this testing of a networked media playback system comprising exemplary Accused Google Players that I understand are representative of the structure and operation of all of the Accused Google Players, as well as exemplary Google Controllers that I understand are representative of the operation of all Google Controllers.  In particular, the specific networked media playback system that was primarily used for testing, which I refer to as the "Google test system," included the following:

- A first Accused Google Player comprising a Nest Hub player running Cast firmware version 1.56.290464, which was named "Kitchen"

- A second Accused Google Player comprising a Home mini player running Cast firmware version 1.56.282045, which was named "Master Bedroom"

- A third Accused Google Player comprising a Nest Audio player running Cast firmware version 1.54.279716, which was named "Living Room"

- One Google Controller comprising a Pixel 4XL device running Android version 12 that was installed with the Google Home (version 2.48.75.6), YouTube Music (version 4.70.50), and Spotify (version 8.7.18.1138) apps for Android, which I will refer to below as the "Android-based Google Controller"

- Another Google Controller comprising an iPhone 12 Pro device running iOS version 15.4.1 that was installed with the Google Home (version 2.50.105), YouTube Music

13

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

(version 5.01.1), and Spotify (version 8.7.20.1724) apps for iOS, which I will refer to below as the "iOS-based Google Controller"

43.    Unless otherwise specified below, the screenshots shown were captured by the iOS-based Google Controller.

44.    Prior to testing, each of the three exemplary Accused Google Players was factory reset and then set up using the Google Home app. During that setup process, the three exemplary Accused Google Players were added to a home named "Expert Test Home" and connected to the same Wi-Fi network. Below are screenshots of Google Home app's "Device settings" page for each of the three Accused Google Players after setup:



45.    After the three exemplary Accused Google Players were set up, I also observed that it was possible to add other Accused Google Players to the Google test system as well. For example, after the three exemplary Accused Google Players were tested in the manner described below, I also oversaw the use and testing of various other Accused Google Players that were later added to the Google test system, including a Home player, a Home Max, Nest Hub Max, a Chromecast, and a Chromecast with Google TV, and I observed that these other Accused Google players all functioned similarly to the three exemplary Accused Google Players.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

46.    After the three exemplary Accused Google Players were set up, I observed that each of the three exemplary Accused Google Players initially began operating in a standalone mode in which the Accused Google Player was configured to play back audio individually, as opposed to a grouped mode in which the Accused Google Player was configured to play back audio as part of a group of Accused Google Players.  Below are screenshots of the Google Home app that show this initial state of the Google test system after the Accused Google Players were set up:

   

As shown in the first screenshot on the left, a "Play music" button was provided for each of the Accused Google Players, indicating that none of them were actively engaging in playback but that a user could start playing audio on any of those players individually if desired.

47.    While each of the three Accused Google Players was operating in standalone mode in which the Accused Google Player was configured to play back audio individually, I confirmed that it was possible for an Accused Google Player to engage in active playback of audio content.  I oversaw testing of this functionality for each of the Accused Google Players using several different Cast-enabled apps, including the Google Home app, YouTube Music app, and Spotify app.  Below are some exemplary Google Home app screenshots that were captured during this testing to show that, while configured to play back audio individually, the first

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Accused Google Player is capable of engaging in active playback of audio content:



As shown, after the "Play music" button was selected, the "Play music" button was replaced with a "Pause" button, indicating that the "Kitchen" player was now actively engaging in playback. I also audibly observed that only the 'Kitchen' player was outputting sound.

48.     While each of the three Accused Google Players was operating in standalone mode and the "Kitchen" player was engaging in active playback of audio content, I then oversaw testing of the functionality provided by Google's Cast technology for creating speaker groups. To start, the Google Home app on the iOS-based Google Controller was used to create a first speaker group that included the "Kitchen" and "Master Bedroom" players, which was saved under the name "Morning." Below are screenshots of the Google Home app that were captured to show the process of creating this first speaker group:

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY



17

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

49.     Next, the Google Home app on the iOS-based Google Controller was used to create a second speaker group that included the "Kitchen" and "Living Room" players, which was saved under the name "Evening."  Below are screenshots that were captured to show the process of creating this second speaker group:



18

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY



50.     There are several notable things that I observed during the process of creating and saving these two speaker groups.  First, I observed that the act of creating and saving a new speaker group does *not* change the operating mode of the Accused Google Players that are placed into the speaker group – the three exemplary Accused Google Players that were selected for inclusion in these new speaker groups each continued to operate in standalone mode even after the speaker groups were created, as opposed to transitioning into a grouped mode, and the "Kitchen" player also continued to engage in active playback of audio content while in standalone mode.  This continued standalone mode operation demonstrates that a speaker group is a grouping of Accused Google Players that is not launched at the time of creation, but rather is predefined and saved for future use, which enables the previously-saved, predefined grouping to be selected for launch at a later time.

51.     Second, I observed that it is possible to include the same Accused Google Player as a member in multiple different speaker groups having different memberships.  Specifically, in the case of the Google test system, the "Kitchen" player was included in both of the first and second speaker groups, whereas the "Master Bedroom" player was only included in the "Morning" speaker group and the "Living Room" player was only included in the "Evening" speaker group.  This ability to include the same Accused Google Player in multiple different speaker groups is a byproduct of the fact that each of the speaker groups is a previously-saved,

predefined grouping of Accused Google Players that persists even during times when the speaker group is not launched.

52.    Third, I observed that Google's Cast technology provides a user with the flexibility to name a speaker group anything.  For instance, the first speaker group that was created and saved was named "Morning," which indicates that this is a grouping of Accused Google Players that was created and saved for use during a morning time of day, and the second speaker group that was created and saved was named "Evening," which indicates that this is a grouping of Accused Google Players that was created and saved for use during an evening time of day.  However, these are just two possible examples, and I confirmed that it was possible to create and save speaker groups that have other types of names as well.

53.    Fourth, I observed that after a speaker group was created and saved using one Google Controller (e.g., the iOS-based Google Controller), I was able to view and access that previously-saved speaker group on a different Google Controller (e.g., the Android-based Google Controller).  I confirmed this was the case even in a scenario where the Google Controller used to create the speaker group was disconnected from the Wi-Fi network after creating the speaker group and then a different Google Controller was subsequently connected to the Wi-Fi network.  This is consistent with the other evidence I have seen demonstrating that, after a new speaker group is created via a Google Controller, the Google Controller being used to create the speaker group sends a "join_group" message over the Wi-Fi network to each Accused Google Player that has been added to the speaker group that comprises an indication that each such Accused Google Player has been added to the speaker group.  *See, e.g.*, Google's Third Suppl. Resp. to Sonos's Interrog. No. 13 at 9-10 (Google explaining that "[i]n the Google Home app, a user may select a specific device and add it to a group in Home app, which causes the Google Home app to send a join_group command to that device," and that "[i]n the scenario where a user is configuring a new group of two players, both players may receive the join group command").

54.    Although not reflected in the screenshots, I also oversaw testing of the process of creating and saving these same two speaker group configurations (i.e., a "Morning" speaker

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   group including the first and second Accused Google Players and an "Evening" speaker group

2   including the first and third Accused Google Players) in various other scenarios, and my

3   observations above held true in those other scenarios as well.

4        55.    For example, I oversaw testing of the process of creating and saving these same

5   two speaker group configurations in scenarios where all of the exemplary Accused Google

6   Players were in standalone mode and none of them were engaging in active playback, as well as

7   scenarios where all of the Accused Google Players were in standalone mode and the "Master

8   Bedroom" and/or "Living Room" players were engaging in active playback.  In all such

9   scenarios, the process of creating and saving the two speaker group configurations worked in the

10  same way described above – each Accused Google Player continued to operate in standalone

11  mode (as opposed to transitioning to a grouped mode) after the speaker groups were created, and

12  any Accused Google Player that was engaging in active playback individually while in

13  standalone mode then continued to engage in that active individual playback even after the

14  speaker groups were created and saved.

15       56.    Although not reflected in the screenshots, I also oversaw testing of the group

16  creation functionality discussed above in scenarios where the "Morning" and "Evening" speaker

17  groups were created via the Android-based Google Controller, and I did not observe any

18  meaningful difference in that group creation functionality when using the Android-based Google

19  Controller as compared to the iOS-based Google Controller.

20       57.    Returning to the scenario discussed above where the first and second speaker

21  groups were created while the "Kitchen" player was engaging in active playback of audio

22  content while in standalone mode, below are screenshots of the Google Home app that show the

23  state of the Google test system both before (on left) and after (on right) the first and second

24  speaker groups were created and saved:

25

26

27

28

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY



These screenshots show a few different things.  First, both before and after the groups were created, the "Pause" playback button was presented below the "Kitchen" player (indicating that the "Kitchen" player was actively engaging in playback and could be paused), while a "Play music" button was presented below the other players (indicating that the "Living Room" and "Master Bedroom" players were not actively engaging in playback but that a user could start playing audio on those players if desired).  I also audibly observed that only the "Kitchen" player was outputting sound both before and after the groups were created.  Second, the right screenshot shows that the first and second speaker groups have now been predefined, saved, and are available for future use, but at this point in the workflow, each Accused Google Player is still operating in a standalone mode in which it is configured to play back audio individually (and the Kitchen player is still engaging in active individual playback), as opposed to a grouped mode in which the Accused Google Player is configured to play back audio as part of any speaker group.  Third, the right screenshot shows that, after the groups were created, icons were presented for each of the "Morning" and "Afternoon" groups along with a respective "Play music" button (indicating that a user could invoke either group for synchronous playback if desired).

58.    Below are screenshots of the "Group settings" pages for the first and second

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

speaker groups, illustrating that the Kitchen player was a member of both groups, while the Master Bedroom player was only a member of the Morning group and the Living Room player was only a member of the Evening group:



59.    After the first and second speaker groups were saved, I then oversaw testing of the functionality provided by Google's Cast technology for launching a speaker group for synchronous audio playback.  Based on that testing, I observed that there were many different ways to initiate a launch of a previously-saved speaker group for synchronous audio playback, including from the Google Home app itself, from the YouTube Music app, and from the Spotify app, among other possibilities.  Additionally, I observed that a previously-saved speaker group could be launched in any of various different scenarios – including but not limited to (i) scenarios where all of the Accused Google Players were operating in standalone mode and the "Kitchen" player was engaging in active playback, (ii) scenarios where all of the Accused Google Players were operating in standalone mode and none of them were engaging in active playback of audio content, and (iii) scenarios where all of the Accused Google Players were operating in standalone mode and the "Master Bedroom" and/or "Living Room" players were engaging in active playback of audio content.

60.    Below are screenshots that were captured during this testing to show some

23

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  representative examples of the different ways to initiate the launch of a previously-saved speaker

2  group for synchronous playback.

3      61.    This first set of screenshots shows an example where the "Morning" speaker

4  group was selected for launch via the Google Home app's main page in a scenario where all of

5  the Accused Google Players were operating in standalone mode and the "Kitchen" player was

6  engaging in active playback of audio content:



As shown, after selecting the "Play music" button corresponding to the Morning group, the "Play

music" button was replaced with a "Pause" button, indicating that the Morning group was now

actively engaging in synchronous playback and could be paused if desired.

        62.    This second set of screenshots shows an example where the "Morning" speaker

group was selected for launch via the YouTube Music app in a scenario where all of the Accused

Google Players were operating in standalone mode and none of them were previously engaging

in active playback:

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY






As shown, after selecting the Morning group from the list of available devices in the second screenshot, the Cast icon at the top of the third screenshot turns to solid white and, in the fourth screenshot, the YouTube Music App indicates that music is being played on the Morning group.

63.    This third set of screenshots shows an example where the "Morning" speaker group was selected for launch via the Spotify app in a scenario where all of the Accused Google Players were operating in standalone mode and the "Master Bedroom" player was engaging in active playback of audio content:

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY



As shown in the third screenshot, after selecting the Morning group from the list of available devices in the second screenshot, the Spotify app indicates that music is being played on the Morning group by flashing a multi-speaker icon in the middle of the screen and then identifying the Morning group in green along with the music that is being played by the Morning group.

64. There are several notable things that I observed during this testing of the aforementioned functionality for initiating the launch of a speaker group for synchronous playback. First, as explained above, each time a speaker group was selected for launch, the interface of the app that was used to select the speaker group provided a visual indication (and in some cases, an audible indication as well) that the Accused Google Players in the selected speaker group had begun to operate in accordance with that speaker group.

65. Second, after a speaker group had been launched and active playback had begun on that launched speaker group, it sounded to me as though the Accused Google Players in the launched speaker group were outputting audio in synchrony with one another, which confirmed that the Accused Google Players in the speaker group had become configured to output audio in synchrony with one another after the speaker group was selected for launch.

66. As a first example, after the "Morning" speaker group was selected for launch via the Google Home app, the "Kitchen" and "Master Bedroom" players automatically began engaging in active playback, and it sounded to me as though the "Kitchen" and "Master

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

Bedroom" players were outputting audio in synchrony with one another.  As a second example, after the "Morning" speaker group was selected for launch via the YouTube Music app, the "Kitchen" and "Master Bedroom" players automatically began engaging in active playback, and it sounded to me as though the "Kitchen" and "Master Bedroom" players were outputting audio in synchrony with one another.  As a third example, after the "Morning" speaker group was selected for launch via the Spotify app while the "Master Bedroom" player was engaging in active playback, the "Kitchen" player and the "Master Bedroom" player took over playback responsibility for that active playback and it sounded to me as though the "Kitchen" and "Master Bedroom" players were outputting audio in synchrony with one another.

67.    This observation that the Accused Google Players in a speaker group become configured to output audio in synchrony with one another after the speaker group is selected for launch at a Google Controller is consistent with the other evidence I have seen demonstrating that, after a speaker group is selected for launch, the Google Controller transmits a "launch" message over the Wi-Fi network to at least one of the Accused Google Players in the selected speaker group that comprises an instruction to begin operating in accordance with the selected speaker group. *See, e.g.*, Google's Third Suppl. Resp. to Sonos's Interrog. No. 13 at 9-10 (Google explaining that "[a] launch request is one of the messages that a leader may receive at the time that a Cast session is launched with a group," and that "when a group launch request is received, the leader may send a launch notification to all followers over the TCP control channel" and the "leader" and "follower" may then carry out actions to begin actively operating as part of the launched group).

68.    I also oversaw testing of the group launch functionality discussed above in connection with the "Evening" speaker group, and I similarly observed that the "Kitchen" and "Living Room" players in the "Evening" speaker group become configured to output audio in synchrony with one another after the "Evening" speaker group is selected for launch at a Google Controller.

69.    I reserve my right to conduct a demonstration of the above functionality and/or to present additional screenshots illustrating the use and testing of the above functionality.

## X.     INFRINGEMENT ANALYSIS OF CLAIM 1 OF THE '885 PATENT

70.     The following section sets forth a detailed discussion of my infringement analysis for claim 1 of the '885 Patent and the opinions I have reached based on that analysis.  This section is broken down into three sub-sections.  First, I explain my analysis and opinions as to whether a Google "speaker group" amounts to a "zone scene" as that term is used throughout claim 1 of the '885 Patent.  Second, I walk through my analysis and opinions regarding infringement of claim 1 of the '885 Patent on a limitation-by-limitation basis.

71.     As explained in detail below, it is my opinion that each Accused Google Player literally meets each and every limitation of claim 1 of the '885 Patent.  In particular, it is my opinion that a Google "speaker group" is a claimed "zone scene," and that each Accused Google Player is a claimed "zone player" that (i) includes all of the hardware limitations of claim 1 of the '885 Patent and (ii) is installed with software that makes each Accused Google Player capable of performing all of the functions recited in claim 1 of the '885 Patent.  Further, as noted above, I have been informed that Google makes, uses, offers to sell, and/or sells each of the Accused Google Players identified above in the United States, and/or also imports each of the Accused Google Players identified above into the United States.  For these reasons, it is my opinion that Google directly infringes claim 1 of the '885 Patent.

### A.     "Zone Scene"

72.     Claim 1 of the '885 Patent includes several limitations that require functionality related to a "zone scene," including:

> **[1.6]**   (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first *zone scene* comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first *zone scene* is invoked; and

> **[1.7]**   (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second *zone scene* comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second *zone scene* is invoked, wherein the second zone player is different than the third zone player;

> **[1.9]**   after the given one of the first and second *zone scenes* has been

28

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second **zone scenes** respectively comprising a given one of the first and second predefined groupings of zone players;

73.    As such, the question of whether a Google speaker group is a "zone scene" is a threshold issue for infringement of claim 1 of the '885 Patent, and I address this threshold issue before turning to my limitation-by-limitation analysis.

74.    With respect to claim construction, I understand that Sonos is proposing a construction for the term "zone scene" of "a previously-saved grouping of zone players that are to be configured for synchronous playback of media when the zone scene is invoked." In this respect, I note that Sonos's proposed construction is very similar to the definition of a "zone scene" that is set forth in the express claim language, which recites that each "zone scene" comprises a "predefined grouping of zone players including at least [two zone players] that are to be configured for synchronous playback of media when the . . . zone scene is invoked."

75.    On the other hand, I understand that Google is advocating for the Court to adopt a preliminary construction of "zone scene" that was preliminarily offered by Judge Alan Albright during a *Markman* hearing held in the Western District of Texas before this action was transferred to the present Court, which would require "a previously saved grouping of zone players according to a common theme."

76.    In my opinion, a Google speaker group is a "zone scene" under either party's proposed construction of that term.

77.    As explained above, a Google speaker group constitutes a previously-saved grouping of Accused Google Players (which are "zone players" as discussed below) that is predefined in advance of the speaker group being invoked for synchronous playback and constitutes a particular set of Accused Google Players to be configured for synchronous playback of audio when the speaker group is invoked. In particular, a Google speaker group is a particular grouping of Accused Google Players for synchronous audio playback that is initially predefined by a user during a workflow for creating the speaker group, but is not launched at the time of creation. Instead, the predefined grouping of Accused Google Players is assigned a name and then

29

saved for future use by a user. Thereafter, a user can access and select the previously-saved speaker group for launch, which activates the speaker group's predefined grouping of Accused Google Players and causes those Accused Google Players to become configured for synchronous audio playback. I have formulated this understanding of a Google speaker group based on various evidence I have reviewed during my infringement analysis.

78.    For instance, Google's website includes a help page for the Accused Google Players entitled "Create and manage speaker groups," which explains that a Google speaker group allows a user to "[g]roup any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home" and provides instructions for creating a speaker group via a Google Controller that concludes with the user entering a "name" for the speaker group and then selecting a "Save" option in order to save the speaker group for future use. GOOG-SONOSWDTX-00007068-74 at 68; *see also* SONOS-SVG2-00055660-61. The workflow for creating a speaker group via the Google Home app is shown in a Google marketing video titled "How to create a Speaker Group." *See* SONOS-SVG2-00055112; SONOS-SVG2-00055113.

79.    Further, an internal Google document entitled "Multizone - cast_shell integration" describes a speaker group of Accused Google Players in terms of a "group configuration" including a "group uuid" and "group name" of the speaker group that is "stored in [a] prefs file" on each Accused Google Player in the speaker group and made available for "casting," but is not invoked until the speaker group is subsequently selected for launch via a Google Controller. GOOG-SONOSWDTX-00048962-66 at 62-65; *see also* GOOG-SONOSWDTX-00040384-96 at 84-89 (describing the separate processes for "[c]reating/configuring a group" and then subsequently "[c]asting to a group" that has previously been created in order to invoke that speaker group); GOOG-SONOSNDCA-00056732-77 at 56-62 (confirming that speaker groups are predefined groupings of Cast receivers for synchronous playback that can have overlapping members and are not activated until the speaker group is launched); GOOG-SONOSWDTX-00048792-838 at 802 (explaining that each Cast receiver device "can be a member of more than one group" and that "[e]ven if a device is part of a group(s) it will still be available for casting as

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    a standalone device").

2    80.    Further yet, in Google's Third Supplemental Response to Sonos's Interrogatory No.

3    13, Google explains that a speaker group (which is also referred to in the response as a "static

4    group") is one that is "created in the Google Home App before media starts playing," and that "[i]f

5    a group has been created, the devices in the group use a record of the group name and its unique

6    identifier, which may be referred to as being in a prefs file." Google's Third Suppl. Resp. to

7    Sonos's Interrog. No. 13 at 9-11.

8    81.    As discussed above, I also confirmed during testing that a Google speaker group is

9    a grouping of Accused Google Players that is predefined, named, and saved by a user for future

10    use, where the Accused Google Players included in the speaker group are not configured in

11    accordance with the speaker group (and thus are not configured for synchronous audio playback)

12    unless and until the speaker group is invoked at a user's request. *See* Section IX.

13    82.    The foregoing evidence establishes that a Google speaker group is "a previously-

14    saved grouping of zone players that are to be configured for synchronous playback of media when

15    the zone scene is invoked," and thus is a "zone scene" under Sonos's proposed construction.

16    83.    For similar reasons, the foregoing evidence likewise establishes that a Google

17    speaker group satisfies the first part of Google's construction, which is a "previously saved

18    grouping of zone players."  The only additional limitation in Google's proposed construction of

19    "zone scene" is that the "previously saved grouping of zone players" be "according to a common

20    theme."  I understand that Google has interpreted the phrase "according to a common theme" in

21    this proposed construction to impose a requirement that the "zone scene" include some kind of

22    "theme" information, which Google has also referred to as "thematic information." *See, e.g.*, N.D.

23    Cal. Case No. 3:21-cv-7559, D.I. 64 at 12-15 (June 1, 2021).  For example, I understand that

24    Google has identified names reflecting a specific time of day (e.g., "morning" and "afternoon")

25    and names reflecting a specific area of a user's home (e.g., "garden") as "theme" information that

26    would satisfy the "according to a common theme" aspect of Google's proposed construction. *Id.*

27    84.    While Google has identified these specific examples of "theme" information, it is

28    not clear what Google's position is on whether other types of names would amount to "theme"

31

information.  However, to the extent Google intends to argue that only these specific types of names constitute "theme" information, I disagree with such a narrow interpretation of the word "theme."  I do not see anything in either Claim 1 of the '885 Patent or the specification of the '885 Patent that restricts the types of names that may be used to identify a "zone scene," and I disagree that the plain and ordinary meaning of the word "theme" is limited only to the specific types of names that Google has equated to "theme" information.  *See* SONOS-SVG2-00067584-88 (defining "theme" as any "topic of discourse or discussion" or as any "idea or topic expanded in a discourse, discussion, etc").

85.    Regardless, at a minimum, Google's Cast technology indisputably provides the capability to assign ***any*** desired name for a speaker group – including the exact same types of time-based or area-based names that Google has acknowledged to be "theme" information.  N.D. Cal. Case No. 3:21-cv-7559, D.I. 64 at 12-15.

86.    For instance, as one possibility, Google's Cast technology allows for speaker groups that are named according to a specific time of day, such as a "Morning" speaker group comprising Accused Google Players on which the user wishes to listen to audio in synchrony in the morning or an "Afternoon" speaker group comprising Accused Google Players on which the user wishes to listen to audio in synchrony in the afternoon.  As another possibility, Google's Cast technology allows for speaker groups that are named according to a specific area of the user's home, such as an "Upstairs" speaker group comprising Accused Google Players located in the upstairs of the user's home, a "Downstairs" speaker group comprising Accused Google Players located in the downstairs of the user's home, or an "Outside" speaker group comprising Accused Google Players located in outdoor areas of the user's home.  At a minimum, these examples of speaker groups are "according to a common theme" by Google's own prior admission.

87.    Various evidence that I have reviewed during my infringement analysis confirms that Google's Cast technology provides the capability to create and save speaker groups that are named "according to a common theme" as Google itself has interpreted that phrase – including but not limited to time-based names or area-based names.  *See, e.g.*, GOOG-SONOSNDCA-00056732-77 at 56 (illustrating a "1st floor" speaker group); SONOS-SVG2-00067567-83

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

(describing examples of speaker groups named "upstairs," "downstairs," and "deck")*;* SONOS-SVG2-00067561-66 ("Under **Name this speaker group**, type a name ('Whole House' or 'Living Room,' etc.) and tap **Save**.") (emphasis in original); GOOG-SONOSNDCA-00057440-43 at 40 (Google listing "Bedroom speakers" as an example of a speaker group that could be used for playback).

88.     As discussed above, during testing, I also observed this capability to create speaker groups that are named "according to a common theme" as Google itself interprets that phrase, including but not limited to time-based and/or area-based names. For instance, as discussed above, Google's Cast technology provided the capability to create and save speaker groups having names of "Morning" and "Evening," among others not shown in the screenshots above. *See* Section IX.

89.     This capability of the Accused Google Players to be included in Google speaker groups (that can be invoked for synchronous playback) having time-based or area-based names is itself sufficient to satisfy the "zone scene" limitations, because Claim 1 of the '885 Patent is directed to a "zone player" with software that provides the zone player with the ***capability*** to be included in "zone scenes" (that can be invoked for synchronous playback). Whether or not the there is an ***additional*** capability of the Accused Google Players to be included in Google speaker groups having names that are allegedly not "theme" information is irrelevant to the question of whether the Accused Google Players satisfy the "zone scene" limitations.

90.     Thus, for at least the above reasons, it is my opinion that a Google speaker group is a "zone scene" under either party's proposed construction of that term.

**B.      Limitation-by-Limitation Analysis and Opinions**

**1.      Claim Limitation 1.0**

91.     The preamble of claim 1 of the '885 Patent requires a "first zone player."

92.     With respect to claim construction, I understand that the parties agree that the term "zone player" has the same meaning as the term "playback device" (which appears in other Sonos patents). However, the parties disagree as to what that meaning is.

93.     Sonos's proposed construction of "zone player" as that term is used in the '885 Patent (which also applies to the term "playback device" in other Sonos patents) is a "data network

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

device configured to process and output audio," which is the same construction of "zone player" that Sonos and Google agreed to use in the prior ITC investigation. And related to this proposed construction, Sonos's interpretation of the plain and ordinary meaning of the term "data network" is "a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other." I agree with Sonos that this is how a person of ordinary skill in the art ("POSITA") would understand the plain and ordinary meaning of the term "data network" in the context of the '885 Patent, and a detailed discussion of the reasons why I agree with Sonos's interpretation of the plain and ordinary meaning of the term "data network" is set forth in the Declaration of Kevin C. Almeroth that I submitted on April 27, 2021 in the Western District of Texas prior to the case being transferred. *See* N.D. Cal. Case No. 3:21-cv-7559, D.I. 60-25 at 16-29 (June 29, 2021).

94.    On the other hand, Google disagrees with Sonos's proposed construction and argues that "zone player" should be given its plain and ordinary meaning, and that no construction is necessary. *See* D.I. 200 at 7-11. In this respect, Google appears to agree with that a "zone player" is a device configured to "output audio," but disputes that a "zone player" is restricted to a "data network device" or a device that is "configured to process . . . audio." *Id*.

95.    In my opinion, each Accused Google Player is a "zone player" under either party's proposed construction of that term.

96.    As an initial matter, each Accused Google Player is an audio player that is capable of outputting audio either in the form of sound from built-in speakers or in the form of an audio signal that is provided to a connected, external device with speakers. *See* Google's Resp. to Sonos's RFA No. 4 (Google admitting that each of the Accused Google Players "can output audio either (i) in the form of sound waves from one or more integrated speakers and/or (ii) in the form of an audio signal that is provided to a device connected to the [Accused Google Player]"). In particular, each Home, Home Mini, Home Max, Nest Audio, Nest Mini, Nest Hub (formerly branded as the Home Hub), Nest Hub Max, and Nest Wifi Point is configured to output audio in the form of sound from one or more built-in speakers, while each Chromecast, Chromecast Ultra, and Chromecast with Google TV is configured to output audio in the form of an audio signal that

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

is provided to a connected external device with speakers, such as a TV.  *See* Google's Resp. to Sonos's RFA No. 5; SONOS-SVG2-00060265; SONOS-SVG2-00060233; SONOS-SVG2-00060242; SONOS-SVG2-00055114; *see also* Sections VIII-IX.

97.    Based on this audio output capability alone, it is my opinion that each Accused Google Player is a "first zone player" under Google's proposed interpretation of "zone player."

98.    In addition, each Accused Google Player satisfies the additional aspects of Sonos's proposed construction of "zone player."

99.    For instance, each Accused Google Player is capable of connecting to and communicating over a Wi-Fi network.  *See* Google's Resp. to Sonos's RFA No. 9 (Google admitting that each of the Accused Google Players can "interface with a Wi-Fi network"); *see also, e.g.*, Exhibit 2 (summarizing evidence showing that each Accused Google Player includes an SoC that provides an interconnection with a Wi-Fi network); *see also* Sections VIII-IX.  In this respect, a Wi-Fi network is commonly understood by POSITAs to be an example of a "data network," because it serves as a medium for interconnecting devices in a manner that enables them to send digital data packets to and receive digital data packets from each other.  Thus, each Accused Google Player is a "data network device" as required by Sonos's proposed construction.

100.    Further, each Accused Google Player is capable of performing various processing operations on the audio content that is output by the Accused Google Player, such as decompressing audio data, decoding audio data, performing digital-to-analog conversion, performing digital signal processing functions, and/or performing "stream mixing."  *See, e.g.*, GOOG-SONOSWDTX-00051153-56 at 53; GOOG-SONOSWDTX-00048731-55 at 38; GOOG-SONOSWDTX-00048510-12 at 10; GOOG-SONOSWDTX-00048973-83 at 75-76; Exhibit 2 (summarizing evidence showing audio processors of the Accused Google Players); *see also* Sections VIII-IX.  As such, each Accused Google Player is "configured to process and output audio" as required by Sonos's proposed construction.

101.    Thus, each Accused Google Player is a "first zone player" under Sonos's proposed construction of "zone player."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

2.    **Claim Limitations 1.1-1.4**

102.    Claim limitations 1.1-1.4 of the '885 Patent require the "first zone player" to include the following hardware components: **[1.1]** "a network interface that is configured to communicatively couple the first zone player to at least one data network"; **[1.2]** "one or more processors"; and **[1.3]** "a non-transitory computer-readable medium" having **[1.4]** "program instructions" stored thereon that, "when executed by the one or more processors, cause the first zone player to perform" the functions recited in claim 1 of the '885 Patent.

103.    With respect to claim construction, I understand that the parties agree that the term "network interface" should be interpreted to have its plain and ordinary meaning. However, the parties disagree as to what that plain and ordinary meaning is.

104.    Sonos's interpretation of the plain and ordinary meaning of the term "network interface" is "a physical component of a device that provides an interconnection with a data network," which tracks the construction of "network interface" that Sonos and Google agreed to use in the prior ITC investigation. And as I mentioned above, Sonos's interpretation of the plain and ordinary meaning of the term "data network" is "a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other," which is consistent with how a POSITA would understand the plain and ordinary meaning of the term "data network" in the context of the '885 Patent.

105.    On the other hand, Google disagrees with Sonos's interpretation of the plain and ordinary meaning of the term "network interface" and maintains that it should be interpreted consistently with Google's position in the Western District of Texas, where Google argued that a "network interface" does not have to be a "physical" component and does not have to provide an interconnection with "a data network." *See* N.D.Cal. Case No. 2:21-cv-7559, D.I. 64 at 4-5; N.D. Cal. Case No. 2:21-cv-7559, D.I. 81 at 2 n.2 (June 29, 2021).

106.    As far as I am aware, neither party has asked for construction of any other term included in claim limitations 1.1-1.4 besides the "network interface" term and "zone player," which I addressed above in Section X.B.1.

107.    In my opinion, each Accused Google Player includes the hardware components

36

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

required by claim limitations 1.1-1.4 under either parties' interpretation of the plain and ordinary meaning of the term "network interface."

108.    First, each Accused Google Player includes a physical component such as a system-on-chip (SoC) that provides an interconnection with a Wi-Fi network and thus is configured to communicatively couple the Accused Google Player to a Wi-Fi network.  *See* Google's Resp. to Sonos's RFA No. 9 (Google admitting that each of the Accused Google Players can "interface with a Wi-Fi network"); Exhibit 2 (summarizing evidence showing that each Accused Google Player includes an SoC that provides an interconnection with a Wi-Fi network); 9/11/2020 J. West Dep. Tr. from ITC Inv. No. 337-TA-1191 at 224:1-24 (Google engineer admitting that "all cast devices have a network interface"); *see also* Sections VIII-IX.  And as already explained above, a Wi-Fi network is a "data network."  Thus, each Accused Google Player includes "a network interface that is configured to communicatively couple the [Accused Google Player] to at least one data network" under either party's interpretation of "network interface."

109.    Second, each Accused Google Player includes at least a central processing unit (CPU), and typically also one or more audio processors.  *See* Google's Resp. to Sonos's RFA No. 2 (Google admitting that "each [Accused Google Player] includes at least one processor"); Exhibit 2 (summarizing evidence showing that each Accused Google Player includes one or more processors); *see also* Sections VIII-IX.  Thus, each Accused Google Player includes "one or more processors."

110.    Third, each Accused Google Player includes memory that is installed with firmware for performing the functions discussed below, which is sometimes referred to by Google as "Cast firmware."  *See* Google's Resp. to Sonos's RFA No. 3 (Google admitting that "each [Accused Google Player] includes memory that can store computer program instructions, such as Flash memory and/or ROM"); Exhibit 2 (summarizing evidence showing that each Accused Google Player includes memory for storing program instructions); Google Resp. to Sonos Interrog. No. 5 at 11-13 (setting forth a chart of firmware versions for the Accused Google Players); 10/1/2020 K. MacKay Dep. Tr. from ITC Inv. No. 337-TA-1191 at 67:22-71:1 (Mr. MacKay testifying that when the Accused Google Players are sold, "there is already code loaded onto those players that

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

supports multiroom features"); *see also* Sections VIII-IX. Thus, each Accused Google Player includes "a non-transitory computer-readable medium" having "program instructions" stored thereon that, "when executed by the one or more processors, cause the [Accused Google Player] to perform" the functions discussed below, which meet the functional limitations of claim 1 of the '885 Patent.

111.    Thus, for at least the above reasons, it is my opinion that each Accused Google Player meets claim limitations 1.1-1.4 of claim 1 of the '885 Patent.

### 3.    Claim Limitations 1.5-1.7

112.    Claim limitations 1.5-1.7 of the '885 Patent require the "first zone player" to be encoded with executable "program instructions" that cause the Accused Google Player to:

> **[1.5]**    while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:
>
>> **[1.6]**    (i) receiv[e], from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and
>>
>> **[1.7]**    (ii) receiv[e], from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

113.    As far as I am aware, neither party has asked for construction of any term included in claim limitations 1.5-1.7 other than "zone player" and "zone scene," which I addressed above in Sections X.A and X.B.1.

114.    In order to meet these claim limitations, an Accused Google Player must be programmed with the functional capability to:

- Participate in a "networked media playback system" comprising the Accused Google Player and at least two other Accused Google Players;

- Operate in a "standalone mode" in which the Accused Google Player "is configured to play back media individually" while in the "networked media playback system"; and

- While operating in the "standalone mode," receive, from a "network device" over a "data network," (i) a "first indication" that the Accused Google Player has been added

to a "first zone scene," which includes the Accused Google Player and a second Accused Google Player and (ii) a "second indication" that the Accused Google Player has been added to a "second zone scene," which includes the Accused Google Player and a third Accused Google Player that differs from the second Accused Google Player.

115.    In my opinion, each Accused Google Player is programmed with the functional capability required by claim limitations 1.5-1.7.

116.    *First*, each Accused Google Player is capable of being placed into a "networked media playback system" with at least two other Accused Google Players. *See, e.g.*, GOOG-SONOSWDTX-00005732 at 56 (showing a Google system with four devices and stating that "[u]p to ~10 devices speakers in a single group"); GOOG-SONOSWDTX-00007068-74 at 68 ("Group any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home."). During testing, I also observed this capability for each Accused Google Player to be placed into a "networked media playback system" with at least two other Accused Google Players. *See* Section IX.

117.    *Second*, each Accused Google Player is programmed such that, after being set up, the Accused Google Player will operate in one of two mutually-exclusive modes at any given time: (1) a standalone mode in which the Accused Google Player is configured to play back media individually or (2) a grouped mode in which the Accused Google Player is configured to play back media in synchrony with one or more other Accused Google Player as part of a group. *See* GOOG-SONOSWDTX-00048731-55 at 47 (referring to a "non-group" mode as a "standalone" mode); GOOG-SONOSWDTX-00048792-838 at 802 (stating that "[e]ven if a device is part of a group(s) it will still be available for casting as a standalone device"); GOOG-SONOSWDTX-00005793 at 93 (describing how to listen to music on an Accused Google Player that is operating in standalone mode); GOOG-SONOSWDTX-00007068 at 68 ("Group any combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home."); GOOG-SONOSWDTX-00040384 at 85 (document titled "Multizone Audio Design" stating "[t]he primary goal of multiroom audio is to play out the audio in sync across all the devices in a group"). Thus, each Accused Google Player is programmed with the functional capability to operate in a "standalone mode" in which the Accused Google Player "is

39

configured to play back media individually" (rather than as part of a group).

118.     In particular, each Home, Home Mini, Home Max, Nest Audio, Nest Mini, Nest Hub (formerly brand as the Home Hub), Nest Hub Max, and Nest Wifi Point is capable of operating in a "standalone mode" in which it is configured to play back media individually (rather than as part of a group) by virtue of processing and outputting audio in the form of sound from one or more built-in speakers, while each Chromecast, Chromecast Ultra, and Chromecast with Google TV is capable of operating in a "standalone mode" in which it is configured to play back media individually (rather than as part of a group) by virtue of processing and outputting audio in the form of an audio signal that is provided to a connected external device with speakers (such as a TV).  *See* Google's Resps. to Sonos's RFA Nos. 4-5; SONOS-SVG2-00060265; SONOS-SVG2-00060233; SONOS-SVG2-00060242; SONOS-SVG2-00055114.

119.     In fact, "standalone mode" is the default operating mode for any Accused Google Player.  Specifically, after being set up, an Accused Google Player will always begin in a "standalone mode" in which the Accused Google Player "is configured to play back media individually," and will remain in that "standalone mode" unless and until a group that includes the Accused Google Player is created, saved, and then subsequently launched, at which point the Accused Google Player will transition from the standalone mode to a grouped mode.  Thereafter, the Accused Google Player is operable to transition back and forth between the standalone mode and the grouped mode depending on how the users interact with the Google system.

120.     This capability of each Accused Google Player to operate in a "standalone mode" in which the Accused Google Player "is configured to play back media individually" is confirmed by Google's own documents.  *See, e.g.*, GOOG-SONOSWDTX-00005793-802 at 93 (describing how to listen to music on an Accused Google Player operating in standalone mode); GOOG-SONOSNDCA-00056732-77 at 41, 48, 61 (describing various scenarios where a Cast receiver is operating in a standalone mode).  Additionally, during testing, I observed this capability of each Accused Google Player to operate in a "standalone mode" in which the Accused Google Player "is configured to play back media individually."  *See* Section IX.

121.     **Third**, each Accused Google Player is programmed such that, while operating in a

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"standalone mode," the Accused Google Player is capable of receiving any number of "join_group" messages from a Google Controller over a Wi-Fi network, where each "join_group" message serves as an indication that the Accused Google Player has been added to a speaker group that is identified in the "join_group" message with a group uuid and a group name (i.e., the name assigned to the group by the user during group creation).  In line with this functional capability to receive any number of "join_group" messages from a Google Controller over a Wi-Fi network while the Accused Google Player is operating in a "standalone mode," each Accused Google Player has the functional capability to receive at least the following two "join_group" messages from a Google Controller over a Wi-Fi network while operating in a "standalone mode": (i) a first "join_group" message that serves as a "first indication" that the Accused Google Player has been added to a first speaker group including the Accused Google Player and a second Accused Google Player and (ii) a second "join_group" message that serves as a "second indication" that the Accused Google Player has been added to a second speaker group including the Accused Google Player and a third Accused Google Player that differs from the second Accused Google Player.

122.    In this respect, I have already explained above that each Accused Google Player is a "zone player," each Google speaker group is a "zone scene" comprising a "predefined grouping of zone players … that are to be configured for synchronous playback of media when the . . . zone scene is invoked," and a Wi-Fi network is a "data network."  Additionally, a Google Controller is a "network device" because it is configured to connect to and communicate over a data network, such as a Wi-Fi network.  Thus, this functional capability of the Accused Google Players satisfies the requirement that the "first zone player" be capable of receiving, from a "network device" over a "data network" while operating in the "standalone mode," (i) "a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked" and (ii) "a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein

41

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

the second zone player is different than the third zone player."

123.    Various evidence that I have reviewed during my infringement analysis confirms that each Accused Google Player is programmed to function in this manner.  For instance, in Google's Third Supplemental Response to Sonos's Interrogatory No. 13, Google explains that "[i]n the Google Home app, a user may select a specific device and add it to a group in Home app, which causes the Google Home app to send a join_group command to that device," and that "[i]n the scenario where a user is configuring a new group of two players, both players may receive the join group command."  Google's Third Suppl. Resp. to Sonos's Interrog. No. 13 at 9; *see also*, *e.g.*, GOOG-SONOSWDTX-00048962-66 at 62 (showing that a "join_group" message includes a "group uuid" and a "group name" for a speaker group); GOOG-SONOSWDTX-00007068-74 at 68 (describing the user workflow for creating a speaker group); SONOS-SVG2-00055660-61 (same); GOOG-SONOSNDCA-00056732-77 at 56 (showing an example where a Cast receiver has been added to multiple different speaker groups).

124.    I have also confirmed this functional capability in the Google source code.  For instance, the following exemplary source code



125.    Correspondingly, the following exemplary source code for the Google Home app for Android shows

42

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

126.    The functions provided by the foregoing source code can be performed multiple times, in connection with multiple different speaker groups, while an Accused Google Player is operating in a "standalone mode."

127.    Lastly, as discussed above, I observed during testing that a Google Controller can be used to add an Accused Google Player to multiple different speaker groups having different members. *See* Section IX.

128.    Thus, for at least the above reasons, it is my opinion that each Accused Google Player meets claim limitations 1.5-1.7 of claim 1 of the '885 Patent.

### 4.    Claim Limitation 1.8

129.    Claim limitation 1.8 of the '885 Patent requires the "first zone player" to be encoded with executable "program instructions" that cause the Accused Google Player to:

> **[1.8]**    after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

130.    As far as I am aware, neither party has asked for construction of any term included in claim limitation 1.8 other than "zone player" and "zone scene," which I addressed above in Sections X.A and X.B.1.

131.    In my opinion, each Accused Google Player is programmed with the functional capability required by claim limitation 1.8.

132.    As discussed above, each Accused Google Player is programmed such that, while operating in a "standalone mode," the Accused Google Player is capable of receiving any number of "join_group" messages – including "join_group" messages that amount to the claimed "first and second indications" for the "first and second zone scenes."  Each time an Accused Google Player receives such a "join_group" message, it will update its "prefs file" to reflect that the Accused Google Player has been added to a given speaker group identified by a group uuid and a group name, but the receipt of the "join_group" message will <u>not</u> cause the Accused Google Player

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

to begin operating as part of the given speaker group. Instead, the Accused Google Player will continue to operate in the same mode in which it was operating prior to receiving the "join_group" message. This means that any Accused Google Player operating in a "standalone mode" when it receives a "join_group" message for a new speaker group will continue to operate in the "standalone mode" until that speaker group is subsequently selected for launch at a Google Controller. As such, each Accused Google Player is programmed such that, after receiving "join_group" messages for two different speaker groups while operating in a "standalone mode," the Accused Google Player will continue to operate in the "standalone mode" until a given one of the speaker groups "has been selected for invocation" – which satisfies claim limitation 1.8.

133.    Various evidence that I have reviewed during my infringement analysis confirms that each Accused Google Player is programmed to function in this manner. For instance, various Google documents confirm that the act of creating and saving a new speaker group does not change the operating mode of the Accused Google Players that have been added to the speaker group, and that an Accused Google Player operating in a "standalone mode" will continue to operate in that mode and will not begin operating in accordance with the speaker group until that speaker group is selected for launch at a Google Controller. *See, e.g.*, GOOG-SONOSWDTX-00048962-66 at 64-65 (explaining that an Accused Google Player updates its "prefs file" when it receives a "join_group" message but does not begin operating as part of that speaker group unless and until the speaker group is selected for launch); GOOG-SONOSWDTX-00040384-96 at 84-89 (describing the separate processes for "[c]reating/configuring a group" and then subsequently "[c]asting to a group" that has previously been saved when a "user selects the group as the cast target"); GOOG-SONOSWDTX-00048792-838 at 802 (explaining that each Cast receiver device "can be a member of more than one group" and that "[e]ven if a device is part of a group(s) it will still be available for casting as a standalone device"); GOOG-SONOSNDCA-00056732-77 at 56-62 (showing that a Cast receiver does not begin operating as part of a previously-saved speaker group until the speaker group is selected for launch at a Cast sender).

134.    As explained above, I likewise confirmed during testing that the act of creating and saving a new speaker group does not change the operating mode of the Accused Google Players

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

that are added to the speaker group, and that an Accused Google Player operating in a "standalone mode" will continue to operate in that mode and will not begin operating in accordance with the speaker group until it is selected for launch. *See* Section IX.

135.    Thus, for at least the above reasons, it is my opinion that each Accused Google Player meets claim limitation 1.8 of claim 1 of the '885 Patent.

**5.    Claim Limitation 1.9**

136.    Claim limitation 1.9 of the '885 Patent requires the "first zone player" to be encoded with executable "program instructions" that cause the Accused Google Player to:

> **[1.9]**    after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players;

137.    As far as I am aware, neither party has asked for construction of any term included in claim limitation 1.9 other than "zone player" and "zone scene," which I addressed above in Sections X.A and X.B.1.

138.    In my opinion, each Accused Google Player is programmed with the functional capability required by claim limitation 1.9.

139.    For instance, after a speaker group is selected for launch at a Google Controller, the Google Controller will send a message over a Wi-Fi network to at least one of the Accused Google Players in the speaker group (specifically, at least the "leader" of the speaker group) that instructs the at least one Accused Google Player to begin operating in accordance with the selected speaker group. Google typically refers to this message as a "launch" message, and it will be sent by a Google Controller in response to a selection of a speaker group for launch by a user in any of various Cast-enabled apps, including but not limited to the Google Home app, the YouTube Music app, the Google Play Music app, and the Spotify app. Correspondingly, in order to facilitate this group launch functionality, each Accused Google Player is programmed with the functional capability to receive a "launch" message from a Google Controller over a Wi-Fi network that instructs the Accused Google Player to begin operating in accordance with a selected one of

45

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    multiple different speaker groups that include the Accused Google Player.

2    140.    I have already explained above that each Accused Google Player is a "zone player,"

3    each speaker group is a "zone scene" comprising a "predefined grouping of zone players … that

4    are to be configured for synchronous playback of media when the . . . zone scene is invoked," a

5    Wi-Fi network is a "data network," and a Google Controller is a "network device."  Thus, this

6    functional capability of the Accused Google Players satisfies the requirement that the "first zone

7    player" have the functional capability to receive, from the "network device" over the "data

8    network" after "the given one of the first and second zone scenes has been selected for invocation,"

9    "an instruction to operate in accordance with a given one of the first and second zone scenes

10    respectively comprising a given one of the first and second predefined groupings of zone players."

11    141.    Various evidence that I have reviewed during my infringement analysis confirms

12    that each Accused Google Player is programmed to function in this manner.  For instance, in

13    Google's Third Supplemental Response to Sonos's Interrogatory No. 13, Google explains that "[a]

14    launch request is one of the messages that a leader may receive at the time that a Cast session is

15    launched with a group," and that "when a group launch request is received, the leader may send a

16    launch notification to all followers over the TCP control channel" and the "leader" and "follower"

17    may then carry out actions to begin actively operating as part of the launched group.  *See, e.g.*,

18    Google's Third Suppl. Resp. to Sonos's Interrog. No. 13 at 9-10.

19    142.    Further, various Google documents confirm that, after a particular speaker group is

20    selected for launch by a Google Controller, a "launch" message is sent from the Google Controller

21    to at least one Accused Google Player within the speaker group (specifically, at least the "leader"

22    of the speaker group) that instructs the Accused Google Player to begin operating in accordance

23    with the speaker group.  *See, e.g.*, GOOG-SONOSWDTX-00048962-66 at 64-65 (explaining that

24    "a LAUNCH request is received on a group-specific transport port" of an Accused Google Player

25    after a speaker group is selected for launch); GOOG-SONOSWDTX-00038533-79 at 46-48

26    (describing a "launch" message as one that "instructs the Cast Receiver to launch a Receiver

27    application"); GOOG-SONOSWDTX-00040384-96 at 88, 92 (explaining that "[w]hen a group

28    cast is launched," the "leader" of the group receives a "launch request" for the group); GOOG-

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

SONOSNDCA-00056732-77 at 58-62 (showing that Cast receivers in a speaker group will begin operating in accordance with the speaker group after it has been selected for launch at a Cast sender).

143.    I have also confirmed this functional capability in the Google source code.  For instance, the following exemplary source code ███████████████████████████████████

*See also* Google's Third Suppl. Resp. to Sonos's Interrogatory No. 13 at 10 (stating that ███████

144.    Correspondingly, the following exemplary source code for the Google Home app for Android, the YouTube Music app for Android, and the Google Play Music app for Android shows that ████████████████████████████████████

*Google Home app for Android*

47

*YouTube Music app for Android*



*Google Play Music app for Android*

145.    When an Accused Google Player is a member of multiple different speaker groups, the function provided by the foregoing source code can be performed in connection with any of those different speaker groups.

146.    Lastly, as discussed above, I observed during testing that when a particular speaker group was selected for launch at a Google Controller, the Accused Google Players in the selected speaker group became configured to operate in accordance with that speaker group. *See* Section IX.

147.    Thus, for at least the above reasons, it is my opinion that each Accused Google Player meets claim limitation 1.9 of claim 1 of the '885 Patent.

**6.    Claim Limitation 1.10**

148.    Claim limitation 1.10 of the '885 Patent requires the "first zone player" to be encoded with executable "program instructions" that cause the Accused Google Player to:

> **[1.10]** based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the

48

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

149.    As far as I am aware, neither party has asked for construction of any term included in claim limitation 1.10 other than "zone player" and "zone scene," which I addressed above in Sections X.A and X.B.1.

150.    In my opinion, each Accused Google Player is programmed with the functional capability required by claim limitation 1.10.

151.    To begin, as discussed above, each Accused Google Player is programmed with the functional capability to receive a "launch" message from a Google Controller over a Wi-Fi network that instructs the Accused Google Player to begin operating in accordance with a given one of multiple different speaker groups that include the Accused Google Player – which amounts to the claimed "instruction."  In turn, each Accused Google Player is programmed such that, in response to receiving a "launch" message for a given speaker group, the Accused Google Player then functions to transition from (i) operating in a standalone mode in which the Accused Google Player is configured to play back audio individually to (ii) operating in accordance with the given speaker group, which causes the Accused Google Player to become configured to coordinate with at least one other Accused Google Player in the given speaker group over a Wi-Fi network in order to output audio in synchrony with output of audio by the at least one other Accused Google Player. From the perspective of the "leader" of a speaker group, this coordination involves at least (i) exchanging "clock sync" messages with each "follower" of the speaker group that enables determination of a "clock offset" between the "leader" and the "follower" and (ii) generating and transmitting audio frames with associated "timestamps" to each follower.

152.    I have already explained above that each Accused Google Player is a "zone player," each speaker group is a "zone scene" comprising a "predefined grouping of zone players … that are to be configured for synchronous playback of media when the . . . zone scene is invoked," and a Wi-Fi network is a "data network."  Thus, this functional capability of the Accused Google Players satisfies the requirement that the "first zone player" have the functional capability to

49

"based on the instruction, transition[] from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players."

153. Various evidence that I have reviewed during my infringement analysis confirms that each Accused Google Player is programmed to function in this manner.

154. For instance, in Google's Third Supplemental Response to Sonos's Interrogatory No. 13, Google explains that "when a group launch request is received, the leader may send a launch notification to all followers over the TCP control channel," and the "leader" and "follower" may then carry out actions to begin actively operating in accordance with the group that has been selected for launch. *See, e.g.*, Google's Third Suppl. Resp. to Sonos's Interrog. No. 13 at 9-10.

155. Further, various Google documents confirm that each Accused Google Player is programmed to function in the manner required by claim limitation 1.10. For example, Google documents confirm that in response to receiving an Accused Google Player that receives a "launch" message for a particular speaker group, the Accused Google Player transitions to operating in a group mode in accordance with that particular speaker group. *See, e.g.*, GOOG-SONOSWDTX-00048962-66 at 64-65 (showing that when "a LAUNCH request is received on a group-specific transport port," an Accused Google Player begins to operate in accordance with the speaker group that has been selected for launch); GOOG-SONOSWDTX-00040384-96 at 88-89, 92 (describing the functions carried out by a "leader" in order to begin operating in accordance with a speaker group that has been selected for launch).

156. As another example, Google documents confirm that while an Accused Google Player is operating in accordance with a launched speaker group that has been launched, the Accused Google Player is configured to output audio in synchrony with output of audio by at least one other Accused Google Player in the speaker group. *See, e.g.*, GOOG-SONOSWDTX-00007068-74 at 68 (explaining that a Google speaker group allows a user to "[g]roup any

50

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

combination of Google Nest or Google Home speakers and displays and Chromecast devices together for synchronous music throughout the home"); GOOG-SONOSWDTX-00040384-96 at 85, 88-89 (stating that "[t]he primary goal of multiroom audio is to play out the audio in sync across all the devices in a group"); GOOG-SONOSNDCA-00056732-77 at 38 (defining a "Multi-Zone Group[]" as a "[g]roup of devices playing the same audio content synchronously"), 61 (showing a "Cast receiver" labeled "Speaker A" transitioning from operating in a standalone mode to operating in accordance with a previously-saved "Home" speaker group based on an instruction to start "casting" to that "Home" speaker group).

157.   As yet another example, various Google documents confirm that this output of audio in synchrony by the Accused Google Players in a speaker group that has been launched is accomplished by virtue of having one Accused Google Player designated as the "leader" of the speaker group coordinate over the Wi-Fi network with each Accused Google Player designated as a "follower" of the speaker group. *See, e.g.*, GOOG-SONOSWDTX-00040384-96 at 88-91 (providing a detailed discussion of the coordination between a "leader" of a launched speaker group and each "follower" of the launched speaker group, which involves (i) the leader exchanging "clock sync" messages with each follower that enable determination of a "clock offset" and (ii) the leader generating and transmitting audio frames with associated "timestamps" to each follower); GOOG-SONOSWDTX-00048959-61 at 60 (explaining that a "leader" of a speaker group functions to "estimate the timestamp when [an audio frame] will be played" and then that "estimated playback timestamp is used as the actual playback timestamp for the followers"); GOOG-SONOSWDTX-00048967-72 at 69 (explaining that a "leader" of a speaker group functions to "distribut[e] the audio stream to follower devices" where that "audio stream would consist of audio frames with timestamps from the leader's monotonic system clock").

158.   I have also confirmed this functional capability in the Google source code. For instance, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

159.

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

160.    Lastly, as discussed above, I observed during testing that when a speaker group was selected at a Google Controller, the Google Controller shows a visual indication (and for some apps also an audible indication) that the Accused Google Players in the selected speaker group have begun to operate in accordance with that speaker group, and when the selected speaker group began to engage in active playback, it sounded to me as though each Accused Google Player in the selected speaker group was outputting audio in synchrony with one another. *See* Section IX.

161.    Thus, for at least the above reasons, it is my opinion that each Accused Google Player meets claim limitation 1.10 of claim 1 of the '885 Patent.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.



Dated: April 14, 2022                    By: _Kevin C Almeroth_____
                                              Kevin C. Almeroth

DECL. OF DR. ALMEROTH ISO SONOS'S MSJ OF
INFRINGEMENT OF '885 PATENT CLAIM 1
3:20-CV-06754-WHA

# EXHIBIT 1

**EXHIBIT 1 – MATERIALS CONSIDERED BY KEVIN C. ALMEROTH**

- U.S. Patent No. 10,848,885 ("the '885 Patent"), prosecution history, including the patents and file histories in priority chain
- Sonos's Supp. Infringement Contention Chart for the '885 Patent, dated Jan. 20, 2022
- Claim Construction materials in the present case, including Joint Claim Construction and Pre-Hearing Statement (Dkt. No. 126), Sonos, Inc.'s Opening Claim Construction Brief and exhibits thereto (Dkt. No. 184), Google LLC's Responsive Claim Construction Brief and exhibits thereto (Dkt. No. 200), Sonos, Inc.'s Reply Claim Construction Brief and exhibits thereto (Dkt. No. 202), Markman Hearing Transcript, dated Aug. 10, 2021
- Claim Construction materials from *Sonos, Inc. v. Google LLC*, No. 3:21-cv-7559 (N.D. Cal.) (previously No. 6:21-cv-881 (W.D. Tex.), including Sonos's Opening Claim Construction Brief and exhibits thereto (Dkt. No. 60), Google's Responsive Claim Construction Brief and exhibits thereto (Dkt. No. 64), Sonos's Reply Claim Construction Brief and exhibits thereto (Dkt. No. 66), Google's Sur-Reply Claim Construction Brief and exhibits thereto (Dkt. No. 81), Joint Claim Construction Statement (Dkt. No. 94)
- Google's discovery responses, including Google's Third Supp Objs & Resps to Sonos's First Set of Rog Nos. 13-15 (dated Feb. 4, 2022), Google's Fourth Supp. Objs & Resps to Sonos's First Set of Rog Nos. 5, 9, 17 (dated Apr. 5, 2022), Google's Fifth Supp. Objs & Resps to Sonos's First Set of ROG No. 12 (dated Apr. 7, 2022), Google's Objs & Resps to Sonos 1st Set of RFAs (dated Apr. 8, 2022)
- Prior testimony from ITC Inv. No. 337-TA-1191, including Deposition Transcripts of Ken MacKay and James West
- Google's source code made available for inspection, including printouts of certain portions
- Examples of Accused Google Players and Google Controllers
- Internal and publicly-available documents, including the following:

| | |
|---|---|
| GOOG-SONOSNDCA-00056732 | GOOG-SONOSWDTX-00048962 |
| GOOG-SONOSNDCA-00057440 | GOOG-SONOSWDTX-00048973 |
| GOOG-SONOSWDTX-00005229 | GOOG-SONOSWDTX-00051153 |
| GOOG-SONOSWDTX-00005732 | SONOS-SVG2-00055112 |
| GOOG-SONOSWDTX-00005793 | SONOS-SVG2-00055113 |
| GOOG-SONOSWDTX-00007068 | SONOS-SVG2-00055114 |
| GOOG-SONOSWDTX-00038533 | SONOS-SVG2-00055660 |
| GOOG-SONOSWDTX-00040384 | SONOS-SVG2-00060233 |
| GOOG-SONOSWDTX-00048393 | SONOS-SVG2-00060242 |
| GOOG-SONOSWDTX-00048510 | SONOS-SVG2-00060265 |
| GOOG-SONOSWDTX-00048731 | SONOS-SVG2-00067561 |
| GOOG-SONOSWDTX-00048792 | SONOS-SVG2-00067567 |
| GOOG-SONOSWDTX-00048959 | SONOS-SVG2-00067584 |
| All documents cited in Exhibit 2 | |

# EXHIBIT 2

# HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 2 – CHART SUMMARIZING EVIDENCE FOR HARDWARE ELEMENTS**

| Accused Google Player | "Network Interface" | "One or More Processors" | "Non-transitory computer-readable medium" |
|---|---|---|---|
| **Chromecast (3rd Gen)** | *Marvell 88W8887 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051351 at 351. | *Marvell 88DE3006 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051351 at 351. | *NAND Flash Memory* *See, e.g.,* GOOG-SONOSWDTX-00051351 at 351. |
| **Chromecast (4th Gen)** | *Marvell 88W8887 SoC* *See, e.g.,* GOOG-SONOSWDTX-00045197 at 230; GOOG-SONOSWDTX-00045122 at 127. | *Marvell 88DE3006 SoC* *See, e.g.,* GOOG-SONOSWDTX-00045197 at 230; GOOG-SONOSWDTX-00045122 at 127. | *NAND Flash Memory* *See, e.g.,* GOOG-SONOSWDTX-00045197 at 230; GOOG-SONOSWDTX-00045122 at 127. |
| **Chromecast Ultra** | *Marvell 88W8997 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051407 at 407; SONOS-SVG2-00063913 at 914. | *Marvell 88DE3009 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051407 at 407; SONOS-SVG2-00063913 at 914. | *NAND Flash Memory* *See, e.g.,* GOOG-SONOSWDTX-00051407 at 407; SONOS-SVG2-00063913 at 914. |
| **Chromecast with Google TV** | *Broadcom BCM43598 SoC* *See, e.g.,* SONOS-SVG2-00064188; SONOS-SVG2-00064190; SONOS-SVG2-00064582; SONOS-SVG2-00064572 at 579. | *Amlogic S905D3G SoC* *See, e.g.,* SONOS-SVG2-00064188; SONOS-SVG2-00064189; SONOS-SVG2-00064581; SONOS-SVG2-00064572 at 574. | *KLM8G1GETF NAND Flash Memory* *See, e.g.,* SONOS-SVG2-00064188; SONOS-SVG2-00064189; SONOS-SVG2-00064581; SONOS-SVG2-00064572 at 574. |
| **Home** | *Marvell 88W8887 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051384 at 384; SONOS-SVG2-00064589 at 592; SONOS-SVG2-00060265 at 265; SONOS-SVG2-00064596 at 600. | *Marvell 88DE3006 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051384 at 384; SONOS-SVG2-00064589 at 592; SONOS-SVG2-00064782; SONOS-SVG2-00064596 at 598. | *NAND Flash Memory* *See, e.g.,* GOOG-SONOSWDTX-00051384 at 384; SONOS-SVG2-00064589 at 592; SONOS-SVG2-00064596 at 600 |
| **Home Mini** | *Marvell 88W8887 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051299 at 299; SONOS-SVG2-00060265 at 267; SONOS-SVG2-00066165 at 166. | *Marvell 88DE3006 SoC* *See, e.g.,* GOOG-SONOSWDTX-00051299 at 299; SONOS-SVG2-00066165 at 166 | *NAND Flash Memory* *See, e.g.,* GOOG-SONOSWDTX-00051299 at 299; SONOS-SVG2-00066165 at 166. |

**EXHIBIT 2 – CHART SUMMARIZING EVIDENCE FOR HARDWARE ELEMENTS**

| | | | |
|---|---|---|---|
| **Home Max** | *QCA9886 and QCA6174 SoCs*<br>*See, e.g.,* GOOG-SONOSWDTX-00051270 at 270; SONOS-SVG2-00060265 at 270; SONOS-SVG2-00066152 at 154. | *Amlogic A113G SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00051270 at 270; SONOS-SVG2-00060265 at 270; SONOS-SVG2-00066152 at 154. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00051270 at 270, 280; SONOS-SVG2-00066152 at 154. |
| **Nest Audio** | *Marvell 88W8987 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00046699 at 720, 730, 759; SONOS-SVG2-00060265 at 269; SONOS-SVG2-00066496 at 500. | *Synaptics AS370 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00046699 at 720, 730, 759; SONOS-SVG2-00066496 at 500. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00046699 at 710, 720, 730, 759; SONOS-SVG2-00066496 at 500. |
| **Nest Mini** | *Marvell 88W8987 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00051429 at 436; GOOG-SONOSWDTX-00046699 at 720; SONOS-SVG2-00060265 at 267; SONOS-SVG2-00067002 at 004. | *Synaptics AS370 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00051429 at 433; GOOG-SONOSWDTX-00046699 at 720; SONOS-SVG2-00060265 at 267; SONOS-SVG2-00067002 at 003. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00051429 at 435; SONOS-SVG2-00067002 at 003. |
| **Nest Hub (f/k/a Home Hub)** | *Broadcom BCM43458 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00048641 at 648, 650, 693; SONOS-SVG2-00060265 at 271; SONOS-SVG2-00065056 at 061. | *AmLogic S905D2 SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00048641 at 648, 650, 665; SONOS-SVG2-00060265 at 274; SONOS-SVG2-00065056 at 061. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00048641 at 648-650, at 667; SONOS-SVG2-00065056 at 061. |
| **Nest Hub Max** | *Broadcom BCM43458F SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00045854 at 961; SONOS-SVG2-00060265 at 272; SONOS-SVG2-00066761 at 761, 766. | *AmLogic T931G SoC*<br>*See, e.g.,* GOOG-SONOSWDTX-00045854 at 877, 961; SONOS-SVG2-00066761 at 765. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00045854 at 877, 961; SONOS-SVG2-00066761 at 765. |
| **Nest WiFi Point** | *Dual-band (2.4 GHz/5GHz) SoCs*<br>*See, e.g.,* GOOG-SONOSNDCA-00068358 at 368; GOOG-SONOSWDTX-00023521 at 522; GOOG-SONOSWDTX-00048912 at 925; GOOG-SONOSNDCA-00068495 at 501. | *Quad-core 64bit ARM CPU*<br>*See, e.g.,* GOOG-SONOSNDCA-00068358 at 366; GOOG-SONOSWDTX-00023521 at 522; GOOG-SONOSNDCA-00068495 at 501. | *NAND Flash Memory*<br>*See, e.g.,* GOOG-SONOSWDTX-00023521 at 523; GOOG-SONOSWDTX-00048912 at 926; GOOG-SONOSNDCA-00068495 at 502; GOOG-SONOSNDCA-00068358 at 367. |