Volume 3

Pages 371 - 568

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

SONOS, INC.,                          )
                                      )
          Plaintiff and               )
Counter-Defendant,                    )
                                      )
  VS.                                 )    NO. C 20-6754 WHA
                                      ) Related Case No. C 21-07559 WHA
GOOGLE, LLC,                          )
                                      )
          Defendant and              )
Counter-Claimant.                    )
_____)
                          San Francisco, California
                          Tuesday, May 9, 2023

__TRANSCRIPT OF JURY TRIAL PROCEEDINGS__

__APPEARANCES__:

For Plaintiff/Counter-Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
                BY: **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
                    **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
                BY: **ALYSSA M. CARIDIS, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff/Counter-Defendant:

 3                          LEE SULLIVAN SHEA & SMITH LLP
                            656 West Randolph Street
 4                          Floor 5W
                            Chicago, Illinois 60661
 5              BY:  DAVID R. GROSBY, ATTORNEY AT LAW
                     SEAN M. SULLIVAN, ATTORNEY AT LAW
 6                   COLE B. RICHTER, ATTORNEY AT LAW
                     JOHN DAN SMITH, III, ATTORNEY AT LAW
 7
     For Defendant/Counter-Claimant:
 8
                            QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 9                          50 California Street, 22nd Floor
                            San Francisco, California 94111
10              BY:  SEAN PAK, ATTORNEY AT LAW
                     MELISSA J. BAILY, ATTORNEY AT LAW
11                   JAMES D. JUDAH, ATTORNEY AT LAW
                     LINDSAY COOPER, ATTORNEY AT LAW
12                   IMAN LORDGOOEI, ATTORNEY AT LAW

13

14   Also Present:        Kevin MacKay, Google Representative
                          Alaina Kwasizur, Sonos Representative
15

16

17

18

19

20

21

22

23

24

25
```

1                              **I N D E X**

2  Tuesday, May 9, 2023 - Volume 3

3  <u>**PLAINTIFF'S WITNESSES**</u>                          <u>**PAGE**</u>   <u>**VOL.**</u>

4  <u>**NICHOLAS, MILLINGTON (RECALLED)**</u>
   (PREVIOUSLY SWORN)                                 391    3
5  Cross-Examination resumed by Mr. Lordgooei         391    3

6  <u>**LAMBOURNE, ROBERT**</u>
   (SWORN)                                            405    3
7  Direct Examination by Ms. Caridis                  405    3
   Cross-Examination by Mr. Pak                       471    3

8                          **E X H I B I T S**

9  <u>**TRIAL EXHIBITS**</u>                       <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

10   TX120                                              441    3

11   TX2424                                             551    3

12   TX2425                                             549    3

13   TX2831                                             559    3

14   TX3930                                             535    3

15   TX3937                                             561    3

16   TX3941                                             545    3

17   TX6539                                             437    3

18   TX6544                                             460    3

19   TX6545                                             456    3

20   TX6609                                             555    3

21   TX6780                                             470    3

22   TX6973                                             410    3

23   TX6991                                             416    3

24

25

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| TX8236 | | 432 | 3 |
| TX8239 | | 468 | 3 |

| | |
|---|---|
| 1 | **Tuesday - May 9, 2023**                              **7:30 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | (Proceedings were heard outside the presence of the jury:) |
| 5 | **THE CLERK:** All rise.  Court is now in session.  The |
| 6 | Honorable William Alsup presiding. |
| 7 | **THE COURT:** Good morning.  Please be seated. |
| 8 | (Pause in proceedings.) |
| 9 | **THE COURT:** All right.  I have a request.  First, I |
| 10 | did go through the deposition designation of a 30(b)(6) witness |
| 11 | named -- I think Christopher Chan.  I have ruled on -- here. |
| 12 | Hand that to Orrick counsel -- but I haven't gotten to the |
| 13 | others, and I want to make a request. |
| 14 | It looks to me like a lot of miscellaneous did anybody -- |
| 15 | Mr. Pak, did you, yourself, review these? |
| 16 | **MR. PAK:** I did, Your Honor. |
| 17 | **THE COURT:** Do you really want the poor judge to have |
| 18 | to go through and overrule all these objections? |
| 19 | **MR. PAK:** Your Honor, let me take another look. |
| 20 | **THE COURT:** Why don't you take another look. |
| 21 | **MR. PAK:** Yes. |
| 22 | **THE COURT:** I would say that only about 10 percent |
| 23 | deserve to be made. |
| 24 | **MR. PAK:** Yes, Your Honor. |
| 25 | **THE COURT:** So I did go through it on the first one. |

1          **MR. PAK:**  Yes, Your Honor.

2          **THE COURT:**  But I feel that you are overdoing it and

3   that there's going to be very -- if they want to waste their

4   time on things that -- that are just 403, do you really care?

5   The things that I looked at that would put the jury to sleep,

6   and you should be grateful that they are trying to do that.

7          **MR. PAK:**  I agree, Your Honor.

8          **THE COURT:**  So you should revise your objections.  All

9   right.  That's number -- point number one.

10          Point number two, I believe the jury is totally confused,

11   in my humble opinion, has no idea what either side is trying to

12   prove.  So, at some time today, I'm going to give each side

13   four minutes.  When you have the floor you can make a little

14   speech about -- in the nature of an opening statement that --

15   not argumentative but opening statement type thing -- of what

16   you think has been proven so far and what you are trying to

17   prove with this witness or the next witness.  You have some

18   flexibility there.  But I will give you some -- I think they

19   have no clue what you mean by prior art.  They have no idea

20   what the patents cover.  Plaintiffs have done a great job of

21   making it sound like smart speakers is what the -- is covered,

22   and obviously, you infringe smart speakers.

23          And so the -- but that's not what's covered.  So they are

24   confused on that, if that's what the jury believes.

25          You, each side, can have four minutes and you get -- when

1    you have the floor you can decide when to use it.  And it has

2    got to be today.  It doesn't -- you don't get to carry it over

3    until tomorrow.

4        All right.  I may repeat that at various points during the

5    trial, but I believe that it's important for the jury not to

6    have to wait until a closing arguments to figure out what it is

7    you have been trying to prove all along.  Okay.

8        **MR. PAK:**  Your Honor, on the four-minute presentation

9    on that, could we do it after Mr. Lambourne, I think that might

10    be quite helpful.

11        **THE COURT:**  Well, when does he come?

12        **MR. PAK:**  Right after Mr. Millington.

13        **THE COURT:**  When you still have the floor?

14        **MR. PAK:**  Yes.

15        **THE COURT:**  All right.  Well, if you still have the

16    floor and you've finished with your cross-examination, is that

17    what you mean?

18        **MR. PAK:**  Yes.

19        **THE COURT:**  You can say I want to take my four minutes

20    now.  Yeah, you can do that.

21        **MR. PAK:**  Thank you, Your Honor.

22        **THE COURT:**  But if it goes over until tomorrow, I'm

23    not -- you may not have the four minutes anymore.

24        **MR. PAK:**  Yes, Your Honor.

25        **MR. RICHTER:**  Your Honor, may I make a small request

 1  regarding the deposition designations?

 2          **THE COURT:**  Go ahead.

 3          **MR. RICHTER:**  Thank you.  This is Cole Richter for

 4  Sonos.

 5      We have a number of these videos queued up to play today.

 6  Can I make a request to the other side that they tell us which

 7  objections they're --

 8          **MR. PAK:**  I'm going to look at them, right, now.

 9          **MR. RICHTER:**  Oh, okay.  Wonderful, Your Honor.  Thank

10  you.

11          **THE COURT:**  All right.  There were some -- all right.

12  What do you want to bring up with me in this 30-minute period?

13          **MR. RICHTER:**  One piece of housekeeping regarding an

14  exhibit, Your Honor.  We reviewed the list of admitted exhibits

15  that the Court put onto the docket last night and it looks all

16  correct except I believe one was admitted that was missing from

17  that list, if I could just read that in.

18          **THE COURT:**  Which one?

19          **MR. RICHTER:**  That's TX347, Your Honor.

20          **THE COURT:**  347?  I do have it.  It's in.  My notes

21  say it's in.  I address that at the very end of the day.  And I

22  think you both agreed it was in.

23          **MR. RICHTER:**  I think that's right.  I just saw.  It

24  may not have been listed on the docket entry that listed the

25  exhibits.

PROCEEDINGS

```
1          THE COURT:  Okay.  Well, then there was a clerical

2   error, but my notes say it was in.  All right.  Okay.

3          MR. RICHTER:  Thank you, very much.

4          THE COURT:  All right.  Yes, sir?

5          MR. LORDGOOEI:  Your Honor, Dr. Almeroth, their

6   expert, may go up today, so we would like to address the issue

7   of his demonstratives.

8          THE COURT:  Remind me what the issue is.

9          MR. LORDGOOEI:  The issue is throughout the case we

10  had stuck very closely on our side to Your Honor's standing

11  order requiring that the expert demonstratives to be displayed

12  at trial be disclosed during the expert reports.  Now, what we

13  got for Dr. Almeroth was a whole new set of demonstratives,

14  which the other side -- I understand their position is that

15  it's just merely reformulating and moving things around from

16  the demonstratives that were disclosed, but from our

17  perspective it looks like a wholly new set of demonstratives.

18         THE COURT:  All right.  Then show me the before and

19  the after.

20         MR. LORDGOOEI:  I believe we filed those.

21         THE COURT:  I'm sorry.  I have no idea what you filed.

22         MR. LORDGOOEI:  So I have a set of the after I can

23  hand up to Your Honor, and we are looking for a set of the

24  before.

25                  (Pause in proceedings.)
```

1          **MR. LORDGOOEI:**  And we are pulling up the old ones for

2     you now, Your Honor.

3          **THE COURT:**  I can't find -- my law clerk gave to me

4     but I have my standing order somewhere.  Here it is.  All

5     right.

6               (Pause in proceedings.)

7          **THE COURT:**  All right.  Here is what my -- first of

8     all, Rule 26 says every demonstrative must be in the report.

9     There's no exceptions.  That's what Rule 26 says.

10         I have a little bit more flexibility.  My guidelines say

11    illustrative animations, diagrams, charts and models may be

12    used on direct exam only if they were part of the expert's

13    report, with the exception of simple drawings and tabulations

14    that plainly illustrate what is already in the report, which

15    can be drawn by the witness at trial or otherwise shown to the

16    jury.

17         All right.  So, I'll allow that little simple exception

18    there, but -- all right.  So I really have to do this.  Is that

19    what I have to do?  I have got to go through this?  You can't

20    follow my rule?

21         **MR. SHEA:**  So, Your Honor, we believe we have followed

22    your rule.

23         So just so Your Honor has a little bit of background,

24    because of Your Honor's rule, with each report -- so just as --

25    well, so Dr. Almeroth has served seven expert reports in this

 1    case because of the different phases of the case and because he

 2    is addressing multiple things.  With each of those reports,

 3    Your Honor, we put in a set of demonstratives at the time we

 4    put in that report, along with Dr. Almeroth's report.

 5         What we have done now, because we have seven different

 6    sets of demonstratives spread over across those reports is --

 7    all we have done is tried to streamline --

 8         THE COURT:  Use the ones -- don't say "streamline."

 9    No.  You're fixing them up.  Use the ones that you already --

10    that you gave with your report.

11         MR. SHEA:  So, Your Honor, if I could give an example,

12    I think it would help.  You know, for instance, in these slides

13    we have one slide that has -- we are not talking about, like,

14    figures, pictures.  What we are talking really about is things

15    showing what the claim numbers are, what the claim language is,

16    annotations of the claim language.  That is all we are talking

17    about here, Your Honor.

18         THE COURT:  Give me -- give me one that -- I will

19    consider one from each side.  You give me your example of

20    before and after.

21         MR. SHEA:  Okay.  So, do you guys have the old slides

22    up, is that what we are looking at here?

23         MR. LORDGOOEI:  These are the new slides.

24         MR. PAK:  No.  These are the old slides.

25         MR. SHEA:  Okay.  So can we go to 2 -- here.  Let me

 1    see -- 28 of that?  Oh, no, sorry.  210, please.

 2        Sorry, Your Honor.  I'm trying to make sure I have got the

 3    right one.  212 is what I would like to see.

 4        So, Your Honor, this is the type of slide that we are

 5    talking about.  This is the after.  It's the claim language --

 6    it's what's on the poster board that's been in court and will

 7    be in court.  The only thing that has been added is the colored

 8    annotations on top, and that's -- the only thing that wasn't in

 9    a prior slide was the colored annotations.  And as I read

10    Your Honor's --

11            **THE COURT:**  What do the annotations signify?

12            **MR. SHEA:**  They signify Dr. Almeroth's attempt to

13    simplify and group some of these limitations together for

14    purposes of discussion with the jury, so that it's easier for

15    the jury to understand.

16            **THE COURT:**  All right.  You mean you are going to get

17    your expert to say the patent says A, B, C and D but that

18    really means F?

19            **MR. SHEA:**  No, Your Honor.

20            **THE COURT:**  You can't do that.  It's -- it says what

21    the PTO says it says.  You can't change the language after the

22    fact.

23            **MR. SHEA:**  No, no, Your Honor.  I don't mean to

24    suggest that at all.  I'm just saying that as we walk through

25    the claims -- and we are going to walk through them and walk

**PROCEEDINGS**

 1   through them element by element -- we want to have some logical

 2   breakdown of how the elements relate to one another.

 3       And I think in Your Honor's rule, as we understood it, it

 4   falls within things that are just --

 5       **THE COURT:**  Why isn't that right, let's say?  Why, on

 6   this example, why isn't that close enough?

 7       **MR. LORDGOOEI:**  Well, Your Honor, it was our

 8   understanding, and we tried to stick to Your Honor's rule and

 9   my understanding -- I joined the case late, but my

10   understanding is that we attempted to meet and confer with them

11   and try to get their understanding and their take on

12   Your Honor's standing order, and we were unable to come to any

13   sort of understanding of whether the demonstratives that were

14   exactly disclosed would have to be the ones used in court, and

15   so that was our understanding.

16       **THE COURT:**  Well, are you going to do the same thing

17   when your experts show up?

18       **MR. LORDGOOEI:**  We are -- so we are planning on using

19   the exact demonstratives -- not all of the demonstratives.

20   There were several demonstratives disclosed, but anything that

21   was disclosed is what we are planning on using.  And so we

22   haven't gone through and tried to reshuffle or reorganize and

23   take something from one slide --

24       **THE COURT:**  Well, but this is just -- this is

25   literally just the claim language.  It is not a new diagram.

1    It has got some boxes and color coded around some of the

2    claims, yes, true, but why isn't that okay?  It's a small

3    change.

4             MR. SHEA:  And, Your Honor --

5             THE COURT:  I'm going to allow this one.  I will allow

6    this one.  All right?

7        Now give me one on your side, on the Google side, that you

8    think is beyond the pale.

9             MR. LORDGOOEI:  So if we could pull up, let's say,

10   PDX2.21.

11            MR. SHEA:  So actually, Your Honor, I can actually

12   moot this one.  In the updated dec we sent them last evening,

13   we have removed this slide so . . .

14            THE COURT:  You withdrew it?

15            MR. SHEA:  Yeah.  We withdrew it.

16            THE COURT:  All right.  Problem solved.

17       What's your next one?

18            MR. LORDGOOEI:  Let's try PDX2.64.

19       And we are happy to go either way, Your Honor.  We would

20   just like, ultimately, I guess, clarification on what would be

21   allowed and what's --

22            THE COURT:  That's ridiculous to say.  No.  I've said

23   what the rule was.  You are stuck with what was in the report

24   unless it's -- it plainly illustrates what's already in the

25   report, which can be drawn by the witness at trial or otherwise

 1   shown to the jury.

 2        So it's got to be something very simple.  It's got to

 3   already be in the report.  It's got to be -- if he can draw it

 4   in a diagram to illustrate what he is doing, his report has

 5   already said.  It can't be a new opinion, but it can be an old

 6   opinion that you could illustrate with a stick drawing or

 7   animation, maybe, but --

 8             **MR. LORDGOOEI:**  That's fine with us, Your Honor.

 9             **THE COURT:**  Thank you.  Good.  All right.  End of

10   story.

11        Okay.  Now we go to -- what's your next problem?

12        **MS. BAILY:**  Melissa Baily for Google.

13        I don't know that we will get to Mr. Malackowski today,

14   but we have several objections to his demonstratives and his

15   exhibits, so I don't know if we want to start working through

16   those now or . . .

17             **THE COURT:**  All right.  Let's get started on it.

18        **MS. BAILY:**  Okay.  Google's first objection --

19        (Off-the-record discussion.)

20             **THE COURT:**  Is this -- are these new demonstratives

21   like what I just heard, or are these the old demonstratives but

22   you just don't like them?

23        **MS. BAILY:**  These are new demonstratives.  We have

24   some evidentiary objections, and then also one demonstrative.

25             **THE COURT:**  If they are new ones and they violate the

1    rule that I just read, I'm not going to allow them.

2        I'm not saying the testimony is out.  I'm saying the

3    demonstrative is out unless it's a simple drawing.

4            **MS. CARIDIS:**  Okay, Your Honor.

5            **THE COURT:**  Is it a simple drawing?

6            **MS. CARIDIS:**  Your Honor, I believe it is.

7            **COURT REPORTER:**  Could you state your name?

8            **MS. CARIDIS:**  Sorry.  Alyssa Caridis.

9            **COURT REPORTER:**  Thank you.

10           **MS. CARIDIS:**  I believe they are simple drawings in

11   light of the conversation that just happened with Dr. Almeroth.

12   I would submit that the best course of action here for the

13   parties is to sit down and meet and confer.

14       Google filed its motion --

15           **THE COURT:**  Is it the claim language, or is it -- is

16   it diagrams like -- like this?  That one -- if this is it, I

17   would not allow it.

18           **MS. CARIDIS:**  It is not diagrams like that.  He is the

19   damages expert, so it's not claim language, but I think the

20   parties can shortcut a lot of this by sitting down and talking

21   in light of what just happened with Dr. Almeroth, at least as

22   it relates to the demonstrative objections.

23       I understand that Ms. Baily might have other issues

24   relating to evidentiary objections.

25           **MS. BAILY:**  That's fine, Your Honor.

PROCEEDINGS

1          **THE COURT:**  Okay.  You're okay with that?  All right.

2     Good.

3          **MS. BAILY:**  We can meet and confer on the

4     demonstratives, but we do have evidentiary issues.

5          **THE COURT:**  All right.  What's your evidentiary --

6     give me one evidentiary issue that I can grasp.

7          **MS. BAILY:**  So the first evidentiary issue is the

8     Sonos royalty agreements that we started talking about

9     yesterday.

10         So, as I mentioned on the record yesterday -- and we filed

11    a brief it was a little late I think it was at 8:00 p.m.,

12    Your Honor, and I apologize for that.  We put some of this into

13    the record, but the Sonos license agreements -- as I mentioned

14    yesterday, both experts have said that they are not probative

15    of the hypothetical negotiation.

16         Yesterday when we were talking about this --

17         **THE COURT:**  Yeah, but maybe the jury could decide they

18    are.  You know, just -- I have learned in these patent cases

19    that each side gets into contorted positions where they --

20    something is not comparable, but these are real world --

21    Legrand is that what you are talking about, Legrand and

22    Bluesound?  These are real world agreements, not some crazy

23    construct from IFTTT.  These are real world agreements, and

24    you're trying to keep them away from the jury.

25         **MS. BAILY:**  Well, your Honor, if I could just make a

 1   record on it because I actually believe --

 2        THE COURT:  Your record has already been made 14

 3   times.  You're saying they say it's is not comparable and you

 4   say it's not comparable and, therefore, it shouldn't come in,

 5   but I disagree with you.  It could be -- the jury could find

 6   that it's comparable.  I'm going to allow all of these in.

 7   These three get to come in.  And in my opinion for once they

 8   are trying to show something that is a real world actually done

 9   thing, and you are trying to hide that from the jury.

10        MS. BAILY:  I'm not trying to hide it from the jury,

11   Your Honor.

12      They are going to put the rates up and then say that

13   they're not relevant.  They're clearly --

14        THE COURT:  Then you can cross-examine and explain why

15   they are not relevant.

16        MS. BAILY:  We will, Your Honor.

17        THE COURT:  That would be okay.

18        MS. BAILY:  Great.

19        THE COURT:  You can do that.  You can cross examine

20   great, but that's a real world that covers these -- that covers

21   this very patent; right?

22        MS. BAILY:  It covers a whole hundred -- hundreds of

23   patents.

24        THE COURT:  Yes, yes.  And so you can say it covers a

25   hundred.  You got to subtract out 99.  You got to subtract out

PROCEEDINGS

```
 1   for the cross-license.  That -- people do -- they are able to
 2   do those kinds of complicated math.
 3           MS. BAILY:  Yes, Your Honor.
 4           THE COURT:  All right.  So that's the ruling on that.
 5       What's your next problem?
 6           MS. BAILY:  My next problem --
 7           THE COURT:  The jury is all here.  We can get started
 8   if the witness is here.  Is the witness here?
 9           MR. RICHTER:  The witness is here, Your Honor.
10           MS. BAILY:  That's fine.
11           THE COURT:  Can we get started?
12           MS. BAILY:  We can hold these over until tomorrow.
13           THE COURT:  All right.  Thank you.
14       Let's bring back the lawyer, bring back the witness and
15   bring in the jury.
16                       (Pause in proceedings.)
17           THE COURT:  By the way, on the ruling that I made
18   yesterday about some e-mail about Mr. Big going through the
19   floor and saying this is a great product, who was the employee
20   who overheard that?  Please hurry.
21           MR. SULLIVAN:  I'm sorry, Your Honor.  You mean the
22   employee at Google who overheard that?
23           THE COURT:  No.  The employee -- who reported -- who
24   wrote that e-mail?  Wasn't it a Sonos e-mail?
25           MR. SULLIVAN:  Oh.  Are you talking about the CEO?
```

PROCEEDINGS

```
 1              THE COURT:  Yes.

 2              MR. SULLIVAN:  Yeah.  We're not going to use that

 3    exhibit, Your Honor.

 4              THE COURT:  Are you going to try to call the CEO?

 5              MR. SULLIVAN:  We are not, Your Honor.

 6              THE COURT:  All right.  Good.  End of problem.  Thank

 7    you.

 8              MR. PAK:  Thank you, Your Honor.

 9                   (Off-the-record discussion.)

10              THE COURT:  How much more do you have on your cross?

11              MR. LORDGOOEI:  15, 20 minutes, Your Honor.

12              THE COURT:  And the next witness is going to be who?

13              MR. PAK:  Mr. Lambourne.

14              THE COURT:  Lam?

15              MR. PAK:  Lambourne.

16              THE COURT:  Lambourne.  He is the inventor.  All

17    right.

18              MR. PAK:  Thank you.

19                   (Pause in proceedings.)

20              THE CLERK:  All rise for jury.

21         (Proceedings were heard in the presence of the jury:)

22              THE COURT:  So great to see you back.  Thank you.

23    Have a seat.  I want to thank you for being so on time.

24         While the rest of California is still in bed thinking

25    about their first latte.  Here you are, all seven of you, in
```

1    the United States District Court, ready to do your country's

2    work.  It's great.  Thank you for being on time.

3         You will remember that we have on the stand our first

4    witness, Mr. Millington, and he has already done his direct

5    examination and counsel tells me we'll have 15 to 20 more

6    minutes of cross-examination, and then both sides will have

7    examined this witness.  So please, are you ready over there?  I

8    think you are.

9         Counsel, please proceed.

10                   **MILLINGTON NICHOLAS**,

11   called as a witness for the Plaintiff, having been previously

12   duly sworn, testified further as follows:

13                   **CROSS-EXAMINATION**    (resumed)

14   **BY MR. LORDGOOEI:**

15   **Q.**   Good morning, Mr. Millington?

16   **A.**   Good morning.

17   **Q.**   So I want to go back to one of the exhibits that your

18   Counsel, introduced yesterday.  This is TX6730.  If you could

19   pull that up in your binder.

20         **MR. LORDGOOEI:**  And, Mr. Fisher, if we could display

21   that exhibit.

22                   (Pause in proceedings.)

23   **BY MR. LORDGOOEI:**

24   **Q.**   Mr. Millington, this is the document that shows a log of

25   basically every software release that Sonos made over a period

1  of time beginning from early 2005 until the summer of 2020;

2  correct?

3  A.   Yes, that's correct.

4  Q.   And this document has 26 pages of Sonos' releases dating

5  back to January 27th, 2005; correct?

6  A.   It begins with a list of the releases, followed by a more

7  detailed summary; but, yes, you are correct.

8  Q.   It is not until 2020 on page 3 where you get to the S2

9  release in which Sonos claims to have released its zone styles

10  grouping technology as you called it; correct?

11  A.   You are referring to the zone scenes style grouping?

12  Q.   I believe that's what you called it, that's correct.

13  A.   I'm sorry.  Sir, you said "zone styles grouping," so I

14  wanted to make sure I understood your question.  Sorry.  Could

15  you repeat the question, please?

16  Q.   Sure.  So it is not until 2020 on page 3 that you get to

17  when Sonos claims to have released its zone scenes style

18  grouping as you called it; correct?

19  A.   Yes, that's correct.

20  Q.   Now, between January 27th, 2005, all the way in the back

21  of this document and the S2 release on page 3, how many

22  features did Sonos release in its products?

23  A.   I can't put a number on it sitting here today, but it

24  would be safe to say that each release contained at least one

25  feature.  Is that good enough?

1  Q.   Well, in the aggregate, would you say it's on the order of

2  dozens, hundreds, thousands?

3  A.   Somewhere between dozens and hundreds.

4  Q.   And if we can turn to pages 25 to 26 of TX6730, there's a

5  version 1.2 release on July 20th, 2005.  Do you see that?  We

6  have it on the screen for you as well, if it's easier.

7  A.   Yes, I see that.

8  Q.   So now this release includes a feature that increased the

9  maximum number of tracks on the controller to 40,000 tracks;

10  correct?

11  A.   It says "Increased max number of tracks to 40,000 tracks."

12  Q.   Okay.  So that's a feature that Sonos added in July 20th,

13  2005; correct?

14  A.   That's correct, although the feature was implemented on

15  the players, not the controller.

16  Q.   Further down that list you see there is "Save EQ settings

17  across reboots and upgrades."  Do you see that?

18  A.   Yes, I do.

19  Q.   So that's another feature that was released in 2005;

20  correct?

21  A.   That is correct, yes.

22  Q.   Now, where were those EQ settings saved?

23  A.   You are asking me how this feature worked in 2005?

24  Q.   Well, it says, "Save EQ settings across reboots and

25  upgrades."  Is it your understanding that that refers to the

1    prior art CR100 controller or the prior art ZP100 ZonePlayer?

2    **A.**   I will be honest with you, sir.  I don't remember how this

3    feature works.

4    **Q.**   That's another feature that was released before the zone

5    scenes style grouping that you introduced in 2020; correct?

6    **A.**   Yes, that's correct.

7    **Q.**   Let's turn to page 23, the version 3.3 release on

8    September 23rd, 2010, added a Sonos controller for the iPad;

9    correct?

10   **A.**   Sorry.  Which release number are you referring to?

11   **Q.**   Version 3.3.

12   **A.**   Okay.

13          Yes, that's correct.  One of the -- yes.  One of the

14   features -- one of the -- it's not really a feature, but an

15   addition to the product was the Sonos controller for iPad in

16   version 3.3.

17   **Q.**   Now, let's go to the bottom of page 5, the version 8.6

18   release on June 13th, 2018, added Polish language support;

19   correct?

20   **A.**   Yes, sir.  That appears correct.

21   **Q.**   It also added voice support in the French language;

22   correct?

23   **A.**   Correct.

24   **Q.**   So, again, these are all features that Sonos has been

25   adding to its product prior to the S2 release in which it

1    introduced the zone scenes style grouping; correct?

2    A.    For the examples you gave, that is correct, yes.

3    Q.    Now, one of the other features that Sonos added before

4    zone scenes style grouping was support for voice activation;

5    correct?

6    A.    Yes, that's correct.

7    Q.    So, for example, support for Amazon Alexa; correct?

8    A.    Correct.  Amazon Alexa was the first voice service that

9    was supported on Sonos.

10   Q.    And in the version 10.2 release, you added support for

11   Google Assistant; correct?

12   A.    That is correct, yes.

13   Q.    So, again, all of these features added before Sonos

14   released the zone scenes style grouping?

15   A.    Correct.

16   Q.    Okay.  Now, yesterday we were discussing the Sonos 2005

17   prior art system controller and ZonePlayer.  Do you recall that

18   discussion?

19   A.    Yes, I do.

20   Q.    And you agreed those prior art devices had processors;

21   correct?

22   A.    Yes, I did.

23   Q.    And you agreed that those prior art products had

24   programming instructions; correct?

25   A.    Yes, I did.

1  Q.   You also agreed that they included memory; correct?

2  A.   Yes, I did.

3  Q.   Now, we just looked at a feature that was added, the "Save

4  EQ settings."  Are those saved anywhere in persistent memory on

5  the devices?

6  A.   As I stated before, I don't remember exactly how those

7  features worked, but what you said is probably correct.

8  Q.   So what types of persistent memory did the ZP100 prior art

9  ZonePlayer include?

10       THE COURT:  Could you tell us what persistent -- the

11  witness -- what persistent memory is first and then answer the

12  question?

13       THE WITNESS:  Persistent memory tends to mean memory

14  that lasts longer than volatile memory.  So you have -- often

15  you have in computers, you have something like RAM, which is

16  volatile memory, and then you have persistent memory like a

17  hard disk or flash memory that lasts longer.

18       THE COURT:  All right.  Thank you.  Now go ahead and

19  answer the question.

20       THE WITNESS:  Would you please repeat the question?

21  BY MR. LORDGOOEI:

22  Q.   Sure.  So with that understanding of persistent memory,

23  what types of persistent memory were included on the prior art

24  ZP100 ZonePlayer?

25  A.   NAND flash.

1  Q.   What did you store in the NAND flash memory in the prior

2  art ZP100?

3  A.   We stored things like the software itself that the ZP100

4  ran, and we stored things like -- you know, things like the

5  name of the player.

6  Q.   Did the prior art CR100 controller, did that also include

7  a NAND flash persistent memory?

8  A.   Yes, it did.

9  Q.   What types of things were stored on the CR100 prior art

10 NAND flash memory?

11 A.   Silting here today, what I recall is the first -- the

12 memory on the NAND flash memory on the CR100 would include the

13 program instructions, you know, the actual software that the

14 CR100 ran.  And it would also include information about the

15 network identity that the CR100 would use to connect to the

16 Sonos players.

17 Q.   Do you recall what the storage capacity was of the NAND

18 flash used in these devices?

19 A.   No, not exactly, sorry.

20 Q.   So the programming instructions that you just referred to,

21 those are basically the software that tells it how to create

22 and operate in different types of modes and how to display the

23 user interface to the user.  That's what you are talking about;

24 correct?

25 A.   Those are good examples of programming instructions, yes.

1  Q.  So one of the things we talked about was All Zones-Party

2  Mode being displayed to users.  That was a feature that was

3  implemented through the use of these programming instructions;

4  correct, sir?

5  A.  Correct.

6  Q.  So the controller had programming instructions for

7  implementing Party Mode in its persistent NAND flash memory;

8  correct?

9  A.  Yes, that is correct.

10  Q.  Because you don't want it to disappear every time you turn

11  off the device and turn it back on and reboot the device;

12  correct?

13  A.  You are talking about the software not disappearing?

14  Q.  That's right.

15  A.  Correct.  It would be desirable for the software on the

16  CR100 controller not to disappear.

17  Q.  Right.  Makes sense; correct?

18  A.  Yes.

19  Q.  Okay.  Now, I want to re-visit something else that we were

20  talking about yesterday.  We were talking about the zone group

21  topology information.  Do you recall that discussion?

22  A.  Yes, I do.

23  Q.  Now, just to reorient the jury, the zone group topology

24  was the list of all the ZonePlayers in a user's prior art Sonos

25  2005 system; correct?

1    **A.**   It is a -- like I explained yesterday, it's a cache, a

2    temporary storage area of that storage information that is

3    provided to the controllers so they don't have to go and --

4    provided to the controllers by a player so they don't have to

5    go and rediscover that information each time they wake up from

6    stand-by.

7    **Q.**   And that cache of information is also stored locally on

8    each of the ZonePlayers; correct?

9    **A.**   Correct, although not in persistent memory.

10   **Q.**   Now, we talked about these ZonePlayers being grouped in

11   order to play music in synchronous playback mode; do you recall

12   that?

13   **A.**   I think, yes, they were grouped to configure them for

14   synchronous audio playback.

15   **Q.**   And so in the scenario where you have two speakers

16   coordinating to play back music synchronously there is

17   something called the "group coordinator"; correct?

18   **A.**   One of the players will act as the coordinator of the

19   group, and we call it the group coordinator.

20   **Q.**   Now, that group coordinator has information about all the

21   other ZonePlayers that are part of the currently active group;

22   correct?

23   **A.**   Yes, that is correct.

24   **Q.**   Where is that information stored in the ZonePlayer?

25   **A.**   That information is stored in a table in RAM.

1   **Q.**   Is it the same table in which the zone group topology

2   information is stored?

3   **A.**   No.

4   **Q.**   So it is a separate table?

5   **A.**   I think that's correct, yes.

6   **Q.**   So you have one table that includes the zone group

7   topology information and another table that includes the group

8   information; is that correct?

9   **A.**   I just want to make sure that I answer the question

10  clearly.  I think what you asked me is does the -- is the --

11  does -- you first asked me does the group coordinator know the

12  members of its group, and then you asked me is that stored in

13  a -- where is that stored.  And now you are asking me is that a

14  separate table from the zone group topology information.  Is

15  that right, or could you please repeat the question?

16  **Q.**   Sure.  So the question is:  The zone group topology

17  information is stored in a table on the ZonePlayer; correct?

18  **A.**   Yes, it is.

19  **Q.**   For a group coordinator, the group membership information

20  is also stored on that ZonePlayer in a table; correct?

21  **A.**   Yes, that's correct.

22  **Q.**   Now, we have been talking about group mode, and I think

23  you mentioned yesterday that when a ZonePlayer enters group

24  mode, it begins acting as part of the group immediately;

25  correct?

1   **A.**   I think what I said yesterday is that when two players are

2   grouped together, they are immediately configured for audio

3   synchronization purposes.

4   **Q.**   Okay.  So if a ZonePlayer -- let's call it ZonePlayer A --

5   is grouped with a ZonePlayer -- let's call that ZonePlayer B --

6   if ZonePlayer B is the group coordinator and it's playing

7   music, then ZonePlayer A would begin playing the same music

8   that the group coordinator is playing; is that correct?

9   **A.**   You are talking about the 2005 implementation?

10  **Q.**   That's right.  We are talking about the prior art at this

11  point.

12  **A.**   Okay.  So your question is if ZonePlayer B is the group

13  coordinator playing music and then ZonePlayer A is added to the

14  group, then what will happen is both of them will play the same

15  music in sync.

16  **Q.**   Okay.

17  **A.**   Assuming that ZonePlayer B was already playing music, like

18  in your question.

19  **Q.**   Right.

20      So the other scenario is ZonePlayer B is not playing music

21  and ZonePlayer A is added.  What would happen in that scenario?

22  **A.**   So in the scenario where ZonePlayer B is playing music and

23  you --

24          **THE COURT:**  Oh, no, no, no.  He said where --

25          **THE WITNESS:**  Sorry.

1          THE COURT:  -- ZonePlayer B is not playing music but

2    ZonePlayer A is added what would happen.  That's what he was

3    asking.

4          THE WITNESS:  Yes, you are right.  I made a mistake,

5    Your Honor.

6       So ZonePlayer B is not playing music and then ZonePlayer A

7    is added.  It is true that the -- the group will -- as a whole

8    will continue to not play music.  However, as I explained, they

9    begin to coordinate for the purposes of audio synchronous audio

10   playback because of all of the clock issues that I described

11   yesterday.

12   BY MR. LORDGOOEI:

13   Q.   So if there is a speaker that is playing music and it is

14   added to a group that is not playing music, it will stop

15   playing music; is that correct?

16   A.   That is correct, yes.

17   Q.   And I said "speaker," but I meant ZonePlayer, so I will

18   try to get that; right?

19   A.   Understood.  I apologize.

20   Q.   Okay.

21   A.   Or I understand, I should say.

22   Q.   Now, if we could pull up another exhibit that your

23   Counsel, introduced TX6974.

24          MR. LORDGOOEI:  Mr. Fisher, if we can display that.

25   \\\

1  BY MR. LORDGOOEI:

2  Q.   I believe you described this as a -- as an investor pitch

3  deck yesterday; is that correct?

4  A.   I used the term "pitch deck" for sure.

5  Q.   Now, if we could turn to page 6.  You mentioned that the

6  *Wall Street Journal* article, you were particularly proud of

7  that commendation; correct?

8  A.   Yes, I did mention that.

9  Q.   Now, that article and the *CNET* article and the *Fortune*

10  article, those are all talking about the prior art Sonos 2005

11  system; correct?

12  A.   That is correct.  They are talking about that system.

13  Q.   Let's turn to the next page.  Only positive reviews.  Do

14  you see that?

15  A.   Yes, I do.

16  Q.   And so this is a collection of all the different magazines

17  and journals and things that have provided reviews on the Sonos

18  product, positive reviews; correct?

19  A.   That's what the -- yes, that's what the slide appears to

20  say.  I haven't personally verified, obviously, but I have read

21  those reviews.

22  Q.   Now, all of these are also talking about the Sonos 2005

23  product; correct?

24  A.   Yes, they are.

25  Q.   And the Sonos 2005 product that we have been talking

1   about, that's all prior art; correct?

2   **A.**   That is correct, yes.

3   **Q.**   That means it was publicly available, known, sold to the

4   public prior to February 2005; correct?

5   **A.**   Yes, that's correct.

6         **MR. LORDGOOEI:**   I will pass the witness.

7         **THE COURT:**   Okay.   Thank you.

8   We now -- do you have any redirect?

9         **MR. SULLIVAN:**   Nothing further from us, Your Honor.

10        **THE COURT:**   All right.   So may Mr. Millington step

11  down?

12        **THE WITNESS:**   Thank you, Your Honor.

13        **MR. SULLIVAN:**   Yes, Your Honor.

14                    (Witness excused.)

15        **THE COURT:**   All right.   Thank you, sir.

16   Now we will take care of all those documents.   I will ask

17  counsel to clear off that witness bench and call your next

18  witness, please.

19        **MR. SULLIVAN:**   Our next witness, Your Honor, is Rob

20  Lambourne.

21        **THE COURT:**   All right.   Lambourne.   Okay.

22                    (Pause in proceedings.)

23        **THE CLERK:**   May the witness please approach the

24  witness stand.

25        **THE COURT:**   Welcome to the court.   Please come up here

```
 1    and -- to the witness stand and raise your right hand and take
 2    an oath to tell the truth.
 3                      (Pause in proceedings.)
 4                       ROBERT LAMBOURNE,
 5    called as a witness for the Plaintiff, having been duly sworn,
 6    testified as follows:
 7          THE CLERK:  Please be seated, speak directly into the
 8    microphone.  State your full name for the record and spell your
 9    last name.
10          THE WITNESS:  Robert Andrew Lambourne; last name
11    L-A-M-B-O-U-R-N-E.
12          THE COURT:  Welcome to the court.
13       Counsel.
14                     DIRECT EXAMINATION
15    BY MS. CARIDIS:
16    Q.   Good morning, Mr. Lambourne.
17    A.   Can I have a glass of water?
18          THE COURT:  Yes, you may.  No.  Counsel has already
19    got it, Angie.  It's fine.
20          MS. CARIDIS:  May I approach?
21          THE COURT:  You may, please.
22          THE WITNESS:  Thank you.
23                      (Pause in proceedings.)
24    BY MS. CARIDIS:
25    Q.   Mr. Lambourne, who is your current employer?
```

1   **A.**   Sonos.

2   **Q.**   And what is your current position at Sonos?

3   **A.**   I'm the director of user experience for professional.

4   **Q.**   And what your responsibilities as the director of user

5   experience for professional?

6   **A.**   Yes.  I manage the design team that works on user

7   experience that addresses the needs of professional users in

8   business environments.

9   **Q.**   And can you tell us a little bit about your educational

10  background?

11  **A.**   Yes.  I have a degree -- well, I'm from the UK originally.

12  I have a degree from the University there called Loughborough

13  University, and that's in design and technology, and I

14  graduated there in 1991.

15  **Q.**   Okay.  You mentioned a degree in design and technology.

16  Can you explain a little bit more what that is?

17  **A.**   Yes.  It's a degree in product design sometimes called

18  industrial design.  At other universities that run similar

19  course it is sometimes referred to as industrial design

20  engineering.  My university called it design and technology.

21  **Q.**   And did you attain any other degrees after your design and

22  technology degree from Loughborough University?

23  **A.**   Yes.  I have a second degree, a master's degree in

24  computer-related design, and that's from the Royal College of

25  Art in London in the UK.

**LAMBOURNE - DIRECT / CARIDIS**

1   **Q.**   After you finished your schooling what did you do next?

2   **A.**   I went to work for Phillips Electronics first as an

3   intern; and then when I graduated, I went to work there

4   full-time.  And that was in the Netherlands and subsequently

5   the United States.

6   **Q.**   And can you describe a little bit the type of work you did

7   at Phillips Electronics?

8   **A.**   Yes.  I worked in the design department there.  I worked

9   on various projects including a universal remote control, which

10  was a device -- a hand-held device that would allow a user to

11  control the technology in their homes, things like televisions,

12  set-top boxes, cable boxes, audio equipment and things like

13  that.

14  **Q.**   And then what year did you join Sonos?

15  **A.**   I joined Sonos in 2003.

16  **Q.**   How many employees were at Sonos when you joined?

17  **A.**   There were 13 at the time.

18  **Q.**   And can you describe briefly why you decided to join

19  Sonos?

20  **A.**   Yes.  It was a great opportunity.  Sonos was very much a

21  start-up.  I was interested in joining a start-up, helping to

22  build something from the ground up.

23       The founders had a great vision, which was to redefine

24  audio in the home, and they didn't really -- they didn't -- had

25  done some engineering work by the time I arrived, but they

 1   didn't really think about the design of the product and how a
 2   user would interact with the product, so this was a great
 3   opportunity for me to work on that design from the ground up
 4   and create something new and different.
 5   **Q.**   And what was your position when you first joined Sonos
 6   back in 2003?
 7   **A.**   Well, we didn't really have official titles, but I was
 8   generally considered to be the lead UX person, user experience.
 9   **Q.**   And what were your responsibilities at that time?
10   **A.**   Yes.  Well, it was my job to really think about how a user
11   would interact with the products or the system that we are
12   trying to make to really understand the needs of the users and
13   to design products to satisfy the needs, things like that.
14   **Q.**   And so between that time and today, have you held any
15   other positions at Sonos before you became the director of UX
16   for Sonos professional?
17   **A.**   Yes.  Before my current role I was the director of --
18   well, just called the director of user experience.  And during
19   that time I was really focusing on products that were designed
20   for consumers, so for people in their homes to use.  And I did
21   that for a good few years at the beginning.
22       I then followed that with a -- I had a role called
23   distinguished designer, and in that my role was to think about
24   how third-party products, like smart home devices, might
25   interact with Sonos.

1  Q.   So what was your first project or task that you worked on

2  when you joined Sonos?

3  A.   Yes.  Well, I mean, generally to think about how the user

4  would go about using the system.

5       One of the first products I worked on was a product we

6  called a "controller," which was a hand-held controller that

7  would allow a user to control the music that was played

8  throughout their home.

9  Q.   And what type of features were you hoping to include in

10  the controller that you were designing at that time?

11  A.   Yes.  Well, it was a music system and the -- the great

12  vision of it was that the system would allow a user to play

13  music throughout their home by putting audio players in their

14  homes, one in each room where they wanted to play music.  And

15  it was my job to think about, okay, well, do people want to

16  play the same music throughout their home or different music in

17  different rooms or perhaps a combination of rooms playing music

18  together?  So it was really my role to think about what

19  features we wanted to provide to our users and then the user

20  interface that would allow them to achieve those things.

21       MS. CARIDIS:  Your Honor, may I approach with a

22  witness binder?

23       THE COURT:  Yes, please.

24                 (Pause in proceedings.)

25  \\\

1   **BY MS. CARIDIS:**

2   **Q.**   And, Mr. Lambourne, can you please turn to tab TX6973 in

3   your binder?

4   **A.**   6973 you said?  Oh, yes.  Here it is.

5   **Q.**   Do you recognize this document?

6   **A.**   Yes, I do.  Yes, I do.

7   **Q.**   And what is it?

8   **A.**   This is a -- a document that was made to record Sonos'

9   early history.  It is called "From Rincon to Sonos" Rincon was

10   the name of the company when we began.  It became Sonos.  So a

11   colleague of mine created this document to record the history.

12          **MS. CARIDIS:**  Your Honor, I would move to admit TX6973

13   into evidence.

14          **MR. PAK:**  No objection, Your Honor.

15          **THE COURT:**  Received in evidence.  You can show it to

16   the jury.

17          **MS. CARIDIS:**  Thank you.

18      (Trial Exhibit   TX6973 received in evidence.)

19   **BY MS. CARIDIS:**

20   **Q.**   And, Mr. Lambourne, let's turn to page 6 of TX6973, and I

21   want to focus on the middle picture.  Here can you describe

22   what the middle picture on page 6 is showing?

23   **A.**   Yeah.  That's a projection on a screen like we are doing

24   here, and it's showing an image of a very early concept I had

25   for the design of the hand-held controller that we were making.

**LAMBOURNE - DIRECT / CARIDIS**

1  You can see it's very sketchy.  I put it up on the screen.  I

2  discussed it with colleagues.  I made notes around it as we

3  discussed things, and I talked about the features and my design

4  concepts for this controller.

5  **Q.**  And let's then focus your attention -- I want to focus

6  your attention on the bottom picture of this page 6.  And can

7  you describe what we're looking at here?

8  **A.**  Yes.  This, again, is a very early concept or an idea.  I

9  made a -- frankly, it's a cardboard prototype of a hand-held

10  controller.  And I did that to really get a feel for, okay,

11  what does this thing feel like in the hands, how big should it

12  be?  The screen or the image of the screen there I glued onto

13  the cardboard together with some buttons that I was thinking

14  for the product at that time.

15      And as you can see, I have made some notes on yellow

16  stickies of sort of different ideas.  So really trying to

17  conceptualize the creation of the hand-held controller.

18  **Q.**  And can you please turn to page 12 of TX6973?  And I want

19  to focus on the bottom picture on this -- on this page.  And

20  can you tell us what's shown in this picture?

21  **A.**  Yes.  These are models that we made of two products that

22  we were making at the time, our ZonePlayer 100 product, which

23  was the player that people would put -- player that people

24  would put in the rooms of their houses and then the hand-held

25  device which we called the CR100, which was the hand-held

1  device people would use to control the music.

2      So these are very early models.  They are made out of sort

3  of a very dense foam that you can shape.  And we really wanted

4  to explore, okay, well what shape should our product?  How big

5  should it be?  What should it look like?  And these are

6  examples of that.

7  Q.  And did Sonos end up selecting its first commercial design

8  from these prototypes?

9  A.  Yes.  Obviously we added and sort of refined them as we

10 went, but the product in the top at the back there, the middle

11 product that looks like sort of a box that's the product that

12 became our ZonePlayer 100, the player that people put in the

13 rooms of their house.

14     And then the CR100 is similar to the model we have at the

15 bottom of -- the bottom of the image.  It's got a label I think

16 D on it the.  Bottom right, that's the CR100 early idea.

17 Q.  And let's turn to page 17, please.

18     And can you describe what's shown on this page?

19 A.  Yes.  So this is a little bit later when I've refined the

20 design.  So this is an illustration of this CR100, this

21 hand-held controller that we made.  And that's in the middle of

22 the screen.

23     And then surrounding it are various other screens.  They

24 are effectively menus, so the way that functionality is

25 presented to the users so they can play music throughout their

**LAMBOURNE - DIRECT / CARIDIS**

1    home, change the volume, decide where the music should play and

2    so on.

3    **Q.**   And which of these menus shows the functionality for

4    grouping and ungrouping audio players?

5    **A.**   Yes.  So that's the image at the bottom right there.

6    **Q.**   And can you explain this image a little bit?

7    **A.**   Yeah.  So, this is what we call the "zone menu," which is

8    really describing the rooms in the house.  You can see there

9    are four rooms, the kitchen, living room, master bedroom, and

10   patio.

11        You can see that the kitchen and the living room are

12   grouped together, so that is shown visually on the screen.

13   They are grouped together.  That means that they are playing

14   the same music in a synchronized way.

15        So they are playing Jack Johnson music and then the master

16   bedroom and the patio are separate, so they are standalone

17   audio players.  And you can see the master bedroom is playing

18   NPR radio station and somebody is playing "Yes I will" from

19   Spearhead on patio.

20        So this room menu gives the user an overview of what's

21   playing, what play -- what the speakers are playing and then

22   which rooms are grouped together and which ones are standalone.

23   **Q.**   Can you please flip back to page 7 of TX6973.  At the

24   bottom of the page here, there is a picture of two individuals.

25   Do you recognize the people in this photo?

**LAMBOURNE - DIRECT / CARIDIS**

1  **A.**   I hope so, yes.

2  **Q.**   And who are they?

3  **A.**   Yeah.  So that's me on right, a somewhat younger version

4  of myself.  And on the left is a colleague of mine called Mieko

5  Kusano who was our product manager at the time, also my wife.

6  **Q.**   Is she still your wife today?

7  **A.**   She is thankfully, yes.

8  **Q.**   Do you know when this picture was taken?

9  **A.**   I couldn't say exactly.  I think it is sometime --

10  sometime near 2004.  This would have been some kind of audio

11  show that we were presenting our first either prototype or

12  product.  We were showing it there.

13  **Q.**   And what's in your hand in the picture here?

14  **A.**   Oh, yes.  I'm holding the CR100, so that controller I

15  talked about that let's people control the music throughout

16  their house, that's what I'm showing there.  It's highlighted

17  as well.

18  **Q.**   And when was the CR100 released for commercial sale?

19  **A.**   It was in early 2005.

20       **MS. CARIDIS:**  Your Honor, permission to approach the

21  witness to hand a physical exhibit that's already been admitted

22  into evidence.

23       **THE COURT:**  Yes, please.

24            (Pause in proceedings.)

25  \\\

1   **BY MS. CARIDIS:**

2   **Q.**   Mr. Lambourne, I have handed you what has been marked as

3   PX0100.  And do you recognize this device?

4   **A.**   Yes.  So this is one of the controllers we made.  So this

5   is the CR100 controller.

6   **Q.**   And can you briefly describe some of the components on the

7   CR100?

8   **A.**   Yes.  Well, as you saw in the images we projected, it has

9   a screen on it.  So this is the screen where the menus and the

10  choices that the user could -- to select are on the screen.

11  It's got some buttons around that.  The volume buttons are

12  here, which would allow the user to change the volume in an

13  individual room or in a group of rooms.

14      They have got some play/pause buttons at the bottom here

15  on the right, and then it's got a scroll wheel, which would

16  allow a user to select an item on the screen by going up and

17  down menus.

18      And then at the top here it has got a button called

19  "zones," and that's the button that the user would press in

20  order to be able to control where the music was playing and

21  then a button called "music," which would allow the user to

22  basically pick the music they wanted to play, and the music

23  choices would be presented on the screen.

24  **Q.**   Thank you.  You can set that aside.

25      Can you please turn to TX6991 in your binder?

 1       And do you recognize this document?

 2  **A.**   Yes.

 3  **Q.**   And is it -- is it an early user guide for your first --

 4  for Sonos' first commercial system?

 5  **A.**   It is, yes, our user guide, yes.

 6       **MS. CARIDIS:**  Your Honor, I would move to admit TX6991

 7  into evidence.

 8       **MR. PAK:**  No objection, Your Honor.

 9       **THE COURT:**  Received in evidence, and it may be shown

10  to the jury.

11       (Trial Exhibit   TX6991 received in evidence.)

12  **BY MS. CARIDIS:**

13  **Q.**   Mr. Lambourne, what -- what products are shown on the

14  cover of this document?

15  **A.**   Yes, so this -- in the middle there, the boxy-shaped

16  product is the ZonePlayer 100, the player that people would put

17  in the rooms of their houses.  At the back are speakers that

18  they would connect to it.  And in the front on the left is

19  the -- the CR100 controller.

20  **Q.**   And let's turn to page 29 of this document.

21       Do you see the header "zone groups" on this page?

22  **A.**   Yes.

23  **Q.**   And can you explain what zone groups were in Sonos'

24  original 2005 system?

25  **A.**   Right.  Yes.  So as we saw on one of the illustrations

1  before when I was showing the screen of the product, I showed

2  two of the rooms grouped together.  They were in a gray box

3  grouped together.  That's what we called a "zone group."

4      And the way the user created a zone group, they would --

5  we called them dynamic groups because they were made in

6  realtime.  So the user would basically use the controls to

7  select one room and then group two rooms together.  So dynamic.

8  We called them "dynamic groups," we also called them "ad hoc

9  groups."

10 **Q.**  And what would be the result of two rooms being grouped

11 together?

12 **A.**  Well, two rooms would be grouped together to play music.

13 They might be playing music at the time you grouped them.  One

14 of the rooms might be playing music at the time you group them

15 together or they could be grouped together and not playing

16 music, ready to play music whenever the user chose some music

17 to play.

18 **Q.**  And once rooms were grouped together ready to play music,

19 was there any sort of configuration that was a result of that

20 grouping?

21 **A.**  Yes.  So, the room -- the rooms that were grouped together

22 we considered to be configured for playback.

23 **Q.**  Configured for what kind of playback?

24 **A.**  To play back music or they can be configured to be in a

25 zone group that's not playing music.

1    Q.   Can you give an example of a -- of a situation where you

2    would want two players grouped together?

3    A.   Yes.  An example might be if you have a living room and a

4    kitchen, you might want to group those rooms together so they

5    are playing music at the same time.

6         You might want to group more than two rooms together in

7    your house to play music.  You might want to ungroup players so

8    that they can play music alone.

9    Q.   And how long would a zone group in Sonos' original 2005

10   system kind of remain in existence?

11   A.   Well, they were dynamic groups.  They would remain in

12   existence until the user decided to do something else.  So if

13   the living room and the dining room are joined together in the

14   group and then later on the user decided, well, I only want to

15   play music in just the living room, they would ungroup the

16   original group, and that group wouldn't exist anymore.

17   Q.   On this same page of TX6991 --

18        THE COURT:  Can I ask a question about that?

19        So let's say on a Monday you have the kitchen and the

20   living room under this system grouped together and then you go

21   off on a vacation and you turn the system off and then you come

22   back a week later.  Are they -- is the kitchen and living room

23   still grouped together, or is it you have to start all over

24   again?

25        THE WITNESS:  Um, well, the -- the -- there wasn't

1   really a concept of turning them off in the system.  So while

2   you were away, they would still be on because they're networked

3   Wi-Fi devices.

4       So, yes, if you went away for a few days with the two

5   rooms grouped together and came back, they would still be

6   grouped together.

7       If you turned the players off; in other words, you

8   unplugged them from the wall, then they wouldn't -- well, I

9   don't think they would come back grouped together.

10      **THE COURT:**  All right.  Let me ask you then -- while

11  I'm interrupting -- another question.

12      You frequently said "playing music," playing music.  But

13  could they also play the news?  Could they also play something

14  other than music, or is it just they only work with music?

15      **THE WITNESS:**  Yeah.  So, the -- well, at the time we

16  released the product, they could play music from the user's

17  music collection that might be saved to a hard drive.  We also

18  added internet radio stations.  So the user could, yeah, play

19  the news from NPR or CNN or some other news station.

20      **THE COURT:**  Okay.  Thank you.

21      All right.  Thank you for the interruption.  Go ahead.

22  **BY MS. CARIDIS:**

23  **Q.**   If we focus back on TX6991, page 29, do you see the

24  reference to "All Zones-Party Mode" in that text?

25  **A.**   Yes, I do.

1  **Q.**   And can you explain what the Party Mode was in the

2  original 2005 Sonos system?

3  **A.**   Yes.  So in the original system, Party Mode was a way that

4  a user could effectively group all the rooms in the system

5  together.  So if they had four rooms in their system, All

6  Zones-Party Mode would cause those four rooms to be grouped

7  together.

8        This was a feature that was hard coded into the

9  controller.  It was sort of a shortcut to grouping all of the

10 rooms together so that they could -- would play music -- they

11 would play -- they could play back music.

12 **Q.**   And what do you mean by they were hard -- Party Mode was

13 hard coded into the controller?

14 **A.**   Yeah.  So the user couldn't configure what rooms were in

15 this Party Mode.  That was baked into the product.  That was

16 coded by the engineers into the CR100 product.

17 **Q.**   And did you create any demonstratives to illustrate how

18 Sonos' dynamic grouping worked in its 2005 products?

19 **A.**   Yes.

20 **Q.**   And can we please pull up Mr. Lambourne's demonstratives

21 and turn to PDX5.2.

22        **THE COURT:**  All right.  These are not being offered

23 for evidence, so they can go ahead and show these to the jury,

24 but remember on these demonstratives they will not be in the

25 jury room.  So if you want to make notes to take into account

**LAMBOURNE - DIRECT / CARIDIS**

 1  they are not going to be in the jury room, please do, but it's

 2  up to you.  Please, go ahead.

 3          **MS. CARIDIS:**  Thank you.

 4  **BY MS. CARIDIS**

 5  **Q.**   And Mr. Lambourne, I believe you do have a copy of these

 6  demonstratives in your binder, but you can also refer to the

 7  screen, if that's helpful.

 8  **A.**   Yes.  I have it here.  Thank you.

 9  **Q.**   Can you describe for us what's shown on PDX5.2, which is

10  on the screen?

11  **A.**   Yes.  So on the right is the CR1000 controller that the

12  user uses to control the system.  On the left is a three zone

13  players or audio players one, two and three.

14  **Q.**   And what's shown on the screen on the controller?

15  **A.**   Yes.  So that's showing the zone menu, so that was the

16  menu we looked at a little while ago that those the rooms in

17  the house, what they may -- may be playing if they are already

18  playing or if they are not playing it will show they are not

19  playing.  And it shows, in this case, ZonePlayer 1, 2, and 3

20  are all separate, which means they are not grouped together at

21  this point.

22  **Q.**   And let's turn to PDX5.3.  And can you explain how a user

23  would create a dynamic group in Sonos' 2005 system?

24  **A.**   Yes.  So to create a dynamic group, the user would use the

25  scroll wheel, select the first player that they want to start

1   with -- in this case ZonePlayer 1.  You can see -- well,

2   hopefully you can see it highlighted at the -- on the top left

3   image at the top of the screen.  Then they would the button

4   that's showed in yellow called "link zone."

5   Q.   And what would happen next?

6   A.   That would cause a menu to pop up that would allow the

7   user to create the group.  And it's basically saying, okay, you

8   are starting with ZonePlayer 1.  Select the other player that

9   you want it to be grouped with.  And in this case, the user has

10  chosen ZonePlayer 2.  So they scroll to ZonePlayer 2, hit okay.

11  And then you can see at the bottom, on the bottom image with

12  the green highlight, that causes ZonePlayer 1 and ZonePlayer 2

13  to be linked together in a group.

14  Q.   So, let's turn to PDX5.4.

15       And so what you just described was an example of creating

16  a dynamic group with two players.  Can you explain how a user

17  would create a dynamic group with more than two players in

18  Sonos' original system?

19  A.   Yes.  Well, it is a little tedious, but they would

20  basically go through that same sequence again.  So, they would

21  choose to link zones.  They are already starting with zone 1

22  and zone 2 joined together.  Then they would select the third

23  player to join -- to join that group.  In this case, okay, the

24  two -- the two players are bathroom and bedroom.  They would

25  choose den to join the group, select okay.  And then if they

1    want to add the dining room, they would press that link zone

2    button again, select dining room to be joined to the other

3    three, and dining room would then be part of that group and so

4    on.

5         So they end up in this case with five rooms that are all

6    joined together in a group.

7              **MS. CARIDIS:**  Thank you.  We can take down the

8    demonstratives for now.

9    **BY MS. CARIDIS**

10   **Q.**   Mr. Lambourne, after Sonos launched its first commercial

11   products in 2005, did you receive any feedback from customers

12   or the press regarding Sonos' dynamic grouping technology?

13   **A.**   Yes.  It was very well received.

14   **Q.**   What, if any, drawbacks did you see with the dynamic

15   grouping in Sonos' initial 2005 system?

16   **A.**   Yes.  Well, while it was terrific and our first product

17   and well received, there were some drawbacks to it, one of

18   which is a group that is made -- so you think like the living

19   room, the dining room and the kitchen are joined together -- if

20   the user wanted to play something just in kitchen, they would

21   remove the kitchen from the group, but that would cause the

22   original group to be lost, like the living room and dining room

23   and kitchen would no longer exist.  And that's what we mean by

24   dynamic grouping is when you change the grouping, the original

25   grouping of three players in this case, is no longer there.

1  Q.   So then in that example if, later, the user wanted to

2  resume playback in the living room, dining room and kitchen as

3  a group, how would the user be able -- what would the user have

4  to do in order to do that?

5  A.   They would have to recreate that group.  So they pulled

6  out the kitchen from the living room and the dining room.  They

7  would have to manually go back and re-add the kitchen.

8  Q.   And then what drawbacks, if any, existed with dynamic

9  grouping in Sonos' initial system relating to using the same

10  audio player in multiple groups?

11  A.   Yes.  So, right now we have talked about one group of

12  players, but it was possible to create more than one group.

13  So, for instance, you could have the living room -- sorry, the

14  dining room and the kitchen joined together and you might have

15  the living room and the den joined as a separate group.  So the

16  dining room and the kitchen might be playing one music, and the

17  den and the living room might be playing something else.

18      Now, if the user decided that they wanted to pull the

19  dining room into the group of that second group I described,

20  the living room and the den, they could do that.  But then the

21  original group that the dining room was in together with the

22  kitchen would no longer be a group anymore, so that would be

23  destroyed.

24  Q.   And so then once that dining room kitchen group is

25  destroyed, what would a user have to do to play music again to

1  just those two players?

2  **A.**   Yeah.   If they wanted to apply the music in just the

3  dining room and kitchen again, like they started maybe the day

4  doing, they would have to go in and manually recreate that

5  group, going through the steps that we showed on the screen

6  there.

7  **Q.**   And so to what extent, if at all, would it be possible in

8  Sonos' initial 2005 system to have overlapping groups of audio

9  players?

10  **A.**   They couldn't overlap in the original system.

11  **Q.**   What drawbacks, if any, existed with dynamic grouping in

12  Sonos' initial system relating to user efficiency?

13  **A.**   Well, yes.   I mean, as we described in the scenarios just

14  now that if the user had a group and then broke it apart, they

15  would have to -- and then wanted that group back together, they

16  would have to go remake it.   And you can imagine that could

17  be -- that could be awkward, for instance, if they wanted to

18  start each day with two rooms grouped together but end each day

19  with those two rooms apart.   Then every morning they would have

20  to, like, recreate that group, recreate that group, recreate

21  that group.

22       So it was a powerful system, but, in that respect, it

23  wasn't very efficient.

24  **Q.**   And then what drawbacks, if any, existed with dynamic

25  grouping in Sonos' initial system relating to naming of groups?

**LAMBOURNE - DIRECT / CARIDIS**

1   **A.**   Yeah.  You couldn't name a group.

2   **Q.**   And did you take any action in view of these drawbacks

3   that you just walked through?

4   **A.**   I did, yes.  I set about thinking about a design that

5   would improve upon that.

6   **Q.**   And did that -- did that new design that would improve

7   upon the drawbacks have a name?

8   **A.**   Yes.  Well, it had various names.  As I was thinking

9   through concepts I called it zone profiles, zone groups, zone

10  scenes, profiles, configurations.  I used various names, but

11  eventually landed on the name "zone scene."

12  **Q.**   And were there any kind of principles or guidelines that

13  you were attempting to achieve in your zone scenes technology?

14  **A.**   Well, I was trying to improve upon the drawbacks that we

15  have just discussed that were in the original system.

16  **Q.**   And so what were some of the benefits of your zone scene

17  technology?

18  **A.**   Yes.  Well, the zone scenes functionality allowed a user

19  to create a zone scene, so a group of players that could be

20  saved as a group.  One of the benefits was -- of saving a group

21  in the system is that it can be recalled at a later time

22  easily.

23       So, where we talked about the inefficiency of the user

24  having to sort of link and relink and relink players, the idea

25  of zone scenes is that the user wouldn't have to do it.  They

1  would set it one time, save it, and then they would be able to

2  recall it later more easily.

3  **Q.**  And what benefits, if any, did your zone scene technology

4  provide relating to overlapping zone scenes?

5  **A.**  Yes, well, the nice thing about a zone scene that could be

6  saved and then invoked later -- and when I say "invoked," I

7  mean like acted upon -- is that a player could appear in more

8  than one zone scene.  So, for instance, you could have a zone

9  scene that said "living space," which might include the living

10  room, dining room and kitchen.  You could also have a zone

11  scene that was called "downstairs," which would allow those

12  three rooms I have just described to be in it as well as maybe

13  the den or one of the kids' playrooms, something like that.

14  **Q.**  And then what -- I think you just mentioned invoking zone

15  scenes later.  What benefits did your zone scene technology

16  provide relating to invoking zone scenes?

17  **A.**  Well, yes.  I mean, because they are saved, they can be

18  called upon later, which means the user doesn't have to kind of

19  keep rebuilding zone groups.  They can just immediately get

20  to -- or much more quickly get to a zone grouping of their

21  choice.

22  **Q.**  And then what benefits did your zone scene technology

23  provide relating to naming of groups?

24  **A.**  Yes.  So, these -- these saved zone scenes I allowed the

25  user to give a name to so that they can easily recognize them

 1   and record them later.

 2   **Q.**   Can you give an example of a name that a user might want

 3   to provide a zone scene?

 4   **A.**   Yes.  An example might be downstairs, which links all the

 5   rooms downstairs together.  Upstairs is another one.  But they

 6   could name after, like, the time of day.  So if they always

 7   want to wake up with their kitchen and the dining room joined

 8   together, regardless of whether they went to sleep with them

 9   all joined together, they might call that a morning scene or an

10   evening scene, if they wanted to do something later.

11   **Q.**   And did you create any demonstratives to illustrate how

12   your zone scene technology would work?

13   **A.**   Yes, a lot of words but maybe some pictures will help.

14        **MS. CARIDIS:**  Mr. Jay, can we pull up PDX5.5 please.

15   BY MS. CARIDIS:

16   **Q.**   Why don't you walk us through what you are showing here.

17   **A.**   In contrast to the ad hoc or dynamic grouping that I

18   described last time we had pictures on the screen here, this

19   shows how a zone scene can be created.  So you can see the

20   players are all ungrouped in this case to begin with.  The user

21   would press a button to start the process of saving a zone

22   scene, link the zones together.  They would choose players that

23   they wanted to be included in the zone scene.  In this case you

24   can see on the second illustration at the right ZonePlayer 1

25   and ZonePlayer 2 are going to be part of the scene.  So they

 1   will be grouped together when the scene is invoked and the user
 2   presses done.
 3       It's not shown how the user gives the name, but there
 4   would be a mechanism on the screen where a user could type out
 5   a name.  In this case they called this zone scene "morning."
 6       And you can see, like, they created a morning scene, but
 7   they haven't invoked it yet because ZonePlayer 1, ZonePlayer 2
 8   and ZonePlayer 3 are still separate.  So they created a group,
 9   saved it for later.  That's the idea.
10   Q.   So if group was saved for later, how would the individual
11   players be configured at this point?
12   A.   Um, the individual players would be configured -- in this
13   case they are standalone, so they are -- the players are saved
14   in the zone scene, but the players state that the configuration
15   is standalone.  You can see ZonePlayer 1, ZonePlayer 2 and
16   ZonePlayer 3 are standalone.
17   Q.   And what does standalone mean?
18   A.   Oh, yeah.  So standalone really means not in a group.  So
19   a player can be in a group or it can be standalone, which means
20   not in a group.
21   Q.   Does whether the player is actually playing music change
22   whether it is in standalone mode or not standalone mode?
23   A.   No.  It doesn't really matter because standalone mode
24   means a player can be playing or it can be not playing music
25   but it's not joined to anything else, it's just sort of waiting

1  for the command to go play music, but it doesn't have to be

2  playing, no.

3  Q.   Let's turn to PDX5.6.  And can you describe to us what you

4  are showing in this diagram?

5  A.   Yeah.  So this diagram shows the creation of a second zone

6  scene.  In the first example we created a zone scene called

7  "morning."  This -- this example is showing a second zone scene

8  being created, so the user presses link zone, and now they are

9  joining zone 2 and 3 together in a zone scene.  On the second

10  screen there shown with the arrow that's saying I want to

11  ZonePlayer 2 and ZonePlayer 3 to be part of a zone scene.  They

12  hit done.  Again, we don't show the mechanism for naming it,

13  but in this case they have named this zone scene "evening."

14  And that zone scene is ready for use whenever the user wants to

15  invoke it.

16  Q.   Let's turn to slide 5.7.  And Mr. Lambourne, can you

17  describe how a user would invoke one of the created scenes?

18  A.   Yes.  So in -- the zone scenes are here presented on the

19  zone menu.  So the user press the zone button on the CR100,

20  brings up the zone menu and they scroll in this case to the

21  morning scene, selected it, hit okay.  And then at that time

22  the zone scene is invoked.  So at that point it brings together

23  ZonePlayer 1 and ZonePlayer 2, which is the morning zone scene.

24  So they are joined together at that time.

25  Q.   And would music necessarily be playing out of zones 1 and

1  2 here?

2  **A.**   Not necessarily.  The joining of the two players in the

3  zone scene could cause the music -- well, the music could be

4  playing, but if there's no music playing on either of those

5  players, then they would just join together ready to play music

6  whenever the user commanded it.

7  **Q.**   And how would a user start playing music in that

8  situation?

9  **A.**   They would -- so in this case the zone scene -- the

10  ZonePlayers are joined together.  The user would press the

11  music button, go find some music in the music menu and then hit

12  play, and then the music would play in those two rooms.

13  **Q.**   Thank you.

14      **MS. CARIDIS:**  Mr. Jay, we can pull those down.

15  **BY MS. CARIDIS:**

16  **Q.**   Mr. Lambourne, when did you first come up with the idea

17  for the zone scene grouping technology that we were just

18  discussing?

19  **A.**   Yeah.  So that was around the 2'5 kind of timeframe --

20  2005, sorry, after we'd launched our original products.

21  **Q.**   And can you please turn to TX8236 in your binder.

22  **A.**   Yes.

23              (Witness examines document.)

24  **BY MS. CARIDIS:**

25  **Q.**   Can you tell me what this document is?

 1    A.    Yes.  This is a notebook or a sketch book that I kept.

 2             MS. CARIDIS:  Your Honor, I would move to admit TX8236

 3    into evidence.

 4             MR. PAK:  No objection, Your Honor.

 5             THE COURT:  Thank you.  Received in evidence.

 6        You may show it to the jury.

 7             MS. CARIDIS:  And, Your Honor, I'm getting a note that

 8    we are not entirely sure the jury's monitors are on.  Can we

 9    get a confirmation whether they can see?

10             THE COURT:  Can you see the screens?

11        They all indicate they can.

12        (Trial Exhibit    TX8236 received in evidence.)

13             THE COURT:  I didn't hear.  There's a problem?

14             JUROR BROCKETT:  I said the PDXs were not on the

15    screen.

16             MS. CARIDIS:  I think the demonstratives may not have

17    been showing but the TXs are showing, so we can resolve that

18    during a break.

19             THE COURT:  Okay.  Thanks.

20    BY MS. CARIDIS:

21    Q.    And Mr. Lambourne, can you please turn to page 40 of

22    TX8236?

23    A.    Yes.

24    Q.    And what's shown on this page?

25    A.    Yeah, so this is a brainstorm idea, some notes I made

1  around this concept of waking to music.  So I had the idea

2  that, yes, a user could choose music to play in their home, but

3  wouldn't it be great if they could wake up to their favorite

4  music, a bit like an alarm clock.

5  Q.   And does -- how, if at all, does this alarm clock idea

6  that you had relate to zone scenes?

7  A.   Yes, well, as well as the sort of normal attributes of an

8  alarm clock, there is the ability to set -- set up the time you

9  want to wake up as well as the music that you want to wake up

10  to.  And then this other component is, well, what rooms do you

11  want to wake up into?  Where do you want the music to play when

12  you wake up?  Maybe it's the bedroom, bedroom and bathroom,

13  bedroom and more rooms in the house.

14      So in this context I was thinking about what rooms does

15  the user want to play -- wake up in, which is pretty much a

16  zone scene; right?  It's defining I want to wake up in the

17  bedroom -- I want the music to wake me up in the bedroom and

18  maybe the bathroom, so I will create a grouping there in the

19  alarm, which is a zone scene.

20  Q.   And what part, if any, of this particular diagram kind of

21  references those concepts that you just described?

22  A.   Yes.  So, it may not be very easy to see, but the note

23  says, "Which room?"  So here I'm sort of raising the question

24  of, like, well what room will the user want to define to wake

25  up in.  Create a macro I talk about.  And then have this -- and

1    then I have written "save room sets," like I call them "sets,"

2    but ifs effectively the same as a scene.  It is a group of

3    rooms that are -- the user defines to be grouped together at

4    some time in the future, in this case when the alarm triggers.

5    **Q.**    And you mentioned a macro, and I see it on the screen

6    here.  What is a macro?

7    **A.**    Yeah, so in this context it's really like a series of

8    instructions that a computer or technology or, in our case, a

9    player would sort of -- would sort of automatically go through,

10   so put this room together, put this room together, put this

11   room together would be an example of a macro.

12   **Q.**    And do you know when you created this alarm clock sketch?

13   **A.**    Well, it doesn't have a date on it.

14   **Q.**    You can maybe turn to page 42.

15       To what extent does this page assist you in identifying

16   what -- the date of your alarm clock sketch?

17   **A.**    Right.  So partway down this page, roughly halfway down,

18   there's a date of February 28th, '05.

19   **Q.**    So what does that indicate to you?

20   **A.**    Well, that indicates that, well, this page was created

21   after the page we just looked at.  So that alarm sketch I made

22   was before the February 28th.

23   **Q.**    And do you have any idea when prior to February 28th,

24   2005, your alarm clock sketch was drawn?

25   **A.**    Well, I think if we go back through the sketchbook, there

**LAMBOURNE - DIRECT / CARIDIS**

1  might be a previous date.

2                    (Witness examines document.)

3        **THE WITNESS:** Sorry. Which page did we start on?  I

4  have lost my way here.

5  **BY MS. CARIDIS:**

6  **Q.** We started on page 40 of --

7  **A.** Yes. Okay. Thank you. Yeah.

8                    (Pause in proceedings.)

9  **BY MS. CARIDIS:**

10 **Q.** I might be able to help you out. Why don't you flip to

11 page 23.

12 **A.** Oh, yeah. It's here. Thank you.

13        So, yeah, on this page, on page 23, which is some pages

14 earlier, there's a date Friday the 20th of January. So I made

15 the notes that I was making here on the 20th of January.

16 **Q.** And so what does that date tell you about the date that

17 you made your original alarm clock sketch?

18 **A.** Right. Well, I can't say precisely, but it would be --

19 would have been sometime between the 20th of January and that

20 second date, which I think was the 28th -- well, the 28th of

21 February was the next day, so I would say between the 20th of

22 January and the 27th of February.

23 **Q.** Let's turn to --

24        **THE COURT:** Before -- before you leave the -- there is

25 a confusing thing about this. At the top there's the original

1  number for the pages in the notebook, but then you lawyers have

2  stamped it with a different set of numbers at the bottom, page

3  numbers.  So when you were referring to numbers a moment ago,

4  which one -- which set were you referring to?

5          THE WITNESS:  Oh, thank you.  Yeah.  I was referring

6  to the page at the bottom, the page number at the bottom of the

7  page.

8          THE COURT:  And so the one that has the January date

9  is on what page?

10         THE WITNESS:  At the bottom of the page it is page 23.

11         THE COURT:  23.

12     I'm just sorry.  At the bottom of page 23, I don't see any

13  date.

14         THE WITNESS:  So the page numbers at the bottom of the

15  page, but date is all the way at the top of the page.

16         THE COURT:  Oh, I see.  It says Friday, 20 January.

17  Is that what you are referring to?

18         THE WITNESS:  Yes, that's right.

19         THE COURT:  I got it.  Okay.  Thank you for the

20  clarification.  And just for the record, it's page 15 of the

21  original book; right?

22         THE WITNESS:  Correct, yes.

23         THE COURT:  Okay.  Thank you.

24     Go ahead, Counsel.

25  \\\

 1   BY MS. CARIDIS:

 2   Q.   Mr. Lambourne, can you please turn to TX6539 in your

 3   notebook?

 4   A.   Yes.

 5                  (Witness examines document.)

 6           THE COURT:   I'm sorry.   There's another -- there's

 7   another notebook?

 8           MS. CARIDIS:   Sorry.   I meant his witness binder.

 9           THE COURT:   Okay.   All right.   Got it.   Okay.   6539.

10   BY MS. CARIDIS:

11   Q.   And Mr. Lambourne, can you describe this document?

12   A.   Yes.   So this would have been another one of my notebooks.

13           MS. CARIDIS:   Your Honor, I would move to admit TX6539

14   into evidence.

15           MR. PAK:   No objection, Your Honor.

16           THE COURT:   Received in evidence.

17   You can show it to the jury.

18   (Trial Exhibit   TX6539 received in evidence.)

19   BY MS. CARIDIS:

20   Q.   Mr. Lambourne, if you can please turn to page 2.   And I'm

21   referring to the page numbers at the bottom of the screen.   And

22   tell me what is shown on this page.

23   A.   Yes.   So this is a sketch I made where I'm -- I'm writing

24   down some ideas I have around zone groups thinking about zone

25   grouping.

1      In this case I'm referring to permanent links and

2   semi-permanent links as two different concepts.

3   **Q.**   And can you explain what permanent and semi-permanent

4   refer to here?

5   **A.**   Yeah.  So semi-permanent is what we really have been

6   talking about when they walk about zone scenes, this ability to

7   save a grouping of rooms to be invoked later, and the user can

8   configure those.

9      The permanent links or permanent groups that I'm referring

10   to is really I am addressing there's a situation where a user

11   would want to permanently join one or more audio players or

12   ZonePlayers together permanently.

13      An example of that might be if you have, for instance, two

14   players in your living room.  And there's never really a

15   circumstance where you wouldn't want them to play different

16   music.  You would always want them to play the same music.  And

17   I thought, well, that -- that's a good example of where --

18   well, those two rooms -- sorry.  Those two players in the

19   living room should be permanently joined together because the

20   user would never want to sort of separate them to play

21   individual music on them.

22   **Q.**   And is this page 2 that we are looking at of TX6539 dated?

23   **A.**   It's not dated, no.

24   **Q.**   Is there anything in this document that would indicate to

25   you a potential approximate date of this diagram?

1  **A.**    Yes.  On the following page there's a date at the top of

2  the page, so this is page 3 of the -- as described at the

3  bottom of the document, and that's describing March 2nd, 2005.

4  So that would indicate that the sketch I was talking about with

5  permanent links was made some time before March or thereabouts

6  March 2nd.

7  **Q.**    And sticking on this page 3 here that we have on the

8  screen, can you describe what's shown on this page?

9         **MS. CARIDIS:**  And Mr. Jay, if we can maybe zoom out a

10  little bit.  Thank you.

11         **THE WITNESS:**  Yes.  So this -- this page is showing,

12  again, me thinking about zone scenes, zone groups.  In this

13  case I'm thinking about something a little more complicated, a

14  little more advanced and -- I'm hearing an echo.  I'm getting

15  too close to the microphone there.

16         **THE COURT:**  It's probably okay.

17         **THE WITNESS:**  Yeah, it's okay.

18         **THE COURT:**  It's okay.

19         **THE WITNESS:**  A little more advanced.

20     So we talked so far about the user creating a morning

21  scene, an evening scene to be invoked -- to be invoked at a

22  later date separately.  So in the morning you would invoke the

23  morning scene and in the evening, the evening scene.  And each

24  one of those scenes would comprise of a number of audio

25  players, living room, bedroom, dining room, so on.

1    Here I'm thinking about a more advanced scene where I'm

2    thinking, well, wouldn't it be good if a user could easily

3    invoke a scene of more than one group.  So, for instance, it

4    might have bedroom, living room, and dining room grouped

5    together.  And then, at the same time, when the user invokes

6    it, the patio and garden are grouped together.  So it's sort of

7    like an advanced version of a zone scene.

8    **BY MS. CARIDIS:**

9    **Q.**   And do you see on the left-hand side the comment "Rooms

10   can only appear in one group at a time"?

11   **A.**   Yes.

12   **Q.**   What did you mean by that?

13   **A.**   Yes.  So this is a bit different from the overlapping --

14   the ability to overlap a room in a sort of zone scene.

15       Here I'm saying, well, group 1 and group 2 are grouped

16   together at the same time in the morning scene.  And I'm

17   saying, well, if they are happening at the same time a room

18   like the patio can't be in two places at once.  It can only be

19   either in group 1 or group 2.  So that's what I really mean

20   here is that for this zone scene that's triggering two groups

21   to be created, a single room can't appear in both of those two

22   groups.

23   **Q.**   And, again, why can't a single room appear in both of

24   those two groups in this situation?

25   **A.**   Well, it's sort of physically impossible for the patio to

**LAMBOURNE - DIRECT / CARIDIS**

```
 1  be -- well, for the patio to be playing music with the garden
 2  at the same time it's playing music together with the living
 3  room.
 4  Q.   Let's turn to TX120 in your binder.
 5                    (Pause in proceedings.)
 6        THE WITNESS:  Okay.
 7  BY MS. CARIDIS:
 8  Q.   And do you recognize this document?
 9  A.   Yes.  This is an e-mail message, a number of e-mail
10  messages that I was having together with a colleague Andrew
11  Schulert.
12  Q.   And who is Mr. Schulert?
13  A.   Mr. Schulert was at the time the leader of the software
14  organization at Sonos, and he was my manager.
15        MS. CARIDIS:  Your Honor, I would move to admit TX120
16  into evidence.
17        MR. PAK:  No objection, Your Honor.
18        THE COURT:  Thank you.  Received.  You may show it to
19  the jury.
20      (Trial Exhibit   TX120 received in evidence.)
21  BY MS. CARIDIS:
22  Q.   And Mr. Lambourne, sticking on page 1 of TX120, do you see
23  the e-mail at the bottom of the page?
24  A.   At the bottom of page 1?
25  Q.   Yes.
```

**LAMBOURNE - DIRECT / CARIDIS**

1    **A.**    Yes.

2    **Q.**    And this was an e-mail that you wrote?

3    **A.**    Yes.

4    **Q.**    And can you generally explain the subject matter of this

5    e-mail?

6    **A.**    We are discussing effectively zone scenes.  Well, in fact,

7    we are talking about two different types of groupings, the

8    permanent grouping that I talked about where two players in the

9    living room might be always grouped -- permanently linked

10   together.  And then where the number 2 is, if you can read

11   that, allow a user to save a zone profile.  That was one of the

12   names I used for what eventually became zone scenes.

13   **Q.**    And do any of the zone scene examples in this e-mail

14   overlap?

15   **A.**    Yeah.  So under item 2 where you can see I have written

16   examples of possible group profiles or zone scene, I have

17   talked about a downstairs scene, an upstairs scene, and an

18   upstairs and downstairs scene.

19        So, for instance, if the kitchen appears in the downstairs

20   scene as it might, it would also appear in the upstairs and

21   downstairs scene because when you are playing upstairs and

22   downstairs, you are playing in the rooms upstairs and the room

23   downstairs, and the kitchen is downstairs.

24   **Q.**    And why did you send this particular e-mail that we are

25   looking at here?

LAMBOURNE - DIRECT / CARIDIS

1   **A.**   It looks like Mr. Schulert and I were having a

2   conversation about zone scenes, and I was putting forward some

3   ideas I had been thinking about.

4   **Q.**   So was the e-mail at the bottom of page 1 of TX120 a

5   response to an e-mail that Mr. Schulert sent you originally?

6   **A.**   Yes.

7   **Q.**   And can we turn to page 2 and focus on the bottom e-mail

8   there?

9   **A.**   Yes.

10  **Q.**   What are we looking at here?

11  **A.**   So this e-mail, the first sentence Mr. Schulert is

12  describing one of the problems our system is we don't have

13  permanent -- permanently linked zones.   We talked permanently

14  linked zones together, so I think he is talking about the

15  permanent groups that we described earlier.

16  **Q.**   Do you see in the second paragraph Mr. Schulert writes,

17  "I'd like to solve this without introducing the complexity of

18  zone groups"?

19  **A.**   Yes, I see that.

20  **Q.**   Do you agree that the zone scene technology you were

21  designing was -- had complexity?

22  **A.**   Yes, I do.   Yes.

23  **Q.**   Can you -- what made it complex?

24  **A.**   Well, there was -- Sonos is a system.   And I often

25  describe to my colleagues at work that -- I call it there's no

1   "just" at Sonos.  You can't just make something quickly.

2   Everything is fairly complicated because it's a system -- we

3   have a system of products that all work together on a network.

4       So I was thinking about the complexities of how zone

5   scenes would interact with dynamic grouping or ad hoc grouping,

6   which is the type of grouping that we had in our original

7   product, like, well, if I introduce scenes to the product,

8   well, how do the two interact?  How will the user know what is

9   what?  That's an example.

10      The complexities of this idea that if you join two rooms

11  together in a scene, well, what happens if those two rooms were

12  originally playing music?  Well, what music should the zone

13  scene play, if at all?

14      So, the -- there are a lot of, sort of, detailed questions

15  around zone scenes that -- that I try to answer in my design

16  work.

17      So I think this is -- this is why Mr. Schulert is saying

18  without the complexity of zone scenes because, you know, as an

19  MIT graduate he is a very smart fellow, and he was saying, you

20  know, this is complex, and I was -- I was agreeing with him.

21          THE COURT:  Ms. Caridis, how much longer do you have

22  on direct?

23          MS. CARIDIS:  I have a ways, Your Honor, so if you

24  want to take a break --

25          THE COURT:  All right.  It's time for a break for the

**PROCEEDINGS**

1    jury.  A 15-minute break.  Please remember admonition.  No

2    talking about the case, no internet research about the case.

3    See you back here in 15 minutes.

4            **THE CLERK:**  All rise for the jury.

5        (Proceedings were heard outside the presence of the jury:)

6            **THE COURT:**  All right.  Be seated everyone.

7        Witness can step down, if you wish, take your break.

8        Counsel, let me ask a question just so I understand.  Why

9    is he going into his engineering notebooks and -- I thought the

10   priority date was the patent specification -- back in -- it

11   dates back to 2005, doesn't it?

12           **MS. CARIDIS:**  Your Honor, I believe that Sonos'

13   position that there is a conception date in December of 2005

14   and the provisional priority date is in -- is in 2006 -- is in

15   2006, but just showing his general design and conception

16   process, how he originally came up with the idea, how he came

17   up with the idea over time.

18       We believe that Google is planning on arguing that

19   Mr. Lambourne may have read this idea on a website, and so we

20   are establishing that he had been thinking about these

21   problems, that he had been working through these problems for

22   an extended period of time leading up to his ultimate

23   conception as -- as that --

24           **THE COURT:**  Well -- all right.  What is the priority

25   date?  I thought you both agreed that the Sonos original system

1    predated the priority date.

2         MS. CARIDIS:  Your Honor, so the Sonos original system

3    does predate the priority date that's not in dispute here.

4         THE COURT:  Then what difference does it make -- what

5    about your -- what -- the date of conception?

6         MS. CARIDIS:  Your Honor, I don't believe -- and

7    Mr. Pak can correct me -- that Google is arguing that the Sonos

8    2005 system anticipates the zone scene patents here.

9         Google is arguing, among other things, that the 2005

10   system, in combination with forum posts, renders obvious the

11   zone scene patents.

12        And there has been some insinuation throughout this case

13   that Mr. Lambourne or Sonos in general used the idea as it was

14   described in the forum posts in order to come up with this

15   idea, and so we --

16        THE COURT:  That's fine.

17        All right.  Is that -- I want -- tell me your view.

18        MR. PAK:  Yes, Your Honor.  I do think there is

19   potential for jury confusion here because the agreed-upon

20   conception date is December 21st, 2005.  So I'm happy to bring

21   that out on the witness cross-examination.  Or if we could just

22   have either Your Honor instruct the jury or maybe we can bring

23   that out on direct examination.  But I think this is

24   potentially confusing because we are seeing documents before

25   that date, and the jury may be confused that he conceived of

1    the actual invention claimed in the patent prior to

2    December 21st, 2005.  So I would like some correction on the

3    record on that.  And I don't know what the best way to do that

4    is.  I'm happy to do it on my cross but -- because we have all

5    agreed throughout this case that the date is December 21st,

6    2005.  And the forum postings that we intend to offer into

7    evidence will be all before that date.

8         THE COURT:  When was the forum post?  Is that the one

9    with boyG?

10         MR. PAK:  Yes, Your Honor.  So we -- there's a range

11   of them.  There is one in February of 2005 and there's one in,

12   I believe, September of 2005.  So we would like to get locked

13   down in front of the jury's mind that the conception date,

14   which is the only thing that matters for these claims, is

15   December 21st, 2005.  And I am -- I am concerned that they are

16   hearing all about random notes in his notepad, which no one in

17   this case is saying is the conception date.  And that -- that

18   is an issue that I'm very concerned about at this point.

19         THE COURT:  Can you two meet and confer and come up

20   with a two-sentence statement that says basically the priority

21   date is December 2005 but that the reason you are going into

22   these notebooks is "fill in the blank," and then you add a

23   sentence that is going to be your rebuttal to "fill in the

24   blank."  And so -- and then that's short and sweet.  I think it

25   will help.  And this will be in addition to your four minutes

 1   that you each will get.

 2          MR. PAK:  Thank you, Your Honor.

 3          MS. CARIDIS:  Yes, Your Honor.

 4          THE COURT:  And you can work on that, please.

 5       All right.  Thank you.  See you in a few minutes.

 6          THE CLERK:  Court is in recess.

 7                 (Recess taken at 9:16 a.m.)

 8              (Proceedings resumed at 9:30 a.m.)

 9          THE CLERK:  Please remain seated.  Come to order.

10          THE COURT:  All right.  Please be seated, everyone.

11          MR. PAK:  Your Honor, we did agree upon -- sorry.

12   Sean Pak of Quinn Emanuel.

13       We did agree to put on a short statement that I could read

14   into the record.

15          THE COURT:  Let me see it and maybe I will read it.

16          MR. PAK:  Yes.

17          MS. CARIDIS:  And, Your Honor, we are also working on

18   printing out copies of the patents as quickly as possible

19   but --

20          THE COURT:  I want you to highlight the -- in some way

21   the claims that are in issue so that the jury doesn't waste

22   time on things that are not an issue.

23                 (Pause in proceedings.)

24          THE COURT:  All right.  I'm going to amplify on this,

25   and you lawyers will just have to take your lumps if you don't

1    like what I say because I don't -- I don't think -- I think the

2    jury is having a hard time following this.  And then you can

3    make your objections later, but I will basically use what you

4    have given me here.

5        All right.  I'm going to interrupt to let the jury --

6    bring in the jury, please.

7                        (Pause in proceedings.)

8        **THE COURT:**  I'm also going to give them a -- not right

9    this moment but probably by the end of today a list of the

10   ultimate questions they will have to answer subject to revision

11   so they will have a sense of what we are even asking them to do

12   in this case.

13       All right.  Let's go.

14       **THE CLERK:**  All rise for the jury.

15   (Proceedings were heard in the presence of the jury:)

16       **THE COURT:**  Okay.  Be seated.  Let me try to give you

17   a little guidance over there in the jury box.

18       Sometimes I can -- I've done a lot of these cases, almost

19   50 years' worth if you count my time as a lawyer, and I have a

20   sixth sense, so to speak, of when things are clear and not

21   clear.  And these lawyers are excellent lawyers, they are doing

22   a great job, but, nevertheless, it's a hard subject matter, so

23   I want to try to help you with some of the finer points.

24       One of the issues in this case that you will have to

25   decide concerns the validity or invalidity of the patents.

 1      Now, the Patent Office has already issued them, and they

 2   are presumed to be valid.  The burden is on Google to try to

 3   prove otherwise.  You saw that in the video that we showed you.

 4   But, Google has the right to try to do that and to present to

 5   you maybe evidence that the PTO did not see.

 6      But that wouldn't -- it still would be up to you.  Whether

 7   the PTO saw the evidence or not, it would be up to you to

 8   decide whether or not the patents are valid.

 9      Now, you remember you heard the word "new" and you heard

10   the word "obvious."  You are not supposed to get a patent on

11   something that has already been done before.  It has to be new

12   to get a patent.  And secondly, even if it's new, it can't be

13   something that's obvious to those that are skilled in the art.

14      So, in this case Google is making an argument -- I'm not

15   saying that I agree or disagree with it; that's going to be up

16   to you -- Google is making an argument that the 2005 Sonos

17   system, which you've heard so much about, is prior art,

18   meaning, it preceded the patents in question and, thus, is fair

19   game for you to consider whether or not the -- how much of an

20   improvement over the prior art the patents are.

21      Google will combine -- I know this because we -- I've

22   heard the arguments -- will combine the 2005 Sonos system with

23   some additional information that you haven't heard yet to try

24   to argue to you that it would have been obvious to someone of

25   skill in the art to make the claimed invention at the time of

1   the priority date.

2       Now, what is a priority date?  The priority date in this

3   case, they all agree, is December 21, 2005.  I think that's the

4   date that the patent -- the original family of patents was

5   applied for; is that right?  No?  What is that date?

6           **MS. CARIDIS:**  That's a conception date, Your Honor.

7           **THE COURT:**  Okay.  But they both agree that that's it;

8   right.

9           **MR. PAK:**  Yes, Your Honor.

10          **THE COURT:**  That's one thing they agree on.

11  December 21.  That date is the darkest day of the year.

12  December 21.

13                          (Laughter.)

14          **THE COURT:**  It's the coldest and the darkest day of

15  the year.  That's a Robert Frost poem.

16      All right.  December 21, 2005.  So they agree on that.

17      So one of the questions for you at the end is going to be

18  whether or not the 2005 Sonos system, in combination with some

19  additional information that I don't need to get into right now,

20  rendered the claims in suit obvious to one of skill in the art.

21  I'm not saying yes, I'm not saying no.  That would be a

22  question for you.

23      All right.  Now, the -- we are seeing some notebook

24  entries that predate December 21, 2005; right?  So you might be

25  saying why are we going into that if the conception date is

1    December 21, 2005?

2        Well, because Sonos wants to show that this witness that

3    we have actually have him here on the stand, this witness

4    actually thought of the idea earlier.  That's what they want to

5    show.  Now, I'm not saying that it does show that, but that is

6    the purpose of you hearing all of this testimony about the

7    notebooks is to show that the inventor on patents even went to

8    the trouble to write down some of these points in his

9    engineering notebook.

10        The other side is going to have some things to say about

11    that subject, but we haven't heard it yet because their turn

12    has not yet come, so I'm not going to even try to get into

13    that.

14        So that is a short version of -- to try to give you a

15    setting of what -- why you are even hearing this information.

16    And it's -- both sides are going to be trying to make their

17    points on this subject and it's -- they are doing a good job.

18    And I'm just trying to help you get a context so you can see

19    how it fits into what you got to do in this case, which is to

20    decide whether or not the patents are valid or invalid.

21        All right.  Now, that having been said -- that having been

22    said, I'm going to let --

23        Ms. Caridis, you can just continue right on, and I'm sorry

24    for the interruption.

25        By the way, I'm going to have the lawyers prepare for you

1  a set of the patents in suit, so you will have your own

2  personal copy.  It will be done by the end of the day.

3      Okay.  Go ahead.

4          MS. CARIDIS:  Thank you, Your Honor.

5  BY MS. CARIDIS:

6  Q.  Mr. Lambourne, can we turn back to TX120, which was that

7  e-mail that we left off at a few minutes ago?

8  A.  Yes.

9  Q.  And I'd like to turn your direction to page 2 and to your

10  actual first response to Mr. Schulert's e-mail.  So this is

11  your April 8, 6:54 p.m. e-mail.  Do you see that?

12  A.  Yes.  In the middle of the page?

13  Q.  Yes.

14  A.  Okay.  Yes.

15  Q.  And can you please read allowed the last paragraph

16  starting with "I also think"?

17  A.  Yes.  "I also think that we will eventually do some kind

18  of zone groups.  I did some thinking around this at the

19  beginning of the year when things were a bit quieter.  I was

20  making some progress."

21  Q.  So what were you referring to when you said "zone groups"

22  here?

23  A.  Well, I think it's also discussed in the e-mails we've

24  looked at.  Zone scenes.  This notion of saving a group of

25  zones.

**LAMBOURNE - DIRECT / CARIDIS**

1  Q.   And so to what extent, if any, had you been thinking about

2  zone scenes before Mr. Schulert e-mailed you on April 8th?

3  A.   Yes.  Well, I mean, this was my job at Sonos to think

4  about the user experience, how people would choose to play

5  music in different rooms in the house, so I had been thinking

6  about this almost, you know, continually since we made our

7  first products.

8  Q.   Let's turn back to TX6539, which is already in evidence.

9  And I would like to turn your direction to -- or turn your

10  attention to page 24.  And can you explain to me what's

11  described on this page?

12  A.   Yes.  Well, the title -- well, the note at the top of the

13  page is "alarm clock zone profiles groups."  So here, again,

14  I'm thinking about the alarm clock functionality that we talked

15  about earlier and the -- the need for a zone profiles or zone

16  scenes -- I use a number of names for it -- to be part of an

17  alarm clock.

18  Q.   And what's the date on this page?

19  A.   October 21st, 2005.

20  Q.   And does it -- to what extent does this page discuss

21  overlapping zone scenes?

22  A.   Yes, so sort of just below the middle of the page below

23  the circle there's a note I have.  The circle says "group

24  profiles" and the note below it says, "Pick a room

25  group/profile, same room it be in two groups."  So that's this

1    notion that a room, for instance, that the kitchen can be in

2    this sort of downstairs scene as well as the upstairs and

3    downstairs scene, for example.

4    **Q.**    Thank you.  Let's turn to page 57 of TX6539.

5    **A.**    Okay.

6    **Q.**    And can you explain what's described on this page?

7    **A.**    Yes.  So here I'm thinking about -- I'm calling it

8    configuration at this point, but I'm talking about zone scenes

9    in this page as well.

10             **MS. CARIDIS:**  And if we can zoom in, Mr. Jay, to the

11   bottom half of the screen to that figure with the annotation.

12   **BY MS. CARIDIS:**

13   **Q.**    And Mr. Lambourne, can you describe what is being shown

14   here?

15   **A.**    Yes.  So the illustrations are -- the quick notes I'm

16   making there are for the ZonePlayers we have talked about,

17   those boxy products.  So I'm talking about this notion that the

18   alarms and the zone scenes that would be attached to them are

19   stored on the all ZonePlayers.

20   **Q.**    And let's flip back a few pages to page 52.

21   **A.**    Okay.

22   **Q.**    And what does this page tell you, if anything, about the

23   date you drew those figures that we were just looking at on

24   page 57?

25   **A.**    Yeah.  As you can see here, there's a note at the bottom

1    of page 52, 4th of November, 2005.  So that would tell me, I

2    think, that the page we were just looking at is shortly after

3    that.

4    Q.    Thank you.

5          Mr. Lambourne, please turn to TX6545 in your binder.

6    A.    Okay.

7    Q.    Do you recognize this document?

8    A.    I do, yes.  This is a user interface or UI specification

9    that I wrote about zone scenes.

10          MS. CARIDIS:  Your Honor, I would move to admit TX6545

11   into evidence.

12          MR. PAK:  No objection, Your Honor.

13          THE COURT:  Received.

14    (Trial Exhibit   TX6545 received in evidence.)

15          MS. CARIDIS:  May we publish?

16          THE COURT:  Sure.

17   BY MS. CARIDIS:

18   Q.    Mr. Lambourne, does this specification describe any

19   differences between your new zone scene technology and the

20   dynamic grouping technology that was being utilized in Sonos'

21   original system?

22   A.    It does, yes.  In the introduction it talks about it.

23   Q.    So is that the introduction on page 2?

24   A.    Yes.

25   Q.    And can you explain how this introduction discusses

1  differences between your new zone scene technology and the

2  dynamic grouping that was part of Sonos' original system?

3  **A.**   Well, the second paragraph I describe currently in the

4  Sonos UI -- that's user interface -- "Zone groups are created

5  by manually linking zones one at a time until the desired zone

6  grouping is reached."

7       And then later on I say, "The zone scene feature would

8  allow the user to create a group with one command."

9  **Q.**   In the first paragraph you also mention Party Mode.  Do

10  you see that?

11  **A.**   Yes.

12  **Q.**   And can you explain what you are describing with respect

13  to Party Mode?

14  **A.**   Yes.  So, as you might recall, Party Mode was a feature

15  that was built into the controller, so it was hard coded into

16  the controller.  And what I'm saying here is that the zone

17  scene feature has some similarities to the Party Mode feature

18  that was in the existing product.  However, the zone scene

19  feature is much more flexible and powerful.  So I'm

20  describing -- there's more to zone scenes than what was in the

21  original Party Mode feature.

22  **Q.**   And can you turn to page 5 of TX6545?

23  **A.**   Yes.

24  **Q.**   Did you ever envision a zone scene called a Party Mode?

25  **A.**   Yes.  I thought there could be a Party Mode in the Sonos

1   system when we had zone scenes.

2   **Q.**   And is that what we are seeing on the diagram in the image

3   on page 5 here?

4   **A.**   Yes.

5   **Q.**   Is this zone scene called Party Mode in TX6545 the same as

6   the All Zones-Party Mode in Sonos' 2005 system?

7   **A.**   No, it isn't.  It had the same name for familiarity, but

8   it would work in a different way.  So, as you might recall,

9   Party Mode in the original system was designed so it would

10  group all the -- all the rooms together.  That was hard coded

11  into the controller.  The user couldn't configure it.  Whereas,

12  the Party Mode in this case I thought the user could configure

13  Party Mode.

14      For instance, Party Mode for somebody might not be:  I

15  want to play all the rooms in the house.  Maybe Party Mode for

16  somebody is:  I want to play in all the rooms but not the

17  baby's room, for instance.

18      So I thought it would be much more powerful to have a user

19  configurable zone scene called Party Mode that's different from

20  the original Party Mode.

21  **Q.**   And in the image on -- on page 5 of TX6545, next to the

22  Party Mode button, there's a note that says "Zone scene select

23  to invoke."  Do you see that?

24  **A.**   Yes.

25  **Q.**   How, if at all, was the ability to select to invoke a

1  Party Mode different in your zone scene technology than as

2  compared to the original Sonos 2005 system?

3  **A.**   Yeah.   So, the Party Mode in this case is saved for later,

4  so it's user configurable, and it's -- the user can save it for

5  use later.   So in this notion, the users configured Party Mode

6  and they can press that button called "select to invoke," which

7  would cause Party Mode to trigger.

8  **Q.**   In the original 2005 system, when was the Party Mode

9  invoked?

10  **A.**   At the time that the Party Mode button wasn't pressed.   So

11  Party Mode wasn't saved in the -- the players that would play

12  in Party Mode wasn't saved in the system in the original

13  design.

14  **Q.**   And can you just generally describe the remainder of the

15  specification?

16  **A.**   Yes.   It's 20 or so pages long, but I'm discussing various

17  aspects of the zone scene, the feature, how a user would find

18  it to invoke a scene, how they would go about creating a scene,

19  so deciding which rooms would go into the scene, which rooms

20  that the user would want to play music when the scene was

21  invoked.

22       I'm -- it -- it defines this capability of both the CR100,

23  which we looked at that earlier but also a desktop controller,

24  which was an application that would run on a Windows or a

25  Macintosh computer, which would have similar control

1  capabilities as the CR100.  So in this spec I'm describing how

2  zone scenes would work in that context.

3  Q.   And what was the date of this specification?

4  A.   Um, created December 20th, 2005, modified on the

5  December 21st.

6  Q.   Thank you.

7       Mr. Lambourne, can you please turn to TX6544 in your

8  binder?

9  A.   Yes.

10 Q.   And do you recognize this document?

11 A.   I do, yes.  This is a specification that I wrote for the

12 alarm clock feature that I was describing earlier.

13        MS. CARIDIS:  Your Honor, I would move TX6544 into

14 evidence.

15        MR. PAK:  No objection, Your Honor.

16        THE COURT:  Thank you.  It's received in evidence.

17     You may show it.

18     (Trial Exhibit   TX6544 received in evidence.)

19 BY MS. CARIDIS:

20 Q.   Mr. Lambourne, do you see the reference to zone scenes in

21 the table of contents on the front page?

22 A.   Yes, I do.

23 Q.   And can you explain why you were discussing zone scenes in

24 this alarm clock specification document?

25 A.   Yes.  Well, as I described earlier, I considered zone

1   scenes to be a good piece of functionality that would be

2   included in an alarm clock feature so that the user could

3   decide when they want to wake up, what music they want to play

4   as well as where it would be playing.

5   **Q.**   And then under the table of contents on the first page, do

6   you see the note "This spec doesn't yet include concepts of

7   zone scenes"?

8   **A.**   Yes, that's right.

9   **Q.**   What did you mean by that?

10  **A.**   Well, this was a spec I wrote when we were developing at

11  Sonos the alarm clock functionality.  It wasn't going to be

12  possible to include the zone scene feature that I described in

13  this alarm clock feature.  We didn't have enough time allocated

14  to do the development work to build it.

15      So, I was basically saying this is the spec for the alarm

16  clock feature.  Zone scenes is noted, but we didn't include it

17  fully in the spec because we weren't going to build it at that

18  time.

19  **Q.**   And did you ever write a spec dedicated to zone scenes?

20  **A.**   Yes, I did.

21  **Q.**   And was that the document that we were just looking at

22  prior?

23  **A.**   Yes, it was.

24  **Q.**   In your head, in your mind, if you think of the zone scene

25  specification on one hand and the alarm clock specification on

 1   the other, which would you consider a more accurate description

 2   of your zone scene technology?

 3   **A.**   The zone scene specification.

 4   **Q.**   Do you believe that the Party Mode in the original Sonos

 5   2005 product was a full implementation of your zone scenes

 6   technology?

 7   **A.**   In the original 2005 product, no, it was not.

 8   **Q.**   And why not?

 9   **A.**   Well, it didn't have the attributes that -- the major

10   attributes that the zone scene -- the later zone scene that we

11   had been discussing had in that it wasn't user configurable.

12   It couldn't be saved to be invoked later.

13   **Q.**   Can you turn to the last page in Exhibit 6544.  I believe

14   that's page 27.

15   **A.**   Yes.

16   **Q.**   Do you see kind of in the middle of the screen, the middle

17   of the page here there's a sentence that says, "Party Mode that

18   currently ships with the product is one example of a zone

19   scene"?

20   **A.**   Yes.

21   **Q.**   What did you mean by that?

22   **A.**   I was broadly describing zone scene as something sort of

23   familiar to the -- to the audience for this document that

24   could -- because I talked about Party Mode has some familiarity

25   with people.  It has some similarities to the original product,

1  so that's why I wrote that.

2  **Q.**   Sitting here today, do you believe that to be a true

3  statement?

4  **A.**   No.

5  **Q.**   So, if it's not true, why did you write it?

6  **A.**   These were some notes that I added to the end of a spec

7  that was sort of -- the main body of the spec was previous

8  pages.  I used the -- I used the description imprecisely.

9        I think if I was to write -- could write it again I

10  wouldn't have used the word zone -- Party Mode as an example of

11  zone scene there.

12  **Q.**   And can you identify where you may have been more precise

13  about the differences between Party Mode and zone scenes?

14  **A.**   Yeah.  So you can consider these sort of brief notes about

15  zone scenes at the end of an alarm clock spec.  The spec I

16  wrote about zone scenes was where I created more clear

17  descriptions, more accurate descriptions of zone scenes.

18        **MS. CARIDIS:**  And Mr. Jay, if we can turn back to

19  6545, which is already in evidence, and look at page 2.

20  **BY MS. CARIDIS:**

21  **Q.**   Mr. Lambourne, is this the -- is this kind of part of the

22  description that you were just talking about that had a more

23  accurate explanation of zone scenes?

24  **A.**   Yes.  This is the spec for zone scenes, which is -- it has

25  more accurate descriptions.

**LAMBOURNE - DIRECT / CARIDIS**

1  **Q.**   And just because I think it's important, what were the

2  differences, again, between Party Mode and the original 2005

3  system and zone scenes?

4  **A.**   So Party Mode on the original system was hard coded into a

5  controller, which means the engineers coded it into the

6  controller.  The user couldn't configure them, zone scenes.  It

7  was all the players in a system.  It couldn't be saved to be

8  invoked later.

9       So Party Mode in the original system was invoked

10  immediately.  You would press the button and it would link all

11  the zones together; whereas, a zone scene is an intent to group

12  rooms together that's saved, but it's not invoked immediately.

13       **THE COURT:**  Can I ask a question about that that the

14  jury may be wondering?

15       On the 2005 controller when you hit "Party Mode," you say

16  it was not saved, but didn't it automatically bring all of the

17  speakers into sync and -- not speakers -- players into sync

18  throughout the house without any further configuration?

19       **THE WITNESS:**  You are right in the sense that it did

20  bring all the players in the house together, but those -- the

21  distinction I think is that those players were not saved ahead

22  of time.

23       So Party Mode in the original system would be the user

24  presses it.  The system says, okay, well what players are in

25  the system.  Okay.  I'll just group what's there together.  So

 1    it wasn't defined as the living room, the dining room, the

 2    bedroom and the bathroom are in Party Mode.  It wasn't saved

 3    like that, as the later zone scenes was saved.

 4        Is that a clear explanation?

 5            THE COURT:  I think I understand what you are saying,

 6    but in a layman's sense wasn't it saved automatically, the

 7    Party Mode, because you didn't have to -- you never had to

 8    program it.  It was in there from the get-go.  And whatever --

 9    whatever players were in the house where it would be

10    automatically brought -- brought to life; right?

11            THE WITNESS:  They would automatically be grouped

12    together, but the Party Mode button or the functionality behind

13    it didn't save the speakers in that function.  They were not --

14    they were not saved in the sense -- it was invoked at the time

15    when Party Mode was invoked on the original system.

16        It was very much like the grouping I showed in the

17    original system where the user says, okay, I start with the

18    ZonePlayer, I link a zone, I link a zone, I link a zone.  So

19    that's what the Party Mode in the original system did.  It

20    said, okay, well, what players are out there?  Let me link them

21    all together.

22            THE COURT:  Okay.  Thank you.

23    BY MS. CARIDIS:

24    Q.  Mr. Lambourne, after preparing your zone scene

25    specification, do you recall what you did next with respect to

**LAMBOURNE - DIRECT / CARIDIS**

1  developing your zone scene technology?

2  **A.**   Well, I refined it some more and then we eventually filed

3  for a patent.

4  **Q.**   And do you remember approximately when you filed for that

5  patent?

6  **A.**   I think it was -- I may be forgetting the dates, but I

7  think it was 2005.

8  **Q.**   Does 2006 sound a bit more familiar?

9  **A.**   Might have been 2006, yes.   Thank you.

10 **Q.**   Are you familiar with something called "Sonos forums"?

11 **A.**   Yes.   Yeah.

12 **Q.**   And what are Sonos forums?

13 **A.**   Sonos forums are a website where Sonos users can go in and

14 write about their experiences of using a Sonos system for other

15 people to read.

16 **Q.**   To what extent, if any, are Sonos forums similar to a

17 message board that we might be familiar with today?

18 **A.**   Yeah.   It would be similar to a message board, yes.

19 **Q.**   During your design and development of zone scene

20 technology, do you recall looking at comments on the Sonos

21 forums?

22 **A.**   From time to time I looked at comments, yes.

23 **Q.**   And during your design and development of the zone scenes

24 technology, do you recall seeing any comments on Sonos forums

25 related to zone scenes or otherwise being informed about

1   comments on Sonos forums relating to zone scenes?

2   **A.**   I don't recall that, no.

3   **Q.**   Did any of the comments on Sonos forums help you design

4   and develop the zone scene technology?

5   **A.**   No.

6           **MS. CARIDIS:**   Your Honor, may I have permission to

7   approach to hand Mr. Lambourne physical Exhibits TX8237 and

8   TX8238, which are already admitted into evidence?

9           **THE COURT:**   Please, go ahead.

10                   (Pause in proceedings.)

11  **BY MS. CARIDIS:**

12  **Q.**   Mr. Lambourne, do you recognize the two documents that I

13  just handed you?

14  **A.**   Yeah.   The pages are stapled together in this one, but,

15  yes, I do.   Yeah.

16  **Q.**   And what are they?

17  **A.**   These are two patents that were granted that describe the

18  zone scene functionality.

19  **Q.**   Can you please read the patent number ending in '966?

20  **A.**   The patent number?

21  **Q.**   Yes.

22  **A.**   It is 10,469,966.

23  **Q.**   And what is the title of the '966 patent?

24  **A.**   "Zone Scene Management."

25  **Q.**   Are you the inventor listed on the cover of the '966

**LAMBOURNE - DIRECT / CARIDIS**

1  patent?

2  **A.**   I am, yes.

3  **Q.**   And can you please read the patent number ending in '885,

4  the other exhibit?

5  **A.**   Yes.  This is number 10,848,885.

6  **Q.**   And what is title of this patent?

7  **A.**   Also "Zone Scene Management."

8  **Q.**   And are you the only inventor listed on the cover of the

9  '885 patent?

10  **A.**   Yes.

11          **MS. CARIDIS:**  Your Honor, may I approach to hand the

12  witness a copy -- a physical Exhibit TX8239?

13          **THE COURT:**  Sure.

14                     (Pause in proceedings.)

15  **BY MS. CARIDIS:**

16  **Q.**   Mr. Lambourne, do you recognize this as a certificate of

17  correction for your '885 patent?

18  **A.**   Yes.

19          **MS. CARIDIS:**  Your Honor, I would move to admit TX8239

20  into evidence.

21          **MR. PAK:**  No objection, Your Honor.

22          **THE COURT:**  Received in evidence.

23      (Trial Exhibit   TX8239 received in evidence.)

24  **BY MS. CARIDIS:**

25  **Q.**   Mr. Lambourne, was your zone scene invention ever

1  incorporated into Sonos' commercial products?

2  **A.**    It was, yes.

3  **Q.**    Do you recall approximately when that was?

4  **A.**    Sometime in the last three years, so, from about 2020.

5  **Q.**    Do you know why it took so long for Sonos to incorporate

6  the zone scene technology into its commercial products?

7  **A.**    No, I don't.  That wasn't my decision.

8  **Q.**    Would you have preferred that technology to be

9  incorporated sooner?

10  **A.**    Yes.  I thought it was a very good feature, a very useful

11  feature that I thought users would enjoy and benefit from.  So,

12  yes, I thought we could have done it earlier, and users would

13  have been happier.

14  **Q.**    After Sonos incorporated your zone scene inventions into

15  its commercial products, are you aware of any feedback from

16  customers or the press?

17  **A.**    Yes, I am.

18  **Q.**    And what can you tell us about that?

19  **A.**    They were very -- very happy with it.

20  **Q.**    Can you turn to TX6780?

21  **A.**    Yes.

22  **Q.**    Is this an example of praise you recall regarding your

23  zone scene technology after it was released in Sonos'

24  commercial products?

25  **A.**    Yes.  This is some praise from CNN.

 1          MS. CARIDIS:  Your Honor, move to admit TX780 --

 2   TX6780 into evidence.

 3          MR. PAK:  No objection, Your Honor.

 4          THE COURT:  Thank you.  Received.

 5          MS. CARIDIS:  May we display?

 6          THE COURT:  Sure.

 7      (Trial Exhibit    TX6780 received in evidence.)

 8   BY MS. CARIDIS:

 9   Q.   And Mr. Lambourne, if you can turn to page 3 of 6780 and

10   the second paragraph.  Can you read that, that first two

11   sentences of that paragraph?

12   A.   Yes.  It says, "By far the best feature of Sonos S2 is the

13   ability to save a group of speakers as a preset.  No longer

14   will you need to constantly select which speaker you want to

15   listen to each time."

16   Q.   And, Mr. Lambourne, how did it make you feel to see the

17   industry's reaction to your zone scene technology?

18   A.   I felt very good.  I felt validated that the feedback,

19   when we eventually incorporated in the product, was very

20   positive.

21          MS. CARIDIS:  Thank you, Your Honor.  I pass the

22   witness.

23          THE COURT:  Okay.  Thank you.  Cross-examination.

24          MR. PAK:  Thank you, Your Honor.

25      Mr. Kim, would you mind passing up the cross-examination

1    binder?

2                        (Pause in the proceedings.)

3              **MR. PAK:**  Mr. Kim, would you mind pointing out the

4    claim language.

5                        (Pause in proceedings.)

6              **MR. PAK:**  May I proceed, Your Honor?

7              **THE COURT:**  Yes, you may.

8                        <u>**CROSS-EXAMINATION**</u>

9    BY MR. PAK:

10   **Q.**   Good morning, Mr. Lambourne.

11   **A.**   Good morning.

12   **Q.**   I just have to check my clock.

13          So as I understand it, sir, you are the named inventor and

14   the only named inventor on the '885 and '966 patents; is that

15   correct?

16   **A.**   Yes.

17   **Q.**   And the invention of these two patents are directed to

18   what you have been discussing as zone scenes; is that right?

19   **A.**   Yes.

20   **Q.**   And the patents are titled zone scene management; is that

21   correct?

22   **A.**   Yes.

23   **Q.**   Now, you talked earlier about some of the drawbacks that

24   you felt existed in the Sonos 2005 prior art system.  Do you

25   recall that?

1   **A.**    I do, yes.

2   **Q.**    But it did take over 15 years for Sonos to implement any

3   feature or technology that actually practices the '885 and the

4   '966 patents; is that correct?

5   **A.**    Yes.

6   **Q.**    And what you just told the jury is you, as the director of

7   user experience at Sonos, doesn't have an explanation for that

8   delay; is that correct?

9   **A.**    Well, it wasn't my decision.

10  **Q.**    It wasn't your decision?

11  **A.**    Yeah.  As director of user experience, I was responsible

12  for designing the product, not for deciding when features would

13  be released.

14  **Q.**    So others at Sonos made decisions about which features to

15  prioritize over the zone scenes feature for roughly 15 years

16  before the final release; is that correct?

17  **A.**    Yes.

18  **Q.**    Now, I want to also talk to you about the claims of these

19  two patents.  You are the named inventor, so you understand

20  these claims; correct?

21  **A.**    I am the named inventor, but I understand claims are a

22  very legal way of describing an invention, so I have -- I have

23  no legal background.

24  **Q.**    I'm not asking for your legal opinions today.  I do just

25  want to walk you through the claim language.  Is that okay?

1  A.   Yes.

2  Q.   All right.  So why don't we take a look at claim 1 of the

3  '885 patent.

4       MR. PAK:  And if we could have that on the screen,

5  Mr. Fisher, and I believe we have -- actually, Mr. Kim, if we

6  can have the '885, patent claim 1.

7                    (Pause in proceedings.)

8  BY MR. PAK:

9  Q.   And it is also on the screen as well.

10      I want to cover some basic things that are in the claims

11  and things that are not in the claims.  Are you with me?

12  A.   Yes.

13      THE COURT:  Well, wait.  You said "claims," but we are

14  only talking about claim 1 at this point.

15      MR. PAK:  That's right, Your Honor.  Thank you for

16  that clarification.

17      THE COURT:  And the jury needs to understand.

18      This thing that's on the screen is all -- the whole thing,

19  two columns or one and a half columns, it's a long claim, all

20  of that is just one claim.  So there are other claims in the

21  case, but right now on the screen is just one claim, and this

22  is from the '885 or the '966.

23      MR. PAK:  Your Honor, the one we are showing is

24  claim 1 of the '885 patent.

25      THE COURT:  All right.  That's -- go ahead.

1    BY MR. PAK:

2    Q.   So, first of all, Mr. Lambourne, the '885, claim 1, which

3    is the only claim being asserted for this patent, the beginning

4    of that claim is a first ZonePlayer.  Do you see that?

5    A.   Yes.

6    Q.   Now, I think we have established this earlier, but the

7    ZonePlayer around the Sonos 2005 time period actually was not a

8    smart speaker in the sense that the electronics were embedded

9    into a speaker unit; correct?

10   A.   Can you repeat the question?

11   Q.   Sure.  Back in 2005, 2006 time period, what Sonos called a

12   ZonePlayer was not a speaker with electronics such as CPUs and

13   memory and network interfaces inside the speaker; correct?

14   A.   Are you saying the ZonePlayer was not that product?

15   Q.   Was not that product.

16   A.   The ZonePlayer had -- I mean, it was essentially a

17   computer.

18   Q.   Right.  But let me --

19        THE COURT:   I think what he is getting at is you had

20   the ZonePlayer and then wires coming out of that to the

21   speakers in 2005.  Isn't that what your own -- your own diagram

22   showed that.  Isn't that -- so the speakers were separate from

23   the ZonePlayer.  I think that's his point.

24        THE WITNESS:   Is that the point you are making --

25   \\\

1    BY MR. PAK:

2    Q.   Yes, sir.

3    A.   -- the judge described?

4         Yeah.  You would attach drivers or speakers to the

5    ZonePlayer.  Yes.

6    Q.   Well, so, Mr. Lambourne, I'm holding up TX3840, which is a

7    ZonePlayer, the ZP100, that Sonos made in 2005; correct?

8    A.   Yes.

9    Q.   So this thing does not have any speakers inside of it;

10   correct?

11   A.   Right.  The speakers you attach --

12   Q.   Right.

13   A.   -- to it.

14   Q.   And so on the back of this device are ports, and you would

15   take wires and connect it to these ports in order to connect

16   them to speakers; correct?

17   A.   That would -- yes.

18   Q.   And Sonos itself, in 2005, 2006, didn't sell speakers

19   correct?

20   A.   At some point -- I can't remember the exact date -- we did

21   sell external speakers.

22   Q.   I'm talking about 2005, 2006 when it first released the

23   product.

24   A.   Not in 2005 when we released the product.  At some point

25   we added speakers, which were also on the illustration on the

1    user guide.  I don't recall when they were added.

2    Q.   Let me clarify then.  In January of 2005 when Sonos first

3    released its Sonos 2005 system, that system did not include any

4    speakers from Sonos; correct?

5    A.   Sonos didn't sell -- yeah.  Sonos didn't make the speakers

6    you connect to it.

7    Q.   So I could take this -- I could buy this from Sonos and I

8    could take a 1940s speaker that I had in my living room and

9    connect it to this device; correct?

10   A.   Yes.

11   Q.   And that was what you were describing as a ZonePlayer

12   during your testimony today; correct?

13   A.   Yes.

14   Q.   Okay.  So, first of all, we are not -- when we talk about

15   ZonePlayers, we are not talking about smart speakers that have

16   CPUs and memory and network interfaces inside a speaker unit;

17   correct?

18   A.   The ZonePlayer wouldn't have -- it didn't -- in 2005

19   didn't have a speaker driver in it.

20   Q.   That's right.

21       And your testimony is that you came up with the idea or

22   you conceived of the actual claims of the patents on

23   December 20th, 2005; correct?  That's the date.  That's the

24   conception date?

25           THE COURT:  21st.

1          MR. PAK:  21st, Your Honor.  Sorry.  Let me re-ask the

2    question.

3    BY MR. PAK:

4    Q.   December 21, 2005, is the actual conception date of all of

5    the claims at issue in this case; correct?

6    A.   I believe as it relates to the patent, but --

7    Q.   That's all I'm asking about.

8    A.   -- the notebooks show earlier thinking around it.

9    Q.   Right.  We are going to get to the notebooks, but I'm

10   talking about these claims -- the actual conception date for

11   these claims at issue in this case is December 21st, 2005;

12   correct?

13   A.   That's when -- yeah, the create -- the patent creation,

14   yes.

15   Q.   You understand the term "prior art"; correct?

16   A.   Roughly, yes.

17   Q.   Okay.  And you understand as an inventor that anything

18   that is prior art that comes before that conception date of

19   December 21, 2005, can be used to consider the validity of your

20   patent claims.  You understand that?

21   A.   Yes.

22   Q.   And, in fact, you understand, as a named inventor, you had

23   to sign a declaration saying that anything that might be prior

24   art I need to disclose to the Patent Office.  Do you understand

25   that?

1   **A.**   Yes, I understand that part of the process.

2   **Q.**   First element or limitation in this claim 1 of the '885 is

3   a network interface.  Do you see that?

4   **A.**   I see network interface, yes.

5   **Q.**   It does not require a wireless network interface; is that

6   true?

7          **MS. CARIDIS:**  Your Honor, I would object to the extent

8   that Mr. Pak is trying to get a lay witness to construe claim

9   terms while showing those claims to the jury.

10         **THE COURT:**  He is the inventor.  Overruled.

11     Please -- please answer the question.

12         **THE WITNESS:**  Can you repeat the question, please?

13         **MR. PAK:**  Yes, sir.

14  **BY MR. PAK:**

15  **Q.**   The network interface limitation of claim 1 does not

16  require the network interface to be wireless; correct?

17         **THE COURT:**  To meet the objection, why don't you say

18  "Does not expressly require."

19         **MR. PAK:**  Thank you, Your Honor.

20  **BY MR. PAK:**

21  **Q.**   The term "network interface," as stated in claim 1 of the

22  '885 patent, does not explicitly require a wireless network;

23  correct?

24  **A.**   I would have to -- can I read the claim?

25  **Q.**   Absolutely.

1              (Pause in proceedings.)

2         **THE WITNESS:**  Okay.  I've read it, but understanding

3    that I didn't draft these claims, a patent attorney did, and

4    there's a lot of language that I may not fully comprehend in

5    there.  But what was your question again?

6    **BY MR. PAK:**

7    **Q.**   Simple question.  The network interface language in the

8    first ZonePlayer claim of the '885 patent does not expressly

9    require a wireless network; correct?

10   **A.**   I don't see the word "wireless network" in there so --

11   sorry.  Can you ask your question again?

12   **Q.**   Network interface limitation of claim 1 of the '885 patent

13   does not expressly require a wireless network; correct?

14   **A.**   I don't see the word "Wi-Fi network" in there, so right.

15   It doesn't expressly require a Wi-Fi network, I guess.

16   **Q.**   The same limitation, one or more processors.  It could be

17   any type of processor; correct?

18   **A.**   Well, it describes one or more processors, yes.

19   **Q.**   It could be a CPU, it could be an embedded processor, it

20   could be a laptop.  It could be anything; correct?

21   **A.**   As I read it here, I think so.

22   **Q.**   Okay.  Now, take a close look at claim 1 of the '885

23   patent.  It does not expressly talk about a user; correct?

24   **A.**   In this claim you were describing?

25   **Q.**   Yes, sir.

1    **A.**    I don't see word "user" specifically called out, so it

2    doesn't use the word "user."

3    **Q.**    Nowhere in this claim does it say that the user must

4    create the zone scenes; correct?

5                        (Pause in proceedings.)

6            **THE WITNESS:**  No, I didn't -- it doesn't use the word

7    "user."  I mean, it talks about receiving over network device

8    data, which could be user created, but it doesn't expressly use

9    the word "user."

10    **BY MR. PAK:**

11    **Q.**    It could also be system created; correct?

12    **A.**    I'm not sure I can answer that question.  I don't see the

13    word "system" either.

14    **Q.**    Right.  So it could be either a system or a user that

15    creates a zone scene according to claim 1; correct?

16                        (Pause in proceedings.)

17            **THE WITNESS:**  I mean, I -- there's -- I'm not an

18    expert in the claims here.  I -- I -- I would say I guess --

19    I guess so.  I don't know for sure.

20    **BY MR. PAK:**

21    **Q.**    But you do know, having read the claims, that it does not

22    specifically and explicitly state that the user must create the

23    zone scenes; correct?

24    **A.**    Again, I don't see the word "user" or "system" in there,

25    so it doesn't specify.

1    Q.    Does not specify.

2         Mr. Lambourne, the claims also -- the claim 1 of the '885

3    patent does not specify that the user must save the zone

4    scenes; correct?

5                        (Pause in proceedings.)

6         **THE WITNESS:**  I'm taking a long time because these are

7    written in not sentences that I would ordinarily use, so I'm

8    trying to understand the -- the meaning of some of these

9    sentences, as written in the claims.

10        **MR. PAK:**  Take your time.

11                       (Pause in proceedings.)

12        **THE WITNESS:**  I'm looking for the word "save,"

13   actually.

14                       (Pause in proceedings.)

15        **THE WITNESS:**  I don't see the word "save."  So what

16   was your question again, please?

17   **BY MR. PAK:**

18   Q.    Let's establish that as well.  Claim 1 of the '885 patent

19   does not explicitly say anything about saving.  Do you see

20   that?

21   A.    I don't see the word "save" in there, unless I've missed

22   it.

23   Q.    And the claim definitely does not say that the user must

24   save the zone scenes; correct?

25   A.    It doesn't say the user must save, no.

1    Q.    Claim 1 of the '885 also does not state that the user must

2    name the zone scenes; correct?

3             MS. CARIDIS:  Your Honor --

4             THE COURT:  I'm sorry, what?

5             MS. CARIDIS:  -- I would like to object to this

6    question to the extent that he is attempting to relitigate,

7    Your Honor's claim construction --

8             THE COURT:  Well, I don't -- maybe that's true, but

9    I -- this is cross-examination.  I will allow the line of

10   questions.  He is the inventor.  He signed the -- these claims

11   were in the patent application, weren't they, when you --

12            THE WITNESS:  Yes.

13            THE COURT:  So he signed the application.  This is a

14   fair game type thing, so I will -- overruled.

15        Please -- your question is does it use the word "saved"?

16            MR. PAK:  We have already answered that question.  I'm

17   on to --

18   BY MR. PAK:

19   Q.    So clearly claim 1 does not require the user to name the

20   speaker -- the zone scenes; correct?

21   A.    There isn't language in there saying that the user names

22   the zone scene.

23            THE COURT:  Well, there is language about

24   "predefined."

25            MR. PAK:  Correct.

1    **THE COURT:**  All right.  So, what -- you better ask

2    some questions about that.

3    **MR. PAK:**  Yeah.  I will, Your Honor.

4    **BY MR. PAK:**

5    **Q.**   So it uses the word "predefined."  Do you see that in the

6    claims?

7    **A.**   Could you give me an indication of where -- where is it?

8    **Q.**   Sure.  So I think if you look further down into the

9    predefined grouping language, which is in the little i.  Do you

10   see four lines down it says "Predefined grouping of

11   ZonePlayers"?

12   **A.**   Thank you.  Yeah.

13   **THE COURT:**  It appears later on too.

14   **BY MR. PAK:**

15   **Q.**   It also appears in the little ii.  There's predefined

16   grouping.  Do you see that?

17   **A.**   If - yes, I see those words.  So what's your question

18   again?

19   **Q.**   And so following up on His Honor's helpful suggestion,

20   Mr. Lambourne, the claims do not say that it must be the user

21   who predefines the ZonePlayers into zone scenes; correct?

22   **A.**   It does not say the user needs to predefine in this

23   particular paragraph we are looking at or paragraphs.

24   **Q.**   Nowhere in this claim, claim 1 of the '885 patent, does it

25   say that you have to save the zone scenes even after you have

1    rebooted the system; correct?

2          THE COURT:  It's a hard -- I can't follow that.

3          MR. PAK:  Your Honor --

4          THE COURT:  Too convoluted.  Ask it a different way.

5    BY MR. PAK:

6    Q.   You talked earlier about the -- one of the benefits of

7    some of the ideas that you had, which was to keep the zone

8    groups or zone scenes in your mind even when the system has

9    been rebooted.  Do you recall that?

10   A.   I don't think I expressly talked about rebooting.

11   Q.   Okay.  So do you understand what rebooting means?

12   A.   Unplugging and plugging the product back in --

13   Q.   Thank you.

14   A.   -- for example.

15   Q.   So we will just use that simple example.

16       Nowhere in this claim, claim 1 of the '885 patent, does it

17   state that the zone scenes must be saved even after you unplug

18   the ZonePlayer; correct?

19   A.   I mean, it doesn't expressly use those words.  It may say

20   it in a different language that I'm not understanding fully,

21   but no.  It does not say those words, "saved through

22   rebooting," I think you said.

23   Q.   Nowhere in this claim, claim 1 of the '885, does it state

24   that you must save the zone scenes even after you have changed

25   which ZonePlayers belong to that zone scene; correct?

 1    **A.**    I'm sorry.  Can you repeat the question?

 2    **Q.**    Sure.

 3        Nowhere does the claim 1 of the '885 patent require the

 4    zone scene to be saved even after you have changed the

 5    membership of the zone scene by adding or subtracting --

 6        **THE COURT:**  It's ambiguous.  Do you mean saved in

 7    the -- well, first, we know the word "saved" is not in there,

 8    but do you mean saved after -- with the change made or saved in

 9    the original form before the change was made?  It's ambiguous.

10        **MR. PAK:**  Let me ask -- let me ask those two follow-up

11    questions, Mr. Lambourne.

12    **BY MR. PAK:**

13    **Q.**    Nowhere does it say in claim 1 that you take a zone scene,

14    you delete one of the ZonePlayers, that the original zone scene

15    information must be saved; correct?

16    **A.**    I'm afraid I don't understand the concept.

17        You are saying a zone scene might contain three players.

18    One of them has been turned off?

19    **Q.**    Correct.

20    **A.**    And then -- and then the second part of your question is

21    does that second scene -- does that second group have to be

22    saved?

23        **THE COURT:**  No.

24    **BY MR. PAK:**

25    **Q.**    It's slightly different.

 1           **THE COURT:**  One of the problems with your form of

 2  question, Mr. Pak, is that you are asking a negative question,

 3  "nowhere in," and then -- and then ending "correct."  That is

 4  inherently ambiguous.  Please, it's better just to say:  Does

 5  the claim anywhere say how long it has to be predefined or

 6  whatever you want to say, but I think it's a mistake to put

 7  that word "not" in there.  Because of the form of your

 8  question, it's going to be ambiguous.

 9           **MR. PAK:**  Thank you, Your Honor.

10  BY MR. PAK:

11  **Q.**   The claim 1 language of the '885 patent does not

12  require --

13           **THE COURT:**  You're doing it again.  You are saying

14  "not."

15           **MR. PAK:**  Okay.

16           **THE COURT:**  Just ask if it does.  Does it expressly

17  say.  Does it -- that will be much clearer to the jury.

18  BY MR. PAK:

19  **Q.**   Claim 1 of the '885 patent explicitly states --

20           **MR. PAK:**  It's kind of hard --

21           **THE COURT:**  Ask does it expressly state.

22           **MR. PAK:**  Okay.  I will ask it that way.

23  BY MR. PAK:

24  **Q.**   Claim 1 of the '885, does it explicitly state that the

25  original zone scene must be stored or maintained after you

1   delete one of the ZonePlayers from the zone scene?

2   **A.**   Well, we have already established that I don't see the

3   word "save" in this claim.  There might be another way of

4   describing "save," which I'm not clearly getting, but . . .

5   **Q.**   Thank you, Mr. Lambourne.

6        I want to focus now on the other portion.  It says in

7   little ii -- or, actually, it's in both little i and little ii.

8   Do you see when it says, "When the first zone is invoked" in

9   little i; and 2 says, "When the second zone scene is invoked."

10  Do you see that?

11  **A.**   When the first zone scene is invoked.  Yes, I see that.

12  **Q.**   Does this claim say anything about how long you have to

13  wait until you invoke the first zone scene?

14  **A.**   I don't see anything there about -- mentioning how long it

15  waits.

16  **Q.**   It could be one second; correct?

17  **A.**   I suppose it could be.

18  **Q.**   It could be five minutes?

19  **A.**   Yes.

20  **Q.**   It could be five hours?

21  **A.**   Possibly, yeah.

22  **Q.**   And going back to your earlier discussion about Party Mode

23  that existed in the prior art Sonos 2005 system.  Are you with

24  me?

25  **A.**   Are you talking about the Party Mode in the original

1  system?

2  **Q.**   Yes.

3  **A.**   Yes.

4  **Q.**   I could create -- let me restate.  There was a button that

5  would cause the Party Mode to be activated in the original

6  Sonos 2005 system; correct?

7  **A.**   Yes.

8  **Q.**   That was a soft button?

9  **A.**   Yes.

10  **Q.**   So, let's say I have a speaker.  All the speakers in my

11  house are not playing any music.  Are you with me?

12  **A.**   Okay.

13  **Q.**   I hit the soft button called "All Zones-Party Mode."  Are

14  you following me?

15  **A.**   Yes.

16  **Q.**   No music is playing on any of the speakers.  I could hit

17  that Party Mode button.  I could go get a cup of coffee and

18  five minutes later I could come back and invoke the Party Mode

19  to play music; correct?

20  **A.**   Well, the Party Mode didn't cause the music playback.

21  **Q.**   That's right.  So the Party Mode configured all the

22  speakers in the house to act as one synchronized group;

23  correct?

24  **A.**   It linked all the players in the house together, yes.

25  **Q.**   That's right.  The user then would have to come back at

1  some other point in time to push a play button in order for all

2  the speakers in Party Mode to start playing music together;

3  correct?

4  **A.**   Um, not -- not if they were all -- um, let me get this

5  right.

6       If one or more were already playing music, that's not

7  necessarily the case.  Are you talking about a scenario where

8  the music wasn't playing back at the beginning?

9  **Q.**   That's right.

10 **A.**   Yeah.  If there's no music playing in the house and the

11 user pressed the Party Mode button, it would link those players

12 together.  And you are asking would those then players then be

13 playing music?

14 **Q.**   Immediately then there's no music on any of the

15 ZonePlayers in the house; correct?

16 **A.**   They are not playing music in this case, yes.

17 **Q.**   That's right.  So, the user could go away, grab a cup of

18 coffee, come back after they push the Party Mode button when

19 there was no music playing.  Five minutes later they come back,

20 push play on one of the ZonePlayers and the music would then be

21 playing throughout the house; correct?

22 **A.**   If there was music in one of the queues, yes.

23 **Q.**   Okay.  You could take a vacation, come back two weeks

24 later, push play, and at that point all the speakers in the

25 house would play music together as a group; correct?

1  **A.**    Yes, assuming all the players were on for the duration

2  when you are away, yes.

3  **Q.**    And again, this claim has -- says nothing about turning on

4  or off the ZonePlayers; correct?

5  **A.**    It doesn't talk about turning off or on the players.

6  **Q.**    And let's turn to the specification of the '885 patent,

7  claim 10.

8          **MR. PAK:**    And I'm going to line 52, Mr. Fisher.

9          **THE COURT:**    I think the jury needs to understand what

10  a specification is, so I will give a little explanation.

11          **MR. PAK:**    Yes.

12          **THE COURT:**    The claims come at the end of the patent,

13  but before you get there, there's an explanation of the

14  background of the alleged invention and then a description of

15  how the invention would solve the problem or would work and

16  usually there's a thing called an embodiment, a specific

17  example of the invention, but it -- the embodiment doesn't have

18  to list every possible embodiment.    It just has to adequately

19  explain the invention.    So that's called a specification,

20  meaning, it specifies the background and what the invention is

21  and that's in every -- every single patent it has to have one

22  of those all right so with that background, now counsel can ask

23  a question.

24          **MR. PAK:**    Thank you, Your Honor.

25  \\\

1   BY MR. PAK:

2   **Q.**   Mr. Lambourne, you helped prepare the specification, the

3   written description of your invention, for the '885 patent;

4   correct?

5   **A.**   Yeah, just let me take a look at it.

6                        (Witness examines document.)

7           **THE WITNESS:**  Can you give me a clue where the

8   specification part starts?

9           **MR. PAK:**  Sure.  If you look at your copy of the

10  patent, there's the front page and then there's a long list of

11  articles and patents.  Do you see that?

12          **THE WITNESS:**  Yes.

13  BY MR. PAK:

14  **Q.**   And then the specification begins with the figures.  Do

15  you see the figures in the patent?

16  **A.**   Yes.

17  **Q.**   Okay.  And that's on page 30 of your patent, '885.  And if

18  you keep -- that's part of the specification.  Do you

19  understand that?

20  **A.**   Yes.

21  **Q.**   And then if you start going further into the document, you

22  will see on page 41 of the '885 patent, a written description

23  that begins with "zone scene management number 1."  Do you see

24  that?

25  **A.**   Yes.

1  Q.  And the specification continues on for several pages until

2  you get to the end where it starts to talk about the claims.

3  And this is on page 46 of the '885 patent?

4  A.  Sorry, I don't have page numbers in --

5  Q.  No problem.  Claim 11, do you see column 11 at the end?

6  A.  Yes.

7  Q.  And just before it says "I claim."  Do you see that?

8  A.  Yes.

9  Q.  So you understand now that that is the specification for

10 your '885 patent beginning with the figures going all the way

11 to the end of the written description just before "I claim."

12 Do you understand that?

13 A.  Yes, yes.

14 Q.  Mr. Lambourne, as the sole named inventor, you did help

15 prepare the specification the '885 patent; correct?

16 A.  Yes.  I worked with a patent attorney for that.

17 Q.  I understand your lawyers wrote the claims, but you wrote

18 the specification; correct?

19 A.  I think the specification was -- I helped to write.  It

20 was written based on other descriptions I had given, yes.

21 Q.  So you and others helped to write the specification of the

22 '885 patent; correct?

23 A.  Yes.

24        MR. PAK:  Thank you, Your Honor.

25 \\\

BY MR. PAK:

Q.   So looking at column 10, line 53, in your description of your invention in the specification of the '885 patent, you wrote "given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at step 610." Do you see that?

A.   I see that, yes.

Q.   So in your description of your '885 invention, you were telling the world you could invoke, play music in the zone scene at any time after you have created it; correct?

A.   Well, this doesn't say play music.  This is talking about may activate a scene at any time and the -- as we discussed during my direct conversation, the players may or may not be playing at the time that the zone scene is activated.

Q.   Thank you.  So I want to get some language straight.

     You can configure a zone scene at a certain point in time by grouping all the ZonePlayers according to a zone scene.  Do you understand that?

A.   Well, um, you used the word "grouping."  Are you referring to the grouping that was in the original product, the ad hoc grouping where the players would be put together as a group at that moment?

Q.   We are going to come back to that.  I'm just focusing on your zone scenes concept that you claim is in the '885 and '966 patents.

1          At some point in time, a zone scene can be created that

2    contains a grouping of ZonePlayers.  Are you with me?

3    **A.**    Yes.

4    **Q.**    At that point the ZonePlayers are part of a zone scene.

5    So they are in group mode; correct?

6    **A.**    At the time that the zone scene is created the players are

7    in a group mode?  Not necessarily, no.

8    **Q.**    Okay.  So in any event, at the time I created the zone

9    scene, all of the ZonePlayers that belong to the zone scenes

10   have been linked together.  Would you agree?

11   **A.**    No, not necessarily.

12   **Q.**    Let's set that aside for now.  I will come back to that.

13   I have a zone scene.

14          **THE COURT:**  We're talking about the patent '885 or are

15   we talking about the 2005?

16          **MR. PAK:**  Right now I'm talking about the '885 patent.

17   I will come back to the prior art.

18          **THE COURT:**  All right.

19   **BY MR. PAK:**

20   **Q.**    The '885 patent -- at some point in time you have

21   ZonePlayers that have been linked together according to a zone

22   scene.  Are you with me?

23   **A.**    Yes.

24   **Q.**    Okay.  That does not mean that you have to start playing

25   music together on all the ZonePlayers in that zone scene

1    immediately; correct?

2    **A.**    We don't have to.

3    **Q.**    You don't have to; correct?

4    **A.**    Are you talking about when the zone scene is saved or

5    invoked?

6    **Q.**    When the zone scene is -- what was the first word you

7    used?

8    **A.**    Saved or invoked.

9    **Q.**    Let's use your saved language.  When the zone scene is

10   first saved, you do not have to start playing music on all the

11   ZonePlayers together at that point in time; correct?

12   **A.**    Um, I mean, my -- are we talking about a situation where

13   the players are -- wait a minute.  So this is -- at the time

14   where the zone scene is saved, are you saying does it have to

15   play back music?

16   **Q.**    Immediately.

17   **A.**    It does not.

18   **Q.**    Right.  So for example, one of the examples you give is a

19   morning zone scene; correct?

20   **A.**    Yes.

21   **Q.**    And it could be 2:00 p.m. in the afternoon.  I could save

22   a zone scene that I would call "morning."  That does not mean

23   that I have to start playing music according to that zone scene

24   immediately at 2:00 p.m.; correct?

25   **A.**    Correct.

1  Q.   I could go to bed, next morning wake up at 9:00 a.m. and

2  play music by invoking the zone scene named "morning"; correct?

3  A.   Well, the zone scene wouldn't necessarily play music at

4  the time you invoked it.

5  Q.   Okay.  So let's get that clear.  So when you see the word

6  "invoke," you are not talking about playing music; is that

7  correct?

8  A.   Well, it depends on the -- the state of the system.  Like,

9  if a player was already playing -- and, I mean, the way I

10  thought about the implementation -- I think I know what you

11  mean -- the way I thought about in my -- the way it would be

12  implemented would be if any player -- well let me get this

13  right.  Can you ask the question again?  I'm getting confused

14  between saved and invoked.

15  Q.   Let me just get the easy facts out.  We will come back to

16  saved and invoke.

17       I have a zone scene that I create at 2:00 p.m. called

18  "morning."

19  A.   All right.

20  Q.   Are you with me?  I don't have to play the morning music

21  play list immediately on that morning zone scene; correct?

22  A.   At the time you save it?

23  Q.   Yes.

24  A.   Correct.

25  Q.   I could wait until next day when it's morning time to play

1   any music in synchronized fashion according to the morning zone

2   scene; correct?

3   **A.**   Yes.  You could wait to do it -- you could invoke it in

4   the morning.

5   **Q.**   Right.  And then what you are now saying is even after I

6   invoke the zone scene in the morning at 9:00 a.m., the

7   following day, if none of the speakers are playing music, I

8   don't have to play the music immediately; correct?

9   **A.**   If they are not already playing -- invoking the scene

10  wouldn't have to play the music.

11          **THE COURT:**  What would it play if it's not playing

12  music?  Would it play the news what --

13          **THE WITNESS:**  So it could just group the rooms

14  together and then the user would, as a next step, choose music

15  to play.

16          **THE COURT:**  So, if I'm lying in bed and I hit the

17  morning thing, you are saying that's not enough to get the

18  music going.  I got to also hit another button?

19          **THE WITNESS:**  Yes.  I mean, the way I was thinking

20  about the zone scene, you know, in the same way as an alarm

21  could be -- would add the time to when the zone scene is

22  created, that could be music attached to a zone scene as an

23  extra thing, but there is a circumstance in which, yeah, you

24  could invoke the zone scene.  It groups the rooms together as

25  you might want them, but it wouldn't necessarily be playing

 1  music -- it wouldn't automatically play music in that case.

 2         THE COURT:  Now, is this what you are describing in

 3  the '885 the way it's described there, or is this the way you

 4  were thinking about it in your notebooks?

 5         THE WITNESS:  Well, this was the invention described

 6  in the -- in the patents and notebooks.

 7         THE COURT:  All right.

 8         THE WITNESS:  I can maybe give you an example.

 9         THE COURT:  Let's hear your example, and then while --

10  I'm interrupting counsel, and I don't like to do that.  Go

11  ahead.

12         THE WITNESS:  Yeah.  So, you might end the day with

13  all your players in standalone mode so that they are not part

14  of any group.  But you always like to start the day, perhaps,

15  with your kitchen and dining room, which is next to the kitchen

16  grouped together because when you walk into the kitchen, you

17  want to be able to, like, choose a play list to play or a news

18  station and it would play in those rooms.  You wouldn't then

19  have to manually go and, like, build that group every morning.

20  The group of speakers would be saved -- pre-saved and then

21  invoked in the morning for you ready -- ready for you to play

22  music.

23         THE COURT:  All right.  Next question.

24         MR. PAK:  Thank you.

25  \\\

1    BY MR. PAK:

2    Q.    So, the ZonePlayers in your zone scenes could be invoked

3    in the sense they are part of the group in a group mode but

4    still not play any music together because that could come at a

5    later point in time; correct?

6    A.    Yeah.  They could be configured to play music, I think the

7    example you are giving there.

8    Q.    But configured to play music does not require actively

9    playing music as a group; correct?

10   A.    Correct.

11   Q.    Okay.  I want to pull up the -- now, you understand, sir,

12   that the '885 patent that we have been discussing and the '966

13   patent share the same specification.  Do you understand that?

14   A.    Yes.

15   Q.    They have the same figures.  They have the same written

16   text of your invention; correct?

17   A.    Yes.

18         MR. PAK:  So I'm just going to focus now on the claim

19   language of the '966 patent.  If we can bring up, Mr. Fisher,

20   claim 1 of the '966 patent.

21                     (Pause in proceedings.)

22   BY MR. PAK:

23   Q.    So at this time claim 1 talks about a computing device.

24   Do you see that?

25   A.    Yes.

1  **Q.**   And that is serving as a controller in the second

2  limitation while serving as a controller.  Do you see that?

3  **A.**   Again, I -- can I read the claim?

4  **Q.**   Sure.

5  **A.**   The terminology --

6  **Q.**   Take your time.

7  **A.**   -- is not everyday language.

8                    (Pause in proceedings.)

9           **THE WITNESS:**  Yes.  So a computing device comprising

10  of one or more processes while serving as a controller for the

11  rest of the paragraph.

12  **BY MR. PAK:**

13  **Q.**   Just for the jury to understand what we are talking about,

14  I think you have a physical controller in front of you; is that

15  correct?

16  **A.**   Yes.

17  **Q.**   So, the '885 patent that we talked about earlier was

18  talking about a ZonePlayer like this one the ZP100; correct?

19  **A.**   Yes.

20  **Q.**   Now, the '966 patent is talking about a controller like

21  the one you are holding in your hand, the CR100; correct?

22  **A.**   Yes.

23  **Q.**   And so, again, I just ask very quickly the same line of

24  questions.  This patent claim, claim 1 of the '966 patent does

25  not contain the word "user" anywhere; correct?

**LAMBOURNE - CROSS / PAK**

1   **A.**   I do want to add that there's more than one type of

2   controller in the system.  The desktop controller, for

3   instance.

4   **Q.**   Thank you.  And we will come back to that.  I'm just

5   asking about the claims now.

6      Claim 1 --

7        **THE COURT:**  That negative followed by "correct" is

8   going to be ambiguous if he says no or yes, so I urge you to

9   say does it --

10   **BY MR. PAK:**

11   **Q.**   Does claim 1 of the '966 patent say anything about a user?

12              (Pause in proceedings.)

13        **THE WITNESS:**  I don't see -- sorry, I don't see a

14   reference to the word "user" in there.

15   **BY MR. PAK:**

16   **Q.**   Does claim 1 of the '966 patent state that a user must

17   save any zone scene?

18   **A.**   I have already scanned for the word "user," so I don't

19   think there's going to be the word "user" next to zone scene

20   either.

21   **Q.**   Does claim 1 of the '966 patent say anything about a user

22   creating a zone scene?

23   **A.**   I don't see the word "user" in this claim.

24   **Q.**   Does claim 1 of the '966 patent talk about having a user

25   name the zone scenes?

1   A.   It doesn't describe the word "user" is not there, so it

2   doesn't say -- what was the topic of the last question?

3   Q.   Naming.

4   A.   Doesn't describe a user naming a system.

5   Q.   So we know now what the claims say, I want to go back to

6   the Party Mode in the Sonos 2005 prior art system.  Are you

7   with me?

8   A.   In the original system?

9   Q.   Yes.

10   A.   Yes.

11   Q.   The original system Party Mode was saved by the system;

12   correct?

13   A.   Party Mode was hard coded into the controller.

14   Q.   It was always there.  It was always saved; correct?

15   A.   But not in the same way as zone scene was saved.  Be clear

16   about that.

17   Q.   We will get to that.  I'm just asking Party Mode in the

18   Sonos 2005 system was always available to the user because the

19   system saved that mode; correct?

20   A.   Party Mode was hard coded into the controller.

21   Q.   It was saved in the system; correct?

22   A.   The Party Mode feature was, but the rooms within -- the

23   rooms that would be invoked by Party Mode were not saved, if

24   that's -- if that's your question.

25   Q.   Every time I turn on the device there is Party Mode;

**LAMBOURNE - CROSS / PAK**

1  correct?

2  **A.**   Yes.

3  **Q.**   Okay.  Let's go to the example we were talking about

4  before.  I wake up in the morning.  I hit Party Mode.  Are you

5  with me?

6  **A.**   Yes.

7  **Q.**   That invokes the Party Mode; correct?

8  **A.**   Yes.

9  **Q.**   At that time all the speakers in the house are linked

10  together; correct?

11  **A.**   Yes.

12  **Q.**   And the Party Mode containing all the speakers in the

13  house at that point are saved in the system; correct?

14  **A.**   Well, the system knows they are a group because it

15  displays it on the display.

16  **Q.**   So it's saved in the system; correct?

17  **A.**   Yeah, it's stored somewhere.  Those -- all those players

18  are linked together.

19  **Q.**   And the fact that all the players are linked together in a

20  Party Mode is saved somewhere in the system at the time I push

21  Party Mode; correct?

22  **A.**   Yes, the system knows that -- that they are linked

23  together for -- for synchronous playback.

24  **Q.**   So I wake up in the morning, I push play mode.  None of

25  the speakers are playing.  Are you with me?

1   A.   Sorry, you.

2   Q.   I just woke up.  The only thing I did was:  Woke up and

3   pushed Party Mode, but there's no music coming out of any of

4   the speakers.  Are you with me?

5   A.   Yes, okay.

6   Q.   At the time I push play, the zone scene or let's call it a

7   zone group for Party Mode, all the speakers in the house are

8   saved in the system somewhere; correct?

9   A.   I don't mean to be rude about -- are we talking about the

10  original 2005 system now --

11  Q.   Yes.

12  A.   -- or are we talking about the patent -- zone scene

13  patent?

14  Q.   No.  I'm talking about the -- let me make my question very

15  clear.

16      In the prior art Sonos 2005 system I wake up.  I push the

17  Party Mode button, but there's no music playing on any of the

18  speakers.  Are you with me?

19  A.   Right.

20  Q.   At that point when I hit the play button for party --

21  sorry.  At that time when I wake up and I push the Party Mode

22  button in the Sonos 2005 system, all the speakers in the house

23  would be linked together, and somewhere in the system that

24  information is saved; correct?

25  A.   Yes.  The system knows that those players are together.

1   Q.   Now, I like to grab some coffee in the morning.  So I'm

2   going to go get some coffee.  Fifteen minutes later I come

3   back.  I'm ready for my music.  Then I can push play on any of

4   the zone's players in the house and then sound will come out at

5   that point on all the speakers in the house according to Party

6   Mode; correct?

7   A.   If there was music queued up to play; otherwise, you would

8   have to choose -- go into the music menu and choose your music.

9   Q.   Right.  I could have music already preloaded in a queue or

10  I could select my favorite music song at a time after all the

11  speakers have been grouped together in the Party Mode of the

12  Sonos 2005 system and that information has been saved somewhere

13  in the system; correct?

14  A.   Yeah, it's -- it's stored somewhere in the system, yes.

15  Q.   And I could wait 15 minutes, five hours, five weeks later.

16  As long as I don't change anything in the system, I can wait as

17  long as I want to actually start playing music according to the

18  Party Mode in the Sonos 2005 system; correct?

19  A.   Yes.

20  Q.   Okay.  Party Mode is a thematic name; correct?

21  A.   Can you describe what you mean by "thematic name"?

22  Q.   It has a theme, a party.  It's a theme.

23  A.   Yes.

24  Q.   And, in fact, in the '966 patent itself you show Party

25  Mode as being an example of a zone scene; correct?

1   A.   Yes.

2            MR. PAK:   And maybe we can get that figure 7 of the

3   '966 patent for the jury's benefit.

4                     (Pause in proceedings.)

5   BY MR. PAK:

6   Q.   This is a figure from your '966 patent; correct?

7   A.   Yes.  It's also one of the screens that we discussed

8   earlier.

9   Q.   If you see the third option down is Party Mode; correct?

10  A.   Yes.

11  Q.   So I'm going to switch gears a little bit and talk about

12  some of the other things that were discussed during your

13  examination.

14           THE COURT:   How much do you have left?

15           MR. PAK:   I probably have another hour or so,

16  Your Honor.

17           THE COURT:   Okay.  I think we better take a break

18  then.

19           MR. PAK:   Thank you.

20           THE COURT:   We will take a 15-minute break.  Please

21  remember the admonition.

22           THE CLERK:   All rise for the jury.

23      (Proceedings were heard outside the presence of the jury:)

24           THE COURT:   Okay.  Be seated.  Any issues for the

25  Judge?

1          **MR. PAK:**  No, Your Honor.

2          **MS. CARIDIS:**  Your Honor, we would like to get a

3    clarification read to the jury.  Mr. Pak just spent the last 20

4    minutes asking the witness whether the word "saved," whether

5    the word "user" was written in the claims.

6          Your Honor's claim construction, which is part of the

7    party's stipulated jury instruction, says that the '885 patent

8    claim 1 indication that the first ZonePlayer has been added to

9    a zone scene is construed to mean indication from the network

10   device that the ZonePlayer has been added by the user to a zone

11   scene.

12         And the phrase "zone scene" in all asserted claims,

13   Your Honor, is construed to mean a previously saved grouping of

14   ZonePlayers according to a common theme.

15         **THE COURT:**  That's something you have agreed to?

16         **MR. PAK:**  That's fine with me, Your Honor.

17         **THE COURT:**  Well, then, I think -- highlight what you

18   want me to read to the jury when they come back.  I will start

19   with that.

20         **MS. CARIDIS:**  Thank you, Your Honor.

21         **THE COURT:**  Okay.  We will take a 15-minute break.

22         **THE CLERK:**  Court is in recess.

23              (Recess taken at 11:09 a.m.)

24            (Proceedings resumed at 11:27 a.m.)

25         **THE CLERK:**  Please remain seated.  Please come to

**PROCEEDINGS**

1    order.

2         THE COURT:  All right.  Hand that up.  Bring back in

3    the jury.  Be seated, everyone.

4         MS. CARIDIS:  Your Honor, I do have those binders of

5    the patents.  I don't know if you wanted to pass them out.

6         THE COURT:  I didn't want binders.  I just want the

7    patents because the binders will be too bulky.  If you can take

8    the patents out and just have them loose and each one stapled.

9    That's what -- that's the way I want to hand them out.

10        THE CLERK:  All rise for the jury.

11        (Proceedings were heard in the presence of the jury:)

12        THE COURT:  Be seated, please.  Welcome back.  I want

13   to give you possibly a helpful statement.  I had previously

14   interpreted the meaning of some of the language in the patent

15   claims.  You must accept these instructions as correct.

16        For the '885 patent, I have determined that the phrase,

17   "Indication that the first ZonePlayer has been added to a zone

18   scene" means "Indication from the network device that the

19   ZonePlayer has been added by the user to a zone scene."

20        I will say that again so you will get it.  It means

21   "Indication from the network device that the ZonePlayer has

22   been added by the user to a zone scene."

23        For both patents I have determined that "zone scene" means

24   a previously saved grouping of ZonePlayers according to a

25   common theme.

 1        I have further determined that a user's ability to name

 2   speaker groups means that the user can group speakers according

 3   to a common theme.

 4        I don't know if that helps or hurts, but that's what I

 5   have -- before you all got into the case, we have spent many

 6   days and hours and -- on the case and I have made -- done some

 7   previous work, and I stand by my previous work and the lawyers,

 8   both sides, wanted me to give you the benefit of what I had

 9   previously determined.  So there we are.  Mr. Pak, you may

10   continue.

11            **MR. PAK:**  Thank you.

12   **BY MR. PAK:**

13   **Q.**   Just picking up on what His Honor read, I want to confirm

14   a few things with you, Mr. Lambourne.

15        His Honor has just told the jury that a zone scene is a

16   previously saved grouping of ZonePlayers according to a common

17   theme.  Did you hear that?

18   **A.**   I did, yes.

19   **Q.**   His Honor's instruction to the jury of what a zone scene

20   means does not require the user to save the zone scene;

21   correct?

22   **A.**   I don't think I heard the word "user" in His Honor's

23   words, no.

24   **Q.**   Okay.  "Indication" and the other language that was just

25   told to the -- explained by His Honor was indication that the

PROCEEDINGS

1    first ZonePlayer has been added to a zone scene means

2    indication from the network device that the ZonePlayer has been

3    added by the user to a zone scene.  Do you recall that?

4    **A.**    In the statement just read?

5            **THE COURT:**  That is what I said, yes.

6            **THE WITNESS:**  Okay.

7            **THE COURT:**  What's your question?

8    **BY MR. PAK:**

9    **Q.**    Question is this:  In the Party Mode that existed in the

10   Sonos 2005 system, it is the user that hits the Party Mode

11   button in order to add all of the speakers in the house to

12   Party Mode; correct?

13   **A.**    Yes.

14   **Q.**    Thank you.  I want to go to another topic.  Let's go to

15   '966 patent, column 10, line 64.

16           **MR. PAK:**  If we can have that on the screen.

17                     (Pause in proceedings.)

18   **BY MR. PAK:**

19   **Q.**    One of the things I heard in your direct examination was

20   when you were thinking about zone scenes, you wanted the zone

21   scenes to be all saved at a ZonePlayer.  Do you recall that

22   testimony?

23   **A.**    Yes.  And the implementation I was thinking about was that

24   the zone scene would be saved on the four players that were in

25   the illustration.

1   **Q.**   Let's see what your patent actually says.  If I look at

2   column 10, line 64, in middle of what's shown on the screen,

3   which goes to, I believe, column 11, 3, do you see that

4   paragraph, column 10, line 64 to column 11, line 3?

5   **A.**   Do you want me to read it?

6   **Q.**   No.  I just want to confirm that you see it on the screen.

7   **A.**   The one that starts with "It is assumed"?  Yes, I see

8   that.

9   **Q.**   Okay.  So what you wrote in your written description of

10  the patent is "A member; e.g., a controller."  Do you see that?

11  **A.**   In the second part, yeah.

12  **Q.**   "e.g." means for example, correct?  So what you were

13  telling the world is a member includes controllers; correct?

14  **A.**   Okay.  I have reread the paragraph.  Can you ask your

15  question again.

16  **Q.**   Yeah, of course.  No worries.  You can always take the

17  time you need to read anything you want, Mr. Lambourne.

18      What I'm asking you is in your patent specification for

19  the '885 and '966 patents what you told the world is a member

20  of a zone scene could include a controller; correct?

21  **A.**   That's what's written here.  I mean, that's not how we

22  implement -- implement it in the sense of the zone scene was

23  made of the players and the controller was the device that the

24  user used to create the scene.

25  **Q.**   Right.  But what we are here to talk about your two zone

1   scene patents.  You understand that?

2   **A.**    Yes.

3   **Q.**    We are not comparing your implementation to anything else

4   in this case.  Do you understand that?

5   **A.**    Right.

6   **Q.**    We are looking at what you said in the patents and what

7   your lawyers said in the claims of these two patents.  Do you

8   understand that?

9   **A.**    Yes.

10  **Q.**    Okay.  And what you wrote in your patents is, a member

11  could include a controller; correct?

12  **A.**    Yes.

13  **Q.**    And can you pick up that CR100 again and let the jury see

14  that that's the controller we are talking about here; correct?

15  **A.**    I haven't read the rest of the text, but I would think so,

16  based on that single paragraph.

17  **Q.**    Okay.

18         THE COURT:  Well, to be fair here, you just got

19  through telling him that we are not talking about the 2005

20  system --

21         MR. PAK:  Fair enough, Your Honor.

22         THE COURT:  -- and comparing it.  Now you are

23  comparing it --

24         MR. PAK:  Fair enough.

25         THE COURT:  -- so we ought to be -- keep that point

1    straight.

2    **BY MR. PAK:**

3    **Q.**    Let's talk about the specification figure.

4         **THE COURT:**    Yes, please stick with the specification

5    for now.

6    **BY MR. PAK:**

7    **Q.**    So let's take a look at figure 1 of the '966 patent, which

8    the jury will have at the end of the day.  This figure 1 is a

9    description of your system that you were trying to describe for

10   these two patents; correct?

11   **A.**    Yes.

12   **Q.**    Okay.  So we see a ZonePlayer 102.  Do you see that?

13   **A.**    Yes.

14   **Q.**    That ZonePlayer has wires coming out of it to connect to

15   speakers; correct?

16   **A.**    Correct.

17   **Q.**    So the ZonePlayer, itself, did not have speakers inside of

18   them as we talked about; correct?

19   **A.**    Yes, in the original ZonePlayer.

20   **Q.**    And what you see marked as 140 and 142 with the little

21   screen and some buttons, those are the controllers in your

22   patents; correct?

23   **A.**    Yes, those are these -- the controller.

24   **Q.**    And the controllers would have processors inside of them;

25   correct?

1   **A.**   Yes.

2   **Q.**   They would have memory inside of them; correct?

3   **A.**   Some kind of memory.

4   **Q.**   Yes.  And then the ZonePlayer also had processors inside

5   of them; correct?

6   **A.**   Yes.

7   **Q.**   It would also have some type of memory inside of them;

8   correct?

9   **A.**   Yes.

10  **Q.**   So going back to what we just saw, when it says "A member

11  e.g., for example, a controller, in your patent," going back to

12  figure 1 -- let's go back to figure 1, Mr. Fisher -- what you

13  are saying is 140 and 142 are also members of a zone scene;

14  correct?

15  **A.**   Yes, that's what it says, yes.

16  **Q.**   So ZonePlayers can be members, 104 and 102 as well as

17  controllers 140 and 142.  They can also be members of a zone

18  scene, correct, according to your patents?

19  **A.**   I'm frowning because, you know, I think I went from the

20  user point of view, in which case, you know, the ZonePlayers

21  make up the members of the zone scene.  The ZonePlayer's living

22  room, patio, dining room are the members of the zone scene.

23  **Q.**   I'm talking about your patents now, sir.  Are you with me?

24  **A.**   Yes.

25  **Q.**   According to your patents, not what may be inside of your

 1  head.  What the patent says -- what the patents say is that the

 2  controllers 140 and 142 as well as the ZonePlayers 104, 102 as

 3  well as 106, they can all be members of a zone scene; correct?

 4  **A.**    Members, yes.

 5  **Q.**    Okay.  And let's turn to column 2, line 56 of the '966

 6  patent.

 7                        (Pause in proceedings.)

 8  **BY MR. PAK:**

 9  **Q.**    If you can blow that up, thank you.  And what you wrote in

10  these two patents to the world is "Although various scenes may

11  be saved in any of the members in a group."  Do you see that?

12  **A.**    Yes.

13  **Q.**    The scenes we are talking about are the zone scenes;

14  correct?

15  **A.**    Yes.

16  **Q.**    So the zone scenes, according to your patents, could be

17  saved in any member of a zone scene, including controllers,

18  correct, according to your patents?

19  **A.**    Yes.

20  **Q.**    Thank you.

21        Now, let's quickly go to claim 1 of the '966 patent.

22  Claim 1.  Does claim 1 of the '966 patent say anything about

23  saving or storing zone scenes at a ZonePlayer?

24                        (Pause in proceedings.)

25              **THE COURT:**  Are you ready to answer?

1          **THE WITNESS:**  I just reread -- are you talking about

2      saving on a ZonePlayer, is it required to be saved on a

3      ZonePlayer?

4      **BY MR. PAK:**

5      **Q.**  Correct.

6      **A.**  Is the text in here talking about that?

7      **Q.**  Correct.

8                          (Pause in proceedings.)

9          **THE WITNESS:**  It says causing storage -- causing

10     storage of which I -- I think means save.

11     **BY MR. PAK:**

12     **Q.**  But it does not -- let me ask it in the positive way.

13     Does it say anywhere in this claim 1 that you have to store any

14     of the zone scenes at a ZonePlayer.

15                         (Pause in proceedings.)

16          **THE WITNESS:**  It does not.

17          **THE COURT:**  I didn't hear your answer.

18          **THE WITNESS:**  Sorry.  It does not.

19          **MR. PAK:**  Thank you.

20          **THE COURT:**  Next question.

21     **BY MR. PAK:**

22     **Q.**  Claim 1 of the '885 patent -- can we have that on the

23     screen, Mr. Fisher? -- take the time if you need to look at the

24     claim.  Same question.  Does claim 1 require the zone scenes to

25     be stored at a ZonePlayer.

PROCEEDINGS

1                    (Pause in proceedings.)

2            **THE WITNESS:**  I don't see the words "requires it to be

3    saved on a ZonePlayer" there.

4    **BY MR. PAK:**

5    **Q.**   Thank you.  Let's go to one of the documents -- now we can

6    take this down -- Mr. Lambourne.  I want to understand your

7    testimony first.

8            Are you telling us here today that the Sonos 2000 prior

9    art system had no zone scenes in it whatsoever?  Is that your

10   testimony?

11   **A.**   Yes.

12   **Q.**   Now, you met -- I'm not going to get into the substance,

13   but you met with lawyers to prepare for your testimony here

14   today; correct?

15   **A.**   Correct.

16   **Q.**   And the events that took place that we are talking about

17   in terms of your conception is 2005; correct?  December 21st,

18   2005; is that correct?

19   **A.**   The conception of the patent, yes.

20   **Q.**   So roughly 18 years ago; is that right?

21   **A.**   Yes, yes.

22   **Q.**   So let's look at a historical document, a document that

23   existed during that time period, and it was one that was shown

24   to you by counsel for Sonos.

25           Let's take a look again at TX6544.

1          **THE COURT:**  All right.  It's in evidence.  The jury

2      can see it.

3          **MR. PAK:**  Thank you, Your Honor.

4      And, Mr. Fisher, let's have that blown up on the bottom,

5      Trial Exhibit 6544.  At the bottom there's a label.  Thank you.

6      **BY MR. PAK:**

7      **Q.**   You discussed this document with counsel for Sonos;

8      correct?

9      **A.**   Yes.

10     **Q.**   And if you go to the top of this document, this was a

11     Sonos UI specification, Mr. Lambourne, that you wrote

12     personally back in October of 2005 and modified by

13     January 19th, 2006; correct?

14     **A.**   Yes.

15     **Q.**   So, your conception date for these two patents falls

16     between these two dates; correct?

17     **A.**   Yes.

18     **Q.**   December 21st, 2005 would be between October 26th, 2005,

19     and January 19th, 2006; correct?

20     **A.**   Yes.

21     **Q.**   This even has a copyright of Sonos, Inc.  This was a

22     business record; correct?

23     **A.**   Yes.

24     **Q.**   And if you go to -- and that's your name, Rob Lambourne;

25     is that right?

**PROCEEDINGS**

1  **A.**   Yes.

2  **Q.**   And if you go down to the bottom of this page, you talked

3  about that there was a section called "4.1 zone scenes";

4  correct?

5  **A.**   Yes.

6  **Q.**   It is under additional details; is that right?

7  **A.**   Yes.

8  **Q.**   You talked about another document that talked about zone

9  scenes, but this document also talks about zone scenes;

10  correct?

11  **A.**   Briefly, yes.

12  **Q.**   Well, what you say here at the bottom is -- under Notes,

13  "Concept of zone scenes" in quotes.  Do you see that?

14  **A.**   Yes.

15  **Q.**   They are described in the final chapter.  Do you see that?

16  **A.**   Yes.

17  **Q.**   That final chapter is 4.1; correct?

18  **A.**   Yes.  It's the last thing that was in the -- in the

19  document, yes.

20  **Q.**   So what you wrote here is although it's talking about

21  alarms and clocks for the Sonos products in the future, there

22  was a chapter called "Zone Scenes," which described your ideas

23  for zone scenes; correct?

24  **A.**   Yes.  It describes the notes I made for zone scenes.  It

25  didn't describe the full zone scene functionality.

1  Q.   That's okay.  We are talking about zone scenes right now.

2  Are you with me?

3  A.   Yes.

4  Q.   If you go to the last section, 4.1, the title of this is

5  "Zone Scenes"; correct?

6  A.   Yes.

7  Q.   And at the top you wrote, "Zone scenes are a mechanism

8  whereby the user can set up and invoke zone grouping using a

9  single action."  Do you see that?

10 A.   Yes.

11 Q.   In the current design zone, groups are created by linking

12 rooms one by one.  Do you see that?

13 A.   Yes.

14 Q.   When you are talking about the current design, you were

15 talking about the Sonos 2005 prior art system; right, sir?

16 A.   Yes.

17 Q.   If you go further down, you say the zone feature would

18 allow the user to create a group, living room plus kitchen plus

19 den with one command.  Do you see that?

20 A.   Yes.

21 Q.   The next sentence reads:  "Party Mode that currently ships

22 with the product is one example of a zone scene."  That is what

23 you wrote; correct?

24 A.   That's what I wrote, yes.

25 Q.   "Party Mode that currently ships with the product."  The

1  product you were discussing was a Sonos 2005 prior art system;

2  correct?

3  **A.**    I'm sorry.  I missed the last point.

4  **Q.**    Sure.  When you say, "Party Mode that currently ships with

5  the product," you were referring to the Party Mode that existed

6  in the Sonos prior art 2005 system; correct?

7  **A.**    I was referring to Party Mode of the original product,

8  yes.

9  **Q.**    That was in the Sonos 2005 prior art system?

10  **A.**    The original Party Mode, yes.

11  **Q.**    And what you wrote here, that is one example of a zone

12  scene; correct?

13  **A.**    That's what I wrote.

14  **Q.**    But now having had -- after having met with attorneys and

15  approximately 18 years later, your sworn testimony is that the

16  Party Mode in the Sonos 2005 prior art system is not a zone

17  scene.  Did I get that right?

18  **A.**    Yes.

19  **Q.**    Thank you.  Let's set that aside.

20           **MR. PAK:**  Counsel for Sonos showed you another

21  document, TX120.  Let's put that on the screen.

22                    (Pause in proceedings.)

23  **BY MR. PAK:**

24  **Q.**    Just again, not to be confused, this is an earlier

25  document, April 11th, 2005; correct?

1    **A.**    April 11, 2005, yes.

2    **Q.**    But by this point you had not conceived of the actual

3    claimed inventions of the two patents at issue in this case?

4    **A.**    Well, I was clearly beginning to form the ideas around

5    what would eventually become the zone scene invention.

6    **Q.**    I understand, but just to make sure the jury understands,

7    the actual conception date for these two patents is

8    December 21, 2005; correct?

9    **A.**    That's what is on the patent.

10    **Q.**    This is earlier in time than that; correct?

11    **A.**    Yes.

12    **Q.**    If you go to Mr. -- let's go to your e-mail in this chain.

13    This is TX120.  You wrote, "Mr. Rob Lambourne is from" sent

14    April 11th, 2005.  Do you see that?

15    **A.**    Yes.

16    **Q.**    The subject of this e-mail thread is "Another UI

17    idea-grouping ungrouping zones."  Do you see that?

18    **A.**    Yes.

19    **Q.**    And what you wrote here is -- in part 2, "Allow a user to

20    save zone" --

21        **MR. PAK:**  Actually, the first part of that Mr. Fisher.

22    **BY MR. PAK**

23    **Q.**    "Allow a user to save zone profiles, as requested by Tom

24    and others."  Do you see that?

25    **A.**    I do, yes.

1   Q.   So the idea of having a user save zone files -- zone

2   profiles was requested by someone other than you; correct?

3   A.   Well, not necessarily.  I mean, I may be reacting here to

4   other people describing situations where maybe their system

5   wasn't working what you might call optimally.  So, I made the

6   inference that -- that some of those needs are expressed or

7   maybe shortcomings that are expressed to me could be included

8   in something that I was calling zone profiles at that point.

9   Q.   Who is Tom?

10  A.   I would assume that's -- well, I would imagine that would

11  be Tom Cullen.

12  Q.   Who is that?

13  A.   He is one of the founders of Sonos.

14  Q.   He is not a named inventor on these two patents; correct?

15  A.   That's correct.

16  Q.   Who are the others?

17  A.   Sitting here today, I couldn't tell you who the others

18  are.

19  Q.   What you wrote after that is, "This would allow a user

20  with one click to put their zones into predefined groups."  Do

21  you see that?

22  A.   Yes.

23  Q.   We already saw the claims talking about predefined groups

24  for both the '885 and '966 patents; correct?

25  A.   Yes.

PROCEEDINGS

1   **Q.**  And what you wrote right afterwards was "Think Party Mode

2   but instead of linking all the zones, certain zones get

3   grouped."  Do you see that?

4   **A.**  Yes.

5   **Q.**  The Party Mode that you were describing in this document

6   was the same Party Mode that already shipped in the 2005 Sonos

7   prior art product; correct?

8   **A.**  Well, what I'm saying is that the -- there are

9   similarities between Party Mode of the original system, but I'm

10  saying instead of doing that, instead of linking all the zones,

11  certain zones get grouped.  So I'm saying it's not the same.

12  **Q.**  Let me be clear.  When you use the word "Party Mode" in

13  this document, April 12th -- 11th, 2005, you were referring to

14  the Party Mode that already existed in the 2005 Sonos prior art

15  system; correct?

16  **A.**  Yes, because I'm using it to contrast the new version of

17  zone scenes.

18  **Q.**  We already saw the historical document where you said that

19  same Party Mode in the Sonos 2005 prior art system is an

20  example of zone scenes.  We saw that; correct?

21  **A.**  Yes, but I think we also --

22  **Q.**  That's all I'm asking, Mr. Lambourne.  Did you see that

23  document?

24  **A.**  Yes --

25  **Q.**  Okay.

1  **A.**    -- I saw that document.

2  **Q.**   Mr. Lambourne, so, another thing you talked about in your

3  testimony was dynamic grouping.  Do you recall that?

4  **A.**   Yes.

5  **Q.**   Dynamic grouping was another feature that already existed

6  in the Sonos 2005 prior art system; correct?

7  **A.**   Yeah, dynamic grouping, yes, existed in the original

8  system.

9  **Q.**   That was already in addition to the Party Mode; correct?

10  **A.**   I mean, well, I -- I would consider Party Mode part of the

11  original system to be a version of dynamic or ad hoc grouping.

12  So, yes, Party Mode and ad hoc grouping were -- lived in the

13  original product.

14  **Q.**   But Party Mode, unlike the dynamic grouping feature that

15  you talked about, was always there.  I could turn on and off

16  the system and the ability to invoke Party Mode was always

17  there in the system; correct?

18  **A.**   The original system did we have a button called Party

19  Mode.

20  **Q.**   Yes?

21  **A.**   Yes, we did.  And I mean one small clarification is,

22  I believe if you only had one player on your system, Party Mode

23  may not be there.  I would have to verify that, but, yes, Party

24  Mode was included in the original system as a -- as a shortcut

25  to dynamic grouping.

**PROCEEDINGS**

1  Q.   And you had Party Mode.  Was it possible in the Sonos 2000

2  prior art system to create what you have been calling "dynamic

3  groups" that would consist of ZonePlayers less than all the

4  ZonePlayers in the house?

5  A.   Yes.  You could create an ad hoc grouping of any number of

6  players.

7  Q.   So let me give you a simple example.

8       Living room, kitchen, and den, there are three ZonePlayers

9  in the house.  Are you with me?

10 A.   Yes.

11 Q.   Party Mode would cover all three ZonePlayers; correct?

12 A.   If those were the only players in the system, yes.

13 Q.   The user could also create a dynamic group that could

14 consist just of kitchen and den; is that correct?

15 A.   Yes.

16 Q.   So kitchen and den could belong to both the Party Mode as

17 well as the new group that the user created; correct?

18 A.   I'm sorry.  Can you say the question again, please?

19 Q.   Sure.  Party Mode in Sonos -- let me just -- maybe I can

20 get the question read back just so I don't have to restart

21 again from the beginning.

22               (Record read as requested.)

23          **THE WITNESS:**  Yes, but not at the same time.

24 **BY MR. PAK:**

25 Q.   But at different points in time they could belong to two

PROCEEDINGS

1  different groups; correct?

2  A.   Yes.

3  Q.   One could be the Party Mode that includes all the

4  ZonePlayers and another group that the user created, which

5  would only consist of the kitchen and den ZonePlayers; correct?

6  A.   Yes.

7  Q.   I want to briefly touch on the notebooks that counsel

8  talked to you about.

9       So, let's pull up the -- I believe it's TX6539.

10      This was part of the notebook that you presented to the

11  jury on direct examination; correct?

12  A.   6539?  Am I supposed to have it in the folder you gave me

13  or the --

14  Q.   No.  You may want to go back to -- I didn't want to kill

15  more trees so . . .

16  A.   All right.  Thank you.

17  Q.   6539?

18  A.   Okay.  Right.

19  Q.   So these are some photocopied pages from your notebook

20  that you maintained during the 2005 time period; correct?

21  A.   Yes.

22  Q.   Now, I didn't notice that these notebooks -- let me ask it

23  in a more positive way.  These notebook entries were not signed

24  by somebody else at the time you created them; correct?

25  A.   Correct.

1  **Q.**  So you didn't hand it to somebody to corroborate the date

2  of these entries; correct?

3  **A.**  Correct.

4  **Q.**  And if we look on this page -- sorry -- a couple pages

5  after the first, so we are looking at the bottom number page 3

6  of 127 in TX6539.  Are you with me?

7  **A.**  Yes.

8  **Q.**  At the top it says "Set up zone groups macros."  Do you

9  see that?

10 **A.**  Yes.

11 **Q.**  Can you explain to the jury again what do you mean by

12 macros?

13 **A.**  Um, I mean broadly speaking I -- a macro is -- you might

14 consider it to be a sequence of instructions that happen in an

15 automated way, like step one, step two, step three.  And

16 typically macros are invoked.  So in a user situation, a

17 user -- a user would, like, press a button and then those three

18 steps are -- are -- are invoked.  One, two, three in sequence

19 automatically.

20 **Q.**  So in a computer system you can think of macros as a

21 series of programming instructions; correct?

22 **A.**  Broadly speaking, yeah.

23 **Q.**  And one of the solutions that you were thinking of for

24 your eventual zone scenes invention was the use of macros to

25 implement zone scenes; correct?

1  **A.**    Yes.  And I use the words somewhat interchangeably.  You

2  know, my focus was on creating user-facing functionality.  So I

3  sort of describe them loosely as zone groups, macros, zone

4  scenes and other things.

5  **Q.**    They were interchangeable to you from a UI designer's

6  perspective; correct?

7  **A.**    Yes.

8  **Q.**    Okay.  And you are the only named inventor on these two

9  patents; correct?

10  **A.**    Yes.

11  **Q.**    And if we look at claim 1 of the '966 patent, it actually

12  says "program instructions stored on the non-transitory

13  computer readable medium"; correct?

14  **A.**    Can someone highlight that?

15  **Q.**    It's at the top right there on your screen.

16  **A.**    Right.

17  **Q.**    From your perspective as a named inventory, macros would

18  qualify as program instructions that could carry out the rest

19  of your zone scene claims; correct?

20  **A.**    I mean, program instructions here may be more referring to

21  software code that was written.  It could be the case, but,

22  yes, I was thinking from a user perspective sequences of

23  events.

24  **Q.**    Let me get this right.  You didn't include anyone else as

25  an inventor on these two patents; is that correct?

1   **A.**    That's correct.

2   **Q.**    In your written description, you didn't provide any

3   descriptions of other types of source code or program

4   instructions because you don't write those types of

5   instructions; correct?

6   **A.**    That's right.   I don't write source code.

7   **Q.**    You have never written source code for any Sonos product;

8   correct?

9   **A.**    Correct.

10  **Q.**    That's not your job responsibility; right?

11  **A.**    Correct.

12  **Q.**    And so here when we look at your invention being described

13  in the '966 patent, one of the things that could be a set of

14  program instructions to carry out the rest of your invention

15  claim could be a macro; correct?

16  **A.**    I'm not sure I would make that leap.   I mean, macros I'm

17  describing in the sketchbook as a sequence of events.   Group

18  this with this room with this room.

19      When the claims talk about program instructions, they

20  could be referring to the source code, software code.

21  **Q.**    Sir, you didn't describe any software or source code in

22  your written description of your invention for the '966 and the

23  '885 patents; correct?

24  **A.**    Are you talking about notepads here or the patents?

25  **Q.**    The patents.

1   **A.**   Did I write about source code?

2   **Q.**   Correct.

3   **A.**   I don't see it in the claims.  I don't know whether it's

4   in the rest of the patent specification.

5   **Q.**   Well, this is your invention, and you didn't write any

6   source code for any of the Sonos products, including the one

7   that had the zone scenes technology in it; correct?

8   **A.**   Correct.

9   **Q.**   And I looked, I didn't see any, but can you think of,

10   sitting here today, of any description of source code for

11   carrying out these particular instructions?

12   **A.**   In the patent sitting here today I can't remember one.  If

13   you want me to, I can go look through it, but I don't remember

14   one.

15   **Q.**   Okay.  So just big picture, you agree with me that macros

16   can be thought as programming instructions; correct?

17   **A.**   Big picture, yes.

18   **Q.**   Okay.  And big picture, you could, in your mind, as a UI

19   designer or user interface designer, you could use macros to

20   implement zone scenes; correct?

21   **A.**   From a user perspective is the way I was describing macros

22   in the notepad, yes.  That was one word I had for it.

23   **Q.**   And you presented these notebooks as evidence of how you

24   came ultimately to invent, in your mind, the zone scenes

25   inventions of the '966 and '885 patents; correct?

1  **A.**    Yes, we showed that earlier.

2  **Q.**    If we look at the '885 claim 1, we see the same language

3  about program instructions stored on the non-transitory

4  computer readable medium.  Do you see that?

5  **A.**    Yes.

6  **Q.**    You talked briefly about, I believe, Sonos forums in your

7  direct examination.

8  **A.**    Yes.

9  **Q.**    Now, you have seen Sonos forums -- before I get too far

10  into it, can you explain to the jury what is a Sonos forum?

11  **A.**    Yes.  We talked about it earlier.  It's a website where

12  Sonos users or maybe non-Sonos users, I don't know, can write

13  comments about Sonos that are available to be read by other

14  users.

15  **Q.**    And you, as part of your job responsibilities at Sonos

16  from 2004 to 2006 timeframe, you actually saw some of these

17  Sonos postings on the forums; correct?

18  **A.**    Yeah, yes.

19  **Q.**    You visited the forums to see what people were saying

20  about Sonos' products that were released; correct?

21  **A.**    From time to time, yes.

22  **Q.**    So if we went and looked at posts about systems after your

23  January 1st, 2005, release of the Sonos 2005 prior art systems,

24  the user postings would be describing that system; correct?

25  **A.**    Yes.

1   Q.    Okay.  They weren't talking about other people's systems

2   on your forum; correct?

3   A.    You mean non-Sonos systems.

4   Q.    Right.

5   A.    I mean, they might have been, but I would imagine the

6   majority would be about Sonos.

7   Q.    And the only system that existed from Sonos in December of

8   2005 would have been the Sonos 2005 prior art systems

9   consisting of the ZP100 and the CR100; is that correct?

10  A.    Yes.

11  Q.    Isn't it true, sir, that you would consult or review the

12  Sonos forum postings in order to collect feedback from users on

13  new features at Sonos?

14  A.    If the post talked about new features.  Then, yes, they

15  would be on the forums.

16  Q.    Right.  And it was true that you and others at Sonos would

17  review Sonos forum postings to see what people were saying

18  about your product incorporate that as feedback in designing

19  new product features for the Sonos line of products; correct?

20  A.    It's possible.

21  Q.    Do you remember whether or not, sitting here today,

22  whether you did that?

23  A.    Do I remember what?

24  Q.    Do you remember whether you actually did that in the 2004

25  to 2006 time period?

**PROCEEDINGS**

1  **A.**    I -- I think I have looked at Sonos forums in that time

2  period, yes.

3  **Q.**    Okay.  Common practice in the industry, based on your

4  personal knowledge, to look at what users are saying about a

5  product, what they like, what they don't like, and incorporate

6  that feedback into future planning for products; correct?

7  **A.**    That's one of the uses of Sonos forums, yes.

8  **Q.**    That's right.  And the Sonos forum postings were publicly

9  available; correct?

10  **A.**    I believe so.

11  **Q.**    So users from the public could come who use your Sonos

12  2005 prior art system, post comments about that system and

13  provide feedback to you at Sonos to how to improve those

14  products; correct?

15  **A.**    They could post feedback, yes.

16  **Q.**    In fact, Sonos actually conducted user surveys on these

17  Sonos forum postings of various features; correct?

18  **A.**    I don't recall an example of that, but it's possible.

19  **Q.**    Why don't we look at some evidence.  So this is --

20       **MR. PAK:**  Your Honor, this may be a new piece of

21  evidence, so I would like to have the witness take a look at

22  TX6572.

23       **THE WITNESS:**  Oh.  This is in your folder; right?

24            (Pause in proceedings.)

25       **THE WITNESS:**  Help me out here.  I'm seeing TX6 --

PROCEEDINGS

```
 1   670.

 2            MR. PAK:  Okay.  It may be that we have another binder

 3   for you.  I apologize.  Let's move on and I will see if I can

 4   come back to this.

 5            THE WITNESS:  Okay.

 6   BY MR. PAK:

 7   Q.   Let's take a look at TX3930.

 8            MR. PAK:  Your Honor, may I hand you up a copy?

 9            THE COURT:  Sure.  Thank you.

10                      (Pause in proceedings.)

11            MR. PAK:  Sir, do you see that this is a Trial Exhibit

12   marked 3930, which is a copy of a Sonos forum posting titled

13   "Macro Presets"?  Do you see that?

14            THE WITNESS:  Yes.

15            MR. PAK:  I would like to move that into evidence at

16   this time, Your Honor.

17            THE COURT:  Any objection?

18            MS. CARIDIS:  No objection.

19            THE COURT:  3930 is in evidence.

20        (Trial Exhibit    TX3930 received in evidence.)

21   BY MR. PAK:

22   Q.   So --

23            THE COURT:  Show it to the jury.

24            MR. PAK:  Thank you, Your Honor.

25                      (Pause in proceedings.)
```

1  BY MR. PAK:

2  **Q.**   So people, users who are using the Sonos forum postings

3  can give their own user names; correct?  But these are actual

4  people posting comments about the Sonos products; right?

5  **A.**   Yes.

6  **Q.**   So if I look at this one, it is titled "Macro Presets."

7  Do you see that?

8  **A.**   Yes.

9  **Q.**   And here Jeff T, that's the name of the user, he posted

10  something on September 22nd, 2005.  Do you see that?

11  **A.**   Yes.

12  **Q.**   And just to explain to the jury what's going on, in your

13  website, you could hover the mouse over something like 17 years

14  ago and then it would pop up to show you the exact date of the

15  posting; correct?

16  **A.**   Yes, looks to be the case, yes.

17  **Q.**   And Sonos doesn't go back after time and change the date

18  somehow of these postings; correct?

19  **A.**   Correct.

20  **Q.**   So here is Jeff T.  This is September 22nd, 2005.  So this

21  is roughly three months before your conception date of

22  December 21st, 2005, for the zone scene patents; correct?

23  **A.**   The date on the patents, yes.

24  **Q.**   Okay.  And Jeff T writes, "Just got the intro bundle."

25  Was there an intro -- introductory bundle available for buying

**PROCEEDINGS**

1  the Sonos system in September of 2005 time period?

2  **A.**    Yeah, we did bundle products together and sold them at

3  discounted price for multiple products, yes.

4  **Q.**    And again, that's the Sonos 2005 prior art system;

5  correct?

6  **A.**    Yes.

7  **Q.**    And it says, "I am impressed.  I did a search and I did

8  not find this suggested, but I would save zone links as

9  favorites."  Do you see that?

10  **A.**    Yes.

11  **Q.**    Sometimes you have also used the word "favorites" or

12  shortcuts to talk about your zone scenes; correct?

13  **A.**    I'm not sure.  I used zone scenes, zone profiles, zone

14  configurations, and a number of names, but . . .

15  **Q.**    You used the word "shortcuts" in your direct examination

16  to talk about zone scenes; correct?

17  **A.**    Right.  Right.

18  **Q.**    It says, "With only two ZPs" -- those are ZonePlayers;

19  correct?

20  **A.**    Yes.

21  **Q.**    -- "it is not a problem yet, but when I add more, it may

22  be.  I would like to set up, say, a morning mode for the units

23  I want in the morning and a preset volume between the units."

24  Do you see that?

25  **A.**    Yes.

1  Q.   And this is, again -- in the subject of this is macros and

2  presets.  Do you see that?

3  A.   Yes.

4  Q.   So people were suggesting ideas how to use macros and

5  presets to improve upon the Sonos 2005 prior art system from

6  their perspective; correct?

7  A.   Yes.

8  Q.   And he says, "I could use macros to, for example, set up

9  morning mode for the units I want in the morning and a preset

10  volume between the units."  Do you see that?

11  A.   Yes.

12  Q.   Morning mode, sir, is one of the examples you gave in your

13  patent for zone scenes; correct?

14  A.   Yes.

15  Q.   So if the jury were to look for that, they could find

16  morning mode as one of the examples in your patents.

17       So another example.  I would have to two Party Modes,

18  summer and winter; correct?

19  A.   Yes.

20  Q.   Now, you can't have both summer and winter in terms of

21  calendar time; correct?

22  A.   Right.

23  Q.   So if I was in summer, I could set up my summer Party Mode

24  and then I could set up a winter Party Mode that would be saved

25  for later use; correct?

**PROCEEDINGS**

1    **A.**    Yes.

2    **Q.**    Again, that's consistent with the examples that you gave

3    in your patents of zone scenes; correct?

4    **A.**    There could be more than one setup, yes.

5    **Q.**    It says, "The summer mode would include the deck speakers

6    and the winter mode would not"; correct?

7    **A.**    Yes.

8    **Q.**    So if I had a house and I had deck speakers as well as my

9    inside speakers, the summer mode would include the deck

10   speakers according to Jeff T; correct?

11   **A.**    Yes.

12   **Q.**    But the winter mode would not; correct?

13   **A.**    Correct.

14   **Q.**    It says also, "It would be nice to have play lists or

15   radio station associated with each mode."  Do you see that?

16   **A.**    Yes.

17   **Q.**    What Jeff T, the user, was describing in a publicly

18   available Sonos forum posting dated September 22nd, 2005, is

19   having multiple zone scenes that are saved for later; correct?

20   **A.**    Yes.

21   **Q.**    And those zone scenes could be overlapping in that they

22   would share a speaker or a ZonePlayer; correct?

23   **A.**    Yes, and in the summer and winter mode he is describing,

24   yes.

25   **Q.**    Thank you.  Now, let's take a look at the same document.

1    Let's look at the next post down.  And this is someone named

2    Ken Greenwood.  That's actually towards the top, Mr. Fisher.

3    It seems this is another user of the Sonos 2005 prior art

4    system; correct?  It starts at the very bottom of the first

5    page -- of that page first page and it goes to the top of the

6    second page.

7    **A.**    Yes, I see it.  Yes, yes.

8    **Q.**    And the way these forum postings would work is, an

9    original poster would post something and other people can

10   follow up and reply to that original post, and you have a

11   thread of postings; is that right?

12   **A.**    Yes.

13   **Q.**    And Mr. Greenwood here is another user.  He says, "I would

14   find this functionality useful as well."  Do you see that?

15   **A.**    Yes.

16   **Q.**    So he was talking about the zone scenes functionality that

17   Mr. Jeff T was describing in the prior post that we saw;

18   correct?

19   **A.**    Yes.

20   **Q.**    And Mr. Ken Greenwood says, "I found myself manually

21   linking and unlinking zones and setting volumes in a very

22   repetitive way.  I would think that a macro-type function would

23   be able to save those manual steps into a single selection of a

24   favorite."

25          Do you see that?

1    **A.**    Yes.

2    **Q.**    So Mr. Greenwood, in this prior public posting about the

3    Sonos 2005 system, was describing the same type of problem that

4    you were trying to solve with zone scenes and suggesting

5    macros, which is a similar solution to what you had in mind for

6    that functionality; correct?

7    **A.**    In broad terms, yes.  As an outcome, yes.

8    **Q.**    That's right.  So the problem is, I don't want to manually

9    link or unlink every time I want to use groups in the Sonos

10    2005 system.  So let's have a macro-type function, which would

11    be a computer function.  So I could save those manual steps

12    into a single selection of a favorite.  Do you see that?

13    **A.**    Yes, that's what he wrote.

14    **Q.**    That's consistent with how you were thinking about zone

15    scenes in the documents that you presented to us from the

16    notebooks; correct?

17    **A.**    In broad terms, I think that the notebooks and documents

18    are presented.  There were many more details, the complexity of

19    zone scenes.

20    **Q.**    We will talk about that.

21    **A.**    Okay.

22    **Q.**    But zone scenes was being -- was being described -- zone

23    scenes were being described by users of the Sonos 2005 prior

24    art system before your December 20th, 2005, date, which is a

25    conception date, and they were talking about zone scenes,

1  overlapping zone scenes and using macros, which is one of the

2  solutions you had in mind, to implement zone scenes; correct?

3  **A.**    Yes.   They were talking about macros and scene groups,

4  yes.

5  **Q.**    They were thinking about the same problem coming up with

6  the same solution; correct?

7  **A.**    Well, I don't know if they had the same solution.

8  Certainly the user need is expressed here.

9  **Q.**    They were also suggesting macros, sir.   Macros is one of

10  the solutions that you had in mind for carrying out your zone

11  scenes on a computer; correct?

12  **A.**    Yes.

13  **Q.**    Okay.   Let's talk about some of these complexities.   Let's

14  pull up claim 1 of the '885 patent.

15                    (Pause in proceedings.)

16  **BY MR. PAK:**

17  **Q.**    Just so the jury is not confused, claim 1 of the patent we

18  already established doesn't contain the word "user"; correct?

19            **THE COURT:**   Let's not go through that again.

20  **BY MR. PAK:**

21  **Q.**    Sorry.   Claim 1 says -- does claim 1 say anything about a

22  user?

23  **A.**    The claim doesn't.   I believe the -- that the patent

24  specification that precedes the claim does.

25  **Q.**    Claim 1, does it say anything about a user interface for

1  zone scenes?

2  **A.**    Again, I don't see user interface in there, but the

3  specification in the patent -- the design -- you know, the

4  description of the idea does use the word "user."

5  **Q.**    I understand, but the claims, do they say anything about a

6  particular type of user interface?

7  **A.**    Well, I have talked before.  There is no word "user" in

8  there, so, no, it doesn't describe user interface.

9  **Q.**    So whatever complexities you thought of from a user

10  interface perspective has nothing to do with these program

11  instruction claims in the '885 patent; correct?

12  **A.**    I'm pausing here because I know in the patent

13  specification, like the sort of more, forgive me, more human

14  readable version of this, we did talk about the user.

15  **Q.**    I'm focused on the claims right now, Mr. Lambourne.

16       As the inventor, having heard His Honor's instructions

17  about what certain terms mean and looking at the claims, the

18  claim language here, does the claim say anything about solving

19  the complexity of user interfaces for implementing zone scenes?

20  **A.**    I'm going to have to read it again.

21  **Q.**    Sure.  Take your time.

22                     (Pause in proceedings.)

23          **THE WITNESS:**  I mean, I would consider these claims to

24  be quite complicated in the way they are written, but I don't

25  see the word describing complexities in there.

1    BY MR. PAK:

2    Q.    Let's talk about the -- just briefly and then we will go

3    back to the Sonos forum postings -- claim 1 of the '966 patent.

4    Claim 1 of the '966 patent does not say anything about user

5    interfaces or the complexities associated with them; correct?

6    A.    No.  I think we have established the word "user" doesn't

7    appear in the claims.  It does appear in the patent

8    specification, but I don't see the word "user" in the claim.

9    Q.    Okay.

10        MR. PAK:  You can take this down, Mr. Fisher.

11   BY MR. PAK:

12   Q.    Now, T -- I think --

13        MR. PAK:  I believe, Your Honor, I may have to

14   introduce another Exhibit 3941.

15   BY MR. PAK

16   Q.    So, Mr. Lambourne, if you can turn to the tab titled 3941.

17                    (Pause in proceedings.)

18        THE WITNESS:  3941?

19   BY MR. PAK

20   Q.    3941.

21   A.    Yes, thank you.

22                    (Pause in proceedings.)

23   BY MR. PAK:

24   Q.    This an e-mail that you wrote or you exchanged -- there

25   are some e-mails here that you exchanged with Mr. Coburn, Tad

**PROCEEDINGS**

1   Coburn and others?

2   **A.**   Yes.

3   **Q.**   And if you look at the front page at the very top, you

4   wrote to Tad Coburn and others on October 21st, 2010, do you

5   see that?

6   **A.**   Yes.

7   **Q.**   And who is Mr. Tad Coburn?

8   **A.**   He is a software developer at Sonos.

9   **Q.**   At Sonos; is that correct?

10  **A.**   Yes.

11  **Q.**   Okay.  So then here you say, "Thanks.  Yes, zone scenes,

12  as we think about it, can be seen as two features."

13          **THE COURT:**  This is not in evidence yet, is it?

14          **MR. PAK:**  Sorry.  I apologize, Your Honor.

15          **THE COURT:**  Any objection to 3941?  Any objection?

16          **MS. CARIDIS:**  No, Your Honor.

17          **THE COURT:**  Thank you.  It's in evidence.

18      You may show it to the jury.

19          **MR. PAK:**  Thank you, Your Honor.

20      (Trial Exhibit   TX3941 received in evidence.)

21  **BY MR. PAK:**

22  **Q.**   So looking at the top portion, now that's you, Rob

23  Lambourne; is that correct?

24  **A.**   Yes.

25  **Q.**   This is 3941.  You write, "Thanks, yes.  Zone scenes as we

**PROCEEDINGS**

1  think about it can be seen as two features."  Do you see that?

2  A.    Yes.

3  Q.    One is permanent zone groupings.  Do you see that?

4  A.    Yes.

5  Q.    The other that you listed as one of the features of zone

6  scenes is zone scene macros.  Do you see that?

7  A.    Yes.

8  Q.    So macros are what we saw also being described in the

9  Sonos forum postings; correct?

10  A.    Broadly speaking.

11  Q.    And it says, "Party Mode is one example where all zones

12  are grouped."  Do you see that?

13  A.    Yes.

14  Q.    So Party Mode is another type of zone scene according to

15  this e-mail; correct?

16  A.    Let me read it in more detail, please.

17                    (Pause in proceedings.)

18          THE WITNESS:  And your question again?

19  BY MR. PAK:

20  Q.    Yes.  Party Mode is one example that you could use zone

21  scene macros for; correct?

22  A.    Yes.

23  Q.    Okay.  So we can put that down.

24        And if we go back to the Sonos forum posting, we had the

25  macro presets.

**PROCEEDINGS**

1          **MR. PAK:**  Can we look at the other Sonos forum posting

2    document, Mr. Fisher?

3                 (Pause in proceedings.)

4          **THE COURT:**  This is 3930.  Is that what you mean, the

5    one we were on before?

6          **MR. PAK:**  Yes.

7          **THE COURT:**  3930.

8          **MR. PAK:**  3930.  Thank you, Your Honor.

9                 (Pause in proceedings.)

10   **BY MR. PAK:**

11   **Q.**   Okay.  Great.  And if you go down, there's a -- after

12   Mr. Greenwood, there's somebody named Majik.

13   **A.**   I'm sorry.  The screen is a bit blurry here.  Can you tell

14   me the number so I can see it?

15   **Q.**   Sure.  It's 3930.

16   **A.**   Okay, yeah.

17   **Q.**   We are now looking at the next page, the second page.  And

18   do you see this one is Majik is the user's name?

19   **A.**   Yes.

20   **Q.**   So that's another user reapplying to the macros presets.

21         And his actual name is Keith.  Do you see that at the

22   bottom?

23   **A.**   Yes.

24   **Q.**   And it says, "Yes, this sounds good, something like the

25   ability to create a zone group, which appears on the zone list

**PROCEEDINGS**

1   and perhaps the ability to hide/lock individual zones."  Do you

2   see that?

3   **A.**   Yes.

4   **Q.**   And then in the third paragraph he says, "Perhaps we need

5   a presets page.  Perhaps using the soft keys on the zone screen

6   to allow a preset to be initiated."  Do you see that?

7   **A.**   Yes.

8   **Q.**   And we saw some documents and your testimony referring to

9   zone scenes also as presets; correct?

10  **A.**   Yes.

11  **Q.**   This preset could comprise of a zone or zone group, a

12  volume profile and a source or play list, or it could be a

13  macro sequence.  Do you see that?

14  **A.**   Right, I see that.

15  **Q.**   So Keith, user name Majik, was suggesting various ways

16  that a preset for zone scenes could be implemented; correct?

17  **A.**   Yes, on a broad level, yes.

18  **Q.**   Okay.  Now, I want to look at just one more Sonos forum

19  posting.  This is Trial Exhibit 2425, which is in your binder.

20          **MR. PAK:**  Your Honor, if I may hand this up to you.

21                  (Pause in proceedings.)

22  **BY MR. PAK:**

23  **Q.**   Do you see, sir, this is another forum posting 2425, and

24  this one is titled "Virtual Zones and Zones Grouping."  Do you

25  see that?

PROCEEDINGS

```
 1   A.   Yes.

 2            MR. PAK:  Your Honor, I would like to move this into

 3   evidence.

 4            THE COURT:  Any objection?

 5            MS. CARIDIS:  No objection.

 6            THE COURT:  2425 in evidence.

 7        You can show it to the jury.

 8        (Trial Exhibit   TX2425 received in evidence.)

 9            MR. PAK:  Thank you.

10   BY MR. PAK:

11   Q.   So this one is from a user, his name is theboyG, and

12   I guess he goes by G at the end.  Do you see that?

13   A.   Yes.

14   Q.   This is another user making a public posting on Sonos'

15   forums; correct?

16   A.   Yes.

17   Q.   And he says, "This link/unlink business is really

18   cumbersome and not a joy to use, which goes against the ease of

19   use of the rest of the system."  Do you see that?

20   A.   Yes.

21   Q.   And, again, when he's talking about the system, he's

22   talking about the 2005 prior art Sonos system; correct?

23   A.   Well, it's 17 years ago, so I presume so.

24   Q.   And the user boyG says, "Why can't I have a virtual zone,

25   a zone called downstairs and I can group all my downstairs
```

1  zones into this?  Then I don't have to keep manually

2  linking/unlinking multiple zones every time.  Please."  Do you

3  see that?

4  A.   Yes.

5  Q.   So, again, this virtual zone where you have a downstairs

6  zone that is saved for future use so you don't have to manually

7  link it and unlink it, that was describing your idea for zone

8  scenes; correct?

9  A.   Yes.  But, I mean, without much detail.  But, yes, that --

10 that -- broadly speaking.

11 Q.   I will represent to you, sir, that this one is dated

12 February 27th, 2005.

13         THE COURT:  It doesn't say that.  Where do you see

14 that?

15         MR. PAK:  I have another document, but let me --

16         THE COURT:  Let's -- do both sides agree that's the

17 date?

18         MS. CARIDIS:  Your Honor, I don't see that on the face

19 of this document.

20         MR. PAK:  I will reserve it for later, Your Honor, on

21 this date.

22 BY MR. PAK:

23 Q.   Now, isn't it true --

24         MR. PAK:  I can actually show Your Honor the one with

25 the date, if that would be okay, and I can move this into

**PROCEEDINGS**

```
 1   evidence.
 2            THE COURT:  Just move it into evidence then.
 3   BY MR. PAK:
 4   Q.   Okay.  Let's look at -- you can look at in your binder
 5   TX2424.
 6                       (Pause in proceedings.)
 7   BY MR. PAK:
 8   Q.   Do you see it?
 9   A.   2424, yes.
10   Q.   And do you see that this one does have the date?
11   A.   Yes.
12   Q.   Okay.
13            MR. PAK:  I would like to move this into evidence,
14   Your Honor.
15            THE COURT:  Any objection?
16            MS. CARIDIS:  No objection.
17            THE COURT:  Received in evidence.
18       (Trial Exhibit   TX2424 received in evidence.)
19   BY MR. PAK:
20   Q.   So TX2424, February 27th, which happens to be my birthday,
21   2005.  Do you see that?
22   A.   Yes.
23   Q.   And this is the same e-mail that we were just discussing
24   from theboyG user; correct?
25   A.   Yes.
```

1   **Q.**   What was the earliest date entry that you were able to

2   locate in your notebook; do you recall?

3   **A.**   I think that was the -- the document where I was

4   discussing zone scenes in the context of an alarm, and there we

5   said that the date was between January 20th, I think, and

6   February 27th.

7   **Q.**   Do you find that to be a coincidence?

8   **A.**   Yeah.

9   **Q.**   So on the same day that you start to think about zone

10  scenes, Mr. -- theboyG publicly was also posting about zone

11  scenes on public postings; is that true?

12  **A.**   You said when I started to think about zone scenes the

13  same day, and I started to think about zone scenes before that.

14  **Q.**   Well, let's stick to the evidence.

15       The first entry that you showed us from your notebook, you

16  could date it in a particular date range falling on

17  February 27th, 2005; is that correct?

18  **A.**   The last date was February -- well, the date after --

19  after was February 28th.  So sometime between February 20th and

20  February -- sorry, January 20th and February 27th.

21  **Q.**   Sitting here today, you can't tell whether it was

22  February 27th when you wrote that entry down or something

23  earlier; correct?

24  **A.**   Sitting here today, no, because there was no date on that

25  particular image.

1  **Q.**  It's true, sir, that you did look at Sonos forum postings

2  during your career, you just don't happen to know or remember

3  now all of the times you looked at those postings; correct?

4  **A.**  Correct, yes.

5  **Q.**  It could be just a coincidence that theboyG post happened

6  on February 27th and your notebook entry is right before

7  February 28th.  That's that could be a coincidence; correct?

8  **A.**  Yes.

9  **Q.**  It's also possible that you did look at this post as well?

10  **A.**  No, I don't think so.  I mean, but I don't recall looking

11  at this.

12  **Q.**  You don't recall?

13  **A.**  Yeah.

14  **Q.**  Could be one way or the other.  You just don't recall;

15  correct?

16         **THE COURT:**  Is that correct?  What was your answer to

17  that last question?

18      Can you tell one way or the other whether or not it was a

19  coincidence or you actually saw that post?

20         **THE WITNESS:**  I said -- sorry.  I said I don't recall

21  seeing it.

22         **THE COURT:**  Is your memory after all these years so

23  good that you can tell for sure that you did not see it?

24         **THE WITNESS:**  I'm saying, sir, that I don't recall

25  seeing it.

1            **THE COURT:**  You are not answering my question.

2       Is your memory good enough to tell us for sure that you

3   did not see it?

4            **THE WITNESS:**  No, I don't think so.

5            **THE COURT:**  All right.  Next question.

6   BY MR. PAK:

7   **Q.**    I want to switch topics here.

8       You joined Sonos in 2003; is that right?

9   **A.**    Yes.

10  **Q.**    And the Sonos prior art system product was released in

11  January of 2005; correct?

12  **A.**    Yes.

13  **Q.**    So by the time you joined Sonos in 2003 until January of

14  2005, Sonos had not publicly released and shipped a commercial

15  product; is that fair?

16  **A.**    Yes.

17  **Q.**    As part of your product development process for the first

18  Sonos 2005 system, it's true that you looked at a number of

19  other products out there in the market; correct?

20  **A.**    Yes.

21  **Q.**    There's nothing wrong with looking at other people's

22  products when you are designing your own product.  That's done

23  all the time; right?

24  **A.**    Right.

25  **Q.**    Especially from your perspective as a UI or user interface

1    designer, it's important to see how other people implemented

2    their solutions; correct?

3    **A.**    Yes.  It's good to have some sense of the products that

4    are out there.

5    **Q.**    So let's take a look at TX6609 in your binder.

6                         (Pause in proceedings.)

7               **THE WITNESS:**  Okay.

8               **MR. PAK:**  Your Honor, may I hand you a copy?

9                         (Pause in proceedings.)

10   **BY MR. PAK:**

11   **Q.**    This is a historical document that you created on

12   November 25th, 2003, as an employee of Rincon Networks, which

13   was the predecessor name to Sonos; correct?

14   **A.**    Yes.

15              **MR. PAK:**  Your Honor, I would like to move this

16   document into evidence, 6609.

17              **MS. CARIDIS:**  No objection.

18              **THE COURT:**  Thank you.  In evidence.

19      (Trial Exhibit   TX6609 received in evidence.)

20              **THE COURT:**  You can show it to the jury.

21   **BY MR. PAK:**

22   **Q.**    So this is one of the documents that you wrote in 2003,

23   the year you joined the company; correct?

24   **A.**    Yes.

25   **Q.**    And so you say there are a number of companies that

1    provide networked audio in the home.  Do you see that?

2    A.    Yes.

3    Q.    But most solutions center around an audio rack product

4    housing a small 8-line LCD screen for UI combined with a

5    conventional remote control.  Do you see that?

6    A.    Yes.

7    Q.    Again, we established that the claims at issue in this

8    case describe nothing about user interfaces explicitly;

9    correct?

10   A.    I'm sorry, can you repeat that?

11   Q.    Yeah.  We already established earlier that the claims in

12   this case about the '885 and the '966 patent, they don't say

13   anything explicitly about user interfaces; correct?

14   A.    Yes, not explicitly.

15   Q.    Yeah.  But here you were in November of 2003 trying to

16   think about how to design the Sonos 2005 prior art system, and

17   you were listing a number of products here.  Do you see that?

18   A.    Yes.

19   Q.    One of the products you listed was Squeezebox; correct?

20   A.    Yes.

21   Q.    And that was by a company called Slim Devices; correct?

22   A.    Yes.

23   Q.    Are you aware that that company was later acquired by

24   Logitech?

25   A.    No, I don't think I know that.

1    Q.    Okay.   You listed a website www.slimdevices.com; correct?

2    A.    Yes.

3    Q.    Slim Devices was an actual company that existed at the

4    time; correct?

5    A.    Yes.

6    Q.    They operated a website; correct?

7    A.    Yes.

8    Q.    They also built and sold, basically, ZonePlayers, you

9    would agree, as we have been using the term?

10   A.    I mean, I wouldn't equate their product to a Sonos

11   ZonePlayer, no.

12   Q.    But a computer, a mini-computer that you could connect to

13   existing speakers that had a processor, network card, memory.

14   Those requirements are all satisfied by the Slim Devices'

15   product called Squeezebox in 2003; correct?

16   A.    I mean, I'm not -- I'm not a technical expert, so I can't

17   say that the technology that lived inside the boxes, but they

18   were -- they were some kind of network device.

19   Q.    Right.   So let's take a look at -- and it played music;

20   correct?

21   A.    I don't recall whether you connected speakers through it

22   to play music or not, but the idea was that you would use a

23   Slim Device to create -- to play music.

24   Q.    So in November of 20 -- November 25th, 2003, you knew, and

25   as part of your work you were looking at information about a

**PROCEEDINGS**

1   Squeezebox product that was being sold by Slim Devices;

2   correct?

3   **A.**   Yes, I was.  As title of the document says I was focusing

4   on graphic design when I was looking at it.

5   **Q.**   So I want to show you -- this is TX2831.  This is actually

6   a physical exhibit?

7   **A.**   Oh, sorry.

8   **Q.**   I hold in my hand a physical Slim Devices device called

9   "Squeezebox 2."  It has a remote.  Basically, you can connect

10  different speakers to it and it had a wireless networking card.

11  Do you recall seeing this product around this time period?

12  **A.**   Sitting here today, I don't recall whether I saw the

13  product physically.  I have seen pictures of it and I have been

14  to their website, so I'm aware of it, yes.

15  **Q.**   Okay.  This -- this -- this is the slim box -- let me --

16  this is one of the Squeezeboxes that would have been available

17  at the time, based on your personal experience?

18        **THE COURT:**  Do you know that of your own personal

19  knowledge?

20        **THE WITNESS:**  I know -- I'm aware of the slim -- the

21  Squeezebox.

22        **THE COURT:**  All right.  Is that thing he is holding in

23  his hand, a Squeezebox?

24        **MR. PAK:**  Can I hand it up to him, Your Honor?

25        **THE COURT:**  Yeah, please, but it's got to be

1    authenticated.  It can't be authenticated by the lawyer.

2            THE WITNESS:  Let's see.

3                        (Pause in proceedings.)

4            THE WITNESS:  Yes, this is Slim Devices.  It says

5    "Squeezebox" on the back.

6            MR. PAK:  I would like to move this into evidence,

7    Your Honor.

8            THE COURT:  All right.  This is just the larger box,

9    not the controller, not the remote; is that right?

10            MR. PAK:  It will come with the remote as well.

11            THE COURT:  Well, he has got to vouch for the remote.

12                        (Pause in proceedings.)

13            THE COURT:  Is that the remote that goes with it?

14            THE WITNESS:  Presumably but --

15            MR. PAK:  I actually don't need the remote, so

16    let's --

17            THE COURT:  I'm going to say 2831 is in without the

18    remote.

19            MR. PAK:  Thank you, Your Honor.

20        (Trial Exhibit   TX2831 received in evidence.)

21    BY MR. PAK:

22    Q.   If you turn to the back of that device, can you tell the

23    jury where that was designed and manufactured?

24    A.   On the back of the device?

25    Q.   Yes.

PROCEEDINGS

 1          **MS. CARIDIS:**  Your Honor, I object to this as hearsay.

 2          **THE COURT:**  It's in evidence.

 3      What does the unit say, and if it has a place of

 4  manufacture.

 5          **THE WITNESS:**  Should I answer the question?

 6          **THE COURT:**  Does it -- first of all, does it say on

 7  back where it was made?

 8          **THE WITNESS:**  It says, "Designed and manufactured in

 9  Mountain View, California."

10          **THE COURT:**  Okay.

11          **MR. PAK:**  Thank you.

12          **THE WITNESS:**  USA.

13          **THE COURT:**  All right.  That's in evidence, so it can

14  come in.

15          **MR. PAK:**  I would like to introduce my next -- I would

16  like to have you turn to 3937 in your binder.

17                  (Pause in proceedings.)

18  **BY MR. PAK:**

19  **Q.**  Sir, do you see that this is an e-mail dated

20  December 24th, 2003, the day before Christmas?

21  **A.**  Yes.

22  **Q.**  And you were listed as one of the participants in this

23  e-mail thread; correct?

24  **A.**  Yeah, my name is on the CC list.

25          **MR. PAK:**  Your Honor, I would like to move TX3937 into

**PROCEEDINGS**

 1  evidence.

 2          **MS. CARIDIS:**  No objection.

 3          **THE COURT:**  Received.

 4      (Trial Exhibit   TX3937 received in evidence.)

 5  **BY MR. PAK:**

 6  **Q.**  So, 3937, TX3937, that's your name there highlighted;

 7  correct?

 8  **A.**  Yes.

 9  **Q.**  The subject is "Slim Devices Squeezebox."  Do you see

10  that?

11  **A.**  Yes.

12  **Q.**  The author is Paul Hainsworth.  Do you see that?

13  **A.**  Yes.

14  **Q.**  Who was Mr. Paul Hainsworth in December of 2003 at Sonos?

15  **A.**  I believe he was a product manager.

16  **Q.**  And who was Jonathan Lang, who is in the "to" column?

17  **A.**  At that time I think also a product manager.

18  **Q.**  And this was what Mr. Hainsworth wrote as an employee of

19  Sonos on Christmas Eve 2003.  "Hi, Jonathan.  On Monday we

20  received and set up 2 Slim Devices Squeezebox wireless music

21  players."  Do you see that?

22  **A.**  Yes.

23  **Q.**  So Sonos employees obtained two Squeezebox devices;

24  correct?

25  **A.**  Yes.

1   Q.   And they characterized those devices that are in front of

2   you, one of which is in front of you as a wireless music

3   player.  Do you see that?

4   A.   Yes.

5   Q.   Okay.  And it goes through and it -- it says that the

6   wording of the prompts displayed throughout the setup process

7   is very computer oriented.  Do you see that?

8   A.   Yes.

9   Q.   So this e-mail indicates that at least one employee of

10  Sonos had actually obtained Squeezebox; set it up; correct?

11  A.   Yes.

12  Q.   And it goes through some of the setup mechanisms.  Do you

13  see that?  And connected it to a network.  Do you see that?

14       And I will focus on No. 4.  Let's put that on the --

15  highlight that.

16  A.   Okay.  Thank you.

17  Q.   "When the network settings were finally entered properly,

18  this took me half an hour, both boxes did get IP addresses

19  immediately and were recognized by the server."  Do you see

20  that?

21  A.   Yes.

22  Q.   So we know now, based on that entry, Mr. Hainsworth was

23  the one who set up the two Squeezeboxes on December 24, 2003.

24  Do you see that?

25  A.   Yes.

1    **Q.**   And he connected, according to this e-mail, to a network.

2    They got their internet protocol or IP addresses immediately

3    and then they were recognized by the server on the same

4    network.  Do you see that?

5    **A.**   Yes, I see that, yes.

6    **Q.**   And it says, "From the PC."

7         So you had these two Squeezeboxes sitting at Sonos being

8    operated by Mr. Hainsworth.  There was a personal computer, a

9    PC connected to the same network according this e-mail;

10   correct?

11   **A.**   Yes.

12   **Q.**   And it says Mr. -- according this e-mail, Mr. Hainsworth

13   was able to rename the servers from IP address to say room

14   names, living room and master bedroom.  Do you see that?

15   **A.**   Yes.

16   **Q.**   And in step 6 he says, "From the PC, I was able to easily

17   join players by selecting a room, e.g., living room, and then

18   selecting synchronization."  Do you see that?

19   **A.**   Yes.

20   **Q.**   And he says that "There were already two rooms joined, we

21   also set up a wired SlimP3 that plays well with the others.  A

22   synchronization choice appears, dining room plus master

23   bedroom."

24   **A.**   Yes.

25   **Q.**   Do you see that?

1    So what Mr. Hainsworth did is, he, from the PC, he first

2    was able to join two rooms; correct?  That's dining room and

3    master bedroom.

4    **A.**    Yes.

5    **Q.**    So he gave it those names; correct?

6    **A.**    He did, yes.

7    **Q.**    And then with the Squeezeboxes, he could name them and

8    then he could join them together to form dining room plus

9    master bedroom group; correct?

10   **A.**    Well, yeah.  He said dining room synchronized with master

11   bedroom.  I -- I don't think it's the same synchronization that

12   Sonos has.

13   **Q.**    I'm not talking about -- I won't make that comparison

14   because it might be different.  That's not what I'm suggesting.

15       But whatever synchronization was happening in Squeezebox,

16   you could see that he was able to join two rooms, dining room

17   plus master bedroom together using the two Squeezeboxes that

18   Mr. Hainsworth had in his possession; correct?

19   **A.**    Yes.

20   **Q.**    And then he could then -- when I selected that choice, a

21   "joining synchronization group" message appears.  Do you see

22   that?

23   **A.**    Yes.

24   **Q.**    So I -- what had happened was, you had dining room and

25   master bedroom ZonePlayers I will call them, they were grouped

**PROCEEDINGS**

1    together.  And then you could go from the living room and see

2    that group as one of the options, a group option to join from

3    the living room.  Do you see that?

4    **A.**    You mean where it says the group becomes dining room plus

5    master bedroom plus living room.

6    **Q.**    Yes, sir?

7    **A.**    Yes.

8    **Q.**    That's right.  So when Mr. Hainsworth confirmed by testing

9    and setting up two Squeezeboxes along with -- with the PC is he

10    would have two ZonePlayers, gave them names, living room and

11    master bedroom.  Then there were already a group called dining

12    room and master bedroom.  So I could take the living room

13    ZonePlayer add it to that dining room plus master bedroom;

14    correct?

15    **A.**    Yes.

16    **Q.**    Then you could also select no synchronization that tells a

17    selective room to leave a group; correct?

18    **A.**    Correct.

19    **Q.**    So, according to testing by Mr. Hainsworth, Squeezebox had

20    the ability to dynamically add or delete ZonePlayers from

21    groups of ZonePlayers; correct?

22    **A.**    Dynamically, yes.

23    **Q.**    And then he says on Step 7, "I created a 50 minute MP3

24    file and played it on two synchronized players."

25    **A.**    Yes.

1    Q.    Do you see that?  And he says, "throughout the playback of

2    that track, I could not detect any drift in the audio."

3         Do you see that?

4    A.    Yes.

5    Q.    So not only did he group three speakers -- ZonePlayers

6    together using Squeezebox, he played synchronized music at

7    least where he couldn't detect any drift in the audio on that

8    group using the Squeezebox devices; correct?

9    A.    Well, you said he joined three ZonePlayers but I think you

10   mean joined three Squeezeboxes together?

11   Q.    Yes.  I was using ZonePlayers as a shortcut.  Yeah, I will

12   stick with Squeezebox devices.  He was able to group three

13   Squeezebox devices -- in this testing of the Squeezebox system

14   on December 24, 2003, Mr. Hainsworth was able to confirm that

15   he could dynamically add or delete slim box devices and also

16   play music in a synchronized fashion on that group; correct?

17   A.    Yes, but as I said before, I believe the synchronization

18   is different from Sonos, the way it works.

19        THE COURT:  All right.  It's past 1:00 o'clock.  It's

20   time to break for the day.  Thank you, this jury, for your

21   careful attention.  Please remember the admonition.  Please be

22   on time just like you were today, and we will get started early

23   if you all are here early.  Thank you.  Have a safe journey

24   home.

25        THE CLERK:  All rise for the jury.

1    (Proceedings were heard outside the presence of the jury:)

2         **THE COURT:**  Witness can step down, please.  Witness is

3    on cross-examination, so he shouldn't be talking with lawyers

4    about his testimony.

5         Everyone else be seated.  Is there anything I can help the

6    lawyers with before we break for the day?

7         **MR. PAK:**  Not from Google, Your Honor.

8         **MR. RICHTER:**  Good afternoon, Your Honor, Cole Richter

9    for Sonos.  I think there still may be the matter of the

10   objections to the deposition designations.  We wanted to play

11   some videos tomorrow after this witness' testimony.

12        **THE COURT:**  You want to hand them up to me.  I won't

13   be able to look at them until the morning.

14        **MR. PAK:**  Your Honor, why don't I do this, I think I

15   have almost no problems with the remaining objections.  I will

16   confer with Counsel and see if we can work out the remaining

17   couple and then if there's anything we need --

18        **THE COURT:**  Please do that.

19        **MR. PAK:**  Thank you.

20        **THE COURT:**  Now, anything else?

21        **MR. RICHTER:**  Not from Sonos, I don't think so,

22   Your Honor.

23        **THE COURT:**  All right.  My total, each side has 840

24   minutes to use up.  Google has used 242.  Sonos has used 178.

25   So, if you have heartburn over my math, let me know so we can

**PROCEEDINGS**

1  see where we are -- you know, any difference between us.

2      **MR. PAK:**  Thank you, Your Honor.

3      **THE COURT:**  But, you know, I think you are taking a

4  lot of time with this witness and it's deadly boring.

5                  (Laughter)

6      **THE COURT:**  I don't know how --

7      **MR. PAK:**  I apologize, Your Honor.

8      **THE COURT:**  Every now and then I get a flash in my own

9  mind.  I think I understand something but I -- then it goes

10  away after about two minutes.  So I -- you should be thinking

11  "Do I need this time with some other witness?"  I'm not going

12  to give you additional time.

13      **MR. PAK:**  I understand, Your Honor.

14      **THE COURT:**  All right.  See you tomorrow morning.

15              (Proceedings adjourned at 1:02 p.m.)

16                  ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, May 9, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
           United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25