Volume 4

Pages 569 - 709

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

SONOS, INC.,                          )
                                      )
            Plaintiff and             )
Counter-Defendant,                    )
                                      )
  VS.                                 )   **NO. C 20-6754 WHA**
                                      ) Related Case No. **C 21-07559 WHA**
GOOGLE, LLC,                          )
                                      )
            Defendant and             )
Counter-Claimant.                     )
_____)

                        San Francisco, California
                        Wednesday, May 10, 2023

            <u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff/Counter-Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
            BY:  **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
                 **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
            BY:  **ALYSSA M. CARIDIS, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

1    **APPEARANCES**:    (CONTINUED)

2    For Plaintiff/Counter-Defendant:

3                            LEE SULLIVAN SHEA & SMITH LLP
                            656 West Randolph Street
4                           Floor 5W
                            Chicago, Illinois 60661
5                    BY:    **DAVID R. GROSBY, ATTORNEY AT LAW**
                            **SEAN M. SULLIVAN, ATTORNEY AT LAW**
6                           **COLE B. RICHTER, ATTORNEY AT LAW**
                            **JOHN DAN SMITH, III, ATTORNEY AT LAW**
7
     For Defendant/Counter-Claimant:
8
                            QUINN, EMANUEL, URQUHART & SULLIVAN LLP
9                           50 California Street, 22nd Floor
                            San Francisco, California 94111
10                   BY:    **SEAN PAK, ATTORNEY AT LAW**
                            **MELISSA J. BAILY, ATTORNEY AT LAW**
11                          **JAMES D. JUDAH, ATTORNEY AT LAW**
                            **LINDSAY COOPER, ATTORNEY AT LAW**
12                          **IMAN LORDGOOEI, ATTORNEY AT LAW**

13

14   Also Present:        **Kevin MacKay, Google Representative**
                           **Alaina Kwasizur, Sonos Representative**
15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2    Wednesday, May 10, 2023 - Volume 4

3                                              **PAGE**  **VOL.**

4    Opening Statement by Mr. Pak                  636    4
     Opening Statement by Mr. Sullivan            639    4

5    **PLAINTIFF'S WITNESSES**                      **PAGE**  **VOL.**

6
     **LAMBOURNE, ROBERT (RECALLED)**
7    (PREVIOUSLY SWORN)                           599    4
     Cross-Examination resumed by Mr. Pak         599    4
8    Redirect Examination by Ms. Caridis          603    4
     Recross-Examination by Mr. Pak               619    4
9
     **SHEKEL, TOMER**
10   By Videotaped Deposition (not reported)      650    4

11   **PEDRO, JUSTIN**
     By Videotaped Deposition (not reported)      651    4
12
     **KENNETH, MACKAY**
13   By Videotaped Deposition (not reported)      654    4

14   **MACKAY, KENNETH**
     By Videotaped Deposition (not reported)      663    4
15
     **MACKAY, KENNETH**
16   By Videotaped Deposition (not reported)      668    4

17   **ALMEROTH, KEVIN**
     (SWORN)                                      669    4
18   Direct Examination by Mr. Shea               670    4

19                       **E X H I B I T S**

20   **TRIAL EXHIBITS**                       **IDEN**  **EVID**  **VOL.**

21    TX36                                           666    4

22    TX38                                           666    4

23    TX41                                           666    4

24    TX43                                           666    4

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| TX44 | | 666 | 4 |
| TX45 | | 667 | 4 |
| TX48 | | 667 | 4 |
| TX62 | | 652 | 4 |
| TX78 | | 653 | 4 |
| TX81 | | 653 | 4 |
| TX82 | | 653 | 4 |
| TX84 | | 653 | 4 |
| TX125 | | 650 | 4 |
| TX155 | | 668 | 4 |
| TX156 | | 668 | 4 |
| TX440 | | 699 | 4 |
| TX464 | | 702 | 4 |
| TX466 | | 697 | 4 |

```
1    Wednesday - May 10, 2023                    7:26 a.m.

2                      P R O C E E D I N G S

3                          ---oOo---

4        (Proceedings were heard outside the presence of the jury:)

5            THE COURT:  Please have a seat.

6                    (Pause in proceedings.)

7            THE COURT:  Okay.  The jury is not present.  All the

8    lawyers are here.

9        I have a question about that thing you gave me to read to

10   the jury about claim construction.  Yesterday I read it to the

11   jury at your request.

12       It started out "I have previously interpreted and so

13   forth."  And my law clerk told me afterwards that I have not

14   determined that zone scene means a previously saved group,

15   et cetera, that I had assumed that for arguendo and then made

16   my ruling based on an assumption.

17       So, I -- is that true?  Isn't it true, I guess I should

18   say.

19           MR. PAK:  I believe technically it's true, Your Honor.

20   We have stipulated to that for the purposes of the jury

21   instructions and for this case, so . . .

22           THE COURT:  Well, does that mean you are -- when you

23   say -- have both sides irrevocably stipulated to that, or are

24   you just saying that's what the judge ruled, so we are

25   reserving our rights but we will stipulate to it for purposes
```

1    of this trial?

2         MR. PAK:  So, from our perspective, I believe those

3    two definitions we have stipulated to the first two.

4         THE COURT:  For all purposes?

5         MR. PAK:  For all purposes.

6         THE COURT:  How about the other side?

7         MS. CARIDIS:  Same, Your Honor.

8         THE COURT:  All right.  So -- all right.  Well, I

9    am -- I may have some other questions for you on some of these

10   other things that I told the jury yesterday, but for right now

11   I'm not going to try and go back to correct anything at this

12   moment.

13       It could be that, by the time the evidence is over, I will

14   see things differently, and I reserve the right to overrule

15   your stipulations and interpret it in accordance with the law.

16        MR. PAK:  Thank you, Your Honor.

17        THE COURT:  Here is one of the reasons:  It's a

18   mistake for the judge to give a stipulated instruction without

19   thinking about it.  Here is why:  What if the jury asks a

20   question about the stipulation and the two sides don't agree?

21   Then the judge has got to give an interpretation of something

22   he or she may never have agreed with to begin with.

23       So think about that.  I have had that very scenario come

24   up.

25                      (Laughter.)

1          **THE COURT:**  I also had a case where the two sides --

2     and it's probably not true here -- it was a collusive deal.

3          **MR. PAK:**  Oh.

4          **THE COURT:**  It wasn't a jury trial.  It was a case

5     where they both agreed on an interpretation, but it was a

6     gimmick.  The gimmick was to get the judge to bless some very

7     broad interpretation and they had in the background a

8     settlement and then they were going to use that to say Judge

9     Alsup has interpreted this and held the patent valid.  It

10    was -- most people should have been put in jail.

11         **MR. PAK:**  Yes.

12         **THE COURT:**  So you can't just trust every stipulation

13    that comes along.

14        All right.  But for the moment I'm going to live with what

15    you have said and -- but I'm reserving the right to think about

16    it.

17        I have some -- I got another question.  In the darkness of

18    my chambers, I pull out this claim language and tried to

19    understand it.

20        On the '966, there is a -- the very last clause of the

21    '966 claim 1 says, "Based on the third request causing the

22    first zone player to transition from operating in the

23    standalone mode to operating in accordance with the first

24    predefined grouping of zone players such that the first zone

25    player is configured to coordinate with at least the second

1  zone player to output media in synchrony," et cetera.

2      But, if you were to request instead of the first

3  predefined group the second predefined group, it's not covered.

4      Now, to me, that's a little odd that you wouldn't have a

5  claim that would cover the second.  But am I reading that,

6  right that there's a -- it only covers it if you happen to

7  select the first predefined group?

8          **MR. PAK:**  That's right, Your Honor.

9          **THE COURT:**  Why is that?  Why wouldn't it also have a

10  claim that would say if you select the second predefined group,

11  it would be covered too?

12          **MR. PAK:**  Yes.  For the Sonos attorneys, since I

13  didn't write the claims or was involved --

14          **THE COURT:**  All right.  What does Sonos say about

15  that?

16          **MR. SMITH:**  Your Honor, this is Dan Smith on behalf of

17  Sonos.

18      So, Your Honor, if you look at claim 2 of the '966 patent,

19  you will see --

20          **THE COURT:**  But it depends from claim 1.

21          **MR. SMITH:**  It does.  You are correct.

22          **THE COURT:**  Oh, so it's stuck with this anyway.

23          **MR. SMITH:**  Yes.  However, Your Honor, what I was

24  going to explain is that claim 2 talks about then transitioning

25  from the first zone scene to the second zone scene.

1    **THE COURT:**  But that can't be, because you are

2    stuck -- you are stuck with this language on -- it's dependent,

3    so you have to meet the language of 1.8 of the -- the language

4    I just read.  I don't know.

5    So if that's your only answer, you may have some trouble

6    with me later, but -- all right.  Here comes my law clerk.

7    (Pause in proceedings.)

8    **THE COURT:**  All right.  We -- she wants me to bring

9    up -- and I understand why, because we have been trying to

10    see -- in the '966 -- first of all, the '885 -- I'm going to

11    generally bring up the question of saving versus predefined

12    versus storage, three different terms.

13    Now, the word "saving" is never in any of the claims;

14    correct?

15    **MR. PAK:**  That's correct.

16    **THE COURT:**  All right.  Predefined is in both the '885

17    and the '966.

18    **MR. PAK:**  That's correct.

19    **THE COURT:**  Storage is only in the '966.

20    **MR. PAK:**  That's right.

21    **THE COURT:**  So, I have a sneaking feeling that

22    somewhere in the near future one side or the other -- you are

23    going to have a disagreement over what these terms -- how these

24    apply here.

25    Let's start with Google.  What do you say to that point?

**PROCEEDINGS**

1           **MR. PAK:**  I think they are distinct requirements,

2      Your Honor.  The saving comes from the parties agreed-upon

3      construction of zone scenes, which says "previously saved."

4           That previously saved zone scene, as you can see in the

5      first part of the claim language of each of the '885 and '966

6      claims, requires this predefined grouping.  There's a first

7      predefined grouping and a second predefined grouping, and the

8      '966 has the additional limitation that after you create the

9      zone scene, you have to then cause the storage of that zone

10     scene.  So we do think they are distinct concepts that have now

11     been required by the claims.

12          **THE COURT:**  Well, let me give you an example.

13          **MR. PAK:**  Yes.

14          **THE COURT:**  Let's say that the user wants to configure

15     zone players 1 and 3 into a group and does so and it only gets

16     stored in RAM memory.  It's not stored in a permanent fashion.

17     It is only stored in RAM memory.  And let's say it is stored in

18     a speaker -- not a speaker, a zone player.  Then you go off to

19     get your coffee and you come back.  Is that what I would call

20     temporary storage or temporary residence in RAM?  Is that

21     saving, is that predefined and is that storage?

22          **MR. PAK:**  I think our view is that that would not be

23     storage.  What you have done is you have created in memory,

24     temporary in RAM, the configuration that Your Honor has in

25     mind, which, in the '966 patent, based on this first request,

PROCEEDINGS

1    you have to take three actions.  One is you cause the creation

2    of the zone scene; two, you have to cause the indication of

3    that zone scene to be sent to a ZonePlayer; and three, further,

4    as a separate action, you have to cause the storage.

5        So that is one of the bases for our non-infringement

6    argument, Your Honor.  That's distinct from the '966 that you

7    have to cause further storage after you have created.

8            THE COURT:  My law clerk is giving me a note

9    indicating that Google took a contrary position in the past.

10           MR. PAK:  I would be happy to take -- go back and look

11   at the briefing and see if there's any inconsistency, but

12   for -- on the non-infringement issue, Your Honor --

13           THE COURT:  You still didn't answer my question

14   exactly.

15           MR. PAK:  Okay.

16           THE COURT:  If you -- if the user simply says add

17   number 1 to number 3 and -- without -- well, let's say -- let's

18   take, to be more precise, the 2005 system -- adds number 1 to

19   number 3, does not hit play yet, goes to get coffee.  Is that a

20   predefined --

21           MR. PAK:  Yes, I do believe that sounds predefined to

22   me.

23           THE COURT:  Is it saved?

24           MR. PAK:  It is saved in temporary memory, because

25   obviously the computer won't know anything until it's

 1  temporarily saved in memory.

 2          **THE COURT:**  What do you say?

 3          **MR. SMITH:**  Well, so on that point, Your Honor, we

 4  disagree.

 5       So I think the example that you are giving is a situation

 6  where, again, in the 2005 system we have this concept of

 7  dynamic grouping, and that is invoked at the time of creation.

 8  So in that situation, Your Honor, to the extent that would be

 9  saved, it would be at the time of creation there, and so it

10  wouldn't satisfy the requirements of the zone scene --

11          **THE COURT:**  But it's not -- it may be invoked, but

12  it's not yet playing.  The play button hadn't been hit yet in

13  this scenario.  In other words, you add number 1 to number 3,

14  go get coffee and then you come back and hit play, so . . .

15          **MR. SMITH:**  Again, Your Honor, in that situation it's

16  already invoked before you hit play.

17       So as you heard, even from the witnesses, yesterday, in

18  that situation, once you create that dynamic group, the players

19  start to coordinate with each other, such that they are

20  configured to coordinate -- excuse me -- configured to

21  coordinate for purposes of synchronous playback.

22       If you look at the claim, I think the language is -- well,

23  you know, on that point, Your Honor, I think that's all I

24  really need to say on that, so . . .

25          **THE COURT:**  Okay.  I'm not going to get to the bottom

1    of this today.  I just wanted to see if there was a difference,

2    and I think there may be a difference.

3        **MR. PAK:**  Your Honor, on that point I do think today

4    we are going to have Dr. Almeroth testify, and I do have some

5    cross-examination questions on that topic, so I think it might

6    be more fleshed out by the time we get to the end of the day

7    so . . .

8        **THE COURT:**  All right.  I'm still going to give each

9    of you four minutes --

10        **MR. PAK:**  Thank you.

11        **THE COURT:**  -- when you have the floor to make your

12    clarifying speech.

13        **MR. PAK:**  Thank you.

14        **THE COURT:**  All right.  I need to change the subjects.

15        You filed a brief last night about these witnesses on the

16    depositions.  So help me understand what is it that I have left

17    to rule upon.

18        **MR. PAK:**  So maybe I can clarify, Your Honor.  I did

19    take your suggestion to heart.  I went back and reviewed all

20    the remaining objections.  I think we have withdrawn most of

21    them.  There's just a few left on one of the witnesses.  The

22    issue is really a door-opening issue.

23        There are a number of witnesses; for example, Mr. Vincent

24    Mo, who is a 30(b)(6) designee, on the previously accused Cast

25    set of products that were at issue in the Q patents when we

 1   were still litigating those.

 2       Your Honor has ruled that if they start to focus on the

 3   casting functionality and specifically focusing on this

 4   2013-'15 time period when there was collaboration or at least a

 5   meeting to talk about that technology, that that would open the

 6   door for us to bring in the fact that casting functionality was

 7   previously accused of two patents in this case and that

 8   Your Honor had determined those two patents to be invalid based

 9   on prior art.

10       So we don't have a problem with them playing these videos.

11   That would be -- the ones that we identified were Vincent Mo

12   and Shekel.  They relate to the casting issue.  But, again,

13   then, we believe that they have opened the door, and we should

14   be able to draw out from the witnesses that two of the patents

15   in this case directed to that functionality.

16       **THE COURT:**  Well, let me ask Mr. Sullivan.  How is it

17   going to -- give me your take on why that testimony would be

18   relevant to the issues in the case now.

19       **MR. SULLIVAN:**  Yeah.  Your Honor, this is Sean

20   Sullivan on behalf of Sonos.

21       I think there's just some confusion.  The word "cast" is

22   used by Google like an umbrella, it's a very broad term.  And I

23   think we are not getting into anything on direct control at all

24   on any of this, Your Honor.  The word "cast" is showing up

25   again because the accused products are the Google Chromecast

1  audio, the Google Home app used to be called the Chromecast
2  app, and before that it was actually known as just the Cast
3  app.
4      And within that functionality is the ability to do zone
5  scenes, to do this grouping.  I can show you an example
6  document if you would like to see it, Your Honor, but we are
7  not getting into direct control.  We know that's out.  I don't
8  want to waste any time on that technology.  But the word "cast"
9  is going to show up in these documents because it's relevant to
10  zone scenes and the accused products for zone scenes.
11      **THE COURT:**  Well, I previously said that YouTube alone
12  and YouTube Music alone are not accused.
13      **MR. SULLIVAN:**  These are not YouTube apps that we're
14  talking about here, Your Honor.  It is just the word "cast"
15  that Google is trying to say somehow invokes this, you know,
16  direct control issue, but we are not getting into that
17  technology.
18      **THE COURT:**  That is strictly zone scenes is the
19  relevance.
20      **MR. SULLIVAN:**  Absolutely, Your Honor.
21      **THE COURT:**  Is that true?
22      **MR. PAK:**  No, Your Honor.
23      So as we noted, Mr. Shekel, his video testimony that they
24  are trying to designate in their case-in-chief is all about the
25  2013 and '14 meetings where Cast for Audio --

1          **THE COURT:**  Oh.  You were talking about Mr. Mo?

2          **MR. PAK:**  Oh, Mr. Mo, absolutely.  So this has -- he

3     has no knowledge -- none of the testimony is tethered to the

4     Home app or the grouping functionality.

5          All of the testimony that they have designated is simply

6     about YouTube, YouTube Music and casting technology, as we laid

7     out in our briefing.  So we think that is either irrelevant and

8     confusing to the jury or if they want to play it, then I think

9     we should be able to say YouTube and YouTube Music were some of

10    the specific accused technologies.

11         **THE COURT:**  All right.  I'm going to just -- I'm not

12    going to give you an advanced ruling.  I'm going to listen to

13    it and if I think it is even suggesting that there was some

14    violation of a prior patent or a different patent, I'm going to

15    let Google bring out that I ruled that that's out of the case,

16    its invalid.

17         But I -- here you both are telling me exactly the opposite

18    things.  One of you is saying it's only relevant for zone

19    scenes.  The other one is saying no, it's also -- they are

20    going to try to make an argument about casting.

21         Are you telling me the truth?  I'm going to go ask you

22    each.  Are you telling me the truth, Mr. Pak?

23         **MR. PAK:**  On Mr. Mo and Mr. Shekel's testimony we

24    believe this is relating to the Cast for Audio and the YouTube

25    music.

1          THE COURT:  It's not just what the -- the 30(b)(6) --

2          MR. PAK:  Yes.

3          THE COURT:  Don't give me that lawyer argument.

4          MR. PAK:  Right.

5          THE COURT:  The substance of the testimony from that,

6     will the jury think that -- that the other side had a patent

7     about casting and this was shown to -- that they somehow

8     violated that patent?

9          MR. PAK:  I don't think we are going to get to the

10    patent issue, Your Honor.

11         THE COURT:  Well, what's the point?  I mean, what's

12    your point about how you are prejudiced?

13         MR. PAK:  I think it's -- we are prejudiced in two

14    ways, Your Honor.  One is this testimony about YouTube and

15    YouTube Music untethered to the Home app and the accused zone

16    scene or group casting functionality or the grouping

17    functionality is prejudicial because that's not the accused

18    instrumentality here.

19         They all know that YouTube and YouTube Music is a very

20    popular app.  I don't know if they are --

21         THE COURT:  I'm going to say to the jury 14 times, if

22    need be --

23         MR. PAK:  Yes.

24         THE COURT:   -- that YouTube and YouTube Music --

25         MR. PAK:  Music.

1          **THE COURT:**  -- is irrelevant unless it is in tandem

2     with the Home app.

3          **MR. SULLIVAN:**  No problem, Your Honor.

4          **MR. PAK:**  Okay.

5          **THE COURT:**  So if I say that won't that cure the

6     problem?

7          **MR. PAK:**  That's for Mr. Mo.  I think that clarifies.

8     That would be helpful.

9          And then, Your Honor, on the Shekel, though, that is about

10    2013.  So this has nothing to do with the development of the

11    technology for Home app.  This is about his meeting with

12    Mr. Millington and others in 2013 and '14 to talk about a

13    technology called Cast for Audio, which, again, that is the

14    technology that they were trying to accuse for the Q patents;

15    has nothing to do with this case.

16         **THE COURT:**  If there's going to be any suggestion by

17    Sonos that Google met with Shekel and -- no.  Shekel met with

18    Sonos and learned about Cast for Audio -- cast technology and

19    then stole the technology or copied it, then I'm going to let

20    them bring up the thing about the patents are invalid.  Because

21    if you get close to that line -- you don't have to use the word

22    "patents."  If you get close to "they stole our technology,"

23    then I'm going to let the jury know, hey, that technology was

24    bogus to begin with.  So it's up to you how close you want to

25    get to that claim.

PROCEEDINGS

1          MR. SULLIVAN:  Nowhere near it, Your Honor.

2          THE COURT:  If you get burned don't blame me later.  I

3   can't -- I'm not ruling in advance.  I'm just telling you how I

4   feel about that.  There's not going to be any suggestion in

5   this case that Google stole casting technology.  If there is,

6   then I'm going to tell the jury that technology was in the

7   public domain to begin with.

8          MR. PAK:  Thank you, Your Honor.

9          THE COURT:  All right?

10          MR. SULLIVAN:  No problem, Your Honor.

11          THE COURT:  All right.  So do I have to rule on

12   anything more?

13          MR. PAK:  No, not for us.

14          THE COURT:  All right.  Excellent.

15          MR. PAK:  Thank you.

16          THE COURT:  All right.  Now, do I have something else

17   to bring up?  I guess not.  Oh -- no.  No.  I'm going to do

18   this on my own.  I'm not going to try to get the lawyers'

19   permission.

20      All right.  What else do we have?

21          MS. CARIDIS:  Your Honor, we have copies of the

22   asserted patents for the jury that you asked for.

23          THE COURT:  All right.  Do this:  Put the -- have you

24   shown them to the other side?

25          MS. CARIDIS:  No, Your Honor.

1            **THE COURT:**  Be sure you show them to the other side.

2  Have you highlighted the ones that are in suit?

3            **MS. CARIDIS:**  Yes, Your Honor.

4            **THE COURT:**  Okay.

5            **MR. PAK:**  These look fine to us, Your Honor.

6            **THE COURT:**  Okay.  So let's put two copies on each

7  chair -- I mean one copy of each on the -- on the chairs.

8       What -- how can I help you?

9            **MR. RICHTER:**  Good morning, Your Honor; Cole Richter

10  for Sonos.  Just a couple housekeeping issues, one with the

11  time charged to both parties.

12            **THE COURT:**  Yeah.

13            **MR. RICHTER:**  We looked at the trial minutes, and it

14  appears accurate with respect to Sonos, but it appears to us

15  that Google has used 250 minutes just based --

16            **THE COURT:**  250?

17            **MR. RICHTER:**  250 based purely on the trial minutes.

18            **THE COURT:**  Do you agree with that?

19            **MR. PAK:**  Your Honor, we came to a different number,

20  but it's only a matter of minutes, so I'm fine --

21            **THE COURT:**  Okay.  So you are okay with 250?

22            **MR. PAK:**  Yes, Your Honor.

23            **THE COURT:**  All right.  I'm going to add -- take it up

24  to 250.  All right.

25            **MR. RICHTER:**  Second housekeeping.  We thought it

1  might be a good idea -- we are going to play some dep videos

2  today, I think we heard that.  It might be a good idea to just

3  introduce the person who will be testifying on the video clip.

4  So we wrote a neutral statement and -- and just to explain why

5  they are hearing a deposition video, if Your Honor would

6  permit.

7        THE COURT:  Well, let me see what you -- you want me

8  to say this to the jury?

9        MR. RICHTER:  This is a proposal.  Yes, correct.

10        THE COURT:  Well, give it to me.

11        MR. RICHTER:  No problem.

12        THE COURT:  Let me -- I don't have a clerk right this

13  moment.  Here.  Walk it around to me so I can see what

14  you're -- what you're proposing.

15                    (Pause in proceedings.)

16        THE COURT:  I will give some version of this before --

17  you tell me when you are ready for the lead-in, and I will give

18  a good lead-in.

19        MR. RICHTER:  Okay.  Thank you, Your Honor.

20        MR. PAK:  Thank you, Your Honor.

21        THE COURT:  Anything more to bring up with me?

22        MR. PAK:  No.

23        THE COURT:  All right.

24                    (Pause in proceedings.)

25        THE COURT:  Okay.  My law clerk says that in terms of

 1   inconsistent positions by Google, go back and take a look at

 2   your opposition to Sonos motion in limine No. 2.

 3            **MR. PAK:**  Thank you, Your Honor.

 4            **THE COURT:**  All right.

 5                      (Pause in proceedings.)

 6            **THE COURT:**  How much more do you have with Lambourne?

 7            **MR. PAK:**  About five or ten minutes, Your Honor.

 8            **THE COURT:**  All right.  Then the next witness is who?

 9            **MS. CARIDIS:**  Alyssa Caridis.  Your Honor, I believe

10   that after Mr. Lambourne will testify, we will be putting --

11   playing some videos, deposition designation videos for the

12   jury.

13            **THE COURT:**  All right.  Okay.  Great.

14            **MR. PAK:**  Your Honor, I do note one issue, which is

15   there is a characterization that "Tomer Shekel, a Google

16   product manager familiar with Google's multizone technology,"

17   that is not -- that's not true, so I would just say -- I think

18   we should keep it neutral, just say "Tomer Shekel, a Google

19   employee."  But I don't like the characterization there because

20   that's the person whose testimony relates to the 2013, 2014

21   cast audio technology meeting.  So if we can just make it

22   "Google employee," that's fine with us.

23            **THE COURT:**  Well, is that all right, Google employee?

24            **MR. RICHTER:**  His third question is:  "And what is

25   your title when you started working at Google?"

1         "I was product manager."

2         "And how long did you hold that title?"

3         "I'm still a product manager."

4         And he is familiar with the Google multizone technology,

5    so I'm not sure.

6            MR. PAK:  Just -- I'm not sure, so can we just say

7    "product manager" is fine, but I don't think we need to

8    characterize it any further.

9            THE COURT:  Well, here it says "Product manager

10   familiar with Google's multizone technology."  Is that -- is

11   that -- do you say that's not correct?

12           MR. PAK:  I think the testimony that's being given is

13   not related to multizone technology.  It's 2013, 2014 set of

14   meetings about Cast for Audio.  So if we want to change it for

15   a Google product manager, that would be fine.

16           MR. RICHTER:  We could say:

17       "QUESTION:  Which products did you work on during your

18       time as product manager of that team?"

19       One of the answers is:

20       "ANSWER:  I was involved" --

21           THE COURT:  I'm just going to say -- I'm going to take

22   out -- I'm going to say "Product manager familiar with Google's

23   technology."

24           MR. PAK:  Sounds good.

25           THE COURT:  Take out "multizone."

 1          **MR. PAK:**  Thank you.

 2          **MR. RICHTER:**  Thank you.

 3                    (Pause in proceedings.)

 4          **THE COURT:**  Do you know how -- you lawyers have listed

 5    exhibit numbers up into the 6,000s.  And can you imagine

 6    what -- the sinking feeling in the jury's heart when they

 7    realize that they got to go through 6,000 exhibits?

 8          **MR. PAK:**  I think we will end up with far, far less

 9    than that by the time we are done.

10          **THE COURT:**  Well, I may -- I may tell them exactly

11    that because they don't know that yet.

12          **MR. PAK:**  Right.

13          **THE COURT:**  They think that you are going to present

14    6,000 exhibits.

15                    (Laughter.)

16          **THE CLERK:**  They are all here.

17          **THE COURT:**  Let's bring them in then.

18          **THE CLERK:**  All rise for the jury.

19       (Proceedings were heard in the presence of the jury:)

20          **THE COURT:**  Welcome back and please be seated.

21       Before we get started again, I want to let you know a few

22    things.

23       On your chair, we put a copy of each patent for your own

24    use.  We are not going to take this copy back.  You get -- you

25    can make notes on it, circle particular words, you know,

 1    whatever you want.

 2         And I think the lawyers have highlighted for you the

 3    particular claims -- and those appear near the end of each

 4    patent -- the particular claims that are being asserted in this

 5    case, okay?  So you will have those.

 6         Let me ask the lawyers this:  I want you -- you don't have

 7    to say yes or no right now, but if any members of the jury want

 8    to take those patents home and study them in between sessions,

 9    I'm going to ask you later if you can agree they can do that

10    much.  But don't -- don't answer right now.  But it's a lot of

11    reading if you wanted to read them but, of course, it's

12    evidence in the case and you are entitled to read as much of

13    that as you want.

14         So that's one little thing I wanted to bring up with you.

15         And, again, I thank you, by the way.  You are here early

16    again and that's wonderful.  We are going to get an early

17    start.

18         Second, you've heard numbers up to 6,572 of the number of

19    exhibits in this case and I -- you must be saying, oh, my God

20    are we going to have to go through 6,000 exhibits?  And the

21    answer is no.

22         There probably are that many marked for potential use, but

23    my guess is that it will be fewer than a hundred exhibits that

24    go into the jury room and they are admitted into evidence, so

25    don't freak out over that number.  It's -- it's really nowhere

1  near the number that you are going to really use.

2       Next, I want to just give you a overview of the issues

3  that you will have to decide at the end of the case because I

4  know you are sitting over there saying what are we here for?

5  What are we going to have to decide?  We are hearing all this

6  evidence about how these complicated machines work and, yet,

7  what is -- why are we trying to learn this?

8       All right.  So I'm going to tell you right now.  And I'm

9  going -- what I'm about to say now is tentative, preliminary.

10 It's close but it's not exactly the way we will phrase it to

11 you at the end because I have got to hear the whole case

12 before -- I have a general idea what you are going to have to

13 decide.

14      Okay.  So we have two patents, they are on your chair, and

15 these are both being asserted.

16      So the '885 patent is one where me, the judge, have

17 already determined that the -- that the Google system practiced

18 claim 1, and that is a -- already determined.

19      However, what the Court has not determined and which will

20 be up to you are some questions about whether or not the claim

21 itself is valid and meaning whether it should have ever been

22 issued by the Patent Office.

23      Now, it is presumed to be valid because the government

24 issued it, but, nevertheless, the government makes mistakes now

25 and then, and so maybe they made a mistake here.

1     And so I will be asking you questions about -- for you to

2  decide based on the -- the things like the prior art, what

3  already existed.

4     For example, no one -- this is still America.  No one can

5  claim a patent on something in the public domain.  Anything in

6  the public domain everyone has the right to use.  Even if

7  somebody thought up it all on their own, if it was already in

8  the public domain, too bad, you can't get a patent on it.  So

9  everyone can use the public domain.

10     Similarly, nobody gets -- has a right to get a patent on

11  something that would have been obvious to someone skilled in

12  the art.

13     Now, that is something that you are going to have to help

14  the Court with by making findings, because these parties

15  disagree on what -- what somebody skilled in the art -- they

16  don't even agree on who is skilled in the art.  One of them

17  says it's two years of college, the other says four years of

18  college, all right?  So you are going to have to decide what

19  somebody skilled in the art in this particular field was.

20     All right.  So I'm going to need your help on that one.

21  And then based on your findings, I will probably make a

22  decision one way or the other to either sustain the patent or

23  to say that it was invalid, this claim number 1.  That's the

24  only one that's in issue in the '885.

25     Now, let's say that you were to decide that it's valid or

1  I were to decide that it was valid.  Regardless, you have to

2  decide on the damages issue.  And you also have to decide

3  meaning how much -- how much money would compensate Sonos for

4  the use of that patent.  And that would be an economics thing.

5  You'd get into damages.  And that's all I will just say for the

6  moment is how much money would compensate Sonos, the patent

7  owner.

8      There's an issue of willfulness, meaning did Google -- if

9  the patent is valid and if it is infringed, has Sonos shown

10  that it was a willful infringement?  If so, then that may lead

11  to enhanced damages that I would -- that's only for the '966 --

12  I'm sorry, yeah.  The '966 is the only one, my law clerk

13  rightly points, out where willfulness is an issue.  On the '885

14  it is not an issue in the case for you to decide.

15      Okay.  Now, there's also the '966 patent, which has some

16  similarities and some differences.  The '966 patent is written

17  from the point of view of the -- the little controller unit;

18  whereas, the '885 is written from the point of view of the zone

19  player, so the -- and in some ways, it has been said in this

20  case, they are like two sides to the same coin; kind of.

21      But just like a real coin, they had different things on

22  it.  One's has got a head on it and the other has got a picture

23  of a bird.  So they are not quite the same.  They are similar,

24  though.  There are some similarities and from different points

25  of view, and so they each are going to require their own

1  analysis.  And here there's more than one claim asserted.  It

2  is 1, 2, 4, 6 and 8.

3       And, once again, there's an issue of are these patents --

4  it's not the patent, it's the claim.  Are these claims, patent

5  claims, valid?  Should they have been issued by the Patent

6  Office?  So that will be an area where you have to make

7  findings and help the Court on that issue.

8       And this is the one where there is a willfulness issue.

9  If -- you have to decide did Google willfully infringe if you

10 find that they were infringed at all.  And then -- then there's

11 the issue of damages for the '966 patent.

12      So, now, I -- the lawyers, each side, are probably having

13 heartburn over how I'm describing these issues to you, and

14 I'm -- I want to make it clear.  This is a preliminary

15 statement for you so that you will be thinking about what you

16 have to decide at the end of the case because I know -- I know,

17 I have done lots of trials, and you are over there sitting:

18 Why am I here?  What am I going to have to decide?  Why am I

19 even hearing all of this evidence?

20      And what I'm trying to tell you now, it relates to these

21 ultimate assignments that you are going to get to make these

22 important decisions.

23      So, there we go.  That's -- I will have a lot more to say

24 on this later, and what I say later is the final word and what

25 counts, but this gives you a heads-up as to what you're very

 1  likely be asked to decide when the case goes to you for

 2  decision.  Okay.

 3      **MR. PAK:**  Your Honor, just one note on the '885 claim

 4  1.  I think there is still an open question on the new design,

 5  whether that practice --

 6      **THE COURT:**  Yes, yes.  Okay.  Yes.  Thank you for

 7  bringing that up.

 8      **MR. PAK:**  Yes.

 9      **THE COURT:**  After I ruled that the claim 1 was

10  practiced by the Google, they went and redesigned it in an

11  attempt to get around the patent.  This is what often happens

12  in patent cases.

13      And that -- I have not made a decision on whether or not

14  that redesign falls within the patent or not.  And, in any

15  event, it is highly relevant -- not "highly," I shouldn't say

16  that -- it is just arguably relevant to one of the issues you

17  are going to have to decide on damages.

18      So I may get your -- your input on that.  And you may have

19  to decide; in fact, I think you do have to decide whether or

20  not the redesigned product infringes claim 1 of the patent.

21      So, you see, that's -- that's -- that's kind of the

22  ballpark.  Since you added one, let me ask the other side.

23      Do you have anything you want to add to the list of issues

24  that I have laid out?

25      **MS. CARIDIS:**  No, Your Honor --

1          **THE COURT:**  All right.

2          **MS. CARIDIS:**  -- your recitation sounded good.

3          **THE COURT:**  Okay.  So -- and, again, this is

4     approximate, it's not final.  In a few -- in a couple of weeks

5     or less I will be telling you the final version of what needs

6     to be decided by you.

7          Okay.  Now, yesterday we spent a lot of time with

8     Mr. Lambourne, who is the inventor.  Welcome back.  And on both

9     of these patents -- he is the named inventor on the patents,

10    and he has given a lot of testimony so far.  And I'm told you

11    have five minutes more to go?

12         **MR. PAK:**  Yes, Your Honor.

13         **THE COURT:**  All right.  Five minutes more of

14    cross-examination, and then we go to either redirect or a

15    brand-new witness.

16         So the floor is yours, Mr. Pak.

17                      **ROBERT LAMBOURNE,**

18    called as a witness for the Plaintiff, having been previously

19    duly sworn, testified further as follows:

20                  **CROSS-EXAMINATION**    (resumed)

21    **BY MR. PAK**

22    **Q.**   Good morning, Mr. Lambourne.  Welcome back.

23    **A.**   Good morning.  Thank you.

24    **Q.**   So I want to pick up where we left off yesterday.  We were

25    discussing an e-mail between you and other colleagues at Sonos

 1  including, Mr. Paul Hainsworth, dated -- on Christmas Eve 2003.

 2  Do you recall that?

 3  **A.**   Yes.

 4  **Q.**   And if you could speak up a little louder.

 5  **A.**   I will get up to the --

 6          **THE COURT:**  Can you adjust the mic so that it catches

 7  your voice?

 8          **THE WITNESS:**  Yeah.  Is that better?

 9          **THE COURT:**  Much better.

10  **BY MR. PAK:**

11  **Q.**   And to remind the jury, Mr. Hainsworth at that time was

12  the product manager for Sonos; is that correct?

13  **A.**   He was a product manager, yes.

14          **MR. PAK:**  So I would like to pull back up, Mr. Fisher,

15  TX3937.

16                      (Pause in proceedings.)

17  **BY MR. PAK:**

18  **Q.**   So yesterday we were talking about the acquisition and

19  testing of the Squeezebox devices.  Do you recall that?

20  **A.**   Yes.

21  **Q.**   That was done by Mr. Hainsworth, and he described the

22  results of his testing.  Do you recall that?

23  **A.**   Yes.

24  **Q.**   And we walked through -- I was able to set it up, use it,

25  and tested some of the grouping functionality in that

 1    technology.  Do you recall that?

 2    A.    Yes.

 3    Q.    Okay.  So I just want to focus now just on bottom piece,

 4    after he describes the testing and his experience working with

 5    Squeezebox.  Let's take a look at what he wrote to you and

 6    others on Christmas Eve 2003.

 7          MR. PAK:  So, Mr. Fisher, if we can highlight or blow

 8    that bottom section up.

 9          Thank you.

10                    (Pause in proceedings.)

11    BY MR. PAK:

12    Q.    So Paul is Mr. Hainsworth, and he is writing to you and

13    other colleagues at Sonos and he says, "So, I think that a

14    bunch of the world's Georges will go for the Squeezebox."  Do

15    you see that?

16    A.    Yes.

17    Q.    So he was commenting, based on his results, that there

18    could be market demand for a product like Squeezebox; correct?

19    A.    Yes.

20    Q.    Okay.  He also notes, based on his testing and analysis of

21    the prior art Squeezebox system, that the industrial design is

22    nice, and the product is small enough to fit into any room

23    unobtrusively.  Do you see that?

24    A.    Yes.

25    Q.    So he is providing some commentary, positive commentary

1  about his experience from an industrial design and the size of

2  the product; correct?

3  **A.**   That's right, yes.

4  **Q.**   And he says, "Slim Devices still loves their display,

5  which is a vacuum fluorescent display, VFD, from Noritake that

6  I believe cost them at least $40."  Do you see that?

7  **A.**   Yes.

8  **Q.**   So he was talking about this product that I hold in my

9  hand, the Squeezebox product that you talked about earlier;

10  correct?

11  **A.**   Correct.

12  **Q.**   And he also says, "Dave is planning to take two

13  Squeezeboxes home for the weekend and then will send them to

14  Jonathan next week."  Do you see that?

15  **A.**   Yes.

16  **Q.**   So Mr. Hainsworth tested the products, then he said, "I'm

17  going to hand them off to Dave for the weekend," and then

18  Jonathan will then also take the products and take a look at

19  them.  Do you see that?

20  **A.**   I see that, yes.

21  **Q.**   So let's take a look at the top and I just want to know

22  who Mr. Dave could be.  Is that David Brooks?

23  **A.**   I would imagine so, yes, because that's the only Dave on

24  the list of the e-mail.

25  **Q.**   And at that time in 2003 who was Mr. Brooks at Sonos?

1    **A.**   Dave was sort of our IT person.  So he set up laptops and

2    things like that at the company.

3    **Q.**   Great.  And who would be Jonathan or John?

4    **A.**   Can you scroll down so I can see how it was spelled?

5         Oh.  Jonathan.  Jonathan Lang listed there.

6    **Q.**   Okay.  And who was Mr. Jonathan Lang in 2003 at Sonos?

7    **A.**   I believe he was also a product manager.

8    **Q.**   Thank you.

9         **MR. PAK:**  That's all, Your Honor.  I pass the witness.

10        **THE COURT:**  Thank you.

11   Redirect, Ms. Caridis?

12                    <u>**REDIRECT EXAMINATION**</u>

13   **BY MS. CARIDIS:**

14   **Q.**   Good morning, Mr. Lambourne.

15   **A.**   Good morning.

16   **Q.**   Do you have some water up there?

17   **A.**   I do.  Thank you, yes.

18   **Q.**   Wonderful.

19        Mr. Lambourne, just a few questions this morning.  Do you

20   recall yesterday when Mr. Pak was asking you questions about

21   what the claims do or do not include?

22   **A.**   I do, yes.

23   **Q.**   And did Mr. Pak provide you with the Court's claim

24   constructions prior to asking you those questions?

25   **A.**   I don't think so, no.

1   Q.   Do you recall ever even seeing the Court's claim

2   constructions in this case prior to your testimony yesterday?

3   A.   Could you explain what the Court's claim constructions

4   are?

5   Q.   The Court's interpretation of certain claim terms.

6   A.   Oh.  No, I did not see that.

7   Q.   And do you recall yesterday when Mr. Pak asked you

8   questions about whether the claims of the -- of your '966

9   patent talked about storing zone scenes at a player?  Do you

10  recall him asking you those questions?

11  A.   Yes.

12  Q.   Mr. Pak didn't show you claims 3 or 4 when he was asking

13  you those questions, did he?

14  A.   No.  I believe we just looked at claims 1.

15       MS. CARIDIS:  Mr. Jay, let's pull up claims 3 and 4 of

16  the '966 patent.

17            (Pause in proceedings.)

18  BY MS. CARIDIS:

19  Q.   And, Mr. Lambourne, do you see claim 3 on the screen here?

20  A.   Yes.

21  Q.   And if you can take a look at it on your screen, where

22  does claim 3 of the '966 patent say the zone scene is stored?

23  A.   I will just read it.  One moment.

24            (Pause in proceedings.)

25       THE WITNESS:  It talks about "The first zone scene

1   comprises causing storage of the first zone scene at a

2   location."

3        THE COURT:  At a location.

4        THE WITNESS:  "At a location other than the computing

5   device."

6   BY MS. CARIDIS:

7   Q.   And remind us, in your understanding, what is the

8   computing device in this claim?

9   A.   The zone player, I believe.

10       MS. CARIDIS:  Mr. Jay, let's pull back up claim 1.

11  Actually, nevermind.  We can keep claim 4 on the screen.  I

12  apologize.

13                   (Pause in proceedings.)

14  BY MS. CARIDIS:

15  Q.   Mr. Lambourne, why don't you look at claim 4.

16  A.   Yes.

17  Q.   And where is the zone player -- strike that.

18       Where is the zone scene stored in claim 4 of the '966

19  patent?

20  A.   In 4?  "The computing device of claim 3 wherein the

21  location other than the computing device comprises a zone

22  player of the first defined grouping of zone players."  So a

23  location other than the computing device.

24  Q.   Which is what in this claim?

25  A.   I would think that would be the controller.

1   **Q.**   So the computing device is the controller; correct?

2           **MR. PAK:**  Objection.  Leading, Your Honor.

3           **THE COURT:**  Well, answer the question, and then I have

4   a clarifying question.

5       Earlier you said it was the zone player.  Now you are

6   saying it's the controller.  And -- and I think this needs to

7   be clear.  Didn't he say that?

8           **MS. CARIDIS:**  I believe he did, Your Honor.  I'm

9   trying to --

10          **THE COURT:**  All right.  So I heard you correctly and I

11  think one of the two is not correct.

12          **THE WITNESS:**  Maybe I'm reading --

13          **THE COURT:**  A computing device is not both so.

14          **THE WITNESS:**  I'm sorry.  I may be --

15          **THE COURT:**  You are the inventor.  You ought to know.

16  So tell us which one it is.  Is it the -- is the computing

17  device the zone player, or is it the controller?

18          **MS. CARIDIS:**  And maybe we can bring claim 1 up on the

19  screen to assist Mr. Lambourne on this.

20          **THE COURT:**  Yeah.  I think you should look at claim 1.

21  It's long -- very long.  But, nevertheless, I don't want

22  there -- I don't want there to be inconsistent testimony here.

23          **THE WITNESS:**  Thank you.

24      I will just reread claim 1.  I apologize.

25          **THE COURT:**  Please.

LAMBOURNE - REDIRECT / CARIDIS

```
 1                    (Pause in proceedings.)

 2           THE WITNESS:  I'm sorry.  Yeah.  I believe this is

 3   talking about a computing device serving as a controller for a

 4   network playback system.

 5   BY MS. CARIDIS:

 6   Q.    Thank you.  So, just so that we have this clear, what is

 7   computing device, in your understanding, in this claim?

 8   A.    The controller for the network system.

 9   Q.    Right.

10           MS. CARIDIS:  And then, Mr. Jay, let's go back to

11   claims 3 and 4.

12                    (Pause in proceedings.)

13   BY MS. CARIDIS:

14   Q.    So, Mr. Lambourne, with that understanding, where is the

15   zone scene stored in claim 3 of your '966 patent?

16   A.    Okay.  Oh.  The zone scene -- cause storage of the first

17   zone scene at a location other than the computing device.  And

18   the computing device is the controller, so it would be not on

19   the controller, which means the zone player.

20   Q.    Wonderful.

21         And then claim 4, where is the zone scene stored in claim

22   4.

23   A.    I have to see whether this computing device is the same

24   one as in claim 1.  This is -- I have trouble with the way

25   claims are written, so let me just try to focus here.
```

1   Q.   That's okay.  We can move on.

2   A.   Yeah, okay.

3   Q.   Um, so yesterday when Mr. Pak was asking -- do you recall

4   Mr. Pak asking you questions about whether the claims of the

5   '966 patent discuss a user interface?

6   A.   He asked me the questions about user interface, yes.

7   Q.   And he didn't show you claim 8 when he was asking you

8   those questions, did he?

9   A.   No.  I just -- I referred back to the specification part

10  of the patent, referred to the user.

11          MS. CARIDIS:  And, Mr. Jay, let's pull up claim 8 of

12  the '966 patent.

13  BY MS. CARIDIS:

14  Q.   And, Mr. Lambourne, does claim 8 of your '966 patent

15  discuss a user interface?

16  A.   Yes.  I see the word "user interface" there, yes.

17  Q.   And let's take a step back.  You mentioned yesterday that

18  you worked with lawyers to write the specification of your zone

19  scene patents.  Do you recall that?

20  A.   Correct.

21  Q.   And how long ago did that happen?

22  A.   Um, well, I think we are talking about at least 17 years

23  ago, I believe, yeah.

24  Q.   And did you have your specification memorized when you

25  were answering questions yesterday?

**LAMBOURNE - REDIRECT / CARIDIS**

1  A.   No.

2  Q.   Okay.  Let's move away from the actual patent document.

3       Do you recall yesterday when Mr. Pak asked you whether you

4  had met with lawyers before testifying in this case?

5  A.   He did, yes.

6  Q.   And then he showed you your alarm clock specification

7  where you said you were imprecise with some of your zone scene

8  descriptions do you recall that?

9  A.   That's right, yes.

10      MS. CARIDIS:  Let's pull back -- pull back up TX6545,

11  Mr. Jay.

12                   (Pause in proceedings.)

13      MS. CARIDIS:  And, Mr. Jay, on this document on the

14  cover page let's blow up the Trial Exhibit sticker.  This is

15  TX6545.

16  BY MS. CARIDIS

17  Q.   Do you see that, Mr. Lambourne?

18  A.   Yes.

19      MS. CARIDIS:  And then, Mr. Jay, zooming back out.

20  BY MS. CARIDIS

21  Q.   Remind us, Mr. Lambourne, what this document is.

22  A.   This is the zone scene -- user interface specification

23  that I wrote.

24  Q.   And how long ago did you write this document?

25  A.   At the end of 2005.

1  Q.   Did you write this document before or after you met with

2  lawyers in preparation for this case?

3  A.   A long time before.

4  Q.   And which is a more authoritative description of your zone

5  scenes technology, what's written in the zone scene

6  specification or what's written in the alarm clock

7  specification?

8  A.   The zone scenes specification.

9       MS. CARIDIS:  And Mr. Jay let's pull up page 2 of 6545

10  and blow up that introduction section.

11                    (Pause in proceedings.)

12  BY MS. CARIDIS:

13  Q.   And, Mr. Lambourne, can you read aloud the first

14  paragraph?

15  A.   Very first paragraph --

16  Q.   Yes.

17  A.   -- in the introduction?  Yes.

18       "The zone scene feature allows the user to arrange" -- oh,

19  it moved -- "the zone scene feature allows the user to arrange

20  the zones into groups using one single command.  This is

21  similar to the current Party Mode setting that is available.

22  However, the zone scene feature is much more flexible and

23  powerful."

24  Q.   And did you write that statement before or after meeting

25  with lawyers for this case?

1   **A.**   Before.

2   **Q.**   And can you remind us how the zone scene feature was more

3   flexible and powerful than Party Mode in the original Sonos

4   2005 system?

5   **A.**   Yes.  It was configurable by the user, so user

6   customizable.  They could choose the rooms that would be in it.

7   It could be saved, and it could be invoked later whenever the

8   user wished it to be invoked.

9   **Q.**   Okay.  So sticking with the 2005 Sonos original system,

10  the Party Mode in the 2005 Sonos original system.  I want you

11  to imagine I had such a system that had a controller with three

12  zone players.  And in this example each of the zone players is

13  in standalone mode; okay?

14  **A.**   Yes.

15  **Q.**   At that point in time, when each of the zone players is in

16  standalone mode, is a list of the players in -- in a Party Mode

17  group saved anywhere in the system?

18  **A.**   No.

19  **Q.**   At that point in time, when the players are in a

20  standalone mode, is there a predefined group of players for a

21  Party Mode group saved anywhere in the system?

22  **A.**   No.

23  **Q.**   Now, Mr. Pak gave you an example yesterday about a Sonos

24  2005 system that had one group that consisted of a kitchen and

25  a den and also that system had the ability to create a Party

1   Mode group.  Do you recall that?

2   **A.**   Yes.

3   **Q.**   And you said yesterday that those two groups could exist

4   in Sonos' 2005 system but not at the same time.  Do you recall

5   that?

6   **A.**   With the same room in two groups?  Yes.  It could not

7   exist.

8   **Q.**   And I wanted to give you a chance to explain that.

9        Why couldn't the Sonos 2005 system have two groups at the

10  same time where a player was in each -- where the same player

11  would have been in each of those groups?

12  **A.**   Yes.  So the zone grouping in the 2005 product had this

13  dynamic grouping, which we call ad hoc, which is really in

14  real-time grouping.

15       So, when the living room is linked to the kitchen, the

16  kitchen cannot also be linked to the dining room.  It's just

17  physically impossible; like that speaker can't be in two groups

18  in real-time.

19  **Q.**   And still focusing on the Sonos 2005 system, if I have a

20  house with three zone players, can you explain whether it would

21  be possible to use Party Mode to create a group with just two

22  of those players?

23  **A.**   It would not be possible in the 2005 system.

24  **Q.**   Okay.  Switching gears.  Do you recall yesterday being

25  asked a series of questions about various Sonos forum posts?

LAMBOURNE - REDIRECT / CARIDIS

```
 1  A.   I do, yes.
 2       MS. CARIDIS:  And, Mr. Jay, let's pull up TX3930 which
 3  is one of those forum posts.
 4  BY MS. CARIDIS:
 5  Q.   And do you recall --
 6  A.   Yes.
 7  Q.   -- Mr. Pak asking you questions about this document
 8  yesterday?
 9  A.   I do, yes.
10  Q.   And do you recall him pointing out that this document uses
11  the words "macros" and "morning mode" and discusses the
12  possibility of overlapping groups?
13  A.   Yes.
14  Q.   And what is date of this document?
15  A.   September the 22nd, 2005.
16       MS. CARIDIS:  Mr. Jay, let's keep this up on the
17  screen but then also pull up page 3 of TX6539, which was
18  admitted yesterday.
19  BY MS. CARIDIS:
20  Q.   And, Mr. Lambourne, remind us of what TX6539, which is on
21  the right side of the screen here, is.
22  A.   That's -- that's a page out of my notebook where I'm
23  describing a zone scene functionality.
24  Q.   And where, if at all, does page 3 of TX6539 discuss
25  macros?
```

LAMBOURNE - REDIRECT / CARIDIS

1   **A.**   In the header there you can see set up zone groups and

2   then in parentheses it says macros.

3   **Q.**   And where, if at all, of page 3 of TX6539 does it discuss

4   a morning scene?

5   **A.**   Yes, so in the box below the header it says

6   "name:morning."

7   **Q.**   And what is the date on this page of TX6539, which is your

8   sketchbook?

9   **A.**   March the 2nd, 2005.

10  **Q.**   And did you make these notes about zone scenes in TX6539

11  before or after the September 22nd date of the forum post that

12  Mr. Pak was discussing with you?

13  **A.**   Before.

14  **Q.**   Okay.

15       MS. CARIDIS:   Mr. Jay, let's keep TX3930 on the screen

16  but then put TX0120 on the other side.

17  **BY MS. CARIDIS:**

18  **Q.**   Mr. Lambourne, I believe you testified yesterday that your

19  e-mail at the bottom of the first page of TX120 discussed the

20  idea of overlapping groups.   Right?

21  **A.**   Yes.

22  **Q.**   And what's the date of your e-mail to Mr. Schulert?

23  **A.**   April 11th, 2005.

24  **Q.**   And was that before or after the macro forum post that you

25  were discussing with Mr. Pak yesterday?

1  **A.**   Before.

2          **MS. CARIDIS:**  Let's bring up TX2424, please.

3                    (Pause in proceedings.)

4  **BY MS. CARIDIS:**

5  **Q.**   This was the February 27th, 2005, forum post; and Mr. Pak

6  asked you several questions about this document.  Do you recall

7  that?

8  **A.**   Yes.

9  **Q.**   And by the way, are you aware that February 27th, 2005,

10  was a Sunday?

11  **A.**   I am not aware of that, no.

12  **Q.**   That's okay.

13          **MS. CARIDIS:**  So let's keep TX2424 on the screen but

14  then pull up with the side-by-side of TX8326 at page 40.

15  **BY MS. CARIDIS:**

16  **Q.**   And, Mr. Lambourne, remind us of what we are seeing on the

17  right-hand side here.

18  **A.**   The right side of the screen shows my sketchbook again,

19  one of my sketchbooks where I'm describing a feature called

20  waking to music.

21  **Q.**   And do you recall Mr. Pak asking you whether it was a

22  coincidence that these two documents could have been created on

23  the same day?

24  **A.**   I do, yes.

25  **Q.**   Seeing these documents side-by-side, do you think it's

LAMBOURNE - REDIRECT / CARIDIS

1  reasonable that you would have created your alarm clock sketch

2  in response to seeing this forum post?

3  **A.**   I don't think that was the case, yeah, I -- not

4  reasonable.

5  **Q.**   Does your sketchbook describe alarm clocks?

6  **A.**   It does, yes.

7  **Q.**   Where, if at all, in the forum posts are alarm clocks

8  discussed?

9  **A.**   Alarm clocks are not discussed in the forum post.

10 **Q.**   Do you see kind of directly to the left of wake to music

11 in your sketchbook a comment about what happens to current room

12 groups?

13 **A.**   I do, yes.

14 **Q.**   And where, if at all, does the forum post discuss what

15 happens to current room groups?

16                    (Pause in proceedings.)

17      **THE WITNESS:**   It doesn't describe what happens to

18 current zone groups or room groups.

19 **BY MS. CARIDIS:**

20 **Q.**   And do you see a reference to macros in your sketchbook?

21 **A.**   Yes.  You want me to describe it or --

22 **Q.**   Yeah, why don't you point it out?

23 **A.**   It's highlighted -- well, it is not highlighted.

24 Actually, you said the word macros?  Sorry.

25 **Q.**   Yes.

**A.**   So I'm asking at the top notation "which room, question

mark, like a macro" is highlighted there.

**Q.**   Okay.  So then focusing back to the forum post, do you see

where the forum post discusses virtual zones in the header?

**A.**   Yes.

**Q.**   And where, if at all, does your sketchbook mention virtual

zones?

**A.**   It doesn't mention virtual zones.

**Q.**   And, Mr. Lambourne, back in the 2005 timeframe, were you

checking the Sonos forums every day?

**A.**   No.

**Q.**   Okay.

         **MS. CARIDIS:**  Let's pull up TX3937.

                    (Pause in proceedings.)

**BY MS. CARIDIS:**

**Q.**   And, Mr. Lambourne, this was the e-mail that you answered

questions about yesterday and a few this morning.  Do you

recall that?

**A.**   Yes.

**Q.**   To what extent, if any, does this e-mail describe saving a

group of Squeezebox players?

**A.**   It does not talk about saving a group.

**Q.**   To what extent, if any, does this e-mail describe a single

Squeezebox player being a member of two different groups at the

same time?

1   **A.**   It does not.

2   **Q.**   To what extent, if any, does this e-mail describe a

3   Squeezebox player being used for individual playback after that

4   player has been added to a group?

5   **A.**   It does not.

6   **Q.**   Last question, Mr. Lambourne, opposing counsel walked you

7   through a lot of material yesterday and today about Squeezebox

8   and about Sonos' 2005 original system.

9       Can you explain for the jury whether or not you believe

10  that you invented something different from the grouping in

11  those other systems?

12  **A.**   Yes, I believe what I invented was different.

13  **Q.**   And why is that?

14  **A.**   Um, well, the synchronization was different, as I

15  explained yesterday, and the grouping was different.  I believe

16  that the grouping that was explained in the e-mail there is

17  more like dynamic grouping ad hoc.  It's not -- it's not the

18  functionality of zone scenes which we are talking about in this

19  session.

20      **MS. CARIDIS:**  Thank you, Your Honor.  Pass the

21  witness.

22      **THE COURT:**  All right.  Thank you, anything more

23  Mr. Pak?

24      **MR. PAK:**  Thank you, Your Honor.

25  \\\

1      <u>**RECROSS-EXAMINATION**</u>

2      **BY MR. PAK:**

3      **Q.**    Mr. Lambourne, let's talk about a few things.  Why don't

4      we pull up claim 4 or claim 3 and 4 of the '966 patent.

5      Counsel asked you some questions about that.

6           So do you understand that there are independent claims in

7      a patent and dependent claims?

8      **A.**    I'm not familiar with claims language.

9      **Q.**    Okay.

10     **A.**    I'm familiar with the invention and what we built and

11     created, less so the legal -- the legal notation or the way

12     that plain claims are written.

13     **Q.**    No problem.  Do you see in claim 3 it says "computing

14     device of claim 1"?

15     **A.**    Yes.

16     **Q.**    So do you understand that the language that appears in

17     claim 3 does not appear in claim 1?

18     **A.**    The computing device of claim 1 does not appear in

19     claim 3.

20     **Q.**    No.  So if we go back to claim 1 -- let's put up claim 1

21     first -- the language you just saw from claim 3 does not appear

22     in claim 1; correct?

23               **THE COURT:**  Well, it's -- that's too convoluted.  Let

24     me explain something to the jury that may help and then you can

25     use it.

1       This is a point of patents -- I had this in so many cases

2   so I am familiar with this problem -- claim 1 here is what's

3   called an independent claim but claim -- is it 3?

4       **MR. PAK:**  Yes, Your Honor.

5       **THE COURT:**  -- 3 is dependent on claim 1 because it

6   starts off by saying the system of claim 1, but then it gives a

7   further limitation.

8       So, in order to meet the -- the definition of claim 3, the

9   accused product would have to meet everything in claim 1 plus

10  the additional feature in claim 3.

11      So, it is more narrow in that sense.  It narrows it down

12  more to -- it requires even more features and more

13  functionality than claim 1.  So, it's -- claim 1 plus the

14  additional feature in claim 3.

15      Now, some of you over there are probably thinking well,

16  why -- if you have already claimed it in claim 1, why do you

17  need to have it more narrowed down?  A very good question.  And

18  this gets into patent lawyers.

19      If claim 1 is ever held to be invalid because it was in

20  the prior art, then maybe claim 3, which has an additional

21  feature, is not in the prior art and would be valid.

22      So the lawyers, when they work on these things, they

23  sometimes say, "Well, we will claim it generally in number 1

24  but if that turns out to be invalid, we will save ourselves by

25  making these additional features."

1          And I'm not saying anything is invalid or valid here.

2     That's a different point.  I'm just saying generally why they

3     do it.

4          So they have a general claim 1, more general, and then

5     they have more specifications in the dependent claims as a

6     hedge against the day that some judge, like me, might say

7     claim 1, no, that was in the prior art, invalid.

8          Then they would say, "Oh, Judge, but look, we have got

9     claim 3 and that is also infringed and that one was not in the

10    prior art."  And they might be right about that.

11         So, that is a little bit of patent law 101 for you.

12         Now, this witness is an inventor and he actually should

13    know all of this.  He swore under oath to this when he got the

14    patent.  Even though the lawyers for sure worked on this, he

15    has to swear under oath whenever he gets the patent that it's

16    all true, correct, everything.

17         So, in a general sense he should know some of this stuff;

18    and it's a fair question for Mr. Pak to ask this question to

19    the inventor.  So I'm going to -- now with the benefit of what

20    I have explained to the jury, you can ask your question again.

21              **MR. PAK:**  Thank you, Your Honor, very much.

22    **BY MR. PAK:**

23    **Q.**   Mr. Lambourne, with that in mind, claim 1 does not have

24    the requirement of causing storage of the first zone scene at a

25    location other than the computing device that you see in

1    claim 3; correct?

2    **A.**   Okay.  So you are asking me in claim 1 does it talk --

3            THE COURT:  I'm going to ask a better question.

4    Claim 3 adds an additional limitation, doesn't it?

5            THE WITNESS:  It does.

6            THE COURT:  All right.  And that additional limitation

7    is by definition not in claim 1; true?

8            THE WITNESS:  Okay.  Yes -- I apologize.  I'm not a

9    patent attorney and I don't spend time with patents.

10           THE COURT:  You are right but --

11           THE WITNESS:  Yes.

12           THE COURT:  But so, claim 3 adds something new to

13   claim 1, but it nevertheless falls within the general

14   definition of claim 1 because claim 1 doesn't reach that

15   particular refinement; right?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.  Ask your next question.

18           MR. PAK:  Thank you, Your Honor.

19   BY MR. PAK:

20   **Q.**   So, Mr. Lambourne, you could do all the elements for these

21   limitations of claim 1 as the inventor without satisfying or

22   doing what is further required in claim 3; correct?

23                   (Pause in proceedings.)

24           THE WITNESS:  If claim 1 can stand alone, I believe

25   that would be the case but I'm not entirely sure.

LAMBOURNE - RECROSS / PAK

```
 1   BY MR. PAK:
 2   Q.   Fair enough.  Now, with respect to claim 3, let's take a
 3   look at figure 1 of the '966 patent.
 4        You have that in mind.  Claim 3 just says storage location
 5   or other than the computing device.  Do you recall that?
 6   A.   The computing device in this -- in this term is the
 7   controller.
 8   Q.   Right.
 9   A.   Yeah.
10   Q.   A controller; correct?
11   A.   A controller, yes.
12   Q.   Now, in figure 1, in the system depicted of your
13   invention, how many controllers are there?
14   A.   There are two controllers shown there.
15   Q.   So 140 and 142 are two distinct controllers; is that
16   correct?
17   A.   Yes.
18   Q.   So claim 3 simply says a location other than a controller;
19   correct?  We can --
20            MR. PAK:  If we can put up figure -- claim 3 again.
21                     (Pause in proceedings.)
22   BY MR. PAK:
23   Q.   Do you see in claim 3 it says "causing the storage of the
24   first zone scene at a location other than the computing device
25   which is a controller."  Do you see that language?
```

1    **A.**    Yes, it says other than the computing device.

2    **Q.**    So, even for the additional limitation of claim 3, one of

3    the other locations other than the controller claimed in

4    claim 1 will be the other controller shown in figure 1;

5    correct?

6    **A.**    I suppose it could, yes.

7    **Q.**    That's right.  And then you will have to get to claim 4

8    where it says in addition to all of the things that are

9    required by claim 1 and claim 3, claim 4 is the only claim

10    shown here that adds this additional limitation, that the

11    location other than the computing device comprises a zone

12    player of the first defined grouping of zone players.  Do you

13    see that?

14    **A.**    Yes.

15    **Q.**    Thank you.  Now, let's turn to claim 8.  You were asked

16    some questions about that and it follows along the lines of

17    what we just talked about.

18         If I can have claim 8, so now you understand that claim 8

19    depends from claim 1 because it says the computing device of

20    claim 1.  Do you see that?

21    **A.**    Yes.

22    **Q.**    So when claim 8, a dependent claim, talks about this

23    additional limitation of a user interface, that requirement,

24    that additional requirement, is not present in claim 1;

25    correct?

1    **A.**    Correct, claim 1 didn't describe a user interface.

2    **Q.**    That's right.  And even in claim 1, are you -- sorry, let

3    me re-ask my question.

4         Even in claim 8 that talks about a user interface, does

5    this claim say anything about a particular type of user

6    interface?

7    **A.**    The claim doesn't -- I mean, the invention talked about

8    user interface and the description but the claim says user

9    interface.

10   **Q.**    That's right.  It just says user interface; correct?

11   **A.**    Yes.

12   **Q.**    So it could be a text interface like a -- how you type

13   commands into a computer; correct?

14   **A.**    Theoretically.  My invention talked about -- I mean, the

15   illustrations in the invention talk about the controller.

16   **Q.**    Right.  But looking here at claim 8, the language of the

17   claims, it does not specify a particular type of user

18   interface.  You would agree?

19   **A.**    It does not.

20   **Q.**    So it could be any type of user interface, correct, for

21   claim 8?

22   **A.**    In theory.

23   **Q.**    Now, I want to switch topics and talk about the

24   specifications going back in time to 2005.

25        **MR. PAK:**  Let's pull up TX6544.

1                   (Pause in proceedings.)

2  **BY MR. PAK:**

3  **Q.**   So this is the document I discussed with you during

4  examination.  Do you recall that?

5  **A.**   Yes.

6  **Q.**   So, first of all, this document, clock and alarm clock,

7  was created in October 20 -- 2005 last modified on January 19,

8  2006.  Do you see that?

9  **A.**   Yes.

10 **Q.**   First of all, that was roughly 20 -- 17 years ago; is that

11 right, 17 years ago?

12 **A.**   Yes.

13 **Q.**   So I think you testified in response to counsel's

14 questions from Sonos that you can't remember everything that

15 happened 17 years ago; correct?

16 **A.**   Yes, that's right.

17 **Q.**   No one can?

18 **A.**   Right.

19 **Q.**   Sitting here today, we have this document, don't we?

20 **A.**   Yes.

21 **Q.**   And this is a document that you wrote as a business record

22 back in 2005 and modified on January 19th, 2006.  Do you see

23 that?

24 **A.**   Yes.

25 **Q.**   So between your recollection of what may have happened

1  versus this business record from the time that you were working

2  on the zone scenes technology, which in your opinion is a more

3  reliable source?

4  A.   Um, well, I think the document is written down.  I mean,

5  I -- the point it's trying to make with that --

6  Q.   If you can answer my question, Mr. Lambourne.  Between

7  your recollection sitting here today trying to remember what

8  happened 17 years ago versus a business record that you

9  created, last modified January 19th, 2006, in your opinion

10  which is a better and more reliable source of what actually

11  happened in the January timeframe of 2006?

12  A.   In the document -- the document would be more reliable.

13  Q.   Thank you.  And you see that January 19th, 2006, is the

14  last modification document.  Do you remember that?

15  A.   Yes.

16  Q.   And let's scroll through again just to remind the jury

17  what this document is.  If you go down to section 4, do you

18  recall that we talked about the zone scenes chapter?

19  A.   Yes.

20  Q.   And zone scenes chapter is described in the notes as

21  concept of zone scenes but they are described in the final

22  chapter.  Do you see that?

23  A.   Yes.

24  Q.   And if we go to chapter 4 -- Mr. Fisher, page 27 -- this

25  is what you wrote in your business record back in January of

1    2006.   "Party Mode that currently ships with the product is one

2    example of a zone scene;" correct?

3    A.   I did write that, yes.

4    Q.   You disagree with it now but what you wrote back then is

5    Party Mode that currently ships with the 2005 prior art system

6    is one example of a zone scene; correct?

7    A.   I did write that, yes.

8    Q.   Yes.   The dates are important.   So if this document, going

9    back to the first page, was last modified January 19th, 2006?

10   A.   Correct.

11   Q.   Keep that date in mind.   The document that counsel showed

12   you, the zone scene specification --

13           MR. PAK:   Let's pull up TX6545 -- Mr. Fisher, maybe we

14   can leave this on the top portion of the screen.   On the bottom

15   let's pull up TX6545.

16                     (Pause in proceedings.)

17   BY MR. PAK:

18   Q.   Do you see, sir, that TX6545, the zone scenes UI

19   specification that you discussed with counsel, was last

20   modified on December 21, 2005?

21   A.   Yeah, I see that, yes.

22   Q.   So you had completed your work on the zone scenes

23   specification in its entirety by December 21, 2005.   Do you see

24   that?

25   A.   I had completed the spec, yes.

1  Q.   That's right.  And then later you came back and last

2  modified the TX6544, the clock and alarm clock specification,

3  on January 19th, 2006; correct?

4  A.   Yes.

5  Q.   So after you had completed your zone scenes UI

6  specification, a few weeks later you came back and modified the

7  Sonos UI specification for clock and alarm clock with a chapter

8  titled "Zone Scenes;" is that true?

9  A.   I wouldn't -- I wouldn't agree with that conclusion.  I

10  modified the document but I might have modified any part of it.

11  Q.   Sir, we are talking about the facts, not your

12  recollection.  You don't know with certainty what you actually

13  did 17 years ago; correct?

14        THE COURT:  Well, his -- what he is saying is he might

15  have modified the document but maybe that chapter was already

16  in there.

17  BY MR. PAK:

18  Q.   We don't know?

19        THE COURT:  We don't -- he is saying that.  He says he

20  doesn't know, but the way you pitched your question was he

21  modified chapter 4 and -- after he finished the other document,

22  and he is saying he doesn't agree necessarily with that

23  conclusion.

24        MR. PAK:  Thank you, Your Honor.

25  \\\

1    BY MR. PAK:

2    Q.    My point is simply this:  Around the same time that you

3    were completing the zone scenes UI specification, which is

4    TX6545, you were around the same time period writing the clock

5    and alarm clock UI specification with the last modification

6    date of January 19th, 2006; correct?

7    A.    Yes.

8    Q.    And in that first document, TX6544, you wrote "Party Mode

9    is one example of a zone scene;" correct?

10    A.    Yes.

11    Q.    Thank you.  And I don't want to repeat my examination from

12    yesterday, but I think we already established that nothing in

13    the actual claim language of claim 1 of the '885 and claim 1 of

14    the '966 patent requires a user to create and save the claimed

15    zone scenes; correct?

16    A.    The claim didn't use the -- use the word "user."  I didn't

17    see the word "user," correct.

18    Q.    So when you gave testimony about how the Party Mode in the

19    Sonos 2005 system was not user created or user named, the

20    actual claims being asserted in this case do not contain those

21    requirements for claim 1 of each patent; correct?

22    A.    I mean, yeah, the invention described "user" a lot.  The

23    word "user" is not in the claims.

24    Q.    You wrote the specification.  Your lawyers wrote the

25    claims; is that right?

1   **A.**   Well, the lawyers helped write the specification based on

2   my input, yes.

3   **Q.**   But you also reviewed the claims and swore under oath that

4   you understood the claims and that it actually described your

5   invention for the purposes of the claims; correct?

6   **A.**   Yes.

7   **Q.**   And that was under the penalty of perjury.  You understand

8   that?

9   **A.**   Yes.

10          **MR. PAK:**  Let's put up TX120.

11                       (Pause in proceedings.)

12   **BY MR. PAK:**

13   **Q.**   Counsel showed you this document on her Redirect

14   Examination.  Here, if we go down to below, this is the portion

15   that we discussed.  Again, in the section 2, allow user to save

16   zone profiles, it says "as requested by Tom and others."  Do

17   you see that?

18   **A.**   Yes.

19          **MS. CARIDIS:**  Your Honor, this is going outside the

20   scope of anything I asked.

21          **THE COURT:**  I think it is.  Aren't you outside the

22   scope of the cross?

23          **MR. PAK:**  That's fine, Your Honor.  I will withdraw

24   that question.

25   \\\

1   BY MR. PAK:

2   Q.   Now, with respect to TX8236, let's pull up -- this is some

3   of the -- some of the conception or your notebook that you

4   kept.  Do you remember that?

5   A.   Yes.

6   Q.   So 8236.  And if we can go to, I believe, the section that

7   you were discussing with counsel -- do you have the page --

8                    (Pause in proceedings.)

9   BY MR. PAK:

10  Q.   Let's go to page 3.  Go back to page 3 -- actually, so,

11  it's page 40, sorry.  First let's start with this.  This

12  document -- page does not talk about overlapping speaker

13  groups; correct?

14  A.   It does not.

15  Q.   And again, the claims in this case, all of them, require

16  overlapping zone scenes; correct?

17                   (Pause in proceedings.)

18           THE WITNESS:   I mean, the invention, um, talked about

19  overlapping zone scenes, yes.

20  BY MR. PAK:

21  Q.   And those -- that portion of your invention is explicitly

22  required by every claim in this case; correct?

23  A.   I would have to go back and review the claims to see --

24  Q.   That's fair enough.

25  A.   -- if it's in all the claims.

1    Q.    But at least based on your understanding of your invention

2    for those two patents, that invention requires two overlapping

3    zone scenes; correct?

4    A.    Um --

5            THE COURT:   Two or more, wouldn't it be?

6            MR. PAK:   Yes, Your Honor.

7    BY MR. PAK:

8    Q.    Two or more?

9    A.    Requires?   I mean, certainly the capability needs to be

10   there for overlapping zone scenes.   It wouldn't be a

11   requirement that the user create overlapping zone scenes.

12   Q.    Fair enough.   Your invention for each of the asserted

13   claims in this case requires the capability to create two or

14   more overlapping zone scenes.   Agreed?

15   A.    It requires the capability, yes.

16   Q.    Okay.   And the last page, it would be -- let's pull up

17   TX6539 on page 3.   Do you remember counsel asked you about this

18   page?

19   A.    Yes.

20   Q.    This is the page that has the March 1st, 2005, date in

21   your notebook; correct?

22   A.    March the 2nd, yes.

23   Q.    March 2nd, sorry.

24   A.    Yes.

25   Q.    Let's focus in on -- do you see drawing to the left where

1  you have group 1 and group 2?

2  **A.**   Yes.

3  **Q.**   And let's see what you wrote in your notebook entry on

4  this date.  What you wrote right below that figure is rooms can

5  only appear in one group at a time; correct?

6  **A.**   I wrote that, yes.

7  **Q.**   So this is TX6539, page 3; correct?

8  **A.**   Yes.

9  **Q.**   And if you look at the picture at the top, there are no

10  zone players that show up in both groups, group 1 and group 2;

11  correct?

12  **A.**   That's right.  But if you remember from yesterday, I was

13  explaining that this was a single zone scene that contained two

14  groups.

15  **Q.**   So, this page entry that counsel asked you about dated

16  March of 2005 does not disclose your claimed invention for

17  these two patents, which require the -- at least the capability

18  of creating two or more overlapping zone scenes; correct?

19  **A.**   This particular spec does not talk about overlapping zone

20  scenes but can you zoom out so I can be sure?

21  **Q.**   Sure.

22                     (Pause in proceedings.)

23          **THE WITNESS:**  This -- this particular page describes a

24  different aspect of zone scenes, which was multiple groups

25  within a zone scene.

1  BY MR. PAK:

2  **Q.**   This page, March 2nd, 2005, page 3, TX6539, does not

3  disclose your claimed invention for the two zone scene patents

4  which require the capability to create two or more overlapping

5  zones; correct?

6  **A.**   Right, correct.

7          **MR. PAK:**   Thank you.   I pass the witness.

8          **THE COURT:**   Okay.   May the witness step down?

9          **MS. CARIDIS:**   Yes, Your Honor.

10         **THE COURT:**   All right.   Mr. Lambourne, you are free to

11  go.

12         **THE WITNESS:**   Thank you.

13                    (Witness excused.)

14         **THE COURT:**   Leave all those documents up here and we

15  will have the lawyers take care of the documents.

16         **MR. PAK:**   Your Honor, I would like to do that

17  four-minute opening or mini opening.

18         **THE COURT:**   All right.   I'm going to let

19  Mr. Lambourne -- since you're -- he is not going to be

20  recalled, is he?

21         **MR. PAK:**   No, he is not.

22         **THE COURT:**   You are free to stay if you wish.   You are

23  a civilian now.   You can go back there and sit if you wish, or

24  you are free to go.   It's up to you.

25         **MR. LAMBOURNE:**   Thank you.

 1          **THE COURT:**  All right.  Now, I have told both sides

 2   that they can have up to four minutes to give you a

 3   statement -- it's not proof.  What they are about to say is not

 4   proof -- but they can make it some time today.  And Mr. Pak is

 5   going to make his now, I guess -- of what they think they have

 6   proven or where they are headed with their proof or to try to

 7   help you get a glimpse into the issues in the case and what you

 8   are hearing.

 9          And it is good to do this after a couple of days of

10   testimony because now you are -- you got your feet very much

11   wet in the facts of the case, so this will be useful to you.

12          So it's short.  It's going to be short, just four minutes

13   or less; but it will be intended to help you grasp why you are

14   even hearing this testimony and so forth.

15          I need to emphasize:  Not one word a lawyer ever says is

16   evidence.  If Mr. Pak says something that you don't think was

17   actually proven, your memory of that controls; but this is

18   intended to help you place the testimony you have been hearing

19   in context.  I think it will be very useful for both sides to

20   do this.

21          Mr. Pak, you have four minutes.

22                         **<u>OPENING STATEMENT</u>**

23          **MR. PAK:**  Thank you, Your Honor.

24          Thank you, ladies and gentlemen of the jury, for paying

25   close attention to the testimony of both witnesses that you

1    heard.

2         So far we have heard testimony from Mr. Millington, the

3    Chief Innovation Officer of Sonos, and Mr. Lambourne, the named

4    inventor of the '885 and '966 patents.

5         Both testimony is important to the scope, what is covered

6    and not covered, by the patent claims and the question of

7    validity of these two patents that you will be asked to decide.

8         The testimony you heard shows that the claims do not cover

9    synchronization of wireless smart speakers.  For example, they

10   cover -- instead what the claims cover is a particular way of

11   managing overlapping zone scenes.  You heard that.

12        Indeed, Mr. Lambourne agreed that the claims of the '885

13   and '966 patents do not require smart speakers or wireless

14   networks.

15        Mr. Lambourne also agreed that claims do not explicitly

16   require the user to save or name zone scenes or that the zone

17   scenes must be stored for a specific length of time.  That was

18   not something that is in the claims.

19        And the part about where you store the claims only appear

20   in dependent claims as you heard from Mr. Lambourne, which are

21   not requirements of claim 1 of the '966 patent.

22        Mr. Millington, that you heard from yesterday, discussed

23   the evolution of Sonos' products; but as you heard, any prior

24   art that comes before the conception date of December 31st,

25   2005, can be used to invalidate these two patents.

1    Sonos cannot claim an old or obvious technology in view of

2    the prior art including its own Sonos 2005 prior art system and

3    other things that you will hear about and heard about including

4    the public Sonos forum postings which are also prior art.

5    We heard a lot about the Sonos 2005 system because that

6    product is prior art publicly available, sold, and demonstrated

7    before the conception date of 21st of 2005.

8    Mr. Millington and Mr. Lambourne testified that the prior

9    art system of the 2005 included most of the claim elements of

10   the patent claims asserted in this case including a Party Mode

11   zone scene that was pre-saved in the Sonos 2005 system and, as

12   you saw in the historical business record of Sonos, authored by

13   Mr. Lambourne, that Party Mode is an example of a zone scene.

14   These claims require two overlapping zone scenes.  One of

15   the zone scenes was already present in the Sonos 2005 prior art

16   system.

17   Mr. Lambourne also testified regarding the prior art on

18   line forum postings.  Those are prior art.  Those Sonos

19   postings, as you heard from Mr. Lambourne, specifically

20   discussed creating, naming, and saving overlapping zone scenes.

21   Mr. Lambourne also testified to you that those Sonos forum

22   postings discussed both the concept as well as a solution in

23   the form of macros and pre-sets to implement exactly what is

24   claimed in the patents.

25   So the combination of Sonos 2005 prior art system with

1    these public Sonos forum postings renders these claims obvious.

2    If it's obvious, then the patents are invalid.

3        Finally, Mr. Lambourne testified that the Squeezebox

4    system that I showed you was publicly available, sold, and used

5    before the asserted patents' conception date making it prior

6    art as well.

7        He also confirmed for us that the Squeezebox system

8    included zone players that were connected over a wireless

9    network capable of being grouped together for synchronous

10   playback.

11       Mr. Lambourne testified that Sonos itself acquired the

12   Squeezebox system and tested it for grouping functionality

13   before releasing the prior art Sonos 2005 system.

14       So, that's all I will say about that.  You will hear much

15   more evidence in this case including from the experts as well.

16   I thank you, His Honor.

17       THE COURT:  You went 45 seconds over so the other side

18   will get to go over about 45 seconds.  Mr. Sullivan, did you

19   wish to make your statement now?

20       MR. SULLIVAN:  I do, Your Honor.

21       THE COURT:  All right.  You get an extra 45 seconds as

22   well.

23       MR. SULLIVAN:  Hopefully I won't need it.

24       THE COURT:  Thank you.

25   \\\

1              **OPENING STATEMENT**

2         **MR. SULLIVAN:**  Okay.  Thank you for putting up with us

3    so far.  I know it has been a long couple of days.  We

4    appreciate your attention to this matter and these details.

5         So we heard from Nick Millington, and the reason we heard

6    from Nick was he told you about several different things.

7         One, he told you about what it was like back in the early

8    2000s when Sonos was founded; okay.  We have to look at

9    everything back in that time period.  That's what's relevant,

10   not what we know today.  A lot of things seem easier today with

11   the advancements in technology that we have had over the last

12   20 years.

13        We have to go back again to this early 2000 time period

14   and look at it through that lens.  So that's why Mr. Millington

15   kind of explained what that state of the art was like.  He

16   explained how it was, what problem Sonos was trying to face,

17   the challenges it was trying to overcome; and he also talked

18   about the system that they developed, that 2005 system.

19        And he explained to you about how dynamic grouping works

20   and how Party Mode works.  Again, Party Mode is just another

21   form of dynamic grouping.  Instead of having to manually check

22   the boxes, you can hit Party Mode and it is a select all.

23   That's all it is.  It is another dynamic group.  Everything is

24   invoked immediately for the group.  The coordination begins

25   when you hit Party Mode but yet nothing is invoked.

 1        I'm sorry.  Yeah, it is all invoked immediately.  Sorry,
 2    I'm getting the two confused.
 3        Again, for dynamic grouping, it is immediate invocation.
 4    There's no creation and then later on invoking in the future;
 5    okay.  You got all that from Mr. Millington.  That's what he
 6    explained.
 7        Now, Mr. Millington also explained a couple of other
 8    things.  He explained why it took so long to get this
 9    commercialized.  It wasn't that it wasn't that important;
10    right.  He also explained how important this technology is
11    especially to a company like Google.
12        He also explained how the parties did have some
13    collaboration beforehand and also how the parties have now
14    competed in the marketplace.
15        Now, the 2005 system was a great system.  It was.  But it
16    doesn't mean that there wasn't some room for improvement, and
17    that's what you heard from Rob Lambourne.  He came up with a
18    way to improve upon that dynamic grouping.  And that's called
19    zone scenes.
20        Zone scenes, in his words -- and I -- I wrote it down --
21    zone scenes is much more flexible and powerful.
22        It's an improvement on the way things were being done in
23    the original system; okay.  And that's -- that's an inventive
24    concept.  You can have inventions on improvements.
25        So what he did was you would create a group in a zone

1   scene -- you can remember that figure 6 I showed you guys where

2   the first part that is setup or that creation, and then the

3   second part -- sorry -- is the invocation but that's done

4   later.  That's done in the future.

5       Now, there's some big advantages into having this kind of

6   flexible and more powerful technology with zone scenes.

7       For instance, you can have overlapping groups.  You can

8   have one speaker a member of two groups because they are not

9   invoked yet.  You couldn't do that with dynamic grouping.

10      Now, I think Mr. Lambourne, you also saw how he had walked

11  through a lot of material.  He had gone through his lab

12  notebooks, and you had seen that he had invented zone scenes by

13  himself independently.

14      He wasn't getting his ideas from the Sonos forums.  The

15  Sonos forums weren't helping him with this project.  He

16  invented this on his own.

17      Just as important, he invented it before those zone

18  scenes -- those Sonos forum postings; okay.  So he invented it

19  independently, and he invented it prior to those forum

20  postings.

21      So, with that, we are going to hear a lot more about this

22  as we get into the claims as we talk with experts.  I think as

23  my colleague on the other side had referenced, stay tuned.  A

24  lot more to come.  Thank you.

25          THE COURT:  Thank you.  We are going to take our break

1    now.  Fifteen minutes.  Please remember the admonition.  No

2    talking about the case.  Thank you for your careful attention.

3    See you back in 15 minutes.

4            **THE CLERK:**  All rise for the jury.

5        (Proceedings were heard outside the presence of the jury:)

6            **THE COURT:**  Okay.  Be seated.  I have a question.  I

7    think I asked this the other day and I thought I got the answer

8    but now I'm not so sure.

9        We are hearing all this stuff about engineering notebooks.

10   Is there some issue in this case as to what the date of

11   invention was for purposes of what the date of the invention

12   was?

13           **MR. PAK:**  No, absolutely not.  I was a little bit

14   surprised because the conception date is December 21, 2005, and

15   the Sonos forum postings predate that, the ones we are relying

16   on that -- I was a little bit surprised by that.

17           **THE COURT:**  Just a second.  Why -- where does a

18   conception date come from?

19           **MR. PAK:**  It comes from the UI specification that we

20   saw, the zone scenes UI specification that had the date of

21   December 21, 2005.  Parties agreed that is the date.

22           **THE COURT:**  That's stipulated to?

23           **MR. PAK:**  It is stipulated to.

24           **THE COURT:**  Is that true?

25           **MR. SULLIVAN:**  Yes, Your Honor.

1    **THE COURT:**  All right.  So now why are we getting off

2    into the engineering notebooks?

3    **MR. SULLIVAN:**  It's because of the Sonos forums,

4    Your Honor.  There's little snippets in these forums that talk

5    about this just general idea of zone scenes, and they are

6    trying to make it sound like Rob had never -- Rob Lambourne,

7    the inventor, had never thought about this stuff, had never had

8    the idea beforehand.

9    They are trying to get this idea that he didn't

10   independently create it.  So we need to get into the lab

11   notebooks to show that while legally for the patent the

12   conception date for all the limitations of the claims, right,

13   isn't until December of 2005, these general concepts about zone

14   scenes or some portions of the claim, we need to be able to let

15   the jury know that Rob had those ideas earlier in the process.

16   **THE COURT:**  Okay, I see.  Well, I mean, it is true.

17   You are relying on material from these boyG and other Sonos

18   forum posts.  So to meet the implication that Mr. Lambourne

19   stole his idea from the posts, they are showing the engineering

20   notebook.  So, I can see that.  And isn't that fair?

21   **MR. PAK:**  I don't have an objection to that.  The only

22   thing that surprised me in the comments from counsel was he

23   said that the conception date that he came up with the

24   invention is before the Sonos post forums, which is --

25   **THE COURT:**  He did say that.

PROCEEDINGS

```
 1            MR. PAK:  I need to correct the record on that,
 2   Your Honor.
 3            THE COURT:  Well, maybe we will in due course; but you
 4   did use that and it was not a full conception in those early
 5   engineering notebooks.
 6            MR. SULLIVAN:  Yeah, Your Honor.
 7            THE COURT:  It was a start but it was not the full
 8   conception.
 9            MR. SULLIVAN:  Agreed.  I apologize.  I don't believe
10   I used the word "conception."  If I did, I apologize.  It was
11   not my intent.
12            THE COURT:  I could be wrong.  I thought you did.  All
13   right.  Anything else the lawyers want to bring up before we
14   take our break?
15                      (Pause in proceedings.)
16            MR. PAK:  No, Your Honor.
17            MR. SULLIVAN:  Nothing, Your Honor.
18            THE COURT:  All right.  We will see you in 15 minutes.
19            THE CLERK:  Court is in recess.
20                   (Recess taken at 9:11 a.m.)
21                (Proceedings resumed at 9:32 a.m.)
22            THE CLERK:  Please remain seated.  Please come to
23   order.
24            THE COURT:  All right.  Be seated.  Thank you.  Are we
25   about to get into the depositions?  Is that what we are --
```

PROCEEDINGS

```
 1          MR. PAK:  Yes, Your Honor.

 2          MR. RICHTER:  Yes, Your Honor.

 3          THE COURT:  Before we bring in the jury, I want to --

 4     tomorrow, can you be here at 7:00 o'clock or is that --

 5          MR. RICHTER:  Yes.

 6          THE COURT:  Or is that pushing it too much?  Here is

 7     why:  My law clerk and I need to start a discussion with you on

 8     this issue of storage versus user versus -- it's not -- this is

 9     not the same -- what were the three things I had this

10     morning -- wait, no, no, no -- it was storage --

11          MR. PAK:  Save, predefined.

12          THE COURT:  -- save, predefined.

13                    (Pause in proceedings.)

14          THE COURT:  And then user and naming and how those

15     terms might play into the ultimate instructions to the jury.

16     For tomorrow -- you don't have to file anything but you can

17     file up to five pages of whatever you want me to read on that

18     in advance, but then tomorrow we need to start a discussion,

19     does it matter -- maybe you will say it doesn't matter -- or

20     you might say this is very important and here is -- and I need

21     to start understanding the specification and how it ties into

22     the -- into the differences of view and how I'm going to

23     explain it to the jury ultimately.

24          So, you don't have to say a word now.  Just be here at

25     7:00 a.m.
```

1      MR. PAK:  Yes, Your Honor.

2      THE COURT:  Okay.  Let's bring in the jury.

3      MS. CARIDIS:  Your Honor, is there a time in which you

4  want -- by which you want the five pages that you just

5  referenced?

6      THE COURT:  Yes.  8:00 a.m. -- I mean, 8:00 p.m.

7  8:00 p.m.

8      MS. CARIDIS:  Thank you.

9      THE CLERK:  All rise for the jury.

10     (Proceedings were heard in the presence of the jury:)

11     THE COURT:  Welcome back.  Be seated.  Are we now to

12  turn to some depositions?  Is that what I understand; correct?

13     MR. RICHTER:  Yes, Your Honor.

14     THE COURT:  Okay.  All right.  Ladies and gentlemen of

15  the jury, I want to make a -- give you a heads up on what's

16  about to happen here.  I think we are going to have -- is it

17  three witnesses by deposition coming up?

18     MR. RICHTER:  Time permitting, it could be three to

19  five, Your Honor.  One witness is across two videos just to --

20     THE COURT:  Okay, that's fine.  Here is the thing:  In

21  lawsuits both sides get to investigate beforehand, and one of

22  the ways in which you can do investigation is a formal, almost

23  in-court proceeding called a deposition.

24     Usually, though, it occurs at the lawyer's office; but a

25  witness can be subpoenaed to appear at a lawyer's office, to

1   raise their right hand, take an oath to tell the truth, and

2   then proceed just as you would in court, question, answer,

3   question, answer.  They show them documents, read the

4   documents, question, answer.  Just like you have seen it right

5   here in court, and it is under oath; and it is -- it is usable

6   subject to the rules of evidence at trial.

7        Now, sometimes a witness is not available to come in

8   person at the time of the trial.  Sometimes they have even

9   passed away and -- or they may be ill or they are on a safari

10  or something, some exotic vacation.  So they appear by their

11  deposition if they were deposed.  Not everybody gets deposed.

12  Depose is the same thing as deposition.

13       But the testimony counts just as much as if they were here

14  in person.  It's important for you to have that in mind.  It

15  counts just as much as if they were here in person.

16       Now, in the old days we just had the booklet, the Q and A,

17  like the court reporter would do a little booklet of a 150

18  pages of deposition testimony, and then we would read it to the

19  jury.

20       And we still do that occasionally, but I guess for these

21  we are going to do it by video.  So they also videotape these

22  depositions.  So now you will get to see and hear the witness

23  on the screen.  Do you also have the little running script at

24  the bottom?

25            MR. RICHTER:  Yes, we do, Your Honor.

1          **THE COURT:**  So they have got little script at the

2    bottom that will help you follow the testimony as well as hear

3    it, and -- and that's -- so it's just like -- so it's -- it

4    will move right along.  The -- the first -- let's see.

5          So we are going to transition to the operations now of the

6    Google system.  You have been hearing a lot about the Sonos

7    system.  Now we are going to hear about the Google system.

8          And in order to do that, we are going to play deposition

9    testimony from someone named Tomer Shekel, S-H-E-K-E-L, a

10   Google product manager, familiar with Google's technology

11   followed by additional Google employees.  And I will tell you

12   who they are in -- as we get closer to them.

13         How long will Mr. Shekel -- how long will his testimony

14   run just approximately?

15         **MR. RICHTER:**  Eleven minutes.

16         **THE COURT:**  Eleven minutes, okay.  So, I need to alert

17   you to one other thing.  Because it probably was a seven-hour

18   deposition, you are going to hear 11 minutes, there will be

19   bits and pieces throughout the deposition.  It might appear

20   disjointed at sometimes but that's okay.

21         We -- we don't want to play the entire thing for you

22   unless you want to, stay extra, and -- no, I know you don't

23   want to.  They winnowed it down to 11 minutes.  Are you ready

24   to roll?  Okay.

25         So at this time with that long explanation, now this

1    counts from your time.  You have got to give the court reporter

2    a CD for the Court of Appeals to have the record of what was

3    played.  All right.

4          MR. RICHTER:  Sounds good.

5          THE COURT:  You don't have to do it now but you have

6    to do it.  Okay.  Roll the tape.

7                    (Video was played but not reported.)

8          MR. RICHTER:  Your Honor, this completes the video

9    deposition of Mr. Shekel.  Sonos would like to move into

10   evidence TX125, which was discussed during the video.

11         THE COURT:  One through 5?

12         MR. RICHTER:  125.

13         MR. PAK:  Counsel, can I see that because that was not

14   played on the video?

15         MR. RICHTER:  Sure.

16         THE COURT:  125.

17                    (Pause in proceedings.)

18         MR. PAK:  Your Honor, we are fine with this exhibit.

19         THE COURT:  125 is received in evidence.  Okay what's

20   next?

21        (Trial Exhibit TX125 received in evidence.)

22         MR. RICHTER:  Any need for copies to Madam clerk or

23   Your Honor?

24         THE COURT:  Is it for the next deposition or for the

25   one we just saw?

PROCEEDINGS

 1              **MR. RICHTER:**  That was just a copy of Exhibit 125,

 2     Your Honor.

 3              **THE COURT:**  Well, make sure that the -- that there's a

 4     marked copy for the -- going to the jury room.  Is that it

 5     right here?

 6              **MR. RICHTER:**  Yes, that's the marked copy, Your Honor.

 7              **THE COURT:**  Very well.  Okay.  What's next?

 8              **MR. RICHTER:**  The next video is Mr. Pedro, a Google

 9     software engineer.

10              **THE COURT:**  All right.  Same basic statement.  You may

11     go ahead and roll the tape.

12                  (Video was played but not reported.)

13              **MR. PAK:**  Your Honor, Sean Pak, just one note.  I

14     think it would be important to state the dates of these

15     depositions because these depositions were taken before the new

16     functionality --

17              **THE COURT:**  I should have done that.

18              **MR. PAK:**  -- the new design was released.

19              **THE COURT:**  Can you tell us the dates of -- the first

20     deposition was what?

21              **MR. PAK:**  I have those dates.

22              **THE COURT:**  Well, let's make sure we agree.  Sometimes

23     lawyers don't agree.

24              **MR. RICHTER:**  I believe the date of the first

25     deposition, Your Honor, was November 23rd, 2022.

**PROCEEDINGS**

1          **MR. PAK:**  That's correct.

2          **THE COURT:**  All right.  So that's stipulated to and

3     remember -- November what?

4          **MR. PAK:**  2022.

5          **THE COURT:**  All right.  And what's next?

6          **MR. RICHTER:**  I believe the date of the second

7     deposition was July 7th, 2022.

8          **MR. PAK:**  That's correct.

9          **THE COURT:**  All right.  Then keep that in mind.

10         **MR. PAK:**  Thank you.

11         **THE COURT:**  What else do we have?  That was 25

12    minutes.  Do we have another one?

13         **MR. RICHTER:**  Yes, we do, Your Honor.  Before we do

14    that, I would like to move into evidence the exhibits that were

15    just shown with respect to the first -- the second witness we

16    played.

17         **THE COURT:**  Okay.  Go ahead, one at a time.

18         **MR. RICHTER:**  Okay.  The first is TX62.

19         **THE COURT:**  Agreed?

20         **MR. PAK:**  No objection, Your Honor.

21         **THE COURT:**  Received in evidence.

22        (Trial Exhibit TX62 received in evidence.)

23         **MR. RICHTER:**  The next exhibit is TX78.

24         **MR. PAK:**  No objection, Your Honor.

25         **THE COURT:**  Received in evidence.

1       (Trial Exhibit TX78 received in evidence.)

2           **MR. RICHTER:**  TX81.

3           **MR. PAK:**  No objection.

4           **THE COURT:**  Received.

5       (Trial Exhibit TX81 received in evidence.)

6           **MR. RICHTER:**  TX82.

7           **MR. PAK:**  No objection.

8           **THE COURT:**  Received.

9       (Trial Exhibit TX82 received in evidence.)

10          **MR. RICHTER:**  TX84.

11          **MR. PAK:**  No objection.

12          **THE COURT:**  Received.

13      (Trial Exhibit TX84 received in evidence.)

14          **MR. RICHTER:**  Thank you.

15          **THE COURT:**  Another depo now?

16          **MR. RICHTER:**  Yes, correct.  The next deposition is

17  the first video but the next two will be the same individual.

18  His name is Ken Mackay.  I believe he is Google's

19  representative.

20          **THE COURT:**  Mackay.  And that -- okay.  What's the

21  date of the depo?

22          **MR. RICHTER:**  I believe -- I need to check the video

23  on the date of the deposition.  It will appear in the bottom

24  right corner but if my colleague has it...

25          **MR. PAK:**  I have it, Your Honor.  So I think the first

PROCEEDINGS

1   deposition that will be played is May 10th, 2022.

2          MR. RICHTER:  That sounds right to us.

3          THE COURT:  Mr. Mackay.

4          MR. PAK:  Yes, Your Honor.

5          THE COURT:  May, what other --

6          MR. PAK:  May 10th, 2022.

7          THE COURT:  That's the one that the jury will now

8   hear?

9          MR. PAK:  Yes, Your Honor.

10         MR. RICHTER:  Thank you.

11         THE COURT:  So that's evidence in the case.  And how

12  long roughly will this one be?

13         MR. RICHTER:  About 40 minutes, Your Honor.

14         THE COURT:  Great.  Go ahead and roll -- everybody

15  good over there?  Can you go 40 minutes?  Great.  They all are

16  excited.

17                     (Laughter)

18         THE COURT:  Please roll the tape.

19              (Video was played but not reported.)

20         THE COURT:  Counsel, can you pause it a second?  Is it

21  about over?  I need to -- the marshals need to use this room

22  for something, so I'm going to let the jury have a break.  How

23  close to being done are we with this one?

24         MR. RICHTER:  Maybe 10 more minutes.

25         THE COURT:  Let's take a break now then.  Please

1    remember the admonition.  I apologize for the interruption.

2    The U.S. Marshal needs to come through here, and it will be

3    better if the courtroom is empty.  So, please, we will see you

4    back here in 15 minutes.

5              THE CLERK:  All rise for the jury.

6         (Proceedings were heard outside the presence of the jury:)

7              THE COURT:  Okay.  Be seated, please.  I may, just to

8    put the panic mode into both sides, I may give the jury a very

9    simplified instruction on what these claims mean and -- because

10   they are so long and convoluted.  I haven't decided to do that

11   yet, but it would be of enormous help if you would be able to

12   agree on what is -- what specific words you contend are not

13   present in the accused device and/or not present in the prior

14   art for purposes of invalidity, so then the jury can zero in on

15   the right issues.

16        If you don't do that, I may do it for you, because it's a

17   lawyer trick to try to confuse the jury with as much wordage

18   like this as possible and to waive your hands and say it

19   infringes or waive your hands and say it was anticipated.  So,

20   I don't think that's fair to the jury.

21        So, start thinking about that.

22        Okay.  I'm going to take a break, and we will resume in 15

23   minutes.

24              THE CLERK:  Court is in recess.

25                   (Recess taken at 10:47 a.m.)

1          (Proceedings resumed at 11:02 a.m.)

2          **THE CLERK:**  Please remain seated.  Please come to

3     order.

4          **THE COURT:**  All right.  Let's go back to work.

5     Everybody here?  Be seated, please.

6          I have got a question for my own edification.  I have been

7     reading -- when all of you get to be in your 70s, maybe you

8     will understand.  It's so hard to read this fine print.  I

9     really struggle at my age trying to read this print.  And I can

10    do it, but sometimes I have to start over because my eyes go

11    off onto a different line.

12         But is this the -- I'm reading the one that happens to be

13    '966 -- is that the same as what was published in 2005, or is

14    this a brand-new -- brand-new specification?

15         **MR. RICHTER:**  The specification was published in 2006,

16    I believe, Your Honor, but it's a straight continuation and so

17    it's the nearly identical specification from the original

18    filing, yes.

19         **THE COURT:**  But it's different in some respect?

20         **MR. RICHTER:**  It has an initial sentence in the very

21    first that says this application claims priority to such and

22    such an application.  Other than that, no changes.

23         **THE COURT:**  All right.  So this -- column 8 where it

24    has the paragraph that says, "One mechanism for joining zone

25    players together," et cetera, and then it has bathroom bedroom,

1    den, dining room, a bunch of -- foyer.  That was in the 2006.

2    Is that what you are saying?

3            MR. RICHTER:  That's correct, Your Honor.

4                    (Pause in proceedings.)

5            THE COURT:  There is a question lurking around in my

6    mind.  I'm trying to see if I can articulate it before I -- or

7    should I just wait?

8            MR. PAK:  Your Honor, I will look into this more, but

9    I think if you read that paragraph, it says the 2006 date

10   corresponds to the provisional application and then it goes up

11   to talk about a -- another patent application that was filed in

12   September of 2007 and so on.

13       So I do think we probably need to go back -- I think both

14   of us -- to just confirm what was actually being filed as a

15   continued -- as a provisional versus what was published,

16   because there is quite a lengthy chain of applications, so I

17   don't think we should just assume right now that everything is

18   the same because the date -- the 2006 date that I see is the

19   provisional date, Your Honor.

20           THE COURT:  Well, I want you to do that.

21           MR. PAK:  Yeah.

22           THE COURT:  I will give you one example of what is

23   somewhat troubling to me, and I'm sure there's an answer, but

24   here it is:  That is, claim 1 is -- makes a point of several

25   things, but I will just mention two -- that there has to be at

```
 1   least three zone players and that the zone scenes are

 2   overlapping, specifically meaning that the first zone player is

 3   in two different zone scenes; right?

 4            MR. RICHTER:  Yes.

 5            THE COURT:  Both patents require that.

 6      So I am -- what I was looking for in the specification --

 7   and I have only read 80 percent of it -- is where that --

 8   the -- the how-to -- what the written description is of how you

 9   go about achieving the overlapping zone scenes.

10      Now, there is -- okay.  So there's certainly discussion of

11   different zone groups, that's in there, but that's not the same

12   as overlapping.

13      And so I'm asking where is the written description that

14   actually supports the claims?

15            MR. RICHTER:  It could be helpful, Your Honor, if you

16   will recall, Google actually moved for summary judgment.

17            THE COURT:  I know that and I rejected it, but now I'm

18   raising it again.

19            MR. RICHTER:  Well, I was going to say in response to

20   that motion, Sonos actually pointed out how the patent -- those

21   claims did have written description support for the overlapping

22   zone groups concept.

23            THE COURT:  Where is that part so I can read that?

24   That will help me on claim construction.

25                     (Pause in proceedings.)
```

1        **MR. RICHTER:**  Yes, Your Honor.  So the zone scenes

2   specification talks about the process of selecting the zones

3   that you would like to put into a first zone scene and

4   selecting zones that you would like to put into a second zone

5   scene.  And so of the -- on column 10, line 12 the patent reads

6   "Figure 5B shows another user interface 520."

7        **THE COURT:**  Sorry --

8        **MR. RICHTER:**  I'm sorry.

9        **THE COURT:**  -- column what?

10       **MR. RICHTER:**  I'm referencing the '885 patent,

11  Your Honor, but I can --

12       **THE COURT:**  All right.  I have the '966.

13       **MR. RICHTER:**  No problem.  I will reference the '966.

14       **THE CLERK:**  All right.

15       **MR. RICHTER:**  So that will be in column 10, line 12.

16  And that says, "Figure B shows another user interface 520 to

17  allow a user to form a scene.  The user interface 520 that may

18  be displayed on a controller or computing device lists

19  available zones in a system" -- and this is the important

20  part -- "The list of zones in the user interface 520 includes

21  all the zones in the system, including the zones that are

22  already grouped."

23       So that allows the user, even after they have made a first

24  zone scene, they can then go back to the system, create a

25  second zone scene and then they have the list of all the zones

1  to select from to create that second zone scene, including ones

2  that happen to be part of the first zone scene.  And that was

3  the language that Your Honor pointed to in rejecting Google's

4  motion on this very issue.

5          **THE COURT:**  Well, I -- that's it.

6          **MR. PAK:**  It doesn't say much, Your Honor, and that's

7  the reason why --

8          **THE COURT:**  I don't -- well, here is what I -- summary

9  judgment is one thing.  Getting deep into a trial like this is

10 another.

11         One of the things that is coming through to me in all of

12 this testimony is that there was a lot of prior art and that

13 the actual invention over the prior art was this idea of

14 overlapping zone scenes.

15         So, you would think there would be column after column

16 that would explain to an engineer how to implement overlapping

17 zone scenes and because that was the greatest thing since

18 sliced bread was overlapping zone scenes; and, yet, that's all

19 you can point to is that one thing.

20         That -- I may -- I worry if I -- I'm not taking anything

21 back right now anyway, but I'm putting you all on notice that

22 it worries me that something that thin can support something

23 this big as a supposed improvement over the prior art.

24         I know I ruled against you on it and maybe -- is this --

25 I'm going to -- don't answer this now, but is this for the

PROCEEDINGS

 1   jury, or is this for me?  Is there questions of fact here?  And

 2   it troubles me that a thin, single sentence, by implication --

 3   it's not even clear-cut.  It doesn't say "overlapping zone

 4   scenes."  You have to infer that -- that it can support the

 5   essence of the invention over the prior art.

 6          **MR. RICHTER:**  We would be happy to brief the issue.

 7          **THE COURT:**  I think you should.  I -- give me briefs

 8   on that not tomorrow but maybe by the next day, an

 9   8:00 o'clock -- tomorrow at 8:00 o'clock.  Give me -- p.m.

10   Give me five-page briefs on that subject.

11          And don't say something like, "Oh, you have already

12   ruled." I know I ruled.  I went back and looked at it a while

13   ago.  But that was summary judgment.  This is the real thing

14   now.  This is where the rubber meets the road.  And maybe I

15   will change my mind, maybe not.  I'm not sure.  Don't -- I'm

16   just talking out loud here because I'm learning it in greater

17   detail now than I understood it before.

18          **MR. RICHTER:**  Understood, Your Honor.

19          I will note it could be relevant the fact that Google is

20   not challenging the written description at this trial.

21          **THE COURT:**  Well, I'm bringing it up myself.

22          **MR. RICHTER:**  Fair enough.

23          **THE COURT:**  I'm bringing it myself.

24          **MR. RICHTER:**  Understood.

25          **THE COURT:**  Because I'm not going to relive this case

1    later on because I didn't get it right on written description.

2         So, I'm not ruling against you yet, but I'm putting you

3    and Google on notice that I worry that I made a mistake on

4    summary judgment and -- now that I understand the case

5    better -- I didn't understand that it was the heart of the

6    case.  This is the heart of the case is the overlapping -- the

7    overlapping static --

8         All right.  Let's bring in the jury and let's keep the

9    tape rolling.

10                   **MR. PAK:**  Thank you, Your Honor.

11                        (Pause in proceedings.)

12              **THE COURT:**  While we are waiting, have you-all given

13   me the prosecution history?

14              **THE CLERK:**  All rise for the jury.

15        (Proceedings were heard in the presence of the jury:)

16              **THE COURT:**  Welcome back.  Welcome back.

17        By the way, over there in the jury box, feel free, if you

18   think it would help you stay awake or to energize your mind or

19   focus your concentration to stand up now and then and just

20   stretch.  It sometimes does.  I'm tempted to do it myself.  So

21   don't feel that it would be rude.  It would be okay for you to

22   be comfortable about it and stay comfortable and stay alert.

23   This is hard, hard, hard, hard, stuff to get.

24        By the way, I'm going to repeat this:  Both sides have the

25   burden of proof on something here.  If you get to the end of

1    the case and don't understand it, the party with the burden of

2    proof, you might decide, loses.

3        The party with the burden of proof has got to prove that

4    they are more likely to be right than not; right.  And in order

5    to prove that to you, they got to help you understand it.  It's

6    their job to help you understand it.

7        If it turns out, despite your very best efforts, you

8    cannot understand it, you cannot rule that somebody has carried

9    their burden of proof.  Both sides have that problem in this

10   case.  So, try your best to understand it, but keep what I just

11   said in mind.

12       All right.  Roll the tape, please.

13                   (Video was played but not reported.)

14           **THE COURT:**  Is that it?

15           **MR. RICHTER:**  Yes, Your Honor.  That's it for video 1.

16   If you will permit me, I have a few exhibits I would like to

17   move in at this time.

18           **THE COURT:**  Sure.  Go ahead.

19           **MR. RICHTER:**  TX36 --

20           **MR. PAK:**  I think there was a portion of that

21   deposition that was not read for some reason as a counter.

22           **MR. RICHTER:**  One second.

23                   (Pause in proceedings.)

24           **MR. PAK:**  So for completeness I could read a short Q&A

25   that follows the testimony we just saw.

```
 1              THE COURT:  Any objection?

 2              MR. RICHTER:  Yes, I believe we do have an objection,

 3    Your Honor.

 4                        (Pause in proceedings.)

 5              THE COURT:  Is this under the rule of completeness?

 6              MR. PAK:  Yes, Your Honor.

 7              MR. RICHTER:  Well, I don't think so.  I think they

 8    removed this counter last night.  I have to check but we had a

 9    long exchange --

10              MR. PAK:  Your Honor --

11              MR. RICHTER:  -- for weeks leading up and they removed

12    some at the last minute, and I think it is too late to add it

13    back in at this point.

14              THE COURT:  Mr. Pak, is that true?

15              MR. PAK:  I don't think so, Your Honor.

16              THE COURT:  Hand up what you want to read and let me

17    see it first.

18              MR. PAK:  Yes, Your Honor.  It might have been -- it

19    is just the last paragraph, the Q&A.

20              THE COURT:  I can't tell, which is the part you want

21    to read in?

22              MR. PAK:  The red part at the end.

23                        (Pause in proceedings.)

24              THE COURT:  This seems to be relevant to what I heard

25    just now.
```

 1         **MR. RICHTER:**  I'm not sure if it is or isn't.  We

 2   received an e-mail from their counsel late last night and said

 3   "Please remove that portion," and so we had our video guy,

 4   Mr. Jay, he removed that portion at their request.

 5         **THE COURT:**  All right.  All right.  If that's true,

 6   he is reversing himself and wants it read after all.  It's only

 7   a few lines of testimony.  Do you have any objection?

 8         **MR. RICHTER:**  Yes, we object to the testimony being

 9   read.

10         **THE COURT:**  All right.  Overruled.

11         **MR. RICHTER:**  Thank you.

12         **THE COURT:**  Go ahead.  Read it out loud.  Say

13   "Question," read it; say "Answer," read it.  And it's the same

14   witness and the same deposition.  Go ahead.

15         **MR. PAK:**  (As read:) "QUESTION:  And in this chain,

16   and that portion of the chain that we just looked at, referring

17   to whether or not there are plans to enable grouping cast

18   enabled speakers, similar to what Sonos do to allow multiroom

19   playback, that's a chain that you were copied on in March 2015;

20   isn't that right?"

21      "ANSWER:  It appears so, yes.  I did receive hundreds of

22   e-mails per day, and I don't read all of them."

23         **THE COURT:**  Okay.  All right.  That's evidence in the

24   case too.  Okay.  What's next for Sonos?

25         **MR. RICHTER:**  Thank you very much.  If you will permit

1    me, just some of the exhibits I would like to move in at this

2    time, the first one being TX36.

3            **THE COURT:**  Any objection?

4            **MR. PAK:**  No, Your Honor.

5            **THE COURT:**  36 is in.

6        (Trial Exhibit TX36 received in evidence.)

7            **MR. RICHTER:**  TX38, please.

8            **MR. PAK:**  No objection.

9            **THE COURT:**  In.

10        (Trial Exhibit TX38 received in evidence.)

11            **MR. RICHTER:**  TX41.

12            **MR. PAK:**  No objection, Your Honor.

13            **THE COURT:**  In.

14        (Trial Exhibit TX41 received in evidence.)

15            **MR. RICHTER:**  43.  The next one was 43.

16            **MR. PAK:**  No objection.

17            **THE COURT:**  In.

18        (Trial Exhibit TX43 received in evidence.)

19            **MR. RICHTER:**  44.

20            **MR. PAK:**  No objection.

21            **THE COURT:**  In.

22        (Trial Exhibit TX44 received in evidence.)

23            **MR. RICHTER:**  TX45.

24            **MR. PAK:**  No objection, Your Honor.

25            **THE COURT:**  Received.

```
 1        (Trial Exhibit TX45 received in evidence.)

 2             MR. RICHTER:  TX48.

 3             MR. PAK:  And no objection to the last one.

 4             THE COURT:  Received.

 5        (Trial Exhibit TX48 received in evidence.)

 6             MR. RICHTER:  Thank you.  We have one final video for

 7    the day.  I believe it is the same witness deposed later in

 8    that same year.

 9             THE COURT:  All right.  Roll the tape.

10             MR. PAK:  Your Honor, just to clarify for the record,

11    this is after the new design was implemented by Google.  It is

12    the second deposition testimony.

13             THE COURT:  And the name of the witness again is what?

14             MR. PAK:  Ken MacKay.

15             THE COURT:  All right.  So the first, what we heard,

16    was the earlier product, and now we are getting to the redesign

17    product?

18             MR. PAK:  That's exactly right, Your Honor.

19             THE COURT:  All right.  How long is this one going to

20    be?

21             MR. RICHTER:  Twenty-eight minutes, Your Honor.

22             THE COURT:  All right.  Well, we still have an hour to

23    go whenever -- so be ready with your next live witness.

24             MR. RICHTER:  We will.  Thank you.

25             THE COURT:  All right.  Great.  Let's roll the tape.
```

PROCEEDINGS

```
 1              (Video was played but not reported.)

 2         THE COURT:  All right.  We got a live witness coming?

 3         MR. RICHTER:  We do, Your Honor.

 4    May I move two exhibits into evidence?

 5         THE COURT:  Yes, you may.

 6         MR. RICHTER:  Thank you.  TX155 and 156, please.

 7         MR. PAK:  No objection.

 8    (Trial Exhibits TX155 and TX156 received in evidence.)

 9         THE COURT:  Both received.

10         MR. RICHTER:  And I believe the time charged to these

11    videos up here is 88 minutes for Sonos and 11 minutes for

12    Google.

13         THE COURT:  Oh, just a second.  This is for all of the

14    depositions?

15         MR. RICHTER:  Just the ones we saw today, the four

16    videos today.

17         THE COURT:  All right.  All right.  So 88 -- say it

18    again -- 88?

19         MR. RICHTER:  Yeah, 88 for Sonos, I believe, and 11

20    for Google.

21         THE COURT:  All right.  I will change my -- what I

22    have written down.  Thank you.

23         MR. RICHTER:  Thank you.

24         THE COURT:  Before we go to the next witness, how is

25    everyone holding up?  Are you able to push on until
```

PROCEEDINGS

1    1:00 o'clock without a break?  Does somebody need a break?

2                    (Pause in proceedings.)

3         **THE CLERK:**  No one says you need a break.

4      Okay.  Next witness.

5         **MR. SHEA:**  Good morning, Your Honor, Rory Shea on

6    behalf of Sonos, and we will be calling as our next witness,

7    Dr. Kevin Almeroth.

8         **THE COURT:**  All right.  Let's bring him forward.

9      Welcome, sir.  Please come forward, raise your right hand.

10                        **KEVIN ALMEROTH**,

11   called as a witness for the Plaintiff, having been duly sworn,

12   testified as follows:

13        **THE CLERK:**  Please be seated.  Speak directly into the

14   microphone.  State your full name for the record and spell your

15   last name.

16        **THE WITNESS:**  Kevin Christopher Almeroth,

17   A-L-M-E-R-O-T-H.

18        **MR. SHEA:**  And, Your Honor, before we start, there's a

19   few of the physical exhibits that have already been moved into

20   evidence that we may be using with Dr. Almeroth.  Would it be

21   okay if I grabbed those now?

22        **THE COURT:**  Of course.  Go ahead.

23        **MR. SHEA:**  Okay.  Thank you.

24                    (Pause in proceedings.)

25        **MR. SHEA:**  I believe there's one I'm not seeing over

1   there.  Would there be another place, perhaps?  There's the

2   smaller Google one.

3                        (Pause in proceedings.)

4           **MR. SHEA:**  We found it, okay.

5       May I proceed, Your Honor?

6           **THE COURT:**  Yes, you may.

7                       <u>**DIRECT EXAMINATION**</u>

8   **BY MR. SHEA:**

9   **Q.**   Dr. Almeroth, can you please introduce yourself to the

10  jury?

11  **A.**   Yes.  My name is Kevin Almeroth.  I'm a Professor Emeritus

12  at the University of California in Santa Barbara.

13  **Q.**   Dr. Almeroth, did you prepare any slides to help assist

14  with your testimony today?

15  **A.**   Yes, I did.

16          **MR. SHEA:**  Permission to approach, Your Honor.

17          **THE COURT:**  Sure.

18                       (Pause in proceedings.)

19  **BY MR. SHEA:**

20  **Q.**   So, Dr. Almeroth, what I have handed you are two binders.

21  One is your -- a binder of demonstratives and then also a

22  binder of exhibits.

23      What were you asked to do on this case?

24  **A.**   I was asked to offer opinions about infringement, which we

25  haven't heard a lot of yet.  A lot of it has been background

1    and what was happening in 2005.

2        But infringement will be one of the things that I talk

3    about with respect to whether or not the accused Google

4    products infringed the '885 or '966 patent.

5        There's also a couple of damages-related technical issues

6    that I will be talking about.  And then, at some point in the

7    future, I will be talking about validity in more detail.

8    **Q.**   Is there anything you are going to be focusing on

9    specifically today, Dr. Almeroth?

10   **A.**   Yes.  I'm going to be talking about infringement.  And

11   given that it's after 12:00 o'clock, I probably won't get to

12   the damages-related issues.  And then I will also have some

13   background to start as well.

14   **Q.**   And why are we starting with infringement, Dr. Almeroth?

15   **A.**   We are starting with infringement because it's Sonos'

16   burden to describe the accused products, how they operate and

17   whether or not they meet limitations of the claims.  And so I

18   have done a lot of analysis to understand how the accused

19   products work and whether or not they meet the limitations of

20   the claims that we have been talking about.

21   **Q.**   Before we talk about your opinions, I would like to talk a

22   little bit about your background.  What is your current

23   position?

24   **A.**   I am currently a Professor Emeritus in the Department of

25   Computer Science at the University of California in,

**ALMEROTH - DIRECT / SHEA**

1   Santa Barbara.

2   **Q.**   How did you become interested in computer science?

3   **A.**   Well, when I was quite young, it was even before the

4   internet was kind of something that most people understood at

5   least what it was, back in the days when you would use a

6   dial-up modem to connect to bulletin boards, so even before

7   AOL.  I was very interested in being able to reach beyond what

8   you could do on a single computer, to see what other computers

9   you could connect to, what services they did, what kinds of

10  information you could get, and that really spurred my early

11  interest.

12  **Q.**   Can you tell us about your educational background?

13  **A.**   Yes.  I went to school at Georgia Tech and earned three

14  degrees, an undergraduate, a master's and a Ph.D. all in

15  computer science.  My Ph.D. came in 1997.

16  **Q.**   What was the subject of your doctoral dissertation?

17  **A.**   In kind of the mid-90s that was really when the web was

18  first starting to take off.  Before then, most of what was

19  happening was sending e-mails or being able to access documents

20  on certain servers.  And so my interest was really in trying to

21  see if we could get the internet to do things like streaming

22  audio and video, to emulate what you could do with a TV and

23  then to innovate beyond those kinds of services to do things

24  that we take for granted today but didn't really exist in the

25  mid-90s.

ALMEROTH - DIRECT / SHEA

1  Q.   What did you do after you got your Ph.D.?

2  A.   I was interested in teaching.  I wanted to continue in a

3  university setting.  So I looked for academic positions.  And

4  right after I graduated, I ended up in Santa Barbara

5  California, at the university there.

6  Q.   What do you do as a college professor?

7  A.   As a college professor I certainly teach classes.  I have

8  taught classes.  I also do research on trying to solve new

9  problems in the internet and then also work in the field.

10 Q.   What types of courses have you taught?

11 A.   I have taught both undergraduate and graduate-level

12 courses.  Primarily focused in networking and multimedia, so

13 things like audio and video at both the undergraduate and the

14 graduate level.

15 Q.   When you say "research," what do you mean?

16 A.   So research is looking at the way things operate and

17 proposing solutions for the problems that would exist.

18      And since my area of research is focused on networking and

19 multimedia, those are the areas that I look to find problems in

20 the internet and to solve.

21      I work with students, usually graduate-level students who

22 are pursuing their own Ph.D.s.  We try and solve those

23 problems, do analysis and then eventually be able to publish

24 those papers in academic conferences or journals.

25 Q.   Did you have any particular themes that you focused on in

1  your research?

2  **A.**   Yes, so that's on the next slide in the upper left.

3       From the very beginning, I was interested in streaming

4  media in the internet, being able to see audio and video appear

5  on your desktop long before we had broadband or the kinds of

6  smart devices that we use on a daily basis, also looking at

7  being able to send that content across the internet.

8       And then as wireless networking and these smart phones

9  have started to exist, being able to solve the problems across

10  a wide variety of those kinds of devices.

11  **Q.**   I think you -- I heard you mention you worked in the field

12  before.  What did you mean by that?

13  **A.**   Yes.  I was very much interested in not just publishing

14  papers but working with the companies who were actually working

15  on these problems in industry.

16       Sometimes they were start-ups, sometimes they were well

17  established companies like IBM and Intel, for example.

18       But I was interested in working with those companies to

19  see the ideas that we were developing, reach out and actually

20  be deployed and usable by people who use the internet.

21  **Q.**   What is an example of a standards group that you work

22  with?

23  **A.**   Yes.  So as part of this effort, there are standards

24  groups like the Internet Engineering Task Force.  They have

25  developed many of the standards that are the basis for network

**ALMEROTH - DIRECT / SHEA**

1  communication today.  How you send web pages and e-mail are all

2  standards developed by the IETF.  So I participate in that

3  group and I have written some of the standards that relate to

4  streaming audio and video over the internet.

5  **Q.**  Has any of your work in the field involved the kinds of

6  technology that relate to this case?

7  **A.**  Yes.  Some of that work in the standards group, some of

8  the work with Intel, some of the work with a company called

9  Real Networks that has done some streaming.  These are all

10  kinds of companies that have developed and used technology to

11  stream content to things like consumer devices, smart phones,

12  smart speakers, that kind of technology.

13  **Q.**  Have you received any awards during your career?

14  **A.**  Yes.  So I have had some teaching awards and some research

15  awards.  Probably the culmination of my work at the university

16  was something called an IEEE fellow.  I think, actually,

17  Mr. Pak mentioned that in his opening.  It's essentially the

18  top 1 percent of people in the Institute of Electrical and

19  Electronics Engineers to recognize the research contributions

20  that they have made.

21  **Q.**  Thank you, Dr. Almeroth.

22       **MR. SHEA:**  Your Honor, at this time I would like to

23  tender Dr. Almeroth as an expert in the fields of networking

24  and network-based systems and applications.

25       **MR. PAK:**  No objections, Your Honor.

1    **THE COURT:**  All right.  It's unnecessary to get me to

2    certify that.  I don't do that.  The Federal Rules do not

3    require that.

4    But as long as any expert witness stays within their area

5    of expertise, we will be fine.  So please proceed.  Ask your

6    first question.

7    **MR. SHEA:**  Thank you, Your Honor.

8    **BY MR. SHEA:**

9    **Q.**  Dr. Almeroth, are you being compensated for your work on

10   this case?

11   **A.**  Yes, I am.

12   **Q.**  Is that compensation dependent upon anything that happens

13   over the course of this trial?

14   **A.**  No.  I'm here to give my independent opinions as I see the

15   systems and how they operated, and so my compensation is not

16   dependent on giving opinions one way or another.

17   **Q.**  Dr. Almeroth, let's start by talking about the patents.

18   You can find those in your exhibits binder that I handed to

19   you, yes, at -- and the first -- I want to have you go to TX1

20   and TX3.

21   **A.**  Okay.

22   **Q.**  Maybe we could -- we could just look at TX1 as

23   representative.

24   How do the '885 and '966 patents relate?

25   **A.**  They are part of what's called a "continuation chain."  So

1  they date back over time where patents were filed with the same

2  specification and they have different sets of claims at the

3  end.  But the description of the invention, what the

4  specification is, the columns in it, the figures, that's all

5  the same.

6  **Q.**  What do the '885 and '966 patents say about the problems

7  that existed in the art at the time?

8  **A.**  Yeah.  So far we have heard a lot about what was happening

9  in the 2005 timeframe.  The one thing I wanted to add is that

10  there's a part of the specification that describes those kinds

11  of problems before it gets into the part that describes the

12  solution.

13      So, Mr. Jay, if you go to TX1, the '966 patent, about the

14  bottom of column 1 around line 62, that's one of the places to

15  look.

16      And what this talks about generally is the problems with

17  traditional multizone audio systems, that they are hard wired

18  or controlled by a pre-configured and preprogrammed controller.

19      And we have heard that described in a couple of different

20  ways, the idea that you have groups that are already defined,

21  like Party Mode where they can't be changed or even where you

22  have things like traditional speakers that are connected by

23  wires through an AV receiver.

24      And so the patent starts off by describing some of the

25  problems with those kinds of solutions.

1  Q.   Is there anything else we should look at in the patent on

2  this, Dr. Almeroth?

3       MR. SHEA:   If you get into column 2, about line 13,

4  Mr. Jay.

5  BY MR. SHEA:

6  Q.   It talks about how, after describing some of the groups

7  that exist, it says it can be difficult for the traditional

8  system to accommodate the requirement of dynamically managing

9  the ad hoc creation and deletion of groups.

10      So it recognizes that there was some grouping technology

11 that existed at the time, but there was a need and the ability

12 to be able to do some of these more kinds of dynamic groups.

13      And do the patents set up what kind of solution is needed?

14 A.   Yes.   Right after that, there is a paragraph that talks a

15 little bit about what the need is.

16 A.   So, Mr. Jay, if you could to the next paragraph, it says

17 "There's a need for dynamic control of the audio players as a

18 group and then, with minimal manipulation, the audio players

19 can be readily grouped."   And then it shows how that contrasts

20 with a traditional multizone audio system.

21      So that's starting to establish the idea of having zone

22 scenes and management of those zone scenes where a user can be

23 able to create, delete, and also invoke or activate those

24 different zone scenes.

25 Q.   Did some of the challenges that the patent is describing

1  here apply to the Sonos system that existed at the time as

2  well?

3  **A.**    Yes.  So the Sonos system that existed at the time has

4  been called the "Sonos 2005 system."

5      I think Mr. Millington and Mr. Lambourne testified about

6  the functionality of that system and then the ways in which it

7  was limited in the last couple days.

8  **Q.**  Do the patents disclose a solution to the challenges that

9  are laid out there?

10  **A.**  They do.  So, to be very clear, there's a portion of the

11  specification that describes the invention, and then ultimately

12  we get to the claims.  I think it's been reinforced several

13  times that it's the claims that define what the invention is.

14      But before we get to the claims, Mr. Jay, the next couple

15  of paragraphs start to summarize some of what the invention is.

16  **Q.**  So Dr. Almeroth --

17          **THE COURT:**  Might also summarize some of the prior art

18  as well in the specification; isn't that true?

19          **THE WITNESS:**  Yes.  Mr. Jay, if you blow back up the

20  field of the invention and the background of the invention,

21  which I just talked about, column 1 into the first part of

22  column 2 talks about some of what that prior art is.

23          **THE COURT:**  All right.  So the specification covers

24  not just a description of the invention but also what preceded

25  the invention?

1          **THE WITNESS:**  Yes, sir.  Absolutely.

2          **THE COURT:**  All right.  Thank you.

3    BY MR. SHEA:

4    **Q.**  So, Dr. Almeroth, looking at that portion of the summary

5    that you had directed Mr. Jay to, which I think maybe we can

6    start by looking at column 230 -- line 36, Mr. Jay?

7    **A.**    Yes.  And I think the jurors now have the patents.  I'm

8    going to go this and -- go through this fairly quickly, but

9    it's at about column 2, line 36.  There's three paragraphs

10   there, and I want to point out a couple of sentences in each

11   one.

12         So, for the second paragraph that starts at line 36, which

13   is on the screen, and that second sentence says, "According to

14   one aspect of the present invention, a mechanism is provided to

15   allow a user to group some of the players according to a theme

16   or a scene where each of the players is located in a zone."

17         And so that starts to describe some of the characteristics

18   of this term, which will come to be known as a zone scene.

19         And then it says, "When the scene is activated, the

20   players in the scene react in a synchronized manner."

21         So that's, again, some of this formal language in the

22   specification that describes some of that functionality.

23         Mr. Jay, if you could go to the next paragraph and then

24   highlight the second sentence it says, "A user may activate the

25   scene at any time so that only some selected zones in an

1    entertainment system facilitate a playback of an audio source."

2        So, again, this is talking about kind of facilitating

3    selections of groups of players and that -- where you can

4    facilitate playback within the players of that particular

5    group.

6        And then one last paragraph, that last -- according to --

7    and this paragraph is a little bit longer, but now it gets into

8    what the controller does.

9        And to be clear, I think over the last few days there is

10   kind of the concept of a player, and then there's also the

11   concept of a controller.

12       "So according to, still, another aspect of the present

13   invention, a controlling device is provided to facilitate a

14   user to select any of the players in the system to form

15   respective groups."

16       So the idea is, you have the full set of devices and then,

17   from that, multiple groups can be created across those

18   different selections of devices.

19       So that gets into the concept of being able to have

20   overlapping groups that become what the zone scenes are.

21       Next it says, "Although various scenes may be saved in any

22   of the members of a group, commands are preferably sent from

23   the controller to the rest of the members when one of the

24   scenes is executed."

25       So, again, the relationship between the controller and the

1   players.

2   **Q.**   So Dr. Almeroth, I know there's a lot of words there in

3   those few paragraphs.  Can you synthesize this for us?

4   **A.**   Yes.  So these paragraphs -- and this is just before I

5   start focusing on the claims -- talk about the characteristics

6   of a zone scene, what those are.  It talks about the interface

7   that's part of the invention for creating these zone scenes and

8   then being able to activate them or invoke them.

9       And then the third piece gets into what some of the

10  commands are that go between the controller and the player to

11  implement the functionality of the zone scene.

12  **Q.**   So, Dr. Almeroth, you have used this phrase "zone scene" a

13  few times already.  What does that mean?

14  **A.**   So there's an agreed construction.  So, Mr. Jay, if you

15  could go back to the demonstratives for a zone scene -- let's

16  see -- PDX2.7.  And so this is an agreed construction, which is

17  really a definition, and I believe the parties have agreed that

18  it's a previously saved grouping of zone players according to a

19  common theme.

20  **Q.**   And so Dr. Almeroth, what does that tell us about what's

21  required by a zone scene?

22  **A.**   Well, it talks about how you have a previously saved

23  grouping.  So that has to be a grouping that exists before it

24  exists.  You have to have a zone -- grouping of zone players

25  according to a common theme, so something like a name.  And

1    then you also have to be able to invoke that zone scene.

2         There's also a second agreed construction or definition

3    for indication, and the portion of this that becomes relevant

4    is it talks about a zone player that has been added by the user

5    to a zone scene.

6         So that starts to define that the zone scene is very much

7    a user created thing that then gets represented in the system

8    and is then acted on.

9    Q.   Dr. Almeroth, just as a point of clarification, I think

10   when you mentioned "previously saved," I think you said it had

11   to exist before it exists.  Would you be able to clarify?

12   A.   Sure.  It has to exist before it's invoked.  So previously

13   saved is a temporal construct and so it has to exist previous.

14   So the question is previous to what?  And it's previous to when

15   it's used or it's invoked.  Thank you for catching that.

16   Q.   You are welcome, Dr. Almeroth.  There's a lot to keep

17   track of.

18        What comes next in the specification after this?

19   A.   So, next comes more of the specification, so more columns

20   of text describing how the invention would be implemented.  And

21   then also some additional figures that go along with the text

22   to get into some of that detail.

23   Q.   Would it make sense for us to go through all of that stuff

24   here today, Dr. Almeroth?

25   A.   No.  It would take quite a bit of time to go through the

1  rest of the specification and the details, and I don't think it

2  would serve anyone's purpose to go through those details.

3      It is important to recognize that the specification does

4  go into the details of how different implementations or

5  embodiments of the invention would be created or implemented.

6  And those technical details help to fill in what a zone scene

7  is, what the interface looks like and then what the commands

8  are to make the zone players do what the controller is

9  instructing them to do.

10 **Q.**   Without going through everything, is there something we

11 could look at to quickly illustrate what you mean?

12 **A.**   Yes.

13     So, Mr. Jay, if you go to figure 6 of TX1.

14                 (Pause in proceedings.)

15     **THE WITNESS:**  So, this is figure 6 from the

16 specification.  And, very briefly, there's a -- this is a

17 flowchart, so it gets into some of the technical detail.

18 There's a box at the top for "configure a zone scene," and then

19 there's a diamond at the bottom, "invoke a zone scene."

20     So those are kind of the two halves of this particular

21 figure.  And then you will also see next to all of the boxes a

22 number.  And that number corresponds with a portion of the

23 specification that goes into the details of how some of those

24 different functions in the box would be implemented.

25 \\\

1    BY MR. SHEA:

2    **Q.**  So we have talked about --

3          **THE COURT:**  May I ask a question on that?

4      You said a moment ago that there were these -- the patent

5    gave the commands --

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  -- to implement.  Where are those commands

8    in here?

9          **THE WITNESS:**  So the commands are in the claims as an

10   example.  So the two that I was thinking of are with respect to

11   the creation of the zone scene and then the invocation or

12   activation of the zone scene.

13     You see this relationship play out between the two patents

14   when you have a player that will receive the indication that

15   the group has been created, and so that would be one of the

16   commands.  And then you also have a command sent from the

17   controller for the invocation --

18         **THE COURT:**  I don't see the word "command."

19         **MR. SHEA:**  So, Your Honor, I can -- do you want to

20   look at the screen on the bottom box there on 614?  If you are

21   able to see that, you can see --

22         **THE COURT:**  I mean the software commands, the code.

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  It's not in the patent, is it?

25         **THE WITNESS:**  So what's on the screen is what's a

1  blown-up version of 614.

2          THE COURT:  That's as close as it comes.

3          THE WITNESS:  I think there's -- so then if we look in

4  the specification for box 614, it goes into some additional

5  detail as well.

6          THE COURT:  Oh.  Well, I -- the point I wanted to

7  clarify is, you said that there were commands, which to most

8  people means the actual software code.

9      I don't think I see that anywhere in this patent.  I could

10  be wrong.  It's a small print.  So are there particular coded

11  commands that someone could use to practice this patent?

12          THE WITNESS:  The commands are there.  The

13  implementation of those commands are described more at a

14  functional level.

15          THE COURT:  All right.  Show me where the commands

16  are.

17          THE WITNESS:  So, the commands as an example at column

18  10, about line 64 --

19          THE COURT:  64, column 10.  I'm looking at the '966,

20  so it may not be in sync, but --

21          THE WITNESS:  We are in sync, Your Honor.

22          THE COURT:  All right.  Well, so 64.

23                      (Pause in proceedings.)

24          THE WITNESS:  And I will read-out the portion I was

25  looking.

1          **THE COURT:**  Yeah, would you please?  I still don't see

2    it.

3          **THE WITNESS:**  It says at 614, "Commands are executed

4    with the parameters."  And so the parameters are the portions

5    of the command that indicate what is supposed to be acted on

6    relating to, for example, play lists and volumes.  And so the

7    data that's being transmitted as part of the command, for

8    example, either to create or invoke a zone scene would include

9    parameters such that if you go over to the next page, would

10   cause that member, for example, a controller or a ZonePlayer,

11   to be able to synchronize.

12         **THE COURT:**  Okay.  So that's what you were referring

13   to when you said that the patent discloses the commands?

14         **THE WITNESS:**  Yes.

15         **THE COURT:**  All right.  Thank you.

16         **MR. SHEA:**  Thank you, Your Honor.

17   BY MR. SHEA:

18   **Q.**   So Dr. Almeroth, we have been talking about the

19   specification and the figures.

20         But where should we look to see what inventions are

21   protected by each of these patents?

22   **A.**   So that's the claims.

23   **Q.**   So, I would like to look at the claims now, starting with

24   claim 1 of the '885 patent.  Do you have a demonstrative we can

25   look at for that claim?

1  **A.**    Yes.

2        Mr. Jay, if you go back to the demonstratives, claim 1 of

3  the '885 patent is on the screen.  I think we have seen this

4  before.  And I have got a demonstrative that takes that

5  language -- it's still a lot of words -- but tries to put all

6  of them onto the screen so that they are at least a little bit

7  more readable.

8  **Q.**    And what are the numbers here in this slide, Dr. Almeroth?

9  **A.**    So, the numbers that come at the beginning of what are

10 called "limitations," and so a claim can be divided up no a

11 number of limitations, and that helps to refer to a particular

12 aspect of the claim, a particular requirement of the claim.

13 **Q.**    And what part of the overall system is this claim directed

14 to?

15 **A.**    This is directed to a zone player.  So this is going to be

16 the zone player or the smart speaker or the device that you can

17 connect wires to that will play audio.

18 **Q.**    So there are a lot of words here.  Do you have any way of

19 helping us and the jury to understand what is being described?

20 **A.**    Yes.  So on next slide, I have really tried to divide it

21 up into three parts.  And I can go through each of the parts

22 and try and summarize at multiple levels, possibly, what the

23 set or group of limitations is trying to address.

24 **Q.**    Can you start by explaining this first part of the claim

25 to us?

**ALMEROTH - DIRECT / SHEA**

1    **A.**    Yes.  So this talks about a first zone player.  So that's

2    talking about a device, a zone player.  And it has a couple of

3    requirements or limitations.  It has a network interface.  It's

4    connected to a data network.  It has one or more processors.

5    It has a non-transitory computer readable medium, which is a

6    claim term that really talks about having some storage that

7    continues to exist.  And then that last part is it stores

8    instructions in that medium that can perform certain functions.

9    And then the functions it has to perform are in the rest of the

10   claim.

11   **Q.**    Can you explain the second part of the claim to us?

12   **A.**    Yes.  So, there's a requirement here that talks about

13   while operating in standalone mode and then a couple of things

14   have to happen while that's happening.

15        There's a receiving -- actually, I think I can do some of

16   this.  There's a receiving, a first indication that that player

17   has been added to a zone scene.

18        And then there's a second requirement.  There's another

19   receiving limitation where there's a second indication that the

20   first zone player has been added to a second zone scene.

21        So in -- there's a lot of additional words there that go

22   into the specific requirements, but the idea is that if you

23   have a player, that it will receive an indication that it has

24   been added to a zone scene.

25        And it's added to a zone scene for one zone scene and then

1    it gets a second indication that it's been added to a second

2    zone scene.

3        And while it's receiving these indications, there's a last

4    requirement in this blue box that says it continues to operate

5    in standalone mode until there has been a zone scene that has

6    been selected for invocation.

7        And what that means is that one of those two zone scenes

8    that has been created is then going to be activated.

9    **Q.**   Dr. Almeroth, I see this phrase "standalone mode."  What

10   does that mean?

11   **A.**   That's referring to a ZonePlayer that's configured to play

12   back media individually.  And that's to contrast from the other

13   option that the claim describes, which is playing in

14   synchronization with another one or more players in group mode.

15       So, the claim really contemplates that you have a device,

16   it's either in a mode where it's playing back audio or, sorry,

17   in a mode where its configured with other players to play back

18   audio in synchronization like group mode.  And then if it's not

19   in group mode, then it's in this standalone mode.

20   **Q.**   Dr. Almeroth I would also see in the blue part of the

21   claim here a reference to three different zone players.  Can

22   you explain to us the relationship between those players?

23   **A.**   Sure.  So, this first 1.6 has a first and second zone

24   player, and that's describing the first zone scene.

25       And then the second one is describing a first zone player

1  and a third zone player.

2       So the device needs programming on it to be able to handle

3  being added to a group where it's in two groups at the same

4  time.

5       And so that's defining this overlapping relationship for

6  this first zone player to be in two different zone scenes at

7  the same time.

8  Q.   Can you explain the third part of the claim to us,

9  Dr. Almeroth?

10 A.   Yes.  So now what happens is there will be an input that

11 causes an invocation of one of the first and second zone

12 scenes.  And so, that invocation, after there's a selection

13 that takes place, receiving from the network an instruction to

14 operate in accordance with a given one of the first or second

15 zone scene.

16      So this will be now that the group has been invoked that

17 the first player, this one player, will act in accordance with

18 the other devices of the group.

19      And then there's a longer limitation that says based on

20 that instruction transitioning from the operation in standalone

21 mode to operating basically in group mode.  And there's some

22 several lines of requirements about operating in

23 synchronization with the other members of the group, et cetera.

24 Q.   So, Dr. Almeroth, I think that takes us through the end of

25 claim 1.  And I want to move to -- excuse me -- claim 1 of the

 1   '885 patent.  I do want to ask you about claim 1 of the '966

 2   patent.

 3       Before I do that, can you remind us which one of these

 4   claims is the one where there's already been a finding that

 5   Google infringed?

 6   **A.**   That's the '885 patent for claim 1.  There has already

 7   been a determination by His Honor that there's infringement of

 8   claim 1 of the '885 patent.

 9           **THE COURT:**  Infringement provided that the patent is

10   valid.

11           **THE WITNESS:**  Yes, sir.

12           **THE COURT:**  That decision has not yet been made, but

13   the Court has determined, I will remind the jury, that the

14   accused products practice claim 1 of the '885.  That has been

15   already been determined by me.

16       Okay.  Please continue.

17           **MR. SHEA:**  Thank you, Your Honor.

18   **BY MR. SHEA**

19   **Q.**   So let's take --

20           **MR. PAK:**  Your Honor, just so that -- the older

21   design, not the new design.

22           **THE COURT:**  All right.  Well, I have not yet ruled,

23   and maybe the jury is going to rule on the new design.  I was

24   just -- what I was just referring to was the original design by

25   Google.

```
 1              MR. PAK:  Thank you, Your Honor.
 2              THE COURT:  Go ahead.
 3              MR. SHEA:  Thank you, Your Honor.
 4   BY MR. SHEA:
 5   Q.   So, Dr. Almeroth, let's go ahead and look at claim 1 of
 6   the '966 patent.
 7   A.   Okay.  And I have done the same thing.  I have taken the
 8   language of '966 and put it on a demonstrative where you can
 9   see all of the limitations and then added similar kind of
10   numbering to the beginning of those limitations.
11   Q.   Thank you.  And, again, I know there's a lot here and it's
12   hard to parse this language, but can you try to help us
13   understand what is being covered here?
14   A.   Yes.  This one will be a little bit easier to explain.  We
15   have heard this term, two sides of the same coin.  Where the
16   '885 was the player, the '966 is more about the controller.
17        So, there are certainly some differences with respect to
18   the two sides of the coin, but there are also some similarities
19   that I can point out.
20        So here there is a yellow group of limitations, there is a
21   computing device, one or more processors, the same
22   non-transitory computer readable memory, but now you have
23   program instructions that when they are executed cause the
24   computing device to serve as a controller instead of as a
25   player.  So it's two different sets of instructions.
```

1    So while it is serving as a controller, then there's the

2    similar set of blue limitations.

3  **Q.**   So can you tell us a little bit about those blue

4    limitations in this claim, Dr. Almeroth?

5  **A.**   Yes.

6    So now we are talking about the controller, which tends to

7    have the interface for the group creation and then the

8    invocation.

9    So, there's a request to create a first zone scene and it

10   comprises a predefined group of zone players at that point.

11   And then based on receiving that first request, three things

12   have to happen, causing creation of the zone scene, causing an

13   indication that the zone scene has been created to the first

14   ZonePlayer, and then causing storage of the first zone scene.

15   So, those are the things that the controller does through

16   its software.  It causes creation, causes an indication to be

17   sent, and causes storage of the first zone scene.

18   The two sides of the same coin here are the indication

19   that's sent from the controller when the group is -- the zone

20   scene is created is the indication that's received by the

21   player informing it that the group has been created, the zone

22   scene has been created.

23   And then there's a second request to create a second zone

24   scene and then a similar limitation for the second request and

25   second zone scene causing creation of the second zone scene,

1  causing an indication of the second zone scene, and then

2  causing storage of the second zone scene.

3      Now, because this is on the controller side, there is an

4  additional requirement in the '966 patent where you are

5  displaying a representation of the first zone scene and a

6  representation of the second zone scene.

7      So that is part of what allows a user to then select one

8  of those zone scenes for invocation.

9  Q.  And how about the third part in the green, Dr. Almeroth?

10 A.  Yes.  So while displaying the representations described

11 there, there's a third request to invoke the first zone scene.

12     And so based on that request, causing the first zone

13 player to transition from operating in standalone mode to

14 operating in accordance with the predefined group.

15     So this is the part where the group is selected,

16 activated, that there is a message sent to invoke the group and

17 have the zone player act in accordance with the zone scene.

18 Q.  How do these claims that we have looked at of the '885 and

19 '966 patents compare to one another?

20 A.  The -- the first patent, the '885 patent, describes the

21 player.  The '966 patent describes the controller.  And I have

22 tried to sort of focus on some of the relationships between

23 them for the indications, so there's many of those limitations

24 that are similar, the "two sides of the same coin" aspect.

25 Q.  Are there any differences between these claims that we

1    should be aware of?

2    **A.**    Yes.   There are actually three differences, the first of

3    which is that there's a display requirement here.   That's not

4    in the player.   The player doesn't do any kind of displaying.

5         The second difference here is also with respect to -- the

6    '885 patent had a requirement -- and I can go back a little

7    bit -- where the zone player has to continue to operate in the

8    standalone mode until a given one of the first in zone scenes

9    has been selected.

10        If you see this limitation 1.8 and then go forward to the

11   '966 patent, that's not a limitation in this patent.   What it

12   does say is that while it's operating in standalone mode, it

13   has to do each of these additional limitations.   It doesn't say

14   it has to continuously operate in standalone mode.

15        And then the third difference is that there's also causing

16   storage of the first zone scene.   That's related to the zone

17   scene in the '885 patent, but the storage requirement isn't

18   explicit in the '885 patent.

19   **Q.**    So, Dr. Almeroth, is there an example we can talk about

20   that's going to help us understand this a little better?

21   **A.**    Yes.   So, finally, kind of an example to put some of this

22   in the context of how things work, we can look at the Sonos

23   products, the current products, as an example of how these

24   claims would work.

25           **MR. SHEA:**   Permission to approach, Your Honor?

 1          THE COURT:  Yes, please.

 2                    (Pause in proceedings.)

 3   BY MR. SHEA:

 4   Q.   Dr. Almeroth -- Dr. Almeroth, I have handed you three

 5   exhibits that have been marked TX466, TX467, and TX468.  Can

 6   you tell us what these are?

 7   A.   Yes.  These are the Sonos products that implement the zone

 8   scene functionality, the two kinds of players for the '885, and

 9   then you have a controller running the instructions.  It would

10   be the Sonos app inside of a phone.

11          MR. SHEA:  Your Honor, at this time I would like to

12   move TX466, which is the phone device, into evidence.

13          MR. PAK:  No objection, Your Honor.

14          THE COURT:  Okay 466 in evidence.

15     (Trial Exhibit   TX466 received in evidence.)

16          MR. SHEA:  I believe the other two are already in

17   evidence, Your Honor.

18          THE COURT:  Okay.

19   BY MR. SHEA:

20   Q.   Dr. Almeroth, so do these products in front of you have

21   the zone scene technology we just discussed?

22   A.   Yes, they do.  They are the modern versions of the zone

23   scene products and then also the app as well.

24   Q.   When did that zone scene technology get added to these

25   products?

ALMEROTH - DIRECT / SHEA

1    **A.**    That was in 2020.

2    **Q.**    What can we look at to help illustrate how the

3    technology -- the zone scene technology on those products works

4    today?

5    **A.**    There's a lot of different things that we can look at.

6    One of the first places to potentially start, though, is the

7    user interface.  It makes the most sense to start with the user

8    interface and understand the creation and invocation of groups

9    in the current technology.

10    **Q.**    And do you have anything that you -- that can help us go

11    through that?

12    **A.**    Yes.  I also have some demonstratives that I can show that

13    reflect some of the testing that I did with these products to

14    understand how these products work.

15    **Q.**    Before we go to those demonstratives, can I have you go in

16    your binder to TX440?

17    **A.**    Okay.  I'm there.

18                        (Pause in proceedings.)

19    **BY MR. SHEA:**

20    **Q.**    Can you tell us what this is, Dr. Almeroth?

21    **A.**    Yes.  This is an exhibit that includes a number of screen

22    shots that I took or directed to be taken in the process of

23    understanding how the Sonos -- the Sonos zone scene technology

24    works.

25                **MR. SHEA:**  Your Honor, at this time I would like to

1    move TX440 into evidence.

2            MR. PAK:  No objection, Your Honor.

3            THE COURT:  It's received in evidence.

4        The jury can see it.

5        (Trial Exhibit    TX440 received in evidence.)

6    BY MR. SHEA:

7    Q.    Okay.  So I think you mentioned, Dr. Almeroth, that you

8    have put some of those screen shots onto demonstratives.  Can

9    we take a look at those?

10   A.    Yes.  So the first demonstrative are some of the screen

11   shots from TX440 that shows the idea of creating a zone scene.

12   Q.    And what does this show us?

13   A.    So on the left side you see an animated hand or a hand

14   that is adding both the kitchen and the master bedroom.

15       You see at the top portion here where the user can enter a

16   group name.

17       You see in this example it's been called "morning," and

18   the kitchen and master bedroom are being included in the zone

19   scene.

20   Q.    And what do we see on the top right there, Dr. Almeroth?

21   A.    There are also, then, the user can hit save, and so that's

22   the process of saving that zone scene.

23   Q.    Once that zone scene is saved, how can it be used?

24   A.    Now what happens is on the next slide -- these are more

25   screen shots from TX440 -- you see that morning has been

**ALMEROTH - DIRECT / SHEA**

1    created as one zone scene.  I didn't step through the creation

2    of the evening zone scene, but that's also been created.  And

3    so a user can click on "morning," and when that zone scene is

4    activated, then you can have the kitchen and master bedroom

5    ready to play audio.

6        In this particular scenario, the kitchen is already

7    playing music, and so now the zone scene is not only activated

8    or invoked, but it also will start to play music.

9    **Q.**    Is this all that you looked at to understand how Sonos'

10   zone scene technology works?

11   **A.**    No, it's not.  One of the things I did want to look at was

12   whether or not Sonos practiced the same asserted claims against

13   Google in its own technology.

14       And so I looked at a variety of documents, both

15   public-facing documents and internal documents.  I also looked

16   at these kinds of testing setups, all to be able to determine

17   whether or not Sonos practiced the claims of the '885 and '966

18   patent.

19   **Q.**    What was your conclusion, Dr. Almeroth?

20   **A.**    That they do.  That the versions of the products and then

21   the app that existed after 2020 implement the zone scene

22   technology that are in the patents.  Sort of a -- implementing

23   that same functionality.

24           **THE COURT:**  You are referring to the Sonos products?

25           **THE WITNESS:**  Yes, sir.  Still Sonos.

ALMEROTH - DIRECT / SHEA

BY MR. SHEA:

Q.   Although a good transition I think, Dr. Almeroth, I think
that's all I wanted to ask you about the Sonos products for
now.  Can we start talking about those Google products?

A.   Yes, sir, we can.

Q.   So what Google products are accused of infringing the '885
patent?

A.   There is a whole set of products.  They include the Nest
Audio, the Nest Mini, the Nest Hub, the Nest Hub Max, the Nest
Wi-Fi point Chromecast, Chromecast Ultra, Chromecast with
Google TV, Home, Home Mini and Home Max.  Those are the
products accused of infringing the '885 patent.

Q.   And what Google products have been accused of infringing
the '966 patent?

A.   For the '966 patent it's the Google Home app, so an app
that you can download onto your phone, and then that app
running on a variety of different computing devices, some of
which include Google pixel phones, Google pixel tablets, Google
pixel book and then other kinds of smart phones or tablets or
any kinds of devices that can run that Google Home app.

        MR. SHEA:  Permission to approach, Your Honor.

        THE COURT:  Yes, please.

BY MR. SHEA:

Q.   Dr. Almeroth, I have handed you what has been TX464,
TX458 and TX459.  Can you tell us what these are?

1    **A.**    So, the two 458 -- there it is -- 459 are examples of the

2    Google smart speakers that have been accused of infringement of

3    the '885 patent.

4        And then 464 is an example phone with the Google Home app

5    on it.

6            **MR. SHEA:**  Your Honor, I would like to move TX464 into

7    evidence.

8            **MR. PAK:**  Yes.  Can we just have identification of the

9    device to the TX number, just for the record?

10           **MR. SHEA:**  Oh, yeah, sure.  So TX464 being a Pixel 7,

11   Google Pixel 7 phone.

12           **THE COURT:**  Any objection?

13           **MR. PAK:**  No objection, Your Honor.

14           **THE COURT:**  Received in evidence.

15       (Trial Exhibit   TX464 received in evidence.)

16   **BY MR. SHEA:**

17   **Q.**   Dr. Almeroth, what does Google call the accused zone scene

18   functionality?

19   **A.**   It calls it speaker groups in its literature.

20   **Q.**   What can we look at to get a basic understanding of how

21   Google's speaker groups work?

22   **A.**   Well, we can look at a variety of things.  We can look at

23   the devices themselves and use them in a test bed.  We can also

24   look at documents from Google that publish on their home page

25   that describe how the technology works.

ALMEROTH - DIRECT / SHEA

1  Q.   Is there any specific document that would be worth looking

2  at right now?

3  A.   I believe there's one TX36 that describes some of the

4  speaker group technology.

5  Q.   So, Dr. Almeroth, what is TX36?

6  A.   TX36 is a document that Google publishes on its web page

7  describing speaker groups and how they work.

8  Q.   And have you reviewed this document before, Dr. Almeroth?

9  A.   Yes, I have.

10         MR. SHEA:  At this time we would like to move TX36

11  into evidence.

12         THE COURT:  36 is already in evidence, according to my

13  notes.

14         MR. SHEA:  My apologies, Your Honor.

15     So, Mr. Jay, can we please pull up TX36?

16                 (Pause in proceedings.)

17  BY MR. SHEA:

18  Q.   And, Mr. Jay, if you can -- there's a top level title

19  "Create and Manage Speaker Groups."  If you can highlight that

20  and the next couple of paragraphs to start, I would appreciate

21  it.

22                 (Pause in proceedings.)

23         THE WITNESS:  So this portion here, create and manage

24  speaker groups, it talks about "group any combination of Google

25  Nest or Google Home speakers and displays and different types

1  of devices all for synchronous music throughout the home.  Your

2  music and audio from Chromecast enabled apps are instantly

3  available to stream."

4       So that's describing the ability to create these zone

5  scenes or speaker groups and be able to play music on those

6  devices in those groups in synchronization.

7       And then the next paragraph talks then about some of the

8  range of different products that support this functionality.

9  **BY MR. SHEA:**

10  **Q.**   Is there anything else in this document that we should

11  look at, Dr. Almeroth?

12  **A.**   Yes.  So, step 1, create an audio group.  It talks about

13  the steps that you have to be able to perform at that point.

14  You have your mobile devices, which would be essentially your

15  phone.  That's connected to the network.

16       You use the Google Home app in step 2.  You create a

17  speaker group and then you tap the devices to include in the

18  speaker group.  You enter a name and then you click on save.

19  That's the process for creating the speaker groups.

20       And then -- you can then, as it says above, invoke and

21  play those groups -- those devices in the group in

22  synchronization.

23  **Q.**   So, Dr. Almeroth, have you gone through the steps that are

24  set forth there in order to create a speaker group?

25  **A.**   Yes, I have.  So I have a similar test environment that I

1  had access to for the accused products.  I was able to use

2  those, investigate how those products worked, and so I have

3  some screenshots from that test bed as well.

4  **Q.**  I think we are going to look at those but maybe not this

5  second, Dr. Almeroth.

6      One other thing I wanted to ask you is we heard in -- at

7  times in the video testimony played here in the courtroom this

8  phrase "static group."  Do you have an understanding of what

9  that is?

10  **A.**  Yes.  So there is a static group where you create the

11  group and then you can invoke it.  And that's different than

12  dynamic groups where you can add players to an existing playing

13  group.  And so I'm focused on static groups.

14  **Q.**  And this document here, when it refers to speaker groups,

15  how does that tie in?

16  **A.**  This document is referring to static groups.

17          **THE COURT:**  Are you about to turn to something that's

18  going to take more than three minutes?

19          **MR. SHEA:**  Yes, Your Honor, I was going to suggest --

20          **THE COURT:**  All right.  This will be a good place to

21  break because I have a feeling you are about to get into a

22  more -- something that takes more than three minutes.

23      We are going to break for the day.  I want to thank the

24  jury for your -- your being here early and being so attentive.

25  And please remember all the admonitions.

**PROCEEDINGS**

1    I think we are on track.  I think we are on track and I

2    think there's a very good chance the case will be over at the

3    end of next week, but I can't guarantee that yet.  Remember, we

4    have the protocol that -- for the extra three days if we need

5    it, but we are moving along.

6        Also remember that we are taking Monday off of next week

7    for Mother's Day.  It's -- Mother's Day, of course, is on

8    Sunday but this will give you a chance to travel.

9        So there we go.  But we will be here all the way through

10   Friday this week, so this is -- this is Wednesday.  We got

11   Thursday and Friday of this week to go and then four days next

12   week starting with Tuesday.

13       And then the three extra days if we need them that -- I

14   don't remember the dates right now, but we all had them in

15   mind.  Have a safe journey home.  Thank you.

16           **THE CLERK:**  All rise for the jury.

17       (Proceedings were heard outside the presence of the jury:)

18           **THE COURT:**  Please be seated.  And, Mr. Witness, you

19   can step down but please be back at 7:30.

20           **THE WITNESS:**  Yes, Your Honor.

21           **THE COURT:**  Anything the lawyers need the Judge for?

22           **MR. PAK:**  Yes, Your Honor.  There were some videos

23   that were played where we do have the outstanding requests that

24   it has opened the door with respect to the Cast for Audio.  If

25   Your Honor would like, we would like to file a five-page

1  submission on that at 8:00 p.m. today.

2      THE COURT:  I just didn't see anything that I

3  thought -- I mean, some of these products are called cast, and

4  I didn't see anything that made it sound like the other side

5  was trying to accuse you of violating cast technology.

6      MR. PAK:  There were --

7      THE COURT:  Let me ask, what was there?

8      MR. PAK:  There was a specific testimony relating to

9  the Cast for Audio meeting that occurred and the document -- we

10  can brief this further, Your Honor -- but the document that was

11  introduced into evidence is for the Cast for Audio document.

12      And there was a suggestion in the questioning that there

13  were meetings that occurred between employees of Sonos,

14  employees of Google related to Cast for Audio.

15      So the issue is now they have injected cast.  I think we

16  should be able to respond that cast is Google technology; and,

17  therefore, any meetings that occurred about Cast for Audio is

18  involving our technology.  Their patents on that technology

19  were invalidated.  And that would be the argument that we would

20  make.

21      THE COURT:  Well, I will give you three pages.  You

22  can develop it but I'm skeptical at this point.  I don't see

23  how yet anything has gone before the jury that would cause them

24  to believe that you are being accused of violating cast

25  patents, so -- but maybe I missed it, so you can get three

 1   pages on that.

 2          MR. PAK:  Thank you, Your Honor.

 3          THE COURT:  I have something that I would like to get

 4   you to do; but before I do that, Mr. Sullivan, what would you

 5   like to bring up?

 6          MR. SULLIVAN:  I was going to ask you what time would

 7   you like that briefing by?

 8          THE COURT:  What did I say, 8:00 o'clock tonight.

 9          MR. PAK:  Yes.

10          MR. SULLIVAN:  Okay.

11          THE COURT:  Here is the thing that I want to have

12   straight in my mind -- and this can be done in one page.  It

13   would ideally be stipulated to but you don't have to.  It would

14   say this kind of timeline:  The patents originally were applied

15   for on date X back in 20 --

16          MR. PAK:  Yes, Your Honor, the provisional was filed

17   in 2006.

18          THE COURT:  With a priority date of December --

19          MR. PAK:  A conception date of December 21, 2005.

20          THE COURT:  All right.  And so then that would be

21   line 1.  Line 2 is when Sonos products came out originally.  It

22   was somewhere in that range.  I think 2005.

23          MR. SULLIVAN:  January 2005, Your Honor.

24          THE COURT:  All right.  And then fast forward to when

25   Google product came out that had the accused in feature and

**PROCEEDINGS**

 1  then next when did Sonos apply for the -- these two patents,

 2  which, I believe, was like 2020, but -- I don't remember for

 3  sure -- and then when those issued and then finally, when Sonos

 4  itself came out with the patented feature.

 5           **MR. PAK:**  Yes, Your Honor, we can work on that

 6  together.

 7           **THE COURT:**  All right.  Okay.  Thank you.  Anything

 8  else today?

 9           **MR. PAK:**  No, Your Honor, not from Google.

10           **MR. SULLIVAN:**  No.

11           **THE COURT:**  Great.  See you tomorrow.

12           **MR. PAK:**  Thank you.

13           **MR. SULLIVAN:**  Thank you.

14           **THE COURT:**  Remember, 7:00 o'clock, right, didn't I

15  say 7:00?

16           **MR. SULLIVAN:**  You did, Your Honor.

17           **THE COURT:**  We have some things to help me with.

18  Thank you.

19           **THE CLERK:**  Court is adjourned.

20                (Proceedings adjourned at 1:02 p.m.)

21                          ---oOo---

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Wednesday, May 10, 2023

8

9

10

11   _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25