**Volume 6**

**Pages 946 - 1175**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter-Defendant, | ) | |
| | ) | |
| VS. | ) | **NO. C 20-6754 WHA** |
| | ) | Related Case No. **C 21-07559 WHA** |
| GOOGLE, LLC, | ) | |
| | ) | |
| Defendant and | ) | |
| Counter-Claimant. | ) | |
| _____ | ) | |

San Francisco, California
Friday, May 12, 2023

<u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff/Counter-Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
          BY:  **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
               **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
          BY:  **ALYSSA M. CARIDIS, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    United States District Court - Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiff/Counter-Defendant:

3                              LEE SULLIVAN SHEA & SMITH LLP
                             656 West Randolph Street
4                             Floor 5W
                             Chicago, Illinois 60661
5              BY:  **DAVID R. GROSBY, ATTORNEY AT LAW**
                    **SEAN M. SULLIVAN, ATTORNEY AT LAW**
6                   **COLE B. RICHTER, ATTORNEY AT LAW**
                    **JOHN DAN SMITH, III, ATTORNEY AT LAW**
7
     For Defendant/Counter-Claimant:
8
                              QUINN, EMANUEL, URQUHART & SULLIVAN LLP
9                             50 California Street, 22nd Floor
                             San Francisco, California 94111
10             BY:  **SEAN PAK, ATTORNEY AT LAW**
                    **MELISSA J. BAILY, ATTORNEY AT LAW**
11                  **JAMES D. JUDAH, ATTORNEY AT LAW**
                    **LINDSAY COOPER, ATTORNEY AT LAW**
12                  **IMAN LORDGOOEI, ATTORNEY AT LAW**

13

14   Also Present:        **Kevin MacKay, Google Representative**
                         **Alaina Kwasizur, Sonos Representative**
15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Friday, May 12, 2023 - Volume 6

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **ALMEROTH, KEVIN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 978 | 6 |
| Recross-Examination by Mr. Pak | 979 | 6 |
| | | |
| **KOWALSKI, TIMOTHY** | | |
| By Video Deposition (not reported) | 999 | 6 |
| | | |
| **KWASIZUR, ALAINA** | | |
| (SWORN) | 1000 | 6 |
| Direct Examination by Mr. Richter | 1001 | 6 |
| Cross-Examination by Ms. Baily | 1052 | 6 |
| Redirect Examination by Mr. Richter | 1070 | 6 |
| Recross-Examination by Ms. Baily | 1074 | 6 |
| | | |
| **MALACKOWSKI, JAMES EDWARD** | | |
| (SWORN) | 1077 | 6 |
| Direct Examination by Ms. Caridis | 1078 | 6 |
| Cross-Examination by Ms. Baily | 1137 | 6 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6130 as amended | | 1028 | 6 |
| 6136 as amended | | 1042 | 6 |
| 6631 | | 1018 | 6 |
| 6632 | | 1014 | 6 |
| 6721 | | 1012 | 6 |
| 8240 | | 999 | 6 |

1  **Friday - May 12, 2023**                              **7:23 a.m.**

2                      **P R O C E E D I N G S**

3                          **---000---**

4      (Proceedings were heard out of the presence of the jury:)

5          **THE CLERK:**  All rise.  The court is now in session.

6  The Honorable William Alsup is now presiding.

7          **THE COURT:**  All right.  Be seated.

8      Good morning.  And let's get to work.

9      The jury is not present, the lawyers are.

10     I want to have a discussion with you.  I read the Google

11  submission, and I need the help of both sides to understand

12  this sequence of events and the legal import of it concerning

13  the -- let me set the stage.

14     Those of you who have been here day to day know that I

15  have asked in the past about what is it in the specification

16  that supports overlapping zone scenes to be saved and used

17  later, and each time it has come down to one paragraph.  So I

18  looked at it, and I can see the argument.  I thought the -- it

19  was thin, but I couldn't say it didn't get at the idea.

20     So I raised the question:  Was this in the specification

21  in 2005?  And you told me it was, but it's not.  It was in

22  something called at best an appendix.

23     Now, appendices are not published.  It doesn't teach the

24  world how to do the invention.  But in 2019 for the first time

25  Sonos moved by amendment to the PTO to move that paragraph in

1   the appendix, which had been concealed from the public, into

2   the specification.  I say "concealed."  That may be too strong

3   a word, but it was something no one would go and look at.

4       So if that's true, wouldn't the Google system be prior art

5   and invalidate the entire system?

6       All right.  I want to hear from Mr. Pak first, and I want

7   to thank you for doing this excellent work.

8           **MR. PAK:**  Thank you, Your Honor.

9           **THE COURT:**  And I'm shocked to find out that I'm only

10  finding this out now for the first time.

11      All right.  Go ahead, Mr. Pak.

12          **MR. PAK:**  Yes, Your Honor.  So I'm just going to state

13  the facts --

14          **THE COURT:**  Tell me this.

15          **MR. PAK:**  Yes.

16          **THE COURT:**  When was the first time the

17  specification -- was it published in 2006?  How does it work

18  with the provisional?

19          **MR. PAK:**  You know, I don't know the exact date when

20  this provisional was published, but Counsel for Sonos may.

21          **MR. SHEA:**  I don't have the exact date; but,

22  Your Honor, the provisional with the appendix would have

23  published and become available to the public on the same day as

24  the -- the subsequent specification, Your Honor.

25          **THE COURT:**  As what?

PROCEEDINGS

1          **MR. SHEA:**  The provisional --

2          **THE COURT:**  What year was it published?

3                    (Pause in proceedings.)

4          **THE COURT:**  All right.  You don't know the answer.

5      All right, Mr. Pak, he interrupted you.  I want to give

6  you the floor.  I want to learn as much as I can about this --

7          **MR. PAK:**  Yes, Your Honor.

8          **THE COURT:**  -- in 30 minutes.

9          **MR. PAK:**  So, Your Honor, as we've heard throughout

10  the case, there is this one paragraph --

11          **THE COURT:**  Yes.

12          **MR. PAK:**  -- it's associated with Figure 5B.

13          **THE COURT:**  Yes.  But what is the legal significance

14  of bringing it from the appendix to the specification?

15  That's -- I -- I have not had this problem before.  I just

16  understand general principles, but I don't understand.  What is

17  the arcane rule in the PTO?

18          **MR. PAK:**  I don't know if I know the answer to that

19  question precisely for our case.

20      On written description, one of the issues that we had was

21  it wasn't just lifted out of the appendix and put into the

22  final specification through amendment; but if you go and look

23  at that original provisional Appendix A, it's associated with a

24  different figure, which is a hand-held controller user

25  interface, which that document says "Do not use for managing

1   zone scenes."

2       That sentence that Counsel and others have been relying on

3   for written description support of overlapping zone speakers

4   was actually in that original provisional appendix as

5   describing zone groups or the prior art technique of doing

6   dynamic or ad hoc zone groups.

7       They lifted that sentence from that figure, which that

8   appendix says "Do not use for zone scenes," put it by amendment

9   next to Figure 5B, replaced "zone group" with "zone scenes."

10      So as far as this case is concerned, Your Honor, we do not

11  believe there is written description support that goes back to

12  2006.

13      **THE COURT:**  Yes.  But -- all right.  You see, you slid

14  off onto something that is important --

15      **MR. PAK:**  Yes.

16      **THE COURT:**  -- but that tells me that you know

17  something about the law --

18      **MR. PAK:**  Yes.

19      **THE COURT:**  -- that -- I'm just focusing on the

20  paragraph itself --

21      **MR. PAK:**  Yes.

22      **THE COURT:**  -- which was in an appendix.

23      **MR. PAK:**  Yes.

24      **THE COURT:**  Was that paragraph faithfully reproduced

25  from the appendix to the specification in 2017?

1          MR. PAK:  No, we do not believe so.

2          THE COURT:  Well, what is -- how was it forged or

3    modified?

4          MR. PAK:  So, Your Honor, let's take a look -- I think

5    you have the binder.

6          THE COURT:  No I don't.

7          MR. PAK:  Oh, you don't.  Okay.

8          THE COURT:  It's in chambers.

9          MR. PAK:  Yes, Your Honor.

10     And maybe we can bring up -- Mr. Fisher, can you pull up

11   the provisional application if we have that ready?

12     I can walk Your Honor through what --

13         THE COURT:  I forgot my --

14         MR. PAK:  Yes.  It's on the screen now, Your Honor,

15   and I'll walk you through this and see if I can lay out the

16   facts as we know that.

17     So that paragraph -- this is on -- if you turn to page 17,

18   which is 4.1 of this provisional -- in the appendix,

19   Mr. Fisher, so we're looking at Appendix A.

20                    (Pause in proceedings.)

21         MR. PAK:  So if you go to the appendix, which is --

22         THE COURT:  What's on the screen now?  That looks like

23   the specification.

24         MR. PAK:  This would be page 17 in the appendix, which

25   is towards the back.

PROCEEDINGS

1                    (Pause in proceedings.)

2           THE COURT:  I'm very sorry.  I -- I have this big --

3    I'm going to hand it down.  I can't -- I don't have anyone to

4    hand it down to.

5           MR. PAK:  Okay, Your Honor.

6           THE COURT:  I've got Exhibit 4.  I've got Exhibit 6.

7           MR. PAK:  Okay.  So if Your Honor turns to the

8    provisional, which should be the first document, I believe, in

9    the chain, the priority --

10          THE COURT:  What page is -- Exhibit 4; is that right?

11          MR. PAK:  No.  This is the provisional.

12       Oh, not the prosecution history, Your Honor.  We're

13   looking at the continuation.

14          THE COURT:  I -- it's impossible for me to follow it.

15          MR. PAK:  Yeah.  Let me hand this up to you,

16   Your Honor, please.

17          THE COURT:  All right.

18                      (Pause in proceedings.)

19          MR. PAK:  I can show it on the ELMO too if that would

20   be helpful for everybody to see.

21          THE COURT:  All right.  Just a moment.

22       Okay.  What is this?  What is this?

23          MR. PAK:  This is the provisional -- this is

24   Appendix A to the original provisional document, provisional

25   application, that's going back to 2006.

PROCEEDINGS

 1    So this is the document that Sonos has claimed provides

 2   written description support for the overlapping zone scenes

 3   that takes them back to the 2006 provisional filing, and this

 4   is the provisional filing.

 5    So they filed this.  They attached two appendices.

 6   Appendix A is the one that we're looking at, which is a

 7   modified version of Mr. Lambourne's conception document.

 8          **THE COURT:**  Okay.  But the text does say "Annexed

 9   hereto is Appendix A providing examples to teach and refer to

10   various features, design," et cetera, et cetera, et cetera.

11          **MR. PAK:**  That's right, Your Honor.

12          **THE COURT:**  All right.  So that is in the

13   specification.

14    And so did this Appendix A come before or after the

15   claims?  There were no claims.

16          **MR. PAK:**  There were no claims.  This was 2006, a long

17   time ago.

18    So if you turn to that page that I showed you, which is

19   Appendix A, on that document, that little sentence about having

20   all zone -- zones, do you see that at the bottom -- bottom of

21   that page, Your Honor?

22          **THE COURT:**  No.  It says "including the zones that are

23   already grouped"?

24          **MR. PAK:**  That's right.  That's the same sentence that

25   was lifted from this document and put into the patent

 1   specification by amendment as Your Honor noted.

 2        That sentence is describing nothing about zone scenes.

 3   This sentence is describing zone groups, which is a -- as we

 4   heard from Sonos, in the prior art Sonos 2005 system, there was

 5   Party Mode and then you had the ability to create dynamic or

 6   ad hoc groups that could not be saved.  So this sentence is

 7   talking about groups, not scenes.

 8        And the picture that you see with the little controller

 9   UI, Your Honor, that figure that's above that sentence --

10        **THE COURT:**  Yes.

11        **MR. PAK:**  -- that is not talking about zone scenes.

12   That's talking about how you add members to groups, dynamic

13   groups, and you could expand the members of that group by

14   adding one more speaker or another previously grouped set of

15   speakers.

16        They took that sentence, which is not about zone scenes,

17   and we know that because there's another section that we

18   highlight in the brief that says that -- that controller, the

19   hand-held controller UI, cannot be used for zone scene

20   management -- they took that sentence and by amendment in --

21   much later in time, 2000 whenever the -- 2017-'18 time period,

22   they took that sentence, they put it in Figure 5B -- next to

23   Figure 5B.  Instead of calling it "zone groups," as was in the

24   original provisional, they changed it to talk about "zone

25   scenes."

PROCEEDINGS

1      So --

2              THE COURT:  All right.  Okay.  This is important.

3              MR. PAK:  Yes.

4              THE COURT:  And I -- you're -- I'm going to come to

5      this, but I'm looking at paragraph -- column 10 --

6              MR. PAK:  Yes.

7              THE COURT:  -- the paragraph near 12 to 17 or 19 that

8      starts "Figure 5B shows another user interface."  Do you see

9      what I'm saying?

10             MR. PAK:  Yes.  I have that exactly.

11             THE COURT:  All right.  Now, I'm asking:  Does that

12     paragraph appear in the appendix?

13             MR. PAK:  What we find when we looked is -- if we can

14     have that on the screen.

15         This is the closest that we found, page -- and for the

16     record, I'll make a note, page 2651, page 45, is the

17     provisional document.

18         And, Mr. Fisher, if we can zoom in on the bottom.

19             THE COURT:  Just a minute.  45?

20             MR. PAK:  Page --

21             THE COURT:  I don't know if I'm looking at the right

22     document.

23             MR. PAK:  It's on the screen, Your Honor, now.  We

24     have it.

25         Thank you.

1      So this is what's going on:  You have page 45 of the

2    provisional on the left.  You have the --

3           **THE COURT:**  It says page 17.

4           **MR. PAK:**  Yes.  Page 17 in your version, Your Honor.

5           **THE COURT:**  All right.  So page -- all right.  But

6    it's renumbered.

7      Okay.  All right.

8           **MR. PAK:**  Okay.  So do you see how, Your Honor, it's

9    got two screenshots?  This is the controller UI user interface,

10   and it says (as read):

11              "List of zones in the screen above includes all the

12          zones in the system, including the zones that are already

13          grouped."

14          **THE COURT:**  Yeah.

15          **MR. PAK:**  If you go to the top, this is talking about

16   (as read):

17              "Currently as discussed in the introduction of this

18          document, the current link and drop zones feature allows

19          the user to link and drop zones one at a time.  This

20          feature would allow the user to link and drop multiple

21          zones in one screen."

22     So this -- in this Section 4.1, it is not talking about

23   zone scenes.  This is talking about the preexisting zone group

24   or what we've heard is ad hoc or dynamic group.  They took that

25   sentence and --

PROCEEDINGS

1          **THE COURT:**  I get that -- I get that that's what

2   you're saying.

3          **MR. PAK:**  Yes.

4          **THE COURT:**  I'm trying to first find out -- it was

5   represented to me that this exact paragraph was in the

6   appendix.

7          **MR. PAK:**  It's not.

8          **THE COURT:**  All right.  So I --

9          **MR. PAK:**  That is absolutely --

10         **THE COURT:**  So I want to go sentence by sentence.

11         **MR. PAK:**  Yes.

12         **THE COURT:**  Figure 5B shows another -- I know

13  Figure 5B couldn't be in the appendix, but some figure shows

14  another user interface to allow a user to form a scene.  Is

15  that sentence anywhere in the appendix?

16         **MR. PAK:**  No.  I wasn't --

17         **THE COURT:**  Are you sure?

18         **MR. PAK:**  I'm pretty sure that sentence does not

19  appear because there's no Figure 5B in this provisional and

20  it --

21         **THE COURT:**  Well, I know that.  That wouldn't be fair

22  to ding them for that because it has to be renumbered.

23      But some figure in the appendix show -- does it say "shows

24  another user interface to allow a user to form a scene"?

25         **MR. PAK:**  I was not able to find that.

PROCEEDINGS

1          THE COURT:  All right.  The next sentence says (as

2     read):

3               "The user interface 520 that may be displays on a

4          controller or computing device lists available zones in a

5          system."

6          Is that sentence in there?

7          MR. PAK:  I was not able to find that, Your Honor.

8          THE COURT:  All right.  The next one I think is in

9     there (as read):

10              "The list of zones in the user interface includes all

11         the zones in the system, including the zones that are

12         already grouped."

13         Is that in there exactly in those words or is it --

14         MR. PAK:  If you -- let's blow that up and compare

15    it -- in comparison.

16         I think that particular sentence appears to be the one

17    that's at the bottom.

18         THE COURT:  All right.  I think so too.

19         And then next (as read):

20              "A check box is provide" -- I think it means

21         provided -- "A check box is provide next to each of the

22         zones so that a user may check in the zones to be

23         associated with the scene."

24         Is that sentence in the appendix?

25         MR. PAK:  I was not able to find that one, Your Honor.

1          **THE COURT:**  So I'm going to give you a chance over

2     there on the Sonos side.  Maybe I'm -- not yet.  Not yet.  But

3     yesterday you represented to me, I believe, that this paragraph

4     was in the appendix.  All right.  Okay.  But I'm now learning

5     maybe it wasn't.

6          All right.  Please continue with your -- so you're making

7     two points.  One, this language is not in there; and two, the

8     diagram has been transmogrified from the original to make it

9     look -- what used to be "dynamic grouping" has now become

10    "scenes," but that was not what was in the document.

11         **MR. PAK:**  Exactly.

12         **THE COURT:**  And, in fact -- and, in fact, the

13    document, the appendix, said you cannot use or should not use

14    the controller to do scenes.

15         **MR. PAK:**  Exactly right.

16         And the legal significance, Your Honor, for this case, I

17    don't know what legal significance there may be for other

18    claims, but if, in fact, the 2006 provisional is not providing

19    written description support and they're stuck with the

20    amendment date, which is two, three years after our product was

21    released --

22         **THE COURT:**  Yeah, your product would be --

23         **MR. PAK:**  -- it would be invalidated.

24         **THE COURT:**  -- prior art.  The whole patent would be

25    invalid, and we would be in the attorneys' fees territory at

PROCEEDINGS

 1    this point.

 2           **MR. PAK:**  That's right.

 3           **THE COURT:**  All right.  I want to give the other side

 4    a chance to respond to what I've just heard.

 5           **MR. RICHTER:**  Thank you, Your Honor.  Cole Richter for

 6    Sonos.

 7        First, I'd like -- if this can stay on the screen, that's

 8    fine.  Well, okay.

 9        Mr. Jay?  Okay.  Great.

10        So what we see on the left side is a portion of Appendix A

11    of the provisional; and so this bottom screen here, Your Honor,

12    that is Figure 5B of the -- of the patent.  And I'll hold it up

13    here, and I can also have our trial technologist put it on the

14    screen.

15        But this is --

16           **THE COURT:**  Yeah, I get that you put it in the bottom

17    half.

18           **MR. RICHTER:**  Well, yes, correct, the bottom half.

19        Let me take a step back and explain the history of the

20    filing.

21        So the provisional was filed September 2006.  The

22    provisional is -- was -- consisted of what was called a

23    specification, some drawings, and two appendices.  All of that

24    material is considered the provisional.  That was filed with

25    the Patent Office.

1          **THE COURT:** Was that published?

2          **MR. RICHTER:** It was published -- it was made

3     available for inspection when the nonprovisional application,

4     which claimed priority to it, first published.  That published

5     in 2013 or -- yes, 2013.

6          **THE COURT:** So between 2005 and 2013, if somebody --

7     was there anything that would have taught the world how to

8     practice anything?  If it wasn't published, how could that be?

9          **MR. RICHTER:** Not taught the world at that time,

10    Your Honor, but the important thing is that it was filed at the

11    Patent Office.  It was filed at the Patent Office explaining

12    how to practice the invention, and it was making its way

13    through the Patent Office until it issued on -- issued as a

14    patent in the first nonprovisional patent, the '853, patent in

15    2013.

16       That predates Google's system, for whatever that's

17    relevant for, predates Google's system.

18          **THE COURT:** All right.  And were those appendices

19    published at that time?

20          **MR. RICHTER:** At that time they were made available

21    for inspection in the file history available for everyone.

22          **THE COURT:** No, no.  Answer my question.

23       Were those appendices published like the patent was

24    published or -- you're saying "made available for inspection."

25    That would mean you've got to get on an airline, fly back

 1    there, and ask to see them.

 2         MR. RICHTER:  No.  I -- well, that's one way.  I think

 3    you could use the internet.

 4         So they weren't part of the patent document, the four

 5    corners of the ribbon copy, but they were available to the

 6    public at that time.  You can go on the internet and get them.

 7    That's --

 8         THE COURT:  All right.  All right.  We'll come back to

 9    that point.

10         MR. RICHTER:  Okay.  No problem.

11         So, I mean, we've heard a lot about this sentence, this --

12    the list at the very bottom of this portion of the

13    specification (as read):

14         "The list of zones in the screen above includes all

15         zones in the system, including the zones that are already

16         grouped."

17         That was the sentence that was added into the

18    specification.

19         But the important point is:  This is the zone scene

20    specification, Your Honor.  Look, it says it at the very top,

21    "Sonos UI specification zone scenes."  The entire document is

22    talking about zone scenes.

23         THE COURT:  What entire document?  What entire

24    document?

25         MR. RICHTER:  The entire Appendix A to the

1    provisional.  This is -- this is talking about zone scenes.

2    This is --

3            **THE COURT:**  It's not.  It's talking about dynamic

4    grouping.

5            **MR. RICHTER:**  No.  This is not talking about dynamic

6    grouping.  This is talking about a modification to the existing

7    system to allow you to create groups; and when you're creating

8    groups, you're displaying all of the zones that -- even if

9    they're already in existing groups.

10           At the time it is correct that the Sonos '05 system did

11   not allow -- did not display screens like this.  This is a

12   proposed modification to the Sonos '05 system.

13           This is -- this document -- this section is in the context

14   of a zone scene specification describing different ways to

15   create and invoke zone scenes.

16           And, yes, it's correct, Mr. Pak pointed out that the

17   document also says at page 39 -- 37 that it is not expected

18   that the zone scenes should be set up using a hand-held

19   controller.  It didn't say not impossible to do that.  This is

20   describing many different ways to create and invoke zone

21   scenes, and this particular way is a modification of the zone

22   picker screen.

23           And let me now address the addition of this sentence into

24   the specification.

25           First of all, this sentence is not the only support for

1   overlapping groups.  Okay?  It's -- I'll come back to that in a

2   second.

3            **THE COURT:**  I've read it.  I can only find one other

4   arguable place where there's a reference to a den being in the

5   morning and the evening, but that's clearly dynamic.  It's

6   talking dynamic.  Nothing about zone scenes in that paragraph.

7            **MR. RICHTER:**  I'm happy to -- yeah.  I'm happy to

8   address all the other places in the 2007 specification that --

9            **THE COURT:**  There's none.  There's none.  I've looked

10  at it, but I'll give you a chance to -- I'm going to give you a

11  chance to, but I've read it quite carefully for this.  I'd be

12  surprised if I missed something where overlapping zone scenes

13  and the nature of this can be -- all right.

14       We've got to bring the jury in in a minute.  I want -- I

15  keep interrupting you.  So, please, I want to give you equal

16  time, please.

17           **MR. RICHTER:**  Okay.  Thank you.  No problem,

18  Your Honor.

19       Let me briefly address the fact that the sentence was

20  added to the specification in 2019.  This is a perfectly

21  permissible procedure.  It's provided by Rule 37 CFR 1.57(g) --

22           **THE OFFICIAL REPORTER:**  I'm sorry?

23           **MR. RICHTER:**  I'll slow down just a little bit.

24       What I just mentioned was the Code of Federal Regulations.

25  That's 37 CFR 1.57(g), and that says (as read):

**PROCEEDINGS**

1           "Any insertion of material incorporated by reference

2      into the specification or drawings of an application must

3      be by way of an amendment to the specification or

4      drawings.  Such an amendment must be accompanied by a

5      statement that the material being inserted is the material

6      previously incorporated by reference and that the

7      amendment contains no new matter."

8      That's exactly what happened.

9           **THE COURT:**  Well, yours did -- yours did include new

10   matter.

11          **MR. RICHTER:**  No.  That matter was in the 2006

12   provisional and it was incorporated by reference into the 2007

13   nonprovisional filing.

14          **THE COURT:**  It's not word for word.

15          **MR. RICHTER:**  That sentence --

16          **THE COURT:**  The first two sentences?

17          **MR. RICHTER:**  Well, the --

18          **THE COURT:**  The first two sentences in that paragraph

19   by Mr. Pak says that they're not in.  He couldn't find them.

20          **MR. RICHTER:**  Well, it is correct that not every word

21   of the 2007 nonprovisional needs to be in the 2006 provisional,

22   but the portion of the material that we were bringing in by way

23   of amendment was.  That's what the rule says.  That's the part

24   that was brought in.

25          Figure 5B was in the provisional, and this portion of the

**PROCEEDINGS**

1    2007 nonprovisional is describing Figure B.  The part that was

2    brought in by amendment is the portion describing Figure B that

3    says (as read):

4         "The list of zones in the user interface 520" -- that

5         was Figure 5B, which was referred to as the screen above

6         here -- "includes all the zones in the system, including

7         the zones that are already grouped."

8    This amendment was made August 2019 during the --

9         **THE COURT:**  Let's say that I determine that you're

10   wrong and this is new material or some of it is new material.

11   That new material cannot support a priority date of 2005.

12   Isn't that true if it's new material?

13        **MR. RICHTER:**  If it's -- if it's new material, then

14   I -- I think the -- what would happen is that that sentence

15   would then just be struck from the specification.  The entire

16   specification just doesn't go away, Your Honor.

17        **THE COURT:**  Of course.  I agree with that.  And so if

18   it's new material and it's not considered and this is the only

19   thing that would support the invention, then the written

20   description is no good, the patent is no good or -- and then

21   Mr. Pak is going to ask for a lot of attorneys' fees.

22        **MR. RICHTER:**  Well, this --

23        **MR. SHEA:**  Your Honor, may I just clarify one thing?

24        **THE COURT:**  Sure.

25        **MR. SHEA:**  Because I think there's still a little bit

1    of confusion.  I know it's a confusing -- it is, actually, a

2    very confusing priority chain.  I've seen a lot, and it's

3    confusing.

4        So I think one thing that's getting overlooked here is

5    there's the provisional, and that was filed in 2006.  Then

6    there was the first nonprovisional filing.  That happened in

7    2007, and that is -- other than this sentence and a couple

8    other figures, that is the operative -- that's the exact

9    specification that we're looking at today.

10       So Your Honor has asked a couple times about the rest of

11   the sentences in that paragraph.  Those all were filed with

12   the -- for the first time 2000 -- verbatim 2007,

13   September 2007.

14       So that -- that material -- what happened was that was the

15   original specification.

16           THE COURT:  Wait, wait.  You're saying Figure 5B was

17   in 2007?

18           MR. SHEA:  That's right, Your Honor.  That's right.

19           THE COURT:  He said it was 2017.

20           MR. SHEA:  Yeah, that's absolutely incorrect.

21           THE COURT:  That's not true?

22           MR. SHEA:  Yeah, that's absolutely incorrect.

23           THE COURT:  Incorrect or correct?

24           MR. SHEA:  Incorrect.  Yeah, incorrect.

25       2007 filing Sonos -- because the way this works,

1    Your Honor, is you -- you file the provisional first, as I tell

2    my clients to placeholder, it's to get your filing date; and

3    then you file your nonprovisional patent a year later, and you

4    have to.  You get one year; right?  Once you file a

5    provisional, you get one year to file a nonprovisional patent.

6        So we went and filed the first patent in this chain, the

7    first real patent in this chain, not a provisional but the

8    nonprovisional, in 2007, and Figure 5B and -- and this

9    paragraph, other than the one sentence we're talking about,

10   were verbatim in that specification.

11       The only thing that wasn't, for purposes of this

12   discussion at least, is this one additional sentence, and that

13   one additional sentence had already been part of the

14   provisional.

15       **THE COURT:**  I'm sorry.  Which sentence are you

16   referring to?

17       **MR. SHEA:**  Yeah, sorry.  The one that says "all zones,

18   including the zones that are already grouped."

19       So --

20       **THE COURT:**  Well, but that -- that's only half.  The

21   full sentence says (as read):

22           "The list of zones in the user interface includes all

23       zones in the system, including the zones that are already

24       grouped."

25       **MR. SHEA:**  That's right, Your Honor.

PROCEEDINGS

1        So what happened was this; right?  In 2007 the

2  specification had Figure 5 -- that was filed in 2007, what I

3  like to refer to as the first nonprovisional application, that

4  was filed September 2007.  It had Figure 5B.  That's --

5            THE COURT:  That very same Figure 5B?

6            MR. SHEA:  Exactly that 5B.

7            MR. PAK:  That's wrong, Your Honor.

8            THE COURT:  Okay.  I'm going to give you a chance,

9  Mr. Pak.  I want to hear counsel's statement.

10       Please continue.

11           MR. SHEA:  So my understanding, Your Honor -- and

12  we'll double-check it again, because, I mean -- but my

13  understanding is that Figure 5B was in that filing.

14                    (Pause in proceedings.)

15           MR. SHEA:  And, Your Honor, and this paragraph, other

16  than that sentence, was part of that filing.

17           THE COURT:  All right.  Well, that would make some

18  difference to me if that's true.

19       Mr. Pak, I give you a short rebuttal.

20           MR. PAK:  Yes.  So here's the problem:  Let's go back

21  to the provisional where that sentence first appeared.

22       If we look at this, they -- whether it's in an earlier

23  figure -- nonprovisional filing or not, do you see, Your Honor,

24  there's an arrow that goes from the top figure to the bottom

25  figure?  Do you see that, Your Honor?

1           **THE COURT:**  Yes.

2           **MR. PAK:**  That -- what this means is that this is the

3     entire figure.  The top figure and the bottom figure are linked

4     together.  Why is that important?  Because you can see that the

5     menu that's on the bottom is a result of pushing this zone

6     scene -- zones linking button.  And at the top you have three

7     speakers "living room, kitchen, and patio, one group; master

8     bedroom, an individual speaker.

9           And then you push the zones linking button, and it tells

10    you these are the other things you can group together with that

11    selection.

12          And then that sentence that we've been talking about, "The

13    list of zones in the screen above includes all the zones in the

14    system, including the zones that are already grouped," is with

15    respect to this bottom figure.

16          And what you see here, sir, is this is adding to an

17    existing dynamic group the ability to expand or shrink that

18    group by putting not only individual speakers or other groups.

19          What that means is you will never have in this full

20    picture a scenario where you have overlapping -- even

21    overlapping zone groups.  You can shrink a group.  You can make

22    it bigger.

23          But by chopping off the top of this figure where this

24    provisional says "Don't use this for zone scenes," and you can

25    see that this has -- zone linking is a separate button and on

1  the right you can see that this is talking about zone menu, you

2  push that button, it takes you to the zone menu.  This is zone

3  grouping, the dynamic zone grouping, that's prior art.

4         THE COURT:  All right.  Look, you've made this point

5  earlier.

6     But what Counsel is saying that you're dodging and sliding

7  off onto something else -- wait a second -- is -- is -- I'm

8  looking at column 10 where it begins "Figure 5B shows another,"

9  he says that whole paragraph, with one exception of one

10 sentence use --

11        MR. SHEA:  Yes.

12        THE COURT:  -- came in in 2007.

13        MR. SHEA:  That's right, Your Honor.  I mean, I'm

14 holding up this is the 2007 5B right here.  It's identical to

15 the 5B in that -- in the --

16        THE COURT:  You said the whole paragraph was

17 identical.

18        MR. SHEA:  Yeah, well, I'm sorry.  You had asked me

19 earlier about 5B, and the paragraph -- and we can find that too

20 for Your Honor -- everything but the one sentence is in 2007.

21        THE COURT:  Is that true?

22        MR. PAK:  The Figure 5B, which is a chopped-off

23 version of this, does appear in the first nonprovisional

24 application, I agree with that.

25    The thing that is missing, which is critical to the

1   overlapping zones issue, is this sentence because that

2   Figure 5B without that sentence does not get to overlapping

3   zone scenes.  So that that sentence -- this Figure 5B and that

4   sentence does not appear in the first patent application.

5          THE COURT:  Well, when was that sentence added?

6          MR. PAK:  That's the list of zones in the user

7   interface 520, including all zones in the system.

8          THE COURT:  I understand, but when was the sentence

9   added to the spec?

10          MR. PAK:  I believe for the purposes of these two

11   patents, it was added by amendment in 20 -- was it '18?

12          MR. RICHTER:  Well, it was technically in the

13   specification since the provisional, which was 2006.  It was

14   added into the four corners of the specification for purposes

15   of printing in 2019 --

16          MR. PAK:  '19.

17          MR. RICHTER:  -- and the applicant explained in that

18   amendment that it was adding it pursuant to Rule 57(g), and the

19   examiner said permissible and then allowed the application,

20   Your Honor.  This is a perfectly permissible practice to

21   amend --

22          THE COURT:  I may disagree with you and the examiner,

23   but I'm not -- I'm not there yet.

24          MR. RICHTER:  Understood.

25          THE COURT:  Lots of things get through the PTO that --

**PROCEEDINGS**

1   because you know how busy they are.  They're busier than even a

2   district judge, and so I'm -- and they may not have understood

3   the significance of it and the priority dates and leaving to

4   the judge later to figure out does this sentence count for

5   purposes of a 2005 priority or for purposes of a 2018 priority.

6   If it's 2018, then maybe the Google system predates your whole

7   thing and your patent is invalid.  Maybe.

8         **MR. SHEA:**  So, Your Honor --

9         **THE COURT:**  But just a second.

10      You led me to believe, Mr. Pak, that 5B came in in 2018.

11        **MR. PAK:**  I apologize if that was the impression.  I'm

12   talking about 5B with that sentence.  5B with that sentence.

13   Without that sentence, 5B does not get you to overlapping zone

14   scenes.  That sentence is critical to understand how you go

15   from Figure 5B.

16        **THE COURT:**  All right.  We've got -- is the jury

17   ready?

18        **THE LAW CLERK:**  Yeah.

19        **THE COURT:**  All right.  Hang on a minute.

20      I want additional briefing.

21        **MR. PAK:**  Thank you.

22        **MR. SHEA:**  Thank you, Your Honor.

23        **THE COURT:**  I want to know -- and I want it by Sunday

24   night at 5:00 p.m., not 8:00 p.m., and I -- and I want to

25   understand the legal significance of an appendix:  Is it part

1    of the specification?  What does it mean?

2         The priority date -- there's, in my mind, a 50-50 chance

3    that these patents are invalid because the Google system

4    predated them because it was inadequate written description

5    prior to that date, and that's the very reason you snuck it in

6    there.

7         That's my suspicion.  You're sitting around the conference

8    room there at the Sonos saying "How can we -- we don't have a

9    good enough description.  Maybe we better -- let's move this

10   in."

11        Now, maybe -- maybe the law is, "Oh, no, this counts as

12   part of the appendix.  It counts."  But, to my mind, the whole

13   point of the written description is to teach the world how to

14   do it.  If you have to go find something in some appendix

15   that's online, that's crazy.  What a crazy way to run a system.

16        So I -- I feel like there's a significant written

17   description issue here with respect to the claims in suit.  Do

18   not slide off of that.  I want to know case law that deals with

19   appendixes priority dates laid it out.

20        **MR. PAK:**  Thank you, Your Honor.

21        **THE COURT:**  Now, I want to know something.  Was there

22   anything else in 2018 or '19 that was snuck into the

23   specification?  Even one word I want to know.

24        **MR. PAK:**  I'll go back and check.  I don't know.

25        **MR. SHEA:**  I can address that, Your Honor.  I know the

PROCEEDINGS

1    answer to your question.  There were -- there were

2    additional -- two additional figures that were also brought in

3    from the provisional.

4         THE COURT:  Which ones?

5         MR. SHEA:  They were Figures 7 and 8, Your Honor.

6         THE COURT:  All right.  Okay.  And were there anything

7    else?

8         MR. SHEA:  The descriptions of those figures in the

9    specification.

10        THE COURT:  What else?

11        MR. SHEA:  I believe that is the extent of it.

12        THE COURT:  Was the word "scene" somehow snuck in

13   there several times?

14        MR. SHEA:  Your Honor, the word "scene" has been in

15   2006, 2007, both.

16      Again, Your Honor, I want to -- so, to be clear, again,

17   the specification that was filed in 2007 --

18        THE COURT:  Was the word "scene" snuck in any

19   additional times?  I know it was in the original sometime.  Was

20   there any additional place where the word "scene" was snuck in?

21        MR. SHEA:  I don't -- we'll double-check, Your Honor.

22   In describing those figures, it's possible the word "scene" was

23   used.

24        THE COURT:  All right.  Well, I'd like to know that.

25        MR. SHEA:  Okay.

1        THE COURT:  It's possible -- I have a feeling it's

2   more than possible because that's what -- that's the gimmick

3   that was going on at Sonos to cover the Google product.

4        All right.  Bring in the jury.

5        Who is our witness?

6        THE CLERK:  All rise for the jury.

7        (Proceedings were heard in the presence of the jury:)

8        THE COURT:  Be seated, please.

9        All right.  We are starting three minutes late.  My

10  apologies.

11       We still have Dr. Almeroth on the stand.

12                       **KEVIN ALMEROTH**,

13  called as a witness for the Plaintiff, having been previously

14  duly sworn, testified further as follows:

15       THE COURT:  Where are we?  Are we on direct or still

16  on cross?  I think we're on direct, aren't we?

17       MR. SHEA:  Your Honor, yeah, I had just been to the

18  end of my redirect actually.

19       THE COURT:  All right.  So is there any recross?

20       MR. PAK:  Are you at the end?

21       MR. SHEA:  Your Honor, yeah, so I was -- I had not

22  quite finished; but for the record, in the interest of time,

23  I'm finished with my redirect.

24       THE COURT:  All right.

25       MR. PAK:  Okay, Your Honor, I have some recross.  It

1   won't be very long, though.

2                           <u>**RECROSS-EXAMINATION**</u>

3   **BY MR. PAK:**

4   **Q.**   Good morning, Doctor.

5   **A.**   Good morning.

6   **Q.**   All right.  So, Doctor, I want to tell you I didn't want

7   to put you on the spot the other day about the prosecution

8   history statements that you may not have seen recently, but you

9   do agree with me that looking at the prosecution history

10  statements as part of the record of the patent is important in

11  thinking about what the claims cover and what the claims do not

12  cover in a patent?  Would you agree?

13  **A.**   It is important to look.  To the extent it has any bearing

14  or not, that's one of the determinations.

15  **Q.**   Thank you.

16       Now, doctor, I want to go back to some of the testimony

17  that you gave on redirect yesterday.

18       **MR. PAK:**  So, Mr. Fisher, if we could put up trial

19  transcript 929, 5 through 17.

20  **BY MR. PAK:**

21  **Q.**   So this is for the jury's benefit, you were asked (as

22  read):

23       "QUESTION:  So can you explain to us what action causes

24       the accused Google products and the ones that are accused

25       of infringement to go into group mode?

1      "ANSWER:  That's where you would do a launch and that --

2      and the launch would invoke the group in the Google

3      system."

4      Do you recall that testimony?

5  A.   I do.

6  Q.   And so just for everyone's benefit, launch is a command

7  inside of the Google system; is that correct?

8  A.   It is.  It's a command.  It's a message that gets sent to

9  the players.

10  Q.   And we saw that each of the claims talk about invoking a

11  group or a zone scene in some of their claim elements.  Do you

12  recall that?

13  A.   I do.

14  Q.   Yes.  So what you were doing was you were mapping the

15  launch command in the Google system to the invocation of the

16  zone scenes as required by some of the claim elements that

17  we've seen so far; is that fair?

18  A.   Not quite.

19  Q.   Is it your -- is it true, sir, that the launch process in

20  the Google products you believe invokes the accused zone scene

21  in the Google products?  Is that a fair statement?

22  A.   Not exactly.  The launch command has multiple uses, and so

23  one of the uses is with respect to launching the group --

24  Q.   Thank you.

25  A.   -- launching the zone scene.

1    Q.   And launch, again -- so I understand that.  Thank you very

2    much.

3         The launch can be used to do other things; but in this

4    particular scenario, you analyzed for purposes of infringement

5    the launch command is used to invoke the claimed zone scene in

6    the Google products; is that fair?

7    A.   The invocation was accomplished with a launch function.

8    Q.   Thank you.

9         So just to remind the jury, what we're seeing on the

10   screen when we're operating the Home app -- this is a

11   controller -- let's put up your Demonstrative PDX2.50.

12                    (Pause in proceedings.)

13        MR. PAK:  And I believe it's -- is this 50?  There's a

14   slide called "Google's Speaker Group Technology Slide,"

15   I believe.

16                    (Pause in proceedings.)

17        MR. PAK:  Give us a few seconds.  I'm going to get

18   Mr. Fisher on the right page, Your Honor.

19                    (Pause in proceedings.)

20        MR. PAK:  Okay.  We have it on the screen now.

21   BY DEFENSE COUNSEL:

22   Q.   Do you recall discussing the launch function within the

23   Google products using these series of screenshots?

24   A.   I do.

25   Q.   So what's happening here is the user pushes the morning

1  group with the button on the right; correct?  That's the

2  finger?

3  **A.**   Yes.

4  **Q.**   And then that would launch the morning group.  And then

5  you see the picture to the right?  Is that fair?

6  **A.**   I believe that's a decent high-level summary.

7  **Q.**   Right.  So what you were saying is the user pushes the

8  button on the right next to morning; and then somewhere in the

9  system, a launch command would be used to invoke the morning

10 group in the Google system.  Would you agree?

11 **A.**   That's close.  That's not quite how I would describe it.

12 **Q.**   Please.  Please describe what you're describing with

13 these.

14 **A.**   Sure.  So the idea is that in the source code there's

15 functionality that when you invoke the group, it causes a

16 launch command to be sent to the group leader; and then from

17 there, that will invoke the group so that it meets the rest of

18 the limitations with respect to playing -- to be configured to

19 play in synchronization.

20 **Q.**   Thank you.  Perfect.

21     So now, Doctor, I want to now help the jury by figuring

22 out what the dispute is between you and Dr. Schonfeld on this

23 issue.

24     So if we put up claim 1 of the '885 patent.

25     Now, I'm using PDX2.10.  That's the slide that you used to

1  talk about claim 1; is that correct?

2  **A.**   I did use that slide.

3  **Q.**   Okay.  So here, if we focus on the language saying

4  "continuing to operate in the standalone mode until given one

5  of the first and second zone scenes has been selected for

6  invocation."  Can you see that in the claim?

7  **A.**   Yes, I can.

8  **Q.**   Can you identify for the jury which number we're looking

9  at?

10  **A.**   1.8.

11  **Q.**   Okay.

12        MR. PAK:   So, Mr. Fisher, if you can highlight that.

13             (Pause in proceedings.)

14  BY MR. PAK:

15  **Q.**   So 1.8 of claim 1 of the '885 patent has this language of

16  "continuing to operate in the standalone mode until a given one

17  of the first and second zone scenes has been selected for

18  invocation"; correct?

19  **A.**   That's what it says.

20  **Q.**   So you and I would agree that in order to meet this

21  limitation, whatever you're accusing has to be in standalone

22  mode and continue to operate in standalone mode until a given

23  one of the first and second zone scenes has been selected for

24  invocation; correct?

25  **A.**   That's correct.  And this is the claim that's already been

**ALMEROTH - RECROSS / PAK**

1  found to be infringed.

2  **Q.**  Now with respect to the new design; correct?

3  **A.**  That's correct.

4  **Q.**  And we're talking about the new design for the '885

5  patent; correct?  For the jury's benefit?

6  **A.**  I think that's the first time you said you were talking

7  about the redesign.

8  **Q.**  Okay.  Talking about the new design, Dr. Almeroth, the

9  jury is going to decide whether this limitation is still

10  satisfied in the new design of the Google products.  Do you

11  understand that?

12  **A.**  Yes, I do.

13  **Q.**  So the disagreement that is happening between you and

14  Dr. Schonfeld and Google is that Dr. Schonfeld and Google have

15  taken the position that this invocation process which uses the

16  launch command is happening not in a mode other than standalone

17  mode.  Do you understand that?

18  **A.**  I think there was a double negative in there.

19          **THE COURT:**  Yeah.  You've got to rephrase it.  Double

20  negatives.

21  **BY MR. PAK:**

22  **Q.**  You understand that Dr. Schonfeld and Google dispute that

23  Google speakers are in standalone mode when the launch command

24  is invoked?  Do you understand that?

25  **A.**  Yes.

ALMEROTH - RECROSS / PAK

1   Q.   Okay.

2   A.   I understand that's what Dr. Schonfeld says.

3   Q.   That's what the jury has to decide.  The jury has to

4   decide when the invocation of the zone scenes that you say is

5   the Google group, the static groups, in the new design, whether

6   that is happening in standalone mode or a different mode other

7   than the standalone mode.  Do you understand that?  That's the

8   jury's decision?

9   A.   That's close.  Some of the first words you used with

10  respect to I think you said dynamic group, I would disagree;

11  but it is -- it is a question of whether or not at the time of

12  invocation, the first zone player is continuing to operate in

13  standalone mode.

14  Q.   Thank you.

15       And if the jury were to agree with Google and

16  Dr. Schonfeld that this invocation step or functionality in the

17  new design for the Google product is happening in a mode other

18  than standalone mode, if the jury agrees with that, then you

19  would agree that there is no infringement of claim 1 of the

20  '885 patent for the new design; correct?

21  A.   I think if they agree with Dr. Schonfeld, then there's not

22  going to be infringement for the redesign.

23  Q.   That's right.  Because the infringement test is an

24  all-or-nothing test.  You have to have every element of that

25  claim; correct?

1   **A.**   That's correct.

2   **Q.**   And we're going to do the same exercise now with the '966

3   patent.

4              **MR. PAK:**   If we can have claim 1 of the '966 patent.

5                       (Pause in proceedings.)

6   **BY MR. PAK:**

7   **Q.**   And here, your testimony we went through a lot of

8   exchanges you and I, but one thing you said during the

9   hearing -- or the transcript last time is that the requirement

10  here isn't for continuously staying in standalone mode, but at

11  each one of the steps it has to be in standalone mode.  Do you

12  recall that testimony?

13  **A.**   I do.

14  **Q.**   And you stand by that; correct?

15  **A.**   I do.

16  **Q.**   So for every one of these steps, 1.5 through 1.10, those

17  steps have to be taken while the zone player is in standalone

18  mode.  Do you agree?

19  **A.**   For each of those steps, that's correct.

20  **Q.**   That's right.

21        So now I want to focus on the specific limitation now.

22  It's the same dispute, whether the group is invoked or

23  launched, but I want to find the claim language that the jury

24  has to consider to decide the question of infringement for this

25  claim on the new design as well.

1    So if we look at "receiving a third request to invoke the

2    first zone scene," that is in this claim 1 of the '966 patent;

3    correct?

4    **A.**   So you had a big run-up to the question, and I disagree

5    with your characterization.

6    **Q.**   Let me ask the simple question.  "Receiving a third

7    request to invoke the first zone scene," that appears in this

8    claim as a limitation; correct?

9    **A.**   That is a limitation.

10   **Q.**   And for the jury's benefit, that's 1.10 in Dr. Almeroth's

11   demonstrative for claim 1 of the '966 patent; correct?

12   **A.**   That's correct.

13   **Q.**   So, again, you say this step 1.10 happens in the accused

14   Google devices when the Google speaker is in standalone mode;

15   correct?

16   **A.**   That's correct, in both the older versions and in the

17   redesign.

18   **Q.**   And you understand that Google and Dr. Schonfeld dispute

19   that with respect to the new design; correct?

20   **A.**   I do.

21   **Q.**   They say that invocation launch command happens in a mode

22   other than standalone mode in the accused new design for

23   Google.  Do you understand that?

24   **A.**   I do, but there's a different requirement than that

25   characterization.

1  Q.   I'm just asking you:  There's a dispute on this limitation

2  1.10; correct?

3  A.   There's a dispute -- yes, there's a dispute on this

4  limitation.

5  Q.   If the jury were to agree with Dr. Schonfeld and Google

6  that the invocation or launching of the accused groups in the

7  new design takes place in a mode other than standalone mode,

8  then this limitation 1.10 would not be satisfied; correct?

9  A.   No, actually, this limitation is different.  The receiving

10  a third request to invoke the first zone scene is on the

11  controller so it's not the invocation yet.  That happens in

12  1.11 where based on the request, the zone player transitions.

13  Q.   I'm going to --

14  A.   This -- this part that you have highlighted, "receiving a

15  third request," is receiving a third request into the

16  controller and then the controller takes action.

17  Q.   I want to read --

18  A.   So when the request is received at the controller, that's

19  when it has to be in standalone mode, not after invocation.

20  Q.   I want to bring up your trial transcript page 844, 1

21  through 3.

22                    (Pause in proceedings.)

23  BY MR. PAK:

24  Q.   This is what you stated under oath that you confirmed

25  today (as read):

1              "The requirement here isn't for continuously staying

2         in standalone mode, but at each one of the steps it has to

3         be in standalone mode."

4         You stand by that testimony; correct?

5    A.   Absolutely.

6    Q.   Okay.

7    A.   It's what I just described.

8    Q.   But, again, if they -- if the jury agrees with

9    Dr. Schonfeld and Google on this issue of when and which mode

10   the launching takes place, then there will be no infringement;

11   correct?

12   A.   I disagree.

13   Q.   Okay.  We'll see about that.

14        Now, just quickly --

15             MR. PAK:  You can take this down, Mr. Fisher.

16   BY MR. PAK:

17   Q.   One of the other topics that you discussed on redirect

18   with counsel was you said that Sonos kept some of its -- or all

19   of its source code for the Sonos 2005 prior art system because

20   they didn't want anyone to find out the inner workings or

21   details of that system; correct?

22   A.   No, that was not my testimony.

23   Q.   You understand that the source code was kept confidential

24   by Sonos for the Sonos 2005 prior art system; correct?

25   A.   I believe that's correct.

1   Q.   Okay.  But in this case both you and Dr. Schonfeld had the

2   opportunity to look at the actual operation of the Sonos 2005

3   prior art system by doing product testing; correct?

4   A.   Yes, we both did testing of the Sonos 2005 -- no.  I don't

5   recall.  I don't remember if there was actually a setup for the

6   Sonos 2005 system.

7   Q.   You are aware that Sonos did not submit to the Patent

8   Office for inspection or examination an actual working version

9   of the Sonos 2005 prior art system; is that correct?

10  A.   I don't think they did because there's not a mechanism to

11  even do that.

12  Q.   Are you an expert in patent prosecution procedures?

13  A.   No, but I know that much.

14  Q.   You're not aware of interviews taking place with patent

15  examiners to display and explain workings of prior art systems?

16  You're not aware of that?

17  A.   I'm aware of that.  I'm not sure that it's applicable to

18  this situation.

19  Q.   You also heard Mr. Millington testify that there were lots

20  of tests that were conducted of the Sonos 2005 prior art

21  system.  Do you recall that?  By Sonos.

22  A.   Not specifically, but that makes sense.

23  Q.   Makes sense, right, because you would want to test a

24  product before you release it?  After you release it, you want

25  to test it to see if there are any bugs or if there's

1   opportunities for improvement?  Do you agree?

2   **A.**   Yes, you would want to do testing.

3   **Q.**   And you're also aware that none of those test results

4   regarding the Sonos 2005 prior art system was submitted to the

5   United States Patent and Trademark Office with respect to these

6   two patents; correct?

7   **A.**   Not that I recall.  I don't think that would have added

8   anything to what the Patent Office already had.

9   **Q.**   And you and Dr. Schonfeld had the opportunity to study the

10  source code for the Sonos 2005 system; is that correct?

11  **A.**   I believe that's correct.

12  **Q.**   And, again, that source code was kept confidential by

13  Sonos so it was not submitted to the examiner at the United

14  States Patent Office for these two patents; correct?

15  **A.**   Not the source code but the details of how the system

16  would have operated.

17  **Q.**   Well, what was submitted were just user manuals; correct?

18  **A.**   I wouldn't call them just user manuals.  They go into

19  significant detail about how the system works.

20  **Q.**   We'll talk about that when you're back up on the stand in

21  the validity side of the case.

22      But you agree with me that the things that were submitted

23  about the Sonos 2005 system to the Patent Office were user

24  manuals of that system; correct?

25  **A.**   They were.

1   Q.   Thank you.

2        One last question -- set of questions.

3            MR. PAK:   If we can put up DDX4.9.

4   BY MR. PAK:

5   Q.   You understand that this is the agreed-upon construction

6   of zone scene; correct?

7   A.   Let me check.

8   Q.   It's on the screen as well.

9   A.   It is.  I just want to make sure all the words were there.

10  Sometimes words get left out.

11       (Witness examines document.)  Yes.

12  Q.   Okay.  And what this construction or definition says is

13  "previously saved grouping of zone players according to a

14  common theme."  Do you see that?

15  A.   I do see that.

16  Q.   And this grouping of zone players, according to a common

17  theme has to be previously saved; correct?

18  A.   It is.

19  Q.   So one of the things that's required to be previously

20  saved is the grouping of zone players; correct?

21  A.   No.  That's not what previously saved talks about with

22  respect to previous.  That's -- it's kind of a mistake that I

23  made.  You can't save something before it's created.  So the

24  previously saved grouping is with reference to the invocation

25  of the group.  You have to have it saved before you invoke it.

1  Q.   We're going to come back to that later.

2       Let's take out the word "previously."  Let's just talk

3  about saved.  Are you with me?  What is being saved?

4  A.   The -- the zone scene.

5  Q.   And that -- the thing that you are saving as a zone scene

6  has to include the grouping of zone players according to this

7  construction.  Do you agree?

8  A.   I disagree.

9  Q.   Okay.  The language here is grouping of zone players,

10  correct, for zone scene?

11  A.   Yes.

12  Q.   You have to save it at some point?

13  A.   The grouping of zone players --

14  Q.   Yes or no, please.

15  A.   I can't answer that yes or no.

16  Q.   Okay.

17  A.   I don't think that's a fair question.

18  Q.   You would at least agree with me that these words appear

19  in the construction of zone scene, "previously saved grouping

20  of zone players according to a common theme"; correct?

21  A.   That's what the words are.

22  Q.   A grouping of zone players includes the identification of

23  which zone players belong to a grouping; correct?

24  A.   It can but it need not be the thing that's saved.

25  Q.   Grouping.  I'm just focusing on grouping of zone players

ALMEROTH - RECROSS / PAK

1  includes the identification of which zone players belong to

2  that grouping.  Agreed?

3  **A.**   I think you're misreading the requirement here.  I think I

4  can explain why I think that.

5  **Q.**   We'll have a chance to talk later in the case.

6       **THE COURT:**  No.  I'd like to hear --

7       **MR. PAK:**  Sure.

8       **THE COURT:**  I'd like to hear this.

9       Go ahead.  Please explain your point.

10      **THE WITNESS:**  Yes, sir.  Thank you.

11      So it's describing previously saved with respect to the

12  zone scene.  So the previously saved is modifying the entire

13  rest of the limitation, which is the zone scene itself.

14      This doesn't say that previously saved has to include the

15  identification of the zone players.  So one of the examples

16  could be that on each of the players you save what groups that

17  player is in, and so that would include things like the

18  identification for the zone scene and then also the name of the

19  zone scene; and if all of the players store that information,

20  then the zone scene can be created based on those players

21  knowing.

22      And so the invocation happens.  You send out the launch

23  and everyone can see the -- sorry -- everyone can see the

24  launch; and if they are part of that zone scene, then they

25  invoke the zone scene.

1          So I don't think it's a requirement even with this --

2    within this agreed construction that you have to exactly store

3    every member of the group in a certain location.

4    **BY MR. PAK:**

5    **Q.**   You understand that's a dispute between you and

6    Dr. Schonfeld; correct?

7    **A.**   I think it's part of the dispute.

8    **Q.**   Dr. Schonfeld says based on this plain language previously

9    saved grouping of zone players according to a common theme,

10   what you're saving is the identification of zone players?  You

11   understand that's Dr. Schonfeld's position?

12   **A.**   Yes.  And even if you take that position --

13   **Q.**   Doctor, that's all I'm asking.

14   **A.**   -- it's still saved.

15        Well, I'm trying to finish my answer.

16   **Q.**   Please go ahead.

17   **A.**   Even if Dr. Schonfeld and I disagreed on that point, I

18   still believe the accused products store the group of zone

19   players.

20   **Q.**   But just on the claim application or interpretation issue,

21   there is a dispute between you and Dr. Schonfeld as to whether

22   the grouping of zone players in the zone scene definition

23   requires identification of the zone players that belong to the

24   group; correct?

25   **A.**   I think you're rephrasing the disagreement.  I think the

 1  disagreement may be with respect to what has to be previously

 2  saved, whether or not that requires the specific identification

 3  of all of the zone players in the group.

 4  **Q.**    I'd like to thank you for your testimony.  I'll see you

 5  again later.  Thank you.

 6         **THE COURT:**  All right.  Any reredirect?

 7         **MR. SHEA:**  No, Your Honor.

 8         **THE COURT:**  Great.

 9     Okay.  Dr. Almeroth, you may step down.  And I know you're

10  going to be coming back, so you're not excused permanently.

11     You can leave all those notebooks up here.  The lawyers

12  will take care of that.

13         **THE WITNESS:**  Thank you, Your Honor.

14            (Witness excused subject to recall.)

15         **THE COURT:**  Okay.  Let's go to the next witness.

16         **MR. RICHTER:**  Good morning, Your Honor.  Cole Richter

17  for Sonos.

18     At this time we think it would be appropriate to read in

19  one of the discovery responses that we've designated for

20  reading in.  This would be Interrogatory Number 1.  Would that

21  be okay with Your Honor?

22         **THE COURT:**  Sure.  Before you do that, I'm going to

23  tell the -- now, you got to read the entire answer.  You can't

24  just read part of it.  You've got to...

25     I told you about depositions.  There's another discovery

PROCEEDINGS

1    investigating tool called an interrogatory.  So the one side or

2    the other can send a question in writing to the other side and

3    say "Please answer this question within 30 days," and then the

4    other side has to answer it within reason under oath, and then

5    that answer can then be used at trial as evidence.

6        So -- and Counsel -- I told you nothing a lawyer ever says

7    is evidence.  This is an exception because he's going to read

8    it exactly, and you're going to follow along to make sure that

9    it's read exactly, and then this will be evidence in the case.

10       So tell us what the interrogatory number is, the date of

11   it, the date of the answer, and who verified it for -- if you

12   have all that information.  Go ahead.

13           MR. RICHTER:  I believe I do, Your Honor.

14       This was an interrogatory served by Sonos on Google, and

15   Google's lawyers have signed it and the date was December 23,

16   2021.

17       We had designated and agreed on a specific portion of the

18   response to read, Your Honor, but if you'd like me to --

19           THE COURT:  If you both agree on the response, then

20   I'll accept that.

21           MR. RICHTER:  Okay.  Thank you very much.  It shortens

22   it, so I think that's better.

23           THE COURT:  All right.

24           MR. RICHTER:  Okay.  The interrogatory states (as

25   read):

1           "Describe in detail when and how Google first became

2       aware of each patent in suit and the steps, if any, taken

3       by Google as a result of such awareness, including but not

4       limited to an explanation of the circumstances surrounding

5       Google's acquisition of such awareness and identification

6       of the persons who first became aware of each patent in

7       suit and the source of such awareness (person, document,

8       or otherwise) and an identification of the Google

9       employees, officers, or directors that were aware of each

10      patent in suit prior to the filing of the above captioned

11      litigation."

12      Response (as read):

13          "Google first became aware of the existence of the

14      '966 patent on or around September 28, 2020, when Sonos

15      sent a draft complaint" -- "sent a draft of the complaint

16      to Google the day before it filed the Western District of

17      Texas action."

18      At this time, Your Honor, we would like to play the video

19  deposition of Google employee Mr. Tim Kowalski.  The run time

20  is about 11 minutes.

21          **MS. BAILY:**  Google just notes its objections that it

22  filed yesterday.

23          **THE COURT:**  All right.  I'm going to overrule those

24  objections, and let the entire -- I believe whatever we saw

25  yesterday be played.

PROCEEDINGS

1        So -- but this is -- you're about to see a deposition of a

2   Google employee named Kowalski.

3        Spell that name for us so the jury can write it down.

4            **MR. RICHTER:**  Absolutely.  K-O-W-A-L-S-K-I.

5            **THE COURT:**  All right.  Roll the tape, please.

6                (Video was played but not reported.)

7            **THE COURT:**  Okay.  Is that it?

8            **MR. RICHTER:**  That's it, Your Honor.

9            **THE COURT:**  All right.  Next witness.

10       Are there documents you want to put in evidence?

11           **MR. RICHTER:**  Yes.  Thank you.  Just one.  That would

12   be TX8240.  We would move that document into evidence.

13           **THE COURT:**  Is that the declaratory relief?

14           **MR. RICHTER:**  It is, Your Honor.

15           **THE COURT:**  All right.

16           **MR. PAK:**  No objection subject to the issues that

17   we've been discussing, Your Honor.

18           **THE COURT:**  Those objections are overruled, and 8240

19   in evidence.

20       (Trial Exhibit 8240 received in evidence.)

21           **THE COURT:**  Okay.  Next witness.

22           **MR. RICHTER:**  Okay, Your Honor, at this time Sonos

23   would like to call to the stand Ms. Alaina Kwasizur.

24       Your Honor, would it be appropriate before Ms. Kwasizur

25   takes the stand to clear off those binders?

PROCEEDINGS

1       THE COURT:  Yes, it would.

2       MR. RICHTER:  Okay.

3       THE COURT:  Tell me how long the deposition lasted

4   then.  Did you say 11 minutes?

5       MR. RICHTER:  Yes, Your Honor, 11 minutes all for

6   Sonos' time.

7       THE COURT:  All right.  Who's our next witness?

8       MR. SULLIVAN:  It's Sonos' General Counsel Alaina

9   Kwasizur.  They're just clearing off the desk, Your Honor.

10      THE COURT:  Great.  Okay.

11      THE CLERK:  Please raise your right hand.

12                  **ALAINA KWASIZUR**,

13  called as a witness for the Plaintiff, having been duly sworn,

14  testified as follows:

15      THE CLERK:  Please speak directly into the microphone,

16  state your full name for the record and spell your last name.

17      THE WITNESS:  Alaina Catherine Kwasizur, last name

18  K-W-A-S-I-Z, as in zebra, U-R.

19      THE COURT:  Welcome and thank you.

20     Now, you're going to need to move this a little closer to

21  your voice so that you don't have to lean over so far.  It'll

22  be more comfortable.

23      THE WITNESS:  Is that better?

24      THE COURT:  That's much better.

25     All right, counsel, go ahead.

1          **MR. RICHTER:**  Thank you, Your Honor.

2                          **DIRECT EXAMINATION**

3    **BY MR. RICHTER:**

4    **Q.**   Good morning, Ms. Kwasizur.

5    **A.**   Hi.

6          **MR. RICHTER:**  Your Honor, may I approach the witness

7    with a witness binder for the exhibits?

8          **THE COURT:**  Of course.  Go ahead.

9          **MR. RICHTER:**  Thank you.

10                         (Pause in proceedings.)

11   **BY MR. RICHTER:**

12   **Q.**   Ms. Kwasizur, you're employed by Sonos; is that right?

13   **A.**   Yes, that's correct.

14   **Q.**   Where are you from, Ms. Kwasizur?

15   **A.**   I'm from San Diego.  I live in San Diego with my husband

16   and two sons, 10 and 12.

17   **Q.**   So do you work remotely from home then?

18   **A.**   I do.  I work out of an old garage in my backyard.  I like

19   to joke that that's Sonos' San Diego headquarters.

20   **Q.**   What's your job at Sonos?

21   **A.**   I'm our General Counsel of Americas and Pacific.  So

22   everywhere but Europe.

23   **Q.**   Have you ever testified at a trial before?

24   **A.**   No, I have not.  This is not a normal day for me in my

25   job.

1  Q.   What would be a normal day for you at your job at Sonos?

2  A.   I mean, usually, like I said, I sort of work in any

3  backyard.  I spend most of my mornings on Zoom calls.  I look

4  at contracts all day and work on deals.

5       And in the afternoon I take a break, go pick up my boys

6  from school, although really just the little one because the

7  older one's too cool for me now; and then, you know, finish my

8  day reviewing documents and things like that.

9  Q.   What are your general job responsibilities at Sonos as

10 General Counsel?

11 A.   Well, I work on a ton of different legal matters that come

12 up throughout the company.  You know, we have all sorts of

13 things.

14      But relevant to this case I work on partnership

15 agreements, most of our major partners.  So I worked on

16 agreements with any of our music partners, like Spotify, Google

17 Music, things like that; and then I also work on any of our

18 licensing agreements and any of our IP licenses.

19 Q.   Have you done other jobs at Sonos besides the ones you

20 just described?

21 A.   I have.  I started as a sort of senior counsel, and I

22 focused on product things; and then I also for a period of

23 time, about two and a half years, our CEO asked me to be our

24 chief diversity inclusion officer so I did that in conjunction

25 with my legal job.  I had two jobs for a while.

1  Q.  How did you start working at Sonos?

2  A.  Well, I started back in 2013.  I -- I had purchased a

3  Sonos for my home.  It was actually one of my first, like,

4  adult purchases.  I was obsessed with my Sonos system because

5  back then it was like so revolutionary.  You could play any

6  music just from a controller in your hand, and it was just so

7  awesome.

8        So I was kind of obsessed with the company; and when I saw

9  that they had a job posting in the legal department, I reached

10  out to a friend who already worked there and then he confirmed

11  that it was a great company and so I applied, and luckily they

12  hired me and that was almost ten years ago now.

13  Q.  And, briefly, prior to working for Sonos, did you have

14  other jobs in the -- in the industry?

15  A.  Yeah.  I worked at two other companies.  I worked at a

16  company called DivX, which used to do video compression

17  software.  We licensed out some video compression software.

18        And then I also worked at a company called ROVI, which

19  later went on to become TiVo, and they sort of licensed

20  technology in the video space, streaming of video, things like

21  that.

22  Q.  What did you study after high school, Ms. Kwasizur?

23  A.  Sorry.  I'm going to take a sip of water.

24  Q.  No problem.

25  A.  After high school, I went to college and I got my BS in

1  psychology with a premed concentration from the University of

2  Florida, and then I went on to law school and got my law degree

3  from the University of Miami.

4  **Q.**  Can you tell us about Sonos' business generally?

5  **A.**  Sure.  Well, when I started, our mission was to fill every

6  home with music.  That's one of the reasons I joined.  I really

7  believed in the mission.  I'm a lover of music.  I was a lover

8  of tech.  I still am.  So our mission was to fill every home

9  with music, and that really resonated with me.

10      As we've grown, we now aspire to be the world's leading

11  sound experience company.  We've sort of broadened our horizons

12  a little bit I would say.  But, you know, we primarily do that

13  through selling speakers.  I mean, we sell all sorts of

14  speakers:  Home theater; you know, portable, a variety of

15  speakers.  We -- basically our mission is to make sure people

16  have more music in their lives because that's -- you know, it

17  brings people joy.  So that's -- that's primarily what we do.

18  **Q.**  Can you tell us about Sonos' patent portfolio?

19  **A.**  Sure.  I think pretty early on, you know, the founders

20  realized they were doing something pretty unique and different.

21      Back then, you know, this is the early 2000s, the only way

22  to have music in your home, which I think you guys saw some of

23  the slides that we have floating around Sonos with the wires

24  come out, really the only way to have music throughout your

25  home was to put holes in your walls and have an installer come

1    in and put speakers, and it wasn't really a practical way for

2    most people to have music throughout their home.

3          And so I think when the founders came up with the idea to

4    do it using Wi-Fi, they realized that was sort of a game

5    changer for most people who liked having music in their homes.

6    And so I think, you know, they started really innovating on

7    that, and they also realized that the best way to protect your

8    innovation is using the patent system and so they started

9    filing for patents fairly early on in Sonos' history.

10         And since then -- I mean, just beyond that, I would say

11   over the years we've really continued with, like, innovation is

12   sort of one of our core values of the company, and so we've

13   always sort of just continued to build on that.  We have, like,

14   Hack Week and all these things where everyone around the

15   company comes up with ideas.  I actually participated in Hack

16   Week once.  I was very proud of myself.

17         We take those ideas and we continue to file patents when

18   they're worth the energy and the time.  We file patents for

19   those, and so we have all sorts of patents.  I think we have a

20   lot at this point.  There's a whole list on our website where

21   you can see them; but, yeah, we have -- we continue to file

22   patents.

23   Q.   About roughly what size is Sonos' patent portfolio today

24   in the United States?

25   A.   I think we're between a thousand and 1,500 or so.  I'm

1    not -- I don't track the numbers like some of my colleagues do.

2    **Q.**   And the -- can you tell us generally the subject matter of

3    Sonos' patent portfolio, what the patents generally are

4    directed to as a whole?

5    **A.**   I mean, they're all sort of directed to the home audio

6    space.  Like I said, our whole goal in life is to make sure

7    that people get to listen to music in their lives or have great

8    sound experiences.  So we have some that are around sort of

9    like the grouping technology, some around volume controls, some

10   around how you set up your players, home theater.  We have

11   things around just the sound for home theater.

12       We have all sorts of stuff.  We even have some now in the

13   voice realm.  One of my favorites that's a little bit more

14   recent in time is we have ones that if -- it basically

15   listen -- it figures out how your room is configured and based

16   on where your furniture is, and that sort of thing, and where

17   your speakers are.  It makes -- it optimizes the sound for the

18   way your room is set up.  It's called Trueplay.  I think that's

19   one of my favorites at least.

20       But, yeah, we're pretty -- pretty proud of our patent

21   portfolio.  I think we've come up with innovative ideas; and,

22   you know, a lot of employees contribute to it so it's a nice

23   thing for the company to talk about and be proud of.

24   **Q.**   Would you mind turning in your binder to TX307?

25   **A.**   (Witness examines document.)  307?  Sorry.  0307.  Got it,

1  yeah.

2  **Q.**   And what is that document, Ms. Kwasizur?

3  **A.**   This is the IEEE patent power ranking from 2017 for the

4  electronics industry it looks like.

5  **Q.**   This is a document you've seen before?

6  **A.**   I have.

7         **MR. RICHTER:**   Your Honor, we'd like to move TX307 into

8  evidence.

9         **MS. BAILY:**   Objection, Your Honor.   It's hearsay.

10  There's no foundation.   403.

11         **THE COURT:**   Sustained.

12  **BY MR. RICHTER:**

13  **Q.**   Ms. Kwasizur, why did Sonos initially pursue patents?

14  **A.**   Well, I think, you know, back in the day, they realized

15  that they were really doing something new and interesting and,

16  you know, the sort of whole point of a patent system is to

17  protect innovation; and so I think -- I think that our founders

18  realized that, and so they started creating a patent portfolio

19  to sort of protect themselves from another company coming in

20  and basically taking their idea before they had grown enough to

21  really establish a business.

22         I think, you know, probably some of the testimony from

23  Nick and others you could see early days, you know, it was a

24  startup; right?   So they were trying to protect themselves

25  really, protect their business.

1   Q.   And why does Sonos continue to pursue patents?

2   A.   Well, like I said, one of our core values is innovation.

3   I mean, we really believe in IP and sort of the fairness of all

4   of it, and so I think we continue.  When we have innovation,

5   you know, we take a look at the ideas that people come up with

6   across the company and we try to protect the things that are

7   innovative there.  You know, if we come up with something new,

8   like the room thing I was telling you about, we want to make

9   sure that that's something we can use and something that

10  benefits our business.

11  Q.   Has Sonos licensed its patent portfolio before?

12  A.   Yes.  We have a couple -- a couple of patent licenses.

13  Q.   Okay.

14          MR. RICHTER:  Mr. Jay, would you mind bringing up

15  TX7220 and Slide 50 in particular please?

16                      (Pause in proceedings.)

17          THE COURT:  Sorry.

18          MR. RICHTER:  Thank you.

19  BY MR. RICHTER:

20  Q.   Ms. Kwasizur, what do we see on this slide here?

21  A.   You can see this is a timeline of sort of when Sonos came

22  up with their innovation and when others started adopting that

23  innovation -- that same innovation.

24  Q.   So I think we see Sonos arrow at the bottom, but moving up

25  from that arrow, I think we see "Bluesound."  Who is Bluesound?

1  **A.**    Yeah, you can see Sonos at the bottom there around

2  January 2004, which apparently is our first CES demo; and,

3  yeah, the next one you can see is Bluesound about -- it's the

4  end of 2013.  So several years later.

5      Sorry.  Did you ask who was Bluesound?  Or what was your

6  question?  Sorry.

7  **Q.**    That's okay.  My question was "who is Bluesound?

8  **A.**    Oh, yeah.  Bluesound is an audio tech company or, I guess,

9  maybe more of a traditional audio company.  They make speakers

10  and they make speakers that compete with Sonos around --

11  starting around the end of 2013 they came out with speakers

12  that did the same sort of multiroom functionality, the smart

13  speaker thing that we've been talking about a little bit.

14  **Q.**    And let's take a look at the next arrow up.  I believe

15  that one says Denon HEOS.  What was Denon HEOS?

16  **A.**    Yeah, Denon is a traditional, more of an old school audio

17  brand.  I think they used to make the real big speakers that

18  people would have, like, in the '80s; but in around 2014 they

19  also started making a multiroom sort of smart speaker that was

20  similar to Sonos.

21  **Q.**    So in this 2014 to 2015 timeframe, did other companies

22  come onto the market to compete with Sonos at this time?

23  **A.**    Oh, yeah, definitely.  You know, around end of 2013 we

24  started seeing competitors come on the market.

25      I mean, in many ways Sonos was sort of ahead of its time.

1    It took a little while.  I mean, Sonos came out really even

2    before streaming music was a thing, and so it took time for the

3    streaming music adoption to really become a thing with people

4    paying for subscriptions.

5         And then once you started seeing that trend, then you saw

6    competitors really coming on the market.  There was -- it

7    started sort of with Bluesound, but there was a bunch of

8    others.  LG, I think Samsung has a competing product, Amazon --

9    right? -- Google.  So, yeah, there was definitely more than

10   just shown on this slide.

11   **Q.**   When did Google start competing with Sonos?

12   **A.**   Well, looking at this, you know, 2015, about 10 years or

13   so after we first released our products.

14   **Q.**   Let's circle back to Denon.  Does Denon have a license to

15   Sonos' patent portfolio?

16   **A.**   Yes, they do.  Yes.

17   **Q.**   And how did this license come about?

18   **A.**   We sued Denon for infringement, and they -- the trial --

19   we went to trial with them, and it -- all of our patents were

20   found valid and infringed, and they were found to willfully

21   infringe and we did a settlement license.  It was both to

22   settle the litigation and also a license agreement for them to

23   sort of --

24        **THE COURT:**  That answer is ambiguous.  When the

25   witness says "all of our licenses" -- "all of our patents were

 1  found valid."

 2          **THE WITNESS:**  The ones in case.  Sorry.

 3          **THE COURT:**  The ones in that case, the ones that were

 4  asserted in that case is what you are talking about.

 5          **THE WITNESS:**  Yes.

 6          **THE COURT:**  Those were not the ones in this case;

 7  true?

 8          **THE WITNESS:**  No.

 9          **THE COURT:**  Okay.  Next question.

10          **MR. RICHTER:**  Thank you, Your Honor.

11  **BY MR. RICHTER:**

12  **Q.**   Ms. Kwasizur, can you turn to TX6721 in your binder,

13  please?

14  **A.**   6721 you said?

15  **Q.**   Yes.  That one actually may not be in your binder, but I

16  think I have it back here.

17  **A.**   Okay.  I was going to say.

18                     (Pause in proceedings.)

19          **MR. RICHTER:**  Your Honor, may I hand the witness

20  Exhibit 6721?

21          **THE COURT:**  Sure.  Go ahead.

22          **MR. RICHTER:**  Thank you.

23                     (Pause in proceedings.)

24  **BY MR. RICHTER:**

25  **Q.**   Ms. Kwasizur --

1          MS. BAILY:  Do you have a copy for me?  I apologize.

2          MR. RICHTER:  I think this was an exhibit you guys had

3    designated maybe for cross.

4          MS. BAILY:  Okay.

5    BY MR. RICHTER:

6    Q.    Let me ask you this:  Do you recognize this document,

7    Ms. Kwasizur?

8    A.    Yes, I do.

9    Q.    And what do you recognize it as?

10   A.    This is our license agreement with Denon or the parent

11   company DEI.

12   Q.    And did you participate in the negotiations of this

13   license agreement?

14   A.    I did.

15         MR. RICHTER:  Your Honor, at this time we'd like to

16   move TX6721 into evidence.

17         MS. BAILY:  No objection.

18         THE COURT:  What?  67 -- did you say "objection"?

19         MS. BAILY:  I said "no objection."

20         THE COURT:  No objection.

21    All right.  I think your microphone is not turned on.

22    6217?

23         MR. RICHTER:  6721, please.

24         THE COURT:  All right.  That's in evidence.

25    (Trial Exhibit 6721 received in evidence.)

1              THE COURT:  You can show it to the jury.

2              MR. RICHTER:  Okay.  Let's just bring up the first

3    page.

4    BY MR. RICHTER:

5    Q.    Okay.  And is this the document we've been looking at,

6    Ms. Kwasizur?

7    A.    Yes, this is the same document.

8    Q.    And can you remind us what type of license the Sonos-Denon

9    license is?

10   A.    This was, like I said, both to settle the active

11   litigation and a patent license agreement between us and Denon.

12   It was a global license.  It was a running royalty rate whereby

13   you get -- basically they pay -- each unit they sell, they pay

14   an amount based on each unit.

15   Q.    I think you might have said a running royalty rate.  Did

16   you -- did you mean something different?

17   A.    Oh, sorry.  Yeah, one is -- was a different one.

18         Yeah, no, this one was actually a lump sum -- I'm sorry --

19   because we knew how much units they had sold as part of the

20   litigation, we just sort of did the math and turned it into a

21   lump-sum payment.

22   Q.    Were the patents in suit covered by this license

23   agreement?

24   A.    No, they were not.

25   Q.    Let's turn to Bluesound.  I believe you mentioned that

1   Bluesound was licensed.  Do I have that right?

2   **A.**   Yes, that's correct, Bluesound has also taken a patent

3   license.

4   **Q.**   And how did that license come about?

5   **A.**   That one we sent them a letter and then we ended up suing

6   them.  We had some conversations with them, and then we ended

7   up suing them and it settled very early in the case.  I don't

8   remember exactly when, but they decided to take a license.

9   **Q.**   Would you mind turning to TX6632 in your binder?

10          **MR. RICHTER:**  Your Honor, may I approach and retrieve

11  the previous exhibit.

12          **THE COURT:**  Of course.  Go ahead.

13                      (Pause in proceedings.)

14  **BY MR. RICHTER:**

15  **Q.**   What is this document, Ms. Kwasizur?

16  **A.**   This is our patent license between Sonos and Lenbrook,

17  which is the company that makes the Bluesound products.

18  **Q.**   And did you help -- did you participate in the

19  negotiations of -- that led to this license?

20  **A.**   Yes, I did.

21          **MR. RICHTER:**  Your Honor, can we move into evidence

22  TX6632?

23          **MS. BAILY:**  No objection.

24          **THE COURT:**  Thank you.  Received in evidence.

25          (Trial Exhibit 6632 received in evidence.)

1        **MR. RICHTER:**  And do we have permission to publish the

2   exhibit, Your Honor?

3        **THE COURT:**  Yes.

4        **MR. RICHTER:**  Thank you.

5   BY MR. RICHTER:

6   **Q.**   Is this the license we've been looking at, Ms. Kwasizur?

7   **A.**   Yes.  This is -- yes, this the Lenbrook license.

8   **Q.**   What type of license is the Lenbrook license?

9   **A.**   So this one -- this one is a running royalty license.

10  Yeah, it's a running royalty license covering our patent

11  portfolio.

12  **Q.**   And generally can you explain what a running royalty

13  license is?

14  **A.**   So a running royalty license, or sometimes called a per

15  unit license, is when basically the infringing products would

16  pay each unit they sell.  So it's based on the units rather

17  than one -- the other one was sort of a lump sum where you pay

18  once.

19  **Q.**   And are the patents in suit, the '885 and the '966, are

20  they covered by this license?

21  **A.**   No, they are not.

22  **Q.**   Let's turn to page 6 of TX6632.

23       At the very top of the screen, the table, what do we see

24  here?

25  **A.**   So that is the royalty rate that we agreed to in this

1  agreement.

2  **Q.**   Can you explain the structure of the running royalty

3  agreement?

4  **A.**   Sure.  You can see it's sort of a tiered structure.  We

5  prefer to have sort of a tiered structure that increases, and

6  so this shows -- by "tiered" I mean you can see like the

7  products 0 to 5,000 have one price and then 5,000 to 10,000 a

8  different, 10,000 to 20; and so you can see depending on how

9  many products they sell, that's the rate that they would pay.

10         **MR. RICHTER:**  And can we bring up page 2, Mr. Jay?

11         And the definition of licensed patents, can we highlight

12  that?

13  **BY MR. RICHTER:**

14  **Q.**   I think, Ms. Kwasizur, you had mentioned that the patents

15  in suit were not covered by this license agreement; but reading

16  this definition here, licensed patents, would that refresh your

17  recollection as to whether the patents in suit are covered by

18  the Lenbrook license here?

19  **A.**   Oh, yes, they would be covered under this agreement today.

20  Sorry.  At the date -- the date we entered it they were not

21  covered because they weren't issued yet, but the license

22  covered our whole patent portfolio.  So, yes, they cover the

23  patents in suit today.

24  **Q.**   Okay.  I think I understand.

25         The patents in suit -- are you saying the patents in suit

1    were not issued yet so at the -- are you saying at the time of

2    the -- you entered into the license they didn't --

3    **A.**   Yeah.   Correct.

4    **Q.**   Okay.   So when the patents did issue, would they have then

5    been covered by this license agreement?

6    **A.**   Yeah.   Any patents at issue automatically roll into the

7    license agreements.   They get a portfolio license so, yes,

8    correct.

9    **Q.**   Can I have you look, Ms. Kwasizur, in your binder for

10   TX6631?

11   **A.**   (Witness examines document.)

12   **Q.**   What is this document when you're ready?

13   **A.**   This is another license agreement.   This is a license

14   agreement between us and a company -- well, they go by the name

15   Legrand, but the parent company is Pass & Seymour.   So on the

16   document itself -- I'm sorry.   Pass & Seymour.   It's their

17   parent company of Legrand.

18   **Q.**   And what does Legrand make or sell, if anything?

19   **A.**   Legrand also makes a multiroom home audio product that

20   competes with Sonos.

21   **Q.**   And what type of license did Sonos and Legrand negotiate

22   and sign?

23   **A.**   This one was also similar, a running royalty to our patent

24   portfolio.

25           **MR. RICHTER:**   Your Honor, can I move TX6631 into

```
 1   evidence.
 2            MS. BAILY:  No objection.
 3            THE COURT:  Received.
 4       (Trial Exhibit 6631 received in evidence.)
 5            THE COURT:  You can show it to the jury.
 6            MR. RICHTER:  Thank you, Your Honor.
 7   BY MR. RICHTER:
 8   Q.  Ms. Kwasizur, was this license agreement a settlement of a
 9   lawsuit of any kind?
10   A.  No.  This one we had sent them a notice letter, and then
11   we engaged in some negotiations and then we settled on having a
12   license.
13       We actually really don't like to litigate.  It's not as
14   fun as it might seem here.  So we try to generally -- we reach
15   out to companies, we try to negotiate a fair deal, and do a
16   license agreement.  That's our preference.
17   Q.  Are the patents in suit, the '885 and the '966, are they
18   covered by this license agreement?
19   A.  Yes, they would be.
20            MR. RICHTER:  And can we look at page 6, Mr. Jay.
21   Thank you.
22   BY MR. RICHTER:
23   Q.  And what do we see on the screen here, Ms. Kwasizur?
24   A.  Sorry.  I have to keep taking my glasses off to read.
25       Page 6 we see the royalty rate similar to the other one.
```

1    It's a tiered structure.  This is sort of what we do with all

2    of them, we try to have this tiered structure where it

3    increases.  The more the company sells, the rate goes up.

4    **Q.**   So I think we heard about Denon, Bluesound, Legrand.  Has

5    Sonos licensed any other companies to its patent portfolio?

6    **A.**   No.

7    **Q.**   And what preference, if any, does Sonos have on the form

8    of its patent licenses?

9    **A.**   Well, like I said, we, you know, prefer to have the

10   per-unit royalty.  We tend to do, you know, global if that's

11   what they want, cross-license; but, yeah, we really prefer the

12   per-unit royalty.

13   **Q.**   Why does Sonos have that preference?

14   **A.**   We actually just think it's the, like, smartest way to

15   handle it and the fairest, to be honest.  Because, you know,

16   basically the more they sell, the more they -- well, two

17   things.  The more they sell, the more they're really cutting

18   into our business.

19       I mean, you have to understand these are competing

20   products.  These companies, you know, potentially are taking a

21   potential Sonos customer away from us; and with us, it's not

22   really just one customer.  We think of everything as a

23   household.  So, like, if one customer buys one Sonos, we know

24   from our data that on average they buy 2.9 or 3 more products.

25   I mean, I think you heard the Google Mr. Kowalski in the video

1    say he has eight; right?

2        So for us, as soon as we lose one customer, it's really

3    more than just one customer that we might lose; and so we've

4    come up with this tiered structure to try to compensate us

5    more.  If they're cutting into our business more, then they

6    should pay more because they're taking more of our customers.

7        And also in fairness to them, if they sell little, like if

8    they're just in some niche market, like maybe there is some

9    crazy high end that we don't compete with or something and they

10   only sell, you know, 500 units a year, they don't have to pay

11   as much.  So we feel it's really the fairest way to handle it.

12       And then we also -- not only would they not have to pay;

13   but if they sold nothing really, they'd have to pay nothing.

14   But also it's sort of the industry standard to have the per

15   unit because -- another reason is because if they have new

16   products, you know, companies don't want to tell other

17   companies like, "Hey, we have a new product coming out," and

18   this way it covers them for future products.

19       Like these deals are five years long; right?  So that way

20   they can -- they can release their product knowing how much it

21   will cost them without having to, like, disclose to a

22   competitor that, "Hey, we have a new product."

23       And so -- and it's the industry standard.  You see it in

24   most licensing agreements.

25   Q.   So I think I heard you say that Sonos really competes for

1    households.  Can you elaborate a little more on that?

2    **A.**    Yeah.  Like I was saying, you know, we don't -- we don't

3    think of our users really as individual -- well, we don't think

4    of the users as individuals when we think of products.  We

5    think of it as a household.  And, I mean, even in the way we

6    design our products, like, everything works together.

7         Like, this concept of you have household, it's actually

8    what makes Sonos so magical and what made it work in the

9    beginning and so popular is because it is music for throughout

10   your home.  You can play one song, one song there, you can play

11   music everywhere.

12        So when we look at households, you know, we do look at how

13   much our customers buy and how likely they are to buy another

14   Sonos product or another one; or even -- even if you bought

15   this one product, you are probably more likely to buy this, you

16   know, home theater thing.

17        Like, we tend to look at it in the aggregate as

18   households.  So, like I said, on average one customer buys I

19   think it's up to 2.98 is the latest stat on how you know what

20   the repeat trends are, so...

21             **MR. RICHTER:**  And, Mr. Jay, maybe we can bring up

22   TX7200 again and take a look at page 13.

23   **BY MR. RICHTER:**

24   **Q.**    Is this basically what you were describing, Ms. Kwasizur?

25   **A.**    Yeah.  Yeah.  You can see there on the left, 2.9 -- I

1   think this slide might be from further back in time.  I think

2   we're up to 2.98 as of yesterday, but 2.9 products per

3   household.

4        And then we calculate -- that LTV is lifetime value.  So

5   that's, like, what we think a customer's lifetime value of them

6   buying products over time.

7        And so you can see that -- I don't know when this slide

8   was from, but I think it was from maybe a few years ago.  You

9   can see we were sort of looking at our potential as we came out

10  with new products, which some of those products have been

11  released now.

12       So you know we thought that we could get the lifetime

13  value up to 400 to 600 with maybe four to six products a

14  household as we come out with new compelling products that we

15  thought our customers might add-on to their home, like things

16  for the outdoor or more home theater or whatever the case might

17  be.

18            **MR. RICHTER:**  Mr. Jay, can we turn to the page 1 of

19  this exhibit?

20  **BY MR. RICHTER:**

21  **Q.**   And, Ms. Kwasizur, does that date there refresh your

22  recollection as to when this slide was --

23  **A.**   Oh, yes.

24  **Q.**   -- created on or about?

25  **A.**   Yes.  So it's from March 9th, 2021.

1        Thank you Mr. Jay.

2   **Q.**   So we heard a lot this week about Sonos not releasing the

3   feature practiced by the asserted patents in this case until

4   2020.  Do you remember hearing some of that testimony?

5   **A.**   Yes, I did.

6   **Q.**   And do you have a perspective on that?

7   **A.**   Sure.  I mean, you heard a little bit of it from

8   Dr. Almeroth, but I can give some of the inside-the-company

9   perspective.

10       Like he said, some of our old products the hardware

11   couldn't support this -- these newer features.  Not just this

12   feature, other new features as well.

13       You know, Sonos first started releasing products in 2005,

14   and those products -- I mean, honestly the chips on those

15   products are, like, probably similar to, like, a modern day

16   calculator.  They're really old.

17       And so as we released new products, we had this tenet in

18   Sonos that it all has to work together.  We were always very

19   much we wanted your whole home system to work together.  And so

20   as you might imagine, when you have products that are that old

21   that still need to work with something that new, it gets very,

22   very complicated for the modern software to even work on those

23   little chips.

24       And so we had this long, long running debate in the

25   company about we knew at some point we'd have to modernize, at

1    some point you have to rip off the Band-Aid and you'd have to

2    just basically say, "Okay, we're going to move to a new

3    software system and some things are going to get left behind."

4        That was what the S2 software platform was, it was to be

5    able to start putting some of these new features out there in

6    the world and really start having more modern software

7    architecture.

8        But unfortunately for our customers what that meant is

9    some of the old players -- again, these are speakers from 2005

10   you know, it would be like your Mac book from the '90s.  I

11   mean, no -- nothing really works from back then anymore; but

12   customers when it comes to speakers felt their speakers should

13   work, and so we had a really lively debate would be an

14   understatement within our company about how to handle it.

15       And so where we landed was that we would -- we would move

16   forward with this new architecture, but we did try to wait as

17   long as we could really to protect our customers who had

18   invested in those old systems.  I mean, we knew it was going to

19   be rough for our customers, for us.  Just, you know, it was a

20   really big change, and so we waited as long as we could before

21   we had to move.  I mean, we literally had to move to S2.

22       And so I'm pretty sure I still get e-mails weekly from

23   customers who have those old players and are mad that they

24   can't buy the new product and connect it with the really,

25   really old one.

1        So, yeah, it's -- it hasn't -- I wouldn't say it's been

2    the funnest from a legal perspective, but I think ultimately it

3    is the best solution for our customers because we could enable

4    some of these new features like you've been hearing about,

5    so...

6    **Q.**   Ms. Kwasizur, was there a time when Sonos provided notice

7    to Google of the '966 patent?

8    **A.**   Yes.  Yes.  We provided notice September 28th, 2020.

9    **Q.**   And how was this notice provided to Google?

10   **A.**   I sent an e-mail to some folks at Google.

11   **Q.**   And can I have you turn to TX6310 in your binder?

12   **A.**   TX -- sorry.  Which one?  660?

13   **Q.**   6130.

14   **A.**   (Witness examines document.)

15   **Q.**   And what is this document, Ms. Kwasizur?

16   **A.**   This is an e-mail from me to some folks at Google,

17   including Mr. Kowalski, who you just saw in that video there

18   before, on September 28th notifying them that we would be

19   filing a complaint alleging infringement of the '966 patent on

20   the next day.

21   **Q.**   You sent this e-mail; is that correct?

22   **A.**   I did.

23           **MR. RICHTER:**  Your Honor, we'd like to move into

24   evidence TX6130.

25           **MS. BAILY:**  Your Honor, we object.  It violates a

 1   motion in limine order.

 2          **THE COURT:**  You what?

 3          **MS. BAILY:**  We object as a violation of a MIL.

 4          **MR. RICHTER:**  This is an e-mail --

 5          **MS. BAILY:**  I can expand.  I'm not sure if you'd like

 6   me to in front of the jury.

 7          **THE COURT:**  Well, I thought I was going to let this

 8   in, and then you can get to cross examine about all the rulings

 9   on the other patents.

10          **MS. BAILY:**  Agreed on that.  This refers also, though,

11   to the licensing discussions that are out.

12          **THE COURT:**  I just didn't hear you.  Say it again.

13          **MS. BAILY:**  This refers to the licensing discussions

14   that I believe Your Honor ordered were out for both parties.

15          **THE COURT:**  Well, just a minute.

16                        (Pause in proceedings.)

17          **THE COURT:**  What sentence is that?  Is that the second

18   sentence?

19          **MS. BAILY:**  It is the first two sentences.

20          **THE COURT:**  Well, the -- the first paragraph is

21   self-serving and will be stricken.

22      The second paragraph will be allowed.  So don't put up the

23   first paragraph.  It's -- it's self-serving from Sonos' point

24   of view.  It could be true, it couldn't.

25      She can testify to all of that if she wishes, but -- that

1    wouldn't be okay, but the document itself is hearsay and it has

2    things that you would be using to prove up the truth of them

3    and they're unnecessary for notice.

4        So the -- the second paragraph will -- and the third

5    paragraph, I'm going to allow the third paragraph.

6            **MS. BAILY:**  The last sentence, Your Honor?

7            **THE COURT:**  Including that because -- well --

8            **MS. BAILY:**  I think we would --

9            **THE COURT:**  It's just too argumentative and

10   self-serving.  I'm just -- let me explain to the jury what's

11   going on.

12       This is like a nastygram.  The author is telling the other

13   side how unreasonable they've been and then saying "We're going

14   to sue you tomorrow."

15       Well, should I allow into evidence a document that says --

16   if she wants to testify to them being unreasonable, that's one

17   thing, but -- that's subject to cross-examination; but this

18   poor document is not.

19       So it's self serving so I'm going to allow the part that

20   says "We continue to be hopeful that Google will reconsider its

21   infringement," period.  And then the rest of that sentence is

22   stricken and the first whole paragraph is stricken, but

23   otherwise it can come into evidence.

24           **MS. BAILY:**  Just to be clear, are you permitting now

25   evidence to come in of all these discussions?

1    **THE COURT:**  I don't know.  I would say -- didn't I

2   rule that out.

3    **MS. BAILY:**  You did.

4    **THE COURT:**  Not because it -- it's just 403, and there

5   were discussions finger pointing.  It's not going to help the

6   jury.  So I'm not actually going -- I'm not going to allow that

7   into evidence either.

8    All right.  So that's it.  You can use this letter --

9   e-mail, I guess it is, as amended.

10    All right.  6130 in evidence with those amendments.

11    (Trial Exhibit 6130 as amended received in evidence.)

12    **MR. RICHTER:**  And would the Court prefer to receive a

13   redacted version before we publish it to the jury?

14    **THE COURT:**  I think so, yes.

15    **MR. RICHTER:**  Okay.

16    **THE COURT:**  But you can read it out loud.  She can

17   read it.  It's not very long.  You can start with "Attached

18   please fine" -- I'll read it for you.  Are you ready?  (as

19   read):

20     "Attached please find" --

21    **MR. RICHTER:**  Your Honor, if the Court's ready to

22   receive this document with redactions, we would renew our

23   objection to receive the document with objections to the other

24   material as well.

25    **THE COURT:**  Here's what's going on here:  Sonos in

 1   their complaint, they accused them of violating a number of

 2   patents, some of which I later found to be invalid, and that's

 3   what they're fighting over here.

 4       But the ones -- the '966 patent, that has not been found

 5   to be invalid, at least yet.  So that's something that maybe

 6   you're going to have to decide.

 7       It -- this is -- the jury can know this.  This is not

 8   prejudicial to anybody.  So I'm going to let the other side

 9   bring it all out, but not the licensing discussions that went

10   on.  That is just finger pointing at both sides about how

11   unreasonable they were.

12       Okay.  So we're not going to go there.

13       Next question.

14           MR. RICHTER:  Understood.  Thank you, Your Honor.

15           THE COURT:  How much more do you have?  Because we're

16   getting close to time for a break.

17           MR. RICHTER:  Good question.  Maybe 10, 15 minutes.

18           THE COURT:  Let's take our break now.

19       Please remember the admonition.  Don't discuss the case.

20           THE CLERK:  All rise for the jury.

21       (Proceedings were heard outside the presence of the jury:)

22           THE COURT:  All right.  Please have a seat.

23       The witness, you may step down and use the facility as you

24   wish.

25       I have some -- I've got some points to bring up with the

 1  lawyers.  I want to go back to what we were talking about.

 2        **MR. PAK:**  Yes, sir.

 3        **THE COURT:**  Mr. Pak, you didn't mislead me, I don't

 4  suppose, but I got -- I did not fully understand what you were

 5  saying.  And I thought you were saying 5B -- there was never a

 6  5B to begin with in the original.

 7        **MR. PAK:**  I apologize if I created that impression.

 8  What I was saying is that 5B in the original application did

 9  not have that sentence.  That's the point I was --

10        **THE COURT:**  All right.  But did it have that same

11  diagram?

12        **MR. PAK:**  Yes, it did have that same cut-off diagram.

13        **THE COURT:**  All right.  So what would be useful to me

14  would be to have a little notebook -- not a big thick notebook

15  but one about an inch thick at most -- that has in

16  chronological order what was at the PTO and was it in an

17  appendix, where was it.  Something that I can go step by step

18  with the dates on it, what was printed, when it got printed,

19  when it was public, and when it first began to teach something.

20      All right.  That -- I would like to have that.  Do all the

21  highlighting you can.

22        **MR. PAK:**  Yes, sir.

23        **THE COURT:**  So that's number one.

24      I have a different point I want to bring up.  I'm sorry.

25      Okay.  I want to put you on notice and invite you to give

 1  me briefing on claim construction of the '966.

 2       In this case Sonos has been arguing, and your own

 3  witnesses have been arguing -- Mr. Almeroth, for example --

 4  that the '966 would cover a mere smartphone with the Home app

 5  downloaded whether or not it's connected or used with any

 6  speakers.  I disagree with that for a very good reason.

 7       The claim itself says that "an indication must be

 8  transmitted to the first zone player."  That is impossible to

 9  do -- actually to the second zone player too -- but it's

10  impossible to do unless it is configured with -- the controller

11  is configured with the zone player.

12       I don't want you to argue with me now.  I'm giving you a

13  chance to put it in your briefs.

14       To my mind, that means that the accused device, which is

15  the phone, does not infringe until it is so configured.  Now,

16  there are probably millions that are configured.  I suspect

17  that that's true.

18       So this does not gut your case by any means, but the idea

19  that merely downloading the Home app is infringing, I'm

20  probably -- I'm 90 percent certain I'm not going to allow that

21  argument.

22       So I'm giving you the chance to adjust your flow and to,

23  you know, argue with me on that.  Maybe you can convince me,

24  but by Sunday night at 5:00 p.m. you've got to give me your

25  briefs on that point.

1          All right.  I'm going to take a break here.

2              MR. PAK:  Your Honor, on that binder, should I have

3     that ready by Tuesday morning for Your Honor's benefit or

4     should I try to get that to you before?

5              THE COURT:  I guess Tuesday morning would work, but --

6     yeah, that will have to work because I'm not going to read it

7     over -- I'm not going to read it over the weekend; or my law

8     clerk may read it over the weekend, but I'm not going to.

9              MR. RICHTER:  And do I understand that's a binder from

10    each side, Your Honor?

11             THE COURT:  Yes.  Yes.

12             MR. RICHTER:  Okay, Your Honor.

13             THE COURT:  I would like for you to -- what?

14        Oh, she says Monday.  Monday would be better.  So let's

15    say noon on Monday.  Yes, both sides of course.

16        What did I -- oh, I have this question:  If a -- if this

17    '966 patent reaches all the way back for priority date to 2005,

18    does the 20 years run from the 2005 or does it run from 2019?

19    When does it run from?

20             MR. RICHTER:  It runs from, I believe, September 12th,

21    2007.  That's the filing date of the first nonprovisional

22    application.  That's a statutory term defined by statute.

23             THE COURT:  All right.  So it would be from '07?

24             MR. RICHTER:  Correct, Your Honor, subject to any

25    patent term adjustment that the Patent Office determines.  I

 1    can't recall, but I'm not aware of any for these two patents,

 2    but sometimes other patents have that.  So I just want to add

 3    that caveat.  Sometimes the Patent Office says your term is

 4    extended by 50 days or 10 days or something.

 5            **THE COURT:**  All right.  I have one other thing.  Why,

 6    Mr. Pak, did Google not raise -- you're the one -- and if you

 7    go back to the summary judgment, your side is the one that

 8    injected the validity issues into the briefing.  They moved for

 9    infringement, and you weren't content to just live with that.

10        You then said, "Okay.  In addition, it's invalid."  And

11    then you were the one that raised them, but you never raised

12    any of this stuff that you -- back then.  Why didn't you do it

13    then?

14        Now you want me to vacate -- I mean, I would be within my

15    rights to say "Too bad to Google."  Google gave me a record.  I

16    made a ruling on the basis of that record.  The other side

17    relied on it.  Now we get into trial, and it's just like

18    Mr. Clem Roberts trying to lard the record with an offer of

19    proof and get me to -- so I feel like I -- I feel like you

20    should have done this the first time right.  So what's your

21    excuse?

22            **MR. PAK:**  So, Your Honor, my understanding is there

23    was a showdown procedure where they had the opening brief and

24    then we were responding, and then they got the last word.  And

25    I think there were page limits.  We were covering a lot of

 1    issues.

 2        We had preserved the written description and the validity

 3    issues throughout the case, but it was a very limited

 4    opportunity for us to present these issues.

 5        **THE COURT:**  But this is the first time you ever told

 6    me any of this was last night.

 7        **MR. PAK:**  To be honest, Your Honor, I didn't -- I

 8    personally did not discover this until Your Honor asked us to

 9    go back through the chain, which I did, and that's when I

10    started to look and I found these things.

11        So I do apologize that we were not able to connect the

12    dots all the way.  And, you know, I think Mr. Lambourne's

13    testimony, there were some things about the conception document

14    as we noted, that we saw some irregularities after we heard his

15    testimony, so I do apologize it was not presented before

16    Your Honor before.  I do accept that there was a procedure in

17    the showdown that gave us this opportunity.  We just didn't

18    have the opportunity, from our perspective, to, you know, fully

19    study the record.

20        **THE COURT:**  You're saying the biggest company in the

21    world who hires the biggest law firm in the world did not have

22    an opportunity?

23        **MR. PAK:**  No, it's not that, Your Honor.  It's just

24    I -- I'm saying that we -- I personally did not discover this

25    issue until recently, so I do apologize.

1        **THE COURT:**  That's a better answer.

2        **MR. PAK:**  Yes, Your Honor.

3        **THE COURT:**  All right.

4        **MR. RICHTER:**  I will note, Your Honor, I mean, it's

5    very prejudicial.  They did make a strategic decision.  They

6    presented this in opposition to the motion to summary judgment

7    in the showdown procedure.  Sonos responded to it, and

8    Your Honor found in Sonos' favor.

9        We moved on with the trial.  They did not present any

10   further expert opinion or contend this fact for the remainder

11   of the case.  We prepared our case accordingly.  We submitted

12   our expert opinions.  They have the burden of proof on this

13   fact issue by clear and convincing evidence, and it's just

14   prejudicial to be raising it on their half -- on their behalf

15   at this time, Your Honor.

16       **THE COURT:**  Well, that is -- I'm sympathetic to that

17   and that's one of the reasons why this is such a hard job.

18       But I do feel -- I do feel that I wish I had known and

19   you, as the patent owner, could have -- you made a big point

20   out of that sentence being in there, and then I come to learn

21   that it was put in there way after the fact, so -- but that's

22   part of what you're going to be briefing is:  What is the

23   significance of it being in an appendix?

24       All right.

25       **MR. PAK:**  Thank you, Your Honor.

 1        **THE COURT:**  Thanks.  Let's take a short break.

 2        **THE CLERK:**  Court is in recess.

 3              (Recess taken at 9:31 a.m.)

 4              (Proceedings resumed at 9:46 a.m.)

 5        (Proceedings were heard out of the presence of the jury:)

 6        **THE CLERK:**  Remain seated.  Come to order.

 7        **THE COURT:**  Be seated, please.

 8     Let's call in the jury and the witness.  We need a

 9  witness.

10        **MR. RICHTER:**  Actually, Your Honor, there may be one

11  small issue we could take up before the jury relating to an

12  exhibit I'm about to show the witness related to the same issue

13  we just discussed.

14        **THE COURT:**  All right.

15        **MR. RICHTER:**  I'm about to introduce the draft

16  complaint that Sonos -- Ms. Kwasizur and Sonos sent to Google,

17  and I think it contains some of the same references to

18  licensing discussions.

19     So I want to let Your Honor know we want to talk about the

20  '966 portion of that complaint and then the notice of

21  infringement of the '206 patent, which is part of the notice

22  that Ms. Kwasizur gave.

23        **MS. BAILY:**  So, Your Honor, first of all, just so that

24  you're aware, there's an extensive discussion of the prior

25  licensing discussions in the draft complaint so I'm just

 1    flagging that.

 2            **MR. RICHTER:**  We could take all that out, yeah.

 3            **MS. BAILY:**  The notice of the '206 is completely

 4    irrelevant in this case.

 5            **MR. RICHTER:**  They just brought that up, Your Honor.

 6    They just -- they want to tell the jury that the '206 was part

 7    of this case.  We should tell the first story on it.  We can't

 8    open the door to just one side only.

 9            **THE COURT:**  Well, just a second.  Does the -- does the

10    draft complaint refer to these prior discussions?

11            **MS. BAILY:**  Yes.

12            **MR. RICHTER:**  Yes.  Some paragraphs do, yes.

13            **THE COURT:**  Do those prior discussions happen to

14    include the '966?

15            **MS. BAILY:**  No.

16            **MR. RICHTER:**  They include zone scene discussions, but

17    not the '966 specifically.  They do include claim charts of

18    infringement of '966.  That's what we want to use in part and

19    notice of the '206.

20            **THE COURT:**  How could it include -- how can it include

21    that if it's not even sued on?

22            **MR. RICHTER:**  It was a draft complaint, Your Honor.

23    So we had laid out --

24            **THE COURT:**  I see what you mean.

25            **MR. RICHTER:**  Yes, Your Honor.

1          **THE COURT:**  But did the prior discussions include

2     '966?

3          **MR. RICHTER:**  No, not the '966, but it did include the

4     '206, which is a patent mentioned in that e-mail and in the

5     draft complaint.

6          **MS. BAILY:**  Your Honor, if we open the door to the

7     licensing discussions, we need to put in the term sheet.

8          **MR. RICHTER:**  This doesn't open the door to the

9     licensing discussions.  It's prior notice of a patent, not the

10    licensing discussions.

11         **THE COURT:**  Well --

12         **MS. BAILY:**  Prior --

13         **THE COURT:**  -- I'm not sure of that.  I don't want the

14    part about prior discussions to come in.

15         **MR. RICHTER:**  Can I hand up the exhibit so we know --

16         **THE COURT:**  Yes.

17         **MR. RICHTER:**  Okay.

18                     (Pause in proceedings.)

19         **THE COURT:**  Look, give it to me, please.

20       But, see, you're just trying to do this out of the

21    presence of the jury and wasting the jury's time.  I'm going to

22    tell you what the ground rule is.

23       The prior discussions had nothing -- had nothing to do

24    with the '966 patent; true?  True.  So I don't think that

25    should come in and it's too remote.

1    There were other patents that were discussed back then,

2  and some of these were probably sued on here, but that -- the

3  '966 and the term sheet and those discussions I'm not going to

4  allow, so you're going to have to redact those portions of the

5  complaint.

6    But it is okay to put in and leave in the other patents

7  that were sued upon and which the witness on the stand was

8  complaining about so that the other side can point out, "Hey,

9  look how many patents they accused us of and all of them have

10  fallen away and we're down to two patents."

11    That's fair game.  That -- it's okay.  The jury will get

12  it.

13    So you have to -- you're going to have to do some

14  redacting on the -- on this document, but -- so that's what's

15  going to happen.  The prior discussions don't come in because

16  the '966 hadn't even issued yet.

17         MS. BAILY:  Your Honor --

18         MR. RICHTER:  But to be clear, references to the

19  '206 -- paragraph 20 references to the '206 patent?

20         THE COURT:  You can refer to the fact that it was sued

21  on, but you cannot refer to the fact that there was discussions

22  on the '206 because the '206 is out of the case.

23         MR. RICHTER:  Well, yeah, it's notice of infringement

24  of the '206 patent, but I understand Your Honor's ruling to be

25  that the parties are now allowed to discuss the patents that

1  were previously sued on but are no longer in the case; and

2  we're just attempting to show that we gave notice of the '206

3  patent, the patent that was in the complaint.

4          THE COURT:  Yeah, but what good does notice do?

5          MR. RICHTER:  It does --

6          THE COURT:  What good does -- a patent you've already

7  lost on, what good does it do to show the jury you gave notice

8  of that?

9          MR. RICHTER:  We withdrew it from the case, yes,

10  correct, Your Honor, but we gave notice of infringement of the

11  '206, which is the parent to the two patents --

12          THE COURT:  Parents and family, not enough.  Parents

13  and family, not enough.  Now the Federal Circuit may disagree

14  with me, but this has got to stop someplace.

15      You lawyers have got to learn to give real notices in a

16  timely fashion instead of night before.  That's just

17  gamesmanship.

18      Okay.  I'm not making anymore rulings.  I'm done with

19  this.  Let's bring back the jury.

20          THE CLERK:  Your Honor, does the witness need to be --

21          THE COURT:  Yes, the witness ought to come back.

22                      (Pause in proceedings.)

23          THE CLERK:  All rise for the jury.

24      (Proceedings were heard in the presence of the jury:)

25          THE COURT:  Welcome back.  Please be seated.

1        Counsel, you may continue.

2              **MR. RICHTER:**  Thank you, Your Honor.

3   **BY MR. RICHTER:**

4   **Q.**   Welcome back, Ms. Kwasizur.

5   **A.**   Thank you.

6   **Q.**   Before the break, I believe we were talking about an

7   e-mail that you sent to Google attaching a draft complaint and

8   referencing the '966 patent; is that correct?

9   **A.**   Yes.

10  **Q.**   Can you tell us why Sonos sent that e-mail to Google?

11  **A.**   We sent that as a courtesy to let them know that we

12  intended to file suit alleging infringement of the '966 patent

13  on the next day.

14      I mean, they -- they were and they are a partner of ours,

15  so we thought sort of the partnership thing to do would be to

16  let them know.

17  **Q.**   And was there any legal significance to your understanding

18  of sending an advance copy of the patent and the draft

19  complaint?

20  **A.**   Yes.  We were told that certain courts for certain types

21  of infringement require --

22              **MS. BAILY:**  I object.

23              **THE COURT:**  Sustained.  Sustained.  I don't know

24  what -- so what she's talking about certain courts, but I'm the

25  one that's going to tell the jury what the law is on this.

1      **MR. RICHTER:**  Understood.  Withdrawn, Your Honor.

2  **BY MR. RICHTER:**

3  **Q.**   And the draft complaint that was attached to your e-mail,

4  what, if anything, concerning the '966 patent did that draft

5  complaint contain?

6  **A.**   It alleged patent infringement of the '966 patent.

7  **Q.**   And can I have you turn to TX6136 in your binder?

8  **A.**   (Witness examines document.)

9  **Q.**   Okay.  What is this document?

10  **A.**   This is the complaint that was attached to my e-mail.

11      **MR. RICHTER:**  And without publishing it just yet,

12  Your Honor, we'd like to move TX6136 into evidence.

13      **THE COURT:**  All right.  What's the problem?

14      **MS. BAILY:**  None, Your Honor.

15      **THE COURT:**  All right.  It's received in evidence with

16  the redactions that I said you should make, and that will be

17  done in due course before it goes to the jury.

18      (Trial Exhibit 6136 as amended received in evidence.)

19      **THE COURT:**  Now, I need to -- just to give you a

20  heads-up, this document is written by the Sonos -- from the

21  Sonos point of view and it has a lot of statements that are

22  allegations and statements about Sonos.  Like Sonos is an

23  American success story and it goes on to say how great Sonos

24  is; and all that may or may not be true, but this is not proof

25  of a thing.  Whether Sonos is an American success story or not,

 1   this doesn't prove it.

 2        This is being offered, though, for one purpose and one

 3   purpose only, to show that one day before the lawsuit was filed

 4   Sonos gave this voluminous notice to Google, and including '966

 5   and a few other patents.  You'll hear more about that in due

 6   course.

 7        That's the only -- it's being offered to show notice.

 8   That's the only thing you can consider.  You cannot consider

 9   these statements in here about infringement as proof that there

10   is any infringement whatsoever, and that includes the claim

11   charts at the end.  There are claim charts.  For all we know,

12   this's full of hearsay.

13        So it's not admitted for any purpose other than to show

14   notice of the patents and the allegation of infringement.  I'm

15   sure counsel will agree that that's the only purpose, but

16   you've got to redact those things I told you to redact.

17        **MR. RICHTER:**  Understood.  Of course, Your Honor.

18   Thank you.

19        And, Mr. Jay, can we -- permission to publish the claim

20   chart portion of the '966 section, Your Honor?  And if you'd

21   like to look, that's page 67.

22                     (Pause in proceedings.)

23        **THE COURT:**  67?

24        **MR. RICHTER:**  Yes, Your Honor.

25        **THE COURT:**  I believe I'm going to let you do that,

 1  but let me just find 67.

 2                    (Pause in proceedings.)

 3         **THE COURT:**  Is this the '966?

 4         **MR. RICHTER:**  That's correct, Your Honor.

 5         **THE COURT:**  Okay.  What you're about to see is what's

 6  called a claim chart.  It is not proof of anything, zero, other

 7  than the allegations being made in this case and then in the --

 8  in the draft complaint were provided to Google one day before

 9  the lawsuit started.

10      So that is what -- and I'm not saying that -- and this

11  cannot be considered as proof that it's true, but it's proof

12  that notice of what Sonos was alleging was given one day prior

13  to the lawsuit.

14      Okay.  You can publish that to the jury.

15         **MR. RICHTER:**  Thank you very much, Your Honor.

16      Yes, page 67 of this portion.

17  **BY MR. RICHTER:**

18  **Q.**   And, Ms. Kwasizur, what does this chart set forth?

19         **MR. RICHTER:**  And, Mr. Jay, actually, if we can scroll

20  to -- from 67 to 78.  I believe all those pages are the charts.

21  **BY MR. RICHTER:**

22  **Q.**   And, Ms. Kwasizur, what's generally described here by the

23  chart?

24  **A.**   This is a claim chart which is laying out the claims of

25  the '966 patent and how they're infringed by the Google

1    products.

2    **Q.**    And this formed a part of the draft complaint that Sonos

3    sent to Google on September 28, 2020?

4    **A.**    Yes, correct.  On the left you can see sort of the

5    elements of the claim mapped out, and then on the right you can

6    see what Sonos was purporting to be the evidence of the

7    infringement.

8    **Q.**    Thank you.

9        **MR. RICHTER:**  And we can take that down, Mr. Jay.

10   Thank you.

11   **BY MR. RICHTER:**

12   **Q.**    Ms. Kwasizur, how did Google respond, if at all, to your

13   e-mail attaching the '966 patent and a copy of the draft

14   complaint?

15   **A.**    Well, they went to California court and filed their own

16   declaratory judgment action saying that they did not infringe

17   the '966 patent that same day.

18   **Q.**    And did Sonos end up filing its draft complaint?

19   **A.**    Yes.  As my e-mail indicated, we filed it the next day in

20   the Western District of Texas.

21   **Q.**    And why did Sonos select the Western District of Texas to

22   file that complaint on September 29, 2020?

23   **A.**    Well, we wanted this whole thing to be resolved quickly.

24   We're a smaller company and we have not as much resources, so

25   we wanted to move quickly.  And at the time the California --

1    this was the height of COVID still.  The California courts

2    weren't -- they were semi-operational and the Texas courts,

3    Texas handled COVID quite differently than California.  As most

4    people know, they were fully operational and they were moving

5    cases through quicker than California.

6    Q.   And so other than the '966 patent, are there other patents

7    mentioned in the draft complaint?

8    A.   There are, yes.

9    Q.   And what are those patents?  What are the numbers of those

10   patents?

11   A.   So there's -- do you want me to read the full number or

12   just how we refer to them?

13   Q.   Yeah, how you would refer to them.  I think by the last

14   three digits is going to be sufficient.

15   A.   Yeah, usually people refer to patents by the last three

16   numbers.  I don't know why.  Sorry.

17        So it's the '615, the '033, the '206, the '966, and the

18   '460.

19   Q.   Okay.  And the '966 is one of the asserted patents at

20   issue here in this trial; is that right?

21   A.   Correct, yes.

22   Q.   And I think I heard you mention the '206 patent.  Can you

23   explain just generally what that patent is?

24   A.   The '206 patent was another patent relating to zone

25   scenes.

1   Q.   And what about the '460 patent?

2   A.   The 460 related to equalize -- sound equalization

3   techniques.

4   Q.   And what about the '615 and the '033 patents?

5   A.   The '615 and '033 both related to direct control

6   technology, which is -- well, direct control technology.

7   Q.   And so those are four other patents.

8        And let me ask you:  Why is the '206 and the '460 not at

9   issue today in this trial?

10  A.   Well, both of those were withdrawn.  The '206 we had

11  already added the '885 to this case, and so to sort of

12  reserve -- it was similar -- similar technology, also zone

13  scenes; and so to preserve some resources, we decided to let

14  that one go because we felt it wasn't as strong as the '966 and

15  the '885.  So we withdrew it from the case.

16       And then the '460 we also withdrew from the case.

17  Q.   And had there been some prior litigation in Texas

18  concerning the '206 patent?

19  A.   Yes.  As I said, we filed in Texas and so, yes, there

20  was -- some prior portions of the case had moved forward in

21  Texas around the '206.

22  Q.   And what indications, if any, had the prior court in Texas

23  given with respect to the '206 patent?

24  A.   The judge there in one of the hearings had sort of

25  indicated that he might reverse a ruling that he had previously

 1    held about the '206 patent, and it seemed to make it maybe less

 2    strong than the '885 and the '966; and so as a legal team, we

 3    decided we'll just go with our strongest patents, which we

 4    thought, again, were the '966 and '885.  And so we withdrew the

 5    '206 from the case.

 6         And then subsequently the case was transferred here -- or

 7    it might have been transferred and then we withdrew it.  I'm

 8    not exactly sure of the order, but then the case was moved from

 9    the Western District to here so we never really got the outcome

10    on Texas.

11    **Q.**   And I think I heard you mention the '615 and the '033

12    patents.  And why are those patents not at issue in this trial?

13    **A.**   Oh, they're completely -- oh, well, because they were

14    found invalid by Your Honor.

15    **Q.**   Do the '615 or the '033 patents have to do with zone scene

16    technology?

17    **A.**   No, no.  They're -- they're a different technology.

18    **Q.**   Okay.  And what about the '460 patent?  Does that have to

19    do with zone scene technology?

20    **A.**   No.  That's equalization.  That's totally different.  As I

21    was saying earlier, we have a lot of different areas that

22    relate to audio sounds in our patent portfolio, and so those

23    other ones are completely different technologies than zone

24    scenes.

25         **MR. RICHTER:**  Mr. Jay, can we bring up TX8240, please?

1          (Pause in proceedings.)

2          MR. RICHTER:  I believe this one's in evidence,

3    Your Honor.

4          THE COURT:  It's already in evidence?

5          MR. RICHTER:  Yes, sir.

6          THE COURT:  All right.  Then --

7          MR. SULLIVAN:  Through the video, Your Honor.

8          THE COURT:  But I've already said it's in evidence?

9          MR. RICHTER:  Yes, Your Honor.

10          THE COURT:  Okay.  Great.  Then I -- let's go ahead.

11    It's already in evidence.

12    BY MR. RICHTER:

13    Q.    Okay.  Do you recognize this document on the screen and in

14    your binder, Ms. Kwasizur?

15    A.    Yes.

16    Q.    What do you recognize it as?

17    A.    This is the complaint that Google -- after they received

18    my e-mail, they went to the California court and filed their

19    own complaint for declaratory judgment -- that's when you ask a

20    court to basically make a statement -- that they did not

21    infringe the patents listed here on this complaint, including

22    '206 and the '966.

23    Q.    Can we flip to the end?  I just want to ask you how many

24    pages this document is.

25    A.    Sure.  It looks to be 13 pages, assuming the numeration at

1    the bottom is correct.

2    **Q.**    Okay.  And without showing it on the screen, Ms. Kwasizur,

3    can you turn back to TX6136, which I believe is in evidence and

4    is Sonos' draft complaint that it sent to Google?  And I want

5    to ask you how many pages that document is.

6    **A.**    It is 67 pages, again assuming the pagination is correct

7    on the bottom.

8        Oh, sorry.  87.  So I have to take my glasses off.

9    **Q.**    Okay.  And one thing.  I think I heard your testimony this

10   morning, I had asked you if the Sonos Denon license covered the

11   patents in suit and you had said that it did not.

12       Can we bring up -- actually, let me just ask you:  Is it

13   correct that the Denon license does not cover the patents in

14   suit?

15   **A.**    No, they didn't at the time we entered the license

16   agreement because some of these patents weren't in existence,

17   but the license itself does cover.  As I said, any -- any new

18   patents we got would automatically be covered by the license

19   because it's sort of a portfolio-wide license.

20   **Q.**    When in relation to time did the asserted patents in this

21   case issue relative to the Sonos-Denon license agreement?

22   **A.**    Years later.

23   **Q.**    You're saying the issued patents issued years later?

24   **A.**    Yeah.

25   **Q.**    Okay.

1    **A.**    Correct.

2    **Q.**    Thank you very much.

3          **MR. RICHTER:**  At this time we pass the witness,

4    Your Honor.

5          **THE COURT:**  Okay.  Before you step down, I want to say

6    the same thing about this complaint by Google that I said about

7    the Sonos complaint.

8          It is full of hearsay and self-serving allegations.  None

9    of it can be taken for the truth because it's just an

10   allegation.  For example, it has things like tooting their own

11   horn, revolutionary, leading the world.

12         Okay.  No, you can't -- that's not -- you cannot consider

13   that kind of puffery for any purpose in this case.  The only

14   reason I'm allowing this document into evidence is to show that

15   Google was at least aware of the patents in suit by -- at the

16   time they filed this lawsuit.

17         And as I will instruct you later, under the rules, they --

18   the lawyers had to have done an adequate enough investigation

19   to be able to make these allegations in good faith.  So that

20   implies that at least for some period of time, Google was aware

21   of the patents in suit.  How long I don't know, and it's up to

22   you to figure out.

23         But it goes to the issue of notice of the patents and

24   whether or not the Plaintiff has proven there was willful

25   infringement.  Infringement after this lawsuit started doesn't

1   count for willful because now we're in the suit.  But before,

2   before if, if there was infringement and if it was valid and if

3   all of those things, and it was done with knowledge of the

4   patents, then there could be what's called willful

5   infringement.

6        I'll tell you more about that later, but what I'm trying

7   to do for you now is just set the stage and explain to you why

8   you're even hearing about these complaints and lawsuits.

9        Okay.

10           **MR. RICHTER:**  Thank you, Your Honor.

11           **THE COURT:**  Are you done?

12           **MR. RICHTER:**  Yes, I am.

13           **THE COURT:**  All right.  Now we go to the other side.

14           **MS. BAILY:**  Can my colleague approach the witness,

15   please?

16           **THE COURT:**  Of course.  Yes, please.

17        Baily will now cross examine.

18                          <u>**CROSS-EXAMINATION**</u>

19   BY MS. BAILY:

20   **Q.**   Good morning, Ms. Kwasizur.

21   **A.**   Hi.  Good.  How are you?

22   **Q.**   So we've heard from you about two complaints, one that

23   Sonos filed in Texas and one that Google filed here; correct?

24   **A.**   Correct, yes.

25   **Q.**   And I want to draw your attention to TX8240.  This is the

1  complaint for declaratory judgment of noninfringement filed by

2  Google.

3  **A.**    Sorry.  Can you just say that number again?

4  **Q.**    Sure.

5                    (Pause in proceedings.)

6        **THE COURT:**  While they're adjusting the mic, I want

7  you to understand something because it went by us too fast.

8        There was a -- when the lawsuit got filed in Texas and

9  then, of course one filed right here -- the system had to

10  decide -- they were overlapping lawsuits -- the system, the

11  judicial system, had to figure out why -- we can't have one in

12  Texas and one here.  So where should they -- where should they

13  both go?

14        You know, in theory they could have gone to Delaware maybe

15  or someplace else, but the system decided the Texas case should

16  come here, and so both cases are actually being tried right now

17  here.

18        We could have just as easily wound up with both cases in

19  Texas and instead of you, a Waco, Texas, jury would be deciding

20  this case.

21        So welcome to Patent Litigation 101.  We could have been

22  in Texas.  No.  We're in California and, God bless you, you're

23  our jury that's going to decide this case.

24        But the main point is there's not going to be two

25  lawsuits.  There now is just one lawsuit and this is it.

1    Ms. Baily, continue please.

2         **MS. BAILY:**  Thank you, Your Honor.

3    Thank you, Mr. Fisher.  If we could just highlight --

4         **THE WITNESS:**  Wait.  Sorry.  Can you repeat the

5    number?

6         **MS. BAILY:**  I apologize.  It's TX8240.

7              (Pause in proceedings.)

8         **MS. BAILY:**  Mr. Fisher, if we can just highlight the

9    title "Complaint for Declaratory Judgment of Non-Infringement

10   of Several U.S. Patents."

11        **THE WITNESS:**  Okay.

12   **BY MS. BAILY:**

13   **Q.**   Do you have that?

14   **A.**   I'm with you now, yeah.  Thank you.  Sorry.

15   **Q.**   That's okay.

16   The first patent listed there is 9967615.  Do you see

17   that?

18   **A.**   Correct.

19   **Q.**   And that patent was about networked music playback; is

20   that right?

21   **A.**   Yeah.  We call it direct control but, yes.

22   **Q.**   And it was issued by the government on May 8th, 2018.  Do

23   you recall that was the approximate date of issuance?

24   **A.**   I don't know the date of issuance of our patents, but I

25   assume you're telling me the truth, yeah.

1  **Q.**   And Your Honor mentioned that this Court made a

2  determination regarding the validity of that patent; is that

3  correct?

4  **A.**   That is correct.

5  **Q.**   And the Court found that patent to be invalid?

6  **A.**   Yes, that is correct.

7  **Q.**   And the Court found that patent to be invalid as obvious.

8  Do you recall that?

9  **A.**   I don't know exactly what the ruling was.  I'm not sure.

10 I can't -- I'd have to read his ruling.

11 **Q.**   Do you recall that the '615 patent was found invalid over

12 certain Google prior art?  Do you recall that?

13 **A.**   I, again, would have to read -- I -- just to be clear, I

14 don't work in our, like, litigation in the weeds.  So I -- I

15 would have to read his ruling to see exactly why it was ruled

16 invalid.  I just know it was ruled invalid.

17         **THE COURT:**  Do we -- if she's not up to speed on it,

18 it's going to waste the jury's time.  Can't you in some other

19 way prove up what the nature of the ruling was if that matters?

20     I mean isn't it enough to just say "The Court ruled that

21 particular patent was invalid"?  I think trying to argue with

22 her over the nitty-gritty of the legal reasoning behind that

23 is -- may take up too much time.

24         **MS. BAILY:**  Understood, Your Honor.

25 \\\

1   BY MS. BAILY:

2   Q.   Do you recall at least that with respect to the issue of

3   the '615 patent, the issue that was decided by the Court

4   related to the invalidity of that patent in relation to Google

5   prior art?  You don't recall that?

6   A.   No.  Again, I'm sorry, I don't.  I don't know the details

7   of the ruling.

8   Q.   Okay.  The next patent listed here is the 10779033.  Do

9   you see that?

10  A.   Yes.

11  Q.   The '033 patent was entitled "Systems and methods for

12  networked music playback"; right?

13  A.   Yes.  Again, we call it direct control within the company

14  but, yes.

15  Q.   And it was issued by the PTO?

16  A.   Again, I don't -- yeah.  If you say so, yes, I believe

17  you.

18  Q.   You know your patent was issued; right?

19  A.   Yes.  I just don't know the exact date.  Of course I know

20  it's issued.

21  Q.   And the Judge in this case ruled that that patent also was

22  invalid; correct?

23  A.   That's correct.

24  Q.   The next patent is 9344206.  Do you see that?

25  A.   Yes.

1  Q.   And that's a zone scene patent; right?

2  A.   Yes, that is.  It's -- yes, it is also a zone scene

3  patent.

4  Q.   It's called "Method and apparatus for updating zone

5  configurations in a multizone system"; correct?

6  A.   Yes, that sounds right.

7  Q.   And the '206 patent has the same inventor as the '966

8  patent, Robert Lambourne; correct?

9  A.   Yes.  I believe they're related patents so, yes.

10  Q.   Sonos withdrew all its infringement allegations against

11  Google regarding the '206 patent; right?

12  A.   Yes, that's correct.

13  Q.   And Sonos dismissed the '206 patent from this case with

14  prejudice; correct?

15  A.   Yes, that's correct.

16  Q.   And that means Sonos can no longer assert the '206 patent

17  against Google in any way; correct?

18  A.   Yes, that's correct.

19  Q.   And Sonos did that after the court in Texas said that it

20  was going to find this patent invalid; correct?

21  A.   Well, as I said earlier, there was a hearing in Texas

22  where the judge had sort of indicated that he might reverse one

23  of his earlier rulings about this particular patent; and so,

24  yeah, given that we had the '885 in the case and that also was

25  a zone scenes and we have '966, which is also zone scenes, we

1  decided to reserve some resources and just focus on the two

2  that you now see in the case, '885 and '966, and we withdrew

3  it.

4  **Q.**   Do you recall that the Texas court was going to find that

5  the claim terms "zone configuration" and "group configuration"

6  were indefinite?

7  **A.**   I wasn't at that hearing; but, yes, if you're telling me

8  that, then, yes, that's -- yes, correct.

9  **Q.**   And that's --

10  **A.**   As I said, he was -- he was going to reverse something

11  that he had said previously and so, yes.

12  **Q.**   And let's skip to the '966.

13        The '966 patent is at issue in this case; correct?

14  **A.**   Correct, yes.

15  **Q.**   So the jury will decide whether Google infringes the '966

16  patent?

17  **A.**   That's my understanding, yes.

18  **Q.**   And the jury will decide whether the '966 patent is valid

19  or invalid?

20  **A.**   I believe that's up to Your Honor; but, yes, I think

21  that's what he will instruct them on.

22  **Q.**   So moving on to the next patent listed in Google's

23  complaint for declaratory judgment of noninfringement, it's the

24  9,219,460?

25  **A.**   Yes, I see it.

1    Q.   And that patent is entitled "Audio settings based on

2    environment"?

3    A.   Yeah.  That sounds right, yes.

4    Q.   And Sonos withdrew its claim for infringement of the '460

5    patent; is that correct?

6    A.   Yes, that's correct.

7    Q.   And that's because that patent was unenforceable; right?

8    A.   No, that's not my understanding.

9    Q.   Well, let me just -- so we've talked about the validity

10   and -- strike that.

11        We've talked about the invalidity findings for the '615

12   and the '033; right?  Those were the patents that were found

13   invalid in this court?

14   A.   Yes, that's correct.

15   Q.   And with respect to the '615, there was also a ruling that

16   Google did not infringe that patent.  Do you recall that?

17   A.   Yes, that's correct.

18   Q.   So in Google's complaint for declaratory judgment of

19   noninfringement, there were five patents, correct, at issue?

20   A.   Yeah.  In the DJ, yes.  Yes.

21   Q.   And the '615 and the '033 were found invalid?  Yes?

22   A.   Yeah, yeah.  You just stated that, yes.

23   Q.   The '206 and '460 were withdrawn by Sonos; correct?

24   A.   Correct.

25   Q.   '615 was found not infringed by Google; correct?

1   **A.**   Yes, I believe that's right.

2   **Q.**   So what's remaining is for the jury to decide on the '966;

3   right?

4   **A.**   And '885 because we added it to the case; but, yes, that's

5   correct, that's -- yes, that's what we're here for.

6          **MS. BAILY:**   You can take that down, Mr. Fisher.

7   **BY MS. BAILY:**

8   **Q.**   You mentioned that Sonos has between 1,000 and 1,500

9   patents; is that right?

10  **A.**   Yes, somewhere in there.

11  **Q.**   Is that Sonos' global patent portfolio or U.S. patent

12  portfolio?

13  **A.**   Um, well we do have a global portfolio, but -- well, I

14  think actually it probably answers both.  Probably our global

15  is still in there.  It's probably maybe closer to 1,500.  It

16  might go a little over, but U.S., primarily U.S.

17  **Q.**   So at least a thousand U.S. patents would you say for

18  Sonos?

19  **A.**   Yeah.  Yeah.  I don't know the exact number but, yes.

20  **Q.**   And one of the licensing agreements you raised today was a

21  January 2020 agreement between Sonos and Lenbrook; correct?

22  **A.**   Yes.

23  **Q.**   That was the Bluesound agreement?

24  **A.**   Correct.  Bluesound, yes.

25  **Q.**   And that agreement was a settlement agreement that was

1  entered into after Sonos sued Lenbrook; right?

2  **A.**  Yes, that's correct.

3  **Q.**  And in that agreement Lenbrook received a license to

4  Sonos' entire worldwide patent portfolio; correct?

5  **A.**  The majority of -- yeah, a big chunk of our patent

6  portfolio, yes.  Not all.

7  **Q.**  Is there something that was excluded from that patent

8  portfolio?

9  **A.**  Yeah.  We generally don't include design, and I think

10  sometimes we also don't include our voice, and actually our

11  process now is to not include a new technology that we have for

12  any new agreements; but, yes.

13  **Q.**  All right.  Let us just bring it up and get clarity on

14  this.

15       **MS. BAILY:**  So it's Exhibit 6632, please.

16            (Pause in proceedings.)

17  **BY MS. BAILY:**

18  **Q.**  And if you go --

19  **A.**  Oh, you know what?  Sorry.  Lenbrook was everything.

20  Sorry.  You're right.  I correct myself.

21       Lenbrook we did end up putting in design at the last

22  minute because they wanted it to be the full thing so, yeah.

23  **Q.**  Thank you.

24       So through this agreement Lenbrook received a license to

25  each and every one of Sonos' 1,000 to 1,500 patents; right?

1  **A.**   Yes, that's correct.

2  **Q.**   And I think earlier there were some royalty rates that

3  were displayed to the jury.  Do you recall that?

4  **A.**   Yes.

5  **Q.**   And the highest rate that was listed in the agreement is

6  $30 per unit, but that was for the entirety of Sonos' United

7  States patent portfolio; right?

8  **A.**   Can we pull up the page that shows the royalty rate?  I

9  think it was page --

10  **Q.**   So you can just look in your binder.  It's Exhibit 6632.

11         **MS. BAILY:**  You can take that down, Mr. Fisher.

12  **BY MS. BAILY:**

13  **Q.**   The highest rate listed in the agreement is $30 per unit

14  for the entirety of Sonos' United States patent portfolio;

15  right?

16         **MS. BAILY:**  Or if you had it, Mr. Fisher, you can

17  bring it up.

18         **THE WITNESS:**  Yeah.  He just had it up.

19      Sorry.  You said -- yes, the highest rate is $30 per unit.

20  **BY MS. BAILY:**

21  **Q.**   And Lenbrook never actually paid Sonos $30 a unit for

22  anything, did they?

23  **A.**   I don't know.  You'd have to -- I don't know.  Sorry.  I

24  don't -- I don't actually see the payments come in.  That's

25  finance and accounting's department.

1    Q.   In this case we're only talking about two patents; right?

2    The '885 and the '966?

3    A.   In this -- you mean the Google?  Yes, correct.

4    Q.   Yes.

5    A.   Yes.

6    Q.   And so that's about .1 percent of Sonos' worldwide patent

7    portfolio that was licensed to Lenbrook in this agreement;

8    correct?

9    A.   I don't -- I haven't done the math, but I'll take your

10   word for it.  Yes, they had a patent portfolio.

11   Q.   The royalty rates in the Lenbrook agreement were for 1,500

12   patents, but what the jury is going to potentially think about

13   in this case is .1 percent of that portfolio; right?

14            THE COURT:  How do you get to .1?  2 out of 1,500,

15   what is that?

16            MS. BAILY:  That's right.  I have a calculator,

17   Your Honor.  Should I do the math?

18            THE COURT:  Let's do the math because I don't see how

19   you get to .1.  Because a thousand times 2 is 2,000.  So I

20   think it's going to be more like .15.

21                    (Pause in proceedings.)

22            MS. BAILY:  I brought a calculator.

23            THE COURT:  Good.  Okay.  What is the answer?

24            MS. BAILY:  The answer is --

25            THE COURT:  2 divided by 1,500.

1          MS. BAILY:  It's .13.

2          THE COURT:  Okay.  .13.  All right.

3      So are you okay with that math?

4          THE WITNESS:  Yeah.  I mean, I think patents --

5  different patents have different values, and so I -- I actually

6  doubt Lenbrook uses all 1,500 patents.  I mean, there's no way

7  they do.

8      So, yeah, they do have a portfolio license, but each

9  patent sort of has its own value depending on what use cases a

10  patent -- a licensee is trying to put to use.

11  BY MS. BAILY:

12  Q.  But you agree now with the math that I've done on the

13  calculator that the two patents is .13 percent of the worldwide

14  portfolio to Lenbrook?

15  A.  I do not disagree with the calculator and your math.

16  Q.  And Lenbrook could and can use any of those 1,500 Sonos

17  patents in their products; correct?

18  A.  Yeah.  I think there's some limitations on how they can do

19  it; but, yes, generally they can -- if they want to use one of

20  the 1,500, they are free to do.  So that's the whole point,

21  yes.

22  Q.  Now, the terms of the December 2020 Sonos-Legrand

23  agreement are pretty similar to the ones we just discussed;

24  right?

25  A.  Correct.  If you're going to ask me specific to one, tell

1    me which one it is so I can look.

2    **Q.**    Sure.  It is TX6631.

3    **A.**    (Witness examines document.)  Yes, they are generally --

4    6631.

5         They are similar.  I think with Lenbrook it is not the

6    full license.  I think that's where we started carving out

7    design, or I think that that one has some carve-outs.  It

8    might -- no.  I think it's just the design.

9    **Q.**    Okay.

10   **A.**    So it's not the full portfolio but, yes, it's similar.

11   **Q.**    Should we do the math again?  How many patents would be

12   eliminated?  Would it be a substantial number of patents

13   eliminated through the design patents?

14   **A.**    No, not -- I don't know what percentage our portfolio is

15   design -- sorry -- but maybe 10 percent.  I'm guessing, though.

16   Sorry.

17   **Q.**    Okay.  Still the two patents at issue in this case,

18   obviously very small percentage of the portfolio license to

19   Legrand; correct?

20   **A.**    Yes.  But, again, it depends on what technology they're

21   trying to use as to sort of which ones they find to be the most

22   valuable in the portfolio or how much value it is; but, yes,

23   correct, they -- it's a small -- I agree, it's a small

24   percentage of a bigger license.

25   **Q.**    But just to be clear, Legrand can use any of the patents

1  that were licensed under this portfolio license, any Sonos

2  patent?

3  **A.**   Yes, they can.  Yeah, they can use any.  Yes, correct,

4  with the exception of the design ones.

5  **Q.**   Now, Legrand has actually paid Sonos under this -- under

6  their agreement payments of about -- that total about $200,000;

7  correct?

8  **A.**   Yeah.  Like I said, I don't see when it comes in, but I

9  checked a while ago and that would be in line with what I

10 checked, but this was a while ago.  But, yeah, something like

11 that.  I'm not exactly sure.

12 **Q.**   So the total payments that Legrand has made to Sonos for

13 more than a thousand patents has been $200,000?

14 **A.**   Yeah.  I think Legrand was somewhere around there, and

15 then the other one was a few million.  So, yeah, I think that's

16 right.

17 **Q.**   And the Lenbrook agreement, Lenbrook paid Sonos for its

18 portfolio license about $1.5 million total; right?

19 **A.**   Yeah.  It was -- like I said, a few years ago I asked

20 accounting like, "Hey, how much did we get?"  And that sounds

21 about right.  I'll take your word for it.  I'm sure you have

22 evidence of it.

23 **Q.**   Now, there was another set of royalty rates in these

24 agreements -- in these agreements for products that were sold

25 for less than a hundred dollars.  Are you aware of that?

1  **A.**   Correct.

2  **Q.**   And for products sold less than a hundred dollars, the

3  royalty rate for Sonos' entire portfolio, with the caveats that

4  you made with respect to the second agreement, is $6; right?

5  **A.**   I'd have to look at what page that's on; but, yeah, that

6  sounds right.  The flat rate, yeah.  I don't know exactly where

7  it is; but, yes, that's right.

8  **Q.**   And it's still $6 for the entire portfolio; right?

9  **A.**   Yeah.  The reason we do that is because we don't really

10  sell products that are sort of in the 50-dollar range, and so

11  we don't view those people as competing as much with us; and so

12  it's -- again, we try to be fair with our licensing, and so we

13  felt like it was, like, a fair way to handle that, so...

14  **Q.**   Are you aware that approximately 61 percent of the Google

15  products accused of infringing the '885 patent are sold by

16  Google for less than a hundred dollars?

17  **A.**   I am not aware of that.  Although if Google would like to

18  pay us $6, maybe that's something we could discuss.

19  **Q.**   Well, just to be very, very clear, the $6 is for the

20  entire Sonos patent portfolio; right?

21  **A.**   For these -- for these small competitors, I am aware that

22  that's what these license agreements say, yes.

23  **Q.**   Right.  And with respect to Sonos' entire patent portfolio

24  for products sold under a hundred dollars, Sonos charges a

25  6-dollar rate?

KWASIZUR - CROSS / BAILY

1  **A.**   To these competitors who don't have the same ecosystem as

2  Google does and doesn't -- don't make the same money on the

3  products the way Google does, yes, that's correct.

4  **Q.**   So if we were going to say anything about the $6, we would

5  have to take into account 1,500 patents; right?  Not the two

6  patents that are at issue here; right?

7  **A.**   Well, like I said, we carve out voice and -- yes, I get

8  your point.  Yes, it's a bigger number.

9  **Q.**   Now, you talked a little bit about the Denon lump-sum

10  agreement; right?

11  **A.**   Yes.

12  **Q.**   And that's, if you want to reference it, at 6721.

13                     (Pause in proceedings.)

14  **BY MS. BAILY:**

15  **Q.**   Do you have it?

16  **A.**   No, I don't.

17  **Q.**   I think your Counsel might have handed it up separately.

18  **A.**   I don't see it.  Sorry.

19  **Q.**   I think your Counsel might have --

20  **A.**   Yeah, that was the one in the folder.

21       Well, go ahead.  I kind of --

22  **Q.**   The Denon license does not have running royalty; right?

23  **A.**   That's correct.  That one was a lump-sum payment, yes.

24  **Q.**   And the Denon license was $10 million for a license to all

25  of Sonos utility patents worldwide?

1  **A.**   For a period of four years, I believe, yes.  That's

2  correct, yes.

3  **Q.**   That's right.  So $10 million for 1,300 patents?

4  **A.**   Well, when it started, how many patents we had then, oh --

5  **Q.**   Well, let me ask it different.

6       You're aware, right, that the portfolio license for Denon,

7  that covers patents issued to Sonos after the agreement was

8  executed?  Correct?

9  **A.**   Yes.  As patents came into the portfolio, they had a

10 license during the term for those patents, that's correct.

11 **Q.**   So today how many patents are covered by the Denon

12 agreement?

13 **A.**   Well, the Denon agreement is expired today, so none.

14 **Q.**   How many patents were covered by the Denon agreement in

15 the four-year term of the agreement?

16 **A.**   At the date it expired, I don't know.  It is probably

17 close to what we're at today, but I think we get about -- I

18 don't know what the math would be -- maybe a couple -- a

19 hundred, a hundred fifty less I'm guessing to when it expired.

20 I'm not real sure.  Sorry.

21 **Q.**   Still $10 million for more than a thousand patents; right?

22 **A.**   Towards the end it was possibly more than a thousand.  I'm

23 going to guess when we first signed it, it was probably less

24 than a thousand.  Probably -- I don't know.  Again, I'd have to

25 look at our history.  Maybe 700 when we first signed it, 600

1  when we first signed it; and then, you know, maybe we got a

2  hundred a year so -- but, yeah, at the end probably over a

3  thousand patents if that's -- yeah.

4  **Q.**   Okay.  So.  Let's just do the math.  Are you ready?

5       2 divided by 1,000.  So that would be .2 percent.  The two

6  patents at issue here are .2 percent of the number of patents

7  that were licensed to Denon in that portfolio agreement; right?

8  **A.**   I was told there would be no math; but, yeah, I trust your

9  calculator and I trust your math here.  That seems right.

10          **MS. BAILY:**  That's all, Your Honor.

11          **THE COURT:**  Is that it?

12          **MS. BAILY:**  Yes.

13          **THE COURT:**  Okay.  Now we go back to direct.

14          **MR. RICHTER:**  Your Honor, is it okay if I ask a few

15  follow-up questions?

16          **THE COURT:**  Sure.  Of course.  Please go ahead.

17          **THE WITNESS:**  Can I take a sip of water, sir?

18          **MR. RICHTER:**  Yeah.  Absolutely.

19                  (Pause in proceedings.)

20                  <u>**REDIRECT EXAMINATION**</u>

21  BY MR. RICHTER:

22  **Q.**   Maybe we can pick up right where Ms. Baily left off.

23  I believe she was doing some math talking about the Denon and

24  attempting to divide the amount of money that Denon paid Sonos

25  by the amount of patents that Sonos would have.

1    But I believe your testimony earlier on the Denon license

2  was that it was a cross-license.  Can you explain a little bit

3  more about how a cross-license works?

4  **A.**    It was a cross-license, which is our preference.  A

5  cross-license is when another company also has some patents,

6  you do basically a cross-license.  You basically sort of

7  evaluate each party's patent portfolio, determine the worth,

8  and then figure out, you know, what is a fair way, who's paying

9  who and which way it goes and what's fair based on both

10  parties' patent portfolios.

11  **Q.**    So am I correct that Denon paid Sonos money for the

12  license and then Sonos received money and a license to Denon's

13  patents?  Is that right?

14  **A.**    Yes, that's correct, yeah.

15  **Q.**    And so is that a fair -- let me start over with my

16  question.  I'm sorry.

17    Is simply dividing the amount of money that Denon paid

18  Sonos by the total number of Sonos patents really a fair

19  approximation of the value of the Sonos-Denon license at that

20  time?

21  **A.**    No.  You would have to factor in their patent portfolio

22  and the cross-license as part of the value of course, yeah.

23  **Q.**    And at the time of that Denon license, Denon was selling

24  products competing with Sonos; right?

25  **A.**    Indeed they were, yes.

1  **Q.**   And do -- are you aware of what that per-unit equivalent

2  is of the Denon license amount?

3  **A.**   Am I aware -- sorry.  Can you restate the question?

4  **Q.**   Yeah.  Sorry about that.

5      Are you aware what that lump-sum payment would translate

6  into as a per-unit royalty equivalent?  And if you're not,

7  that's okay.  I'm just asking if you're aware of that.

8  **A.**   I think if you did the math, it was like $35 or something.

9  I don't remember off the top of my head, but I want to say it

10  was like $35 or something like that.

11          **MR. RICHTER:**  Mr. Jay, do you mind if we pull up the

12  Legrand agreement, which I believe is TX6631?

13                  (Pause in proceedings.)

14          **MR. RICHTER:**  And maybe a good page to look at is

15  page 2.

16  **BY MR. RICHTER:**

17  **Q.**   And so I don't think Ms. Baily showed you this page, but

18  can I direct your attention to licensed patents?

19      And can -- would you read that for us, if you don't mind,

20  Ms. Kwasizur?

21  **A.**   Yeah.  This is the Legrand agreement that we're reading.

22  **Q.**   Yes.

23  **A.**   (as read):

24          "'Licensed patents' means all utility patents owned

25      or controlled by Sonos at any time during the term, but

1  excluding any of the Sonos patent portfolio related to

2  concurrent voice technology; i.e., patents directed to

3  concurrently operating multiple voice services on a single

4  product offering or device" -- quote/unquote -- "excluded

5  patents."

6  **Q.**   And so is it a fair approximation of the value of this

7  license to Sonos by just taking the licensing rates and

8  dividing it by the total number of Sonos patents in Sonos'

9  patent portfolio at this time?

10 **A.**   No, definitely not the total.  As I said, there were some

11 carve-outs.  This is -- the voice is obviously one of them as

12 you're pointing out here and then the design ones are another.

13 So it's not the total portfolio, no.

14 **Q.**   I think Ms. Baily was also referencing some of the

15 payments made from Legrand to Sonos, and she may have mentioned

16 it was in the $200,000 range or so.  Do you remember those

17 questions?

18 **A.**   I remember those questions.  Yes, I remember the

19 questions.

20 **Q.**   And is that amount of money that was paid from Legrand to

21 Sonos a reflection of how many units Legrand sold?

22 **A.**   Well, they paid a per-unit royalty so, yeah, in some ways

23 it is a reflection of how much they sold, correct.  As I said,

24 earlier the reason we do per unit is if they sell less, they

25 pay less, and that's maybe a good example that they didn't sell

1    as much.

2    **Q.**    And so is it a fair statement that if Legrand would have

3    sold more units, they would have paid more money to Sonos?

4    **A.**    Yes, of course; and if they got into higher tiers, the

5    rate would go up, as I explained earlier, because they'd be

6    competing with us more.

7    **Q.**    And that's a feature of the license agreement -- the

8    running royalty portions of the license agreement, that's a

9    feature of them; is that right?

10    **A.**    Yeah.  Yeah, yeah.  That's how the agreements are set up.

11    **Q.**    Same question with respect to the Bluesound agreements.

12    I believe Ms. Baily was mentioning they may have paid on the

13    order of 1 to 2 million.  And that's a function of how many

14    units Bluesound sold?  Do I have that right?

15    **A.**    Yeah, yeah.  The number of covered products, you just

16    multiply it by the tier that it falls in, and that's how they

17    make the payments so, yes.

18    **Q.**    Thank you for your testimony, Ms. Kwasizur.

19            **MR. RICHTER:**  Pass the witness, Your Honor.

20            **THE COURT:**  Thank you.  Any more?

21                          <u>**RECROSS-EXAMINATION**</u>

22    BY MS. BAILY:

23    **Q.**    I just have a couple of questions.

24    **A.**    Okay.  A couple of answers.

25    **Q.**    You talked with counsel about the Denon patent portfolio;

1   right?

2   **A.**   Yes.

3   **Q.**   You said that was a cross-license?

4   **A.**   Yes.

5   **Q.**   And you didn't present any historical valuation of Denon's

6   patent portfolio; right?

7   **A.**   I don't believe we did, no.

8   **Q.**   And with respect to the Legrand agreement --

9   **A.**   Yes.

10  **Q.**   -- you talked about an exclusion for some concurrent voice

11  patents.  Do you recall that?

12  **A.**   Yes.  I just read that out, yes.

13  **Q.**   And that's a small number of patents; correct?

14  **A.**   I wouldn't call it small.  I don't know the number off the

15  top of my head; but, you know, as the rise of voice has

16  happened, we also have paid attention and been innovating in

17  that space particularly like it said in there where it comes to

18  multiple voice agents and things like that.

19  **Q.**   You didn't present any historical valuation of the

20  concurrent voice patents; correct?

21  **A.**   We don't -- we don't really have valuations of different

22  segments of our patent portfolio so, no, I couldn't present

23  that.

24  **Q.**   And just coming back to the Lenbrook agreement, there was

25  nothing excluded from Sonos' portfolio with respect to the

1    license that Lenbrook received; correct?

2    **A.**    Yeah.  I believe Lenbrook was the full portfolio.  I would

3    have to double-check.  Yeah.  I think that's right, yeah.

4    **Q.**    So to get an average -- an average price per patent with

5    respect to the Lenbrook agreement, you would have to multiply

6    30 times 30-dollar rate.  That would be the highest rate;

7    right?

8    **A.**    Sorry.  Can you repeat the question?

9    **Q.**    Yeah.  Sure.  It was confusing.

10         So in the Lenbrook agreement, the highest royalty rate

11    that's even listed is $30 per unit; right?

12    **A.**    Yeah.  I'm not going to look again.  Yes, I trust you're

13    right on that.  Okay, yes, I'm with you.

14    **Q.**    And we discussed the percentage that these two patents

15    make up of the worldwide patent portfolio of Sonos; right?

16    That was .13 percent?

17    **A.**    As it sits today, yeah.  It's rough math, yeah, because we

18    don't have the perfect number; but, correct, yes.

19    **Q.**    So if I do the math correctly -- I don't know if I will --

20    that would mean each patent is worth less than 2 cents; right?

21    Two cents per unit if you were to use the royalty rate in the

22    Lenbrook agreement?

23    **A.**    I'm going to assume your math is right; but, again,

24    different patents have different value so, you know, I'm not

25    sure -- it doesn't totally break down that way that just every

PROCEEDINGS

1  patent is two cents, but I get -- I get your point.

2  **Q.**  Thank you.

3  **A.**  Yes.

4         **THE COURT:**  Okay.  Thank you.

5      You may step down.

6                    (Witness excused.)

7         **THE COURT:**  Next witness.

8         **THE CLERK:**  May the witness please approach the

9  witness stand.

10     **MR. RICHTER:**  Your Honor, before our next witness

11 approaches, may we remove the devices, the demonstrative

12 exhibits?

13        **THE COURT:**  Sure.  Let's do it.  Yes, you may.

14     **MR. RICHTER:**  I believe our next witness is Mr. James

15 Malackowski, Sonos' damages expert.

16        **THE COURT:**  All right.

17                    (Pause in proceedings.)

18               **JAMES EDWARD MALACKOWSKI**,

19 called as a witness for the Plaintiff, having been duly sworn,

20 testified as follows:

21        **THE CLERK:**  Thank you.

22     Please speak directly into the microphone.  State your

23 full name for the record and spell your last name.

24        **THE WITNESS:**  James Edward Malackowski,

25 M-A-L-A-C-K-O-W-S-K-I.

1          **MS. BAILY:**  Your Honor, I apologize.  There may be a

2    very small portion of Mr. Malackowski's direct examination that

3    relates to highly sensitive confidential financial information

4    of Google.

5          And I understand that Sonos does not have an objection to

6    sealing the courtroom at that time.  I know that's not the

7    Court's preference, but the -- this financial information

8    doesn't affect an understanding of Mr. Malackowski's

9    calculations, and so --

10          **THE COURT:**  When will we get to that in this

11    examination?

12          **MS. CARIDIS:**  Your Honor, maybe in 15 to 20 minutes.

13          **THE COURT:**  When we get there, let me know and then I

14    will possibly excuse the jury so we can argue about this.  I'm

15    not saying yes or no to it yet.

16          **MS. CARIDIS:**  May I proceed, Your Honor?

17          **THE COURT:**  You can.  Yes, you can.

18                        <u>**DIRECT EXAMINATION**</u>

19    BY MS. CARIDIS:

20    **Q.**   Good morning, Mr. Malackowski.

21    **A.**   Good morning.

22    **Q.**   Can you please explain to the jury what your role is in

23    this case?

24    **A.**   Yes.  I've been asked to provide my opinion and analysis

25    for the amount of damages that I think should be awarded in the

1  event that you, the jury, find that the patents are valid and

2  infringed.  So the damages Google should pay to Sonos.

3  **Q.**  Thank you.

4  And have you prepared a -- any materials to assist in

5  introducing yourself and explaining your work in this case?

6  **A.**  I have, and the Power deck is shown on the screen.

7  **MS. CARIDIS:**  Your Honor, may I approach the witness?

8  **THE COURT:**  Sure.

9  (Pause in proceedings.)

10 **BY MS. CARIDIS:**

11 **Q.**  Can you please briefly tell us about yourself and describe

12 your educational background?

13 **A.**  Sure.  So I grew up in Indiana in a very small town.  I

14 was the first in my family to go to college.  I attended the

15 University of Notre Dame where I studied accounting and

16 philosophy.

17 Following graduation, I went to work, lived in Chicago

18 with my family, two children.  One just graduated from college

19 and one just finished her sophomore year.

20 **Q.**  And can you briefly describe your professional work

21 history after graduating from Notre Dame?

22 **A.**  It's summarized on the first slide that's shown, but real

23 briefly I've essentially spent my entire career, now more than

24 35 years, focused on the valuation of technology and the

25 intellectual property patent rights, for example, that it

1  protects.

2      So back in the 1980s I started what was the first firm

3  dedicated to that.  We started with five and we grew to about

4  300 before we sold that.

5      I then spent some time looking at investments in

6  intellectual property, and then started my current firm

7  Ocean Tomo right after my daughter was born.  So 20 years ago.

8  And today we have about a hundred people focused on the

9  valuation and management of intellectual property.

10 **Q.**  And can you describe a little bit more about the business

11 of Ocean Tomo?

12 **A.**  Sure.  We're a hundred folks, as I mentioned.  We're part

13 of a larger organization that has about 1,500 engineers.  So we

14 work with the engineers to understand the technology and then

15 apply the business valuation skills.

16     We do three things:  Valuation in the courtroom, working

17 with clients who own intellectual property to manage their

18 portfolios for licensing or other reasons, and then we act as a

19 broker.

20     So if you wanted to buy or sell a patent or a music

21 copyright or a trademark, we would do that in a live auction or

22 through a private sale process.  Kind of like Sotheby's would

23 sell art or you would buy a car at a car auction.

24 **Q.**  And so sticking with your professional experience, have

25 you taught any subjects relating to patent licensing or

**MALACKOWSKI - DIRECT / CARIDIS**

1   damages?

2   **A.**   Oh, sure.  That's part of the job I enjoy the most,

3   frankly.

4       So I teach people at the firm.  I teach at a number of

5   universities, including my alma mater Notre Dame; and then I

6   teach a lot of lawyers at bar association meetings, and we talk

7   about how to value intellectual property for litigation but

8   also how to value it sort of in the real-world marketplace.

9   **Q.**   So I think a moment ago you mentioned some work that you

10  do outside of the courtroom or the context of litigation.  Can

11  you provide some examples of work that you've done in that

12  context?

13  **A.**   I'm often asked to either be a senior adviser or a member

14  of the board to companies or other patent holders.  Some

15  examples you may know would be Ford Motor Company where we help

16  to manage all of the intellectual property for Ford, Jaguar,

17  Aston Martin, Volvo at the time.  Small startup companies;

18  universities such as the University of Chicago, School of

19  Molecular Engineering; biotech firms.  My new favorite is a

20  boat manufacturer in Europe.  So it's a wide diversity.

21  **Q.**   And have you had any positions of industry leadership or

22  recognition relating to the licensing of patents?

23  **A.**   Yes.  I'll touch on one of each.

24      Leadership, I ran the world's largest technology transfer

25  professional association, which I know you never heard of.

1    It's called LES, Licensing Executive Society.  But when I ran

2    that group, which teaches people how to value patents or

3    license them, we had 10,000 members in 32 countries.  So it was

4    a pretty big deal.

5        As far as recognition, the thing I'm probably proudest

6    of -- you don't know this either -- there's actually an

7    Intellectual Property Hall of Fame, a global Hall of Fame, that

8    in its history has less than a hundred people, mostly Patent

9    Office directors, actually a few presidents; and I'm the only

10    valuation person that's been admitted.  I think I'm number 96

11    in the Hall of Fame.

12    **Q.**    And have you ever been named as an inventor on any U.S.

13    patent?

14    **A.**    Oh, many times.  I have 20 issued patents or so.

15    **Q.**    And do you have any certifications relating to financial

16    analysis?

17    **A.**    Several.  Two that are relevant here is, one I studied

18    accounting, as I mentioned, so I am a CPA.  I've been a CPA

19    since the mid-1980s.

20        But I'm also a certified licensing professional.  So

21    that's someone who has training and experience in the valuation

22    and transfer of intellectual property or technology, and I have

23    that certification as well.

24    **Q.**    And have you been qualified by courts as an expert in

25    intellectual property damages licensing and licensing

1   negotiations in the past?

2   **A.**   Yes, ma'am.

3   **Q.**   And how many times?

4   **A.**   I've sat in a courtroom like this or a tax court,

5   bankruptcy court, international arbitrations, more than a

6   hundred times.

7   **Q.**   And is your compensation dependent upon the opinions you

8   render or the outcome of this case in any way?

9   **A.**   In no way, no, ma'am.

10  **Q.**   Okay.  So with that introductory background to the side,

11  Mr. Malackowski, can you explain what you were asked to do in

12  this case?

13  **A.**   Yes.  I show on the screen a very high-level summary.

14  It's very simple:  What is the amount of compensation or money

15  that Google would pay to use the patented technology of Sonos?

16      And in our industry we refer to that as a reasonable

17  royalty damages.  The way I think about it is if you wanted to

18  rent somebody's apartment, you have to pay them rent to use the

19  apartment.  Same thing here.  If Google wants to use Sonos'

20  patents, they have to pay rent or a royalty.

21  **Q.**   And in the event that the Court or the jury finds that

22  Google does not infringe the asserted patents, how would your

23  opinions change?

24  **A.**   It would change dramatically.  If there is no

25  infringement, there should be no award of damages at all.

**MALACKOWSKI - DIRECT / CARIDIS**

1    I actually start my work by assuming the patents are valid

2    and that they're infringed; but that's, I understand, a

3    decision that the jury will make.

4    **Q.**    And I believe you mentioned it a moment ago, but based on

5    your analysis, what type of damages did you find would be

6    appropriate in this case?

7    **A.**    I believe the appropriate measure is the minimum

8    requirement, which is a reasonable royalty or the rent that we

9    spoke of.  There are other measures that I considered that

10   would be higher, but I'm trying to be conservative in my

11   analysis.

12   **Q.**    And what types of information did you study or rely on in

13   reaching your conclusions in this case?

14   **A.**    It was a lot.  As I show on the screen here, I list the

15   major components.

16       But in all of my work, it always starts at the same place,

17   which is you have to read the patents.  You have to understand

18   generally what they cover.  And I had the benefit of getting to

19   talk to the Sonos employees, getting to talk to Dr. Almeroth

20   and the technical experts.  Lawyers help too to understand it.

21       And once I understand the technology, then I look for

22   benchmarks:  Are there similar patents that have been sold in

23   the marketplace or that have been licensed that I can use as a

24   starting point to value these patents?

25       So comparable technology, and that may be a patent

 1    license.  It may be other technology sold in the market.  It

 2    may be a piece of software.

 3          The other thing is, as an expert, I sign an agreement to

 4    keep everything confidential.  So I get to actually look at the

 5    business records of both Sonos and Google, their accounting

 6    information.

 7          Finally, I do my own research, my own homework.

 8          And, lastly, Google has their own damages expert that

 9    you'll hear from and they have their own technical experts that

10    you've already heard from, and I get to read their reports to

11    make sure I'm not missing something as it relates to my work.

12    Q.    Are your conclusions here based on any legal principles?

13    A.    They are.  And I'm not a lawyer or giving legal opinion,

14    but we have to refer back to the bedrock principle of how to

15    measure damages, which is shown on the screen 35 U.S.C. 284.

16          And I won't read it except to focus on what's highlighted

17    in blue:  Damages must be adequate to compensate for the

18    infringement -- so there's a relationship between the extent of

19    use in infringement and the number that you would encourage --

20    but in no event, less than a reasonable royalty.

21          So that's that notion that what I'm going to talk about

22    today is the minimum measure of damages.  I could have

23    calculated other methods that would have been greater.

24    Q.    Can you just mention for us what -- you know, some of

25    those other types of damages would be possible -- would be

1  potential?

2  **A.**   Well, the most obvious one is called lost profits, which:

3  Is if Sonos allows Google to use this technology, will that

4  help Google to sell more speakers that would actually take away

5  sales from Sonos?  And if that happened, the damages would be

6  greater.

7       Another example would be called price erosion.  Maybe

8  Google's use of the technology won't cause Sonos to lose the

9  sale, but maybe Sonos would have to lower the price to keep it,

10  and that would also be a measure of damage that I'm not

11  including.

12  **Q.**   So to be clear, though, you're not offering any opinions

13  in this case relating to lost profits or price erosion;

14  correct?

15  **A.**   Correct.

16  **Q.**   Okay.  So what, if any, framework did you rely upon in

17  supporting your reasonable royalty analysis and opinions in

18  this case?

19  **A.**   So in each of my work it comes down -- there's a few

20  slides that I think are really central or important

21  conceptually.  This is one of them.

22       So obviously Sonos and Google did not come to an agreement

23  and licensed the patents.  If they did, we wouldn't be here.

24  But what we have to do for a reasonable royalty is essentially

25  go back and recreate what should have happened if both sides

1  sat down and actually did come to that agreement, and we call

2  that a hypothetical negotiation.  It's hypothetical because it

3  never happened.

4      And, importantly, what I show on the screen is you have to

5  assume both sides are reasonable and actually going to go come

6  to an agreement.  No one can sit down and Sonos can't say they

7  want some really crazy high number and Google can't say they

8  don't want to pay anything.  They have to compromise and come

9  up with a royalty.

10 **Q.**   So I believe you mentioned that this is a common

11 framework.  How many times have you used this hypothetical

12 negotiation framework before?

13 **A.**   Hundreds, probably more than a thousand over the last

14 30 years, plus I'm supervising a hundred people that are using

15 it every day.

16 **Q.**   Okay.  Now I believe you mentioned some of them, but let's

17 kind of get it all out there.

18     Are there any assumptions you rely on at the outset of

19 this framework?

20 **A.**   Yes.  Aside from assuming the patents are valid and

21 infringed, I have to understand when would this negotiation

22 occur because the date could make a difference, maybe not but

23 it could; and the date that's relevant is the date of first

24 infringement for each patent.

25     In this case what we know is Google actually started

1  selling the accused products before the patents issued.  So the

2  first aligning date would be the date the patent was issued by

3  the PTO.  And you can see in the chart, for the '966 that would

4  be November of 2019 and for the '885 that would be a year

5  later, November of 2020.

6      The second assumption I already shared, patents are valid

7  and infringed.

8      And the third one I already shared, you have to reach an

9  agreement.

10  Q.   Other than the hypothetical nature of the exercise, are

11  there any other differences between the hypothetical

12  negotiation and the real-world negotiations?

13  A.   One other very significant difference.  And, again, it

14  goes back to common sense.  If you were going to negotiate with

15  someone to buy or sell something, you have information that,

16  you know, you don't fully disclose.  You hold that to yourself

17  because you're trying to negotiate the best deal.

18      A hypothetical negotiation in the courtroom is different.

19  All of the information is laid cards up on the table.

20  Everybody knows essentially everything that is expected or

21  reasonably knowable at the time of the negotiation.  And that's

22  important because that makes it easier to compromise because

23  there is no hidden information.

24  Q.   Okay.  So what are the questions that drive the outcome of

25  this hypothetical negotiation that you've been discussing?

1  **A.**   So in each and every case, they're going to be different;

2  and so my practice is, after I go through all that wheel of

3  information, is to sit back and say:  Well, what are the issues

4  that are going to help us understand what the right royalty

5  rate should be?

6       Sometimes there are two questions.  Sometimes it's a long

7  list.  In this case there were five key questions for me.

8  We'll go through them, but it relates to competition,

9  comparable technologies, how valuable the patents are, how

10  these companies would share in that value, and if Google has

11  any other alternatives.

12  **Q.**   Okay.  So let's kind of focus on the first question first.

13       What is the importance of the competitive relationship

14  between the two parties in this case?

15  **A.**   So the competitive relationship is really key for two

16  reasons.  One, conceptually.  Put yourself in the place of

17  Sonos for a minute.  If you're going to license your patents to

18  someone who only makes a few speakers a year or doesn't compete

19  with you at all versus someone who is one of your lead

20  competitors, who are you going to want more money from?  The

21  lead competitor because of all the risk that we talk about.  So

22  that's important.

23       And it's also important when we look at those comparable

24  benchmarks.  So if I'm looking at another license -- and you

25  just heard testimony about several licenses -- I want to look

**MALACKOWSKI - DIRECT / CARIDIS**

1  for licenses that are also with competitors, competitor to

2  competitor.  I'm not going to be interested in licenses that

3  are with universities or nonpracticing entities because those

4  rates aren't going to be appropriate for my negotiation.

5  **Q.**  So turning to your second question on the screen here, can

6  you explain the importance of comparable technologies and

7  relevant value indicators to your work in this case?

8  **A.**  Yeah.  Let's go back to the notion of you want to rent an

9  apartment, how much should you pay; and my daughter just went

10 through this for her summer job.

11      Well, how much are other apartments in the building or in

12 the building next-door or in any building walking distance

13 that's usable to you?

14      And the same thing is true of intellectual property.  If

15 you want to know what a patent royalty rate should be, are

16 there other patent royalty rates you can look to either for the

17 companies or using general research, or are there other

18 transfers of technology where the benefits of that transfer are

19 similar and you could use that as a benchmark or starting

20 point, and I looked at all of the above.

21 **Q.**  And then turning to your question three, how does the

22 importance of the patented technology fit in here?

23 **A.**  Simple.  More important.  More valuable.  And you can

24 assess the importance by things like the extent of use.  And

25 also in complex products, like a smartphone where there may

1    be -- where there are hundreds of features, what are the

2    features that are actually promoted in the market place?

3    Because those tend to be more important than the ones that are

4    not.

5    **Q.**    So turning to question four, were you able to determine

6    how Google values and shares the benefits of third-party

7    technology here?

8    **A.**    Yes.  In every case imagine you're in this negotiation and

9    you finally all agree that this patent will generate X dollars.

10   You know how big the pie is.  Well, now you've got to divide

11   the pie.  Well, how do you do that other than, you know, arm

12   wrestling and argue about it?  You try to look back to what the

13   parties actually do in the real world every day.

14       And this case is unique because Google has built much of

15   its business on working with other technology developers and

16   sharing it at the app store and they have a very common

17   standard, almost universal way of doing it, which is a 70/30

18   split, and we'll talk about that in a little bit.

19   **Q.**    And, lastly, did you find that Google would be able to

20   design and implement any noninfringing alternatives that would

21   be acceptable to customers here?

22   **A.**    I did largely in working with Dr. Almeroth.  You heard him

23   talk about a couple of those alternatives yesterday, and Google

24   has done their best to look for them; but Dr. Almeroth's

25   conclusion was that they are not noninfringing commercially

1  acceptable alternatives, and so I take that into account in my

2  work.  There is no other option.

3  **Q.**  Okay.  So based on this information, would you please

4  share with the jury your conclusions regarding the reasonable

5  royalty due to Sonos?

6  **A.**  Yeah.  So the bottom line -- and we'll talk about how we

7  get there -- in my opinion, the reasonable royalty, A, should

8  be a running royalty.  We just heard discussion of what that

9  is.

10      Second, it ought to be slightly different for the two

11  patents because, remember, those hypothetical dates are over a

12  year apart and so that makes a difference.

13      Third, it ought to be for a specific time period.  So for

14  the '966 patent, it would be the date the patent issued,

15  November 5th, 2019, through September 30th of last year.  And

16  the reason for the end date is only because that's the most

17  recent accounting data that I have.  The royalty rate for the

18  '966 should be 82 cents a unit.

19      For the '885 it's similar.  Running royalty starting with

20  the date of issuance, a little bit different ending date

21  because of the information I have.  This one goes through

22  November 15th of 2022.  The rate is slightly higher because of

23  that timing difference.  It would be 87 cents a unit.

24      So, you know, when I teach class, I talk about chalkboard

25  numbers, numbers that I go actually write down because they're

1    important.  These are two chalkboard numbers.

2    **Q.**    Okay.  So if that's the conclusion, why don't we talk

3    about how we get there?  What process did you follow in

4    determining the reasonable royalty due to Sonos?

5    **A.**    One I use all the time.  It's fairly straightforward.  So,

6    first, using my CPA or my certified licensing professional

7    experience, what data do I have?  What benchmarks can I start

8    with that indicate value?

9         And then once I have those benchmarks, there's a list of

10   factors that virtually every expert uses to see if those

11   benchmarks should be adjusted upwards or downwards.  Those

12   factors are called the *Georgia-Pacific* factors only because

13   back in the 1970s there was a court case where Georgia-Pacific

14   was the Plaintiff, and that's where they first started using

15   the factors.

16        But, importantly, once you understand the benchmarks and

17   you consider the factors, it's really the expertise of the

18   appraiser -- in this case me -- to determine how the parties

19   would negotiate to a royalty.

20        There's no actual mathematical formula that you use.  And

21   at first that might sound unusual; but if you ever bought a

22   house and you get an appraiser, what she'll do is she'll show

23   three or four houses and she'll say "This one has a bedroom.

24   This one has a pool.  This one has a fireplace," and then she

25   gives her opinion as to taking all that into account what's the

**MALACKOWSKI - DIRECT / CARIDIS**

1  value of your house, and it's similar here.

2  **Q.**   Can you explain -- are there multiple valuation approaches

3  that are used to determine a reasonable royalty?

4  **A.**   There are.  The three most common approaches are shown on

5  the screen.  One is called the market approach.  So what are

6  other comparable technologies worth?  If I want to know what my

7  house is worth, what did my neighbor's house sell for?

8       Second is the income approach:  Will this technology help

9  you increase sales or profits or reduce your costs?

10       And, third, the cost approach.  Google would argue:  Is

11  there some alternative we can use that would certainly be a

12  factor to help lower the rate?

13  **Q.**   And so I believe you mentioned that the market approach

14  looks at what the parties would pay for technology that is like

15  the asserted patents.  Where can you find that information?

16  **A.**   So you can look in a number of places.  You can look in

17  the business records and you can look in publicly available

18  data.  I'm going to change my analogy here but still keep in

19  the home theme.

20       Let's suppose that the technology you want to acquire is

21  you just moved into your new house and you need to mow the

22  lawn.  So you want to acquire technology of a lawn mower.

23       Well, you might get lucky and go to Home Depot and see

24  exactly the lawn mower you want, you know what it's worth.  But

25  maybe you go to Home Depot and there's all kinds of lawn mowers

1    but nothing exactly comparable to what you want; too big, too

2    little.

3        You also have the option of hiring a lawn service; and so

4    you can look not only to comparable transactions, but

5    comparable services.

6        And the same is true for intellectual property.  You might

7    find a comparable patent license, a comparable patent for sale,

8    or a comparable technology for sale that accomplishes the same

9    result.

10   **Q.**   And can you explain what you investigated under the income

11   approach?

12   **A.**   Yes.  So the income approach is fairly direct:  What was

13   the use and how valuable was it?  So more products, greater

14   usage, more revenue are all factors that would be considered.

15       This is probably the second-most important slide in the

16   deck because it has two other chalkboard numbers that we need

17   to know, and that is:  What is the accused infringement for

18   each of the patents being asserted here?

19       So for the '966, the accused infringement is represented

20   by Google Home app installs, and I believe now the parties --

21   the experts agree that that represents 94.7 million

22   installations.

23       And then for the '885 patent, that represents the sales of

24   the products, such as the Home, Nest, Chromecast, the speakers;

25   and I believe here, again, the experts agree that represents

**MALACKOWSKI - DIRECT / CARIDIS**

1   14.1 million sale transactions.

2   **Q.**   And without going into any numbers at this point, has

3   Google generated a significant amount of revenue based on the

4   accused products?

5   **A.**   Of course.  Yes, ma'am.

6   **Q.**   But has Google provided enough information to accurately

7   quantify the amount of revenue that they have generated from

8   the accused products?

9   **A.**   Not completely because the revenue associated with these

10  products comes from not only the sale but often they'll give

11  away product, literally even giving away speakers or apps; and

12  they also generate revenue from advertising and sale of data,

13  and I don't have full information in that regard.

14  **Q.**   So can you finally please explain the third valuation

15  method, the cost approach?

16  **A.**   Yes.  Just a refresher.  In a negotiation, if Google could

17  do something else and pay less, obviously they're going to

18  bring that to the table and they're going to argue that that

19  should at least temper or lower the royalty rate.

20  **Q.**   And would you expect the outcomes of all of these analyses

21  to be identical?

22  **A.**   No.  They should all converge and be helpful, but they're

23  all starting points that have to be considered in light of

24  those *Georgia-Pacific* factors.

25  **Q.**   Speaking of *Georgia-Pacific* factors, let's get into those.

1    So now that we've covered the three valuation approaches,

2  what is the next step?

3  **A.**    So the next step is to look at those factors and now

4  really dig into the detail.  And so there are 15

5  *Georgia-Pacific* factors.  They can be generally grouped into

6  three categories:  Factors that relate to the licensing of

7  technology, factors that talk about the importance of the

8  invention, and factors that talk about the economics of the

9  parties.

10  **Q.**    And which, if any, of these factors are relevant to this

11  case?

12  **A.**    Well, they're all relevant.  In every case you look to all

13  of them.  Some may not be so determinative or important to the

14  outcome but, I've considered all 15.

15  **Q.**    So let's start at number one.  Can you explain to the jury

16  what the first *Georgia-Pacific* factor is?

17  **A.**    Yes.  As shown on the screen, *Georgia-Pacific* factor 1 --

18  and I'll probably start calling it GP1 -- talks about other

19  licenses for the patents from the patent holder.  So what

20  evidence is there regarding Sonos' licensing history?

21    And what I show on the timeline here are actually the

22  three licenses that we just heard testimony about:  The Denon

23  or DEI, the Lenbrook, and the Pass & Seymour license.

24  **Q.**    So in your opinion, are any of these agreements relevant

25  to the economic terms of the hypothetical negotiation?

**A.**    Yes and no.  They are relevant because they set a cap and they establish the form of payment; but as we just heard in the last testimony, they're for a larger portfolio so we have to apportion down from that.

**Q.**    And does the license Sonos granted to Lenbrook, which is this July 2020 box in your demonstrative, does that contain a license to the asserted patents?

**A.**    It does.  And we just heard testimony highlighting that agreement and this chart, you know, summarizes some of those terms, yes.

**Q.**    And so what terms do you think are important or would inform a hypothetical negotiation in this case?

**A.**    Well, the whole agreement works together, but most importantly is the structure of the agreement.  I won't repeat what we just heard, but it is a running royalty license.  So you pay each and every unit.  It's a portfolio license or I teach it -- I call it a buffet license.  So if you go to lunch at the buffet and the buffet is $35, you can pick whatever you want from the buffet.

But if you go and say "You know what?  I'm just going to have the steak and I'll take -- you've got 30 entrees divided by $30.  Can I just pay a dollar on each steak?"  No, you can't.  That's not the way the buffet works.  And so this is a similar structure to that agreement.

**Q.**    Are there any other relevant economic terms in the

1   Lenbrook license?

2   **A.**   The Lenbrook license has one very unique term that's not

3   in the others.  It's generally referred to as a most-favored

4   licensee clause.  They call it a discounted royalty.

5       What that means is Sonos has promised Lenbrook that they

6   will not give any other company in a similar situation a better

7   deal.  And that's important for here because in this

8   hypothetical, Sonos has got to be thinking all the time, "Look,

9   Google, you may want that but I can't give that to you because

10  it would violate other agreements that I have."

11  **Q.**   Let's turn to Sonos' second license.  What are the

12  relevant economic terms of Sonos' license with Legrand or

13  Pass & Seymour?

14  **A.**   They are essentially identical.  They are a portfolio

15  buffet license running royalty.  Rates escalate with volume to

16  discourage those large competitors from having a free ride.

17  **Q.**   And I believe earlier you mentioned a third agreement with

18  DEI or Denon.  What impact, if any, did that have in your

19  analysis?

20  **A.**   Correct.  I did not consider Denon to be relevant.  We

21  heard testimony that the effective rate is similar, 35 or $30,

22  but it was settled after litigation and it was compressed in

23  time.  There was no ability to renew it into the future and the

24  other agreements allow you to do that, so the other agreements

25  are much more consistent with hypothetical negotiation.

1  Q.  Okay.  So turning back to the Legrand and Lenbrook

2  agreements, what effect would those have on the hypothetical

3  negotiation between Sonos and Google here?

4  A.  In my opinion they tell us, one, that this should be a

5  running royalty and not a lump sum; and, two, they set the cap

6  for the running royalty amount.  And so the negotiators would

7  start to negotiate some percentage of that approximate cap of

8  $30 on down.

9  Q.  I believe a couple minutes ago you mentioned a concept of

10 NPE or nonpracticing entity.  Do you recall that?

11 A.  Yes, ma'am.

12 Q.  Can you expand on what you mean by nonpracticing entity

13 and how that might factor into the parties' discussions here?

14 A.  Yes.  This is actually one of those charts that's also

15 really important because, as we'll see, Google has a number of

16 patent licenses, they've actually bought a number of patents,

17 and the amounts in those agreements are relatively small.

18      And so when I started to read those, it's like:  What's

19 going on here?  How come this big company is paying so little

20 for all this technology?  And what I realized is they were

21 buying patents from nonpracticing entities or licensing from

22 nonpracticing entities either by themselves or as part of a

23 group.  So what this chart explains to you is why that makes a

24 difference.

25      So let's assume that you are sitting down cross from a

1   competitor and you want to license your technology versus

2   sitting across the table from a NPE, a nonpracticing, maybe an

3   individual.

4        Well, you're going to have to think about your pricing

5   pressure.  If you license a competitor to use your technology,

6   that may come back to bite you and you might have to lower your

7   price.  If you're licensing your neighbor next-door for

8   whatever reason and he doesn't sell your products, you don't

9   have to worry about it.

10       The same is true for market share.  If you license a

11  competitor and they're using your technology to compete, that

12  may come back and create risk.

13       And the same is true for reputation.  If you work to

14  develop a new feature that you're going to market to the public

15  as "Come to my business to get this and get this here" but then

16  all of the sudden your competitor has it and maybe your

17  competitor actually got to market first, well, that's hugely

18  damaging to your professional reputation.

19       And the results of all three of those factors is what?

20  You want a higher rate from a competitor than you do from a

21  nonpracticing entity.  And for our purposes today, it means we

22  need to take all those NPE agreements and set them aside.  They

23  should not be the basis of this negotiation.  We need to look

24  to the competitor-to-competitor rates.

25  Q.   So you mentioned that you looked at some Google

1  agreements; right?

2  **A.**    Yes, a number.

3  **Q.**    So it's fair to say that Google had technology agreements

4  that you reviewed?

5  **A.**    Yeah.  That's actually *Georgia-Pacific* Factor Number 2.

6  So if we put that up on the screen, here are five of those

7  agreements.

8      And what I noted is whether they would be relevant.  If

9  they're not, I put a red X.  I put the reason why they would

10  not be relevant, and you can see in each case it's largely

11  related to this NPE factor.

12      I also have for a couple of them via IIF.  Those are

13  cooperative buying.  A bunch of companies get together and they

14  go buy one patent and then they only pay for their part.  So

15  that obviously reduces the rate as well.

16      But I also looked at what the Google expert said, and he

17  agreed with me on all but one.  There's one that he thought the

18  technology was so similar that it should be considered.  So I

19  did take a second look at that one.

20  **Q.**    In your opinion, does Google prefer to purchase or license

21  patents?

22  **A.**    Oh, Google's perspective is they would prefer to purchase,

23  though, in fact, they do both.  They'll try to purchase them if

24  they can, largely from those nonpracticing entities; but for

25  really important technology, say standard essential technology,

1  they're publicly listed as paying running royalties.

2  **Q.**   So I notice on the screen here there's one green check

3  under the Google expert column for Outland Research.  Did you

4  find anything significant in your review of the Google

5  agreement for Outland Research?

6  **A.**   Yes.  The Google experts said they were similar from a

7  technology point of view so I sat down with Dr. Almeroth and we

8  went through it.  And what I noted as to what the technology

9  was, it was a game controller or a computer input device such

10  as your cell phone --

11              **MS. BAILY:**  Your Honor?

12              **THE WITNESS:**  -- that can be used for --

13              **THE COURT:**  Wait a minute.

14       What's the problem?

15              **MS. BAILY:**  This is outside the scope.

16  Mr. Malackowski does not offer an opinion on technical

17  comparability.

18              **THE COURT:**  Is this in your report?

19              **THE WITNESS:**  I do refer and discuss this in my

20  reliance --

21              **THE COURT:**  You can read from your report on this

22  point, but you cannot give new testimony that's not in your

23  report.

24              **THE WITNESS:**  Yes, sir.

25              **THE COURT:**  And the same ground rule applies to you on

 1   the Google side.

 2       All right.  So if it is in the report, you can read what's

 3   in your report on that point.

 4           MS. CARIDIS:  We can move on from that so I don't have

 5   to pass up a --

 6           THE COURT:  All right.  Would be a good point to take

 7   a break?

 8           MS. CARIDIS:  Sure.

 9           THE COURT:  All right.  We will take a break now.

10   Please remember the admonition.

11           THE CLERK:  All rise for the jury.

12       (Proceedings were heard outside the presence of the jury:)

13           THE COURT:  The witness can step down and take a break

14   too.

15       What is the issue with the number you want me to keep from

16   the public?

17           MS. BAILY:  It's internal confidential financial

18   information by product, also financial information related to

19   unaccused products, and also --

20           THE COURT:  Can I see -- is there a document that

21   relates to this?

22           MS. CARIDIS:  There's a single demonstrative slide,

23   Your Honor.

24           THE COURT:  Can I see that too?

25           MS. BAILY:  Your Honor, there's two issues here.

1   There's the confidentiality issue and then we have a

2   substantive objection that all this revenue unrelated to the

3   accused products is coming in, like search revenue.

4       **THE COURT:**  I don't see any financial information on

5   the screen.

6       **MS. CARIDIS:**  I handed you a paper copy, Your Honor,

7   so that we weren't publishing something Google has an issue

8   with being public.

9       **THE COURT:**  Oh, all right.

10                  (Pause in proceedings.)

11      **THE CLERK:**  Well, I -- which part of this is so

12  sensitive nobody can see it?

13      **MS. BAILY:**  All of the search revenue broken down by

14  paid distribution, but broken down by various categories:

15  Percent total of play and search revenue.

16      Search revenue shouldn't even be coming in, Your Honor.

17  Search has absolutely nothing to do with this case, and

18  Your Honor already ruled that unaccused product revenues would

19  not come in, I believe.

20      **THE COURT:**  Well, which part of this do you think is

21  relevant?

22      **MS. CARIDIS:**  Your Honor's order during the motions in

23  limine specifically said that Sonos and Mr. Malackowski could

24  rely on Google's financial information to establish loss leader

25  or lock-in effects that Google uses to purposely lower the

 1   price of its products, lower the profits of its accused

 2   products, but generate revenue and profit for other products.

 3   This is exactly what Your Honor ruled would be admissible

 4   during the pretrial conference.

 5        MS. BAILY:  Your Honor, in their MILs, Sonos says

 6   "Sonos agrees not to reference financial information unrelated

 7   to the accused products."

 8        THE COURT:  Is that right?

 9        MS. CARIDIS:  We are not relating -- we are not

10   referring to this as any sort of royalty base, Your Honor.  We

11   have always said and Your Honor specifically said that we can

12   rely on -- on revenue and profitability numbers of Google to

13   show Google's loss leader and lock-in effect strategies.

14        MS. BAILY:  Your Honor --

15        MS. CARIDIS:  I can point, Your Honor --

16        THE COURT:  Didn't you say you were going to tie it

17   into the accused products?

18        MS. CARIDIS:  Your Honor, it is tied into the accused

19   products.  What you're looking at is Pixel revenue.  Pixels are

20   the phones that are accused of infringing in this case.  So

21   this is revenue directly related to the hardware devices that

22   are accused in this case.

23        MS. BAILY:  Your Honor, this refers to search revenue

24   and play revenue.  And obviously, you know, the Google Play

25   Music the YouTube Music, all of that is not in this case.

1          **THE COURT:**  Well, the Pixel is the phone itself, isn't

2     it?

3          **MS. BAILY:**  The Pixel is the phone itself.

4          **THE COURT:**  All right.  The search revenue I assume is

5     coming from advertisers; is that right?

6          The ordinary consumer like me, if I had a Pixel, I

7     wouldn't be paying for search.  Somebody else pays for the

8     search; right?  That would be the advertisers.

9          And Play, what is Play?  Is that YouTube?  What is that?

10          **MS. BAILY:**  Play is the Play Store the app store,

11     I believe, but it's not my demonstrative.

12          **THE COURT:**  I don't think we should be getting into

13     search revenue.

14          **MS. CARIDIS:**  Your Honor, may I read back something

15     that you said during the pretrial conference?

16          **THE COURT:**  Yes.  Go ahead.

17          **MS. CARIDIS:**  Sorry.  This is first something that

18     Mr. Richter said.  Mr. Richter said (as read):

19               "I will point Your Honor to the fact that

20          Mr. Malackowski also relies on the financial data provided

21          by Google to explain that Google loses money on some of

22          the accused products."

23     You said (as read):

24               "That's okay.  That's okay, if it's got a legitimate

25          basis there."

1      And then you continue to ask Mr. Judah (as read):

2          "Do you have any problem -- it's okay for them to say

3      Google loses money and is a loss leader and all of that.

4      Well, what's wrong with that?"

5      Mr. Judah responded (as read):

6          "One, I fully agree that when there's actually facts,

7      like the actual financial data, that that's something that

8      can be introduced and relied on; but the characterizations

9      of that, that there's, therefore, a strategy which is

10     based purely on *ipse dixit* of the expert is different."

11     You said (as read):

12         "That's okay.  That's what the expert's bought and

13     paid for."

14     So, Your Honor, in this case we suspect, based on the

15 expert reports, that Google is going to come in and say that

16 the royalty rates should be lower because Google does not

17 generate a significant amount of profit from the accused

18 products.

19     And here we are showing that Google has a strategy of a --

20 Google has a loss-leader strategy, a lock-in strategy, of

21 reducing the profits on the hardware products that are accused

22 in order to then generate search or play revenue or other

23 revenue on those exact products, which is what that slide

24 demonstrates.

25         **MS. BAILY:**  Your Honor, the general concept can be

 1   stated, but these numbers clearly skew the damages horizon for

 2   the jury.  They're not relevant and they're extremely

 3   prejudicial and sensitive.

 4        **THE COURT:**  I thought when I made the thing about loss

 5   leader, I thought we were referring to somehow Google was

 6   selling the accused products for less than they were worth.

 7   The accused product is the Home app.  How much does the

 8   customer pay for the Home app?

 9        **MS. BAILY:**  It's free, Your Honor.

10        **MS. CARIDIS:**  Your Honor, the accused product, recall,

11   is the actual hardware devices.  So in this example, the Pixel

12   phone itself.

13        **MS. BAILY:**  I mean, Your Honor, the phone --

14        **THE COURT:**  Why would that be relevant?  Explain how

15   it ties into the *Georgia-Pacific* factors again.

16        **MS. CARIDIS:**  Your Honor, I believe that's partly

17   Mr. Malackowski's charge; but in general, if an accused product

18   generates additional revenue, indirect revenue, so if the sale

19   of a product -- razor blades is a great example.  You can sell

20   a razor with the expectation that a consumer is going to

21   continue to buy razor blades into the future.  So you should be

22   at least aware of the fact that not only -- not only the price

23   and the revenue and profit relating to the razor itself but

24   also the future revenue and profit that will be realized as a

25   result of the sale of that razor through the razor blades in

1    this example.

2         **MS. BAILY:**  Your Honor, this is totally different from

3    a razor blade example and there's no foundation for it.

4    There's no economic analysis in Mr. Malackowski's report that

5    would justify putting up these huge numbers and tying it to the

6    Home app.

7         **THE COURT:**  Why can't he say this, though, he --

8    something along the lines of:  Look, Google gives this product

9    away for free?  If you buy the Pixel, you get it for free; and

10   the reason Google does that is so that there will be all these

11   phones out there and they can make money off the search revenue

12   and all the other ways that they make money.  And so it's worth

13   it to Google to have a -- to saturate the market with the

14   reason that Google would be willing to give it away for free,

15   is that it's going to make the money in -- money in other ways.

16        **MS. BAILY:**  You would have to actually have an offer

17   of proof with respect to that.

18        **THE COURT:**  Well, this is it right here.

19        **MS. BAILY:**  The Home app connected to billions of

20   dollars in search revenue?

21        **MS. CARIDIS:**  Your Honor, the total amount of money

22   collected by Google through the accused products, which is the

23   Pixel device, is relevant to the amount that the parties would

24   be discussing at the hypothetical negotiation.

25        **THE COURT:**  Tell me this:  Does -- do you know from

1   public figures, from the SEC for example, what the annual

2   profit is of Google?

3          MS. CARIDIS:  I'm sure that we can search for it over

4   the break; but, Your Honor, I think just we were trying to

5   be -- we were trying to tie this to the facts because the

6   revenue there is specific to the Pixel devices that are accused

7   in this case.  If we look at Google's SEC filings, if we look

8   at their global profit or even their U.S. profits or revenues,

9   it's going to be more than just what is tied to the accused

10  products here.

11         MS. BAILY:  Well, that's exactly right, Your Honor.

12  To do this kind of analysis, the products that you're bringing

13  in have to be functionally related to the products that are

14  accused, and there's been no showing of that here.

15         And, Your Honor, all of these numbers, including the ones

16  that Your Honor referenced, I mean, those would be extremely

17  prejudicial and solely skew the damages horizon for the jury.

18         The argument itself is okay, Your Honor, if you're leaning

19  that way; but the publication and the publishing in open court

20  of these financial numbers, we object.  There's been no

21  evidence anyone buys a Pixel because it has a Home app on it.

22                      (Pause in proceedings.)

23         THE COURT:  I'm not going to decide -- for the time

24  being, don't use this document.  As I hear the rest of his

25  testimony, I might change my mind.

1    I'm worried that Google is trying to flimflam me and that

2    whenever I hear your damages expert, you'll say there's no

3    evidence and then this would have been the evidence, and then

4    you got me excluding.  So I don't want to -- I don't want to be

5    party to that kind of a gimmick.

6    But I think your point in a single sentence, Google's

7    point, is that it would be fantastic to assume -- or too

8    fantastic to assume that people buy the Pixel simply because

9    there is the Home app; that they would probably sell 98 percent

10   of the same number if it didn't have the Home app and,

11   therefore, getting into all these extra numbers is just laying

12   a lot of big numbers in front of the jury.

13   So I -- I'm going to -- that's my ruling for now, but I

14   may change my mind before it's over.

15   Now, I want to understand.  I want you to tell me

16   something, Ms. Baily.  In closing argument and anywhere else in

17   this case, are you going to say something like, "Well, there's

18   no proof of any loss leader"?

19        **MS. BAILY:**  No.

20        **THE COURT:**  Are you going to prove --

21        **MS. BAILY:**  Nobody's analysis is actually based on

22   this, Your Honor.

23        **THE COURT:**  What?

24        **MS. BAILY:**  Nobody's analysis is based on this.

25   Mr. Malackowski's analysis is based on IFTTT.  Our expert's

 1    analysis is based on other things.  This is not relevant to

 2    anything.

 3         THE COURT:  I'll wait till the end and maybe even the

 4    redirect before I make a decision on this; but for now, it's

 5    not going to be used.

 6         MS. CARIDIS:  Your Honor, just so that I understand

 7    your ruling as we're going -- as we continue this direct, can

 8    Mr. Malackowski, without putting the slide up, say generally

 9    that Google generates additional revenues from services in

10    connection with its Pixel devices without publishing or saying

11    out loud the number or the scale of the number?

12         THE COURT:  All right.  He can do that much.

13         MS. CARIDIS:  Thank you, Your Honor.

14         THE COURT:  Now, I want -- I just want to remind you

15    on the IFTTT, as I said earlier, I'm going to listen carefully

16    to everything he says about it and the cross-examination, but

17    there is a substantial chance I'm going to say to the jury

18    eventually "Disregard everything on IFTTT."

19         MS. CARIDIS:  I understand that, Your Honor.

20         THE COURT:  I'm giving you a chance to make the best

21    record you can on that, and -- and if it -- you know, this is

22    not inflammatory.  If I say disregard it, the jury will be able

23    to do that.  And I assume he's got other bases for his

24    testimony.

25         So all right.  We will --

1          MS. BAILY:  Just so you're aware, the only numbers

2    that Mr. Malackowski puts forward are based at foundation on

3    the IFTTT.

4          THE COURT:  Well, I have a feeling maybe, but the jury

5    has seen these other agreements.  The jury may be able to come

6    to its own conclusion about what the right number should be.

7          MS. BAILY:  Yes, Your Honor.

8          THE COURT:  We're going to take a few minutes

9    ourselves.

10          THE CLERK:  Court is in recess.

11               (Recess taken at 11:32 a.m.)

12             (Proceedings resumed at 11:43 a.m.)

13          THE CLERK:  All rise for the jury.

14     (Proceedings were heard in the presence of the jury:)

15          THE COURT:  Welcome back.  Be seated.

16       Please, the floor is yours.

17   BY MS. CARIDIS:

18   Q.   Welcome back, Mr. Malackowski.

19   A.   Thank you.

20   Q.   Before the break, we were talking about the Google

21   Outland Research agreement.  Do you recall that?

22   A.   I do.

23   Q.   How, if at all, would the Outland Research Google

24   agreement affect the hypothetical negotiation in this case?

25   A.   It would not be an effect in the negotiation largely

1  because it would be an NPE-based agreement; and when buying

2  licenses from an NPE, the rates are lower, noncompetitive.

3  **Q.**    So then what effect would the information under

4  *Georgia-Pacific* Factor Number 2 have on the hypothetical

5  negotiation?

6  **A.**    In this case there would be no import to *Georgia-Pacific*

7  Factor Number 2 because there are no licenses from Google or

8  patent acquisitions from Google that would be relevant to the

9  negotiation.

10  **Q.**    I believe we have an old version of the slides on the

11  screen here, so I apologize.

12      I believe the next factor is *Georgia-Pacific* Factor

13  Number 3 as opposed to the Number 2 on the screen here.

14      But can you please explain the meaning of *Georgia-Pacific*

15  Factor Number 3?

16  **A.**    Yes.  GP3 just talks about the nature of the license and,

17  importantly, whether it would be exclusive, meaning only

18  available for Google in this case, or whether it's a license

19  that would be generally available.

20      You have to look at what the benchmarks tell us.  The

21  benchmarks from Sonos are nonexclusive.  They license to

22  multiple parties.  And the hypothetical negotiation would be

23  nonexclusive.  So that would generally result in a lower rate.

24  **Q.**    Okay.  And turning to *Georgia-Pacific* Factor Number 4, can

25  you explain what that factor is?

1    **A.**    *Georgia-Pacific* Factor 4 talks about the policy of the

2    patent holder and whether they sought to control their

3    portfolio, license it when needed, or generally not license it.

4        And as we heard the testimony earlier today, although

5    Sonos has licensed the portfolio, they've only done so when

6    they thought there was infringement in order to curtail the

7    infringement and in the context of litigation.

8        In fact, what I show on the screen is one of the press

9    releases they issued after reaching the agreement with

10   Lenbrook.  And if you look to the bottom of the press release,

11   it tells you they will consider licensing, but they want to

12   make sure that those licenses provide appropriate compensation.

13   Very consistent with what we've discussed.

14   **Q.**    Okay.  So let's turn to the next *Georgia-Pacific* factor,

15   and I think this is one under the economics column of your

16   chart.

17       How does the competitive relationship between the parties

18   affect the negotiation outcome here?

19   **A.**    This one is more important.  This shows that it is a

20   competitor-to-competitor hypothetical negotiation.  Sonos and

21   Google do compete.  Well, how do we know that?  I was able to

22   go back and look through the Google business records, and I

23   found several records where they talk about the competition

24   with Sonos.  And Sonos says similar.

25       What I show on the screen are specific documents from

**MALACKOWSKI - DIRECT / CARIDIS**

1    Google where they're comparing themselves to Sonos, and the

2    easiest part of all is the right side of the screen where they

3    simply show the Sonos products and the product that they think

4    from Google is the competitive product.

5        So clearly this is a competitor-to-competitor situation.

6    The royalty should be higher.

7            **THE COURT:**  What does -- help us understand.  What

8    is -- what product do they compete in or did they compete in?

9            **THE WITNESS:**  Your Honor, there are generally two

10   classes of products.  There are the entry-level products, which

11   are the Sonos Play 1 and the Google Home.  Those are the

12   products that sell for a hundred to $200.  You see those on the

13   left side.

14           **THE COURT:**  Are those speakers?

15           **THE WITNESS:**  They are speakers, yes.

16           **THE COURT:**  Okay.  And?

17           **THE WITNESS:**  And then there are also premium

18   speakers, Your Honor, and they compete with those as well.

19           **THE COURT:**  Now, I think I heard some testimony to the

20   effect that Google got out of the speaker market.  Did you hear

21   that?

22           **THE WITNESS:**  It got out of the premium speaker

23   market.  The high-end speaker that you see here I think was

24   last sold in, I believe, November of 2020; but to my

25   understanding, they are still selling other accused '885

MALACKOWSKI - DIRECT / CARIDIS

1  products.

2          **THE COURT:**  The lower end?

3          **THE WITNESS:**  Correct.

4          **THE COURT:**  Okay.  At least that's your assumption,

5  and they -- all right.  That's helpful to know.  Thank you.

6      Go ahead, Counsel.

7  **BY MS. CARIDIS:**

8  **Q.**  So you talked about Google recognizing the competition

9  between Google and Sonos internally.  Are you aware of any

10  public indications of that competition?

11  **A.**  Yes, from my research and my own experience.  If you go

12  to, for example, a Best Buy store, you'll see the Google

13  product right next to -- on the shelf to the Sonos product; and

14  the documents in this record that I've been privileged to see

15  talk about that as an intended strategy because of the

16  competitive relationship of the parties.

17  **Q.**  And can you -- next, turning to the next factor,

18  GP Factor 6, can you explain what derivative or convoyed sales

19  are?

20  **A.**  Yeah.  GP6 tells us to -- we need to not only look at the

21  goods that are covered by the patents, but if you sell a

22  patented product and that helps you to generate other

23  revenue -- a classic example would be you sell spare parts or

24  the old, if you sell the razor, you're going to sell the

25  blades -- well, in this case we have the same.

1    That part of Google's strategy is to capture the home by

2  putting out products into the marketplace because that allows

3  them to then generate advertising revenue, data revenue, and

4  other significant economic results from having these products.

5  **Q.**   And so what impact, if any, does *Georgia-Pacific* Factor

6  Number 6 have in this case?

7  **A.**   Two impacts.  And the bottom line is, it suggests that the

8  royalty rate would be higher if you're basing the royalty only

9  on the number of directly accused units; and then

10 qualitatively, it helps us to understand some of the accounting

11 information, which may show lower profits on the accused units

12 because they make it up on other products.

13 **Q.**   Let's turn to the next factor, GP Factor Number 7.  Can

14 you explain this factor and what effect it has on the

15 hypothetical negotiation?

16 **A.**   This one is simple.  It talks about whether the

17 negotiation is for a long time or a short period of time.  This

18 is one of those happy-in-the-middle factors.  It really doesn't

19 make a significant difference.  Google's expert agrees.  We can

20 skip this one.

21 **Q.**   Okay.  Without advancing the slide, can you explain what

22 GP Factor Number 8 is?

23 **A.**   GP factor 8 talks about the profitability and commercial

24 success of the accused products, and this speaks generally to

25 what I just referenced; that we look to see if Google is

1  successful in selling the products at issue or if they're

2  giving them away, what's the economic impact to them for that.

3      And what I found in my research is that there are other

4  significant benefits to Google from the products that are

5  accused aside from what the basic accounting information would

6  tell you.

7  **Q.**  And, again, without going into any numbers, can you just

8  give a little bit more description of the profitability of the

9  products at issue in this case?

10 **A.**  So in -- these products are often what we considered a

11 loss leader.  So they can be sold at an amount that doesn't

12 generate a net profit.  And so to understand why Google would

13 do that, it is in order to capture that home, to be able to

14 then deliver those advertisements and to collect that data.  So

15 that's part of the strategy of this business.

16 **Q.**  So moving to your final column of your *Georgia-Pacific*

17 factors, which are 9 and 10, can you describe what Factors 9

18 and 10 contemplate?

19 **A.**  Yes.  They relate to the technical benefits of old modes

20 or devices, the real value of the invention.

21     And in this case what I show on the screen is essentially

22 an excerpt from Dr. Almeroth's report.  I rely upon him for the

23 technical features of this product.  We heard his testimony

24 this week.

25 **Q.**  And do Google's proposed noninfringing alternatives impact

1    *Georgia-Pacific* Factors 9 and 10 in this case?

2    **A.**    They do.  If Google had alternatives they could advance,

3    they would suggest that, therefore, the benefits of these

4    patents are lower.

5         And as we've already talked about and as you heard from

6    Dr. Almeroth, there are no alternatives that Google can offer

7    or is, in fact, offering that are noninfringing and

8    commercially acceptable according to Dr. Almeroth.

9    **Q.**    And were you -- did you also see the video deposition

10    clips that were played several days ago relating to those

11    alternatives?

12    **A.**    I did, yes.

13         **MS. CARIDIS:**  Your Honor, permission to play two short

14    video clips from the deposition designations that were played

15    for the jury on Wednesday.

16         **THE COURT:**  Go ahead.

17         **MS. CARIDIS:**  Mr. Jay, can you please play

18    Mr. Shekel's deposition at page 99, lines 9 through 16?

19              (Video was played but not reported.)

20         **MS. CARIDIS:**  Mr. Jay, can you please play

21    Mr. Shekel's deposition at page 109, line 12 through line 19?

22              (Video was played but not reported.)

23    **BY MS. CARIDIS:**

24    **Q.**    Mr. Malackowski, you understand that the video clips that

25    we just saw were of a Google engineer discussing Google's

1    alleged noninfringing alternatives; right?

2    **A.**    That's my understanding.    A senior engineer.

3    **Q.**    And what do you take away from him testimony as it relates

4    to *Georgia-Pacific* Factors 9 and 10?

5    **A.**    So I evaluate this in the context of the larger record

6    understanding that Google goes through tremendous research to

7    understand what to deliver to their customers and that every

8    feature is important to them.

9        This speaks directly to what would happen at the

10    negotiation.    If Google came to the negotiation or their expert

11    said, "Well, we could do this or that," Sonos would say, "Well,

12    wait a minute.    Your senior engineer specifically looked at

13    that and said it would be a poor consumer experience.    That's

14    not commercially acceptable so you do have to pay us a fair

15    rate because it's important."

16    **Q.**    So then summing up, what conclusion do you come to with

17    respect to *Georgia-Pacific* Factors 9 and 10?

18    **A.**    That they should point to a higher royalty relative to the

19    benchmark.

20    **Q.**    And what is the next relevant factor to the hypothetical

21    negotiation?

22    **A.**    It's one I mentioned at the very beginning.    GP11 talks

23    about the extent and benefit of the invention.    And you

24    remember earlier I said one way to determine that is by the

25    extent of use or whether or not they promote the invention.

1    And so in my work, I went back to look through the Google

2 marketing documents; and what's shown on the screen, Slide 34,

3 is that Google did, in fact, promote this room -- this room

4 grouping feature to its customers.

5    You can see in the left side an example of "Let's play

6 party play list on my speakers.  Let's move from room to room."

7    And then on the right side they actually give the consumer

8 instructions of how to set up the groups that are accused.

9 **Q.**   And how does that affect the outcome of the hypothetical

10 negotiation?

11 **A.**   It points to a higher rate.

12 **Q.**   Can you explain to me what *Georgia-Pacific* Factor 12 is?

13 **A.**   Yes.  *Georgia-Pacific* Factor 12 is an important factor

14 with respect to these benchmarks.

15    You remember GP1 says let's look to the Google license --

16 I mean, the Sonos licenses for benchmarks.  GP2 says let's look

17 to the Google licenses for benchmarks.  GP12 says let's look to

18 analogous inventions in an analogous business.

19    So it's teaching me as an expert:  Put patent acquisitions

20 and patent licensing aside.  You need to do a broader, more

21 in-depth search, and so I did.  I looked to see if there were

22 other technologies that would provide a similar benefit, and I

23 looked to see if there was a nexus between those technologies

24 in both the benefits and the parties here.  So I did -- I was

25 able to find that actually.

**MALACKOWSKI - DIRECT / CARIDIS**

1    **Q.**    And what did you find?

2    **A.**    So if you go to Slide 12, this will be the third slide I

3    tell you is really important because it's a great, in my

4    opinion, benchmark for GP Factor 12 as opposed to GP1 and 2.

5            **THE COURT:**  All right.  Before we get started, in your

6    notes you should make a note or an asterisk that there is a

7    contention in this case and I will have to make a ruling about

8    IFTTT.  I haven't made the ruling yet, but one side or the

9    other wants me to exclude all of the testimony of this witness

10   concerning IFTTT.

11        I don't need to get into the reasons for that now, but I

12   don't -- if we come to that, I want you to be able to sever and

13   delete that from your analysis over there in the jury box.  So

14   draw a line or an asterisk or something.

15        I'm not saying that we're going to do that.  I'm saying it

16   might happen, and I want you to be able to adjust it if it

17   does.

18        So I'm sorry for the interruption, but please go ahead and

19   the floor is yours with respect to IFTTT.

20           **MS. CARIDIS:**  Thank you.

21   **BY MS. CARIDIS:**

22   **Q.**   Mr. Malackowski, can you explain to the jury what IFTTT is

23   capable of?

24   **A.**   Yes.  So first to put it in context, what are we trying to

25   do?  We're looking for technology that allows you to group

1    speakers.  We have a range of options for that, and the jury's

2    has already seen this.

3        The first option is people can cut holes in the walls and

4    run wires and connect them.  The other option is the

5    sophisticated technology of the patents in suit with integrated

6    software, but there are things in between; and in between one

7    of those options that's very close, as we'll see, to the

8    patents in suit here is an application that you put on your

9    control device, your phone, called if this, then that, IFTTT.

10    Not the most creative name, but it kind of gets the point

11    across.

12        And you can download the app and you can very simply

13    program it to group your speakers, save those groups, and

14    invoke them later, and we heard Dr. Almeroth explain at some

15    detail how this happened.

16    **Q.**    Does IFTTT offer different levels of features?

17    **A.**    They do.  There are basically good, better, best options

18    you can have for IFTTT.

19        The core plan is a free plan where you can do limited

20    things.  The pro plan costs you in this case $2.50 each month,

21    but you can do more sophisticated things.  And then there's a

22    pro plus where you can do custom programming.

23        As you heard Dr. Almeroth talk about yesterday, in order

24    to group speakers to have multiple speakers in a group, you

25    need what are called multiaction applets, which means you need

1  to have the IFTTT pro plan to be comparable.

2      But that's really helpful because it tells us -- IFTTT

3  they say can do most anything under the sun, but those are all

4  the free things.  You know, what's the weather forecast?  I use

5  it to set the news for me.

6      But if you want to do the more advanced features that are

7  analogous to this patent in suit, you need to pay that fee and

8  so that's what I focused on for my work.

9  **Q.**  And how many applets are needed to create overlapping zone

10  scenes?

11  **A.**  You need at least two; one for each zone scene and if they

12  share a speaker, they would overlap.  Now, many customers are

13  going to create many more than two.  I create more than two,

14  but you need at least two to have that overlap.

15  **Q.**  And so does the IFTTT multiaction applets that you're

16  talking about, do they satisfy all of the functionality of the

17  asserted patents?

18  **A.**  Good question because they don't.  They are not quite as

19  good.

20      So one of the considerations I had was to look at the

21  capability of the Sonos patents in suit, as I understood from

22  Dr. Almeroth and the record; look at the capability of IFTTT,

23  also as I understood from Dr. Almeroth and the record; and you

24  can see both create predefined speaker groups.  Both can save

25  predefined speaker groups.  Both allow you to invoke predefined

1  speaker groups at a later time.  Both allow you to name the

2  predefined speaker group to a common theme, such as morning,

3  evening.  Both allow you to have predefined speaker groups that

4  will overlap.

5      And the difference that I found is that the

6  synchronization for IFTTT is not the same, not as good as what

7  the Sonos technology is.

8      So as a damages expert what that tells me is my benchmark

9  of $2.50 that I'm starting with, that's probably a little low

10  because it doesn't have all the features; but it certainly, in

11  my opinion, is comparable and it's exactly the type of thing

12  that I believe *Georgia-Pacific* 12 looks for.

13  **Q.**  And so what is the value that consumers are willing to pay

14  for IFTTT?

15  **A.**  So it varies.  IFTTT was -- I'm just going to call it

16  IFTTT.  IFTTT was a startup.  So they started giving it away

17  for free.  Eventually they began to charge.

18      As I show on the next slide, Slide 39, it was really

19  interesting, this is kind of a -- I guess a tech thing, they

20  let you set your own price.  They thought it would be worth

21  9.99 a month, but you could pick a lower price -- frankly, I

22  don't know who wouldn't -- but it couldn't go below $1.99.

23      So in this negotiation when Google and Sonos are talking

24  about what this type of technology is worth, Google is going to

25  say, "Look you, know, if anything, it's got to be the lowest

1    price possible."  So I used -- I started with the $1.99 for my

2    analysis.

3    **Q.**  And just so we're clear, the $1.99 that you're using as

4    indicated in Slide 39 is for the pro version and -- is for the

5    pro version that you are paying for in order to get multiaction

6    applets; correct?

7    **A.**  Yes.  That is what's required to be comparable to this

8    invention.

9    **Q.**  So, then, why is the value that a consumer, like yourself,

10   would pay to IFTTT relevant to the amount Google would pay

11   Sonos in a hypothetical negotiation?

12   **A.**  Well, it's obviously a key question; right?

13       Google in licenses technology -- or acquires technology to

14   provide to their customers.  That's the entirety of their

15   business, and you see that substantially with the app platform.

16   They'll allow technology innovators to put the apps on their

17   platform, not because Google people get excited about it --

18   they probably do -- but because consumers can then access that.

19   And consumers pay a fee in many cases for those apps, and then

20   Google keeps part of the fee as its business model.

21       So I'm not saying that Google would pay Sonos 1.99 because

22   that's what customers pay; but what I'm saying is Google would

23   begin to figure out how much of that 1.99 they could keep for

24   themselves, and that's what's informing of a royalty.

25       And as you'll see, we're going to go way down from 1.99.

1  That's just where we're starting.

2  **Q.**   So I think you stated that the 1.99 is a monthly fee, and

3  we can see that on the screen here; right?

4  **A.**   Yes.

5  **Q.**   So is it your assumption that Sonos charges Google a

6  monthly fee as well?

7  **A.**   Well, I certainly thought about that.  And Sonos would

8  definitely like to charge a monthly fee because those numbers

9  would become significant, but Google would push back and Google

10 would say "That's not custom and practice in the industry.

11 When we look at the Lenbrook agreement or other agreements,

12 you're not charging these people monthly."

13     And so the next thing that I did is I determined what

14 would be a reasonable one-time payment per device starting with

15 this monthly analysis, and the way that I did that is looked to

16 the average life of these products.

17     Now, speakers can last a decade -- I have Sonos speakers

18 that are older than my kids -- but smartphones don't last very

19 long, a couple of years.  And so what I said is to be

20 conservative, to work in Google's benefit, let's just assume

21 the monthly fee is only going to last two and a half years, and

22 it'll be okay that speakers last longer.  And so what is the

23 value today of paying 1.99 per month for two and a half years

24 discounted back?  And that's how I began the analysis.

25 **Q.**   Has IFTTT always charged a fee for its services?

1   **A.**    No.  As I indicated, they started giving it away for free.

2   They always knew they were going to charge a fee, but they were

3   trying to build an audience.

4        **THE COURT:**  What did they charge in November of 2020

5   and whatever the relevant dates were again?

6        **THE WITNESS:**  I believe, Your Honor, right at that

7   time they started charging the pro fee; but to your question,

8   it's really important, if you go back to the first negotiation

9   a year earlier, it was free at that time.

10  **BY MS. CARIDIS:**

11  **Q.**    And so if it was free at the time of the first

12  hypothetical negotiation, how are you able to use that price in

13  your analysis here?

14  **A.**    Fair, good question.

15       So two things.  One is, the point of a *Georgia-Pacific*

16  analysis, one of the factors calls you to specifically look at

17  the term of the license, what's expected to happen over the

18  next years while the patent's valid.  So they would sit down

19  and say:  Well, even if IFTTT gives it away for free today

20  because they're trying to build an audience, A, is that

21  comparable to Google because Google has an audience?  And, B,

22  would they do that for the rest of their business without any

23  ad support?  And of course they wouldn't.  They're not in the

24  business to give it away free.

25       So in my opinion as an expert, the parties would consider

1    the economic value that IFTTT would be charging as a starting

2    point for comparable.

3    **Q.**    Speaking of the economic value of IFTTT, did you account

4    for the fact that IFTTT can do more than just group speakers?

5    **A.**    Yes.  In two ways.  One, remember the free version does

6    all kinds of things that are one-step apps and they'll turn on

7    my lights, all that's free.  I don't count for that at all

8    because the pro plan is only charging you for those enhanced

9    features like the multistep apps.  So we're already pushing

10   aside all of the simple stuff.

11        And then, second, the pro plan uses -- allows for 20 apps

12   for $2.50.  I'm only going to take two applets because that's

13   the minimum that's needed to invoke the invention, even though

14   I recognize that many users have more than two groups, but that

15   would be to Google's benefit.  So I'll essentially reduce my

16   starting point by 10 percent, 2 out of 20.

17   **Q.**    You reduce your starting point by 10 percent or to

18   10 percent?

19   **A.**    To 10 percent.  I'm sorry.  I reduce it by 90 percent.

20   **Q.**    Did you apportion the IFTTT value calculations in any

21   other way?

22   **A.**    Yes.  The other thing that I thought about is:  Well,

23   Google might say, "Yeah, this is an infringement every time

24   it's put on a phone or speaker, but not everybody has a lot of

25   speakers in a group.  How do you account for that?"

1      And so I did more research, and I found that there is data

2  showing, both within Sonos and publicly, that only about

3  29 percent of households who have speakers have multiple

4  speakers.

5      So I reduced it by another 70 percent.  So I took the

6  lowest price, cut it by 90 percent, cut it by 70 percent, cut

7  it by two and a half years as opposed to a lifetime.

8  Q.   From an economics -- from a perspective of your economic

9  analysis, does it matter how often those households actually

10  group speakers?

11 A.   No.  The benefit of the invention is you usually group

12  once, play many times.  You group and you save, and then you

13  can invoke the groups on a daily basis or as often as you like.

14  You don't need to regroup every time.

15 Q.   Nevertheless, are you aware of any data showing that the

16  accused Google speakers here have been configured into groups?

17 A.   Yes.  One of the documents that the Google expert points

18  to is there is for a limited period of time some Google

19  information that shows how this was actually used, but it

20  doesn't show how often they invoke it.  Just how it was

21  grouped.  So I don't think it's relevant to the calculation.

22      THE COURT:  And the "it" you're referring how -- "it"

23  was used, you mean IFTTT or --

24      THE WITNESS:  Grouping speakers, Your Honor, the

25  infringement.

1          **THE COURT:**  All right.  So you're talking about the --

2    what's the alleged invention as opposed to IFTTT.

3          **THE WITNESS:**  Correct.

4          **THE COURT:**  Okay.

5    **BY MS. CARIDIS:**

6    **Q.**    So I believe earlier you mentioned that you convert the

7    monthly IFTTT rate to a per-device rate.  Can you kind of

8    describe what calculations you did to get between those two

9    points?

10   **A.**    Yes.  So it's a spreadsheet where I show the monthly data

11   by patent.  We then bring it back to present value.  And so the

12   bottom line conclusion is for the '966 patent, the per-unit

13   rate before we start these sharing and apportionments would be

14   $4.04; and for the '885 patent, the per-unit rate would be

15   $4.27.

16   **Q.**    And can you just describe the present value factor that

17   you have on the screen here?

18   **A.**    Yes.  I went back to the date of each hypothetical

19   negotiation, and I found what's called a discount rate.  It's a

20   dollar in the future is worth than less than a dollar today.

21   So we discount those amounts back to the date of hypothetical

22   using the weighted average cost of capital of Google.

23   **Q.**    And then what did you do after getting to these discounted

24   IFTTT prices?

25   **A.**    Then I took into account the households that have multiple

1  speakers.  So this is one of those chalkboard charts where the

2  numbers are important.

3      So ultimately I believe that one of the factors that would

4  go into the hypothetical negotiation would be the

5  *Georgia-Pacific* Indicator Number 12 of $1.17 for the '966

6  patent and $1.24 for the '885 patent, and that's what would be

7  negotiated between the parties of how far they would share it.

8  **Q.**  Let's review.  We went through a lot of numbers.  There's

9  a lot of things on the screen.  Can we just review the steps

10  and explain what they are and if they favor Google or Sonos in

11  each of your steps of apportionment here?

12  **A.**  I prepared a summary of that.

13      So the first thing is we have to pick a subscription

14  price, and I picked the lowest one that was available, $1.99

15  per month.  So that would be in Google's favor.

16      Second, is although that gets you 20 applets and many

17  people might use all 20, I said the minimum required to invoke

18  the invention is 2 so I reduced by 90 percent, 10 percent of 2

19  of 20.  That was in Google's favor.

20      Then I said rather than account for this for the full life

21  of products, and speakers which can last many years, we're

22  going to limit the economic analysis to a shorter period, two

23  and a half years.  That was in the benefit of Google.

24      And then finally I said, even though every sale would be

25  an infringement, let's take into account the use.  And only

1    about 29 percent of the households have multiple speakers that

2    could use it, so I reduced it by another 71 percent.  That was

3    to the benefit of Google.

4    Q.    Thank you.

5          So that was *Georgia-Pacific* Factor 12.

6          Why don't we turn to the next *Georgia-Pacific* factor, and

7    can you tell us what that is?

8    A.    *Georgia-Pacific* Factor 13 talks about that sharing, how

9    would they share those indicators; or going back to

10   *Georgia-Pacific* 1, how would they share the royalty rates that

11   they saw.

12         And in the Google records there are literally thousands,

13   tens of thousands, of applications that are on the Google

14   platform that if their revenue bearing followed this procedure,

15   that 70 percent goes to the innovator, 30 percent goes to

16   Google.  And I believe the same would apply here, so I used

17   that sharing principle.

18   Q.    Turning to GP Factor Number 14, I believe you've mentioned

19   this kind of throughout this morning, but did you consider

20   the -- or rely on the opinions of other experts in this case?

21   A.    Yes.  Dr. Almeroth, as I've described.

22   Q.    Okay.  And then summing it up, can you tell us what are

23   the most valuable inputs that would be brought to the

24   hypothetical negotiation table?

25   A.    This is the last one.  So this is the good news.

1    *Georgia-Pacific* Factor 15 has us bring it all together.

2         So the key inputs for me would be we know from GP1 that it

3    would be unit based; we know that from GP12 there are analogous

4    inventions and analogous businesses that can be apportioned,

5    and we know from GP9 and 10 that there's no alternatives

6    available.  So with that input, we have the sharing analysis

7    from GP13 and that's how we ultimately would get to our

8    royalty.

9    **Q.**   And what were your conclusions regarding the

10   *Georgia-Pacific* factors here?

11   **A.**   So these are numbers you've all seen before.  We start

12   with the $1.17 for the '966, the $1.24 for the '885, we apply

13   the 70/30 split, and we get a reasonable royalty per unit for

14   the '966 of 82 cents and a reasonable royalty per unit for the

15   '885 of 87 cents.

16   **Q.**   So let's put actual dollars and cents to this framework.

17        What is the comparable technology market price for your

18   conclusions?

19   **A.**   So if you then take these figures and you multiply it by

20   the extent of use that we talked about -- so the final slide,

21   so to speak -- is for the '966 patent, there are 94,606,967

22   instances of accused infringement multiplied by 82 cents.  In

23   my opinion, the damages which this jury should award for that

24   patent is $77,546,923 for the period of November 5th, 2019,

25   through September 30th, 2022.

1    Likewise, for the '885 patent, the accused units are

2    14,133,558.  The per-unit royalty would be 87 cents.  The total

3    damages would be $12,246,294 for the period of November 24th,

4    2020, through November 15th, 2022.

5    **Q.**   And, Mr. Malackowski, do these reflect reasonable royalty

6    damages in your opinion?

7    **A.**   In my opinion, they do, both because they rigorously

8    follow the *Georgia-Pacific* factors, they are consistent with

9    the market approach of GP1 for the larger portfolio of or

10   buffet; and if you look at it in the context of these products,

11   this represents well less than 1 percent, in some cases

12   .1 percent, of the revenues of the products at issue.  So it's

13   a very modest fee in consideration of the benefits, in my

14   opinion.

15   **Q.**   Thank you for your time, Mr. Malackowski.

16        **MS. CARIDIS:**  I pass the witness.

17        **THE COURT:**  All right.  Thank you.

18   Cross-examination.

19                    **CROSS-EXAMINATION**

20   **BY MS. BAILY:**

21   **Q.**   Good afternoon, Mr. Malackowski.

22   **A.**   Good afternoon.

23   **Q.**   I believe you started your testimony by telling the jury

24   that if there was no infringement found in this case, there

25   would be no damages; is that right?

1    A.    And I stand by that, yes, ma'am.

2    Q.    All right.  And it's also true that if the jury finds the

3    patents invalid, there would be no damages in this case either;

4    correct?

5    A.    Of course.

6    Q.    So if the jury finds either noninfringement or invalidity,

7    they can disregard everything you have to say; right?

8    A.    I hate the word "disregard," but they certainly wouldn't

9    factor it into their opinions.

10   Q.    Now, there are three common ways that folks in your line

11   of work evaluate reasonable royalty damages in the context of a

12   hypothetical negotiation; right?

13   A.    I assume you're referring to the cost market and income

14   approach?

15   Q.    That's right.

16   A.    Yes, ma'am.

17   Q.    And in this case you used the income approach; correct?

18   A.    Well, I considered all three as described in my testimony.

19   Q.    Your IFTTT analysis, you considered that under the income

20   approach in this case?

21   A.    Income and market, yes.

22   Q.    And the income approach attempts to value an asset by

23   measuring the benefits derived from use of the asset; correct?

24   A.    True.

25   Q.    And the type of asset we are trying to value here is a

1    patent; correct?

2    **A.**    Yes, ma'am.

3    **Q.**    And so the income approach attempts to value a patent by

4    measuring the benefits derived from use of the patent; correct?

5    **A.**    Of the benefits of the technology that's protected by the

6    patent, correct.

7    **Q.**    Well, sir, you agree that the income approach attempts to

8    value an asset by measuring the benefits derived from use of

9    the asset?  You just agreed with me on that; right?

10   **A.**    And I think I'm saying the same thing.  Yes, of course.

11          **MS. BAILY:**  Let's show DDX6.1 because this is

12   important.

13   **BY MS. BAILY:**

14   **Q.**    You would agree that the income approach to coming up with

15   a reasonable royalty in this case attempts to value a patent by

16   measuring the benefits derived from use of the patent; right?

17   **A.**    That's the question you just asked me.  I don't disagree;

18   but if you look up income approach in a textbook, you're going

19   to get pages.  So you're just capturing the essence of the

20   idea.  I don't dispute this.

21   **Q.**    So in the context --

22          **MS. BAILY:**  You can take that down, Mr. Fisher.

23   **BY MS. BAILY:**

24   **Q.**    In the context of the income approach and now you say also

25   the market approach, we've heard that you based your

1  calculation of a reasonable royalty in this case on the IFTTT

2  app; correct?

3  **A.**   In part, yes, ma'am.

4  **Q.**   And you hadn't used the IFTTT app before your work on this

5  case; correct?

6  **A.**   No.  I have Sonos speakers.  I can group them separately.

7        **THE COURT:**  I didn't hear the answer.  Is the answer

8  yes or no?

9        **THE WITNESS:**  No, I did not.  I don't --

10       **THE COURT:**  All right.

11 **BY MS. BAILY:**

12 **Q.**   And you didn't learn about the IFTTT app from Sonos;

13 right?

14 **A.**   That was my independent research.  No, correct.

15 **Q.**   Nobody at Sonos told you that Sonos relies on the IFTTT

16 app to negotiate license agreements in the real world?  Nobody

17 from Sonos told you that; right?

18 **A.**   No.  You wouldn't expect that, ma'am.

19 **Q.**   Now let's look at how the IFTTT app advertises itself.

20       **MS. BAILY:**  Let's bring up DDX6.2.

21             (Pause in proceedings.)

22 **BY MS. BAILY:**

23 **Q.**   Do you recognize this?

24 **A.**   Yes.  I think I actually quoted this in my testimony.

25 **Q.**   And so this is how IFTTT presents and sells itself to the

1  world; right?

2  **A.**    In part.

3  **Q.**    And I think you explained this earlier, but just to make

4  sure the jury understands, IFTTT stands for if this, then that;

5  right?

6  **A.**    Exactly.

7  **Q.**    And you agree that -- I'm going to start calling it IFTTT,

8  because it's hard to do the IFTTT.

9        You would agree that IFTTT has a wide range of

10  capabilities and a lot flexibility; fair?

11  **A.**    Yes, ma'am.

12  **Q.**    And that wide range of capabilities and flexibility

13  extends to all kinds of software and services; right?

14  **A.**    I don't dispute that.

15  **Q.**    And Dr. Almeroth testified yesterday that the pro version,

16  the version you have to pay for, of IFTTT could be used in

17  millions of different ways.  Do you disagree?

18  **A.**    I don't disagree.  It's like, I think, the tube of glue

19  analogy.  You can use glue for a lot of things.

20  **Q.**    But you agree that the pro version of IFTTT can be used

21  for millions of different purposes; correct?

22  **A.**    Conceptually theoretically, yes.

23  **Q.**    If you pay for the pro version, you can write what are

24  called applets in the form of if this, then that and that;

25  right?

1  **A.**    Exactly.

2  **Q.**    And so you're paying for the ability to not just do if

3  this then, that but to do instead if this, then that and that;

4  right?

5  **A.**    And that and that, the multistep function.

6  **Q.**    And so with the pro version of IFTTT, you could build an

7  applet to use on your vacation, say, and you can say "If I take

8  a picture, then I will -- then post it to my travel blog and

9  post it to my Instagram"?

10 **A.**    Sure.

11 **Q.**    And then when you get home from vacation and you're back

12 at work, you can change your applet and you can change it to

13 say "If it's 7:00 a.m., then trigger an alarm on my phone and

14 send me a notification from my calendar to tell me when my

15 first meeting is"?  That's another example; right?

16 **A.**    Or program a new applet, sure.

17 **Q.**    And then a month later you can change your applet again,

18 and you can just do something fun.  You can make it so if the

19 space station is over my house, send me a notification and send

20 me a link to a live video from NASA; right?

21 **A.**    Sure.

22 **Q.**    None of these examples have anything to do with speaker

23 grouping; correct?

24 **A.**    They are a tool set that your particular examples do not.

25 **Q.**    And none of these examples have anything to do with a

**MALACKOWSKI - CROSS / BAILY**

1   smart home; right?

2   **A.**   Well, you execute the if on the smartphone.  That's the

3   control device.  So I would argue they do have a lot to do with

4   the phone.

5   **Q.**   Sorry.  I might have misspoken or just not have been

6   clear.  My question was actually:  None of these examples have

7   anything to do with a smart home?

8   **A.**   It depends what the application is.

9   **Q.**   Well, my three examples.

10  **A.**   I don't know the context of your home, but I'm happy to

11  admit that you can find three examples that don't.

12  **Q.**   And so if you're interested in writing little applets like

13  this, you can do millions of things with access to the

14  pro version of IFTTT; right?

15  **A.**   You're speaking in these broad, general numbers, millions.

16  I don't know.  You can do a lot.

17  **Q.**   What Dr. Almeroth did in this case is use the pro version

18  of the IFTTT app to make an applet where the if was pressing a

19  button and the thens would be to play on a first speaker --

20  play music on a first speaker and play music on a second

21  speaker.  Is that your understanding?

22  **A.**   Of the first grouping he created, that would be my

23  understanding.

24  **Q.**   And you understand that Dr. Almeroth's applet does not

25  sync the music played back by those two individual speakers?

1    Do you understand that?

2    **A.**    Yes, as he and as I described today, that's one of the

3    deficiencies of IFTTT as compared to the patented technologies.

4    **Q.**    So even if you're trying to play the same song to both

5    speakers, the songs aren't playing at the same time when you

6    use IFTTT; right?

7    **A.**    They're not in the same level of synchronization that the

8    Sonos patents are.  Dr. Almeroth expressed the technical

9    difference.  I leave that to him.

10   **Q.**    Right.  But just for the jury's purposes, the

11   synchronization -- the lack of synchronization means that if

12   you play the same song using IFTTT to two speakers, you can't

13   listen to the music?

14   **A.**    Well, it depends on the degree of synchronization.  That

15   is a limitation of the app.  The patents are more valuable than

16   IFTTT.

17   **Q.**    And the limitation in IFTTT is significant, right, because

18   if I -- if my intent is to group two speakers and I want to

19   listen to music on two speakers and then I perform the app that

20   Dr. Almeroth did, I'll figure out that it doesn't work?  Right?

21   **A.**    So you're asking me sort of a qualitative question.

22        I mean, people do think of using IFTTT to group speakers

23   so it can be done, but there are limitations to it.

24   **Q.**    Okay.  Well, let's assume that a person created the

25   applets that Dr. Almeroth created in this case thinking that

1    they were going to be able to use them to group their speakers.

2        Are you with me?

3    **A.**   So far.

4    **Q.**   And once they created the applets and tried it out, this

5    person would realize that they hadn't actually grouped their

6    speakers together; right?

7    **A.**   Well, I would disagree.  You may think it's something more

8    technical that I'm referring to, but I think you do group the

9    speakers.

10   **Q.**   Well, if somebody used Dr. Almeroth's applets and tried it

11   out, they would realize that the music isn't synced between the

12   speakers; correct?

13   **A.**   No.  It depends on the application.  If you're playing in

14   the kitchen and then on the outdoor deck, that may work

15   perfectly fine.

16       That's really not an issue that's relevant to me, but I

17   think it depends upon how close the speakers are, how you set

18   it up.  There may be some noticeable difference, there may not

19   be.

20   **Q.**   And you just said that's not relevant to your analysis;

21   right?

22   **A.**   Correct, because I recognize that synchronization is not

23   provided in IFTTT but is an additional feature of the patent.

24   It still makes it a comparable starting point, however.

25   **Q.**   If grouping speakers was the only thing that someone

MALACKOWSKI - CROSS / BAILY

1  wanted to do with the IFTTT app and they tried to do it with

2  Dr. Almeroth's applets, they would be unsuccessful?

3  **A.**   I disagree.  I mean, one example, at Sonos I group all the

4  bedrooms because I wake my kids up in the morning with music,

5  and I can't hear what's playing in my daughter's room if it's

6  slightly off from what's playing in my room.  IFTTT would be a

7  perfect application for that.

8  **Q.**   If somebody -- let me ask you this:  If somebody purchased

9  a subscription to IFTTT because it's flexible and can do a lot

10 of things, they could try to group their speakers how

11 Dr. Almeroth did and then when they saw that the music wasn't

12 synced, they could then use the same two applets to do

13 something else; correct?

14 **A.**   It's a tool.  It's a tool with value, and they could use

15 the tool for other purposes.  I do not dispute that.

16 **Q.**   And so the person might continue to pay the subscription

17 fee for reasons totally unrelated to speaker grouping; correct?

18 **A.**   Sure.

19 **Q.**   And when you were doing your royalty calculation, you

20 didn't try to figure out how many people had purchased a pro

21 subscription from IFTTT, did you?

22 **A.**   "Try to figure out" is a very broad question.  I

23 considered that issue.  I can tell you what I did find if you

24 want to know, but it's something I considered.  I haven't

25 quantitatively factored that in.  I don't believe you should.

**MALACKOWSKI - CROSS / BAILY**

1   **Q.**   In your view, it is irrelevant whether anyone has actually

2   purchased a pro subscription from IFTTT; correct?

3   **A.**   It is because they don't need it because all the Google

4   speakers have it, as do the Sonos speakers.

5   **Q.**   Well, for a large portion of the time that you're dealing

6   with, Sonos speakers didn't have the patented technology.

7   You're aware of that; right?

8   **A.**   True.

9   **Q.**   So they were conceived I think 15 years before the feature

10  was actually implemented by Sonos.

11  **A.**   True, but Sonos is one of the applets on IFTTT.  So you

12  could group your speakers before they offered the invention.

13  **Q.**   When you were doing your royalty calculation, you didn't

14  try to figure out if anyone besides Dr. Almeroth had ever used

15  the IFTTT app in the way Dr. Almeroth did; correct?

16  **A.**   Correct.  That would not be relevant, in my view.

17  **Q.**   That's not relevant in your view?

18  **A.**   True.

19  **Q.**   And so even though your opinions are based on a consumer's

20  willingness to pay for IFTTT, you've never actually determined

21  whether anyone has paid for IFTTT; correct?

22  **A.**   I've looked into that information.  I know people have

23  actually paid for IFTTT, hundreds of thousands of people.  I

24  can't tell you they've specifically used it for grouping

25  speakers.  We can see on forums that people talk about using

1    IFTTT for grouping speakers, but I haven't called them.    I

2    don't know who they are.    That's all true.

3    **Q.**    Everything that you just said you looked into well after

4    proffering your opinions and doing your calculations in this

5    case; correct?

6    **A.**    In response to the Google's expert's critique, yes, ma'am.

7    It was my follow-up.

8    **Q.**    I'm going to switch gears for a minute and we're going to

9    come back to IFTTT.    I'm going to switch gears.

10        When you were doing your calculations, your understanding

11    was that the patents in this case provided a new way of

12    grouping networked media players, such as smart speakers,

13    together for synchronous playback of media; correct?

14    **A.**    I would agree with that.

15    **Q.**    So you understood that the patents are about one way of

16    grouping speakers?

17    **A.**    Sure.

18    **Q.**    But you didn't take into account any usage metrics for

19    grouping in your royalty calculations for the patents; correct?

20    **A.**    I don't understand that question.    All of the accused

21    units is a metric of the grouping or capability of grouping.

22    So maybe I don't understand your question.

23        **MS. BAILY:**    Let's play the deposition at 244:16 to

24    244:19.

25        (Video was played but not reported.)

1          **THE COURT:**  Louder.

2                  (Video was played but not reported.)

3    **BY MS. BAILY:**

4    **Q.**   And what that means is that you did not take into account

5    how many people in the real world actually group their

6    speakers; correct?

7    **A.**   I did not mathematically know the actual number.  I took

8    into account the number of people who could through the

9    70 percent reduction, but I think that's -- your question is

10   fair.

11   **Q.**   Well, and to that 70 percent reduction, you agree that

12   even people who have many speakers don't necessarily group

13   them; right?

14   **A.**   I do.

15   **Q.**   And there are a lot of things that people do with their

16   speakers that have nothing to do with grouping; correct?

17   **A.**   Sure.

18   **Q.**   You can play music on a speaker without grouping it;

19   right?

20   **A.**   Of course.

21   **Q.**   You can set a timer that has nothing to do with grouping?

22   **A.**   On certain speakers you can.

23   **Q.**   You can say "Hey, Google" or "Hey, Alexa" and ask what the

24   weather will be tomorrow without grouping your speakers;

25   correct?

1   **A.**    Yes, ma'am.

2   **Q.**    You can use audio apps like the Disney storytelling app

3   without grouping; correct?

4   **A.**    Yes, ma'am.

5   **Q.**    And none of that has anything to do with the patents

6   because the patents are about a specific way of grouping.  You

7   agree?

8   **A.**    Well, it depends.  If the functionality is within each of

9   those speakers in your example, they do have something to do

10  with the patents because they're infringing devices; but the

11  particular use case that you cited would not invoke a use

12  method, as I understand it, of the patents in suit.

13  **Q.**    Just to be clear, in this case you have assessed a royalty

14  on a single speaker that has never been grouped with any other

15  speaker with the Home app; right?

16  **A.**    I am required to assess a royalty on each and every

17  infringement.  I do take into account that in many cases that

18  won't be used, that's the 70 percent reduction, but there is a

19  minimum measure of damage for each instance of infringement.

20  **Q.**    Your reduction has nothing to do with the use of grouping

21  because you agree that even people who have many speakers don't

22  necessarily group them; right?

23  **A.**    Those aren't inconsistent.  It does have to do with

24  grouping because you can't group if you don't have multiple

25  speakers, but I also agree with you that some people have

1    multiple speakers and don't group.

2    **Q.**   As another example, you're assessing a royalty on somebody

3    with an Apple phone that has a Google Home app but no speakers

4    at all?

5    **A.**   Yes.  That is an infringing device that would have

6    benefits because you have the option of using it in the future.

7    I take into account the fact that not everybody uses it, but it

8    would require a royalty.

9            **THE COURT:**  All right.  I need to tell the jury, this

10   is an important point that I may give you later an instruction

11   on whether or not what the witness just said is true as to

12   whether or not it -- a phone by itself untethered to any

13   speaker is infringing.

14       That's an important issue in this case.  I'm not yet ready

15   to make a ruling.  What the witness just said is in contention

16   so keep that in mind.

17       Next point.

18   **BY MS. BAILY:**

19   **Q.**   And just to be clear, you did not use usage metrics for

20   grouping functionality in your reasonable royalty calculations

21   for the zone scene patents?

22   **A.**   I think that's true, correct.

23   **Q.**   You've never -- you didn't take into account evidence from

24   Sonos as to how many Sonos users group their speakers; correct?

25   **A.**   True.  My focus was on the infringement, not Sonos'

1    activity.  So that's fair.

2    **Q.**    You didn't ask Sonos to give you any information about how

3    often speaker grouping is used; correct?

4    **A.**    Well, that's a very broad question.  I do have information

5    that they consider it important -- they promote it, it was a

6    key feature -- but I don't incorporate any statistics because

7    I'm focused on Google's use.

8    **Q.**    You didn't do a survey of people who own three or more

9    speakers to see how many of them group their speakers?

10   **A.**    Of course not.

11   **Q.**    You've seen surveys like that done in other patent cases

12   you've been involved in; right?

13   **A.**    There is survey evidence, for example, from Google in this

14   case.  So, sure, it's not infrequent to see surveys.

15   **Q.**    But you didn't do a survey here?

16   **A.**    I did not.

17   **Q.**    And in this case I think you've mentioned that you're

18   aware that Google produced usage metrics regarding its grouping

19   functionality; correct?

20   **A.**    I mentioned that in my direct.  It was for a limited

21   period of time.  I don't believe it would be applicable to the

22   analysis, but there is some data showing actual infringement.

23   **Q.**    You're aware that Google produced usage metrics regarding

24   its grouping functionality?

25   **A.**    I think that's the same question.  Yes, of course.  Same

1    answer.

2    **Q.**    You didn't take that information into account when you

3    calculated your royalty?

4    **A.**    No, I don't believe that would be a proper measure for all

5    the reasons I discussed today.

6    **Q.**    Just to be clear, you also didn't try to figure out how

7    many people group their speakers in the way that is actually

8    described by the patent; correct?

9    **A.**    As I understand your question, you're asking me about

10    infringement and I'm assuming infringement.  So, no, that's not

11    a separate analysis that I did.

12    **Q.**    That wasn't quite my question.  You didn't try to figure

13    out how many people actually group their speakers in the way

14    that is described in the patents?

15    **A.**    I don't believe that data is available.

16    **Q.**    You understand that some types of speaker grouping are not

17    covered by the patents; correct?

18    **A.**    Yes, ma'am.

19    **Q.**    I want to talk just for a few minutes about the Home app.

20    **A.**    Okay.

21    **Q.**    There are a lot of things you can do with the Google Home

22    app; correct?

23    **A.**    There are.

24    **Q.**    A lot of them have nothing to do with speakers?

25    **A.**    I agree.

**MALACKOWSKI - CROSS / BAILY**

1  **Q.**  You can control your lights?

2  **A.**  Yes, ma'am.

3  **Q.**  You can control your thermostat?

4  **A.**  I personally do.

5  **Q.**  You can control your oven?

6  **A.**  I'm sure.  That one I haven't done, but I'm presuming you

7  can.

8  **Q.**  You can control your outdoor cameras?

9  **A.**  Yes.

10 **Q.**  And you would agree that there are many people who

11 download the Home app onto their phone who do not have even one

12 speaker?

13 **A.**  I suppose that is true.

14 **Q.**  And you didn't try to estimate how many people who have

15 the Home app on their phone actually use it to group three or

16 more speakers; correct?

17 **A.**  Only to the extent of at the negotiation looking at the

18 infringing base and adjusting it downward by that 70 percent

19 factor.  That would be what would be examined in a go-forward

20 hypothetical, and I think that would be a reasonable

21 conclusion.

22 **Q.**  After -- after you did your IFTTT analysis, you came to a

23 number; right?

24 **A.**  Yes, ma'am.

25 **Q.**  And you split the results with 70 percent going to Sonos

1   and 30 percent going to Google?

2   A.   Correct.

3   Q.   And to arrive at that split you relied on the Google Play

4   Store service fees; right?

5   A.   Generally, yes.

6   Q.   And the Google Play Store is a marketplace where app

7   developers sell their products; right?

8   A.   Exactly.

9   Q.   And when an app developer is successful in selling a

10  product, he keeps 70 percent of the revenue; right?

11  A.   Sure, exactly.

12  Q.   And the app developer pays 30 percent to Google for the

13  use of Google's infrastructure, like the billing system; right?

14  A.   Yes, ma'am.

15  Q.   So that 30 percent is like a commission; right?

16  A.   It's a sharing revenue share by commission.  I have no

17  objection to that term.

18  Q.   Now, in the Google Play Store context, the app developer

19  is not licensing a patent to Google; correct?

20  A.   Well, that's a very complex question.  There are

21  agreements that discuss the intellectual property transfer

22  between those, I've studied that, but it's not a bare patent

23  nonexclusive license like we have here, that is true.

24  Q.   Google is not licensing a patent to the app developer in

25  the context of the Google Play Store; correct?

1  A.   I actually think that's incorrect.  I think part of the

2  app distribution agreement provides the developer with a

3  limited license to certain technologies.

4  Q.   Well, you would agree that when Google is taking a

5  commission in the Google app store, Google is getting paid for

6  the use of its infrastructure; right?

7  A.   In some parts, sure.

8  Q.   And you looked at several agreements where Google

9  purchased or received a license to one or more patents; right?

10 A.   Yes, some of which I discussed earlier today.

11 Q.   All of those agreements were lump-sum payments; correct?

12 A.   And all NPEs, yes.

13 Q.   There was no reference in any of those agreements to

14 running royalties with a 70/30 split; correct?

15 A.   Well, of course.  They were all lump sums.

16 Q.   And there was no evidence that you cited that any of those

17 lump sums were determined with reference to a 70/30 split of

18 revenue from products; correct?

19 A.   By definition, because you're dealing with a nonpracticing

20 entity, they're not making product to share revenue on.  So,

21 no, you wouldn't see that.

22 Q.   But Google is making a product; right?

23 A.   Not necessarily through those patent licenses.  There's no

24 evidence to suggest that those were all then put on the app

25 store and sold.

1    Q.    Well, let's get at it this way:  In the hypothetical

2    negotiation with Sonos, Google is the one making the accused

3    products; right?

4    A.    Yes.

5    Q.    And if Google succeeds in making sales, then Sonos will

6    get a royalty under your analysis; right?

7    A.    Yes.

8    Q.    And when you are evaluating the split between the licensee

9    and the licensor under *Georgia-Pacific* 13, the split is

10   supposed to have the twin effects of giving the licensor

11   reasonable compensation for the use of its intellectual

12   property and the licensee reasonable compensation for assuming

13   the business risks associated with developing, making,

14   promoting, and selling the product that embodies the particular

15   technology?

16   A.    The specific risk associated with adding this technology,

17   I agree with that, which is de minimis in this case.

18   Q.    Let's just put up your report at page 119.

19                       (Pause in proceedings.)

20   BY MS. BAILY:

21   Q.    You see it says this is -- this is something you wrote;

22   right, sir?

23   A.    Yes, sir -- yes, ma'am.  Sorry.  Excuse me.

24   Q.    And it says (as read):

25            "The split has the twin effects of giving the

1          licensor reasonable compensation for the use of its

2          intellectual property and the licensee reasonable

3          compensation for assuming the business risks associated

4          with developing, manufacturing, promoting, and selling the

5          product that embodies the particular technology."

6          Right?

7   A.    Absolutely.  That's what I just said.  Then I go on to

8   explain how that applies in this case.

9   Q.    In the app store, the app developer is making and selling

10  the product and assuming the business risk; right?

11  A.    The innovator, yes.

12  Q.    And in the app store, the app gets -- the app developer

13  gets the 70 percent; right?

14  A.    The innovator.  Same here.

15  Q.    The app developer who takes on the business --

16          THE COURT:  You need to -- you're arguing with -- in

17  every answer you give, you argue.  She's entitled in

18  cross-examination -- as you know from many times in court,

19  she's entitled to get a fair and square answer yes or no

20  instead of an argument with each question.

21      Ask that question again, and this time say yes or no.  Ask

22  it again, Ms. Baily.

23  BY MS. BAILY:

24  Q.    In the app store, the app developer is the one making and

25  selling the product and assuming the business risk; right?

1  **A.**    Yes.

2  **Q.**    And the app developer gets 70 percent of the split of

3  revenue; correct?

4  **A.**    Yes.

5  **Q.**    And in the hypothetical negotiation, Google is making and

6  selling the products and assuming the business risk; correct?

7  **A.**    Both parties are.  So I can't say yes or no; but Google

8  does, yes.

9  **Q.**    In the hypothetical negotiation, all Sonos is doing is

10  licensing its patents; correct?

11  **A.**    But they had to develop the technology so it's more than

12  just -- they're taking a risk to develop the innovation as

13  well.

14  **Q.**    Sonos didn't have to develop any technology; correct?

15  Sonos could still have a patent and license it?

16  **A.**    I don't agree with that.  You have to reduce the invention

17  to practice to get a patent.  You have to --

18      **THE COURT:**  What she's saying is that in the -- well,

19  what the law requires under *Georgia-Pacific* is a license

20  negotiation for the patented technology to Google from Sonos.

21      **THE WITNESS:**  I agree with that.

22      **THE COURT:**  All right.  And then Google turns around

23  and uses that as part of whatever this app is called.  What's

24  it called?  The Home app, the one that does the speakers?

25      **MS. BAILY:**  The Home app.

1          THE COURT:  But doesn't it have name, like speakers or

2   something?

3          MS. BAILY:  No.  It's just the Google Home app because

4   it does all kinds of things.

5          THE COURT:  Well, anyway, who wrote that app?

6          THE WITNESS:  Google wrote the app in this case as the

7   infrastructure.

8          THE COURT:  Okay.

9      All right.  So what she's trying to say is Google wrote

10  the app.  Part of that app, arguably, uses the technology, and

11  you're assuming that it does -- and that is the assumption you

12  should make -- and -- but the law requires a royalty between

13  Google and Sonos but only for the license to the patented

14  technology and not for all the other work that Google put into

15  this feature.  That's what she's trying to explore with you.

16     Am I saying it right?

17         MS. BAILY:  Yes, Your Honor.

18         THE COURT:  All right.  Go back over that point.

19  BY MS. BAILY:

20  Q.   Okay.  In the context of the hypothetical negotiation,

21  Google is the one at the hypothetical negotiation table that is

22  making the products?

23  A.   Yes.

24  Q.   The speakers?

25  A.   Yes.

MALACKOWSKI - CROSS / BAILY

1    **Q.**    The Home app?

2    **A.**    Yes.

3    **Q.**    And assuming the business risk associated with selling

4    those products; correct.

5    **A.**    Yes.

6    **Q.**    And in your analysis, Google is receiving 30 percent of

7    the split?

8    **A.**    Correct.

9    **Q.**    In the app store, the app developer is making and selling

10   the product and assuming the business risk; right?

11   **A.**    They are.

12   **Q.**    And the app developer gets 70 percent; correct?

13   **A.**    Correct.

14        **MS. BAILY:**  All right.  You can take that down

15   Mr. Fisher.

16   **BY MS. BAILY:**

17   **Q.**    Now, you mentioned the market approach earlier; correct?

18   **A.**    Yes, ma'am.

19   **Q.**    And the way the market approach works is that you look at

20   the terms of a similar license agreement and draw inferences

21   from that to figure out what a licensor and licensee would

22   agree to in the hypothetical negotiation.  Do you agree?

23   **A.**    It includes that, yes.

24   **Q.**    And you did not perform any royalty calculation under the

25   market approach in this case; right?

1        Well, I guess you say your IFTTT is under both market and

2   income; is that your testimony?

3   **A.**   Well, the whole -- the entire *Georgia-Pacific* analysis is

4   under the market approach or informed by the market approach.

5   **Q.**   Let me ask you this:  You didn't calculate a royalty based

6   on comparable similar license agreements in the real world;

7   correct?

8   **A.**   I did not make a mathematic calculation from those

9   agreements.

10  **Q.**   And you looked at the Sonos-Legrand agreement when you

11  were coming up with your opinions in this case; correct?

12  **A.**   Yes, ma'am.

13  **Q.**   And Legrand paid approximately $200,000 in royalties under

14  that agreement; right?

15  **A.**   That's what I understand from the prior testimony, yes.

16  **Q.**   And your opinion is that the Sonos-Legrand agreement is

17  not comparable to the hypothetical license that would be

18  granted in this matter; correct?

19  **A.**   It's informative but not fully economically comparable.

20  **Q.**   Okay.  Let's bring up your report at page 45.

21                      (Pause in proceedings.)

22  **BY MS. BAILY:**

23  **Q.**   Okay.  And here you're talking about the Sonos-Legrand

24  agreement, and you say (as read):

25              "Mr. Bakewell and I" --

1          You understand Mr. Bakewell is Google's damages expert in

2     this case?

3     A.    I do.

4     Q.    And he's going to testify later in the case?

5     A.    Presumably.

6     Q.    And you say (as read):

7               "Mr. Bakewell and I both agree that this agreement is

8          not comparable to the hypothetical license that would be

9          granted in this matter."

10         Right?

11    A.    True.

12    Q.    Okay.

13         MS. BAILY:  You can take that down.  Thank you.

14    BY MS. BAILY:

15    Q.    You came to that conclusion because the license is a

16    portfolio license and includes rights to a multitude of

17    technologies not at issue in this case; right?

18    A.    Yes, ma'am.

19    Q.    And it is your opinion that from an economic perspective,

20    a license to Sonos' entire portfolio is not economically

21    comparable to a bare patent license that would result from the

22    hypothetical negotiation?

23    A.    I agree.

24    Q.    You looked at the Sonos-Lenbrook license?

25    A.    In a similar way, yes, ma'am.

1  Q.  Lenbrook paid Sonos approximately $1.5 million under that

2  license?

3  A.  Correct.

4  Q.  And it is your opinion that the Sonos-Lenbrook license is

5  not probative of the outcome of a hypothetical negotiation in

6  this case; correct?

7  A.  In the same way, yes, ma'am.

8  Q.  And you looked at the Sonos-Denon agreement?

9  A.  Yes.

10 Q.  And it's your opinion that this agreement is not probative

11 of the outcome of a hypothetical negotiation in this case

12 either; correct?

13 A.  For different reasons but, yes.

14 Q.  And you did not use the rates for many of these agreements

15 in your analysis; correct?

16 A.  Only as I described here today, not in the calculation.

17       THE COURT:  What -- for that 70 and -- that number you

18 came up with, how, if at all, did these agreements factor into

19 it?

20       THE WITNESS:  They are represented as a cap that the

21 royalty could not be higher; and so as I started my analysis, I

22 began to look not from a top-down apportionment but from a

23 bottom-up analysis using *Georgia-Pacific* 12.  So I did not take

24 the $30 and multiply it by 70 percent, for example.

25       THE COURT:  Next question.

1  BY MS. BAILY:

2  Q.    In your work on this case you also looked at several

3  Google agreements in which Google licensed or purchased

4  patents; correct?

5  A.    Yes, ma'am.

6  Q.    And those were the lump-sum agreements we talked about a

7  bit earlier?

8  A.    They were -- are.

9  Q.    One of those was between Google and Outland Research;

10 right?

11 A.    Correct.

12 Q.    And in that agreement, Google purchased 12 patents and 4

13 patent applications for $2.25 million; correct?

14 A.    I believe that's accurate.

15 Q.    And you're aware that Google's position is that those

16 patents are technologically similar to the patents at issue

17 here; right?

18 A.    I believe they say they're partially similar, or words to

19 that effect.

20 Q.    You don't have a basis to disagree with Google's technical

21 experts that the patents covered by the Outland Research

22 agreement are technically comparable to the '885; correct?

23 A.    So putting aside whether it's partially comparable from

24 your last question, I would defer to Dr. Almeroth on that.  I

25 don't have an independent technical opinion.

1   **Q.**   You're not a technical expert; correct?

2   **A.**   Correct.

3   **Q.**   Yesterday Dr. Almeroth did not offer any opinions at all

4   on the Outland Research patents; right?

5   **A.**   I believe there are -- I don't know.  I don't recall him

6   speaking to it yesterday.

7   **Q.**   The inventor of the Outland Research patents is Louis B.

8   Rosenberg.  Do you know that?

9   **A.**   Yeah.  He's a movie producer.

10  **Q.**   Did you see in his research that he's also a Stanford

11  Ph.D.?

12  **A.**   Yes.  He's in the film department, I believe.

13  **Q.**   Did you -- he's a Ph.D. from Stanford; right?

14  **A.**   Yes.

15  **Q.**   Okay.  He also founded a company called Immersion

16  corporation; correct?

17  **A.**   Yes.

18  **Q.**   And did you read anything in your research about

19  Dr. Rosenberg, about how he has integrated his company's

20  technology into Microsoft products?

21  **A.**   Generally, yes.  He's a prolific inventor.  I'm aware of

22  him.

23  **Q.**   And have you read anything about how Dr. Rosenberg

24  integrated his company's technology into Logitech products?

25  **A.**   Generally, yes.

**MALACKOWSKI - CROSS / BAILY**

1  Q.   And it's for the jury to decide whether the license to the

2  Rosenberg patents is economically comparable to the

3  hypothetical negotiation in this case; right?

4  A.   Sure.

5  Q.   And if the jury decides that the license to the Rosenberg

6  patents is similar to the hypothetical license agreement here,

7  then it would be relevant that Google paid for the Rosenberg

8  patents with a lump sum of 2.25 million; right?

9  A.   If they find it to be technically and economically

10  comparable, it would be relevant, meaning should be considered.

11  Q.   And Dr. Almeroth didn't offer any opinions on technical

12  comparability of the Outland Research patents and the patents

13  at issue here; right?

14  A.   Not in his testimony yesterday that I recall.

15  Q.   And you're not offering any technical opinions; right?

16  A.   I am not.

17  Q.   And so Dr. Schonfeld will testify later in this case.

18  You're aware of that; right?

19  A.   Presumably.

20  Q.   And so he can give technical opinions about the

21  relationship between the Rosenberg patents and the patents at

22  issue in this case; right?

23  A.   I'm not one to say what he can and can't do.

24  Q.   The jury can credit that testimony if they so desire?

25  A.   They can credit whatever they hear, of course.

MALACKOWSKI - CROSS / BAILY

1    Q.    Now, you haven't calculated a reasonable royalty under the

2    cost approach; correct?

3    A.    Not a separate royalty.  It was only considered in --

4    considered in the alternatives.

5    Q.    Under the cost approach, from an economic perspective, the

6    licensee would pay no more in royalties than the cost of the

7    noninfringing alternative; correct?

8    A.    As an input into *Georgia-Pacific*, true, not as a limit to

9    damages.

10   Q.    Okay.  Let's just put up your report at page 91.

11         It says under the cost approach (as read):

12             "The licensee would pay no more in royalties than the

13         cost of a noninfringing alternative."

14         Do you see that?

15   A.    Yes.

16   Q.    And in this case the licensee would be Google; right?

17   A.    Yes.

18   Q.    And just to help the jury understand this concept of the

19   cost approach, if a patent holder wanted to license his patents

20   for a hundred dollars but the licensee could spend $2 to change

21   the way it's doing things, not infringe the patent, and still

22   satisfy their customers, then under the cost approach, the

23   reasonable royalty would end up being much closer to the $2

24   than the $100; correct?

25   A.    No necessarily.  That's where you're confusing cost

1  approach with *Georgia-Pacific*.  I'm happy to explain.

2  **Q.**  Well, suffice it to say, under the cost approach, the

3  licensee would pay no more in royalties than the cost of an

4  noninfringing alternative; correct?

5  **A.**  But the cost approach is not a damage calculation.  It's

6  an input to the damage calculation.

7  **Q.**  Understood.

8      Under the cost approach, the licensee is Google; right?

9  **A.**  Yes.

10 **Q.**  Google would pay no more in royalties than the cost of the

11 noninfringing alternative.  Do you see that?

12 **A.**  Under that input, yes.

13 **Q.**  And you're aware that Google has asserted there are a

14 variety of noninfringing alternatives in this case; correct?

15 **A.**  Two I'm aware of.

16 **Q.**  And you're aware that Google is going to present evidence

17 regarding noninfringing alternatives; right?

18 **A.**  Presumably.

19 **Q.**  And also evidence as to whether actual consumers have

20 accepted one of those alternatives?  Google's going to present

21 evidence of that.  Did you hear that in the opening?

22 **A.**  Yes, ma'am.

23 **Q.**  And it's for the jury to decide if the cost approach is a

24 reasonable way to approach damages in this case; right?

25 **A.**  This is all within the purview of the jury so, yes.

1  Q.   Now, you used the same method to determine your reasonable

2  royalty for each of the two patents in the case; correct?

3  A.   Yes, ma'am.

4  Q.   And with respect to the '885 patent, Sonos --

5         MS. BAILY:  Well, let's put up PDX2.21 please.

6  BY MS. BAILY:

7  Q.   With respect to the '885 patent, Sonos is asking for the

8  same royalty on each one of these products; correct?

9  A.   Correct, the same per-unit royalty.

10 Q.   And that's regardless of the price of these products;

11 correct?

12 A.   Correct.

13 Q.   Now, are you aware of the prices of these products?

14 A.   They -- yes is the answer.

15 Q.   And so, for example, the Chromecast, are you aware of

16 approximately what the price for the Chromecast is?

17 A.   Less than a hundred dollars.

18         MS. BAILY:  Let's go to PDX2.22.

19                    (Pause in proceedings.)

20 BY MS. BAILY:

21 Q.   Sonos is also asking for the same royalty on every phone,

22 laptop, or tablet with the Home app; right?

23 A.   Yes, ma'am.

24 Q.   Regardless whether the product is made by Google or not;

25 right?

MALACKOWSKI - CROSS / BAILY

1    **A.**    So long as it's infringing, yes, ma'am.

2    **Q.**    So if somebody has an Apple phone -- you agree Google

3    doesn't make Apple phones; right?

4    **A.**    Of course.

5    **Q.**    So if somebody has an Apple phone and downloads the Google

6    Home app, you're charging a royalty on that Apple device to

7    Google; correct?

8    **A.**    If it's found to infringe, yes.

9    **Q.**    And you have reviewed information regarding unit sales in

10   this case?

11   **A.**    I have.

12   **Q.**    And so you're aware that approximately 7 percent of the

13   accused Google Home app installations in your royalty base for

14   the '966 patent are on Google products; correct?

15   **A.**    You're talking about the Android products, for example?

16   What are you referring to as Google products?  The Google Home

17   app is on all of the products.

18   **Q.**    I'm talking about the Google products.  So the Google

19   Pixel phones, the Pixel tablets, and the Google Pixel books.

20   **A.**    I don't recall the precise number, but I'm happy to accept

21   you represent that's what it is.

22   **Q.**    It's a very small number of accused instances of the

23   Google Home app that are on products made by Google; correct?

24   **A.**    I don't have a connotation of small versus large.  I

25   accept your representation.

1          **MS. BAILY:**  Your Honor, I can keep going.

2          **THE COURT:**  No.  It's 1:00 o'clock.

3      You're still -- you have questions you have to go?

4          **MS. BAILY:**  Just a few, yes.

5          **THE COURT:**  All right.  Well, we're going to -- the

6  witness will be back at Tuesday 7:30 a.m.  We'll pick it up

7  there.

8          Now, let me explain to the jury where we are.  We're going

9  to take a three-day weekend for Mother's Day and then start on

10  Tuesday morning at the normal time.

11          I've been keeping track.  The lawyers have used up getting

12  close to two-thirds of their time.  I haven't done the math

13  yet, but so you've heard most of the case but you haven't heard

14  it all.  You haven't heard the Google side of the story except

15  for the cross-examinations, but that's where we are.

16          I don't know.  I said earlier that we might be able to

17  send the case to you for decision on Friday.  In my opinion,

18  maybe still, but that is looking less likely now to me than --

19  so we would then go to one of the -- I forget.  I don't have it

20  in front of me, but there was another day -- it was -- what was

21  it?  I don't want to say something without being -- I can just

22  tell you on Tuesday.  We'll -- Tuesday morning we'll give you

23  the rest of the schedule.  So that's where we are.

24          You have been very attentive, a wonderful jury.  I wish I

25  had you in every case.  That would be a huge burden on you, but

PROCEEDINGS

1    I thank you so much for your careful attention and I look

2    forward to seeing you here.

3        Please don't look up anything on the internet.  Don't talk

4    to your loved ones or friends about the issues in the case.

5    Keep an open mind, and we'll -- we'll see you back here Tuesday

6    morning at 7:45.

7        Thank you very much.  Have a safe journey home.

8        **THE CLERK:**  All rise for the jury.

9        (Proceedings were heard outside the presence of the jury:)

10       **THE COURT:**  Okay.  Be seated, please.

11   The witness can step down.  Thank you for that.

12   Let's see...

13   All right.  Anything to bring up with me?

14       **MR. PAK:**  No, Your Honor.

15       **MR. RICHTER:**  No, Your Honor.

16       **THE COURT:**  All right.  Let me see if I can tell you

17   the -- for Plaintiff I have -- you have to do the math -- 537

18   plus 37 plus 34.

19       For Defendant 49 -- no, 445 plus 42.

20       So Plaintiff has used considerably more than Defendant,

21   but Defendant hasn't even put on its case yet.

22       **MR. RICHTER:**  We are at 608 minutes, Your Honor, for

23   Plaintiff.

24       **THE COURT:**  Is that what my math comes up with?  Is

25   that what you said?  608?

1        **MR. RICHTER:**  I think so.

2        **THE COURT:**  From the numbers I gave you?  Okay.

3        **MR. PAK:**  For Defendant it looks like it's 487.

4        **THE COURT:**  All right.  So there we are.

5                  (Pause in proceedings.)

6        **THE COURT:**  I can't remember if the witness said -- I

7  was going to ask, but then I forget.

8      Has the witness ever used this approach IFTTT in any other

9  case?  Do we know the answer to that?

10        **MS. CARIDIS:**  Your Honor, I don't know if we know the

11  answer, but he'll be back on the stand on Monday and you're

12  welcome to -- or on Tuesday.

13        **MS. BAILY:**  He said no in his deposition.

14        **THE COURT:**  What?

15        **MS. BAILY:**  He said no in his deposition.

16        **THE COURT:**  Okay.

17      All right.  We will adjourn ourselves.  I'll see you here

18  at 7:30 on Monday morning.  It's a chance I'll ask you to be

19  here even earlier; but if I do, it would -- I said "Monday," I

20  meant Tuesday morning.  Tuesday morning.

21      And so -- now, I have a criminal case and maybe a civil

22  case today --

23        **THE CLERK:**  Just the criminal.

24        **THE COURT:**  Just the criminal?

25      -- immediately so I'm going to need the -- the marshals

PROCEEDINGS

1   are going to need room to be on the security alert.  So help me

2   out with clearing up the courtroom.  Thank you.

3          **THE CLERK:**  Court is adjourned.

4              (Proceedings adjourned at 1:03 p.m.)

5                      ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, May 12, 2023

8

9

10

11    _____

12            Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25