**Volume 8**

**Pages 1396 - 1616**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| SONOS, INC., | ) |
| | ) |
|        Plaintiff and | ) |
| Counter-Defendant, | ) |
| | ) |
|   VS. | )    **NO. C 20-6754 WHA** |
| | )Related Case No. **C 21-07559 WHA** |
| GOOGLE, LLC, | ) |
| | ) |
|        Defendant and | ) |
| Counter-Claimant. | ) |
| _____ | ) |

San Francisco, California
Wednesday, May 17, 2023

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff/Counter-Defendant:

            ORRICK, HERRINGTON & SUTCLIFFE LLP
            The Orrick Building
            405 Howard Street
            San Francisco, California  94105
    BY: **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
        **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

            ORRICK, HERRINGTON & SUTCLIFFE LLP
            777 South Figueroa Street, Suite 3200
            Los Angeles, California 90017
    BY: **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
        **GEOFFREY G. MOSS, ATTORNEY AT LAW**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
             United States District Court - Official Reporter

```
1    APPEARANCES:  (CONTINUED)

2    For Plaintiff/Counter-Defendant:

3                         LEE SULLIVAN SHEA & SMITH LLP
                          656 West Randolph Street
4                         Floor 5W
                          Chicago, Illinois 60661
5                  BY:   DAVID R. GROSBY, ATTORNEY AT LAW
                         SEAN M. SULLIVAN, ATTORNEY AT LAW
6                        COLE B. RICHTER, ATTORNEY AT LAW
                         JOHN DAN SMITH, III, ATTORNEY AT LAW
7
                          ORRICK, HERRINGTON & SUTCLIFFE LLP
8                         51 West 52nd Street
                          New York, New York  10019
9                  BY:   JOSEPH R. KOLKER, ATTORNEY AT LAW

10   For Defendant/Counter-Claimant:

11                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          50 California Street, 22nd Floor
12                        San Francisco, California 94111
                   BY:   SEAN PAK, ATTORNEY AT LAW
13                       MELISSA J. BAILY, ATTORNEY AT LAW
                         JAMES D. JUDAH, ATTORNEY AT LAW
14                       LINDSAY COOPER, ATTORNEY AT LAW
                         IMAN LORDGOOEI, ATTORNEY AT LAW
15                       JASON C. WILLIAMS, ATTORNEY AT LAW

16

17   Also Present:       Kevin MacKay, Google Representative
                         Alaina Kwasizur, Sonos Representative
18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2   Wednesday, May 17, 2023 - Volume 8

 3                                             PAGE   VOL.

 4   Defendant Rests                           1614    8

 5   DEFENDANT'S WITNESSES                      PAGE   VOL.

 6   SCHONFELD, DAN (RECALLED)
     (PREVIOUSLY SWORN)                         1414    8
 7   Direct Examination resumed by Mr. Pak      1416    8
     Cross-Examination by Mr. Roberts           1459    8
 8   Redirect Examination by Mr. Pak            1500    8
     Recross-Examination by Mr. Roberts         1509    8
 9
     CHAN, CHRISTOPHER
10   (SWORN)                                    1511    8
     Direct Examination by Ms. Baily            1512    8
11   Cross-Examination by Mr. Richter           1524    8

12   BAKEWELL, WILLIAM CHRISTOPHER
     (SWORN)                                    1540    8
13   Direct Examination by Ms. Baily            1541    8
     Cross-Examination by Ms. Caridis           1576    8
14   Redirect Examination by Ms. Baily          1607    8

15                        E X H I B I T S

16   TRIAL EXHIBITS                   IDEN    EVID   VOL.

17    006                                     1496    8

18    140                                     1521    8

19    158                                     1597    8

20    2508                                    1445    8

21    2625                                    1457    8

22    2673                                    1499    8

23    2674                                    1498    8

24    2676                                    1493    8

25
```

1

**I N D E X**

2

**E X H I B I T S**

3

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3007 | | 1447 | 8 |
| 3509 | | 1514 | 8 |
| 3698 | | 1427 | 8 |
| 3786 | | 1517 | 8 |
| 3787 | | 1515 | 8 |
| 3808 | | 1444 | 8 |
| 6353 | | 1531 | 8 |
| 6513 | | 1438 | 8 |

| | |
|---|---|
| 1 | **Wednesday - May 17, 2023**                                     **7:25 a.m.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE CLERK:**  All rise.  Court is now in session.  The |
| 6 | Honorable William Alsup is now presiding. |
| 7 | **THE COURT:**  Thank you.  Please be seated. |
| 8 | (Pause in proceedings.) |
| 9 | **THE COURT:**  All right.  Everyone is here, not the |
| 10 | jury. |
| 11 | I'm inclined to agree with Sonos that the expert exceeded |
| 12 | his report on direct examination and that we should strike that |
| 13 | part that deals with idle mode. |
| 14 | I'll let Google have -- try to convince me otherwise. |
| 15 | (Pause in proceedings.) |
| 16 | **THE COURT:**  Only the part by the expert, not the part |
| 17 | by the witness who was Mr. -- |
| 18 | **MR. PAK:**  MacKay, Your Honor. |
| 19 | **THE COURT:**  -- MacKay.  He's not bound by the expert |
| 20 | report requirements but the expert is. |
| 21 | **MR. PAK:**  Thank you, Your Honor. |
| 22 | So I think it comes back to the -- the language of the |
| 23 | function itself that this is talking about stopping the current |
| 24 | app. |
| 25 | There's a different command, Your Honor, in the system for |

1  stopping current playback, and I think that Dr. Schonfeld made

2  clear that he was talking about this function throughout and he

3  talked about the stopping and the terminating language with

4  respect to the app, and that's the reason why we're --

5           THE COURT:  All right.

6           MR. PAK:  -- taking this position.

7           THE COURT:  What you can do is read -- he can read

8  from his own report --

9           MR. PAK:  Yes.

10          THE COURT:  -- the exact words.

11          MR. PAK:  Thank you, Your Honor.

12          THE COURT:  And -- but he cannot do this idle -- idle

13 thing.

14          MR. PAK:  Yes, Your Honor.

15          THE COURT:  So I'm going to tell the jury to disregard

16 his testimony about idle, and then you can -- is he still on

17 the stand by your examination.

18          MR. PAK:  Yes, Your Honor.

19          THE COURT:  All right.  Then you can say "In lieu of

20 that," get the report out and read it exactly, and no one can

21 criticize you for that.

22          MR. PAK:  Thank you, Your Honor.

23          THE COURT:  Is that satisfactory?

24          MR. PAK:  Yes, Your Honor.

25          THE COURT:  Let me ask.

1          **MR. ROBERTS:**  It is, Your Honor.  Thank you.

2          **THE COURT:**  All right.

3      Okay.  Now, how else can I help you this morning?

4          **MR. PAK:**  Your Honor, I think from our side we wanted

5  your guidance.  We will be submitting later today our written

6  submission on Rule 50(a); but if you'd like to hear some

7  argument on any of those issues, we have counsel prepared to

8  deal with them.

9      I think, for example, I know there was a filing on the

10 IFTTT issue.  If, Your Honor, would like further argument on

11 that, we would be happy to entertain that.

12     There's also the issue on their failure of proof on some

13 of the claim limitations.

14     So it's up to Your Honor whether you wanted to deal with

15 that this morning.

16         **THE COURT:**  Why do I need more argument on IFTTT?

17     By the way, Mr. Roberts has larded the record again with

18 yet another IFTTT last night; right?

19         **MR. ROBERTS:**  I did.

20         **THE COURT:**  I'm going to throw IFTTT out.  It's beyond

21 the pale.  I don't need any more argument.

22         **MR. PAK:**  Thank you, Your Honor.

23         **THE COURT:**  I'm going to tell the jury in due course

24 that they must disregard the IFTTT, but there are some patent

25 licenses in the record.  I'm not going to throw out damages

 1    altogether.  I believe that the jury could -- with the record

 2    they got could come back with a decent award for Sonos.

 3        **MR. PAK:**  Thank you, Your Honor.

 4        **MR. ROBERTS:**  Thank you, Your Honor.

 5        **THE COURT:**  All right.  I'm also going to tell them

 6    that the '966 does not apply to -- it only applies if it is

 7    interconnected with speakers.  I disagree vehemently with this

 8    overreaching by Sonos that it applies just merely because the

 9    app is on the -- on the home page.

10        So I'm sorry.  We briefed it to the nth degree.  Your

11    record is good for appeal.

12        **MR. ROBERTS:**  Thank you, Your Honor.

13        **THE COURT:**  All right.

14        **MR. ROBERTS:**  This is Mr. Roberts.

15        The only thing I wanted to say was that the reason I put

16    in that additional brief was because I wanted to explain the

17    way the testimony had actually come in.  Everything we had done

18    before that was about what we expected the testimony to be.

19    I'm not arguing anything, Your Honor.  I'm just explaining why

20    I submitted it.

21        **THE COURT:**  All right.  But it didn't surprise me in

22    any way the way the testimony came in.

23        I'm going to do a -- try to do an order in due course, a

24    memorandum opinion.  I don't have time now to do it and explain

25    in detail now, but in due course I will explain in some detail

 1    why I have made this determination.  There's just too much.

 2         Which leads me to the next thing.  We've been working very

 3    hard and do not have for you a set of instructions or verdict

 4    form.  Part of it is because you lawyers have failed us.  You

 5    have so many claims, so many subparts.  We're trying to come up

 6    with matrixes that will help us help the jury, but you have

 7    failed me.

 8         Why have you failed me?  You have failed to come up with

 9    simplified ways to put this case to the jury.  For example, I'm

10    not -- I can't order you to do this, but on the '966 you got

11    how many claims in suit?  Five or six?  How many?  I forgot.

12              MR. PAK:  Six, I believe, Your Honor.

13              THE COURT:  Six.  Do they -- can't they all stand or

14    fall together?  I think in other cases lawyers -- this many

15    lawyers would say, "Hey, just tell them to go with claim 1 and

16    all the others will stand or fall with claim 1."

17         Yeah, technically you've got an extra little argument here

18    or there, but for the sake of simplicity for the jury to decide

19    a case like this, isn't it better that we put it to them in

20    a -- with the main issues, not all the detail but the main

21    issues?

22              MR. ROBERTS:  Your Honor, we'll consider it.

23              THE COURT:  No, no, no.  You won't do that.

24         What?

25              MR. ROBERTS:  I said we'll consider it and come back

PROCEEDINGS

1    to you.

2         THE COURT:  All right.  Well, please, that would help.

3      Other things, are there other ways we could streamline

4    this for the jury?

5         MR. PAK:  Your Honor, if it would help -- Your Honor,

6    we will -- for the purposes of trial, we will take off the

7    table the anticipation question on one of the patents, the

8    '966.

9         THE COURT:  Is that the one where you had the --

10        MR. PAK:  Squeezebox system.

11        THE COURT:  Squeezebox, yeah.  My law clerk and I

12   spent 30 minutes on that this morning, and I said I don't

13   believe that Google really believes that there's anticipation.

14   That's just another Mr. Pak add-on argument that he's got -- he

15   won't let go of anything, and I said but he will let go of that

16   argument because it's a loser.

17        MR. PAK:  I'm letting go of that argument.

18        THE COURT:  All right.  And obviousness is your main

19   point.

20        MR. PAK:  That's right, Your Honor.

21        THE COURT:  Why do you want to mess it up with

22   anticipation by the Squeezebox?

23      So, anyway, that's 30 minutes of our time this morning

24   down the drain on account of you wouldn't give that up earlier.

25   Thank you, though, for doing that.

1          **MR. PAK:**  Okay.  Thank you.

2          **THE COURT:**  All right.  That issue is out.  Anything

3   else you want to give up?

4          **MR. PAK:**  I don't think so, but I will confer with

5   Mr. Roberts and we'll see if we can try to work on the

6   rise-and-fall issue.

7          **THE COURT:**  How about coming up with an agreement on

8   what is an ordinary skill in -- a person of ordinary skill in

9   the art?

10          **MR. ROBERTS:**  That's easy.  We can do that.

11          **MR. PAK:**  We'll work that out, Your Honor.

12      I did want to ask for your Court's guidance.  I think when

13   we are done with our case, Dr. Almeroth will be testifying in

14   his rebuttal to the prior art.

15      I'm not going to go into the written description issue on

16   the current patents in suit, but I did want to get into the

17   record the earlier applications and the provisional.

18   Dr. Almeroth testified that they are exactly the same on his

19   direct examination, and I would like to test that on cross and

20   I wanted to ask for your honor's permission to do that.  It

21   will not be a lengthy examination, but I did want to get that

22   record before the jury.

23          **THE COURT:**  Any problem with that?

24          **MR. ROBERTS:**  I think that that would be okay,

25   Your Honor, provided it's limited to the scope of the direct.

1    If it's going outside the scope of the direct and he's getting

2    into written description.  They said written description was

3    not going to be presented to the jury; and so if they want it

4    to test credibility, I don't think I can object.  But if they

5    want to use it to try to argue about written description, I

6    think that that's not part of the case.

7            **THE COURT:**  Well, I -- help me remember.  Is written

8    description an issue for the jury?

9            **MR. PAK:**  The written description issue right now is

10    not an issue for the jury, Your Honor, because Your Honor had

11    ruled on the current patents in suit.

12        I think the priority date issue is a separate issue, which

13    is:  What is the date that Sonos is entitled to?  And they have

14    a burden of proving that alleged priority date, which goes back

15    to the other issue.  So that's the reason why I think it's

16    still an issue in the case as Your Honor has been exploring.

17        But, again, I do -- just for the jury's purpose, I do want

18    to test his statement on direct examination that they were all

19    the same, and that -- that would be the purpose.

20            **MR. ROBERTS:**  So, again, there was an actual --

21    I believe, Mr. Pak can correct me if I'm wrong, that there was

22    a stipulation that -- between the parties that -- not just that

23    Your Honor ruled on it, but there was a stipulation between the

24    parties that written description would not be presented to the

25    jury.

1    Second, with respect to priority date, he's dead wrong

2    about who has the burden of proof on it, and we have put that

3    law in the submission we gave to Your Honor this morning.  They

4    said that they -- that we had the burden of proof on it last

5    night.  We put in case law showing that that's absolutely

6    wrong.  That's not the way it works at all.  I'll leave that to

7    the briefing.

8        In addition, priority date, this is yet another brand new

9    argument.  There's no priority date argument in the expert

10   reports.  There's no priority date argument in the pretrial.

11   There's no priority date argument in the -- in the affirmative

12   offenses pled in the answer.  There's no priority date argument

13   anywhere.

14       We pointed this out to Your Honor in the brief.  We went

15   all the way through all of the various things in the 55-page

16   behemoth we filed, and I do apologize for that, Your Honor.  We

17   do appreciate how hard you're working.

18       But we put all of the places where they should have, if

19   they wanted to challenge the priority date, put that argument

20   and it wasn't in any of them.

21       And that is a question of fact, and we have not developed

22   a factual record on the priority date issue.  We have not taken

23   expert discovery on it.  We have not done expert reports on it.

24   And to suggest that he's going to come in here and depose an

25   expert who has not offered any opinions about priority date and

1    who has not prepared a report about priority date in support of

2    a priority date argument is grossly unfair.

3            **MR. PAK:**  I can respond briefly, Your Honor.

4        We did deal with this issue in the showdown and both

5    Dr. Almeroth and Dr. Schonfeld did provide opinions on whether

6    Sonos is entitled to a priority date or not.  We disagree on

7    the law.

8        But I think that by having Dr. Almeroth on direct

9    examination say all the figures are the same, all the columns

10   are the same, the specifications are the same going back to the

11   original provisional date opened the door.  That's a factual

12   issue, but we are now allowed to contest that; and I believe

13   that it is ultimately their burden of persuasion to show that

14   they can claim priority back to the provisional.

15           **THE COURT:**  Well, what do you -- what did we say at

16   the pretrial conference on the priority date?  I thought it was

17   all tried on the basis of December 21, 2005.

18           **MR. ROBERTS:**  It was.  That's what we said.  They

19   stipulated, Your Honor, to a conception date.  There's an

20   agreed conception date of 2005 here.  Their argument is -- goes

21   against that.

22       If -- the argument that Sonos -- or the idea that Sonos

23   conceived of the invention in 2005, had full possession of the

24   2005 but isn't entitled to a 2006 or at worse a 2007 priority

25   date is -- makes absolutely no sense.  If Sonos had conceived

1  of the invention but now they're saying, oh, they didn't

2  actually have written description support for it, those two

3  things are completely incompatible.

4      **THE COURT:**  No -- okay.  Well, there are subparts

5  here.  I'm going to make a ruling.

6      The Almeroth -- is that his name?

7      **MR. PAK:**  Yes, Your Honor.

8      **THE COURT:**  He did say what you say, and I'm going to

9  let you cross-examine him to show that it's not true.

10      **MR. PAK:**  Thank you.

11      **THE COURT:**  You can do that because it goes to

12  credibility and that's enough.

13      Now, on the larger issue, we have the issues that the jury

14  should decide and we have a different set of issues that are of

15  great concern to me that I was bamboozled by Sonos.

16      I ruled for Sonos specifically culling out a sentence in

17  the specification that was served up by Sonos to say there was

18  an adequate written description.  I did not realize that that

19  came in later by amendment.  That would have made a difference

20  to me if I had known that.

21      So there's a whole different set of concerns of after this

22  verdict, we're going to get into whether or not and the extent

23  to which that makes a difference.  And maybe I vacate a lot of

24  prior orders and maybe I go back and say there was fraud on the

25  Court.  Maybe.  Maybe not.

 1          I'm not -- you-all have given me so much briefing on this

 2     that I am -- I haven't read it all yet.  One of the briefs was

 3     55 pages long.  I've read some of it.

 4          I am very concerned.  I'm going to tell you what I think

 5     happened here.  I believe what happened here is that there was

 6     a submission made in 2006 to the PTO and at no time in the

 7     early days did Sonos claim what it's now claiming to be the

 8     invention.  Instead, it claimed other things.

 9          Then Google came out with its product.  In other words,

10     Google was actually the one to invent the supposed invention

11     and came out into the marketplace; and then in response, Sonos

12     says "Wait a minute.  They beat us to the market.  Is there a

13     way to go back and say we invented that first?"

14          So they go into the conference room and they come up with

15     the idea:  Okay.  We'll come up with what's called a blocking

16     patent.  Even though they got there first.  We're going to find

17     a way to block it.  And that then led to the application for

18     these two patents.

19          Then the good lawyers on the Sonos side realized that the

20     written description was inadequate, and they beefed it up with

21     that pulling one statement from the appendix and saying -- and

22     they -- it's a complicated arcane point of patent procedure,

23     and the patent examiner allowed the amendment.

24          And then -- now, ordinarily, as I understood the law

25     before this case, that would admit that your priority, because

1    it's new matter being submitted in, that your priority date

2    would be the -- would be well after Google had already been in

3    the market.  So that would have meant that Google's product was

4    prior art.

5        But Sonos convinced the examiner that the priority date

6    should go all the way back to 2005, and the examiner went along

7    with that.

8        Now, that's the piece that troubles me.  And I don't know

9    the -- we've been over this, but I'm saying to you that issue

10   is not going to the jury.  This case has not been tried that

11   way, and -- but if there is a verdict for Sonos, and even maybe

12   if there is a verdict for Google, we're going to come back and

13   revisit that, and it could be that there's going to be a long

14   opinion by Judge Old Bill which addresses that point.

15       I haven't made up my mind on that because it gets into

16   things about Patent Office procedure that I need education on.

17   And it could be that Sonos did it correctly, but I am troubled

18   that that's the way our patent system would work; that Google

19   could come out with a product first and then only then does the

20   specification get changed to try to cover what Google had

21   already come out with.  That, to me, is not the way the patent

22   system should work, and then we're going to visit that again.

23       But what I'm saying to you -- I don't want to hear

24   argument on this now.  What I am going to say to you, though,

25   is we will -- that issue will not be submitted to the jury.  It

 1  will be for the Court to decide after we get to the -- get the

 2  verdict.  We've got a jury here.  We've got to get their

 3  verdict on the parts that we're trying to them, and then we're

 4  going to save this other issue for post-verdict.  Okay?

 5          MR. PAK:  Thank you, Your Honor.

 6          THE COURT:  All right.  I am -- I have not read all

 7  the things that -- I've read the one about -- the one I agree

 8  with Sonos on, so we're going to start with that when the jury

 9  comes back in.

10          MR. PAK:  Thank you, Your Honor.

11          MR. ROBERTS:  Thank you, Your Honor.

12          THE COURT:  Is the jury all here?

13          THE CLERK:  I was going to check if they're all here.

14                  (Pause in proceedings.)

15          MR. PAK:  Your Honor, just so the jury is not

16  confused, would it be acceptable for Your Honor to clarify that

17  your motion -- your ruling on Sonos' motion only applies to

18  Dr. Schonfeld and not to the factual testimony?

19          THE COURT:  Yes, I will say that.

20          MR. ROBERTS:  Your Honor, because it wasn't clear from

21  your ruling, is Mr. Pak going to be allowed to argue idle mode

22  in closing despite the fact that the theory was not disclosed?

23          THE COURT:  Yes.  The fact witnesses are not bound by

24  any expert report, but what he cannot argue is that Schonfeld

25  said anything about it.

**PROCEEDINGS**

1    **MR. ROBERTS:**  Your Honor, I would submit that Google

2    should not be allowed to argue a noninfringement theory that

3    has never been disclosed before they got the fact witness up to

4    testify to the groundwork for it.  To call a fact witness to

5    testify to the groundwork for a brand new fact theory not

6    disclosed in discovery not disclosed in the expert reports is

7    wrong.

8        **THE COURT:**  It's close enough.  This is -- this is in

9    the ballpark of factual information that can roll into evidence

10   as the case proceeds, and the expert report requirement only

11   applies to experts.  So I disagree with you, but that point is

12   preserved for the multitudinous appeals in this case.

13                   (Pause in proceedings.)

14       **THE CLERK:**  They're all here now.

15       **THE COURT:**  Let's bring them in.  Let's bring back the

16   witness.

17                   (Pause in proceedings.)

18                   **DAN SCHONFELD**,

19   called as a witness for the Defendant, having been previously

20   duly sworn, testified further as follows:

21       **MR. PAK:**  Dr. Schonfeld, if you could have the

22   rebuttal expert report.  Do you have that in front of you,

23   paragraph 108?  I will put it on the screen as well.

24       **THE COURT:**  Is that the one you read to me yesterday?

25       **MR. PAK:**  Yes, Your Honor.

1          **THE COURT:**  All right.  108?

2          **MR. PAK:**  Yes, Your Honor, Rebuttal Report 108.

3          **THE COURT:**  All right.

4          **THE CLERK:**  All rise for the jury.

5      (Proceedings were heard in the presence of the jury:)

6          **THE COURT:**  Good morning, everyone.  Please be seated.

7      Welcome back.  Welcome back.

8      I want to say again how wonderful this jury is.  Thank you

9  for being early.  Here we are 11 minutes until 8:00 o'clock,

10  and you're ready to go.  Thank you.

11      Okay.  You remember yesterday we've got -- I apologize --

12  don't tell me -- Schonfeld from Chicago; right.

13          **THE WITNESS:**  Yep.

14          **THE COURT:**  He's on the stand, and he is the expert

15  witness for Google.  And yesterday there was a -- a fight among

16  the lawyers about some of his testimony.

17      Now, remember I told you that these expert witnesses have

18  got to comply with some rules.  One of the rules is they give a

19  detailed expert report that describes what they're going to say

20  at trial so the other side can get ready to meet that.

21      And the experts on direct examination, which is what we

22  are on right now, must stick to what's in the report and not

23  veer off into new matter.

24      Now, it's my determination after thinking about it

25  overnight that Dr. Schonfeld violated that rule, and he did

veer off into new material and that new material was something

about idle mode.  Idle mode.  Remember there was standalone

group and then idle mode.  And that was not in his report.

Idle mode was not in his report so I'm striking from your

consideration and you should not -- you should disregard that

part of his testimony.

     Now, what I will allow is for him to stick to what's in

his report and to read from his -- I think it's paragraph 108

of his report.  That will be fine because that was in his

report.

     And I will also say to you that this idea of idle mode

that came from -- MacKay was it?

          MR. PAK:  Yes, Your Honor.

          THE COURT:  -- Engineer MacKay, I'm not striking that

because he's a fact -- so called fact witness, and he's not

bound by these rules about experts.  So that testimony stands

for MacKay but it does not stand for Schonfeld.  So I'm

striking his testimony, Schonfeld, that deals with idle mode.

     Okay?

          MR. PAK:  Thank you, Your Honor.

          THE COURT:  With that explanation, you may resume.

Please go ahead.

          MR. PAK:  All right.

                    **DIRECT EXAMINATION**  (resumed)

\\\

1   BY MR. PAK:

2   **Q.**   Good morning, Dr. Schonfeld.

3   **A.**   Good morning.

4   **Q.**   Let's take you to paragraph 108 of your rebuttal report.

5          **MR. PAK:**  And, Mr. Fisher, let's have it on the

6   screen.

7                      (Pause in proceedings.)

8   BY MR. PAK:

9   **Q.**   Dr. Schonfeld, if you could take the time for the jury to

10  read exactly what you wrote in that paragraph.

11         **THE COURT:**  Read slowly.

12  BY MR. PAK:

13  **Q.**   Yeah, read slowly.

14  **A.**   The entire paragraph?

15  **Q.**   Yes, please.

16  **A.**   (as read):

17          "As a further example" --

18         **THE COURT:**  No, no.  We can't hear you.

19         **THE WITNESS:**  Oh, sorry.

20         **THE COURT:**  You've got to use the microphone and read

21  slowly so the jury can pick it up.

22      By the way, let me explain to the jury.  These expert

23  reports don't go into evidence.  You won't have them in the

24  jury room.  They never go in.  They're hearsay.  So this is --

25  I'm allowing him to read what was in his report as his

1    testimony, but don't think you're going to be getting these

2    reports in the jury room.

3         Okay.  Go ahead.

4         **THE WITNESS:**  (as read):

5         "As a further example, limitations 1.6 and 1.8, 9.3

6    and 9.5 require the controller to take particular actions

7    based on the first and second requests; namely, to" --

8    quote -- "cause the creation of the first second zone

9    scene; two, cause the indication of the first second zone

10   scene to be transmitted to the first second zone player;

11   and, three, cause storage of the first second zone scene.

12   As I described above, however, the accused steps do not

13   take place while the accused first zone player is in a

14   standalone mode.  Rather, as I described, immediately upon

15   making the request to add a speaker to a group, the

16   speaker being added to the group or the group being

17   created begins playback or nonplayback as a group rather

18   than the remaining accused standalone mode."

19        "As one specific example, the source code I analyzed

20   in multizone, underscore, manager dot CC supra confirms

21   that group playback begins prior to adding the group.  As

22   I discussed, for local, underscore, groups that are not

23   found within the set of speaker groups, underscore,

24   playback for that group is immediately terminated

25   ('StopCurrentApp') and only after this playback is

 1          terminated on the speaker is the new group then added

 2          through the AddGroup function."

 3               "Accordingly, the controller does not" -- quote --

 4          "cause the creation of the first second zone scene; two,

 5          cause an indication of the first second zone scene to be

 6          transmitted to the first second zone player; and, three,

 7          cause storage of the first second zone scene" -- end

 8          quote -- "while the accused zone player remains in the

 9          accused standalone mode."

10     BY MR. PAK:

11     Q.   Thank you, Doctor.

12          And do you stand by that testimony?

13     A.   Yes, absolutely.

14     Q.   Okay.

15               MR. PAK:  Your Honor, may I proceed to the other

16     topics?

17               THE COURT:  Yes.  Please go ahead.

18               MR. PAK:  Okay.  Thank you.

19          So let's take that down.

20     BY MR. PAK:

21     Q.   We're back to the prior art discussion that we were having

22     about the Sonos 2005 prior art system.

23          Are you with me?

24     A.   I am.

25     Q.   Okay.

1          **MR. PAK:**  So let's put up, Mr. Fisher, DDX10.,

2    I believe, 57.

3                    (Pause in proceedings.)

4    **BY MR. PAK:**

5    **Q.**    So we finished claim 1 elements, some of the elements of

6    the '966.  We're going back to the '885 patent, which is

7    written from the zone player perspective; is that correct?

8    **A.**    That is correct.

9    **Q.**    And what we -- what you have highlighted here in the last

10   two elements is 1.9 "After" -- starting with "After the given

11   one of the first and second zone scenes" and 1.10 "Based on the

12   instruction transitioning from operating in the standalone mode

13   to operating in accordance with the given one of the first and

14   second predefined grouping of zone players."

15         Do you see that?

16   **A.**    I do.

17   **Q.**    And before we get into some of the evidence, what is your

18   conclusion, Doctor, after seeing all the evidence on whether

19   the Sonos 2005 prior art system satisfies limitations 1.9 and

20   1.10 of claim 1 of the '885 patent?

21   **A.**    Yeah, Sonos 2005 satisfies both limitations 1.9 and 1.10

22   of claim 1 of the '885 patent.

23          **MR. PAK:**  Let's go to the next slide.

24                    (Pause in proceedings.)

25   \\\

1    BY MR. PAK:

2    Q.    So, Doctor, we covered a lot of ground yesterday about how

3    the system works, but can you summarize for us the evidence

4    you've seen on the Sonos 2005 prior art system with respect to

5    these limitations?

6    A.    Sure.  So what we are talking about right now is on the

7    controller side, the CR100 or the desktop controller, the user

8    said they want to play a particular song and that in turn

9    invokes the play message.  And the play message is received by

10   the coordinator, in this case it's zone player 102.  It's on

11   bottom right-hand corner.

12        And if you remember from yesterday, the zone player has a

13   linked list, something called a group management service, which

14   stores all of the participants' identifiers.  It then forwards

15   a message to allow play on zone players 104 and 106, the

16   participants, and then at that point all of the players play in

17   synchrony.

18   Q.    Is that happening for the Party Mode group functionality

19   of the Sonos 2005 prior art system?

20   A.    In this example I did it for the Party Mode group, that's

21   right.

22   Q.    So just to summarize what I've heard, Doctor, there's a

23   group coordinator, that's the zone player on the bottom right;

24   he receives the play message from the controller, and then that

25   group coordinator coordinates with the other zone players in

1    order to allow music for all the zone players in the house

2    called Party Mode.  Did I get that right?

3    **A.**    That's correct.

4              **MR. PAK:**  So let's turn to the next slide.

5    **BY MR. PAK:**

6    **Q.**    So for the Sonos 2005 prior art system for claim 1 of the

7    '966 patent, which describes the same system from the

8    controller's perspective, what is your opinion on limitation

9    1.10, "While displaying the representation," 1.11, "Based on

10   the third request"?

11   **A.**    So based on the same evidence and analysis I just

12   performed for claim limitations 1.9 and 1.10 of the '885

13   patent, claim limitations 1.10 and 1.11 of the '966 patent are

14   satisfied respectively.

15   **Q.**    Okay.  So we've gone through a lot with the Sonos 2005

16   prior art system, but there's still two limitations from each

17   claim that we still need to discuss; is that correct?

18   **A.**    That's correct.

19              **MR. PAK:**  Just to help the jury orient where we are,

20   if you go to the next slide.

21   **BY MR. PAK:**

22   **Q.**    What is the difference based on all the evidence that you

23   saw in your expert analysis between the functionality that

24   existed in the Sonos 2005 prior art system and the claims at

25   issue for the '966 and '885 patents?

1    **A.**    So we have everything in all of the limitations of claim 1

2    for both patents and we have two overlapping groups, for

3    example, the Party Mode and another group, but only the Party

4    Mode is saved for later.    The second one is not saved for

5    later.

6    **Q.**    That's the gap; is that right?

7    **A.**    That is the difference between Sonos 2005 and what's

8    required by the claims.

9    **Q.**    And how difficult would it be given all of the

10    functionality and code that was running in the Sonos 2005 prior

11    art system to make a modification to that system in order to

12    allow you to save that extra second group?

13            **THE COURT:**    Can I quarrel a bit with the verb tense?

14        **MR. PAK:**    Ah.

15            **THE COURT:**    I think you should say "How difficult

16    would it have been" --

17        **MR. PAK:**    Yes.

18            **THE COURT:**    -- not "how difficult it would be now."

19        **MR. PAK:**    Thank you, Your Honor.

20            **THE COURT:**    Please rephrase your question.

21    **BY MR. PAK:**

22    **Q.**    How difficult would it have been back in 2005 timeframe to

23    a person of ordinary skill in the art to make the modification

24    of saving one of the extra groups that was provided for in that

25    system?

1    **A.**    It would be a trivial step in my view, and I can explain

2    why.

3    **Q.**    Can you please explain?

4    **A.**    Sure.  It's -- we're talking about saving it for later and

5    if you remember yesterday, I said you need two things:  One is

6    to continue to operate as you are now until you need it later;

7    and when you do need it later, you have to make sure it's

8    available.

9        So all you have to do is, if you remember yesterday, I

10    said that there is a channel that has to be shifted from the

11    local playlist to the external playlist, you just move the same

12    code in response to the play message instead of the set

13    AVTransport URI message; and then the same -- the same

14    information that was saved already in persistent memory on the

15    coordinator, the only difference you just keep instead of

16    discarding it when you no longer -- when you are done working

17    with a particular zone group just like you would for the Party

18    Mode.  So these are two very simple steps.

19    **Q.**    So given your and Dr. Almeroth's description of a person

20    of ordinary skill in the art, somebody who has an engineering

21    degree in the relevant field, two to four years of experience,

22    how difficult would it be for that person -- would it have been

23    for that person back in 2005 to make the simple modifications

24    that you were just describing?

25    **A.**    In my opinion, it would have been a trivial exercise to

1    do.  You are just shifting one code and not discarding the

2    identifiers.  That's a very simple operation to do in the code.

3            **MR. PAK:**  Let's go to the next slide.

4    **BY MR. PAK:**

5    **Q.**  So you've already shown us this slide of what actually

6    existed in the Sonos 2005 prior art system; but for the jury to

7    understand, a person of ordinary skill in the art back in 2005

8    could make the modification -- would it have been obvious to

9    make the modification that you talked about to save the first

10   zone group here for later?  Is that your testimony?

11   **A.**  It is my testimony.  The moment you just decide that

12   that's what you want to do, you can do it immediately.

13   **Q.**  And if that obvious modification would have been made back

14   in 2005 by a person of ordinary skill in the art, what would be

15   the result in terms of the functionality that we're seeing here

16   with Party Mode group and first zone group?

17   **A.**  Every claim limitation of both claim 1 of the '885 patent

18   and claim 1 of the '966 patent would have been satisfied.

19           **MR. PAK:**  Let's go to the next slide.

20   **BY MR. PAK:**

21   **Q.**  So now we're checking off all the boxes; is that correct?

22   **A.**  Now we are checking off all of the boxes, that's right.

23   **Q.**  So claim 1 of the '885 patent at the top you have "Sonos

24   2005 prior art system plus POSITA," P-O-S-I-T-A.  That stands

25   for person of ordinary skill in the art; is that correct?

1   **A.**   That's correct.

2   **Q.**   So your testimony now is Sonos 2005 prior art system

3   combined with the knowledge and skills of a person of ordinary

4   skill in the art back in 2005 would have made this obvious

5   modification that you described to satisfy 1.7 and 1.8 of

6   claim 1 of the '885 patent; is that correct?

7   **A.**   That's my opinion, yes.

8   **Q.**   And then we'll come back to the corresponding element of

9   the claim 1 of the '966 patent, but I want to walk you through

10  some additional evidence that you've seen on just these two

11  limitations, 1.7 and 1.8.

12      Would that be okay with you?

13  **A.**   Sure.

14  **Q.**   You didn't stop there; right, Doctor?  You looked at some

15  additional pieces of prior art?

16  **A.**   I did, yes.

17  **Q.**   So if you could turn to TX3698 in your binder.

18  **A.**   (Witness examines document.)

19  **Q.**   You should see the Crestron document.

20  **A.**   I do.

21  **Q.**   And is this a document that you reviewed and considered in

22  forming your opinions?

23  **A.**   I did.

24          **MR. PAK:**   I'd like to move, Your Honor, TX3698 into

25  evidence.

1              **MR. ROBERTS:**  No objection.

2              **THE COURT:**  Any objection?

3              **MR. ROBERTS:**  Mr. Roberts.  No objection.

4              **THE COURT:**  Thank you.  Received in evidence.

5         (Trial Exhibit 3698 received in evidence.)

6    **BY MR. PAK:**

7    **Q.**   So let's turn to the next slide, TX3698 at page 67.

8         What is being described in this Crestron document?

9    **A.**   So the Crestron document talks about having groups that

10   were previously saved -- they are called preset groups -- and

11   it gives one example of the Party Mode that we have heard about

12   several times, including in the patent and the prior art.

13   **Q.**   And is Crestron prior art to these two patents in suit?

14   **A.**   It is.

15   **Q.**   Okay.  Let's take another look at the next page.

16        So looking at TX3698 at lines 99 -- or pages 99 to 100,

17   can you summarize for us what you saw when you looked at the

18   Crestron prior art?

19   **A.**   So here you can see up on top it talks about Party Mode

20   and then it has a list of groups that are available, these are

21   the preset groups, and it gives three examples:  Party, dine

22   and read.

23        And as you can imagine, party is all of the speakers.  The

24   other ones are overlapping groups so it discloses overlapping

25   groups, party and either dine or read.

 1          And it does one more thing.  It indicates in asterisk
 2     which group is currently active, which means that the moment
 3     it's Party Mode.  So none of the speakers are available for
 4     individual playback at the moment because they are all part of
 5     Party Mode.
 6          But if you were to shift it to dine, that would be a
 7     smaller group of speakers, which means some of the speakers
 8     would not be in the Party Mode and would be available to play
 9     back individually.
10          So all of that information is clear when you read what
11     Crestron teaches.
12     Q.   Now, this document also says at the top (as read):
13               "Party Mode and other room groups are preset settings
14          used to recall source room combinations."
15          Do you see that?
16     A.   I do.
17     Q.   And were you here when Mr. Lambourne testified and said
18     preset is one way or one solution for his claimed invention of
19     saving zone scenes for later use?
20     A.   I do recall that testimony.
21     Q.   And there's also disclosure here that says "Pressed --
22     "Press the soft button labeled 'Groups' to display the list of
23     groups" and it has names of those groups.  Can the user change
24     the names of these groups to different things?
25     A.   Yeah.  In Crestron you can change the name to any theme

1  you want, and there are three examples over here:  Party, dine,

2  and read.

3  **Q.**  But you can make it any theme you wanted?

4  **A.**  That's right.

5  **Q.**  Okay.

6        **MR. PAK:**  So let's go to the next slide.

7  **BY MR. PAK:**

8  **Q.**  So we're back to claim 1 of the '966 patent that describes

9  the same system from the controller's perspective.

10       And, Doctor, were you able to check off all the boxes for

11  this Sonos 2005 combined with the knowledge and skill set of a

12  person of ordinary skill in the art for that claim as well?

13  **A.**  Yeah.  Based on the same -- based on the evidence and the

14  analysis I performed for claim limitations 1.7 and 1.8 of the

15  '885 patent, I was able -- it discloses claim limitations 1.7

16  and 1.8 of claim 1 of the -- sorry, let me make sure I get the

17  right -- 1.7 and 1.8 of claim 1 of the '966 patent.

18       And I think I misspoke.  It's based on the evidence and

19  analysis I performed for claims 1.6 and 1.7 of

20  claim limitation 1 of the '885 patent.

21  **Q.**  I know there are lots of limitations and claims; but in

22  summary, the evidence that you already showed us for claim 1 of

23  the '885 patent, do they support your understanding and opinion

24  that all of the elements of claim 1 of the '966 patent are also

25  satisfied on Sonos 2005 combined with the knowledge of a person

 1    of ordinary skill in the art?

 2    **A.**    That's correct.

 3    **Q.**    Okay.

 4            **MR. PAK:**  Go to the next slide.

 5            **THE COURT:**  Let me ask a question before.

 6        On this Crestron -- am I saying it right?

 7            **MR. PAK:**  Crestron, Your Honor.

 8            **THE COURT:**  Crestron, all right.

 9        Was that before the examiner?

10            **THE WITNESS:**  It was, sir.

11            **THE COURT:**  All right.  So have you explained why

12    you -- how did -- the examiner must have disagreed with you

13    then.

14            **THE WITNESS:**  Well, my -- here I'm just applying the

15    general knowledge of a POSITA to the Sonos 2005 system, and

16    Sonos 2005 system was not available before the examiner.  Only

17    user manuals were available, not the source code that shows the

18    messages, not the deposition testimony, the interrogatory

19    response.  So he was -- in my opinion, the examiner was not in

20    a position to identify all of the limitations that are

21    disclosed in the system based on the user manual alone.

22            **THE COURT:**  All right.  Thank you for that.

23    **BY MR. PAK:**

24    **Q.**    And just to follow-up on His Honor's question Crestron was

25    part of about 70,000-plus pages of material that was submitted

1  for the patent examiner; is that right?

2  **A.**   In total, not including -- not -- for the two patents not

3  including the actual patent prior arts, which are several

4  hundred patents.

5  **Q.**   Is that correct?

6  **A.**   Yes.

7  **Q.**   And was Crestron reference specifically discussed by the

8  examiner during prosecution?

9  **A.**   Not to the best of my recollection, no.  It was just

10  listed.

11         **MR. PAK:**  So now let's turn to the next slide.

12  **BY MR. PAK:**

13  **Q.**   And looking at claim 1 of the '885 patent, we're not going

14  to switch to the Sonos prior art forum postings that we've

15  heard a lot about in this case.

16      Are you with me?

17  **A.**   I am.

18  **Q.**   This time we're combining Sonos 2005 prior art systems

19  with the Sonos prior art forum postings about that same system;

20  is that correct?

21  **A.**   That is correct.

22  **Q.**   Okay.  And just right off the bat, would it have been

23  obvious to those skilled in the art back in 2005 when they

24  looked at the Sonos 2005 system and also looked at the forum

25  postings about that system to make a combination in their mind?

1   **A.**   Yeah, absolutely.  The Sonos forum was posting of people

2   who were interested -- users, dealers who were interested in

3   the Sonos 2005 system, and they were making suggestions of how

4   to modify the Sonos 2005 system to improve it.

5   **Q.**   So this time we're going to be focusing on we saw the

6   Sonos 2005 prior art system had everything but not 1.7 -- 1.7

7   and 1.8 limitations of claim 1 of the '885 patent; correct?

8   **A.**   That's correct.

9   **Q.**   So you're combining Sonos forums, which is prior art, to

10  address those limitations; is that correct?

11  **A.**   That is correct.

12  **Q.**   All right.  So let's look at the evidence now that the

13  jury has already seen and see if we can piece it together.

14          **MR. PAK:**  Let's go to the next slide DDX10.67.

15  **BY MR. PAK:**

16  **Q.**   We're looking at one of the Sonos forum prior art postings

17  dated February 27, 2005; is that correct?

18  **A.**   That is correct, yes.

19  **Q.**   This is TX2424.  This was the user boyG, theboyG, do you

20  recall that?

21  **A.**   I do.

22  **Q.**   And he says "Why can't I have a virtual zone, a zone

23  called downstairs, and I can group all my downstairs zones into

24  this?  Then I don't have to keep manually linking/unlinking

25  multiple zones every time."

1     What does this disclosure in this piece of prior art tell

2  you about claim limitations 1.7 and 1.8?

3  **A.**   So in here the person with the handle name theboyG is

4  complaining about the fact that every time they want to use a

5  group like downstairs, they have to link it manually; and every

6  time they want to go back to what is described in the claim as

7  the operating in standalone mode, they have to unlink it.

8     And so they are saying instead of pressing those three

9  buttons that I mentioned yesterday, they would like to just

10  press one button and still have the ability to play

11  individually on the speakers until you want to press that

12  button.

13     **MR. PAK:**   Let's go to the next slide.

14  **BY MR. PAK:**

15  **Q.**   So we're looking at two more pieces of prior art from the

16  Sonos forum posts, TX3930 at page 1, Jeff T.

17     What was Mr. T -- Jeff T saying about the problem and the

18  solution for these zone scenes?

19  **A.**   So, Jeff T proposes two different things.  The first one

20  is similar to theboyG.  He proposes the morning mode, which

21  is -- would be a saved zone scene.  And in addition to that, he

22  also says We:  Have a Party Mode right now.  I'd like to have

23  two party modes.  One summer Party Mode, which would be just

24  like the current Party Mode in Sonos 2005, and then a new Party

25  Mode that excludes the deck speakers, the deck zone player,

 1  because during the winter I don't need to play music on the

 2  deck.

 3      And so both of these are -- disclosures were part of

 4  Jeff T.

 5  **Q.**   He had another Sonos prior art posting from the same

 6  location, TX3928 at page 3.  This one is from a user named

 7  Floras Dad.  Do you see that?

 8  **A.**   I do.

 9  **Q.**   This was dated September 27th, 2005; is that correct?

10  **A.**   That is correct.

11  **Q.**   And he says:  Great idea.  A macro-like scripter would

12  enable you to set groups of zones, associate different things

13  like volumes, and you could do these as dynamic presets based

14  on the Party Mode, which a spouse would love, like

15  entertaining, romantic dinner, ambiance, et cetera.

16      What was Mr. Floras Dad saying about the problem and

17  solution of the patents in suit?

18  **A.**   So in this particular post Floras Dad is excited about the

19  idea for the two overlapping zone groups, and he says:  Here is

20  how we can do it.  We can have those presets, which means that

21  they are saved, and then we can write a macro-like scripter to

22  allow it to be used when we want so it can play individually

23  when we want it and then just activate all of the -- all of the

24  zones together when we want to play in the same scene.  And

25  then in addition on the bottom, he's suggesting other themes,

1  like entertaining, romantic dinner, and so on.

2  **Q.**   And is a macro-like scripter program instructions?

3  **A.**   Yeah, they are program instructions at a high level.

4  **Q.**   So if we go to -- and all of this is happening before

5  Mr. Lambourne says he came up with the ideas for the zone scene

6  patents; correct.

7  **A.**   Yeah, it's all before the conception date of December 21,

8  2005.

9        **MR. PAK:**  Let's go to the next slide.

10       Actually, the one just before that.  Oh, actually, so

11  let's go to the next slide.  This is fine.

12  **BY DEFENSE COUNSEL:**

13  **Q.**   We're looking at TX3930 at 10 -- at 1.

14       Just to visualize what we're seeing in Jeff T's post, what

15  are you showing here with the figure?

16  **A.**   So I showed you before the two overlapping groups, but in

17  this case the two overlapping groups are two Party Mode groups

18  proposed by Jeff T.  The summer Party Mode is the original

19  Party Mode in Sonos 2005 and the winter Party Mode would

20  operate in exactly the same way but on a smaller group of zone

21  players.

22  **Q.**   And, again, it's your view that these are overlapping zone

23  scenes; correct?

24  **A.**   They are overlapping.

25  **Q.**   And let's see what Mr. Lambourne, the inventor of these

1  patents, said about exactly this post.  He was asked during

2  trial that the jury heard (as read):

3      "What Jeff T the user was describing in a publicly

4      available Sonos forum posting dated September 22nd, 2005,

5      is having multiple zone scenes that are saved for later;

6      correct?"

7  The answer he gave was:  "Yes."

8  He was further asked (as read):

9      "And those zone scenes could be overlapping in that

10     they would share a speaker or a zone player; correct?"

11 Answer (as read):

12     "Yes.  And in the summer and winter mode he is

13     describing, yes."

14 Is Mr. Lambourne's sworn testimony before this Court the

15 same as your opinions regarding this post?

16 **A.**   Yeah.  We completely agree on this issue.

17 **Q.**   So we have Mr. Lambourne's testimony, we have your

18 independent review, and let's take a look at one more critical

19 piece of testimony from the inventor, Mr. Lambourne, which is

20 at page 541, 2 through 7.  He was asked (as read):

21     "So Mr. Greenwood, in this prior public posting about

22     the Sonos 2005 system, was describing the same type of

23     problem that you were trying to solve with zone scenes and

24     suggesting macros, which is a similar solution to what you

25     had in mind for that functionality; correct?"

1    Answer (as read):  "In broad terms, yes.  As an outcome,

2    yes."

3    That was the sworn testimony that you heard from

4  Mr. Lambourne; correct?

5  **A.**    That is correct.

6  **Q.**    And based on your independent review of all of the

7  evidence, do you agree with Mr. Lambourne's testimony about the

8  Sonos prior art forums combined with Sonos 2005 system?

9  **A.**    I do agree, yes.

10    **MR. PAK:**  So turning to -- Mr. Fisher, if we could go

11  to DDX10.75.  Actually, prior to that.

12    (Pause in proceedings.)

13    **MR. PAK:**  Yeah.

14  **BY MR. PAK:**

15  **Q.**    So looking at Sonos 2005 plus Sonos forums for now 1.78

16  limitation, 1.8 limitation of the '966 patent, what is your

17  opinion on whether that combination satisfies those limitations

18  as well as all the other limitations?

19  **A.**    So, again, these two limitations are satisfied by the

20  combination of Sonos 2005 system together with Sonos forums

21  based on the evidence and analysis I performed for claim

22  limitations 1.6 and 1.7 of the '885 patent.

23  **Q.**    To summarize, if we take the Sonos 2005 prior art system,

24  combine it with the prior art Sonos 2005 forum postings, what

25  is your opinion on whether the independent claims of the '966

1    patent and the '885 patent would have been obvious to those of

2    ordinary skill in the art?

3    **A.**    I think that they would have definitely been obvious in my

4    mind based on the knowledge of person skill -- of a person of

5    ordinary skill in the art when you combine these two systems.

6    **Q.**    Dr. Schonfeld, let's take a look at TX6513.  This is the

7    Nourse patent.

8    **A.**    (Witness examines document.)  Yeah, I see it.

9    **Q.**    Is this an earlier patent that you considered in forming

10   your opinions in this case?

11   **A.**    It is, yes.

12          **MR. PAK:**  Your Honor, I'd like to move TX6513 into

13   evidence.

14          **MR. ROBERTS:**  Mr. Roberts.  No objection.

15          **THE COURT:**  Thank you.  In evidence.

16       (Trial Exhibit 6513 received in evidence.)

17   **BY MR. PAK:**

18   **Q.**    We're going to talk about Nourse briefly, but Sonos 2005

19   prior art system combined with another prior art, Nourse, would

20   that have rendered 1.7 and 1.8 limitations of claim 1 of the

21   '885 patent obvious to those skilled in the art?

22   **A.**    In my opinion, it would.

23   **Q.**    And let's look at this patent.  So this was dated earlier,

24   September 2002, in terms of filing date; is that correct?

25   **A.**    That's correct, yes.

SCHONFELD - DIRECT / PAK

1  **Q.**   And this is a patent that belongs to somebody else other

2  than Sonos; correct?

3  **A.**   It is, yes.

4  **Q.**   And briefly what is the Nourse patent teaching about what

5  you can do back as part of the prior art?

6  **A.**   So it's a general management system for general speaker

7  systems and any application such as public announcement system

8  or any other speaker system.

9       And if you go to the next slide, it teaches two -- at

10 least two things.  First, up on top it teaches the fact that

11 each of the plurality of speakers can further be assigned up to

12 four group identifiers.

13      And I said something similar in a different context

14 yesterday, but it means if you -- one speaker belongs to four

15 different group identifiers, it means that all four of these

16 groups contain that speaker, which means that all four of these

17 groups are overlapping.

18      And, secondly, it teaches the fact that each speaker based

19 on the addresses can receive your new content to the speaker

20 and play individually or as a group depending on which address

21 is used, which means it's able to play and operate in

22 standalone mode and play back individually or play

23 synchronously as part of a group.

24 **Q.**   And it says here that the addresses that you were using,

25 the address data that you would be using, is 16 bits.  Do you

1    see that?

2    **A.**    I do see it, yes.

3    **Q.**    And then there's four group identifiers there for --

4    **A.**    Yes.

5    **Q.**    -- speaker?

6        So how difficult would it have been for somebody to take

7    these bits of information and store them for later use?

8    **A.**    It's just a matter of storing in this case 64 bits.  It's

9    a trivial operation.  Most type of computing devices have in

10   the order of typically over 30 megabytes of data.  Here we're

11   talking about 16 bit per address.  It's a trivial thing to do.

12   **Q.**    And megabytes is a million bites or a million times 8

13   bits; is that right?

14   **A.**    That's right.

15   **Q.**    And based on your review of the evidence on the Sonos 2005

16   prior art system, do they have that type of storage?

17   **A.**    Absolutely.  They have much more.  They had to store all

18   of the code, thousands of titles.  This would have been a

19   trivial change.

20           **MR. PAK:**  Can we go to the next slide.

21   BY MR. PAK:

22   **Q.**    So if we're looking at Sonos 2005 prior art system with

23   Nourse, what is your opinion on whether 1.7 and 1.8 of claim 1

24   of the '966 patent is rendered obvious?

25   **A.**    In my opinion, claim 1.7 and 1.8 would have been satisfied

1  based on the combination of Sonos 2005 and Nourse based on the

2  evidence and analysis I presented for claim limitations 1.6 and

3  1.7 of claim 1 of the '885 patent.

4  **Q.**   And why would it have been obvious to those skilled in the

5  art back in 2005 to combine Nourse with Sonos 2005 prior art

6  system?

7  **A.**   It's addressing management of speaker systems.  They're

8  both addressed to the same type of topic.  They are solving

9  very similar problems of managing saving zone groups and making

10  them available and flexible to play individually or play later.

11  **Q.**   Okay.  We've gone through a lot of prior art, but I do

12  want to talk about one just more briefly.  That's the

13  Squeezebox system that the jury has seen.

14      Did you analyze that system as well?

15  **A.**   I did, yes.

16  **Q.**   And this time we're just going to focus on claim element

17  1.7 and 1.8 of the '966 as well as the claim 1 of the '885

18  patent.

19      Are you with me?

20  **A.**   Okay.

21  **Q.**   So before we go through some of the evidence briefly,

22  Sonos 2005 prior art system combined with the Squeezebox prior

23  art system, would that combination satisfy all the limitations

24  of claim 1 of the '885 patent?

25  **A.**   Yeah, that combination would have been obvious in

1  satisfying all -- those limitations; and, therefore, all of the

2  limitations of claim 1 of the '885 patent would have been

3  satisfied.

4  **Q.**   And we saw some testimony earlier in the trial from

5  Mr. Lambourne.  Do you recall that?

6  **A.**   I do.

7  **Q.**   And he says, this is at page 556 of the trial transcript

8  (as read):

9              "But here you were in November of 2003 trying to

10       think about how to design the Sonos 2005 prior art system

11       and you were listing a number of products here."

12       Do you see that?

13  **A.**   I do.

14  **Q.**   And he says (as read):

15       **"ANSWER:**  Yes.

16       **"QUESTION:**  One of the products you listed was Squeezebox;

17       correct?

18       **"ANSWER:**  Yes."

19       Do you recall that?

20  **A.**   I do.

21  **Q.**   Do you recall his testimony that they also obtained two of

22  these Squeezebox systems and tested them for grouping

23  functionality in 2003?

24  **A.**   Yeah.  I remember them talking about how well they

25  performed and other people in an e-mail chain were chiming in.

1    Q.    So what is your opinion hearing all of that and your

2    independent review on whether someone of ordinary skill in the

3    art back in 2005 would have combined what was known in the

4    Squeezebox system with the Sonos 2005 prior art system?

5    A.    That they were competitors back then.  They were trying to

6    do the same type of system.  They would have looked into each

7    other's system and tried to see what the competitor is doing

8    and they did.

9    Q.    So if we turn to -- actually turn to 3808 in your

10   manual -- in your binder.  That should be the 3808, TX3808,

11   which is the Squeezebox manual.

12   A.    (Witness examines document.)  Yeah, I see it.

13        THE COURT:  Is that already in evidence?

14        MR. PAK:  Your Honor, I think I have to introduce this

15   one in.

16        And we can actually put it on the screen, Your Honor,

17   TX3808.

18   BY MR. PAK:

19   Q.    Do you recognize this document?

20   A.    I do.

21   Q.    And is this something that you reviewed and relied upon in

22   forming your testimony?

23   A.    Yes, it is.

24        MR. PAK:  I'd like to move 3808 into evidence,

25   Your Honor.

1          **MR. ROBERTS:**  No objection.

2          **THE COURT:**  Received.

3          (Trial Exhibit 3808 received in evidence.)

4    BY MR. PAK:

5    **Q.**  All right.  What are we showing here from the manual for

6    the Squeezebox prior art system?

7    **A.**  So you can see the Squeezebox up in the middle, and that's

8    a device that connects with wires.  Just like the ZP100 from

9    Sonos it connects with wires to speakers.  You can see it on

10   the bottom right.

11        And then in addition, it can connect either by ethernet

12   wire or wirelessly through Wi-Fi to a controller.  In this case

13   the controller is just a computer.  It could be a desktop

14   computer or laptop.  And what is shown here is one Squeezebox,

15   but you can connect multiple Squeezeboxes.

16   **Q.**  And in forming your opinions about the Squeezebox prior

17   art system, did you analyze some of the available source code

18   and test that product?

19   **A.**  I did, yes.

20   **Q.**  So briefly let's go through some of that analysis you did.

21        What is Softsqueeze?

22   **A.**  So Softsqueeze is a an emulator that gives you a software

23   version of Squeezebox that you can run on a computer.  It's

24   provided by the company -- by the same company that produces

25   Squeezebox, and it behaves just like the Squeezebox itself.

1   Q.   If I look at the picture on the bottom, that's the picture

2   of the actual Squeezebox system or the product; correct?

3   A.   That's correct.  On bottom left, yeah.

4   Q.   And what is shown on the right?

5   A.   That's what you see on the screen when you run the

6   Softsqueeze.  That is designed by the company to operate just

7   like the Squeezebox on the left.

8   Q.   And Doctor, can you take a look at TX2508 in your binder?

9   A.   (Witness examines document.)

10       MR. PAK:  If I can have it on the screen briefly.

11   Mr. Fisher, if you can put up the next slide.

12       THE WITNESS:  I see it.

13   BY MR. PAK:

14   Q.   Is this a document that you considered and relied upon in

15   forming your opinions?

16   A.   It is, yes.

17       MR. PAK:  I'd like to move TX2508 into evidence.

18       MR. ROBERTS:  No objection.

19       THE COURT:  Thank you.  In evidence.

20       (Trial Exhibit 2508 received in evidence.)

21   BY MR. PAK:

22   Q.   And what are you showing us here in TX2508?

23   A.   So this is a printout from a website called the

24   Wayback Machine.  The Wayback Machine is an archive on the

25   internet that authenticates the way other websites were on

1    particular dates.

2         And this particular printout contains links to a source

3    code and to executable code, software, running -- that is

4    available for various components of Squeezebox.  Squeezebox

5    believed in open source, which means it shares the code with

6    everybody.  This way it allowed other people to modify the

7    code, change code.  So they made it available back then to

8    anybody to play with and download.

9    **Q.**   And which specific version of the SlimServer code --

10   source code did you look at and what was the date corresponding

11   to that?

12   **A.**   So that would have been SlimServer V.5.3.1.  It's on the

13   bottom over here in yellow.  The date is October 1, 2004.

14   **Q.**   And did you change any of that code, the actual open

15   source code, in performing your analysis?

16   **A.**   No, I did not.  I just downloaded as it was.  I reviewed

17   the source code, and I ran the software itself.

18   **Q.**   And is that source code prior art to these two patents?

19   **A.**   That source code is prior art to these two patents, yes.

20   **Q.**   And looking at TX3007 in your binder.

21   **A.**   (Witness examines document.)

22           **THE COURT:**  Zero zero seven?

23           **MR. PAK:**  That's right, Your Honor, TX3007.

24           **THE WITNESS:**  Yep.

25   \\\

1   BY MR. PAK:

2   **Q.**   Did you rely on these set of printouts?

3   **A.**   These are -- yeah.  I believe, 3007 is the entire source

4   code in electronic form, and these printouts are excerpts

5   showing what some of the printouts of the source code that I

6   relied on looked like.

7           **MR. PAK:**  And I'd like to move, Your Honor, TX3007

8   into evidence.

9           **MR. ROBERTS:**  No objection.

10          **THE COURT:**  Thank you.  In evidence.

11          (Trial Exhibit 3007 received in evidence.) **July**

12  BY MR. PAK:

13  **Q.**   And so you looked at -- you downloaded the source code,

14  you printed some of them out, and this is what we're looking

15  at; is that correct?

16  **A.**   That is correct yes.

17  **Q.**   And did you actually then do product testing in addition

18  to the source code?

19  **A.**   I did, yes.

20  **Q.**   And on this source code and based on the product testing,

21  is there a storage of the membership information in Squeezebox

22  of all the different groups?

23  **A.**   Yeah, there is a storage in two places.  One of them is on

24  the controller.  It's actually stored on the disk or flash.

25  It's just a computer and it stores it in nonvolatile memory,

 1  which is certainly persistent.

 2      And in addition, on the Squeezebox itself there is the

 3  same notion of coordinator and participant.  It's called by

 4  different names, but it's the same idea.  And, again, the

 5  coordinator includes all of the list -- it's an array in this

 6  case -- of all of the other members of that particular group.

 7          **MR. PAK:**  And so turning to the next slide,

 8  Mr. Fisher.

 9  **BY MR. PAK:**

10  **Q.**  So when you performed the testing of the Squeezebox and

11  the Softsqueeze player, what were you able to find in terms of

12  synchronization of the different groups?

13  **A.**  Yeah, the Squeezebox system was designed to allow you to

14  play to individual Squeezebox players or to synchronize

15  multiple of them; and I was able to see the actual

16  synchronization tab allow to build the synchronization group,

17  and I actually played music in synchronized fashion from those

18  multiple different speakers.

19  **Q.**  And just can you read into the record the user interface

20  screen that you saw when you tested the Squeezebox system?

21  **A.**  Sure.  It says (as read):

22          "Synchronize.  The player can be synchronized with

23      other players enabling them to play the same music

24      simultaneously.  Choose the players you would like to

25      synchronize with from the list of available

1     synchronization groups."

2          **MR. PAK:**  And then if you turn to the next slide,

3     Mr. Fisher.

4     **BY MR. PAK:**

5     **Q.**    So just help us understand what you were doing.  Is this

6     an accurate depiction of the testing that you did without

7     modifying any of the source code for the Squeezebox system?

8     **A.**    That's correct.  It's -- I actually ran their software

9     directly, and I just simply ran it and created these two

10    overlapping groups.

11    **Q.**    And are those two overlapping groups zone scenes as you

12    have been discussing in this case?

13    **A.**    Yeah, they are zone scenes.  Their name is Player 1 plus

14    Player 2, but they are zone groups that are previously saved

15    and provide the information about all of the grouping.

16    **Q.**    Okay.

17          **MR. PAK:**  If we turn to the next slide.

18    **BY MR. PAK:**

19    **Q.**    What do we see here on this screen?

20    **A.**    So I just showed you a visual, but I didn't perhaps

21    convince you that I really actually did it; and to show you

22    what happens on the controller, it has something that's known

23    as a preference file where it keeps a record of all of the

24    information that it built when you created the groups, and

25    it -- there's a portion up on top that has a few parameters

 1    that I highlighted.  One of them is the sync group ID, which

 2    tells you what is the group number, and that number ends with

 3    235 and it contains Player 1 and Player 3.

 4         And on the bottom it's the same idea, but this time it's a

 5    different group, different sync group ID ending in 355 in both

 6    cases, and it contains different players, Player 1 and

 7    Player 2.  But as you can see Player 1, resides in both of the

 8    groups; and, therefore, the picture I just showed you in the

 9    previous slide depicts exactly what I just simply constructed

10    here.

11    Q.   And so were you able to actually generate these test files

12    in the configuration file for the Squeezebox system without

13    changing any of the source code?

14    A.   Yeah.  The system itself generated this, and I just

15    grabbed that information from the preference file.

16    Q.   So what we see here is Player 1, that's one speaker or

17    zone player, belonging to two different overlapping zone

18    scenes; is that correct?

19    A.   That's correct.

20    Q.   And I think you mentioned before with this, the Squeezebox

21    system, you could also change the name of the speakers; right?

22    You could go from Player 1 to upstairs and give it any other

23    name you wanted?

24    A.   I believe that's correct.

25    Q.   Now let's turn to the next slide.

1    **A.**   Actually, that's correct, I did do it, yes.

2    **Q.**   Okay.  We're covering a lot of material.

3         So claim 1 of the '966 patent, which is the same system

4    written from the controller perspective, the combination of

5    Sonos 2005 combined with Squeezebox, were you able to check off

6    all the boxes including limitation 1.7 and 1.8?

7    **A.**   I was.  Again, based on the evidence of claim limitations

8    1.6 and 1.7 of claim 1 of the '885 patent, these two

9    limitations are satisfied as well by this combination.

10   **Q.**   Now, there's some dependent claims for the '966 patent;

11   correct?

12   **A.**   There are, yes.

13   **Q.**   So we're going to briefly talk about a few of those.

14        **MR. PAK:**  If you go to the next slide.

15   **BY MR. PAK:**

16   **Q.**   Can you just explain briefly what claim 2 which depends

17   from claim 1 of the '966 patent requires?

18   **A.**   Sure.  In claim 1 of the '966 patent, if you remember the

19   last step was to invoke one of the zone scenes, the first zone

20   scene, and what this requires is that you have another message

21   which actually tears down that particular group and invokes the

22   second zone scene.  And so that's what's required by the claim.

23   **Q.**   And based on -- let me ask you.  Are the limitations, the

24   additional limitations, of claim 2 satisfied by the prior art

25   Sonos 2005 system?

1   **A.**    Yes.  Based on the evidence I presented for claim 1 of the

2   '966 patent, it satisfies this dependent limitation as well.

3   **Q.**    Can you briefly summarize why?

4   **A.**    So if you look at the next slide, you recall I talked

5   about the play message arriving for one of the zone scenes or

6   one of the zone groups, and this could apply to any message.

7   If you were to apply it in the next slide, you will see you can

8   do the same thing to the Party Mode as I spoke about earlier,

9   and that would do exactly what's required.  It would tear down

10  the previous zone group and begin to activate in synchrony in

11  this particular Party Mode in this case.

12  **Q.**    So we checked off claim 2.

13       Looking at claims 3 and 4 of the '966 patent, what do they

14  add that's not covered by claim 2?

15  **A.**    Claim 3 and 4 requires that the storage be done somewhere

16  outside of the controller and, for example, the zone player

17  would satisfy this.

18  **Q.**    And were you able to find those elements of claim 3 and 4

19  in the prior art Sonos 2005 system?

20  **A.**    I was.

21  **Q.**    And where did you find the storage of the membership

22  information for a group in the Sonos 2005 prior art system?

23  **A.**    So based on the same information, the same evidence and

24  analysis I did for claim 1 of the '966 patent, I spoke about

25  the fact that you have a linked list, that group management

1  service in the coordinator, that's where the storage takes

2  place, and the coordinator is a zone player.

3  **Q.**   So, for example, if we look at this slide, any one of

4  these zone players on the left could be one of those group

5  coordinators; correct?

6  **A.**   That is correct, yes.

7  **Q.**   And that would be true for the Party Mode as well;

8  correct?

9  **A.**   That is correct.

10  **Q.**   So we've checked off 2, 3, 4.

11       Claim 6 what does that add?

12  **A.**   This requires that the two groups be such that one is not

13  a part of the other one.  So each one has at least one zone

14  player that's not in the second group.

15  **Q.**   And --

16  **A.**   Or not in the other group, to be more precise.

17  **Q.**   And did you find claim 6 to be present in the Sonos 2005

18  prior art system?

19  **A.**   Yes.  Based on the same evidence I presented for claim 1

20  of the '966 patent, this is satisfied as well.

21  **Q.**   So if we look at this slide, what's shown here about the

22  Sonos 2005 prior art system?

23  **A.**   So I showed how to build one zone group, which consisted

24  of two zone players; but you could do the same thing again and

25  choose different two that are overlapping, in which case this

1  is the picture that would correspond to two zone groups that

2  are -- you are able to create in the Sonos 2005 system.  You

3  just repeat.  If you remember, I had the group in blue.  You

4  just do it again but for a different group.

5  **Q.**  And is this related to what the Sonos prior art forum

6  posters were saying about how having different Party Modes or

7  different zone scenes?

8  **A.**  Yeah.  It would -- you could do this even without that.

9  You could do it just on a regular Sonos 2005 system; but if you

10 also wanted to meet claim limitations 1.7 and 1.8 of the '885,

11 you would have to do this extra step.

12 **Q.**  Okay.  We're down to the last claim.

13     Claim 8 of the '966 patent, did you find that claim

14 element to be satisfied in the Sonos 2005 prior art system?

15 **A.**  I did, based on the same evidence and analysis of claim 1

16 of the '966 patent.

17 **Q.**  And briefly can you summarize the evidence that we've

18 already seen that satisfies this element?

19 **A.**  Yeah.  This particular claim limitation requires that you

20 have user inputs for both the first request when you first form

21 the first group by linking and then do it again for the second

22 group, and that's depicted on the left-hand side; and then

23 ultimately that you do the third request with user input, which

24 means you invoke, you press the "Play" button.  This shows

25 "Okay" but in reality there is a button underneath the hand

1  that's the "Play" button that could be based on user input, and

2  this claim is satisfied.

3  **Q.**  Okay.  We're now done with your prior art opinions.  I

4  want to briefly touch on a few issues that also relate to

5  damages in this case.

6      But, sir, you understand that if the jury were to find

7  that these patents are invalid, then there is no infringement

8  and no damages; correct?

9  **A.**  That is correct.

10 **Q.**  All right.

11      **MR. PAK:**  So let's turn to the next slide.

12 **BY MR. PAK:**

13 **Q.**  Do you remember I believe this was Mr. Lambourne talking

14 about this 2020 article from CNN?  Do you see that?

15 **A.**  I do recall that.

16 **Q.**  This is TX6780.  When you look at this article, does it

17 say anything about overlapping zone scenes?

18 **A.**  No.

19 **Q.**  And it says (as read): "Save a group of speakers as a

20 preset."

21      Do you see that?

22 **A.**  I do.

23 **Q.**  Have we seen that idea somewhere in the prior art?

24 **A.**  Yeah.  I kept on referring to this notion of saving zone

25 scene repeatedly, and we saw it in at least three or four, if

1    not more, references.

2    **Q.**    So is this CNN article talking at all or giving any praise

3    about the specific claims in this case which require

4    overlapping zone scenes?

5    **A.**    No.  It's unrelated to the particular claims in this case.

6    **Q.**    Okay.  And let's look at --

7              **MR. PAK:**  Go back, Mr. Fisher.

8    **BY MR. PAK:**

9    **Q.**    You were asked to provide some opinions, technical

10    opinions, about an agreement, the patent purchase agreement,

11    between Google and Outland Research, which is TX6016; is that

12    correct?

13    **A.**    That's correct.

14    **Q.**    And did you, in fact, analyze this purchase agreement and

15    some of the patents that are covered by this agreement?

16    **A.**    I did, yes.

17    **Q.**    And what's your opinion -- and we're going to talk about

18    some of the specification opinions.  What is your general

19    opinion on whether at least some of the patents covered in this

20    purchase agreement are technologically comparable to the two

21    zone scene patents that we're discussing?

22    **A.**    Yeah, in my opinion at least some of the patents in this

23    portfolio are technologically comparable to the claims in this

24    case.

25    **Q.**    And let's look at one example of that, and if you look at

1    TX2625.

2        We can put it on the screen just for a brief moment.

3        TX2675, United States Patent 7603414, did you rely on this

4    document in forming your opinions about the purchase agreement?

5    **A.**    I did, yes.

6        **MR. PAK:**  All right.  Your Honor, I'd like to move

7    TX2675 into evidence.

8        **MR. ROBERTS:**  No objection.

9        **THE COURT:**  2675.

10    (Trial Exhibit 2625 received in evidence.)

11    **BY MR. PAK:**

12    **Q.**    All right.  So this is one of the patents that Google

13    purchased from Outland Research; is that correct?

14    **A.**    It is, yes.

15    **Q.**    And can you tell us the relevant aspects of this patent

16    that led to your conclusion that at least some of the patents

17    covered by the Outland purchase agreement is technologically

18    comparable?

19    **A.**    Sure.  So at least this patent talks about the fact that

20    you have multiple speakers in a voice communication and that

21    you want to provide background sound or music to all of them

22    simultaneously in synchrony, and so it teaches how to provide

23    that background music or sound to all of the speakers.  It

24    teaches synchronization.  It actually goes into the timing

25    information.  It goes further into synchronization signals, all

1  of the things that are required in order to allow for

2  synchronization.

3  **Q.**   Is synchronization one of the claimed elements of the two

4  patents in suit for group operation?

5  **A.**   Yeah.  That's the end result of both patents.

6  **Q.**   Okay.  Did you find some other patents in the purchase

7  agreement between Google and Outland that has similar

8  disclosures in forming your opinions on technological

9  comparability?

10  **A.**   Yeah.  Some of them were similar, others were a little bit

11  weaker, but there were at least four that were in the general

12  area that I would view as technical comparability.

13       **MR. PAK:**  Thank you, Your Honor.  I would like to pass

14  the witness.

15       **THE COURT:**  All right.  Can we get started on the

16  cross-examination or does anyone need a break right now?

17                    (No response.)

18       **THE COURT:**  Okay.  We'll get started on the cross.

19  Please begin.

20       **MR. ROBERTS:**  Thank you, Your Honor.

21     Permission to approach the witness and give him --

22       **THE COURT:**  Sure.  Go ahead.

23       **MR. ROBERTS:**  Thank you.

24                    (Pause in proceedings.)

25  \\\

1  <u>**CROSS-EXAMINATION**</u>

2  **BY MR. ROBERTS:**

3  **Q.**  Let me know when you're ready.

4  **A.**  I am.

5  **Q.**  Good morning.  My name's Clem Roberts.  I'm going to do

6  your cross-examination today.

7       Dr. Schonfeld, you read at the beginning of this morning

8  paragraph 108 from your expert report; correct.

9  **A.**  I did, yes.

10  **Q.**  And that paragraph relates to the '966 patent that's in

11  the '966 section of your report?

12  **A.**  I am -- I would have to go back and check.

13  **Q.**  Okay.  Why don't you look very quickly.

14  **A.**  (Witness examines document.)

15  **Q.**  If you look, the '966 section begins on page 54 at

16  paragraph 98.

17  **A.**  (Witness examines document.)  I believe that is correct.

18  I believe the similar sentence would appear in the first

19  section for '885, but that was an example.

20  **Q.**  Okay.  That wasn't my question.  My question was just:

21  This paragraph is about the '966; correct?

22  **A.**  I believe so.

23  **Q.**  You have been deposed in roughly 45 or 50 patent cases;

24  correct, sir?

25  **A.**  That sounds about right.

1   **Q.**   And you've been an expert witness for Google before?

2   **A.**   I have, yes.

3   **Q.**   Your rough estimate is that you've been an expert witness

4   for Google seven or eight times?

5   **A.**   Not in trial but in cases involving Google, that sounds

6   right.

7   **Q.**   More than 50 percent of your annual income comes from

8   being an expert witness or litigation consultant; correct?

9   **A.**   That's absolutely right.

10  **Q.**   The claims of both of the patents in this case call for

11  the zone player to remain in standalone mode after it has been

12  added to a group; correct?

13  **A.**   After it has been added before it was invoked, that's

14  right.

15  **Q.**   Your view is that to operate in standalone mode, you

16  actually have to be playing audio individually; correct?

17  **A.**   My view is that to operate in standalone mode in which you

18  play -- the zone player plays back media individually, you

19  actually have to test it by playing audio, that's right.

20          **MR. ROBERTS:**  Let's -- let's roll the tape from

21  Sonos -- from Mr. Dr. Schonfeld's deposition testimony

22  February 3rd, 2023, 44:18 through 45:12, please.  Roll, please.

23          **MR. JAY:**  Video?

24          **MR. ROBERTS:**  Video, please, yes.  Thank you, Mr. Jay.

25              (Video was played but not reported.)

1  BY MR. ROBERTS:

2  Q.   And yesterday, sir, you testified that operating in

3  standalone mode in which the zone player is configured to play

4  back media individually, that phrase means you are actually

5  playing audio, you hear it; correct?

6  A.   That's right.

7  Q.   And you testified that operating in standalone mode is the

8  process of continuously waiting for the invocation while the

9  individual speaker is playing audio; correct?

10  A.   I think I talked about it in the context of the entire

11  claim while applied to the other limitations, but generally

12  correct.

13  Q.   But, sir, a player can be in standalone mode even if it's

14  not playing audio; correct?

15  A.   If you just take standalone mode by itself and don't look

16  at it in the context of the entire claim limitation of

17  operating in standalone mode in which the zone player is

18  configured to play back media individually, if you just take

19  the phrase standalone mode, I agree.

20  Q.   To put it differently, sir, it's possible for a player to

21  be in standalone mode when it's not playing audio; right?

22  A.   Yeah.  As I -- as I said, that would not be a test for the

23  limitation; but if you just focus on standalone mode by itself,

24  perhaps, yes, I agree with that.

25  Q.   Okay.  And it's not your understanding in order to meet

1  the standalone mode, the zone player has to be playing audio;

2  right?

3  **A.**   I would disagree with that.

4       **MR. ROBERTS:**   Let's play the Schonfeld deposition

5  transcript from August 31st at 49:12 through 16.

6            (Video was played but not reported.)

7  **BY MR. ROBERTS:**

8  **Q.**   When the claim says that the player is, quote, "configured

9  to play back audio individually," sir, that means the player is

10  not configured to play as part of the group; correct?

11  **A.**   No.   That -- that means in that context that to test if

12  the apparatus satisfies the claim, you actually have to run a

13  test.   You have to play audio and see if it still plays

14  individually.   Once you have that and you pass that test, then

15  you can either play or not play, but you actually have to play

16  audio when you do the test.

17       **MR. ROBERTS:**   Let's play Dr. Schonfeld's August 31st,

18  2022, deposition at 51:4 through 8.

19            (Video was played but not reported.)

20  **BY MR. ROBERTS:**

21  **Q.**   Now, the statements I've been playing here, sir, have been

22  from your August 31st, 2022, deposition; correct?

23  **A.**   There have been part of them, but you can play page 53

24  from the same deposition.

25  **Q.**   Okay.   Your --

1  **A.**   52.

2  **Q.**   In the new or redesigned versions of Google speaker

3  products, Google added a StopCurrentApp function to the code;

4  correct?

5  **A.**   That's correct, yes.

6  **Q.**   You were in the courtroom the other day when Mr. MacKay

7  testified; correct?

8  **A.**   I was, yes.

9        **MR. ROBERTS:**  Can we put up Mr. MacKay's testimony

10  from 1282, lines 2 through 5?

11        **THE COURT:**  Now, can I -- I'm going to allow you to do

12  this, but be aware that on cross-examination he is not limited

13  to his report; and if you introduce things that MacKay said, he

14  is free to pick it up and run with it.  So be aware of that

15  ground rule.

16        **MR. ROBERTS:**  I'm asking a very limited question about

17  this.

18        **THE COURT:**  Okay, fine.  Just I'm worried about where

19  you might be headed.

20        **MR. ROBERTS:**  Yep.

21  **BY MR. ROBERTS:**

22  **Q.**   Sir, you were there when Mr. MacKay confirmed that he did

23  not make any changes to the Google Home app that runs on the

24  controller; correct?

25  **A.**   That's right.  That's correct.

1    Q.    Okay.

2          MR. ROBERTS:    You can take that down.

3    BY MR. ROBERTS:

4    Q.    So the Android devices loaded with the Google Home app is

5    the same device with the same software both before and after

6    the redesign; correct?

7    A.    I cannot go there because it just means that Mr. MacKay

8    did not make changes.    I'm not sure if anybody else made

9    changes.

10   Q.    Okay.    So you are not aware of any changes between the

11   Android device before and after the redesign?

12   A.    I'm not aware of any particular changes, but it's a

13   different question from the one you asked me.

14   Q.    Okay.    Sir, after the StopCurrentApp function is received

15   or let's say after it's called by the player, the player will

16   stop playing music; correct?

17   A.    Well, it will actually tear down the app as I mentioned

18   yesterday.

19   Q.    Sir, that's -- just please give me an answer to my

20   question.    This is a yes-or-no question.

21         The player will stop playing music; correct?

22   A.    It will certainly stop playing music.

23   Q.    Even after it stops playing music, it's powered on;

24   correct?

25   A.    Unless you power it off.

1    Q.    The operating system is still running?

2    A.    Yeah, unless you power it off.

3    Q.    Just stop playing -- the StopCurrentApp function is called

4    and after that, the app is still -- the -- strike that.

5          After that, the device is still connected to the network;

6    correct, sir?

7    A.    With the same assumption, yes.

8    Q.    The device can still receive commands?

9    A.    With the same assumption assuming that you have a working

10   internet and it's connected to other devices.

11   Q.    Yeah, assume nothing else has changed.  It can respond to

12   those commands; correct?

13   A.    Again, it requires a lot of assumptions; but if everything

14   is still connected and it's allowed to interact with other

15   devices, yes.

16   Q.    So -- and one of the things we saw was that it can respond

17   to commands by adjusting the volume of the device; correct?

18   A.    It can adjust the volume of the device, but not the volume

19   of -- essentially, it cannot change the music volume because

20   there is no app.

21         MR. ROBERTS:  Move to strike the second part.

22   BY MR. ROBERTS:

23   Q.    Sir --

24         THE COURT:  No.  That's within the scope of your

25   question.

1    BY MR. ROBERTS:

2    Q.    In particular, sir, it will respond to a volume change by

3    issuing an audible boop; correct?

4    A.    That's what Mr. MacKay said; but we are talking about just

5    like in the old stereo receiver system, you can turn the volume

6    nob off even when it's turned off and then when you turn it

7    back on, the volume would be higher.

8    Q.    Sir, it will receive -- it will make an audible boop;

9    correct?

10   A.    I don't remember the boop, but I heard Mr. MacKay talk

11   about the boop.

12   Q.    Okay.  The boop is a piece of audio; correct?

13   A.    It's a sound made, but it's not the music because there is

14   no app.  It's part of the operating system.

15   Q.    Sir, it's audio; correct?  It's audible?  You can hear it?

16   A.    Yes.  A boop is audible.  I don't remember the boop,

17   frankly, but I'm just relying on Mr. MacKay's testimony.

18   Q.    Now, sir, after the stop command but before there's a

19   command to play a particular group, the speaker at that point

20   in time is not coordinating to play back in synchrony; correct?

21   A.    It's not coordinating to play back in synchrony or in

22   standalone or in any mode.  It's just waiting.

23   Q.    Sir, I'd ask you to answer my question.  My question was

24   very narrow.  It is not coordinating to play back in synchrony;

25   correct?

1  **A.**   Yeah.  It was part of my previous response, I agree.

2  **Q.**   Sir, my phone is configured to receive calls even if I'm

3  not talking on it; correct?

4  **A.**   I mean, I'm not sure what you mean about configured in

5  that context.  Every -- when we talk about the word configured,

6  it can mean a lot of different things; and when I talk to my

7  family about my phone, I don't talk about what it's configured

8  to be in that context.

9  **Q.**   Sir, the cable-ready TV I bought at Best Buy is configured

10  to accept cable even when it's in the box in the store;

11  correct?

12  **A.**   Again, the word "configured" can be used to mean a lot of

13  different things in a lot of different contexts, and this is

14  one of them.  If that's your -- I understand what you're trying

15  to say with the statement, but I'm not sure -- I'm not sure how

16  it's relevant.

17  **Q.**   Let me give an easier one.

18       Sir, my car is configured to drive on U.S. roads even when

19  it's sitting in my garage; correct?

20  **A.**   In the context of the way the word "configured" is used in

21  the claims, in my opinion that would be inappropriate.  In the

22  context of the way you described it, I guess you could say it.

23  Most people would not talk in that way.

24  **Q.**   The first limitation -- let's talk about storage.

25       The first limitation of claim 1 of the '966 patent calls

1  for a nontransitory computer-readable medium and program

2  instructions stored on the nontransitory computer-readable

3  medium that when executed by the one or more processors caused

4  the computing device to perform certain functions; correct?

5  **A.**   Just one clarification I missed at the beginning.  Are you

6  talking about the '966 patent?

7  **Q.**   Yes, sir.

8  **A.**   Okay.  I'm doing it from memory, but I think that sounds

9  right.

10  **Q.**   Okay.  A nontransitory computer-readable medium is a type

11  of storage; correct?

12  **A.**   A nontransitory computer-readable medium is legal

13  terminology for describing some type of memory but doesn't have

14  to be storage.

15  **Q.**   Okay.  It's some type of memory or storage, but it gives

16  you information about how the information is being retained;

17  correct?

18  **A.**   That's correct.  It's a legal term so I would leave it to

19  the Court to make the determination; but my understanding, it

20  could even apply to temporary memory.

21  **Q.**   Okay.

22        **MR. ROBERTS:**  Let's put up the '966 patent, claim 1,

23  and I'm looking specifically at the sixth limitation if we can,

24  please, Mr. Jay.

25                    (Pause in proceedings.)

1  BY MR. ROBERTS:

2  **Q.**   Sir, I have a blowup of part of the sixth limitation of

3  claim 1 of the '966, and I want to focus on the little 3 that

4  talks about causing storage of the second zone scene.  Do you

5  see that?

6  **A.**   I do see that, yes.

7  **Q.**   In this instance, the claim does not call out a particular

8  kind of storage; correct?

9  **A.**   No.  It just talks about storage; but from this context,

10  as I said, I viewed this as persistent storage but it does not

11  spell it out in the claim.

12  **Q.**   The claim doesn't say that the zone scene is stored in

13  nonvolatile memory; correct?

14  **A.**   No, yeah, it does not.  Nonvolatile memory is one way you

15  can do storage, but you don't have to to meet this claim.

16  **Q.**   It doesn't say that the zone scene is stored in a single

17  location; correct?

18  **A.**   Well, it says storage of the zone scene; and as I

19  testified yesterday, it means that you are talking about some

20  information that has to be stored.  So it has to be stored in

21  some kind of a storage mechanism; and my view is that that's

22  not talking about distributing the storage across dozens of

23  devices, so I -- I don't completely agree with your

24  characterization.

25  **Q.**   Well, sir, you have heard of the term "distributed

1  storage"; correct?

2  **A.**   Yes, but it's -- there is a difference between distributed

3  storage and just simply looking at a bunch of stored elements

4  scattered over many different devices and viewing them as a

5  single storage.  They are two different things.

6  **Q.**   Sir, it's common in computer science to break information

7  up into pieces and store those different pieces in different

8  locations.  That's a common technique?

9  **A.**   That's a technique, I agree with you, but it is a

10  technique to store and is just designed for full tolerance to

11  make sure that the data is secure.  It's not what we are

12  talking about here.

13  **Q.**   The claim just says "causing storage"; correct?

14  **A.**   Causing storage of the second zone scene and the first

15  zone scene.

16  **Q.**   Let me show you figure 2A from the '966 patent, if I may?

17       **MR. ROBERTS:**  Mr. Jay, please.

18       Thank you.

19  **BY MR. ROBERTS:**

20  **Q.**   Sir, are you familiar with 2A from the '966?

21  **A.**   I am, yes.

22  **Q.**   Okay.  And this figure shows an exemplary functional block

23  diagram of a player in accordance with the present invention;

24  correct?

25  **A.**   That's correct.

1   Q.   Okay.  It has both a memory that's labeled 206 and a

2   module that's labeled 212?

3   A.   That's correct.

4   Q.   And, sir, you would agree that for a person of ordinary

5   skill in the art, memory is usually volatile memory; correct?

6   A.   Memory is typically volatile memory to -- in order to have

7   a description within the specification that corresponds to

8   storage, in this case memory would have to be broader than

9   just -- just that type of memory unless it's persistently

10  stored.

11  Q.   So it says in the patent that memory 206 is used to save

12  one or more saved zone scene -- strike that.  Let me rephrase

13  that.

14       Memory 206 is used to save one or more saved zone

15  configuration files; correct?

16  A.   I don't have the --

17  Q.   That's fine.  We can show it.  It's the '966 --

18  A.   Let me just --

19  Q.   -- column 5, 65 through 68.

20  A.   Let me just find your binder.  Just one second.

21       MR. ROBERTS:  Maybe, Mr. Jay, you can put it up for

22  me.

23       THE WITNESS:  (Witness examines document.)  What is

24  the TX number?

25  \\\

1    BY MR. ROBERTS:

2    Q.    It's TX0001.

3    A.    Okay.

4    Q.    I have it on the screen, sir.

5    A.    Okay.

6          (Witness examines document.)  Yeah, I see that.

7    Q.    Okay.  So it expressly calls out saving the zone scene

8    configuration files in the memory?

9    A.    That's correct, but --

10   Q.    And a person of ordinary skill in the art would understand

11   that memory can include nonvolatile memory?

12   A.    That's right.  As long as its persistent, you can store

13   persistently nonvolatile memory.

14         THE COURT:  All right.  Are we getting close to a

15   breaking point?

16         MR. ROBERTS:  Yeah.  I think I have about two more

17   questions on storage.

18         THE COURT:  All right.  Please continue.

19   BY MR. ROBERTS:

20   Q.    Sir, the patents also say that in one embodiment, module

21   212 is used to save a zone scene; correct?

22   A.    Can you --

23   Q.    Yeah, I'm happy to find that.

24         MR. ROBERTS:  Mr. Jay, could you put it up?  This is

25   6, 22 through 25.

 1   BY MR. ROBERTS:

 2   Q.   I have it on your screen if that's easier for you.

 3   A.   (Witness examines document.)  Yep, I see that.

 4   Q.   So module 212 may be implemented as a combination of

 5   hardware and software; correct?

 6   A.   That's correct.

 7   Q.   And module 212 doesn't say that it's limited to

 8   nonvolatile memory; correct?

 9   A.   It doesn't say, but we already have the memory; and to the

10   extent memory -- the memory we just spoke about in Figure 2A is

11   distinct from this module, typically in computer systems you

12   have RAM and then you have something like flash.

13   Q.   And in one embodiment module 212 is used to save a scene;

14   correct?

15   A.   That's correct.

16   Q.   So taken together, the patent teaches that it could be

17   saved either in volatile or nonvolatile memory; correct?

18   A.   The saving can be done even temporarily, I agree with

19   that.  The storage has to be done persistently, and I agree

20   that it can be done in volatile or nonvolatile memory.

21        MR. ROBERTS:  Why don't we take our break.

22        THE COURT:  Thank you.

23   All right.  Please remember the admonition.  We'll see you

24   all back here soon.

25        THE CLERK:  All rise for the jury.

1       (Proceedings were heard outside the presence of the jury:)

2           THE COURT:  All right.  Please have a seat.

3       Any issues for the judge?

4           MR. PAK:  Not from Google, Your Honor.

5           MR. ROBERTS:  Not at this time.

6           THE COURT:  Okay.  We'll all take our break as well.

7   Thanks.

8           THE CLERK:  Court is in recess.

9               (Recess taken at 9:07 a.m.)

10              (Proceedings resumed at 9:25 a.m.)

11      (Proceedings were heard out of the presence of the jury:)

12          THE CLERK:  Please remain seated.  Please come to

13  order.

14          THE COURT:  Can I bring in the jury now?

15          MR. ROBERTS:  Okay by me, Your Honor.

16          THE COURT:  All right.  You might as well stand up.

17  They're going to come in.

18                  (Pause in proceedings.)

19          THE CLERK:  All rise for the jury.

20      (Proceedings were heard in the presence of the jury:)

21          THE COURT:  Be seated, please.

22      Okay.  All set over there?  Let's -- all ready?

23      Great.  Go ahead, Counsel.

24  BY MR. ROBERTS:

25  Q.   Dr. Schonfeld, welcome back.

1    A.    Thank you.

2    Q.    I would like to turn to your invalidity opinion.  Okay?

3    A.    Sure, absolutely.

4    Q.    Sir, it is your understanding that there is a presumption

5    that especially if the examiner checked off a particular

6    reference on an IDS, the examiner fully considered it in their

7    conclusion when they granted the allowance; correct?

8    A.    Yeah.  I'm not an attorney, but that's my understanding.

9    Q.    With respect to the Sonos system, your opinion is based

10   only on obviousness; correct?

11   A.    Absolutely.

12   Q.    You are not claiming that Sonos anticipated its own

13   patent?

14   A.    I am not.

15   Q.    You have inspected Sonos players that have been made

16   available for inspection in this case; correct?

17   A.    I have, yes.

18   Q.    You did a physical analysis of the products; correct?

19   A.    That is correct.

20   Q.    But, sir, you did no testing of the actual operation of

21   the Sonos prior art; correct?

22   A.    Well, I tried to, but I couldn't because Sonos didn't

23   provide a working system.

24   Q.    Sir, you did no testing of it; correct?

25   A.    Yeah, as a result, that's correct.

1   Q.   Okay.  You didn't go out and get a working system of it

2   yourself, did you?

3   A.   I asked for it, but I was told Sonos could not do it and

4   so I couldn't do it either.

5   Q.   That's what your attorneys told you?

6   A.   That's my understanding of what I was informed about,

7   yeah.

8   Q.   In the Sonos prior art system, a zone group is activated

9   for synchronous playback at the time of creation; correct?

10  A.   Correct, with one caveat.  Only if the coordinator is

11  actually playing music because you heard Mr. Millington and

12  Mr. Lambourne talk about the fact that if the coordinator is

13  not playing music, that would not be correct.

14        **MR. ROBERTS:**  Let's play Dr. Schonfeld's deposition

15  transcript at 174:21 through 25.

16              (Video was played but not reported.)

17  **BY MR. ROBERTS:**

18  Q.   In other words, sir, the formation of the group and the

19  invocation are contemporaneous in the Sonos prior art system;

20  correct?

21  A.   When the coordinator is playing music, that would be

22  correct.

23        **MR. ROBERTS:**  Let's play 175, 1 through 10, from

24  August 31st.

25              (Video was played but not reported.)

1    BY MR. ROBERTS:

2    Q.    And leaving aside Party Mode for one moment, the actual

3    Sonos prior art system didn't have the ability to save regular

4    zone scenes; correct?

5    A.    That's absolutely correct.  That's what I said on direct.

6    Q.    The user had to pick the zones to go into a regular zone

7    scene each time he or she wanted to play music from that group?

8    A.    That's correct.

9    Q.    Now, you have offered the opinion that Party Mode in the

10   Sonos 2005 system is a zone scene; correct?

11   A.    It's not just me.  Mr. Lambourne as well, but I agree with

12   him.

13   Q.    Sir, you agree that in the actual Sonos prior art system,

14   whether it's a normal zone scene or Party Mode, each indication

15   that a zone player has been added to a zone scene comes with

16   the invocation of that scene; correct?

17   A.    Not -- not accurate.

18        MR. ROBERTS:  Let's play your deposition transcript

19   from August 31st, 185:17 to 186:10, please.

20             (Video was played but not reported.)

21   BY MR. ROBERTS:

22   Q.   So, again, sir, each invocation comes with the indication

23   it corresponds to; correct?

24   A.   No.  My testimony is accurate in the deposition and today.

25   Q.   Okay.  Now, you have testified that Sonos' prior art

 1  system met limitations 1.9 and 1.10 of the '966 patent;

 2  correct?

 3  **A.**   Oh, let me see.

 4       (Witness examines document.)   Could you repeat the

 5  question, please?

 6  **Q.**   Yes, sir.

 7       You testified on direct, I think it was the very end of

 8  yesterday and beginning of today, that Sonos' prior art, its

 9  2005 system, satisfied limitations 1.9 and 1.10 of the '966

10  patent?

11  **A.**   That is correct.

12  **Q.**   Sir, those two limitations have additional claim

13  requirements that are not found in any limitations of the '885

14  patent; correct?

15       Let's put it up.   We'll help you.

16  **A.**   That's completely --

17          **MR. ROBERTS:**   TX001 and let's put up claim limitation

18  1.9 please.

19  **BY MR. ROBERTS:**

20  **Q.**   So, sir, this is from the '966 patent, and this limitation

21  calls for displaying a representation of the first zone scene

22  and a representation of the second zone scene; correct?

23  **A.**   That's correct.

24  **Q.**   Limitations 1.6 and 1.7 of the '885 do not call for

25  displaying a representation of the first zone scene and a

1  representation of the second zone scene; correct?

2  **A.**    No.  Only the analysis I did with limitations does not.

3  **Q.**    Sir, can you answer my question?

4      Limitations 1.6 and 1.7 of the '885 patent don't contain

5  analogous language to the one that's highlighted on your

6  screen; correct?

7  **A.**    That's correct.

8  **Q.**    And limitation 1.10 -- let's put that up as well -- says

9  (as read):

10         "While displaying" -- it's right below the

11         highlighted language, sir -- "While displaying the

12         representation of the first zone and the representation of

13         the second zone scene receiving a third request to invoke

14         the first zone scene."

15      Do you see that, sir?

16  **A.**    I do.

17  **Q.**    And the comparable limitations of the '885 patent don't

18  say anything about displaying the representation of the first

19  zone scene and the representation of the second zone scene

20  while or at the time that you receive a third request; correct?

21  **A.**    I agree with you partially that there is a language of

22  selection in claim 1 of the '885 which corresponds to the

23  request, but the display part is not there in the claim

24  language, only in my analysis.

25  **Q.**    Okay.  So, sir, let's put up -- in your expert report in

1    this case, the only thing you said about these limitations in

2    the '966 is that we should look at your analysis of the '885;

3    correct?

4    **A.**   Claim limitations 1.6, 1.7, and I think a couple of others

5    from the '885.

6         **MR. ROBERTS:**   So let's put up paragraphs 976, 977 from

7    page 649.  And can we blow those up, Mr. Jay, please?

8    **BY MR. ROBERTS:**

9    **Q.**   So in 976 here, you say (as read):

10         "See supra '885 claim limitations 1.6 and 1.7."

11    And you point to the '885 for your discussion of this

12   limitation 1.10, "while displaying the representation of the

13   first zone scene"; correct?

14   **A.**   I didn't completely follow you.  Are you talking about

15   976?

16   **Q.**   Yeah.  So the -- you have paragraph 976 at the top of your

17   screen?

18   **A.**   Yep.

19   **Q.**   It says see supra '885, claim 1, limitations 1.6 and 1.7.

20   **A.**   That's right.

21   **Q.**   And that relates to limitation 1.10 -- oh, excuse me.

22    That relates to limitation 1.9.  I was looking below.  I

23   should have been looking above.

24   **A.**   Now I follow.

25   **Q.**   So you said if you want to see your analysis for

1    limitation 1.9, which calls for displaying a representation and

2    a second representation, we should look at your analysis of the

3    '885; correct?

4    **A.**    That's correct.

5    **Q.**    But, sir, your analysis of the '885 did not include any

6    analysis about displaying representations; correct?

7    **A.**    Incorrect.

8    **Q.**    Well, I look forward to your counsel showing it on

9    recross.

10         One of the prior art references you considered was

11   Squeezebox; correct, sir?

12   **A.**    It was, yes.

13   **Q.**    In this context, for the zone player itself you are

14   reading that on one of the Squeezebox players or the

15   Softsqueeze; correct?

16   **A.**    Let me be more precise for what I did.  I was reading it

17   on the Squeezebox system.  I was testing it in many different

18   ways, one of which was confirming its operation using

19   Softsqueeze.

20   **Q.**    That wasn't quite my question, sir.  Let me -- let me

21   rephrase it.

22         When we talk about the zone players, the component of the

23   Squeezebox system that is analogous to the zone players, are

24   the Squeezebox player or the software alternative, the

25   Softsqueeze; correct?

1    **A.**    Yeah, that's correct.

2    **Q.**    And those players were designed to work with a server

3    called a SlimServer; correct?

4    **A.**    With one or more but, yes.

5    **Q.**    All right.  So let's start with the players.

6        You did not analyze the source code for these Squeezebox

7    players; correct?

8    **A.**    Only the software not the source code, I agree with you.

9    **Q.**    And you did not have access to the Softsqueeze source code

10    either; correct?

11    **A.**    That's right.

12    **Q.**    You are aware, sir, that none of the Squeezebox devices

13    you tested have firmware that was released prior to the

14    priority date for the '885 patent; correct?

15    **A.**    I think that's incorrect.  There was one Squeezebox that

16    did have a date prior to that.

17    **Q.**    Let's test --

18        **MR. ROBERTS:**  Let's play 216:12 through 217:2 of your

19    August 31st depo.

20            (Video was played but not reported.)

21    **BY MR. ROBERTS:**

22    **Q.**    During your testing of the physical system, sir, you did

23    not test how to add a single Squeezebox player to two different

24    sync groups that existed at the same time; correct?

25    **A.**    They did exist at the same time on the two servers but not

 1   in a single server.

 2   **Q.**   Sir, I was talking about the physical --

 3   **A.**   Oh.

 4   **Q.**   -- Squeezebox and your testing of the physical devices;

 5   correct?

 6   **A.**   I'm sorry.  I misunderstood.  You're correct.

 7   **Q.**   Okay.

 8         **MR. ROBERTS:**  Let's put up DDX10.84, which you looked

 9   at this morning, please.

10                    (Pause in proceedings.)

11   **BY MR. ROBERTS:**

12   **Q.**   You showed this diagram this morning, this demonstrative,

13   sir?

14   **A.**   I did, yes.

15   **Q.**   Okay.  To show the testing?

16   **A.**   Part of the testing, yes.

17   **Q.**   But, sir, you didn't assemble any physical devices in this

18   configuration; correct?

19   **A.**   For the physical devices, correct.

20   **Q.**   Okay.  So this is not a representation of the physical

21   testing that you did; correct?

22   **A.**   That, I disagree with.

23   **Q.**   Well, sir, no physical devices were in two overlapping

24   zones in your testing; correct?

25   **A.**   That's correct, but it is a representation of the

1  Softsqueeze, which is a representation of the Squeezeboxes.

2  **Q.**   Okay.  So let's talk about the Softsqueeze.

3       But, okay, so let me put it this way:  When you put up

4  this picture, you weren't meaning to suggest to the jury that

5  they should read these as being physical devices; correct?

6  **A.**   They should because that -- what I showed was at the time

7  you could do exactly that with the physical devices, and I

8  proved it with the Softsqueeze.

9  **Q.**   Well, let's talk about the Softsqueeze then.

10      When the Squeezebox players -- you can take this down --

11  are in a sync group, you are not aware of any direct

12  communication between those Squeezebox players; correct?

13  **A.**   Only through the server.

14  **Q.**   And, sir, you agree that the server, the SlimServer, in

15  the Squeezebox system is not a router; correct?

16  **A.**   It is not a router, no.

17  **Q.**   And, therefore, no messages are routed from one Squeezebox

18  through the SlimServer to another Squeezebox; correct?

19  **A.**   They are intended to arrive there but not in the routing

20  protocol.

21  **Q.**   Well, nothing gets routed through; right?

22  **A.**   If you mean by routing, you mean a routing protocol, I

23  agree.  If you mean it gets passed through, the information is

24  conveyed, I would disagree?

25       **MR. ROBERTS:**  Let's play his testimony at 226:21

1    through 227:6.

2                    (Video was played but not reported.)

3    BY MR. ROBERTS:

4    Q.   When you gave this answer, you intended to say it doesn't

5    get routed through but it gets passed through?

6    A.   I think the answer I gave back then is completely

7    consistent.  The information gets passed through but nothing

8    gets routed.

9    Q.   That's not how you answered the question in the

10   deposition; correct?

11   A.   They are both correct.

12   Q.   Sir, you said you created this overlapping system with the

13   Softsqueeze; correct?

14   A.   The Softsqueeze and two SlimServers, that's right.

15   Q.   Okay.  And to do that, you created a system with multiple

16   virtual machines that would talk to each other; correct?

17   A.   That's right.  I had to go back in time so I needed

18   virtual machines to put me back in 2005.

19   Q.   Okay.

20        MR. ROBERTS:  So let's show DDX10.85.

21   BY MR. ROBERTS:

22   Q.   And this is the slide that you showed to illustrate that

23   virtual construction.

24        Sir, you were not aware of anyone who at the relevant time

25   linked multiple virtual servers up together in order to create

1    this kind of a system; correct?

2    **A.**   I think -- I'm aware of creating multiple servers, but not

3    necessarily for this particular way of doing it.  I would agree

4    with that.

5                         (Pause in proceedings.)

6    **BY MR. ROBERTS:**

7    **Q.**   Sir, you also described a Crestron system in your

8    testimony this morning?

9    **A.**   I did, yes.

10   **Q.**   And you described Crestron as being a prior art system;

11   correct?

12   **A.**   Yeah.  It was part of my combination with the knowledge of

13   a person of skill, but I did describe this prior art.

14            **MR. ROBERTS:**  And let's look at TX3698, just the first

15   page of it, please.

16   **BY MR. ROBERTS:**

17   **Q.**   This was already admitted into evidence.  It's in your

18   direct binder, sir.

19   **A.**   I recognize the document.

20   **Q.**   You recognize the document?

21   **A.**   I do.

22   **Q.**   This is the document you testified about this morning?

23   **A.**   It is, yes.

24   **Q.**   And this is the document you based your opinions on?

25   **A.**   Part of my opinions, yes.

1   Q.   Okay.

2          MR. ROBERTS:   Can we look at TX39 -- 698 at page 2 at

3   the bottom of the page?  And can we just blow up the bottom of

4   the page, sir?

5   BY MR. ROBERTS:

6   Q.   What is the copyright date of this document, sir?

7   A.   2008.

8   Q.   Thank you.

9        Is that before or after the conception and priority date

10  of this patent?

11  A.   That would be after the conception date.

12       Were you asking priority or conception?

13  Q.   Both, but you've answered the question so we can move on.

14  Thank you.

15       And I'll withdraw it.  I'm just asking the claimed

16  priority date for the patent, sir, as you understand it, is

17  2006; correct?

18  A.   The alleged priority date is 2006, that's right.

19  Q.   That's the date you applied in your analysis?

20  A.   Yeah, that's correct.

21  Q.   You also understand, sir, that the Crestron system, a

22  different guide was actually in front of the examiner during

23  the examination; correct?

24  A.   I don't recall that.

25  Q.   We'll get to it in a minute then.

1          And, sir, the user guide for the Sonos 2005 system, that

2     was also in front of the user; correct?

3     **A.**    The guide itself, yes.

4     **Q.**    And we talked about the Squeezebox or Slim Devices;

5     correct?

6     **A.**    We did, yes.

7     **Q.**    And those were also in front of the examiner?  The manuals

8     for those documents -- the documents for those products were in

9     front of the examiner?

10    **A.**    Some of the documents.  Only the documents were in front

11    of the examiner.

12    **Q.**    Sir, there were six documents related to those systems

13    that were considered by the examiner during prosecution and

14    listed on an information disclosure statement; correct?

15    **A.**    There were multiple.  I don't remember the number.

16    **Q.**    Why don't we put them up.

17          **MR. ROBERTS:**  It's the '885 file history, excerpt

18    pages 6585 through 6589.  And 6587, 6588.  Could we pull them

19    out and highlight them, Mr. Jay?

20    **BY MR. ROBERTS:**

21    **Q.**    It's line 22, sir.  Do you see line 22 here?

22    **A.**    Yes.

23    **Q.**    That's the owner's guide that was in front of the examiner

24    on an IDS?

25    **A.**    Not prior art but, yes, it was.

1   Q.   Okay.  The 24, the Squeezebox network music player?

2   A.   That --

3   Q.   That was prior art that was in front of the examiner?

4   A.   It was.

5          MR. ROBERTS:  Line 17.  Let's go up a little bit.

6                   (Pause in proceedings.)

7   BY MR. ROBERTS:

8   Q.   The Logitech SlimServer; right?  That's the -- that's the

9   server for the Squeezebox system that was in front of the

10  examiner?

11  A.   Not exactly.  A reference to the -- to a page was there

12  but just the page.

13  Q.   Okay.  Well, sir, you see there were these other three

14  documents were all there?

15  A.   I do see the listing of those documents.

16  Q.   Okay.  Including the Logitech SlimServer Version 2.3

17  Release 19 May 2002, he had two pages from that as well?

18  A.   Yeah.  It's just a listing but it's not the actual code,

19  but I see it listed.

20  Q.   Okay.  Now, you also relied on the Nourse patent; correct,

21  sir?

22  A.   I did, yes.

23  Q.   The Nourse patent was also in front of the examiner during

24  prosecution?

25  A.   Yeah, absolutely.

1    **Q.**    It was listed on an IDS?

2    **A.**    I think so.

3    **Q.**    It was fully considered by the examiner?

4    **A.**    I don't know if it was fully, but I think the word he used

5    were "fully considered."

6    **Q.**    You also relied on the Yamaha DME system; correct?

7    **A.**    Not for my invalidity analysis.

8    **Q.**    Okay.  You're not relying on Yamaha for your invalidity

9    analysis?

10    **A.**    Are you asking me in the context of my reports or in the

11    context of what is being represented here?

12    **Q.**    If you're not relying on the Yamaha system for invalidity,

13    that's fine.

14    **A.**    Only so far as knowledge of a person of ordinary skill in

15    the art I am.

16    **Q.**    And you understand, sir, that the Yamaha DME system was

17    also in front of the examiner?

18    **A.**    Yeah.  Actually, the examiner discussed it in detail, as I

19    mentioned.

20    **Q.**    All right.  Let's talk about the Outland Research

21    agreement.

22    Sir, you would agree with me that the evaluation of

23    technological comparability involves an element of

24    approximation and uncertainty; correct?

25    **A.**    Well, you were talking about the word "evaluation," and

1  that goes beyond my technical knowledge.  So if you're talking

2  about evaluation from a dollars-and-cents point of view, I'm

3  not the right person to ask this.

4  **Q.**  Okay.  Well, let's look at your rebuttal report, paragraph

5  15.

6  **A.**  You want me to open it?

7  **Q.**  Sir, I've got it up here on the screen, and I just want to

8  put the last three lines in front of you.

9        Sorry.  I don't think this is the correct report.

10                   (Pause in proceedings.)

11        **MR. ROBERTS:**  The rebuttal report, please, Mr. Jay.

12        You don't have it?  All right.

13                   (Pause in proceedings.)

14  **BY MR. ROBERTS:**

15  **Q.**  So, yes, sir, if you can open your rebuttal report,

16  paragraph 15.

17  **A.**  (Witness examines document.)  I have it.  It was the same

18  paragraph that was shown.

19  **Q.**  Okay.  Then I have the wrong cite.  We'll move on.

20                   (Pause in proceedings.)

21  **BY MR. ROBERTS:**

22  **Q.**  Sir, you agree that something can be technologically

23  comparable to a claimed invention without teaching each and

24  every claim limitation; correct?

25  **A.**  That's correct.

1    Q.    You reviewed an agreement with Outland Research?

2    A.    I did, yes.

3    Q.    And that agreement contains 28 patents and applications?

4    A.    I remember 12.

5    Q.    So let's look at TX6016, Exhibit A, page 10.

6                      (Pause in proceedings.)

7    BY MR. ROBERTS:

8    Q.    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 --

9    next page, please.

10          So I see at least 16 here.  Do you agree with that, sir?

11   A.    Yeah.  I was counting 12 patents, but you counted the

12   applications too.  I think we're in agreement.

13   Q.    Okay.  And you think that four of them are comparable;

14   correct?

15   A.    Yeah, generally technically comparable; some more

16   comparable, some less comparable.

17   Q.    Let's start with the '694.  It's your opinion that the

18   '694 patent is technologically comparable to the '885 and '966

19   patents?

20   A.    I'm going to have to open it up.  If you don't mind giving

21   me the TX number.

22   Q.    Yeah.  It's TX2676.  I believe it's in evidence.

23          MR. ROBERTS:  Can we pull it up, please?

24                      (Pause in proceedings.)

25          MR. ROBERTS:  It's not in evidence.

1    BY MR. ROBERTS:

2    **Q.**    Okay.  So let me ask you to look at it, sir.

3         Sir, this is one of the patents that you opined with

4    technologically comparable?

5    **A.**    It is.

6              **MR. ROBERTS:**  I offer TX2676 in evidence.

7              **THE COURT:**  Received in evidence 2676.  Hearing no

8    objection in evidence.

9         (Trial Exhibit 2676 received in evidence.)

10              **MR. ROBERTS:**  All right.  Let's put up the title page.

11    BY MR. ROBERTS:

12    **Q.**    Sir, this is a portable music player with synchronized

13    transmissive visible -- visual overlays; correct?

14    **A.**    That is correct.

15    **Q.**    And the beginning of the abstract says it's directed to a

16    portable music player apparatus that outputs visual content to

17    a head-worn transmissive display, the visual content being

18    modulated in time with playing musical content and overlaid

19    upon the user's direct view of his or her physical

20    surroundings; correct?

21    **A.**    That's correct.

22    **Q.**    This is directed to a VR headset?

23    **A.**    I wouldn't put it this way.  It's directed to

24    synchronization between audio and visual display.

25    **Q.**    Well, let's look at Picture Number 1.

1          This is the apparatus that's claimed -- depiction of the

2     apparatus that's claimed in the invention?

3     **A.**   That's correct.

4     **Q.**   And your view is that this is analogous?

5     **A.**   That's right.  There is synchronization of two media.

6     It's -- in my opinion, it's technically comparable.

7     **Q.**   There's no selection of groups; correct?

8     **A.**   No.  It's just one group.  The group happen to be the

9     media you see visually and the media you hear.

10    **Q.**   And so in forming your opinion of the '694 technologically

11    comparable, you didn't perform an analysis of whether it met

12    the limitations of either claim of -- or claim 1 of the '885

13    patent; correct?

14    **A.**   Well, I do think it's related to the synchronization

15    aspect of the claim.  That's a big part of it.  If you look at

16    column 6 of this patent --

17    **Q.**   I'm sorry, sir.  Just because I have limited time, my

18    question was not whether it's related.  My question was:  Did

19    you perform an analysis of whether it met the claims?

20    **A.**   I did not check limitation by limitation and perform such

21    an analysis.  It's my understanding that it's not required as

22    you stated.

23    **Q.**   Okay.  You --

24         **MR. ROBERTS:**  I was passed a note to add the file

25    history experts to already admitted TX006.  Any objection?

1          **MR. PAK:**  No objection.

2          **THE COURT:**  What's the number?

3          **MR. ROBERTS:**  Zero zero six.

4          **THE COURT:**  I just don't understand what's being

5    added.

6          **MR. MOSS:**  Your Honor, a few days ago Mr. Pak added

7    excerpts from the file history for the '885 patent in evidence.

8    You invited Sonos to supplement with additions that they felt

9    were important.  They were discussed with Dr. Schonfeld, and we

10   want to make sure they are in the record.

11         **THE COURT:**  I don't have them.  Where are they?

12         **MR. MOSS:**  I passed them to your clerk, Your Honor.

13         **THE COURT:**  Where are they?  Is this it right here?

14         **MR. MOSS:**  Yes, Your Honor.

15         **THE COURT:**  Have you looked at this?

16         **MR. PAK:**  May I see the specific?  You're not moving

17   the whole history in?

18         **MR. MOSS:**  Just --

19                    (Pause in proceedings.)

20         **MR. PAK:**  This is fine, Your Honor.

21         **THE COURT:**  Okay.  What's -- what number do I say is

22   in evidence?

23         **MR. PAK:**  I think you say TX006 with excerpts from

24   both parties.

25         **THE COURT:**  All right.  In evidence.  Thank you.

```
 1              (Trial Exhibit 006 received in evidence.)
 2              MR. ROBERTS:  Thank you, Your Honor.
 3    BY MR. ROBERTS:
 4    Q.    I apologize for the interruption, sir.
 5          You also contend that the '414 patent from the
 6    Outland Research agreement is technologically comparable;
 7    correct?
 8    A.    I do.
 9    Q.    Can we show you TX2675 and ask you to confirm that that is
10    the '414 patent that you contend is technologically comparable?
11              THE COURT:  It's already in evidence.
12              MR. ROBERTS:  Thank you.
13    BY MR. ROBERTS:
14    Q.    Sir, this is the '414 patent that you claim is
15    technologically comparable?
16    A.    Yeah, I believe that's probably the most technically
17    comparable.
18    Q.    Okay.  And let me ask you to look at the abstract.
19          It calls for a system method and computer program product
20    for enabling a plurality of users engaged in realtime voice
21    communication -- excuse me -- engaged in realtime voice
22    communications over a wireless communication link to
23    collaborate --
24    A.    Collaboratively.
25    Q.    -- collaboratively select one or more music files and to
```

1  jointly listen to the collaboratively selected musical media

2  file in approximate synchronicity as mutually perceivable

3  background musical stream; correct?

4  **A.**    That's correct.

5  **Q.**    The fact that the players are only approximately in

6  synchrony doesn't make this technologically incomparable in

7  your view; correct?

8  **A.**    No.  When they say -- they describe in detail the timing

9  synchronization signals going back and forth and when they say

10  "in approximate synchronicity," they mean that you can never

11  get perfection.

12  **Q.**    Sir, you also think the '117 patent is technologically

13  comparable; correct?

14       Well, sir, this patent, before we move on, also doesn't

15  deal with saving groups and then later invoking the groups;

16  correct?

17  **A.**    I would say that's probably correct even though I didn't

18  test for it, but it sounds right.

19  **Q.**    Okay.  You also think the '117 patent is technologically

20  comparable; correct?

21  **A.**    And what number is that?

22  **Q.**    The '117 patent, sir.  It's 7,562,117.

23  **A.**    Did you say 7?

24  **Q.**    7,562,117.

25  **A.**    (Witness examines document.)  I don't see it in your

1  binder.  I know the patent number you're referring to.  I

2  remember it.

3  **Q.**    It is TX2674.

4  **A.**    Oh.

5          **THE COURT:**  While he's looking, any objection?

6          **MR. PAK:**  No objection.

7          **THE COURT:**  Received in evidence.

8      (Trial Exhibit 2674 received in evidence.)

9  **BY MR. ROBERTS:**

10  **Q.**    Sir, the abstract here, and if I just go down to A -- I

11  don't want to read it -- spend too much reading it all, but it

12  describes sending, receiving, and tallying media suggestions

13  and broadcasting consensus media choice for realtime playback;

14  correct?

15  **A.**    That's correct.

16  **Q.**    It doesn't claim a process for saving and invoking groups

17  of players; correct?

18  **A.**    I would agree with that.

19  **Q.**    The last patent you testified is comparable is the '816.

20  That is at TX2673 in your binder, sir.

21  **A.**    (Witness examines document.)  That is correct.

22  **Q.**    And it is titled "System and method and computer program

23  product for automatically selecting, suggesting, and playing

24  music media files"; correct?

25  **A.**    That is correct.

1          **MR. ROBERTS:**  I move TX2673 in evidence.

2          **THE COURT:**  Any objection?

3          **MR. PAK:**  No objection.

4          **THE COURT:**  Received in evidence.

5          (Trial Exhibit 2673 received in evidence.)

6    **BY MR. ROBERTS:**

7    **Q.**   And let's look at the abstract again (as read):

8              "System method and computer program product to

9          intelligently correlate ambient sensor signals,

10         chronographic information daily life schedule information,

11         and/or external meteorological information with a user's

12         previous music media file selection patterns for

13         predicting future music media file play recommendations to

14         a user of a portable media player."

15         Correct?

16   **A.**   That's correct.

17   **Q.**   So this is about recommending music to users?

18   **A.**   In a collaborative fashion between multiple players,

19   that's correct.

20   **Q.**   Not about saving and invoking groups of speakers; correct?

21   **A.**   It is not about saving but -- and invoking is just about

22   the synchronization and timing synchronization for

23   recommendations.

24         **MR. ROBERTS:**  I think that's all I have.  I pass the

25   witness.

1          **THE WITNESS:**  Thank you.

2          **THE COURT:**  Thank you.

3          **MR. PAK:**  I have a brief redirect.

4          **THE COURT:**  Please go ahead.

5                      **REDIRECT EXAMINATION**

6    BY MR. PAK:

7    **Q.**   All right.  Good morning, Dr. Schonfeld.

8          I'm going to ask you a few questions about the questions

9    from Sonos' Counsel.

10         **MR. PAK:**  So let's pull up DDX10.6.

11   BY MR. PAK:

12   **Q.**   Just to remind the jury, the claims talk about operating

13   in a standalone mode in which the first zone player is

14   configured to play back media individually.  Do you see that?

15   **A.**   I do.

16   **Q.**   The claims don't say just in standalone mode; correct?

17   **A.**   Absolutely correct.

18   **Q.**   Is your testimony that you gave in your depositions and

19   also the trial testimony consistent with the actual language of

20   the claims?

21   **A.**   Yeah.  I repeated it over many pages.

22   **Q.**   And then also you testified -- we can take that down --

23   you testified in response to questioning from Sonos' Counsel

24   that when StopCurrentApp is called by the player, that it will

25   tear down the app.  Do you recall that?

1   **A.**   That's right.

2   **Q.**   And is that --

3        **MR. ROBERTS:**  Objection, Your Honor.  I did not talk

4   about that at all.  I asked if it stopped playing the music and

5   he interjected that.

6        **MR. PAK:**  Just -- let me ask just one more question

7   after that, but that is the testimony that was given.

8        **THE COURT:**  Wait a minute.

9        **MR. PAK:**  Yes, sir.

10        **THE COURT:**  What is your question going to be?  Let me

11   hear the question.

12        And don't answer it yet.

13   **BY MR. PAK:**

14   **Q.**   Is your testimony regarding StopCurrentApp consistent with

15   what Mr. MacKay said?

16        **MR. ROBERTS:**  That's an attempt to get the expert to

17   adopt --

18        **THE COURT:**  Let's not go there.

19        **MR. PAK:**  Okay.  No worries, Your Honor.

20   **BY MR. PAK:**

21   **Q.**   Now, when you were analyzing the claim language for

22   infringement, are the words that are used to describe the

23   accused functionality that matter or the actual functionality

24   itself?

25   **A.**   The words in the claim you mean?

SCHONFELD - REDIRECT / PAK

1   **Q.**   No.  Just when you're talking about -- the words in the

2   claims absolutely matter.

3   **A.**   Okay.

4   **Q.**   But when you're talking about the functionality that is in

5   the accused devices, does the labeling of that functionality

6   matter or is it the actual functionality that matters?

7   **A.**   Whether you call something in one name, like idle or stop

8   or just say it's not operating in two other modes --

9        **MR. ROBERTS:**  Objection, Your Honor.  This is the same

10   testimony in another form.

11        **THE COURT:**  I don't think so.

12        Please -- I don't understand the question, though.  You're

13   going to have to ask that question again because it -- it --

14   it's gone over my head.  So --

15        **MR. PAK:**  Okay, Your Honor.

16        **THE COURT:**  -- try again.

17   **BY MR. PAK:**

18   **Q.**   When we look at the functionality of the accused products

19   for assessing infringement, is the functionality that matter or

20   labels that one might put on that functionality?

21        **THE COURT:**  Well, that's too argumentative.  I'm going

22   to sustain my own objection.

23                         (Laughter)

24        **THE COURT:**  This -- I mean, you, yourself, have

25   pointed to things that -- in the -- you know, this prior art

1  that were in the user manual and -- and made a point of what

2  was in the user manual, how they referred to it.  So I think

3  this is too argumentative.  I'm sustaining my own objection.

4          **MR. PAK:**  No worries, Your Honor.

5      Let's move on.  The point's been made.

6      Let's put up DDX10.38.

7                      (Pause in proceedings.)

8  **BY MR. PAK:**

9  **Q.**   This is for the '966 patent, causing storage of the first

10  zone scene.  Do you see that?

11  **A.**   I do.

12  **Q.**   And is that language, causing storage of the first scene,

13  an additional requirement in addition to creating a zone scene

14  according to these claims?

15  **A.**   That's right.  In -- based on receiving the request, you

16  must both cause the creation and cause the storage.

17  **Q.**   And if we focus us on the "based on the third request

18  language" on the bottom on the right-hand side, it says you

19  cause the first zone player to transition from operating in the

20  standalone mode to operating in accordance with the first

21  defined grouping.  Do you see that?

22  **A.**   I do.

23  **Q.**   And that first predefined grouping, which you are supposed

24  to use for group mode, is that supposed to be the one that is

25  stored as part of the storage step of the first zone scene?

SCHONFELD - REDIRECT / PAK

1    **A.**    Yeah.    The first predefined grouping is pointing in an

2    antecedent basis to the first predefined grouping A first

3    predefined grouping in the first -- in the receiving

4    limitation.

5    **Q.**    And so when you were talking about persistent storage

6    being required for these elements, these are extra elements,

7    can you just briefly explain to the jury what you meant by

8    that?

9    **A.**    Yeah.    It means that when you store it, whether you do it

10   in volatile or nonvolatile memory, you have to make sure it can

11   last so that when you want to use it later, you can use it.    So

12   in case you want to use it tomorrow morning, it's still sitting

13   there.

14   **Q.**    And based on that understanding and based on the actual

15   claim language, are these limitations in the '966 patent claims

16   satisfied by the accused devices from Google?

17   **A.**    No, they are not.

18   **Q.**    Okay.    So let's look at one more topic, which is DDX10.49.

19        **MR. PAK:**    Let's put that up.

20   **BY MR. PAK:**

21   **Q.**    You were asked some questions about whether when you were

22   cross-referencing the evidence and analysis for the '885,

23   whether you showed us evidence of how the controller portrays

24   certain representations of zone scenes in groups.    Do you

25   recall that?

1    **A.**    I do.

2    **Q.**    And so this is a slide TX6974 at 5.  What were you showing

3    to us as part of the '885 presentation of evidence?

4    **A.**    I was showing and describing how a user can press the

5    button in order to create this kind of a zone scene, how a user

6    can press another button to create another zone scene, and then

7    I was describing how the user can play -- press the "Play"

8    button to the right of this on the CR100 to invoke a zone

9    scene.

10         **MR. PAK:**  If you turn to the next slide, DDX10.50.

11   **BY MR. PAK:**

12   **Q.**    Were you showing us how the controller would display

13   various zone groups or scenes, including All Zones-Party Mode,

14   in the Sonos 2005 prior art system as part of your '885

15   presentation?

16   **A.**    I did.  I described exactly those issues in connection

17   with these two slides.

18   **Q.**    So is the evidence and analysis that you did for the '885

19   claim elements, do those things support your view that

20   corresponding elements or additional elements like display

21   limitations are satisfied for the '966 patent?

22   **A.**    Yeah.  The '885 claim limitations that I pointed to do

23   support my analysis for the limitations of the claim 1 of the

24   '966 patent and the other claims.

25   **Q.**    There were some exchanges between you and Counsel about

SCHONFELD - REDIRECT / PAK

1   this Softsqueeze software that you actually operated?

2   **A.**   That's right.

3   **Q.**   Number one, is the software prior art?

4   **A.**   The software is prior art, yes.

5   **Q.**   And can you just briefly explain what you did with the

6   Softsqueeze prior art to understand the operation of the prior

7   art Squeezebox system?

8   **A.**   The source code and software and executable or just the

9   executable?

10  **Q.**   The executable and then we can talk about the SlimServer.

11  **A.**   Okay.  So in terms of the actual executable code, I ran

12  both the SlimServer and Softsqueeze, which is -- are the

13  Squeezebox terminals, and I ran them in something called a

14  virtual machine.  It's basically a time warp.  It's software

15  that puts it in an environment where you create a computer that

16  is from that time period.

17       So I chose a virtual machine from that time period called

18  VMware.  I put the software inside.  I put an operating system

19  inside the virtual machine, Fedora software from that time

20  period, and created the complete environment that is as if I

21  lived in 2005 from the point of view of the software.

22  **Q.**   Is that a reliable way from an engineering standpoint to

23  try to understand how the system operated back in 2005 time

24  period?

25  **A.**   Absolutely.

1  Q.    Okay.

2          MR. PAK:  And then let's just put up DDX10.77.

3  BY MR. PAK:

4  Q.    For the Squeezebox combination, which elements were you

5  combining Squeezebox with the Sonos 2005 prior art system?

6  A.    I was combining it for the purpose of showing the

7  overlapping storage and saving.

8  Q.    Did you find that functionality based on your software

9  review, the source code review, and the testing that you did?

10 A.    Based on all of the evidence, including the source code

11 and software.

12 Q.    Okay.  Just briefly, there was some discussion about the

13 Crestron manual.  It had a 2008 copyright.  But you understand

14 there was an earlier 2005 manual as well that was presented to

15 the examiner?  Do you recall that?

16 A.    That's my understanding.

17 Q.    And did you review that in forming your opinions --

18 A.    I did.

19 Q.    -- as well?

20     Do your opinions about what Crestron taught publicly and

21 the system that existed publicly change whether we look at the

22 2008 or the 2005?

23 A.    No.  The disclosure of the 2008 is no different from the

24 system, the earlier description in 2005.

25 Q.    Okay.  And there were a number of suggestions that the

1  patent examiner may have seen everything about the prior art.

2  Do you recall that from Counsel, Sonos' Counsel?

3  **A.**   I'm not sure that's what he was trying to convey, but I

4  remember the line of questions.

5  **Q.**   Let's review quickly what the patent examiner did not have

6  the opportunity to consider.

7      Did the patent examiner have the actual source code for

8  the Sonos 2005 prior art system when he was analyzing the

9  patents in suit?

10  **A.**   No.

11  **Q.**   Did he have access to Mr. Lambourne's testimony and the

12  documents that went back to 2005, the examiner at the Patent

13  Office, when he was thinking about the two patents in suit?

14  **A.**   Only some of the documents.  The public documents, not the

15  confidential documents.

16  **Q.**   Like the sworn declaration and the user interface

17  specifications, did the examiner have access to any of that

18  information?

19  **A.**   No.

20  **Q.**   And also there was mention about the SlimServer software

21  that you analyzed.  There was only one page listed, the front

22  page, finding the directory where you can find those things;

23  correct?

24  **A.**   That's correct.

25  **Q.**   So did the patent examiner actually get to see all of the

1    code that you saw?

2    **A.**    I would be very surprised if he did.

3    **Q.**    Is there any evidence that he actually considered the

4    actual software code, the source code?

5    **A.**    No.

6    **Q.**    Did Mr. -- or the examiner at the Patent Office have

7    access to the operational executable code, the Squeezebox

8    products, as well as the servers that you used to conduct your

9    testing?

10   **A.**    No.

11   **Q.**    Okay.  So in your opinion, Doctor, did the patent examiner

12   have all of the pieces of evidence that we have presented

13   through your testimony regarding the prior art that you

14   discussed?

15   **A.**    No.  All of my analysis for prior art is based on evidence

16   that was not available to the examiner in the combinations that

17   I analyzed.

18   **Q.**    Thank you.

19           **MR. PAK:**  I pass the witness, Your Honor.

20           **THE COURT:**  All right.

21                        <u>**RECROSS-EXAMINATION**</u>

22   **BY MR. ROBERTS:**

23   **Q.**    Just one question, sir.

24       You did not attempt to explain to the jury which parts of

25   your analysis were found in the code and not found in the

1  documents; correct?

2  **A.**   I did in parts.  Mr. Pak asked me where did I find the set

3  AVTransport URI message, and I answered that question.

4  **Q.**   Other than that example, you didn't go through and say,

5  "Well, this function wasn't in the document and I only found it

6  in the code, and I wouldn't have known about it from the

7  document"?  That wasn't part of your testimony; correct?

8  **A.**   No, but I could do the same thing for Squeezebox.

9          **MR. ROBERTS:**  Okay.

10         **THE COURT:**  Okay.  Is that it?

11         **MR. PAK:**  That's it, Your Honor.

12         **THE COURT:**  All right.  May the witness step down?  I

13 think so.

14    Okay.  Thank you, Dr. Schonfeld.  You may step down.

15                    (Witness excused.)

16         **THE COURT:**  Next witness.

17         **MR. PAK:**  Yes, Your Honor.  The next witness will be

18 Chris Chan from Google, and my colleague Ms. Melissa Baily will

19 be presenting that witness.

20         **THE CLERK:**  May the witness please approach the

21 witness stand.

22         **THE COURT:**  How long approximately will this witness

23 be?

24         **MS. BAILY:**  Not very long, Your Honor.

25         **THE COURT:**  All right.

PROCEEDINGS

1           **MS. BAILY:**  May my colleague approach with some

2     materials?

3           **THE COURT:**  Yes.  I think you should clear the witness

4     bench so that the witness will have an opportunity to spread

5     out things.

6           **MR. PAK:**  We're doing some weightlifting, Your Honor.

7           **THE COURT:**  It looks like it, yes.  Thank you.

8        All right.  Let's swear in the witness.

9                        <u>**CHRISTOPHER CHAN**</u>,

10    called as a witness for the Defendant, having been duly sworn,

11    testified as follows:

12          **THE CLERK:**  Thank you.

13       Please state your full -- you may sit down.

14       Please state your full name for the record and spell your

15    last name.

16          **THE WITNESS:**  Christopher Chan, C-H-A-N.

17          **THE COURT:**  All right.  Just so you'll be more

18    comfortable, this microphone moves back and forth so you don't

19    have to lean forward quite so much.

20          **THE WITNESS:**  Thank you.

21          **THE COURT:**  But it is important that it be close

22    enough to catch your voice.

23          **THE WITNESS:**  Okay.

24          **THE COURT:**  That's good right there.

25       Ms. Baily, you may proceed.

1    **MS. BAILY:**  Thank you, Your Honor.

2        My colleague is just going to bring some items up to the

3    witness stand?

4        **THE COURT:**  Fine.

5                    <u>DIRECT EXAMINATION</u>

6    BY MS. BAILY:

7    **Q.**   Good morning, Mr. Chan.

8    **A.**   Good morning.

9    **Q.**   Could you please introduce yourself to the jury?

10   **A.**   My name is Christopher Chan.  I'm a product manager at

11   Google.

12   **Q.**   Can you tell the jury just a little bit about yourself?

13   **A.**   I was born and raised in Hayward.  I now live in Oakland

14   with my wife, who is a physician at Kaiser, and my two girls,

15   Sophia and Alyssa, and her parents.

16   **Q.**   And can you tell us just a bit about your educational

17   background?

18   **A.**   I went to Stanford University where I got both my

19   bachelor's and master's in computer science.

20   **Q.**   When did you join Google?

21   **A.**   I joined Google as a full-time product manager in 2017.

22   **Q.**   When you joined Google, what products did you work on?

23   **A.**   I worked on our smart speaker products.

24   **Q.**   What role did you have?

25   **A.**   I was a software lead.

1  Q.   As a software lead, what kinds of features did you work on

2  with respect to the speaker products?

3  A.   Some examples of features I worked on are Project Marble,

4  an initiative to make the Google Assistant faster on our smart

5  speakers.  I also worked on Smart Sound, a feature that

6  optimized the speaker sound based on the acoustics of the room

7  using artificial intelligence techniques.

8  Q.   You mentioned Google Assistant.  What is that?

9  A.   Google Assistant is a voice-activated helper that you can

10  use to play music on a device, control your smart home, set

11  timers and alarms or get general information to use it.  You

12  just say "Okay, Google"; and an example of that is "Okay,

13  Google, what's the weather tomorrow?"

14  Q.   Did you prepare some demonstratives to help with your

15  testimony today?

16  A.   I did.

17       MS. BAILY:  Let's go to DDX11.1.

18            (Pause in proceedings.)

19  BY MS. BAILY:

20  Q.   Can you please tell the jury what's on this slide?

21  A.   So this is the smart home tab of the online Google store,

22  and it showcases all of the smart home products that we

23  currently sell.

24       MS. BAILY:  Let's go to DDX11.2.

25  \\\

1    BY MS. BAILY:

2    **Q.**    What's being shown here?

3    **A.**    These are our Chromecast devices, which are part of our

4    total smart home offering, and Chromecast devices are used for

5    streaming content from your phone to your TV.

6    **Q.**    Do you see a physical exhibit up there TX3509?

7    **A.**    Yes, I do.

8    **Q.**    What is that?

9    **A.**    This is Chromecast with Google TV.

10          **MS. BAILY:**  Your Honor, permission to move TX3509 into

11    evidence.

12          **MR. PAK:**  No objection, Your Honor.

13          **THE COURT:**  Three five?

14          **MS. BAILY:**  Zero nine.

15          **THE COURT:**  In evidence.  Thank you.

16       (Trial Exhibit 3509 received in evidence.)

17          **MS. BAILY:**  Thank you.

18          **THE COURT:**  Can you hold it up again?  I didn't --

19          **MS. BAILY:**  Yeah.

20    BY MS. BAILY:

21    **Q.**    Can you hold it up to the jury so they can see it, and

22    could you just explain what it does?

23    **A.**    Yeah.  So this is Chromecast with Google TV.  You connect

24    this part to the back of your TV through an HDMI port, and you

25    can use it to either stream content from your phone; for

1    example, YouTube or Netflix.  You can also use the remote to

2    browse apps that are actually on the TV.  Again, all of the

3    kind of streaming services are supported, like HBO, Hulu, and

4    so forth, and you can use it to find content to watch.

5            **MS. BAILY:**  And let's bring up DDX11.3.

6    **BY MS. BAILY:**

7    **Q.**    What are these?

8    **A.**    These are the smart speakers that we currently sell.

9    **Q.**    Do you have a physical exhibit TX3787 in front of you?

10   **A.**    I do.

11   **Q.**    What is that?

12   **A.**    This right here is Nest Audio.

13           **MS. BAILY:**  I'd like to move TX3787 into evidence.

14           **MR. PAK:**  No objection, Your Honor.

15           **THE COURT:**  Received.

16       (Trial Exhibit 3787 received in evidence.)

17   **BY MS. BAILY:**

18   **Q.**    So if you could just hold that one up as well just so the

19   jury can see it.

20       What are some of the popular features on the Nest Audio,

21   Nest Mini speakers?

22   **A.**    So Nest Audio and Nest Mini both have the Google Assistant

23   inside.  So that's a voice-activated helper where you can run

24   commands.  You can play music on the device.  You can control

25   various smart devices like lights, thermostats, and cameras.

1  You can set timers and alarms, as well as get general

2  information.

3  **Q.**   Has Google ever sold a speaker that was more expensive

4  than the Nest Audio and the Nest Mini?

5  **A.**   We have.  We sold the Google Home Max in 2017 for $399.

6  **Q.**   And what happened to the Google Home Max?

7  **A.**   It was discontinued shortly after launching because it

8  generally wasn't successful.  We learned that pretty quickly

9  after one holiday sale cycle.

10 **Q.**   All right.  And do you have an understanding as to why the

11 Google Home Max was not successful?

12 **A.**   Our sense was that people generally sought our smart

13 speaker products for the Google Assistant and found a lot of

14 value actually in our Mini line, which was offered at a far

15 more competitive price at $49.

16      **MS. BAILY:**  Let's go to the next slide, DDX11.4.

17 BY MS. BAILY:

18 **Q.**   What are these products?

19 **A.**   These are our smart display products.  They're similar to

20 the smart speaker products in that they also have the Google

21 Assistant built in; but in addition to that, they have a

22 display to augment responses with some sort of visual answer.

23 They also have a dashboard for various controls.

24      The Nest Hub Max also has a camera built in, and so that's

25 useful for video calling.  You can also set it up as a security

 1  camera when you're away from home.

 2  **Q.**   Do you have a physical Exhibit TX3786 in front of you?

 3  **A.**   I do.

 4  **Q.**   What is that?

 5  **A.**   This here is a Nest Hub.

 6          **MS. BAILY:**  I'd like to move TX3786 into evidence.

 7          **MR. PAK:**  No objection, Your Honor.

 8          **THE COURT:**  Okay.  It's in evidence.

 9          (Trial Exhibit 3786 received in evidence.)

10          **MS. BAILY:**  Thank you, Your Honor.

11          DDX11.5.

12  **BY MS. BAILY:**

13  **Q.**   What is this?

14  **A.**   This is Nest Wi-Fi Point.  It's a mesh router.

15  **Q.**   It's a what?  Sorry?

16  **A.**   Mesh router.

17  **Q.**   And can you just describe a little bit for the jury what

18  it does?

19  **A.**   It's useful for extending Wi-Fi coverage in your home, and

20  it also has the Google Assistant built in.

21  **Q.**   Okay.  So we've seen a lot of products.

22          **MS. BAILY:**  We can take the demonstrative down.

23  **BY MS. BAILY:**

24  **Q.**   At a very high level, what goes into developing products

25  like this at Google?

1    **A.**    There's a lot of work that goes into developing hardware

2    products at Google.  It's a really extensive collaboration

3    across hardware and software teams and many functions from

4    engineering to design to research, as well as broader functions

5    like business, sales, and marketing.

6        There are also multiple phases to the development of a

7    hardware product from concept, where you're validating a

8    business idea and figuring out potential product directions; to

9    development, where you're ultimately defining the hardware as

10   well as the specs, manufacturing, where once you figured out

11   the specs and the definition, how to manufacturer the product

12   reliably and at scale; and, then, finally in market or

13   sustaining, where once a product hits shelves, how you're

14   continuing to meet demand and to ensure that there are new

15   features available for users.

16   **Q.**    Approximately how many people at Google touch a product

17   from concept to launch in your experience?

18   **A.**    Many people touch a product at Google, both in development

19   as well as once it's in market.  As an example, for the most

20   recent product that I worked on, over a hundred people worked

21   on both hardware and software.

22   **Q.**    And in your experience at Google, how long does it take to

23   bring a product like the ones we've been discussing to market?

24   **A.**    It can take many years.  The last product I worked on took

25   at least three years, but sometimes longer.

1    Q.    Did you work on speaker grouping functionality during your

2    time as a product manager for Google's smart speakers?

3    A.    Yes, I did.

4    Q.    And in that context what does speaker grouping mean?

5    A.    Speaker grouping is the ability to take two speaker

6    products and to play content out of both of them in synchrony.

7    You can use it to fill multiple rooms with music, for example.

8    Q.    Are there different ways that Google speakers can be

9    grouped?

10   A.    Yes.  I can think --

11   Q.    What are those ways?

12   A.    I can think of three ways.  The first we generally call

13   speaker grouping or static speaker groups.  You can use the

14   Google Home app to assign two or more of your speakers a name.

15   The most common use of static speaker groups is to assign all

16   of the devices you own the name "All my speakers," so then

17   later you can say, "Okay, Google, Play music on all my

18   speakers."

19         The second example of groups is something we call stereo

20   pairing, and that's when you take two identical products and

21   put it in the same room to output stereo sound.  It's analogous

22   to the way headphones work where you have the left channel of a

23   stereo mix outputting out of the left ear and the right channel

24   of a stereo mix outputting in the right ear.  The same thing is

25   happening with these two products to fill a room with stereo

1    sound.

2        The final grouping feature we call dynamic groups, and

3    that's the ability to add or remove a device from playback

4    while you're listening to content.

5    **Q.**    Why did Google introduce dynamic speaker groups?

6    **A.**    We introduced dynamic groups because we found that static

7    groups were somewhat hard to set up and ultimately use.  They

8    were hard to set up because people didn't necessarily know that

9    the feature existed or know to open the Google Home app to give

10    it a try; and then even if they did, they didn't necessarily

11    remember the names of the groups that they had set up.

12    **Q.**    From your work on Google's speaker products, do you have

13    an understanding of how often speaker grouping functionality is

14    used?

15    **A.**    I do.

16    **Q.**    What is that?

17    **A.**    My sense was that they weren't used very often.

18    **Q.**    And why is that?

19    **A.**    We saw that -- well, first of all, in order to be able to

20    create a group, you needed to own two or more devices and most

21    users only had one; and then even if you did own two or more

22    devices, you had to know to find the functionality in the Home

23    app to set it up.

24        Once you did set it up, you'd have to remember the name to

25    be able to use it by voice, and not everyone did that or told

1  other members of the household that they had set it up.

2  **Q.**   In your work at Google, have you seen data relevant to how

3  often Google speakers are grouped?

4  **A.**   I have.

5       **MS. BAILY:**  May I approach the witness, Your Honor?

6       **THE COURT:**  Yes.

7                   (Pause in proceedings.)

8  **BY MS. BAILY:**

9  **Q.**   If you could take a look at the document in your binder

10 labeled TX0140?

11 **A.**   Okay.

12 **Q.**   What is that?

13 **A.**   This is a spreadsheet of setup and usage data for groups

14 functionality.

15      **MS. BAILY:**  I'd ask that TX0140 be moved into

16 evidence.

17      **MR. RICHTER:**  No objection, Your Honor.

18      **THE COURT:**  140?

19      **MS. BAILY:**  Yes.

20      **THE COURT:**  Received in evidence.

21    (Trial Exhibit 140 received in evidence.)

22      **MS. BAILY:**  We can publish a sampling of the

23 spreadsheet to the jury.

24 **BY MS. BAILY:**

25 **Q.**   Do these spreadsheets contain any data that identifies

1  users?

2  **A.**    They do not.  It contains device-level data only.

3  **Q.**    So can you give an overview to the jury of what kind of

4  data is contained in these spreadsheets?

5  **A.**    Yes.  So there are three sheets in the spreadsheet.  The

6  first sheet is about setup information and how often people set

7  up each of the three types of groups I mentioned earlier:

8  Static groups, stereo pairs, and dynamic groups.  It is broken

9  out by product as well as broken out by date.

10        The second sheet called, Daily Multizone, refers to how

11  often people are using groups.  Again, grouped by product as

12  well as by date.  And it's a percentage of total connected

13  devices.  I'll also note that in that device count, Column C,

14  it's about whether a device is in a group as a percentage of

15  total.

16        Finally, for the third sheet, 28-day Multizone, it's

17  looking at that same information, devices that are in groups,

18  divided by total connected devices but in a 28-day window.

19  **Q.**    And from reviewing these three categories of data and as

20  informed by your experience working with the Google speaker

21  products, what can you conclude regarding the usage of the

22  grouping functionality?

23  **A.**    When looking at all of this information, as well as

24  drawing from my experience with these devices, my sense is that

25  a very small fraction of total users, around 5 percent at the

1  most, are using groups.

2  **Q.**   And what about with respect to static grouping versus

3  dynamic grouping versus stereo pairs?  Do you have any

4  conclusions to draw with respect to usage as divided amongst

5  those categories of grouping?

6  **A.**   What we saw was that about half of people using groups

7  were using dynamic groups versus static groups; and then of the

8  people using static groups, the majority of people who do use

9  it, use it to assign the name "All of my speakers" or

10  "Everywhere" to all of the devices they owned.

11  **Q.**   All right.

12       **MS. BAILY:**  We can take the spreadsheets down.

13  **BY MS. BAILY:**

14  **Q.**   Are you aware that Google has implemented a new design

15  that changes the way Google speaker grouping works?

16  **A.**   I am.

17  **Q.**   And are you aware whether that new design has been rolled

18  out to consumers?

19  **A.**   I am.

20  **Q.**   Are you aware of how many products have been affected by

21  the new design?

22  **A.**   I believe at least 17 million.

23  **Q.**   And what is your understanding of how a user would

24  understand the experience of the new speaker grouping design?

25  **A.**   My understanding of what the user would experience is that

1    if or when they set up a speaker group, that all of the devices

2    assigned to that group would stop playing audio if they were

3    playing audio.

4    Q.    And in your view, based on your experience, how would that

5    impact the user experience more generally with respect to

6    grouping?

7    A.    Very minimally.  First, again, most people have just one

8    device and so they wouldn't be able to create a group in the

9    first place; but if they did and they had two or more and they

10   knew that this functionality existed, odds are it wouldn't

11   necessarily be playing audio or media while they were setting

12   it up.  But if it were, it would stop and they might notice,

13   but it's ultimately a minor inconvenience because they can very

14   easily restart the content that they were listening to.

15   Q.    Thank you, Mr. Chan.

16         MS. BAILY:  Pass the witness?

17         THE COURT:  Okay.  Cross-examination.

18         MR. RICHTER:  Yes, Your Honor.  Good morning.  Cole

19   Richter for Sonos.

20                    CROSS-EXAMINATION

21   BY MR. RICHTER:

22   Q.    Good morning, Mr. Chan.

23   A.    Good morning.

24   Q.    Good to see you again.

25         I believe your counsel just asked you a couple questions

1  about Google selling speakers.  Do you recall those questions?

2  A.   Yes.

3  Q.   Google sells its speakers on its own website; is that

4  right?

5  A.   That's right.

6  Q.   And I believe counsel asked you questions about Google

7  selling individual speakers and how those -- an individual

8  speaker, like, for example, the Nest Audio, would cost $99; is

9  that right?

10 A.   That's right.

11 Q.   Google sells speakers in bundles; is that right?

12 A.   I'm not familiar actually with our current bundling plans.

13 Those change from time to time.

14 Q.   I thought you had just testified about the smart home tab

15 of the online Google store; is that --

16 A.   I did, yes.

17 Q.   I'm looking at the Google store on my phone right now, and

18 are you aware that the Google store today offers something

19 called a room-filling audio package?

20 A.   That does look familiar, yes.

21 Q.   Okay.  And then I'll scroll a little bit, and it looks

22 like there's two Nest Audios.  Do you see that?

23 A.   Yes.

24 Q.   Okay.  And the price of those two, it says pay 179.98.

25 Does that sound familiar?

1   **A.**    I'm not familiar with current pricing, but I'm sure that's

2   correct.

3   **Q.**    Okay.  And are you aware that the site says "Hear music

4   the way it should sound with crisp vocals and powerful bass.

5   Pair two Nest Audio speakers for stereo sound or group them for

6   amazing sound across multiple rooms"?  Does that sound

7   familiar?

8   **A.**    It does.

9   **Q.**    Okay.  Great.

10       I believe your counsel had asked you some questions about

11  usage of multizone group features.  Do you remember those,

12  Mr. Chan?

13  **A.**    Yes.

14  **Q.**    So am I correct that Google tracks how its customers use

15  Google products?

16  **A.**    We do make available certain data sets for our team to

17  look at to improve our products, but it does depend on the kind

18  of data we're talking about.

19          **MR. RICHTER:**  Mr. Jay, would you mind bringing up

20  PDX14, please?  14, that is.  Thank you.

21  **BY MR. RICHTER:**

22  **Q.**    This is a slide I prepared, Mr. Chan, and I took a

23  screenshot of TX140 that I think your counsel just asked you

24  about.

25  **A.**    Yep.

1   **Q.**   And then what I did was I filtered the product model by

2   the Prince name, and then I just screen capped here November 8,

3   2022, November 9, 2022, and November 10, 2022.  What product

4   does Prince refer to?

5   **A.**   Prince is the internal code name for Nest Audio.

6   **Q.**   And that's the gray speaker right there in front of you;

7   is that right?

8   **A.**   That's right.  This is one of the available colors for it,

9   yep.

10  **Q.**   And I think you had testified that device count, that

11  refers to the number of devices that were in a multizone group

12  on that particular day; is that right?

13  **A.**   That's right.

14  **Q.**   Is that a launched multizone group or a saved multizone

15  group?

16  **A.**   So, like, I think "launched" and "saved" are more

17  technical concepts, but I can speak to the user experience.

18  And it can be a device that is in any of the three kinds of

19  groups I had mentioned previously:  A static speaker group, a

20  dynamic group, or a stereo pair.

21  **Q.**   Okay.  So let's look at the bottom row, November 8.  And I

22  also want to focus your attention on the column over to the

23  right.  That says 3.32 percent of Prince devices were in a

24  multizone group on November 8, 2022; is that right?

25  **A.**   Yeah.

1  **Q.**   Okay.  And the next day it was 3.38 percent of Prince

2  devices that were in a multizone group; is that right?

3  **A.**   Looks like it.

4  **Q.**   From this data, though, you're not able to tell me how

5  many Prince devices from November 8 are counted in the

6  November 9 row, are you?

7  **A.**   I'm not from the data alone.

8  **Q.**   And the number under the connected count, that refers to

9  the total number of Prince devices that were online on that

10 day?  Do I have that right?

11 **A.**   Yes.

12 **Q.**   From this data, though --

13 **A.**   In the U.S.

14 **Q.**   In the US, okay.

15 **A.**   Yeah.

16 **Q.**   Okay.  Thank you.

17 **A.**   Yeah.

18 **Q.**   From this data, though, you're not able to tell how many

19 of these connected devices are in households with two or more

20 speakers, are you?

21 **A.**   From this data alone, you cannot tell that.

22 **Q.**   So let me say that another way.  In other words, the data

23 from TX140, that captures households that have just one single

24 device; isn't that right?

25 **A.**   It is inclusive of households with any number of devices.

1   Q.   I think we heard some testimony that Google had released

2   its static grouping feature in 2015; is that right?

3   A.   That sounds familiar.

4   Q.   Okay.  And that's the feature that's accused of

5   infringement today; right?

6   A.   I'm actually not too familiar with what's been accused of

7   infringement.

8   Q.   You're not sure which of the grouping features in Google's

9   product are accused of infringement; is that right?

10  A.   I think it's something about grouping in general and

11  overlapping groups.

12  Q.   Okay.  Well, let me just ask you a couple of questions

13  about static grouping then.

14      The static grouping feature is still in the products

15  today; is that right?

16  A.   My understanding is that it is, yes.

17  Q.   Okay.  And if it was added in 2015, that's about

18  seven-plus years; is that right?

19  A.   Yes.

20  Q.   And over that time, Google has advertised multizone

21  features; is that right?

22  A.   Um, so I personally define "advertising" as kind of

23  content on television or video ads or things like that.  I'm

24  not familiar with any advertising campaigns.

25  Q.   Okay.  What about advertising online?  Are you familiar

1  with any advertisements online that Google does concerning its

2  multizone features?

3  **A.**   We have support articles that talk about our group

4  functionality and the occasional blog post, but I wouldn't

5  consider those advertising.

6  **Q.**   Okay.  Fair enough.

7       Let me ask it to you this way:  Google provides

8  instructions to customers on how to create multizone groups of

9  two or more speakers; isn't that right?

10  **A.**   Yes.

11  **Q.**   And over these past seven years, I think I heard you

12  mention blog posts, but do I have it right that Google wrote

13  blog posts about its multiroom features?

14  **A.**   Yes.

15  **Q.**   And you wrote blog posts concerning Google's multiroom

16  features; isn't that right?

17  **A.**   That's right.

18       **MR. RICHTER:**  Your Honor, may I approach the witness

19  with a binder?

20       **THE COURT:**  Yes, please.

21       **MR. RICHTER:**  Thank you.

22                      (Pause in proceedings.)

23  **BY MR. RICHTER:**

24  **Q.**   Mr. Chan, can I have you turn to TX6353, please?  And when

25  you're there, can you let us know what document this is?

1    **A.**    I don't see that number.  I see numbers that are much

2    smaller like 2444, 3509.

3            **THE COURT:**  Will you go over and help the witness with

4    the notebook?

5            **MR. RICHTER:**  Sure.  Absolutely.

6                        (Pause in proceedings.)

7    **BY MR. RICHTER:**

8    **Q.**    Do you recognize this document, Mr. Chan?

9    **A.**    I do.

10   **Q.**    Okay.  Great.

11           And is this a blog post that you wrote on or around

12   October 2019?

13   **A.**    Yes.

14   **Q.**    Okay.

15           **MR. RICHTER:**  Mr. Jay -- I'm sorry.

16           Before we do that, Your Honor, may I move into evidence

17   TX6353?

18           **MS. BAILY:**  No objection.

19           **THE COURT:**  Yes.  Received in evidence.

20           (Trial Exhibit 6353 received in evidence.)

21           **MR. RICHTER:**  Okay.  Wonderful.

22           And, Mr. Jay, would you mind pulling that up?  And can we

23   focus just on the bottom bullet point?  I'd like Mr. Chan to

24   read that bullet point aloud please.

25           **THE WITNESS:**  (as read):

1              "Fill your home with music.  If you have more than

2         one Google Home and Nest smart speaker or display, you can

3         set up a speaker group in the Home app, transfer music

4         from a single speaker to the speaker group to fill your

5         whole home with music."

6    BY MR. RICHTER:

7    Q.   And do I have it right, this is a blog post that you wrote

8    concerning Google's multiroom features?  Is that right?

9    A.   It was concerning kind of a knew feature we were calling

10   stream transfer.

11   Q.   Okay.

12        MR. RICHTER:  And we can take that down, Mr. Jay.

13   Thank you.

14   BY MR. RICHTER:

15   Q.   I think I heard you testify on direct that you started at

16   Google in 2017; is that right?

17   A.   Yes.

18   Q.   And who was your manager at that time?

19   A.   Tomer Shekel was my first manager.

20   Q.   And about how long was Mr. Shekel your manager?

21   A.   I don't remember actually.  I think it might have been

22   just a couple months.

23   Q.   Okay.  And at that time that Mr. Shekel was your manager,

24   I believe you may have worked on the Google Home -- Google Home

25   Max product; is that right?

1   **A.**   Yes.

2   **Q.**   Okay.  And were you aware that Mr. Shekel in and around

3   this time had participated in defining certain aspects of how

4   the Google Home product worked?

5   **A.**   Yes.

6   **Q.**   Okay.  And are you aware that one of those aspects that

7   Mr. Shekel participated in defining was how the Google Home

8   participated in multigroup playback?  Are you aware of that?

9   **A.**   Yes.

10  **Q.**   Do I have it right that Mr. Shekel tasked you with working

11  on multiroom audio features when he was your manager?

12  **A.**   I think I started working on it after he left; but it's

13  been a long time, so I don't remember the details.

14  **Q.**   Did Mr. Shekel ever express to you that adding multiroom

15  audio features to Google speakers would help encourage users to

16  buy more Google speakers?

17  **A.**   Possibly.  I'm sorry, it's been a long time so I don't

18  know if he directly stated that.  It was just one of many

19  features I sort of inherited when he transitioned away from the

20  team.

21  **Q.**   And I think you had just testified that you were involved

22  during the development of the Google Home Max; is that right?

23  **A.**   I was, yes.

24  **Q.**   Okay.  And the engineering team involved during the

25  development of that product considered a competitive set of

1  products; is that right?

2  **A.**    We looked at other devices that might be comparable in

3  terms of audio quality as part of our benchmarking.

4  **Q.**    And that competitive set of products included Sonos

5  products; is that right?

6  **A.**    For certain types of evaluation, we would directly compare

7  the audio of the -- I think it was the Sonos Play 5, but we

8  were also comparing against other devices.

9  **Q.**    And that would have been true during the development of

10  the Nest Audio, the engineering team there also considered

11  Sonos devices; is that right?

12  **A.**    Yes, but across many others as well, including Amazon and

13  Apple.

14            **MR. RICHTER:**  Pass the witness, Your Honor.

15        Thank you, Mr. Chan.

16            **THE COURT:**  Thank you.

17            **MS. BAILY:**  I don't have any further questions for

18  Mr. Chan.

19            **THE COURT:**  Mr. Chan, you may step down.  Thank you,

20  sir.

21                        (Witness excused.)

22            **THE COURT:**  All right.  Next witness.  Let's see, how

23  are you doing over there in the jury box?  Do you need a break

24  yet?

25            **JUROR JOHNSON:**  I can take a break.

1          **THE COURT:**  You need a break?

2          **JUROR JOHNSON:**  Yes, please.

3          **THE COURT:**  All right.  We're going to take a break

4     and we'll resume in 15 minutes.

5          **THE CLERK:**  All rise for the jury.

6      (Proceedings were heard outside the presence of the jury:)

7          **THE COURT:**  Be seated, please.

8      Any issues for the judge?

9          **MR. PAK:**  No, Your Honor.

10         **MR. RICHTER:**  No, Your Honor.

11         **THE COURT:**  And this is our last witness?

12         **MR. PAK:**  I believe this is our last witness in our

13    case, and then we are going to go to rebuttal and then we have

14    a surrebuttal.

15         **MR. RICHTER:**  One witness in rebuttal, Dr. Almeroth.

16         **THE COURT:**  All right.  Now, you-all -- you still have

17    time left but by my notes, Google is up to 763 minutes.  And I

18    haven't done the math yet for Plaintiff, but Plaintiff is -- I

19    don't know -- I'm going to -- roughly 730 minutes.  It could be

20    more or less.

21     So you both still have time, but we will be very close by

22    the end of today to the absolute limit.  So be mindful.

23         **MR. SULLIVAN:**  Openings tomorrow, Your Honor?

24    Closings.

25                         (Laughter)

1      **MR. PAK:**  I don't want to do this again, Mr. Sullivan.

2      **MR. SULLIVAN:**  Can I do an opening and a close?

3      **THE COURT:**  I don't think we are going to get to the

4  closings tomorrow.  The reason is that we have to go over -- I

5  have to do a charging conference, and so I think the closings

6  will be Friday.

7      **MR. SULLIVAN:**  Sounds great, Your Honor.

8      **THE COURT:**  I also have a doctor's appointment

9  tomorrow afternoon that I cannot miss.  It is for myself.  It's

10  important, and I -- so tomorrow afternoon will be off

11  completely.

12     So we -- we're going to have to figure out a way to get

13  the -- this is why it's so important, if I can get you-all to

14  help me streamline the case, then it would be easier to do

15  these instructions.

16     **MR. PAK:**  Yes, Your Honor.  We will work with

17  Mr. Sullivan and Mr. Roberts to make that happen, and we will

18  submit the jury instructions for you.

19     **THE COURT:**  Well -- well, wait.  Don't -- just --

20  don't submit instructions so much as tell me the areas where

21  you agree it can be winnowed down easily or --

22     **MR. PAK:**  Will do, Your Honor.

23     **THE COURT:**  -- one single sentence will did.  So that

24  I can work that into the mix as I go along.

25     **MR. PAK:**  Thank you, Your Honor.

1          **MR. SULLIVAN:**  No problem, Your Honor.

2          **THE COURT:**  All right.  Thank you.

3          **THE CLERK:**  Court is in recess.

4                    (Recess taken at 10:46 a.m.)

5                    (Proceedings resumed at 10:59 a.m.)

6          (Proceedings were heard out of the presence of the jury:)

7          **THE CLERK:**  Please remain seated.  Please come to

8     order.

9          **MR. SULLIVAN:**  I've just got one procedural issue for

10    Your Honor.  Well, maybe we have two.

11         **THE COURT:**  Okay.

12         **MR. SULLIVAN:**  Your Honor, I know we talked before

13    about doing the Rule 50(a) directed verdict motions outside the

14    presence of the jury.  I'm not going to get an opportunity to

15    do that I think after Defendant's rest their case, so I'd like

16    to just make sure I preserve those --

17         **THE COURT:**  We will deem it as if you had made those

18    motions and proceed to your case, and you can make the motion

19    later.

20         **MR. SULLIVAN:**  Thank you, Your Honor.

21         **THE COURT:**  It will be deemed as if it had been made

22    at the required time.

23         **MR. SULLIVAN:**  Thank you very much, Your Honor.  I

24    appreciate it.

25         **THE COURT:**  What's the other thing?

1      **MS. CARIDIS:**  Your Honor, Sonos just has a brief

2 objection as to one of the demonstrative exhibits that we

3 understand Mr. Bakewell is going to be testifying about; and

4 specifically during the motion in limines in this case, Google

5 made representations that Bakewell will not opine or suggest

6 that reasonable royalty damages are capped at the costs of

7 implementing noninfringing alternatives as a matter of law.

8      Based on the demonstrative that we were provided last

9 night, we're concerned that Mr. Bakewell is going to be giving

10 testimony that violates that representation.

11          **THE COURT:**  Which demonstrative do you have in mind?

12      **MS. CARIDIS:**  It's DDX12.7.

13      **MS. BAILY:**  We can put that on the screen.  This is

14 actually quotations from Sonos' expert report,

15 Mr. Malackowski's report, discussing the cost approach.

16      So this is from Sonos' expert's report, and Mr. Bakewell

17 is not going to be offering any legal conclusions that, as a

18 matter of law, anything happens, including that, as a matter of

19 law, noninfringing alternatives is a cap.

20      **MS. CARIDIS:**  The representation that was made during

21 the motion in limine phase is that Bakewell will not suggest

22 that a reasonable royalty damage is capped by the cost of

23 implementing noninfringing damages.

24      By putting up this excerpt out of context for

25 Mr. Malackowski's report, the only purpose to put up this point

PROCEEDINGS

1  is to suggest that reasonable royalties are capped by the cost

2  of noninfringing alternatives.

3       **MS. BAILY:**  Counsel, just to be clear, the

4  representation was that the expert would not make a

5  representation as a matter of law that this was a cap.  That's

6  what we agreed to, and we're not going to violate that,

7  Your Honor.

8       **MS. CARIDIS:**  I'm reading directly from your brief (as

9  read):

10          "Bakewell will not opine or suggest that reasonable

11      royalty damages are capped by the cost of implementing

12      noninfringing alternatives as a matter of law."

13      That is what this slide is intended to elicit.

14       **MS. BAILY:**  The expert's not talking about the law,

15  Your Honor.  This is a quote from Mr. Malackowski's report.

16       **MS. CARIDIS:**  Taken out of context.

17       **MS. BAILY:**  They can cross him on it, Your Honor.

18       **THE COURT:**  I think you're free to talk about

19  noninfringing alternatives as a factor; but I think if you come

20  close to this slide -- I think you should not use the slide,

21  but you can elicit from him that noninfringing alternatives are

22  a factor because if it's too expensive to go the other way,

23  then noninfringing alternatives would be -- might be cheaper.

24      But I -- this does indicate a cap idea.  So please don't

25  go there in light of the representation that Ms. Caridis read

1   to me.

2          **MS. BAILY:**  Sure.

3          **MS. CARIDIS:**  Thank you, Your Honor.

4          **THE COURT:**  Can we bring in the jury now?  And is the

5   witness here?

6          **MS. BAILY:**  Yes.

7          **THE COURT:**  Okay.  Come on up.  The witness can come

8   on up.

9                    (Pause in proceedings.)

10         **THE COURT:**  This is your last witness?

11         **MS. BAILY:**  It is.

12         **THE COURT:**  I'm going to explain that to the jury so

13  their heart can rise -- please go ahead and have a seat --

14  instead of sink.

15                    (Pause in proceedings.)

16         **THE CLERK:**  All rise for the jury.

17      (Proceedings were heard in the presence of the jury:)

18         **THE COURT:**  Be seated, please.  Thank you.

19      Let's call our next witness.

20         **MS. BAILY:**  Google calls Christopher Bakewell.

21         **THE COURT:**  All right.  Please stand right there, sir,

22  and the clerk will swear you in.

23                **WILLIAM CHRISTOPHER BAKEWELL**,

24  called as a witness for the Defendant, having been duly sworn,

25  testified as follows:

1      **THE CLERK:**  Thank you.  Please be seated.

2      **THE COURT:**  All right.  Before we get started with our

3  next witness, this is -- will be Google's last witness in its

4  case-in-chief, and then both sides get to present short

5  rebuttals as long as they stay within their overall time

6  limits.  So this is not our last of the last, but it's the last

7  of the case-in-chief witnesses for Google.  So we are making

8  some progress.

9      Okay.  Are you --

10     **THE CLERK:**  Please state your full name for the record

11  and spell your last name.

12     **THE WITNESS:**  My full name is William Christopher

13  Bakewell.  My last name is B-A-K-E-W-E-L-L.

14     **THE COURT:**  Wonderful.

15     Please go ahead, Ms. Baily.

16     **MS. BAILY:**  Thank you.

17                    <u>**DIRECT EXAMINATION**</u>

18  BY MS. BAILY:

19  **Q.**   Good morning, Mr. Bakewell.

20     Could you please introduce yourself to the jury?

21  **A.**   Good morning.  My name is Chris Bakewell.  People when

22  they've been introducing themselves have been talking about

23  their families.  I have three kids.  One of them is fully

24  grown, two of them are half grown-up and half adult.  They're

25  in college.  And then I've been married for a while.  I have a

BAKEWELL - DIRECT / BAILY

1    wife too.

2    **Q.**    What do you do for a living?

3    **A.**    I value intellectual property.

4    **Q.**    What testimony are you here to present to the jury today?

5    **A.**    I'm here to provide testimony on reasonable royalties and

6    licensing issues.

7    **Q.**    You understand that Google does not believe it owes a

8    reasonable royalty in this case?

9    **A.**    I do.

10    **Q.**    And are you saying that Google definitely owes a

11    reasonable royalty in this case?

12    **A.**    No.

13    **Q.**    Do you know why Google would put up a witness to talk

14    about a reasonable royalty if Google doesn't believe it owes

15    anything?

16    **A.**    Well, it's part of the process, number one.  It's the way

17    the process works, and Google has a right to respond to

18    evidence that Sonos put and Sonos' expert in case damages

19    become an issue.

20    **Q.**    All right.  Let's put up -- well, Mr. Bakewell did you

21    create some demonstratives to help explain your testimony to

22    the jury?

23    **A.**    Yes, I did.

24    **Q.**    Okay.

25         **MS. BAILY:**  Let's put those up, please.  Thank you.

1    BY MS. BAILY:

2    Q.    I'd like to talk about your background.  Who do you work

3    for?

4    A.    I work for a firm called Kroll.  We used to be named

5    Duff & Phelps.

6    Q.    What does Kroll do?

7    A.    We are a leader in terms of risk management and valuation

8    advisory services.

9    Q.    And what do you do at Kroll?

10   A.    I lead our intellectual property advisory services

11   practice, and I have some other leadership responsibilities in

12   the firm.  I'm a managing director.

13   Q.    And what's your area of expertise?

14   A.    It's valuation of intellectual property and licensing.

15   Q.    And how did you acquire that expertise?

16   A.    It's really the culmination of my career.  I've always

17   been interested in two things:  Finance and information

18   technology.  I studied both for both of my degrees, and I found

19   a way to combine those interests in my career.  And I'll be

20   glad to talk about that in a minute if you like.

21   Q.    Sure.  First, you mentioned that you value intellectual

22   property.  Can you explain what you mean by that?

23   A.    Sure.  So it can be for a lot of purposes.  When companies

24   are engaged in licensing, sometimes they need help to

25   communicate with the other party or to figure some things out

**BAKEWELL - DIRECT / BAILY**

1    in licensing discussions.  That's one of the things that I do

2    as a consultant.

3        Sometimes for financial reporting, there's something

4    called purchase price allocations.  When companies buy and sell

5    other companies, they have to allocate the value for accounting

6    purposes to intellectual property and other assets and

7    sometimes it's for business strategy purposes.

8        And then there's disputes, as we've seen in and are all

9    aware of, and sometimes damages are an issue, and I'll work on

10   that.

11   **Q.**   Let's talk briefly about your educational background.

12   Could you describe that to the jury?

13   **A.**   Sure.  So I mentioned I have a two degrees.  I have an

14   undergraduate degree, a Bachelor of Science degree, from a

15   college like smack dab in the middle of the country, Bradley

16   University.  It's in Peoria, Illinois.  And then I have a

17   graduate degree, an MBA, from the University of Maryland.

18   That's in finance and information systems.

19   **Q.**   And in addition to your degrees, do you have any

20   professional certifications?

21   **A.**   I do.  I have two.  You can see on this slide I have

22   something called an ASA, that stands for accredited senior

23   appraiser; and CLP, that's certified licensing professional.

24   **Q.**   What does it take to become an ASA?

25   **A.**   It takes a lot of work and continued work because I have

1  to meet continuing education requirements every year.  The

2  thing that's the most memorable is you have to demonstrate

3  10,000 hours of experience in valuation.  In my case, it's

4  valuation of intellectual property.  You have to pass a series

5  of examinations, submit your work product to be reviewed on a

6  blind basis by your peers.  It's a difficult one to obtain.

7  **Q.**    You also mentioned that you're a certified licensing

8  professional.  Is that something different?

9  **A.**    That's something different.  That's about licensing, the

10  type of licensing we've heard a little bit about over the last

11  couple of weeks, licensing of intellectual property rights.

12  And it's the same, it's a credential that requires me to stay

13  abreast of issues in the field and requires examinations to

14  acquire it as well.

15  **Q.**    Have you received any awards or recognitions for your

16  work?

17  **A.**    I do.  Over the years, I've received -- I've received

18  several.  I've been named one of the leading economic experts

19  in intellectual property for a decade or so.

20  **Q.**    I'm not sure if you mentioned it.  Have you actually

21  negotiated patent licenses?

22  **A.**    So I have in a couple ways.  My career, I've been working

23  now for longer than I like to admit, 30 years; and big chunk of

24  that, seven or eight, I spent in industry.  I worked for a

25  company.  We were making -- the company still makes, like,

1    clean energy products and technologies, and I worked for seven

2    or eight years on that developing our intellectual property

3    portfolio, developing our IP, building some businesses in that

4    space.

5         And then the other 20 or so years I've been in the

6    consulting space mostly doing intellectual property related

7    consulting.

8         Between undergraduate and graduate school, I actually

9    programmed computers.  I worked on some cellular systems,

10   pretty early generation stuff.

11        So, as I said, I managed a way to kind of put all that

12   stuff together, and I think I have a really interesting job.

13   **Q.**   Is your firm being compensated for your time here today?

14   **A.**   It is.

15   **Q.**   Does your compensation depend in any way on the outcome of

16   this case or on your opinions?

17   **A.**   No.

18   **Q.**   Let's turn to the work you did in this case.

19        What were you asked to do?

20   **A.**   So I was asked to form my own independent opinions about

21   damages should you-all get to that question.  I asked that

22   question.  I have to make some assumptions hypothetically if

23   the patents are found to be valid and infringed.

24        And then we heard Mr. Malackowski testify, and I responded

25   to some of the information that he provided in his expert

BAKEWELL - DIRECT / BAILY

1  reports.

2  **Q.**    And were you here in the courtroom throughout trial?

3  **A.**    Yes.

4  **Q.**    Did you review written materials in coming up with your

5  views on this case?

6  **A.**    Written materials, deposition testimony.  We've seen --

7  I've reviewed a whole bunch of stuff, and I think we can see

8  just looking at some of the binders here that this process is

9  pretty data intensive.

10  **Q.**    Did you interview anyone in connection with your work?

11  **A.**    I did.  I interviewed people from Google.  Mr. Chan is an

12  example of that.  Dr. Schonfeld is an example.  Mr. MacKay I

13  interviewed.  I also read deposition transcripts of witnesses

14  and people from Sonos.

15  **Q.**    I think you already mentioned that for your work, you had

16  to assume that the patents are valid and infringed for all

17  purposes; is that right?

18  **A.**    That's right.  That's a requirement for this exercise.

19  **Q.**    But you still realize that the jury is going to decide a

20  variety of issues related to infringement and invalidity;

21  right?

22  **A.**    That's what I understand.

23  **Q.**    What is your opinion on reasonable royalties for the '885

24  and '966 patents?

25  **A.**    So there's a variety of evidence.  I think the best

 1  evidence is -- relates to something called noninfringing

 2  alternatives, and we'll talk about that.  I think that there's

 3  some other information that provides context for that that

 4  we'll talk about as well.

 5  **Q.**   I think you mentioned that you were here for

 6  Mr. Malackowski's testimony?

 7  **A.**   Yes.

 8  **Q.**   And you might recall we just put an asterisk next to the

 9  IFTTT analysis at that time.  Do you recall that?

10  **A.**   Yes, I do.

11  **Q.**   Okay.  So we're just going to put that to the side for now

12  and talk about some other things.  All right?

13  **A.**   That's fine with me.

14  **Q.**   So I'd like to ask you about this hypothetical negotiation

15  that we heard about earlier.  Is that something that you're

16  required to do when you quantify a reasonable royalty?

17  **A.**   That's a requirement for determining a reasonable royalty.

18  It's a way of determining a reasonable royalty where you go

19  back in time hypothetically and try to determine what the

20  parties would have negotiated for a license that involves

21  specifically the technology at issue -- here, two patents --

22  that provides an amount that's adequate to compensate.

23        **MS. BAILY:**  Let's go to the next slide.

24  **BY MS. BAILY:**

25  **Q.**   What does this slide show?

1   **A.**   So this is indicating the hypothetical negotiation or

2   negotiations that -- we can think of this as one negotiation or

3   two negotiations for each patent.  The important thing is that

4   we keep in mind that we're valuing two patents.  That's it.

5         And the date of first infringement for the '966 is alleged

6   to be November 2019.  So that's where that analysis would

7   occur.  And for the '885 it's November 20th, and that's where

8   that analysis would occur.

9             **MS. BAILY:**  Let's go to the next slide.

10  **BY MS. BAILY:**

11  **Q.**   Are there any other relevant dates that you considered in

12  the context of the hypothetical negotiation?

13  **A.**   There are.  I added three to this slide.  So we've heard

14  about these.  One is at the bottom, Sonos began practicing the

15  '885 and '966 in June of 2020.  That kind of helps get our

16  bearings as to that.  It went 15 years without practicing these

17  patents, which I think indicates that there's limited economic

18  value.

19        Google released the Chromecast in July 2013.  That helps

20  explain that the date of first infringement here is when

21  patents issued, and I think that provides some context.

22        And then these patents are set to expire in

23  September 2027.  So we'll talk a little bit about what that

24  means.  A lump-sum type of license or royalty would provide an

25  amount through September 2027.  A running royalty, the data

1   that's been available, is only for a short period of time.  So

2   I think it's important that the jury keeps that in mind.

3   **Q.**   And in the negotiation that we're discussing here, what

4   are the parties negotiating for?

5   **A.**   They're negotiating for what's called a nonexclusive,

6   people call it a bare or a naked patent license.  It's just for

7   patent rights, nothing else.  And it's for either a lump-sum

8   amount through September 2027 or for the period from which

9   there's data that runs through November 2022 for the '966 and

10  September for the '885, September 2022.

11  **Q.**   And we'll talk more about lump sum versus running royalty;

12  but just taking a step back, in negotiations like this, what

13  kinds of things do parties typically talk about?

14  **A.**   So they'll talk about:  What can I do instead?  If they're

15  sitting down, like:  Is there any other way that I can do --

16  get sort of the same benefits?  Or if I take this technology

17  out, are my customers going to care?  Is this something that is

18  really changing market share between the companies or driving

19  demand?  That's going to be something that people would

20  discuss.

21      I think they'd want to know about the parties' licensing

22  history and if there's any licenses that are comparable and

23  what sort of insights you can gain from that information.

24      And those would be the -- those would be the primary

25  things.

1  **Q.**   All right.

2        **MS. BAILY:**  Let's go to the next slide.

3  **BY MS. BAILY:**

4  **Q.**   Is there a way that you think about the types of evidence

5  that you just described that people consider in negotiations to

6  value patent rights?

7  **A.**   Yes.  So all the stuff I just discussed a moment ago, you

8  can think about it falling into three buckets and that's what I

9  have on the screen.

10       The cost approach, it's noninfringing alternatives; the

11  income approach, that's like economic analysis, does this -- is

12  this the kind of invention that causes more sales or changes in

13  market share or lost profits or things like that; and then the

14  market approach, can you look at things that are comparable,

15  other licenses to other patents, for example.

16  **Q.**   We also have already heard a lot about the *Georgia-Pacific*

17  factors.  Did you consider those?

18  **A.**   That's right.  There's 15 of those, and I considered them

19  all.

20  **Q.**   Do we need to walk through all 15?

21  **A.**   No.  I think we're going to go through them all.  I think

22  there's a way to discuss them in these three buckets; and at

23  the end, I'll kind of recap for you-all what -- what this

24  information means in terms of the GP factors.  So we can just

25  wait to do that for the moment.

1      If we keep these three buckets in mind, I think it's a

2  good -- a good way to have some signposts and to cabin off some

3  of the data that we'll have.

4          MS. BAILY:  Let's go to the next slide and start with

5  the first category, the cost approach.

6  BY MS. BAILY:

7  Q.   Is this a category of information that parties consider

8  when negotiating patent licenses?

9  A.   It is.  This is noninfringing alternatives.  It's --

10 there's a road sign there, and what I'm meaning to depict is we

11 have to, like, rewind and go back in time and imagine what

12 would have happened at the time of first alleged infringement,

13 so back in 2019 and 2020, and see if things could have gone in

14 a different direction.  And if Google could say, "Well, we'll

15 just take our products in a different direction and that would

16 be that."

17 Q.   And in your experience, are noninfringing alternatives

18 something that parties in the real world actually consider in

19 licensing negotiations?

20 A.   Yes, for sure, in the way that I just discussed.

21 Q.   Did you analyze noninfringing alternatives in this case?

22 A.   I did.

23         MS. BAILY:  Let's skip the next slide and just go to

24 DDX12.8.

25                   (Pause in proceedings.)

1          MS. BAILY:  12.7.  There we go.

2     BY MS. BAILY:

3     Q.   What did you find when you considered noninfringing

4     alternatives?

5     A.   So this case is a little bit unusual and interesting in

6     that Google actually implemented a redesign, and we have to

7     think about that redesign having occurred back a few years ago

8     instead.

9          I think the redesign, because it's oriented around the

10    claims of a patent, it's a way, from my perspective -- I'm not

11    a technical expert, I'm a damages and economic expert -- I can

12    see how this invention sort of shows up commercially and what

13    you need to do in practical terms and if it changes the

14    products in a way that affects consumers.

15         That's the first bullet.  It's, like, I'm trying to

16    describe there that it's a way to figure out what the

17    boundaries are of the patents from an economic perspective.

18    Q.   What else did you consider in the context of noninfringing

19    alternatives?

20    A.   So whether or not they would be commercially acceptable.

21    And my understanding is that from an economic point of view, at

22    least in my field, what you're interested in is seeing if

23    there's a change, if there's going to be an impact from making

24    that change, and that's what commercial acceptability means to

25    me.

**BAKEWELL - DIRECT / BAILY**

1  **Q.**  And then you have two other bullets on this slide.  What

2  are those referencing?

3  **A.**  Yeah.  So there is real-world evidence that we've seen.

4  There's been a design change.  We heard Mr. MacKay and Mr. Chan

5  just a moment before me talk about what happened and that

6  consumers haven't noticed or, you know, pitched a fuss over it.

7       And the last bullet is that in Mr. Malackowski's analysis,

8  he didn't consider noninfringing alternatives at all.

9       **MS. CARIDIS:**  Your Honor, I have to object to that

10  last answer.  Mr. Bakewell is going outside the scope of his

11  report.  His report did not talk about the functionality that

12  was implemented as described by Mr. MacKay and Mr. Chan in

13  their testimony.  And I would direct Your Honor to page 160 of

14  Mr. Bakewell's report.

15       **THE COURT:**  Is that true?

16       **MS. BAILY:**  I believe that Mr. Bakewell talked about

17  the commercial acceptability of the alternative.  Now, I don't

18  know the relevant dates of how much information he had.

19       **THE COURT:**  But his report probably doesn't refer to

20  this testimony that we only recently received.

21       **MS. BAILY:**  It surely does not talk about the trial

22  testimony, and we can avoid that.

23       **THE COURT:**  All right.  Well --

24       **MS. CARIDIS:**  Nor does it talk about the alternative

25  that Mr. Bakewell relied on.

1        **MS. BAILY:**  It does talk about two alternatives, the

2    no standalone mode alternative and additional context for that

3    with respect to taking out overlapping speaker groups

4    altogether.

5        **THE COURT:**  Well, stick to what's in the report.  Do

6    not embellish with new information that wasn't available at the

7    time of the report.

8        However, if on cross-examination, you open the door, he

9    can walk right through and lay all of this before the jury.

10   That's the way I handle it.

11       So stick to the report.  Do not on direct examination get

12   into Mr. Chan and Mr. MacKay.

13       **MS. BAILY:**  Thank you, Your Honor.

14   BY MS. BAILY:

15   **Q.**   Mr. Bakewell, did you consider the impact of noninfringing

16   alternatives on damages in this case?

17   **A.**   I did.

18   **Q.**   And what specifically did you consider?

19   **A.**   So I considered that there were two alternatives, and I

20   evaluated what the cost of those would be and, if I recall

21   correctly from my report, what they were, those costs, because

22   it was implemented before my report was issued; and then I

23   considered the evidence about commercial acceptability.

24   **Q.**   And one of the alternatives that you discussed in your

25   report is the no standalone noninfringing alternative.  Do you

1  recall that?

2  **A.**    That's right.

3  **Q.**    And did you find that that was technically feasible?

4  **A.**    So I interviewed Dr. Schonfeld about that, and I

5  understand that it is technically feasible.  In my report I

6  interviewed Mr. MacKay and I considered that as well.

7  **Q.**    And what about economic comparability with respect to the

8  no standalone noninfringing alternative?

9  **A.**    Yes, so I interviewed Mr. MacKay about that as well and

10  wrote about that in my report.  I also considered a variety of

11  evidence, deposition testimony, other surveys in this case that

12  relate to the products overall.  Those indicated that this

13  wouldn't be a change that consumers would notice.

14      There's usage and other economic data that I considered.

15  So it kind of overlaps with the income approach, and we'll get

16  to that.  That category of information we can think of as

17  falling in that bucket, but there's economic evidence that

18  shows that this change -- or these changes are commercially

19  acceptable.

20  **Q.**    And did you come to a conclusion about the costs

21  associated with implementing the no standalone noninfringing

22  alternative?

23  **A.**    Yes.

24  **Q.**    And what were your conclusions in that regard?

25  **A.**    $200,000 is the cost for rolling that change out,

1    including the testing changes, the testing process as well as

2    Mr. MacKay's time.

3    **Q.**    Does this cost relate to both of the patents in suit?

4    **A.**    Yes.  This would be a cost that would -- you can think

5    about it as relating to either or both of the patents in suit.

6    We heard -- or I wrote about in my report that this could --

7    would apply to both.  That's what I understand from

8    Dr. Schonfeld.

9    **Q.**    Did you also consider what would have happened if Google

10   removed overlapping groups altogether?

11   **A.**    Yes.  That was another noninfringement alternative that I

12   considered.

13   **Q.**    And what did you conclude and how did you use that in your

14   analysis?

15   **A.**    So the cost of that would be similar if not the same.  My

16   understanding is that it would just require a small change in

17   the code, and the evidence that I've seen from an economic

18   point of view and what Mr. MacKay told me when I interviewed

19   him was that it would be commercially acceptable.

20   **Q.**    So going back to the hypothetical negotiation that the

21   jury has to consider, do noninfringing alternatives provide a

22   relevant data point in your view?

23   **A.**    They do.  They provide a relevant data point.

24   **Q.**    Now, you've mentioned a bit about the differences between

25   lump sum and running royalty payments; right?

1  **A.**    Yes.

2  **Q.**    Can you briefly go over those concepts for the jury?

3  **A.**    Sure.  So a lump sum is a one-time payment.  It's like a

4  cash on the barrelhead.  You pay somebody in a license and then

5  you agree to just go on and there's no ongoing payments, and it

6  relates usually to the term of the patents when they're set to

7  expire.  That's a lump sum.

8       The other big category is running royalties.  Those can be

9  a variety of forms, like per unit would be one, and they go on

10 for whatever the -- is agreed in the license.  It could be for

11 a certain period of time, as is the case here, or for the

12 entirety of the patent life.

13      And there you have to count up the number of units and

14 apply a royalty rate if it's a per-unit rate.  That's a running

15 royalty.

16 **Q.**    And do noninfringing alternatives impact the form of the

17 royalty payment in your view?

18 **A.**    They do generally.  Sometimes there's a change and there's

19 like an ongoing payment associated with the change.  Here, the

20 change for the one-time cost, that there's no evidence that

21 there's an ongoing impact that you'd have to quantify.  So what

22 that shows is that this case, the noninfringing alternative,

23 indicates that the form of a reasonable royalty would be a lump

24 sum.

25      **MS. BAILY:**  Let's go to DDX12.9.

1  BY MS. BAILY:

2  Q.   So you also considered the income approach; is that right?

3  A.   This is the income approach.  It also relates to

4  commercial acceptability of noninfringing alternatives.

5  Q.   And what are you conveying with this bar graph here?

6  A.   Yes, this is like a spreadsheet that the numbers go up

7  here on the bar.  It's -- what you're looking for is to see if,

8  hey, there's any impact from this technology, does it cause to

9  be further additional sales, is there any demand that relates

10  to the -- the technology to the two patents, are there any

11  changes in market share that's specific to these two patents.

12  That's what I'm showing there.

13  Q.   And did you conduct this type of analysis in this case?

14  A.   I did.

15  Q.   What did you find?

16  A.   So these are very specific patents that relate to very

17  specific features that -- just overlapping groups of speakers;

18  and I found that not many, if any, consumers are affected by

19  this or utilize this feature, and the parties don't use the --

20  that specific functionality to compete with one another.

21  Q.   Did you review usage data in this case?

22  A.   I did.

23       MS. BAILY:  Let's go to slide 12.10.

24  BY MS. BAILY:

25  Q.   Is usage a *Georgia-Pacific* factor?

1    **A.**   It is.  This is *Georgia-Pacific* Factor 11, and the second

2    part of it I think is in cases like this and I think generally

3    pretty important.  It says so you want to look at the extent to

4    which the infringer has made use of the invention; and then the

5    second part is, and any evidence probative of the value of that

6    use.  That's the type of stuff that I just talked about, like

7    are there changes in market share that are attributable to

8    the -- specifically to those two patents that we talked about.

9            **MS. BAILY:**  Let's go to the next slide.

10   **BY MS. BAILY:**

11   **Q.**   Is this a summary of some of the usage data that you

12   looked at in this case?

13   **A.**   Yes.  This summarizes the usage data.  There's -- we've

14   heard there -- I've reviewed evidence about devices in a group

15   that's collected measuring devices in a group on a daily basis.

16   That's less than one half of 1 percent.  There's data that

17   Google has and was produced in this case that relates to

18   devices in a group over a month, 30-day devices in a group.

19   That's less than 3 percent.

20           And then the bottom -- should I go on to that?

21   **Q.**   Sure?

22   **A.**   The bottom is devices that joined a static group on a

23   daily basis.  So there's information about devices that joined

24   a group and four specific commands that can be used to join a

25   group that I reviewed.

**BAKEWELL - DIRECT / BAILY**

1    The static grouping that I understand is at issue in this

2    case relates to only a fraction of that grouping, and that

3    number is 0.022 percent.  So all this information shows that in

4    terms of using grouping of speakers and static commands in

5    particular, those numbers are low.

6    And what we have to think about in this case is we're

7    talking about even a subset of this.  We're talking about these

8    two patents and overlapping groups.  So those numbers are going

9    to be lower than these that are even shown on the screen.

10    **MS. BAILY:**  Let's go to DDX12.12.

11   **BY MS. BAILY:**

12   **Q.**   What is this slide showing us?

13   **A.**   This is the market approach.  I'm showing a house here.

14   The idea with this approach is you consider comparable sales,

15   or if you're renting comparable leasing provides prices for

16   homes.  Not every home is going to be exactly the same, and you

17   want to see if you can make adjustments for any differences or

18   if you can take anything away from looking at comparables.

19   **Q.**   And in connection with the market approach, did you look

20   at any patent agreements in this case?

21   **A.**   I looked at a bunch of patent agreements that were

22   produced in this case.  There's a bunch of licenses.

23   **Q.**   And what did you find?

24   **A.**   So a couple of things.  There's a lot of lump-sum

25   agreements so that I think that is consistent with the evidence

BAKEWELL - DIRECT / BAILY

1    I've reviewed regarding noninfringing alternatives and demand.

2    It's also consistent with my experience in technology space.

3    There's a lot of lump-sum agreements.

4        And there's some agreements that involve lots of patents,

5    like thousands of patents, and then there's a lot of agreements

6    that are more narrow; and there's one that we heard about, this

7    Outland agreement that involves comparable patent rights that

8    tells us a little bit more about kind of comparable agreements.

9    **Q.**  Could you give us a brief overview of the Outland Research

10   agreement?

11   **A.**  So that's an agreement that involved, I think, 12 patents,

12   4 patent applications.  It was in 2011, and the amount was

13   $2.25 million.  It was a lump-sum agreement.

14   **Q.**  Okay.

15       **MS. BAILY:**  Let's just pull that up.  It's TX6016

16   already in evidence.

17   **BY MS. BAILY:**

18   **Q.**  And was the Outland Research agreement a license agreement

19   or a patent purchase agreement?

20   **A.**  This one was a purchase.  It was a purchase only of patent

21   rights.

22   **Q.**  And how does it being a patent purchase agreement affect

23   your analysis since the agreement in this case would be a

24   license agreement?

25   **A.**  So we use this phrase in finance and economics called

1    "holding all else equal."  So holding everything equal, if you

2    buy a patent that's more valuable than if you license a patent.

3    If you take a nonexclusive license, other people can use that

4    asset.  If you buy a patent, you get to control it.  It's like

5    if you buy a house, there's more value to that than if you're

6    renting a house.

7        So we have to keep that in mind when we're looking at this

8    agreement.  It's a purchase and, therefore, more valuable

9    than -- holding all else equal, than this hypothetical license

10   or these two hypothetical licenses.

11   **Q.**   All right.  Let's just look quickly at the payment term,

12   which is Section 3.4 on page 3.

13       How much did Google pay pursuant to this agreement?

14   **A.**   2.25 million.

15   **Q.**   And what was the form of the payment?

16   **A.**   It was a lump sum.

17   **Q.**   Now I think we heard from Mr. Malackowski that

18   Outland Research is a nonpracticing entity.  Do you recall

19   that?

20   **A.**   I do.

21   **Q.**   Is Outland Research a nonpracticing entity?

22   **A.**   It is.

23   **Q.**   And what does that mean to you?

24   **A.**   So it just means it doesn't practice its patent rights.

25   That's what "nonpracticing entity" means.

**BAKEWELL - DIRECT / BAILY**

1   **Q.**   All right.   Is the agreement that we're looking at here

2   still informative even though Outland Research is a

3   nonpracticing entity?

4   **A.**   I think it is.   You know, Sonos for 15 years didn't

5   practice these two patents; and so in that way, Sonos wasn't

6   practicing for a long period of time.

7         And then I think what I'm the most interested in is if

8   these are the types of patents that are really going to move

9   the needle in terms of selling products or creating demand and,

10  like, if somebody has them that might compete a little bit,

11  whether or not it's being used to compete.

12  **Q.**   Did the term of the Outland agreement differ from the term

13  of the hypothetical license?

14  **A.**   It was when you -- when you buy a patent, you get it for

15  its life.   And here, Google bought a bunch of patents for the

16  lives of the patents and it's much longer than the hypothetical

17  licenses either if they're a lump sum or if they're just for a

18  short period of time.

19        I think I have a slide that illustrates that.

20  **Q.**   Yeah.

21           **MS. BAILY:**   Let's bring up 12.13.

22                      (Pause in proceedings.)

23           **THE WITNESS:**   Do you want me to go -- I'd be happy to

24  describe it.

25  \\\

1   **BY MS. BAILY:**

2   **Q.**   Yeah.  I didn't realize it was up.

3        So what does this slide show?

4   **A.**   So at the top the Outland agreement, it probably relates

5   to a longer period of time.  I took one of the comparable

6   patents and used that as the ending date.  I went from

7   July 2011 through January 2027 and drew that black line.

8        And then we have these hypothetical licenses -- I'm

9   assuming they're lump sums -- for the entire life of these

10  patents.  So for the '885, the license would be from

11  November 2020 until September 2027 when the '885 is set to

12  expire.  That's like less than half of the total time period

13  that the Outland agreement relates to.  So in that way the

14  Outland agreement is more valuable.

15       And the same for the '966.  Although the dates are a

16  little bit different, that hypothetical negotiation would be in

17  November 2019.  If it's a lump sum, it would go through

18  September 2027.  That's a shorter period of time than the

19  Outland agreement relates to.  So in that way, holding all else

20  equal, the Outland agreement is more valuable.

21  **Q.**   And so just taking a step back, what in your view does the

22  Outland agreement bring to your analysis of a hypothetical

23  negotiation in this case?

24  **A.**   So it says that lump sum is a form that's appropriate.  It

25  sort of is in the same ballpark as noninfringing alternatives.

1    And I think what also -- we'll talk about this, I think,

2  in a moment because we -- and I reviewed in my report other

3  licenses that were portfolio licenses to thousands of patents.

4    I think this license is instructive because it allows you

5  to kind of narrow down from licenses with -- with a thousand

6  patents; that here we're focusing in on a narrower set of

7  patent rights that relate to very specific features, and so

8  it's a little more granular in that way.

9  **Q.**   All right.  Well, let's talk about the Sonos licenses in

10  this case.  I think you sort of vaguely referenced those.

11      **MS. BAILY:**  Let's bring up DDX12.14.

12  **BY MS. BAILY:**

13  **Q.**   Do we know the total amounts that Sonos has been paid

14  under its portfolio licenses?

15  **A.**   We do.  So for two of them we have royalty reports; and

16  for the third one, the Denon agreement, that one was a lump

17  sum.  It was for $10 million for a period of time and for a

18  thousand patents or so we heard about and I reviewed the

19  agreement and wrote this in my report.

20      And then these are the royalty reports for a summary of

21  them from Lenbrook, which was called Bluesound, the products

22  are sold as Bluesound; and Legrand, which is also called

23  Pass & Seymour.  The total payments there are at the bottom of

24  this slide.  The royalty payments were live for Lenbrook were

25  about one and a half million dollars of which half, 780,000

1    were in the U.S. and Legrand is about $200,000.  A little bit

2    more.  A little less than $300,000 for both.

3    **Q.**    And how many patents approximately did these Sonos

4    licenses cover?

5    **A.**    Like a thousand depending upon what timeframe you measure.

6    Sometimes more, sometimes a little less.

7    **Q.**    And when you were putting your opinion together, were you

8    aware of any evidence that would lead you to conclude that the

9    patents at issue here drove the value associated with these

10   licenses?

11   **A.**    We haven't seen evidence like that.

12   **Q.**    And so how do these licenses impact your assessment of the

13   hypothetical negotiation?

14   **A.**    Well, we -- we know that -- that Sonos is open to the idea

15   of a lump sum.  There's one lump-sum agreement.  And these are

16   for many, many patents, many more than is at issue in the

17   hypothetical license.

18        And I think, you know, comparing this or considering

19   Outland together with this and noninfringing alternatives,

20   maybe in that order, allows you to kind of isolate in and focus

21   in on these two patents relative to the big portfolio licenses

22   that were entered into that we've seen that Sonos produced.

23   **Q.**    During this trial -- well, strike that.

24        Did you do any analysis in connection with coming up with

25   your opinions about whether Google and Sonos are competitors?

1    **A.**    I did.

2    **Q.**    And can you explain your thoughts on whether Google and

3    Sonos are competitors and to what degree?

4    **A.**    So they compete in some ways, but I think the competition

5    needs to be kept in perspective.  It relates to specific

6    products and specific circumstances.

7        And even then, these patents aren't really used to compete

8    or move market share.  So when we talk about competition, I

9    think we have to keep in context what that competition actually

10   means.

11   **Q.**    And how, if at all, did that impact your analysis in this

12   case?

13   **A.**    Well, we want to focus in on these two patents and what

14   they mean for competition, and these are patents that relate to

15   very specific features of which there's many in these products,

16   like countless features; and these just -- these are not the

17   type of patents that really have a significant impact.  When we

18   focus in on overlapping speaker groups, it's not the type of

19   technology that has an impact in terms of competition in a

20   major way.

21   **Q.**    All right.

22       **MS. BAILY:**  Let's put up DDX12.17.

23   **BY MS. BAILY:**

24   **Q.**    Near the start of your testimony you talked about circling

25   back to the *Georgia-Pacific* factors.  Can you just briefly

1    describe what this slide shows?  How did Factors 1 and 2 come

2    into your analysis?

3    **A.**    Sure.  So 1 and 2 relate to comparable agreements, and

4    we've talked about those.  Remember, I said we would talk about

5    them as we go.  The good news here is that we've already talked

6    about those; and when you read *Georgia-Pacific* Factors 1 and 2,

7    it relates to the types of agreements we were just talking

8    about.

9    **Q.**    And how about Factor 3?

10   **A.**    Factor 3 is the nature and the scope of the license.  We

11   talked about lump sum versus running royalties and the fact

12   that this is a bare -- or these are, whichever way you look at

13   it, bare patent licenses that relate to only one or two patents

14   in a space where there's literally -- we know there's over a

15   thousand patents and there's a lot more than that actually.  So

16   this nonexclusive bare patent license concept is important.

17   **Q.**    And how did Factor 5 influence your analysis?

18   **A.**    We just talked about competition.  There's competition,

19   but we've to keep it in context.

20   **Q.**    How about Factors 9 and 10?  How did those impact your

21   analysis?

22   **A.**    This is where noninfringing alternatives comes into play.

23   Also, we've heard about the prior art.  There's other ways of

24   doing things; and these two patents, we have to consider their

25   incremental contribution over the prior art.  And that's what's

BAKEWELL - DIRECT / BAILY

1    described in Factors 9 and 10, and one way to look at that is
2    through noninfringing alternatives.
3    **Q.**    And how did Factor 11 influence your opinions?
4    **A.**    We had a slide on this.  I just summarized it as usage.
5    It's evidence probative of value of the use.
6    **Q.**    And, finally, Factor 13, did that come into account when
7    you were coming up with your views on the patents?
8    **A.**    This is a space where there's lots of patents, there's
9    lots of features, and we've got to make sure we're valuing only
10   these two patents, nonexclusive license, naked license to only
11   two patents:  The '885 and the '966.
12   **Q.**    And what do all the data points that we've talked about
13   here today mean for your final opinion on what a reasonable
14   royalty would be in this case?
15   **A.**    Well, they all explain why the hypothetical licenses
16   should be lump sums; and the amount of noninfringing
17   alternatives is it's one data point and it's instructive and
18   it, I think, provides some indication of the value and what the
19   parties would negotiate in a hypothetical license.
20   **Q.**    And so in conclusion, what is your opinion regarding the
21   reasonable royalty that would come into play in this case?
22   **A.**    It's a lump sum.  It's ultimately up to the folks on the
23   jury to make that determination.  We've covered evidence of
24   data points that are -- range from 200,000 to $2.2 million.
25   **Q.**    Thank you.

1            MS. BAILY:  Pass the witness.

2            THE COURT:  Thank you.

3            MS. CARIDIS:  Your Honor, do you want to continue

4    through or do you want to take a break?

5            THE COURT:  Huh?

6            MS. CURTIS:  Would you like to continue now or would

7    you like to take a break?

8            THE COURT:  Well, we can take our break now.  Let's

9    take it now.

10        Please remember the admonition.  We'll give the lawyers a

11   chance to set up.

12        So 15 minutes.  Thank you.

13            THE CLERK:  All rise for the jury.

14        (Proceedings were heard outside the presence of the jury:)

15            THE CLERK:  Court is in recess.

16                (Recess taken at 11:47 a.m.)

17              (Proceedings resumed at 11:54 p.m.)

18        (Proceedings were heard out of the presence of the jury:)

19            THE COURT:  I want to raise a question about the

20   instructions with the lawyers right now before we bring the

21   jury back.

22        Ready?  Here is my question:  In doing the verdict form, I

23   see no point in trying to get the jury to answer a question

24   about indirect infringement.

25        I think the case has been tried on the basis of these two

**PROCEEDINGS**

1    products either infringe or they don't, and we don't have to

2    get into somebody in Perth Amboy, New Jersey, who's loading it

3    down to each individual person and how many people have loaded

4    it down.

5        It seems to me there ought to be a way for you-all to

6    agree on how that point is presented to the jury without

7    burdening them with the idea of indirect infringement or, for

8    that matter, contributory infringement.  Do you see what I'm

9    getting at?

10            **MR. PAK:**  Yes, Your Honor.

11            **THE COURT:**  Can't you solve this problem?  Why do you

12    have to make it so difficult for the poor jury in the -- and

13    for me?  You're going to wind up getting instructions that you

14    don't like and wind up getting instructions that you feel like

15    you don't have enough time to complain about because you've

16    made it so complicated for me to present it to the jury.  We're

17    going to -- you know, we got -- today is Wednesday.  We're

18    going to argue it on Friday morning, and I can't be here

19    tomorrow afternoon.

20        So can you -- can you agree with me that we just leave

21    that out?

22            **MS. CARIDIS:**  Your Honor, I think we need to confer

23    internally, but let's -- Mr. Pak and our team will chat and, we

24    can get back to you and see if we can simplify some things.

25            **THE COURT:**  That's good to hear.

 1        Let's see what else I got.

 2        All right.  That's the -- that would -- I'm hoping -- I

 3   don't know, this is a big hope, because we've been working hard

 4   on it -- that I can give you a version of a verdict form.  I'm

 5   trying to make it so that it doesn't look like an internal

 6   revenue form, and that's hard to do because you've got so many.

 7        So if you would just eliminate a lot of these claims in

 8   the '966 and say it all turned on claim 1 -- I don't know.  I

 9   understand why you might want to keep them for validity

10   purposes, but --

11        **MR. PAK:**  Your Honor, we've already offered that.

12        **THE COURT:**  It's so much extra work.  It's so much

13   extra work for the jury, and it's so much extra work for us

14   because we've got to tee it up in a way that logically flows.

15        **MR. PAK:**  Yes.  We've offered that as a possibility to

16   just try claim 1 of the '966 as a representative claim, and

17   we'll discuss it further and see if we can reach agreement on

18   that as well, Your Honor.

19        **THE COURT:**  Well, maybe you pick one of the '966 that

20   has the most number of elements -- limitations so that you

21   don't -- and then just stipulate that -- I don't know.  Please

22   help me out.

23        **MR. PAK:**  We will work on it, Your Honor.

24        **THE COURT:**  Okay.  Let's bring back the witness and

25   bring back the jury.

1          (Pause in proceedings.)

2          **THE COURT:**  By the way Google, is over 800 minutes

3     now.

4          **MR. PAK:**  We're fully aware, Your Honor.  We're on

5     target.

6          **THE COURT:**  Good.  I hope so.

7       Okay.  You can -- then I haven't done the math for

8     Plaintiff, but you have more time left.

9          (Pause in proceedings.)

10         **THE COURT:**  How much on cross do you have?

11         **MS. CARIDIS:**  I'm hoping less than 15 minutes,

12    Your Honor.

13         **THE COURT:**  Can we start on your rebuttal case?

14         **MS. CARIDIS:**  Yes, Your Honor.  Mr. Almeroth is ready

15    to take the stand.

16         **THE COURT:**  Did I excuse him before or does he need to

17    be re-sworn?  I don't remember how I left it.  Can -- I can

18    just admonish him if you both stipulate that he's still under

19    oath and then save some time.  Is that all right with Google?

20         **MR. PAK:**  Yes, Your Honor.

21         **THE COURT:**  All right.  You too?

22         **MS. CARIDIS:**  Yes, Your Honor.

23         **THE CLERK:**  All rise for the jury.

24       (Proceedings were heard in the presence of the jury:)

25         **THE COURT:**  Okay.  Be seated.

1    And before we get started with cross-examination, I've got

2    a point I want to bring up to tell you where we are.

3    We are getting close to the end of the evidence, but we

4    won't finish it today.  We will finish it probably tomorrow

5    morning before 1:00 o'clock.  In fact, I would say well before

6    1:00 o'clock, but we will not argue the case tomorrow to you

7    because I need to spend some time with the lawyers working on

8    jury instructions to give them a chance to improve upon what

9    I've been drafting.

10    Now, however, right now I would say the case is going to

11    go to you for argument and deliberations on Friday.  However,

12    because it will be going to you for deliberations, usually

13    juries will decide -- this is up to you, you, the jury are the

14    statutory body and you are the ones that get to decide, but

15    many jurors like to stay as late as possible on a Friday and

16    decide the case.  You don't have to.  It's up to you.

17    You can stop at 1:00 o'clock.  You can stop at

18    3:00 o'clock.  You can stop at 7:00 o'clock or 10:00 o'clock.

19    It's up to you.  We decide -- you decide and we stay here and

20    conform to your -- so you might want to think about today, not

21    among yourselves yet, but think about your own schedule on

22    Friday to see if you -- how late -- you might wind up having a

23    doctor's appointment at 2:00 o'clock on Friday and can't do it,

24    and that's fine.  It has to be everybody.

25    So -- but sometimes jurors can work it out so that they

 1   can stay.  And then tomorrow I'm going to let you discuss just

 2   your schedule among -- so you can discuss not the merits of the

 3   case, but what your timetable is going to be on Friday.

 4        Is there any objection to that part?

 5            MR. PAK:  No objection.

 6            THE COURT:  Okay.  All right.  Keeping in mind that if

 7   you don't reach a verdict on that -- on Friday, then I think we

 8   are coming back when?  The next Friday?

 9            MS. CARIDIS:  Friday the 26th, Your Honor.

10            THE COURT:  So it would be a week later.  So you could

11   get a start on it, but you wouldn't -- so that is the -- that

12   is the -- I'm looking ahead here to see how this is going to

13   work out.

14        So just think about overnight what your -- what you -- how

15   late you can stay on Friday, two days from now.

16        All right.  Ms. Caridis, your turn to ask questions.

17            MS. CARIDIS:  Thank you, Your Honor.

18                        <u>**CROSS-EXAMINATION**</u>

19   BY MS. CARIDIS:

20   Q.   Good morning, Mr. Bakewell.

21   A.   Good morning.

22            MS. CARIDIS:  Your Honor, permission to approach the

23   witness?

24            THE COURT:  Of course.

25            THE WITNESS:  Thank you.

1                        (Pause in proceedings.)

2    BY MS. CARIDIS:

3    Q.    Mr. Bakewell, I believe that you discussed this with

4    Google's Counsel, but just so we're all on the same page, your

5    task in this case was to assume that Google was liable for

6    infringement of the '966 patent and the '885 patent; correct?

7    A.    Yes.

8    Q.    So those are valid and infringed patents as far as you're

9    concerned; correct?

10   A.    Assumed, correct.

11   Q.    And in your opinion, the damages that Google should pay

12   for infringing the '885 patent is less than $200,000; correct?

13   A.    I think that's the best evidence.  There's some other

14   evidence that we talked about, but that's I think the best data

15   point we have.

16   Q.    And in your opinion, the damages that Google should pay

17   for infringing the '966 patent is also less than $200,000;

18   correct?

19   A.    I think that's the best data point of all the information

20   that we have.

21   Q.    Now, you submitted two damages reports in this case;

22   correct?

23   A.    Um, I did submit two reports.  I don't know if the

24   characterization in this case, but I did submit two reports.

25   Q.    And in your first damages report, you said that the

1  damages for the '885 patent should be no more than $5,000;

2  correct?

3  **A.**  I did.  I would consider that to be in a different case --

4  or a different phase of the case, but I did, that's correct.

5  **Q.**  But that was still your opinion about the '885 patent;

6  correct?

7  **A.**  At the time.

8  **Q.**  Now, at the time of your deposition, your firm had accrued

9  around $1.4 million of invoices to Google for your work in this

10  case; correct?

11  **A.**  No, not in this case.  It was in multiple cases.  There's

12  been -- there's been -- I don't know how much I can talk about

13  it, but that's in more than this case.

14  **Q.**  You recall being deposed prior to your testimony today;

15  correct?

16  **A.**  Yes.

17      **MS. CARIDIS:**  And I will read into the record

18  Mr. Bakewell's deposition at line 75 -- strike that -- at

19  page 75, line 23, to page 76, line 2 (as read):

20      **"QUESTION:**  So you have billed Google $1.4 million for

21      your work on this case so far?

22      **"ANSWER:**  I don't know how much of that has actually been

23      billed.  I'd check but that's kind of what's been

24      accrued."

25  \\\

1    BY MS. CARIDIS:

2    Q.    That was your testimony; correct, Mr. Bakewell?

3    A.    That's part of my testimony, yes.

4    Q.    Okay.  And you understand that the accused products in

5    this case for the '885 patent are Google's audio players;

6    correct?

7    A.    Yes.

8    Q.    And you also understand that the accused products for the

9    '966 patent are computing devices like smartphones with the

10   Google Home app; correct?

11   A.    Generally, yes, I'd agree.

12   Q.    And those are different products; correct?

13   A.    Um, do you mean between the '885 and '966?

14   Q.    I mean --

15   A.    Is that what you're asking?  I didn't follow exactly your

16   question.

17   Q.    Sure.

18        Google's audio players that are accused of infringing the

19   '885 patent are different from computing devices like

20   smartphones with the Google Home app, which are accused of

21   infringing the '966 patent; correct?

22   A.    Sort of in a plain way, yes, not -- there's some ways

23   where the answer might be no; but in a plain way, yes.

24   Q.    If I buy a speaker, I don't get a smartphone for free;

25   correct?

1   **A.**   True.

2   **Q.**   And you understand that the law requires an infringer to

3   compensate the patentee in no event less than a reasonable

4   royalty for the use made of the invention by the infringer;

5   correct?

6   **A.**   Correct.

7   **Q.**   So following that, if the accused Google audio products

8   are found to infringe a valid claim of the '885 patent, Sonos

9   would be entitled to at least a reasonable royalty for that

10  infringement; correct?

11  **A.**   Specifically for that patent, that's correct.

12  **Q.**   And you understand that the Court has already determined

13  that Google's audio products infringe claim 1 of the '885

14  patent; correct?

15  **A.**   Yes.

16  **Q.**   And if Google's Home app installed on a smartphone is

17  found to infringe a valid claim of the '966 patent, Sonos would

18  be entitled to at least a reasonable royalty for that

19  infringement as well; correct?

20  **A.**   Yes.

21  **Q.**   Now, you spoke briefly with Google's Counsel about the

22  cost approach; correct?

23  **A.**   I did.

24  **Q.**   And so at least part of your analysis in this case, part

25  of your opinions, is based on the cost of Google's alleged

1  noninfringing alternatives; correct?

2  **A.**    True.

3  **Q.**    And you rely on Dr. Schonfeld to identify whether any

4  alternatives are actually noninfringing; correct?

5  **A.**    In part.

6  **Q.**    You aren't here to provide any opinions as to whether any

7  of Google's proposed noninfringing alternatives are, in fact,

8  noninfringing; correct?

9  **A.**    That's true.

10  **Q.**    If the jury determines that those alleged alternatives are

11  either not acceptable or still infringe the asserted patents

12  here, the cost of those alternatives would not be relevant to

13  the damages in this case; correct?

14  **A.**    I disagree, and I'd be glad to explain.

15  **Q.**    We can get into why you would think that would not be the

16  case on your redirect if you'd like.

17        So, Mr. Bakewell, your report discusses an alleged

18  noninfringing alternative -- actually pause.

19          **MS. CARIDIS:**    Mr. Jay, can we get up paragraph 451 of

20  Mr. Bakewell's January 13 report and include the header there?

21  Great.

22  **BY MS. CARIDIS:**

23  **Q.**    This is a copy or at least a snippet of your report;

24  correct, Mr. Bakewell?

25  **A.**    It appears to be, yes.

1    Q.   And your report discusses an alleged noninfringing

2    alternative of when an accused standalone speaker is added to a

3    target group, it matches the music or silence of the target

4    group?  Did I read that properly?

5    A.   Yes.

6    Q.   And you sat through the testimony of Dr. Schonfeld

7    yesterday and today, sir; correct?

8    A.   I did.

9    Q.   And Dr. Schonfeld didn't discuss any alleged alternatives

10   about matching the states of a target group; correct?

11   A.   I disagree.  He spoke about the technology sort of deeper

12   in; and as I understand it, he was talking about this

13   noninfringing alternative.

14   Q.   So if you were mistaken and he wasn't actually talking

15   about this noninfringing alternative, then you would have no

16   evidence in the record here about whether or not that

17   alternative infringes; correct?

18   A.   No, I disagree, because I considered a second

19   noninfringing alternative that's broader, if you will, and it

20   would capture different sort of flavors or variances of this

21   particular noninfringing alternative.

22   Q.   Did you hear Mr. Schonfeld testify about that alleged

23   noninfringing alternative?

24   A.   Um, sort of, yes, I did.  Not like in a specific category;

25   but his testimony, from my perspective, related to how the

1    technology works and how one would go about not including the

2    overlapping speaker groups.

3    **Q.**    Okay.  Let's focus on the word "standalone" here in this

4    noninfringing alternative that we have on the screen.

5         Mr. Bakewell, your understanding is that standalone mode

6    refers to a speaker acting as an individual speaker whether it

7    is playing music or not playing music; correct?

8    **A.**    Um, we've heard a lot about the technology.  I'm not sure

9    where you -- where you get that and how that would fit in with

10   the technical part of the case.

11   **Q.**    Sure.

12        **MS. CARIDIS:**  Mr. Jay, let's pull up paragraph 85 of

13   Mr. Bakewell's rebuttal report.

14   **BY MS. CARIDIS:**

15   **Q.**    And reading from that bullet point -- first of all, this

16   is your report; correct?

17   **A.**    It appears to be.

18   **Q.**    And you write (as read):

19        "Claim 1 also requires speaker 1 to stay in a

20        standalone mode even after being added to the two speaker

21        groups.  In other words, I understand that speaker 1 will

22        continue to act as an individual speaker, i.e., either

23        playing music or not playing music, despite being grouped

24        together with speaker 2 and 3."

25        You wrote that, sir; correct?

1    **A.**    I did.

2    **Q.**    So it is your understanding that a speaker in standalone

3    mode can either be playing music or not playing music; correct?

4    **A.**    I'd have to see what I wrote and I'd have to check with a

5    technical expert as to exactly what that means.

6    **Q.**    Okay.

7            **MS. CARIDIS:**    I will read into the record an excerpt

8    of Mr. Bakewell's deposition starting at page 99, line 20,

9    continuing to page 100, line 2 (as read):

10            "**QUESTION:**    Is it your understanding that standalone mode

11            does not require playing music?

12            "**ANSWER:**    Does not require playing music?  So this comes

13            from Dr. Schonfeld, so my understanding, I think that's

14            part of what you are implying with your question, but it

15            says the opposite here; i.e., either play music or not

16            playing music."

17            **THE COURT:**    Okay.  That's evidence in the case.  It

18    was read by Counsel; but when they read it exactly from a

19    deposition, that's evidence in the case.

20            Go ahead.

21    **BY MS. CARIDIS:**

22    **Q.**    And, Mr. Bakewell, you understand that standalone mode

23    means that a first speaker will continue to act as an

24    individual speaker despite being grouped together with second

25    and third speakers; correct?

1  **A.**    I'd have to check with a technical expert.  That's a part

2  of my report where I was summarizing interviews, and I'd have

3  to read the whole part of my report as well.

4  **Q.**    Okay.

5        **MS. CARIDIS:**  I will read into the record an excerpt

6  from the Bakewell deposition page 101, line 18, to page 102,

7  line 1 (as read):

8        **"QUESTION:**  Do you know what standalone mode means?

9        **"ANSWER:**  Yes.  This is what I understand, is that I

10       understand that speaker 1 will continue to act as an

11       individual speaker despite being grouped together with

12       speakers 2 and 3.  So it's doing its own thing even after

13       being part of the group, as I understand it.

14        "As I said, I would defer to a technical expert.  I

15       think that's part of what they are tasked with here."

16  **BY MS. CARIDIS:**

17  **Q.**    Changing gears a bit, Mr. Bakewell, in forming your

18  opinions, you considered patent licenses that Google produced

19  in this case; correct?

20  **A.**    I did.

21  **Q.**    And Google has entered into more patent licenses than just

22  those that you reviewed; correct?

23  **A.**    True.

24  **Q.**    Approximately how many Google patent licenses did you

25  review in performing your analysis in this case?

1  **A.**   I can't give you an exact count, but it's like a number

2  it's like 20.  Sort of that gives you the feel for it.  Maybe

3  more, maybe less.

4  **Q.**   And you would expect that Google has entered into much

5  more than 20 patent licenses over the term of its company;

6  correct?

7  **A.**   True.

8  **Q.**   And so you just reviewed a handful of Google licenses that

9  you were provided with; correct?

10  **A.**   That's not exactly right.  I reviewed all the licenses

11  I believe that were produced in this case by agreement between

12  the parties.

13  **Q.**   You produced the Google licenses that Google lawyers

14  decided to produce in this case; correct?

15  **A.**   So I didn't produce them.  I reviewed them.

16  **Q.**   Sorry?

17  **A.**   And my understanding is the way that the process works is

18  there's interrogatories and there's answers to interrogatories,

19  and the licenses that end up being produced are by agreement.

20  Because, as you mentioned, Google has a lot of licenses and

21  there's a lot of patents so there's some subset.  And I

22  reviewed everything that was available in this case.

23  **Q.**   And as far as you're aware, Google is the one who decided

24  what to produce or not produce as it relates to Google licenses

25  in this case?  Sonos didn't produce any Google licenses;

1    correct?

2    **A.**    So the first part of your question I don't agree with.  I

3    understand that it's part of the process.  You have to ask for

4    licenses and there's production, there's dialogue, and I

5    reviewed all of the licenses that were produced.

6         I can't remember the second part of your question now.

7    **Q.**    That's okay.

8         You reviewed all the licenses that were produced by

9    Google; correct?

10   **A.**    Correct.

11   **Q.**    And that's not all of the licenses that Google has entered

12   into; correct?

13   **A.**    That's true.  We just said that.  I agree.

14   **Q.**    And it's your opinion that the Google patent licenses that

15   you reviewed had issues that make them not good benchmarks for

16   this case; correct?

17   **A.**    There's some issues, sure.

18   **Q.**    But I heard during your direct examination that you have

19   concluded that Google would prefer a lump-sum structure for the

20   hypothetical negotiation in this case; correct?

21   **A.**    I think that's the way the industry works and I think

22   that's also Google's preference for that reason.

23   **Q.**    But you can't tell the jury sitting here today that Google

24   has never entered into a running royalty license; correct?

25   **A.**    I can't say never.  I can say that the large majority of

1    its licenses are lump sums.

2    **Q.**    You only looked at 20 -- approximately 20 of those

3    licenses; correct?   That's what you just told the jury a couple

4    minutes ago.

5    **A.**    That were produced in this case, correct.

6    **Q.**    Okay.   So you also considered some patent purchase

7    agreements that Google produced in this case; correct?

8    **A.**    Yes.

9    **Q.**    And, again, those are not the only patent purchase

10    agreements that Google has entered into in its history;

11    correct?

12    **A.**    Probably.

13    **Q.**    And of the patent purchase agreements that you reviewed,

14    you set aside all of them except for the Outland Research

15    agreement that you talked about on direct examination; correct?

16    **A.**    Right.   I looked at them, and I -- I discussed the Outland

17    agreement.

18    **Q.**    And Outland Research is a nonpracticing entity or NPE;

19    correct?

20    **A.**    True.   I said that.

21    **Q.**    And the Outland Research agreement was signed in 2011;

22    right?

23    **A.**    Correct.

24    **Q.**    That's eight years before the earliest hypothetical

25    negotiation date in this case; right?

1   **A.**    Correct.

2   **Q.**    And it's also years before Google released the first

3   accused product in this case; correct?

4   **A.**    Two years.

5   **Q.**    And it's your understanding that at least some of the

6   patents sold in the Outland Research agreement are technically

7   comparable to the '885 and '966 patents; correct?

8   **A.**    Patents purchased you mean?  You said "sold."  You meant

9   the patents purchased by Google?

10  **Q.**    I guess it depends on what side of the transaction you're

11  looking at.

12  **A.**    Yes, I have that understanding from Dr. Schonfeld.

13  **Q.**    And so that understanding that some of the patents are

14  technically comparable include the '694 patent that

15  Dr. Schonfeld discussed on cross-examination; correct?

16  **A.**    Yes, I think so.  I don't have those numbers like at the

17  tip of my tongue, but that sounds like one of them.

18          **MS. CARIDIS:**  Mr. Jay, let's get on the screen TX2676,

19  which was admitted into evidence earlier today.

20  **BY MS. CARIDIS:**

21  **Q.**    Just to confirm, this is one of the patents that you

22  understand is technically comparable to the '885 and '966

23  patents; correct?

24  **A.**    I think so, yes.

25          **MS. CARIDIS:**  Let's look at Figure 2 on page 4.

1    BY MS. CARIDIS:

2    Q.    And you understand from your discussions with

3    Dr. Schonfeld that the patents in the Outland Research

4    agreement, including the '694 patent that's on the screen here,

5    are more essential than the asserted patents in this case;

6    correct?

7    A.    Right.  Looking at the claims there -- that's what he

8    said.

9    Q.    Now you mentioned some Sonos license agreements in your

10   direct examination.  Do you recall that?

11   A.    Yes.

12   Q.    And two of those agreements were running royalty and one

13   was lump sum; correct?

14   A.    Yes, that's what I said.

15   Q.    And were you here for Ms. Kwasizur testimony last week

16   concerning some of those agreements?

17   A.    I was.

18   Q.    And you heard her explain that the lump-sum agreement was

19   entered into after the licensee was found to be a willful

20   infringer?

21   A.    Yes.  There was a lawsuit.

22   Q.    There was a lawsuit and there was a determination that

23   that licensee was found to be a willful infringer; right?

24   A.    That's right.

25   Q.    And so you would agree that because of a determination

1  that the licensee was a willful infringer, that's not a

2  comparable agreement in this case; correct?

3  **A.**    No.  I think it's because of the number of patents that

4  are involved and the lack of specificity to any comparable

5  patents here.

6  **Q.**    You understand that the patents asserted in this case are

7  actually part of that license agreement; correct?

8  **A.**    That's only partially true.  That's not entirely true.

9  **Q.**    Is it your testimony that the license agreement with Denon

10  DEI did not include the licenses that are -- sorry -- did not

11  include the patents that are asserted in this case?

12  **A.**    I think they were included as part of a big covenant not

13  to sue, and there's terms in the agreement that relate to that

14  covenant.

15  **Q.**    And a covenant not to sue can be thought of as a license;

16  correct?

17  **A.**    Sometimes, yes.

18  **Q.**    The Federal Circuit has said that the covenant not to sue

19  and the license are just two terms to basically discuss the

20  same thing; right?

21        **MS. BAILY:**  Objection to the Federal Circuit opining

22  on the law.

23        **THE COURT:**  He is not a lawyer, so sustained.

24        **MS. CARIDIS:**  Fair enough.

25  \\\

1    **BY MS. CARIDIS:**

2    **Q.**   Sitting here today, Mr. Bakewell, putting aside the

3    agreement that was entered into after a finding of willful

4    infringement, are you aware of Sonos ever agreeing to license

5    any of its patents for a lump sum?

6    **A.**   Well, we have three and there's one that is; so if you set

7    aside the one that is, that leaves two that are running

8    royalties.  So I guess the answer is yes -- or I think the

9    answer is no to your question.  There are no others.  If you

10   set the one aside that's a lump sum, then the remaining two are

11   running royalties.

12   **BY MS. CARIDIS:**

13   **Q.**   Thank you.

14   **A.**   Did I understand your question correctly.

15   **Q.**   You understood it perfectly.

16   **A.**   Okay.

17   **Q.**   You talked in your direct examination about some data that

18   you looked at relating to Google products in this case;

19   correct?

20   **A.**   Yes.

21   **Q.**   And I believe you said that you looked at data reflecting

22   the use of commands sent to Google speakers that are used to

23   create groups; right?

24   **A.**   Among other things.

25   **Q.**   And you understand that once a user creates a static

 1   group, the whole point of that functionality is they can use

 2   that group later without having to create it again?

 3   **A.**   I don't know about the whole point, but I think that's the

 4   result.

 5   **Q.**   And you also looked at data that measures how many devices

 6   were put into speaker groups over a certain period of time;

 7   correct?

 8   **A.**   Yes.

 9   **Q.**   Now, did you review any data that shows how many computing

10   devices with the Google Home app are connected to Google

11   speakers?

12   **A.**   Some, yes, that relates to that issue.

13   **Q.**   You reviewed data that Google has provided in this case

14   that shows how many computing devices with the Google Home app

15   are connected to accused Google speakers?  That's your

16   testimony?

17   **A.**   There's data that relates to that issue.  There's not a

18   specific count like your question is, but there is data that

19   relates to that question.

20   **Q.**   Thank you.

21      And Google didn't produce the specific counts, to use your

22   terminology; correct?

23   **A.**   I don't think so.  I think there's broader data, but I

24   don't know about that.  Nothing comes to mind.

25   **Q.**   And the -- the information that Google did provide, that

1    wasn't for the entire damages period, was it?

2    **A.**    No, it wasn't.

3    **Q.**    It was only for a six-month window of data; correct?

4    **A.**    200 days.

5              **MS. CARIDIS:**  Mr. Jay, let's pull up PDX14.1.

6                        (Pause in proceedings.)

7    **BY MS. CARIDIS:**

8    **Q.**    And, Mr. Bakewell, were you here in court when Mr. Chan

9    was testifying about this data?

10   **A.**    Yes.

11   **Q.**    And his testimony was that -- and his testimony was that

12   you could not tell from this data how many Prince devices from

13   November 8th are counted in the November 9th row; correct?

14   **A.**    Not entirely correct, no.

15   **Q.**    You heard my colleague here Mr. Richter ask him if you

16   have a -- if you know that there's 3.32 percent of devices on

17   November 8th, you can't tell how many of those are on

18   November 9th?  Do you recall that?

19   **A.**    There was a specific question like that, but there was

20   broader testimony about what this data means like when taken

21   together, and so I think there's more that he said that relates

22   to this issue than just the answer to that question.

23   **Q.**    So I'm just talking about the data that we have that

24   Google produced in this case.  Okay?

25   **A.**    If you limit it to just this in that question, I can

1   answer that question.

2   Q.   Sure.  Based on the data on the screen, you cannot tell

3   how many Prince devices from November 8th are counted in the

4   November 9th row; correct?

5   A.   Not only from this.

6   Q.   Okay.

7   A.   You need more information.

8   Q.   So if 3.32 percent of connected devices were used on

9   November 8th and a separate 3.38 percent of connected devices

10  were used on November 9th, that would result in 6.7 percent of

11  connected devices being used over those two days; correct?

12  A.   Well, that would be totally wrong; but if you did that

13  math, that's the number you get, but that is not the way this

14  data works at all.

15  Q.   The data just shows the number of connected devices on a

16  particular date; correct?  This data, that's what that shows;

17  right?

18  A.   Yes.

19  Q.   And Google didn't provide you data so that you could

20  assess how many speakers had been placed into speaker groups

21  during the entire damages period in this case; correct?

22  A.   I think that it did.  I think that you can make a

23  reasonable estimate of that.  There's not a specific report

24  that has that count, like a spreadsheet like this, but I think

25  there's data where you can at least get the direction of it.

1  **Q.**   So you might be able to make assumptions or extrapolate,

2  but Google did not provide you with actual data so that you

3  could tell how many speakers were put into groups during the

4  entire damages period; correct?

5  **A.**   Put into groups?  Oh, not during the entire damages

6  period.  It has the -- if your question is about the 200-day

7  window, this data was for a 200-day window.

8  **Q.**   And the damages period in this case is much longer than

9  200 days; correct?

10 **A.**   It's longer.

11 **Q.**   Mr. Bakewell, you reviewed a variety of business surveys

12 and studies produced by Google in forming your opinions in this

13 case; correct?

14 **A.**   Correct.

15 **Q.**   Can I have you turn to Exhibit TX0158 in your binder?

16 **A.**   Yes.

17 **Q.**   This is a Google survey presentation titled "Prince

18 Conjoint Survey Results" dated November 2019; correct?

19 **A.**   It is.

20 **Q.**   And Prince is the code name for Nest Audio, which is one

21 of the accused products in this case; correct?

22 **A.**   I think that's true, yes.

23 **Q.**   And you cited and discussed this survey in your report;

24 correct?

25 **A.**   I did.

1          **MS. CARIDIS:**  Your Honor, I'd move to admit TX0158

2   into evidence.

3          **MS. BAILY:**  No objection.

4          **THE COURT:**  All right.  In evidence.

5       (Trial Exhibit 158 received in evidence.)

6   **BY MS. CARIDIS:**

7   **Q.**   And, Mr. Bakewell, can you please turn to page 3 of

8   TX0158?

9   **A.**   (Witness examines document.)

10  **Q.**   And do you see the second bullet point under "Key

11  Takeaways"?

12  **A.**   Did you say the first -- the one with the big red arrow?

13  I should look on the screen.  That's the one you're referring

14  to.

15  **Q.**   I'm referring to the first of the highlighted bullet

16  points?

17  **A.**   I see that.

18  **Q.**   If says (as read):

19          "Offering a 2 pack will increase share.  Future

20          feature recs also support 2 pack."

21          Correct?

22  **A.**   Yes, it says that.

23  **Q.**   And in the first sub-bullet under that line it says (as

24  read):

25          "60 percent of consumers plan to buy more than one

1        smart speaker and almost half build a 2 pack of smart

2        speakers."

3        Correct?

4   A.   That's what it says.

5   Q.   Those are some of the key takeaways from this survey that

6   Google conducted; correct?

7   A.   It's on this page.  It says "key takeaways."

8   Q.   And just to orient us, Mr. Chan testified or explained

9   that two packs are bundles are when Google would sell more than

10  one device at a time; correct?

11  A.   Yeah.  I think he said something like that, yes.

12  Q.   And the date of this document -- and we can flip to the

13  cover -- we can see the date is the same month as the

14  hypothetical negotiation for the '966 patent, November 2019;

15  correct?

16  A.   True.

17  Q.   So let's turn to page 23.  And I think Mr. Jay will bring

18  it up on the screen if you don't want to flip through the page.

19       This page is titled "Likelihood to add a third smart

20  speaker is decently high but a 5 pack seems niche."

21       Did I read that correctly?

22  A.   Yes, you did.

23  Q.   So I want to focus on the top portion of the graphic

24  that's on this page.

25       Now, I don't have a calculator, but I think I can handle

1  this math.  Google's own document from November of 2019, the

2  same month of the hypothetical negotiation of the '966, reports

3  that 58 percent of survey respondents were either very likely

4  or extremely likely to purchase a bundle of three smart

5  speakers; correct?

6  **A.**  Yes, you did that.  I did the math too.  I think that's

7  right.

8  **Q.**  I'm glad we agree.  So let's flip forward a few pages to

9  page 36.

10     And, Mr. Bakewell, do you recognize this figure?

11  **A.**  I do.

12  **Q.**  And this was a figure that you actually copied directly

13  into the text of your report; right?

14  **A.**  I took a picture of this, like a screenshot, and it's in

15  my report, yes.

16  **Q.**  And in that report you described this graphic as depicting

17  some of the findings of Google's November 2019 survey; right?

18  **A.**  That's right.

19  **Q.**  And you described this graphic as showing what features

20  survey respondents found appealing; correct?

21  **A.**  I don't remember exactly the word that I used, but

22  "appealing" shows up in the title.

23        **MS. CARIDIS:**  So, Mr. Jay, let's blow up that figure a

24  bit.

25  \\\

1   BY MS. CARIDIS:

2   Q.   And, Mr. Bakewell, do you see that there's a line going

3   through the graphic over halfway up that's labeled "Anchor"?

4   A.   I do.

5   Q.   And the text beneath that Mr. Jay has so helpfully blown

6   up says (as read):

7           "An item above the anchor is actually appealing."

8   Do you see that?

9   A.   Yes.

10      MS. CARIDIS:   So, Mr. Jay, let's zoom in on the left

11  side of the screen now.

12  BY MS. CARIDIS:

13  Q.   And, Mr. Bakewell, the feature of group speakers to hear

14  music in multiple rooms at the same time is found above the

15  anchor line; correct?

16  A.   It's the lowest one above.

17  Q.   And because it is above, according to this graphic, it is

18  an item that is actually appealing; correct?

19  A.   Well, "actually" is in quotes and there's a reason for

20  that.  That's the only reason why I point it out.  I think it's

21  important that you include those quotes when you say that

22  because it means something.

23  Q.   Okay.  "Actually appealing."

24      MS. CARIDIS:   Okay.  We can take that slide down,

25  Mr. Jay.

1  BY MS. CARIDIS:

2  **Q.**   Mr. Bakewell, you agree that all else equal, licenses

3  between competitors contain royalties that are significantly

4  higher than those between noncompetitors; correct?

5  **A.**   Yeah, sort of in a -- in a -- myopically that's true.

6        **THE COURT:**  What do you mean myopically?

7        **THE WITNESS:**  Because you have to consider overall the

8  competitive circumstances, and that says "holding all else

9  equal."  It's like looking only at an issue, and that's what I

10  meant by that.

11        **THE COURT:**  Well, but -- all right.  But you agree

12  that everything else being the same, because we can only

13  consider things one at a time, everything else being the same,

14  licenses between two competitors generally tend to have a

15  higher royalty?

16        **THE WITNESS:**  Generally that's true.  I think you also

17  have to look at the features, but generally that's true, yes.

18        **THE COURT:**  All right.  Well, yes, there are other

19  factors to consider, but she's just asking about the

20  competitive effect.

21     Okay.  Can I inter -- while I'm interjecting here, I want

22  to -- I think everyone agrees with this, but don't we all agree

23  that the patents require three zones; right?  No, you don't?

24        **MS. BAILY:**  Yes.

25        **THE COURT:**  To have overlapping, how can you not?  All

1  the patents refer to three; right?  Three?

2       MS. CARIDIS:  Your Honor, the patents --

3       THE COURT:  Three speakers?

4       MS. CARIDIS:  The patents refer to three speakers, but

5  this goes back to the question of configured or capability that

6  we've been talking about.

7       THE COURT:  All right.  Well, yes, okay.

8    But even under that approach, the controller would have to

9  be configured to work with three speakers?

10      MS. CARIDIS:  I believe for the '966 patent the

11 controller would have to have programming instructions that

12 when executed are capable of configuring three speakers.

13      THE COURT:  And so does the '885.  It requires three

14 speakers.

15      MS. CARIDIS:  Well, the '885 is on the side of the

16 speaker and so ultimately the '885 patent, the claims certainly

17 do require -- or certainly do list three speakers.

18      THE COURT:  Well, I'm going to tell the jury that it

19 requires three in both.

20   Now, so there's a difference between multiple and three.

21 Multiple can be three.  It could be ten, but it can also be

22 two.

23   So keep that in mind.  And merely because we have multiple

24 or speaker groups is not necessarily enough.  There have to be

25 overlapping.  Remember that idea, overlapping speaker groups.

1    And sometimes we're not focusing on that requirement.

2    Sometimes you do.  So -- but let's -- let's keep that in mind.

3        All right.  Go ahead.

4        MS. CARIDIS:  Mr. Jay, let's pull up Mr. Bakewell's

5    rebuttal report at page 225, paragraph 647.

6            (Pause in proceedings.)

7    BY MS. CARIDIS:

8    Q.   And starting at the beginning of the second line,

9    Mr. Bakewell, you wrote (as read):

10           "Holding all else equal, licenses between competitors

11           contain royalties that are significantly higher than those

12           between noncompetitors."

13       Those are your words; correct?

14   A.   Yes.

15   Q.   But in this case you generally don't think Sonos and

16   Google are competitors; is that correct?

17   A.   I'd say it the opposite.  I think that they compete but

18   it's in a limited way.

19       THE COURT:  Well, how was it at the time of the

20   alleged negotiation when alleged infringement first started?

21   That's when the negotiation takes place.  Were they competitors

22   then?

23       THE WITNESS:  They were competitors and they were

24   working together to partner, and they had some products that

25   competed and some that didn't.  So you could say, yes, they

1    were competitors and stop.  I think that would be true, but I

2    think there's a little more to it.

3          **THE COURT:**  Next question.

4          **MS. CARIDIS:**  Let's turn to page 18 of TX0158.

5    **BY MS. CARIDIS:**

6    **Q.**   And, again, this slide, just to remind ourselves, comes

7    out of a Google document, an internal Google document, dated

8    November 2019; right?

9    **A.**   I think it's the same document.

10   **Q.**   Yep.

11         And the slide is titled "Current State."  Do you see that?

12   **A.**   Yes.

13   **Q.**   And there are several speakers shown below the heading;

14   correct?

15   **A.**   Yes.

16   **Q.**   And the Google Home Mini, the Google Home, and the Google

17   Home Max are the first three speakers; correct?

18   **A.**   Correct.

19   **Q.**   And you understand those products are accused of

20   infringement in this case?

21   **A.**   I do.

22   **Q.**   And after those Google products, this internal Google

23   document shows speakers from Amazon, Sonos, Apple, and Bose;

24   correct?

25   **A.**   Yes.

1          **MS. CARIDIS:**  And let's turn to page 21 of TX0158.

2    **BY MS. CARIDIS:**

3    **Q.**    Now, this slide looks similar but it's titled "Adding a 2

4    pack Prince to the line-up slightly improves Google's overall

5    share."  Do you see that?

6    **A.**    Yes.

7    **Q.**    And under Google Home we now see a column that shows two

8    speakers in a pack; correct?

9    **A.**    Yes, I see there's two columns actually.  Oh, that column,

10   that's right, correct.

11   **Q.**    And so "2 pack Prince," as indicated by the title, is in

12   reference to speakers that are sold or bundled together;

13   correct?

14   **A.**    Yes.

15   **Q.**    And Google bundled those speakers together so they can be

16   used in a group like stereo pair; correct?

17   **A.**    No, not necessarily.  I think there -- that's one

18   potential use.  Another could be you could put one in each room

19   or you could give one to somebody else and keep one for

20   yourself.

21          **MS. CARIDIS:**  I'll read into the record Bakewell depot

22   transcript at page 209, line 12 to 22.

23        And, Your Honor, is it okay if I omit the objection?

24          **THE COURT:**  Well, it depends.  If the objection is

25   necessary to understand the answer, then you've got to read it;

1   but if it is just a boilerplate, you don't have to read it.

2   I'll leave it to -- do you care?

3            **MS. BAILY:**  No, Your Honor.

4            **MR. PAK:**  No, Your Honor.

5            **THE COURT:**  All right.  You can leave it out.

6            **MS. CARIDIS:**  (as read):

7        **"QUESTION:**  Okay.  So why does Google sell the speakers in

8        sets?

9        **"ANSWER:**  I think it relates to potentially being used in

10       stereo.

11       **"QUESTION:**  So in a group?

12       **"ANSWER:**  I've seen stereo referred to in different ways.

13       Sometimes it's just called stereo and maybe sometimes it's

14       called grouping.  On the app it's more, I think, oriented

15       around stereo."

16   **BY MS. CARIDIS:**

17   **Q.**   And so in this -- in the context of this bundling and

18   multiple speakers -- selling multiple speakers at the same

19   time, we saw a few minutes ago in this same document at page

20   23 -- and this is TX0158 -- that 58 percent of survey

21   respondents indicated they were very likely or extremely likely

22   to purchase a bundle of three smart speakers at the time of the

23   hypothetical negotiation of the '966 patent; correct?

24   **A.**   Um, I -- I think it's adding a third speaker into a

25   bundle.  Yes, I see that.

1    Q.    The answer is yes; correct?

2    A.    I wasn't quite sure with your question, but it says three

3    speakers for $250 so I'm assuming they're grouped together in a

4    bundle.

5    Q.    And 58 percent of Google survey respondents indicated they

6    were very likely or extremely likely to purchase three smart

7    speakers; correct?

8    A.    That's what's on here, correct.

9              MS. CARIDIS:  Pass the witness.

10             THE COURT:  Okay.  Thank you.

11        And now we go to Google.

12             MS. BAILY:  Thank you, Your Honor.

13                       <u>REDIRECT EXAMINATION</u>

14   BY MS. BAILY:

15   Q.    I just want to go through a couple of things that were

16   raised in your cross-examination, Mr. Bakewell.

17        First and maybe most fundamentally, just to be clear,

18   because I think there was some confusion, if the '885 patent is

19   found by the jury to be invalid, then there is no infringement

20   and no damages; correct?

21   A.    That's correct.

22   Q.    And now there were a lot of questions about noninfringing

23   alternatives.  Do you recall that?

24   A.    I do.

25   Q.    And you considered multiple noninfringing alternatives in

 1  this case; correct?

 2  **A.**    I did.

 3  **Q.**    And with respect to technical opinions related to those

 4  noninfringing alternatives, you relied on Dr. Schonfeld?

 5  **A.**    I did in part.

 6  **Q.**    And did you rely on Dr. Schonfeld for the analysis of the

 7  claim language at issue in this case?

 8  **A.**    I relied on him to do that, yes.

 9  **Q.**    And was it your understanding that Dr. Schonfeld has

10  provided opinions that the noninfringing alternatives are

11  noninfringing?

12  **A.**    Yes.

13  **Q.**    And did you rely on Dr. Schonfeld's opinions in that

14  respect?

15  **A.**    I did, yes.

16  **Q.**    And you used them as one of the inputs for your opinions

17  regarding the valuation of the claimed technology for these

18  patents as related to those noninfringing alternatives?

19  **A.**    It's one of the inputs, yes.

20  **Q.**    And what else did you consider related to that on

21  noninfringing alternatives?

22  **A.**    So I think that Dr. Almeroth for the second noninfringing

23  alternative, he doesn't raise an issue as to whether it's not

24  infringing so that's one of the things.

25          And then I also considered economic considerations related

BAKEWELL - REDIRECT / BAILY

1    to commercial acceptability of the noninfringing alternatives.

2    Q.    We just heard mention of other Google patent licenses

3    between the one that you called to the jury's attention; right?

4    A.    Yes.

5    Q.    Okay.  You were here for Mr. Malackowski's testimony?

6    A.    I was.

7    Q.    Did he provide any testimony on any other Google patent

8    licenses?

9    A.    No.

10    Q.    Is it your understanding that he had access to exactly the

11    same documents that you did?

12    A.    Yes.  We both had access to the same information.

13    Q.    Now, we talked -- you talked on cross a little bit about

14    some usage information?

15    A.    Yes.

16    Q.    And I think there was a presentation of one set of data

17    points from one set of data.  Is that how you understood that

18    slide?

19    A.    Yes.

20    Q.    And you're aware that there were multiple sets of usage

21    data provided to you in this case?

22    A.    That's correct.

23    Q.    And can you just go over for the jury, because there's

24    only one reference there, what all the different types of data

25    were that you were presented with?

1  **A.**   Sure.  So Google presented data about daily activations,

2  like how much -- how many speakers were activated on a

3  particular day.

4       And then it provided data for three windows of time.

5  30-day speakers that are activated or like active -- this isn't

6  quite right, but a term is like "active users" but it's

7  actually "active speakers" -- so speakers that are active in

8  groups.

9       And then they did it for 100 days and 200 days, and there

10 was like an enormous amount of data that -- it's a huge

11 spreadsheet with multiple tabs, that's one spreadsheet and

12 that's another.

13      And then there is survey information that relates to usage

14 too that Google produced 30 surveys, Sonos produced 30 surveys

15 too, and that has some information that you can gather from it

16 that actually relates to the lack of usage, but that

17 information goes to that question you just asked.

18 **Q.**   And with respect to the data that was provided, does the

19 additional datasets give you any indication as to whether the

20 daily data related to speakers in groups is additive by day?

21 **A.**   Well, you can tell from looking at it it's not additive by

22 day.  When you look at it, trend it out, those numbers stay

23 level for a prolonged period of time.

24      So the inference of the question is that you would just

25 add three together.  I mean, if you'd go 33 days, if I have my

1    math right, and you'd start to have numbers, if that's what

2    they were -- the supposition is supposed to be, numbers would

3    be over a hundred percent.  And we don't have any data like

4    that or indication like that, and it wouldn't even make sense.

5    You go for 200 days and you'd have 200 percent.

6         So that's one thing that you can tell from looking at the

7    data.  You can also tell when you trend it out.

8         And then there's a lot of evidence that I've seen that, to

9    the extent this grouping is done, it's by the overlapping

10   grouping.  It's by a very small subset of that, and it would be

11   contained in a small group of users.

12   **Q.**   Were you here for Mr. Chan's testimony?

13   **A.**   I was.

14   **Q.**   And he interpreted the three datasets based on his

15   experience working with Google speakers.  Did you hear that?

16   **A.**   Yes.

17   **Q.**   He provided his understanding of that data in that

18   context; right?

19   **A.**   Yes, he did.

20   **Q.**   And he said that no more than 5 percent of users do any

21   kind of grouping with respect to the Google speakers; correct?

22   **A.**   That was grouping in general, and then he talked about

23   overlapping grouping being much lower.

24   **Q.**   And you just mentioned that you reviewed survey evidence

25   in this case?

1  **A.**    Yes.

2  **Q.**    Can you give us an idea of the amount of survey evidence

3  that you reviewed?  I think you saw one on cross.

4  **A.**    It was a lot.  The Google and Sonos, each produced over 30

5  surveys.

6        **MS. BAILY:**  And, Mr. Fisher, very quickly can we pull

7  up Exhibit 13 and 13.1 from Mr. Bakewell's report?

8  **BY MS. BAILY:**

9  **Q.**    In doing your work analyzing all of the survey evidence in

10  this case, did you see any evidence that overlapping groups of

11  at least three speakers were anywhere referenced in any survey

12  as something that was attractive or valuable in connection with

13  the speakers that we're talking about here?

14  **A.**    No.  There's lots of features that are mentioned and

15  studied in these surveys, and this one is Sonos.  So of the 30

16  surveys it produced, only 6 mentioned grouping or things that

17  might be like speaker grouping, but you can see they mention

18  all kinds of other features in these.

19        Generally what these companies are interested in and what

20  drives sales are other things that are provided in these

21  speakers.  And you can see in particular for Sonos this relates

22  to competition where Sonos is focused on sound quality.  All

23  six of these had some sound quality listed.

24  **Q.**    You were shown in your cross-examination some documents

25  that talk about two speakers in a pack and stereo pairing?

1    **A.**    Yes.

2    **Q.**    Do you understand that that relates -- both of those

3    things relate to two speakers?

4    **A.**    Yes.

5    **Q.**    Do you understand that in this case three speakers are

6    required for infringement of the patents in suit?

7    **A.**    That's my understanding from what His Honor was just

8    saying a moment ago, and so I'd say yes.

9            **MS. BAILY:**  All right.  I'll pass the witness.  Thank

10   you.

11           **THE COURT:**  Before you leave the witness, just I lost

12   track of it.  What is the dollar amount that he says would be

13   paid for in the hypothetical negotiation?

14           **MS. BAILY:**  Somewhere between $200,000 and

15   $2.5 million.

16           **THE COURT:**  Is that correct?

17           **THE WITNESS:**  Yes, 200,000 to 2.25 million.

18           **THE COURT:**  Is that a lump sum?

19           **THE WITNESS:**  Lump sum, yes.

20           **THE COURT:**  Okay.  Thank you.  I missed it.

21       All right.  Recross?

22           **MS. CARIDIS:**  No, Your Honor.

23           **THE COURT:**  Okay.  You may step down.

24           **THE WITNESS:**  Thank you, Your Honor.

25           **THE COURT:**  Thank you, Mr. Bakewell.

PROCEEDINGS

```
 1                      (Witness excused.)

 2           THE COURT:  It's too late in the day to start a new

 3   witness, don't you think?  Is that all right?

 4           MR. PAK:  Yes, Your Honor.

 5           MR. SULLIVAN:  Agreed, Your Honor.

 6           THE COURT:  But this is your last witness anyway;

 7   right?

 8        All right.  So why don't we hear you say "I rest."

 9           MR. PAK:  Yes, let me say that.

10           THE COURT:  Please do.

11        Okay.  So --

12           MR. PAK:  Yes, Your Honor.  Your Honor, so I'll say it

13   on the record:  Google rests its case in chief.

14        And, Your Honor, we will raise our 50 motions in person

15   tomorrow.

16           THE COURT:  All right.  They can be done after the

17   jury has exited.

18        But we still have a little more evidence to hear by way of

19   rebuttal tomorrow, but you will not be here too long tomorrow.

20   I'm going to say it could be as brief as two hours, and then

21   you'll be going home a little early tomorrow.  So we'll see.

22        Thank you for your careful attention.  We'll see you here

23   tomorrow at the normal time.

24           THE CLERK:  All rise for the jury.

25        (Proceedings were heard outside the presence of the jury:)
```

1          MR. PAK:  Your Honor?

2          THE COURT:  Be seated please.

3          MR. PAK:  On the record, I just want to make sure, I

4    was looking at the live transcript there and I meant to say

5    that we will raise our 50 motions pursuant to the procedure

6    that we discussed with His Honor through written submissions.

7    Thank you.

8          THE COURT:  So each side is going to raise your

9    Rule 50 motions later; right?

10         MR. PAK:  Yes, Your Honor.

11         THE COURT:  Okay.  Is that right?

12         MR. SULLIVAN:  Yes, Your Honor.

13         THE COURT:  Well, timewise, Google has by my count 28

14   minutes left and Sonos has 40 plus 26.  So you have a little --

15   you have more than an hour left.

16      But no matter how you cut it, when an hour and a half is

17   up tomorrow, it's over.  So at least the evidence part.

18      Anything I can help you with today before we adjourn?

19         MR. PAK:  Not from Google, Your Honor.

20         MR. SULLIVAN:  Nothing from us, Your Honor.

21         THE COURT:  I'm going to try -- I don't know if I can

22   get you the instructions -- I doubt it -- today, but I'm going

23   to try to get you at least a form of verdict form.

24      And I don't want you to submit more paperwork tonight.  I

25   just want you to see what we're up against and for you to put

**PROCEEDINGS**

1    your heads together and come up with a way to streamline this

2    for the jury.  We want it to be not simple-simple but we don't

3    want it to be overly complex.

4         So please read it with that in mind, and you'll get your

5    opportunity to object to the verdict form in due course.

6         Okay.  See you tomorrow.

7              **MR. PAK:**  Thank you, Your Honor.

8              **MR. SULLIVAN:**  Thank you, Your Honor.

9              **THE CLERK:**  Court is in recess.  Court is adjourned.

10                 (Proceedings adjourned at 12:51 p.m.)

11                          ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, May 17, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25