Volume 9

Pages 1617 - 1756

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

```
SONOS, INC.,                      )
                                  )
          Plaintiff and           )
Counter-Defendant,                )
                                  )
  VS.                             )    NO. C 20-6754 WHA
                                  )Related Case No. C 21-07559 WHA
GOOGLE, LLC,                      )
                                  )
          Defendant and           )
Counter-Claimant.                 )
_____   )
```

San Francisco, California
Thursday, May 18, 2023

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff/Counter-Defendant:

               ORRICK, HERRINGTON & SUTCLIFFE LLP
               The Orrick Building
               405 Howard Street
               San Francisco, California  94105
          BY:  **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
               **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

               ORRICK, HERRINGTON & SUTCLIFFE LLP
               777 South Figueroa Street, Suite 3200
               Los Angeles, California 90017
          BY:  **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
               **GEOFFREY G. MOSS, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff/Counter-Defendant:

 3                        LEE SULLIVAN SHEA & SMITH LLP
                          656 West Randolph Street
 4                        Floor 5W
                          Chicago, Illinois 60661
 5             BY:   DAVID R. GROSBY, ATTORNEY AT LAW
                     SEAN M. SULLIVAN, ATTORNEY AT LAW
 6                   COLE B. RICHTER, ATTORNEY AT LAW
                     JOHN DAN SMITH, III, ATTORNEY AT LAW
 7
                          ORRICK, HERRINGTON & SUTCLIFFE LLP
 8                        51 West 52nd Street
                          New York, New York  10019
 9             BY:   JOSEPH R, KOLKER, ATTORNEY AT LAW

10   For Defendant/Counter-Claimant:

11                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          50 California Street, 22nd Floor
12                        San Francisco, California 94111
               BY:   SEAN PAK, ATTORNEY AT LAW
13                   MELISSA J. BAILY, ATTORNEY AT LAW
                     JAMES D. JUDAH, ATTORNEY AT LAW
14                   LINDSAY COOPER, ATTORNEY AT LAW
                     IMAN LORDGOOEI, ATTORNEY AT LAW
15                   JASON C. WILLIAMS, ATTORNEY AT LAW

16

17   Also Present:      Kevin MacKay, Google Representative
                        Alaina Kwasizur, Sonos Representative
18

19

20

21

22

23

24

25
```

**I N D E X**

Wednesday, May 18, 2023 - Volume 9

|                                                                  | **PAGE** | **VOL.** |
|------------------------------------------------------------------|----------|----------|
| Plaintiff and Defendant Rests Rebuttal Case                      | 1717     | 9        |

| **PLAINTIFF'S WITNESSES**                                        | **PAGE** | **VOL.** |
|------------------------------------------------------------------|----------|----------|
| **ALMEROTH, KEVIN (RECALLED IN REBUTTAL)**                       |          |          |
| (PREVIOUSLY SWORN)                                               | 1640     | 9        |
| Direct Examination by Mr. Shea                                   | 1641     | 9        |
| Cross-Examination by Mr. Pak                                     | 1681     | 9        |
| Redirect Examination by Mr. Shea                                | 1699     | 9        |
| Recross-Examination by Mr. Pak                                   | 1705     | 9        |
| Further Redirect Examination by Mr. Shea                        | 1708     | 9        |

| **DEFENDANT'S WITNESSES**                                       | **PAGE** | **VOL.** |
|------------------------------------------------------------------|----------|----------|
| **SCHONFELD, DAN (RECALLED IN REBUTTAL)**                        |          |          |
| (PREVIOUSLY SWORN)                                               | 1712     | 9        |
| Direct Examination by Mr. Pak                                    | 1712     | 9        |
| Cross-Examination by Mr. Shea                                    | 1715     | 9        |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 2425               |          | 1702     | 9        |
| 2651               |          | 1706     | 9        |
| 3928               |          | 1629     | 9        |
| 6787               |          | 1704     | 9        |
| 6788               |          | 1680     | 9        |
| 6958               |          | 1676     | 9        |

PROCEEDINGS

| | |
|---|---|
1 | **Thursday - May 18, 2023**                              **7:31 a.m.**

2 |                     P R O C E E D I N G S

3 |                         ---oOo---

4 |     (Proceedings were heard out of the presence of the jury:)

5 |         **THE CLERK:**  All rise.  Court is now in session.  The

6 | Honorable William Alsup is now presiding.

7 |         **THE COURT:**  Good morning.

8 |     **ALL:**  Good morning, Your Honor.

9 |         **THE COURT:**  Please be seated.

10 |     Let's go back to work.

11 |     Juror number 5 called Angie and said she's running late

12 | today.  We'll give you an update as we know more.

13 |     How can we make -- how can I help the lawyers this

14 | morning?

15 |         **MR. SULLIVAN:**  I don't have anything for you this

16 | morning, Your Honor.

17 |         **MR. PAK:**  Your Honor, I did want to just convey to you

18 | that I spoke with Mr. Sullivan to try to streamline the case,

19 | and I'll state on the record that we are withdrawing the

20 | anticipation theory and Squeezebox.  We are withdrawing the

21 | derivation defense.  We have worked out language on a person of

22 | ordinary skill in the art that will be submitted to Your Honor

23 | that will be --

24 |         **THE COURT:**  Can you give me that now?

25 |         **MR. PAK:**  The person of ordinary skill of the art

 1  definition, we will --

 2          THE COURT:  Can you hand that up?

 3          MR. PAK:  Oh, sure, Your Honor.  Yes, I can have it

 4  written out, Your Honor.

 5          THE COURT:  Soon because we's are working on these

 6  instructions as we speak.

 7          MR. PAK:  Yes, I'll write it out.

 8          THE COURT:  All right.  But you don't have to write it

 9  out right this second, but what else have you resolved?

10          MR. PAK:  So we discussed the possibility of

11  potentially limiting the jury verdict form to just one claim

12  per patent, and I know Mr. Sullivan is going to think about

13  that after he hears Dr. Almeroth's testimony.

14          MR. SULLIVAN:  Yeah, that's true, Your Honor.  I'll be

15  honest, though, I'm not sure we're going to be able to drop any

16  claims at this point in time, but I'll give it another thought

17  after I hear Dr. Almeroth talk about it in his rebuttal.

18          THE COURT:  Well, another possibility not as good

19  would be to limit '966 to two claims.  It would be the most --

20  the broadest claim and then the most narrow claim.  That way

21  you would have some back up in case the jury decided it was --

22  claim 1 was invalid, you would have a more narrow claim to

23  possibly assert instead of making the jury go through five of

24  them.

25          All right.  Well, think about it.

**PROCEEDINGS**

1              MR. PAK:  Thank you, Your Honor.

2              MR. SULLIVAN:  Will do, Your Honor.

3              MR. PAK:  That's it, Your Honor, from our side.

4              THE COURT:  Did I send out the request that you each

5      give me two points?

6              MR. PAK:  Yes.

7              THE COURT:  All right.  I'd like to hear that now so

8      that we take advantage of the time we have right now.  So let's

9      start with Plaintiff.

10         You give me one of yours, then we will get one of the

11     other side.  Now, I know you have other points.  There's no way

12     we can just -- but I want to make sure that I want to focus on

13     the most important.  You want to make sure that is in those

14     instructions or not in the instructions, as the case may be.

15         So you get to go first.  Tell me your name again.

16             MS. MOULTON:  Elizabeth Moulton.

17             THE COURT:  Ms. Moulton.

18         All right.  You go first.

19             MS. MOULTON:  Okay.  So the first one, we would like

20     to use the hindsight instruction, which is in the -- within

21     obviousness taken from the AIPLA model instruction.

22             THE COURT:  Well, I don't know if I'm -- I had one in

23     there already about don't use hindsight.

24             MS. MOULTON:  Can I read you what's in the model?

25             THE COURT:  You can.  I want my law clerk to focus on

**PROCEEDINGS**

1   it; but, yes, go ahead, read it to us.

2       MS. MOULTON:  Okay.  It's from the AIPLA model 7.0 (as

3   read):

4           "In deciding obviousness, you must avoid using

5       hindsight; that is, you should not consider what is known

6       today or what was learned from the teachings of the

7       patent.  You should not use the patent as a road map for

8       selecting and combining items of prior art.  You must put

9       yourself in the place of a person of ordinary skill in the

10      art as of the cut-off date," which in this case is the

11      conception date.

12      THE COURT:  All right.  I think we've got something

13  very similar to that I did, but what does A mean, AIPLA?

14      MS. MOULTON:  It's the American Intellectual Property

15  Law Association.  It's one of the three sets of model patent

16  jury instructions.

17      THE COURT:  Do you have a copy of -- can you hand up

18  to me a copy of what you just read?

19      MS. MOULTON:  Yes.

20      THE COURT:  Hand that up to me.

21              (Pause in proceedings.)

22      THE COURT:  Actually just give it to my law clerk.

23  And that sounded close to what we should give.

24  Any problem with that language, Mr. Pak?

25      MR. PAK:  No, Your Honor.

1          **THE COURT:** All right. Your turn. You get to bring

2     up -- to bring up something you want to make sure is in the

3     instructions.

4          **MS. BAILY:** Your Honor, we'd like to make sure that

5     the instructions reflect that there's no dispute that the Sonos

6     forum posts are prior art. We think that there was some

7     confusion and maybe an implication was made otherwise to the

8     jury. And so that's one of our top two points with respect to

9     the jury instructions.

10         **THE COURT:** All right. Any problem with that on the

11    Plaintiff's side?

12         **MS. MOULTON:** I think as long as we're talking about

13    the two specific posts, theboyG post and then the Jeff T --

14         **MR. PAK:** There's four actually, Your Honor, that

15    predate the conception date.

16         **MS. BAILY:** We can hand those up.

17         **THE COURT:** Well, first, do you know which four

18    they're talking about?

19         **MS. MOULTON:** I only know boyG and Jeff T.

20         **MS. BAILY:** We can print those out.

21         **THE COURT:** Let's -- we've got a moment here, let's

22    pull those out and see if Plaintiff agrees.

23                    (Pause in proceedings.)

24         **MR. PAK:** So, Mr. Fisher, can you pull up TX2424?

25                    (Pause in proceedings.)

1          MR. PAK:  So, Your Honor, this is theboyG forum post

2   dated February 27th, 2005.

3          THE COURT:  Any problem with that one?

4          MS. MOULTON:  No.

5          THE COURT:  Okay.  What's the next one?

6          MR. PAK:  TX3930.

7          THE COURT:  Okay.  Wait a minute.  Give me that --

8   theboyG is which one?

9          MR. PAK:  Your Honor, that's TX2424.

10          THE COURT:  Okay.  And what's the next one?

11          MR. PAK:  It's Jeff T, that's TX3930.

12          THE COURT:  3930.  Any objection to that one?

13          MS. MOULTON:  No.

14          THE COURT:  Okay.  Done.

15          MR. PAK:  TX3928.

16          THE COURT:  Which one is that?

17          MR. PAK:  That's the Floras Dad dated September 27th,

18   2005.

19          THE COURT:  Any problem with that one?

20          MS. MOULTON:  I don't see it yet.

21          THE COURT:  Huh?

22          MS. MOULTON:  I don't see it yet.

23          MR. PAK:  This one (indicating).

24          MS. BAILY:  It's on the screen.

25          MS. MOULTON:  Oh, sorry.  It was -- the Jeff T one was

1    on there.

2         THE COURT:  3928 is the one we're talk being now.

3         MS. MOULTON:  I'm sorry.  It was on the bottom.

4    Yeah, that's...

5         THE COURT:  All right.  Good.

6    Next one?

7         MR. PAK:  Your Honor, there's one more I need to track

8    down that I used with Mr. Lambourne.  So if you could give me a

9    minute, I'll track that down.

10        THE COURT:  All right.  We'll pause here.

11                    (Pause in proceedings.)

12        THE COURT:  Now, while they're doing that, let me make

13   a comment to the Plaintiff.

14      I wasn't -- I -- to be evenhanded, if there's some

15   specific item of prior art you want to have included and called

16   out as prior art, I'll be happy to include that too.  So be

17   thinking about what that would be, if anything.

18                    (Pause in proceedings.)

19        MR. PAK:  Your Honor, I think we -- I'm pretty sure we

20   moved that into evidence, but I'm not seeing it in the exhibit

21   list, but it's TX3928.  That's got the two posts, the macro

22   presets.  So in case, I'd like to move that into evidence as

23   well.  That was discussed during --

24        THE COURT:  I'm sorry, which one 3928?

25        MR. PAK:  3928.

1      **THE CLERK:**  It was not moved into evidence.

2      **MR. PAK:**  Yeah.  So I'd like to move that into

3  evidence now, and that was discussed earlier.

4      **THE COURT:**  Was it used with a witness?

5      **MR. PAK:**  Yes, Your Honor.  It was used with

6  Mr. Lambourne.

7      **MS. MOULTON:**  Your Honor, we need to check the

8  transcript on that.

9      **MR. PAK:**  But that has the other two posts that we're

10  talking about, Your Honor.

11      **THE COURT:**  Well --

12      **MR. PAK:**  It was also used with Dr. Schonfeld, 3928.

13      **THE COURT:**  Why wouldn't I have it on my list?  Let me

14  see.

15              (Pause in proceedings.)

16      **MR. PAK:**  Mr. Fisher, if you could bring up DDX10.68.

17      **THE COURT:**  On a quick read of my list, I don't see

18  3928, but I'm doing it very quickly.  So I see 3698.

19      **THE CLERK:**  I don't have it either, Your Honor.

20      **THE COURT:**  And Angie says she doesn't have it either.

21      **MR. PAK:**  Yeah, so we'd like to move that into

22  evidence.  That was discussed.

23      **THE COURT:**  Well, I -- is there an objection to 3928?

24      **MS. MOULTON:**  We're going to have to check the

25  transcript, Your Honor.

1          **THE COURT:**  All right.  It's not in evidence yet.

2          **MR. PAK:**  Thank you.

3          **THE COURT:**  So right now I'm just going to give them

4    the instruction on the first two; but if you -- the other one

5    is still hanging fire.

6       Okay.  Now we go back to Sonos.  Is there anything that

7    you...

8                          (Pause in proceedings.)

9          **MS. MOULTON:**  Sorry, Your Honor.  We're just trying to

10   make sure which witness it was discussed with and whether that

11   witness can actually authenticate it.

12         **MR. PAK:**  I can just bring it up.

13      Mr. Fisher, do you have the trial transcript at 1434?

14                         (Pause in proceedings.)

15         **MR. PAK:**  3928, this was with Dr. Schonfeld.

16         **MS. MOULTON:**  Is this in Schonfeld's report?

17         **MR. PAK:**  No.  This is his -- yes, absolutely.

18         **MS. MOULTON:**  Okay.

19         **THE COURT:**  All right.  Does that help?  3928, it was

20   shown to the jury?

21         **MR. PAK:**  Yes, Your Honor.

22                         (Pause in proceedings.)

23         **MS. MOULTON:**  Okay.  We're good.

24         **THE COURT:**  So that means --

25         **MS. MOULTON:**  So we're admitting it?

1          THE COURT:  -- 3928 in evidence?

2          MS. MOULTON:  Yeah.

3          MR. RICHTER:  Yeah.

4          THE COURT:  All right.

5      (Trial Exhibit 3928 received in evidence.)

6          THE COURT:  And I can say that it's prior art?

7  Agreed?

8          MR. PAK:  Yes, Your Honor.

9          MS. MOULTON:  I think just as to the Floras Dad point

10  post, but that document that they were showing earlier had both

11  Floras Dad and this Majik post, but Majik didn't have a date.

12          MR. PAK:  What is the agreement -- I think the way to

13  do it, Your Honor, would be anything before in those exhibits

14  or those Sonos forum postings that predate the conception date

15  of December 21st, 2005.

16          THE COURT:  Predates December?

17          MR. PAK:  21st, 2005.

18          THE COURT:  I'm going to say "expressly predates."

19          MR. PAK:  Yes, Your Honor.

20          THE COURT:  All right.

21      Okay.  Do you have any prior -- items of prior art you

22  want to be called out to the jury?

23          MS. MOULTON:  We would like to say that the Crestron

24  document, which is from 2008, which is not prior art.

25          THE COURT:  What do you say to that?

1          **MR. PAK:**  Your Honor, I think the -- there may have

2    been some confusion.  There is a 2008 one that we showed.

3    There is a 2005 user manual as well as part of the intrinsic

4    record, but I don't have a problem saying the 2008 version was

5    not prior art.  I think that's what you're asking for.

6          **THE COURT:**  What is the exhibit number of the 2008?

7          **MS. MOULTON:**  It's TX3698.

8          **THE COURT:**  3698?

9          **MS. MOULTON:**  Yes.

10         **THE COURT:**  And that's in evidence already.

11         **THE CLERK:**  Yes, it is, yesterday, Your Honor.

12         **THE COURT:**  Now, is there a 2005 in evidence?  I heard

13   reference to it, but I didn't -- I don't remember if it was

14   actually put into evidence.

15         **MR. PAK:**  I will check.  I'm not sure that we actually

16   moved that one into evidence, Your Honor.

17         **THE COURT:**  Well, I think that may be a gap in your

18   proof.

19       But, Ms. Moulton, is that right?

20         **MS. MOULTON:**  Yes.

21         **THE COURT:**  It is correct that 2008 would not work,

22   and we -- I'm not going to be -- I'm not willing to assume that

23   that was an identical document in 2005.  It might be similar,

24   but it's --

25         **MR. PAK:**  That's fine, Your Honor.

1    THE COURT:  All right.

2        Okay.  And, now, your turn.  What's your next instruction

3    you want to make sure is in there somewhere?

4        MS. MOULTON:  So based on Your Honor's damages

5    rulings, we would ask to include the AIPLA Model 10.3, which is

6    that doubts are resolved against the infringer on damages.

7        THE COURT:  Say it again.

8        MS. MOULTON:  Doubts are resolved against the

9    infringer on damages.  I can read it if you like.

10       THE COURT:  Read that to me.  I --

11       MS. MOULTON:  Okay.  So this is from the Model

12   Instruction 10.3 (as read):

13           "Any doubts that you may have on the issue of damages

14       due to the Defendant's failure to keep proper records

15       should be decided in favor of the Plaintiff.

16           "Any confusions or difficulties caused by the

17       Defendant's records should also be held against the

18       Defendant and not the Plaintiff."

19       And this goes to Your Honor's point that the claim

20   construction requires three speakers.  Because Google doesn't

21   have data on how many controllers are configured with three

22   speakers, any doubts about that evidence should be resolved

23   against Google.

24           THE COURT:  What does Ms. Baily say?

25       MS. BAILY:  Your Honor, a couple of things.  First of

PROCEEDINGS

1  all, I mean, there should obviously be no confusion that the

2  burden of proof on damages is on the Plaintiff.

3      Second of all, you know, there were discovery issues in

4  the case.  There was no motion to compel additional evidence

5  with respect to some of these metrics, and I just -- there was

6  an inference made yesterday in front of the jury that Google

7  had done something wrong in connection with its document

8  production.  There's no evidence of that, and so I think, you

9  know, putting on a jury this issue of what may or may not have

10  happened in discovery at this point is improper.

11          MS. MOULTON:  I think Your Honor heard testimony --

12          THE COURT:  This is not -- but the instruction is not

13  going to discovery.

14      Read it to me again.  It just may be everybody performed

15  okay, it's just that there are doubts now.

16      Read it to me again.

17          MS. MOULTON:  (as read):

18          "Any doubts that you have" --

19      Sorry.  Let me start over (as read):

20          "Any doubts that you may have on the issue of damages

21      due to the Defendant's failure to keep proper records

22      should be decided in favor of the Plaintiff.

23          "Any confusion or difficulties caused by the

24      Defendant's records should also be held against the

25      Defendant not the Plaintiff."

1    MS. BAILY:  Your Honor, the insinuation that we didn't

2    keep proper records that we were required to keep, like in

3    connection with some sort of spoliation issue, I mean, it

4    implies --

5            MS. MOULTON:  It doesn't have anything to do with

6    that.

7            MS. BAILY:  -- it implies wrong doing by Google that

8    has never been established and is not appropriate.

9            THE COURT:  Well, can I see the document?

10           MS. MOULTON:  Yes.

11           THE COURT:  I'm not sure I want to give that in

12    that -- at least in that form, but --

13           MS. BAILY:  Also, Your Honor, my colleague informs me

14    that this instruction is typically given in the lost profits

15    context.

16           THE COURT:  Well, okay.  Thank you.

17           MS. BAILY:  And lost profits are obviously not at

18    issue here.

19           THE COURT:  Okay.  What's this?

20           MS. MOULTON:  That was my bookmark.  Sorry.

21                    (Pause in proceedings.)

22           THE COURT:  Okay.  What's your next point?

23           MS. BAILY:  Our next issue is with respect to the

24    obviousness instructions for the jury and sort of combined with

25    the verdict form in terms of how obviousness is presented to

1    the jury.

2        We want to just make sure that the jury instruction -- we

3    see that the verdict form emphasizes reasonable expectation of

4    success.  We want to make sure that the jury instruction talks

5    about the, you know, relatively small number of possible

6    approaches as well, which is sort of usually talked about in

7    the context of a --

8        **THE COURT:**  I have something in there already about

9    that.  So when there's a small number of ways to address a

10   problem -- I have forgotten how to goes, but it's -- I've seen

11   it before.

12       Yes?

13       **MS. BAILY:**  So from that perspective, we would like

14   the instruction to include that, which it sounds like it

15   already has; and for the verdict form to then just ask the one

16   question about obviousness and then in an attempt to sort of

17   streamline the verdict form --

18       **THE COURT:**  Well, but my law clerk tells me that she

19   reads the case law the jury has to make a factual determination

20   on motivation and reasonable expectation of success, and that

21   the ultimate legal question is for me on -- all right.

22       So if they say "yes" to both of those, then I can say

23   "yes" to obviousness, but you just want to leap forward and

24   give them the legal question.

25       **MS. BAILY:**  Your Honor, I think -- so from our

1   research, the way it's been done is that, you know, it is a

2   question with respect to obviousness as informed by the

3   instructions for the jury and then you take that verdict and,

4   you know, make an assessment.

5          THE COURT:  What would be the question that you would

6   pose to the jury?

7          MS. BAILY:  It would be --

8          THE COURT:  The court reporter needs a break.

9                      (Pause in proceedings.)

10          THE COURT:  Can we go?

11          THE OFFICIAL REPORTER:  Yes.

12          THE COURT:  Go ahead, continue.

13          MS. BAILY:  So it would -- it would be basically a

14   version of what's there as 1A (as read):

15          "Has Google proven by clear and convincing evidence

16       that a person having ordinary skill in the art as of

17       December 21, 2005, with knowledge of the prior art,

18       including the 2005 system, would have found the invention

19       set forth in claim 1 of the '885 patent to have been

20       obvious?"

21       And I understand Your Honor's concern because there's

22   factual findings by the jury and obviousness is for the Court,

23   but my understanding is that this is how it has been done.

24          THE COURT:  I know it has been done that way in other

25   cases of mine but both sides agreed.  Has it ever been

1   contested and upheld by the Federal Circuit in that form where

2   the -- where somebody wanted a finding by the jury?

3          MS. BAILY:  I don't know the answer to that,

4   Your Honor.

5          THE COURT:  What's the answer to that?  Do you know?

6          MS. MOULTON:  If you just ask is it obvious, yes or

7   no, has that been upheld by the Federal Circuit?

8          THE COURT:  Well, yes, if you -- and let's say that

9   the one side wanted the detailed questions and the other side

10  wanted just the word "obvious" to be used in the verdict form,

11  and the Federal Circuit said that's okay as long as the

12  instructions told them what they had to find on motivation and

13  reasonable expectation of success.

14         MS. MOULTON:  I'm not sure, Your Honor.  I know the

15  Northern District models offer both verdict -- both types of

16  verdict forms as models.

17     But I did want to clarify that reasonable expectation of

18  success and motivation to combine are not the only underlying

19  fact findings.

20         THE COURT:  Is that true?

21         MS. MOULTON:  All --

22         THE COURT:  I thought both of those -- well, what --

23  if that's true, then why don't we just give a general verdict

24  on obviousness?  And I was led to believe that if they found

25  those two, then it was obvious.

1          **MS. MOULTON:**  No.  All four *Graham* factors are

2    underlying fact findings.

3          **THE COURT:**  Say it again.

4          **MS. MOULTON:**  All four of the *Graham* factors are

5    underlying fact findings.

6          **THE COURT:**  What are those other two factors then?

7          **MS. MOULTON:**  So the four *Graham* factors are the scope

8    and content of the prior art, differences between the prior art

9    and the claims, the level of ordinary skill, and then objective

10   indicia of non-obviousness, and you look at all those four

11   factors and then you ask:  Was there a motivation to combine

12   and reasonable expectation of success?

13         **THE COURT:**  Can you hand up those four factors to me?

14         **MS. MOULTON:**  I don't have those printed out, but

15   I'm --

16         **THE COURT:**  I don't think we have those four factors

17   in our instructions yet.

18         **MS. MOULTON:**  It's from *Graham vs. John Deere*.

19         **THE CLERK:**  Everyone is here.

20         **THE COURT:**  They are?

21         **THE CLERK:**  Yes.

22         **THE COURT:**  Oh, good.

23    So we're going to get to start on time anyway.

24         **MS. BAILY:**  Your Honor, I think what this suggests is

25   that, you know, the instructions provide instructions to the

 1  jury on these issues and, you know, that the general obvious

 2  question be asked in a verdict form.

 3        THE COURT:  Well, I'm going to call it to a halt here

 4  because all jurors are now present and Ms. Cameron got here on

 5  time after all.  Excellent.

 6        MS. MOULTON:  Your Honor, I have the level of ordinary

 7  skill if you want me to pass that up.

 8        THE COURT:  Is that the agreed-upon one?

 9        MR. PAK:  I have it here, Your Honor.

10        THE COURT:  I'm not sure it's the same.

11        MS. BAILY:  They reviewed this one.

12        MR. PAK:  All right.  That's fine.

13        THE COURT:  Here, let's hand that up to me.  Thank

14  you.

15        MS. CARIDIS:  And, Your Honor, since we're so close to

16  the end of the parties' allotted times, can we get on record --

17  I think there's a dispute between the parties as to how much

18  time was used yesterday.  We went and based on the trial

19  minutes, we calculated those times so we just wanted to

20  understand.

21        THE COURT:  Well, what I have is that you've used 774,

22  the other side has used 812.  Now, you know, I could be off so

23  tell me.

24        MR. JUDAH:  James Judah.

25     We agree with your numbers, Your Honor.

PROCEEDINGS

1          THE COURT:  What's your view?

2          MS. CARIDIS:  Your Honor, I believe that -- that --

3   sorry.

4      I have the numbers the other -- I believe that Sonos has

5   68 minutes left based on the trial minutes and Google has

6   23 minutes left, and that's based on this Court's trial minutes

7   that were issued this morning at 7:11.

8          THE COURT:  7:11?

9          THE CLERK:  That's when I filed it.

10         THE COURT:  You've been putting down the time too?

11         THE CLERK:  I have to on the --

12         THE COURT:  Oh, you do?

13         THE CLERK:  Yes.

14         THE COURT:  Well, I have the Defendant has -- the

15  Defendant has 28 minutes left.  What did you say?

16         MS. CARIDIS:  23 minutes, Your Honor.

17         THE COURT:  And that you had 40 plus 26.  What is

18  that?  66.

19         MS. CARIDIS:  Yes.  And, Your Honor, based on

20  yesterday's timing, I had 68 for Sonos.

21         THE COURT:  How much -- how much time are you going to

22  use this morning?

23      No, no.  It's your turn now; right?

24      So why can't I go with my own numbers, 66 and 28?

25         MS. CARIDIS:  Your Honor, if that's what you'd like,

 1    then that's fine.  I was going based on the Court's trial

 2    minutes that were submitted.

 3              THE COURT:  All right.  Well, I'm going to go with

 4    what I've got here.  So you have 66.  You have 28.

 5              MR. JUDAH:  Thank you, Your Honor.

 6              MS. CARIDIS:  Thank you.

 7              THE COURT:  Let's bring in the jury and -- now, who's

 8    going to be our first witness?

 9              MS. CARIDIS:  Your Honor, it will be Dr. Almeroth.

10              THE COURT:  Great.  Welcome back.

11              THE WITNESS:  Thank you, Your Honor.

12                          **KEVIN ALMEROTH**,

13    called as a witness for the Plaintiff, having been previously

14    duly sworn, testified further as follows:

15              THE CLERK:  All rise for the jury.

16         (Proceedings were heard in the presence of the jury:)

17              THE COURT:  Be seated, please.

18         Ms. Cameron, I want to thank you for solving the transport

19    problem this morning.  Thank you for doing that.  It means a

20    lot to us.

21         Okay.  We have now heard both cases in chief and both

22    sides have limited amount of time left, and they can use it, if

23    they wish, for rebuttal.

24         At this time the Plaintiff gets to present rebuttal.  Who

25    will be your first witness?

1        MR. SHEA:  Your Honor, we'll be presenting Dr. Kevin

2   Almeroth.

3        THE COURT:  All right.  You-all remember our witness.

4   He has been here before.

5        Is it sufficient for me to say to him he's still under

6   oath?

7        MR. PAK:  Yes, Your Honor.

8        THE COURT:  Okay.  You're still under oath.

9        THE WITNESS:  I understand, Your Honor.

10       THE COURT:  Great.

11   First question.

12       MR. SHEA:  Thank you, Your Honor.

13                    **DIRECT EXAMINATION**

14  BY MR. SHEA:

15  Q.   Good morning, Dr. Almeroth.

16  A.   Good morning.

17  Q.   Have you prepared any slides to help assist with your

18  testimony today?

19  A.   Yes.

20       MR. SHEA:  May I approach, Your Honor?

21       THE COURT:  You may.

22                    (Pause in proceedings.)

23  BY MR. SHEA:

24  Q.   Dr. Almeroth, what will you be testifying about today?

25  A.   I have a couple of opinions to go back over on

1  infringement and then I will be presenting my invalidity

2  opinions.

3           MR. SHEA:  Mr. Jay, can we pull up slide DDX10.38?

4                (Pause in proceedings.)

5           MR. SHEA:  And this is going to be from

6  Dr. Schonfeld's demonstrative deck.

7  BY MR. SHEA:

8  Q.   Dr. Almeroth, did you hear Dr. Schonfeld say that the

9  causing storage requirement of the '966 patent is not met?

10 A.   Yes, I did hear him say that.

11 Q.   What is your response?

12 A.   My response is that I disagree.  I believe that there is

13 significant evidence in the record that the -- that those

14 limitations of the '966 patent are met both by the previous

15 versions and the redesign.

16 Q.   And can you give some examples of the evidence that you're

17 referring to?

18 A.   Yes.  So Mr. MacKay talked about storage of the UUID, the

19 universally unique identifier.  There was also testimony about

20 the name that was stored.  There was testimony that the

21 membership that each speaker was in was also stored.  Mr. Pedro

22 also testified about information being stored when the group

23 was created at the controller.

24      So there's really storage of information at multiple

25 places in the system, and that makes sense; right?  You don't

1  want to have to go back and recreate the speaker group once

2  it's been created; and if you want to come back later and

3  invoke it, you need to have that information stored in the

4  system.

5  **Q.**   So even though the evidence shows that Google's speaker

6  groups are stored, what is Dr. Schonfeld's basis for saying

7  that they aren't?

8  **A.**   Dr. Schonfeld is basically adding additional requirements

9  to what the claim requires as it relates to storage above and

10 beyond just what the words of the claim say.

11 **Q.**   So what do the words of the claim actually say?

12 **A.**   For the '966 it says "causing storage of the first zone

13 scene and causing storage of the second zone scene."

14 **Q.**   So then to summarize, Dr. Almeroth, do all of the

15 versions, accused versions, of the Google Home app have that

16 functionality including with the redesign?

17 **A.**   Yes, they do, absolutely.

18 **Q.**   So, Dr. Almeroth, did you also hear Dr. Schonfeld talk

19 about the examiner's statements from the prosecution history?

20 **A.**   Yes, I did.

21 **Q.**   So I want to take a look at what he said about that.

22         **MR. SHEA:**   So, Mr. Jay, can we pull up the trial

23 transcript page 1347, line 6 through 14?

24                    (Pause in proceedings.)

25 \\\

1  BY MR. SHEA:

2  Q.   So, Dr. Almeroth, what does this show us?

3  A.   Yes, this was his testimony that he gave I believe it was

4  the day before yesterday or yesterday.  I can't keep track

5  anymore.  He said (as read):

6          "So what does the statement from the examiner say

7       about the interpretation of while operating in standalone

8       mode?"

9       And he says (as read):

10          "I think my understanding is that it's consistent

11       with the previous statement, just a little stronger; and

12       the examiner says until you engage and invoke the

13       synchrony group, you want to have to [sic] continuous

14       uninterrupted play without any user manipulation."

15      And so what he's saying is between creation of the group

16  and invocation of the group, you have to be continuously

17  outputting audio.  He said that was a requirement of the

18  claims.

19  Q.   Now, this interpretation of Dr. Schonfeld's, is that based

20  on any statement made by Sonos or the inventor?

21          MR. PAK:  Your Honor, I'd like to -- on the

22  prosecution history point, Your Honor, Dr. Almeroth did not

23  provide any opinions regarding prosecution history on these

24  issues in his expert report so I'd like to see where he said

25  that.

 1          THE COURT:  All right.  He's got to be limited to his

 2     rebuttal report now.

 3          MR. SHEA:  Your Honor, we -- this is the last of my

 4     questions about this.  All I'm asking is what is --

 5          THE COURT:  No, no.  Don't ask it unless it's in the

 6     report --

 7          MR. SHEA:  Okay.

 8          THE COURT:  -- rebuttal report.

 9          MR. SHEA:  Okay.  I'll withdraw that question,

10     Your Honor.

11          THE COURT:  Thank you.

12     BY MR. SHEA:

13     Q.   Dr. Almeroth, do you believe that Dr. Schonfeld's

14     interpretation of what standalone mode requires makes sense?

15     A.   No, it doesn't.

16     Q.   And why not?

17     A.   Well, if you think about it, the requirement that he's

18     saying to be in standalone mode, you have to be playing audio

19     you have to hear audio doesn't make sense.  So he had an

20     example where you could create a group at 2:00 p.m. at one day

21     and then the next day you would invoke it.  He created a

22     morning scene at 2:00 p.m. with the expectation that the next

23     morning you would invoke the group.

24          Well, according to his requirement of the claims, at least

25     one of those speakers would have to be playing from 2:00 p.m.

1  when it was created to 7:00 a.m. when it was invoked; that in

2  order to be in standalone mode and in order to continuously be

3  in standalone mode where you had to play out audio, there was a

4  requirement that you had to actually hear audio coming from the

5  speaker for it to be in standalone mode.  And that just doesn't

6  make sense in the context of the invention.

7  **Q.**    So, Dr. Almeroth, do you believe that Dr. Schonfeld's

8  interpretation is consistent with the invention and what the

9  claims require?

10 **A.**    No, it's not consistent.  Standalone mode doesn't require

11 actually outputting audio so that you can hear it.

12 **Q.**    So let's go back to the actual claim language.

13        **THE COURT:**  Can I -- I'm going to ask a question, and

14 I don't know if this is in the reports or not but the witness

15 is -- maybe can answer this on this very point.

16     I remember seeing something about Yamaha prior art -- the

17 jury has heard it too -- concerning standalone mode, and one of

18 the examiner's questions to distinguish the Yamaha prior art

19 was something to the effect that Sonos had represented that

20 the -- that the playback continued during standalone mode in

21 the invention.

22     Do you remember what I'm talking about?

23        **THE WITNESS:**  I do remember that, Your Honor.

24        **THE COURT:**  All right.  Okay.  What is your take on

25 that item?

1           **THE WITNESS:**  So two things.  One, it was under the

2   notice of allowance so it wasn't a statement that Sonos made.

3   It was the examiner.  I think you pointed that out.

4        The second thing is that statement doesn't say anything

5   about standalone mode.  If you look at the statement, what it's

6   describing is if you have a speaker that's trying to join

7   another speaker that's already playing, what the consequence of

8   that is.  That's what he was saying, Yamaha didn't describe how

9   that was supposed to happen.

10       And that ends up not being related to standalone mode.

11  It's if you have a speaker join a speaker that's already

12  playing, what's supposed to happen?

13          **THE COURT:**  I thought the -- so is my memory

14  incorrect?  I thought the word "standalone" was in that

15  explanation.

16          **THE WITNESS:**  I don't think so.

17       Mr. Jay --

18          **THE COURT:**  Okay.  If it's not, then -- is it?  I

19  don't remember.

20          **MR. SHEA:**  I do not believe so, Your Honor.

21          **THE COURT:**  All right.  Is that right, Mr. Pak?

22          **MR. PAK:**  I think he was talking about the standalone

23  mode, Your Honor, but we can -- we can go into that on

24  cross-examination.

25          **THE COURT:**  All right.  Thank you.

1    Okay.  Go ahead.

2        MR. SHEA:  So can we go to DDX10.6, Mr. Jay?

3    BY MR. SHEA:

4    Q.   So looking at the claim language, Dr. Almeroth, what does

5    the standalone mode limitation require?

6    A.   It says "Operating in a standalone mode in which the first

7    zone player is configured to play back media individually."

8    It's operable to play back media alone by itself.  There isn't

9    a requirement that it actually be outputting audio in order to

10   be in standalone mode.

11   Q.   And then based on this requirement, Dr. Almeroth, are the

12   standalone mode limitations infringed by all versions of

13   Google's accused products?

14   A.   They are infringed when you consider what the claim

15   actually requires about standalone mode, and this applies both

16   to the previous versions as well as the redesign.

17   Q.   So can you summarize your conclusions then for us on

18   infringement?

19   A.   Yes.  I think over the last few days there were really two

20   issues in dispute.  The storage issue and that really only

21   relates to the '966 patent, and so I think I've shown evidence

22   where, in fact, it is stored according to the requirements of

23   the claim.  And then with respect to the standalone mode, I

24   disagree with Dr. Schonfeld that the claim requires outputting

25   audio in order to be in standalone mode.

1      And based on that, there's infringement of the '966 patent

2   in the previous versions as well as infringement of the

3   redesign for both the '885 and the '966 patents.

4   **Q.**   So let's turn to validity now, Dr. Almeroth, and maybe we

5   can have you pull your demonstratives back up.

6      What analysis were you asked to perform?

7   **A.**   I was asked to perform whether or not the prior art that

8   Dr. Schonfeld presented would invalidate the claims or not, and

9   the prior art he talked about was the Sonos 2005 system and

10  then he included a number of secondary references to meet one

11  of the additional requirements of the claims.

12  **Q.**   What burden of proof did you apply?

13  **A.**   There's -- the requirement is, first of all, the patent is

14  presumed to be valid, that the Patent Office did its job and

15  the issued patents are valid.   And so Google has to prove by

16  clear and convincing evidence that the patents are not valid.

17  **Q.**   And what ground of invalidity is Dr. Schonfeld relying on?

18  **A.**   He's relying on a ground called obviousness.

19  **Q.**   And what is required for Google to prove obviousness?

20  **A.**   There's a set of factors that I'm informed of by the

21  lawyers about what the requirements are to prove obviousness.

22  They include what was in the prior art, so the scope and

23  content of the prior art; what the level of ordinary skill in

24  the art at the time of the invention was, so we're talking

25  about December 21st, 2005 is the time of the invention; the

1  differences between the claimed invention and the teachings of

2  the prior art, and this is why it's an obviousness analysis

3  because not all of what is described in the claim is actually

4  in that primary reference; and then the fourth factor is

5  there's consideration of evidence of non-obviousness, and so

6  sometimes these are called secondary considerations.

7  **Q.**   And what can we take away from the fact that Dr. Schonfeld

8  is only presenting theories on obviousness?

9  **A.**   What he is saying is that there's no single prior art

10  reference that Sonos 2005 system does not include all of the

11  limitations of any of the asserted claims but there's some

12  aspect that's missing and so, therefore, he has to rely on some

13  other evidence from the time.

14  **Q.**   And when doing an obviousness analysis, what are some of

15  the things you need to be careful about?

16  **A.**   Right.  So you've heard this statement "hindsight is

17  20/20."  So we might be sitting here today, especially experts

18  who can testify and sitting on the stand might say:  Well,

19  sitting here today, that invention was obvious.  You know, I

20  could do that right now.

21      But that's not the test.  The test is whether back in 2005

22  a person of ordinary skill in the art at that time would have

23  considered the invention to be obvious.  And so you have to

24  protect against this hindsight, they call it a bias, where you

25  don't use the claims as a road map.  You don't say, "Oh, I've

1    got the claims and now I have to see if those limitations are

2    in the prior art."

3        There has to be for an obviousness combination a

4    motivation to take one reference and then change it, augment

5    it, make it different or better by what's not in that prior art

6    reference.  And so there has to be a motivation to combine the

7    references in the manner that would get the claimed invention.

8    And so there might be a lot of different reasons or things that

9    a reference could be changed.

10        The second is you have to have a reasonable expectation of

11   success, that the idea that you -- that people at the time,

12   people with skill in the art, would say, "Okay.  That's

13   something that would be obvious to do."

14        And then the third, there's these things called secondary

15   considerations.  So whether or not there was praise for the

16   invention that could come later or whether people were

17   skeptical that the solution that was being proposed in the

18   claims would actually work or not.

19   **Q.**   How did you go about evaluating whether the claims of the

20   '885 and '966 patents are obvious?

21   **A.**   I've given my methodology for a lot of the different

22   opinions that I've offered.  There's a methodology here.  It

23   involves the same kind of step 1 of considering the patents.

24   But now step 2 is to compare the claims against the prior art

25   that Google has identified and that Dr. Schonfeld testified

1  about yesterday.

2  **Q.**    What materials did you consider?

3  **A.**    In short, I considered the patents and I considered

4  everything that Dr. Schonfeld considered.  So I think the jury

5  has heard something back and forth about reports that have been

6  submitted.  Dr. Schonfeld submitted a report.  He gave

7  testimony about why he thought the claims were invalid.  I

8  considered everything that he considered, and then I decided

9  whether or not I agreed with his opinions or not.

10  **Q.**    And what claim constructions did you apply?

11  **A.**    I've shown this slide a couple of times.  These are the

12  agreed constructions.  It's the same constructions I presented

13  when I talked about infringement for zone scene, and then the

14  indication requirement in the '885 and that's also mirrored in

15  the '966.

16  **Q.**    What level of ordinary skill did you apply?

17  **A.**    So this is the same demonstrative I showed previously.

18  It's the same level of skill that I described, and what's

19  important to understand again is this is the knowledge a person

20  would have again in 2005.  It's very important to consider 2005

21  is the timeframe when considering whether or not an invention

22  is obvious.

23  **Q.**    So based on your analysis, what conclusion did you reach?

24  **A.**    So based on all of my analysis, I concluded that even in

25  the face of the opinions offered by Dr. Schonfeld and Google

1  with respect to the Sonos 2005 system and the secondary

2  references that he described, that the claims are actually

3  still valid, that I disagree with his opinions that the claims

4  are invalid.

5  Q.  Now, are you prepared to walk through all of your analysis

6  responding to Dr. Schonfeld's theories?

7  A.  Yes.  I had three reports, thousands of pages.  I could go

8  through all of the individual arguments and the limitations and

9  the references and do it step by step by step, but I doubt that

10  anyone would want to see that at this point.

11  Q.  Yeah, that sounds like it could take us a while.

12      Is there anything you could do to streamline it for us?

13  A.  I can.  I think there are some fundamental missing

14  components in Dr. Schonfeld's analysis with respect to what's

15  described in the prior art.

16  Q.  So can you --

17  A.  Go ahead.

18  Q.  Sorry, Dr. Almeroth.  I didn't mean to speak over you.

19      What I was just going to ask you:  Could you crystallize

20  for us your disagreements with Dr. Schonfeld?

21  A.  Yes.  I think there's two fundamental disagreements that

22  I'll talk about as it relates to validity.

23      The first is the Sonos 2005 system does not include zone

24  scenes; and because the Sonos 2005 system does not include zone

25  scenes, that means many of the limitations that Dr. Schonfeld

1   checked off when he tried to do his invalidity analysis are

2   actually not present in that system, and for that reason alone

3   the claims would be valid.

4        As a second reason, I believe that Dr. Schonfeld has

5   incorporated hindsight into his analysis.  He's considered his

6   own knowledge and skill and what would be easy for him to do as

7   opposed to putting himself in the mind of a person of skill in

8   the art in 2005 specifically.

9   Q.   Starting with that first point about the zone scene

10  limitations not being part of the combinations, can you start

11  by taking us back to what the patents tell us about zone

12  scenes?

13  A.   Yes.  So I went through this analysis in a fair amount of

14  detail.  We've put up the '966 patent and walked through the

15  specification where it was describing what the invention was.

16  I've put it onto a demonstrative so I can summarize it in

17  20 seconds, a couple of the key aspects, and I've highlighted

18  those in red here.

19       So the idea is that you're allowing a user to group some

20  of the players according to a theme or zone -- or scene.

21  That's part of what the patent describes.

22       So that when that scene is activated, we've used the term

23  "invoked," the players in the scene react in a synchronized

24  manner.  They may play audio or at least they're synchronized

25  and prepared to play audio.  So, again, just because you have

1    the scene invoked doesn't mean that you actually have to play

2    the audio.

3        And then there was a second paragraph that talked about

4    the controller, which were the claims on the second side of the

5    coin for the '966 patent, where you had that controlling device

6    to facilitate a user to select any of the players to form

7    respective groups.

8        So this gets at the idea of being able to have multiple

9    zone scenes at the same time and they can be composed of

10   different members of the available scenes -- sorry -- the

11   available players even to the point where some of those can be

12   overlapping.

13       The next point is that the scenes may be saved in any of

14   the members in a group.  So then that starts to get into the

15   storage requirement.

16   **Q.**   So is what the specification says about zone scenes

17   reflected in the agreed constructions?

18   **A.**   Yes, it is, and I can go back to those.

19       So those same concepts that I just went through in

20   column 2 are embodied in the agreed constructions, and the

21   agreed constructions include terms from the claims themselves.

22       So this is where the concepts from the summary of the

23   invention are included in what the actual claims at the end say

24   about what the invention requires.

25   **Q.**   Is there anything else we should look at to understand the

1  core of the invention here?

2  **A.**   Yes.   One last thing.   This Figure 6 from the patents has

3  come up a couple of times.   It's been described I think by both

4  myself and Dr. Schonfeld.   And I think the key aspect that I

5  want to point to here is this distinction that's described in

6  the patent about when setup or creation happens versus when you

7  have invocation.

8       And you see that in the claims where you can create -- you

9  have indications to create these zone scenes and those are

10  separate from the invocation of those zone scenes; and that

11  really gets to the core of the patent, the idea that you can

12  have multiple overlapping zone scenes, and then one of those

13  can be invoked and then the other ones can be invoked at some

14  point later in time.

15  **Q.**   So what other aspects of the invention flow from these

16  core concepts?

17  **A.**   Yes.   So I have a demonstrative that just sort of

18  summarizes this.   I sort of -- I've talked about these multiple

19  zone scenes that you see in the claims.   The idea that they're

20  customized, again based on the constructions.   There is a

21  common theme that's also in the construction.   Previously

22  saved, also in the construction.   And then the claims

23  themselves talk about overlapping.   And then I just mentioned

24  the separation of group creation from invocation.   That's also

25  important.

1    And then this idea that standalone mode while groups

2    exist.  So the fact that you can create groups while the

3    individual speakers stay in standalone mode or are in

4    standalone mode, depending on which patent we're talking about,

5    and that will also become important in understanding the

6    distinctions over the prior art.

7    And then for the '966, there's also this additional

8    limitation for the display of multiple zone scenes that have

9    been created and then that can be selected for invocation.

10   **Q.**   Are those aspects embodied in the claims of the '885 and

11   '966 patents?

12   **A.**   Yes.  I think we've gone through the claims in a fair

13   amount of detail so I'm not going to show where they're

14   manifested in the claims, but I believe those concepts are all

15   in the claims.

16   **Q.**   Can you remind us what prior art combinations

17   Dr. Schonfeld is relying on?

18   **A.**   Yes.  So he's relying on the Sonos 2005 system and

19   I believe he's relying on that for almost all of the

20   limitations.  When he did his analysis, he checked all but a

21   couple of the boxes in the claims based on the Sonos 2005

22   system.

23   And then he's relying on a number of secondary references

24   I believe he said for the additional limitation of saving the

25   second group.

1    Q.   In the Sonos 2005 system, what did he identify as the zone

2    scenes required by the claims?

3    A.   Right.  So he identified from the Sonos 2005 system a zone

4    group.  So there's a difference between a zone scene, which is

5    in the patents, and a zone group, which is what existed in the

6    Sonos 2005 system.

7    Q.   Did he identify anything else as a zone scene in the Sonos

8    2005 system?

9    A.   Yeah.  Also as a zone scene he identified Party Mode from

10   that 2005 system.

11   Q.   So I'd like to take those one by one.  Why is a zone group

12   not a zone scene in your opinion?

13   A.   So if you remember, a zone group is not previously saved.

14   The zone group in the 2005 system was where you identify

15   speakers and they're immediately launched into a group.  So

16   there's not this notion that they're previously saved.

17        Second of all, with respect to the zone group, there isn't

18   some common theme.  There isn't a name that somebody can give

19   to one of those zone groups.

20        MR. SHEA:  So maybe we can just quickly look at

21   TX6991.  And this is the 2005 user guide for Sonos, which is

22   already in evidence.

23        And can we go to page 66, Mr. Jay, 66 and 67?

24   BY MR. SHEA:

25   Q.   Dr. Schonfeld -- or excuse me -- Dr. Almeroth, what does

1    this show us?

2    **A.**    So from the first top it says (as read):

3          "Two or more zones can be grouped together to form a

4    zone group which will allow you to play the same music

5    across zones."

6    So this is exactly that concept.  You can't create a zone

7    scene and then save it and name it.  Instead what you do is you

8    pick the speakers or the zones, the zone players, and they're

9    immediately invoked and so they're organized into a group at

10   that point.

11   **Q.**    I think I heard you say you can't name or save a zone

12   scene.  Did you mean zone group?

13   **A.**    I meant a zone group, that's correct.  Sorry.

14   **Q.**    And just to be clear, a zone group is also something that

15   during this trial we've sometimes heard referred to as a

16   dynamic group; is that right?

17   **A.**    Yes.  A dynamic group meaning you create it on the fly and

18   it's immediately invoked.

19   **Q.**    Okay.  So we've talked about the zone group not being a

20   zone scene.

21   Why is the Party Mode option from Sonos' 2005 system not a

22   zone scene?

23   **A.**    So, Mr. Jay, you can leave this up.

24   And the reason why a Party Mode is not a zone scene is

25   it's also not previously saved.  The group membership for what

1  the zone scene is doesn't exist.

2       And then it's also not customizable by a user.  It's all

3  the zones that would exist in the scene -- sorry -- in the

4  system at the same time, and so the user can't add or customize

5  what that Party Mode is.

6  Q.  Now, did you hear Dr. Schonfeld rely on testimony from

7  Mr. Lambourne to support his opinion that Sonos' 2005 Party

8  Mode option was a zone scene?

9  A.  Yes.  In large part he was relying on Mr. Lambourne and

10 what Mr. Lambourne said.

11 Q.  So let's take a look at that -- those statements.

12           MR. SHEA:  Mr. Jay, can we pull up DDX10.51?

13                   (Pause in proceedings.)

14 BY MR. SHEA:

15 Q.  So this is from Mr. Schonfeld's slide deck.  And can you

16 tell us what we're looking at here?

17 A.  Yes.  This was from Dr. Schonfeld's slides, and this is

18 where he was relying on a declaration from Mr. Lambourne to

19 basically say that he was saying Mr. Lambourne said Party Mode

20 was a zone scene.

21 Q.  And just as a starting point, Dr. Almeroth, does anything

22 in these two paragraphs say that Party Mode was a zone scene?

23 A.  No, it doesn't.  He was trying to interpret what

24 Mr. Lambourne said to meet all of the requirements of the zone

25 scene.

1    Q.   Did Dr. Schonfeld show us any other paragraphs from this

2    declaration?

3    A.   No.  He just showed this on his demonstrative and tried to

4    argue that Mr. Lambourne was saying Party Mode was a zone

5    scene.

6    Q.   What I'd like to do is look at the full declaration.

7              MR. SHEA:  So, Mr. Jay, can we pull up TX3923?

8                   (Pause in proceedings.)

9              MR. SHEA:  And can I have you turn to paragraph 12 for

10   us and blow that up?

11   BY MR. SHEA:

12   Q.   What does this show us, Dr. Almeroth?

13   A.   Yeah, so Mr. Lambourne was saying that the Sonos system at

14   the time included a hardcoded All Zones-Party Mode option, but

15   that option only applied to scenarios where a user wished to

16   form a zone group including all of the zone players.

17        And, in other words, Party Mode was really just the same

18   thing as a zone group but it was all of the players.  It did

19   not provide users with any ability to customize and pre-save

20   their own defined groups of zone players.

21             MR. SHEA:  And with this up, can we also go to

22   paragraph 16, Mr. Jay?  And can we blow that up?

23   BY MR. SHEA:

24   Q.   What does this show us, Dr. Almeroth?

25   A.   Here he's describing the April 2005 Sonos User Guide,

1  which is what some of the evidence Dr. Schonfeld relied on, and

2  he is specifically saying that Sonos' system at the time -- so

3  that second part of the first sentence -- did not have any zone

4  scene technology that would enable a user to customize and

5  pre-save a defined grouping of zone players that could later be

6  invoked on demand for synchronous playback.

7  **Q.**   And did Dr. Schonfeld show the jury any of this from

8  Mr. Lambourne's declaration?

9  **A.**   No.  Again, Dr. Schonfeld really only showed part of what

10  Mr. Lambourne said; and when you consider Mr. Lambourne's full

11  opinions, he's very much testifying that zone scenes were not

12  in that prior art system.

13         **MR. SHEA:**  So can we also, Mr. Jay, pull up DDX10.52?

14               (Pause in proceedings.)

15  **BY MR. SHEA:**

16  **Q.**   And what do we see here, Dr. Almeroth?

17  **A.**   This was another slide from Dr. Schonfeld.  Here he had

18  taken some of the testimony from Mr. Lambourne at trial and

19  where Mr. Lambourne was being asked about a document, and so

20  that was again part of the opinion Dr. Schonfeld was relying on

21  to say that Mr. Lambourne actually said that there were zone

22  scenes in that prior art system.

23  **Q.**   Did Dr. Schonfeld provide the full context for this

24  testimony?

25  **A.**   No, he didn't.

1    Q.   So maybe we can look at that or at least an example of

2    that.

3           MR. SHEA:   Mr. Jay, can you pull up the trial

4    transcript at 462, lines 4 through 12?

5                        (Pause in proceedings.)

6    BY MR. SHEA:

7    Q.   What does this show us, Dr. Almeroth?

8    A.   So, again, he was asked during this trial whether he

9    thought Party Mode in the original Sonos product was the full

10   implementation of zone scenes as it's being claimed, and he

11   said (as read):

12           "In the original 2005 product, it didn't."

13       And then he provided some reasons why not.

14   Q.   So was it accurate for Dr. Schonfeld to characterize

15   Mr. Lambourne of saying that a Party Mode from Sonos' 2005

16   system was a zone scene?

17   A.   No, it's not accurate.  That's not what Mr. Lambourne's

18   full opinion was.

19   Q.   Did you also hear Dr. Schonfeld say that it's the play

20   command in the Sonos 2005 system that invokes a Party Mode?

21   A.   Yes, I did hear that.

22   Q.   Do you agree with that?

23   A.   No.  I believe what he was trying to say is that, again,

24   that play would invoke the zone Party Mode and that's not

25   accurate.  Again, playing is with respect to the music.  When

1  you set up the zone scene -- sorry.

2      When you set up the zone group in the 2005 system, it's

3  immediately invoked.  Those speakers are ready to play music

4  even though you don't actually hear the music.

5      So the fact that a later play command causes audio to come

6  out of all of the speakers is not when the invocation takes

7  place.

8  **Q.**  So what is the consequence of these things, the zone group

9  and the Party Mode option from Sonos' 2005 system, not being

10  zone scenes?

11  **A.**  Yeah.  So when you look at the full evidence, there are

12  not zone scenes in the prior art system and zone scenes are

13  required by the claims.

14  **Q.**  So maybe we could pull your demonstratives back up.

15      And I'd like to ask you to show us that within the

16  language of claim 1 of the '885 patent.

17  **A.**  Yes.

18      Mr. Jay, could you help me get to Slide 106?

19                  (Pause in proceedings.)

20          **THE WITNESS:**  Okay.  So this is the claim again.  And

21  the idea here is there are requirements in most of these

22  limitations here at the end that talk specifically about zone

23  scenes.

24      And because there are not zone scenes in the prior art

25  combinations that Dr. Schonfeld relied on, I would put Xs by

1  all of these limitations not being disclosed by the prior art;

2  and because these limitations aren't disclosed by the prior

3  art, the claims cannot be invalid so they must be valid.

4  **BY MR. SHEA:**

5  **Q.**   And can you show us that in the language of claim 1 of the

6  '966 patent as well?

7  **A.**   Yes.  So similarly in the '966, starting with limitation

8  1.5 where it describes creating a first zone scene and then the

9  rest of the limitations discuss zone scenes, those limitations

10  would not be present in the Sonos 2005 system or in the

11  combinations identified by Dr. Schonfeld.

12  **Q.**   So let's go one step further, though, Dr. Almeroth.  Let's

13  assume that the zone groups in the Party Mode option from

14  Sonos' 2005 system were zone scenes like Dr. Schonfeld says.

15  Even if that was the case, would the limitations of these

16  claims be met?

17  **A.**   No.  There's an additional problem.  Even assuming you had

18  zone scenes, the problem is the Sonos 2005 system and the other

19  combinations Dr. Schonfeld relied on don't have this separation

20  between creation and invocation.

21       The zone groups in the 2005 system in the Party Mode, as

22  soon as they're created, they're also invoked.  That's what it

23  means to have a dynamic group.

24       There was a reference to you press the button for Party

25  Mode and it's created and invoked at that point.  Those are

1  what I also described as atomic actions.  You can really only

2  have Party Mode or a zone group.  You can't have multiple

3  pre-saved groups that exist, and so that separation between

4  creation and invocation does not exist in the Sonos 2005

5  system.

6  Q.  And then can you explain -- sorry.

7      Can you tell us what the implications of that are for the

8  claim 1 of the '885?

9  A.  Sure.  So it's still the case even under -- even assuming

10  that there are zone scenes in the Sonos 2005 system, what that

11  would get you is limitations 1.5 and 1.6 in the '885 patent,

12  but you still wouldn't be able to create a second zone scene

13  and you wouldn't be able to do that while continuously being in

14  standalone mode because the invocation of that zone group, even

15  assuming it's a zone scene, would happen immediately.

16  Q.  How about claim 1 of the '966 patent?  How does that

17  apply?

18  A.  It's very similar to the '885.  The limitations after the

19  request to create the first zone scene, so receiving that

20  second request, and then also invoking the separation required

21  in the '966 that's required by the claim would not be present

22  in the prior art system in combinations.

23  Q.  So I want to take it even one step further, Dr. Almeroth.

24  I want you to now assume, first of all, that the things we've

25  been talking about from the Sonos 2005 system were zone scenes

1  like Dr. Schonfeld says.

2  **A.**   Okay.

3  **Q.**   And I want you to assume that it would have been obvious

4  to save the zone group in Sonos' 2005 system as Dr. Schonfeld

5  also says.

6  **A.**   Okay.

7  **Q.**   Based on those assumptions, would the claims be met?

8  **A.**   No.  Just the fact that you could save the second zone

9  group and even assuming that it was a zone scene, doesn't get

10  you the separation between the creation and the invocation.

11       It allows you to set up a zone group and launch it right

12  away, and then you could save it and then even coming back to

13  it later.  Because you're launching it right away, you're

14  invoking it at the time of creation, you still have the same

15  problems of these limitations not being met in the '885 patent

16  and the same set of limitations that I just identified for the

17  '966 patent.

18  **Q.**   We've been focusing on the independent claims.  How does

19  what we've been discussing apply to the dependent claims?

20  **A.**   So two things.  One is all of the dependent claims require

21  all of the limitations to be met by the prior art in order to

22  be invalid.  And because the independent claims are not

23  invalid -- because the independent claims are valid, then all

24  of the dependent claims would necessarily be valid.

25       In addition, there are a number of requirements in the

1    dependent claims that are not met.  So, for example, one of the

2    claims, claim 6, requires that there not be overlap.  But,

3    remember, Party Mode is all of the players.  It would

4    necessarily have to overlap with another zone group.

5         So there's dependent requirements that Dr. Schonfeld

6    really didn't address that would also keep the claims valid for

7    an additional set of reasons.

8    Q.   Sorry, Dr. Almeroth, I just want to clarify.  I think you

9    said claim 6 requires them to not overlap.  Did you mean not

10   fully overlap?

11   A.   Not fully overlap, that's correct.

12   Q.   Now, did the analysis that you performed and that we've

13   been discussing apply to all of the different prior art

14   combinations that Dr. Schonfeld is relying on?

15   A.   Yes.  When he did his charts, everything but those

16   limitations, I believe it was 1.6 and 1.7 for the '885 patent

17   and then corresponding limitations for the '966 patent, were

18   all in the Sonos 2005 system.  And so all he relied on in the

19   combinations for -- in the knowledge of a person of skill in

20   the art, in Nourse, the Sonos forums, and everything else he

21   presented, my opinions apply equally to all of those

22   combinations.

23   Q.   So I think we talked about the first reason that you had

24   highlighted for your disagreements with Dr. Schonfeld.

25        Now I want to turn to the second reason.  Let's assume

1  that Dr. Schonfeld is right, that all the limitations are met

2  by the combinations he identified.  Does he still have

3  problems?

4  **A.**   Yes, he does, and this goes to my second point with

5  respect to the use of hindsight bias in his analysis.

6  **Q.**   So can you explain to us what you're looking for here?

7  **A.**   Sure.  So the first one would be you have to have a

8  motivation to combine the references to achieve the claimed

9  invention.  There has to be a motivation that he has to

10 describe what that motivation would be.

11 **Q.**   And what perspective does that analysis have to be

12 performed from?

13 **A.**   It has to be done from the level of a person of ordinary

14 skill in the art but, more importantly, it has to be done from

15 the time period in December 2005.  You can't consider it from

16 the perspective of today.  It has to be from 2005.

17 **Q.**   So I want to take a look at something from the trial

18 transcript, Dr. Almeroth.

19        **MR. SHEA:**  So, Mr. Jay, can we pull up 1334, 2 through

20 22?

21                    (Pause in proceedings.)

22 **BY MR. SHEA:**

23 **Q.**   So what do we see here, Dr. Almeroth?

24 **A.**   So Mr. Pak was asking Dr. Schonfeld about his level of

25 ordinary skill in the art, and he didn't mention a timeframe

1  and so the Court actually said (as read):

2          "Now, is the time period important here?"

3      And Mr. Pak said (as read):

4          "I don't -- in terms of relative -- I think I will

5      establish that, Your Honor.  It's not very important."

6      And so -- and then Dr. Schonfeld didn't address a

7  particular time period.

8      So the idea that Dr. Schonfeld and Google believe that the

9  time period is not very important I believe is significant as

10 it relates to hindsight.

11 Q.   So can you give us an example where Dr. Schonfeld has used

12 hindsight bias in his analysis?

13 A.   Yes, I can for each of the three requirements.

14 Q.   Okay.  So maybe we can pull your demonstratives back up.

15                  (Pause in proceedings.)

16 BY MR. SHEA:

17 Q.   Can you talk about the motivation, which is the first

18 bullet?

19 A.   Sure.  So the point I would make here is it's

20 Dr. Schonfeld's burden to identify what the motivation was.

21     There were thousands of different features that existed

22 across all of the different products that existed at the time.

23 And so Dr. Schonfeld didn't provide a motivation for why a

24 person of skill in the art would select that one particular

25 feature out of all of the possible features and modify the

 1    Sonos 2005 system to be able to add storage for the second zone

 2    scene.

 3    **Q.**   And then how about the second bullet here, Dr. Almeroth?

 4    **A.**   There also must be a reasonable expectation of success,

 5    that the proposed invention would have to be something that --

 6            **MR. PAK:**  Your Honor, this -- he does not discuss

 7    reasonable expectation of success in his expert reports,

 8    Your Honor.

 9            **THE COURT:**  Is that true?

10            **MR. SHEA:**  It's untrue, Your Honor.

11            **THE COURT:**  Read to me where it's in the rebuttal

12    report.

13            **MR. SHEA:**  Yeah, it's in rebuttal paragraph 645,

14    Your Honor.

15            **THE COURT:**  All right.  Look at that, Mr. Pak, and see

16    if you agree.

17            **MR. PAK:**  I looked at that paragraph.  I believe this

18    is talking about just the legal standard, but we'd like to take

19    a look at it now.

20                        (Pause in proceedings.)

21            **MR. SHEA:**  It's not the legal standard, Your Honor,

22    and I can --

23            **THE COURT:**  Well, hand it to up me.  Let me see where

24    that appears.

25                        (Pause in proceedings.)

```
 1              MR. PAK:  I have 645, Your Honor.

 2              THE COURT:  Please hand it to Angie and she'll hand it

 3      to me.

 4              MR. SHEA:  Sorry, Your Honor.  I think I might have

 5      typed the wrong one.  One moment please.

 6              THE COURT:  Is this the entire paragraph?

 7              MR. PAK:  Yes, Your Honor.

 8                         (Pause in proceedings.)

 9              THE COURT:  645 does not.

10              MR. SHEA:  I have the wrong one, Your Honor.

11              THE COURT:  That must be the wrong paragraph.

12              MR. SHEA:  Yeah, it is.  I apologize, Your Honor.

13          So it's 685.  Sorry, Your Honor, I.  Wrote it wrong in my

14      notes.

15              THE COURT:  May I see that paragraph?

16              MR. SHEA:  Yes.

17                         (Pause in proceedings.)

18              THE COURT:  685, this is about the Sonos forum post.

19              MR. SHEA:  That's right, Your Honor.  And what he says

20      is he says (as read):

21               "I've seen posts contradicting his theory that a

22          person of ordinary skill in the art would be motivated to

23          replace the functionality with the claimed zone scene

24          functionality."

25          And it says (as read):
```

1          "I've seen other user posts casting doubt on how

2       overlapping zone scenes would have worked.  For

3       instance..."

4       And then he goes on to discuss some evidence right there

5   in his report and then discussing that, and says (as read):

6          "Given this skepticism, it's my opinion that a person

7       of ordinary skill would have been dissuaded from doing

8       this."

9          **MR. PAK:**  Your Honor, this is a motivation of combined

10  opinion, not a reasonable expectation of success opinion.  And

11  we looked.  There's no mention of expectation or success.

12  That's just simply not in Dr. Almeroth's report.

13         **MR. SHEA:**  Your Honor, it says "Casting doubt on how

14  that would have worked."  That is just a different set of words

15  to say there was no reasonable expect expectation of success.

16         **MR. PAK:**  I think if they want to read 685 into the

17  record, that's fine, Your Honor, but this is going beyond

18  what's there.

19         **THE COURT:**  Well, I'm going to let him read it.  Just

20  read -- he can read paragraph 685 --

21         **MR. PAK:**  Thank you.

22         **THE COURT:**  -- from his report into the record, and

23  that will be deemed to be evidence from this witness.

24      Let's just make sure the jury understands.  Do you

25  remember there was some guy named boyG and some posts to a

1    Sonos forum, and this is connected with that general subject.

2        So go ahead.  The witness can read 685.

3        Do you have it handy?

4             THE WITNESS:  I don't, Your Honor.

5             THE COURT:  All right.  You can have it right here.

6             THE WITNESS:  I'm about to have it handy.

7             MR. SHEA:  Your Honor, just quickly, for purposes of

8    time, this has been a lengthy objection we've been discussing,

9    can we get some of that time back?

10            THE COURT:  No, you cannot.

11            MR. SHEA:  Okay.  Thank you, Your Honor.

12            THE COURT:  It's a legitimate point that was raised

13   and it comes out of whoever has the floor.

14       Okay.  Go ahead.  Read that paragraph.

15            THE WITNESS:  (as read):

16            "I have also seen other Sonos forum posts

17       contradicting Dr. Schonfeld's theory that a POSITA would

18       have been motivated to replace Sonos' ad hoc zone group

19       functionality with the claimed zone scene functionality in

20       view of the identified user posts from the Sonos forums.

21       For instance, as explained above, I have seen other user

22       posts from the Sonos forums casting doubt as to how

23       overlapping zone scenes would have worked in the Sonos'

24       system.

25            "For example, even after the claimed conception date

1    opposed from Majik on April 18th, 2006, suggests that

2    there were concerns about potential side effects if" --

3    quote -- "zones can be allowed to be in more than one

4    group.

5        "I have also seen evidence from other Sonos threads

6    suggesting that even in 2016 users thought overlapping

7    zone scenes would have been logically impossible to

8    implement in Sonos' system.

9        "Given this skepticism, it is my opinion that a

10   person of skill in the art would have been dissuaded from

11   modifying the Sonos' 2005 system in view of the identified

12   user posts from the Sonos forum."

13            **THE COURT:**  Okay.  Thank you.

14   **BY MR. SHEA:**

15   **Q.**   So, Dr. Almeroth, I'd also like to take a look at one of

16   these documents, which is TX6958.  Maybe we can pull your

17   demonstratives back up.

18                    (Pause in proceedings.)

19            **THE WITNESS:**  Yeah.  So can you help me get to 115,

20   Mr. Jay?

21   **BY MR. SHEA:**

22   **Q.**   So what -- yeah.  What is this, Dr. Almeroth?

23   **A.**   These are some of those posts that I just referenced in

24   that paragraph, and what they say again is, quote (as read):

25            "Once again, it is logically impossible to have the

1           same speakers in multiple groups."

2           And then the next one says (as read):

3               "As a software developer, I care.  I support creating

4           permanent groups.  I do not support the illogical concept

5           of a speaker belonging to more than one group.  It's

6           stupid."

7   **Q.**   So, you know --

8           **MR. SHEA:**  I'm sorry, Your Honor.  It appears this

9   document has not yet been moved into evidence.  May I please

10  move TX68 -- 6958 into evidence?

11          **THE COURT:**  Any objection?

12          **MR. PAK:**  No objection, Your Honor.

13          **THE COURT:**  Received in evidence.

14          (Trial Exhibit 6958 received in evidence.)

15  **BY MR. SHEA:**

16  **Q.**   So what does this show us, Dr. Almeroth?

17  **A.**   It shows skepticism.  This idea of what the patent covers

18  having zone scenes, multiple zone scenes, overlapping groups to

19  some users didn't sound right.

20          So the idea that a person of skill in the art in 2005

21  would have modified the Sonos system that existed at that time

22  to have these kinds of zone scenes with overlapping groups

23  would have been met by skepticism.  And you have to consider

24  this kind of skepticism in why that would have made the

25  combination suggested by Dr. Schonfeld not obvious.

ALMEROTH - DIRECT / SHEA

1  Q.   So we've been talking here about skepticism.  Have you

2  seen any other evidence of secondary considerations?

3  A.   Yes.  So for the last category, secondary considerations,

4  it's also a factor to determine whether or not the claimed

5  technology has been praised by the industry.

6  Q.   And so can we look at an example starting with TX6780?  So

7  can I have you take a look at that at least in your

8  demonstratives, Dr. Almeroth?  What is this?

9  A.   This is an article from CNN describing the Sonos products

10 that implemented the zone scene technology.

11       MR. SHEA:  Your Honor, I'd like to move TX6780 into

12 evidence.

13       MR. PAK:  No objection, Your Honor.

14       THE COURT:  6780 in evidence.

15       MR. SHEA:  Thank you, Your Honor.

16       THE CLERK:  It is in evidence already.

17       THE COURT:  It's in evidence already.

18       MR. SHEA:  Oh, thank you, Your Honor.

19 BY MR. SHEA:

20 Q.   Can we take a look at that on your demonstratives,

21 Dr. Almeroth?

22 A.   I've got it up.

23 Q.   So what does this tell us?

24 A.   This is saying, an article from CNN, that by far the best

25 feature of Sonos S2 -- that was the product that implemented

 1  the zone scene technology -- is the ability to save a group of

 2  speakers as a preset, and then it goes on and talks about the

 3  benefits of that technology.

 4  **Q.**  And how is this --

 5           THE COURT:  But I have to say this:  It doesn't say

 6  "overlap."  It doesn't say "three or more."  It just says "a

 7  group of speakers as a preset."

 8           THE WITNESS:  Yes, Your Honor.  I can explain.

 9           THE COURT:  All right.  Please do.

10           THE WITNESS:  Yeah.  So in my original testimony, I

11  went through the evidence showing that the speaker grouping

12  technology implemented the claims.  And so when there's a

13  reference to the speaker group technology of Sonos S2, it's

14  referring to what I had already established as what was meeting

15  the requirements of the claims.

16      It's not my understanding that it has to refer to every

17  aspect of the claim but to establish a nexus between the claims

18  and what's being praised here; and because I filled in that gap

19  by saying the "Sonos S2" products --

20           THE COURT:  All right.  This -- I'm going to tell the

21  jury that's not quite right.  The praise is supposed to be of

22  the invention, and here the invention requires three or more

23  and overlapping.  This does not praise that.  It praises

24  something that may be in the same ballpark but it's a group of

25  speakers as a preset.

1          MR. SHEA:  Maybe I can at least just ask the witness,

2    Your Honor.  I understand that this doesn't say those

3    additional things.

4    BY MR. SHEA:

5    Q.   Did the Sonos' implementation of the saved grouping allow

6    for overlapping groups?

7    A.   Yes.  What's being referred to here, even though it

8    doesn't mention it specifically, is referring to the technology

9    in Sonos' system that included overlapping groups as an

10   example.

11   Q.   So maybe we can just look at one other example,

12   Dr. Almeroth.  If we can go to TX6787, if you have a slide on

13   that.

14   A.   Yes, so 6787 is here.

15   Q.   Okay.  And, sorry, I may have skipped it.  Actually, let's

16   look at 6788.  I think that was back one.

17   A.   That was back one.

18   Q.   Yeah.

19   A.   Yes.

20   Q.   Can you tell us what we're looking at here?

21   A.   Yeah.  So this is from TechHive, an article describing

22   again the functionality of the Sonos system at the time, and it

23   talks about a new feature called room groups could be very

24   useful.  It talks about remembering frequently grouped speakers

25   such as upstairs, downstairs, front of house, and back of

1    house.  So you don't need to repeatedly create those scenarios.

2        And, again, I believe it's describing the functionality

3    that Sonos had implemented that was the claimed technology.

4        **MR. SHEA:**  So, Your Honor, I would also like to move

5    TX6788 into evidence?

6        **MR. PAK:**  No objection, Your Honor.

7        **THE COURT:**  Received.

8        (Trial Exhibit 6788 received in evidence.)

9    **BY MR. SHEA:**

10   **Q.**   So, Dr. Almeroth, what are the implications of this kind

11   of evidence?

12   **A.**   It shows that there were secondary considerations that

13   demonstrate that the combinations suggested by Dr. Schonfeld

14   would not have been obvious.

15   **Q.**   And so based on all the analysis you have done, what is

16   your conclusion as to whether the patents are valid?

17   **A.**   It's my conclusion that the patents are valid in the face

18   of the evidence that Dr. Schonfeld tried to present that the

19   claims are not valid.  I believe considering that evidence,

20   considering the arguments that I've offered, the claims are

21   actually valid.

22   **Q.**   And then maybe one last thing, Dr. Almeroth.  Is there

23   something we can look at that really crystallizes the validity

24   of the patents as compared to the arguments Google is making?

25   **A.**   Yes.

```
 1        So, Mr. Jay, if you go back to Dr. Schonfeld's
 2   demonstratives I believe it was Number 60.
 3                    (Pause in proceedings.)
 4   BY MR. SHEA:
 5   Q.   What does this show us?
 6   A.   This is Dr. Schonfeld saying that the Sonos 2005 system
 7   had the entirety of the alleged invention except for the saving
 8   of the second group.  And I think it's pretty clear that there
 9   were not zone scenes in the Sonos 2005 system.
10        And that even getting to the combination suggested by
11   Dr. Schonfeld, shows hindsight bias; and so for those reasons I
12   think that the claims in this case are valid.
13   Q.   Thank you, Dr. Almeroth.
14             MR. SHEA:  I pass the witness.
15             THE COURT:  All right.  Thank you.
16        Cross-examination.
17             MR. PAK:  Yes, Your Honor.
18             THE COURT:  Remember, your time is limited, Mr. Pak.
19             MR. PAK:  Yes, Your Honor.  I'm ready to begin.  May I
20   proceed?
21             THE COURT:  Please.
22                      CROSS-EXAMINATION
23   BY MR. PAK:
24   Q.   Good morning, Dr. Almeroth.
25        I want to jump right in.  How much have you been paid by
```

1    Sonos for your work in this litigation so far?

2    **A.**    I don't recall.

3    **Q.**    It's about 280,000 plus?  Does that sound right?

4    **A.**    Yes.

5    **Q.**    Okay.  You have represented Sonos in multiple cases;

6    correct?

7    **A.**    I have.  I believe three at this point, including this

8    one.

9    **Q.**    You've been paid around a million dollars for -- by Sonos

10   for your litigation consulting work, ballpark?

11   **A.**    That sounds about right.

12   **Q.**    And roughly half of your income comes from litigation

13   consulting work generally; correct?

14   **A.**    It does sometimes.

15   **Q.**    But how much you are being compensated has no effect, you

16   believe, on your independent judgment in this case; correct?

17   **A.**    No, absolutely not.

18   **Q.**    And the same would true hold for Dr. Schonfeld; correct?

19   **A.**    I can't speak for Dr. Schonfeld.

20   **Q.**    Well, you're not suggesting that he's not a qualified

21   expert in this case; correct?

22   **A.**    No, I'm not suggesting that.  It's not my job to offer

23   that kind of testimony.

24   **Q.**    All right.  I want to turn to the Lambourne declaration,

25   which is TX3923.

 1                    (Pause in proceedings.)

 2          THE WITNESS:  Do you have a copy of it.

 3   BY MR. PAK:

 4   Q.    I'm going to show it.  It's already in evidence.

 5          Now, this is the declaration that you were pointing out

 6   where he talked about the Party Mode being hardcoded and you

 7   provided some more context.  Do you recall that?

 8   A.    Yes, I do.

 9   Q.    I just want to jump to the second-to-the-last page at 7,

10   and then actually if you keep going to 7, last page.

11          Do you see that this was executed or signed on

12   February 20th, 2023?  Do you see that?

13   A.    I do.

14   Q.    All right.  So now -- so this is earlier this year;

15   correct?

16   A.    That's correct.

17   Q.    Okay.  So we have his declaration, which is basically a

18   written testimony, on February 20, 2023.

19          I want to show you now, if we can pull up DDX10.52.  This

20   was a question I was asking Mr. Lambourne about a historical

21   document that goes back to December of 2005.  Do you understand

22   that?

23   A.    Yes, I do.

24   Q.    So this statement Party Mode that currently ships with the

25   product is one example of a zone scene where he said yes.  He

1  was talking about a December 2005 document around the time that

2  he says he conceived of the ideas.  Do you understand that?

3  A.   That's the document you were asking about.

4  Q.   Yeah.

5         MR. PAK:  Let's just bring that up, TX6544.

6                  (Pause in proceedings.)

7  BY MR. PAK:

8  Q.   This is for the jury's benefit TX6544, the Sonos UI

9  Specification Clock and Alarm Clock.  Do you see that?

10  A.   I do.

11  Q.   If you scroll down, it says "Additional ideas.  Zone

12  scenes," page 27.  Do you see that?

13  A.   That's correct.  He was still in the process of figuring

14  out what zone scenes would look like.

15  Q.   Doctor, just answer my questions, please.

16        If you go to pages 27 --

17  A.   I did, Mr. Pak.  I'm sorry.  I did.

18  Q.   So let's go to page 27.  This is the place where in

19  December of 2005 he wrote "Party Mode that currently ships with

20  the product is one example of a zone scene"; correct?  Yes or

21  no.

22  A.   I think you got part of that information wrong about the

23  date of the document.

24  Q.   "Party Mode that currently ships with the product is one

25  example of a zone scene," he wrote that in this document;

1    correct?

2    A.    That's what he said and then later said he didn't think it

3    was accurate.

4    Q.    Let me see what he says about that.

5          MR. PAK:  Let's pull up the trial transcript and this

6    is on page 627.  I asked him this very question at trial (as

7    read):

8          "QUESTION:  If you can answer my question, Mr. Lambourne.

9          Between your recollection sitting here today trying to

10         remember what happened 17 years ago versus a business

11         record that you created last modified January 19th, 2006,

12         in your opinion, which is a better and more reliable

13         source of what actually happened in the January timeframe

14         of 2006?

15         "ANSWER:  And the document -- the document would be more

16         reliable."

17   BY MR. PAK:

18   Q.    That was his sworn testimony that all of us heard;

19   correct?  Yes or no, please.

20   A.    That's what he said at that point in time.

21   Q.    Thank you.

22         That was what he also said here in court; correct?

23   A.    That's what he said in court.

24   Q.    Yes.

25   A.    He also provided some context for it.

1           THE COURT:  He's entitled to get a straight answer to

2   his question.

3           MR. PAK:  Thank you, Your Honor.

4           THE COURT:  Please go ahead.

5   BY MR. PAK:

6   Q.   Yes, so now we addressed that issue.

7        And your -- turning to the infringement issues in this

8   case, you were here, Doctor, when His Honor indicated that the

9   claims in both the '885 and the '966 patent required three or

10  more zone players; correct?  You heard that?

11  A.   I don't recall if that's exactly what he said.

12  Q.   It's going to be His Honor's job to instruct the jury on

13  exactly what is required by these claims; correct?

14  A.   I believe that's correct.

15  Q.   But the infringement opinions you provided to this jury is

16  that a single Google speaker can infringe the '885 patent even

17  when there are no other speakers connected to a network;

18  correct?

19  A.   I believe that's what the actual requirement of the claim

20  is for the claim that's already been determined to infringe.

21  Q.   It's His Honor's job to tell the jury what the claims

22  require and do not require.  You understand that?

23  A.   It's up to His Honor to say what he's going to say to the

24  jury.

25  Q.   Now, with a single Google speaker, no other speakers

1  connected to the network, it's not physically possible to form

2  two overlapping zone groups; correct?

3  **A.**    Not physically possible but it still does have that source

4  code.

5  **Q.**    You also presented to the jury that the Google Home app

6  infringes the '966 patents when it is installed on a phone even

7  though there are no Google speakers connected through a network

8  to that phone; correct?

9  **A.**    That's correct, because the claim requires the existence

10  of that functionality, that source code, those programmed

11  instructions, to be there.

12  **Q.**    Again, it's His Honor's job to instruct the jury on what

13  the claims require and don't require; correct?

14  **A.**    It will be up to His Honor.

15  **Q.**    If there are no speakers connected to the network to the

16  phone, you cannot physically form two overlapping groups of

17  speakers; correct?

18  **A.**    You won't use that source code if there aren't the

19  speakers to group.

20  **Q.**    Let's go to some of the praise documents.

21        **MR. PAK:**  Let's go to PDX8.118.

22                    (Pause in proceedings.)

23  **BY MR. PAK:**

24  **Q.**    Again, I'm just asking about what the words say.

25        The words in this document that you showed us do not talk

1    about overlapping zone scenes; correct?

2    **A.**    Not specifically.

3            **MR. PAK:**  PDX8.119.

4    BY MR. PAK:

5    **Q.**    Again, this document, the words do not say "overlapping

6    zone scenes"; correct?

7    **A.**    They don't say the words specifically but that's the

8    functionality it's referring to.

9    **Q.**    Well, let's look at the functionality:  Upstairs,

10   downstairs, front of the house, back of the house.  You could

11   create groups of speakers that are upstairs, downstairs, front

12   of the house, back of the house without necessarily creating

13   overlapping groups; correct?

14   **A.**    It's possible but I think in the context of what this is

15   describing, in the technology it's describing you certainly

16   could.

17   **Q.**    Nothing in this document explicitly says anything about

18   overlapping zone scenes.  Those words do not appear; correct?

19   **A.**    Those words do not appear, I will agree with you that far.

20           **MR. PAK:**  Let's go to PDX8.120.

21   BY MR. PAK:

22   **Q.**    Again, this document on its own does not say anything

23   about overlapping zone scenes; correct?

24   **A.**    Give me one second to read it.

25       (Witness examines document.)  Not explicitly, but I think

1    the concept is there.

2            MR. PAK:  Let's go to PDX8.121.

3    BY MR. PAK:

4    Q.   This document, again, does not say anything explicitly

5    about overlapping zone groups; correct?

6    A.   Not explicitly but it's describing the implementation of

7    the functionality in the invention.

8            MR. PAK:  Now, let's take that down.

9    BY MR. PAK:

10   Q.   You criticized Dr. Schonfeld because he didn't offer

11   opinions about what one of ordinary skill in the art in 2005

12   would have found obvious?  Was that your critique?

13   A.   No.  Just that both you and he said it wasn't an important

14   consideration.

15   Q.   I don't think I said that.

16       Now let's look at Volume 8, page 140 -- this is in the

17   trial transcript -- 1423.  Let's go to page 22 [sic].  I asked

18   him (as read):

19           "How difficult would it have been back in 2005

20       timeframe to a person of ordinary skill in the art to make

21       the modification of saving one of the extra groups that

22       was provided for in that system?"

23       Do you see that, sir?

24   A.   I do.

25   Q.   And the answer he gave is (as read):

1          "It would be a trivial step in my view, and I can

2      explain why."

3      Do you see that?

4  **A.**   I do.

5  **Q.**   And then he provides his explanation; correct?

6  **A.**   He does.  He says "in my view."

7  **Q.**   Sir, I was asking him multiple questions during this trial

8      about what one of ordinary skill in the art would have

9      considered obvious back in 2005.  You heard that; correct?

10 **A.**   I did.  Sometimes you did.  Sometimes you asked without a

11     timeframe.

12 **Q.**   I apologize if I have missed a few questions, but you

13     certainly heard, the jury heard Dr. Schonfeld provide his

14     obviousness opinions from the 2005 timeframe; correct?

15 **A.**   Only some of the time was he asked.

16 **Q.**   Some of the times that was addressed; correct?

17 **A.**   Some of the times.

18 **Q.**   All right.  Now, I want to go to the Sonos forum posts.

19     The Sonos forum posts that are dated before December 21,

20     2005, you understand that is prior art; correct?

21 **A.**   I haven't disputed that they're prior art.

22 **Q.**   That's right.  And His Honor will instruct the jury on

23     what is and what is not prior art in terms of their dates;

24     correct?

25 **A.**   I believe he will.

1  Q.   All right.

2           MR. PAK:   Now, let's take a look at I believe this

3  is TX6958.

4                     (Pause in proceedings.)

5  BY MR. PAK:

6  Q.   This is a document where you said (as read):

7           "I would have been able to look at this document and

8       see some users who called the idea stupid."

9       Do you recall that?

10 A.   I do.

11 Q.   Now --

12 A.   I think it was this one.  I'm not sure.  I don't see it.

13 Q.   Well, let's just look at the date at the top.  Nine years

14 ago, do you see that?

15 A.   Yes, I do.

16 Q.   Back in 2016, that's what you showed us in the

17 demonstrative; correct?

18 A.   That's correct.

19 Q.   This is what users were saying in 2016 not what users were

20 saying back in 2005; correct?

21 A.   That's correct, in this document.  I showed another one

22 that was earlier, and so it's establishing the track record of

23 skepticism.

24 Q.   2016 is not 2005; correct?

25 A.   It is not.

1    Q.   And we were supposed to be looking at what one of ordinary

2    skill in the art would have been motivated to do and have

3    expectation of success back in 2005 time period not what users

4    may be saying in 2016; correct?

5    A.   I would agree with the first part of that question.   I

6    would disagree with the second part.

7    Q.   You just told us a minute ago that it was important to

8    look at the timeframe.   You got to look at 2005.   You're

9    showing us forum posts from 2016; correct?

10   A.   I do.   I think it's cumulative.   It helps understand what

11   a person at the time would have thought.

12   Q.   Dr. Almeroth, 2016 forum posts are not prior art, you

13   agree?

14   A.   No, they're not, but they can still go to the question of

15   hindsight.

16   Q.   Well, let's look at some of the posts in this very thread

17   in 2016 that you didn't show us.

18       So let's take a look at page 2 of this a document.

19       MR. PAK:   And, Mr. Fisher, if we could pull up the

20   John Canter post in 2016.

21   BY MR. PAK:

22   Q.   (as read):

23           "Surely as a" -- this is from John Canter, one of the

24       posters -- "Surely as a software developer, you would know

25       that if there is an illogical concept, then software can

ALMEROTH - CROSS / PAK

1    be programmed to deal with it."

2    Do you see that?

3  **A.**  I do.  I haven't read the whole thing yet.

4  **Q.**  You didn't read this whole thing before you presented it

5  to the jury?

6  **A.**  No.  Just since you've shown it to me now, I'm just trying

7  to understand the context of the portion you're reading right

8  now.

9  **Q.**  Of course.

10  **A.**  So if you give me a second.

11  (Witness examines document.)  Yes, okay, I see that.

12  **Q.**  And he goes on to say, at the end he says (as read):

13    "It is not a difficult concept really."

14  Do you see that?

15  **A.**  Yes, but you have to understand what the --

16  **Q.**  That's all I'm asking.  I'm limited on time, Doctor.  If

17  counsel wants to ask you questions, he can.

18  I'm asking --

19  **A.**  You've not read the rest of it.

20  **Q.**  Mr. John Canter says (as read):

21    "It is not a difficult concept really."

22  Do you see that?

23  **A.**  I do.

24  **Q.**  And then let's look at one more.  And the jury will have

25  the rest and they can take a look as well, but let's look at

1    the last one at page 5 that I want to talk about.

2        There's a user name Chewy Waffles.  He's one of the post

3    users back in 2016 not 2005.  Do you see that?

4    A.   Yes.

5    Q.   And he says (as read):

6            "Wow" --

7        This is 2016.  Remember, Sonos came up with the idea in

8    2005 but they didn't release the feature until 2020; correct?

9    A.   That's correct.

10   Q.   So this is 2016 when Sonos had not implemented the zone

11   scenes technology that's covered by these two patents; correct?

12   A.   In 2016 they hadn't yet implemented it.

13   Q.   And look at what Mr. Chewy Waffles says (as read):

14           "Wow.  I'm greatly disappointed that this wasn't a

15        basic feature right out of the gate.  I just got my second

16        Play 1 and planned on getting a third to group them up in

17        interesting ways, but I'm rethinking this.  This reeks of

18        lack of competition that this hasn't been implemented."

19       That's what he said; correct?

20   A.   Yes.  So the "this" there --

21   Q.   That's all I'm asking.

22   A.   You are asking me what he's saying, and I'm trying to

23   describe it.

24           THE COURT:  Make your point.

25           THE WITNESS:  Yeah.  So in 2016 he says "This wasn't a

1    basic feature."  He couldn't have been talking about the

2    functionality that was released in 2020.  He's talking about

3    something else that there's no context for by just reading

4    this.

5    BY MR. PAK:

6    Q.   Doctor, this is in the same thread that you were using to

7    talk about, quote, "skepticism of overlapping zone scenes."  Do

8    you understand that?

9    A.   No.

10         MR. PAK:  Let's go up to the top at the very top.

11   Just go to the first page of this document, please, Mr. Fisher.

12   BY MR. PAK:

13   Q.   (as read):

14         "Party Mode is a problem.  We need to create multiple

15         groups of rooms."

16         Do you see that, sir?

17   A.   I do.

18   Q.   This is the same thread that you have presented as part of

19   your skepticism evidence; correct?

20   A.   It's part of the same thread but you haven't established

21   what the "this" is that he's talking about in that post.

22   Q.   The jury will be able to understand and read this exhibit,

23   do you understand that, that now it's been introduced into the

24   record?

25         Now, Doctor, on the -- one of the things that you said

1  during trial that I want to hit very quickly is you told the

2  jury -- and let's take a look at trial testimony 676, line 22.

3  You were asked (as read):

4      "QUESTION:  How do the '885 and '966 patents relate?

5      "ANSWER:  They are part of what's called a continuation

6      chain.  So they date back over time where patents were

7      filed with the same specification and they have different

8      sets of claims at the end; but the description of the

9      invention, what the specification is, columns in it, the

10     figures, that's all the same."

11     That's what you told this jury; correct?

12  A.  That's correct, that the '885 patent and the '966 patents

13  as issued have the same specification and figures.

14  Q.  But you would agree with me that the earlier patents that

15  led to these patents, the continuation chain, have patents that

16  do not have the same figures and there's differences in the

17  descriptions of the inventions?  You would agree?

18  A.  I understand there are some differences.  I haven't

19  offered opinions about what those differences were from the

20  earlier patents.

21  Q.  Take a quick look at TX6667.  Do we have the binder?

22      MR. SHEA:  Your Honor, I'm going to object to this.

23  When this was raised yesterday, Your Honor, said that if there

24  was an issue as to an inconsistency in Dr. Almeroth's

25  testimony, Mr. Pak could get into this.  There has not been an

1   inconsistency.  He's answered Mr. Pak's question that there

2   could be differences, he's not prepared to answer opinions

3   about it.

4        It's outside of the scope of the issues that are going to

5   go to the jury in this case, Your Honor.

6           MR. PAK:  Your Honor, he says "So they date back over

7   time where the patents were filed with the same specification

8   and they have different claims at the end."

9           MR. SHEA:  Your Honor, we just saw that statement.  It

10  was clearly in the context of a question about the '885 and

11  '966 patent, and he was simply referring to that those two

12  patents have the same specification.

13          THE COURT:  I'm going to say to the jury to cut

14  through all of this the '885 and '966 being more recent, they

15  do have the same specification, but there are differences that

16  may be important between that specification and the original

17  one that was filed back in 2005 and they are not the same.

18          MR. PAK:  Thank you, Your Honor.

19  BY MR. PAK:

20  Q.   I'm going to move on in the interest of time.

21       Now, you and I both agree that the Sonos 2005 prior art

22  system source code was not submitted to the patent examiner for

23  review in the context of these two patents; correct?

24  A.   It was not.

25  Q.   And, in fact, sir, you, yourself, couldn't get a working

1  version of the Sonos 2005 prior art system because Sonos

2  couldn't give it to you; correct?

3  A.   I didn't need one.

4  Q.   But you know that we asked for it, Google did?  Do you

5  understand that?

6  A.   I do.  I thought that was a bit of a strange request.

7  Q.   But you know that Sonos told Google "We don't have one

8  because it's an old product"?  Do you know that?

9  A.   I believe that's correct.

10 Q.   But you know, based on Mr. Millington's testimony, that

11 they did test the Sonos 2005 system back when it was released

12 in January of 2005.  You heard that testimony?

13 A.   Yes, 18 years ago.

14 Q.   And none of those tests of the Sonos 2005 system were

15 submitted to the patent examiner for review in the context of

16 these two patents; correct?

17 A.   No, not the tests.  The functionality was.

18 Q.   The tests were not submitted; correct?

19 A.   The tests weren't.  The functionality was.

20      MR. PAK:  Pass the witness, Your Honor.

21      THE COURT:  All right.  Anything more for this

22 witness?

23      MR. SHEA:  Yes, Your Honor.  I'm getting my notes

24 together here.

25      THE COURT:  You have a total of ten minutes left.

1          **MR. SHEA:**  Thank you, Your Honor.

2                    <u>**REDIRECT EXAMINATION**</u>

3    **BY MR. SHEA:**

4    **Q.**   Dr. Almeroth, Mr. Pak asked you some questions about a

5    document that Mr. Lambourne wrote in 2005-2006 timeframe.  Do

6    you remember that?

7    **A.**   Yes.

8    **Q.**   I want to take a look at a different document he wrote

9    around that time.

10         **MR. SHEA:**  So, Mr. Jay, can I have you pull up TX6545?

11                    (Pause in proceedings.)

12         **MR. SHEA:**  And this is a document that's already been

13   entered into evidence.  Can I have you go to the second page,

14   Mr. Jay?  And blow up the introduction section for us.

15   **BY MR. SHEA:**

16   **Q.**   So what does this say, Dr. Almeroth?

17   **A.**   Right.  So this was the UI spec that came out in

18   December 21st, 2005, that helps establish conception of the

19   invention.  And that first paragraph says (as read):

20              "The zone scene feature allows the user to arrange

21         the zones into groups using one single command.  It's

22         similar to the current Party Mode setting that's

23         available; however, the zone scene feature is much more

24         flexible and powerful.  It's describing that the zone

25         scene is an invention, an evolution beyond what existed in

1          the Sonos 2005 system."

2     Q.    So why is this important, Dr. Almeroth?

3     A.    This is important because I think it directly contradicts

4     Dr. Schonfeld's opinion that the Sonos 2005 system had all of

5     the limitations but saving the second group.

6               MR. SHEA:    And I'd also like to pull up some testimony

7     from Mr. Lambourne on this document.  Can I have you go to

8     461:24 through 462:3, Mr. Jay?

9     BY MR. SHEA:

10    Q.    So if you look at this, Dr. Almeroth, starting at line 24,

11    what does this tell us?

12    A.    Right.  So he was saying:  In your head, in your mind, if

13    you think of the zone scene specification, the one that I just

14    talked about, and the alarm clock specification on the other,

15    that Mr. Pak showed me, which would you consider a more

16    accurate description of your zone scene technology?  And he

17    said:  The zone scene specification, the one that you just

18    showed me.

19    Q.    Okay.  So why is that important, Dr. Schonfeld --

20    Dr. Almeroth?

21    A.    It's important because the zone scene specification

22    describes what the differences were, what the innovation was

23    above and beyond what the -- what the Sonos 2005 system

24    described, and I think that's the accurate description.

25    Q.    Did Mr. Lambourne think he had an innovation here?

1   **A.**   Yes, he did.

2   **Q.**   Okay.  You know, Mr. Pak also asked you some questions

3   about those Sonos forum posts.  He made a big deal about the

4   fact that one of them was from 2016, I heard that.

5        What is -- if a person in 2016 is still struggling to

6   conceptualize how feasible this would be, is that reflective of

7   how somebody in the 2005 frame would view it?

8   **A.**   Yes.  I think the continued skepticism even into 2016 and

9   evidence from 2016 shows that the skepticism would have existed

10  even in 2005.

11  **Q.**   So maybe we can look at something else on this.

12        **MR. SHEA:**  Can we pull up Dr. Almeroth's

13  demonstratives?  And can we go, Mr. Jay, to page 8.14?

14                    (Pause in proceedings.)

15  **BY MR. SHEA:**

16  **Q.**   So, Dr. Almeroth, this --

17        **MR. PAK:**  Your Honor, I think this is starting to go

18  beyond cross now or beyond my cross.  We're talking about a

19  different document.

20        **THE COURT:**  Is that true?

21        **MR. SHEA:**  Your Honor, this -- he asked him about the

22  forum posts from the 2006 timeframe, and this is a document

23  that has been raised by both sides and I'd just like to ask the

24  statement from Dr. Almeroth on it.  It goes directly to the

25  issue.

1        **THE COURT:**  All right.  Go ahead.

2   BY MR. SHEA:

3   Q.   So what does this show us, Dr. Almeroth?

4   A.   Basically this is another forum post from April 18th,

5   2006, in that exact timeframe and this is evidence also of

6   skepticism.  So another poster says (as read):

7            "Now this brings an interesting question:  Should

8        zones be allowed in more than one group?  If this is

9        allowed, aren't there unwanted side effects with this?"

10       So this is similar skepticism evidence but also from 2006.

11       **MR. SHEA:**  And I believe this is already in evidence,

12  Your Honor; but in an abundance of caution, I'd like to ask to

13  move TX2425 into evidence.

14       **MR. PAK:**  No objection, Your Honor.

15       **THE COURT:**  2425 in evidence.

16       (Trial Exhibit 2425 received in evidence.)

17       **MR. SHEA:**  Thank you.

18  BY MR. SHEA:

19  Q.   So why is this important, Dr. Almeroth?

20  A.   This establishes skepticism with direct evidence all the

21  way back to 2006 and continuing on for more than a decade.

22  That shows that there are secondary considerations and reasons

23  why it would not have been obvious to modify the Sonos 2005

24  system.

25  Q.   And so then, Dr. Almeroth, can I also have you flip ahead

1    a few slides to those secondary considerations?

2    **A.**    (Witness examines document.)   Yes.

3    **Q.**    So maybe we can go -- one of those, I believe it's TX6788,

4    there were some references to I think four different groups

5    that could have been created there.  Do you see that?

6    **A.**    Yes.

7    **Q.**    And I think it says upstairs, downstairs, front of house,

8    back of house.  Do you see that?

9    **A.**    Yes.

10   **Q.**    And if you had an upstairs and a front of house or back of

11   house group, does that tell you that there would be overlap

12   there?

13   **A.**    There would very likely be overlap.  Mr. Pak asked if it

14   was possible there wouldn't be overlap; but based on reading

15   this, it's very likely that there would be overlap.

16   **Q.**    And then how about can we go to the one slide forward?

17   Mr. Pak asked you about this one on his cross as well, and I

18   see here that there's discussion of -- sorry, my notes here

19   were just --

20          **MR. SHEA:**  You know, Your Honor, I realize this one

21   didn't get into evidence so I'd like to move into evidence

22   TX6787.

23          **THE COURT:**  Any objection?

24          **MR. PAK:**  No objection, Your Honor.

25          **THE COURT:**  Received in evidence.

1          (Trial Exhibit 6787 received in evidence.)

2     BY MR. SHEA:

3     Q.   So, Dr. Almeroth, the last thing I want to just ask you

4     about is Google and Dr. Schonfeld have spoken a lot about these

5     Sonos forum posts, and let's -- they want -- you know, they

6     mentioned on your cross that they're prior art.

7          You know, if one were to combine Sonos' 2005 system with

8     these forum posts, would that disclose all the limitations of

9     the claims?

10    A.   No, it doesn't.  So I had presented evidence that the

11    Sonos 2005 system that Dr. Schonfeld relied on for zone scenes

12    doesn't disclose zone scenes.  The forum post doesn't solve

13    that problem and it's not something Dr. Schonfeld relied on.

14         All he relied on the forum posts for was saving the second

15    group, and that's where he said, "Oh, that would be trivial.

16    You could just store those groups."  But he never described

17    relying on the zone scenes or creating zone scenes from the

18    forum posts and modifying the Sonos 2005 system.

19         If he's incorporating more of the forum posts into the

20    Sonos 2005 system, that creates all sorts of additional

21    complications that he never got anywhere close to addressing.

22    Q.   Thank you, Dr. Almeroth.

23         MR. SHEA:  I'll pass the witness, Your Honor.

24         THE COURT:  All right.  Just a second.

25                   (Pause in proceedings.)

```
 1            THE COURT:  You have a grand total of 7 minutes left.

 2            MR. PAK:  We will use it wisely, Your Honor.

 3            THE COURT:  You want to use it all up on this witness

 4    or part of it, go ahead but 7 minutes.

 5            MR. PAK:  Thank you, Your Honor.

 6            THE COURT:  The other side has 1 minute left.

 7                          (Laughter)

 8            MR. PAK:  We're getting close, Your Honor.

 9            THE COURT:  We're getting close.

10            MR. PAK:  All right.  May I proceed, Your Honor?

11            THE COURT:  Yes.

12            MR. PAK:  Can I hand up a document?

13            THE COURT:  Yes.

14                      RECROSS-EXAMINATION

15    BY MR. PAK:

16    Q.   Doctor, we -- I've handed you TX2651, that's the

17    provisional application.  Do you understand that?

18    A.   I think so.

19            MR. PAK:  I'd like to move this into evidence,

20    Your Honor.

21            THE COURT:  What's the exhibit number?

22            MR. PAK:  2651.

23            THE COURT:  Any objection?

24            MR. SHEA:  No objection to moving it in, Your Honor.

25            THE COURT:  Thank you.  In evidence.
```

1        (Trial Exhibit 2651 received in evidence.)

2   BY MR. PAK:

3   Q.   Sir, isn't it true, if we look at page 49 of 95, this

4   is -- if you go flip one more page before -- this is talking

5   about the zone scenes -- one of the zone scenes UI

6   specifications.  Do you see that?

7            MR. PAK:  And I'm actually in Appendix B, Mr. Fisher.

8   So page TX2651, page 51.

9                      (Pause in proceedings.)

10  BY MR. PAK:

11  Q.   Then if we go to 49, do you see that this is a version of

12  the alarm clock UI specification that Mr. Lambourne wrote?

13  A.   Give me a second.  You sort of jumped around so you're

14  just asking about --

15  Q.   Just the table of contents.

16  A.   Okay.  I think the next page says that it's the Sonos UI

17  specification for the alarm clock.  So that's not here, but I

18  think that's what this is.

19  Q.   Okay.  So go to the page before.

20       So this is the version of the UI specification that was

21  actually submitted to the Patent Office as part of these two

22  patents, but do you see that it leaves out the section on zone

23  scenes altogether?

24            MR. SHEA:  Objection, Your Honor.  Again, I don't see

25  the relevance of this discussion at this point.  We're now

```
 1   talking about what was and wasn't submitted to the Patent

 2   Office.  This has no relevance to the issues that are going to

 3   the jury in this case.

 4          THE COURT:  Well, it relates -- all right.

 5      What's your answer to that?

 6          MR. PAK:  It obviously relates, Your Honor, to what

 7   was before the Patent Office with respect to the Sonos 2005.

 8          MR. SHEA:  Your Honor, I think there's no dispute what

 9   was in front of the Patent Office in the 2005 system.  The

10   manual for the products was in front of the Patent Office.

11   They are fully aware of what was in front of them.

12          THE COURT:  Overruled.

13      Please answer the question.

14   BY MR. PAK:

15   Q.   The zone scene section for the alarm clock UI

16   specification was left out when this document was submitted to

17   the Patent Office; correct?

18   A.   I'm not -- not sure what you mean "left out."  Left out of

19   what document?

20   Q.   Left out of the original version of the alarm clock UI

21   specification that we've seen from Mr. Lambourne, correct?

22   A.   You'd have to show that to me.  I don't have that

23   memorized.

24   Q.   I'm just asking really quickly here.  You don't see any

25   mention of the section titled "Zone Scenes" in this document;
```

1  correct?

2  **A.**    In which document?

3  **Q.**    The Table of contents, what's shown on the screen, there's

4  no zone scenes there?

5  **A.**    (Witness examines document.)   I don't see the word "zone

6  scene" in the Table of Contents.

7  **Q.**    Thank you.

8         **MR. PAK:**  Pass the witness?

9         **THE COURT:**  All right.   Anything more?

10        **MR. SHEA:**  Yes, Your Honor.   I do have one follow-up

11  question.

12        **THE COURT:**  Okay.

13        **MR. SHEA:**  Could we get that document right back up?

14        **THE COURT:**  Okay.

15        **MR. SHEA:**  Mr. Jay, could you go to about the 20th

16  page of this document?   Flip forward a little bit until we get

17  to Appendix A.

18                  <u>**FURTHER REDIRECT EXAMINATION**</u>

19  BY MR. SHEA:

20  **Q.**    Okay.   So I don't think Mr. Pak showed you this, but just

21  to be clear, Dr. Almeroth, what is this showing us?

22  **A.**    So this is the Sonos UI specification on zone scenes.

23  This was Appendix A.   He just asked me about Appendix B.

24  **Q.**    Okay.   And this was also part of the provisional; correct?

25  **A.**    Yes, I believe it is.

1        **MR. SHEA:**  Thank you.

2        **THE COURT:**  All right.  Can we let the witness step

3   down?

4        **MR. PAK:**  Yes, I believe so.

5                        (Witness excused.)

6        **MR. PAK:**  And I believe this might be end of your

7   rebuttal case?

8        **MR. SHEA:**  That is right, Your Honor.

9        **THE COURT:**  All right.  What we're going to do is take

10   a break at this point.  The jury has been going more than

11   90 minutes.

12      Thank you.  We're almost done with the evidence, but we

13   have a little bit more to go.

14      Let me ask this a question, though:  Ms. Brockett, I think

15   if I recall correctly, isn't today the day you have an airplane

16   flight?

17        **JUROR BROCKETT:**  That's not me.  That's --

18        **THE COURT:**  I can't hear you.

19        **JUROR BROCKETT:**  No.  Mine is on Monday.

20        **THE COURT:**  All right.  I'm sorry.  Is tomorrow the

21   day, though?  But was there somebody else that has an airplane

22   flight tomorrow.

23        **JUROR CAMERON:**  I do.

24        **THE COURT:**  You do.  And what time is your flight

25   tomorrow?

1    **JUROR CAMERON:**  4:30 or 5:00.  I'm not sure.

2    **MR. PAK:**  4:30, 5 o'clock is what she's saying.

3    **THE COURT:**  Oh, 4:30-5:00.  Okay.  So you would not be

4  able to stay very late tomorrow anyway.

5    **JUROR CAMERON:**  No.

6    **THE COURT:**  All right.  I need to think about that.

7       Did you-all discuss what you would prefer to do if it

8  works out in terms of hearing and how late you would stay

9  tomorrow, and so forth?  Have you discussed that yet?

10    **JUROR PRUITT:**  We will be able to stay until about

11  2:00 o'clock.

12    **THE COURT:**  2:00.  Okay.  I appreciate that input very

13  much.

14       And I may be the problem because I have to instruct you on

15  what the law is, and I'm still working on it.  And I'm close

16  but I'm still working on it, and I need to give the lawyers a

17  fair opportunity to complain about what I would say to you and

18  help me improve upon it, and so -- we still might work it out

19  so that it happens tomorrow, but I want you to protect those

20  later days, those other three days which I've forgotten

21  exactly.  Let me... 26, 30, and 31.  Please protect those

22  days.  We may need them.  All right?  So that you can be here

23  on those days.

24       All right.  So have a 15-minute break, and we'll finish up

25  the testimony in short order when you come back.

1      **THE CLERK:**  All rise for the jury.

2      (Proceedings were heard outside the presence of the jury:)

3      **THE COURT:**  All right.  It has to be the end of your

4  case because you're out of time.  So you have three minutes

5  left.  What are you going to do with your three minutes?

6      **MR. PAK:**  I'm going to just put up Mr. -- or

7  Dr. Dan Schonfeld for three minutes.

8      **THE COURT:**  Well, I hope he's succinct because --

9      **MR. PAK:**  Yes, we'll make sure we abide by your time

10  limit, Your Honor.

11      **THE COURT:**  All right.  To keep Schonfeld honest, I'm

12  going to give you one minute of cross-examination, but that's

13  giving you an extra minute.

14      **MR. SHEA:**  Thank you, Your Honor.  Appreciate it.

15      **MR. PAK:**  Thank you.

16      **THE COURT:**  All right.  I'm going to go work on your

17  jury instructions for a while.

18      **MR. PAK:**  Thank you.

19      **THE CLERK:**  Court is in recess.

20          (Recess taken at 9:33 a.m.)

21          (Proceedings resumed at 9:49 a.m.)

22      (Proceedings were heard out of the presence of the jury:)

23      **THE COURT:**  Are we ready?

24      **MR. PAK:**  Yes, Your Honor.

25      **THE COURT:**  I'm giving the other side one extra

 1   minute.  You get four minutes.

 2        MR. PAK:  Okay.  Thank you, Your Honor.  That's very

 3   kind and generous.

 4        THE COURT:  Four minutes and one on cross, and then it

 5   will be over.

 6                    (Pause in proceedings.)

 7        THE CLERK:  All rise for the jury.

 8      (Proceedings were heard in the presence of the jury:)

 9        THE COURT:  Okay.  Be seated.

10      All set, Mr. Pak?  You have four minutes.

11        MR. PAK:  Okay, Your Honor.  May I proceed?

12        THE COURT:  Yes.

13                      <u>DAN SCHONFELD</u>,

14   called as a witness for the Defendant, having been previously

15   duly sworn, testified further as follows:

16                    <u>DIRECT EXAMINATION</u>

17   BY MR. PAK:

18   Q.   Dr. Schonfeld, what timeframe were you applying in the

19   answers you gave during your direct examination about the

20   obviousness opinions you have in this case?

21   A.   That would be 2005.

22   Q.   And based on the evidence that you have seen, is it your

23   opinion that the Party Mode in the Sonos 2005 system is a zone

24   scene according to the claims?

25   A.   Yes, absolutely.

1  Q.   And is it also your opinion based on everything that we've

2  heard that it would have been obvious to modify the Sonos 2005

3  system to meet the additional requirements for the second zone

4  scene?

5  A.   Absolutely, for the same reasons I discussed yesterday.

6  Q.   Okay.

7       MR. PAK:  Let's go to DDX10.54.

8  BY MR. PAK:

9  Q.   We heard Dr. Almeroth suggest that the Party Mode in Sonos

10 2005 prior art system does not meet the zone scene definition

11 because it is created and invoked around the same time.  Did

12 you hear that testimony?

13 A.   I did, yes.

14 Q.   Do you agree or disagree with that?

15 A.   Well, I disagree with his opinion; but even if I accept

16 his opinion, it is still not done exactly at the same time

17 because once you receive the set AVTransport URI message, you

18 still -- after that point, you have to send an AddMember

19 message, and there is a whole sequence of -- of exchanges that

20 take place before you are invoked to what Dr. Almeroth calls

21 invoke.  And the claim does not -- it just simply says after.

22 The patent specification says it could be at any time.

23      So even if you accept Dr. Almeroth's view, it would still

24 meet the zone scene understanding.

25      I did my analysis under obviousness analysis where I took

**SCHONFELD - DIRECT / PAK**

1  a snippet of code and moved it; but either way, you get to the

2  same point.

3  **Q.**    Okay.  And is that what we're seeing here in DDX10.54

4  where there are additional messages that have to be sent in

5  order to create the Party Mode and invoke it?

6  **A.**    That's right.  That's after the set AVTransport.

7  **Q.**    Thank you.

8        So let's set that aside.  I want to go to my last topic,

9  which is DDX10.18.

10       This is the prosecution history statement that you cited

11  during your direct examination about why you believe that to

12  those skilled in the art while operating in standalone mode

13  means there's continuous output of music or audio.  Do you

14  recall that?

15 **A.**    I do.

16 **Q.**    And can you explain to His Honor and the jury what is your

17  basis for that belief?

18 **A.**    Sure.  So if you look at what the examiner stated, he's

19  talking about what happens after you invoked it states.  It's

20  the third line that's highlighted.  That is a transition of

21  going from operating in standalone mode to operating in what I

22  refer to as group synchrony.  And so that is referring to what

23  is happening in standalone mode where you have continuous

24  output of media.

25       And this whole thing, to put it in context, is the

1   examiner responding to what happened.  Yesterday we discussed

2   that initially the Yamaha DME was used by the examiner to

3   reject the original claims.  Then in response Sonos added and

4   amended the claims to include standalone mode, and then the

5   examiner came back and said there is no standalone mode because

6   it doesn't produce continuous output of media.

7           THE COURT:  What doesn't have standalone mode?

8           THE WITNESS:  Yamaha DMEs.

9           THE COURT:  All right.

10  BY MR. PAK:

11  Q.   Okay.  So just to summarize, I only have a few seconds

12  here, Doctor, all the claims require while operating in

13  standalone mode based on this prosecution history, which

14  relates to the amendment of the claims to get around the Yamaha

15  prior art, what is your opinion on the definition of while

16  operating in standalone mode?

17  A.   Well, it's my understanding that at least the examiner

18  understood operating in standalone mode consistent with this,

19  which is continuous output of media?

20          MR. PAK:  Thank you.  I pass the witness, Your Honor.

21          THE COURT:  All right.

22          MR. SHEA:  Thank you, Your Honor.

23                     **CROSS-EXAMINATION**

24  BY MR. SHEA:

25  Q.   I just have three questions left for you, and then we'll

1  all be done, and I think there will be some people that will be

2  happy about that.

3      You considered all of the testimony that Mr. Lambourne has

4  given in this case; correct?

5  **A.**   Yes, I did.

6  **Q.**   And that includes the testimony from Mr. Lambourne that

7  you decided not to present to the jury; correct?

8  **A.**   I reviewed all of his testimony.

9  **Q.**   And you understand that when you review all that

10  testimony, that in order to find a patent invalid, there has to

11  be clear and convincing evidence of the patent's invalidity?

12  You understand that; correct?

13  **A.**   Absolutely.  That's what I showed, I hope.

14      **MR. SHEA:**  Thank you, Your Honor.  No further

15  questions.

16      **THE COURT:**  All right.  Thank you.

17      The witness may step down.

18      **THE WITNESS:**  Thank you.

19                  (Witness excused.)

20      **THE COURT:**  And, both sides, have you read to the

21  jury, I guess, all the stipulations you got that you want?

22      **MR. PAK:**  Yes, Your Honor.  I'll just note for the

23  record, I think this probably applies to both sides, that on

24  the issue of invalidity where Google has the burden, we will be

25  addressing that in our 50(a) motion that we'll be submitting

PROCEEDINGS

 1 | later today.

 2 |       **MR. SULLIVAN:**  Yeah, Your Honor, we don't have

 3 | anything further to read into the record.

 4 |       **THE COURT:**  May I let the jury go home for now then?

 5 |       **MR. PAK:**  Yes, Your Honor.

 6 |       **MR. SULLIVAN:**  Yes, Your Honor.

 7 |       **THE COURT:**  All right.  Now, here -- I'd like to know

 8 | if there's any issues from the members of the jury on this.

 9 | Here's what -- I'm just going to tell you how it works with me

10 | here.

11 |      I am going to meet with the lawyers the rest of the

12 | morning and maybe early afternoon, and then I will -- we will

13 | make a decision whether to go with Plan A, which is to call you

14 | back in tomorrow morning, which you should assume that that's

15 | what we're going to do, and be here unless we tell you

16 | otherwise.  So be here tomorrow 7:45 unless I tell you

17 | otherwise by phone.

18 |      So check your voice -- how do we do it?  Voice mail?  How

19 | do we communicate with the jury?

20 |       **THE CLERK:**  By telephone, Your Honor.

21 |       **THE COURT:**  Check your phone numbers that you gave us

22 | to see if Angie has left you a special message.

23 |      But if there's no message, be here tomorrow.  So Plan A is

24 | we go as we originally said we would, we would have court

25 | tomorrow, and we would not stay any later than all of you could

1  stay.  So that no one's going to miss their flight on account

2  of this trial.

3      There is a chance that I will need the extra time and will

4  not be ready for you tomorrow.  I'd say it's about 1 in 3

5  chance that that's the way it's going to work out.  In which

6  case we would bring you back in a week from tomorrow for the

7  closing arguments on the -- on the 26th.  That's -- that would

8  be a possibility, but I'm saying it's more likely that we will

9  go ahead tomorrow.

10     The main point right now is today check your machines in

11  the off chance that I have to cancel tomorrow.  I won't be

12  really cancelling.  I would be using it to work with the

13  lawyers to give you better instructions, but it would be

14  canceled for you.

15     Anything that anybody there on the jury box wants to raise

16  about the schedule?  Yes?

17         **JUROR JOHNSON:**  I hope it won't come down to that

18  because you already expressed it probably wouldn't, but I have

19  a flight on the 31st in the morning.

20         **THE COURT:**  At what time?

21         **JUROR JOHNSON:**  I think 8:00 a.m.

22         **THE COURT:**  Well, did I know about that?

23         **JUROR JOHNSON:**  Yes.  When I told you, you were quite

24  adamant that we probably wouldn't come down to that.

25         **THE COURT:**  All right.  Well, if it comes to that, I

1  don't know what we will do, but --

2      **JUROR JOHNSON:**  We'll try our best.

3      **THE COURT:**  We will try our best and -- but, yeah,

4  thank you for reminding me.

5      Anyone else?

6                      (No response.)

7      **THE COURT:**  Okay.  So you've heard all the evidence

8  now, but you have not heard the arguments, and I still urge you

9  and ask you not to do any homework.  Don't talk with anyone

10  about the case.  It will be your duty to talk about the case

11  when it goes to you for decision, but not yet.  And so know

12  you'll be looking forward to the closing arguments and the jury

13  instructions.

14      So have a safe journey home.  We'll see you back here

15  tomorrow unless you get the phone call otherwise.

16      **THE CLERK:**  All rise for the jury.

17      (Proceedings were heard outside the presence of the jury:)

18      **THE COURT:**  Okay.  Be seated.

19      I've got a question for you.  The -- on the obviousness

20  question, I'll tell you what the question is going to be and

21  then -- and that is:  Will both sides agree that provided I

22  give proper instructions on obviousness, that I can ask the

23  jury to just render a general verdict either of obviousness or

24  not without making findings, express findings?

25      **MR. PAK:**  That is acceptable to Google, Your Honor.

1          **MR. SULLIVAN:**  It's acceptable to Sonos as well,

2  Your Honor.

3          **THE COURT:**  Okay.

4          **MR. SULLIVAN:**  Progress.

5          **THE COURT:**  Progress.

6      Now, what I got to do is make sure I give all the factors

7  that you want and I will work hard on that.

8          **MR. PAK:**  Thank you.

9          **THE COURT:**  I had a couple more questions.

10     Oh, on indirect infringement, I don't see the point of

11  complicating it.  You see how the verdict form is set up and

12  the way the case has been pitched to the jury, that they'll

13  be -- it will be coming out of left field if we bring up

14  contributory infringement and/or indirect infringement.  So

15  can't we pitch it to the jury just the way the verdict form

16  does?

17         **MS. BAILY:**  So, Your Honor, I think the verdict form

18  with a slight tweak to the language of the infringement

19  questions is probably okay.

20     I do think with respect to the jury instructions, the

21  indirect infringement instructions need to be there because

22  most, if not all, of the case is actually indirect

23  infringement.  So I don't see a way around --

24         **THE COURT:**  Well, what would we say in -- what would

25  we say in the instructions to the jury on that subject?

**PROCEEDINGS**

1          **MS. BAILY:**  Just the extra elements with respect to

2   indirect infringement.

3          **THE COURT:**  Well, give me -- just take one example.

4   What would that be?

5          **MS. BAILY:**  Specific intent to infringe.

6          **THE COURT:**  By Google?

7          **MS. BAILY:**  Well, knowledge of inducement basically.

8   I mean, so let me put it this way:  So just taking it from the

9   most detail to the least, I mean, I don't think -- you know, I

10  don't know if Sonos is willing to take contributory

11  infringement out of the case.  I don't think there's a real

12  dispute on that, but that's a question for Sonos.

13      I think most of the case actually is induced infringement

14  on Sonos' theory, and so I do think the requirements for

15  indirect infringement that relate to actual inducement with

16  knowledge that you're inducing actual infringement and specific

17  intent to do so need to be in the instructions.  I don't think

18  it needs to be set out that way in the verdict form.

19      I've seen and I think we have some authority that

20  indicates that you can just ask the question:  Does Google

21  infringe?  Similar to how Your Honor has it without getting

22  into all of the elements of indirect infringement; but since

23  all or most of the case is induced infringement, we'd like the

24  induced infringement instructions.

25          **THE COURT:**  Well, then that would go something like

1  Google sells -- you're talking -- you're not talking about the

2  speakers.  You're talking about the -- you're talking about the

3  '966?

4          **MS. BAILY:**  Predominantly, Your Honor, yes.

5                    (Pause in proceedings.)

6          **MS. BAILY:**  You know, it's page 29 of our filing

7  Docket 617.  So intentionally take an action that actually

8  induced direct infringement, aware of the '966 patent, and

9  knowledge that the acts it was causing would infringe the

10 patent.

11         **THE COURT:**  Well, I mean, you know, if the app when

12 it's connected does infringe if there's three or more speakers.

13 It -- it almost has to infringe, doesn't it?  I mean, on the

14 way it's been pitched here, I can't imagine a scenario where it

15 would -- where if it -- that's the whole point of the app.

16         **MS. BAILY:**  No, Your Honor.  So the whole point of the

17 app is not to group speakers.  The Google Home app -- and I

18 think the evidence has been pretty clear on this, we put

19 evidence on yesterday I think with respect to this -- the

20 Google Home app does thousands of things in your home.

21         **THE COURT:**  Well, I'm talking about on the speaker

22 part, it's to -- it's to control the speakers, and one -- and

23 it does have the capability -- once it's in the network with

24 three speakers, it does have the capability to do all the

25 things that the '966 calls out, doesn't it?

1          MR. PAK:  We disagree, Your Honor, for the reasons we

2   set forth.

3          THE COURT:  Well, give me one reason.  I'm missing

4   something.

5          MR. PAK:  Yes.  So I'm happy to address it,

6   Your Honor.

7          So on the issue of noninfringement on the '966 patent,

8   what the claims require is you create -- first of all,

9   Your Honor, the agreed-upon definition says "previously saved

10  grouping of zone players."  It is our position that grouping

11  requires the identification of the speakers that belong to the

12  group.

13         Then the requirements of the '966 claim say you have to do

14  three things in response.  You have to create, you have to send

15  an indication about the group, and you have to store for later

16  use and invocation.

17         And our point is that we don't generate -- we generate

18  membership information dynamically at the time that we need it.

19  We never go back in time to look at something that is stored at

20  the time of creation in terms of membership information to

21  invoke.

22         And that was the uncontested testimony of Mr. MacKay,

23  Mr. Maclellan.  That's a factual issue that the jury has to

24  decide now, and so I think the point that Ms. Baily is making

25  is:  We're fine with just a simple question on infringement.

1    We've laid out our positions on the extra limitations of the

2    '966.  So has Sonos.  That's a factual inquiry for the jury.

3        We just -- I think for legal purposes and appeal purposes,

4    I think both parties would like, my understanding, an indirect

5    infringement instruction to be given that is consistent with,

6    you know, the model.

7            THE COURT:  But if it -- if you win on that, you win

8    whether it's indirect or not.  What I'm trying to find out is

9    "what turns on whether or not a consumer --

10           MR. PAK:  Yes.

11           THE COURT:  -- has it in their hands versus somebody

12   in the back room at Google doing a test?

13           MR. PAK:  So I think the issue there, Your Honor, is

14   all the evidence that's come in now, that you could use the

15   Home app in a lot of different ways, even for situations where

16   the user never purchases a single Google speaker.  And so for

17   those direct situations, for every -- now they're accusing all

18   Home app installations, they're seeking royalties on every

19   single Home app installation.

20       So our point is they need to show under the proper law on

21   indirect infringement that we would have induced customers who

22   have never bought speakers to inter-operate with the Home app

23   even assuming under their theory that there is direct

24   infringement, and there's just simply very little evidence of

25   that, if any.  So that's the reason why we --

1          **THE COURT:**  Well, why would you put the app on there

2     if you didn't expect people to use it?

3          **MR. PAK:**  Not -- but the issue is we don't expect --

4     we're not instructing anyone to create overlapping groups with

5     three speakers.  We don't sell -- as Your Honor heard, at most

6     we sell two speakers in a pack, which can be divided into --

7          **THE COURT:**  I saw some evidence that there was

8     50 percent would buy three or more.

9          **MR. PAK:**  That's just -- even if you bought three or

10    more, there's no instruction anywhere that says you have to

11    create --

12         **THE COURT:**  It doesn't but it does have the

13    capability; and at that level, I do think capability is all

14    they've got to show.  It's networked in and --

15         **MR. PAK:**  So I think --

16         **THE COURT:**  I don't remember all the evidence, but

17    the -- you don't have -- you don't put an app on there unless

18    you expect some people are going to use it.

19         **MR. PAK:**  Yeah.  Just to be clear, we're not at all

20    suggesting, Your Honor, that you go back.  You know, we

21    understand Your Honor's instruction to the jury about the three

22    speakers at a minimum with the Home app.  We're now just

23    speaking about the three-speaker combination with the Home app.

24         And even then, there is no instruction that we're giving

25    to the user on that point to create overlapping groups, number

**PROCEEDINGS**

1    one.

2         Number two is, I believe that indirect infringement

3    requires specific intent to induce infringement not just to

4    simply cause the --

5             THE COURT:  Well, is there -- is there enough of a --

6    in the instruction manual that would allow the user to -- if

7    they read the instruction manual to create overlapping groups

8    even if you don't instruct them to do so?

9             MR. PAK:  It's unclear on the record so far based on

10   the evidence that was adduced at trial.

11        But, more importantly, Your Honor, the legal standard for

12   indirect inducing infringement is, number one, have

13   intentionally taken action that actually induced direct

14   infringement, that's Your Honor's question; number two, have

15   been aware of the '966 patent, that's the second requirement.

16        There's a third requirement, have known that the acts it

17   was causing would infringe the patent.  And from our

18   perspective, we've always maintained and we put forth evidence

19   in this case that we don't believe that we infringed this

20   patent and, therefore, we would -- at a minimum would like that

21   instruction element to be in the jury instructions, the "have

22   known that acts it was causing would infringe the patent."

23             THE COURT:  Is that the indirect infringement?

24             MR. PAK:  Yes, Your Honor.

25             MS. MOULTON:  Can I make a couple points?

PROCEEDINGS

 1          **THE COURT:** Sure.  Yes.

 2          **MS. MOULTON:** Thank you.

 3      So Mr. Pak said that you have to actively intend to

 4  infringe.  There's an important difference between intending

 5  the acts that would constitute infringement versus intending to

 6  actually violate the patent rights.  That second part is more

 7  towards willfulness and is not a requirement for inducement.

 8  That's what the three separate requirements are.  So they're in

 9  all of the model instructions.

10          **MR. PAK:** We disagree with that interpretation; but at

11  a minimum, we should just read it into the jury instructions,

12  which is have known --

13          **MS. MOULTON:** We agreed on this instruction.

14          **MR. PAK:** That's right.  So all we're -- what we're

15  saying is have known the acts it was causing would infringe the

16  patent.  There's agreement that that language should be in the

17  jury instruction, and I think that's all we're asking for.

18          **MS. MOULTON:** That's correct.  Your Honor.

19      And in terms of what -- the second point I wanted to make,

20  the evidence we have that Google, for this first point,

21  intentionally took action that actually induced direct

22  infringement, you saw the Google help pages that talk about how

23  to group speakers and Mr. Chan's blog post that talk about how

24  to create speaker groups.

25          **MR. PAK:** We don't think that's sufficient, but we

1  think that's a factual issue for the jury to decide.  All we're

2  asking for at this point in terms of the jury instructions is

3  that all three --

4         THE COURT:  All right.  I'll have to put in indirect

5  infringement --

6         MR. PAK:  Thank you, Your Honor.

7         MS. MOULTON:  In the instructions, but --

8         THE COURT:  -- in the instructions, and I -- I don't

9  know how that will affect the verdict form.  I would prefer to

10 keep it simpler.

11     Have you got any other ideas on how to simplify this case?

12        MS. BAILY:  Not any -- I know we were going to meet

13 and confer with Sonos about -- now that all of the testimony is

14 in about whether they can select one or two claims of the '966.

15 So I think that's still at least on the table for discussion.

16                    (Pause in proceedings.)

17        THE COURT:  Anything on your side?

18        MS. MOULTON:  In terms of narrowing the case?

19        THE COURT:  Yeah, simplify it for the jury.

20        MS. MOULTON:  I think we can ask just one question

21 about infringement and that was what we -- both sides proposed

22 in the verdict forms that we submitted with the joint pretrial

23 order.

24        THE COURT:  Was what?

25        MS. MOULTON:  To have one question on infringement:

1   Did Google infringe these claims of the patent?  But not ask

2   separate questions about direct and indirect.

3        **MS. BAILY:**  Right.  And that's how it is already.  I

4   think the only tweak that needs to be made, if the instructions

5   go in on indirect infringement, is -- sorry, Your Honor.  I've

6   got to find it.

7                   (Pause in proceedings.)

8        **MS. BAILY:**  Just to be clear sort of for appellate

9   purposes, the infringement question should just be what's here,

10  but "is met by Google with respect to the redesign accused

11  products," for example, instead of "met by Google's products."

12       My understanding is if we do it that way, then everyone

13  will be covered with respect to indirect, direct, et cetera.

14       And then the other --

15       **THE COURT:**  So you're saying that the -- it doesn't --

16  we don't have to call out indirect in the special?

17       **MS. BAILY:**  Exactly.  We don't have to call indirect

18  out in the verdict form as long as the instructions are given.

19       **THE COURT:**  All right.  I'll try to work with that.

20       **MS. BAILY:**  And then the other just on narrowing the

21  case, you know, I don't know if contributory infringement can

22  be left out of the instructions.  I don't think there's a real

23  dispute about that as opposed to the --

24       **THE COURT:**  Can we leave out contributory?

25       **MS. MOULTON:**  Your Honor, I need to think about that

PROCEEDINGS

1    with the new claim construction on requiring the speakers as

2    part of the controller claim.

3        One other idea I had about consolidating things is you

4    heard Mr. MacKay agree that they made no change to the Home app

5    in the redesigned products, so there really is no -- there is

6    no new version and old version for the '966 patent.  There's

7    just one version of the Home app that hasn't changed for the

8    entire case.  So we don't need to ask separate questions about

9    that.

10           **MR. PAK:**  We disagree, Your Honor.  Obviously the Home

11   app we've heard all along it's a system.  The Home app when

12   it's working with the new design products will behave very

13   different.  We saw evidence of that.

14       And so since Your Honor is going to limit the Home app to

15   instances in which it is working with at least three

16   speakers --

17           **THE COURT:**  But it wouldn't have to be Google

18   speakers.  It could be somebody else's speakers.

19           **MR. PAK:**  I think there's --

20           **MS. BAILY:**  No, it can't.

21           **MR. PAK:**  I don't think that's true, Your Honor,

22   because the only evidence in this case is that the Google

23   speakers are the ones that have the capability that's been

24   accused, and so that's what we've been discussing.  That's the

25   source code analysis, that's everything that we've had.  So I

1   don't think that's right, Your Honor.

2       I do think it's when you -- more to the basic point, the

3   Home app on its own doesn't do anything with respect to

4   speakers unless you add the three speakers.  Once you add the

5   Google speakers, they would have the new design for the

6   17 million units that have already shipped.

7       So that is the reason why the new design issue is

8   important because the accused functionality really at the end

9   of the day is on the speaker side.  We made the change.  We

10  have presented credible defenses.  The other side will say we

11  didn't, but that's a factual issue.  But we think the new

12  design question needs to be on that '966 question as well,

13  Your Honor.

14      **THE COURT:**  I'm going to step off and work on this for

15  awhile.  Probably in about an hour I will have a -- one to two

16  hours -- a set of instructions for you.  So we will -- you can

17  stay here if you wish.  In fact, I encourage it.

18      But I -- we'll get in touch with you in some manner to get

19  you to come back in here.  Now, I have to leave to go to a

20  doctor's appointment early in the afternoon and I won't be back

21  today.

22      So we will see how much progress we make.  If we don't

23  make enough progress, we just cannot bring the jury in

24  tomorrow.

25      **MR. PAK:**  Thank you, Your Honor.

1      May I ask for --

2           **THE COURT:**  And then we're going to have problems if

3      we only have two days.  I'm not going to require Ms. Johnson to

4      stay here for -- to miss her flight on the 31st.  So we have

5      issues downstream if we cannot make some progress today.  If

6      you want to argue it tomorrow, do some compromising.

7           **MR. PAK:**  Thank you, Your Honor.

8      May I ask for an accommodation?  We have Ms. Baily, who's

9      incredibly capable to handle the instruction issues.  Would it

10     be okay if I'm excused so I can work on the closings in case we

11     can do that tomorrow or would Your Honor like me to be present?

12          **THE COURT:**  Well, is she going to say "I got to go

13     talk to Mr. Pak"?

14          **MR. PAK:**  No.

15          **THE COURT:**  If she's got full authority, that's okay.

16          **MR. PAK:**  Thank you, Your Honor.

17          **MR. SULLIVAN:**  We have the same.  I have the same

18     request.

19          **THE COURT:**  All right.  Same ruling.

20     Now, I'm thinking in terms of closings, how much time do

21     you think you need?

22          **MR. SULLIVAN:**  One hour, Your Honor.

23          **MR. PAK:**  One hour is fine with us, Your Honor; but if

24     Your Honor is inclined, an hour 15.

25          **THE COURT:**  I don't think this case can be adequately

1   argued in one hour.  I'll say I'll give each side an hour and

2   15 minutes, but we have wrinkle.  You get to save 15 minutes

3   for your rebuttal, but they get a rebuttal too on invalidity.

4        So you, Mr. Pak, will get the last word --

5            **MR. PAK:**  Thank you.

6            **THE COURT:**  -- but only on invalidity --

7            **MR. PAK:**  Thank you.

8            **THE COURT:**  -- because you have the burden of proof on

9   it.

10           **MR. PAK:**  Okay.

11           **THE COURT:**  So it would go Plaintiff -- meaning

12  Sonos -- Plaintiff --

13           **MR. PAK:**  One hour.

14           **THE COURT:**  -- Defendant, one hour; rebuttal, on all

15  issues 15 minutes; and then only on invalidity where you have

16  the burden of proof, 15 minutes.

17           **MR. PAK:**  Thank you, Your Honor.

18           **THE COURT:**  Okay.  Stand by for some more action.  I

19  feel like I'm not close to being ready to give you a good set.

20  So I think it's 50/50 whether we're going to do this tomorrow,

21  but let's try our best to get there.

22           **MR. SULLIVAN:**  Thank you, Your Honor.

23                    (Recess taken at 10:21 a.m.)

24                    (Proceedings resumed at 12:08 p.m.)

25        (Proceedings were heard out of the presence of the jury:)

1          **THE COURT:**  Okay.  Let's go on the record.

2     Marla, you ready?

3          **THE OFFICIAL REPORTER:**  Yep.  Thank you.

4          **THE COURT:**  The lawyers are here, not the jury.

5     I have made all my edits on the instructions, but you --

6     they're still being inputted so you don't have those yet, but

7     maybe in ten minutes you will.

8          But I thought we could -- we could get a start on the

9     verdict form.  I tried to take your suggestions and hope that I

10    succeeded here.

11         So let's start with Plaintiff and see what your concerns

12    are on the verdict form.

13         **MS. MOULTON:**  Thank you, Your Honor.  Elizabeth

14    Moulton.

15         **THE COURT:**  Please.

16         **MS. MOULTON:**  So a few things.  One is the

17    infringement question should come first.  Invalidity is a

18    defense to infringement.  That way the jury could answer

19    infringed, invalid, and there wouldn't be all of these

20    contingent instructions in the middle.  We think that that's

21    consistent with us serving as Plaintiff as Google stipulated

22    to.

23         **THE COURT:**  Okay.  I'm going to overrule that and do

24    it my way.  So your point is made for the record.  It's

25    complicated a little bit here, but I've already found

1   infringement on the '885 so that's one of the reasons I started

2   it out this way.

3       But I -- it's also if it's invalid, they don't need to

4   reach these other points, so -- but your point's preserved.

5       Okay.  What's next?

6           MS. MOULTON:  So on the question of infringement of

7   the '885, so that's Question 2 on your verdict form --

8           THE COURT:  Sure.

9           MS. MOULTON:  -- you have a parenthetical where it

10  says "If you answered yes to Question 2, both the new" --

11  sorry -- "both the original and new versions infringe"; and

12  then say "If you answered no, only the original accused

13  versions infringe as the Judge has already determined."

14      And so I was -- as I was reading that, the jury may think

15  you've also already determined infringement as to the new

16  product.  So taking that parenthetical out may make more sense

17  or putting it at the beginning; that "The judge has already

18  determined the new products infringed, so then you need to

19  decide whether -- sorry.  Let me start over.

20      "The judge has already decided whether the original

21  products infringed and the jury will determine whether the new

22  products infringe."

23          THE COURT:  That would go before the question itself?

24          MS. MOULTON:  Yeah.

25                  (Pause in proceedings.)

1      **THE COURT:** All right. Let me -- I'm okay with that

2  idea, but let me write it out here.

3      **MS. BAILY:** I'm sorry. I just I didn't follow. So

4  I'm not sure what's being proposed, and I apologize.

5      **MS. MOULTON:** It's all right. So this is the -- this

6  is the latest version.

7      **MS. BAILY:** Right. I have that. What are you

8  proposing?

9      **MS. MOULTON:** So instead of putting this at the end

10 putting it at the beginning so it doesn't seem like it's

11 contingent on the answer.

12     **MS. BAILY:** I mean, I don't -- it's all right,

13 Your Honor. I don't think that introducing your finding into

14 the jury's question is necessarily appropriate, but...

15     **THE COURT:** Well, it is necessary because they will

16 get confused "How come the judge is only asking us about the

17 new product? He forgot to ask us about the old one."

18     **MS. BAILY:** Then it can come after the question I

19 think.

20     **THE COURT:** What question?

21     **MS. BAILY:** The infringement question, and then -- I

22 mean, we like the way you have it so that it's not injecting:

23 You know, the judge already found infringement with respect to

24 these products, so what do you say to these other products?

25     So I think it's less prejudicial the way that it's written

 1  now instead of setting the jury up with your finding of

 2  infringement in the very question where they're going to --

 3  they're supposed to determine infringement with respect to the

 4  second set of products.

 5         MS. MOULTON:  I think it's prejudicial that this

 6  question starts with "If the asserted claim is valid."  What

 7  you're telling them is:  "Find it's invalid and then you can

 8  skip the rest of the questions."

 9         MS. BAILY:  I mean, all throughout the trial we've

10  said, you know, if it's valid, then it's not infringed.  I

11  mean, this is the way that we've set it up throughout the

12  entire trial is the way the verdict form is drafted now.

13         THE COURT:  You know, you-all are making this so hard

14  on me.  Do you really want to argue this tomorrow?  Do you want

15  to run the risk that we run out of jurors because Ms. Johnson

16  can't be here, and you're arguing over -- I'm leaving it

17  exactly the way it is.  Overruled.  All objections overruled.

18      All right.  What's your next one?  And I'm probably going

19  to do the same thing, but you can make your record because

20  you're not giving me -- you're giving me the points that where

21  it -- you're trying to get an edge up on the other side somehow

22  and that -- instead of helping the Judge.

23      All right.  Question 3, any problems?

24         MS. MOULTON:  I'm genuinely trying to simplify this.

25  If we -- because the way that it's laid out requires all of

1  these contingent instructions about subparts and answering yes

2  or no to certain subparts, and I think that that is very

3  confusing and is going to lead to juror questions when they

4  don't have much time.

5      **THE COURT:**  The easy answer is:  Drop some of these

6  claims.  I have to do it this way in order to -- because you've

7  got so many claims in suit and you won't drop them.  That's

8  overruled.

9      What's your next one?

10      **MS. MOULTON:**  I don't think there's enough space in

11  the damages awards question.  We're talking about millions of

12  units, and there's not enough room for them to fill that in.

13      **THE COURT:**  All right.  So you want more room for

14  bigger numbers.  All right.  I'll do that.

15      **MS. MOULTON:**  Thank you.

16      **THE COURT:**  Do you have any issues over there?

17      **MS. BAILY:**  Just two, Your Honor.  On the -- on all of

18  the infringement questions, they're written from the

19  perspective of the products:  Do the products infringe?  And I

20  just think because it's indirect infringement, we don't have

21  to -- we don't have to get into indirect infringement in the

22  verdict form like I said prior.

23      **THE COURT:**  You told me earlier the verdict form would

24  stay the same if I -- even I changed the instructions.  Now

25  you're going back on that and saying I got to change both.

1          **MS. BAILY:**  No.  I actually think I made the

2    suggestion of how to change it so that we don't have to have

3    multiple questions earlier.

4          It's the same suggestion I made earlier, which is just

5    instead of saying that "the products infringe," it should say

6    "Does Google infringe with respect to X products?"  So that the

7    mental state at least can get sort of brought into the picture.

8          **THE COURT:**  All right.  Give me -- which question is

9    it?

10         **MS. BAILY:**  So, for example, Question Number 2 --

11    wait.  Let me get the most recent version.   Sorry.

12                    (Pause in proceedings.)

13         **MS. BAILY:**  (as read):

14          "If the asserted claim of the '885 patent is valid,

15      has Sonos proven by a preponderance of the evidence that

16      Google infringes claim 1 of the '885 patent with respect

17      to the new version of the accused products?"

18         **THE COURT:**  I'm okay with that.  Are you okay with

19    that?

20         **MS. MOULTON:**  Yes.

21         **MS. BAILY:**  Then that kind of change would also be

22    implemented in the next infringement question, which is number

23    4A and B.

24                    (Pause in proceedings.)

25         **THE COURT:**  It will now read -- I'm going to take out

1   "if it's valid," start with "Has Sonos proven by a

2   preponderance of the evidence that Google infringes claim 1 of

3   the '885 patent with respect to the new version of the accused

4   products?"

5           **MS. BAILY:**  Yes, Your Honor.

6           **THE COURT:**  All right.  That's what I'll do.

7           **MS. BAILY:**  And then it would be a very similar change

8   to 4A and 4B, which are the other infringement questions.

9                        (Pause in proceedings.)

10          **THE COURT:**  4...

11                       (Pause in proceedings.)

12          **THE COURT:**  All right.  Then B would be...

13                       (Pause in proceedings.)

14          **THE COURT:**  Okay.

15          **MS. BAILY:**  And then our last issue just to raise is

16  with respect to the willful infringement question, which I

17  think is still Number 5.

18          **THE COURT:**  Uh-huh.

19          **MS. BAILY:**  Just because the case wasn't really

20  presented with respect to the words "willful blindness".  In

21  the Northern District of California model verdict form they

22  kind of spell out it would be Google actually knew,

23  intentionally ignored, or recklessly disregarded that its

24  actions constituted infringement, but I'm looking at this in

25  the absence of the instruction so --

 1          **THE COURT:**  I'm going to leave it alone for now.

 2          **MS. BAILY:**  Okay.

 3          **THE COURT:**  Is that it on your side?

 4          **MS. BAILY:**  That's it.

 5          **THE COURT:**  Is that it on your side?

 6          **MS. MOULTON:**  Yes, Your Honor.

 7          **THE COURT:**  Okay.  Have the instructions come through

 8   yet?  No.

 9        Well, I'm going to step off the bench, and we'll come back

10   I'm going to guess within 15 minutes and start looking at the

11   instructions.

12          **MS. BAILY:**  Thank you.

13                    (Recess taken at 12:20 p.m.)

14               (Proceedings resumed at 12:42 p.m.)

15      (Proceedings were heard out of the presence of the jury:)

16          **THE COURT:**  Okay.  Back to work.

17        We're going to try to give you the revised verdict form.

18   We have a very long line for the numbers now.  You can put in

19   billions if you want.  And also some other changes.

20        But now let's turn to the draft instructions, and let's do

21   this:  Let's skip all the way over to the substantive ones,

22   which start at Number 11, and I'll just call out the -- what do

23   you -- do you have any issues with Number 11?

24          **MS. MOULTON:**  I had one issue with the preliminaries.

25          **THE COURT:**  All right.  What's that?

1    **MS. MOULTON:**  On page 2, Number 4A --

2    **THE COURT:**  Okay.  Go ahead.

3    **MS. MOULTON:**  -- at line 5 it says "Lawyers are not

4    witnesses in this case."  We did have witness two witnesses who

5    are lawyers.  We had Mr. Kowalski and Ms. Kwasizur.

6                   (Pause in proceedings.)

7    **THE COURT:**  Well, okay.  I'm going to say "Arguments

8    and statements by trial counsel are not evidence.  Trial

9    counsel are not witnesses."  How is that?

10   **MS. MOULTON:**  Thank you.

11   **THE COURT:**  That's -- okay.

12       Now I'll make that change.  Well, okay.  I don't need any

13   further.

14       All right.  What's -- how about what's your first issue on

15   the -- on there after that you want to discuss?

16   **MS. MOULTON:**  Your Honor, on --

17   **THE COURT:**  By the way, I'm going to -- on the

18   assumption that we -- that I feel that we can do this within

19   about an hour, we will also start at 7:00 a.m. in the morning

20   and then bring -- so that will give us an hour to go over the

21   instructions again; but if there are going to be major, major

22   issues, then I -- I may have to decide not to proceed tomorrow

23   and just use it as a charging conference.  But then we're

24   putting pressure on the jury and their availability.  So I

25   don't -- you see the problem.

```
1          All right.  So what is -- have you read this sufficiently

2    to tell me what your -- anything you know for sure you don't

3    like?

4               MS. MOULTON:  I got to page 9.

5               THE COURT:  Okay.  9.

6               MS. MOULTON:  Sorry.  We have an -- on page 4 is the

7    next one.

8               THE COURT:  Sorry.  What?

9               MS. MOULTON:  On page 4 is our next issue.

10              THE COURT:  Page 4?

11              MS. MOULTON:  Yes.

12              THE COURT:  Oh.  I thought you said 9.

13              MS. MOULTON:  I only read through page 9 so far.

14              THE COURT:  Okay.  Let's see, I'm on page 4.

15              MS. MOULTON:  Okay.  So you talk about the IFTTT.

16              THE COURT:  Uh-huh.

17              MS. MOULTON:  You also struck Dr. Schonfeld's

18   testimony about idle mode.

19              THE COURT:  All right.

20              MS. BAILY:  I just -- sorry.

21              THE COURT:  That's true, I did.

22              MS. BAILY:  Okay.

23              THE COURT:  So I'm going to put that in someplace.

24         All right.  And what else?

25              MS. MOULTON:  On page 6 --
```

1    **THE COURT:**  Okay.

2    **MS. MOULTON:**  -- lines 4 through 17 seem to be talking

3    about written description, which is not an issue being tried to

4    this jury.  So this instruction is unnecessary and isn't tied

5    to any of the issues in this case.

6    **THE COURT:**  Yes, it gets tied in later because I'm

7    going to instruct the jury that the jury can -- can make an

8    inference from the amount of detail in the specification that

9    the inventor thought not much was needed to -- for those

10    skilled in the art, that if there's a lot of detail, they might

11    need it to practice the invention.

12    This is where your skimpy detail comes back to haunt you

13    on obviousness.

14    **MS. MOULTON:**  Google agreed not to raise an enablement

15    argument, and so we didn't -- based on that representation, we

16    didn't --

17    **THE COURT:**  It's not an enablement argument.  This is

18    an obviousness argument.  It's one of -- in my mind, this is

19    the perfect case for the Federal Circuit to consider this

20    point.

21    **MS. MOULTON:**  You don't use the patent specification

22    as part of the prior art when determining obviousness so

23    there's no compare -- no relevant comparison between what's in

24    the specification and what's in the prior art.

25    **THE COURT:**  Your objection is overruled.  I believe

1    this is a correct statement.  You have the skimpiest

2    specification in history and the reason it's skimpy is for

3    reasons we all know, but that's not for the jury.  But what is

4    for the jury is obviousness; and whenever the specification

5    itself doesn't teach much about the alleged invention, that

6    tells us something on obviousness or should.

7        Okay.  Your point is preserved for appeal.

8        All right.

9        MS. MOULTON:  All right.  Also on page 6 at lines 21

10   and 22 you say that "Google allegedly infringed," but they do

11   infringe claim 1 of the '885 patent.

12       THE COURT:  That's definitely true.  Where do I say

13   that?

14       MS. MOULTON:  Lines 21 and 22.

15       THE COURT:  It's money damages.  Well, but it's -- I

16   can't say they infringe both.

17       MS. MOULTON:  You can say that they infringe claim 1

18   of the '885 patent and allegedly infringe claims 1, 2, 4, 6,

19   and 8.

20       MS. BAILY:  I think I'm just not sure in the context

21   of damages we can do that because obviously --

22       THE COURT:  I make it so clear.  I say at various

23   times here that I've already found, I've already found.  I

24   don't think that's a -- I disagree with you.  You're just

25   trying to get an elbow up on the jury with the other side.

1        No.  I'm leaving it as it is.  That's not a mistake.

2   That's just gamesmanship.

3        **MS. MOULTON:**  We're trying to accurately convey what's

4   happened so far in this case.

5        **THE COURT:**  I am too.  I am too.

6        **MS. MOULTON:**  Thank you.

7        **THE COURT:**  Okay.  What else on this?

8        **MS. MOULTON:**  Sorry.  I just -- when I raised the

9   objection about Schonfeld's idle mode, I did want to note that

10  we are preserving our objection that IFTTT should be part of

11  the case.

12       **THE COURT:**  Of course.  Yes, I think you should

13  preserve it.

14       **MS. MOULTON:**  Thank you.

15       **THE COURT:**  Maybe I'm wrong.

16       **MS. MOULTON:**  Okay.  At the bottom of page 6.

17       **THE COURT:**  Yes.

18       **MS. MOULTON:**  So it says (as read):

19        "If the asserted claims are invalid, Google does not

20     have to pay any money damages even if the asserted claims

21     are otherwise infringed."

22  And we just note that this is inconsistent with the

23  verdict form which asks them to decide invalidity first and

24  infringement second.

25       **THE COURT:**  Overruled.

PROCEEDINGS

1          MS. MOULTON:  Do you have --

2          THE COURT:  Now, you only got up to page 6?

3          MS. MOULTON:  I got to page 9.

4          THE COURT:  All right.  What else do you have?

5          MS. MOULTON:  In Instruction 13, it lists the accused

6   products for the '885 patent.  I think Chromecast Audio is

7   missing.

8          THE COURT:  Well, let's put it in.  Where do you want

9   me to put it?

10         MS. MOULTON:  As the first one.

11         THE COURT:  Okay.  What about we say "Chromecast" and

12  then "Chromecast Audio"?

13         MS. MOULTON:  Yeah, that works.

14         THE COURT:  Okay.

15         MS. MOULTON:  Okay.  On lines 8 through 10 you talk

16  about why you didn't find infringement of the '885 patent was

17  willful, and I just want to note that we're preserving our

18  objection to that because we disagree that the complaint can't

19  serve as notice.

20         THE COURT:  Okay.  You know, I'll just say, as I have,

21  there has to be -- you know, you could have a rule that the

22  complaint itself could be notice and you could have that as a

23  rule because -- but it's not the way to run a railroad.

24      The way to run a railroad is to -- the -- you should give

25  notice of any prior to lawsuit so that we encourage people to

1    give notice.  And if you allow the lawsuit itself to be notice,

2    it's just unfair to the Defendant and doesn't promote

3    settlements.  It promotes litigation.

4         So I believe that you're wrong on that, but it's possible

5    that the Federal Circuit would disagree, and I hope you take an

6    appeal.  And I won't say I hope you win but, God bless you.

7    It's okay with me if you win.

8         Okay.  All right.  So next -- your point's preserved.

9              MS. MOULTON:  Thank you.

10        At line 13 you wrote "and help determine whether that

11   claim is invalid."  I think that may have been --

12             THE COURT:  Yes, that is -- that is misleading, isn't

13   it?  "You must decide whether or not... and determine," not

14   "help determine whether that claim is" because we changed it to

15   a general verdict.

16        All right.  Good point.

17             MS. MOULTON:  Our preference would just be to take out

18   the "and help" through the end of that sentence.

19             THE COURT:  Don't they have to decide whether it is

20   invalid?

21             MS. MOULTON:  Right, but that has nothing to do with

22   infringement and the next sentence says "If the claim is found

23   to be valid..."

24             THE COURT:  All right.  That's okay.  I'll take that

25   out because we cover invalidity elsewhere.

1        **MS. MOULTON:** That's right.

2     Okay. And in Instruction 14, so this is page 7, line 20,

3  through page 8, line 4, obviously we preserve our objection

4  that the '966 patent should cover just a controller installed

5  with a Home app and not networked with three speakers

6  configured for overlapping zone scenes.

7        **THE COURT:** All right. Now, you know, I disagree with

8  you on that; and I could, again, be wrong, but I believe that

9  I'm -- it would be a crazy, crazy system that would allow your

10 view. So I think the networking is required.

11       **MR. ROBERTS:** Your Honor --

12       **THE COURT:** No. I'm not going to let you lard the

13 record. So we -- we've argued over this already.

14       **MS. MOULTON:** Okay. And then lines --

15       **THE COURT:** Overruled.

16    What's your next one?

17       **MS. MOULTON:** So at lines 1 and 2 of page 8 you say

18 that there's --

19       **THE COURT:** 1 and 2?

20       **MS. MOULTON:** Yeah, lines 1 and 2.

21       **THE COURT:** All right.

22       **MS. MOULTON:** The language about a small subset of

23 computing devices that Sonos has accused of infringing we think

24 is argumentative.

25       **THE COURT:** Overruled. It is a small subset. I'm

1  trying to help the jury, otherwise they might get confused and

2  think they're -- no.

3      MS. MOULTON:  Okay.  On lines 8 and 9 you have the

4  same "help determine whether these claims are invalid."

5      THE COURT:  All right.  I'll take that out.

6      MS. BAILY:  I think there, Your Honor, the "help" can

7  come out but I think -- sorry.  Let me just get the context.

8      THE COURT:  I'm going to take -- I'm just going to end

9  it with "infringed" because I pick up in the next sentence

10  "valid and infringed."

11      MS. BAILY:  Okay.

12      THE COURT:  Okay.

13      MS. MOULTON:  Okay.  So then the next instruction is

14  the claim construction instruction.

15      THE COURT:  Now there's one that we didn't get to.

16  You wanted me on the Google side to define "standalone mode"

17  based on the Yamaha, and that's a point you and I need to

18  discuss in chambers because I think there may be some validity

19  to that point, but I'm -- I did not get to that yet.  I kept

20  meaning to turn to it, but I -- but I -- that's not the point

21  you want to make so you can --

22      MS. MOULTON:  But on that point, we filed a brief I

23  think on Sunday that addresses the standalone mode argument and

24  that Yamaha rejection, and in that brief we explain that the

25  examiner's statement of allowance was not in response to an

1  amendment to standalone mode.  So I just ask you to review that

2  document and the prosecution history.

3          THE COURT:  But, yes, we will.  Did you put in a brief

4  on that?

5          MS. BAILY:  We did put in a brief on this, Your Honor.

6          THE COURT:  All right.  My law clerk is going to try

7  to find that and look at that, but I feel there is a legitimate

8  issue there but I haven't gotten there.

9      But is that -- you were going to raise a different point.

10          MS. MOULTON:  Yes.  So we disagree with taking "user"

11  out of the claim construction, which, as you note, was

12  stipulated to by the parties.

13      And we also disagree with the characterization that Sonos

14  somehow -- the way that this instruction reads is that Sonos

15  sort of induced you to put the word "user" in the construction,

16  and we don't think that's a fair characterization.

17          THE COURT:  What page am I on?

18          MS. MOULTON:  Page 9, line 19.

19                  (Pause in proceedings.)

20          THE COURT:  Okay.

21          MS. MOULTON:  We could just take out at line 18 "I

22  have never determined," just take out from there to line 21 "I

23  have now omitted the user language."  I don't think the jury

24  needs to know why and I don't think there's --

25          THE COURT:  All right.  I agree with you they don't.

**PROCEEDINGS**

1        Okay.

2            **MS. MOULTON:**  That's as far as I got, sir.

3            **THE COURT:**  All right.  You will have more later

4    because you haven't read the rest of it.  So you have to have

5    that chance.

6        All right.  Ms. Baily, just getting up to paragraph 16,

7    what points do you want to bring up?

8            **MS. BAILY:**  The only note I had was the outstanding

9    Yamaha claim construction issue, which you addressed, and

10   that's it.

11           **THE COURT:**  Yeah, okay.

12       All right.  Is that it?

13           **MS. BAILY:**  Well, I also haven't completed reading.

14   I'm only up through Instruction 17 so I need more time as well.

15           **THE COURT:**  All right.  Here's what we'll do:  I have

16   tried to do something either close to or what you suggested on

17   indirect.  Maybe it was you, Ms. Baily.

18       And so indirect and contributory are now in here in so

19   much detail that I believe it's going to be a disservice to the

20   jury; and even though you both want it in there now, you will

21   live to regret it, both of you.

22       But at your request I put it in.  I ask you to look at it

23   to see if you think it really ought to be in there or if

24   there's a better way, a simpler way to deal with it.

25       We're going to tell the jury to be here at 7:45, and we

1  will argue the case at 8:00 o'clock, and I will do my best job

2  to get the best instructions I can.  So you need to be here at

3  8:00 o'clock tomorrow -- sorry --

4          MS. BAILY:  7:00?

5          THE COURT:  -- 7:00 o'clock tomorrow for a charging

6  conference.

7          MS. MOULTON:  We're happy to be here earlier if you

8  would like as well.

9          THE COURT:  Well, Marla, can you be here at 6:45?

10          THE OFFICIAL REPORTER:  Yeah.

11          THE COURT:  It will go down in the annals as the

12  earliest case ever.

13                      (Laughter)

14          THE COURT:  Wait a minute.  What is this?

15     She wants to know should they file objections.  If I let

16  them file objections, it will go on forever.

17     I'll tell you what.  You can make your -- without

18  prejudice to making further objections tomorrow at 6:45, you

19  can have four pages and only four pages to tell us the things

20  you have the greatest heartburn about.  That way you'll tell us

21  the things that are of the most concern to you.

22          And then you can still put on the record tomorrow all of

23  your other objections, but the ones that we will have some

24  advance notice of are the things that you care the most about.

25          MS. MOULTON:  Your Honor, I have two things.  I got a

 1   note that on the objection to the instruction about the

 2   capability claim, the instruction that says "There's a small

 3   subset of computing devices."

 4        So right now I don't think we have a specific number of

 5   computing devices -- of computing devices connected to groups

 6   of three speakers because Google didn't produce that evidence.

 7        And the testimony that suggested it was just a small

 8   percentage of speakers was just about speakers that had already

 9   been grouped.  There was no -- the testimony saying it's just a

10   small number wasn't about, I don't think, exactly having three

11   speakers with overlapping groups.

12        And because it had already been acknowledged that this was

13   a capability claim based on the summary judgment opinion in the

14   '885 patent and relying on a representation from Google that

15   they didn't have evidence of how many speakers --

16        THE COURT:  I'm going to change it from "small" to

17   "smaller."

18        MS. MOULTON:  Okay.

19        THE COURT:  That way -- that's okay.  Okay.

20        MS. MOULTON:  Sorry.  There was one more thing.

21             (Pause in proceedings.)

22        MS. MOULTON:  I lost my piece of paper about it, but

23   we had agreed to, Your Honor admitted the draft complaint and

24   Ms. Kwasizur's cover e-mail to that complaint with redactions,

25   and we just wanted to note that we didn't -- we wanted to

 1   preserve our objection that we don't agree that those exhibits

 2   should be submitted with redactions based on the briefing that

 3   we had put in about notice versus the licensing discussions.

 4        THE COURT:  You'll have to show me the exhibits.

 5   That's an evidentiary point.

 6        MS. MOULTON:  Just as we were finalizing the

 7   exhibits -- we have now submitted a set of redacted exhibits of

 8   those two exhibits, but I just wanted to make sure it was clear

 9   on the record that we didn't agree to be submitting those with

10   any redactions -- or they're being redacted over our objection

11   I guess is what I'm saying.

12        MS. BAILY:  Right.  I mean, Your Honor ordered that

13   the licensing discussions be redacted so that we didn't have a

14   mini trial about that.  Obviously if that was not going to be

15   redacted, then we were going to put in evidence of the

16   license -- the term sheet that the parties agreed to that

17   reflects a number other than what Sonos presented to --

18        THE COURT:  This has nothing to do with my

19   instructions.  This is an evidentiary point that came up days

20   ago and now I only have the vaguest memory of, and I'm not here

21   to reopen that issue.

22        Whatever I ruled before, I stand by, but I am not -- see,

23   this is larding the record.  This is -- whatever I ruled

24   before, there was a record.  It was adequately made, and I'm --

25   I'll stand or fall on what I -- the record that was given to me

PROCEEDINGS

 1  before.

 2      But for you now to try to reargue something is just not

 3  fair to me because I haven't got enough of a memory of what

 4  you're even talking about to go back and try to argue over it.

 5      So okay.  So let's stick with the instructions for now,

 6  and I'm going to let you both go home.

 7      And have we -- now I'm asking my law clerk -- have we

 8  given them the revised verdict form?

 9          **THE LAW CLERK:**  I just handed it to them.

10      **THE COURT:**  And they have it and they have the draft

11  instructions, and we will resume at 6:45 a.m.

12      **MS. BAILY:**  Your Honor, just for the filing tonight,

13  just the four pages, is 8:00 p.m. -- or what time would you

14  like it?

15          **THE COURT:**  Yeah, 8:00 p.m.

16      **MS. BAILY:**  Okay.  Thank you, Your Honor.

17          **THE COURT:**  No attachments, no declarations, double

18  spaced.

19      **MS. BAILY:**  Yes, Your Honor.

20      **MS. MOULTON:**  Thank you.

21      **THE COURT:**  Okay.  All right.  I have another case to

22  call here so I'm going to have to ask you-all to leave.  I'm

23  sorry.  I'm about to...

24      Okay.  Let's go.  Let's call the next case.

25              (Proceedings adjourned at 1:04 p.m.)

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, May 18, 2023

8

9

10

11     _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25