Volume 10

Pages 1757 - 1940

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

SONOS, INC.,                        )
                                    )
            Plaintiff and           )
Counter-Defendant,                  )
                                    )
  VS.                               )    NO. C 20-6754 WHA
                                    )Related Case No. C 21-07559 WHA
GOOGLE, LLC,                        )
                                    )
            Defendant and           )
Counter-Claimant.                   )
_____)
                          San Francisco, California
                          Friday, May 19, 2023

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff/Counter-Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
                BY: **CLEMENT S. ROBERTS, ATTORNEY AT LAW**
                    **ELIZABETH R. MOULTON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
                BY: **ALYSSA M. CARIDIS, ATTORNEY AT LAW**
                    **GEOFFREY G. MOSS, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff/Counter-Defendant:

 3                          LEE SULLIVAN SHEA & SMITH LLP
                            656 West Randolph Street
 4                          Floor 5W
                            Chicago, Illinois 60661
 5                     BY:  DAVID R. GROSBY, ATTORNEY AT LAW
                            SEAN M. SULLIVAN, ATTORNEY AT LAW
 6                          COLE B. RICHTER, ATTORNEY AT LAW
                            JOHN DAN SMITH, III, ATTORNEY AT LAW
 7
                            ORRICK, HERRINGTON & SUTCLIFFE LLP
 8                          51 West 52nd Street
                            New York, New York  10019
 9                     BY:  JOSEPH R, KOLKER, ATTORNEY AT LAW

10   For Defendant/Counter-Claimant:

11                          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                            50 California Street, 22nd Floor
12                          San Francisco, California 94111
                       BY:  SEAN PAK, ATTORNEY AT LAW
13                          MELISSA J. BAILY, ATTORNEY AT LAW
                            JAMES D. JUDAH, ATTORNEY AT LAW
14                          LINDSAY COOPER, ATTORNEY AT LAW
                            IMAN LORDGOOEI, ATTORNEY AT LAW
15                          JASON C. WILLIAMS, ATTORNEY AT LAW

16

17   Also Present:       Kevin MacKay, Google Representative
                         Alaina Kwasizur, Sonos Representative
18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2     Friday, May 19, 2023 - Volume 10

3                                                    <u>PAGE</u>   <u>VOL.</u>

4     Charging Conference                            1760   10
      Jury Instructions                              1792   10
5     Closing Argument by Mr. Sullivan               1801   10
      Closing Argument by Mr. Pak                    1842   10
6     Rebuttal Argument by Mr. Sullivan              1883   10
      Rebuttal Argument by Mr. Pak                   1891   10
7     Final Jury Instructions                        1902   10

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Friday - May 19, 2023                           6:44 a.m.

 2                     P R O C E E D I N G S

 3                         ---000---

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE COURT:  Welcome back, everybody.  Have a seat.

 6        Okay.  Thank you for your briefs last night.  I read them

 7   both.

 8        Let's start with Sonos' brief.  The way I'm going to

 9   proceed is go over your main points, and then we'll -- I think

10   we'll have some time to go over your miscellaneous further

11   points.  So are you ready?

12        Okay.  So Sonos' brief -- and I know -- I know you have

13   other further points and I limited you page-wise so don't --

14   don't start getting apoplectic over your record, but I do want

15   to focus first on your main points.

16        All right.  Sonos has an objection to my Instructions

17   Number 11 and 18.  Let me -- I've read that twice.  What is

18   your view over there?

19        MS. BAILY:  Good morning, Your Honor.

20        We think the instructions are appropriate and we have some

21   case law, I know it's late in the process, that we can read

22   into the record that we believe supports Your Honor's

23   construction.

24        THE COURT:  Well, just give me -- I don't have time

25   for a bunch of case law, but give me one quotation.
```

1       **MS. BAILY:**  Sure.  So from some Federal Circuit cases,

2   *In Re: Publi*cover, 813 Federal Appendix 527, Fed. Circuit 2020.

3   *Publicover* argues that Venable and Kiderman's disclosures are

4   too sparse to adequately explain to a skilled artisan how to

5   modify Venable's system to identify the accused technology; but

6   as the examiner and board correctly found, *Publicover's*

7   specification is just as sparse on how a system would identify

8   this type of eye movement.

9       So there is Federal Circuit case law and there are other

10  Federal Circuit cases that support this notion that looking to

11  the specification to see how robust the description is is

12  relevant to looking to see what's in the public domain and

13  doing a 103 analysis.

14      There's just one other, *Uber Tech v. X One*, which is 957

15  F.3d 1334, the specification of the '593 patent is entirely

16  silent on how to transmit user locations and maps from a server

17  to a user's mobile device suggesting that a person of ordinary

18  skill in the art was more than capable of selecting between the

19  known methods of accomplishing this.

20      **THE COURT:**  Well, that's much closer.  Who said that?

21      **MS. BAILY:**  That was the Federal Circuit, *Uber Tech*

22  *vs. One, Inc*. [sic]

23      **THE COURT:**  All right.  Well, your position over

24  there, Sonos, is preserved.  I am positive this should be the

25  law, I believe it is the law, and I'm not going to change it so

1    your point is preserved.  Time is of the essence.

2         Here's the basic point:  It comes up in the context of

3    what somebody of ordinary skill in the art at the time would

4    know what to do, and one of the -- if the specification is so

5    thin that it barely gets through the PTO, it's because the

6    people of ordinary skill in the art would understand some of

7    these features and know how to do it.  Like probably the word

8    "storage" is a good example of that.  People of ordinary skill

9    in the art have got to know what "storage" means.  It's not

10   defined.  So similarly with some of these other things and it's

11   very thin, so I don't want you to make any more arguments.  You

12   can make it to the Federal Circuit.  Time is -- I'm not

13   changing it.

14        MS. MOULTON:  Understood, Your Honor.

15        THE COURT:  All right.

16        MS. MOULTON:  Because you're not changing it, I have

17   two suggestions subject to our overall objection.  So the first

18   is that we should include the point that the prior art as a

19   whole needs to enable the claimed invention, which we put in

20   our proposed instructions at Docket 617, page 56.

21        THE COURT:  I don't even think that's correct.  What

22   if the prior art enables all but one little thing, one little

23   limitation where it's all right there in the prior art but

24   anyone of ordinary skill in the art would understand how to do

25   that last point but you can't find the last point in some

1    reference?

2           MS. MOULTON:  No, Your Honor.  Sorry.  That's not what

3    "enablement" means.  If -- it is true that the prior art as a

4    whole has to enable the invention and render the invention

5    obvious.  So the idea --

6           THE COURT:  I'm not going to change it.

7           MS. MOULTON:  Okay.

8           THE COURT:  I'm not going to change that point.  I

9    think the way it's worded now is right.

10          MS. MOULTON:  Okay.  The other point --

11          THE COURT:  Your point is preserved for the record.

12          MS. MOULTON:  One more, Your Honor.

13          THE COURT:  All right.

14          MS. MOULTON:  In Instruction 18 on page 10 you talk

15   about what the specification has and, as you know, the

16   specification incorporates by reference the provisional.  That

17   should be made clear from these instructions.  That's part of

18   what the jury considers when it's looking at the

19   specifications.

20          THE COURT:  I'm not going to make that change.  You

21   can make whatever argument you think the record supports.  The

22   thing that got published is the specification.

23       Okay.  Now, we go to Instruction 14 and 30.

24       All right.  What is Google's view on 14 and 30?

25          MS. BAILY:  Your Honor, well, we think Your Honor has

1    it right and that the claim construction issue that's kind of

2    enveloped in these instructions is proper -- was properly

3    decided that a device is a device that controls zone scenes and

4    needs to be construed in connection with the three -- sorry --

5    it's a device that controls zone players and needs to be

6    construed in connection with three zone players.

7              THE COURT:  Well, but that's -- what -- what Sonos

8    wants me to do is take out the part where I say that --

9              MS. BAILY:  Oh, I apologize, Your Honor.

10             THE COURT:  -- and substitute in these --

11             MS. BAILY:  Yeah.

12             THE COURT:  -- new instructions.

13             MS. BAILY:  Well, I don't think that would be

14   appropriate at all because obviously in front of the jury Sonos

15   has contended this entire time that there's an additional

16   royalty base, that there's additional infringing units, and the

17   jury has already heard that so the jury needs a clarifying

18   instruction that makes clear that that is not how the jury

19   should proceed in its deliberations.  So I think there does

20   need to be an explanation about --

21             THE COURT:  Let me hear from the other side on that.

22        What do you say to that?

23             MS. MOULTON:  So, Your Honor, we -- we have always

24   contended that computing devices installed with the Home app

25   and networked with three players infringe the patent.  We said

1    it was more than that, but we certainly included that within

2    our contention.

3        And this does accurately say that for Instruction 30,

4    which is around line 19 of our brief, "A computing device

5    installed with the Home app that is not yet networked with

6    three zone players does not infringe."

7        So I think this instruction makes clear what doesn't

8    infringe.  It tells them it's a smaller subset of what you --

9    of all -- of all computing devices installed with the Home app,

10   so I think this is accurate and it avoids -- it focuses them on

11   the question they're supposed to decide.

12       MS. BAILY:  Your Honor, I think this is actually very

13   misleading.  I mean, it's not what Sonos was contending

14   throughout trial.  I think the jury needs to understand that

15   there's a difference between what Sonos was presenting as

16   instances of infringement and what the jury needs to consider

17   as instances of infringement.

18       THE COURT:  Well, it is true that Sonos has contended

19   throughout trial something much broader than what's listed here

20   and --

21       MS. BAILY:  I do think this would be confusing as it's

22   written by Sonos to the jury.

23       THE COURT:  I'm not going to decide right now.  I need

24   to -- I need to consider this a little more.  I have been

25   considering it.

1      Okay.  Let's go to the next -- line 22.  I don't think --

2  did I say the '966 accused products do not infringe?  If I did,

3  that's wrong.

4          MS. MOULTON:  So, Your Honor, you do --

5          THE COURT:  Where is that?

6          MS. MOULTON:  There is an ellipses there.  It's on

7  page 15 of Docket 751.  That was the instructions you sent us.

8          THE COURT:  I'm sorry, paragraph 15 or --

9          MS. MOULTON:  Page 15.

10         THE COURT:  Page 15.  Let's go to that.

11                 (Pause in proceedings.)

12         THE COURT:  Okay.  Where would that be?

13         MS. MOULTON:  At the very -- very bottom.

14                 (Pause in proceedings.)

15         THE COURT:  Well, that is correct.

16         MS. MOULTON:  So the way that you have it in

17  Instruction 14 I think is a little --

18         THE COURT:  Your quote "The '966 accused products do

19  not infringe," well, but that's not what I said.  What I said

20  was that I have found that the '966 accused products computing

21  devices with the Home app installed that are not yet networked

22  with at least three zone players do not infringe the '966.

23  That's a much different statement.

24         MS. MOULTON:  Well, it would be more accurate to say

25  that "computing devices with the Google Home app that are not

1   networked with at least three zone players do not yet infringe

2   the '966 patent"; or to say it more affirmatively "infringement

3   requires the Home app" -- "computing devices with the Home app

4   installed must be networked with at least three zone players"

5   to fit how Your Honor has construed the claims.

6        **THE COURT:**  No.  I'm going to be -- that's just

7   flyspecking it.  I'm -- I don't agree with you on that.  I

8   think it's fine as it is.

9        Okay.  Next is Instruction 28, dependent claims.  I don't

10  get your point here.  What is Instruction 28?

11       **MS. MOULTON:**  So the Instruction 28 talks about how a

12  dependent claim ads an additional limitation to the independent

13  claim; and as the Court currently has it, it's embedded within

14  the infringement section of the instructions, and we would just

15  ask to move that forward so that it comes before invalidity and

16  clarify that it applies to both infringement and invalidity.

17       **THE COURT:**  All right.  But worded just the same as it

18  is?

19       **MS. MOULTON:**  Yes.

20       **THE COURT:**  All right.  I'm going to say to my law

21  clerk I'm okay with that.  All right.  We're going to do that

22  one.

23       Okay.  Next one Instruction 46, lump sum.  I think you are

24  correct on that.  I'm going to change it from "revenue" to

25  "number."

 1           MS. MOULTON:  Thank you.

 2           THE COURT:  Then doubts against infringer, I am going

 3   to give some version -- let me see if I can find it -- of the

 4   doubts.

 5                     (Pause in proceedings.)

 6           THE COURT:  I can no longer find the piece of paper

 7   that I had that -- I think I left it in chambers; but, anyway,

 8   I am going to give it, but it's not going to be quite worded

 9   the same way.

10           MS. MOULTON:  Your Honor, Mr. Kolker was going to

11   argue that if you want to hear argument on it.

12           THE COURT:  No, I don't need any argument.  I don't

13   know that there's any proof here that Google should have kept

14   records that showed how many of its apps were configured with

15   three speakers that could be overlapped.

16       To me, it's a big stretch to say that a company has some

17   public duty to do that --

18           MR. KOLKER:  Your Honor, might I just say one word on

19   that point?

20           THE COURT:  -- and in all those cases where --

21   antitrust cases where lost profits is the issue, but I know

22   some courts have applied that instruction to royalties too.

23       Go ahead.  What's your point?

24           MR. KOLKER:  Good morning, Your Honor.

25       Just two things very briefly.  First, these cases we

1  believe stand for a little bit of a broader proposition than

2  you are reading them for.  If you look at *Bigelow*, for example

3  (as read):

4          "The constant tendency of courts is to find a way in

5      which damages can be awarded where a wrong was done."

6      Second, I don't think that these cases require discovery

7  misconduct or an affirmative duty to preserve certain

8  information subject to a litigation hold; rather, they are

9  courts looking for a way to assess damages where a wrong was

10  done, in these cases because liability was found, in order to

11  prevent the Defendant from getting away with no damages merely

12  because they did not keep relevant records.

13      And with respect to the fact that these cases primarily

14  involve the lost profits context, we agree with that; but the

15  reason that this comes up in the lost profits context is

16  because in those cases, the Plaintiff is trying to prove how

17  many products or sales the Defendant made in order to calculate

18  damages, and that is precisely what we are trying to do here as

19  part of our per-unit royalty base.

20          **THE COURT:**  No, that's not quite right.  In the

21  antitrust cases it is -- what you say is true, that the -- when

22  the antitrust violator has, for example, sold product that

23  rightfully belonged to the Plaintiff and took over that market

24  share, and -- I'm sorry, I can't -- I'm on something else right

25  now.  I've forgotten where I was.

1    In the antitrust context, the number of units sold is

2 quite important, and I've seen myself cases where the wrong

3 doer says, "Well, you know, we didn't have those records.  We

4 kept it a different way," and it just isn't very credible.

5    But here, Google knows exactly how many apps have been

6 installed; but you overreached, in my judgment, and tried to

7 sue for apps when your patent doesn't cover the app unless it's

8 configured and networked with speakers, three speakers.  So

9 I -- I don't -- it's hard to say that.

10    Anyway, here's what I'm going to say to the jury:  If you

11 find that Google failed to keep proper records -- it's going to

12 be up to the jury what a proper record is -- if you find that

13 Google failed to keep proper records, any doubt that you may

14 have on the issue of damages due to any such failure to keep

15 proper records should be decided in favor of Sonos.

16    **MS. BAILY:**  Can I state my objections to that on the

17 record, please?

18    **THE COURT:**  Go ahead.  State your objection.

19    **MS. BAILY:**  There's no evidence at all that Google

20 failed to keep proper records.  There's no requirement that

21 Google be keeping records that accord with Sonos' narrow

22 patents.

23    Sonos itself could have information about how many

24 users -- how many of their own users group three products

25 together.  They could have extrapolated from that for a damages

 1    analysis.  They --

 2         THE COURT:  Or they could have gone out and done some

 3    kind of a survey.

 4         MS. BAILY:  That's right.

 5         THE COURT:  Instead of having eight lawyers each day

 6    at the trial, some of that money could have gone to fund a

 7    survey.  I agree with you totally on that, but I say "if."  I

 8    say "if."

 9         MS. BAILY:  But it implies that we destroyed or had

10    some sort of failure on our part when there's no evidence of

11    that.

12         THE COURT:  If the argument is improper, I will

13    interrupt -- where is Mr. Sullivan?

14         If the argument is improper, I will interrupt and say

15    there's no proof of that, so -- but I'm going to -- no, you

16    want this -- this -- some version of this instruction, I'm

17    going to give it.  Your objection is preserved for the record.

18         Okay.  Time is short.  We can't argue over every little

19    thing.

20         MR. KOLKER:  Thank you, Your Honor.

21         THE COURT:  Now, I want to come to Google's heartburn.

22         Instruction Number 27 to 34, there is no direct

23    infringement claim against Google with respect to the '966.

24         All right.  What do you say to that?

25         MS. MOULTON:  We have evidence that Google tested the

 1    products internally and networked its controllers with at least

 2    three speakers.

 3          THE COURT:  You mean for like in the laboratory?

 4          MS. MOULTON:  Yes.  That would be direct infringement.

 5          MS. BAILY:  And that was not during the infringement

 6    period.  There's no evidence that Google ever did anything like

 7    this during the infringement period.

 8          THE COURT:  Is that true?

 9          MS. MOULTON:  I don't know what that means.

10          MS. BAILY:  From the time that the patents issued

11    onward.

12          MS. MOULTON:  Dr. Almeroth testified that he had seen

13    evidence of internal testing.  Mr. Pedro and Mr. MacKay both

14    testified to that.

15          MS. BAILY:  That was before Google introduced the

16    feature which was before the patents issued.

17          MS. MOULTON:  They must have tested the redesign.

18          THE COURT:  I'm going to go with Sonos on that one.

19      Instruction number 37.  I do want to say it's crazy in a

20    case, if that's your infringement theory, that they did it in

21    the laboratory to come up with a redesign.  There must be about

22    $4.22 worth of infringement damages, and it's crazy to waste

23    the jury's time with something like that; but time is so short,

24    I'm not going to say anything more.

25      Willfulness, I'm inclined to -- to -- wait a minute.

```
1              (Pause in proceedings.)

2         THE COURT:  I know.

3    37.  What's your view on 37?

4         MS. MOULTON:  We're okay with adding "intent" but

5    we're not okay with adding "prior to the suit."  Google tacked

6    that onto the end of that sentence.

7         MS. BAILY:  Yeah, we should have called out that we

8    did tack that onto the end, "prior to the suit."

9         THE COURT:  Well, the willfulness has to be before the

10   suit; right?

11        MS. MOULTON:  The challenged conduct continued.

12        THE COURT:  Yes, okay.  If it was -- if it was presuit

13   conduct, I guess that's right.  I see your point.  If it was on

14   the '966, the jury could find that willfulness began prior to

15   the suit and continued on.  I think that's -- that's a -- okay,

16   I'm rejecting 37.

17        MS. BAILY:  Can we just have the "and intent" language

18   that Sonos said they had no objection to, Your Honor?

19        THE COURT:  Is that right?

20        MS. MOULTON:  Yes.

21        THE COURT:  Okay.  We'll put in "and intent."

22   Number 38, because the claims and declaratory are directed

23   to -- okay.  I'm going to make that change.

24        MS. BAILY:  Thank you, Your Honor.

25        THE COURT:  41, Malackowski.  I am going to say in
```

1  some fashion that those gargantuan numbers, 77 million and

2  12 million, derive from this ITT [sic] exercise and should be

3  disregarded.

4       MS. MOULTON:  We're not going to present those numbers

5  in closing, Your Honor.  I don't think you need to get into the

6  specifics.

7       THE COURT:  Yes, but the jury heard those gigantic

8  numbers and they need to be rooted out and thrown into

9  oblivion.

10       MS. MOULTON:  Can you not characterize them as

11  gigantic?

12       THE COURT:  What?

13       MS. MOULTON:  Can you avoid characterizing them as

14  gigantic?

15       THE COURT:  I'm not going to characterize them.  I'm

16  just going to quote them verbally.  That number is just for the

17  lawyers' benefit.

18       Okay.  46 to 47.  I don't even understand the point.

19       MS. BAILY:  Sorry, Your Honor.

20       So there's -- there's an instruction that is good about

21  how a reasonable royalty must reflect the value attributable to

22  the infringing features and no more.  We just think that

23  applies to both running royalties and lump sums.  It doesn't

24  matter what the form of the royalty is.

25       And so we're just asking that that instruction apply to

1  both forms of --

2      **THE COURT:**  Oh, I see.  If that's all you're asking

3  for, I'm okay.

4      Are you okay with that?  I mean, you can't have an

5  excessive lump sum any more than an excessive --

6      **MS. MOULTON:**  Yeah.  So just to be clear, I think what

7  would happen is we have -- so I'm on page 23 of Docket 751.

8      **THE COURT:**  I don't know.

9      **MS. MOULTON:**  That's the instructions that you put on

10  the docket yesterday.

11      **THE COURT:**  All right.  23.  And then where?

12      **MS. MOULTON:**  So it would start with Number 45, "one

13  way to calculate a royalty is what's called the per-unit

14  royalty."

15      And then in the -- in this third sentence in Number 45 it

16  would read "You then need to multiply the number of products

17  the Defendant sold by the rate that you would have" -- "that

18  you find would have resulted from the negotiation."

19      **THE COURT:**  Is that your -- that's a change you wanted

20  a while ago.

21      **MS. MOULTON:**  Yes, that's right.

22      **THE COURT:**  Well, why are we going back to that?

23      **MS. MOULTON:**  Your Honor, I'm just -- I'm saying how I

24  think it would read with both of our changes.  So we would have

25  that per-unit instruction.

1      **THE COURT:**  But your change is a different point.

2      **MS. MOULTON:**  Yeah.  I'm just walking through it.

3      So we have the per-unit instruction.  Then Number 47, the

4   lump-sum instruction.

5      **THE COURT:**  Where does -- where is the paragraph that

6   you -- Ms. Baily, the sentence that you want to move?  Where is

7   that?  46.

8      **MS. BAILY:**  Yeah, so 46 is the one that we want to

9   move so that it applies to both the running royalty, which is

10  described in 45, and the lump sum that's described in 47.

11     **MS. MOULTON:**  More or less we're switching the order

12  of 46 and 47.

13     **MS. BAILY:**  And then we would just change the language

14  to --

15     **THE COURT:**  All right.  I'm going to say to my law

16  clerk that first sentence of 46, we should find a way to make

17  sure it describes both measures of damages and not just lump

18  sum.  It's got to be the other one too.

19     And I -- I'm not going to take the time now.  You just

20  have to trust us we will come up with a way to make sure it

21  describes both.

22     **MS. BAILY:**  Thank you, Your Honor.

23     **THE COURT:**  All right.  Then you say Question Number 5

24  on the verdict form.

25     I'm okay with the way that -- you want to reword it.

1      Are you okay?

2           **MS. MOULTON:**  Yes.

3           **THE COURT:**  All right.  So we'll make that change.

4           **MS. BAILY:**  Your Honor, just one other housekeeping

5      point, unless I'm jumping the gun.

6      Just on the IFTTT issue, there were two exhibits moved in

7      by Sonos that perhaps should not go back to the jury because

8      they relate to that analysis.  So I just wanted to raise that,

9      and sorry for the last-minute issue.

10          **THE COURT:**  Time is too precious right now to get into

11     that.

12          **MS. BAILY:**  Okay.

13          **THE COURT:**  We'll deal with that by the time the

14     documents go to the jury.

15     All right.  Remind me, though.

16     Now let's go over miscellaneous points.

17     Sonos, any other miscellaneous -- oh, can I raise one

18     for -- with all of you?

19     In my humble opinion, you-all have larded this up with

20     indirect infringement to the point of -- that it's ridiculous,

21     but there's one -- at least a small change can be made to

22     delete anything having to do with contributory infringement for

23     the obvious reason that you cannot have contributory

24     infringement unless the product has no noninfringing uses.

25     These speakers and these -- this app definitely have

 1   noninfringing uses.

 2       So, now, that's taking my view of the -- taking your view

 3   of the -- Sonos' view that the app in and of itself without

 4   being configured with anything is infringing, I disagree with

 5   that.

 6       But once you accept my view that it has to be networked

 7   with three speakers, then if it's only networked with two

 8   speakers, it does not infringe.  So there are noninfringing

 9   ways to use the app.

10       So I suggest to you both that we should take anything

11   having to do with contributory out reserving to Sonos it's

12   larger contention that I'm totally wrong on what the claims

13   mean.

14       **MS. MOULTON:**  I still disagree that we should take out

15   contributory infringement.  Under the *Lucent vs. Gateway*

16   case -- I can grab the cite for you -- you look at the specific

17   functionality that's accused and ask whether that functionality

18   has substantial noninfringing uses.

19       **THE COURT:**  Okay.  I can't get you both to agree.

20   There's no point in asking Google.

21       One side or the other is going to so confuse the jury that

22   they will return a verdict against that side.  I don't know who

23   that is yet, but that -- you-all have larded this up with so

24   much, and it should be -- it's a much simpler case.

25       Okay.  You get to, on the Sonos side, to bring up your

 1   miscellaneous points.

 2           MS. MOULTON:  Okay.  Our first one is in the

 3   obviousness instruction, we should add an instruction about

 4   nexus.  So when the accused -- sorry.  When Sonos' product

 5   practices the patent, there's a presumption that praise for

 6   that product is related to the claims and Google has the burden

 7   of rebutting that presumption, and I have a proposed addition

 8   if you'd like to see it.

 9           THE COURT:  Can I see your language?

10           MS. BAILY:  May I see it too?

11           MS. MOULTON:  Yes.

12                   (Pause in proceedings.)

13           THE COURT:  Where did this come from?  I don't believe

14   that this is the law.

15           MS. MOULTON:  So, Your Honor, it comes from -- it's

16   from the Federal Circuit, from the *WBIP vs. Kohler* case, which

17   is 829 F.3d 1317.

18       So the quote there is (as read):

19           "There is a presumption of nexus for objective

20           considerations when the patentee shows that the asserted

21           objective evidence is tied to a specific product and that

22           product is the invention disclosed and claimed in the

23           patent."

24           MS. BAILY:  Well, that's the distinguishing point.  Of

25   course the Sonos 2020 system is not in its entirety the claimed

1   invention.

2          MS. MOULTON:  It embodies the claimed invention and

3   it's Google's burden to show that presumption doesn't apply.

4          MS. BAILY:  The notion that all praise for the Sonos

5   2020 system is directed to grouping overlapping speakers is --

6          MS. MOULTON:  Your Honor saw the evidence from the two

7   articles that talk specifically about grouping including

8   overlapping groups or groups that --

9          THE COURT:  No.  The word "overlapping" was never

10  used.  There was one thing where it was upstairs, downstairs

11  front, back; and if you did the math and thought about it for

12  about five minutes, you could figure out that probably that

13  included overlapping.

14         MS. MOULTON:  So, Your Honor --

15         THE COURT:  However -- however, the other one did not

16  come close.  It just had other -- you could have Speakers A and

17  B and C and D, but -- and those don't overlap, and so that had

18  nothing to do with the -- with the claimed invention.

19         MS. MOULTON:  It specifically praised grouping; and

20  then under the Federal Circuit's law there's a presumption that

21  that includes praise for the claimed invention, and Google has

22  to rebut that presumption.

23         MS. BAILY:  That's not even what this says,

24  Your Honor.

25         THE COURT:  I want to find where -- where all those

 1  second -- where do I have the secondary considerations already?

 2      MS. MOULTON:  Instruction 21.

 3              (Pause in proceedings.)

 4      THE COURT:  Yeah, it's Number 6 (as read):

 5          "Acceptance by others of the claimed invention as

 6      shown by praise from others in the field or from licensing

 7      of the claimed invention."

 8      So that's -- that's close -- as close as I'm going to get

 9  to this because I don't think -- on our case I find it very

10  hard to believe that the praise that you put in was directed

11  at -- only at the invention of three speakers that you can

12  overlap.  So I'm -- your point is preserved for the record.

13      This is called nexus instruction.  We need to put this in

14  the record, Angie, so that the Federal Circuit will know what I

15  rejected.

16      Okay.  What's your next one?

17      MS. MOULTON:  Okay.  I've got one more proposal and

18  then one small one.

19      Thank you.

20      So if Mr. Pak is planning to argue about the unasserted

21  patents in closing or the patents that were previously asserted

22  and are no longer asserted, then we'd ask the Court to remind

23  the jury that that's only relevant for purposes of willful

24  infringement as you previously instructed them.  So I have a

25  proposed curative on that.

1    THE COURT:  Are you going to make that argument,

2    Mr. Pak?

3    MR. PAK:  Yes, I am going to be raising the prior

4    history, Your Honor.

5    THE COURT:  Can I see your proposal?

6    (Pause in proceedings.)

7    MS. BAILY:  Your Honor, we don't think this

8    instruction is appropriate.  It was Sonos' option to open the

9    door to this.  That's what they did.

10    THE COURT:  Well, what is the argument going to be

11    about the unasserted patents so that I can understand the

12    context?

13    MR. PAK:  Your Honor, I'm going to be saying that in

14    response to the -- the sending of the Western District of Texas

15    complaint, the history of what happened and why we're here; and

16    the fact that there were two patents that were found to be

17    invalid by Your Honor, two patents that Sonos withdrew based on

18    defenses that we raised, and that this is evidence or a fact

19    for them to consider.

20    THE COURT:  Well, first does the jury know -- I can't

21    remember.  Has the jury been informed that two patents were

22    found invalid?

23    MR. PAK:  Yes, Your Honor.

24    THE COURT:  And that two were withdrawn?

25    MR. PAK:  Yes, Your Honor.

 1          THE COURT:  All right.  So what is your point going to

 2     be based on that?

 3          MR. PAK:  Based on that will be, Your Honor, that we

 4     brought this case as a declarant in order to provide our

 5     defense, and there were five -- there were six patents in the

 6     case at some point.

 7               THE COURT:  Is there testimony to support that?

 8               MR. PAK:  Yes, Your Honor.

 9          THE COURT:  Because you can't start adding testimony.

10          MR. PAK:  Absolutely not.  This was --

11          THE COURT:  Even though you were in the case, you're

12     not a witness.

13          MR. PAK:  That's right, Your Honor.  We established

14     that through the cross-examination of Ms. Kwasizur, Your Honor.

15               THE COURT:  All right.  Tell me again your point.

16          MR. PAK:  My point simply is going to be I'm going to

17     start at the beginning of the presentation walking through the

18     history that they put us on notice they were claiming willful

19     infringement.  We provided defenses to those allegations.

20        And the facts have borne out that we had credible and

21     reasonable defenses to clear our name, and that's what I'm

22     going to be arguing.  And I'm going to tell them that

23     Your Honor has done your job, and we're here so that -- with

24     the remaining two, we're going to be asking the jury to do

25     their job.

 1      And that's the extent of what I'm going to be talking

 2  about.

 3          THE COURT:  Well, I think you should add this sentence

 4  in there --

 5          MR. PAK:  Yes.

 6          THE COURT:  -- and maybe you avoid me having to

 7  interrupt you, which I will do just like I will interrupt

 8  Mr. Sullivan if you go off into left field.

 9          MR. PAK:  Yes, Your Honor.  Go ahead, please.

10          THE COURT:  Something along the lines:  I want to make

11  clear that merely because those patents are no longer in the

12  suit, that there is something wrong with Sonos' assertion of

13  the '966 and '885 and that's why we are here today to find out,

14  and it's your decision.  Google will live or die by your

15  decision whatever.  Something -- in other words, make it quite

16  clear that your referring to those prior patents in no way

17  suggests that these patents are bogus.

18          MR. PAK:  Will do, Your Honor.

19          THE COURT:  All right.  Okay.  I'll keep this up here

20  as a possible curative instruction.  I want to see the way it

21  comes out in the actual argument.  So I'm not going to say yes

22  or no now to that now.

23          MR. PAK:  Thank you, Your Honor.

24          THE COURT:  Okay.  You said you had one more.

25          MS. MOULTON:  Yes, Your Honor.  Are we going to see a

1  final copy that includes the idle -- that Schonfeld's idle mode

2  theory was struck?

3      **THE COURT:**  Yes.  I'm going to put that in and there

4  are going to be -- I'm going to try to give you a redlined --

5  we're working very hard.

6      **MS. MOULTON:**  Understood.

7      **THE COURT:**  You have eight lawyers, maybe it's nine,

8  at your table.  If you count the ones in the back, it's

9  probably 20.  My law clerk is the only one I got and she

10  doesn't get to sleep thanks to you and thanks to Google; but,

11  nevertheless, before this argument starts, we're going to try

12  to give you a clean copy of what I'm going to actually say.

13     Okay.  Is that it?

14     **MS. MOULTON:**  Thank you.

15     **THE COURT:**  Now, what do you have by the way of

16  miscellany?

17     **MS. BAILY:**  We don't have anything except just on that

18  prior point with respect to the Schonfeld testimony, just to

19  make sure that it's clear that the fact testimony regarding

20  idle mode --

21     **THE COURT:**  I will make that I'm not striking what

22  MacKay said, but I am striking what Schonfeld said.

23     **MS. BAILY:**  Yes, Your Honor.

24     **THE COURT:**  Okay.  What I'm going to try to do now is

25  retire to chambers, and then -- I can't -- you gave me so many

1    notes, I don't know what -- I'm not going to hand them out now,

2    no.

3                    (Pause in proceedings.)

4         THE COURT:  I'm going to try to get all this in time

5    so the jury -- we will not start the closings until I hand you

6    what we're going to actually give.  I'm not going to entertain

7    more argument; but if I -- if I somehow make an obvious goof

8    where you can see that I meant '885 and not the '966, of course

9    you should bring that to my attention, but I'm not going to

10   entertain yet more arguments.

11        MR. ROBERTS:  Question, Your Honor.

12        THE COURT:  Yes.

13        MR. ROBERTS:  If we have objections we would like to

14   preserve for the record based upon the final set --

15        THE COURT:  No.  This is the time and place to do it.

16        MR. ROBERTS:  Okay.

17        THE COURT:  I've asked for miscellaneous objections.

18   I don't want after the fact.  No, you don't get a chance to

19   lard the record.

20        MR. ROBERTS:  Just because we hadn't seen the final

21   set.

22        THE COURT:  How come it's always you that bring these

23   things up?

24        MR. ROBERTS:  Part of my job is protecting our record

25   for appeal, Your Honor.

1      **THE COURT:**  Well, okay.  No, this is the time to

2  protect the record.  Is there more you want to bring up?

3      **MS. MOULTON:**  We haven't seen the final jury

4  instructions yet.

5      **THE COURT:**  Well, yeah, but you've seen -- is there

6  more you want to bring up based on the ones you have seen?

7      **MS. MOULTON:**  Subject to our prior objections, no.

8      **THE COURT:**  Okay.  Then I'm going to try to do it in

9  such a way as to -- you know, if I overrule one of your

10  objections, your record is okay.  You don't have to make that

11  again.  But -- but if there's something you could have in

12  fairness raised right now and you didn't, then, in my view,

13  it's waived.  So there.

14      See you soon.

15      **MS. BAILY:**  Thank you, Your Honor.

16      **THE COURT:**  Oh, I have one other thing.  On the --

17  it's called -- on the closing arguments, you cannot engage in

18  sandbagging in your rebuttal.

19      Here's what sandbagging is.  I'll give you the classic

20  case in a different type of case.  Plaintiff gets up, makes an

21  argument; Defendant gets up and makes an argument; and then the

22  Plaintiff, who gets the last word, for the first time gets into

23  punitive damages.  Teach them a lesson.  Send a message to the

24  big company.  Well, that is called sandbagging.  You cannot do

25  that in your rebuttal.

 1        In your rebuttal you are limited to two things, two

 2   subjects.  Whatever subjects you brought up on your opening,

 3   and it can't just be you use two words.  It's whatever you in

 4   fairness brought up in your opening whether or not the other

 5   side responded to it.  For example, if you brought up points A,

 6   B, and C and the other side ignores that, you can point out in

 7   your rebuttal, "Hey, I told them A, B, and C.  Did you hear a

 8   single word about A, B, or C?  No.  They ignored it."  That's

 9   okay.

10        The second thing you can bring up is any response to

11   anything the other side has said, but what you cannot do is

12   bring up new material that neither side has addressed.  That is

13   sandbagging.

14        So, for example, Mr. Pak, if you were to just do a cursory

15   job on invalidity and then save all your ammunition, keep your

16   powder dry for the rebuttal, that would be sandbagging even

17   though you mentioned the word "invalidity."  So you've got to

18   give Mr. Sullivan a fair shot at what your arguments are on

19   invalidity.

20        **MR. PAK:**  Yes, Your Honor.

21        **THE COURT:**  Same thing.  He has got to give you a fair

22   chance because you only -- you won't get a rebuttal on -- so

23   his opening has got to give you a fair shot at what his case

24   is.

25        **MR. PAK:**  Thank you, Your Honor.

1      THE COURT:  And you're limited to invalidity now on

2  your --

3      MR. PAK:  Absolutely.

4      THE COURT:  -- rebuttal.

5      MR. PAK:  Thank you.

6      THE COURT:  All right.  It is 15 and 15 for the

7  rebuttal.

8      MR. PAK:  Appreciate it.

9      THE COURT:  All right.  Thank you.

10                 (Recess taken at 7:25 a.m.)

11              (Proceedings resumed at 8:28 a.m.)

12      (Proceedings were heard out of the presence of the jury:)

13      THE CLERK:  Please remain seated.

14      THE COURT:  We're going to bring the jury in, and I

15  will read the first few pages -- the preliminary part of the

16  instructions to get that out of the way, and then we'll turn --

17  but I will not yet read the substantive parts, and then we will

18  have the closings.

19      My law clerk is trying to send you now a PDF of the

20  revised instructions which take into account some of the

21  requirements or objections that you made earlier today and

22  overnight, but not all.

23      Okay.

24      MR. PAK:  Your Honor, may I just confirm that you're

25  not changing the numbering on any of those?

 1          THE COURT:  Yes, they are being changed.

 2          MR. PAK:  They are being changed.

 3          THE COURT:  They have been changed because of some of

 4   the -- I forget.  I think Sonos wanted me to move one of the

 5   paragraphs up earlier, and I tried to do that.  It turned out

 6   to be sort of a nightmare, and that's -- that accounts for

 7   30 minutes of the delay alone because it wasn't so easy to make

 8   it fit in at that spot, but I think we've now got it fixed, but

 9   the paragraph numbering is not the same.

10      Okay.  Ready?  Go bring in the jury, please.

11                    (Pause in proceedings.)

12          THE COURT:  While we're bringing in the jury, for

13   those you in the gallery, you're most welcome to be here.

14   Please do not go in or out during the reading of the

15   instructions or in the closing arguments.  Wait until there's

16   some break.  I don't want the jury to be distracted from either

17   of those two events.

18                    (Pause in proceedings.)

19          THE CLERK:  All rise for the jury.

20      (Proceedings were heard in the presence of the jury:)

21          THE COURT:  Okay.  Be seated.  Welcome back.

22      Okay.  Today we will do closing arguments and instructions

23   and.  By instructions of law, that simply means the judge

24   giving you the law that governs the case and then you try to

25   apply that law in your deliberations to the facts.  And it's

1    always up to you to decide what the facts are unless I have

2    told you something is conclusively proven.

3        So to give you a -- this is going to take some time.  We

4    will probably -- it will probably take close till noon to get

5    all of this done.

6        Each side has an hour and 15 minutes for closing.  One

7    hour of that they can use in their opening, the first part, and

8    then they get a rebuttal that's 15 minutes.  And it will go

9    Plaintiff first, Sonos, for one hour; then Google, one hour;

10   then rebuttal Sonos, 15 minutes; and then a rebuttal by Google

11   for 15 minutes, but Google's is limited to -- rebuttal is

12   limited to one issue, which is the validity or invalidity of

13   the patents because the party with the burden of proof gets the

14   rebuttal.  So, in fairness to Google, they get a rebuttal on

15   the part they have the burden of proof on.

16       So it's one hour, one hour, 15, and 15.  We will take

17   appropriate breaks in there; and of course anytime you raise

18   your hand and need a break, we will immediately take a break.

19       Now, the way I'm going to do the instructions mostly will

20   be at the very end, but you can imagine that in a case like

21   this I've got 25 pages of instructions, that's going to take me

22   an hour to read.

23       I'm going to read right now the first few pages because

24   these are preliminary, and I shouldn't say -- they're just as

25   important, but they don't get yet into the substance of the law

 1   but it does get into some evidentiary points.  And so what I'd

 2   like to do is read you that part now so that when I resume, I

 3   will have already done six pages worth of the 25.

 4        Okay.

 5                        (No response.)

 6        **THE COURT:**  You can take notes.  You don't have to

 7   take notes.  It's up to you to whether you want to take notes

 8   or not.

 9        In a way, what this is like you going to law school.  The

10   lawyers all went to law school for three years.  You get to go

11   for one hour.

12                        (Laughter)

13        **THE COURT:**  And -- but we have worked hard, me and the

14   lawyers, to try to reduce this down to the law that governs

15   this case.  So you don't need to know law about other things,

16   like criminal law or constitutional law, no.  Patent law.

17        Ready?

18                        (No response.)

19        **THE COURT:**  Okay.  Members of the jury, it is my duty

20   now to instruct you on the law that applies to this case.  Each

21   of you will receive a copy of these instructions to consult

22   during your deliberations.

23        These instructions have several parts.  The first part

24   will address guidelines for evaluating evidence, burden of

25   proof and related matters.

It is your duty to find the facts from all the evidence in the case.  To those facts you must apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with the law or not.  You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathies.  This means you must decide the case solely on the evidence before you.

Please perform these duties fairly.  You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others.  They are all equally important.

You must not read into these instructions or into anything the judge may have said or done as suggesting what verdict you should return.  That is a matter entirely up to you.

I will now instruct you about what is evidence in this case and how you may use it.

The evidence from which you are to decide what the facts are consists of the exhibits that have been received into evidence; the sworn testimony of witnesses who appeared in court on both direct and cross-examination regardless of who called the witness; the sworn testimony of witnesses and depositions read into evidence or shown by video; any facts to which all the lawyers have stipulated.

1    When I say "all the lawyers," I mean both sides.  I don't

2    mean 16 lawyers.  I mean one lawyer for each side.

3    Any facts to which all lawyers have stipulated.

4    Agreed upon before you in court.

5    Somebody is coughing.  Do you need a cough drop?  Because

6    we've got a lot of them, don't we?  You let me know if you want

7    water.  We have water too.

8    You must treat any stipulated facts as having been

9    conclusively proven.

10    In reaching your verdict, you may consider only the

11    evidence that I have just described.  Certain things are not

12    evidence, not evidence, and you may not consider them in

13    deciding what the facts are.

14    I'm going to list those for you.  Arguments and statements

15    by trial counsel are not evidence.  Trial counsel are not

16    witnesses.  What they said in their opening statements and will

17    say in their closing arguments and elsewhere is intended to

18    help you interpret the evidence but your interpretation of the

19    evidence controls.

20    A suggestion and a question to a witness by trial counsel

21    or the judge is not evidence unless it is adopted by the answer

22    of the witness.  In other words, a question by itself is not

23    evidence.  Consider it as evidence only in light of the answer.

24    An objection to a question is not evidence.  Lawyers have

25    a duty to their clients to consider objecting when they believe

1  a question is improper, but the objection itself is not

2  evidence that the question was improper.  If an objection is

3  sustained, then you must disregard the question and any answer.

4      Anything you may have seen or heard when the court was not

5  in session is not evidence.  Again, you should decide the case

6  solely on what you hear right here in the courtroom and the

7  evidence received at trial.

8      Evidence may be direct or circumstantial.  Direct evidence

9  is direct proof of a fact such as testimony by a witness about

10  what that witness personally saw, heard, or did.  Personally

11  saw, heard, or did.

12      Circumstantial evidence is proof of one or more facts from

13  which you could find another fact.  By way of example, if you

14  wake up in the morning and see that the sidewalk is wet, you

15  may find from that fact that it rained during the night.

16  However, other evidence, such as a turned-on garden hose, may

17  explain the presence of water on the sidewalk.

18      Therefore, before you decide that a fact has been proven

19  by circumstantial evidence, you must consider all the evidence

20  in light of reason, experience, and common sense.

21      In determining what inferences to draw from evidence you

22  may consider, among other things, a party's failure to explain

23  or deny the evidence.

24      The law permits you to give equal weight to direct and

25  circumstantial evidence, but it is always up to you to decide

1  how much weight to give to any evidence.

2      The weight of the evidence as to a fact does not

3  necessarily depend on the number of witnesses who testify nor

4  does it depend upon which side called the witnesses or produced

5  the evidence.  The testimony of one witness worthy of belief is

6  sufficient to prove any fact.

7      In deciding the facts of this case, you may have to decide

8  which testimony to believe and which testimony not to believe.

9  You may believe everything a witness says or part of it or none

10  of it.

11      In considering the testimony of any witness, you may take

12  into account the opportunity and ability of the witness to see,

13  hear, or know the things testified to; the memory of the

14  witness; the manner of the witness while testifying; the

15  interest of the witness in the outcome of the case and any bias

16  or prejudice; whether other evidence contradicted the testimony

17  of the witness; the reasonableness of the testimony of the

18  witness in light of all other evidence; and any other factors

19  that bear on believability.

20      You have heard testimony from witnesses who testified

21  about their opinions and the reasons for those opinions.  These

22  witnesses were Dr. Kevin Almeroth, Dr. Dan Schonfeld, Mr. James

23  Malackowski, and Mr. Christopher Bakewell.

24      This opinion testimony is allowed because of the

25  specialized knowledge, skill, experience, training, or

1    education of these witnesses with respect to the underlying

2    technology for Dr. Almeroth and Dr. Schonfeld and the

3    assessment of damages for Mr. Malackowski and Mr. Bakewell.

4        Such opinion testimony should be judged just like any

5    other testimony with two exceptions that I will explain later

6    on.

7        You may accept or reject opinion evidence and give it as

8    much weight as you think it deserves considering the witness'

9    specialized knowledge, skill, experience, training, or

10    education, the reasons provided for the opinion, and all other

11    evidence in the case.

12        The two exceptions involve opinion evidence concerning,

13    one, if this, then that offered by Mr. Malackowski and

14    Dr. Almeroth to support Sonos' damages analysis; and, two, idle

15    mode offered by Dr. Schonfeld to support Google's

16    noninfringement analysis.

17        I'm going to tell you in a few minutes to disregard both

18    of those subjects from those witnesses.

19        Note these witness' opinions are not necessarily -- no,

20    I'm sorry.

21        Note these witness -- these types of experts now are

22    necessarily based on an assumed set of circumstances.

23        In evaluating their opinions, you should take into account

24    the extent to which you agree or do not agree with the

25    circumstances assumed by those witnesses.

1    Any witness may be discredited or impeached by

2   contradictory evidence or by evidence that at some other time

3   the witness has said or done something or has failed to do or

4   say something that is inconsistent with the present testimony.

5    If you believe that any witness has been impeached and,

6   thus, discredited, you may give the testimony of that witness

7   the credibility, if any, you think it deserves.

8    Discrepancies in a witness' testimony or between a

9   witness' testimony and that of other witnesses do not

10  necessarily mean that such a witness should be discredited.

11  Inability to recall and innocent misrecollection are common.

12  You should consider whether a discrepancy pertains to an

13  important matter or only to something trivial.

14   A witness willfully false in one part of that witness'

15  testimony, however, is to be distrusted in other parts.  You

16  may reject the entire testimony of a witness who has willfully

17  testified falsely on a material point unless from all the

18  evidence you believe that the probability of truth favors that

19  witness' testimony in other particulars.

20   In these instructions I will refer to a party's burden of

21  proof.  When a party has a burden of proof on an issue, it

22  means that you must be persuaded by the evidence of the truth

23  of that party's allegation with respect to that issue.

24   But how persuaded you must be for that party to meet its

25  burden?  There are two standards of proof that you will apply

1  to the evidence in this case depending on which issue you are

2  considering.

3      On most issues you must decide whether certain facts have

4  been proven by a preponderance of the evidence.  A

5  preponderance of the evidence means that the fact that is to be

6  proven is more likely than not.

7      To put it differently, if you were to put the evidence

8  favoring one party and the evidence favoring the other party on

9  opposite sides of a scale, the party with the burden of proof

10  on that issue would have to make the scale tip toward its side

11  even if just slightly.  If that party fails to meet this

12  burden, then that party loses on that issue.

13      On other issues you must decide whether certain facts have

14  been proven by clear and convincing evidence.  This is a more

15  demanding standard of proof.

16      Clear and convincing evidence means that the fact to be

17  proven is highly probable.  A slight tip of the scale in favor

18  of the party with the burden of proof on an issue would not be

19  enough to support a finding of clear -- by clear and convincing

20  evidence.

21      The party with the burden of proof on the issue must

22  present evidence that leaves you with a firm belief or

23  conviction that the fact has been proven.  Again, if that party

24  fails to meet this burden, then that party loses on that issue.

25      So we've got two standards.  I'm going to just

1    interlineate here.  Preponderance of the evidence, that's the

2    normal standard, I'll say 51 percent, 51/49.  Clear and

3    convincing evidence, that's the other standard, it's got to be

4    more than 51 percent.  It's got to be enough to leave you with

5    a firm belief or conviction that the fact has been proven.

6        Both of these standards are different from what you have

7    heard about in criminal cases where a fact must be proven

8    beyond a reasonable doubt.

9        As you move from preponderance of the evidence where the

10   proof need only be sufficient to tip the scale in favor of the

11   party proving that fact to beyond a reasonable doubt where the

12   fact must be proven to a very high degree of certainty, you may

13   think of clear and convincing as being between those two

14   standards.

15       So in the criminal cases, proof beyond a reasonable doubt,

16   somewhere below that is clear and convincing and then you get

17   down to preponderance of the evidence 51 percent.

18       Now, this is a good point to suspend reading instructions

19   and to turn to the main business of the day, which are the

20   closing arguments.

21       I want to remind you that not one word these lawyers ever

22   say is evidence, but they are excellent lawyers and they're

23   here to try to help you understand the case.  Sometimes they

24   may misstate the evidence in some way; and if so, I can't

25   possibly correct it.  It's up to you to correct it.  You have

1  to remember what the evidence was.  So be careful and listen

2  carefully to what the lawyers say.

3      They have my permission to use the instructions of law

4  that I'm going to be giving later on so they can -- that's

5  fine.  They will say that "Judge Alsup's going to say the

6  following" and they will be quoting from what I will -- they

7  may even use the verdict form, I've given them that permission

8  too, to say, you know:  Do you find X true?  The one on the

9  side will say, "Fine, yes"; the other side will say, "Fine,

10  no."  That's perfectly okay.  That's what closing arguments are

11  for.

12      Okay.  We're going to get right down to it.

13      Mr. Sullivan, the floor is yours.

14                    **CLOSING ARGUMENT**

15      **MR. SULLIVAN:**  Thank you, Your Honor, for that

16  introduction.

17      I will move this up here a little bit.

18      Okay.  Closing time.  My favorite part of the case.

19      Thank you again for putting up with us these past couple

20  of weeks.  You know, as I said during opening statements, we

21  really, really appreciate your guys' help with resolving this

22  dispute.  I know I speak on behalf of both sides when I say

23  that.

24      Now, this case is not nearly as complicated as Google has

25  tried to make it.  So let's get back to what the core issues

1    are here.  There's three of them that you're going to need to

2    decide, and the first one is:  Are the asserted claims of the

3    '885 and '966 patents infringed?  The second one is:  Are those

4    claims valid?  And the third one is:  What are the damages?

5        Okay.  So let's start with infringement actually.  Now, as

6    a reminder, infringement of the '885 patent, claim 1, by

7    Google's prior versions has already been decided by His Honor.

8    He has found that that claim is infringed again by Google's

9    prior versions of their speakers.

10       Okay.  So that means all of those limitations that you see

11   here in claim 1 of the '885 patent, all of those are checked

12   off.  Those are present in those prior versions.

13       Now, as we've seen throughout this case, a lot of

14   discussion about how the '885 patent and the '966 patent are

15   two sides of the same coin; the '885 being on the audio player

16   side, the '966 being on the controller side.

17       And I think for a lot of the same reasons that the -- that

18   Sonos -- sorry -- the Google speakers, the prior versions,

19   infringe the '885 patent, really applies to the controllers,

20   the prior controllers that Google has with respect to the '966

21   patent.

22       All right.  In fact, I think the only dispute we have here

23   on whether or not the prior versions of the Google controllers

24   infringe the '966 patent is whether or not there's any storage

25   of that static zone group.

1       So you can see here, this is what we took from the opening

2  statement, it basically says that if it's not stored in a

3  persistent manner -- I caution you the word "persistent" is not

4  actually in the claims.  There is an example of storage in the

5  claims in the '966 patent.  But Google's position is that their

6  prior versions of the controllers don't store the static group.

7       Well, we know from the testimony you've seen from

8  Mr. MacKay and the evidence in this case that that's not true.

9  Actually, Google does store their static groups.

10      Here you can see some testimony from Mr. MacKay where he

11 says (as read):

12          "The static group is something that the user

13      configures and it's saved persistently."

14      So even Mr. MacKay agrees that it's saved, not only saved

15 and stored but done so persistently.

16      All right.  Let's take a look at what Google's instruction

17 sheets on how to create group says about this feature.  So

18 again, it says here you create the speaker group by adding the

19 speakers that you want to that group and then you save it;

20 right?  You save it.  You store it.  Of course you're going to

21 do that.  That's the whole purpose of these static groups.  You

22 don't want to have to -- have to redo the entire group every

23 single time you want to use it.  You want to store it for later

24 use.

25      Okay.  Let's take a look at an actual example of how we

1  create these static groups in the Google system.  You can see

2  on the left, you select the two speakers.  You've got the attic

3  speaker and the den speaker.  You put those together in a group

4  that you're going to name in the middle screen there, and of

5  course you're going to save it; right?  And then you can see on

6  the right-hand side, you see the box around "morning" there,

7  that's showing you that you've created the static group, you've

8  saved the static group for later use, and it's called morning.

9          Now, as you heard from Dr. Almeroth, he confirmed all of

10  this.  He confirmed that Google's static groups are indeed

11  stored.  You can see here the group configuration is updated

12  and stored in the preference file on the device.  That would be

13  sufficient to meet the requirements of the claim.  Again, we're

14  talking about the '966 patent here.

15          So, again, with respect to the prior versions, you've seen

16  the evidence here.  We can check all those boxes next to the

17  claim elements.  The '966 patent, claim 1, is infringed by the

18  prior versions of Google's controller.

19          Now let's talk a little bit about the redesigned products.

20  I want to start first with the controller.  So the redesign did

21  not change anything in the Google Home app.  They only made the

22  change on the speaker.  I'll talk about that in a minute.

23          But with respect to the Google Home app, they didn't make

24  any changes.  Well, that means that the redesign is the exact

25  same as the prior version.  Well, since the prior version

1  infringes -- right? -- we know that the redesign infringes as

2  well.

3       And here's a little bit of testimony from Mr. MacKay to

4  confirm that there was no change to the Google Home app on the

5  controller for the redesign.  And here we asked him (as read):

6            "You did not make any changes to the Google Home app

7       that runs on the controller; correct?"

8       He said:  "That's correct."

9       So, again, I think that's an easy one for you.  The

10  redesign controllers, the new version of Google's controllers,

11  infringes claim 1.

12       Now with respect to the speakers, they did make a change.

13  They made one change on the speakers, and that is that they

14  stopped playback when a speaker is added to a group.

15       All right.  You can see here, this is from the opening

16  statement again by Google's Counsel, and it says that since

17  it's -- well, I got it on the next slide here -- that you have

18  to be actively playing music in order to be in standalone mode;

19  and they believe that since they stopped the music, they've

20  taken themselves out of standalone mode when that static group

21  is created.

22       Now let me just talk a little bit about standalone mode

23  here.  I don't really think it's that hard of a concept.  If

24  you think about it, standalone, it means you're standing alone,

25  you're standing by yourself; right?  It doesn't matter if

1   you're playing music or not playing music.

2       Okay.  Let me give you a simple illustration.  Imagine I'm

3   a speaker.  Okay.  So I'm standing here alone, stand alone.

4   I'm in standalone mode.  It doesn't matter if I'm playing or

5   not.  Okay.  So I'm in standalone mode.

6       Now let's say -- stand up, guys.  Get up.  I'll come down

7   in a second.

8       All right.  Now, let's say, okay, I'm with these guys;

9   right?  Now I'm not standing alone anymore.  I'm in a group, a

10  pretty great group I might add.

11      Okay.  So it's that simple.  It doesn't matter if we're

12  playing music or not.  It's just whether I'm standing alone or

13  whether I'm not standing alone and I'm in a group.

14      Okay.  Thanks, guys.

15      All right.  So now I'm not the only one that thinks that;

16  right?  So here we have some testimony from Google's expert

17  Dr. Schonfeld, and we asked him (as read):

18          "In order to meet the standalone mode, does the zone

19      player have to be playing audio?  Is that a requirement?"

20      He says:  "No, that's not my understanding."

21      We asked him again (as read):

22          "What does it mean for a player to be configured to

23      play audio individually?"

24      He says "That's not configured to be played as part of the

25  group."

1    It has nothing to do with whether or not you're playing

2    music.  It just means if you're standing alone or if you're

3    standing with somebody -- or sorry -- or if you're with

4    somebody else in the group.

5        Okay.  Let's look at Google's other expert, Mr. Bakewell.

6    He wrote in his report here (as read):

7            "Claim 1 also requires speaker 1 to stay in a

8        standalone mode even after being added to the two speaker

9        groups.  In other words, I understand that the speaker 1

10       will continue to act as an individual speaker; i.e.,

11       either playing music or not playing music despite being

12       grouped together with speakers 2 and 3."

13       And, again, when he was asked about this, Mr. Bakewell

14   said -- confirmed, again, that standalone mode is either where

15   you're playing music or not playing music.  That doesn't --

16   that doesn't determine whether you're in standalone mode or

17   not.

18       All right.  Now let's take a look at Google's products in

19   operation here.  You can see on the left you have standalone

20   mode.  You have the attic speaker and the den speaker -- and,

21   again, this is the redesign now that we're talking about

22   here -- for the players.

23       If you group these two players, create a group -- attic in

24   the middle, attic speaker, den speaker -- and you put them into

25   a static group that you're going to call morning -- you can see

1   that on the bottom right-hand side -- even though that group's

2   been created, those two speakers are still in standalone mode.

3   You've got attic speaker and den speaker.

4        Why?  Well, because the static group hasn't been invoked

5   yet.  So it's just been saved for later use; but, again,

6   they're still in standalone mode.

7        And when we asked Mr. MacKay to confirm this scenario, he

8   did confirm that, again, there's no operational behavior,

9   change in that behavior, on the player even though the

10  StopCurrentApp is executed in this scenario.  You stay in

11  standalone mode.

12       Okay.  We saw from Dr. Almeroth, his testimony says, again

13  here (as read):

14            "So the fact that you stopped playing audio as part

15       of group creation does not take that speaker out of

16       standalone mode.  It has nothing to do with whether or not

17       you're playing music."

18       So, again, I think you can see here from all the evidence,

19  we've talked about the controller already, but with respect to

20  the speakers, the new version, the redesigns of those Google

21  speakers, they infringe claim 1 of the '885 patent.

22       So here we've got a conclusion here.  You can see we

23  checked all the boxes for both the prior versions and the new

24  versions of all of Google's products.

25       I'll just add you can see that the -- some of the

 1   dependent claims that are listed there under the '966 patent.

 2   See claims 2, 4, 6, and 8.  I didn't talk about those because

 3   they're really not being disputed by Google that they infringe

 4   those if they infringe claim 1.

 5        As Your Honor reminded you guys at the beginning here, our

 6   burden on infringement is just a preponderance of the evidence.

 7   Okay?  That's all we have to prove for infringement here.  It's

 8   more likely than not.  And we think we've carried that burden

 9   here.

10        Now I want to turn to validity.

11        Getting back to the burden issue here, the burden changes.

12   Now it's -- it's Google's burden to prove invalidity.  The

13   patents are presumed to be valid so that means Google has to

14   prove invalidity by clear and convincing evidence.  That's a --

15   that's a higher standard than preponderance than we have for

16   infringement.

17        Okay.

18        **THE COURT:**  While you're pausing I want to make sure

19   the jury understands.  All of these slides will not be in the

20   jury room.  This is part of the closing argument, but the

21   closing arguments don't go into the jury room.  So I encourage

22   you to take notes if you think you're seeing something that you

23   want to remember.  Thank you.

24        Go ahead.

25        **MR. SULLIVAN:**  Thank you, Your Honor.

1    All right.  Now let's look at what Google's invalidity

2    theory is.  You can remember seeing this from a -- well, I

3    don't know, a day or two ago.  I forget which day we're on, to

4    be honest with you, but Dr. Schonfeld showed this.  It

5    basically sums up what his invalidity theory is here in this

6    case.

7    Google believes that the Sonos 2005 system, that original

8    system that we talked with Mr. Millington about, he believes

9    that that system had all of the elements of the claims that are

10   at issue here in this case with the exception of that second

11   zone group, second zone scene.  Okay?  Saving of that zone

12   scene.  He doesn't believe that's in there, so he has to go

13   outside of the Sonos system for that.

14   Now, we'll get to those other references that he looks at

15   and uses; but, and I can't stress this enough, Google's

16   invalidity theory is a house of cards.  It's all dependent upon

17   whether or not this Party Mode in the original Sonos system is

18   actually a zone scene.  If it's not, then all of these theories

19   fall apart.  They collapse like a house of cards would.

20   All right.  So let's talk about what Party Mode is a

21   little bit.

22   You know, Party Mode, it's not a zone scene.  It's not

23   saving of a group.  Okay?  Here I have on the slide something

24   to kind of drive this home a little bit for you.

25   What Party Mode is, is it's a select all.  It's a shortcut

1    to be able to automatically put checkmarks next to all the

2    zones that you want to group -- right? -- all these different

3    rooms.  You hit that "Select all" and it selects those.

4        Okay.  It's not -- you're not saving the group.  It's

5    selecting those and then it's also invoking that group right

6    away.  You're not creating a group, saving it, and storing it

7    for later use.

8        I think another way to think about it is this:  Party Mode

9    is like a rule that you're saving and the rule says:  Look

10   throughout the system, find all the zone players you have in

11   your house, put them into a group -- right? -- and activate

12   that group right away.  That's what it does.  And you can think

13   of it as a reply all message in e-mail, for instance.

14       When you hit "Reply all," it creates an e-mail --

15   right? -- with all the people that were on the e-mail that you

16   got, but there's no group save there.  It's just a function

17   that's saved there.  In fact, the "Reply all" button doesn't

18   know who's going to send you an e-mail.  It has to figure that

19   out after the fact; and it takes that, again, it puts it into

20   the e-mail and sets it all up for you right away.

21       Again, it's very clear, I think in my mind, that Party

22   Mode is not a zone scene.

23       All right.  If you remember this Figure 6 in the patents,

24   and Figure 6 has these two different phases.  So, again,

25   there's the setup phase and that's where you're going to

1  create, name, save, your group -- right? -- but you're not

2  going to invoke it right away.  That happens in the second

3  phase.  That's where you're now going to invoke the group and

4  configure it for group playback.

5      So there are two different phases.  Again, that's not

6  what's happening in Party Mode.

7      All right.  Now let's take a look at some of the evidence

8  that Google's been relying on and what some of the people have

9  talked about here during the trial.

10     So this is the user guide from Sonos from its 2005

11 original system, and it says "Zone Groups" at the top and it

12 talks about how you can dynamically make groups of zone players

13 on the fly.  You select a couple rooms.  You hit "Done."

14 You're ready to go.  The group's invoked.  You're ready to

15 play.  It's dynamic grouping.  There's no saving for later use.

16 It's immediate.

17     Okay.  Well, that's what All Zones Party Mode is.

18     Now, you heard from Mr. Millington and he talked a little

19 bit about what a dynamic group is versus what a zone scene

20 group is.  As you can see here, he said:  (As read): "Dynamic

21 groups are invoked immediately and they're temporary.  They're

22 not saved."

23     Zone scene grouping, on the other hand, was a pre-created

24 group -- right? -- a pre-created group of players that is later

25 on invoked.  It's saved and then later on invoked.  That's not

1   what's happening in Party Mode.

2       Now, Dr. Schonfeld appears to agree.  He testified that

3   Sonos' prior art system -- again, we are talking about this

4   2005 system -- is a group that's activated for synchronous

5   playback at the time of creation, and he said, "That's my

6   understanding."

7       Now let's take a look at what the inventor said.  The

8   inventor again described what Party Mode was in the original

9   system.  It's hardcoded into the controller.  The user can't

10  configure it.  It couldn't be saved to be invoked later.

11  Instead, Party Mode, like dynamic grouping, just another form

12  of dynamic grouping, is invoked immediately; whereas, zone

13  scenes are saved but not invoked immediately.

14      Okay.  Now, we've seen some of this testimony come up

15  before.  All right.  Yes, Rob Lambourne made a mistake.  He put

16  a comparison between Party Mode and zone scenes into an alarm

17  specification and it wasn't a true statement.

18      Now, I know about how to be precise with your words as a

19  lawyer; right?  My kids make fun of me all the time.  I send

20  them texts I proofread it.  They're full sentences.

21  Everything's capitalized.  And I sign it all "Love, Dad."  They

22  laugh at me for that.

23      All right.  So I know what it's like to be precise.  But

24  Rob's not a lawyer.  In fact, he's a human being and human

25  beings make mistakes; right?

 1          I think -- well, let me just turn to the next slide.

 2          So it's important to note that what Rob did here was --

 3     and, again, this is all back at that time.  This isn't what

 4     Rob's trying to do now.  Rob admitted to you guys he made a

 5     mistake.

 6          But in 2005 in the actual zone scene specification --

 7     right? -- which is the more accurate description of zone

 8     scenes, not the alarm specification, the alarm clock, we're

 9     talking about the zone scenes now in 1, and, again, in 2005 he

10     made it very clear here that while similar, zone scenes is a

11     much more flexible and powerful feature than Party Mode.  It's

12     not the same.  He made that clear.

13          Now, it's also something that I don't know if we spent a

14     lot of time on it here.  I think it got brought up briefly by

15     Google's Counsel that there was something missing in the

16     provisional application which is shown on the right.

17          On the left you have the alarm -- alarm clock

18     specification.  There is a section on zone scenes.  That's

19     where Rob made his mistake.

20          On the right you can see what was filed from that alarm

21     clock specification with the provisional application.  He

22     removed that.  That's gone.

23          Now, that's not -- that's not some nefarious thing that he

24     did.  He removed that because it was wrong.  He corrected it.

25          The date that I think Google wants to use of this

1  January 19th, 2006, modification date on the alarm clock

2  specification on the left, that's not the last time Rob revised

3  that spec.  He revised it before he filed it with the Patent

4  Office because it wasn't right.  It was a mistake.  The

5  statement wasn't accurate so he took it out.

6      All right.  Now, you don't have to take my word for it

7  that the 2005 Sonos system does not render these claims

8  obvious.  This same user manual that Google is trying to use,

9  114 pages was already provided to the Patent Office and these

10 patents were allowed to issue over it.  So the Patent Office

11 already blessed these claims over that prior art.

12     So, again, in conclusion, we think since Party Mode is not

13 a zone scene, the claims of the '885 and the '966 patent are

14 valid.

15     Now, let me turn to Google's obviousness theories.  All

16 right.  Now, obviousness is hard to prove.  Google understands,

17 as I showed you in that previous slide, that it can't find a

18 second zone scene in the 2005 original Sonos product.

19     So even if you could set aside that a Party Mode is not a

20 zone scene -- right? -- even if you could set aside that and

21 agree with Google for a minute, okay, let's say a Party Mode is

22 a zone scene, there's no second zone scene in that 2005 system.

23 So they have to go to other art.  They have to try to fill in

24 that gap in other ways.

25     Now, there's some requirements that they need to do to

1  establish obviousness in this case.  You'll get a lot more

2  instruction on this later.

3      But the claimed invention as a whole must have been

4  obvious based on a combination of prior art references.  That's

5  one thing that they have to show.  Again, this is all with

6  clear and convincing evidence.

7      There must have been a motivation to combine or modify the

8  prior art references in the same way as the claimed invention.

9  There must have been a reasonable expectation that that

10  combination would be successful.  There has to be a combination

11  of prior art references that enable the claimed invention.

12      And they cannot use hindsight reasoning.  This is

13  something I talked about earlier in the case.  You can't use

14  the knowledge that we have today and go back to 2005, 18 years

15  ago, and take the knowledge from today and apply that to

16  whether or not something was obvious 18 years ago.  That's

17  impermissible hindsight.

18      Now, Google has thrown up some of these Sonos forums

19  throughout this case that you've seen and it's where people

20  have said in those forum posts they'd love to see presets,

21  they'd love to see virtual zones, they'd love to see modes,

22  summer and winter modes.  They'd love to see these kinds of

23  things in Sonos' products.

24      But these forum posts are just a wish list of features

25  that people would want to see.  They don't tell you how to do

1    it.  I would love to have a flying car that I could push a

2    button, shoot up over traffic, and just skip it all right to my

3    house; right?  But no one's invented a flying car yet.  It's

4    not that easy to do.  I don't know how to make a flying car.

5         So, again, these things are telling you about what the

6    result is, what the end wish is.

7         The patent, on the other hand, tells you the four-step

8    process that you're going to go ahead and use to do that.  We

9    talked about, again, creating, saving, invoking it later,

10   configuring it for a group mode.  Those things, as well as the

11   messages between the speakers and the controllers, that's

12   what's in the invention, that's what's in the claims.  That's

13   not in those Sonos forums.

14        All right.  The other thing just to provide a little bit

15   more kind of this context.  I know we've put out a lot of dates

16   for you guys.  We've seen a lot of forums.  We've seen a lot of

17   lab notebooks.  We've seen a lot of these different things out

18   there in the record.  We put together a timeline slide here,

19   and what this timeline shows you is that Rob Lambourne did not

20   rely on those Sonos forum posts for his invention work.  He did

21   that on his own.  He's earlier than all of these Sonos forums

22   with his ideas on how to do zone scenes.  This is not something

23   he cribbed from the Sonos forums.

24        All right.  With respect to the other art that Google's

25   relying on, you can see here I've listed this out for you.

 1    These are all the different references.  We've heard about
 2    Crestron.  We've heard about the Nourse patent.  We've heard
 3    about Squeezebox, Yamaha, Bose, and these different systems.
 4    They were all disclosed to the Patent Office.
 5         And, you know, I know Counsel likes to get up here and
 6    say, "Well, examiner didn't have source code.  He didn't have,
 7    you know, detailed source code on how these products operated."
 8         Number one, I don't think their expert used source code to
 9    evaluate how these systems worked; number two, I don't think
10    you need the source code to understand how these systems
11    worked.
12         Look at this one here, this Yamaha reference.  That's a
13    507-page manual.  There's no doubt that that manual explains
14    exactly how that DME system works, what it says and what it
15    doesn't say.  The source code is not necessary for the
16    examiner.
17         All right.  Now, let me talk here a little bit about some
18    of the praise for the original Sonos 2005 system.  And, again,
19    this deals with whether or not there was a motivation to
20    combine the different references that Google's relying on for
21    its obviousness theories.
22         Now, the praise for the 2005 system, which covers the
23    dynamic grouping that was in that system, and it says -- here's
24    a *PC* magazine, I think I showed this to you earlier, *PC*
25    magazine article from back in the time 2005 shortly after these

1  products were launched (as read):

2        "It can play the same music throughout the house

3     perfectly synchronized.  Other hubs don't do it, and you

4     can join multiple groups to play the same music or put

5     something different on in other rooms on the fly."

6     Again, that's talking about that dynamic grouping.

7     The point here is that dynamic grouping got a lot of

8  praise.  It was a really good system.  It's a fantastic way to

9  group.  So I ask you then:  Why would someone be motivated to

10 try to change that?  If it ain't broke, don't fix it.  So I

11 don't think there would have been any motivation, again, back

12 in 2005, to change something that was so successful.

13    Now, here we have an internal e-mail again from the

14 April 2005 timeframe, and this is from Andy Schulert, Rob

15 Lambourne's boss, to Rob and he talks about the complexity of

16 zone scenes.  Zone scenes were complex in 2005 even to Sonos

17 engineers who had created the original system.  This is not

18 something that would have been obvious for someone to do back

19 in 2005.

20    Now, there's some skepticism.  You saw Dr. Almeroth go

21 through this.  There's this first one.  This is from Majik.

22 This is one of the posters that Google relies on, and that same

23 poster says (as read):

24        "Now this brings an interesting question.  Should

25     zones be allowed to be in more than one group?"  We talked

1          about this overlapping group concept.  "If this is

2          allowed, are there any unwanted side effects?"

3              So there's some doubt here, some doubt on whether or not

4      this could be done; and if there's doubt, then you're talking

5      about is there a reasonable expectation of success in doing

6      this modification that Google now proposes.  And you see that

7      that skepticism goes all the way through to 2016.

8              Now, Google's Counsel has argued that, well, that's 2016.

9      It's not back in 2005 or 2006.  But as Dr. Almeroth

10     explained -- right? -- the fact that there's still doubt,

11     there's still skepticism in 2016 means that this was not a

12     trivial invention.  This was not obvious.

13             Now, speaking of trivial, you don't generally get praise

14     for things that are trivial or things that are obvious; right?

15     But Sonos got praise for the release of its zone scenes in 2020

16     when they launched the S2 update.

17             All right.  Here you see (as read):

18          "By far the best feature of Sonos S2 is the ability

19          to save a group of speakers as a preset.  No longer will

20          you need to constantly select which speaker you want to

21          listen to each time.  Save it as a group and you're better

22          off.  It's really great."

23             You heard from Dr. Almeroth.  He explained to you how the

24     S2 update that Sonos launched in 2020, that practiced the

25     claims that are issued here.  So this praise of that feature in

 1  that product, that S2 product, is praise of the invention.

 2  It's praise of what's in the claims.  And, again, you don't get

 3  praise for things that are trivial or things that are obvious.

 4       Thank you.

 5       All right.  Here's another article that says (as read):

 6            "A new feature called room groups can be very useful

 7            and will also remember frequently grouped speakers such as

 8            upstairs, downstairs, front of house, and back of house,

 9            because you don't neat to repeatedly create those

10            scenarios."

11       Now, again, this is hinting at overlapping groups, the

12  feature that was present in Sonos' S2 update with zone scenes.

13  Upstairs, downstairs, front of house, back of house, there's

14  overlap there between those groups.

15       Again, praise for that invention.  That means it's not

16  obvious, it's not trivial.

17       All right.  Now, I talked a little bit about this before.

18  You can't use hindsight reasoning to construct your obviousness

19  analysis.  What's easy to do today is not necessarily easy to

20  do all the way back then 15-plus years ago.

21       So we think the evidence in this case shows pretty clearly

22  that, again, there's validity of the '885 patent and the '966

23  patent.

24       Next up is damages.  All right.  Now, we heard from

25  Mr. Malackowski.  He explained to you the hypothetical

 1   negotiation that experts in these types of situations typically

 2   use to evaluate what the reasonable royalty should be that

 3   Google should have to pay for its infringement.

 4        And, again, you're talking about bringing the parties

 5   together back at the time of the first infringement -- so for

 6   these two patents we're talking about November 2019 and

 7   November 2020 -- as if those parties would have been reasonably

 8   and voluntarily trying to reach an agreement.

 9        Now, to do this, to evaluate this hypothetical

10   negotiation, Mr. Malackowski looked at these 15 *Georgia-Pacific*

11   factors.  It's kind of the gold standard for determining

12   royalties in a patent case.  You can see them all here.  I

13   won't read them, but let's take a look at a few of those that

14   Mr. Malackowski looked at.

15        There was Factor Number 1, that was the first

16   *Georgia-Pacific* factor that he looked at.

17        And you heard from Sonos' General Counsel Ms. Kwasizur.

18   She talked about the Bluesound and Legrand licenses.  Now,

19   these are real-world licenses, again, that Sonos has on its

20   patents, including the two patents in this case.  They cover

21   those two patents, the '885 and the '966, and these are

22   real-world examples of how Sonos has dealt with competitors

23   regarding these patents.

24        Let's take a look at the Lenbrook, which is also the

25   Bluesound agreement, and you can see here you've got a royalty

1  rate from 12 to $30 and depending on how many units are sold.

2  Now, there's also a floor for units that are under a hundred

3  dollars.  Those would be at $6.

4      I'm sorry.  I didn't show it on the slide.  It's already

5  got a lot of information on there.

6      But this agreement is telling you that the more the

7  infringement there is, the more units that are sold by

8  Bluesound and Lenbrook, the higher the royalty rate should be.

9  That's because Sonos is getting damaged more by those extra

10 sales -- right?  They're not able to make those sales.  It's

11 increased competition and, as a result, Sonos would want a

12 higher royalty to cover that.

13     Now you see the same thing here again.  This is the

14 Pass & Seymour, which is also the Legrand license, and it's got

15 the same rates that we've been talking about here.

16     All right.  Let's look at Factor Number 2.  Now, this is

17 the time when we go look at -- so Factor Number 1, we looked at

18 Sonos' agreements.  Factor Number 2, let's go look at Google's

19 agreements.

20     Now, there was a bunch of agreements that Google had

21 produced in this case.  I think both experts generally agree

22 that none of them were economically comparable to this

23 situation here with one exception and that's Outland Research.

24     Now, Outland Research is a nonpracticing entity.  Okay?

25 That's what "NPE" means.  That means that basically they have

1    paper patents.  They don't -- they don't practice their

2    inventions, they don't sell any products.

3        That's not the situation with Google.  Google makes its

4    money off of selling speakers.  It's not a patent licensing

5    company.

6        All right.  Now, Mr. Bakewell believed that this was

7    useful for evaluating damages in this case because he thought

8    it was technologically comparable.  He relied on Dr. Schonfeld

9    for that.

10        I don't know if you remember, this Outland Research

11    technology was at issue.  We showed this slide a couple times.

12    This is what Google said was technologically comparable to zone

13    scenes.  I -- I don't see it.  I don't see any comparability

14    there.  That doesn't look like zone scenes to me.

15        All right.  Factor Number 5 takes a look at the commercial

16    relationship between the parties.  Google recognizes

17    competition with Sonos.  We see that in a number of documents

18    that have been shown throughout this case.  Despite Google's

19    protests or characterization that there's really no competition

20    between these two companies, there absolutely is.  They

21    absolutely compete in the marketplace.  That would tell you,

22    that competition would tell you that Sonos is entitled to

23    higher royalty rate.

24        Now, Number 6, *Georgia-Pacific* Factor Number 6.  This is

25    looking at ways that Google is making money off of these

1   products.  Now, we know they sell these products as loss

2   leaders.  You heard Mr. Malackowski talk about this.

3       So they must be making the money somewhere else.  Well,

4   they are.  They're making it through their advertising, their

5   search revenue, the data collection information that they have,

6   their e-commerce, their premium subscription that they offer

7   for YouTube and YouTube music.  They're making monies in all

8   kinds of ways, just not off the hardware.

9       And that's important because that should be factored into

10  the hypothetical negotiation.  Not just the fact that they're

11  not making any money off of the hardware, but that they have

12  all these other revenue sources.  That tells you that this is

13  important technology for Google and they would pay for it.

14      *Georgia-Pacific* Factor Number 12, this is looking at kind

15  of customary industry value benchmarks, and I put this up

16  because you're going to hear about -- in the jury instructions

17  some things about three or more speakers and some information

18  on that so I wanted to provide you guys with some information

19  we have in the industry as well as from Google on this.

20      You can see in this slide, 29 percent of households have

21  three or more smart speakers in their home.

22      Here, in this survey that Google was -- talked about in

23  this case, Google acknowledges that 60 percent of consumers

24  plan to buy more than one smart speaker.  Almost half build a

25  two-pack of smart speakers.  So 60 percent of consumers,

1  according to Google, plan to buy multiple speakers.

2      Here's another one we saw.  58 percent of consumers are

3  either very likely or extremely likely to buy three smart

4  speakers.  There's a lot of evidence out there that buying

5  three smart speakers, having a lot of smart speakers in your

6  home, is not a fluke.  That's what these things are for.  It's

7  a multiroom audio product.  It's for multiple rooms.  You want

8  to put these things all over your house.  That's what Google

9  wants you to do.  That's what Sonos wants you to do.

10     Okay.  Now, it's going to be your job to determine damages

11 in this case.  We're hoping that you come up with a reasonable

12 royalty rate, a running royalty, because we think the running

13 royalty is the way to go here.  As you saw back in those

14 licenses that Sonos has had, you're only charged for what you

15 actually are selling.

16     Now, Google criticizes Sonos for saying, "Oh, look, in the

17 Bluesound and the Legrand agreements, you guys really haven't

18 collected any money."  Well, yeah, that's because we did the

19 licensing fair.  They haven't sold many products so they don't

20 have to pay us much.  If they sold a lot more -- right? -- let

21 me go back to that real quick.

22                   (Pause in proceedings.)

23     **MR. SULLIVAN:**  If they sold a lot more, they would be

24 up in this higher range; right?  They would be up into this --

25 they'd be at a higher rate of $30 and they'd have a lot more

 1   units to multiply that by.

 2        Now, Google, we already know, is way off this scale;

 3   right?  Google is selling millions of these units; right?  And

 4   that's what this other slide gets to.

 5        So, again, I think the running royalty is the fairest way

 6   to go.  We ask you guys to come up with a decent royalty rate

 7   that's fair for Sonos in this case due to Google's

 8   infringement.

 9                  (Pause in proceedings.)

10        **MR. SULLIVAN:**  And, again, I remind you that the --

11   you can see there's 94.7 million Google Home app installs at

12   issue in this case so far and 14.1 million Google Home, Nest,

13   and Chromecast units that are at issue in this case so far.

14        All right.  This is my favorite part of the closing, the

15   fun part now.

16        You saw this slide from Google's Counsel during opening.

17   He talked about all the paths in the state park.  Well, I think

18   that's exactly Google's game plan here.  Google wants you to

19   wander out on those paths and get lost.

20        This is not that complicated of a case when you get down

21   to it.  Google is trying to make it complicated and it's come

22   up with a lot of excuses, again, to try to get themselves out

23   of infringement here.

24        Let's take a look at some of those excuses.  So first you

25   have this idle mode.  Okay.  You heard Mr. MacKay talk about

1    idle mode.  Well, that's not a real thing.  Okay.  Idle mode is

2    something they came up with here at trial, again, to help -- to

3    help the redesign escape infringement.

4         Dr. Schonfeld didn't have any opinions on idle mode.  And

5    when you look at what Mr. MacKay said about idle mode, you can

6    see that the speakers are not really idle in the so-called idle

7    mode.  Let's see what he said (as read):

8              "So even the living room speaker is in what you refer

9         to as idle mode, the speaker is still operating; correct?

10             "Yes, they're still code running.

11             "It's plugged in?

12             "Correct.

13             "Powered on?

14             "Yes.

15             "The speaker's operating system is running?

16             "Correct.

17             "Available for selection by a user?

18             "Correct.

19             "Operating in a mode in which its audio volume level

20        can be adjusted?

21             "Correct.  Yes."

22        That doesn't sound very idle to me.  I'm not sure Google

23   ever wants their products to be idle.

24        All right.  Now, they come up with a couple of

25   noninfringing alternatives, and actually this first

1    noninfringing alternative is the redesign because they have

2    actually implemented it now.

3        But this is just stop the music.  We already talked about

4    how that's still infringing.  But to be a proper noninfringing

5    alternative, it has to also be commercially acceptable.

6        What do we know about the commercial acceptability of

7    stopping playback?  Well, you can look at what Tomer Shekel,

8    Google's engineer, said here, product manager.  We asked him

9    (as read):

10            "Would you say it's an important feature for the

11        music playback to not be disturbed while you set up your

12        groups?"

13        He said (as read):

14            "In my opinion, if by setting a group you'll now be

15        stopping a music a person played, that would not be a

16        great experience for the user."

17        Now here's their other proposed NIA:  Let's get rid of

18    overlapping groups.  Well, what did Mr. Shekel say about that?

19    Again, he said, "That would be a poor user experience."

20        Now, Google doesn't like that testimony from Mr. Shekel.

21    So you heard Mr. MacKay get up there and say, "Well, he wasn't

22    really involved.  He was out of the picture.  He didn't really

23    participate."

24        But let's not let Google throw poor Mr. Shekel under the

25    bus here.  I mean, Mr. Shekel is an important guy.  He's the

1    mastermind, the guy that announced their first multiroom audio

2    product, the Chromecast Audio, in December 2015.  This is his

3    blog post.  He's saying here (as read):

4            "Multiroom lets you group Home Cast audio devices

5        together, blast the same song in every room."

6        Okay.  Here you see on the left Mr. Shekel saying -- or

7    Mr. MacKay saying that Mr. Shekel is kind of not really

8    involved in the implementation or design of the old design.  He

9    said that too.  But that's not true.  You heard Mr. Shekel say

10   "I define how it participates" -- he's talking about the Google

11   Home here, accused products -- "I define how it participates in

12   multigroup.  In group playback as well."

13       Now, let's not forget too, Mr. Shekel was Mr. Chan's boss.

14   Mr. Chan, Google's other witness, acknowledges that Mr. Shekel

15   had participated in defining certain aspects of how the Google

16   Home product worked.  No reason to discount Mr. Shekel's

17   testimony.

18       Okay.  Here's a slide we've seen before.  I took this from

19   the opening.  Google believes that it independently created

20   their own grouping functionality in the accused products.  As

21   you can see on this slide, I think there's something missing on

22   the left.  Let's take a look.

23       If you remember the testimony from Mr. Millington, he says

24   this is an e-mail he sent to Mr. Yerga on May 15th, 2013.  What

25   was his response?  (as read):

 1              "I would love to see Sonos' integration as well.  Off

 2          the record" -- this is Google now, Mr. Yerga talking --

 3          "we're talking about internally now and I hope we can

 4          begin officially engaging on that front soon."

 5      We asked Mr. Millington (as read):

 6              "Did Sonos ever meet with Google's engineers?"

 7              "Yes.  The summer of 2013."

 8      We didn't get the time to talk about this document a lot,

 9  but I wanted to show it on the screen for you.  Here's the

10  meeting agenda for that July 16th meeting.  You can see here

11  there's discussions about not only Sonos' current road map but

12  its future road map.

13      They shared a lot of information with Google back in that

14  timeframe.  Well, what did they share?  We heard from

15  Mr. Millington.  They shared actual physical hardware products.

16  They sent zone players and controllers to Google to evaluate.

17  They gave them their APIs.  They gave them a lot of information

18  about how Sonos' products work.

19      We saw the praise that Google's own engineer, Debajit

20  Ghosh, had where he says (as read):

21              "I was really quite impressed by the out-of-the-box

22          experience, the sound quality, the ease with which I was

23          able to group and ungroup devices."

24      He grouped and ungrouped the Sonos devices back in 2013.

25          All right.  Here we see Mr. Shekel.  He's acknowledging in

1    2015 that Google's Cast-enabled speakers are going to enable

2    grouping similar to what Sonos does.

3        So, again, when we look at that timeline, it's very

4    important that we fill in what's on the left side.  Google just

5    didn't start from scratch.

6        All right.  Now, here's the timeline that Google likes to

7    put up here.  This is, again, from their -- from their opening

8    slides, I believe.  And it shows that there's this big 15-year

9    gap between when Sonos launched the original products and when

10   Sonos introduced zone scenes in it's -- in its S2 update in

11   2020.

12       Well, again, this is -- this is Google trying to have it

13   both ways.  They say that zone scenes was in the original

14   product.  Well, if it was in the original product, then there

15   isn't any gap.  The reality is, it wasn't in the original

16   product.  It was in the 2020 product.  That's where it first

17   gotten enabled.  And you heard a whole bunch of reasonings,

18   which I won't get into now, about what caused that 15-year gap.

19   It wasn't that zone scenes wasn't important to Sonos.  It was.

20       All right.  Now, we saw some of the information that

21   Google's relied upon here to talk about low usage of static

22   groups.

23       Okay.  Now, I don't think that data and that information

24   is clear enough to tell you what kind of usage there actually

25   was; but even if it was a low usage, that doesn't mean that

1   there's no value to this feature for Google.

2       Listen, airbags is a perfect example.  People readily pay

3   for airbags in their cars.  No one wants to ever use it.  It

4   doesn't mean it's not important.

5       And ask yourself this question too:  If this feature was

6   so worthless, not used by anybody, not valuable to Google at

7   all, why haven't they taken it out of their product?  Why are

8   they fighting us on this?  Why don't they just remove it?

9   Maybe Mr. Pak can answer that for you.

10      All right.  They did this other thing on -- how much time

11  do I have left?

12                  (Pause in proceedings.)

13          MR. SMITH:  You have gone 48 minutes.

14          MR. SULLIVAN:  Beautiful.

15      Okay.  Now, you saw the calculator with Google's Counsel

16  and they were taking 2 divided by 1,500 to look at the Sonos

17  license agreements, and I think they came up with -- I think

18  actually His Honor came up with some quick math that it was

19  .13 percent of a penny per patent or for these two patents;

20  right?

21      That's not how licensing works.  Here's an example that

22  Mr. Malackowski gave about the buffet.  If you go to the

23  buffet, you pay 30 or $35 to eat at that buffet.  You can't say

24  "I only want one piece of steak.  Can I pay you 2 bucks for

25  it?"  That's not how it works.  If you want a portfolio

1  license, you've got to pay for the whole thing.  You can't do

2  it a la carte.

3      Here's another example to kind of drive that home.

4  Imagine you want to get a one-year subscription of a magazine.

5  You'd get a discount; right?  You would get each issue for

6  58 cents let's say.  But if you wanted just one, okay, you've

7  got to go to the newsstand to buy it and it's full price.  It's

8  a full $5.

9      This is one of my favorite ones.  Google -- Google's

10  damages expert charged Google $1.4 million to reach his opinion

11  that Sonos' patents are only worth 200 grand.

12      All right.  This is one of the last things I want to talk

13  to you about.  There's -- I think there's been a little bit of

14  confusion about Google's awareness of Sonos' patents,

15  particularly the '966 patent.

16      So there was a DJ complaint filed.  That was filed after

17  Sonos sent its draft complaint to Google on September 28th,

18  2020.

19          **THE COURT:**  You better explain what "DJ" means.

20          **MR. SULLIVAN:**  You bet, Your Honor.  That's a great

21  point.

22      Declaratory judgment of noninfringement.  You see it up

23  there on the top right.  That's what I mean by "DJ."

24      So, here's what happens:  Sonos sends the draft complaint

25  September 28th, 2020.  Google in about a half a day's time

1    files their declaratory judgment of noninfringement of the same

2    patents in that draft complaint that Sonos sent earlier in the

3    day.  But to be able to do that, they'd have to study the

4    patents, they'd have to study the claim charts in that draft

5    complaint -- that's an 87-page complaint -- they'd have to

6    study the file histories.  We saw the big binders and the boxes

7    that they were bring you up to the experts with all this stuff

8    they'd have to look through.

9         They'd have to look at the source code on the Google

10   products.  They'd probably have to interview Google's witnesses

11   like Mr. MacKay.  They'd have to do an expert analysis.  They'd

12   have to do a lot of work.  There's no way they did that in half

13   a day.  What does that mean?  That means they knew about Sonos'

14   patents before that time.  Again, they had to do a lot of due

15   diligence here.

16        All right.  Now, we tried to get some of these answers to

17   when they first knew about the patents, to how were they

18   tracking Sonos' patents, to what kind of investigation due

19   diligence they were doing.  You saw Mr. Kowalski give back

20   answers where he couldn't answer.  He just claimed privilege

21   and didn't tell us what was going on.

22        Again, I think that's enough on its own to tell you that

23   there was knowledge about these patents and about Google's

24   infringement before they filed their DJ complaint.

25        But one last point here.  You can see here from the

1    related U.S. application date on the '966 patent, all right,

2    there's two continuations mentioned there.  So these are part

3    of the same patent family.  These are ancestors.

4         You had the '206 patent underlined in red.  That was

5    actually in this complaint and DJ complaint that I was just

6    talking about, but you also had the older '853 patent.  Okay.

7         Now, it's in the record in the file history when these

8    patents issued.  You can see the '853 patent issued on

9    July 9th, 2013.  That '206 patent issued on May 17th, 2016.

10   These are zone scene patents.  They're in the same family with

11   the '966.

12        So I think if we look at this timeline of some of the key

13   dates that are at issue in this case, these are the dates that

14   are important to keep in mind.  I'll run through them real

15   quick for you.

16        Sonos' first zone scene patent issues on July 9th, 2013.

17   Actually, on July 16th.  So if I do my math correctly, that's a

18   week later Sonos and Google meet.  That's that collaboration --

19   first collaboration meeting I talked about.

20        2015, they launch their first Chromecast Audio product.

21   That's the first accused product of infringement.

22        2016, May 17th, 2016, the '206 patent issues, Sonos'

23   second zone scene patent issues.

24        November 2016, the Google Home product is released.

25        And you've got some years that go by, and then you've got

PROCEEDINGS

1    the '966 patent issues in 2019.

2        Our complaint is filed September 2020.  So is the DJ

3    complaint.

4        And then, again, here the '885 patent issues after that on

5    November 24th, 2020, and then that got added by amendment to

6    the lawsuit.

7        I will be back.

8        **THE COURT:**  Okay.  Thank you.

9        And we should take -- Mr. Pak, I think let's give the jury

10   a break.

11       **MR. PAK:**  Yes, absolutely.

12       **THE COURT:**  We'll take a 15-minute break.

13       Please don't talk about the case yet.  It will be your

14   duty to do so soon, but not until the arguments and

15   instructions are over.

16       We'll see you back here in 15 minutes.

17       **THE CLERK:**  All rise for the jury.

18       (Proceedings were heard outside the presence of the jury:)

19       **THE COURT:**  All right.  Any issues for the judge?

20       **MR. PAK:**  No, Your Honor.

21       **MR. SULLIVAN:**  No, Your Honor.

22       **THE COURT:**  All right.  Did you-all get the PDFs?

23       **MR. PAK:**  Yes.

24       **THE COURT:**  On both the verdict form and the

25   instructions?

1          MR. PAK:  Yes.

2          THE COURT:  All right.  Yes, okay.

3          MR. SULLIVAN:  Libby has a new objection, Your Honor.

4    I apologize.

5          THE COURT:  All right.  Okay.  Everyone be seated.

6       Let me hear your new objection.

7          MS. MOULTON:  Thank you, Your Honor.  Elizabeth

8    Moulton.

9       So in the new Instruction 28 on the '966 patent, you added

10   that the speakers must be acquired separately.

11         THE COURT:  I'm sorry, paragraph 28?

12         MS. MOULTON:  Yes.

13         THE COURT:  Wait a minute, I want to use this.

14      What is this?

15               (Discussion held off the record.)

16         THE COURT:  All right.  Just a second.  28.

17      All right.  Which line?

18                  (Pause in proceedings.)

19         THE COURT:  I see where you're saying "a computing

20   device is not capable..."

21      Okay and -- what -- you're saying "and those three zone

22   players must be acquired separately"?

23         MS. MOULTON:  Yes.  So I -- I don't think the jury is

24   going to understand why they have to be acquired separately or

25   what that means, and we also heard testimony from Mr. Chan that

PROCEEDINGS

1  the speakers can be sold in bundles.  So they may be confused.

2      **THE COURT:**  They can be what?

3      **MS. MOULTON:**  Sold in bundles.  So I think they're

4  going to be confused.

5      **THE COURT:**  You mean -- I think this is worded in a

6  strange way.  This sounds like you've got to acquire speaker

7  number 1 and then wait a few weeks, acquire a speaker and

8  that's not what we meant.  I'm going to -- why don't we just

9  take out "and those three zone players must be acquired

10 separately."  Do you have any problem with that, Mr. Pak?

11     **MS. MOULTON:**  I --

12     **THE COURT:**  What?  Mr. Pak?

13     **MR. PAK:**  No problem with it.

14     **THE COURT:**  All right.  We're going to take out that

15 last -- I'm going to take out "and those three zones players

16 must be acquired separately."

17     All right.  Any other?

18     **MS. MOULTON:**  So, we maintain all of our prior

19 objections?

20     **THE COURT:**  Yes, you do.

21     **MS. MOULTON:**  Thank you.

22     I had one question about the 50(a) motions.  Do you want

23 to see oppositions to those or are you just going to deny them?

24     **THE COURT:**  Well, let's talk about that after the

25 closings.  The answer is I am going to want to see oppositions,

 1  but right now we're quite deep in the closings.

 2      All right.  Do you have any objections?

 3      **MR. PAK:**  Yes -- no objections to Your Honor's

 4  instructions.

 5      One thing I did hear from Mr. Sullivan I wanted to address

 6  in my closing as well, but I would like a curative instruction

 7  from Your Honor on that the jury should not take any type of

 8  adverse inference from invoking attorney-client privilege.  You

 9  know, that's a common misunderstanding of our rule.

10      So he suggested in a way that somehow there was anything

11  wrong with our attorneys making privilege objections and our

12  witness following them.

13      So I don't know if that was your intent, Mr. Sullivan, but

14  that's --

15      **MR. SULLIVAN:**  Your Honor, I think we dealt with this

16  already.  They fought about this, whether or not we could show

17  that testimony to the jury, and you said we could and that's

18  what I put up on the slide.  And that's what it says.

19      **MR. PAK:**  I think the implication after that was

20  somehow that there was anything improper about doing that, and

21  I think that's the part of --

22      **THE COURT:**  I'm going to let you make the argument.

23  I'm not sure that I need to go so far as a curative

24  instruction, but you can make the argument that Mr. Kowalski

25  invoked the attorney-client privilege and there's absolutely

**PROCEEDINGS**

 1  nothing wrong with doing that, but you don't -- what that

 2  presupposes, Mr. Pak --

 3          **MR. PAK:**  Yes.

 4          **THE COURT:**  -- is that that was a legitimate -- that

 5  it really was privileged, and I'm not prepared to tell the jury

 6  it really was.

 7          **MR. PAK:**  I understand.

 8          **THE COURT:**  I don't know what was lurking behind there

 9  and what that privilege was covering up and whether or not it

10  really was privileged.  I'm not going to go there.  I've seen

11  too many -- I'm not saying you did, but I've seen too many

12  cases in 50 years where privilege was grossly abused so -- but

13  you can make your argument.

14          **MR. PAK:**  Great.

15          **THE COURT:**  All right.  Anything more?

16          **MR. PAK:**  Nothing -- nothing from me, Your Honor.

17          **MR. SULLIVAN:**  No, Your Honor.

18          **THE COURT:**  All right.  Thank you.

19          **MR. PAK:**  Thank you.

20          **THE CLERK:**  Court is in recess.

21                  (Recess taken at 9:48 a.m.)

22                  (Proceedings resumed at 9:59 a.m.)

23      (Proceedings were heard out of the presence of the jury:)

24          **THE CLERK:**  Please remain seated.  Please come to

25  order.

1      **THE COURT:**  Any issues for the judge?

2      **MR. PAK:**  No, Your Honor.

3      **MR. SULLIVAN:**  No, Your Honor.

4      **THE COURT:**  Okay.  Let's bring in the jury then.

5      **THE CLERK:**  All rise for the jury.

6      (Proceedings were heard in the presence of the jury:)

7      **THE COURT:**  Welcome back.  Be seated.

8      All set over there?  Great.

9      Mr. Pak, your turn.

10      **MR. PAK:**  Thank you, Your Honor.  May I proceed?

11      **THE COURT:**  Yes.

12                        **CLOSING ARGUMENT**

13      **MR. PAK:**  Good morning, ladies and gentlemen of the

14     jury.  Thank you on behalf of my entire team, folks at Google,

15     and especially Mr. MacKay and others, the engineers who have

16     brought forth the testimony that you heard and the evidence.

17      I want to begin by agreeing with Mr. Sullivan on one

18     point.  I do think there are some issues in this case that are

19     very simple, and I think that has to do with whether these

20     patents cover old and obvious ideas.

21      And some of the most important evidence that you have

22     heard in this case come from the man, Mr. Robert Lambourne, who

23     claims to have invented the technology for these two patents;

24     and I think that the evidence that you have seen from him,

25     historical documents, admissions under cross-examination, are

 1   some of the most important evidence, from our perspective, that

 2   you've heard.

 3        I want to address something about why we're here.  Why are

 4   we here?  If you recall, there were six patents being asserted

 5   against Google at the beginning of this case.  Six.  And to

 6   defend Google against six patents, we had to bring forth

 7   evidence and defenses that we have always believed prove that

 8   these patents are both not infringed and/or invalid and we did

 9   that.  We worked very hard with our experts and our witnesses

10   to bring you the evidence.

11        And the one thing that I think both Mr. Sullivan and I

12   would agree is what I think, what Mr. Sullivan thinks, what any

13   of the lawyers here think is not evidence.  It doesn't matter.

14   What's most important is the evidence that you have seen and

15   heard, and that's where I want to spend my time today.

16        I want to help you organize some of the key pieces of

17   evidence using His Honor's instructions to help you do your job

18   because, you see, when this case started, there were six.  Two

19   of the patents were withdrawn.  Two of the patents were

20   withdrawn by Sonos after Google raised defenses against them,

21   including defenses of invalidity and noninfringement.  That's

22   the '206 and the '460.

23        Two of the patents, '615 and '033, His Honor invalidated

24   despite being issued from the United States Patent Office.

25        What this shows, ladies and gentlemen, is that we had good

 1  faith belief that we do not infringe these patents and that

 2  these patents are invalid.

 3      And we believe that this history of how this litigation

 4  has played out bears proof that we had firm conviction and we

 5  brought evidence forward to defend ourselves.

 6      And we're here now to talk about just two patents that are

 7  left, the '966 and '885, and my job here this morning is to

 8  walk you through some of that evidence using His Honor's

 9  instructions.

10      **THE COURT:**  Before you do that, Mr. Pak, one thing

11  that I think you want me to add is to tell the jury that merely

12  because those other four patents are out of the case, does not

13  mean that the two remaining ones are invalid or not invalid.

14      **MR. PAK:**  Absolutely.

15      **THE COURT:**  That's why we're here.

16      Or it doesn't matter whether they are or are not infringed

17  except for the Court's already decided that '885 is infringed

18  as to the original patent --

19      **MR. PAK:**  Exactly.

20      **THE COURT:**  -- original products.

21      **MR. PAK:**  That's right, Your Honor.

22      **THE COURT:**  All right.  But there are a lot of things

23  here for you to decide, and none of that is presaged in any way

24  by these other four patents being out of the case.

25      So please proceed.

1        **MR. PAK:** Thank you, Your Honor.

2        Just as His Honor just instructed you, His Honor has made

3   many rulings but has reserved very important questions for you

4   to decide based on all the evidence that you've heard.

5        What evidence did Google present?  We heard sworn

6   testimony.  We've seen expert analysis of software, including

7   source code.  And I did want to correct Mr. Sullivan on that

8   point.  Source code for both the Sonos 2005 prior art system as

9   well as the Squeezebox prior art system were presented through

10  the expert testimony on both sides.  That is all evidence that

11  was not considered by the examiner at the United States Patent

12  Office.

13       Furthermore, products were tested.  Product test results

14  that existed in 2005 for the Sonos 2005 system were never

15  submitted to the Patent Office, but we heard about the actual

16  operation of those products from the sworn testimony of

17  Mr. Millington and Mr. Lambourne.

18       This is all evidence that was not considered by the

19  examiner.  And His Honor is absolutely correct.  There is lots

20  of evidence here that was not submitted to the Patent Office,

21  not considered before in prior proceedings, and that's why

22  we're asking you to carefully think through all of that

23  evidence applying His Honor's instructions to decide whether

24  these two patents are, first, invalid; and if so -- and then

25  there can be no infringement; but if you were to go to the next

 1  step, consider the evidence carefully on the issues of

 2  infringement.

 3      We submit to you that we have met our burden, that there

 4  is clear and convincing evidence that you have seen that these

 5  two patents cover old and obvious ideas not only to those who

 6  would have looked at it from the perspective of ordinary skill

 7  in the art in 2005 but, in fact, key elements of these patents

 8  were already performed and done by other companies long before

 9  Sonos.

10      But as I said, some things are simple and what we can look

11  at are the very words and the documents that Mr. Lambourne

12  wrote not today but what he said back in the day in 2005 when

13  he was working on his invention.

14      Jury Instruction Number 20 will tell you the Sonos 2005

15  system is prior art to these patents.  So whatever existed in

16  that system is prior art.  That is not these two patents.

17      And we saw some documents and testimony from Mr. Sullivan

18  about meetings that may have happened in 2013 or you saw from

19  Mr. Millington some of the news articles about the 2005 system.

20  That's about the prior art.  That is about the prior art.  That

21  is not about these two patents.

22      If you look at what Mr. Lambourne wrote in 2005, this is

23  what he wrote (as read):

24          "Party Mode that currently ships with the product is

25      one example of a zone scene."

1        And just for your benefit, I've included some citations to

2    the evidence in the left lower-hand corner of these slides.  So

3    if you want to jot that down, please do.

4        He was asked (as read):

5            "When you say 'Party Mode that currently ships with

6        the product,' you were referring to the Party Mode that

7        existed in the Sonos 2005 prior art system?

8            "Yes."

9        The man who knows his invention, the man knows how it --

10   what the problems were, what the solutions were, telling us in

11   his documents that zone scene technology existed.  The problem

12   was it was only one zone scene that was previously saved

13   hardcoded into the product.

14       It doesn't matter what I think.  It doesn't matter what

15   Mr. Sullivan thinks is Party Mode.  Let's look at the evidence.

16   Mr. Lambourne wrote that down in his original documents in

17   2005-2006.

18       That document, ladies and gentlemen, is TX6544.  That is a

19   UI specification that Mr. Lambourne wrote in Sonos 2005.

20   That's where that sentence comes from.  This is not something

21   that is an attorney argument.  This is not something that he is

22   reflecting on 17 years later.  This is a historical business

23   record that confirms that zone scene technology existed in the

24   Sonos 2005.

25       And I asked Mr. Lambourne this very important question (as

1    read):

2            "Between your recollection sitting here today trying

3        to remember what happened 17 years ago versus a business

4        record that you created in 2006, in your opinion, which is

5        a better and more reliable source of what actually

6        happened in 2006?"

7        And he told all of us the document is more reliable than

8    the testimony he might be giving today after 17 years.

9        One thing that I want to address upfront, these important

10   pieces of evidence -- for example, these statements, these

11   historical statements that Mr. Lambourne wrote about the Sonos

12   2005 prior art and its Party Mode -- were not submitted to the

13   patent examiner.  You might have heard some implications that

14   the conception documents were submitted to the Patent Office so

15   they got to see everything.  Absolutely untrue.

16       What we see here, this is on the right TX6545, this is the

17   actual conception document that Mr. Lambourne wrote in 2005.

18       What was submitted to the Patent Office left out the

19   critical piece of evidence that you-all got to see and hear

20   about.

21       This is similar to the current Party Mode setting that is

22   available.  Had the examiner seen that evidence, that admission

23   that this is similar to something that already existed in the

24   prior art, would he have issued the patent?  That's a question

25   that we will never know because that statement was taken out

1    before it was submitted to the Patent Office.

2        As a result, we have a nonsensical sentence.  That's what

3    the examiner saw (as read):

4            "The zone scene feature allows the user to manage the

5        zones into groups using one single command.  However, the

6        zone scene feature is much more powerful" -- "flexible and

7        powerful."

8        How can the same thing be more flexible and powerful than

9    itself?  It doesn't make sense.

10       What was submitted to the examiner left out critical

11   pieces of information that you heard about that we believe

12   proves that these two patents cover obvious and old ideas.

13       That's not all.  That alarm clock UI specification that

14   Sonos suggested to you is irrelevant to these two patents, they

15   were submitted as an appendix to the very provisional

16   application to the Patent Office for these two patents.

17       It's the same document or different versions of the same

18   document.  What was left out?  (as read):

19           "The important historical evidence that Party Mode

20       that currently ships with the Sonos 2005 product is one

21       example of a zone scene."

22       This is TX6544.  If you compare it to the provisional

23   TX2651, they took out the entire section on zone scenes,

24   including this statement.

25       The patent examiner never got to see the actual historical

1  evidence on what the Sonos 2005 prior art did and how it

2  relates to the claimed inventions in this case.  He never got

3  to see that evidence.

4      The only thing that is missing based on the historical

5  evidence that you've heard so much about, Sonos 2005 system

6  could do everything that these claims cover:  Wireless system,

7  even though it's not claimed; zone players coordination,

8  synchronization, all of that including one zone scene in the

9  form of Party Mode that was hardcoded that was always

10  available, that was saved for later use was in the Sonos 2005

11  system.

12      So if you look at the claims, we've been talking about

13  overlapping zone scenes, what do you need?  You need two, two

14  zone scenes, and they have to have one common speaker.  That's

15  it.  That's all what these inventions cover, adding yet one

16  more zone scene.

17      And we've already heard Sonos 2005 prior art system could

18  create as many groups as you want.  The problem?  It couldn't

19  save them for later.

20      So you take Party Mode was a zone scene, you take any of

21  the dynamic groups that we heard so much about, all you had to

22  do was save one of those groups and you get the claimed

23  invention.  That's why Dr. Schonfeld presented to you all of

24  the evidence in this case.

25      One thing else that the patent examiner never got to see

 1    that we'll talk about, Sonos forum posts.  That is prior art.

 2    His Honor will tell you that.  It is prior art not submitted to

 3    the Patent Office.

 4         Jury Instruction Number 20 that you will see (as read):

 5             "Sonos forum posts that expressly predate

 6         December 21, 2005, are prior art."

 7         Remember, December 21, 2005, is the conception date.

 8    Conception date.  That is when Sonos is claiming that

 9    Mr. Lambourne first came up with all of the elements in the

10    claim, 2005 December 21.

11         Everything I'm going to show you now is prior art.  It is

12    evidence.  It is publicly available and this is something that

13    can be used to invalidate these two patents.

14         TX2424.  February 27th, 2005, a user named theboyG was

15    telling the world (as read):

16             "Let's create virtual zones and zone grouping.  Then

17         I don't have to keep manually linking and unlinking

18         multiple zones every time."

19         Contrary to what was suggested in the closing, people were

20    complaining about the product.  They weren't happy with the

21    Sonos 2005 system because the one thing they couldn't do is

22    save the groups that they were creating.  They wanted something

23    to be added to that system, a simple modification to allow at

24    least one of those groups to be saved.  2005.

25         Another really important piece of prior art evidence,

 1  TX3928.  Jeff T, another user.  Remember, these are interesting

 2  names but behind each of these names are informed users of the

 3  Sonos 2005 system talking about modifications that could be

 4  made.  Many of them, as you saw in the forum posts, were

 5  software programmers.

 6      Jeff T writes (as read):

 7          "I would save zone links as favorites."

 8  And he talks about two party modes:  Summer and winter.

 9  Then he gave exactly the same example that you saw in the

10  patent (as read):

11          "When I get up, I press morning, the DI chill radio

12      station plays."

13  He's talking about exactly this invention of having

14  overlapping zone scenes that could be saved for later use:  I

15  create one summer matter mode, I create another we'll call

16  winter, they overlap, and they can be saved.

17      I confirmed that by asking Mr. Lambourne, the man who

18  knows his invention best (as read):

19          "Is what Mr. Jeff T is describing your idea of saving

20      overlapping zone scenes?"

21  This is at the transcript 539 (as read):

22          "Is having multiple zone scenes that are saved for

23      later?

24          "Yes."

25  That is evidence.  (as read):

1          "Zone scenes could be overlapping in that they would

2      share a speaker or zone player; correct?

3          "Yes."

4      Another piece of evidence, and he specifically identifies

5  those summer and winter party modes that the users were talking

6  about.

7      Mr. Sullivan suggested this is a wish list.  It's a wish

8  list.  There are no solutions here.  Not so.

9      What did -- what evidence did we see from Mr. Lambourne

10  himself?

11      Remember, Mr. Lambourne is a great UI designer, but he's

12  not a programmer.  He doesn't write software code.  So the

13  solution he had in his mind and that he used to write his

14  patents was something called macros.  These are just simple

15  automated program instructions that would allow you to automate

16  simple tasks.

17      I asked him (as read):

18      "QUESTION:  Based on his conception documents and

19      notebooks, macros is one of the solutions that you had in

20      mind for carrying out your zone scenes?

21      "ANSWER:  Yes."

22      Another key piece of evidence.  He told all of us that

23  using macros is one of the solutions that would meet the

24  elements of the claims.

25      What did we see in the Sonos forum posts?  September 27,

1    2005, TX3928, exactly that being proposed three months before

2    Mr. Lambourne claimed that he invented the idea.  Floras Dad,

3    another user of the Sonos 2005 system, a macro -- he says (as

4    read):

5                "First of all, great idea.  A macro like scripter

6          would enable you to set groups of zones.  You could do

7          these as dynamic presets based on the Party Mode."

8          That's the Party Mode that already existed in the Sonos

9    2005 system.

10         And what do we see here?  Thematic names:  Entertaining,

11   romantic, dinner, ambience.  He was saying you could use macros

12   to do exactly what the claims required:  Create overlapping

13   zone scenes that are presaved, give it a thematic name whether

14   it's done by the user or the system.  That was all in the prior

15   art.  Sonos forum posts are prior art.

16         And, again, I asked Mr. Lambourne about that very post in

17   this prior posting about the Sonos 2005 system (as read):

18         **QUESTION:**  Mr. Greenwood was describing the same type of

19          problem that you were trying to solve with zone scenes and

20          suggesting macros, which is a similar solution to what you

21          had in mind for that functionality?

22         **ANSWER:**  In broad terms, yes.  As an outcome, yes."

23         That is another piece of evidence.

24         So let me pause there.  Mr. Lambourne had the idea of

25   creating overlapping zone scenes, save for later.  What was his

1    solution?  Macros.  That's it.

2         You can look through that patent and you will not find a

3    single piece of source code instruction.  We went through that

4    in some of the examination.  Why?  Because Mr. Lambourne was

5    not a programmer.  His solution was a macro, and that was

6    already known in the prior art through the Sonos forum posts.

7         You're going to find these jury instructions in -- when

8    you go back to your deliberations, Jury Instruction Number 21

9    and Number 19.  They will give you, as well as the other

10   instructions, the law that you need to apply to determine

11   whether these patents are obvious.  If they're obvious, then

12   they're invalid.

13        A patent is invalid if the claimed invention would have

14   been obvious to a person of ordinary skill in the art.

15        These are people with engineering degrees back in 2005 who

16   would have had at least two to four years of experience, people

17   who would have known exactly how to save things, how to use

18   macros, how to write code, to implement the claimed invention

19   of having overlapping zone scenes.

20        Jury Instruction Number 19 is also very important for you

21   to consider (as read):

22             "Cursory detail in the patent specification may

23        indicate that the inventor expected those of ordinary

24        skill in the art would already know enough to practice

25        that point with only minimal disclosure."

1      What is His Honor telling you?  If I look at a patent on a

2   critical feature like saving another zone scene and all I see

3   is very little detail, the inventor is assuming that engineers

4   out there will know exactly how to do that.

5      So Sonos can't have it both ways.  Their patent simply

6   says "Save using things like macros."  That's what the inventor

7   had in mind.  They cannot impose a higher burden on the prior

8   art than what they taught in their own patent specification.

9      So if you compare here on this slide TX3928, which is one

10   of the macros posts "Save zone links as favorites," what do we

11   see on the left-hand side from the patent itself, '885 patent,

12   Figure 6, column 10, line 42?  All we see is a flowchart and a

13   box that says "Save the scene."  "Save the scene with the

14   primers."

15      If you look at the description, all it says is the scene

16   is saved.  That's it.  That's all Mr. Lambourne had to say

17   because all the engineers that he worked with would have known

18   how to save the groups that were being created.

19      If this is enabling, then so are the Sonos forum posts.

20   And not only that, we'll show you evidence and we have seen

21   evidence in this case that it would have already been done.

22   The idea of saving multiple overlapping groups had already been

23   done by other people and patented by others.

24      Getting to the verdict form, the first question you're

25   going to be asked to decide:  Is claim 1 of the '885 patent

1    invalid?

2        We believe that we have more than met our burden on this

3    point.  Not just based on what Mr. Lambourne did with his Sonos

4    2005 prior art system and the existence of the one zone scene

5    according to his records, but the Sonos forum posts themselves,

6    prior art combined with that very system, invalidate this

7    claim.

8        We'll show you more evidence that Dr. Schonfeld walked you

9    through with actual analysis and product testing and review of

10   the source code.

11       But I agree with Mr. Sullivan.  This is an easy case.  If

12   you look at the actual evidence presented by Mr. Lambourne

13   himself, the problem and the solution were already known in the

14   prior art.

15       It says -- this Question 1 says (as read):

16           "If you answer yes, you move on to question 3."

17       Question 3 is (as read): "If any of the following asserted

18   claims of the '966 patent are invalid, and there's a series of

19   one, two, three, four five claims.  And, again, these are

20   patents that cover the same -- same coin from the perspective

21   of the zone player for one and the controller for the other.

22       It does have one important difference that I'll talk to

23   you about, but that important difference was also satisfied by

24   the combination of Sonos 2005 and the forum posts.

25       If you decide that it would have been obvious to those

1  skilled in the art of ordinary skill in 2005 to simply save

2  another zone group that was being created by the older system,

3  then your work is done.  We do believe that this is as simple

4  as that.

5      But we didn't stop there.  We brought you Dr. Schonfeld

6  and he walked you through all of this evidence about what other

7  people had done before the December 21st, 2005, conception

8  date:

9      The Nourse patent that taught us things about the actual

10  mechanisms that you would use to save multiple groups involving

11  overlapping speakers.

12      We had Yamaha that the patent examiner considered and

13  said, "Here are all the things that Yamaha taught and here's

14  the one little piece that's missing."

15      Same with Bose, Sonos 2005 system, Sonos forums, the

16  Squeezebox that Sonos itself was analyzing in 2003 to

17  understand how to do grouping.

18      All of that is prior art; and as you will find in the

19  instructions, one of ordinary skill in the art would be

20  presumed, would have known about all of this in thinking about

21  whether the claims are obvious and, therefore, invalid.

22      And I want to know something.  What I think, what

23  Mr. Sullivan thinks, again, is not evidence.  What could be

24  evidence are things that Mr. -- or Dr. Almeroth said on the

25  stand under oath.

1    He didn't say a word about Nourse.  He didn't say a word
2    about Bose.  He didn't say a word about the substance of Sonos
3    forums or Squeezebox.  He didn't analyze any of those things
4    and tell you why Dr. Schonfeld's analysis was wrong.  He never
5    addressed why they wouldn't be combined together.  And he only
6    relied on a 2016 nonprior art forum post to suggest that
7    somehow would have been difficult.
8        That's it.  All of these prior art combinations -- Nourse,
9    Bose, the Sonos forums, Squeezebox -- unrebutted by
10   Dr. Almeroth.
11       We brought you important evidence from the prosecution
12   history.  This is what the patent examiner actually said as a
13   matter of public record.
14       Remember DME is the Yamaha DME prior art.  He says (as
15   read):
16           "Examiner takes official notice that grouping and
17       subgrouping audio players was well known in the art before
18       the effective filing date of these two patents and would
19       have been an obvious inclusion."
20       That's part of the record for these two patents.
21       What else did he say?  (as read):
22           "Grouping of playback devices would have been obvious
23       as a matter of routine experimentation."
24       That means that this would have been well within the skill
25   and knowledge of those skilled in the art.

1    "Average skill practitioner," that's another word for

2    people of ordinary skill.  (as read):

3             "Using the DME reference to create, save, and recall

4        various configurations."

5    Create, save, and recall, those are the things that you

6    will find is the definition of zone scene.

7    The examiner himself by looking at this reference said

8    that was all known or it would have been obvious to do those

9    things.

10   You didn't hear one word from Dr. Almeroth about this key

11   piece of evidence because he couldn't -- he couldn't dispute

12   what the examiner said was known.

13   We brought you this evidence so you can understand that we

14   agree with the patent examiner on many things.  The things that

15   he analyzed and considered, we agree with his statements and he

16   was saying that the idea of saving another zone scene would

17   have been obvious.

18   It wasn't just the examiner.  Let's look at TX004 as part

19   of the prosecution history.  This is Sonos responding back to

20   the examiner saying (as read): "This Yamaha DME reference had

21   zone scenes -- these are scenes -- up to 999 of them that can

22   be configured, stored, and recalled.  999 zone scenes in an

23   actual product being sold by Yamaha.  You could configure them,

24   store them, recall.

25   What was the one missing piece?  To create overlapping

 1    ones.  That's it.  That's what the examiner said was missing

 2    and allowed these claims.

 3         But what did we see already?  We already saw all the Sonos

 4    forum posts saying "Let's do exactly that" as pieces of prior

 5    art evidence.

 6         Again, this is TX2426.  This is the Yamaha prior art.  It

 7    talks about storing a scene.  Storing a scene.  These were

 8    saved in a persistent manner on the device.  And you can see

 9    you can go all the way up to 999 zone scenes.  This was already

10    known.  People knew how to do this.  Of course they could save

11    zone scenes.

12         We saw the Bose reference.  Even Party Mode before Sonos

13    2005 was already done by another company called Bose.  They had

14    room buttons that you could select individual groupings of

15    speakers.  You could also push a button called "House."  That

16    was a Party Mode where all the speakers in the house would play

17    together.

18         And if you had this functionality, then you would have

19    overlap.  Because as Dr. Schonfeld pointed out, Room A and

20    Room C groups would overlap.

21         The patent examiner, again TX006 (as read):

22              "Bose displays static groupings as rooms that can be

23         individually activated and/or grouped into a Party Mode."

24         So even before Sonos came out with their system that

25    implemented the zone scenes, the examiner already said Bose had

1    Party Mode and you could also have multiple groups of them that

2    could be overlapping.

3        Nourse, this is a piece of evidence that we brought to you

4    that was not even addressed by Dr. Almeroth.  It's a United

5    States patent issued to a different company.  It specifically

6    lays out the mechanism, the how.  You address different bits,

7    you associate different bits of information to say, "Hey, this

8    speaker belongs in this group" and you can assign up to four

9    groups to each speaker.

10        This is a mechanism that is taught in the prior art that

11    was already known; and as Dr. Schonfeld explained to you, you

12    could just use a handful of bits to store a second zone scene.

13        Dr. Schonfeld's opinion:  That would be a trivial exercise

14    to those with computer engineering degrees and two to four

15    years of experience.

16        Squeezebox.  We brought you the physical device.  Remember

17    when I cross examined Mr. Lambourne.  He authenticated that

18    device for us.  He looked at the back and said it was made here

19    in Mountain View; that they were looking at this device in

20    2003.  They tested multiple Squeezebox systems in order to

21    understand how they group the technology together as they were

22    in the process of designing their Sonos 2005 system.

23        Prior art.  Clearly a motivation to combine Squeezebox

24    with Sonos 2005.  Why?  Because Sonos did it.  They were

25    looking at this product to see:  What are elements that we

1    could implement similarly in our products?

2         Dr. Schonfeld then took the source code that he had

3    available, executable code, these are the code that you can

4    run, and he could form tests without modifying any of that code

5    to confirm that, in fact, the Sonos -- the Squeezebox system

6    had the capability to configure and store multiple overlapping

7    zone scenes.

8         You saw this really important piece of evidence that was

9    not discussed by Dr. Almeroth.  These are the actual test

10   results that the examiner never got to see:  Player 1 belonging

11   to two separate groups at the same time that have been stored

12   persistently on the device.  Never submitted to the Patent

13   Office.

14        The Squeezebox software was never submitted.  Other than

15   one page, none of the source code was submitted to the Patent

16   Office.  All important evidence that you got to see.

17        Dr. Schonfeld walked you through all of these combinations

18   claim limitation by limitation and checked off all the boxes

19   for you in terms of each element of claim 1 of the '885 patent

20   and how they were rendered invalid by each of these

21   combinations.

22        Sonos 2005 combined with the working knowledge of ordinary

23   people skilled in the art back in 2005, combining Sonos 2005

24   with Sonos forums which is prior art, Sonos 2005 with the

25   Nourse patents, Sonos 2005 combined with Squeezebox.  Why did

 1  we do this?  Because we wanted to present the evidence to you

 2  of the whole history of what happened not just bits and pieces,

 3  not leaving out things from documents submitted to the Patent

 4  Office.

 5      This was our opportunity in court.  We wanted to bring you

 6  the evidence to prove once and for all that these patents cover

 7  old and obvious ideas, and we believe we've done that.

 8      He did the same for the '966 patent.  For each of these

 9  combinations he checked off all the boxes for us using his

10  expert analysis and opinions.

11      And then for the dependent claims, he walked through each

12  of the elements that you will be asked to consider and

13  explained how the Sonos 2005 system met every single one of

14  them.

15      There was no rebuttal from Dr. Almeroth other than to say

16  Sonos 2005 system did not have any zone scene technology.  Yet

17  that's contradicted by what Mr. Lambourne said about his own

18  invention in his historical records back in 2005.  Those are

19  the pieces of evidence.

20      And just going back to my opening, I told you that an

21  incomplete picture sometimes can convey the wrong impression;

22  and when you put all the pieces together, what this shows is

23  that these two patents cover old and obvious ideas that all of

24  us can use.  This is public property.  They don't have the

25  right to go back in time and claim something that predate their

1    conception to say "We now have a legal monopoly.  We're going

2    to block others from using it.  We're going to charge

3    exorbitant royalties."  That's not what the patent system was

4    designed to reward.

5        I'm going to talk briefly about some of the alleged

6    evidence that Dr. Almeroth showed us.  He showed us these are

7    secondary considerations.  You'll read about that in the jury

8    instructions.  This is to prevent hindsight.

9        So if there was truly praise from people who know about

10   technology at the time of that invention and they say, "Wow,

11   this is incredible, groundbreaking," that's important evidence.

12   There's no such evidence like that in this case.

13       He showed us 2020 news coverage about articles describing

14   not overlapping zone scenes but the idea of just having

15   flexible zone groupings.

16       Number one, it's 2020.  Do you remember in this case

17   they're accusing Google's products as shipped in 2015?  So, of

18   course, these things are not talking about anything new.

19       Number two, he talked to you about a couple of non-prior

20   art forum posts in 2016 and also in 2006 to suggest that there

21   was a lot of skepticism, a lot of concern about how this would

22   be implemented.  I think the evidence shows otherwise.

23       This is TX2425.  This is -- remember Mr. Majik that Sonos'

24   counsel talked to you about where he said, "I'm not sure if

25   it's logical to have so many groups or zone scenes"?  What does

1    he say in that same forum thread that Dr. Almeroth didn't

2    bother to read?  (as read):

3         "Majik:  I think it would be reasonable to limit it

4       to, say, 32 zone groups."

5    So even Mr. Majik, Keith, eventually after talking through

6    the issue with other forum posters said, "You're right.  We

7    can't have thousands but 32 sounds like a good reasonable

8    limit."

9         This is not evidence of skepticism.  This is evidence that

10   it was very straightforward and you could put reasonable limits

11   on number of zone scenes that you want to create in any system.

12        I showed you this in my cross-examination with

13   Dr. Almeroth when he showed you the 2016 post which came after

14   Google released the product.  And what is Mr. Chewy Waffles

15   saying in this post, which is not prior art, but it shows us

16   that Sonos waited 15 years to ship this feature now that

17   they're saying it's so valuable?

18        And Mr. Chewy Waffles says (as read):

19        "Wow, I'm greatly disappointed that this wasn't a

20      basic feature right out of the gate."

21        He goes on to say (as read):

22        "I'm rethinking this.  This reeks of lack of

23      competition that this hasn't been implemented."

24        What these Sonos forum posts that come after the

25   conception date show is, number one, it's straightforward,

1  people were demanding it, people knew how to do it using

2  macros, and much later in time they were surprised and

3  disappointed that Sonos had not shipped this basic feature for

4  15 years.  That's what these forum posts show.

5      I want to talk to you about infringement.  Again, if you

6  decide that these patents are invalid, then there is no

7  infringement.  His Honor will tell you that, but I do want to

8  touch on the issues of infringement because that is Sonos'

9  burden, and we have a response to some of the things that we

10 heard.

11     These are the important jury instructions that you will

12 find:

13     Number 29, even if you miss one requirement, the product

14 does not directly infringe.

15     Jury Instruction Number 34, this is on indirect

16 infringement or induced infringement.  That's a different way

17 to argue infringement, but one of the important elements of

18 induced infringement is you have to have known that the acts it

19 was causing would infringe the patent.

20     What this is saying is that for you to find that Google

21 induced infringement, we would have to have known and

22 encouraged others to actually infringe these patents.  That is

23 exactly the opposite of what happened.  We brought our

24 declaratory judgment complaint so that we can prove that we

25 don't infringe and ultimately that these patents are invalid.

1        Number three element is not met.  Induced infringement is

2    not an issue in this case.

3        Jury Instruction Number 35, this is the contributory

4    infringement, another way that Sonos may try to say we

5    infringe.  Contributory infringement is if you build something,

6    a component of a larger system, and that component can only do

7    one thing, then you can contribute to infringement.

8        What have you seen?  All the evidence in this case, all of

9    our smart speakers can do hundreds of different things by

10   unlocking the "Hey, Google" functionality.  The Home app can do

11   thousands of different things connected to dozens or even

12   hundreds of other devices like lightbulbs and thermostats.

13   Again, we'll submit to you that contributory infringement is an

14   irrelevant issue for this case.  It just doesn't belong here.

15       You heard some suggestion about what these claims require,

16   it is simply capability.  Not so.  Sonos wrote these claims and

17   they wrote it like a driving test.  So if you wanted to get

18   your driver's license, you have to go to DMV and DMV examiner

19   says "I want to see if you're capable of driving on the

20   street."  And he would have a checklist:  While operating in

21   driving mode or while driving, check the mirrors, check the

22   blind spots.  You could do all of these things on the checklist

23   but you fail one, like using your turn signal, you may not

24   pass.  You fail.

25       That's how these claims are written.  And you might have

 1    to retake that test, but it doesn't mean that you have to keep

 2    driving according to the driver's examination's instructions.

 3    You can drive however you want after you pass the test, but you

 4    still have to pass the test.

 5        And as you've heard, and everybody agrees, infringement is

 6    an all-or-nothing test.  Even if one of the elements is

 7    missing, there can be no infringement.

 8        Both of these patents require "while operating in a

 9    standalone mode."  Where Mr. Sullivan talked about just being

10    in standalone mode, that's not what the claims say.  The claims

11    say "operate in standalone mode."  Drive.  Operate.  Play

12    music.  That's the test; and if you are driving and you don't

13    turn your signals on, you fail the test.  If you are operating

14    in standalone mode by playing music and you don't do any of

15    these things, you fail the test.  There's no infringement.  And

16    that's what we proved to you.

17        There's no dispute that all of the accused smart speaker

18    products stop playing music or audio when there is invocation

19    of the group.  When you're actually launching the group for

20    music, they're not operating in standalone mode because the

21    sound is gone.  They're not playing anything that you were

22    playing.  That is uncontested.

23        And we submit to you that operating in standalone mode

24    means exactly that.  You're playing music or continuous output

25    of media.

 1      That appears in the '966 claims as well.  What evidence
 2  did we bring you on why this is the right meaning?  We brought
 3  you the prosecution history statement, and I want to make sure
 4  that you understand what's going on.
 5      Sonos added the language "while operating in a standalone
 6  mode" to the claims to get around the Yamaha prior art.  That
 7  Yamaha prior art they said doesn't operate while its operating
 8  in standalone mode, and the examiner ultimately agreed with
 9  Sonos.  And what did the examiner say?  DME, the Yamaha DME,
10  does not allow for continuous output of media when a scene is
11  invoked.
12      That is exactly the meaning that Dr. Schonfeld uses for
13  while operating in a standalone mode.  And it's just common
14  sense.  When you're operating in a standalone mode, that means
15  you're playing music or audio.
16      This is another undisputed piece of evidence, and I want
17  to be very clear about His Honor's instruction regarding
18  Dr. Schonfeld.  He is not -- all of the evidence that you heard
19  from the Google engineers about the accused functionality is
20  evidence, all evidence that you can rely on, and this is one
21  piece of undisputed evidence from Mr. MacKay who designed the
22  system.  He said that he put the StopCurrentFunction in there
23  so it stops playing audio.  Undisputed.
24      So what's going on?  Dr. Almeroth says that's something
25  different than the plain meaning "while operating in a

1    standalone mode."  The patent examiner said exactly the same

2    thing as Dr. Dan Schonfeld.  Operating in standalone means

3    playing music continuously or audio when you're launching the

4    group.  There's no dispute here that the new design products do

5    not work in this way.  They stop the music before they join and

6    launch the group.

7         Another problem with Dr. Almeroth's opinion -- this is his

8    burden or Sonos' burden to meet -- he says you have to be in

9    two modes and you can only be in two modes according to the

10   patent:  Standalone and group.

11        And he says that launching or invoking the group has to be

12   in that standalone mode.  So when I asked him invocation if it

13   happens in a mode other than the standalone mode in the new

14   design, he agrees there will be no infringement.

15        And what did Mr. MacKay tell you?  Invocation of a group

16   occurring when the speaker is in standalone mode, no evidence.

17   All the speakers that you're adding to the group when you're

18   launching a group for music play, what are they in?  Idle mode.

19        And you heard Mr. MacKay talk about how that functionality

20   worked and how the word "idle" appears in his source code.  It

21   means that it's not running any app that can possibly play

22   music.

23        We walked through all of these slides with you with

24   testimony from Mr. MacKay showing that the launch command, the

25   invocation step, only occurs when the -- when you're in this

1  third mode called idle.

2      So Google and Sonos work very differently.  The Sonos

3  patents you only have two modes:  Standalone and group.  So you

4  can only go back and forth between them.

5      Google has three modes:  Idle, standalone, and group.  And

6  you have to be in the idle mode before you can launch into

7  group.  Three is not two.  It's different.

8      And idle mode when you're not playing music and have no

9  app to play music because you killed it, that's not operating

10  in standalone mode.

11      And all of those facts are undisputed, undisputed about

12  how our actual products work and what the code does when

13  Mr. MacKay invokes them.

14      And although Dr. Schonfeld was prevented from using the

15  word "idle," he provided his own separate opinions about the

16  same functionality and using his own words.  You heard him talk

17  about terminating the app, killing the app, and what he says is

18  you cannot do it in the new design while operating in

19  standalone mode; therefore, there's no infringement.

20      I want to note one thing about the Home app.  This is for

21  the '966 patent.  He says (as read):

22          "How many devices were you required to infringe claim

23          1 of the '966 patent?"

24      Dr. Almeroth said, "Just one device."  And he said (as

25  read):

1        "I'm accusing every installation of the Home app even

2    when they're not connected to any speakers."

3    Well, what you're going to find is (as read):

4        "I have determined" -- this is His Honor going to

5    instruct you -- "I have determined that mere installation

6    of Google Home app on a computing device does not itself

7    infringe until, if ever, a computing device with a Google

8    Home app installed is network with at least three zone

9    players and may be added to overlapping zone scenes."

10   Using that app, it cannot fall within the claims.

11       So Dr. Almeroth presented his entire infringement theory

12   to you based on just putting Home apps on phones and tablets

13   even when the user has no speakers in the house.

14       Yet His Honor is going to instruct you otherwise, that

15   that cannot possibly show infringement alone.  You need more

16   than that, and we submit that Sonos has failed to meet that

17   based on Dr. Almeroth's theory.

18       One last point on infringement, very important.  First of

19   all, none of the claims have anything about users.  I want all

20   of us to understand that.  His Honor changed the meaning of

21   indication that the first zone player has been added to a zone

22   scene to take out the word "by the user."  You will hear that

23   in the instruction.  So if you look at all the claims, with the

24   exception of the last claim in the '966 patent, the word "user"

25   doesn't appear anywhere.

1    The system can save it, create it, send indications about

2    it.  The user doesn't have to be involved.  But in that last

3    element all it says is "an instruction comes from the user

4    interface that's running on the computer."  The indication can

5    be from the system itself.

6        Bottom line, please don't be distracted about user

7    defining and creating zone scenes.  That's not anywhere in the

8    claims.

9        But what the construction, the Court's construction, says

10   is:  Zone scene has to be previously saved grouping.  It's not

11   just a name or an ID.  It's the group.  You have to know which

12   speakers belong to the group.

13       And this is important because the '966 patent claims all

14   require an extra step.  You have to store the first and second

15   zone scenes so you can use it later to invoke the group.

16       And you heard about the new technology that Google

17   developed, the ACA technology, where the zone scene is not

18   saved.  Zone scene is not saved.  Why?  Because there's no need

19   to store actual grouping or membership information of the

20   speakers.

21       Undisputed testimony from Mr. Ken MacKay (as read):

22           "Is there a need to store actual grouping or

23       membership information in speakers?

24           "No."

25       And he explained to you why.  Because in Google's system

1  you're automatically and continuously checking to see who the

2  members are and who the leader is.  There's no need to go back

3  and look at anything that was previously stored.

4      So you can't look at just an instant in time for the

5  claims.  You have to look at whether you're storing it for

6  later use.  And you see here, all this evidence was unrebutted

7  about how the Google products work.

8      And we asked Mr. MacKay under oath (as read):

9          "Are the things that are stored, like the ID and the

10     name, do they contain information about membership

11     information about the actual grouping?"

12     He said (as read):

13         "No.  Those are just names and IDs.  You don't know

14     who the members are until you need to use them."

15     Undisputed.

16     Mr. Pedro said the same thing (as read):

17         "Membership information in the cache of the

18     controller is never used for playback purposes."

19     One more important piece of history that we brought you.

20  Remember Mr. MacKay and Mr. Maclellan developed their

21  technology without using anything from Sonos, and one important

22  piece of evidence was the March 30, 2015 design document.

23     In that document 6454, Mr. MacKay actually independently

24  came up with the idea of storing membership information for

25  later use, but he recognized there were cons, there were

 1   problems with this approach, so he came up with Option 4.

 2   Doesn't have any a priori knowledge.  That just means any

 3   knowledge about what happened in the past.  You don't need it

 4   with this system.  It's better.

 5        He says first option you store all the group members; but

 6   what he selected is Option 4, which doesn't have any stored

 7   information and doesn't know about what membership information

 8   may have existed in the past.

 9        And he said (as read):

10             "That's the option that had the best engineering

11          tradeoffs.  That's the option we implemented."

12        That's the accused technology.  It works fundamentally

13   different than what's required in the '966 patent.

14        And, again, it was their burden to prove infringement and

15   these facts are not disputed.

16        Dr. Dan Schonfeld talked to you about why only storing the

17   name and identifier does not satisfy this extra step of storing

18   the actual group identification members, the actual list of

19   speakers or zone players that belong in a group and using it

20   later to play music as a group.  He said that's not enough.

21        A couple of thoughts on willful infringement.  If you ever

22   get to this question, these are the factors that you would have

23   to consider.

24        They're saying we willfully infringed.  They're saying we

25   did something with the actual knowledge and willful intent or

 1   that we were willfully blind, and it's the opposite is true.

 2   We brought a declaratory judgment action.  We defended

 3   ourselves against six patents that were being asserted.  Four

 4   of them are gone based on defenses that we raised.

 5       That shows that, in fact, Google had reasonable belief and

 6   that, in fact, those patent defenses were valid defenses; but,

 7   as His Honor said, we still have to decide these two patents.

 8       But as you think about willful infringement and they're

 9   pointing to this notice in the DJ complaint, please consider

10   the entire history and you're allowed to do that.  There's no

11   evidence here that we tried to cover up our infringement.

12       We provided all the source code to them.  We released our

13   products publicly.  We developed our technology independently.

14   That's why we brought all the engineers from Google to speak to

15   you under oath.  All of them got up, looked you in the eye, and

16   said, "We didn't take anything from Sonos."

17       And, in fact, it makes sense because Google came out with

18   their technology in 2015 while it took Sonos five more years to

19   release the product.  How could we have possibly taken anything

20   from Sonos when Sonos itself decided not to release it for

21   15 years?

22       I want to talk very briefly about damages.  It is our

23   position, just to be clear, that we don't believe we owe Sonos

24   anything for these patents because they're invalid.  We don't

25   believe anyone owes anything to Sonos.  They can use the

1    technology just like we can because they're old and obvious.

2        And Jury Instruction Number 40 will tell you that.  If the

3    claims are ultimately found to be invalid, Google will not have

4    to pay money damages.  We believe that is the right outcome.

5    That's why we've been working so hard to go through each of the

6    patents that have been asserted down to the last two.

7        And we believe that we have proven, based on all the

8    evidence, including the Sonos forum prior art posts, as well as

9    all the other systems and patents, that this was an obvious and

10   old idea.  No one should own a monopoly for that.  Zero

11   damages, and you can find that by checking off the invalidity

12   questions.

13       But just think logically here.  Use your common sense.

14   His Honor is going to tell you that's some of the most

15   important tools.

16       If it was so important, if the technology was so valuable,

17   why did they wait 15 years?

18       And you saw Mr. Millington talk about all the different

19   features, hundreds of features, increasing the number of

20   soundtracks, integrating with voice technologies that occurred

21   between this gap.

22       Mr. Lambourne couldn't tell you why they waited so long.

23   I think we know why.  It's not very valuable.  We've seen the

24   usage statistics.  Very few people use their grouping

25   technology for speakers in the way that's actually claimed, and

 1   Sonos itself knew that, waited 15 years to release it.

 2        This is very important.  Some of the big numbers that we

 3   saw, 90 million at the beginning of the case, the foundation

 4   for those opinions are gone.  His Honor will instruct you, and

 5   he already has but he will give you more detailed instructions,

 6   saying that IFTTT, the theory that Mr. Malackowski used to

 7   justify the $90 million, is no longer in this case.  You cannot

 8   rely on that.  That foundation is gone.

 9        He's also going to tell you that the Google Home app by

10   itself cannot fall within the claims of the '966 patent.  And

11   Sonos hasn't proven with any kind of certainty exactly how many

12   speakers out there are actually grouped using overlapping zone

13   scenes technology that they're accusing.  No evidence of that.

14        The evidence we have that Google showed you is a very,

15   very small percentage, less than 1 percentage, could even

16   possibly meet that definition.  Yet they're asking for

17   royalties on everything even when the Home app is simply

18   downloaded to control your lightbulb.  It does not make sense

19   and it's not the law.

20        The licenses.  The Outland Research, that was a purchase

21   agreement for real technology, 2.25 million.  Mr. Sullivan just

22   showed you one figure; but if you pick up that patent TX6016,

23   you will see detailed descriptions of synchronization

24   technology for a virtual reality system by one of the most

25   prolific inventors in the country.  Google bought over a dozen

 1   of those patents for 2.25 million.  Obviously a license is much

 2   lower in value than that.

 3        But even if you were to take the Denon, and that was a

 4   lump-sum payment, if you were to take the Denon agreement that

 5   Sonos presented through Ms. Kwasizur, the $10 million number

 6   for lump sum was for a thousand patents.  In using the buffet

 7   analogy, there are lots of things on the buffet that most

 8   people may not be interested in.

 9        What Sonos has failed to prove is that these two patents

10   are so fundamental and important that you could even get close

11   to $10 million.  There are a thousand patents that were being

12   licensed to Denon just for $10 million.

13        These other two, you saw those royalty rates, again $30 a

14   unit, those are all for a thousand -- over a thousand patents,

15   $30 for a thousand patents.  And if you look at the actual real

16   world, these are the numbers:  Lenbrook paid 783,000; Legrand,

17   239,000.  That's the real world.  Not just on a rate sheet.

18   This is the actual amount that was paid and that was for a

19   thousand patents, not these two.

20        And we brought you Mr. Bakewell who explained that one of

21   the ways you can think about damages is:  What's the

22   noninfringing alternative?  We changed our design not to

23   infringe, and we believe that we've shown you evidence of that.

24        If you believe us, that because of the changes that were

25   made to stop the music app and no longer produce sound and go

1  into this idle mode, then $200,000 would be another way to look

2  at damages because that's a fork in the road.  You could either

3  go look at the license agreements, which have problems with

4  respect to Sonos license agreements; or you look at -- you can

5  look at the $200,000 number.

6      You might be asking again:  Why fight over 200,000?  It's

7  important to us.  We want to clear the name of our Google

8  engineers.

9      But also, remember, there were six patents that Sonos was

10 asserting at the beginning of this case.  So that's why we're

11 here.

12     So with that, I want to thank all of you for paying close

13 attention.  I'm going to let Mr. Sullivan respond to some of

14 the things I said; but, again, I'll just remind all of us that

15 what we say as lawyers is not important.  What's important is

16 His Honor's instructions and the actual evidence that you

17 heard.  And I think it's clear this is a simple case.

18     Thank you.

19         **THE COURT:**  Thank you, Mr. Pak.

20     Let's take a ten-minute break so everyone will be fresh.

21 Not a 15-minute.  Let's try to keep it short so we'll move it

22 right along.  Ten minutes.

23     Thank you.

24         **THE CLERK:**  All rise for the jury.

25     (Proceedings were heard outside the presence of the jury:)

**PROCEEDINGS**

1          **THE COURT:**  Okay.  Be seated.

2      Any issues for the judge?

3          **MR. PAK:**  No, Your Honor.

4          **MR. SULLIVAN:**  No, Your Honor.

5          **THE COURT:**  Okay.  See you in ten minutes.

6          **THE CLERK:**  Court is in recess.

7                  (Recess taken at 10:59 a.m.)

8              (Proceedings resumed at 11:11 a.m.)

9      (Proceedings were heard out of the presence of the jury:)

10          **THE COURT:**  Okay.  We're going to bring the jury in in

11     about half a minute.  If the jury is able, I'll go immediately

12     after your two rebuttals into the -- we're ready?  Thanks.

13          **THE CLERK:**  All rise for the jury.

14     (Proceedings were heard in the presence of the jury:)

15          **THE COURT:**  Welcome back.  Be seated.

16      Before Mr. Sullivan resumes, let me just give you a

17     heads-up on we have 15 minutes of rebuttal by Mr. Sullivan.  He

18     can address any issues that he raised and/or that Mr. Pak

19     raised in his 15 minutes.

20      And then we will proceed to the issues that Mr. Pak has

21     the burden of proof on, which is the invalidity issues, and he

22     is limited in his -- in his rebuttal to that set of issues so

23     he will not be allowed to speak to say, for example,

24     infringement.

25      So I just -- that's the ground rule that we have here for

1  the party with the burden of proof.

2       The floor is yours Mr. Sullivan.  Go ahead.

3       **MR. SULLIVAN:**  Thank you.

4                    **REBUTTAL ARGUMENT**

5       **MR. SULLIVAN:**  Okay.  So I didn't bring my calculator.

6  I think I disagreed with about 93 percent of what Mr. Pak said,

7  but I'm sure that's not going to surprise you.  There were a

8  few things obviously that we, I think, do agree on.

9       I'm not going to be able to address all the things that he

10  said that I disagree on in these 15 minutes.  I'll just try to

11  hit a few of the highlights for you.

12      You know, Mr. Pak made a comment about users complaining

13  that dynamic grouping wasn't good enough and they wanted these

14  virtual zones or these presets and things like that.

15      Well, you know, again, I go back to my flying car example.

16  You know, I wish my car could fly, but I still love my car.

17  There's nothing wrong with dynamic grouping.  Those people

18  weren't complaining about dynamic grouping.  They were having a

19  wish list about things that they'd like to see in the future.

20      But, again, when you look at the claims and you look at

21  all the messaging in the claims and all the details in the

22  claims, that's really how you achieve that, that wish list.

23      One other issue I wanted to address.  Mr. Lambourne and

24  his statement that he put in the alarm clock specification, not

25  the zone scene specifications.  You got to remember, and

1    Mr. Pak keeps repeating that, "Well, that's what he said back

2    in 2005."  Well, in the zones scene specification in 2005, he

3    distinguished the two, Party Mode from zone scene.

4         So, again, this is not something where Rob's trying to

5    rewrite it today for anybody.  He wrote that in 2005.  He made

6    sure that the specifications that went into the provisional

7    application in 2006, that those were corrected; that those

8    mistakes about comparisons between zone scenes and Party Mode

9    were taken out, they were corrected.

10        Now, it seems to me that Google may be trying to imply

11   that by taking those things out in those provisional

12   applications, that we were hiding something from the Patent

13   Office.  Let's go look at what the Patent Office had.

14        So, Dr. Jay, if you can pull up for me TX6991.

15        So now this is the user manual.

16        Put that first page up for me, will you, Dr. Jay?  And

17   then we'll come back to these.

18        Okay.  So you see here 6991.  This is the user manual, the

19   user guide I should say.  This is before the examiner in these

20   patents.

21        All right.  Now let's turn to -- I think the first one's

22   page 29.

23        All right.  You can see here on the right -- if you can

24   blow up "Zone Groups" for me.

25        All right.  So you see here it tells the examiner all

1    about this All Zones-Party Mode.  It mentions that right here

2    in this guide.  We didn't hide that from the examiner.  That's

3    there.

4         Okay.  Now let's look at the detail in the user guide on

5    how this feature works.

6         Okay.  Let's go ahead to page 67.  If we can kind of zoom

7    in at the top there.  Yeah.

8         So you see here on the right in that screen, it says "All

9    Zones-Party Mode."

10        Okay.  And if we go down to the bottom of this page, it

11   tells you (as read):

12             "Highlight the zone you want to add to the group and

13        touch 'Okay.'  If you want to join all the zones in your

14        house to this music queue, select All Zones-Party Mode."

15        It was before the examiner.

16        Now, Google seems to be trying to rest their entire case

17   about Party Mode being a zone scene on one inaccurate statement

18   that Mr. Lambourne said in 2005 in an alarm clock specification

19   that he corrected in the provisional application that he filed

20   with the Patent Office.  That's not clear and convincing.

21        Mr. Lambourne said in his zone scene specification that

22   these are different animals and they are, and that's why he

23   took it out of the specifications before he filed them in the

24   provisional application with the Patent Office.

25        If the Patent Office thought they were the same, they

1  would have said so.  They had the information before them right

2  here in the user manual.

3      Okay.  Let's -- let's take a look at -- oh, one other

4  issue I wanted to raise that I'm not sure it's come up, but --

5  I think it's obvious, but Mr. Pak seems to imply that there's

6  this disconnect between the number of controllers and the

7  number of players.

8      Two things to keep in mind.  I think you heard about this

9  from Mr. Pedro in this case.  Okay.  The controllers that

10  Google has, the Home app on a smartphone, for instance, that

11  can control Google speakers and any cast-enabled speakers out

12  there with that technology.  So it could be other brands, not

13  just Google speakers.  That's one.

14      Two, okay, I'm a perfect example of this.  So I have a

15  wife and three kids.  We all have our own controller in our

16  house for our Sonos system.  I have a controller, my wife has a

17  controller, my daughter has a controller, my two sons have

18  controllers.  We use our own controllers to control the system,

19  this multiroom audio system.

20      The same thing is true with Google Home app.  It's not

21  just a one-to-one relationship.  You may have multiple

22  controllers for the same set of three speakers, for instance.

23      Okay.  I just wanted to get that out there.

24      Okay.  Let's pull up the transcript at, is it, 1646:13,

25  the trial transcript, Dr. Jay, if you would, please?

```
 1         Now, I was taking some notes.  I may have misheard
 2   Mr. Pak, but I thought he said -- and he'll correct me if I'm
 3   wrong, but I thought he said that our expert Dr. Almeroth
 4   didn't address the DME statement about continuously that the
 5   examiner made in the file history.  I just want to make sure
 6   the record's clear.
 7         He did address that issue, and here you see the testimony
 8   that starts, and I think it was His Honor that asked him about
 9   this.  And you can see here at the bottom of the page --
10   well --
11              MR. PAK:  What page?
12              MR. SULLIVAN:  1646:13 to 1647:12.
13                       (Pause in proceedings.)
14              MR. SULLIVAN:  Okay.  So here you can see His Honor
15   saying (as read):
16               "I remember seeing something about Yamaha prior art."
17         Yamaha is the DME prior art.  Okay.  So he asked a
18   question about that to explain that, and then you can see
19   Dr. Almeroth did give an answer following that.  I think it's
20   at the top of the next page, 1647.
21         So here Dr. Almeroth explained that, two things.  One it
22   was under the notice of allowance.  So it wasn't a statement
23   that Sonos made.  It was the examiner.
24         The second thing is the statement doesn't say anything
25   about standalone mode.  It's not used in there at all.  If you
```

1  look at the statement, what it's describing is if you have a

2  speaker that's trying to join another speaker that's already

3  playing, what the consequence of that is.  That's what he was

4  saying, Yamaha didn't describe how that was supposed to happen

5  and that ends up not being related to standalone mode.  It's if

6  you have a speaker join a speaker that's already playing,

7  what's supposed to happen?

8      Now, to be honest with you, I'm not even sure why we're

9  even talking about DME here.

10      Let's pull up the transcript, or maybe you have it on a

11  slide, 1490:6-7.

12                    (Pause in proceedings.)

13      **MR. SULLIVAN:**  Okay.  Yeah, so here's Dr. Schonfeld's

14  testimony in this trial.  We asked him (as read):

15          "You also relied on the Yamaha DME system; correct?"

16      He says (as read):

17          "Not for my invalidity analysis."

18      So, again, I'm not even sure what the relevance of that

19  is.

20      Let me -- let's go back to my deck if you can.

21      Okay.  Well, again, we talked about -- a little bit I

22  talked about in my first statement about, you know, why hasn't

23  Google just removed this feature.  I mean, if it's that

24  worthless, that valuable, [sic] just take it out.  They don't

25  even need to pay for it.  You can just take it out.  They

 1    haven't done that.

 2         Well, the reason is that it is important to Google, it is

 3    very's important to Google.  So you can see here in this

 4    diagram static grouping was the only way, zone scenes were the

 5    only way to group in their system starting in 2015 and they

 6    went years without adding dynamic groups.  All they had was

 7    static grouping.

 8         And when we asked Mr. MacKay why, he said he was trying to

 9    be compatible with the existing cast ecosystem.  He says (as

10    read):

11              "Existing sender apps would be able to use that as a

12         cast target."

13         Again, it's a very important static grouping to Google to

14    be able to use this technology with their ecosystem with their

15    other products.

16         Let me go back here.

17                   (Pause in proceedings.)

18         **MR. SULLIVAN:**  Well, there we go.

19         Okay.  So we talked -- Mr. Pak raised this again about why

20    did we wait 15 years, it wasn't important.  Again, that's not

21    true.

22         We heard from Mr. Millington, Ms. Kwasizur about the

23    issues that Sonos was dealing with during this time.  You got

24    to remember Mr. Millington, the 10th employee at Sonos;

25    Mr. Lambourne the 14th employee at Sonos, they're trying to get

1    a whole new system out that operates on a whole new paradigm.

2    They're trying to get new products out.

3         That sheet that Mr. Pak keeps referring to, that change

4    log with all the things they were doing, yeah, that shows us

5    how busy Sonos was trying to get new products out trying to

6    compete in this marketplace as a startup.  That doesn't show

7    that it wasn't important.

8         And, again, we talked about this too.  Sonos had the

9    disadvantage of starting with much more immature technology

10   back in 2005.  Google came on the scene in 2015.  They had much

11   better technology at the time to work with for their products.

12   They had memory that they could store all the zone scenes on.

13   That hardware existed for them in 2015 when they started.  It

14   wasn't there in 2005.

15        So, again, the hardware difficulties, again that's

16   something you heard Dr. Almeroth and Ms. Kwasizur talk about,

17   that that's a lot of the reason why it took so long to make

18   this switch to zone scenes, not that it wasn't important.

19        How am I doing on time, Your Honor?

20            THE COURT:  You have about three minutes.

21        MR. SULLIVAN:  All right.  Well, let me leave you with

22   this thought.  I'll get there, I promise.

23                      (Pause in proceedings.)

24        MR. SULLIVAN:  Okay.  Google has their hands in

25   everything.  You've heard that from Mr. Pak both in opening,

1  you heard him again say the Google Home app does a lot of

2  different things in his closing statement.

3      In comparison -- well, Google is actually a verb.  I

4  didn't even realize this.  I looked it up on their own

5  dictionary.  That's how big time they are.

6      And in comparison Sonos, does one thing, does one thing

7  only.  It makes products to fill your entire home full of

8  music.  That's all it does.

9      Sonos came out in 2005.  The big tech companies all came

10  in in this 2016 timeframe, end of 2015, early into 2016.

11  Somebody's got to stand up to Google.  Sonos has got to defend

12  itself.  That's why we're here, and I need your guys' help to

13  do that.

14      Thank you.

15      **THE COURT:**  Thank you, Mr. Sullivan.

16  Mr. Pak, you have 15 minutes.

17      **MR. PAK:**  Thank you, Your Honor.

18  I will try to stay within my 15 minutes, Your Honor.

19                    **REBUTTAL ARGUMENT**

20      **MR. PAK:**  All right.  I do want to respond to a few of

21  the things I heard, so I think let's start with DDX14.38.

22      His Honor has been continually reminding us we have to

23  look at the claims.  We have to look at the claims whether you

24  look at prior art or for any other purpose in this case.

25      The claims do not say anything about the user creating,

1    the user saving, the user naming, none of it.  So when

2    Mr. Lambourne was talking about how zone scenes -- some of the

3    zone scenes can be more powerful or flexible, he was talking

4    about those things:  User naming, user creating, user saving.

5    They didn't make it.  Those advantages that he had in his mind

6    didn't make it into these claims.

7        And even the previously saved construction, let's look at

8    1454.  This is what His Honor has told us that these words

9    mean.  Zone scene is not a previously saved grouping of zone

10   players created by a user.  It doesn't say that.  It doesn't

11   say "according to a common theme named by a user."  The word

12   "user" doesn't appear anywhere.

13       So although Mr. Lambourne -- and I discussed this on

14   cross-examination with Mr. Lambourne, yes, he had some other

15   ideas of using zone scene technology that involved users.  They

16   didn't make it into this claim.

17       So we're not talking about what advantages that

18   Mr. Lambourne may have had in his mind about using zone scenes.

19   We're talking about what is the actual claimed technology in

20   this case.  It has nothing to do with the user.

21       So that takes us back to Party Mode 2005.  Party Mode 2005

22   was always saved by the system, was saved in the code that

23   created it.  When the system booted up, it would recognize all

24   the members, it was saved again; and then when the user pushed

25   the Party Mode button, it would then be stored down onto the

 1  zone players.

 2      This is all the evidence that Dr. Schonfeld walked you

 3  through, including source code.  Remember that set AVT

 4  transport [sic] message?  That came from source code that Sonos

 5  produced to us about that system.

 6      None of that was before the Patent Office, but all of that

 7  proved independently of Lambourne's testimony --

 8  Mr. Lambourne's testimony that Sonos 2005 Party Mode met every

 9  single one of these claim requirements.  The only thing that

10  was missing was just having one more.

11      And I want to just remind us about what was said by

12  Mr. Lambourne looking at the historical prior art.  And this

13  is -- again, let's go back to DDX10.15.  And I didn't see any

14  rebuttal on this point so I wanted everybody to remember this

15  testimony very clearly.

16      And if you want -- if you need transcripts read, you can

17  have it read.  You won't get the entire transcript.  But it's

18  541, line 2 through 7.  He was talking about -- I was asking

19  him (as read):

20          "Look, here is a Sonos forum prior art posting by

21      Mr. Greenwood.  As the inventor, when you look there, what

22      do you see?"

23  He says (as read):

24          "The prior public posting about the Sonos 2005 system

25      was describing the same type of problem, how do you create

1          overlapping zone scenes and save it, that you were trying

2          to solve with zone scenes and suggesting macros, which is

3          a similar solution to what you had in mind for that

4          functionality; correct?

5               "Broad terms, yes.  As an outcome, yes."

6     He wasn't saying this is just a wish list.  He saw the

7     macros in there.  Macros were the solutions he had in mind for

8     his invention.

9          He didn't put any computer program instructions into his

10    patents because he didn't talk in code.  Remember that?  He

11    didn't talk in code, but he knew that if he said "program

12    instructions" or "macros," that other engineers at Sonos would

13    be able to implement them.

14         That's exactly what he saw in these prior art posts.  This

15    is an admission by Sonos' inventor that said everything, two

16    overlapping zone scenes being saved using a macro as a solution

17    was all known in the prior art.  That's the case.

18         And I could have rehashed through all of the evidence that

19    Dr. Schonfeld walked you through, but I have a limited amount

20    of time and I didn't want to retread all of that ground; but

21    that is all evidence, including the source code, testing, all

22    of that that the patent examiner never saw.

23         But to get to the truth, this case -- these two patents,

24    this case begins and ends with Mr. Lambourne.  Not just his

25    sworn testimony but what his business records said.  It's easy

1   17 years later after speaking with lawyers to have a different

2   viewpoint.  But what did his business records say?  He said

3   Party Mode was a zone scene technology.

4        And then when he looked at the forum posts, what did he

5   find?  He found the other thing that was missing.  The save

6   more, one more or many more, give it names if you wanted to,

7   and they would overlap.  That was all prior art sworn

8   admissions from Mr. Lambourne.

9        So I just -- I want to make sure that you understand that;

10  that this case can be very simple.  There are a lot of complex

11  things about some of the infringement issues; but if you're

12  asking yourself what is the single truth that we have learned

13  from this case, it came from the business records of

14  Mr. Lambourne saying Party Mode is a zone scene technology and

15  looking at the claims that say nothing about the advantages

16  that he had in mind, which were all about what the user can do.

17  That's the important evidence.

18       And then Sonos forum posts, the one thing I want to make

19  sure everybody understands, was never submitted to the Patent

20  Office.  So the patent examiner never got to see the

21  combination of the Sonos 2005 prior art with the forum posts.

22       And I'm willing to bet that if the examiner did see that

23  combination and had seen the source code where you can find

24  messages like set AVT transport [sic] and got to see all the

25  documents that Sonos produced in this case, they would come to

1    the same conclusion that Mr. Lambourne did.

2        The claimed problem creating two overlapping zone scenes,

3    using program instructions like macros, that was already in the

4    prior art.  These patents would not have issued had the patent

5    examiner got to see all of that evidence, including the things

6    that were taken out of the conception documents.

7        And that's why we're here.  All right?  The patent

8    examiner does his job, and we thank the Patent Office for doing

9    their job.

10        As you heard, Google owns one of the largest portfolio of

11   patents, but we also believe it is important to enforce only

12   valid patents because sometimes things are overlooked or, in

13   this case, so much evidence was not presented to the examiner.

14        That's why we're really asking all of you to make the

15   right decision here based on the evidence.  And His Honor did

16   the same, and he made one ruling about the '885 patent on the

17   old design but he left all the other issues, including the

18   prior art issues.  And if these patents cover old and obvious

19   ideas, then they belong to all of us and Sonos shouldn't have a

20   monopoly on that old and obvious idea.

21        So that's -- that's one important thing I wanted to

22   convey.

23        The other is there were some discussion about Yamaha.  Do

24   you remember the Yamaha discussion by Mr. Sullivan?  What

25   happened was Dr. Almeroth did not include any discussion of the

1  prosecution history in his expert reports.  That's why I had to

2  object when he got up.

3       And do you remember when I cross-examined him for the

4  first time and I showed him some of these prosecution

5  statements about Yamaha?  He couldn't recall the details

6  because he hadn't done that analysis.  And then the next time

7  he came up, I made the objection.  I said, "It's not in his

8  report," and that objection was sustained because he had not

9  done that work.

10      Of course His Honor had questions and it was completely

11 appropriate for His Honor to ask those questions, but that had

12 to do with infringement, that had to do with whether continuing

13 to operate in standalone mode is about music playing, which the

14 prosecution statement clearly shows.  It was not about the

15 prior art disclosure in Yamaha.

16      And Dr. Schonfeld, a few questions after what Mr. Sullivan

17 showed you, said (as read):

18          "I consider Yamaha to be part of what a person of

19      ordinary skill in the art would have known and understood

20      because it was part of the prior art record."

21      And so just to be clear, he's not using it as a separate

22 combination, but he definitely considered it as part of what

23 people would have known.

24      And he also testified to you at length about the findings

25 that the Patent Office made about Yamaha, about Bose, that

 1    disclosed virtually all of the claims.  The only thing that was

 2    missing?  Overlapping, overlapping in Yamaha.  And you know

 3    what?  That was previously disclosed in the Sonos forum posts

 4    and all the prior art that you saw.

 5          So I just wanted to set the context for that as well.

 6          So I wanted to put up, just so everybody knows exactly

 7    what happened in this case, put back up DDX14.77.

 8          Again, I think we have more than met the challenge here

 9    with Mr. Lambourne's testimony, his historical records, and the

10    Sonos forums about the Sonos 2005 system; but these are the

11    things that were not rebutted by Dr. Almeroth in terms of the

12    substance of what they disclosed, the reasons why people would

13    have been motivated to combine them with other prior art, and

14    the expectation of success.  Dr. Almeroth gave you no opinions

15    on these combinations specifically.

16          Squeezebox combined with Sonos 2005 system, he didn't say

17    a word about that combination, not one word.  I went back and

18    checked again.

19          Same thing with Bose.  Same thing with Yamaha.  Same thing

20    with Nourse.  He never addressed the merits of these positions.

21    The only discussion around Yamaha was in response to His

22    Honor's question about claim construction.

23          Why does that matter?  Because unlike what Mr. Sullivan

24    and I say in court, what Dr. Almeroth says, what Dr. -- or

25    doesn't say and what Dr. Schonfeld says is evidence, and they

1  brought you their technical expertise to help you understand

2  the evidence.

3       And when Dr. Schonfeld got up and walked through all of

4  the prior art, the only thing really that Dr. Almeroth said:

5  Is Sonos 2005 system doesn't have any zone scene technology.

6  That's completely contrary to what Mr. Lambourne wrote down in

7  his historical document.

8       Mr. Lambourne said many things on the stand, but one thing

9  he did not say is "I made a mistake in writing that document."

10 Do you remember?  I asked him (as read):

11          "Which is more reliable?  Your recollection of what

12      happened 17 years ago versus what you wrote down when you

13      were working as an employee of Sonos and inventing these

14      technologies?"

15 He said (as read):

16          "The business record is more reliable than my

17      memory."

18      He never testified that "I made a mistake when I put zone

19 scenes in there."  Never.

20      And that piece of evidence was not submitted to the Patent

21 Office, all those things that were left out of those documents.

22      And Mr. Sullivan suggested that alarm clocks have nothing

23 to do with zone scenes?  Then why did they include it in the

24 provisional application for these two patents but just left out

25 all the things that would tell the examiner, "Hey, zone scenes

1  is similar to what Party Mode was.  Hey, it's an example of a

2  zone scene"?  Why were those statements left out?  We won't

3  know the answer to that question, but I will tell you this:

4  The examiner never got to see the evidence, that those things

5  were written down in historical documents at the time

6  Mr. Lambourne is inventing the technology.  He didn't get to

7  see that evidence.

8      So when Sonos has been suggesting throughout this case

9  "Defer to the Patent Office, they got to see everything," just

10 because some user manuals were listed, that just is not true.

11 You had access to so much more information and that's why I

12 talked to you and this is where I will end.

13     The checks and balances are important.  We are being

14 accused -- Google is being accused of wrongful infringement, of

15 willful infringement.  That is a serious charge.

16     Mr. MacKay, Mr. Maclellan, Mr. Pedro, Mr. Chan, they are

17 being accused of taking something willfully.  That's why we

18 brought them here, to help you not only understand the

19 technology but had them look you in the eye, give you the facts

20 of how they developed the technology to show you that they

21 didn't take anything.

22     And so that's the reason why we are here.  The patents are

23 invalid.  That's just the truth.  And we can go as deep as you

24 want or we can stop and end with Mr. Lambourne's admissions

25 under oath and his own historical records.

**PROCEEDINGS**

1    Do you want to believe Dr. Almeroth 17 years after the

2    fact testifying as an expert looking backwards?  Do you want to

3    believe Mr. Lambourne's testimony that says these things about

4    user definitions when the claims don't say that?  Or do you go

5    back to the record?  Go back to the truth?  What did he write

6    in 2005?  It's all there.  What did he say about the Sonos

7    forum posts?  It's all there.  That's the real evidence.

8        Thank you, ladies and gentlemen of the jury.  We really

9    appreciate the opportunity to have this day in court.  We've

10   waited a long time.  We know you're going to make the right

11   decision.

12       Thank you.

13       **THE COURT:**  All right.  Thank you, Mr. Pak.

14   We're down to one last piece, and it will take about

15   45 minutes to read the rest of these instructions.

16       If there are any members of the public who want to leave

17   during the -- please leave now.

18       I don't -- I'm not in any way insulted, but the jury has

19   got to listen.  But I have learned from prior cases that most

20   of the public won't pay attention anyway.  They want to go out

21   and get coffee, that's fine.

22       I just don't want you to be distracted by people leaving

23   so anyone else that wants to leave, now's the time but please

24   don't leave during the reading of the instructions.  Thank you.

25            (Pause in proceedings.)

1      **THE COURT:**  If any of you need a bathroom break or any

2   kind of break, raise your hand and interrupt me, and we'll do

3   it.  Okay?  Otherwise I'm going to power through.

4      Ready?

5                    (Pause in proceedings.)

6      **THE COURT:**  I've got to wait until this lady leaves.

7   Anyone else?

8                    (No response.)

9      **THE COURT:**  Okay.  Thank you.

10   I will now instruct you on the law in this case.  Before

11   summarizing the contentions of the parties and what each side

12   must prove to win it on its contentions, however, I feel it is

13   important to remind you why you are being asked to decide the

14   facts in this matter.

15      A patent is an intellectual property right over a new

16   invention granted by our federal government.  It is a right to

17   exclude others from exploiting the invention during the life of

18   the patent, which typically lasts 20 years.  Ordinarily for

19   20 years a patent owner has a limited monopoly and can exclude

20   others from making, using, selling, offering to sell, and

21   importing into the United States the invention claimed by a

22   patent.

23      As the Supreme Court once -- as the Supreme Court once

24   explained it, the patent system is a, quote, "reward, an

25   inducement to bring forth new knowledge."  One way the patent

system requires this new knowledge is through its disclosure requirement.

In exchange for a limited monopoly on the invention, a patent owner must publicly disclose technical details about how to make and use the invention.  The patent document itself must include the disclosure usually called a specification, and it is published as part of the patent.  This ensures that others can learn from the disclosure and contributes to the advancement of knowledge.

Importantly, the disclosure requirement also helps prevent inventors from receiving broader -- rights broader than their contribution.  No patent owner should receive a right to exclude others from exploiting something that the patent owner did not, in fact, disclose.  A patent owner, therefore, must describe the invention and how it differs from what was already known in the art at the relevant time.

Patents are presumed valid but they may be invalidated by a jury if the claimed invention was not, in fact, new or was obvious in view of what came before, which is referred to as the prior art.

I will now summarize the contentions of the parties and what each side must prove to win on its contentions.

In brief, Sonos seeks money damages from Google for infringement of the '885 and '966 patents.  Specifically, Sonos seeks money damages from Google for infringement of claim 1 of

1   the '885 patent and claims 1, 2, 4, 6, and 8 of the '966

2   patent.

3       As you heard throughout the case, patent claims are

4   numbered paragraphs at the end of the patent that describe the

5   limits of the patents protection.

6       Separately and as a defense to infringement, Google seeks

7   to invalidate the asserted claims of the '885 and '966 patents.

8       If the asserted claims are invalid, Google does not have

9   to pay any money damages to Sonos even if the asserted claims

10  are otherwise infringed.

11      With respect to the '885 patent, Sonos accuses Google

12  media players of infringement of claim 1.  These media players

13  are, and I'm going to give you a long list.  You're going to

14  have this list when I give you these instructions in the jury

15  room.  The media players are:

16      Google's Chromecast, Chromecast Audio, Chromecast Ultra,

17  Chromecast with Google TV, Home, Home Mini, Home Max, Nest

18  Audio, Nest Mini, Nest Hub a/k/a Home Hub, Nest Hub Max, and

19  Nest Wi-Fi Point.  We will refer to these as the '885 accused

20  products.

21      You will recall that I have already determined that the

22  original versions of the '885 accused products infringe claim 1

23  of the '885 patent.

24      I have also already determined that Google's infringement

25  of the '885 patent was not willful recognizing that this patent

1  issued after this lawsuit was filed and that Google did not

2  have sufficient notice of infringement, but I have not

3  determined whether the redesigned versions of the '885 accused

4  products infringe claim 1.  Sonos contends that they do and

5  Google disputes this.

6      You, you the jury, must decide whether or not Google's

7  redesign products infringe claim 1; and if that claim is valid,

8  you will need to decide the amount of money damages to

9  compensate Sonos for infringement of the '885 patent.

10     With respect to the '966 patent, Sonos accuses computing

11 devices, such as phones, tablets, and laptops that have or had

12 the Google Home app installed.  We will refer to these as the

13 '966 accused products.

14     I have not made any determination on whether the original

15 and redesigned versions of the '966 products infringe any of

16 the asserted claims of the '966 patent.

17     The same goes for the determination of whether any

18 infringement of the '966 patent was willful.  You must decide

19 whether or not the asserted claims of the '966 patent have been

20 infringed; and if you decide that any of the asserted claims

21 are valid and infringed, you will need to decide any money

22 damages to be awarded to Sonos to compensate it for

23 infringement of the '966 patent.

24     You will also need to make a finding as to whether any

25 infringement of the '966 patent was willful.  If you decide

1    that any infringement was willful, that decision should not

2    affect any damages -- damage award you give.  I will take any

3    willfulness finding by you into account later.

4        You will need to understand these patent claims.  You must

5    interpret the language of the claims using its plain and

6    ordinary meaning except where I give you a specific definition.

7        I have interpreted the meaning of some of the language in

8    the patent claims involved in this case, and you must accept my

9    interpretations as correct.

10       My interpretation of the language should not be taken as

11   an indication that I have a view regarding the issues of

12   infringement and invalidity.  Once more, factual determinations

13   bearing on infringement and invalidity are yours to make.

14       All right.  With respect to the '885, claim 1, the phrase,

15   quote, "indication that the first zone player has been added to

16   a... zone scene," close quote, I construe that to the mean the

17   following:  Indication from the network device that the first

18   zone player has been added to a zone scene.

19       I would reread this to you, but you're going to get it in

20   writing.

21       In the '885 patent, claim 1, and the '966 patent, claims

22   1, 2, 4, 6, and 8, the phrase "zone scene," close quote, I

23   interpret that to mean a previously saved grouping of zone

24   players according to a common theme.

25       You may recognize these constructions.  Early in the trial

1    the parties requested that I read to you a stipulated version

2    of what I had previously determined, which I did.  The above

3    constructions, however, are more precise and they are the ones

4    that control.

5        Previously the parties requested that I tell you that for

6    the '885 patent I have determined that the phrase "indication

7    that the first zone player has been added to a zone scene"

8    means indication from the network that the network device --

9    indication from the network device that the zone player has

10   been added by the user to a zone scene.  I have now omitted the

11   "user" language from the construction.

12       I will now instruct you on the law regarding the

13   invalidity of patents.

14       There can be no infringement of invalid patent claims so

15   it is necessary to decide if the asserted claims of the '885

16   and '966 patents are invalid.

17       Patents are issued by the Patent and Trademark Office and

18   are presumed to be valid.  The burden of proof to prove

19   invalidity of a claim is on Google, and that burden of proof is

20   by clear and convincing evidence.  I have already explained to

21   you what I mean by clear and convincing evidence.

22       To prove invalidity of any asserted claim, Google must

23   persuade you by clear and convincing evidence that the asserted

24   claim is in invalid.

25       A patent claim is invalid if the claimed invention would

1    have been obvious to a person having ordinary skill in the art

2    at the time of the claimed invention, which I will further

3    explain in detail.

4        The claims have already been explained at length in this

5    trial so I will not go into them here or read them to you.  You

6    have those.

7        With one exception, you must consider each of the asserted

8    claims of the patent individually.  The one exception to

9    considering claims individually concerns dependent claims.

10       A dependent claim includes all of the requirements of a

11   particular independent claim plus additional requirements of

12   its own.  If you find that an independent claim is invalid, its

13   dependent claims, due to the additional limitations, are not

14   necessarily invalid.

15       Conversely, if you find that an independent claim is not

16   infringed, you must also find that its dependent claims are not

17   infringed.

18       And if you find that an independent claim has been

19   infringed, you must still separately decide whether the

20   additional requirements of the dependent claims have also been

21   infringed.

22       This is like in college where you took a logic course.

23   Remember that, those days?  You might want to read it again if

24   you have any -- next time if it becomes important to you.

25       Sonos asserts independent claim 1 of the '885 patent as to

 1  the redesign versions of the '885 accused products.  Sonos

 2  asserts claims 1, 2, 4, 6, and 8 of the '966 patent.  Claim 4

 3  depends from claim 3.  Claims 2, 3, 6 and 8 depend from

 4  claim 1.

 5      You can read the claims themselves, and it's quite obvious

 6  which -- how that works.  You don't need to take notes on that.

 7      The question of invalidity of a patent -- okay.  Now I'm

 8  changing gears a little.

 9      The question of invalidity of a patent claim is determined

10  from the perspective of a person having ordinary skill in the

11  art in the field of invention in the relevant timeframe.

12      Here, the parties have stipulated to the level of ordinary

13  skill in the art and the relevant timeframe.  For the '885 and

14  '966 patents that timeframe is December 2005.

15      And the relevant -- and the level of ordinary skill in the

16  art is a person having a -- a bachelor's degree in computer

17  science, computer engineering, electrical engineering, or an

18  equivalent thereof; and, B, two to four years of professional

19  experience in the field of networking and network-based systems

20  or multimedia playback systems, such as consumer audio systems,

21  or an equivalent level of skill, knowledge, and experience.

22      In deciding what would have been known by those of

23  ordinary skill in the art, you may take into account the extent

24  to which a patent specification explained a point in detail or

25  did not explain a point in detail.

**FINAL JURY INSTRUCTIONS**

1    On the one hand, a detailed explanation may indicate that

2    the inventor expected those of ordinary skill in the art might

3    need the details to practice that point.

4    On the other hand, cursory detail may indicate that the

5    inventor expected those of ordinary skill in the art would

6    already know enough to practice that point with only minimal

7    disclosure.

8    You will recall that the specification which comes before

9    the patent claims is supposed to include a description of the

10   invention and an explanation of how to practice it.

11   An important aspect of our patent system is to confer a

12   right of exclusive ownership of an invention for 20 years in

13   exchange for an explanation to the world of how to practice it.

14   You may consider the extent to which the detail provided

15   in the specification explains how to implement certain aspects

16   of the invention as indicative of the view of the inventor as

17   to how much help those of ordinary skill in the art would have

18   needed that detail to practice the invention.

19   If one of the claimed inventive features of a claim -- I'm

20   sorry.

21   If one of the claimed inventive features of a claim over

22   the prior art received very little explanation in the patent

23   specification, then you may infer that the inventor expected

24   those of ordinary skill in the art already understood how to

25   implement that aspect of the claimed invention.

1    Conversely, if considerable detail was set forth as to

2  that claimed inventive aspect, then you may infer that the

3  inventor expected those of ordinary skill in the art would need

4  the extra detail to practice the claimed invention.  It is up

5  to you to decide how much weight to give any evidence,

6  including this inference.

7    In order for someone to be entitled to a patent, their

8  alleged invention must actually be new; and even if it is new,

9  it must not be obvious in light of the prior art.

10    Prior art is considered in determining whether a claim of

11  a patent would have been obvious to a person having ordinary

12  skill in the art in the relevant timeframe, in this case

13  December 2005.

14    Prior art may include items that were publicly known or

15  that have been used or offered for sale or references, such as

16  publication and patents, that disclose the claimed invention or

17  elements of the claimed invention.

18    The prior art must predate the stipulated conception date,

19  that -- the date that Sonos allegedly conceived of the

20  invention, which is December 21, 2005.  For example, the Sonos

21  2005 system is prior art because it was shipped to customers as

22  early as January 2005.

23    Similarly, the Sonos forum posts that expressly predate

24  December 21, 2005, are prior art, for example, those of the

25  boyG and Jeff T.

1    Meanwhile, the Crestron 2008 user manual is not prior art

2 because it was published after December 21, 2005.

3    Excuse me.

                    (Pause in proceedings.)

5    **THE COURT:**  Google contends that the asserted claims

6 of the '885 and '966 patents are invalid because their claimed

7 inventions would have been obvious in December 2005 to those of

8 ordinary skill in the art.

9    A patent claim is invalid if the claimed invention would

10 have been obvious to a person having ordinary skill in the art

11 at the time the claimed invention was made.  In other words,

12 even if the claimed invention was new in the sense it had never

13 been described before in the prior art, it might, nevertheless,

14 be true or not true that the claimed invention would have been

15 obvious to a person having ordinary skill in the art with

16 knowledge of all of the prior art.

17    The ultimate conclusion of whether a claim is obvious must

18 be based upon your determination of several factual issues.

19 Lawyers often refer to these as the *Graham* factors.

20    First, you ordinarily must decide the level of ordinary

21 skill in the art that someone would have had at the time of the

22 claimed invention.  Here, the lawyers have done that for you

23 and I've already told you about that.

24    Second, you must decide the scope and content of the prior

25 art.  In order to be considered as prior art to the asserted

1    patents, the items must be reasonably related to the claimed

2    invention of that patent.  An item is reasonably related if it

3    is in the same field as the claimed invention or is from

4    another field to which a person of ordinary skill in the art

5    would look to solve a known problem.

6         Third, you must decide what difference, if any, existed

7    between the claimed invention and the prior art.

8         Finally, you should consider any of the following factors

9    that you -- that have been shown by the evidence.  Okay.  These

10   are -- it's a long list so I'm just going to go through them.

11        Commercial success of a product due to the merits of the

12   claimed invention, a long-felt need for the solution provided

13   by the claimed invention, unsuccessful attempts by others to

14   find the solution provided by the claimed invention, copying of

15   the claimed invention by others, unexpected and superior

16   results from the claimed invention, acceptance by others of the

17   claimed invention as shown by praise from others in the field

18   or from licensing of the claimed invention, other evidence

19   tending to show nonobviousness, independent invention of the

20   claimed invention by others before or at about the same time as

21   the -- as the named inventor thought of it, and other evidence

22   tending to show obviousness.

23        A patent claim is composed of several elements -- no.  I'm

24   sorry.

25        A patent claim composed of several elements is not proved

obvious merely by demonstrating that each of its elements was independently known in the prior art.

In evaluating whether such a claim would have been obvious, you must consider whether Google has proven by clear and convincing evidence that a person having ordinary skill in the art as of December 2005 with knowledge of the prior art would have been motivated to combine their teachings to achieve the invention set forth in each asserted claim.

If you determine that Google has made this showing, then you must further determine whether Google has proven by clear and convincing evidence that a person having ordinary skill in the art as of December 2005 with knowledge of the prior art would have had a reasonable expectation of success in combining those teachings to achieve the invention set forth in each asserted claim.

In making these factual determinations, you may also consider whether an inventor would look to the prior art to help solve that particular problem at hand, whether the change was merely the predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness, whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent, whether the innovation applied a known technique that had been used to improve a similar device or method in a similar way, and

1  whether the claimed invention was one of a relatively small

2  number of possible approaches to the problem with a reasonable

3  expectation of success by those of ordinary skill in the art.

4      You must be careful not to determine obviousness using the

5  benefit of hindsight.  Many true inventions might seem obvious

6  after the fact.  You should put yourself in the position of a

7  person of ordinary skill in the art at the time the claimed

8  invention was invented.  You should not consider what is known

9  today or what is learned from the teachings of the patent.

10     I will now instruct you on the law regarding infringement

11  of patents and the rules you must follow in deciding whether

12  Sonos has proven that Google has infringed.  More specifically,

13  I will now instruct you on the rules you must follow in

14  deciding whether the redesigned versions of the '885 accused

15  products infringe claim 1 of the '885 patent and whether the

16  original and redesigned versions of the '966 accused products

17  infringe claims 1, 2, 4, 6, 8 of the '966 patent.

18     You know, I need to say one thing.  In my instructions, I

19  keep referring to "redesigned," but in the verdict form I think

20  we say "old" and "new."So "new" means redesigned.  I just -- I

21  should just point that out.  I'm sure you would have picked

22  that up.

23     The burden of proof on Sonos for proving all infringement

24  is a preponderance of the evidence.  I already explained to you

25  what I meant by preponderance of the evidence.  As applied

1    here, this means in order to prove infringement of any asserted

2    claim, Sonos must prove -- persuade that it is more likely than

3    not that Google has infringed the asserted claim.  Infringement

4    or not is a question of fact for you to decide.

5        Before explaining ways in which a patent may be infringed

6    and how to determine infringement, I will instruct you on two

7    relevant rulings that I have made.

8        First, with respect to the '966 accused products, I have

9    determined that the mere installation of the Google Home app on

10   a computing device does not itself infringe.  The claim

11   language does not recite any functions to be performed by the

12   accused product unrelated to these computing devices serving as

13   a controller.

14       Significantly, a computing device is not capable of

15   serving as a controller unless it is networked with at least

16   three zone players that may be added to overlapping zone

17   scenes.

18       Until, if ever, a computing device with a Google Home app

19   installed is networked with at least three zone players that

20   may be added to overlapping zone scenes using the Google Home

21   app, it cannot fall within the claims of the '966 patent, and

22   Google is not capable of infringing unless a computing device

23   is networked with at least three zone players that may be added

24   to overlapping scenes using the Google Home app.

25       I instruct you that the only computing devices networked

1    with at least three zone players that may be added to

2    overlapping zone scenes using the Google Home app qualify for

3    consideration.

4        This would be a subset of the computing devices that Sonos

5    has accused of infringing, but that subset may or may not

6    infringe.  That determination will be up to you and must be

7    made by -- it must be based on your finding of whether or not

8    all other claim requirements, sometimes called limitations, are

9    met as to that subset.

10       Second, with respect to the redesign and '885 and '966

11   products, as you may recall, I struck Dr. Schonfeld's testimony

12   regarding idle mode from the evidence.  You must disregard that

13   testimony.

14       Idle mode was used to refer to a mode that is neither

15   standalone nor group with respect to noninfringement of the new

16   version of the accused products.

17       As a witness providing opinion testimony, Dr. Schonfeld

18   was limited to discussing what was mentioned in his expert

19   reports, and none of his expert reports discussed idle mode or

20   a third mode, for that matter.  As a witness, however,

21   providing testimony as to facts only, Mr. Ken MacKay was

22   allowed to discuss idle mode.  The weight you ascribe to his

23   testimony is up to you.

24       I will now instruct you on the relevant ways in which a

25   patent may be infringed and how to determine infringement.

1    A patent can be infringed directly or indirectly.  I will

2  first address direct.

3    You will recall a patent's -- a patent -- a patent's

4  claims define what is covered by the patent.  Sonos claims that

5  Google directly infringed the '885 and '966 patents.

6    To decide whether an accused product directly infringes an

7  asserted claim in this case, you must compare an accused

8  product with the asserted claims and determine whether every

9  requirement of the asserted claim is included in the accused

10  product.  If so, the accused product directly infringes that

11  claim.

12    If, however, the accused product is missing even one

13  requirement of the asserted claim, the accused product does not

14  directly infringe the claim.

15    Whether Google knew its products infringed or even knew of

16  the patents does not matter in determining direct infringement.

17    If an asserted claim uses the term "comprising," that

18  asserted claim is to be understood as an open claim.  An open

19  claim is infringed when every requirement in that claim is

20  present in the accused product.  The fact that an accused

21  product also includes other parts or performs other functions

22  will not avoid infringement so long as the accused product

23  satisfies every requirement in the asserted claim.

24    An accused product directly infringes an asserted claim if

25  it is reasonably capable of satisfying the claim elements even

1   though it may also be capable of noninfringing modes of

2   operation.

3      If a claim requires only that the system or product has

4   the capability to perform a function, a product with that

5   capability directly infringes even though that capability is

6   not used.

7      As I stated above, I have found that Google cannot

8   infringe the '966 patent with respect to computing devices with

9   the Google Home app installed that are not yet networked with

10  at least three zone players that may be added to overlapping

11  zone scenes using the Google Home app.  For those that are so

12  networked, it is up for you to decide whether Sonos has proven

13  direct infringement.

14     You have heard evidence about both Sonos' commercial

15  products and Google's accused products.  However, in deciding

16  the issue of direct infringement and all other infringement,

17  for that matter, you may not compare Google's accused products

18  to Sonos' accused products.  Rather, you must compare the

19  accused products to the asserted claims of the two patents.

20     I will now instruct you on indirect infringement.

21     Sonos accuses Google of indirectly infringing the '966

22  patent.  If you find that Google infringed the '966 patent

23  directly or indirectly, you may indicate on the verdict form

24  that Google has infringed that patent.

25     There are two forms of indirect patent infringement:

**FINAL JURY INSTRUCTIONS**

1   Induced and contributory infringement.  I will take them up in

2   turn.

3       Sonos asserts that Google has actively induced others,

4   mainly consumers, to infringe the '966 patent by inducing them

5   to install the Google Home app on their computing devices.

6       In order for Google to have induced infringement, Google

7   must have induced another to directly infringe an asserted

8   claim of the '966 patent.

9       So I'm -- just to be clear on that, in order for Google to

10  have induced infringement, Google must have induced somebody

11  else, in this case the consumers, to directly infringe an

12  asserted claim of the '966 patent.

13      If there is no direct infringement by anyone, there can be

14  no induced infringement.  As with direct infringement, you must

15  determine induced infringement on a claim-by-claim basis.

16      In order to be liable for inducing infringement, Google

17  must, one, have intentionally taken action that actually

18  induced infringement; two, have been aware of the '966 patent;

19  and, three, have known that the acts it was causing would

20  infringe the patent.

21      Google may be considered to have known that the acts it

22  was causing would infringe the asserted claims if it

23  subjectively believed that there was a high probability that

24  the accused product was directly infringing and, nevertheless,

25  took steps to avoid learning that fact thereby blinding itself.

 1      Sonos also argues that Google is guilty of contributory

 2   infringement.  Contributory infringement may arise when someone

 3   supplies something that is used to infringe one or more of the

 4   patent claims.  As with direct infringement, you must consider

 5   contributory infringement on a claim-by-claim basis.

 6      In order for there to be contributory infringement by

 7   Google, someone other than Google must directly infringe a

 8   claim of the '966 patent.  If there was no direct infringement

 9   by anyone, once again, there can be no contributory

10   infringement.

11      If you find consumers or someone else had directly

12   infringed the '966 patent, then contributory infringement

13   exists if, one, Google supplied an important component of the

14   infringing part of the product; two, that component is not a

15   common component suitable for noninfringing use; and, three,

16   Google supplied the component with knowledge of the '966 patent

17   and knowledge that the component was especially made or adapted

18   for use in an infringing manner.

19      A common component suitable for noninfringing use is a

20   component that has uses other than a component of the patented

21   product and those other uses are not occasional, farfetched,

22   impractical, experimental, or hypothetical.

23      Google may be considered to have known that the acts it

24   was causing would infringe the -- everyone okay?

25      Okay.  I thought.  Do you need --

1        **JUROR JOHNSON:**  No.

2        **THE COURT:**  Okay.  Just let me know if you need a

3    break.  I am -- I still have about ten minutes.

4        I will not -- Google may be considered to have known that

5    the acts it was causing would infringe the asserted claims if

6    it subjectively believed there was a high probability that the

7    accused product was directly infringing and, nevertheless, took

8    steps to avoid learning that fact thereby blinding itself.

9        I will now instruct you on willful infringement.

10       In this case Sonos argues that Google willfully infringed

11   the '966 patent.  To prove willful infringement, Sonos must

12   first persuade you that Google infringed the '966 patent.  The

13   requirements for proving such infringements were already

14   discussed.

15       If you decide that Google has infringed any of the

16   asserted claims of the '966 patent, you must go on to address

17   the additional issue of whether that infringement was willful.

18   You will address this question separately on the verdict form.

19       Willfulness requires you to determine whether Sonos has

20   proven that it is more likely than not Google knew of the '966

21   patent and that -- and that the infringement by Google was

22   intentional.  You must base your decision -- you must base your

23   decision on Google's knowledge and actions at the time of

24   infringement.

25       You may not determine that the infringement was willful

1  just because Google was aware of the '966 patent and infringed

2  it.  Instead, you must also find that Google deliberately

3  infringed the '966 patent or recklessly disregarded Sonos'

4  patent rights.

5      Again, if you decide any infringement was willful, that

6  decision should not affect any damages award you give.  I, as

7  the judge, will take willfulness into account later.

8      To determine whether Google acted willfully, consider all

9  of the facts and assess Google's knowledge and intent at the

10  time of the challenged conduct.  Knowledge of a fact may be

11  inferred where a party intentionally blinds itself to that

12  fact.

13      Facts that may be considered include, but not are not

14  limited to, whether or not Google acted consistently with the

15  standards of behavior for its industry, whether or not Google

16  reasonably believed its products did not infringe or that the

17  patent was invalid at the time of infringement, whether or not

18  Google made a good faith effort to avoid infringing the

19  asserted patents, and whether or not Google tried to cover up

20  its infringement.

21      You have heard evidence that Google filed a declaratory

22  relief lawsuit seeking a judgment stating it did not infringe

23  the '966 patent, among others, one day before Sonos filed its

24  infringement lawsuit alleging that Google infringed the '966

25  patent, among others.

1    Google filed its 12-page complaint in the Northern

2  District of California -- that's this Court -- several hours

3  after it received an e-mail from Sonos' counsel informing

4  Google that Sonos would be filing an 87-page complaint in the

5  Western District of Texas.

6    Sonos' attached complaint -- no.

7    Sonos' attached draft complaint expressly discussed the

8  '966 patent and provided claim charts making a case for

9  Google's infringement.

10    Under the Federal Rules of Civil Procedure, Google's

11  presentation to a court of the complaint for declaratory relief

12  contained a certification by Google's lawyers that to the best

13  of their knowledge, information, and belief found after an

14  inquiry reasonable under the circumstances.

15    The statements made in their complaint for declaratory

16  relief were warranted under the law and the factual contentions

17  had evidentiary support.

18    In light of this certification, you may infer that the

19  lawyers and party who presented the complaint had conducted an

20  inquiry reasonable under the circumstances into the '966 patent

21  and the extent to which it was or was not infringed on behalf

22  of Google.

23    You may also infer that such an inquiry would have

24  provided knowledge to Google of the '966 patent prior to

25  commencement of this litigation.  It is up to you to decide how

1    much weight to give any evidence including this inference.

2        I will now instruct you on the measure of damages.

3        By instructing you on the measure of damages, I am not

4    suggesting which party should win on any issue.

5        Since I have already found that the original versions of

6    the accused products infringe claim 1 of the '885 patent, if

7    that claim is found to be valid, you must determine the amount

8    of money damages to be awarded to Sonos to compensate it for

9    infringement of the '885 patent.

10       Similarly, if you find that any asserted claim of the '966

11   patent is infringed and valid, you must determine the amount of

12   money damages to be awarded to Sonos to compensate it for

13   infringement of the '966 patent.

14       If the asserted claims of both parties are ultimately

15   found to be invalid, however, Google will not have to pay money

16   damages.  Once more, this is because there can be no

17   infringement of invalid patent claims.

18       The amount of damages must be adequate to compensate Sonos

19   for infringement.

20       A damages award should put the patent holder in

21   approximately the financial position it would have been in had

22   the infringement not occurred but in no event may damages award

23   be less than a reasonable royalty.

24       You should keep in mind that the damages you award are

25   meant to compensate a patent holder and not to punish an

1  infringer.

2      Sonos and Google agree that any damages for the

3  infringement of the '885 patent began on November 24, 2020, and

4  any damages for infringement of the '966 patent began on

5  November 5, 2019.

6      Those are the dates they were issued -- patents issued.

7  Those are the -- just happen to be the dates the patents became

8  effective.

9      Okay.  We're getting closer.

10     Sonos has the burden to persuade you of the amount of

11  damages by a preponderance of the evidence.  You should award

12  only those damages that Sonos more likely than not suffered.

13     While Sonos is not required to prove its damages with

14  mathematical precision, it must prove them with reasonable

15  certainty.

16     Sonos is not entitled to damages that are remote or

17  speculative.

18     As I mentioned during the trial, Google challenged the

19  testimony of the witness who Sonos called to testify regarding

20  the IFTTT app and associated damages calculation,

21  Mr. Malackowski, as well as the associated IFTTT testimony of

22  Dr. Almeroth.

23     One of my functions as a judge presiding over a trial is

24  to ensure that the evidence you consider meets the minimal

25  requirements for admissibility.

1    Upon further review, I have found that this testimony and

2  theory of damages does not meet those minimum requirements.  As

3  such, I have made a ruling striking the IFTTT theory from the

4  record.  What this means is that you shall not factor in any

5  information regarding IFTTT into your calculations of damages

6  and you cannot factor in the damages -- and you cannot factor

7  in the damages figures he calculated, which were 12,246,294

8  with respect to the '885 and 77,546,923 with respect to the

9  '966.  You can, however, use other evidence in the record to

10  calculate the damages award.

11    There are license agreements, for example, admitted into

12  evidence that you may find sufficiently comparable and that you

13  may use along with other evidence of economic value if

14  applicable.

15    To calculate damages you calculate a royalty.  A royalty

16  is a payment made to a patent holder in exchange for a license

17  which confers the right to practice the claims found valid and

18  infringed.

19    The proper approach to calculating a royalty is to

20  consider a hypothetical negotiation between Sonos and Google at

21  the time infringement began and at which both sides acted

22  reasonably to negotiate a license for the nonexclusive right to

23  practice these claims.

24    In considering the nature of this hypothetical

25  negotiation, you must assume that both parties would have acted

1  reasonably and would have entered into a license agreement.

2  You must also assume that both parties believe the claims were

3  valid and infringed.  Your role to determine what the

4  results -- your role is to determine what the result of that

5  negotiation would have been.

6      The test for damages is what royalty would have resulted

7  from the hypothetical negotiation and not simply what either

8  party would have preferred.  It is up to you based on the

9  evidence to decide what type of royalty is appropriate in this

10  case.

11     A royalty can be calculated in several ways.  It is for

12  you to determine which way is the most appropriate based on the

13  evidence you heard.  You should consider all the facts known

14  and available to the parties at the time the infringement

15  began.

16     I will now instruct you on various ways to calculate a

17  royalty.

18     In determining the amount of a reasonable royalty, you may

19  consider evidence on any of the following factors referred to

20  by the parties as the, quote, *"Georgia-Pacific"* factors in

21  addition to other evidence presented by the parties on economic

22  value of the patent with the exception that you must ignore the

23  evidence involving IFTTT.

24     It will be up to you to determine which factors may or may

25  not be relevant to -- other factors may or may not be relevant

1    to this case.

2        Here are these other factors:

3        The royalties received by Sonos for the licensing of the

4    patent in suit proving or tending to prove an established

5    royalty.

6        The rates paid by Google for the use of other patents

7    comparable to the patents in suit.

8        The nature and scope of the license as exclusive or

9    nonexclusive or as restricted or nonrestricted in terms of

10   territory or with respect to whom the manufactured product may

11   be sold.

12       Sonos' established policy and marketing program to

13   maintain its patent monopoly by not licensing others to use the

14   alleged invention or by granting licenses under special

15   conditions designed to preserve that monopoly.

16       Now, I need to say that I'm not saying that that's what

17   the evidence shows.  I'm saying that that's what the law -- if

18   it has these factors, that the law will allow you to consider

19   if you think these factors have been met.

20       Okay.  Next, the commercial relationship between Sonos and

21   Google, such as whether they are competitors in the same

22   territory, in the same line of business, or whether they are

23   inventor and promotor.

24       The effect of selling the patented speciality in promoting

25   sales of other products of Google.

**FINAL JURY INSTRUCTIONS**

1    The existing value of the alleged invention to Sonos as a

2  generator of sales of its non-patented items and the extent of

3  such derivative or convoyed sales.

4    The duration of the patent and the term of its license.

5    The established profitability of the product made under

6  the patent, its commercial success, and its current popularity.

7    The utility and advantages of the patented property over

8  the old modes or devices, if any, that had been used for

9  working out similar results.

10    The nature of the alleged patented invention.

11    The character of the commercial embodiment of it as owned

12  and produced by Sonos and the benefits to those who have used

13  the alleged invention.

14    The extent to which Google has made use of the alleged

15  invention and any evidence probative of the value of that use.

16    I'm almost done.

17    The portion of the profit of the selling price that may be

18  customary in the particular business or in comparable

19  businesses to allow for the use of the alleged invention or

20  analogous inventions.

21    The portion of the realized profit that should be credited

22  to the alleged invention as distinguished from the nonpatented

23  elements.

24    The manufacturing process business risks or other

25  significant features or improvements added by Google.

**FINAL JURY INSTRUCTIONS**

1       The opinion testimony of qualified experts.

2       The amount that a licensor, such as Sonos, and licensee,
3   such as Google, would have agreed upon at the time infringement
4   began if both had been reasonably and voluntarily trying to
5   reach an agreement; that is, the amount in which a prudent
6   licensee who desired as a business proposition to obtain a
7   license to manufacture and sell a particular article embodying
8   the alleged patented invention would have been willing to pay
9   as a royalty and yet be able to make a reasonable profit and
10  which would have been acceptable to a prudent patentee who was
11  willing to grant a license.

12      Okay.  That's all those factors.  I had to read them to
13  you because that's the *Georgia-Pacific* case.

14      No one factor is dispositive and you can and should
15  consider the evidence that has been presented to you in this
16  case on each of these factors.

17      You may also consider any other factors which in your mind
18  would have increased or decreased the royalty Google would have
19  been willing to pay and Sonos would have been willing to accept
20  as normal, prudent business people.

21      Comparable agreements are another factor that may inform
22  your decision as to the proper amount in a form of the royalty
23  award similar to the way in which the value of a house is
24  determined relative to comparable houses sold in the same
25  neighborhood.

**FINAL JURY INSTRUCTIONS**

1    When an agreement is comparable to the license under the

2    hypothetical license scenario -- whether an agreement is

3    comparable depends on many factors, such as whether they

4    involved comparable technologies, comparable economic

5    circumstances, comparable structure, and comparable scope.

6    If there are differences between an agreement and the

7    hypothetical license, you must take those into account when you

8    make your reasonable royalty determination.

9    The ultimate combination of a royalty base and a royalty

10    rate must reflect the value attributable to the infringing

11    features of the product and no more when the accused infringing

12    products have both patented and unpatented features.  Measuring

13    this value requires you to identify and award only the value of

14    the patented features.

15    In this case, the '885 and '966 patents cover only one

16    component of the product that Google uses or sells.  It is

17    Sonos' burden to separate the value of the patented

18    contribution from the value of the other parts of the product

19    that are not attributable to the alleged invention.

20    If you find Google has -- if you find that Google failed

21    to keep proper records, any doubts that you may have on the

22    issue of damages due to any such failure to keep proper records

23    should be decided in favor of Sonos.

24    I am not suggesting that Google failed to keep proper

25    records.  That would be a question for you to decide.

1    One way to calculate a royalty is to determine what is

2  called a per-unit royalty.  To calculate a per-unit royalty,

3  you must first determine the base, that is the product on which

4  Google is to pay; then you need to multiply the revenue -- is

5  that right?

6    Help me out here.  Were we going to change that to

7  "number"?

8    **MS. CARIDIS:**  I think it should be "rate," the base

9  times the rate.

10   **THE COURT:**  Let me just read it.

11   You must then -- wait a minute.

12   To calculate a per-unit royalty, you must first determine

13 the base, that is the product on which Google -- then you

14 multiply the revenue?

15   **MS. CARIDIS:**  The number of units.

16   **MS. BAILY:**  Number the units.

17          (Pause in proceedings.)

18   **THE COURT:**  Number of units.

19   Okay.  You then need to multiply the number of units the

20 Defendant obtained from that base by the rate or percentage

21 that you find would have resulted from the hypothetical

22 negotiation.

23   Another way to calculate a royalty is to determine a

24 one-time lump-sum payment that Google would have paid at the

25 time of the hypothetical negotiation for a license covering all

1  sales of the licensed product, both past and future.

2      This differs from the payment of a per-unit royalty

3  because with a per-unit royalty Google pays based on the number

4  of actual licensed products it sells.

5      When a one-time lump sum is paid, Google pays a single

6  price for a license covering both past and future infringing

7  sales.

8      A milestone has been reached.  I will now turn to the

9  third and final part of these instructions.

10      When you begin your deliberations, you should elect one

11  member of your jury as your foreperson.  That person will

12  preside over the deliberations and speak for you here in court.

13      You will then discuss the case with your fellow jurors to

14  reach agreement if you can do so.  Your verdict as to the

15  charge must be unanimous.

16      Each of you must decide the case for yourself, but you

17  should do so only after you have considered all the evidence,

18  discussed it fully with your fellow jurors, and listened to the

19  views of your fellow jurors.

20      Do not be afraid to change your opinion if the discussion

21  persuades you that you should but do not come to a decision

22  simply because other jurors think it's right.  It's important

23  that you attempt to reach a unanimous verdict but, of course,

24  only if each of you can do so after having made your own

25  conscientious decision.

1    Do not change an honest belief about the weight and effect

2    of the evidence simply to reach a verdict.

3    I will give you a verdict form to guide your

4    deliberations.

5    As I noted before the trial began, when you retire to the

6    jury room, you will have these things:  A work copy of these --

7    I don't think I actually told you this before, but here we go.

8    You will have a work copy of these instructions for each

9    of you; a work copy of the verdict form for each of you, the

10   verdict -- the official verdict form; and all of the exhibits

11   received in evidence.

12   Some of you have taken notes.  Whether or not you took

13   notes, you should rely on your memory of what was said.  Notes

14   are just to assist your memory.  Don't be overly influenced by

15   notes.

16   When you go into the assigned room, the clerk will bring

17   to you the trial exhibits received in evidence.

18   At no time may you conduct your own research about the

19   definition of the claims, the meaning of any terms, the law

20   governing the claims alleged, the process of jury deliberation,

21   or any other topic.  You may not consult any law books,

22   Internet sources, nonjurors, or other sources of information on

23   how to reach a verdict or understand the law.  If you have a

24   question, you must direct it to -- in writing to me.

25   A court security officer -- I guess in this case it's

1  going to be Angie -- will be outside the jury room door during

2  your deliberations.

3      If it becomes necessary during your deliberations to

4  communicate with me, you may send a note through the Court --

5  through Angie signed by your foreperson or by one or more

6  members of the jury.

7      No member of the jury should ever attempt to communicate

8  with me except by a signed writing via Angie, and I will

9  respond to the jury concerning the case only in writing or here

10  in open court.

11      If you send out a question, I will consult with the

12  parties before answering it, which may take some time.  It

13  usually does.  I have to give the lawyers a chance to explain

14  to me how we should answer any question.  You may continue your

15  deliberations waiting for the -- you may continue your

16  deliberations while waiting for any answer to my question -- to

17  any question.

18      Remember that you're not to tell anyone, including me, how

19  far the jury stands numerically or otherwise until after you

20  have reached a unanimous verdict or have been discharged.  Do

21  not disclose any vote count in any note to me.

22      If you do not reach a verdict by the end of today, please

23  place your work materials in the brown envelope provided and

24  cover up any easels with your work notes so that if my staff

25  needs to go in the room, they will not inadvertently see any of

1   your work in progress.  We never spy on our jurors so -- but if

2   we have to go in there for some reason, we don't want to see,

3   you know, your work product.

4       We have been required to be here each day 7:45 to 1:00.

5   Now that you are going to begin your deliberations, you are

6   free to modify this within reason.  If you want to continue

7   deliberations in the afternoon after a reasonable lunch break,

8   that is fine.

9       We're going to get you lunch today.

10      Right?

11          **THE CLERK:**  Yes.

12          **THE COURT:**  Yeah, you're going to have lunch today.

13      I do recommend, however, that you continue to start your

14  deliberations by 7:45.

15      If you do not reach a verdict by the end of today, you

16  will resume your deliberations on next Friday; right?  Isn't

17  that what we agreed?  Next Friday?

18      Okay.  It is very important that you let us know via Angie

19  in advance what hours you will be deliberating so that the

20  lawyers and parties may be present in the courthouse at any

21  time you are deliberating.

22      You may only deliberate when all of you are together.

23  This means, for instance, in the mornings before everyone has

24  arrived or when someone steps out of the room to go to the

25  restroom, you may not discuss the case.

**FINAL JURY INSTRUCTIONS**

1   One thing you can do while you're waiting for other people

2   is you can read your notes.  You can read exhibits.  You can

3   read the jury instructions.  You can study the verdict form.

4   Just in silence while you're waiting for everyone to arrive.

5   So you can put the time to good use, but what you can't do is

6   some subset of you discuss the case.  Discussions require all

7   of you to be together.

8       All right.  As well, the admonitions that you're not to

9   speak to anyone outside the room about this case still applies

10  during your deliberations.  Once you're discharged you can

11  write a book.

12                  (Laughter)

13      **THE COURT:**  "I served on the jury of Sonos v. Google."

14  It would be a best seller.  So you can do that, but you cannot

15  do that now and you cannot talk to anyone -- book agents or

16  anyone else for the time being.

17      All of you have reached unanimous agreement on -- after

18  all of you have reached unanimous agreement on a verdict, your

19  foreperson will fill in, date, sign the verdict form and advise

20  me through the court -- through Angie that you have reached a

21  verdict.  The foreperson should hold on to the filled-in

22  verdict form, and bring it into the courtroom when the jury

23  returns a verdict.

24      Thank you for your careful attention.  You have done

25  yeoman's work in this case, which is now in your hands.  You

1    may go to the assigned room and begin your deliberations.

2         THE CLERK:  All rise for the jury.

3         (Jury beginning deliberations at 12:40 p.m.)

4    (Proceedings were heard outside the presence of the jury:)

5         THE COURT:  Be seated.

6    Are there any issues that the lawyers want to bring up

7    with the judge?

8         MR. PAK:  No, Your Honor.

9         MR. SULLIVAN:  No, Your Honor, except I just got a

10   note from the team saying we just want to make sure our

11   objections to the jury instructions and everything else is

12   preserved.  That's all.

13        THE COURT:  Objections that you've raised before, you

14   know, I don't mean in the -- the objections you made today and

15   last night, yes.  And I don't remember what else you might be

16   referring to.  If you're talking about something that you filed

17   three weeks before the trial started, that doesn't count

18   anymore.  What counts is what you -- how you objected to what I

19   sent out as the proposed instructions.

20        MR. SULLIVAN:  Understood, Your Honor.  Thank you.

21        MR. PAK:  Thank you, Your Honor.

22        THE COURT:  All right.  Now here's what's going to

23   happen.  Angie's going to take in -- there were two documents

24   that you wanted to exclude from Dr. Malackowski --

25        MR. PAK:  Yes, Your Honor.

PROCEEDINGS

 1      **THE COURT:** -- that involve the IFTTT, and I agreed

 2  those should not go in, but those are -- otherwise, all the

 3  exhibits should go in.

 4      And then we're going to go and get the final version of

 5  the charge and verdict form, and we will send those in.  You

 6  don't get to look at them yet again.  I'll just give you copies

 7  and I will conform to the various -- very minor things where I

 8  made changes on the fly here, like the "number" versus

 9  "revenue."  That was a mistake by us.

10      Okay.  And then you need at least one of you be here to

11  answer questions or they can even have a verdict before

12  2:00 o'clock.  I doubt it, but they -- but if there's a

13  question, somebody's got to be here and you need -- you can be

14  in the lawyer's lounge, but you've got to give Angie how to

15  find you.  Okay?

16          **MR. PAK:**  Thank you, Your Honor.

17          **THE COURT:**  All right.  Thank you.  Good luck to both

18  sides.

19          **THE CLERK:**  Court is in recess.

20              (Recess taken at 12:42 p.m.)

21              (Proceedings adjourned at 2:00 p.m.)

22                  ---oOo---

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, May 19, 2023

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter