CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
BAS DE BLANK (SBN 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., | Case No. 3:20-cv-06754-WHA |
| Plaintiff and Counter-defendant, | Consolidated with<br>Case No. 3:21-cv-07559-WHA |
| v. | **SONOS, INC.'S RULE 50 AND 59 MOTION** |
| GOOGLE LLC, | |
| Defendant and Counter-claimant. | Judge: Hon. William Alsup<br>Courtroom: 12, 19th Floor<br>Trial Date: May 8, 2023 |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ......................................................................................................... 1

II.   LEGAL STANDARD ................................................................................................... 1

III.  A REASONABLE JURY WAS REQUIRED TO FIND THAT GOOGLE DIRECTLY
      INFRINGES THE '966 PATENT .................................................................................. 1

      A.    The jury determined that Google's "no standalone mode" redesign infringes. .......... 2

      B.    A reasonable jury could not have found that Google's accused products do not
            store the zone scene. ............................................................................................... 4

      C.    A correctly instructed jury would be required to find that the '966 patent was
            directly infringed. .................................................................................................... 7

            1.    The Court's non-infringement finding and related claim construction ruling
                  are incorrect as a matter of law. ...................................................................... 8

                  a.    The asserted claims of the '966 patent are apparatus claims reciting a
                        single computing device with software that provides certain capabilities... 8

                  b.    The asserted claims of the '966 patent do not require a computing device
                        networked with three zone players. ........................................................... 9

                  c.    Google's arguments in favor of the Court's claim construction ruling
                        are wrong as a matter of law. .................................................................. 14

            2.    The Court should grant Sonos judgment as a matter of law that the '966
                  patent was directly infringed or grant Sonos's Rule 59 motion. ...................... 16

IV.   A REASONABLE JURY WAS REQUIRED TO FIND THE '966 PATENT
      INDIRECTLY AND WILLFULLY INFRINGED ......................................................... 17

      A.    A reasonable jury was required to find the '966 patent indirectly infringed. .......... 17

            1.    Sonos established acts of direct infringement by third parties. ....................... 17

            2.    Sonos established Google's inducement, knowledge of infringement, and
                  that the Google Home App was not suitable for non-infringing use. .............. 18

            3.    Sonos established Google's specific intent to infringe. ................................. 21

      B.    A reasonable jury was required to find that Google's infringement of the '966
            patent was willful. .................................................................................................. 22

V.    IF THE COURT GRANTS SONOS A NEW TRIAL ON INFRINGEMENT OF THE
      '966 PATENT, THE COURT SHOULD CORRECT CERTAIN RULINGS. .................. 25

VI.   CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) .................................................................................... 18

*Bayer Healthcare LLC v. Baxalta Inc.*,
  989 F.3d 964 (Fed. Cir. 2021) ...................................................................................... 23

*California Inst. of Tech. v. Broadcom Ltd.*,
  25 F.4th 976 (Fed. Cir. 2022) ......................................................................................... 1

*Commil USA, LLC v. Cisco Sys., Inc.*,
  575 U.S. 632 (2015) ..................................................................................................... 18

*Dow Chem. Co. v. United States*,
  226 F.3d 1334 (Fed. Cir. 2000) ...................................................................................... 7

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ...................................................................................... 3

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ........................................................................... 9, 12, 14

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021), *cert. denied sub nom.*, No. 22-37, 2023 WL
  3440748 (U.S. May 15, 2023) ....................................................................................... 21

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) ................................................................................................ 18, 22

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
  946 F.2d 821 (Fed. Cir. 1991) ............................................................................. 7, 9, 10

*INVT SPE LLC v. Int'l Trade Comm'n*,
  46 F.4th 1361 (Fed. Cir. 2022) .................................................................................... 13

*Ironburg Inventions Ltd. v. Valve Corp.*,
  64 F.4th 1274 (Fed. Cir. 2023) .................................................................................... 22

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
  383 F.3d 1337 (Fed. Cir. 2004) .................................................................................... 23

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................................... 19

*Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*,
  970 F. Supp. 2d 1229 (D. Utah 2013) .......................................................................... 22

*NetFuel, Inc. v. Cisco Sys. Inc.*,
  438 F. Supp. 3d 1031 (N.D. Cal. 2020) ................................................................. 9

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
  607 F.3d 784 (Fed. Cir. 2010) ............................................................................... 9

*Sonos, Inc. v. D&M Holdings, Inc.*,
  No. 14-1330-RGA, 2017 WL 3669514 (D. Del. Aug. 24, 2017) .............................. 10, 11, 12

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  14 F.4th 1323 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 2732 (2022) ................... 22

*Suprema, Inc. v. Int'l Trade Comm'n*,
  626 F. App'x 273 (Fed. Cir. 2015) ........................................................................ 25

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ............................................................................. 18

*VirnetX, Inc. v. Apple Inc.*,
  792 F. App'x 796 (Fed. Cir. 2019) ........................................................................ 12

**Statutes**

35 U.S.C. § 271(a) ................................................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 11 ........................................................................................ 20, 23, 24

Fed. R. Civ. P. 50 .................................................................................................... 1

Fed. R. Civ. P. 59 ......................................................................................... 1, 17, 21

## I.    INTRODUCTION

Sonos is entitled to judgment as a matter of law that Google infringes the '966 patent directly, indirectly, and willfully.  The Court should enter judgment in Sonos's favor, or, in the alternative, grant Sonos's motion for a new trial pursuant to Rule 59.

## II.    LEGAL STANDARD

This Court may grant judgment as a matter of law under Federal Rule of Civil Procedure 50 when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue."  Fed. R. Civ. P. 50(a)(1).  Where, as here, the Court denied without prejudice Sonos's Rule 50(a) motion, Dkt. 796, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  Judgment as a matter of law "is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that of the jury." *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 985 (Fed. Cir. 2022) (quoting *Monroe v. City of Phoenix*, 248 F.3d 851, 861 (9th Cir. 2001)).  "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party."  *Id.*  And under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues … after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

## III.    A REASONABLE JURY WAS REQUIRED TO FIND THAT GOOGLE DIRECTLY INFRINGES THE '966 PATENT

Sonos's '885 and '966 patents are, in Google's words, "two sides of the same coin."  *See, e.g.*, Trial Transcript ("Tr.") at 1857:19-21 (Google closing argument) ("And, again, these patents that cover the same -- same coin from the perspective of the zone player for one and the controller for the other.").  The '885 patent claims zone players—*e.g.*, speakers with zone scene technology—and the '966 patent claims computing devices—*e.g.*, smartphones with zone scene technology.  The jury found the asserted claims of both patents valid, and found Google infringes the asserted claim of the '885 patent.

1    At trial, Google did not dispute infringement of the vast majority of the limitations of the

2    asserted claims of the '966 patent. *See, e.g.*, Tr. at 1867:5-1876:20.  And as explained in Sonos's

3    Rule 50(a) Motion, Sonos provided substantial evidence that Google meets all the limitations of

4    the asserted claims. *See* Dkt. 754 at 4-12, 16.

5    Google presented three non-infringement arguments for the '966 patent: (a) the redesigned

6    accused products do not remain in standalone mode while the speaker groups were set up and

7    invoked, (b) the speaker groups are not stored on the accused media players, and (c) Sonos failed

8    to prove that any customer had networked three accused media players with a computing device

9    provisioned with the Google Home App.  The jury's finding that Google does not infringe the

10   asserted claims of the '966 patent is wrong as a matter of law.  Sonos addresses each non-

11   infringement argument below.

12   **A.    The jury determined that Google's "no standalone mode" redesign infringes.**

13   For the redesigned products, Google contended that its products do not continue to operate

14   in "standalone mode" after being added to a speaker group.  This argument fails for two reasons.

15   First, claim 1 of the '966 patent does not require "continuous" operation in standalone

16   mode.  Standalone mode appears just twice in claim 1 of the '966 patent, once in the initial claim

17   element describing that the computing device is configured to serve as a controller for a media

18   playback system and again in the final claim element describing that the first zone player

19   transitions from "standalone mode" to operating in accordance with the predefined grouping:

20
21   while serving as a controller for a networked media playback system
     comprising a first zone player and at least two other zone players,
     ***wherein the first zone player is operating in a standalone mode***
22   ***in which the first zone player is configured to play back media***
     ***individually*** …

23   based on the third request, ***causing the first zone player to transition***
24   ***from operating in the standalone mode to operating in***
     ***accordance with the first predefined grouping of zone players***
25   such that the first zone player is configured to coordinate with at
     least the second zone player to output media in synchrony with
26   output of media by at least the second zone player.

27

28

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1   TX0001 at 40 (emphases added).  Neither of these references to standalone mode require the first

2   zone player remain in standalone mode throughout the entire zone scenes set up and invocation

3   process.  Instead, claim 1 requires the controller be programmed to serve as a controller while the

4   first zone player is in standalone mode and be programmed to cause the first zone player to

5   transition from a standalone mode to a group mode when the zone scene is invoked.  But there is

6   no requirement that the zone player *remain* in standalone mode after it is added to the speaker

7   group (unlike in claim 1 of the '885 patent).  Tr. at 804:2-9; *id.* at 804:18-20.  And there is no

8   dispute that the programming in Google's Home App meets these limitations—in both the

9   redesign and the original accused products.  Tr. at 770:3-19; 790:17-791:20.

10          Second, even if claim 1 of the '966 patent required continuous operation in standalone

11  mode, the jury's verdict that Google's new version infringes claim 1 of the '885 patent

12  necessarily means that Google's products meet the "standalone mode" requirements of claim 1 of

13  the '966 patent.

14          At trial, Google argued that the new versions of the '885 accused products do not infringe

15  because these new versions—*i.e.*, the addition of the "StopCurrentApp" function to the firmware

16  on the accused media players—meant the products do not continue to operate in standalone mode

17  after being added to the speaker group.  This was Google's only non-infringement argument for

18  the '885 patent.  *See* Tr. at 1869:8-1872:19 (Google closing argument).  Google asked the jury to

19  find that its new versions did not infringe the '885 patent because (1) "operating in standalone

20  mode means" "playing music or continuous output of media," (2) the "StopCurrentApp" function

21  meant "the accused smart speaker products stop playing music or audio when there is invocation

22  of the group," and thus (3) "[w]hen you're actually launching the group for music, they're not

23  operating in standalone mode because the sound is gone."  Tr. at 1869:17-25.  The jury found in

24  Sonos's favor infringement of the '885 patent, Dkt. 774 at 1, so it necessarily rejected that non-

25  infringement argument.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1215 (Fed. Cir.

26  2014) ("To prove literal infringement, the patentee must show that the accused device contains

27  *each and every limitation* of the asserted claims."); Dkt. 762 (final jury charge) at 16 ("If,

28

3

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

however, the accused product is missing even one requirement of the asserted claim, the accused product does not directly infringe that claim.").  Put differently, the jury necessarily found that Google's "redesign" continuously operates in standalone mode from group creation through invocation.

Google offered no argument at trial suggesting that its redesign might avoid infringement of the '966 patent even if the redesign did not avoid infringement of the '885 patent.  *See, e.g.*, Tr. at 1869:8-1872:19 (Google closing argument) ("Both of these patents require 'while operating in a standalone mode'").  Nor could it.  First, as explained above, Google's "no standalone mode" argument made even less sense as a theory of non-infringement for the '966 patent than it did for the '885 patent because the '966 patent does not require "continuing" to operate in standalone mode.  And second, Google's redesign *effected no change whatsoever* to the Google Home App, which is the accused software installed on all of the '966 accused products.  *See* Tr. at 1282:2-5 (MacKay testifying that he did not make any changes to the Google Home App); *id.* at 1805:3-8 (Sonos closing argument quoting MacKay testimony).

In light of the jury's finding that Google's "redesign" still infringes the '885 patent,[1] there is no basis on which a reasonable jury could conclude that Google does not infringe the '966 patent as to the "standalone mode" limitation.

**B.    A reasonable jury could not have found that Google's accused products do not store the zone scene.**

Google offered only one non-infringement theory unique to the '966 patent:  the accused products (in both prior and new versions) do not "cause storage" of speaker groups (aka zone scenes).  No reasonable jury could find that the Google Home App does not cause storage of the zone scene.  Google's arguments regarding "causing storage" were inconsistent with the plain and ordinary meaning of "storage" and Google's own witnesses and technical documents showed that the zone scene is stored.

---

[1] And for the reasons that Sonos has previously explained, a reasonable jury could not have found otherwise.  *See, e.g.*, Dkt. 754 at 1-4.

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1    Google tried various ways of limiting "storage" to mean persistently stored, stored in a

2    single location, or that "storage of the first zone scene" meant storing a list of the members of the

3    zone scene. *E.g.*, Tr. at 1242:10-1245:7. None of those restrictions on "storage" are consistent

4    with the plain and ordinary meaning of storage, and those restrictions are not found elsewhere in

5    the claims. Indeed, Dr. Schonfeld admitted that the claim language "just talks about storage"

6    without expressly requiring the additional limitations that Google reads into the language. Tr. at

7    1469:2-11.

8    When the plain and ordinary meaning of "storage" is used, there was overwhelming

9    evidence, including from Google's own witnesses and documents, demonstrating that the Google

10   Home App causes storage of the zone scene. Google's own engineer and corporate

11   representative, Ken MacKay, admitted that Google's accused speaker groups are "saved

12   persistently," including the "the name and ID of the group." Dkt. 754-2 (MacKay 5/10/22) at 11;

13   Dkt. 754-3 at 117:20-24; Tr. at 1277:5-9. Google's internal technical document describe that "the

14   group configuration is updated and ***stored*** in the prefs file on the device." TX6453 at p. 1

15   (emphasis added). And Dr. Almeroth, Sonos's technical expert, further corroborated these

16   admissions based on his review of Google's source code and his testing of accused products. Tr.

17   at 787:23-789:25. For example, Dr. Almeroth testified that he observed Google source code that

18   shows storing, noting "[t]here's other source code that goes through the process of what

19   [TX6453] describes as storing the configuration in the prefs file, and so that is certainly present in

20   the source code." Tr. at 789:15-20. And Dr. Almeroth directly observed storing in his testing,

21   explaining "I mean, you can do it from the perspective of a user where you click on save and that

22   group is saved, and you can come back later and that group still exists. And so you've caused

23   storage of that group as required by the '966 patent." Tr. at 789:21-25.

24   Google's non-infringement theories do not provide a basis for a reasonable jury to

25   conclude that Google's products do *not* cause storage as required by the '966 patent. Google's

26   argument boils down to the assertion that because "Google's speakers *manage* groups

27   dynamically," the list of group members is not stored persistently by the speakers and therefore

28

SONOS'S RULE 50 AND 59 MOTION
                                                        3:20-CV-06754-WHA

1  the groups are not saved.  *See* Dkt. 767 at 7-8 (emphasis added).  Google's argument is flawed

2  and unsupported by the actual evidence put forth at trial.

3       Take the "persistent storage" argument.  Fundamentally, zone scenes must be saved

4  persistently because (as Google's witnesses admitted) after creation the zone scene can be

5  invoked hours, days, or weeks later.  *See* Tr. at 1278:15-25 (MacKay).  And Mr. Mackay

6  admitted that Google's speaker groups are "saved persistently."  Dkt. 754-2 (MacKay 5/10/22) at

7  11; Dkt. 754-3 at 117:17-24.  Moreover, the Court has already found that Google's speaker

8  groups are *saved* in the context of the '885 patent.  Prior to trial, the Court construed "zone scene"

9  as a "*previously-saved* grouping of zone players according to a common theme."  Dkt. 762 at 9

10  (emphasis added).  As such, claim 1 of the '885 patent requires *saving* zone scenes, just as claim

11  1 of the '966 patent requires *causing storage—i.e.*, saving—the zone scenes.  And the Court

12  found that Google's older speaker versions infringe claim 1 of the '885 patent.  Dkt. 309.  Thus,

13  the Court has found that Google's speaker groups are saved (which is just another way of saying

14  "stored") and (by implication) Google's computing devices necessarily infringe the limitations in

15  the '966 patent that call for "causing storage" of the zone scenes.

16       Next take the "group membership" argument.  Google insists the claims of the '966 patent

17  require causing the storage of "*group membership*"—which Google reads to mean a list of the

18  speakers who are members of the particular group.  Dkt. 767 at 7-9 (emphasis added).  As part of

19  this argument Google says "The 'group configuration' on each speaker is limited to storing an

20  identifier and name(s) of the speaker group(s) that that speaker belongs to; it does not and cannot

21  identify any other members of any groups."  Dkt. 767 at 8.  So, Google admits that the speaker

22  stores "an identifier and name(s) of the speaker group(s) that that speaker belongs to."  That is

23  more than enough to show infringement, but Google reads the claim to require an unrecited

24  storage of a list of the speakers who are members of the particular group.

25       The claims do not require storage of this membership information.  In fact, the

26  specification identifies storage of membership information as one non-limiting example of storing

27  group information: player may save "a set of data pertaining to the scene" and "[i]n one

28

6

1  embodiment, the parameters include, but may not be limited to, identifiers (*e.g.*, IP address) of the

2  associated players." TX0001 at 10:46-49. That example cannot limit the claims. *See Dow*

3  *Chem. Co. v. United States*, 226 F.3d 1334, 1342 (Fed. Cir. 2000) (as a general rule, claims of a

4  patent are not limited to the preferred embodiment); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946

5  F.2d 821, 836 (Fed. Cir. 1991) ("Where a specification does not *require* a limitation, that

6  limitation should not be read from the specification into the claims."). Setting Google's

7  unsupported reading of the claims aside, the jury heard evidence that Google does store

8  membership information for its speaker groups. Specifically, Mr. Mackay testified that the group

9  leader "stores information about the followers that are currently connected to it." Dkt. 754-2

10  (MacKay 5/10/22) at 8; Dkt. 766-2 at 95:14-20. This is more than enough to meet "storage" of

11  the zone scene, and even more than enough to meet the specification's description of "a set of

12  data pertaining to the scene." No more is required.

13      Last, Google's argument rests on the flawed premise that speakers, and not the Google

14  Home App, cause storage of the zone scene. Dkt. 767 at 8. Google's own witness contradicts,

15  and thus dooms, this argument. Mr. Mackay testified that the Home App sends the

16  "MultizoneJoin_Group" message, which causes the speakers to save group information. Tr. at

17  1243:3-1244:8; Dkt. 756 (Google JMOL) at 8, 11 (admitting same). *See also* Tr. at 1642:8-

18  1643:17 (Almeroth rebuttal testimony). That satisfies the claims—including dependent claim 4

19  (requiring storage on the zone player).

20      **C.**     **A correctly instructed jury would be required to find that the '966 patent was**

21          **directly infringed.**

22      That leaves only one basis on which the jury might have found Google did not infringe the

23  '966 patent: the Court's ruling that "Google cannot infringe the '966 patent with respect to

24  computing devices with the Google Home app installed that are not yet networked with at least

25  three zone players that may be added to overlapping zone scenes using the Google Home app."

26  Dkt. 762 at 16-17 (Instruction No. 31). Had the jury been correctly instructed that, according to

27  binding precedent, a computing device installed with the Google Home App by itself infringes the

28

1    '966 patent, a reasonable jury would have been compelled to find that Google directly infringes

2    the '966 patent.  Accordingly, the Court should grant Sonos's motion for judgment as a matter of

3    law that Google directly infringes the '966 patent.  In the alternative, the Court should grant

4    Sonos's motion for a new trial on infringement of the '966 patent so that a correctly instructed

5    jury can determine infringement.

6    
7    
**1.    The Court's non-infringement finding and related claim construction ruling are incorrect as a matter of law.**

8    Over Sonos's objections[2], the Court instructed the jury that "I have found that Google

9    cannot infringe the '966 patent with respect to computing devices with the Google Home app

10   installed that are not yet networked with at least three zone players that may be added to

11   overlapping zone scenes using the Google Home app."  Dkt. 762 at 16-17 (Instruction No. 31);

12   *see also id.* at 15-16 (Instruction No. 28).  The Court's *sua sponte* finding of non-infringement

13   and claim construction was wrong as a matter of law.

14   
15   
**a.    The asserted claims of the '966 patent are apparatus claims reciting a single computing device with software that provides certain capabilities.**

16   At trial, Sonos asserted that Google infringes claims 1, 2, 4, 6 and 8 of the '966 patent.

17   Claim 1 is an independent claim, and the other asserted claims all depend from claim 1.  Each of

18   these claims is an apparatus claim directed to "a computing device" that performs certain

19   functions.  TX0001 at 40-41.  The computing device recited in claim 1 has three primary

20   components: (1) one or more processors, (2) a non-transitory computer readable medium—*i.e.*,

21   memory, and (3) that non-transitory computer readable medium must store program instructions

22   that, ***when executed***, causes the computing device to perform the functions set forth in the rest of

23   the claim.  This means that the computing device must have programing that allows the device to

24   serve as a controller for a networked media playback system, including programming that allows

25   the device to receive requests, perform functions based on those requests, and display

26   representations of zone scenes.  No other devices beyond this singular claimed computing device

27   

28   
---
[2] *See, e.g.*, Tr. at 1749:2-6; Dkt. 753 at 3; Dkt. 720.

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1   are required by claim 1.  Similarly, the asserted dependent claims 2, 4, 6 and 8 do not recite any

2   components beyond the claimed computing device.  Instead, they specify that the program

3   instructions stored on the device must, when executed, provide for additional or more specific

4   capabilities beyond those recited in claim 1.

### b.   The asserted claims of the '966 patent do not require a computing device networked with three zone players.

7        As Sonos has explained, Sonos's patent claims to a "computing device" are infringed

8   whenever Google (or its customers) makes, uses, sells, offers to sell, or imports into the United

9   States a computing device installed with software capable of performing the claimed functions.

10  *See* 35 U.S.C. § 271(a).  Google infringes the claims even if no one actually carries out the

11  claimed functions.  *Intel*, 946 F.2d at 832.  Instead, infringement occurs "so long as the product is

12  designed 'in such a way as to enable a user of that [product] to utilize the function . . . without

13  having to modify [the product].'"  *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794

14  (Fed. Cir. 2010) (citation omitted).  *See also, e.g.*, Dkt. 309 at 9 (citing *Finjan, Inc. v. Secure*

15  *Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) and *NetFuel, Inc. v. Cisco Sys. Inc.*, 438

16  F. Supp. 3d 1031, 1035 (N.D. Cal. 2020)).  The Court's instruction appears to accept this

17  caselaw—stating that Google does not infringe "until networked with at least three zone players

18  that ***may be added*** to overlapping zone scenes using the Google Home app" (emphasis added),

19  but the first part of the instruction—that the computing device must be "networked with at least

20  three zone players" is still incorrect.

21       There are no limitations of the '966 patent that require the computing device be networked

22  with three zone players.  Claim 1 requires that a computing device be *programmed* so that it can

23  perform a series of functions that include "serving as a controller for a networked media playback

24  system," but the claim does not recite a computing device that is *currently* or *already* networked

25  with that system (such as unasserted method claim 17 does).  *See* TX0001 at 40.  For example,

26  claim 1 requires programming that allows the computing device to "receiv[e] a first request to

27  create a first zone scene comprising a first predefined grouping of zone players including at least

28

9

1   the first zone player and a second zone player." TX0001 at 40.  All of that functionality is

2   contained on the Google Home App before the computing device is networked to the speakers.

3   The Google Home App is programmed with instructions that tell the device to display the option

4   to create a group, display available zone players that can be members of the group, and create,

5   save, and invoke those groups.  *See* TX441 (Dr. Almeroth's screenshots showing Google Home

6   App performing these functions); Tr. at 770:3-791:20.  Dr. Almeroth demonstrated all this

7   without making any changes to the software underlying the Google Home App—he simply

8   invoked functionality already programmed in the software.  *Id.*  That is all that is required for

9   infringement of these claims.  *Intel*, 946 F.2d at 832.

10      Multiple Federal Circuit and district court cases confirm that the claims are infringed by a

11   single computing device with the necessary software.

12      This same issue came up with a Sonos patent in *Sonos, Inc. v. D&M Holdings, Inc.*, No.

13   14-1330-RGA, 2017 WL 3669514, at *1 (D. Del. Aug. 24, 2017).  In that case, the defendant

14   attempted to argue that infringement of the speaker-directed apparatus claims would not occur

15   unless the speaker was "plugged in, connected to a data network, and otherwise set up as

16   described in the claims."  *Id.*  The district court disagreed and found that a speaker alone,

17   containing software instructions that if and when executed would cause the speaker to carry out

18   the functions recited by the claims, is all that is necessary to infringe.  In other words, it was not

19   relevant to infringement whether or not the device was ever taken out of the box, plugged in, and

20   set up for use with other speakers—it is enough for infringement for the speaker device to simply

21   have the necessary software instructions provisioned on the device.  Because "the accused

22   products ship with firmware pre-installed that enables the end user to utilize the functions

23   described in the asserted claims . . . that is all that is necessary for the sale or importation of the

24   product to constitute infringement."  *Id.* at *1-2.  And the court specifically rejected the position

25   that the accused speaker alone was not "capable" of infringing until it was set up and connected to

26   a network with the app because, again, the "devices ship with firmware pre-installed, such that

27   the device is capable of meeting all limitations of the asserted claims without modification."  *Id.*

28

10

at *2; *see also* Final Jury Instructions, *Sonos, Inc. v. D&M Holdings Inc.*, Case No. 14-cv-1330-WCB (D. Del. Dec. 15, 2017), Dkt. No. 524 at 5-7 (Judge Bryson giving a curative instruction including an explanation of "capable of performing" because infringer presented legally flawed argument throughout trial that the accused devices must be set up and connected to one another to directly infringe).

As *D&M Holdings* explains, a device can be *programmed* to perform the claimed functions without actually being *connected* to the other devices with which it is programmed to function. Indeed, Google never elicited any testimony from Dr. Schonfeld identifying any limitation of the claims that is not met unless the computing device is networked with three zone players. *See also, e.g.*, Dkt. 721 (Google's brief regarding claim construction, identifying no relevant opinion from Dr. Schonfeld).[3] In other words, there has been and currently is no dispute between the parties that a computing device with the Google Home App installed thereon has the necessary software for carrying out each of the above functions—regardless of whether the device is networked with three zone players.

In fact, Google previously made and lost an argument on this exact issue before the ITC, which explains why it chose not to make the same argument again here. In that case, the asserted

---

[3] Tellingly, Google never once advanced this construction during the case. And its experts have never offered any opinion in this case that in order to meet the elements of the '966 patent, a computing device with the Google Home App installed must be networked together with three accused Google media players. Moreover, when Google has asserted its apparatus claims that recite multiple devices, it has never taken the position that in order to infringe those claims there needed to be multiple devices hooked up and networked together. To the contrary, Google recognized the proper interpretation of claims like these and has alleged that Sonos players "satisfy all claim limitations . . . at the time of their importation into and/or sale in the United States." *See, e.g.*, *Google LLC v. Sonos, Inc.*, Case No. 20-cv-3845-EMC, Dkt. 35 at ¶ 98 (N.D. Cal. Aug. 26, 2020) (Google's amended complaint against Sonos asserting, *inter alia*, apparatus claim 1 of U.S. Pat. No. 10,229,586 to an "audio-enabled wireless device," alleging "the Accused '586 Products satisfy all claim limitations of the Asserted '586 Claims at the time of their importation into and/or sale in the United States."); *In re Certain Audio Players and Components Thereof*, USITC Inv. No. 337-TA-1330, Complaint (Aug. 9, 2022) at ¶ 62 (Google's ITC complaint against Sonos asserting, *inter alia*, apparatus claim 10 of U.S. Pat. No. 11,024,311, alleging "the Accused Voice Products satisfy all claim limitations of the asserted claims at the time of importation into the United States."). This further confirms that the correct construction of the '966 patent requires only a computing device that has program instructions stored thereon rendering the device functionally capable of performing the functions recited by the claim—not a computing device that is actually networked with three or more zone players.

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

claims required a "first zone player"—the accused device—with "'tangible, non-transitory computer-readable memory *having instructions stored thereon* that, *when executed*'" or "program instructions" that "'cause the first zone player to' perform the required [functions or steps], including interacting with a 'second zone player' in a synchrony group." Dkt. 720-3 at 19-20. Google argued that its accused speakers did not infringe Sonos's apparatus claims when imported as "standalone devices" because the claims required them to have the functionality to "enter[] into a synchrony group" with other speakers and controllers. *Id.* at 17. The ITC, however, correctly rejected this argument as "legally meritless." *Id.* at 19. As the ITC explained, the claims were directed to a single device, a first zone player, with "program instructions" that would perform certain functions in conjunction with other devices "when executed." *Id.* at 20. Accordingly, the ITC concluded that "the actual presence of, and interaction with, a second zone player *is not required* for the first zone player to practice these claims." *Id.* (citation omitted) (emphasis added).

Moving to Federal Circuit cases, in *Finjan*, one of the infringed claims recited a "computer-readable storage medium storing program code for causing a server that serves as a gateway to a client to perform the steps of: receiving ...; comparing ...; and preventing execution...." *Finjan*, 626 F.3d at 1205. As the court explained, "[t]his language does not require that the program code be 'active,' only that it be ***written*** 'for causing' a server ('194 patent claim 65) or a computer ('780 patent claim 18) to perform certain steps." *Id.* (emphasis added). It is irrelevant to the question of infringement whether or not these steps are ever, in practice, carried out. Accordingly, the accused device was still infringed even though the "software components" were not "'active' or 'enabled.'" *Id.* at 1205-06. Similarly, in *VirnetX*, the claim recited software on a DNS server that was capable of performing steps in connection with DNS requests received from a separate client device. *VirnetX, Inc. v. Apple Inc*., 792 F. App'x 796, 808 (Fed. Cir. 2019). The Federal Circuit found that the defendant infringed the claims when the defendant sold DNS servers "with [the accused app] installed." *Id.* There (as here), infringement did not require a system of both the DNS server and the client device. *Id.*; *see also, e.g.*, *D&M Holdings Inc.*,

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1  2017 WL 3669514, at *2 (rejecting argument that a speaker claim did not infringe until physically

2  unboxed, set up, and networked with a controller, because the speaker's firmware alone contained

3  the functionality required by the claims).

4  The Federal Circuit's recent decision in *INVT SPE LLC v. Int'l Trade Comm'n* is directly

5  on point as well. 46 F.4th 1361, 1371 (Fed. Cir. 2022). In that case, the court examined the

6  question of whether functional limitations in apparatus claims mentioning other devices require

7  that those devices be present for infringement. The Court reaffirmed that they do not. The

8  apparatus claims in *INVT* recited a "communication apparatus" with various components that

9  perform certain steps in communicating with other devices. *Id.* In line with a now decade of

10  precedent, the Federal Circuit confirmed that these claims were "directed to capability—as in a

11  device that includes 'software components with specific purposes,' programmed to have the

12  ability to perform the operative steps." *Id.* at 1374 (citation omitted). And although the claims

13  required that the device have programming to perform steps in connection with another device—a

14  base station—the court explained that those limitations only indicated that the base station was

15  "part of 'the environment' in which the user device must function." *Id.* at 1375 (citation omitted).

16  But the Federal Circuit made clear that the claim itself was directed only to a user device capable

17  of operating in conjunction with a base station, and that the claim did not actually require a base

18  station. Specifically, the court explained that "the recited base station ***is not*** 'a limitation on the

19  claimed invention itself,' in the sense that an infringer ***would not*** need to, for instance, use, make,

20  or sell the base station." *Id.* (emphasis added, citation omitted). Rather, the court explained that

21  "the base station's operation affects whether the claims are met." *Id.*

22  The claims of the '966 patent work in the same way. Just as the claims in *INVT* were

23  directed to a communications apparatus that was *capable* of operating in conjunction with a base

24  station, the asserted claims here are directed to a computing device with software *capable* of

25  operating in conjunction with speakers. But just like in *INVT*, that does not mean that Google or

26  its customers would "need to, for instance, use, make, or sell" the speakers for infringement to

27  occur, just as the defendant in *INVT* was not required to make, use, or sell a base station. *Id.* at

28

13

1    1375.  Rather, because the asserted claims are directed to a single computing device containing

2    program instructions that provide the recited capabilities, Google (and its customers) can infringe

3    simply by selling, offering for sale, making, or using such a computing device.

4         Sonos's asserted claims are indistinguishable from the capability claims analyzed in the

5    above cases.  Claim 1 recites a device containing program instructions that "when executed,"

6    cause certain functions to be performed.  This claim language does not require that the computing

7    device be networked with three zone players. Thus, to infringe the asserted claims, Google (or its

8    customers) only needs to make, use, sell, or import a device that has the app installed and

9    therefore is "capable of operating" to perform the claimed program instruction steps.  *Finjan*, 626

10   F.3d at 1205.

11        **c.    Google's arguments in favor of the Court's claim construction ruling**

12        **are wrong as a matter of law.**

13        At trial, Google presented only two arguments in favor of the claim construction that the

14   Court adopted over Sonos's objections.  Each is wrong as a matter of law.

15        First, Google argued (mid-trial) that "computing device" should be construed as "a device

16   configured to control a plurality of zone players" in order to "appropriately tether[] the claims

17   directly to the scope of the alleged invention disclosed in the specification."  Dkt. 721 at 2; *see*

18   *also generally id.* at 1-3.  No construction of computing device is needed.  *See, e.g.*, Dkt. 720 at 2-

19   3 (explaining that the recited computing device has three primary components, and no other

20   devices are required by the claim).  But even if the Court adopted this construction, it makes no

21   difference.

22        The Google Home App is configured to control a plurality of zone players.  It contains

23   software that allows essentially unlimited numbers of zone players to be networked together.  *See*

24   Tr. at 1276:1-8 (MacKay testimony that a single Google player can be in 256 different groups).

25   And it is "configured to control" the zone players even before the players are networked to the

26   phone, because the software that allows a user to control a zone player *once setup and connected*

27   to the phone already exists within the app at the time of installation.  If and when a zone player is

28

                          14                    **SONOS'S RULE 50 AND 59 MOTION**
                                                **3:20-CV-06754-WHA**

1   purchased, set up, and connected to the Google Home App, to control the zone player the user

2   simply accesses software functionality that was already existing within the Google Home App

3   and the phone since the instant the Google Home App was installed on the phone.  All of the

4   cases discussed above confirm this.  For example, in the ITC decision discussed above, claim 17

5   of the '258 patent recited "computer-readable memory having instructions stored thereupon that,

6   when executed by the one or more processors, cause the first zone player to … enter into the

7   synchrony group with the second zone player, wherein in the synchrony group, the first and

8   second zone players *are configured to playback audio* in synchrony …."  Dkt. 720-3 at 14-15

9   (emphasis added).  Notwithstanding that language, the ITC held that the second zone player was

10  not required at all, *id.* at 20, meaning the first zone player could *not* have been "configured to

11  playback audio in synchrony" with the "second zone player[]" in the way that Google here

12  intends to use "configured to control"—to require the actual presence of the controlled devices.

13  In any event, Google has put forward no evidence or legal authority providing that "configured to

14  control" requires the actual presence of devices that are not accused of infringing the '966 patent.

15       Second, Google argued that Sonos failed to "me[e]t its burden to prove that an installation

16  of Google Home app alone is 'capable of' causing the claimed functions to be performed without

17  additional hardware and software."  Dkt. 721 at 5.  Google hangs its hat on the argument that

18  "[t]he Federal Circuit has emphasized that an apparatus claimed 'in functional terms' is only

19  infringed if 'the product is designed in such a way as to enable the user of that [product] to utilize

20  the function *without having to modify the product*.'"  Dkt. 721 at 3-4 (quoting *Nazomi Commc'ns,

21  Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345 (Fed. Cir. 2014)).  Accordingly, Google argues, "the

22  apparatus as provided must be 'capable' of performing the recited function, not that it might later

23  be modified to perform that function."  *Id.* (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659

24  F.3d 1376, 1380 (Fed. Cir. 2011)).  Dr. Almeroth amply showed that the Google Home App can

25  perform all of the claimed functions without any modification to the software.  TX441; Tr. at

26  770:3-791:20.  At no point in his testing did he "modify" the software; all Dr. Almeroth did was

27  invoke existing functionality as it was designed for customers to invoke (and as Google, in fact,

28

advertised to customers how to invoke).  For example, Dr. Almeroth did not change any programming within the Google Home App or add any additional software to cause the Home App to send the "join_group" message.  Tr. at 784:9-16; TX78 at SC-GOOG-SONOSNDCA-000146.  That functionality was already programmed into the Google Home App at the time of manufacture and was present on a computing device the instant the Google Home App was downloaded and installed onto that computing device—Dr. Almeroth even pointed out to the jury the exact lines of source code containing that function.  *Id.*; *see also* TX6453.  And Google never disputed that these were genuine software instructions that Google engineers added to the Google Home App.  To be sure, the Home App will not *actually* send a "join_group" message until it has a speaker that can receive the message, but learning the identity of that speaker is not a modification or addition to the Google Home App software.  It is just execution of the existing software.  And, as numerous Federal Circuit cases confirm, actual execution is not necessary to establish infringement of an apparatus claim drawn to capability.  Thus, no reasonable jury could find that Google does not infringe claim 1 of the '966 patent for this reason.

**2.**      **The Court should grant Sonos judgment as a matter of law that the '966 patent was directly infringed or grant Sonos's Rule 59 motion.**

Google argued to the jury that it did not infringe the '966 patent based on the Court's ruling that installation of the Google Home App on a computing device does not itself infringe unless the computing device is networked with at least three zone players.  Tr. at 1872:20-1873:17 (Google closing argument).  Google's non-infringement argument on this point hinged entirely on the Court's incorrect jury instructions.  *See id.*  Absent that, a reasonable jury would have no basis for finding that the installation of the Google Home App on a computing device does not infringe the '966 patent—as explained above, Google's only other non-infringement arguments were either already rejected by the jury ("no standalone mode" redesign) or could not be credited by a reasonable jury (causing storage).  Because a properly instructed jury would be compelled to find that the '966 patent was infringed, the Court should grant Sonos judgment as a matter of law that Google directly infringed the '966 patent.

In the alternative, the Court should grant Sonos a new trial under Rule 59 to determine direct infringement with a jury instruction consistent with the Federal Circuit caselaw governing the construction of claims that recite software capability.

## IV.    A REASONABLE JURY WAS REQUIRED TO FIND THE '966 PATENT INDIRECTLY AND WILLFULLY INFRINGED

### A.    A reasonable jury was required to find the '966 patent indirectly infringed.

Sonos established that Google both induced infringement of the '966 patent and contributorily infringed by offering the Google Home App for installation on internet-connected computing devices.

#### 1.    Sonos established acts of direct infringement by third parties.

As a threshold matter, even under the Court's erroneous claim construction ruling, Sonos established acts of direct infringement by third parties.  The jury heard evidence that 29% of households with speakers have three or more speakers, Tr. at 1132:1-4; Dkt. 791-3 at PDX3.41 (citing TX6920), which Google did not rebut.  *See also* Tr. at 1203:12-16 ("Q.  And the number of people who own three or more Google speakers is something less than this 14 million number; correct?  A. [By Mr. Malackowski] We don't know the precise number but, yes, we would presume it's less than that.").  The jury also heard evidence that "58 percent of survey respondents were either very likely or extremely likely to purchase a bundle of three smart speakers."  *Id*. at 1599:1-7 ("Q. … Google's own document from November of 2019, the same month of the hypothetical negotiation of the '966, reports that 58 percent of survey respondents were either very likely or extremely likely to purchase a bundle of three smart speakers; correct?  A. [By Mr. Bakewell] Yes, you did that.  I did the math too.  I think that's right."); *see also* TX158.  And during jury selection, the Court asked the venire "how many have at least three smart speakers of the same type in their home?"  Tr. at 141:13-14.  Four of the 14 potential jurors in the jury box raised their hands—which is 28.6%, exactly in line with the record evidence.  *Id*. at 141:16-17; *see id*. at 22:25-23:14 (explaining 14 potential jurors will be seated in the jury box during *voir dire*).

Under the Court's construction, once a computing device installed with the Home App is networked to three or more speakers, that system "necessarily infringes the patent in suit" because the Home App has all required functionality. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). And because there is no serious dispute that some households have three or more speakers, a reasonable jury could only find that there were acts of direct infringement.

### 2. Sonos established Google's inducement, knowledge of infringement, and that the Google Home App was not suitable for non-infringing use.

Induced infringement requires that Google: (1) "took certain affirmative acts to bring about the commission by others of acts of infringement"; and (2) "had 'knowledge that the induced acts constitute[d] patent infringement.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011)). Contributory infringement requires that: (1) Google had "knowledge of the ['966 patent]," (2) Google had "knowledge of patent infringement," and (3) Google's accused products were not common components suitable for non-infringing use. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). Willful blindness can satisfy the knowledge element. Willful blindness develops when the defendant "subjectively believe[s] that there is a high probability that a fact exists" and "take[s] deliberate actions to avoid learning of that fact." *Glob.-Tech*, 563 U.S. at 769.

Here, no reasonable juror could find that Google did not induce infringement of the '966 patent. Google admits that it had knowledge of the '966 patent. Tr. at 996:16-998:17 (Google Resp. to Rog. 1). Ms. Kwasizur further testified to Google's knowledge and Sonos's disclosure of Google's infringement. *Id*. at 1025:6-22; 1042:3-10; 1044:15-1045:7.

Sonos's evidence showed that Google took active steps to induce infringement. Google encourages people to install the Google Home App on their computing devices—in fact, installation of the Google Home App is required to set up and operate Google's speakers. Undisputed evidence establishes this. For example, Google's senior product engineer Christopher

18

1    Chan testified, for example, that "[w]hen setting up a smart speaker, there is a quick-start guide in

2    the packaging that instructs users to set up and download the Google Home app.  And then in

3    addition to that, when they plug in a speaker, the Google assistant's voice also instructs users to

4    download the Google Home app."  Dkt. 754-5 (Chan 11/29/2022) at 9-10; Dkt. 754-6 at 90:16-

5    18, 90:22-91:2; *see also, e.g.*, Dkt. 754-5 (Chan 11/29/2022) at 10; Dkt. 754-6 at 91:15-16, 91:19-

6    21; Dkt. 754-7 (Shekel 11/23/22) at 2, 6; Dkt. 754-8 at 7:11-14, 14:7-13, 16:8-12, 16:18-22,

7    140:3-4, 140:7-15.  Mr. Chan also confirmed that users are required to have "[a]ccess to the

8    Home app" in order "to set up a Google smart speaker" and that "[t]he Google Home app is

9    required to create a static speaker group."  Dkt. 754-5 (Chan 11/29/2022) at 10; Dkt. 754-6 at

10    91:3-5, 91:8-11, 91:13-14.  And, as explained above, once the Google Home App is downloaded

11    and installed onto a computing device, infringement has occurred and a user need not actually

12    operate a Google speaker via the Google Home App in order to infringe the claims.

13          Even though it is not required to establish acts of encouragement for these capability

14    claims, Google further encourages people to use the accused functionality to create static speaker

15    groups.  For example, Mr. Chan testified that Google provides instructions to customers on how

16    to create multizone groups of two or more speakers.  Tr. at 1530:7-10.  And as Mr. Chan testified,

17    he wrote a blog post in approximately October 2019 that encourages users to "set up a speaker

18    group in the Home app."  TX6353 at 1; Tr. at 1531:7-20.

19          Similarly, the jury heard testimony and saw evidence establishing as a matter of law that

20    the Google Home App—and the specific accused programming within it—is a material

21    component of infringing devices and is not a staple article or commodity of commerce suitable

22    for substantial non-infringing use because the only possible use for this software component is to

23    be installed and run on infringing computing devices.  As the Federal Circuit explained in *Lucent*,

24    a software seller can be liable for contributory infringement even if the software includes some

25    non-infringing features or tools within the infringing software.  *Lucent Techs., Inc. v. Gateway,*

26    *Inc.*, 580 F.3d 1301, 1320-21 (Fed. Cir. 2009).  Instead, the "particular tool" or "feature" within

27

28

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1   the software is what must be analyzed for to determine if it is "suitable only for an infringing

2   use." *Id.*  As in *Lucent*, there is no non-infringing use of the accused speaker grouping feature.

3       Google also had knowledge that its acts were causing infringement of the '966 patent.

4   Sonos provided notice of the '966 patent on September 28, 2020, "notifying them that [Sonos]

5   would be filing a complaint alleging infringement of the '966 patent on the next day."  Tr. at

6   1025:6-20; *see also id.* at 1041:6-13; TX6130.  That complaint contained a detailed, element-by-

7   element analysis of how Google's products infringe the '966 patent.  TX6136 ¶¶ 70-73, 117-129;

8   Tr. at 1044:22-1045:7.  As the Court instructed the jury, this draft complaint is "proof that notice

9   of what Sonos was alleging was given one day prior to the lawsuit."  *Id.* at 1044:5-13.  *See also*

10  *id.* at 1051:13-16 ("The only reason I'm allowing this document into evidence is to show that

11  Google was at least aware of the patents in suit by -- at the time they filed this lawsuit."); *id.* at

12  1051:23 ("it goes to the issue of notice of the patents").

13      Google thus undisputedly received notice of infringement of the '966 patent on September

14  28, 2020—and then filed the declaratory judgment action that kicked off this case on that same

15  day. Dkt. 1; TX8240; Dkt. 754-9 (Kowalski 5/8/23) at 5-6; Dkt. 754-10 at 86:23-24, 87:4-5,

16  87:7-10, 87:13-15, 87:17-88:3, 88:12-19, 89:8-10, 89:12-14.  Under Rule 11, by presenting its

17  declaratory judgment complaint to the Court, Google's counsel represented that the factual

18  contentions contained therein had evidentiary support, to the best of the person's knowledge,

19  information, and belief, formed after an inquiry reasonable under the circumstances.  Fed. R. Civ.

20  P. 11(b).  In order to comply with Rule 11, this inquiry would have taken weeks, if not months.

21  Tr. at 720:1-10 ("There's a thing called Rule 11 of the Federal Rules of Civil Procedure.  I can

22  read it to you here, but it says this:  You can't file a lawsuit, you cannot file a lawsuit in federal

23  court unless you are certifying that you -- you have read it and there is a good faith basis for

24  everything in there.  Now, it takes weeks -- it would take weeks of work for Google to have

25  analyzed those products in those patents in order to decide -- to be able to be in a position to say

26  'We don't infringe or they're invalid.'").

27

28

1    Faced with this evidence, a reasonable jury could only find that Google had the requisite

2    knowledge and affirmative acts for indirect infringement.

3            **3.        Sonos established Google's specific intent to infringe.**

4    Google has argued that it lacked specific intent to infringe.  *See, e.g.*, Dkt. 756 (Google

5    JMOL) at 17-19.  But Google fails to acknowledge that "[w]hile proof of intent is necessary,

6    direct evidence is not required; rather, circumstantial evidence may suffice." *GlaxoSmithKline*

7    *LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021), *cert. denied sub nom., Teva*

8    *Pharms. USA, Inc. v. GlaxoSmithKline LLC, et al.*, No. 22-37, 2023 WL 3440748 (U.S. May 15,

9    2023)).  And as Google does acknowledge, "'advertising an infringing use or instructing how to

10   engage in an infringing use' may support specific intent if the advertisement or instruction

11   'encourage[s], recommend[s], or promote[s] infringement.'"  Dkt. 756 at 18 (quoting *Takeda*

12   *Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (Google's

13   emphases omitted)).  Here, the jury heard and saw evidence that Google instructs users on how to

14   use the Google Home App to set up speaker groups.  Google hangs its hat on those instructions

15   "only discuss[ing] creating a single, discrete speaker group." *Id*.  But because "direct evidence is

16   not required," and because the jury heard evidence regarding the number of speaker owners who

17   own multiple speakers, a reasonable jury would be required to conclude that by instructing users

18   on how to set up speaker groups generally, Google intended for users to set up more than one

19   speaker group.

20                              *      *      *

21   Google has presented no facts to rebut Sonos's evidence that Google knew about Sonos's

22   '966 patent and Google's infringement at least since before the commencement of this lawsuit.

23   Accordingly, the Court should grant judgment as a matter of law to Sonos that Google indirectly

24   infringed the '966 patent.  In the alternative, and at a minimum, the Court should grant Sonos's

25   motion for a new trial under Rule 59 to determine indirect infringement with a jury instruction

26   consistent with the Federal Circuit caselaw governing the construction of claims that recite

27   software capability.

28

                                21

1

2

**B.**    **A reasonable jury was required to find that Google's infringement of the '966 patent was willful.**

3

Willful infringement requires the jury to find that Google knew of the '966 patent and

4

engaged in "deliberate or intentional infringement."  *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th

5

1323, 1330 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 2732 (2022).  Reckless disregard of the

6

plaintiff's patent rights can demonstrate willfulness.  *See Ironburg Inventions Ltd. v. Valve Corp.*,

7

64 F.4th 1274, 1296 (Fed. Cir. 2023).  And here too, willful blindness can show Google's

8

knowledge of the patent.  *See Glob.-Tech*, 563 U.S. at 766.

9

Sonos presented conclusive proof of willfulness.

10

The jury heard evidence that Sonos and Google worked together in the 2013-2014 time

11

frame, that Google had access to Sonos products, and that Sonos put Google on notice of specific

12

allegations of infringement via Sonos's draft complaint.  The jury also heard evidence that several

13

key Google engineers, including Mr. Chan and Mr. Shekel, were aware of Sonos products during

14

the development of the accused features and products and even specifically considered and

15

compared Sonos products during this development.  Dkt. 754-7 (Shekel 11/23/22) at 4; Dkt. 766-

16

4 at 91:23-92:2 ("We looked at Sonos and other manufacturers' multi-room solution as part of our

17

work in Cast Audio, and that -- some of those looks or trying those out happened before we

18

launched our multi-room solution.").  Google presented no evidence in rebuttal that it had

19

determined that it did not infringe any Sonos patents or any evidence that it made any effort to

20

even look for Sonos patents to confirm this.  This close comparison of the accused products to

21

Sonos's products without any evidence that Google even attempted to look for or conclude that it

22

did not infringe Sonos's patents establishes, as a matter of law, that Google willfully disregarded

23

a high risk that it was infringing Sonos's patents.  *Glob.-Tech*, 563 U.S. at 766 ("[P]ersons who

24

know enough to blind themselves to direct proof of critical facts in effect have actual knowledge

25

of those facts."); *Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229, 1237 (D.

26

Utah 2013) ("[P]arties cannot escape liability by deliberately shielding themselves from clear

27

28

22

1    evidence of critical facts that are strongly suggested by the circumstances.") (internal quotations

2    omitted).

3         For all the reasons explained above in the context of indirect infringement—regarding

4    Google's knowledge of the '966 patent and knowledge of infringement—a reasonable jury would

5    be required to determine Google's infringement of the '966 patent to be willful.  Indeed, the

6    Court has already ruled that Google's receipt of a draft complaint and filing of a declaratory

7    judgment action on the same day "goes to the issue of notice of the patents and whether or not the

8    Plaintiff has proven there was willful infringement."  *See* Tr. at 1051:23-1052:5.  Google

9    contends that because it had a Rule 11 basis to file its declaratory judgment complaint, it had no

10   intent to infringe.  But Google refused to answer any questions about its prior knowledge of the

11   patents, the basis for its assertions in the declaratory judgment complaint, or even whether it had a

12   Rule 11 basis for filing the complaint.  *See* Dkt. 754-9 (Kowalski 5/8/23) at 4-5, 6-8; Dkt. 766-5

13   at 65:9, 65:16-17, 66:5-6, 66:9-11, 66:13-14, 66:17-22, 66:25-67:1, 92:2-9, 92:11-95:21.

14        Google has argued that "Sonos's attempt to imply specific intent to infringe by eliciting an

15   adverse inference through Google's invocation of attorney-client privilege was improper,"  Dkt.

16   767 at 14 n.6 (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d

17   1337, 1344 (Fed. Cir. 2004)).[4]  But Sonos did not elicit an adverse inference from Google's

18   invocation of the attorney-client privilege.  Tr. at 1835:13-24 (Sonos closing argument).  Rather,

19   Sonos argued that the filing of the declaratory judgment complaint and Sonos's pre-suit

20   communications with Google meant that Google had pre-suit knowledge of the patents.  *Id.* at

21   1834:12-1837:6.  Then, the Court explained to the jury that (1) Google's lawyers certified "that,

22   to the best of their knowledge, information, and belief, found after an inquiry reasonable under

---

23   [4] It is unclear if Google means to suggest that Sonos was required to establish "specific intent"

24   *beyond* establishing deliberate or intentional infringement.  *See, e.g.*, Dkt. 767 at 14 (citing Dkt.
      156 (quoting *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987-88 (Fed. Cir. 2021)).

25   That, of course, is not the law.  As *Bayer* makes clear, "willfulness requires deliberate or
      intentional infringement," 989 F.3d at 988; "specific intent" is just another name for that

26   requirement and not a separate legal requirement.  *Accord* Dkt. 762 at 19 ("You may not
      determine that the infringement was willful just because Google was aware of the '966 patent and

27   infringed it.  Instead, you must also find that Google *deliberately infringed* the '966 patent or
      recklessly disregarded Sonos's patent rights." (emphasis added)).

28

**SONOS'S RULE 50 AND 59 MOTION**
                                                                                                       3:20-CV-06754-WHA

the circumstances, the statements made in their complaint for declaratory relief were warranted under the law and the factual contentions had evidentiary support[;]" (2) that "[i]n light of this certification, you may infer that the lawyers and party who presented the complaint had conducted an inquiry reasonable under the circumstances into the '966 patent and the extent to which it was or was not infringed on behalf of Google[;]" and (3) that "[y]ou may also infer that such an inquiry would have provided knowledge to Google of the '966 patent prior to the commencement of this litigation."[5] Dkt. 762 at 20. To the extent the jury drew any inference from Mr. Kowalski's testimony, it was simply the inference the Court instructed: that Google had conducted a sufficient investigation before filing the declaratory judgment complaint.

Even setting aside the declaratory judgment complaint, Sonos had ample evidence of Google's willful infringement. For example, Google's infringement continued even after the Court's finding that Google infringed the '885 patent, and Google did not make a single change to the Google Home App after the Court found that there were no disputed facts that Google infringed the '885 patent. The jury also heard evidence that Google's non-infringement arguments were not tied to the claim language, conclusively rejected Google's non-infringement arguments related to the "redesign," and found the patents were valid, further suggesting Google had (and has) no reasonable, good faith non-infringement arguments.

The Court should accordingly grant Sonos judgment as a matter of law that Google's infringement of the '966 patent was willful. At a minimum, should the Court grant Sonos's alternative request for a new trial on infringement of the '966 patent, the jury in that new trial should be permitted to decide under all the facts whether Google's infringement was willful.

---

[5] And to the extent Google may now complain that this instruction itself involved an adverse inference, it was an inference based on Google's Rule 11 statement in September 2020, not on Google's invocation of privilege in May 2023. Google waived any challenge to the Court's instruction on Rule 11 by failing to object during the charge conference. *See* Tr. at 1752:6-14 (Google not objecting during May 18, 2023 charge conference), Dkt. 752 at 6 (Google objecting in written objections to charge only that "[b]ecause the claims in Google's declaratory judgment complaint were directed to non- infringement only, Google requests that 'and was or was not valid' be removed from the sentence at page 19 lines 13 to 16"); Tr. at 1760:5-1787:15 (Google not objecting during May 19, 2023 charge conference); *id.* at 1787:11-13 ("[I]f there's something you could have in fairness raised right now and you didn't, then, in my view, it's waived.").

1
2

## V.    IF THE COURT GRANTS SONOS A NEW TRIAL ON INFRINGEMENT OF THE '966 PATENT, THE COURT SHOULD CORRECT CERTAIN RULINGS.

3
4
5
6
7

As explained above, Sonos is entitled to judgment as a matter of law that Google infringes the asserted claims of the '966 patent.  Sonos would then be entitled to a new trial on damages for infringement of the '966 patent, which the jury has not yet determined.  Because the Court has already denied Sonos's requests and the parties have extensively briefed these issues, Sonos does not rehash its arguments here.  At any new trial, the Court should:

8
9
10

- Permit Sonos to rely on its IFTTT damages theory in support of its claim for damages for infringement of the '966 patent.  *See, e.g.*, Dkt. 735, Dkt. 607-11, Dkt. 610-6.

11
12
13
14
15
16
17

- Permit Sonos to present evidence of Google's pre-suit knowledge of the patents and its infringement based on Sonos's disclosure of the "zone scenes" patent family, including licensing discussions and detailed infringement charts showing that Google's accused products use Sonos's patented technology.  5/3/23 Tr. at 59:8-22; Tr. at 180:18-25.  *Cf. Suprema, Inc. v. Int'l Trade Comm'n*, 626 F. App'x 273, 280-81 (Fed. Cir. 2015); *see also generally* Dkt. 705 (Sonos Inc.'s Proffer of Testimony of Alaina Kwasizur).

18
19
20

- Permit Sonos to pursue pre-suit damages for the '966 patent, including for pre-suit indirect infringement and pre-suit willfulness.  Case No. 3:21-cv-07559-WHA, Dkt. 156 at 7-8, 11.

21

## VI.    CONCLUSION

22
23
24

For the foregoing reasons, the Court should grant Sonos's motion for judgment as a matter of law, or in the alternative, Sonos's motion for a new trial on infringement and damages for the '966 patent.

25
26
27
28

SONOS'S RULE 50 AND 59 MOTION
3:20-CV-06754-WHA

1

Dated:  June 23, 2023

2

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

3

4

By: */s/ Clement Seth Roberts*
Clement Seth Roberts

5

*Attorneys for Sonos, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28