1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Sean Pak (Bar No. 219032)
2  seanpak@quinnemanuel.com
   Melissa Baily (Bar No. 237649)
3  melissabaily@quinnemanuel.com
   James Judah (Bar No. 257112)
4  jamesjudah@quinnemanuel.com
   Lindsay Cooper (Bar No. 287125)
5  lindsaycooper@quinnemanuel.com
   Iman Lordgooei (Bar No. 251320)
6  imanlordgooei@quinnemanuel.com
7  50 California Street, 22nd Floor
   San Francisco, California 94111-4788
8  Telephone:     (415) 875-6600
   Facsimile:     (415) 875-6700
9

10   Marc Kaplan (*pro hac vice*)
     marckaplan@quinnemanuel.com
11 191 N. Wacker Drive, Ste 2700
   Chicago, Illinois 60606
12 Telephone:     (312) 705-7400
   Facsimile:     (312) 705-7401
13

14 *Attorneys for GOOGLE LLC*

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17               SAN FRANCISCO DIVISION

18

19                                    Case No. 3:20-cv-06754-WHA
                                      Consolidated with Case No. 3:21-cv-07559-
20 SONOS, INC.,                       WHA

21          Plaintiff and Counter-    **GOOGLE LLC'S NOTICE OF MOTION
            Defendant,                AND MOTION FOR JUDGMENT AS
22                                    A MATTER OF LAW AND NEW TRIAL**

23      vs.
                                      Location: Courtroom 12, 19th Floor
24 GOOGLE LLC,                        Judge:    Hon. William Alsup

25          Defendant and Counter-
            Claimant.
26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 10, 2023 at 8:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 12 before the Honorable William H. Alsup, 450 Golden Gate Avenue, San Francisco, California, Defendant Google LLC ("Google") shall and hereby does respectfully seek an order (1) granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and (2) granting a new trial pursuant to Federal Rule of Civil Procedure 59 or, in the alternative, remittitur.  This Motion is based on the testimony and evidence admitted at trial, all pleadings, exhibits, and records in this action, and such other papers, evidence, and/or argument as may be submitted to the Court in connection with this Motion or that the Court may take notice or otherwise consider.

Google hereby renews its motion for judgment as a matter of law of invalidity of the asserted claims of U.S. Patent No. 10,848,885 (the "'885 patent") and U.S. Patent No. 10,469,966 (the "'966 patent"), non-infringement of claim 1 of the '885 patent by Google's new design, and damages for any infringement of claim 1 of the '885 patent.  In the alternative, Google hereby moves for a new trial on invalidity and non-infringement of Google's new design.  Google also hereby moves for a new trial on damages, or in the alternative remittitur, on the grounds that the jury's royalty rate of $2.30 per unit is excessive and contrary to and unsupported by the evidence.

1  DATED:  June 23, 2023                    QUINN EMANUEL URQUHART & SULLIVAN,
2                                           LLP

3                                     By      */s Sean Pak*
4                                           Sean Pak
                                            Melissa Baily
5                                           James D. Judah
                                            Lindsay Cooper
6                                           Marc Kaplan
7                                           Iman Lordgooei

8                                           *Attorneys for GOOGLE LLC*
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ASSERTED CLAIMS**

'885 Patent, Claim 1:

[1.0]. A first zone player comprising:

[1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network;

[1.2] one or more processors;

[1.3] a non-transitory computer-readable medium; and

[1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

[1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

[1.6] (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

[1.7] (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

[1.8] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

[1.9] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

[1.10] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

'966 Patent, Claim 1:

[1.0] A computing device comprising:

[1.1] one or more processors;

[1.2] a non-transitory computer-readable medium; and

[1.3] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

[1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

[1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

[1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and

[1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

[1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

'966 Patent, Claim 2:

01980-00181/14135277.1

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

[2.0] The computing device of claim 1,

[2.1] further comprising program instructions stored on the non-transistory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[2.2]  while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

[2.3] based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with a t least the third zone player to output media in synchrony with output of media by at least the third zone player.

'966 Patent, Claim 4:

[4.0] The computing device of claim 3,

[4.1] wherein the location other than the computing device comprises a zone player of the first predefined group of zone players.

'966 Patent, Claim 6:

[6.0] The computing device of claim 1,

[6.1] wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

'966 Patent, Claim 8:

[8.0] The computing device of claim 1,

[8.1] wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

# <u>TABLE OF CONTENTS</u>

I.      LEGAL STANDARD .........................................................................................................1

II.     ARGUMENT .....................................................................................................................2

      A.      The Court Should Enter Judgment Of Invalidity Of The '885 And '966
            Patents As A Matter of Law ...............................................................................2

           1.      Claim 1 of the '885 Patent Is Invalid .................................................3

           2.      The Asserted Claims of the '966 Patent Are Invalid for the Same
                 Reasons..............................................................................................12

           3.      Sonos Did Not Prove Any Secondary Considerations .......................12

      B.      The Court Should Enter Judgment OF Non-Infringement Of the '885 Patent
            As A Matter of Law ..........................................................................................13

           1.      Google's New Design Enters An Idle Mode And Does Not Practice
                 the "Operating In Standalone" Limitations While Continuing To
                 Operate In The Claimed Standalone Mode ..................................14

           2.      Google's New Design Does Not Continue To Operate In The
                 Claimed Standalone Mode Under The Proper Claim Construction
                 Requiring Active Playback Of Media .................................................16

      C.      The Court Should Enter Judgment For Google On Damages As a Matter Of
            Law.....................................................................................................................18

           1.      The $2.30/Unit Royalty Rate Had No Evidentiary Support.........................18

           2.      The Legally Relevant Evidence Does Not Support A Damages
                 Verdict In Excess Of $2.25 Million ..............................................22

      D.      The Court should Grant a New Trial On Limited Issues .........................................22

           1.      Google Is Entitled To A New Trial On Validity Of The '885 Patent
                 And Infringement Of Its New Design ........................................22

           2.      Google Is Entitled To A New Trial On Damages .......................................22

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page**

3
## <u>Cases</u>

4   *Apple Inc. v. Wi-LAN Inc.*,
    25 F.4th 960 (Fed. Cir. 2022)..................................................................................... 19, 23
5

6   *Apple Inc. v. Wi-LAN, Inc.*,
    No. 14CV2235 DMS (BLM), 2019 WL 4248899 (S.D. Cal. Jan. 3, 2019), *aff'd*,
7   25 F.4th 960 (Fed. Cir. 2022)............................................................................................ 25

8   *Apple, Inc. v. Samsung Elecs. Co.*,
    926 F. Supp. 2d 1100 (N.D. Cal. 2013) ................................................................................. 2
9

10  *Apple, Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846-LHK, 2013 WL 5958176 (N.D. Cal. Nov. 7, 2013) ........................... 21, 24

11  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    No. C 10-3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ....................................... 25
12

13  *CUPP Computing AS v. Trend Micro Inc.*,
    53 F.4th 1376 (Fed. Cir. 2022) ....................................................................................... 16
14

15  *Daubert v. Merrell Dow Pharmaceuticals, Inc*.,
    509 U.S. 579 (1993) ....................................................................................................... 23

16  *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
    95 F.3d 1422 (9th Cir. 1996)........................................................................................ 1, 22
17

18  *Emblaze Ltd. v. Apple Inc.*,
    No. 5:11-cv-01079-PSG, 2015 WL 396010 (N.D. Cal. Jan. 29, 2015) ................................... 1
19

20  *ePlus, Inc. v. Lawson Software, Inc.*,
    764 F. Supp. 2d 807 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) ........................ 21

21  *Forest Laboratories, LLC v. Sigmapharm Laboratories, LLC*,
    918 F.3d 928 (Fed. Cir. 2019)........................................................................................... 9
22

23  *Frazier v. Layne Christensen Co.*,
    239 Fed. App'x 604 (Fed. Cir. 2007)................................................................................... 7
24

25  *Hanson v. Alpine Valley Ski Area, Inc*.,
    718 F.2d 1075 (Fed. Cir. 1983)........................................................................................ 22

26  *Hynix Semiconductor Inc. v. Rambus Inc.*,
    No. CV-00-20905-RMW, 2006 WL 1991760 (N.D. Cal. July 14, 2006)......................... 2, 25
27

28  *Informatica Corp. v. Bus. Objects Data Integration, Inc.*,
    No. C 02 03378 EDL, 2007 WL 2344962 (N.D. Cal. Aug. 16, 2007) ................................... 25

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) ............................................................................... 1

*Landes Const. Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ................................................................................ 1

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ........................................................................ 19, 24

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) .................................................................... 19, 20

*Mentor H/S, Inc. v. Med. Device All., Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) .............................................................................. 1

*MLC Intellectual Property, LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) ........................................................................... 19

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ................................................................................. 1

*Norian Corp. v. Stryker Corp.*,
   363 F.3d 1321 (Fed. Cir. 2004) ............................................................................. 7

*Odom v. Microsoft Corp.*,
   429 Fed. App'x. 967 (Fed. Cir. 2011) ................................................................. 13

*Ohio Willow Wood Co. v. Alps South, LLC*,
   735 F.3d 1333 (Fed. Cir. 2013) ........................................................................... 13

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ........................................................... 18, 19, 21, 23

*Pavao v. Pagay*,
   307 F.3d 915 (9th Cir. 2002) ................................................................................. 3

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ............................................................................. 19

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
   563 F.3d 1358 (Fed. Cir. 2009) ............................................................................. 1

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
   820 F.3d 419 (Fed. Cir. 2016) ............................................................................. 17

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
   563 F.3d 1271 (Fed. Cir. 2009) ........................................................................... 21

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .............................................................. 19, 23, 24

*Vectura Ltd. v. Glaxosmithkline LLC,*
    981 F.3d 1030 (Fed. Cir. 2020) .......................................................................... 18

*Viasat, Inc. v. Space Sys./Loral, Inc.,*
    No. 3:12-CV-00260-H WVG, 2014 WL 3896073 (S.D. Cal. Aug. 8, 2014) ........................ 25

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.,*
    609 F.3d 1308 (Fed. Cir. 2010) .............................................................. 1, 19, 22

*ZUP, LLC v. Nash Mfg.,*
    896 F.3d 1365 (Fed. Cir. 2018) .................................................................... 9, 10

## **Other Authorities**

Fed. R. Civ. P. 50(b) ............................................................................................ 1

Fed. R. Civ. P. 59 ................................................................................................. 1

Fed. R. Civ. P. 59(a) ........................................................................................... 22

Fed. R. Civ. P. 702 ............................................................................................. 23

## MEMORANDUM AND POINTS OF AUTHORITIES

Google renews its motion for judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b).  No substantial evidence supported a verdict for Sonos on validity of the asserted patents or infringement of the '885 patent by Google's redesigned products, and the evidence did not support more than the $2.25 million lump sum damages proposed by Google's damages expert. At a minimum, Google should be awarded a new trial.

## I.    LEGAL STANDARD

The Court should enter JMOL following a jury trial where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014) (quotations omitted).  "In other words, to set aside the verdict, there must be an absence of substantial evidence—meaning relevant evidence that a reasonable mind would accept as adequate to support a conclusion—to support the jury's verdict." *Emblaze Ltd. v. Apple Inc.*, No. 5:11-cv-01079-PSG, 2015 WL 396010, at *3 (N.D. Cal. Jan. 29, 2015) (cleaned up).

A new trial should be awarded if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quotations omitted).  In addressing a Rule 59 motion, "the judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1371 (Fed. Cir. 2009).  Thus, a "trial court may grant a new trial, even though the verdict is supported by substantial evidence[.]" *Mentor H/S, Inc. v. Med. Device All., Inc.*, 244 F.3d 1365, 1374 (Fed. Cir. 2001); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  In particular, a trial court should grant a new trial if the jury's damages award "is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422, 1435 (9th Cir. 1996) (citations omitted).  Rule 59 also permits remittitur, reducing an excessive jury award to a supportable

amount.  *Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100, 1109-10 (N.D. Cal. 2013).  If the Court chooses remittitur, the party that prevailed may accept the reduced award or demand a new trial.  *Hynix Semiconductor Inc. v. Rambus Inc.,* No. CV-00-20905-RMW, 2006 WL 1991760 (N.D. Cal. July 14, 2006).

## II.   **ARGUMENT**

### A.   **The Court Should Enter Judgment Of Invalidity Of The '885 And '966 Patents As A Matter of Law**

The Court should grant JMOL that the asserted claims are invalid because no reasonable jury could have found the asserted claims valid over:  (1) the Sonos 2005 System in view of Sonos Forums; (2) the Sonos 2005 System in view of Squeezebox; and (3) the Sonos 2005 System in view of Nourse.

It is undisputed that the Sonos 2005 System is prior art.  Multiple Sonos witnesses confirmed that the Sonos 2005 System was on sale in January 2005, which is more than a year before the filing of Sonos's provisional application in September of 2006. Trial Tr. (Millington) at 280:4-11, 280:16-19, 314:3-9, 315:13-24; *id*. (Lambourne) at 520:14-16; TX0062; TX0063; TX6991; TX6974; TX6979; TX6730.

Google's expert, Dr. Schonfeld, also testified that the prior art rendered obvious every element of Claim 1 of the '885 and '966 patents.  Trial Tr. at 1375:15-1390:17, 1419:21-1426:13, 1431:13-1438:5, 1438:6-1441:10, 1441:11-1451:9, 1455:13-1456:5, 1713:9-1714:2.  For instance, Google presented testimony from Dr. Schonfeld on '885 patent elements [1.0]-[1.4] (*id*. at 1375:18-1377:8) and [1.5]-[1.6] (*id*. at 1377:9-1389:14) and [1.0]-[1.6] and '966 patent elements [1.9] (*id*. at 1389:17-1390:18). Google also presented testimony from Dr. Schonfeld on elements [1.9]-[1.10] of the '885 patent (*id*. at 1420:5-1422:3) and [1.10]-[1.11] of the '966 patent (*id*. at 1422:6-14).[1]  And with respect to '885 patent elements [1.7]-[1.8] and '966 patent elements [1.7]-[1.8], because Sonos 2005 disclosed a first zone scene (as well as overlapping groups) but not a second overlapping zone

---

[1] *See also* Trial Tr. (Millington) at 357:8-14, 357:24-358:4, 395:16-396:2 (Sonos 2005 taught claim limitations 1.0-1.4), 336:5-10, 343:5-16 (describing indication messages received by zone players in Sonos 2005), 320:21-321:9 (Sonos 2005 taught limitation 1.9); *id*. (Lambourne) at 429:17-20 (equating standalone with "not in a group"), 421:9-21 (admitting that Sonos 2005 system taught operating in a standalone mode).

1    scene, Google showed that this difference was obvious in view of the knowledge of a person of skill

2    in the art and when combined with any one of the Sonos Forums, Nourse, and Squeezebox prior art

3    references.  *Id*. at 1422:15-1451:9.

4         Google also presented substantively unrebutted testimony from Dr. Schonfeld with respect

5    to the asserted dependent claims of the '966 patent.  Trial Tr. (Schonfeld) at 1451:10-1455:2.  Dr.

6    Schonfeld showed that the prior art teaches the '966 patent claims 2 (*id*. at 1451:23-1452:12), 3-4

7    (*id*. at 1452:13-1453:9), 6 (*id*. at 1453:10-1454:11), and 8 (*id*. at 1454:12-1455:2).  The evidence,

8    even "construed in the light most favorable to [Sonos], permits only one reasonable conclusion, and

9    that conclusion is" that all asserted claims are invalid.  *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th

10   Cir. 2002) (citations omitted).  Below, Google addresses Sonos's attempted distinctions.

11              **1.    *Claim 1 of the '885 Patent Is Invalid***

12                   (a)    *Claim 1 is Invalid Over the Combination of the Sonos 2005 System
                            and the Sonos Forums*

13

14                        (i)    Sonos 2005 System Disclosed a Party Mode Zone Scene

15        With respect to the Sonos 2005 System, Sonos's expert, Dr. Almeroth, disputed **only** that

16   the Sonos 2005 System disclosed "zone scenes."  Trial Tr. 1653:21-1654:8; 1658:1-1665:11.  Thus,

17   Dr. Schonfeld's mapping of the Sonos 2005 prior art system to the asserted claims limitations was

18   otherwise undisputed.  There also was no *genuine* dispute that the Sonos 2005 System included a

19   first "zone scene."  The Court construed "zone scene" as "a previously-saved grouping of zone

20   players according to a common theme."  Dkt. 762 at 8-9.  Dr. Schonfeld showed that the "party

21   mode" in the Sonos 2005 system was a previously-saved grouping of zone players according to a

22   common theme.  Trial Tr. at 1381:8-1383:6.  The testimony of Sonos's own witnesses, including

23   Mr. Lambourne (the sole inventor) was in accord.  The Sonos 2005 System's party mode was a

24   grouping of all zone players in the system that was "hard-coded" in the controller (*i.e.*, previously

25   stored) and grouped according to a common theme (*i.e.*,  a whole-house "party").  *E.g.*, Trial Tr.

26   (Millington) 324:7-22, 327:3-17; Trial Tr. (Lambourne) at 420:1-7, 489:23-25, 490:1-5, 502:25-

27   503:1-2, 503:12-23, 505:9-23, 504:20-25, 505:20-506:1; TX3923 (Lambourne Decl.) ¶ 6; *see also*

28   TX0062 at 30; TX0063 at 4.  The pre-saved party mode could then be invoked from the zone menu

screen using a "single touch."   TX3923 ¶ 6.  Users could also modify the party mode to remove

zone players and create a smaller group of zone players.  *E.g.*, Trial Tr. (Millington) at 327:14-

328:1; Trial Tr. (Schonfeld) at 1384:15-24.  The testimony from Sonos's inventor, corroborated by

his contemporaneous documents, conclusively established that the party mode in the Sonos 2005

System was a "zone scene."  *E.g.*, Trial Tr. (Lambourne) at 420:1-7, 489:23-25, 490:1-5, 502:25-

503:1-2, 503:12-23, 505:9-23, 520:20-521:10, 546:11-22, 627:6-12; *see also* TX6544 at 27 (Sonos

UI Specification: "'Party Mode' that currently ships with the product is one example of a Zone

Scene."); '966 Patent at Fig. 7 (illustrating "Party Mode" as an exemplary zone scene); TX3941 at

1 ("Zone Scene Macros. 'Party Mode' is one example"); TX0120 at 1 ("think Party mode").

Dr. Almeroth nevertheless argued that party mode was not a zone scene because it "did not

provide *users* with any ability to *customize* and pre-save their own defined groups of zone

players."  Trial Tr. (Almeroth) 1659:21-1660:5, 1661:17-20 (emphasis added).  But claim 1 has no

such requirement.  In fact, the Court expressly "***omitted the user language*** from the

construction."[2]  Dkt. 762 (Final Charge to the Jury) at 8-9; *see also* Trial Tr. (Lambourne) 479:22-

483:23, 501:11-25 (agreeing the claim nowhere requires a user), 509:19-23.  Under the correct claim

construction, no reasonable jury could find that party mode in the Sonos 2005 system was not a zone

scene.  Thus, the only claim elements not taught by Sonos 2005 were the addition of a second zone

scene that overlaps with the first zone scene and remaining in standalone mode until a zone scene is

invoked.  And those limitations were conclusively disclosed by Sonos Forums and other prior art.

          (ii)       Sonos Forums Disclosed Multiple Overlapping Zone Scenes

Google established that the Sonos Forums website—which "allowed users to write about

their experiences of using a Sonos system"—rendered the asserted claims obvious by adding to the

Sonos 2005 System a second, overlapping zone scene that could be saved and later invoked—prior

to Sonos's alleged December 21, 2005 conception date.  Trial Tr. at 466:12-15, 535:11-551:25;

TX2424; TX3928; TX3930.  Google showed that two Sonos Forums threads—(1) "Virtual Zones

and Zone Grouping" (TX2424, TX2425) and (2) "Macro / presets" (TX3930, TX3928)—included

---

[2]   All emphases added unless otherwise noted.

postings that disclosed adding a second, overlapping zone scene to the Sonos 2005 system.

In the first thread, titled "Virtual Zones and Zone Grouping," the user "theboyg" noted that the way the Sonos 2005 System permitted users to create groups—by linking and unlinking speakers in real time—was "cumbersome." TX2424 at 1. He suggested adding "a virtual zone – *i.e.*, a zone called 'Downstairs'" that would allow a user to "group all [the] downstairs zones" and avoid the necessity to "keep manually linking/unlinking multiple zones at a time." *Id*. This thread thus disclosed creating a saved and named speaker group for later use. *See* Dkt. 762 at 9 (jury charge defining "zone scene"); *e.g.* Trial Tr. (Sonos Opening) 211:1-2 ("Here, in zone scenes you create the group, you save it as a zone scene and then you invoke it in the future.").

In the second thread, titled "Macro / presets," the user "JeffT" suggested that the Sonos 2005 system should "save Zone links as favorites" so that, for example, he could set up "2 party modes, Summer and Winter," where the "Summer mode" would include "the deck speakers and the Winter mode would not." TX3928 at 1. Users "Majik," "kengreenwood" and "floras_dad" agreed with JeffT that adding this feature would be "useful" and a "great idea," and explained that the functionality could be implemented using a ***"macro" function*** that would allow the user to invoke the group using a "single selection." TX3928 at 2-3; TX3930 at 1-2; *see also* Dkt. 309 (SJ Order) at 8 ("This conclusion also aligns with the basic purpose of the invention, which is to allow users to pre-save customized speaker groups and later 'invoke' the named group on demand.").

Sonos did not dispute that these posts were prior art. The "theboyg" posting was dated "27 February 2005," TX2424 at 1, and the postings from JeffT, Majik, kengreenwood and floras_dad had dates ranging from "22 September 2005" to "27 September 2005." TX3928. The jury instructions thus directed the jury to accept that the above-mentioned Sonos Forum posts are prior art. Dkt. 751 at 16 (Final Jury Instructions) ("the Sonos forum posts that expressly predate December 21, 2005, are prior art (e.g., those of 'theboyg' and 'JeffT'"); *see also* Trial Tr. (Almeroth) 1690:18-21 ("I haven't disputed that they're prior art.").

There was also no genuine dispute that these postings disclosed adding to the Sonos 2005 system an ability to create multiple, overlapping zone scenes. *E.g.*, TX3928 at 1 (describing overlapping "summer and winter" zone scenes). Mr. Lambourne ***admitted*** that the Sonos Forum

posts disclosed creating overlapping zone scenes that could be saved and later invoked:

> Q. But zone scenes was being – was being described – zone scene were being described by users of the Sonos 2005 prior art system before your December 20th, 2005 date which is a conception date, and they were talking about *zone scenes overlapping zone scenes and using macros which is one of the solutions you had in mind, to implement zone scenes; correct*?
>
> A. *Yes* they were talking about macros and seen [*sic*] groups, yes.

Trial Tr. (Lambourne) at 466:19-22, 536:20-539:25 ("those zone scenes could be overlapping in that they would share a speaker or a ZonePlayer; correct? A. Yes."); *see also id*. at 537:21-25, 538:1-539:4, 539:17-24, 540:13-19, 541:2-542:12, 549:24-550:10.  In fact, he admitted that the Sonos Forums disclosed implementing the overlapping zone scene functionality using "macros," the *same solution* that he described in his alleged conception documentation.  Trial Tr. (Lambourne) at 528:11-25, 529:1-7, 531:15-22, 541:2-25, 542:1-12, 546:8-13, 548:8-17; TX6539 at 3, 28, 31, 42-44, 46-48, 52.  He also conceded that he reviewed the Sonos Forums "[d]uring the design and development of zone scene technology."  *Id*. at 466:19-22; Trial Tr. (Lambourne) at 553:1-4.[3]  The Forums posts also taught that the zone players *remain in standalone mode* until the zone scene is invoked later–for example, JeffT disclosed creating a morning party mode for later invocation (TX3930), which means that the zone players would remain in the standalone mode until the user gets up in the morning and "press Morning."  *E.g.*, Trial Tr. (Schonfeld) 1426:2-7, 1490:12-15; *see also id*. 1432:5-1438:5.  Indeed, even the Examiner took "official notice" during prosecution that *grouping zone players for later invocation* "was well known in the art before the effective filing date of the instant invention and would have been *an obvious inclusion*."  TX4 at 4577 (also explaining that creating, saving, and recalling various zone scene configurations "would have been *obvious as a matter of routine experimentation* over the course of normal operation by the average skilled practitioner"); *see also* Trial Tr. at 1343:5-13445:8.   Sonos had previously argued

---

[3] Dr. Almeroth argued in one sentence that Dr. Schonfeld never opined that the Sonos Forums disclosed "zone scenes."  Trial Tr. (Almeroth) at 1704:3-21.  Not so.  *E.g.*, (Schonfeld) at 1432:16-1433:21 ("Jeff T proposes two different things. The first one is similar to theboyG. He proposes the morning mode, which is -- would be a saved zone scene"); 1433:22-1435:24.

1    successfully to this Court saving a zone scene for later (as shown in Fig. 6 of the asserted patents)

2    was sufficient to disclose the "while operating in a standalone mode" limitations.  Dkt. 309 at 16.

3         Additionally, Sonos disputed that the combination of Sonos 2005 and Sonos Forums

4    disclosed the limitation of the asserted '966 patent claims that requires displaying the zone scenes

5    for selection.  Yet Sonos Forums clearly taught that the zone scenes could be saved as presets and

6    displayed to users for selection "using the soft-keys *on the Zone screen[]* to allow a preset to be

7    initiated."  TX3928 at 2; TX6974 at 5 (showing exemplary soft keys on the Zone screen in Sonos

8    2005); Trial Tr. (Schonfeld) 1505:12-24.

9                        (iii)    Combining Sonos 2005 With Sonos Forums Was Obvious

10        Sonos did not genuinely dispute that skilled artisan would have been motivated to combine

11   the Sonos 2005 system with the teachings of the Sonos Forum postings.  Nor could it, as the Sonos

12   Forum postings teach improvements to *the Sonos 2005* system and were made by users of that

13   system.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1328 (Fed. Cir. 2004) (affirming

14   judgment of obviousness where the prior art reference "expressly discussed" the secondary

15   reference).  Mr. Lambourne agreed that the Sonos Forums were directed at new features and

16   improvements for the Sonos 2005 System.  Trial Tr. (Lambourne) at 467:10-18, 532:9-14, 532:22-

17   533:6.  He also conceded that he reviewed Sonos Forum postings "[d]uring the design and

18   development of zone scene technology."  *Id*. at 466:19-467:1, 532:9-21, 533:11-20.

19        Mr. Lambourne also acknowledged that it was "common practice in the industry" to consider

20   posts from users and "incorporate that feedback into future planning for products."  *Id*. at 534:1-

21   7.  A skilled artisan thus would have looked to the Sonos Forums to identify potential modifications

22   to the Sonos 2005 System, and named inventor Lambourne did just that.  *See Frazier v. Layne*

23   *Christensen Co.*, 239 Fed. App'x 604, 607 (Fed. Cir. 2007) (skilled artisan was "motivated to look

24   to techniques for cleaning oil wells to find methods for cleaning water wells.")

25        Google's expert also presented unrebutted testimony that the combination was obvious,

26   given the explicit suggestions to modify the Sonos 2005 System in the Sonos Forums.  *See Trial Tr.*

27   (Schonfeld) at 1431:22-1432:4 ("The Sonos forum was posting of people who were interested –

28   users, dealers who were interested in the Sonos 2005 system, and they were making suggestions of

1   how to modify the Sonos 2005 system to improve it").

2       A skilled artisan would also have had a reasonable expectation of success in combining the

3   references to arrive at the asserted claims. Mr. Lambourne testified that his solution for

4   implementing zone scenes involved using macros. Trial Tr. (Lambourne) at 528:11-25 ("Q. And

5   one of the solutions that you were thinking of for your eventual zone scenes invention was the use

6   of macros to implement zone scenes; correct? A. Yes...."); *see also id.* at 466:19-22, 531:15-22,

7   537:21-25, 538:1-25, 541:22-542:12, 546:8-13, 548:8-17. The Macro/Presets thread in the Sonos

8   Forums suggested the ***same "macro" solution***. *Id.*; *see also* TX2425, TX3930. Dr. Schonfeld

9   confirmed that a skilled artisan in 2005 would have had a reasonable expectation of success in

10  combining Sonos 2005 system with the Sonos Forums at least because (1) Sonos Forum posters

11  "were interested in the Sonos 2005 system, and they were making suggestions of how to modify the

12  Sonos 2005 system to improve it" (Trial Tr. (Schonfeld) at 1431:22-1432:4), and (2) they were

13  discussing the same "solution" implementing macros. Trial Tr. (Schonfeld) at 1423:22-1424:18,

14  1434:16-1435:2; *see also id.* at 1388:22-1389:12, 1425:5-18.

15      Sonos presented two rebuttals to the Sonos 2005 System and Sonos Forums combination,

16  both of which fail as a matter of law based on the trial record:

17      *First*, Dr. Almeroth suggested that Dr. Schonfeld did not identify a "motivation for why a

18  person of skill in the art" would "modify the Sonos 2005 System to be able to add storage for the

19  second zone scene." Trial Tr. (Almeroth) 1670:21-1671:2. But Dr. Schonfeld clearly ***did*** articulate

20  a motivation to combine, which was explicit in the Sonos Forums posts that recommended adding

21  overlapping zone scenes. *Supra* III.A.1.a.(i),(ii). No reasonable jury could have found otherwise.

22      *Second*, Dr. Almeroth contended that ***a different*** Sonos Forums poster ***in 2016*** exhibited

23  "skepticism" about including overlapping zone groups in the Sonos system at that time. Dr.

24  Almeroth relied on a single post in which a user asserted, without support, that "it is logically

25  impossible to have the same speakers in multiple groups."  Trial Tr. (Almeroth) 1675:22-1676:6.

26      As a threshold matter, the 2016 post is legally irrelevant because the obviousness analysis

27

28

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

must be performed at the time of the alleged invention in December 2005.[4] *See Forest Laboratories, LLC v. Sigmapharm Laboratories, LLC*, 918 F.3d 928, 937 (Fed. Cir. 2019); Trial Tr. (Almeroth) 1650:21-23 ("The test is whether back in 2005 a person of ordinary skill in the art at that time would have considered the invention to be obvious."); *id.* (Almeroth) 1652:18-22, 1669:12-15, 1669:23-1670:10.  Dr. Almeroth did not apply the correct standard, which he repeatedly espoused.

Furthermore, Dr. Almeroth did not agree with the statements of this user that it was "logically impossible" to have the same speaker in multiple groups (nor could he given his infringement opinions), and the evidence from the same Sonos Forums document contradicted this statement.  Multiple users responded to the post and explained that having the same speaker in multiple groups was not only possible but also a "***basic feature***" and "***not a difficult concept***."  Trial Tr. (Almeroth) at 1691:6-1695:21.  It was also undisputed Google had already implemented the accused grouping functionality by the time of this post.  Trial Tr. (Mackay) at 1272:23-1273:2, Trial Tr. (Maclellan) at 1299:6-9.  No reasonable jury could find that a skilled artisan would have found overlapping speaker groups "logically impossible" in 2016 after Google already implemented the feature in its products.  At best, this was extremely weak evidence of "skepticism" under the secondary considerations analysis, which was legally insufficient to overcome Google's strong prima facie case of obviousness.  *ZUP, LLC v. Nash Mfg.*, 896 F.3d 1365, 1375 (Fed. Cir. 2018) ("[W]here a claimed invention represents no more than the predictable use of prior art . . . evidence of secondary indicia are frequently deemed inadequate") (quotations omitted); Trial Tr. (Almeroth) 1676:16-1677:2 (acknowledging this evidence was relevant to alleged skepticism).

(b) *Claim 1 is Invalid Over the Combination of the Sonos 2005 System and the Squeezebox System*

Claim 1 is also obvious in further view of the Squeezebox System's disclosure of saving

---

[4]  Dr. Almeroth's attempted reliance on a 2005 user post that asked if there were "any unwanted side-effects" of allowing zones "to be in more than one group" also fails.  Trial Tr. (Almeroth) 1702:7-9; TX2425 at 3.  That user never actually identified any "side-effects" of overlapping zone groups, and he stated that although he "would be happy with a grouping that allowed zones to be in at most one group," "others may not."  *Id.*  The post immediately following that one then stated that a "zone can be in 1 or more zone groups," making clear there was no legitimate skepticism from users regarding overlapping zone groups at this time.  *Id.* at 4.

1 overlapping zone scenes for later invocation and invoking one of the zone scenes while the zone

2 player is operating in a standalone mode.

3     The Squeezebox System was a prior art device that was "designed to allow you to play to

4 individual Squeezebox players or to synchronize multiple of them."  Trial Tr. (Schonfeld) at

5 1448:13-15; TX3808 at 61.  Google established that Squeezebox source code (Slimserver v.5.3.1)

6 was dated October 1, 2004 and was therefore prior art.  Trial Tr. (Schonfeld) at 1445:23-1446:20,

7 TX2508 (wayback machine for code directories), TX3007 (source code).  Dr. Almeroth **did not**

8 **rebut** any of this evidence at trial.

9     Google also established that the Squeezebox System included creating and saving

10 overlapping zone scenes for later invocation.  The system was designed to allow users to play to

11 individual Squeezebox players or synchronize multiple Squeezebox players, and a user could create

12 and save two overlapping zone scenes.  Trial Tr. (Schonfeld) at 1448:14-1449:16.  Specifically, one

13 player could reside in two different groups with two different sync group IDs.  *Id*. at 1449:19-

14 1450:24.  Google established, **without rebuttal**, that the Squeezebox System disclosed the ability to

15 create overlapping zone scenes that could be saved and later invoked **before** Sonos's alleged

16 December 21, 2005 conception date.  *Id*. at 561:4-566:18, TX3937, TX3808 (Squeezebox user

17 manual), TX2508 (wayback machine for code); *see also* Trial Tr. at 1442:21-1443:8.[5]

18     Skilled artisans were motivated to combine the Sonos 2005 System with the teachings of

19 Squeezebox.  Indeed, Sonos admitted that its employees set up and tested multiple Squeezeboxes

20 for grouping functionality in November 2003, when thinking about how to design the Sonos 2005

21 system.  Trial Tr. (Lambourne) at 556:15-22; 557:24-558:3); TX2831.  Google established that

22 Squeezebox and Sonos were competitors and that skilled artisans working on one would have looked

23

[5]   Sonos's only rebuttal was a suggestion that the Squeezebox devices Dr. Schonfeld tested had
24 firmware after the priority date and that he was not able to test every scenario with the physical
devices.  Trial Tr. at 1482:12-16; 1482:22-1483:6.  But even if true, this argument ignores Dr.
25 Schonfeld's software testing, which proved the invalidating functionality.  *See id*. at 1482:8.  Sonos
did not dispute that the Squeezebox source code Dr. Schonfeld relied upon was prior art, or that Dr.
26 Schonfeld ran "virtual machines" that simulated the operation of the Squeezeboxes in 2005.  Trial
Tr. (Schonfeld) at 1485:12-19, 1506:3-1507:1.  Sonos never responded to Dr. Schonfeld's virtual
27 machine or software testing, so any reasonable jury would have found that the prior art combination
including Squeezebox disclosed overlapping zone scenes.
28

1   to the other to see what they were doing.  Trial Tr. (Schonfeld) at 1443:1-8.

2       Sonos did not rebut this point.  In fact, Dr. Almeroth did not discuss the Squeezebox System

3   or its combination with the Sonos 2005 System.  Instead, he merely critiqued the Sonos 2005

4   System.  Trial Tr. (Almeroth) at 1668:15-22.

5               (c)     *Claim 1 is Invalid Over the Combination of the Sonos 2005 System
                         and Nourse*

6

7       Google also demonstrated that the claim 1 of the '885 patent is obvious based on the

8   combination of the Sonos 2005 system in further view of the Nourse patent.  Nourse is a patent

9   publication published in 2003.  TX6513, Trial Tr. (Schonfeld) at 1438:6-1441:10.  Google

10  established that Nourse described a "general management system for general speaker systems," and

11  taught that "each speaker based on the addresses can receive …. content to the speaker and play

12  individually or as a group depending on which address is used, which means it's able to play and

13  operate in standalone mode and play back individually or play synchronously as part of a

14  group."  Trial Tr. (Schonfeld) at 1439:18-23.  Google also established, without rebuttal from Sonos,

15  that Nourse disclosed the ability to create overlapping zone scenes that could be saved and later

16  invoked.  Trial Tr. (Schonfeld) at 1438:6-1441:10, TX6514.

17      A skilled artisan would have been motivated to combine the Sonos 2005 system with

18  Nourse's teachings of storing a second overlapping zone scene because Nourse already disclosed

19  zone scene storage and because both Sonos 2005 and Nourse addressed the same issue of how to

20  save zone groups.  Trial Tr. (Schonfeld) at 1439:24-1440:19.  Dr. Schonfeld's unrebutted testimony

21  also established that a skilled artisan would have had a reasonable expectation of success in

22  combining the Sonos 2005 System with Nourse to arrive at the asserted claims.  It would have been

23  a "trivial operation" to store the group information for later use, especially considering the relatively

24  huge amount of storage the Sonos 2005 System included.  Trial Tr. (Schonfeld) at 1440:6-19, *see*

25  *also* 1441:4-10 ("They're both addressed to the same type of topic. They are solving very similar

26  problems of managing saving zone groups and making them available and flexible to play

27  individually or play later.").

28

As with Squeezebox, Dr. Almeroth **did not discuss** the Nourse reference in particular or its combination with the Sonos 2005 System, leaving Dr. Schonfeld's analysis substantively unrebutted.  Trial Tr. (Almeroth) at 1668:15-22.

> **2.**     ***The Asserted Claims of the '966 Patent Are Invalid for the Same Reasons***

The '885 patent and the '966 patent are essentially "two sides" of the same coin with the exception of the additional storage limitation for the '966 patent.  Trial Tr. (Almeroth) at 693:11-694:18-22.  Thus, as Dr. Schonfeld analyzed the '885 patent claim, he identified elements of the '966 Patent claims that were also met by the relevant prior art disclosures.  *See, e.g.,* Trial Tr. at 1390:3-11 ("I didn't present my analysis from the point view of a ZonePlayer or from the controller point of view. I presented it from a bird's-eye point of view as for the system as a whole, and I presented it once and applied it for both claims."); *see also supra* Section II.A.  This included showing that the controller causes storage of the zone scenes (Limitations 1.6 and 1.8) and that it displays a representation of them (Limitations 1.9-1.10).  *Id.* at 1421:2-21, 1452:13-1453:2, 1422:6-14, 1505:12-24.  Dr. Schonfeld also identified disclosures from the prior art references that met unique elements of the asserted '966 patent claims, including the asserted dependent claims.  *Id.* at 1451:10-1455:2.  Accordingly, Dr. Schonfeld comprehensively showed that the asserted '966 Patent claims are invalid.

The only substantive dispute between Dr. Schonfeld and Dr. Almeroth that was unique to the '966 Patent involved dependent claim 6, and Dr. Almeroth's opinions on that claim were limited to just a few lines of testimony.  Dr. Almeroth testified, without analysis, that dependent claim 6 was not met by the Sonos 2005 System because "party mode" would "fully overlap" with other groups and dependent claim 6 requires groups that do not ***fully*** overlap.  Trial Tr. (Almeroth) 1667:18-1668:11.  But as described in Section III.A.1.a.i, the Sonos Forums explicitly disclosed zone scenes that did not fully overlap.

> **3.**     ***Sonos Did Not Prove Any Secondary Considerations***

Sonos only briefly addressed secondary considerations of non-obviousness.  Dr. Almeroth identified two instances of what he contended was industry praise of the claimed invention.  The first was an article (TX6780) that did not describe the claimed invention, and the Court held that it

was irrelevant to secondary considerations.  Trial Tr. (The Court) 1678:20-25 ("The praise is supposed to be of the invention, and here the invention requires three or more and overlapping.  ***This does not praise that***."); Trial Tr. (Almeroth) at 1687:24-1688:2.  The second article Dr. Almeroth relied upon did not show industry praise of the invention either, because the relevant portion was merely a quote from a "Sonos spokesperson."  TX6788 at 2.  Even if this were industry praise, and not Sonos merely touting its own products, Dr. Almeroth admitted that the speaker group examples in the article could be created without necessarily overlapping, as required by the claims.  Trial Tr. (Almeroth) 1688:5-19.  As a result, all of Dr. Almeroth's alleged evidence of praise is irrelevant as ***lacking a nexus to the invention***.

Moreover, no reasonable jury could have concluded that Sonos's alleged secondary considerations overcame Google's strong invalidity showing.  *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344, (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, as here, evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness."); *Odom v. Microsoft Corp.*, 429 Fed. App'x. 967, 973 (Fed. Cir. 2011) ("we have stated that weak secondary considerations generally do not overcome a strong prima facie case of obviousness.").

## B.   THE COURT SHOULD ENTER JUDGMENT OF NON-INFRINGEMENT OF THE '885 PATENT AS A MATTER OF LAW

No substantial evidence supported the jury's verdict that Google's new design infringes claim 1 of the '885 patent.  Claim 1 requires, *inter alia*, that a first zone player "operate[] in a standalone mode in which the first zone player is configured to play back media individually" (Lim. 1.4) and, "while operating" in that standalone mode, (1) receive respective indications that it has been added to two overlapping zone scenes (Lim. 1.5, 1.6), and (2) continue to operate in standalone mode until one of those scenes is invoked (Lim. 1.8, 1.10).  No reasonable jury could have found that speakers with Google's new design practice these "Standalone Limitations."

First, extensive evidence showed that Google introduced a new, materially different design after the Court held during the patent showdown that an earlier design infringed claim 1 of the '885 patent.  Trial Tr. 775:22-776:8.  In the new design, before a speaker is added to a group, it exits

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

standalone mode and enters an idle mode in which the speaker stops media playback and "kills" (closes out) any application that *could* play back media.  As a result, the speaker is no longer "configured to" play back media individually as required by the Standalone Limitations.

Second, under the proper construction of "while operating in a standalone mode in which the first zone player is configured to play back media individually," the accused speakers must actively play back media individually while executing the Standalone Limitations.  The accused products with the new design undisputedly stop media playback and, thus, do not actively play back media during the accused operations.  Google's new design does not infringe for this reason.

> **1.      *Google's New Design Enters An Idle Mode And Does Not Practice the "Operating In Standalone" Limitations While Continuing To Operate In The Claimed Standalone Mode***

Google's new design no longer performs the accused operations in a standalone mode.  *E.g.*, Trial Tr. (MacKay) at 1256:12-1261:3; *id.* (Schonfeld) at 1366:24-1367:9.  Claim 1 requires that "after receiving the first and second indications," the zone player "***continu[es] to operate in the standalone mode*** until a given one of the first and second zone scenes has been selected for invocation."  Google's new design does ***not*** continue to operate in the claimed standalone mode or, indeed, in any mode in which it is configured to play back media.  Rather, the unrebutted evidence presented at trial demonstrated that speakers with the new design can operate in three modes:  (i) an idle mode in which the speaker is not configured to play back any media; (ii) an individual mode in which the speaker is configured to play back media individually; or (iii) a group mode in which the speaker is configured to play back media as part of a speaker group.  Trial Tr. (MacKay) at 1254:15-1255:10.  Google speakers operate in idle mode when they are initially powered up, for example.  *Id.* at 1258:18-24.  In idle mode, ***no*** application for media playback runs on the speaker, and the speaker thus neither plays back media nor is even capable playing back media.  *Id.* at 1254:21-1255:1 ("Idle mode is when there is no app running on the speaker so it's not able to play media.").  To play media, speakers must enter an individual or group playback mode by, for example, receiving a "launch" command from the Google Home app.  *Id.* at 1259:2-6 ("The launch command is a command that indicates that an app should be launched and it could be launched either on a single device or on a group.").  The launch command causes the speaker to launch a media playback

1   application, thereby configuring the speaker for playback of media in either an individual or group

2   mode.  *Id.*  Google speakers in idle mode are indisputably not configured to play back media.

3       Unrebutted record evidence established that, in the new design, a speaker operating in

4   individual mode ***exits*** individual playback mode and "returns to the idle mode" when it receives an

5   instruction from the Google Home app to join a new speaker group (the alleged "zone scene").  *Id.*

6   at 1256:18-1257:4.  Specifically, it was unrebutted that when such speakers are to be added to a new

7   speaker group, they execute a "StopCurrentApp()" function that "tears down" any playback app

8   running on the speakers and removes that playback app from memory.  *Id.* at 1256:23-25 (Q:  "And

9   when it says 'StopCurrentApp,' are you just pausing the app?"  A:  "No.  The app is killed.  It's torn

10  down completely."), 1267:7-22 ("It [StopCurrentApp()] stops the software that's running the app .

11  . . it tears down the app completely and removes it from memory."), 1282:25-1283:5 ("It not only

12  stops playing audio, it actually kills the entire app.").  Indeed, not only is the playback app torn

13  down and removed from memory, but the speaker must "essentially download[] the app from the

14  internet again" to play back later because the app is "gone" and is "not on the player anymore."  *Id.*

15  at 1292:3-15.

16      Google's speakers with the new design remain in this idle mode until they receive a "launch"

17  command to play back media either as an individual speaker or in a speaker group.  *Id.* at 1256:18-

18  1258:7.  Because no media application runs on the speaker in idle mode, the speaker is not

19  configured for playback and is, thus, not in standalone mode when any such launch command is

20  received.  *See id.* at 1267:7-22 ("StopCurrentApp()" "stops the software that's running the app. . . .

21  [I]t tears down the app completely and removes it from memory."), 1254:24-1255:1 (Q: "Is it

22  configured for any type of playback operation in idle mode?" A: "No.").

23      The evidence presented by Mr. MacKay and other Google witnesses proved that when a

24  Google speaker with the new design receives a launch command to invoke a new speaker group and

25  play back media synchronously in that group, the speaker is not and cannot be operating in the

26  standalone mode as required by the claims in which it was operating before it was added to that

27  speaker group; it is instead in idle mode.  *E.g.*, *id.* at 1258:8-14; *id.* (Maclellan) at 1301:8-1302:11;

28  (Schonfeld) at 1366:24-1367:9; TX0155.  Sonos's expert, Dr. Almeroth, ignored the idle mode and

simply asserted, with no support, that the accused products can only operate in group mode or standalone mode.  Trial Tr. (Almeroth) at 1282:25-1283:5; 986:15-22 (agreeing "there's not going to be infringement for the redesign" if group playback is invoked while the speaker is in a mode other than standalone mode).  No reasonable jury could credit Dr. Almeroth's conclusory and baseless testimony and opinions.

**2.    *Google's New Design Does Not Continue To Operate In The Claimed Standalone Mode Under The Proper Claim Construction Requiring Active Playback Of Media***

At trial, Google identified a dispute regarding the meaning of the claim term "while operating in a standalone mode in which the first zone player is configured to play back media individually" and asked the Court to construe this phrase to mean "operating in a mode [in which] a zone player is actively playing back media individually."  Dkt. 732 at 1, 3-4.  As explained in Google's trial brief, its proposed construction is supported by the plain language of the claims as well as the intrinsic evidence.  *Id*.  Critically, Sonos argued during prosecution of the '885 patent that the Yamaha DME reference did not disclose the "while operating in a standalone mode" limitation (TX6 at 4087, 4102), and the Examiner agreed because Yamaha DME ***did not "allow for continuous output of media"*** "when a scene is invoked" (TX6 at 5850).  Sonos must stay consistent with its prior argument at the Patent Office that "while operating in standalone mode" does not require active media playback.  *CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1382 (Fed. Cir. 2022) ("The doctrine of prosecution disclaimer precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.").

No reasonable jury would have accepted Sonos's argument that the Standalone Limitations do not require active playback.  Google provided unrebutted testimony that a person of ordinary skill in the art would have understood a zone player must be actively playing back media to be "operating in a standalone mode" as claimed.  *E.g.*, Trial Tr. (Schonfeld) 1345:12-1346:9.  As explained above, Sonos secured allowance of the '885 patent by adding the Standalone Limitations to overcome Yamaha DME, and the Examiner relied on the lack of continuous output of media when a zone scene is invoked in DME as the reason why these limitations were not disclosed.  *E.g.*, Trial Tr. (Schonfeld) at 1714:8-1715:19; TX6 at 4084-4106 (amending claims to add Standalone

1   Limitations and arguing the amendments distinguish DME); *id*. at 4137, 5850 (Examiner agreeing

2   that DME did not allow for continuously outputting media when invoking a zone scene).

3       No reasonable jury could have found that Google's new speaker design infringes because

4   when such speakers are added to a new speaker group, they undisputedly stop media playback and

5   do not allow for continuous output of media when a speaker group is later invoked. *E.g.*, Trial Tr.

6   (Almeroth) at 799:18-20, 802:23-25; *id*. (MacKay) at 1256:12-1261:3. Under the correct

7   construction, the new design does not meet the Standalone Limitations because, like the Yamaha

8   DME prior art system distinguished during prosecution, it does not continuously output media when

9   the alleged zone scene is invoked. Even Sonos's expert conceded that, in the new design, media

10  playback is terminated before a speaker is added to a speaker group (the alleged "zone scene"). *E.g.*,

11  *id.* at 799:18-22 ("And so the person who's putting the speaker into the group, if it's playing in

12  standalone mode, will stop playing."). Google is thus entitled to JMOL under the proper

13  construction of "operating in a standalone mode." *See SimpleAir, Inc. v. Sony Ericsson Mobile*

14  *Commc'ns AB*, 820 F.3d 419, 425 (Fed. Cir. 2016) ("Where an infringement verdict relies on an

15  incorrect claim construction, and no reasonable jury could have found infringement under the proper

16  claim construction, this court may reverse the district court's determination with respect to JMOL

17  without remand.").

18      Sonos suggested that speakers in idle mode are still configured to play back media

19  individually because they are "still plugged in, powered on, with code running on the device," and

20  the "user can even adjust the audio volume level and individually output audio" that generates a

21  "little boop noise" to indicate a change in volume level. *See, e.g.*, Dkt. 754 at 2 (citing Trial Tr.

22  (MacKay) at 1279:7-1281:10). That theory could not support the verdict. The "little boop noise"

23  made to indicate a change in volume level does not constitute ***media*** playback, and there was no

24  evidence that this "boop" constitutes ***media*** playback. Trial Tr. (MacKay) at 1290:2-1291:11. The

25  "boop" is simply an audible confirmation of the new volume setting to be used when the user plays

26  back media in the *future*. *See* Trial Tr. (MacKay) at 1291:7-11 (confirming that the audio volume

27  change does not mean "music [is] coming out of the speaker"); *see also* Trial Tr. (Schonfeld) at

28  1466:2-14 (explaining the "boop" is not media playback).

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

C.     **THE COURT SHOULD ENTER JUDGMENT FOR GOOGLE ON DAMAGES AS A MATTER OF LAW**

There was no legally sufficient evidentiary basis for a royalty rate of $2.30 per unit.  The jury's royalty rate ***far exceeded*** both the $2.25 million lump-sum award that Google's damages expert, Mr. Bakewell, proposed (*see* Trial Tr. (Bakewell) at 1570:20-24, 1613:11-21), ***and*** the $0.87 per unit running royalty award that Sonos's damages expert, Mr. Malackowski, proposed (*Id.* (Malackowski) at 1092:19-23) before his IFTTT-based model was excluded by the Court.  Dkt. 762 at 22; Dkt. 813.  Although the Court instructed the jury to consider other evidence in the record such as "sufficiently comparable" license agreements (Dkt. 762 at 22), none of those agreements supported a royalty rate of $2.30 per unit.  At most, the admissible, relevant, and reliable evidence in the record supported a one-time lump sum award of $2.25 million.  Thus, even if the liability verdict stands, the Court should reduce the damage award to $2.25 million.

1.     *The $2.30/Unit Royalty Rate Had No Evidentiary Support*

There was no support for the jury's $2.30 per unit royalty rate.  Mr. Bakewell opined that a hypothetical negotiation for the '885 patent would have yielded, at most, a one-time lump sum license for $2.25 million.  Trial Tr. (Bakewell) at 1570:20-24; 1613:11-21.  While Mr. Malackowski opined that the parties would have entered into a running royalty agreement of ***$0.87*** per infringing unit sold based on his analysis of the IFTTT app (*Id.* (Malackowski) at 1092:19-23), the Court excluded that testimony and instructed the jury to disregard it.  Dkt. 762 at 22; Dkt. 813.

Sonos may point to its portfolio-wide license agreements, but those agreements are legally insufficient because Sonos ***failed to apportion*** them to the claimed invention.  As the Federal Circuit explained in *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376-77 (Fed. Cir. 2021), apportionment is required in every case.  A comparable license may have "built-in apportionment," but "[f]or built-in apportionment to apply the license must be 'sufficiently comparable' in that 'principles of apportionment were effectively baked into' the purportedly comparable license."  *Id.* at 1377 (citing *Vectura Ltd. v. Glaxosmithkline LLC,* 981 F.3d 1030, 1041 (Fed. Cir. 2020)).  This is not the case here because Sonos's portfolio-wide licenses had far broader scope, and no witness from Sonos provided any apportionment of these agreements, which were deemed by its expert to

1    be non-comparable.

2         "The patentee has the burden of proving damages, and where licenses are at issue, that

3    includes 'the burden to prove that the licenses were sufficiently comparable[.]'" *Id.* (citing *Lucent*

4    *Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009)).  The Federal Circuit

5    routinely rejects damages awards where the patentee failed to establish that a license agreement was

6    sufficiently comparable and thus apportioned to the claimed invention.  *E.g.*, *Apple Inc. v. Wi-LAN*

7    *Inc.*, 25 F.4th 960, 972-73 (Fed. Cir. 2022) (portfolio-wide license not comparable because there

8    was no evidence that the asserted patents were the focus of the underlying negotiations, and the

9    negotiating parties generally treated the asserted patents as "chaff, not wheat"); *MLC Intellectual*

10   *Property, LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed. Cir. 2021) (affirming exclusion of

11   reasonable royalty theory where expert relied on a portfolio-wide license covering 41 patents, only

12   one of which was at issue in the case, and did not apportion to the single patent at issue);

13   *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (rejecting

14   plaintiff's reliance on two non-comparable licenses to determine a royalty rate where there was

15   insufficient evidence to show that the licenses were comparable to the asserted patent); *Uniloc USA,*

16   *Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (holding that "there must be a basis

17   in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation

18   at issue in the case"); *Wordtech*, 609 F.3d 1308, 1319-22 (Fed. Cir. 2010) (finding lump sum award

19   unsupported where there was no evidence connecting it to the licenses in the record or the patents-

20   in-suit); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868, 870 (Fed. Cir. 2010) (rejecting

21   patentee's expert testimony that "used licenses with no relationship to the claimed invention to drive

22   the royalty rate up to unjustified double-digit levels"); *Lucent*, 580 F.3d at 1325-32 (holding that

23   "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the

24   hypothetical license at issue in suit[,]" and that patentee's failure to do so—including by using

25   licenses "directed to a vastly different situation than the hypothetical licensing scenario of the

26   present case"—weighed "strongly against the jury's award").

27        Likewise here, Sonos's license agreements did not support a $2.30 per-unit rate for the '885

28   patent.  Four license agreements were admitted at trial.  Two were lump sum agreements and did

                                                   -19-                    Case No. 3:20-cv-06754-WHA

not support any running royalty rate.  *See* TX6016; TX6721.  And the two running royalty agreements both covered more than *1,000* U.S. patents.  *See* TX6631; TX6632.  These agreements called for royalty rates of between $12 and $30 per unit depending on volume, and a flat rate of $6 per unit for products priced below $100.  TX6631 at 6; TX6632 at 5-6.  But as Sonos's General Counsel, Alaina Kwasizur, confirmed, these rates covered over 1,000 U.S. patents.  Trial Tr. (Kwasizur) at 1060:8-1066:4.  For this reason, *both sides'* damages experts agreed that Sonos's license agreements were *not* comparable for purposes of the hypothetical negotiation.  Trial Tr. (Malackowski) 1162:5-1164:13; *id.* (Bakewell) at 1590:9-1591:5.

Critically, *no evidence in the record enabled the jury to apportion* these portfolio-wide rates from the more than 1,000 Sonos patents they cover to just the '885 patent, particularly at a rate far higher than the excluded royalty rate from Sonos's own expert.  For example, there was no evidence regarding the relative importance of the '885 patent to the other patents in Sonos's portfolio.  Nor was there any evidence that the '885 patent drove the rates in the portfolio-wide licenses, or was even mentioned in the licensing discussions.

Dividing the highest portfolio-wide rates by the number of covered patents yields a royalty rate of less than two cents per patent.  *Id.* (Kwasizur) at 1076:14-1077:1.  And to the extent the record speaks to the importance of the '885 patent at all, it supports a below-average royalty rate— not a royalty rate *115 times* the portfolio average.  Although Sonos claims to have invented the claimed functionality in 2005, Sonos took *more than fifteen years* to implement the functionality into its own products.  *Id.* (Millington) at 392:16-19; 451:2-12.  And the evidence confirmed that the accused feature is not widely used and does not drive demand for the accused products.  *Id.* (Chan) at 1522:19-152310; *id.* (Bakewell) at 1567:7-11; *Lucent*, 580 F.3d at 1333-34 (reversing denial of JMOL and vacating $360 million verdict where accused feature was a minor component and patentee could not show there was substantial use).

Mr. Malackowski testified that Sonos's portfolio-wide licenses are like a "buffet" where a licensee pays the same fee no matter how many or few patents they actually practice.  Trial Tr. (Malackowski) at 1098:11-19.  That testimony was not sufficient apportionment.  In *Omega*, the patentee argued there was sufficient evidence to sustain the jury's $5.00 per unit rate because its

1    president testified that Omega charged "five dollars [per unit] whether it's one patent or 50 patents"

2    as "[no] particular patent [is] treated as more valuable than another." 13 F.4th at 1379 (alterations

3    in original). The Federal Circuit **rejected** that "buffet" theory, holding that such testimony did not

4    provide "a basis in fact to associate the royalty rates used in prior licenses to the particular

5    hypothetical negotiation at issue in this case." *Id.* at 1379-81 (cleaned up).

6         Moreover, all three of Sonos's agreements, including one of the running royalty agreements,

7    included cross-licenses. TX6721 at 1-2; TX6632 § 3.1; TX6631 § 3.2.[6] The Court warned Sonos

8    that it would have to "adjust[] for the cross-license" if it planned to rely on these licenses for

9    damages. Trial Tr. at 183:8-9; *see also id.* (Kwasizur) at 1071:1-10. But Sonos presented **no**

10   evidence regarding the value of the cross-licenses. Ms. Kwasizur agreed that "a fair approximation

11   of the value of the Sonos-Denon license" would require "factor[ing] in their patent portfolio and the

12   cross-license as part of the value," and she admitted that Sonos "didn't present any historical

13   valuation of Denon's patent portfolio[.]" *Id.* (Kwasizur) at 1071:11-1071:22, 1074:25-

14   1075:7. Sonos's failure to account for these cross-licenses confirms that the evidence did not

15   support the jury's award. *See, e.g., Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK,

16   2013 WL 5958176, at *4 (N.D. Cal. Nov. 7, 2013) (excluding cross-license in part because

17   "[n]either the [cross-license] itself nor the parties' experts attempt to place a dollar amount on the

18   value of the license to [the patent owner]"); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d

19   807, 813-16 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) (excluding expert testimony

20   relying on "two settlement agreements" involving "extensive cross-licensing agreements respecting

21   numerous patents" because "the hypothetical negotiation does not involve . . . cross-licensing of a

22   wide variety of patents").

23        That all three of the Sonos agreements were negotiated in the context of litigation provides

24   yet another basis for holding that they were not comparable. Two of Sonos's licenses were

25   negotiated to settle pending litigation. Trial Tr. (Kwasizur) at 1010:14-23; 1013:25-1014:8. The

26

27   ─────────────────────
     [6]  In the Legrand-Sonos Agreement, Legrand covenanted not to sue Sonos for infringement of the
28   Licensee Patents, which the Federal Circuit has held is equivalent to a license. *See TransCore, LP
     v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009).

1   third was negotiated to settle threatened litigation and thus included a release of claims and covenant

2   not to sue.  *Id.* at 1018:8-19; TX6631 at § 2.1, § 3.2.  The Federal Circuit has been skeptical of the

3   comparability of settlement agreements like this because they are often "strongly influenced by a

4   desire to avoid full litigation."  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79

5   (Fed. Cir. 1983); *see Wordtech,* 609 F.3d at 1308 (agreements not sufficiently comparable in part

6   because patentee negotiated them "after initiating or threatening litigation against the licensees, and

7   litigation itself can skew the results of the hypothetical negotiation.") (quotations omitted).

8              **2.    *The Legally Relevant Evidence Does Not Support A Damages Verdict In
                       Excess Of $2.25 Million***

9

10          With Mr. Malackowski's IFTTT theory excluded and no apportionment of Sonos's

11  portfolio-wide licenses, the only relevant and reliable damages opinion was Mr. Bakewell's opinion

12  based on Google's cost of implementing non-infringing alternatives and his analysis of a Google

13  agreement to purchase technically comparable patents.  Trial Tr. (Bakewell) at 1555:15-1558:24,

14  1561:10-1566:8.  Based on these inputs and other *Georgia-Pacific* factors, he determined Google

15  and Sonos would have entered into a one-time lump sum license for $2.25 million or less.  *Id.* at

16  1570:20-24; 1613:11-21.  The Court should therefore limit any recovery to $2.25 million.

17       **D.    THE COURT SHOULD GRANT A NEW TRIAL ON LIMITED ISSUES**

18             **1.    *Google Is Entitled To A New Trial On Validity Of The '885 Patent And
                       Infringement Of Its New Design***

19          If the Court does not grant JMOL on the above bases, it should order a new trial under Rule

20  59(a).  As shown, the jury's verdict was against the great weight of the evidence and

21  unreasonable.  Fed. R. Civ. P. 59(a).  Google also requests a new trial based on the Court's failure

22  to instruct the jury on the proper construction of "operating in standalone mode."

23             **2.    *Google Is Entitled To A New Trial On Damages***

24          If the Court does not grant JMOL on damages, it should grant a new trial on damages.

25                    (a)    *The Verdict Was Not Supported By the Evidence And Was Instead
                             Based on Speculation or Guesswork*

26

27          As explained above, the jury's royalty rate of $2.30 per unit had no record basis and was

28  based on speculation or guesswork.  *See Del Monte Dunes*, 95 F.3d at 1435.  The Court struck the

only expert opinion regarding a per-unit royalty rate from the record and instructed the jury to disregard it. Dkt. 762 at 22; Dkt. 813. And to the extent Sonos points to its portfolio-wide licenses as evidence to support the jury's $2.30 rate, those licenses were insufficient without further evidence of apportionment or a viable way for the jury to account for the fact that they contain cross-licenses and/or were negotiated to resolve litigation or potential litigation. A new trial on damages is appropriate. *Apple v. Wi-LAN*, 25 F.4th at 972-73 (district court abused its discretion in denying new trial on damages where patentee relied on portfolio-wide licenses and failed to tie them to asserted patents); *Omega*, 13 F.4th at 1379-81 (district court abused its discretion in denying new trial on damages where patentee failed to present "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case") (cleaned up).

A new trial on damages is particularly warranted here because Google respectfully submits that the Court erred in two respects with respect to evidentiary issues regarding damages.

*First*, the Court erred by performing its "gatekeeping" duty only after Mr. Malackowski testified. District judges are admonished to be "gatekeepers," which means ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993). Google moved *in limine* to exclude Mr. Malackowski's testimony under Rule 702. Dkts. 607, 610. During the pretrial conference, the Court agreed that "there are serious questions about this whole model." Trial Tr. (Pre-Trial Conference) at 105:21-106:3. Nevertheless, the Court allowed Mr. Malackowski to testify on the assumption that the jury would disregard Mr. Malackowski's testimony if instructed to do so. *Id.* at 105:21-25, 106:5-8. After he testified, the Court held that his opinion was unreliable and told the jury to disregard it. Dkt. 762 at 22; Dkt. 813. But at that point, the cat was out of the bag. The jury had already heard Mr. Malackowski's opinion that Sonos was entitled to a royalty of $0.87 per unit based on IFTTT, which likely had an anchoring effect on their discussions regarding an appropriate royalty rate. Although the Court belatedly held that the IFTTT "gate" should have "remain[ed] firmly closed" (Dkt. 813 at 10), it should have made that determination **before** Mr. Malackowski testified. Google is entitled to a new trial to correct this prejudicial error. *See Uniloc*, 632 F.3d 1292, 1318-21 (Fed. Cir. 2011) (affirming grant of new damages trial after patent owner's expert

1   improperly cited $19.28 billion in total revenue as a "check" because the figure "skew[ed] the

2   damages horizon for the jury" and "le[nt] legitimacy to the reasonableness of [the patent owner's

3   damages expert's] $565 million damages calculation").

4       *Second*, the Court erred by admitting Sonos's portfolio-wide licenses.  The parties' experts

5   agreed that Sonos's licenses were not comparable.  Trial Tr. (Malackowski) at 1162:5-1164:13; *id.*

6   (Bakewell) at 1590:9-1591:5.  The Court nevertheless admitted them based on the premise that

7   "maybe the jury could decide they [we]re."  Trial Tr. at 387:17-387:18.  The Court then instructed

8   the jury to use them: "There are license agreements admitted into evidence that you may find

9   sufficiently comparable and that you may use, along with other evidence of economic value, if

10  applicable."  Dkt. 762 at 22.  The notes the jury sent out during deliberations indicate that they did

11  use them.  For example, it asked whether either side provided a breakdown of "affected units that

12  were >$100 vs <$100," a question apparently referring to Sonos licenses with different royalty rates

13  for products priced above and below $100.  Dkt. 773 at 3; *see also* TX6631 at 6; TX6632 at 5-

14  6.  Admission of these non-comparable agreements, without any way to account for the cross-

15  licenses and litigation context was clear error.  *LaserDynamics*, 694 F.3d at 79 ("Relying on this

16  irrelevant evidence [non-comparable license agreements] . . . served no purpose other than to

17  increase the reasonable royalty rate above rates more clearly linked to the economic demand for the

18  claimed technology."); *Apple*, 2013 WL 5958176, at *5 (excluding license in part because no

19  damages expert found the license comparable: "as acknowledged by both sides' experts" the

20  agreements are "certainly not the most reliable evidence of a hypothetical negotiation[.]").

21      If the Court grants a new trial, neither Sonos nor Mr. Malackowski should be permitted to

22  proffer new damages theories because "a patent owner may waive its right to a damages award when

23  it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid

24  damages theory."  *Promega Corp. v. Life Techs*. Corp., 875 F.3d 651, 666 (Fed. Cir. 2017).  Further,

25  "a district court does not abuse its discretion by declining to give that plaintiff multiple chances to

26  correct deficiencies in its arguments or the record."  *Id.*

27          (b)   *The Verdict Is Grossly Excessive*

28      Google is also entitled to a new trial because the verdict is grossly excessive. The jury

1    awarded a per-unit royalty that was **115 times** the portfolio average, and, if anything, the '885 patent

2    warranted a lower-than-average royalty rate. *Supra* § III.1. Google thus deserves a new trial on

3    damages. *See Viasat, Inc. v. Space Sys./Loral, Inc.*, No. 3:12-CV-00260-H WVG, 2014 WL

4    3896073, at *10 (S.D. Cal. Aug. 8, 2014) ("In light of the jury's award of royalty damages many

5    times greater than [defendant's] expected profit from the [accused product] and the insufficient

6    evidence that [plaintiff] presented to support that disproportionate award, a new trial is necessary to

7    prevent a miscarriage of justice."); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-

8    3428 PSG, 2013 WL 831528, at *25 (N.D. Cal. Jan. 10, 2013) (granting new trial on punitive

9    damages "to prevent [defendants] from suffering injustice from the excessive award").

10                          (c)      *At a Minimum, Damages Should Be Remitted*

11        In the alternative, damages for the '885 patent should be remitted to a one-time lump sum

12   damages award of $2.25 million for past and future damages. "[T]he use of remittitur enables

13   parties to avoid the delay and expense of a new trial when a jury's verdict is excessive in relation to

14   the evidence of record." *Hynix*, 2006 WL 1991760, at *4. "The proper amount of a remittitur is the

15   maximum amount sustainable by the evidence." *Informatica Corp. v. Bus. Objects Data*

16   *Integration, Inc.,* No. C 02 03378 EDL, 2007 WL 2344962, at *4 (N.D. Cal. Aug. 16, 2007).

17        Remittitur is appropriate in this case because the jury's verdict was grossly

18   excessive. Because Sonos's portfolio licenses were not comparable and the IFTTT model was

19   fundamentally flawed, "the maximum amount sustainable by the proof" was Mr. Bakewell's

20   estimate based on Google's comparable agreement with Outland Research and the cost of

21   implementing the non-infringing alternative of removing speaker grouping. *Informatica Corp.*,

22   2007 WL 2344962, at *4. Remittitur to $2.25 million is thus warranted. *See Apple Inc. v. Wi-LAN,*

23   *Inc.*, No. 14CV2235 DMS (BLM), 2019 WL 4248899, at *5 (S.D. Cal. Jan. 3, 2019), *aff'd*, 25 F.4th

24   960 (Fed. Cir. 2022) (granting remittitur because Wi-LAN's expert's testimony regarding

25   apportionment was unreliable and "should not have been presented to the jury").

26

27

28

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

DATED:  June 23, 2023

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By ____/s Sean Pak____
      Sean Pak
      Melissa Baily
      James D. Judah
      Lindsay Cooper
      Marc Kaplan
      Iman Lordgooei


*Attorneys for GOOGLE LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

       Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on June 23, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via email.

4

5

6

                          */s/ Sean Pak*

7

                          Sean Pak

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28