QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>              Plaintiff and Counter-Defendant,<br><br>       vs.<br><br>GOOGLE LLC,<br><br>              Defendant and Counter-Claimant. | Case No. 3:20-cv-06754-WHA<br>Consolidated with Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S OPPOSITION TO SONOS, INC.'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES**<br><br>Judge:  Hon. William Alsup<br>Location:  Courtroom 12, 19th Floor |

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   SONOS IS NOT ENTITLED TO A PERMANENT INJUNCTION ........................... 2

    A.   SONOS CANNOT DEMONSTRATE IRREPARABLE INJURY ....................... 2

        1.   SONOS HAS NOT IDENTIFIED ANY IRREPARABLE HARM ............... 3

            (A)   SONOS HAS NOT PRESENTED ANY EVIDENCE OF LOST SALES OR
            MARKET SHARE VIA A "LOCK-IN EFFECT" ................................................. 3

            (B)   THERE IS AT MOST ONLY LIMITED EVIDENCE OF DIRECT COMPETITION
            5

        2.   SONOS HAS NOT ESTABLISHED A CAUSAL NEXUS BETWEEN ANY
        ALLEGED HARM AND GOOGLE'S INFRINGEMENT ........................................ 6

    B.   MONETARY DAMAGES ARE SUFFICIENT TO COMPENSATE SONOS ................. 10

    C.   THE BALANCE OF HARDSHIPS FAVORS GOOGLE ................................... 13

    D.   AN INJUNCTION WOULD NOT BE IN THE PUBLIC INTEREST ............................... 14

    E.   REQUIRING GOOGLE TO PROVIDE NOTICE OF INFRINGEMENT AND THE
    PERMANENT INJUNCTION WOULD BE UNJUSTIFIED ....................................... 16

III.  SONOS'S REQUEST FOR AN ENHANCED ONGOING ROYALTY IS PREMATURE
      16

    A.   SONOS'S REQUEST FOR AN ONGOING ROYALTY IS PREMATURE ................... 17

    B.   SONOS IS NOT ENTITLED TO AN ONGOING ROYALTY ........................... 18

    C.   SONOS'S REQUESTED ONGOING ROYALTY RATE IS EXCESSIVE ...................... 18

    D.   THE COURT SHOULD REJECT SONOS'S IMPROPER ATTEMPT TO USE
    WILLFULNESS AS A BASIS FOR ENHANCING THE ONGOING ROYALTY RATE ...... 20

IV.   SONOS'S REQUEST FOR SUPPLEMENTAL DAMAGES IS PREMATURE ............... 22

        1.   PRE-VERDICT SUPPLEMENTAL DAMAGES ................................... 22

        2.   SUPPLEMENTAL DAMAGES BASED ON GOOGLE'S REDESIGN .................... 22

V.    AN AWARD OF PRE- AND POST-JUDGMENT INTEREST IS PREMATURE, AND
PRE-JUDGEMENT INTEREST IS UNWARRANTED IN LIGHT OF THE EXCESSIVE
VERDICT) ................................................................................................................ 23

    A.   SONOS'S REQUEST FOR INTEREST IS PREMATURE ................................. 23

    B.   SONOS IS NOT ENTITLED TO PRE-JUDGMENT INTEREST ...................... 24

    C.   IF THE COURT AWARDS PRE-JUDGMENT INTEREST, IT SHOULD BE SET AT
    THE TREASURY BILL RATE AND COMPOUNDED ANNUALLY .................................. 24

    D.   THE COURT SHOULD AWARD POST-JUDGMENT INTEREST ONLY IF THE
    JURY'S AWARD WITHSTANDS GOOGLE'S POST-TRIAL MOTIONS AND APPEAL ... 25

VI.   CONCLUSION ..................................................................................................... 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*ActiveVideo Networks v. Verizon Communications,*
  694 F.3d 1312 (Fed. Cir. 2012) ................................................................................. 11

4

*Acumed LLC v. Stryker Corp.,*
  551 F.3d 1323 (Fed. Cir. 2008) ................................................................................. 11

5

6

*Affinity Labs of Tex. V. BMW N. Am., LLC,*
  783 F. Supp. 2d 891 (E.D. Tex. 2011) ....................................................................... 22

7

*Alzheimer's Inst. of Am. v. Eli Lilly & Co.,*
  No. 10-CV-00482-EDL, 2016 WL 7732621 (N.D. Cal. Apr. 14, 2016) ................................. 25

8

*Am. Calcar, Inc. v. Am. Honda Motor Co.,*
  No. 06CV2433 DMS (CAB), 2008 WL 11337489 (S.D. Cal. Nov. 18, 2008) ................. 12, 13

9

10

*Apple Inc. v. Motorola, Inc.,*
  757 F.3d 1286 (Fed. Cir. 2014) ................................................................................. 11

11

*Apple Inc. v. Samsung Elecs. Co.,*
  695 F.3d 1370 (Fed. Cir. 2012) ..................................................................... 3, 13, 16

12

*Apple Inc. v. Samsung Elecs. Co.,*
  809 F.3d 633 (Fed. Cir. 2015) ................................................................................. 10

13

14

*Apple Inc. v. Samsung Elecs. Co.,*
  877 F. Supp. 2d 838 (N.D. Cal. 2012) ....................................................................... 10

15

*Apple, Inc. v. Motorola, Inc.,*
  869 F. Supp. 2d 901 (N.D. Ill. 2012) ................................................................... 13, 15

16

*Apple, Inc. v. Samsung Elecs. Co.,*
  678 F.3d 1314 ................................................................................................... 10

17

18

*Apple, Inc. v. Samsung Elecs. Co.,*
  735 F.3d 1352 (Fed. Cir. 2013) ......................................................... 2, 3, 7, 8, 9, 10, 15

19

*Apple, Inc. v. Samsung Elecs. Co.,*
  No. 12-CV-00630-LHK, 2014 WL 6687122 (N.D. Cal. Nov. 25, 2014) ..................... 17, 18

20

*Asetek Danmark A/S v. CMI USA, Inc.,*
  No. 13-CV-00457-JST, 2015 WL 5568360 (N.D. Cal. Sept. 22, 2015) ........................... 16

21

22

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.,*
  No. 2:18CV585, 2023 WL 2329746 (E.D. Va. Jan. 27, 2023) ...................................... 21

23

*Bosch LLC v. Pylon Mfg. Corp.,*
  659 F.3d 1142 (Fed. Cir. 2011) ................................................................................. 14

24

*Broadcom Corp. v. Emulex Corp.,*
  732 F.3d 1325 (Fed. Cir. 2013) ................................................................................. 15

25

26

*Cave Consulting Grp., LLC v. Optuminsight, Inc.,*
  No. 5:11-CV-00469-EJD, 2016 WL 4658979 (N.D. Cal. Sept. 7, 2016) ......................... 17

27

28

*Centrak, Inc. v. Sonitor Techs., Inc.*,
   915 F.3d 1360 (Fed. Cir. 2019) ...................................................................................23

*Cioffi v. Google, Inc.*,
   No. 2:13-CV-103, 2017 WL 4011143 (E.D. Tex. Sept. 12, 2017) ..............................21

*Conceptus, Inc. v. Hologic, Inc.*,
   No. 09-2280, 2012 WL 44064 (N.D. Cal. Jan. 9, 2012).........................................11, 24

*Cordance Corp. v. Amazon.com, Inc.*,
   730 F. Supp. 2d 333 (D. Del. 2010) ...........................................................................18

*Douglas Dynamics, LLC v. Buyers Products Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ..................................................................................12

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ........................................................................................ 2, 14, 15

*EMC Corp. v. Zerto, Inc.*,
   No. CV 12-956 (GMS), 2017 WL 3434212 (D. Del. Aug. 10, 2017) ...............19, 21

*Epistar Corp. v. Lowes Companies, Inc.*,
   No. LACV1703219JAKKSX, 2022 WL 18911616 (C.D. Cal. Oct. 4, 2022) ...............24

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
   No. 2:15-CV-1202-WCB, 2017 WL 3034655 (E.D. Tex. July 18, 2017)
   (Bryson, J., sitting by designation) .........................................................................20, 21

*Essence Imaging Inc. v. Icing Images LLC*,
   No. 2:13–cv–5449–CAS, 2014 WL 1384028 (C.D. Cal Apr. 9, 2014) ....................12

*Fitness Anywhere LLC v. WOSS Enterprises LLC*,
   No. 14-CV-01725-BLF, 2018 WL 6069511 (N.D. Cal. Nov. 20, 2018)..................25

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007) ..................................................................................14

*Fresenius USA, Inc. v. Baxter, Int'l, Inc.*,
   No. C03-1431 PJH, 2012 WL 761712 (N.D. Cal. Mar. 8, 2012).............................22

*Genband US LLC v. Metaswitch Networks Corp.*,
   861 F.3d 1378 (Fed. Cir. 2017) ..................................................................................10

*Genband US LLC v. Metaswitch Networks Corp.*,
   No. 2:14-CV-00033-JRG, 2018 WL 11357619 (E.D. Tex. Mar. 22, 2018)...........................19

*GuideTech, Inc. v. Brilliant Instruments, Inc.*,
   No. C 09-5517 CW, 2014 WL 4182340 (N.D. Cal. Aug. 22, 2014) ..........................3

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. 93 (2016) ..................................................................................... 20, 21, 22

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   609 F. Supp. 2d 951 (N.D. Cal. 2009) ...................................................................12, 13

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ....................................................................................13

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES

1    *Inc. v. Shah*,
       No. SA CV 13-1321, 2015 WL 13917980 (C.D. Cal. Dec. 11, 2015) ....................................24
2
3    *Innogenetics, N.V. v. Abbott Labs.*,
       512 F.3d 1363 (Fed. Cir. 2008) ...........................................................................................11
4    *L.A. Mem. Coliseum Comm'n v. NFL*,
       634 F.2d 1197 (9th Cir. 1980) .............................................................................................12
5
6    *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
       798 F. Supp. 2d 541 (D. Del. 2011) .......................................................................................5
7    *Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
       869 F.3d 1372 (Fed. Cir. 2017) ...........................................................................................23
8    *Monsanto Co. v. Geertson Seed Farms*,
       130 S. Ct. 2743 (2010) ...........................................................................................................2
9
10   *Nichia Corp. v. Everlight Americas, Inc.*,
       855 F.3d 1328 (Fed. Cir. 2017) .............................................................................................3
11   *Nutrition 21 v. U.S.*,
       930 F.2d 867 (Fed. Cir. 1991) .............................................................................................10
12   *Paice LLC v. Toyota Motor Corp.*,
13     504 F.3d 1293 (Fed. Cir. 2007) ....................................................................................17, 18
14   *Paice LLC v. Toyota Motor Corp.*,
       609 F. Supp. 2d 620 (E.D. Tex. 2009) .................................................................................22
15   *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
       No. C 09-5235 MMC, 2015 WL 604582 (N.D. Cal. Feb. 12, 2015) ......................................8
16
17   *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
       No. 3:09-cv-05235-MMC, Dkt. 667 (N.D. Cal. Nov. 25, 2014) ...........................................24
18   *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
       875 F.3d 1369 (Fed. Cir. 2017) .....................................................................................10, 14
19   *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
20     No. 08-CV-335-IEG-NLS, 2013 WL 4068833 (S.D. Cal. Aug. 12, 2013) ...........................13
21   *Purewick Corp. v. Sage Prod., LLC*,
       No. CV 19-1508-(MN), 2023 WL 2734418 (D. Del. Mar. 31, 2023) ...................................17
22   *Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*,
       No. CV 11-484-RGA, 2014 WL 4695765 (D. Del. Sept. 12, 2014) ........................................8
23
24   *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
       920 F.3d 777 (Fed. Cir. 2019) .............................................................................................15
25   *TiVo Inc. v. Echostar Corp.*,
       646 F.3d 869 (Fed. Cir. 2011) .............................................................................................23
26   *Transbay Auto Serv., Inc. v. Chevron U.S.A., Inc.*,
       No. C 09-04932 SI, 2013 WL 843036 (N.D. Cal. Mar. 6, 2013) .........................................24
27
28   *TransPerfect Glob., Inc. v. MotionPoint Corp.*,
       No. C 10-2590 CW, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) ................................16, 25

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
    329 F. Supp. 3d 1070 (N.D. Cal. 2018) ................................................................................. 12

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc*.,
    809 F. App'x 965 (Fed. Cir. 2020) ........................................................................................ 22

*VirnetX Inc. v. Apple Inc.*,
    No. 6:12-CV-00855-RWS, 2018 WL 10048706 (E.D. Tex. Aug. 30, 2018) ........................... 6

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ................................................................................................. 18

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ............................................................................................. 11

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018) ....................................................................................... 17, 20

**<u>Statutes</u>**

28 U.S.C. § 1961 ............................................................................................................... 24, 25

**<u>Other Authorities</u>**

FRE 602, and (3) ....................................................................................................................... 1

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES

1  I.     **INTRODUCTION**

2       The Court should deny Sonos's request for a permanent injunction.  Sonos admitted at trial

3  that any alleged harm from infringement of the '885 patent is readily compensable by monetary

4  damages and, indeed, even now seeks an enhanced ongoing royalty rate and supplemental damages

5  while alleging irreparable, non-compensable harm.  There is simply no evidence that Sonos has

6  suffered irreparable harm from Google's infringement.   Although Sonos claims to have invented

7  the claimed speaker grouping functionality in 2005, Sonos waited ***fifteen years*** to implement the

8  claimed functionality in its own products.  After Google introduced the accused functionality in its

9  own products in 2015, Sonos waited an additional ***four*** years to amend the specification of the '885

10 patent, incorporate new matter and draft claims to cover Google's products.  And when the '885

11 patent issued in 2020, Sonos added the patent to this case without moving for preliminary injunctive

12 relief.  Sonos's inexcusable delay, combined with its failure to allege irreparable harm at any point

13 before now, eviscerates Sonos's argument.

14      Sonos alleges irreparable harm based on lost sales and market share, but it has completely

15 failed to carry its burden to prove or even identify any lost sales.  Sonos does not even presented

16 market share data to support its claim.  Instead, it relies on a self-serving declaration from its general

17 counsel, Alaina Kwasizur, who is biased and not at all qualified to speak to these complex issues.[1]

18      Sonos also has not established any causal nexus between Google's infringement and Sonos's

19 alleged harms.  The niche speaker grouping feature at issue does not drive demand for the accused

20 products, and Sonos's evidence of the alleged importance of the accused functionality is focused on

21 speaker grouping generally and not the narrow invention claimed in the '885 patent: creating

22 overlapping zone scenes while remaining in standalone mode.

23      Sonos fares no better with respect to the other *eBay* factors.  Money damages can adequately

24 compensate it, as shown by Sonos's request for a royalty award, the jury's award of one, and Sonos's

25 prior licenses and licensing offer to Google.  The balance of hardships favors Google, particularly

26 given the scope of Sonos's broad, vaguely-worded proposed injunction which would apply not just

27

28 [1]  Google is separately moving to strike Ms. Kwasizur's declaration because it (1) is based on hearsay, (2) lacks personal knowledge as required by FRE 602, and (3) is improper expert testimony.

1   to the accused products but also "substantially similar" products and activities that plainly do not

2   constitute patent infringement.  The public interest also favors Google.

3          Sonos's requests for additional damages in the form of enhanced ongoing royalties,

4   supplemental damages, and pre- and post-judgment interest are premature.  Pending motions may

5   nullify the jury's verdict and moot Sonos's requests.  For every category of additional damages that

6   Sonos seeks, the Court has discretion to delay ruling on Sonos's requests, and it should do so.

7          Sonos's requests for additional damages are also unwarranted.  Sonos seeks an ongoing

8   royalty that is ***higher*** than the one the jury awarded because "the '885 patent has been found to be

9   valid and infringed."  Mot. 11.  But this alone does not compel enhancement.  The Court had already

10  determined infringement before trial on the older designs, and both parties' damages experts

11  assumed the '885 patent was valid in rendering their opinions.  Sonos presents no new evidence that

12  warrants enhancing the jury's rate, which already overcompensates Sonos and was unsupported by

13  the evidence.  Sonos also seeks "supplemental damages" for products sold ***before*** the damages

14  period based on Google's implementation of its redesign.  This request has no basis in law.

15  **II.    SONOS IS NOT ENTITLED TO A PERMANENT INJUNCTION**

16         "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter

17  of course."  *Apple, Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) ("*Apple III*")

18  (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010)).  "[A] plaintiff

19  seeking a permanent injunction 'must demonstrate: (1) that it has suffered an irreparable injury; (2)

20  that remedies available at law, such as monetary damages, are inadequate to compensate for that

21  injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

22  in equity is warranted; and (4) that the public interest would not be disserved by a permanent

23  injunction.'"  *Id.* (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

24         **A.    Sonos Cannot Demonstrate Irreparable Injury**

25         Under *eBay*, there is no presumption of irreparable harm from patent infringement.  *eBay*,

26  547 U.S. at 391-392.  To prove irreparable injury, Sonos must show (1) "that absent an injunction,

27  it will suffer irreparable harm," and (2) "that a sufficiently strong causal nexus relates the alleged

28  harm to the alleged infringement."  *Apple III*, 735 F.3d at 1359 (quoting *Apple Inc. v. Samsung*

*Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*")).  Sonos falls short on both prongs.

### 1.  Sonos Has Not Identified Any Irreparable Harm

Sonos contends that it has lost sales and market share.  *See* Mot. at 2-3.[2]  Its assertion is based on the unsupported arguments that: (1) customers are "locked in" when they purchase Google devices such that Sonos loses future sales; and (2) Google and Sonos are direct competitors.  Sonos has not proven either one, nor has it shown that money damages would be inadequate to compensate for this alleged harm.

#### (a)    *Sonos Has Not Presented Any Evidence of Lost Sales or Market Share Via A "Lock-In Effect"*

Sonos has not presented any evidence that it has lost sales or market share to Google due to alleged "lock-in."  To begin, Sonos does not provide ***any*** evidence regarding lost sales or market share—circumstantial or otherwise—let alone evidence of harm occurring ***as a result of*** Google's infringement.  The ***only*** evidence Sonos cites is the self-serving declaration of its general counsel, whose declaration consists of nothing more than conclusory and unsupported statements.  Ms. Kwasizur claims that: "[c]ustomers sometimes choose Google over Sonos"; when a customer purchases a Google speaker, "it is more likely that subsequent smart speaker purchases from that same consumer would be of Google smart speaker devices, as opposed to . . . Sonos"; and "if Sonos loses out on an initial sale of a speaker product to a new household, then Sonos likely loses out on the sale of at least three devices."  Dkt. 821 ¶¶ 13-14.  But Ms. Kwasizur is not an economic or market expert and does not have the qualifications to make these kinds of claims.  And the economic experts that Sonos did hire failed to identify any lost profits.[3]  This failure of proof, alone, should end the inquiry.  *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1343 (Fed. Cir. 2017) (affirming finding of no irreparable harm and denial of permanent injunction because "Nichia did not prove that it had suffered even a single lost sale from Everlight's infringement"); *GuideTech, Inc. v. Brilliant Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 4182340, at *7 (N.D. Cal. Aug. 22,

---

[2]    Sonos also alleges reputational harm in discussing the adequacy of remedies available at law. Google addresses that argument in connection with that element.

[3]    Sonos originally asserted a lost profits theory of damages, but was unable to identify any such damages and ultimately dropped this theory.  *See* Dkt. 591-10; Dkt. 591-9 at 16:20-24, 162:25-163:18.

1    2014) ("GuideTech's arguments . . . regard[ing] [lost sales] are speculative because they offer little

2    more than attorney argument in support.").

3    Sonos also alleges that "Google capitalizes on this 'lock-in' effect by pricing its products at

4    a loss." Mot. 1; Dkt. 821 ¶¶ 15-17. Again, this is baseless speculation. Ms. Kwasizur has no basis

5    to know how Google "seeks to monetize [its] customers." *Id.* ¶ 15. Nor does Eddie Lazarus, another

6    Sonos lawyer whose unsupported hearsay statements Ms. Kwasizur purports to incorporate into her

7    declaration. *Id.* ¶ 17. Sonos also did not adduce any evidence at trial—besides its own expert's *ipse*

8    *dixit*, Trial Tr. (Malackowski) 1120:10-14, which was itself speculation—that Google prices the

9    accused products at a loss.[4] At best, Google's financial records demonstrate that it loses money on

10   sales of some accused products. Ex. 2 ¶ 255. But this does not show that Google intentionally

11   prices products in a way to lose money no matter the sales volume. To put this argument to rest

12   once and for all: Google does not price the accused products below cost. Declaration of Chris Chan

13   ("Chan Decl.") ¶ 6.

14   Sonos's "lock-in effect" argument is particularly dubious in light of its own significant delay

15   in implementing the functionality it claims is so important. If Sonos had actually been concerned

16   about irreparable harm, it would not have waited *fifteen years* before implementing saved

17   overlapping speaker groups (while releasing "[s]omewhere between dozens and hundreds" of other

18   features during that timeframe, including voice support in Polish and French). Trial Tr.

19   (Lambourne) at 468:25-469:7, 472:2-5; Trial Tr. (Millington) at 392:20-395:1. When Google

20   introduced the claimed feature to the market in 2015 ((Trial Tr. (MacKay) at 1237:24-1238:3),

21   Sonos had not even filed the application that led to the '885 patent. TX0003 at 3 (filed April 12,

22   2019). Instead of pursuing its patent claims diligently, Sonos waited an additional *four* years to

23   amend the specification of the '885 patent, incorporate new matter, and draft claims to cover

24   Google's products. *See* Dkts. 712 at 1; 729 at 5, 7-10; 785 at 4, 11, 14; 788 at 1; 819 at 1-6. And

25

26   _____

27   [4] Google moved *in limine* to preclude Sonos from advancing this "loss leader" argument at trial because it was based on speculation. Dkt. 619 at 1-4. The Court denied Google's motion, allowing Sonos to introduce evidence to support the argument if it had any. *See* PTC Hr'g Tr. at 67:11-67:14.

28   Sonos did not introduce any such evidence that Google employs "loss leader" pricing at trial, nor does it submit any with its motion.

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES

1    when the '885 patent issued in 2020, Sonos added it to this case **without seeking preliminary**

2    **injunctive relief**.  If Sonos actually believed it was losing sales as a result of a lock-in effect, it could

3    and would have introduced the claimed feature and sought injunctive relief years earlier.

4        Even assuming *arguendo* that Sonos has lost sales or market share, Sonos still has not

5    established that **Google** caused any such losses.  Sonos's own cited evidence confirms there are

6    numerous other companies in the smart speaker market, such as Amazon, Apple, and Bose.  *See*

7    TX158 at 18.  Amazon has the "'dominant share' of the U.S. market for smart speakers"—

8    maintaining a "big lead over Google." Ex. 1.  To the extent Sonos lost any sales or market share at

9    all, Sonos's losses are likely due to other companies.  *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp*.,

10   798 F. Supp. 2d 541, 563 (D. Del. 2011) ("[T]there is a lack of specific evidence tying Whirlpool's

11   lost sales to LG's infringement in the multi-competitor refrigerator market. . . . A portion of

12   Whirlpool's lost sales may be due to customers' desire for other features, or sales lost to competitors

13   other than LG.").  Sonos's alleged harm due to loss of sales **to Google** fails for this reason alone.

14           (b)    *There Is At Most Only Limited Evidence of Direct Competition*

15       Sonos's motion and Ms. Kwasizur's declaration attempt to paint a picture of intense "head

16   to head" competition between the parties.  Mot. at 4; Dkt. 821 ¶¶ 15-17.  Neither the trial record nor

17   the evidence Sonos submits with its motion supports this characterization.

18       Google and Sonos are not direct competitors with respect to a majority of the accused

19   products.  Google sells its products at lower price points and aims to attract customers interested in

20   the intelligence of the Google Assistant to control their smart homes (Trial Tr. (Chan) at 1516:10-

21   13), whereas Sonos prices its premium products at higher price points and aims to attract audiophiles

22   who desire high-quality audio.  Chan Decl. ¶ 9; Exs. 3-7; Ex. 2 ¶¶ 111, 656-660.  As Ms. Kwasizur

23   admitted at trial, Sonos does not "really sell products that are sort of the 50-dollar range, and so we

24   don't view [sellers of such products] as competing much with us."  Trial Tr. (Kwasizur) at 1067:8-

25   11.  Yet many of the accused products—including the Chromecast, Chromecast Audio, Chromecast

26   with Google TV, Google Mini, and Nest Mini devices—are sold for $50 or less.  Trial Tr. (Chan) at

27   1516:10-15; Dkt. 768-1 at 200-203; Ex. 2 at Exhibits. 14.0-14.4.  In fact, during the damages period

28   for the '885 patent, **79%** of the accused products sold are in the "50-dollar range" (or less) where

Sonos admits it does not compete. Declaration of Jocelyn Ma ("Ma Decl.") ¶ 3. In addition, **61%** of those accused products were Chromecast devices that plug into televisions and are primarily used to stream video, not audio—a product category in which Sonos offers no equivalent product. *Id*. ¶ 4. A significant portion of the remainder, 43.5%, is made up of smart speaker products with display screens such as Google's Home Hub, Nest Hub and Nest Hub Max, or wifi extenders with an integrated speaker such as Google's Nest Wifi Point. *Id.* ¶ 5. Sonos does not offer any competitive products in these categories either. Chan Decl. ¶ 10. Thus, Sonos's broad-strokes statements regarding competition are, at a minimum, highly dubious and should carry little weight. *See VirnetX Inc. v. Apple Inc.*, No. 6:12-CV-00855-RWS, 2018 WL 10048706, at *24 (E.D. Tex. Aug. 30, 2018), *aff'd in part, rev'd in part on other grounds*, 792 F. App'x 796 (Fed. Cir. 2019) (denying injunction where parties did not directly compete because "[f]or the majority of the [products compatible with plaintiffs' software], Apple's products present no competition at all"). [5]

Google has also stopped making many of the accused products—including the Google Home and Google Home Max, which are a key part of Sonos's arguments regarding competition (Mot. 3)—as well as the Google Home Mini, Google Home Hub, Chromecast Ultra, and Chromecast Audio. Chan Decl, ¶ 5. If anything, the competitive landscape for Sonos has improved over the course of this litigation because Google is no longer selling the Google Home Max, which was its sole foray into the higher-end speaker market. *Id.*; Trial Tr. (Chan) 1516:3-15 ("[The Google Home Max] was discontinued shortly after launching because it generally wasn't successful. We learned that pretty quickly after one holiday cycle.").

## 2. Sonos Has Not Established A Causal Nexus Between Any Alleged Harm and Google's Infringement

Sonos has also failed to connect any alleged harm (*e.g.*, purported lost sales and market share) to Google's infringement. Accordingly, Sonos cannot meet the second requirement that there

---

[5] None of the evidence Sonos references warrants a different conclusion. The conjoint study Sonos cites does not show "head to head" competition between Google and Sonos. Mot. 3 (citing TX158). The study compares speakers of many brands, and in fact concludes that "Brand is a strong influencer on choice, and Google does well – but Amazon owns this space." *Id.* at 3. And Sonos offers no persuasive evidence that the parties' products are placed next to one another in brick and mortar stores. Mot. 3. The placement of products is likely variable between stores and locations.

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES

1    be a "sufficiently strong casual nexus" between infringement claim 1 of the '885 patent and the

2    alleged "harm" that allegedly flows therefrom.  *Apple III*, 735 F.3d at 1360.  While the patented

3    feature need not be the "***sole reason*** for consumers' purchases," Sonos must show "that the

4    infringing feature drives consumer demand for the accused product" given its allegation of lost sales

5    and market share.  *Id.* at 1364 (cleaned up).  Sonos's showing falls far short.

6         Sonos begins its causal nexus argument by attempting to recast the '885 patent as covering

7    "grouping" or "static grouping" generally.  Mot. 4-5 (citing evidence regarding the alleged

8    importance of grouping speakers or creating static speaker groups, including testimony from Mr.

9    MacKay and Mr. Chan).  But Sonos's patent covers only one narrow way to implement static

10   grouping involving at least two overlapping speaker groups.  Trial Tr. 662:2-7; Dkt. 786-1 at 86-89;

11   Trial Tr. (Millington) 322:7-10 (admitting that the Sonos 2005 prior art system was capable of

12   grouping speakers).[6]  The causal nexus inquiry must focus on "the importance of the ***claimed***

13   ***invention*** in the context of the accused product"—not just "the importance, in general, of features

14   of the same type as the claimed invention."  *Apple III*, 735 F.3d at 1364 (emphasis added).  For

15   example, Sonos refers to a survey concluding that the ability to "group speakers to hear music in

16   multiple rooms at the same time" is barely over the threshold for an "'actually' appealing" feature.

17   TX158 at 36.  But this survey did not study the importance of static grouping specifically, let alone

18   the importance of overlapping static speaker groups implemented in the manner Sonos claimed.[7]  If

19   anything, the survey shows that there are at least five features consumers find ***more*** appealing than

20   the ability to group speakers.  TX158 at 36 (discussing voice control, surround sound, working with

21   other smart home devices, reducing loud sounds and stereo sound).

22        Sonos next argues that ***Sonos*** "advertised and promoted its 'zone scenes' technology" and

23   "received widespread praise for zone scenes."  Mot. 5; TX6780; Dkt. 820-2 (quoting articles

24   regarding the general "ability to save 'room groups," "save a group of speakers as a preset, and

25

26   _____

     [6]   And as Mr. Chan explained, there are at least two other ways to group Google speakers that do
27   not involve creation of a static group: dynamically and by creating a stereo pair.  Trial Tr. (Chan) at
     1519:1-1520:11.
28   [7]   Nor is there any evidence on what the term "actually appealing" means or whether it relates to
     purchasing decisions, let alone driving demand for a product.

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES

"link[ing] speakers together into pre-set groups").  But the key inquiry is the importance of the claimed invention in the context of ***the accused product***.  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. C 09-5235 MMC, 2015 WL 604582, at *3 (N.D. Cal. Feb. 12, 2015) (citing *Apple III*, 735 F.3d at 1364) (finding no causal nexus because evidence was directed at the patentee's products, when "[c]ustomers may buy a patentee's product because it contains a patented feature[] but buy the defendant's infringing product for entirely different reasons").  This is particularly true given that Sonos did not allege copying and Google introduced evidence of its own independent development.  Trial Tr. (MacKay) 1236:15-1241:16 1272:23-1274:2,

Moreover, even if information about Sonos's feature were relevant, news articles discussing grouping in general are insufficient to establish causal nexus.  *Id.* at 1377 (an article that "simply explains and praises Android's QSB feature but says nothing about consumer demand" was insufficient to establish causal nexus).  Indeed, the articles Sonos cites relate to speaker groups generally, not the specific implementation claimed by Sonos.  *Cf.* Trial Tr. 1677:6-1678:25 (The Court: "The praise is supposed to be of the invention, and here the invention requires three or more and overlapping. This does not praise that.  It praises something that may be in the same ballpark but it's a group of speakers as a preset.").  And again, the alleged value and importance of the claimed technology is belied by the fact that Sonos waited fifteen years to implement the feature and four more years to seek patent protection.

Sonos also argues that Google advertises the ability to create speaker groups.  Mot. 5.  But the evidence Sonos cites as "advertising" is limited to help pages and blog posts (Mot. at 5), some of which are not even directed to accused products.  TX6353 (regarding the non-accused "stream transfer" functionality).  There is no evidence that Google promotes the ability to create speaker groups generally, let alone that it promotes multiple overlapping speaker groups in the manner required by the claims, nor would such evidence be proof of consumer demand anyway.  *See Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*, No. CV 11-484-RGA, 2014 WL 4695765, at *12 (D. Del. Sept. 12, 2014) (advertisements that "promot[ed] infringing features copied or derived from Silver Peak" were insufficient to demonstrate causal nexus because they "do nothing to prove that customer demand is driven by the patented functionality of the '736 and '921 patents").

1    Sonos also incorrectly claims that Mr. Chan's testimony regarding "all my speakers" is proof

2    of consumer demand for the accused feature.  Mot. 5.  It is not.  Mr. Chan merely explained that,

3    out of the small percentage of people who use static grouping at all (less than 5%), most create only

4    one single group covering every speaker they own.  Trial Tr. (Chan) at 1522:19-1523:1, 1523:6-10;

5    Chan Decl. ¶ 3.  He did not testify, and Sonos provides no evidence, that users are routinely creating

6    an "all my speakers" group ***and*** additional subgroups of fewer speakers, or that such functionality

7    "cause[s] consumers to make their purchasing decisions."  *Apple III*, 735 F.3d at 1364.

8    Sonos also cites testimony from Mr. Shekel regarding the Cast for Audio feature—a program

9    "meant to bring the Google Cast technology . . . to . . . speakers by third-party speaker

10   manufacturers" that is not accused.  Ex. 8 at 29:12-18.  This testimony also does not establish any

11   causal connection.  Mr. Shekel was expressing his own personal opinion regarding the user

12   experience if speakers were limited to one group—an opinion that was subsequently proved

13   incorrect, as it is contrary to the actual usage metrics evidence.

14   Finally, Sonos suggests that Google's design change demonstrates that it "recognizes" the

15   accused feature as "important to consumers."  Mot. 6.  It does not.  Google had a good faith belief

16   that its first design change based on the actual claim language avoided infringement.  That Google

17   did not immediately remove the accused feature to avoid Sonos's patent is not conclusive proof that

18   the feature is important.  It is also not proof that the feature drives demand for Google's products.

19   There is simply no evidence that the ability to save overlapping speaker groups in the manner

20   claimed by Sonos drives demand for the accused products.  There is, however, ample evidence that

21   other features drive demand instead.  As Mr. Chan testified, a primary reason consumers seek out

22   Google's smart speakers is "for the Google Assistant," Google's voice-activated assistant.  Trial Tr.

23   (Chan) at 1516:10-13.  In addition, Mr. Bakewell reviewed over 60 Google and Sonos surveys and

24   ***did not find a single reference*** to "overlapping groups of at least three speakers . . . as something

25   that was attractive or valuable"; instead, "[w]hat these companies are interested in and what drives

26   sales are other things that are provided in these speakers" such as design, sound quality and support

27   for multiple voice assistants.  Trial Tr. (Bakewell) 1612:9-23; Ex. 2 ¶¶ 257-265, Exhibits 13.0 and

28   13.1.  Even Ms. Kwasizur admits that "[c]ustomers sometimes chose Google over Sonos[] for

-9-                                    Case No. 3:20-cv-06754-WHA

1   variety of reasons," including "price, integration with other Google smarthome devices, and brand

2   familiarity."  Dkt. 821 ¶ 11.  This evidence precludes a finding of irreparable harm, as Sonos fails

3   to demonstrate that any alleged lost sales to Google were lost due to the accused feature.  *See, e.g.*,

4   *Genband US LLC v. Metaswitch Networks Corp*., 861 F.3d 1378, 1384 (Fed. Cir. 2017) ("Where

5   the patentee relies on lost sales to show irreparable injury, it matters what reasons various buyers

6   have for making the purchases lost to the patentee."); *Presidio Components, Inc. v. Am. Tech.*

7   *Ceramics Corp*., 875 F.3d 1369, 1383 (Fed. Cir. 2017) (internal quotations and citation omitted)

8   ("Where irreparable injury is based on lost sales, a likelihood of irreparable harm cannot be shown

9   if sales would be lost regardless of the infringing conduct."); *Apple, Inc. v. Samsung Elecs. Co.*, 678

10  F.3d 1314, 1324-25 ("A mere showing that Apple might lose some insubstantial market share as a

11  result of Samsung's infringement is not enough.").

12      In complex, multi-feature products like the accused products, it is not enough to show that

13  the claimed functionality is useful or even important.  *Apple III*, 735 F.3d at 1366-68.  A patentee

14  must demonstrate that the claimed functionality drives demand for the accused product.  Here, there

15  is no evidence consumers focus on the minor overlapping speaker grouping feature at issue in

16  making their purchasing decisions, and Sonos's showing is a far cry from the type of evidence the

17  Federal Circuit has found sufficient.  *See e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 644

18  (Fed. Cir. 2015) (finding causal nexus based in part on a study that "established that consumers

19  would not have purchased a Samsung phone if it lacked the patented features, that they valued these

20  features, and that they were willing to pay considerably more for a phone that contained these

21  features").

22      **B.      Monetary Damages Are Sufficient to Compensate Sonos**

23      "This factor requires a patentee to demonstrate that 'remedies available at law, such as

24  monetary damages, are inadequate to compensate' the patentee for the irreparable harm it has

25  suffered."  *Apple III*, 735 F.3d at 1368 (citation omitted).  Sonos, as the moving party, "bears the

26  burden of providing '[s]ome evidence and reasoned analysis' for the inadequacy of monetary

27  damages to compensate its alleged harms."  *Apple Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838,

28  902 (N.D. Cal. 2012) (citing *Nutrition 21 v. U.S.*, 930 F.2d 867, 872 (Fed. Cir. 1991)).  A jury's

1   damages award tends to show that harm is not irreparable.  *See Innogenetics, N.V. v. Abbott Labs.*,

2   512 F.3d 1363, 1380-81 (Fed. Cir. 2008) (no irreparable harm where jury awarded damages as

3   requested by patentee); *Conceptus, Inc. v. Hologic, Inc.*, No. 09-2280, 2012 WL 44064 at * 2 (N.D.

4   Cal. Jan. 9, 2012) (jury damages award shows that damages are reparable).

5           There cannot be any serious dispute that monetary damages are sufficient to compensate

6   Sonos.  Sonos offered to license the '885 patent to Google before litigation began.  *See* TX6260 at

7   1-2, 4 (term sheet "summariz[ing] the principal terms of a proposed patent license and business

8   engagement agreement" that would provide Google with a license to Sonos "utility patents" like the

9   '885 patent that issued during the five-year license term).  Sonos also provided competitors such as

10  Denon, Lenbrook, and Legrand with portfolio-wide licenses that encompassed the '885 patent.  *See*

11  Trial Tr. (Kwasizur) 1015:6-11, 1016:14-23, 1017:4-8, 1017:21-24, 1050:9-19; TX6631 at 2, 9;

12  TX6632 at 2, 9; TX6721 at 1-2, 6.  Sonos's willingness to license the '885 patent to Google and

13  others "strongly suggest[s] that money damages are adequate to fully compensate [Sonos] for any

14  infringement."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1332 (Fed. Cir. 2014), *overruled on*

15  *other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *ActiveVideo*

16  *Networks v. Verizon Communications*, 694 F.3d 1312, 1340 (Fed. Cir. 2012) (finding "that money

17  damages can adequately compensate [patent owner] for any [] infringement" in part because the

18  record showed "extensive licensing, licensing efforts, [and] solicitation of the defendant over a long

19  period of time preceding and during litigation"); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328

20  (Fed. Cir. 2008) ("the fact that a patentee has previously chosen to license the patent may indicate

21  that a reasonable royalty does compensate for an infringement").

22          Sonos reiterates its unsubstantiated "loss leader" argument to suggest that monetary damages

23  are inadequate. Mot. at 6.  Again, this is pure speculation.  Sonos has not established that Google

24  prices the accused products at a loss.  *Supra* § II.A.1(a).  Sonos also argues that monetary damages

25  are inadequate because Google generates revenue from other sources. Mot. 6 (arguing that Google

26  uses the accused products to "deliver advertisements," "collect[] . . . data," and "capture a user base

27  for *other* Google products").  This is speculation as well.  Any advertisements would only be the

28  result of other, unaccused applications that a user chooses to use—Google does not "deliver"

additional "advertisements" on its speaker products.  Chan Decl. ¶ 7.  Google also does not sell customer data that it collects from speakers.  *Id.* ¶ 8.  Even if Sonos could prove that it had suffered these alleged harms, they are the type of harms that courts find to be compensable by money damages.  *See, e.g.*, *L.A. Mem. Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1202 (9th Cir. 1980) ("monetary injury [from lost revenues] is not normally considered irreparable" and "lost revenues would be compensable by a damage award"); *Essence Imaging Inc. v. Icing Images LLC*, No. 2:13–cv–5449–CAS, 2014 WL 1384028, *3 (C.D. Cal Apr. 9, 2014) (denying preliminary injunction, finding that lost sales are the "type of injury [that] would not constitute irreparable harm because it is compensable in money damages").

Sonos alleges that Google's infringement has harmed Sonos's "reputation as an innovator." Mot. 7.  As an initial matter, there is no threat of such harm because Sonos did not establish a reputation as an "innovator" in saved speaker grouping technology in the first place.  Sonos did not implement the feature until 2020, multiple years after Google and Amazon.  Ex. 2 ¶ 358; Ex. 1. Sonos relies on statements from its general counsel who asserts that "[w]hen other companies use Sonos's proprietary technology, especially without permission, it damages Sonos's reputation." Dkt. 821 ¶ 22.  But Ms. Kwasizur cites ***no*** evidence of reputational harm.  *Id.*  She also does not tie Sonos's alleged reputational harm to Google's infringement.  *Id.*  This Court and others have rejected similar attempts to rely on attorney argument or pure speculation.  *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 983-84 (N.D. Cal. 2009) (rejecting reputational harm argument where patentee did "not introduce any evidence from industry participants . . . showing that infringement has caused them to think less of [the patentee].") (cleaned up); *Am. Calcar, Inc. v. Am. Honda Motor Co*., No. 06CV2433 DMS (CAB), 2008 WL 11337489, at *1 (S.D. Cal. Nov. 18, 2008) (rejecting patentee's argument that infringement causes "harm to its reputation" as "not supported by any evidence and is purely speculative").[8]  There is simply no reasoned basis to believe

---

[8]    *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) is inapposite.  There, "the patentee never licensed and intentionally chose not to license the infringed patents in order to retain market exclusivity." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 329 F. Supp. 3d 1070, 1121 (N.D. Cal. 2018).  Here, Sonos has licensed the asserted patents to at least three other entities and cannot assert it would suffer reputational loss from lack of exclusivity.

1    that consumers view Sonos's speakers as less valuable merely because Google's speakers can also

2    be put into saved overlapping groups, particularly when that functionality is barely used and when

3    Google first introduced that feature years prior to Sonos.  Trial Tr. (Chan) at 1522:3-1523:1; *id.*

4    (Bakewell) at 1560:11-1561:5.

5          Sonos's "ecosystem" argument fares no better.  There is no evidence that Sonos lost **any**

6    sales to Google due to the alleged infringement.  Sonos's assertion that monetary relief is inadequate

7    because certain "customers . . . bought Google's infringing products over Sonos's and joined the

8    Google ecosystem instead of the Sonos ecosystem" is merely further speculation.  Mot. at 7;

9    *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335-IEG-NLS, 2013 WL

10   4068833, at *6 (S.D. Cal. Aug. 12, 2013) (finding that this factor did not favor patentee in part

11   because anticipated lost sales were "just a hypothetical").

12         Sonos's suggestion that the Court needs to grant an injunction to punish Google for "pay[ing]

13   to avoid infringement" is inappropriate.  Mot. at 6.  The purpose of injunctive relief is not to "punish"

14   but rather to "prospectively relieve future harm."  *Hynix*, 609 F. Supp. 2d at 968 (holding that

15   injunctions "do not punish" but rather prospectively relieve future harm).  Because Sonos fails to

16   establish that monetary remedies are insufficient, this factor favors Google.

17         **C.    The Balance of Hardships Favors Google**

18         This factor "assesses the relative effect of granting or denying an injunction on the parties."

19   *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).  "An injunction that imposes

20   greater costs on the defendant than it confers benefits on the plaintiff reduces net social welfare."

21   *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 922 (N.D. Ill. 2012).

22         Sonos will not suffer any hardship in the absence of an injunction.  As discussed above,

23   Sonos has not established irreparable harm that cannot be compensated by monetary damages.

24   Sonos complains about being forced to "compete against its own patented invention."  Mot. 8.  But

25   as discussed above, Sonos has not proved that it competes with Google for the vast majority of the

26   accused products.  To the contrary, the evidence shows that the vast majority of such products do

27   **not** compete with Sonos.  *Supra* § II.A.1(b).  Again, an injunction may not be used as a punishment.

28   *Hynix*, 609 F. Supp. 2d at 968.  Nor may injunctive relief be used to thwart competition beyond the

1    specific innovations protected by the patents at issue. *Apple II,* 695 F.3d at 1375.

2        By contrast, Google will suffer significant hardship if the Court imposes an injunction.

3    Sonos's proposed injunction is extremely overbroad, extending to not just the minor feature at issue

4    but also the accused speaker products as a whole.[9]  The proposed injunction also extends well

5    beyond the evidence presented at trial and the jury's findings.  Although Sonos only presented a

6    direct infringement theory at trial, the proposed injunction attempts to enjoin indirect infringement

7    as well.  Dkt. 820-5 at 1 (prohibiting "inducing or contributing to" infringement).  The proposed

8    injunction further overreaches by attempting to prohibit Google from activities that do not even

9    arguably constitute patent infringement, such as "negotiating . . . agreements relating to the Enjoined

10   Products" and "preparing documentation regarding the operation, use, or intended use of any

11   Enjoined Products."  Dkt. 820-5 at 1.  Worse, it would prevent Google from developing new

12   products "substantially similar to" the accused products. *Id.* at 2.  This vague language is overbroad

13   and practically guarantees future disputes. *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263,

14   1272 (Fed. Cir. 2007) (finding injunction overbroad and modifying it "to delete the language 'any

15   products that infringe the '712 patent, including . . . .'").

16       **D.    An Injunction Would Not Be In The Public Interest**

17       The public interest factor requires Sonos to demonstrate that "the public interest would not

18   be disserved by a permanent injunction." *eBay*, 547 U.S. at 391.  The only public interest that Sonos

19   cites—preserving rights of patent holders—cannot alone justify injunctive relief because such

20   interests "are always present in a patent case." *Presidio*, 723 F. Supp. 2d at 1339.

21       Moreover, the public has an interest in ***avoiding*** the extremely broad injunction that Sonos

22   seeks.  The accused products have substantial non-infringing uses, including streaming music and

23   video, controlling smart home devices, facilitating video calling, providing access to the Google

24   Assistant, displaying real-time weather and upcoming calendar events, and setting timers and

25   alarms. *See* Trial Tr. (Chan) at 1514:23-1515:4, 1516:24-25, 1517:19-20, 1515:22-1516:2.  In

26

27   [9]  This case is unlike *Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011), where
     the infringing products were simple, interchangeable wiper blades.  Google's products are complex
28   and multi-featured, and there is no evidence that Sonos's products are a direct substitute.

addition, Sonos's proposed injunction would enjoin consumers who only intend to purchase a single Google device and use it without creating any speaker groups. Dkt. 820-5. The Federal Circuit has found that the public would be disserved by an injunction that applied to "entire products" where the functionality at issue merely covered "limited non-core features." *Apple III*, 735 F.3d at 1372; *see also eBay*, 547 U.S. at 396–97 (Kennedy, J., concurring) ("When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations . . . an injunction may not serve the public interest."). The vaguely-worded injunction that Sonos requests would also impose an administrative burden on this Court, for there is little doubt that Sonos will aggressively seek to extend it to non-accused products. *Motorola*, 869 F. Supp. 2d at 921 (denying motion for permanent injunction in part based on "the cost to the judiciary as well as to the parties of administering an injunction").

An injunction would be disruptive for third-party suppliers, retailers and carriers that already have the accused products in stock, and for this reason courts often impose sunset provisions far longer than the 14 days that Sonos suggests here. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc*., 920 F.3d 777, 793 (Fed. Cir. 2019) (nine-month sunset was sufficient time for defendant "to remove the infringing product from the market without causing significant inconvenience to OEMs and consumers"); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1339 (Fed. Cir. 2013) ("The eighteen months allowed for time to remove the infringing product from the market without causing significant downstream disturbance for OEMs and consumers.").

It would also be disruptive for consumers. *Motorola*, 869 F. Supp. 2d at 921 (in analyzing the public interest factor, courts should consider "the harm that an injunction might cause to consumers who can no longer buy preferred products because their sales have been enjoined"). Ms. Kwasizur claims that Sonos can meet the demand for speaker products if Google's products were enjoined (Dkt. 821 ¶¶ 23-24), but the proposed injunction would cover several product categories where **Sonos does not offer any comparable product at all**. *Supra* § II.A.1(b). Furthermore, Sonos's historic inability to meet demand for its own products casts serious doubt on these statements. *See* Exs. 9, 10; Sonos CFO noting on an earnings call that "we have been so short on some components that we have had manufacturing shutdowns"); Ex. 11 (Sonos's Malaysian

-15-

1    manufacturing plant was forced "to shut down temporarily because of pandemic-related restrictions

2    and . . . challenges in hiring workers").  Ms. Kwasizur dismisses these issues as limited to "early in

3    the COVID-19 pandemic" (Dkt. 821 ¶ 23), but Sonos cited "supply chain issues" as one reason

4    behind its price increases as recently as this year.  Exs. 12, 13.  The public interest will not be served

5    by limiting consumer access to speaker products under these circumstances.

      **E.    Requiring Google to Provide Notice of Infringement and the Permanent
          Injunction Would be Unjustified**

7        Sonos requests that Google provide notice of infringement and any injunction not only to

8    its "parents, subsidiaries, successors, assigns, officers, agents, servants, employees, attorneys, and

9    persons or entities in active concert or participation with them (including any affiliated entities),"

10   but also its "manufacturers, distributors, retailers, licensees."  Mot. 20.  Sonos contends that this

11   requirement is "standard," yet provides ***no authority*** for that assertion.  *Id.*  In fact, the request is

12   unnecessary, improperly punitive, and a clear attempt by Sonos to "leverage its patent for

13   competitive gain beyond that which the inventive contribution and value of the patent warrant."

14   *Apple II*, 695 F.3d at 1374–75.  For example, the Court ***dismissed*** Sonos's indirect infringement

15   arguments for the '885 patent before trial.  Dkt. 556 at 30-31.  Yet Sonos's proposed notice would

16   require Google to notify third parties that are relevant to an indirect theory of infringement such as

17   "consumers," "distributors," "retailers" and "licensees."  This request is overbroad.  *See Asetek*

18   *Danmark A/S v. CMI USA, Inc.*, No. 13-CV-00457-JST, 2015 WL 5568360, at *19 (N.D. Cal. Sept.

19   22, 2015), *aff'd in part, vacated in part*, 852 F.3d 1352 (Fed. Cir. 2017) (declining to require notice

20   to manufacturers because there was no claim or verdict of induced infringement at trial).[10]

21

22   ## III.    SONOS'S REQUEST FOR AN ENHANCED ONGOING ROYALTY IS

23   [10]  Sonos's request that Google provide notice to "[c]onsumers who own infringing media players"
    is also overbroad because the royalty that the jury awarded already accounts for past infringement.

24   Thus consumers who already own the accused products effectively have a license to the '885 patent.
    To the extent this relief is warranted, it should only affect devices purchased in the future.  *Id.* at

25   968 ("By its nature, injunctive relief is prospective."); *TransPerfect Glob., Inc. v. MotionPoint*
    *Corp.*, No. C 10-2590 CW, 2014 WL 6068384, at *7 (N.D. Cal. Nov. 13, 2014) (declining to require

26   notice of infringement to customers because "[t]he Court has no wish unnecessarily to paint
    MotionPoint as an infringer in the market, or to worry its customers").  Sonos's request with respect

27   to "product sales and help pages" is likewise overbroad.  Although claim 1 of the '885 patent covers
    an extremely narrow functionality of saving overlapping speaker groups, Sonos seems to suggest

28   that Google should be required to post notice of the infringement and injunction on its general help
    page for all smart speakers and displays.  Dkt. 820-5 at 3.

1

**PREMATURE**

2      An ongoing royalty is a discretionary remedy that a court can award in lieu of a permanent

3    injunction if "necessary" to remedy "ongoing infringement."  *Paice LLC v. Toyota Motor Corp.*,

4    504 F.3d 1293, 1314-15 (Fed. Cir. 2007) (internal quotations omitted).   Sonos bears the burden of

5    demonstrating both that it is entitled to an ongoing royalty and the appropriate amount of an ongoing

6    royalty.  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 6687122, at *2 (N.D.

7    Cal. Nov. 25, 2014).  To determine an ongoing royalty rate, courts consider three factors:

8
9
10

>    (i) the change in the parties' bargaining positions, and the resulting change in
>    economic circumstances, resulting from the determination of liability; (ii) changed
>    economic circumstances, such as changes related to the market for the patented
>    products; and (iii) any other post-verdict factor that would impact what a hypothetical
>    negotiation would look like after the prior infringement verdict.

11    *Purewick Corp. v. Sage Prod., LLC*, No. CV 19-1508-(MN), 2023 WL 2734418, at *16 (D. Del.

12    Mar. 31, 2023) (citing *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1297 (Fed. Cir. 2018))

13    (cleaned up).  Consideration of an ongoing royalty award is a fact-intensive inquiry that may require

14    additional evidence.  *Paice*, 504 F.3d at 1315, 1315 n.15.

15    **A.      Sonos's Request for an Ongoing Royalty is Premature**

16      Sonos asks the Court to impose an ongoing royalty on Google's post-verdict sales and set

17    the ongoing royalty rate at $3.00 per unit, 33% higher than the royalty rate the jury awarded.  Mot.

18    9-13.  As a threshold matter, Sonos's request is premature in light of Google's pending post-trial

19    motions, the parties' anticipated appeals, and a post-trial evidentiary record that is still developing.

20    Sonos's request could be mooted by Google's pending Motion for Judgment as a Matter of Law and

21    New Trial (Dkt. 824, Google's "JMOL"), Google's equitable defenses (Dkt. 819), or by the Court's

22    evaluation of written description (*see* Dkt. 785).  The Court can and should exercise its discretion

23    to reserve the issue of an ongoing royalty until the conclusion of the appeals process.  *See Cave*

24    *Consulting Grp., LLC v. Optuminsight, Inc.*, No. 5:11-CV-00469-EJD, 2016 WL 4658979, at *24

25    (N.D. Cal. Sept. 7, 2016) ("Given the number and complexity of the issues in this case that remain

26    unresolved, the Court finds that it would be appropriate to delay the consideration of evidence and

27    calculating the ongoing royalty rate until after the completion of the appeals in this case.");

28    *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 345-46 (D. Del. 2010) (denying motion

1    for an ongoing royalty without prejudice because "the court plans to address these issues only after

2    Federal Circuit review of the jury's and the court's findings regarding infringement and validity").

3    **B.    Sonos is Not Entitled to an Ongoing Royalty**

4    Sonos is not entitled to an ongoing royalty as a matter of course. *Whitserve, LLC v.*

5    *Computer Packages, Inc.,*, 694 F.3d 10, 35 (Fed. Cir. 2012) ("[A] trial court is not required to grant

6    a compulsory license even when an injunction is denied."); *Paice*, 504 F.3d at 1314-15 ("[A]warding

7    an ongoing royalty where 'necessary' to effectuate a remedy . . . does not justify the provision of

8    such relief as a matter of course whenever a permanent injunction is not imposed.").

9    Even if the Court denies Google's JMOL and leaves the jury's award intact, the Court should

10   decline to award an ongoing royalty in this case because the jury's award already overcompensates

11   Sonos. The jury awarded ***more than twice*** what Sonos asked for in its opening statement (Trial Tr.

12   at 217:23-218:6), a request that was based on Mr. Malackowski's since-stricken IFTTT theory. Dkt.

13   813. To the extent Sonos's portfolio-wide licenses support any royalty rate at all (they do not, *see*

14   Dkt. 824 at 18-22), they support a royalty rate of less than two cents per patent. Trial Tr. (Kwasizur)

15   at 1076:14-1077:1. Instead, the jury awarded a royalty rate of 115 times that.

16   **C.    Sonos's Requested Ongoing Royalty Rate is Excessive**

17   If the Court does decide to award Sonos an ongoing royalty, it should reject Sonos's

18   improper attempt to inflate the damages award and instead set the ongoing royalty rate at a rate that

19   the Court determines to be supported by the trial record, as discussed in Google's pending JMOL.

20   As a preliminary matter, consideration of a higher ongoing royalty rate requires an analysis of the

21   *Georgia-Pacific* factors. *See Apple*, 2014 WL 6687122, at *13 ("[T]o assess ongoing royalties, the

22   Court considers the law regarding reasonable royalties under *Georgia–Pacific*."). Despite

23   requesting a 33% increase over the jury's royalty rate, Sonos fails to quantify why such an increase

24   is warranted.

25   That the jury found the '885 patent valid and infringed does not compel an enhanced ongoing

26   royalty rate. Mot. 11. Both parties' damages experts already assumed that the '885 patent was valid

27   and infringed when they rendered their opinions. *See* Trial Tr. (Malackowski) at 1078:24-1079:2;

28   *id.* (Bakewell) 1546:22-23. And the Court instructed the jury that it had already determined

infringement for the older designs.  Dkt. 762 at 21.  In these circumstances, courts have held that a jury verdict of validity and infringement does not substantially strengthen the patentee's bargaining position in a post-verdict negotiation.  *See Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-00033-JRG, 2018 WL 11357619, at *20 (E.D. Tex. Mar. 22, 2018) ("[T]he Court does not find that a higher rate is justified under *Georgia-Pacific* Factor 15, particularly where both parties relied on a hypothetical negotiation employing the assumption that the asserted patents were both valid and infringed"); *EMC Corp. v. Zerto, Inc.*, No. CV 12-956 (GMS), 2017 WL 3434212, at *3 (D. Del. Aug. 10, 2017) (concluding that any "degree of uncertainty and approximation inherent" in assuming validity and infringement in the pre-verdict hypothetical negotiation does not "materially affect[] the royalty rate calculation").

        Sonos contends that an enhanced ongoing royalty rate would recognize "longstanding and ongoing competition between Sonos and Google"; the "the success of Google's products in driving search and ad revenue"; the parties' "desire to secure households"; "Google's ability to undercut Sonos's prices"; "consumers' desires to have the ability to create multiple, static speaker groups"; "Google's inability to easily design-around the '885 patent"; and "Google's willful infringement." Mot. 11-12.  But each of these were either presented to the jury and thus already incorporated into the jury's verdict, or excluded during trial altogether:

- *"[L]ongstanding and ongoing competition between Sonos and Google":* As discussed above in Section II.A.1.(a), the parties presented extensive evidence regarding their relationship in the smart speaker market.  Such evidence showed that the parties are not direct competitors because they sell their products at different price points to attract different types of customers.

- *"[S]uccess of Google's products in driving search and ad revenue":* Sonos agreed not to reference financial information related to Google's unaccused search and ad revenue at trial, confirming in its Opposition to Google's Motion *in Limine* No. 4 that "Sonos will agree not to reference financial information unrelated to the accused products." Dkt. 619-9 at 5; *see also* Dkt. 660 at 3.

- *"[T]he parties' desire to secure households":* During trial, Sonos emphasized its desire to secure households.  Ms. Kwasizur testified that "we don't think of the users as individuals when we think of products.  We think of it as a household" because "[t]hese companies, you know, potentially are taking a potential Sonos customer away from us; and with us, it's not really just one customer."  Trial Tr. (Kwasizur) at 1019:20-22; 1020:25-1021:6.  During its closing Sonos further stressed that "You want to put these [speakers] all over your house.  That's what Google wants you to do.  That's what Sonos wants you to do."  *Id.* at 1826:7-9.

- **"*Google's ability to undercut Sonos's prices*":** In its Pretrial Order, the Court excluded "references to alleged anticompetitive conduct based on salacious headlines and news articles" as "irrelevant, prejudicial, and rank hearsay." Dkt. 660 at 3. Since Sonos's arguments regarding Google's alleged price gauging were based solely on third-party news articles and blog posts, the Court's ruling effectively precluded Sonos from presenting this theory at trial. *See* Dkt. 619 at 4. And as discussed above, Sonos's theory is still entirely speculative and wrong.

- **"*[C]onsumers' desires to have the ability to create multiple, static speaker groups*":** During trial, Google demonstrated that its users rarely create multiple, static speaker groups. Mr. Chan testified that "a very small fraction of total users, around 5 percent at the most, are using groups." Trial Tr. (Chan) at 1522:25-1523:1. And the usage data that Google introduced shows that the accused speaker products are grouped on average only 1% to 3% of the time. TX0140; Trial Tr. (Chan) at 1521:20-1523:10; *id.* (Bakewell) at 1560:11-1561:9. Sonos did not introduce any evidence of its own customers' usage of the claimed functionality. But Sonos's damages expert admitted that "overlapping speaker groups" were not "a popular feature among Google users[.]" *Id.* (Malackowski) at 1270:9-14.

- **"*Google's inability to easily design-around the '885 patent*":** The jury was instructed to assume that claim 1 of the '885 patent was both valid and infringed when calculating damages. Accordingly, the jury's damages award assumes that Google would be unable to design around the '885 patent.

- **"*Google's willful infringement*":** Sonos contends that Google is liable for post-verdict willful infringement because it continued selling its products after the jury's verdict. Mot. at 12-13. This argument is contrary to established law as explained in the next section. Nevertheless, Google's ongoing infringement was considered in the jury's damages award since the jury was required to assume that Google infringed. *See* Dkt. 762 at 21.

Since the jury already considered the circumstances Sonos claims would merit a higher ongoing royalty, it would be improper for the Court to reconsider them in calculating an ongoing royalty rate. *See XY*, 890 F.3d at 1297 ("To incorporate [evidence] a second time in the context of the ongoing rate essentially amounts to undoing a jury finding.").

### D.    The Court Should Reject Sonos's Improper Attempt to Use Willfulness as a Basis for Enhancing the Ongoing Royalty Rate

Contrary to Sonos's assertions, any ongoing royalty rate should not be imposed because Google's post-verdict infringement is necessarily willful. *See* Mot. at 12-13. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016) "counsels against" a rule "that every adjudged infringer of an unexpired patent must immediately cease all infringing activity or be subject to an enhanced ongoing royalty for willfulness." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 3034655, at *11 (E.D. Tex. July 18, 2017) (Bryson, J., sitting by designation). In *Halo*, the Supreme Court "directed district courts to exercise their discretion to award enhanced

1  damages for willfulness as a means of punishing 'egregious' conduct; the Court did not suggest

2  adopting a bright-line rule punishing all instances of knowing infringement." *Id.* Thus, "the entry

3  of a verdict and judgment does not justify recharacterizing [a defendant's] post-verdict behavior as

4  'wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—

5  characteristic of a pirate.'" *Id.* (quoting *Halo*, 579 U.S. at 103-04).  Although a verdict informs a

6  defendant that its conduct has been found to be infringing, a defendant does "not commit[] any new

7  acts deserving of enhanced punishment" by continuing to infringe post-verdict.  *Id.*  In addition,

8  branding all post-verdict infringement as willful "would give the patentee unfair bargaining power

9  after a verdict to force the infringer to agree to license the patent at an enhanced rate in order to

10 avoid an even greater enhancement by the court[.]"  *Id.*  "As a result, even infringers who have not

11 engaged in egregious misconduct would effectively be punished through the imposition of enhanced

12 damages, contrary to the thrust of *Halo*."  *Id.*

13      Sonos's motion ignores a substantial body of case law declining to use post-verdict willful

14 infringement to enhance ongoing royalty rates where the verdict did not include a finding of

15 willfulness. *See Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, No. 2:18CV585, 2023 WL

16 2329746, at *3 (E.D. Va. Jan. 27, 2023) (dismissing argument that ongoing royalty should be

17 enhanced where "Plaintiff failed to secure a jury finding of willfulness as to the one patent that

18 Plaintiff did allege was willfully infringed" because "the record does not suggest any egregious or

19 nefarious conduct by Defendants before, during, or after trial"); *Cioffi v. Google, Inc.*, No. 2:13-

20 CV-103, 2017 WL 4011143, at *7-8 (E.D. Tex. Sept. 12, 2017) ("declin[ing] to enhance the ongoing

21 royalty rate in this case based on a theory of willfulness" where "Plaintiffs did not assert willful

22 infringement at trial and instead dropped all allegations of willful infringement up through the jury

23 verdict"); *see also EMC Corp.*, 2017 WL 3434212, at *5; *UroPep*, 2017 WL 3034655, at *9-10

24 (dismissing argument that ongoing royalty should be enhanced as a result of post-verdict willful

25 infringement where the patent owner did "not me[e]t its burden to prove willful pretrial

26 infringement").  In this case, the Court ***dismissed*** Sonos's willful infringement allegations for the

27 '885 patent before trial.  Dkt. 566 at 30-31.  The jury also rejected Sonos's willful infringement

28 allegations for the '966 patent, which were based on the same evidence Sonos relied on for the '885

1  patent.

2         Sonos cites a handful of cases for the proposition that "[f]ollowing a jury verdict and entry

3  of judgment of infringement and no invalidity, a defendant's continued infringement will be willful

4  absent very unusual circumstances."  Mot. at 12 (citing *Affinity Labs of Tex. V. BMW N. Am., LLC*,

5  783 F. Supp. 2d 891, 899 (E.D. Tex. 2011); *Fresenius USA, Inc. v. Baxter, Int'l, Inc.*, No. C03-1431

6  PJH, 2012 WL 761712 (N.D. Cal. Mar. 8, 2012); *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp.

7  2d 620, 630 (E.D. Tex. 2009)).  These cases are all outdated because they were before *Halo* and

8  therefore did not consider the Supreme Court's instruction that "[a]wards of enhanced damages . . .

9  are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or

10 'vindictive' sanction for egregious infringement behavior."  579 U.S. at 103.

11 **IV.      SONOS'S REQUEST FOR SUPPLEMENTAL DAMAGES IS PREMATURE**

12        Sonos's request for supplemental damages is premature for the same reasons explained

13 above.  As with Sonos's request for an ongoing royalty, the Court has discretion to defer Sonos's

14 request until after resolution of all appeals and it should do so here.  *Verinata Health, Inc. v. Ariosa*

15 *Diagnostics, Inc.*, 809 F. App'x 965, 977 (Fed. Cir. 2020) (affirming district court's decision to

16 defer request for supplemental damages and accounting until after resolution of appeal).

17                    1.    Pre-Verdict Supplemental Damages

18        If a per-unit royalty-based damages award is still warranted after the Court rules on Google's

19 post-trial motions, Google will provide updated sales data for the accused products at that point.

20 However, for the reasons detailed in Google's JMOL, there is no evidentiary basis to apply the $2.30

21 per-unit royalty to the additional infringing products sold between October 1, 2022 and the date of

22 the verdict.  Dkt. 824 at 18-22.  Google submits that a new trial should be granted so a legally-

23 supported royalty rate can be determined.  *Id.* at 22-25.

24                    2.    Supplemental Damages Based On Google's Redesign

25        Sonos's unjustified request for "supplemental damages" based on Google's redesign finds

26 no basis in the law.  Sonos argues it is entitled to additional damages for speakers sold ***prior to*** the

27 issuance of the '885 patent—but that received the firmware update for Google's redesign during the

28 course of this litigation—because Google "made" those infringing devices by pushing the firmware

1    update. Mot. 15. This is a new argument designed to inflate the damages award. Sonos never

2    previously argued that pushing a firmware update constituted an act of infringement even though

3    Google pushed software and firmware updates to these devices *before* implementing the redesign.

4          The cases Sonos cites are inapposite. In *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360

5    (Fed. Cir. 2019), it was the combination of a customer's existing network and Sonitor's hardware

6    and software that created a system accused of infringement. *Id.* at 1363-64. Sonitor personnel

7    would "configure" the system on site by bringing certain hardware components "online as part of a

8    [customer's] existing network." *Id.* The court merely held that there was a genuine dispute of fact

9    as to whether a party that completes the "software setup necessary to make the system work"

10   infringes by virtue of "mak[ing] a combination of hardware and software that is 'configured' to

11   infringe" even when it does not make all the components needed. *Id.* at 1373. Here, providing

12   firmware updates to hardware devices that already exist is not "assembling components into the

13   claimed assembly"—the products were fully assembled and "made" long before they received

14   firmware update from Google. *Id.* at 1364. *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372

15   (Fed. Cir. 2017), involved an appeal of a motion to dismiss, was not about software at all, and again

16   discussed "assembling the components of an invention." *Id.* at 1378-79. Neither case involved

17   products sold and fully assembled before the start of the damages period.

18         Unsurprisingly, Sonos fails to provide any authority for the notion that attempting to

19   implement a redesign after an infringement finding can give rise to a new cause of action. Indeed,

20   setting such a precedent would disincentivize accused infringers from pursuing redesigns. *See TiVo*

21   *Inc. v. Echostar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011) ("[L]egitimate design-around efforts

22   should always be encouraged as a path to spur further innovation."). The Court should reject this

23   attempt to exploit Google's good-faith efforts.

24   **V.    AN AWARD OF PRE- AND POST-JUDGMENT INTEREST IS PREMATURE,**
         **AND PRE-JUDGEMENT INTEREST IS UNWARRANTED IN LIGHT OF THE**
25   **EXCESSIVE VERDICT)**

26       **A.    Sonos's Request for Interest is Premature**

27         Sonos's request for pre- and post-judgment interest is also premature. If the Court grants

28   Google's JMOL and reduces the damages award to $2.25 million, pre- and post-judgment interest

1    will need to be calculated based on a different damages award.  *See* Dkt. 824 at 18-22.  Likewise, if

2    the Court grants Google's request for a new damages trial, there will be no operative damages award

3    until a new jury returns a verdict.  *Id.* at 22-25.  The Court should defer ruling on Sonos's motion

4    for pre- and post-judgment interest at least until it rules on Google's motion for JMOL or a new

5    trial.  *See Epistar Corp. v. Lowes Companies, Inc.*, No. LACV1703219JAKKSX, 2022 WL

6    18911616, at *24 (C.D. Cal. Oct. 4, 2022) ("considering [patent owner's] request for pre- and post-

7    judgment interest is premature" because "this Order vacates the jury's damages award and orders a

8    joint report concerning a potential new trial on damages"); *see also Power Integrations, Inc. v.*

9    *Fairchild Semiconductor International, Inc.*, No. 3:09-cv-05235-MMC, Dkt. 667 at 1 (N.D. Cal.

10   Nov. 25, 2014).

11        **B.    Sonos is Not Entitled to Pre-Judgment Interest**

12        If the Court considers Sonos's request for pre-judgment interest at this juncture, it should

13   find that pre-judgment interest is not warranted because the jury's award already overcompensates

14   Sonos for Google's pre-verdict infringement.  *See supra* Section III.B; *mophie, Inc. v. Shah*, No. SA

15   CV 13-1321 (JEMX), 2015 WL 13917980, at *3 (C.D. Cal. Dec. 11, 2015) ("[Plaintiff] has already

16   been granted a substantial damages award by the jury.  The Court finds that this award is adequate

17   to further the purpose of making [plaintiff] whole and removing incentives for copyright

18   infringement, and declines to award pre-judgment interest."); *Conceptus, Inc. v. Hologic, Inc.*, No.

19   C 09-02280 WHA, 2012 WL 44064, at *4 (N.D. Cal. Jan. 9, 2012) (Alsup, J.) (denying motion for

20   pre-judgment interest because "[t]he jury award was generous enough").

21        **C.    If the Court Awards Pre-Judgment Interest, It Should be Set at the Treasury**
             **Bill Rate and Compounded Annually**

22
23        The Ninth Circuit, whose law controls, has held that "[t]he post judgment interest rate, set at

24   the rate equal to that paid on 52–week U.S. treasury bills as set by 28 U.S.C. § 1961, is the same

25   rate that should be applied to pre-judgment interest 'unless the trial judge finds, on substantial

26   evidence, that the equities of the particular case require a different rate.'"  *Transbay Auto Serv., Inc.*

27   *v. Chevron U.S.A., Inc.*, No. C 09-04932 SI, 2013 WL 843036, at *10 (N.D. Cal. Mar. 6, 2013)

28   (quoting *W. Pac. Fisheries, Inc. v.* SS *President Grant*, 730 F.2d 1280, 1288-89 (9th Cir. 1984)).

1    Citing out-of-circuit cases, Sonos asserts that prejudgment interest should be set at the prime rate

2    and compounded quarterly, but it offers no reason for doing so here.  Mot. at 17-19.  Because Sonos

3    has failed to present substantial evidence that a different rate is required, the Court should calculate

4    pre-judgment interest based on the Treasury Bill rate and annual compounding.  *See TransPerfect*,

5    2014 WL 6068384, at *5 ("[B]ecause TransPerfect has not presented any compelling reasons to

6    deviate from the method used to calculate post-judgment interest, the parties shall calculate pre-

7    judgment interest based on the Treasury Bill rate and annual compounding."); *see also Fitness*

8    *Anywhere LLC v. WOSS Enterprises LLC*, No. 14-CV-01725-BLF, 2018 WL 6069511, at *7 (N.D.

9    Cal. Nov. 20, 2018) (using treasury-bill rate, compounded annually).

10          **D.      The Court Should Award Post-Judgment Interest Only If the Jury's Award
                      Withstands Google's Post-Trial Motions and Appeal**

11
12          If the jury's damages verdict survives Google's post-trial motions and the parties'

13    anticipated appeals, Google agrees that the Court should award post-judgment interest in accordance

14    with 28 U.S.C. § 1961.  *See* Mot. 19.  However, Google disagrees with Sonos's contention that post-

      judgment interest should begin on May 27, 2023.  *Id*.  Although the Court initially entered final
15
      judgment on May 26, 2023, it later issued an order vacating final judgment.  *See* Dkts. 787, 816.
16
      Thus, post-judgment interest should "be calculated from the date of the entry of the judgment[.]"  §
17
      1961(a); *see also Alzheimer's Inst. of Am. v. Eli Lilly & Co.*, No. 10-CV-00482-EDL, 2016 WL
18
      7732621, at *8 (N.D. Cal. Apr. 14, 2016).
19
      **VI.    CONCLUSION**
20
            Sonos's requests for a permanent injunction, ongoing royalties, supplemental damages, and
21
      pre- and post-judgment interest should be denied.
22

23

24

25

26

27

28

1    DATED:  June 29, 2023                QUINN EMANUEL URQUHART & SULLIVAN,
                                          LLP
2

3                                    By _____/s/ Sean Pak_____
                                         Sean Pak
4                                        Melissa Baily
                                         James Judah
5                                        Lindsay Cooper
                                         Marc Kaplan
6                                        Iman Lordgooei
7
                                         *Attorneys for GOOGLE LLC*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S OPPOSITION TO SONOS'S MOTION FOR INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES