QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Marc Kaplan *(pro hac vice)*
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., <br><br> Plaintiff and Counter-Defendant, <br><br> vs. <br><br> GOOGLE LLC, <br><br> Defendant and Counter-Claimant. | Case No. 3:20-cv-06754-WHA <br><br> Consolidated with <br> Case No. 3:21-cv-07559-WHA <br><br> **GOOGLE LLC'S REPLY IN SUPPORT OF GOOGLE'S BRIEF ON AFFIRMATIVE DEFENSES (DKT. 819)** |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1
II. GOOGLE IS ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS AFFIRMATIVE DEFENSES OF PROSECUTION LACHES ................................................................... 1
   A. The Proper Standard of Proof is Preponderance of the Evidence – Not Clear and Convincing Evidence. ........................................................................................ 2
   B. Prosecution Laches Remains a Viable Affirmative Defense ............................... 4
   C. Sonos Unreasonably Delayed Prosecution .......................................................... 5
   D. Google Suffered Prejudice As a Result of Sonos's Delay ................................... 6
III. GOOGLE IS ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS EQUITABLE ESTOPPEL AFFIRMATIVE DEFENSE ....................................................................... 8
   A. Sonos misled Google into inferring that Sonos would not enforce the '885 and '966 patents against Google ........................................................................................... 8
   B. Sonos Mischaracterizes Google's Arguments With Respect to Cast for Audio ... 9
   C. Google Relied on Sonos's Conduct ................................................................... 11
   D. Sonos's Conduct Prejudiced Google .................................................................. 12
IV. CONCLUSION ............................................................................................................. 12

# TABLE OF AUTHORITIES

**Page**

### Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992), *abrogated on other grounds by*
  *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod.*, LLC,
   580 U.S. 328 (2017) ................................................................................................. 3, 4

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
  52 F.3d 1062 (Fed. Cir. 1995) ......................................................................................... 8

*Hyatt v. Hirshfeld*,
  998 F.3d 1347 (Fed. Cir. 2021) ................................................................................... 1, 2

*Intuitive Surgical, Inc. v. Computer Motion, Inc.*,
  No. Civ. A. 01-203-SLR, 13 2002 WL 31833867 (D. Del. Dec. 10, 2002) ...................... 3

*Jazz Pharms., Inc. v. Roxane Lab'ys, Inc.*,
  No. 2:10-CV-06108-ES-JAD, 2013 WL 6858765 (D.N.J. Dec. 30, 2013) .................. 4, 5

*Microsoft Corp. v. i4i Ltd. P'shp*,
  564 U.S. 91 (2011) ........................................................................................................... 4

*Natera, Inc. v. Genosity Inc.*,
  No. CV 20-1352, 2022 WL 767602 (D. Del. Mar. 14, 2022) ......................................... 5

*Personalized Media Commc'ns., LLC v. Apple, Inc.*,
  552 F. Supp. 3d 664 (E.D. Tex. 2021) ............................................................................ 2

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
  57 F.4th 1346 (Fed. Cir. 2023) ....................................................................................... 3

*Regents of Univ. of Cal. v. Monsanto Co.*,
  No. C 04-0634 PJH, 2005 WL 3454107 (N.D. Cal. Dec. 16, 2005) ............................... 4

*Reiffin v. Microsoft Corp.*,
  270 F. Supp. 2d 1132 (N.D. Cal. 2003) .......................................................................... 4

# ASSERTED CLAIMS

'885 Patent, Claim 1:

[1.0]. A first zone player comprising:

[1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network;

[1.2] one or more processors;

[1.3] a non-transitory computer-readable medium; and

[1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

[1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players;

[1.6] (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

[1.7] (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

[1.8] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

[1.9] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

[1.10] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

'966 Patent, Claim 1:

[1.0] A computing device comprising:

[1.1] one or more processors;

[1.2] a non-transitory computer-readable medium; and

[1.3] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

[1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

[1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

[1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and

[1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

[1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

'966 Patent, Claim 2:

[2.0] The computing device of claim 1,

[2.1] further comprising program instructions stored on the non-transistory computer-

readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[2.2] while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

[2.3] based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with a t least the third zone player to output media in synchrony with output of media by at least the third zone player.

'966 Patent, Claim 4:

[4.0] The computing device of claim 3,

[4.1] wherein the location other than the computing device comprises a zone player of the first predefined group of zone players.

'966 Patent, Claim 6:

[6.0] The computing device of claim 1,

[6.1] wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

'966 Patent, Claim 8:

[8.0] The computing device of claim 1,

[8.1] wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

I.  **INTRODUCTION**

Sonos's opposition fails to rebut the key facts established in Google's motion for judgment on its affirmative defenses of prosecution laches and equitable estoppel. Sonos does not deny that it waited over thirteen years to attempt to claim the alleged invention of the patents-in-suit—*i.e.*, overlapping zone scenes—and that it did so only *after* Google had already released the accused products. Sonos provides no explanation for this delay, nor does it legitimately dispute that Google was substantially prejudiced by Sonos's manipulation of the Patent Office. Rather, Sonos's rebuttal focuses on its improper assumption that prosecution laches applies only in the context of "submarine patents" and that the problem of "submarine patents" was resolved by statutory changes in 1995. But Sonos cites no authority for its proposition that prosecution laches is no longer a valid affirmative defense in patent cases. Nor can it. No court has held that the 1995 statutory changes foreclosed prosecution laches as a defense. Indeed, the doctrine of prosecution laches applies squarely to Sonos's conduct with respect to the patents-in-suit, and Sonos should, thus, be barred from asserting its claims.

Similarly, Sonos's tactical silence and delay regarding its alleged invention bars enforcement of its patents under the doctrine of equitable estoppel. Sonos cannot explain away its attempt to use its confidential knowledge of Google's product line, paired with its delay and strategic attempt to claim Google's developments for its own after Google had established those products in the market. Sonos should be equitably estopped from asserting its claims against Google.

II. **GOOGLE IS ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS AFFIRMATIVE DEFENSES OF PROSECUTION LACHES**

The parties agree that Sonos's conduct in prosecuting the asserted patents must be considered under a totality of the circumstances, but Sonos incorrectly analyzes those circumstances and the egregious and prejudicial nature of its delay. Opp. at 2; *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1360 (Fed. Cir. 2021).

Sonos delayed prosecuting (or even disclosing) its alleged inventions relating to overlapping speaker groups for 13 years—four years after Google introduced its products into the market and six years after Google confidentially disclosed its overlapping speaker group designs to Sonos.

Because Sonos provides no reason or excuse for its delay, and because this delay prejudiced Google, the Court should grant judgment in Google's favor on its defense of prosecution laches. *See Hyatt*, 998 F.3d at 1359 (holding that prosecution laches requires "(a) that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances, and (b) that the accused infringer suffered prejudice attributable to the delay"). Sonos's various arguments—that the clear and convincing evidence standard should apply instead of the preponderance of the evidence standard that applies to ***all*** laches defenses; that prosecution laches does not even exist as a defense for patents filed after 1995; and that Google somehow suffered no prejudice despite six years of product development and sales after informing Sonos that it planned to implement overlapping speaker grouping—are all legally and factually meritless.

### A. *The Proper Standard of Proof is Preponderance of the Evidence – Not Clear and Convincing Evidence.*

Sonos contends that the "proper burden of proof is clear and convincing evidence," but it does not meaningfully address Google's cited authority showing that the proper standard for proving any laches defense, including prosecution laches, is a preponderance of the evidence. Sonos fails to cite any binding precedent supporting its own position for the burden of proof. However, regardless of which standard is applied, the asserted patents are unenforceable due to prosecution laches because the proof of Sonos's conduct is at least clear and convincing.

First, for its contention that prosecution laches must be proved by "clear and convincing evidence," Sonos relies on cases that address a different and inapposite defense: inequitable conduct. Opp. at 7-8. Sonos does not confront the district court cases cited by Google (*see* Mot. at 5-6) and, instead, cites only one district court case that noted courts in the Eastern District of Texas have "previously applied the clear-and-convincing-evidence standard when the enforceability of an issued patent is challenged for prosecution laches." *Personalized Media Commc'ns.*, *LLC v. Apple, Inc.*, 552 F. Supp. 3d 664, 684 (E.D. Tex. 2021). Neither that case nor the predecessor case in the Eastern District of Texas is binding on this Court, nor did the Eastern District of Texas cases analyze or even acknowledge other district court cases holding that the preponderance standard applies.

Sonos also relies on *Microsoft Corp. v. i4i Ltd. P'shp*, 564 U.S. 91, 95 (2011), for the

proposition that "[35 U.S.C.] § 282 requires an invalidity defense to be proved by clear and convincing evidence." Opp. at 7. But Sonos's reliance on *Microsoft* is misplaced, as prosecution laches is a case-specific ***equitable*** defense, not an invalidity defense, and *Microsoft* is entirely silent on the appropriate standard for equitable defenses such as prosecution laches.

Second, Sonos argues Google has "no binding support" for its argument because the cases cited by Google "did not reach the Federal Circuit." Opp. at 4. But the Federal Circuit also did not address the evidentiary standard for prosecution laches in the cases cited by Sonos.[1] And Sonos ignores that the Federal Circuit has already held preponderance of the evidence is "the appropriate evidentiary standard to establish the facts relating to the laches issue." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1045 (Fed. Cir. 1992)[2], *abrogated on other grounds by SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod.*, LLC, 580 U.S. 328 (2017). There, the Federal Circuit explained: "The issue of laches concerns delay by one party and harm to another. Neither of these factors implicates the type of special considerations which typically trigger imposition of the clear and convincing quantum of proof. Indeed, to the limited extent courts have touched on this issue, the great weight of authority favors application of the general preponderance of evidence standard." *Id.*[3] In *A.C. Aukerman*, the plaintiff sued the defendant for infringement of two patents more than eight years after the parties first discussed a license. As the court noted, the elements of laches include (a) the patentee's unreasonable and inexcusable delay, and (b) material prejudice suffered by the alleged infringer attributable to the delay. *Aukerman*, 860 F.2d 1020 at 1028. Although the court in *Aukerman* considered the plaintiff's delay in filing suit (rather than prosecuting its patents), the court was "clarify[ing] and apply[ing] principles of laches and equitable estoppel" generally, and these principles apply equally to prosecution laches. *Id.*

---

[1] Although *Personalized Media* reached the Federal Circuit on the issue of prosecution laches, neither party challenged the burden of proof, thus the Federal Circuit only addressed the District Court's substantive findings and affirmed that the plaintiff's patent was unenforceable due to prosecution laches. *Personalized Media Commc'ns v. Apple Inc.*, 57 F. 4th 1346 (Fed. Cir. 2023).
[2] The court in *Aukerman* also noted that "[t]he application of the defense of laches is committed to the sound discretion of the district court." Further, "a determination of laches is not made upon the application of 'mechanical rules'" 960 F.2d at 1032.
[3] The Federal Circuit's affirmance in *Personalized Media Commc'ns* did not discuss the appropriate standard to apply for laches and, thus, did not change the existing preponderance standard. *See supra* n.1.

-3-   Case No. 3:20-cv-06754-WHA

This court should follow *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, which considered the appropriate standard to apply for prosecution laches because it was an "unsettled question." No. Civ. A. 01-203-SLR, 13 2002 WL 31833867, at *5 n.4 (D. Del. Dec. 10, 2002). That court followed *Aukerman* and held that preponderance of the evidence standard should apply to prosecution laches, just as it does to other forms of laches. *Id.* ("Defendant argues that, consistent with the burden of proof in equitable laches and estoppel cases, the preponderance of the evidence standard should apply. This court agrees."). Sonos attempts to distinguish *Intuitive Surgical*'s holding that the preponderance standard applies as mere "dicta," but does not dispute the underlying rationale that "laches concerns delay by one party and harm to another" and ***does not*** "implicate[] the type of special considerations which typically trigger imposition of the clear and convincing quantum of proof." *Aukerman*, 960 F.2d at 1045; *see also Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1156 (N.D. Cal. 2003) ("the burden of proof on a defendant raising the defense of prosecution laches should be no higher than that required to raise other equitable defenses in patent cases") (citing *Aukerman*); *Regents of Univ. of Cal. v. Monsanto Co.*, No. C 04-0634 PJH, 2005 WL 3454107, at *24 (N.D. Cal. Dec. 16, 2005) (same). There is simply no reasoned distinction between prosecution laches and any other form of laches that would warrant applying a higher burden of proof.

### B.     *Prosecution Laches Remains a Viable Affirmative Defense*

Sonos next argues that prosecution laches cannot apply to applications filed after the 1995 change to calculate patent terms. Opp. at 2-3. Yet Sonos cites no law in support of this argument, and the relevant cases show that the opposite is true. Other courts have rejected the same argument Sonos raises here—that the prosecution laches defense is no longer viable for patents filed after the change to term calculation in 1995. For example, in *Jazz Pharms., Inc. v. Roxane Lab'ys, Inc.*, Jazz opposed a motion to amend a complaint to add a prosecution laches defense because "since the 1994 amendments to the patent law changed the life of a patent from beginning to run from the date of filing to the date of issuance, delay by the patentee in filing patent applications cannot extend the life of a patent." No. 2:10-CV-06108-ES-JAD, 2013 WL 6858765, at *5 (D.N.J. Dec. 30, 2013). The court recognized the change in patent term calculation but agreed with the defendant "that this point does nothing to render the prosecution laches defense futile in this case because [defendant]

is not arguing that Jazz's delay in filing its patent applications has effectively extended the life of its patents" but instead was arguing "that Jazz's unexplained delays have had the effect of prolonging this litigation which has the practical effect of preventing Roxane from launching its product." *Id.* Like Sonos here, "Jazz's opposition [was] devoid of any argument and/or legal authority that the prosecution laches defense may not be applied under the facts and circumstances that [defendant] has alleged." *Id.* The court therefore allowed the defendant to plead prosecution laches. *Id.* There is no authority or rationale for why this defense no longer applies post-1995.

Other plaintiffs have likewise moved to dismiss prosecution laches defenses arising from post-1995 priority date patents, and if the law were that no such defense could be pled, those defenses would have to be dismissed under Sonos's theory. And yet courts frequently reject motions to dismiss the prosecution laches defenses, indicating there is no bright line rule eliminating this defense. *See*, *e.g.*, *Natera, Inc. v. Genosity Inc.*, No. CV 20-1352, 2022 WL 767602, at *6 (D. Del. Mar. 14, 2022) (denying motion to strike affirmative defense of prosecution laches for 2014 priority date patent, holding that defendant's allegations "plausibly support an inference that Natera's prosecution delay is 'unreasonable and unexplained'").

Accordingly, contrary to Sonos's assertion, prosecution laches was not abrogated by the 1995 statutory amendments directed to the problem of "submarine patents."

### C. *Sonos Unreasonably Delayed Prosecution*

On the merits, Sonos argues that it did not delay prosecution of the '885 and '966 patents, and instead expedited prosecution by using the USPTO's "Track One" procedure. But Sonos ignores that it filed its provisional application in 2006, and filed several patents in the same family over the course of the following decade, yet waited until **2019** to even disclose the concept of overlapping zone scenes in its specification (*i.e.*, through amendment as explained in many briefings relating to the lack of written description issues—*see, e.g.*, Dkt. 808) and seek claims covering overlapping "zone scenes." Sonos did so despite having known since at least 2015 (and as early as 2013) that Google was implementing overlapping speaker grouping functionality in its products.

Between 2006 and 2019, Sonos kept the prosecution chain alive by filing applications in 2007, 2013, and 2016. TX0001 at 3-4; TX0003 at 3-4. This resulted in an inexcusable and

unexplained **13-year delay** between its original September 2006 provisional application and its April 2019 applications for the asserted patents. To the extent that Sonos's use of the USPTO "Track One" procedure is of any relevance, it shows further abuse of Patent Office procedures. In particular, Sonos does not explain why it chose to expedite prosecution of the '885 and '966 patents as opposed to any of its other patents. The only logical explanation is so that it could assert those patents against Google in the instant litigation after the parties' prior licensing negotiations and executed term sheet broke down. *See* Dkt. 590-7 (Google Opp to Sonos MIL 1, Ex. 2) ¶¶ 499-508. Accordingly, the evidence shows, at most, that Sonos manipulated USPTO procedures to delay prosecution of the patent family and withhold disclosure of overlapping zone scenes until it sought to sue Google, at which point it amended its specification to purportedly add that concept and accelerated prosecution of claims specifically targeting Google's products.

Indeed, the Federal Circuit in *Personalized Media* explained that "'[l]aches is an equitable and flexible doctrine" and that the patentee's conduct need not "look like '*Hyatt* or the handful of other [laches] cases'" in order to find prosecution laches. 57 F.4th at 1354. Rather, the Federal Circuit affirmed that it was egregious for PMC (the patentee) to implement prosecution strategies aimed "specifically to ambush companies like Apple many years after PMC filed its applications"—which is precisely what Sonos is attempting to do here. *Id*.

This type of behavior and delay is unreasonable and should be barred.

### D.    *Google Suffered Prejudice As a Result of Sonos's Delay*

Sonos claims Google "could not have been prejudiced by Sonos's later filing of the patents in suit, which had narrower claims that covered zone scenes." Opp. at 15. Sonos argues that because the 2006 disclosure was first published in 2013, before Google's 2015 release date, Google has no intervening rights. *Id*. But Sonos's argument here is tied to the parties' dispute with respect to lack of written description and ignores that the claims of the patents-in-suit were ***not*** first published in 2013, nor are they "narrower."

First, the asserted claims are directed to the concept of overlapping zone scenes, which is a different invention than what was claimed in Sonos's earlier patents—indeed, Sonos had to affirmatively amend the specifications of the patents-in-suit in 2019 to allegedly provide written

description support for overlapping zone scenes. Second, Sonos's claims directed to overlapping zone scenes were not disclosed nor supported in any earlier application and, therefore, were not part of the 2006 disclosure or 2013 publication. *See* Dkts. 712, 729, 785, 788, 808. Instead, even assuming the specification supports overlapping zone scenes, any such support was only added to the specification in 2019, four years *after* Google's product release in 2015. Sonos's argument that Google had no intervening rights thus fails. The fact is that Sonos sat on its purported rights for 13 years—including four years after Google had already commercialized its "multiroom audio" products—before disclosing and seeking claims on overlapping zone scenes.

Even if Sonos had included a disclosure of overlapping speaker groups in the 2013 publication (it did not), there is still no explanation or justification for its delay in waiting until four years after Google deployed its multiroom audio products, and nearly six years after Google began confidentially discussing its overlapping speaker group technology with Sonos (*i.e.*, in 2013-2014 with respect to the Cast for Audio project), to seek patents on the alleged invention or even disclose that it believed it had the rights to overlapping speaker groups. *See* Mot. at 17-23. Google specifically showed Sonos its overlapping speaker group technology in presentations about Cast for Audio in 2013:



TX0125 at 18. Yet Sonos never mentioned or identified its alleged overlapping speaker group technology, and instead laid in wait to spring its patents on Google. Indeed, despite the fact that the parties had been negotiating regarding patent rights since 2016—making Sonos aware of the

capabilities of Google's speaker systems and Google's own 2006-era patents—Sonos provided Google with no indication prior to serving the complaint in 2020 that it had any rights to the concept of overlapping speaker grouping functionality. *See* Dkts. 483, 536-3.

Sonos unjustifiably waited until well after Google's products were established in the market to file the applications for the '885 and '966 patents and amend its specification to claim a monopoly over the concept of "overlapping zone scenes."

### III.   GOOGLE IS ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS EQUITABLE ESTOPPEL AFFIRMATIVE DEFENSE

#### A.   *Sonos misled Google into inferring that Sonos would not enforce the '885 and '966 patents against Google*

Sonos contends that Google cannot rely on silence alone because a "patentee may mislead by silence only 'if such silence is accompanied by some other factor indicating that the silence was sufficiently misleading to amount to bad faith.'" Opp. at 17 (citing *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995)). But Google does not rely on silence alone. Google argues that both Sonos's conduct and silence were misleading, and Sonos's conduct provides evidence of several accompanying factors referenced by *ABB Robotics*. These accompanying factors include the relationship between the parties, and the alleged infringer's knowledge that the patentee was not active in the area of the patents and was therefore not losing sales or profits as a result of the alleged infringement. *Id.*

In 2013-2014, Google presented to Sonos on its plans for Cast for Audio, including multi-zone group technology and cross-brand capabilities. Opp. at 17-23. And beginning in 2015, Google developed its own products that implemented multi-zone group technology, releasing new Chromecast devices and its first smart speaker product, Google Home, in 2016. *Id.* at 23. At no point between 2013 and 2020 did Sonos notify Google of the existence of the asserted patents, its claim to rights in the overlapping speaker grouping technology, or Google's alleged infringement. Sonos also did not have its own practicing products until 2020. Accordingly, the relationship between the parties from 2013 to 2020 and Sonos's own lack of practicing products until 2020 are accompanying factors that indicate Sonos's silence was misleading and in bad faith.

Sonos claims it "continued to notify Google of infringement during the period 2016 to 2019, providing Google with multiple detailed presentations and letters, as well as claim charts for hundreds of Sonos patents." Opp. at 21. Similarly, Sonos states it told Google it was "infringing the '853 patent [and '228 patent] in September and October 2016." *Id.* at 23. But these patents do not claim or even disclose overlapping speaker groups, nor did Sonos ever assert the '853 or '228 patents against Google. The "multiple" communications from Sonos relating to "hundreds of … patents" are in fact additional evidence that Sonos's silence *on the patents at issue here* was sufficiently misleading to amount to bad faith. Google could not have inferred from Sonos's behavior that Sonos would sue on the asserted patents. To the contrary, Sonos's behavior led Google to believe that Sonos repeatedly sent notices of infringement on different purported "Zone Scene" patents that did not claim overlapping speaker groups (and which Sonos did not seek to enforce against Google in any event).

### B.     *Sonos Mischaracterizes Google's Arguments With Respect to Cast for Audio*

Sonos argues that Google now seeks to rely on Cast for Audio evidence that Google previously represented to the Court was not relevant to zone scenes or "overlapping speaker group technology." Opp. at 23. Sonos mischaracterizes Google's position. At trial, Google simply explained the undisputed fact that Cast for Audio was not an accused product, and that Sonos's introduction of evidence related to Cast for Audio and the company's collaborations and meetings in the 2013-2015 timeframe would open to the door to the Court's rulings of invalidity and/or non-infringement on Sonos's patents directed to casting.

As Google explained in earlier briefing (Dkt. 702), Cast for Audio was a Google program started in 2013 to allow third-party speaker manufacturers to integrate Cast technology into their own devices. *See, e.g.*, Dkt. 755-2 at 3 (Shekel testimony at 29:12-18). In connection with that program, Mr. Shekel and other members of the Cast for Audio team met with a number of third-party speaker manufacturers in 2013 and 2014. Importantly, Cast for Audio utilized Google's Cast technology, which was an accused functionality for the '615 and '033 patents, but not the '885 or '966 patents. Moreover, as Google explained, Cast for Audio predated the development and release

of the accused multizone speaker technology, which was first implemented in December 2015 in one of Google's hardware products (Chromecast Audio).

During trial, Google raised its concern that Sonos's introduction of Mr. Shekel's testimony in connection with a potential Cast integration would give the jury the incorrect impression that Cast integration related to Sonos's claimed "zone scenes" technology. *See* Dkt. 702; *see also*, Trial Tr. at 582:2-15 ("Your Honor has ruled that *if they start to focus on the casting functionality and specifically focusing on this 2013-'15 time period when there was collaboration or at least a meeting to talk about that technology, that that would open the door for us* to bring in the fact that casting functionality was previously accused of two patents in this case and that Your Honor had determined those two patents to be invalid based on prior art. So we don't have a problem with them playing these videos. That would be -- the ones that we identified were Vincent Mo and Shekel. They relate to the casting issue. But, again, then, *we believe that they have opened the door*, and we should be able to draw out from the witnesses that two of the patents in this case [are] directed to that functionality") (emphasis added); *id*. at 707:15-18 ("[T]he issue is now they have injected cast. I think we should be able to respond that cast is Google technology; and, therefore, any meetings that occurred about Cast for Audio is involving our technology."). Moreover, it is *Sonos* that argued Cast for Audio was relevant to the '885 and '966 patents, and the Court sided with Sonos and disagreed with Google, declining to find that this evidence opened the door to Sonos's assertion of the '615 or '033 patents (although the Court ultimately ruled that Sonos had opened the door based on its introduction of evidence relating to the draft Texas complaint). Sonos cannot now complain that the Cast for Audio evidence that *Sonos* injected into the case as relevant to the asserted patents proves that Sonos's claims are equitably estopped.

None of the foregoing changes the fact that in 2013-2014, Google presented its plans for Cast for Audio to Sonos, including its multi-zone group technology and cross-brand capabilities. Mot. at 17-23. And beginning in 2015, Google started developing its own products, releasing new Chromecast devices and its first smart speaker product, Google Home, in 2016. *Id.* at 23. Sonos waited at least four years after Google deployed its multiroom audio products, and nearly six years after Google began confidentially discussing its plans for overlapping speaker group technology

before informing Google of its patents. *See* Mot. at 17-23 (equitable estoppel portion re C4A). Although Cast for Audio itself was not accused, Sonos does not dispute that it reflects Google's ideas and plans for overlapping speaker group functionality and that Google presented those plans confidentially to Sonos in 2013-2014. Accordingly, nothing prevents Google from relying on these 2013-2014 meetings as evidence that in the years following these meetings Sonos should have disclosed to Google that it (allegedly) invented overlapping zone scenes first.

### C.    *Google Relied on Sonos's Conduct*

Sonos claims that Google has not shown Google's reliance on Sonos's conduct. Sonos distinguishes *ABB Robotics* and *Intel* on grounds that the facts at issue here are less extreme than in those cases, and suggests that it had no obligation to identify its alleged rights to overlapping zone scenes until the asserted patents issued. Opp. at 27. Sonos fails to cite any cases of its own, however, and simply points back to "Sonos's increasingly vocal assertions to Google, over the period 2016 to 2020." *Id.* But, again, until 2020 none of these assertions related to the '885 and '966 patents or the alleged invention of overlapping speaker groups. As explained above in relation to prosecution laches, after delaying prosecution of family members of the '885 and '966 patents, Sonos later decided to expedite prosecution of the applications that led to the '885 and '966 patents, without informing Google that Sonos claimed exclusive rights to overlapping speaker groups. *See* Section I. *supra* (prosecution laches). Sonos delayed seeking patent protection for overlapping zone scenes until it applied for the '885 and '966 patents in April 2019. Between 2006 and 2019, Sonos kept the prosecution chain "alive" by filing applications in 2007, 2013, and 2016. TX0001 at 3-4; TX0003 at 3-4. In 2014, Google disclosed to Sonos its plans for the implementation of multizone speaker functionality, including overlapping speaker groups and continuing playback on an individual speaker when it was added to a speaker group, and moved forward and entered the wireless audio products market in 2015. For the ensuing six years, Sonos never mentioned any alleged infringement by Google's overlapping speaker groups and never informed Google that Sonos claimed ownership over such technology. Between 2014 and 2020 there were no "vocal assertions" about alleged infringement by Google of inventions claiming overlapping speaker groups, and Google relied in good faith on Sonos's silence.

### D. *Sonos's Conduct Prejudiced Google*

Sonos argues there is no evidence of prejudice to Google, but that is not correct. First, Sonos dismisses any "financial and reputational harm" simply because it "could be claimed by every infringer." Opp. at 28. Sonos further dismisses Google's investment in its products by arguing (erroneously) that Google "intentionally sells the accused products at a loss." *Id.* But there is no dispute that Google expended significant resources in developing and marketing these products. *See e.g.*, Trial Tr. at 1517:24-1518:25 (Chan direct) (*e.g.*, "[t]here's a lot of work that goes into developing hardware products at Google. It's a really extensive collaboration across hardware and software teams and many functions from engineering to design to research, as well as broader functions like business, sales, and marketing"). Sonos did not inform Google that it had intellectual property rights related to overlapping speaker groups for years while Google was expending these resources. Further, Sonos is incorrect that Google "intentionally" sells the accused products at a loss. Dkt. 755-2 at 79 (Chan testimony at 125:15-22) ("Q. Would Google sell a product that wasn't profitable? A. I can't speak to the hypothetical, but I can say that Google encourages all of our hardware products to be run sustainably.").

Finally, Sonos claims that Google has "no evidence that it would have done anything differently had Sonos told Google it would later obtain patents on overlapping zone scenes." Sonos relies on *Gasser Chair* for the proposition that evidence of causation is necessary, but the only evidence of causation there was the defendant's conclusory assertion that it had relied on the plaintiff's "supposed silence from 1981 to 1988." Here, the evidence shows that Google attempted to design around the asserted patents once they were asserted in this case. And even though the design alternative was found infringing at trial (pending resolution of Google's JMOL), Google nevertheless took steps to avoid infringement and could have taken other steps had Sonos asserted its claims earlier (*e.g.*, by seeking review of the patents by the USPTO before introducing overlapping speaker groups into its products or implementing other design alternatives). Thus, there is additional evidence of causation beyond a simple conclusory assertion.

### IV. CONCLUSION

The Court should hold the asserted patents unenforceable against Google.

DATED: July 6, 2023

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Sean Pak*
   Sean Pak
   Melissa Baily
   James D. Judah
   Lindsay Cooper
   Marc Kaplan
   Iman Lordgooei

*Attorneys for GOOGLE LLC*