CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
BAS DE BLANK (SBN 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ls3ip.com
MICHAEL P. BOYEA (*pro hac vice*)
boyea@ls3ip.com
COLE B. RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:     +1 312 754 0002
Facsimile:     +1 312 754 0003

*Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., | Case No. 3:20-cv-06754-WHA |
| Plaintiff and Counter-defendant, | Consolidated with Case No. 3:21-cv-07559-WHA |
| v. | **SONOS, INC.'S OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL** |
| GOOGLE LLC, | |
| Defendant and Counter-claimant. | Judge:  Hon. William Alsup |
| | Courtroom:  12, 19th Floor |
| | Trial Date: May 8, 2023 |

**TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD........................................................................................... 1

III.   ARGUMENT ........................................................................................................ 1

    A.   Google Did Not Meet Its Burden To Prove Invalidity Of Either Patent.......................... 1

        1.   Google failed to prove the asserted claims are invalid............................................. 1

            a.   The Sonos 2005 System did not use zone scenes. .................................. 2

            b.   The Sonos Forums did not disclose how to save overlapping groups and later invoke them. ...................................................................... 5

            c.   Squeezebox and Nourse did not render the asserted claims obvious.................. 6

            d.   Google did not establish a motivation to combine or a reasonable expectation of success, and it relied on improper hindsight. ....................... 7

        2.   Additional evidence supports the jury's determination that the asserted claims of the '966 patent are valid. ............................................................. 9

        3.   Objective indicia of non-obviousness also support the jury's verdict....................... 10

    B.   Google Infringes The '885 Patent. ......................................................... 12

        1.   The jury correctly rejected Google's "idle mode" arguments.................................. 12

        2.   Google's claim construction argument fails as a matter of law. ............................. 16

    C.   Google Fails To Show That It Is Entitled To Overturn The Damages Award. ............. 19

        1.   Substantial evidence supports the jury's damages award. ....................................... 19

        2.   Google is not entitled to a new trial on damages or to remittitur............................. 24

IV.   CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Hospira, Inc.*,
    944 F.3d 1327 (Fed. Cir. 2019) .......................................................................... 24

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014) .......................................................................... 22

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 12–CV–00630–LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014) ............................... 17

*Barnard v. Theobald*,
    721 F.3d 1069 (9th Cir. 2013) .......................................................................... 1, 12

*Bayer Healthcare LLC v. Baxalta Inc.*,
    989 F.3d 964 (Fed. Cir. 2021) .......................................................................... 24

*Contour IP Holding, LLC v. GoPro, Inc.*,
    No. 3:17-CV-04738-WHO, 2021 WL 4148651 (N.D. Cal. Sept. 13, 2021) ......................... 17

*DSPT Int'l, Inc. v. Nahum*,
    624 F.3d 1213 (9th Cir. 2010) .......................................................................... 1

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021) .......................................................................... 9

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018) .......................................................................... 20

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
    918 F.3d 928 (Fed. Cir. 2019) .......................................................................... 11

*Fujifilm Corp. v. Motorola Mobility LLC*,
    No. 12-CV-03587-WHO, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015) ........................... 17

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) .......................................................................... 1

*Henny Penny Corp. v. Frymaster LLC*,
    938 F.3d 1324 (Fed. Cir. 2019) .......................................................................... 10

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) .......................................................................... 7

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
   292 F.3d 728 (Fed. Cir. 2002) ................................................................................. 20

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
   688 F.3d 1342 (Fed. Cir. 2012) ................................................................................. 7

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) .............................................................................................. 7, 9

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ............................................................................... 1, 19

*Monsanto Co. v. Ralph*,
   382 F.3d 1374 (Fed. Cir. 2004) ............................................................................... 20

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ............................................................................... 20

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.*,
   760 F. App'x 977 (Fed. Cir. 2019) .............................................................. 21, 22, 24

*SRAM Corp. v. AD-II Eng'g, Inc.*,
   465 F.3d 1351 (Fed. Cir. 2006) ................................................................................. 1

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ............................................................................. 7, 8

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ............................................................................... 22

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) ............................................................................... 11

*Weeks v. Angelone*,
   528 U.S. 225 (2000) .......................................................................................... 20, 25

**Other Authorities**

Rule 59 ........................................................................................................................ 1

1

## I.    INTRODUCTION

Google bore the burden to prove Sonos's '885 and '966 patents invalid by clear and convincing evidence, and a reasonable jury could have found that it failed to meet that burden. Substantial evidence supports both the jury's conclusion that the new versions of Google's products infringe the '885 patent and its determination of a per-unit royalty for that infringement. The Court should deny Google's motion for judgment as a matter of law and a new trial.

## II.    LEGAL STANDARD

In assessing a renewed motion for judgment as a matter of law (JMOL), the Court must view the trial evidence in the light most favorable to the non-moving party and "draw all reasonable inferences in that party's favor." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (citation omitted). The Court must deny JMOL unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)). And the Court "must not weigh the evidence, but should simply ask whether the [non-moving party] has presented sufficient evidence to support the jury's conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). Under Rule 59, the Court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted).

## III.    ARGUMENT

### A.    Google Did Not Meet Its Burden To Prove Invalidity Of Either Patent.

Google had the burden to overcome the presumption of validity for both patents with "clear and convincing evidence." Dkt. 762 at 6, 9; *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). The jury reasonably found that Google failed to meet that burden.

#### 1.    Google failed to prove the asserted claims are invalid.

Google argues that the asserted claims are invalid over the combination of the Sonos 2005 System with any one of the Sonos Forums, Squeezebox, and Nourse. Dkt. 824 ("Google Br.") at

3-12.  Each combination requires that the Sonos 2005 System include zone scenes.  A reasonable jury could have found against Google on that point alone.  And there were several other failings in Google's proof, as shown below.

### a. The Sonos 2005 System did not use zone scenes.

Google's obviousness arguments all depend on its contention that Party Mode in the Sonos 2005 System was a zone scene.  Google relied on the Party Mode feature to teach zone scenes themselves and to teach the limitations of creating, saving, and invoking a zone scene in the asserted claims.  Party Mode was not a zone scene because (1) it was not previously saved, and (2) it was simultaneously created and invoked—there was no separate step of invoking Party Mode.  The jury could have found that Google failed to prove Party Mode had either or both of those features and thus rejected Google's obviousness arguments.

**Previously saved:**  The Court construed "zone scene" as "a previously-saved grouping of zone players according to a common theme," Dkt. 762 at 9, and Sonos presented substantial evidence that Party Mode was not a "previously saved grouping."  Instead, Party Mode was merely an "instruction" to link "each of the players that are in the system" "one-by-one."  Trial Transcript ("Tr.") at 342:7-10 (Millington); *see also id.* at 327:18-23 (Mr. Millington explaining that Party Mode linked all players "dynamically").  In other words, when a user invoked Party Mode, the Sonos 2005 System would then form a group of "all the zones" that happened to be "in the system at the same time," but that group membership would not be saved.  Tr. at 1659:24-1660:5 (Almeroth); *see also id.* at 459:8-13 (Mr. Lambourne explaining that "the players that would play in Party Mode w[ere]n't saved in the system in the original design").  So, Party Mode was akin to the reply-all function in an email client.  Dkt. 765 at 2.  Like Party Mode, the reply-all function is "hard coded" into the email client, but the list of email addresses populated in an email when a user chooses to "reply-all" is not "previously saved."  On the contrary, when a user invokes reply-all, the system identifies all of the other email addresses on the original message to create a group of recipients for the new message *at that time*.  *Id.*  But the next time the user selects "reply all" to a different email, the system reengages in the process to identify the then-

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

relevant email addresses and then creates a different group of recipients.  In the same way, Party Mode was not "a previously-saved grouping of zone players according to a common theme."

The testimony from Sonos's witnesses that Google cites to show that Party Mode was "pre-saved," Google Br. at 3-4, actually makes clear that Party Mode is *not* a "pre-saved" grouping of players.  Mr. Lambourne said that Party Mode "would cause [all the rooms in the system] to be grouped together."  Tr. at 420:1-7; *see id.* at 489:10-12 (Party Mode "would link those players together").  When Mr. Lambourne said that "Party Mode was hard coded into the controller," he clarified that he meant the "Party Mode *feature*" was hard-coded, because "the rooms that would be invoked by Party Mode were not saved."  Tr. at 502:13-24 (emphasis added).  Mr. Lambourne also explained that a statement in his "Alarm Clock" specification describing Party Mode as "one example of a Zone Scene," TX6544 at 27, used the term zone scene "imprecisely," because "the zone scene feature is much more flexible and powerful" than Party Mode.  Tr. at 457:16-19; 462:16-463:11.  And Mr. Lambourne noted that the "spec for zone scenes … has more accurate descriptions" of zone scenes than the Alarm Clock specification.  Tr. at 463:21-25; *see* TX6545 at 2 (Sonos UI specification for Zone Scenes).

Similarly, Mr. Millington testified that any groups in the Sonos 2005 System could not be saved "for future use," including Party Mode; players were "instantly grouped together in that moment" at invocation.  Tr. at 327:18-328:20.  And contrary to Google's citation, Google Br. at 3, the fact that "all the speakers in the house would play music together as a group" if a user invoked Party Mode and then "c[a]me back two weeks later [and] push[ed] play" did not show that the group was pre-saved; it showed that the group was invoked but waiting for music to output.  Tr. at 489:23-490:2 (Lambourne).

**Created and later invoked:**  Even assuming that Party Mode qualified as a "zone scene" under the Court's construction of that term, Party Mode did not operate in the way the claims require.  Claim 1 of the '885 patent requires a first zone player to "receiv[e]" separate "indication[s]" that it has been added to two different zone scenes and ***then*** "operate in the standalone mode until a given one of the first and second zone scenes has been selected for

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

invocation." TX0003 at 46; *see also* TX0001 at 40 (similar for '966 patent).  But in Party Mode, creating the group and invoking it occurred simultaneously, as Dr. Almeroth explained:  "You're not keeping track of all the players in the system.  You press the button.  It creates and invokes at the same time."  Tr. at 904:16-24.  Dr. Schonfeld also admitted that "the formation of the group and the invocation are contemporaneous in the Sonos prior art system," at least "when the coordinator is playing music."  Tr. at 1476:18-22.  Sonos introduced Dr. Schonfeld's previous deposition testimony, *id*. at 1477:18-20, where he agreed that, for Party Mode, "each indication comes with the invocation," Dkt. 793-3 at ECF p. 13.  The Sonos 2005 System otherwise only allowed for the creation of other types of "dynamic" groups that, in the same way, were created and invoked simultaneously.  Tr. at 327:18-328:20.

Despite that testimony, Google argues that Dr. Schonfeld "showed" that Party Mode "was a previously-saved grouping of zone players according to a common theme."  Google Br. at 3. To be sure, Dr. Schonfeld said that Party Mode "was one zone scene that was … predefined."  Tr. at 1381:11-13.  But Dr. Schonfeld also called Party Mode "a zone ***group*** corresponding to all ZonePlayers in the house."  Tr. at 1381:14-18 (emphasis added).  As Dr. Almeroth described, zone groups in the Sonos 2005 System were not "previously saved" and instead were "immediately launched into a group" when a user identified the speakers.  Tr. at 1658:11-19; *see also id*. at 328:11-20 (Mr. Millington testifying that players in a zone group were only "instantly grouped together in that moment" so a user "can't come back the next day and reapply that group").  And, as explained above, Dr. Schonfeld conceded that creation of the group and invocation occurred simultaneously for Party Mode, meaning that the group was not pre-saved and then later invoked, and therefore did not meet key limitations of the asserted claims.  Tr. at 1476:18-22; Dkt. 793-3 at ECF p. 13.

Thus, adding "a second zone scene that overlaps with the first zone scene and remain[s] in standalone mode until a zone scene is invoked" would not have brought the Sonos 2005 System within the scope of Claim 1.  *Contra* Google Br. 4.  Because there was substantial evidence for

the jury to conclude that the Sonos 2005 System did not teach zone scenes, all of Google's combination arguments fail out of the gate.

### b. <u>The Sonos Forums did not disclose how to save overlapping groups and later invoke them</u>.

Google makes much of posts from the Sonos Forums stating that users wanted the ability to create and save for later overlapping groups of speakers.  Google Br. at 4-5 (citing TX2424 at 1; TX3928 at 1).  In Google's view, these posts—some of which vaguely referenced using "a macro sequence" or "a macro type function" to create saved groups, TX3928 at 2—"rendered the asserted claims obvious by adding to the Sonos 2005 System a second, overlapping zone scene that could be saved and later invoked."  Google Br. at 4-7.  But—setting aside that the Sonos 2005 System had no zone scenes to begin with—the user posts never discussed *how* to implement overlapping groups or groups that could be saved and invoked later.  That means they did not teach any of the claim limitations requiring sending/receiving indications that a player has been added to the group, or separately sending/receiving indications that the group is being invoked.

Google's contention that the mere mention of "a macro" taught these particular claim limitations is wrong.  A macro is just "a series of instructions that a computer or technology … would sort of automatically go through."  Tr. at 434:7-11; *see also id*. at 1435:2-3 (Dr. Schonfeld acknowledging that macros are "program instructions at a high level").  In other words, "macro" is just another word for "computer programming," not a specific solution for creating and saving separate groups of media players.  *Contra* Google Br. at 8.  Telling someone to use macros to develop something is like telling them to use code, or "telling someone to use paper and pencil to make a picture."  Dkt. 765 at 4.  Thus, although Dr. Schonfeld testified that the Sonos Forums taught limitations 1.7 and 1.8 of Claim 1 of the '885 patent or limitations 1.5-1.8 of Claim 1 of the '966 patent, he never showed where the Forum posts taught the limitations requiring separately defining and saving groups of players.[1]  Tr. at 1431:13-1438:5.

---

[1] The limitations are numbered on page iii of Google's brief.

Likewise, Dr. Schonfeld never opined that the Sonos Forums taught how to overcome the foundational architectural differences between the ad hoc, immediately invoked groups in the Sonos 2005 System and the static groups that could be saved and invoked later in the asserted patents.  He testified only that the Forums suggested "overlapping" groups.  Tr. at 1435:16-24.  And although Dr. Schonfeld testified that it would be a "trivial" change to the Sonos 2005 System to save a group "for later," *id*. at 1389:3-9, "he never described relying on the zone scenes or creating zone scenes from the Forum posts and modifying the Sonos 2005 System," as Dr. Almeroth explained, *id*. at 1704:3-21.[2]

Google also suggests that Mr. Lambourne got the idea for overlapping groups from the Sonos Forums because he testified that he "looked at comments" on the Forums "from time to time."  Tr. at 466:19-22; Google Br. at 6-8.  But Mr. Lambourne's notebooks showed that he developed the idea for Zone Scenes before the posts in question appeared on the Forums.  Tr. at 613:16-617:11; TX6539 at 3 (Mr. Lambourne's sketch, dated March 2, 2005); TX8236.  And Mr. Lambourne said expressly that he did not recall seeing any comments "relating to Zone Scenes" and did not rely on any comments in designing or developing zone scenes.  Tr. at 467:1-5.

**c.     Squeezebox and Nourse did not render the asserted claims obvious**.

Google contends that the Squeezebox System disclosed "saving overlapping zone scenes for later invocation and invoking one of the zone scenes while the zone player is operating in standalone mode."  Google Br. at 9-10.  The jury could have discounted Dr. Schonfeld's opinions about Squeezebox because he admitted that he did not test a single Squeezebox with firmware "that was released prior to the priority date for the '885 patent."[3]  Tr. at 1482:18-20; *see also* Dkt.

---

[2] Google proclaims that "even the Examiner took 'official notice' during prosecution" of the '966 patent that "*grouping zone players for later invocation* 'was well known in the art before the effective filing date … and would have been *an obvious inclusion*.'"  Google Br. at 6 (quoting TX0004 at 4577).  Here, Google cites the examiner's initial rejection of the application that became the '966 patent.  TX0004 at 4574.  Of course, the '966 patent ultimately issued after Sonos explained that, contrary to the examiner's initial position, the DME system did not teach "overlapping device groups"; a device could belong to only one group in DME.  TX0004 at 823.

[3] Google says "Sonos did not dispute that the Squeezebox source code Dr. Schonfeld relied upon was prior art."  Google Br. at 10.  But Dr. Schonfeld conceded that he "did not analyze the source code for the[] Squeezebox players."  Tr. at 1482:6-8.

793-3 at ECF p. 15 ("the Squeezeboxes themselves are after the—are after the critical date").  Dr. Schonfeld also admitted that he never tested "how to add a single [physical] Squeezebox player to two different sync groups that existed at the same time."  Tr. at 1482:22-1483:6; *see also id.* at 1483:23-1484:1.

Google similarly argues that Nourse "disclosed the ability to create overlapping zone scenes that could be saved and later invoked."  Google. Br. at 11.  "Could" is misleading here, because Nourse did ***not*** save any groups.  Instead, Dr. Schonfeld testified only that Nourse taught assigning speakers "up to four group identifiers" each, such that if "one speaker belongs to four different group identifiers, it means that all four of these groups contain that speaker" and "are overlapping."  Tr. at 1439-9-17.  So Nourse did not render Claim 1 obvious.

Moreover, the examiner considered both the Squeezebox System and Nourse, among other references, before issuing both the '996 and the '885 patents.  Tr. at 1488:1-1490:5.  The burden of showing invalidity "is especially difficult" to meet "when the prior art was before the PTO examiner during prosecution of the application."  *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990).  Google did not meet that burden here.

### d.   Google did not establish a motivation to combine or a reasonable expectation of success, and it relied on improper hindsight.

To invalidate a patent on the basis of obviousness, a defendant must show "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention" and "would have had a reasonable expectation of success in doing so."  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (citation omitted); Dkt. 762 at 13.  Google did neither, and Dr. Schonfeld's testimony about obviousness also demonstrated impermissible "hindsight bias."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); Dkt. 762 at 14.

Expert testimony on obviousness must explain why a person of ordinary skill in the art (POSITA) would have combined the teachings of prior art references "*in the way the claimed invention does*."  *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1360 (Fed. Cir. 2019).  But

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1   Dr. Schonfeld made only conclusory assertions that his prior art combinations were possible and

2   obvious; he never explained *why* a POSITA would have been motivated to combine them in the

3   manner of Sonos's claimed inventions, as opposed to some other way.

4        Regarding the Sonos Forums, for example, Dr. Schonfeld testified that the combination

5   would have been obvious because "[t]he Sonos forum was posting[s] of people who were

6   interested—users, dealers who were interested in the Sonos 2005 system." Tr. at 1431:22-1432:4.

7   The fact that consumers wanted a feature does not explain why a POSITA would have developed

8   the feature in the same way Sonos did. Similarly, for Squeezebox, Dr. Schonfeld said only that

9   the combination would have been obvious because "they were competitors back then" and

10  "would have looked into each other's system and tried to see what the competitor is doing." Tr.

11  at 1443:1-8. Again, that testimony says nothing about why a POSITA in 2005 would have

12  combined the teachings exactly as Sonos's invention does, although it shows Dr. Schonfeld's

13  hindsight bias about how he would expect competitors to behave. Dr. Schonfeld's testimony on

14  Nourse suffered from the same problem. He claimed that both Nourse and the Sonos 2005

15  System "address[] management of speaker systems" and "solv[e] very similar problems of

16  managing saving zone groups and making them available and flexible to play individually or play

17  later." Tr. at 1441:4-10; *but see infra* 7. Sonos did not agree that the Sonos 2005 System

18  addressed "managing saving zone groups." But even if Dr. Schonfeld's testimony is assumed to

19  be accurate, at best it suggests that a POSITA might have wanted to figure out how to save groups

20  of media players, but it says nothing about why the POSITA would have wanted to accomplish

21  that "*in the way the claimed invention does*." *TQ Delta*, 942 F.3d at 1360.

22        On expectation of success, Dr. Schonfeld similarly offered only conclusory testimony that

23  making various changes would have been "trivial." *E.g.*, Tr. at 1423:32-1424:18, 1440:6-19. For

24  example, Dr. Schonfeld said that it would have been "a trivial operation" to modify Nourse to

25  store group identifiers "for later use," but he gave no explanation for his view other than that

26  there would have been enough storage space to do so. Tr. at 1440:6-18. Dr. Schonfeld also said

27  that modifying the Sonos 2005 System to save a group would have been "a trivial step" because

28

"you just keep instead of discarding" the group.  Tr. at 1423:22-1424:18.  While Dr. Schonfeld contends in hindsight that saving the group appears easy and obvious, his testimony says nothing about why a POSITA in 2005 "would have had a reasonable expectation of successfully achieving the claimed invention."  *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021).

As the discussion above shows, and as Dr. Almeroth explained to the jury, Dr. Schonfeld "incorporated hindsight into his analysis.  He's considered his own knowledge and skill and what would be easy for him to do as opposed to putting himself in the mind of a person of skill in the art in 2005 specifically."  Tr. at 1654:4-8.  That kind of analysis is forbidden in assessing obviousness.  *KSR Int'l*, 550 U.S. at 421.

### 2.  Additional evidence supports the jury's determination that the asserted claims of the '966 patent are valid.

Along with the failings detailed above, Google also failed to show how the prior art performs limitations 1.9 and 1.10 of Claim 1 of the '966 patent.  Both limitations require "displaying a representation of the first zone scene and a representation of the second zone scene."  TX0001 at 40.  Google did not offer evidence that any prior art taught these display limitations or that any combination of the prior art made that limitation obvious.

Google concedes that Dr. Schonfeld did not separately analyze how the prior art met the elements of Claim 1 of the '966 patent.  Google Br. at 12.  Instead, Dr. Schonfeld conducted his analysis for Claim 1 of the '885 patent and then simply ported that analysis over to the non-identical Claim 1 of the '966 patent, both in his trial testimony and in his expert report.  *E.g.*, Tr. at 1390:3-17, 1479:25-1481:4.  That is a problem for Google, because the '885 patent does not require the '966 patent's display limitations.  *Compare* TX0001 at 40, *with* TX0003 at 46.[4]

Dr. Schonfeld testified that limitation 1.9 of Claim 1 of the '966 patent was "satisfied by Sonos 2005 based on the same evidence and analysis I just presented for claim limitation 1.6 of the '885 patent."  Tr. at 1390:12-17.  But he admitted later that limitations 1.6 and 1.7 of the '885

---

[4] Sonos challenged Google's unsupported cross-referencing between the two patents with its second motion in limine.  Dkt. 594.

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1  patent do not contain "analogous language" to limitation 1.9 of the '966 patent "call[ing] for

2  displaying a representation" of the zone scenes.  Tr. at 1478:20-1479:7.  Likewise, after testifying

3  that the Sonos 2005 System satisfied limitation 1.10 of the '966 patent "based on the same

4  evidence and analysis I just performed for claim limitations 1.9 and 1.10 of the '885 patent," Tr.

5  at 1422:6-14, Dr. Schonfeld again admitted that "the display part is not there in the claim

6  language" of the '885 patent, *id*. at 1479:17-24.

7        None of Dr. Schonfeld's testimony that Google cites explains how the prior art covered

8  the '966 patent's display limitations.  *See* Google Br. at 12 (citing Tr. at 1421:2-21, 1452:13-

9  1453:2, 1422:6-14, 1505:12-24).  He just asserted it without analysis—because his expert report

10  would not support any more robust testimony.  On redirect, Google's counsel pointed Dr.

11  Schonfeld to a slide, DDX10.50, as "showing us how the controller would display various zone

12  groups or scenes, including All Zones-Party Mode."  Tr. at 1505:10-17; *see also* Dkt. 768-1 at

13  130.  As explained above, Party Mode was not a zone scene.  What's more, the controller on that

14  slide does not display "a representation of the first zone scene and a representation of the second

15  zone scene," TX0001 at 40; it displays Party Mode and *individual* zone players, Dkt. 768-1 at

16  130.

17        For this additional reason, the jury reasonably found that Google did not meet its burden

18  to prove obviousness for the '966 patent by clear and convincing evidence.

19        **3.    Objective indicia of non-obviousness also support the jury's verdict**.

20        Sonos introduced multiple news articles that showed industry praise for Sonos's claimed

21  inventions, along with evidence of skepticism about the possibility of creating overlapping zone

22  scenes.  Because "evidence of secondary considerations may often be the most probative and

23  cogent evidence in the record," *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed.

24  Cir. 2019) (citation omitted), this evidence supports the jury's finding that Google failed to prove

25  invalidity by clear and convincing evidence.

26        The jury saw a 2020 CNN article declaring: "By far the best feature of Sonos S2 is the

27  ability to save a group of speakers as a preset. … It's really great."  TX6780 at 3.  Google argues

28

10

1    that the CNN article "was irrelevant to secondary considerations" because it does not describe

2    having "three or more overlapping" speakers.  Google Br. at 13 (quoting Tr. at 1678:20-25).  But

3    the law presumes a "nexus for objective considerations when the patentee shows that the asserted

4    objective evidence is tied to a specific product and that product 'is the invention disclosed and

5    claimed in the patent.'"  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016) (citation

6    omitted).  Here, it is undisputed that Sonos's 2020 system practices the claimed invention, and

7    Google never tried to rebut the presumption of nexus.

8        The jury also saw a 2020 article from TechHive describing the ability to save and control

9    groups of Sonos speakers as "very useful."  TX6788 at 2.  Google dismisses this article because it

10   contains "a quote from a 'Sonos spokesperson.'"  Google Br. at 13 (quoting TX6788 at 2).

11   Although the article quotes a Sonos employee, the "very useful" description is the author's words,

12   not Sonos's.  And contrary to Google's argument that the article does not praise overlapping

13   speaker groups, Google Br. at 13, Dr. Almeroth explained "that's the functionality it's referring

14   to."  Tr. at 1688:5-8; *see also* 1679:5-10.  Thus, Google failed to rebut the nexus presumption.

15       Along with the industry articles, Dr. Almeroth testified that posts from the Sonos Forums

16   "cast[] doubt as to how overlapping zone scenes would have worked in the Sonos system" as late

17   as 2016.  Tr. at 1674:15-1675:12.  Google argues that the 2016 post "is legally irrelevant because

18   the obviousness analysis must be performed at the time of the alleged invention in December

19   2005."  Google Br. at 8-9 (citing *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928,

20   937 (Fed. Cir. 2019)).  But Google's own case says that the Federal Circuit "permit[s] *evidence*

21   from after the patent is granted to be considered in assessing whether there are unexpected

22   results" that "can support a conclusion of non-obviousness."  *Forest Lab'ys*, 918 F.3d at 937.

23       Finally, the jury also heard extensive evidence about both parties' commercial success

24   with media players that embody the claimed inventions—evidence that Google ignores here.

25                                                    * * *

26       Before trial, the Court denied Google's motion for summary judgment of invalidity,

27   finding genuine disputes of material fact prevented Google from showing invalidity as a matter of

28

11

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1    law.  Dkt. 566 at 26-29.  The jury resolved those disputes in Sonos's favor, and substantial

2    evidence supports the jury's conclusion that both patents are valid.  For the same reason,

3    Google's cursory, one-sentence request (Google Br. at 22) for a new trial on invalidity fails.

4           **B.    Google Infringes The '885 Patent**.

5           Google has not shown, and cannot show, that it is entitled to judgment that Google's new

6    design does not infringe the '885 patent.  Google offers two arguments for overturning the jury's

7    verdict.  Both fail to establish that "the evidence permits only one reasonable conclusion, and that

8    conclusion is contrary to the jury's verdict."  *Barnard*, 721 F.3d at 1075.

9           **1.    The jury correctly rejected Google's "idle mode" arguments**.

10          Google argues that the jury was required as a matter of law to ***both*** credit Google's trial-

11   created "idle mode" narrative ***and*** conclude that "idle mode" avoids the '885 patent's standalone

12   mode limitations.  Google is wrong on both counts.  Google's "idle mode" theory was

13   unsupported by documentary evidence or expert testimony, and the jury could reasonably

14   discount Mr. MacKay's self-serving testimony regarding idle mode.  Moreover, even on its own

15   terms "idle mode" fails to avoid infringement—and at the very least, a reasonable jury was

16   permitted to find in Sonos's favor on this question, as the jury here did.

17          Google argues that "the ***unrebutted*** evidence presented at trial demonstrated that speakers

18   with the new design can operate in three modes," including "an idle mode in which the speaker is

19   not configured to play back any media."  Google Br. at 14 (emphasis added).  That is inaccurate.

20   Google's only support for its idle mode theory was Mr. Mackay's testimony.  Google had no

21   supporting documentary evidence and no expert testimony showing how Mr. Mackay's "idle

22   mode" mapped onto claim 1 of the '885 patent.  The Court precluded Google's expert, Dr.

23   Schonfeld, from offering any testimony that idle mode demonstrates noninfringement, because

24   the "idle mode" theory had never been disclosed in Dr. Schonfeld's expert report.  Tr. at 1400:11-

25   13, 1400:15-17, 1415:24-1416:6.  So it was ***Dr. Almeroth***'s expert testimony—explaining that

26   Google's speakers operate in one of ***two*** modes, *see infra* 14-15—that was substantively

27   unrebutted, not Google's.  Google's own brief demonstrates this: the only testimony that Google

28

1   cites in support of this argument is Dr. Schonfeld's assertion that Google's new design requires

2   "leav[ing] operation in standalone mode" in order to launch or invoke a group—not that idle

3   mode is different from standalone mode. *See* Tr. at 1366:24-1367:9 (cited at Google Br. 14, 15);

4   *see also generally* Google Br. § II.B.1.

5          Google's related argument that "Dr. Almeroth[] ignored the idle mode," Google Br. at 15,

6   is particularly nonsensical. Dr. Almeroth's testimony tracked the opinions he disclosed during

7   discovery, while Google invented "idle mode" for the first time for Mr. MacKay's trial testimony.

8   And because Dr. Schonfeld was (correctly) precluded from offering an opinion regarding "idle

9   mode" there was also no expert opinion on idle mode offered by Google for Dr. Almeroth to

10  rebut.[5]

11         While Mr. MacKay testified about idle mode, his testimony does not support

12  noninfringement because he did not perform any comparison of "idle mode" to claim 1 of the

13  '885 patent, and acknowledged that he was not offering any opinion regarding infringement. Tr.

14  at 1274:15-17. A reasonable jury was thus entitled to give Mr. MacKay's testimony limited

15  weight. *See* Tr. at 1917:21-23 ("Mr. Ken MacKay was allowed to discuss idle mode. The weight

16  you ascribe to his testimony is up to you."). And the jury correctly heeded the Court's instruction

17  that it "must disregard" "Dr. Schonfeld's testimony regarding idle mode," which "was used to

18  refer to a mode that is neither standalone nor group with respect to noninfringement of the new

19  version of the accused products." Tr. at 1917:10-16; *see also id.* at 1917:19-20 (instructing the

20  jury that "none of [Dr. Schonfeld's] expert reports discussed idle mode ***or a third mode***, for that

21  matter" (emphasis added)).

22         A reasonable jury would ***also*** be well within its rights in concluding that Google's made-

23  for-trial "idle mode" narrative—even if creditable—did not avoid infringement. Google now

24  argues that "idle mode" avoids infringement because "no ***media application*** runs on the speaker"

25

26  ───────────────

27  [5] Notably, Google does not present any argument that the exclusion of Dr. Schonfeld's
    undisclosed opinions was in any way incorrect, and does not request judgment as a matter of law
    or a new trial on that basis. *See* Google Br. at 13-17, 22.

28                                                          13

1  in that mode, so a speaker in "idle mode" "is not configured to play back any media."  Google Br.

2  at 14-15 (emphasis added).

3       Dr. Almeroth explained why Google's redesigned speakers continue to operate in

4  standalone mode, notwithstanding execution of the StopCurrentApp function.  As Dr. Almeroth

5  explained, "the idea of the StopCurrentApp that Google is proposing is that if there is an app

6  running that's playing music, then it will be stopped as part of group creation."  Tr. at 799:14-17.

7  Explaining further, Dr. Almeroth noted "[a]nd so the person who's putting the speaker into the

8  group, if it's playing in standalone mode, will stop playing.  Now, *it still stays in standalone*

9  *mode*, but it will stop playing music.  If it wasn't playing music and it was in standalone mode,

10  then nothing changes about how that operates."  Tr. at 799:18-22 (emphasis added).  Dr.

11  Almeroth confirmed that in his own testing he observed "exactly those two scenarios."  Tr. at

12  799:23-24.

13       Dr. Almeroth further explained that part of claim 1 requires "during the creation process,

14  the speakers have to remain in standalone mode throughout the creation of the first zone scene

15  and the second zone scene."  Tr. at 802:9-12.  As Dr. Almeroth put it, "Google ties playing music

16  and hearing audio to being in standalone mode or not.  Google says if you're not hearing music,

17  then you're in some other mode and so you're not in standalone mode.  But the reality is the

18  claim talks about two modes: You're either in group mode where you're synchronized to play in

19  group mode or you're not, you're in standalone mode."  Tr. at 802:13-22.  For that reason, Dr.

20  Almeroth explained, "the fact that you stop playing audio as part of group creation does not take

21  that speaker out of standalone mode"; instead, "[i]t just stops the ability to hear audio of what's

22  already playing."  Tr. at 802:23-25.  And as Mr. MacKay testified, if that speaker is not already

23  playing, then the function StopCurrentApp() doesn't change what the user hears.  In Dr.

24  Almeroth's summary, Google's new version has a "very minimal" "impact on the device," with

25  "an impact on the user interface; but with respect to what's happening in the source code, it's still

26  operating in standalone mode."  Tr. at 803:3-6.

27

28

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

Mr. Mackay's testimony essentially reinforced Dr. Almeroth's.  Mr. Mackay testified that in a scenario in which there are two Google players, neither of which is engaged in active playback, and a user creates a new static speaker group that includes those two players, the StopCurrentApp function will not cause *any change* to the operational behavior of the player beyond running that function itself.  Tr. at 1285:12-24, 1287:7-15.  The jury could reasonably rely on that admission to conclude that Google's redesign was still infringing.

Moreover, Mr. MacKay admitted that a newly created static speaker group is not automatically launched at the time it is created, such that a speaker does not transition to group mode at the time of creation.  Tr. at 1278:7-14; *see also id.* at 1283:9-11 ("Q.  And the StopCurrentApp function does not cause a new static speaker group to be launched; correct?  A.  That's correct.").  In other words, Google agrees that StopCurrentApp() does *not* put speakers into *group mode*.  Because the claim limitations divide speakers into two modes[6]—standalone and group—a reasonable jury could, at a minimum, conclude that an operation that does not put speakers into group mode describes "continuing to operate in standalone mode."

And while Mr. MacKay testified that the StopCurrentApp() function closes out any application that was playing back media, Mr. MacKay admitted that even when a speaker is in the newly fashioned "idle mode," it is still plugged in, powered on, with code running on the device, the operating system running, the speaker available for selection by a user, and still in a mode where the user can even adjust the audio volume level and individually output audio.  Tr. at 1279:7-1281:10.  As Mr. MacKay admitted in response to questions from the Court, adjusting the volume level results in "the speaker mak[ing] a little boop noise"—"[i]t goes boop."  *Id.* at 1290:19-1291:6.  This is unequivocally a mode in which the device is "configured to play back media individually," even if it isn't actually playing music back individually.  These admissions would allow a reasonable jury to conclude that the "idle mode" story testified to and disclosed for the first time at trial is merely Google's attempt to repackage standalone mode in order to avoid a

---

[6] *See also* Tr. at 1917:10-20 (instructing the jury to "disregard" "Dr. Schonfeld's testimony regarding idle mode" and that "none of [Dr. Schonfeld's] expert reports discussed idle mode *or a third mode*, for that matter" (emphasis added)).

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1   finding of infringement.[7]   And a reasonable jury could also question Mr. MacKay's credibility

2   based on his contradictory testimony regarding whether restarting playback after the

3   StopCurrentApp() function's operation requires downloading an app or not.  *See* Tr. at 1292:3-24

4   (asserting on cross examination that "[t]he launch command essentially downloads the app from

5   the internet again" but when pressed by the Court admitting that "[i]t's not downloading an app.

6   It's more like opening a web page").

7       As Sonos explained, the jury could only reach one reasonable conclusion, Dkt. 754 at 1-4,

8   and it was the conclusion that the jury reached.  But at a minimum, a reasonable jury was at least

9   permitted to find in Sonos's favor.

10              **2.       Google's claim construction argument fails as a matter of law**.

11      Google also asks the Court to overturn the jury's verdict based on a claim construction

12   argument that Google raised for the first time midway through trial.  Google argues that the claim

13   term "configured to play back media individually" must be construed to mean "***actively playing***

14   ***back media*** individually."  Google Br. at 16 (emphasis added).  Google is wrong.

15      Prior to trial, Google's experts took the position that standalone mode did not require

16   active playback of media.  *See* Tr. at 1584:10-16 ("QUESTION:  Is it your understanding that

17   standalone mode does not require playing music?  ANSWER:  Does not require playing music?

18   ***So this comes from Dr. Schonfeld***, so my understanding, I think that's part of what you are

19   implying with your question, but it says the opposite here; i.e., either play music ***or not playing***

20   ***music***." (emphasis added)); *id*. at 1462:4-6, 17-19; *see also id.* at 1583:15-1584:1 (confirming

21   that speaker 1 stays in "standalone mode"—"i.e., either playing music or not playing music").

22   And Google stuck with that understanding of standalone mode until the close of Sonos's case in

23   chief, when it requested that the Court construe standalone mode to require active playback.  *See*

24   Dkt. 733 at 1.  As Sonos argued at trial and notes again now, this request came too late.  *See*

---

[7] Google's only response to this evidence is to argue that it would have failed to "support the verdict" under the claim construction that Google proposed for the very first time midway through trial, which the Court did not adopt.  *See* Google Br. at 17 (addressing this evidence only in § II.B.2 of Google's brief, not in § II.B.1).  As discussed in § III.B.2, Google's request for that claim construction was both untimely and unsupported.

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

*Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *5 (N.D. Cal. Feb. 20, 2015); *Apple Inc. v. Samsung Elecs. Co.*, No. 12–CV–00630–LHK, 2014 WL 252045, at *3–5 (N.D. Cal. Jan. 21, 2014).

Google's argument fails on the merits as well.

Claim 1 of the '885 patent recites operating "in a standalone mode in which the first zone player is configured to play back media individually." The claim language does not specify that the player must be actively playing media. Sonos therefore submits that under the plain and ordinary meaning of that claim limitation, standalone means "***configured to*** play back media individually." The structure of the claims further confirms that "standalone mode" is a mode in which the player is ***configured for*** individual playback. The claim language explains, for example, that the player "transition(s)" from "operating in the standalone mode" in which the player is "configured to play back media individually" to operating in group mode in which "the zone player is configured to coordinate with at least [one other] zone player … to output media in synchrony." If all the claim language meant was "***playing*** media," then there are much simpler ways to say that. *Cf., e.g.*, *Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738-WHO, 2021 WL 4148651, at *10 (N.D. Cal. Sept. 13, 2021) ("[I]f the patent *did* intend to claim a personal portable computing device, it is difficult to think of a more oblique way of doing so."). And even Dr. Schonfeld admitted that "if you just take the phrase standalone mode," a player can be in standalone mode even if it's not playing audio. Tr. at 1461:13-24.

Moreover, claim 1 divides speakers into two modes: standalone mode (configured for individual playback) and group mode (configured for group playback). As noted above, Mr. MacKay ***agreed*** that the StopCurrentApp() function does not put speakers into group mode. *See supra* (citing Tr. at 1283:9-11). Because the StopCurrentApp() function does not put speakers into group mode, a reasonable jury could—and did—find that the function does not remove speakers from standalone mode.

By contrast, Google would rewrite "***configured*** to play back media" to "***playing*** back media." The only support Google relies on is a statement by the Examiner in a different

context—describing joining group mode, not operating in standalone mode.[8]  Google Br. at 16;
*but see* Dkt. 733 at 3-4.  Google points to the Notice of Allowance, in which the Examiner
distinguished the DME prior art because it did not "allow for continuous output of media on a
particular playback device and joining of the continuous output," among other reasons.  TX0006
at p. 5850.

But the immediately preceding prosecution history shows that the Examiner's statements
were not about standalone mode at all. The examiner allowed the claims following an amendment
describing *grouped* mode:

> based on the instruction, transitioning from operating in the standalone mode to operating in
> accordance with the given one of the first and second predefined groupings of zone players such that
> the first zone player is configured to coordinate with at least one other zone player in the given one of
> the first and second predefined groupings of zone players over a data network in order to [play back ]
> <u>output</u> media in synchrony with <u>output of media by</u> the at least one other zone player in the given one
> of the first and second predefined groupings of zone players.

TX0006 at p. 4127 (underlining showing adding claim language and brackets showing deleted
claim language); *see also* TX0004 at p. 25 (parallel amendment to application that led to the '966
patent).  As shown above, the Examiner required an amendment to describe that when the players
move from standalone mode into grouped mode, the players become "configured to coordinate
with" each other "in order to output media in synchrony."  This has nothing to do with whether or
not the first zone player is required to actively output audio in standalone mode.

---

[8] Google also contends that it "provided unrebutted testimony that a person of ordinary skill in the
art would have understood a zone player must be actively playing back media to be 'operating in
a standalone mode' as claimed," Google Br. at 16, but the cited testimony merely restates Dr.
Schonfeld's unsupported assumption that there are three modes instead of two.  In any event, Dr.
Almeroth rebutted this testimony, *e.g.*, Tr. at 1645:13-1647:12; 1648:4-10.

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1    As Sonos has explained, Sonos did not agree with or endorse the Examiner's statement,

2  the Examiner's statement cannot meet the standard for clear and unmistakable disclaimer, and it

3  is Google that now seeks to adopt a new theory that is contrary to Google's prior positions on

4  whether standalone mode requires active playback.  Dkt. 733 at 4; *see generally id.* at 2-4.

5  So there is no basis to construe standalone mode to require active playback of media.  *See, e.g.*,

6  Tr. at 1645:13-1648:16.

7    Because Google cannot establish that its unsupported claim construction was required as a

8  matter of law, its request for judgment as a matter of law of non-infringement fails as well.  For

9  the same reason, and because the jury's verdict was not "contrary to the clear weight of the

10  evidence," *Molski*, 481 F.3d at 729, Google's request for a new trial must be denied as well.

11    **C.**    **Google Fails To Show That It Is Entitled To Overturn The Damages Award**.

12        **1.**    **Substantial evidence supports the jury's damages award**.

13    Google argues that the jury had "no legally sufficient evidentiary basis" for its $2.30 per-

14  unit royalty because Sonos's portfolio license agreements were not sufficiently comparable to the

15  hypothetical negotiation and the Court excluded Mr. Malackowski's IFTTT model.  Google Br. at

16  18-22.  But the Sonos license agreements and the IFTTT testimony were far from the only pieces

17  of evidence relevant to damages.  And Google ignores the heavy presumptions favoring the jury's

18  verdict.  Substantial evidence, including testimony about the value of the infringing features to

19  customers and Google's lack of non-infringing alternatives, supports the jury's damages award.

20    Google does not raise any objection to the Court's instructions on damages—nor could it.

21  The Court instructed the jury that it needed to determine a reasonable royalty, and that any

22  reasonable royalty must be apportioned to "reflect the value attributable to the infringing features

23  of the product, and no more."  Dkt. 762 at 24.  The Court also instructed the jury that it could

24  consider, among other things, the *Georgia-Pacific* factors in determining a reasonable royalty.  *Id*.

25  at 23-24.  The *Georgia-Pacific* factors provide a framework for the jury to apportion damages:

26  "[T]he standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of

27  the inventive contribution in determining the royalty rate that would have emerged from the

28

19

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1   hypothetical negotiation." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879

2   F.3d 1332, 1349 (Fed. Cir. 2018) (citation omitted).  "A jury is presumed to follow its

3   instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  And when the jury decides "an

4   ultimate question of law or fact," like the amount of patent damages to award, "it is assumed that

5   the jury resolved the evidentiary facts as appropriate to support the verdict." *Juicy Whip, Inc. v.*

6   *Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002).  So here, the law presumes that the jury

7   properly apportioned its royalty award to reflect only the value attributable to the infringing

8   features of Google's products, and that the jury made all the factual findings necessary to support

9   its award.  *See Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (a "jury's award of

10   damages is entitled to deference").  Google ignores these presumptions.

11       Instead, Google mainly argues that Sonos's portfolio license agreements do not support

12   the verdict because they are not sufficiently comparable.[9]  Had the jury chosen, for example, a

13   per-unit royalty of $12, as in the Seymour and Lenbrook agreements, TX6631 at 6; TX6632 at 6,

14   then Google might have a point.  *See Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379

15   (Fed. Cir. 2021) (granting a new trial on damages where the jury awarded a per-unit royalty that

16   matched the licensing fee the patentee charged for a bundle of all of its patents).  At most,

17   however, the jury used the running royalties from the license agreements as an "approximate cap"

18   on its award; Mr. Malackowski explained that the royalty in this case of course "could not be

19   higher" than the royalties from those agreements.  Tr. at 1100:1-8, 1164:17-24.  And the jury

20   understood that the license agreements contained cross-licenses and so were different from the

21   hypothetical negotiation between Sonos and Google.  *E.g.*, Tr. at 1071:1-1072:10.

22       Moreover, the jury learned about the *Georgia-Pacific* factors from both sides' damages

23   experts and heard other evidence to which it is presumed to have applied those factors.  *See* Tr. at

24   1097:1-1123:25, 1135:8-1136:8 (Malackowski); 1551:16-1570:24 (Bakewell).  For example,

25   Sonos presented evidence that 29% of households with speakers have multiple speakers, Tr. at

---

[9] Google refers to the license agreements as "portfolio-wide," but the agreements had carveouts.
The Legrand agreement, for example, excluded Sonos's "concurrent voice technology" patents
and "design" patents.  Tr. at 1072:21-1073:13.

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1132:1-4, which Google did not rebut.  Mr. Chan confirmed that Google sells speakers in

bundles, encouraging users to group Nest Audio speakers for sound across multiple rooms.  Tr. at

1525:11-1526:8.  Similarly, Ms. Kwasizur testified that "if one customer buys one Sonos, we

know from our data that on average they buy 2.9 or 3 more products."  Tr. at 1019:23-24.  And

Google's own data showed that 58% of people are very likely or extremely likely to buy three or

more speakers.  Tr. at 1599:1-7.

The jury also heard that Google promotes grouping technology to consumers, *e.g.*,

TX6612 (Google blog post touting the ability to "group Chromecast Audio devices together" to

play "synchronous music"); Tr.at 1530:3-1532:10 (Chan), indicating that Google believes the

feature is valuable.  Indeed, Google's behavior here proves that the ability to create overlapping

speaker groups matters to consumers.  After the Court found that the prior versions of Google's

products infringed the '885 patent, Google still refused to remove the overlapping-group feature

and instead tried (unsuccessfully) to redesign its products a different way to preserve that

feature.[10]  And the jury heard testimony from Mr. Shekel, a former product manager for Google,

who said that removing the ability to create overlapping groups from Google's products "would

not be a good experience" for users or "will be poor, maybe more specifically."  Tr. at 820:12-

821:12.  The "absence of non-infringing alternatives would strengthen [Sonos's] hand" in a

hypothetical negotiation.  *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977,

984 (Fed. Cir. 2019).

Likewise, Mr. Malackowski testified that Google's promotion of the speaker-grouping

feature in marketing documents "points to a higher rate."  Tr. at 1122:22-1123:11.  Mr.

Malackowski also explained, among other things, that competition between the parties is an

"important" *Georgia-Pacific* factor, Tr. at 1116:14-1117:6, and that Google's lack of

---

[10] Google contends that "the accused feature is not widely used," citing Mr. Bakewell's testimony
that usage data showed only a small percent of devices grouped on a daily basis.  Google Br. at
20; *see* Tr. at 1560:11-1561:5.  But Mr. Bakewell admitted later that the data showed only the
"number of connected devices on a particular date," not the percent of speakers grouped during
the entire damages period.  Tr. at 1595:8-1596:10.  So the jury reasonably could have rejected the
testimony that not many consumers used the accused features.

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

"noninfringing and commercially acceptable" alternatives to Sonos's technology would increase the royalty rate, Tr. at 1120:16-1122:19; *see id*. at 1122:9-15 ("Your senior engineer [Mr. Shekel] specifically looked at" removing speaker grouping "and said it would be a poor consumer experience.  That's not commercially acceptable.").  Google's damages expert, Mr. Bakewell, agreed that Google's November 2019 survey found that the speaker-group feature of playing music in multiple rooms at the same time is "actually appealing."  Tr. at 1599:8-1600:22.  He also conceded that "licenses between two competitors generally tend to have a higher royalty."  Tr. at 1601:2-17.  And the jury heard evidence about the prices of Google's products.  The Nest Audio, for example, costs $99, while a bundle of two Nest Audios costs about $180; the Google Mini "was offered" at $49.  Tr. at 1516:14-15, 1525:6-1526:2.

From that evidence, the jury reasonably could set a $2.30 per-unit value on the '885 patent's technology.  The Federal Circuit has made clear that "apportionment can be achieved in different ways," including "through the jury's determination of an appropriate royalty by applying the so-called *Georgia-Pacific* factors, under proper instructions embodying apportionment principles."  *Sprint*, 760 F. App'x at 983.  Moreover, "estimating a 'reasonable royalty' is not an exact science," so "the record may support a range of 'reasonable' royalties."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[I]t is well-understood that [apportionment] may involve some degree of approximation and uncertainty.").

Considering the evidence described above, the jury could have used Mr. Bakewell's opinion as a starting point and made upward modifications to reach a $2.30 rate.  Mr. Bakewell opined that $2.25 million would have been an appropriate lump-sum royalty.  But the jury could have reasonably rejected the opinion that a lump sum was appropriate and instead credited Sonos's evidence—including Sonos's licenses to other speaker manufacturers—that the parties would have agreed to a running royalty.  Contrary to Google's argument, Google Br. at 24,

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

Sonos's licenses were properly admitted as relevant to the form of the reasonable royalty, and Google never requested any limiting instruction to the jury on how to consider Sonos's licenses.

Mr. Bakewell testified that a lump-sum award was proper because, thanks to Google's redesign, "there's no evidence that there's an ongoing impact that you'd have to quantify."  Tr. at 1558:16-24.  Plainly, the jury disagreed, since it found that the new versions of Google's products still infringe the '885 patent.  Ms. Kwasizur also explained that Sonos would have insisted on a per-unit royalty, which is "the industry standard" and the "smartest way to handle it and the fairest."  Tr. at 1019:7-15; 1020:23-24.  As she said, if a licensee sells more products and thus "cut[s] into our business more, then they should pay more because they're taking more of our customers."  Tr. at 1019:19-1020:6.  Indeed, Ms. Kwasizur emphasized that Sonos prefers "a tiered structure" for royalties where licensees who sell higher numbers of products pay higher royalties.  Tr. 1016:4-9.  Here, the jury found that Google infringed with more than 14 ***million*** units, which would have supported a higher royalty rate in a hypothetical negotiation.  And Mr. Malackowski confirmed that a per-unit royalty would be appropriate.  Tr. at 1100:1-5.

As to the amount of that per-unit royalty, the jury could have reasonably rejected a number of Mr. Bakewell's assumptions that led to his low $2.25 million number.  For example, Mr. Bakewell testified that he accounted for two non-infringing alternatives—"no standalone" and removing overlapping groups—and that they were "technically feasible" and "commercially acceptable."  Tr. at 1555:24-1557:23.  But changing to "no standalone" was, in fact, ***not*** technically feasible:  Google's redesign failed to accomplish that change and still infringed.  And, as explained above, ample evidence contradicted Mr. Bakewell's testimony that removing the ability to create overlapping groups of speakers would have been acceptable to consumers.

Mr. Bakewell also relied on Google's licensing agreement with Outland Research, Tr. at 1562:9-1566:8, but Mr. Malackowski explained that the agreement reflected a lower price because Outland Research was a non-practicing entity, Tr. at 1114:23-1115:2 ("when buying licenses from an NPE, the rates are lower, noncompetitive").  Dr. Schonfeld was also impeached on whether the Outland Research agreement was technologically comparable to the asserted

1    patents.  Tr. 1492:17-1494:5.  Thus, the jury could have made upward adjustments to Mr.

2    Bakewell's analysis to arrive at $2.30 per unit.

3         "A party need not present expert testimony on damages or … on every aspect of

4    damages."  *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 984-85 (Fed. Cir. 2021).  It is

5    the jury's province to determine a reasonable royalty, including by applying the *Georgia-Pacific*

6    factors.  *See Sprint*, 760 F. App'x at 983; *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1341-42

7    (Fed. Cir. 2019) (amount of damages is a fact question for the jury).  As explained above,

8    substantial evidence supports the jury's royalty award here, and Google does not come close to

9    meeting the extremely high standard for undoing a jury's damages award.

10        **2.    Google is not entitled to a new trial on damages or to remittitur.**

11        Google contends that it needs a new trial because the verdict is "grossly excessive," since

12   the jury's per-unit royalty is "***115 times*** the portfolio average."  Google Br. at 24-25.  But Google

13   presented no evidence that it would be accurate to value Sonos's individual patents by simply

14   dividing the per-unit royalty in a given license agreement by the total number of patents covered.

15   On the contrary, Mr. Malackowski testified that Google's math was not appropriate for

16   calculating a royalty from Sonos's patent licensing agreements:  "[I]f you go to lunch at the buffet

17   and the buffet is $35, you can pick whatever you want from the buffet.  But if you go and say

18   'You know what?  I'm just going to have the steak and I'll take—you've got 30 entrees divided

19   by $30.  Can I just pay a dollar on each steak?'  No, you can't.  That's not the way the buffet

20   works.  And so this is a similar structure to that agreement."  Tr. at 1098:5-24.  Similarly, Ms.

21   Kwasizur testified that "different patents have different value," so "it doesn't totally break down

22   that way that just every patent is two cents."  Tr. at 1076:23-1077:1.  And because substantial

23   evidence supports the jury's per-unit royalty, as explained above, it is not grossly excessive.

24        Google also contends that the Court should remit damages to a one-time lump-sum award

25   of $2.25 million (Mr. Bakewell's number) because the jury's award is "grossly excessive."

26   Google Br. at 25.  Again, this argument fails because substantial evidence supports the jury's

27   award.  Among other things, the jury could have adjusted upward from Mr. Bakewell's number

28                                  24                    SONOS'S OPP. TO GOOGLE'S JMOL
                                                          3:20-CV-06754-WHA

1  using the *Georgia-Pacific* factors.

2      Google next argues that it needs a new trial because the jury's damages award "was based

3  on speculation or guesswork."  Google Br. at 22-24.  The jury did not simply pull a number out of

4  thin air.  It had Mr. Bakewell's damages calculation as a floor and Sonos's license agreements as

5  a ceiling, and it applied the *Georgia-Pacific* factors to the ample evidence of, among other things,

6  competition between Sonos and Google and the value of the infringing feature to consumers.

7      In Google's view, the Court erred by allowing Mr. Malackowski to testify about IFTTT in

8  the first place.  Google Br. at 23.  But the Court instructed the jury to disregard all of his IFTTT-

9  related testimony, Dkt. 762 at 22, and the jury "is presumed to follow its instructions," *Weeks*,

10  528 U.S. at 234.  The jury did just that, jettisoning the IFTTT damages theory and arriving at its

11  own reasonable royalty.  What happened here is nothing like *Uniloc USA, Inc. v. Microsoft Corp.*,

12  on which Google relies, where the district court erroneously allowed the patentee to introduce

13  evidence that the defendant earned almost $20 billion in revenue from sales of the accused

14  product.  632 F.3d 1292, 1318-21 (Fed. Cir. 2011).  Google also argues that admitting Sonos's

15  portfolio licenses improperly skewed the jury's award.  Google Br. at 23-24.  But, as Google

16  acknowledges, the jury heard from both sides' experts that those licenses were broader and not

17  directly comparable for purposes of the hypothetical negotiation.  Google Br. at 20.  Instead, they

18  showed that Sonos and Google would have reached a per-unit royalty instead of a lump sum, and

19  the royalty rates in the agreements set a "cap" here.  Tr. at 1097:24-1098:4.  Sonos's licenses

20  were relevant for at least those purposes, and Google never sought any limiting instruction (nor

21  raised any objection to the Court's instruction on comparable licenses).  And given the evidence

22  discussed above, the jury reasonably determined that the infringing features accounted for $2.30

23  of the value of each infringing media player—barely 2% of the cost of a Nest Audio, for example.

24  *Supra* 22.  The mere fact that a jury note might have referred to Sonos's agreements, Google Br.

25  at 24, does not show that the jury's ultimate award flowed solely from those agreements.

26  **IV.**    <u>**CONCLUSION**</u>

27      The Court should deny Google's motion for judgment as a matter of law and a new trial.

28

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA

1    Dated:  July 7, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

By: */s/ Clement Seth Roberts*
      Clement Seth Roberts

*Attorneys for Sonos, Inc.*

SONOS'S OPP. TO GOOGLE'S JMOL
3:20-CV-06754-WHA