QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:      (312) 705-7400
Facsimile:      (312) 705-7401

*Attorneys for GOOGLE LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>                    Plaintiff,<br><br>         vs.<br><br>GOOGLE LLC,<br><br>                    Defendant. | Case No. 3:20-cv-06754-WHA<br>Consolidated with Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S OPPOSITION TO SONOS, INC.'S RULE 50 AND 59 MOTION** |

# TABLE OF CONTENTS

**Page**

I.    ARGUMENT ........................................................................................................... 1

    A.    The Jury Reasonably Found That Google Did Not Directly Infringe the '966
        Patent ............................................................................................................... 1

        1.    Google Showed That The Accused Products Do Not Meet the
             "Causing Storage" Limitations ............................................................. 2

        2.    The Court Correctly Construed The Claims To Require Three Or
             More Zone Players ................................................................................. 7

        3.    Sonos Failed to Show Evidence of Infringement Under *the Court's*
             Construction ........................................................................................... 9

    B.    Sonos Failed to Show That the Redesigned Products Infringe the
        "Standalone Mode" Limitations ................................................................... 11

        1.    Sonos's Standalone Mode Claim Construction Arguments ....................... 11

        2.    Sonos's Reliance on the '885 Infringement Verdict ................................... 13

    C.    A Reasonable Jury Could Have Found That Google Did Not Indirectly or
        Willfully Infringe the '966 Patent ............................................................... 14

        1.    Sonos Did Not Present Evidence of Any Direct Infringement ................... 14

        2.    Sonos Did Not Prove that Google Had Knowledge of the '966
             Patent, a Specific Intent to Infringe, or That the Google Home App
             Was Not Suitable For Non-Infringing Use ....................................... 15

             (a)    The Jury Correctly Found that Google's Declaratory
                  Judgment Complaint Was Insufficient Evidence of
                  Knowledge or Intent ........................................................... 15

             (b)    None of Sinus's Alleged "Circumstantial Evidence" of
                  Specific Intent Requires Disturbing the Jury's Verdict .......... 16

             (c)    There Was Substantial Evidence that the Google Home App
                  Was Suitable For Non-Infringing Use ................................. 18

        3.    Sonos Did Not Prove Willful Infringement ................................................. 19

    D.    The Court Should Not Grant a New Trial On Infringement of the '966
        Patent Or Modify the Rulings Identified by Sonos .................................... 22

II.   CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

### Cases

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) ................................................................................ 14, 15, 17

*In re Affinity Labs of Texas, LLC*,
856 F.3d 902 (Fed. Cir. 2017) ................................................................................................ 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................................. 5

*Apple Inc. v. Princeps Interface Techs. LLC*,
2020 WL 1478350 (N.D. Cal. 2020) ...................................................................................... 15

*Barry v. Medtronic, Inc.*,
914 F.3d 1310 (Fed. Cir. 2019) ............................................................................................. 16

*Baxter Healthcare Corp. v. Spectramed, Inc*.,
49 F.3d 1575 (Fed. Cir. 1995) ............................................................................................... 21

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ............................................................................................... 20

*Becton, Dickinson & Co. v. Tyco Healthcare Grp*.,
LP, 616 F.3d 1249 (Fed. Cir. 2010) ........................................................................................ 4

*Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*,
998 F.3d 1320 (Fed. Cir. 2021) ............................................................................................. 12

*California Beach Co., LLC v. Exqline, Inc.*,
No. C 20-01994 WHA, 2020 WL 6544457 (N.D. Cal. Nov. 7, 2020) .................................. 16

*CIF Licensing, LLC v. Agere Sys. Inc.*,
727 F. Supp. 2d 337 (D. Del. 2010) ...................................................................................... 17

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015) ............................................................................................................... 16

*Deep9 Corp. v. Barnes & Noble, Inc.*,
2012 WL 4336726 (W.D. Wash. Sept. 12, 2012),
*aff'd*, 504 Fed. Appx. 923 (Fed. Cir. 2013) ............................................................................. 9

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ............................................................................................. 16

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
    325 F. Supp. 3d 1116 (W.D. Wash. 2018), *aff'd*, 946 F.3d 1367 (Fed. Cir. 2020) .................21

*Fluidigm Corp. v. IONpath, Inc.*,
    No. C 19-05639 WHA, 2020 WL 408988 (N.D. Cal. Jan. 24, 2020) ...................................... 16

*Google LLC v. Princeps Interface Techs. LLC*,
    2020 WL 1478352 (N.D. Cal. Mar. 26, 2020) ........................................................................... 16

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999) ................................................................................................ 11

*Illinois Tool Works, Inc. v. MOC Prod. Co.*,
    856 F. Supp. 2d 1156 (S.D. Cal. 2012) .................................................................................... 22

*INVT SPE LLC v. Int'l Trade Comm'n*,
    46 F.4th 1361 (Fed. Cir. 2022) .................................................................................................. 9

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) ..........................................................................................20, 21

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
    656 F. App'x 504 (Fed. Cir. 2016) ......................................................................................... 16

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
    545 F.3d 1340 (Fed. Cir. 2008) ............................................................................................... 17

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    572 U.S. 915 (2014) ................................................................................................................. 14

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ..........................................................................................16, 18

*Masimo Corp. v Philips Elec. N.A. Corp.*,
    62 F. Supp. 3d 368 (D. Del. 2014) ............................................................................................ 2

*MasterObjects, Inc. v. Google, Inc.*,
    No. C 11-1054 PJH, 2013 WL 12177460 (N.D. Cal. May 2, 2013) ........................................ 22

*In re Nat'l Sec. Agency Telecomm. Records Litig.*,
    669 F.3d 928 (9th Cir. 2011) ..................................................................................................... 2

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
    739 F.3d 1339 (Fed. Cir. 2014) ................................................................................................. 9

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007) ................................................................................................. 8

*Ottah v. Bracewell LLP*,
    No. 2022-1876, 2022 WL 16754378 (Fed. Cir. Nov. 8, 2022) .................................................. 9

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
No. 814CV01352JLSKES, 2020 WL 9158697 (C.D. Cal. Aug. 7, 2020),
*aff'd*, 35 F.4th 1367 (Fed. Cir. 2022) ........................................................................................... 4

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) ........................................................................................... 14, 18

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ................................................................................................... 8

*Ricoh Co. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) ................................................................................................. 18

*Sonos, Inc. v. Google LLC*,
591 F. Supp. 3d 638 (N.D. Cal. 2022) ...................................................................................... 15

*Sonos, Inc. v. Google LLC*,
No. 21-cv-7559-WHA, Dkt. 156 (N.D. Cal. Mar. 16, 2022) ..................................................... 19

*Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
785 F.3d 625 (Fed. Cir. 2015) .................................................................................................... 17

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ................................................................................................. 10

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) ................................................................................................. 19

*Typhoon Touch Technologies, Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011) ................................................................................................. 10

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ................................................................................................. 16

## Rules

Rule 11 ............................................................................................................................... 15, 20

Rule 50 ................................................................................................................................. 4, 23

Rule 50(a) .................................................................................................................................... 2

Rule 50(b) ............................................................................................................................ 4, 19

Rule 59 ...................................................................................................................................... 23

## Other Authorities

Lemley, *Inducing Patent Infringement*, 39 U.C. Davis. L. Rev. 225 (2005) ................................ 16

## ASSERTED CLAIMS

'885 Patent, Claim 1:

[1.0]. A first zone player comprising:

[1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network;

[1.2] one or more processors;

[1.3] a non-transitory computer-readable medium; and

[1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

[1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players;

[1.6] (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

[1.7] (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

[1.8] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

[1.9] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

[1.10] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

'966 Patent, Claim 1:

[1.0] A computing device comprising:

[1.1] one or more processors;

[1.2] a non-transitory computer-readable medium; and

[1.3] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

[1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

[1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

[1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and

[1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

[1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

'966 Patent, Claim 2:

[2.0] The computing device of claim 1,

[2.1] further comprising program instructions stored on the non-transitory computer-

readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[2.2]  while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

[2.3] based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with a t least the third zone player to output media in synchrony with output of media by at least the third zone player.

'966 Patent, Claim 4:

[4.0] The computing device of claim 3,

[4.1] wherein the location other than the computing device comprises a zone player of the first predefined group of zone players.

'966 Patent, Claim 6:

[6.0] The computing device of claim 1,

[6.1] wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

'966 Patent, Claim 8:

[8.0] The computing device of claim 1,

[8.1] wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

Sonos is not entitled to judgment as a matter of law on any of the issues raised in its Motion because Sonos failed to meet its burden of proof on its claims.

I.     **ARGUMENT**

A.     **The Jury Reasonably Found That Google Did Not Directly Infringe the '966 Patent**

Sonos's motion seeks judgment as a matter of law that Google directly infringes the asserted claims of the '966 patent based largely on the findings of infringement of the '885 patent.  *E.g.*, Mot. at 3-4.  Sonos seizes on Google's arguments at trial that the two patents are "two sides of the same coin," but ignores that Google also made clear that the asserted claims of the '966 patent include an additional limitation requiring "causing storage of the [first/second] zone scene[s]."  Trial Tr. (Schonfeld) at 1367:17-1367:20 ("So the '966 patent has an extra step or an extra limitation which requires storage of the zone scene, and that is not performed in the new design or the old design and that applies only to the '966 patent.").  Indeed, even Sonos's technical expert admitted  that this is a key difference between the asserted claims of the two patents-in-suit.  *Id.* (Almeroth) at 696:15-696:18 ("[T]he third difference is that there's also causing storage of the first zone scene.  That's related to the zone scene in the '885 patent, but the storage requirement isn't explicit in the '885 patent.").  Fatal to Sonos's arguments seeking judgment as a matter of law is the extensive evidence presented by Google that the accused products do not "caus[e]" and are not capable of "causing storage of the [first/second] zone scene[s]."  *Id.*. (MacKay) at 1239:1-1254:11, 1276:9-14, 1277:5-13; *id.* (MacLellan) at 1300:19-1301:4; *id.* (Pedro) at 1312:21-1315:24; *id.* (Schonfeld) at 1367:12-1373:17.  As Google's witnesses testified, group membership information is never stored in Google's system for later invocation.  *Id*.  Accordingly, there was a legally sufficient evidentiary basis for the jury's verdict of non-infringement for the '966 patent, and Sonos has failed to show otherwise.

Sonos also argues the Court improperly instructed the jury that the asserted claims of the '966 patent require a computing device networked with three zone players and that, under the purportedly appropriate construction of the claims, the jury would have been compelled to find infringement.  Not so.  The Court correctly construed the claims (*see* Dkt. 721 at 1-3), and the jury

correctly found non-infringement under that construction. Even accepting Sonos's construction, the jury's finding of non-infringement is still supported by the substantial evidence that the accused products do not cause storage of zone scenes.

Finally, even if the Court agrees with Sonos on the points above, it should nevertheless deny judgment as a matter of law of direct infringement because the jury reasonably found the accused Google Home App not infringing when used with Google speakers implemented with Google's new design, which does not meet the standalone mode limitations of the asserted claims for reasons set forth in Google's renewed motion for judgment as a matter of law. Furthermore, Sonos's motion fails to establish that *each and every* element of the '966 patent asserted claims was met by the accused products. *See* Mot. at 1-7. Instead, Sonos argues Google "did not dispute" infringement for particular limitations of the asserted claims of the '966 patent.[1] *Id.* But to prevail on its motion Sonos had to prove Google's products met every element of the asserted claims, not just those disputed by Google. Sonos's motion should be denied on this ground alone.

      1.    <u>Google Showed That The Accused Products Do Not Meet the "Causing Storage" Limitations</u>

Undisputed testimony established that Google's speakers are grouped dynamically using an adaptive, continuous, and automatic ("ACA") technology wholly different from Sonos's alleged invention and in which there is no "storage" of zone scenes as required by the asserted claims. *E.g.*, Trial Tr. (Mackay) at 1253:19-1254:11. The Court's construction of "zone scene" clarified that a "zone scene" is "a *previously-saved grouping of zone players* according to a common theme"— *i.e.*, a zone scene is not just some arbitrary value, it is a specific grouping of zone players that were previously saved as members of the zone scene. Dkt. 762 at 9 (Final Jury Charge). But Google's accused products do not store data that would define a zone scene. *See* Trial Tr. (MacKay) at 1276:9-14 ("The group membership we *don't store* persistently."). As demonstrated by unrebutted

---

[1] Sonos's attempt to incorporate by reference nine pages of its Rule 50(a) motion where it allegedly "provided substantial evidence" of infringement of the other claim elements (Mot. at 2) is insufficient to meet its affirmative burden of proving infringement and improperly circumvents the 25-page limit for its brief. *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 669 F.3d 928, 931 (9th Cir. 2011) ("Ordinarily we do not permit parties to incorporate by reference briefs in other cases."); *see also Masimo Corp. v Philips Elec. N.A. Corp.*, 62 F. Supp. 3d 368, 376 (D. Del. 2014) (holding it is improper to incorporate prior briefing by reference to circumvent briefing page limits).

evidence at trial, Google's accused devices use an architecture where "each device ***doesn't . . . have stored*** information about what other members of the group exist so it ***doesn't know*** which other devices are members of that group." Trial Tr. (MacKay) at 1240:23-1241:3; 1241:20-1242:8; *id.* (Schonfeld) at 1367:14-1373:17; TX6454; *see also id.* (Pedro) at 1312:21-1315:24 (explaining that group membership information is only stored by the Google Home app in cache for purposes of display to the user, but is not used for any later invocation of the group).

Google's accused products operate dynamically, without persistent storage of the grouping, because the system "only care[s] about the ***current*** state of the network." *Id.* (MacKay) at 1242:1-8 (emphasis added); *see also id.* (Maclellan) at 1299:18-1301:4; *id.* (Pedro) at 1312:21-1317:11.  Indeed, at the design phase, Google considered but ***rejected*** an implementation where the previously-saved group membership information would be stored persistently.  *Id.* (MacKay) at 1239:20-1241:19.  Instead, in the accused products, the "group configuration" on each speaker is limited to storing a group identifier and name of each speaker group to which that speaker belongs, but it does not and cannot store the identities of the other speakers in those groups, let alone any previously-saved grouping of speakers.  *Id.* at 1242:10-1245:7 (discussing TX6453, explaining that the JoinGroup message includes the Group UUID and Group Name, neither of which contains membership information for the group), 1367:14-1373:17; *see also id.* (Schonfeld) at 1373:7-17.  The jury was entitled to and did find that this was not storing a "previously-saved grouping of zone players" as required by the claims.

Sonos makes a number of arguments why the substantial evidence identified above would have been insufficient for a reasonable jury to rely upon, but each fails.  First, Sonos argues that the jury was required to find "the name and ID of the group" sufficient to meet the Court's construction of "zone scene" (Mot. at 5), but this is not true for the reasons stated above.  Neither the name nor the ID of the group identifies the previously-saved grouping of speakers that belong to a group.  Next, Sonos relies on the functional aspects of the accused products to show storage—"you can come back later and that group still exists"—but it fails to show storage ***of the claimed zone scenes*** because this does not show storage of any previously-saved group membership.  *See id.* at 5-6.  Sonos's position that merely "coming back later" and using the same group would constitute

"storage" of the group would necessarily mean that Sonos's 2005 System invalidated the claims because it included speaker groups, and a user could return days or weeks later and use the same speaker group. Trial Tr. (Millington) at 418:19-419:6 ("So, yes, if you went away for a few days with the two rooms grouped together and came back, they would still be grouped together."). Because Sonos argued those prior art speaker groups were not "stored" as required by the claims, the jury could have credited this argument and found for those same reasons that Google's system could not infringe.[2] *See, e.g.*, *id.* (Almeroth) at 1658:3-19, 1704:3-21.

Sonos also argues that because "the Court already found that Google's speaker groups are *saved* in the context of the '885 patent," the "causing storage" limitations of the '966 patent must be met as well. Mot. at 6. Not so. First, Sonos's motion does not show that it raised this point to the jury, as required under Rule 50. *See, e.g.*, *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 814CV01352JLSKES, 2020 WL 9158697, at *3-4 (C.D. Cal. Aug. 7, 2020), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022) (granting plaintiff's motion for judgment as a matter of law pursuant to Rule 50(b) because the defendant "presented no evidence or argument bearing on invalidity" and thus the defendant "waived its invalidity defenses and the jury had no legally sufficient basis to find in [defendant's] favor on invalidity"). Second, there was no evidence of any limitation of the '885 patent requiring saving zone scenes, let alone that such limitation is equivalent to the "storage" limitation of the '966 patent in this context. Sonos relies on pure attorney argument. *See* Mot. at 6; *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, LP, 616 F.3d 1249, 1260 (Fed. Cir. 2010) ("Unsupported attorney argument" that was not presented at trial "is an inadequate substitute for record evidence."). Moreover, the '885 claim language does not mention saving or storing, and the only instance in which the word "saved" appears in the context of the '885 patent is with respect to the Court's construction of "zone scene" as "a ***previously-saved*** grouping of zone players according to a common theme." But there is nothing in the Court's construction that imports a saving or causing storage limitation into the claims of the '885 patent and, as such, Sonos cannot rely on the

---

[2] Because Google relies on the "party mode" and obviousness in its invalidity analysis (Dkt. 824 (Google JMOL) at 3-12), there is no inconsistency in the jury crediting this argument but erring in finding that the Sonos 2005 System (in combination with other references) did not invalidate the claims.

infringement findings with respect to the '885 patent as mandating a similar finding for the '966 patent.  Third, Google introduced substantial evidence at trial showing that the accused speaker groups or any other previously-saved grouping of speakers were not ***stored*** for later invocation, as required by the claims.  *E.g.*, Trial Tr. (MacKay) at 1276:9-14 ("The group membership we ***don't store*** persistently.").  Sonos argues that the Court already held that the grouping of zone players is stored by the accused products, Mot. at 6, but this is meritless because the specific issue regarding the "causing storage" limitation of the '966 patent was not argued during summary judgment briefing on the '885 patent, nor could it, given that there is no "storage" requirement in the '885 claims.

Sonos also argues that storing a "grouping of zone players" only requires storing "an identifier and name(s) of the speaker group(s) that that speaker belongs to."  Mot. at 6.  Once again, Sonos cites no facts or evidence in support of its assertion and instead relies solely on attorney argument.  *See id.*  The jury was asked to decide whether Sonos proved by a preponderance of the evidence that a mere group identifier and name were sufficient to meet the claimed "previously-saved grouping of zone players" construction, and the jury properly found it insufficient because nothing in Google's system keeps track of any previously-saved grouping of zone players.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("the drawing of legitimate inferences from the facts are jury functions, not those of a judge").  The jury reasonably found the accused "group UUID" cannot meet the storage limitation given Mr. MacKay's unrebutted testimony that the group UUID is "a random string essentially" and "***doesn't contain*** information about the identity of the members."  Trial Tr. (MacKay) at 1243:23-12:44:1.  Mr. MacKay further testified the "name that the user assigned to the group" "***does not***" "***contain*** any information about the actual grouping or membership information of a group."  *Id.* at 1244:2-8.  Nor does the testing information Google uses internally store any grouping or membership of a previously-saved group, as required by the Court's construction of "zone scene."  *Id.* at 1244:9-1245:7.

Finally, Sonos argues that because the '966 specification identifies group membership as a parameter for "zone scenes," this requirement must be *excluded* from its construction.  Mot. at 6-7.  Specifically, Sonos relies on the portion of the specification disclosing that "[i]n operation, a set

of data pertaining to the scene includes a plurality of parameters," that "the parameters [may] include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist," and that "[t]he parameters may also include volume/tone settings for the associated players in the scene." TX0001 at 10:46-51. In other words, according to Sonos, the specification describes the data describing a zone scene as the membership of the speakers in the group and the volume/tone settings for those speakers. Yet, tellingly, Sonos does not (and cannot) cite a single embodiment of a zone scene in the '966 patent that does not include group membership information. And contrary to Sonos's assertions (Mot. at 7), Google has not argued that the construction of "zone scenes" should exclude all other data that *could* describe the "grouping of zone players" and be limited to IP addresses of group members. Google instead argued to the jury (and argues now) the plain meaning of a "previously-saved grouping of zone players" must include some information identifying the *members* of that group as opposed to information only identifying the group itself, which is the only information Sonos relies on for infringement.

Sonos's reliance on Mr. MacKay's testimony that the group leader "stores information about the followers that are currently connected to it" also fails to prove infringement. *Id.* As Mr. MacKay clarified at trial, this information is not *stored* as is explicitly required by the claims. Trial Tr. (MacKay) at 1277:10-13 (testifying that information about connected followers is only "temporary"). Accordingly, the *only* data Sonos identified to try to show storage of the "previously-saved grouping of zone players" was simply not "stored," as both Mr. MacKay and Dr. Schonfeld confirmed. *Id.*; *id.* (Schonfeld) at 1373:7-21; *see also id.* (Pedro) at 1312:21-1317:11. Dr. Schonfeld opined that the storage of information must be persistent in that the group membership must be *stored for later use in invoking that group*, and Sonos's own expert, Dr. Almeroth, likewise opined that storage of zone scenes must be "persistent" (*i.e.*, not temporary) whether stored in volatile or nonvolatile memory. *Id.* (Almeroth) at 899:18-901:11 ("the user created groups that are predefined and pre-saved as part of the zone scenes are persistent"); *id.* (Schonfeld) at 1367:21-1368:3 ("what does storing of zone scenes require? A. So that would require that you take the members of the group and you store them, put them somewhere so it's available persistently"); *see also id.* (MacKay) at 1276:9-14 ("The group membership we *don't store* persistently."). Substantial

evidence showed, as part of the group leader election process, that the accused products only store information about the speakers that announce themselves to be members of a group at a given moment in time, which is *not* a "previously-saved grouping" of speakers generated when a user forms a speaker group. *Id.* (MacKay) at 1288:23-1289:6; *id.* (Schonfeld) at 1371:9-12, 1373:7-17; *see also id.* (Pedro) at 1312:21-1317:11. Accordingly, there was substantial evidentiary support for the jury's verdict of non-infringement, and there is no valid basis to overturn that verdict.

2.   The Court Correctly Construed The Claims To Require Three Or More Zone Players

The Court held the claims require, by their express terms, a system including at least three zone players. In the jury charge, the Court confirmed "the mere installation of the Google Home app on a computing device does not itself infringe." Dkt. 762 at 15. Rather, the claimed "computing device is not capable of serving as a controller unless it is networked *with at least three zone players* that may be added to overlapping zone scenes." *Id.* This holding followed directly from the plain language of the asserted claims of the '966 patent, which cover a "computing device" that serves as "a controller for a networked media playback system *comprising a first zone player and at least two other zone players*." TX0001 at 40 (emphasis added). The claim limitations thus explicitly require a system that is capable of creating two zone scenes including the first and second zone player, and the first and third zone player, respectively, confirming that at least three zone players must be included in order for the claimed computing device to have the capabilities required by the claims. *Id*.

Sonos argues the Court's construction is incorrect for the same reasons it already raised in response to the Court's request for briefing on this issue. *See* Dkt. 720 (Sonos brief); Dkt. 721 (Google brief). Sonos simply repeats the same arguments and cites to the same cases. *Compare* Mot. at 8-16 *with* Dkt. 720. The Court has already considered these arguments and cases and correctly rejected them based on the plain language of the claims, which requires the computing device to "serve as a controller." This is the correct holding because in claim construction courts "strive to capture the scope of the actual invention, rather than . . . allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs., Inc. v.*

1   *Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (emphasis added).  "[T]o attribute

2   to the claims a meaning broader than any indicated in the patent[] would be to ignore the totality of

3   the facts of the case and exalt slogans over real meaning."  *Ormco Corp. v. Align Tech., Inc.*, 498

4   F.3d 1307, 1316 (Fed. Cir. 2007).  It would have been inappropriate and incorrect to allow any

5   mobile device, ***not*** serving as a controller as required by the claims, to infringe.

6         Although Sonos spends pages expounding on its view of the scope of apparatus claims

7   generally (Mot. at 7-16), Sonos only spends a single sentence addressing the Court's actual holding,

8   which is the following:

9         The claim language does not recite any functions to be performed by the accused
      products unrelated to those computing devices "serving as a controller."
10        Significantly, a computing device is not capable of serving as a controller unless it
      is networked with at least three zone players that may be added to overlapping zone
11        scenes.

12        Sonos argues in response that the claims merely require "a computing device be programmed

13   so that it can perform a series of functions that include 'serving as a controller for a networked media

14   playback system' . . . ."  Mot. at 9 (emphasis in original).  But this does not address the fact that the

15   entire claim covers a computer device "serving as a controller" with the specific requirements of

16   that controller, as the Court found.  Sonos's attempt to analogize this case to numerous others is

17   meritless.  Mot. at 8-13.  None of the cases Sonos cites analyzed the same claim language at issue

18   here, and on the principle that the scope of the claims should track the scope of the invention, the

19   cases Google cited in its prior briefing on this issue are closer and are controlling.  *See* Dkt. 721 at

20   2-3.  Sonos's reliance on cases generally interpreting computer readable medium and apparatus

21   claims misses the point, which is that the Court must interpret this claim language in light of this

22   specification, and here it is clear not every "computing device" is covered by the claims, only those

23   that serve as a controller in a system that includes at least three zone players.

24        Moreover, the testimony of Sonos's own expert confirms that the Google Home app is not

25   capable of "causing storage of the [first/second] zone scene."  *See* Trial Tr. (Almeroth) at 787:20-

26   788:13 ("The information about the group is stored on the players.").  Thus, the Google Home app

27   also cannot perform this limitation of the claim without additional hardware and software (that of

28   the speakers).  *See Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345-46 (Fed. Cir. 2014);

*Deep9 Corp. v. Barnes & Noble, Inc.*, No. C11–0035JLR, 2012 WL 4336726, *13-14 (W.D. Wash. Sept. 12, 2012) (Barnes & Nobles "Nook device" did not satisfy claim directed to "[a] computer readable medium encoded with a set of executable instructions to perform a method for updating modules of information via a common communication channel interconnecting a plurality of terminals" because computer instructions needed to "update" and "download" information from a "terminal" over a "communication channel" were not present on the device at the time of sale), *aff'd*, 504 Fed. Appx. 923 (Fed. Cir. 2013).

            3.    <u>Sonos Failed to Show Evidence of Infringement Under *the Court's* Construction</u>

Sonos failed to show infringement under the Court's construction because there is no evidence any user (or Google) created multiple overlapping speaker groups. No witness testified that any user of Google's products created overlapping speaker groups or that Google specifically encouraged users to create such an obscure speaker grouping setup, nor did any documents in the record indicate as much.

Sonos must prove each and every element is met by the accused system. *Ottah v. Bracewell LLP*, No. 2022-1876, 2022 WL 16754378, at *2 (Fed. Cir. Nov. 8, 2022) ("A finding of literal patent infringement 'requires that each and every limitation set forth in a claim appear in an accused product.'"). But Google does not make or sell a phone or tablet that has the Google Home app pre-installed on it. *See e.g.*, Trial Tr. (Schonfeld) at 1354:2-1354:5 (noting that users must download the Google Home app); Dkt. 762 (final jury charge) at 17 (acknowledging same). Any infringement could occur only if and when a user downloads ("installs") the Google Home app onto a phone or tablet and then configures that device to add at least three Google speakers. But even in the context of claims "directed to capability," the Federal Circuit has made clear the patentee is still required to prove infringement in the ordinary manner, which involves "compar[ing] the claims to the accused products." *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1380 (Fed. Cir. 2022). The Federal Circuit demands that for infringement, "the apparatus as provided must be 'capable' of performing the recited function, not that it might later be modified to perform that function." *Typhoon Touch Technologies, Inc. v. Dell, Inc*., 659 F.3d 1376, 1380 (Fed. Cir. 2011)

1    (internal citation omitted); *see also Telemac Cellular Corp. v. Topp Telecom, Inc*., 247 F.3d 1316,

2    1326, 1330 (Fed. Cir. 2001) (finding accused product non-infringing because it could not place

3    international calls, a claim limitation of the asserted patent, without an outside carrier).  Because

4    Google does not make or sell a phone or tablet with the Google Home app pre-installed on it, there

5    is no computing device "'capable' of performing the recited function" that does not have to "later

6    be modified to perform that function."  *Telemac*, 247 F.3d at 1380.

7         Without any evidence of infringement, Sonos clings to vague and irrelevant metrics

8    regarding speaker ownership generally, but this cannot meet Sonos's burden of proof or overcome

9    the deference owed to the jury.  First, Sonos argues "29% of households with speakers have three

10   or more speakers."  Mot. at 17.  But Mr. Malackowski's testimony, unsupported by any admitted

11   evidence, was merely that 29% of households have "multiple" speakers of any brand (Trial Tr.

12   (Malackowski) at 1132:1-4)—not three speakers compatible with the Google Home app—and the

13   jury was free to disregard his speculative testimony.  Mot. at 17; Dkt. 762 at 4 ("you may accept or

14   reject opinion evidence . . . considering . . . the reasons provided for the opinion").  The only other

15   evidence Sonos relies upon is TX158, which Sonos argues shows "58 percent of survey respondents

16   were either very likely or extremely likely to purchase a bundle of three smart speakers."  Mot. at

17   17.  This badly mischaracterizes the document and Mr. Bakewell's testimony.  The document cited

18   shows the likelihood users would purchase "3 smart speakers" as a bundle *if they could save*

19   *approximately $50*.  TX158 at 23.  It does not say, as Sonos implies, that 58% of Google customers

20   have actually purchased a bundle of three speakers—in fact, it does not even show that even a *single*

21   Google customer has purchased such a bundle.  Nor does it show any user had a computing device

22   "networked with at least three zone players that may be added to overlapping scenes using the

23   Google Home app," as required by the Court's construction.  Dkt. 762 at 15.  Mr. Bakewell also did

24   not agree with Sonos's assertion; he was merely confirming counsel's *math* summing the 32% of

25   individuals surveyed who would be "very likely" to purchase the bundle and the 26% of people who

26   would be "extremely likely" to purchase bundle was accurate.  Mot. at 17 ("Yes, you did that.  I did

27   the math too.  I think that's right.").

28        Finally, Sonos bafflingly contends that actual infringement can be established by the

prospective jurors' responses to Sonos's counsel's question during venire.  Mot. at 17.  Of course, this was not admissible evidence presented to the jury—indeed, when the question was posed, the final jury had not even been selected yet.  Dkt. 762 at 2 (limiting "the evidence from which you are to decide what the facts are" to exhibits in evidence, sworn testimony, and stipulations).  Sonos's reliance on this point merely underscores the lack of evidence to support its position on infringement.

**B.**   **Sonos Failed to Show That the Redesigned Products Infringe the "Standalone Mode" Limitations**

As Google explained in its motion for judgment as a matter of law, Google's redesigned products do not infringe the standalone mode limitations.  Dkt. 824 at 13-17.  Google fully incorporates those arguments herein by reference.

1.   Sonos's Standalone Mode Claim Construction Arguments

Sonos makes two claim construction-related arguments for why the Google products must meet the standalone mode limitations.  First, Sonos argues that "there is no requirement that the zone player remain in standalone mode."  Mot. at 2-3.  This argument incorrectly construes the claim limitations, which **do** require the zone player to remain in standalone mode.  '966 Claim 1 Limitation 1.4 ends with a colon and requires that "**while** serving as a controller . . . the first zone player **is operating in a standalone mode** . . ."  *See infra* '966 Pat. Cl. App'x.  The following claim limitations 1.5, 1.6, 1.7, 1.8, and 1.9, regarding the creation and display of the zone scenes, must then take place "while . . . operating in a standalone mode."  *Id.*  This is clear from the structure of the claims, which uses an "and" after limitation 1.9 to signal that the next "while"—"while displaying"—begins at that point.  But until Limitation 1.9, the claim limitations must be performed "while . . . operating in a standalone mode."  *See Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation."); *In re Affinity Labs of Texas, LLC*, 856 F.3d 902, 907 (Fed. Cir. 2017) (noting that claim limitations "offset by semicolons" is a "punctuation choice [that] strongly indicates that each step is separate and distinct.").  Any other reading of the claims would improperly eliminate the "while . . . operating in a standalone mode" elements from the claims.  *Bio-*

1  *Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1330 (Fed. Cir. 2021) ("We cannot rewrite

2  the claims to remove that narrowing limitation.").

3      Indeed, Sonos's own expert conceded that "at each one of the steps it has to be in standalone

4  mode."  Trial Tr. (Almeroth) at 844:2-844:3; 846:5-846:10 ("Q. Let's take the first two, receiving a

5  first request based on a first request.  Are you with me?  A.  Yes, sir.  Q. You do believe those have

6  to be done while operating in standalone mode?  A.  Individually they do, that's correct."); *id*.

7  (Schonfeld) at 1329:3-1329:19 (analyzing claims and agreeing that the first zone player is "operating

8  in that standalone . . . and that applies all the way down"), 1330:20-1331:2 (noting that Dr. Almeroth

9  agreed with this understanding).  Accordingly, Sonos's argument that "there is no requirement that

10  the zone player remain in standalone mode" is incorrect based on the plain language of the claims

11  and its ***own expert's*** interpretation of those claims.  Sonos's reliance on the fact that "[s]tandalone

12  mode appears just twice in claim 1," Mot. at 2-3, is irrelevant because the claim elements must be

13  performed "while" operating in standalone mode.  Claim construction is not merely an exercise of

14  counting the number of times a particular term appears, but instead understanding the meaning of

15  those terms.

16      Even if Sonos had argued—consistent with its expert's testimony—that there was no

17  requirement to remain in standalone mode ***in between*** the performance of Limitations 1.5-1.9, this

18  would still not show infringement. As explained further below, this construction would be

19  inconsistent with the prosecution history and incorrect.  Google showed at trial that the group

20  creation and display limitations are ***not*** performed while the first zone player is operating in a

21  standalone mode, and therefore the claim elements cannot be met even under Sonos's expert's

22  construction.  *See* Dkt. 824 (Google JMOL) at 13-17.  Rather, "as soon as each of the speakers

23  receive and process the JoinGroup command," "it calls a function called StopCurrentApp and that

24  moves each speaker into the idle mode," which does not simply pause the app; instead "the app is

25  killed" and "torn down completely."  Trial Tr. (MacKay) at 1256:18-1257:4.  The "immediate next

26  program instruction that is executed" after StopCurrentApp is the AddGroup function, which "sets

27  up the structures in memory to represent the group for that device."  *Id.* at 1257:9-1257:25.  All of

28  this takes place while the speaker is "still operating in idle mode"—***not*** while the speaker is in

standalone mode.  *Id.*  Accordingly, the jury had ample evidence to find that the standalone mode limitations were not met even under Sonos's construction that the speaker need not remain in standalone mode in between the claim limitations.

Second, Sonos argues the claim "does not require 'continuous' operation in standalone mode," but this position is squarely foreclosed by the prosecution history.  As Google explained at trial, the Yamaha DME prior art reference "was used by the examiner to reject the original claims," and in "response Sonos . . . amended the claims to include standalone mode," and the Examiner concluded that "there is no standalone mode [in Yamaha DME] because it doesn't produce continuous output of media."  Trial Tr. (Schonfeld) at 1714:18-1715:19.  Accordingly, the Examiner believed that Sonos's claim amendment that added "standalone mode" required "continuous output of media" and issued the claims on that basis.  Google's expert also pointed out that if the claimed speaker would "jump in and out of standalone mode" that this would require multiple different standalone modes, contrary to the antecedent basis required in the claims.  *Id.* at 1331:3-1332:15.  Sonos did not argue infringement under a construction requiring continuous output of media, and the jury was entitled to use the same plain and ordinary meaning applied by the Examiner and find that Sonos failed to prove infringement.

### 2.   Sonos's Reliance on the '885 Infringement Verdict

Sonos argues the jury's verdict on claim 1 of the '885 patent "necessarily means that Google's products meet the 'standalone mode' requirements of claim 1 of the '966 patent."  Mot. at 3.  But this argument overlooks the fact that *Sonos* bore the burden of proving infringement with respect to both patents.  While Sonos could have met its burden of proving infringement of the '885 patent (but did not, as discussed in Google's JMOL), that does not mean that it "necessarily" met its burden of proving infringement of all the claim elements of the '966 patent.  Even accepting Sonos's "two sides of the same coin" argument,[3] the two sides of a coin are ***different***, and Sonos

---

[3]  Sonos appears to imply that Google has taken the position that the limitations are identical based on a metaphor comparing the two patents as "two sides of the same coin," Mot. at 1, but closing argument is not evidence, and as discussed *supra*, Google consistently argued that there were differences between the '885 and '966, including the requirement for "storage" of the zone scene in the '966 patent.

therefore bore the burden of proving infringement with respect to the controller and all the requirements of the '966 patent claims, which it failed to do.  Sonos never argues in its motion that claim 1 of the '885 patent and claim 1 of the '966 patent are ***identical*** with respect to the standalone mode requirements, and therefore it has failed to meet its burden of proof by relying exclusively on the verdict with respect to the '885 patent.  For example, as discussed *supra*, Sonos failed to show even a single instance of direct infringement of the '966 patent.

### C.   A Reasonable Jury Could Have Found That Google Did Not Indirectly or Willfully Infringe the '966 Patent

#### 1.   Sonos Did Not Present Evidence of Any Direct Infringement

To establish induced and contributory infringement, Sonos must first prove "a third party directly infringed the asserted claims" of the '966 patent.  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *see also Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014); Dkt. 762 at 17-18.  Sonos had to "either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit" to prove indirect infringement.  *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  As discussed above in Section I.A, Sonos did not show any "specific instances of direct infringement," and as shown below, Sonos cannot prove that "the accused device necessarily infringes" either.

If "the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe[.]"  *ACCO*, 501 F.3d at 1313.  Here, the record demonstrates that computing devices (*e.g.*, smartphones) with Google Home installed have many non-infringing uses.  Even Sonos's expert Dr. Almeroth admitted that the accused computing devices have "thousands" of non-infringing features.  Trial Tr. (Almeroth) at 912:19-913:22.  The Google Home app likewise has many non-infringing uses, such as controlling lightbulbs, thermostats, ovens, and cameras, and even non-patented speaker and grouping features such as setting up one speaker or playing music to one speaker group.  *Id.* (Chan) 1515:24-1516:2 ("You can control various smart devices like lights, thermostats, and cameras. You can set timers and alarms, as well as get general information.");   *id.*   (Malackowski)   at   1153:21-1154:13;   *id.*   (Pedro)   at   1306:19-

1309:14.  Accordingly, Sonos offered no evidence of direct infringement, and Sonos did not and could not show that an accused device "necessarily" infringed, precluding its attempts to skirt this requirement.

        2.   <u>Sonos Did Not Prove that Google Had Knowledge of the '966 Patent, a Specific Intent to Infringe, or That the Google Home App Was Not Suitable For Non-Infringing Use</u>

        (a)   *The Jury Correctly Found that Google's Declaratory Judgment Complaint Was Insufficient Evidence of Knowledge or Intent*

"[B]oth forms of indirect infringement—induced and contributory infringement—require knowledge of the patent and knowledge of infringement."  *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 647 (N.D. Cal. 2022).  It is undisputed that Sonos did not provide direct evidence of Google's pre-suit knowledge of the '966 patent.  Sonos also offers no other proof beyond Sonos's draft complaint and the Court's suggested inferences from Google's declaratory judgment complaint.  *See* Mot. at 20.  Even if the jury accepted that Google's declaratory judgment complaint provided circumstantial evidence of knowledge before Sonos filed suit, there is still no evidence that Google had a ***specific intent to infringe*** the '966 patent.  To the contrary, Google's declaratory judgment complaint demonstrated a good faith belief in ***non-infringement***.

There is no logical basis to presume that Google's allegation of non-infringement was factual support for the exact opposite proposition.[4]  *E.g.*, *Apple Inc. v. Princeps Interface Techs. LLC*, No. 19-cv-06352-EMC, 2020 WL 1478350, at *4 (N.D. Cal. 2020) ("Apple, in filing an action seeking a declaratory judgment of noninfringement, arguably asserts a 'reasonable, good-faith belief in noninfringement,' which 'can negate the specific intent required for induced infringement.'") (citation omitted); *Google LLC v. Princeps Interface Techs. LLC*, No. 19-cv-06566-EMC, 2020 WL 1478352, at *4 (N.D. Cal. Mar. 26, 2020) (same); *see also* Lemley, *Inducing Patent Infringement*, 39 U.C. Davis. L. Rev. 225, 243 (2005) ("[I]t is not reasonable to assume that merely because a defendant is aware of the existence of a patent, he intended to infringe it.").  Indeed, "if an accused

---

[4]  Sonos goes one step further and illogically argues that Google's ***good faith belief*** of non-infringement, as evidenced by its Rule 11 declaratory judgment complaint, must show Google believed it infringed the '966 patent. Mot. at 20 (arguing that Google's non-infringement analysis "would have taken weeks, if not months"). To the contrary, this only bolsters the conclusion that Google had no intent to infringe.

infringer 'reads the patent's claims differently from the plaintiff,' and if 'that reading is reasonable,' then the accused infringer should not be liable for indirect infringement." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 523 (Fed. Cir. 2016) (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015)).  Here, Google's good faith belief in non-infringement was reasonable, and Sonos did not present evidence regarding Google's subjective belief.  The only evidence bearing on Google's specific intent to infringe was Google's declaratory judgment complaint, which is evidence of Google's subjective belief of ***non-infringement***.

(b)   *None of Sinus's Alleged "Circumstantial Evidence" of Specific Intent Requires Disturbing the Jury's Verdict*

The other "circumstantial evidence" that Sonos points also fails to demonstrate that the jury was required to find Google had the "intent to encourage infringement." *Fluidigm Corp. v. IONpath, Inc.*, No. C 19-05639 WHA, 2020 WL 408988, at *3 (N.D. Cal. Jan. 24, 2020).  To prove induced infringement, Sonos had to prove Google had "knew or should have known his actions would induce actual infringements." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019).  "[M]ere knowledge of possible infringement will not suffice." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).  "[I]nducement requires evidence of culpable conduct[.]" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321-22 (Fed. Cir. 2009) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)).  Here, the record shows at most that Google "merely s[old] a commercial product suitable for some lawful use." *California Beach Co., LLC v. Exqline, Inc.*, No. C 20-01994 WHA, 2020 WL 6544457, at *2 (N.D. Cal. Nov. 7, 2020).

Sonos's contention that "Google intended for users to set up more than one speaker group" is inaccurate and is not sufficient circumstantial evidence of specific intent, as Sonos suggests.  Mot. at 21.  As an initial matter, there is no evidence that Google intended for users to set up more than one speaker group.  And Sonos's speculation that some Google speaker owners may have owned multiple speakers does not come close to establishing that those (completely hypothetical) owners would have created overlapping speaker groups.  *See id.*  Neither merely having multiple speakers nor setting up multiple speaker groups constitutes infringement, and thus is not "circumstantial"

-16-

1  evidence of infringement.  They are multiple speculative, hypothetical leaps from establishing

2  infringement, each of which has no basis in fact.

3       Sonos also argues that Google actively induces infringement because Google (1)

4  "encourages people to install the Google Home App,"[5] (2) encourages those users to "create static

5  speaker groups," and (3) because Google "provides instructions to customers on how to create

6  multizone groups of two or more speakers."  Mot. at 18-19.  But this alleged evidence is wholly

7  insufficient because it all relates to non-infringing functionality.  *See Kyocera Wireless Corp. v.*

8  *Int'l Trade Comm'n*, 545 F.3d 1340, 1353-154 (Fed. Cir. 2008); *Takeda Pharms. U.S.A., Inc. v. W.-*

9  *Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (citation omitted).  And nothing in the

10  record suggests that Google encouraged users to download the Google Home app in order to network

11  three or more speakers (or create two overlapping static speaker groups).  Indeed, as discussed

12  above, there is no evidence of ***any*** user actually doing so.[6]  Because Sonos "failed to propound

13  sufficient evidence that any of [Google]'s customers or end users actually enabled the [accused]

14  feature on an accused product," it cannot establish intent to encourage infringement.  *CIF Licensing,*

15  *LLC v. Agere Sys. Inc.*, 727 F. Supp. 2d 337, 353 (D. Del. 2010); *see also ACCO Brands, Inc. v.*

16  *ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312-14 (Fed. Cir. 2007).

17       Sonos also failed to present evidence that any purported attempt to induce users to infringe

18  ever reached alleged infringers.  Inducement "requires successful communication between the

19  alleged inducer and the third-party direct infringer."  *Power Integrations*, 843 F.3d at 1330-

20  31.  Thus, the Court's instructions to the jury expressly required a finding that Google had

21  "intentionally taken action that ***actually*** induced infringement" to satisfy inducement.  Dkt. 762 at

22  18.  Here, the record was devoid of any evidence that Google succeeded in encouraging any user to

---

[5]   Sonos's argument relies on its position that "once the Google Home App is downloaded and installed onto a computing device, infringement has occurred and a user need not actually operate a Google speaker via the Google Home App in order to infringe the claims."  Mot. at 19.  This position was squarely foreclosed by the Court's jury instructions, which specifically require an infringing system to include each of the claimed elements, including "at least three zone players that may be added to overlapping scenes using the Google Home app."  Dkt. 762 at 15 (jury charge).  As discussed *infra*, this instruction is correct.

[6]   For example, Mr. Chan's testimony regarding permitting users to create speaker groups (Mot. at 19), is irrelevant to infringement because speaker grouping *per se* is not claimed and clearly existed in the prior art.

infringe the '966 patent.

Finally, Sonos also continues to ignore Google's efforts to redesign its products to avoid infringement.  "[F]ailure to remove or diminish infringing features of a distributed product is relevant to a party's intent that those features be used for direct infringement."  *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1343 (Fed. Cir. 2008).  Google's redesign demonstrates that Google did not intend to encourage infringement of the '966 patent.

(c)   *There Was Substantial Evidence that the Google Home App Was Suitable For Non-Infringing Use*

Sonos argues that Google should be liable for contributory infringement because the Google Home App "is not . . . suitable for substantial non-infringing use because the only possible use for this software component is to be installed . . . ."  Mot. at 19.  Merely installing the software is not an infringing act, *supra*, and even if it were, the Google Home App is capable of a huge number of unclaimed uses.  Dr. Almeroth admitted the accused computing devices have "thousands" of non-infringing features (Trial Tr. at 912:19-913:22), and it was undisputed that the Google Home app has a huge number of non-infringing uses, such as controlling lightbulbs, thermostats, ovens, and cameras.  *Id.* (Malackowski) at 1153:21-1154:13; *id.* (Pedro) at 1306:19-1309:14.

Sonos attempts to rely on *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1320-21 (Fed. Cir. 2009) for the proposition that contributory infringement may exist "even if the software includes some non-infringing features."  Mot. at 19.  *Lucent* is readily distinguishable.  In *Lucent*, the court found that the date-picker tool would necessarily infringe when used to fill out a form.  *Id.* at 1321 ("the infringing feature for completing the forms, i.e., the date-picker tool, is suitable only for an infringing use").  Here, the accused "tool" is static speaker grouping, and there is no dispute that creating static speaker groups alone does not infringe.  The **only** accused use is creating overlapping speaker groups in accordance with the claimed standalone mode along with each of the other claim requirements.  Accordingly, even focusing on the speaker grouping "tool," this feature is capable of non-infringing speaker group creation.

In *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012), the claims covered creating DVDs, but it was undisputed that if a user did not "finalize" the DVD—meaning that the

-18-

GOOGLE'S OPPOSITION TO SONOS'S RULE 50 AND 59 MOTION

1    user could continue to write data to the DVD—there would be no infringement.  The court found

2    that Toshiba had not proved contributory infringement because Toshiba "did not introduce evidence

3    showing that" choosing not to finalize the DVDs was "unusual, far-fetched, illusory, impractical,

4    occasional, aberrant, or experimental."  *Id.*  So too here.  Sonos introduced no evidence showing

5    that creating *non*-overlapping speaker groups was "unusual, far-fetched, illusory, impractical,

6    occasional, aberrant, or experimental."  As in *Toshiba*, Sonos "did not introduce evidence showing

7    how often users" create overlapping speaker groups or even show that it was "recommended" that

8    users create overlapping speaker groups.  *See id.*  Sonos "had the burden of proof, but failed to

9    introduce evidence sufficient" to meet its burden of proof to show that that non-overlapping speaker

10   groups were "not a substantial non-infringing use."  *See id.*

11                      3.    <u>Sonos Did Not Prove Willful Infringement</u>

12         Sonos falls far short of demonstrating that the jury lacked a "legally sufficient evidentiary

13   basis" to find in favor of Google on willfulness.  Fed. R. Civ. P. 50(b).  As stated in the jury

14   instructions, Sonos had to prove by preponderance of the evidence that "Google knew of the '966

15   patent and that the infringement by Google was intentional."  Dkt. 762 at 19.  Merely showing that

16   "Google was aware of the '966 patent and infringed it" was insufficient—Sonos had to convince

17   the jury that Google "***deliberately*** infringed the '966 patent or recklessly disregarded Sonos's patent

18   rights," *Id.* (emphasis added); *Sonos, Inc. v. Google LLC*, No. 21-cv-7559-WHA, Dkt. 156 at 4

19   (N.D. Cal. Mar. 16, 2022) (ruling that Sonos "must prove knowledge of the patent and knowledge

20   of infringement" in order to establish willful infringement).[7]

21         As discussed above, it was reasonable for a jury to find that Google's declaratory judgment

22   complaint was insufficient evidence to prove Google willfully infringed the '966 patent.  *See supra*

23   Sec. I.C.2.  Curiously, Sonos appears to challenge Google's Rule 11 basis for filing that complaint

24

25   _____

26   [7] Sonos asserts that "[i]t is unclear" what Google contends is the law with respect to the "specific intent" requirement, citing Google's motion for judgment as a matter of law.  Mot. at 23, fn. 4.  But Google merely recited an exact quote from the Federal Circuit holding that "the patentee must show

27   the accused infringer had a specific intent to infringe at the time of the challenged conduct."  *Id.* (quoting *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987-88 (Fed. Cir. 2021)).  Google

28   has never suggested that there is some other "specific intent" requirement beyond proving that Google had the state of mind of intentional infringement.

based on Google's invocation of privilege (Mot. at 23), yet Sonos's willfulness claim hinges entirely on the notion that Google *did* satisfy Rule 11—and thus had knowledge of the patents and of infringement prior to Sonos filing suit.  Even assuming *arguendo* those facts were enough to prove Google had knowledge of the '966 patent, they cannot establish that Google had the state of mind required—*intentional* infringement—when Google specifically represented to the Court that it did not infringe and sought a ruling consistent with this belief.  *Id.*  Thus, contrary to Sonos's assertions in its opposition brief, Google's knowing and deliberate infringement is exactly the improper inference Sonos attempted to elicit from Mr. Kowalski's testimony during its closing argument:

> All right.  Now, we tried to get some of these answers to when they first knew about the patents, to how were they tracking Sonos' patents, to what kind of investigation due diligence they were doing.  **You saw Mr. Kowalski give back answers where he couldn't answer.  He just claimed privilege and didn't tell us what was going on.**
> **Again, I think <u>that's enough on its own</u> to tell you that there was knowledge about these patents and about Google's infringement before they filed their DJ complaint.**

Trial Tr. (Sonos's Closing Argument) at 1835:16-24 (emphasis added).  Sonos's assertion that Google's privilege claim was "enough on its own" for the jury to infer that Google knew it infringed is precisely what the Federal Circuit has held improper.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2004) ("An adverse inference that a legal opinion was or would have been unfavorable shall not be drawn from invocation of the attorney-client and/or work product privileges[.]").  In any event, the jury was unconvinced by this strained factual argument after hearing evidence that Google implemented the technology years before Sonos did, Google's engineers independently developed the accused functionality, and Google immediately sought the Court's assistance because it believed its products were non-infringing.  Trial Tr. (MacKay) at 1237:1-1238:3, 1273:12-1274:2; *id.* (MacLellan) at 1298:22-1299:9, 1303:4-19); *id.* (Pedro) at 1317:12-1318:5); *id.* (Lambourne) at 468:25-469:7; *see also id.* at 1376:24-1866:21.  Sonos has failed to provide any authority requiring the Court to disturb the jury's verdict of no willfulness.  *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1584 (Fed. Cir. 1995) (declining to upset the jury's determination "unless it is based upon a jury's findings of fact that are unsupported by substantial evidence"); *Eko Brands, LLC v. Adrian Rivera Maynez*

1  *Enterprises, Inc.*, 325 F. Supp. 3d 1116, 1122 (W.D. Wash. 2018), *aff'd,* 946 F.3d 1367 (Fed. Cir.

2  2020) ("The Court will not disturb the jury's finding of non-willfulness, which was supported by

3  substantial evidence in the record.")

4        Faced with this scant evidentiary record, Sonos concocts new theories involving events that

5  took place years before the '966 patent issued.  First, Sonos suggests that a reasonable jury *had* to

6  conclude that Google willfully infringed the '966 patent because the parties "worked together in the

7  2013-2014 timeframe" on a completely unrelated technology involving casting.  Mot. at

8  22.  Second, Sonos points to the fact that Google "was aware of" and "compared" Sonos products

9  "during the development of the accused features" back in the 2014 timeframe—and then makes the

10  far-fetched leap that Google was willfully blind because it did not "ma[k]e an effort to look for

11  Sonos patents" or "conclude that it did not infringe Sonos's patents."[8]  *Id.*  Both theories involve

12  events that took place at least *five years* before the ***application*** for the '966 patent was even filed

13  and thus plainly cannot be the basis for any willfulness finding.  "Google's pre-issuance conduct"

14  in 2014 is "irrelevant to the issue of willful infringement" because, as this Court has held, "[i]f there

15  was no valid patent to infringe, there is no way that Google could have willfully blinded itself to the

16  'particular fact' of its infringement."  *MasterObjects, Inc. v. Google, Inc.*, No. C 11-1054 PJH, 2013

17  WL 12177460, at *1 (N.D. Cal. May 2, 2013) (Alsup, J.).  And critically, even assuming Google

18  "specifically considered and compared Sonos products," that would be irrelevant because Sonos's

19  products did not even practice the '966 patent at the time and would not do so until ***five years later***

20  in 2020.  Trial Tr. (Lambourne) at 468:25-469:7.

21        None of the other examples of so-called "ample evidence" warrants overturning the jury's

22  verdict.  Sonos provides no basis for the notion that the jury was required to find that Google

23  willfully infringed the '966 patent because it "did not make a single change to the Google Home

24

25  ───────────────

26  [8]  Moreover, Sonos omits the portion of Mr. Shekel's testimony where he states that he did not look
at the *implementation* of multi-zone technology, but rather simply "tried using multi-zone by [a]
few of the other manufacturers."  Dkt. 754-7 at 91:8-15.  Sonos's argument is also nonsensical.  As

27  the jury heard, Google gave a presentation to Sonos in 2014 regarding its Cast for Audio product,
which included a slide on "Multi-Zone Groups."  Dkt. 754-7 at 78:7-22.  If Sonos knew it had or

28  would have patents regarding such technology, it should have informed Google at that time instead
of asserting that Google was required to go searching for such patents before they were even issued.

GOOGLE'S OPPOSITION TO SONOS'S RULE 50 AND 59 MOTION

app" after the Court found that it infringed a *different* patent, the '885.  Mot. at 24.  Moreover, even though there had been no ruling on infringement of the '966 patent, Google immediately began implementing a redesign that it believed in good faith would design around both the '966 and '885 patents without needing to change the Google Home app.  *Cf.* Trial Tr. (Almeroth) 804:10-20 (opining on infringement of the '966 patent with respect to the redesign).  Sonos fails to support the implausible notion that a party's attempt to design around a patent and purposely ***avoid*** infringement—although ultimately deemed unsuccessful by a jury—compels a willfulness finding.  *Cf. Illinois Tool Works, Inc. v. MOC Prod. Co*., 856 F. Supp. 2d 1156, 1168 (S.D. Cal. 2012) (finding that genuine disputes of fact remained as to the defendant's knowledge of infringement for an indirect infringement claim because upon learning of infringement, defendant "took deliberate action to avoid infringing" by redesigning its products).

Accordingly, the Court should deny both Sonos's motion for judgment as a matter of law and its request for a new trial as to its willful infringement claim.

### D.     The Court Should Not Grant a New Trial On Infringement of the '966 Patent Or Modify the Rulings Identified by Sonos

In three bullets on the last page of its motion, Sonos identifies three damages-related arguments that it claims to have made previously but does not substantively discuss in its brief.  Mot. at 25.  Since Sonos chose not to "rehash" those arguments, Google is unable to and need not respond to the three bullets regarding IFTTT, pre-suit knowledge, and pre-suit damages.  *See id.*  As even Sonos recognizes, the Court has already denied Sonos's requests after extensive briefing, and Sonos provides no reason those evidentiary rulings should be reconsidered.  *See* Dkt. 566 at 30-31.  To the extent Sonos believes any of these arguments constitute a basis for reversal under Rule 50 or for a new trial under Rule 59, the arguments are waived.

## II.     <u>CONCLUSION</u>

For the foregoing reasons, Sonos's motion for judgment as a matter of law and request for a new trial should be denied.

1    DATED:  July 7, 2023                    QUINN EMANUEL URQUHART & SULLIVAN,
                                             LLP
2

3                                      By  _____/s/ Sean Pak_____
                                             Sean Pak
4                                            Melissa Baily
                                             James D. Judah
5                                            Lindsay Cooper
                                             Marc Kaplan
6                                            Iman Lordgooei

7

8                                          *Attorneys for GOOGLE LLC*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28