QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Marc Kaplan (*pro hac vice*)
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC.,<br><br>       Plaintiff and Counter-<br>       Defendant,<br><br>    vs.<br><br>GOOGLE LLC,<br><br>       Defendant and Counter-<br>       Claimant. | Case No. 3:20-cv-06754-WHA<br>Consolidated with Case No. 3:21-cv-07559-WHA<br><br>**GOOGLE LLC'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL**<br><br>Hearing Date: August 10, 2023, 8:00 a.m.<br>Location: Courtroom 12, 19th Floor<br>Judge:     Hon. William Alsup |

# ASSERTED CLAIMS

'885 Patent, Claim 1:

[1.0]. A first zone player comprising:

[1.1] a network interface that is configured to communicatively couple the first zone player to at least one data network;

[1.2] one or more processors;

[1.3] a non-transitory computer-readable medium; and

[1.4] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the first zone player to perform functions comprising:

[1.5] while operating in a standalone mode in which the first zone player is configured to play back media individually in a networked media playback system comprising the first zone player and at least two other zone players:

[1.6] (i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked; and

[1.7] (ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player;

[1.8] after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation;

[1.9] after the given one of the first and second zone scenes has been selected for invocation, receiving, from the network device over the data network, an instruction to operate in accordance with a given one of the first and second zone scenes respectively comprising a given one of the first and second predefined groupings of zone players; and

[1.10] based on the instruction, transitioning from operating in the standalone mode to operating in accordance with the given one of the first and second predefined groupings of zone players such that the first zone player is configured to coordinate with at least one other zone player in the given one of the first and second predefined groupings of zone players over a data network in order to output media in synchrony with output of media by the at least one other zone player in the given one of the first and second predefined groupings of zone players.

'966 Patent, Claim 1:

[1.0] A computing device comprising:

[1.1] one or more processors;

[1.2] a non-transitory computer-readable medium; and

[1.3] program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[1.4] while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

[1.5] receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

[1.6] based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

[1.7] receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

[1.8] based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

[1.9] displaying a representation of the first zone scene and a representation of the second zone scene; and

[1.10] while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

[1.11] based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

'966 Patent, Claim 2:

[2.0] The computing device of claim 1,

[2.1] further comprising program instructions stored on the non-transistory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

[2.2] while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

[2.3] based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with a t least the third zone player to output media in synchrony with output of media by at least the third zone player.

'966 Patent, Claim 4:

[4.0] The computing device of claim 3,

[4.1] wherein the location other than the computing device comprises a zone player of the first predefined group of zone players.

'966 Patent, Claim 6:

[6.0] The computing device of claim 1,

[6.1] wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.

'966 Patent, Claim 8:

[8.0] The computing device of claim 1,

[8.1] wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

## **TABLE OF CONTENTS**

I.     THE '885 AND '966 PATENTS ARE INVALID AS A MATTER OF LAW ...................1

       A.    The Sonos 2005 Prior Art System "Party Mode" Is a Zone Scene ...........................1

       B.    Sonos Forums Disclosed How to Save Overlapping Groups and Later
             Invoke Them In Even Greater Detail Than the Asserted Patents..............................3

       C.    Squeezebox and Nourse Also Rendered the Asserted Claims Obvious.....................5

       D.    Google Established Motivation to Combine and Expectation of Success .................5

       E.    Google Established the Asserted Claims of the '966 Patent Are Invalid..................6

       F.    Sonos Failed To Prove Any Objective Indicia of Non-Obviousness ........................7

II.    THE REDESIGNED PRODUCTS DO NOT INFRINGE AS A MATTER OF
       LAW ...........................................................................................................................7

       A.    Speakers Transitioned to Idle Mode Are No Longer "Configured to Play
             Back Media Individually" .........................................................................................8

       B.    There Is No Infringement Under the Proper Construction of the Standalone
             Mode Limitation.......................................................................................................10

III.   THE DAMAGES AWARD CANNOT STAND ................................................................11

       A.    Sonos Admits Its License Agreements Cannot Support the $2.30 Royalty
             Rate...........................................................................................................................12

       B.    Mr. Bakewell's Lump-Sum Opinion Is Not "Substantial Evidence"
             Supporting the Jury's $2.30 Royalty Rate ...............................................................12

       C.    The Court Should Grant a New Trial on Limited Issues or Remittitur....................14

# TABLE OF AUTHORITIES

Page(s)

### Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ..................................................................................... 9

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) ...................................................................................... 15

*Boesen v. Garmin Int'l, Inc.*,
   455 F. App'x 974 (Fed. Cir. 2011) ................................................................................ 9

*Bos. Sci. Corp. v. Johnson & Johnson*,
   550 F. Supp. 2d 1102 (N.D. Cal. 2008) ...................................................................... 14

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
   879 F.3d 1332 (Fed. Cir. 2018) ............................................................................ 13, 14

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) ................................................................................... 14

*Ingram v. City of San Bernardino*,
   No. EDCV 05-925-VAPSGLX, 2007 WL 5030225 (C.D. Cal. Aug. 27, 2007) .................... 11

*Intel Corp. v. PACT XPP Schweiz AG*,
   61 F.4th 1373 (Fed. Cir. 2023) ..................................................................................... 6

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
   292 F.3d 728 (Fed. Cir. 2022) ..................................................................................... 12

*LaserDynamics*,
   694 F.3d at 79 ............................................................................................................ 15

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ......................................................................... 11, 12, 13

*Lucent Techs., Inc. v. Microsoft Corp.*,
   837 F. Supp. 2d 1107 (S.D. Cal. 2011) ....................................................................... 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................................... 10

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ................................................................................... 14

*Pause Tech., LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005) ................................................................................... 11

*Promega Corp. v. Life Techs. Corp.*,
    875 F.3d 651 (Fed. Cir. 2017) ....................................................................... 13, 14

*Uber Tech., Inc. v. X One, Inc.*,
    957 F.3d 1334 (2020) ...................................................................................... 3, 6

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ........................................................................ 15

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) .......................................................................... 7

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10, 30 (Fed. Cir. 2012) ...................................................................... 13

**Statutes**

35 U.S.C. § 284 ................................................................................................... 14

**Other Authorities**

Federal Rule 50(b) ............................................................................................... 11

Federal Rule 59 .................................................................................................... 11

## I.   THE '885 AND '966 PATENTS ARE INVALID AS A MATTER OF LAW

No reasonable jury could have found the asserted claims valid in view of the substantial evidence showing they were disclosed by the combination of Sonos 2005 and any one of Sonos Forums, Squeezebox, and Nourse.  Dkt. 824 at 3-13.  Tellingly, Sonos's own expert failed to rebut key evidence presented on these combinations.  Indeed, Dr. Almeroth did not even mention any aspect of Squeezebox, Nourse, or their combinations with Sonos 2005.  Sonos claims "[e]ach combination requires that the Sonos 2005 System include zone scenes" and asserts that the Party Mode feature of Sonos 2005 was not a zone scene.  Opp. 2.  But Sonos fails to draw any coherent distinction between the prior art Party Mode and a zone scene, and in any event ignores that the Sonos Forums, Squeezebox, and Nourse references each undisputedly disclosed zone scenes.

### A.   The Sonos 2005 Prior Art System "Party Mode" Is a Zone Scene

Sonos's opposition rests on the proposition that the Sonos 2005 Party Mode is not a zone scene.  Opp. 2-4.  But no reasonable jury would have overlooked the substantial evidence proving Party Mode met the Court's construction.  And contrary to Sonos's arguments, Party Mode (1) *was* previously saved, and (2) *did* separate between creation and invocation.

*Previously saved*:  Party Mode was undisputedly a "previously saved grouping."  Sonos's own witnesses testified that Party Mode was hard coded into Sonos's controllers (TX3923 ¶ 6; Tr. (Lambourne) 420:1-16, 1383:7-1384:14; *id.* (Millington) 334:24-335:2) *and* that Sonos 2005 had pre-saved knowledge of all zone players in the Party Mode group *before* the user invoked Party Mode.  *Id.* (Lambourne) 420:1-16 (explaining that "what rooms were in this Party Mode" "was baked into the product" and "was coded by the engineers into the CR100 [controller] product"), 504:20-25 ("Q. . . . *[S]omewhere in the system that information is saved*; correct?  A. *Yes*. The system knows that those players are together."); *id.* (Millington) 348:10-349:8, 355:10-357:18, 398:19-399:9 (the identity of every zone player in a Sonos 2005 system was *saved* in each zone player and controller); *id.* (Schonfeld) 1381:8-1383:6 (same).  Sonos and its expert's *ipse dixit* assertion that the Party Mode "group membership would not be saved" (Opp. 2 and Tr. (Almeroth) 1659:24-1660:1) is, thus, contrary to the undisputed evidence of Sonos 2005's operation.

Similarly, no reasonable jury would have credited Mr. Lambourne's testimony that "the

players that would play in Party Mode wasn't saved in the system in the original design."  Tr. at 459:8-13; *see also* Opp. 3.  Mr. Lambourne's testimony was belied by contemporaneous evidence and contradicted by his own admissions that the prior art Party Mode **was** a zone scene and saved the identities of the zone players.  *Id*. at 520:21-521:10, 546:11-22, 627:6-12, 420:1-16, 504:20-25; TX3941; TX6544.  Moreover, Mr. Lambourne is not a programmer and never wrote code for any Sonos product.  Tr. (Lambourne) 530:6-11.  No reasonable jury would have credited his testimony over the extensive evidence that identities of the zone players were pre-saved as part of Party Mode, including the testimony of Mr. Millington, a Sonos 2005 software developer.  *Id*. at 251:6-252:4, 264:13-25, 348:10-349:8, 355:10-357:18, 398:19-399:9 (pre-saving speaker identities in 2005).

Sonos's analogy to "the reply-all function in an email client" (Opp. 2-3) fails for the same reason.  While "all of the other email addresses on the original message" used as part of the "reply-all function" may not be pre-saved in an email application, all the identifiers for every zone player in Sonos 2005 **were** pre-saved as zone topology information.  The identities of the zone players in the "All Zones-Party Mode" group were not created for the first time at invocation of Party Mode.

***Created and later invoked***:  Sonos also attempts to distinguish Party Mode from a zone scene by arguing (incorrectly) that Sonos 2005 created and invoked Party Mode "simultaneously." Opp. 3-4.  Sonos argues that as a result, Sonos 2005 did not meet the limitations requiring a zone player to receive an indication that it has been added to the Party Mode and, later, an instruction invoking the Party Mode for synchronous media playback.  This argument fails for several reasons.

First, unrebutted evidence showed that zone players received an indication that they were added to the Party Mode in the form of a "SetAVTransportURI" message and were later invoked for synchronous media playback using a separate play message.  *E.g.*, Tr. (Schonfeld) 1378:7-1380:3, 1386:15-1388:4, 1380:11-1381:4; *see also id.* (Millington) 336:5-10, 342:24-343:16. Indeed, "a whole sequence of . . . exchanges …[] take place" from when a Sonos 2005 zone player receives an indication it has been added to Party Mode to the invocation of the Party Mode.  *Id.* (Schonfeld) 1713:9-1714:6; *id.* at 1379:12-1380:3, 1386:15-1388:4.  Contrary to Sonos's assertion, Dr. Schonfeld did not testify that "each indication comes with the invocation" for Party Mode.  Opp. 4.  Rather, he explained, consistent with his deposition, that the indication for Party Mode comes

1   with invocation "[o]nly if the coordinator is actually playing music" but "if the coordinator is not

2   playing music, that would not be correct."  Tr. (Schonfeld) 1476:8-22, 1477:13-24.

3          Finally, even if the indication and invocation of Party Mode were simultaneous, Sonos's

4   argument ignores that the limitations requiring creating and sending an indication of a zone scene

5   for later invocation would have been obvious once a second zone scene was added to the Sonos

6   2005 system, as suggested by Sonos Forums (and disclosed in the Squeezebox system and Nourse

7   patent).  Even Mr. Lambourne agreed that Sonos Forums disclosed adding multiple zone scenes

8   saved for later use.  *E.g.*, Tr. (Lambourne) 539:17-24 (agreeing Sonos Forums disclosed "having

9   multiple zone scenes that are *saved for later*"), 549:24-550:10 (agreeing Sonos Forums disclosed "a

10  downstairs zone that is *saved for future use*" which "was describing [Lambourne's] idea for zone

11  scenes").  Thus, even if Sonos 2005 did not disclose zone scenes, Sonos has not rebutted that each

12  of the secondary references combined with Sonos 2005 taught zone scenes.  Dkt. 824 at 4-7 (Sonos

13  Forums disclosed overlapping zone scenes), 10 (same for Squeezebox), 11 (Nourse).

14          **B.      Sonos Forums Disclosed How to Save Overlapping Groups and Later Invoke
15                   Them In Even Greater Detail Than the Asserted Patents**

16          Sonos Forums not only described zone scenes and how to implement overlapping groups

17  and groups that could be saved and invoked later, it did so in greater detail than the asserted patents.

18  As the Court has recognized, the written description for overlapping zone scenes is "thin" at best,

19  and what little there is "in the specification has come down to one paragraph."  Tr. 660:8-661:5,

20  749:3-13, 949:14-19.  Yet neither that one paragraph ('885 Patent at 10:12-19) nor any other part of

21  the asserted patents describes "how to implement overlapping groups or groups that could be saved

22  and invoked later" or provides any "specific solution for creating and saving separate groups of

23  media players" as Sonos demands from the prior art.  The asserted patents at best imply overlapping

24  zone scenes by describing that zones could be added to a zone scene using a checkbox and then

25  saved with no disclosure of *how*.  *Id.*; *id*. at 10:42-43 (stating "[a]t 606, the scene is saved" without

26  any describing how); *id*. at Fig. 6 (black boxes to "configure" and "save" without disclosing *how*).

27          Sonos cannot hold the prior art to a higher standard of disclosure than its own patents.  *E.g.*,

28  *Uber Tech., Inc. v. X One, Inc.*, 957 F.3d 1334, 1339 (2020).  Consistent with the case law, the Court

1  instructed the jury that "[i]f one of the claimed inventive features of a claim over the prior art

2  received very little explanation in the patent specification, then you may infer that the inventor

3  expected those of ordinary skill in the art already understood how to implement that aspect of the

4  claimed invention."  Dkt. 762 at 11.  Here, compared to the disclosure of the asserted patents, a

5  reasonable jury would have found Sonos Forums contained more details than the patents and more

6  than sufficient description of overlapping zone scenes to teach the alleged invention.

7        In particular, Sonos Forums disclosed "a macro type function" that saved different zone

8  configurations and automated the existing zone grouping process in the Sonos 2005 system to group

9  and synchronize media playback on zone players in one of several pre-saved zone scenes—such as

10  Morning, Summer Party, or Winter Party zone scenes.  Dkt. 824 at 4-7.  This was not just a "vague[]

11  reference[]" to zone scenes that failed to "teach any of the claim limitations requiring

12  sending/receiving indications that a player has been added to the group, or separately

13  sending/receiving indications that the group is being invoked," as Sonos alleges.  Opp. 5.  Rather,

14  Sonos Forums disclosed using macros with the existing mechanisms of Sonos 2005 to set up and

15  save multiple zone scenes with overlapping speakers for later invocation.  Indeed, macros were one

16  of the solutions Mr. Lambourne himself had in mind for implementing zone scenes.  Tr. 542:9-12.

17  Sonos Forums did not need to expressly disclose the specific separate indications because the

18  Forums posts were suggesting modifications to the existing Sonos 2005 system, which already

19  included a SetAVTransportURI message to indicate that a zone player was added to a group and a

20  play message to later invoke the group to play back music.  *See supra*.

21        Sonos also argues that Dr. Schonfeld never addressed "the foundational architectural

22  differences between the ad hoc, immediately invoked groups in the Sonos 2005 System and the

23  static groups that could be saved and invoked later in the asserted patents."  Opp. 6.  But there was

24  no evidence of any such "foundational" differences.  Rather, the only evidence was Dr. Schonfeld's

25  testimony that saving a zone group as a zone scene and using the existing SetAVTransportURI

26  indications and "play" button to later invoke the scene would have been a trivial modification to the

27  Sonos 2005 system—a sentiment shared by many of the Sonos Forums users.  *See* Tr. (Schonfeld)

28  1423:22-1425:18; Dkt. 824 at 6-9; Tr. (Almeroth) 1691:6-1695:21.

Finally, Sonos's argument that Mr. Lambourne did not take the idea of overlapping groups from Sonos Forums misses the point. Opp. 6. Even if Mr. Lambourne came up with the idea independently, he testified that the ***prior art*** Sonos Forums disclosed the same problem and the same solution as his alleged invention. Dkt. 824 at 5-9 (citing evidence including Tr. (Lambourne) 528:11-25, 529:1-7, 531:15-22, 541:2-25, 542:1-12, 546:8-13, 548:8-17). No reasonable jury could have found the patents valid in view of such admissions from the inventor himself.

### C.   Squeezebox and Nourse Also Rendered the Asserted Claims Obvious

Because Sonos did not rebut any aspect of Dr. Schonfeld's testimony at trial, its only argument against Squeezebox now is that "[t]he jury could have discounted" his opinions because he did not test a physical Squeezebox player with prior art firmware. Opp. 6-7. But "Sonos did not dispute that the Squeezebox source code Dr. Schonfeld relied upon was prior art, or that Dr. Schonfeld ran 'virtual machines' that simulated the operation of the Squeezeboxes in 2005. Sonos never responded to Dr. Schonfeld's virtual machine or software testing, so any reasonable jury would have found that the prior art combination including Squeezebox disclosed overlapping zone scenes." Dkt. 824, n.5; *see also id*. at 9-11; Tr. at 1482:22-1485:18, 1505:25-1507:11. And contrary to Sonos's assertion, the evidence showed the PTO examiner did ***not*** consider Squeezebox products, software, or source code that are the basis for invalidity. *E.g.*, Tr. (Schonfeld) at 1508:20-1509:17.

Sonos's sole argument against Nourse is similarly unavailing. No reasonable jury could have found, as Sonos argues, that Nourse did not save groups merely because it assigned "up to four group identifiers" to each speaker. Opp. 7. Indeed, assigning group identifiers to speakers that are part of the group is akin to the very functionality Sonos accused and the jury found to infringe. *See also* Dkt. 824 at 11. If, as Sonos argued for infringement, assigning a group ID to each speaker constitutes saving the zone scene, then Nourse invalidates.

### D.   Google Established Motivation to Combine and Expectation of Success

Sonos next argues that Dr. Schonfeld "never explained why a POSITA would have been motivated to combine [the prior art] in the manner of Sonos's claimed inventions, as opposed to some other way." Opp. 8. Yet Dr. Schonfeld clearly explained that Sonos Forums provided the motivation for modifying Sonos 2005 in the claimed manner because Sonos Forums identified the

1    same problem and suggested the same solution.  Dkt. 824 at 7-9.  A POSITA would have been

2    motivated to "combine the teachings exactly as Sonos's invention does" (Opp. 8) because Sonos

3    Forums expressly proposed the claimed invention of overlapping zone groups that are saved for

4    later invocation.  *See supra* § I.B; *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed.

5    Cir. 2023) (because prior art "address[ed] the same problem and [provided] a known way to address

6    that problem" that was "precisely the reason that there's a motivation to combine").  The same

7    suggestions would have also led a POSITA to look to Squeezebox, a similar product in the same

8    field that Mr. Lambourne and others investigated in designing Sonos's products.  Tr. (Lambourne)

9    556:15-22, 560:15-566:18; TX3937.  A POSITA would have similarly been motivated to look to

10   Nourse, a relevant patent in the same field of invention as the asserted patents.

11        Sonos's only rebuttal is that there was no evidence of why a POSITA would have combined

12   the references "exactly as Sonos's invention does."  But this argument fails because all but one

13   aspect of the alleged invention were already part of the Sonos 2005 system.  *Supra* § I.A.  The only

14   thing missing was ***the concept*** of overlapping zone groups saved for later invocation, which was

15   taught by Sonos Forums, Squeezebox, and Nourse.  Dkt. 824 at 9-11.  And since the asserted patents

16   do not describe overlapping zone scenes in any level of detail (*supra* § I.B), a POSITA need only

17   have added ***the concept*** of overlapping zone scenes to Sonos 2005 to arrive at the alleged invention.

18        As for expectation of success, Dr. Schonfeld again presented unrebutted testimony that a

19   POSITA would have expected success in adding overlapping zone scenes to Sonos 2005 as taught

20   by any one of Sonos Forums, Squeezebox, or Nourse because it would have been a trivial addition.

21   Dkt. 824 at 8, 11.  Importantly Dr. Schonfeld's opinions were not based on hindsight—they were

22   based on the suggestions of Sonos Forums and the disclosures of Forums, Squeezebox, and Nourse

23   of how to implement overlapping zone scenes commensurate with the level of disclosure of the

24   asserted patents.  Indeed, the lack of detailed disclosure of overlapping zone scenes in the asserted

25   patents meant "that the inventor expected those of ordinary skill in the art already understood how

26   to implement that aspect of the claimed invention."  Dkt. 762 at 11; *Uber*, 957 F.3d at 1349.  No

27   reasonable jury would have found a lack of reasonable expectation of success.

28   **E.     Google Established the Asserted Claims of the '966 Patent Are Invalid**

Sonos also argues that the prior art did not teach the display limitations of the '966 Patent. Opp. 9. Not so. Indeed, Dr. Schonfeld testified that the prior art Sonos 2005 system displays zone scenes for invocation by a user. Tr. (Schonfeld) 1386:21-1387:10, 1479:17-1481:7, 1505:12-24. Mr. Millington also testified that Sonos 2005 *displayed* the Party Mode option. *Id.* (Millington) 398:1-5; TX6974 at 5. No reasonable jury could have found that the Party Mode zone scene was not displayed, and regardless, the zone scenes in Squeezebox were undisputedly displayed, rendering this feature obvious at a minimum. *E.g.*, *id.* (Schonfeld) 1448:10-1449:15 (testing sync grouping); TX3808 at 87 (discussing menus to access sync groups).

### F. Sonos Failed To Prove Any Objective Indicia of Non-Obviousness

As explained in Google's Motion, Sonos failed to prove a nexus between the alleged objective indicia and the claimed invention. Dkt. 824 at 12-13. The alleged industry praise was for saved groups, but there was no praise for saved *overlapping* groups. *E.g.*, TX6780; TX6788. Nexus cannot be presumed here, as Sonos's 2020 system was not "the invention disclosed and claimed in the patent." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329-30 (Fed. Cir. 2016) (finding nexus where praise was for product results achieved only through practice of the invention). Here, the praise was for saved groups and Sonos's S2 software, but the invention is directed to overlapping zone scenes and Sonos's S2 is not coextensive with that. Tr. (Millington) at 287:2-13 (explaining S2 includes many "really important features" unrelated to zone scenes). Sonos's citation to Sonos Forums posts that cast doubt on overlapping zone scenes is also unpersuasive, as such "skepticism" came after Google had already released the accused functionality.

## II. THE REDESIGNED PRODUCTS DO NOT INFRINGE AS A MATTER OF LAW

No substantial evidence supports the jury's verdict of infringement. Dkt. 824 at 13-17. First, extensive evidence showed that before a speaker is added to a group in Google's new design, it exits standalone mode and enters an idle mode in which it stops media playback and "kills" (closes out) any application that *could* play back media. The speaker is thus no longer "configured to" play back media, as required by the claims. Second, under the proper construction of "while operating in a standalone mode in which the first zone player is configured to play back media individually," the accused speakers must actively play back media individually while in standalone mode. The

1  accused products with the new design undisputedly stop media playback and, thus, do not actively

2  play back media as required.

3    A.    **Speakers Transitioned to Idle Mode Are No Longer "Configured to Play Back Media Individually"**

4

5        Sonos does not dispute that the accused speakers terminate any media application that was

6  running before the speaker is added to a group.  Indeed, Dr. Almeroth admitted that "the idea of the

7  StopCurrentApp that Google is proposing is that if there is an app running that's playing music, then

8  it will be stopped as part of group creation[.]"  Tr. (Almeroth) 799:14-799:22.  Google's technical

9  witness confirmed this, testifying that when speakers are added to a new speaker group, they execute

10 a "StopCurrentApp()" function that "tears down" any playback app running on the speakers and

11 removes that playback app from memory.[1]  *Id.* (Mackay) 1256:23-25, 1267:7-22 , 1282:25-1283:5,

12 1254:24-1255:1.  Mr. MacKay testified—unrebutted—that not only is the playback app torn down

13 and removed from memory by executing the StopCurrentApp command, but the speaker must

14 "essentially download[] the app from the internet again" to play back later because the app is

15 "gone."[2]  *Id.* at 1292:3-15.  Dr. Almeroth did not testify to the detailed operation of the

16 StopCurrentApp function, but agreed that the music application is terminated (stopped).

17       Second, Sonos does not dispute that once the accused speaker terminates the playback

18 application, the speaker cannot play back media.  Dr. Almeroth confirmed that StopCurrentApp

19 "stops the ability to hear audio of what's already playing." Tr. (Almeroth) 802:24-802:25.  Google's

20 technical witnesses confirmed this.  *Id.* (MacKay) 1254:21-1255:1 ("Idle mode is when there is no

21 app running on the speaker so it's not able to play media.").

22       The non-infringing functionality was thus undisputed at trial.  When a speaker receives a

23

24 [1]  Sonos argues that Google's "idle mode" non-infringement arguments were based entirely on the testimony of Mr. MacKay, but that is incorrect.  The source code was introduced into evidence, Mr.

25 MacLellan confirmed the operation of the design around, and Dr. Schonfeld testified to its operation as well.  Tr. (MacLellan) 1301:8-1302:11; *id.* (Schonfeld) 1358:8-1360:18, 1364:11-1365:4,

26 1466:18-22; TX0155.

27 [2]  Sonos argues that Mr. MacKay's testimony is entitled to less weight because he did not compare the products to the claims (Opp. 12-13), but as the author of the source code and a seasoned engineer,

28 Mr. MacKay possessed the requisite specialized knowledge and experience to describe the non-infringing functionality.

1    command to join a speaker group, that speaker terminates any media application running on that

2    application.  And when the media application is terminated, the speaker *cannot* play back media.

3    As a result, the speaker is no longer "configured to play back media individually" and thus does not

4    "remain" in the standalone mode as required by claim 1 of the '885 patent.  Sonos disputed only the

5    *labels* for this undisputed functionality, not the functionality itself.  Tr. (Almeroth) 1282:25-1283:5;

6    *id*. at 986:15-22 (agreeing "there's not going to be infringement for the redesign" if group playback

7    is invoked while the speaker is in a mode other than standalone mode)

8         Sonos argues that removing any playback configuration through the StopCurrentApp

9    command does not place the speaker into "idle mode" and instead the speaker remains in

10   "standalone mode."  Opp. 12-14.  But Dr. Almeroth did not address "idle mode" (Opp. 13).

11   Although Sonos claims Dr. Almeroth "explained why Google's redesigned speakers continue to

12   operate in standalone mode" despite being stripped of their playback configuration, this is not true.

13   He simply testified, *ipse dixit*, that even if the speaker "will stop playing music" due to the

14   StopCurrentApp command, it "still stays in standalone mode."  Opp. 14.  But that does not "explain"

15   why the speaker remains in standalone mode, nor does it address any of the testimony from Mr.

16   MacKay explaining why the speaker is no longer configured for individual playback, as required in

17   standalone mode.  Dr. Almeroth's naked *labeling* of the product's functionality as infringing is

18   insufficient because it is unsupported by any evidence.  *ActiveVideo Networks, Inc. v. Verizon*

19   *Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (finding expert testimony insufficient where

20   the expert "never provided any factual basis for his assertions").

21        Dr. Almeroth also rests his infringement opinions on a fundamental misunderstanding of the

22   claim language, wherein he assumes a speaker must be in standalone mode if it is not in group mode.

23   Opp. 14.  But there is no such restriction because the claim does not define "standalone mode" and

24   "group mode" as the only possible modes.  *Boesen v. Garmin Int'l, Inc.*, 455 F. App'x 974, 977

25   (Fed. Cir. 2011) ("'Comprising' is a term of art used in claim language which means that the named

26   elements are essential, but other elements may be added and still form a construct within the scope

27   of the claim.").  Sonos's argument that StopCurrentApp "does not put speakers into group mode,"

28   so the speaker must remain in standalone mode (Opp. 15), fails for the same reason—the claims do

1   not require that the speaker exclusively exist in one of those two modes.

2   Finally, Sonos relies on *volume control* as evidence that the speaker remains in standalone

3   mode configured to play back media individually.  Opp. 15.[3]  But the "little boop noise" that plays

4   when the speaker is not playing back anything as the volume is adjusted is not a configuration for

5   individual playback because "the [media] app has been killed."  Tr. 1290:2-1291:11.  That noise

6   simply gives the user an indication of "the volume of the device so that later when you play out

7   music," "the music will play at that new volume."  *Id.*; *see also id.* (Schonfeld) 1466:2-14

8   (explaining the "boop" is not media playback).  There was no testimony or evidence that the "boop"

9   indicator constituted media playback, and the jury could not have relied on this to reach its verdict.

10   **B.      There Is No Infringement Under the Proper Construction of the Standalone**
11   **Mode Limitation**

12   The proper construction of "while operating in a standalone mode in which the first zone

13   player is configured to play back media individually" is "operating in a mode [in which] a zone

14   player is actively playing back media individually."  *See* Dkt. 732 at 1, 3-4.  This construction is

15   supported by the plain language of the claims and the prosecution history.  *Id.*  Because there is no

16   dispute that the accused speakers stop media playback when added to a speaker group, there can be

17   no infringement under the proper construction.  *E.g.*, Tr. (Almeroth) 799:18-20 ("And so the person

18   who's putting the speaker into the group, if it's playing in standalone mode, will stop playing."),

19   802:23-25; *id.* (MacKay) 1256:12-1261:3.

20   Sonos argues that Google raised the dispute "too late."  Opp. 16.  But binding Federal Circuit

21   law requires that the Court resolve claim construction disputes because they are inappropriate for

22   the jury to decide.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1358-60

23   (Fed. Cir. 2008).  Indeed, Sonos has conceded that "the Court can conduct claim construction at any

24   time."  Dkt. 733 at 2.  Whether Google's expert changed his position over time is irrelevant, but in

25

26   [3]    Sonos argues that the "jury could also question Mr. MacKay's credibility" based on
   "contradictory testimony" regarding StopCurrentApp.  Opp. 16.  But there was no inconsistency in
27   Mr. MacKay's description of the "launch" command "essentially" downloading an app, and then
   clarifying when asked by the Court for more detail that this was "more like opening a webpage"
28   than downloading an app.  In either case, something new had to be loaded onto the speaker.  *Id.*

1   any event, Dr. Schonfeld's opinion regarding the requirement of "standalone mode" has been

2   consistent.  Tr. (Schonfeld) 1460:17-19, 1500:18-21, 1747:22-24.

3       On the merits, Sonos ignores critical claim language requiring that the zone player be

4   "*operating*" in standalone mode.  Sonos effectively argues that "operating" in standalone mode

5   should mean "configured to" operate in standalone mode.  Opp. 17-18.  But the claim language

6   explicitly requires that the zone player be *operating* in a standalone mode in which the first zone

7   player is configured to play back media individually."  The claim separately refers to a standalone

8   mode "configuration" of the zone player, but "operating" must also be given meaning, and here

9   "operating" means to perform the function of the configured speaker—*i.e.*, to actively play back

10  media individually.  *See Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("In

11  construing claims, however, we must give each claim term the respect that it is due.").

12      The prosecution history also supports Google's construction.  Sonos argues that the

13  Examiner's statements related to group mode rather than standalone mode.  Not so.  The Examiner

14  was explicit that "continuous output of media" must take place "on a *particular* playback device"—

15  *i.e.*, in standalone mode.  TX6 at 5850.  Sonos points to the preceding paragraph (Opp. 18), but that

16  paragraph also described "operating in the standalone mode," and its statements about the transition

17  to group playback are consistent with the requirement of "continuous output of media."

18  **III.    THE DAMAGES AWARD CANNOT STAND**

19      A jury's damages award should be set aside when it is "clearly not supported by evidence[]

20  or based only on speculation or guesswork."  *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301,

21  1310 (Fed. Cir. 2009) (internal citation and quotations omitted).[4]  That is the case here.  Sonos

22  suggests that the Court must *assume* the jury's damages award was properly apportioned and

23  adequately supported by facts, but this is not the law.  *See* Opp. 20.  As the Federal Circuit expressly

24  stated in a case Sonos relies on, a JMOL motion permits a court to analyze and determine "whether

---

[4]    Sonos vaguely references "heavy presumptions favoring the jury's verdict" and asserts that
Google ignores them.  Opp. 19-20.  First, "deference" is a far cry from a "heavy presumption," and
at least one district court has noted that "there is no presumption in favor of the verdict."  *Ingram v.
City of San Bernardino*, No. EDCV 05-925-VAPSGLX, 2007 WL 5030225, at *3 (C.D. Cal. Aug.
27, 2007).  Second, Google does not "ignore" presumptions regarding the jury's process, but rather
challenges them via the proper procedural vehicle pursuant to Federal Rules 50(b) and 59.

the [jury's] presumed factual findings . . . were **supported by substantial evidence** at the trial." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2022).  (emphasis added); *see also Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1121 (S.D. Cal. 2011) (a district court must "scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied").  Sonos falls far short of demonstrating that this standard has been met here.

### A.   Sonos Admits Its License Agreements Cannot Support the $2.30 Royalty Rate

Sonos tacitly concedes that its portfolio-wide license agreements are not comparable, and thus that it was inappropriate for the jury to use them to calculate a per-unit royalty.[5]  *See* Opp. 19, 20.  This is consistent with the opinions of both parties' damages experts.  Dkt. 824 at 24.  Sonos nonetheless speculates, with no basis, that their admission does not require vacating the damages award because the jury "[a]t most . . . used the running royalties from the license agreements as an 'approximate cap' on its award."  Opp. 20.  But Sonos encouraged the jury to use its licenses and focused on their highest royalty rate, $30 per unit, in its closing argument.  Tr. 1822:16-1823:15, 1826:10-1827:8.  And the jury's inquiry during deliberation seeking the breakdown of infringing units that were priced at $100 or below clearly referred to the license term applying a $6 royalty to such products.  *Id.* (Kwasizur) 1067:2-13; TX6631 at 6; TX 6632 at 6; Dkt. 773 at 4.

### B.   Mr. Bakewell's Lump-Sum Opinion Is Not "Substantial Evidence" Supporting the Jury's $2.30 Royalty Rate

Having abandoned its own patent licenses, Sonos theorizes that the jury could have converted Mr. Bakewell's $2.25 million lump-sum royalty into a running royalty rate "as a starting point" and then adjusted upward.  Opp. 22-23.  But Sonos does not even attempt to explain how the jury would have performed such a conversion, nor was there a legally sufficient evidentiary basis for one.  Sonos disregards that "[s]ignificant differences exist between a running royalty license and lump-sum license."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d at 1326.  A lump sum license is "an upfront, paid-in-full royalty" for "the remainder of the patent term."  *Id.*  In contrast, a running

---

[5]  Sonos takes issue with Google's description of the license agreements as "portfolio-wide," but Ms. Kwasizur herself described them using that term.  Tr. (Kwasizur) 1050:12-19, 1010:13-16, 1016:14-23, 1015:8-11, 1016:14-23, 1017:21-24.  She also admitted that two of Sonos's three agreements did not contain any exclusions, and that the carve-outs for the Legrand license would not be substantial.  *Id.* at 1010:14-16, 1075:24-1076:3, 1065:17-24.

royalty "is tied directly to how often the licensed invention is later used" and is "dependent on the level of sales or usage by the licensee."  *Id.*  Because of such "fundamental differences," "some basis for comparison must exist in the evidence presented to the jury" in order for the jury to perform such a conversion.  *Id.* at 1329-30; *see also Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) (reversing award where plaintiff's expert "did not offer any testimony to explain how [lump-sum] payments could be converted to a royalty rate").  No such basis exists here.

Sonos then suggests that the jury could have apportioned using a hodgepodge of "evidence" that (1) users purchased or were likely to purchase multiple speakers, (2) Google has sold speakers in bundles, (3) Google promotes the general ability to group speakers, (4) speaker groups allegedly matter to consumers, (5) the parties supposedly compete, and (6) Google attempted a redesign.  *See* Opp. 20-21.  Sonos simply then states in a conclusory manner that "[f]rom that evidence, the jury reasonably could set a $2.30 per-unit value on the '885 patent's technology"—without any explanation as **how** such "evidence" supports this rate.  *Id.* at 22.  However, it is well established that an expert may not "merely address[] the *Georgia–Pacific* factors in light of the facts and then pluck[] the . . . royalty rate out of nowhere."[6]  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018).  The same rule applies to parties.  As the patentee, Sonos "b[ore] the burden of proving damages" and had to do so "by evidence."  *Lucent*, 580 F.3d at 1324; *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017).  Even taking the facts in the light most favorable to Sonos, Sonos has not shown a legally sufficient basis for concluding that $2.30 is a properly-apportioned royalty rate.

Sonos's assertion that calculating a reasonable royalty "is not an exact science" is unavailing (*id.* at 22), as Sonos was "required to explain the extent to which [the evidence] factored into the

---

[6]  *Exmark* is on point.  There, the patentee's damages case consisted of its expert discussing "the benefits of the patented technology, sales and profitability, and the competitive relationship of the parties," and then "conclud[ing] with little explanation that Exmark and Briggs would have agreed to a 5% reasonable royalty rate[.]"  *Id.* at 1349.  The Federal Circuit vacated the damages award because "[i]t is not  enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence."  *Id.* at 1351.  Sonos similarly does not demonstrate how the hodgepodge of *Georgia-Pacific* evidence it cites supports the jury's $2.30 royalty rate.

1    value of the [invention] and . . . royalty rate" and failed to do so.  *Exmark*, 879 F.3d at 1350.  Sonos

2    argues the jury could have "made upward modifications" based on Mr. Malackowski's testimony,

3    but this conflates the issues.  The fundamental problem is that there was not sufficient evidence to

4    support a properly apportioned, baseline royalty rate for the jury to even modify.  Sonos asserts that

5    Google's alleged promotion of the speaker-grouping feature generally would "point[] to a higher

6    rate" (Opp. at 21)—but higher than ***what***?  The jury had no way to calculate an appropriate starting

7    point for the '885 patent, such that the damages award was necessarily borne out of guesswork.  But

8    damages "must not be left to conjecture by the jury[;] [t]hey must be proved, and not guessed at."

9    *Promega*, 875 F.3d at 660; *see Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312 (Fed. Cir.

10   2018) ("While any reasonable royalty analysis 'necessarily involves an element of approximation

11   and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable

12   royalty.'").  The Court should therefore limit damages to the amount the record supported—a lump-

13   sum payment of $2.25 million.[7]  *Bos. Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1120

14   (N.D. Cal. 2008) ("Where little or no satisfactory evidence of a reasonable royalty is presented, the

15   court should 'award such reasonable royalties as the record evidence will support.'").

16       **C.    The Court Should Grant a New Trial on Limited Issues or Remittitur**

17       Alternatively, the Court should grant a new trial.  As discussed above, the verdict was not

18   supported by the evidence and was instead based on guesswork.  Mot. 22-23.  The verdict was also

19   grossly excessive for the reasons stated in Google's Motion.  *Id.* at 24-25.  Despite the per-unit

20   royalty 115 times its own portfolio average, Sonos argues "Google presented no evidence that it

21   would be accurate to value Sonos's individual patents by simply dividing the per-unit royalty" by

22   the number of the patents.  Opp. 24.  But it is ***Sonos's*** burden to prove damages, not Google's.  And

23   Mr. Malackowski's "buffet" theory has been rejected by the Federal Circuit, a point that Sonos does

24   not even address.  *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376-77 (Fed. Cir. 2021).

---

7   If the Court finds Sonos failed to satisfy its burden such that "the record lacks any evidence of a
reasonable royalty rate," the Federal Circuit has even gone so far as to approve an award of "zero
damages."  *Bos. Sci. Corp.*, 550 F. Supp. 2d at 1120.  ("[35 U.S.C. § 284] requires the award of a
reasonable royalty, but to argue that this requirement exists even in the absence of any evidence
from which a court may derive a reasonable royalty goes beyond the possible meaning of the
statute.") (cleaned up).

1   Nor is it analogous in any event: a diner at a buffet can only eat one meal regardless of how much

2   food is available; a patent licensee can practice any number of patents.

3        The Court also erred with respect to two evidentiary issues.  First, Mr. Malackowski's IFTTT

4   opinions skewed the damages horizon despite the limiting instructions to the jury.  *See Uniloc USA,*

5   *Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1321 (Fed. Cir. 2011).  That is why the Court is charged

6   with its gatekeeping duty.  Sonos argues the jury did not adopt Mr. Malackowski's $0.87 per-unit

7   rate, instead "arriving at its own reasonable royalty."  Opp. 25.  But the jury's verdict was

8   significantly ***higher*** than even the overreaching and unsupportable rate that Mr. Malackowski

9   proposed (and roughly a third of the total IFTTT-derived royalty he offered for both asserted

10  patents), indicating that the jury at least "may have used the [inadmissible] figure to 'check' its

11  significant award[.]"  *Uniloc*, 632 F.3d at 1312 (internal quotations omitted).   Second, the Court

12  should not have admitted or instructed the jury to consider Sonos's portfolio-wide licenses.  The

13  parties' damages experts agreed that they were not comparable, and Sonos appears to concede as

14  much now.  Tr. (Malackowski) 1162:5-1164:13; *id.* (Bakewell) at 1590:9-1591:5; *see supra* § III.A.

15  Despite this, Sonos made its portfolio-wide licenses and their highest per-unit rate a focus of its

16  closing argument.  Tr. 1822:16-1823:15, 1826:10-1827:8.  This was prejudicial error.  *Apple Inc. v.*

17  *Wi-LAN Inc.*, 25 F.4th 960, 972-73 (Fed. Cir. 2022) (district court abused its discretion in denying

18  new trial on damages where patentee relied on portfolio-wide licenses and failed to tie them to

19  asserted patents); *see also LaserDynamics*, 694 F.3d at 79.[8]  The introduction of the per-unit royalty

20  rates from these non-comparable licenses, combined with Sonos's emphasis on them and failure to

21  introduce any evidence to account for the manifold differences or apportion the value of the '885

22  patent, requires a new trial on damages.

23       Finally, as discussed above, at minimum damages should be remitted to a one-time lump

24  sum damages award of $2.25 million—a number Sonos concedes is supported by substantial

25  evidence—if the Court does not grant a new trial on damages.

26

27

28  [8]   Significantly, Sonos does not even attempt to address or distinguish either the *Wi-Lan* or *LaserDynamics* cases.

DATED:  July 14, 2023

QUINN EMANUEL URQUHART & SULLIVAN,
LLP


By    */s Sean Pak*
         Sean Pak
         Melissa Baily
         James D. Judah
         Lindsay Cooper
         Marc Kaplan
         Iman Lordgooei

         *Attorneys for GOOGLE LLC*

REPLY ISO MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL