Volume 11

Pages 1941 - 2026

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

SONOS, INC.,                    )
                                )
            Plaintiff and       )
Counter-Defendant,              )
                                )
  VS.                           )   **NO. C 20-6754 WHA**
                                )Related Case No. **C 21-07559 WHA**
GOOGLE, LLC,                    )
                                )
            Defendant and       )
Counter-Claimant.               )
_____)

                        San Francisco, California
                        Wednesday, May 24, 2023

                **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff/Counter-Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
            **BY:  ELIZABETH R. MOULTON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street, Suite 3200
                    Los Angeles, California 90017
            **BY:  ALYSSA M. CARIDIS, ATTORNEY AT LAW**

 **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

**<u>APPEARANCES</u>**:  (CONTINUED)

For Plaintiff/Counter-Defendant:

                      LEE SULLIVAN SHEA & SMITH LLP
                      656 West Randolph Street
                      Floor 5W
                      Chicago, Illinois 60661
           BY:  **COLE B. RICHTER, ATTORNEY AT LAW**
                  **RORY PATRICK SHEA, ATTORNEY AT LAW**


For Defendant/Counter-Claimant:

                      QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                      50 California Street, 22nd Floor
                      San Francisco, California 94111
           BY:  **SEAN PAK, ATTORNEY AT LAW**
                  **MELISSA J. BAILY, ATTORNEY AT LAW**
                  **LINDSAY COOPER, ATTORNEY AT LAW**
                  **IMAN LORDGOOEI, ATTORNEY AT LAW**

1    **Wednesday, May 24, 2023**

2                      **P R O C E E D I N G S**

3                           **---oOo---**

4    (The following proceedings were held outside of the

5    presence of the Jury)

6    **THE COURTROOM DEPUTY:** Calling Civil Action 20-6754,

7    Sonos Inc. versus Google, LLC, and related cases. Counsel,

8    please approach the podium and state your appearances for the

9    record, beginning with counsel for plaintiff.

10    **MR. RICHTER:** Good morning, Your Honor. Good to be

11    with you. Cole Richter on behalf of Sonos. With me today is

12    my partner, Rory Shea. Also with me is Alyssa Caridis and

13    Elizabeth Moulton, all on behalf of Sonos.

14    **THE COURT:** Thank you. Welcome to you.

15    **MR. PAK:** Good morning, Your Honor. Sean Pak on

16    behalf of Google. With me is Melissa Baily, Lindsay Cooper and

17    Iman Lordgooei. Thank Your Honor.

18    **THE COURT:** Thank you. Each of you made a Rule 50

19    motion. The jury is not here today, but is in deliberations,

20    and will resume its deliberations on Friday. But I thought

21    since you each filed a brief and an opposition, we will get a

22    start, at least, and maybe -- maybe this will be our only

23    hearing on Rule 50.

24    So I want to give each of you a chance to make -- and

25    maybe even more, if time permits -- make one major point that

1  you want to make sure is impressed on me.  Then I'll give the

2  other side a chance to respond to your major point.  And then

3  we will flip it around, and the other side gets to make a major

4  point.

5      So we'll see.  That will probably take about an hour, just

6  that much.

7      Okay.  Who wants to go first?  Since the defendant usually

8  gets to go first on Rule 50, Google, you get to go first.

9          MR. PAK:  Thank you, Your Honor.

10         THE COURT:  But you only get to make one point.

11  Because a lot of it's in the briefs.  I don't want to -- I want

12  you to make a point that you feel like I might otherwise --

13  where oral argument is an additional benefit.

14      Go ahead.

15         MR. PAK:  Thank Your Honor.

16      So if we could have the slides up.

17      (Document displayed)

18         MR. PAK:  Turning to slide 3, Your Honor -- and I'll

19  be happy to hand these up after the conclusion.

20      Your Honor, the first point I want to make is that the

21  claims in this case -- all the claims -- do not require any

22  type of user action in terms of creation, configuration, saving

23  and recollection of any of the zone scenes.

24      And I wanted to present to you some of the testimony that

25  we heard from Dr. Almeroth, the Sonos expert, on this issue.

1   Quoting from Transcript 1659, Line 21 to 1660, Line 5.  As part

2   of his examination with Sonos's counsel, as you can see, he was

3   trying to distinguish the Party Mode option as not being a zone

4   scene.  And he repeatedly refers to "user action" throughout

5   his testimony.  Not customizable by the user, the user cannot

6   add or customize.

7        If we turn to the next slide, Transcript 1661, Line 12 to

8   20.

9        (Document displayed)

10       **MR. PAK:**  Did not provide a user with any ability to

11   customize, and so on.

12       So we've heard this throughout the case.  And I think it

13   is very clear, Your Honor, that this is not a basis to

14   distinguish the Party Mode that existed.  And, to just make

15   clear what the evidence showed at trial, Party Mode was

16   persistent.  It was always saved in the system in the form of

17   both the executable code that resides in the flash memory of

18   the devices, the zone players of the Sonos 2005 system.

19       After you initiate the startup of all the zone players in

20   the house, they will communicate with each other.  They will

21   collect what's called "group topology" which is all of the

22   members that are present in the room.  That membership

23   information is saved.

24       And we had testimony from Mr. Millington --

25       **THE COURT:**  You's are referring to the Sonos prior art

 1    system.

 2         **MR. PAK:**  That's right, Your Honor.  So the Sonos 2005

 3    system, which had the built-in Party Mode.  The Party Mode

 4    would be saved at that time when all of the group topology

 5    information was collected, and stored -- I think we heard

 6    something called xml file format, where that information

 7    resides in temporary memory.  That is present before a user

 8    takes any action.  So you have the creation and the saving of

 9    that information by the system, automatically.

10         Then at some point the user can go to the user interface

11    of the controller.  And they will always see the Party Mode as

12    an option that's built in.  When the user pushes Party Mode, it

13    invokes that Party Mode group.  We heard testimony from both

14    Mr. Millington as well as Dr. Schonfeld that at that point,

15    there's a further recreation of that Party -- all -- all zones

16    Party Mode feature.  In that all the members of that speaker

17    group will then receive the AVTransport URI message, except for

18    the group coordinator, which is one of the zone players in the

19    system.  That causes all the other ones to communicate with

20    that group coordinator zone player.  At.

21         Some point, all that information is saved.  And then,

22    there is a further storage that occurs.

23         **THE COURT:**  Wait, wait.  All of it is saved to

24    identify the -- what?  The Party Mode participants?

25         **MR. PAK:**  That's right, Your Honor.  So what happens

1    is then at that point, all of that information is further

2    stored in terms of the operation of the devices, where the

3    group coordinator now knows through the set AVTransport

4    messages being communicated and the internal messages that are

5    happening between the zone players.  There will be a storage of

6    that information in a persistent manner.

7        We heard evidence in this case that the Party Mode

8    information as well as the group topology information is saved,

9    is stored.

10        THE COURT:  Where was it stored?

11        MR. PAK:  It's stored in the zone players, Your Honor.

12    So in the group coordinator device, it's stored in a persistent

13    manner.

14        And one of the reasons why we heard for that is you could

15    have multiple controllers in the same house.  So using one

16    controller, you can set up the Party Mode.  Another controller

17    can enter the house.  It doesn't have any *a priori* knowledge of

18    what the group topology is, or what the different party mode

19    settings are.  It will then be able to grab that information

20    and be able to know which zone players are in the system and

21    which Party Mode members exist.

22        That's all in evidence.  So there's further causation of

23    storage of that information, in a persistent manner.

24        Persistence, Your Honor, both experts agree that this is

25    with respect to the '966 element of causing storage.  That it

1    has to be persistent, in that between the time you create and

2    save the zone scene, there is a period of time before you

3    invoke it.

4        But the critical point is, the claims say nothing about

5    how long you have to wait.  There's no time restriction.  And

6    in fact, we saw in the patent, itself, that it specifically

7    teaches that any saved zone scene can be invoked at any time.

8        And we have some very important testimony that came in,

9    Your Honor.  And I want to turn to --

10        **THE COURT:**  Before you -- I want to hear what you're

11    about to say.  But, at a higher level, where is this headed?

12        So let's say that we decide Party Mode is a zone scene.

13    But that's only one.  Where's the -- you need an overlapping

14    zone scene.

15        **MR. PAK:**  That's right, Your Honor.

16        **THE COURT:**  Where are you headed, as to what the other

17    one is?

18        **MR. PAK:**  So the other one -- if you remember in the

19    Sonos 2005 prior art system, you also have what are called

20    "dynamic groups."  So those dynamic groups can be created on

21    top of Party Mode.  The dynamic group can be given names so the

22    user could go in and create whatever name they wanted to give

23    it.

24        Those dynamic groups necessarily overlapped with the Party

25    Mode because Party Mode included everything.  These dynamic

1    groups could be set to only include a subset.  But no matter

2    how you set up the dynamic groups, there was always overlap

3    with the Party Mode, which included every zone player in the

4    house.

5         Where we're heading, Your Honor, is this.  The only thing

6    the Sonos 2005 system could not do was save those dynamic

7    groups for later use.  And so this is where we get all of the

8    obviousness opinions that we heard about.  Much of it was --

9         **THE COURT:**  Wait.  You said something about 30 seconds

10   ago that I don't remember in the testimony.  You said that a

11   dynamic group could be named and -- could be named.  I don't

12   remember that.  I thought -- I thought it would be that you

13   could -- you could add dining room to the garage, or -- but you

14   -- it didn't -- I don't remember there being a way to name

15   that.  And really, naming implies that it is saved.  But there

16   was -- but I thought the testimony was it was not saved.

17        **MR. PAK:**  So the names I'm referring to, Your Honor,

18   are the speaker names.  So one of the things that the system

19   allows you to do with dynamic groups is, if I add a zone player

20   to the system, I can name that zone player "Dining Room,"

21   "Living Room," "Party Speaker 1," whatever name you wanted to

22   give it.  The system would, when you create the dynamic group,

23   append each of those named speaker names, and create a

24   different name.

25        So we think that qualifies as a common theme, regardless

 1   of the fact that it was the individual zone players that were

 2   named.  But when you concatenate, you basically have a theme

 3   that would be a common theme, or into the group.

 4        But the --

 5             THE COURT:  But that wouldn't show up on the little

 6   handheld -- what's it called?

 7             MR. PAK:  Controller.

 8             THE COURT:  Controller.  The name wouldn't show up on

 9   the controller, would it?

10             MR. PAK:  It would.  The additions, if I named it

11   "Living Room" and "Party Speaker," the controller would show

12   that the group that I'm forming would be the living room

13   speaker with the Party Mode -- or party speaker.  So that would

14   be --

15             THE COURT:  There would be a line item on the

16   controller that says "Living Room" plus --

17             MR. PAK:  Correct.

18             THE COURT:  Would that literally say "plus"?

19             MR. PAK:  I believe that's right.  We can go back and

20   look at the controller.  But --

21             THE COURT:  I don't remember that.

22             MR. PAK:  Yeah.

23             THE COURT:  But maybe that's true; I just don't

24   remember it.  Okay, continue with where you are headed.

25             MR. PAK:  Yes.  So where we are headed is regardless

1    of whether the user names it or not, the issue is:  What is the

2    additional evidence that we saw where, given the capability of

3    the Sonos 2005 system -- and we saw the -- Mr. Lambourne's

4    historical record showing that Party Mode was, in fact, a zone

5    scene.  And he said that that was more reliable than any

6    testimony he can give today.

7        Where we are headed is all of the other evidence that came

8    in through trial, most of it unrebutted by Dr. Almeroth,

9    including the Sonos forum posts -- and if you can turn to, just

10   to give you an example, on slide 39.

11       (Document displayed)

12       **MR. PAK:**  This is one of the posts that we saw,

13   Your Honor, that was talked about extensively with the various

14   witnesses.  This is part of the thread called "Macros/presets."

15       And as Your Honor recalls, Mr. Lambourne was not an

16   engineer or programmer.  His solution for his invention was a

17   macro.  And that was confirmed during my cross-examination of

18   Mr. Lambourne.

19       **THE COURT:**  That diagram on the left, is that

20   something you ginned up?  Or --

21       **MR. PAK:**  We created that to illustrate what's in the

22   document above.  So the document above is TX3930.  And it talks

23   about summer and winter party modes, as well as a morning mode.

24   And it specifically says that summer and winter modes will be

25   overlapping, in that the summer mode would include the deck

PROCEEDINGS

1    speakers, while the winter mode would not.

2        So we're illustrating that scenario on the image to the

3    left where, for example, winter, if the zone player on the

4    left-hand side, 106, was a deck speaker, it would be included

5    in the summer mode.  But it would not be included in the winter

6    mode.

7        So you would have two party modes, according to this Sonos

8    prior art posting, where you have two distinct zone scenes that

9    would be saved that would have a thematic name, summer and

10   winter, and they would overlap.

11       And whenever Your Honor's ready I could turn to --

12       **THE COURT:**  Up at the top it says "Macro/presets."  Is

13   that something that was in the original?  Or is that something

14   that you added to it?

15       **MR. PAK:**  No.  This is in the original document,

16   Your Honor.

17       **THE COURT:**  "Macro/presets"?

18       **MR. PAK:**  Yes, Your Honor.  So this is part of -- the

19   entire thread starts with "Macro/presets."  That's the topic.

20   And I'll show you some more forum posts that talk about macros

21   specifically.  But that was in the original document, part of

22   the prior art posting by the Sonos users.

23       And if you turn to the next slide.

24       (Document displayed)

25       **MR. PAK:**  I was asking Mr. Lambourne on

1    cross-examination about that very document, which is TX3930.

2    And I asked him (As read):

3              "QUESTION:  What Jeff T, the user, was

4              describing in a publicly available Sonos

5              forum posting dated September 22, 2005, is

6              having multiple zone scenes that are saved

7              for later; correct?

8              "ANSWER:  Yes.

9              "QUESTION:  And those scenes (sic) could be

10             overlapping in that they would share a

11             speaker or a zone player, correct?

12             "ANSWER:  Yes, and in the summer and winter

13             mode he is describing, yes."

14       So we have clear testimony from the man who knows his

15    invention best that what he was seeing in these Sonos prior

16    forum postings is multiple overlapping zone scenes that are

17    saved for a later invocation.

18       If you turn to the next slide.

19       (Document displayed)

20       MR. PAK:  We brought many more posts.  This is

21    "theboyg" forum posting that we've discussed with Your Honor

22    and presented to the jury.  This one is entitled "Virtual Zones

23    and Zone Grouping."

24       In that, you see the virtual zone -- which is his name for

25    the concept of zone scenes -- called "Downstairs."  And he

1  says:

2              "I can group all my downstairs zones into

3              this.  Then I don't have to keep manually

4              linking/unlinking multiple zones everytime."

5       That is precisely the problem that Mr. Lambourne

6  identified for his inventions.

7       And if you go to the next slide.

8       (Document displayed) 42

9              MR. PAK:  I asked Mr. Lambourne about this post.

10 And I asked him -- this is transcript 549, Line 24, to 550 at

11 10 (As read):

12             "QUESTION:  And theuserboyG says, 'Why can't

13             I have a virtual zone, a zone called

14             downstairs and I can group all my downstairs

15             zones into this?  Then I don't have to keep

16             manually linking/unlinking multiple zones

17             every time.  Please.'

18             "ANSWER:  Yes.

19             "QUESTION:  So, again, this virtual zone

20             where you have a downstairs zone that is

21             saved for future use so you don't have to

22             manually link it and unlink it, that was

23             describing your idea for zone scenes;

24             correct?

25             "ANSWER:  Yes.  But, I mean, without much

 1             detail.  But, yes, that -- broadly speaking."

 2       So he acknowledges again, Mr. Lambourne, that the concept

 3  of having multiple zone scenes that save for later was

 4  disclosed in the prior art.

 5       And if you turn to the next slide.

 6       (Document displayed)

 7         **MR. PAK:**  This is where the solution piece comes in.

 8  It's not just that he was seeing the idea of zone scenes,

 9  Mr. Lambourne, in these forum postings, he was also seeing the

10  same solution.  This is critical to all the issues that the

11  other side has raised in their briefing.

12       This is transcript, at Page 528, Line 11, to 529, Line 7.

13  If you recall, Mr. Lambourne walked through his conception

14  story with the various notebook entries, and his conception

15  document, which is dated December 21, 2005.

16       I asked him, based on that testimony (As read):

17         **"QUESTION:**  One of the solutions that you

18            were thinking of for your eventual zone scene

19            invention was the use of macros to implement

20            zone scenes?

21         **"ANSWER:**  Yes."

22       And this is critical.

23         **"ANSWER:**  I use the words somewhat

24            interchangeably.  You know, my focus was on

25            creating user-facing functionality.  So I

1           describe them loosely as zone groups, macros,

2           zone scenes and other things.

3              "QUESTION:  They were interchangeable to you

4           from a UI designer's perspective; correct?

5              "ANSWER:  Yes."

6       And if we turn to the next slide, transcript Page 531,

7    Line 15 through 22, I asked him:

8              "QUESTION:  ...macros can be thought of as

9           programming instructions..."

10      Which are the limitation language of the claims.

11             "ANSWER:  Big picture, yes.

12             "QUESTION:  And big picture, you could, in

13          your mind, as a UI designer or user interface

14          designer, you could use macros to implement

15          zone screens; correct?

16             "ANSWER:  From a user perspective is the way

17          I was describing macros in the notepad, yes.

18          That was one word I had for it."

19      And this is where the important examination questions come

20   in.  Next slide.

21      (Document displayed)

22          MR. PAK:  Transcript at Page 538, Line 4, to 539,

23   Line 4:

24             "QUESTION:  So people were suggesting" --

25          these people are the forum posts -- "were

1      suggesting ideas how to use macros and

2      presets to improve upon the Sonos 2005 prior

3      art system from their perspective; correct?

4      "ANSWER:  Yes.

5      "QUESTION:  So if I was in summer, I could

6      set up my summer Party Mode and then I could

7      set up a winter Party Mode that could be

8      saved for later use; correct?

9      "ANSWER:  Yes.

10     "QUESTION:  Again, that's consistent with the

11     examples that you gave in your patents of

12     zone scenes; correct?

13     "ANSWER:  There can be more than one setup,

14     yes."

15     And then if you turn to the next slide, at TX3930.

16     (Document displayed)

17     MR. PAK:  This is another prior art posting

18     Your Honor, Ken Greenwood, dated September 22, 2005:

19     "I would find this functionality useful as

20     well..."

21     He was responding to the earlier post that we just saw

22     from boyG:

23     "I find myself manually linking and unlinking

24     setting volumes in a very repetitive way.  I

25     would think that a macro type function would

PROCEEDINGS

1           be able to save those manual steps into a

2           single selection of a favorite."

3      And if we turn to the next slide.

4      (Document displayed)

5           **MR. PAK:**  This is the key testimony that I obtained on

6  cross-examination that I presented to the jury in closing.

7      Transcript Page 541, Line 2 through 7:

8           "**QUESTION:**  So Mr. Greenwood, in this prior

9           public posting about the Sonos 2005 system,

10          was describing the same type of problem that

11          you were trying to solve with zone scenes and

12          suggesting macros, which is a similar

13          solution to what you had in mind for that

14          functionality; correct?

15          "**ANSWER:**  In broad terms, yes.  As an

16          outcome, yes."

17     And if you turn to the next slide.

18     (Document displayed)

19          **MR. PAK:**  TX3928.  Here's another piece of prior art

20  forum posting that was presented during trial.  September 22,

21  2005.  This time from Mr. Majik, also known as Keith (As read):

22          "Perhaps we need a 'pre-set' (sic) page (perhaps

23          using the soft-keys on the Zone screen)" -- that

24          would be on the controller -- "to allow a pre-set to

25          be initiated.  This pre-set could comprise a zone (or

1          zone group)..."

2          And it goes on to say:

3          "...or it could be a macro sequence."

4     "Macro sequence."

5     And why this is so important -- and if you turn to the

6  next slide, 548.

7          (Document displayed)

8          MR. PAK:  And he confirms this, Mr. Lambourne

9  (As read):

10          "QUESTION:  And in the third paragraph he

11          says 'Perhaps we read in a presets page.

12          Perhaps using the soft keys on the zone

13          screen to allow pre-set to be initiated.'  Do

14          you see that?

15          "ANSWER:  Yes.

16          "QUESTION:  And we saw documents and your

17          testimony referring to zone scenes also as

18          presets; correct?

19          "ANSWER:  Yes.

20          "QUESTION:  So Keith, user name Majik, was

21          suggesting various ways that a pre-set for

22          zone scenes could be implemented; correct?

23          "ANSWER:  Yes, on a broad level, yes."

24     And just one more piece of evidence that came in.  And

25  most of this, Your Honor, in terms of substance was not

 1  rebutted by Dr. Almeroth.

 2      If you go to the next slide, TX3928, Page 2

 3      (Document displayed)

 4      **MR. PAK:**  September 27, 2005, this time from a user

 5  named flora's_dad (As read):

 6              "Great idea.  A macro-like scripter would

 7              enable you to set groups of zones... You

 8              could do these dynamic 'presets' based on the

 9              Party Mode" -- that's the Party Mode that

10              existed in Sonos in 2005 -- "which the spouse

11              would love--like Entertaining, Romantic

12              Dinner, Ambiance..."

13      These are all thematic names, all talking about using

14  presets and macros, which were exactly the solution that

15  Mr. Lambourne had in mind.

16      And if you turn to the next slide.

17      (Document displayed)

18      **MR. PAK:**  Transcript at Page 541, Line 22 (As read):

19              "**QUESTION:**  But the zone scenes were being

20              described by users of the Sonos 2005 prior

21              art system before your December 20, 2005,

22              date, which is a conception date, and they

23              were talking about zone scenes, overlapping

24              zone scenes and using macros, which is one of

25              the solutions you had in mind, to implement

1       the zone scenes; correct?

2           "**ANSWER:**  Yes.  They were talking about

3           macros and scene groups, yes."

4       And so if you turn to the next slide.

5       (Document displayed)

6           **MR. PAK:**  The Sonos forum posts unquestionably were

7   talking about the Sonos 2005 system.  And we have clear

8   testimony from Mr. Lambourne saying not only did he see the

9   idea of overlapping zone scenes, but he saw his own solution in

10  there, which was to use macros.

11      And Your Honor asked multiple witnesses:  Am I going to

12  see source code instructions in the patent?  And the answer is:

13  Of course not.  He didn't talk in code.  He never wrote code.

14  He described the invention from a user interface perspective.

15      And all these conception documents show is that macros and

16  scripts, presets were the solution he had in mind, that

17  constitute the programming instructions.  So this is

18  overwhelming evidence.  Just combining Sonos 2005 system with

19  the Sonos forum posts which disclose multiple overlapping zone

20  scenes that could be saved for use later, and using macros and

21  scripts and presets to implement them.

22      But we have more than that, Your Honor.  This is evidence

23  that was -- came in unrebutted, and this is why we think we

24  have a very, very strong case here, as a matter of law, based

25  on the evidence that was presented during trial.

1    If you turn to Page 53.

2    (Document displayed)

3    **MR. PAK:**  This is the USPTO statement.  If Your Honor

4    recalls, the '885 and '966 patent, where it went -- both of

5    them underwent prosecution, where there was discussion of the

6    Yamaha DME prior art.

7    In this -- this is TX004 at Page 4577 (As read):

8             "...Examiner takes official notice that the

9             grouping and subgrouping of a constellation

10            of audio players...was well known in the art

11            before the effective filing date of the

12            instant invention and would have been an

13            obvious inclusion."

14   Next slide.

15   (Document displayed)

16   **MR. PAK:**  He goes on to say:

17            "The DME system" -- which was the prior art

18            under consideration -- "enables the practice

19            of the claimed subject matter without undue

20            experimentation and as such grouping of

21            playback device and channels thereon would

22            have been obvious" -- "obvious as a matter of

23            routine experimentation over the course of

24            normal operation by the average skilled

25            practitioner upon the DME interface to

```
 1          create, save and recall" -- "save and recall"

 2          -- that's saving for later invocation --

 3          "various configurations including..."

 4      If you remember the Yamaha DME reference disclosed

 5  already, up to 999 zone scenes.

 6          THE COURT:  I know you'll get to it, but -- that's

 7  what the examiner said at one point.  But the examiner

 8  eventually changed his mind and allowed the claims or allowed

 9  some amended claims.

10          MR. PAK:  That's right, Your Honor.

11          THE COURT:  What was that sequence?

12          MR. PAK:  Mr. Lordgooei will address this as part of

13  any argument we have on the "while operating in standalone

14  mode."

15      But the reason why the claims were allowed is in the face

16  of the Yamaha rejection, they added the language about "while

17  operating in standalone mode."  And making that amendment, the

18  examiner then made the finding that the Yamaha reference did

19  not disclose operating in standalone mode because when you

20  invoke a scene, you do not have continuous output of media.

21          THE COURT:  Say that last part again.

22          MR. PAK:  Yes.  He said that Yamaha did not meet the

23  standalone mode set of limitations because Yamaha did not

24  continue to play media, continuous output of media, when you

25  are invoking the zone scene.
```

1    So this is -- if you go to DDX 14.41.

2        (Document displayed)

3        **MR. PAK:**  DDX 14.41, Page 41.

4        (Document displayed)

5        **MR. PAK:**  This is part of my closing that I presented

6    to the jury, as explained by Dr. Schonfeld.

7        TX006 at 4102 and 4087.  The claim amendments were made,

8    it says (As read):

9            "...the DME manual does not teach at least:

10           'while operating in a standalone mode...'"

11       And you can see above that, that the claim was amended to

12   add the language about "while operating in a standalone mode."

13   This is the Yamaha DME manual.

14       If you go to the next slide.

15       (Document displayed)

16       **MR. PAK:**  And the U.S. PTO examiner at TX006 at Page

17   5850 stated (As read):

18           "The following is an examiner's statement of

19           reasons for allowance:  the prior art does

20           not reasonably teach the subject matter of

21           the independent claims.  Particularly while

22           DME operates to accomplish playback of

23           selected media in synchrony on a selected set

24           of first, second, playback devices when a

25           scene is invoked..." -- And according to all

1              the claims, you invoke the scene while you

2              still operate in standalone mode -- "DME does

3              not allow for continuous output of media on a

4              particular playback device and joining the

5              continuous output by a selected payback

6              device..."

7        That is exactly the position that we have taken.  And

8   Dr. Schonfeld explained that "while operating in standalone

9   mode" is playing media, actively playing media.  Or in the

10  words of the examiner, "continuous output of media."

11       So that was the reason Your Honor, that these claims

12  survived the rejection.  Was based on this idea that "operating

13  in standalone mode" is about continuous output of media.

14       Now, throughout this trial we've heard Sonos taking --

15       THE COURT:  Help me on something.  What does that

16  mean?  You use the examiner's phraseology here, as to what was

17  the shortfall of the Yamaha system in the examiner's view.

18  But, give me an example.

19       MR. PAK:  Sure, Your Honor.  So for example, in

20  Yamaha, I had up to 999 zone scenes.  But when I wanted to

21  invoke one zone scene from out of that set, it did not

22  continuously play music as an individual standalone device when

23  I was invoking the zone scene.  And that --

24       THE COURT:  What does that mean?  So let's say you

25  have got six speakers.  Six zone players.  What are those zone

1  players doing, under the Yamaha machine in the moment before

2  you press a zone scene, that would say:  Invoke the first four

3  out of the six.

4      MR. PAK:  Let's imagine that we can just take one of

5  those speakers out of the six.  One of the six speakers was

6  playing music individually.  So it's playing music as a

7  standalone speaker.  So it's operating in standalone mode.

8      When the user invoked the zone scene that had all six

9  speakers as a group, it would terminate playing that music

10  individually.  And then it would switch over to the zone scene

11  that included all six speakers.

12      So what the examiner was saying here is as he understood

13  "while operating in standalone mode" to mean which is

14  continuous output of media, that limitation was not satisfied.

15      THE COURT:  Well, why wouldn't it be?  In the example

16  you gave, it was playing in standalone.  And the exact instant

17  that they hit the button, it switches over to the other media.

18      MR. PAK:  So according to the examiner, what he found

19  in the Yamaha manual was that there was some point where it

20  ceased to operate in standalone mode; then the zone scene was

21  invoked.  And therefore, it didn't continue to output the media

22  individually on that speaker.  The one speaker that we're

23  talking about.

24      THE COURT:  For how long?  A split-second?

25      MR. PAK:  Could be -- it could be a split-second.

1    That's based on the manual.  That's what the examiner found.

2        Now, the critical point is it supports -- this examination

3    record supports us in two ways.  One, it supports us on our

4    view consistently that the new designs do not meet the

5    "operating in a standalone mode" because we terminate, as

6    Your Honor heard, not only the playback of music, but we tear

7    down the app.  It is actually even configured to play music.

8    And we go into what Mr. Mackay talked about as idle mode.

9        Now, it also supports us from an obviousness standpoint

10   because there is no question that the Sonos forum posts had

11   everything, including saving for later.

12       And if Your Honor recalls, the only thing that they

13   pointed to in the patent and supporting "while operating in

14   standalone" was figure 6.  And in figure 6 you went around in

15   circles waiting to see when a zone scene is invoked after you

16   created it.

17       Every forum post that I went through talks about creating

18   things like winter mode, summer mode, morning mode, that would

19   not be invoked at the time of creation.  It is saved for later.

20   We presented all of that evidence.  Multiple zone scenes could

21   be overlapping and saved for later.

22       But this piece of prosecution history shows that the

23   examiner -- and then if you turn to the next slide -- Sonos,

24   itself --

25       (Document displayed)

1          **MR. PAK:**  Sorry.  Going back to the deck that I was

2     using for the argument, going to slide 55.

3          (Document displayed)

4          **MR. PAK:**  Not only did the examiner say it would have

5     been obvious to have configurations, storage and recalling of

6     zone scenes, Sonos admitted the same.  And this is at TX4823.

7     This is Sonos speaking, in response to the examiner (As read):

8               "DME scenes" -- which are the zone scenes in

9               Yamaha -- "can be configured/stored and

10              recalled within the DME device group."

11    What they say is it does not suggest that recalling a DMC

12    (sic) can re-group individual devices into different DME device

13    groups.  Which is, they said it doesn't allow you to create

14    overlapping zone scenes.  But they admitted here that not only

15    was it obvious to save and recall zone scenes, that DME did

16    that.

17         And just to remind us on page -- the next slide --

18         (Document displayed)

19         **THE COURT:**  I don't understand the point.  Go back to

20    that one.

21         **MR. PAK:**  Yes, sir.

22         (Document displayed)

23         **THE COURT:**  What -- I -- what is it that Sonos was

24    telling the patent examiner was missing from Yamaha there?  I

25    -- I don't quite get the point that Sonos was making back then.

1    So help me understand their point.

2         MR. PAK:  Sure, Your Honor.  It starts with the

3    "...but the DME manual does not suggest that a DME scene can

4    re-group individual devices..."

5         THE COURT:  No, it says:

6              "...does not suggest that recalling a DME

7              Scene can re-group individual devices into

8              different DME device groups."

9    What does "re-group" mean?  I've not heard that term

10   before.

11        MR. PAK:  As I understand this statement, Your Honor,

12   it is that -- and Dr. Schonfeld explained this.  The DME scene

13   was done with respect to a particular device group.  So in

14   Yamaha, you didn't have the ability to re-group an individual

15   speaker into multiple zone scenes because they belong to one

16   device group that you were creating --

17        THE COURT:  So in the Yamaha system, even though you

18   could save 999, you could not do overlapping?

19        MR. PAK:  That's right.

20        THE COURT:  That's kind of overkill, isn't it?  To

21   have -- most people obviously have, say, max, ten.  So how many

22   -- you can't have very many -- if you can't overlap, you're not

23   going to have very many -- you won't have any need for anything

24   close to 999.

25        MR. PAK:  So the --

PROCEEDINGS

1          **THE COURT:**  I don't get it.  Why, why -- is that

2     right?  That's the way Yamaha worked?  If No. 6 speaker was in

3     Group A, then No. 6 is accounted for, you can't -- it won't be

4     in anything else?  Is that the way Yamaha worked?

5          **MR. PAK:**  Yamaha was a high-end system, Your Honor.

6     So if you turn to the next slide, you can see what the

7     interface looked like.

8          (Document displayed)

9          **MR. PAK:**  So the idea was this was a high-end system

10    where you can control lots of different speaker groups in all

11    kinds of environments.  So imagine if you're running a

12    conference room or a restaurant or a commercial building, you

13    have the ability to create multiple zone scenes.  They were all

14    saved, stored, recall later.  But it didn't allow for the

15    functionality of saving them in overlapping configurations.

16         But there's another important piece of history, which is

17    the next slide.

18         (Document displayed)

19         **MR. PAK:**  This is the Bose reference that was also

20    discussed during prosecution.  And it talks about -- this is a

21    USPTO at TX006 at 5850:  Bose displays static groupings,

22    attached as rooms.  The rooms may be individually activated

23    and/or grouped into a Party Mode where all rooms synchronously

24    deliver a common media.

25         So if you go to the next slide.

1      (Document displayed)

2           MR. PAK:  What Bose taught was the idea of having

3      overlap.  Because you could have a house button, which is the

4      equivalent to a Party Mode, where all the room speakers are

5      linked together and available for playback as a group.  That is

6      the house button.  You could also individually select two

7      rooms, like Room A and Room C, by pushing the room button to

8      group them together for playback.

9           So Bose prior art that was of record disclosed the

10     overlapping zone group.

11          THE COURT:  What did the examiner say about Bose?

12          MR. PAK:  I was showing you.  This is the 5850, if you

13     go to the prior slide.

14     (Document displayed)

15          MR. PAK:  So the examiner said (As read):

16           "Bose displays static groupings of media

17           players attached as 'rooms' and the rooms may

18           by individually activated and individually

19           configured for delivery of a synchronous

20           media and/or grouped into a Party Mode where

21           all rooms synchronously deliver a common

22           media."

23          So the prosecution history all points to one thing that

24     was missing in the Yamaha and the Bose reference.  And it was

25     this idea of "while operating in a standalone mode."  Are you

 1    continuing to play music as a standalone device, when all the

 2    various limitations of the claims are invoked or performed.

 3         In this case, Sonos has taken the position that "while

 4    operating in standalone mode" does not require continuous

 5    output of media on the individual device.  We disagree with

 6    that, based on this prosecution history.

 7         But certainly, under their view, there is no question that

 8    the Sonos forum posts, all the other combinations taught that

 9    element.  And under our view that while operating in standalone

10    mode, we also have the disclosure in the Sonos forum posts

11    where if I do the winter mode and summer mode -- I'm not going

12    to invoke them now, because it's not summer or winter, then you

13    would continue to be able to operate the device in a

14    stand-alone mode, play music, and then switch to any of those

15    modes upon invocation while it's in standalone mode or while

16    it's operating in standalone mode.

17         **THE COURT:**  All right.  I've got to give the other

18    side a chance to respond.

19         **MR. PAK:**  Sure.  Great.

20         **THE COURT:**  So let's hear from the other side.

21         **MR. SHEA:**  Thank you, Your Honor.  Rory Shea on behalf

22    of Sonos.

23         I'm going to try to address all of that, Your Honor.  I

24    think there was more than one point in there.  But, let me try

25    to do my best.

1    I want to start with the discussion of the prior art and

2  obviousness.  So first and foremost, I mean, we're here, I

3  think, talking about the judgment of matter of law motions.

4  And when we talk about the scope and content of the prior art

5  and whether or not that meets the claimed invention as a whole,

6  that is a question of.

7    Fact.  And there is testimony in the record, absolutely,

8  testimony from both Dr. Almeroth and Sonos's witnesses that

9  contradict what Mr. Pak just said.  So --

10    **THE COURT:**  Wait.  What did -- contradict which part

11  of what he just said?

12    **MR. SHEA:**  Yeah.  Sorry.  So, I think several parts of

13  it, Your Honor.  So maybe I can take it one by one.  First and

14  foremost --

15    (Reporter clarification)

16    **THE COURT:**  But, Mr. Pak did quote the actual

17  testimony.  And I don't believe he forged what I just saw on

18  the screen.  So that -- here, you two, let me say in my own

19  words what I think he was saying.

20    We're supposed to compare the prior art, what was known in

21  the prior -- all of it, not just -- all of it against the

22  claimed invention.  And, and then see how much of it was

23  already in the prior art.  And then ask the question:  Would it

24  have been obvious to somebody skilled in the art to make that

25  leap from or -- big leap from what was already there to the

1   claimed invention?

2       And what I think he's saying is that that little leap or

3   big leap was described in the forum posts.  So that's the part

4   I think that would be of some use for you to try to help me

5   understand.  How close did the prior art get, you know, the

6   Yamaha thing with the examiner?  And then how close -- was that

7   gap closed by the forum posts?

8           **MR. SHEA:**  Sure, Your Honor.

9       So as a starting point, yeah.  I think it's important to

10  remember that the way that the combination was presented at

11  trial started with the Sonos 2005 system.  Correct.

12          **THE COURT:**  Yeah.

13      **MR. SHEA:**  And it was premised on this notion that

14  Party Mode was a zone scene, was the first zone scene.  And --

15          **THE COURT:**  That's right.

16      **MR. SHEA:**  And then the dynamic group was the starting

17  point for the second zone scene.  Although, I think there's no

18  dispute that the second -- that the zone group doesn't qualify

19  as a zone scene.

20      There is -- so just as a starting point, Your Honor, the

21  fundamental premise being this Party Mode is a zone scene,

22  Dr. Almeroth explained -- I think what's getting lost here is

23  not is it just is it a zone scene (Indicating quotation marks),

24  and there's a set of requirements that are in the construction

25  for that.  But, the claim elements step through the process

1    that is required.

2         So in order for you to have a zone scene, you first have

3    to have a first portion of the process where you create the

4    zone scene.  And each claim has limitations that get at that

5    issue.  Then after you create it, there's some period of time

6    where it exists, it's pre-saved and in existence, and then

7    available for later invocation.

8         And Dr. Almeroth testified, he explained very clearly why

9    Party Mode option in the Sonos 2005 system did not meet the

10   requirements of a zone scene, the construction of a zone scene;

11   that's one thing.  And for more reasons than just that it

12   wasn't user-created.  There were other reasons.  But more --

13   just as importantly, maybe I shall say, it didn't meet the --

14   the claim limitations that were -- walk you through how this

15   happens.  You have to create it first.  It has to exist in an

16   uninvoked state for some period of time, and then the user can

17   later invoke it.  I mean, that really is what the invention of

18   zone scenes is.

19        And it was -- Mr. Lambourne and Sonos were innovating over

20   the exact things that were in the Sonos 2005 system.  I mean,

21   that's what their goal was.  So there's clear testimony in the

22   record from Dr. Almeroth as well as other witnesses that Party

23   Mode didn't meet all those requirements of the claim.  And

24   Dr. Almeroth laid that out.

25        So once you -- once you come to that conclusion, that

1    Party Mode isn't a zone scene and doesn't meet the requirements

2    of the claim in terms of the creation existing in an uninvoked

3    state and then eventually being invoked, then, Your Honor,

4    everything else that Dr. Schonfeld presented in terms of his

5    invalidity combination fall -- it's all premised on that.  So

6    that's Point 1.

7          Now, they have presented all these other secondary

8    references.  And Dr. Schonfeld said that they were presenting

9    those for one purpose, and one purpose, only, which was that

10   you couldn't save a second group.  So all of that art -- and

11   his demonstratives show this, his testimony shows this -- all

12   of that art was presented to just fill in one part of the

13   claim.  And that's all he reached opinions on with respect to

14   that art, is filling in this notion that you could have a

15   second zone scene that would allow you -- which really just

16   meant you could save (Indicating quotation marks) the second

17   group.

18         But that -- that, again, is all premised on this notion

19   that Sonos -- Sonos's system, its 2005 system, had everything

20   else in the claim.  Had the messages.  Had the particular

21   sequence of functions that were required in order to create --

22              THE COURT:  When you say "messages," what do you mean?

23         MR. SHEA:  Yeah, sorry, Your Honor.  So in claim -- in

24   the '885 claim, Limitations 1.6 and 1.7 both require that the

25   player receives an indication that it has been added to the

1    player from the network device.  And then thereafter, later in

2    the claim -- this is now Limitation 1.9 and 1. -- 10, then

3    there is a receipt of an instruction from the network device.

4        And so in the parlance of '885, when I talk about the

5    messages, it's the indication limitations which are 1.6 and

6    1.7, and then that separate later instruction limitation that's

7    1.9 going into 1.10.

8        And those are messages.  You know, they're -- the word

9    "message" isn't used.  But they're -- you know, they're --

10   let's call them "communications" because they're specified as

11   coming from the network device, which would be the controller

12   in the parlance of the '885, to the players.  Right?

13       And then in the '966 claim which we've heard a lot is the

14   other side of the coin, that claim likewise recites indications

15   being sent at the time of creation of the messages -- or excuse

16   me, of the zone scenes being sent to the players.  And then it

17   has a limitation at the end that says that the controller then

18   causes the player to transition thereafter into that grouped

19   mode upon invocation.

20       So in both claims you see this split, right?  There's the

21   creation, and the indications that are sent over the network to

22   achieve that creation, amongst other things that the claims

23   require.  And then you have this second phase of invocation,

24   and you have limitations around that, including communications

25   that take place directly or indirectly between the controller

1    and the player.

2        And that framework, those claim limitations that walk

3    through step by step, you know, what is happening, you create a

4    first group and you send that indication -- to the zone scene,

5    you create a second zone scene, you send that indication.

6    There's something that kind of happens in between.  It differs,

7    depending on the claim.  '885 says you continue to operate in

8    standalone mode.  '966 says you display those.

9        And then after that, then there is a selection of one of

10   the two that have been created, and saved.  And then that

11   prompts an additional set of actions that then causes the

12   invocation, and the players to enter that group mode.

13       So all of those limitations, Dr. Schonfeld didn't map any

14   of these secondary references to any of that.  At all.  He

15   didn't even try.  He relied on Sonos's 2005 system for all of

16   that.  And he just left this little gap for himself where he

17   said: This is all I need from the secondary references.  And

18   then he went and tried to pull those in.  He tried to fill that

19   small gap which he, himself, characterized as just saving the

20   second group.  That's all -- that's all he said was missing.

21   He went to all these secondary references and said:  Well,

22   yeah, it would be known to save the second group.

23       But, all of that was premised on that the Sonos 2005

24   system had all that other stuff.  And it just simply didn't.

25   And Dr. Almeroth --

1          **THE COURT:**  Give me an example of what it did not

2    have.

3          **MR. SHEA:**  Yeah.  So, so this idea that you would

4    create a group, and have an indication sent to create a group

5    at a first point in time, but at a time when the group wasn't

6    invoked, and then at a later point in time in the claim would

7    you send an instruction to then invoke that group that has

8    previously been uninvoked, that separation of creation and

9    invocation and sending separate messages to achieve those two

10   purposes, Sonos's 2005 system did not have that, as

11   Dr. Almeroth testified.

12        What we've seen in the evidence -- and even Dr. Schonfeld

13   conceded this with Party Mode -- is that creation and

14   invocation happened at the same time.  It was "anatomic"

15   action, is the word Dr. Almeroth used.  But what -- it

16   occurred, both things happened at once.  These groups were

17   automatically invoked at the time of creation.  That's just how

18   they worked.

19        And so because of that, you don't see this separation in

20   these two different functions to achieve, one for creation, and

21   then one that you can achieve later for invocation.

22        And again --

23          **THE COURT:**  Well, let me test you on that a minute.

24        In thinking about it, let's say you have a system with

25   just three speakers, or zone players.  There's memory on each

1    one of the zone players that tells the zone player that it is a

2    participant in Party Mode.  If and when it's invoked.

3         Now, that's the way I read your patent.  Is that not true?

4    What you now seem to be saying is Party Mode is created and

5    invoked at the same time.  But there has to be something on

6    those zone players that will catch the message that -- the

7    invocation and then string them together.

8         **MR. SHEA:**  You're speaking of the prior art Party Mode

9    now, Your Honor?

10        **THE COURT:**  I'm talking about on the Sonos 2005

11   system.

12        **MR. SHEA:**  Yeah, yeah.  So prior to the selection of

13   the Party Mode option, there's nothing on the players that

14   memorializes any existence of Party Mode.  So what happens is

15   when Party Mode is selected -- and I think we had some

16   witnesses testify to this, but I'm pretty familiar with it,

17   Your Honor -- and so everything was at the controller.  It was

18   hard-coded -- it was a hard-coded rule.

19        And when the user selected Party Mode, the controller

20   interpreted that as a selection to create a new dynamic group

21   with everybody that was currently in the system at the time.

22   And the controller then just cycled through and sent to -- to

23   each of the players an instruction that said: Create and invoke

24   this group now.  And that's how it worked.

25        And the player, that instruction, it wasn't a broadcast;

1   it didn't blast it out.  That's not how it worked.  They were

2   directed messages to each of the members that were to be

3   included in that Party Mode.  And it said -- and it told each

4   of them:  You need to create and invoke this group right now.

5   And that's what the players did.

6        **THE COURT:**  Before you -- on the 2005 prior art

7   system, before -- let's say you're listening to your system,

8   and you want to hit Party Mode, but you don't hit it yet.

9        And moments before you hit Party Mode button, doesn't the

10  controller know, have some information inside it, as to which

11  -- the identity of the speakers that are part of the system?

12       **MR. SHEA:**  So Your Honor, I do believe that the

13  controller, for a separate purpose, does have knowledge of

14  which players are in the system prior to that.  Because there

15  is some information just so that -- because setting aside all

16  of this, right, Party Mode, grouping, all of this, right, that

17  controller served to individually control each of the players

18  in the system.  Right?  So before these groups get formed, the

19  controller can control the volume on each of them, and can

20  control playback on each of them, individually.  Right?

21       So, yes.  The controller has awareness of the players in

22  the system.  But in terms of when -- you know, that information

23  is -- is not -- it's not with the Party Mode.  You know, the

24  Party Mode, again, it's not even a group.  It's not -- it's

25  just -- it's a piece -- it's some code in the controller that

1  says:  When the user selects this, here's a set of steps I want

2  you to take in order to create a new dynamic group that has

3  everybody in the system.

4       And that's how it worked.  And so at that time -- but I

5  think what's important, Your Honor, is regardless of what the

6  controller did or didn't know, again, the claims require there

7  be two separate sets of -- two separate communications

8  happening at two different times.  Right?  For even a single --

9  before we even get the overlapping and the second zone scene in

10 play.

11      You've got to have an indication to the player telling it:

12 Hey, you've been added to a new zone scene, but it hasn't been

13 invoked yet.  And then there needs to be a selection from

14 somewhere that, to invoke it.  And then an affirmative action

15 by some actor -- I, mean the user in almost all cases,

16 Your Honor, right?  That the user says:  Okay, invoke it now.

17 I created it earlier.  Invoke it now.

18      And then there's a separate second message sent.  And the

19 claims require that.  The claims require two separate

20 interactions, let me call them, with the -- between the player

21 and the controller at two separate times.  And so that -- you

22 know, which is what facilitates all of this.  That's what

23 facilitates the ability for users to achieve the real purpose

24 and goal of this invention, which is to allow users to

25 customize and pre-save groups so that they don't have to go and

1  create them every time.

2      And the key distinction why it's different than the Party

3  Mode in that system, I mean, the claim -- that's why the claim

4  has these separate communications.  Because, Party Mode, you

5  didn't need -- it was predefined.  Right?  I mean, in a sense

6  that, like, Party Mode, you -- the rule in the code said "all

7  players."  Right?  User couldn't customize that.  So there was

8  no need to communicate with the player.  It's just a totally

9  different -- it's just a shortcut, really, on the controller.

10      And so that's why -- I mean, with zone scenes, there needs

11 to be a lot more work to be done.  Because you need to allow

12 for creation of something that's -- that is customized by -- by

13 some actor entity -- again, the user in almost all cases,

14 regardless of whether the -- I mean, that word is in the claim

15 language or not.  There has to be an affirmative creation.  And

16 then a later invocation.

17      And Party Mode didn't allow that, Your Honor, in Sonos's

18 2005 system.  It just simply did not meet all those other

19 limitations of the claims.  And Dr. Schonfeld did not rely or

20 explain -- even try to explain how any of those other secondary

21 prior art references filled those gaps of having two separate

22 messages or -- or indications or instructions for, you know,

23 creating and invoking at two different times.  It didn't have

24 -- you know, depending on the prior art references, missing

25 other things as well.

1    You know, naming of these -- these groups, that was

2  something that was missing in various places.  I think Your

3  Honor already pointed that, out in some capacity.

4    There -- I could look through the claims and look at

5  others, Your Honor.  But I think the important thing -- and

6  Dr. Almeroth talked through this.  Because one of the things

7  that Dr. Almeroth told us is -- we started by saying okay,

8  well, he explained why Party Mode isn't a zone scene, zone

9  group isn't a zone scene.  He started doing -- that was the

10  first portion of his testimony on that issue.

11    But then he was asked to assume, assume they are.  Assume

12  that -- let's just call them zone scenes, let's use that word,

13  let's assume they meet the requirements of the construction for

14  zone scene.  Even though he disagreed -- you know, he had told

15  us already he disagrees that's true.  He then explained:  Well,

16  even if you call them zone scenes, you still don't meet all

17  these other limitations of the claim.  The key being this

18  separation between creation and invocation.  You just don't

19  meet those other limitations of the claim.

20    And then --

21    **THE COURT:**  That's what the examiner said?  Or the

22  witness said?

23    **MR. SHEA:**  At this point I'm talking about

24  Dr. Almeroth, Your Honor.  Yeah, the expert witness, Sonos's

25  expert witness.  And that's all in the transcript.  And

1  Google's counsel didn't ask him about any of that, that he

2  testified.  And even --

3       **THE COURT:**  What did the examiner say about the Sonos

4  2005 system?

5       **MR. SHEA:**  So, so Your Honor, the examiner did not

6  even raise the Sonos 2005 system as a reference he thought

7  presented a concern for these claims.  He was -- had the

8  manual, he was provided with that.  He reviewed it.  He

9  acknowledged that it was considered by him as part of his

10  analysis of these claims.

11       But as far as I know, at least certainly in the '885 and

12  the '966 file histories, the examiner never even elevated that

13  to a reference that he rejected the claims upon.

14       And I think there's so much confusion on the DME

15  reference, Your Honor, and I'm happy to try to clarify because

16  I think I probably have a better understanding of what DME is

17  and isn't than what's coming through in this.  I think there's

18  a lot of misleading statements being made about that.  There's

19  a lot of clipping the file histories, and not looking at it in

20  the proper context.

21       First and foremost, the word "scene" in DME didn't even

22  refer to a group of players.  It had nothing to do with groups

23  of players.  So this -- it -- it stuns me that we're talking

24  about this, but anyway, so, the -- in DME there was a concept

25  of a group, separate from a scene.  They were logically

1  separate concepts.  You could group players.  You couldn't

2  pre-save player -- groups and do the things that the zone scene

3  technology required.  But you could create groups.  You could

4  create.  You couldn't overlap.

5          THE COURT:  But you could save them, too.  999, right?

6          MR. SHEA:  So that's the scenes, Your Honor.  But this

7  is the key.  A scene is not -- what you're saving has nothing

8  to do with a group of players.  What a scene was in DME were

9  effects.  Audio effects.  Like, I'm going to have equalization

10  at this level, I'm going have volume at this level.  I'm going

11  to do certain things, I'm going to manipulate the output of the

12  audio in certain ways.  This is why there were 999 of them,

13  Your Honor.  It had nothing to do with groups.

14          THE COURT:  But did it allow you to group?

15          MR. SHEA:  So, what -- not the scene.  So what you did

16  was you would create a group, totally separate.

17          THE COURT:  Like four or five speakers.

18          MR. SHEA:  Four or five speakers, whatever you want.

19  You could only -- it was a dynamic group, just like in Sonos's

20  2005 system.  A player could only ever be in one.  You didn't

21  pre-create them, you didn't pre-save them.  You just created a

22  group.  Right?  The concept of a group.

23      And then you could then -- what's called -- there's apply

24  a scene (Indicating quotation marks).  Okay, Your Honor.  And

25  what that means is:  Okay, I've got my group.  I already have

1    that preexisting group.  I mean, you could see it even in one

2    of the statements Mr. Pak showed us.  This came through in that

3    statement, if you understand it.  You have a group.

4        Now you can take a scene, which talks about how to

5    manipulate the audio output of the players or the audio in that

6    group.  And you could apply that scene to that group.  So you

7    could marry the two.  You could --

8        **THE COURT:**  Let's say you've got speakers 1 through 5

9    that are in a group.

10       **MR. SHEA:**  Uh-huh.

11       **THE COURT:**  And can that be saved for future use as a

12   pre-set?

13       **MR. SHEA:**  That's not my understanding of DME,

14   Your Honor.  And I don't think any of the -- regardless of

15   whether it's my understanding or not, I guess, none of the --

16       **THE COURT:**  Well, but wait.

17       **MR. SHEA:**  Yeah.

18       **THE COURT:**  Well, that is different than what I was

19   picking up from Mr. Pak.  I thought he was saying that if you

20   had a system, let's say, with ten speakers, you could connect

21   1, 2, 3, 4, and 5 as Group No. 1, and save it as a pre-set so

22   that next time you wouldn't have to dynamically do all -- just

23   the five; you would hit button No. 1 and then you would be

24   automatically playing -- now, you didn't have overlap, I get

25   that part.

1        Speakers 6, 7 could not be -- that would be on a

2   different -- and 1, 2, 3, 4 and 5 are already accounted for;

3   they couldn't be used in some other -- I get that.  But I

4   thought he was saying it could be as a preset, and save for

5   future use.  What you're adding to it is, okay, you get the

6   volume, you get the equalization; you could also save that too.

7        But are you sure about the pre-set thing, that it could

8   not be preset?

9        **MR. SHEA:**  So Your Honor, I'm saying my

10  understanding -- and I don't think we have seen any evidence

11  that suggests to the contrary, I mean, maybe there is -- but

12  that a scene did not allow for that.

13       **THE COURT:**  Well, did anything in Yamaha allow for

14  that?

15       **MR. SHEA:**  Your Honor, not to my recollection.  Which

16  is why, again -- it gets back to why you couldn't do overlap.

17  Right?  The reason you couldn't do overlap in Yamaha was

18  because the groups -- the groups were automatically invoked in

19  DME.  So that's why you couldn't have overlap of the groups.

20       **THE COURT:**  What do you mean, automatically invoked?

21       **MR. SHEA:**  So, so, not pre-saved for future use.  When

22  it was created, it was active.  And that's why, whenever you

23  have a system like that, where you -- the groups are invoked at

24  the time of creation, like, like Sonos's 2005 system, that's

25  when you can't have overlap.

1    **THE COURT:**  You're saying that the -- that the dynamic

2  groups were -- I mean, you're saying that the Yamaha was all

3  dynamic groups, and no static groups?  I could have sworn I saw

4  the examiner refer to "static."

5    **MR. SHEA:**  I think that was in the context of Bose,

6  Your Honor, where you saw the word "static."

7    **THE COURT:**  So you're saying Yamaha was dynamic, only.

8    **MR. SHEA:**  That is my understanding.  And just to take

9  a step back on Yamaha, I mean, a couple of other points,

10  Your Honor, may be worth noting.

11    I mean, first of all, Yamaha and Sonos 2005 wasn't even

12  one of the combinations that Dr. Schonfeld relied on.  He's

13  relying on person of ordinary skill in the art --

14    **THE COURT:**  Well, look, I don't have to -- the idea

15  that you have to have an expert testify to everything in the

16  universe --

17    **MR. SHEA:**  Yeah.

18    **THE COURT:**  -- is wrong.  I can decide this, myself.

19  The Federal Circuit might reverse me.  God bless them, that's

20  okay.  But, just because I'm not locked into what an expert

21  says, I'm going to decide in my own mind.

22    And I keep thinking this.  Back in the nineties, we had

23  speed dial.  I could make all the groups I wanted with my

24  telephone.  And that way, I could recall them instantly.  And

25  that was years -- decades before this patent.  To me, that was

 1    third-grade -- third-grade technology, by the time your patent

 2    came -- your invention came along.

 3        So the idea of saving a pre-set group to me is -- is

 4    obvious as these people on the Sonos forum.

 5        Now, it's somewhat more complicated because of the

 6    language of the claims.  So I -- and the standalone, it's

 7    complicated.  More complicated.  But maybe not that much more

 8    complicated.  So I'm trying to understand it, myself.

 9        And, both sides, you keep throwing back what the experts

10    said and did not say.  Yes, that's important.  But it's -- it

11    could be that somebody wins or loses this case, based on

12    something that an expert did not say, but is in the evidence

13    anyway.

14        So I'm trying to understand the evidence.

15            MR. SHEA:  And that --

16            THE COURT:  I hate to get on your case about this.

17    But both of you are saying this.

18        Okay, I've given you equal time.  I need to -- I'm going

19    to give the other side a very brief rebuttal.  And then we're

20    going to reverse it, and let you make a main point.

21        All right, Mr. Pak, you get about two or three minutes and

22    that's it.

23            MR. PAK:  Okay, Your Honor.

24            THE COURT:  What do you say about the Yamaha

25    situation?

1          MR. PAK:  We can just look right here.  Let's pull up

2  Slide 10.19.

3          THE COURT:  I don't see a thing.

4          MR. PAK:  Sorry.  DX10.19.

5          THE COURT:  Not on my screen.

6          MR. PAK:  I'll just -- do we have that?

7      (Document displayed)

8          THE COURT:  Here we go.  Now it is.

9          MR. PAK:  (As read)

10          "...the prior art enables the selection of a

11          device or group for synchronized playback of

12          media..."

13      And it goes on to say that:

14          "...invocation of a scene which adds a

15          playback device or group thereof..."

16      This is USPTO examiner.  Clearly, scenes were linked to

17  groups.  And we can see it in the next slide as well.

18      (Document displayed)

19          MR. PAK:  This is Sonos.  The DME scenes can be

20  configured, stored, recalled within a given DME device group.

21      So these scenes were working in the context of saved

22  groups.  The scenes could be used to add additional parameters.

23  But clearly, these were all pre-sets for groups.

24          THE COURT:  Well, the phrase "save and recall,"

25  "create, save and recall various configurations" seems to me to

1    indicate that -- yes.  But counsel will say:  No, that's

2    referring to equalization and volume of sound, and not to --

3    not to groups of speakers.

4        MR. PAK:  No, it's very clear.  First of all, Yamaha

5    definitely disclosed having predefined and saved groups.  Once

6    within that -- and I can -- I can show you the prosecution

7    history.

8        Do you have the prosecution history there as well?  Yeah,

9    let's put that up.

10       So this is the preceding sentence before "Thus DME scenes

11   can be configured or stored or recalled within a DME."

12       (Document displayed)

13       MR. PAK:  (Reading) So you have multiple zones in an

14   area that can be in a device group.  No question that was

15   stored.  However, individual pieces in DME cannot be assigned

16   to multiple device groups or overlapping device groups.  A zone

17   can include up to 32 device groups, and all devices belong to

18   one of those groups.

19       So it's clear what the examiner was saying about DME.  You

20   had predefined and saved groups within a group.

21       THE COURT:  All right.  But you still couldn't do

22   overlap.

23       MR. PAK:  That's right.  And that's where Bose comes

24   in.  And that's where the Sonos forum postings come in.  So we

25   have Sonos forum postings, Your Honor, that I went through

1    already on.

2        So this is just background of the art.  The background of

3    the art already said you can store, recall, all kinds of

4    configurations involving multiple zone scenes.  What they

5    argued was you couldn't have overlap.  We saw Bose create an

6    overlap.

7            THE COURT:  What do you say to the point that counsel

8    made that I believe I understood, and he said that when you hit

9    the Party Mode button on the 2005, it created and invoked at

10   the exact same moment.  And therefore, it didn't satisfy the

11   two-step process of the claims.

12           MR. PAK:  So there are two points I would say to that,

13   Your Honor.  Number one, none of the claim language is about

14   user invocation at all.  Or user action.  This could be system

15   messages.  And Your Honor hit it exactly right.

16           THE COURT:  Let's even assume that.

17           MR. PAK:  Yes.

18           THE COURT:  It does say in the '885, for example,

19   after you have the indications for two different zone scenes,

20   then it says -- just a minute.

21       Here we go (As read):

22           "After receiving the first and second

23           indications, continuing to operate in the

24           standalone mode until a given one of the

25           first and second zone scenes has been

 1                        selected for invocation..."

 2           And, then dropping down again:

 3                   "...based on the instruction transitioning

 4                   from operating in the standalone mode to

 5                   operating in accordance with the given one of

 6                   the first and second predefined groupings."

 7           So that seems to be counsel is saying that there's --

 8   there's got to be a few milliseconds of time in between.

 9              **MR. PAK:**  Yes, Your Honor.  And we have evidence on

10   exactly that.  So if we turn to slide 37 of my PowerPoint.

11          (Document displayed)

12              **MR. PAK:**  So Dr. Schonfeld clearly explained this in

13   his testimony.  This is at transcript Page 171, Line 9, to 174,

14   Line 2:

15                   "Well, I disagree with Doctor..."

16          (Reporter clarification)

17              **MR. PAK:**

18                   "Well, I disagree with Dr. Almeroth's

19                   opinion; but even if I accept his opinion, it

20                   is still not done exactly at the same time

21                   because once you receive the set AVTransport

22                   URI message, you still -- after that point,

23                   you have to send an AddMember message, and

24                   there is a whole sequence of exchanges that

25                   take place before you are invoked to what

1          Dr. Almeroth calls invoke."

2          **THE COURT:**  He's referring to the 2005?

3          **MR. PAK:**  That's right.  This is Sonos 2005 Party

4    Mode.  And the claim does not say -- it simply says "after."

5          **THE COURT:**  Now these messages are AVTransport -- what

6    is that, "URI message"?

7          **MR. PAK:**  And then there's the subsequent AddMember

8    messages.

9          **THE COURT:**  All right, those are -- those are what,

10   Java -- what language is that?

11         **MR. PAK:**  I believe -- I don't know -- I think it's

12   probably implemented in a language other than Java.  But these

13   are the computer messages that are sent back and forth between

14   the group members that belong to the Party Mode.

15         So, set -- you have the AVTransport URI message.  Then

16   there's a second message, AddMember message.  These are all

17   system messages that are found in the Sonos 2005 prior art

18   system source code which was not available to the patent

19   examiner.

20         And this is the key part.  We went through this a lot with

21   all the witnesses.  The claims don't specify any amount of time

22   that you have to wait before invocation, in the claims.

23         Furthermore, the specification says you can invoke it at

24   any time.  That's at Column 2, Line 46 through 51 of the '885

25   patent.  So if Your Honor has a copy of that, or I can have

 1   that brought up.

 2          **THE COURT:**  Sorry, I --

 3          **MR. PAK:**  The '885 patent --

 4      (Document displayed)

 5          **THE COURT:**  Well --

 6          **THE CLERK:**  Here, Judge.

 7          **MR. PAK:**  Thank you, Your Honor.

 8          **THE COURT:**  What column?

 9          **MR. PAK:**  Column 2, Line 46 through 51.

10      (Document displayed)

11          **MR. PAK:**  If you go to Column 2, Line 46?

12      (Document displayed)

13          **THE COURT:**  2 --

14          **MR. PAK:**  To Line 46 through --

15          **THE COURT:**  46.  All right.

16          **MR. PAK:**  Through 51.

17      (Document displayed)

18          **THE COURT:**  All right.

19           "According to another aspect of the present

20            invention..."

21          **MR. PAK:**  ...a user may activate the scene.

22            at any time..."

23          **THE COURT:**  Does not say that.  Let me read it:

24           "According to another aspect of the present

25            invention, the scene may be activated at any

1          time or a specific time."

2          MR. PAK:  Correct.

3          THE COURT:  (As read)

4          "A user may activate the scene at any time so

5          that only some selected zones in an

6          entertainment system facilitate a playback of

7          an audio source.  When the scene is activated

8          at a specific time, the scene may be used as

9          an alarm or buzzer."

10     All right.  So what's the key language here?

11          MR. PAK:  The key language, Your Honor, is the patent

12     specification talks about "activation" to mean "invocation."

13     The patent says that invocation can happen at any time after

14     creation.  It does not require any amount of time --

15          THE COURT:  So let's say, for the sake of argument,

16     you're right.  And on the 2005 you hit the Party Mode button.

17          MR. PAK:  Yes, Your Honor.

18          THE COURT:  All right.  Walk through the steps of why

19     that would fit, or how -- how -- to what extent it would fit

20     the claim language of the '885.

21          MR. PAK:  So let's bring up slide 3 from the deck.

22     (Document displayed)

23          MR. PAK:  This was all uncontested evidence that came

24     in.  And it was confirmed by Mr. Millington --

25          THE COURT:  Don't say all these argumentative things.

1  I know the other side would deny that.

2      **MR. PAK:**  So, so --

3      **THE COURT:**  Just tell me what he said.

4      **MR. PAK:**  So this is the Party Mode, what happens in

5  the Party Mode system or with Party Mode for all zones is this.

6      Remember, the controller has both the code, and it also

7  has all of the knowledge of what zone players exist in the

8  system, stored in memory.  And I think counsel recognized that.

9  Because it has to know where to send these set AVTransport URI

10  messages.  Those are messages that are sent by the system.  The

11  claims do not require user messages.

12      These messages are sent to these zone players, at a given

13  point in time.  Then these zone players 106 and 104 then also

14  transmit additional messages to the group coordinator of that

15  zone player, including the AddMember message.  And so what we

16  are having is a series of messages that are operated in

17  sequence after the user pushes the Party Mode button.

18      It causes, number one, a delay in time, as Dr. Schonfeld

19  talked about, between the time that they are created to the

20  time that there is invocation.  And --

21      **THE COURT:**  All right.  I -- I think I understand.

22  What the -- the term "set AVTransport URI," what is our

23  testimony as to what that actually consisted of?

24      **MR. PAK:**  That consisted of -- we have multiple

25  testimony on that, Your Honor.  That's Mr. Millington, as well

 1    as Dr. Schonfeld.  So let's take a look at that.

 2              THE COURT:  No, no, we don't have time --

 3              MR. PAK:  Yeah.  I think we cited it, Your Honor.

 4    But, it's Mr. Millington's testimony about the set AVTransport

 5    URI --

 6              THE COURT:  What did he say?

 7              MR. PAK:  He said that -- just -- that Party Mode uses

 8    set AVTransport URI messages that are sent from the controller

 9    to the zone players.  He also testified --

10              THE COURT:  What did they do for a living?  What do

11    those messages do?

12              MR. PAK:  They basically cause the zone players to

13    start communicating.  So every zone player, other than the

14    group coordinator, would receive that message from the

15    controller.  They then communicate with the group -- the group

16    coordinator, which is 102, using other messages, including the

17    AddMember message.

18         And so it fires off a sequence of operations among the

19    zone players to basically create and then invoke the zone

20    scenes.  And so that -- or the Party Mode, as one zone scene.

21    So that's all in evidence at this point, Your Honor, from both

22    Mr. Millington and --

23              THE COURT:  All right.  I've given you a -- I'll give

24    you a chance to respond to that, and then we've got to move on.

25              MR. SHEA:  Yeah.  Your Honor, this is not a matter of

1    time.  I mean, the claim lays out a sequence of three key

2    actions here.  There's more in the claim, but there's a

3    sequence of three key actions.  First you create it.  Then it's

4    selected, second.  That's the middle part of the claim.  And

5    then it's invoked.

6         So it's not a matter of how long.  You've got to have it

7    created first, and then make it available to select it after

8    it's created.  And then it's invoked, based on that selection

9    of the thing.

10        Party Mode did not meet that.  It doesn't matter how much

11    time it took for these messages.  You selected it first --

12         **THE COURT:**  But the selection could be by the system.

13    Doesn't have to be by a user.

14         **MR. PAK:**  (Nods head)

15         **MR. SHEA:**  That's right, Your Honor.  I think for

16    purposes of what I'm saying, it just doesn't matter.  Party

17    Mode is selected first.  And then creation and invocation

18    happen immediately after that.  And they happen -- Dr. Almeroth

19    believes they happen "atomically," meaning at the same time.

20    If there's some minimalist time in between, it just doesn't

21    matter.  Because what the key is is they were created first,

22    then allowed selection -- allowed for selection, and then

23    invoked after the selection.

24         That's what the claim requires.  And that's what Party

25    Mode did not meet.  Amongst other things, Your Honor.

1    **THE COURT:**  All right.  We've got to switch to -- I'm

2    going to give your side -- I have a medical appointment that I

3    need to make later in the early afternoon.  So I've got at

4    least 30 more minutes, but that's about it.

5        So I want to give Sonos a chance to make your -- a main

6    point.  Could be anything in your paperwork that you want to

7    make sure that I have -- be thinking about.

8        **MR. SHEA:**  Thank you, Your Honor.

9        You know, I mean, I think we believe it's pretty clear on

10   the briefs.  I mean, we don't necessarily feel we need to

11   burden Your Honor with more argument today.

12       **THE COURT:**  Good, then let's just go home.  But -- no,

13   come on.

14       **MR. SHEA:**  Okay.

15       **THE COURT:**  There must be something you would like to

16   emphasize.

17       **MR. SHEA:**  Yeah.  Yeah.  Yeah.  So Your Honor, I

18   really think -- I just don't believe there really is any

19   further dispute that the prior versions of Google's products

20   meet the limitations of the '966 patent.

21       As Your Honor likely recalls, the -- the prior versions of

22   the products have already been found on summary judgment to

23   satisfy the limitations of the '885 claims.  We've heard

24   throughout this entire trial that they're two sides of the same

25   coin, they're very similar limitations --

1          **THE COURT:**  But they're not identical.

2          **MR. SHEA:**  They're not identical.

3          **THE COURT:**  There are differences.

4          **MR. SHEA:**  So the one remaining limitation, I think,

5     or the other limitation that Google has disputed is this notion

6     that the controllers do not cause storage of -- of the zone

7     scenes.  Right, that's the only dispute remaining on the prior

8     version of the products for infringement purposes, Your Honor.

9          And I think the evidence we've laid out in our motion, the

10    evidence Your Honor heard throughout the trial shows that

11    absolutely those speaker groups are stored.

12         Let me just start here, Your Honor.  They have to be

13    stored.  Otherwise, it would be impossible to recall them

14    later.

15         **THE COURT:**  Well, see, this is the kind of the same

16    flip side of the argument we were just having a while ago about

17    the two steps.  And you say it's all one step and the -- okay.

18         All right.  Let's -- okay.  Let's find out what the answer

19    is.  Mr. Pak, what is your answer to this point that counsel is

20    making?  Then I'm going to give him a chance to shoot down what

21    you say.

22         **MR. PAK:**  Thank you, Your Honor.  So if we go to the

23    presentation, my presentation at Page 55.

24         (Document displayed)

25         **MR. PAK:**  Actually, in the other deck.  This is for

 1   the causing storage.

 2        Let me start by saying, Your Honor, that "causing storage

 3   of the first zone scene" language appears only in the '966

 4   claims.

 5        (Document taken off display)

 6             **THE COURT:**  Yes, that's right.

 7             **MR. PAK:**  It's separate from creation.  And what's

 8   being caused to be stored is, quote, "zone scenes."  So you

 9   have to have the first zone scene that is stored and a second

10   zone scene that is stored.

11        (Document displayed)

12             **MR. PAK:**  So we have it on the PowerPoint now.

13             **THE COURT:**  And there's also the icon, the '855

14   doesn't -- '885 doesn't have any icon.  They're displaying a

15   representation.

16             **MR. PAK:**  That's right, Your Honor.

17             **THE COURT:**  All right.

18             **MR. PAK:**  So if you go to two slides before that.

19        (Document displayed)

20             **MR. PAK:**  This is the key point that we have been

21   saying all along in trial.  "Zone scene" is not just anything.

22   It's "A previously-saved grouping" and you are saving it

23   according to the language of the claims for later invocation.

24   That time could be any amount of time.  But you have to save

25   the grouping for invocation purposes.

1          "Grouping" is not just a name or an ID.  It is the

2     identity of the members of the group.  And that's plain from

3     the language of the claims, claim construction, Dr. Almeroth's

4     testimony, as well as Dr. Schonfeld.

5          If you go to Slide 56.

6          (Document displayed)

7          **MR. PAK:**  We went through this, Your Honor.  We had

8     Mr. Mackay talk about his technology, the ACA technology, where

9     there's no need to store the actual grouping or membership

10    information of the speakers because you're only pulling the

11    information at the time that you need it.  And this was all the

12    testimony that came in.  He provided, at length, descriptions

13    of his technology.

14          **THE COURT:**  Well, it must be stored somewhere.  The

15    identity of the membership has to be stored somewhere.

16          **MR. PAK:**  It's not stored -- no, Your Honor.  It's

17    only -- it's not stored.  Because, if Your Honor recalled, you

18    were asking I think both witnesses, Mr. Mackay as well as

19    Dr. Schonfeld, there's a broadcasting going on.

20          So what happens is each speaker in the Google system is

21    continuously broadcasting out, "I'm a member of this group, I'm

22    a member of this group."  When the controller needs the

23    membership information for invocation of that group, they are

24    listening -- the controller's is listening to those broadcasts.

25          If a speaker drops out of the system unbeknownst to the

```
 1   controller, it won't know that it dropped out.  All it will
 2   know is that at that point in time, I got messages back; I'm
 3   looking for all the members that belong to Group 1.  It heard
 4   from two speakers.  Two speakers said "I'm here and I belong to
 5   Group 1."  Then it uses that information to identify the leader
 6   for a group playback.
 7        And the key thing --
 8        THE COURT:  Let's say that's exactly the way it
 9   worked.  Why isn't -- each of the speakers understands that
10   it's a member of that particular group.
11        MR. PAK:  Right.
12        THE COURT:  So that info has to be stored somewhere on
13   the speaker.
14        MR. PAK:  The group information, the group ID
15   information, absolutely, it's stored.
16        THE COURT:  Why isn't that enough to satisfy "causing
17   storage of the first zone scene"?  It's -- it's subdivided
18   between speakers, but it's stored somewhere.
19        MR. PAK:  Because the other part of that construction,
20   Your Honor, is the previously-saved.  So what you are trying to
21   do is at the time you create the group, let's say where there
22   were three speakers at the time you created the group, what
23   you're supposed to do, according to the claim language, is save
24   the list of three that is previously saved, pre-defined
25   grouping, according to the claims.
```

**PROCEEDINGS**

1        When you invoke the group, you're supposed to go back to

2    the list of three speakers.  Because that's what you previously

3    saved, that was previously defined.

4        **THE COURT:**  Well, wait a second.  Did I define that

5    somewhere as the -- that had to be in a list stored somewhere

6    as a list?

7        **MR. PAK:**  You didn't define that, Your Honor.  But

8    it's in the -- I'm using the construction which is in the

9    previously-saved grouping of zone players according to a common

10   theme.

11       Both Dr. Schonfeld and Dr. Almeroth agree that that's

12   membership information.  You have to store information about --

13       **THE COURT:**  But you're making it sound like it has to

14   be in a single file as a list, as opposed to stored on three

15   different speakers as -- as a -- just a piece of it, that

16   Speaker A is a member of Group 1 and Speaker B is a member of

17   Group 1.  Could be members of others, but it's broadcasting out

18   "I am a member of Group 1, I am a member of Group 1."

19       **MR. PAK:**  Right.

20       **THE COURT:**  So, but that information in the aggregate,

21   though it is segregated between multiple speakers, it is

22   stored, isn't it?  Previously stored?  Because it's on the

23   speakers?

24       **MR. PAK:**  The ID is stored.  But here's the key

25   distinction between the Google system and the claims.  The

PROCEEDINGS

1   claims say if I have three speakers, no matter how you

2   distribute the storage, that's previously saved, previously

3   defined at the time of creation.  Then when you invoke that

4   zone scene, you're supposed to use the three that you have

5   identified.  Because those are the ones that were identified --

6           THE COURT:  All right.

7           MR. PAK:  Google's products, and all the products, all

8   work totally differently.  Because at the time I created the

9   group or a zone scene, accused zone scene, I may have three

10  speakers.

11          THE COURT:  You have what?

12          MR. PAK:  Three speakers, we'll say.

13          THE COURT:  All right.

14          MR. PAK:  At a later point in time when I'm trying to

15  use the group or invoke the group, I may only have two.

16  Because in our system, in the Google system, I never go back in

17  time to when the group was created.  We never store anything

18  about that historical point in time.

19      What we're doing is at the time that you need it, you

20  listen to the broadcast.  So in the scenario where I described

21  that one of the speakers fell out, Your Honor, out of the

22  three, one fell out of the network or the wifi strength is not

23  very good for that speaker, the new group identity will be two

24  speakers, not three.

25      So this is what Mr. Mackay described as a different

1   solution, in his historical document.  He considered an option

2   like the one independently, like the one that is claimed where

3   you store the information about the group members, and use that

4   previously-stored information for later use.

5           THE COURT:  But let's say there hasn't -- you're

6   assuming that an asteroid has fallen out of outer space, and

7   hit your house and knocked out a speaker.  Let's assume it's

8   just a routine thing, and you've got three speakers, and they

9   continue to work.

10          MR. PAK:  Yes.

11          THE COURT:  Why isn't that, then -- analyze that

12  situation.

13          MR. PAK:  Sure

14          THE COURT:  You've got the information that's all

15  stored; you can invoke them.

16          MR. PAK:  No, because according to the system, it

17  never knows what was saved.  It doesn't store any information

18  in the system about the three speakers.  Only you and I

19  remember that when I created the group, that it was three

20  speakers.  The system doesn't --

21          THE COURT:  You keep making it sound like it has to be

22  stored in one file, and dividing up the information -- what was

23  it called, "distributed storage," that was the phrase.

24          MR. SHEA:  (Nods head)

25          THE COURT:  The distributed storage is not a

 1  legitimate alternative.

 2       MR. PAK:  It's not just -- the issue is this,

 3  Your Honor.  If you plug in Your Honor's construction into the

 4  claim language, it says that you have a pre-defined group.

 5  It's previously saved grouping, academic to the zone scene

 6  language.  And if you read the rest of the claim language, it

 7  says you invoke the group playback based on what you previously

 8  saved, which is the list of speakers, or the grouping.

 9       What we're saying, Your Honor, is the system has no prior

10  knowledge of what speakers may have belonged to any given group

11  or not.  Even in the world in which the same speakers still are

12  broadcasting the information that it belongs to a group, the

13  system doesn't know that.  It doesn't store that information.

14  Only you and I know that, because we happen to use our brain to

15  recall what the setting was.

16       THE COURT:  No, but the speakers are broadcasting that

17  information.  They must have gotten it from somewhere, and

18  stored it somewhere, for rebroadcast later.

19       MR. PAK:  It stores their individual group ID.  But

20  the uncontested evidence -- well, I won't say "uncontested."

21  What Mr. Mackay said is -- and it's confirmed by

22  Dr. Schonfeld -- is:  If I just know the ID and the group name

23  for a given speaker, I still don't get to the list of actual

24  speakers for that group.  Because the group composition can

25  change second by second.  So in the Google -- in the Google

 1  design, I'm never going back to a previously-saved grouping.

 2  I'm pulling the grouping dynamically.

 3      So Your Honor is absolutely right that there is device --

 4  every device in the system stores the group ID it belongs to.

 5  But nowhere in the system does it say that morning group, for

 6  example, has three speakers, and these three speakers are to be

 7  used for invocation of that group.  It doesn't work like that.

 8          **THE COURT:**  All right.  Let's --

 9          **MR. SHEA:**  So Your Honor, you actually --

10          **THE COURT:**  You get to respond.

11          **MR. SHEA:**  Thank you, Your Honor.

12      You don't even need to take my word for it.  So I'm just

13  going to read from a couple of the dep designations that were

14  played in court from Google's witnesses.

15      Let me start with Mr. Mackay.  I took his deposition.  So

16  I asked him -- a little preface Your Honor, if you recall --

17          **THE COURT:**  These were read to the jury, now?

18          **MR. SHEA:**  Yeah.  These were played by video to the

19  jury.

20          **THE COURT:**  Okay.

21          **MR. SHEA:**  And just as a little bit of, like,

22  refresher context, in a speaker group there's one device called

23  the "leader," he's the coordinator, he's in charge.  And the

24  rest of them are called "followers."

25      Okay, so with that context I asked him --

**PROCEEDINGS**

1      THE COURT:  Always say "Question" and read it.

2      MR. SHEA:  Yeah.

3      THE COURT:  And then say "Answer" --

4      MR. SHEA:  Sure, yeah.

5      THE COURT:  For the court reporter.

6      MR. SHEA:  (As read)

7       "QUESTION:  Focusing specifically on

8      whichever player is currently elected as the

9      leader of a particular group, will that

10     player store in memory identifiers of each

11     device that is currently a follower of that

12     group?

13      "ANSWER:  It stores information about the

14     followers that are currently connected to

15     it."

16  So Your Honor this is Mr. Mackay, not, not with this newer

17  theory --

18      THE COURT:  Read that last sentence again.

19      MR. SHEA:  Sure.  He said -- do you want me to read

20  the whole thing, Your Honor?

21      THE COURT:  Just the answer part.

22      MR. SHEA:  The answer said:

23       "It stores information about the followers

24      that are currently connected to it."

25  Your Honor.  So first of all, the leader of the group

1    stores identifying information -- "Identifiers" was the word I

2    used in my question -- of the followers in the group.  So the

3    leader certainly knows.

4        And it makes sense, Your Honor.  The leader has to know

5    who the followers in the group are.  He has to.

6             THE COURT:  Why is that?

7             MR. PAK:  Because when the group is invoked, when it's

8    launched, the leader then needs to talk to the followers so

9    they can coordinate for synchronous playback.

10       If the leader doesn't know who the followers are, he

11   doesn't know who to direct those messages to.  He doesn't --

12   the invocation message doesn't tell the leader: Hey, these are

13   the other members of the group.  That's not how it works.

14   There's just a launch message.  It goes to the leader.  It

15   says:  This is the group ID; I want you to invoke it now.

16   Invoke that group.

17       And the leader says:  Okay, good.

18            THE COURT:  Well, you could -- I want to quarrel with

19   you a little bit.

20       You could have a system where the leader sends out a

21   broadcast to the entire universe, and it has a header that

22   says:  Listen to this message only if you are a member of this

23   group.  So it wouldn't necessarily have to --

24            MR. SHEA:  Okay.

25            THE COURT:  It could be to everyone, but only -- it

1    would only be paid attention to by the members of the group.

2    So I'm not sure you're right that it has to know.

3         MR. SHEA:  Yeah -- sorry, Your Honor.

4         THE COURT:  But, but, maybe, I remember, you are

5    making me remember some testimony about they're constantly

6    deciding who is the leader of the group, based on wifi

7    strength.  So in that sense, it does seem to me the leader

8    would need to know who was in the group.

9         MR. SHEA:  And I apologize for suggesting that's not

10   the only way to do it.  But that is the way Google does it,

11   Your Honor.  I mean, that's how their system works.  They don't

12   send a broadcast message.  The leader communicates individually

13   with those followers --

14        THE COURT:  But is there testimony?  Or is that just

15   you talking?

16        MR. SHEA:  I believe there's testimony from -- in the

17   record on that.  Or documents, source code.  But that is how

18   the system works, Your Honor.

19        And then, the other testimony -- and I should say that the

20   deposition designations that were played in court are lodged at

21   Docket 755-2.  Just for the record, I want to put that --

22        THE COURT:  Good.  Thank you for doing that.

23        MR. SHEA:  So that's one piece of testimony,

24   Your Honor.  And I could grab others from Mr. Mackay on that,

25   from his deposition designations.

1      But I want to also -- there was another conversation I had

2   which I think gets to Your Honor's other point, which is the

3   deposition designation of Mr. Pedro.  Mr. Pedro was another

4   witness who testified live.  He was also a 30(b)(6) witness.

5      And so I had a back-and-forth with him.  It's a little --

6   um, there's a couple questions back and forth.  To provide

7   context for the ultimate answer, would it be okay for me to

8   read them?  Or do you want me to kind of just go to the

9   punchline, Your Honor?

10          **THE COURT:**  Go to the punchline.

11      **MR. SHEA:**  Sure.  So after some back and forth, what I

12   asked him is -- he had previously stated that there is a

13   collection of records that has information about speakers.

14      So I said (As read):

15          "Well, focusing on that collection of

16          records, is it fair to say that that

17          collection of records stores collectively the

18          speaker group for later recollection?"

19      And his answer was:

20          "I would say yes."

21      So Your Honor, this is now Google's other witness who they

22   brought up and who is the Goggle home designee testifying that:

23   Yes, after a group is created, there is a collection of records

24   that collectively stores the speaker group for later

25   recollection.

1           That testimony, Mr. Mackay's testimony I read --

2     Mr. Mackay also separately testified and Your Honor's seen this

3     multiple times that speaker groups are saved persistently

4     (Indicating quotation marks) in Google's system -- all of that

5     testimony overwhelmingly establishes that "causing storage of

6     the first zone scene" -- which is the claim language -- is

7     satisfied here.  There just isn't any way to reach a different

8     conclusion, in our view, Your Honor.

9           THE COURT:  All right.  I'm going to bring up -- well

10    all right, I'll give you one minute to respond to that, and

11    then I have time to bring up something on my own.

12          MR. PAK:  Thank you, Your Honor.  So quickly, at slide

13    55, what we heard from Mr. Mackay was talking about currently,

14    at a current point in time, whether the leader has information

15    about the followers.  But the claim language is talking about

16    causing storage of the first zone scene at the time of creation

17    of the zone scene.

18          (Document displayed)

19          MR. PAK:  And then it goes on to say that you have to

20    then invoke the group in accordance with the first defined

21    grouping.

22          So none of that testimony contradicts the underlying

23    operation in the Google products.  Google products never go

24    back to the time of creation to look at the list of members of

25    a zone group, to say: Hey, this is the list of speakers that we

1  should be using for invocation.  We don't do that.  That's why

2  I said "currently."

3      The last thing I'll say Your Honor, on Pedro is on

4  slide 59.

5          **THE COURT:**  Look.  Here, wait a minute.

6          **MR. PAK:**  Yeah.

7          **THE COURT:**  See, here you say "no causing storage of

8  zone scene for later" -- and you underline the word "later" --

9  "invocation."

10         **MR. PAK:**  That's right.

11         **THE COURT:**  So that's what you say when we're talking

12  about infringement.  But when we talk about validity, you're

13  taking the opposite view, and saying it can be almost into

14  milliseconds, is enough.

15         **MR. PAK:**  No, Your Honor.  So what we're saying is

16  under their view --

17         **THE COURT:**  Under their view, okay.

18         **MR. PAK:**  Under their view, which is their burden to

19  meet for infringement, under their view, first of all, there is

20  no separation in time because -- and also, not only that,

21  Your Honor, the creation of the group already happened long

22  before this point in time.

23     So if you remember in the ACA technology, the group

24  coordination occurs continuously.  And it's happened ever since

25  the user corrected the group.  So there's no question in the

1    Google products, even under their view or our view, that

2    creation happened long before you get to the step of trying to

3    use the actual group for invocation.

4        In that moment, when you're using it for invocation,

5    Mr. Mackay testified consistently during his deposition and

6    during trial that you're only using the current membership

7    information.  Not something that was previously stored.

8        Number two, Your Honor, on Pedro, quickly.  This is 1459.

9        (Document displayed)

10        **MR. PAK:**  All the testimony we heard from Mr. Pedro

11    was talking about the collections of records on the controller

12    for user interface display.

13        But he specifically testified during trial, and not

14    contested, that the membership information in the cache on the

15    controller is never used for playback purposes.  It's only to

16    speed up the display.  But it is not being used to play music

17    as a group.

18        That, when it goes into that mode of trying to invoke a

19    group, it's only listening to the broadcast messages, which at

20    that moment in time will tell you which members are available

21    and who is the leader.

22        So on that point, I would disagree with Mr. Shea that the

23    leadership election process is continuous.  This happened over

24    time.

25        **THE COURT:**  Okay.  I have a question.

1          **MR. PAK:**  Yes.

2          **THE COURT:**  And this concerns the specification.

3      Let's say that a -- a simple three-zone player group --

4  system.  And you have -- the first two are in one group, and

5  then let's say No. 1 and 3 are in a different group.  So 1 and

6  2 is Group A, and 1 and 3 is Group B.  And those are -- those

7  are -- this is according to the way it would work in the

8  specification.

9          When you invoke -- let's say you've got -- Group A is

10 playing.  You know, two different speakers, in tandem and in

11 synchrony.  And then you've got the third speaker playing

12 something else.  And then you hit the button, and it says to

13 invoke Group B.

14         Does -- but since Group A has already been invoked, what

15 does Group 1 -- sorry, does -- not Group 1 -- does Speaker 1

16 switch and go to the second?

17         **MR. SHEA:**  Yeah.

18         **THE COURT:**  Now, your specification doesn't say.  I

19 looked.  I couldn't find anywhere where your specification

20 tells us what the answer is.  So I know that's what -- I

21 anticipated you would say:  Oh, yes --

22         **MR. SHEA:**  Well --

23         **THE COURT:**  Or does it play both?  It could be wired

24 to play both.  It would be confusion.  Or, does it stick with

25 the original invoke?  So you've got kids playing rock and roll,

1    and you've got mom and dad listening to the news, and they got

2    a war going on.  Each one of them's hitting the button.

3        How -- in my view, the specification gives us no guidance

4    on this.  But I'm going to give you a chance to tell me where

5    it does address this problem.

6        MR. SHEA:  Yeah, Your Honor.  Thank you.  And I'm

7    just -- sorry, I was pulling up the spec.  I believe I know

8    where -- sorry.

9        THE COURT:  Where is that?  Where would it be in this

10   thing?

11       MR. SHEA:  One second, Your Honor.  Just give me a

12   second to look, if you don't mind?  Because I don't want to

13   misstate something.

14       THE COURT:  Sure.

15       MR. SHEA:  So if you go to Column 9, Your Honor.

16       THE COURT:  All right.  Let's go there.  Column 9.

17       MR. SHEA:  So, and you can see -- I think we can start

18   on Line 1, actually, Your Honor.

19       THE COURT:  Okay.

20       MR. SHEA:  So what this is describing is what's called

21   an evening scene.  This is a little bit -- the evening scene

22   here actually is a scene that would define two -- pre-define

23   two separate groups.  But I think the key thing, Your Honor, is

24   if you look at -- it starts right after the listing of players.

25       And you see the language where it says (As read):

1                    "...where bathroom, family room and foyer

2                    should be separated from any group if they

3                    were part of a group before the zone scene

4                    was invoked."

5          So I think, Your Honor, this is the piece of the

6     specification -- at least one piece, and there could be others,

7     but this is the one I remember off the top of my head -- where

8     this is the specification telling you that when the zone scene

9     is invoked, any players that were part of a group before that

10    gets separated apart from that group so that they get -- and

11    then they be -- that group is the one that becomes activated.

12         **THE COURT:**  Well, the odd thing about it is, that

13    phrase says "where bathroom, family room and foyer," they're

14    not even referenced in the list above.

15         The whole paragraph reads:

16              "In one embodiment as shown in Figure 3B..."

17         So maybe we've got to look at 3B and that's where it will

18    explain that.

19         **MR. SHEA:**  Yeah, um --

20         **THE COURT:**  Okay, so all right, so we see --

21    (The Court examines document)

22         **THE COURT:**  I'll have to study it because I don't see

23    immediately what your point is.  But the next paragraph -- all

24    right, I'll go back and look at that passage.

25         **MR. SHEA:**  Yeah.

1          THE COURT:  Another paragraph says:

2              "One important" -- it's Line 16.

3              "One important of the features..."

4          MR. SHEA:  Yeah, I think there's just maybe a typo

5      there, Your Honor.

6          THE COURT:  Uhm.  Wait a minute.  Let me -- well, read

7      it as is (As read):

8              "One important of the features benefits

9              enough objects in the present invention is

10             that zones do not need to be separated before

11             a zone scene is invoked.  In one embodiment a

12             command is provided and links all zones in

13             one step, if invoked."

14         MR. SHEA:  Yeah, that's right, Your Honor.

15         THE COURT:  Is that Party Mode?  Is that what they are

16     talking about?

17         MR. SHEA:  Yeah.  That would be a user-created Party

18     Mode, Your Honor.  If you were to -- if a user were to create a

19     zone scene that had all the zones then that would be one

20     example of a zone scene here.

21         But I do think, at least, Your Honor, I've always read

22     that -- that -- that language, and I thank you for pointing it

23     out because I had forgotten it was there, about "do not need to

24     be separated" in the context of the prior passage.  And again,

25     I've always understood that language to mean when you invoke a

1   zone scene, one of the things that's going to happen is if

2   there's a previously-invoked group, it's going to separate that

3   for you automatically as part of invoking the zone scene.

4       And that's where my understanding comes from, Your Honor,

5   to answer Your Honor's question on that.

6           **THE COURT:**  Well, a different way to read that is that

7   you have -- if "bathroom, family room and foyer" were part of

8   one of these two groups that are listed here, then you would

9   have to go and manually separate them before you invoke the

10  zone scene.  That's another way to read that.

11      Okay, I've got to study it some.

12          **MR. SHEA:**  Okay.

13          **THE COURT:**  Here's my -- my last thing.  I'm going to

14  ask each of you to -- I'm sorry?

15      (Off-the-Record discussion)

16          **THE COURT:**  I'm going to ask each of you to submit a

17  proposal or comments on -- I -- I continue to be concerned

18  about the issue of written description.  And the fact that that

19  sentence was added and got by me -- no one bothered to tell me

20  at the time, last, a year ago.  That sentence was newly added

21  that I expressly relied on.  And you had told me that it was in

22  there, and we relied on your brief.  And it turns out that that

23  very sentence which you didn't tell me had been added way after

24  the fact.  And I'm troubled by that, still troubled.

25      So I know I issued a ruling, but I also feel I was not --

 1   I got a half a deck of cards.  And I was not told the complete

 2   truth.

 3       So I want each of you to submit a proposal or comments on

 4   how the Court should go about addressing that problem.  And

 5   including whether or not it's open to the Court to reevaluate

 6   that issue completely, as if it was on summary judgment or on

 7   this trial record or Rule 50.  I don't know the procedural --

 8   but I'm troubled by that.

 9       You don't need to respond now, but I would like you to

10   respond in writing.  So, and then I want each of you to comment

11   on each other's comment.  I don't think you need more than ten

12   pages to do this.

13       So, ten pages.  What is today?

14       MR. SHEA:  It's Wednesday.

15       THE COURT:  Wednesday, all right.  So let's say due

16   next Monday, and then the following Wednesday -- at noon and

17   then the following Wednesday at noon, each side gives -- no,

18   Monday is a holiday, isn't it?

19       THE COURTROOM DEPUTY:  Yes.

20       THE COURT:  You probably don't want to wreck your

21   holiday.  All right, Tuesday at noon.

22       MR. SHEA:  Thank Your Honor.

23       THE COURT:  And then each side respond on Wednesday at

24   noon.  And, with five pages.  No attachments, no nothing, just

25   ten pages, five pages.  And, that's -- I'm not making a ruling

1   on whether we are going to get back into it.

2        Now, I also want to say one thing about Google here.  I've

3   said it before.  I have been surprised that you didn't point

4   these things out to me earlier.  Which leads me to believe that

5   somewhere in this vast armada, that you had a strategic reason

6   -- that you knew about it.  Maybe not you, Mr. Pak, but your

7   team knew about it, and you withheld it from me because you

8   felt it would hurt you on some other PTAB proceeding where

9   you're on the exact opposite side of that issue.  Probably even

10  with Sonos.  And so you didn't want to prejudice your -- your

11  position in some other case.

12       It would not be fair to Sonos for you to hold back on that

13  point, and then only when the judge brings it up that you say:

14  Oh, Judge, you're right, oh, look -- no.  I want to -- I'd like

15  to know when your side, anyone on your side, knew about that --

16  that issue, in any form or fashion.  So you can include that in

17  your ten things.

18       And then if the answer is:  Oh, we just didn't know, how

19  could it be that a team this big did not go back and read the

20  prosecution history?  You need to explain that to me.

21            MR. PAK:  Will do, Your Honor.

22            THE COURT:  All right.  I have to go see a doctor.

23  I'm sorry; I'm going to take off.  All right?  And, I look

24  forward to seeing you again.  On Friday, right?

25            MR. PAK:  Yes, Your Honor.  Would you like the slides

1    that we used?

2            **THE COURT:**  Give it to the law clerk.  And the other

3    side, you didn't have any slides, but you can give them

4    equivalent slides.

5            **THE COURTROOM DEPUTY:**  Court is adjourned.

6        (Proceedings concluded)

**I N D E X**

Wednesday, May 24, 2023 - Volume 11

|                      | **PAGE** | **VOL.** |
|----------------------|----------|----------|
| Hearing re Rule 50   | 1943     | 11       |

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Sunday, May 28, 2023