# ATTACHMENT A

## *Sonos, Inc. v. Google LLC*

# Google's Brief on Affirmative Defenses (Dkt. 819)



# Sonos's Strategic Silence And 13-Year Delay In Disclosing The Alleged Invention



Google and Sonos meet about Google's Cast for Audio technology

Summer 2014

Google releases accused functionality

Dec. 2015

Google and Sonos begin discussing a possible collaboration

Summer 2013

Sep. 29, 2020
Lawsuit Filed

2005 2006 2007 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 2020 2021 2022 2023

Sept. 12, 2006

Sept. 11, 2007

Sonos files Provisional App. No. 60/825,407

Sonos files U.S. Pat. App. No. 11/853,790

Sonos files the applications that issue as the '885 and '966 patents

Apr. 12, 2019

Aug. 23, 2019

Sonos adds "ALL the zones" language (new matter) to the specifications of the '885 and '966 patents

Nov. 5, 2019

'966 patent issues

Nov. 24, 2020

'885 patent issues

June 2020

Sonos introduces products that practice the '885 and '966 patents

2

# Sonos Kept the Prosecution Chain Alive by Filing Successive Applications





**TX0001 at 3-4, TX0003 at 3-4**

## Google and Sonos Discussed Collaboration and Product Integration in 2013



**Nick Millington**
**Sonos's Chief Innovation Officer**

**Q.   What was discussed during this first meeting between Sonos and Google?**

A.   Well, as I mentioned before, the topic of the meeting was to make -- that I attended was to make plans for how the Google Play Music All Access service could be made available as a music service that people who owned Sonos could listen to.

**Trial Tr. at 303:19-24; TX0344; TX0347**

# Google and Sonos Met to Discuss Google's Cast for Audio Technology in 2014





**Tomer Shekel**
Google Product Manager

**Q   And what was your first interaction with Sonos as a company?**

A   I don't know if it was the first.  I don't remember if it was the first.  But one early interaction, at last, was prior to us meeting with them in the context of Cast for Audio.

**Q   Do you recall when that was?**

A   I -- I -- I think it was 2014.

**Dkt. 755-1 (Shekel Deposition Designations) at 42:2-9**

5

## Cast for Audio Provided a Standardized Platform to Make Third-Party Speakers Compatible with Music Streaming Apps



**TX0125 at 3**

## Google Disclosed to Sonos Functional Details Regarding Overlapping Speaker Groups



**TX0125 at 18 (annotations added)**

# Google Disclosed to Sonos Functional Details Regarding Transitioning From Playing Back Individually to Playing As a Group



**TX0125 at 24 (annotations added)**

8

# Prosecution Laches



# Prosecution Laches

"The doctrine of laches is an equitable affirmative defense [that may] render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under a totality of the circumstances."

*Hyatt v. Hirshfeld*, 998 F.3d 1347, 1359-60 (Fed. Cir. 2021) (quoting *Cancer Rsch. Tech. Ltd. v. Barr Lab'ys, Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010))

# The Application of Prosecution Laches is Within the Court's Discretion

"The application of the defense of laches is committed to the sound discretion of the district court."

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992)

## Prosecution Laches Requires Proof of Two Elements

1. "[T]he patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances"

2. "[T]he accused infringer suffered prejudice attributable to the delay"

*Hyatt v. Hirshfeld*, 998 F.3d 1347, 1362 (Fed. Cir. 2021)

## The Underlying Rationale for Prosecution Laches Applies Here

"Prior to 1995, a patent's term was measured as 17 years from the date of issuance. The fact that patent term was keyed to the date of issuance, rather than the date of filing, incentivized certain patentees to delay prosecuting their patents by abandoning applications and filing continuing applications in their place. By doing so, patentees could obtain a patent at a financially desirable time when the accused product market had become suitably developed. This delay strategy has allowed some submarine patentees to specifically target competitors' new products. Critics of this practice have argued that it harms industries by upsetting the expectations of product manufacturers who have invested in manufacturing facilities. The ability to avoid publication of an application offers further opportunity for abuse because it deprives the public of timely disclosure, which is a central goal of the patent system."

*Hyatt v. Hirshfeld*, 998 F.3d 1347, 1351-52 (Fed. Cir. 2021) (citations and quotations omitted)

13

# Unreasonable and Unexplained Delay is a Fact-Intensive Inquiry

"Whether an applicant's delay is unreasonable depends on the specific circumstances. . . . [T]he determination of unreasonable delay is not limited to the circumstances surrounding the particular application at issue; instead, ‘an examination of the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims, may trigger laches.'"

*Hyatt v. Hirshfeld*, 998 F.3d 1347, 1362, 1385-86 (Fed. Cir. 2021) (quoting *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP*, 422 F.3d 1378, 1385-86 (Fed. Cir. 2005))

## Google Introduced Multiroom Audio Products Years Before  Sonos Attempted to Patent the Concept of Overlapping Speaker Groups

SONOS



**Nick Millington**
**Sonos's Chief Innovation Officer**

**Q.  And when did Google launch its first multiroom audio product?**

A.  The product I think launched in December of 2015.

**Q.  And what was the next multiroom audio product that was launched by Google?**

A.  That was the Google Home in October of 2016.

**Trial Tr. at 298:20-299:2, 307:18-23**

# Sonos Had To Amend Its Specification in *2019* To Purportedly Support Its Newly-Filed Claims Directed to Overlapping Speaker Groups



- Please amend current paragraph [0060] of the specification as indicated below, which will become paragraph [0062] to reflect the new paragraphs [0028] and [0029] above.

[0062]   FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. The list of zones in the user interface 520 includes ALL the zones in the system, including the zones that are already grouped. A checkbox is provide next to each of the zones so that a user may check in the zones to be associated with the scene.

**TX0004 at 808**

16

# The Language Added To Sonos's Specification in 2019 Came From The Provisional Application's Description of Zone Linking _Not_ Zone Scenes



**3       Scene Setup**

**3.1     Handheld Controller**

It is not expected that the Zone Scenes should be set up using the Handheld Controller

**Zone Linking**



**The list of zones in the screen above includes ALL the zones in the system, including the Zones that are already grouped.**

– The list of zones in the screen above includes ALL the zones in the system, including the Zones that are already grouped.

**TX2651 (Provisional) at 37, 45; Dkt. 712 at 1-4**

17

# Sonos Buried The Patent Examiner With 70,000+ Pages Of Documents During Prosecution Of The Asserted Patents—*But Not Before*



**'885 and '966 Patents**

PTO "Track One"

1,813 Documents
72,550 Pages

**'853 Patent (TX3888)**

7 Documents

**'228 Patent (TX3892)**

~80 Documents

**'206 Patent (TX2712)**

~180 Documents

18

## Prejudice is Shown Through Evidence of Intervening Rights

"[T]o establish prejudice an accused infringer must show evidence of intervening rights, *i.e.*, that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay."

*Cancer Rsch. Tech. Ltd. v. Barr Lab'ys, Inc.*, 625 F.3d 724, 729 (Fed. Cir. 2010)

## Google Worked on, Invested in, and Used the Accused Technology During Sonos's Delay





**Chris Chan**
**Google Product Manager**

**Q.  Approximately how many people at Google touch a product from concept to launch in your experience?**

A.   Many people touch a product at Google, both in development as well as once it's in market.  As an example, for the most recent product that I worked on, over a hundred people worked on both hardware and software.

**Q.   And in your experience at Google, how long does it take to bring a product like the ones we've been discussing to market?**

A.   It can take many years.  The last product I worked on took at least three years, but sometimes longer.

**Trial Tr. at 1518:16-25**

## Google Worked on, Invested in, and Used the Accused Technology During Sonos's Delay





**Chris Chan**
**Google Product Manager**

**Q.   At a very high level, what goes into developing products like this at Google?**

A.   There's a lot of work that goes into developing hardware products at Google.  It's a really extensive collaboration across hardware and software teams and many functions from engineering to design to research, as well as broader functions like business, sales, and marketing.

There are also multiple phases to the development of a hardware product from concept, where you're validating a business idea and figuring out potential product directions; to development, where you're ultimately defining the hardware as well as the specs, manufacturing, where once you figured out the specs and the definition, how to manufacturer the product reliably and at scale; and, then, finally in market or sustaining, where once a product hits shelves, how you're continuing to meet demand and to ensure that there are new features available for users.

**Trial Tr. at 1517:24-1518:15**

# Sonos Incorrectly Argues That Google Has No Intervening Rights Due to Publication of The Provisional Application in 2016



And as Sonos has explained, Sonos disclosed overlapping zone scenes to the PTO in 2006 and again in 2007. Dkt. 723 at 4-9. And while *disclosure* to the PTO, not *publication*, matters for the priority date, the 2006 disclosure was also made public in 2013, *id.* at 5, 9, two years before Google says it started investing in its infringing products. So whatever rights Google acquired in its infringing products were not "intervening," and Google suffered no prejudice.

**Dkt. 828 (Sonos Opposition) at 15**

**INCORRECT – THE ALLEGED CONCEPT OF OVERLAPPING ZONE SCENES WAS NOT PUBLICLY DISCLOSED UNTIL SONOS'S 2019 AMENDMENT TO THE ASSERTED PATENT SPECIFICATIONS**

# Sonos Incorrectly Argues That Prosecution Laches Only Applies To "Submarine Patents"



18 The lack of support for post-GATT prosecution laches is no accident. Prosecution laches
19 developed to thwart the "practice" of "deliberately and without excuse postpon[ing] beyond the
20 date of the actual invention, the beginning of *the term of* [the patentee's] monopoly." *Hyatt*, 998
21 F.3d at 1360 (quoting *Woodbridge v. United States*, 263 U.S. 50, 56 (1923)) (emphasis added).
22 But that practice is now a relic of the pre-1995 patent system. The '885 and '966 patents are not,
23 and could not be, submarine patents; they claim priority to a 2006 provisional and 2007
24 nonprovisional application, so their terms will expire in 2027. In other words, Sonos did not (and
25 could not) "postpone" its patent monopoly by delaying filing of its patent applications.

**Dkt. 828 (Sonos Opposition) at 9**

23

# Prosecution Laches Remains a Viable Defense After 1995

"Jazz's challenge to this element is its assertion that since the 1994 amendments to the patent law changed the life of a patent from beginning to run from the date of filing to the date of issuance, delay by the patentee in filing patent applications cannot extend the life of a patent.  While this argument may be true in and of itself, the Court is agreement with Roxane that this point does nothing to render the prosecution laches defense futile in this case because, as Roxane has articulated in its moving brief and reply, it is not arguing that Jazz's delay in filing its patent applications has effectively extended the life of its patents.  Roxane's argument is that Jazz's unexplained delays have had the effect of prolonging this litigation which has the practical effect of preventing Roxane from launching its product.  Jazz's opposition is devoid of any argument and/or legal authority that the prosecution laches defense may not be applied under the facts and circumstances that Roxane has alleged."

*Jazz Pharms., Inc. v. Roxane Lab'ys, Inc.*, No. 2:10-CV-06108-ES-JAD, 2013 WL 6858765, at *5 (D.N.J. Dec. 30, 2013) (cleaned up)

# Sonos Claims that a "Clear and Convincing Evidence" Standard Applies



1. **The proper burden of proof is clear and convincing evidence.**

Prosecution laches requires an infringer to prove two elements: (1) "that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of the circumstances," and (2) "that the accused infringer suffered prejudice attributable to the delay." *Hyatt*, 998 F.3d at 1362. The Court should apply a clear-and-convincing-evidence burden to prosecution laches. Although the Federal Circuit has not expressly clarified an infringer's burden of proof for prosecution laches, other unenforceability defenses require proof by clear and convincing evidence. *See Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 732 (Fed. Cir. 2010) (applying the clear-and-convincing standard for the defense of inequitable conduct); *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc) (same). And the clear-and-convincing standard "is consistent with the presumption of validity," *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 552 F. Supp. 3d 664, 684 (E.D. Tex. 2021) (applying clear-and-convincing standard to prosecution laches), because 35 U.S.C. "§ 282 requires an invalidity defense to be proved by clear and convincing evidence," *Microsoft Corp. v. i4i Ltd. P'shp*, 564 U.S. 91, 95 (2011).

**Dkt. 828 at 7**

## Prosecution Laches Must be Proven by a Preponderance of the Evidence

**The cases Sonos cites for the proposition that prosecution laches must be proven by "clear and convincing evidence" are distinguishable**

- *Cancer Research* and *Therasense* addressed the burden of proof for inequitable conduct

- *Microsoft* considered the burden of proof for invalidity defenses

- *Personalized Media* is not binding on this Court and did not analyze or even acknowledge other district court cases holding that the preponderance standard applies

26

## The Federal Circuit Has Applied a "Preponderance of the Evidence" Standard to Other Forms of Laches

"'[P]reponderance of the evidence' is the appropriate evidentiary standard to establish the facts relating to the laches issue."

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1045 (Fed. Cir. 1992)

## Other District Courts Have Applied a "Preponderance of the Evidence" Standard

"Defendant argues that, consistent with the burden of proof in equitable laches and estoppel cases, the preponderance of the evidence standard should apply.  This court agrees."

*Intuitive Surgical, Inc. v. Computer Motion, Inc.*, No. CIV.A. 01-203-SLR, 2002 WL 31833867, at *5 n.4 (D. Del. Dec. 10, 2002)

28

# Equitable Estoppel



## Elements of Equitable Estoppel

1. **<u>Misleading Conduct:</u>** Whether the patent owner's misleading conduct leads the alleged infringer to reasonably infer that the patent owner does not intend to enforce the patent against the alleged infringer

2. **<u>Reliance:</u>** Whether the alleged infringer relies on that conduct

3. **<u>Prejudice:</u>** Whether the alleged infringer will be materially prejudiced if the infringement claim moves forward

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995)

## Equitable Estoppel is a Flexible Doctrine Committed to the Court's Discretion

- "Equitable estoppel is a flexible doctrine that is committed to the sound discretion of the trial judge.  It is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2018 WL 4859314, at *8 (N.D. Cal. Oct. 5, 2018) (Orrick, J.) (internal marks and citations omitted)

- "[E]quitable relief is not a matter of precise formula." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1311 (Fed. Cir. 2010)

- "Being an equitable doctrine, estoppel is committed to the sound discretion of the trial judge." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995)

## Silence Can Establish Misleading Conduct

"***Misleading action by the patentee may be silence, if such silence is accompanied by some other factor indicating that the silence was sufficiently misleading to amount to bad faith***. The trial court found that CM's misleading action was combined with other factors including: (1) CM's objection to the activities as infringing followed by inaction; (2) the relationship between CM and GMF's parent, General Motors, CM's largest single robotics customer; (3) GMF's knowledge that CM was not active in the area of the '536 patent and was therefore not losing sales or profits as a result of the alleged infringement; and (4) other negotiations which took place between CM and GMF which led to licensing agreements under other CM patents. . . . We agree with the trial court that CM's long period of inaction after GMF had denied infringement combined with the 'other factors' found by the trial court led GMF to reasonably conclude that CM did not intend to enforce the '536 patent against it.  The trial court's finding of misleading action was not an abuse of discretion."

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995) (emphasis added)

## Equitable Estoppel Does Not Require Knowledge of the Asserted Patents

"Not only have many courts rejected the need for awareness of the patent in equitable estoppel defenses to infringement, but such a bright line rule is inappropriate in an area of law where the Federal Circuit expressly disfavors such rules. ***Courts have applied equitable estoppel when the alleged infringer lacked awareness of the patent so long as the entire course of conduct between the parties supported an inference that the patentee consented to the manufacturer and sale of the allegedly infringing product.***"

*Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2018 WL 4859314, at *9 (N.D. Cal. Oct. 5, 2018) (emphasis added)