```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
 2
                      Case No. 3:20-CV-06754-WHA
 3
   SONOS, INC.,                      )
 4                                   )
        PLAINTIFF,                   )
 5                                   )
        -v-                          )
 6                                   )
   GOOGLE, LLC,                      )
 7                                   )
        DEFENDANT.                   )   San Francisco, California
 8                                   )   August 10, 2023
   _____)
 9

10               TRANSCRIPT OF MOTIONS PROCEEDINGS

11             BEFORE THE HONORABLE WILLIAM ALSUP

12                  UNITED STATES DISTRICT JUDGE

13

14   Appearances:              (On Page 2.)

15   Reporter                  Stephen W. Franklin, RMR, CRR, CPE
     (561)313-8439             Official Court Reporter
16                             500 West Capitol Avenue
                               Little Rock, AR 72201
17                             E-mail:  SFranklinUSDC@aol.com

18       Proceedings recorded by Digital Audio Recording, and
     transcript prepared utilizing computer-aided transcription.
19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF          Sean M. Sullivan, ESQ.
                                 Lee, Sullivan, Shea & Smith, LLP
 3                               656 West Randolph Street, Suite 5W
                                 Chicago, IL 60661
 4    -and-
                                 Rory P. Shea, ESQ.
 5                               Lee, Sullivan, Shea & Smith, LLP
                                 656 West Randolph Street, Suite 5W
 6                               Chicago, IL 60661
      -and-
 7                               Clement S. Roberts, ESQ.
                                 Orrick, Herrington & Sutcliffe LLP
 8                               405 Howard Street
                                 San Francisco, CA 94105
 9    -and-
                                 Cole B. Richter, ESQ.
10                               Lee, Sullivan, Shea & Smith, LLP
                                 656 West Randolph Street, Floor 5W
11                               Chicago, IL 60661
      -and-
12                               John D. Smith, III, ESQ.
                                 Lee, Sullivan, Shea & Smith, LLP
13                               656 West Randolph Street, Suite 5W
                                 Chicago, IL 60661
14    -and-
                                 Elizabeth R. Moulton, ESQ.
15                               Orrick, Herrington & Sutcliffe LLP
                                 405 Howard Street
16                               San Francisco, CA 94105
      -and-
17                               Alyssa M. Caridis, ESQ.
                                 Orrick, Herrington & Sutcliffe LLP
18                               355 South Grand Avenue, Suite 2700
                                 Los Angeles, CA 90071
19
                                   *  *  *  *  *
20

21

22

23

24

25
```

```
 1   APPEARANCES (CONT.'D):

 2   FOR THE DEFENDANT            Sean S. Pak, ESQ.
                                  Quinn, Emanuel,
 3                                Urquhart & Sullivan, LLP
                                  50 California, Floor 22
 4                                San Francisco, CA 94111
     -and-
 5                                Lindsay Cooper, ESQ.
                                  Quinn, Emanuel,
 6                                Urquhart & Sullivan, LLP
                                  50 California, Floor 22
 7                                San Francisco, CA 94111
     -and-
 8                                Jocelyn Ma, ESQ.
                                  Quinn, Emanuel,
 9                                Urquhart & Sullivan, LLP
                                  50 California, Floor 22
10                                San Francisco, CA 94111
     -and-
11                                Lana Robins, ESQ.
                                  Quinn, Emanuel,
12                                Urquhart & Sullivan, LLP
                                  50 California, Floor 22
13                                San Francisco, CA 94111
     -and-
14                                Iman Lordgooei, ESQ.
                                  Quinn, Emanuel,
15                                Urquhart & Sullivan, LLP
                                  50 California, Floor 22
16                                San Francisco, CA 94111

17   ALSO PRESENT:               Patrick Weston, Google

18                                 *  *  *  *  *

19

20

21

22

23

24

25
```

```
 1          (Call to the order of the Court at 8:34 a.m.)

 2              Next case.  Another Quinn Emanuel case.

 3              Let's go to the next case, the patent case.

 4              Good morning.

 5              THE COURTROOM DEPUTY:  Calling Civil Action 20-6754,

 6   Sonos versus Google.

 7              Counsel, please approach the podium and state your

 8   appearances for the record beginning with counsel for

 9   plaintiff.

10              MR. SULLIVAN:  Good morning, Your Honor.  Nice to

11   see you again.  Sean Sullivan on behalf of Sonos.

12              THE COURT:  Welcome back.

13              MR. SULLIVAN:  Would you like me to introduce the

14   whole team, or ...

15              THE COURT:  I think you should at least say who's

16   here for appearances purposes.  And this is being recorded.

17   It's not -- we don't have a reporter, but it --

18              THE COURTROOM DEPUTY:  We do, Your Honor.

19              THE COURT:  Oh, we do?

20              THE COURTROOM DEPUTY:  We've got a remote reporter.

21              THE COURT:  Oh, I didn't know that.  Who is that?

22   Oh, great.  Okay.  Then we do have a reporter.

23              MR. SULLIVAN:  Yes.  So Your Honor, I have Rory

24   Shea, Clem Roberts, Cole Richter, Dan Smith, Libby Moulton and

25   Alyssa Caridis.
```

```
 1              THE COURT:  Welcome to all of you.

 2              All right.  Mr. Pak, your turn.

 3              MR. PAK:  Good morning, Your Honor.  Sean Pak on

 4    behalf of Google, and with me here today is Lindsay Cooper,

 5    Jocelyn Ma, Lana Robins, Iman Lordgooei, and we have our

 6    client representative Patrick Weston, as well.

 7              THE COURT:  Thank you.  Welcome.

 8              All right.  We've got a lot of motions here and a

 9    lot of -- there's no way we can go through everything, so I

10    will go through some of it, and I want to start with the

11    affirmative defense of prosecution laches.

12              All right.  So Mr. Pak, you get to go first and

13    explain that.

14              MR. PAK:  Thank you, Your Honor.

15              My partner, Imam Lordgooei, will handle the

16    argument.

17              THE COURT:  Let's start -- all right.  Give me your

18    name again.

19              MR. LORDGOOEI:  This is Imam Lordgooei on behalf of

20    Google.

21              THE COURT:  Thank you.

22              Now, let's go back to basics.  How did this doctrine

23    arise?  What was the first Supreme Court decision?

24              MR. LORDGOOEI:  So I believe -- I mean, you know,

25    it's a hundred- year-old doctrine.  It arose --
```

```
 1              THE COURT:  What was the first one?

 2              MR. LORDGOOEI:  I believe it was in the context of

 3    just parties, patentees that were extending the life of their

 4    patents by delaying prosecution.

 5              THE COURT:  What was the name of the case?  You

 6    don't know.

 7              Do you know the name of the case?

 8              MS. MOULTON:  I believe the first case was Webster

 9    Electric.

10              THE COURT:  All right.  This is very important to

11    me.  You lawyers should come prepared and know this cold and

12    know the doctrine, and to me this is the most important issue

13    tendered on this entire group of motions is prosecution

14    laches, and so you should have known that.

15              All right.  Go ahead.  Give me your fact -- give

16    me -- explain to me why you think it should apply here.

17              MR. LORDGOOEI:  So as Your Honor noted, it's a

18    doctrine that goes all the way back to Webster.  This is a

19    1924 case.  Basically the point of the doctrine is to prevent

20    inexcusable delays in the prosecution of patents, which, in

21    the interim, during the delay, period of delay, there's

22    prejudice to the public or other parties as a result of the

23    delay.

24              Now, the typical, the protocol typical fact pattern,

25    as Sonos has noted, that applied in the context of prosecution
```

1    laches for years was the issue of submarine patents.  And so

2    submarine patents were a situation where parties would file

3    their patents, abandon, file a continuation, abandon, file a

4    continuation, and through this process they were able to

5    extend the issuance of their patents for years, decades

6    sometimes, at a point where industry had already released

7    products.  And at that point they're able to basically surface

8    their submarine patents, it's issued, it has 17 years from

9    issuance.

10           So that was the pre-GATT amendments to the patent

11   statutes.

12           Post-GATT, this is 1994, patents have a 20-year term

13   from the priority date, and so submarine patents are no

14   longer, effectively no longer an issue under the traditional

15   notion of submarine patents, where parties were extending and

16   delaying issuance of the patents for the purpose of extending

17   the expiration date.

18           Now, Sonos has argued that post-GATT this is no

19   longer a defense, and we just believe that that's incorrect.

20   The underlying defense is an equitable defense.  It's up to

21   the discretion of the Court.  And the purpose of it is to

22   prevent abuse of PTO procedures.  Even if you engage in

23   prosecution under the PTO rules, you've done it in a way

24   that's inequitable.

25           And so what are the factors that the Court looks at?

```
 1    It's the totality of the circumstances around delay and
 2    whether it's unreasonable and inexcusable in terms of delay.
 3    And there are post-GATT patents that have been found by other
 4    district courts, district courts in New Jersey -- this is the
 5    Jazz Pharma case -- district courts in Delaware -- this is the
 6    Natera case, that have found that this is still a viable
 7    defense even for post-GATT patents.
 8              And so in those cases, for example, the Court looked
 9    at, in Jazz Pharma it was a delay in the litigation that
10    resulted from delays in the prosecution of the patentee's
11    patents.
12              In Natera --
13              THE COURT:  Wait.  I'm following this.
14              Well, how did the litigation result in a delay in
15    prosecution?
16              MR. LORDGOOEI:  So I believe in that case it's a
17    pharma case, and so procedurally I'm not a hundred percent
18    sure how it came about, but I believe the party had sued for
19    release of its generic drug.  And so by extending and delaying
20    the prosecution of the patents, you're not necessarily
21    extending the expiration date, but you are delaying the period
22    of time that the parties are in litigation on that patent.
23    And the same issue came about in Natera, where the delay was
24    explained by the Court, and I can pull this up.
25              So the Court explained in Natera that:  "Natera has
```

1    improperly sought to delay competition in the IVD market by

2    pursuing patent claims it did not invent."

3            And so I think in this case the fact pattern, as

4    Your Honor has heard through numerous briefs that we filed on

5    this written description issue throughout the trial, the fact

6    pattern is actually worse than a submarine patent, because in

7    this case Sonos filed its patent originally in the provisional

8    patent that they say discloses overlapping zone scenes in

9    2006.  It was not until August of 2019 when they amended their

10   specification to clearly, according to them, clearly disclose

11   the concept of overlapping zone scenes.

12           And as Your Honor has noted throughout the trial,

13   the single inventive aspect of overlapping zone scenes is

14   found in the written description of the specification in

15   Column 10 of the patent in the one sentence that they added in

16   August of 2019.  This is the "all the zones" language that

17   they added to the specification.  And so however thin that

18   disclosure is, it was added in August of 2019, 13 years after

19   they had filed the original provisional application.

20           And so in reading Sonos' opposition, I don't think

21   that they've ever attempted to even explain that delay.  All

22   they say is, we didn't delay disclosure of this invention;

23   everything you needed was in the prior 2006 provisional; it

24   was in our original patent that was issued in 2013, the '853

25   patent; and so Google, you are on notice, the public was on

```
 1   notice of this overlapping zone scenes invention.  Which, we
 2   believe, based on all the prior briefing and all the prior
 3   arguments on written description, we believe that is
 4   categorically false.
 5               For example, in Docket 729, that was one of the
 6   motions that we filed, we cited the Crown Operations case from
 7   the Federal Circuit, this is 289 F.3d 1367, for the notion
 8   that:  "Novel aspects of the invention cannot be left to
 9   inference, they have to be expressly and explicitly disclosed
10   in the specification."
11               We also cited the PowerOasis case, 322 F.3d 1299,
12   for the proposition that the invention must be, again,
13   expressly disclosed in the specification.  You can't say that
14   a person of ordinary skill viewing the specification would
15   have understood that the invention was disclosed because it's
16   obvious.  It's not an obviousness test.
17               And so if you look at what they've pointed to, what
18   they've consistently pointed to for written description
19   support for this invention and what Your Honor relied on in
20   issuing the written description order, that sentence that they
21   added was not in the original specification, it was added for
22   the first time in August 2019.
23               THE COURT:  Well, what do you -- yes, but they say
24   it was incorporated by reference and that the rules allowed
25   incorporation by reference.  And what do you say to that
```

1    point?

2           MR. LORDGOOEI:  So this goes to the abuse of PTO

3    procedures.

4           Under PTO procedures -- and we would -- and we've

5    argued to Your Honor that they've incorporated by reference

6    what they've incorporated by reference, the provisional

7    patent, doesn't expressly disclose that one sentence that they

8    added in the context of zone scenes.  And so if you recall,

9    Your Honor, in the prior briefing and arguments, what we

10   showed Your Honor was that the Figure 5B that they

11   identified -- and maybe we can put up a slide to remind His

12   Honor of this.

13          Mr. Wilson, can we have the affirmative defense

14   slide ... Slide 17.

15          THE COURT:  Seventeen?  What do I have to do to see

16   it?

17          MR. LORDGOOEI:  Your Honor, I'm happy to hand up

18   copies of the presentation, as well.

19          THE COURT:  All right.  Well, go ahead and hand them

20   up, but I'd prefer to see it on the screen.  Well, I can't

21   read it.

22          All right.  Which slide do you want me to look at?

23          MR. LORDGOOEI:  It's 17, Your Honor.  And I'm happy

24   to proceed when you're there.

25          THE COURT:  All right.  What is your point about

```
 1    this one?
 2            MR. LORDGOOEI:  This is what they claim was
 3    incorporated by reference and should have put the public,
 4    including Google, on notice of their alleged invention.
 5            Figure 5B from the patent is the bottom half of this
 6    figure from the provisional patents.  This is the zone menu.
 7            Now, what they didn't disclose is that, and as we
 8    point out to Your Honor in prior briefing, is that the top
 9    half of this figure expressly shows that the menu being
10    displayed is the zone-linking menu.  So this is a zone group,
11    not a zone scene.  And the language that they added to the
12    specification is at the bottom.  It says:  "The list of zones
13    in the screen above includes all the zones in the system,
14    including the zones that are already grouped."
15            THE COURT:  You're doing a good job, but I'm just
16    not remembering this.
17            The two little small pictures over on the left, are
18    those in the patent as issued in 2022, or is it -- are these
19    from the original attachments to the 2006?
20            MR. LORDGOOEI:  These are from the provisional
21    patents.
22            THE COURT:  In the actual -- in the patent itself,
23    or were they attachments, the attachments?
24            MR. LORDGOOEI:  This is from the provisional patent
25    that Sonos alleges was incorporated by reference into the
```

1    patents as issued.  The actual figure that you see here was

2    chopped in half, and only the bottom half was presented as a

3    figure in the patent itself as Figure 5B.

4              THE COURT:  All right.  So the figure that was in

5    the material that was incorporated by reference has this,

6    these two pictures in it with the arrow; is that right?

7              Let me hold it up so you can see.

8              MR. LORDGOOEI:  Yes.

9              THE COURT:  You see I'm -- this part right here, was

10   that in all of that in the thing that was attached?

11             MR. LORDGOOEI:  Everything you see on this slide,

12   Your Honor, minus the annotations, was part of the provisional

13   patent filed in 2006, which was incorporated by reference into

14   the asserted patents.

15             THE COURT:  I'm sorry.  See, you're saying it in a

16   slick way that I -- there was something that was incorporated

17   by reference to the 2006.  Was this material --

18             MR. LORDGOOEI:  This is part of the 2006.

19             THE COURT:  -- in that, or was it in the figures

20   that were part of the 2006 that was later incorporated and

21   used for the 2018?

22             MR. LORDGOOEI:  Let me take a step back.

23             In 2006, Your Honor, Sonos filed its provisional

24   patent application.  And if you recall, the provisional

25   included two documents, an Appendix A and an Appendix B that

1    were attached to that provisional patent application.

2            THE COURT:  All right.

3            MR. LORDGOOEI:  So all of that was part of the

4    provisional.

5            This is from that Appendix A that was filed.

6            THE COURT:  All right.  That's what I wanted to

7    understand.  Okay.  So, now, I understand that.

8            Make -- now, tell me what your point is about this.

9            MR. LORDGOOEI:  So the point is that this is not a

10   disclosure of overlapping zone scenes, even if it's

11   incorporated by reference properly into the asserted patents.

12   This didn't disclose overlapping zone scenes, because this is

13   a menu on the Sonos handheld device that shows how you can add

14   and subtract zone players from different zone groups, from a

15   zone group of which they are a member.  So it shows that you

16   can go in the zone-linking menu, which is next to the scenes

17   menu.  The scenes menu is in the middle, so this is not even

18   talking about scenes, zone scenes.  And so a user can click on

19   zone linking, and for a currently configured group they can

20   use the checkmarks to add and remove speakers or zone players

21   from that group.

22           Now, importantly, Your Honor, this same document

23   earlier explains, and we've pointed this out in our prior

24   briefing, that it is not expected that the zone scenes should

25   be set up using the handheld controller.

 1              And so what are we looking at?  What has Sonos been

 2    pointing to throughout this issue and throughout trial as

 3    supposedly disclosing the configuration of overlapping zone

 4    scenes?  It's the handheld controller.  It's the user

 5    interface on the handheld controller which this very document

 6    says is not expected to be used to set up zone scenes.

 7              THE COURT:  All right.  Which -- you said something

 8    earlier about only the top half was, and I didn't follow your

 9    point.  Only the top half of what?

10              MR. LORDGOOEI:  And so this figure is part of the

11    provisional which Sonos says was incorporated by reference.

12    If you look at the patents themselves as they were filed, the

13    patent applications as filed and as issued, there is a Figure

14    5B that was --

15              THE COURT:  That's '885.

16              MR. LORDGOOEI:  In both the '885 and the '966 --

17              THE COURT:  All right.

18              MR. LORDGOOEI:  -- there's a Figure 5B, which is

19    basically a replication of only the bottom half of this

20    figure.

21              THE COURT:  All right.  So your point is -- well,

22    and in the '885 specification, how is Figure 5B presented?

23              MR. LORDGOOEI:  And so in the specification, Figure

24    5B is presented as simply a menu for potentially setting up a

25    zone scene.  Now, the issue is that it only talks about

```
1   setting up a zone scene, it doesn't talk about setting up
2   multiple zone scenes, multiple overlapping zone scenes, as
3   part of the disclosure and the specification.  And so
4   therefore that is why, in August 2019, when Sonos was
5   attempting to claim overlapping zone scenes, they had to go
6   back, amend their specification to ad this additional sentence
7   that:  "The list of zones in the screen above includes all the
8   zones in the system, including the zones that were already
9   grouped."
10          And so their argument has been that that shows,
11  since you've already grouped certain zones as part of this
12  menu, then that means you could have already had a prior zone
13  scene, and now you're creating a new zone scene, and therefore
14  that discloses overlapping zone scenes.  And the fundamental
15  issue with that, Your Honor, as we've pointed out time and
16  again, is that in the provisional where this came up, where
17  this sentence came up, it's in the context of zone groups, not
18  zone scenes.  And, in fact, the provisional says you should
19  not use, it is not expected that you would use this user
20  interface to set up a zone scene.
21          And by omitting that and by pulling the sentence
22  from the portion of the specification that has nothing to do
23  with zone scenes, our position is that they abused the PTO
24  procedures for amending their specification to improperly add
25  new matter, and they duped the examiner.
```

1          Yeah, this sentence appears in the context of this

2    figure, and this figure, part of it is part of the patent

3    specification --

4          THE COURT:  All right.  How did they get this past

5    the examiner, then?

6          MR. LORDGOOEI:  Well, that's another problem with

7    the prosecution of these two patents.

8          Can we pull up the next slide, Mr. Wilson, Slide 18?

9          So these patents are part of the continuation chain

10   as Your Honor recalls, and Sonos has pointed to some of the

11   prior patents in their continuation chain to say that they did

12   nothing wrong, this is just part of regular prosecution, and

13   they disclosed their invention in prior patent applications,

14   but the problem with that is, Your Honor, for example, the

15   '853 patent -- this is TX-3888, when they disclose that to the

16   patent office, when they filed that with the patent office,

17   that contained none of the language in the specification that

18   they subsequently amended to add in 2019; it was filed under

19   regular PTO procedures, so the timeline for prosecution was

20   the typical timeline; and they actually didn't provide the PTO

21   examiner with any documents to review in terms of prior art.

22   The examiner went out and he found seven documents on his own,

23   and you can see all of that on the front page of TX-3888.

24         THE COURT:  What was the year of the '853?

25         MR. LORDGOOEI:  The '853 I believe was filed in

 1    2007, and that's the one that issued in 2013.

 2              THE COURT:  And what about the other ones on this

 3    page?

 4              MR. LORDGOOEI:  So the other ones -- and I think

 5    Sonos' attorney may tell you that -- just to take a step back,

 6    the point I'm making in terms of the prosecution timing, Your

 7    Honor, the asserted patents were filed under the PTO Track 1

 8    procedure, which requires an expedited, accelerated

 9    examination by the examiner.  These other patents not filed

10    under Track 1.

11              Now, Track 1 only became available, I believe, after

12    the '853 patent was filed.  But even for the '228 patent and

13    the '206 patent, which were filed post-2011, those two could

14    have been filed under Track 1, expedited.  They were not.

15    They were filed as regular patents, regular prosecution.  For

16    the '228 patent, the examiner looked over 80 documents, 80

17    prior art documents, that were provided to him.  For the '206

18    patents, that balloons to 180 documents.

19              And then we get to the asserted patents that were

20    filed in 2019.  All of a sudden they file expedited, and they

21    dump over 1800 documents on the examiner to review, over

22    70,000 pages of documents for the examiner to review as part

23    of this prosecution.  And at the same time they're amending

24    their specification to put in this additional language, and

25    they're claiming to the examiner, they're representing to the

```
1    examiner that it is -- it is not new matter, even though as
2    we've shown Your Honor through the prior briefing and the
3    prior arguments, it expressly was new matter.  And so this --
4            THE COURT:  Well, what did the -- explain how it
5    came up with the exam -- when the amendment was made, did the
6    examiner push back and say, oh, no, or give me the exact give
7    and take in the prosecution history on when the amendment was
8    made and what the -- what was said to the examiner and what
9    the examiner said in reply.
10           MR. LORDGOOEI:  So Mr. Pak can walk you through the
11   prosecution history, but in general, Your Honor, the back and
12   forth constituted the examiner raising, if you recall, the
13   Yamaha DME reference, in which the examiner took official
14   notice that creating and saving groups would have been obvious
15   in view of the Yamaha DME.  And so as part of that procedure,
16   Sonos engaged in amending the claims to add the stand-alone
17   limitation and at a certain point I believe also added the
18   written description support for the overlapping zone scenes.
19   And I can't recall right now if it was before or after the
20   Yamaha DME discussion.
21           MR. PAK:  Yes, Your Honor, that's correct.
22           So I'll just be very brief, because I do want to
23   turn it back to the core argument.
24           If Your Honor recalls, we discussed during trial
25   there was a piece of prior art called Yamaha DME that
```

1   disclosed creation and setting up of a number of zone scenes.

2   I think it was close to a thousand different zone scenes.

3   That was presented as prior art invalidating then-pending

4   claims, which did not have the language about "while operating

5   in the standalone mode."  And then the patentee amended claim

6   language to add the "while operating in standalone mode, as

7   well as amending the specification to add the new matter that

8   Mr. Lordgooei talked about.

9          One thing that's critical is there was no

10  substantive discussion during prosecution of the '885 or the

11  '966 patent on whether that new amended language in the

12  specification, the sentence that was taken out of context

13  with -- and attached to a figure that has the top-left, top

14  portion taken out, whether that was a new matter or not.  So

15  that was not something that was substantively discussed during

16  prosecution of the '885 and '966.  Instead, the focus of that

17  prosecution was:  Did the amended claim language overcome the

18  Yamaha DME reference, and the examiner found it did, and that

19  pertains to some of the other issues that we'll talk about in

20  the other motions, as well.

21         They have pointed in the past, we've spent some time

22  during trial, to another patent.  I believe it's one of the

23  ones that Mr. Lordgooei showed you, where there was discussion

24  of new matter, whether something was being added that has

25  support or not.  And in the past, Sonos has argued that there

1    should be some deference given to that ruling or that decision

2    by the patent examiner on the new matter issue.  However, as

3    we pointed out in oral argument and also in briefing on that

4    issue, that patent, the predecessor patent, did not have claim

5    language directed to overlapping zone scenes, it was talking

6    about just setting up a plurality of zone scenes.

7            And so that examiner was not looking at the question

8    of whether this one sentence plucked out of the provisional

9    which was talking about zone groups, and added to a figure

10   that was chopped off in half and then presented for the first

11   time as a zone scene figure, whether that constituted new

12   matter.  So that's number one, that the prosecution history

13   does not provide any clear evidence of the examiner looking at

14   the very issue that Mr. Lordgooei has been discussing with

15   you.

16           But in any event, regardless of what the patent

17   office does, as Your Honor well knows, we're only talking

18   about written description for issued patents in patent

19   litigation matters.  Every examiner has a duty to look through

20   the claim language and make his own decision, but that is not

21   a substitute for judicial review of whether, in fact,

22   collecting all the evidence in the case, there is written

23   description or not.

24           And so for those reasons, we believe that, as we

25   talk about before, we think that Your Honor could vacate your

1    prior Honor's ruling.

2            THE COURT:  You're sliding off into a different

3    subject.

4            MR. PAK:  Sorry.  Let me turn it back --

5            THE COURT:  I'm interested in laches, prosecution

6    laches.

7            MR. LORDGOOEI:  So to --

8            THE COURT:  I don't think anybody answered my

9    question.  I'll give you one more chance.  On any of these

10   patent -- did this language get slipped into any other

11   specification other than '885 and '966?  For example --

12           MR. LORDGOOEI:  It was not in the specification of

13   any of the patents that are on the screen.  I believe as

14   Mr. Pak noted, it was added to a different sibling patent to

15   the '885 and '966, but it -- that amendment also arose at the

16   same time with the amended --

17           THE COURT:  Well, did the examiner say anything

18   about that amendment?

19           MR. LORDGOOEI:  I don't believe so.

20           So the issue of whether the amendment constituted

21   new matter was we believe overlooked by the examiner, and we

22   would posit, Your Honor, that it was due to --

23           THE COURT:  Was there any affirmative

24   misrepresentation by Sonos in any of those amendments?

25           MR. LORDGOOEI:  Our position is is that there was,

```
 1   because they told the examiner this does not constitute new

 2   matter.  They expressly told the examiner that as part of

 3   their amendment.

 4         THE COURT:  Well, read to me what they said.

 5         MR. LORDGOOEI:  So if we could pull up TX-4,

 6   Mr. Wilson.  And I may need to find it, Your Honor.  I have,

 7   at page 808, Mr. Wilson --

 8         THE COURT:  Is the pros -- is the record, the entire

 9   record, for the '885 and '966 --

10         MR. LORDGOOEI:  That's the prosecution --

11         THE COURT:  Is that in our trial record?

12         MR. LORDGOOEI:  It is, Your Honor.

13         THE COURT:  What exhibit number is it?

14         MR. LORDGOOEI:  TX-4 I believe is for the '885

15   patent and TX-6 is the file history for the '966 patent.  And

16   on this issue, I believe they are substantially similar, if

17   not identical.

18         MS. MOULTON:  Your Honor, just quickly, these are

19   excerpts of the file history that the parties agreed on,

20   they're not the complete file history.

21         THE COURT:  Well ...

22         MR. LORDGOOEI:  I believe, Your Honor, and Sonos'

23   counsel can correct me if I'm wrong, but in terms of it not

24   being the complete file history, for example, we didn't

25   include the full 70,000 pages of prior art references that are
```

```
 1    part of the file history, but all of the back and forth with
 2    the examiner is included as part of the file history.
 3              THE COURT:  Well, is the 70,000, is that in the
 4    trial record, or is that just you talking?
 5              MR. LORDGOOEI:  Um, one of the -- yes.
 6              MR. PAK:  Dr. Schonfeld testified to that effect.
 7    The entire record itself is not in --
 8              THE COURT:  But did he say that there were 72,000?
 9    Think so?
10              MR. PAK:  I will check the (inaudible).
11              THE COURT:  All right.  Okay.  What -- finish up
12    your argument on latches.
13              MR. LORDGOOEI:  So in effect, Your Honor, the point
14    is that this was the perfect storm that Sonos created for the
15    examiner about filing these patents as Track 1 expedited
16    patents.  All of a sudden, even though throughout the
17    prosecution of the parent applications, they at most disclosed
18    a hundred references to the examiner to review, all of a
19    sudden they dump 1800 references, and throughout all of this
20    process they amend their specification and represent to the
21    examiner that the amendment does not introduce new matter,
22    even though it clearly introduced new matter, because they
23    were taking a portion of the provisional specification that
24    relates to zone grouping and not zone scenes, and they were
25    representing to the examiner and representing to us throughout
```

1    this case up until trial, when we went through the written

2    description issues, and representing to Your Honor throughout

3    this case and up to trial that this is talking about zone

4    scenes, it doesn't add new matter, and this was all in our

5    prior filings, and nothing has changed, all the specifications

6    are the same, and that's simply not true.  This was added as

7    new matter in August 2019.  It's an abuse of the PTO

8    procedures that allow amendments of the claims.

9              And as we've pointed out in prior briefing, Your

10   Honor, the fact that they added new matter turns this

11   application effectively into a continuation in part, which the

12   Federal Circuit has held invalidates the patents.  And so it's

13   invalid for that reason alone, because they're adding new

14   matter to an application filed as a continuation, but was not

15   filed as a continuation in part.

16             But even setting that aside, it's clearly an attempt

17   to mislead the examiner into granting the patent 13 years

18   after they filed their original provisional application, years

19   after Google met with -- and my colleague, Ms. Robins, can

20   talk about this in the context of equitable estoppel -- but

21   years after they met with Google over similar technology after

22   Google disclosed it's product plans for --

23             THE COURT:  Is that document in the trial record

24   about the disclosing overlapping?  Is that in the trial

25   record?

 1          MR. LORDGOOEI:  Yes, Your Honor.

 2          THE COURT:  That was in 2013.

 3          MR. LORDGOOEI:  So this goes to, if you recall, the

 4   deposition testimony from Tomer Shekel --

 5          THE COURT:  Well, depositions don't count.  It has

 6   to be in the trial record.

 7          MR. LORDGOOEI:  It was played, Your Honor.

 8          THE COURT:  All right.

 9          MR. LORDGOOEI:  So the deposition testimony was

10   played for the jury.  The exhibit is in evidence as TX-125.

11          And maybe we could, Mr. Wilson, pull up Slide 7.

12          And so this is part of the presentation that Google

13   and Mr. Shekel presented to Sonos in the 2014 timeframe.  This

14   is in the trial record, TX125 at page 18, where we're showing

15   to them our product -- confidential product plans for

16   implementing this Cast for Audio technology in which we're

17   presenting overlapping speaker groups.  You can see there

18   speaker C is part of an overlapping speaker group.

19          On the next slide, Slide 8, TX-125 at page 24, we're

20   disclosing functional operation and functional details of what

21   this speaker grouping feature would look like, where, for

22   example, if a user is playing music on speaker A and then

23   another user decides to play music as a group, decides to

24   invoke the group, well, what happens?  Speaker A transitions

25   from playing individually to playing as a group.

```
 1                And so this all, you know, it's not a perfect fit
 2      over the asserted claims, so the asserted claims we still
 3      believe do not read on Google's technology, but they at least
 4      saw the functional details, that Google was willing to
 5      implement overlapping speaker groups, they were going to do it
 6      in a particular way.  They said nothing at any point about
 7      owning the IP or having patents on this technology.
 8                Lo and behold, five years later, after, as Your
 9      Honor recalls, the parties engaged in licensing discussions
10      that fell through, five years later they go back, they decide
11      to file '885, '966, expedited with claims directed to
12      overlapping speaker groups, and the only way they got there
13      was by amending their specification to introduce new matter.
14      And this is after Google has already released millions of
15      speaker products.  Which, by the way, Your Honor, the second
16      element of prosecution laches, the prejudice, including
17      through intervening rights of Google, we released millions of
18      speaker products which now, in other posttrial briefing, for
19      the first time Sonos is alleging, well, you implemented a new
20      firmware software that you pushed to those old speakers that
21      were all sold before the damages period started for these
22      patents.  Now, all of those speakers are infringing, and so we
23      want supplemental damage for those speakers, as well.
24                And so this is -- these are the types of intervening
25      rights and prejudice, including all the investments that
```

1    Google made in releasing this product line and developing this

2    technology that all go to that second factor of prejudice.

3            THE COURT:  All right.  Let's hear from the other

4    side.

5            THE COURTROOM DEPUTY:  Please identify yourself.

6            MR. PAK:  Yes, this is Sean Pak.

7            Just to follow up on His Honor's question, the

8    testimony at trial about the 70,000-plus pages of prosecution

9    history is at 1430, line 24, to 1431, line 4.

10           Thank you, Your Honor.

11           THE COURT:  All right.  Thank you.

12           Okay.  Let's hear from Sonos.

13           MS. MOULTON:  Your Honor, I'm Elizabeth Moulton for

14   Sonos.

15           So what I heard was an argument about why the

16   patents may lack written description or have a different

17   priority date, but I did not hear an argument about

18   prosecution laches.  This amendment to the specification,

19   they're saying that that was somehow an abuse of the patent

20   system.  When Sonos submitted the amendment, Sonos told the

21   examiner, here's our amendment, here's where you can find the

22   amendment in the provisional application, and the examiner

23   accepted that amendment, which is a decision entitled to an

24   especially weighty presumption of correctness, which we've

25   explained in all the prior briefing on priority and written

1   description.

2           I think that's, first of all, completely unconnected

3   with the number of references submitted to the examiner.  As

4   we explained in our briefing, the number of -- the information

5   submitted on the information disclosure statement, or the IDS

6   in the prosecution history, that includes a number of

7   litigation filings that are not prior art.  So they're not

8   references the examiner has to look through to determine

9   novelty or nonobviousness.  But regardless, this sentence that

10  Google says is a new matter, that's not the only support for

11  overlapping zone scenes in the specification, which we've

12  explained to you in all of the briefing on the written

13  description issue.

14          So I just, I don't see where there was any abuse of

15  the patent system.  This argument boils down to the new matter

16  and written description question that has already been --

17          THE COURT:  Well, not quite.

18          Here's the way I understand the argument.  It does

19  double duty.  It goes to written description, but it also goes

20  to the, what was going on in the time period between 2006 and

21  2018.  And at a critical moment in time in 2013, they say

22  you -- no, Google disclosed to Sonos its plan for speakers,

23  and then it was only then that you decided that you would try

24  to get a patent that would cover that.  And the -- and so they

25  are saying some misrepresentations or incomplete disclosures

1   were made to a busy examiner to slip that one sentence by the

2   examiner.  Which, it was important.  I did not know about the

3   history of that sentence when I did the written description

4   order, but I -- it was important, and I called it out as the

5   sentence that saved the day for written description.

6          And then I come to find out that never existed in

7   the original 2006.

8          MS. MOULTON:  I disagree.

9          THE COURT:  That was allegedly, and I say that in

10  quotes, allegedly in the Appendix A.  I didn't know that.

11         Now, Google and their armada of lawyers failed to

12  bring that to my attention, and I -- I am -- whether or not

13  they can go back and revisit written description is a

14  completely separate issue from whether or not they can go back

15  and look at prosecution laches.  And prosecution laches is on

16  the table, because all of the affirmative defenses were

17  preserved.  And so that is -- that's why I'm focusing on this.

18  And they say that if there were slick dealings with the PTO,

19  that I can take that into account.  "Abuse" I guess is the

20  word, that if there was an abuse.

21         Now, maybe there was abuse.  If you truncated that

22  diagram and said it was in Appendix A but it wasn't in

23  Appendix A, wouldn't that be a fraud on the examiner?  And

24  just because the examiner could go and check, we all know they

25  don't have time to do that.  So wouldn't that be a fraud on

1    the examiner?

2              MS. MOULTON:  It would not, Your Honor.

3              The way the prosecution works, as I think you're

4    pretty familiar with, we submit a response to the office

5    action that lays out exactly our arguments and the changes we

6    want to make to the claims or the specification.  That's the

7    entire focus of the prosecution.

8              THE COURT:  Yeah, but then there could never be a

9    fraud on the examiner because the examiner can check it all

10   out, according to you.  You could say anything you wanted, and

11   as long as the examiner could show it's false, then there's no

12   fraud.  But that -- but that undermines the whole idea of

13   fraud on the examiner, and the Supreme Court itself has said

14   if you commit fraud on the examiner your patent's no good.

15             MS. MOULTON:  So to step back a little bit --

16             THE COURT:  Inequitable conduct, that's what it's

17   called.

18             MS. MOULTON:  Yeah, exactly.  Fraud on the examiner

19   would go to inequitable conduct, which they have not pled.

20             Well, I'm not sure they didn't -- they did or they

21   didn't.

22             THE COURT:  Yeah, but they did say abuse, and that

23   fits under the prosecution laches.

24             MS. MOULTON:  But prosecution laches is for

25   unreasonable and unexplained delays in prosecution.  That's --

```
 1   those are the circumstances.

 2            THE COURT:  What is your excuse for the delay?

 3            MS. MOULTON:  I don't think there was any delay.

 4   We --

 5            THE COURT:  2006 to 2019?

 6            MS. MOULTON:  And in that period --

 7            THE COURT:  In a fast moving industry, where

 8   everything goes at lightning speed?  That's 13 years.

 9            MS. MOULTON:  And in that period, Your Honor, Sonos

10   diligently pursued all of the intervening applications.  We

11   never filed applications and abandoned them in this

12   prosecution chain, which is the circumstances in which you're

13   abusing the patent office by continuing prosecution of your

14   application --

15            THE COURT:  That is one species, but not the only.

16   I agree it's not the submarine model.  I -- but it's the --

17   it's a different model.  It's a different model, where you

18   maybe have set back, let the industry develop and finally

19   decided, oh, the industry has developed to the point, now

20   maybe we can find a way to tell the examiner that we invented

21   overlapping.  Oh, here the ticket.  We'll truncate the

22   diagram.  That's a busy examiner.  He's got 72 pages to read,

23   72,000.  I can just imagine how that conversation came down in

24   the law firm.

25            MS. MOULTON:  Google has the burden of proving this.
```

```
 1    They have no evidence about -- of any of that speculation

 2    about what happened in terms of --

 3             THE COURT:  You know what happened in the history.

 4    That is not speculation.

 5             MS. MOULTON:  And what happened in the history is

 6    Sonos told the examiner this is the amendment we want to make,

 7    this is our support for the amendment, we think it's not new

 8    matter.  You make the decision as the examiner, a decision

 9    that is entitled to an especially weighty presumption of

10    correctness, and the examiner --

11             THE COURT:  It would be one thing if you had said --

12             Somebody is trying to bug you.  What do you want,

13    counsel?

14             MR. SHEA:  Sorry, Your Honor.  I just want to

15    clarify --

16             THE COURT:  What is it that you want?  She's doing a

17    good job.  What is your point?

18             MR. SHEA:  I absolutely agree.  I just want to

19    correct one things.

20             THE COURTROOM DEPUTY:  Identify yourself, Counsel.

21             MR. SHEA:  Rory Shea on behalf of Sonos.

22             The diagram was not truncated in 2019.  The diagram

23    had been in the specification since 2007, Your Honor.  I just

24    wanted to clarify that one thing.

25             MR. LORDGOOEI:  The truncated diagram was in the
```

 1    specification, Your Honor, not the full diagram.

 2            MR. SHEA:  But again, to the extent there is any

 3    so-called truncation, that happened in 2007, Your Honor.  The

 4    only amendment that took place in 2019 was a single sentence

 5    added to the specification.  That's all I wanted --

 6            THE COURT:  So that's a fair point.  Thank you for

 7    that clarification.

 8            What do you say to the fact that the diagram was in

 9    there from 2007?

10            MR. LORDGOOEI:  That's fine.  They can say in 2007,

11    as part of their original filed application, that that

12    truncated figure in the patent specification is a form of

13    adding a zone scene, a zone scene.  That's the only thing that

14    was said in that 2007 specification.  They can use it to form

15    a zone scene.

16            The issue is that in 2019, 13 years later, they file

17    an amendment that adds a sentence that now supports,

18    supposedly and purportedly supports multiple overlapping zone

19    scenes, and they pull that sentence from a portion of the

20    provisional application.  The sentence was not in the 2005 --

21    2007 specification, it was in the 2006 provisional.  They pull

22    it from a portion of the provisional that was never talking

23    about zone scenes.  And in fact, as Your Honor saw, it was

24    saying do not use this interface for zone scenes.

25            So that's the primary issue, Your Honor.

```
 1              The other issue is in terms of the delay, I didn't
 2   hear any excuse for why they would delay 13 years to disclose
 3   the concept of overlapping zone scenes in their specification.
 4   Again, we disagree that it was disclosed earlier.  We don't
 5   believe it was.  We believe any disclosure, if at all, came
 6   through this 2019 amendment, and therefore there's --
 7              THE COURT:  I thought there was some art in one of
 8   the co-pending applications, not '885, not '9, but a
 9   co-pending, where the examiner specifically said that it did
10   not support overlap.  Am I wrong about that?
11              MR. LORDGOOEI:  I would have to look into that, Your
12   Honor.  Maybe Mr. Shea ...
13              THE COURT:  Yes?
14              MR. SHEA:  Mr. Shea again for Sonos.
15              Yes.  So, Your Honor, there was no point that I'm
16   aware of where the examiner ever questioned whether there was
17   support for overlapping zone scenes.  I think what Your Honor
18   may be thinking of is, so just to clarify, you've asked a
19   couple questions.  I think I have some answers for you.
20              So there were four patents applications total where
21   this amendment was made, all at around the same time, and
22   maybe you have some of the specific in your mind that --
23              THE COURT:  Yeah, August 6th.  You told me -- my law
24   clerk says August 6, 2020, '532 application rejected.
25              MR. SHEA:  Yeah.
```

1          THE COURT:  McCord finds provisional does not

2  support '532 overlap.

3          MR. SHEA:  So Your Honor, I have -- that was where I

4  have right in front of me.  So Your Honor, my notes on this

5  are that he -- the new matter issue -- what was the date you

6  had, Your Honor?

7          THE COURT:  August 6, 2020.  McCord finds

8  provisional does not support '532 overlap.

9          MR. SHEA:  So Your Honor, the note I have here is

10  that the issue there was not about overlapping zone scenes,

11  but it was about a different limitation directed to selectable

12  indications of two or more zone scenes to be simultaneously

13  displayed, where, yeah, the two or more zone scenes are to be

14  invoked.

15          So two things on this, Your Honor.  Yes, so we're

16  talking about the same thing.  I just wanted to make sure I

17  had the date right.  I didn't want to misstate.  So yes, I

18  have that quoted here.  So that is true, Examiner McCord

19  raised a question about support back to the 2020 provisional

20  with respect to this limitation directed to selectable

21  indications being simultaneously displayed.

22          And in response to that, then Sonos responded to

23  that and told the examiner to please look at the 2006

24  provisional, and specifically at, on the figure on page 5 of

25  the Appendix A, which shows two zone scenes being displayed,

 1    one called morning and one called party mode.  And then at

 2    that time Sonos also stated in its response, it reminded the

 3    examiner it had been previously added to the application in

 4    accordance with 156(g), and the examiner then agreed.  And the

 5    quote I have here says that:  "The examiner found that the

 6    remarks filed are accepted by the examiner and suffice to

 7    establish support for the claim subject matter in a prior

 8    filed parent case, the provisional application, and afford the

 9    instant application an effective priority date of

10    September 12th, 2006."

11          And that was in the Notice of Allowance that was

12    mailed in that '532 case on February 3rd of 2021.

13          THE COURT:  All right.  This could be important to

14    me, so what was the date of that material, what you're reading

15    from.

16          MR. SHEA:  Yes.  So again, I was -- so, Your Honor,

17    the --

18          THE COURT:  Well, what were you reading from?  Is

19    that just you talking, or was that the examiner talking?

20          MR. SHEA:  These are quotes -- that was a quote from

21    the examiner.

22          THE COURT:  Okay.  What was the date of that quote?

23          MR. SHEA:  February 3rd, 2021, Your Honor.

24          THE COURT:  All right.  February 3rd.

25          Now, in the meantime, had that amendment been made

```
 1   for -- and had that amendment been relied top satisfy McCort?
 2              MR. SHEA:  The amendment, the same amendment that
 3   was made to the two cases here --
 4              THE COURT:  Yeah.
 5              MR. SHEA:  -- was similarly made in that case,
 6   That's correct, Your Honor.
 7              THE COURT:  Was that cited to McCord?
 8              MR. SHEA:  Yeah, Your Honor.  I believe the same
 9   exact language was cited in all, all four cases.
10              THE COURT:  All right.  So that sentence was cited
11   to McCord to overcome his problem about, quote, simultaneously
12   displayed.
13              MR. SHEA:  So Your Honor, because, again, I just
14   don't want to misstate the facts.  In that case, because
15   "simultaneously displayed" was a slightly different
16   limitation, it was about displaying, the focus that -- of
17   Sonos' response to the Examiner McCord in that particular
18   application was not on the sentence we're all talking about,
19   it was actually about the figure on page 5 of the appendix of
20   the provisional.
21              THE COURT:  Why, what is that figure?
22              MR. SHEA:  It's -- yeah, I can show you, Your Honor,
23   actually.
24              MR. LORDGOOEI:  Your Honor, I just want to point out
25   that all this shows is that what the examiner noted and what
```

 1    Sonos represented to the examiner in this other application

 2    had nothing to do with overlapping zone scenes.

 3            MR. SHEA:  Your Honor, in fact, I mean, I'm going

 4    to -- yes, sorry.  I'm trying to do too many things at once,

 5    Your Honor.

 6            Slide 12.

 7            THE COURT:  No, I am -- all right.  No one seems to

 8    want to answer my question.

 9            When, in the '532, was that sentence about the

10    overlap?  When was that -- when was that added?

11            MR. SHEA:  Yeah, sure, Your Honor.  That was added

12    in November of 2019 to the '532.

13            THE COURT:  November 2019.

14            Okay.  Now, was that amendment ever advanced to try

15    to satisfy McCord on his problem that he raised on August 6,

16    2020?

17            MR. SHEA:  So again, Your Honor, so --

18            THE COURT:  When you start with the word "so," I

19    know you're going to slide off.

20            MR. SHEA:  I just, I don't want to say -- so when

21    the amendment was made there were multiple things added, and

22    one of those things was cited to Examiner McCord.

23            So, yes, some of that --

24            THE COURT:  Was that one sentence that we're all

25    concerned with cited?

```
 1              MR. SHEA:  No, that was not discussed with Examiner

 2   McCord in that case because that case had different claim

 3   language, Your Honor.

 4              THE COURT:  All right.  Okay.  Now, go into

 5   August 6, 2020.  What I'm reading here says:  "McCord finds

 6   provisional does not support '532 overlap," but you're telling

 7   me that he wasn't even talking about overlap, is that ...

 8              MR. SHEA:  That's -- I'll double-check it, Your

 9   Honor, but my notes that I have is that the limitation at

10   issue was about simultaneous display of indications, and it

11   wasn't -- there was no express requirement in the claim that

12   the zone scenes at issue there were overlapping or not.  I

13   think it could have been either way.

14              So I'm not going to represent to you that that was

15   --

16              THE COURT:  The phrase "simultaneously displayed,"

17   does that mean or include the concept of overlap?

18              MR. SHEA:  It certainly covers it, but I think it's

19   not limited to it, Your Honor.

20              MR. LORDGOOEI:  Your Honor, if I'm recalling

21   correctly now, I think this came up during some of the

22   briefing that we submitted on the written description issue.

23   So for example, our brief at Docket 739 on page 6 talks about

24   this '532 patent, and I believe at that time at trial, counsel

25   was relying on the examiner affirmatively blessing that
```

 1   amendment in the '532 application as supporting what counsel

 2   has said is an especially high weight or high presumption

 3   given to the examiner's acceptance.

 4          And so in our filing at Docket 739, at page 5 to 6,

 5   we explain that the '532 patent had nothing to do with

 6   overlapping zone scenes, and in fact what the limitation was

 7   that was at issue there I believe was, quote, "the recited

 8   display of a selectable indication of a zone scene upon which

 9   selection invokes the zone scene onto the plurality of

10   playback devices," not multiple zone scenes, not multiple

11   overlapping zone scenes, which was at issue in the '885 and

12   the '966.

13          MR. SHEA:  Your Honor, I have the amendment pulled

14   up right here in front of me, and I can just read it to you if

15   you'd like, or however.

16          THE COURT:  Okay.  Which amendment?

17          MR. SHEA:  Sorry.  Yes, so I shouldn't say

18   amendment.  I have the examiner's statement as to what

19   limitation of the '532 he was questioning the support for.

20          THE COURT:  On August 6, 2020.

21          MR. SHEA:  That's correct, Your Honor.

22          THE COURT:  All right.  Please read it.

23          MR. SHEA:  Sure.  So he said:  "The claimed causing

24   of selectable indications of two or more zone scenes to be

25   simultaneously displayed, wherein the displayed selectable

```
 1   indications are each selectable to cause a respective one of
 2   the two or more zone scenes to be invoked by the first zone
 3   player is not supported in the prior filed applications and is
 4   afforded the filing date of the instant application,
 5   April 12th, 2019, as the priority date."
 6           So Your Honor, what we see there is, yes, so the
 7   phrase "overlap" doesn't appear, but it certainly is talking
 8   about multiple zone scenes that are being simultaneously
 9   displayed.  And for completeness, the word "simultaneously" is
10   underlined in the examiner's rejection or objection here, as
11   well as the word "zone player" also underlined.
12           And so that was the August 6, 2020, off section,
13   Your Honor, certainly talking about displaying indications
14   about multiple zone scenes.  And then Sonos responded to that
15   and pointed out the prior amendment to the specification,
16   which included multiple things, one of which was the sentence
17   we've been discussing, as well as a figure from a different
18   page.  And the examiner, then, in his February 3rd, 2020,
19   Notice of Allowance then withdrew this, this objection, and
20   agreed with Sonos that the amendment that they had made
21   resolved that issue and entitled Sonos to the September 12th,
22   2006, priority date.
23           THE COURT:  All right.  Okay.  Hold that thought.
24           Let me ask Google.  What is the clearest, in your
25   view, instance of the abuse of the PTO procedures in acquiring
```

1    the '885 patent?

2            MR. LORDGOOEI:  So in our view, Your Honor, it would

3    be delaying 13 years before submitting an amendment to the

4    specification in which they added the one sentence that

5    everyone keeps going back to for written description support

6    of overlapping zone scenes and representing to the examiner

7    that that did not add new matter.  So that period of delay

8    supports prosecution laches, but the abuse of the process, the

9    clearest abuse of the process, PTO rules and procedures is

10   amending the specification to add a portion of the provisional

11   that has nothing to do with zone scenes and representing to

12   the examiner that it supports overlapping zone scenes, and

13   representing to this Court and to Google and to others and to

14   the public that it supports overlapping zone scenes, when in

15   fact, we believe, and we've briefed this, that it's new

16   matter.

17           THE COURT:  Well, the -- assume for the moment --

18   but you, yourself, admit that the diagram that was cut in half

19   was in the 2006 to begin with, right?  So, see, that can't be

20   new matter.  It may be that it was -- it was -- its origin was

21   different, but at least it was in the original 2006.

22           So what was it about that one sentence that was

23   misrepresented?

24           MR. LORDGOOEI:  Well, that's right, Your Honor.

25   Half of the diagram was part of the original 2007 application

1    that was filed that led to the '853 patent.  The full diagram

2    was in the provisional, but the issue is that the full diagram

3    and that one sentence was in the provisional, in a portion of

4    the provisional that was talking about the graphical user

5    interface on the handheld controller for setting up zone

6    groups, which Sonos and its inventor have vehemently argued

7    throughout the trial is not a zone scene.  They've

8    distinguished zone groups and zone scenes and --

9            THE COURT:  You're not answering my question.

10           All right.  Read to me what the one sentence that

11   was added in 2019 said.  Just that would be useful.  I don't

12   have it in mind.

13           MR. LORDGOOEI:  Sure.

14           If we can put up, Mr. Wilson, we had that up on

15   Slide 17 of Google's presentation.

16           And so I'll read it, Your Honor.  The one sentence

17   is that:  "The list of zones in the screen above includes

18   ALL," capitalized A-L-L, "the zones in the system, including

19   the zones that are already grouped.

20           THE COURT:  So that -- that doesn't ring true to me.

21   That -- is that the sentence that was in the written

22   description argument?

23           MR. LORDGOOEI:  I believe that's the --

24           THE COURT:  Show me the -- give me the patent,

25   please, and then let me read it in the actual specification.

```
1                MR. SHEA:  Your Honor, I have it on a slide
2     annotated as the amendment, if that would be helpful.
3                THE COURT:  I'd just like to see it in the
4     specification, the thing that I relied on on my written
5     description.
6                MR. LORDGOOEI:  We can put up the patents.
7                And I believe, Mr. Wilson, it's the '885.  If you
8     can go to Column 10 of the patents, and zoom in on the portion
9     (inaudible) ...
10               THE COURT:  Too small.
11               MR. LORDGOOEI:  It's that paragraph, sorry.
12               If you could highlight, Mr. Wilson, the sentence
13    that starts:  "The list of zones in the user interface 520
14    include ALL the zones in the system, including the zones that
15    are already grouped."  That was what was added, Your Honor.
16               Your Honor, you know --
17               THE COURT:  Okay.  Where -- is that exact sentence
18    somewhere in the Appendix A?
19               MR. LORDGOOEI:  It is, Your Honor.
20               And so if we could put, either side by side or below
21    this, Mr. Wilson, the portion of Slide 17 that has the
22    language.
23               So Your Honor, it's not exactly the same sentence,
24    because in -- when it was added to the specification, the
25    reference was added "in the user interface 520."  And user
```

1  interface 520 was part of the Figure 5B that was in the

2  patents.  And so the differences are, you know, instead of "in

3  the screen above" which is referred to in the provisional, the

4  patent says "in the user interface 520."

5           And the key issue, Your Honor, is that in the

6  patents, they're representing that this sentence is talking

7  about a screen in which the user is setting up zone scenes.

8  In the provisional, they represented to the world that this is

9  a screen associated with setting up and configuring zone

10 groups.  Which, that same provisional indicates that this

11 screen in the provisional in which they've indicated that the

12 list of zones in the screen above, so the screen above that's

13 referred to in the provisional is the screen that the

14 provisional says is not expected should be used to set up zone

15 scenes.

16          And so they've taken language that applies to zone

17 groups and a screen and the handheld controller that is used

18 to set up zone groups, not zone scenes, they've taken that

19 sentence, they've put it in the specification.

20          THE COURT:  Which one of these -- is that the top

21 half over the bottom half that became 5B?

22          MR. SHEA:  It would be the bottom half, Your Honor.

23          MR. LORDGOOEI:  Of the figures, the 5B.

24          THE COURT:  And what is 520, then?  User interface

25 520.

 1           MR. LORDGOOEI:  Mr. Wilson, maybe we could put up

 2  Figure 5B from the patents.  I believe it's just the screen,

 3  but we can confirm.

 4           MR. SHEA:  It's just referring to the entirety of

 5  the screen, Your Honor, is my understanding.

 6           THE COURT:  All right.  I should have had the

 7  patent, but I don't.

 8           Can somebody show what 520 is referring to?

 9           MR. LORDGOOEI:  We're putting that up on the screen

10  now, Your Honor.  This is Figure 5B from the patents, and 520

11  just refers to the entirety of the patent.

12           THE COURT:  All right.  So 520 is 5B.

13           MR. SHEA:  That's correct.

14           THE COURT:  All right.  Can you put up on the screen

15  the exact explanation that was given to the examiner in the

16  amendment as to where that sentence came from?  Is that

17  available?

18           MR. LORDGOOEI:  I believe it's at TX-4, Mr. Wilson,

19  and if you could go to page 808.

20           So this is the portion of the prosecution history

21  showing the redlines to the specification adding the sentence,

22  and if we could keep flipping through that file history, we'll

23  get to the portion of the office action that has the

24  explanation.

25           Do you have the page number?

```
 1                MR. SHEA:  Twenty-one.

 2                MR. LORDGOOEI:  So 821, Mr. Wilson.  There's a

 3     numbered paragraph 3, Amendment to the Specification.

 4                THE COURT:  Well, this -- you're putting so much so

 5     quickly, I can't read any of it.  Just leave what's up there

 6     there for a minute.

 7                What am I looking at now?

 8                MR. LORDGOOEI:  Your Honor, this is the explanation

 9     that was given to the patent examiner for the amendment that

10     was made to the specification adding the sentence that we've

11     been looking at.

12                So you can see here, Your Honor, they represented

13     that:  "Applicant inserts material into the specification and

14     figures that was previously incorporated by reference in this

15     application, and the amendment contains no new matter."  So,

16     we represent to the examiner that it contains no new matter

17     because it was previously incorporated by reference, according

18     to them.

19                THE COURT:  Well, is this -- is this the --

20     everything that was submitted to the examiner on this point?

21                MR. LORDGOOEI:  I believe so.  On this point this is

22     what was submitted, this paragraph.  I didn't read the full

23     paragraph.

24                THE COURT:  Well, show me -- you put something up

25     there a minute ago that seemed to be more material.  It
```

1  actually had the language.

2          MR. LORDGOOEI:  Right.

3          THE COURT:  Go to that.

4          MR. LORDGOOEI:  What we saw earlier, Your Honor, so

5  typically with these office action responses you'll have

6  amendments.

7          THE COURT:  There, there.

8          MR. LORDGOOEI:  This is the actual amendment.

9          THE COURT:  Just leave it up there.  Leave it there.

10         Can you go back?  Your expert there cut off some of

11 it.  Let me see the full paragraph.  I can read it.  Just stop

12 there.

13         MR. LORDGOOEI:  Your Honor, this is the portion of

14 the office action response that instructs the examiner what

15 the amendments are, and then later they provide the

16 explanation of the amendment.

17         THE COURT:  All right.  Now, is this the entirety of

18 what was submitted to the examiner, or is there more on this

19 one sentence?

20         MR. LORDGOOEI:  On this one sentence, I believe this

21 is it.

22         THE COURT:  All right.  What did the examiner --

23 what's his response?

24         MR. LORDGOOEI:  I believe the examiner just accepted

25 the amendment, made the change.

1          THE COURT:  What exhibit is this found in, this

2     document on the screen?

3          MR. LORDGOOEI:  TX-0004.

4          THE COURT:  All right.  Now, show me what the

5     examiner said.

6          MR. LORDGOOEI:  Mr. Shea has the citation for the

7     examiner's response.

8          THE COURT:  Can you read it out loud if you can't

9     show it to me?

10         THE COURTROOM DEPUTY:  Counsel, please get closer to

11    the microphone.

12         MR. SHEA:  I'm trying to look at to save time.

13    Sorry about that.  Your Honor, so I'm going to try to find it

14    for you.

15         He didn't say anything express about the amendment.

16    So the way the process typically works is that when an

17    examiner allows an application e-mail, something called the

18    Notice of Allowance.  And in that Notice of Allowance, there

19    is often not commentary on all the issues and arguments

20    raised.  And this is the circumstance where he mailed the

21    Notice of Allowance, and in that Notice of Allowance he did

22    not expressly weigh in on the amendments made to either the

23    claims or the specification, other than to say that he had

24    accepted it and allowed the application.

25         THE COURT:  Well, that's what I'd like to see.

```
1              MR. SHEA:  Okay.

2              THE COURT:  So let me see that language.

3              MR. SHEA:  Okay.  So, yeah, I think I have ...

4              Yeah, so if we could go to TX-4, starting at

5    page 19.

6              So Your Honor, this is the first page of it, which I

7    was referring to as the Notice of Allowance.  You can see

8    largely the first page of this is just a template form; it's

9    administrative.  It gets a little bit more substantive at, let

10   me ... at page 23 of TX-4.  So if we could at least look at

11   the top half of that.

12             And so you can see, Your Honor, in bullet 1 there,

13   he says that:  "This communication's responsive to the claims

14   filed 8/23/19," and then there was also an interview

15   8/30/2019.  The bullet where he allows everything is in -- or

16   the claims is bullet 3, and he says:  "The allowed claims are

17   1 through 20."

18             THE COURT:  Well, I thought you said there was

19   someplace where he specifically allowed the amendment to that,

20   to allow the one sentence.

21             MR. SHEA:  Sorry, no, Your Honor.

22             What I was trying to say is there wasn't anything

23   express on that.  So he just, he accepted it by virtue of

24   not -- of mailing this Notice of Allowance and not reraising

25   that objection.
```

```
 1              THE COURT:  Well, who -- who printed the
 2   specification?  Is it the patent office?
 3              MR. SHEA:  Yeah, that's right, Your Honor.
 4              So then what happens is after -- the process is that
 5   once the examiner allows it, like he did here, then there is
 6   some additional back and forth with the examiner, you pay a
 7   fee, and then somebody at the patent office then takes all the
 8   amendments that have been made and finalizes them and prints
 9   the official granted patent, which is the --
10              THE COURT:  Well, let's see.  So I'm just trying to
11   make sure that the patent examiner in fact did accept it.
12              So you're saying that it was not Sonos, but it
13   was -- who did the printing.  It was somebody in the patent
14   office found the amendment, inserted it in its right place and
15   then printed it as the official document?
16              MR. SHEA:  That's right, Your Honor.
17              They take -- we saw that paragraph a few moments ago
18   where it was underlined in that paragraph.  That's how patent
19   attorneys submit amendments to the patent office.  We show
20   them what we're adding with underlying, and then the patent
21   office takes that underlying and then puts it in the right
22   place when they print the patent, and that's what happened in
23   this case.
24              THE COURT:  Did Sonos have any role in helping the
25   staff find the amendments?
```

```
 1            MR. SHEA:  Other than the submissions we've seen,
 2   Your Honor, where they underline the sentence in the standard
 3   form that we do with the patent office, that is how we tell
 4   the patent office here's what needs to be added or sometimes
 5   deleted.  You mark it up, that's the procedure, and then they
 6   use that markup to implement the changes.
 7            THE COURT:  Here's what I'm trying to get at.  I
 8   just want to make sure there's no shenanigans.  Was there any
 9   point in which Sonos submits to the PTO staff, hey, here's how
10   we think the specification should read, and remember there was
11   this amendment, so here it is.  Did that happen, or was all
12   the homework done by somebody at the PTO with respect to
13   inserting that one sentence?
14            MR. SHEA:  That's right, Your Honor.  After --
15            THE COURT:  What's right?
16            MR. SHEA:  Yeah, your character -- sorry.  There was
17   no assistance by Sonos with the patent office.
18            THE COURT:  All right.  Is that correct?
19            MR. LORDGOOEI:  So the --
20            THE COURT:  When you start with "so," I know you're
21   going to slide off.
22            MR. LORDGOOEI:  No, it's correct.
23            There are certain instances where the patent office
24   may inadvertently introduce a typo or an error, and there are
25   procedures where the patentee can then ask for a correction.
```

```
 1   But in this case they submitted their amendment, and the
 2   examiner implemented it into the specification.
 3            THE COURT:  All right.  So what is the most direct
 4   proof that the examiner even saw this amendment, other than a
 5   presumption?
 6            MR. SHEA:  So, well, Your Honor --
 7            THE COURT:  So ...
 8            MR. SHEA:  I got to get out of that habit.  For me
 9   it's --
10            THE COURT:  It just is a dead -- it always to me
11   suggests that you don't want to answer my question, so you're
12   going to answer some other question that sounds like it.
13            MR. SHEA:  Yeah, I'm sorry.  For me, I think it is
14   actually me trying to formulate the most accurate answer I
15   can.
16            THE COURT:  Well, I want to know is it -- to me,
17   there's absolutely nothing in this record that shows the
18   examiner looked at that sentence, but, and that the staff just
19   stuck it in there.  But maybe I'm wrong.  Maybe there's
20   someplace where the exam -- there's a -- the examiner looked
21   at it.
22            PLAINTIFF'S ATTORNEY:  Yeah.  So I think the
23   closest, Your Honor, was if we go back to that page we were
24   looking at, the Notice of Allowance.
25            THE COURT:  Okay.
```

```
 1              MR. SHEA:  Let me get that.

 2              So it's page 23 of TX-40.  And it says that that

 3    communication is responsive to, and it says:  "The claims

 4    filed 8/23/2019."  And I realize it says the word "claims"

 5    there, Your Honor, but the 8/23/2019 date, that's that full

 6    submission that Sonos made that included amendments to both

 7    the claims and the specification.  So by saying here that the

 8    examiner is issuing this Notice of Allowability responsive to

 9    that filing on August 23rd, 2019, that that indicates that he

10    did indeed read, review and acknowledge what was in that

11    response.

12              And just for your context, Your Honor, I should have

13    looked it up in the event you were going to maybe ask about

14    it, but that whole submission, the 8/23/2019 submission, is

15    about 20 pages double spaced.  So it's not like it's a

16    voluminous paper.  It's, the whole thing was that lengths.

17              That's just -- that is just patent office protocol.

18    You submit these responses.  They tend to be around 10 to 20

19    pages long, as a person who does this.  And you mark your

20    amendments, you give your explanations for why you're making

21    those amendments and why you think you're entitled to a

22    patent.  The examiner then reviews that and then issues either

23    a new rejection or a Notice of Allowance.  And in this case

24    the examiner responsive to that submission issued a Notice of

25    Allowance.
```

1              And I think it's important to remember, Your Honor,

2     as well, that all of this was happening while the examiner --

3     the examiner hadn't even questioned whether there was written

4     description support for overlapping groups.  And that's not

5     surprising to me, because as we've laid out on various other

6     briefs, there's a lot of other support for overlapping groups

7     in this specification, including another sentence that is

8     almost verbatim to the one that got added in a different part

9     in the specification.

10             So the examiner wasn't questioning whether there was

11    problems with overlapping group support in this specification

12    at all.  So it's not like he had to withdraw a rejection on

13    written description 112's support for overlapping groups.

14    There was one -- there wasn't one.

15             MR. LORDGOOEI:  Your Honor, I would just point to

16    Mr. Pak's earlier comments that that's no substitute for

17    judicial review.  The examiners get things wrong all the time.

18    And in fact, if you look at the Notice of Allowability in this

19    case, which I believe Mr. Shea was referring to, there's

20    reference to the application being amended as follows, and

21    there are a series of -- unless I'm missing it, I'm not

22    seeing -- I'm seeing amendments to the claims that were made,

23    but I don't see the examiner actually ever discussing the

24    amendment to the specification, let alone --

25             THE COURT:  Where do you see reference to amendment

1    to the claims?

2          MR. LORDGOOEI:  So this would be the Notice of

3    Allowability.  If we could go to TX4, at page 23.  I believe

4    that's the front page of it, but if we go to page 24, the

5    following page, there's an examiner's amendment that was made

6    based on, I guess they had an interview with Brandon Kennedy,

7    who's at counsel's firm, on August 30th.  And based on that,

8    the examiner made certain amendments to the claim which are

9    then reproduced below, but there's no reference at all to

10   whether that additional sentence added to the specification

11   constituted or didn't constitute new matter, whether the

12   examiner ever actually scrutinized that assertion by Sonos.

13   There's simply no reference to it as counsel has noted.

14          The only indication is they asked for the amendment,

15   the amendment was made.  Unclear, it's a complete black box

16   what the examiner did --

17          THE COURT:  Well, but the way the PTO apparently

18   works is the PTO must have felt that it was -- that amendment

19   was allowed because it's in the specification.

20          MR. LORDGOOEI:  And our point has been, Your Honor,

21   that the -- pointed to the examiner, to the provisional.  But

22   that's highly misleading, because where it shows up in the

23   provisional is in the context of zone grouping, not zone

24   scenes.  And unless you spend a lot of time really examining

25   and studying that provisional patent and really understanding

1    what they're saying, including a couple of pages prior to the

2    sentence in the provisional where it says you shouldn't use

3    this for zone scenes, unless you go through that level of

4    analysis and critique, you're not going to pick on up this

5    issue.

6            THE COURT:  Counsel says that there are other

7    places -- you don't even need this sentence here -- other

8    places in the specification that support overlapping zone

9    scenes.

10           MR. LORDGOOEI:  And we've talked about every single

11   one of those in our prior briefing.  It's throughout the

12   briefing that's before Your Honor.  We don't believe there's

13   sufficient support, explicit support --

14           THE COURT:  Well, is there any -- is there a single

15   instance?

16           MR. LORDGOOEI:  We don't believe there is.

17           And you know, I'll point Your Honor back to the

18   Federal Circuit case law that says it's not enough for there

19   to be disclosure through inference.  It has to be an express

20   explicit disclosure of the inventive concept, and there simply

21   is nothing that we've seen that they've pointed to for

22   overlapping zone scenes in the written description, and that's

23   why everyone, including Your Honor, keeps going back to this

24   one sentence.

25           THE COURT:  Well, we're going to take a break, and

```
 1    then I got an 11:00 o'clock calendar.

 2            When we come back, we'll turn to some -- what would

 3    you like to, in the 40 minutes or so I have left, what would

 4    you like to address?

 5            MR. PAK:  Your Honor, from Google's perspective,

 6    we'd like to address our JMOL on invalidity of the claims and

 7    then the damages issue, Your Honor.  Those are the two issues.

 8            THE COURT:  There's not enough time for both of

 9    those, so you might pick one of those two.

10            MR. PAK:  Thank you, Your Honor.

11            THE COURT:  From your point of view, what would you

12    like to discuss?

13            MR. SULLIVAN:  Your Honor, I'm going to -- Sean

14    Sullivan here.  I'm going to shoot for the injunction, if you

15    will.

16            THE COURT:  All right.  We'll try to do both.  We

17    won't have as much time, because I've got an 11:00 o'clock

18    calendar, but we'll do our best.

19            All right.  Thank you.

20            MR. SULLIVAN:  Thank you, Your Honor.

21            MR. PAK:  Thank you, Your Honor.

22            THE COURTROOM DEPUTY:  Court is in recess.

23        (A recess was taken from 9:56 a.m. to 10:11 a.m.)

24            THE COURT:  All right.  Let's hear about invalidity.

25            MR. SULLIVAN:  Well, actually, Your Honor, can we do
```

```
 1    injunction first, since we spent so much time on their

 2    affirmative defense?

 3              THE COURT:  No, injunction you only get to if they

 4    lose on their affirmative.  Trial is not over yet, and you

 5    haven't won yet.  You've just won the jury part.

 6              So I want to hear -- I'm going to give them a few

 7    minutes, and then we'll try to save time for injunction.

 8              MR. SULLIVAN:  Thank you, Your Honor.

 9              THE COURT:  Go ahead, Mr. Pak.

10              MR. PAK:  Thank you, Your Honor.

11              May I hand up the slides?  I apologize.

12              THE COURT:  I don't want to see any slides.

13              MR. PAK:  Okay.

14              THE COURT:  I want you to just tell me the --

15              MR. PAK:  I will be as focused as I can.

16              Your Honor, we have really four arguments to make

17    here, even under --

18              THE COURT:  No, give me your best -- the jury

19    rejected your obviousness grounds.

20              MR. PAK:  Yes.

21              THE COURT:  You wanted a trial.  You wanted a jury.

22    You lost.

23              MR. PAK:  Yes, Your Honor.

24              THE COURT:  You lost.

25              Now, you want to relitigate it like it's summary
```

1    judgment.  You should have just said, I don't want a jury.

2    You might have won.  But I'm not going to overrule a jury

3    verdict unless it is crystal clear that the jury was wrong.

4    And I listened to your argument, and you had a good argument,

5    but it is not necessarily a winner.  The jury did not accept

6    it, and it has to be by clear and convincing evidence.

7          So why don't you just be a good citizen, salute and

8    say, the jury has spoken, the very jury you wanted, you

9    wanted, and now in fact you lost and you won't accept the

10   verdict.  That's what I see here.  I see a big firm with an

11   armada of lawyers wants a jury, thinks they're great, they're

12   going to win, but they lose.  Now, you won't accept that

13   verdict.

14         Okay.  Give me your single best argument on

15   invalidity.

16         MR. PAK:  My single best argument, Your Honor, is

17   this.  The other side's arguments on JMOL -- and just to

18   remind Your Honor, we did argue about this on summary judgment

19   so we thought the issue was ripe for Your Honor's

20   consideration.  The reason why they say our invalidity

21   arguments must fail is because the only evidence we put in

22   front of the jury on this idea of having multiple overlapping

23   zone scenes began with the all-party -- all-zones party mode

24   in Sonos 2005.  So they're saying that every one of our

25   invalidity theories will fail if they convince the jury that

```
 1   the all-party -- all-zones party mode was not a zone scene,
 2   and that's categorically untrue, Your Honor.  So that's the
 3   point that I want to make very clear today.
 4          The most important piece of evidence that came in
 5   that we don't think any reasonable jury could have ignored is
 6   the sworn testimony of Mr. Lambourne about the prior art forum
 7   posts.  And Your Honor recalls that I asked him specifically,
 8   and I showed him page, after page, after page of the Sonos
 9   forum posts, which we all agree is prior art, and he admitted
10   under oath that they disclosed multiple overlapping zone
11   scenes, that other people had publicly posted the idea of
12   having multiple overlapping zone scenes that are saved for
13   later.  We went through the example --
14          THE COURT:  Well, that was after the product came
15   out, right, the Sonos product came out?
16          MR. PAK:  No it's not, Your Honor, because remember,
17   this is going back -- these Sonos forum posts, this is going
18   to -- are you talking about the Sonos 2005 system?
19          Yes, so after the Sonos 2005 system comes out --
20          THE COURT:  Right.
21          MR. PAK:  -- but before the invention date of any of
22   these two patents, people on the web through their Sonos forum
23   posting website, were disclosing not only the idea of having
24   multiple overlapping zone scenes that are saved for later, but
25   they were also proposing exactly the same solution.
```

1          And we saw, for example, macros and presets that
2    were being discussed at length.
3          THE COURT:  Well, was there any evidence that that's
4    what eventually got used was macros?
5          MR. PAK:  Yes, Your Honor.  So this is --
6          THE COURT:  I don't think that -- I don't remember
7    that connection being made.
8          MR. PAK:  Let me show you -- I apologize for using
9    slides.
10          THE COURT:  Let's even assume later on that's
11    what -- the law requires that it not just be the idea, but
12    that the person of ordinary skill in the art would have had a
13    reasonable expectation --
14          MR. PAK:  Yes, sir.
15          THE COURT:  -- that it would have succeeded.
16          All right.  So all you got are crazy guys who are
17    talking on a forum post.  For all I know, they could be
18    anybody.  They could be people who think they're going to the
19    moon next week, and we don't know their credentials.  We don't
20    know if they're somebody skilled in the art.  It's just yak,
21    yak, yak on the -- so how can that translate to somebody
22    skilled in the art?
23          MR. PAK:  So (inaudible) 11.  Let's take a look at
24    the evidence, Your Honor.  So this is what the evidence came
25    in on this point.

1           Trial testimony from Mr. Lambourne at page 541,
2    line 2 through 7:
3           "So Mr. Greenwood, in this prior public posting
4    about the Sonos 2005 system, was describing the same type of
5    problem that you were trying to solve with zone scenes and
6    suggesting macros, which is a similar solution to what you had
7    in mind for that functionality, correct?
8           "Answer:  In broad terms, yes.  As an outcome, yes."
9           And if you turn to the slide right before that,
10   Mr. Wilson.
11          These are not speculation, Your Honor.  This is
12   TX-3930 at page 2, this is prior art, where he says:  "I find
13   myself manually linking and unlinking setting volumes in a
14   very repetitive way.  I would think that a macro-type
15   function, which is a piece of software, will be able to save
16   those manual steps into a single selection of a favorite."
17          And then it's crystal clear on Slide 9, right before
18   then:  "So people" -- this is at trial transcript, page 538,
19   line 4, to 539, line 4:  "So people were suggesting ideas how
20   to use macros and presets to improve upon the Sonos 2005 prior
21   art system?
22          "Yes.
23          "Question:  So if I was in summer I could set up my
24   summer party mode, and then I could set up a winter party mode
25   that would be saved for later use, correct?

1          "Answer:  Yes.

2          "Question:  And again, that is consistent with the

3    examples that you gave in your patents of zone scenes,

4    correct?

5          "Answer:  There can be more than one setup, yes."

6          So as Your Honor recalls, Mr. Lambourne is not an

7    engineer.  He never wrote code.  He's not a programmer of any

8    kind.  There is no disclosure in the patent, and this is the

9    *Publicover* case that we had cited to Your Honor, Your Honor

10   instructed the jury that one of the things you have to look at

11   is the level of disclosure in the patent specification to

12   assess whether the prior art also provides written description

13   or enabling support.

14         Here we have Mr. Lambourne himself admitting that

15   the idea of having multiple overlapping zone scenes was

16   already in the prior art, that people were posting, many of

17   them were engineers, Your Honor, we have evidence of that,

18   were suggesting using macro-type functions and presets, which

19   was not only the solution that he had in mind when he came up

20   with these ideas, but he says those are the kinds of examples

21   that he provided in his patents.

22         There is no description of any particular type of

23   source code other than the general idea of using things like

24   macros and presets.  If that is enabling written disclosure in

25   the patents, then as a matter of law, Your Honor, based on

1   this record -- and again, even if the jury had discounted

2   anything that our expert said or anything that Dr. Almeroth

3   said, we have sworn testimony from the man who knows his pants

4   best saying, my idea, my solution were all present in these

5   prior art --

6           THE COURT:  All right.  I got to let the other side

7   respond so we can save time for injunctive relief.

8           Okay.  Your point.

9           MR. SHEA:  Thank you, Your Honor.

10          I mean, my point is just a rebuttal to Mr. Pak's,

11  Your Honor.  I mean, there was more than sufficient evidence

12  here that there -- that there are five different possible

13  problems with their obviousness combinations, right?  I mean,

14  the jury could have found that Sonos 2005 didn't have what

15  they say they had, they could have found that their secondary

16  references don't overcome those problems, they could have

17  found no motivation, they could have found no reasonable

18  expectation of success, they could have found secondary

19  considerations.  There is sufficient evidence in the record on

20  all of those points that supports a finding of nonobviousness.

21          Now, I want to just -- maybe the one point I want to

22  address, Your Honor, is this is not just about whether or not

23  Sonos 2005 had a single zone scene.  It didn't, and there's

24  more than sufficient evidence to show that it didn't.  But

25  that's not the only evidence that Sonos and Dr. Almeroth

1    relied on for nonobviousness.  He also relied on evidence that

2    there was no separation between creation of groups and

3    invocation of groups, and there's testimony throughout and

4    evidence that the party mode didn't have that separation.

5    Dr. Almeroth testified that that's a requirement of the

6    claims.  We saw that in the claims.  The claims actually tell

7    you you've got to create it, then you've got to select it,

8    then you've got to invoke it.

9           Google and Dr. Schonfeld relied exclusive on Sonos

10   2005 system for that functionality.  They didn't even -- they

11   didn't point to Sonos forums for that functionality.  They

12   didn't point to any of these other secondary references for

13   that separation functionality.  I went back and looked at the

14   transcript and Dr. Schonfeld's testimony.  He never talked

15   about that concept one time in his testimony because they

16   relied on Sonos' 2005 system for that.  And the evidence

17   shows, or at least there's sufficient evidence to support a

18   jury finding that there was no separation, as required by the

19   claims, in Sonos' 2005 system.

20          So this whole idea of macros, it collapses, because

21   that's all those things say is there's a macro, but it doesn't

22   say a macro to do what.  And in Google's brief they say, well,

23   the macro would be to just use the functionality in Sonos'

24   2005 system.  Sonos' 2005 system didn't have the

25   functionality, because they didn't have this separation

```
 1   between creation and invocation.  They didn't have indication
 2   to be added to a group, followed by selection and operating in
 3   standalone mode during -- until selection, and then followed
 4   by an instruction to invoke the group.  They did not have that
 5   separation.
 6            And so the macros, even with the macros in the
 7   forums, it just does not overcome the deficiencies that are in
 8   that Sonos 2005 system.  That's what Dr. Almeroth testified to
 9   at the trial.  The jury reasonably accounted for that in their
10   verdict to find nonobviousness amongst motiv -- the lack of
11   proof that Google put forth on motivation, on reasonable
12   expectation of success and the affirmative evidence on those
13   things, the skepticism, the people questioning whether this
14   made sense; the evidence showing that Sonos' 2005 grouping was
15   already very, very successful, popular, highly praised, and
16   why would a person of ordinary skill in the art in 2005 be
17   motivated to make changes to that.
18            So for all those reasons, Your Honor, I mean, in
19   order to overturn this jury verdict, Google would have to
20   establish that there's only one reasonable conclusion on every
21   single one of those five points, and they just simply can't do
22   that given the evidence in this case.
23            THE COURT:  I got to go to the injunction point, so
24   I'm not going to make a ruling right now.
25            MR. PAK:  Thank you, Your Honor.
```

1              MR. SHEA:  Thank you.

2              THE COURT:  I am going to make one observation if

3    this issue gets to the Federal Circuit, which is this:  I did

4    tell the jury that in determining how obvious something would

5    have been to someone of ordinary skill in the art, the jury is

6    entitled to consider the skimpiness with which the

7    specification teaches the supposed invention.  And in this

8    case it is skimpy, and in this case in my mind it would not

9    have taken much to show that somebody of ordinary skill in the

10   art would have understood this supposed invention.

11             That, however, we are dealing with a jury verdict

12   that Google wanted.  Google wanted a jury.  Google thought its

13   lawyers, the armada, would win the day, but they lost on this

14   issue.  We have to respect the jury -- it's in the system.

15   It's in the statutes.  It's in the Constitution.  And even if

16   I disagree with the verdict, which I'm not saying I do, but if

17   I did, I cannot overrule it just on that ground.  It has to be

18   a very clearcut case, where the evidence was clear and

19   convincing that it was invalid.  And I'm not saying one way or

20   the other yet on that, but it's not as easy as Mr. Pak wants

21   it to sound.

22             Okay.  We're going to injunction.

23             MR. PAK:  Thank you, Your Honor.

24             MR. SHEA:  Thank you, Your Honor.

25             MR. SULLIVAN:  Thank you, Your Honor.  Could we do

```
 1   slides, or no slides?
 2            THE COURT:  No, I don't want any more slides.
 3            MR. SULLIVAN:  You got it, Your Honor.
 4            THE COURT:  I don't want slides.
 5            MR. SULLIVAN:  All right.  Try to get through this
 6   as quick as I can for you.
 7            Sean Sullivan on behalf of Sonos.
 8            THE COURT:  Well, what do you think are your best
 9   points for an injunction?
10            MR. SULLIVAN:  Well, I think, you know --
11            THE COURT:  I understand you won, and so the '885 or
12   maybe the speakers go off the shelf because they have to be
13   enjoined, but what do you think their best point is, and
14   what's your answer?
15            MR. SULLIVAN:  I think my best point is that we're
16   direct competitors, right?  Sonos practices its invention.
17   This is a critical feature, so there is a drive for demand
18   here with this feature.  There's a causal nexus between the
19   harm and the infringement.
20            This is a feature that Google tried to remove,
21   couldn't remove it.  Right?  Tried to do a redesign instead of
22   just dropping it all together.  They could have just removed
23   it entirely, gone with dynamic grouping instead of static
24   grouping or zone scenes.  They didn't do that.  So obviously
25   it's important to them.
```

```
 1            THE COURT:  If they could do zone scenes that don't
 2   overlap, that would evade the statute.  I mean, the claims.
 3            MR. SULLIVAN:  It would, but their own witness,
 4   Tomer Shekel, said that would be a poor user experience.
 5            THE COURT:  Well, but they would still -- yes, may
 6   be, but they would -- it could be done that they could
 7   continue to sell their speakers but disable the ability to do
 8   overlapping zone scenes.
 9            MR. SULLIVAN:  Right.  So then the injunction
10   wouldn't hurt them, Your Honor.
11            You put the injunction in so they can't use this
12   invention.  We -- it's a constitutional right to exclude here.
13   That's what we want.
14            Google's a giant.  We're 1-1000th of a size.  We
15   can't compete with Google.  They're selling their products at
16   a loss.  They don't make any money on these products.  They're
17   killing us in the marketplace with this infringement.  We have
18   to compete against an invention we practice ourselves.  It has
19   all the benchmarks for why an injunction should be issued in
20   this case.
21            THE COURT:  Okay.  I'm going to give you rebuttal.
22            Why shouldn't the Court, if you lose on your
23   defenses, issue an injunction to take these speakers off the
24   market unless you disable the overlap function?
25            MS. COOPER:  Your Honor, Lindsay Cooper for Google.
```

```
 1              The Federal Circuit has weighed in on this exact

 2   issue.  They're asking for an injunction that applies to the

 3   full products.  The issue, the feature in this case is a very

 4   narrow --

 5              THE COURT:  Well, that's what I'm saying, enjoin you

 6   from -- I could enjoin you from using the overlap function.

 7   You could still have zone scenes, but you couldn't have zone

 8   scenes that overlap.  What's wrong with that?

 9              MS. COOPER:  In order -- in order to do that, they

10   would need to meet all of the injunction factors to begin

11   with.  We don't believe they have.  They have --

12              THE COURT:  What are they missing here?  They're

13   competitors.  You're killing them in the market.

14              MS. COOPER:  They need to prove irreparable harm,

15   and specifically they need to prove causal nexus.  They need

16   to prove that there's a connection between the claimed feature

17   and demand for the products.  There is literally no evidence

18   of that in the record right now.

19              THE COURT:  Well, if there's not, you lost the case.

20   They don't have to prove it.  You're the infringer.  You're

21   the bad actor here, not the~-- the plaintiffs won the case.

22              MS. COOPER:  It's their --

23              THE COURT:  They won.  I mean, you're the loser and

24   the infringe -- not just the loser, the infringer.

25              And by the way, given that the jury verdict came
```

1  down against you on '885, you are becoming a willful

2  infringer.

3          MS. COOPER:  I disagree with that, Your Honor.  But

4  at the injunction phase, there is no presumption of

5  irreparable harm based on an infringement verdict alone.

6  Their injunction case boils down to an infringement verdict

7  plus very limited evidence of competition.  That is not enough

8  for an injunction following eBay.

9          THE COURT:  You won't even pay the money.  You won't

10  even pay a royalty.  You don't want to pay the -- you say the

11  jury got it wrong and you're not going to pay.  So in the

12  meantime, they -- they're suffering in the marketplace.

13          MS. COOPER:  We believe the jury got it wrong on

14  damages, Your Honor.

15          THE COURT:  Yeah.

16          MS. COOPER:  If it comes to it, we are willing to

17  design around.  If Your Honor believes an injunction is

18  appropriate, if Your Honor believes they've established

19  irreparable harm and causal nexus, we're prepared to design

20  around.  We're already working on it.  The design-around we

21  would implement would be --

22          THE COURT:  You should not be -- see, what you're

23  saying here is you're blaming me.  You're trying to set it up

24  so later you'll say, well, Judge, we told you.

25          You should be making your own decision and instead

1   of waiting for me to get an order out when I got a million

2   cases.  You should -- and don't come back later and say, oh,

3   we told you, Judge, we were -- if you told us to design

4   around, we would.  That's not good enough.  You ought to be

5   thinking about designing around now, and the way to do it is

6   to disable the overlap function.

7          MS. COOPER:  We are working on it, and that's

8   exactly what we plan to do if the verdict stands.

9          THE COURT:  Well, you know, that will be two years

10  before we know what the Federal Circuit says.

11         MS. COOPER:  Well, we've --

12         THE COURT:  You mean if I uphold the verdict.  Well,

13  there's a good -- what do you mean, if the verdict stands?

14  Right now the verdict has ruled against you.

15         MS. COOPER:  We have a number of --

16         THE COURT:  You should not be saying, oh -- you're

17  saying, you know, if the Judge doesn't bail you out, you will

18  design around.

19         MS. COOPER:  Right.  And we're actively working on

20  it.

21         THE COURT:  Well, you should be.  And to my mind

22  it'd be an easy thing to disable the overlap function.  It

23  wouldn't be -- it might be a bad user experience, but if so,

24  that's -- until this patent gets invalidated somehow, maybe

25  that's the way you gotta go.

1          And you got a willfulness problem, too.

2          I have a different question is -- and that is, I had

3    thought, but I think Sonos has talked me out of it because you

4    don't want it anymore, I had thought it would be best to

5    explain to consumers that they are buying an infringing

6    product; that a jury has determined that Google's speakers

7    infringe if used in groups of three or more.  But Sonos says,

8    no, they don't want that, because you say they're not the

9    infringers.  Well, okay.

10          Now, you had a long list of lawyers and everything,

11   and I'm not going to do a notice to all those people, but the

12   consumers I wanted to protect from something, some accusation

13   by Sonos that they were bad people.  But you don't want that,

14   is that correct?

15          MR. SULLIVAN:  Well, I'm happy to -- you mean giving

16   notice to the consumers about Google's infringement?

17          THE COURT:  No, no, no, not at all.  Giving notice

18   to the consumers that if they use them in groups of three or

19   more.  It's use within the statute; use.  Make or sell.

20          MR. SULLIVAN:  Yeah, make, use or sell.

21          THE COURT:  So if the consumer is using them, why

22   wouldn't that be infringement?

23          MR. SULLIVAN:  Well, I don't want to threaten

24   consumers, Your Honor.

25          THE COURT:  See, I know you don't.  So now I'm

1    giving up on my idea because you -- you don't want to do that.

2    Okay, that's fine.  That's one less step I gotta worry about.

3            I think there's a good chance here, unless I somehow

4    grant one of these affirmative defenses -- which I am not

5    saying yes to or no to.  I gotta think it through.  There's a

6    good chance I'm going to enjoin, I'm going to order you to

7    suspend and get rid of the overlap function.  So you should be

8    thinking about that.

9            And even as we speak now, you are a willful

10   infringer from the moment of the jury verdict, at least for a

11   reasonable time thereafter.  You should not be waiting and

12   saying later you were waiting on the poor judge to make a

13   decision.  It could be months before I can get an order out.

14   It could be a week, I don't know.  But I do have other cases.

15   You saw today your law firm has got me in other cases.  So I

16   have a lot of cases to deal with, and I can't just say that

17   I'll get you an order within one or two weeks.

18           So you should be thinking, am I a willful infringer.

19           Is that Mr. Google back there?  Yes, you should be

20   thinking, is Google a willful infringer.

21           All right.  Go ahead.

22           MR. SULLIVAN:  I don't have anything else, Your

23   Honor.

24           THE COURT:  All right.

25           MS. COOPER:  Your Honor, I would just ask if the

1    Court is inclined to go down that road and issue some form of

2    injunctive relief, we just want to make sure the language is

3    clear there are multiple ways to do overlapping grouping, some

4    of which were not accused in the case.  For example, dynamic

5    grouping.  I just want to make sure that the injunction order

6    is precise and --

7              THE COURT:  Well, I don't remember it well enough

8    anymore to say whether it would or -- I thought dynamic was

9    where you had whatever you were listening to at the moment was

10   dynamic, but the -- I don't remember well enough now.  I'm not

11   going to say without going back, and I'll just issue an order

12   and Google will have to comply.

13             See, you're trying to -- give me again -- how would

14   you -- tell me how you would write the order.

15             MS. COOPER:  That the patent relates to saving

16   overlapping groups.  Dynamic grouping is where a user can

17   create different groups on the fly and they're not saved.  So

18   --

19             THE COURT:  Can I see that chart, that famous chart

20   you made for me?  I don't see it anymore.  The one that was

21   used through the trial, that one.

22             How would you write the order?  If I say to you,

23   stop overlap, how would you write it?

24             MS. COOPER:  I would suggest that it say, um -- you

25   know, it could just say Google is ordered to design around the

```
 1   patent.  There's --

 2            THE COURT:  No, you tried that and lost.

 3            MS. COOPER:  But, but --

 4            THE COURT:  I'm not going to do that again, because

 5   you pulled a trick and the jury saw through it.  So I'm not

 6   going to do that.  To my mind, you gotta get rid of overlap to

 7   avoid this patent.

 8            All right.  We're -- which one of these is talking

 9   about saving in the '855?

10            MR. PAK:  Your Honor, it's in the definition of Zone

11   C, it talks about previously saved.

12            THE COURT:  Yes.

13            MR. PAK:  This is Sean Pak for Google.

14            THE COURT:  Well, I'm not going to opine on what

15   you're asking me.  I -- you need to root out of your -- I'm

16   not ordering this yet, but if I do, it's going to be an

17   injunction ordering you to -- you can continue to sell, but

18   you gotta take out the overlap capability.  And that, to my

19   mind, would solve this problem, but I'm not -- I don't want

20   any cutesy.  I don't want any cutesy, where you come back and

21   say, well, overlap 1 is okay and overlap 2 is not.  Then I may

22   just enjoin the entire line of products.  So no more cutesy.

23   The jury saw through your first attempt.

24            MR. PAK:  Your Honor, on the -- just to make the

25   record clear, I think it's -- and I don't think we're going to
```

```
 1    hear any disagreement.  There are two types of grouping
 2    functionality in Google's products.  There a something called
 3    dynamic, where you can group, where you don't save the groups.
 4    And then there's something called static, where you group them
 5    and you save them.  The only accusations of infringement were
 6    directed toward static groups.  So to the extent there is an
 7    injunction, Your Honor -- and we're going through it, the
 8    exercise on our own -- it would be designing out the
 9    overlapping functionality for the static groups.
10              THE COURT:  Well, I am -- maybe that's right, but
11    maybe it's wrong, and I'm not prepared to accept your view
12    right now.
13              MR. PAK:  Thank you, Your Honor.
14              THE COURT:  All right.  Enough on this?
15              Okay.  I'll give each side a minute if you have
16    anything else procedural-wise to bring up so that I can --
17    because I got 15 minutes before my next hearing.  Anything
18    else anybody wants to bring up?  I don't have time to argue
19    any of the motions, but anything procedural?
20              MR. SULLIVAN:  Nothing from Sonos, Your Honor.
21              MR. PAK:  No, Your Honor.
22              Thank you very much for entertaining our argument.
23              THE COURT:  All right.  Thanks.  Good luck to both
24    sides.
25              MR. SULLIVAN:  Thank you, Your Honor.
```

```
 1        (Proceedings concluded at 10:40 a.m.)

 2                        * * * * *

 3                CERTIFICATE OF REPORTER

 4        I, Stephen W. Franklin, Registered Merit Reporter, and

 5   Certified Realtime Reporter, certify that the foregoing is a

 6   correct transcript, to the best of my ability, from the record

 7   of proceedings in the above-entitled matter.

 8        Dated this 12th day of AUGUST, 2023.

 9

10        /s/Stephen W. Franklin
          _____
11        Stephen W. Franklin, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```