# EXHIBIT 24
# Filed Under Seal

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Marc Kaplan *(pro hac vice)*
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>                        Plaintiff<br><br>           v.<br><br>SONOS, INC.,<br><br>                        Defendant. | Case No. 3:20-cv-06754-WHA |

**GOOGLE LLC'S EIGHTH SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF SONOS, INC.'S FIRST SET OF FACT DISCOVERY INTERROGATORIES (NO. 18)**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Google LLC ("Google") hereby objects and responds to Plaintiff Sonos, Inc.'s ("Sonos") First Set of Fact Discovery Interrogatories to Defendant ("Interrogatories"). Google responds to these

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Subject to and without waiving the foregoing General and Specific objections, Google responds, as follows:[1]

### '885 Patent & '966 Patent

Google incorporates by reference the opinions disclosed in Dr. Schonfeld's Opening Expert Report, Dr. Schonfeld's Rebuttal Report, and Dr. Schonfeld's deposition testimony regarding non-infringing alternatives.

*Non-Infringing Alternative #1 – Google's products*

Google's products do not infringe the asserted claims of the '885 and '966 patents. Accordingly, the accused Google products are themselves non-infringing alternatives to the asserted claims.

*Non-Infringing Alternative #2 – no standalone mode*

A non-infringing alternative is an implementation in which when the accused "standalone" speaker is added to a target group, and it matches the music (or silence) of the target group. Pursuant to FRCP 33(d), Google also refers Sonos to the source code files made available on the Quinn Emanuel LA Office source code review computer, and for which excerpts were provided to counsel for Sonos on September 1, 2022. See, e.g., SC-GOOG-SONOSNDCA-001598 - SC-GOOG-SONOSNDCA-001682.

Claim 1 of the '885 patent is exemplary. Claim 1 includes limitations that require the zone player to be added to two different zone scenes: "(i) receiving, from a network device over a data network, a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked" and "(ii) receiving, from the network device over the data network, a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to

---

[1] While Google provides estimates for implementing the non-infringing alternatives, these approximate time frames may be shorter based on the number of engineers involved.

be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player." The claim then requires that "after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation." In other words, the claim requires the zone player that was playing back music individually to be added to two different zone scenes, but to continue to operate in a "standalone mode" until one of the two zone scenes is "invoked."

With this non-infringing alternative, infringement is avoided by having the "standalone" speaker that is added to two zone scenes not continue to operate in "standalone" mode after it has been added to those zone scenes. Instead, the accused "standalone" speaker after being added to a zone scene may match the music (or silence) of the target zone scene. Indeed, currently, when a single speaker is playing music and a group is playing music and the single speaker is added to the group, the speaker will begin playing the music that the group was playing. Having this same behavior for the situation where a speaker is playing music and joined to a group that is not playing music would harmonize the behavior in these two situations.

In this alternative, the accused zone player would never "continue to operate in standalone mode" after receiving the indication that it "has been added to a first zone scene." Rather, the accused zone player would immediately adopt the behavior of the accused "zone scene" to which it was added. Therefore, the accused zone player would no longer be "configured to play back media individually" or, equivalently, remain in the accused "standalone mode."

All asserted claims of the '885 and '966 patents require the "standalone mode" functionality discussed above, and therefore this non-infringing alternative applies to all asserted claims. For example, in claim 1 of the '966 patent, that claim requires that a "first zone player is operating in a standalone mode," and that after a "first request," a "second request," and a "third request," that "based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players." Accordingly, the '966 patent claims, which each require these same steps, are subject to the alternative. This alternative would have been straightforward and taken minimal time, which

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

1  reflects its ready availability. Google estimates that it would need one Level-6 software engineer
2  working for one day to implement this alternative.

3  Google has publicly released a new version of its source code through software updates to
4  25% of the accused Google products with a display, and plans to continue rolling out the change to
5  the remaining accused products through December 2022. Google reserves the right to supplement
6  this interrogatory response, including when and if it publicly releases a new version of source code
7  relevant to this non-infringing alternative.

*Non-Infringing Alternative #3 - no overlapping groups*

9  A non-infringing alternative is an implementation in which a speaker that is already a
10 member of one group will be forced out of this (first) group when a user attempts to add the speaker
11 to a new (second) group. In other words, with this non-infringing alternative, no speaker can be a
12 member of more than one group at the same time.

13 This is a requirement of the asserted claims. For example, claim 1 of the '885 patent requires
14 that the zone player "receiv[es], from a network device over a data network, a first indication that
15 the first zone player has been added to a first zone scene" and that the zone player "receiv[es], from
16 the network device over the data network, a second indication that the first zone player has been
17 added to a second zone scene." "[A]fter receiving the first and second indications, [the zone player]
18 continu[es] to operate in the standalone mode until a given one of the first and second zone scenes
19 has been selected for invocation." Similarly, claim 1 of the '966 patent requires a "first request to
20 create a first zone scene comprising a first predefined grouping of zone players including at least
21 the first zone player" and a "second request to create a second zone scene comprising a second
22 predefined grouping of zone players including at least the first zone player." Claim 1 of the '966
23 patent also requires "while displaying the representation of the first zone scene and the
24 representation of the second zone scene, receiving a third request to invoke the first zone scene."
25 These representative claims (for this limited purpose) show that the asserted claims require the
26 overlapping groups described above.

27 Sonos's expert Dr. Almeroth has opined that this is the case. For example, Dr. Almeroth
28 opined that exemplary claim 1 of the '885 Patent recites that the "first zone player" has the capability

-10-

to be added to both a "first zone scene" and a "second zone scene" that are then both available to be "selected for invocation." See e.g., Almeroth Rebuttal Report at ¶299. Dr. Almeroth repeatedly opined that the claimed zone scenes have "overlapping" members. E.g., Almeroth Op. Rep. ¶304 ("As explained above, the claimed 'zone scene' technology enables users of the Accused Google Players to create and save predefined groups (referred to by Google as 'speaker groups' or 'static groups') of Accused Google Players, including groups that have one or more overlapping Accused Google Players, where each such group can later be launched at any time to cause the Accused Google Players in the previously-saved, predefined group to become configured to play back audio in synchrony."); ¶¶75, 86, 184, 304, 306, 315, 317, 334; Almeroth Reb. Rep. ¶336 ("Turning to claim 1's additional requirement that the 'first zone player' be programmed with the capability to be a member of two different 'zone scenes' comprising overlapping 'predefined' groups that are both in existence at the same time such that they are both available to be 'selected for invocation,' . . ."); ¶337 ("this scenario also does not meet the additional requirement that there be two overlapping groups that are both in existence and available for selection at the same time"); ¶403 ("However, limitation 1.7 requires much more than just 'overlapping groups' – it requires the capability to receive 'indications' that the 'first zone player' 'has been added' to two different 'zone scenes' comprising customized, pre-saved groups of 'zone players' that are then both in existence at the same time and available to be 'selected for invocation' by a user so that one of the 'zone scenes' can later be 'invoked' on demand."). The Court has also recognized this requirement. Dkt. 309 at 12 (the Court finding that "claim 1 recites a specific kind of device — a 'zone player' — that can be readily placed in pre-saved groups with other zone players to allow synchronous playback on demand," and "[t]he claimed ability to customize and save overlapping speaker groups and easily control group playback represents a clear technological improvement over the 'conventional multi-zone audio system,' which, as the specification explained, presents significant technological and physical obstacles to forming speaker groups").

      This claim language is consistent with the Asserted Patents' disclosure that a "zone player" can simultaneously be a member of multiple different groups that are predefined and pre-saved as part of multiple different "zones scenes" in existence at the same time, and provides yet another

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

*Non-Infringing Alternative #3 – Cloud Service, Not Playback Device, Communicates With Cloud Servers To Identify the Next One Or More Media Items In The Remote Playback Queue*

All asserted claims of the '033 patent recite a computing device that transmits "an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item."

Sonos's infringement contentions are vague and do not adequately disclose its theory of how any instruction from the sender device configures a playback device to perform items (i)-(iii) of this limitation. Sonos appears to allege that this limitation is met because a receiver device may receive a setPlaylist message from an MDx server and then (i) send a GetWatchNext request that, according to Sonos, returns a GetWatchNext response identifying a next one or more media items that are in the remote playback queue, and (ii) send a GetPlayer request that, according to Sonos, uses the information in the GetWatchNext response to obtain data to retrieve a media item in the cloud queue. '033 Infringement Contentions at Limitation 1.7. Google does not admit that this functionality satisfies the claimed limitation or that it fully and accurately describes the functionality of the accused products.

Nevertheless, a non-infringing alternative is for the receiver device to not send a GetWatchNext message or getPlayer requests. Instead, in Alternative 32 the receiver device would send a request to a Onesie agent. The Onesie agent would send the GetWatchNext request and GetPlayer request, and then stream the media data from the Onesie agent to the receiver device. In other words, in Alternative #3 the receiver device does not "obtain data identifying a next one or more media items that are in the remote playback queue," and does not "use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service."

Google has implemented Onesie for many receiver devices and is currently working on a feature called Streaming Watch which can allow the Onesie agent to make the GetWatchNext and

-13-

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

GetPlayer calls.  See, e.g., GOOG-SONOSNDCA-00071671; GOOG-SONOSNDCA-00070863; GOOG-SONOSNDCA-00073429; GOOG-SONOSNDCA-00073577.   Onesie and Streaming watch are discussed in further detail in the opening and rebuttal reports of Dr. Bhattacharjee, which are incorporated herein by reference.

*Non-Infringing Alternative #4 – Continue Playback*

All of the asserted claims require "transitioning from i) the first mode in which the computing device is configured for playback of the remote playback queue to ii) a second mode in which the computing device is configured to control the at least one given playback device's playback of the remote playback queue and the computing device is no longer configured for playback of the remote playback queue."

To the extent Google's accused products are found not to already do so, a non-infringing alternative that Google would have had at the time of the alleged first infringement is continuing playback at the control device after playback has been transferred to the playback device.  The playback can be continued with only the video alone (and the audio muted).  After transfer occurs, a "set and forget" operation could turn the receiver into a playback device without direct control from the YT app on the phone or tablet.  Video and audio would be playing back on the screen, and video would be playing on the phone/tablet. The user could retain control of the receiver through other means such as Google Assistant or Google Home.  Because the playback would not be stopped on the control device as part of the transfer step, this alternative does not infringe the Asserted Claims.

End users would have found this alternative to be an acceptable alternative.  This would thus provide additional functionality that the user may choose to take advantage of or may choose to ignore if they prefer.  In fact, users may prefer this method.  For instance, if the playback of a video continues on the control device after transferring playback is complete, the user would have the benefit of viewing the video both on their phone and on the television.

This alternative would have been straightforward and taken minimal time, which reflects its ready availability.  Google estimates that the modification to all the relevant accused products after

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | DATED: November 21, 2022 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |

By:   */s/ Charles K. Verhoeven*
Charles K. Verhoeven (*pro hac vice*)
charlesverhoeven@quinnemanuel.com
Melissa Baily (*pro hac vice*)
melissabaily@quinnemanuel.com
Lindsay Cooper (*pro hac vice*)
lindsaycooper@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:   (415) 875 6600
Facsimile:   (415) 875 6700

*Counsel for Defendant Google LLC*