# Exhibit 35
# Filed Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    GOOGLE LLC,

6               Plaintiff,

7          vs.                    No. 3:20-cv-06754-WHA

8    SONOS, INC.,

9               Defendant.

     _____/

10

11

12       -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

13

14    VIDEO-RECORDED DEPOSITION OF ALAINA KWASIZUR, ESQ.,

15       INDIVIDUALLY AND AS A FEDERAL RULE 30(B)(6)

16               WITNESS FOR SONOS, INC.

17               Remote Zoom Proceedings

18               San Diego, California

19           Wednesday, November 30, 2022

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 176                    Job No. 5592691

                                       Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5  GOOGLE LLC,

6        Plaintiff,

7        vs.        No. 3:20-cv-06754

8  SONOS, INC.,

9        Defendant.

_____/

10

11

12   -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

13

14    Video-recorded deposition of ALAINA KWASIZUR,

15  ESQ., individually and as a Federal Rule 30(b)(6) witness

16  for SONOS, INC., taken on behalf of the Plaintiff, Remote

17  Zoom Proceedings from San Diego, California, beginning at

18  9:18 a.m. Pacific Standard Time and ending at 2:45 p.m.

19  Pacific Standard Time, on Wednesday, November 30, 2022,

20  before Leslie Rockwood Rosas, RPR, Certified Shorthand

21  Reporter No. 3462.

22

23

24

25

Page 2

1  APPEARANCES:

2

3  FOR THE PLAINTIFF GOOGLE LLC:

4    QUINN EMANUEL URQUHART & SULLIVAN LLP

5    BY: JAMES D. JUDAH, ESQ.

6    50 California Street, 22nd Floor

7    San Francisco, California 94111

8    (415) 785-6420

9    jamesjudah@quinnemanuel.com

10

11

12  FOR THE DEFENDANT SONOS, INC. AND THE WITNESS:

13    LEE SULLIVAN SHEA & SMITH LLP

14    BY: COLE B. RICHTER, ESQ.

15    565 West Randolph Street, Floor 5W

16    Chicago, Illinois 60661

17    (312) 754-9602

18    richter@ls3ip.com

19

20  Also Present:

21    Jeffrey Nichols, Videographer

22

23

24

25

Page 3

1        I N D E X

2

3

4  WEDNESDAY, NOVEMBER 30, 2022

5

6  WITNESS                    EXAMINATION

7  ALAINA KWASIZUR, ESQ.

8

9   BY MR. JUDAH                      9

10

11  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12

13          Page    Line

14          12      2

15          12      18

16          30      25

17          31      5

18          32      7

19          39      10

20          39      17

21          45      19

22          54      21

23          56      4

24          167     23

25          168     8

Page 4

1
168      17
2
169      1
3
170      4
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 1 | DEPOSITION EXHIBITS | | |
| 2 | ALAINA KWASIZUR, ESQ. | | |
| 3 | NUMBER | DESCRIPTION | IDENTIFIED |
| 4 | Exhibit 1 | Google LLC's Fed. R. Civ. P. | 8 |
| 5 | | 30(b)(6) Notice of Deposition | |
| 6 | | to Sonos, Inc. | |
| 7 | Exhibit 2 | LinkedIn Profile | 8 |
| 8 | Exhibit 3 | GOOG-SONOSNDCA-00055243 - 252 | 27 |
| 9 | Exhibit 4 | SONOS-SVG2-00042905 - 922 | 68 |
| 10 | Exhibit 5 | SONOS-SVG2-00054781 | 68 |
| 11 | Exhibit 6 | SONOS-SVG2-00042923 - 944 | 68 |
| 12 | Exhibit 7 | SONOS-SVG2-00059384 - 404 | 68 |
| 13 | Exhibit 8 | SONOS-SVG2-00043164 - 166 | 99 |
| 14 | Exhibit 9 | SONOS-SVG2-00043167 - 199 | 106 |
| 15 | Exhibit 10 | SONOS-SVG2-00043743 | 108 |
| 16 | Exhibit 11 | SONOS-SVG2-00043746 - 766 | 109 |
| 17 | Exhibit 12 | SONOS-SVG2-00043744 | 112 |
| 18 | Exhibit 13 | SONOS-SVG2-00043767 | 116 |
| 19 | Exhibit 14 | SONOS-SVG2-00198096 - 097 | 118 |
| 20 | Exhibit 15 | SONOS-SVG2-00198098 - 100 | 120 |
| 21 | Exhibit 16 | SONOS-SVG2-00198101 - 105 | 121 |
| 22 | Exhibit 17 | SONOS-SVG2-00198106 - 140 | 122 |
| 23 | Exhibit 18 | GOOG-SONOSNDCA-00116067 - 071 | 133 |
| 24 | | | |
| 25 | | | Page 6 |

| | | | |
|---|---|---|---|
| 1 | Exhibit 19 | The Verge, Google Play Music | 146 |
| 2 | | adds built-in Sonos support | |
| 3 | | on Android | |
| 4 | Exhibit 20 | SONOS-SVG2-00070566 - 567 | 147 |
| 5 | Exhibit 21 | SONOS-SVG2-00059332 - 349 | 153 |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | Page 7 |

1  San Diego, California; Wednesday, November 30, 2022
2       9:18 A.M.
3
4       PROCEEDINGS
5  (Exhibit 1, Google LLC's Fed. R. Civ. P.
6  30(b)(6) Notice of Deposition to Sonos, Inc.,
7  marked for identification electronically by
8  counsel.)
9  (Exhibit 2, LinkedIn Profile, marked for
10  identification electronically by counsel.)    09:18:16
11      THE VIDEOGRAPHER:  Good morning.  We are going
12  on the record at 9:18 a.m. on November 30th, 2022.
13      This is Media Unit 1 of the video-recorded
14  deposition of Alaina Kwasizur and Alaina Kwasizur as a
15  30(b)(6) witness for Sonos, Inc., taken by counsel for    09:18:29
16  Plaintiff, in the matter of Google LLC versus Sonos,
17  Inc., and Sonos, Inc., versus Google LLC, filed in the
18  United States District Court, for the Northern District
19  of California, San Francisco Division.  The case number
20  is 3:20-cv-06754-WHA, with the related case number of    09:18:47
21  3:21-cv-07559-WHA.
22      My name is Jeff Nichols from the firm Veritext
23  Legal Solutions, and I am the videographer.  The court
24  reporter is Leslie Rosas from the firm Veritext Legal
25  Solutions.    09:19:10
Page 8

1      Counsel will now please state their appearances
2  and affiliations for the record.
3      MR. JUDAH:  James Judah of Quinn Emanuel on
4  behalf of Google.
5      MR. RICHTER:  Good morning.  Cole Richter from    09:19:25
6  Lee Sullivan Shea & Smith in Chicago on behalf of Sonos
7  and the witness.
8      THE VIDEOGRAPHER:  Thank you.
9      Will the court reporter please swear in the
10  witness.    09:19:34
11      THE REPORTER:  Thank you.
12      Alaina, if you would raise your right hand,
13  please, I'll swear you in.
14      Thank you.
15      You do solemnly state that the evidence you
16  shall give in this matter shall be the truth, the whole
17  truth and nothing but the truth, so help you God?
18      THE WITNESS:  I do.
19      THE REPORTER:  Thank you.
20      You may proceed, Counsel.    09:19:51
21
22      EXAMINATION
23  BY MR. JUDAH:
24      Q.  Good morning, Ms. Kwasizur.  Could you please
25  state your full name for the record?    09:19:57
Page 9

3 (Pages 6 - 9)

1 side of the fence.
2    Q.  Okay.  So do you recall when the -- when you
3 created the single template that replaced, sort of, the
4 two -- two-sided agreement that we're looking at here in
5 Exhibit 3?                                    09:47:49
6        MR. RICHTER:  Object to form, scope.
7        THE WITNESS:  I don't remember.  I don't
8 remember.
9    Q.  BY MR. JUDAH:  Was it during the time period
10 before you were general counsel AMPAC or after?   09:47:59
11       MR. RICHTER:  Object to form.
12       THE WITNESS:  I don't know.  I would be guessing
13 to tell you.  I don't know.  Sorry.
14    Q.  BY MR. JUDAH:  Fair to say it was after the time
15 that Google and Sonos executed Exhibit Number 3?   09:48:18
16    A.  Oh, yeah.  For sure.
17    Q.  Do you feel it was, in your recollection, like
18 several years later?
19       MR. RICHTER:  Object to form.
20       THE WITNESS:  If I had to guess, it was probably   09:48:30
21 a year or 2 later.  18 months, 2 years later.  I don't
22 remember exactly.  But I relatively new at this
23 point, so it would have been once I got more up to speed
24 and understood all of our agreements better, so yeah.
25    Q.  BY MR. JUDAH:  And why did you feel the need to   09:48:52
Page 30

1 create a -- a sort of single template instead of this
2 double-sided agreement?
3        MR. RICHTER:  I'll instruct the witness not to
4 answer on grounds of privilege and work product.
5    Q.  BY MR. JUDAH:  Okay.  Well, let me ask you,   09:49:12
6 Ms. Kwasizur, was it for, like, concerns over potential
7 litigation that Sonos made changes to the SMAPI
8 agreement?
9        MR. RICHTER:  Same instruction not to answer.
10       MR. JUDAH:  I'm just trying to establish whether   09:49:32
11 there's any basis for the privilege.  I mean, I could see
12 reasons why there would be privilege and work product
13 that would prevent the witness from answering, but there
14 could be reasons to change the agreement that aren't
15 based on that, and so I don't understand the categorical   09:49:46
16 instruction at this point.
17       MR. RICHTER:  I don't -- yeah, I don't agree
18 that the reason has to be based on litigation.  I mean,
19 you're asking an attorney what her reasons were for
20 modifying an agreement, and I think that's almost the   09:49:59
21 definition of work product.  So, I mean, if you can -- if
22 you can ask some other foundational questions that would
23 not implicate privilege or work product, you know, you're
24 free to do so, but, yeah, that's my instruction.
25    Q.  BY MR. JUDAH:  Well, let me ask you:   09:50:21
Page 31

1 Ms. Kwasizur, do you recall why you created this single
2 template SMAPI agreement to replace the double-sided --
3 double-sided version that's reflected in Exhibit 3?
4        MR. RICHTER:  Object to form, scope.  I think
5 that's a "yes" or "no" question, just for the record.   09:50:41
6        THE WITNESS:  Yes.
7    Q.  BY MR. JUDAH:  And was it for, like, legal
8 and/or work product-based reasons?
9        MR. RICHTER:  I'll instruct the witness not to
10 answer that on the grounds of privilege and work product.   09:51:05
11    Q.  BY MR. JUDAH:  Okay.  You're going to follow
12 that instruction, Ms. Kwasizur?
13    A.  Yes.
14    Q.  Okay.  Who do you recall discussing the decision
15 to create the single template SMAPI agreement to replace   09:51:23
16 the double-sided agreement?
17    A.  I probably spoke to Craig about it.  He was my
18 boss at the time.
19    Q.  Do -- did anyone else work -- withdrawn.
20       Did anyone else help draft that single template   09:51:56
21 for the SMAPI agreement that replaced the double-sided
22 agreement in Exhibit 3?
23       MR. RICHTER:  Object to form, scope.
24       THE WITNESS:  No.  I drafted it.
25    Q.  BY MR. JUDAH:  Did you have any communications   09:52:15
Page 32

1 with any outside counsel about that change to the single
2 template SMAPI agreement?
3        MR. RICHTER:  Object to form, scope.
4        THE WITNESS:  No.
5    Q.  BY MR. JUDAH:  Had Sonos been involved in any   09:52:32
6 litigation involving the double-sided Content Integration
7 Agreement?
8        MR. RICHTER:  Object to form, scope.
9        THE WITNESS:  No, not that I'm aware of.
10    Q.  BY MR. JUDAH:  Are you aware of any threatened   09:52:53
11 litigation involving the double-sided Content Integration
12 Agreement as of the time when you created this single
13 template?
14       MR. RICHTER:  Object to form, scope.
15       THE WITNESS:  No.   09:53:21
16    Q.  BY MR. JUDAH:  And then I think you said that
17 there was one -- at least one additional change to the
18 SMAPI agreement after you created the single template; is
19 that correct?
20    A.  Yeah.   09:53:34
21       MR. RICHTER:  Object to form on the last one.
22 Sorry.
23    Q.  BY MR. JUDAH:  And could you just restate at a
24 high level what that -- what that change was?  I think it
25 remained a single template; is that correct?   09:53:49
Page 33

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 agreement, that they're combined into one?

2 A. Yeah, pretty much.

3 Q. And so when you say Google signed the earlier

4 agreement, you -- you're referring to Exhibit 3, even

5 though it's the double-sided one and Google didn't --          10:05:26

6 A. (Nods nod.)

7 Q. Okay. So let me ask this then: Did Google --

8 has Google signed the single template version of the

9 SMAPI agreement?

10 A. I don't believe so, no. There'd be no need to,          10:05:36

11 because they had this one.

12 Q. And then I may have asked this, and I apologize,

13 but did you -- you drafted the -- this direct control

14 SMAPI agreement?

15 A. Yes. Sorry. Yes.          10:05:57

16 Q. And did anyone else help draft that agreement?

17 A. I probably had Shelby sort of shadow me on it.

18 She's my direct report, and probably as, like, a

19 development opportunity, I probably had her, you know,

20 contribute a little and sort of help a little bit, but          10:06:15

21 sort of under my supervision, if that makes sense.

22 Q. Was -- was any outside counsel involved in

23 helping review or draft that 2018 agreement?

24 A. No, not that I recall. No, I don't think so.

25      MR. JUDAH: All right. We've been going over an          10:06:36

Page 42

---

1 hour. Is this a good time for a break?

2      THE WITNESS: Fine by me.

3      MR. RICHTER: Fine with me, too.

4      THE VIDEOGRAPHER: We are going off the record.

5 The time is 10:06.          10:06:45

6      (Recess.)

7      THE VIDEOGRAPHER: We are back on the record.

8 The time is 10:19.

9 Q. BY MR. JUDAH: All right. Ms. Kwasizur, if you

10 could look at Exhibit Number 3.          10:19:28

11 A. Yeah, I have it open.

12 Q. Okay. So this -- were all Sonos partners in the

13 2013 time period required to sign the Content Integration

14 Agreement reflected in Exhibit 3?

15      MR. RICHTER: Object to form, scope.          10:20:01

16      THE WITNESS: Yes.

17 Q. BY MR. JUDAH: Were changes ever made to the

18 Content Integration Agreement, or is it a form agreement

19 that the partners were required to sign as drafted?

20      MR. RICHTER: Object to form.          10:20:25

21      THE WITNESS: Were changes ever made by us, like

22 an evolution of the template? Or you mean were changes

23 ever made by partners, like redlines?

24 Q. BY MR. JUDAH: The latter.

25 A. Oh, yes.          10:20:37

Page 43

---

1 Q. And do you recall any of the partners who

2 proposed changes that were redlines that were

3 implemented?

4      MR. RICHTER: Object to form, scope.

5      THE WITNESS: I mean, a lot of the bigger          10:20:51

6 partners had redlines for sure.

7 Q. BY MR. JUDAH: Were you involved in the

8 negotiation of this agreement with Google Exhibit 3?

9 A. This original agreement, no.

10 Q. Who was involved on Sonos' side in the          10:21:14

11 negotiation of this agreement?

12 A. I would assume Craig Shelburne, and probably

13 Kristen Bender was sort of the partner person back then.

14 Q. Did you speak with either Ms. Bender or

15 Mr. Shelburne to prepare for your corporate testimony          10:21:40

16 today?

17 A. No.

18 Q. Did you review Ms. Bender's deposition

19 transcript in this case to prepare for your deposition

20 today on this corporate topic?          10:21:53

21 A. No.

22 Q. And so do you consider yourself prepared to be

23 Sonos' designee on Topic Number 6 today?

24      MR. RICHTER: Object to form. And also just

25 note that the witness is appearing pursuant to our          10:22:18

Page 44

---

1 objections and our clarifications on the scope of Topic

2 6.

3      THE WITNESS: Yes.

4 Q. BY MR. JUDAH: Well, what, if anything, did you

5 do to prepare to testify on Topic Number 6 today on          10:22:28

6 behalf of Sonos?

7      MR. RICHTER: Object to form, asked and

8 answered.

9      THE WITNESS: I met with counsel, looked at

10 docs, yeah.          10:22:40

11 Q. BY MR. JUDAH: But you won't tell me what

12 documents you looked at to prepare for your corporate

13 testimony on Topic Number 6; is that correct?

14      MR. RICHTER: Object to form.

15      THE WITNESS: Well, no, I answered you earlier          10:22:51

16 when you asked if they were -- I forgot now what you

17 asked, but you asked if they were agreements, emails,

18 something else maybe.

19 Q. BY MR. JUDAH: Okay. Well, then let me ask

20 again. What documents did you look at to prepare to          10:23:04

21 testify as Sonos' corporate representative on Topic

22 Number 6?

23      MR. RICHTER: Same instruction not to answer as

24 before.

25 Q. BY MR. JUDAH: And are you going to not answer          10:23:18

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 that question, Ms. Kwasizur?

2    A.  Yes.

3    Q.  Okay.  So it's correct that you won't tell me

4 what documents you reviewed to prepare to testify today

5 on Topic Number 6; correct?                    10:23:30

6        MR. RICHTER:  Object to form.

7        THE WITNESS:  Correct.

8    Q.  BY MR. JUDAH:  All right.  So what do you know

9 about the facts and circumstances regarding the

10 negotiation of the Content Integration Agreement in     10:23:43

11 Exhibit Number 3 between Sonos and Google?

12        MR. RICHTER:  Object to form.

13        THE WITNESS:  Do you want to be more specific?

14 I mean, I kind of sort of already explained.  It's our

15 Content Integration Agreement.  This is what we called  10:24:02

16 the back end the partners needed in order to basically

17 launch something that they had built after signing the

18 front end and getting access to the materials.

19    Q.  BY MR. JUDAH:  Well, I understand --

20        MR. JUDAH:  And, Cole, you can correct if this   10:24:18

21 is not right --

22    Q.  -- that kind of the scope that Sonos has agreed

23 to put you up -- put up a witness on for Topic Number 6

24 is the facts and circumstances regarding the negotiations

25 and executions of the Content Integration Agreement.    10:24:31

                                                      Page 46

1        Is that -- is that consistent, Ms. Kwasizur,

2 with your understanding of the scope of your designation

3 on Topic Number 6?

4        MR. RICHTER:  Object to form.  I'll instruct the

5 witness to exclude from her answer any understanding she  10:24:46

6 has that came from counsel, but otherwise she can answer

7 if possible.

8        THE WITNESS:  Yes.

9    Q.  BY MR. JUDAH:  And so I'm trying to understand

10 what you know about that topic and specifically the facts  10:24:57

11 and circumstances regarding the negotiations.

12        And so with that in mind, I'd like to ask

13 what -- what can you tell me about the facts and

14 circumstances about the negotiations between Sonos and

15 Google that led to the execution of Exhibit Number 3?    10:25:19

16        MR. RICHTER:  Object to form.

17        THE WITNESS:  I know Google wanted to be on our

18 platform and that we had them sign this agreement.

19    Q.  BY MR. JUDAH:  Are you familiar with any of the

20 specific communications between Google and Sonos that    10:25:40

21 were exchanged as part of the negotiations that led to

22 the execution of Exhibit Number 3?

23    A.  No.

24    Q.  And are you aware of any of the specific

25 communications related to the execution of this          10:26:04

                                                      Page 47

1 agreement, Exhibit Number 3?

2    A.  No.

3    Q.  So have you reviewed Exhibit Number 3 before?

4    A.  Yes.  I've seen Exhibit Number 3 before, yes.

5    Q.  Did you see it at the time it was executed?     10:26:28

6    A.  Sometime once it was -- I've seen this before,

7 yes.  Google's one of our partners.  Over the years, I've

8 had to look at this agreement for one reason or another

9 I'm sure, so yes.

10    Q.  Do you recall the first time you looked at this   10:26:51

11 agreement?

12    A.  No.

13    Q.  Did you look at any drafts of this agreement

14 before it was executed?

15    A.  This 2013, no.                           10:26:58

16    Q.  Are you familiar with something called the beer

17 run test?

18    A.  Yes.

19        MR. RICHTER:  Object to form, scope.

20    Q.  BY MR. JUDAH:  What is the beer run test?        10:27:12

21        MR. RICHTER:  Same objection.

22        THE WITNESS:  The beer run test is -- it was

23 sort of a principle at Sonos of how we wanted Sonos to

24 work, and it sort of relates into why we do everything

25 via Wi-Fi and not Bluetooth.                      10:27:27

                                                      Page 48

1        We wanted it -- so we never wanted the music to

2 be basically going from your phone just to a speaker,

3 like a Bluetooth speaker works, because if the person

4 controlling the music left to run and get a beer, the

5 music would stop, so it was like this thing that -- it     10:27:46

6 sort of supported the -- the, sort of, founding principle

7 that Wi-Fi was the technology we were basing all the

8 connections around, if that makes sense.

9    Q.  BY MR. JUDAH:  Are you familiar with something

10 called the media route provider protocol or MRP?         10:28:01

11        MR. RICHTER:  Object to form, scope.

12        THE WITNESS:  I mean, I vaguely know what it is,

13 but I'm not a software engineer or anything.  So I guess

14 it depends what you mean with familiar, but, yeah, I

15 vaguely sort of know what it is.                  10:28:20

16    Q.  BY MR. JUDAH:  What's your understanding of what

17 it is?

18        MR. RICHTER:  Object to form, scope.

19        THE WITNESS:  My understanding is that I think

20 it was a Google thing, a way that they wanted the Google   10:28:29

21 implementation to work.

22    Q.  BY MR. JUDAH:  And what implementation are you

23 referring to?

24    A.  The SMAPI implementation or the partnership we

25 had with them.                                 10:28:49

                                                      Page 49

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 attachment to a filing.  But if you could, I guess, start
2 by looking at the next page.
3     If you could review this, and let me know if you
4 recognize it.
5     A.  Yes, I recognize it.                    14:05:48
6     Q.  Is -- what is -- what is Exhibit 21?
7     A.  It looks like it's our 2018 agreement with
8 Google.
9     Q.  So this is the -- this is the agreement that you
10 wrote?                                          14:06:03
11    A.  Yes.  Well, I created the template.  I believe
12 Shelby did the, like, redlining back and forth with them
13 on this with me.
14    Q.  So in -- your testimony is that this agreement
15 is specific to direct control implementations; is that  14:06:21
16 right?
17        MR. RICHTER:  Object to form, scope.
18        THE WITNESS:  This is the version of the
19 agreement that we use for partners who have direct
20 control functionality, yes, that's right.       14:06:36
21    Q.  BY MR. JUDAH:  This was executed between the
22 parties in -- if you go down -- you've got to go pretty
23 far down.  Hold on.
24        2018.  December 2018, I see.
25        Do you see that?                         14:07:02
                                           Page 154

1     A.  Yeah.
2     Q.  And you -- you signed this on behalf of Sonos?
3     A.  Yes.
4     Q.  So is it your testimony that Google and Sonos
5 did not have any direct control implementation prior to  14:07:14
6 December 2018?
7        MR. RICHTER:  Object to form, scope, calls for
8 expert testimony.
9        THE WITNESS:  No, we didn't have a contract
10 governing it until -- well, they might -- like I said    14:07:34
11 earlier, they might have signed our DPA at some point.
12 That might have had some language around direct control
13 rights-type thing.
14       But, yeah, we didn't have a contract in place
15 around it until -- until then.                  14:07:50
16    Q.  BY MR. JUDAH:  Until this -- this contract in
17 2018?
18    A.  Yeah.
19       MR. RICHTER:  Object to form, scope.
20    Q.  BY MR. JUDAH:  Does Sonos typically enter into  14:07:59
21 collaborations that -- without any contract governing
22 the -- the terms of that -- of that agreement --
23 withdrawn.
24       Does Sonos typically enter into, you know,
25 collaborations with -- with music service provider       14:08:21
                                           Page 155

1 partners without a governing contract?
2        MR. RICHTER:  Object to form, scope, calls for a
3 legal conclusion.
4        THE WITNESS:  No, not typically.  No, I wouldn't
5 say that.                                       14:08:35
6     Q.  BY MR. JUDAH:  Can you think of any other
7 examples where that's happened?
8        MR. RICHTER:  Object to form, scope.
9        THE WITNESS:  Yeah, we probably have had
10 instance where things go live while the contract's still  14:08:47
11 being finalized.  Yes, I'm sure that's happened in the
12 past.
13    Q.  BY MR. JUDAH:  Was this 2018 contract still
14 being finalized in 2014 when the first part of the Google
15 Play Music/Sonos direct control implementation was       14:09:04
16 launched?
17        MR. RICHTER:  Object to form, scope.
18        THE WITNESS:  No, that -- no, that wouldn't make
19 any sense.  No.
20    Q.  BY MR. JUDAH:  So is your testimony that there  14:09:22
21 was no contract in place that governed the parties'
22 respective rights with respect to the collaboration work
23 that went into that Google Play Music/Sonos direct
24 control feature?
25        MR. RICHTER:  Object to form, scope.          14:09:44
                                           Page 156

1        THE WITNESS:  Yeah.  Like I said, they -- I
2 think they did sign the DPA portion.  I don't know what
3 the date was on that, but yes -- yeah, that is -- I mean,
4 at the time -- you mean at the time of that article
5 launch?  Yeah, I don't think there was any contract       14:10:03
6 governing the, sort of, direct control aspect of it.
7     Q.  BY MR. JUDAH:  Did anyone from Sonos involved in
8 the negotiation of the 2013 Content Integration Agreement
9 believe that it applied to the direct control feature
10 that the parties collaborated on?                14:10:28
11       MR. RICHTER:  Object to form, scope.
12       And instruct the witness to exclude from her
13 answer any communications to or from counsel regarding
14 legal advice or -- or work product.
15       THE WITNESS:  No.  I mean, the contract is       14:10:46
16 fairly clear that it covers SMAPI.  I don't -- I don't
17 think anyone would think that that contract covered it --
18 covered a direct control implementation.
19    Q.  BY MR. JUDAH:  Are you aware of whether any
20 Sonos employees involved in the negotiation of that       14:11:00
21 contract have testified that they believe it did cover
22 the direct control implementation?
23       MR. RICHTER:  Same objections.
24       Same instruction.
25       THE WITNESS:  Yeah, I don't know what other       14:11:17
                                           Page 157

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 people have testified, but I don't -- I don't think that
2 it covered it. I'm not sure -- I'm not sure exactly who
3 you're referring to, but -- but the contract's pretty
4 clear that it doesn't cover it. So I'm not sure if they
5 were just confused or what. But that contract was our    14:11:35
6 standard SMAPI agreement.
7        Like this other one, you can see if you look at
8 it, it has, like, direct control experience. It has,
9 like -- I think we call it the enhanced app or whatever.
10 We clearly make a distinction in the contract for direct    14:11:53
11 control. And that -- the old one did not, but...
12    Q. BY MR. JUDAH: If you go back to Exhibit 3,
13 which is that 2013 Content Integration Agreement, it
14 references Google's media route provider protocol,
15 correct?                                                   14:12:14
16    A. Yes, it does say that somewhere in here. Yeah.
17    Q. And, specifically, I can just direct you. It's
18 Section 3.3 that references it.
19        So is it your testimony that Google's media
20 route provider has nothing to do with direct control    14:12:29
21 implementation?
22        MR. RICHTER: Object to form, scope, misstates
23 testimony, asked and answered. Also, calls for expert
24 testimony.
25        MR. JUDAH: I'll just note, Cole, I haven't been    14:12:41
                                                          Page 158

1 that has to do with anything.
2        I do see it in the agreement, if that's -- if --
3 yes, I see it in the agreement. It's referenced there.
4 But I don't --
5    Q. BY MR. JUDAH: But your testimony is that    14:14:10
6 nothing in this 2013 Content Integration Agreement
7 relates to the direct control implementation with Google
8 Play Music; is that correct?
9        MR. RICHTER: Object to form, scope.
10        THE WITNESS: Yeah, that's correct. This is our    14:14:28
11 SMAPI agreement. I mean, it doesn't have any direct
12 control language. It doesn't reference direct control.
13 It doesn't -- it doesn't seem like a direct control
14 agreement.
15        Again, Craig was probably the person who drafted    14:14:40
16 it, but just -- you know, from what I know of Sonos, this
17 is our SMAPI agreement. The integrated service offering
18 doesn't -- the way it's defined, doesn't include a
19 reference to direct controls. So, yes, I would say this
20 is about our SMAPI implementation.                      14:14:57
21    Q. BY MR. JUDAH: Well, you said that this
22 doesn't -- this agreement doesn't have any direct control
23 language. But you don't know whether media route
24 provider protocol relates to direct control; isn't that
25 true?                                                    14:15:15
                                                          Page 160

1 too strict on this, but, you know, under Judge Alsup's
2 rules, you're really just supposed to object to form.
3        MR. RICHTER: Okay. Well, is it your
4 understanding that all of those types of objections that
5 I've objected to, including scope, like, would fall under    14:12:59
6 form?
7        MR. JUDAH: Scope -- I mean, scope is -- is, I
8 think, different. But the other ones are subsumed in
9 form.
10        So, I mean, that's his rule. You can -- you can    14:13:08
11 follow or ignore it as you will, but I'll just remind you
12 of that.
13    Q. But in any event, I have a question pending,
14 Ms. Kwasizur. Do you want me to repeat it?
15    A. Yeah. Sorry. If you don't mind.                  14:13:24
16    Q. Yeah.
17        So is it your testimony that Google's media
18 route provider has nothing to do with the direct control
19 implement of Google Play Music on Sonos speakers?
20        MR. RICHTER: Same objections.                   14:13:41
21        THE WITNESS: Yeah, I don't -- I don't know what
22 a media remote -- media route provider does. I don't --
23 I can't -- I mean, I see that it's referenced in this
24 agreement, but, I mean, for all I know, it's some UX
25 feature. I don't know what it is, so I can't say what    14:13:56
                                                          Page 159

1        MR. RICHTER: Object to form, scope.
2        THE WITNESS: Yeah, correct. I don't know what
3 the media route provider protocol -- am I saying it
4 right? I don't know what that is or what it does. It's
5 probably a question for our -- the people who worked in    14:15:25
6 software on it. I don't know what that is.
7    Q. BY MR. JUDAH: Is -- is it your view that the
8 2018 agreement, which is Exhibit 21, in any way modified
9 or superceded or nullivated the 2013 Content Integration
10 Agreement?                                              14:16:09
11    A. No --
12        MR. RICHTER: Beyond the scope.
13        THE WITNESS: Yeah, 100 percent the intent was
14 for this to replace the 2013 agreement.
15    Q. BY MR. JUDAH: And so you -- and what's --    14:16:17
16 what's your basis for that statement?
17        MR. RICHTER: Object to form, scope.
18        THE WITNESS: I mean, that's how we usually do
19 it. If someone signs a new agreement, sort of covering
20 what the old agreement covers, it supercedes it. I think    14:16:31
21 there's even language probably towards the end says that
22 supersedes, you know, that standard boilerplate that we
23 have in there.
24        Hold on. I'll find it.
25        Where is it? 12.8, I'm guessing -- this    14:16:56
                                                          Page 161

41 (Pages 158 - 161)