1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA 94105-2669
6  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
7
   SEAN M. SULLIVAN (*pro hac vice*)
8  sullivan@ls3ip.com
   MICHAEL P. BOYEA (*pro hac vice*)
9  boyea@ls3ip.com
   COLE RICHTER (*pro hac vice*)
10 richter@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
11 656 W Randolph St., Floor 5W
   Chicago, IL 60661
12 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
13
   *Attorneys for Sonos, Inc.*

14

15

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18                      SAN FRANCISCO DIVISION

19  GOOGLE LLC,                        Case No. 3:20-cv-06754-WHA
                                       Related to Case No. 3:21-cv-07559-WHA
20        Plaintiff and Counter-defendant,
                                       **SONOS INC.'S OPPOSITION TO**
21  v.                                 **GOOGLE'S MOTIONS FOR SUMMARY**
                                       **JUDGMENT**
22  SONOS, INC.,
                                       Date: March 30, 2023
23        Defendant and Counter-claimant.   Time: 8:00 a.m.
                                       Place: Courtroom 12, 19th Floor
24                                     Judge: Hon. William Alsup
25
                                       Complaint Filed: September 28, 2020
26

27
                          **FILED UNDER SEAL**
28

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.    THERE ARE MATERIAL DISPUTES OF FACT OVER WHETHER THE '033 PATENT
      IS OBVIOUS ............................................................................................................... 1

      A.   Google Is Judicially Estopped From Arguing That YTR Uses A Remote Playback
           Queue. ................................................................................................................ 2

      B.   The YTR App Does Not Disclose A Remote Playback Queue. ....................... 3

           1.   YTR Party And Non-Party Modes Used The Same Infrastructure.............................. 4

           2.   The Party Playlist Saved By The Lounge Server In Party Mode Is Not A Remote
                Playback Queue.................................................................................................. 6

           3.   YTR Does Not Disclose Limitation 1.7 of Claim 1 of the '033 Patent. ..................... 7

II.   THERE ARE MATERIAL DISPUTES OF FACT REGARDING THE VALIDITY OF THE
      '885 AND '966 PATENTS.......................................................................................... 10

      A.   Sonos's Market-Leading "Zone Scene" Technology ...................................... 10

      B.   The Prior Art Does Not Disclose, Alone Or In Combination, The Claimed Zone Scene
           Technology....................................................................................................... 12

      C.   Google Cannot Show A Motivation To Combine Or A Reasonable Expectation of
           Success. ............................................................................................................ 15

      D.   The Prior Art Does Not Enable The Claims. ................................................. 17

      E.   There Is Substantial Objective Evidence Of Non-Obviousness. .................... 19

III.  THERE ARE MATERIAL DISPUTES OF FACT REGARDING GOOGLE'S
      REDESIGNED PRODUCTS........................................................................................ 19

1

A.  Google's "Redesign" Still Infringes Claim 1 Of The '885 Patent. ................................ 19

2

B.  Google's "Redesign" Does Not Avoid Infringement Of The '966 Patent. ..................... 23

3

IV.  THERE ARE MATERIAL DISPUTES OF FACT REGARDING WILLFULNESS AND

4

INDIRECT INFRINGEMENT ................................................................................................. 23

5

CONCLUSION ........................................................................................................................... 25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Int'l Trade Comm'n*,
725 F.3d 1356 (Fed. Cir. 2013) ............................................................................. 19

*Apple Inc. v. Princeps Interface Techs. LLC*,
No. 19-cv-06352-EMC, 2020 WL 1478350 (N.D. Cal. Mar. 26, 2020)................ 24

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ............................................................................. 17

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
501 F.3d 1274 (Fed. Cir. 2007) ............................................................................. 18

*Conceptus, Inc. v. Hologic, Inc.*,
771 F. Supp. 2d 1164 (N.D. Cal. 2010) ................................................................... 1

*In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ............................................................................. 15

*Eli Lilly & Co. v. Barr Lab'ys, Inc.*,
251 F.3d 955 (Fed. Cir. 2001) ............................................................................ 1, 2

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .............................................................................................. 25

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ............................................................................. 16

*Hyosung TNS Inc. v. Int'l Trade Comm'n*,
926 F.3d 1353 (Fed. Cir. 2019) ............................................................................. 14

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017) ............................................................................. 14

*Nat'l Prods., Inc v. Arkon Res., Inc.*,
No. CV 18-02936 AG (SSX), 2019 WL 1034321 (C.D. Cal. Jan. 9, 2019)..... 22, 23

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*,
166 F.3d 1190 (Fed. Cir. 1999) ............................................................................. 18

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........................................................................................... 3, 22

*Optivus Technology, Inc. v. Ion Beam Applications S.A.*,
469 F.3d 978 (Fed. Cir. 2006) .......................................................................... 15, 16

*Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*,
    42 F. Supp. 3d 579 (D. Del. 2014) ........................................................................ 18

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013) ............................................................................ 19

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
    993 F.3d 1374 (Fed. Cir. 2021) ............................................................................ 17

*Spigen Korea Co. v. Ispeak Co.*,
    No. SA CV 15-1050-DOC, 2016 WL 3982307 (C.D. Cal. July 22, 2016) ............ 15

*SRI Int'l. v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) ............................................................ 23

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
    977 F.3d 1232 (Fed. Cir. 2020) ............................................................................ 17

*Vallavista Corp. v. Amazon.com, Inc.*,
    657 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................. 1

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) .............................................................................. 22

**Other Authorities**

Fed. R. Civ. P. 56(c) ............................................................................................... 1

## TABLE OF EXHIBITS

| EX. | DESCRIPTION |
|---|---|
| A | Declaration of Rob Lambourne |
| B | Declaration of Nick Millington |
| C | Declaration of Douglas C. Schmidt |
| D | Declaration of Kevin C. Almeroth |
| E | Opening Expert Report of Douglas C. Schmidt dated November 30, 2022 (excerpts) |
| F | Rebuttal Expert Report of Douglas C. Schmidt dated January 13, 2023 (excerpts) |
| G | Reply Expert Report of Douglas C. Schmidt dated January 23, 2023 (excerpts) |
| H | Supplemental Opening Expert Report of Dr. Kevin C. Almeroth for "Patent Showdown" dated July 18, 2022 (excerpts) |
| I | Rebuttal Expert Report of Dr. Kevin C. Almeroth for "Patent Showdown" dated July 27, 2022 (excerpts) |
| J | Opening Expert Report of Dr. Kevin C. Almeroth dated November 30, 2022 (excerpts) |
| K | Rebuttal Expert Report of Dr. Kevin C. Almeroth dated January 13, 2023 (excerpts) |
| L | First Supplemental Reply Expert Report of Dr. Kevin C. Almeroth dated January 26, 2023 (excerpts) |
| M | Deposition transcript of Kenneth J. Mackay taken on May 10, 2022 (excerpts) |
| N | Deposition transcript of Kenneth J. Mackay taken on January 25, 2023 (excerpts) |
| O | Deposition transcript of Dan Schonfeld taken on August 31, 2022 (excerpts) |
| P | Deposition transcript of Dan Schonfeld taken on February 3, 2023 (excerpts) |
| Q | Sonos, Inc.'s Fourth Supplemental Responses and Objections to Google's First Set of Interrogatories [1-20] dated November 8, 2022 (excerpts) |
| R | Sonos specification (SONOS-SVG2-00026839) (excerpts) |
| S | CNN Underscored article (SONOS-SVG2-00062361) (excerpts) |

## PATENTS

| DKT. NO. | DESCRIPTION |
|---|---|
| Dkt. 1-3 | U.S. Patent No. 10,779,033 |
| Dkt. 1-5 | U.S. Patent No. 10,469,966 |
| 3:21-cv-07559-WHA, Dkt. 51-45 | U.S. Patent No. 10,848,885 |

1

**INTRODUCTION**

2      Google moves for summary judgment on four separate issues. Dkt. 483 (Mot.). This Court

3 should deny Google's first motion and summarily deny the remaining motions without

4 consideration. The Court's Scheduling Order is clear that "[e]ach party" may file "*one* summary

5 judgment motion." Dkt. 67 ¶19 (emphasis added). If that motion is filed early *and* granted, the

6 Court will consider a second motion. *Id.* ¶¶19-20. The Court's Order makes clear that a "summary

7 judgment *motion*" cannot consist of multiple issues; in the case of an early motion, for example, "a

8 movant should base its motion on its best *ground* for summary relief." *Id.* ¶20 (emphases added).

9 That is different from the showdown procedure, where the Court expressly permits each party to

10 file a single brief that covers multiple different issues, and does not limit each motion to a single

11 "ground." *Cf.* Dkt. 68 ¶2. Even if the Court considers Google's four motions on the merits, each

12 involves material disputes of fact and none are appropriate for summary judgment.

13

**LEGAL STANDARD**

14      Summary judgment is only appropriate "if 'there is no genuine issue as to any material

15 fact and the moving party is entitled to judgment as a matter of law.'" *Vallavista Corp. v.*

16 *Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1135 (N.D. Cal. 2008) (quoting Fed. R. Civ. P. 56(c)).

17 Granting a motion for "summary judgment of noninfringement" "would require finding that no

18 reasonable juror, when drawing all reasonable inferences in favor of [patentee], could return a

19 verdict of infringement." *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1175 (N.D. Cal.

20 2010). And "a moving party seeking to invalidate a patent at summary judgment must submit

21 such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."

22 *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

23

**ARGUMENT**

24 **I.    THERE ARE MATERIAL DISPUTES OF FACT OVER WHETHER THE '033**
25 **PATENT IS OBVIOUS**

26      Sonos's '033 Patent claims a controller (e.g., a smart phone) that can play a list of media

27 items (e.g., songs). The list of songs is maintained in a "remote playback queue provided by a

28 cloud-based computing system associated with a cloud-based media service." Dkt. 1-3 ("'033

Patent"), claim 1.  The controller can transfer playback of the "remote playback queue" from itself to a "playback device," like a smart speaker.  *Id.*  Google now contends that the asserted claims of the '033 Patent are invalid in light of the prior art YouTube Remote ("YTR") app.  But Google previously told the Court that YTR used *only* a *local* playback queue.  Google cannot now argue that YTR also used a *remote* playback queue.  Not only is this argument contrary to Google's prior representations to this Court, it is incorrect.  Because the YTR system uses only a local playback queue and does not use a remote playback queue, it cannot invalidate the '033 Patent.  At a minimum, there are genuine disputes of material fact regarding the operation of YTR that preclude summary judgment.

A.    **Google Is Judicially Estopped From Arguing That YTR Uses A Remote Playback Queue.**

Google previously argued that the YTR app invalidates Sonos's '615 Patent.  Dkt. 221-03 ("Showdown MSJ"), 16.  Like the '033 Patent, the '615 Patent claims computer programming for transferring playback from a controller, like a smartphone, to a smart speaker.  But the '615 Patent requires using a *local* playback queue stored on the speakers, and does not claim the use of remote playback queues at all.  In asking this Court to invalidate the '615 Patent, Google argued that YTR used a *local* playback queue, and further argued that there can only be one playback queue in a system.  For example, Google repeatedly told the Court that the prior art YTR systems *used only* a "local playback queue" stored on a playback device:

> [T]he YouTube Remote prior art product is a direct ancestor of the YouTube product Sonos accuses of infringement …. The **key difference** is that where the **accused YouTube** applications **use … a cloud queue**, the **prior art YouTube Remote used … a local queue**. Thus, Google's **current (remote queue)** products cannot infringe the ['615] Patent, but its **prior art (local queue)** products invalidate that same patent." Showdown MSJ, 2.
>
> **"[O]lder versions** of [the MDx] protocol **stored the playback queue on the playback device**. When Google transitioned to MDx Version 3, it **eliminated** the **playback queue on the playback device** in favor of a **cloud queue** in the [sic] maintaining it on the MDx server."** Showdown MSJ, 5.

Google also told the Court that the existence of a "local playback queue" in a system is **mutually exclusive** of a "remote playback queue" (or "cloud queue") and **vice versa**:

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

"**THE COURT:** All right. So, Mr. Verhoeven, the argument against you here [as to infringement] is that -- there are two queues: There is one in the Cloud, and there is another one on the speaker. The local playback queue is on the speaker, and all it needs to know is what is the next one. And so that's good enough for its purposes and just calls the next one. . . . What do you say to that?

**MR. VERHOEVEN [FOR GOOGLE]:** I say that that's unpersuasive in the extreme . . . We're talking about *a* queue. *Somebody has to own that queue*. Somebody has to *maintain that queue*. Somebody has to be in charge of *that queue*. Who is it? It's the Cloud. That's why it's called *the* Cloud *queue*. *The queue* is maintained in the Cloud. If you want to know -- if you're the speaker and you want to know the next item in *the queue*, you ask the Cloud because the Cloud maintains *the queue*." Dkt. 308 (7/13/22 Hr'g Tr.) at 59:16-60:9.

The Court sided with Google based on these representations and granted summary judgment that the YTR System invalidated claim 13 of the '615 Patent.  Dkt. 316 at 11.  The Court thus necessarily agreed with Google that the YTR System includes a "local playback queue," as required by claim 13 of the '615 Patent.  *See* Showdown MSJ, 17-18 (arguing that YTR discloses a local playback queue).  So Google took a position about the scope of the YTR prior art, convinced the Court to adopt that position, and successfully invalidated Sonos's patent on that basis.  "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  Google is judicially estopped from now arguing that the YTR app discloses a remote playback queue, and the Court should deny Google's motion for summary judgment on that basis.

**B.      The YTR App Does Not Disclose A Remote Playback Queue.**

As a separate basis for denying summary judgment, there are at minimum disputes of fact over whether the YTR app uses a remote playback queue, as required by the asserted claims of the '033 Patent.  Google asserts that the YTR "Party Mode" makes the claims of the '033 Patent obvious.  Mot. at 2-3.  The YTR "Party Mode" is simply a mode that allows multiple YouTube accounts to add songs to the same queue.  It does not change anything about the location of the playback queue.  Indeed, the media player (e.g., a TV or "Leanback" device) does not even know if the YTR system is in party mode or not.  Sonos first explains why there is no relevant difference

1    between the YTR party mode and non-party mode, and then explains that the YTR system uses a

2    local playback queue, not a remote playback queue.

3         **1.    YTR Party And Non-Party Modes Used The Same Infrastructure.**

4         The YTR System included: (1) a YTR software application installed on one or more

5    computer devices, such as mobile phones, that were also referred to as "remotes"; (2) a "Lounge

6    Server," also called an "MDx Server," that operated using an "MDx Protocol"; and (3) one or more

7    "Leanback Screens," such as TVs, that were also referred to as "Connected Screens" (or simply

8    "Screens" for short).  Mot. at 3; Ex. F (Schmidt Reb.), ¶155.  In both party mode and non-party

9    mode, "[t]he YTR application could be used for local playback on the mobile device ('Local

10   Playback Mode')" or, "[w]hen video playback was transferred from the YTR application … to one

11   or more Screens, the YTR application would serve as a remote control that could be used to control

12   playback on the Screens ('Remote Control Mode')."  Ex. F (Schmidt Reb.), ¶155.

13        The YTR application could be paired with multiple Leanback Screens (TVs), and the same

14   media would be played on that set of Leanback Screens.  The YTR application would control the

15   playback for the whole set.  *See* Ex. F (Schmidt Reb.), ¶163.  In addition, in both party mode and

16   non-party mode, the YTR application could be used on more than one computer device (e.g., mobile

17   phone) in the same session.  Ex. F (Schmidt Reb.), ¶164.  In other words, the set of Leanback

18   Screens could be controlled by multiple YTR remote controls.  Ex. F (Schmidt Reb.), ¶164.  And

19   just like in party mode, in non-party mode, a second remote control (smart phone) could be added

20   to an existing session between a first remote control and one or more Leanback Screens, and the

21   second remote control, like the first remote control, would obtain a copy of the entire list of videos

22   for playback.  Ex. F (Schmidt Reb.), ¶164.

23        Consequently, YTR's non-party mode allowed multiple remote controls and multiple

24   Leanback Screens to communicate with each other through a single Lounge Server.  Ex. F (Schmidt

25   Reb.), ¶199.  YTR's party mode did the same thing – it allowed multiple remote controls and

26   multiple Leanback Screens to communicate with each other through a single Lounge Server.  *Id*.

27   The only difference was that non-party mode remote controls and Leanback Screens had to be

28   logged into the same YouTube Account, while party mode purportedly permitted remote controls

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    and Leanback Screens logged into different YouTube Accounts.  *Id.*

2         Party mode's ability to use TVs and smartphones logged in to different YouTube accounts

3    means that the messages amongst the various devices in party mode inform the Lounge Server that

4    it needs to relay the playlist and updates to not just the remote controls and Leanback Screens

5    associated with the host's YouTube account, but also to the remote controls and Leanback Screens

6    associated with any guests' YouTube accounts in the same session.  Ex. F (Schmidt Reb.), ¶200.

7    As explained below, however, in all other respects, the messages are the same for both non-party

8    mode and party mode.

9         For example, in non-party mode, a remote control sends a copy of its entire local playback

10   queue in a "SET_PLAYLIST" message to the Lounge Server.  Ex. F (Schmidt Reb.), ¶174.  The

11   Lounge Server then sends the SET_PLAYLIST message to any and all of the connected Leanback

12   Screens in the session.  Ex. F (Schmidt Reb.), ¶174.  Likewise, in party mode, a host remote control

13   sends a copy of its entire local playback queue in a "SET_**PARTY**_PLAYLIST" message to the

14   Lounge Server.  Ex. F (Schmidt Reb.), ¶207.  The Lounge Server then sends a SET_PLAYLIST

15   message to any and all of the connected Leanback Screens of the host and guests in the session.

16   Ex. F (Schmidt Reb.), ¶208.

17        The SET_PLAYLIST message that each Leanback Screen receives from the Lounge Server

18   in party mode is *the same* as the SET_PLAYLIST message that each Leanback Screen receives

19   from the Lounge Server in non-party mode.  Ex. F (Schmidt Reb.), ¶209.  After receiving this

20   SET_PLAYLIST message from the Lounge Server, each Leanback Screen, whether in a party

21   mode or a non-party mode session, saves a copy of the entire playlist into its local playback queue.

22   Ex. F (Schmidt Reb.), ¶¶175, 209.  Just as in a non-party mode session, each Leanback Screen in a

23   party mode session uses its own local playback queue, which now contains the entire party playlist,

24   to playback the media items sent from the remote control(s) via the Lounge Server.  Ex. F (Schmidt

25   Reb.), ¶209.

26        In both party mode and non-party mode, all connected remotes in the session can modify or

27   edit the playlist with updates.  Ex. F (Schmidt Reb.), ¶¶177, 213.  To do so, a remote will send an

28   update message to the Lounge Server, which will, in turn, send the updates for the playlist to the

connected remotes and Leanback Screens in the session.  *Id..*  Notably, the UPDATE_PLAYLIST message that each Leanback Screen receives from the Lounge Server in party mode is *the same* as the UPDATE_PLAYLIST message that each Leanback Screen receives from the Lounge Server in non-party mode.  Ex. F (Schmidt Reb.), ¶¶177, 214.  Once the updates have been processed by the Leanback Screens, the locally-stored playback queue on each Leanback Screen will maintain the full updated playlist and each Leanback Screen will continue to playback the media items from their locally-stored playback queue.  *Id.*

Accordingly, in the YTR System's party and non-party modes, the playback queue locally stored on the Leanback Screen: (i) comprises the list of media items that is used for playback by the Leanback Screen; (ii) contains the entire list of media items selected for playback; (iii) is not being used merely to process a list of media items maintained elsewhere for playback; and (iv) is the queue that "runs the show."  Dkt. 316 at 8, 10 (construing and applying construction of "playback queue"); Ex. F (Schmidt Reb.), ¶¶178, 215.  Put another way, regardless of whether the YTR System is operating in party mode or non-party mode, the Leanback Screens maintain a local playback queue.  Ex. F (Schmidt Reb.), ¶¶179, 216.

## 2. The Party Playlist Saved By The Lounge Server In Party Mode Is Not A Remote Playback Queue.

Google contends that because the Lounge Server retains a copy of the playlist in party mode, the Lounge Server has a remote playback queue.  As Google's technical expert, Dr. Bhattacharjee, previously explained in connection with Sonos's argument that the modern YouTube system infringes claim 13 of the '615 Patent:

> That the accused YouTube system does not use a "local playback queue" is further evidenced by the fact that in the accused system if the MDx servers were to go offline, playback of the playlist would not be possible.  In contrast, in a system that stored *the "playback queue" locally on the device, the playback device could continue to play the queue—whether a remote copy was available or not*. As an example, consider the prior art YouTube Remote System that I discuss in this Declaration (Section VII): *the playback device in the YouTube Remote prior art stores a list of videoIDs for the playlist and is thus capable of playing back the playlist even if the MDx server were not available.*

Dkt. 210.03, ¶74.

This is exactly what happens in YTR party mode:  the Screens maintain a local playback

queue and can continue playing videos even if the Lounge Server (MDx Server) goes offline.  Ex. F (Schmidt Reb.), ¶211.

Moreover, a Leanback Screen in party mode uses its own locally-stored copy of the queue for playback without any dependency on the copy of the playlist on the Lounge Server (*i.e.*, Dr. Bhattacharjee's alleged "remote playback queue"):

> Q Well, all the devices such as the Leanback screens and the YouTube remotes, they also store and maintain a copy of that playlist; correct?
>
> A Well, they need to so that they can show it in [GUI] to the user.
>
> Q And so they can play it back; right?
>
> A Well, in remote mode, yes, the lounge screen plays back those videos.
>
> *Q Plays back those videos stored locally on the screen; right?*
>
> *A Well, it gets a list of videos and which one to play and starts playing that video. And then in order to know which video to play next when the current one ends, it refers to that list.*
>
> *Q The locally stored list on the Leanback screens; correct?*
>
> *A Yes. I don't believe it asked the MDx server for which video to play next when the current ended. I believe it referred to that list that it caught before.*

Ex. F (Schmidt Reb.), ¶210 (quoting Levai Dep. Tr.).  Thus, according to Google's YTR engineer, Mr. Levai, a Leanback Screen in party mode "starts playing that video" from its "*locally* stored list" of videos, "refers to that list" in order "to know which video to play next," and does *not* "ask[] the MDx server for which video to play next."

In sum, the Leanback Screens do not depend on the copy of the playlist retained by the Lounge Server in YTR party mode any more than they do in YTR non-party mode, which Google has already admitted relies exclusively on local playback queues.  And to the extent the experts disagree about how party mode works, that is a dispute of fact for the jury.

### 3. YTR Does Not Disclose Limitation 1.7 of Claim 1 of the '033 Patent.

Sonos disputes that YTR discloses several limitations, including limitations 1.4-1.9 (and the corresponding limitations 12.1-12.6), of the asserted claims of the '033 Patent.  This brief will

- 7 -

focus on limitation 1.7:

> [1.7] based on receiving the user input, [1.7(a)] transmitting an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, [1.7(b)] wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from the cloud-based media service; and (iii) play back the retrieved at least one media item

As an initial matter, Google entirely fails to address limitation 1.7(a). As explained above, the Leanback Screens—the alleged "playback devices"—use a *local* playback queue regardless of which mode they are in. As such, they do not "take over responsibility for playback of the *remote* playback queue from the computing device."

As to limitation 1.7(b), Google argues that YTR discloses subpart (i) because the Leanback Screens "sent a message to the YouTube 'Player Service' in the cloud to obtain one or more URLs (called 'Bandaid URLs') that were used to retrieve the audio and video content of the next video in the party queue from Google's Content Delivery Network (called 'Bandaid')." Mot. at 11. This argument is flawed for several reasons.

*First,* the parties dispute whether "*data identifying* a next one or more *media items*" has to be a URL or could be another type of identifier. Specifically, Google says that "data identifying . . . media items" must be a URL, and not a videoId. Google is wrong. The claim plainly does not refer to a URL, and the '033 Patent's specification makes clear that, in addition to a URL, the claimed "data" may be "an identifier" or "some other identification," such as a "song identifier." *See, e.g.,* '033 Patent at 12:50-58 ("a URL (*or some other identification* or address) for a song and/or playlist"); 15:55-63 ("*an identifier* for a single track, a playlist, a streaming radio station, a programmed radio station, and so on"); 13:33-37 ("an application can pass *a song identifier* to a local playback system [to] find[] an available audio stream").

In the YTR System, a videoId is an "internal identifier to a video" that "represents a video." Ex. F (Schmidt Reb.), ¶170. As such, the videoIds, not the Bandaid URLs, constitute the recited "data identifying . . . media items" in subpart (i). But in YTR, those videoIds are stored in the *local* playback queue on the Leanback Screens, so they are not "in the remote playback queue" as

1   required by the claims. *See* Dkt. 210-03, ¶181 ("The list of videoIDs in the setPlaylist message are

2   stored locally on the Screen as an array (a 'local playback queue on the particular playback

3   device')").

4       *Second*, Limitation 1.7(b)(i) further requires that the "data identif[ies] a ***next*** one or more

5   media items."   The Bandaid URLs Google points to only identify the ***current*** media item for

6   playback, ***not*** the ***next*** media item, as required by subpart (i).  Specifically, in order for a Leanback

7   Screen to play back a video, a SET_VIDEO message is sent from the Lounge Server to the

8   Leanback Screen to set the video for current playback, and then the Leanback Screen sends the

9   videoId for that video from its local playback queue to the Player Service, which provides a

10  corresponding Bandaid URL for that videoId.  Mot. at 3, 11; Ex. F (Schmidt Reb.), ¶¶176, 212; *see*

11  *also* Ex. E (Schmidt Op.), ¶¶162-166.  The Leanback Screen then uses that Bandaid URL to obtain

12  the video from the Bandaid server and play it back.  *Id*.  Therefore, the Leanback Screens use the

13  Bandaid URLs to obtain the video that it is ***currently*** set to play back, not the video that is set to

14  play back ***next***.

15      Google's argument thus equates the claim term "next" with "current."  Not only is this

16  illogical from a commonsense standpoint, but it is also contrary to the '033 Patent's specification,

17  which clearly distinguishes these terms and uses them differently.  For example, the '033 Patent

18  specification makes a reference to "content that the user is ***currently*** playing," but makes a different

19  reference to "a short list of tracks to play ***next***."  '033 Patent at 16:49-67; *see also id*. at 16:16-27

20  ("know what is ***currently*** playing on the local playback system"); 16:28-38 ("***current*** point of

21  playback (e.g., now playing . . .");  13:1-3 ("what to play ***next***").

22      *Third*, the Leanback Screens in the YTR System do not "obtain data identifying a next one

23  or more media items that are in the ***remote playback queue***."  Again, the Leanback Screens play

24  media items from their ***local*** playback queue.  The Leanback Screens do not obtain any data or

25  media items from a ***remote*** playback queue.  Even if one were to accept, for the sake of argument,

26  Google's allegation that the "party queue" stored on the Lounge Server (aka MDx Server) is the

27  "remote playback queue" for purposes of limitation 1.4, Mot. at 7, this "party queue" on the MDx

28  server could not satisfy limitation 1.7.  There is simply no dispute that the Leanback Screens in

YTR party mode do not "ask[] the MDx server for which video to play next when the current [video] ended." Ex. F (Schmidt Reb.), ¶210.  Instead, the Leanback Screens simply play the next video in their local playback queue.

Google's suggestion that the "Player Service" and/or "Bandaid" server provide the remote playback queue is equally unavailing.  Neither the "Player Service" nor the "Bandaid" server maintains any YTR playback queues or playlists. Ex. E (Schmidt Op.), ¶¶163-66, Ex. F (Schmidt Reb.), ¶¶170, 204.  To the contrary, the "Player Service" is merely a mapping service that connects Bandaid URLs to the videoIds that are stored in the local playback queues on the Leanback Screens. *Id.*  Likewise, the "Bandaid" server is merely a content delivery network that maps videos to the Bandaid URLs, which were previously mapped to the videoIds.  *Id.*  Thus, for YTR, the "data" identifying media items in a playback queue is in the form of videoIds, and those videoIds are stored in a ***local*** playback queue on the Leanback Screens, not a ***remote*** playback queue on the Player Service or the Bandaid server.  *Id.*

Accordingly, Google has not shown the YTR system discloses every limitation of the challenged claims and therefore cannot show the '033 Patent is invalid.

## II.    THERE ARE MATERIAL DISPUTES OF FACT REGARDING THE VALIDITY OF THE '885 AND '966 PATENTS

Google moves for summary judgment of obviousness of both the '885 and '966 Patents. As a preliminary matter, the Court already granted summary judgment of validity of claim 1 of the '885 Patent, so Google's motion is moot as to that claim. Dkt. 382.  And Google's motion as to the '966 Patent blatantly flouts the Court's page limits on summary judgment; the majority of Google's analysis is contained in an exhibit to its motion rather than in the body of the motion itself.  *Compare* Mot. at 20 with Ex. 10.  The motion should be denied on those grounds alone.

Even setting those issues aside, Google barely engages with the clear and convincing evidence standard and omits *any* mention of the *Graham* factors.  Google cannot show that there are no material disputes of fact that the '885 and '966 Patents are invalid as obvious.

### A.    Sonos's Market-Leading "Zone Scene" Technology

The '885 and '966 Patents are directed to Sonos's "zone scene" technology, which is a

1    novel way of creating, saving, and later invoking a customized group of networked media players

2    (e.g., smart speakers) for synchronous playback of media.  *See generally*, 3:21-cv-07559-WHA

3    ("7559 Action"), Dkt. 51-45 ('885 Patent) and Dkt. 1-5 ('966 Patent ).  The '885 Patent claims

4    the smart speaker and the '966 Patent claims the controller (e.g., the smart phone) that controls

5    the speakers and makes the speaker groups.

6          Sonos recognized that "conventional multi-zone audio system[s]" were "hard-wired" and

7    "inflexible," which made it difficult to group different audio players together for playback at

8    different times.  *See* '966 Patent at 1:46-2:16; Dkt. 309 at 3-4.  Sonos developed, patented, and

9    launched a networked multi-zone audio system designed to overcome those problems.  *See* Dkt.

10   309 at 2-5.

11         The initial version of Sonos's networked multi-zone audio system included technology for

12   grouping speakers (which Sonos calls "zone players") together for synchronous playback.  Ex. B

13   (Millington Decl.), ¶¶5-7; Ex. A (Lambourne Decl.), ¶¶5-7.  In particular, if a user wished to

14   listen to audio in synchrony on a group of speakers, the user would use a Sonos controller device

15   to select the particular speakers to group together.  Speaker selection was performed one-by-one

16   on an ad-hoc basis, and would result in a temporary grouping of speakers that would immediately

17   enter a grouped mode for synchronous playback.  The group was not persistently saved, so when

18   the user no longer wished to use the speakers for grouped playback, the group ceased to exist.

19   Sonos referred to such a temporary, ad-hoc group as a "zone group."

20         Sonos's ad-hoc grouping technology provided a clear advance over multi-zone audio

21   systems that existed at the time, and was widely praised.  Ex. K (Almeroth Reb.), ¶709.  Robert

22   Lambourne, the inventor of the '885 and '966 Patents—who was Sonos's director of user

23   experience design at the time—also recognized that Sonos's ad-hoc grouping technology had

24   certain drawbacks.  For instance, Mr. Lambourne recognized that the act of grouping speakers

25   together for synchronous playback using Sonos's ad-hoc grouping technology could be inefficient

26   and time consuming, because each time the user wished to use a different group for synchronous

27   playback, the user had to repeat the ad-hoc process of selecting each of the speakers to include in

28   the group even if it was a grouping of speakers that had previously been formed and used on

1   many other occasions in the past.  *See* Ex. A (Lambourne Decl.), ¶¶8-11.

2          Mr. Lambourne sought to solve that problem by developing new technology for creating

3   and using persistent speaker groups, which would allow users to customize and save a predefined

4   grouping of speakers that can *later* be invoked on demand for synchronous playback.  '966 Patent

5   at 8:45-9:30, 10:4-11:20, FIGs. 5A-B, 6.  The '885 and '966 Patents refer to such a customized,

6   saved group of speakers as a "zone scene."  *Id.*  This new "zone scene" technology provides

7   certain advantages over ad-hoc grouping technology, particularly in scenarios where a user uses

8   the same groupings of "zone players" on a recurring basis and can save those groupings and then

9   invoke them on demand rather than having to re-create them during each and every use.  Ex. K

10  (Almeroth Reb.), ¶¶128-29.  The '885 and '966 Patents claim particular processes for setting up

11  and invoking zone scenes.

12      **B.**     **The Prior Art Does Not Disclose, Alone Or In Combination, The Claimed**
                   **Zone Scene Technology.**
13

14         Google relies on two references to show obviousness:  Sonos's 2005 speaker system and

15  customer posts in Sonos's Forums.  Neither discloses nor makes obvious the claimed zone scene

16  technology.

17         *First*, the Sonos 2005 system did not have any "zone scene" technology.  Mr. Lambourne

18  (the inventor of the '885 and '966 Patents who was Sonos's director of user experience design in

19  2005) and Nick Millington (who was Sonos's director of software development in 2005) both

20  confirm that Sonos's 2005 system did not have any "zone scene" technology.  Ex. A (Lambourne

21  Decl.), ¶¶8-16; Ex. B (Millington Decl.), ¶¶8-10.  And documents from the relevant timeframe

22  likewise confirm that the Sonos 2005 system did not have any "zone scene" technology.  For

23  example, Sonos's 2005 User Guide makes no reference to any "zone scene" technology. Ex. K

24  (Almeroth Reb.), ¶¶503-20.  Instead, Sonos was in the process of developing the technology

25  necessary to implement zone scenes, as confirmed by the internal "Sonos UI Specification" for

26  "Zone Scenes" dated December 21, 2005.  That design document describes a new "Zone Scene

27  feature" that would provide an alternative to the "[c]urrent[]" grouping technology available in

28  the Sonos 2005 system. Ex. R (SONOS-SVG2-00026839); *see also* Ex. K (Almeroth Reb.),

¶¶497-526 (summarizing various evidence showing that Sonos's 2005 system did not have any "zone scene" technology).

Google nevertheless argues that the Sonos 2005 system included the "building blocks of the purported inventions claimed in the '885 and '966 Patents," and focuses on two aspects of the Sonos 2005 system's functionality: (i) the ability to form a "zone group" of Sonos ZonePlayers and (ii) the "All Zones-Party Mode" option that was hard-coded into Sonos controller devices and allowed a user to more quickly build a "zone group" comprising all ZonePlayers within the system. Mot. at 16-19. But neither of these functions of the Sonos 2005 system satisfies the "zone scene" requirements of the asserted claims. *See, e.g.,* Ex. R (SONOS-SVG2-00026839) (Mr. Lambourne explaining that his new "Zone Scenes feature" was "much more flexible and powerful" than the "current Party Mode setting that [was] available" and would avoid the need to "manually link[] zones one at a time until the desired zone grouping is reached"). In particular, the "zone groups" of the Sonos 2005 system were not persistently saved so they could be later invoked by a user. Ex. K (Almeroth Reb.), ¶¶509-514. Likewise, "All Zones-Party Mode" was merely a hard-coded option for activating a zone group containing all ZonePlayers. *See* Ex. I (Almeroth Showdown Reb.), ¶¶313-314, 344, 362-365 ("All Zones-Party Mode" option fails to meet the limitations of the '885 Patent); Ex. K (Almeroth Reb.), ¶¶516-19 ("All Zones-Party Mode" option fails to meet the limitations of the '966 Patent). So nothing in Sonos's 2005 system included any mechanism that allowed a user to customize and save a predefined group of ZonePlayers that was available to be *later* invoked on demand for synchronous playback, as required by the asserted claims, let alone the specific technology claimed for setting up and invoking zone scenes (e.g., the claimed communications between the zone players and controllers).

*Second,* the Sonos Forum Posts—which merely convey a proposed wish-list feature—do not disclose the claimed zone scenes technology.[1] For example, claim 1 of the '885 Patent

---

[1] Google's motion includes copies of five user posts, but two of those five user posts are dated in April 2006 – after Sonos's conception date of December 2005 – and Google expressly states that its summary judgment motion only relies on posts that predate Sonos's conception date. Google Mot. at 17-18. Thus, the two April 2006 user posts are not relevant to Google's motion.

1    requires a zone player receive (i) "indications" that the zone player "has been added" to two

2    newly-created "zone scene[s]" and (ii) an "instruction to operate in accordance with" a "zone

3    scene" that has been selected for invocation after its creation. *See* '885 Patent claim 1. And the

4    asserted claims of the '966 Patent capture similar functionality from the perspective of the

5    controller. *See* '966 Patent claim 1. However, the Sonos Forum posts failed to disclose *any* of

6    the claimed communications between the zone players and controllers necessary for setting up

7    and invoking zone scenes. The Sonos Forum Posts also do not disclose that the zone player

8    would "continu[e] to operate in [a] standalone mode" after it receives the "indications" that it

9    "has been added" to the claimed "zone scenes," nor do they disclose that "zone scenes" are stored

10   at zone players within the "zone scenes." Because neither reference discloses the claim

11   limitations, together they do not render the claims obvious. *Hyosung TNS Inc. v. Int'l Trade*

12   *Comm'n*, 926 F.3d 1353, 1360 (Fed. Cir. 2019) (affirming a finding of non-obviousness because

13   the patent challenger "failed to show that the alleged prior art combination satisfied" one of the

14   claim limitations of the asserted claims); *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870

15   F.3d 1320, 1327 (Fed. Cir. 2017) (upholding a jury verdict of non-obviousness because

16   substantial evidence supported the jury's conclusion that the prior art did not disclose a limitation

17   of the asserted claims).

18        Even considering what a person of ordinary skill would draw from the 2005 Sonos system

19   and the Sonos Forum posts, the claims are not obvious. For example, the '885 Patent requires

20   that the speaker remain in a "standalone mode" after it is added to a speaker group. Google

21   argues that this limitation is rendered obvious because "the Sonos forum posts suggest a departure

22   from the Sonos 2005 'linking' features, which automatically transitioned an individual speaker to

23   its linked group rather than allowing the speaker to remain in standalone mode." Mot. at 18. So

24   Google effectively admits that the Sonos Forum posts are totally silent as to whether the added

25   ZonePlayer would "continu[e] to operate in [a] standalone mode" versus whether the added

26   ZonePlayer would immediately begin operating in accordance with newly-created "zone scene,"

27   and that Sonos's 2005 system did not disclose this claim limitations. *See* Ex. I (Almeroth

28   Showdown Reb.), ¶363. There is no support for finding a very specific claim limitation obvious

1   in light of a vague customer "suggestion" that Sonos "depart" from an existing feature.

2          As another example, nothing in the proposed combination suggests that the Zone Player

3   needs to be told that it has been added to a speaker group, as required by both the '885 and '966

4   Patents.  Google claims that "[i]n the Sonos 2005 system, the controller (either handheld or

5   desktop software) sent an indication to the zone player that it has been added to a speaker group."

6   Mot. at 18.  But this suggests nothing about whether a zone player would be told it has been

7   added to a group that *is not being invoked*, but is merely being saved for later use.  And nothing in

8   the Sonos Forum posts discusses where the "zone scenes" should be stored, let alone that it

9   should be stored at a zone player, as required by asserted claim 4 of the '966 Patent.

10         Sonos's expert discusses multiple other failings of Google's proposed combination.  *See*

11  Ex. I (Almeroth Showdown Reb.), ¶¶420-435.  Google's motion should be denied; at minimum, it

12  raises material disputes of fact as to the scope and content of the prior art and the differences

13  between the prior art and the claimed invention which must be resolved by a fact finder.  *Spigen*

14  *Korea Co. v. Ispeak Co.*, No. SA CV 15-1050-DOC (DFMX), 2016 WL 3982307, at *11-12

15  (C.D. Cal. July 22, 2016) (concluding that "issues of material fact remain" based on "conflicting

16  expert declarations" over whether prior art references disclosed certain claim element).

17         **C.     <u>Google Cannot Show A Motivation To Combine Or A Reasonable</u>**
18                 **<u>Expectation of Success.</u>**

19         Google "must demonstrate by clear and convincing evidence that a skilled artisan would

20  have had reason to combine the teaching of the prior art references to achieve the claimed

21  invention, and that the skilled artisan would have had a reasonable expectation of success from

22  doing so."  *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Pat. Litig.*, 676 F.3d

23  1063, 1068-69 (Fed. Cir. 2012) (citation omitted).  Instead of explaining why a person of ordinary

24  skill would be motivated to combine the references, Google simply asserts that "[b]ecause the

25  Sonos forum posts expressly discuss modifying the Sonos 2005 system, there is a clear

26  motivation to combine the prior art system and the users' suggested modifications to that system."

27  Mot. at 18.  And Google utterly fails to address whether a person of ordinary skill would have had

28  a reasonable expectation of success in doing so.

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

*First*, the sole legal authority Google cites does not support any "clear motivation" here. In *Optivus Technology*, the Federal Circuit concluded that there was "no error in the district court's conclusion that a motivation to combine the two references exists" where one prior art reference was a *neutron* therapy cancer-treatment facility and the other was a "Conceptual Design Report" or "CDR," which provided an "overview of *proton* beam cancer therapy." *Optivus Technology, Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 989-91 (Fed. Cir. 2006) (emphasis added). While the facility "use[d] neutrons, rather than protons, to treat cancer," the CDR, in turn, had a "stated design goal" of "creat[ing] a" treatment facility using different "particle therapy methods." *Id.* at 989-90. Among those methods, the CDR "argue[d] that protons have important advantages over neutron and other particle therapy methods." *Id.* at 990. Thus, the reference itself disclosed the motivation to combine. By contrast, here, Google at most identifies the aspirational wishes of users, not—for example—a technical document laying out the technological benefits of applying zone scenes technology in the context of wireless multiroom audio systems. Google's reliance on this authority is misplaced.

*Second,* Google fails to explain why a person of ordinary skill would replace Sonos's existing "party mode" and ad-hoc grouping technology with the vague "virtual scenes" suggested in the Forum posts. Sonos's existing technology was widely praised in the industry, Ex. K (Almeroth Reb.), ¶709 (summarizing evidence of Sonos's existing ad-hoc grouping technology being praised throughout the industry), and even Google's witnesses recognized that ad-hoc grouping had advantages over saved groups. *See, e.g.*, Ex. M (5/10/22 MacKay Dep. Tr.) at 263:6-264:12 (Google 30(b)(6) witness testifying that an advantage of ad-hoc grouping technology relative to "zone scene" technology is that it does not require a user to "know what they want to do before they do it"). This evidence likewise contradicts Google's conclusory allegation that a person of ordinary skill would have been motivated to replace Sonos's existing ad-hoc grouping technology with "zone scene" technology. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331-32 (Fed. Cir. 2019) (upholding finding of no motivation to combine where the "benefits, both lost and gained" yielded "tradeoffs to … an unappetizing combination") (citation omitted); *see also* Ex. K (Almeroth Reb.), ¶684.

1    Moreover, Google fails to acknowledge evidence teaching away from combining the prior

2    art to arrive at the claimed invention and expressing skepticism that the combination would be

3    operable.  Multiple users expressed skepticism that persistent, overlapping speaker groups would

4    be technologically possible; including one post where a user raised concerns about "unwanted

5    side-effects" and another post from a software developer stating that it was "logically impossible"

6    and "stupid" to allow a speaker to belong to multiple "permanent groups."  Ex. K (Almeroth

7    Reb.), ¶284 (citing GOOG-SONOS-WDTX-INV-00015870 at 871), ¶285 (citing SONOS-SVG2-

8    00226916 at 916), ¶685.  This evidence contradicts Google's conclusory allegation regarding

9    motivation.  *See, e.g.*, *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350,

10    1363 (Fed. Cir. 2017) (upholding a jury's finding of non-obviousness where the evidence

11    suggested reasons to combine but also suggested certain "problems" with the combination).

12    *Third*, Google's conclusory allegation fails to establish that a person of ordinary skill

13    would have been motivated to combine the Sonos 2005 system and the identified Sonos Forum

14    posts in the same way that the claimed invention does.  *See, e.g.*, *St. Jude Med., LLC v. Snyders*

15    *Heart Valve LLC*, 977 F.3d 1232, 1242 (Fed. Cir. 2020) (upholding finding that, while a person

16    of ordinary skill would have been motivated to combine the prior art references themselves, there

17    was no motivation to make the "particular combination" that was required to "arrive at the

18    claimed invention").  For example, the asserted claims of the '885 and '966 Patents require a

19    specific set of functionality for creating and pre-saving a "zone scene" that requires

20    communication between a controller and a zone player in the "zone scene," and the Sonos Forum

21    posts fail to show that a person of ordinary skill would have been motivated to implement the

22    "virtual zones" in this specific manner (as opposed to, for example, carrying out the process of

23    creating and pre-saving a "virtual zone" on a controller without engaging in any communication

24    with a zone player).  Because Google has not established a motivation to combine or a reasonable

25    expectation of success, it is not entitled to summary judgment of obviousness.

26    **D.**    <u>**The Prior Art Does Not Enable The Claims.**</u>

27    "To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to

28    make and use the claimed invention."  *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374,

1380-82 (Fed. Cir. 2021). Nothing in the Sonos 2005 system or the Sonos Forum posts teaches a

person of ordinary skill in the art how to implement the claimed "zone scene" technology. The

Sonos Forum posts express a mere hope that Sonos would one day invent technology that allowed

users to have "virtual zones," without providing any direction, guidance, or working examples of

how to carry out the invention. *See* Ex. I (Almeroth Showdown Reb.), ¶¶196, 428; Ex. K

(Almeroth Reb.), ¶¶277, 680. For instance, the Sonos Forum posts do not provide any guidance

on how a controller would interact with a ZonePlayer in order to create and save a "virtual zone,"

how and where a "virtual zone" would be stored, how a ZonePlayer would operate after being

added to a "virtual zone," or how a "virtual zone" would be invoked, among other critical details

of the claimed inventions of the '885 and '966 Patents.

Instead, the Sonos Forum posts merely propose an idea: "Why can't I have a virtual zone

… and I can group all my downstairs zones into this" or "I would like to see … the ability to

configure your own groups." Mot. at 16-17. They do not propose any of the programming or

functionality actually required to implement those ideas. This barebones discussion is insufficient

to satisfy the enablement requirement. *E.g., Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501

F.3d 1274, 1284 (Fed. Cir. 2007) (finding that the claimed invention was not enabled where the

specification provided "only a starting point, a direction for further research" and failed to

provide "reasonable detail sufficient to enable use of" the claimed invention) (citation omitted);

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1198 (Fed. Cir.

1999) (finding that the claimed invention was not enabled where the specification merely

suggested a "theoretical answer" to a recognized need in the art and "provide[d] a starting point

from which one of skill in the art can perform further research in order to practice the claimed

invention"); *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, 42 F. Supp. 3d 579, 593 (D. Del. 2014)

(finding that the claimed invention was not enabled where the specification was "devoid of

direction, guidance, and/or working examples of how the supposed superior invention is to be

implemented"). Google has failed to show that the prior art enables the claimed invention, and its

motion for summary judgment can be denied on that basis.

E.    **There Is Substantial Objective Evidence Of Non-Obviousness.**

Google fails to even acknowledge Sonos's evidence of objective indicia of non-obviousness, but the Federal Circuit has "consistently pronounced that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1355 (Fed. Cir. 2013). Sonos's zone scene technology received substantial praise in the industry. For example, CNN touted Sonos's zone scene technology as "the best feature" of the Sonos system because it provides "the ability to save a group of speakers as a preset." Ex. S (SONOS-SVG2-00062361) at 363. At least a dozen other publications highlighted Sonos's zone scenes technology *specifically* with similar praise. *See, e.g.*, Ex. K (Almeroth Reb.), ¶¶1613-1640. This evidence confirms that the asserted claims of the '885 and '966 Patents are not obvious, or at the very least raises disputed issues of material fact regarding obviousness. *See Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013) ("Secondary considerations evidence can establish that an invention appearing to have been obvious in light of the prior art was not and may be the most probative and cogent evidence in the record.") (citation omitted).

III.   **THERE ARE MATERIAL DISPUTES OF FACT REGARDING GOOGLE'S REDESIGNED PRODUCTS**

Several months after this Court found that Google's media players infringe claim 1 of the '885 Patent, Google changed the source code for its players. There are material disputes of fact over how Google's "redesign" works and whether it infringes the '885 and '966 Patents.

A.    **Google's "Redesign" Still Infringes Claim 1 Of The '885 Patent.**

Claim 1 of the '885 Patent recites a "first zone player" that is capable of operating in one of two modes at any given time—a "standalone mode" for individual playback or a grouped mode for synchronous playback. The "first zone player" is programmed with the capability to "operat[e] in a standalone mode in which the first zone player is configured to play back media individually" and to "*continu[e]* to operate in the standalone mode" after being added to "first" and "second" "zone scenes," until one of the "zone scenes" is "invoked" at the request of a user, which causes the "first zone player" to "transition[]" from "operating in the standalone mode" to "operating in

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1  accordance with the … predefined grouping[] of zone players" for synchronous grouped playback.

2  '885 Patent, claim 1; *see also* Dkt. 309 at 15-17. Sonos and Google dispute whether Google's

3  redesigned players continue to operate in "standalone mode" after being added to a new Google

4  speaker group (i.e., "zone scene").

5      *First*, there is a dispute over how Google's new source code actually works. As Google's

6  motion explains, Google's "redesign" added a "StopCurrentApp()" function to its infringing source

7  code. Mot. at 22. This is the *only* change. Ex. L (Almeroth Supp. Reply), ¶92. The

8  StopCurrentApp() function simply causes a redesigned Google player to stop playing any audio it

9  is currently playing when it is added to a speaker group. Ex. L (Almeroth Supp. Reply), ¶¶93-94;

10  Mot. at 22. The StopCurrentApp() function does *not* cause a redesigned player that is added to a

11  speaker group to transition from "standalone mode" to grouped mode in which it operates in

12  accordance with the speaker group for synchronous playback. Ex. L (Almeroth Supp. Reply), ¶¶93-

13  94.

14      In fact, in a scenario where a redesigned player is operating in standalone mode while not

15  actively playing audio when it is added to a new speaker group, the StopCurrentApp() function has

16  no effect on the operating mode of the redesigned player and it will *continue* operating in standalone

17  mode while not actively playing audio after being added to the new speaker group. *Id.*, ¶¶65-66,

18  93; Mot. at 22-23 (Google explaining that when a "redesigned" player not actively playing audio

19  is added to a new speaker group "the speaker calls the StopCurrentApp() command (although there

20  is no operation of the speaker to terminate) …."). This is exactly how the originally accused players

21  operated. Ex. L (Almeroth Supp. Reply), ¶¶92-94; Ex. N (1/25/23 MacKay Dep. Tr.) at 54:24-56:6

22  (when a "redesigned" player not actively playing audio is added to a new speaker group it will

23  behave in the same way that a pre-"redesigned" player would have behaved). And if a redesigned

24  player operating in standalone mode is actively playing audio when it is added to a new speaker

25  group, the StopCurrentApp() function will cause the redesigned player to stop playing audio, but

26  the redesigned player will *continue* operating in standalone mode, albeit not actively playing audio.

27  Ex. L (Almeroth Supp. Reply), ¶¶65-66, 93. In both scenarios, the "redesigned" Accused Google

28  Player will not transition to grouped mode until the new speaker group is invoked (or "launched"

in Google's terms) at the request of a user.  *Id.*; Ex. P (2/3/23 Schonfeld Dep. Tr.) at 140:6-23 ("[W]hen you create a new group, all of the speakers are silent and they are waiting to be invoked before they would play back in synchrony.").

Thus, with respect to the "standalone mode" limitations, Sonos contends that the "redesign" did *not* change how Google's infringing media players operate after being added to a new speaker group—they continue to operate in "standalone mode."  Google's redesigned players therefore satisfy the "standalone mode" limitations for at least the same reasons the Court already found that Google's originally accused players satisfy the "standalone mode" limitations.  Dkt. 309 at 15-17.

Google nevertheless asserts that in the above-described scenarios a redesigned player does not continue operating in "standalone mode" because "the speaker transitions to being controlled as part of a group, playing nothing because the group is playing nothing."  *See* Mot. at 22-23. Google is mistaken, and at minimum there are disputes of fact for the jury.

Specifically, as was the case prior to the "redesign," after a new speaker group is created, the new speaker group always starts out in an *uninvoked state* (or an "unlaunched" state in Google's terms).  Ex. L (Almeroth Supp. Reply), ¶¶65-66, 93, 98-101, 134-136; Ex. P (2/3/2023 Schonfeld Dep. Tr.) at 140:6-141:11.  This means that redesigned players added to the new speaker group are not "act[ing] in accordance with the group" or being "controlled as part of a group" as a result of the new speaker group being created.  *See id.*  Instead, just like the originally accused players, redesigned players added to a new speaker group do not begin operating as a group for synchronous playback until the new speaker group is launched at the request of a user.  Indeed, it is the "launch" command that causes the players in a speaker group to operate together for synchronous playback; not the StopCurrentApp() or "AddGroup()"[2] functions Google points to in its motion.  *Id.*; Ex. H (Almeroth Showdown Supp. Op.), ¶¶272; Ex. N (1/25/23 MacKay Dep. Tr.) at 43:24-44:7

---

[2] Google's mention of the AddGroup() function is a red herring.  Google's redesign did not change that function relative to Google's infringing players. Ex. N (1/25/23 MacKay Dep. Tr.) at 27:4-7 (confirming that there were no changes made to the AddGroup() function).  The AddGroup() function causes a player that is added to a new speaker group to store information about the new group, but the redesigned player remains in standalone mode. Ex. L (Almeroth Supp. Reply), ¶¶89-91.

1   (testifying that when a redesigned player is added to a new speaker group the AddGroup() function

2   "will not cause the [player] to be launched as part of the group").

3         Moreover, contrary to Google's assertion, after a redesigned player is added to a new

4   speaker group it is not "playing nothing because the group is playing nothing." As explained above,

5   it is not playing audio after being added to the new speaker group simply because it was either not

6   playing audio before being added to the new speaker group or its active playback was stopped by

7   the StopCurrentApp() function. This has nothing to do with what the other players in the group are

8   doing. *See also* Ex. N (1/25/23 MacKay Dep. Tr.) at 37:3-19 ("no group information is passed into

9   the StopCurrentApp() function" and that this function does not "perform any checking of group

10  state"); Ex. L (Almeroth Supp. Reply), ¶¶98-101.[3]

11        *Second*, there is a dispute over whether a redesigned Google player that is not actively

12  playing back music is in "standalone mode" or not. That is a question of fact for the jury to resolve.

13  *E.g.*, *Nat'l Prods., Inc v. Arkon Res., Inc.*, No. CV 18-02936 AG (SSX), 2019 WL 1034321, at *6

14  (C.D. Cal. Jan. 9, 2019) ("How a person of ordinary skill would apply the claim language to the

15  accused products is a factual determination."). Sonos contends that a redesigned player can operate

16  in "standalone mode" regardless of whether or not it is actively playing back media so long as the

17  "first zone player" is "configured to play back media individually," as opposed to being configured

18  to play back as part of a group. This is clear from the claim language, which equates "standalone

19  mode" with being "*configured to* play back media individually," not with actively *playing* audio.

20  Ex. H (Almeroth Showdown Supp. Op.), ¶¶164-65, 167. Google's expert, Dr. Schonfeld, likewise

21  testified that "standalone mode" does not require the "zone player … to be playing audio." Ex. O

22  (8/31/22 Schonfeld Dep. Tr.) at 49:12-16; *see also id.* at 53:8-13; 72:23-73:2. He further testified

23  that a player is "configured to play back audio individually" so long as it "is not configured to play

24

25

26  [3] Sonos's opposition addresses scenarios where a redesigned player is added to a *new* speaker
27  group, not an *existing* speaker group. A redesigned player will transition from standalone mode to
    grouped mode after being added to a speaker group if added to an *existing* speaker group that is
    already *launched*, but this does not avoid infringement. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g,*
28  *Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) ("[I]nfringement is not avoided by the presence of elements
    or steps in addition to those specifically recited in the claim.").

1  as part of the group." *Id.* at 51:4-8.  Now that Google has redesigned its products, however, Dr.

2  Schonfeld seems to have changed his mind and now asserts that "to operate in standalone mode,

3  you actually have to be *playing* audio individually."  Ex. P (2/3/23 Schonfeld Dep. Tr.) at 45:3-5;

4  *id.* at 40:2-11.[4]

5          **B.      Google's "Redesign" Does Not Avoid Infringement Of The '966 Patent.**

6          Google makes no unique noninfringement arguments for the '996 Patent.  Mot. at 23-24.[5]

7  Its arguments fail for the reasons discussed above, and for the additional reason that, unlike claim

8  1 of the '885 Patent, the asserted claims of the '966 Patent do not require that a Google media

9  player *continue* to operate in "standalone mode."

10         Specifically, the asserted claims of the '966 Patent say nothing about the "first zone player"

11 *continuing* to operate in "standalone mode" after being added to "first" and "second" "zone scenes"

12 and until one of the zone scenes is invoked.   Ex. J (Almeroth Op.), ¶¶743-44; *SRI Int'l. v.*

13 *Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) ("It is settled law

14 that when a patent claim does not contain a certain limitation and another claim does, that limitation

15 cannot be read into the former claim in determining either validity or infringement.").  Instead, they

16 require a "computing device" that is capable of adding a "first zone player" to "first" and "second"

17 "zone scenes," at a time when it is operating in "standalone mode," but they do not require the first

18 zone player to remain in standalone mode continuously throughout that process.  *Id.*  So even if

19 Google's redesigned players do not continue to operate in "standalone mode" after being added to

20 a speaker group (as Google asserts), Google has not shown that its accused controllers (each of

21 which is a claimed "computing device") fail to meet a limitation of the '966 claims.

22 **IV.     THERE ARE MATERIAL DISPUTES OF FACT REGARDING WILLFULNESS**
   **AND INDIRECT INFRINGEMENT**
23

24         Google asks the Court to grant summary judgment on Sonos's claims of willful and indirect

25 infringement for all three patents remaining in this suit.  There are material disputes of fact over

26 _____

27 [4] Google's reliance on a statement by Dr. Douglas Schmidt is misplaced because it relates to
   different claim language from the unrelated '033 Patent.  *See* Mot. at 23 (citing Ex. 4, ¶170).
28 [5] Google also does not move for summary judgment that its earlier products do not infringe the
   '966 Patent.  *See* Mot. at 20, n. 6.

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    Google's knowledge of the patents and its intent to infringe that preclude summary judgment.

2    First, Google does not even appear to ask for summary judgment as to *post*-complaint

3    willfulness and indirect infringement, focusing solely on purported deficiencies in Sonos's

4    evidence of *pre*-suit knowledge of infringement.  Since at least the filing of the declaratory

5    judgment complaint in this case, Google has been on notice of the '966 and '033 Patents and its

6    infringement.  Dkt. 1.  And at least since Sonos served Google with a draft complaint and

7    infringement contentions detailing Google's infringement of the '885 Patent, Google has been on

8    notice of its infringement of that patent. The Court has already held that "[a] jury could plausibly

9    conclude that the forty-day notice provided Google adequate time to assess Sonos' allegations as

10   to the '885 Patent." 7559 Action, Dkt. 210 at 6.  Google has since been found to infringe the '885

11   Patent and still continues to sell infringing products, including products that infringe the counterpart

12   '966 Patent. *Cf.* Mot. Ex. 10, Dkt. 483-10 (aligning '885 and '966 claims).  Google's motion should

13   be denied as to post-complaint willfulness and indirect infringement.

14   Second, as this Court explained at the pleading stage, Google's decision to file a declaratoy

15   judgment complaint necessarily means that Google had "already studied the patents versus the

16   accused products" which allowed Sonos "to plead the infringer's conceded knowledge of the

17   patents and that the infringer has had sufficient time to analyze the accused product vis-à-vis those

18   patents (along with other specifics needed to show willfulness)." 7559 Action, Dkt. 156 at 8; *see*

19   *also* 7559 Action, Dkt. 210 at 4-5.  Google suggests that Sonos was required to come forward with

20   "evidence that Google started its investigation into the '033 and '966 Patents *before* receiving

21   Sonos's draft complaint." Mot. at 25.  The Court's order at the pleadings stage contains no such

22   requirement.  On the contrary, it agrees that Sonos's complaint raises "murky questions about the

23   reality of Google's subjective intent and potential egregious behavior [that] will be dealt with at

24   later stages as a more complete record is developed." 7559 Action, Dkt. 210 at 5.  Sonos has

25   developed that "more complete record," and the evidence raises material disputes of fact that

26   Google was, at a minimum, willfully blind to its infringement of the asserted patents. *See, e.g.*, Ex.

27   Q (Sonos's 4th Supp. Resp.) at 347-48; Ex. G (Schmidt Reply), ¶¶89-101; Ex. L (Almeroth Supp.

28   Reply), ¶¶238-248.

SONOS'S OPP. TO GOOGLE'S MSJ
3:20-CV-06754-WHA

Google also argues that its filing of a declaratory judgment action shows its good faith belief in noninfringement.  Mot. at 25.  *Even if* Google's filing of a declaratory judgment action "arguably" showed a reasonable, good-faith basis in noninfringement, *Apple Inc. v. Princeps Interface Techs. LLC*, No. 19-cv-06352-EMC, 2020 WL 1478350, at *4 (N.D. Cal. Mar. 26, 2020), it would be error to grant summary judgment based on what the evidence might "arguably" show. In Google's telling, it had exactly as much knowledge as it needed to determine that it was *not* infringing, but lacked any reason to know that it *was* or could be infringing.  Google's strained argument further shows that there is at least a genuine dispute of fact as to whether Google was willfully blind to its infringement.  *See, e.g.*, *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

## **CONCLUSION**

Google's motions for summary judgment should be denied.

Dated: February 21, 2023

By:  */s/ Clement S. Roberts*

CLEMENT SETH ROBERTS
BAS DE BLANK
ALYSSA CARIDIS

ORRICK, HERRINGTON & SUTCLIFFE LLP

SEAN M. SULLIVAN
MICHAEL P. BOYEA
COLE B. RICHTER

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Sonos, Inc.*