1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
   croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
   acaridis@orrick.com
4  EVAN D. BREWER (STATE BAR NO. 304411)
   ebrewer@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
6  405 Howard Street
   San Francisco, CA 94105-2669
7  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
8
   SEAN M. SULLIVAN (*pro hac* vice)
9  sullivan@ls3ip.com
   MICHAEL P. BOYEA (*pro hac* vice)
10 boyea@ls3ip.com
   COLE B. RICHTER (*pro hac* vice)
11 richter@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
12 656 W Randolph St., Floor 5W
   Chicago, IL 60661
13 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
14
   *Attorneys for Sonos, Inc.*
15

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                SAN FRANCISCO DIVISION

19 GOOGLE LLC,                          Case No. 3:20-cv-06754-WHA
                                        Related to Case No. 3:21-cv-07559-WHA
20        Plaintiff and Counter-defendant,
                                        **SONOS, INC.'S OPPOSITION TO**
21 v.                                   **GOOGLE'S MOTION FOR SUMMARY**
                                        **JUDGMENT PURSUANT TO THE**
22 SONOS, INC.,                         **COURT'S PATENT SHOWDOWN**
                                        **PROCEDURE**
23        Defendant and Counter-claimant.
                                        Date: June 9, 2022
24                                      Time: 8:00 a.m.
25                                      Place: Courtroom 12, 19th Floor
                                        Judge: Hon. William Alsup
26
                                        Complaint Filed: September 28, 2020
27

28              **FILED UNDER SEAL**

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .................................................................................................. 1

II.   LEGAL STANDARD .......................................................................................... 1

III.  ARGUMENT ....................................................................................................... 2

    A.    Google Infringes Claim 13 of the '615 Patent .......................................... 2

        1.    Casting Involves a "Local Playback Queue" on the Receiver ................ 2

            a.    Casting YouTube Involves a "Local Playback Queue" .................... 3

            b.    Casting GPM Involved a "Local Playback Queue" .......................... 7

            c.    Google's "Queue" Arguments Fail .................................................. 8

        2.    "Multimedia Files" Need Not Be Added to a "Playback Queue"........................ 10

        3.    Casting YouTube Adds "Resource Locators".................................... 11

    B.    Claim 13 of the '615 Patent Is Not Invalid Over the Alleged Prior Art ..................... 13

        1.    Overview of Google's YTR App ...................................................... 14

         2.    The YTR App Does Not Anticipate Claim 13 ..................................... 15

            a.    The YTR App Does Not Disclose Limitation 13.2........................... 15

            b.    The YTR App Does Not Disclose Limitation 13.4.......................... 16

            c.    Google Failed to Prove YTR Discloses Limitations 13.5-13.6 ..................... 18

        3.    The YTR App Does Not Render Obvious Claim 13.................................... 18

    C.    Google Infringes Claim 1 of the '885 Patent ........................................... 23

IV.   CONCLUSION .................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ........................................................................................ 22

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003) ........................................................................................ 12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................................... 1

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) .......................................................................................... 6

*Callaway Golf Co. v. Acushnet Co.*,
   Case No. 06-CV-091, 2007 WL 4326776 (D. Del. Dec. 4, 2007) .................................... 23

*Eko Brands, LLC v. Adrian Rivera Maynez Enter., Inc.*,
   946 F.3d 1367 (Fed. Cir. 2020) ........................................................................................ 24

*EMC Corp. v. Pure Storage, Inc.*,
   154 F. Supp. 3d 81 (D. Del. 2016) .................................................................................... 13

*EMI Grp. N. Am., Inc. v. Intel Corp.*,
   157 F.3d 887 (Fed. Cir. 1998) .......................................................................................... 13

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ................................................................................... 23, 24

*Griffin v. Bertina*,
   285 F.3d 1029 (Fed. Cir. 2002) ........................................................................................ 10

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
   385 F.3d 1360 (Fed. Cir. 2004) .......................................................................................... 6

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
   946 F.2d 821 (Fed. Cir. 1991) ............................................................................................ 6

*Juicy Whip, Inc., v. Orange Bang, Inc.*,
   292 F.3d 728 (Fed. Cir. 2002) .......................................................................................... 18

*Miles Labs., Inc. v. Shandon Inc.*,
   997 F.2d 870 (Fed. Cir. 1993) ............................................................................................ 6

*In re Robertson*,
   169 F.3d 743 (Fed. Cir. 1999) .......................................................................................... 17

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
    727 F.2d 1540 (Fed. Cir. 1984) ................................................................................. 25

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ...................................................................................... 1

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002) ................................................................................. 18

**Other Authorities**

MPEP § 2111.03 ......................................................................................................... 10

I.    **INTRODUCTION**

Google's motion for summary judgment should be denied because Google infringes claim 13 of the '615 Patent and claim 1 of the '885 Patent and Google has not met its burden to demonstrate that claim 13 of the '615 Patent is invalid or because, at a minimum, there are material issues of fact in dispute regarding infringement and validity.

Google's summary of the parties' collaboration is irrelevant to summary judgment and inaccurate.  Google reached out to Sonos in 2011 inquiring about Sonos's technology.  Google reached out to Sonos again in June 2013 inquiring as to Sonos's willingness to collaborate on a set of projects.  Prior to collaborating with Sonos, Google had not considered using a cloud to maintain a playback queue and did not have an implementation of such a feature.  But this was not a new idea to Sonos.  Years before, Sonos had already conceived of using the cloud to maintain a playback queue and had already described the idea in independent patent filings in 2011, 2012, and 2013 (all prior to the collaboration with Google), including the very filing from which the '615 and '033 Patents claim priority.  Thus, it is inconceivable for Google to argue that Sonos misappropriated anything from Google in June 2013.  To the contrary, while Sonos and Google collaborated, Google secretly worked to undermine this collaboration by incorporating features (including Sonos-patented features) into new products that would compete with the very product on which the parties were collaborating.

Threaded throughout Google's motion is the false premise that a multi-device system can have either a "cloud queue" or a "local playback queue" but not both.  This is not true, as demonstrated by Google's own admissions.  In truth, Google has invented this false dichotomy to distract from its infringing functionality and push its false misappropriation tale.

II.    **LEGAL STANDARD**

Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, "the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

III.    **ARGUMENT**

A.    **Google Infringes Claim 13 of the '615 Patent**

Claim 13 of the '615 Patent is directed to a computer-readable storage medium with executable instructions that enable a "control device"[1] to perform recited functions for transferring media playback from the "control device" to a "playback device." Sonos accuses Google of infringement for providing "control devices" (e.g., smart phones, tablets, etc.) provisioned with any of (i) the YouTube, YouTube Music, YouTube Kids, or YouTube TV apps (collectively, "the YouTube apps") or (ii) the GPM app. Google often refers to these devices as "Senders." Ex. 1, ¶¶48-49. Each Sender is provisioned with the accused "Cast" technology that enables it to transfer media playback responsibility from itself to a Cast-enabled media player (i.e., "playback device"), which Google typically refers to as a "Receiver" or "Cast Device." *Id.*

Google argues that it does not infringe '615 claim 13 because its YouTube and GPM apps fail to satisfy limitation 13.5(a), which recites "causing one or more first cloud servers to add multimedia content to a local playback queue on the particular playback device" by adding "one or more resource locators corresponding to respective locations of the multimedia content at one or more second cloud servers of a streaming content service." In short, Google argues that its Receivers do not have a "local playback queue" and do not have a queue with "multimedia content" or "resource locators." As explained below, Google's arguments are without merit, and at the very least, there are genuine issues of fact regarding these arguments that precludes summary judgment.

1.    **Casting Involves a "Local Playback Queue" on the Receiver**

Contrary to its attorneys' arguments here, Google has routinely admitted that a Receiver has a local queue that dictates its playback when in a Cast session. For example, Google's source code includes comments indicating that Google's engineers view a Receiver as maintaining a local queue. *See, e.g.*, Ex. 2, lns. 35-36 ("Notifies the receiver about any local changes to the cloud queue and asks the *"receiver"* to refresh *its queue*."); Ex. 3, lns. 526-29 ("videoQueuer" "[m]anages the *video queue* and transitions."); /2021-02-01_YTReceivers09292020/.../application.ts, lns. 3519-22 ("isQueueEmpty" "True if there are no videos in the queue")*. Google's engineers also internally

---

[1] Sonos refers to the claim limitations herein according to Google's labeling.
[2] All emphasis has been added herein unless otherwise noted.

describe a Receiver as having a queue. *See, e.g.*, Ex. 4, 2009 ("[R]eceivers can **retain a local version of the remote queue**…. It sounds like the queue is intentionally retained to guard against flaky networks …."). Consistent with Google's internal recognition, Google publicly describes a Receiver as maintaining a playback queue. *See, e.g.*, Ex. 5, 66 ("The **Receiver SDK maintains the queue** and responds to operations on the queue as long as the queue has at least one item currently active (playing or paused)."); Ex. 6, 82 ("Cast utilizes … **receiver-implemented queueing**.").

As noted in the above admissions, the Receiver's local queue is kept in sync with a "remote queue" stored in the cloud (or "cloud queue") by virtue of the Receiver retrieving or loading segments of the remote queue into its local queue. *See also, e.g.*, Ex. 7, 82 (showing "Receiver" will "[r]etrieve remote queue" at start of a Cast session); G.Ex. 8, 67 ("Tells the receiver to load the cloud queue."); Ex. 5, 66 ("The **receiver maintains a session for queue items** until the last item completes playback … or until a sender **loads a new queue on the receiver**."); Ex. 8, 74 (explaining that Cast's "[q]ueuing" functionality provides "[s]upport of Google's … cloud queue implementation so externally stored and created **queue** can be **directly loaded into Cast devices**.").

Similarly, the Sender has a local queue that syncs with the remote queue when in a Cast session with a Receiver. *See, e.g.*, Ex. 9, 43 ("[YouTube Music Sender's] MDx integration includes a **local queue** that is kept in sync with the remote queue."). In this way, the Receiver and Sender "share a queue state" when in a Cast session. Ex. 10, 90 ("While Casting, YTM [Senders] and Cast receivers share a queue state via MDx's 'remote queue'.").

Although the Receiver's local queue is implemented differently when Casting YouTube versus GPM, both implementations infringe limitation 13.5(a).

### a.    Casting YouTube Involves a "Local Playback Queue"

To initiate a Cast session with a Receiver, the Sender transmits a "setPlaylist" message to an "MDx session server" that in turn sends a setPlaylist message to the Receiver. Ex. 1, ¶¶59-61. The setPlaylist message often includes a "videoId" corresponding to the multimedia item (e.g., song or video) that the Receiver is to begin playing. *Id.* In response to receiving a setPlaylist message with a videoId, the Receiver loads the videoId in its queue, thereby updating its internal logic such that the videoId corresponds to the item the Receiver is set to currently playback. *Id.*, ¶62.

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

By virtue of the Sender transmitting the setPlaylist message to the MDx server, the Sender also causes a "WatchNext" server to transmit a "WatchNextResponse" (WNR) to the Receiver that gets stored by the Receiver. *Id.*, ¶63. The contents of the WNR may vary depending on the Sender's playback state when the user initiated the Cast session, but the WNR typically will include at least a videoId for the item that the Receiver is set to currently playback and a videoId for the next item that the Receiver is set to playback (the WNR often includes additional videoIds, such as one for the item that comes before the current item). *Id.*, ¶64; G.Ex. 6, 91 ("When [Receiver] plays a video in the queue, the Watch Next service will send the video id … for the next video in the queue so that [Receiver] knows what to play when the current video finishes.").

Each of the videoIds contained in a WNR gets loaded into the Receiver's queue and corresponds to a "playback scenario" that the Receiver might perform. Ex. 1, ¶65. In other words, the videoIds from the WNR enable the Receiver to playback a given media item when the Receiver is to perform a given scenario. *Id.* For example, in a case where a Sender was playing the third video of a five-video playlist when a Cast session was initiated, the WNR can include a videoId for the current video (video #3), a videoId for the video before the current video (video #2), and a videoId for the video after the current video (video #4). *Id.*, ¶66. If the user provided skip-backward input at the Sender, the Receiver would retrieve from its queue the videoId for the video before the current video (video #2) to use to retrieve that video for playback. *Id.*, ¶67. Likewise, if the user provided skip-forward input at the Sender, or allowed the Receiver to complete playback of the current video, the Receiver would retrieve from its queue the videoId for the video after the current video (video #4) to use to retrieve that video for playback. *Id.*

Accordingly, when a YouTube Sender Casts to a Receiver, the Sender functions to cause the MDx and WatchNext servers to add to the Receiver's memory videoIds that at least dictate what the Receiver is set to playback currently and playback next. Ex. 11, 136:6-21, 151:10-17, 175:1-5. These stored videoIds form a "local playback queue" on the Receiver. Ex. 1, ¶¶69-71. More specifically, according to its plain and ordinary meaning, a "local playback queue" is a data construct on the playback device that can contain one or more resource locators (e.g., videoIds), each corresponding to multimedia content (e.g., a particular song or video) that the playback device

1   is to playback. *Id.* With respect to Google's Receiver, the data construct storing the current videoId

2   alone and/or in combination with the data construct storing the next videoId satisfies the "local

3   playback queue" of limitation 13.5(a). *Id.*, ¶¶70-71. As such, Google itself recognizing that its

4   Receiver has a local queue, as discussed above, is not surprising. *Supra* §III.A.1.

5       To avoid this conclusion, Google argues that a "playback queue" is limited to an "ordered

6   list of multimedia items selected by the user for playback."[3] Yet, even under this erroneous

7   construction, the "playback queue" of limitation 13.5(a) is still satisfied.

8       To start, the Receiver's storage of a WNR literally satisfies the "playback queue" element

9   under Google's construction and under the plain and ordinary meaning. Ex. 1, ¶¶71, 75, 78-81.

10  Indeed, despite Google downplaying the significance of a WNR to a Receiver's playback (G.Br.,

11  9-10), a WNR often contains multiple videoIds that, together, dictate the Receiver's playback of

12  multiple items. As explained, a WNR can specify, for example, the item that the Receiver is

13  currently set to play, the item that the Receiver is to play if the user decides to skip backwards, and

14  the item that the Receiver is to play if the user decides to skip forwards or after the Receiver finishes

15  playing the current item. *Supra* §III.A.1.a. Each of these items can be (i) from a collection of items

16  directly selected by the user for playback or (ii) a service-recommended item that was indirectly

17  selected by the user by virtue of the user's initial selection of an item or collection of items seeding

18  the recommendation. Ex. 1, ¶¶59, 78-80. In this way, the WNR is a data structure that can provide

19  multiple videoIds and specify the order in which the Receiver is to playback the corresponding

20  multimedia content that was selected by the user. *Id.*, ¶¶75. Thus, Google's argument that the WNR

21  does not amount to a "playback queue" apparently because it is not "a data structure [that] link[s]

22  together different multimedia items" (G.Br., 9-10) is simply not true. Ex. 1, ¶¶101-102.

23      Moreover, while Google argues that the Receiver's data variables containing the videoIds

24  of the current and next items are not an "ordered list" under its construction of "playback queue,"

25  these variables still infringe at least under DoE or at least present a genuine dispute of material fact

26  precluding summary judgment. As an initial matter, Google incorrectly contends that Sonos

27  surrendered any right to equivalents of the "playback queue" merely by virtue of adding the term

28  
---
[3] The evidence demonstrates that Google's proposed construction for "playback queue" is contrary to how Google itself refers to the concept of a playback queue. Ex. 1, ¶¶73-74.

1    during prosecution.  G.Br., 10-11.  ***First***, the amendment had nothing to do with the particular ***form***

2    of the "local playback queue," which is the equivalent in question here.  At most, the surrendered

3    subject matter is any equivalent ***broader*** than the amendment – namely, "causing one or more cloud

4    servers to add multimedia content to a local playback queue on the particular playback device."

5    *See Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed. Cir. 2004) (holding

6    that "plaintiffs have rebutted the Festo presumption that a narrowing amendment made for a reason

7    of patentability surrenders the entire territory between the original claim limitation and the amended

8    claim limitation.").  ***Second***, the rationale underlying the amendment bears no more than tangential

9    relation to the equivalent in question here, which relates only to the particular ***form*** of the "playback

10    queue."  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1365-66 (Fed. Cir. 2020)

11    (affirming finding of no prosecution history estoppel because the claim amendment bears no more

12    than tangential relation to the alleged equivalent).  In fact, in making the amendment, Sonos made

13    no statement or prior-art distinction regarding the "playback queue."

14        Turning to the substance of Sonos's DoE theory, a POSITA would readily appreciate that

15    there is merely an insubstantial difference between a Receiver having (i) a singular data structure

16    that provides an ordered list of the current and next videoIds for playback and (ii) a combination of

17    data variables that collectively provides current and next videoIds that the Receiver knows to use

18    for playback in a specific order.  Ex. 1, ¶76.  Indeed, "[t]o allow [Google] to escape infringement

19    simply because it used separate [videoId data variables in a specific order], as opposed to a single

20    [ordered list of videoIds], is the exact type of injustice the doctrine of equivalents prevents."  *See*

21    *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed. Cir. 1993); *see also Intel Corp. v. U.S.*

22    *Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("[W]e held that infringement under [DoE]

23    may be established even though the accused device requires a number of components to perform

24    functions which the patented invention achieves by use of one component.").

25        In this respect, regardless of whether a Receiver has a singular data structure or a set of data

26    variables that provides videoIds for playback in a particular order, the Receiver performs

27    substantially the same function (e.g., adding multimedia content to the "local playback queue"), in

28    substantially the same way (e.g., by adding a current and next videoId to respective locations in the

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

Receiver's memory), to achieve substantially the same result (e.g., maintaining a "local playback queue" that includes videoIds that the Receiver knows to use for playback in a specific order) as a Receiver having a singular data structure that provides an ordered list of videoIds of the current and next media items for playback. Ex. 1, ¶77. Moreover, regardless of whether a Receiver has a singular data structure or a set of data variables that provides videoIds for playback in a particular order, the Sender performs the same function (e.g., causing playback of the corresponding media items to be transferred), in the same way (e.g., by transmitting a setPlaylist message to the MDx session server), to achieve the same result (e.g., causing the MDx and WatchNext servers to add the current and next videoIds to the Receiver's memory such that Receiver knows the order in which it should use the videoIds for playback). *Id.*

### b.    Casting GPM Involved a "Local Playback Queue"

Because the details of how a Sender Casts YouTube to a Receiver differ from how a Sender Casts GPM to a Receiver, Google makes a similar, but not identical, argument for non-infringement with respect to GPM. Google's GPM argument fares no better than its YouTube argument.

To initiate a Cast session with a Receiver, a GPM Sender transmitted a "Load" message causing the Receiver to load a current media item and receive from a "CQ server" a window of media items in an "ItemWindowResponse" (IWR) from a cloud queue at the CQ server. Ex. 1, ¶¶82-84. An IWR included a URL for (i) the current item, (ii) the item before the current item, and (iii) the item after the current item, which were all loaded into the Receiver's queue and dictated what item the Receiver would playback and when. *Id.*, ¶84. For instance, if the user provided input at the GPM Sender to play the song before the currently playing song, the Receiver would retrieve from its queue the URL corresponding to the "previous" song and use it to retrieve the corresponding song from a Bandaid cloud server. *Id.*, ¶85.

Thus, under the plain and ordinary meaning of "playback queue," as well as under Google's construction of that term, limitation 13.5(a) is satisfied by an IWR that was added to the Receiver's memory, which contained URLs for three multimedia items (i.e., songs) that were selected by the user for playback. *Id.*, ¶86. Like the WNR in the YouTube context, an IWR in GPM specified the song that the Receiver was currently set to play, the song before the current song, and the song after

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    the current song. *Id.* In this way, an IWR was a data construct that contained multiple resource

2    locators (e.g., URLs) and specified the order in which the Receiver was to playback the

3    corresponding multimedia content, thereby amounting to a "playback queue." *Id.*

### c.    Google's "Queue" Arguments Fail

5    Despite the clear recognition by Google itself, Google's attorneys throw out a variety of

6    arguments as to why Casting does not involve a queue on the Receiver, all of which fail or at least

7    demonstrate genuine issues of material facts, thereby precluding summary judgment.

8    **First**, at the core of Google's argument is the false premise that a "local playback queue"

9    and a "cloud queue" are mutually exclusive. G.Br., 1, 3-7, 13-15. In other words, Google

10    incorrectly contends that a "playback queue" can only exist at one device in a multi-device system.

11    The flaw in this premise is clear from the '615 Patent and Google's own words. Ex. 1, ¶88.

12    There is nothing in claim 13 that precludes the possibility that some other queue might exist

13    in the system beyond the claimed "local playback queue." *Id.*, ¶89. In fact, the '615 Patent makes

14    it clear that multiple devices in a system can share a queue such that each of multiple devices can

15    maintain a respective copy of the queue (or some portion thereof). *Id.*, ¶¶90-92. For instance, the

16    '615 Patent describes embodiments where (i) a playback device's "local playback queue" is kept

17    "synchronized" with an "application-specific queue" maintained at a control device ('615 Pat.,

18    16:20-31), (ii) a playback device "periodically fetches a short list of tracks to play next" from an

19    "application-specific queue" that are then loaded into the playback device's "local playback queue"

20    (*id.*, 16:63-17:1), and (iii) a playback device's "local playback queue" and a control device's

21    "application-specific queue" are synchronized to a "shared queue [ ] provided between" the two

22    (e.g., a queue in the cloud). *Id.*, 16:63-17:4.

23    As discussed before, despite Google's YouTube and GPM implementations utilizing a

24    "cloud queue," Google itself describes multiple devices within its system as sharing a queue much

25    like the '615 Patent's teachings. *Supra* §III.A.1. Moreover, the Receiver's receipt of a WNR in the

26    YouTube context and an IWR in the GPM context are very similar to the '615 Patent's teachings

27    regarding a playback device periodically fetching a set of tracks from a queue maintained at another

28    device that are then loaded into the playback device's "local playback queue." Ex. 1, ¶¶93, 96.

1    **Second**, for YouTube, Google asserts that a Receiver only "request[s] cloud queue items

2    one-by-one," and thus, does not have a local queue.  G.Br., 5; *id.*, 1, 7.  This assertion is contradicted

3    by the evidence.  As noted above, a WNR includes multiple videoIds corresponding to multiple

4    items from the cloud queue, such as the respective videoIds of the item before and the item after

5    the current item.  *Supra* §III.A.1.a.; Ex. 1, ¶¶95-96.  Google's 30(b)(6) witness also testified that

6    there are circumstances where the first WNR provides the Receiver with videoIds of the first two

7    items it is to playback.  *See* Ex. 11, 161:5-162:1, 163:4-164:1.

8    **Third**, for both YouTube and GPM, Google argues that, by virtue of there being a cloud

9    queue, the Receiver does not locally store the "***complete***" set of the media items that the Receiver

10   is scheduled to playback and thus, cannot have a "local playback queue."  *See* G.Br., 8-9, 15.  But

11   this implied requirement is contrary to the '615 Patent that, for example, explains that a playback

12   device "periodically fetches a short list of tracks" from a queue maintained at another device that

13   are then loaded into the playback device's "local playback queue."  Ex. 1, ¶¶97-98.  Google's

14   "complete" requirement is also contrary to how Google itself describes the different queues that

15   exist alongside the cloud queue in its own system.  *Id.*, ¶¶54-57, 99.

16   **Fourth**, Google argues that the claimed "playback queue" must be able to be "managed and

17   edited by the user" and "[t]he local variables that Sonos accuses cannot" (G.Br., 8-9).  This is

18   another limitation Google is reading into "playback queue" (no such requirement is found in the

19   claims or patents), and also a red herring.  While Casting, a user can indisputably "manage" the

20   queue via the Sender in various ways, including modifying what media item the Receiver is to play

21   next. Ex. 1, ¶¶103-107.  In doing so, the Receiver's data construct amounting to the "local playback

22   queue" is updated to reflect the change in the media item that is to play next.  *Id.*  At least in this

23   way, the Receiver's "local playback queue" can be managed by the user.

24   **Fifth**, for YouTube, Google argues that the Receiver's next videoId data variable is limited

25   to a "recommended 'autoplay' video" or song (*see* G.Br., 7-8) and this data variable "exists for

26   only a few milliseconds …."  G.Br., 9.  Neither point is correct.  Indeed, Google's 30(b)(6) witness

27   explained that the Receiver will store in a data variable the videoId of an item that the Receiver is

28   to play next, whether or not that item is a service-recommended item (e.g., an "Autoplay" video)

1   or from a collection of items directly selected by the user. [4]  Ex. 1, ¶109; Ex. 11, 174:10-175:5

2   ("[T]he next one doesn't have to be associated with the autoplay.").  Moreover, far from existing

3   for only a few milliseconds, Google's 30(b)(6) witness explained that the Receiver stores the "next"

4   data variable until it finishes playback of the current item, after which "it will look up that data

5   model and then it will extract the appropriate endpoint for the next video to play." *Id.*, 175:6-23.

6        **Sixth**, for YouTube, Google incorrectly suggests that the Receiver only retains a videoId

7   for a service-recommended media item "well after playback has been transferred." G.Br., 9.  In

8   truth, there are numerous cases in which the second media item that the Receiver is to play will be

9   a service-recommended media item such that the Receiver's first WNR will contain a videoId for

10  a service-recommended media item as the next videoId. Ex. 1, ¶110.  Even outside of those cases,

11  the first WNR stored at the Receiver often contains a videoId for a service-recommended media

12  item that will be used "after the device has exhausted the playlist" (G.Br., 9). Ex. 1, ¶110.

13           **2.    "Multimedia Files" Need Not Be Added to a "Playback Queue"**

14           Google uses another false premise to support its non-infringement position by contending

15  that "add[ing] multimedia content to a local playback queue" must involve adding a "multimedia

16  file." G.Br., 4, 11-12, 15.  To make this argument, Google distorts the plain language of limitation

17  13.5(a) – "causing one or more first cloud servers to add multimedia content to a local playback

18  queue … , **wherein** adding the multimedia content to the local playback queue **comprises** the one

19  or more first cloud servers adding, to the local playback queue, one or more resource locators" – in

20  a manner contrary to how any POSITA would interpret it. Ex. 1, ¶¶111-17.

21           Limitation 13.5(a) follows a standard claim-drafting convention in which the "wherein"

22  clause specifies ***how*** the "one or more first cloud servers" are to "add multimedia content to a local

23  playback queue." *Id.*, ¶113.  The "wherein" clause explains that "add[ing] multimedia content to a

24  local playback queue" means, and is characterized by, "adding, to the local playback queue, one or

25  more *resource locators*." *See, e.g., Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) ("Each

26  'wherein' clause … giv[es] meaning and purpose to the [claimed functions]."); MPEP § 2111.03

---

28  [4] Google's suggestion that a recommended media item is not "selected by the user" (G.Br., 9) is misplaced because such a media item is identified by Google's service based on the user's selection and thus, is indirectly "selected by the user." Ex. 1, ¶79.

1    ("[T]ransitional term 'comprising' … is synonymous with … 'characterized by[.]'").

2         Moreover, when viewing claim 13 as a whole, no POSITA would interpret limitation

3    13.5(a) as Google does because it would result in non-sensical redundancy.  Ex. 1, ¶114.  In this

4    regard, limitation 13.6 later recites "the particular playback device *retrieving the multimedia*

5    *content from one or more second cloud servers* of a streaming content service and playing back

6    the retrieved multimedia content."  A POSITA would readily appreciate that, if "adding the

7    multimedia content to the local playback queue" of limitation 13.5(a) was interpreted to require

8    adding one or more multimedia files to the "local playback queue on the particular playback device"

9    as Google claims, there would be no need for the "playback device" to "retriev[e] the multimedia

10   content *from one or more second cloud servers*," as required by limitation 13.6, because it would

11   already have the multimedia content locally in its "playback queue."  *Id*.  Thus, Google's

12   interpretation is contrary to the plain meaning that a POSITA would ascribe to limitation 13.5(a).[5]

13        The '615 specification and file history also demonstrate that Google's interpretation is

14   contrary to the plain and ordinary meaning.  *Id.*, ¶¶115-16.  In this regard, the '615 Patent

15   demonstrates to a POSITA that a "resource locator," such as a URL or other identification, is first

16   added to the playback device's "playback queue" before it retrieves the music corresponding to the

17   "resource locator," which is exactly what limitations 13.5(a) and 13.6 recite.  *See, e.g.*, '615 Pat.,

18   11:62-12:3, 12:53-63.  In fact, in the '615 file history, Sonos explained to the USPTO that limitation

19   13.5(a) "recite[s] 'causing one or more first cloud servers to add the multimedia content to a local

20   playback queue on the particular playback device' *by 'adding*, to the local playback queue, one or

21   more resource locators ....'"  D.I. 185-8, App'x B, 4 (original emphasis omitted).

22        Thus, Google's non-infringement argument for both the YouTube apps and the GPM app

23   premised on the assertion that limitation 13.5(a) requires adding a "multimedia file" to the "*local*

24   *playback queue*" is contrary to the intrinsic evidence and thus, fails.

### 3.    Casting YouTube Adds "Resource Locators"

26        Limitation 13.5(a) specifies that "adding the multimedia content to the local playback

27   queue" is accomplished by adding "one or more resource locators ...."  Google raises a specific

28

---

[5] Google's discussion of claim 20 is a red herring as that claim merely recites a specific type of "resource locator" that is added to the "local playback queue."  D.I. 184, 18-19; D.I. 202, 13.

1   argument for YouTube: a videoId does not amount to a "resource locator." Google is wrong.

2          To facilitate Casting from a YouTube Sender to a Receiver, Google's MDx and WatchNext

3   servers are caused to add one or more videoIds to the Receiver's "local playback queue." Ex. 1,

4   ¶¶61-63. Each videoId enables the Receiver to access (e.g., locate and retrieve) a given media item

5   from a Bandaid server. *Id.*, ¶¶68, 119. Indeed, much like certain URLs, the Receiver provides a

6   videoId to an intermediate service (the Player Service) that translates the videoId into at least one

7   URL for retrieving the given item from a Bandaid server. *Id.*, ¶119. Consequently, the "resource

8   locator" element is satisfied by the videoId under the plain and ordinary meaning of that term in

9   the context of the '615 Patent because it is information that enables the Receiver to access a resource

10   (e.g., a song or video) in the cloud. *Id.*; *cf. ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1092-

11   93 (Fed. Cir. 2003) (explaining the term "URL" is met "so long as it provides sufficient information

12   for the system to identify a [resource]" and finding "file names that identify specific information

13   stored on … servers" amounted to URLs). In fact, in its *Markman* brief, Google conceded that

14   information that "point[s], ***indirectly***, to the location of a resource" amounts to a "resource locator"

15   (*see* D.I. 200, 21), which is ***exactly*** what a videoId does. Thus, it is unsurprising that one of

16   Google's engineers referred to the videoIds as "pointers" to content that the Receiver could play.

17   Ex. 1, ¶119 citing Ex. 12, 108:5-10, 114:19-115:1.

18          Moreover, the "resource locator" element is satisfied literally, and under DoE, even under

19   Google's overly-narrow construction: an address of a resource on the Internet. As to literal, after

20   the Player Service translates a given videoId into at least one URL, that URL is added to the

21   Receiver's memory in a "DashManifest" that is used to retrieve the corresponding media item from

22   a Bandaid server for playback. *Id.*, ¶120. Google cannot dispute that a URL amounts to "an address

23   of a resource on the Internet." Thus, the "resource locator" element is literally satisfied under this

24   alternative infringement theory with the "DashManifest" storing the URL constituting the "local

25   playback queue" since it is a data construct on the Receiver that contains a resource locator (e.g.,

26   URL) corresponding to multimedia content the Receiver is to playback. *Id.*, ¶121.

27          As to DoE, Dr. Schmidt explained that there is merely an insubstantial difference between

28   a Sender (i) causing one or more cloud servers to add at least one "address of a resource on the

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

Internet" to a "local playback queue" and (ii) causing one cloud server to first add at least one videoId to a "local playback queue" and then another cloud server to subsequently translate the videoId into an "address of a resource on the Internet" that the Receiver uses for playback. *Id.*, ¶122. *See EMI Grp. N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 896 (Fed. Cir. 1998) ("Equivalency is not defeated by using an additional step to achieve what the patentee does in one step."). In this respect, whether a Sender directly or indirectly causes one or more cloud servers to add at least one "address of a resource on the Internet," the Sender is performing substantially the same function (e.g., causing one or more cloud servers to add multimedia content to the Receiver's "local playback queue"), in substantially the same way (e.g., by sending a message to the one or more cloud servers that causes this function to occur without any intervening user action), to achieve substantially the same result (e.g., one or more cloud servers adding at least one "address of a resource on the Internet" to the Receiver's memory to facilitate playback). Ex. 1, ¶122. In other words, there is merely an insubstantial difference between a cloud server adding an "address of a resource on the Internet" in one step and a cloud server adding information representing an "address of a resource on the Internet" in a first step that is resolved into that address in a subsequent step. *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 96 (D. Del. 2016) (denying non-infringement MSJ because "jury could reasonably conclude that ***returning an index representing the identifier*** either literally satisfies the claim language '***returning the identifier***' or satisfies it under [DoE].").

## B.    Claim 13 of the '615 Patent Is Not Invalid Over the Alleged Prior Art

To continue the false narrative that it was Google (and not Sonos) who was the innovator, Google concocts an anticipation theory based on an alleged November 9, 2010 version of its own product—the YouTube Remote ("YTR") software app—by blatantly ignoring and/or misinterpreting limitations of claim 13 of the '615 Patent. When all the limitations are properly considered, it is clear that the YTR app is missing multiple features of the claim.

Recognizing the deficiencies of its anticipation theory, Google then asserts that claim 13 would have nevertheless been obvious over the YTR application in view of an allegedly related Google patent—U.S. Patent No. 9,490,998 (the "'998 Patent")—and various other secondary references that allegedly evidence the "general knowledge" of a POSITA. But Google's conclusory

1   and overly simplistic obviousness theories also fail because the secondary references do not

2   disclose many of the features Google relies on them for, and Google's YTR app teaches away from

3   making any such combinations or modifications in the manner Google proposes.

4          What's more, Google's own development story for the YTR app confirms that there is no

5   anticipation and that claim 13 would not have been obvious at the time of the invention because

6   Google did not allegedly **add** the missing features of claim 13 to a version of the YTR app until

7   **after** the July 15, 2011 invention date.[6] Moreover, in order to address multiple complex and distinct

8   issues in its motion, Google attempts to circumvent the Court's strict page limits and prove

9   invalidity by focusing on only some, but not all, of the limitations of claim 13, and by not attaching

10  evidence upon which it relies as exhibits.  To prove invalidity, however, Google is required to prove

11  by clear and convincing evidence that **each and every** limitation is disclosed by or rendered obvious

12  over the prior art.  Thus, the Court should deny Google's motion for this reason alone.

13         Finally, as explained below, there are, at the very least, genuine issues of material fact

14  regarding the validity of '615 claim 13 that preclude the granting of Google's motion.

## 1.    Overview of Google's YTR App

16         The first version of Google's YTR app was allegedly released on November 9, 2010.  *See*

17  G.Br., 16.  This "beta" version of the YTR app could allegedly be installed on an Android mobile

18  phone and "paired" in a "session" with a TV or computer so that the YTR app could be used to

19  control the playback of videos on such a device.  *See id.*, 18; G.Ex. 1, ¶132; Ex. 1, ¶125-27.  As

20  explained by Google, "in order for a YTR [app] to be paired to one or more televisions … over the

21  Internet," the user had to navigate to the "Leanback" website and "log[] each television into the

22  same YouTube account that the YTR [app] is logged into."  G.Br., 18.  In this way, the architecture

23  that enabled such "pairing" (and subsequent communication between the paired devices) relied on

24  an intermediary cloud server referred to by Google as a "Lounge Server" or "MDx server." *See id.*;

25  G.Ex. 1, ¶¶128, 132.  Herein, Sonos refers to a paired TV or computer as a "Leanback Screen." *Id.*

26         One of the touted benefits of this cloud-based architecture was that the mobile phone

27  running the YTR app (herein "YTR device") did not have to be connected to the same local area

---

[6] For purposes of summary judgment, Google is not challenging the invention date.  *See* G.Br., 19 n.7; G.Ex. 1, ¶124.

network (LAN) (e.g., a home Wi-Fi network) as the Leanback Screen.  As such, the YTR app could be paired with and control a Leanback Screen when the YTR device was only connected to a wide area network (WAN) (e.g., a 3G cellular network).  *See* Ex. 14, 94:2-21; GOOG-SONOSNDCA-00071320, 2:51-3:20 (YTR app can be paired with Leanback Screen "*over 3G and Wi-Fi*"); G.Ex. 1, ¶157 ("In order to pair … the YTR [app] and a Screen both had to be connected to the *Internet—which could be* done by connecting to a user's home network through *Wi-Fi*."); '998 Pat., 4:51-55 ("[B]y using the network service as an intermediary, the remote control and the controlled device … may *not need to be connected to the same local area network* …."); Ex. 1, ¶128.

While Google alleges that a YTR app could be simultaneously paired with multiple Leanback Screens in a session, Google acknowledges that in such a configuration the same media would be played on *all* the Leanback Screens and that the YTR app and/or cloud-based Lounge Server would be configured to control the playback on all paired Leanback Screens *collectively* (as opposed to controlling any one of the multiple Leanback Screens *individually* or controlling a subset of the multiple Leanback Screens).  *See* G.Ex. 1, ¶¶140, 144, 158, 160-162; Ex. 1, ¶127.

## 2.  The YTR App Does Not Anticipate Claim 13

### a.  The YTR App Does Not Disclose Limitation 13.2

Limitation 13.2 requires "after connecting to a [LAN] via a network interface, identifying playback devices connected to the [LAN]."  The plain language requires the "control device" to not only *identify* playback devices, but also to identify playback devices that are connected to the *same LAN* as the control device.  Ex. 1, ¶146.  Moreover, when read in light of limitation 13.4, limitation 13.2's "identifying" must allow a particular playback device (from the identified playback devices) to be selected via the control device to transfer playback of multimedia from the control device to the particular playback device.  *See id.*  The YTR app does not teach this limitation.

According to Google, the YTR app performs the "identifying" of limitation 13.2 because "[e]ach time a television was paired [with a YTR app], it registered with the MDx server and the server sent a 'loungeScreenConnected' message to the YTR [app] indicating that the television was connected and available to transfer playback." G.Br., 18.  Google is wrong.  Conspicuously omitted from Google's brief is the actual description of the "loungeScreenConnected" message from the

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

document Google cites, which explains that this message merely "informs the [YTR app] that there is at least one screen connected in the session."[7] Ex. 13, 37.  Notifying the YTR app that there is "at least one screen … in the session," and doing so via a message sent from the ***cloud***- or ***WAN***-based Lounge Server/MDx server, does not enable the YTR app to ***identify*** the Leanback Screen in the session, let alone identify the Leanback Screen as being connected to the ***same LAN*** that the YTR device is connected to, as required by limitation 13.2.  *See id.*; Ex. 1, ¶147.

Further, even if the loungeScreenConnected message included information from which the YTR app could identify the specific Leanback Screen that was registered with the ***WAN***-based Lounge Server (there is no such evidence), this would still not satisfy limitation 13.2 because the YTR app could not identify the Leanback Screen as being connected to the ***same LAN*** that the YTR device is connected to.  Ex. 1, ¶148.  This makes sense because the YTR app receives the loungeScreenConnected message from the ***WAN***-based Lounge Server regardless of whether the YTR app and Leanback Screen are both operating on the same LAN or different LANs, or whether the YTR app is only operating on a WAN (e.g., a 3G cellular network), and the loungeScreenConnected message provides no indication of the network that the Leanback Screen is connected to.  *See supra* III.B.1.

### b.  The YTR App Does Not Disclose Limitation 13.4

The plain language of limitation 13.4 requires at least ***two separate and distinct inputs*** to transfer playback from the control device to a particular playback device, where each input must meet the specific requirements set forth in limitation 13.4's subparts (i) and (ii).  Ex. 1, ¶150.  The YTR app does not teach the two required inputs of this limitation.

According to Google, the YTR app detects the inputs of limitation 13.4 via selection of the "menu" and/or "Connect" buttons shown in the image here.  *See* G.Br., 19.  Again, Google is wrong.



---

[7] The term "Connected" in the message name refers to the Leanback Screen being registered with and connected to the cloud-based Lounge Server and thus, in a "session" with a YTR app – it does ***not*** refer to a connection between the Leanback Screen and whatever network the Leanback Screen and/or YTR device is operating on.  *See* Ex. 13, 37; Ex. 1, ¶147 n.27.

1    Selection of the "menu" button does not meet either of the required inputs at least because

2    it is not a button for transferring playback from the YTR app or a button for selecting a particular

3    playback device to transfer playback to. Ex. 1, ¶152. Instead, as shown in the image above, the

4    "menu" button does exactly what its name describes, it simply activates a "menu" on the YTR app,

5    where the "menu" includes a "Refresh," "Switch User," "Search," and "Connect" button. *Id.*

6    The only other input identified by Google is the input received via selection of the

7    "Connect" button. *See* G.Br., 19. However, a *single* input via the "Connect" button cannot satisfy

8    the *two* separate and distinct inputs of limitation 13.4. *See In re Robertson*, 169 F.3d 743, 745 (Fed.

9    Cir. 1999) (reversing finding of anticipation because the cited reference only disclosed two of the

10    claimed fastening elements and did not disclose the third claimed fastening element, which "is

11    separate from and in addition to the other mechanical fastening means and performs a different

12    function than they do."); Ex. 1, ¶153. Thus, the YTR app fails to teach limitation 13.4.

13    Even if a single input could satisfy the two separate and distinct inputs of limitation 13.4 (it

14    cannot), a selection of "Connect" is not "a selection of *the particular playback device* from the

15    identified playback devices connected to the [LAN]." Ex. 1, ¶154. For instance, as shown in the

16    image above, the "Connect" button does *not* provide any indication of *the particular Leanback*

17    *Screen* to transfer multimedia to. This makes sense because, as discussed for limitation 13.2, the

18    YTR app did not even identify the specific Leanback Screens paired in a session with the YTR app.

19    Without such an identification, the YTR app could not present a particular Leanback Screen for

20    selection or detect its selection.

21    Moreover, Google's expert confirms that a selection of the "Connect" button is *not* "a

22    selection of *the particular playback device* from the identified playback devices connected to the

23    [LAN]." According to Dr. Bhattacharjee, when multiple Leanback Screens are paired in a session

24    with a YTR app, "[p]ressing the Connect button transfers playback to *all the Screens* that have

25    been paired with the YTR [app] in a session ...." G.Ex.1, ¶162. In other words, from the

26    perspective of the YTR app, a selection of the "Connect" button merely indicates a selection of *all*

27    Leanback Screens in a session. Ex. 1, ¶155. A selection of a button divorced from any particular

28    Leanback Screen is *not* a selection of "*the particular*" Leanback Screen to transfer playback to.

1    Further, Google's own product development story confirms that the alleged November 9,

2  2010 prior art version of the YTR app is missing features of limitation 13.4.  Specifically, Google

3  acknowledges that it was not until a later ***non-prior art foreign*** version of the YTR app that Google

4  first "released" the ability to "select and control" "individual" Leanback Screens.  *See* G.Br., 20.[8]

5              **c.      Google Failed to Prove YTR Discloses Limitations 13.5-13.6**

6    Google fails to meet its burden to prove by clear and convincing evidence that the YTR app

7  discloses limitations 13.5-13.6.  Google's arguments for at least certain aspects of these limitations

8  rely on an "API" document (G.Ex. 10) and/or source code that allegedly describe the November 9,

9  2010 version of the YTR app.  *See* G.Br., 17-18.  However, the "API" document is dated July 12,

10  2010 and the "evidence" cited by Google tying it to the November 9, 2010 YTR app is an

11  uncorroborated 2022 declaration of an interested witness, Janos Levai, who did not even work at

12  Google until July 2011 (as an intern), which is insufficient corroboration.  G.Ex. 11, ¶¶2, 9; *Union*

13  *Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189 (Fed. Cir. 2002)

14  ("Uncorroborated oral testimony by interested parties is insufficient as a matter of law to establish

15  invalidity of [a] patent.") (citation omitted); *Juicy Whip, Inc., v. Orange Bang, Inc.*, 292 F.3d 728,

16  743 (Fed. Cir. 2002) (evidence presented by accused infringer was "insufficient as a matter of law

17  to surmount the clear and convincing evidence hurdle" because "[t]he testimony about the [alleged

18  prior art] came more than eight and twelve years, respectively, after the witnesses saw the [alleged

19  prior art]."); Ex. 1, ¶134.  Likewise, Google's "evidence" tying the source code to the November

20  9, 2010 YTR app is the same uncorroborated declaration of Mr. Levai.  G.Ex. 11, ¶6.

21    Moreover, limitation 13.5 requires the "transferring playback" to include "causing the

22  playback at the control device to be ***stopped***."  However, the November 14, 2010 video relied on

23  by Google does not establish that the media on the YTR device was "stopped."  *See* G.Ex. 1, ¶182.

24  To the contrary, the media on the phone's screen appears to still be in a playback state (albeit

25  paused) after the alleged "transfer" of playback.

26          **3.      The YTR App Does Not Render Obvious Claim 13**

27    Google's conclusory and overly simplistic obviousness theories fail for numerous reasons.

28
_____

[8] Google asserts that this added functionality was included in a 12/1/2011 capture of source code, but that is irrelevant as it is also after Sonos's uncontested 7/15/2011 invention date.  G.Ex. 1, ¶170.

For instance, contrary to Google's assertions (*see* G.Br., 19-21), the limited evidence Google cites for the '998 Patent, the Tungsten system, the Al-Shaykh Publication, and Sonos's alleged prior art products does not disclose any "inputs to ***transfer playback*** from the control device to a particular playback device," let alone an input in the form of "a selection of the particular playback device from the identified playback devices connected to the [LAN]," as required by limitation 13.4.  *See* Ex. 1, ¶160.  Instead, Google's evidence for these references merely shows that a control device could be used to ***control playback*** on one or more playback devices (e.g., starting or stopping playback) or for ***streaming media content*** from the control device to a playback device.  *Id.*[9]  Thus, a POSITA would not have been motivated to consider the teachings of these alleged prior art references in order to modify the YTR app to include the "inputs to ***transfer playback***" required by limitation 13.4.  *Id.*.  These references do not include such teachings.

Take for example Google's lead obviousness argument based upon the '998 Patent's disclosure at 10:62-11:6.  G.Br., 20.  That disclosure does not mention or suggest "***transferring*** playback" from a "remote control" to a "controlled device."  Ex. 1, ¶171-72.  Consequently, this disclosure does not teach the selection of a particular "controlled device" to ***transfer*** playback to.

Moreover, it is not clear that this disclosure even teaches the ability of a "remote control" to present "controlled devices" in a manner that would allow a user to select a particular "controlled device" for individual control, as Google asserts.  Ex. 1, ¶173; Ex. 15, 104:21-105:3 (after inventor testified about what she allegedly was "thinking" about at the time, when pressed to explain what the "plain language" of the patent actually disclosed, she could not do so).  Instead, consistent with how the alleged prior art YTR app operated, it appears that this passage is referring to the ability to control any and all "controlled devices" that have been "previously paired" with a "remote control" in a session, with no ability to choose from amongst those "controlled devices."  Ex. 1, ¶173.

As another exemplary failure of Google's lead obviousness argument, the '998 Patent does

---

[9] "Transferring playback" from a "control device" to a "particular playback device" as recited in claim 13 is not met by merely streaming media content from a control device to a playback device and/or initiating playback on one or both devices. *See* limitations 13.4-13.6; Ex. 1, ¶160. The control device has to be capable of being in a playback state when it "detect[s] a set of inputs to transfer playback" and thereafter "caus[e] playback to be transferred from the control device to the particular playback device," which includes "causing playback at the control device to be stopped" and "causing the particular playback device to play back the multimedia content." *Id.*

1    not disclose a "control device" "identifying playback devices connected to the [LAN]," as required

2    by limitation 13.2, and thus, cannot make up for the lack of this functionality in the YTR app. *Id.*,

3    ¶175. While the '998 Patent discloses a ***cloud server*** maintaining and using "unique identifiers"

4    for the "remote control" and "controlled devices" that are paired in a session ('998 Pat., 4:4-58,

5    8:1-10, 17:44-57), the '998 Patent does not disclose anything about the "***remote control***" receiving

6    the "unique identifiers" of the "controlled devices" or otherwise identifying the "controlled

7    devices" based on the "unique identifiers," let alone identifying the "controlled devices" as being

8    connected to the same LAN as the "remote control." Ex. 1, ¶175. In fact, the '998 Patent shuns

9    such a disclosure and instead touts a reliance on an intermediary cloud/WAN server—including its

10   maintenance and use of the "unique identifiers"—as enabling the "remote control" and "controlled

11   device[s]" to be paired in a session while "***not need[ing] to be connected to the same [LAN]***, nor

12   in physical proximity to each other." '998 Pat., 4:51-55; Ex. 1, ¶176.

13        As part of Google's backup obviousness theory, Google points to an alleged 2010 version

14   of Apple AirPlay. G.Br., 21. Google's reliance on Apple AirPlay is also misplaced. Unlike the

15   YTR app, which was specifically designed with only a ***WAN***-based communication channel to

16   allow the YTR app to be paired with and control a Leanback Screen that was ***not on the same LAN***,

17   Apple AirPlay utilized a fundamentally different system architecture that required an AirPlay

18   control device to be on the ***same LAN*** (Wi-Fi) as the AirPlay playback device. Ex. 1, ¶161. Thus,

19   a POSITA would not be motivated to modify the YTR app, which allowed the YTR app to be paired

20   with and control Leanback Screens on different networks, with a "***fundamentally different***" system

21   like AirPlay, which requires the control device and players to be on the same network. Ex. 1, ¶161-

22   63; Ex. 16, 96 (Google characterizing YTR as "fundamentally different" than Apple AirPlay); *see*

23   *also* '998 Pat., 1:14-50 (distinguishing WAN-based system architecture of the YTR app from

24   system architectures of other prior art systems like Apple AirPlay that enabled remote controls to

25   communicate directly with playback devices over a LAN).

26        In addition to the above-described deficiencies based on the teachings (or lack thereof) in

27   Google's secondary references, Google's obviousness theories also fail for many other reasons.

28   For example, the system architecture for the alleged prior art version of the YTR app teaches away

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    from modifying the YTR app in the manner proposed by Google.  Ex. 1, ¶164.  Moreover, at the

2    very least, the architecture makes such modification more difficult than Google asserts and would

3    require changes that Google and Dr. Bhattacharjee fail to address in their conclusory analysis.  *Id.*

4    As explained by Google, "in order for a YTR [app] to be paired with one or more televisions …

5    over the Internet," the user had to "log[] each television into the same YouTube account that the

6    YTR [app] is logged into." G.Br. 18.  In other words, when a user wished to control media playback

7    on a particular Leanback Screen using the YTR app, the user identified the particular Leanback

8    Screen (without caring about whether the Leanback Screen and YTR app were connected to the

9    same LAN) and used the ***user interface of that particular Leanback Screen*** to log the Leanback

10   Screen into the same YouTube account that the YTR app was logged into, which caused the WAN-

11   based Lounge Server to pair the devices in a session.  Ex. 1, ¶161.  Given this architecture, there

12   was no need for the YTR app to identify the Leanback Screen (let alone identify it as being on the

13   same LAN as the YTR app), and then present the Leanback Screen for selection via ***the user***

14   ***interface of the YTR app*** because the user had already identified and selected the particular

15   Leanback Screen they wished to control.  *Id.*  In this regard, the YTR app taught against detecting

16   the claimed "selection" required by subpart (ii) of limitation 13.4.  *Id.*

17        Moreover, in a scenario where a YTR app and multiple Leanback Screens were paired

18   together in a session (the scenario Google relies on), Google acknowledges that the YTR app and/or

19   Lounge Server were configured to control the playback of the same media on ***all*** paired Leanback

20   Screens ***collectively***.  G.Ex. 1, ¶¶140, 144, 158, 160-162.  In other words, the YTR app and/or

21   Lounge Server did not have the capability to control *a particular* paired Leanback Screen.  Ex. 1,

22   ¶165.  Nevertheless, Google asserts that limitation 13.4 was obvious because a POSITA would

23   have modified the YTR app to allow a user to select and control a particular Leanback Screen in a

24   session (G.Br., 19-21), but Google has not adequately explained how a POSITA would have

25   modified the system architecture such that, after multiple Leanback Screens have been paired

26   together in a session by the WAN-based Lounge Server, the YTR application and/or Lounge Server

27   would be configured to only control a particular Leanback Screen.  *Id.*  Further, a POSITA would

28   not have been motivated to modify the YTR app to allow for a selection of a particular Leanback

1   Screen because using multiple Leanback Screens was not even a prominent feature for the YTR
2   app.  *Id.*, ¶166.  Indeed, Google's own declarant testified that: (i) using YTR with multiple screens
3   "sounds like an [edge] case," (ii) "I don't remember using multiple screens at the same time," and
4   (iii) "why would I want to see a video on multiple screens?"  Ex. 14, 110:23-111:16.

5          As yet another exemplary deficiency in Google's obviousness theories, despite the YTR
6   app not disclosing limitation 13.2's "identifying playback devices connected to the local area
7   network" (*supra* III.B.2.a.), Google fails to adequately explain how a POSITA would modify the
8   YTR app to include the missing features of this claim limitation.  Ex. 1, ¶168.  Instead, Google
9   declares that it would have been obvious without any analysis or support.  G.Br., 18-21 (concluding
10  that "[t]he YTR prior art satisfies these limitations [13.2 and 13.4], or they are obvious" but only
11  analyzing obviousness for limitation 13.4); *see also* G.Ex. 1, ¶¶165-166, 173 (concluding it would
12  have been obvious to modify the YTR application to "identify playback devices … on the [LAN]"
13  because this was well known).  The mere conclusion that it would have been obvious to modify the
14  YTR app to include the features of limitation 13.2 is insufficient to prove invalidity.  *See*
15  *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012)
16  (affirming JMOL overturning obviousness verdict because "the expert's testimony on obviousness
17  was essentially a conclusory statement that a [POSITA] would have known, based on the 'modular'
18  nature of the claimed components, how to combine any of a number of references to achieve the
19  claimed inventions," which "is not sufficient and is fraught with hindsight bias.").

20         Further, Google's conclusory assertion that modifying the November 9, 2010 version of the
21  YTR app to include the features of limitations 13.2 and 13.4 would have provided an obvious
22  "improve[ment]" that was "straightforward" to implement in the YTR app (G.Br., 21) ignores the
23  YTR system architecture, which, as explained above, both teaches away from Google's proposed
24  modifications and also renders such modifications more complicated than Google posits.  Ex. 1,
25  ¶167.  This assertion is also contradicted by Google's own development story for the YTR app.
26  *Id.*.  Indeed, it took Google **more than a year** – and **after** the '615 Patent's invention date – to
27  modify the YTR app to allegedly allow a user to select a particular Leanback Screen for
28  playback/control.  G.Br., 20 (asserting that version of YTR with feature was released by 1/25/2012).

SONOS'S OPPOSITION TO GOOGLE'S MSJ
                                                    3:20-CV-06754-WHA

1    Clearly this was not a straightforward improvement.  Ex. 16, 94-95 (Google acknowledging that

2    modifying the YTR pairing architecture "requires a complete redesign" and "lots of changes").

3          Lastly, secondary considerations of non-obviousness for the claimed invention exist (or at

4    a minimum, there is a genuine issue of fact regarding their existence) that undercuts Google's

5    conclusory obviousness argument. Ex. 1, ¶177-79.  Indeed, because Google infringes '615 claim

6    13, evidence such as praise of a Sender that is provisioned with the accused Cast technology has a

7    sufficient nexus to the invention.  *See, e.g., Callaway Golf Co. v. Acushnet Co.*, Case No. 06-CV-

8    091, 2007 WL 4326776, at *1 (D. Del. Dec. 4, 2007) (holding evidence of praise of accused

9    products is admissible where accused products infringed asserted claims).

10        **C.**     **Google Infringes Claim 1 of the '885 Patent**

11          Google disputes only whether its speaker groups are "zone scenes" under Google's

12    construction of the term.  G.Br., 21-25.  Google raises no noninfringement argument under the

13    proper construction of "zone scene," which tracks the plain claim language: "a previously-saved

14    grouping of zone players that are to be configured for synchronous playback of media when the

15    zone scene is invoked."  *See* D.I. 209.02, 8; *see also* D.I. 126, App. A, 27.

16          As an initial matter, Google's proposed construction, which adopts Judge Albright's prior

17    preliminary oral construction, is not law of the case. Dkt. 184, 1-3. It is also incorrect.  *See, e.g.*,

18    *Sonos, Inc. v. Google LLC*, No. 3:21-cv-07559-WHA, D.I. 60, 11-16; *id.*, D.I. 66, 7-8.

19          Regardless, under Google's proposed construction, the Accused Google Players infringe

20    because they are capable of being included in "a previously saved grouping of zone players

21    according to a common theme." Each Accused Google Player contains program instructions for

22    receiving a message indicating that it has been added to a speaker group.  D.I. 209.02, 9 (describing

23    "join_group" message with a "group uuid" and a "group name").  A user can name the speaker

24    group according to anything the user desires, including, for example, names that specify a theme

25    like a time of day ("Morning") or an area of the user's home ("Garden").  *See* G.Br. 24; D.I. 209.02,

26    10-11. These are the ***exact*** types of "themes" contemplated by the '885 Patent.  *Id.*; '885 Pat., 8:47-

27    61, 10:36-41, Fig. 5A.  The Accused Google Players' undisputed capability to be included in

28    previously-saved groups "according to a common theme" establishes infringement.  *See Finjan,*

1   *Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).

2       Because Google cannot prevail under the plain language of the construction it has adopted,

3   Google tries to further limit "according to a common theme" to require an "option to add or change

4   'scene' or 'theme' information" other than a group name, such as "a particular playlist, volume,

5   equalization, or other 'attributes' described in the specification that are consistent with the common

6   theme."   G.Br. 22-23; *see also id.* at 24 (referring to zone scene "settings").   However, such

7   "attributes" (or "'theme' information") – let alone the capability to "add or change" them – are not

8   required by claim 1, even under Google's construction, and cannot be used to avoid infringement.

9   Google's primary support for its new limitation is a passage in the specification explaining that

10  devices "***can*** be configured in a particular scene … where … attributes for the grouping are

11  automatically effectuated."   *Id.*, 24 (emphasis changed); *see also* '885 Pat., 9:20-30 ("[A] zone

12  scene command ***could*** apply [] attributes").   But this is plainly just one example embodiment of a

13  "zone scene," and when describing other "zone scene" embodiments, the specification makes no

14  mention of these other "attributes." *See e.g.*, *id.*, 8:53-67, 10:12-19, Figs. 3A, 5B.   Thus, importing

15  such a requirement into the claims is improper as a matter of law.   *See Eko Brands, LLC v. Adrian*

16  *Rivera Maynez Enter., Inc.*, 946 F.3d 1367, 1372-73 (Fed. Cir. 2020).

17      Google is also wrong to argue that "the specification confirms that 'naming' groups is

18  different from the claimed 'zone scenes.'"   G.Br., 24.   To the contrary, the '885 Patent discloses

19  that a name is one attribute of a "zone scene" that is established during creation of the "zone scene."

20  '885 Pat., 8:52-61, 10:36-43, Figs. 5A, 7-8.   This confirms that naming is a part of "zone scenes,"

21  and that a thematic name satisfies the "according to a common theme" aspect of Google's

22  construction.   Google's related suggestion that a zone scene's name cannot amount to a "common

23  theme" because the '885 Patent discloses thematic names for "conventional" speaker groups (G.Br.,

24  24) is based on a misreading of the patent.   The disclosure Google points to describes the need in

25  the prior art for a better way to group speakers so that a user can listen to audio on a first group in

26  the "morning," a second group in the "evening," and a third group on the "weekend," where those

27  groups have one or more overlapping speakers.   *See* '885 Pat., 2:9-15.   Nothing in that passage

28  discloses if or how the prior art enabled such groups to be named.   Regardless, whether the prior

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1  art allowed a "conventional" group to be named is irrelevant to the question of whether a Google

2  speaker group having a thematic name is "according to a common theme" – which it clearly is.

3      Google's other noninfringement arguments fail as well.  Google contends that Sonos's

4  interpretation of "common theme" is improper because it allegedly depends on what the user is

5  "thinking" during creation of a "zone scene."  G.Br., 23.  This is not true.  As explained, each

6  Accused Google Player infringes under Google's proposed construction because each is capable of

7  being included in previously saved groupings of players that are undisputedly "according to a

8  common theme," such as a speaker group named "Morning" or "Garden."  This infringement is not

9  based on what the user is "thinking" – it is based on the functional capability of the Accused Google

10  Players.  No inquiry into the user's state of mind is needed.

11      Google also argues that it does not infringe because its speaker groups are "merely generic

12  speaker groups, which were well known in speaker systems at the time."  G.Br., 22.  Of course,

13  using "generic" technology is not an infringement defense, but regardless, Google is wrong – "zone

14  scenes" such as Google's speaker groups are far from being "generic" or "well known."[10]  Indeed,

15  Google ignores the key aspects of a Google speaker group that make it a "zone scene" and

16  distinguish it from a "generic speaker group" – namely, that it is a "***previously saved***" grouping of

17  "zone players" that are "to be configured for synchronous playback of media ***when the [Google***

18  ***speaker group] is invoked***."  '885 Pat., cl. 1; D.I. 126, App. A, 27.  This allows an Accused Google

19  Player to be included in a pre-saved speaker group that can be invoked at any future time, and also

20  allows an Accused Google Player to be included in multiple different speaker groups—both of

21  which are features that distinguish "zone scenes" such as Google's speaker groups from "generic

22  speaker groups." *See, e.g.,* '885 Pat., 1:61-2:17, 8:42-45, 11:51-67; D.I. 209.03, ¶22-25.

23  **IV.    CONCLUSION**

24      For the foregoing reasons, the Court should deny Google's motion for summary judgment.

25

26

---

27  [10] Nor would it show that '885 Patent claim 1 is invalid because there are other elements in the

28  claim; a patent claim may have both old and new elements.  *See, e.g., Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed. Cir. 1984) ("[A] combination may be patentable whether it be composed of elements all new, partly new, or all old").

SONOS'S OPPOSITION TO GOOGLE'S MSJ
3:20-CV-06754-WHA

1    Dated:  May 5, 2022

2    By:  _/s/ Michael P. Boyea_____

    CLEMENT SETH ROBERTS
3    BAS DE BLANK
    ALYSSA CARIDIS
    EVAN D. BREWER
4
    ORRICK, HERRINGTON & SUTCLIFFE LLP
5
    SEAN M. SULLIVAN (*pro hac* vice)
6    MICHAEL P. BOYEA (*pro hac* vice)
    COLE B. RICHTER (*pro hac* vice)
7
    LEE SULLIVAN SHEA & SMITH LLP
8
    *Attorneys for Sonos, Inc.*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28