# EXHIBIT 1
Filed Under Seal



OCEAN TOMO®

A PART OF JS|HELD

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CIVIL ACTION NO. 3:20-CV-06754

**GOOGLE LLC,**
**V.**
**SONOS, INC.**

---

**SUPPLEMENTAL EXPERT REPORT OF JAMES E. MALACKOWSKI**

**December 9, 2022**

INTELLECTUAL CAPITAL EQUITY

**Figure 19: Third-Party Casting Applications with Comparable Direct Control Technology**[428]

| Comparable Third-Party Casting Application | Comparable Feature(s) | Last Updated | Availability | Fees | Advertising | Installs |
|---|---|---|---|---|---|---|
| AllCast | AllCast allows a user to cast photos, music, and videos from an Android phone to a television. Specifically, according to the Play Store, AllCast allows a user to cast to Chromecast, Amazon FireTV, Apple TV, Xbox 360, Xbox One, Roku, WDTV, and Smart TVs from Samsung, Sony and Panasonic. | 8-Jul-20 | Android Devices | $4.99 one-time payment | The free version of AllCast shows ads on the phone during casting. Upgrading to premium version removes ads. | 10,000,000+ |
| Cast to TV | Cast to TV enables you to cast online videos and all local videos, music, and images to TV, Chromecast, Roku, Amazon Fire Stick, Amazon Fire TV, Xbox, Apple TV, or other DLNA Devices. Additional features include local playback for videos, playback queue, auto search for available cast devices and streaming devices. | 21-Oct-22 | Android Devices | $2.49 - $4.99 per item | The free version of Cast to TV includes ads and offers in-app purchases. | 50,000,000+ |
| iMedia Share | iMedia Share allows a user to play photos, videos, and music to any connected TV screen or audio system. Supported players include Xbox 360, Xbox One, DISH Hopper, Apple TV, and internet-connected TVs from Samsung, Sony, Panasonic, LG, and Philips. However, it is not a traditional mirror cast app since the user cannot access online conent with it and can only stream videos, photos, music and some social media. | 18-Dec-17 | Android Devices | Free with ads | The app includes ads. | 10,000,000+ |
| LocalCast | LocalCast enables a user to send videos, music or pictures from a phone, tablet, or application (such as Google Drive or Dropbox) to a Chromecast, Smart TVs from Samsung, LG, and Panasonic, Roku, Nexus Player, Apple TV, Amazon Fire TV, Amazon Fire Stick, Sony Bravia, Xbox 360, Xbox One, Sonos, and other DLNA devices. Unique features include the ability to zoom, rotate, and pan on Chromecast and other Google Cast devices.<br>There are subscriptions per month, per year, and one-time purchase options to unlock all Pro features. | 2-Oct-22 | Android Devices | $0.99 - $29.99 | The free version of LocalCast includes ads and offers in-app purchases. | 10,000,000+ |
| Web Video Cast | Web Video Caster® allows you to watch on your TV videos from your favorite websites including movies, TV shows, live streams of news, sports, and IPTV. It also lets you cast local videos stored on your phone. Photos and audio files are also supported. Subtitles are detected on the web page, you can also use your own subtitles, or you can use the integrated search of OpenSubtitles.org. | 11-Nov-22 | Android Devices | $2.99 - $5.99 per item | In-app advertising in the free version. | 10,000,000+ |
| EasyCast | EasyCast has all functions that fulfills your wishes. TV Cast video, photo, game, music and movie to your TV in wireless display. | 18-Nov-22 | Android Devices | Free with ads | The app includes ads. | 10,000,000+ |
| Screen Mirroring | Screen Mirroring - All Mirror, helps you cast a small phone screen to big TV screen in high quality and real-time speed. You can easily access all types of media files, including mobile games, photos, music, videos & E-books on the big screen. With the Cast to TV app, you can cast to TV and make screen share with your family or friends in simple steps. Save your eyes from the small phone screen and enjoy big screen TV series shows in the family area. Download this stable & free TV mirror and screen share app. | 12-Jul-22 | Android Devices | $3.99 per item | In-app advertising in the free version. | 10,000,000+ |
| Cast Web | Cast Web allows you to cast videos from web browser, or phone to smart TVs. Compatible streaming devices include Roku Express, Roku Streaming Stick, Chromecast 1, 2, and Ultra HD 4K, Fire TV and Fire Stick, Apple TV Airplay, DLNA Receivers, Xbox One, Xbox 360, Google Cast receivers, Smart TVs with DLNA built-in. | 18-Nov-22 | Android Devices | $0.99 - $5.99 per item | In-app advertising in the free version. | 1,000,000+ |

According to Dr. Schmidt:

*My analysis of these apps involved reviewing each of the app's Google Play Store webpage and overseeing and directing testing of these apps on a Pixel 6 device to gain a high-level understanding of the structure and operation of these apps.*

*Each of these apps can be installed on an Android device, such as a Pixel smartphone, and used to cause a networked media device (e.g., a smart TV) that is on the same network as the Android device to play back multimedia (e.g., videos and/or music).  In this regard, these apps are generally comparable to the Direct Control technology claimed in the '033 Patent.*

*Based on my analysis, however, it appears that these apps operate in a similar fashion to the prior art that Google has asserted against the '033 Patent (e.g., Al-Shaykh, Apple Airplay, etc.).  Like the prior art, these apps do not perform each and every limitation of the asserted independent claims of the '033 Patent.  For example, each of these apps does not appear to (i) "operat[e] in a first mode in which the computing device is configured for playback of a remote playback queue," as required by limitation 1.4/12.1, (ii) "display[] a representation of one or more playback devices in a media playback system" "while operating in the first mode," as required by limitation 1.5/12.2, and/or (iii) "transmit[] an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to (i) communicate with the cloud-based computing system in order to obtain data identifying a next one or more media items that are in the remote playback queue, (ii) use the obtained data to retrieve at least one media item in the remote playback queue from*

---

[428] Appendix 6.3.



**INTELLECTUAL CAPITAL EQUITY**

*the cloud-based media service; and (iii) play back the retrieved at least one media item," as required by limitation 1.7/12.4.*

*Nevertheless, especially given that Google represents that the prior art that appears to operate in a similar manner as these apps is relevant to the '033 Patent, it is my opinion that, while they may be inferior to the '033 Patent, these apps are all technologically comparable to the Direct Control technology claimed in the '033 Patent.[429]*

I understand that Dr. Schmidt has opined that these apps are technically comparable to the technology claimed in the '033 Patent, albeit less valuable. This is due to the fact that, like the prior art, these apps do not perform each and every limitation of the independent Asserted Claims of the '033 Patent.[430]

Since the main feature being provided by these third-party comparable casting applications is the cast feature, there is no additional meaningful apportionment to be made to the one-time subscription fees that these applications charge. In other words, to the extent that these comparable casting applications have any additional features, they are ancillary to the core casting feature of each application and offset by the advantageous features of the '033 Patent that each application is missing.

Thus, no further apportionment is necessary. And lastly, while the fees ranged greatly between the third-party applications, I have conservatively assumed that a $1.99 subscription fee would be the quantitative indicator that Sonos and Google would consider based upon the available third-party comparable applications. By picking a fee in the middle of the range, I have further accounted for the secondary benefits, if any, that these casting applications may have over the '033 Patent.

## 12.2    The Income Approach

The Income Approach provides a systematic framework for estimating an asset's price based on the value of the benefits derived from the use of that asset. As described in <u>Economic Damages in Intellectual Property</u>:

*The income approach is a method used to value intellectual property assets based on the present value of the future income stream generated by an asset. There are three major inputs to the income approach: (1) expected future cash flows from the asset; (2) economic life of the asset; and (3) business risk associated with the realization of the cash flow stream. The key goal is to estimate the present value of incremental profits generated by the asset over its economic life, taking into account the risk associated with generating those profits. Once the present value of the incremental profits is determined, these profits are split in some manner between the licensor and licensee, typically in the form of a royalty.[431]*

As discussed throughout this report, I understand that the Asserted Patents provide valuable features to the Accused Instrumentalities. While there is a lack of relevant comparable license agreements in this matter which read on the value of these specific features, I have been provided with information relevant for the Income Approach which would be considered by the parties to the hypothetical negotiation in this case.

---

[429] Opening Schmidt Report, pp. 165-166.
[430] Opening Schmidt Report, p. 166.
[431] Slottje, D., "Economic Damages in Intellectual Property," pp. 291-293.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 12.2.3    Direct Control Quantitative Indicator Conclusion

Based upon the reasonable royalty indicators calculated above, I believe the appropriate starting point for the *Georgia-Pacific* analysis is $1.39, based upon the incremental YouTube advertising and subscription revenue royalty quantitative indicator.[480]

### 12.2.4    Zone Scene Reasonable Royalty Indicator

As described above, Google does not earn substantial income on the sales of the '885 Accused Instrumentalities themselves, but instead relies on the functionality to increase the number of users and amount of time those users are interacting with the Google ecosystem in an effort to generate additional advertising revenue. Therefore, I have considered an approach under which Sonos, as the technology developer, would charge Google a fee to implement this technology into its products.

I have investigated the offerings of a third-party company, If This Then That ("IFTTT") which provides similar, albeit less valuable, functionality as Sonos's patented Zone Scene technology.

### 12.2.4.1    IFTTT Background

IFTTT is a web-based service that allows its users to create sequential chains of simple conditional statements, comprised of "if" statements ("triggers"), which check for a condition, and "then" statements ("actions"), which act upon a service based upon the returned value of the trigger.[481] For example, IFTTT offers pre-made applets that allow a consumer to integrate across applications, devices, and services to perform functions such as: determining the temperature of your home using the current weather conditions, activating a security system upon leaving home, and voice-activation of a device.[482]

I understand that Dr. Almeroth has reviewed IFTTT and provided input regarding its technical comparability to the claimed technology in the '885 Patent:

> *I have been asked to review the "Applets" provided by "IFTTT" to determine whether they are technologically comparable to the claimed technology of the '885 and '966 Patents. According to the IFTTT website, "IFTTT is short for If This Then That, and is the best way to integrate apps, devices, and services." To provide such integration, IFTTT offers "Applets" that have "a combination of triggers and actions that can be combined to create the automations that help you achieve your goals, be more efficient, and improve your smart home." For example, a first IFTTT Applet can be programmed and saved with routines or actions, which are executed with the press of a first button, to play music on multiple smart speakers in a home. Similarly, a second Applet can be programmed and saved with routines or actions, which are executed with the press of a second button, to play music on at least one of the speakers in the first Applet together with at least one different speaker (not included in the first Applet) in the same home.*

---

[480] $1.39 = $1.12 royalty rate for advertising revenue + $0.27 royalty rate for subscription revenue. See Appendices 5.1.1.1 and 5.1.2.1-S.

[481] "IFTTT – Trust, Ownership, Control and Business Model," *Mere Civilian*, https://www.merecivilian.com/ifttt/#:~:text=IFTTT%20has%20stated%20that%20there%20are%20over%20200%2C0 00,expensive%20tiers%20and%20any%20revenue%20from%20IFTTT%20partners.

[482] "WTF is IFTTT?" *IFTTT*, https://ifttt.com/explore/new_to_ifttt.



INTELLECTUAL CAPITAL EQUITY

*In this regard, the IFTTT Applets are technologically comparable to the "zone scene" technology claimed in the '885 and '966 Patents. That is, these Applets can be used to create and save a predefined group of playback devices, such as speakers, that can later be invoked to cause such devices to playback the same song. These saved groups can also be named according to a common theme, such as "Garden," "Morning," "Afternoon," and "Evening." Moreover, the Applets allow for these predefined groups to include overlapping playback devices and to be capable of playing back the same song.*

*It should be understood, however, that the IFTTT Applets do not perform each and every limitation of the claims of the '885 and '966 Patents and do not provide the full scope of advantages explained above. As one non-limiting example, these Applets do not enable the creation of groups of speakers that are "configured for synchronous playback of media" when invoked, as required by limitations 1.6 and 1.7 of claim 1 of the '885 Patent and limitations 1.5 and 1.7 of claim 1 of the '966 Patent. As such, unlike the '885 and '966 Patents' claimed technology, the smart speaker groups created via these IFTTT Applets do not provide the advantage of synchronous audio playback because the smart speakers in a group created and invoked with an IFTTT Applet would have unwanted echo (e.g., echo caused by clock drift between the smart speakers and/or echo caused by differences in the playback start time of the audio on each smart speaker).*

*Nevertheless, it is my opinion that, while the technology incorporated into the IFTTT Applets may be inferior to the claimed technology of the '885 and '966 Patents, the IFTTT Applets are technologically comparable to the claimed "zone scene" technology of the '885 and '966 Patents.*[483]

I understand that while asserted claim 1 is directed to and infringed by a single "zone player" with certain functional capability, the claim recites three separate "zone players" (*e.g.*, speakers), two separate groups or zone scenes, and one common or overlapping "zone player" at a minimum.[484]

To help with building an applet, IFTTT offers pre-made triggers and actions. One such pre-made trigger is the "Button press," which can prompt numerous workflows and automations, as shown in the figure below.[485]

---

[483] Opening Almeroth Report, pp. 384-385, 395. Internal cites omitted.
[484] Opening Almeroth Report, pp. 264-265.
[485] Opening Almeroth Report, pp. 386-387.



INTELLECTUAL CAPITAL EQUITY

Figure 33: Adding Actions to an Applet[488]




Using these pre-made offerings, an IFTTT user may build an applet by choosing the "Button press" trigger, choosing an action for resuming or playing music on a first speaker, and choosing an action for resuming or playing music on a second speaker. Once a user has chosen the trigger and actions for his or her applet, the IFTTT application allows the user to name and save the applet.[489] The user can name the button or action sequence to name the speaker group, to options such as "Garden" to designate location or "Evening" to designate a timeframe. I understand that while this creation does not sync the music played back by the speakers in the group, this applet does pre-define, name, and save a group of speakers that can be recalled for playback at a later time, as well as provides the option to include the same speaker in multiple, different speaker groups.[490] I understand that Dr. Almeroth oversaw and directed certain testing to further understand

---

[488] Opening Almeroth Report, p. 387.

[489] Opening Almeroth Report, pp. 388-389.

[490] Opening Almeroth Report, pp. 386-395.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

IFTTT's operational and functional capabilities, including building, creating, saving, and invoking different groups of speakers.[491]

Given these abilities, I find that, contrary to Dr. Schonfeld's claim that "the technology contained within IFTTT is totally unrelated to the technology of the '885 Patent," the IFTTT service allows a user to create, name, and save a speaker group for later recall, providing comparable functionality to the Asserted Claims of the '885 Patent.[492] Dr. Schonfeld also argues that IFTTT is "does not appear targeted at facilitating or suggesting grouping of speakers…because the whole point of IFTTT is to allow a user to access a huge number of apps and create a near-infinite number of applets that automate tasks for users."[493] I do not disagree with Dr. Schonfeld that IFTTT offers immense capabilities outside of the ability to group speakers, such as "creating notifications based on the Weather Underground app, […] which has nothing in common with the alleged invention."[494] However, my analysis of the IFTTT service is merely the first step in my analysis in calculating a quantitative indicator for the Zone Scene technology; it does, despite Dr. Schonfeld's opinion, allow for a user to create similar, albeit less valuable, speaker groups similar to those contemplated in the Zone Scene Patents. As such, IFTTT's ability to charge for the ability to create this service provides an initial indicator to the value of the Zone Scene Patents.

### 12.2.4.2   IFTTT Pricing History

From its inception through September 2020, IFTTT offered services to its users for free, with no limitations in terms of speed, applet count, or access. In September 2020, IFTTT rolled out two subscription plans: "Standard" and "Pro."[495] At that time, the "Standard" plan would allow users to turn on unlimited applets and to create up to three applets, but did not allow "multi-step applets."[496] The "Standard" subscription had no monthly fee.[497] At the same time, the "Pro" plan provided users with unlimited applet creation, multi-step applets with queries, conditional logic statements, and multiple actions (*i.e.*, "if-then-then" statements), exclusive customer support, and faster execution.[498] Initially, IFTTT's initial pricing model for the "Pro" subscription gave users the ability to set their price as one of four options: $3.99, $5.99, $9.99, and custom.[499] The custom field allowed users to input the price they wanted to pay, as long as it was at least $1.99 per month.[500] The creator of IFTTT thought the true value of the technology was $9.99 per month, and it was

---

[491] Opening Almeroth Report, pp. 386-395.

[492] Rebuttal Expert Report of Dan Schonfeld, Ph.D., July 27, 2022, p. 37.

[493] Rebuttal Expert Report of Dan Schonfeld, Ph.D., July 27, 2022, pp. 38, 45.

[494] Rebuttal Expert Report of Dan Schonfeld, Ph.D., July 27, 2022, pp. 38, 45.

[495] "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

[496] "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

[497] "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

[498] "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

[499] Hearn, P., "IFTTT Pricing: Is Pro Worth The Cost?" *Online Tech Tips*, https://www.online-tech-tips.com/software-reviews/ifttt-pricing-is-pro-worth-the-cost/; Varughese, A., "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

[500] Hearn, P., "IFTTT Pricing: Is Pro Worth The Cost?" *Online Tech Tips*, https://www.online-tech-tips.com/software-reviews/ifttt-pricing-is-pro-worth-the-cost/; Varughese, A., "How much does IFTTT Cost?" *Automate Your Life*, https://automatelife.net/how-much-does-ifttt-cost/.

 **INTELLECTUAL CAPITAL EQUITY**

save each applet.[516]  To activate the IFTTT applets, the user simply activates the "Button press" trigger (which can be saved, for example, as a widget on an iPhone home screen), which then implements one of the three methods listed above, causing a group of speakers to play a song.  In other words, *if* the "Button press" trigger is activated, *then* the relevant Sonos or Spotify actions are executed, resulting in a group of speakers playing a song.[517]

As such, IFTTT provides for a portion of the zone scene functionality contemplated by the Asserted Claims of the '885 Patent and '966 Patent.  Specifically, the actions described above allow an IFTTT user to program, name, save, and then activate a first group of speakers for music playback, as well as program, name, save, and activate a second group of speakers for music playback, where there is at least one overlapping speaker between the first speaker group and second speaker group.  The speakers in each group can also be set up to play the same song.  However, I understand IFTTT is unable to enable the entire functionality contemplated in the Asserted Claims of the '885 Patent and '966 Patent.  For example, music that is played through a speaker group via an IFTTT applet is not synced.

The "Pro" subscription is the cheapest plan that allows users to create two multi-action applets, thereby replicating the functionality of zone scene technology.  Given that, I have assumed that the "Pro" subscription fee would be an appropriate starting point for determining what Sonos would charge Google as a per-device royalty for each of the Zone Scene Patents.

Around the time of the hypothetical negotiation for the '885 Patent, in November 2020, the "Pro" subscription cost $3.99 per month, or $11.97 per quarter.  In September 2020, a few months before the hypothetical negotiation, users were given the option of selecting their own subscription fee, as long as it was at least $1.99 per month.  I understand this was the first instance in which IFTTT users were asked to pay for the services provided by IFTTT applets.[518]  In order to be conservative, I have provided a range of "Pro" subscription fees as a starting point including the lowest fee IFTTT offered of $1.99 per month ($5.97 per quarter) as a low price and the next lowest offered price, which was $3.99 per month ($11.97 per quarter), as a high price.

Around the time of the hypothetical negotiation for the '966 Patent, in November 2019, the "Pro" subscription was provided at no cost to IFTTT users.  As stated above, IFTTT users were first asked to pay for IFTTT services for the first time in September 2020, with the option to subscribe to the "Pro" plan for as little as $1.99 per month.  I believe that the parties would understand that IFTTT would not be able to offer its services for free indefinitely, and the initial prices offered would be known or knowable at the time of the hypothetical negotiation for the '966 Patent.  In order to be conservative, I use $1.99 per month, the lowest IFTTT "Pro" plan price offered as a starting point to my reasonable royalty analysis for the '966 Patent; this results in $5.97 per quarter.

---

[516] SONOS-SVG2-00227592; SONOS-SVG2-00227584-585.

[517] Opening Almeroth Report, pp. 386-395.

[518] "IFTTT.com Plans," *Wayback Machine*, https://web.archive.org/web/20200930053720/https://ifttt.com/plans; Hearn, P., "IFTTT Pricing: Is Pro Worth The Cost?" Online Tech Tips, https://www.online-tech-tips.com/software-reviews/ifttt-pricing-is-pro-worth-the-cost/.

INTELLECTUAL CAPITAL EQUITY

I understand that IFTTT's "Pro" subscription currently gives a user the ability to create 20 applets, however, the functionality that replicates zone scene technology can be accomplished on just two applets. Therefore, I apportion IFTTT's "Pro" subscription fees by a factor of 2/20 (10%) to get a low per-device subscription fee of $0.60 per quarter and a high per-device subscription fee of $1.20 per quarter for the '885 Patent.[519] For the '966 Patent, I apportion the IFTTT "Pro" subscription fee by the same factor (2/20).

**Figure 36: Quarterly IFTTT Subscription Fees for Comparable Zone Scene Technology**[520]

|  | Low | High |
|---|---|---|
| IFTTT "Pro" Price Subscription | $ 5.97 | $ 11.97 |
| Apportionment Metric | *10.0%* | *10.0%* |
| **Quarterly Subscription Fee for Comparable Zone Scene Functionality** | **$ 0.60** | **$ 1.20** |

IFTTT subscriptions would continue indefinitely as long as the user stays subscribed to the service. However, I have only considered the lifetime value of one smartphone as the total time that the zone scene subscription fee would be applicable. The average lifetime value of a smartphone (*i.e.*, a Google Pixel phone) is two and a half years or ten quarters.[521] Therefore, I applied the quarterly subscription fee for zone scene to the lifetime value of a smartphone, ten quarters, and then discounted those fees by Google's weighted average cost of capital ("WACC") at the time of the hypothetical negotiation, of 7.4% and 8.8% for the '885 Patent and '966 Patent, respectively, to calculate the NPV of the lifetime value of zone scene technology per device.[522] Using the low quarterly subscription fee, the NPV of lifetime value of zone scene technology per device is $4.27 for the '885 Patent and $4.04 for the '966 Patent.[523] Using the high quarterly subscription fee, the NPV of lifetime value of zone scene technology per device is $8.56 and $8.09.[524]

---

[519] Appendices 4.4 and 4.3.

[520] Appendix 4.3.

[521] Jesper, "What is the average lifespan of a smartphone?" *CoolBlue.nl*, https://www.coolblue.nl/en/advice/lifespan-smartphone.html; Chng, R., "How Long Can A Smartphone Last? (With 6 Real Examples)," *Valorvortech.com*, https://valorvortech.com/how-long-can-a-smartphone-last/; "Average lifespan (replacement cycle length) of smartphones in the United States from 2014 to 2025," *Statista.com*, https://www.statista.com/statistics/619788/average-smartphone-life/.

[522] Google's weighted average cost of capital as of Q4 2020 and Q4 2019 was 7.4% and 8.8%. *Bloomberg Terminal*, accessed November 18, 2022. Appendices 4.1.4 and 4.2.4.

[523] Appendices 4.1.4 and 4.2.4.

[524] Appendices 4.1.4 and 4.2.4.

**Figure 37: NPV of Lifetime Value of '885 Patent Per Device**[525]

| Low | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarterly Subscription Fee for '885 Patent - Low | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 |
| Partial Period Factor | 0.101 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 0.899 |
| Mid-Period Factor | 0.051 | 0.551 | 1.601 | 2.601 | 3.601 | 4.601 | 5.601 | 6.601 | 7.601 | 8.601 | 9.551 |
| Present Value Factor | 0.996 | 0.961 | 0.892 | 0.831 | 0.773 | 0.720 | 0.670 | 0.624 | 0.581 | 0.541 | 0.506 |
| Present Value | $ 0.06 | $ 0.57 | $ 0.53 | $ 0.50 | $ 0.46 | $ 0.43 | $ 0.40 | $ 0.37 | $ 0.35 | $ 0.32 | $ 0.27 |
| **NPV of Lifetime Value of '885 Patent Per Device - Low** | $ 4.27 | | | | | | | | | | |

| High | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarterly Subscription Fee for '885 Patent - High | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 |
| Partial Period Factor | 0.101 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 0.899 |
| Mid-Period Factor | 0.051 | 0.551 | 1.601 | 2.601 | 3.601 | 4.601 | 5.601 | 6.601 | 7.601 | 8.601 | 9.551 |
| Present Value Factor | 0.996 | 0.961 | 0.892 | 0.831 | 0.773 | 0.720 | 0.670 | 0.624 | 0.581 | 0.541 | 0.506 |
| Present Value | $ 0.12 | $ 1.15 | $ 1.07 | $ 0.99 | $ 0.93 | $ 0.86 | $ 0.80 | $ 0.75 | $ 0.70 | $ 0.65 | $ 0.54 |
| **NPV of Lifetime Value of '885 Patent Per Device - High** | $ 8.56 | | | | | | | | | | |

| NPV Inputs | |
|---|---|
| NPV Date | 24-Nov-20 |
| Year End | 31-Dec-20 |
| Partial Period | 0.101 |
| Discount Rate | 7.4% |

**Figure 38: NPV of Lifetime Value of '966 Patent Per Device**[526]

| Low | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarterly Subscription Fee for '966 Patent - Low | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 | $ 0.60 |
| Partial Period Factor | 0.153 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 0.847 |
| Mid-Period Factor | 0.077 | 0.577 | 1.653 | 2.653 | 3.653 | 4.653 | 5.653 | 6.653 | 7.653 | 8.653 | 9.577 |
| Present Value Factor | 0.994 | 0.953 | 0.870 | 0.799 | 0.735 | 0.675 | 0.621 | 0.571 | 0.524 | 0.482 | 0.446 |
| Present Value | $ 0.09 | $ 0.57 | $ 0.52 | $ 0.48 | $ 0.44 | $ 0.40 | $ 0.37 | $ 0.34 | $ 0.31 | $ 0.29 | $ 0.23 |
| **NPV of Lifetime Value of '966 Patent Per Device -** | $ 4.04 | | | | | | | | | | |

| High | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarterly Subscription Fee for '966 Patent - High | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 |
| Partial Period Factor | 0.153 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 0.847 |
| Mid-Period Factor | 0.077 | 0.577 | 1.653 | 2.653 | 3.653 | 4.653 | 5.653 | 6.653 | 7.653 | 8.653 | 9.577 |
| Present Value Factor | 0.994 | 0.953 | 0.870 | 0.799 | 0.735 | 0.675 | 0.621 | 0.571 | 0.524 | 0.482 | 0.446 |
| Present Value | $ 0.18 | $ 1.14 | $ 1.04 | $ 0.96 | $ 0.88 | $ 0.81 | $ 0.74 | $ 0.68 | $ 0.63 | $ 0.58 | $ 0.45 |
| **'966 Patent Per Device - High** | $ 8.09 | | | | | | | | | | |

| NPV Inputs | |
|---|---|
| NPV Date | 5-Nov-19 |
| Year End | 31-Dec-19 |
| Partial Period | 0.153 |
| Discount Rate | 8.8% |

As discussed above, I understand that while asserted claim 1 of the '885 Patent is directed to and infringed by a single "zone player" with certain functional capability, the claim recites three separate "zone players" (*e.g.*, speakers), two separate groups or zone scenes, and one common or overlapping "zone player" at a

---

[525] Appendix 4.1.4.

[526] Appendix 4.2.4.

INTELLECTUAL CAPITAL EQUITY

**Figure 66: '885 Patent Royalty Rate**[687]

| Metric | Low | High |
|---|---|---|
| '885 Patent Quantitative Indicator | $ 1.24 | $ 2.48 |
| Sonos's Share Based on Revenue Split | *70.0%* | *70.0%* |
| **'885 Patent Royalty Rate** | **$ 0.87** | **$ 1.74** |

Similar to the methodology for the '885 Patent, I have also applied the 70% revenue share to the quantitative indicators I have calculated for the '966 Patent. Assuming Sonos would keep 70% of the zone scene quantitative indicators results in $0.82 to $1.64 per '966 Accused Instrumentality.[688]

**Figure 67: '966 Patent Royalty Rate**[689]

| Metric | Low | High |
|---|---|---|
| '966 Patent Quantitative Indicator | $ 1.17 | $ 2.35 |
| Sonos's Share Based on Revenue Split | *70.0%* | *70.0%* |
| **'966 Patent Royalty Rate** | **$ 0.82** | **$ 1.64** |

Based on the foregoing analysis and the quantitative indicators and qualitative factors discussed above, it is my opinion that the parties to the hypothetical negotiation would conservatively agree to a royalty rate of $0.97 per device for Google's use of the '033 Patent, a royalty rate of $0.87 per device for Google's use of the '885 Patent, and $0.82 per device for Google's use of the '966 Patent, all in connection with the Accused Instrumentalities.[690]

## 15. DETERMINATION OF REASONABLE ROYALTIES

Based on the totality of the circumstances in this case and the information available to me at this time, I have concluded that the appropriate form of compensation in this case, for each of the Asserted Patents, is an award of reasonable royalty damages.

I have analyzed quantitative and qualitative valuation metrics, including the *Georgia-Pacific* factors, and have reached a conclusion regarding the appropriate reasonable royalties due Sonos. Regarding the '033 Patent relating to Direct Control, in my opinion, the total royalty rate is $0.97.[691] Alternatively, the royalty rate for

---

[687] Appendix 4.1.2.

[688] Appendix 4.2.2.

[689] Appendix 4.2.2.

[690] Appendices 3.1-S, 5.1.1 and 5.1.2-S. $0.97 = $0.79 advertising revenue royalty rate + $0.19 subscription revenue royalty rate.

[691] Appendices 5.1.1 and 5.1.2-S. $0.97 = $0.79 advertising revenue royalty rate + $0.19 subscription revenue royalty rate.