# EXHIBIT 3
# FILED UNDER SEAL

Page 122

1  to the IFTTT app; correct?
2      A.  In part, yes.
3      Q.  And that's part of your market approach;
4  correct?
5      A.  Market approach or income approach.  It's
6  generally part of the analysis of Georgia-Pacific factor
7  12.
8      Q.  On page 66, first paragraph, you describe the
9  IFTTT analysis as "an approach under which Sonos, as the
10 technology developer, would charge Google a fee to
11 implement this technology into its products."
12         Do you see that?
13     A.  Yes.
14     Q.  Are you aware of Sonos actually charging a fee
15 for the functionality protected by the '885 patent?
16     A.  No.  I believe but for the infringement, Sonos
17 would not make this available to its competitors on a
18 bare license basis.  They would only consider licensing
19 it as part of a larger strategic relationship between the
20 parties.
21     Q.  But for its own customers, are you aware of
22 Sonos charging a fee specifically for the technology
23 protected by the '885 patent?
24     A.  No.  Sonos' pricing model is not to break out
25 each of the attributes or benefits and charge customers

Page 123

1  accordingly, which is exactly why in my analysis I don't,
2  for example, use the spreadsheet that you referred to in
3  Mr. Bakewell's report. Neither party uses a
4  pay-as-you-go model.
5       Q.  How did you first learn about the IFTTT app?
6       A.  Through research that I conducted as part of my
7  work in this case.
8       Q.  So you learned about the IFTTT app yourself?
9       A.  I have to give credit to my associate Nate
10 Blanchette. He was given the task of looking for
11 benchmarks under Georgia-Pacific 12, and he first brought
12 it to my attention.
13      Q.  Did he bring other potential benchmarks to your
14 attention?
15      A.  Yes, specifically related to the other patents
16 in this case. Those are listed in my report and are no
17 longer relevant. But not as related to the '885.
18      Q.  So for the '885, the IFTTT app is the only
19 benchmark your associate was able to find?
20      A.  Well, it's -- yes. We have not identified
21 others, but it seemed to be a pure play comparison, so we
22 were quite comfortable in utilizing it.
23      Q.  Have you downloaded the IFTTT app yourself?
24      A.  Of course.
25      Q.  When did you download it?

Page 152

1   end up with a per device royalty rate of $1.24 on the low
2   end and $2.48 on the high end; correct?
3        A.   Right.
4        Q.   The next adjustment you make is the 70/30
5   revenue split; correct?
6        A.   Correct.  The sharing.  That now extends from
7   beyond the quantitative input into the actual
8   Georgia-Pacific analysis.  But arithmetically, that the
9   correct.
10       Q.   So let's go to that portion of your report,
11  which I think is page 99.
12            Your conclusion here is that Google would keep
13  30 percent of the revenue that would be generated through
14  the use of the infringing functionality; is that right?
15       A.   Ultimately, yes, because of the Google practice
16  I cite in the report.  But also in consideration of the
17  many conservative adjustments that we made along the way
18  to get to that metric.  All of which I think we've
19  discussed except maybe the fact that the multiple
20  adoption of speakers at 29 percent was actually trending
21  upwards, and we didn't use a higher number.
22            But, yes, that's true.
23       Q.   And that 30 percent figure comes from the
24  service fees Google charges for app developers on the
25  Play Store; correct?

Page 153

1    A.   It comes from Google's experience in benefit
2  sharing for other technology providers, yes.
3    Q.   The 30 percent number, that's Google's standard
4  rate for any app on the App Store; correct?
5    A.   Generally speaking, yes.  There are, I believe,
6  some exceptions for non-profits or lower-quantity apps.
7  And there have been some recent changes to it.  But
8  generally speaking, 30 percent is the sharing principle.
9    Q.   And that 30 percent, that's not specific to
10 music apps; correct?
11   A.   It is specific to Google as the licensee, and it
12 is Google's policy across all applications which, in my
13 view, make it appropriate to apply here.
14   Q.   In this hypothetical where the parties are
15 splitting revenue and Google is the proprietor of the
16 application store, the Play Store, Google is the
17 licensee; correct?
18   A.   Google is the service or product supplier to the
19 market and would be the licensee in most cases, yes.
20   Q.   And the app developer would be the licensor?
21   A.   Correct.
22   Q.   But in the hypothetical negotiation, Sonos is
23 the licensee; correct?
24   A.   No.  Sonos is the licensor providing the
25 technology to Google as the licensee.  Same relationship.

1  Q. Oh. Yep, apologies.
2      The 30 percent fee that Google charges for apps
3  on the Play Store, that's not specific to a given type of
4  app. For example, a music app; correct?
5  A. Correct, it is not. It's reflective of Google's
6  licensing practice generally. But it is specific to them
7  as a party. So it is not a rule of thumb. It is tied to
8  the facts of the case, which is why I feel comfortable
9  using it.
10 Q. Have you ever looked to this kind of
11 relationship between two licensing parties before?
12 A. Yes. Both in my own work as well as in my
13 research of other cases that have employed similar
14 methodology. Including cases advanced by your firm.
15 Q. Do you have any evidence that Google has used
16 the commission it charges on apps in the Play Store as a
17 data point in real-world licensing negotiations?
18 A. I'm not aware of any public information in that
19 regard. This was a subject that was discussed in the
20 Google/Oracle case at some length. But I'm not relying
21 upon that for my work here.
22 Q. Are you saying that in the Google/Oracle case,
23 you offered a similar opinion, where you looked to the
24 30/70 split that Google charges app developers for your
25 expert analysis?

1      A.   My recollection is, yes, there was a similar
2  analysis.
3      Q.   What was your opinion in that case specifically?
4      A.   I -- I don't recall a lot of the details.  It
5  was an analysis of the value of the technology associated
6  with Java code libraries.
7      Q.   And you're saying you offered an opinion that
8  Google and Oracle would have agreed to a 30/70 split
9  based, in part, on Google's rates it charges app
10 developers?
11         MR. SULLIVAN:  You know, I just want to caution
12 the witness, too, when you're talking about the details
13 of what was dealt with in that case, that he not violate
14 any protective orders or confidentiality agreements of --
15 of that kind.
16         THE WITNESS:  As I sit here, my recollection is
17 that was definitely a subject of my report in that case.
18 I don't recall the exact implementation or conclusions.
19 I don't believe it was inconsistent.
20     Q.   BY MS. COOPER:  And you also got opinion on
21 behalf of Oracle; right?
22     A.   Correct.
23     Q.   Did Google challenge the reliability of that
24 opinion under Daubert or Rule 702?
25     A.   There were challenges to my opinion under

Page 156

1   Daubert.  There was a limitation with respect to future
2   lost profits calculations, but no limitation with respect
3   to the rest of my work.
4          So to the extent that it was challenged, it was
5   accepted.  But I can't recall if it was specifically
6   challenged.  Because it's, frankly, not that
7   controversial.
8       Q.   Have you used this 70/30 split in any other case
9   where you provided an expert opinion?
10      A.   Yes.  I've used it in other matters involving
11  Apple, though I can't recall specifically which ones.
12      Q.   In any of those cases, was their use of Apple's
13  30/70 split challenged under Daubert or Rule 7092?
14      A.   I don't recall.  But it has never even excluded,
15  if it was.
16      Q.   Are you aware of any evidence that Sonos has
17  looked to these numbers in its own real-world licensing
18  negotiations?
19      A.   No.  But Sonos would not have a need to do so,
20  because they would not seek to solely license one aspect
21  of their technology to a competitor like this.
22          As we spoke of earlier, they would only license
23  their patents as part of a larger strategic relationship
24  for a cross-license.  So you wouldn't expect to see that.
25      Q.   Are you aware of any instances when Sonos has

Page 157

1  pointed to this 30/70 split in its licensing negotiations
2  with Google?
3       A.   No.  Because the negotiations with Google were
4  not patent feature specific.  They were portfolio-wide
5  and based upon other allocations of profitability, as
6  described within my report.
7       Q.   Are you aware of any evidence that Google has
8  agreed to a revenue share like this in patent licensing
9  negotiations?
10      A.   Well, Google has agreed to this revenue share in
11 its business dealings repeatedly.  Whether or not that's
12 been specific to a patent license, I've not seen any
13 agreements they've produced that are running royalties or
14 that are competitive licenses for unique features.
15           Most of what Google has licensed, as I
16 understand it and as reflected in the documents produced
17 in this case, are settlements of disputes or patent
18 acquisitions.  And the details behind the computation of
19 those amounts have not been revealed to me.
20      Q.   Have you ever seen a party utilize a 70/30 split
21 or look to these numbers to support a 70/30 split in
22 real-world licensing negotiations?
23      A.   Yes.  Using the 70/30 split is something that I
24 have done frequently, both for business licensing
25 decisions and valuations whenever we're dealing with a

Page 181

```
 1  STATE OF CALIFORNIA    ) ss:
 2  COUNTY OF MARIN        )
 3
 4         I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
 5  hereby certify:
 6         That the foregoing deposition testimony was
 7  taken before me at the time and place therein set forth
 8  and at which time the witness was administered the oath;
 9         That testimony of the witness and all objections
10  made by counsel at the time of the examination were
11  recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16         I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20         IN WITNESS WHEREOF, I have subscribed my name
21  this 30th day of August, 2022.
22
23
24
25             LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

105:23 106:3
109:16 110:3,8
110:15,22
111:12,22
130:25 147:6,12
148:7,15 154:17
171:23 172:3,5
174:5
**date** 30:8 33:23
34:5 35:1 48:22
64:17,18,20 66:2
66:22,25 67:1,2
67:6,9 98:18
99:11,18 162:3
183:24
**dated** 140:20
**daubert** 22:17
27:5 29:1
155:24 156:1,13
**day** 55:24 64:21
68:8 72:22,24
103:4 118:9
121:4,13 135:23
136:13 164:25
181:21
**daylight** 2:15,16
**days** 72:22
182:17
**de** 160:6
**deal** 81:19
**dealing** 157:25
**dealings** 157:11
**dealt** 155:13
**december** 102:1
102:7
**decide** 158:20
**decision** 23:7
161:14

**decisions** 82:22
83:7,11 149:9
157:25
**declare** 180:1
**decrease** 66:24
67:7 94:14
**deduct** 159:17
159:19
**defendant** 1:8
2:8 3:13 18:9
19:10
**defendant's** 29:7
132:18 140:9
159:15 167:13
**defendants** 18:7
**defer** 13:22
44:16 47:19
48:4,12 50:16
56:4,20 57:12
60:3 61:22 62:4
62:13 84:10
139:1 173:9
**defined** 63:19
92:9 158:6
**definitely** 155:17
**degree** 10:12
11:1 171:14
**degrees** 10:15,18
**delay** 49:13
**deliberately**
111:25 112:2
114:8,14,19
**demand** 75:1
76:23 95:14
**denon** 97:10
**department**
50:10

**depend** 16:6
**dependent** 43:4
54:12,18,20
165:16
**depending** 179:5
**depends** 90:6
**deponent** 182:13
**deposing** 182:13
**deposition** 1:12
2:12 5:1 7:7,10
8:22 43:24
45:14 46:15
165:1 181:6
**depositions**
56:14
**describe** 38:12
45:8 56:3 72:15
81:1 122:8
131:6 138:25
172:15,23
173:24
**described** 10:16
13:1 14:5 29:19
31:21 41:15
53:11,19 56:5,7
57:4,9 73:12
79:12 93:3
104:6 127:19
129:17 130:1,4
139:13 141:18
145:21 157:6
159:21 169:20
175:20
**describes** 29:3
72:16
**describing** 18:3
49:12 125:16

**description** 5:3
11:23 16:15
39:1 44:17
60:20 72:25
117:8 118:25
**descriptions**
44:20 56:12
**descriptive**
133:21
**design** 88:15
**designate** 20:9
**designated** 18:5
18:13 19:22
33:10
**designing** 12:22
**designs** 119:5
**desire** 80:11
141:17
**desires** 77:23
**detail** 14:5 56:3
62:13 92:16
164:21 171:4
**detailed** 10:11
47:7 128:19
137:16
**details** 90:17,20
155:4,12 157:18
**determinant**
43:10
**determination**
44:2 66:9 97:17
**determinations**
15:20
**determinative**
73:10
**determined**
20:16,23 21:3
22:2,20,21,25