**FILED UNDER SEAL**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Sean Pak (Bar No. 219032)
  seanpak@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
  Lindsay Cooper (Bar No. 287125)
  lindsaycooper@quinnemanuel.com
  Iman Lordgooei (Bar No. 251320)
  imanlordgooei@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:   (415) 875-6600
Facsimile:   (415) 875-6700

  Marc Kaplan *(pro hac vice)*
  marckaplan@quinnemanuel.com
191 N. Wacker Drive, Ste 2700
Chicago, Illinois 60606
Telephone:   (312) 705-7400
Facsimile:   (312) 705-7401

*Attorneys for GOOGLE LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOS, INC., <br><br> Plaintiff and Counter-Defendant, <br><br> vs. <br><br> GOOGLE LLC, <br><br> Defendant and Counter-Claimant. | Case No. 3:20-cv-06754-WHA <br> Related to Case No. 3:21-cv-07559-WHA <br><br> **GOOGLE LLC'S TRIAL BRIEF** <br><br> **FILED UNDER SEAL** <br><br> Date:     May 3, 2023 <br> Time:    12:00 p.m. <br> Location: Courtroom 12, 19th Floor <br> Judge:   Hon. William Alsup |

## I. INTRODUCTION

Defendant Google LLC ("Google") submits this trial brief to assist the Court in understanding certain issues specific to trial in this case. This trial brief is intended as a summary for the Court's reference, and is not exhaustive in rehearsing arguments or evidence. To the extent any argument is not expressly set forth below, that does not mean that Google has waived or intends to waive the argument.

## II. RELEVANT FACTUAL BACKGROUND

### A. The Parties

Google was founded in 1998 with the goal of organizing the world's information and making it universally accessible and useful. Over the past two decades, in service of that goal, Google has become one of the world's most innovative companies. Google's revolutionary advances in search, mobile computing, machine learning, artificial intelligence, content playback technologies, and voice-assisted technologies have changed millions of lives. Google continues its efforts to make information universally accessible and useful at the household level through advanced voice recognition, voice search, and media playback technologies in its Pixel, Google Home, Google Nest, and Chromecast products.

Throughout its existence, Sonos has been a wireless speaker company. While Sonos has attempted to cast itself as the pioneer of wireless multi-room audio systems during this litigation, the facts tell a different story. Sonos was started in the early 2000s, but by the time Sonos introduced its first wireless speaker product in 2005, other companies had already released and sold wireless speaker systems. In fact, wireless audio systems were already on the market before Sonos was even founded and before the earliest alleged conception dates of the Asserted Patents.

### B. Procedural History

On September 28, 2020, Sonos informed Google that it planned to file a complaint in the Western District of Texas the next day accusing Google of infringing five patents: U.S. Patent Nos. 9,967,615 ("'615 patent"), 10,779,033 ("'033 patent"), 9,344,206 ("'206 patent"), 10,469,966 ("'966 patent"), and 9,219,460 ("'460 patent"). Dkt. 11-1 at 7-9. Upon receiving the draft complaint, Google investigated Sonos's allegations and filed a declaratory judgment action in this

Court. Dkt. 1. Sonos then filed suit in the Western District of Texas the next day. *Sonos, Inc. v. Google LLC*, No. 3:21-cv-07559-WHA, Dkt. 1 (N.D. Cal. Sept. 29, 2020) ("Transferred Action").

The Court subsequently stayed this case pending the resolution of Google's motion to transfer venue of the Transferred Action to this District and ordered Google to amend its complaint. Dkt. 36. While the Western District of Texas considered Google's motion to transfer, Sonos amended its complaint in that case to add a claim for infringement of U.S. Patent No. 10,848,885 ("'885 patent") and withdraw its claim for infringement of the '460 patent. Transferred Action, Dkt. 51. The parties then completed claim construction briefing, and the Western District of Texas held a *Markman* hearing. Dkt. 48 at 4. During the *Markman* hearing, the Western District of Texas found the '206 patent indefinite. Transferred Action, Dkt. 106 at 52:5-7.

Although the Western District of Texas denied Google's motion to transfer on August 2, 2021, the Federal Circuit granted Google's petition for writ of mandamus and directed the case to be transferred on September 27, 2021. Dkt. 116. After the Transferred Action was transferred to this Court, the Court related the Declaratory Judgment and Transferred Actions. Dkts. 117, 122.

In October 2021, the Court implemented its patent showdown procedure. Dkt. 68. It then allowed Google to amend its declaratory judgment complaint to add claims for, *inter alia*, declaratory judgment of non-infringement and invalidity of the '885 patent. Dkt. 111. In light of the Western District of Texas' claim construction ruling, the parties stipulated to the dismissal of the '206 patent on February 4, 2022. Dkts. 122, 132. On March 18, 2022, Sonos filed its answer to Google's second amended complaint and asserted counterclaims for infringement of the '033, '615, '885, and '966 patents. Dkt. 170.

After the Court granted Google's request to file a motion to dismiss, Google filed a motion to dismiss Sonos's claims of willful and indirect infringement of the '885, '033, and '966 patents. Dkts. 133, 138. On March 16, 2022, the Court granted Google's motion, finding that the parties' pre-suit licensing negotiations regarding other, unasserted Sonos patents did not establish Google's knowledge of the '885, '033, or '966 patents or knowledge of infringement thereof. Transferred Action, Dkt. 156 at 9-10 ("MTD Order"). However, the Court allowed Sonos to move for leave to amend its complaint to allege that Google had knowledge "knowledge of the patents" and "sufficient

1  time to analyze the accused product vis-à-vis those patents (along with other specifics needed to
2  show willfulness)" as a result of Google "commenc[ing] its own declaratory relief claim first." *Id.*
3  at 10, 13.  The Court subsequently granted Sonos's motion for leave to amend, and Sonos filed its
4  third amended complaint on July 8, 2022.  Dkts. 210, 211.

5  During the patent showdown, Sonos moved for summary judgment of infringement of claim
6  1 of the '885 patent, and Google moved for summary judgment of non-infringement and invalidity
7  of claim 13 of the '615 patent as well as non-infringement of the '885 patent.  Dkts. 208, 211.  The
8  Court granted Sonos's motion for summary judgment of infringement of claim 1 of the '885 patent
9  but found claim 13 of the '615 patent both invalid and not infringed.  Dkts. 309 (also denying
10 Google's motion to invalidate claim 1 of the '885 patent as covering unpatentable subject-matter
11 under 35 U.S.C. § 101 and lacking written description support under 35 U.S.C. § 112"), 316.

12 On October 18, 2022, the Court granted summary judgment of validity of the '885
13 patent.  Dkt. 382.  That ruling was later withdrawn when the Court granted Google's motion for
14 reconsideration to raise additional invalidity arguments not required to have been raised at summary
15 judgment.  Dkt. 539.

16 Sonos subsequently moved for summary judgment on Google's contract-related claims, and
17 Google moved for summary judgment of (1) invalidity of claims 1-2, 4, 9, 11-13, and 16 of the
18 '033 patent, (2) invalidity of claims 1-2, 4, 6, 8-10, 12, 14 and 16 of the '966 patent, (3) invalidity
19 of claim 1 of the '885 patent, (4) non-infringement of the '885 and '966 patent by Google's
20 redesigned products, and (5) no willful or indirect infringement of the '033, '885, and '966 patents.
21 Dkts. 478, 483.  The Court:

22 • Granted Google's motion for summary judgment of invalidity of the '033 patent and
23   its motion for summary judgment of no willful or indirect infringement of the '885
24   patent;

25 • Denied Google's motion for summary judgment of invalidity of the '885 and '966
26   patents and its motion for summary judgment of no willful and indirect infringement
27   of the '966 patent;

28 • Denied as moot Google's motion for summary judgment of no willful or indirect

        infringement of the '033 patent and Sonos's motion for summary judgment as to Google's breach of contract and conversion claims; and

- Deferred Google's motion for summary judgment of non-infringement of the '885 and '966 patents based on Google's design around.

Dkt. 566. In its order, the Court also consolidated the Declaratory Judgment and Transferred Actions for trial. *Id.* at 33. The parties agreed to realign the Declaratory Judgment Action so that Sonos would be the plaintiff and Google would be the defendant at trial. Dkt. 555.

On April 20, 2023, the Court issued an order that "the jury will decide whether the purported design-around infringes unless the evidence is so clear that the Court can resolve the issue under Rule 50 of the Federal Rules of Civil Procedure" and also held that "the '615 patent is out of the case." Dkt. 580.

### C. Overview of The '885 And '966 Patents

Only the '966 and '885 patents remain for trial. Sonos refers to these patents as its "Zone Scene" patents. Sonos is presently asserting claims 1, 2, 4, 6, and 8 of the '966 patent, and claim 1 of the '885 patent. Both patents are entitled "Zone Scene Management" and name Robert A. Lambourne as the sole inventor. The '966 patent issued on November 5, 2019, and the '885 patent issued on November 24, 2020. The two patents were both filed on April 12, 2019, and both claim priority through a series of continuation applications to an application filed on September 11, 2007, as well as a provisional application filed on September 12, 2006. Sonos's serial patent filings have resulted in more than **12** different patents and **274** claims issuing from the mere 11 columns of written description in the Zone Scene patents, and Sonos continues to prosecute further continuation applications to this day. Put another way, Sonos has obtained more than one patent and 25 claims for each column of written description in the Zone Scene patents.

The alleged invention of the Zone Scene patents relates to creating, saving, and invoking multiple speaker groups (called "zone scenes") in a system that requires three or more speakers (called "zone players"). The Zone Scene patents do not, however, purport to invent grouping speakers together for music playback or even saving a single grouping of speakers for later use. Such speaker groupings have long been known in the art. Patents filed years before the Zone

Scene patents described "remote unit[s] for selectively controlling . . . music from the at least one group of speakers." U.S. Patent No. 7,339,492 at 1:10-12. The Zone Scene patents likewise admit that "multi-zone audio system[s] that usually include[ ] a number of audio players" were "conventional" at the time. *See* '885 Pat. at 1:46-61. Home audio systems from companies such as Bose and Crestron provided home theater enthusiasts the ability to set up multiple speaker zones in their house and dynamically select music to play from each. Additionally, there were also mainstream consumer devices from companies such as Logitech that allowed users to set up multiple speaker groups in their home for synchronized audio playback. Indeed, even Sonos had publicly released and sold its own prior art products before the alleged invention date that could group speakers into "zones" and combine zones into "zone groups," and even had a pre-saved, preset zone group known as the "Party Mode."

The Zone Scene patents thus claim an exceedingly specific use case involving a system with no less than three speakers grouped into no less than two "zone scenes." In particular, the asserted claims require, among other things, that a first speaker initially operate in a "standalone mode" where it is configured to playback media individually, and that the first speaker continue to operate in that standalone mode [1] while a user groups the first speaker into a first speaker group and a second, overlapping speaker group, and [2] until a user invokes one of the speaker groups.

Sonos attempts to characterize the Zone Scene patents as valuable, but it is undisputed that Sonos did not even implement the alleged invention in its own product offerings until June 2020, almost 15 years after the purported conception date.

### D.   Overview of The Accused Products

#### 1.   Direct Infringement

The asserted claims of the Zone Scene patents recite an apparatus containing a "computer readable medium" with software instructions. The software instructions in both patents accomplish substantially the same functions, but the '885 patent claims are drafted from the perspective of a "zone player" (e.g., a speaker), while the '966 patent claims are drafted from the perspective of a "computing device" (e.g., a smartphone, tablet, or laptop serving as a controller in a media playback system that includes more than three zone players).

**'885 patent:** Sonos accuses Google of directly infringing the '885 patent by making, using, offering for sale, or selling Google's Home Mini, Nest Mini, Home, Home Max, Home Hub, Nest Hub, Nest Hub Max, Nest Wifi Point, Chromecast, Chromecast Audio, Chromecast Ultra, Chromecast with Google TV, and Nest Audio media players.

Sonos does not accuse Google of indirectly infringing the '885 patent.

**'966 patent:** Sonos accuses Google of directly infringing the '966 patent by making, using, offering for sale, or selling Pixel smartphones, laptops, and tablets ("Pixel products"). Sonos's infringement allegations for the Pixel products require that a specific application be installed on the product: the Google Home application. The Google Home application, however, is an application for managing and controlling a wide variety of smart home devices, which includes the accused media players but also includes a host of other devices that have no media playback capabilities (e.g., Nest thermostats). Sonos's infringement claims center on the ability of a user to create and save speaker groups using the Google Home application while those speakers remain in standalone playback mode (in which they are configured to play back media individually), and to select a speaker group for playback. The accused media players constitute only a fraction of the devices that can be managed and controlled using the Google Home application. Indeed, the Google Home application currently supports many thousands of different smart home devices, including lights, appliances, plugs, thermostats, cameras, doorbells, sensors, and more. And even when it comes to media players, the ability to create and play back speaker groups is a minor feature that is rarely used in practice by users of Google's accused products. In fact, data that Google produced in this case demonstrates that the accused speaker grouping feature is used extremely rarely. Moreover, Sonos's accusations broadly capture even scenarios in which users only have two speakers, whereas the asserted claims require three or more speakers, thus use of the accused feature in systems comprising three or more speakers (as the claims require) is even rarer. Indeed, Sonos has not identified *any* evidence of a Google user ever employing the accused feature in a system comprising three or more speakers.

Sonos also accuses Google of indirectly infringing the '966 patent when a Google Home application is installed on a smartphone, tablet, or laptop manufactured by a third party.

**Redesign products:** Google pursued a re-design of its accused products after the Court held that the prior versions of the accused products infringed claim 1 of the '885 patent during the patent showdown. This redesign alters the way in which the accused prodcuts. Sonos nevertheless continues to accuse the redesigned products of infringement. The redesigned products do not infringe. *See* Section III.A.

## III. LEGAL AND FACTUAL ISSUES TO BE TRIED

Google maintains that the current version of its accused products (implementing Google's redesign) do not infringe any asserted claims of the '966 and '885 patents, and that prior versions of its accused products do not infringe the '966 patent. Google also maintains that the asserted claims of these patents are invalid over the prior art. Google further contends that Sonos's damages model is unreliable and has filed *Daubert* motions to exclude testimony of Sonos's damages expert. For the sake of brevity, the following discussion focuses on a few exemplary defenses.

### A. Google's Redesign Does Not Infringe The '966 And '885 Patents

For purposes of this statement, Claim 1 of the '885 Patent is representative of the claims of the "Zone Scene" Patents. Claim 1 is directed to a system comprising at least three "zone players" (e.g., speakers). The first zone player in the system must "operate[] in a standalone mode in which the first zone player is configured to playback media individually." The claims further recite, inter alia, that "while operating" in the standalone mode the first zone player must [1] receive respective indications that it has been added to a first speaker group and a second speaker group, and [2] continue to operate in a standalone mode until one of those speaker groups is invoked. In other words, the claims require that a speaker continuously operate in standalone mode while receiving indications that it has been added to a first and second speaker group, and thereafter until one of those speaker groups is invoked. The redesigned versions of Google's accused products do ***not*** continue to operate in a standalone mode after being added to a speaker group, as required by the asserted claims.

1    Speakers in the accused Google system can be in one of three states: (i) an inactive state in
2  which the speaker is not configured to play back any media, (ii) an individual state in which the
3  speaker is configured to play back media individually, and (iii) a group state in which the speaker
4  is configured to play back media as part of a speaker group.  The image on the far left shows three



5  speakers that are in the inactive state (Kitchen,
6  Living Room, Master Bedroom).  In the inactive
7  state **the app has no playback controls** (e.g.,
8  play, pause, skip, etc.), which reflects the fact
9  that the speakers are unable to playback any
10 media in this state.  In fact, software applications
11 required for playback of media are not running
12 on the accused devices in the inactive state and,
13 as such, the devices have no capability of playing
14 back media in that state.  The image farther to the
15 right shows a "Kitchen" speaker in the individual playback state.  In the individual state the app
16 shows playback controls for controlling playback.  There are also playback controls when in the
17 group state.  And unlike in the inactive state, the necessary software required to playback media is
18 actively running on accused devices when they are in the individual or group playback states.
19   A speaker that is in the inactive state must transition out of the inactive state in order to be
20 configured to play back media—whether in the individual or group states.  This requires active
21 user input using, for example, the Google Home application on a mobile device.  For example, a
22 user may select an individual speaker or speaker group using the user interface of the Google
23 Home app, whereby a "launch" message is transmitted to the speaker(s).  The launch message, as
24 its name implies, launches an appropriate music application on the speaker (*e.g.*, the YouTube
25 Music application) so that the speaker is then configured to playback media.  The "launch"
26 message, which launches a music application on the speaker, is what configures the speaker for
27 play back of media.
28   In Google's redesigned products, creating a speaker group including a speaker operating in

-8-                    Case No. 3:20-cv-06754-WHA
                              GOOGLE'S TRIAL BRIEF

an individual state (the accused "standalone mode") actively causes the speaker to exit the individual state and, instead, enter the inactive state. In particular, whenever a speaker is added to a new speaker group by the Google Home app, it executes a "StopCurrentApp" command that terminates any music application running on the speaker, thereby returning the speaker to the inactive state.[1] As discussed above, the speaker is not configured for playback of media in this inactive state. The speaker must instead wait for the user to select the speaker or a group that includes the speaker using, for example, the Google Home app, which results in the transmission of a new launch command to configure the speaker to play back media. Thus, in the redesigned products, the accused speakers are forced into an inactive state whenever a speaker group is created that includes the speakers—they do not continue to operate in a standalone mode. They cannot infringe. Specifically, the redesigned products do not practice the asserted claim limitation requiring "after receiving the first and second indications [that the zone player has been added to a group], ***continuing to operate in the standalone mode*** [in which the first zone player is configured to play back media individually] until a given one of the first and second zone scenes has been selected for invocation."

### B. The '966 And '885 Patents Are Invalid

Sonos asserts that saving speaker groups is the primary innovation of the asserted patents over the prior art. But this idea was plainly obvious at the time of the invention based on the prior art. Sonos does not dispute that its prior art 2005 system included the building blocks of the purported inventions claimed in the '885 and '966 patents. With these building blocks in place, adding the ability to save speaker groups so they could be invoked at a later time was a trivial modification undeserving of a patent. In fact, multiple Sonos users publicly suggested the feature to Sonos prior to the effective filing date of the Zone Scene patents. And even aside from Sonos's own prior art, other prior art speaker systems, such as Logitech's Squeezebox, allowed users to save and invoke speaker groups long before the alleged invention of the Zone Scene patents.

---

[1] The case involving an existing speaker group is different. In the case where the speaker is added to an existing speaker group playing music, that speaker will ultimately take on the behavior of the group and begin music playback in conjunction with the speaker group. Thus, adding a speaker to an existing speaker group causes the speaker to exit the individual state and enter the group state.

1    **Sonos 2005 system:** The Sonos prior art system launched no later than January 2005, when
2    Sonos publicly announced that it had shipped to customers. Because the claimed earliest effective
3    filing date for the '885 and '966 patents is September 2006, the Sonos prior art system is prior art
4    under at least 35 U.S.C. § 102(b). Sonos does not dispute that the Sonos system is prior art.

5    The prior art Sonos system included a handheld controller. The handheld controller was not
6    able to play back media itself, but could control playback on Sonos speakers (called "zone players").
7    The handheld controller could control playback of
8    media on an individual speaker. Or it could control
9    playback of media of speaker groups, including user-
10   created groups and a pre-set, persistently saved
11   "party mode" group that included all the speakers in
12   the system. For instance, the image above shows the
13   "Zone Menu" display on the Sonos handheld



14   controller which is used to "link" speakers together in real time to create speaker groups (e.g., the
15   "Kitchen" and "Patio" group).

16   **Sonos 2005 Forum Posts:** Sonos maintained public online forums that allowed users to
17   discuss Sonos products, suggest features, report issues, and generally collaborate with Sonos and
18   other Sonos customers. By 2005, multiple Sonos users (including users "theboyg" and "JeffT")
19   communicated to Sonos that it would be desirable to allow users to name and persistently save often-
20   used speaker groups so that they can be invoked at a later time—the alleged improvement over the
21   prior art Sonos system. It is undisputed that these 2005 Sonos forum posts are prior art under 35
22   U.S.C. § 102(a) and/or (b) because they pre-date the critical date (*i.e.*, prior to September 12, 2005),
23   pre-date the alleged conception date (i.e., prior to December 21, 2005), and were published prior to
24   the patent filing date on September 12, 2006.

1   For instance, in a thread entitled "Virtual Zone and Zone Grouping," one user ("theboyg")
2   posted a comment on February
3   27, 2005 stating that the way
4   the Sonos 2005 system
5   permitted users to create
6   groups—by linking and
7   unlinking speakers in real

8   time—was "cumbersome," and suggesting that Sonos add the ability to create "a virtual zone" that
9   could be saved and invoked at will.  Others users agreed that the ability to create and save "virtual
10  zone" would be great and that such functionality would be "what we have now" in the 2005 system
11  but with the added "ability to persist [i.e., save] the groups."



19  Another thread entitled "Macro/Presets" included a similar suggestion several months later.
20  In that thread, a post from user
21  "JeffT" on September 22,
22  2005 suggested that the Sonos
23  2005 system "save Zone links
24  [i.e., speakers linked into a

25  group] as favorites" so that, for example, he could set up "2 party modes, Summer and Winter,"
26  where the "Summer mode" would include "the deck speakers and the Winter mode would not."
27  **Logitech Squeezebox:** The ability to create, save and invoke speaker groups was reflected
28  in prior art totally unrelated to Sonos as well.  For example, one popular competitor of the Sonos

system at the time was Logitech's Squeezebox system. The Squeezebox system was publicly available, on sale, offered for sale, and described in printed publications both before the critical date (*i.e.*, prior to September 12, 2005), before the alleged conception date (i.e., prior to December 21, 2005), and prior to the patent filing date on September 12, 2006. Thus, it was prior art under at least section 102(a) and 102(b).

The Squeezebox system included a number of playback devices that could be set up and controlled using a software application on a separate computer called the "SlimServer." The image on the right shows a number of Squeezebox playback devices.  These devices could be played individually or as a group. For instance the image on the right shows the SlimServer software managing a number of Squeezebox playback devices (Players 1-4), some of which were placed into groups while another (Player 2) was not.



### C. Sonos Cannot Show That Any Alleged Infringement Was Willful

Sonos's claim of willful infringement of the '966 patent is unsupported by the record. Sonos contends that Google willfully infringed the '966 patent pre-suit because (1) the parties' pre-suit licensing communications "informed Google of the breadth and depth of Sonos's patent portfolio and its applicability to the accused Google products, including for patents in the same family as the asserted patents" and (2) Google filed a declaratory judgment claim for non-infringement of the '966 patent the day before Sonos filed its complaint in the Western District of Texas, demonstrating that "Google had pre-suit knowledge of the asserted patents and pre-suit knowledge of its infringement thereof[.]" Transferred Action, Dkt. 211 ¶¶ 30, 55-63, 195. Sonos also claims that Google willfully infringed the '966 patent post-suit because Google "has not changed the design or operation of the accused products since these products were accused of practicing the asserted

claims" and "has no reasonable non-infringement or invalidity defense." Transferred Action, Dkt. 211 ¶¶ 64-65. Both theories fail.

As the Court recognized in its order granting Google's motion to dismiss Sonos's willful and indirect infringement claims, Sonos "must prove knowledge of the patent and knowledge of infringement" to "establish willful patent infringement." MTD Order at 4. "Mere knowledge of a 'patent family' or the plaintiff's 'patent portfolio' is not enough." *Id.* Sonos "must show the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Id.* Despite having taken discovery on its willful infringement claim, Sonos cannot provide any evidence that Google had "knowledge of the patent," "knowledge of infringement," or "a specific intent to infringe at the time of the challenged conduct." There is no evidence that Google was aware of the existence of the '966 patent, let alone purported infringement of that patent, until Sonos sent its draft complaint.

Sonos's allegations of pre-suit willful infringement are plainly insufficient under the Court's willful infringement "ground rules." *Id.* at 9. First, Sonos's "willful blindness" theory of pre-suit willful infringement, based on the parties' licensing negotiations, suffers from the same defects the Court identified in its order dismissing Sonos's willful infringement claims. Correspondence about unasserted patents does not establish pre-suit notice or knowledge of infringement. MTD Order at 9-10 ("The operative complaint references various correspondence Sonos sent to Google in October 2016, February 2019, and January 2020 regarding Sonos's patent… All are insufficient."). Second, Sonos has failed to demonstrate intentional infringement at the time of the challenged conduct (i.e., September 2020) as a result of its declaratory judgment complaint. MTD Order at 10. Sonos has not proffered any evidence that Google started its investigation into the '966 patent before receiving Sonos's draft complaint. And Sonos has not accounted for the fact that Google's decision to file a declaratory judgment complaint demonstrates Google's good faith belief in its **non-infringement**. Significantly, Google implemented the accused multizone speaker functionality in 2015, several years before Sonos even filed the continuation application for the '966 patent (in 2019) or implemented the purported invention in its own products (in 2020). Accordingly, not only is there no evidence of willful infringement, but it defies logic and common sense to argue that Google had a specific intent to infringe the '966 patent at the time it received Sonos' draft complaint.

Sonos's post-suit willful infringement claims are likewise deficient. The fact that Sonos has withdrawn its infringement claims for four of the five patents originally identified in Sonos's draft complaint only reinforces Google's subjective belief in its non-infringement, and that this belief was reasonable. Sonos also fails to acknowledge that as soon as the Court found that the accused products infringed claim 1 of the '885 patent during the patent showdown, Google developed a re-design that Google contends avoids infringement. *See* Section III.A.

Accordingly, Sonos's failure to present any evidence of Google's pre- or post-suit willful infringement compels a finding of no willful infringement of the '966 patent.

### D.  Sonos's Damages Theories Are Unreliable

Sonos originally said it was seeking up to ***$3 billion*** in damages in this case for infringement of the '615, '033, '885, and '966 patents that were still at issue as of the patent showdown. With only two patents left, Sonos has decreased its number but still seeks ***$90 million*** for the '885 and '966 patents—a figure that Sonos alleges would only encompass damages from when the patents issued in November 2019 and November 2020 through the fall of 2022. Sonos has not articulated any viable theory for this excessive damages award. To the extent any damages are warranted, Google will demonstrate that a lump sum award based on the cost to implement non-infringing alternatives and/or technically comparable patent agreements is more appropriate.

Sonos's damages expert, James Malackowski, offers a damages theory for both the '885 and '966 patents that (1) calculates a per-unit rate based on a generic scripting app, "If This Then That" (IFTTT), that has nothing to do with Google, and (2) applies it to royalty base of unit sales of Google's media players for the '885 patent and Google Home app installs for the '966 patent. As Google detailed extensively in its motions *in limine*, both steps suffer from incurable flaws—including but not limited to: (1) using the IFTTT app as a starting point, which is not technologically comparable and admittedly so broad in functionality that it could be used as a starting point for damages in nearly every patent case involving software features; (2) applying various flawed "adjustments" to the subscription fees, including an arbitrary 70/30 revenue split based on the service fee that Google charges app developers whose apps are made available for download on the Google Play Store; and (3) failing to apportion for the alleged invention by not accounting for non-

accused functionality in the app or the additional value that one would receive from an app beyond just a bare license to practice the patents.

Mr. Malackowski's royalty base is also problematic. *First*, Mr. Malackowski uses a royalty base of all Google Home app installations6 but fails to ackknowledge that the Google Home app is used in connection with a myriad of *non-speaker* devices, such as cameras, lightbulbs, doorbells, thermostats, and even vacuums. Mr. Malackowski fails to acknowledge or account for users who have downloaded the Google Home app for other purposes and simply assumes that all installations are relevant to grouping speakers. *Second*, Mr. Malackowski ignores usage metrics Google produced regarding speaker grouping and fails to account for the fact that the accused functionality is rarely utilized. Even when the Google Home app is used in connection with speaker devices, ==only a miniscule fraction of speakers (less than 3%)== are even in groups on a daily or monthly basis—a percentage that is still overinclusive given that the claimed technology is far more narrow than grouping a speaker. *Third*, Mr. Malackowski's theory suffers from a double counting problem. For the '885 patent, Mr. Malackowski applies a per-unit royalty rate to his estimate of applicable smart speakers sold during the damages time period. For the '966 patent, Mr. Malackowski applies a per-unit royalty rate to the number of installations of the Google Home app on accused devices. But in order to group Google speakers together, a user must utilize the Google Home app. Thus, there is an overlap in Mr. Malackowski's royalty base between customers who both own one or more Google smart speakers and have the Google Home app installed on their devices. Any user who owns speakers and groups them together would be in the '885 patent royalty base—as someone who purchased a speaker—*and* in the '966 patent royalty base—as someone who installed the Google Home app, yet Mr. Malackowski makes no adjustment for this double-counting.

By contrast, Google's damages expert, Mr. Christopher Bakewell, calculated estimates using the costs to implement two non-infringing alternatives, including one alternative that Google actually already implemented as a redesign in December 2022. Mr. Bakewell also analyzed a patent purchase agreement involving patents that the parties agree are technically comparable and calculated a lump sum payment that would cover both past and future infringement.

| | | |
|---|---|---|
| 1 | DATED: April 26, 2023 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 2 | | |
| 3 | | By   *Sean Pak* |
| 4 | |      Sean Pak |
| | |      Melissa Baily |
| 5 | |      James D. Judah |
| | |      Lindsay Cooper |
| 6 | |      Marc Kaplan |
| | |      Iman Lordgooei |
| 7 | | |
| 8 | | *Attorneys for GOOGLE, LLC* |

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on April 26, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via email.

                                                           */s/ Sean Pak*
                                                         Sean Pak