# EXHIBIT 8

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Jocelyn Ma <jocelynma@quinnemanuel.com> |
| **Sent:** | Friday, June 10, 2022 11:58 AM |
| **To:** | Cole Richter; Anne-Raphaëlle Aubry; Lindsay Cooper; Sonos-NDCA06754-service |
| **Cc:** | QE-Sonos3; LS3 Team; Amy Brody |
| **Subject:** | RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) \| Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice |

**This message originated from outside your organization**

Cole,

Google designates James Goddard on Topic 1(iii)(a), (b), and (c). Additionally, Justin Pedro will be Google's designee on Topic 1(i) as it relates to the Google Home app. As we noted previously, Mr. Pedro is available June 28. We will follow up with Mr. Goddard's availability.

Best,
Jocelyn

**From:** Cole Richter <richter@ls3ip.com>
**Sent:** Wednesday, June 8, 2022 3:04 PM
**To:** Anne-Raphaëlle Aubry <anneraphaelleaubry@quinnemanuel.com>; Lindsay Cooper <lindsaycooper@quinnemanuel.com>; 'Sonos-NDCA06754-service' <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>; LS3 Team <LS3_team@ls3ip.com>; Amy Brody <brody@ls3ip.com>
**Subject:** RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

**[EXTERNAL EMAIL from richter@ls3ip.com]**

Counsel,

Following up on the below. Please provide us with (1) Google's position in response to my April 20 email requesting a designee on Topic 1(iii)(c) (stream transfer for Google Play Music); and (2) Google's position on whether it will designate someone on Topic 1(i) as it relates to app functionality.

Best,
Cole

**From:** Cole Richter
**Sent:** Wednesday, May 25, 2022 9:28 PM
**To:** Anne-Raphaëlle Aubry <anneraphaelleaubry@quinnemanuel.com>; Lindsay Cooper <lindsaycooper@quinnemanuel.com>; Sonos-NDCA06754-service <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>; LS3 Team <LS3_team@ls3ip.com>; Amy Brody <brody@ls3ip.com>
**Subject:** RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

Anne,

1

We will consider the below and get back to you shortly, though we expect a meet and confer would be helpful.

In the meantime, can you provide us with Google's position in response to my April 20 email requesting a designee on Topic 1(iii)(c) (stream transfer for Google Play Music)?

Additionally, given that Mr. Mackay was designated on Topic 1(i) "as it relates to speaker functionality" (*see* 3/29 Cooper eml.), we request a designee on Topic 1(i) as it relates to app functionality.  Can you let us know if Google plans to designate an individual in this respect?

Finally, can you provide deposition availability for the following individuals:
- Chris Patnoe
- Justin Pedro

Please let me know if a meet and confer would be productive on any of the above.

Best,
Cole

---

**From:** Anne-Raphaëlle Aubry <anneraphaelleaubry@quinnemanuel.com>
**Sent:** Monday, May 16, 2022 4:21 PM
**To:** Cole Richter <richter@ls3ip.com>; Sonos-NDCA06754-service <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>
**Subject:** RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

Counsel,

We write in response to your email regarding the alleged insufficiency of testimony from Google's corporate designees Mr. Mo and Mr. Patil.   Contrary to your email, these witnesses were adequately prepared and did testify on Topic 1(ii), Topic 1(iii), Topic 1(iv), Topic 1(v), Topic 1(vi), and Topic 1(vii) for YouTube, YouTube Music, YouTube Kids, and YouTube TV, and Topic 1(iii) for Google Play Music.

With respect to Mr. Mo, the examples you provided below are cherrypicked from Mr. Mo's transcript and ignore the context of his testimony and other testimony he provided that was responsive to these deposition topics.  As an initial matter, broad topics of inquiry do not "give rise to an obligation to prepare a witness to answer every conceivable detailed question relating to the topic." *United States v. Guidant Corp.*, No. 3:03–0842, 2009 WL 3103836, at *3 (M.D. Tenn. Sept. 24, 2009); *Shapiro v. Am.'s Credit Union*, No. 12-5237-RBL, 2013 WL 12310679, at *2 (W.D. Wash. May 31, 2013). Similarly, "[s]imply because [defendant's] witness could not answer every question posed to [him] does not equate to the fact that [defendant] did not satisfy its obligation to prepare its 30(b)(6) witness." *Siyu Dong v. BMW of N. Am., LLC,* No. 19: 02202-DMS (BGS), 2020 WL 5891525, at *2 (S.D. Cal. Oct. 5, 2020) (internal citation omitted).

When Sonos's questions were not misleading or confusing, Mr. Mo did testify adequately on the designated topics.  We address each of your examples of alleged insufficiencies in turn below.

We are available for a meet and confer on this if it would be helpful.

Best,

Anne

\*\*\*

Topic 1(ii):  "the design and operation of the aforementioned 'Casting' Accused Functionality"

- *See* Mo Tr. at 103:6-10 ("Q . . . can you cast being from a YouTube Music sender to a speaker pair? A.  I actually don't know for sure.")

Mr. Mo was not designated with respect to speaker pairs or speaker groups. As you know at least from the ITC depositions, the implementation of speaker pairs generally uses the same code as the implementation for a multizone group apart from the selection of audio channels to play. *See e.g.* Ken McKay ITC Transcript at 262:14-263:10.

- *See* Mo Tr. at 107:20 – 108:1 ("Q . . . what actually is being sent that causes the cast receiver to launch the app as you kind of described before. Is that a, quote/unquote, launch message?  A. . . the specific message I don't know actually.")

Mr. Mo did testify that messages at the cast layer will result in a cast app launch on the receiver side.  Mo Tr. e.g. at 108:4-109:25. To the extent Sonos wanted information with respect to a specific "launch message," Sonos could have pointed Mr. Mo to the source code which was available.  Mr. Mackay also testified to this in the ITC, and explicitly stated "I'd have to look at the code to see what we do when we receive a launch message." (e.g. McKay ITC Tr. at 134:18-135:6)  Despite knowing that this was a nuanced issue, Sonos did not flag it in its deposition topics nor was Sonos prepared to show Mr. Mo the relevant source code, which Sonos has been able to inspect for many months.

- *See* Mo Tr. at 141:16 – 142:1 ("Q . . . Is there a URL that corresponds to the video ID that the cast receiver can then use to actually go out and get the song or video for playback? . . .  A.  I can't speak to the specifics of what is returned in that response and what are the specific pieces of information that a player -- a player needs.")

Sonos's line of questioning related to how servers provide the player with video content, which Mr. Mo was not designated on.  Moreover, Mr. Mo did testify about his high level of understanding of the steps through which the player gets the song or video for playback.  *See e.g.*, Mo. Tr. at 144:8-145:25 (" . . . YouTube playback relies on what we call band-aid servers . . . ")

- *See* Mo Tr. at 154:14-20 ("Q.  Other than just looking at this code, can you tell me what -- where the get player request ultimately gets sent out by the cast receiver, what code kind of drives that? A.  It's not -- it wouldn't be in the remote. Q.  What source file would it be in?  . A.  I don't know from the top of my head.")

"Rule 30(b)(6) is not designed to be a memory contest." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 150 (S.D.N.Y. 1997). Asking Mr. Mo to identify the name of a single file from one of a huge number of relevant source code files from memory is unreasonable. Sonos had the source code available and could have pointed Mr. Mo to a relevant source code file. It did not.  Where Mr. Mo was able to identify file or function names, or even come close to the exact name, he did so.  *E.g.*, Mo Tr. at 191:3-5 ("I don't recall the exact name, but they are something like store – store session and resume session.  Essentially there's two API"); *id.* at 204:18-19.  Nor did Mr. Mo allow the fact that periodically he was unable to remember a specific file or function name prevent him from testifying substantively about those.  *Id.* at 230:9-17.

- *See* Mo Tr. at 207:14-18 ("Q. . . . When the cast session is invoked, will the shared queue get populated with the currently playing song and the songs following the autoplay section? A.  I don't know.")

Mr. Mo repeatedly asked for clarification from Sonos on this issue. Mo. Tr. at 208:2-4 ("So to clarify, …"), 208:10-12 ("If you could provide maybe a little bit more concrete example and we can walk through phases that may help to provide an answer.")  Mr. Mo attempted to provide a detailed and responsive answer but the questioning did not permit him to do so in the example cited here.  Further, the particular line of questions Sonos has cited here related to "particular example" based on screenshots that Sonos purportedly created. Mo. Tr. at 209:24.  Asking about such a specific use case was not fairly on notice from Sonos's deposition topics—nor can Mr. Mo be expected to understand the circumstances behind Sonos's creation of these screenshots.  For instance, while the question relate to a "shared queue" in a cast session, there is nothing in the screenshot that indicates the use case is for a cast session.  In fact, the screenshot appears to relate to a non-casting scenario and an auto-play section that appears when not casting.  Thus, Sonos's attempt to ask questions about a shared queue in a casting scenario based on a screenshot that Mr. Mo could not know how Sonos created and appears to relate to a non-casting scenario says nothing about whether Mr. Mo was adequately prepared on the noticed topics.

Topic 1(iii):  "the design and operation of the aforementioned 'Stream Transfer Accused Functionality"
- *See* Mo Tr. at 23:20-23 ("Q.  Are you going to be able to tell me how that feature is actually implemented?  A.  I'm not. I do not know how stream transfer works underneath the...")

Sonos is selectively quoting one answer from Mr. Mo, which Sonos cut off, and omits Mr. Mo's lengthy testimony on stream transfer.  For example, Mr. Mo testified he was knowledgeable about stream transfer as it pertained to YouTube and provided "super helpful" information, as Sonos itself acknowledged. *See e.g.* Mo. Tr. at 184:14-21, 188:19-191:16.

- *See* Mo Tr. at 193:12-16, 194:10-14 ("Q.  Do you know what message causes the destination receiver to launch the YouTube app in this particular circumstance? A. No. . . . Q.  Do you think it's a message over the local network or would it be a message going through the cloud? . . . THE WITNESS: I don't know.)

Again, Sonos' questions were directed to a very specific message and scenario ("this particular circumstance").  A deposition is not a memory test – Sonos had the source code available and could have pointed Mr. Mo to a number of source code files that would have provided context and relevant information regarding this detailed lined of questions.  Mr. Mo explained the flow of information generally, and it was only the specific message name(s) resulting from the flow that he would have needed to see source code to opine fully.  Mo. Tr. e.g. at 229:25-230:17.  As noted above, where Mr. Mo could remember off the top of his head specific source code message names, even in the absence of any useful documentation from Sonos, he provided it.

Topic 1(iv):  "the design and operation of a Cast-Enabled Media Player receiving and playing a sequence of media items (e.g., songs, videos, podcast episodes, etc.), individually and collectively with one or more other Cast-Enabled Media Players"
- *See* Mo Tr. at 207:14-18 ("Q. . . . When the cast session is invoked, will the shared queue get populated with the currently playing song and the songs following the autoplay section? A.  I don't know.")

Google responded regarding this same portion of testimony above.

Topic 1(v):  "the design and operation of a computer device, such as a Pixel device, receiving and playing a sequence of media items (e.g., songs, videos, podcast episodes, etc.)"
- *See* Mo Tr. at 53:2-5 ("Q.  Is a local queue stored on the phone in this context? . . . THE WITNESS: I don't know.")

4

Mr. Mo was repeatedly asked about what Sonos attempted to identify as a "local queue." He testified extensively about the renderer on the device that showed particular songs identified by the user for playback. *See e.g.*, Mo. Tr. at 58:25-59:5, 60:5-14, 171:23-172:8.

- *See* Mo Tr. at 65:25 – 66:2 ("Q Can you explain to me what the autoplay section of the queue means? A. I wouldn't be able to tell you.")

Nothing in topic 1(v) mentions "autoplay." Nonetheless, Mr. Mo did testify extensively about autoplay. *See e.g.,* Mo. Tr at 126:3-128:1; 128:20-25; 166:25-167:5168:23-169:19.

- *See* Mo Tr. at 66:20-23 ("Q. Are you able to give any testimony on behalf of Google here as to what the autoplay reference in this document is referring to? A. No, I'm not.")

Again, this passage is related to one specific use of "autoplay" in a particular document, but nothing in topic 1(v) sets out mentions "autoplay." Nonetheless, Mr. Mo did testify about autoplay. *See e.g.,* Mo. Tr at 126:3-128:1; 128:20-25; 166:25-167:5168:23-169:19.

- *See* Mo Tr. at 69:2-6 ("Q. Are you familiar with how a YouTube sender would initiate playback on a long playlist? . . . THE WITNESS: No, I'm not.").

This question is specific to "long playlists in YouTube Music" which is not referenced in the deposition topic. Such a specific sub-topic from playlists was not adequately noticed, but regardless, Mr. Mo did testify extensively to the construction and use of playlists in his testimony.

Topic 1(vi): "the design and operation of the aforementioned 'Up Next' Accused Functionality"
- *See* Mo Tr. at 24:13-22 ("Q. . . . Are you going to be able to [tell] me how the up next feature is implemented in Google's system? A. No, I'm not able to.")

Sonos's question was broad, and Sonos did not ask Mr. Mo about any specific (or relevant) aspects of the "Up Next" functionality. Similar to the "Autoplay" accused functionality, the "Up Next" functionality exists across different casting and non-casting use cases. Nonetheless, Mr. Mo did testify about the autoplay features (e.g. at 166:25-167:9, 168:22-169:19, 170:23-172:24)

Topic 1(vii): "the design and operation of the aforementioned 'Autoplay Accused Functionality"
- *See* Mo Tr. at 27:18 – 28:4 ("Q. . . . are you familiar with how the autoplay feature is implemented? . . . A. Before casting, I'm not familiar with autoplay.")

Sonos' question was directed to a specific instance of autoplay before casting. As described above, however, Mr. Mo did testify extensively about the autoplay functionality. *See e.g.,* Mo. Tr at 126:3-128:1; 128:20-25; 166:25-167:5168:23-169:19.

- *See* Mo Tr. at 72:6-9 ("Q. In the context of the YouTube Music service, are you familiar with a queue -- an autoplay section of a queue? A. No, I'm not familiar with that.").

Sonos's question was directed to a specific instance of autoplay for "the YouTube Music service." Mr. Mo's response indicates he was not familiar with autoplay when casting on YTM. But Mr. Mo did testify about the autoplay accused functionality. *See e.g.,* Mo. Tr at 126:3-128:1; 128:20-25; 166:25-167:5, 168:23-169:19.

Additionally, Sonos raised particular issues with Mr. Patil's testimony regarding Google Play Music on the Hub devices as it used "stream transfer": *See* Patil Tr. at 58:22 – 59:3 ("Q. So sitting here today, you can't speak to the functionality of Google Play Music operating on the Hub devices . .. correct? A. That is correct."). It is

unreasonable for Sonos to expect a witness to testify about the functionality of Google Play Music with respect to every individual receiver device, such as a hub device. Nonetheless, Mr. Patil was more than knowledgeable about GPM's operation with receivers generally, and did testify that the Google Hub device can act as a Chromecast receiver, and play music that is cast to it. *See e.g.,* Patil Tr. at 57:10-25.

---

**From:** Cole Richter <richter@ls3ip.com>
**Sent:** Friday, April 29, 2022 1:42 PM
**To:** Lana Robins <lanarobins@quinnemanuel.com>; Sonos-NDCA06754-service <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>
**Subject:** RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

[EXTERNAL EMAIL from richter@ls3ip.com]

---

Counsel,

As a follow-up to our request below, we request that Google make available one or more additional designees who are prepared to testify on Topic 1(ii), Topic 1(iii), Topic 1(iv), Topic 1(v), Topic 1(vi), and Topic 1(vii) for YouTube, YouTube Music, YouTube Kids, and YouTube TV, and one or more additional designees who are prepared to testify on Topic 1(iii) for Google Play Music.  Google's designees, Mr. Mo and Mr. Patil, were insufficiently competent to testify on this Topic.

For instance, Mr. Mo was designated on Topic 1(ii), Topic 1(iii), Topic 1(iv), Topic 1(v), Topic 1(vi), and Topic 1(vii) for YouTube, YouTube Music, YouTube Kids, and YouTube TV.  *See, e.g.,* Mo Tr. at 17:2-6.  However, Mr. Mo was not sufficiently competent to testify on this Topic as evidenced by his myriad responses that he did not have knowledge when asked basic questions regarding the functionalities called for by this topic.  By way of example only, below are just some of the instances that illustrate that Mr. Mo was not competent to testify on the given topic.

Topic 1(ii):  "the design and operation of the aforementioned 'Casting' Accused Functionality"
- *See* Mo Tr. at 103:6-10 ("Q . . . can you cast being from a YouTube Music sender to a speaker pair? A.  **I actually don't know for sure**.")

- *See* Mo Tr. at 107:20 – 108:1 ("Q . . . what actually is being sent that causes the cast receiver to launch the app as you kind of described before. Is that a, quote/unquote, launch message?  **A. . . the specific message I don't know actually**.")

- *See* Mo Tr. at 141:16 – 142:1 ("Q . . . Is there a URL that corresponds to the video ID that the cast receiver can then use to actually go out and get the song or video for playback? . . .  **A.  I can't speak to the specifics** of what is returned in that response and what are the specific pieces of information that a player -- a player needs.")

- *See* Mo Tr. at 154:14-20 ("Q.  Other than just looking at this code, can you tell me what -- where the get player request ultimately gets sent out by the cast receiver, what code kind of drives that? A.  It's not -- it wouldn't be in the remote. Q.  What source file would it be in?  . **A.  I don't know from the top of my head**.")

- *See* Mo Tr. at 207:14-18 ("Q. . . . When the cast session is invoked, will the shared queue get populated with the currently playing song and the songs following the autoplay section? A.  **I don't know**.")

Topic 1(iii):  "the design and operation of the aforementioned 'Stream Transfer Accused Functionality"
- *See* Mo Tr. at 23:20-23 ("Q.  Are you going to be able to tell me how that feature is actually implemented?  **A.  I'm not. I do not know how stream transfer works underneath the...**")

6

- *See* Mo Tr. at 193:12-16, 19410-14 ("Q.  Do you know what message causes the destination receiver to launch the YouTube app in this particular circumstance? A. No. . . . Q.  Do you think it's a message over the local network or would it be a message going through the cloud? . . . **THE WITNESS: I don't know**.)

Topic 1(iv):  "the design and operation of a Cast-Enabled Media Player receiving and playing a sequence of media items (e.g., songs, videos, podcast episodes, etc.), individually and collectively with one or more other Cast-Enabled Media Players"
- *See* Mo Tr. at 207:14-18 ("Q. . . . When the cast session is invoked, will the shared queue get populated with the currently playing song and the songs following the autoplay section? A.  **I don't know**.")

Topic 1(v):  "the design and operation of a computer device, such as a Pixel device, receiving and playing a sequence of media items (e.g., songs, videos, podcast episodes, etc.)"
- *See* Mo Tr. at 53:2-5 ("Q.  Is a local queue stored on the phone in this context? . . . **THE WITNESS: I don't know.**")

- *See* Mo Tr. at 65:25 – 66:2 ("Q Can you explain to me what the autoplay section of the queue means? **A.  I wouldn't be able to tell you**.")

- *See* Mo Tr. at 66:20-23 ("Q.  Are you able to give any testimony on behalf of Google here as to what the autoplay reference in this document is referring to? **A.  No, I'm not**.")

- *See* Mo Tr. at 69:2-6 ("Q.  Are you familiar with how a YouTube sender would initiate playback on a long playlist? . . . **THE WITNESS: No, I'm not.**").

Topic 1(vi):  "the design and operation of the aforementioned 'Up Next' Accused Functionality"
- *See* Mo Tr. at 24:13-22 ("Q. . . . Are you going to be able to [tell] me how the up next feature is implemented in Google's system? **A.  No, I'm not able to**.")

Topic 1(vii):  "the design and operation of the aforementioned 'Autoplay Accused Functionality"
- *See* Mo Tr. at 27:18 – 28:4 ("Q.  . . . are you familiar with how the autoplay feature is implemented? . . . **A.  Before casting, I'm not familiar with autoplay.**")

- *See* Mo Tr. at 72:6-9 ("Q.  In the context of the YouTube Music service, are you familiar with a queue -- an autoplay section of a queue? **A.  No, I'm not familiar with that**.").

Additionally, Mr. Patil was unable to competently testify regarding functionality of the Google Play Music product on the Hub devices (including as regards the "stream transfer" functionality):

- *See* Patil Tr. at 58:22 – 59:3 ("Q.  So sitting here today, you can't speak to the functionality of Google Play Music operating on the Hub devices . .. correct? **A.  That is correct**.").

Please let us know who Google will additionally designate for this topic and when we can expect such individuals to be available.  Please let us know if you think conferral on the matter would be productive.

Best,
Cole

**From:** Cole Richter <richter@ls3ip.com>
**Sent:** Wednesday, April 20, 2022 10:22 AM
**To:** Lana Robins <lanarobins@quinnemanuel.com>; Sonos-NDCA06754-service <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>
**Subject:** RE: Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

**This message originated from outside your organization**

Lana,

We don't understand the basis for this new objection, particularly as Sonos has clearly accused "stream transfer" functionality for Google Play Music in every iteration of its infringement contentions.  See Ex. A ('615 Chart) at 29-30.



In addition, the objection is improper on other grounds, particularly as the topic is well within the bounds of Rule 26 (as evidenced by Google's prior designation) and was only belatedly raised.

Please withdraw the objection and provide a prompt designation or let us know if you confer this morning.

Best,
Cole

---

**From:** Lana Robins <lanarobins@quinnemanuel.com>
**Sent:** Tuesday, April 19, 2022 11:39 PM
**To:** Sonos-NDCA06754-service <Sonos-NDCA06754-service@orrick.com>
**Cc:** QE-Sonos3 <qe-sonos3@quinnemanuel.com>
**Subject:** Google LLC v. Sonos, Inc. ( 3:20-cv-06754-WHA) | Google's Amended Objections and Responses to Sonos's Rule 30(b)(6) Notice

**This message originated from outside your organization**

---

Counsel,

Please find attached Google LLC's Amended Objections and Responses to Sonos, Inc.'s January 5, 2022 Rule 30(b)(6) Notice.

Best,

Lana

**Lana Robins**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6345 Direct
415.875.6600 Main Office Number
415.875.6700 FAX
lanarobins@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.