# EXHIBIT 5

# FILED UNDER SEAL

CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
COLE RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone: +1 312 754 0002
Facsimile: +1 312 754 0003

*Attorneys for Defendant Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>  Plaintiff and Counter-defendant,<br><br>  v.<br><br>SONOS, INC.,<br><br>  Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**OPENING EXPERT REPORT OF<br>DR. KEVIN C. ALMEROTH** |

technology provides over prior art grouping technology in granting Sonos's motion for summary judgment of infringement of Asserted Claim 1 of the '885 Patent. *See* D.I. 309 at 3-4, 12.

730. Lastly, during a discussion with Mr. Nick Millington, who is Sonos's Chief Innovation Officer, I asked Mr. Millington for his thoughts regarding the importance of Sonos's "saved groups" feature. In response, Mr. Millington indicated that he believed this feature, which practices the claimed technology of the '885 and '966 Patents (*see* Section XVII), was important to Sonos and its customers for similar reasons to those summarized above with respect to Google. Mr. Millington also pointed out that providing "saved groups" can be very beneficial for a user who likes to invoke "save groups" for synchronous playback via voice. In my opinion, Google customers that prefer to invoke Google "speaker groups" via Google Assistant would likewise benefit from Google's use of Sonos's patented "zone scene" technology.

## XVI. ALLEGED NON-INFRINGING ALTERNATIVES

731. I have been asked to evaluate and provide my opinions regarding whether there are any acceptable non-infringing alternatives to the claimed technology of the '885 and '966 Patents.

732. As part of my evaluation, I have reviewed Google's First Supplemental Response to Interrogatory No. 18, which sets forth three alleged non-infringing alternatives. I also reviewed the June 22, 2022 Opening Expert Report of Google's expert, Dr. Dan Schonfeld, regarding Asserted Claim 1 of the '885 Patent, the July 27, 2022 Rebuttal Expert Report of Dr. Schonfeld regarding Asserted Claim 1 of the '885 Patent, and the August 31, 2022 deposition testimony of Dr. Schonfeld. Based on my review of these materials, it is my understanding that Google and/or Dr. Schonfeld are asserting three purported non-infringing alternatives to the claimed technology of the '885 and '966 Patents.[12]

733. For the reasons explained below, it is my opinion that none of Google's three

---

[12] As noted above, I understand that recently Google allegedly produced a "new version of its source code" that relates to its second purported non-infringing alternative that Google refers to as "no standalone mode." However, I have not yet had a chance to inspect the "new" code. Thus, I reserve my right to address the "new" code in a supplement to this report and/or in my reply report after I have inspected the "new" code and/or have been provided with additional evidence related to the "new" code.

purported non-infringing alternatives is non-infringing, available to Google, and commercially acceptable. Moreover, I am currently unaware of any other alternative to the claimed technology of the '885 and '966 Patents that is non-infringing, available to Google, and also provides the same advantages as the claimed technology of the '885 and '966 Patents such that it would be considered commercially acceptable.

### A. <u>Non-Infringing Alternative #1</u>

734. As set forth in Google's First Supplemental Response to Interrogatory No. 18, Google refers to its first purported non-infringing alternative as "Google's products" and asserts that "Google's products do not infringe the asserted claims of the '885 and '966 patents" and "[a]ccordingly, the accused Google products are themselves non-infringing alternatives to the asserted claims." *See* Google's Eighth Suppl. Resp. to Sonos's First Set of Interrogatories at 8.

735. As an initial matter, this is not an "alternative" to the Accused Google Controllers or the Accused Google Players. Additionally, the Court has already ruled that the Accused Google Players infringe Asserted Claim 1 of the '885 Patent. *See* D.I. 309. Thus, the Accused Google Players are not "non-infringing." Moreover, for all the reasons explained above, including many of the same reasons set forth by the Court for why the Accused Google Players infringe Asserted Claim 1 of the '885 Patent, the Accused Google Controllers infringe each of the Asserted Claims of the '966 Patent and thus are not "non-infringing."

### B. <u>Non-Infringing Alternative #2</u>

#### 1. <u>Overview of Non-Infringing Alternative #2</u>

736. As set forth in Google's First Supplemental Response to Interrogatory No. 18, Google refers to its second alleged non-infringing alternative as "no standalone mode" and asserts that "[w]ith this non-infringing alternative, infringement is avoided by having the 'standalone' speaker that is added to two zone scenes not continue to operate in 'standalone' mode after it has been added to those zone scenes" and "[i]nstead, the accused 'standalone' speaker after being added to a zone scene may match the music (or silence) of the target zone scene." *See* Google's Eighth Suppl. Resp. to Sonos's First Set of Interrogatories at 8-9. Google further asserts:

313

> In this alternative, the accused zone player would never "continue to operate in standalone mode" after receiving the indication that it "has been added to a first zone scene." Rather, the accused zone player would immediately adopt the behavior of the accused "zone scene" to which it was added. Therefore, the accused zone player would no longer be "configured to play back media individually" or, equivalently, remain in the accused "standalone mode."
>
> All asserted claims of the '885 and '966 patents require the "standalone mode" functionality discussed above, and therefore this non-infringing alternative applies to all asserted claims.

*Id.* at 9. In other words, according to Google, its second purported non-infringing alternative allegedly avoids infringement of Asserted Claim 1 of the '885 Patent and all the Asserted Claims of the '966 Patent because the Accused Google Players would not "continue to operate in standalone mode" after being added to a new speaker group.

737.    Similarly, in describing what Google's expert, Dr. Dan Schonfeld, alleges to be this same purported non-infringing alternative in his Opening Expert Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld stated:

> [Claim 1 of the '885 Patent] requires that "after receiving the first and second indications, continuing to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation." In other words, the claim requires the a zone player that was playing back music individually to be added to two different zone scenes, but to continue to operate in a "standalone mode" until one of the two zone scenes is "invoked." . . . Infringement may therefore be avoided simply by having the "standalone" speaker that is added to two zone scenes not continue to operate in "standalone" mode after it has been added to those zone scenes.

Opening Expert Report of Dan Schonfeld, dated June 22, 2022 and corrected on July 10, 2022, at ¶¶ 727-728. Thus, consistent with the statements in Google's First Supplemental Response to Interrogatory No. 18, Dr. Schonfeld asserts that Google's second purported non-infringing alternative allegedly avoids infringement of Asserted Claim 1 of the '885 Patent because the Accused Google Players would not "continue to operate in standalone mode" after being added to a new speaker group.

738.    Dr. Schonfeld also testified regarding how this alleged non-infringing alternative would operate in four different scenarios:

314

> Q. … [I]f we have a player that is playing audio and it's added to a new group with a player that's not playing audio, what would happen with the non-infringing alternative?
>
> A. Both players would play the same audio that the player was playing.
>
> Q. If a player playing audio is added to a new group with a player that's playing different audio, what would happen with the non-infringing alternative?
>
> A. Once the group would elect the leader, [] the audio playing on the leader would be playing on both devices.
>
> Q. If a player that is not playing audio is added to a new group with a player that is playing audio, what would happen with the non-infringing alternative?
>
> A. … They would both be playing the same audio.
>
> Q. … [I]f a player is not playing audio and is added to a new group with another player that's also not playing audio, what would happen?
>
> A. They both would not be playing, ... but the moment either one of them is playing, it would start playing on both.

Schonfeld Dep. Tr. (August 31, 2022) at 66:10-24, 69:19-71:13.

739.    Dr. Schonfeld went on to testify that this alleged non-infringing alternative would function such that once Accused Google Players are added to a new speaker group then "they are part of the group" and they "could not actually play individually from that moment on … until the group was dismantled." *Id*. at 71:14-72:6.  In this way, Dr. Schonfeld's testimony makes clear that Google's second purported non-infringing alternative allegedly avoids infringement because the Accused Google Players would not continue to operate in standalone mode after being added to a new speaker group.

740.    In my opinion, Google's second alleged non-infringing alternative would neither be non-infringing nor commercially acceptable.

### 2. Non-Infringing Alternative #2 Is Not "Non-Infringing"

741.    In my opinion, Google's second purported non-infringing alternative is not "non-infringing" for at least the reason that it still infringes the Asserted Claims of the '966 Patent.

742.    As noted above, both Google and its expert Dr. Schonfeld assert that this second purported non-infringing alternative allegedly avoids infringement of Asserted Claim 1 of the '885

Patent and all the Asserted Claims of the '966 Patent because the Accused Google Players would not *continue* to operate in standalone mode *after* being added to a new speaker group at an Accused Google Controller. Instead, each Accused Google Player "would immediately adopt the behavior of the accused 'zone scene' to which it was added," which I understand to mean that a new "speaker group" (a claimed "zone scene") would be launched automatically in response to a user requesting that the new "speaker group" be created at an Accused Google Controller (as opposed to not being launched unless and until a user separately requests that the new "speaker group" be launched via an Accused Google Controller, which would cause the Accused Google Controller to send a message to at least one Accused Google Player in the new speaker group that causes the Accused Google Players in the new speaker group to begin operating in accordance with the new speaker group). In support of this alleged "non-infringement" position, Google and its expert, Dr. Schonfeld, appear to rely on the express language of claim limitation 1.8 of Asserted Claim 1 of the '885 Patent, which recites "*after* receiving the first and second indications" that the first zone player has been added to first and second zone scenes, the first zone player "*continuing* to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation." *See* Google's Eighth Suppl. Resp. to Sonos's First Set of Interrogatories at 8-9; Opening Expert Report of Dan Schonfeld, dated June 22, 2022 and corrected on July 10, 2022, at ¶¶ 727-728; Schonfeld Dep. Tr. (August 31, 2022) at 66:10-24, 69:19-71:13, 71:14-72:6.

743.    However, unlike Asserted Claim 1 of the '885 Patent, the Asserted Claims of the '966 Patent do *not* require the first zone player "*continuing* to operate in the standalone mode" "*after* receiving the first and second indications" that the first zone player has been added to first and second zone scenes, respectively. Instead, with respect to the "first zone player" operating in "standalone mode," independent claims 1 and 9 of the '966 Patent (the only asserted independent claims of the '966 Patent) recite the following:

> **[1.4]/[9.1]**   while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a *standalone mode* in which the first zone player is configured to play back media individually:

**[1.5]/[9.2]**   receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

**[1.6]/[9.3]**   based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

**[1.7]/[9.4]**   receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

**[1.8]/[9.5]**   based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

**[1.9]/[9.6]**   displaying a representation of the first zone scene and a representation of the second zone scene; and

**[1.10]/[9.7]**   while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

**[1.11]/[9.8]**   based on the third request, causing the first zone player to transition from operating in the *standalone mode* to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

744. In my opinion, claim limitations 1.5-1.10/9.2-9.7 of claims 1 and 9 of the '966 Patent can be met by a "computing device" that is capable of performing each respective function of claim limitations 1.5-1.10/9.2-9.7 at a time when the "first zone player" is operating in "standalone mode," regardless of whether the "first zone player" "continues to operate in "standalone mode" during the time in-between when any two of the respective functions recited in claim limitations 1.5-1.10/9.2-9.7 are performed. Neither claim limitation 1.4/9.1 nor claim limitation 1.11/9.8 nor any other limitation of claims 1 and 9 of the'966 Patent requires the "first zone player" to operate in "standalone mode" *continuously* while all of claim limitations 1.5-1.10/9.2-9.7 are performed by the "computing device." Rather, with respect to the "standalone mode" requirement, the "computing device" need only be capable of (i) performing each

respective function of claim limitations 1.5-1.10/9.2-9.7 at a time when a first Accused Google Player is operating in "standalone mode" and then (ii) performing the function of claim limitation 1.11/9.8, which recites, among other things, "causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players."

745. Applying this proper interpretation of the "standalone mode" requirement of the Asserted Claims of the '966 Patent, Google's second purported non-infringing alternative does *not* avoid infringement. As explained below, each Accused Google Controller is still programmed with the functional capability for (i) performing each respective function of claim limitations 1.5-1.10/9.2-9.7 at a time when a first Accused Google Player is operating in "standalone mode" and then (ii) performing the function of claim limitation 1.11/9.8, which recites, among other things, "causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players."

*Claim Limitations 1.5/9.2 and 1.6/9.3*

746. Based on my understanding of Google's second purported non-infringing alternative, it is my opinion that each Accused Google Controller is still programmed with the functional capability required by claim limitations 1.5/9.2 and 1.6/9.3.

747. For instance, based on my understanding of Google's second purported non-infringing alternative, each Accused Google Controller (the claimed "computing device") still has the functional capability to perform each respective function of claim limitations 1.5/9.2 and 1.6/9.3 at a time when a first Accused Google Product (the claimed "first zone player") is operating in standalone mode (whether or not engaging in active playback of media). *See* Sections XIV.C.3, XIV.C.4.

*Claim Limitations 1.7/9.4 and 1.8/9.5*

748. Based on my understanding of Google's second purported non-infringing alternative, it is my opinion that each Accused Google Controller is still programmed with the functional capability required by claim limitations 1.7/9.4 and 1.8/9.5.

749. For instance, based on my understanding of Google's second purported non-

infringing alternative, each Accused Google Controller (the claimed "computing device") still has the functional capability to perform each respective function of claim limitations 1.7/9.4 and 1.8/9.5 at a time when the first Accused Google Product (the claimed "first zone player") is operating in standalone mode (whether or not engaging in active playback of media). *See* Sections XIV.C.5, XIV.C.6.

750. Indeed, the only relevant difference from the prior operation of Google's products is that, in Google's second purported non-infringing alternative, the performance of claim limitation 1.6/9.3 by the Accused Google Controller would cause the first "speaker group" (the claimed "first zone scene") to be launched automatically and thus cause the first Accused Google Product to stop operating in standalone mode and to begin operating in accordance with the first "speaker group." But this does not avoid infringement of claim limitations 1.7/9.4 and 1.8/9.5, as the Accused Google Controller still has the functional capability to perform each of the respective functions of claim limitations 1.7/9.4 and 1.8/9.5 at a time when the first Accused Google Product is operating in standalone mode. For example, after the first "speaker group" is launched automatically and the first Accused Google Product begins operating in accordance with the first "speaker group," the Accused Google Controller can be used to cause the first Accused Google Product to stop operating in accordance with the first "speaker group" and to resume operating in standalone mode prior to the Accused Google Controller performing claim limitations 1.7/9.4 and 1.8/9.5 (e.g., by tapping the "Stop" button for the first "speaker group" that is presented by the GUI for the Google Home app's Media tab or the "Stop Casting" button for the first "speaker group" that is presented by the GUI for the YouTube Music app).

*Claim Limitations 1.9/9.6 and 1.10/9.7*

751. Based on my understanding of Google's second purported non-infringing alternative, it is my opinion that each Accused Google Controller is still programmed with the functional capability required by claim limitations 1.9/9.6 and 1.10/9.7.

752. For instance, based on my understanding of Google's second purported non-infringing alternative, each Accused Google Controller (the claimed "computing device") still has the functional capability to perform each of the respective functions of claim limitations 1.9/9.6

and 1.10/9.7 at a time when the first Accused Google Product (the claimed "first zone player") is operating in standalone mode (whether or not engaging in active playback of media). *See* Sections XIV.C.7, XIV.C.8.

753. Indeed, the only relevant difference from the prior operation of Google's products is that, in Google's second purported non-infringing alternative, the performance of claim limitation 1.8/9.5 by the Accused Google Controller would cause the second "speaker group" (the claimed "second zone scene") to be launched automatically and thus cause the first Accused Google Product to stop operating in standalone mode and to begin operating in accordance with the second "speaker group." But this does not avoid infringement of claim limitations 1.8/9.5 and 1.10/9.7, as the Accused Google Controller still has the functional capability to perform each of the respective functions of claim limitations 1.9/9.6 and 1.10/9.7 at a time when the first Accused Google Product is operating in standalone mode. For example, after the second "speaker group" is launched automatically and the second Accused Google Product begins operating in accordance with the second "speaker group," the Accused Google Controller can be used to cause the first Accused Google Product to stop operating in accordance with the second "speaker group" and to resume operating in standalone mode prior to the Accused Google Controller performing claim limitations 1.9/9.6 and 1.10/9.7 (e.g., by tapping the "Stop" button for the second "speaker group" that is presented by the GUI for the Google Home app's Media tab or the "Stop Casting" button for the second "speaker group" that is presented by the GUI for the YouTube Music app).

*Claim Limitation 1.11/9.8*

754. Based on my understanding of Google's second purported non-infringing alternative, it is my opinion that each Accused Google Controller is still programmed with the functional capability required by claim limitation 1.11/9.8.

755. For instance, based on my understanding of Google's second purported non-infringing alternative, each Accused Google Controller (the claimed "computing device") still has the functional capability to perform the function of claim limitation 1.11/9.8 and thereby cause the first Accused Google Player (the claimed "first zone player") to transition from operating in the standalone mode to operating in in accordance with that first "speaker group" (the claimed "first

320

zone scene") such that the first and second Accused Google Players (the claimed "first" and "second" "zone players") become configured to coordinate with one another in order to output audio in synchrony. *See* Section XIV.C.9.

756. Indeed, the only relevant difference from the prior operation of Google's products is that, in Google's second purported non-infringing alternative, the performance of claim limitation 1.8/9.5 by the Accused Google Controller would cause the second "speaker group" (the claimed "second zone scene") to be launched automatically and thus cause the first Accused Google Product to stop operating in standalone mode and to begin operating in accordance with the second "speaker group." But this does not avoid infringement of claim limitation 1.11/9.8, as the Accused Google Controller still has the functional capability to perform the function of claim limitation 1.11/9.8 at a time when the first Accused Google Product is operating in standalone mode. For example, after the second "speaker group" is launched automatically and the second Accused Google Product begins operating in accordance with the second "speaker group," the Accused Google Controller can be used to cause the first Accused Google Product to stop operating in accordance with the second "speaker group" and to resume operating in standalone mode prior to the Accused Google Controller performing claim limitation 1.11/9.8 (e.g., by tapping the "Stop" button for the second "speaker group" that is presented by the GUI for the Google Home app's Media tab or the "Stop Casting" button for the second "speaker group" that is presented by the GUI for the YouTube Music app).

### 3. Non-Infringing Alternative #2 Is Not Commercially Acceptable

757. In my opinion, in addition to not being "non-infringing," Google's second purported non-infringing alternative is also *not* commercially acceptable because it would significantly degrade the user experience by causing the user to lose control of the playback (or silence) in different areas of the user's home when the user wants to create and save a Google "speaker group" for future use.

758. For instance, consider a scenario where a user is enjoying listening to music on an individual Accused Google Player on the first floor of the user's home and decides to set up a new "speaker group" for future use that includes the Accused Google Player that is playing music on

the first floor and another Accused Google Player that is not playing music on the second floor of the user's home where the user's baby is sleeping. In this scenario, implementing Google's second purported non-infringing alternative would mean that both Accused Google Players would be caused to play the same music in synchrony in response to the act of setting up the new "speaker group," despite the fact that the user does not want to wake up the sleeping baby by playing music on the second floor. Such a disruption to a user's listening experience and loss of control as to where music is playing in the user's home would not be commercially acceptable.

759. As another example, consider a scenario where a first user is enjoying music on an Accused Google Player on the first floor of a home and a second user is enjoying different music on a different Accused Google Player on the second floor of the home. If one of the users decides to set up a new "speaker group" for future use that includes both of these Accused Google Players, according to Google's second purported non-infringing alternative, one of the users would be forced to not only stop listening to his or her music but also be forced to listen to the other user's music. Further, it would be difficult for the users to know which user's music would be played by the group because my understanding is that the music being played by the Accused Google Player that is designated as the leader would prevail and the users are unlikely to know which Accused Google Player is the leader. Again, such a disruption to a user's listening experience and loss of control as to where music is playing in the user's home would not be commercially acceptable.

760. Notably, a Google product manager, Tomer Shekel, confirmed that Google's second purported non-infringing alternative would not be commercially acceptable. Specifically, Mr. Shekel testified that "if by setting a group you'll now be stopping the   music a person played [on an Accused Google Player then] that would *not be a great experience* for that user." *See* 11/23/2022 T. Shekel Dep. Tr. at 99:9-16 (Q: "Would you say that it's an important feature for the music playback [on Accused Google Players] to not be disturbed while you set up new groups?" A: In my opinion, if by setting a group you'll now be stopping the music a person played that would not be a great experience for that user.").

761. Further, I understand that Google has been providing users with the ability to listen to audio on an individual Accused Google Player while setting up new speaker groups that include

the Accused Google Player and to continue to listen to that same audio on the Accused Google Player after setting up one or more speaker groups that include the Accused Google Player, and to do so without initiating synchronous audio playback on another Accused Google Player in the user's home since at least as early as December 2015. *See, e.g.,* SONOS-SVG2-00040246-49; 5/10/2022 K. MacKay Dep. Tr. at 260:21-263:20 (testifying that Google began developing its "static" speaker group functionality in "March of 2015" and that "one advantage might be that the group is available as a Cast target separately from the individual devices" in the group). Thus, at the time Google would have allegedly implemented its second purported non-infringing alternative some four to five years later in November 2019 and/or November 2020 (when the '966 Patent and '885 Patent issued, respectively), Google's customers would have been accustomed to being able to create and save a new speaker group without interrupting active playback on an Accused Google Player in the new speaker group and without initiating synchronous audio playback on another Accused Google Player in the user's home. In my opinion, this further confirms that Google's second purported non-infringing alternative would not have been commercially acceptable.

762. Further yet, during a discussion with Mr. Nick Millington, who is Sonos's Chief Innovation Officer, I asked Mr. Millington for his thoughts regarding a hypothetical change to the design of Sonos's "saved groups" feature whereby the act of creating a new saved group would cause the new saved group to be invoked automatically. In response, Mr. Millington indicated that he did not believe Sonos's customers would consider this to be an acceptable change to Sonos's "saved groups" feature due to the loss of control and disruption of a user's listening experience – particularly in the example scenarios summarized above.

  **C.** **Non-Infringing Alternative #3**

    **1.** **Overview of Non-Infringing Alternative #3**

763. As set forth in Google's First Supplemental Response to Interrogatory No. 18, Google refers to its third purported non-infringing alternative as "no overlapping groups" and asserts that this "non-infringing alternative is an implementation in which a speaker that is already a member of one group will be forced out of this (first) group when a user attempts to add the speaker to a new (second) group" and "with this non-infringing alternative, no speaker can be a

817.  To help assist in my testimony at trial, I have prepared a number of demonstratives that are attached hereto as **Exhibit Q**. These demonstratives are exemplary and I reserve the right to create additional demonstratives and/or to modify the demonstratives in **Exhibit Q** based on the material in this report. For example, I reserve the right to create additional demonstratives and/or to modify the demonstratives in **Exhibit Q** based on the testing screenshots I included in this report as well as the evidence cited in this report. I also reserve the right to rely on the demonstratives that were attached as Exhibit H to my Opening report regarding Asserted Claim 1 of the '885 Patent dated June 22, 2022.

818.  I have also reviewed Sonos's Technology Tutorial that provides an overview of the '885 Patent, which I understand was submitted to the court in February 2022. I incorporate by reference herein Sonos's Technology Tutorial and expressly reserve the right to use the Technology Tutorial in whole or in part as a demonstrative to assist in my testimony.

## XX. RESERVATION OF RIGHT

819.  I reserve the right to further expound on my opinions set forth herein in subsequent declarations, reports, and/or at trial.

Dated: November 30, 2022           By:  *Kevin C. Almeroth*
                                         Kevin C. Almeroth