# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT BP

# FILED UNDER SEAL

Exhibit 0021

**SONOS**

# SONOS, INC.
# SERVICE INTEGRATION AGREEMENT

This Service Integration Agreement ("**Agreement**") is entered into as of the date of the last signature below "**Effective Date**" between Sonos, Inc., a Delaware corporation ("**Sonos**"), and Google, LLC, incorporated in the state of Delaware ("**Service Provider**"), each may individually be known as a "**Party**" and collectively the "**Parties**".

## Recitals

Whereas, Service Provider operates an Internet-based service providing audio content to consumers.

Whereas Sonos manufactures, markets, and offers products and technology comprising a wireless multi-room audio system.

Whereas, through the use of application program interface(s) developed by Sonos, the Parties wish to allow End Users to play the Content Service over the Sonos System either (a) by controlling the Content Service within the Sonos Application or (b) by playing to the Sonos System from within the Content Service Application.

Now therefore the Parties hereby agree as follows.

1. **Definitions**

    1.1 "**Affiliate**" means, with respect to a Party, any corporation or entity worldwide that Controls such Party, that such Party Controls, or that is under common Control with such Party.

    1.2 "**Confidential Information**" means any non public information shared by one Party with the other that is clearly and conspicuously marked as "confidential" (or with a similar designation) or disclosed in a manner in which the discloser reasonably communicated, or the recipient should have reasonably understood (under the circumstances) that the disclosure should be treated as confidential. "Confidential Information" does not include information that: (a) was known to recipient without restriction before receipt from discloser; (b) is or becomes publicly available through no fault of recipient; (c) is rightfully received by recipient from a third party without a duty of confidentiality; or (d) is independently developed by recipient.

    1.3 "**Content Service**" means the cloud-based service providing audio content to consumers operated and controlled by Service Provider.

    1.4 "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and operating policies of the entity in respect of which the determination is being made, or of its assets, whether by way of ownership of more than 50% of its voting or equity securities or assets, contract, management agreement, voting trust, or otherwise.

    1.5 "**Direct Control Experience**" means the experience whereby an End User may control the Sonos System from within the Service Provider App.

    1.6 "**End User**" means any end user of a Sonos Product and the Content Service.

    1.7 "**Intellectual Property Rights**" means any and all rights, titles and interests, whether foreign or domestic, in and to any and all trade secrets, patents, copyrights, service marks, trademarks, know-how, or other intellectual property rights, as well as any and all moral rights, rights of privacy, publicity and similar rights of any type under the laws or regulations of any governmental, regulatory, or judicial authority, foreign or domestic.

    1.8 "**Launch Approval Guidelines**" means the documented process steps ensuring the minimum experience and performance thresholds to be met prior to public release of the Sonos App Experience or the Direct Control Experience.

    1.9 "**Marks**" means either Party's respective trademarks, logos, service names, and/or trade names, whether registered or otherwise used as an identifier of goods or services. Marks

shall respectively be referred to as "**Service Provider Marks**" or "**Sonos Marks**" as applicable.

1.10 "**Provider Developments**" consist of any and all development work done solely by Service Provider in creating the Service Provider App or Direct Control Experience, excluding any Sonos Materials.

1.11 "**Service Provider**" means the party to this Agreement as outlined in the introduction.

1.12 "**Service Provider App**" means the Service Provider branded application which allows End Users to interact with the Content Service and Sonos System.

1.13 "**Service Provider Materials**" means the Service Provider App, including any protocol documentation, that describes the format required to be used when making access to the Content Service available to End Users, and any updates thereto.

1.14 "**Sonos APIs**" means the application programing interfaces comprised of a set of routine definitions, protocols, and tools for building software and applications that interact with the Sonos System.

1.15 "**Sonos App**" means the Sonos branded application which allows End Users to interact with their Sonos System and the Content Service.

1.16 "**Sonos App Experience**" means the experience whereby an End User may access to the Content Service from within the Sonos App.

1.17 "**Sonos Cloud Service**" means cloud based gateways used to communicate with Sonos Products.

1.18 "**Sonos Materials**" means the Sonos APIs, including any protocol documentation, self-tests, and sample apps, that describes the format required to be used when making access to the Sonos System available to content services and other partners so that End Users may play audio through their Sonos System, and any updates thereto.

1.19 "**Sonos Hardware**" means the hardware products created and sold by Sonos.

1.20 "**Sonos Platform Products**" means third party devices and/or applications that have the ability to control playback of the Content Service on Sonos Hardware. The Sonos Platform Products may also, but do not have to, be able to display certain information with respect to playback of content from the Content Service. For the sake of clarity, Sonos Platform Products shall not have the rights to display Service Provider video content.

1.21 "**Sonos Products**" means the Sonos Hardware and Sonos Software, comprising a wireless multi-room audio system.

1.22 "**Sonos Software**" means the code within the Sonos Products and Sonos Cloud Service.

1.23 "**Sonos System**" means the Sonos Products and the Sonos Cloud Service.

1.24 "**System Data**" means any information relating to an End User's Sonos System or such End User's use of the Content Service on the Sonos System.

1.25 "**Term**" shall have the meaning set forth in Section 8.1 of this Agreement.

2. **License Grant.**

    2.1 <u>Materials License.</u>

    2.1.1 <u>License to the Sonos Materials.</u> Subject to the terms and conditions of this Agreement, Sonos hereby grants Service Provider and its Affiliates a worldwide, non-exclusive, non-assignable (except pursuant to Section 12.6), non-transferable, paid-up, royalty-free license under Sonos' Intellectual Property Rights in the Sonos Materials to use and implement the Sonos Materials to enable End User playback of the Content Service through the Sonos Products.

    2.1.2 <u>License to the Service Provider Materials.</u> Subject to the terms of this Agreement, Service Provider grants Sonos and its Affiliates a worldwide, non-exclusive, non-assignable (except pursuant to Section 12.6), non-transferable, paid-up, royalty-free license under Service Provider's Intellectual Property Rights in the Service Provider Materials to use and implement the Service Provider Materials to enable End User



DocuSign Envelope ID: E071Z732-C868-4362-BE82-B8B51E5268DD
Case 3:20-cv-06754-WHA   Document 865-39   Filed 09/05/23   Page 5 of 20

SONOS

playback of the Content Service through the Sonos Products via the user interface of the Sonos Application and/or other methods of input currently existing or developed in the future (e.g. control by a home automation device or by voice command), provided any voice commands will be limited solely to transport controls (i.e. volume up, volume down, next song, previous song, play, pause, or to request the auditory display of "now playing" metadata). For clarity, Sonos will not permit End Users to use voice commands to initiate playback of the Content Service unless and until Service Provider has provided explicit written approval (email sufficing) for Sonos to do so.

2.1.3   Service Provider acknowledges that Sonos APIs may allow Sonos Platform Products to interact with an End User's Sonos System in order to allow End User to play and utilize basic transport controls (i.e. volume up, volume down, next song, previous song, play, pause, or to request the auditory display of "now playing" metadata) in order to interact with the Content Service on Sonos Hardware and display static (visual or auditory) content metadata. Service Provider further acknowledges that certain System Data and Service Provider Materials may be shared with Sonos Platform Products as necessary to play the Content Service on Sonos Products as well as necessary to display information about the audio Content Service's audio content playing on the Sonos System and information in connection with such interactions (e.g. Sonos Product state, or "now playing metadata). Sonos shall contractually ensure that Sonos Platform Products provide attribution compliant with Service Provider's brand guidelines. Further Sonos shall contractually ensure all Sonos Platform Products (including those Sonos Platform Products who contract with Sonos following the Effective Date of this Agreement) comply with, applicable local data protection rules and regulations and provide End Users with an accessible privacy policy no less protective than Sonos' or Service Provider's own privacy statement.

2.2 Trademark License.

2.2.1   Except as otherwise outlined in Section 4.8 and Exhibit C, each Party hereby grants the other a limited, royalty-free, non-exclusive, non-sub-licensable, non-transferable (subject to Section 12.6), license during the Term to use its Marks for the promotion of the interoperability of the Content Service and Sonos System, or as otherwise agreed to by this Agreement. Unless otherwise agreed upon, all such use shall be in accordance with each Party's policies regarding advertising and trademark usage guidelines as amended from time to time. Each party must obtain written consent from the other party prior to using such parties' Marks. Service Provider agrees such consent shall not be unreasonably withheld and where Sonos submits a request to use Service Provider Marks to ytm-partner-creative-reviews@google.com, Service Provider agrees to respond to the request within three (3) business days. Each Party will retain all right, title and interest in and to its own Marks worldwide, subject to the limited license granted to the other Party hereunder.

2.2.2   In connection with Sonos' and/or its Affiliates' marketing of the interoperability of the Content Service and Sonos System, Service Provider grants Sonos and its Affiliates (and their agents and contractors acting on their behalf) the right to demo the Content Service and, subject to Service Provider's written approval (email sufficing and in accordance with the process outlined in 2.2.1 above) for each use, to use Service Provider Marks, screen shots and images of the Content Service as displayed within the Sonos App, and any videos of the Direct Control Experience or Sonos App Experience, including but not limited to use in instructional materials, training materials, and marketing materials.



2.2.3 Each Party agrees not to take actions adverse to the other Party's respective trademarks, nor attempt to register for any trademark containing the other Party's trademarks without the other Party's consent.

2.3 <u>Title</u>. Each Party's Materials and Marks are licensed to the other, not sold. Title to the Materials and Marks remains vested in the Party owning such Materials or Marks and cannot be assigned or transferred. All goodwill arising out of the use of a Party's Marks by the other Party shall inure to the benefit of the Party having title to such Mark. Each Party is expressly forbidden from selling or otherwise distributing the other Party's Materials, or any portion thereof. Except for the limited licenses outlined in this Section 2, this Agreement does not grant to either Party any implied rights to the Party's Intellectual Property Rights.

3. **Obligations.**

    3.1 <u>Release Approval</u>.

    3.1.1 <u>Sonos App Experience</u>. Prior to commercial launch, Sonos shall perform the requisite quality assurance testing to verify compatibility between the Sonos System and the Content Service, in accordance with Launch Approval Guidelines outlined in Exhibit A. Once Sonos is satisfied that a compliant beta may be offered, Sonos shall inform Service Provider in writing that it may release the Sonos App Experience publicly. To the extent that Sonos requires additional integration work to be done by Service Provider to comply with the Launch Approval Guidelines, Sonos shall notify Service Provider, with a reasonable level of detail on the issues to be addressed. The Parties shall work together to further modify the Sonos App Experience to deliver a compliant beta offering as soon as is reasonably practicable. For the avoidance of doubt, it shall be considered a material breach of this Agreement if either Party promotes, advertises or otherwise publicly discloses the Sonos App Experience or Service Provider/Sonos integrated service offering prior to launch without written approval from the other party.

    3.1.2 <u>Direct Control Experience</u>. Prior to commercial launch, Service Provider shall perform the requisite quality assurance testing to verify compatibility between the Sonos System and the Content Service in accordance with the Launch Approval Guidelines outlined in Exhibit A. Sonos shall be entitled to review the experience (during beta or any similar period) and/or request proof of compliance with such Launch Approval Guidelines prior to release. Service Provider shall ensure that an approved Sonos App Experience is ready for public release prior to seeking public release of any Direct Control Experience.

    3.2 <u>Access</u>. The Sonos App Experience and Direct Control Experience will be accessible to any existing or new customer of the Sonos System, provided that the End User (i) has established an account, (ii) has registered with Sonos, and (iii) accepted Sonos' terms and conditions and/or similar policies (e.g. privacy policy).

    3.3 <u>Feature maintenance</u>. Service Provider will use commercially reasonable efforts to maintain the feature set of the Sonos App Experience and to provide reasonable advanced notice of changes to the Service Provider App that will affect the Sonos App Experience.

    3.4 <u>Customer facing information.</u> Service Provider will maintain the accuracy of any customer facing information (e.g. support URLs, phone numbers, etc.).

DocuSign Envelope ID: F0717732-C868-4362-BE82-B8B51E5260DD
Case 3:20-cv-06754-WHA    Document 865-39    Filed 09/05/23    Page 7 of 20

SONOS

3.5 Open Source. Service Provider acknowledges that parts of the Sonos Software may contain open source listed in Exhibit D. Service Provider shall follow any requirements stated in the applicable license related to such code.

3.6 Changes.

    3.6.1 API Changes. Sonos shall provide Service Provider with a commercially reasonable amount of advanced written notice of any known or planned modifications to the Sonos APIs that would impact interoperability between the Sonos System and the Content Service.

    3.6.2 Change to the Content Service. To the extent that Service Provider proposes to discontinue or substantially change the Content Service, e.g. addition/removal of territories, addition/removal of significant functionality) Service Provider will use good faith efforts to provide commercially reasonable prior notice to Sonos of such changes.

3.7 Support.

    3.7.1 End User Support. Each Party shall provide support to End Users for its own products and services under this Agreement consistent with its general practices. In addition, each Party will provide the other Party with reasonable technical support to answer questions and provide consultation regarding such Party's products or services that are subject to this Agreement.

    3.7.2 The Parties agree to the requirements, support and escalation obligations outlined in Exhibit B.

3.8 Marketing. The Parties hereby commit to the marketing obligations outlined in Exhibit C.

4. **Restrictions.**

    4.1 Use of Certification Marks. The License granted in Section 2.2.1 notwithstanding, Service Provider shall not use any Sonos certification Marks prior to passing all required certification milestones. Any certification obligations shall be outlined in an amendment to this Agreement.

    4.2 Software restrictions. Neither Party may translate, reverse engineer, decompile, or disassemble the other Party's software provided solely in object code format (machine readable) except to the extent applicable law specifically prohibits the restriction.

    4.3 Unauthorized Access. Neither Party shall improperly access, alter or store the other Party's Materials, including (i) using any robot, spider, site search/retrieval application, or other tool to retrieve, duplicate, or index any portion of the other Party's Materials or Sonos System; (ii) making excessive service calls via the Sonos APIs that are not strictly required for the proper functioning of the Sonos App Experience or Direct Control Experience; or (iii) provide or enable access to the Sonos Materials for any third party.

    4.4 API key. Service Provider may not authorize any third party to make use of the API key assigned to a Service Provider App.

    4.5 Sonos only devices. Service Provider shall not use the Sonos Materials to enable playback of audio on any non-Sonos device.

4.6 <u>Extraneous Materials.</u> Service Provider shall only use Sonos Materials to build the Sonos App Experience or Direct Control Experience and will notify Sonos of any known extraneous materials instructing others on how to develop any unauthorized Sonos App Experience or Direct Control Experience.

4.7 [Intentionally Omitted]

4.8 <u>Suspension</u>. Either party may suspend the Sonos App Experience or Direct Control Experience without liability to the other party under the following conditions:

    4.8.1    where required to do so by law; or

    4.8.2    If Sonos believes, in its reasonable and good faith judgment, that the Content Service is in material violation of third party Intellectual Property Rights or Sonos reasonably believes such suspension is necessary to minimize risk exposure of a security concern; or

    4.8.3    If the operation of the Content Service continually fails to meet the up-time and performance specifications or experience guidelines outlined in Exhibit B.

4.9 <u>Publicity</u>. Except as expressly permitted in Exhibit C, neither Party shall issue any press release or public announcement relating to this Agreement or its terms without the other Party's prior written approval.

5. **Feedback and Ownership.**

    5.1 <u>Feedback</u>. In its sole discretion, Service Provider may advise Sonos of suggestions, comments or other feedback relating to the Sonos System, Sonos Materials, or other Sonos technology ("**Feedback**"). Sonos may use and include any Feedback that Service Provider voluntarily provides to improve the Sonos System, Sonos Materials or other related Sonos technologies. Accordingly, if either party provides Feedback, the Parties agree that the receiving Party shall own such Feedback and its licensees may freely use, reproduce, license, distribute, modify, and otherwise commercialize the Feedback in the Sonos System, Sonos Materials, or other Sonos technologies. For the avoidance of doubt, Sonos is not under any obligation to incorporate Feedback into the Sonos System, Sonos Materials or other Sonos technology.

    5.2 <u>Ownership of Service Provider Intellectual Property Rights</u>. All right, title and interest, including Intellectual Property Rights, to the Content Service and Provider Developments, are retained by Service Provider. Sonos will not claim for itself or for any third party any right, title, interest or licenses to the Content Service, except for the limited license granted herein.

    5.3 <u>Ownership of Sonos Intellectual Property Rights</u>. All right, title and interest, including Intellectual Property Rights, to the Sonos System are retained by Sonos. Service Provider will not claim for itself or for any third party any right, title, interest or licenses to the Sonos System, except for the limited license granted herein. Both parties recognize and acknowledge that certain features of either Parties' Materials, the Service Provider App and the Sonos System may be protected by patent law.

6. **Reporting and Data Collection.**

    6.1 <u>Reporting</u>. As requested by Sonos but no more than once per quarter, Service Provider will report aggregated data from the previous quarter as outlined in the table below.

    6.2 <u>API monitoring</u>. Service Provider acknowledges that Sonos may monitor use of the Sonos APIs by Service Provider or End Users and may collect related data as required under this Section 6.

| Type | Permitted | Policy Limitations |
|---|---|---|
| End users that listened at least once per quarter, per country | Yes | Number of users that listened per quarter/country – at least 100 unique users |
| Total number of hours users listened on the Sonos System during the quarter, per country | Yes | Number of users that listened per quarter/country – at least 100 unique users |

6.3 <u>System Data</u>. Neither Party may disclose System Data to any Third Party without the End User's consent. For the purpose of this Section, "Third Party(ies)" shall exclude users or devices who join a Sonos Product's local area network.

6.4 <u>Data Usage</u>. In accordance with Service Provider's policies, including privacy policies, all applicable laws and regulations, and the terms of the Agreement, both Parties acknowledge that in order to enable certain features on the Sonos System and the best user experience (e.g. to display users' recently played Service Provider content), certain System Data will be available to and temporarily stored by Sonos for a maximum of six (6) months. For the sake of clarity, System Data shall not include Service Provider video content nor Service Provider content data more specific than container-level content data.

6.5 <u>Data Accessibility</u>. Pursuant to Section 6.3, both Parties acknowledge that in order to ensure continuity of control and the best user experience, certain System Data will be available to Sonos Platform Products (e.g. system state, now playing metadata, volume information, room names, container-level meta data, and grouping data).

6.6 <u>Service Provider Duty of Care</u>. Service Provider shall treat any System Data or other data related to End Users with as much care as it handles its own customer data or Confidential Information.

7. **Confidentiality.**

Each Party will protect the other's Confidential Information obtained pursuant to this Agreement from unauthorized dissemination and use with at least the same degree of care that such Party uses to protect its own like information. Except as expressly set forth herein, neither Party will use the other's Confidential Information for purposes other than those necessary to directly further the purposes of this Agreement. Except as expressly permitted under this Agreement, neither Party will disclose to third parties the other's Confidential Information without the prior written consent of the other Party. The Parties may disclose the terms and conditions of this Agreement to their legal and financial advisors who are subject to a written confidentiality agreement that protects such Confidential Information to the same extent as this Agreement. The Parties may disclose Confidential Information if required by law as part of a judicial or regulatory proceeding, so long as the Party required to disclose takes all reasonable steps available to obtain protective treatment and uses best efforts to notify the other Party prior to disclosure in sufficient time to enable such Party to seek protective treatment.

8. **Term and Termination.**

8.1 <u>Term</u>. This Agreement will commence as of the Effective Date and continue for a period of two (2) years, unless earlier terminated by either Party in accordance with the provisions of this Agreement (the "**Initial Term**"). This Agreement shall automatically renew for additional successive one (1) year periods (each a "**Renewal Term**", which together with the Initial Term



shall collectively be known as the **"Term"**), unless written notice of non-renewal is received no later than sixty (60) days prior to the expiration of the then current term.

8.2 <u>Termination for Convenience</u>. This Agreement may be terminated by either Party for any reason, or no reason at all, upon three (3) months prior written notice to the other Party.

8.3 <u>Termination for Cause</u>. This Agreement may be terminated by a Party for cause immediately upon the occurrence of and in accordance with the following:

 8.3.1 <u>Insolvency Event</u>. Either Party may terminate this Agreement by delivering written notice to the other Party upon the occurrence of any of the following events: (i) a receiver is appointed for the other Party or its property; (ii) the other Party makes a general assignment for the benefit of its creditors; (iii) the other Party commences, or has commenced against it, proceedings under any bankruptcy, insolvency or debtor's relief law, which proceedings are not dismissed within ninety (90) days; or (iv) the other Party is liquidated or dissolved.

 8.3.2 <u>Discontinuation of the Content Service</u>. Sonos may terminate the Agreement if Service Provider ceases to offer the Content Service to End Users.

 8.3.3 <u>Default</u>. Either Party may terminate this Agreement effective upon written notice to the other if the other Party violates any material covenant, agreement, representation or warranty contained herein in any material respect or defaults or fails to perform any of its obligations or agreements hereunder in any material respect, which violation, default or failure to perform is not cured within thirty (30) calendar days after notice thereof from the non-defaulting Party stating its intention to terminate this Agreement by reason thereof.

8.4 <u>Return of Materials; Survival</u>. Upon the expiration or earlier termination of this Agreement, (i) each Party will promptly return all Confidential Information provided to it by the other, or certify in writing that all such materials have been deleted or otherwise destroyed, (ii) each Party will cease using, displaying and promoting the Marks of the other Party, (iii) Sonos will cease making available the Sonos App Experience, and (iv) Service Provider will cease making available the Direct Control Experience within the Service Provider App. Sections 1, 4, 8.4, 9, 10, 11, and 12 of this Agreement will survive the expiration or earlier termination of this Agreement for any reason.

9. **WARRANTY AND DISCLAIMER.**

 9.1 <u>Mutual Warranty</u>. Each Party warrants and represents to the other that (i) it has the full corporate power and authority to enter into and carry out its obligations under this Agreement, (ii) that it will act in conformance with all applicable laws, regulations and court orders (in the territories and jurisdictions in which the Service Provider App is available), in performance of its obligations hereunder, and (iii) the execution and delivery of the Agreement by such Party, and the performance by such Party of its obligations pursuant to the Agreement, will not result in any material violation of or constitute a default under, any material agreement or obligation to which such Party is currently bound.

 9.2 If either party reasonably believes that the other party has itself or through a third party taken or encouraged an action that materially infringes upon third party Intellectual Property Rights, that party will notify the other party's current business point of contact and both parties will participate in a discussion to review the alleged infringement and, if necessary, create a plan of action detailing how such action will be remediated. For clarity, this review process does not affect any

other remedy under this Agreement or any other right (including any statutory, legal, compulsory or implied right) or defense that either party would have had, or will have.

9.3 EXCEPT FOR THE WARRANTIES PROVIDED IN THIS SECTION 9, NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED, OR OTHERWISE. SERVICE PROVIDER AND SONOS EACH EXPRESSLY DISCLAIM ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NONINFRINGEMENT WITH RESPECT TO ITS RESPECTIVE PRODUCTS OR SERVICES, AS APPLICABLE. EACH PARTY ACKNOWLEDGES THAT OTHER THAN THE WARRANTIES PROVIDED IN THIS SECTION 9, THE PRODUCTS AND/OR SERVICES PROVIDED HEREUNDER CARRY NO WARRANTY WHATSOEVER AND ARE PROVIDED SOLELY ON AN "AS-IS" BASIS.

10. **Limitation of Liability.**

10.1 <u>Limitation of Liability</u>. IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES OR LOST PROFITS (EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, HOWEVER CAUSED, AND UNDER ANY THEORY OF LIABILITY. EXCEPT IN CASE OF GROSS NEGLIGENCE OR WILFUL MISCONDUCT, BREACH OF CONFIDENTIALITY OR WILLFUL MISAPPROPRIATION OF THE INTELLECTUAL PROPERTY OF THE OTHER PARTY, AND EXCEPT FOR THE PARTIES' OBLIGATIONS UNDER SECTION 7 OR 11 HEREOF, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY'S TOTAL LIABILITY OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY CLAIMS HEREUNDER, REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY, INFRINGEMENT OR ANY OTHER LEGAL THEORY, EXCEED FIVE HUNDRED THOUSAND DOLLARS ($500,000); PROVIDED, HOWEVER, THAT IN NO EVENT SHALL THE LIMITATION SET FORTH HEREIN LIMIT A PARTY'S RIGHT TO OBTAIN INJUNCTIVE RELIEF AGAINST THE OTHER PARTY. EACH PARTY ACKNOWLEDGES THAT THE LIMITATION OF LIABILITY SET OUT IN THIS SECTION 10 REFLECTS AN INFORMED, VOLUNTARY ALLOCATION BETWEEN THE PARTIES OF THE RISKS (KNOWN AND UNKNOWN) THAT MAY EXIST IN CONNECTION WITH THIS AGREEMENT.

10.2 <u>Exceptions</u>. EXCEPT FOR EITHER PARTY'S INDEMNITY LIABILITY ARISING FROM GROSS NEGLIGENCE OR WILFUL MISCONDUCT, OR BREACH OF CONFIDENTIALITY NEITHER PARTY'S AGGREGATE LIABILITY OF ALL KINDS ARISING OUT OF OR RELATED TO THE PARTIES INDEMNIFICATION OBLIGATIONS IN SECTION 11, REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE WILL EXCEED ONE MILLION DOLLARS ($1,000,000).

11. **Indemnity.**

11.1 <u>Indemnification by Sonos</u>. Subject to Section 11.3, Sonos shall defend, indemnify and hold harmless Service Provider and its Affiliates, and their officers, directors, employees, shareholders, agents, successors and assigns from and against any and all loss, damages, liabilities, settlements, costs and expenses (including reasonable legal expenses and the expenses of other necessary professionals) incurred as a result of a third party claim, action, suit or proceeding (collectively and individually, a "**Claim**") brought against Service Provider (and/or its Affiliates) arising out of the breach of any representation or warranty provided by Sonos under Section 6, 7 or 9 of this Agreement.



**SONOS**

11.2 <u>Indemnification by Service Provider</u>. Subject to Section 11.3, Service Provider shall defend, indemnify and hold harmless Sonos and its Affiliates, and their officers, directors, employees, shareholders, agents, successors and assigns from and against any and all loss, damages, liabilities, settlements, costs and expenses (including reasonable legal expenses and the expenses of other necessary professionals) incurred as a result of a Claim (as defined above) brought against Sonos (and/or its Affiliates) arising out of the breach of any representation or warranty provided by Service Provider under Section 6, 7 or 9 of this Agreement.

11.3 <u>Procedure</u>. The Party seeking relief under this Section 11 ("**Indemnitee**") shall: (i) promptly notify the other Party ("**Indemnitor**") in writing of any Claim; (ii) provide Indemnitor with sole control of the defense and/or settlement thereof, provided that any settlement requiring Indemnitor to admit liability, pay money, or take (or refrain from taking) any action, will require the indemnified party's prior written consent, not to be unreasonably withheld, conditioned, or delayed; and (iii) provide Indemnitor with reasonable assistance and full information with respect thereto. Indemnitee shall have the right to participate, at its own expense, with counsel of its own choosing in the defense and/or settlement of such Claim. The indemnification obligations of the parties in this Section 11 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the consent of Indemnitor, of which consent shall not be unreasonably withheld or delayed. The failure to deliver written notice to Indemnitor within a reasonable time after the commencement of any Claim, if prejudicial to its ability to defend such Claim, shall reduce Indemnitor's obligations under this Section 11 in proportion to the prejudice.

## 12. Miscellaneous.

12.1 <u>Amendments and Waivers</u>. No amendment of this Agreement will be valid unless stated in writing and signed by authorized representatives of the Parties. No waiver of any default, misrepresentation or covenant in this Agreement, will affect any prior or subsequent default, misrepresentation.

12.2 <u>Applicable Law and Jurisdiction</u>. This Agreement will be governed by and construed in accordance with the laws of the State of California as applied to residents of California without regard to its Conflict of Laws principles. FOR ANY DISPUTE RELATING TO THIS AGREEMENT, THE PARTIES CONSENT TO PERSONAL JURISDICTION IN, AND THE EXCLUSIVE VENUE OF, THE COURTS IN SANTA CLARA COUNTY, CALIFORNIA.

12.3 <u>Notice</u>. Any notice, approval, request, authorization, direction or other communication under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes (a) on the delivery date if delivered personally to the Party to whom the same is directed; (b) three (3) business days after deposit with a commercial overnight carrier, with written verification of receipt; or (c) via email to a valid email address noted below (with evidence of message-delivered). Notices shall be given to the following address (as such addresses may be amended from time to time):

<u>If to Service Provider:</u>             <u>With a copy to:</u>



Confidential                                    SONOS-SVG2-00059341

Google LLC
1600 Amphitheatre Pkwy, Mountain View, CA 94043
Attention: YouTube Legal

Email: legal-notices@google.com

Google LLC
76 9th Ave.
New York, NY 10011
Attention: Heather Rivera

Email: thompsonh@google.com

If to Sonos:

Sonos, Inc.
614 Chapala St.
Santa Barbara, CA 93101
Attention: Chief Executive Officer
Email: ceo@sonos.com

With a copy to:

Sonos, Inc.
614 Chapala St.
Santa Barbara, CA 93101
Attention: General Counsel
Email: legal@sonos.com

12.4  Relationship of the Parties. The Parties are independent contractors. Nothing in this Agreement will be construed to create any partnership, joint venture, or similar relationship. Neither Party is authorized to bind the other to any obligations with third parties.

12.5  Severability. If any provision of this Agreement is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose.

12.6  Assignment. This Agreement will bind and inure to the benefit of each Party's permitted successors and assigns. Neither Party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where: (a) the assignee has agreed in writing to be bound by the terms of this Agreement; (b) the assigning Party remains liable for obligations under the Agreement if the assignee defaults on them; and (c) the assigning Party has notified the other party of the assignment. Any other attempt to assign is void.

12.7  Signatures; Binding Effect. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one and the same instrument. Signatures may be provided in electronic format and shall have the same force and effect as an original signature.

12.8  Entire Agreement. This Agreement, including its attachments, constitutes the entire agreement between the Parties regarding its subject matter, and supersedes all prior communications, negotiations, understandings, agreements or representations, either written or oral, by or among the Parties regarding its subject matter. To the extent Sonos or Service Provider and/or their employees are required to click through or otherwise indicate acceptance of any standard agreements or terms and conditions in order to access materials, related documentation, test accounts, software or other materials to be provided and used for activities authorized pursuant to this Agreement, this Agreement shall govern.

*Signature page follows*



# SONOS

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

| Sonos, Inc. | Google LLC |
|---|---|
| DocuSigned by: *alaina kwasizur* <br> 89B7D83B467F4D4... <br> Name: Alaina Kwasizur | Name: *Philipp Schindler* (signature) <br> Philipp Schindler <br> Authorized Signatory |
| Title: Assistant Secretary | Title: |
| Date: 2018-12-11 | Date: 2018.12.12 08:30:36 -08'00' |



![SONOS]

## Exhibit A:

## Launch Approval Guidelines

**Sonos App Experience**

Service Provider shall endeavor to meet the following minimum requirements prior to launch:

- At least 100 active Service Provider App users per day
- On per user basis,
    - No more than 1 play error per every 4 hour period
    - No more than 1 connection error per every 4 tracks streamed
    - No more than 1 browser error per every 10 browses
    - No more than 1 search error per every 100 searches

For clarity, Service Provider's obligations in this Exhibit A are contingent upon Sonos providing documentation to support reporting (e.g. error reporting).

**Direct Control Experience**

- Service Provider shall provide Sonos with access to Direct Control Experience in both their Android and iOS applications during the integration development and beta testing phase.
- Sonos shall provide feedback during the beta testing phase on the use of Marks, API functionality and performance (as applicable) for the Service Provider to address prior to launch.
- Service Provider shall make commercially reasonable efforts to provide Sonos with the timelines for launch of the application and access to consumer messaging both in application, in marketing activities and on associated marketing and customer care digital outlets.
- For clarity, Sonos will not conduct any marketing activities without prior approval from Service Provider.



## Exhibit B:

## Support Guidelines

These guidelines identify how Sonos provides support and how YouTube Music agrees to share escalation responsibilities with Sonos.

1. **Sonos customer care overview.** Sonos maintains various customer care tiers within its organization.
    1.1 Tier 1 is Sonos' front line support organization and handles End User questions via phone, email, social media (e.g. Twitter and Facebook), and a web-based Sonos Community).
    1.2 Tier 2 handles more technical issues, such as service outages and complex technical problems. Tier 2 also handles Service Provider escalations.
    1.3 Sonos assigns level of support based on End User location, language, and/or type of issue.

Sonos offers regional language support in English, Spanish, French, German, Danish, Dutch, Italian, Norwegian, Polish, Swedish, and Chinese. Exact languages offered can vary by the End User's country.

2. **Scope of work.** Service Provider agrees to handle End User account, payment, and authentication problems. For problems related to setting up and playing Service Provider's content on Sonos speakers, Service Provider can refer End User to Sonos customer care.

3. **Directing End User to Sonos customer care team:**

   3.1 When an End User asks questions about their Sonos System or reports a technical problem unrelated to Service Provider content, Service Provider may direct them to http://www.sonos.com/contact. This page shows all country-specific Sonos support options, including phone, email, web community, and social media channels.

   3.2 Sonos will refer to Service Provider for user account, payment, and authentication problems related to use of Service Provider App on Sonos Products. For all problems setting up and playing content on Sonos speakers, Service Provider should refer End Users to Sonos customer care team. For higher-quality support, End Users should create a Sonos diagnostic from their Sonos App using this guide: http://faq.sonos.com/diagnostic; End Users should then visit http://www.sonos.com/contact for their support options.

   3.3 Rules of engagement for customer inquiries:
       3.3.1 Frontline support and subsequent escalation handled by Sonos and/or Service Provider will remain consistent with each Party's regularly established processes.
       3.3.2 There will be no live incident referral between Sonos and Service Provider support teams.

# SONOS

    3.3.3    Based on End User problem, End Users referred to Sonos or Service Provider customer support teams will receive a referral message which shall be approved by each Party.

3.4 When Service Provider is directing an End User from Service Provider customer support team to Sonos customer care, Service Provider shall use the following procedures during their interaction with End Users:
    a.    If interacting by email or phone: 'Please contact Sonos via sonos.com/contact.'
    b.    If via Twitter: 'Hey @sonossupport can you help out here?'

4. **Directing End User to Service Provider customer care team:**
    a.    SLA for individual escalations:
        i.    Initial contact acknowledgement within a commercially reasonable amount of time.
    b.    Case resolution within a commercially reasonable amount of time.
    c.    Music Service escalations for service availability or functionality will use regularly established processes and SLA's outside of these rules of engagement.
    d.    Single End User management escalations, including VIP End Users, will be handled by exception through management escalation contacts.

5. **Management escalation contacts.**

    5.1 Sonos Contacts:

David Moreira - AMPAC (Escalation Team Manager) - Boston, MA
- david.moriera@sonos.com
- O – 617 225 2110 x11867
- C – 508 981 7196

Andreas Mundler - EMEA (Escalation Leader) - Netherlands
- andreas.mundler@sonos.com
- C – +31 6 317 88 523

Brian Gerk - AMPAC (Escalation Manager) – Santa Barbara, CA
- Brian.gerk@sonos.com
- O – 508 308 8013
- C – 805 766 6636

James Yazejian (Director Customer Care (Escalation)) – Boston, MA
- james.yazejian@sonos.com
- O – 857 998 5180
- C – 617 571 5427

    5.2 Service Provider contact for escalations:



![SONOS]

YTMPartnerships@google.com

6. **Partner support options.**

i. YouTube Customer Support:

- Support channels offered: Phone, Chat, Email, Community Forum, and Twitter.
- Location of Support Centers:
    - Manila, Philippines (Cognizant)
    - Gurgaon, India (Cognizant)
    - Kuala Lumpur, Malaysia (Accenture)
    - Dublin, Ireland (Accenture)
- What levels of support do you offer? I.E. 1st 2nd 3rd line support
    - Tier 1 - Front line support team that handles all user contact via Phone, Chat, Email, Social Media (Twitter), and YouTube's Help Community.
    - Tier 2 - Subject Matter Experts (SMEs) handle all escalation and consult cases from Tier 1 team, such as technical issues or complex billing queries.
    - Tier 3 - Full time YouTube team (Product Support Leads) consulted by Tier 2 as the final escalation point. The Product Support Leads can escalate to the Engineering and Product Management teams if product bugs are identified.



![SONOS]

## Exhibit C:
## Marketing Obligations & Activities

- The Parties agree to discuss in good faith mutually agreeable marketing activities and commitments at a future date following the Effective Date of this Agreement.



![SONOS]

Exhibit D:

Approved Open Source:

http://www.sonos.com/documents/gpl/8.4/SonosOpenSourceAttributions.pdf

