1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA 94105-2669
6  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
7
   SEAN M. SULLIVAN (*pro hac vice*)
8  sullivan@ls3ip.com
   COLE RICHTER (*pro hac vice*)
9  richter@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
10 656 W Randolph St., Floor 5W
   Chicago, IL 60661
11 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
12
   *Attorneys for Sonos, Inc.*
13

14

15                 UNITED STATES DISTRICT COURT

16               NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18 GOOGLE LLC,                          | Case No. 3:20-cv-06754-WHA
                                        | Related to Case No. 3:21-cv-07559-WHA
19        Plaintiff and Counter-defendant,
                                        | **SONOS'S MOTION FOR SUMMARY**
20 v.                                   | **JUDGMENT REGARDING GOOGLE'S**
                                        | **CONTRACT-RELATED CLAIMS**
21 SONOS, INC.,
                                        | Date: April 13, 2023
22        Defendant and Counter-claimant. | Time: 8:00 A.M.
                                        | Place: Courtroom 12, 19th Floor
23                                      | Judge: Hon. William Alsup
24                                      | Complaint Filed: September 28, 2020
25

26

27                     __FILED UNDER SEAL__

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that on April 13, 2023, or as soon thereafter as may be heard before the Honorable Judge William Alsup in Courtroom 12 on the 19th Floor of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Sonos, Inc ("Sonos") will, and hereby does, move this Court for an Order granting summary judgment as to Google's claims for breach of contract and conversion.

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ......................................................................................................... 1

II.   BACKGROUND ............................................................................................................ 2

    A.    Sonos's Patented Smart Speaker Technology........................................................ 2

    B.    Sonos And Google Begin Collaborating On Ways To Allow Google Music
         Services To Play On Sonos's Smart Speakers ......................................................... 6

    C.    The 2018 Service Integration Agreement Supersedes The 2013 Content
         Integration Agreement ........................................................................................ 7

III.  LEGAL STANDARD ..................................................................................................... 9

IV.   ARGUMENT ................................................................................................................ 10

    A.    The 2013 Content Integration Agreement Does Not Give Google Rights To
         Sonos's 2011 Invention....................................................................................... 10

    B.    Direct Control Technology Is Governed By The 2018 SIA—Which
         Superseded All Prior Related Agreements............................................................. 15

    C.    Direct Control Technology Is Outside The Scope Of The 2013 CIA.................... 16

V.    CONCLUSION ............................................................................................................. 20

1

2

**TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Cases**

5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 9

6

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ............................................................. 13, 14

7

8

*Cedars–Sinai Med. Ctr. v. Shewry*,
137 Cal. App. 4th 964 (2006) ....................................................................................... 9

9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................. 9, 15

10

11

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920 (2015) ................................................................................................ 12

12

*Genentech, Inc. v. Trs. of Univ. of Pa*,
871 F. Supp. 2d 963 (N.D. Cal. 2012) ........................................................................ 12

13

14

*In re Imperial Credit Indus., Inc.*,
527 F.3d 959 (9th Cir. 2008) ........................................................................................ 9

15

16

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
No. C 09-00355 WHA, 2011 WL 5974668 (N.D. Cal. Nov. 29, 2011) ...................... 14

17

*Kashmiri v. Regents of Univ. of Cal.*,
156 Cal. App. 4th 809 (2007) ....................................................................................... 9

18

19

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ................................................................................... 12

20

21

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011) ................................................................................................ 12

22

*Miran v. Convergent Outsourcing Inc.*,
No. 16-CV-0692-AJB-(JMA), 2016 WL 7210382 (S.D. Cal. Dec. 13, 2016) ...................... 15

23

24

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Landmark Am. Ins. Co.*,
No. C 05-02803 WHA, 2006 WL 1390591 (N.D. Cal. May 22, 2006) ...................... 9

25

26

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
21 F.4th 1362, 1370 (Fed. Cir. 2022) ........................................................................ 13

27

28

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

*Openwave Sys. Inc. v. Myriad France S.A.S.*,
  No. C 10-02805 WHA, 2011 WL 2580991 (N.D. Cal. June 29, 2011) ................................... 9

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004) ................................................................................................. 9

*Thomas v. Cricket Wireless, LLC*,
  506 F. Supp. 3d 891 (N.D. Cal. 2020) ............................................................................ 9, 18

*United States Cellular Inv. Co. of L.A. v. GTE Mobilnet, Inc.*,
  281 F.3d 929 (9th Cir. 2002) ................................................................................................... 9

*Wells Fargo v. Bank of Am.*,
  32 Cal. App. 4th 424 (1995) ................................................................................................. 15

*Young v. Benton*,
  21 Cal. App. 382 (1913) ....................................................................................................... 15

**Statutes**

35 U.S.C. § 120 ............................................................................................................................ 12

35 U.S.C. § 282 ............................................................................................................................ 11

Cal. Civ. Code § 1532 .................................................................................................................. 16

**Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................................................. 1, 9

*Conceptus, Inc. v. Hologic, Inc.*,
  No. 3:09-cv-002280-WHA, Dkt. 475 .................................................................................. 12

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

**STATEMENT OF THE RELIEF REQUESTED**

Pursuant to Fed. R. Civ. P. 56(a), Sonos requests the Court issue an Order granting summary judgment against Google as to Google's claims for breach of contract and conversion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Sonos accuses Google of infringing U.S. Patent No. 10,779,033 ("the '033 patent"), which claims an aspect of Sonos's "direct control" technology.  Ex. 1 to the Declaration of Joseph R. Kolker in Support of Motion ("Kolker Decl.") filed concurrently herewith.  Direct control allows a user to seamlessly control their Sonos speakers through a music app—for example using a Spotify app on a smartphone to select songs, change the volume, and advance to the next song on a playlist, while the music selections are output on a smart speaker.

Google claims that Sonos's direct-control technology belongs to Google, and asserts claims for breach of contract and conversion.  In particular, Google alleges that: (1) a 2013 agreement between the parties gave Google rights to direct control technology, (2) Sonos breached the 2013 agreement when, in 2019, Sonos claimed direct control technology in the '033 patent, and (3) by obtaining the '033 patent, Sonos converted Google's intellectual property rights in direct control technology.  Put differently, Google's theory is predicated on Google's assertion that the 2013 agreement assigned Sonos's direct control inventions to Google.

But Google's reading of the 2013 agreement fails as a matter of law because (1) the application leading to the '033 patent (and to which the '033 patent claims priority through a series of continuation applications) was filed in 2011 and therefore *predates* the 2013 agreement, and (2) the 2013 agreement expressly provides that Sonos retained *all* its pre-existing intellectual property: "The Sonos [system] *and any and all intellectual property rights arising from or related thereto are and shall remain the sole and exclusive property of Sonos.*"  Kolker Decl. Ex. 2 (2013 Content Integration Agreement ("CIA")) at § 3.5 (emphasis added).  Thus, under the express terms of the agreement that Google relies on, everything disclosed in the '033 patent was, and remains, Sonos's intellectual property.

If that weren't enough, the 2013 agreement was superseded by a 2018 agreement. And Google does not, and never has, claimed that Sonos breached the 2018 agreement. In particular, although Sonos filed the parent *application* leading to the '033 patent in 2011, Sonos did not file the actual *claims* of the '033 patent until 2019—by which time the 2013 agreement, and the contractual language on which Google relies—had been overtaken. Put simply, Google's contention that it owns the direct control technology claimed in the '033 patent fails whether you look at the 2011 priority date of the '033 patent (because it is preexisting technology) or the 2019 date when Sonos first sought patent claims covering the particular aspect of direct-control technology that Google claims to own. Nor can the 2013 agreement even be read to encompass direct control technology more generally. Because there are no material facts in dispute and Google's claims are squarely resolved by the plain language of the contracts, the Court should grant summary judgment on Google's breach of contract and conversion claims.

## II.     BACKGROUND

### A.     Sonos's Patented Smart Speaker Technology

Sonos created the market for wireless, multi-room speakers. Sonos completely reimagined the in-home music system as a decentralized network of smart playback devices. To support its wireless network of speakers, Sonos also developed a platform that could (1) retrieve and play back cloud-based media content while (2) seamlessly and wirelessly distributing audio room by room or throughout the home at the user's discretion.

One aspect of Sonos's technology is the ability to use Sonos's controllers and associated software applications to select media content from cloud-based music sources/services, such as Rhapsody or Spotify, and play that content back on the Sonos system. *See, e.g.*, Kolker Decl. Ex. 3 (Millington Dep. Tr.) at 152:3-8 ("Q: Were there any music services that you can think of where the Sonos S5 player would access content directly from the music services cloud? A: Yes. I think the … Rhapsody implementation was just a transaction between the S5 and Rhapsody's servers."). To facilitate this functionality, beginning in 2005, Sonos partnered with cloud-based music services so that those services could utilize a Sonos-developed application program interface (API), referred to as Sonos Music API, or SMAPI for short. *See* Kolker Decl. Ex. 4

1    (Kwasizur Dep. Tr.) at 19:5-9 ("Sonos has a number of agreements with different music service

2    providers whereby we … can have them be on our platform, so that's like Spotify, Apple Music,

3    … music providers, any of the streaming services you might think of.").  A SMAPI application is

4    a back-end server application that acts as a connection from the music service (e.g., Spotify) to

5    the Sonos system, enabling a user to use the Sonos controller and controller apps to browse the

6    available music content from the music service.  *See, e.g.*, *id.* at 37:14-17 ("the SMAPI

7    implementation" is "when you open the [Sonos] app and you play the music service from the

8    Sonos app"); 50:1-10 ("SMAPI is about playing through the Sonos app."); Kolker Decl. Ex. 3

9    (Millington Dep. Tr.) at 173:3-6 ("Sonos'[s] own products have passed the beer test since 2005

10   because the Sonos app is not the source of the music"); Kolker Decl. Ex. 5 (Corbin Dep. Tr.) at

11   40:19-23 ("in a SMAPI integration, there's an existing music service, … which has its way of

12   operating things. And then you can build a layer on top of that to interface with our APIs, so that

13   layer they build into their music service").

14          Another aspect of Sonos's technology—"direct control"—is the ability to transfer

15   playback responsibility for a cloud-based stream of media content (e.g., a Spotify playlist) from

16   playing on a smartphone to playing back on smart speakers.  Kolker Decl. Ex. 4 (Kwasizur Dep.

17   Tr.) at 35:25-36:22.

18          Sonos engineers first came up with this aspect of direct control in July 2011.  Sonos

19   engineers Tad Coburn and Joni Hoadley, along with others, were working on the "Play-to-Sonos"

20   (or "Direct Control") initiative within Sonos.  *See, e.g.*, Kolker Decl. Ex. 6 (Hoadley Dep. Tr.) at

21   173:7-174:12; Kolker Decl. Ex. 7 (Coburn Dep. Tr.) at 171:1-21.  As Ms. Hoadley testified,

22   "Play-to-Sonos was the ability to play music using a non-Sonos app on the Sonos system" or

23   "[a]llowing people to use non-Sonos applications to play music through the Sonos system."

24   Kolker Decl. Ex. 6 (Hoadley Dep. Tr.) at 111:17-18, 114:3-4; Kolker Decl. Ex. 8 (Hoadley

25   7/7/2011 email) at SONOS-SVG2- 00027228 ("Let's explore the options for creating code that

26   let's 3rd party apps control Sonos.");  *see also, e.g.*, Kolker Decl. Ex. 7 (Coburn Dep. Tr.) at

27   16:14-19.  More specifically, Ms. Hoadley explained that, "as mobile devices were becoming

28   more prevalent and music services were becoming more commonly used," Sonos recognized a

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

1    "couple of different problems at the time" that they were trying to solve—including "how do we

2    allow multiple people to collaborate and create a joint music listening experience" in the home

3    that could include people "who were there who didn't necessarily have the Sonos app on their

4    device" or "who weren't necessarily familiar with how Sonos worked" but may have been

5    familiar with a "music service[]" that was "becoming more commonly used."  The "Play-to-

6    Sonos" initiative was a solution to those problems.  Kolker Decl. Ex. 6 (Hoadley Dep. Tr.) at

7    95:5-96:1.  *See also generally* Ex. 1 to the Declaration of Douglas C. Schmidt in Support of

8    Motion ("Schmidt Decl.") (Schmidt Rebuttal Report), ¶¶ 136-152.

9          At the center of the Play-to-Sonos technology was a cloud-based remote playback queue.

10   In Sonos's system, each speaker could communicate with the servers of a given music streaming

11   service, like Rhapsody or Spotify, to access a playlist of songs.  *See, e.g.*, Kolker Decl. Ex. 3

12   (Millington Dep. Tr.) at 142:12-22, 151:23-152:8; Kolker Decl. Ex. 9 (Sonos Controller for iPad

13   User Guide 2010), at SONOS-SVG2-00059442 (explaining that "Sonos is compatible with

14   several music services").  Sonos engineers were developing software programming that would

15   give "3rd party apps the ability to sync their state into the cloud, using web services and

16   representation that is like a Sonos queue + what's playing now.  Then the Sonos system can grab

17   that state and load the queue from what's in the cloud."  Kolker Decl. Ex. 8 (Kuper 7/10/2011

18   email) at SONOS-SVG2-00027227.  In other words, they were considering how to integrate

19   cloud-based streaming services with Sonos's smart speaker systems.  Engineers working on the

20   program within Sonos had begun to "diagram how the play-to-Sonos would work using the IDs

21   thrown over into the cloud" and had thought through the mechanics of such a system, including a

22   "centralized web service" that includes queue information.  Kolker Decl. Ex. 8 (Kuper 7/15/2011

23   email) at SONOS-SVG2-00027224; *see also*, *e.g.*, Kolker Decl. Ex. 7 (Coburn Dep. Tr.) at

24   221:13-222:9, 223:25-224:7, 231:16-19 ("Well, it's fairly evident to me from the term 'queue

25   state' that it's referring to a queue ….").

26         On December 30, 2011, Sonos filed a patent application describing this aspect of direct

27   control technology.  The '033 patent at issue here is a continuation of the 2011 patent application.

28   So the specification of the '033 patent is *substantively identical* to, and has no additional material

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

1    (beyond the first paragraph of the '033 patent reciting its chain of priority), relative to Sonos's

2    2011 application.[1]

3         In that specification, Sonos disclosed a wireless multiroom playback system.  In that

4    system, multiple smart speakers are connected to a network, like the Internet, and can play music

5    from the Internet.  Control devices, like smart phones, tell the speakers what music to play, how

6    loud to play, when to move to the next song, and the like.

7         The '033 patent claims at issue in this case cover a feature of direct control called a

8    "remote playback queue."  A remote playback queue facilitates transferring music playing on a

9    computer or smartphone to playing on a speaker *without* interrupting the music.  For example, the

10   specification describes an embodiment in which a user listens to music from an online media

11   service on the user's MacBook Pro, such as "turntable.fm or other virtual room that a user can

12   enter to choose from a plurality of online disc jockeys (DJs) deciding what to play next …."

13   Ex. 1 ('033 patent) at 12:65-13:3.[2]  The user then decides to play that music on the user's home

14   smart speakers by selecting "[a] button or other indicator … added to the turntable.fm Web

15   application" that "switch[es] the content being played to the playback system for output (e.g., to

16   the Sonos™ system rather than … the Mac Book™)."  *Id.* at 13:3-13:11.  The specification

17   describes several other examples of remote playback queues.  *See, e.g.*, *id.* at 15:18-29, 16:21-67,

18   17:8-11; Schmidt Decl. Ex. 1 (Schmidt Rebuttal Report), ¶¶ 938-61.

19        Thus, by 2011 Sonos already had developed and released smart speakers, partnered with

20   third party music services, invented direct control, and filed a patent application that both

21   describes the technology and supports the claims at issue in this case.

22

23

24

25   _____

26   [1] Specifically, the '033 patent is a continuation of US Patent No. 10,567,831, which is a
     continuation of U.S. Patent No. 9,883,234, which is a continuation of U.S. Patent No. 9,654,821.
27   There are no continuations-in-part between the December 30, 2011 application and the '033
     patent and, thus, no "new matter" added to the specification after that 2011 application.
28   [2] For convenience, citation is made to the specification of the '033 patent but the identical
     quotations appear in the 2011 application leading to the '033 patent.

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

**B.      Sonos And Google Begin Collaborating On Ways To Allow Google Music Services To Play On Sonos's Smart Speakers**

In 2013, Google offered a music streaming service called Google Play Music. Both parties wanted to make Google's streaming service available on Sonos speakers, so they began exploring the feasibility of collaborating to make this happen. That collaboration led the parties to the 2013 Content Integration Agreement. Kolker Decl. Ex. 2. The CIA covered one aspect of the parties' collaboration: Google's use of the Sonos Music Application Program Interface ("API" or "SMAPI"). Sonos eventually entered into a series of SMAPI agreements "with different music service providers" including "Spotify [and] Apple Music" to enable those "streaming services" to "be on [Sonos's] platform." Kolker Decl. Ex. 4 (Kwasizur Dep. Tr.) at 18:23-19:19.

As the CIA explains, Google "operates an Internet-based music service providing content to consumers," while Sonos makes and sells "products comprising a wireless home music system" that allow consumers to access "Internet-based music content and other media services … such as" Google's Internet-based music service. Kolker Decl. Ex. 2, CIA Recitals. The CIA expressly explains that Google will use an API developed by Sonos to develop an application that allows Sonos consumers to access Google's Internet-based music service on Sonos's system and products (i.e., its players and controllers). *Id.* The result of those development efforts—i.e. the ability of consumers to access Google's music service on Sonos's speakers and controllers—was defined as the "Integrated Service Offering" and it referred to the SMAPI application Google would develop. *Id.*; *see also, e.g., id.* § 2.1 ("[Google] will make available the Music Service for consumer use on or through the Sonos MMS[3] in the form of the Integrated Service Offering …"), § 3.3 ("By execution of this Agreement and subsequent delivery of the Integrated Service Offering to Sonos, [Google] hereby notifies … Sonos that the Integrated Service Offering is ready for final compatibility testing and approval for commercial launch.").

---

[3] The CIA defines the "Sonos MMS" as follows: "Sonos manufactures, markets and sells products comprising a wireless home music system (the 'Sonos MMS') that facilitate consumer access to Internet-based music content and other media services that consumers can access, via online sources, such as the Music Service." Kolker Decl. Ex. 2, CIA Recitals.

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

To faciliate the development of the Integrated Service Offering, the CIA gives Google "a limited, royalty-free, non-transferable, non sub-licensable, non-exclusive, license under Sonos's intellectual property rights to use and make copies of the Licensed Software for the purpose of allowing the Integrated Service Offering to communicate with the Sonos API so that the Music Service may be offered via the Sonos MMS." *Id.*, § 3.1.  The CIA holds back rights to Sonos's intellectual property:

> 3.5     Ownership of Sonos Intellectual Property Rights. The Sonos MMS and any and all intellectual property rights arising from or related thereto are and shall remain the sole and exclusive property of Sonos. Service Provider will not claim for itself or for any third party any right, title, interest or licenses to the Sonos MMS.

*Id.*, § 3.5.

The CIA also addresses who would own the intellectual property arising from the parties' collaboration.  Specifically, the CIA provides that Google would own the programming it created for the SMAPI application, which integrated Google's music streaming service to Sonos's controller applications and allowed Google's music streaming service to be accessed by Sonos players and controllers (§ 3.4).  Thus, the CIA gives Google rights to the "Provider Developments," which "consist of any and all development work done by or on behalf of Service Provider *in creating* the Integrated Service Offering, and any code or other materials owned or controlled by Service Provider and included by Service Provider in the Integrated Service Offering, excluding the Licensed Software, under the terms of the Development Agreement."  *Id.*, § 3.4 (emphasis added).

Over the course of this collaboration, Sonos worked with Google to integrate the Google Play Music service into the Sonos ecosystem, and as a result, Google Play Music launched on the Sonos platform in 2014.  *See* Kolker Decl. Ex. 10 (Wired Article).

**C.     The 2018 Service Integration Agreement Supersedes The 2013 Content Integration Agreement**

Sonos and Google continued to work together to offer Google's streaming music services on Sonos's devices.  As smartphone and smart speaker technology became more sophisticated, Sonos felt it needed a new agreement to govern its partnership with Google.  *See, e.g.*, Kolker

1    Decl. Ex. 4 (Kwasizur Dep. Tr.) 28:25-29-4 ("[L]ater on when we added some new functionality,

2    I created a new agreement to cover, sort of, an expanded sort of offering."); *id.* at 162:21-163:11

3    ("[T]his combined agreement … combined SMAPI and direct control.  So for some partners, if

4    they just had a SMAPI agreement, we would do an addendum or an amendment that would add

5    direct control so that they'd have the full package.  And so for Google, … [w]e just decided to put

6    it into one newer agreement.").  In December 2018, the parties entered into a new agreement, the

7    Service Integration Agreement (SIA).  The SIA provides that it "constitutes the entire agreement

8    between the Parties regarding its subject matter, and supersedes all prior communications,

9    negotiations, understandings, agreements or representations, either written or oral, by or among

10   the Parties regarding its subject matter."  Ex. 1 to the Declaration of Alaina Kwasizur ("Kwasizur

11   Decl.") in Support of Motion, § 12.8.

12        The SIA makes clear that it governs aspects of the parties' use of direct control

13   technology.  For example, the SIA defines "Direct Control Experience" to mean "the experience

14   whereby an End User may control the Sonos System from within the Service Provider App [e.g.,

15   the Google Home App]." Kwasizur Decl. Ex. 1 (SIA), SIA Recitals; *see also id.* ("Whereas,

16   through the use of application program interface[s] developed by Sonos, the Parties wish to allow

17   End Users to play the Content Service over the Sonos System … by playing to the Sonos System

18   from within the Content Service Application").  Where the CIA defined Provider Developments

19   to only include work arising from the Integrated Service Offering, i.e. creating the Service

20   Provider App using the Sonos API, *see supra* 7, the SIA defines Provider Developments to

21   include "any and all development work done *solely* by [*Google*] in creating the Service Provider

22   App *or Direct Control Experience, excluding any Sonos Materials*."  *Id.* (emphasis added).  Thus,

23   the SIA expressly refers to direct control and expressly supersedes the CIA.

24        The SIA also provides that it "will be governed by and construed in accordance with the

25   laws of the State of California as applied to residents of California without regard to its Conflict

26   of Laws principles."  *Id.*, § 12.2.

27

28

1     **III.     <u>LEGAL STANDARD</u>**

2          Summary judgment is proper where the pleadings, discovery, and affidavits show that there

3     is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a

4     matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over material facts will preclude summary

5     judgment—"[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v.*

6     *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment "has the

7     initial burden of production to demonstrate the absence of any genuine issue of material fact."  *Nat'l*

8     *Union Fire Ins. Co. of Pittsburgh, PA v. Landmark Am. Ins. Co.*, No. C 05-02803 WHA, 2006 WL

9     1390591, at *3 (N.D. Cal. May 22, 2006) (citing *Playboy Enters., Inc. v. Netscape Commc'ns*

10    *Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004)).  But "[o]nce the moving party meets its initial

11    burden, the nonmoving party must 'designate specific facts showing there is a genuine issue for

12    trial.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

13         And "[u]nder California law, the goal of contract interpretation is 'to give effect to the

14    mutual intent of the parties.'"  *Openwave Sys. Inc. v. Myriad France S.A.S.*, No. C 10-02805 WHA,

15    2011 WL 2580991, at *3 (N.D. Cal. June 29, 2011) (quoting *In re Imperial Credit Indus., Inc.*, 527

16    F.3d 959, 966 (9th Cir. 2008)).  "This standard … is an objective one and does not depend on the

17    parties' subjective intents."  *Id.* (citing *Cedars–Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964,

18    980, 41 Cal. Rptr. 3d 48 (2006)).  Objective intent is evidenced by the words of the contract.  *Id.*

19    Accordingly, "[t]he mutual intent of the parties is typically determined 'from the written terms [of

20    the contract] alone,' so long as the 'contract language is clear and explicit and does not lead to

21    absurd results.'"  *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 901 (N.D. Cal. 2020)

22    (quoting *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809 (2007)).  Where a contract is

23    fully integrated, "extrinsic evidence may be introduced to explain an ambiguous contract term …

24    only if offered to prove an interpretation to which the language is reasonably susceptible."

25    *Openwave Sys.*, 2011 WL 2580991, at *4 (citing *United States Cellular Inv. Co. of L.A. v. GTE*

26    *Mobilnet, Inc.*, 281 F.3d 929, 938 (9th Cir. 2002)).

27

28

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

**IV.    ARGUMENT**

Google's two claims based on Sonos's alleged violation of the 2013 CIA—breach of contract and conversion—suffer the same fatal flaw. Both require that Google prove that the CIA gives Google rights to Sonos's direct control technology, specifically the "remote playback queue" claimed in the '033 patent and disclosed in the 2011 application. But nothing in the CIA gives Google rights to pre-2013 Sonos inventions. In 2011, Sonos filed the application that led to the '033 patent. That was ***before*** the parties entered into the 2013 CIA. Because the CIA did not give Google any rights to pre-existing Sonos technology, it can't be the basis for Google owning the '033 patent or any of the other patents resulting from that 2011 application. The parties then signed a subsequent agreement—the SIA—in 2018, which expressly superseded the CIA. It was only after that SIA took effect that Sonos amended the claims of the '033 patent's application to recite the disputed term "remote playback queue." Google has not claimed that the 2018 SIA gave Google any rights to Sonos's direct control technology or to remote playback queues. Moreover, the CIA itself does not purport to govern the parties' collaboration on direct control technology or assign Google any related rights. Because the unambiguous language of both agreements makes clear that Sonos retains ownership of its existing technology, including the remote playback queue aspect of direct control, the Court should grant summary judgment in favor of Sonos and against Google on Google's claims of breach of contract and conversion.

**A.    The 2013 Content Integration Agreement Does Not Give Google Rights To Sonos's 2011 Invention**

The 2013 CIA makes clear that it does not give Google the right to any of Sonos's preexisting intellectual property. Google does not appear to dispute this point, but we begin by explaining why the contract is unambiguous on this point. The CIA provides that "[t]he Sonos MMS and any and *all intellectual property rights arising from or related thereto are* and *shall remain* the sole and exclusive property of Sonos." Kolker Decl. Ex. 2 (CIA), § 3.5 (emphasis added). Even modifications that Sonos made to Sonos's software at Google's suggestion "shall be owned by Sonos" unless the parties agree otherwise in a separate written agreement. *Id.*, § 3.1. And the CIA confirms that "[Google] will not claim for itself or any third party any right, title,

1    interest or licenses to the Sonos [system]."  *Id.*, § 3.5.

2        Just as the 2013 CIA does not give Google any of Sonos's preexisting intellectual

3    property, it also does not give Sonos any of Google's preexisting intellectual property in Google

4    Play Music.  *See id.*, § 3.4 ("Sonos will not claim for itself or for any third party any right, title,

5    interest or licenses *to the Music Service* or Provider Developments, except for the limited license

6    granted herein." (emphasis added)).  Similarly, the 2013 CIA confirms that Google gets the

7    intellectual property arising from any new inventions of its own stemming from its work in

8    developing the application that allows consumers to access Google's Internet-based music service

9    on Sonos's players and controllers.  *Id.*, CIA Recitals; *see also, e.g., id.*, § 2.1 ("[Google] will

10   make available the Music Service for consumer use on or through the Sonos [system] in the form

11   of the Integrated Service Offering …").

12       In sum, the 2013 CIA does not purport to assign *any* of Sonos's preexisting intellectual

13   property to Google, and instead confirms that each party retains the relevant intellectual property

14   that it had coming into the agreement.  So there is no question that the 2013 CIA does not give

15   Google ownership over an invention Sonos disclosed to the Patent Office in 2011.

16       Instead of disputing this plain reading of the contract, Google claims that the 2011 patent

17   application (the parent application to what became the '033 patent) does not disclose a "remote

18   playback queue."  But Google's theory lacks any record evidence demonstrating a genuine

19   dispute of material fact.

20       The '033 patent is entitled to a presumption of validity.  That includes a presumption that

21   the patent's claims are supported by the specification.  *See* 35 U.S.C. § 282 ("A patent shall be

22   presumed valid."); § 112 (requiring that the claims of a patent must be supported by its

23   specification).  Here, the specification has not changed in any material respect since 2011.  As

24   shown in Ex. 11, which is a redline between the 2011 specification and the specification of the

25   '033 patent, the only changes are (1) updates to the mandatory disclosure of the chain of priority

26

27

28

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

1    applications[4] and (2) resulting changes to the paragraph numbering between the two applications.

2    So the Court must presume that the "remote playback queue" limitation was supported by the

3    2011 specification.

4         It is Google's burden to prove that Sonos's patent lacks adequate written description, by

5    clear and convincing evidence. *See, e.g.*, *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243

6    (2011); *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1929 (2015).  At the *pleadings* stage,

7    the Court concluded that Google could amend its complaint to add these theories, notwithstanding

8    the specification's 2011 date, reasoning that duly issued patents may be subject to written

9    description challenges.  *See* Dkt. 111 at 6.  But with discovery closed, Google has identified no

10   substantive factual or legal support for such a theory.

11        As a threshold matter, even though the burden is Google's, Sonos has already demonstrated

12   that the 2011 application leading to the '033 patent contains ample written description support for

13   the remote playback queue aspect of direct control technology.  *See supra* 4-5; Schmidt Decl. Ex.

14   1 (Schmidt Rebuttal Report), ¶¶ 938-61.  The specification contains multiple examples of a remote

15   playback queue, and even in cases where "the embodiments of the specification *do not* contain

16   examples explicitly covering the full scope of the claim language," a "claim will not be invalidated

17   on section 112 grounds" on that basis alone.  *Genentech, Inc. v. Trs. of Univ. of Pa*, 871 F. Supp.

18   2d 963, 980 (N.D. Cal. 2012) (quoting *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336,

19   1345 (Fed. Cir. 2005)) (emphasis added); *see also, e.g.*, *Conceptus, Inc. v. Hologic, Inc.*, No. 3:09-

20   cv-002280-WHA, Dkt. 475 ¶ 39 (N.D. Cal. Oct. 14, 2011) (final jury charge) (same).

21        This is an even simpler case, where there can be no reasonable dispute that the embodiments

22   *do* contain examples explicitly discussing the claimed remote playback queue.  *Cf.* Dkt. 308 at 93

23   (MSJ oral argument transcript) ("Sometimes it's clear cut, and the specification actually does read

24   right on it, and it's an easy project, and the PTO grants the new claim.")   As the Court has

25   recognized, "the specification does not have to use the term verbatim to provide sufficient

26

27   _____

28   [4] *See* 35 U.S.C. § 120 (specification must "contain[] or [be] amended to contain a specific reference to the earlier filed application").

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

1    disclosure."  Dkt. 309 at 16 (citing *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352

2    (Fed. Cir. 2010) (en banc); *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370

3    (Fed. Cir. 2022)).  All the "disclosure need" do is "clearly allow persons of ordinary skill in the art

4    to recognize that the inventor invented what is claimed."  *Novartis Pharms.*, 21 F.4th at 1370

5    (quoting *Ariad Pharms.*, 598 F.3d at 1351).

6         In an attempt to carry its burden of establishing lack of written description support, Google

7    has advanced three arguments.  But each of those arguments fails to demonstrate any genuine

8    dispute of material fact and fails as a matter of law.

9         *First*, Google contends that the '033 patent limits a "remote playback queue" to a playback

10   queue in a *third-party application*.  *See* Kolker Decl. Ex. 12 (Bhattacharjee Op. Report), ¶ 691.

11   Google has already (1) tried to make that same argument in claim construction, (2) abandoned this

12   position, and then (3) unsuccessfully attempted to resuscitate it.  *See, e.g.*, Dkt. 432 at 1-2 ("While

13   this case was in the Western District of Texas, Google sought to construe the term 'remote playback

14   queue' as a 'remote playback queue provided by a third party application.'  When this case was

15   transferred here, however, Google dropped the term from its disclosures and abandoned its claim

16   construction position.").  Google should not be permitted to advance this argument yet again.

17        Nor does Google's argument create any genuine dispute as to any material fact.  As Dr.

18   Schmidt explains, the '033 patent does include some *examples* in which a third-party application is

19   used, but the '033 patent also provides examples of a "remote playback queue" that are not limited

20   to a "third-party" application.  Schmidt Decl. Ex. 1 (Schmidt Rebuttal Report), ¶¶ 947-54.  And

21   again, because the specification is the same as the earlier application, each of these examples was

22   disclosed in *2011*.  For example, the '033 patent discloses embodiments of a "playback queue" that

23   is not local to either a "playback device" or a computing device running a media-playing

24   application; the specification refers to this as a "shared queue"—"[i]n certain embodiments, a

25   shared queue is provided between the local playback system and the third party application to keep

26   the local system and application synchronized."  Kolker Decl. Ex. 1 ('033 patent) at 16:64-67.  In

27   other words, the '033 patent says that a "shared queue" is provided between a local playback system

28   (containing one or more playback devices) and a third-party application; it does not say that the

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

"shared queue" is provided by the third-party application. Similarly, the '033 patent discloses embodiments of a "playback queue" that (i) is not local to a "playback device" located at a user's house and (ii) a user can setup and/or configure via a media-playing application agnostic to the application's "party." *Id.* at 17:8-12 ("Certain embodiments facilitate control of a local playback [device] from outside of a household or other location at which the local playback [device] is configured. For example, a user can queue up music while away from his or her house. The application can facilitate setup and/or configuration."). The '033 patent then provides an example of such an embodiment where the media-playing application takes the form of a third-party application. *Id.* at 17:12-14 ("For example, a third party application may ask the user ….").

**Second**, Google contends that "the specification does not provide written description support for the 'remote playback queue' limitation" based on the Australian prosecution history of a different Sonos patent. Kolker Decl. Ex. 12 (Bhattacharjee Op. Report), ¶ 694. The Court has already rejected this theory, denying Google leave to reopen claim construction on this basis, and Google has not moved for reconsideration. *See* Dkt. 432 at 2-4. The Court need not consider this theory yet again.

**Third**, Google argues that "Sonos was not in possession of a 'remote playback queue' to the extent the term encompasses a cloud queue" based on the status of Sonos's *commercial* implementations of the technology in 2011. *See* Kolker Decl. Ex. 12 (Bhattacharjee Op. Report), ¶¶ 697-702. But this is irrelevant as a matter of law, to both written description and to Google's contract claims. As this Court has noted, the written description test "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. C 09-00355 WHA, 2011 WL 5974668, at *9 (N.D. Cal. Nov. 29, 2011) (quoting *Ariad Pharms.*, 598 F.3d at 1351). It does not involve a comparison of the claim language to commercial embodiments. Besides, whether Sonos had a commercial embodiment has no bearing on Sonos's rights under the 2013 CIA, because Sonos retained the rights to all of its preexisting intellectual property, and not just preexisting inventions that Sonos had commercialized. *See, e.g.*, Kolker Decl. Ex. 2 (CIA) § 3.5 ("The Sonos [system] and any and *all intellectual property rights arising from or related thereto* are and shall remain the

1    sole and exclusive property of Sonos." (emphasis added)).

2         As such, Google has not "designate[d] specific facts showing there is a genuine issue for

3    trial" with respect to its written description challenge. *Celotex*, 477 U.S. at 323-24. And it has no

4    other legal basis for claiming that Sonos had not invented the claimed technology by 2011—as

5    confirmed by the USPTO's issuance of the '033 patent, supported on the 2011 specification. For

6    these reasons, and because Google cannot reasonably contest that the 2013 CIA does not assign

7    Sonos's preexisting intellectual property to Google, the Court should grant summary judgment

8    against Google on Google's claims of breach of contract and conversion.

9         **B.    Direct Control Technology Is Governed By The 2018 SIA—Which**

10            **Superseded All Prior Related Agreements**

11        There is a second independent reason the Court should grant summary judgment against

12    Google. In 2018, the parties entered into a new agreement (the 2018 SIA) that governed the parties'

13    collaboration on integration of Google's music service into the Sonos system—including, but not

14    limited to, direct control. The 2018 SIA unambiguously superseded the CIA through an express

15    statement that the SIA replaced all earlier related agreements between the parties. In this case,

16    Google claims that Sonos's wrongful conduct took place in *2019*, after the 2018 SIA came into

17    effect. Thus, the relevant contract for alleging a breach would be the SIA. But Google has never

18    claimed that Sonos breached the operative agreement governing the parties' direct control

19    collaboration in 2019—the 2018 SIA—and instead bases its breach of contract and conversion

20    claims on a no-longer-operative agreement (the 2013 CIA). For this reason too, Google's claims

21    fail as a matter of law, and the Court should grant summary judgment.

22        Novation "is the substitution of a new obligation for an existing one." *Miran v. Convergent*

23    *Outsourcing Inc.*, No. 16-CV-0692-AJB-(JMA), 2016 WL 7210382, at *3 (S.D. Cal. Dec. 13,

24    2016) (quoting *Wells Fargo v. Bank of Am.*, 32 Cal. App. 4th 424, 431 (1995)). And "[u]nder

25    California law, the party attempting to prove novation must satisfy 'four essential requisites: (1) a

26    previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the

27    extinguishment of the old contract; and (4) validity of the new one.'" *Id.* (quoting *Young v. Benton*,

28    21 Cal. App. 382, 384 (1913)). Here, Google itself contends that the 2013 CIA was a "previous

SONOS'S MSJ REGARDING GOOGLE'S
CONTRACT-RELATED CLAIMS
3:20-cv-06754-WHA

1  valid obligation" covering direct control, and neither party disputes that both subsequently

2  "agree[d] … to the new contract." *Id.* Nor has Google argued that the "new" contract is not a

3  "valid[] … one." *Id.* Thus, the only question is whether the 2018 SIA extinguished the old contract

4  or not. The text of the 2018 SIA makes unambiguously clear that it does.

5  The SIA provides that it "constitutes the entire agreement between the Parties regarding its

6  subject matter, and *supersedes* all prior communications, negotiations, understandings, *agreements*

7  or representations, either *written* or oral, *by or among the Parties* regarding its *subject matter*."

8  Kwaszur Decl. Ex. 1 (SIA), § 12.8 (emphases added). The entire basis for Google's arguments

9  related to the 2013 CIA is Google's position that the 2013 CIA's subject matter includes the parties'

10  collaboration on direct control technology. If Google is right about the scope of the 2013 CIA, and

11  it really does cover direct control technology, then there can be no reasonable dispute that the 2013

12  CIA and the 2018 SIA both concern the same subject matter with respect to the parties'

13  collaboration on direct control technology. *See, e.g., id.,* SIA Recitals (defining Provider

14  Developments to more broadly include "any and all development work done solely by [Google] in

15  creating the Service Provider App *or Direct Control Experience,* excluding any Sonos Materials"),

16  *id.* (defining "Direct Control Experience" to mean "the experience whereby an End User may

17  control the Sonos System from within the Service Provider App").

18  The 2018 SIA provides that it supersedes prior written agreements made by or between

19  Sonos and Google regarding its subject matter. On Google's own theory of what the 2013 CIA

20  encompasses, the 2018 SIA clearly reflects an intent to replace the prior contract with the new one.

21  *See* Cal. Civ. Code § 1532 ("Novation is made by contract, and is subject to all the rules concerning

22  contracts in general."). So, at the time that Sonos in 2019 filed the claims in the patent application

23  that led to the '033 patent, Sonos's conduct was governed by the SIA and not the CIA. Google's

24  claims for breach of contract or conversion under the CIA thus fail as a matter of law. And Google

25  does not argue that Sonos breached the 2018 SIA, *see supra* 15, so there is no basis for any breach

26  of contract or conversion claim whatsoever.

27  **C.     Direct Control Technology Is Outside The Scope Of The 2013 CIA**

28  The Court should also grant summary judgment because the 2013 CIA is unambiguous that

1    Google only retains intellectual property rights to Google Play Music and development of the

2    Integrated Service Offering.  Specifically, § 3.4 of the CIA gives Google:

3          3.4.    Ownership of Service Provider Intellectual Property Rights.
      The Music Service, the Provider Developments (as defined below),
4          and any and all intellectual property rights arising from or related
      thereto are and shall remain the sole and exclusive property of
5          Service Provider. Sonos will not claim for itself or for any third party
      any right, title, interest or licenses to the Music Service or Provider
6          Developments, except for the limited license granted herein. The
      Provider Developments consist of any and all development work
7          done by or on behalf of Service Provider in creating the Integrated
      Service Offering, and any code or other materials owned or
8          controlled by Service Provider and included by Service Provider in
      the Integrated Service Offering, excluding the Licensed Software,
9          under the terms of the Development Agreement.

10   *See* Kolker Decl. Ex. 2 (CIA), § 3.4

11          Although "Music Service" is not defined in the agreement, no one disputes that it refers to

12   Google Play Music, and no one disputes that Google retains ownership of the IP related to Google

13   Play Music.  Besides the Music Service, under § 3.4, the only intellectual property that Google has

14   ownership over would be "Provider Developments … done by or on behalf of Service Provider in

15   creating the Integrated Service Offering."  The "Integrated Service Offering" is defined as "an

16   application that allows consumers of the Sonos MMS to directly access, control and play content

17   provided by the Music Service on or through the Sonos MMS."  CIA Recitals.  That "application"

18   will be developed "[t]hrough the use of an application program interface developed by Sonos (the

19   'Sonos API')," provided to Google under a separate agreement.  *Id.*  Thus, Google was going to

20   develop programming that would enable the Sonos controller application to "access, control and

21   play content provided by the Music Service on or through the Sonos MMS."  That is the *exact*

22   *opposite* of direct control; direct control is the integration of Sonos control functionality into a

23   content provider application (e.g., the Spotify app).  Google nonetheless contends that "Provider

24   Developments" should be read to encompass *all* of Google's and Sonos's collaboration work, and

25   not *just* "development work done … in creating the Integrated Service Offering."  *See* Dkt. 125

26   (Second Am. Complaint), ¶¶ 23-30 (alleging that parties' "collaborat[ion] … on cloud queue for

27   Google Play Music between 2013 and 2015" was done "[p]ursuant to the parties' agreements").

28          But this argument lacks any support in the text of the contract.  Section 3.4 of the CIA

- 17 -

expressly limits Google's Intellectual Property Rights to the Integrated Service Offering, which the CIA then defines as the integration of Google's music service into Sonos's app for controlling its speakers. That's why the CIA is a *Content* Integration Agreement, with Google Play Music's content being integrated into the "Sonos MMS" through use of a Sonos-provided API. Unsurprisingly then, throughout the CIA, the agreement makes clear that its purpose and scope is limited to Google's production of an application that allows Sonos users to access Google Play Music. Kolker Decl. Ex. 2 (CIA), § 3.4. For example, in discussing the countries in which the "Service Offering" will be available, the CIA notes that "[Google] will make available the Music Service for consumer use on or through the Sonos MMS in the form of the Integrated Service Offering …"). *Id.*, § 2.1. Similarly, the CIA provides "[b]y execution of this Agreement and subsequent delivery of the Integrated Service Offering to Sonos, [Google] hereby notifies … Sonos that the Integrated Service Offering is ready for final compatibility testing and approval for commercial launch." *Id.*, § 3.3.

The rights granted to Google under the CIA are thus limited to the "Integrated Service Offering" and related "Provider Developments," which both limit themselves expressly to Google's production of an application, using the Sonos API, that allows Sonos users to access Google Play Music through a Sonos controller, and that integrates a path to access Google's content into the Sonos system. Because there is no ambiguous term, and no absurd result from reading the contract to apply solely to the integration of Google content on Sonos speakers, the Court should not and need not examine any parol evidence in order to determine the mutual intent of the parties. *See, e.g.*, *Thomas*, 506 F. Supp. 3d at 901 ("The mutual intent of the parties is typically determined 'from the written terms [of the contract] alone,' so long as the 'contract language is clear and explicit and does not lead to absurd results.'").

But even if the Court were to believe some ambiguity existed and examine evidence outside the 2013 CIA, the result would not change. First, the 2018 SIA is powerful extrinsic evidence that the 2013 CIA did not encompass direct control technology. Where the 2013 CIA says nothing about the parties collaborating on direct control technology, the 2018 SIA puts that technology front and center. *See, e.g.*, Kwasizur Decl. Ex. 1 (SIA), SIA Recitals (defining "Direct Control

Experience" to mean "the experience whereby an End User may control the Sonos System from within the Service Provider App").  Where the CIA defined Provider Developments to only include work arising from the Integrated Service Offering, *see supra* 7, the SIA defines Provider Developments to include "any and all development work done solely by [Google] in creating the Service Provider App *or Direct Control Experience*, excluding any Sonos Materials."  *Id.* (emphasis added).

Second, Google elicited deposition testimony from Sonos personnel that the 2013 CIA was merely one of many such agreements in the 2013-2016 time frame "with different music service providers" including "Spotify, Apple Music," and "Google Play Music," that enables those "streaming services" to "be on our platform."  Kolker Decl. Ex. 4 (Kwasizur Dep. Tr.) at 18:23-19:19.  Similarly, Google elicited deposition testimony that "Sonos's Content Integration Agreement" was a "form agreement" that was referred to within Sonos as "our SMAPI [Sonos Music API] agreement."  *Id.* 27:14-28:2.  And the original form "Content Integration Agreement"/"SMAPI agreement" was limited to "SMAPI" but was later "expanded" in other agreements to "add[] direct control functionality and the rights around direct control for the partner."  *Id.* 33:16-35:24.  Direct control is a specific "functionality" and refers to way in which a user can open "the native app," such as a "Spotify app" and "click on… a little picture of a speaker," which "will show your Sonos speakers, and then you can" control the Sonos speakers while "bypassing the Sonos app."  *Id.* 35:25-36:22.  Sonos and Google *did* collaborate on direct control technology and *did* have an agreement that "covered that collaboration" specifically, but that agreement was the 2018 SIA—which Google has not alleged gave it ownership of the '033 patent. *Id.* 36:23-37:9.

Accordingly, whether the Court looks only at the four corners of the 2013 CIA or examines evidence produced in discovery in this case, there is no genuine dispute that the agreement does not encompass Sonos's direct control technology or assign any related rights to Google.  Because both Google's breach of contract claim and conversion claim require that the 2013 CIA covers this technology and grants related rights to Google, the Court should grant summary judgment against Google on both of these claims.

V.      **CONCLUSION**

For the foregoing reasons, Sonos requests that the Court grant Sonos's motion for summary judgment against Google with respect to Google's claims for breach of contract and conversion.

Dated: February 6, 2023

By: */s/ Clement S. Roberts*

CLEMENT SETH ROBERTS
BAS DE BLANK
ALYSSA CARIDIS
EVAN D. BREWER

ORRICK, HERRINGTON & SUTCLIFFE LLP

SEAN M. SULLIVAN
COLE B. RICHTER

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Sonos, Inc.*