# EXHIBIT 4

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
3
4
5    GOOGLE LLC,
6              Plaintiff,
7         vs.                      No. 3:20-cv-06754-WHA
8    SONOS, INC.,
9              Defendant.
     _____/
10
11
12     -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --
13
14   VIDEO-RECORDED DEPOSITION OF ALAINA KWASIZUR, ESQ.,
15        INDIVIDUALLY AND AS A FEDERAL RULE 30(B)(6)
16                 WITNESS FOR SONOS, INC.
17                  Remote Zoom Proceedings
18                   San Diego, California
19              Wednesday, November 30, 2022
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 176                          Job No. 5592691
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Page 18**

1  about seven others, probably seven to nine.  It probably
2  ranged a little bit.
3     Q.  Who did you report to at those times, 2013 to
4  2016?
5     A.  I reported originally to Mark Triplett, and then          09:30:42
6  at some point, I don't remember exactly when, I reported
7  in to Craig Shelburne.
8     Q.  What was Mr. Triplett's title at that point?
9        MR. RICHTER:  Object to form.
10     Q.  BY MR. JUDAH:  When you reported to him.               09:31:01
11        THE WITNESS:  What was that, Cole?  Sorry.
12        MR. RICHTER:  I just objected to the form.  You
13  can answer.
14        THE WITNESS:  I'm not positive, but I believe it
15  was vice president of intellectual property.              09:31:10
16     Q.  BY MR. JUDAH:  And how about Mr. Shelburne at
17  that time when you reported to him?
18     A.  He was our general counsel.
19     Q.  Is Mr. Shelburne still with Sonos?
20     A.  No.                                   09:31:27
21     Q.  Roughly when did he leave?
22     A.  2018.
23     Q.  All right.  It says -- okay.  It says here as
24  well that you -- your roles in that senior counsel role
25  2013 to 2016 included negotiating and drafting content     09:31:48

**Page 19**

1  distribution agreements.
2        Do you see that?
3     A.  Correct.
4     Q.  Can you explain what that refers to?
5     A.  So Sonos has a number of agreements with           09:31:56
6  different music service providers whereby we, you know,
7  can have them be on our platform, so that's like Spotify,
8  Apple Music, you know, music providers, any of the
9  streaming services you might think of.
10     Q.  Google Play Music, was the agreement with Google   09:32:16
11  Play Music one of those content distribution agreements?
12     A.  Yep --
13        MR. RICHTER:  Object to form.
14        THE WITNESS:  Oh, sorry.  Yes.
15     Q.  BY MR. JUDAH:  Roughly how many of those content   09:32:28
16  distribution agreements did you negotiate and draft in
17  the 2013 to 2016 time frame?
18     A.  I don't know.  Maybe 5 to 10.  I mean, yeah.
19  Probably 5 to 10, somewhere in there.
20     Q.  And then it also says that you, I guess,            09:32:51
21  negotiated and drafted codec technology licenses.
22        Do you see that?
23     A.  Uh-huh, yep.
24     Q.  Can you explain what that refers to?
25     A.  So in order for streaming music to work, there's    09:33:04

**Page 20**

1  various audio codec that you need, like MP3 or AAC, so we
2  have agreements with those folks.  Dolby is sort of a
3  codec as well.  It's a more commonly known one.  So
4  things like that.
5     Q.  And then it also refers to "manufacturing,           09:33:22
6  design and distribution agreements."
7     A.  Uh-huh.
8     Q.  What are the distribution agreements that are
9  referred to there?
10     A.  We have various distribution agreements as part    09:33:31
11  of -- I mean, we build a product, right, and so then once
12  you manufacture it, then you need a way to distribute it,
13  so, you know, various deals with retailers or other
14  channel partners.
15     Q.  All right.  And then it looks like -- I see         09:33:50
16  something from -- that's from -- senior counsel is 2013
17  to 2016, and then the next title I see -- oh, no.  Okay.
18  So right.  So you then became general counsel AMPAC and
19  assistant secretary 2016?
20     A.  Correct.                                 09:34:11
21     Q.  And then the way LinkedIn does it, for some
22  reason, the chief diversity and inclusion officer's in
23  between those roles, even though that started in 2019.
24  Got it.  So --
25     A.  It was both -- I had -- so while I was chief       09:34:24

**Page 21**

1  diversity and inclusion officer, I still maintained my
2  legal, so I had two jobs.  That's sort of, I think, why
3  it does it that way.
4     Q.  Yeah.  No.  Understood.  It just would -- it'd
5  make more sense to me if the job that you immediately     09:34:36
6  took was immediately after, as opposed -- but in any
7  event, if I read it, which I have now, it is clear
8  enough.
9        So let me ask you:  When you were promoted to --
10  well, let me ask:  AMPAC stands for what?                09:34:49
11     A.  Americas and Pacific.  It's basically everywhere
12  but Europe was my realm.
13     Q.  And is there -- is there a general counsel for
14  Europe?
15     A.  There is.                                 09:35:01
16     Q.  Who's that?
17     A.  Volker Weisshaar.  I always say his last name
18  wrong, which I understand, because people get my last
19  name wrong, too, so --
20     Q.  Yeah, I get it a lot, too.  Maybe not as often      09:35:13
21  as you and the Europe GC, but...
22        Okay.  And who did you report to when you first
23  became general counsel AMPAC and assistant secretary?
24     A.  Craig Shelburne still.  He became chief legal
25  officer at some point in there.                       09:35:33

**Page 26**

1  THE WITNESS: Well, for a period of time, I ran
2  the whole legal team, so the whole corporate side of
3  legal reported in to me. And then for a period of time,
4  Europe also reported in to me, so, I mean, do you want me
5  to list everyone in our whole legal department?   09:41:10
6  Q. BY MR. JUDAH: If it was the whole legal
7  department, I think that would answer that question.
8  A. Yeah, the corporate side of legal.
9  Q. Corporate side of legal.
10     What are the other sides of legal?   09:41:22
11  A. We're divided into sort of a corporate side and
12  then an IP side.
13  Q. And who does the IP side -- who is the IP side
14  reporting to during that time period?
15  A. Also Craig and then Eddie, but Mark Triplett   09:41:31
16  runs, sort of, that side.
17  Q. And when -- and at the moment, who does the
18  corporate side of legal report to?
19  A. Eddie Lazarus.
20  Q. And how about the IP side of legal?   09:41:49
21  A. Eddie.
22  Q. All right. Let's see. Okay. Turning your
23  attention back to Topic Number 1 -- sorry -- Exhibit
24  Number 1, and then Topic Number 6.
25     If you could let me know when you're there.   09:42:25

**Page 27**

1  A. Yeah, I have it open.
2  Q. All right. And so what are the facts and
3  circumstances regarding Sonos' negotiation of the Content
4  Integration Agreement with Google?
5     MR. RICHTER: Object to form.   09:42:41
6     THE WITNESS: Yeah, could you be a little bit
7  more specific?
8  Q. BY MR. JUDAH: So -- well, let me, I guess,
9  introduce an exhibit. Maybe that's the easier way to do
10  it.   09:42:59
11     (Exhibit 3, GOOG-SONOSNDCA-00055243 - 252,
12     marked for identification electronically by
13     counsel.)
14  Q. BY MR. JUDAH: All right. If you refresh, you
15  should be able to see Exhibit Number 3.   09:43:52
16     If you could open that up, and then my first
17  question's going to be do you recognize it?
18  A. Yes.
19  Q. And so what is Exhibit Number 3?
20  A. This is our content -- Sonos' Content   09:44:12
21  Integration Agreement. Also known -- well, go ahead.
22  Q. Yeah, also known as what?
23  A. We call it our SMAPI agreement.
24  Q. SMAPI agreement.
25     This is -- this is a -- this is a form agreement   09:44:26

**Page 28**

1  that Sonos has?
2  A. Yeah. Yes.
3  Q. Did you draft this -- this Content Integration
4  Agreement?
5  A. No.   09:44:39
6  Q. Who did draft this agreement?
7  A. Presumably Craig, but I don't know for sure.
8  Q. Was this agreement already -- well, let me
9  ask -- okay. Withdrawn.
10     Let me ask it this way: When did Sonos start   09:44:59
11  using its form Content Integration Agreement?
12     MR. RICHTER: Object to form.
13     THE WITNESS: I don't know. It predates me.
14  Q. BY MR. JUDAH: It predates when you joined the
15  company in 2013?   09:45:11
16  A. Yeah. It was already in use when I joined.
17  Q. Has this form agreement changed over time?
18     MR. RICHTER: Object to form, scope.
19     THE WITNESS: Yes.
20  Q. BY MR. JUDAH: And what changes are you aware of   09:45:30
21  to --
22     MR. RICHTER: Same objections.
23     (Interruption in proceedings.)
24  Q. BY MR. JUDAH: -- to this agreement over time.
25  A. Originally it was a two-sided agreement. It had   09:45:48

**Page 29**

1  a front end and a back end. Over time I created a single
2  template for it, and then a little later on when we added
3  some new functionality, I created a new agreement to
4  cover, sort of, an expanded sort of offering.
5  Q. And so which -- so is this -- the one we're   09:46:17
6  looking at here in Exhibit 3, is this the two-sided
7  agreement?
8     MR. RICHTER: Object to form.
9     THE WITNESS: Yes, it does appear to be the
10  two-sided agreement.   09:46:37
11  Q. BY MR. JUDAH: And when you say "two-sided
12  agreement," what -- can you explain what you mean?
13  A. We had -- we called it the front end of a SMAPI
14  and the back end. The front end was basically kind of
15  like an evaluation agreement where a partner could go to   09:46:51
16  our portal, they signed the front end, which would give
17  them access to the materials that they would need, then,
18  to, like, sort of tinker around and try to build.
19     And then once they had a product that they felt
20  good about, then they would engage us for the back end.   09:47:08
21  That's what we called it, the back end part of the
22  agreement, which that part of the agreement would give
23  them the rights to actually, like, put their -- the thing
24  that they created out into the world and sort of
25  commercialize it and, like, sort of make it work on our   09:47:23

**Page 30**

1 side of the fence.
2   Q. Okay. So do you recall when the -- when you
3 created the single template that replaced, sort of, the
4 two -- two-sided agreement that we're looking at here in
5 Exhibit 3?                                    09:47:49
6   MR. RICHTER: Object to form, scope.
7   THE WITNESS: I don't remember. I don't
8 remember.
9   Q. BY MR. JUDAH: Was it during the time period
10 before you were general counsel AMPAC or after?   09:47:59
11   MR. RICHTER: Object to form.
12   THE WITNESS: I don't know. I would be guessing
13 to tell you. I don't know. Sorry.
14   Q. BY MR. JUDAH: Fair to say it was after the time
15 that Google and Sonos executed Exhibit Number 3?   09:48:18
16   A. Oh, yeah. For sure.
17   Q. Do you feel it was, in your recollection, like
18 several years later?
19   MR. RICHTER: Object to form.
20   THE WITNESS: If I had to guess, it was probably   09:48:30
21 a year or 2 later. 18 months, 2 years later. I don't
22 remember exactly. But I was relatively new at this
23 point, so it would have been once I got more up to speed
24 and understood all of our agreements better, so yeah.
25   Q. BY MR. JUDAH: And why did you feel the need to   09:48:52

**Page 31**

1 create a -- a sort of single template instead of this
2 double-sided agreement?
3   MR. RICHTER: I'll instruct the witness not to
4 answer on grounds of privilege and work product.
5   Q. BY MR. JUDAH: Okay. Well, let me ask you,   09:49:12
6 Ms. Kwasizur, was it for, like, concerns over potential
7 litigation that Sonos made changes to the SMAPI
8 agreement?
9   MR. RICHTER: Same instruction not to answer.
10   MR. JUDAH: I'm just trying to establish whether   09:49:32
11 there's any basis for the privilege. I mean, I could see
12 reasons why there would be privilege and work product
13 that would prevent the witness from answering, but there
14 could be reasons to change the agreement that aren't
15 based on that, and so I don't understand the categorical   09:49:46
16 instruction at this point.
17   MR. RICHTER: I don't -- yeah, I don't agree
18 that the reason has to be based on litigation. I mean,
19 you're asking an attorney what her reasons were for
20 modifying an agreement, and I think that's almost the   09:49:59
21 definition of work product. So, I mean, if you can -- if
22 you can ask some other foundational questions that would
23 not implicate privilege or work product, you know, you're
24 free to do so, but, yeah, that's my instruction.
25   Q. BY MR. JUDAH: Well, let me ask you:   09:50:21

**Page 32**

1 Ms. Kwasizur, do you recall why you created this single
2 template SMAPI agreement to replace the double-sided --
3 double-sided version that's reflected in Exhibit 3?
4   MR. RICHTER: Object to form, scope. I think
5 that's a "yes" or "no" question, just for the record.   09:50:41
6   THE WITNESS: Yes.
7   Q. BY MR. JUDAH: And was it for, like, legal
8 and/or work product-based reasons?
9   MR. RICHTER: I'll instruct the witness not to
10 answer that on the grounds of privilege and work product.   09:51:05
11   Q. BY MR. JUDAH: Okay. You're going to follow
12 that instruction, Ms. Kwasizur?
13   A. Yes.
14   Q. Okay. Who do you recall discussing the decision
15 to create the single template SMAPI agreement to replace   09:51:23
16 the double-sided agreement?
17   A. I probably spoke to Craig about it. He was my
18 boss at the time.
19   Q. Do -- did anyone else work -- withdrawn.
20       Did anyone else help draft that single template   09:51:56
21 for the SMAPI agreement that replaced the double-sided
22 agreement in Exhibit 3?
23   MR. RICHTER: Object to form, scope.
24   THE WITNESS: No. I drafted it.
25   Q. BY MR. JUDAH: Did you have any communications   09:52:15

**Page 33**

1 with any outside counsel about that change to the single
2 template SMAPI agreement?
3   MR. RICHTER: Object to form, scope.
4   THE WITNESS: No.
5   Q. BY MR. JUDAH: Had Sonos been involved in any   09:52:32
6 litigation involving the double-sided Content Integration
7 Agreement?
8   MR. RICHTER: Object to form, scope.
9   THE WITNESS: No, not that I'm aware of.
10   Q. BY MR. JUDAH: Are you aware of any threatened   09:52:53
11 litigation involving the double-sided Content Integration
12 Agreement as of the time when you created this single
13 template?
14   MR. RICHTER: Object to form, scope.
15   THE WITNESS: No.                         09:53:21
16   Q. BY MR. JUDAH: And then I think you said that
17 there was one -- at least one additional change to the
18 SMAPI agreement after you created the single template; is
19 that correct?
20   A. Yeah.                               09:53:34
21   MR. RICHTER: Object to form on the last one.
22 Sorry.
23   Q. BY MR. JUDAH: And could you just restate at a
24 high level what that -- what that change was? I think it
25 remained a single template; is that correct?   09:53:49

**Page 34**

1  A.  Yes.  We added a -- well, so the -- it sort of
2  depends on what the partner wants to do, but we basically
3  created another -- I would say it's another template that
4  includes direct control functionality.
5  Q.  Do you remember when that -- when that template       09:54:12
6  was created?
7  A.  Not off the top of my head, no.
8  Q.  What -- what partners of Sonos have executed
9  that -- well, withdrawn.
10     How would you refer -- is there a way that you       09:54:42
11 refer to that template that includes direct control
12 functionality?
13  A.  Not really.  I mean, the direct control
14 template.  I mean, there's not really a way we refer to
15 it, you know.                                             09:54:59
16  Q.  What are -- what are the differences between
17 that -- that template and then, for example, Exhibit
18 Number 3?
19     MR. RICHTER:  Object to form, scope, and I'll
20 instruct the witness not to answer on -- on -- or I'll    09:55:18
21 instruct the witness to exclude from her answer any --
22 any privileged or work product analysis of -- of the
23 differences between those agreements.
24     But if you can answer otherwise, go ahead.
25     THE WITNESS:  So Exhibit Number 3 is -- first of     09:55:42

**Page 35**

1  all, is only a part of the original, sort of, SMAPI
2  agreement, so I'd say there are significant differences,
3  because this is not really -- I mean, it's missing some
4  sections.
5     But, I mean, if you're asking more generally          09:55:59
6  between, sort of, the SMAPI initial contract and then the
7  more expanded one, it added direct control functionality
8  and the rights around direct control for the partner.
9  Q.  BY MR. JUDAH:  Did -- did the single template
10 that you created, did that exclude direct control         09:56:32
11 functionality?
12     MR. RICHTER:  Object to form, scope.
13     THE WITNESS:  The original single template that
14 I created did not have direct control functionality,
15 correct.                                                  09:56:51
16  Q.  BY MR. JUDAH:  And how about the two-sided, the
17 front and back end?  I understand Exhibit Number 3 is
18 only the back end.  Is it your view that that also did
19 not include direct control functionality?
20  A.  Yes.                                                09:57:06
21     MR. RICHTER:  Object to form, scope.
22     THE WITNESS:  Sorry.
23     Yes.  That did not include direct control
24 functionality.
25  Q.  BY MR. JUDAH:  And when you say it didn't          09:57:14

**Page 36**

1  include direct control functionality, what -- can you
2  explain what you mean?
3  A.  So there's --
4     MR. RICHTER:  Object to form, scope.
5     Sorry.  Go ahead.                                     09:57:20
6     THE WITNESS:  Sorry.  I should give you a moment
7  to object.
8     MR. RICHTER:  It's okay.  It's okay.
9     THE WITNESS:  Sorry.  My bad.
10    There's -- the way music services, sort of, play      09:57:27
11 music to Sonos speakers is, sort of, via the app.  I
12 don't know if you're familiar with Sonos, but you open it
13 and you can, sort of, click on Spotify, whatever, play
14 music.
15    And then direct control functionality is              09:57:42
16 where -- within the native app, so you open your Spotify
17 app, and you click on -- I think it's a little picture of
18 a speaker.  You click on that, and it will show your
19 Sonos speakers, and then you can -- it's more or less
20 kind of going from the app to the speakers without --    09:57:57
21 you're sort of bypassing the Sonos app.  That's what we
22 call direct control, if that makes sense.
23  Q.  BY MR. JUDAH:  Google and Sonos collaborated
24 with direct control functionality; correct?
25    MR. RICHTER:  Object to form, scope.                  09:58:15

**Page 37**

1     THE WITNESS:  I believe so.
2  Q.  BY MR. JUDAH:  Is there a contract, in your
3  view, that covered that collaboration?
4     MR. RICHTER:  Object to form, scope.
5     THE WITNESS:  Yes.  We have a contract with them     09:58:31
6  that has the direct control functionality.
7  Q.  BY MR. JUDAH:  What contract is that?
8  A.  The one -- I think it's in 2018, somewhere in
9  there.
10  Q.  Does the Exhibit Number 3 we're looking at, does   09:58:49
11 that not include direct control functionality?
12    MR. RICHTER:  Object to form, asked and
13 answered, scope.
14    THE WITNESS:  Yeah, correct.  This is just our
15 standard SMAPI, which standard SMAPI is, sort of, when   09:59:00
16 you open the app and you play the music service from the
17 Sonos app.  That's the SMAPI implementation.
18  Q.  BY MR. JUDAH:  Did the Google-Sonos direct
19 control functionality that -- that was rolled out and
20 launched prior to 2018, wasn't it?                       09:59:20
21    MR. RICHTER:  Object to form, scope.
22    THE WITNESS:  I don't know when that launched.
23  Q.  BY MR. JUDAH:  You're not aware that that
24 launched in 2014 or 2015?
25    MR. RICHTER:  Same objections.                        09:59:33

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    Q.  Okay.  And that was an implementation of playing
 2  on -- playing Google Play Music on Sonos speaks through
 3  the Sonos app or playing Google Play Music on Sonos
 4  speakers through the Google Play Music app?
 5        MR. RICHTER:  Object to form, scope, calls for    10:29:20
 6  expert testimony.
 7        THE WITNESS:  Yeah, I don't know what the
 8  media -- whatever that thing is, I don't know what that
 9  related to specifically.  SMAPI is about playing through
10  the Sonos app.                                          10:29:34
11    Q.  BY MR. JUDAH:  So is it your testimony that
12  the -- the media route provider protocol was -- was
13  involved in the parties' collaboration to play Google
14  Play Music on Sonos speakers through the Sonos app?
15        MR. RICHTER:  Object to form, scope, calls for    10:30:07
16  expert testimony.
17        THE WITNESS:  I don't know.  I mean, that's a --
18  you'd have to ask one of our engineers.  I don't know
19  enough about that protocol.  I don't know what it did.
20    Q.  BY MR. JUDAH:  You're aware that an aspect of     10:30:22
21  Sonos and Google's collaboration in the -- in the 2013 to
22  2015 time frame was for a direct play implementation to
23  play Google Play Music on Sonos speakers through the
24  Google Play Music app; correct?
25        MR. RICHTER:  Object to form, scope.              10:30:48
                                                         Page 50
```

```
 1        THE WITNESS:  Yeah, I believe they're one of the
 2  partners that we were hoping to do sort of a direct
 3  control slash -- back then we called it Play to Sonos
 4  type thing.
 5    Q.  BY MR. JUDAH:  Sorry.  One second.                10:31:04
 6        And -- but you don't know whether the --
 7  Google's MRP protocol was involved in that direct play
 8  aspect of the Google-Sonos collaboration as opposed to
 9  the SMAPI aspect of that collaboration; is that correct?
10    A.  Yeah.                                             10:31:54
11        MR. RICHTER:  Object to form, scope.
12        THE WITNESS:  Oh, sorry.
13        I don't know what that protocol does, so I'm not
14  the right person to ask probably.
15    Q.  BY MR. JUDAH:  So for all you know, the MRP       10:32:12
16  protocol could be relevant to the direct play aspect of
17  the collaboration as opposed to the SMAPI aspect of the
18  collaboration; is that right?
19        MR. RICHTER:  Object to form, scope.
20        THE WITNESS:  Yeah, I don't know what it does,    10:32:33
21  again, so I'm not real sure what it -- you know, I don't
22  know what it does, so --
23    Q.  BY MR. JUDAH:  Well, so Exhibit Number 3, right,
24  the Content Integration Agreement executed between Sonos
25  and Google in 2013, I believe you said earlier that you  10:32:58
                                                         Page 51
```

```
 1  don't think any direct play functionality is covered by
 2  this agreement; is that correct?
 3    A.  Correct.
 4    Q.  What's the basis for that -- that statement?
 5    A.  This --                                           10:33:19
 6        MR. RICHTER:  Hold on a second, Alaina.
 7        Object to form and scope, and I'll instruct the
 8  witness to exclude from her answer any communications
 9  with counsel or work product analysis of her own, but
10  otherwise she can answer.                               10:33:34
11        THE WITNESS:  Yeah.  This is our standard SMAPI
12  agreement.  It's meant to cover SMAPI implementation.
13  That's sort of what its purpose is.
14    Q.  BY MR. JUDAH:  Okay.  And do you -- is there any
15  other -- other than this -- your knowledge of the basic 10:33:54
16  purpose of the form agreement that -- that you didn't
17  draft in the first instance, do you have any other basis
18  for your view that this Exhibit Number 3 does not cover
19  any direct play functionality implementation between
20  Google and Sonos' -- and their collaboration?           10:34:27
21        MR. RICHTER:  Same objection.  Same instruction.
22        THE WITNESS:  Well, if the parties intended it
23  to cover that, presumably it would have language
24  referring to that or sort of talking about what rights go
25  along with that and obligations go along with that, and 10:34:45
                                                         Page 52
```

```
 1  this contract has none of that.  So that's sort of
 2  forming the basis of my opinion as well.
 3    Q.  BY MR. JUDAH:  Okay.  So directing your
 4  attention to Section 3.4.
 5    A.  Uh-huh.                                           10:35:00
 6    Q.  It says, "Ownership of Service Provider
 7  Intellectual Property Rights."
 8        Do you see that?
 9    A.  I do.
10    Q.  It's your contention that this -- this section   10:35:11
11  doesn't cover any rights relating to direct play
12  functionality; is that correct?
13        MR. RICHTER:  Object to form and scope.  I'll
14  instruct the witness not to answer -- or I'll instruct
15  the witness to exclude from her answer any communications 10:35:28
16  with counsel and any analysis or work product of her own.
17  If she can answer otherwise, then she can answer.
18        THE WITNESS:  Yes.  Yeah.  This does not cover
19  direct control.  Yes, that's my belief.
20    Q.  BY MR. JUDAH:  And what's the basis for that     10:35:47
21  belief?
22        MR. RICHTER:  Same objection.  Same instruction.
23        THE WITNESS:  Sort of the same answer as before.
24  If it was intended to cover direct control, it would have
25  extra language, which, you know, in the newer version of 10:36:00
                                                         Page 53
```

14 (Pages 50 - 53)

## Page 162

1  supersedes -- sorry.  "And supersedes all prior
2  communications, negotiations, other standing agreements
3  or representations regarding this subject matter."
4      So, yeah, this was -- this was meant to
5  supercede the 2013 agreement.                14:17:11
6      Q.  BY MR. JUDAH:  Which -- which provision were you
7  referring to?
8      A.  Section 12.8.  It's the first sentence.
9      Q.  So your -- your testimony is that this 2018
10 agreement superceded what all -- all prior agreements   14:17:30
11 between the parties, or only that 2013 Content
12 Integration Agreement?
13     MR. RICHTER:  Object to form, scope.
14     THE WITNESS:  It would supercede the 2013 one,
15 and then the DPA that we had with them.        14:17:47
16     Q.  BY MR. JUDAH:  Because this covers the same
17 subject matter as the -- as the 2013 Content Integration
18 Agreement?  Is that why it would supercede it?
19     A.  Yeah.
20     MR. RICHTER:  Object to form, scope.       14:18:02
21     Q.  BY MR. JUDAH:  And that subject matter is direct
22 control?
23     A.  No.  SMAPI.  So this -- this combined agreement
24 that we called it, this combined SMAPI and direct
25 control.                                      14:18:12

## Page 163

1      So for some partners, if they just had a SMAPI
2  agreement, we would do an addendum or an amendment that
3  would add direct control so that they'd have the full
4  package.
5      And so for Google, because we wanted to replace   14:18:26
6  the whole thing -- or they did.  I don't even remember
7  who asked for a new agreement back then.  We just gave
8  them the single template rather than having the old one
9  exist with some other -- well, the DPA was sort of to
10 cover the some other, but then we just decided to put it  14:18:40
11 into one newer agreement.
12     Does that make sense?  Sorry.
13     Q.  I understand.  I understand what you're saying.
14     Is -- was this -- so was this 2018 agreement an
15 amendment of the 2013 or just a complete supersession?   14:18:55
16     A.  No, it just completely replaces it.
17     Q.  Does it reference at any point that earlier
18 agreement, the 2013 Content Integration Agreement?
19     A.  Maybe in the recitals.  Although, I kind of
20 doubt it.  Hold on.  Let me look at it at the top.    14:19:20
21     No, it doesn't reference it.
22     Q.  All right.  We've been going over an hour.  Let
23 me take a break.  I -- I think I'm pretty much done.  I
24 just want to check my outline and whatnot.  But --
25     A.  Okay.                                 14:19:39

## Page 164

1      Q.  A ten-minute break.  Come back at 2:30.
2      A.  Perfect.
3          THE VIDEOGRAPHER:  We are going off the record.
4  The time is 2:19.
5          (Recess.)                             14:33:24
6          THE VIDEOGRAPHER:  We are back on the record.
7  The time is 2:33.
8      Q.  BY MR. JUDAH:  All right.  Ms. Kwasizur -- I
9  apologize if I mispronounced it.  I may have been saying
10 "Kwasizur," "Kwasizur."  Sorry.                14:33:39
11     So just a couple other questions on Exhibit 21.
12     So did you -- were you the person at Sonos who
13 was negotiating this agreement with -- with Google?
14     A.  No.  Shelby Hall did the back and forth on this
15 one.                                          14:34:00
16     Q.  Shelby Hall.
17     Are you aware of any communications between
18 Sonos and Google as part of the negotiations for
19 Exhibit 21 in which either Sonos or Google expressly
20 stated the intention that this -- this Service    14:34:23
21 Integration Agreement would supercede the 2013 Content
22 Integration Agreement?
23     MR. RICHTER:  Object to form, scope.
24     THE WITNESS:  No.  We'd probably have to look
25 through emails with probably Neha.  Neha was, sort of,  14:34:43

## Page 165

1  the business person on this, I'm pretty sure.  But
2  nothing -- I can't think of anything off the top of my
3  head.
4      Q.  BY MR. JUDAH:  Okay.  And then -- one -- one
5  moment.                                       14:35:01
6      Are you aware of any communications between
7  Sonos and Google during the course of the parties'
8  collaboration on the direct control implementation, where
9  Sonos informed Google that Sonos -- Google's Cloud Queue
10 functionality infringed any of Sonos' patents?  14:35:53
11     MR. RICHTER:  Object to form, scope.
12     THE WITNESS:  Sorry.  During the negotiation of
13 this contract?
14     Q.  BY MR. JUDAH:  No.  And it's not about -- not
15 limited to the negotiations.  Let me ask it again.  I   14:36:05
16 might not have phrased it well.
17     Are you aware of any communications between
18 Sonos and Google during the course of the parties'
19 collaboration on the direct control implementation in
20 which Sonos informed Google that Sonos believed Google's  14:36:19
21 Cloud Queue functionality infringed any of Sonos'
22 patents?
23     MR. RICHTER:  Object to form, scope.
24     THE WITNESS:  Well, we have, sort of, the back
25 and forth that we went through with them in the    14:36:35

42 (Pages 162 - 165)