# EXHIBIT 7

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3    SONOS, INC.,
 4         Plaintiff,
 5             vs.           Case No. 3:21-CV-07559-WHA
 6    GOOGLE LLC,
 7         Defendant.
      _____
 8
      -AND-
 9
      GOOGLE LLC,
10
           Plaintiff,
11
               vs.           Case No. 3:20-CV-06754-WHA
12
      SONOS, INC.,
13
           Defendant.
14    _____
            GOOGLE DESIGNATED ATTORNEYS' EYES ONLY
15         SONOS DESIGNATED HIGHLY CONFIDENTIAL &
       ATTORNEYS' EYES ONLY UNDER THE PROTECTIVE ORDER
16
         ZOOM DEPOSITION OF TAD COBURN AS 30(B)(1) &
17         AS SONOS' 30(b)(6) CORPORATE REPRESENTATIVE
18    (Reported Remotely via Video & Web Videoconference)
      Wolfeboro, New Hampshire (Deponent's location)
19
                     Tuesday, July 12, 2022
20
      STENOGRAPHICALLY REPORTED BY:
21    REBECCA L. ROMANO, RPR, CSR, CCR
      California CSR No. 12546
22    Nevada CCR No. 827
      Oregon CSR No. 20-0466
23    Washington CCR No. 3491
24    JOB NO. 5319142
25    PAGES 1 - 245
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Page 14

1  if you could raise your right hand for me, please.
2         THE DEPONENT:  (Complies.)
3         THE COURT REPORTER:  You do solemnly
4  state, under penalty of perjury, that the testimony
5  you are about to give in this deposition shall be
6  the truth, the whole truth and nothing but the
7  truth?
8         THE DEPONENT:  I do.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  /////

Page 15

1         TAD COBURN,
2  having been administered an oath, was examined and
3  testified as follows:
4
5         EXAMINATION
6  BY MS. BAILY:
7     Q.  Good morning, Mr. Coburn.
8     A.  Good morning.
9     Q.  Could you please state your full name and
10  address for the record?
11     A.  Sure.  My full legal name is
12  Arthur Leslie Coburn, IV.  And my address -- my
13  legal address is 66 Liberty Ave, Lexington, Mass,
14  02420.
15     Q.  And in your work at Sonos, do you go by
16  Tad Coburn?
17     A.  I do.
18     Q.  Is there any reason you cannot offer
19  accurate, complete, truthful testimony today?
20     A.  No.
21     Q.  Starting in 2013, you were part of a
22  collaboration between Sonos and Google; is that
23  correct?
24         MS. BRODY:  Objection to form.
25     Q.  (By Ms. Baily)  You can answer the

Page 16

1  question, Mr. Coburn.
2     A.  Oh, I did collaborate -- I did work on a
3  collaboration with Google.
4     Q.  And that was in connection with your work
5  at Sonos, correct?
6     A.  That's correct.
7     Q.  And did that work that you did in the
8  context of a collaboration with Google, did that
9  begin in 2013?
10     A.  I believe it did.
11     Q.  And what was your understanding of the
12  purpose of the collaboration between Sonos and
13  Google that started in 2013?
14     A.  We were working with Google to implement
15  a feature that Sonos refers to as -- as play to
16  Sonos, which is a feature where a -- an application
17  written by another company, a music application, in
18  particular, can directly transfer music playback to
19  Sonos speakers.
20     Q.  So what was your role in connection with
21  the collaboration between Sonos and Google?
22     A.  I was the technical lead on the project,
23  on the implementation project for Sonos.
24     Q.  Ultimately, Sonos and Google worked on
25  what was called a cloud queue design for streaming

Page 17

1  Google Play Music to Sonos speakers; is that
2  correct?
3         MS. BRODY:  Objection to form.
4         THE DEPONENT:  Ultimately, we worked
5  on -- on an implementation that -- that leveraged a
6  concept, which is often referred to as a cloud
7  queue, yes.
8     Q.  (By Ms. Baily)  And in the context of the
9  Sonos-Google collaboration, what is your
10  understanding of the term "cloud queue"?
11     A.  Well, it depends on the context.  Can you
12  be a bit more specific.  I mean -- or are you just
13  looking for a general, sort of layman's definition?
14     Q.  Well, the term "cloud queue" was used by
15  Sonos and by Google in the context of
16  communications that formed part of the
17  collaboration between the two companies, right?
18     A.  Yes.
19     Q.  And as that term was used in those
20  communications, what did it mean to you?
21     A.  It refers to the idea that the -- the
22  knowledge of -- the music that is going to be
23  played by the speakers doesn't live within the
24  application on a mobile device and it does not live
25  on the speakers.  It lives in sort of an abstract

Veritext Legal Solutions
800-567-8658                                                           973-410-4098

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Page 170

1  to be a little bit cute -- but I do not remember
2  any details of the circumstances of the conception
3  of that patent. It was quite a while ago.
4      Q. Do you remember anything about the facts
5  and circumstances of the reduction to practice of
6  the invention claimed in that patent?
7      A. Well, my understanding -- and I am not a
8  lawyer so this is not my area.
9          But my -- my -- my layman's understanding
10 is that filing a patent is considered a reduction
11 to practice.
12     Q. So the '615 patent was reduced to
13 practice on the date on which the application was
14 filed; is that correct?
15         MS. BRODY: Objection to form.
16         THE DEPONENT: That -- that sounds like a
17 question for lawyers. I'm -- I'm not -- if you're
18 asking was there a reduction to practice prior to
19 the patent filing, I think that I can safely answer
20 no, there was not a reduction to practice prior to
21 the patent filing.
22     Q. (By Ms. Baily) Now, with respect to the
23 '033 patent, when -- well, let me ask this: You
24 are a coinventor on the '033 patent, correct?
25     A. That is correct.

Page 171

1      Q. Do you recall what other inventors are
2  named on the '033 patent?
3      A. I should know that, but I -- because I
4  did review it in preparation. But honestly, I'm
5  not 100 percent sure. I suspect it was also
6  Joni Hoadley again, but I'm not 100 percent certain
7  of that.
8      Q. Well, what did -- sorry. I apologize.
9          What do you recall about the facts and
10 circumstances of the conception of the subject
11 matter of the '033 patent?
12     A. If I remember correctly, it --
13 unfortunately, my answer is going to be fairly
14 similar as to the previous one.
15         I believe that there were a number of
16 people involved in -- in sort of bouncing around
17 ideas. And I don't recall the specific details of
18 the sequence of conversations or who the
19 conversations were exactly among.
20         Yeah. I -- I don't really have much more
21 specific for you, I'm afraid.
22     Q. When did you and your coinventor conceive
23 of the subject matter of the '033 patent?
24     A. My memory is failing me. I'm sorry. I'd
25 have to actually go back and -- and actually view

Page 172

1  the patent again to -- to try to recollect the
2  rough timeline.
3      Q. Was there any reduction to practice of
4  the subject matter of the '033 patent prior to the
5  patent filing?
6      A. No, there was not.
7      Q. What is the earliest known use of the
8  alleged invention claimed in the '615 patent?
9      A. When you say "use," you mean reduction to
10 practice in actual software as opposed to the
11 patent?
12     Q. Yes.
13     A. I'd like to give you a clean crisp answer
14 to that, but I'm not sure that I can.
15         In general, with these patents, we -- as
16 you can see, we filed these patents and --
17 where the patent was the reduction to practice, and
18 so we did not have an actual working implementation
19 at the time.
20         I -- I -- I actually do not track,
21 you know, if and when there is an actual reduction
22 to practice. That is covered by the patents. I
23 think that's something that our -- our lawyers
24 worry about. But that's not something that I
25 really have knowledge of.

Page 173

1      Q. So in topic No. 2 in Exhibit 1137 --
2      A. Yes.
3      Q. -- do you see that it says "the earliest
4  known use of the alleged inventions claimed in the
5  Patents-in-Suit"?
6      A. Yes.
7      Q. Did you do anything to figure out what
8  Sonos' view is on the earliest known use of the
9  alleged inventions claimed in the patents-in-suit?
10     A. So as I mentioned, Sonos itself did not
11 reduce the -- the '033 patent to -- into practice
12 because it required a partner to -- the -- the
13 whole patent was around a third-party app playing
14 to Sonos.
15         So we never -- we, Sonos, never actually
16 reduced it to practice in the sense of an actual
17 implementation that worked.
18         So I guess that's the -- that's the
19 degree to which I did some research on this ahead
20 of time.
21     Q. And are you aware -- if I understand --
22 well, let me make sure I understand.
23     A. Okay.
24     Q. Sonos has never used the alleged
25 invention of the '033 patent; is that right?

```
                                                    Page 218                                                      Page 220
 1        MS. BRODY: Can we go off the record           1       A. I got it.
 2   briefly while the documents is being uploaded,     2       Q. And now if you can open up a document
 3   since I don't have the capability to do so?        3   that's been marked as Exhibit 11- -- 1145. It's
 4        THE VIDEOGRAPHER: Is that okay,               4   bearing Bates number SONOS-SVG2-00027224 to -228.
 5   Ms. Baily? Do you want to go off the record?       5          (Exhibit 1145 was marked for
 6        MS. BAILY: I mean, I guess why -- why         6   identification by the court reporter and is
 7   are we going off the record? It's just going to    7   attached hereto.)
 8   take longer to get back on. And then I'm going to  8       THE DEPONENT: All right. Hold on. I'm
 9   have less time to ask my questions --              9   not sure how to open two things at once.
10        MS. BRODY: I'm not going anywhere,           10          All right. There's 1140. And I'm sorry,
11   Melissa. I just -- I want to have the document    11   what was the second one?
12   uploaded and I don't appear to have the capability 12       MS. BRODY: 1145.
13   to do so.                                         13       THE DEPONENT: Okay. I see a file. It
14        MS. BAILY: I got that. But I just want       14   doesn't have Exhibit 1145, but it says
15   to understand what's going to happen here. Because 15   SONOS-SVG2-00027224.
16   I was told that the witness has a firm stop at    16          Is that the correct one?
17   6:30. And I can tell that the witness feels like  17       MS. BRODY: Yes.
18   he has a stop soon, and I have questions related to 18     Q. (By Ms. Brody) And if you look at the
19   your questions. And so I just want to understand  19   top email, is an email to you from Ron Kuper, dated
20   how this is going to work.                        20   July 15th, 2011 time, time-stamped 10:09 a.m.
21        MS. BRODY: I just have a couple more         21          Do you see that?
22   questions, as soon as I get the document uploaded. 22       A. I'm sorry. One more time, please,
23        MS. BAILY: Mr. Coburn, how much time do      23   from -- from whom and at what time.
24   you have to stay with us?                         24       Q. From -- from Ron Kuper --
25        I mean, frankly --                           25       A. Yes.

                                                    Page 219                                                      Page 221
 1        THE DEPONENT: I can -- yeah.                  1       Q. -- dated July 15th, 2011, time-stamped
 2        MS. BAILY: -- I got up 6:30 in the            2   10:09 a.m.
 3   morning --                                         3       A. Yes, I see that.
 4        THE DEPONENT: I know. I know.                 4       Q. Do you see that there's an attachment to
 5        MS. BAILY: -- because I was told that         5   this email, "PlayTosonos.pdf"?
 6   Mr. Coburn had a hard stop at 6:30.                6       A. Yes, I see that.
 7        THE DEPONENT: Yeah.                           7       Q. I will represent to you that Exhibit 1140
 8        MS. BAILY: So I just want to understand       8   that you looked earlier in your deposition is the
 9   what we're doing.                                  9   attachment referred to there. That, again, is
10        THE DEPONENT: My -- my real hard stop is     10   Bates-numbered SONOS-SVG2-00027229.
11   at 7:00. I said 6:30 because I was worried we     11       MS. BAILY: Object to form.
12   might run over. So my real hard stop is at 7:00.  12       THE DEPONENT: Okay.
13        MS. MA: Amy, it says I'm labeling these      13       Q. (By Ms. Brody) Now, in Mr. Kuper's email
14   a certain number, or should I just go ahead and   14   to you, among others at Sonos, do you see in the
15   label it whatever the next following number is?   15   middle of the email he refers to queue state and
16        MS. BRODY: You do it the next number,        16   IDs?
17   please, 1145.                                     17       A. Yes, I see that.
18        MS. MA: Sure.                                18       Q. Is the discussion there an example of a
19        MS. BRODY: I appreciate that.                19   cloud service sending IDs to a player?
20     Q. (By Ms. Brody) Mr. Coburn, as that is        20       MS. BRODY: Object to form.
21   being uploaded, I'm going to ask you to open up   21       THE DEPONENT: I'm sorry, Amy. I'm just
22   again Exhibit 1140, please --                     22   slow. Can you repeat the question one more time.
23     A. Okay.                                        23       Q. (By Ms. Brody) Is this -- I just -- let
24     Q. -- which should be the document bearing      24   me state -- strike that.
25   Bates numbers SONOS-SVG2-00027229.                25          Is this discussion an example of a cloud
```

Page 222

1 service sending IDs to a player?
2    A.  I believe so.  The -- the event called
3 play from would be -- I don't know why it's called
4 an event here.  I would refer to it as a command
5 that's sent to the player.  And it, among other
6 things, is documented here as being able to include
7 a queue state which includes -- could be a single
8 ID or a list of IDs which -- which are IDs of music
9 tracks to play.
10        MS. BRODY:  Subject to any other
11 questions Ms. Baily may have, Mr. Coburn, I have no
12 further questions.
13        THE DEPONENT:  Okay.
14             FURTHER EXAMINATION
15 BY MS. BAILY:
16    Q.  Okay.  Mr. Coburn --
17    A.  Sure.
18    Q.  -- what can you tell about the facts and
19 circumstances regarding the conception of the
20 '615 patent?
21    A.  As I mentioned before, the -- I mean --
22 it's a very difficult question to answer because
23 it's very broad.  The --
24    Q.  Well, let me ask you this.
25    A.  Yeah.

Page 223

1    Q.  Let me ask you this.
2    A.  Uh-huh.
3    Q.  Ms. Brody asked you a question during her
4 questioning --
5    A.  Uh-huh.
6    Q.  -- and you said that documents that were
7 shown to you during this deposition refreshed your
8 recollection about the conception of the
9 '615 patent; is that right?
10    A.  That's correct.  It's still not
11 completely clear, but I've remembered a few
12 details.
13    Q.  So what have you remembered about the
14 conception --
15    A.  Oh, okay.
16    Q.  -- of the '615 patent?
17    A.  I've remembered that Ron Kuper was
18 clearly one of the people that I was internally
19 collaborating with on these ideas.
20        I have been reminded that the queue state
21 includes a list of identifiers.  And I can pretty
22 easily assume from the email that we just saw that
23 those -- that means identifiers for music tracks.
24    Q.  Anything else?
25    A.  The other -- well, the other -- the other

Page 224

1 thing that I was just reminded of was the fact that
2 we had discussed this notion of a shared queue.  I
3 had forgotten that detail and -- and it's clear
4 that when we were thinking about the shared queue,
5 it was a queue that is -- does not live on the
6 Sonos player and it was managed by a music-playing
7 app.
8    Q.  The shared queue is not in the cloud,
9 correct?
10        MS. BRODY:  Objection to form.
11        THE DEPONENT:  I don't think it said
12 anywhere that it's not in the cloud.  I don't think
13 it said exactly where the shared queue lives.
14    Q.  (By Ms. Baily)  It doesn't say that it's
15 in the cloud, correct?
16    A.  It's -- neither says that it's in the
17 cloud.  Nor does it say that it's not in the cloud.
18    Q.  When did you conceive a shared queue?
19 What date?
20        MS. BRODY:  Objection to form.
21        THE DEPONENT:  We were just looking at a
22 document that -- oh, I guess we were looking at one
23 of the patents that used the phrase shared --
24 shared queue.
25    Q.  (By Ms. Baily)  Did you conceive of a

Page 225

1 shared queue before the date of the '615 patent
2 filing?
3    A.  We were just looking at the '615 patent,
4 correct?
5    Q.  Correct.
6    A.  When you say did I conceive -- did -- did
7 you conceive, do you mean me specifically or do you
8 mean me, Sonos?
9    Q.  Did Sonos conceive of a shared queue at
10 some point prior to the filing for the '615
11 application?
12        MS. BRODY:  Objection to form.
13        THE DEPONENT:  Oh, my goodness.  I'm
14 sorry.
15        You said prior to?
16    Q.  (By Ms. Baily)  The filing of the --
17    A.  The filing.
18    Q.  -- application for the '615 patent.
19    A.  Honestly, I don't recall when exactly
20 that term or -- was -- went into use.  It may have
21 been as part of the patent filing.  It may have
22 been beforehand.  I can't -- that's the kind of
23 detail that I can't remember without seeing
24 specific emails.
25    Q.  How many documents did you review in

```
                                                    Page 230
 1      What these documents disclose is an ID
 2  being -- being sent to a player, correct?
 3          MS. BRODY:  Objection to form.
 4          THE DEPONENT:  I believe you're splitting
 5  hairs.  It seems that if an -- if -- if one or more
 6  IDs are sent to a player, that that player has to
 7  store them somewhere.  And so, you know, at this --
 8  at this point in time, this is 2011, the only place
 9  Sonos had to store them at that point was the local
10  queue on the player.
11          So while I agree that it does not say
12  that explicitly, I think it can be reasonably
13  inferred from this email.
14      Q.  (By Ms. Baily)  Exhibit 1140 and 1145
15  nowhere discuss a local play queue, correct?
16          MS. BRODY:  Objection to form.
17          THE DEPONENT:  1140 does not use the term
18  "local playback queue."  And neither does 11- --
19  1145 does also not -- also does not use the term
20  "local playback queue."
21      Q.  (By Ms. Baily)  And neither of these
22  documents are talking about adding information to a
23  local playback queue, correct?
24          MS. BRODY:  Objection to form.
25          THE DEPONENT:  It depends on whether
```

```
                                                    Page 231
 1  you're looking at the words literally as they sit
 2  on the page or if you're looking at the meaning
 3  behind the words.  The words do not use the term
 4  "local playback queue."
 5          However, as I said previously, I believe
 6  a reasonable person could infer that they have to
 7  be stored on the local player somewhere, and that
 8  that location was quite likely to be the thing that
 9  Sonos refers to as the local queue or the local
10  playback queue.
11      Q.  (By Ms. Baily)  Well, where in
12  Exhibit 1140 or Exhibit 1145 do those documents
13  talk about a queue or where that queue might
14  reside?
15          MS. BRODY:  Objection to form.
16          THE DEPONENT:  Well, it's fairly evident
17  to me from the term "queue state" that it's
18  referring to a queue, which I think answers the
19  first part of your question.
20          The second part of your question is, does
21  it describe where that queue lives and that -- I
22  would say that these two exhibits do not explicitly
23  discuss where the queue lives.
24      Q.  (By Ms. Baily)  If you could turn to
25  Exhibit 1127 --
```

```
                                                    Page 232
 1      A.  Got it.
 2      Q.  -- Nick Millington copied you into his
 3  correspondence with Debajit Ghosh in this exhibit,
 4  correct?
 5      A.  Yes.  I believe that Nick copied me on
 6  his last reply to Debajit.
 7      Q.  And that included all of the other
 8  correspondence in Exhibit 1127 that Mr. Ghosh and
 9  Mr. Millington had, correct?
10      A.  Yes, it did.
11      Q.  And Mr. Millington says in his email,
12  "when this thread took more of a technical turn, I
13  should have included Tad, and I'm copying him here
14  now in preparation for next week, he is going to
15  share a few thoughts he has written up on Cloud
16  Queue command/event set."
17          Do you see that?
18      A.  I do.
19      Q.  And when you received this email from
20  Nick Millington, do you believe that you read the
21  correspondence between Mr. Millington and
22  Mr. Ghosh?
23          MS. BRODY:  Objection.  Outside the
24  scope.
25          THE DEPONENT:  I believe that I read
```

```
                                                    Page 233
 1  through the email, yes.
 2      Q.  (By Ms. Baily)  And earlier, in response
 3  to my questions, you testified as to your
 4  understanding of those emails at the time, correct?
 5          MS. BRODY:  Objection.  Outside the
 6  scope.
 7          I'll also object to form.
 8          THE DEPONENT:  I'm sorry, Rebecca.  Can
 9  you just repeat the question.  I want to make sure
10  I answer it correctly.
11          Rebecca -- excuse me.  Melissa.
12          MS. BAILY:  Sure.
13          THE DEPONENT:  Excuse me.  I'm getting
14  tired.
15      Q.  (By Ms. Baily)  In response to my earlier
16  questions regarding Exhibit 1127 --
17      A.  Okay.
18      Q.  -- you testified regarding your
19  understanding of the emails contained in
20  Exhibit 1127 at the time, correct?
21          MS. BRODY:  Objection to form.  And
22  outside the scope.
23          THE DEPONENT:  Yes, I believe I tes- -- I
24  did tes- -- testify to what I believe Nick meant.
25      Q.  (By Ms. Baily)  What you believed Nick
```