# EXHIBIT 6
# Filed Under Seal

REBUTTAL EXPERT REPORT OF DR. KEVIN C. ALMEROTH

21, 2022 Order and Claim Construction Developments" in which he sets forth various characterizations of the Court's July 21, 2022 order, Sonos's claim construction positions, and the alleged implications on the scope and meaning of the Asserted Claims of the '885 and '966 Patents. That section includes 4 sub-sections, which are entitled (1) "Zone Scene," (2) "Indication," (3) "Standalone," and (4) "Written Description."

186. I find Dr. Schonfeld's characterizations of the Court's July 21, 2022 order and its alleged implications on the scope and meaning of the Asserted Claims of the '885 and '966 Patents to be flawed for various reasons, which I have outlined below in four sub-sections that correspond to the four sub-sections set forth in Dr. Schonfeld's Opening Report.

### 1.   Dr. Schonfeld's "Zone Scene" Sub-Section

187. I disagree with several of Dr. Schonfeld's statements in his "Zone Scene" sub-section regarding the Court's July 21, 2022 order and "claim construction developments."

188. First, Dr. Schonfeld states that "the Court indicated it understood 'zone scene' as 'a previously-saved grouping of zone players according to a common theme.'" Schonfeld Op. Report at ¶ 97. I disagree – in my opinion, this is not an accurate characterization of the Court's July 21, 2022 order as it relates to the term "zone scene."

189. As explained above, the Court began its analysis of whether Google's products include the claimed "zone scene" functionality by stating as follows:

> Google argues that the accused products do not allow users to form a "zone scene," which it proposes defining as "a previously-saved grouping of zone players according to a common theme" (Opp. 4–7). Even assuming, *arguendo*, that this is the proper construction of "zone scene," this order concludes that the accused products meet this limitation.

D.I. 309 at 7. It is clear from this statement that the Court was only applying Google's proposed construction of "a previously-saved grouping of zone players according to a common theme" for purposes of evaluating Google's non-infringement arguments under that proposed construction, and was not stating that the Court "understood" this to be the meaning of "zone scene." Moreover, elsewhere in its July 21, 2022 opinion, the Court described a "zone scene" as a user-customized, pre-saved group that is able to exist in an uninvoked state (during which time the group members

59

can operate individually or as part of other groups) while remaining available for selection by a user so that the group can be invoked later on demand for synchronous playback. *Id*. at 4-5, 8, 12, 13, 15-16. In my opinion, this description more completely and accurately reflects the Court's understanding of a "zone scene."

190. Second, Dr. Schonfeld states that "based on the Court's Order, I understand the Court to consider that a 'zone scene' does not require certain attributes such as volume control, nor does a 'zone scene' require anything beyond a named speaker group that can be saved and later invoked." Schonfeld Op. Report at ¶ 100. I agree with the first half of this statement – the Court has indeed made clear that "a 'zone scene' does not require certain attributes such as volume control" – but I disagree that the second half of this statement is a complete and accurate characterization of the Court's July 21, 2022 order as it relates to the term "zone scene."

191. In particular, Dr. Schonfeld appears to be suggesting here that the only thing required to qualify as a "zone scene" is "a named speaker group that can be saved and later invoked," but this characterization fails to account for several other key aspects of a "zone scene" that were recognized by the Court, including that the group defined by the "zone scene" is (i) "customized" by a "user," (ii) able to exist in an invoked (or inactivate) state during which time the group members "operate individually" (or as part of other groups), and (iii) remains available for selection by a user while in an invoked state so that the "zone scene" can be "later invoke[d]" by the user "on demand for synchronized playback." D.I. 309 at 4-5, 8, 12, 13, 15-16.

192. Third, Dr. Schonfeld makes the following statement regarding the Court's discussion of "zone scene":

> In my opinion, because the Court's July 21, 2022 Order takes broad positions with respect to the meaning of certain claim terms, such as "zone scene," it accordingly expands the scope of prior art and prior art combinations which invalidate the '885 patent. By way of background, the ability to stream music already existed in 2004, as did home stereo systems which enabled users to have different speakers in different rooms. *See supra*. And the ability to group and name different items, e.g., songs or playlists, was well known by 2005. . . . ==For example, I understand Sonos considered the iPod, which allowed for saved playlists and could be used to play to speaker systems, and its scroll-wheel as part of its design.==

Schonfeld Op. Report at ¶ 100. I disagree with this statement for several reasons.

60

193. As an initial matter, I disagree with Dr. Schonfeld's statement that "the Court's July 21, 2022 Order takes broad positions with respect to the meaning of certain claim terms, such as 'zone scene.'" *Id*. In my opinion, the Court's description of a "zone scene" in its July 21, 2022 order is entirely consistent with the intrinsic evidence – which similarly describes a "zone scene" as a user-customized, pre-saved group that is able to exist in an uninvoked state (during which time the group members can operate individually or as part of other groups) while remaining available for selection by a user such that the group can be invoked later on demand for synchronous playback – so I fail to see how this constitutes a "broad position[]" with respect to the meaning of "zone scene." Dr. Schonfeld's statement to the contrary appears to be based on his incomplete and inaccurate characterization of how the Court "understood" the meaning of "zone scene," his own flawed interpretation of the meaning of a "zone scene," or both.

194. Relatedly, I disagree with Dr. Schonfeld's statement that the Court's July 21, 2022 order "expands the scope of prior art and prior art combinations which invalidate the '885 patent." *Id*. Again, the Court's description of a "zone scene" is entirely consistent with the intrinsic evidence, so I fail to see how the Court's July 21, 2022 order "expand[ed]" anything, and I also fail to see the relevance of Dr. Schonfeld's statement here given that the Court already entered summary judgment of validity of the '885 patent. But in any event, for the reasons I already explained in my '885 Rebuttal Report, I disagree that Asserted Claim 1 of the '885 Patent is invalid over any of the prior art or prior art combinations identified by Dr. Schonfeld.

195. Fourth, Dr. Schonfeld makes the following statement regarding the Court's discussion of "zone scene":

> Effectively, I understand the Court's Order to generally equate a "zone scene" with a "zone group" that can be named and saved, but this is disclosed and/or rendered obvious by the prior art, along with (i) the ability to have speakers in overlapping zone scenes, and (ii) the ability for speakers to operate in standalone mode even after being added to a "zone scene"—under the Court's holding regarding "zone scene."

Schonfeld Op. Report at ¶ 101. I also disagree with this statement for several reasons.

196. As an initial matter, the Court's July 21, 2022 order did not "equate a 'zone scene' with a 'zone group' that can be named and saved." Further, this statement is premised on yet

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

9, 2023 discussion with Mr. Lambourne, it is my opinion that the inventions of the Asserted Claims of the '966 Patent were conceived by no later than December 21, 2005. I discuss in detail below the bases for my opinion.

240. In addition, it is my opinion that the '407 Provisional, having a filing date of September 12, 2006, constitutes a constructive reduction to practice of the Asserted Claims of the '966 patent because it discloses the subject matter of the Asserted Claims of the '966 Patent, as demonstrated in the table above, and does so in a manner that meets the enablement and written description requirements.

241. The evidence I reviewed shows that, by December 21, 2005, Sonos began actively working towards a system comprising a networked-enabled computing device of the time (e.g., the CR100 and the Sonos "Desktop Controller" (also referred to as "DCR")) that meets each Asserted Claim of the '966 Patent (the claimed "computing device"), as well as one or more of Sonos's network-enabled audio players of the time (*e.g.*, the ZP100). *See* SONOS-SVG2-00026839 - SONOS-SVG2-00026858; Lambourne Dep. Tr. 61:23-63:6, 66:1-19, 85:17-86:9; 1/9/2023 Discussion with Mr. Lambourne. Prior to December 21, 2005, Sonos released a system including the Sonos CR100 Controller and the Sonos Desktop Controller software, which, as the parties do not dispute, included the hardware elements recited in Asserted Claim 1 of the '966 Patent. *See, e.g.,* Sonos's Validity Contentions, Attachment A to Sonos's Supp. Response to Google's First Set of Rogs, at 39-43; Schonfeld Op. Report at ¶¶ 124-174; Lambourne Dep. Tr. 84:16-87:7; Lambourne Dep. Exs. 1077-78; 7/19/2022 Discussion with Mr. Millington; 1/9/2023 Discussion with Mr. Lambourne. Mr. Lambourne was familiar with and involved in the development of this system, including working directly on the various controllers (e.g., the CR100 and Desktop Controller) for the ZP100. *E.g.*, Lambourne Dep. at 86:2-5; 153:5-154:8; SONOS-SVG2-00026625-26751; 1/9/2023 Discussion with Mr. Lambourne. The evidence also shows that Mr. Lambourne viewed his "Zone Scenes" concept as capable of being used in conjunction with the Sonos CR100/Desktop Controller system. *See, e.g.,* SONOS-SVG2-00026839 - SONOS-SVG2-00026858 at 26840-53; SONOS-SVG2-00026625-26751; 1/9/2023 Discussion with Mr. Lambourne.

117

265. ZonePlayers could be positioned about a user's house and could be given names reflecting the rooms in which the ZonePlayers were located, such as "Kitchen," "Jack's Bedroom," or "Garden." Operationally, each ZonePlayer was configured to retrieve media from one or more music sources that were either located on a user's home storage device, such a network-accessible storage device, or via a music service accessible via the Internet, such as Rhapsody, among others. The controllers of Sonos's 2005 system were configured to browse the available music libraries of the music sources and to control the ZonePlayers within the system to retrieve and output media from the music sources. The controllers of Sonos's 2005 system were also operable to control the ZonePlayers' playback of audio, including adjusting the volume of playback, skipping to a previous or next track, and pausing the playback, etc. The below image illustrates one example of a Sonos CR100 Controller:



Sonos 2005 User Guide (Lambourne Dep. Exs. 1077-1078), at 60.

266. The controllers of Sonos's 2005 system were also operable to group the ZonePlayers within the system together into "zone groups," which were groups of two or more ZonePlayers that were configured to coordinate with one another over the data network to output audio in synchrony. The Sonos 2005 User Guide includes a section entitled "Zone groups" where it describes the grouping capabilities of the Sonos ZonePlayers that existed at the time. That "Zone

B. **Sonos Forums**

272. Dr. Schonfeld's "Sonos Forums" reference consists of forum posts from two separate threads: (1) a thread entitled "Macro / presets," and (2) a thread entitled "virtual zones and zone grouping." Schonfeld Op. Report at ¶¶ 175-182. In his Opening Report, Dr. Schonfeld opines that "the Sonos Forums were publicly available at least as of September 2005, making them prior art under 35 U.S.C 102(a), 102(b), and 102(f)." *Id.* at ¶ 175. I disagree – in my opinion, the Sonos Forums reference, as a whole, does not qualify as prior art, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

273. First, the Sonos Forums reference, as a whole, does not qualify as prior art under §102(a). Specifically, Dr. Schonfeld has relied on several posts from the "Macro / presets" thread that are dated after the claimed conception date of December 21, 2005. Thus, I understand that these posts do not qualify as prior art under §102(a). In fact, there are only 4 posts from the "Macro / presets" thread (dated from September 22, 2005 to September 27, 2005) that could qualify as prior art under §102(a), since every other post in that thread is dated no earlier than June 3, 2006. These posts are reproduced below:





GOOG-SONOS-WDTX-INV-00015877 at 877-78.

274. Likewise, Dr. Schonfeld has relied on several posts from the "virtual zones and zone grouping" thread that are dated after the claimed conception date of December 21, 2005. Thus, I understand that these forum posts do not qualify as prior art under §102(a). In fact, there are only 5 posts from the "virtual zones and zone grouping" thread (dated from February 27, 2005 to February 28, 2005) that could qualify as prior art under §102(a), since every other post is dated no earlier than April 18, 2006. These posts are reproduced below:

165

provides the following instructions for how to use the ROOM button to set up a "shared source" in multiple rooms:

> **Setting up a shared source**
> Now, let's say the system is already on and you want to play the FM radio in rooms A and B:
> 1. Wake up the Personal music center.
> 2. Press the ROOM button until the room indicator [A] is displayed. Press the FM source button and adjust the volume to the desired level for room A.
> 3. Press the ROOM button again to select room [B]. Press the FM source button and adjust the volume to the desired level for room B. Now, the indicators A [B] are displayed.
> 4. Press the ROOM button again. The indicators [A] [B] appear on the display indicating that you can control these two rooms together. Any button command given now (SOURCE, VOLUME, MUTE, ON/OFF, SLEEP) is applied to both rooms.

*Id*.

359. The Bose Lifestyle 50 Guide discloses that the HOUSE button enables a user to "link all rooms together and control them as one," such that "[a]ny button pressed after that (any source button, VOLUME, MUTE, or SLEEP) affects every room":

> **Using the HOUSE button**
> Using the HOUSE button, you can link all rooms together and control them as one. When you press the HOUSE button, an empty box indicator is displayed for each connected room. Any button pressed after that (any source button, VOLUME, MUTE, or SLEEP) affects every room. When you are done listening you can press OFF to turn off the entire system.
> **Note:** If you do not press any additional buttons after pressing HOUSE, pressing HOUSE again cancels HOUSE mode.

*Id*. at 45. In this way, a user can use the HOUSE button followed by a source button to set up a shared source for all rooms A-D in their home.

360. Notably, neither the Bose Lifestyle 50 Guide nor any of the other evidence I have reviewed discloses anything about what specific information is transmitted from the Personal Music Center to the Multi-Room Interface as a result of "link[ing]" rooms together and setting up a "shared source." However, based on the evidence I have reviewed, it appears that no information would be sent from the Personal Music Center to the Multi-Room Interface until at least the user selects the source at which point the Personal Music Center would send some sort of information to the Multi-Room Interface to cause the Multi-Room Interface to configure itself to distribute

207

audio from the selected audio source to the selected room(s). *See, e.g.,* BOSE_SUB-0000001-55 at 6 ("The Bose multi-room interface, with four independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD player and an Acoustimass module connected the Multi-Room Interface), 17 (illustrating various audio sources connected to Multi-Room Interface via audio input cables), 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface."), 44-45 (explaining how to use ROOM and HOUSE buttons to set up an audio source for one or more rooms).

361. Based on my review of the Bose Lifestyle 50 Guide, it is my opinion that the Bose Lifestyle 50 System is a type of conventional audio system with a centralized Multi-Room Interface that is hard-wired to one or more Acoustimass modules so that audio could be distributed from the centralized Multi-Room Interface to the "Acoustimass module(s)" and then to the wired Jewel cube Speakers. *See* BOSE_SUB-0000001-55 at 11-12. A POSITA would not consider the Multi-Room Interface and the Acoustimass modules to be operating on a data network because the hard-wired connection described in the Bose Lifestyle 50 Guide is not a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other. In contrast, the '966 Patent is specifically directed to *networked* multimedia systems that operate on local and wide area *data networks*, which are distinctly different from conventional multimedia systems such as the Bose Lifestyle 50 System. *Compare* '966 Patent at 4:39-5:15, Fig. 1 *with* 1:46-2:16.

362. Likewise, applying Sonos's constructions of "zone player" and "data network," neither a Jewel Cube speaker, nor an Acoustimass module, nor an SA-2 or SA-3 amplifier is a "first zone player" because these devices (i) are not data network devices that can send digital data packets to and receive digital data packets from another device and (ii) are not capable of performing any digital data processing on the audio before outputting it. Instead, the evidence I have reviewed shows that a Jewel Cube speaker merely receives an audio signal over an audio cable from an Acoustimass module or SA-2 or SA-3 amplifier and outputs audio, and that an Acoustimass module or SA-2 or SA-3 amplifier receives an audio signal over an audio cable from

505. The Sonos 2005 User Guide also includes a similar "Zone groups" section in the chapter on the Sonos CR100 Controller, as shown below:



*Id.* at 5-9.

506. As demonstrated by the above excerpts from the Sonos 2005 User Guide, a user could create a new "zone group" using a Sonos controller by selecting a specific set of ZonePlayers (logically identified as zones) in a Sonos system to group together into the "zone group," such as a Kitchen + Jack's Bedroom group or a Garden + Kitchen group, and the act of creating this new

265

"zone group" would then "*cause all the zones in the zone group to play the same music.*" *Id*. at 3-11. Additionally, the Sonos 2005 User Guide notes that "[a]ny zones you link [into a zone group] *will automatically drop their current music queue and begin to play the music queue from the highlighted zone*," and that if "there is no music playing" in the highlighted zone, then "any zone you link to it will also be silent." *Id*. at 3-12, 5-8, 5-9.

507.    The 2005 User Guide also explains that once a new "zone group" is formed and thereby activated, all of the ZonePlayers in the "zone group" "will then play the same music until you drop the zones from the zone group." *Id*. at 5-9. The 2005 User Guide then goes on to describe the process "[t]o drop a room from your zone group" as follows:



508.    As demonstrated by the above excerpt from the Sonos 2005 User Guide, once a ZonePlayer is removed from a "zone group," that ZonePlayer "stops playing music" in accordance with the "zone group" while "[t]he other zones in the zone group continue unaffected." *Id*. at 5-10.

266