1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA 94105-2669
6  Telephone:     +1 415 773 5700
   Facsimile:     +1 415 773 5759
7
   SEAN M. SULLIVAN (*pro hac vice*)
8  sullivan@ls3ip.com
   COLE RICHTER (*pro hac vice*)
9  richter@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
10 656 W Randolph St., Floor 5W
   Chicago, IL 60661
11 Telephone:     +1 312 754 0002
   Facsimile:     +1 312 754 0003
12
   *Attorneys for Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>　　　　Plaintiff and Counter-defendant,<br><br>v.<br><br>SONOS, INC.,<br><br>　　　　Defendant and Counter-claimant. | Case No. 3:20-cv-06754-WHA<br>Related to Case No. 3:21-cv-07559-WHA<br><br>**SONOS'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING GOOGLE'S CONTRACT-RELATED CLAIMS**<br><br>Date: March 30, 2023<br>Time: 8:00 A.M.<br>Place: Courtroom 12, 19th Floor<br>Judge: Hon. William Alsup<br><br>Complaint Filed: September 28, 2020 |

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

**Page(s)**

I. ARGUMENT ................................................................................................................... 2

    A. The 2013 Content Integration Agreement Does Not Give Google Rights To Sonos's 2011 Invention ........................................................................................ 2

        1. Sonos Retains All Preexisting Intellectual Property Under the CIA. .......... 2

        2. Google Cannot Show Any Material Dispute Of Fact As To Written Description. ................................................................................................. 4

    B. The 2018 SIA Superseded All Prior Related Agreements. ..................................... 7

    C. The 2013 CIA Did Not Grant Any Rights In Direct Control To Google. .............. 9

    D. The Court Should Reject Google's New Theories Of Breach. ............................. 13

    E. Sonos Did Not Convert Google's Property .......................................................... 14

II. CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
　598 F.3d 1336 (2010) .................................................................................................... 5, 6

*CLRB Hanson Indus., LLC v. Google Inc.*,
　No. C 05-03649 JW, 2008 WL 2079200 (N.D. Cal. May 14, 2008) ..................................... 11

*Conceptus, Inc. v. Hologic, Inc.*,
　No. 3:09-cv-002280-WHA, Dkt. 475 (N.D. Cal. Oct. 14, 2011) ............................................. 7

*Fanucchi & Limi Farms v. United Agri Products*,
　414 F.3d 1075 (9th Cir. 2005) ................................................................................................ 8

*Genentech, Inc. v. Trs. of Univ. of Pa.*,
　871 F. Supp. 2d 963 (N.D. Cal. 2012) .................................................................................... 7

*Global Trim Sales, Inc. v. Checkpoint Systems UK Ltd.*,
　No. 12-cv-1314-JLS, 2014 WL 12690629 (C.D. Cal. Sept. 17, 2014) .................................... 8

*Harper v. Charter Commc'ns, LLC*,
　No. 2:19-cv-00902-WBS, 2019 WL 3683706 (E.D. Cal. Aug. 6, 2019) ............................. 7, 8

*Hartford Life Acc. Ins. Co. v. White*,
　No. C 09-05668 JSW, 2010 WL 2573926 (N.D. Cal. June 25, 2010) .................................. 14

*Howard v. County of Amador*,
　220 Cal. App. 3d 962 (1990) .................................................................................................. 8

*Hunt v. Smyth*,
　25 Cal. App. 3d 807 (1972) .................................................................................................... 7

*Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,
　No. C 09-00355 WHA, 2011 WL 5974668 (N.D. Cal. Nov. 29, 2011) .................................. 5

*Key Pharms. v. Hercon Lab'ys Corp.*,
　161 F.3d 709 (Fed. Cir. 1998) ................................................................................................ 4

*Life Techs. Corp. v. Pac. Biosciences of Cal., Inc.*,
　No. 11-cv-1582-PSG, 2012 WL 28712 (N.D. Cal. Jan. 5, 2012) ....................................... 5, 6

*Malveda v. Experian Info. Sols., Inc.*,
　No. 21-CV-07244-RS, 2022 WL 94921 (N.D. Cal. Jan. 10, 2022) ........................................ 8

*Miran v. Convergent Outsourcing Inc.*,
　No. 16-CV-0692-AJB-(JMA), 2016 WL 7210382 (S.D. Cal. Dec. 13, 2016) ........................ 8

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
  21 F.4th 1362 (Fed. Cir. 2022) .................................................................................................. 6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................................................. 4

*Reuland Electric Co. v. Burgi Engineers LLC*,
  No. 13-cv-9499-SJO, 2015 WL 12683953 (C.D. Cal. Apr. 24, 2015) ...................................... 8

*Scheer v. Tollman*,
  No. 94-cv-4382 JFK, 1996 WL 420172 (S.D.N.Y. July 25, 1996) ........................................... 8

*TechSearch, L.L.C. v. Intel Corp.*,
  286 F.3d 1360 (Fed. Cir. 2002) .................................................................................................. 4

*Vallely Invs., L.P. v. BancAmerica Com. Corp.*,
  88 Cal. App. 4th 816 (2001) ...................................................................................................... 8

*Waller v. Truck Ins. Exch., Inc.*,
  11 Cal. 4th 1 (1995) ................................................................................................................. 12

*Wi-LAN Inc. v. LG Electronics, Inc.*,
  No. 18-cv-01577-H-BGS, Dkt. 278 (S.D. Cal. Oct. 24, 2019) .................................................. 8

*Wyeth v. Abbott Lab'ys*,
  No. CIV.A. 08-1021 JAP, 2012 WL 175023 (D.N.J. Jan. 19, 2012), *aff'd sub nom. Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380 (Fed. Cir. 2013) ....................... 5

**STATEMENT OF THE RELIEF REQUESTED**

Pursuant to Fed. R. Civ. P. 56(a), Sonos requests the Court issue an Order granting summary judgment against Google as to Google's claims for breach of contract and conversion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Court should grant summary judgment in favor of Sonos on Google's claims for breach of contract and conversion. Both claims rely on Google's theory that a 2013 agreement between the parties gave Google rights to direct control technology, and that Sonos breached that 2013 agreement and converted Google's property when, in 2019, Sonos claimed a particular aspect of direct control technology in the '033 patent. Google's claims fail for multiple reasons.

First, Sonos invented the claimed direct control technology in 2011. Google does not dispute that under the plain language of the 2013 agreement *none* of Sonos's preexisting intellectual property was assigned to Google. The invention claimed in the '033 patent was fully described in 2011, when Sonos's inventors filed a specification that is *identical* to the specification of the '033 patent. As a result, under the express terms of the agreement that Google relies on, the inventions described in that (common) specification are Sonos's preexisting intellectual property and were *not* assigned to Google. § I.A.

Second, if, as Google contends, Sonos's breach came in 2019 which Sonos first filed the claims of the '033 patent, the 2013 agreement had been expressly superseded by a 2018 agreement. Google disputes this by arguing that the 2018 agreement relates to different subject matter. But the 2018 agreement *actually says* it covers direct control technology. Thus, to the extent Google is correct that Sonos obtained intellectual property rights to the direct control technology claimed in the '033 patent sometime in or after 2018, Google cannot claim that was a breach of the 2013 agreement because by that time the 2013 agreement was not operative. § I.B.

Stuck in this box, Google makes a series of irrelevant arguments about whether the 2013 agreement did or did not cover direct control. § I.C. Google also raises entirely new theories of how Sonos breached the 2013 agreement, but none have merit. § I.D. Finally, Google tries to salvage its conversion claim, but that is entirely wrapped up its claim to ownership of direct control technology via the 2013 agreement. § I.E. The Court should grant summary judgment.

# I. ARGUMENT

## A. The 2013 Content Integration Agreement Does Not Give Google Rights To Sonos's 2011 Invention

### 1. Sonos Retains All Preexisting Intellectual Property Under the CIA.

The 2013 CIA does not give Google the right to any of Sonos's preexisting intellectual property. *See* Mot. at 10-11. Google does not dispute this fact. Opp. at 19. More specifically, the CIA provides that Google retained rights to its "Music Service" (at that time, Google Play Music), as well rights to the "Provider Developments" used to make the "Integrated Service Offering," which was the programming that would allow users to access the Google Play Music service via the Sonos controller app. Kolker Decl. Ex. 2 (CIA), § 3.4 & Recitals. That is the extent of the affirmative grant of intellectual property to Google in the CIA. The CIA makes the limited nature of this grant explicit by providing that "[t]he Sonos MMS and any and *all intellectual property rights arising from or related thereto are* and *shall remain* the sole and exclusive property of Sonos." *Id.* § 3.5 (emphasis added). In other words, the CIA says both what it grants to Google in § 3.4, and clarifies that Sonos retains all other intellectual property in § 3.5. Thus, the 2013 CIA did not purport to (and cannot reasonably be construed to) give Google ownership over an invention that Sonos disclosed to the Patent Office in 2011. Mot. at 6-7.

Google nonetheless argues that the aspects of remote playback queue technology claimed in the '033 patent belongs to Google. Because the specification supporting the '033 patent was filed in 2011, a necessary hurdle to Google's argument is to demonstrate, by clear and convincing evidence, that the '033 patent claims lack written description support in the 2011 specification. Mot. at 11-12.[1] Google disputes this conclusion on three bases, none of which have merit.

First, Google erroneously suggests in passing that the Court has already rejected Sonos's written description arguments, because "*at the pleading stage*" the Court permitted Google to

---

[1] That is just a first hurdle. It is not relevant here, given the unambiguous scope of the contract, but even if Google *could* demonstrate that the '033 patent lacked written description support, that would not mean Google has rights to any aspect of direct control technology, or cloud queue technology. Ample evidence outside the '033 specification demonstrates that Sonos independently developed remote playback queues, cloud queues, and direct control.

1  amend to add the breach of contract and conversion claims. Opp. at 18-19 (emphasis added). As
2  Sonos explained, in that ruling the Court merely concluded that Google could amend its complaint,
3  notwithstanding the specification's 2011 date, reasoning that duly issued patents *may* be subject to
4  written description challenges. Mot. at 12 (citing Dkt. 111 at 6). Since the pleading stage, Google
5  has identified no substantive factual or legal support for such a theory.

6  Second, Google contends that "[n]o IP right existed in the '033 patent until after 2019,"
7  because "Sonos *products*" "did not have a cloud queue API" prior to 2013. Opp. at 19 (emphases
8  altered). But Google is confusing Sonos's commercial embodiments with the scope of the 2011
9  invention. To the extent that Google means to suggest that Sonos's retention of preexisting
10 intellectual property rights in the CIA is limited to existing "Sonos products," Google offers no
11 support—textual or otherwise—for such a proposition. Sonos's intellectual property in the field of
12 wireless multiroom audio is "related" to the "Sonos MMS" under any reading of those terms.
13 Kolker Decl. Ex. 2, CIA Recitals. Nor does Google point to any provision in the contract that
14 *divested* Sonos of preexisting intellectual property. Instead, Google cites 19th century authority for
15 the proposition that until a patent is actually issued, there is no property right in it. The '033 patent
16 does not merely "claim priority to" 2011, Opp. at 19, its claims were issued on the basis of a
17 continuation application with an *identical* specification to the 2011 application. So Google's
18 argument does not avoid the written description question at all—either the 2011 specification
19 contained written description support for the 2019 patent claims asserted in this case, or it did not.[2]

20 Third, Google argues that "[r]egardless of what Sonos disclosed in a specification filed in
21 2011, Sonos agreed in 2013 not to claim Google's development work as its own, *whether based on*
22 *some previously filed specification or otherwise*." Opp. at 19 (emphasis added). Once again,
23 Google's argument highlights the written description problem rather than avoiding it. Under the
24 CIA's express terms, Sonos retained the right to its preexisting intellectual property, and Google
25 retained the right to anything new that it created as part of the development work. If what Google

---

[2] Even if Sonos did not have enforceable patent rights in the '033 patent before it issued, Opp. at 19, Sonos did have the right to draft claims to every invention disclosed in the 2011 specification. Moreover, if Sonos's "IP right" did not exist until 2019, then Sonos's allegedly wrongful conduct took place *after* the 2013 CIA was superseded by the 2018 SIA. *Infra* § I.B.

- 3 -  SONOS'S REPLY ISO MSJ
3:20-cv-06754-WHA

characterizes as "Google's development work" is actually Sonos's 2011 invention (or prior work not expressly disclosed in the 2011 specification), then that "work" was by definition not "develop[ed]" by Google at all. Meanwhile, Google admits that Sonos's development of "direct control" technology was underway in 2011—before the CIA, and consistent with Sonos's arguments. Opp. at 3, 5. In sum, despite Google's arguments, the contract and conversion claims boil down in the first instance to a written description question.

**2. Google Cannot Show Any Material Dispute Of Fact As To Written Description.**

The 2011 specification fully supports the claims of the '033 patent. Google has two quarrels with the specification. Neither creates a material dispute of fact. Opp. at 19-20. The primary "evidence" that Google points to is the report of Google's expert, Dr. Bhattacharjee. Opp. at 20. But that conclusory expert testimony, which does not even apply the correct claim construction, does not sustain Google's burden of establishing lack of written description support by clear and convincing evidence. *Cf. TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) ("unsupported or conclusory [expert] averments are insufficient to avoid summary judgment where the moving party has met its initial burden"); *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent'") (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

*First*, Google contends that the '033 patent does not adequately describe the term "remote playback queue," and that to the extent remote playback queue is supported it must be limited to a third-party queue. This is yet another attempt to advance a claim construction argument that Google has already made, abandoned, and unsuccessfully attempted to resuscitate. *See* Mot. at 13-14; Dkt. 432 at 1-4. Regardless, as Sonos's expert explained, the '033 patent contains multiple examples of remote playback queues, both third-party and otherwise. Mot. at 5; Schmidt Reply Decl. Ex. 13 (Schmidt Rebuttal Report), ¶¶ 962-971. As one example, the '033 patent describes a "a shared queue" that is "provided between the local playback system and the third party application to keep the local system and application synchronized." Kolker Decl. Ex. 1 ('033 patent) at 16:64-67. As

another, the specification describes an embodiment where "a user can queue up music while away from his or her house" using an "application," without limiting the application to a third-party music service. *Id.* 17:8-12.[3]

Google nonetheless maintains that the 2011 specification fails to adequately describe remote playback queues based on the status of Sonos's commercial implementations of the technology in 2011. Opp. at 20. But as Sonos explained, this evidence doesn't move the ball, because the written description test "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art," and thus has *nothing* to do with what was in a commercial embodiment. *See Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. C 09-00355 WHA, 2011 WL 5974668, at *9 (N.D. Cal. Nov. 29, 2011) (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (2010)).

Google responds that such evidence nonetheless "will 'shed light on whether possession would be understood.'" Opp. at 20 (quoting *Life Techs. Corp. v. Pac. Biosciences of Cal., Inc.*, No. 11-cv-1582-PSG, 2012 WL 28712, at *2 (N.D. Cal. Jan. 5, 2012)). But *Life Tech* involved a motion to compel discovery on this issue, not a party resisting summary judgment on the *sole* basis of an actual reduction to practice argument. *Life Tech* even rejects Google's position explicitly, noting that "an actual reduction to practice [is] neither *necessary* nor sufficient." 2012 WL 28712, at *2 (emphasis added). *Wyeth*, on which Google also relies, Opp. at 20, is also inapposite. *See Wyeth v. Abbott Lab'ys*, No. CIV.A. 08-1021 JAP, 2012 WL 175023, at *7 (D.N.J. Jan. 19, 2012), *aff'd sub nom. Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380 (Fed. Cir. 2013). Google cites *Wyeth* for the proposition that "[l]ogically, the inventors could not have described a knowledge that they did not possess" where neither inventor "knew exactly how" to implement the claimed invention. Opp. at 20 (quoting *Wyeth*, 2012 WL 175023, at *8). But Google has pointed to no evidence about what the inventors of the '033 patent knew or did not know in 2011. All Google

---

[3] Google faults the "shared queue" embodiment on the basis of (1) Google's erroneous technical understanding that "[t]he shared queue is stored locally on the playback device," *cf.* Schmidt Reply Decl. Ex. 13 (Schmidt Rebuttal Report), ¶ 971, and (2) Google's erroneous assumption that a user queuing music via a third-party application does not disclose a remote playback queue, *cf.* Schmidt Decl. Ex. 1 (Schmidt Rebuttal Report), ¶¶ 947-951.

1  has established is that Sonos did not *sell products* practicing the invention in 2011.  But as *Life Tech* notes, even if such evidence might "shed light" on "possession," it is not a "necessary" element of written description support.  2012 WL 28712, at *2.  Rather, "it is the specification itself that must demonstrate possession."  *Ariad*, 598 F.3d at 1352.  Despite citing district court decisions from both coasts, Google identifies no case in which a lack of commercial embodiments *alone* (or in combination with rebutted, conclusory expert testimony) was enough to sustain a written description challenge by clear and convincing evidence.

*Second*, Google says the specification does not describe the claimed "instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue."  Wrong again.  Dr. Schmidt explains that the patent describes a control device (like a smartphone) connected to a local area network (e.g., a WiFi network) which communicates with the speakers to instruct the speakers to take over playback, "from the same spot" as was playing on the phone, including instructions for the speakers to "fetch content from a cloud and/or other networked source," including retrieving "a song and/or playlist."  Kolker Decl. Ex. 1 ('033 Patent), 12:41-64; *see also, e.g.*, *id.* 15:54-63; Schmidt Reply Decl. Ex. 13 (Schmidt Rebuttal Report), ¶¶ 962-971.

Finally, Google argues that written description challenges are fact intensive and therefore not generally amenable to resolution on summary judgment, but Google's actual arguments rely on theories that can and should be rejected as a matter of law.  For example, Google argues that the '033 patent lacks written description support because the specification does not literally say the words "remote playback queue."  See Opp. at 22 ("There is no mention of a 'remote playback queue.'").  But Google ignores this Court's prior ruling that "the specification does not have to use the term verbatim to provide sufficient disclosure."  Dkt. 309 at 16 (citing *Ariad*, 598 F.3d at 1352; *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370 (Fed. Cir. 2022)); Mot. at 12-13 (citing Dkt. 309 at 16).

Google then argues that "Sonos also suggests that the written description does not need to support the full scope of the claim."  Opp. at 22.  That is inaccurate.  Rather, Sonos noted the uncontroversial legal principle that "the *embodiments* of the specification" need "not contain

- 6 -

SONOS'S REPLY ISO MSJ
3:20-cv-06754-WHA

*examples* explicitly covering the full scope of the claim language." Mot. at 12 (citing *Genentech, Inc. v. Trs. of Univ. of Pa.*, 871 F. Supp. 2d 963, 980 (N.D. Cal. 2012); *Conceptus, Inc. v. Hologic, Inc.*, No. 3:09-cv-002280-WHA, Dkt. 475 ¶ 39 (N.D. Cal. Oct. 14, 2011) (final jury charge)). These cases reject the idea that a written description challenge can be sustained on the basis that one single embodiment in the specification must cover the claim exactly, which is what Google seeks to do here. But Google offers no response to the arguments Sonos actually made, and the holdings that Sonos actually cites.

For all of these reasons, Google's arguments regarding a lack of written description fail. Because the 2011 specification fully supports the '033 patent claims, Sonos never gave Google ownership over that intellectual property under the 2013 CIA.

**B.     The 2018 SIA Superseded All Prior Related Agreements.**

If the Court agrees that the '033 patent claims an invention disclosed in 2011, it can stop there and grant summary judgment in favor of Sonos. If the Court disagrees and considers Google's argument that Sonos breached the 2013 CIA when Sonos filed the claims in the '033 patent in 2019, then the Court should grant summary judgment in favor of Sonos because the 2013 CIA was superseded in 2018.

In 2018, the parties signed a new contract called the Service Integration Agreement, or SIA. The SIA expressly governed direct control technology and expressly superseded the CIA. Mot. at 15-16. Specifically, the SIA states that it "*supersedes* all prior communications, negotiations, understandings, agreements or representations, either written or oral, by or among the Parties regarding its subject matter." Kwasizur Decl. Ex. 1 (SIA), § 12.8.

Google does not dispute the four requirements for novation under California law, Mot. 15, but challenges whether the SIA extinguished the CIA, Opp. at 22-23. Google's primary argument seems to be that the SIA had to expressly mention the CIA to constitute a novation. Opp. at 23-24. There is no such requirement in California. *See Hunt v. Smyth*, 25 Cal. App. 3d 807, 818 (1972) ("it is not necessary to meet and state either in writing or orally that the original contract was rescinded"). The express language that the SIA "supersedes all prior … agreements" is more than sufficient to establish novation. *See Harper v. Charter Commc'ns, LLC*, No. 2:19-cv-00902-WBS,

2019 WL 3683706, at *7 (E.D. Cal. Aug. 6, 2019) (clause that agreement "supersedes any other agreement" sufficient to establish "extinguishment of the old contract").

Given the plain language of the contracts, there is no need to consult any extrinsic evidence to determine the "intent" of the parties.[4] Where "the issue turns upon the meaning of a written instrument and there is no conflicting extrinsic evidence, then the question is one of law upon which a reviewing court may exercise its independent judgment." *Howard v. County of Amador*, 220 Cal. App. 3d 962, 980 (1990). The intent is plain from the face of the SIA: to supersede all prior agreements.

None of Google's cases counsel against a finding of novation given the contractual language at issue here. *Harper* actually *supports* finding novation, as it considered similar language that the new agreement "supersedes any other agreement" sufficient for novation. And in *Malveda*, the clause at issue contained no "explicit language indicating intent to supersede prior contracts, unlike the clause at issue" in the SIA here. *Malveda v. Experian Info. Sols., Inc.*, No. 21-CV-07244-RS, 2022 WL 94921, at *2 (N.D. Cal. Jan. 10, 2022); *see also Vallely Invs., L.P. v. BancAmerica Com. Corp.*, 88 Cal. App. 4th 816, 832 (2001) (no language in the contract supported a novation). Similarly, the court distinguished the language at issue in *Wi-LAN Inc. v. LG Electronics, Inc.*, No. 18-cv-01577-H-BGS, Dkt. 278 at 56-57 (S.D. Cal. Oct. 24, 2019)—that the new contract "supersede all prior and contemporaneous oral or written *understandings* between the Parties with respect to the subject matter thereof"—from other cases upholding novation where the contract expressly stated it *superseded* prior *agreements*. In sum, Google has not identified a single case involving similar contract language to the SIA that either denied novation or found a question of fact preventing summary judgment. Summary judgment is appropriate here.

---

[4] While Google emphasizes that intent is a fact question, the cases it cites in support involved disputed issues regarding a purported oral novation, as in *Fanucchi & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1085 (9th Cir. 2005) and *Scheer v. Tollman*, No. 94-cv-4382 JFK, 1996 WL 420172, at *5 (S.D.N.Y. July 25, 1996), and cases where the contract *lacked* clear language that the contract superseded prior agreements, as in *Global Trim Sales, Inc. v. Checkpoint Systems UK Ltd.*, No. 12-cv-1314-JLS, 2014 WL 12690629, at *4 (C.D. Cal. Sept. 17, 2014), *Reuland Electric Co. v. Burgi Engineers LLC*, No. 13-cv-9499-SJO, 2015 WL 12683953, at *8 (C.D. Cal. Apr. 24, 2015), and *Miran v. Convergent Outsourcing Inc.*, No. 16-CV-0692-AJB-(JMA), 2016 WL 7210382, at *4 (S.D. Cal. Dec. 13, 2016).

Google also contends that the "2018 SIA cannot be a novation of the 2013 CIA because the 2018 SIA and 2013 CIA are directed to different subject matter." Opp. at 24. According to Google, the CIA was about integrating Google Play Music and the SIA was about integrating YouTube Music. *Id.* Yes, between 2013 and 2018 YouTube Music was in the process of replacing Google Play Music, and Google Play Music was eventually taken off the market. *See, e.g.*, Kolker Reply Decl. Ex. 16 (House Tr.) at 145:7-20. But the SIA does not just cover integrating YouTube Music with the Sonos system. There is no reasonable dispute that the SIA covers direct control technology. The SIA defines the "Direct Control Experience" to mean "the experience whereby an End User may control the Sonos System from within the Service Provider App." Kwasizur Dec. Ex. 1 (SIA), § 1.5. And the purpose of the agreement was

> [T]o allow End Users to play the Content Service over the Sonos System either (a) by controlling the Content Service within the Sonos Application or (b) *by playing to the Sonos System from within the Content Service Application.*

*Id.*, SIA Recitals; *see also id.* § 3.1.2 ("Direct Control Experience"). So either both the SIA and the CIA cover direct control technology, and the SIA supersedes the CIA. Or the CIA (which omits any mention of the "direct control experience" or playing music "from within the Content Service Application") did not cover direct control, and therefore Google cannot claim any reading of the CIA that would give it ownership over direct control technology. In either case, Google has no claim to ownership of direct control technology and summary judgment should be granted.

**C.     The 2013 CIA Did Not Grant Any Rights In Direct Control To Google.**

The two points above fully resolve this motion: either Sonos described the claimed aspects of direct control in 2011 and did not give up direct control in the 2013 CIA, or Sonos first claimed the asserted direct control implementation in 2019, after the 2018 SIA superseded the 2013 CIA. Google nonetheless contends that the 2013 CIA *had to* cover direct control because the parties worked on direct control technology sometime between 2013 and 2018. (Of course, if the CIA covered direct control, then there is no dispute that the SIA superseded the CIA.) For completeness, we respond briefly to this erroneous assertion that the 2013 CIA covered direct control at all. But again, it makes no difference because Sonos either already invented, and retained rights to, direct

control, or Sonos's purported "breach" occurred after the SIA superseded the CIA.

The 2013 CIA contains a limited grant of intellectual property rights to Google, namely rights to Google Play Music and the "Integrated Service Offering." Mot. at 16-17 (citing Kolker Decl. Ex. 2 (CIA), § 3.4). Sonos retains all other intellectual property rights. *Id.*, CIA § 3.5. Google does not dispute this. Instead, Google argues that the "Integrated Service Offering" encompassed direct control technology. Opp. at 15. It does not.

*First*, Google searches for a textual hook for its interpretation of the CIA, pointing to the definition of Integrated Service Offering and a reference to a "Media Route Protocol." Opp. at 15-16. Google cannot manufacture any ambiguity in the definition of Integrated Service Offering. That definition—programming that would allow the Sonos app to "play content provided by the Music Service on or through the Sonos MMS"—unambiguously supports Sonos, not Google.

The "Integrated Service Offering" is defined as "an application that allows consumers of the Sonos MMS to directly access, control and play content provided by the Music Service on or through the Sonos MMS." Kolker Decl. Ex. 2, CIA Recitals. That "application" was to be developed "[t]hrough the use of an application program interface developed by Sonos (the 'Sonos API')," and provided to Google under a separate agreement. *Id.* So under the CIA, Google was going to develop programming that would enable the Sonos controller application to "access, control and play content provided by the Music Service on or through the Sonos MMS." That is why the CIA is a *Content* Integration Agreement, with Google Play Music's content being integrated into the "Sonos MMS" through use of a Sonos-provided API. Both parties agree that this refers to "SMAPI," or the "Sonos Music API," whereby "customers who were 'subscribed to a music service that was compatible with Sonos' were required to log in to the compatible music service using the Sonos app before music could be streamed to their Sonos speakers." Opp. at 3; *see also id.* at 6. That is the exact opposite of direct control; direct control is the integration of Sonos control functionality into a content provider application (e.g., the Spotify app). Mot. at 16-17; *compare* Kwasizur Decl. Ex. 1 (SIA), § 3.1.2.

Google's extrinsic evidence confirms that the parties consistently used the term "direct control" to refer to the integration of Sonos control functionality into a content provider application,

1  thereby allowing a user to control their speakers through a non-Sonos app. *See* Kwasizur Decl. Ex.
2  1 (SIA), § 3.1.2.  In contrast, the CIA was about putting non-Sonos *content* into the Sonos app.
3  Thus the CIA talks about the ability to "directly access, control and play *content* provided by the
4  Music Service," not the ability to directly control *speakers*.  The definition that Google cites do not
5  say that users will be able to *directly control Sonos speakers* via a content provider's application.
6  To the limited extent that they refer to "directly … control" at all, they say that users will be able
7  to playback and directly control *Google Play Music*.  *See* Kolker Decl. Ex. 2, CIA Recitals (defining
8  "Integrated Service Offering" as "an application that allows consumers of the Sonos MMS to
9  directly access, control and play *content provided by the Music Service* on or through the Sonos
10 MMS" (emphasis added)).

11      Google's reliance on the CIA's mention of the "Media Route Provider protocol," Opp. at
12 15-16, is also inapt.  Cloud queue didn't use MRP, Kolker Reply Decl. Ex. 14 (Ghosh Tr.) at
13 160:12-17, 161:9-162:6, so at best this shows that the CIA included some MRP-related technology,
14 not cloud queue.  Google has made *no* attempt to tie MRP to cloud queue.  Regardless, the definition
15 of Integrated Service Offering makes no mention of this isolated reference to MRP.  Kolker Decl.
16 Ex. 2 (CIA), Recitals & § 3.4.  Google's reliance on extrinsic evidence to support this argument
17 makes clear that this is not really a textual argument at all.  *See* Opp. at 16 (citing three depositions
18 and one extrinsic document).

19      Finally, Google contends that the CIA must have encompassed direct control technology
20 because (1) both the 2013 CIA and 2018 SIA refer to APIs developed by Sonos and (2) the 2018
21 SIA *expressly* refers to direct control technology. Opp. at 16.  But the parties have never disputed
22 that Sonos has had many different APIs over the years.  Obviously, an API referenced in a 2013
23 form agreement is not necessarily the same as an API referenced in a 2018 form agreement that *on
24 its face* has a broader scope.

25      **Second**, Google seeks refuge in extrinsic evidence.  Because Google has identified no
26 textual ambiguity or absurdity, no extrinsic evidence should be considered. *See, e.g., CLRB Hanson
27 Indus., LLC v. Google Inc.*, No. C 05-03649 JW, 2008 WL 2079200, at *3 (N.D. Cal. May 14,
28 2008) ("[o]nly when terms are ambiguous, does the court look to extrinsic evidence to aid

1   interpretation") (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19, (1995)).  Google
2   nonetheless tries to manufacture a triable issue of fact by pointing to parole evidence.  But Google's
3   purported evidence fails to even do that.

4   The only extrinsic evidence Google can point to is ambiguous deposition testimony.  For
5   example, Google attempted to get one witness to state that the CIA's reference to MRP suggested
6   that the CIA encompassed direct control.  *See* Opp. at 17 (citing Google Ex. 34 (Torgerson Tr.)).
7   But all that witness testified was that the CIA's reference to MRP suggested that the CIA was not
8   exclusively limited to SMAPI.  *See id.*  Google also hangs its hat on a statement by a single project
9   manager that "to the best of [her] knowledge" the CIA encompassed "the direct playback aspect of
10  the Google/Sonos collaboration" in addition to "cover[ing] SMAPI."  *See* Opp. at 17 (citing Google
11  Ex. 9 (Bender Tr.)).  Google dismisses contrary testimony from Sonos's Assistant General Counsel
12  and argues that this testimony should be ignored in favor of a sole non-lawyer project manager,
13  whose testimony was not backed up by anyone—but most importantly is not backed up with the
14  text of the CIA.  *See id.*

15  Google also takes issue with testimony establishing that the 2013 CIA was simply a form
16  agreement, arguing that it was "a custom one that was 'negotiat[ed] and redline[d]' over the course
17  of five months."  Opp. at 17.  But that hardly helps Google's cause.  If the parties extensively
18  negotiated and modified this agreement and yet never saw fit to add any express reference to direct
19  control technology, that just further establishes Google's inability to point to any genuine factual
20  dispute precluding summary judgment.

21  At core, Google seems to urge the Court to deny summary judgment simply because, in
22  Google's words, the "implication that there is *no* contract that governed the parties' years-long
23  development of the cloud queue API is illogical and unreasonable given the sophistication of these
24  parties."  Opp. at 2.  But sophisticated parties make all kinds of decisions that you might not expect.
25  Google cites no authority supporting its gut-based argument that the parties *must* have executed a
26  formal written contract to cover one aspect of their collaboration during a particular period,
27  ignoring the plain and unrebutted evidence of what actually happened:  the parties executed the
28  2013 Content Integration Agreement to cover their collaboration regarding SMAPI and the

*integration* of Google's *content*—Google Play Music—and only later, in 2018, executed a separate agreement covering both SMAPI and direct control technology, at a time when Google Play Music was in the process of being replaced by Google's successor product, YouTube Music. Nothing in the text of the CIA supports this argument. There is no basis for reading the CIA to cover direct control technology.

### D. The Court Should Reject Google's New Theories Of Breach.

Besides claiming direct control technology in the asserted '033 patent, Google for the first time identifies three other ways Sonos purportedly breached the CIA. Opp. at 18. First, Google argues that Sonos breached the 2013 CIA by filing "patent application[s]" related to "the cloud queue API" that resulted in patents not asserted here. *Id.* Second, Google argues that "Sonos used Google's cloud queue API—including material in documents that Google shared with Sonos during the collaboration—with its other partners …." *Id.* And third, Google argues that "Sonos has attempted to exercise dominion over Google's right to commercialize the cloud queue API by accusing the cloud queue API of infringement in this lawsuit." *Id.*

None of these theories were previously disclosed, and thus none are timely. Google's complaint makes this perfectly clear. First, the phrase "cloud queue API" appears exactly once in Google's operative complaint, *see* Dkt. 125 ¶ 29, in a paragraph that says nothing about Sonos's filing of related patents. *Cf.* Opp. at 18. Second, Google's operative complaint[5] makes zero mention of *any* theory of breach related to "Sonos us[ing] Google's cloud queue API … with its other partners." *Cf.* Dkt. 125; Opp. at 18. Third, Google's operative complaint makes no reference to Sonos "attempt[ing] to exercise dominion over Google's right to commercialize the cloud queue API by accusing the cloud queue API of infringement in this lawsuit," Opp. at 18. Rather, Google's complaint made clear that the basis for its "exercisin[g] dominion" claim was in Sonos "fil[ing] for

---

[5] Google *did* disclose a version of this theory on the last day of discovery as a new basis for its unclean hands *defense*. As Judge Ryu's minute order notes, "by serving a supplemental response on the last day of discovery that disclosed [this] new information, Google prejudiced Sonos' ability to take discovery on its unclean hands defense based on Sonos's conduct with third parties," requiring "additional discovery" to "remed[y]" "[t]his prejudice." Dkt. 519. By contrast, Google did *not* disclose that this argument would serve as a new basis for its breach theory at any point during discovery.

1  patents" "including the '033 patent." Dkt. 125 ¶ 96. The complaint simply does not allege that
2  Sonos breached any agreement by filing this lawsuit.

3  Moreover, the only disclosure of these theories in Google's expert reports is in connection
4  with an improper inventorship argument under pre-AIA § 102(f)—not breach of contract or
5  conversion. *See* Google Ex. 36 (Bhatta. Op.), ¶ 813. The Court has already explained why Google
6  cannot use a conversion claim as a backdoor to an inventorship argument. Dkt. 111 at 9
7  ("inventorship is exclusively a matter of federal patent law"). For the same reason—i.e., federal
8  preemption—Google cannot use a breach of contract claim as a backdoor to an inventorship
9  argument.

10  In addition to being undisclosed and untimely, Google's new theories fail to create a
11  genuine dispute of material fact. Two of the theories are barred by the statute of limitations. For
12  example, Google's claim that Sonos breached the 2013 CIA by filing "patent application[s]" related
13  to "the cloud queue API" "six months into the parties' collaboration"—i.e., *10 years ago*—would
14  be barred by the statute of limitations even if Google had attempted to amend its complaint to add
15  this claim. *See, e.g.*, *Hartford Life Acc. Ins. Co. v. White*, No. C 09-05668 JSW, 2010 WL 2573926,
16  at *4 (N.D. Cal. June 25, 2010) ("Under California law, the statute of limitations on claims for
17  breach of contract is four years."). Google has known about those applications and patents since
18  at least September 2016. Kolker Reply Decl. Ex. 15 (9/2/2016 email and attachment) at SONOS-
19  SVG-00043200-202. The same is true of Google's new claim that "Sonos used Google's cloud
20  queue API—including material in documents that Google shared with Sonos during the
21  collaboration—with its other partners …." Opp. at 18. According to Google, Sonos publicly took
22  credit for cloud queue at a "summit [Sonos] hosted in June 2015"—more than *five* years before this
23  suit. *Id.* at 12.

24  Because none of Google's new theories create any genuine dispute of fact, the Court should
25  grant summary judgment on Google's breach of contract and conversion claims.

26  **E.   Sonos Did Not Convert Google's Property.**

27  Google's conversion claim is premised on its contention that Google owns or has a right to
28  the aspects of direct control claimed in the '033 patent. Dkt. 125 ¶¶ 95-96. Indeed, the first element

of a claim of conversion is "ownership or right to possession of personal property." Dkt. 111 at 7; *see also id.* at 9 (permitting amendment to plead "allegations regarding *ownership* of the cloud queue technology") (emphasis added).

Google now argues that by "relying upon information shared during the cloud queue collaboration to draft patents and claims" to cloud queue technology, "Sonos has wrongfully exercised dominion over the cloud queue API." Opp. at 25. This still requires Google prove that it owns cloud queue technology or the cloud queue API; Sonos obviously cannot "wrongfully" exercise dominion over its own property. Because Google's conversion theory turns entirely on its claim of ownership of (all or part of) cloud queue technology, and Google's only basis for claiming ownership is the CIA, Google's breach of contract and conversion claims rise and fall together.

## II. CONCLUSION

For the foregoing reasons, Sonos requests that the Court grant Sonos's motion for summary judgment against Google with respect to Google's claims for breach of contract and conversion.

Dated: February 28, 2023

By: */s/ Clement S. Roberts*

CLEMENT SETH ROBERTS
BAS DE BLANK
ALYSSA CARIDIS

ORRICK, HERRINGTON & SUTCLIFFE LLP

SEAN M. SULLIVAN
COLE B. RICHTER

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Sonos, Inc.*