# Sonos, Inc.'s Motion *In Limine* No. 2

# EXHIBIT E

# (Filed Under Seal)

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
COLE RICHTER (*pro hac vice*)
richter@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:     +1 312 754 0002
Facsimile:     +1 312 754 0003

*Attorneys for Defendant Sonos, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION"

| | |
|---|---|
| GOOGLE LLC, | Case No. 3:20-cv-06754-WHA |
| Plaintiff and Counter-defendant, | Related to Case No. 3:21-cv-07559-WHA |
| v. | **REBUTTAL EXPERT REPORT OF** |
| SONOS, INC., | **DR. KEVIN C. ALMEROTH** |
| Defendant and Counter-claimant. | |

# TABLE OF CONTENTS

I.      BACKGROUND AND QUALIFICATIONS ........................................................................1

II.     BRIEF OVERVIEW OF CASE POSTURE ......................................................................6

III.    SCOPE OF ASSIGNMENT ................................................................................................8

IV.     METHODOLOGY AND INFORMATION CONSIDERED .............................................9

V.      SUMMARY OF OPINIONS ..............................................................................................10

VI.     LEGAL STANDARDS ........................................................................................................12

        A.      Priority Date .........................................................................................................12

        B.      Qualification as Prior Art ...................................................................................12

        C.      Prior Art Considered by USPTO ........................................................................13

        D.      Presumption of Validity .......................................................................................14

        E.      Anticipation (35 U.S.C. § 102)............................................................................14

        F.      Obviousness (35 U.S.C. § 103) ............................................................................15

        G.      Obviousness-Type Double Patenting ..................................................................19

        H.      Conception & Reduction to Practice ..................................................................19

        I.      Acceptable Non-Infringing Alternatives ...........................................................21

VII.    LEVEL OF ORDINARY SKILL IN THE ART ...............................................................22

VIII.   THE COURT'S SUMMARY JUDGEMENT ORDERS REGARDING THE '885
        PATENT ..............................................................................................................................24

IX.     OVERVIEW OF THE '966 PATENT ...............................................................................33

        A.      Background.............................................................................................................34

        B.      Sonos's Zone Scene Technology..........................................................................35

        C.      The Asserted Claims.............................................................................................43

        D.      Prosecution History ..............................................................................................45

X.      CLAIM CONSTRUCTION ...............................................................................................45

        A.      Claim Terms Addressed in the Court's Summary Judgment Order.....................45

                1.      "Zone Scene"..............................................................................................47

                2.      "Indication" – "Has Been Added"............................................................50

3.    "Indication" – "Comprising a [Given] Predefined Grouping of Zone Players Including at Least the First Zone Player and a [Given Other] Zone Player" .................................................................. 51

B.    Other Disputed Claim Terms ................................................................ 53

1.    "Data Network" ....................................................................... 53

2.    "Zone Player" .......................................................................... 54

3.    "Standalone Mode" ................................................................ 55

C.    Response to Dr. Schonfeld's Section Entitled "The Court's July 21, 2022 Order and Claim Construction Developments" ................................. 58

1.    Dr. Schonfeld's "Zone Scene" Sub-Section ............................. 59

2.    Dr. Schonfeld's "Indication" Sub-Section ............................... 62

3.    Dr. Schonfeld's "Standalone" Sub-Section ............................. 68

4.    Dr. Schonfeld's "Written Description" Sub-Section ................ 69

XI.   RELEVANT DATES FOR THE '966 PATENT ................................................ 79

A.    Priority Date ........................................................................................ 79

B.    Invention Date .................................................................................... 116

1.    Conception ............................................................................ 118

2.    Diligence between December 21, 2005 and September 12, 2006 .......... 149

XII.  STATE OF THE ART ..................................................................................... 154

XIII. OVERVIEW OF THE ALLEGED PRIOR ART ............................................ 155

A.    Sonos System ...................................................................................... 155

1.    Introduction of Dr. Schonfeld's "Sonos System" Reference ................. 155

2.    Overview of Dr. Schonfeld's "Sonos System" Evidence ....................... 156

3.    Overview of Sonos's 2005 System ........................................ 157

B.    Sonos Forums ...................................................................................... 164

C.    Squeezebox .......................................................................................... 172

1.    Introduction of Dr. Schonfeld's "Squeezebox" Reference .................... 172

2.    Overview of Dr. Schonfeld's "Squeezebox" Evidence .......................... 173

3. Overview of a "Squeezebox" System ...................................... 200

D. Bose Lifestyle 50 System ..................................................... 203

1. Introduction of Dr. Schonfeld's "Bose Lifestyle" Reference ................. 203

i. Overview of the Bose Lifestyle 50 System ..................... 203

ii. Overview of the Bose Lifestyle SA-2 and SA-3 Stereo Amplifiers ...................................................... 209

iii. Overview of the Bose Link Communication Protocol ............... 213

iv. Overview of the Bose FreeSpace E4 Series II Business Music System ...................................................... 217

2. Dr. Schonfeld's "Bose Lifestyle" Reference Does Not Qualify as Prior Art ...................................................... 223

E. Millington ........................................................................... 229

F. Nourse (U.S. Patent No. 7,197,148) ....................................... 231

G. Crestron .............................................................................. 236

1. Introduction of Dr. Schonfeld's "Crestron" Reference ........................... 236

i. Overview of the Crestron Adagio AES Entertainment System ...................................................... 236

ii. Overview of the Crestron Adagio AMS Media System ............. 239

2. Dr. Schonfeld's "Crestron" Reference Does Not Qualify as Prior Art ...................................................... 242

H. Yamaha DME ....................................................................... 243

I. Rajapakse (U.S. Patent No. 8,239,559) ..................................... 246

J. Lindemann (U.S. Patent Publication No. 2004/0223622) ................. 248

XIV. VALIDITY OF THE '885 PATENT ............................................ 250

XV. VALIDITY OF THE '966 PATENT ............................................. 251

A. Sonos's 2005 System ............................................................ 251

1. Asserted Claim 1 is Not Rendered Obvious Based on Sonos's 2005 System ...................................................... 258

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

i.      Sonos's 2005 System Did Not Have "Zone Scenes"
        Functionality ................................................................. 258

ii.     Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.5 .......... 280

iii.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.6 .......... 284

iv.     Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.7 .......... 289

v.      Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.8 .......... 292

vi.     Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.9 .......... 297

vii.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.10 ........ 301

viii.   Sonos's 2005 System Did Not Meet Limitation 1.11 ................. 308

ix.     Asserted Claim 1 Would Not Have Been Obvious Based on
        Sonos's 2005 System in view of the Secondary References
        Identified by Dr. Schonfeld ....................................................... 315

x.      Summary ............................................................................ 386

2.      Asserted Claim 2 is Not Rendered Obvious Based on Sonos's 2005
        System ................................................................................. 387

3.      Asserted Claim 4 is Not Rendered Obvious Based on Sonos's 2005
        System ................................................................................. 391

4.      Asserted Claim 6 is Not Rendered Obvious Based on Sonos's 2005
        System ................................................................................. 395

5.      Asserted Claim 8 is Not Rendered Obvious Based on Sonos's 2005
        System ................................................................................. 397

6.      Asserted Claim 9 is Not Rendered Obvious Based on Sonos's 2005
        System ................................................................................. 400

7.      Asserted Claim 10 is Not Rendered Obvious Based on Sonos's
        2005 System ........................................................................ 400

8.      Asserted Claim 12 is Not Rendered Obvious Based on Sonos's
        2005 System ........................................................................ 401

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

9.    Asserted Claim 14 is Not Rendered Obvious Based on Sonos's 2005 System ...................................................................401

10.   Asserted Claim 16 is Not Rendered Obvious Based on Sonos's 2005 System ...................................................................401

B.    Squeezebox ....................................................................................401

1.    Asserted Claim 1 is Not Rendered Obvious Based on Squeezebox ........407

    i.    Dr. Schonfeld Fails to Map his "Squeezebox" Reference to the Claimed Devices of Claim 1 ...................................................407

    ii.    Squeezebox Did Not Have "Zone Scenes" Functionality ..........408

    iii.   Squeezebox Did Not Meet Limitations 1.4 / 1.5 .......................431

    iv.   Squeezebox Did Not Meet Limitations 1.4 / 1.6 .......................435

    v.    Squeezebox Did Not Meet Limitations 1.4 / 1.7 .......................440

    vi.   Squeezebox Did Not Meet Limitations 1.4 / 1.8 .......................443

    vii.   Squeezebox Did Not Meet Limitations 1.4 / 1.9 .......................449

    viii.  Squeezebox Did Not Meet Limitations 1.4 / 1.10 .....................453

    ix.   Squeezebox Did Not Meet Limitation 1.11 ...............................461

    x.    Asserted Claim 1 Would Not Have Been Obvious Based on Squeezebox in view of the Secondary References Identified by Dr. Schonfeld ..........................................................474

    xi.   Summary ...................................................................498

2.    Asserted Claim 2 is Not Rendered Obvious Based on Squeezebox ........498

3.    Asserted Claim 4 is Not Rendered Obvious Based on Squeezebox ........503

4.    Asserted Claim 6 is Not Rendered Obvious Based on Squeezebox ........507

5.    Asserted Claim 8 is Not Rendered Obvious Based on Squeezebox ........510

6.    Asserted Claim 9 is Not Rendered Obvious Based on Squeezebox ........513

7.    Asserted Claim 10 is Not Rendered Obvious Based on Squeezebox ......513

8.    Asserted Claim 12 is Not Rendered Obvious Based on Squeezebox ......513

9.    Asserted Claim 14 is Not Rendered Obvious Based on Squeezebox ......514

10. Asserted Claim 16 is Not Rendered Obvious Based on Squeezebox ......514

C.    The Bose Lifestyle 50 System ...............................................................514

1.    Asserted Claim 1 is Not Rendered Obvious Based on The Bose
      Lifestyle 50 System ..................................................................520

      i.     Dr. Schonfeld Fails to Map his Alleged "Bose Lifestyle 50
             System" Reference to the Claimed Devices of Claim 1 .............520

      ii.    The Bose Lifestyle 50 System did not have "Zone Players" .......521

      iii.   The Bose Lifestyle 50 System did not have "Zone Scenes"
             Functionality .................................................................525

      iv.    The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.5 ........................................................................543

      v.     The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.6 ........................................................................548

      vi.    The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.7 ........................................................................557

      vii.   The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.8 ........................................................................560

      viii.  The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.9 ........................................................................567

      ix.    The Bose Lifestyle 50 System Did Not Meet Limitations
             1.4 / 1.10 ......................................................................572

      x.     The Bose Lifestyle 50 System Did Not Meet Limitation
             1.11 ..............................................................................584

      xi.    Asserted Claim 1 Would Not Have Been Obvious Based on
             The Bose Lifestyle 50 System in view of the Secondary
             References Identified by Dr. Schonfeld ......................................590

      xii.   Summary .......................................................................612

2.     Asserted Claim 2 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................613

3.     Asserted Claim 4 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................616

4.     Asserted Claim 6 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................621

5.     Asserted Claim 8 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................624

6.     Asserted Claim 9 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................627

7.     Asserted Claim 10 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................627

8.     Asserted Claim 12 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................628

9.     Asserted Claim 14 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................628

10.    Asserted Claim 16 is Not Rendered Obvious Based on the Bose
       Lifestyle 50 System ....................................................................628

D.     Obviousness Type Double Patenting Over U.S. Patent No. 9,141,645...............628

       1.     Dr. Schonfeld Fails to Analyze the Claims of the '966 Patent...............629

       2.     Dr. Schonfeld's Analysis Improperly Relies on the Specification of
              the '645 Patent Rather than the Claims ..................................629

       3.     Claim 1 of the '645 Patent Fails to Disclose or Render Obvious the
              Asserted Claims of the '966 Patent .......................................632

XVI.   SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS ................................651

       A.     Requisite Nexus...................................................................652

       B.     Evidence of Secondary Considerations of Non-Obviousness ...........................679

              1.     Praise by Others.......................................................679

XVII.  ALLEGED NON-INFRINGING ALTERNATIVES ......................................................684

XVIII. DEMONSTRATIVES ......................................................................................................690

XIX.   RESERVATION OF RIGHT .........................................................................................690

transmission frames to control speaker attributes such as speaker group, enabling or disabling a sub-woofer, and volume of the loudspeaker digitally.

* * * *

When digital audio is transmitted to a wireless speaker the speaker needs to reliably recover the data as a stream of digital audio samples and needs to generate an accurate digital audio sample rate clock to output the data. When transmitting to several wireless loudspeakers simultaneously, as is the case with stereo or six channel surround sound, the sample rate clocks for the loudspeakers must be accurately synchronized to the data and with each other. Small delays from one speaker to the next would compromise the stereo or surround sound imaging of the sound. Even worse, variable delays would cause sounds to appear to move around in space. This invention solves the audio sample rate synchronization problem by generating the audio sample rate clock directly from the RF receiver symbol rate clock. For an RF system with continuously streaming data transmission, as is the case with digital audio in this invention, this clock is highly accurate and is guaranteed to be synchronized between RF receivers in multiple loudspeakers because it is generated at a single location in the RF transmitter.

*Id.* at ¶ 11, 13.

471.    Lindemann further discloses that a "Group Selection Switch" may be provided that "allows a loudspeaker to be assigned to one of many groups of loudspeakers," and that there may be "status information contain[ing] commands to enable or disable a particular group of speakers" as well as "[a]nother status message [that] determines enabling of different speaker modes according to speaker group." *Id.* at ¶¶ 64-66, FIG. 18 (illustrating an example of a "Group Selection Switch 1800").

## XIV.   VALIDITY OF THE '885 PATENT

472.    In his Opening Report, Dr. Schonfeld includes opinions, theories, and analysis regarding the alleged invalidity of Asserted Claim 1 of the '885 Patent. *See* Schonfeld Op. Report at ¶¶ 1, 6, 219-962.  In fact, as explained elsewhere in this report, Dr. Schonfeld *only* provided an analysis of his cited references in the context of Asserted Claim 1 of the '885 Patent, and never provides any analysis of the Asserted Claims of the '966 Patent.

473.    However, as noted above, the Court has already granted summary judgement in favor of Sonos on the issue of validity of the '885 Patent, and I understand that the validity of the '885 Patent is no longer at issue in this action.  D.I. 382.

474.    In view of the Court's summary judgement ruling, I have <u>not</u> been asked by Sonos

to address Dr. Schonfeld's opinions regarding Asserted Claim 1 of the '885 Patent or to otherwise provide any opinions regarding the validity of the '885 Patent in this rebuttal report.  However, I note that I did previously provide my opinions regarding the validity of the '885 Patent in both my May 19, 2022 reply declaration and my '885 Rebuttal Report that were submitted during the "patent showdown" phase of the case.  Thus, to the extent that Dr. Schonfeld is permitted to offer any opinions regarding the validity of the '885 Patent at the upcoming trial, I hereby incorporate my May 19, 2022 reply declaration and my '885 Rebuttal Report, and I also expressly reserve the right to supplement my opinions and analyses to address any new opinions or analyses that Dr. Schonfeld is now offering regarding the alleged invalidity of the '885 Patent.

475.    While Dr. Schonfeld only provided an analysis of his cited references in the context of Asserted Claim 1 of the '885 Patent, I have also made my best effort to discern what aspects of Dr. Schonfeld's analysis are applicable to the Asserted Claims of the '966 Patent, and I have addressed those aspects of Dr. Schonfeld's analysis below as part of my own analysis of the validity of to the Asserted Claims of the '966 Patent.

## XV.    VALIDITY OF THE '966 PATENT

### A.    Sonos's 2005 System

476.    In his Opening Report, Dr. Schonfeld opines that each of the Asserted Claims of the '966 Patent is rendered obvious by a reference he calls the "Sonos System" in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington." *See* Schonfeld Op. Report at ¶¶ 963-1000.  I disagree.

477.    As an initial matter, Dr. Schonfeld provides little to no analysis with respect to his opinion that the Asserted Claims of the '966 Patent are rendered obvious based on the Sonos System in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington." *Id.*  Instead, with respect to his invalidity "analysis" of the Asserted Claims of the '966 Patent, Dr. Schonfeld more or less just cites to his invalidity analysis of Asserted Claim 1 of the '885 Patent.  *Id.*  In so doing, Dr. Schonfeld has failed to even acknowledge the fact that the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, let alone provide any explanation as to how his prior discussion of Squeezebox in the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

context of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, it is my opinion that Dr. Schonfeld has failed to provide any basis or reasoning for his opinion that the Asserted Claims of the '966 patent are rendered obvious based on the Sonos System in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington." *Id*.

478.    Given Dr. Schoenfeld's reliance on his prior discussion of the Sonos System in the context of Asserted Claim 1 of the '885 Patent, where appropriate, I have referred back my rebuttal analysis and opinions regarding Asserted Claim 1 of the '885 Patent from my '885 Rebuttal Report. However, unlike Dr. Schonfeld, I have also provided analysis in the context of the specific requirements of the Asserted Claims of the '966 Patent, as set forth below.  To the extent Dr. Schonfeld is permitted to provide analysis and/or new opinions regarding the Asserted Claims of the '966 Patent, I reserve my right to address such analysis and/or opinions in a supplemental report and/or at trial.

479.    Based on my analysis of the Asserted Claims of the '966 Patent and the cited references, I disagree with Dr. Schonfeld's unsupported opinion that the Asserted Claims of the '966 patent are rendered obvious based on the Sonos System in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington."

480.    To begin, as explained below, it is my opinion that Sonos's own 2005 system failed to disclose at least the following limitations of the Asserted Claims of the '966 Patent:

*Claims 1 and 9*

- A "zone scene" comprising a "predefined grouping of zone players . . . that are to be configured for synchronous playback of media when the . . . zone scene is invoked";

- **[1.4] / [1.5]** and **[9.1]** / **[9.2]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4] / [1.6]** and **[9.1] / [9.3]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene";

- **[1.4] / [1.7]** and **[9.1] / [9.4]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4] / [1.8]** and **[9.1] / [9.5]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene";

- **[1.4] / [1.9]** and **[9.1] / [9.6]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "displaying a representation of the first zone scene and a representation of the second zone scene";

- **[1.4] / [1.10]** and **[9.1] / [9.7]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" and "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene"; and

- **[1.11]** and **[9.8]** "based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player".

*Claims 2 and 10 (depending from 1 and 9)*

- **[2.0]** "The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

one or more processors, cause the computing device to perform functions comprising";

- **[10.0]** "The non-transitory computer-readable medium of claim 9, wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[2.1]** and **[10.1]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene"; and

- **[2.2]** and **[10.2]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene".

*Claims 3 and 11 (depending from 1 and 9)*

- **[3.0]** "The computing device of claim 1";

- **[11.0]** "The non-transitory computer-readable medium of claim 9";

- **[3.1]** and **[11.1]** "wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device"; and

- **[3.2]** and **[11.2]** "wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device".

*Claims 4 and 12 (depending from 3 and 11)*

- **[4.0]** "The computing device of claim 3";

- **[12.0]** "The non-transitory computer-readable medium of claim 11";

- **[4.1]** and **[12.1]** "wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players".

*Claims 6 and 14 (depending from 1 and 9)*

- **[6.0]** "The computing device of claim 1";

- **[14.0]** "The non-transitory computer-readable medium of claim 9";

- **[6.1]** and **[14.1]** "wherein the first predefined grouping of zone players does not include the third zone player"; and

- **[6.2]** and **[14.2]** "wherein the second predefined grouping of zone players does not include the second zone player".

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

*Claims 8 and 16 (depending from 1 and 9)*

- **[8.0]** "The computing device of claim 1";

- **[16.0]** "The non-transitory computer-readable medium of claim 9";

- **[8.1]** and **[16.1]** "wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device";

- **[8.2]** and **[16.2]** "wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface"; and

- **[8.3]** and **[16.3]** "wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface".

481. Additionally, it is my opinion that these limitations that were missing from Dr. Schonfeld's "Sonos System" reference also would not have been obvious based on the Sonos System in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington." This opinion is based in part on the fact that I have not seen any evidence showing an apparent reason why a POSITA in 2005-06 would have been motivated to modify the Sonos System and/or combine it with any of the references identified by Dr. Schonfeld in order to achieve the claimed inventions of the Asserted Claims of the '966 Patent. I have also seen other objective, real-world evidence demonstrating that a POSITA in 2005-06 would not have found the Asserted Claims of the '966 Patent to have been obvious, which stands in stark contrast to Dr. Schonfeld's failure to support his obviousness opinions with any objective evidence.

482. My opinions regarding the non-obviousness of the Asserted Claims of the '966 Patent over the Sonos System in view of "the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington" are further supported by the fact that the Sonos System as well as various of the secondary references identified by Dr. Schonfeld were considered by U.S. Patent Office ("USPTO") during prosecution of the '966 Patent, which was then allowed to issue over these references. In particular:

- With respect to the "Sonos System" reference, the "Sonos Digital Music System User Guide, Version: 050801, Aug. 2005, 114 pages" was considered during prosecution of the '966 Patent (*see* '966 Patent at p. 15), and the specification of the '966 Patent also describes the grouping mechanism utilized by Sonos's multi-room audio system at the time when framing the drawbacks with the prior art that the "zone scene"

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

technology of the '966 Patent is intended to improve upon (*see* '966 Patent at 8:29-45);

- The Nourse patent as well as its prior publication were considered during prosecution of the '966 Patent (*see* '966 Patent at p. 4, 6);

- Several U.S. counterparts to the Millington Canadian patent relied upon by Dr. Schonfeld were considered during prosecution of the '966 Patent, including U.S. Pat. No. 8,234,395 (*see* '966 Patent at p. 5);

- With respect to Yamaha DME, various materials were considered during prosecution of the '966 Patent, including the "Yamaha DME Designer 3.5 user manual (Year 2004)" (*see* '966 Patent at p. 1, 17), "Yamaha DME 32 manual; copyright 2001" (*see* '966 Patent at p. 17), "Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages" (*see* '966 Patent at p. 17), and "Yamaha DME Designer software manual guide; Copyright 2004, 482 pages" (*see* '966 Patent at p. 17)[15];

- The Rajapakse patent as well as its prior publication were considered during prosecution of the '966 Patent (see '966 Patent at p. 5, 7); and

- The Lindemann publication was considered during prosecution of the '966 Patent (*see* '966 Patent at p. 7).

483.    As I explained in my '885 Rebuttal Report, the Sonos System as well as various of the secondary references identified by Dr. Schonfeld were also considered by U.S. Patent Office during prosecution of the '885 Patent, which was then allowed to issue over these references.

484.    Because the U.S. Patent Office considered these references during prosecution of the '966 Patent and then decided to issue the '966 Patent (including Asserted Claims 1, 2, 4, 6, 8, 9, 10, 12, 14, 16) over these references, I understand that Dr. Schonfeld has the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.

---

[15] During prosecution of the '966 Patent, the Examiner also acknowledged that "DME does not explicitly teach the inclusion, exclusion, etc. of particular enumerated first, second, etc. players of the set of available players to form, create, save, recall etc. a particular first, second, etc. grouping…." *See* July 5, 2019 Office Action at p. 4. Additionally, after considering Sonos's claim amendments and arguments for why Yamaha DME does not teach the claimed "zone scene" technology of the '966 Patent (*see* August 23, 2019 Response to Office Action), the Examiner allowed the '966 Patent (including Asserted Claims 1, 2, 4, 6, 8, 9, 10, 12, 14, 16) to issue over Yamaha DME and in the Reasons for Allowance, the Examiner stated that "the prior art," including "DME," "does not reasonably teach the subject matter of the independent claims" (*see* September 5, 2019 Notice of Allowance).

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.[16]

485.    In his Opening Report, Dr. Schonfeld states that the "[s]imply because the USPTO cited certain references during prosecution does not mean that these references were considered – the USPTO did not rely on any of these references as the basis for its rejections."  Schonfeld Op. Report at ¶ 327.  I disagree.  The Examiner did rely on Yamaha DME as a basis for his preliminary rejections, and while the Examiner of the USPTO did not rely on any of Dr. Schonfeld's other cited references as a basis for his preliminary rejections, the references identified above were all considered by the Examiner as indicated by the Examiner's statement that "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH," followed by the Examiner's signature.  Thus, it is my understanding that the Examiner did consider the references identified above and determined that the claimed inventions of the '966 Patent were novel and non-obvious over those references.

486.    After suggesting that the USPTO did not consider the above-identified references, Dr. Schonfeld then states that "the USPTO did not have the benefit of the Court's claim construction for 'zone scene.'"  Schonfeld Op. Report at ¶ 327.  However, Dr. Schonfeld does not explain how that is related to whether or not the USPTO considered the references.  I further note that I have not seen anything in the prosecution history that suggests that the USPTO interpreted the term "zone scene" in a manner that is contrary to the Court's Order re Cross Motions for Partial Summary Judgment as to Claim 1 of the'885 Patent (D.I. 309).  Regardless, for the reasons explained below, it is my opinion that the USPTO's decision to grant the '966 Patent over the identified references was correct, because those references fail to anticipate or render obvious any Asserted Claim of the 966 Patent.

487.    My opinions regarding Dr. Schonfeld's "Sonos System" reference are further

---

[16] I further note that various Squeezebox materials were considered during prosecution of the related '885 Patent, including "Squeezebox Network Music Player. Owner's Manual, Slim Devices, 2003," "Squeezebox by Logitech. Owner's Guide, 2007," "NewsRoom. Slim Devices Introduces Squeezebox, Nov. 18, 2003," "Logitech Slimserver. Server for Logitech Squeezebox Players," "Logitech/slimserver. Github," and "Logitech/Slimserver. Github. Version 23 Release. May 19, 2002" (*see* '885 Patent at p. 23-24).

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

supported by my discussions with Nick Millington, Sonos's director of software development in 2005, who confirmed that Sonos's multi-room audio system as it existed in 2005-06 did not incorporate the "zone scene" technology that is described and claimed in the Asserted Claims of the '966 Patent.

488.    In the sub-sections below, I have provided a summary of the bases for my opinions, as well as responses to Dr. Schonfeld's opinions.

## 1.    Asserted Claim 1 is Not Rendered Obvious Based on Sonos's 2005 System

489.    For the reasons discussed below, in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### i.    Sonos's 2005 System Did Not Have "Zone Scenes" Functionality

490.    Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with certain functional capability for creating and invoking a "zone scene," which is a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that the group can be invoked later on demand for synchronous playback. And more specifically, Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with functional capability for creating multiple "zone scenes" having an overlapping "zone player" and then later invoking one of the "zone scenes."

491.    As explained above, there a several key distinctions between a "zone scene" and the types of temporary, ad-hoc groups that could be created by a user in prior art systems such as Sonos's 2005 system.

492.    First, a "zone scene" comprises a user-customized, pre-saved group of zone players that is able to exist in an inactive state while remaining available for selection by a user so that the group can be invoked later on demand for synchronous playback, whereas an ad-hoc group created using prior art grouping processes only existed for the limited period of time during which the group was activated and did not remain available for selection by a user after being deactivated.

258

493.     Second, because a "zone scene" is able to exist in an inactive state, this provides a user with the ability to create a "zone scene" that includes a "zone player" but then still use that "zone player" for individual audio playback (or for playback as part of a different group) without having to remove the "zone player" from the "zone scene."  In other words, the existence of a "zone scene" comprising a user-customized, pre-saved group of "zone players" does not automatically restrict the functionality of those "zone players" such that they can only be used for grouped audio playback as part of that one particular group during the time that they are members of the group – instead, each such "zone player" can still be used for individual playback (or playback as part of some other group) while simultaneously remaining a member of the group that is predefined and pre-saved as part of the "zone scene."  In contrast, when a user created a new ad-hoc group of "zone players" using prior art grouping processes, the user was no longer able to use any such "zone player" for individual audio playback (or for playback as part of a different group) while the ad-hoc group was in existence because the ad-hoc group would be automatically activated for the entirety of its existence, and during that time, the functionality of the "zone players" in the ad-hoc group was restricted such that they could only be used for grouped audio playback.  As such, once an ad-hoc group was created that included a "zone player" as a member, the only way to use that "zone player" for individual audio playback (or for playback as part of a different group) was to remove the "zone player" from the ad-hoc group, which would destroy the ad-hoc group such that it could not be selected again in the future.

494.     Third, because a "zone scene" is able to exist in an inactive state, this allows a "zone player" to simultaneously be a member of multiple different user-customized, pre-saved groups that were in existence and available for selection by a user contemporaneously.  For instance, a first "zone player" could simultaneously be a member of a first user-customized group that is predefined and pre-saved as part of a first "zone scene," a second user-customized group that is predefined and pre-saved as part of a second "zone scene," and so on, and then at any given time, a user can request that any given one of these co-existing, pre-saved groups be invoked on demand for synchronous playback (while the other unselected group(s) remain in existence).  In contrast, a "zone player" was only capable of being of a member of one single ad-hoc group at any given

259

time, because a zone player's membership within one ad-hoc group was mutually exclusive to its ability to operate as a member of another ad-hoc group (or to play back audio on its own). Thus, once a "zone player" was a member of a first ad-hoc group, the only way that a user could create a second ad-hoc group that included the "zone player" as a member was by first removing the "zone player" from the first ad-hoc group (and thereby destroying the first ad-hoc group) – it was not possible for a "zone player" to be a member of multiple different ad-hoc groups that were in existence and available for selection by a user contemporaneously.

495.    Fourth, the user-customized groups that are predefined and pre-saved as part of the "zone scenes" are persistent, which means that not only are they able to exist prior to being activated, but they also remain in existence after a user chooses to uninvoke a previously-invoked "zone scene" and thereby deactivate the group. In contrast, an ad-hoc group was temporary – it only exists during the limited time that the group was activated for playback, and once a user decided to deactivate the ad-hoc group, it was destroyed such that the user could not re-use the ad-hoc group in the future.

496.    Because of these distinctions, the claimed technology for creating and invoking "zone scenes" provided users with a new way to group "zone players" together for synchronous playback in a networked multi-zone audio system, which was intended to improve upon certain drawbacks with both the existing process for grouping players in "conventional multi-zone audio systems" as well the existing process for grouping "zone players" together for synchronous playback that was being practiced by Sonos's own commercial system at the time of the invention of the '966 Patent in 2005. *See* '966 Patent at 1:30-2:24, 8:30-45. Indeed, as the Court recognized in its Order re Cross Motions for Partial Summary Judgment as to Claim 1 of the '885 Patent, "[t]he claimed ability to customize and save overlapping speaker groups and easily control group playback represents a clear technological improvement over the 'conventional multi-zone audio system,' which, as the specification explained, presents significant technological and physical obstacles to forming speaker groups." D.I. 309 12; *see also id*. at 3-5, 8, 13, 16.

497.    Turning to Sonos's system as it existed in 2005, the evidence I have reviewed establishes that the controller(s) (e.g., a Sonos CR100) in Sonos's 2005 system did not have ***any***

functional capability for creating or invoking a "zone scene" – let alone the required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause a selected one of the two different "zone scenes" to be invoked, as required by Asserted Claim 1 of the '966 Patent.

498.    As an initial matter, the Sonos UI Specification for "Zone Scenes" establishes that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene."   In particular, that Sonos UI Specification, which was created on December 20, 2005 and modified on December 21, 2005, includes the following "Introduction" section:



SONOS-SVG2-00026839-58 at SONOS-SVG2-00026840; *see also* '407 Provisional, at App'x A, 1 (attaching another version of the Sonos UI Specification for "Zone Scenes").

499.    This "Introduction" section of Sonos's UI specification for "Zone Scenes" confirms that the "current[]" mechanism for grouping ZonePlayers in Sonos's system in December 2005 was an ad-hoc grouping approach whereby "zone groups [were] created by manually linking zones one at a time until the desired zone grouping is reached."  *Id*.  In turn, the Sonos UI specification for "Zone Scenes" goes on to introduce and describe the "zone scenes" technology that is described and claimed in the '966 Patent as a new feature that would provide an alternative to the "current"

ad-hoc grouping approach being practiced by Sonos's system at the time. *Id*. (also noting that "the Zone Scene feature is much more flexible and powerful" than the "current Party Mode setting that is available"); *see also* '966 Patent at 8:30-61 (explaining that the "*current* mechanism" for "'joining' zone players together for music playback" was an ad-hoc grouping process whereby a user "must start with a single zone and then manually link each zone to that zone" at the time the user wishes to use the group for synchronous audio playback, and then introducing and describing the "zone scenes" technology as a new feature that would provide an alternative to this "current mechanism" for grouping).

500.    Several other objective aspects of this UI specification document confirm that Sonos's 2005 system did not have the features discussed in the UI specification and that this was a proposal for a feature addition to Sonos's 2005 system as it existed in December 2005.  First, the document bears a version number ("Version 001"), which is something generally found on draft documents that change over time as features are modified:



501.    Second, the footer bears the legend "FOR INTERNAL USE ONLY," which further confirms that this was a working draft of a confidential feature that was still under development and not yet released:



502.    This document alone definitively establishes that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

503.    The "Sonos Digital Music System User Guide" dated April 2005 ("Sonos 2005 User Guide") also establishes that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene."  For instance, in the chapter on the Sonos "Desktop Controller Software" for Windows, the Sonos 2005 User Guide includes a section entitled "Zone groups" where it describes the grouping capabilities of Sonos's 2005 system that existed at the time.  That "Zone groups" section begins by explaining as follows:

> A zone can be grouped together with any other zone(s) to form a zone group. This will cause all the zones in the zone group to play the same music. You can link or drop zones from a zone group while the music is playing. You can also link all the ZonePlayers in your house with one touch by selecting **All Zones-Party Mode**.

Sonos 2005 User Guide (Lambourne Dep. Exs. 1077-1078), at 3-11; *see also id*. at 5-8.  To provide some additional context for this passage, my understanding is that Sonos's 2005 system used "zones" as a way to logically identify ZonePlayers in Sonos's 2005 system in a more user-friendly manner.  In this respect, my understanding is that each ZonePlayer in Sonos's 2005 system would have been identified in terms of a respective "zone," which typically would have been a descriptor of a room or other area within a user's listening environment.  Thus, my understanding is that the discussion of grouping "zones" in the foregoing passage is a reference to grouping ZonePlayers in Sonos's 2005 system.  My understanding set forth above is based on my review of various evidence related to Sonos's 2005 system as well as my discussion with Mr. Millington, and is further confirmed by the portion of the foregoing passage stating that "You can link all the ***ZonePlayers*** in your house with one touch by selecting ***All Zone***-Play Mode."  *Id*. (emphasis added); 7/19/2022 Discussion with Mr. Millington.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

504.    In turn, the "Zone groups" section describes the process for creating a "zone group" as follows:

**To link a zone to a zone group**

You can create a zone group first and then select music to play, or you can add a zone to a zone group where music is already playing.

 **Note:** Any zones you link will automatically drop their current music queue and begin to play the music queue from the highlighted zone. You may sometimes want to save your music queue before linking a zone. See "To create a Sonos playlist" on page 3-17.

1.  From the **Zones** pane, highlight the zone you want to link another zone or zone group to.

2.  Choose one of the following options:

    •   Click **Link Zone.**

Or,

    •   From the **Zones** menu, click **Link Zone.**



3.  Select a zone to add to the group, and click **OK.** If you want to join all the zones in your house to this music queue, select **All Zones-Party Mode.** All of your ZonePlayers will then play the same music until you drop the zones from the zone group.

 **Note:** The order in which you add a zone makes a difference. If you select **Link Zone** from a zone where there is no music playing, any zone you link to it will also be silent.

*Id*. at 3-12.

505.    The Sonos 2005 User Guide also includes a similar "Zone groups" section in the chapter on the Sonos CR100 Controller, as shown below:



*Id*. at 5-9.

506.    As demonstrated by the above excerpts from the Sonos 2005 User Guide, a user could create a new "zone group" using a Sonos controller by selecting a specific set of ZonePlayers (logically identified as zones) in a Sonos system to group together into the "zone group," such as a Kitchen + Jack's Bedroom group or a Garden + Kitchen group, and the act of creating this new

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"zone group" would then "*cause all the zones in the zone group to play the same music*." *Id*. at 3-11.  Additionally, the Sonos 2005 User Guide notes that "[a]ny zones you link [into a zone group] *will automatically drop their current music queue and begin to play the music queue from the highlighted zone*," and that if "there is no music playing" in the highlighted zone, then "any zone you link to it will also be silent."  *Id*. at 3-12, 5-8, 5-9.

507.    The 2005 User Guide also explains that once a new "zone group" is formed and thereby activated, all of the ZonePlayers in the "zone group" "will then play the same music until you drop the zones from the zone group."  *Id*. at 5-9.  The 2005 User Guide then goes on to describe the process "[t]o drop a room from your zone group" as follows:

**To drop a room from your zone group**

**1.**    Touch the **Zones** button on your Controller.



*Select zone to drop from group*

**2.**    Use the scroll wheel to highlight the zone group you want to change, and touch **Drop Zone**.

**3.**    Highlight the zone you want to drop from the group, and touch **OK**. The room that's removed from the zone group stops playing music. The other zones in the zone group continue unaffected.

508.    As demonstrated by the above excerpt from the Sonos 2005 User Guide, once a ZonePlayer is removed from a "zone group," that ZonePlayer "stops playing music" in accordance with the "zone group" while "[t]he other zones in the zone group continue unaffected."  *Id*. at 5-10.

509.    Based on the foregoing description, it is clear that a "zone group" created in this manner only existed temporarily during the limited time that the group was activated for playback, and as soon as a user wanted to use a ZonePlayer in an existing group for individual playback or wanted to create a new group that included one or more of the ZonePlayers in the existing group, the existing group would need to be destroyed by removing the one or more ZonePlayers that the user wanted to use for individual playback or wanted to include in a new "zone group." 7/19/2022 Discussion with Mr. Millington; 1/9/2023 Discussion with Mr. Lambourne.  As a result, the only way a user could use a group having that same group membership again in the future was by re-creating a new temporary group that included the same members as the previously-existing group. *Id*.  And as explained above, such a temporary, ad-hoc group that was automatically activated at the time of creation and then only remained in existence during the limited time it was activated is distinctly different from a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.

510.    Indeed, as an initial matter, a "zone group" of ZonePlayers was not a pre-saved group that was available to be *later invoked on demand* for synchronous playback at some time after the creation of the "zone group," which is a fundamental requirement of the claimed "zone scenes." *Id*.  To the contrary, a "zone group" of ZonePlayers was a temporary, ad-hoc group that was automatically activated at the time it was created and then only remained in existence until the time that the "zone group" was deactivated, at which time the "zone group" would be automatically destroyed such that the "zone group" was <u>not</u> available to be *later invoked on demand* for synchronous playback. *Id*.

511.    Further, a "zone group" of ZonePlayers was not a pre-saved group that was *able to exist in an inactive state* in which the pre-saved group was available for selection by a user but the "zone players" in the pre-saved group could still be used for individual audio playback (or as part of another group), which is another fundamental requirement of the claimed "zone scenes."  *Id*. To the contrary, a "zone group" of ZonePlayers was only able to exist in an active state during which time it was not possible for a user to use any of the ZonePlayers added to the "zone group"

1  for individual audio playback, and once a "zone group" was deactivated, it would be automatically
2  destroyed such that it was no longer available for selection by a user. *Id.*

3      512.    Further yet, a "zone group" of ZonePlayers was not capable of having a group
4  member that was also a member of a different "zone group" available for selection by a user, which
5  is another requirement of the claimed "zone scenes." *Id*.  To the contrary, a ZonePlayer could only
6  be a member of one "zone group" that was in existence at any given time, and the only way a
7  ZonePlayer in a first "zone group" could have been added to a second "zone group" was to destroy
8  the first "zone group." *Id*.

9      513.    Lastly, there was no ability for a user to assign a thematic name to a "zone group,"
10  which fails to meet the additional "according to a common theme" requirement of Google's
11  proposed construction of a "zone scene," as interpreted by the Court. *Id*.

12      514.    Thus, for at least these reasons, it is my opinion that a "zone group" created by
13  selecting a specific set of ZonePlayers in a Sonos system to group together into the "zone group"
14  in an ad-hoc manner does not constitute a "zone scene."

15      515.    As demonstrated by the above excerpts from the Sonos 2005 User Guide, a user
16  could also create a new "zone group" by selecting the "All Zones-Party Mode" option, which
17  would then cause all of the ZonePlayers in a Sonos system to "play the same music until you drop
18  the zones from the zone group."  Sonos 2005 User Guide (Lambourne Dep. Exs. 1077-1078), at
19  3-12, 5-9.  This "All Zones-Party Mode" option, which was hard-coded into the Sonos Desktop
20  Controller software and the Sonos CR100 Controller firmware, provided an alternative way for a
21  user to create a new "zone group" including all ZonePlayers in a Sonos system that avoided the
22  need for the user to select each of the group members one at a time during the process of creating
23  the "zone group."  7/19/2022 Discussion with Mr. Millington; 1/9/2023 Discussion with Mr.
24  Lambourne.

25      516.    However, because the "All Zones-Party Mode" option was hard-coded into the
26  Sonos Desktop Controller software and the Sonos CR100 Controller firmware, it was not a user-
27  created, customized group that was predefined and pre-saved at a user's request as part of an initial
28  "setup" phase, which is a required aspect of the claimed "zone scenes."  *See* Case No. 20-6754,

D.I. 309 at 4 (the Court finding that Sonos's patented "zone scene" technology ""allows a *user to customize and save* multiple groups of smart speakers or other players . . . and then later 'activate a *customized* group, called a 'zone scene,' on demand), 8 (the Court noting that the "basic purpose of the invention . . . is to allow *users to pre-save customized speaker groups* and later 'invoke' the named group on demand"), 12 (the Court finding that *"[t]he claimed ability to customize and save overlapping speaker groups* and easily control group playback represents a clear technological improvement over the 'conventional multi-zone audio system,' which, as the specification explained, presents significant technological and physical obstacles to forming speaker groups").

517.    Further, because the "All Zones-Party Mode" option was hard-coded into the Sonos Desktop Controller software and the Sonos CR100 Controller firmware – and thus was not a user-created, customized group that was predefined and pre-saved at a user's request as part of an initial "setup" phase – the "All Zones-Party Mode" option of Sonos's 2005 system also fails to meet several other limitations of Asserted Claim 1 of the '966 Patent.  For instance, a Sonos controller in a Sonos system never received "a request to create" the "All Zones-Party Mode" option, never "caus[ed] creation of" the "All Zones-Party Mode" option, never "caus[ed] an indication of" the "All Zones-Party Mode" option to be transmitted to a ZonePlayer based on a "request to create" that option, and never "caus[ed] storage of" the "All Zones-Party Mode" option based on a "request to create" that option.  7/19/2022 Discussion with Mr. Millington; 1/9/2023 Discussion with Mr. Lambourne.

518.    Further yet, there was no ability for a user to assign a thematic name to the "All Zones-Party Mode" option, which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene," as interpreted by the Court. 7/19/2022 Discussion with Mr. Millington; 1/9/2023 Discussion with Mr. Lambourne.

519.    Thus, for at least these reasons, it is my opinion that the "All Zones-Party Mode" option provided by Sonos's 2005 system was merely just a different way to create an ad-hoc "zone group," and also does not constitute a "zone scene."  *See also* SONOS-SVG2-00026839-58 at SONOS-SVG2-00026840 (explaining that the "Zone Scene feature" is "similar to the current Party Mode setting that is available" but that "*the Zone Scenes feature is much more flexible and*

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

*powerful*").

520.    I further note that the Sonos 2005 User Guide never uses the term "zone scenes" or otherwise describes any technology that would have enabled a user to create a user-customized, pre-saved group of ZonePlayers that was able to exist in an inactive state while remaining available for selection by a user so that it could later be invoked on demand for synchronous playback, which further confirms that the Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene."

521.    I have also seen various other Sonos documents confirming that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene." As one example, in an April 2005 email chain between Sonos employees Rob Lambourne (inventor of the '885 and '966 Patent) and Andrew Schulert, Mr. Schulert notes that "one of the problems with our system is we don't have a way of permanently linking zones together." SONOS-SVG2-00026888. In response, Mr. Lambourne proposes a feature that would "[a]llow a user to save Zone Profiles" that "would allow a user . . . to put their Zones into predefined groups…" *Id.* Mr. Schulert's comments noting that the current Sonos system does not have a way to create "permanent" groups and Mr. Lambourne's proposal to add a "predefined groups" feature in April 2005 further confirms to me that Sonos controllers in Sonos's system at this time did not have any functional capability for creating or invoking a "zone scene."

522.    As another example, entries in Mr. Lambourne's notebook dated October-November 2005 memorialize his ongoing work on the "zone scene" concept at this time, which further confirms that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene." SONOS-SVG2-00026625 at 648 (showing Mr. Lambourne's work on "permanent groupings?" and "group profiles"); *id.* at 653 (showing Mr. Lambourne's work on "Perma Groups"); *id.* at 666 (showing Mr. Lambourne's work on "Room Configurations" including "Morning Mode" and "Working Mode"); *id.* at 668 (showing Mr. Lambourne's work on a proposal for how ZonePlayers might be selected for including in a "Zone groupings/Macro").

523.    As another example, in an email exchange dated July 6, 2006, Mr. Schulert asks

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Mr. Lambourne if he "ha[s] a list of small 'nice-to-have' feature requests," to which Mr. Lambourne responds with a list of features that did not exist in the then-current Sonos system but were requested, including noting that "there are some biggies like "Zone Scenes." SONOS-SVG2-00026916. That Mr. Lambourne was referring to "zone scenes" as a requested feature in July 2006 further confirms that Sonos controllers in Sonos's system through this time period, including 2005, did not have any functional capability for creating or invoking a "zone scene."

524. Additionally, I have reviewed the "v1.2-gold" snapshot of Sonos's source code that Dr. Schonfeld appears to be relying on in his Opening Report, which I understand to be from July 2005, and I did not see any source code modules that provided "zone scenes" capability, which also supports my opinion that Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene."

525. For completeness, I further note that the evidence summarized above likewise establishes that the ZonePlayers in Sonos's 2005 system did not have any functional capability to be added to a "zone scene" that was created at the request of a user or to operate in accordance with "zone scene" that was invoked at the request of a user. Rather, the ZonePlayers in Sonos's 2005 system were only capable of being added to and operating in accordance with a temporary, ad-hoc "zone group," which was not a "zone scene" for all of the reasons explained above.

526. Lastly, as noted above, my opinion that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have the "zone scenes" capability that is described and claimed in the '966 Patent is supported by conversations I have had with Nick Millington and Rob Lambourne, who confirmed that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have the "zone scenes" capability that is described and claimed in the '966 Patent. I understand that both Mr. Millington and Mr. Lambourne have been Sonos employees since 2003, and during the 2005-06 timeframe, Mr. Millington and Mr. Lambourne were heavily involved in designing and developing the technology that was being practiced by Sonos's system as it existed in 2005.

527. Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scene" capability, Dr. Schonfeld nevertheless

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

opines that the "zone scene" limitations required by the Asserted Claims of the '966 Patent were either disclosed or rendered obvious by the Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 971-1000. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and the "zone scene" limitations of the Asserted Claims of the '966 Patent to be flawed for several reasons.

528.    As an initial matter, Dr. Schonfeld fails to set forth any basis or reasoning for his opinions regarding Sonos's 2005 system and the "zone scene" limitations of the Asserted Claims of the '966 Patent. Instead, Dr. Schonfeld merely refers back to his discussion of certain claim limitations of Asserted Claim 1 of the '885 Patent and makes the following conclusory statement:

> 971.    *See supra* '885 claim 1 Limitation 1.6. Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6 I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene.

However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the "zone scene" limitations of Asserted Claim 1 of the '885 Patent applies to the "zone scene" limitations of the Asserted Claims of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of the "zone scene" limitations of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    opinions regarding the "zone scene" limitations of the Asserted Claims of the '966 Patent.[17]

2    529.    Moreover, I have reviewed the section of Dr. Schonfeld's Opening Report where

3    he discusses Sonos's 2005 system in the context of claim limitation 1.6 of Asserted Claim 1 of the

4    '885 Patent, and nothing in that section of Dr. Schonfeld's Opening Report alters my opinion that

5    Sonos's 2005 system did not include the "zone scenes" capability required by the Asserted Claims

6    of the '966 Patent.

7    530.    Indeed, Dr. Schonfeld's theories and opinions regarding the alleged existence of

8    "zone scenes" capability in Sonos's 2005 system are all premised on Dr. Schonfeld's incorrect

9    interpretation of what is required to qualify a "zone scene," which I previously discussed above,

10    and are also premised on several inaccurate and misleading characterizations of Sonos's 2005

11    system functionality and the evidence related thereto.

12    531.    For instance, at paragraph 338 of his Opening Report, Dr. Schonfeld states as

13    follows:

> The Sonos System allows a user to add a speaker to a group and send an indication
> of that addition. A user may, for example, use the desktop controller software to
> "link" zone players together to create a "zone scene," under Sonos's understanding
> of that term. Below, the example of "linking" the Kitchen Zone Player with the
> "Jack's room" Zone Player is described. Another example of linking "Kitchen"
> with "[All Zones – Party Mode]" is also given.

18    Schonfeld Op. Report at ¶ 338 (citing to the Sonos 2005 User Guide at 3-12); *see also id.* at ¶ 336

19    (stating that "[t]he 'zone scene' may be a group of speakers either defined by the user or predefined

20    by the system, such as 'Kitchen,' 'Dining Room,' 'Party Mode,' etc."), ¶ 345 (stating that "Sonos's

21    own prior art system discloses "zone scenes" because it allowed a user to group zones together

22    'with any other zone' to form a zone group.") (citing to the Sonos 2005 User Guide at 5-9), ¶¶

23    346-348 (citing SONOS-SVG2-00227363-399; SONOS-SVG2-00227400-406; SONOS-SVG2-

24    00227407-413;    SONOS-SVG2-00227414;    SONOS-SVG2-00227415-417;    SONOS-SVG2-

25    00227422; SONOS-SVG2-00227427-429; SONOS-SVG2-00227437-438).  However, this theory

26    is based exclusively on the "Zone groups" section of the Sonos 2005 User Guide that I already

---

[17] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies
in his Opening Report, I expressly reserve my right to respond.

summarized above, and as I explained there, the ad-hoc "zone groups" that could be created in Sonos's 2005 system were not "zone scenes" because they were not user-customized, pre-saved groups of "zone players" that were able to exist in an inactive state while remaining available for selection by a user so that they could be later invoked on demand for synchronous playback.

532.    Turning to paragraph 340 of his Opening Report, Dr. Schonfeld states as follows:

> Zone Players and therefore groups of Zone Players may be named or renamed per the user's preference. Other groups such as "Party Mode" are preconfigured and also available to a user. The claims do not require the "zone scenes" to be "user selected." Predefined groups, such as the "party mode" in the Sonos System, therefore meet this claim limitation.

Schonfeld Op. Report at ¶ 340 (citing to the Sonos 2005 User Guide at 5-23); *see also id.* at ¶ 349 (stating that "[t]he user could also name individual speakers (zone players), in turn naming the zone groups" and that "[t]he previously-saved and named group, for example "Jack's room + Kitchen" in the example below, can also be modified by removing Zone Players from the group") (citing to the Sonos 2005 User Guide at 3-13), ¶ 350 (stating that "Zone Players and therefore groups of Zone Players may be named or renamed in accordance with the user's preference" and that "while a user may potentially name the zone scene with a 'non-thematic' name, the Court has held that the capability to so name the zone scene is sufficient to meet the language of the claim") (citing to the Sonos 2005 User Guide at 5-23), ¶ 351 (stating that "[o]ther groups such as 'Party Mode' are preconfigured and also available to the user") (citing to the Sonos 2005 User Guide at 3-12), ¶ 352 (stating that "[u]nder the Court's Order, 'Party Mode' is a speaker group with a thematic name, which satisfies the claim 'zone scene' elements under the Court's Order"). However, this theory is flawed for several reasons.

533.    First, Dr. Schonfeld's statement that "groups of Zone Players may be named or renamed per the user's preference" is misleading and inaccurate. In reality, Sonos's 2005 system only provided users with the capability to assign names to individual ZonePlayers, not to "zone groups."

534.    Second, while it is not clear, Dr. Schonfeld appears to be suggesting here that if a group of "zone players" could be named by a user, this would satisfy the requirements of a "zone

scene." I disagree – this suggestion ignores all of other key characteristics of a "zone scene." In particular, as I explained above, a "zone scene" requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback. Thus, even if Sonos's 2005 system did provide a user with the capability to name a "zone group" after it has been created, this naming capability would not transform the "zone group" into a "zone scene."

535.    Third, while it is not clear, Dr. Schonfeld also appears to be suggesting here that if a group of "zone players" is "preconfigured and also available to a user," this would satisfy the requirements of a "zone scene." Again, I disagree – a "zone scene" does not just require a "preconfigured" group that is "available to a user," it requires a group of "zone players" that that is customized and pre-saved by a user during an initial "setup" phase that is carried out using a controller device . *See* D.I. 309 at 4-5, 8, 12, 13, 16. Thus, even accepting Dr. Schonfeld's characterization that the "All Zones-Party Mode" option provided by Sonos's 2005 system was a "preconfigured" group that was "available to a user," this does not satisfy the requirements of a "zone scene."

536.    Fourth, Dr. Schonfeld's statement that "[t]he claims do not require the zone scene to be 'user selected'" is incorrect. *See* Schonfeld Op. Report at ¶ 340. As an initial matter, this statement appears in Dr. Schonfeld's analysis of Asserted Claim 1 of the '885 Patent and it is not clear whether Dr. Schonfeld intends for this statement to be applicable to the Asserted Claims of the '966 Patent, which highlights the problems with Dr. Schonfeld's failure to separately analyze the Asserted Claims of the '966 Patent. Moreover, this statement is contrary to the Court's repeated acknowledgment that a "zone scene" constitutes a group that is "customized" and "pre-save[d]" by a "user," as well as the requirement of Asserted Claim 1 of the '966 Patent that a "zone scene" is created based on a "request to create a … zone scene" that is received by the "computing device" while it is "serving as a controller" – which a POSITA would understand to be a *user* request.

537.    Fifth, Dr. Schonfeld's statement that "[o]ther groups such as 'Party Mode' are preconfigured and also available to a user" appears to suggest that there were multiple different

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"preconfigured" groups available for selection in Sonos's 2005 system, which is not correct. The only group option available in Sonos's 2005 system that could even possibly be characterized as a "preconfigured" group was the "All Zones-Party Mode" option that was hard-coded into the Sonos Desktop Controller software and the Sonos CR100 Controller firmware. However, this hard-coded "All Zones-Party Mode" option merely provided a different way to create a "zone group," and does not meet the requirements of a "zone scene" for the reasons I have already explained above.

538.    Turning next to paragraph 343 of his Opening Report, Dr. Schonfeld states as follows:

> Sonos has also provided documentation showing that "zone scenes" were included in the Sonos System. For example, Mr. Lambourne testified that "party mode" was a "zone scene." Lambourne Dep. Tr. at 63:8-13 ("Q. The Party Mode setting is a Zone Scene; right? THE WITNESS: Yeah. I think I describe a Party Mode as an example of a Zone Scene that can be set up, created.") (objection omitted); 48:13-22 ("Q. Below the macros, in parenthesis, room configurations, there's a box with three entries. One says "party mode," one says "morning mode," and the final says "working mode." Do you see that? A Yes. Q. Were those examples of zone scenes? A Yes. Q. How do you know? A. Because I designed it.").

Schonfeld Op. Report at ¶ 343 (also citing to Lambourne Dep. Ex. 1097 at 42). However, this this theory is premised on a misleading and inaccurate characterization of Mr. Lambourne's testimony and documents.

539.    Contrary to the Dr. Schonfeld's statement, the "Party Mode" that Mr. Lambourne was describing here in this cited deposition testimony was not the same thing as the "All Zones-Party Mode" option that was hard-coded into the Sonos Desktop Controller software and the Sonos CR100 Controller firmware in Sonos's 2005 system. Rather, what Mr. Lambourne was describing in this cited deposition testimony was a "zone scene" named "Party Mode" comprising a group that was customized and pre-saved by a user during an initial "setup" phase carried out using a Sonos controller. In fact, Mr. Lambourne specifically noted this distinction on several occasions during his deposition, but for some reason Dr. Schonfeld choose not to mention this in his report. *See, e.g.*, 6/6/2022 R. Lambourne Dep. Tr. at 62:13-63:13, 66:20-68:4, 74:21-75:5. In any event, this distinction is critical – while Sonos's 2005 system did provide a user with an "All Zones-Party Mode" option that was hard-coded into the Sonos Desktop Controller software and Sonos CR100

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   Controller firmware, the Sonos's 2005 system did <u>not</u> include the later-developed "zone scene"

2   technology that would have provided a user with the ability to use a controller device to create a

3   "zone scene" named "Party Mode" comprising a user-customized, pre-saved group of "zone

4   players" that were added by the user via the controller device, which was designed to be a "much

5   more flexible and powerful" feature than the hard-coded "All Zones-Party Mode" option. *See*

6   SONOS-SVG-00026839-58 at SONOS-SVG2-00026840.

7   540.    Along similar lines, the lone document that Dr. Schonfeld cites in support of this

8   paragraph is a single page out of Mr. Lambourne's sketchbook where he had sketched out how a

9   user could use the "zone scenes" technology he had begun to design to create a "zone scene" named

10  "Party Mode," but again, this user-customized "zone scene" named "Party Mode" was distinctly

11  different from the "All Zones-Party Mode" option that was hard-coded into the Sonos Desktop

12  Controller software and the Sonos CR100 Controller firmware in Sonos's 2005 system. *See*

13  SONOS-SVG2-00026625-751 at SONOS-SVG2-00026666.

14  541.    Turning next to paragraph 344 of his Opening Report, Dr. Schonfeld states as

15  follows:

16      Sonos has also argued at times that a group must either be saved or named for a
        group to be considered a zone scene. As described above, however, groups that the
17      user creates and groups that the Sonos System creates, such as Party Mode, are
        saved. A user can, for example, play to a particular group, pause or stop playback
18      to that group, and restart or play new music to that group later. Party Mode is
        another group that is constantly accessible to the user. And a user may name Zone
19      Players, which when grouped together take on a concatenated name. As such, a user
20      can create a group with a particular name. Each of these features are discussed
        *supra* e.g., Section X.

21
    Schonfeld Op. Report at ¶ 344.  However, this theory is flawed for several reasons.
22
23  542.    First, as in paragraph 344 of his Opening Report, Dr. Schonfeld appears to be

24  suggesting here that if a group of "zone players" could be named by a user, this would satisfy the

    requirements of a "zone scene."  I disagree for the reasons I already explained above.
25
26  543.    Second, Dr. Schonfeld's appears to be suggesting here that an ad-hoc "zone group"

27  of ZonePlayer on Sonos's 2005 system was "saved" in the same way that a "zone scene" is saved.

    Again, I disagree.  As I explained above, a "zone scene" comprises a predefined group of "zone
28

players" that is saved at a user's request in a ***persistent*** manner that is not dependent on the activation state of the group so that it remains in existence and is available for selection by a user even during times when the group is in an inactive state, which is what enables the group to be later invoked on demand for synchronous playback.   The ad-hoc "zone groups" in Sonos's 2005 system were not saved in this way.   Rather, those ad-hoc "zone groups" were only saved temporarily during the limited time that the "zone groups" were activated, and the "All Zones-Party Mode" option was hard-coded into the Sonos Desktop Controller software and the Sonos CR100 Controller firmware rather than being saved at a user's request as part of an initial "setup" phase.

544.    Third, Dr. Schonfeld's appears to be suggesting here that because the "All Zones-Party Mode" option was "constantly accessible to the user," this satisfies the requirements of a "zone scene."   Yet again, I disagree – this just appears to be a different way to say that the "All Zones-Party Mode" option was hard-coded into the Sonos Desktop Controller software and the Sonos CR100 Controller firmware, and for all of the reasons I have previously explained, a hard-coded option for creating an ad-hoc group does not meet the requirements of a "zone scene."

545.    Turning next to paragraphs 345-352 of his Opening Report, Dr. Schonfeld largely just repackages and/or repeats the same talking points regarding the ad-hoc "zone groups" and the "All Zones-Party Mode" option of Sonos's 2005 system, which rely on Dr. Schonfeld's incorrect interpretation of what is required to qualify as a "zone scene" as well as his inaccurate and misleading characterizations of Sonos's 2005 system functionality and thus fail for all of the reasons that I have already explained.

546.    Turning lastly to paragraphs 353-357 of his Opening Report, Dr. Schonfeld describes and cites to various source code that was involved in the process for forming an ad-hoc "zone group" in Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 353-357.  However, an ad-hoc "zone group" is not a "zone scene" for all of the reasons I explained above, and  the cited source code does not otherwise encode any functional capability for creating or invoking a "zone scene," which is not surprising given all of the other evidence showing that Sonos's 2005 system did not include any "zone scenes" capability.  .

547.     Turning to the additional requirement 966 that the claimed "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time, while it is not entirely clear, Dr. Schonfeld appears to be offering an opinion that Sonos's 2005 system met this requirement as well.

548.     For instance, at paragraphs 374-380, Dr. Schonfeld appears to be offering an opinion that Sonos's 2005 system met this requirement based on the fact that a user could remove a ZonePlayer from a first "zone group" and then add the ZonePlayer to a second "zone group."  I disagree.  In addition to the fact that these "zone groups" are not the claimed "zone scenes" for the reasons I explained above, this scenario also does not meet the additional requirement that there be two overlapping groups that co-exist with one another and are both available for selection by a user at the same time.  *See* Schonfeld Op. Report at ¶¶ 374-380.  To the contrary, the two "zone groups" in this scenario would have never existed at the same time – they would have been mutually exclusive of one another.

549.     At paragraphs 374-380, Dr. Schonfeld also appears to be offering an opinion that Sonos's 2005 system met this requirement based on the fact that a user could add a ZonePlayer to a "zone group" while the hard-coded "Party Mode-All Zones" option was available to a user.  *See* Schonfeld Op. Report at ¶¶ 374-380.  Again, I disagree – neither this "zone group" nor the hard-coded "Party Mode-All Zones" option amounts to a "zone scene" for the reasons I explained above.

550.     At paragraph 381, Dr. Schonfeld also states as follows:

> Sonos allows users to wire speakers to the Zone Players in multiple configurations due to the wiring options included with each Zone Player. Accordingly, any Zone Player may be connected to speakers in the same room, different rooms, or even speakers connected to different Zone Players, allowing for freedom for the user to create multi-room and overlapping speaker setups, as Sonos encouraged above.

Schonfeld Op. Report at ¶ 381.  However, I fail to see how this alleged capability to physically "wire speakers to the Zone Players in multiple configurations due to the wiring options included with each Zone Player" has anything to do with the "zone scene" technology that is described and claimed in the '966 Patent.

551.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have any functional capability for creating or invoking a "zone scene" – let alone the966 required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause selected one of the two different "zone scenes" to be invoked.

### ii.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.5

552.    When read together, limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
>> **[1.5]**    receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

553.    In my opinion, Sonos's 2005 system did not meet this requirement.

554.    As explained above, the evidence I have reviewed establishes that the Sonos controllers in Sonos's 2005 system were only capable of receiving requests to form ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Sonos controllers in Sonos's 2005 system did not have the required functional capability to "receiv[e] a *first request to create a first zone scene* comprising a first predefined grouping of [ZonePlayers] including at least the first [ZonePlayer] and a second [ZonePlayer] that are to be configured for synchronous playback of media when the first zone scene is invoked."

555.    Moreover, the hard-coded "All Zones-Party Mode" option of Sonos's 2005 system that is relied upon by Dr. Schonfeld fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "All Zones-Party Mode" option.

556.    Despite this clear evidence establishing that the Sonos controllers and ZonePlayers

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 970-972. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

557.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)    Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970.    *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

> *(v)* *Limitation 1.5 receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;*

971.    *See supra* '885 claim 1 Limitation 1.6.  Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6  I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene.

972.    Additionally, dependent claim 6 of the '966 patent informs the scope of independent claim 1.  Dependent claim 6 of the '966 patent recites that "wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player," effectively requiring that the first and second predefined groupings of zone players not be entirely overlapping, each with the same three zone players.  Because claim 6 depends from claim 1 and must necessarily narrow the scope of claim 1, I understand that claim 1 includes first and second predefined groupings of zone players, where those groupings of zone players can wholly overlap.  Indeed, such an overlap scenario would be consistent e.g., with a user having a user-created zone group including all three zone players, and having a "Party Mode," *i.e*, a zone group including all three zone players.  I therefore incorporate by reference the disclosure of "party mode" from my discussion, *supra*, regarding claim 1 of the '885 patent.  I note that the claim scope of claim 7 of the '885 patent includes a similar limitation and therefore implies a similar scope for claim 1 of the '885 patent.  This is supportive of my opinions regarding claim of the '885 patent as well.

558.    As these screenshots demonstrate, other than paragraph 972, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a

different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system. And along similar lines, Dr. Schonfeld never once articulates what he considers to be the claimed "first request to create a first zone scene" in Sonos's 2005 system. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent.[18]

559. With that said, as I have discussed above in Section XV.A.1.i as well as in my '885 Rebuttal Report, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

560. Lastly, to the extent I correctly understand Dr. Schonfeld's statement in paragraph 972 that he "understand[s] that claim 1 includes first and second predefined groupings of zone

---

[18] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

players, where those groupings of zone players can wholly overlap," we appear to be in agreement on this point. *See* Schonfeld Op. Report at ¶ 972. Specifically, I agree with Dr. Schonfeld that Asserted Claim 1 of the '966 Patent encompasses a scenario where one of the claimed "predefined grouping[s] of zone players" of one of the claimed "zone scenes" is wholly encompassed by the other of the claimed "predefined grouping[s] of zone players" of the other of the claimed "zone scenes," such as a scenario where the "first zone scene" includes the first, second, and third zone players while the "second zone scene" includes only the first and third zone players (or vice versa). However, Dr. Schonfeld then goes to state that "such an overlap scenario would be consistent e.g., with a user having a user-created zone group including all three zone players, and having a 'Party Mode,' i.e, a zone group including all three zone players," which appears to be a reference to the "zone scene" and "Party Mode" functionality of Sonos's 2005 system. Dr. Schonfeld never attempts to actually map this alleged "overlap scenario" to the claim limitations of the '966 Patent, but regardless, I disagree that the co-existence of an ad-hoc "zone group" and a hard-coded "All Zones-Party Mode" option amounts to the claimed requirement of having co-existing, overlapping "zone scenes" because neither an ad-hoc "zone group" nor a hard-coded "All Zones-Party Mode" option is a "zone scene" for all of the reasons explained above. Moreover, I fail to see how this scenario involving the hard-coded "All Zones-Party Mode" option of Sonos's 2005 system could possibly have any relevance to limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent given that a Sonos Controller never received any "request to create" the hard-coded "All Zones-Party Mode" option.

561.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.5 of Asserted Claim 1 of the '966 Patent.

### iii.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.6

562.    When read together, limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

…

**[1.6]**    based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

563.    In my opinion, Sonos's 2005 system did not meet this requirement.

564.    As explained above, the evidence I have reviewed establishes that the Sonos controllers in Sonos's 2005 system only had functional capability for forming ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Sonos Controllers in Sonos's 2005 system did not have the required functional capability to "i) caus[e] creation of the first zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [ZonePlayer], and iii) caus[e] storage of the first zone scene."

565.    Moreover, the hard-coded "All Zones-Party Mode" option of Sonos's 2005 system that is relied upon by Dr. Schonfeld above fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "All Zones-Party Mode" option and also would have never "caus[ed] creation of" the hard-coded "All Zones-Party Mode" option, "caus[ed] an indication of" the hard-coded "All Zones-Party Mode" option to be "transmitted to the first [ZonePlayer]," or "caus[ed] storage of" the hard-coded "All Zones-Party Mode" option.

566.    Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system.  *See* Schonfeld Op. Report at ¶¶ 970, 973.  However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

567.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's

2005 system and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)*     *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970.    *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

> *(vi)*     *Limitation 1.6 based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;*
>
> 973.    *See supra* '885 claim 1, Limitation 1.6.

568.     As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system. And along similar lines, Dr. Schonfeld never articulates what he

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

considers to be the claimed functions of "i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene" in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. [19]

569.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

570.    For instance, in his section discussing Sonos's 2005 system and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Sonos's 2005 system for forming ad-hoc "zone groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained.

571.    Further, when discussing the "first indication that the first zone player has been added to a first zone scene" required by limitation 1.6 of the '885 Patent, Dr. Schonfeld states that "[t]he Sonos System allows a Zone Player to receive a first indication in the form of network messages passed from the controller indicating that the Zone Player is to synchronously playback media with other Zone Players when the 'zone scene' that those players were added to is invoked by selecting that 'zone scene' for synchronous playback."  Schonfeld Op. Report at ¶ 336;  *see also id*. at ¶ 337 (opining that "[t]he Sonos System user manual also describes using the CR100

---

[19] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

controller as well as the Mac and Windows desktop controllers to send the claimed indication to the Zone Player"), ¶ 338 (opining that "[t]he Sonos System allows a user to add a speaker to a group and send an indication of that addition" and point to the "Zone groups" section at 3-12 of the Sonos 2005 User Guide); ¶ 342 (asserting that Sonos's 2005 system sent the "claimed indication" based on deposition testimony from Mr. Lambourne where he was explaining that "the Party Mode in our original controller was a command sent by the control design that would tell the speakers in that moment to go for a group, and Party Mode was the term we gave to all the speakers together"); ¶¶ 353-357 (explaining that when "the controller adds [a] first Zone Player to a first joinee group," a "SetAVTransportURI SOAP action with a Rincon group URI that identifies the group to join (joinee group)" is sent from the "controller" to the "first Zone Player" and is then received and handled by the "first Zone Player").

572.    Although it is not entirely clear, what Dr. Schonfeld appears to be relying on here as the alleged "first indication" of claim limitation 1.6 of the '885 Patent is a SetAVTransportURI message containing a URI argument set to "x-rincon:<GROUP COORDINATOR UUID>," which would have been sent by a Sonos controller to one or more ZonePlayers when a user requested to form a new ad-hoc "zone group" in Sonos's 2005 system. However, as I previously explained in my '885 Rebuttal Report, the SetAVTransportURI message identified by Dr. Schonfeld was not an "indication that the [ZonePlayer] has been added to a first zone scene," as required by limitation 1.6 of Asserted Claim 1 of the '885 Patent. For similar reasons to those explained in my '885 Rebuttal Report, the SetAVTransportURI message identified by Dr. Schonfeld is not an "indication" of a "first zone scene," as required by limitation 1.6 of Asserted Claim 1 of the '966 Patent. Instead, that SetAVTransportURI message was a direction for the ZonePlayer to enter into a new ad-hoc "zone group," which is not a "zone scene" for all of the reasons I have already explained above.

573.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.6 of Asserted Claim 1 of the '966 Patent.

### iv.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.7

574.    When read together, limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.7]**    receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

575.    In my opinion, Sonos's 2005 system did not meet this requirement.

576.    As explained above, the evidence I have reviewed establishes that the Sonos controllers in Sonos's 2005 system were only capable of receiving requests to form ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Sonos controllers in Sonos's 2005 system did not have the required functional capability to "receiv[e] *a second request to create a second zone scene* comprising a second predefined grouping of [ZonePlayers] including at least the first [ZonePlayer] and a third [ZonePlayer] that are to be configured for synchronous playback of media when the second zone scene is invoked."

577.    Further, the hard-coded "All Zones-Party Mode" option of Sonos's 2005 system that is relied upon by Dr. Schonfeld fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "All Zones-Party Mode" option.

578.    Further yet, claim limitations 1.4 and 1.7 require the "computing device" to "receiv[e] [the] second request to create [the] second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Sonos's 2005 system, it was not possible for an ad-hoc "zone group" to exist in an inactive state in which the members of the "zone group" could be used for individual playback while the "zone group" remained available for selection by a user; rather, an ad-hoc "zone group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "zone group" would cease to exist.

579.    Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 970, 974. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

580.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)* *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970. *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

> *(vii)* *Limitation 1.7 receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;*
>
> 974. *See supra* '885 claim 1, Limitation 1.6, 1.7.

581. As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system. And along similar lines, Dr. Schonfeld never once articulates what he considers to be the claimed "second request to create a second zone scene" in Sonos's 2005

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent. [20]

582.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

583.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.7 of Asserted Claim 1 of the '966 Patent.

                    **v.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.8**

584.    When read together, limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
>       …

---

[20] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**[1.8]**    based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

585.    In my opinion, Sonos's 2005 system did not meet this requirement.

586.    As explained above, the evidence I have reviewed establishes that the Sonos controllers in Sonos's 2005 system only had functional capability for forming ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Sonos Controllers in Sonos's 2005 system did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [ZonePlayer], and iii) caus[e] storage of the second zone scene."

587.    Further, the hard-coded "All Zones-Party Mode" option of Sonos's 2005 system that is relied upon by Dr. Schonfeld above fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "All Zones-Party Mode" option and also would have never "caus[ed] creation of" the hard-coded "All Zones-Party Mode" option, "caus[ed] an indication of" the hard-coded "All Zones-Party Mode" option to be "transmitted to the first [ZonePlayer]," or "caus[ed] storage of" the hard-coded "All Zones-Party Mode" option.

588.    Further yet, claim limitations 1.4 and 1.8 require the "computing device" to carry out the claimed actions with respect to a "second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Sonos's 2005 system, it was not possible for an ad-hoc "zone group" to exist in an inactive state in which the members of the "zone group" could be used for individual playback while the "zone group" remained available for selection by a user; rather, an ad-hoc "zone group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "zone group" would cease to exist.

589.    Still further, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.8 require the "computing device" to carry out the

claimed actions with respect to a "second zone scene" that includes at least one common "zone player" with the "first zone scene" (i.e., the claimed "first zone player") but without modifying or destroying the "first zone scene" that was created, such that the overlapping "first zone scene" and "second zone scene" can thereafter both be "display[ed]" to a user for selection. However, in Sonos's 2005 system, it was not possible to create a new ad-hoc "zone group" comprising a ZonePlayer that was already a member of another preexisting "zone group" without first modifying or destroying that preexisting "zone group." For this additional reason, a Sonos controller in Sonos's 2005 system did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [ZonePlayer], and iii) caus[e] storage of the second zone scene," where the "second zone scene" includes at least one common "zone player" with the created "first zone scene."

590.    Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 970, 975. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

591.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)    Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970.    *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

> (viii) *Limitation 1.8 based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;*
>
> 975.  *See supra* '885 claim 1, Limitation 1.6, 1.7.

592.    As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the claimed functions of "i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene" in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions

regarding claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent.[21]

593.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

594.    For instance, in his section discussing Sonos's 2005 system and claim limitations 1.6-1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Sonos's 2005 system for forming ad-hoc "zone groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained.

595.    Further, when discussing the "second indication that the first zone player has been added to a second zone scene" required by limitation 1.7 of the '885 Patent, Dr. Schonfeld describes a hypothetical scenario in which a user used a Sonos controller to remove a ZonePlayer from a first "zone group" and then add the ZonePlayer to a second "zone group." *See* Schonfeld Op. Report at ¶¶ 374-380 (describing a scenario where a first ZonePlayer ZP1 is "drop[ped]" from a "previously created (see prior limitation) group ZP2 + ZP1" and then added as a "group member" of a new "group comprising ZP3 + ZP1 and stating that "[a]s above, the 'indication' may be a SetAVTransportURI SOAP action specifying a Rincon group URI with the group coordinator UUID"); ¶ 381 (explaining that "ZP1 may be joined to ZP2 and ZP3 through the 'party mode' / 'all zones' group" and that "[i]n this instance, ZP1 will receive from the controller a second indication that the zone player is joined to the 'party mode' group, which is configured for synchronous playback").

596.    In such a scenario, my understanding is that the Sonos controller would have sent a SetAVTransportURI message containing a URI argument set to "x-rincon:<GROUP

---

[21] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

COORDINATOR UUID>" to the ZonePlayer that was added to the second "zone group" (assuming the ZonePlayer was not the coordinator of the second "zone group"), and although not entirely clear, Dr. Schonfeld appears to be relying on this SetAVTransportURI message as the claimed "second indication" of limitation 1.7 of the '885 Patent.  However, as I previously explained in my '885 Rebuttal Report, the SetAVTransportURI message identified by Dr. Schonfeld was not an "indication that the [ZonePlayer] has been added to a second zone scene." For similar reasons to those explained in my '885 Rebuttal Report, the SetAVTransportURI message identified by Dr. Schonfeld is not an "indication" of a "second zone scene," as required by limitation 1.8 of Asserted Claim 1 of the '966 Patent.  Instead, that SetAVTransportURI message was a direction for the ZonePlayer to enter into a new ad-hoc "zone group," which is not a "zone scene" for all of the reasons I have already explained above.

597.    Moreover, it would have only been possible for a Sonos controller to send such a SetAVTransportURI message to the ZonePlayer that was added to the second "zone group" after the first "zone group" had been destroyed and was no longer in existence, which fails to meet the claimed functionality of causing an "indication" of the "second zone scene" to be "transmitted to the first [ZonePlayer]" while the "first zone scene" is still in existence such that the overlapping "first zone scene" and "second zone scene" can thereafter both be "display[ed]" to a user for selection, as required by Asserted Claim 1 of the '966 Patent.

598.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.8 of Asserted Claim 1 of the '966 Patent.

### vi.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.9

599.    When read together, limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

297

…

**[1.9]**    displaying a representation of the first zone scene and a representation of the second zone scene; and;

600.    In my opinion, Sonos's 2005 system did not meet this requirement.

601.    As explained above, the evidence I have reviewed establishes that Sonos's 2005 system only provided users with the ability to form and use ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Sonos controllers in Sonos's 2005 system did not have any functional capability for "displaying a representation" of a "zone scene" – let alone the required functional capability for "displaying a representation of the first zone scene and a representation of the second zone scene" in a manner that allows a user to select between them for purposes of requesting invocation.

602.    Further, as explained above, the "first zone scene" and the "second zone scene" for which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player").  However, in Sonos's 2005 system, it was not possible for two ad-hoc "zone groups" to overlap with one another; rather, each ZonePlayer could only be a member of a single "zone group" at any given time.  Thus, for this additional reason, a Sonos controller in Sonos's 2005 system did not have the required functional capability to "display[] a representation of the first zone scene and a representation of the second zone scene."

603.    Further yet, claim limitations 1.4 and 1.9 require the "computing device" to "display[] a representation of the first zone scene and a representation of the second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that the "representation[s]" are "display[ed]" (otherwise, the "first zone player" could not be in "standalone mode").  However, in Sonos's 2005 system, it was not possible for an ad-hoc "zone group" to exist in an inactive state in which the members of the "zone group" could be used for individual playback while the "zone group" remained available for selection by a user; rather, an ad-hoc "zone group" only remained in existence for the temporary period of time during which it

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

was activated, and once deactivated, the "zone group" would cease to exist. Moreover, while a Sonos controller was capable of displaying the hard-coded "All Zones-Party Mode" option at a time when a ZonePlayer was operating in standalone mode, (i) the hard-coded "All Zones-Party Mode" option was not a "zone scene" for the reasons explained above and (ii) the hard-coded "All Zones-Party Mode" option alone cannot possibly meet the claimed requirement of displaying "representations" of multiple overlapping "zone scenes."

604.    Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 970, 976. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

605.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)    Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970.    *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

> (ix)    Limitation 1.9 displaying a representation of the first zone scene and a representation of the second zone scene; and
>
> 976.    *See supra* '885 claim 1, Limitations 1.6 and 1.7.

606.    As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene" or the displayed "representation of the second zone scene" in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent. [22]

607.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885

---

[22] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

608.    For instance, in his section discussing Sonos's 2005 system and claim limitations 1.6-1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Sonos's 2005 system for forming ad-hoc "zone groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained.

609.    Further, as mentioned above, the lone substantive paragraph that Dr. Schonfeld included in his discussion of Asserted Claim 1 of the '966 Patent (paragraph 972) references an "overlap scenario" involving "a user having a user-created zone group including all three zone players, and having a 'Party Mode,' i.e, a zone group including all three zone players." *See* Schonfeld Op. Report at ¶ 972. Dr. Schonfeld never attempts to actually map this alleged "overlap scenario" to the claim limitations of the '966 Patent, but regardless, I disagree that the co-existence of an ad-hoc "zone group" and a hard-coded "All Zones-Party Mode" option amounts to the claimed requirement of displaying "representation[s]" of two co-existing, overlapping "zone scenes" for at least that reasons that (i) neither an ad-hoc "zone group" nor a hard-coded "All Zones-Party Mode" option is a "zone scene" for all of the reasons explained above, and (ii) the ad-hoc "zone group" in this alleged "overlap scenario" could only exist in an active state, which means that none of the ZonePlayers in this "overlap scenario" would be operating in a "standalone mode" as required by claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent.

610.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.9 of Asserted Claim 1 of the '966 Patent.

**vii.    Sonos's 2005 System Did Not Meet Limitations 1.4 / 1.10**

611.    When read together, limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.10]**    while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

612.    In my opinion, Sonos's 2005 system did not meet this requirement.

613.    As explained above, the evidence I have reviewed establishes that Sonos's 2005 system only provided users with the ability to form and use ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, the Sonos controllers in Sonos's 2005 system did not have any functional capability for either "displaying a representation" of a "zone scene" or receiving a "request to invoke" a "zone scene" – let alone the required functional capability for "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

614.    Further, as explained above, the "first zone scene" and the "second zone scene" for which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player"). However, in Sonos's 2005 system, it was not possible for two ad-hoc "zone groups" to overlap with one another; rather, each ZonePlayer could only be a member of a single "zone group" at any given time. Thus, for this additional reason, a Sonos controller in Sonos's 2005 system did not have the required functional capability to "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

615.    Further yet, claim limitations 1.4 and 1.10 require the "computing device" to be

"displaying the representation of the first zone scene and the representation of the second zone scene" and to "receiv[e] a third request to invoke the first zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode"). However, in Sonos's 2005 system, it was not possible for an ad-hoc "zone group" to exist in an inactive state in which the members of the "zone group" could be used for individual playback while the "zone group" remained available for selection by a user; rather, an ad-hoc "zone group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "zone group" would cease to exist. Moreover, while a Sonos controller was capable of displaying the hard-coded "All Zones-Party Mode" option at a time when a ZonePlayer was operating in standalone mode, (i) the hard-coded "All Zones-Party Mode" option was not a "zone scene" for the reasons explained above and (ii) the hard-coded "All Zones-Party Mode" option alone cannot possibly meet the claimed requirement of displaying "representations" of multiple overlapping "zone scenes."

616.    Still further, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.10 require the "computing device" to receive the "request to invoke the first zone scene" at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request." Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" received the "request to invoke the first zone scene" that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed "representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene." However, in Sonos's 2005 system, a Sonos Controller would have only received a single request that served to both create and invoke a "zone group" – it would have never received an initial "request to create" a "zone group" followed by some later, separate

"request to invoke" the "zone group." This is because an ad-hoc "zone group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "zone group" would cease to exist. Thus, in Sonos's 2005 system, there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group."

617. Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 970, 977. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

618. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(iv)* *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 970. *See supra* '885 claim 1 "network device" disclosure in, *e.g.*, 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1, "zone player" disclosure in, e.g., preamble, 1.1, 1.4-1.7, .9-.10, "standalone mode" disclosure in, e.g., 1.5, 1.8, 1.10.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1

2

> (x)    *Limitation 1.10 while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and*

3

977.    *See supra* '885 claim 1, Limitation 1.9.

4

5

6

619.    As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Sonos's 2005 system.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene," the displayed "representation of the second zone scene," or the "third request to invoke the first zone scene" in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent. [23]

620.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885

---

[23] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

621.    For instance, in his section discussing Sonos's 2005 system and claim limitation 1.9 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Sonos's 2005 system for controlling and playing back audio on an ad-hoc "zone group," as demonstrated by the following paragraph of Dr. Schonfeld's Opening Report:

> In the Sonos System, a user may select a zone group for playback using the "Zones pane" and the playback controls to cause the Zone Players to operate as a synchronous playback group, as described below in the Sonos System user manual. The user may select the Zone Player or group in the "zones pane" on the lefthand side using the desktop controller (shown below) or the handheld controller CR100. The desktop controller or handheld controller provides an instruction to the Zone Players to operate in accordance with those saved groups ("zone scenes") to synchronously play back media. The groups include user defined groups as discussed supra as well as groups that are provided by the Sonos System, such as "Party Mode," which may play music synchronously through all the Zone Players in the system.

Schonfeld Op. Report at ¶ 441 (citing to Sonos 2005 User Guide at 3-7 - 3-15).  However, for similar reasons to those I explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, this theory is flawed for several reasons.

622.    First, because a "zone group" is not a "zone scene" for all of the reasons explained above, this alleged functionality cannot meet  the claimed requirement of receiving a "request to invoke" a "zone scene."

623.    Second, even setting aside the other fundamental differences between a "zone group" and a "zone scene," neither the user action of selecting a previously-created "zone group" in the "Zones" pane/menu of the "desktop controller" or "handheld controller" nor the user action of using the "playback controls" for the selected "zone group" amounts to a "request to invoke" the "zone group."  This is because a "zone group" was automatically invoked at the time of its

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group."   Thus, at the time that a "zone group" was selected in the "Zones" pane/menu of the "desktop controller" or "handheld controller," such a "zone group" would have already been "invoked" and thus such a selection was not a "request to invoke" the "zone group."   Rather, the user would have been selecting an already-invoked "zone group" for purposes of controlling that already-invoked "zone group," not "request[ing] to invoke" the "zone group."   And for similar reasons, any subsequent user action in the user interface with respect to the "zone group," such as an interaction with the "playback controls," also would not amount to a "request to invoke" the "zone group."

624.    Dr. Schonfeld's position to the contrary appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but in my opinion, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent.   Rather, a POSITA would understand that the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" refers to the point in time when the pre-saved group of "zone players" is activated for synchronous playback such that the "zone players" enter a mode in which they are controlled and used as part of the group, which is distinct from the act of initiating playback on that group of "zone players" (although in some scenarios it is possible that playback could be automatically initiated as a result of the "zone scene" being invoked).   *See, e.g.*, '407 Provisional at App'x A, p. 4 (explaining that when a "Zone Scene" is invoked at a time when "no music is playing in any Zone – then the zones will simply link in a group" without playing any music); 6/6/2022 Lambourne Dep. Tr. at 59:5-16 (inventor of the '885 and '966 Patents testifying that a "zone scene" does not have to start actively playing audio "at that moment when the group is invoked"); D.I. 309 (the Court describing "standalone mode" as a mode in which a "zone player" "operate[s] individually" as contrasted with a mode in which the "zone player" is "being controlled

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

as part of [a] group" and never mentioning active playback as a required aspect of "standalone mode"). And as explained previously, the "zone groups" in Sonos's 2005 system were automatically invoked at the time of their creation and then only remained in existence for the temporary period of time during which they were in an active state, so there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group" as required by Asserted Claim 1 of the '966 Patent.

625.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitations 1.4 / 1.10 of Asserted Claim 1 of the '966 Patent.

**viii.    Sonos's 2005 System Did Not Meet Limitation 1.11**

626.    Limitation 1.11 of Asserted Claim 1 of the '966 Patent requires the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.11]**    based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

627.    In my opinion, Sonos's 2005 system did not meet this requirement.

628.    As explained above, the evidence I have reviewed establishes that Sonos's 2005 system only provided users with the ability to form and use ad-hoc "zone groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, the Sonos controllers in Sonos's 2005 system did not have any functional capability for invoking a "zone scene" – let alone the required functional capability for "based on the third request [to invoke the first zone scene], causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player."

629.    Further, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at a time when (i) the "first zone scene" and "second zone scene" have been created and are both in existence and (ii) the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Sonos's 2005 system, it was not possible for an ad-hoc "zone group" to exist in an inactive state in which the members of the "zone group" could be used for individual playback while the "zone group" remained available for selection by a user; rather, an ad-hoc "zone group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "zone group" would cease to exist.  Moreover, while a Sonos controller was capable of displaying the hard-coded "All Zones-Party Mode" option at a time when a ZonePlayer was operating in standalone mode, (i) the hard-coded "All Zones-Party Mode" option was not a "zone scene" for the reasons explained above and (ii) the hard-coded "All Zones-Party Mode" option alone cannot possibly meet the claimed requirement of displaying "representations" of multiple overlapping "zone scenes."

630.    Further yet, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request."  Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" carries out the functionality of limitation 1.11 that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed "representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene."  However, in Sonos's 2005 system, a Sonos Controller would have only received a single request that served to both create and invoke a "zone group," and this single request is what would have triggered the

Sonos controller to cause the selected ZonePlayers to begin coordinating with one another for synchronous playback in accordance with the "zone group" – a Sonos Controller would have never received an initial "request to create" a "zone group" followed by some later, separate "request to invoke" the "zone group." This is because an ad-hoc "zone group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "zone group" would cease to exist. Thus, in Sonos's 2005 system, there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group" that would subsequently trigger the Sonos controller to cause the selected ZonePlayers to begin coordinating with one another for synchronous playback in accordance with the "zone group."

631. Despite this clear evidence establishing that the Sonos controllers and ZonePlayers in Sonos's 2005 system did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶ 978. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitation 1.11 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

632. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claim limitations 1.4 and 1.11 of Asserted Claim 1 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

> (xi)  *Limitation 1.11 based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.*
>
> 978.  *See supra* '885 claim 1, Limitation 1.10.

633. As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitation 1.11 of Asserted Claim 1 of the '966 Patent uses different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was actually *disclosed* by Sonos's 2005 system versus whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was only *rendered obvious* by the Sonos's 2005 system. And along similar lines, Dr. Schonfeld never articulates what he considers to be the "third request to invoke the first zone scene" or what functionality satisfies the "causing" limitation in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitation 1.11 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitation 1.11 of Asserted Claim 1 of the '966 Patent. [24]

634.    With that said, as I have discussed above in Section XV.A.1.i as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

635.    For instance, in his section discussing Sonos's 2005 system and claim limitation

---

[24] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1.10 of Asserted Claim 1 of the '885 Patent, which is directed to player-side functionality for "transitioning from operating in the standalone mode to operating in accordance with" a selected "zone scene," Dr. Schonfeld again relies on the functionality in Sonos's 2005 system for controlling and playing back audio on an ad-hoc "zone group." This is demonstrated by the following paragraph of Dr. Schonfeld's Opening Report:

> As described in the previous claim limitation, a user may select a zone group for playback using the "Zones pane" and the playback controls to cause the Zone Players to operate as a synchronous playback group, as described below in the Sonos System user manual. The user may select the Zone Player or group in the "zones pane" on the left hand side using the desktop controller (shown below) or the handheld controller CR100. The desktop controller or handheld controller provides an instruction to the Zone Players to operate in accordance with those saved groups ("zone scenes") to synchronously play back media. The groups include user defined groups as discussed *supra* as well as groups that are provided by the Sonos System, such as "Party Mode," which may play music synchronously through all the Zone Players in the system. The Zone Players will then coordinate with each other to attempt to provide synchronous playback of media.

Schonfeld Op. Report at ¶ 450 (citing to Sonos 2005 User Guide at 3-7 - 3-15).

636.    However, as an initial matter, the alleged functionality described in this paragraph fails to amount to a Sonos controller receiving the claimed "request to invoke the first zone scene" for all of the reasons explained above with respect to limitation 1.10 of Asserted Claim 1 of the '966 Patent.

637.    Further, because a "zone group" is not a "zone scene" for all of the reasons explained above, this alleged functionality cannot meet the claimed requirement of "based on receiving the third request [to invoke the first zone scene], causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players" of the "first zone scene."

638.    Further yet, even setting aside the other fundamental differences between a "zone group" and a "zone scene," neither the user action of selecting a previously-created "zone group" in the "Zones" pane/menu of the "desktop controller" or "handheld controller" nor the user action of using the "playback controls" for the selected "zone group" amounts to a "request to invoke" the "zone group" that triggers the Sonos controller to cause the selected ZonePlayers to begin

coordinating with one another for synchronous playback in accordance with the "zone group." This is because a "zone group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group" that would subsequently trigger the Sonos controller to cause the selected ZonePlayers to begin coordinating with one another for synchronous playback in accordance with the "zone group." Instead, at the time that a "zone group" was selected in the "Zones" pane/menu of the "desktop controller" or "handheld controller," the "zone group" would have already been invoked and the ZonePlayers in the "zone group" would have already been coordinating with one another for synchronous playback in accordance with the "zone group," so the "zone group" selection would not have triggered the Sonos controller to cause the selected ZonePlayers to transition from operating in a standalone mode to operating in accordance with the "zone group" such that the ZonePlayers begin coordinating with one another for synchronous playback in accordance with the "zone group." And for similar reasons, any subsequent user action in the user interface with respect to the already-invoked "zone group," such as an interaction with the "playback controls," also would not have triggered the Sonos controller to cause the selected ZonePlayers to transition from operating in a standalone mode to operating in accordance with the "zone group."

639.    As above, Dr. Schonfeld's position to the contrary appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but as explained above, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent. Rather, a POSITA would understand the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to refer to the point in time when the pre-saved group of "zone players" is activated for synchronous playback such that the "zone players" enter a mode in which they are controlled and used as part of the group.

640.    In his section discussing Sonos's 2005 system and claim limitation 1.10 of Asserted Claim 1 of the '885 Patent, which is directed to player-side functionality for "transitioning from operating in the standalone mode to operating in accordance with" a selected "zone scene," Dr. Schonfeld separately discusses a ZonePlayer's handling of a SetAVTransportURI message for a "zone group." Schonfeld Op. Report at ¶¶ 451-452; *see also id.* at ¶¶ 442-443.  Thus, although far from clear, it appears that Dr. Schonfeld may also be asserting that a Sonos controller's transmission of a SetAVTransportURI message for a "zone group" to a ZonePlayer meets limitation 1.11 of Asserted Claim 1 of the '966 Patent.  If so, I disagree for several reasons.

641.    First, because a "zone group" is not a "zone scene" for all of the reasons explained above, a Sonos controller's transmission of a SetAVTransportURI message for a "zone group" to a ZonePlayer would not have caused the ZonePlayer "to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players" of the "first zone scene."

642.    Second, as explained above, Dr. Schonfeld already appears to be relying on the Sonos controller's transmission of a SetAVTransportURI message for a new "zone group" for the functionality of "causing an indication of the first zone scene to be transmitted to the first zone player" required by limitation 1.6 of Asserted Claim 1 of the '966 Patent, and based on the surrounding language of Asserted Claim 1 of the '966 Patent, a POSITA would understand that this is a separate function that the "computing device" must carry out ***before*** it carries out the "causing" function of limitation 1.11 of Asserted Claim 1 of the '966 Patent.  Thus, it is not be proper for Dr. Schonfeld to rely on this same SetAVTransportURI message to satisfy both the "causing an indication of the first zone scene to be transmitted to the first zone player" requirement of limitation 1.6 and the "causing" requirement of limitation 1.11, which is yet another reason why his opinions are flawed.    In fact, any attempt by Dr. Schonfeld to rely on this same SetAVTransportURI message for both the "causing an indication of the first zone scene to be transmitted to the first zone player" requirement of limitation 1.6 of Asserted Claim 1 of the '966 Patent and the "causing" requirement of limitation 1.11 of Asserted Claim 1 of the '966 Patent just further highlights the distinction between a "zone group," which was automatically invoked at the

314

time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, and a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be "invoked" on demand for synchronous playback.

643.    Dr. Schonfeld himself appears to recognize these problems with mapping the SetAVTransportURI message to these two different claimed functions, because in paragraph 442, he goes on to state that:

> However, the SetAVTransportURI message may be understood and/or it would have been obvious to parse that message into two separate messages: (a) a first message to notify zone players that they have joined a zone group and identify the group coordinator (meeting the indication limitations); and (b) a second message that provides the remote channel source (typically the group coordinator) and thus provides an instruction that results in synchronous playback (the present instruction limitation). To the extent that this would be a modification of the Sonos System, it would have been obvious to a POSITA because it allows greater flexibility in assigning and updating group coordinators and channel sources.

Schonfeld Op. Report at ¶ 442.  I disagree with this obviousness theory for the reasons explained below, but Dr. Schonfeld's acknowledgement here that Sonos's 2005 system would have to be modified to meet the requirements of the claimed "zone scene" technology further supports my opinion that a ZonePlayer in Sonos's 2005 system did not have the functional capability required by limitation 1.11 of Asserted Claim 1 of the '966 Patent.

644.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by limitation 1.11 of Asserted Claim 1 of the '966 Patent.

ix.    **Asserted Claim 1 Would Not Have Been Obvious Based on Sonos's 2005 System in view of the Secondary References Identified by Dr. Schonfeld**

645.    In his Opening Report, Dr. Schonfeld does not offer any opinion that Asserted Claim 1 of the '966 Patent is anticipated by Sonos's 2005 System.  *See* Schonfeld Op. Report at Section XII.A, ¶¶ 963-978.  Instead, Dr. Schonfeld only opines that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system.  *Id.*

315

646.    In particular, Dr. Schonfeld's section for the '966 Patent as compared to Sonos's 2005 system is entitled "'966 Claims Are Obvious Based On [Sonos's 2005 System]," and in that section, Dr. Schonfeld states that "[i]n my opinion, Claim 1 is rendered obvious based on the Sonos System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington, as described below."  Schonfeld Op. Report at Section XII.A, ¶ 965.  Dr. Schonfeld then includes a sub-section entitled "Claim 1 Is Obvious Based On [Sonos's 2005 System]" where he lists out each limitation of Asserted Claim 1 of the '966 Patent, although Dr. Schonfeld does not provide any analysis of how the limitations of Asserted Claim 1 of the '966 Patent are allegedly disclosed or rendered obvious by "the Sonos System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington."  *Id*. at Section X11.A.2, ¶¶ 966-978.  Instead, Dr. Schonfeld merely refers back to the limitation-by-limitation analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious based on Sonos's 2005 system.  *Id*.

647.    However the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), Asserted Claim 1 of the '966 Patent requires a different combination of claim limitations than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent.  As a result, Dr. Schonfeld fails to articulate how or why even a single claim limitation of Asserted Claim 1 of the '966 Patent would be "rendered obvious based on the Sonos System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington" as he states – let alone how or why the entire combination of claim limitations of Asserted Claim 1 of the '966 Patent would be "rendered obvious based on the Sonos System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington."  For these reasons, I disagree that Dr. Schonfeld has provided a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and Dr. Schonfeld's failure to do so has prejudiced my ability to fully discern, assess, and respond to his

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

obviousness opinions regarding Asserted Claim 1 of the '966 Patent. [25]

648.    Nevertheless, in the sub-sections below, I have made my best effort to assess and respond to Dr. Schonfeld's unsupported and conclusory opinion that Asserted Claim 1 of the '966 Patent is "rendered obvious based on the Sonos System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington."

### (a)    Sonos's 2005 System in view of the General Knowledge of a POSITA

649.    At paragraph 965 of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the "general knowledge of a POSITA." Schonfeld Op. Report at ¶ 965; *see also id.* at ¶ 6. I disagree – in my opinion, claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the "general knowledge of a POSITA," and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

650.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the "general knowledge of a POSITA." *See* Schonfeld Op. Report at ¶¶ 966-978. Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of the "general knowledge of a POSITA," without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id.* For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the "general knowledge of a POSITA" to be deficient.

651.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of the "general knowledge of a

---

[25] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

POSITA" suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

652.    First, even if Sonos's 2005 system were to be modified in the various ways proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

653.    Second, Dr. Schonfeld's proposed modifications to Sonos's 2005 system are all nothing more high-level suggestions – such as "add[ing] overlapping groups" – and Dr. Schonfeld has failed to provide any explanation as to how these proposed modifications to Sonos's 2005 system would have actually been implemented, let alone how the proposed modifications would have achieved either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.  Moreover, in my opinion, implementing Dr. Schonfeld's high-level suggestions would have required substantial, non-obvious modifications to the grouping functionality of Sonos's 2005 system at the time.

654.    Third, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system in any one of the ways proposed by Dr. Schonfeld – let alone all of the different ways proposed by Dr. Schonfeld.    As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality).  The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly

synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the specific "zone scenes" functionality that is claimed in the '885 and '966 Patents.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the claimed "zone scenes" functionality, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

655.    Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported,

conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to modify Sonos's 2005 system in the various ways proposed by Dr. Schonfeld. However, in addition to the fact that Dr. Schonfeld failed to articulate any reasoning as to why a POSITA would have been motivated to modify Sonos's 2005 system to achieve the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

656.    Starting with paragraph 328 of his Opening Report, Dr. Schonfeld states as follows:

> Nonetheless, as I discuss further below, there is evidence of why a POSITA in 2005-2006 would have been motivated to modify the Sonos System with other references. As Dr. Almeroth acknowledged, the Sonos System was released in January 2005 and allowed for a so-called "ad-hoc grouping process" which was time consuming. Almeroth Rebuttal Report at [285], [288]. Accordingly, at least as of January 2005, a POSITA using Sonos's system would have been motivated to find an alternative to this time consuming grouping process, including pre-defined or saved groups (the claimed "zone scenes"). Indeed, Sonos users indicated as much on Sonos forums, and former Sonos employee Graham Farrar testified that Sonos employees themselves monitored these Sonos forums.

Schonfeld Op. Report at ¶ 328; *see also id*. at ¶ 358. I disagree.

657.    As an initial matter, my previous statement that Sonos's ad-hoc "zone group" functionality could sometimes be "time consuming" was based on the description of that functionality in the *specification* of the '885 and'966 Patents, and the fact that the inventor of the '885 and '966 Patents considered the ad-hoc grouping mechanism of Sonos's 2005 system to be "time consuming" does not establish that a *POSITA in 2005-06* would have recognized this as a problem with the ad-hoc "zone group" functionality of Sonos's 2005 system.[26] Moreover, even if a POSITA in 2005-06 were to have recognized this as a problem with the ad-hoc "zone group" functionality of Sonos's 2005 system, there is no evidence that this would have motivated a POSITA in 2005-06 to modify Sonos's ad-hoc "zone group" functionality at all given the benefits of Sonos's ad-hoc "zone group" functionality – let alone would have motivated a POSITA in 2005-06 to replace Sonos's ad-hoc "zone group" functionality with the specific "zone scenes"

---

[26] Likewise, the fact that a very small handful of Sonos users submitted comments about the existing ad-hoc "zone group" functionality of Sonos's 2005 system does not establish that a POSITA in 2005-06 would have found that "zone group" functionality to be some "time consuming" to the point that it needed to be replaced with a different grouping mechanism.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

658.    Turning next to paragraphs 382-383 of his Opening Report,  Dr. Schonfeld states as follows:

> [T]he claim limitation discloses nothing more than overlapping speaker groups, which would have been obvious to a person of skill in the art at the time. Indeed, the Sonos System already disclosed having groups and also having a "Party Mode" / "All Zones" group, which would necessarily encompass any groups already created and therefore disclose overlapping groups.  A person of skill in the art would have been motivated to add overlapping groups because Sonos's own marketing materials touted the benefits of playing any song, in any room, from anywhere, including the ability to "simultaneously play the same song or different songs in as many rooms as you'd like."
>
> A person of skill in the art would have recognized that by allowing a user to create speaker groups, those groups may either (1) allow overlapping group membership or (2) not allow overlapping group membership. Given that allowing overlapping group membership may be attractive to certain users because there was a recognized "need for dynamic control of the audio players as a group," it would have been obvious to select allowing overlapping group membership when implementing speaker groups. '885 Pat at 1:30-34.

Schonfeld Op. Report at ¶¶ 382-383.  I disagree with this theory for several reasons.

659.    As an initial matter, Sonos's marketing materials touting the ability to "simultaneously play the same song or different songs in as many rooms as you'd like" was a description of capabilities that *already existed* Sonos's 2005 system.  As such, this statement informing potential customers that Sonos's 2005 system already provided the ability to "simultaneously play the same song or different songs in as many rooms as you'd like" would not have motivated a POSITA in 2005-06 to modify Sonos's 2005 system to modify Sonos's ad-hoc "zone group" functionality at all – let alone would have motivated a POSITA in 2005-06 to replace Sonos's ad-hoc "zone group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.  .

660.    Further, I disagree with Dr. Schonfeld's suggestion that this would have simply been matter of whether or not to "allow overlapping group membership" – Sonos's 2005 system was employing a distinctly different type of grouping technology that would not even allow for "overlapping group membership" because "zone groups" were temporary, ad-hoc groups that were

automatically activated at the time they were created.  As such, it would not have been possible to simply modify Sonos's existing grouping technology to "allow overlapping group membership" – a completely different grouping technology would have been required.  And in any event, modifying Sonos's 2005 system to "add overlapping groups" would not have achieved the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

661.    Further yet, the fact that the inventor of the '966 Patent recognized a "need for dynamic control of the audio players as a group" does not establish that a POSITA in 2005-06 would have recognized that same need, and Dr. Schonfeld fails to identify any other evidence to support his statement that this need would have been recognized by a POSITA in 2005-06.  And regardless, even if a POSITA in 2005-06 were to have recognized this need, I fail to see how that would have motivated a POSITA in 2005-06 to modify Sonos's ad-hoc "zone group" functionality at all given that it already allowed for "dynamic control of the audio players as a group" – let alone would have motivated a POSITA in 2005-06 to replace Sonos's ad-hoc "zone group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

662.    Still further, Dr. Schonfeld fails to identify any evidence in support of his statement that "allowing overlapping group membership may be attractive to certain users," but even if this were true, Dr. Schonfeld fails to explain how or why this would have motivated a POSITA in 2005-06 to replace Sonos's ad-hoc "zone group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent, particularly in view of all of the other evidence showing that Sonos's ad-hoc "zone group" functionality was being praised at the time.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music….").

663.    Turning next to paragraphs 418-419 of his Opening Report, Dr. Schonfeld cites to a section of Mr. Lambourne's "Zone Scenes" design specification entitled "What happens to the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Music that's already playing when a Zone Scene is started" and then states as follows:

> [T]he inventor wrote that there were only three possibilities for the behavior when a speaker is added to a group . . . . However, there are actually four possibilities for actions when a speaker is added to a group, not three. A person of skill in the art would have found it obvious to choose from one of these possibilities—stop music, choose music, adopt the music of the only playing speaker, and continue playing the "standalone" music—when adding a speaker to a group. These are a limited number of obvious design options.

Schonfeld Op. Report at ¶¶ 418-419.  I disagree for several reasons.

664.    As an initial matter, the section of Mr. Lambourne's "Zone Scenes" design specification that Dr. Schonfeld cites here was discussing potential options for how to handle the playback of media when a previously-created, saved "zone scene" is *invoked* (referred to as "started" in this disclosure), not how a "zone player" operates "when [it] is added to a group" as Dr. Schonfeld contends.   With that said, I fail to see how the inventor's internal consideration of different options for how to handle the playback of media when a previously-created, saved "zone scene" is invoked could possibly provide support for Dr. Schonfeld's opinion that the claimed "zone scenes" technology would have been obvious to a POSITA in 2005-06.  If fact, if anything, this supports the opposite conclusion.

665.    Moreover, I disagree with Dr. Schonfeld's suggestion that configuring a ZonePlayer to "continue playing 'standalone' music" after being added to a "zone group" would have been recognized as an "obvious design option[]" by a POSITA in 2005-06 – Sonos's 2005 system was employing a distinctly different type of grouping technology that only allowed a user to create temporary, ad-hoc "zone groups" that were automatically activated and could never exist in an inactivate state, and configuring a ZonePlayer to "continue playing 'standalone' music" after being added to a "zone group" would have been directly contrary to the principle of operation of that ad-hoc "zone group" functionality.  For this reason, a POSITA in 2005-06 would not have even considered configuring a ZonePlayer to "continue playing 'standalone' music" after being added to a "zone group" as a possible option, nor would a POSITA in 2005-06 have been motivated to modify Sonos's 2005 system to implement this change, as that would have required a completely different grouping technology.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

666.    Turning lastly to paragraphs 442 and 444 of his Opening Report, Dr. Schonfeld states as follows:

> For example, the first Zone Player receives a SetAVTransportURI SOAP action with a Rincon group URI that meets the claimed "indication" and identifies the group to join (selected joinee group). However, the SetAVTransportURI message may be understood and/or it would have been obvious to parse that message into two separate messages: (a) a first message to notify zone players that they have joined a zone group and identify the group coordinator (meeting the indication limitations); and (b) a second message that provides the remote channel source (typically the group coordinator) and thus provides an instruction that results in synchronous playback (the present instruction limitation). To the extent that this would be a modification of the Sonos System, it would have been obvious to a POSITA because it allows greater flexibility in assigning and updating group coordinators and channel sources.

> * * * *

> For the reasons discussed above e.g., with respect to Limitation 1.6, it would have been obvious to combine the Sonos System with the knowledge of a POSITA, and a POSITA would have found it straightforward to use multiple messages to implement different actions and/or user requests. Doing so would have allowed a POSITA greater flexibility in assigning and updating group coordinators and channel sources. And as discussed above, Sonos System in combination with the knowledge of a POSITA discloses this claim limitation, at least because it would have been obvious to parse the Sonos System SetAVTransportURI message into two separate messages: (a) a first message to notify zone players that they have joined a zone group and identify the group coordinator (meeting the indication limitations); and (b) a second message the Sonos System, it would have been obvious to a POSITA because it allows greater flexibility in assigning and updating group coordinators and channel sources.

Schonfeld Op. Report at ¶¶ 442, 444.  I disagree.

667.    As an initial matter, Dr. Schonfeld fails to cite any evidence showing that a POSITA in 2005-06 would have recognized a desire or need to either "use multiple messages to implement different actions and/or user requests" related to the "zone group" technology in Sonos's 2005 system or to have "greater flexibility in assigning and updating group coordinators and channel sources" in Sonos's 2005 system.  Moreover, even if it were "straightforward to use multiple messages to implement different actions and/or user requests" and/or if a POSITA in 2005-06 were to have recognized a desire for "greater flexibility in assigning and updating group coordinators and channel sources," I fail to see how that would have motivated a POSITA in 2005-06 to modify Sonos's 2005 system to incorporate any form of "zone scenes" functionality – let alone would have

motivated a POSITA in 2005-06 to modify Sonos's 2005 system in order to incorporate the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

668.    Fourth and finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system in the many ways proposed by Dr. Schonfeld, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system, which I understand to be improper.

669.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system alone.

### (b)    Sonos's 2005 System in view of Sonos Forums

670.    At paragraph 965 of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of his "Sonos Forums" reference.   Schonfeld Op. Report at ¶ 965; *see also id*. at ¶ 6. I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the Sonos Forums, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

671.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the Sonos Forums. *See* Schonfeld Op. Report at ¶¶ 966-978.  Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of the Sonos Forums, without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id*. For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the Sonos Forums to be deficient.

672.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the

'885 Patent is rendered obvious by Sonos's 2005 system in view of the Sonos Forums suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

673.    First, as discussed above, the Sonos Forums reference, as a whole, does not qualify as prior art under §102 (a), (b), or (f).  *Supra* Section XIII.C.

674.    Second, even if Sonos's 2005 system were to be modified and combined with the Sonos Forums reference in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

675.    Indeed, in his obviousness analysis for Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies solely on the following two posts from the Sonos Forums:

## Macro / presets

16 years ago  ·  61 replies  ·  15122 views

22 September 2005

 JeffT  Trending Lyricist I · 20 replies

Just got the intro bundle, and I am impressed. I did a search and did not find this suggested, but I would save Zone links as favorites. With only 2 ZPs it is not a problem yet, but when I add more it maybe. I would like to setup say Morning mode for the units I want in the morning and a preset volume between the units. Another example I would have 2 party modes, Summer and Winter. The Summer mode would include the deck speakers and the Winter mode would not. Also it would be nice to have playlists or radio station associated with each mode. So when I get up I press Morning the DI Chill radio station plays.

Jeff

## Virtual Zones and Zone Grouping

17 years ago  ·  190 replies  ·  45480 views

27 February 2005

 theboyg  Avid Contributor I · 22 replies

This "link/unlink" business is really cumbersome - and not a joy to use which goes against the ease of use of the rest of the system.

Why can't I have a virtual zone - ie a zone called "Downstairs" - and I can group all my downstairs zones into this. Then I dont have to keep manually linking/unlinking multiple zones everytime.

PLEASE !

G.

Schonfeld Op. Report ¶ 360 (citing Farrar Dep. Exs. 6, 8); *see also id.* at ¶¶ 363, 364.  Dr. Schonfeld never even goes on to explain how the foregoing posts from the Sonos Forums purportedly satisfy the specific player-side "zone scenes" functionality of Asserted Claim 1 of the '885 Patent – let alone the specific controller-side "zone scenes" functionality of Asserted Claim 1 of the '966 Patent – but regardless, I disagree that the foregoing posts disclose or suggest the controller-side "zone scenes" functionality of Asserted Claim 1 of the '966 Patent.

676.    Indeed, as an initial matter, the foregoing posts' high-level discussion of a "mode" or a "virtual zone" fails to disclose or suggest any particular functionality for creating a "mode" or a "virtual zone," let alone the claimed functionality whereby a "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players" functions to  (a) "receiv[e] a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked" at a time when the "first zone player" is "operating in a standalone mode" (per limitation 1.5 of the '966 Patent) and then (b) "based on the first request, i) caus[e] creation of the first zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first zone player, and iii) caus[e] storage of the first zone scene" (per limitation 1.6 of the '966 Patent).

677.    Further, the foregoing posts do not disclose any claimed functionality for creating multiple, overlapping "zone scenes" that comprise at least one common "zone player."  Rather, at best, the foregoing posts disclose that a user could have "2 party modes, Summer and Winter," where "[t]he Summer mode would include the deck speakers and the Winter mode would not." Farrar Dep. Exs. 6.  However, this post does not say the "Summer" and "Winter" "modes" would include any common players, nor does it disclose any functionality for how to achieve multiple, overlapping "modes" that comprise at least one common "zone player."

678.    Further yet, the foregoing posts do not disclose or suggest any particular functionality for presenting previously-created "zone scenes" to a user, let alone the claimed functionality whereby a "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players" functions to

"display[]" "representation[s]" of two overlapping "zone scenes" to a user at a time when the "first zone player" is "operating in a standalone mode" (which means that the "zone scenes" are both in an inactive state) so as to enable the user to select between the "zone scenes" for purposes of requesting invocation of one such "zone scene" on demand.

679.    Still further, the foregoing posts do not disclose or suggest any particular functionality for invoking a "mode" or a "virtual zone," let alone the claimed functionality whereby a "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players" functions to "receiv[e] a third request to invoke" a first one of two overlapping "zone scenes" that both include the "first zone player" at a time when the "computing device" is displaying "representation[s]" of both zone scenes" and the "first zone player" is "operating in a standalone mode" (which means that the "zone scenes" are both in an inactive state), and then "based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player," as required by claim limitation 1.11 of the '966 Patent).    And along similar lines, the foregoing posts also do not disclose or suggest the claimed functionality whereby the "computing device" thereafter functions to "receiv[e] a fourth request to invoke" a second one of two overlapping "zone scenes" at a time when the first one of the two overlapping "zone scenes" is invoked such that the group members of the first "zone scene" are "configured to coordinate" with one another "to play back media in synchrony," and then "based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player," as required by Asserted Claim 2 of the '966 Patent.

680.    Still further yet, the foregoing posts do not disclose or suggest any particular functionality for storing a "mode" or a "virtual zone," let alone the claimed functionality whereby a "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players" causes a "zone scene" to be stored at a "zone player" that is a group member of the "zone scene," as required by Asserted Claim 4 of the '966 Patent.  In this way, the foregoing posts appear to express nothing more than mere hope that Sonos would someday invent a "zone scene" functionality that had not been achieved before.  *See, e.g.,* GOOG-SONOS-WDTX-INV-00015877 at 877 ("I would like to setup say Morning mode …."); GOOG-SONOS-WDTX-INV-00015870 at 870 ("Why can't I have a virtual zone …. PLEASE!").[27]

681.    Dr. Schonfeld also attempts to rely on Mr. Lambourne's testimony to conclude that "the users requesting 'virtual zones' and 'macro' or 'preset' groups disclosed the 'zone scene' concept."  Schonfeld Op. Report at ¶ 361.  However, Mr. Lambourne testified that his claimed "zone scene" functionality addressed the need of the foregoing users; not that the foregoing users disclosed the claimed "zone scene" functionality.  Lambourne Dep. Tr. at 131:3-7 ("Did you invention address the concerns of these users through adding Zone Scenes? … THE WITNESS: Yes. My invention would describe the need described here.").  In fact, as discussed above, Mr. Lambourne already memorialized his thoughts on his "zone scene" concept at least 4 months before the foregoing post by user "JeffT."  *Supra* Sections XIII.C, XI.B.

682.    Because the Sonos Forums reference fails to disclose or suggest a "computing device" that is programmed with the controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent, even if a POSITA in 2005-06 were to modify Sonos's 2005 system to incorporate the discussion in the identified user posts from Sonos Forums, it is my

---

[27] With respect to the February 27, 2005 "Virtual Zones and Zone Grouping" post, Dr. Schonfeld asserts that "two different 'party modes, Summer and Winter,' [] overlapped because '[t]he Summer mode would include the deck speakers and the Winter mode would not.'"  Schonfeld Op. Report ¶ 363.  I disagree.  This post just says that "[t]he Summer mode would include the deck speakers and the Winter mode would not."  It says nothing about the two "modes" having any speakers in common.

opinion that a Sonos controller in such a modified Sonos system still would not have the "zone scenes" capability required by the Asserted Claims of the '966 Patent.

683.    Third, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the subject matter discussed in the identified user posts from Sonos Forums – let alone how that alleged combination would have achieved the claimed invention.

684.    Fourth, I disagree that these two isolated Sonos Forum posts demonstrate that a POSITA in 2005-06 would have been motivated to replace Sonos's ad-hoc "zone group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent (which go well beyond what is discussed in the Sonos Forums posts), particularly in view of all of the other evidence showing that the existing ad-hoc "zone group" functionality of Sonos's 2005 system was being praised at the time, as well as the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

685.    I have also seen other Sonos Forum posts contradicting Dr. Schonfeld's theory that a POSITA would have been motivated to replace Sonos's ad-hoc "zone group" functionality with the claimed "zone scene" functionality in view of the identified user posts from the Sonos Forums. For instance, as explained above, I have seen other user posts from the Sonos Forums casting doubt as to how overlapping "zone scenes" would have worked in Sonos's system.  For example, even after the claimed conception date, a post from "Majik" on April 18, 2006 suggests that there were concerns about potential "side-effects" if "zones [can] be allowed to be in more than one group." GOOG-SONOS-WDTX-INV-00015870 at 871.  I have also seen evidence from other Sonos threads suggesting that, even in 2016, users thought overlapping "zone scenes" would have been "logically impossible" to implement in Sonos's system.  SONOS-SVG2-00226916 at 916.  Given this skepticism, it is my opinion that a POSITA would have been dissuaded from modifying Sonos's 2005 system in view of the identified user posts from the Sonos Forums.

686.    Fifth and finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system in view of the identified user posts from the

1  Sonos Forums, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his

2  conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005

3  system in combination with the Sonos Forums, which I understand to be improper.

4       687.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is

5  not rendered obvious by Sonos's 2005 system in combination with the Sonos Forums.

6                          **(c)    Sonos's 2005 System in view of Nourse**

7       688.    At paragraph 965 of his Opening Report, Dr. Schonfeld states his opinion that

8  Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of

9  Nourse. Schonfeld Op. Report at ¶ 965; *see also id.* at ¶ 6. I disagree – in my opinion, Asserted

10 Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of Nourse, and

11 Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

12      689.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his

13 stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005

14 system in view of Nourse. *See* Schonfeld Op. Report at ¶¶ 966-978. Instead, Dr. Schonfeld relies

15 exclusively on the obviousness analysis that he set forth in connection with his opinion that

16 Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of Nourse,

17 without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1

18 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id.* For this reason alone, I find

19 Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on

20 Sonos's 2005 system in view of Nourse to be deficient.

21      690.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's

22 obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the

23 '885 Patent is rendered obvious by Sonos's 2005 system in view of Nourse suffers from a number

24 of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

25      691.    First, Nourse was cited on the face of the '966 Patent, which shows that Nourse

26 was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent

27 (including Asserted Claim 1) was allowed to issue over Nourse. *See* '966 Patent at 4. Since the

28 USPTO already considered Nourse, I understand that Dr. Schonfeld and Google have the added

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

692. Second, Nourse fails to disclose or suggest the claimed "zone scene" functionality that was missing from Sonos's 2005 system.

693. As discussed above, Nourse discloses a conventional "centralized speaker system" that includes a "computer" connected to one or more "central stations" referred to "master station(s)" or "master control unit(s)" that are "used to monitor and control respective sets of speakers connected thereto," where each "central station" is connected to its respective set of speakers via (i) a tone generator/mixer that "preferably supplies a 35 Hz or similar tone that is not audible as the power signal for the speakers," (ii) one or more amplifiers that are "collocated" with the "central station" and amplify the output of the tone generator/mixer, and (iii) a respective set of "remote units" that are each hard-wired between the "central station" and a given one of the speakers. *See, e.g.*, Nourse at Abstract, FIG. 1, 1:17-21, 2:17-40, 3:19-41, 4:14-42.

694. However, as an initial matter, the conventional "centralized speaker system" of Nourse – which is primarily designed to serve as a "public address system" – is not a "*networked media playback system*" comprising "zone players." Indeed, the connections between the "central station" and the "remote units" for the "respective set of speakers" comprise conventional "audio lines" (i.e., speaker wires), not a data network as a POSITA would understand that term, and neither the "speakers" nor the "remote units" of Nourse are "zone players" for at least the reasons that such devices (i) are not *data network* devices that are configured to *process* and output audio and (ii) did not have the capability to change their "configur[ation]" as it related to audio playback in order to transition between "standalone mode" and grouped mode. *Id.* For this reason alone, Nourse fails to disclose or suggest any "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players," let alone a "computing device" that has the functional capability to carry out all of the other controller functions for a "network media playback system" that are required by claim

1    limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent.

2        695.    Further, even setting aside the fact that Nourse's "centralized speaker system" is not

3    a "networked media playback system" comprising "zone players," there is no device within

4    Nourse's "centralized speaker system" that has the specific controller-side "zone scenes"

5    functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the

6    additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

7        696.    As explained above, Dr. Schonfeld does not offer any opinions as to whether Nourse

8    discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent.  Instead,

9    Dr. Schonfeld only discusses Nourse in connection with claim limitations 1.6-1.8 of Asserted

10   Claim 1 of the '885 Patent, which require the claimed "first zone player" to be programmed with

11   the functional capability to (i) "receiv[e], from a network device over a data network, a first

12   indication that the first zone player has been added to a first zone scene" while the "first zone

13   player" is "operating in a standalone mode," (ii) "receiv[e], from the network device over the data

14   network, a second indication that the first zone player has been added to a second zone scene"

15   while the "first zone player" is "operating in a standalone mode," and (iii) "after receiving the first

16   and second indications, continu[e] to operate in the standalone mode until a given one of the first

17   and second zone scenes has been selected for invocation."  Schonfeld Op. Report at ¶¶ 367-369,

18   384, 436-437.  However, nothing in Dr. Schonfeld's discussion of Nourse in the context of claim

19   limitations 1.6-1.8 of Asserted Claim 1 of the '885 Patent alters my opinion that Nourse's

20   "centralized speaker system" did not have *any* functional capability for creating or invoking a

21   "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim

22   limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the additional limitations of Asserted

23   Claims 2, 4, 6, and 8 of the '966 Patent.

24       697.    The underlying premise of Dr. Schonfeld's theories regarding Nourse appears to be

25   that a "group" of "speakers" as disclosed in Nourse amounts to a "zone scene."  *See* Schonfeld Op.

26   Report at ¶¶ 385-395, 424-431.  I disagree for several reasons.

27       698.    First, Nourse's "group" does not comprise a user-customized, pre-saved group of

28   "zone players" as required by a "zone scene," because neither the "speakers" nor the "remote

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

units" of Nourse are "zone players."

699.    Second, Nourse's "group" is not a "zone scene" for the additional reason that the "speakers" in a "group" do not become "*configured for synchronous playback*" when the "group" is selected.  In fact, Nourse never discloses or even suggests that the "speakers" in a "group" would engage in "synchronous playback," let alone that the "configur[ation]" of the "speakers" would change when a "group" selected in order to achieve "synchronous playback."  And for this same reason, Nourse likewise fails to disclose or suggest that the "speakers" in a "group" are "configured to coordinate . . . to output media in synchrony with" one another when the "group" is selected, as required by claim limitation 1.11 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.  To the contrary, because Nourse's "speakers" lack data network and data processing capability, a POSITA would understand that the "speakers" have the exact same configuration both before and after a "group" is selected.

700.    Third, Nourse fails to disclose or suggest any capability for a user to assign a thematic name to a "group," which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene."

701.    Further, even setting aside these differences between Nourse's "group" and a "zone scene," Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that would satisfy the other aspects of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

702.    For example, Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that amounts to a "computing device" causing an "indication" of a "group" to be transmitted to a "speaker," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

703.    As another example, Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that amounts to a "computing device" "displaying a representation of the first ['group'] and a representation of the second ['group']" and then "while displaying the representation of the first ['group'] and the representation of the second ['group'], receiving a third request to invoke the first ['group']," as required by claim limitations 1.9-1.10 of Asserted Claim

1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

704.    As yet another example, Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that amounts to a "computing device" receiving a "request to invoke" a "group," and then based on that "request," causing a first "speaker" to "transition from operating in the standalone mode to operating in accordance with [a] first predefined grouping of ['speakers'] such that the first ['speaker'] is configured to coordinate with at least [a second 'speaker'] to output media in synchrony with output of media by at least the second ['speaker']," as required by claim limitations 1.10-1.11 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.  In this respect, I disagree that POSITA would consider Nourse's "group page" functionality to satisfy the requirements of these claim limitations.

705.    As still example, Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that amounts to a "computing device" receiving a "request to invoke" a second "group" at a time when a first "group" is invoked such that the "speakers" in the first "group" are "configured to coordinate" with one another "to play back media in synchrony," and then based on the "request," causing a first "speaker" to "(a) cease to operate in accordance with the first ['group'] such that the first ['speaker'] is no longer configured to coordinate with at least the second ['speaker'] to output media in synchrony with output of media by at least the second ['speaker'] and (b) begin to operate in accordance with the second ['group']  such that the first ['speaker'] is configured to coordinate with at least [a third 'speaker' in the second 'group'] to output media in synchrony with output of media by at least the third ['speaker']," as required by Asserted Claim 2 of the '966 Patent under Dr. Schonfeld's apparent mapping.

706.    As a further example, Dr. Schonfeld fails to identify any functionality of Nourse's "centralized speaker system" that amounts to a "computing device" causing a "group" to be stored at a "speaker" in the "group," as required by Asserted Claim 4 of the '966 Patent under Dr. Schonfeld's apparent mapping.

707.    Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

708.    Third, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the identified functionality of Nourse's "centralized speaker system" – let alone how that alleged combination would have achieved the claimed invention.

709.    Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Nourse's "centralized speaker system."  As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality).  The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can

sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").   And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the identified functionality of Nourse's "centralized speaker system." For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system," particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

710.    Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to combine Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system" in the specific manner proposed by Dr. Schonfeld.  However, in addition to the fact that Dr. Schonfeld failed to provide any analysis as to how or why the combination of Sonos's 2005 and Nourse achieves the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

711.    For instance, at paragraph 384 of his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine Sonos's 2005 system with Nourse because Nourse is "analogous to the '885 patent" and "reasonably pertinent to the problem to be solved by

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the '885 patent . . . ." Schonfeld Op. Report at ¶ 384. However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Sonos's 2005 system at all – let alone why a POSITA in 2005-06 would have been motivated to combine Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system" in the specific manner proposed by Dr. Schonfeld.

712.    At paragraph 384 of his Opening Report, Dr. Schonfeld also states as follows:

> Nourse teaches additional means for improving the user experience by allowing a user to add a playback device to multiple groups. Nourse at 3:57-4:5. It would have been desirable to allow a user to have a particular zone player join multiple groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and living room could be grouped for inside entertainment). Having a speaker join multiple groups would increase the number of customized combinations a user could configure in their home, as the Sonos System and Webpage recognize as an important feature.

Schonfeld Op. Report at ¶ 384.

713.    Dr. Schonfeld fails to support this statement that "[i]t would have been desirable to allow a user to have a particular zone player join multiple groups" with any evidence, but even if a POSITA in 2005-06 were to have recognized that this functionality was "desirable," I have not seen any evidence that this recognition would have motivated such a POSITA to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified functionality of Nourse – particularly given that (i) the existing ad-hoc "zone group" functionality of Sonos's 2005 system already provided a mechanism for grouping ZonePlayers for synchronous playback that was being praised and (ii) Sonos's 2005 system was a networked audio system comprising "zone players" having data networking and data processing capability whereas Nourse is directed to a conventional "centralized speaker system" comprising a "central station," a tone generator/mixer, amplifiers, remote units, and hard-wired speakers. Moreover, even if a POSITA in 2005-06 were to have recognized that it was "desirable" to modify Sonos's 2005 system to "allow a user to have a particular zone player join multiple groups" as Dr. Schonfeld contends, this still would not have motivated a POSITA to combine Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system" or otherwise modify Sonos's 2005 system in the specific ways that would have been required in order to achieve either the specific player-

338

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

714.    I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Sonos's 2005 system with the identified functionality of Nourse's "centralized speaker system."  For instance, as explained above, Nourse discloses a type of conventional "centralized speaker system" that includes passive, hard-wired speakers.  In contrast, Sonos's 2005 system was a networked audio system comprising network-enabled "zone players" that was specifically intended to provide a new paradigm for home audio that improved upon the many deficiencies of conventional hard-wired systems like Nourse's "centralized speaker system." *See, e.g.,* GOOG-SONOS-NDCA-00108095 at 364 (disclosing that "[a] wholehouse sound system usually involves hiring somebody to run wires through your walls, install custom speakers and program a wireless remote control," but with Sonos ZonePlayer, "you're spared the inwall wiring, the installer's visit and the second mortgage."), 467 ("This means that you do not need to go to the effort of installing cables, and you can relocate your ZonePlayer(s) easily.").  Additionally, as explained above, Nourse's "centralized speaker system" was primary designed to serve as a public address system, whereas Sonos's 2005 system was primary designed to serve as home audio system.  Given these differences between Sonos's 2005 system and Nourse's "centralized speaker system," it is my opinion that a POSITA would have been dissuaded from modifying Sonos's 2005 system to combine it with the identified functionality of Nourse's "centralized speaker system."

715.    Along similar lines, Dr. Schonfeld's opinion that a POSITA would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Nourse's "centralized speaker system" is contradicted by the fact that such a modification would have fundamentally altered the principles of operation of Sonos's 2005 system given that Sonos's 2005 system was a *decentralized* system built around ZonePlayers having data networking and data processing capability whereas Nourse is directed to "*centralized* speaker system" that was built around centralized computer that was used to control passive, hard-wired speakers.

716.    Finally, because there is no evidence that a POSITA in 2005-06 would have been

motivated to modify Sonos's 2005 system to combine it with the identified functionality of Nourse's centralized speaker system," it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system in combination with Nourse, which I understand to be improper. *Compare* Schonfeld Op. Report, ¶ 384 ("It would have been desirable to allow a user to have a particular zone player join multiple groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and living room could be grouped for inside entertainment). Having a speaker join multiple groups would increase the number of customized combinations a user could configure in their home, as the Sonos System and Webpage recognize as an important feature.") *with* '966 Patent, 8:62-67 ("Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own."), 2:18-24 ("There is a need for dynamic control of the audio players as a group. With a minimum manipulation, the audio players may be readily grouped. In a traditional multi-zone audio system, the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment.").

717.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in combination with Nourse.

### (d)    Sonos's 2005 System in view of Millington

718.    At paragraph 965 of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Millington.  Schonfeld Op. Report at ¶ 965; *see also id*. at ¶ 6.  I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of Millington, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

719.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Millington.  <u>See</u> Schonfeld Op. Report at ¶¶ 966-978.  Instead, Dr. Schonfeld

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of Millington, without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id.* For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Millington to be deficient.

720. Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of Millington suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

721. First, Millington was cited on the face of the '966 Patent, which shows that Millington was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Millington. *See* '966 Patent at 5 (citing to U.S. Pat. No. 8,234,395, which is a U.S. counterpart to the Millington Canadian patent relied upon by Dr. Schonfeld). Since the USPTO already considered Millington, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

722. Second, Millington fails to disclose or suggest the claimed "zone scene" functionality that was missing from Sonos's 2005 system, which makes sense given my understanding that the ad-hoc "zone group" functionality implemented in Sonos's 2005 system was based on the grouping technology that was disclosed in Millington, a patent application filed by Sonos that lists Mr. Millington as the named inventor.

723. As discussed above, Millington discloses a "network audio system" that includes (i) "zone players," which are data network devices that are configured to process and output audio, and (ii) "user interface modules" that are configured to control the "zone players" (i.e., controllers).

*See, e.g.*, Millington at 4, FIGs. 1-3.  As disclosed in Millington, each of these "zone players" is capable of operating in a standalone mode in which the "zone player" is configured for individual audio playback, and a "user interface module" can also be used to group "zone players" together into a "synchrony group" comprising a set of "zone players" that are configured to "play the same audio program synchronously" by coordinating with one another over a data network.  *Id*. at 6-11; *see also id*. at 13-48.  Millington further discloses that "[i]n the network[ed] audio system 10, the synchrony groups are not fixed" and "[u]sers can enable them to be established and modified dynamically" by using a "user interface module" to cause one "zone player" to "join" into a "synchrony group" with another "zone player," at which point the "zone players" become configured for synchronous playback as part of the "synchrony group."  *Id*. at 7-9, 10, 14-16, 32-33.  In this respect, Millington describes that when a "zone player" is added to a "synchrony group," it will perform various operations in order to configure itself to begin operating as part of the "synchrony group," and will no longer be configured for individual audio playback.  *Id*.

724.    However, as with the "zone groups" in Sonos's 2005 system, the "synchrony groups" disclosed in Millington were temporary, ad-hoc groups that were automatically activated at the time of creation and then only remained in existence during the limited time they were activated.  This is different from a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state in which the group members can be used for individual playback while the pre-saved group remains available for selection by a user so that it can later be invoked on demand for synchronous playback.  Thus, as with the controllers in Sonos's 2005 system, the "user interface modules" in Millington's "network audio system" did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent.  In this respect, Millington fails to disclose or suggest claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent for similar reasons to those summarized above in my discussion of why Sonos's 2005 system fails to disclose or suggest claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent, and likewise fails to disclose or suggest the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent for similar reasons to those summarized below in my discussion of why

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Sonos's 2005 system fails to disclose or suggest the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

725.    As explained above, Dr. Schonfeld does not offer any opinions as to whether Millington discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent.  Instead, Dr. Schonfeld only discusses Millington in connection with claim limitations 1.7-1.8 of Asserted Claim 1 of the '885 Patent, which require the claimed "first zone player" to be programmed with the functional capability to "receiv[e], from [a] network device over [a] data network, a second indication that the first zone player has been added to a second zone scene" while the "first zone player" is "operating in a standalone mode"  and then "after receiving the first and second indications, continu[e] to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation."  Schonfeld Op. Report at ¶¶ 396-400, 420-423.  However, nothing in Dr. Schonfeld's discussion of Millington in the context of claim limitations 1.7-1.8 of Asserted Claim 1 of the '885 Patent alters my opinion that Millington's "network audio system" system did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

For instance, as an initial matter, Dr. Schonfeld never even offers an opinion that a "synchrony group" as disclosed in Millington is a "zone scene," let alone explains how such a "synchrony group" meets all of the requirements of a "zone scene" discussed above – namely a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state in which the group members can be used for individual playback while the pre-saved group remains available for selection by a user so that it can be later invoked on demand for synchronous playback.

726.    Further, I disagree with Dr. Schonfeld's statement that "Millington discloses overlapping speaker groups," which is not correct.  Schonfeld Op. Report at ¶ 400.  Millington's disclosure makes clear that a "zone player" can only be a member of one "synchrony group" at any given time.  *See, e.g.*, Millington at 6-11.  Dr. Schonfeld's statement to the contrary is based on Millington's disclosure that a given "zone player" could operate as both (i) "member" of a first

"synchrony group" and also (ii) an "audio information channel device" ("AICD") for a second "synchrony group" that provides "audio and playback timing information and clock timing information" for the second "synchrony group" but is not configured to play back audio as part of that second "synchrony group." Millington at 17; *see also id*. at 19, 27, 29. However, in this scenario, a POSITA would not consider the "zone player" to be a member of the second "synchrony group" because the "zone player" would not be configured to play back audio in synchrony with the other members of the second "synchrony group," and thus would not consider this to be a disclosure of "overlapping speaker groups" – let alone overlapping "zone scenes" that each comprises A user-customized, pre-saved group of "zone players" that is able to exist in an inactive state in which the group members can be used for individual playback while the pre-saved group remains available for selection by a user so that it can be later invoked on demand for synchronous playback.

727.    In fact, Millington's own disclosure expressly confirms that a "zone player" serving only as an AICD for a "synchrony group" is not considered to be a "member" of that "synchrony group" when it explains that "since 'synchrony group' is used to refer to sets of zone players that are playing the same audio program synchronously, zone player 11(1) *will not be part of zone player 11(6)'s synchrony group*, even though zone player 11(1) is providing the audio information for the audio program to zone player 11(6)." Millington at 7.

728.    Further yet, I disagree with Dr. Schonfeld's suggestion that, when Millington discloses that adding a "zone player" to a "synchrony group" causes the "zone player" to "be *enabled* to play the audio program that is currently being played by that synchrony group," this somehow amounts to a teaching that the "zone player" will remain in standalone mode. Schonfeld Op. Report at ¶ 421. In my opinion, this teaches the exact opposite – namely, that when a "zone player" is added to a "synchrony group," it will automatically configure itself for synchronous playback as part of that "synchrony group" and stop operating in "standalone mode," which is one of the teachings that demonstrates why a "synchrony group" is not a "zone scene." This operation is confirmed by various other aspects of Millington's disclosure as well, which describe that when a "zone player" is added to a "synchrony group," it will perform various operations in order to configure itself to

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

begin operating as part of the "synchrony group," and will no longer be configured for individual audio playback.  Millington at 7-9, 10, 14-16, 32-33.

729.    For similar reasons, I disagree with Dr. Schonfeld's statement that "Millington further discloses keeping a media player in standalone mode after joining a group, because players disclosed by Millington continue to operate independently of the newly joined group," which is not correct. Schonfeld Op. Report at ¶ 422.  Contrary to this statement, Millington discloses that when a "zone player" joins a "synchrony group," it automatically transitions from operating in a "standalone mode" to operating in accordance with the "synchrony group" at that time.  Millington at 7-9, 10, 14-16, 32-33.

730.    Similar to his theories for Sonos's 2005 system, Dr. Schonfeld's position to the contrary here appears to be based on his view that a "synchrony group" is not "invoked" – and thus a "zone player" does not transition out of "standalone mode" and become configured for synchronous playback – until the "synchrony group" is actually caused to play back audio. However, in my opinion, this is not how a POSITA would understand the terms "invoke" or "standalone mode" in the context of the claim language and specification of the '885 Patent. Rather, a POSITA would understand that a "synchrony group" is "invoked" at the point in time when the "synchrony group" becomes activated for synchronous playback such that group members enter a mode in which they are controlled and used as part of the group, which is distinct from the act of initiating playback on that "synchrony group" (although in some scenarios it is possible that playback could be automatically initiated as a result of the "synchrony group" being invoked).  And as explained above,  a "synchrony group" becomes activated for synchronous playback and the group members transition out of "standalone mode" and into a grouped mode at the time that the "synchrony group" is created, not at some later time

731.    Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with the identified functionality of Millington's "network audio system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966

345

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  Patent that Dr. Schonfeld failed to analyze.

2      732.    Third, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005

3  system would have actually been modified to combine it with the identified functionality of

4  Millington's "networked audio system" – let alone how that alleged combination would have

5  achieved the claimed invention.

6      733.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is

7  not rendered obvious by Sonos's 2005 system in combination with Millington.

8                  **(e)    Sonos's 2005 System in view of Squeezebox**

9      734.    In his section entitled "'966 Claims Are Obvious Based On [Sonos's 2005

10  System]," Dr. Schonfeld does not identify Sonos's 2005 system in view of Squeezebox as an

11  obviousness combination for Asserted Claim 1 of the '966 Patent.  Schonfeld Op. Report at ¶¶ 965

12  (stating that "[i]n my opinion, Claim 1 is rendered obvious based on the Sonos System in view of

13  the general knowledge of a POSITA, the Sonos Forums, Nourse, and Millington").  However, in

14  his earlier "Summary of Opinions" section, Dr. Schonfeld includes a bullet stating that "Sonos

15  System in combination with Sonos Forums, *Squeezebox*, Millington, and/or Nourse renders the

16  asserted claims obvious." *Id*. at ¶ 6.  In view of this inconsistency, it is not clear whether Dr.

17  Schonfeld is offering an opinion that Asserted Claim 1 of the'966 Patent is rendered obvious based

18  on Sonos's 2005 system in view of Squeezebox, but to the extent he is offering such an opinion, I

19  disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's

20  2005 system in view of Squeezebox, and Dr. Schonfeld's apparent opinion to the contrary is flawed

21  for several reasons.

22      735.    As an initial matter, to the extent that Dr. Schonfeld is offering an opinion that that

23  Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of

24  Squeezebox, Dr. Schonfeld fails to set forth any bases or reasoning for such an opinion. *See*

25  Schonfeld Op. Report at ¶¶ 966-978.  Instead, Dr. Schonfeld relies exclusively on the obviousness

26  analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent

27  is rendered obvious by Sonos's 2005 system in view of Squeezebox, without providing any

28  explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

applies to Asserted Claim 1 of the '966 Patent.  *Id*.  For this reason alone, I find Dr. Schonfeld's apparent opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Squeezebox to be deficient.

736.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Sonos's 2005 system in view of Squeezebox suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

737.    First, as with Sonos's 2005 system, Squeezebox did not have any "zone scenes" functionality, let alone the specific "zone scenes" functionality required by the Asserted Claims of the '885 and '966 Patents.  Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with the "sync group" functionality of a Squeezebox system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

738.    Second, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the "sync group" functionality of a Squeezebox system – let alone how that alleged combination would have achieved the claimed invention.

739.    Third, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the "sync group" functionality of a Squeezebox system. As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality).  The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same

music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the "sync group" functionality of a Squeezebox system. For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the "sync group" functionality of a Squeezebox system,  particularly in view of the time, effort, and cost that would have been required

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

to overhaul the grouping mechanism of Sonos's 2005 system.

740.    In his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine Sonos's 2005 system with Squeezebox simply because "Mr. Lambourne testified, he was aware of Squeezebox given its competitive nature with the Sonos System," and "[o]thers including reviewers recognized Sonos System as a competitor of Squeezebox." Schonfeld Op. Report at ¶ 403.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Sonos's 2005 system at all – let alone why a POSITA in 2005-06 would have been motivated to combine Sonos's 2005 system with the "sync group" functionality of a Squeezebox system in the manner proposed by Dr. Schonfeld.

741.    I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Sonos's 2005 system with the "sync group" functionality of a Squeezebox system.  For instance, as explained below, the Squeezebox system that has a different system architecture than Sonos's 2005 system that relies on a centralized server called a SlimServer to power the Squeezebox players in the system.  Given this significant difference in the system architectures, a POSITA would have been dissuaded from modifying Sonos's 2005 system to combine it with the functionality of the Squeezebox system, as such a modification would have required to the architecture of Sonos's 2005 system to be redesigned to incorporate a centralized server, which would have altered the principle of operation of Sonos's 2005 system.

742.    Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Squeezebox, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system in combination with Squeezebox, which I understand to be improper.

743.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in combination with Squeezebox.

**(f)    Sonos's 2005 System in view of Crestron**

744.    In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of what Dr. Schonfeld refers to as "Crestron," but in his limitation-by-limitation obviousness analysis of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld does include sub-sections discussing Crestron in connection with claim limitations 1.5, 1.6, 1.7, 1.8, 1.9, and 1.10 of Asserted Claim 1 of the '885 Patent. *Compare* Schonfeld Op. Report at ¶¶ 6, 269, 965 (summarizing Dr. Schonfeld's "Sonos System" obviousness grounds without mentioning Crestron) *with id.* at ¶¶ 332, 370-371, 405, 438-439, 447, 457 (discussing Crestron as part of Dr. Schonfeld's obviousness analysis for Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system).

745.    Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Crestron, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness opinions.  Nevertheless, to the extent that Dr. Schonfeld later attempts to and is permitted to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Crestron, I disagree.

746.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Crestron. *See* Schonfeld Op. Report at ¶¶ 966-978.  Instead, Dr. Schonfeld only discusses Crestron in the context of certain limitations of Asserted Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted Claim 1 of the '966 Patent.

747.    Additionally, Dr. Schonfeld's discussion of Crestron that he includes in his analysis of Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

748.    First, Dr. Schonfeld has failed to establish that his "Crestron" system qualifies as prior art to any claim of either the '885 Patent or the '966 Patent.  In fact, Dr. Schonfeld failed to even identify a particular subsection of 35 U.S.C. § 102 under which Crestron would qualify as prior art.  Regardless, as I explained above, Dr. Schonfeld's alleged "Crestron" system does not

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

qualify as prior art for multiple reasons. For instance, the various documents that Dr. Schonfeld cites to in his Opening Report describe many different products (e.g., Crestron D3 Pro, Crestron Adagio AES, Crestron Adagio AMS, Crestron RoomView, and C2N-DAP8RC) and thus do not evidence the functionality of a single "Crestron" prior art system. This is true even with respect to the only two products that Dr. Schoenfeld actually relies on in connection with his obvious analysis – (1) Crestron Adagio AES Entertainment System, and (2) Crestron Adagio AMS Media System. Indeed, these are two different products that do not constitute a single prior art system. Moreover, the only document that Dr. Schonfeld cites to in his obviousness analysis for the alleged functionality of the Crestron AMS system has a 2008 copyright notice, which is well after the December 21, 2005 invention date and September 12, 2006 priority date of the '885 and '966 Patents. Thus, this document does not qualify as prior art and Dr. Schonfeld has not otherwise established that the disclosures in this document were embodied in a system that was publicly available in the United States at a time that would qualify the system as prior art.

749. Second, the Crestron AES system did not have the claimed "zone scene" functionality that was missing from Sonos's 2005 system.[28]

750. As discussed above, the Crestron AES system is a conventional centralized speaker system that includes an AES device that can be hard-wired to passive speakers in up to 6 different rooms using speaker cable. See GOOG-SONOSNDCA-00117940-941.

751. However, as an initial matter, Crestron's centralized AES speaker system is not a "*networked* media playback system" comprising "zone players." Indeed, the connections between the centralized AES device and the "stereo room speakers" comprise conventional speaker wires, which are not a data network as a POSITA would understand that term, and the "speakers" of the Crestron AES system are not "zone players" for at least the reasons that such devices (i) are not *data network* devices that are configured to *process* and output audio and (ii) did not have the capability to change their "configur[ation]" as it related to audio playback in order to transition

---

[28] Given that the Crestron AMS system is not prior art, my analysis focuses on the Crestron AES system. However, Dr. Schonfeld's reliance on the Crestron AMS system fails for nearly all of the same reasons discussed below for the Crestron AES system, including that the Crestron AMS system did not have the claimed "zone scene" functionality.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

between "standalone mode" and grouped mode.  *Id.*  For this reason alone, the Crestron AES system fails to disclose or suggest any "computing device" that is "serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players," let alone a "computing device" that has the functional capability to carry out all of the other controller functions for a "network media playback system" that are required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent.

752.    Further, even setting aside the fact that Crestron's centralized AES speaker system is not a "networked media playback system" comprising "zone players," there is no device within Crestron's centralized AES speaker system that has the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent or the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

753.    As explained above, Dr. Schonfeld does not offer any opinions as to whether the Crestron AES system discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent.  Instead, Dr. Schonfeld only discusses the Crestron AES system in connection with claim limitations 1.5-1.10 of Asserted Claim 1 of the '885 Patent, which require the claimed "first zone player" to be programmed with the functional capability to (i) "receiv[e], from a network device over a data network, a first indication that the first zone player has been added to a first zone scene" while the "first zone player" is "operating in a standalone mode," (ii) "receiv[e], from the network device over the data network, a second indication that the first zone player has been added to a second zone scene" while the "first zone player" is "operating in a standalone mode," and (iii) "after receiving the first and second indications, continu[e] to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation." Schonfeld Op. Report at ¶¶ 332, 370-371, 405, 438-439, 447, 457.  However, nothing in Dr. Schonfeld's discussion of the Crestron AES system in the context of claim limitations 1.5-1.10 of Asserted Claim 1 of the '885 Patent alters my opinion that Crestron's centralized AES speaker system did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    Asserted Claim 1 of the '966 Patent.

2        754.    The underlying premise of Dr. Schonfeld's theories regarding the Crestron AES

3    system appears to be that a "Room Group" of "speakers" in Crestron's centralized AES speaker

4    system amounts to a "zone scene."  *See* Schonfeld Op. Report at ¶¶ 332, 370-371, 405, 438-439,

5    447, 457.  I disagree for several reasons.

6        755.    First, a "Room Group" in Crestron's centralized AES speaker system does not

7    comprise a user-customized, pre-saved group of "zone players" as required by a "zone scene,"

8    because the "speakers" are not "zone players."

9        756.    Second, a "Room Group" in Crestron's centralized AES speaker system is not a

10    "zone scene" for the additional reason that the "speakers" in a "Room Group" do not become

11    "*configured for synchronous playback*" when the "group" is selected.  In fact, the 2-page AES

12    brochure that Dr. Schonfeld relies on never discloses or even suggests that the "speakers" in a

13    "Room Group" would engage in "synchronous playback," let alone that the "configur[ation]" of

14    the "speakers" would change when a "Room Group" is selected in order to achieve "synchronous

15    playback."  And for this same reason, the 2-page AES brochure likewise fails to disclose or suggest

16    that the "speakers" in a "Room Group" are "configured to coordinate . . . to output media in

17    synchrony with" one another when the "group" is selected, as required by claim limitation 1.11 of

18    Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.  To the contrary,

19    because the "speakers" in Crestron's centralized AES speaker system lack data network and data

20    processing capability, a POSITA would understand that the "speakers" have the exact same

21    configuration both before and after a "group" is selected.

22        757.    Third, Crestron's centralized AES speaker system did not have any capability for a

23    user to assign a thematic name to a "Room Group," which fails to meet the additional "according

24    to a common theme" requirement of Google's proposed construction of a "zone scene."  I note that

25    providing a name via a "labeling strip" that is manually attached to the exterior of the centralized

26    AES device does not satisfy the thematic naming requirement of a "zone scene."  *See* GOOG-

27    SONOSNDCA-00117940-941 at 941.

28        758.    Further, even setting aside these differences between a "Room Group" in Crestron's

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

centralized AES speaker system and a "zone scene," Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that would satisfy the other aspects of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

759.    For example, Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that amounts to a "computing device" causing an "indication" of a "Room Group" to be transmitted to a "speaker," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

760.    As another example, Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that amounts to a "computing device" "displaying a representation of the first ['Room Group'] and a representation of the second ['Room Group']" and then "while displaying the representation of the first ['Room Group'] and the representation of the second ['Room Group'], receiving a third request to invoke the first ['Room Group']," as required by claim limitations 1.9-1.10 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

761.    As yet another example, Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that amounts to a "computing device" receiving a "request to invoke" a "Room Group," and then based on that "request," causing a first "speaker" to "transition from operating in the standalone mode to operating in accordance with [a] first predefined grouping of ['speakers'] such that the first ['speaker'] is configured to coordinate with at least [a second 'speaker'] to output media in synchrony with output of media by at least the second ['speaker']," as required by claim limitations 1.10-1.11 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

762.    As still example, Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that amounts to a "computing device" receiving a "request to invoke" a second "Room Group" at a time when a first "Room Group" is invoked such that the "speakers" in the first "Room Group" are "configured to coordinate" with one another "to play back media in synchrony," and then based on the "request," causing a first "speaker" to "(a) cease to operate in accordance with the first ['Room Group'] such that the first ['speaker'] is no longer

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

configured to coordinate with at least the second ['speaker'] to output media in synchrony with output of media by at least the second ['speaker'] and (b) begin to operate in accordance with the second ['Room Group'] such that the first ['speaker'] is configured to coordinate with at least [a third 'speaker' in the second 'Room Group'] to output media in synchrony with output of media by at least the third ['speaker'']," as required by Asserted Claim 2 of the '966 Patent under Dr. Schonfeld's apparent mapping.

763. As a further example, Dr. Schonfeld fails to identify any functionality of Crestron's centralized AES speaker system that amounts to a "computing device" causing a "Room Group" to be stored at a "speaker" in the "Room Group," as required by Asserted Claim 4 of the '966 Patent under Dr. Schonfeld's apparent mapping.

764. Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with the identified functionality of Crestron's centralized AES speaker system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

765. Third, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the identified functionality of Crestron's centralized AES speaker system – let alone how that alleged combination would have achieved the claimed invention.

766. Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Crestron's centralized AES speaker system. As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality). The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry. *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the identified functionality of Crestron's centralized AES speaker system.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

functionality of Crestron's centralized AES speaker system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

767.    Nevertheless, in his Opening Report, Dr. Schonfeld concludes that it would have been obvious to combine Sonos's 2005 system with the identified functionality of Crestron's centralized AES speaker system.  However, Dr. Schonfeld fails to provide any reasoning whatsoever regarding why such a combination would have been obvious to a POSITA in 2005-06.  Instead, Dr. Schonfeld merely concludes that it would have been obvious and then provides his characterization of the "Crestron" system.  The entirety of Dr. Schonfeld's analysis regarding his "Crestron" system is shown below:

- "As I addressed below in relation to Limitation 1.6, it would also have been obvious to modify the Sonos System with the Crestron system to add this claim limitation, to the extent it is not disclosed, for the same reasons discussed with respect to Limitation 1.6. The Crestron system, as described in Section X (and incorporated herein by reference), includes the ability to create zone groups while maintaining the ability to play to individual zones within those groups (e.g., in standalone mode)." (Schonfeld Op. Report at ¶ 332 re limitation 1.5 of Asserted Claim 1 of the'885 Patent);

- "To the extent it is found that the Sonos 2005 system did not explicitly disclose a "zone scene" as discussed in the Court's Order, such features would have been obvious to a person of skill in the art, in view at least of the Sonos Forums, Nourse, and/or Crestron. For example, as I described in Section X (incorporated herein by reference), Crestron also offered multi-room audio systems including speaker grouping and naming. For example, as shown below in a manual dated November 2005 and copyrighted 2005, Crestron offered multi-room audio including naming. The system supported up to 24 rooms where listeners in each room could 'listen selectively' to different audio sources. The system was plug-and-play compatible with Crestron's iPod connector, called 'iPod Connect.' Further, the system supported 'Room Groups,' which made 'it simple to combine speakers in adjacent rooms, or switch into whole-house party mode, by letting the user link any number of rooms to function as one.' The Crestron system allowed up to 6 groups, and as shown in the image below, the rooms/groups would be identified by name, such as 'Kitchen.' The system manual below did not provide other limitations on grouping—for example restricting which rooms could be grouped or not grouped." (*Id.* at ¶¶ 370-371 re limitation 1.6 of Asserted Claim 1 of the'885 Patent);

- "As I addressed below in relation to Limitation 1.6, it would also have been obvious to modify the Sonos System with Crestron to add this claim limitation, to the extent it is not disclosed for the same reasons discussed with respect to Limitation 1.6. For example, Crestron also offered multi-room audio systems including speaker grouping and the ability for a speaker to be part of multiple speaker groups. For example, as shown below in a manual dated November 2005 and copyrighted 2005,

Crestron offered multi-room audio. The system manual below did not provide other limitations on grouping—for example restricting which rooms could be grouped or not grouped." (*Id.* at ¶ 405 re limitation 1.7 of Asserted Claim 1 of the'885 Patent);

- "It would have been obvious to combine Crestron with Sonos System for the reasons discussed above. As I addressed above in relation to Limitation 1.6, it would have been obvious to modify the Sonos System with Crestron to add this claim limitation, to the extent it is not disclosed for the same reasons discussed with respect to Limitation 1.6. For example, Crestron also offered multi-room audio systems including speaker grouping and naming. For example, as shown below in a manual dated November 2005 and copyrighted 2005, Crestron offered multi-room audio. The system supported up to 24 rooms where listeners in each room could "listen selectively" to different audio sources. The system was plug-and-play compatible with Crestron's iPod connector, called 'iPod Connect.' Further, the system supported "Room Groups," which made "it simple to combine speakers in adjacent rooms, or switch into whole-house party mode, by letting the user link any number of rooms to function as one," but also let 'listeners in each room … listen selectively to any of 10 different stereo sources.' The system manual below did not provide other limitations on grouping." (*Id.* at ¶¶ 438-39 re limitation 1.8 of Asserted Claim 1 of the'885 Patent);

- "As I addressed above in relation to Limitation 1.6, it would also have been obvious to modify the Sonos System with Crestron to add this claim limitation, to the extent it is not disclosed for the same reasons discussed with respect to Limitation 1.6. This is at least because Crestron discloses that a speaker can be part of multiple groups, as I described e.g. in Section X (and incorporated herein by reference), and in order for a speaker to be part of two zone scenes or two groups at the same time, the zone scenes or zone groups must be able to be created separately from any invocation step." (*Id.* at ¶ 447 re limitation 1.9 of Asserted Claim 1 of the'885 Patent); and

- "As I addressed above in relation to Limitation 1.6, it would also have been obvious to modify the Sonos System with Crestron to add this claim limitation, to the extent it is not disclosed, for the same reasons discussed with respect to Limitation 1.6." (*Id.* at ¶ 457 re limitation 1.10 of Asserted Claim 1 of the'885 Patent).

768.    In addition to the fact that Dr. Schonfeld failed to provide any analysis as to how or why the combination of Sonos's 2005 and "Crestron" achieves the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, Dr. Schonfeld's failure to explain why a POSITA in 2005-06 would have allegedly been motivated to combine Sonos's 2005 system with the identified functionality of Crestron's centralized AES speaker system confirms that his analysis is flawed and deficient.[29]

769.    In any event, I have seen evidence of affirmative reasons why a POSITA would not

---

[29] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

have been motivated to combine Sonos's 2005 system with the identified functionality of Crestron's centralized AES speaker system. For instance, as explained above, Crestron's centralized AES speaker system is a conventional centralized speaker system that includes passive, hard-wired speakers. In contrast, Sonos's 2005 system was a networked audio system comprising network-enabled "zone players" that was specifically intended to provide a new paradigm for home audio that improved upon the many deficiencies of conventional hard-wired systems like Nourse's "centralized speaker system." *See, e.g.,* GOOG-SONOS-NDCA-00108095 at 364 (disclosing that "[a] wholehouse sound system usually involves hiring somebody to run wires through your walls, install custom speakers and program a wireless remote control," but with Sonos ZonePlayer, "you're spared the inwall wiring, the installer's visit and the second mortgage."), 467 ("This means that you do not need to go to the effort of installing cables, and you can relocate your ZonePlayer(s) easily."). Given these fundamental differences between Sonos's 2005 system and Crestron's centralized AES speaker system, it is my opinion that a POSITA would have been dissuaded from modifying Sonos's 2005 system to combine it with the identified functionality of Crestron's centralized AES speaker system.

770. Along similar lines, Dr. Schonfeld's opinion that a POSITA would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Crestron's centralized AES speaker system is contradicted by the fact that such a modification would have fundamentally altered the principles of operation of Sonos's 2005 system given that Sonos's 2005 system was a *decentralized* system built around ZonePlayers having data networking and data processing capability whereas Crestron's centralized AES speaker system is directed to a *centralized* speaker system that was built around a centralized AES device that was used to control passive, hard-wired speakers.

771. Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Crestron's centralized AES speaker system, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system in combination with Crestron's centralized AES

speaker system, which I understand to be improper.

772.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in combination with Dr. Schonfeld's "Crestron" system.

### (g)    Sonos's 2005 System in view of Yamaha DME

773.    In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Yamaha DME, but in his limitation-by-limitation obviousness analysis of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld does include sub-sections discussing Yamaha DME in connection with claim limitations 1.6, 1.7, 1.9, and 1.10 of Asserted Claim 1 of the '885 Patent.  *Compare* Schonfeld Op. Report at ¶¶ 6, 269, 965 (summarizing Dr. Schonfeld's "Sonos System" obviousness grounds without mentioning Yamaha DME) *with id.* at p. 285 (unnumbered paragraph between ¶¶ 371-372) and ¶¶ 406, 448, 458 (discussing Yamaha DME as part of Dr. Schonfeld's obviousness analysis for Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system).

774.    Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Yamaha DME, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness opinions.  Nevertheless, to the extent that Dr. Schonfeld later attempts to and is permitted to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Yamaha DME, I disagree.

775.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos 2005 system in view of Yamaha DME.  *See* Schonfeld Op. Report at ¶¶ 966-978.  Instead, Dr. Schonfeld only discusses Yamaha DME in the context of certain limitations of Asserted Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted Claim 1 of the '966 Patent.

776.    Additionally, Dr. Schonfeld's discussion of Yamaha DME that he includes in his

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

analysis of Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

777.    First, various materials related to the Yamaha DME System, including the DME Manual that Dr. Schonfeld primarily relies on in his discussion of the Yamaha DME System, are cited on the face of the '966 Patent, which shows that the Yamaha DME System was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over the Yamaha DME System. *See* '966 Patent at 1, 17.  In fact, during prosecution of the '966 Patent, the Examiner acknowledged that "DME does not explicitly teach the inclusion, exclusion, etc. of particular enumerated first, second, etc. players of the set of available players to form, create, save, recall etc. a particular first, second, etc. grouping…." *See* July 5, 2019 Office Action at p. 4.  Additionally, after considering Sonos's claim amendments and arguments for why Yamaha DME does not teach the claimed "zone scene" technology of the '966 Patent (*see* August 23, 2019 Response to Office Action), the Examiner allowed the '966 Patent (including Asserted Claims 1, 2, 4, 6, 8, 9, 10, 12, 14, 16) to issue over Yamaha DME and in the Reasons for Allowance, the Examiner stated that "the prior art," including "DME," "does not reasonably teach the subject matter of the independent claims" (*see* September 5, 2019 Notice of Allowance).  Since the USPTO already considered the Yamaha DME System, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.   However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

778.    Second, the Yamaha DME System fails to disclose or suggest the claimed "zone scene"  functionality that was missing from Sonos's 2005 system.

779.    As discussed above, the Yamaha DME System  included "one or more DME units and/or SP2060 units" and had a "control space" that was "logically organized using the concepts of 'Area,' 'Zone,' and 'Device Group.'" DME Manual at p. 3. The DME Manual further describes these concepts as follows:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

The space covered by the entire system is the "Area", while independent sonic spaces within that Area are called "Zone" A group of DME or SP2060 units assigned to the same function are considered a "Device Group". An Area is comprised of one or more Zones, and each Zone can include up to 32 Device Groups. A single Device Group can include as many as 16 devices. Each Device Group has one "Group Master".

DME Manual at p. 3.

780.    As further discussed above, the Yamaha DME System also disclosed concepts of "Components", "Configurations," "Preset Parameters," and "Scenes," which are described in the DME Manual as follows:

■ **Components**
Any independent signal-processing block, such as an equalizer, compressor, input/output module, or external device control object is a "Component".

■ **Configurations**
A "Configuration" is group of components, including their placement and interconnections.

■ **Preset Parameters**
The set of parameters for all components in a Configuration is know as the Configuration's "Preset Parameters".

■ **Scenes**
A Configuration and its Preset Parameters are a "Scene".

DME Manual at p. 4-5; *see also id*. at p. 6 (describing "Scenes" as "[t]he information required to switch audio data processing setups" and describing "Configurations" as "Data for Each Device" that comprises "[a] combination of the audio signal processing, audio input/ output, and external device control components and their interconnections, created to create the desired audio system").

781.    However, based on my review of the evidence cited by Dr. Schonfeld for the Yamaha DME system, it is my opinion that none of these concepts meets the requirements of a "zone scene." For instance, the evidence I have reviewed does not disclose or suggest that any of these concepts amounts a pre-saved group that was available to be *later invoked on demand for synchronous playback* at some time after creation, which is a fundamental requirement of the claimed "zone scenes." Further, the evidence I have reviewed does not disclose or suggest that any of these concepts amounts a pre-saved group that was *able to exist in an inactive state* in which the pre-saved group was available for selection by a user but the group members could still be used

for individual audio playback (or as part of another group), which is another fundamental requirement of the claimed "zone scenes." Further yet, the evidence I have reviewed does not disclose or suggest that any of these concepts amounts a pre-saved group comprising group members that are also able to be added to other pre-saved groups that co-exist with the pre-saved group such that multiple co-existing pre-saved groups having common group members can be created and made available for selection. *See* DME Manual at p. 283 (stating that "[a] zone can include up to 32 device groups" and that "all devices *will belong to one* of those groups"). Still further, the evidence I have reviewed does not disclose or suggest that any of these concepts amounts a pre-saved group comprising group members that become "*configured for synchronous playback*" by becoming "configured to coordinate" with one another to "output media in synchrony" when the pre-saved group is "invoked." In fact, the evidence I have reviewed never discloses or suggest that the "DME units and/or SP2060 units" could engage in "synchronous playback" at all, let alone that "DME units and/or SP2060 units" would have ever become "configured to coordinate" with one another in order to achieve "synchronous playback."

782.    As explained above, Dr. Schonfeld does not offer any opinions as to whether the Yamaha DME System discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent. Instead, Dr. Schonfeld only discusses the Yamaha DME System in connection with claim limitations 1.6-1.7 and 1.9-1.10 of Asserted Claim 1 of the '885 Patent. Schonfeld Op. Report at p. 285 (unnumbered paragraph between ¶¶ 371-372) and ¶¶ 406, 448, 458. However, nothing in Dr. Schonfeld's discussion of the Yamaha DME System in the context of claim limitations 1.6-1.7 and 1.9-1.10 of Asserted Claim 1 of the '885 Patent alters my opinion that the Yamaha DME system did not have *any* functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

783.    In fact, Dr. Schonfeld merely repeats the same paragraph regarding the Yamaha DME system for each of claim limitations 1.6-1.7 and 1.9-1.10 of Asserted Claim 1 of the '885 Patent, which is as follows

It would also have been obvious to modify the Sonos System with the Yamaha system to add this claim limitation, to the extent it is not disclosed. This is at least because Yamaha discloses that a speaker can be part of multiple groups, and in order for a speaker to be part of two zone scenes or two groups at the same time, the zone scenes or zone groups must be able to be created separately from any invocation step. In addition, a POSITA would have been motivated to combine Yamaha with the Sonos System at least because users of playback systems considered Yamaha as an alternative to the Sonos System. See e.g., SONOS-SVG2-00032289, SONOS- SVG2-00033695, SONOS-SVG2-00053679. As I described e.g. in Section X (and incorporate herein by reference), the Yamaha system discloses conventional speaker grouping, including multiple speakers that could be grouped into areas, which could then be divided into zones, which could also be divided into device groups, with master and slave devices in those groups. See e.g., DME Manual at 3. at 183. The DME system disclosed creating "scenes" that could be named, saved, and recalled, and included particular configurations and preset parameters and were used in conjunction with the areas and zones. See e.g., DME Manual at 5-6, 25-26, 55.

Schonfeld Op. Report at p. 285 (unnumbered paragraph between ¶¶ 371-372) and ¶¶ 406, 448, 458

784.    However, there is nothing in this paragraph explaining how any of the aforementioned concepts meets the requirements of a "zone scene."[30]   In fact, if anything, Dr. Schonfeld's statement that "the Yamaha system discloses *conventional speaker grouping*" supports the opposite conclusion.

785.    Further, even setting aside the fact that none of the aforementioned concepts amounts to a "zone scene," Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that would satisfy the other aspects of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

786.    For example, Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that amounts to a "computing device" causing an "indication" of a "zone scene" to be transmitted to a "DME unit" or "SP2060 unit," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

---

[30] While Dr. Schonfeld generally points out that the DME manual discloses a concept called a "scene," a "scene" in the Yamaha DME system did not comprise user-customized, pre-saved group and thus was distinctly different from a "zone scene."  Instead, as explained above, the DME manual describes a "scene" as information that defines a "configuration" of internal "signal-processing block[s]" of a one or more "DME and/or SP2060 units" along with a "corresponding set of parameters," which does not include any definition of user-customized, pre-saved group that can be later invoked on demand for synchronous playback.  DME Manual at 4-6.

787. As another example, Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that amounts to a "computing device" "displaying a representation of the first zone scene and a representation of the second zone scene" and then "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene," as required by claim limitations 1.9-1.10 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

788. As yet another example, Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that amounts to a "computing device" receiving a "request to invoke" a "zone scene," and then based on that "request," causing a first "DME unit" (or "SP2060 unit") to "transition from operating in the standalone mode to operating in accordance with [a] first predefined grouping of zone players such that the first ['DME unit'] is configured to coordinate with at least [a second 'DME unit'] to output media in synchrony with output of media by at least the second ['DME unit']," as required by claim limitations 1.10-1.11 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

789. As still example, Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that amounts to a "computing device" receiving a "request to invoke" a second "zone scene" at a time when a first "zone scene" is invoked such that the "DME units" (or "SP2060 units") in the first "zone scene" are "configured to coordinate" with one another "to play back media in synchrony," and then based on the "request," causing a first "DME unit" to "(a) cease to operate in accordance with the first zone scene such that the first ['DME unit'] is no longer configured to coordinate with at least the second ['DME unit'] to output media in synchrony with output of media by at least the second ['DME unit'] and (b) begin to operate in accordance with the second zone scene such that the first ['DME unit'] is configured to coordinate with at least [a third 'DME unit' in the second zone scene] to output media in synchrony with output of media by at least the third ['DME unit']," as required by Asserted Claim 2 of the '966 Patent under Dr. Schonfeld's apparent mapping.

790. As a further example, Dr. Schonfeld fails to identify any functionality of the Yamaha DME system that amounts to a "computing device" causing a "zone scene" to be stored

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

at a "DME unit" (or "SP2060 unit") in the "zone scene," as required by Asserted Claim 4 of the '966 Patent under Dr. Schonfeld's apparent mapping.

791.    Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with the identified functionality of the Yamaha DME System, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

792.    Third, as demonstrated by the lone paragraph reproduced above, Dr. Schonfeld has failed to provide any explanation as to what specific modification(s) of Sonos's 2005 system he is proposing or how Sonos's 2005 system would have actually been modified to combine it with the identified functionality of the Yamaha DME System – let alone how that alleged combination would have achieved the claimed invention. *See* Schonfeld Op. Report at unnumbered ¶ at p. 285 and ¶¶ 406, 448, 458.

793.    Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of the Yamaha DME System. As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality). The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry. *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the identified functionality of the Yamaha DME System.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified functionality of the Yamaha DME System, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

794.    Nevertheless, in his Opening Report, Dr. Schonfeld states that "a POSITA would have been motivated to combine Yamaha with the Sonos System at least because users of playback systems considered Yamaha as an alternative to the Sonos System."  *See* Schonfeld Op. Report at unnumbered ¶ at p. 285 and ¶¶ 406, 448, 458.  I disagree.

795.    As an initial matter, this generic statement fails to establish why a POSITA in 2005-

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

06 would have been motivated to make any modification to Sonos's 2005 system at all – let alone why a POSITA in 2005-06 would have been motivated to combine Sonos's 2005 system with the Yamaha DME System to the include the functionality identified by Dr. Schonfeld.

796.    Further, none of the three documents that Dr. Schonfeld cites to support this assertion even mention the Yamaha DME System.  *See* SONOS-SVG2-00032289, SONOS-SVG2-00033695, SONOS-SVG2-00053679.  Instead, SONOS-SVG2-00032289 appears to be an internal Sonos document dated November 25, 2003 that references a different "Yamaha Music Cast" product and distinguishes that product from the Sonos system being developed at the time, SONOS-SVG2-00033695 is an undated "Sonos Owner Survey" that asks Sonos customers if they considered the brand Yamaha – without any mention of a specific Yamaha product – before buying a Sonos system, and SONOS-SVG2-00053679 is an August 2021 "Sonos Bi-Annual Half Note Tracker" that identifies Yamaha – without any mention of a specific Yamaha product – among a number of different companies including Google as operating in the audio space.  Accordingly, I disagree that these documents support Dr. Schonfeld's assertion that "a POSITA would have been motivated to combine" functionality of the Yamaha DME System with Sonos's 2005 system, let alone modify Sonos's 2005 system to include the functionality identified by Dr. Schonfeld. Additionally, SONOS-SVG2-00033695 is an undated and SONOS-SVG2-00053679 is dated August 2021, which serves as an additional reason why these documents fail to support Dr. Schonfeld's assertion as to whether a POSITA in the **2005-06** would have allegedly found it obvious to combine Sonos's 2005 system with the identified functionality of the Yamaha DME System.

797.    Further yet, even if these documents did reference the Yamaha DME System as an "alternative" to Sonos's 2005 system, I disagree that this alone would show that "a POSITA would have been motivated to combine" the identified functionality of the Yamaha DME System with Sonos's 2005 system, let alone modify Sonos's 2005 system to include the functionality identified by Dr. Schonfeld.

798.    I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Sonos's 2005 system with the identified functionality of the Yamaha

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   DME system.  For instance, as explained above, the Yamaha DME system that has a different
2   system architecture than Sonos's 2005 system that was designed for a different purpose than
3   Sonos's 2005 system.  Given this difference in the system architectures, a POSITA would have
4   been dissuaded from modifying Sonos's 2005 system to combine it with the functionality of the
5   Yamaha DME system.

6       799.    Finally, because there is no evidence that a POSITA in 2005-06 would have been
7   motivated to modify Sonos's 2005 system to combine it with the identified functionality of the
8   Yamaha DME System, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to
9   reach his conclusion that a POSITA would have found aspects of the claimed invention obvious
10  based on Sonos's 2005 system in combination with the Yamaha DME System, which I understand
11  to be improper.  *See* Schonfeld Op. Report at unnumbered ¶ at p. 285 and ¶¶ 406, 448, 458.

12      800.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is
13  not rendered obvious by Sonos's 2005 system in combination with the Yamaha DME System.

14                  **(h)     Sonos's 2005 System in view of Rajapakse**

15      801.    In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted
16  Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005
17  system in view of Rajapakse, but in his limitation-by-limitation obviousness analysis of Asserted
18  Claim 1 of the '885 Patent as compared to Sonos's 2005 system, Dr. Schonfeld does include sub-
19  sections discussing Rajapakse in connection with claim limitations 1.7 and 1.8 of Asserted Claim
20  1 of the '885 Patent.  *Compare* Schonfeld Op. Report at ¶¶ 6, 269, 965 (summarizing Dr.
21  Schonfeld's "Sonos System" obviousness grounds without mentioning Rajapakse) *with id.* at ¶¶
22  385-395, 424-431 (discussing Rajapakse as part of Dr. Schonfeld's obviousness analysis for
23  Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system).

24      802.    Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of
25  either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view
26  of Rajapakse, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness
27  opinions.  Nevertheless, to the extent that Dr. Schonfeld later attempts to and is permitted to offer
28  an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  system in view of Rajapakse, I disagree.

2  803.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that

3  would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on

4  Sonos's 2005 system in view of Rajapakse. _See_ Schonfeld Op. Report at ¶¶ 966-978.   Instead,

5  Dr. Schonfeld only discusses Rajapakse in the context of certain limitations of Asserted Claim 1

6  of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted

7  Claim 1 of the '966 Patent.

8  804.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's

9  discussion of Rajapakse that he includes in his analysis of Asserted Claim 1 of the '885 Patent as

10  compared to Sonos's 2005 system suffers from a number of flaws, many of which are applicable

11  to the Asserted Claims of the '966 Patent as well.

12  805.    First, Dr. Schonfeld has failed to establish that Rajapakse qualifies as prior art to

13  any claim of either the '885 Patent or the '966 Patent.  In fact, Dr. Schonfeld failed to even identify

14  a particular subsection of 35 U.S.C. § 102 under which Rajapakse would qualify as prior art.  With

15  that said, I understand from Google's Invalidity Contentions that Google has asserted Rajapakse

16  as alleged prior art under 35 U.S.C. § 102(a) and (b) (Google's Invalidity Contentions, Ex. 885-

17  3), but my understanding is that Rajapakse does not qualify as prior art under §102(a) or (b).

18  806.    In particular, Rajapakse was not filed until July 13, 2007 and did not publish until

19  August 7, 2012, whereas the claimed invention was conceived by December 21, 2005 and is

20  entitled to a priority date of September 12, 2006,.  Thus, Rajapakse cannot qualify as prior art to

21  the '885 Patent or the '966 Patent based on Rajapakse's own filing date.  Moreover, while I

22  understand that Rajapakse claims priority to a provisional application that was filed on July 15,

23  2006, which is before the September 12, 2006 priority date of the '885 and '966 Patents, I

24  understand that a party seeking to use a provisional application to show an earlier prior art date

25  bears the burden of proving that the earlier-field provisional application adequately supports the

26  relied-upon disclosure from reference patent.  However, not only did Dr. Schonfeld fail to address

27  whether Rajapakse's provisional application adequately supports Rajapakse, he also affirmatively

28  relied on disclosure from Rajapakse that is not found in the provisional application.  For instance,

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Dr. Schonfeld relied on Rajapakse's disclosure that "[z]ones may overlap and may include other zones" and "[e]ach media renderer 203 is assigned to one or more zones" in support of his opinion that "Rajapakse discloses overlapping groups or zones, and therefore overlapping speakers within those zones." *See* Schonfeld Op. Report at ¶¶ 392-393. However, I have not found this same disclosure in Rajapakse's provisional application, and Dr. Schonfeld has not identified where it is disclosed. *See* SONOS-SVG2-00226956. For at least these reasons, it is my opinion that Dr. Schonfeld has failed to establish that Rajapakse qualifies as prior art to claim 1 of the '885 Patent.

807.    Second, not only was Rajapakse cited on the face of several other Sonos patents as acknowledged by Dr. Schonfeld (Schonfeld Op. Report at ¶ 385), Rajapakse was also cited on the face of the '966 Patent. '966 Patent at 5. This shows that Rajapakse was considered by the USPTO during prosecution of the '885 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Rajapakse. Since the USPTO already considered Rajapakse, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

808.    Third, Rajapakse fails to disclose or suggest the claimed "zone scene" functionality that was missing from Sonos's 2005 system.

809.    As discussed above, Rajapakse discloses a system that "performs provisioning dynamically as a control point and/or the media source enters a new zone," which is defined as "a physical space that a number of media renderers belong to and within which the media renderers are physically located," and "[a]s a control point or media source moves to a new zone, media renderers are dynamically detected, resources are allocated, and the system is configured for playback on media renderers within the new zone without noticeable interruption of the streaming and rendering of the media." Rajapakse at 1:50-55.

810.    However, Rajapakse's system did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent.

2         811.    As explained above, Dr. Schonfeld does not offer any opinions as to whether

3    Rajapakse discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent.

4    Instead, Dr. Schonfeld only discusses Rajapakse in connection with claim limitations 1.7-1.8 of

5    Asserted Claim 1 of the '885 Patent, which require the claimed "first zone player" to be

6    programmed with the functional capability to "receiv[e], from [a] network device over [a] data

7    network, a second indication that the first zone player has been added to a second zone scene"

8    while the "first zone player" is "operating in a standalone mode" and then "after receiving the first

9    and second indications, continu[e] to operate in the standalone mode until a given one of the first

10   and second zone scenes has been selected for invocation."  Schonfeld Op. Report at ¶¶ 385-395,

11   424-431.  However, nothing in Dr. Schonfeld's discussion of Rajapakse in the context of claim

12   limitations 1.7-1.8 of Asserted Claim 1 of the '885 Patent alters my opinion that Rajapakse's

13   system did not have *any* functional capability for creating or invoking a "zone scene" – let alone

14   the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of

15   Asserted Claim 1 of the '966 Patent.

16        812.    The underlying premise of Dr. Schonfeld's theories regarding Rajapakse appears

17   to be that a "zone" as disclosed in Rajapakse amounts to a "zone scene." *See* Schonfeld Op. Report

18   at ¶¶ 385-395, 424-431.  I disagree for several reasons.

19        813.    First, Rajapakse's "zone" does not comprise a user-customized, pre-saved group

20   of "zone players" that is *able to exist in an inactive state in which the group members can be used*

21   *for individual playback* while the pre-saved group remains available for selection by a user so that

22   it can be later invoked on demand for synchronous playback, which are requirements of a "zone

23   scene."  Instead, I understand Rajapakse's disclosure to be saying that once "media renderer" has

24   been added to a "zone," it is no longer available to be used for individual audio playback.  This

25   not only serves as a reason why a "zone" is not a "zone scene," but also establishes that once a

26   "media renderer" is added to a first "zone," it cannot thereafter be added to a second "zone" at a

27   time when the first "zone" remains in existence but the "media renderer" is in a "standalone mode,"

28   as required by claim limitations 1.4 and 1.7-1.8.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

814.    Second, Rajapakse's "zone" is not a "zone scene" for the additional reason that the "media renderers" in a "zone" do not become "*configured for synchronous playback*" when the "zone" is selected.  To the contrary, it is the "distribution server" that becomes configured to enable "synchroniz[ation]" of the "rendition of the stream," while the "media renderers" remain in the same configuration both before and after a "zone" is selected.  *See* Rajapakse at 11:60-65.  And for this same reason, Rajapakse likewise fails to disclose or suggest that the "media renderers" in a "zone" are "configured to coordinate . . . to output media in synchrony with" one another when the "zone" is selected.

815.    Third, Rajapakse fails to disclose or suggest any capability for a user to assign a thematic name to a "zone," which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene."

816.    Further, even setting aside these differences between Rajapakse's "zone" and a "zone scene," Dr. Schonfeld fails to identify any functionality of Rajapakse's system that would satisfy the other aspects of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

817.    For example, Dr. Schonfeld fails to identify any functionality of Rajapakse's system that amounts to a "computing device" causing an "indication" of a "zone" to be transmitted to a "media renderer," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.  Instead, Dr. Schonfeld merely identifies certain passages of Rajapakse teaching that a "media renderer" may be "assigned to one or more zones" that are each "typically identified with a Zone Identifier (ZID)" or have a "set of assigned zone identifiers (ZIDs)." Rajapakse at 6:2-4, 7:52-54.  However, these teachings of Rajapakse do not qualify as prior art because they were not included in the provisional application.  Moreover, even if these teachings did qualify as prior art and one were to consider such a ZID to be an "indication" of a "zone" these passages still fail to disclose or suggest that a device "serving as a controller for a networked media playback system" caused such a ZID to be transmitted to the "media renderer" – let alone that a device "serving as a controller for a networked media playback system" performed all of the other functions required by Asserted Claim 1 of the '966 Patent.

373

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

818.    As another example, Dr. Schonfeld fails to identify any functionality of Rajapakse's system that amounts to a "computing device" "displaying a representation of the first ['zone'] and a representation of the second ['zone']" and then "while displaying the representation of the first ['zone'] and the representation of the second ['zone'], receiving a third request to invoke the first ['zone']," as required by claim limitations 1.9-1.10 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

819.    As yet another example, Dr. Schonfeld fails to identify any functionality of Rajapakse's system that amounts to a "computing device" receiving a "request to invoke" a "zone," and then based on that "request," causing a first "media renderer" to "transition from operating in the standalone mode to operating in accordance with [a] first predefined grouping of ['media renderers'] such that the first ['media renderer'] is configured to coordinate with at least [a second 'media renderer'] to output media in synchrony with output of media by at least the second ['media renderer']," as required by claim limitations 1.9-1.10 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.    As still example, Dr. Schonfeld fails to identify any functionality of Rajapakse's system that amounts to a "computing device" receiving a "request to invoke" a second "zone" at a time when a first "zone" is invoked such that the "media renderers" in the first "zone" are "configured to coordinate" with one another "to play back media in synchrony," and then based on the "request," causing a first "media renderer" to "(a) cease to operate in accordance with the first ['zone'] such that the first ['media renderer'] is no longer configured to coordinate with at least the second ['media renderer'] to output media in synchrony with output of media by at least the second ['media renderer'] and (b) begin to operate in accordance with the second ['zone']  such that the first ['media renderer'] is configured to coordinate with at least [a third 'media renderer' in the second 'zone'] to output media in synchrony with output of media by at least the third ['media renderer']," as required by Asserted Claim 2 of the '966 Patent under Dr. Schonfeld's apparent mapping.

820.    As a further example, Dr. Schonfeld fails to identify any functionality of Rajapakse's system that amounts to a "computing device" that is "serving as a controller" of the system causing a "zone" to be stored at a "media renderer" in the "zone," as required by Asserted

374

Claim 4 of the '966 Patent under Dr. Schonfeld's apparent mapping.

821.    Further yet, Dr. Schonfeld's theory that Rajapakse discloses multiple "zone scenes" comprising "overlapping groups" appears to be based exclusively on this passage from Rajapakse:

> A zone is a physical space that a number of media renderers belong to and within which the media renderers are physically located. Typically a zone is a listening space, a space where the audio from all the media renderers in the space can be heard. For example, all media renderers within a single auditorium will be in the same zone. Zones may overlap and may include other zones. For example a campus with multiple auditoriums can have a campus zone with multiple auditorium zones within it. Each media renderer 203 is assigned to one or more zones. Zones are typically identified with a Zone Identifier (ZID).

Rajapakse at 5:61-6:4 (cited at Schonfeld Op. Report at ¶ 392).  However, I disagree that this passage supports Dr. Schonfeld's theories for at least the reasons that (i) this passage of Rajapakse does not qualify as prior art because it was not included in the provisional application, (ii) Rajapakse's "zone" does not meet the claimed requirements of a "zone scene" for the reasons explained above, and (iii) while this passage suggests that a "media renderer" could theoretically be "assigned" to more than one "zone," the rest of the disclosure fails to explain how this would actually work in Rajapakse's system, which is otherwise described throughout Rajapakse in the context of scenarios where each "media renderer" is only assigned to a single "zone" that has a corresponding "zone manager." *Id.* at 17:3-4 ("Each zone has a zone manager 210 that has registered and authenticated with the speakers in its physical zone"), 6:20-22 ("[T]he zone manager 210 holds information specific to *a* [single] zone, manages the media renderers 203 in *the* [single] zone"); *see also id.* at 17:5-7, 17:16-21, 18:35-45, 18:50-59.

822.    Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with identified functionality of Rajapakse's system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

823.    Fourth, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the identified functionality of

Rajapakse's system – let alone how that alleged combination would have achieved the claimed invention.

824.     Fifth, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to incorporate the identified functionality of Rajapakse's system.   As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality).  The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the identified functionality of Rajapakse's system.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified functionality of Rajapakse's system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

825.    In his Opening Report, Dr. Schonfeld says that a POSITA would have found it obvious to combine Sonos's 2005 system with Rajapakse for the sole reason that "Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent" as well as third-party patents, including Google's own patents, that are "closely related to the '885 patent."  Schonfeld Op. Report at ¶ 385.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Sonos's 2005 system at all – let alone why a POSITA in 2005-06 would have been motivated to combine Sonos's 2005 system with Rajapakse in the specific manner proposed by Dr. Schonfeld.

826.    I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Sonos's 2005 system with the identified functionality of Rajapakse's system.  For instance, Rajapakse is directed to an entirely different system architecture than Sonos's 2005 system that requires a number of different components to facilitate its "zone" functionality, including a "bridge renderer 205," a "distribution server 204," and a "zone manager 210," among others.  *See* Rajapakse at FIGs. 2-5; *see also id*. at 11:7-18.  Given the significant differences in the system architectures, a POSITA would have been dissuaded from modifying

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Sonos's 2005 system to combine it with the identified functionality of Rajapakse, as adding Rajapakse's "zone" would have required the architecture of Sonos's 2005 system to be redesigned so that these additional components could be incorporated, which would have altered the principle of operation of Sonos's 2005 system.

827.    Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Rajapakse's, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system in combination with Rajapakse, which I understand to be improper.  *See* Schonfeld Op. Report, ¶ 385 ("Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent, indicating that persons of skill in the art recognized that Rajapakse was highly relevant to the claimed features.").

828.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in combination with Rajapakse.

## (i)    Sonos's 2005 System in view of Lindemann

829.    In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Lindemann, but in his limitation-by-limitation obviousness analysis of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld does include sub-sections discussing Lindemann in connection with claim limitations 1.7 and 1.8 of Asserted Claim 1 of the '885 Patent.  *Compare* Schonfeld Op. Report at ¶¶ 6, 269, 965 (summarizing Dr. Schonfeld's "Sonos System" obviousness grounds without mentioning Lindemann) *with id.* at ¶¶ 401-402, 432-433 (discussing Lindemann as part of Dr. Schonfeld's obviousness analysis for Asserted Claim 1 of the '885 Patent as compared to Sonos's 2005 system).

830.    Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Sonos's 2005 system in view of Lindemann, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness opinions.  Nevertheless, to the extent that Dr. Schonfeld later attempts to and is

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1  permitted to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based
2  on Sonos's 2005 system in view of Lindemann, I disagree.

3      831.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that
4  would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on
5  Sonos's 2005 system in view of Lindemann.  *See* Schonfeld Op. Report at ¶¶ 966-978.  Instead,
6  Dr. Schonfeld only discusses Lindemann in the context of certain limitations of Asserted Claim 1
7  of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted
8  Claim 1 of the '966 Patent.

9      832.    Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's
10 discussion of Lindemann that he includes in his analysis of Asserted Claim 1 of the '885 Patent as
11 compared to Sonos's 2005 system suffers from a number of flaws, many of which are applicable
12 to the Asserted Claims of the '966 Patent as well.

13     833.    First, Lindemann was cited on the face of the '966 Patent, which shows that
14 Lindemann was considered by the USPTO during prosecution of the '885 Patent and that the '966
15 Patent (including Asserted Claim 1) was allowed to issue over Lindemann.  '966 Patent at 7.  Since
16 the USPTO already considered Lindemann, I understand that Dr. Schonfeld and Google have the
17 added burden of overcoming the deference that is due to a qualified government agency, such as
18 the USPTO, that is presumed to have properly done its job based on its expertise in interpreting
19 references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid
20 patents.  However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

21     834.    Second, Lindemann fails to disclose or suggest the claimed "zone scene"
22 functionality that was missing from Sonos's 2005 system.

23     835.    As discussed above, Lindemann discloses a "digital wireless loudspeaker system"
24 comprising "an audio transmission device for selecting and transmitting digital audio data, and
25 wireless speakers for receiving the data and broadcasting sound," which may take the form of
26 "loudspeakers" that each contain an "RF receive antenna" and an "RF receiver," among other
27 components.  Lindemann at Abstract, ¶¶ 11, 55.  Lindemann further discloses that a "Group
28 Selection Switch" may be provided that "allows a loudspeaker to be assigned to one of many

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

groups of loudspeakers," and that there may be "status information contain[ing] commands to enable or disable a particular group of speakers" as well as "[a]nother status message [that] determines enabling of different speaker modes according to speaker group." *Id*. at ¶¶ 64-66, FIG. 18 (illustrating an example of a "Group Selection Switch 1800").

836.    However, even if one were to consider the "loudspeakers" in Lindemann's "digital wireless loudspeaker system" to be "zone players" in a "networked media playback system," Lindemann's system did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent or the additional limitations of Asserted Claims 2, 4, 6, and 8 of the '966 Patent.

837.    As explained above, Dr. Schonfeld does not offer any opinions as to whether Lindemann discloses or suggests any of the claim limitations of Asserted Claim 1 of the '966 Patent.  Instead, Dr. Schonfeld only discusses Lindemann in connection with claim limitations 1.7-1.8 of Asserted Claim 1 of the '885 Patent, which require the claimed "first zone player" to be programmed with the functional capability to "receiv[e], from [a] network device over [a] data network, a second indication that the first zone player has been added to a second zone scene" while the "first zone player" is "operating in a standalone mode" and then "after receiving the first and second indications, continu[e] to operate in the standalone mode until a given one of the first and second zone scenes has been selected for invocation."  Schonfeld Op. Report at ¶¶ 401-402, 432-433.  However, nothing in Dr. Schonfeld's discussion of Linedmann in the context of claim limitations 1.7-1.8 of Asserted Claim 1 of the '885 Patent alters my opinion that Lindemann's system did not have ***any*** functional capability for creating or invoking a "zone scene" – let alone the specific controller-side "zone scenes" functionality required by claim limitations 1.4-1.11 of Asserted Claim 1 of the '966 Patent.

838.    The underlying premise of Dr. Schonfeld's theories regarding Lindemann appears to be that a "group" of "loudspeakers" as disclosed in Lindemann amounts to a "zone scene." *See* Schonfeld Op. Report at ¶¶ 246-254, 281-287.   I disagree for several reasons.

839.    First, Lindemann's "group" of "loudspeakers" does not comprise a user-

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

customized, pre-saved group of "zone players" that is able to exist in an inactive state in which the group members can be used for individual playback while the pre-saved group remains available for selection by a user so that it can be later invoked on demand for synchronous playback, which are requirements of a "zone scene."  .  Rather, I understand Lindemann's disclosure to be saying that once "loudspeaker" has been added to a "group," that "group" is automatically activated such that the "loudspeaker" it is no longer available to be used for individual audio playback.  This not only serves as a reason why a "group" of "loudspeakers" is not a "zone scene," but also establishes that once a "loudspeaker" is added to a first "group," it cannot thereafter be added to a second "group" at a time when the first "group" remains in existence but the "loudspeaker" is in a "standalone mode," as required by claim limitations 1.4 and 1.7-1.8 of the '966 Patent.

840.    Second, Lindemann's "group" of "loudspeakers" is not a "zone scene" for the additional reason that the "loudspeakers" in a "group" do not become "*configured for synchronous playback*" when the "group" is selected.  And for this same reason, Lindemann likewise fails to disclose or suggest that the "loudspeakers" in a "group" are "configured to coordinate . . . to output media in synchrony with" one another when the "group" is selected.

841.    Third, Lindemann's "group" of "loudspeakers" is not a "zone scene" for the additional reason that it is not possible for a "loudspeaker" in one "group" to also be a member of different "group" that is available for selection by a user, which is another requirement of the claimed "zone scenes."  To the contrary, a "loudspeaker" could only be a member of one "group" that was in existence at any given time. *See* Lindemann at ¶ 64.

842.    Fourth, Lindemann fails to disclose or suggest any capability for a user to assign a thematic name to a "group," which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene."

843.    Further, even setting aside these differences between Lindemann's "group" and a "zone scene," Dr. Schonfeld fails to identify any functionality of Lindemann's system that would satisfy the other aspects of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

844.    For example, Dr. Schonfeld fails to identify any functionality of Lindemann's

system that amounts to a "computing device" causing an "indication" of a "group" to be transmitted to a "loudspeaker," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

845.   As another example, Dr. Schonfeld fails to identify any functionality of Lindemann's system that amounts to a "computing device" "displaying a representation of the first ['group'] and a representation of the second ['group']" and then "while displaying the representation of the first ['group'] and the representation of the second ['group'], receiving a third request to invoke the first ['group']," as required by claim limitations 1.9-1.10 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

846.   As yet another example, Dr. Schonfeld fails to identify any functionality of Lindemann's system that amounts to a "computing device" receiving a "request to invoke" a "group," and then based on that "request," causing a first "loudspeaker" to "transition from operating in the standalone mode to operating in accordance with [a] first predefined grouping of ['loudspeaker'] such that the first ['loudspeaker'] is configured to coordinate with at least [a second 'loudspeaker'] to output media in synchrony with output of media by at least the second ['loudspeaker']," as required by claim limitations 1.10-1.11 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's apparent mapping.

847.   As still example, Dr. Schonfeld fails to identify any functionality of Lindemann's system that amounts to a "computing device" receiving a "request to invoke" a second "group" at a time when a first "group" is invoked such that the "loudspeakers" in the first "group" are "configured to coordinate" with one another "to play back media in synchrony," and then based on the "request," causing a first "loudspeaker" to "(a) cease to operate in accordance with the first ['group'] such that the first ['loudspeaker'] is no longer configured to coordinate with at least the second ['loudspeaker'] to output media in synchrony with output of media by at least the second ['loudspeaker'] and (b) begin to operate in accordance with the second ['group'] such that the first ['loudspeaker'] is configured to coordinate with at least [a third 'loudspeaker' in the second 'group'] to output media in synchrony with output of media by at least the third ['loudspeaker']," as required by Asserted Claim 2 of the '966 Patent under Dr. Schonfeld's apparent mapping.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

848.    As a further example, Dr. Schonfeld fails to identify any functionality of Lindemann's system that amounts to a "computing device" causing a "group" to be stored at a "loudspeaker" in the "group," as required by Asserted Claim 4 of the '966 Patent under Dr. Schonfeld's apparent mapping.

849.    Further yet, for at least the reason that a "group" of "loudspeakers" is not a "zone scene," I disagree that Lindemann's recitation in claim 9 of "selectively activating the speaker based on [a] speaker group to which the speaker is assigned" in response to "a control signal in the status data for assigning the speaker to [the] speaker group" amounts to causing an "indication" of a "zone scene" to be transmitted to a "zone player," as required by claim limitations 1.6 and 1.8 of Asserted Claim 1 of the '966 Patent.  In fact, this claim in Lindemann shows that a "loudspeaker" would automatically begin operating as part of Lindemann's "speaker group" as soon as it was "assigned" to that "speaker group," which further supports my opinion that the "group" discussed in Lindemann is not a "zone scene."

850.    Still further, Dr. Schonfeld's theory that Lindemann discloses multiple "zone scenes" comprising "overlapping speaker groups" appears to be based exclusively on this passage from Lindemann:

> Many homes and offices have multiple groups of loudspeakers—e.g. a group of loudspeakers in the living room and another group in the kitchen. The Group Selection Switch allows a loudspeaker to be assigned to one of many groups of loudspeakers.

Lindemann at ¶ 64.  However, in addition to the fact that Lindemann's "group" is not a "zone scene," I fail to see how this passage discloses "overlapping speaker groups."  In my opinion, this passage teaches the exact opposite – namely, that each "loudspeaker" can only be assigned to *"one" single* "group" at any given time.

851.    For at least the reason that Lindemann's "group" is not a "zone scene," Lindemann fails to disclose or suggest the other functional limitations of Asserted Claim 1 of the '966 Patent as well.

852.    Thus, even if a POSITA in 2005-06 were to modify and combine Sonos's 2005 system with identified functionality of Lindemann's system in the manner proposed by Dr.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

853. Third, Dr. Schonfeld has failed to provide any explanation as to how Sonos's 2005 system would have actually been modified to combine it with the identified functionality of Lindemann's system – let alone how that alleged combination would have achieved the claimed invention.

854. Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Lindemann's system. As discussed above, Sonos's 2005 system already included ad-hoc "zone group" functionality that allowed the ZonePlayers to be grouped together on demand for synchronous playback (albeit in a different way than the claimed "zone scenes" functionality). The evidence I have seen shows that this ad-hoc "zone group" functionality was being praised throughout the industry. *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  And conversely, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have led such a POSITA to consider a different mechanism for grouping ZonePlayers in Sonos's 2005 system on demand for synchronous playback – let alone would have led such a POSITA to implement the identified functionality of Lindemann's system.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "zone group" functionality of Sonos's 2005 system with the identified functionality of Lindemann's system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of Sonos's 2005 system.

855.    In his Opening Report, Dr. Schonfeld says that a POSITA would have found it obvious to combine Sonos's 2005 system with Lindemann because "Lindemann was cited by many Sonos patents regarding speaker grouping" and "Lindemann and the Sonos System are both in the same field of endeavor."  Schonfeld Op. Report at ¶ 401.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Sonos's 2005 system at all – let alone why a POSITA in 2005-06 would have been motivated to combine Sonos's 2005 system with Lindemann in the specific manner proposed by Dr. Schonfeld.

856.    I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Sonos's 2005 system with the identified functionality of Lindemann. For instance, Lindemann's "digital wireless loudspeaker system" is based on an entirely different

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

system architecture than Sonos's 2005 system that relies on a dedicated, RF-based "audio transmission device for selecting and transmitting digital audio data." Lindemann at Abstract, ¶ 11. Given the differences in the system architectures, it is my opinion that a POSITA would have been dissuaded from modifying Sonos's 2005 system to combine it with the identified functionality of Lindemann.

857.    Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Sonos's 2005 system to combine it with the identified functionality of Lindemann, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Sonos's 2005 system in combination with Lindemann, which I understand to be improper. *See* Schonfeld Op. Report at ¶ 401 ("Lindemann was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent, indicating that persons of skill in the art recognized that Lindemann was highly relevant to the claimed features.").

858.    Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in combination with Lindemann.

## x.    Summary

859.    As discussed above, there are a number of different limitations of Asserted Claim 1 of the '966 Patent that are neither disclosed by Sonos's 2005 system nor rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld. Any one of these claim limitations serves as a separate basis for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld , and when taken collectively, these claim limitations provide even further support for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

860.    Further, I note that Dr. Schonfeld appears to have only performed his obviousness

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

analysis for Asserted Claim 1 of the '966 Patent on a limitation-by-limitation basis, and has not performed any analysis or offered any opinions as to whether Asserted Claim 1 of the '966 Patent as a whole would have been obviousness, which I understand to be improper.

861.    Further yet, I note that Dr. Schonfeld has only offered obviousness opinions with respect to Sonos's 2005 system as combined with one other reference, and has not performed any analysis or offered any opinions as to whether a POSITA in 2005-06 would have been motivated to modify and combine Sonos's 2005 system with multiple different references.

862.    Accordingly, for all of the reasons explained above, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

## 2.    Asserted Claim 2 is Not Rendered Obvious Based on Sonos's 2005 System

863.    Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

**[2.0]**    The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

**[2.1]**    while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

**[2.2]**    based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

864.    Thus, Asserted Claim 2 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for invoking the claimed "second zone scene" at a time when the "first zone scene" is currently invoked and the first and second "zone players" are "configured to coordinate" with one another for synchronous playback in accordance with the "first zone

387

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

scene."

865.    In my opinion, Asserted Claim 2 of the '966 Patent is not rendered obvious based on Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

866.    Indeed, because Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 2 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

867.    Moreover, it is my opinion that the additional limitations of Asserted Claim 2 of the '966 Patent are neither disclosed by Sonos's 2005 system nor rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.10-1.11, which are directed to functionality for invoking the claimed "first zone scene."   For example, as discussed above, a Sonos "zone group" is not a "zone scene," and the controllers in Sonos's 2005 system did not have any functionality capability for receiving a "request to invoke" a "zone scene" or causing ZonePlayers to operate in accordance with a "zone scene" – let alone the functional capability for performing these operations with respect to two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to Sonos's 2005 system.  And for similar reasons, the controllers in Sonos's 2005 system did not have any functionality capability for receiving a "request to invoke" a "second zone scene" or causing ZonePlayers to operate in accordance with a "second zone scene" at a time when a "first zone scene" having a common member is currently invoked, nor would it have been obvious to add this functionality to Sonos's 2005 system.

868.    Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 2 of the '966 Patent rendered obvious by Sonos's 2005 system.  *See* Schonfeld Op. Report at ¶ 979.  However, I find Dr. Schonfeld's opinion regarding Sonos's 2005 system and Asserted

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

Claim 2 of the '966 Patent to be flawed for several reasons.

869.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and Asserted Claim 2 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

---

**3.    Claim 2 Is Obvious Based On Prior Art Sonos System.**

(i)    Limitation 2.1 *The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:*

(ii)    Limitation 2.2 *while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and*

(iii)    Limitation 2.3 *based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.*

979.    *See* '966 claim 1 *supra*.  As discussed above, the Sonos system and the identified obviousness combinations disclosed the system in claim 1.  Those disclosures included the ability to receive a third request to "invoke" the first zone scene.  For the same reasons, that system also discloses the ability to "invoke" a different (second) zone scene.  Even if the Sonos system did not disclose or render obvious this requirement, the mere addition of one additional transition in a system that already permits this same transition for different "zone scenes," as described *supra*, would have been obvious, as it is merely repeating the same steps using the same functionalities with a different "zone scene."

---

870.    This shows that Dr. Schonfeld is primarily relying on his discussion of Asserted

389

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 2 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 2 of the '966 Patent. [31]

871.    With that said, as I have discussed above in Section XV.A.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 2 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene," an incorrect interpretation of what it means to "invoke" a "zone scene," and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

872.    I also disagree with Dr. Schonfeld's statement that "the mere addition of one additional transition in a system that already permits this same transition for different 'zone scenes,' as described *supra*, would have been obvious, as it is merely repeating the same steps using the same functionalities with a different 'zone scene.'" Schonfeld Op. Report at ¶ 979. As

---

[31] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

explained above, Sonos's 2005 system did not "already permit[] this same transition for different 'zone scenes'" because Sonos's 2005 system had no "zone scene" functionality at all, and Dr. Schonfeld's characterization of Asserted Claim 2 as "merely repeating the same steps using the same functionalities with a different 'zone scene'" is also not accurate – Asserted Claim 1 requires the "computing device" to carry out the functionality of limitations 1.10-1.11 at a time when the "first zone scene" and the "second zone scene" are both uninvoked, whereas Asserted Claim 2 requires the "computing device" to carry out the functionality of limitations 2.1-2.2 at a time when the "first zone scene" is invoked and the group members of the "first zone scene" are "configured to coordinate" with one another for synchronous playback.

873.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by Asserted Claim 2 of the '966 Patent, nor would it have been obvious to add this functionality to Sonos's 2005 system.

### 3.    Asserted Claim 4 is Not Rendered Obvious Based on Sonos's 2005 System

874.    Asserted Claim 4 of the '966 Patent depends from claim 3 of the '966 Patent, which in turn depends from Asserted Claim 1 of the '966 Patent.  Claims 3 and 4 of the '966 Patent require as follows:

> **[3.0]**    The computing device of claim 1, **[3.1]** wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and **[3.2]** wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

> **[4.0]**    The computing device of claim 3, **[4.1]** wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

875.    Thus, Asserted Claim 4 of the '966 Patent requires the claimed "computing device" to cause the claimed "zone scenes" to be stored at a "zone player" within the "predefined grouping" of the "first zone scene," such as the "first zone player" that is included in both the first and second "zone scenes."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

876.    In my opinion, Asserted Claim 4 of the '966 Patent is not rendered obvious based on Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

877.    Indeed, because Asserted Claim 4 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent (through claim 3), it is my opinion that Asserted Claim 4 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

878.    Moreover, it is my opinion that the additional limitations of Asserted Claim 4 of the '966 Patent are neither disclosed by Sonos's 2005 system nor rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.6 and 1.8, which require the claimed "computing device" to have the functional capability to cause storage of the "first zone scene" and the "second zone scene." For example, as discussed above, a Sonos "zone group" is not a "zone scene," and the controllers in Sonos's 2005 system did not have any functionality capability for causing storage of a "zone scene" – let alone the functional capability for causing storage of two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to Sonos's 2005 system. And for similar reasons, the controllers in Sonos's 2005 system did not have any functionality capability for causing a "zone scene" to be stored at a ZonePlayer, nor would it have been obvious to add this functionality to Sonos's 2005 system.

879.    Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that intervening claim 3 and Asserted Claim 4 of the '966 Patent are both rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 980-982. However, I find Dr. Schonfeld's opinion regarding Sonos's 2005 system and claims 3-4 of the '966 Patent to be flawed for several reasons.

880.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and claims 3-4 of the '966 Patent is shown in the screenshots below from Dr.

1    Schonfeld's Opening Report:

### 4.    Claim 3 is Obvious Based On Prior Art Sonos System.

(i)    *3. The computing device of claim 1, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.*

980.    *See* '966 claim 1 *supra*.    As described therein, the claimed "zone scene" is transmitted to and stored at the zone player, which is "a location other than the computing device."

981.    Furthermore, the decision of where to store the zone scene, which consists of a finite list of options, is obvious. The zone scene may be stored at the zone players, at the computing device, or in on a server. Because the prior art system is networked, there is very little if any effect of the location of storage on the efficacy and effectiveness of the prior art solution.

### 5.    Claim 4 Is Obvious Based On Prior Art Sonos System.

(i)    *4. The computing device of claim 3, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.*

982.    *See* '966 claim 3 *supra*.

881.    This shows that Dr. Schonfeld is primarily relying on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 4 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 4 of the '966 Patent. [32]

882. With that said, as I have discussed above in Section XV.A.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 4 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

883. I also disagree with Dr. Schonfeld's unsupported and conclusory statement at paragraph 981 that "the decision of where to store the zone scene, which consists of a finite list of options, is obvious." Schonfeld Op. Report at ¶ 981. As explained above, it would not have been obvious to a POSITA in 2005-06 to incorporate any form of "zone scene" functionality into Sonos's 2005 system, let alone would have been obvious to incorporate "zone scene" functionality in which the "zone scenes" were stored at ZonePlayers as opposed to some other system component.

884. Likewise, I disagree with Dr. Schonfeld's unsupported and conclusory statement at paragraph 981 that "[b]ecause the prior art system is networked, there is very little if any effect of the location of storage on the efficacy and effectiveness of the prior art solution." Schonfeld Op. Report at ¶ 981. In my opinion, storing "zone scenes" on "zone players" rather than on the "computing device" as required by Asserted Claim 4 does indeed improve the "efficacy and effectiveness" of a networked media playback system, because it ensures that the "zone scenes"

---

[32] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

will be available for selection by users on different controller devices as opposed to being available only on the controller device that was used to create the "zone scenes."

885.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by Asserted Claim 4 of the '966 Patent, nor would it have been obvious to add this functionality to Sonos's 2005 system.

### 4.    Asserted Claim 6 is Not Rendered Obvious Based on Sonos's 2005 System

886.    Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

> **[6.0]**    The computing device of claim 1, **[6.1]** wherein the first predefined grouping of zone players does not include the third zone player, and **[6.2]** wherein the second predefined grouping of zone players does not include the second zone player.

887.    Thus, Asserted Claim 6 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene."

888.    In my opinion, Asserted Claim 6 of the '966 Patent is not rendered obvious based on Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

889.    Indeed, because Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 6 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

890.    Moreover, it is my opinion that the additional limitations of Asserted Claim 6 of the '966 Patent are neither disclosed by Sonos's 2005 system nor rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

to those discussed above in connection with Asserted Claim 1 of the '966 Patent. For example, as discussed above, a Sonos "zone group" is not a "zone scene," and the controllers in Sonos's 2005 system did not have any functionality capability for creating a "zone scene" – let alone the functional capability for creating two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to Sonos's 2005 system. And for similar reasons, the controllers in Sonos's 2005 system did not have any functionality capability for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene," nor would it have been obvious to add this functionality to Sonos's 2005 system.

891.    Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 6 of the '966 Patent rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶ 983. However, I find Dr. Schonfeld's opinion regarding Sonos's 2005 system and Asserted Claim 6 of the '966 Patent to be flawed for several reasons.

892.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's 2005 system and Asserted Claim 6 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

---

**6.    Claim 6 Is Obvious Based On Prior Art Sonos System.**

(i)    *6. The computing device of claim 1, wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.*

983.    *See* '966 claim 1 *supra*. As discussed *supra*, claim 1 is disclosed or rendered obvious at least through the disclosure of non-overlapping zone scenes in the prior art.

---

893.    This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent.  For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 6 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 6 of the '966 Patent. [33]

894.    With that said, as I have discussed above in Section XV.A.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 6 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

895.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by Asserted Claim 6 of the '966 Patent, nor would it have been obvious to add this functionality to Sonos's 2005 system.

**5.    <u>Asserted Claim 8 is Not Rendered Obvious Based on Sonos's 2005 System</u>**

896.    Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

---

[33] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

397

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

**[8.0]** The computing device of claim 1, **[8.1]** wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, **[8.2]** wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and **[8.3]** wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

897.    Thus, Asserted Claim 8 of the '966 Patent requires the claimed "computing device" to be programmed with the functional capability to receive "requests" for creating and invoking "zone scenes" that take the form of "one or more inputs" received "via a user interface."

898.    In my opinion, Asserted Claim 8 of the '966 Patent is not rendered obvious based on Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

899.    Indeed, because Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 8 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

900.    Moreover, it is my opinion that the additional limitations of Asserted Claim 8 of the '966 Patent are neither disclosed by Sonos's 2005 system nor rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with Asserted Claim 1 of the '966 Patent.  For example, as discussed above, a Sonos "zone group" is not a "zone scene," and the controllers in Sonos's 2005 system did not have any functionality capability for receiving requests to create or invoke a "zone scene" – let alone the functional capability for receiving requests to create two different, overlapping "zone scenes" and then receiving a request to invoke one of the "zone scenes" – nor would it have been obvious to add this functionality to Sonos's 2005 system.  And for similar reasons, the controllers in Sonos's 2005 system did not have any functionality capability for receiving requests to create or invoke "zone scenes" that take the form of "one or more inputs" received "via a user interface," nor would it have been obvious to add this functionality to Sonos's

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    2005 system.

2    901.    Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted

3    Claim 8 of the '966 Patent rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report

4    at ¶ 984.  However, I find Dr. Schonfeld's opinion regarding Sonos's 2005 system and Asserted

5    Claim 8 of the '966 Patent to be flawed for several reasons.

6    902.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Sonos's

7    2005 system and Asserted Claim 8 of the '966 Patent is shown in the screenshot below from Dr.

8    Schonfeld's Opening Report:

---

**7.    Claim 8 Is Obvious Based On Prior Art Sonos System.**

(i)    *8. The computing device of claim 1, wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.*

984.    *See* '966 claim 1 *supra.*

---

903.    This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted

Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis

for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of

Sonos's 2005 system in the context of certain claim limitations of the '885 Patent.  However, the

Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim

1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a

"zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted

Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how

his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted

Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent.  For these reasons, I

disagree that the Dr. Schonfeld's discussion of Asserted Claim 8 of the '966 Patent amounts to a

detailed and complete statement of all opinions to be expressed and the basis and reasons therefor,

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 6 of the '966 Patent. [34]

904.    With that said, as I have discussed above in Sections XV.A.1 and IX as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Sonos's 2005 system in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 8 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality and the evidence related thereto.

905.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Sonos controllers in Sonos's 2005 system did not have the functional capability required by Asserted Claim 8 of the '966 Patent, nor would it have been obvious to add this functionality to Sonos's 2005 system.

**6.    Asserted Claim 9 is Not Rendered Obvious Based on Sonos's 2005 System**

906.    For the same reasons already discussed above in connection with Asserted Claim 1 of the '966 Patent, in my opinion, Asserted Claim 9 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

**7.    Asserted Claim 10 is Not Rendered Obvious Based on Sonos's 2005 System**

907.    For the same reasons already discussed above in connection with Asserted Claim 2 of the '966 Patent, in my opinion, Asserted Claim 10 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

[34] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

### 8. Asserted Claim 12 is Not Rendered Obvious Based on Sonos's 2005 System

908.    For the same reasons already discussed above in connection with Asserted Claim 4 of the '966 Patent, in my opinion, Asserted Claim 12 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 9. Asserted Claim 14 is Not Rendered Obvious Based on Sonos's 2005 System

909.    For the same reasons already discussed above in connection with Asserted Claim 6 of the '966 Patent, in my opinion, Asserted Claim 14 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 10. Asserted Claim 16 is Not Rendered Obvious Based on Sonos's 2005 System

910.    For the same reasons already discussed above in connection with Asserted Claim 8 of the '966 Patent, in my opinion, Asserted Claim 16 of the '966 Patent is not rendered obvious by Sonos's 2005 system in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### B. Squeezebox

911.    In his Opening Report, Dr. Schonfeld opines that the Asserted Claims of the '966 Patent are rendered obvious by a reference he calls "Squeezebox" in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington." *See* Schonfeld Op. Report at ¶¶ 1001-1033.  I disagree.

912.    As an initial matter, Dr. Schonfeld fails to set forth any basis or reasoning for his opinion that the Asserted Claims of the '966 Patent are rendered obvious based on Squeezebox in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington." *Id.*  Instead, with respect to the Asserted Claims of the '966 Patent, Dr. Schonfeld relies exclusively on his prior discussion of Squeezebox in the context of Asserted

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Claim 1 of the '885 Patent by merely citing to that portion of his Opening Report. *Id.* In so doing, Dr. Schonfeld has failed to even acknowledge the fact that the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, let alone provide any explanation as to how his prior discussion of Squeezebox in the context of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, it is my opinion that Dr. Schonfeld has failed to provide any basis or reasoning for his opinion that the Asserted Claims of the '966 patent are rendered obvious based on Squeezebox in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington." *Id.*

913. Given Dr. Schoenfeld's reliance on his prior discussion of Squeezebox in the context of Asserted Claim 1 of the '885 Patent, where appropriate, I have referred back to my rebuttal analysis and opinions regarding Asserted Claim 1 of the '885 Patent from my '885 Rebuttal Report. However, unlike Dr. Schonfeld, I have also provided analysis in the context of the Asserted Claims of the '966 Patent, as set forth below. To the extent Dr. Schonfeld is permitted to later provide analysis and/or new opinions regarding the Asserted Claims of the '966 Patent, I reserve my right to address such analysis and/or opinions in a supplemental report and/or at trial.

914. Based on my analysis of the Asserted Claims of the '966 Patent and the cited references, I disagree with Dr. Schonfeld's unsupported opinion that the Asserted Claims of the '966 Patent are rendered obvious based on Squeezebox in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington."

915. To begin, Dr. Schonfeld has relied on various evidence for his "Squeezebox" reference that does not qualify as prior art, as I already explained above.

916. Further, as explained below, it is my opinion that Squeezebox failed to disclose at least the following limitations of the Asserted Claims of the '966 Patent:

*Claims 1 and 9*

- A "zone scene" comprising a "predefined grouping of zone players . . . that are to be configured for synchronous playback of media when the . . . zone scene is invoked";

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

- **[1.4]** / **[1.5]** and **[9.1]** / **[9.2]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4]** / **[1.6]** and **[9.1]** / **[9.3]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene";

- **[1.4]** / **[1.7]** and **[9.1]** / **[9.4]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4]** / **[1.8]** and **[9.1]** / **[9.5]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene";

- **[1.4]** / **[1.9]** and **[9.1]** / **[9.6]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "displaying a representation of the first zone scene and a representation of the second zone scene";

- **[1.4]** / **[1.10]** and **[9.1]** / **[9.7]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" and "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene"; and

- **[1.11]** and **[9.8]** "based on the third request, causing the first zone player to

403

transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player".

*Claims 2 and 10 (depending from claims 1 and 9)*

- **[2.0]** "The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[10.0]** "The non-transitory computer-readable medium of claim 9, wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[2.1]** and **[10.1]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene"; and

- **[2.2]** and **[10.2]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene".

*Claims 3 and 11 (depending from claims 1 and 9)*

- **[3.0]** "The computing device of claim 1";

- **[11.0]** "The non-transitory computer-readable medium of claim 9";

- **[3.1]** and **[11.1]** "wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device"; and

- **[3.2]** and **[11.2]** "wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device".

*Claims 4 and 12 (depending from claims 3 and 11)*

- **[4.0]** "The computing device of claim 3";

- **[12.0]** "The non-transitory computer-readable medium of claim 11";

- **[4.1]** and **[12.1]** "wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players".

*Claims 6 and 14 (depending from claims 1 and 9)*

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

- **[6.0]** "The computing device of claim 1";

- **[14.0]** "The non-transitory computer-readable medium of claim 9";

- **[6.1]** and **[14.1]** "wherein the first predefined grouping of zone players does not include the third zone player"; and

- **[6.2]** and **[14.2]** "wherein the second predefined grouping of zone players does not include the second zone player".

*Claims 8 and 16 (depending from claims 1 and 9)*

- **[8.0]** "The computing device of claim 1";

- **[16.0]** "The non-transitory computer-readable medium of claim 9";

- **[8.1]** and **[16.1]** "wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device";

- **[8.2]** and **[16.2]** "wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface"; and

- **[8.3]** and **[16.3]** "wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface".

917. Further yet, it is my opinion that these limitations that were missing from Dr. Schonfeld's "Squeezebox" reference also would not have been obvious based on Squeezebox in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington." This opinion is based in part on the fact that I have not seen any evidence showing an apparent reason why a POSITA in 2005-06 would have been motivated to modify Squeezebox and/or combine it with any of the references identified by Dr. Schonfeld in order achieve the claimed inventions of the '966 Patent. I have also seen other objective, real-world evidence demonstrating that a POSITA in 2005-06 would not have found the Asserted Claims of the '966 Patent to have been obvious, which stands in stark contrast to Dr. Schonfeld's failure to support his obviousness opinions with any objective evidence.

918. My opinions regarding the non-obviousness of the Asserted Claims of the '966 Patent over Squeezebox in view of "[g]eneral [k]nowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, or Millington" are further supported by the fact that various of the secondary references identified by Dr. Schonfeld were considered by USPTO during

405

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

prosecution of the '966 Patent, which was then allowed to issue over these references. In particular:

- The Nourse patent as well as its prior publication were considered during prosecution of the '966 Patent (*see* '966 Patent at p. 4, 6);

- The Rajapakse patent as well as its prior publication were considered during prosecution of the '966 Patent (*see* '966 Patent at p. 5, 7);

- Several U.S. counterparts to the Millington Canadian patent relied upon by Dr. Schonfeld were considered during prosecution of the '966 Patent, including U.S. Pat. No. 8,234,395 (*see* '966 Patent at p. 5); and

- The Lindemann publication was considered during prosecution of the '966 Patent (*see* '966 Patent at p. 7).

919.    As I explained in my '885 Rebuttal Report, the Squeezebox system as well as various of the secondary references identified by Dr. Schonfeld were also considered by U.S. Patent Office during prosecution of the '885 Patent, which was then allowed to issue over these references.

920.    Because the USPTO considered these references during prosecution of the '966 Patent and then decided to grant the '966 Patent (including Asserted Claims 1, 2, 4, 6, 8, 9, 10, 12, 14, 16) over these references, I understand that Dr. Schonfeld has the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.[35]

921.    In his Opening Report, Dr. Schonfeld states that "[s]imply because the USPTO cited certain references during prosecution does not mean that these references were considered – the USPTO did not rely on any of these references as the basis for its rejections." Schonfeld Op.

---

[35] I further note that various Squeezebox materials were considered during prosecution of the related '885 Patent, including "Squeezebox Network Music Player. Owner's Manual, Slim Devices, 2003," "Squeezebox by Logitech. Owner's Guide, 2007," "NewsRoom. Slim Devices Introduces Squeezebox, Nov. 18, 2003," "Logitech Slimserver. Server for Logitech Squeezebox Players," "Logitech/slimserver. Github," and "Logitech/Slimserver. Github. Version 23 Release. May 19, 2002" (*see* '885 Patent at p. 23-24).

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Report at ¶ 327.  I disagree.  While the Examiner did not rely on the above-identified references as a basis for his preliminary rejections, the references identified above were all considered by the Examiner as indicated by the Examiner's statement that "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH," followed by the Examiner's signature.  Thus, it is my understanding that the Examiner did consider the references identified above and determined that the claimed inventions of the '966 Patent were novel and non-obvious over those references.

922.    After suggesting that the USPTO did not consider the above-identified references, Dr. Schonfeld then states that "the USPTO did not have the benefit of the Court's claim construction for 'zone scene.'"  Schonfeld Op. Report at ¶ 327.  However, Dr. Schonfeld does not explain how this assertion is related to whether or not the USPTO considered the references or how "hav[ing] the benefit of the Court's claim construction for 'zone scene'" would have had any impact on the USPTO's decision to grant the '966 Patent.  Regardless, for the reasons explained below, it is my opinion that the USPTO's decision to grant the '966 Patent over the above-identified references was correct, because those references fail to anticipate or render obvious any of the Asserted Claims of the 966 Patent.

923.    In the sub-sections below, I have provided a summary of the bases for my opinions, as well as responses to Dr. Schonfeld's opinions.

### 1.    Asserted Claim 1 is Not Rendered Obvious Based on Squeezebox

924.    For the reasons discussed below, in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Dr. Schonfeld's "Squeezebox" reference (herein sometimes referred to as "Squeezebox") in view of the general knowledge of a POSITA, the Sonos System, the Sonos Forms, the Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### i.    Dr. Schonfeld Fails to Map his "Squeezebox" Reference to the Claimed Devices of Claim 1

925.    Asserted Claim 1 of the '966 Patent requires a physical "computing device" that is configured to "serv[e] as a controller for a networked media playback system" comprising at least three different physical "zone players."

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

926.    In Dr. Schonfeld's Opening Report, he fails to set forth any analysis of Squeezebox the in connection with Asserted Claim 1 of the '966 Patent, and instead merely cites back to certain aspects of his analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent. Schonfeld Op. Report at ¶¶ 1000-1033.  Thus, Dr. Schonfeld fails to articulate what he considers to be the "computing device," the "zone players," and the "networked media playback system" of Asserted Claim 1 of the '966 Patent in his "Squeezebox" reference.

927.    In Dr. Schonfeld's analysis of the "Squeezebox" reference in connection with Asserted Claim 1 of the '885 Patent, he mapped the "network device" of Asserted Claim 1 of the '885 Patent to a computer installed with SlimServer software and mapped the "zone players" of Asserted Claim 1 of the '885 Patent to Squeezebox or Softsqueeze players.  *See* Schonfeld Op. Report at ¶¶ 468, 489-490, 521.  Based on this mapping, I have assumed for purposes of my discussion below that Dr. Schonfeld is mapping (i) the "computing device" of Asserted Claim 1 of the '966 Patent to a computer installed with SlimServer software, (ii) the "zone players" of the '966 Patent to physical Squeezebox players and software-based SoftSqueeze players, which I will collectively refer to as "Squeezebox players" for simplicity, and (iii) the "networked media playback system" of Asserted Claim 1 of the '966 Patent to a system comprising a computer installed with the SlimServer software and Squeezebox players, which I will refer as a "Squeezebox system."  However, to the extent Dr. Schonfeld is permitted to later provide analysis and/or new opinions regarding the Asserted Claims of the '966 Patent, I reserve my right to address such analysis and/or opinions in a supplemental report and/or at trial.

### ii.    Squeezebox Did Not Have "Zone Scenes" Functionality

928.    Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with certain functional capability for creating and invoking a "zone scene," which is a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that the group can be invoked later on demand for synchronous playback.  And more specifically, Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with functional capability for creating multiple "zone scenes" having an overlapping "zone player" and then later invoking one of the "zone scenes."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

929.    As explained above in Section XV.A.1.i, there a several key distinctions between a "zone scene" and the types of temporary, ad-hoc groups that could be created by a user in prior art systems such as the Squeezebox system.

930.    Based on the evidence I have reviewed regarding Dr. Schonfeld's "Squeezebox" reference, it is my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have *any* functional capability for creating or invoking a "zone scene" – let alone the required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause a selected one of the two different "zone scenes" to be invoked, as required by Asserted Claim 1 of the '966 Patent.

931.    The Squeezebox evidence I have reviewed indicates that at some point in time it may have been possible for a user of a Squeezebox system to create something called a "sync group,"[36] which was a configuration in which the SlimServer software would attempt to cause multiple Squeezebox players to play the same music simultaneously.    *See, e.g.*, Slim/Buttons/Synchronize.pm;              Slim/Player/Sync.pm;              Slim/Utils/Prefs.pm; Slim/Player/Source.pm;  Slim/Server/Squeezebox.pm;  Slim/Player/Client.pm;  GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108162, GOOG-SONOS-NDCA-00108169, GOOG-SONOS-NDCA-00108181.  It appears that a user could create such a "sync group" in a few different ways.

932.    For instance, the Squeezebox evidence I have reviewed indicates that at some point in time it may have been possible for a user of a Squeezebox system to create a "sync group" by accessing a web-based user interface (UI) for the SlimServer software, navigating to the "Player Settings" page for a first Squeezebox player, selecting a second Squeezebox player from the "Synchronize" drop-down list, and then pressing the "Change" button in order to create a new "sync group" comprising the first and second Squeezebox players.  One example of this process

---

[36] While the Squeezebox evidence I have reviewed says that Squeezebox players in a sync group were "synchronized," it is my opinion that this configuration would not have provided "synchronous playback of media" as that phrase is used in the context of the '966 Patent, because such a configuration would not have involved any coordination between the Squeezebox players that had been grouped.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

for creating a "sync group" in a Squeezebox system is shown in the following screenshots from

Dr. Schonfeld's Opening Report:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**





**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**



Schonfeld Op. Report at ¶ 524 (excerpted and annotations added).  These screenshots appear to show a hypothetical scenario where a version of the SlimServer software was used to create a "sync group" that includes Squeezebox players named "Player 1" and "Player 2," although it is not clear what type of Squeezebox players were used for this hypothetical scenario.

933.    The Squeezebox evidence I have reviewed indicates that at some point in time it may have also been possible for a user of a Squeezebox system to create a "sync group" using an infrared remote control for a hardware-based Squeezebox device, as described in the following "Frequently Asked Question" from the Slim Devices website:



GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108169.

934.    When a user created a "sync group" in one of the ways described above, the

Squeezebox evidence I have reviewed indicates that this would cause the SlimServer software to (i) store information about the newly-created "sync group" in a file on the computer running the SlimServer software and (ii) configure itself to control the audio buffer and playback on the Squeezebox players in the "sync group" in an effort to cause those Squeezebox players to play back the same music simultaneously. *See, e.g.*, Slim/Buttons/Synchronize.pm:functions():rightline; Slim/Player/Sync.pm:sync(), Sync.pm:unsync(), Sync.pm:saveSyncPrefs(); Slim/Utils/Prefs.pm; Slim/Player/Source.pm; Slim/Server/Squeezebox.pm; Slim/Player/Client.pm; GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108162, GOOG-SONOS-NDCA-00108169-70, GOOG-SONOS-NDCA-00108181.

935.    Further, the Squeezebox evidence I have reviewed indicates that once a "sync group" was created, the particular Squeezebox players in the Squeezebox system that were added to the created "sync group" could not thereafter be used for individual audio playback until the "sync group" was subsequently destroyed. *See, e.g.*, Slim/Player/Source.pm; Slim/Server/Squeezebox.pm.  This is confirmed by the above screenshots from Dr. Schonfeld's Opening Report, which show that once the "sync group" including "Player 1" and "Player 2" is created, there is no way for a user to use either "Player 1" and "Player 2" for individual audio playback until the user destroys the "sync group" in some manner, such as by choosing the "No Synchronization" option in the "Player Settings" of "Player 1" or "Player 2," as shown below:



Schonfeld Op. Report at ¶ 524 (excerpted and annotations added).

936.    Based on the foregoing evidence, it is clear that a "sync group" created in this manner only existed temporarily during the limited time that the group was activated for playback, and as soon as a user wanted to use a Squeezebox player in an existing group for individual

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

playback or wanted to create a new group that included one or more of the Squeezebox players in the existing group, the existing group would need to be destroyed by removing the one or more Squeezebox players that the user wanted to use for individual playback or wanted to include in a new "sync group." As a result, the only way a user could use a group having that same group membership again in the future was by re-creating a new temporary group that included the same members as the previously-existing group. And as explained above, such a temporary, ad-hoc group that was automatically activated at the time of creation and then only remained in existence during the limited time it was activated is distinctly different from a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.

937.    Indeed, as an initial matter, a "sync group" of Squeezebox players was not a pre-saved group that was available to be *later invoked on demand* for synchronous playback at some time after the creation of the "sync group," which is a fundamental requirement of the claimed "zone scenes." To the contrary, the Squeezebox evidence I have reviewed makes clear that a "sync group" of Squeezebox players was a temporary, ad-hoc group that was automatically activated at the time it was created and then only remained in existence until the time that the "sync group" was deactivated, at which time the "sync group" would be automatically destroyed such that the "sync group" was not available to be *later invoked on demand* for synchronous playback. *See, e.g.,* GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108169 (explaining that once a "sync group" is created, the SlimServer software will cause the "Squeezebox" players added to the "sync group" to "play the same thing" until the "sync group" is destroyed); Slim/Buttons/Synchronize.pm:functions():rightline;                Slim/Player/Sync.pm:sync(), Sync.pm:unsync(),   Sync.pm:saveSyncPrefs();   Slim/Utils/Prefs.pm;   Slim/Player/Source.pm; Slim/Server/Squeezebox.pm; Slim/Player/Client.pm. This is confirmed by the various screenshots from Dr. Schonfeld's Opening Report, including the ones I have reproduced above. *See* Schonfeld Op. Report at ¶ 524 (screenshots showing that the act of creating a "sync group" including "Player 1" and "Player 2" causes the SlimServer software to automatically activate the "sync group" for

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the entirety of its existence); ¶¶ 540-546 (screenshots showing that the act of creating a "sync group" including "player1," "player2," and "player3" causes the SlimServer software to automatically activate the "sync group" for the entirety of its existence); ¶¶ 616-620 (screenshots showing that the act of creating a "sync group" including "player1" and "player2" causes the SlimServer software to automatically activate the "sync group" for the entirety of its existence).

938. Further, a "sync group" of Squeezebox players was not a pre-saved group that was *able to exist in an inactive state* in which the pre-saved group was available for selection by a user but the "zone players" in the pre-saved group could still be used for individual audio playback, which is another fundamental requirement of the claimed "zone scenes." To the contrary, the Squeezebox evidence I have reviewed makes clear that a "sync group" of Squeezebox players was only able to exist in an active state during which time it was not possible for a user to use any of the Squeezebox players added to the "sync group" for individual audio playback, and once a "sync group" was deactivated, it would be automatically destroyed such that it was no longer available for selection by a user. *See, e.g.,* GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108169; Slim/Player/Source.pm; Slim/Server/Squeezebox.pm. Again, this is confirmed by various screenshots from Dr. Schonfeld's Opening Report, including the ones I have reproduced above. *See* Schonfeld Op. Report at ¶ 524 (screenshots showing that once the "sync group" including "Player 1" and "Player 2" is created, there is no way for a user to use either "Player 1" and "Player 2" for individual audio playback until the user destroys the "sync group" in some manner); ¶ 525 (screenshot showing that none of the Squeezebox players in the "sync group" are available to be used for individual audio playback); ¶¶ 540-546 (screenshots showing that once the "sync group" including "player1," "player2," and "player3" is created, there is no way for a user to use "player1" for individual audio playback until the user destroys the "sync group" in some manner); ¶¶ 616-620 (screenshots showing that once the "sync group" including "player1" and "player2" is created, there is no way for a user to use "player1" for individual audio playback until the user destroys the "sync group" in some manner).

939. Further yet, a "sync group" of Squeezebox players was not a pre-saved group of "zone players" that are "*to be configured for synchronous playback of media*" when the pre-saved

group is "invoked" for the additional reason that the invocation of a "sync group" – which took place automatically at the time the "sync group" was created– did not involve any change to the *configuration* of the Squeezebox players as its relates to audio playback, which is another requirement of the claimed "zone scene."  To the contrary, the Squeezebox evidence I have reviewed indicates that a Squeezebox player added to a "sync group" would have had the same configuration for audio playback both before and after the "sync group" was invoked.  *See, e.g.,* GOOG-SONOS-NDCA-00108095-588  GOOG-SONOS-NDCA-00108157 (explaining that the SlimServer software "powers Squeezebox"), GOOG-SONOS-NDCA-00108162 (same), GOOG-SONOS-NDCA-00108181 (explaining that "[t]he Slimserver controls the audio buffer and playback on all the players that are synchronized together").  In fact, based on my review of the Squeezebox evidence, it appears that a Squeezebox player would not have had any awareness that it had been added to a "sync group" that would have prompted the Squeezebox player to change its configuration for audio playback – the information about a "sync group" would have been exclusively maintained by the SlimServer software.  *Id*.; *see also* Slim/Server/Squeezebox.pm:stream() (showing that the exact same 'strm' command was sent to every member of a "sync group" and that the 'strm' command did not include any indication that a Squeezebox player was part of a "sync group"); Schonfeld Op. Report at ¶ 366 ("The *SlimServer server* represents sync groups internally using the 'master', 'slaves', and 'syncgroupid' properties for a client (player)."), ¶ 368 ("The *SlimServer* persists the membership of a sync group by storing the definition of the syncgroupid property for each group member into the *SlimServer's* preferences file.").  Dr. Schonfeld's failure to rely on any source code for the Squeezebox players themselves further supports this opinion.

940.    Still further, a "sync group" of Squeezebox players was not capable of having a group member that was also a member of a different "sync group" available for selection by a user, which is another requirement of the claimed "zone scenes."  To the contrary, the Squeezebox evidence I have reviewed establishes that a Squeezebox player could only be a member of one "sync group" that was in existence at any given time, and that the only way a Squeezebox player in a first "sync group" could have been added to a second "sync group" was to destroy the first

"sync group."  Slim/Player/Sync.pm:sync() (function that is called when a given client is added to new "sync group," which starts out by calling an "unsync" function in order to remove the given client from any "sync group" that it was previously in), Sync.pm:unsync() (function that would be called by "sync" function in order to remove the given client from any "sync group" that it was previously in).  This is confirmed by the screenshots below from Dr. Schonfeld's report, which show that if "Player 1" is in a first "sync group" including "Player 1" and "Player 2," the act of adding "Player 1" to a different "sync group," such as a "sync group" including "Player 1," "Player 3," and "Player 4," will first cause the "sync group" including "Player 1" and "Player 2" to be destroyed before the new "sync group" is created:





*See* Schonfeld Op. Report at ¶527.

941.    Lastly, the Squeezebox evidence I have reviewed confirms that there was no ability for a user to assign a thematic name to a "sync group," which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene," as interpreted by the Court.

942.    Thus, for at least these reasons, it is my opinion that a "sync group" created by selecting a specific set of Squeezebox players in a Squeezebox system to group together into the "sync group" in an ad-hoc manner does not constitute a "zone scene."

943.    I also note that the Squeezebox evidence I reviewed never uses the term "zone scenes" or otherwise describes any technology that would have enabled a user to create a user-customized, pre-saved group of Squeezebox players that was able to exist in an inactive state while remaining available for selection by the user so that it could later be invoked on demand for synchronous playback.

944.    For completeness, I further note that the evidence summarized above likewise establishes that the Squeezebox players in a Squeezebox system did not have any functional

capability to be added to a "zone scene" that was created at the request of a user or to operate in accordance with "zone scene" that was invoked at the request of a user.   Rather, the Squeezebox players in a Squeezebox system were only capable of being added to and operating in accordance with a temporary, ad-hoc "zone group," which was not a "zone scene" for all of the reasons explained above.

945.   Despite this clear evidence establishing that computers installed with the SlimServer software and Squeezebox players did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that the "zone scene" limitations required by the Asserted Claims of the '966 Patent were either disclosed or rendered obvious by the Squeezebox system.  *See* Schonfeld Op. Report at ¶¶ 1006-1033.   However, I find Dr. Schonfeld's opinions regarding Squeezebox and the "zone scene" limitations of the Asserted Claims of the '966 Patent to be flawed for several reasons.

946.   As an initial matter, Dr. Schonfeld fails to set forth any basis or reasoning for his opinions regarding Squeezebox and the "zone scene" limitations of the Asserted Claims of the '966 Patent.  Instead, Dr. Schonfeld merely refers back to his discussion of certain claim limitations of Asserted Claim 1 of the '885 Patent and makes the following conclusory statement:

> 1006.  *See supra* '885 claim 1, Limitation 1.6.  Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6. I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene.  Additionally, dependent claim 6 of the '966 patent informs the scope of independent claim 1.  Dependent claim 6 of the

However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

as to how his prior discussion of Squeezebox in the context of the "zone scene" limitations of Asserted Claim 1 of the '885 Patent applies to the "zone scene" limitations of the Asserted Claims of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were only *rendered obvious* by Squeezebox. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of the "zone scene" limitations of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding the "zone scene" limitations of the Asserted Claims of the '966 Patent.[37]

947. Moreover, I have reviewed the section of Dr. Schonfeld's Opening Report where he discusses Squeezebox in the context of claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, and nothing in that section of Dr. Schonfeld's Opening Report alters my opinion that Squeezebox did not include the "zone scenes" capability required by the Asserted Claims of the '966 Patent.

948. Indeed, Dr. Schonfeld's theories and opinions regarding the alleged existence of "zone scenes" capability in the Squeezebox system are all premised on Dr. Schonfeld's incorrect interpretation of what is required to qualify a "zone scene," and are also premised on several inaccurate and misleading characterizations of Squeezebox functionality and the evidence related thereto.

949. For instance, Dr. Schonfeld's opinion that a "sync group" is a "zone scene" appears to be based almost exclusively on his view that "the SlimServer allows a user to group together different Squeezebox and SoftSqueeze players so that synchronous playback is performed." Schonfeld Op. Report at ¶ 524; *see also id.* at ¶ 533 ("SlimServer supports synchronizing multiple Squeezebox players so that they play the same audio"), ¶ 549 ("[A] SlimDevice allowed a user to

---

[37] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

carry out an action to add a Squeezebox player to a group of Squeezeboxes so that synchronous playback is performed."). While Dr. Schonfeld has not sufficiently established that a Squeezebox system in 2005 actually had this capability, even if this statement were true, the mere fact that a "sync group" could allegedly allow for "synchronous playback" does not make the "sync group" a "zone scene" – there are several other requirements of a "zone scene" that distinguish it from other types of playback groups, and a "sync group" fails to meet these other requirements for the reasons explained above.

950.    Turning to paragraphs 526-532 of his Opening Report, Dr. Schonfeld makes various other statements about the alleged functionality of the Squeezebox system, including that (i) "[t]he user of SlimServer may change the name and identifiers of the Squeezebox devices, which in turn changes the name of the grouped Squeezebox devices," (ii) "SlimServer allows a user to change the synchronization groups after they have been created and stored," (iii) "SlimServer also allows a Squeezebox to play media without being in a synchronization group, which corresponds to the claimed standalone mode," (iv) "[t]hat media may be accessible to the SlimServer and organized and processed by the SlimServer software such that it can be delivered to one or more Squeezeboxes," and (v) "[t]he user may name the Squeezebox something other than its IP address." Schonfeld Op. Report at ¶¶ 526-532. While Dr. Schonfeld has not sufficiently established that a Squeezebox system in 2005 had this described functionality, even if all these statements were accurate, they fail to establish that a "sync group" of Squeezebox players is a "zone scene" as claimed, which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can be later invoked on demand for synchronous playback.

951.    In fact, if anything, Dr. Schonfeld's statements at paragraphs 526-532 provide further support for my opinion that a "sync group" is not a "zone scene." For example, Dr. Schonfeld's statement that "Slim Server also allows a Squeezebox to play media without being in a synchronization group, which corresponds to the claimed standalone mode" is consistent with my understanding that a Squeezebox player could only be used for individual audio playback at times when it was not in a "sync group," which is due to the fact that a "sync group" is unable to

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

exist in an inactive state and is one of the reasons that a "sync group" fails to amount to a "zone scene." As another example, Dr. Schonfeld's statement that the "media" played by the Squeezebox players was "processed by the SlimServer software such that it can be delivered to one or more Squeezeboxes" is consistent with my understanding that the "sync group" functionality was exclusively controlled by the SlimServer software and the Squeezebox players themselves did not make any change to their configuration as it relates to audio playback when a "sync group" was created and automatically activated.

952.    Turning next to paragraphs 534-547 of his Opening Report, Dr. Schonfeld describes and cites to, among other things, various SlimServer source code that was allegedly involved in the process for creating a Squeezebox "sync group." *See* Schonfeld Op. Report at ¶¶ 534-547; *see also id*. at ¶¶ 550-552, 556-564. However, Dr. Schonfeld's discussion of the SlimServer source code in these paragraphs is entirely consistent with my understanding of the "sync group" functionality that is summarized above, and as such, that discussion provides further support for my opinion that a "sync group" of Squeezebox players is not a "zone scene."

953.    In his Opening Report, Dr. Schonfeld also describes certain scenarios where at least one member of the "sync group" is "powered off" either at the time of the creation of the "sync group" or after the "sync group" is created. *See, e.g.,* Schonfeld Op. Report at ¶¶ 515-520, 553, ¶¶ 574-589, 608-621, 648-656, 675-737, 765-779. According to Dr. Schonfeld, these scenarios show that "the Squeezebox/SlimServer system can separate sync group definition from active sync group participation with respect to powered-off players," because "[a] powered-off player is temporarily unsynced but still defined to be part of the persistent sync group." *Id*. at ¶¶ 574, 765. And while it is not entirely clear because he never actually ties this scenario to the requirements of a "zone scene," it appears that Dr. Schonfeld is relying on this alleged capability as further support for his opinion that a "sync group" is a "zone scene." *See* Schonfeld Op. Report at ¶ 574. If so, I disagree that this alleged capability of a Squeezebox "sync group" to include a "powered-off player" suddenly transforms such a "sync group" into a "zone scene."

954.    As explained above, the "sync group" functionality of a Squeezebox system was controlled exclusively by the SlimServer software, and from the perspective of the SlimServer

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

software, a "sync group" was automatically activated at the time of its creation and then remained activated (and thus "invoked") for the entirety of its existence, regardless of whether any of the Squeezebox players in the "sync group" were powered off during the time that the "sync group" is in existence. *See, e.g.* Slim/Player/Sync.pm:sync(), Sync.pm:unsync(), Sync.pm:saveSyncPrefs(); Slim/Utils/Prefs.pm; Slim/Player/Source.pm; Slim/Server/Squeezebox.pm. Or said another way, once the "sync group" was created, the SlimServer software would have been configured to cause the Squeezebox players in the "sync group" to be controlled and used as part of the "sync group" for the entirety of the group's existence, regardless of whether any of the Squeezebox players in the "sync group" were powered off during the time that the "sync group" was in existence. The Squeezebox evidence I have reviewed confirms this in various ways.

955. First, the Squeezebox evidence I have reviewed demonstrates that, if a "sync group" was created that included one or more powered-off Squeezebox players, the "sync group" profile saved by the SlimServer software would have identified all of the members of the "sync group" – including any powered-off Squeezebox player(s) – and the SlimServer software operated in accordance with this "sync group" profile when carrying out functionality with respect to the Squeezebox players in the "sync group." *See, e.g.* Slim/Player/Sync.pm:sync(), Sync.pm:unsync(), Sync.pm:saveSyncPrefs(); Slim/Utils/Prefs.pm. Dr. Schonfeld's own discussion of this functionality in his Opening Report confirms this. *See* Schonfeld Op. Report at ¶¶ 517-519, 581, 588, 621, 656, 770, 777. This shows that, from the perspective of the SlimServer software, the "sync group" would have been activated regardless of whether any group member was powered off.

956. Second, the Squeezebox evidence I have reviewed demonstrates that, if a "sync group" was created that included one or more powered-off Squeezebox players, the UI for the SlimServer software (and the powered-on Squeezebox players in the "sync group") would have shown that all of the Squeezebox players in the "sync group" were grouped together and "synched" to one another – including any powered-off Squeezebox player(s) in the "sync group" – and the Squeezebox players in the "sync group" would have been controlled as a group. *See* Schonfeld

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Op. Report at ¶¶ 517 (screenshots showing that "player1" and "player3" are "synched" even though "player3" is powered off), 619-620 (screenshots showing that "player1" and "player2" are "synched" even though "player2" is powered off), ¶¶ 654-655 (screenshots showing that "player1" and "player3" are "synched" even though "player3" is powered off), ¶ 676 (screenshot showing that "player1" is "Synched with player3" even though "player3" is powered off), ¶ 680 (screenshot showing that "player3" is "Synched with player1" and shares the same "playlist" even though "player3" is powered off). This again shows that, from the perspective of the SlimServer software, the "sync group" would have been activated regardless of whether any group member is powered off.

957.   Third, the Squeezebox evidence I have reviewed demonstrates that, if a "sync group" was created that included a powered-off Squeezebox player and playback was then initiated on that "sync group" via the powered-off Squeezebox player, this would cause the powered-off Squeezebox players in the "sync group" to automatically power back on and participate in the playback.   Slim/Player/Source.pm:playmode() (commenting that "if the player is off, we automatically power on when we start to play"); *see also* Schonfeld Op. Report at ¶¶ 515-519. This once again shows that, from the perspective of the SlimServer software, the "sync group" is activated regardless of whether any group member is powered off.

958.   Fourth, the Squeezebox evidence I have reviewed demonstrates that, if a "sync group" was created that included one or more powered-off Squeezebox players, the SlimServer software would have still considered each powered-on Squeezebox player to be a member of an active "sync group" unless and until the "sync group" was destroyed by a user in some manner, which confirms that the "sync group" itself remains activated for the entirety of its existence even if a Squeezebox player in the "sync group" could be powered off.  *See* Slim/Player/Source.pm; Slim/Server/Squeezebox.pm; see also Schonfeld Op. Report at ¶ 524 (screenshots showing that once the "sync group" including "Player 1" and "Player 2" is created, there is no way for a user to use either "Player 1" and "Player 2" for individual audio playback until the user destroys the "sync group" in some manner); ¶ 525 (screenshot showing that none of the Squeezebox players in the "sync group" are available to be used for individual audio playback); ¶¶ 540-546 (screenshots

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

showing that once the "sync group" including "player1," "player2," and "player3" is created, there is no way for a user to use "player1" for individual audio playback until the user destroys the "sync group" in some manner); ¶¶ 616-620 (screenshots showing that once the "sync group" including "player1" and "player2" is created, there is no way for a user to use "player1" for individual audio playback until the user destroys the "sync group" in some manner).

959.    For these and other reasons, a POSITA would not consider a "sync group" that includes a powered-off Squeezebox player to be a *pre-saved* group that is *able to exist in an inactive state* in which the members of the group could be used for individual playback while the group remains available for selection by a user so that it can be later invoked on demand for synchronous playback.

960.    Dr. Schonfeld's position to the contrary appears to be based almost exclusively on his allegation that, in a scenario where every "sync group" member but one is powered off, the lone powered-on Squeezebox player in the "sync group" could be used for individual playback because every other Squeezebox player in the "sync group" would be powered off and thus not be available for playback.  Schonfeld Op. Report at ¶¶ 515-520, 779.  However, in my opinion, a POSITA would not consider a "sync group" in this corner-case scenario to meet the requirements of a "zone scene."

961.    As an initial matter, as explained above, the SlimServer software that was exclusively responsible for controlling the "sync group" functionality in a Squeezebox system, and from the SlimServer software's perspective, the "sync group" in this corner-case scenario would still be considered to be activated and the Squeezebox players would all still be considered to be members of the activated "sync group" regardless of the fact that some members of the "sync group" were powered off.

962.    Further, I disagree that a POSITA would consider a "sync group" in this corner-case scenario to amount to a pre-saved group existing in an inactive state in which the members of the group could be used for individual playback, which is a fundamental requirement of a "zone scene."  Indeed, a POSITA would understand that in order to satisfy the "zone scene" requirement of a pre-saved group existing in an inactive state in which the members of the group could be used

425

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

for individual playback, a user must have the ability to use *each* of the group members for individual playback while the group remains in existence.  Or in other words, when the pre-saved group of a "zone scene" is in an inactivate state, a user must have the ability to use the members of the pre-saved group in the same ways that the members could be used if the pre-saved group did not exist.  This would not have been case for the "sync group" in Dr. Schonfeld's corner-case scenario.  Rather, the only way to construct a scenario where one of the "sync group" members could be used for individual playback would be to power off every other member of the "sync group," which means that those other member(s) would not be available for playback.

963.    Further yet, I disagree that a POSITA would have considered the "sync group" in Dr. Schonfeld's corner-case scenario to be available for selection by a user so that it can be later invoked on demand for synchronous playback, which is a fundamental requirement of a "zone scene."  There are two reasons for this.  First, from the respective of the SlimServer software, the "sync group" would have been invoked automatically at the time of its creation, so any future interaction with the "sync group" in this corner-case scenario would not amount to a later invocation of the "sync group" on demand for synchronous playback.  Second, a "sync group" including one or more members that are powered off would not be *available to be selected by a user on demand for synchronous playback* because the powered-off Squeezebox players in the "sync group" would not have been available for playback.  Rather, a user would have to power on each of the powered-off Squeezebox players before the "sync group" became available for selection by the user, which would then eliminate the ability to use any of the members for individual playback.  Thus, even in this corner-case scenario, it would have never been possible to have a "sync group" existing in a state in which a member could be used for individual playback while the "sync group" was simultaneously available *to be selected by a user on demand for synchronous playback*.

964.    Still further, I note that this corner-case scenario in which a member of an existing "sync group" could be used for individual playback would have only applied to a "sync group" where every single member but one was powered off.  In all other scenarios where two or more "sync group" members were powered on, it would not be possible to use any one of the "sync

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

group" members for individual playback, which further supports my opinion that a "sync group" is not a "zone scene."

965.    Lastly, taking a step back, there appears to be no real dispute that as long as the members of a "sync group" were powered up, it was only possible to control and use those members as part of the group, and none of the members could be used for individual playback, which clearly demonstrates that a "sync group" was an ad-hoc group and not a "zone scene."  The fact that the members of such a "sync group" could also be powered off while the "sync group" was in existence does not somehow transform the "sync group" into a "zone scene."

966.    In addition to the foregoing reasons why a "sync group" comprising a powered-off Squeezebox player is not a claimed "zone scene," it is my opinion that such a scenario also fails to meet various other limitations of Asserted Claim 1 of the '966 Patent, as explained in further detail below.

967.    Turning to paragraphs 762-763 of his Opening Report, Dr. Schonfeld also suggests that a "sync group" in a Squeezebox system is a "zone scene" simply because it can exist at times when playback is not occurring at the group. *See* Schonfeld Op. Report at ¶¶ 762-763.  However, this theory appears to be on a misunderstanding of what is required for a "zone scene" as well as a mischaracterization of Sonos's position.

968.    To be clear, the functions of invoking a group and playing back media to a group are two different things, and a group does not satisfy the requirements of a "zone scene" simply because it can exist at times when playback is not occurring at the group.  To the contrary, a "zone scene" requires a user-customized, pre-saved group of zone players that is able to exist in an *inactive state in which the members of the group could be used for individual playback* while the group remains available for selection by a user so that the group can be invoked later on demand for synchronous playback – at which point the members of the group would be controlled and used as part of the group.  A "sync group" of Squeezebox players does not meet these requirements for all of the reasons explained above.

969.    Turning to Asserted Claim 1's additional requirement that the claimed "computing device" be programmed with functional capability for causing the creation of two overlapping

427

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"zone scenes" that co-exist with one another and are both available for selection by a user at the same time, Dr. Schonfeld opines that a Squeezebox player would have met this requirement as well, based on the following theory:

> [A] single player may be defined in separate sync groups on different SlimServer configurations, persisted to different preferences files. As one example, a player may be used with different servers, which define different sync groups and persist to different preferences files. One example (v6.2.1) is using a player both with a local SlimServer and with the SqueezeNetwork. As another example, a player may be used with different invocations of the same server. Each invocation uses a different preference file, specified on the command line using the '--prefsfile' option.

Schonfeld Op. Report at ¶ 573; *see also id*. at ¶¶ 115 ("[A] single player may be defined in separate sync groups on different SlimServer configurations, saved in different preferences files. One example (v6.2.1) is using a player both with a local SlimServer and with the SqueezeNetwork. As another example, a player may be used with different invocations of the same server, where each invocation uses a different preference file that is specified on the command line using the 'prefsfile' option."), 590-593 (discussing a "'serv' SlimProto message from SlimServer to player that tells a player to switch servers"); ¶¶ 594-739 (describing testing of a hypothetical setup that allegedly included two VMs running separate instances of SlimServer software and three VMs running separate instances of SoftSqueeze software and was allegedly used to create a first "sync group" including "player1" and "player2" while the players were connected to the first SlimServer instance and then to create a second "sync group" including "player1" and "player3" while the players were subsequently connected to the second SlimServer). However, this theory is flawed for a number of reasons.

970.    First, a "sync group" of Squeezebox players is not a "zone scene" for all of the reasons explained above. Thus, for this reason alone, Dr. Schonfeld's attempt to rely on "sync groups" created using two independent SlimServer instances fails to meet the claimed requirement that the "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time.

971.    Second, even setting aside the other fundamental differences between a "sync

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

group" and a "zone scene," I disagree that using two independent SlimServer instances to create two different "sync groups" meets the claimed requirement that the "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" within the same "networked media playback system" that co-exist with one another and are both available for selection by a user such that the user can select between them for purposes of requesting invocation. In such a hypothetical scenario, the Squeezebox players could only be connected to one SlimServer instance (and thus one Squeezebox system) at any given time – as confirmed by Dr. Schonfeld's own description – and once the Squeezebox players are disconnected from the first SlimServer instance, they would be removed from the Squeezebox system defined by the first SlimServer instance and a POSITA would no longer consider the Squeezebox players to be members of any "sync group" that was created at the first SlimServer instance. To the contrary, a POSITA would understand that when the Squeezebox players were hypothetically disconnected from the first SlimServer instance and connected to the second SlimServer instance, this would have formed an entirely different system defined by the second SlimServer instance in which the previously-created "sync group" does not exist and is certainly not available to be selected or used for audio playback.

972. Third, Dr. Schonfeld fails to present any evidence that the hypothetical setup he describes where a user installed and used two different SlimServer instances to create two different "sync groups" including the same Squeezebox player was ever actually implemented – let alone implemented at a time that would qualify it as prior art to the '966 Patent.

973. Fourth, Dr. Schonfeld's multiple SlimServer theory is also premised on a number of statements that are unclear, unsupported, and/or otherwise fail to provide support for Dr. Schonfeld's opinion that a Squeezebox player could be a member of two different "sync groups" that were both in existence at the same time.

974. For example, Dr. Schonfeld says that "a player may be used with different invocations of the same server," but Dr. Schonfeld fails to explain or provide support for this statement, and it is not clear what this means or how it differs from Dr. Schonfeld's hypothetical scenario involving two different SlimServer instances. As another example, Dr. Schonfeld says

that "SlimServer v6.2.1 supports a 'serv' SlimProto message from SlimServer to player that tells a player to switch servers," but Dr. Schonfeld fails to explain the significance or relevance of this alleged functionality to his opinion that a Squeezebox player could be a member of two different "sync groups" that are both in existence at the same time, nor does he explain how such alleged functionality would be incorporated into SlimServer v5.3.1 upon which he primarily relies. *See* Schonfeld Op. Report at ¶¶ 590-591; *see also id*. at ¶ 115 ("[A] single player may be defined in separate sync groups on different SlimServer configurations, saved in different preferences files. One example (v6.2.1) is using a player both with a local SlimServer and with the SqueezeNetwork. As another example, a player may be used with different invocations of the same server, where each invocation uses a different preference file that is specified on the command line using the 'prefsfile' option."). As yet another example, Dr. Schonfeld mentions "[t]he SlimProto TCP Protocol documentation on the current Squeezebox Wiki" that describes a "*later* version of the 'serv' message" that allegedly "supports a '$syncgroupid' optional parameter to enable a player to re-join its sync group when the player connects to the new server," but Dr. Schonfeld fails to establish that this "*later* version of the 'serv' message" was incorporated into any Squeezebox system that could possibly qualify as prior art – nor have I seen any evidence of this – and Dr. Schonfeld fails likewise to explain the significance or relevance of this "later version of the 'serv' message" to his opinion that a Squeezebox player could be a member of two different "sync groups" that are both in existence at the same time. *Id*. at ¶¶592-593; SONOS-SVG2-00226941-946

(https://wiki.slimdevices.com/index.php/SlimProtoTCPProtocol.html#Command_.22grfd.22).

975.    In any event, none of these statements change my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability to cause the creation of a single "zone scene," let alone the capability to cause the creation of two overlapping "zone scenes" that co-exist with one another and are simultaneously available for selection by a user.

976.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have ***any*** functional

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

capability for creating or invoking a "zone scene" – let alone the required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause a selected one of the two different "zone scenes" to be invoked, as required by Asserted Claim 1 of the '966 Patent.

### iii.    Squeezebox Did Not Meet Limitations 1.4 / 1.5

977.    When read together, limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> > **[1.5]**    receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

978.    In my opinion, Squeezebox did not meet this requirement.

979.    As explained above, the evidence I have reviewed establishes that a computer installed with the SlimServer software in a Squeezebox system was only capable of receiving requests to form ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, a computer installed with the SlimServer software did not have the required functional capability to "receiv[e] a *first request to create a first zone scene* comprising a first predefined grouping of [Squeezebox players] including at least the first [Squeezebox player] and a second [Squeezebox player] that are to be configured for synchronous playback of media when the first zone scene is invoked."

980.    Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Squeezebox.  *See* Schonfeld Op. Report at ¶¶ 1005-1006.  However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitations 1.4 and 1.5 of Asserted

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    Claim 1 of the '966 Patent to be flawed for several reasons.

2        981.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding

3    Squeezebox and claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent is shown in

4    the screenshots below from Dr. Schonfeld's Opening Report:

> *(v)*    *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1005.    *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

> (vi)  Limitation 1.5 *receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;*

1006.  *See supra* '885 claim 1, Limitation 1.6. Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6. I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene. Additionally, dependent claim 6 of the '966 patent informs the scope of independent claim 1. Dependent claim 6 of the '966 patent recites that "wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player," effectively requiring that the first and second predefined groupings of zone players not be entirely overlapping, each with the same three zone players. Because claim 6 depends from claim 1 and must necessarily narrow the scope of claim 1, I understand that claim 1 includes first and second predefined groupings of zone players, where those groupings of zone players **can** wholly overlap. Indeed, such an overlap scenario would be consistent e.g., with a user having a user-created zone group including all three zone players, and having a "Party Mode," *i.e.*, a zone group including all three zone players. I therefore incorporate by reference the disclosure of "party mode" from my discussion, *supra*, regarding claim 1 of the '885 patent.

982.  As these screenshots demonstrate, Dr. Schonfeld has not provided any analysis of how Squeezebox allegedly meets these limitations of Asserted Claim 1 of the '966. Instead, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent with the exception of the latter part of paragraph 1006, where he discusses dependent claim 6 and Sonos's "zone group" and "Party Mode" functionality. However, the Asserted Claims of the '966 Patent are directed to a different type of device than

Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Squeezebox. And along similar lines, Dr. Schonfeld never once articulates what he considers to be the claimed "first request to create a first zone scene" in Squeezebox.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent.[38]

983.    With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

984.    Lastly, the latter part of paragraph 1006 where he discusses dependent claim 6 and Sonos's "zone group" and "Party Mode" functionality appears to be a verbatim copy of paragraph 972 from the section of Dr. Schonfeld's Opening Report related to Sonos's 2005 system, which I

[38] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

already addressed above.  I fail to see how this paragraph discussing Sonos's "zone group" and "Party Mode" functionality has any relevance to Squeezebox, which did not have "zone groups" or a hard-coded "All Zones-Party Mode" option, and it appears to me that Dr. Schonfeld's inclusion of this paragraph in his section directed to Squeezebox may have been a copy/paste error.

985.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.5 of Asserted Claim 1 of the '966 Patent.

### iv.    Squeezebox Did Not Meet Limitations 1.4 / 1.6

986.    When read together, limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.6]**    based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

987.    In my opinion, Squeezebox did not meet this requirement.

988.    As explained above, the evidence I have reviewed establishes that a computer installed with the SlimServer software in a Squeezebox system was only capable of forming ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, a computer installed with the SlimServer software did not have the required functional capability to "i) caus[e] creation of the first zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [Squeezebox player], and iii) caus[e] storage of the first zone scene."

989.    Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Sonos's 2005 system. *See* Schonfeld Op. Report at ¶¶ 1005, 1007. However, I find Dr. Schonfeld's opinions regarding Sonos's 2005 system and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

990.    As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> (v)    *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1005.    *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (vii)    *Limitation 1.6 based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;*
>
> 1007.    *See supra* '885 claim 1, Limitation 1.6.

991.    As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by Squeezebox. And along similar lines, Dr. Schonfeld never articulates what he considers to be the claimed functions of "i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene" in Sonos's 2005 system.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. [39]

992.    With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

993.    For instance, in his section discussing Squeezebox and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Squeezebox for forming ad-hoc "sync groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained.

994.    Further, although not entirely clear, Dr. Schonfeld appears to be mapping the "first indication that the first zone player has been added to a first zone scene" required by limitation 1.6 of the '885 Patent to a "gfrd" message that is sent from the computer installed with the SlimServer software to a Squeezebox player when a "sync group" that includes the Squeezebox player is

---

[39] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1   created.  *See* Schonfeld Op. Report at ¶¶ 105, 510, 544-554.

2   995.    In particular, when a user created a "sync group" using an infrared remote control

3   or a web-based UI of the SlimServer software, the computer installed with the SlimServer software

4   was programmed to send a series of "grfd" messages to at least one Squeezebox player in the "sync

5   group" that contain raw display bits (sometimes referred to as "bitmaps") for the Squeezebox

6   player's graphical display, and this series of "grfd" messages would have caused the Squeezebox

7   player's graphical display to have the appearance that a "Synchronize" settings screen showing a

8   text string of "PRESS RIGHT TO SYNC WITH" would shift off of the left of the screen and be

9   replaced by an updated "Synchronize" settings screen showing a text string of "PRESS RIGHT

10  TO UNSYNC WITH." *See* Schonfeld Op. Report at ¶¶ 510, 544-554; *see also id*. at ¶¶ 622, 630-

11  640;         Slim/Buttons/Synchronize.pm;         Slim/Display/VFD/Animation.pm;

12  Slim/Player/SqueezeboxG.pm.

13  996.    Dr. Schonfeld appears to be opining that the last of these "grfd" messages

14  containing the raw display bits for the updated "Synchronize" settings screen that includes the text

15  string of "PRESS RIGHT TO UNSYNC WITH" amounts to "a first indication that the

16  [Squeezebox player] has been added to a first zone scene," *See* Schonfeld Op. Report at ¶¶ 105,

17  510, 544-554.  However, as I previously explained in my '885 Rebuttal Report regarding Asserted

18  Claim 1 of the '885 Patent, I disagree that the "grfd" message identified by Dr. Schonfeld is "a

19  first indication that [the Squeezbox player] has been added to a first zone scene," as required by

20  limitation 1.6 of the '885 Patent.  And for similar reasons to those explained in my '885 Rebuttal

21  Report regarding Asserted Claim 1 of the '885 Patent, I disagree that the "grfd" message identified

22  by Dr. Schonfeld is an "indication" of a "first zone scene," as required by limitation 1.6 of Asserted

23  Claim 1 of the '966 Patent.

24  997.    As an initial matter, because a "sync group" is not a "zone scene" for all of the

25  reasons explained above, any "grfd" message sent from a computer installed with the SlimServer

26  software to a Squeezebox player as a result of a user creating a "sync group" could not possibly

27  amount to an "indication" of a "first zone scene."

28  998.    Moreover, even setting aside the fundamental differences between a "sync group"

438

and a "zone scene," I disagree that the "grfd" message identified by Dr. Schonfeld constitutes an "indication" of a first "sync group."  As explained above, such a "grfd" message would have merely contained raw display bits for a "Synchronize" settings screen that includes a text string of "PRESS RIGHT TO UNSYNC WITH," which the Squeezebox player would have then used to change the appearance of its graphical display.  However, these raw display bits would have had no meaning to the Squeezebox player, nor would the Squeezebox have attempted to interpret the raw display bits in any way – it would have simply used them to populate its graphical display.  As such, a POSITA would not consider these raw display bits for a "Synchronize" settings screen that shows a text string of "PRESS RIGHT TO UNSYNC WITH" to be an "indication" of a first "sync group."

999.    Dr. Schonfeld's assertion to the contrary appears to be based on an incorrect interpretation of what is required to constitute an "indication" of a "zone scene."  In particular, Dr. Schonfeld points to the Court's finding that an "indication" of a "zone scene" need not identify the other "zone player(s)" within the "zone scene" – which is true – but he then jumps to the conclusion that *any* message sent to a "zone player" at the time that a "zone scene" is created would constitute an "indication" of the "zone scene" regardless of the contents of that message.  In my opinion, this is not how a POSITA would interpret the phrase "indication" of a "zone scene" in view of the Court's July 21, 2022 order.  Rather, a POSITA would understand that, in order for a message to constitute an "indication" of a "zone scene," the message must contain some information about the "zone scene" that enables the Squeezebox player to recognize that it has been added to the "zone scene," such as an identifier of the "zone scene."  A message containing raw display bits for a "Synchronize" settings screen that shows a text string of "PRESS RIGHT TO UNSYNC WITH" does not meet this requirement.

1000.   When discussing his opinion that Squeezebox discloses the "first indication that the first zone player has been added to a first zone scene" required by limitation 1.6 of the '885 Patent, Dr. Schonfeld also states as follows:

> In my testing of the Logitech prior art system using a single SlimServer, I was able to setup a synchronization group (zone scene), and later invoke it. As shown below, I setup a first Squeezebox player ("Player1") which was playing the song "Don't

Tempt Me," and also had a second Squeezebox player ("Player3") which was turned off. I then synchronized Player1 (playing "Don't Tempt Me") with Player 3 (which was off)—Player1 switched to playing nothing while Player3 remained off (Step 1 as shown below). In other words, Player 1 received an indication to join a group, and joined the group. This matches the Court's Order, which provided that a user can create a zone scene with a name (here, including the identity of the players) and later play to speakers within that zone scene or invoke the zone scene itself.

*See* Schonfeld Op. Report at ¶ 515; *see also id.* at ¶¶ 516-517.  Notably, Dr. Schonfeld fails to identify any particular message that constitutes the claimed "indication" in this scenario, but in any event, I disagree that this functionality involves the transmission of an "indication" of a "zone scene" for at least the reasons that (i) an ad-hoc "sync group" is not a "zone scene" for the reasons explained above and (ii) in this scenario, the computer installed with the SlimSever software to Player1 would have merely instructed Player1 to change its playback operation and would not have transmitted any "indication" of a "sync group" to Player1, which would have had no awareness that it had been added to a "sync group."

1001.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.6 of Asserted Claim 1 of the '966 Patent.

### v.   Squeezebox Did Not Meet Limitations 1.4 / 1.7

1002.   When read together, limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

**[1.4]**   while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

…

**[1.7]**   receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1003.   In my opinion, Squeezebox did not meet this requirement.

1004.   As explained above, the evidence I have reviewed establishes that a computer installed with the SlimServer software in a Squeezebox system was only capable of receiving requests to form ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, a computer installed with the SlimServer software did not have the required functional capability to "receiv[e] *a second request to create a second zone scene* comprising a second predefined grouping of [Squeezebox players] including at least the first [Squeezebox player] and a third [Squeezebox player] that are to be configured for synchronous playback of media when the second zone scene is invoked."

1005.   Further, claim limitations 1.4 and 1.7 require the "computing device" to "receiv[e] [the] second request to create [the] second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Squeezebox, it was not possible for an ad-hoc "sync group" to exist in an inactive state in which the members of the "sync group" could be used for individual playback while the "sync group" remained available for selection by a user; rather, an ad-hoc "sync group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "sync group" would cease to exist.

1006.   Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Squeezebox.  *See* Schonfeld Op. Report at ¶¶ 1005, 1008.  However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1007.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

> *(v)   Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1005.   *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> *(viii)   Limitation 1.7 receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;*
>
> 1008.   *See supra* '885 claim 1, Limitation 1.6, 1.7.

1008.   As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by Squeezebox. And along similar lines, Dr. Schonfeld never once articulates what he considers to be the claimed "second request to create a second zone scene" in Squeezebox.  For these reasons, I disagree that

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent.[40]

1009.   With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1010.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.7 of Asserted Claim 1 of the '966 Patent.

### vi.    Squeezebox Did Not Meet Limitations 1.4 / 1.8

1011.   When read together, limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> > **[1.8]**    based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

---

[40] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1012.   In my opinion, Squeezebox did not meet this requirement.

1013.   As explained above, the evidence I have reviewed establishes that a computer installed with the SlimServer software in a Squeezebox system only had functional capability for forming ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, a computer installed with the SlimServer software did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [Squeezebox player], and iii) caus[e] storage of the second zone scene."

1014.   Further, claim limitations 1.4 and 1.8 require the "computing device" to carry out the claimed actions with respect to a "second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Squeezebox, it was not possible for an ad-hoc "sync group" to exist in an inactive state in which the members of the "sync group" could be used for individual playback while the "sync group" remained available for selection by a user; rather, an ad-hoc "sync group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "sync group" would cease to exist.

1015.   Further yet, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.8 require the "computing device" to carry out the claimed actions with respect to a "second zone scene" that includes at least one common "zone player" with the "first zone scene" (i.e., the claimed "first zone player") but without modifying or destroying the "first zone scene" that was created, such that the overlapping "first zone scene" and "second zone scene" can thereafter both be "display[ed]" to a user for selection.  However, in Squeezebox, it was not possible to create a new ad-hoc "sync group" comprising a Squeezebox player that was already a member of another preexisting "sync group" without first modifying or destroying that preexisting "sync group."  For this additional reason, a computer installed with the SlimServer software did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

[Squeezebox player], and iii) caus[e] storage of the second zone scene," where the "second zone scene" includes at least one common "zone player" with the created "first zone scene."

1016.   Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Squeezebox.  *See* Schonfeld Op. Report at ¶¶ 1005, 1009.  However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1017.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(v)   Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1005.   *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> *(ix)   Limitation 1.8 based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;*
>
> 1009.   *See supra* '885 claim 1, Limitation 1.6, 1.7.

1018.   As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent use

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by Squeezebox. And along similar lines, Dr. Schonfeld never articulates what he considers to be the claimed functions of "i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene" in Squeezebox. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent.[41]

1019.   With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1020.   For instance, in his section discussing Squeezebox and claim limitations 1.6-1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Squeezebox for forming ad-hoc "sync groups," which are not the claimed "zone scenes" for all of

---

[41] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

1    the reasons I have previously explained.

2        1021.    Further, although not entirely clear, when discussing the "second indication that

3    the first zone player has been added to a second zone scene" required by limitation 1.7 of the '885

4    Patent, Dr. Schonfeld appears to opine that this requirement is met by Squeezebox based on a

5    theory that (i) "a single player may be defined in separate sync groups on different SlimServer

6    configurations," and (ii) after a user would have connected a Squeezebox player to a second

7    SlimServer instance and then created a "sync group" at the second SlimServer instance that

8    included the Squeezebox player, the Squeezebox player would have received a "grfd" message

9    encoding an "UNSYNCH_WITH" text string from the second SlimServer instance, which

10   amounts to "a second indication that the [Squeezebox player] has been added to a second zone

11   scene . . ." *See* Schonfeld Op. Report at ¶¶ 571-573, *see also id.* at ¶¶ 641-672, 739.  However, as

12   I previously explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent,

13   I disagree that the "grfd" message identified by Dr. Schonfeld is "a second indication that [the

14   Squeezbox player] has been added to a second zone scene," as required by limitation 1.7 of the

15   '885 Patent.  And for similar reasons to those explained in my '885 Rebuttal Report regarding

16   Asserted Claim 1 of the '885 Patent, I disagree that the "grfd" message identified by Dr. Schonfeld

17   is an "indication" of a "second zone scene," as required by limitation 1.8 of Asserted Claim 1 of

18   the '966 Patent.

19       1022.    As an initial matter, because a "sync group" is not a "zone scene" for all of the

20   reasons explained above, any "grfd" message sent from a second SlimServer instance to a

21   Squeezebox player as a result of a user creating a "sync group" at the second SlimServer instance

22   could not possibly amount to an "indication" of a "second zone scene."

23       1023.    Moreover, even setting aside the other fundamental differences between a "sync

24   group" and a "zone scene," this theory is flawed for several other reasons as well.

25       1024.    First, I disagree that using two independent SlimServer instances to create two

26   different "sync groups" involves the transmission of an "indication" of a second "sync group"

27   comprising a Squeezebox player that is a member of the second "sync group" while that same

28   Squeezebox player remains a member of a first "sync group" that is still in existence such that the

overlapping first "sync group" and second "sync group" can thereafter both be "display[ed]" to a user for selection. That is because a Squeezebox player in such a hypothetical scenario could only be connected to one SlimServer instance at any given time, and once the Squeezebox player is disconnected from the first SlimServer instance, a POSITA would no longer consider the Squeezebox player to be a member of the first "sync group" that was previously created at the first SlimServer instance. To the contrary, a POSITA would understand that when the Squeezebox player was hypothetically disconnected from the first SlimServer instance and connected to the second SlimSever instance, this would have formed an entirely different system in which the first "sync group" does not exist and is certainly not available to be "display[ed]" to a user for selection along with the second "sync group."

1025. Second, I disagree that the "grfd" message identified by Dr. Schonfeld constitutes an "indication" of a second "sync group." As explained above, such a "grfd" message would not have contained any information about the second "sync group"; instead, such a "grfd" message would have merely contained raw display bits corresponding to a text string of "UNSYNCH_WITH," which the Squeezebox player would have then used to change its graphical display for the "Synchronize" settings menu option. However, these raw display bits would have had no meaning to the Squeezebox player, nor would the Squeezebox have attempted to interpret the raw display bits – it would have simply used them to populate its graphical display. As such, a POSITA would not consider these raw display bits for the "UNSYNCH_WITH" text string to be an "indication" of a second "sync group."

1026. Third, in Dr. Schonfeld's hypothetical scenario, the first "grfd" message identified by Dr. Schonfeld for the first "sync group" would be received from a first SlimServer instance for a first Squeezebox system and the second "grfd" message identified by Dr. Schonfeld for the second "sync group" would be received from a second SlimServer instance for a second Squeezebox system that is distinctly different from the first Squeezebox system. *See* Schonfeld Op. Report at ¶ 595. However, Asserted Claim 1 of the '966 Patent requires the claimed "computing device" to cause the "indication" of the "first zone scene" and the "indication" of the "second zone scene" to be transmitted while "serving as a controller" of the *same* "networked

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

media playback system," which is yet another reason that Squeezebox does not teach limitation 1.8 of Asserted Claim 1 of the '966 Patent under Dr. Schonfeld's theory.

1027. Fourth, Dr. Schonfeld fails to present any evidence that the hypothetical setup he describes where a user installed and used two different SlimServer instances on the same "computing device" to create two different "sync groups" including overlapping Squeezebox players was ever actually implemented – let alone implemented at a time that would qualify it as prior art to the '966 Patent.

1028. Fifth, Dr. Schonfeld's multiple SlimServer theory is also premised on a number of statements that are unclear, unsupported, and/or otherwise fail to provide support for Dr. Schonfeld's opinion that a Squeezebox player had the functional capability required by Asserted Claim 1 of the '966 Patent.

1029. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.8 of Asserted Claim 1 of the '966 Patent.

### vii.    Squeezebox Did Not Meet Limitations 1.4 / 1.9

1030. When read together, limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.9]**    displaying a representation of the first zone scene and a representation of the second zone scene; and;

1031. In my opinion, Squeezebox did not meet this requirement.

1032. As explained above, the evidence I have reviewed establishes that Squeezebox only provided users with the ability to form and use ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, a computer installed with

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the SlimServer software in a Squeezebox system did not have any functional capability for "displaying a representation" of a "zone scene" – let alone the required functional capability for "displaying a representation of the first zone scene and a representation of the second zone scene" in a manner that allows a user to select between them for purposes of requesting invocation.

1033.   Further, as explained above, the "first zone scene" and the "second zone scene" for which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player"). However, in Squeezebox, it was not possible for two ad-hoc "sync groups" to overlap with one another; rather, each Squeezebox player could only be a member of a single "sync group" at any given time. Thus, for this additional reason, a computer installed with the SlimServer software did not have the required functional capability to "display[] a representation of the first zone scene and a representation of the second zone scene."

1034.   Further yet, claim limitations 1.4 and 1.9 require the "computing device" to "display[] a representation of the first zone scene and a representation of the second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that the "representation[s]" are "display[ed]" (otherwise, the "first zone player" could not be in "standalone mode"). However, in Squeezebox, it was not possible for an ad-hoc "sync group" to exist in an inactive state in which the members of the "sync group" could be used for individual playback while the "sync group" remained available for selection by a user; rather, an ad-hoc "sync group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "sync group" would cease to exist.

1035.   Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Squeezebox. *See* Schonfeld Op. Report at ¶¶ 1005, 1010. However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1036.  As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

*(v)   Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*

1005.  *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

*(x)   Limitation 1.9 displaying a representation of the first zone scene and a representation of the second zone scene; and*

1010.  *See supra* '885 claim 1, Limitations 1.6 and 1.7.

1037.  As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by Squeezebox.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene" or the displayed "representation of the second zone scene"

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

in Squeezebox.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent. [42]

1038.   With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1039.   For instance, in his section discussing Squeezebox and claim limitations 1.6-1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in Squeezebox for forming ad-hoc "sync groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained.

1040.   Further , even setting aside the other fundamental differences between a "sync group" and a "zone scene," Dr. Schonfeld fails to identify any scenario where a computer installed with SlimServer software would have been capable of displaying representations of two different "sync groups" having a common member in a manner that allows a user to select between the two "sync groups" for purposes of requesting invocation.  Indeed, even under Dr. Schonfeld's theory that having two overlapping "sync groups" defined by two independent SlimServer instances amounts to having two overlapping "zone scenes" (which is flawed for all of the reasons I explained above),it would not have been possible for the computer installed with the two independent SlimServer instances to display representations of both "sync groups" in a manner

---

[42] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

that allowed a user to select between them for purposes of requesting invocation. Rather, in such a hypothetical scenario, the Squeezebox players could only be connected to one SlimServer instance at any given time – as confirmed by Dr. Schonfeld's own description – and thus, only one of the two different, overlapping "sync groups" could be displayed for selection at any given time.

1041.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.9 of Asserted Claim 1 of the '966 Patent.

### viii.    Squeezebox Did Not Meet Limitations 1.4 / 1.10

1042.    When read together, limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.10]**    while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

1043.    In my opinion, Squeezebox did not meet this requirement.

1044.    As explained above, the evidence I have reviewed establishes that Squeezebox only provided users with the ability to form and use ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, a computer installed with the SlimServer software in a Squeezebox system did not have the required functional capability for either "displaying a representation" of a "zone scene" or receiving a "request to invoke" a "zone scene" – let alone the required functional capability for "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

1045.    Further, as explained above, the "first zone scene" and the "second zone scene" for

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player"). However, in Squeezebox, it was not possible for two ad-hoc "sync groups" in a Squeezebox system to overlap with one another; rather, each Squeezebox player in a Squeezebox system could only be a member of a single "sync group" at any given time. Thus, for this additional reason, a computer installed with the SlimServer software did not have the required functional capability to "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

1046. Further yet, claim limitations 1.4 and 1.10 require the "computing device" to be "displaying the representation of the first zone scene and the representation of the second zone scene" and to "receiv[e] a third request to invoke the first zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode"). However, in Squeezebox, it was not possible for an ad-hoc "sync group" to exist in an inactive state in which the members of the "sync group" could be used for individual playback while the "sync group" remained available for selection by a user; rather, an ad-hoc "sync group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "sync group" would cease to exist.

1047. Still further, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.10 require the "computing device" to receive the "request to invoke the first zone scene" at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request." Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" received the "request to invoke the first zone scene" that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene." However, in Squeezebox, a computer installed with the SlimServer software would have only received a single request that served to both create and invoke a "sync group" – it would have never received an initial "request to create" a "sync group" followed by some later, separate "request to invoke" the "sync group." This is because an ad-hoc "sync group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "sync group" would cease to exist. Thus, in Squeezebox, there would have never been a period of time during which a "sync group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "sync group."

1048. Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by Squeezebox. *See* Schonfeld Op. Report at ¶¶ 1005, 1011. However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1049. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

> (v)    Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"

1005.    *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (xi)    Limitation 1.10 while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

1011.    *See supra* '885 claim 1, Limitation 1.9.

1050.    As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's 2005 system in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by Squeezebox versus whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Squeezebox. And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene," the displayed "representation of the second zone scene," or the "third request to invoke the first zone scene" in Squeezebox. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.10 of Asserted

456

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent.[43]

1051.  With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1052.  For instance, in his section discussing Squeezebox and claim limitation 1.9 of Asserted Claim 1 of the '885 Patent,  which requires the claimed "first zone player" to receive an "instruction to operate in accordance with" a given "zone scene" that has been "selected for invocation,", Dr. Schonfeld appears to opine that this requirement is met by Squeezebox based on two different theories, both of which are flawed.

1053.  Dr. Schonfeld's first theory appears to be that a "zone scene" would have been "selected for invocation" in a scenario where "a user may select a synchronization group for playback using the player selector in the upper right corner of the SlimServer" and then use "playback controls" to initiate playback on a "sync group" such as by "pressing the 'PLAY' button in the Web UI."  *See* Schonfeld Op. Report at ¶¶ 800-804.  However, as I previously explained in my '885 Rebuttal Report, I disagree that Dr. Schonfeld's first theory involves a "zone scene" being "selected for invocation," as required by limitation 1.9 of Asserted Claim 1 of the '885 Patent. And for similar reasons to those explained in my '885 Rebuttal Report, I disagree that Dr. Schonfeld's first theory involves a "request to invoke" a "zone scene," as required by limitation

---

[43] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1.10 of Asserted Claim 1 of the '966 Patent.

1054.  As an initial matter, because a "sync group" is not a "zone scene" for all of the reasons explained above, none of the alleged "selections" identified by Dr. Schonfeld meet the claimed requirement of receiving a "request to invoke" a "zone scene."

1055.  Moreover, even setting aside the other fundamental differences between a "sync group" and a "zone scene," neither the user action of selecting a previously-created "sync group" in the "player selector" dropdown of the SlimServer software's web-based UI nor the user action of using the "playback controls" for the selected "sync group" amounts to a "request to invoke" the "sync group."  This is because a "sync group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "sync group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "sync group."  Thus, at the time that a "sync group" was selected in the "player selector" dropdown of the SlimServer software's web-based UI, such a "sync group" would have already been "invoked" and thus such a selection was not a "request to invoke" the "sync group."  Rather, the user would have been selecting an already-invoked "sync group" for purposes of controlling that already-invoked "sync group," not "request[ing] to invoke" the "sync group."  And for similar reasons, any subsequent user action in the user interface with respect to the "sync group," such as an interaction with the "playback controls," also would not amount to a "request to invoke" the "sync group."

1056.  Similar to his position regarding Sonos's 2005 system, Dr. Schonfeld's position to the contrary here appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but in my opinion, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent.  Rather, a POSITA would understand that the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" refers to the point in time when the group of "zone players" is activated for synchronous playback,

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

which is distinct from the act of initiating playback on that group of "zone players" (although in some scenarios it is possible that playback could be automatically initiated as a result of the "zone scene" being invoked). *See, e.g.*, '407 Provisional at App'x A, p. 4 (explaining that when a "Zone Scene" is invoked at a time when "no music is playing in any Zone – then the zones will simply link in a group" without playing any music); 6/6/2022 Lambourne Dep. Tr. at 59:5-16 (inventor of the '885 and '966 Patents testifying that a "zone scene" does not have to start actively playing audio "at that moment when the group is invoked"). And as explained previously, the "sync groups" in a Squeezebox system were automatically invoked at the time of their creation and then only remained in existence for the temporary period of time during which they were in an active state, so there would have never been a period of time during which a "sync group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "sync group" as required by Asserted Claim 1 of the '966 Patent.

1057.  Dr. Schonfeld's second theory appears to be that a "zone scene" would have been "selected for invocation" in a hypothetical scenario where a "sync group" includes at least one Squeezebox player that is initially powered off and a user then turns on that Squeezebox player. *See* Schonfeld Op. Report at ¶ 779 (stating that "it is clear that even after player1 receives the first and second indications adding it to the two different groups, it continues to operate in standalone mode . . . until one of the groups is selected for invocation," which "may take place by turning on the standalone player or the non-standalone players in the group such that each member of the group plays back music based on the play command in synchrony"). However, as I previously explained in my '885 Rebuttal Report, I also disagree that Dr. Schonfeld's second theory involves a "zone scene" being "selected for invocation," as required by limitation 1.9 of Asserted Claim 1 of the '885 Patent. And for similar reasons to those explained in my '885 Rebuttal Report, I disagree that Dr. Schonfeld's second theory involves a "request to invoke" a "zone scene," as required by limitation 1.10 of Asserted Claim 1 of the '966 Patent.

1058.  As an initial matter, because a "sync group" is not a "zone scene" for all of the reasons explained above, none of the alleged "selections" identified by Dr. Schonfeld meet the claimed requirement of receiving a "request to invoke" a "zone scene."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1059.    Further, even setting aside the other fundamental differences between a "sync group" and a "zone scene," the user action of "turning on" a powered-off Squeezebox player in Dr. Schonfeld's hypothetical "sync group" does not amount to a "request to invoke" the "sync group."  Again, this is because such a hypothetical "sync group" would be automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "zone group."  Thus, at the time that a powered-off Squeezebox player in the hypothetical "sync group" was turned on, such a "sync group" would have already been "invoked" and thus such an action was not a "request to invoke" the "sync group."  Additionally, in my opinion, a POSITA would consider the user action of pressing a "power on" button for an individual Squeezebox player to be distinctly different from the claimed requirement of a "request to invoke" the "sync group."

1060.    Further yet, in this hypothetical scenario involving a user action to turn on a powered-off Squeezebox player in a "sync group," such user action would never have been received by a computer installed with the SlimServer software at a time when the Squeezebox player was operating in "standalone mode," as required by limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent.  Indeed, a POSITA would not consider a Squeezebox player that is powered off to be "operating in a standalone mode in which the first zone player is configured to play back media individually."

1061.    Still further, Dr. Schonfeld fails to present any evidence that a user would have ever created the type of hypothetical "sync group" he describes in his second theory where certain of the group members were powered off – let alone that a user would have created such a hypothetical "sync group" at a time that would qualify it as prior art to the '966 Patent.

1062.    I also note that both of Dr. Schonfeld's theories for limitation 1.9 of Asserted Claim 1 of the '885 Patent appear to be based on a hypothetical scenario in which two independent SlimServer instances would be used to create two different "sync groups," but this scenario is flawed for all of the reasons explained above.

1063.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitations 1.4 / 1.10 of Asserted Claim 1 of the '966 Patent.

### ix.   Squeezebox Did Not Meet Limitation 1.11

1064.   Limitation 1.11 of Asserted Claim 1 of the '966 Patent requires the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.11]**   based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

1065.   In my opinion, Squeezebox did not meet this requirement.

1066.   As explained above, the evidence I have reviewed establishes that Squeezebox only provided users with the ability to form and use ad-hoc "sync groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, a computer installed with the SlimServer software in a Squeezebox system did not have any functional capability for invoking a "zone scene" – let alone the required functional capability for "based on the third request [to invoke the first zone scene], causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player."

1067.   Further, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at a time when (i) the "first zone scene" and "second zone scene" have been created and are both in existence and (ii) the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in Squeezebox, it was not possible for an ad-hoc "sync group" to exist in an

inactive state in which the members of the "sync group" could be used for individual playback while the "sync group" remained available for selection by a user; rather, an ad-hoc "sync group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "zone group" would cease to exist.

1068.  Further yet, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request."  Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" carries out the functionality of limitation 1.11 that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed "representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene."  However, in Squeezebox, a computer installed with the SlimServer software would have only received a single request that served to both create and invoke a "sync group," and this single request is what would have triggered the computer installed with the SlimServer software to configure itself to control the audio buffer and playback on the Squeezebox players in the "sync group" in order to cause those Squeezebox players to become configured to play back the same music simultaneously – a computer installed with the SlimServer software would have never received an initial "request to create" a "sync group" followed by some later, separate "request to invoke" the "sync group." This is because an ad-hoc "sync group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "sync group" would cease to exist.  Thus, in Squeezebox, there would have never been a period of time during which a "sync group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "sync group" that would subsequently trigger the computer installed with the SlimServer software to cause the Squeezebox player in a "sync group" to become configured to

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

play back the same music simultaneously.

1069.   Still further, the evidence I have reviewed establishes that a Squeezebox player did not have the capability to "transition[] from operating in [a] standalone mode to operating in accordance with" a "sync group" such that the Squeezebox player would have been "configured to coordinate with at least [one other Squeezebox player] to output media in synchrony with output of media by at least [the one other Squeezebox player]."  In fact, the evidence I have reviewed establishes a Squeezebox player did not have the capability to "coordinate" with another Squeezebox player" for any purpose – let alone for purposes of outputting audio in synchrony -- nor did a Squeezebox player have the capability to change its "configur[ation]" as it related to audio playback.  To the contrary, the SlimServer software was exclusively responsible for the "sync group" functionality, and the Squeezebox players never changed into a different "mode" for group playback or even had any awareness of whether or not they were part of a "sync group." *See* Schonfeld Op. Report at ¶ 534 ("The *SlimServer server* represents sync groups internally using the 'master', 'slaves', and 'syncgroupid' properties for a client (player)."), ¶ 536 ("The *SlimServer* persists the membership of a sync group by storing the definition of the syncgroupid property for each group member into the *SlimServer's* preferences file."), ¶ 708 ("When the master is in 'play' mode, *SlimServer* causes the client to jump to the current song in the master's playlist and transition from 'stop' mode to 'play' mode").

1070.   Despite this clear evidence establishing that a computer installed with the SlimServer software did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was either disclosed or rendered obvious by Squeezebox.  *See* Schonfeld Op. Report at ¶ 1012.  However, I find Dr. Schonfeld's opinions regarding Squeezebox and claim limitation 1.11 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1071.  As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claim limitations 1.4 and 1.11 of Asserted Claim 1 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

> *(xii)    Limitation 1.11 based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.*

1012.   *See supra* '885 claim 1, Limitation 1.10.

1072.   As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitation 1.11 of Asserted Claim 1 of the '966 Patent uses different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was actually *disclosed* by Squeezebox versus whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was only *rendered obvious* by the Squeezebox. And along similar lines, Dr. Schonfeld never articulates what he considers to be the "third request to invoke the first zone scene" or what functionality satisfies the "causing" limitation in Squeezebox. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitation 1.11 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitation 1.11 of Asserted Claim 1 of the '966 Patent.[44]

1073.   With that said, as I have discussed above in Section XV.B.1.ii as well as in my '885

---

[44] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation of what is required to qualify as a "zone scene," an incorrect interpretation of what is required to "coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player," and an inaccurate and misleading characterization of Squeezebox system functionality and the evidence related thereto.

1074.  For instance, in his section discussing Squeezebox and claim limitation 1.10 of Asserted Claim 1 of the '885 Patent, which is directed to player-side functionality for "transitioning from operating in the standalone mode to operating in accordance with" a selected "zone scene," Dr. Schonfeld again relies on the functionality for selecting and playing back audio on an ad-hoc "sync group" of Squeezebox players.  This is demonstrated by the following paragraphs of Dr. Schonfeld's Opening Report:

> The evidence disclosing this claim limitation is described above, which transitions the Squeezebox or SoftSqueeze player from playing (or not playing) independently of the group to play in accordance with the group. As described above, the Squeezeboxes coordinate through master and slave communication to output music in synchrony, and the strm/play messages cause the speaker to operate in accordance with the claimed "zone scene."

> Further, as described in the previous claim limitation, a user may select a synchronization group for playback using the Player selector box, and use the playback controls to cause the Squeezeboxes to operate as a synchronous playback group. At the time that the synchronization group is selected and media is output from the synchronization group, the Squeezeboxes discontinue their previous playback and begin playing back as part of the synchronization group.

Schonfeld Op. Report at ¶¶ 807-808

1075.  However, as an initial matter, the alleged functionality identified by Dr. Schonfeld in these paragraphs fails to amount to a computer installed with the SlimServer software receiving the claimed "request to invoke the first zone scene" for all of the reasons explained above with respect to limitation 1.10 of Asserted Claim 1 of the '966 Patent.

1076.  Further, because a "sync group" is not a "zone scene" for all of the reasons

explained above, this alleged functionality cannot meet the claimed requirement of "based on receiving the third request [to invoke the first zone scene], causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players" of the "first zone scene."

1077.   Further yet, even setting aside the other fundamental differences between a "sync group" and a "zone scene," neither the user action of selecting a previously-created "sync group" in the "player selector" dropdown of the SlimServer software's web-based UI nor the user action of using the "playback controls" for the selected "sync group" amounts to a "request to invoke" the "sync group" that triggers the computer installed with the SlimServer software to cause the Squeezebox players in a "sync group" to begin coordinating with one another for synchronous playback in accordance with the "sync group."   This is because a "sync group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "sync group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "sync group" that would subsequently trigger the computer installed with the SlimServer software to cause the Squeezebox players in a "sync group" to begin coordinating with one another for synchronous playback in accordance with the "sync group."   Instead, at the time that a "sync group" was selected in the "player selector" dropdown of the SlimServer software's web-based UI, the "sync group" would have already been "invoke[d]" in the sense that the SlimServer software would have already configured itself to control the audio buffer and playback on the Squeezebox players in the "sync group" in order to cause those Squeezebox players to play back the same music simultaneously, so the user actions described in paragraphs 807-808 of Dr. Schonfeld's Opening Report would not have been a "request to invoke" a "sync group" that triggers computer installed with the SlimServer software to cause the Squeezebox players in the "sync group" to transition from operating in a standalone mode to operating in accordance with the "sync group" such that the Squeezebox players begin coordinating with one another for synchronous playback in accordance with the "sync group."   And for similar reasons, a "strm/play message" sent by the computer

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

installed with the SlimServer software in response to a user's interaction with the "playback controls" would not have caused the Squeezebox players in a "sync group" to transition from operating in a standalone mode to operating in accordance with the "sync group."

1078. As above, Dr. Schonfeld's position to the contrary appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but as explained above, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent. Rather, a POSITA would understand the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to refer to the point in time when the pre-saved group of "zone players" is activated for synchronous playback such that the "zone players" enter a mode in which they are controlled and used as part of the group.

1079. Still further, contrary to Dr. Schonfeld's unsupported statement here, the evidence I have reviewed establishes that the Squeezebox players relied on by Dr. Schonfeld would never "coordinate[d] through master and slave communication to output music in synchrony." Instead, it was the SlimServer software that was exclusively responsible for the "sync group" functionality – a Squeezebox player in a "sync group" was not capable of communicating with or otherwise working together with another Squeezebox player in the "sync group" in order to achieve synchronous playback. In fact, a Squeezebox player would not have had any awareness that it had even been added to a "sync group," and was only capable of operating in accordance with instructions received from the computer installed with the SlimServer software. *See, e.g.*, GOOG-SONOS-NDCA-00108095-588 at GOOG-SONOS-NDCA-00108181.[45]

---

[45] For similar reasons, I disagree with Dr. Schonfeld's statement earlier in his Opening Report that "[t]he master device receives a stream of audio content in chunks from a network and pushes the received chunks to the slave devices." *See* Schonfeld Op. Report at ¶ 215. As with Dr. Schonfeld's statement that "the Squeezeboxes coordinate through master and slave communication to output music in synchrony," Dr. Schonfeld fails to support this statement with any evidence, and the I evidence I have reviewed establishes that it is always the computer installed with the SlimServer software – not the "master device" – that sends the audio content to the "slave devices." *See* Slim/Player/Source.pm:playmode();                Slim/Server/Squeezebox.pm:play(); Slim/Server/Squeezebox.pm:stream(); Slim/Server/Squeezebox.pm:sendFrame().

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1080.  Elsewhere in his Opening Report, Dr. Schonfeld appears to acknowledge that a Squeezebox player in a "sync group" was not actually capable of communicating with another Squeezebox player in the "sync group," and that it was the SlimServer software that was responsible for the "sync group" functionality.  *See, e.g.,* Schonfeld Op. Report at ¶¶ 555-556, 564-565.  However, Dr. Schonfeld nevertheless maintains that the SlimServer functionality for controlling Squeezebox players in a "sync group" to play back the same music simultaneously amounts to a first Squeezebox player in a "sync group" being *configured to coordinate with*" a second Squeezebox player in the "sync group" in order to output audio in synchrony, as required by limitation 1.10 of the '885 Patent.  *Id.* at ¶¶ 105, 555-556, 564-565.  This opinion is based on Dr. Schonfeld's flawed view that the Court's findings with respect to the "indication" requirements of claims limitations 1.6-1.7 of the '885 Patent somehow impacted the scope and meaning of the "configured to coordinate" requirement of limitation 1.10 of the '885 Patent, which I disagree with for the reasons I already explained above in Sections X.C.2.

1081.  For instance, at paragraphs 555-556 of his Opening Report, Dr. Schonfeld states as follows:

> Additionally, as I discussed above, the Court's Order with respect to Limitation 1.6 further supports my opinion that Logitech's prior art system also discloses the "configured to coordinate" element of Limitation 1.10. This is because the "coordinat[ion]" element can be met by a similar user action including, for example, a user adding a player to a synchrony group via a UI action, followed by a message to the zone player. As I discussed above, UI buttons on the Squeezebox device itself allow a user to initiate synchronization of the device with a synchronization group.

> As shown below, following the UI selection, there is coordination in terms of (1) using the leader ("master") Squeezebox's playlist and (2) pushing the playlist content to be played back to the other players, for example in "chunks." The source code reproduced below is written from the point of view of the "master" Squeezebox, and performs actions to synchronize this "master" Squeezebox with the other Squeezebox players in the sync group. While I understand the below screenshot to be of server-side code, it nonetheless reflects a leader ("master") and follower ("slave") structure in which the leader Squeezebox coordinates with multiple follower Squeezeboxes ("let[ting] everybody I'm sync'ed with") to playback each "chunk in the queue," in synchrony. *Compare with* SONOS-SVG2-00227433 and SONOS-SVG2-00227434 (discussing master/slave speaker coordination implementation in the Sonos System). The master's playlist and shuffle list (indices into playlist) is used for all clients (players) in the sync group.

> The client's (player's) master is determined by the masterOrSelf() function, which returns the master when the client is a synced slave and the client itself otherwise (i.e., synced master or unsynced client).

Schonfeld Op. Report at ¶¶ 555-556. I disagree with Dr. Schonfeld's statements in these paragraphs for several reasons.

1082. First, I disagree with Dr. Schonfeld's statement that "the 'coordinat[ion]' element can be met by a similar user action including, for example, a user adding a player to a synchrony group via a UI action, followed by a message to the zone player." Schonfeld Op. Report at ¶ 555. As I already explained above in Section X.C.2, the Court's findings with respect to the "indication" requirements of claim limitations 1.6-1.7 of the '885 Patent have no applicability to the "configured to coordinate" requirement of claim limitation 1.10 of the '885 Patent, which is a different claim limitation that has a different linguistic structure, and a "user action . . . followed by a message to the zone player" cannot meet the "configured to coordinate" requirement of claim limitation 1.10 of the '885 Patent for at least the reason that it does not involve any form of communication or interaction between zone players that are working together in order to achieve synchronous playback over a data network.

1083. Second, I disagree with Dr. Schonfeld's statement that "following the UI selection, there is coordination in terms of (1) using the leader ('master') Squeezebox's playlist and (2) pushing the playlist content to be played back to the other players, for example in 'chunks.'" Schonfeld Op. Report at ¶ 556. Both of these functions are carried out by computer installed with the Squeezebox server – not a Squeezebox player – and thus cannot amount to the type of "coordinat[ion]" between "zone players" that is required by claim limitation 1.10 of the '885 Patent.

1084. Third, I find Dr. Schonfeld's statement that "[t]he source code reproduced below [in paragraphs 556-563] is written from the point of view of the 'master' Squeezebox" to be inaccurate and misleading. Schonfeld Op. Report at ¶ 556. To be clear, all of the Squeezebox source code cited by Dr. Schonfeld in his Opening Report is *SlimServer* source code that is written from the point of the *SlimServer* and exclusively describes functions that would have been performed by the computer installed with the SlimServer software. In this respect, the use of the

word "master" in the SlimServer source code refers to functions that were to be performed by *the SlimServer software* with respect to a Squeezebox player that was internally designated as a "master" of a "sync group" within the SlimServer software, and did not involve any "coordinat[ion]" between Squeezebox players.

1085.    Fourth, I find Dr. Schonfeld's statement that "[w]hile I understand the below screenshot to be of server-side code, it nonetheless reflects a leader ('master') and follower ('slave') structure in which the leader Squeezebox coordinates with multiple follower Squeezeboxes . . . to playback each 'chunk in the queue,' in synchrony" to be inaccurate and misleading.    Schonfeld Op. Report at ¶ 556.    To be clear, the "master" and "slave" "structure[s]" that Dr. Schonfeld refers to here are *data structures* that are maintained internally by the *SlimServer software* – they are not the actual Squeezebox players that Dr. Schonfeld is relying on as the claimed "zone players."    In this respect, any discussion in the source code of the "master" and "slave" "structure[s]" refers to functions that were to be internally performed by the *SlimServer software*, and did not involve any "coordinat[ion]" between the actual Squeezebox players themselves.    For example, the masterOrSelf() function identified by Dr. Schonfeld is an internal function performed by the *SlimServer software* in order to determine a given Squeezebox player's current "master" (if any) for purposes of the SlimServer's internal recordkeeping.    As another example, the source code functions identified by Dr. Schonfeld related to the "master's song" or the "master's playlist" are internal functions performed by the *SlimServer software* with respect to data structures that are maintained internally by the SlimServer software.    After performing certain of these functions, the SlimServer software may have then engaged in individual communication with one or more of the Squeezebox players (such as by sending "chunks" of audio content to certain Squeezebox players), but those Squeezebox players had no awareness of the SlimServer's internal data structures or the existence of any "sync groups," and at no point would the Squeezebox players have ever engaged in any form of communication or interaction with one another in order to achieve synchronous playback.

1086.    Fifth, I disagree with Dr. Schonfeld's suggestion that the Squeezebox "sync group" functionality is comparable to the "master/slave speaker coordination implementation in the Sonos

System." Schonfeld Op. Report at ¶ 556.   In Squeezebox, the SlimServer software was exclusively responsible for the "sync group" functionality, the designations of "master" and "slave" were solely used by the SlimServer software for internal recordkeeping, and the Squeezebox players did not have any awareness of the existence of "sync groups" not did they engage in any form of communication or interaction with one another in order to achieve synchronous playback.   In contrast, the ZonePlayers in a Sonos system were responsible for the "zone group" functionality, maintained data indicating the existence of the "zone groups" and the ZonePlayers' roles within the "zone groups," and communicated with one another over a data network in order to achieve synchronous playback.

1087.   Turning to paragraphs 564-565 of his Opening Report, Dr. Schonfeld states as follows:

> The foregoing is consistent with the Court's Order, which does not require the indication to include the identity of each zone player within the zone scene. Instead, zone players within the zone scenes may coordinate using a leader-follower protocol as disclosed in the Squeezebox system as opposed to a direct coordination system implied by having each zone player maintain group membership.

> To the extent Dr. Almeroth finds that the above does not reflect leader-follower coordination, I note, consistent with the Court's statements that the "indication" does not require a zone player communicating with other speakers present in the group, that there is similarly no requirement that the zone player being "configured to coordinate" communicate *directly* with other zone players. In my opinion, Squeezebox communications via the SlimServer would also meet the claim requirements for similar reasons.

Schonfeld Op. Report at ¶¶ 564-565.  I also disagree with Dr. Schonfeld's statements in these paragraphs for several reasons.

1088.   First, as I already explained above in Section X.C.2, I disagree that the Court's findings with respect to the "indication" requirements of claim limitations 1.6-1.7 of the '885 Patent have any applicability to the "configured to coordinate" requirement of claim limitation 1.10 of the '885 Patent, which is a different claim limitation that has a different linguistic structure. In this respect, the fact that the "indications" of claim limitations 1.6-1.7 of the '885 Patent need not identify the members of the pre-saved groups does not change the fact that claim limitation 1.10 of the '885 Patent requires the "first zone player" to become "*configured to coordinate*" with

the "at least one other zone player" over a "data network" in order to achieve synchronous playback, which means that the "first zone player" must engage in some form of communication with the "at least one other zone player."

1089.   Second, I disagree with Dr. Schonfeld's statement that the Squeezebox system discloses "zone players within the zone scenes [that] coordinate using a leader-follower protocol." Schonfeld Op. Report at ¶ 564.  Again, the Squeezebox players in a "sync group" did not engage in any "coordinat[ion]" and there was no "leader-follower protocol" in Squeezebox.  Rather, the SlimServer was exclusively responsible for the "sync group" functionality and managed that functionality using internal data structures and internal "master" and "slave" designations, which is distinctly different from a "leader-follower protocol" as a POSITA would understand that phrase.

1090.   Third, as I already explained above in Section X.C.2, I disagree with Dr. Schonfeld's suggestion that the Court made "statements that the 'indication' does not require a zone player communicating with other speakers present in the group."  Schonfeld Op. Report at ¶ 565.  The Court's findings were confined to the question of whether the "indications" of claim limitations 1.6-1.7 of the '885 Patent were required to identify the members of the pre-saved groups.  The Court did not make any findings with respect to "communicating with other speakers present in the group."

1091.   Fourth, I disagree with Dr. Schonfeld's attempt to dismiss the lack of any "coordinat[ion]" between Squeezebox players based on his statement that claim limitation 1.10 of the '885 Patent does not require "a direct coordination system implied by having each zone player maintain group membership."  Schonfeld Op. Report at ¶ 564; *see also id*. at ¶ 565 ("there is similarly no requirement that the zone player being 'configured to coordinate' communicate ***directly*** with other zone players").  Again, this statement is premised on Dr. Schonfeld's flawed interpretation of the "configured to coordinate" requirement and the implications of the Court's July 21, 2022 order, and also introduces a new concept of a so-called "direct coordination system" that is not discussed in the intrinsic evidence or the Court's July 21, 2022 order.  It is not clear what Dr. Schonfeld means by "direct coordination system" or how he distinguishes that from other

forms of "coordinat[ion]," but in any event, my opinion regarding the lack of "coordinat[ion]" between Squeezebox players is not premised on any requirement of "*direct* coordination." Rather, my opinion is that the Squeezebox players did not engage in the type of "coordinat[ion]" required by claim limitation 1.10 of the '885 Patent because those players were incapable of engaging in any form of communication with one another (whether direct or otherwise) in order to achieve synchronous playback.

1092. Fifth, I disagree with Dr. Schonfeld's suggestion that the Squeezebox players engage in "Squeezebox communications via the SlimServer," which is not an accurate characterization of the functionality of a Squeezebox system. Schonfeld Op. Report at ¶ 565. The functionality of a Squeezebox system was driven entirely by the SlimServer, and all communications in a Squeezebox system were between the SlimServer and the individual Squeezebox players. At no point was there ever communication between Squeezebox players that was carried out "via the SlimServer."

1093. Thus, for these reasons, I disagree with Dr. Schonfeld's opinion that Squeezebox met the "configured to coordinate" requirement of claim limitation 1.10 of the '885 Patent. And for similar reasons, I disagree that Squeezebox met the "configured to coordinate" requirement of claim limitation 1.11 of the '966 Patent.

1094. As discussed above, Dr. Schonfeld also appears to be opining that a "zone scene" would be "invoked" in a Squeezebox system in a hypothetical scenario where a "sync group" includes at least one Squeezebox player that is initially powered off and a user then turns on that Squeezebox player. *See, e.g.,* Schonfeld Op. Report at ¶ 779 (stating that "it is clear that even after player1 receives the first and second indications adding it to the two different groups, it continues to operate in standalone mode . . . until one of the groups is selected for invocation," which "may take place by turning on the standalone player or the non-standalone players in the group such that each member of the group plays back music based on the play command in synchrony"). However, I also disagree that this functionality amounts to claim limitation 1.11 of the '966 Patent for at least the reasons that (i) turning on a powered-off Squeezebox player in a "sync group" does not amount to a "request to invoke" a "sync group" as explained above in connection with claim limitation

1.10 of the '966 Patent, and (ii) turning on a powered-off Squeezebox player in a "sync group" does not cause the Squeezebox players in the "sync group" to "coordinate" with one another to "output media in synchrony" because, as just explained, Squeezebox players were not capable of communicating or otherwise interacting with one another for purposes of engaging in synchronous playback.

1095.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with the SlimServer software in a Squeezebox system did not have the functional capability required by limitation 1.11 of Asserted Claim 1 of the '966 Patent.

> **x.      Asserted Claim 1 Would Not Have Been Obvious Based on Squeezebox in view of the Secondary References Identified by Dr. Schonfeld**

1096.   In his Opening Report, Dr. Schonfeld does not offer any opinion that Asserted Claim 1 of the '966 Patent is anticipated by Squeezebox. *See* Schonfeld Op. Report at Section XII.B, ¶¶ 1001-1012.  Instead, Dr. Schonfeld only opines that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox. *Id.*

1097.  In particular, Dr. Schonfeld's section for the '966 Patent as compared to Squeezebox is entitled "'966 Claims Are Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington." Schonfeld Op. Report at Section XII.B.  Dr. Schonfeld then includes a sub-section entitled "Claim 1 Is Invalid Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington" where he lists out each limitation of Asserted Claim 1 of the '966 Patent, although Dr. Schonfeld does not provide any analysis of how the limitations of Asserted Claim 1 of the '966 Patent are allegedly disclosed or rendered obvious by Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington." *Id.* at Section XII.B.14, ¶¶ 1001-1012.  Instead, Dr. Schonfeld merely refers back to the limitation-by-limitation analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious based on Squeezebox. *Id.*

1098.   However the Asserted Claims of the '966 Patent are directed to a different type of

device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), Asserted Claim 1 of the '966 Patent requires a different combination of claim limitations than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. As a result, Dr. Schonfeld fails to articulate how or why even a single claim limitation of Asserted Claim 1 of the '966 Patent would be rendered obvious based on "Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington"– let alone how or why the entire combination of claim limitations of Asserted Claim 1 of the '966 Patent would be rendered obvious based on "Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington." For these reasons, I disagree that Dr. Schonfeld has provided a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and Dr. Schonfeld's failure to do so has prejudiced my ability to fully discern, assess, and respond to his obviousness opinions regarding Asserted Claim 1 of the '966 Patent.[46]

1099. Nevertheless, in the sub-sections below, I have made my best effort to assess and respond to Dr. Schonfeld's unsupported and conclusory opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on" Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington."

### (a) Squeezebox in view of the General Knowledge of a POSITA

1100. At Section XII.B of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox view of the "general knowledge of a POSITA." Schonfeld Op. Report at Section XII.B, ¶¶ 1001-1012. I disagree – in my opinion, claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of the "general knowledge of a POSITA," and Dr. Schonfeld's opinion to the contrary is flawed for

---

[46] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

several reasons.

1101.    As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of the "general knowledge of a POSITA." *See* Schonfeld Op. Report at ¶¶ 1001-1012. Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox system in view of the "general knowledge of a POSITA," without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id.* For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Sonos's 2005 system in view of the "general knowledge of a POSITA" to be deficient.

1102.    Additionally, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox in view of the "general knowledge of a POSITA" suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1103.    First, even if a Squeezebox system were to be modified in the various ways proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1104.    Second, Dr. Schonfeld's proposed modifications to Squeezebox are all nothing more high-level suggestions – such as "add[ing] overlapping groups" – and Dr. Schonfeld has failed to provide any explanation as to how these proposed modifications to a Squeezebox system would have actually been implemented, let alone how the proposed modifications would have achieved either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.  .  Moreover, in my opinion, implementing Dr. Schonfeld's high-level suggestions would have required substantial, non-

obvious modifications to the "sync group" functionality of a Squeezebox system at the time.

1105.    Third, I disagree that a POSITA in 2005-06 would have been motivated to modify a Squeezebox system in any one of the ways proposed by Dr. Schonfeld – let alone all of the different ways proposed by Dr. Schonfeld.  As discussed above, Squeezebox already included ad-hoc "sync group" functionality that allowed Squeezebox players to be grouped together on demand for "synchronized" playback (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Squeezebox's ad-hoc "sync group" functionality that would have led such a POSITA to consider a different mechanism for grouping Squeezebox players together – let alone would have led such a POSITA to implement the specific "zone scenes" functionality that is claimed in the '885 and '966 Patents.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the claimed "zone scenes" functionality, particularly in view of the time, effort, and cost that would have been required to overhaul Squeezebox's grouping mechanism .

1106.    Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to modify a Squeezebox system in the various ways proposed by Dr. Schonfeld.  However, in addition to the fact that Dr. Schonfeld failed to articulate any reasoning as to why a POSITA would have been motivated to modify a Squeezebox system to achieve the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

1107.    Starting with paragraph 740 of his Opening Report, Dr. Schonfeld states as follows with respect to his proposed modification to "add overlapping groups":

> A person of skill in the art would have been motivated to add overlapping groups because Squeezebox's own marketing materials touted the flexibility of its system to allow users to play back media throughout their household. *Supra*.

Schonfeld Op. Report at ¶ 740.  I disagree.  Squeezebox's marketing materials touting the ability "the flexibility of its system to allow users to play back media throughout their household" was a description of capabilities that purportedly *already existed* a Squeezebox system.  This statement

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

informing potential customers about an existing capability of a Squeezebox system would not have motivated a POSITA in 2005-06 to modify a Squeezebox system in any way – let alone a motivation to modify a Squeezebox system in the many ways required to achieve the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent.

1108.   Turning next to paragraph 741 of his Opening Report, Dr. Schonfeld also states as follows with respect to his proposed modification to "add overlapping groups":

> A person of skill in the art would have recognized that by allowing a user to create speaker groups, those groups may either (1) allow overlapping group membership or (2) not allow overlapping group membership. Given that allowing overlapping group membership may be attractive to certain users because there was a recognized "need for dynamic control of the audio players as a group," it would have been obvious to select allowing overlapping group membership when implementing speaker groups. '885 Pat at 1:30-34.

Schonfeld Op. Report at ¶ 741.  I disagree for the same reasons discussed above with respect to Sonos's 2005 system.

1109.   Specifically, as an initial matter, I disagree with Dr. Schonfeld's suggestion that this would have simply been matter of whether or not to "allow overlapping group membership." The evidence I have reviewed shows that a Squeezebox system was employing a distinctly different type of grouping technology that would not even allow for "overlapping group membership" because "zone groups" were temporary, ad-hoc groups that were automatically activated at the time they were created.  As such, it would not have been possible to simply modify Squeezebox's existing grouping technology to "allow overlapping group membership" – a completely different grouping technology would have been required.  And in any event, modifying a Squeezebox system to "add overlapping groups" would not have achieved the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

1110.   Further, the fact that the inventor of the '966 Patent recognized a "need for dynamic control of the audio players as a group" does not establish that a POSITA in 2005-06 would have recognized that same need, and Dr. Schonfeld fails to identify any other evidence to support his statement that this need would have been recognized by a POSITA in 2005-06.  And regardless,

even if a POSITA in 2005-06 were to have recognized this need, I fail to see how that would have motivated a POSITA in 2005-06 to modify Squeezebox's ad-hoc "sync group" functionality at all given that it already allowed Squeezebox players to be controlled as a group – let alone would have motivated a POSITA in 2005-06 to replace Squeezebox's ad-hoc "sync group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent. .

1111. Further yet, Dr. Schonfeld fails to identify any evidence in support of his statement that "allowing overlapping group membership may be attractive to certain users," but even if this were true, Dr. Schonfeld fails to explain how or why this would have motivated a POSITA in 2005-06 to replace Squeezebox's ad-hoc "sync group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

1112. Turning next to paragraphs 780-781 of his Opening Report, Dr. Schonfeld again cites to the section of Mr. Lambourne's "Zone Scenes" design specification entitled "What happens to the Music that's already playing when a Zone Scene is Started" and repeats his same argument that "[a] person of skill in the art would have found it obvious to choose from one of these possibilities— stop music, choose music, adopt the music of the only playing speaker, and continue playing the 'standalone' music—when adding a speaker to a group" because "[t]hese are a limited number of obvious design options." Schonfeld Op. Report at ¶¶ 780-781. However, Dr. Schonfeld's reliance on this section of the "Zone Scenes" design specification to support this opinion is flawed for all of the same reasons explained above, and I also disagree with Dr. Schonfeld's suggestion that configuring a ZonePlayer to "continue playing 'standalone' music" after being added to a "zone group" would have been recognized as an "obvious design option[]" by a POSITA in 2005-06 – the evidence I have reviewed shows that a Squeezebox system was employing a distinctly different type of grouping technology that only allowed a user to create temporary, ad-hoc "sync groups" that were automatically activated and could never exist in an inactive state, and configuring a Squeezebox player to "continue playing 'standalone' music" after being added to a "sync group" would have been directly contrary to the principle of operation

1   of that ad-hoc "sync group" functionality.  For this reason, a POSITA in 2005-06 would not have

2   even considered configuring a Squeezebox player to "continue playing 'standalone' music" after

3   being added to a "sync group" as a possible option, nor would a POSITA in 2005-06 have been

4   motivated to modify a Squeezebox system to implement this change, as that would have required

5   a completely different grouping technology.

6      1113.   Fourth and finally, because there is no evidence that a POSITA in 2005-06 would

7   have been motivated to modify a Squeezebox system in the many ways proposed by Dr. Schonfeld,

8   it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion

9   that a POSITA would have found the claimed invention obvious based on a Squeezebox system,

10  which I understand to be improper.

11     1114.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is

12  not rendered obvious by a Squeezebox system alone.

13                    **(j)     Squeezebox in view of Sonos Forums**

14     1115.   At Section VII.B of his Opening Report, Dr. Schonfeld states his opinion that

15  Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of his Sonos

16  Forums reference.  Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  I disagree – in my

17  opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of

18  the Sonos Forums, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

19     1116.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his

20  stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox

21  in view of the Sonos Forums. *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  Instead,

22  Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with

23  his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox in view

24  of the Sonos Forums, without providing any explanation as to how that prior obviousness analysis

25  of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent.  *Id*.  For this

26  reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered

27  obvious based on Squeezebox in view of the Sonos Forums to be deficient.

28     1117.   Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox in view of the Sonos Forums suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1118.   First, as discussed above, the Sonos Forums reference, as a whole, does not qualify as prior art under §102 (a), (b), or (f). *Supra* Section XIII.B.

1119.   Second, as explained above, the two Sonos Forums posts relied upon by Dr. Schonfeld fail to disclose or suggest the "zone scenes" functionality that is missing from the Squeezebox system. *Id.* Thus, even if a Squeezebox system were to be modified and combined with the Sonos Forums reference in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1120.   Third, Dr. Schonfeld has failed to provide any explanation as to how a Squeezebox system would have actually been modified to combine it with the subject matter discussed in the identified user posts from Sonos Forums – let alone how that alleged combination would have achieved the claimed invention.

1121.   Fourth, Dr. Schonfeld fails to provide any explanation or evidence of how or why the identified user posts from the Sonos Forums would have motivated a POSITA in 2005-2006 to modify a Squeezebox system in any way – let alone would have motivated a POSITA in 2005-2006 to replace Squeezebox's ad-hoc "sync group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent (which go well beyond what is discussed in the Sonos Forums posts). *See* Schonfeld Op. Report at ¶ 381.

1122.   I have also seen other evidence contradicting Dr. Schonfeld's theory that a POSITA would have been motivated to replace Squeezebox's ad-hoc "sync group" functionality with the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent in view of the identified user posts from the Sonos Forums. For instance, as explained above, I have seen other user posts from the Sonos Forums casting doubt

1  as to how overlapping groups would have worked.

2  1123.  Fifth and finally, because there is no evidence that a POSITA in 2005-06 would

3  have been motivated to modify Squeezebox in view of the identified user posts from the Sonos

4  Forums, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his

5  conclusion that a POSITA would have found the claimed invention obvious based on Squeezebox

6  in combination with the Sonos Forums, which I understand to be improper.

7  1124.  Thus, for these reasons, it is my opinion that claim 1 of the '885 Patent is not

8  rendered obvious by Squeezebox in combination with the Sonos Forums.

9  **(k)    Squeezebox in view of Sonos's 2005 System**

10  1125.  At Section VII.B of his Opening Report, Dr. Schonfeld states his opinion that

11  Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Sonos's

12  2005 system.  Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  I disagree – in my opinion,

13  Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of Sonos's

14  2005 system, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

15  1126.  As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his

16  stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox

17  in view of Sonos's 2005 system. *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.

18  Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection

19  with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious based on

20  Squeezebox, but Dr. Schonfeld also fails to provide any analysis of Squeezebox in view of Sonos's

21  2005 system in that section of his Opening Report. *Id.*  For this reason alone, I find Dr. Schonfeld's

22  opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view

23  of Sonos's 2005 system to be deficient.

24  1127.  Moreover, to the extent that Dr. Schonfeld does intend to offer an opinion that

25  Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Sonos's

26  2005 system, I disagree with such an opinion for at least the same reasons explained in my other

27  sections regarding Dr. Schonfeld's obviousness opinions that are based on Squeezebox and

28  Sonos's 2005 system, including that neither Squeezebox nor Sonos's 2005 system included any

"zone scenes" functionality at all.  Thus, even if a Squeezebox system were to be modified and combined with Sonos's 2005 system, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent.

1128.   In addition to these deficiencies, Dr. Schonfeld also fails to provide any explanation or evidence of how a Squeezebox system would have actually been modified to incorporate the functionality of Sonos's 2005 system, why a POSITA in 2005-2006 would have been motivated to modify a Squeezebox system to incorporate the functionality of Sonos's 2005 system, or how such a hypothetical system would have achieved either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent.

1129.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of Sonos's 2005 system.

### (l)      Squeezebox in view of Bose Lifestyle

1130.   At Section VII.B of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of his Bose Lifestyle reference.  Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of Bose Lifestyle, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

1131.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Bose Lifestyle. *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious based on Squeezebox, but Dr. Schonfeld also fails to provide any analysis of Squeezebox in view of Bose Lifestyle in that section of his Opening Report.  *Id*.  For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Bose

1  Lifestyle to be deficient.

2  1132.   Moreover, to the extent that Dr. Schonfeld does intend to offer an opinion that
3  Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Bose
4  Lifestyle, I disagree with such an opinion for at least the same reasons explained in my other
5  sections regarding Dr. Schonfeld's obviousness opinions that are based on Squeezebox and Bose
6  Lifestyle, including that neither Squeezebox nor Bose Lifestyle included any "zone scenes"
7  functionality at all.  Thus, even if a Squeezebox system were to be modified and combined with a
8  Bose Lifestyle system, such a hypothetical system still would not achieve either the specific player-
9  side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific
10  controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that
11  Dr. Schonfeld failed to analyze.

12  1133.   In addition to these deficiencies, Dr. Schonfeld also fails to provide any explanation
13  as to how a Squeezebox system would have actually been modified to incorporate the functionality
14  of a Bose Lifestyle system, why a POSITA in 2005-2006 would have been motivated to modify a
15  Squeezebox system to incorporate the functionality of a Bose Lifestyle system, or how such a
16  hypothetical system would have achieved either the specific player-side "zone scenes"
17  functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone
18  scenes" functionality required by Asserted Claim 1 of the '966 Patent.

19  1134.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is
20  not rendered obvious by Squeezebox in view of Bose Lifestyle.

21  **(m)    Squeezebox in view of Millington**

22  1135.   At Section VII.B of his Opening Report, Dr. Schonfeld states his opinion that
23  Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of
24  Millington.  Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.  I disagree – in my opinion,
25  Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of Millington,
26  and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

27  1136.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for this
28  opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view

of Millington. *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012. Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox in view of Millington, without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id*. For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Millington to be deficient.

1137. Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by Squeezebox in view of Millington suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1138. First, Millington was cited on the face of the '966 Patent, which shows that Millington was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Millington. *See* '966 Patent at 5 (citing to U.S. Pat. No. 8,234,395, which is a U.S. counterpart to the Millington Canadian patent relied upon by Dr. Schonfeld). Since the USPTO already considered Millington, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1139. Second, for similar reasons to those discussed above in connection with Sonos's 2005 system, Millington fails to disclose or suggest the claimed "zone scene" functionality that was missing from a Squeezebox system. *Supra* Section XV.A.ix.d. Thus, even if a POSITA in 2005-06 were to modify and combine a Squeezebox system with the identified functionality of Millington's "network audio system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone

scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1140.   Third, Dr. Schonfeld has failed to provide any explanation as to how a Squeezebox system would have actually been modified to incorporate the identified functionality of Millington's "network audio system" – let alone how that alleged combination would have achieved the claimed invention.

1141.   Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify a Squeezebox system to incorporate the identified grouping functionality of Millington's "network audio system."  As discussed above, a Squeezebox system already included ad-hoc "sync group" functionality that allowed Squeezebox players to be grouped together on demand for "synchronized" playback (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Squeezebox's ad-hoc "sync group" functionality that would have led such a POSITA to consider a different mechanism for grouping Squeezebox players – let alone would have led such a POSITA to implement the identified functionality of Millington's "network audio system."  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the identified functionality of Millington's "network audio system," particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of a Squeezebox system.

1142.   In his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine Squeezebox with Millington because "Mr. Millington worked on Sonos products that are in the same field of endeavor as the [Squeezebox], and therefore it would have been an obvious choice to look to for guidance about potential modifications to that system," and that "a POSITA would have looked to Millington to understand the Sonos System or its competitors, like Squeezebox." Schonfeld Op. Report at ¶ 754.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Squeezebox at all – let alone why a POSITA in 2005-06 would have been motivated to replace Squeezebox's ad-hoc "sync group" functionality with the grouping functionality of Millington's

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  "networked audio system."

2  1143.  I have also seen evidence of affirmative reasons why a POSITA would not have

3  been motivated to replace Squeezebox's ad-hoc "sync group" functionality with the grouping

4  functionality of Millington's "networked audio system."  For instance, Squeezebox system had a

5  different distinctly system architecture than Millington's "networked audio system" because it

6  relied on a centralized server called a SlimServer that was exclusively responsible for the "sync

7  group" functionality of a Squeezebox system.  Given this difference in the system architectures, a

8  POSITA would have been dissuaded from modifying a Squeezebox system to replace its ad-hoc

9  "sync group" functionality with the grouping functionality of Millington's "networked audio

10  system."

11  1144.  Finally, because there is no evidence that a POSITA in 2005-06 would have been

12  motivated to modify Squeezebox to combine it with the identified functionality of Millington, it

13  appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that

14  a POSITA would have found the claimed invention obvious based on Squeezebox in combination

15  with Millington, which I understand to be improper.

16  1145.  Thus, for these reasons, it is my opinion that claim 1 of the'885 Patent is not

17  rendered obvious by Squeezebox in combination with Millington.

18  **(n)    Squeezebox in view of Nourse**

19  1146.  In Section VII.B of his Opening Report entitled "'966 Claims Are Obvious Based

20  On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums,

21  the Bose Lifestyle, or Millington," Dr. Schonfeld does not identify Squeezebox in view of Nourse

22  as an obviousness combination for Asserted Claim 1 of the '966 Patent.  S Schonfeld Op. Report

23  at Section VII.B, ¶¶ 1001-1012.  However, in his earlier "Summary of Opinions" section, Dr.

24  Schonfeld includes bullets stating that "Squeezebox in combination with Nourse renders the

25  asserted claims obvious" and "Squeezebox in combination with Sonos Forums, Squeezebox,

26  Millington, and/or *Nourse* renders the asserted claims obvious."  *Id*. at ¶ 6.  In view of this

27  inconsistency, it is not clear whether Dr. Schonfeld is offering an opinion that Asserted Claim 1

28  of the'966 Patent is rendered obvious based on Squeezebox in view of Nourse, but to the extent

1    he is offering such an opinion, I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is

2    not rendered obvious by Squeezebox in view of Nourse, and Dr. Schonfeld's apparent opinion to

3    the contrary is flawed for several reasons.

4         1147.   As an initial matter, to the extent that Dr. Schonfeld is offering an opinion that that

5    Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Nourse,

6    Dr. Schonfeld fails to set forth any bases or reasoning for such an opinion.  *See* Schonfeld Op.

7    Report at Section VII.B, ¶¶ 1001-1012.   Instead, Dr. Schonfeld relies exclusively on the

8    obviousness analysis that he set forth in connection with Asserted Claim 1 of the '885 Patent,

9    without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1

10   of the '885 Patent applies to Asserted Claim 1 of the '966 Patent.  *Id*.  For this reason alone, I find

11   Dr. Schonfeld's apparent opinion that Asserted Claim 1 of the '966 Patent is rendered obvious

12   based on Squeezebox in view of Nourse to be deficient.

13        1148.   Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's

14   obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the

15   '885 Patent is rendered obvious based on Squeezebox in view of Nourse suffers from a number of

16   flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

17        1149.   First, Nourse was cited on the face of the '966 Patent, which shows that Nourse

18   was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent

19   (including Asserted Claim 1) was allowed to issue over Nourse.  *See* '966 Patent at 4.  Since the

20   USPTO already considered Nourse, I understand that Dr. Schonfeld and Google have the added

21   burden of overcoming the deference that is due to a qualified government agency, such as the

22   USPTO, that is presumed to have properly done its job based on its expertise in interpreting

23   references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid

24   patents.   However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

25        1150.   Second, for similar reasons to those discussed above in connection with Sonos's

26   2005 system, Nourse fails to disclose or suggest the claimed "zone scene" functionality that was

27   missing from a Squeezebox system.  *Supra* Section XV.A.ix.c. Thus, even if a POSITA in 2005-

28   06 were to modify and combine a Squeezebox system with the identified functionality of Nourse's

"centralized speaker system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1151.   Third, Dr. Schonfeld has failed to provide any explanation as to how a Squeezebox system would have actually been modified to combine it with the identified functionality of Nourse's "centralized speaker system" – let alone how that alleged combination would have achieved the claimed invention.

1152.   Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify a Squeezebox system to incorporate the identified functionality of Nourse's "centralized speaker system." As discussed above, a Squeezebox system already included ad-hoc "sync group" functionality that allowed Squeezebox players to be grouped together on demand for "synchronized" playback (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Squeezebox's ad-hoc "sync group" functionality that would have led such a POSITA to consider a different mechanism for grouping Squeezebox players – let alone would have led such a POSITA to implement the identified functionality of Nourse's "centralized speaker system." For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the identified functionality of Nourse's "centralized speaker system," particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of a Squeezebox system.

1153.   Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to combine Squeezebox with the identified functionality of Nourse's "centralized speaker system" in the specific manner proposed by Dr. Schonfeld. However, in addition to the fact that Dr. Schonfeld failed to provide any analysis as to how or why the combination of Squeezebox and Nourse achieves the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1154.   For instance, at paragraph 742 of his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine a Squeezbox system with Nourse because Nourse is "analogous to the '885 patent" and "reasonably pertinent to the problem to be solved by the '885 patent . . . ." Schonfeld Op. Report at ¶ 742.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to a Squeezbox system at all – let alone why a POSITA in 2005-06 would have been motivated to combine a Squeezbox system with Nourse in the specific manner proposed by Dr. Schonfeld.

1155.   At paragraph 742 of his Opening Report, Dr. Schonfeld also states as follows:

> Nourse teaches additional means for improving the user experience by allowing a user to add a playback device to multiple groups. Nourse at 3:57-4:5. It would have been desirable to allow a user to have a particular zone player join multiple groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and living room could be grouped for inside entertainment). Having a speaker join multiple groups would increase the number of customized combinations a user could configure in their home, as the Squeezebox recognizes as an important feature.

Schonfeld Op. Report at ¶ 742.  Dr. Schonfeld fails to support this statement that "[i]t would have been desirable to allow a user to have a particular zone player join multiple groups" with any evidence, but even if a POSITA in 2005-06 were to have recognized that this functionality was "desirable," I fail to see any evidence that this recognition would have motivated such a POSITA to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the identified functionality of Nourse – particularly given that (i) the existing ad-hoc "sync group" functionality of a Squeezebox already provided a mechanism for grouping Squeezebox playes together and (ii) a Squeezebox system had a distinctly different system architecture than Nourse's conventional "centralized speaker system."  Moreover, even if a POSITA in 2005-06 were to have recognized that it was "desirable" to modify a Squeezebox system to "allow a user to have a particular zone player join multiple groups" as Dr. Schonfeld contends, this still would not have motivated a POSITA to combine a Squeezebox system with the identified functionality of Nourse's "centralized speaker system" or otherwise modify a Squeezebox system in the specific ways that would have been required in order to achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr.

2  Schonfeld failed to analyze.

3       1156.   I have also seen evidence of affirmative reasons why a POSITA would not have

4  been motivated to combine a Squeezebox system with the identified functionality of Nourse's

5  "centralized speaker system."  For instance, as explained above, a Squeezebox system had a

6  distinctly different system architecture than Nourse's conventional "centralized speaker system."

7  Additionally, as explained above, Nourse's "centralized speaker system" was primary designed to

8  serve as a public address system, whereas Sonos's 2005 system was primary designed to serve as

9  home audio system.  Given these differences, it is my opinion that a POSITA would have been

10  dissuaded from modifying a Squeezebox system to combine it with the identified functionality of

11  Nourse's "centralized speaker system."

12       1157.   Finally, because there is no evidence that a POSITA in 2005-06 would have been

13  motivated to modify a Squeezebox system to combine it with the identified functionality of

14  Nourse, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his

15  conclusion that a POSITA would have found the claimed invention obvious based on Squeezebox

16  in combination with Nourse, which I understand to be improper.  *Compare* Schonfeld Op. Report,

17  ¶ 255 ("It would have been desirable to allow a user to have a particular zone player join multiple

18  groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and

19  living room could be grouped for inside entertainment). Having a speaker join multiple groups

20  would increase the number of customized combinations a user could configure in their home, as

21  the Squeezebox recognizes as an important feature.") *with* '966 Patent, 8:62-67 ("Expanding this

22  idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene

23  creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs

24  zones would be linked together in their own group, and the outside zones (in this case the patio)

25  would move into a group of its own."), 2:18-24 ("There is a need for dynamic control of the audio

26  players as a group. With a minimum manipulation, the audio players may be readily grouped. In a

27  traditional multi-zone audio system, the audio players have to be adjusted one at a time, resulting

28  in an inconvenient and non-homogenous audio environment.").

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1158. Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in combination with Nourse.

### (o) Squeezebox in view of Rajapakse

1159. In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Squeezebox in view of Rajapakse, but in his limitation-by-limitation obviousness analysis of Asserted Claim 1 of the '885 Patent as compared to Squeezebox, Dr. Schonfeld does include sub-sections discussing Rajapakse in connection with claim limitations 1.7 and 1.8 of Asserted Claim 1 of the '885 Patent. *Compare* Schonfeld Op. Report at ¶¶ 6, 461 and Section VII.B (summarizing Dr. Schonfeld's "Squeezebox" obviousness grounds without mentioning Rajapakse) *with id.* at ¶¶ 743-753, 788-795 (discussing Rajapakse as part of Dr. Schonfeld's obviousness analysis for Asserted Claim 1 of the '885 Patent as compared to Squeezebox).

1160. Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Squeezebox in view of Rajapakse, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness opinions. Nevertheless, to the extent that Dr. Schonfeld later attempts to and is permitted to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Rajapakse, I disagree.

1161. As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in view of Rajapakse. *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012. Instead, Dr. Schonfeld only discusses Rajapakse in the context of certain limitations of Asserted Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted Claim 1 of the '966 Patent.

1162. Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's discussion of Rajapakse that he includes in his analysis of Asserted Claim 1 of the '885 Patent as compared to Squeezebox suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1163.  First, as explained above, Dr. Schonfeld has failed to establish that Rajapakse qualifies as prior art to claim 1 of the '885 Patent.  *Supra* Section XIII.I.

1164.  Second, not only was Rajapakse cited on the face of several other Sonos patents as acknowledged by Dr. Schonfeld (Schonfeld Op. Report at ¶ 743), Rajapakse was also cited on the face of the '966 Patent. '966 Patent at 5.  This shows that Rajapakse was considered by the USPTO during prosecution of the '885 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Rajapakse.  Since the USPTO already considered Rajapakse, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.  However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1165.  Third, for similar reasons to those discussed above in connection with Sonos's 2005 system, Rajapakse fails to disclose or suggest the claimed "zone scene" functionality that was missing from a Squeezebox system.  *Supra* Section XV.A.ix.h. Thus, even if a POSITA in 2005-06 were to modify and combine a Squeezebox system with the identified functionality of Rajapakse's system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1166.  Fourth, Dr. Schonfeld has failed to provide any explanation as to how a Squeezebox system would have actually been modified to incorporate the identified functionality of Rajapakse's system – let alone how that alleged combination would have achieved the claimed invention.

1167.  Fifth, I disagree that a POSITA in 2005-06 would have been motivated to modify a Squeezebox system to incorporate the identified functionality of Rajapakse's system.  As discussed above, a Squeezebox system already included ad-hoc "sync group" functionality that allowed Squeezebox players to be grouped together on demand for "synchronized" playback (albeit in

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Squeezebox's ad-hoc "sync group" functionality that would have led such a POSITA to consider a different mechanism for grouping Squeezebox players together – let alone would have led such a POSITA to implement the identified functionality of Rajapakse's system. For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the identified functionality of Rajapakse's system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of a Squeezebox system.

1168. In his Opening Report, Dr. Schonfeld says that a POSITA would have found it obvious to combine Squeezebox with Rajapakse for the sole reason that "Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent" as well as third-party patents, including Google's own patents, that are "closely related to the '885 patent." Schonfeld Op. Report at ¶ 743. However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to Squeezebox at all – let alone why a POSITA in 2005-06 would have been motivated to combine Squeezebox with Rajapakse in the specific manner proposed by Dr. Schonfeld.

1169. I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine a Squeezebox system with the identified functionality of Rajapakse's system. For instance, because a Squeezebox system had a different system architecture than Rajapakse's system, it is my opinion that a POSITA would have been dissuaded from modifying a Squeezebox system to combine it with the identified functionality of Rajapakse's system.

1170. Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Squeezebox to combine it with the identified functionality of Rajapakse, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Squeezebox in combination with Rajapakse, which I understand to be improper. *See* Schonfeld Op. Report, ¶ 743 ("Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  family as the '885 patent, indicating that persons of skill in the art recognized that Rajapakse was

2  highly relevant to the claimed features.").

3      1171.  Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent

4  is not rendered obvious by Squeezebox in combination with Rajapakse.

5                     **(p)**      **Squeezebox in view of Lindemann**

6      1172.  In his Opening Report, Dr. Schonfeld never offers an opinion that any Asserted

7  Claim of either the '885 Patent or the '966 Patent is rendered obvious based on Squeezebox in

8  view of Lindemann, but in his limitation-by-limitation obviousness analysis of Asserted Claim 1

9  of the '885 Patent as compared to Squeezebox, Dr. Schonfeld does include sub-sections discussing

10  Lindemann in connection with claim limitations 1.7 and 1.8 of Asserted Claim 1 of the '885 Patent.

11  *Compare* Schonfeld Op. Report at ¶¶ 6, 461 and Section VII.B (summarizing Dr. Schonfeld's

12  "Squeezebox" obviousness grounds without mentioning Lindemann) *with id.* at ¶¶ 759-760, 796

13  (discussing Lindemann as part of Dr. Schonfeld's obviousness analysis for Asserted Claim 1 of

14  the '885 Patent as compared to Squeezebox).

15      1173.  Given that Dr. Schonfeld has not offered an opinion that any Asserted Claim of

16  either the '885 Patent or the '966 Patent is rendered obvious based on Squeezebox in view of

17  Lindemann, it is not clear what relevance these sub-sections have to Dr. Schonfeld's obviousness

18  opinions.  Nevertheless, to the extent that Dr. Schonfeld later attempts to and is permitted to offer

19  an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on Squeezebox in

20  view of Lindemann, I disagree.

21      1174.  As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that

22  would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on

23  Squeezebox in view of Lindemann.  *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1001-1012.

24  Instead, Dr. Schonfeld only discusses Lindemann in the context of certain limitations of Asserted

25  Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to

26  Asserted Claim 1 of the '966 Patent.

27      1175.  Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's

28  discussion of Lindemann that he includes in his analysis of Asserted Claim 1 of the '885 Patent as

compared to Squeezebox suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1176.   First, Lindemann was cited on the face of the '966 Patent, which shows that Lindemann was considered by the USPTO during prosecution of the '885 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Lindemann. '966 Patent at 7.  Since the USPTO already considered Lindemann, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.  However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1177.   Second, for similar reasons to those discussed above in connection with Sonos's 2005 system, Lindemann fails to disclose or suggest the claimed "zone scene" functionality that was missing from a Squeezebox system.   *Supra* Section XV.A.ix.i. Thus, even if a POSITA in 2005-06 were to modify and combine a Squeezebox system with the identified functionality of Lindemann's system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1178.   Third, Dr. Schonfeld has failed to provide any explanation as to how a Squeezebox system would have actually been modified to combine it with the identified functionality of Lindemann's system – let alone how that alleged combination would have achieved the claimed invention.

1179.   Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify a Squeezebox system to incorporate the identified functionality of Lindemann's system.  As discussed above, a Squeezebox system already included ad-hoc "sync group" functionality that allowed Squeezebox players to be grouped together on demand for "synchronized" playback (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Squeezebox's ad-hoc "sync group" functionality that would have led such a POSITA to consider a different mechanism for grouping Squeezebox players together – let alone would have led such a POSITA to implement the identified functionality of Rajapakse's system. For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of a Squeezebox system with the identified functionality of Lindemann's system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of a Squeezebox system.

1180. In his Opening Report, Dr. Schonfeld says that a POSITA would have found it obvious combine Squeezebox with Lindemann because "Lindemann was cited by many digital speaker patents regarding speaker grouping" and "Lindemann and the Squeezebox are both in the same field of endeavor." Schonfeld Op. Report at ¶ 759. However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to a Squeezebox system at all – let alone why a POSITA in 2005-06 would have been motivated to combine a Squeezebox system with Lindemann in the specific manner proposed by Dr. Schonfeld.

1181. I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine Squeezebox with the identified functionality of Lindemann. For instance, because a Squeezebox system had a different system architecture than Lindemann's "digital wireless loudspeaker system," it is my opinion that a POSITA would have been dissuaded from modifying a Squeezebox system to combine it with the identified functionality of Lindemann.

1182. Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify Squeezebox to combine it with the identified functionality of Lindemann, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on Squeezebox in combination with Lindemann, which I understand to be improper. *See* Schonfeld Op. Report at ¶571 ("Lindemann was cited by many digital speaker patents regarding speaker grouping, including patents from the same family as the '885 patent, indicating that persons of skill in the art recognized that Lindemann was highly relevant to the claimed features.").

1183. Thus, for these reasons, it is my opinion that claim 1 of the '885 Patent is not

rendered obvious by Squeezebox in combination with Lindemann.

### xi.    Summary

1184.   As discussed above, there are a number of different limitations of Asserted Claim 1 of the '966 Patent that are neither disclosed by Squeezebox nor rendered obvious by Squeezebox either in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld. Any one of these claim limitations serves as a separate basis for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld, and when taken collectively, these claim limitations provide even further support for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

1185.   Further, I note that Dr. Schonfeld appears to have only performed his obviousness analysis for claim 1 of the '885 Patent on a limitation-by-limitation basis, and has not performed any analysis or offered any opinions as to whether claim 1 of the '885 Patent as a whole would have been obviousness, which I understand to be improper.

1186.   Further yet, I note that Dr. Schonfeld has only offered obviousness opinions with respect to Squeezebox as combined with one other reference, and has not performed any analysis or offered any opinions as to whether a POSITA in 2005-06 would have been motivated to modify and combine Squeezebox with multiple different references.

1187.   Accordingly, for all of the reasons explained above, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 2.    Asserted Claim 2 is Not Rendered Obvious Based on Squeezebox

1188.   Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Patent and requires the following:

> **[2.0]**    The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:
>
>> **[2.1]**    while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and
>>
>> **[2.2]**    based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

1189.    Thus, Asserted Claim 2 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for invoking the claimed "second zone scene" at a time when the "first zone scene" is currently invoked and the first and second "zone players" are "configured to coordinate" with one another for synchronous playback in accordance with the "first zone scene."

1190.    In my opinion, Asserted Claim 2 of the '966 Patent is not rendered obvious based on Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

1191.    Indeed, because Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 2 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1192.    Moreover, it is my opinion that the additional limitations of Asserted Claim 2 of the '966 Patent are neither disclosed by Squeezebox nor rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle,

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.10-1.11, which are directed to functionality for invoking the claimed "first zone scene."   For example, as discussed above, a Squeezebox "sync group" is not a "zone scene," and a computer installed with SlimServer software did not have any functionality capability for receiving a "request to invoke" a "zone scene" or causing Squeezebox players to operate in accordance with a "zone scene" – let alone the functional capability for performing these operations with respect to two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to a Squeezebox system.  And for similar reasons, a computer installed with SlimServer software did not have any functionality capability for receiving a "request to invoke" a "second zone scene" or causing Squeezebox players to operate in accordance with a "second zone scene" at a time when a "first zone scene" having a common member is currently invoked, nor would it have been obvious to add this functionality to Sonos's 2005 system.

1193.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 2 of the '966 Patent rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, or Millington. *See* Schonfeld Op. Report at ¶ 1013.   However, I find Dr. Schonfeld's opinion regarding Squeezebox and Asserted Claim 2 of the '966 Patent to be flawed for several reasons.

1194. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and Asserted Claim 2 of the '966 Patent is shown in the screenshot below from Dr.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Schonfeld's Opening Report:

> **15.  Claim 2 Is Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington.**
>
> (i)   *Limitation 2.1 The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:*
>
> (ii)   *Limitation 2.2 while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and*
>
> (iii)   *Limitation 2.3 based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.*
>
> 1013.  *See* '966 claim 1 *supra*.  As discussed above, the Sonos system and the identified obviousness combinations disclosed the system in claim 1.  Those disclosures included the ability to receive a third request to "invoke" the first zone scene.  For the same reasons, that system also discloses the ability to "invoke" a different (second) zone scene.  Even if the Sonos system did not disclose or render obvious this requirement, the mere addition of one additional transition in a system that already permits this same transition for different "zone scenes," as described *supra*, is would have been obvious, as it is merely repeating the same steps using the same functionalities with a different "zone scene.".

1195.  This shows that Dr. Schonfeld is primarily relying on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Squeezebox in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 2 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 2 of the '966 Patent.[47]

1196.   With that said, as I have discussed above in Section XV.B.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 2 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene," an incorrect interpretation of what it means to "invoke" a "zone scene," and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1197.   The other portion of Dr. Schonfeld's section on Asserted Claim 2 of the '966 Patent appears to be a verbatim copy of language from paragraph 979 from the section of Dr. Schonfeld's Opening Report related to Sonos's 2005 system, which I already addressed above. I fail to see how this paragraph discussing Sonos's 2005 system has any relevance to Dr. Schonfeld's "Squeezebox" opinions, and it appears to me that Dr. Schonfeld's inclusion of this language in his section directed to Squeezebox may have been a copy/paste error, but in any event I disagree with this paragraph from the same reasons explained above.

---

[47] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1198.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer installed with SlimServer software did not have the functional capability required by Asserted Claim 2 of the '966 Patent, nor would it have been obvious to add this functionality to a Squeezebox system.

### 3.   Asserted Claim 4 is Not Rendered Obvious Based on Squeezebox

1199.   Asserted Claim 4 of the '966 Patent depends from claim 3 of the '966 Patent, which in turn depends from Asserted Claim 1 of the '966 Patent.  Claims 3 and 4 of the '966 Patent require as follows:

> **[3.0]**   The computing device of claim 1, **[3.1]** wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and **[3.2]** wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

> **[4.0]**   The computing device of claim 3, **[4.1]** wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

1200.   Thus, Asserted Claim 4 of the '966 Patent requires the claimed "computing device" to cause the claimed "zone scenes" to be stored at a "zone player" within the "predefined grouping" of the "first zone scene," such as the "first zone player" that is included in both the first and second "zone scenes."

1201.   In my opinion, Asserted Claim 4 of the '966 Patent is not rendered obvious based on Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

1202.   Indeed, because Asserted Claim 4 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent (through claim 3), it is my opinion that Asserted Claim 4 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1203.   Moreover, it is my opinion that the additional limitations of Asserted Claim 4 of the '966 Patent are neither disclosed by Squeezebox nor rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.6 and 1.8, which require the claimed "computing device" to have the functional capability to cause storage of the "first zone scene" and the "second zone scene."  For example, as discussed above, a Squeezebox "sync group" is not a "zone scene," and a computer installed with SlimServer software did not have any functionality capability for causing storage of a "zone scene" – let alone the functional capability for causing storage of two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to a Squeezebox system.  And for similar reasons, a computer installed with SlimServer software did not have any functionality capability for causing a "zone scene" to be stored at a Squeezebox player, nor would it have been obvious to add this functionality to a Squeezebox system.

1204.   Further even setting aside the fundamental differences between a Squeezebox "sync group" and a "zone scene," a computer installed with the SlimServer software would not "caus[e]" storage" of a "sync group" on a Squeezebox player in the "sync group."  Instead, as I have explained above, the evidence I have reviewed shows that a "sync group" was stored on and exclusively maintained by the computer installed with the SlimServer software.  *See, e.g.*, Schonfeld Op. Report at ¶ 366 ("The *SlimServer server* represents sync groups internally using the 'master', 'slaves', and 'syncgroupid' properties for a client (player)."), ¶ 368 ("The *SlimServer* persists the membership of a sync group by storing the definition of the syncgroupid property for each group member into the *SlimServer's* preferences file."); Slim/Player/Sync.pm:sync(), Sync.pm:unsync(),              Sync.pm:saveSyncPrefs();              Slim/Utils/Prefs.pm; Slim/Server/Squeezebox.pm:stream() (showing that the exact same 'strm' command was sent to every member of a "sync group" and that the 'strm' command did not include any indication that a Squeezebox player was part of a "sync group"); GOOG-SONOS-NDCA-00108095-588 GOOG-SONOS-NDCA-00108157 (explaining that the SlimServer software "powers Squeezebox"),

GOOG-SONOS-NDCA-00108162 (same), GOOG-SONOS-NDCA-00108181 (explaining that "[t]he Slimserver controls the audio buffer and playback on all the players that are synchronized together").

1205.    Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that intervening claim 3 and Asserted Claim 4 of the '966 Patent are both rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, or Millington. *See* Schonfeld Op. Report at ¶¶ 1014-1015. However, I find Dr. Schonfeld's opinion regarding Squeezebox and claims 3-4 of the '966 Patent to be flawed for several reasons.

1206. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and claims 3-4 of the '966 Patent is shown in the screenshots below from Dr.

Schonfeld's Opening Report:

> **16.    Claim 3 is Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington.**
>
> > (i)    *3. The computing device of claim 1, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.*
>
> 1014.   *See* '966 claim 1 *supra*.   As described therein, the claimed "zone scene" is transmitted to and stored at the zone player, which is "a location other than the computing device." Furthermore, the decision of where to store the zone scene, which consists of a finite list of options, is obvious.   The zone scene may be stored at the zone players, at the computing device, or on a server.   Because the prior art system is networked, there is very little if any effect of the location of storage on the efficacy and effectiveness of the prior art solution.
>
> **17.    Claim 4 Is Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington.**
>
> > (i)    *4. The computing device of claim 3, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.*
>
> 1015.   *See* '966 claim 3 *supra*.

1207.   This shows that Dr. Schonfeld is primarily relying on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.   However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 4 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 4 of the '966 Patent. [48]

1208. With that said, as I have discussed above in Section XV.B.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 4 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1209. The other portion of Dr. Schonfeld's section on intervening claim 3 of the '966 Patent appears to be a verbatim copy of paragraph 981 from the section of Dr. Schonfeld's Opening Report related to Sonos's 2005 system, which I already addressed above in the context of Dr. Schonfeld's "Sonos System" theories and also incorporate here by reference.

1210. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion a computer installed with SlimServer software did not have the functional capability required by Asserted Claim 4 of the '966 Patent, nor would it have been obvious to add this functionality to a Squeezebox system.

### 4. Asserted Claim 6 is Not Rendered Obvious Based on Squeezebox

1211. Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

---

[48] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

**[6.0]**   The computing device of claim 1, **[6.1]** wherein the first predefined grouping of zone players does not include the third zone player, and **[6.2]** wherein the second predefined grouping of zone players does not include the second zone player.

1212.   Thus, Asserted Claim 6 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene."

1213.   In my opinion, Asserted Claim 6 of the '966 Patent is not rendered obvious based on Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

1214.   Indeed, because Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 6 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1215.   Moreover, it is my opinion that the additional limitations of Asserted Claim 6 of the '966 Patent are neither disclosed by Squeezebox nor rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with Asserted Claim 1 of the '966 Patent.  For example, as discussed above, a Squeezebox "sync group" is not a "zone scene," and a computer installed with SlimServer software did not have any functionality capability for creating a "zone scene" – let alone the functional capability for creating two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to a Squeezebox system.  And for similar reasons, a computer installed with SlimServer software did not have any functionality capability for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene," nor would it have been obvious to add this functionality to a Squeezebox system.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1216.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 6 of the '966 Patent rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, or Millington.  *See* Schonfeld Op. Report at ¶ 1016.   However, I find Dr. Schonfeld's opinion regarding Squeezebox and Asserted Claim 6 of the '966 Patent to be flawed for several reasons.

1217.  As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and Asserted Claim 6 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

> 18.    **Claim 6 Is Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington.**
>
> (i)     *6. The computing device of claim 1, wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.*
>
> 1016.  *See* '966 claim 1 *supra*.  As discussed *supra*, claim 1 is disclosed or rendered obvious at least through the diclosure of non-overlapping zone scenes in the prior art.

1218.   This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent.  For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 6 of the '966 Patent amounts to a detailed and complete

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 6 of the '966 Patent. [49]

1219.   With that said, as I have discussed above in Section XV.B.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 6 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of Squeezebox functionality and the evidence related thereto.

1220.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the a computer installed with SlimServer software did not have the functional capability required by Asserted Claim 6 of the '966 Patent, nor would it have been obvious to add this functionality to a Squeezebox system.

### 5.    Asserted Claim 8 is Not Rendered Obvious Based on Squeezebox

1221.   Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

1222.   Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

> **[8.0]**   The computing device of claim 1, **[8.1]** wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, **[8.2]** wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and **[8.3]** wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

1223.   Thus, Asserted Claim 8 of the '966 Patent requires the claimed "computing device" to be programmed with the functional capability to receive "requests" for creating and invoking "zone scenes" that take the form of "one or more inputs" received "via a user interface."

[49] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1224.   In my opinion, Asserted Claim 8 of the '966 Patent is not rendered obvious based on Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

1225.   Indeed, because Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 8 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1226.   Moreover, it is my opinion that the additional limitations of Asserted Claim 8 of the '966 Patent are neither disclosed by Squeezebox nor rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with Asserted Claim 1 of the '966 Patent.  For example, as discussed above, a Squeezebox "sync group" is not a "zone scene," and a computer installed with SlimServer software did not have any functionality capability for receiving requests to create or invoke a "zone scene" – let alone the functional capability for receiving requests to create two different, overlapping "zone scenes" and then receiving a request to invoke one of the "zone scenes" – nor would it have been obvious to add this functionality to a Squeezebox system.  And for similar reasons, a computer installed with SlimServer software did not have any functionality capability for receiving requests to create or invoke "zone scenes" that take the form of "one or more inputs" received "via a user interface," nor would it have been obvious to add this functionality to a Squeezebox system.

1227.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 8 of the '966 Patent rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, or Millington.  *See* Schonfeld Op. Report at ¶ 1017.  However, I find Dr. Schonfeld's opinion regarding Squeezebox and

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Asserted Claim 8 of the '966 Patent to be flawed for several reasons.

1228.  As an initial matter, the entirety of Dr. Schonfeld's discussion regarding Squeezebox and Asserted Claim 8 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

---

**19.    Claim 8 Is Obvious Based On Squeezebox in view of General knowledge of a POSITA, the Sonos System, the Sonos Forums, the Bose Lifestyle, or Millington.**

(i)    *8. The computing device of claim 1, wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.*

1017.  *See* '966 claim 1 *supra.*

---

1229.  This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Squeezebox in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Squeezebox in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent.  For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 8 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 6 of the '966

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    Patent. [50]

2    1230.   With that said, as I have discussed above in Section XV.B.1 as well as in my '885

3    Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of

4    Squeezebox in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws,

5    many of which are applicable to Asserted Claim 8 of the '966 Patent as well – including that his

6    analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone

7    scene" and an inaccurate and misleading characterization of Sonos's 2005 system functionality

8    and the evidence related thereto.

9    1231.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that a computer

10   installed with SlimServer software did not have the functional capability required by Asserted

11   Claim 8 of the '966 Patent, nor would it have been obvious to add this functionality to a

12   Squeezebox system.

13                 **6.    Asserted Claim 9 is Not Rendered Obvious Based on Squeezebox**

14   1232.   For the same reasons already discussed above in connection with Asserted Claim 1

15   of the '966 Patent, in my opinion, Asserted Claim 9 of the '966 Patent is not rendered obvious by

16   Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos

17   Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr.

18   Schonfeld.

19                 **7.    Asserted Claim 10 is Not Rendered Obvious Based on Squeezebox**

20   1233.   For the same reasons already discussed above in connection with Asserted Claim 2

21   of the '966 Patent, in my opinion, Asserted Claim 10 of the '966 Patent is not rendered obvious

22   by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos

23   Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr.

24   Schonfeld.

25                 **8.    Asserted Claim 12 is Not Rendered Obvious Based on Squeezebox**

26   1234.   For the same reasons already discussed above in connection with Asserted Claim 4

27   _____

28   [50] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies
     in his Opening Report, I expressly reserve my right to respond.

of the '966 Patent, in my opinion, Asserted Claim 12 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 9. Asserted Claim 14 is Not Rendered Obvious Based on Squeezebox

1235.   For the same reasons already discussed above in connection with Asserted Claim 6 of the '966 Patent, in my opinion, Asserted Claim 14 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 10. Asserted Claim 16 is Not Rendered Obvious Based on Squeezebox

1236.   For the same reasons already discussed above in connection with Asserted Claim 8 of the '966 Patent, in my opinion, Asserted Claim 16 of the '966 Patent is not rendered obvious by Squeezebox in view of the general knowledge of a POSITA, Sonos's 2005 system, the Sonos Forums, Bose Lifestyle, Millington, or any of the other secondary references identified by Dr. Schonfeld.

### C. The Bose Lifestyle 50 System

1237.   In the section of his Opening Report where he addresses the Asserted Claims of the '966 Patent, Dr. Schonfeld opines that that the Asserted Claims of the '966 patent are rendered obvious based on the Bose Lifestyle 50 System (which he often refers to as just "Bose Lifestyle") in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington." *See* Schonfeld Op. Report at ¶¶ 1034-1065; *see also id.* at ¶ 855. I disagree.

1238.   As an initial matter, Dr. Schonfeld fails to set forth any basis or reasoning for his opinion that the Asserted Claims of the '966 Patent are rendered obvious based on the Bose Lifestyle 50 System in view of "General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington." *Id.* Instead, with respect to the Asserted Claims of the '966 Patent, Dr. Schonfeld relies exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent by merely citing to that portion of his Opening Report. *Id.*

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

In so doing, Dr. Schonfeld has failed to even acknowledge the fact that the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, let alone provide any explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, it is my opinion that Dr. Schonfeld has failed to provide any basis or reasoning for his opinion that the Asserted Claims of the '966 patent are rendered obvious based on the Bose Lifestyle 50 System in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington." *Id.*

1239. Given Dr. Schoenfeld's reliance on his prior discussion of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent, where appropriate, I have cited to and incorporated by reference my rebuttal analysis and opinions regarding Asserted Claim 1 of the '885 Patent from my '885 Rebuttal Report. However, unlike Dr. Schonfeld, I have also provided analysis in the context of the Asserted Claims of the '966 Patent, as set forth below. To the extent Dr. Schonfeld is permitted to later provide analysis and/or new opinions regarding the Asserted Claims of the '966 Patent, I reserve my right to address such analysis and/or opinions in a supplemental report and/or at trial.

1240. Based on my analysis of the Asserted Claims of the '966 Patent and the cited references, I disagree with Dr. Schonfeld's unsupported opinion that the Asserted Claims of the '966 Patent are rendered obvious based on the Bose Lifestyle 50 System in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington." *Id.*

1241. To begin, Dr. Schonfeld has relied on various evidence for his "Bose Lifestyle 50 System" reference that does not qualify as prior art, as I already explained above.

1242. Further, as explained below, it is my opinion that the Bose Lifestyle 50 System failed to disclose at least the following limitations of the Asserted Claims of the '966 Patent:

*Claims 1 and 9*

- A "zone scene" comprising a "predefined grouping of zone players . . . that are to be configured for synchronous playback of media when the . . . zone scene is invoked";

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

- **[1.4] / [1.5]** and **[9.1] / [9.2]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4] / [1.6]** and **[9.1] / [9.3]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene";

- **[1.4] / [1.7]** and **[9.1] / [9.4]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4] / [1.8]** and **[9.1] / [9.5]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene";

- **[1.4] / [1.9]** and **[9.1] / [9.6]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "displaying a representation of the first zone scene and a representation of the second zone scene";

- **[1.4] / [1.10]** and **[9.1] / [9.7]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" and "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene"; and

- **[1.11]** and **[9.8]** "based on the third request, causing the first zone player to

transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player".

*Claims 2 and 10 (depending from claims 1 and 9)*

- **[2.0]** "The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[10.0]** "The non-transitory computer-readable medium of claim 9, wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[2.1]** and **[10.1]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene"; and

- **[2.2]** and **[10.2]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene".

*Claims 3 and 11 (depending from claims 1 and 9)*

- **[3.0]** "The computing device of claim 1";

- **[11.0]** "The non-transitory computer-readable medium of claim 9";

- **[3.1]** and **[11.1]** "wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device"; and

- **[3.2]** and **[11.2]** "wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device".

*Claims 4 and 12 (depending from claims 3 and 11)*

- **[4.0]** "The computing device of claim 3";

- **[12.0]** "The non-transitory computer-readable medium of claim 11";

- **[4.1]** and **[12.1]** "wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players".

*Claims 6 and 14 (depending from claims 1 and 9)*

- **[6.0]** "The computing device of claim 1";

- **[14.0]** "The non-transitory computer-readable medium of claim 9";

- **[6.1]** and **[14.1]** "wherein the first predefined grouping of zone players does not include the third zone player"; and

- **[6.2]** and **[14.2]** "wherein the second predefined grouping of zone players does not include the second zone player".

*Claims 8 and 16 (depending from claims 1 and 9)*

- **[8.0]** "The computing device of claim 1";

- **[16.0]** "The non-transitory computer-readable medium of claim 9";

- **[8.1]** and **[16.1]** "wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device";

- **[8.2]** and **[16.2]** "wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface"; and

- **[8.3]** and **[16.3]** "wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface".

1243. Further yet, it is my opinion that these limitations that were missing from Dr. Schonfeld's "Bose Lifestyle 50" reference also would not have been obvious based on the Bose Lifestyle 50 System in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington." This opinion is based in part on the fact that I have not seen any evidence showing an apparent reason why a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System and/or combine it with any of the references identified by Dr. Schonfeld in order achieve the claimed inventions of the '966 Patent. I have also seen other objective, real-world evidence demonstrating that a POSITA in 2005-06 would not have found the Asserted Claims of the '966 Patent to have been obvious, which stands in stark contrast to Dr. Schonfeld's failure to support his obviousness opinions with any objective evidence.

1244. My opinions regarding the non-obviousness of the Asserted Claims of the '966 Patent over the Bose Lifestyle 50 System in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington" are further supported by the fact that various of the secondary references identified by Dr. Schonfeld were considered by USPTO during prosecution

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

of the '966 Patent, which was then allowed to issue over these references.  In particular:

- The Nourse patent as well as its prior publication were considered during prosecution of the '966 Patent (*see* '966 Patent at p. 4, 6);

- The Rajapakse patent as well as its prior publication were considered during prosecution of the '966 Patent (*see* '966 Patent at p. 5, 7); and

- Several U.S. counterparts to the Millington Canadian patent relied upon by Dr. Schonfeld were considered during prosecution of the '966 Patent, including U.S. Pat. No. 8,234,395 (*see* '966 Patent at p. 5).

1245.    Because the USPTO considered these references during prosecution of the '966 Patent and then decided to grant the '966 Patent (including Asserted Claims 1, 2, 4, 6, 8, 9, 10, 12, 14, 16) over these references, I understand that Dr. Schonfeld has the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.    However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.[51]

1246.    In his Opening Report, Dr. Schonfeld states that "[s]imply because the USPTO cited certain references during prosecution does not mean that these references were considered – the USPTO did not rely on any of these references as the basis for its rejections."  Schonfeld Op. Report at ¶ 327.  I disagree.  While the Examiner did not rely on the above-identified references as a basis for his preliminary rejections, the references identified above were all considered by the

---

[51] I further note that, with respect to Dr. Shconfeld's "Bose Lifestyle 50 System" reference, the "The Bose Lifestyle 50 System. Owner's Guide, Oct. 17, 2001, 55 pages" was considered during prosecution of the related '885 Patent (see '885 Patent at p. 26), as was the "Bose Lifestyle SA-2 and SA-3 Stereo Amplifier Owner's Guide, 2004, 32 pages (see '885 Patent at p. 21).  Further, with respect to the Bose Lifestyle 50 System, during prosecution of the '885 Patent, the Examiner stated in his Reasons for Allowance that "Bose does not allow dynamic additions and subtractions such as the synchronous addition of a particular third media player and removal of a second media player in substantially real time by the selection of an appropriately configured scene, nor does Bose enable scene-wise storage of such diverse groupings of media players."  *See* August 19, 2020 Notice of Allowance.  Likewise, in his Examiner-Initiated Interview Summary that issued on the same day as the Notice of Allowance, the Examiner stated that he and Sonos "[d]iscussed the manner in which the instant claims feature beyond the Bose [Lifestyle 50 System] reference in as much as Bose does not discuss the claims selectively dynamic groupings of media players."  *See* August 19, 2020 Examiner-Initiated Interview Summary (regarding a July 31, 2020 interview).

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Examiner as indicated by the Examiner's statement that "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH," followed by the Examiner's signature. Thus, it is my understanding that the Examiner did consider the references identified above and determined that the claimed inventions of the '966 Patent were novel and non-obvious over those references.

1247. After suggesting that the USPTO did not consider the above-identified references, Dr. Schonfeld then states that "the USPTO did not have the benefit of the Court's claim construction for 'zone scene.'" Schonfeld Op. Report at ¶ 327. However, Dr. Schonfeld does not explain how this assertion is related to whether or not the USPTO considered the references or how "hav[ing] the benefit of the Court's claim construction for 'zone scene'" would have had any impact on the USPTO's decision to grant the '966 Patent. Regardless, for the reasons explained below, it is my opinion that the USPTO's decision to grant the '966 Patent over the above-identified references was correct, because those references fail to anticipate or render obvious any of the Asserted Claims of the 966 Patent.

1248. In the sub-sections below, I have provided a summary of the bases for my opinions, as well as responses to Dr. Schonfeld's opinions.

### 1.     Asserted Claim 1 is Not Rendered Obvious Based on The Bose Lifestyle 50 System

1249. For the reasons discussed below, in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of "[g]eneral knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington."

#### i.     Dr. Schonfeld Fails to Map his Alleged "Bose Lifestyle 50 System" Reference to the Claimed Devices of Claim 1

1250. Asserted Claim 1 of the '966 Patent requires a physical "computing device" that is configured to "serv[e] as a controller for a networked media playback system" comprising at least three different physical "zone players."

1251. In Dr. Schonfeld's Opening Report, he fails to set forth any analysis of the Bose Lifestyle 50 System in connection with Asserted Claim 1 of the '966 Patent, and instead merely cites back to certain aspects of his analysis of the Bose Lifestyle 50 System in the context of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    Asserted Claim 1 of the '885 Patent.  Schonfeld Op. Report at ¶¶ 1034-1065.  Thus, Dr. Schonfeld

2    fails to articulate what he considers to be the "computing device," the "zone players," and the

3    "networked media playback system" of Asserted Claim 1 of the '966 Patent in his "Bose Lifestyle

4    50 System" reference.

5        1252.  Moreover, Dr. Schonfeld's analysis in his Opening Report of the Bose Lifestyle 50

6    System in connection with Asserted Claim 1 of the '885 Patent does not provide any clarity on

7    these issue as it is unclear what devices in the Bose Lifestyle 50 System Dr. Schonfeld is mapping

8    to the "network device," the "zone players," and the "networked media playback system" of

9    Asserted Claim 1 of the '885 Patent.  *See* Schonfeld Op. Report at ¶¶ 855-962.

10        1253.  To the extent Dr. Schonfeld is permitted to later provide analysis and/or new

11    opinions regarding the Asserted Claims of the '966 Patent, I reserve my right to address such

12    analysis and/or opinions in a supplemental report and/or at trial.

13        **ii.    The Bose Lifestyle 50 System did not have "Zone Players"**

14        1254.  Asserted Claim 1 of the '966 Patent requires a "computing device" that is

15    programmed with certain functional capability including "serving as a controller for a networked

16    media playback system comprising a first zone player and at least two other zone players."  As

17    noted above, Sonos's proposed construction of "zone player" as that term is used in the '966 Patent

18    is a "data network device configured to process and output audio."  *Supra* Section X.B.  And related

19    to this proposed construction, Sonos's interpretation of the plain and ordinary meaning of the term

20    "data network" is "a medium that interconnects devices, enabling them to send digital data packets

21    to and receive digital data packets from each other."  *Id*.

22        1255.  As an initial matter, it is not clear what devices in the Bose Lifestyle 50 System Dr.

23    Schonfeld is alleging to be the claimed "zone players."  *See* Schonfeld Op. Report at ¶¶ 859-865.

24    Instead, his analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885

25    Patent, Dr. Schonfeld merely states that the "Bose Lifestyle player corresponds to the claimed

26    Zone Player and it provides the ability to stream music from a controller over a Wi-Fi or ethernet

27    network."  *Id*. at 859.  I am unaware of any device in the Bose Lifestyle 50 System called the "Bose

28    Lifestyle player."  For this reason alone, Dr. Schonfeld has failed to prove that the Bose Lifestyle

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

50 System discloses the "zone players" of Asserted Claim 1 of the '966 Patent.

1256.   Regardless, in my opinion, the Bose Lifestyle 50 System fails to disclose "zone players" for at least the following reasons.

1257.   First, to the extent Dr. Schonfeld is arguing that either a Jewel Cube speaker, an Acoustimass module, or an SA-2 or SA-3 amplifier as a "zone player," I disagree.  Applying Sonos's constructions of "zone player" and "data network," neither a Jewel Cube speaker, nor an Acoustimass module, nor an SA-2 or SA-3 amplifier is a "first zone player" because these devices (i) are not data network devices that can send digital data packets to and receive digital data packets from another device and (ii) are not capable of performing any digital data processing on the audio before outputting it.  Instead, the evidence I have reviewed shows that a Jewel Cube speaker merely receives an audio signal over an audio cable from an Acoustimass module or SA-2 or SA-3 amplifier and outputs audio, and that an Acoustimass module or SA-2 or SA-3 amplifier receives an audio signal over an audio cable from the Multi-Room Interface of the Bose Lifestyle 50 system and outputs audio.  *See* BOSE_SUB-0000001-55 at 7, 11-12, 14-15, 42; BOSE_SUB-0000361-448 at 376.  There is no evidence of two-way digital data packet communication between a Jewel Cube speaker and an Acoustimass module or SA-2 or SA-3 amplifier, or between an Acoustimass module or SA-2 or SA-3 amplifier and the Multi-Room Interface of the Bose Lifestyle 50 system.  There is also no evidence of any communication whatsoever between Jewel Cube speakers or between Acoustimass modules or SA-2 or SA-3 amplifiers when these products are used with a Multi-Room Interface of the Bose Lifestyle 50 system, as Dr. Schonfeld appears to be asserting.  And lastly, there is no evidence that these devices perform any digital data processing before outputting the audio.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1258.  Second, to the extent Dr. Schonfeld is arguing that a Jewel Cube speaker of the Bose Lifestyle 50 System is the "first zone player," I disagree because a Jewel Cube speaker is not configured to *process* and output audio.  Instead, a Jewel Cube speaker is a passive speaker that is hard-wired to an Acoustimass module and simply outputs audio in the form of sound once an analog signal is received via an audio cable.  *See* BOSE_SUB-0000001-55 at 7, 11-12.



**Connecting the Jewel Cube® speakers to the Acoustimass® module**

1. Match each cable to the corresponding speaker location.
   - Front speaker cables have blue RCA connectors at one end, with L, R, or C molded into both the RCA connectors and the Jewel Cube connectors at the other end.
   - Surround speaker cables have orange RCA connectors at one end, with L or R molded into both the RCA connectors and the Jewel Cube connectors at the other end.
2. Insert the Jewel Cube connector of each cable fully into the jack on the rear of one of the five speakers (Figure 7). Match the ridge of the connector to the notch at the top of the jack.
3. Connect each cable to the corresponding jack on the Acoustimass module (Figure 8).
   - Plug the blue connectors into the matching left front, center, and right front jacks.
   - Plug the orange connectors into the matching left surround and right surround jacks.

To lengthen the cable, connect speaker wire with male phono (RCA) plugs on each end to your supplied speaker cable. Use a female-to-female adapter ("barrel" connector). Or, splice in 18-gauge (.75 mm²) or thicker cord (connecting + to + and – to –). To purchase extension wire, see your dealer or electronics store, or call Bose® Customer Service.

*Figure 7*

*Connecting speaker cables to Jewel Cube speakers*



Jewel Cube
speakers

1259.   Third, to the extent Dr. Schonfeld is arguing that an SA-2 or SA-3 amplifier is a "zone player," I further disagree on the basis that an SA-2 or SA-3 amplifier is not part of the actual Bose Lifestyle 50 System, which is shown below:



BOSE_SUB-0000001-55 at 7.

1260.   Regardless, if an SA-2 or SA-3 amplifier were actually connected to the Multi-Room Interface of the Bose Lifestyle 50 System, it appears to me that it would operate like an

Acoustimass module in the sense that it would receive an audio signal over an audio cable from the Multi-Room Interface of the Bose Lifestyle 50 system with no two-way digital data packet communication between an SA-2 or SA-3 amplifier and the Multi-Room Interface of the Bose Lifestyle 50 system. *See* BOSE_SUB-0000001-55 at 11-12, 42; BOSE_SUB-0000361-448 at 376.

1261.  Further, neither a Jewel Cube Speaker, Acousitmass module, or SA-2 or SA-3 amplifier is a "zone player" as required by the Asserted Claims of the '966 Patent because they did not have the capability to change their "configur[ation]" as it related to audio playback in order to transition between "standalone mode" and grouped mode.

1262.  Herein, I sometimes refer to a device that can be used in a Bose Lifestyle 50 System to output audio – including an Acoustimass module, an SA-2 or SA-3 amplifier, and/or a connected speaker (e.g., Jewel Cube Speaker), as a "Lifestyle player."

### iii.    The Bose Lifestyle 50 System did not have "Zone Scenes" Functionality

1263.  Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with certain functional capability for creating and invoking a "zone scene," which is a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that the group can be invoked later on demand for synchronous playback.  And more specifically, Asserted Claim 1 of the '966 Patent requires a "computing device" that is programmed with functional capability for creating multiple "zone scenes" having an overlapping "zone player" and then later invoking one of the "zone scenes."

1264.  As explained above in Sections IX and XV.A.1.i, there a several key distinctions between a "zone scene" and the types of temporary, ad-hoc groups that could be created by a user in prior art systems such as the Bose Lifestyle 50 System.

1265.  Based on the evidence I have reviewed regarding Dr. Schonfeld's "Bose Lifestyle 50 System" reference, it is my opinion that neither the Personal Music Center (which serves as a wireless remote control for the actual Bose Lifestyle 50 System), nor the Personal Music Center in combination with the centralized Multi-Room Interface of the Bose Lifestyle 50 System, nor any of the other Bose controllers alone or in combination with other centralized audio distribution

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

devices in the various Bose documents relied on by Dr. Schonfeld had ***any*** functional capability for creating or invoking a "zone scene" – let alone the required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause a selected one of the two different "zone scenes" to be invoked, as required by Asserted Claim 1 of the '966 Patent.

1266.  As explained above, the evidence I reviewed indicates that the Personal Music Center of the Bose Lifestyle 50 System enabled a user to set up a "shared source" of audio that could be distributed via audio cables from the centralized Multi-Room Interface to Lifestyle players in up to four rooms (rooms A, B, C, and D) so that the same audio could be played back simultaneously[52] via the Lifestyle players and their connected speakers (e.g., the Jewel Cube speakers of the Bose Lifestyle 50 System).  BOSE_SUB-0000001-55 at 44-45.  Based on the Bose Lifestyle 50 System evidence I reviewed, setting up a "shared source" was the only way to create any sort of "group" of Lifestyle players that were capable of playing back the same audio simultaneously.   Herein I sometimes refer to such a group of Lifestyle players as a "shared source group."

1267.  As an example, to set up a "shared source group" in two rooms A and B, a user could (1) use the ROOM button on the Personal Music Center to select room A and then use a source button to set an audio source for room A; and (2) use the ROOM button on the Personal Music Center to select room B and then use the same source button to set the same audio source for room B.  Thereafter, the user could use the ROOM button again to select both rooms A and B together such that both rooms could be controlled together:

---

[52] Notably, the Owner's Guide for the Bose Lifestyle 50 System does not describe a group of Lifestyle players as outputting audio in "synchrony," and it is my opinion that this configuration would not have provided "synchronous playback of media" as that phrase is used in the context of the '966 Patent, because such a configuration would not have involved any coordination between the Lifestyle players or their connected speakers that had been grouped.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

## Setting up a shared source

Now, let's say the system is already on and you want to play the FM radio in rooms A and B:

1. Wake up the Personal music center.
2. Press the ROOM button until the room indicator Ⓐ is displayed. Press the FM source button and adjust the volume to the desired level for room A.
3. Press the ROOM button again to select room Ⓑ. Press the FM source button and adjust the volume to the desired level for room B. Now, the indicators A Ⓑ are displayed.
4. Press the ROOM button again. The indicators Ⓐ Ⓑ appear on the display indicating that you can control these two rooms together. Any button command given now (SOURCE, VOLUME, MUTE, ON/OFF, SLEEP) is applied to both rooms.

BOSE_SUB-0000001-55 at 44.

1268.   Alternatively, a user could set up a "shared source group" for all the available rooms A-D by pressing the HOUSE button on the Personal Music Center followed by pressing a source button to select the audio source that the user wanted to listen to in all rooms:

## Using the HOUSE button

Using the HOUSE button, you can link all rooms together and control them as one. When you press the HOUSE button, an empty box indicator is displayed for each connected room.  Any button pressed after that (any source button, VOLUME, MUTE, or SLEEP) affects every room. When you are done listening you can press OFF to turn off the entire system.

**Note:** If you do not press any additional buttons after pressing HOUSE, pressing HOUSE again cancels HOUSE mode.

BOSE_SUB-0000001-55 at 45.[53]

1269.   As explained above, when a user set up a "shared source group" in one of the ways described above, the evidence I have reviewed indicates that the Personal Music Center would communicate with the centralized Multi-Room Interface and the centralized Multi-Room Interface would configure itself to distribute the same audio from the same audio source to each of the rooms sharing the source so that the same audio could be played back simultaneously via the Lifestyle players.  *See, e.g.,* BOSE_SUB-0000001-55 at 6 ("The Bose Multi-Room Interface, with four

---

[53] It is worth noting that pressing the HOUSE button itself does not cause, and is not used to configure, all the players to play audio in synchrony.  For example, to control multiple players that are each playing different audio, a user could press the HOUSE button followed by pressing the mute button to mute all the players.  *See* BOSE_SUB-0000001-55 at 45.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD player and an Acoustimass module connected the Multi-Room Interface), 17 (illustrating various audio sources connected to Multi-Room Interface via audio input cables), 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface…. If the music center continuously displays "NO RESPONSE," you need to try to establish its link with the multi-room interface again."), 42 (Figure 47 showing "AUDIO OUTPUT" jacks for each room), 44-45 (explaining how to use ROOM and HOUSE buttons of the Personal Music Center to set up an audio source for one or more rooms connected to the Multi-Room Interface), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE.").  In this regard, the simultaneous audio playback in multiple rooms sharing a source was controlled exclusively by the centralized Multi-Room Interface and its ability to output the same source via the "AUDIO OUTPUT" jacks to each room in the "shared source group."  In other words, when a "shared source group" was activated, neither the Lifestyle players nor their connected speakers would change their configuration as it relates to audio playback.  Instead, they would just play back the audio that they received from the centralized Multi-Room Interface in the same manner that would have played audio received from the centralized Multi-Room Interface had they not been added to a "shared source group."  As such, there would be no coordination between the Lifestyle players in a "shared source group" and the Lifestyle players would not have had any awareness of whether or not they were part of a "shared source group."

1270.  Further, the evidence I have reviewed indicates that once a "shared source group" was set up, a Lifestyle player sharing the audio source could not thereafter be used for individual audio playback until a user used the ROOM button of the Personal Music Center to select the Lifestyle player and then used a source button to set the audio source for the Lifestyle player to a different audio source such that it no longer shares an audio source with other Lifestyle players.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

*Id*. at 44 ("Returning to single-room control[:] After you have gained control of multiple rooms using the ROOM button, you can use the ROOM button again to gain control of a single room. Press ROOM until the room you want is displayed (A, B, C, or D). Control that room as desired.").  In this way, a group of Lifestyle players having a "shared source" of audio would have to be destroyed before any one of the Lifestyle players in the group could be used for individual audio playback.

1271.  Based on the foregoing evidence, it is clear that a "shared source group" of Lifestyle players only existed temporarily during the limited time that the "shared source group" was activated for playback, and as soon as a user wanted to use a Lifestyle player in an existing "shared source group" for individual playback or wanted to create a new "shared source group" that included one or more of the Lifestyle players in the existing "shared source group", the existing "shared source group" would need to be destroyed by removing the one or more Lifestyle players that the user wanted to use for individual playback or wanted to include in a new "shared source group" of Lifestyle players.  As a result, the only way a user could use a "shared source group" having that same group membership again in the future was by re-creating a new temporary "shared source group" that included the same members as the previously-existing "shared source group".  And as explained above, such a temporary, ad-hoc group that was automatically activated at the time of creation and then only remained in existence during the limited time it was activated is distinctly different from a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.

1272.  Indeed, as an initial matter, a "shared source group" of Lifestyle players was not a pre-saved group that was available to be *later invoked on demand* for synchronous playback at some time after the creation of the "shared source group", which is a fundamental requirement of the claimed "zone scenes."  To the contrary, the Bose Lifestyle 50 System evidence I have reviewed makes clear that a "shared source group" of Lifestyle players was a temporary, ad-hoc group that was automatically activated at the time it was created and then only remained in existence until the time that the "shared source group" was deactivated, at which time the "shared

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

source group" would be automatically destroyed such that the "shared source group" was <u>not</u> available to be *later invoked on demand* for synchronous playback.  *See, e.g.,* BOSE_SUB-0000001-55 at 43 ("A shared source is one that is playing in the controlled room as well as in up to three additional rooms"), 44 ("Setting up a shared source[:] … Press the ROOM button again. The Ⓐ Ⓑ indicators appear on the display indicating that you can control these two rooms together. Any button command given now (SOURCE, VOLUME, MUTE, ON/OFF, SLEEP) is applied to both rooms."), 44 ("Returning to single-room control[:] After you have gained control of multiple rooms using the ROOM button, you can use the ROOM button again to gain control of a single room.  Press ROOM until the room you want is displayed (Ⓐ, Ⓑ, Ⓒ, or Ⓓ). Control that room as desired."), 45 ("Press the HOUSE button before each command to apply the command to all rooms: Press … HOUSE then a source [to] [p]lay the selected source in all connected rooms.").[54]

1273.   Further, a "shared source group" of Lifestyle players was not a pre-saved group that was *able to exist in an inactive state* in which the pre-saved group was available for selection by a user but the "zone players" in the pre-saved group could still be used for individual audio playback, which is another fundamental requirement of the claimed "zone scenes."  To the contrary, the Bose Lifestyle 50 System evidence I have reviewed makes clear that a "shared source group" of Lifestyle players was only able to exist in an active state during which time it was not possible for a user to use any of the Lifestyle players added to the "shared source group" for individual audio playback, and once a "shared source group" was deactivated, it would be automatically destroyed such that it was no longer available for selection by a user.  *See, e.g.,* BOSE_SUB-0000001-55 at 44 ("Returning to single-room control[:] After you have gained control of multiple rooms using the ROOM button, you can use the ROOM button again to gain control of a single room.  Press ROOM until the room you want is displayed (Ⓐ, Ⓑ, Ⓒ, or Ⓓ). Control that room as desired.").

1274.   Further yet, a "shared source group" of Lifestyle players was not a pre-saved group of "zone players" that are "*to be configured for synchronous playback of media*" when the pre-

---

[54] Like Squeezebox, the Bose Lifestyle 50 System utilizes temporary, ad-hoc grouping that is controlled by a centralized device – the SlimServer of Squeezebox and the Multi-Room Interface of the Bose Lifestyle 50 System.  As such, the Bose Lifestyle 50 System suffers from many of the same defects with respect to Asserted Claim 1 of the '996 Patent as Squeezebox.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

saved group is "invoked" for the additional reason that the invocation of a "shared source group" – which took place automatically at the time the "shared source group" was created – did not involve any change to the *configuration* of the Lifestyle players as its relates to audio playback, which is another requirement of the claimed "zone scene." To the contrary, the Bose Lifestyle 50 System evidence I have reviewed indicates that a Lifestyle player added to a "shared source group" would have had the same configuration for audio playback both before and after the "shared source group" was invoked. BOSE_SUB-0000001-55 at 6 ("The Bose Multi-Room Interface, with four independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD player and an Acoustimass module connected the Multi-Room Interface), 17 (illustrating various audio sources connected to Multi-Room Interface via audio input cables), 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface…. If the music center continuously displays "NO RESPONSE," you need to try to establish its link with the multi-room interface again."), 42 (Figure 47 showing "AUDIO OUTPUT" jacks for each room), 44-45 (explaining how to use ROOM and HOUSE buttons of the Personal Music Center to set up an audio source for one or more rooms connected to the Multi-Room Interface), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE."); BOSE_SUB-0000684-687 at 684-685. In fact, based on my review of the Bose Lifestyle 50 System evidence, it appears that a Lifestyle player and/or its connected speakers would not have had any awareness that it had been added to a "shared source group" that would have prompted the Lifestyle player to change its configuration for audio playback – the information about a "shared source group" would have been exclusively maintained by the Multi-Room Interface.

1275. Further yet, a "shared source group" of Lifestyle players was not capable of having a group member that was also a member of a different "shared source group" available for selection by a user, which is another requirement of the claimed "zone scenes." To the contrary, a Lifestyle

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

player could only be a member of one "shared source group" that was in existence at any given time, and the only way a Lifestyle player in a first "shared source group" could have been added to a second "shared source group" was to destroy the first "shared source group."

1276.   Further yet, the Bose Lifestyle 50 System evidence I have reviewed confirms that there was no ability for a user to assign a thematic name to a "shared source group," which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene," as interpreted by the Court.

1277.   Further yet, a "shared source group" does not comprise a user-customized, pre-saved group of "zone players" as required by a "zone scene," because the Jewel speakers, Acoustimass Modules, and/or SA2 or SA3 amplifiers are not "zone players," as described above.

1278.   Finally, the Bose Lifestyle 50 System is the type of "conventional multi-zone audio system" that the '966 Patent describes as having limitations with regard to grouping and that the "zone scenes" functionality of the '96 Patent distinguished and improved upon.  *See* '966 Patent at 1:30-2:24; *see also* Case No. 20-6754, D.I. 309 at 3-5, 12.

1279.   Thus, for at least these reasons, it is my opinion that a "shared source group" of Lifestyle players in a Bose Lifestyle 50 System does not constitute a "zone scene."

1280.   Further, with respect to creating a "shared source group" using the "HOUSE" button to cause the Multi-Room Interface to output the same audio to all rooms in a home, this "HOUSE" option appears to be hard-coded into the Personal Music Center.  It was not a user-created, customized group that was predefined and pre-saved at a user's request as part of an initial "setup" phase, which is a required aspect of the claimed "zone scenes."  *See* Case No. 20-6754, D.I. 309 at 4 (the Court finding that Sonos's patented "zone scene" technology ""allows a *user to customize and save* multiple groups of smart speakers or other players . . . and then later 'activate a *customized* group, called a 'zone scene,' on demand), 8 (the Court noting that the "basic purpose of the invention . . . is to allow *users to pre-save customized speaker groups* and later 'invoke' the named group on demand"), 12 (the Court finding that *"[t]he claimed ability to customize and save overlapping speaker groups* and easily control group playback represents a clear technological improvement over the 'conventional multi-zone audio system,' which, as the specification

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

explained, presents significant technological and physical obstacles to forming speaker groups").

1281.   Further, because the "HOUSE" option appears to be hard-coded into the Personal Music Center – and thus was not a user-created, customized group that was predefined and pre-saved at a user's request as part of an initial "setup" phase – the "HOUSE" option of the Bose Lifestyle 50 System also fails to meet several other limitations of Asserted Claim 1 of the '966 Patent.  For instance, a Personal Music Center never received "a request to create" the "HOUSE" option, never "caus[ed] creation of" the "HOUSE" option, never "caus[ed] an indication of" the "HOUSE" option to be transmitted to a Lifestyle player based on a "request to create" that option, and never "caus[ed] storage of" the "HOUSE" option based on a "request to create" that option.

1282.   Further yet, there was no ability for a user to assign a thematic name to the "HOUSE" option, which fails to meet the additional "according to a common theme" requirement of Google's proposed construction of a "zone scene," as interpreted by the Court.

1283.   Thus, for at least these reasons, it is my opinion that the "HOUSE" option provided by the Bose Lifestyle 50 System was merely just a different way to create an ad-hoc "shared source group," and also does not constitute a "zone scene."  *See also* SONOS-SVG2-00026839-58 at SONOS-SVG2-00026840 (explaining that the "Zone Scene feature" is "similar to the current Party Mode setting that is available" but that "*the Zone Scenes feature is much more flexible and powerful*").

1284.   I further note that the none of the Bose Lifestyle 50 System evidence that I have reviewed uses the term "zone scenes" or otherwise describes any technology that would have enabled a user to create a user-customized, pre-saved group of Lifestyle players that was able to exist in an inactive state while remaining available for selection by a user so that it could later be invoked on demand for synchronous playback, which further confirms that the Bose Lifestyle 50 System did not have any functional capability for creating or invoking a "zone scene."

1285.   Turning to the additional requirement of the Asserted Claim 1 of the '966 Patent that the claimed "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time, this functionality is also not possible with the Bose

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Lifestyle 50 System. Indeed, even setting aside the above-described fundamental differences between a "shared source group" of Lifestyle players and a "zone scene," the Personal Music Center did not have the possibility to create two overlapping "shared source groups" that co-exist in this manner. To the contrary, the Bose Lifestyle 50 System evidence I have reviewed establishes that a Lifestyle player could only be a member of one "shared source group" of Lifestyle players that was in existence at any given time, and that the only way a Lifestyle player in a first "shared source groups" could have been added to a second "shared source groups" was to destroy the first group by changing the audio source for the Lifestyle player to match the "shared source" of audio for the second group. *See, e.g* BOSE_SUB-0000001-55 at 43-45 (explaining how to use ROOM and HOUSE buttons to set up an audio source for one or more rooms).

1286. Despite this clear evidence establishing that the Personal Music Center, the Multi-Room Interface, and the Lifestyle players in a Bose Lifestyle 50 System did not have any "zone scene" capability, Dr. Schonfeld nevertheless opines that the "zone scene" limitations required by the Asserted Claims of the '966 Patent were either disclosed or rendered obvious by the Bose Lifestyle 50 System. *See* Schonfeld Op. Report at ¶¶ 1034-1065. However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and the "zone scene" limitations of the Asserted Claims of the '966 Patent to be flawed for several reasons.

1287. As an initial matter, Dr. Schonfeld fails to set forth any basis or reasoning for his opinions regarding the Bose Lifestyle 50 System and the "zone scene" limitations of the Asserted Claims of the '966 Patent. Instead, Dr. Schonfeld merely refers back to his discussion of certain claim limitations of Asserted Claim 1 of the '885 Patent and makes the following conclusory statement:

> 1039. *See supra* '885 claim 1, Limitation 1.6. Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6. I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene. Additionally, dependent

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1

1288.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the "zone scene" limitations of Asserted Claim 1 of the '885 Patent applies to the "zone scene" limitations of the Asserted Claims of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that the "zone scene" limitations of the Asserted Claims of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50 System.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of the "zone scene" limitations of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding the "zone scene" limitations of the Asserted Claims of the '966 Patent.[55]

1289.  Moreover, I have reviewed the section of Dr. Schonfeld's Opening Report where he discusses the Bose Lifestyle 50 System in the context of claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, and nothing in that section of Dr. Schonfeld's Opening Report alters my opinion that the Bose Lifestyle 50 System did not include the "zone scenes" capability required by the Asserted Claims of the '966 Patent.

1290.  Indeed, Dr. Schonfeld's theories and opinions regarding the alleged existence of "zone scenes" capability in the Bose Lifestyle 50 System are all premised on Dr. Schonfeld's incorrect interpretation of what is required to qualify a "zone scene," and are also premised on several inaccurate and misleading characterizations of Bose Lifestyle 50 System and the evidence

---

[55] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    related thereto.

2        1291.  As an initial matter, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System

3    discloses a "zone scene" is based in part on functionality that is not related to the actual Bose

4    Lifestyle 50 System itself.  *See* Schonfeld Op. Report at ¶¶ 899-904.  Indeed, in addition to relying

5    on setting up a "shared source group" using the "ROOM" and "HOUSE" buttons of the Personal

6    Music Center of the Bose Lifestyle 50 System (*id.* at ¶ 901 (citing BOSE_SUB-0000001 at 40,

7    43), which I explained above, Dr. Schonfeld also relies on disclosure related to (i) the Bose

8    Freespace E4 system (*id.* at ¶ 902 (citing BOSE_SUB-0000062 at 122 and BOSE_SUB-0000140

9    at 144-145) which, as explained above, is not utilized by or compatible with the Bose Lifestyle 50

10   System, (ii) setting up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link

11   technology of a Bose "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system" (*id.*

12   at ¶ 903 (citing BOSE_SUB-0000274-360 at 289, 290, 297 and BOSE_SUB-0000361-448 at 385-

13   386)) – not a Bose Lifestyle 50 System that does not have Bose link capability: and (iii) the Bose

14   link communication protocol (*id.* at ¶ 904 (citing BOSE_SUB-0000594-601 at 595-596)) – which,

15   as explained above, is not utilized by or compatible with the Bose Lifestyle 50 System.  For these

16   reasons alone, Dr. Schonfeld's theory is flawed and he has failed to prove that the actual Bose

17   Lifestyle 50 System discloses the claimed "zone scene" functionality.

18       1292.  Regardless, none of the disclosures that Dr. Schonfeld identifies teach a "zone

19   scene."

20       1293.  To start, Dr. Schonfeld does not even attempt to explain how what he points to

21   meets the actual requirements of a "zone scene," which requires a user-customized, pre-saved

22   group of "zone players" that is able to exist in an inactive state while remaining available for

23   selection by a user so that it can later be invoked on demand for synchronous playback.  *See*

24   Schonfeld Op. Report at ¶¶ 899-904.  For example, with respect to the actual Bose Lifestyle 50

25   System, Dr. Schonfeld merely states that "Bose LifeStyle allows for the addition of multiple rooms

26   and zones to the be added to the Lifestyle ecosystem, and provides for the ability to operate in

27   multiple rooms" and then points to various disclosure in the Owner's Guide related to setting up a

28   "shared source group" using the "ROOM" and "HOUSE" buttons of the Personal Music Center of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the Bose Lifestyle 50 System. *Id*. at ¶ 901. Dr. Schonfeld's assertion here does not explain how the disclosure he cites to meets the actual requirements of a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback. Regardless, I have already explained above why a "shared source group" in the Bose Lifestyle 50 System is not a "zone scene."

1294.   Turning to his reliance on a Bose Freespace system, Dr. Schonfeld merely states that "Bose Lifestyle explicitly allows for multiple zones and operation" and then points to various disclosure related to the four "zones" of a Bose Freespace system. Schonfeld Op. Report at ¶ 902. Merely "allow[ing] for multiple zones and operation" does not teach a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback. Moreover, as I explained above, the Bose FreeSpace E4 product "allow[s] for an input source to be routed to any of the four amplifier outputs," which allows for audio distribution for up to four different "zones." BOSE_SUB-0000062-136 at 74. As shown and described in the Bose Freespace Owner's Guide, "[s]peaker systems in up to four zones can be connected to the ZONE OUT amplifier outputs" using "the speaker cable from each zone." *Id*. at 93. I have not seen any evidence that the four individual "zones" can be combined together and/or have any overlapping speaker systems.

1295.   With respect to the "Multi-zone paging" disclosure in the cited by Dr. Schonfeld, I fail to see how this teaches a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback. BOSE_SUB-0000062-136 at 122.

1296. At best, the "ALL" paging button provided on the "Multi-zone paging user interface" appears to be similar to the hard-coded HOUSE button of the Personal Music Center. Thus, for the same reasons I explained above with respect to the HOUSE button, the "ALL" paging button in a Bose Freespace system does not teach a "zone scene." Further, there is nothing in this

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

disclosure that would allow a user to group any of the other four "paging zones" together. Thus, even if the "ALL" paging button were a "zone scene" (it is not), there would be no way to create two different, overlapping groups of "zone scenes," as required by Asserted Claim 1 of the '966 Patent.

1297.  I also fail to see how the "Two-Zone System" and "Four-Zone System" figures cited by Dr. Schonfeld teach a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback. BOSE_SUB-0000140 at 144-145.  Instead, these figures merely explain how different "sources" are routed to different "zones" in a two- or four-zone system.

1298.  Turning to Dr. Schonfeld's reliance on the SA-2 and SA-3 Amplifier Guide, Dr. Schonfeld merely states that "Bose LifeStyle also allows for playing in multiple rooms." *See* Schonfeld Op. Report at ¶ 903.  Merely "allow[ing] for playing in multiple rooms" does not teach a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.  While is it unclear what exactly Dr. Schonfeld is relying on in the SA-2 and SA-3 Amplifier Guide, it appears that he may be relying on the following disclosure related to the ability to add additional rooms:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

## Setting Up Additional Rooms For Sound

### Setup guidelines for additional rooms

If you have a Lifestyle® 18 series II, 28 series II, 38 or 48 home entertainment system, you can experience stereo sound in up to 14 other rooms using Lifestyle® stereo amplifiers, compatible speaker systems and remote controls for the other rooms.

- Remote controls for other rooms must be set to the same house code as the main room remote, but each remote must be set to a different room code. See "Setting up remote controls for other rooms" on page 23.

- The Lifestyle® amplifier and its remote control must be set to the same room code. See "Setting up the amplifier room code" on page 24.

- When using more than one amplifier to power more than two speakers in a room (Figure 18, room C), all amplifiers must be set to the same room code. Also, one amplifier must be set to the single amp mode and all others must be set to the supplemental amp mode. See "Single and supplemental amplifiers" on page 25.

**Figure 18**

Sample installation of
Lifestyle® stereo amplifiers



22

BOSE_SUB-0000297

Schonfeld Op. Report at ¶ 903 (citing at BOSE_SUB-0000274-360 at 297); *see also id.* at ¶ 904

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

("[T]he Bose Link communication protocol allows for an indication that additional rooms, for example, have been added to the media center.").

1299.   Although unclear, in this regard Dr. Schonfeld appears to be asserting that manually hardwiring additional SA-2 or SA-3 amplifiers in additional rooms to a Bose link enabled Lifestyle media center teaches a "zone scene." *Id*.  I disagree.  The mere fact that a user can manually hardwire additional SA-2 or SA-3 amplifiers in additional rooms to a Bose link enabled Lifestyle media center does not teach a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.  Such a theory is flawed for numerous reasons.

1300.   First, manually hardwiring SA-2 or SA-3 amplifiers to a Bose link enabled Lifestyle media center does not involve a user creating a group of SA-2 or SA-3 amplifiers using a "computing device" whereby the group is user-customized and pre-saved group at the user's request, which is a required aspect of a "zone scene."

1301.   Second, manually hardwiring SA-2 or SA-3 amplifiers to a Bose link enabled Lifestyle media center does not result in a group of SA-2 or SA-3 amplifiers that are "to be configured for synchronous [media] playback" at a future time when the group is invoked, which is another required aspect of a "zone scene."  Instead, the evidence I reviewed indicates that SA-2 or SA-3 amplifiers that are hardwired in series to a Bose link connector can play different audio (stream 1 or stream 2) depending on the configuration of their corresponding dedicated remote controls.  BOSE_SUB-0000594-601 at 597 (explaining that "[a] Bose link enabled media center is also capable of managing two separate sources at the same time," "any of the expansion rooms can be configured to operate on either stream 1 or stream 2," and "[i]f an expansion remote configured for stream 1 sends an ON command to the media center, the media center will activate the pins that carry stream 1 information").

1302.   Third, because an SA-2 or SA-3 amplifier can only be selected individually via its own dedicated remote control, it was not possible for a group of multiple SA-2 or SA-3 amplifiers in different rooms to be selected for invocation, which is another required aspect of a "zone scene."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

As explained above, the evidence I reviewed indicates that each such SA-2 or SA-3 amplifier could only be controlled by its own dedicated Bose link enabled remote control that was set to the same room code as the SA-2 or SA-3 amplifier. *See* BOSE_SUB-0000361-448 at 384-386 ("Remote controls for other rooms must be set to the same house code as the main room remote, but each remote must be set to a different room code. … The Lifestyle® amplifier and its remote control must be set to the same room code."). Because each dedicated remote control is coded to only a *single* amplifier, there is no remote control that enables the selection of a group of *multiple* amplifiers for invocation. And I have seen no evidence that multiple SA-2 or SA-3 amplifiers that are hardwired to a Bose link enabled Lifestyle media center could be controlled together with a single Bose link enabled remote control. Notably, as explained above, based on the evidence I reviewed, the Personal Music Center of the Bose Lifestyle 50 System was not Bose link enabled and therefore could not be used to control multiple SA-2 or SA-3 amplifiers that are hardwired to a Bose link enabled Lifestyle media center. To the contrary, the Personal Music Center and Multi-Room Interface of the Bose Lifestyle 50 System communicate using a proprietary radio frequency communication protocol that was specifically developed for the Bose Lifestyle 50 System and that is "not compatible" with protocols used in other Bose systems. *See* BOSE_SUB-0000663-683 at 666.

1303. I also note that Dr. Schonfeld cites to a disclosure of the Personal Music Center in the SA-2 and SA-3 Amplifier Guide. Schonfeld Op. Report at ¶ 903 (citing at BOSE_SUB-0000274-360 at 289). To be clear, this disclosure related to using the Personal Music Center with a Multi-Room Interface that does not have a Bose link connector – not using the Personal Music Center with a "Bose link enabled media center."

1304. Moreover, as explained above, in order for SA-2 and SA-3 amplifiers that are hardwired to a Bose link enabled Lifestyle media center to be able to playback the same audio simultaneously, the SA-2 and SA-3 amplifiers need to first be set to the same stream of audio (stream 1 or stream 2). *See, e.g.,* BOSE_SUB-0000594-601 at 597. In this regard, the SA-2 and SA-3 amplifiers that are hardwired to a Bose link enabled Lifestyle media center share a "stream" of audio and thus rely upon the same "shared source" form of grouping as the Bose LifeStyle 50

System. Thus, for the same reasons that the "shared source" functionality of the Bose Lifestyle 50 System fails to teach the "zone scenes" capability required by Asserted Claim 1 of the '966 Patent, this Bose link configuration relied on by Dr. Schonfeld also fails to teach the "zone scenes" capability.

1305. Turning to the additional requirement of the Asserted Claim 1 of the '966 Patent that the claimed "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time, Dr. Schonfeld opines that a Lifestyle player for a Bose Lifestyle 50 System would have met this requirement as well, based exclusively on the following theory: "[T]he Bose Lifestyle expressly teaches managing two separate streaming sources at one time, such that room A can operate on stream 1, and room B can operate stream 2, for example." Schonfeld Op. Report at ¶ 907. However, this theory is flawed for a number of reasons.

1306. First, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System discloses two different, overlapping "zone scenes" each comprising a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback is not based on any functionality of the actual Bose Lifestyle 50 System itself. *See* Schonfeld Op. Report at ¶ 907. Instead, Dr. Schonfeld relies exclusively on disclosure related to the Bose link communication protocol (*id*. at ¶ 907 (citing BOSE_SUB-0000594-601 at 597) – which, as explained above, is not utilized by or incompatible with the Bose Lifestyle 50 System.  For this reason alone, Dr. Schonfeld's theory is meritless.

1307. Second, I fail to see how Dr. Schonfeld's theory has any relevance to the requirement that a "computing device" be programmed with functional capability for causing the creation of two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time, this functionality is also not possible with the Bose Lifestyle 50 System.  Instead, per Dr. Schonfeld's own words, his theory is based on the Bose link communication protocol enabling a single room A (not a group of rooms) being able to play audio provided via stream 1 and a single room B (not a group of rooms) being able to play audio provided

via stream 2.  This has nothing to do with groups of Lifestyle players period, let alone two overlapping "zone scenes" that co-exist with one another and are both available for selection by a user at the same time.  Instead, what Dr. Schonfeld describes is just two separate rooms being able to play two separate streams of audio.

1308.    Third, if Dr. Schonfeld is suggesting that the Bose link technology allows a group of Lifestyle players to be defined by the stream of audio (stream 1 or stream 2) that they are configured to play, any given Lifestyle player can only be configured to play a single stream of audio at a given time.  Thus, a Lifestyle player could never be a member of two different co-existing groups that are defined by different streams of audio.   For example, the only way a Lifestyle player in a first group of Lifestyle players configured for stream 1 could have been added to a second group of Lifestyle players configured for stream 2 would be to destroy the first group by changing the audio stream for the Lifestyle player from stream 1 to stream 2 using the Lifestyle player's dedicated remote control.  *See, e.g.*, BOSE_SUB-0000594-601 at 597 (If an expansion remote configured for stream 1 sends an ON command to the media center, the media center will activate the pins that carry stream 1 information."); BOSE_SUB-0000361-448 at 384-386 ("Remote controls for other rooms must be set to the same house code as the main room remote, but each remote must be set to a different room code. ... The Lifestyle® amplifier and its remote control must be set to the same room code.").

1309.    Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Bose Lifestyle 50 System did not have a "computing device" with any functional capability for creating or invoking a "zone scene" – let alone the required functional capability to cause the creation of two different, overlapping "zone scenes" that are both available for selection by a user and then later cause selected one of the two different "zone scenes" to be invoked.

**iv.    The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.5**

1310.    When read together, limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

> **[1.5]**    receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

1311.    In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1312.    As explained above, the evidence I have reviewed establishes that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface[56]) in the Bose Lifestyle 50 System was only capable of receiving requests to form ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the required functional capability to "receiv[e] a *first request to create a first zone scene* comprising a first predefined grouping of [Lifestyle players] including at least the first [Lifestyle player] and a second [Lifestyle player] that are to be configured for synchronous playback of media when the first zone scene is invoked."

1313.    Moreover, the hard-coded "HOUSE" option of the Bose Lifestyle 50 System that is relied upon by Dr. Schonfeld fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "HOUSE" option.

1314.    Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations

---

[56] Although unclear, some of Dr. Schonfeld's demonstratives that were provided with his Opening Report appear to map the combination of the Personal Music Center and the Multiroom-room interface to the "network device" and the Jewel Cube speakers to the "zone players" of Asserted Claim 1 of the '885 Patent.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶¶ 1038-1039.  However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1315.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

> (v) Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"

1038. *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (vi) Limitation 1.5 receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked;

1039. *See supra* '885 claim 1, Limitation 1.6. Included in my incorporation by reference is my discussion of the "first zone scene" disclosure in, e.g., 1.6. I include in my incorporation by reference the discussion of the creation of the first zone scene, its composition, its synchronous playback configuration, and the ability of invocation of that zone scene. Additionally, dependent claim 6 of the '966 patent informs the scope of independent claim 1. Dependent claim 6 of the '966 patent recites that "wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player," effectively requiring that the first and second predefined groupings of zone players not be entirely overlapping, each with the same three zone players. Because claim 6 depends from claim 1 and must necessarily narrow the scope of claim 1, I understand that claim 1 includes first and second predefined groupings of zone players, where those groupings of zone players **can** wholly overlap. Indeed, such an overlap scenario would be consistent e.g., with a user having a user-created zone group including all three zone players, and having a "Party Mode," *i.e.*, a zone group including all three zone players. I therefore incorporate by reference the disclosure of "party mode" from my discussion, *supra*, regarding claim 1 of the '885 patent.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1

2    1316.   As these screenshots demonstrate, Dr. Schonfeld has not provided any analysis of

3    how the Bose Lifestyle 50 System allegedly meets these limitations of Asserted Claim 1 of the

4    '966.  Instead, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle

5    50 System in the context of certain claim limitations of the '885 Patent with the exception of the

6    latter part of paragraph 1039, where he discusses dependent claim 6 and Sonos's "shared source

7    group" and "Party Mode" functionality.  However, the Asserted Claims of the '966 Patent are

8    directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing

9    device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations

10   1.4 and 1.5 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations

11   of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation

12   as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim

13   limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.5 of

14   Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion

15   is that claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent were actually *disclosed*

16   by the Bose Lifestyle 50 System versus whether his opinion is that claim limitations 1.4 and 1.5

17   of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50

18   System.  And along similar lines, Dr. Schonfeld never once articulates what he considers to be the

19   claimed "first request to create a first zone scene" in the Bose Lifestyle 50 System.  For these

20   reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.5 of

21   Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions

22   to be expressed and the basis and reasons therefor, which I understand to be the governing standard

23   for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess,

24   and respond to his opinions regarding claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966

25   Patent.[57]

26   1317.   With that said, as I have discussed above in Section XV.C.1.iii as well as in my

27

28   [57] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies
     in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

'885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.5 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1318.  Lastly, the latter part of paragraph 1039 where he discusses dependent claim 6 and Sonos's "zone group" and "Party Mode" functionality appears to be a verbatim copy of paragraph 972 from the section of Dr. Schonfeld's Opening Report related to Sonos's 2005 system, which I already addressed above.  I fail to see how this paragraph discussing Sonos's "zone group" and "Party Mode" functionality has any relevance to the Bose Lifestyle 50 System, which did not have "zone groups" or a hard-coded "All Zones-Party Mode" option, and it appears to me that Dr. Schonfeld's inclusion of this paragraph in his section directed to the Bose Lifestyle 50 System may have been a copy/paste error.

1319.  Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.5 of Asserted Claim 1 of the '966 Patent.

           **v.**     **The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.6**

1320.  When read together, limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

…

**[1.6]**    based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;

1321.    In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1322.    As explained above, the evidence I have reviewed establishes that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System was only capable of forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Personal Music Center (and any other controller that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the required functional capability to "i) caus[e] creation of the first zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [Lifestyle player], and iii) caus[e] storage of the first zone scene."

1323.    Moreover, the hard-coded "HOUSE" option of the Bose Lifestyle 50 System that is relied upon by Dr. Schonfeld above fails to meet these limitations for the additional reason that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) of the Bose Lifestyle 50 System would have never received any "request to create" the hard-coded "HOUSE" option and also would have never "caus[ed] creation of" the hard-coded "HOUSE" option, "caus[ed] an indication of" the hard-coded "HOUSE" option to be "transmitted to the first [Lifestyle player]," or "caus[ed] storage of" the hard-coded "HOUSE" option.

1324.    Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by

the Bose Lifestyle 50. *See* Schonfeld Op. Report at ¶¶ 1038, 1040. However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1325. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> (v)     Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"
>
> 1038.   *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (vii)    Limitation 1.6 based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene;
>
> 1040.   *See supra* '885 claim 1, Limitation 1.6.

1326. As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus

whether his opinion is that claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50 System. And along similar lines, Dr. Schonfeld never articulates what he considers to be the claimed functions of "i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene" in the Bose Lifestyle 50 System. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent. [58]

1327. With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1328. For instance, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System meets limitation 1.6 of Asserted Claim 1 of the '885 Patent (upon which he relies for limitation 1.6 of Asserted Claim 1 of the '966 Patent) is based in part on functionality that is not related to or compatible with the actual Bose Lifestyle 50 System itself. *See* Schonfeld Op. Report at ¶¶ 899-904. Indeed, in addition to relying on setting up a "shared source group" using the "ROOM" and "HOUSE" buttons of the Personal Music Center of the Bose Lifestyle 50 System (*id.* at ¶ 901

---

[58] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

(citing BOSE_SUB-0000001 at 40, 43), which I explained above, Dr. Schonfeld also relies on disclosure related to (i) the Bose Freespace E4 system (*id*. at ¶ 902 (citing BOSE_SUB-0000062 at 122 and BOSE_SUB-0000140 at 144-145) which, as explained above, is not utilized by or compatible with the Bose Lifestyle 50 System, (ii) setting up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system" (*id*. at ¶ 903 (citing BOSE_SUB-0000274-360 at 289, 290, 297 and BOSE_SUB-0000361-448 at 385-386)) – not a Bose Lifestyle 50 System that does not have Bose link capability: and (iii) the Bose link communication protocol (*id*. at ¶ 904 (citing BOSE_SUB-0000594-601 at 595-596)) – which, as explained above, is not utilized by or compatible with the Bose Lifestyle 50 System.  For these reasons alone, Dr. Schonfeld's theory is flawed and he has failed to prove that the actual Bose Lifestyle 50 System discloses the claimed "zone scene" functionality of claim limitations 1.4 and 1.6 of Asserted Claim 1 of the '966 Patent.

1329.  Further examples of why Dr. Schonfeld's analysis is flawed are set forth below, where I have separated reasons related to the actual Bose Lifestyle 50 System and  Dr. Schonfeld's alleged Bose Lifestyle 50 System.[59]

Actual Bose Lifestyle 50 System

1330.  First, when discussing the actual Bose Lifestyle 50 System and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in the Bose Lifestyle 50 System for forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained in Section XV.C.1.iii.

1331.  Second, when discussing the actual Bose Lifestyle 50 System and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld did not identify any "first indication that the first zone player has been added to a first zone scene."  As I previously explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, this is not surprising because the

---

[59] Note that while I have sometimes separately addressed the shortcomings of the actual Bose Lifestyle 50 System and Dr. Schonfeld's  alleged Bose Lifestyle 50 System with respect to limitations 1.4-1.11, it should be understood that these shortcomings can be considered together depending on how Dr. Schonfeld intends on combining the various Bose products upon which he relies, which is currently unclear.

Bose Lifestyle 50 System does not disclose "a first indication that [the Lifestyle player] has been added to a first zone scene," as required by limitation 1.6 of the '885 Patent. And for similar reasons to those explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, the Bose Lifestyle 50 System does not disclose an "indication" of a "first zone scene," as required by limitation 1.6 of Asserted Claim 1 of the '966 Patent.

1332. As an initial matter, because a "shared source group" is not a "zone scene" for all of the reasons explained above, there can't possibly be an "indication" of a "first zone scene."

1333. Moreover, even setting aside the fundamental differences between a "shared source group" and a "zone scene," the Bose Lifestyle 50 System evidence that I have reviewed establishes that, when a user set up a "shared source group" of Lifestyle players using the Personal Music Center of the Bose Lifestyle 50 System, the Personal Music Center would communicate with the centralized Multi-Room Interface (not to the Lifestyle players), which would cause the Multi-Room Interface to configure itself to distribute the same audio from the same audio source to each of the rooms so that the same audio could be played back simultaneously via the Lifestyle players. *See, e.g* BOSE_SUB-0000001-55 at 6, 12, 17, 19, 44-45; BOSE_SUB-0000684-687 at 684-685. In other words, a Lifestyle player would not receive any information from the Personal Music Center but instead would merely receive audio from the Multi-Room Interface but audio alone is not an "indication" of a "shared source group." Moreover, I have not seen any evidence as to what information would even be communicated from the Personal Music Center would communicate with the centralized Multi-Room Interface.

1334. Dr. Schonfeld disputes my assertion that the Personal Music Center would only communicate with the centralized Multi-Room Interface and not the Lifestyle players and states that the documentation I have relied on "refers to 'radio links' that transmits data to and from playback speakers." See Schonfeld Op. Report at ¶ 734. However, I see no support in these documents for Dr. Schonfeld's assertion. Instead, the documents I cite only refer to a "radio link" between the Personal Music Center and the Multi-Room Interface. *See, e.g,* BOSE_SUB-0000001-55 at 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface…. If the music center continuously displays

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

"NO RESPONSE," you need to try to establish its link with the multi-room interface again."), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE."), BOSE_SUB-0000684-687 at 685 (describing the "Multi-room interface" as a "[s]mall, hideaway connection box transmits data to, and receives data from, the Personal music center via a radio data link.").

1335.   Third, even setting aside the fundamental differences between a "shared source group" and a "zone scene," Dr. Schonfeld has not identified (and I have not seen) any evidence of the Personal Music Center or any other device in the Bose Lifestyle 50 System "causing storage" of a "shared source group."

1336.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.6 of Asserted Claim 1 of the '966 Patent.

<u>Dr. Schonfeld's alleged Bose Lifestyle 50 System</u>

1337.   First, in his section discussing his alleged version of the Bose Lifestyle 50 System and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies on functionality related to (i) the Bose Freespace E4 system (Schonfeld Op. Report at ¶ 902 (citing BOSE_SUB-0000062 at 122 and BOSE_SUB-0000140 at 144-145), (ii) setting up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system" (*id*. at ¶ 903 (citing BOSE_SUB-0000274-360 at 289, 290, 297 and BOSE_SUB-0000361-448 at 385-386)), and (iii) the Bose link communication protocol (*id*. at ¶ 904 (citing BOSE_SUB-0000594-601 at 595-596)).  However, as I have already explained above in Section XV.C.1.iii, the functionality that he relies on for these various Bose products does not disclose the claimed "zone scene" functionality.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1338. Second, although not clear, Dr. Schonfeld appears to be asserted that the "first indication that the first zone player has been added to a first zone scene" required by limitation 1.6 of the '885 Patent is disclosed by the Bose Link communication protocol based on a theory that "the Bose Link communication protocol allows for an indication that [Lifestyle players in] additional rooms … have been added to the media center." *See* Schonfeld Op. Report at ¶ 904. However, as I previously explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, I disagree that the Bose Link communication protocol discloses "a first indication that [the Lifestyle player] has been added to a first zone scene," as required by limitation 1.6 of the '885 Patent. And for similar reasons to those explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, it is my opinion that the Bose Link communication protocol does not disclose an "indication" of a "first zone scene," as required by limitation 1.6 of Asserted Claim 1 of the '966 Patent.

1339. For instance, in the "Understanding Bose link" document cited by Dr. Schonfeld, the only information transmitted from a Bose link enabled media center to a Lifestyle player that is a Bose link expansion product (e.g., an SA-2 or SA-3 Amplifier) is "on/off, volume and source commands along with audio." *See* BOSE_SUB-0000594-601 at 595. The "Understanding Bose link" document also states that "[e]ach time a source change or on/off command is sent, the expansion product sends information back to the media center letting it know that it is still on (or off) and in the same room." *Id*. These disclosures are consistent with Dr. Schonfeld's characterization: "The Bose Link connection is essentially a conversation between the media center and the expansion device. The media center sends on/off, volume and source change commands along with audio to the zones. The zones then respond by sending information back to the media center to let it know that the zone is still active." Schonfeld Op. Report at ¶ 904. However, in my opinion, none of this information that is allegedly exchanged between a Bose link enabled media center and a Lifestyle player that is a Bose link expansion product amounts to an "indication" of any sort of group of Lifestyle players, let alone an "indication" of a "zone scene."

1340. Dr. Schonfeld's assertion to the contrary appears to be based on an incorrect interpretation of what is required to constitute an "indication" of a "zone scene." In particular, Dr.

Schonfeld points to the Court's finding that an "indication" of a "zone scene" need not identify the other "zone player(s)" within the "zone scene" – which is true – but he then jumps to the conclusion that *any* message sent to a "zone player" at the time that a "zone scene" is created would constitute an "indication" of the "zone scene" regardless of the contents of that message. *See* Schonfeld Op. Report at ¶ 900. In my opinion, this is not how a POSITA would interpret the phrase "indication" of a "zone scene" in view of the Court's July 21, 2022 order. Rather, a POSITA would understand that, in order for a message to constitute an "indication" of a "zone scene," the message must contain some information about the "zone scene" that enables the Lifestyle player to recognize that it has been added to the "zone scene," such as an identifier of the "zone scene." On/off, volume, and source change commands does not meet this requirement.

1341. Moreover, to the extent that Dr. Schonfeld is asserting that the alleged "indication" is sent from the Lifestyle player to the Bose link enabled media center, such a theory would fail for the additional reason that the claim requires the "indication" to be transmitted to the "first zone player." The Bose link enabled media center cannot possibly be the "first zone player" because there is only a single Bose link enabled media center in any given system and thus a Bose link enabled media center could not be added to a "zone scene" with another Bose link enabled media center. *See, e.g.,* BOSE_SUB-0000361-448 at 384 (illustrating SA-2 and SA-3 amplifiers connected to a single Bose link enabled media center).

1342. I also note that at paragraph 904, Dr. Schonfeld also asserts that "[i]mportantly, … the media center will not acknowledge commands from any zone that is not targeted or invoked." *See* Schonfeld Op. Report at ¶ 904. I fail to see how this statement has anything to do with a Lifestyle player receiving an "indication" of a "zone scene."

1343. Third, Dr. Schonfeld's discussion of limitation 1.6 of Asserted Claim 1 of the '966 Patent in connection with (i) the Bose Freespace E4 system (Schonfeld Op. Report at ¶ 902 (citing BOSE_SUB-0000062 at 122 and BOSE_SUB-0000140 at 144-145), (ii) setting up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system" (*id*. at ¶ 903 (citing BOSE_SUB-0000274-360 at 289, 290, 297 and BOSE_SUB-0000361-448 at 385-386)), and (iii) the Bose link

communication protocol (*id*. at ¶ 904 (citing BOSE_SUB-0000594-601 at 595-596)) does not include anything about a "computing device" "causing storage" of a "shared source group" or some other group of Lifestyle players, let alone "causing storage" of a "zone scene."

1344.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in Dr. Schonfeld's alleged Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.6 of Asserted Claim 1 of the '966 Patent.

### vi.    The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.7

1345.   When read together, limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.7]**    receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;

1346.   In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1347.   As explained above, the evidence I have reviewed establishes that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on) in the Bose Lifestyle 50 System was only capable of receiving requests to form ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the required functional capability to

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"receiv[e] a *second request to create a second zone scene* comprising a second predefined grouping of [Lifestyle players] including at least the first [Lifestyle player] and a third [Lifestyle player] that are to be configured for synchronous playback of media when the second zone scene is invoked."

1348.   Moreover, the hard-coded "HOUSE" option of the Bose Lifestyle 50 System that is relied upon by Dr. Schonfeld fails to meet these limitations for the additional reason that a Sonos controller would have never received any "request to create" the hard-coded "HOUSE" option.

1349.   Further yet, claim limitations 1.4 and 1.7 require the "computing device" to "receiv[e] [the] second request to create [the] second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in the Bose Lifestyle 50 System, it was not possible for an ad-hoc "shared source group" to exist in an inactive state in which the members of the "shared source group" could be used for individual playback while the "shared source group" remained available for selection by a user; rather, an ad-hoc "shared source group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "shared source group" would cease to exist.

1350.   Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶¶ 1038, 1041.  However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1351.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> *(v)  Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*

1038.  *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> *(viii)  Limitation 1.7 receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the third zone player is different than the second zone player;*

1041.  *See supra* '885 claim 1, Limitation 1.6, 1.7.

1352.  As these screenshots demonstrate, Dr. Schonfeld has not provided any analysis of how the Bose Lifestyle 50 System allegedly meets these limitations of Asserted Claim 1 of the '966.  Instead, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent were only *rendered obvious*

by the Bose Lifestyle 50 System. And along similar lines, Dr. Schonfeld never once articulates what he considers to be the claimed "second request to create a second zone scene" in the Bose Lifestyle 50 System. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent.[60]

1353. With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.7 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1354. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.7 of Asserted Claim 1 of the '966 Patent.

### vii.    The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.8

1355. When read together, limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

---

[60] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

…

**[1.8]**    based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;

1356.    In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1357.    As explained above, the evidence I have reviewed establishes that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System was only capable of forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Personal Music Center (and any other controller that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the second zone scene to be transmitted to the first [Lifestyle player], and iii) caus[e] storage of the second zone scene."

1358.    Moreover, the hard-coded "HOUSE" option of the Bose Lifestyle 50 System that is relied upon by Dr. Schonfeld above fails to meet these limitations for the additional reason that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) of the Bose Lifestyle 50 System would have never received any "request to create" the hard-coded "HOUSE" option and also would have never "caus[ed] creation of" the hard-coded "HOUSE" option, "caus[ed] an indication of" the hard-coded "HOUSE" option to be "transmitted to the first [Lifestyle player]," or "caus[ed] storage of" the hard-coded "HOUSE" option.

1359.    Further, claim limitations 1.4 and 1.8 require the "computing device" to carry out the claimed actions with respect to a "second zone scene" at a time when the "first zone player" is

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

"operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode"). However, in the Bose Lifestyle 50 System, it was not possible for an ad-hoc "shared source group" to exist in an inactive state in which the members of the "shared source group" could be used for individual playback while the "shared source group" remained available for selection by a user; rather, an ad-hoc "shared source group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "shared source group" would cease to exist.

1360.  Further yet, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.8 require the "computing device" to carry out the claimed actions with respect to a "second zone scene" that includes at least one common "zone player" with the "first zone scene" (i.e., the claimed "first zone player") but without modifying or destroying the "first zone scene" that was created, such that the overlapping "first zone scene" and "second zone scene" can thereafter both be "display[ed]" to a user for selection. However, in the Bose Lifestyle 50 System, it was not possible to create a new ad-hoc "shared source group" comprising a Lifestyle player that was already a member of another preexisting "shared source group" without first modifying or destroying that preexisting "shared source group." For this additional reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) of the Bose Lifestyle 50 System did not have the required functional capability to "i) caus[e] creation of the second zone scene, ii) caus[e] an indication of the first zone scene to be transmitted to the first [Lifestyle player], and iii) caus[e] storage of the second zone scene," where the "second zone scene" includes at least one common "Lifestyle player" with the created "first zone scene."

1361.  Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by the Bose Lifestyle 50. *See* Schonfeld Op. Report at ¶¶ 1038, 1042. However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1362. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> (v)    *Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1038. *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (ix)    *Limitation 1.8 based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene;*
>
> 1042. *See supra* '885 claim 1, Limitation 1.6, 1.7.

1363. As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent. In fact,

Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50 System.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the claimed functions of "i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene" in the Bose Lifestyle 50 System.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent. [61]

1364.  With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1365.  For instance, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System meets limitation 1.7 of Asserted Claim 1 of the'885 Patent (upon which he relies for limitation 1.8 of Asserted Claim 1 of the '966 Patent) is based on functionality that is not related to or compatible with the actual Bose Lifestyle 50 System itself.  *See* Schonfeld Op. Report at ¶¶ 905-907.  Indeed,

---

[61] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

after incorporating his discussion of limitation 1.6 of Asserted Claim 1 of the '885 Patent (which also based on functionality that is not related to or compatible with the actual Bose Lifestyle 50 System itself, as explained above), Dr. Schonfeld relies exclusively on functionality related to the Bose link communication protocol, which, as explained above, is not utilized by or compatible with the Bose Lifestyle 50 System. *Id*. at ¶ 907 (citing BOSE_SUB-0000594-601 at 597). For these reasons alone, Dr. Schonfeld's theory is flawed and he has failed to prove that the actual Bose Lifestyle 50 System discloses the claimed "zone scene" functionality of claim limitations 1.4 and 1.8 of Asserted Claim 1 of the '966 Patent.

1366. Further examples of why Dr. Schonfeld's analysis is flawed are set forth below, where I have separated reasons related to the actual Bose Lifestyle 50 System and Dr. Schonfeld's alleged Bose Lifestyle 50 System.

<u>Actual Bose Lifestyle 50 System</u>

1367. First, when discussing the actual Bose Lifestyle 50 System and claim limitations 1.6 and 1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in the Bose Lifestyle 50 System for forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained in Section XV.C.1.iii.

1368. Second, when discussing the actual Bose Lifestyle 50 System and claim limitation 1.7 of Asserted Claim 1 of the '885 Patent (via the incorporation of his discussion of limitation 1.6 of Asserted Claim 1 of the'885 Patent), Dr. Schonfeld did not identify any "second indication that the first zone player has been added to a second zone scene." And for the same reasons that I already explained above in connection with the "indication" of the "first zone scene" of limitation 1.6 of Asserted Claim 1 of the '966 Patent, the Bose Lifestyle 50 System does not disclose an "indication" of the "second zone scene," as required by limitation 1.8 of Asserted Claim 1 of the '966 Patent.

1369. Third, even setting aside the fundamental differences between a "shared source group" and a "zone scene," Dr. Schonfeld has not identified (and I have not seen) any evidence of the Personal Music Center or any other device in the Bose Lifestyle 50 System "causing storage"

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    of a "shared source group."

2    1370.  Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the

3    Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be

4    relying on such as the combination of the Personal Music Center and the Multi-Room Interface)

5    in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4

6    / 1.8 of Asserted Claim 1 of the '966 Patent.

7    Dr. Schonfeld's alleged Bose Lifestyle 50 System

8    1371.  First, I incorporate my discussion of limitation 1.6 of Asserted Claim 1 of the '966

9    Patent as it relates to Dr. Schonfeld's alleged Bose Lifestyle 50 System, which explains that (1)

10   the functionality Dr. Schonfeld relies on related to (i) the Bose Freespace E4 system, (ii) setting

11   up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose

12   "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system," and (iii) the Bose link

13   communication protocol does not disclose the claimed "zone scene" functionality; (2) the Bose

14   Link communication protocol does not disclose the transmission of an "indication" of any sort of

15   group of Lifestyle players, let alone an "indication" of a "zone scene"; and (3) the functionality

16   that Dr. Schonfeld relies on related to (i) the Bose Freespace E4 system, (ii) setting up SA-2 and/or

17   SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose "Lifestyle 18 series

18   II, 28 series II, 38 or 48 home entertainment system," and (iii) the Bose link communication

19   protocol does not disclose a "computing device" "causing storage" of a "shared source group" or

20   some other group of Lifestyle players, let alone "causing storage" of a "zone scene."

21   1372.  Second, although unclear, Dr. Schonfeld appears to assert that his alleged Bose

22   Lifestyle 50 System discloses a "computing device" that is programmed with functional capability

23   for causing the creation of two overlapping "zone scenes" that co-exist with one another and are

24   both available for selection by a user at the same time based exclusively on the following theory:

25   "[T]he Bose Lifestyle expressly teaches managing two separate streaming sources at one time,

26   such that room A can operate on stream 1, and room B can operate stream 2, for example."

27   Schonfeld Op. Report at ¶ 907.  However, this theory is flawed for all the reasons I explained

28   above in Section XV.C.1.iii.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1373.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in Dr. Schonfeld's alleged Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.8 of Asserted Claim 1 of the '966 Patent.

> **viii.    The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.9**

1374.   When read together, limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:
>
> …
>
> **[1.9]**    displaying a representation of the first zone scene and a representation of the second zone scene; and;

1375.   In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1376.   As explained above, the evidence I have reviewed establishes that the Bose Lifestyle 50 System only provided users with the ability to form and use ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functional capability for "displaying a representation" of a "zone scene" – let alone the required functional capability for "displaying a representation of the first zone scene and a representation of the second zone scene" in a manner that allows a user to select between them for purposes of requesting invocation.

1377.   Further, as explained above, the "first zone scene" and the "second zone scene" for which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player").  However, in

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

1   the Bose Lifestyle 50 System, it was not possible for two ad-hoc "shared source groups" to overlap

2   with one another; rather, each Lifestyle player could only be a member of a single "shared source

3   group" at any given time. Thus, for this additional reason, a Sonos controller in the Bose Lifestyle

4   50 System did not have the required functional capability to "display[] a representation of the first

5   zone scene and a representation of the second zone scene."

6       1378. Further yet, claim limitations 1.4 and 1.9 require the "computing device" to

7   "display[] a representation of the first zone scene and a representation of the second zone scene"

8   at a time when the "first zone player" is "operating in a standalone mode," which means that the

9   "first zone scene" and the "second zone scene" both must be in an inactive state at the time that

10   the "representation[s]" are "display[ed]" (otherwise, the "first zone player" could not be in

11   "standalone mode"). However, in the Bose Lifestyle 50 System, it was not possible for an ad-hoc

12   "saved source group" to exist in an inactive state in which the members of the "shared source

13   group" could be used for individual playback while the "shared source group" remained available

14   for selection by a user; rather, an ad-hoc "shared source group" only remained in existence for the

15   temporary period of time during which it was activated, and once deactivated, the "shared source

16   group" would cease to exist. Moreover, while the Personal Music System was capable of

17   displaying the hard-coded "HOUSE" option at a time when a Lifestyle player was operating in

18   standalone mode, (i) the hard-coded "HOUSE" option was not a "zone scene" for the reasons

19   explained above and (ii) the hard-coded "HOUSE" option alone cannot possibly meet the claimed

20   requirement of displaying "representations" of multiple overlapping "zone scenes."

21       1379. Despite this clear evidence establishing that the Personal Music Center (and any

22   other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination

23   of the Personal Music Center and the Multi-Room Interface) the Bose Lifestyle 50 System did not

24   have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4

25   and 1.9 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by the

26   Bose Lifestyle 50 System. *See* Schonfeld Op. Report at ¶¶ 1038, 1043. However, I find Dr.

27   Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.8 of

28   Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1380.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent is

> *(v)   Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"*
>
> 1038.   *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> *(x)   Limitation 1.9 displaying a representation of the first zone scene and a representation of the second zone scene; and*
>
> 1043.   *See supra* '885 claim 1, Limitations 1.6 and 1.7.

shown in the screenshots below from Dr. Schonfeld's Opening Report:

1381.   As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50 System.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene" or the displayed "representation of the second zone scene" in the Bose Lifestyle 50 System.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent. [62]

1382.   With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1383.   For instance, as explained above, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System meets limitations 1.6 and 1.7 of Asserted Claim 1 of the '885 Patent (upon which he relies for limitation 1.9 of Asserted Claim 1 of the '966 Patent) is based on functionality that is not related to or compatible with the actual Bose Lifestyle 50 System itself. *See* Schonfeld Op. Report at ¶¶ 899-907.  For these reasons alone, Dr. Schonfeld's theory is flawed and he has failed to prove that the actual Bose Lifestyle 50 System discloses the claimed "zone scene" functionality of claim limitations 1.4 and 1.9 of Asserted Claim 1 of the '966 Patent.

1384.   Further examples of why Dr. Schonfeld's analysis is flawed are set forth below, where I have separated reasons related to the actual Bose Lifestyle 50 System and Dr. Schonfeld's alleged Bose Lifestyle 50 System.

Actual Bose Lifestyle 50 System

---

[62] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1385.  First, when discussing the actual Bose Lifestyle 50 System and claim limitations 1.6 and 1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies exclusively on the functionality in the Bose Lifestyle 50 System for forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for all of the reasons I previously explained in Section XV.C.1.iii.

1386.  Second, even setting aside the fundamental differences between a "shared source group" and a "zone scene," Dr. Schonfeld has not identified (and I have not seen) any evidence of the Personal Music Center or any other device in the Bose Lifestyle 50 System displaying representations of two different "shared source groups" having a common member in a manner that allows a user to select between the two "shared source groups" for purposes of requesting invocation.  Indeed, although unclear, to the extent Dr. Schonfeld is relying on a "shared source group" that is created using the "ROOM" button as one of the two overlapping "zone scenes," I have not seen any evidence that the "indicators" for such a "shared source group" (e.g., $\boxed{A}$ $\boxed{B}$) that are displayed by the Personal Music Center are selectable for any purpose, let alone for purposes of requesting invocation.  *See* BOSE_SUB-0000001 at 44.

1387.  Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.9 of Asserted Claim 1 of the '966 Patent.

<u>Dr. Schonfeld's alleged Bose Lifestyle 50 System</u>

1388.  First, in his section discussing his alleged version of the Bose Lifestyle 50 System and claim limitation 1.6 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies on functionality related to (i) the Bose Freespace E4 system (Schonfeld Op. Report at ¶ 902 (citing BOSE_SUB-0000062 at 122 and BOSE_SUB-0000140 at 144-145), (ii) setting up SA-2 and/or SA-3 Amplifiers in "additional rooms" using Bose link technology of a Bose "Lifestyle 18 series II, 28 series II, 38 or 48 home entertainment system" (*id*. at ¶ 903 (citing BOSE_SUB-0000274-360 at 289, 290, 297 and BOSE_SUB-0000361-448 at 385-386)), and (iii) the Bose link

communication protocol (*id*. at ¶ 904 (citing BOSE_SUB-0000594-601 at 595-596)).  However, as I have already explained above in Section XV.C.1.iii, the functionality that he relies on for these various Bose products does not disclose the claimed "zone scene" functionality.

1389.   Second, Dr. Schonfeld has not identified (and I have not seen) any evidence of a "computing device" in Dr. Schonfeld's alleged Bose Lifestyle 50 System displaying representations of two different "shared source groups" having a common member in a manner that allows a user to select between the two "shared source groups" for purposes of requesting invocation.

1390.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in Dr. Schonfeld's alleged Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.9 of Asserted Claim 1 of the '966 Patent.

### ix.    The Bose Lifestyle 50 System Did Not Meet Limitations 1.4 / 1.10

1391.   When read together, limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent require the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

**[1.4]**    while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:

…

**[1.10]**    while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and

1392.   In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1393.   As explained above, the evidence I have reviewed establishes that the Bose Lifestyle 50 System only provided users with the ability to form and use ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above.  Thus, for this

334 of 413

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functional capability for either "displaying a representation" of a "zone scene" or receiving a "request to invoke" a "zone scene" – let alone the required functional capability for "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

1394.   Further, as explained above, the "first zone scene" and the "second zone scene" for which the "representation[s]" are "display[ed]" are required to overlap with one another by including at least one common "zone player" (i.e., the claimed "first zone player").  However, in the Bose Lifestyle 50 System, it was not possible for two ad-hoc "shared source groups" to overlap with one another; rather, each Lifestyle player could only be a member of a single "shared source group" at any given time.   Thus, for this additional reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the required functional capability to "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene."

1395.   Further yet, claim limitations 1.4 and 1.10 require the "computing device" to be "displaying the representation of the first zone scene and the representation of the second zone scene" and to "receiv[e] a third request to invoke the first zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  However, in the Bose Lifestyle 50 System, it was not possible for an ad-hoc "shared source group" to exist in an inactive state in which the members of the "shared source group" could be used for individual playback while the "shared source group" remained available for selection by a user; rather, an ad-hoc "shared source group" only remained in existence for the temporary period of time during which

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

it was activated, and once deactivated, the "shared source group" would cease to exist. Moreover, while the Personal Music Center was capable of displaying the hard-coded "HOUSE" option at a time when a Lifestyle player was operating in standalone mode, (i) the hard-coded "HOUSE" option was not a "zone scene" for the reasons explained above and (ii) the hard-coded "HOUSE" option alone cannot possibly meet the claimed requirement of displaying "representations" of multiple overlapping "zone scenes."

1396. Still further, in the context of the surrounding claim language, a POSITA would understand that claim limitations 1.4 and 1.10 require the "computing device" to receive the "request to invoke the first zone scene" at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request." Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" received the "request to invoke the first zone scene" that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed "representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene." However, in the Bose Lifestyle 50 System, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System would have only received a single request that served to both create and invoke a "shared source group" – it would have never received an initial "request to create" a "shared source group" followed by some later, separate "request to invoke" the "shared source group." This is because an ad-hoc "shared source group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "shared source group" would cease to exist. Thus, in the Bose Lifestyle 50 System, there would have never been a period of time during which a "shared source group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "shared source group."

574

1397.   Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were either disclosed or rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶¶ 1038, 1044.  However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1398.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

> (v)   Limitation 1.4 "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually:"
>
> 1038.   *See supra* '885 claim 1, :network device" disclosure in, e.g., 1.6, 1.7, 1.9, "network interface" disclosure in, e.g., 1.1., "zone player" disclosure in e.g., preamble, 1.1, 1.4-1.7, 1.9-1.10, "standalone mode" disclosure in e.g., 1.5, 1.8, 1.10.

> (xi)   Limitation 1.10 while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene; and
>
> 1044.   *See supra* '885 claim 1, Limitation 1.9.

1399.   As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitations 1.4 and 1.10 of Asserted Claim 1 of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent.  In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent were only *rendered obvious* by the Bose Lifestyle 50 System.  And along similar lines, Dr. Schonfeld never articulates what he considers to be the displayed "representation of the first zone scene," the displayed "representation of the second zone scene," or the "third request to invoke the first zone scene" in the Bose Lifestyle 50 System.  For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent. [63]

1400.  With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitations 1.4 and 1.10 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1401.  For instance, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System meets

---

[63] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  limitation 1.9 of Asserted Claim 1 of the '885 Patent (upon which he relies for limitation 1.10 of

2  Asserted Claim 1 of the '966 Patent) is based in part on functionality that is not related to or

3  compatible with the actual Bose Lifestyle 50 System itself.  *See* Schonfeld Op. Report at ¶¶ 954-

4  959.    Indeed,  Dr. Schonfeld relies on functionality related to the Bose link communication

5  protocol, which, as explained above, is not utilized by or compatible with the Bose Lifestyle 50

6  System. *Id*. at ¶ 956 (citing BOSE_SUB-0000594-601 at 595-597).  For these reasons alone, Dr.

7  Schonfeld's theory is flawed and he has failed to prove that the actual Bose Lifestyle 50 System

8  discloses the claimed "zone scene" functionality of claim limitations 1.4 and 1.10 of Asserted

9  Claim 1 of the '966 Patent.

10     1402.  Further examples of why Dr. Schonfeld's analysis is flawed are set forth below,

11  where I have separated reasons related to the actual Bose Lifestyle 50 System and  Dr. Schonfeld's

12  alleged Bose Lifestyle 50 System.

13                              Actual Bose Lifestyle 50 System

14     1403.  When discussing the actual Bose Lifestyle 50 System and claim limitation 1.9 of

15  Asserted Claim 1 of the '885 Patent, Dr. Schonfeld cites disclosure about the Personal Music

16  Center of the Bose Lifestyle 50 System and states that "a user may select a synchronization group

17  for playback using the Room button [of the Personal Music Center], and use the playback controls

18  to cause Bose LifeStyle to operate as a synchronous playback group." *See* Schonfeld Op. Report

19  at ¶ 955 (citing BOSE_SUB-0000001-55 at 43).  Although, unclear, Dr. Schonfeld appears to be

20  suggesting that the Personal Music Center discloses the "network device" of limitation 1.9 and

21  that, in response to a selection made using the "Room button" or in response to a user "us[ing]"

22  playback controls," the Personal Music Center and/or the Multi-Room Interface transmits the

23  claimed "instruction to operate in accordance with a given one of the first and second zone scenes"

24  to a Lifestyle player in "a synchronization group" to cause the Lifestyle player to operate in

25  accordance with the "synchronization group."  However, for similar reasons to those I explained

26  in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, this theory is flawed

27  for several reasons.

28     1404.  First, this discussion of the Bose Lifestyle 50 System relies exclusively on the

functionality in the Bose Lifestyle 50 System for forming ad-hoc "shared source groups," which are not the claimed "zone scenes" for all of the reasons I have previously explained in Section XV.C.1.iii. Thus, this alleged functionality cannot meet the claimed requirement of receiving a "request to invoke" a "zone scene."

1405.   Second, even setting aside the other fundamental differences between a "shared source group" and a "zone scene," neither the user action of allegedly selecting a previously-created "shared source group" via the Personal Music Center nor the user action of using the "playback controls" for the selected "shared source group" amounts to a "request to invoke" the "shared source group."  This is because a "shared source group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, so there would have never been a period of time during which a "shared source group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "shared source group."  Thus, at the time that a "shared source group" was allegedly selected via the Personal Music Center, such a "shared source group" would have already been "invoked" and thus such a selection was not a "request to invoke" the "shared source group."  Rather, the user would have been selecting an already-invoked "shared source group" for purposes of controlling that already-invoked "shared source group," not "request[ing] to invoke" the "shared source group."   And for similar reasons, any subsequent user action in the user interface with respect to the "shared source group," such as an interaction with the "playback controls," also would not amount to a "request to invoke" the "shared source group."

1406.   Dr. Schonfeld's position to the contrary appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but in my opinion, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent.  Rather, a POSITA would understand that the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" refers to the point in time when the pre-saved group

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  of "zone players" is activated for synchronous playback such that the "zone players" enter a mode

2  in which they are controlled and used as part of the group, which is distinct from the act of initiating

3  playback on that group of "zone players" (although in some scenarios it is possible that playback

4  could be automatically initiated as a result of the "zone scene" being invoked). *See, e.g.*, '407

5  Provisional at App'x A, p. 4 (explaining that when a "Zone Scene" is invoked at a time when "no

6  music is playing in any Zone – then the zones will simply link in a group" without playing any

7  music); 6/6/2022 Lambourne Dep. Tr. at 59:5-16 (inventor of the '885 and '966 Patents testifying

8  that a "zone scene" does not have to start actively playing audio "at that moment when the group

9  is invoked"); D.I. 309 (the Court describing "standalone mode" as a mode in which a "zone player"

10 "operate[s] individually" as contrasted with a mode in which the "zone player" is "being controlled

11 as part of [a] group" and never mentioning active playback as a required aspect of "standalone

12 mode"). And as explained previously, the "shared source groups" in the Bose Lifestyle 50 System

13 were automatically invoked at the time of their creation and then only remained in existence for

14 the temporary period of time during which they were in an active state, so there would have never

15 been a period of time during which a "shared source group" was created and in existence but was

16 in an inactive, uninvoked state such that a user was presented with an option to "request to invoke"

17 the "shared source group" as required by Asserted Claim 1 of the '966 Patent.

18      1407.  Third, even setting aside the other fundamental differences between a "shared

19 source group" of audio and a "zone scene," I have not seen any evidence that the Personal Music

20 Center and/or Multi-Room Interface of the actual Bose Lifestyle 50 System transmits any sort of

21 information in response to a user selecting one or more rooms using the ROOM or HOUSE button

22 of the Personal Music Center. Dr. Schonfeld's only rebuttal is to point to the Bose link

23 communication protocol, which is not utilized by or compatible with the actual Bose Lifestyle 50

24 System, as explained above. *See* Schonfeld Op. Report at ¶ 955 ("Dr. Almeroth contends that

25 'seen no evidence that the Personal Music Center transmits any sort of information in response to

26 a user select ing one or more rooms using the Room or House button of the Personal Music

27 Center." I disagree. As shown above, the Bose link is essentially a conversation between the media

28 center and the playback speakers such that the media center sends commands along with audio to

the playback speak, which then 'responds' with information."). This confirms my position that there is no evidence that the Personal Music Center and/or Multi-Room Interface of the actual Bose Lifestyle 50 System transmits any sort of information in response to a user selecting one or more rooms using the ROOM or HOUSE button of the Personal Music Center. I address Dr. Schonfeld's reliance on the Bose link communication protocol below.

1408. Fourth, even setting aside the other fundamental differences between a "shared source group" of audio and a "zone scene," and assuming that the Personal Music Center does transmit an instruction in response to a user "us[ing] the playback controls, such as an instruction to play audio, I have not seen any evidence that such an instruction is transmitted from the Personal Music Center to a Lifestyle player. Instead, based on the materials I have reviewed, the Personal Music Center can only transmit information to the Multi-Room Interface of the Bose Lifestyle 50 System. *See, e.g.*, BOSE_SUB-0000001-55 at 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest Multi-Room Interface. … Hold the music center close to the Multi-Room Interface. Press and hold MUTE for about 5 seconds until you hear a beep and then release. After about 10 seconds, the music center should beep twice to confirm that the link is established."), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE."); BOSE_SUB-0000684-687 at 685 (describing the "Multi-room interface" as a "[s]mall, hideaway connection box transmits data to, and receives data from, the Personal music center via a radio data link."). Thus, to the extent the Personal Music Center transmits an instruction to play audio on one or more selected rooms each having a Lifestyle player, it is my understanding that the instruction would be transmitted to the Multi-Room Interface, which would then configure itself to start to distribute audio to the one or more selected rooms via the Room A-D audio output connectors. *Id.*; *see also id.* at BOSE_SUB-0000001-55 at 6 ("The Bose multi-room interface, with four independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

player and an Acoustimass module connected the multi-room interface). Further, I have seen no evidence the Multi-Room Interface can relay or transmit such an instruction to play music to Lifestyle player.

1409. Further yet, even if an instruction was sent from the Multi-Room Interface to a Lifestyle player (which I have seen no evidence of), such an instruction would not be received over a data network. As explained above, a POSITA would not consider the Multi-Room Interface and the Lifestyle players to be operating on a data network because the hard-wired connection therebetween is not a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other.

1410. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.10 of Asserted Claim 1 of the '966 Patent.

### Dr. Schonfeld's alleged Bose Lifestyle 50 System

1411. When discussing his alleged Bose Lifestyle 50 System and claim limitation 1.9 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld cites disclosure about the Bose link communication protocol and states the following: "Bose Link is used as protocol to communicate between and amongst the various zones in order to invoke, for example, the play command that simultaneously plays audio in multiple zones. More specifically, Bose Link in conjunction with the media center operates over a network and allows for a user's pre-defined zones to also play different audio in simultaneously." *See* Schonfeld Op. Report at ¶ 956 (citing BOSE_SUB-0000594-601 at 595-597). Although, unclear, Dr. Schonfeld appears to be suggesting that a "play command" sent using the Bose link communication protocol meets the claimed "instruction to operate in accordance with a given one of the first and second zone scenes." However, for similar reasons to those I explained in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, this theory is flawed for several reasons.

1412. First, in his section discussing his alleged version of the Bose Lifestyle 50 System

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

and claim limitation 1.9 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld relies on functionality related to the Bose link communication protocol. *See* Schonfeld Op. Report at ¶ 956 (citing BOSE_SUB-0000594-601 at 595-597). However, as I have already explained above in Section XV.C.1.iii, the functionality that he relies on for the Bose link communication protocol does not disclose the claimed "zone scene" functionality.

1413. Second, to the extent I understand what Dr. Schonfeld is saying, Dr. Schonfeld's position that a "play command" meets the claimed "instruction to operate in accordance with a given one of the first and second zone scenes" of limitation 1.9 of Asserted Claim 1 of the '885 Patent appears to be based on an interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but in my opinion, this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent. Rather, a POSITA would understand that the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" refers to the point in time when the pre-saved group of "zone players" is activated for synchronous playback such that the "zone players" enter a mode in which they are controlled and used as part of the group, which is distinct from the act of initiating playback on that group of "zone players" (although in some scenarios it is possible that playback could be automatically initiated as a result of the "zone scene" being invoked). *See, e.g.*, '407 Provisional at App'x A, p. 4 (explaining that when a "Zone Scene" is invoked at a time when "no music is playing in any Zone – then the zones will simply link in a group" without playing any music); 6/6/2022 Lambourne Dep. Tr. at 59:5-16 (inventor of the '885 and '966 Patents testifying that a "zone scene" does not have to start actively playing audio "at that moment when the group is invoked"); D.I. 309 (the Court describing "standalone mode" as a mode in which a "zone player" "operate[s] individually" as contrasted with a mode in which the "zone player" is "being controlled as part of [a] group" and never mentioning active playback as a required aspect of "standalone mode"). And as explained previously, the "shared source groups" in the Bose Lifestyle 50 System were automatically invoked at the time of their creation and then only remained in existence for the temporary period of time during which they

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1  were in an active state, so there would have never been a period of time during which a "shared

2  source group" was created and in existence but was in an inactive, uninvoked state such that a user

3  was presented with an option to "request to invoke" the "shared source group" as required by

4  Asserted Claim 1 of the '966 Patent.

5        1414.   Third, contrary to Dr. Schonfeld's assertion, I have not seen any evidence of a "play

6  command that simultaneously plays audio in multiple zones" in the "Understanding Bose link"

7  document cited by Dr. Schonfeld.  *See* BOSE_SUB-0000594-601.  Instead, according to the

8  "Understanding Bose link" document cited by Dr. Schonfeld, the only information transmitted

9  from a Bose link enabled media center to a Bose link expansion product (e.g., an SA-2 or SA-3

10  Amplifier) is "on/off, volume and source commands along with audio."  *See* BOSE_SUB-

11  0000594-601 at 595.  In my opinion, none of this information amounts to "an instruction to operate

12  in accordance with" a group of Lifestyle players, and Dr. Schonfeld does not assert otherwise.

13        1415.   Moreover, as explained above, in a Bose link system, each SA-2 or SA-3 amplifier

14  is a Bose link expansion product in each room needs its own dedicated Bose link expansion

15  controller, such as the RC-18S Remote Control, RC-38S Remote Control, and Personal Music

16  Center II, and such controllers can only be set up to control a single room at a time by setting the

17  "room code" of the remote control to match the "room code" of the SA-2 or SA-3 Amplifier.  *See*

18  BOSE_SUB-0000361-448 at 384-386; *see also* BOSE_SUB-0000594-601 at 595 ("Both the

19  expansion product and the remote must be configured to operate on the same room.").  Thus,

20  contrary to Dr. Schonfeld's assertion, there is no way to send a "play command that simultaneously

21  plays audio in multiple zones" using the Bose link communication protocol.

22        1416.   Further, as I explained in my '885 Rebuttal Report, a POSITA would understand

23  that the "instruction to operate in accordance with" the selected "zone scene" requires an

24  instruction that causes the selected "zone scene" to become "invoked" such that the group of "zone

25  players" becomes activated.  However, any alleged "play command" would be sent after a group

26  of Bose link expansion products was set to the same audio stream and was already activated for

27  synchronous playback, as explained above.

28        1417.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in Dr. Schonfeld's alleged Bose Lifestyle 50 System did not have the functional capability required by limitations 1.4 / 1.10 of Asserted Claim 1 of the '966 Patent.[64]

### x.    The Bose Lifestyle 50 System Did Not Meet Limitation 1.11

1418.    Limitation 1.11 of Asserted Claim 1 of the '966 Patent requires the "computing device" to be encoded with executable "program instructions" that cause the computing device to perform the following function(s):

> **[1.11]**    based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.

1419.    In my opinion, the Bose Lifestyle 50 System did not meet this requirement.

1420.    As explained above, the evidence I have reviewed establishes that the Bose Lifestyle 50 System only provided users with the ability to form and use ad-hoc "shared source groups," which are not the claimed "zone scenes" for the reasons explained above. Thus, for this reason, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room

---

[64] Finally, although unclear, in his section discussing the Bose Lifestyle 50 System and limitation 1.8 of Asserted Claim 1 of the '885 Patent (which Dr. Schonfeld does not rely on for limitation 1.10 of Asserted Claim 1 of the '966 Patent), Dr. Schonfeld appears to be suggesting that multiple Bose link enabled Lifestyle players (e.g., SA-2 or SA-3 amplifiers) in a Bose link configuration have the functional capability of limitation 1.8 because they can be "offline" after they are connected to a Bose link enabled media center and then brought "online" when a user invokes the multiple Bose link enabled Lifestyle players using a remote control. *See* Schonfeld Op. Report at ¶¶ 928-932. To the extent Dr. Schonfeld is relying on this "offline" / "online" argument in the same manner that he relied on his "powered-off" theory for Squeezebox, it fails for the same reasons as I explained above in connection with Squeezebox. Moreover, I have reviewed the materials cited by Dr. Schonfeld and I fail to see any discussion of Lifestyle layers being "offline" and then being brought "online." As such, it is not clear what functionality of the Bose Lifestyle 50 System that Dr. Schonfeld is even referring to. Regardless, in my opinion, a POSITA would not consider a speaker that is "offline" to be "operating in a standalone mode in which the first zone player is configured to play back media individually." Additionally, in my opinion, a POSITA would consider the user action of bringing a speaker "online" to be distinctly different from the claimed requirement of a "request to invoke" the "shared source group."

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Interface) in the Bose Lifestyle 50 System did not have any functional capability for invoking a "zone scene" – let alone the required functional capability for "based on the third request [to invoke the first zone scene], causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player."

1421. Further, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at a time when (i) the "first zone scene" and "second zone scene" have been created and are both in existence and (ii) the "first zone player" is "operating in a standalone mode," which means that the "first zone scene" and the "second zone scene" both must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode"). However, in the Bose Lifestyle 50 System, it was not possible for an ad-hoc "shared source group" to exist in an inactive state in which the members of the "shared source group" could be used for individual playback while the "shared source group" remained available for selection by a user; rather, an ad-hoc "shared source group" only remained in existence for the temporary period of time during which it was activated, and once deactivated, the "shared source group" would cease to exist.

1422. Further yet, in the context of the surrounding claim language, a POSITA would understand that the "computing device" is required to carry out the functionality of limitation 1.11 at some point in time that is later than when it received the "request to create [the] first zone scene" and the "first zone scene" was created based on that "request." Indeed, at a minimum, there must be a time gap between the time when the "computing device" received the "request to create [the] first zone scene" and the time when the "computing device" carries out the functionality of limitation 1.11 that is long enough to allow (i) the "first zone scene" to be created, (ii) the "computing device" to display "representation[s]" of the "first zone scene" as well as the "second zone scene," and (iii) a user to view the displayed "representation[s]" of the "first zone scene" and "second zone scene" and then input the "request to invoke the first zone scene." However, in the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Bose Lifestyle 50 System, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) would have only received a single request that served to both create and invoke a "shared source group," and this single request is what would have triggered the Multi-Room Interface of the Bose Lifestyle 50 System to configure itself to distribute audio from the selected audio source to the selected Lifestyle player in the "shared source group" in order to cause those Lifestyle players to play back the same music simultaneously – the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) would have never received an initial "request to create" a "shared source group" followed by some later, separate "request to invoke" the "shared source group."  This is because an ad-hoc "shared source group" was automatically invoked at the time of its creation and then only remained in existence for the temporary period of time during which it was in an active state, after which time the "shared source group" would cease to exist.  Thus, in the Bose Lifestyle 50 System, there would have never been a period of time during which a "shared source group" was created and in existence but was in an inactive, uninvoked state such that a user was presented with an option to "request to invoke" the "shared source group" that would subsequently trigger the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) to cause the Lifestyle players in a "shared source group" to become configured to play the same music simultaneously.

1423.  Still further, the evidence I have reviewed establishes that a Lifestyle player did not have the capability to "transition[] from operating in [a] standalone mode to operating in accordance with" a "shared source group" such that the Lifestyle player would have been "configured to coordinate with at least [one other Lifestyle player] to output media in synchrony with output of media by at least [the one other Lifestyle player]."  In fact, the evidence I have reviewed establishes a Lifestyle player did not have the capability to "coordinate" with another Lifestyle player for any purpose – let alone for purposes of outputting audio in synchrony -- nor did a Lifestyle player have the capability to change its "configur[ation]" as it related to audio

playback.  To the contrary, the evidence I have reviewed shows that the Multi-Room Interface of the Bose Lifestyle 50 System was exclusively responsible for the "shared source group" functionality, and the Lifestyle players never changed into a different "mode" for group playback or even had any awareness of whether or not they were part of a "shared source group." *See, e.g.,* BOSE_SUB-0000001-55 at 6 ("The Bose Multi-Room Interface, with four independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD player and an Acoustimass module connected the Multi-Room Interface), 17 (illustrating various audio sources connected to Multi-Room Interface via audio input cables), 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface…. If the music center continuously displays "NO RESPONSE," you need to try to establish its link with the multi-room interface again."), 42 (Figure 47 showing "AUDIO OUTPUT" jacks for each room), 44-45 (explaining how to use ROOM and HOUSE buttons of the Personal Music Center to set up an audio source for one or more rooms connected to the Multi-Room Interface), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE.").

1424.  Despite this clear evidence establishing that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any "zone scenes" capability, Dr. Schonfeld nevertheless opines that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was either disclosed or rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶ 1045.  However, I find Dr. Schonfeld's opinions regarding the Bose Lifestyle 50 System and claim limitation 1.11 of Asserted Claim 1 of the '966 Patent to be flawed for several reasons.

1425.  As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claim limitation 1.11 of Asserted Claim 1 of the '966 Patent is shown in

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the screenshot below from Dr. Schonfeld's Opening Report:

> *(xii)* *Limitation 1.11 based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player.*
>
> 1045. *See supra* '885 claim 1, Limitation 1.10.

1426. As these screenshots demonstrate, Dr. Schonfeld is relying exclusively on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), claim limitation 1.11 of Asserted Claim 1 of the '966 Patent uses different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent. In fact, Dr. Schonfeld fails to even state whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was actually *disclosed* by the Bose Lifestyle 50 System versus whether his opinion is that claim limitation 1.11 of Asserted Claim 1 of the '966 Patent was only *rendered obvious* by the Bose Lifestyle 50 System. And along similar lines, Dr. Schonfeld never articulates what he considers to be the "third request to invoke the first zone scene" or what functionality satisfies the "causing" limitation in the Bose Lifestyle 50 System. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of claim limitation 1.11 of Asserted Claim 1 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions

regarding claim limitation 1.11 of Asserted Claim 1 of the '966 Patent. [65]

1427.   With that said, as I have discussed above in Section XV.C.1.iii as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to claim limitation 1.11 of Asserted Claim 1 of the '966 Patent as well – including that he relies on functionality that is not even part of the actual Bose Lifestyle 50 System, that he fails to identify what he is alleging to meet the various aspects of these claim limitations, and that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1428.   For instance, Dr. Schonfeld's opinion that the Bose Lifestyle 50 System meets limitation 1.10 of Asserted Claim 1 of the'885 Patent (upon which he relies for limitation 1.11 of Asserted Claim 1 of the '966 Patent) is based on his analysis of "previous claim elements" of Asserted Claim 1 of the'885 Patent, which, as explained above, are based on functionality that is not related to or compatible with the actual Bose Lifestyle 50 System itself.  *See* Schonfeld Op. Report at ¶¶ 960-961.  For these reasons alone, Dr. Schonfeld's theory is flawed and he has failed to prove that the actual Bose Lifestyle 50 System discloses the claimed "zone scene" functionality of claim limitation 1.11 of Asserted Claim 1 of the '966 Patent.

1429.   Further, in his section discussing the Bose Lifestyle 50 System and claim limitation 1.10 of Asserted Claim 1 of the'885 Patent, Dr. Schonfeld's entire analysis is the following statement: "[a]s described in the previous claim elements, a user may select a synchronization group for playback using the Player selector box, and use the playback controls to cause Bose LifeStyle to operate as a synchronous playback group."  *See* Schonfeld Op. Report at ¶¶ 960-962.  This theory is flawed for numerous reasons.

1430.   First, Dr. Schonfeld references his analysis of "previous claim elements," which are flawed for all of the reasons stated above.

---

[65] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1431.   Second, Dr. Schonfeld references a "Player selector box," but I am not aware of such a feature in the Bose Lifestyle 50 System.  Instead, this appears to be referencing the "Player selector box" of Squeezebox, which I addressed above in my discussion of Squeezebox.

1432.   Third, nowhere in this "analysis" does Dr. Schonfeld mention anything about Lifestyle players being "configured to coordinate" for synchronous playback, which is a requirement of limitation 1.10 of Asserted Claim 1 of the '885 Patent as well limitation 1.11 of Asserted Claim 1 of the '966 Patent.

1433.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by limitation 1.11 of Asserted Claim 1 of the '966 Patent.

> xi.   **Asserted Claim 1 Would Not Have Been Obvious Based on The Bose Lifestyle 50 System in view of the Secondary References Identified by Dr. Schonfeld**

1434.   In his Opening Report, Dr. Schonfeld does not offer any opinion that Asserted Claim 1 of the '966 Patent is anticipated by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at Section XII.C, ¶¶ 1034-1065.  Instead, Dr. Schonfeld only opines that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System.  *Id*.

1435.   In particular, Dr. Schonfeld's section for the '966 Patent as compared to the Bose Lifestyle 50 System is entitled "'966 Claims Are Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington."  Schonfeld Op. Report at Section XII.C.  Dr. Schonfeld then includes a sub-section entitled "Claim 1 Is Invalid Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington" where he lists out each limitation of Asserted Claim 1 of the '966 Patent, although Dr. Schonfeld does not provide any analysis of how the limitations of Asserted Claim 1 of the '966 Patent are allegedly disclosed or rendered obvious by the Bose Lifestyle 50 System in view of General knowledge of a POSITA, the Sonos Forums, Nourse,

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Rajapakse or Millington. *Id*. at Section X11.C.26, ¶¶ 1134-1045. Instead, Dr. Schonfeld merely refers back to the limitation-by-limitation analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious based on the Bose Lifestyle 50 System. *Id*.

1436. However the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), Asserted Claim 1 of the '966 Patent requires a different combination of claim limitations than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. As a result, Dr. Schonfeld fails to articulate how or why even a single claim limitation of Asserted Claim 1 of the '966 Patent would be rendered obvious based on "Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington" as he states – let alone how or why the entire combination of claim limitations of Asserted Claim 1 of the '966 Patent would be rendered obvious based on "Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington." For these reasons, I disagree that Dr. Schonfeld has provided a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and Dr. Schonfeld's failure to do so has prejudiced my ability to fully discern, assess, and respond to his obviousness opinions regarding Asserted Claim 1 of the '966 Patent. [66]

1437. Nevertheless, in the sub-sections below, I have made my best effort to assess and respond to Dr. Schonfeld's unsupported and conclusory opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on "Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington."

---

[66] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

(a)     **The Bose Lifestyle 50 System in view of the General Knowledge of a POSITA**

1438.   At Section XII.C of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA." Schonfeld Op. Report at Section XII.C, ¶¶ 1034-1045. I disagree – in my opinion, claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA," and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

1439.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for his stated opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA." *See* Schonfeld Op. Report at ¶¶ 1034-1045. Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA," without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent. *Id*. For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA" to be deficient.

1440.   Additionally, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System in view of the "general knowledge of a POSITA" suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1441.   First, even if the Bose Lifestyle 50 System were to be modified in the various ways proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1442.   Second, Dr. Schonfeld's proposed modifications to the Bose Lifestyle 50 System

are all nothing more high-level suggestions – such as "add[ing] overlapping groups" – and Dr. Schonfeld has failed to provide any explanation as to how these proposed modifications to a the Bose Lifestyle 50 System would have actually been implemented, let alone how the proposed modifications would have achieved either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze. Moreover, in my opinion, implementing Dr. Schonfeld's high-level suggestions would have required substantial, non-obvious modifications to the "shared source group" functionality of the Bose Lifestyle 50 System at the time.

1443.   Third, I disagree that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System in any one of the ways proposed by Dr. Schonfeld – let alone all of the different ways proposed by Dr. Schonfeld.  As discussed above, the Bose Lifestyle 50 System already included ad-hoc "shared source group" functionality that allowed Lifestyle players to be grouped together on demand to play the same audio source simultaneously (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality that would have led such a POSITA to consider a different mechanism for grouping Lifestyle players together – let alone would have led such a POSITA to implement the specific "zone scenes" functionality that is claimed in the '885 and '966 Patents.  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "shared source group" functionality of the Bose Lifestyle 50 System with the claimed "zone scenes" functionality, particularly in view of the time, effort, and cost that would have been required to overhaul the Bose Lifestyle 50 System's grouping mechanism.

1444.   Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to modify the Bose Lifestyle 50 System in the various ways proposed by Dr. Schonfeld.  However, in addition to the fact that Dr. Schonfeld failed to articulate any reasoning as to why a POSITA would have been motivated to modify the Bose Lifestyle 50 System to achieve the specific

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

1445.    Starting with paragraph 908 of his Opening Report, Dr. Schonfeld states as follows with respect to his proposed modification to "add overlapping groups":

> A POSITA would have been motivated to add overlapping groups because Bose LifeStyle's own marketing materials touted the flexibility of its system to allow users to play back media throughout their household. *Supra*.

Schonfeld Op. Report at ¶ 908.  I disagree.  Bose's marketing materials touting the ability "the flexibility of its system to allow users to play back media throughout their household" was a description of capabilities that purportedly *already existed* in the Bose Lifestyle 50 System.  This statement informing potential customers about an existing capability of the Bose Lifestyle 50 System would not have motivated a POSITA in 2005-06 to modify the Bose Lifestyle 50 System in any way – let alone a motivation to modify the Bose Lifestyle 50 System in the many ways required to achieve the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent.

1446.    Turning next to paragraph 909 of his Opening Report, Dr. Schonfeld also states as follows with respect to his proposed modification to "add overlapping groups":

> A person of skill in the art would have recognized that by allowing a user to create speaker groups, those groups may either (1) allow overlapping group membership or (2) not allow overlapping group membership. Given that allowing overlapping group membership may be attractive to certain users because there was a recognized "need for dynamic control of the audio players as a group," it would have been obvious to select allowing overlapping group membership when implementing speaker groups. '885 Pat at 1:30-34.

Schonfeld Op. Report at ¶ 909.  I disagree for the same reasons discussed above with respect to Sonos's 2005 system.

1447.    Specifically, as an initial matter, I disagree with Dr. Schonfeld's suggestion that this would have simply been a matter of whether or not to "allow overlapping group membership." The evidence I have reviewed shows that the Bose Lifestyle 50 System was employing a distinctly different type of grouping technology that would not even allow for "overlapping group membership" because "shared source groups" were temporary, ad-hoc groups that were

1   automatically activated at the time they were created.  As such, it would not have been possible to

2   simply modify the existing grouping technology of the Bose Lifestyle 50 System to "allow

3   overlapping group membership" – a completely different grouping technology would have been

4   required.  And in any event, modifying the Bose Lifestyle 50 System to "add overlapping groups"

5   would not have achieved the specific "zone scenes" functionality required by either Asserted Claim

6   1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

7       1448.   Further, the fact that the inventor of the '966 Patent recognized a "need for dynamic

8   control of the audio players as a group" does not establish that a POSITA in 2005-06 would have

9   recognized that same need, and Dr. Schonfeld fails to identify any other evidence to support his

10  statement that this need would have been recognized by a POSITA in 2005-06.  And regardless,

11  even if a POSITA in 2005-06 were to have recognized this need, I fail to see how that would have

12  motivated a POSITA in 2005-06 to modify the Bose Lifestyle 50 System's ad-hoc "shared source

13  group" functionality at all given that it already allowed Lifestyle players to be controlled as a group –

14  let alone would have motivated a POSITA in 2005-06 to replace the Bose Lifestyle 50 System's

15  ad-hoc "shared source group" functionality with the specific "zone scenes" functionality required

16  by either Asserted Claim 1 of the '885 Patent or Asserted Claim 1 of the '966 Patent.

17      1449.   Further yet, Dr. Schonfeld fails to identify any evidence in support of his statement

18  that "allowing overlapping group membership may be attractive to certain users," but even if this

19  were true, Dr. Schonfeld fails to explain how or why this would have motivated a POSITA in

20  2005-06 to replace the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality with

21  the specific "zone scenes" functionality required by either Asserted Claim 1 of the '885 Patent or

22  Asserted Claim 1 of the '966 Patent.

23      1450.   Turning next to paragraphs 934-936 of his Opening Report, Dr. Schonfeld again

24  cites to the section of Mr. Lambourne's "Zone Scenes" design specification entitled "What

25  happens to the Music that's already playing when a Zone Scene is Started" and repeats his same

26  argument that "[a] person of skill in the art would have found it obvious to choose from one of

27  these possibilities— stop music, choose music, adopt the music of the only playing speaker, and

28  continue playing the 'standalone' music—when adding a speaker to a group" because "[t]hese are

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

a limited number of obvious design options." Schonfeld Op. Report at ¶¶ 934-936. However, Dr. Schonfeld's reliance on this section of the "Zone Scenes" design specification to support this opinion is flawed for all of the same reasons explained above, and I also disagree with Dr. Schonfeld's suggestion that configuring a Lifestyle player to "continue playing 'standalone' music" after being added to a "shared source group" would have been recognized as an "obvious design option[]" by a POSITA in 2005-06 – the evidence I have reviewed shows that the Bose Lifestyle 50 System was employing a distinctly different type of grouping technology that only allowed a user to create temporary, ad-hoc "shared source groups" that were automatically activated and could never exist in an inactive state, and configuring a Lifestyle player to "continue playing 'standalone' music" after being added to a "shared source group" would have been directly contrary to the principle of operation of that ad-hoc "shared source group" functionality. For this reason, a POSITA in 2005-06 would not have even considered configuring a Lifestyle player to "continue playing 'standalone' music" after being added to a "shared source group" as a possible option, nor would a POSITA in 2005-06 have been motivated to modify the Bose Lifestyle 50 System to implement this change, as that would have required a completely different grouping technology.

1451.   Fourth, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System in the many ways proposed by Dr. Schonfeld, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on the Bose Lifestyle 50 System, which I understand to be improper.

1452.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System alone.

**(b)     The Bose Lifestyle 50 System in view of the Sonos Forums**

1453.   At Section XII.C of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the Sonos Forums. Schonfeld Op. Report at ¶¶1034-1045. I disagree – in my opinion,

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the Sonos Forums, and Dr. Schonfeld's apparent opinion to the contrary is flawed for several reasons.

1454.    As an initial matter, to the extent that Dr. Schonfeld is offering an opinion that that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the Sonos Forums, Dr. Schonfeld fails to set forth any bases or reasoning for such an opinion. *See* Schonfeld Op. Report at ¶¶ 1034-1045.  Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System, but Dr. Schonfeld also fails to provide any analysis of the Bose Lifestyle 50 System in view of the Sonos Forums in that section of his Opening Report.  *Id*.  For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the Sonos Forums to be deficient.

1455.    Moreover, to the extent that Dr. Schonfeld does intend to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of the Sonos Forums, I disagree with such an opinion for at least the same reasons explained in my other sections regarding Dr. Schonfeld's obviousness opinions that are based on the Bose Lifestyle 50 System and the Sonos Forums, including that neither the Bose Lifestyle 50 System nor the Sonos Forums disclose or suggest the controller-side "zone scenes" functionality of Asserted Claim 1 of the '966 Patent.  Thus, even if the Bose Lifestyle 50 System were to be modified and combined with the Sonos Forums, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1456.    In addition to these deficiencies, Dr. Schonfeld also fails to provide any explanation as to how the Bose Lifestyle 50 System would have actually been modified to incorporate the functionality of the Sonos Forums, why a POSITA in 2005-2006 would have been motivated to modify the Bose Lifestyle 50 System to incorporate the functionality of the Sonos Forums, or how

such a hypothetical system would have achieved either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent.

1457.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the Sonos Forums.

### (c)      The Bose Lifestyle 50 System in view of Nourse

1458.   At Section VII.C of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Nourse.  Schonfeld Op. Report at Section XII.C, ¶¶ 1034-1045.  I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of Nourse, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

1459.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Nourse.  *See* Schonfeld Op. Report at Section VII.C, ¶¶ 1001-1012.  Instead, Dr. Schonfeld only discusses Nourse in the context of certain limitations of Asserted Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted Claim 1 of the '966 Patent.

1460.   Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's discussion of Nourse that he includes in his analysis of Asserted Claim 1 of the '885 Patent as compared to the Bose Lifestyle 50 System suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1461.  First, Nourse was cited on the face of the '966 Patent, which shows that Nourse was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Nourse.  *See* '966 Patent at 4.  Since the USPTO already considered Nourse, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1462. Second, for similar reasons to those discussed above in connection with Sonos's 2005 system, Nourse fails to disclose or suggest the claimed "zone scene" functionality that was missing from a Squeezebox system. *Supra* Section XV.A.ix.c. Thus, even if a POSITA in 2005-06 were to modify and combine the Bose Lifestyle 50 System with the identified functionality of Nourse's "centralized speaker system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1463. Third, Dr. Schonfeld has failed to provide any explanation as to how the Bose Lifestyle 50 System would have actually been modified to combine it with the identified functionality of Nourse's "centralized speaker system" – let alone how that alleged combination would have achieved the claimed invention.

1464. Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System to incorporate the identified functionality of Nourse's "centralized speaker system." As discussed above, the Bose Lifestyle 50 System already included ad-hoc "shared source group" functionality that allowed Lifestyle players to be grouped together on demand to play the same audio source simultaneously (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality that would have led such a POSITA to consider a different mechanism for grouping Lifestyle players – let alone would have led such a POSITA to implement the identified functionality of Nourse's "centralized speaker system." For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "shared source group" functionality of the Bose Lifestyle 50 System with the identified functionality of Nourse's "centralized speaker system," particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of the Bose Lifestyle 50 System.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1465.   Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to combine the Bose Lifestyle 50 System with the identified functionality of Nourse's "centralized speaker system" in the specific manner proposed by Dr. Schonfeld.  However, in addition to the fact that Dr. Schonfeld failed to provide any analysis as to how or why the combination of the Bose Lifestyle 50 System and Nourse achieves the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent, I disagree with Dr. Schonfeld's theories for the reasons explained below.

1466.   For instance, at paragraph 910 of his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine the Bose Lifestyle 50 System with Nourse because Nourse is "analogous to the '885 patent" and "reasonably pertinent to the problem to be solved by the '885 patent . . . ." Schonfeld Op. Report at ¶ 910.  However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to the Bose Lifestyle 50 System at all – let alone why a POSITA in 2005-06 would have been motivated to combine the Bose Lifestyle 50 System with Nourse in the specific manner proposed by Dr. Schonfeld.

1467.   At paragraph 910 of his Opening Report, Dr. Schonfeld also states as follows:

> Nourse teaches additional means for improving the user experience by allowing a user to add a playback device to multiple groups. Nourse at 3:57-4:5. It would have been desirable to allow a user to have a particular zone player join multiple groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and living room could be grouped for inside entertainment). Having a speaker join multiple groups would increase the number of customized combinations a user could configure in their home, as the Bose Lifestyle recognizes as an important feature.

Schonfeld Op. Report at ¶ 910.  Dr. Schonfeld fails to support this statement that "[i]t would have been desirable to allow a user to have a particular zone player join multiple groups" with any evidence, but even if a POSITA in 2005-06 were to have recognized that this functionality was "desirable," I fail to see any evidence that this recognition would have motivated such a POSITA to replace the existing ad-hoc "sync group" functionality of the Bose Lifestyle 50 System with the identified functionality of Nourse – particularly given that (i) the existing ad-hoc "shared source

group" functionality of the Bose Lifestyle 50 System already provided a mechanism for grouping Lifestyle players together and (ii) the Bose Lifestyle 50 System had a distinctly different system architecture and communication protocol than Nourse's conventional "centralized speaker system." Moreover, even if a POSITA in 2005-06 were to have recognized that it was "desirable" to modify the Bose Lifestyle 50 System to "allow a user to have a particular zone player join multiple groups" as Dr. Schonfeld contends, this still would not have motivated a POSITA to combine the Bose Lifestyle 50 System with the identified functionality of Nourse's "centralized speaker system" or otherwise modify the Bose Lifestyle 50 System in the specific ways that would have been required in order to achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1468. I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine the Bose Lifestyle 50 System with the identified functionality of Nourse's "centralized speaker system." For instance, as explained above, the Bose Lifestyle 50 System had a distinctly different system architecture than Nourse's conventional "centralized speaker system," which requires, among other things, a "central station" with a "collocated" amplifier. Additionally, as explained above, Nourse's "centralized speaker system" was primary designed to serve as a public address system, whereas the Bose Lifestyle 50 System was primary designed to serve as home audio system. Further, as explained above, the Personal Music Center and Multi-Room Interface of the Bose Lifestyle 50 System, which are used to set up a "shared source group" of Lifestyle players, communicate using a proprietary radio frequency communication protocol that was specifically developed for the Bose Lifestyle 50 System and that is "not compatible" with protocols used in other Bose systems, much less any third-party system like the one in Nourse. *See* BOSE_SUB-0000663-683 at 666. Given these differences, it is my opinion that a POSITA would have been dissuaded from modifying the Bose Lifestyle 50 System to combine it with the identified functionality of Nourse's "centralized speaker system."

1469. Finally, because there is no evidence that a POSITA in 2005-06 would have been

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

motivated to modify the Bose Lifestyle 50 System to combine it with the identified functionality of Nourse, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on the Bose Lifestyle 50 System in combination with Nourse, which I understand to be improper. *Compare* Schonfeld Op. Report, ¶ 910 ("It would have been desirable to allow a user to have a particular zone player join multiple groups (e.g., the kitchen and patio could be grouped for outside entertainment, and the kitchen and living room could be grouped for inside entertainment). Having a speaker join multiple groups would increase the number of customized combinations a user could configure in their home, as the Bose Lifestyle recognizes as an important feature.") *with* '966 Patent, 8:62-67 ("Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own."), 2:18-24 ("There is a need for dynamic control of the audio players as a group. With a minimum manipulation, the audio players may be readily grouped. In a traditional multi-zone audio system, the audio players have to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment.").

1470.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in combination with Nourse.

#### (d)    The Bose Lifestyle 50 System in view of Rajapakse

1471.   At Section VII.C of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Rajapakse.  Schonfeld Op. Report at Section XII.C, ¶¶ 1034-1045.  I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of Rajapakse, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

1472.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning that would support an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Rajapakse.  *See* Schonfeld Op. Report at Section VII.C,

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

¶¶ 1001-1012.  Instead, Dr. Schonfeld only discusses Rajapakse in the context of certain limitations of Asserted Claim 1 of the '885 Patent, without providing any explanation as to how that discussion applies to Asserted Claim 1 of the '966 Patent.

1473.   Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's discussion of Rajapakse that he includes in his analysis of Asserted Claim 1 of the '885 Patent as compared to the Bose Lifestyle 50 System suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1474.   First, as explained above, Dr. Schonfeld has failed to establish that Rajapakse qualifies as prior art to claim 1 of the '885 Patent.  *Supra* Section XIII.I.

1475.   Second, not only was Rajapakse cited on the face of several other Sonos patents as acknowledged by Dr. Schonfeld (Schonfeld Op. Report at ¶ 911), Rajapakse was also cited on the face of the '966 Patent. '966 Patent at 5.  This shows that Rajapakse was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Rajapakse.  Since the USPTO already considered Rajapakse, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents.  However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1476.   Third, for similar reasons to those discussed above in connection with Sonos's 2005 system, Rajapakse fails to disclose or suggest the claimed "zone scene" functionality that was missing from the Bose Lifestyle 50 System.  *Supra* Section XV.A.ix.h. Thus, even if a POSITA in 2005-06 were to modify and combine the Bose Lifestyle 50 System with the identified functionality of Rajapakse's system in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1477.   Fourth, Dr. Schonfeld has failed to provide any explanation as to how the Bose

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Lifestyle 50 System would have actually been modified to incorporate the identified functionality of Rajapakse's system – let alone how that alleged combination would have achieved the claimed invention.

1478. Fifth, I disagree that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System to incorporate the identified functionality of Rajapakse's system. As discussed above, the Bose Lifestyle 50 System already included ad-hoc "shared source group" functionality that allowed Lifestyle players to be grouped together on demand to play the same audio source simultaneously (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality that would have led such a POSITA to consider a different mechanism for grouping Lifestyle players together – let alone would have led such a POSITA to implement the identified functionality of Rajapakse's system. For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "sync group" functionality of the Bose Lifestyle 50 System with the identified functionality of Rajapakse's system, particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of the Bose Lifestyle 50 System.

1479. In his Opening Report, Dr. Schonfeld says that a POSITA would have found it obvious to combine the Bose Lifestyle 50 System with Rajapakse for the sole reason that "Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent" as well as third-party patents, including Google's own patents, that are "closely related to the '885 patent." Schonfeld Op. Report at ¶ 911. However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to the Bose Lifestyle 50 System at all – let alone why a POSITA in 2005-06 would have been motivated to combine the Bose Lifestyle 50 System with Rajapakse in the specific manner proposed by Dr. Schonfeld.

1480. I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to combine the Bose Lifestyle 50 System with the identified functionality of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    Rajapakse's system.

2    1481.   For example, because the Bose Lifestyle 50 System had a different system

3    architecture than Rajapakse's system, which requires a number of different components to

4    facilitate its "zone" functionality, including a "bridge renderer 205," a "distribution server 204,"

5    and a "zone manager 210," among others (*see* Rajapakse at FIGs. 2-5; *see also id*. at 11:7-18), it

6    is my opinion that a POSITA would have been dissuaded from modifying the Bose Lifestyle 50

7    System to combine it with the identified functionality of Rajapakse's system because, for example,

8    adding Rajapakse's "zone" functionality would have required adding additional components to the

9    Bose Lifestyle 50 System and thereby altered the operation of the Bose Lifestyle 50 System.

10    1482.   As another example, the Personal Music Center and Multi-Room Interface of the

11    Bose Lifestyle 50 System, which are used to set up a "shared source" of audio for multiple Lifestyle

12    players, communicate using a proprietary radio frequency communication protocol that was

13    specifically developed for the Bose Lifestyle 50 System and that is "not compatible" with protocols

14    used in other Bose systems, much less any third-party system like the one in Rajapakse.  *See*

15    BOSE_SUB-0000663-683 at 666.   As such, a POSITA would have been dissuaded from

16    modifying the Bose Lifestyle 50 System to combine it with the identified functionality of

17    Rajapakse.

18    1483.   These examples show that a POSITA would have been dissuaded from modifying

19    the Bose Lifestyle 50 System because, to the extent it was even possible, it would have required

20    wholesale changes to the system architecture and communication protocol of the Bose Lifestyle

21    50 System in order to, for example, enable the Personal Music Center and/or Multi-Room Interface

22    of the Bose Lifestyle 50 System to communicate with the additional components from Rajapakse

23    that are required to facilitate Rajapakse's "zone" functionality.

24    1484.   Finally, because there is no evidence that a POSITA in 2005-06 would have been

25    motivated to modify the Bose Lifestyle 50 System to combine it with the identified functionality

26    of Rajapakse, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his

27    conclusion that a POSITA would have found the claimed invention obvious based on the Bose

28    Lifestyle 50 System in combination with Rajapakse, which I understand to be improper.  *See*

Schonfeld Op. Report, ¶ 911 ("Rajapakse was cited by many Sonos patents regarding speaker grouping, including patents from the same family as the '885 patent, indicating that persons of skill in the art recognized that Rajapakse was highly relevant to the claimed features.").

1485.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in combination with Rajapakse.

### (e)    The Bose Lifestyle 50 System in view of Millington

1486.   At Section VII.C of his Opening Report, Dr. Schonfeld states his opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Millington.  Schonfeld Op. Report at Section XII.C, ¶¶ 1034-1045.  I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of Millington, and Dr. Schonfeld's opinion to the contrary is flawed for several reasons.

1487.   As an initial matter, Dr. Schonfeld fails to set forth any bases or reasoning for this opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Millington.  *See* Schonfeld Op. Report at Section VII.B, ¶¶ 1034-1045. Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System in view of Millington, without providing any explanation as to how that prior obviousness analysis of Asserted Claim 1 of the '885 Patent applies to Asserted Claim 1 of the '966 Patent.  *Id.*  For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Millington to be deficient.

1488.   Additionally, as I previously explained in my '885 Rebuttal Report, Dr. Schonfeld's obviousness analysis that he provides in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System in view of Millington suffers from a number of flaws, many of which are applicable to the Asserted Claims of the '966 Patent as well.

1489.   First, Millington was cited on the face of the '966 Patent, which shows that

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Millington was considered by the USPTO during prosecution of the '966 Patent and that the '966 Patent (including Asserted Claim 1) was allowed to issue over Millington. *See* '966 Patent at 5 (citing to U.S. Pat. No. 8,234,395, which is a U.S. counterpart to the Millington Canadian patent relied upon by Dr. Schonfeld). Since the USPTO already considered Millington, I understand that Dr. Schonfeld and Google have the added burden of overcoming the deference that is due to a qualified government agency, such as the USPTO, that is presumed to have properly done its job based on its expertise in interpreting references, its understanding of the level of ordinary skill in the art, and its duty to issue only valid patents. However, it is my opinion that Dr. Schonfeld failed to satisfy this added burden.

1490. Second, for similar reasons to those discussed above in connection with Sonos's 2005 system, Millington fails to disclose or suggest the claimed "zone scene" functionality that was missing from the Bose Lifestyle 50 System. *Supra* Section XV.A.ix.d. Thus, even if a POSITA in 2005-06 were to modify and combine the Bose Lifestyle 50 System with the identified functionality of Millington's "network audio system" in the manner proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1491. Third, Dr. Schonfeld has failed to provide any explanation as to how the Bose Lifestyle 50 System would have actually been modified to incorporate the identified functionality of Millington's "network audio system" – let alone how that alleged combination would have achieved the claimed invention.

1492. Fourth, I disagree that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System to incorporate the identified grouping functionality of Millington's "network audio system." As discussed above, the Bose Lifestyle 50 System already included ad-hoc "shared source group" functionality that allowed Lifestyle players to be grouped together on demand to play the same audio source simultaneously (albeit in a different way than the claimed "zone scenes" functionality), and I have not seen any evidence suggesting that a POSITA in 2005-06 would

607

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

have recognized any particular problem with the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality that would have led such a POSITA to consider a different mechanism for grouping Lifestyle players – let alone would have led such a POSITA to implement the identified functionality of Millington's "network audio system."  For at least these reasons, I disagree that a POSITA in 2005-06 would have been motivated to replace the existing ad-hoc "shared source group" functionality of the Bose Lifestyle 50 System with the identified functionality of Millington's "network audio system," particularly in view of the time, effort, and cost that would have been required to overhaul the grouping mechanism of the Bose Lifestyle 50 System.

1493.  In his Opening Report, Dr. Schonfeld says that a POSITA would have been motivated to combine the Bose Lifestyle 50 System with Millington because "Mr. Millington worked on Sonos products that are in the same field of endeavor as the Bose Lifestyle, and therefore it would have been an obvious choice to look to for guidance about potential modifications to that system," and that "a POSITA would have looked to Millington to understand the Sonos System or its competitors, like Bose LifeStyle." Schonfeld Op. Report at ¶ 922. However, these generic statements fail to establish why a POSITA in 2005-06 would have been motivated to make any modification to the Bose Lifestyle 50 System at all – let alone why a POSITA in 2005-06 would have been motivated to replace the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality with the grouping functionality of Millington's "networked audio system."  Moreover, it is unclear why Dr. Schonfeld states that a POSITA "would have looked to Millington to understand the … Bose LifeStyle" because Millington does not describe the Bose LifeStyle system.  *Id*.  Further, Dr. Schonfeld's statement that "Millington was also assigned to Sonos and was filed in the same timeframe as the Sonos System was released" has no bearing on whether a POSITA would have been motivated to combine the Bose Lifestyle 50 System with Millington.  *Id*.

1494.  In his Opening Report, Dr. Schonfeld also states as follows:

[A] person of skill in the art would have been motivated to combine Bose LifeStyle with Millington. They are both in the same field of endeavor—control of speaker systems, speaker groups, synchronous playback of speakers, and home audio systems—and they both describe the same features and devices (e.g., "zone

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

players") in the same language.

Schonfeld Op. Report at ¶ 939.

1495.   However, this statement appears to be carried over from the Sonos prior art section of Dr. Schonfeld's Opening Report and does not apply to the alleged combination of the Bose Lifestyle 50 System with Millington.  The Bose Lifestyle 50 System and Millington do not "describe the same features and devices (e.g., "zone players") in the same language." *Id*.

1496.   I have also seen evidence of affirmative reasons why a POSITA would not have been motivated to replace the Bose Lifestyle 50 System's ad-hoc "shared source group" functionality with the grouping functionality of Millington's "networked audio system."

1497.   For example, the Bose Lifestyle 50 System had a different distinctly system architecture than Millington's "networked audio system" because it relied on a centralized device called a Multi-Room Interface that was exclusively responsible for the "shared source group" functionality of the Bose Lifestyle 50 System.  Given this difference in the system architectures, a POSITA would have been dissuaded from modifying the Bose Lifestyle 50 System to replace its ad-hoc "shared source group" functionality with the grouping functionality of Millington's "networked audio system."

1498.   Along similar lines, as explained above, Millington discloses a "network audio system" that includes "zone players" that are capable of being added to a "synchrony group" comprising a set of "zone players" that are configured to "play the same audio program synchronously" by coordinating with one another over a data network.  *Supra* Section XIII.E.  In contrast, the Bose Lifestyle 50 System was a conventional centralized audio system with Lifestyle players that were hardwired via audio cable to a centralized Multi-Room Interface and did not have the capability to coordinate with one another over a data network for synchronous audio playback. *See* BOSE_SUB-0000001-55 at 11-12.   Given these fundamental differences between the centralized Bose Lifestyle 50 System and Millington's "network audio system" it is my opinion that a POSITA would have been dissuaded from modifying Sonos's 2005 system to combine it with the identified functionality of Millington's network audio system.

1499.   As another example, the Personal Music Center and Multi-Room Interface of the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Bose Lifestyle 50 System, which are used to set up a "shared source" of audio for multiple Lifestyle players, communicate using a proprietary radio frequency communication protocol that was specifically developed for the Bose Lifestyle 50 System and that is "not compatible" with protocols used in other Bose systems, much less any third-party system like the one in Millington. *See* BOSE_SUB-0000663-683 at 666. As such, a POSITA would have been dissuaded from modifying the Bose Lifestyle 50 System to combine it with the identified functionality of Millington.

1500. These examples show that a POSITA would have been dissuaded from modifying the Bose Lifestyle 50 System because, to the extent it was even possible, it would have required wholesale changes to the system architecture and communication protocol of the Bose Lifestyle 50 System.

1501. Finally, because there is no evidence that a POSITA in 2005-06 would have been motivated to modify the Bose Lifestyle 50 System to combine it with the identified functionality of Millington, it appears that Dr. Schonfeld has used the asserted claims as a roadmap to reach his conclusion that a POSITA would have found the claimed invention obvious based on the Bose Lifestyle 50 System in combination with Millington, which I understand to be improper.

1502. Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in combination with Millington.

**(f)       The Bose Lifestyle 50 System in view of Squeezebox**

1503. At Section XII.C of his Opening Report, entitled "'966 Claims Are Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington," Dr. Schonfeld does not identify the Bose Lifestyle 50 System in view of Squeezebox as an obviousness combination for Asserted Claim 1 of the '966 Patent. Schonfeld Op. Report at ¶¶1034-1045. However, in his earlier "Summary of Opinions" section, Dr. Schonfeld includes a bullet stating that "Bose in combination with Sonos Forums, *Squeezebox*, Millington, and/or Nourse renders the asserted claims obvious." *Id*. at ¶ 6. In view of this inconsistency, it is not clear whether Dr. Schonfeld is offering an opinion that Asserted Claim 1 of the'966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Squeezebox, but to the extent he is offering such an opinion, I disagree – in my opinion, Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of Squeezebox, and Dr. Schonfeld's apparent opinion to the contrary is flawed for several reasons.

1504.   As an initial matter, to the extent that Dr. Schonfeld is offering an opinion that that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Squeezebox, Dr. Schonfeld fails to set forth any bases or reasoning for such an opinion. *See* Schonfeld Op. Report at ¶¶ 1034-1045.   Instead, Dr. Schonfeld relies exclusively on the obviousness analysis that he set forth in connection with his opinion that Asserted Claim 1 of the '885 Patent is rendered obvious by the Bose Lifestyle 50 System, but Dr. Schonfeld also fails to provide any analysis of the Bose Lifestyle 50 System in view of Squeezebox in that section of his Opening Report. *Id*.   For this reason alone, I find Dr. Schonfeld's opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Squeezebox to be deficient.

1505.   Moreover, to the extent that Dr. Schonfeld does intend to offer an opinion that Asserted Claim 1 of the '966 Patent is rendered obvious based on the Bose Lifestyle 50 System in view of Squeezebox, I disagree with such an opinion for at least the same reasons explained in my other sections regarding Dr. Schonfeld's obviousness opinions that are based on the Bose Lifestyle 50 System and Squeezebox, including that neither the Bose Lifestyle 50 System nor Squeezebox included any "zone scenes" functionality at all.   Thus, even if the Bose Lifestyle 50 System were to be modified and combined with Squeezebox, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent that Dr. Schonfeld failed to analyze.

1506.   In addition to these deficiencies, Dr. Schonfeld also fails to provide any explanation as to how the Bose Lifestyle 50 System would have actually been modified to incorporate the functionality of Squeezebox, why a POSITA in 2005-2006 would have been motivated to modify the Bose Lifestyle 50 System to incorporate the functionality of Squeezebox, or how such a hypothetical system would have achieved either the specific player-side "zone scenes"

functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by Asserted Claim 1 of the '966 Patent.

1507.   Thus, for these reasons, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of Squeezebox.

### xii.    Summary

1508.   As discussed above, there are a number of different limitations of Asserted Claim 1 of the '966 Patent that are neither disclosed by the Bose Lifestyle 50 System nor rendered obvious by the Bose Lifestyle 50 System either in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.  Any one of these claim limitations serves as a separate basis for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld, and when taken collectively, these claim limitations provide even further support for my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

1509.   Further, I note that Dr. Schonfeld appears to have only performed his obviousness analysis for Asserted Claim 1 of the '885 Patent on a limitation-by-limitation basis, and has not performed any analysis or offered any opinions as to whether Asserted Claim 1 of the '885 Patent as a whole would have been obviousness, which I understand to be improper.

1510.   Further yet, I note that Dr. Schonfeld has only offered obviousness opinions with respect to the Bose Lifestyle 50 System as combined with one other reference, and has not performed any analysis or offered any opinions as to whether a POSITA in 2005-06 would have been motivated to modify and combine the Bose Lifestyle 50 System with multiple different references.

1511.   Accordingly, for all of the reasons explained above, it is my opinion that Asserted Claim 1 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 2.    Asserted Claim 2 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1512.    Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

**[2.0]**    The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:

**[2.1]**    while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and

**[2.2]**    based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.

1513.    Thus, Asserted Claim 2 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for invoking the claimed "second zone scene" at a time when the "first zone scene" is currently invoked and the first and second "zone players" are "configured to coordinate" with one another for synchronous playback in accordance with the "first zone scene."

1514.    In my opinion, Asserted Claim 2 of the '966 Patent is not rendered obvious based the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

1515.    Indeed, because Asserted Claim 2 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 2 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1516.   Moreover, it is my opinion that the additional limitations of Asserted Claim 2 of the '966 Patent are neither disclosed by the Bose Lifestyle 50 System nor rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.10-1.11, which are directed to functionality for invoking the claimed "first zone scene."   For example, as discussed above, a "shared source group" in the Bose Lifestyle 50 System is not a "zone scene," and the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for receiving a "request to invoke" a "zone scene" or causing Lifestyle players to operate in accordance with a "zone scene" – let alone the functional capability for performing these operations with respect to two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.  And for similar reasons, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for receiving a "request to invoke" a "second zone scene" or causing Lifestyle players to operate in accordance with a "second zone scene" at a time when a "first zone scene" having a common member is currently invoked, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

1517.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 2 of the '966 Patent rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶ 1046.  However, I find Dr. Schonfeld's opinion regarding the Bose Lifestyle 50 System and Asserted Claim 2 of the '966 Patent to be flawed for several reasons.

1518.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and Asserted Claim 2 of the '966 Patent is shown in the screenshot below

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

from Dr. Schonfeld's Opening Report:

> **27.    Claim 2 Is Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington.**
>
> (i)    *Limitation 2.1 The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising:*
>
> (ii)    *Limitation 2.2 while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene; and*
>
> (iii)    *Limitation 2.3 based on the fourth request, causing the first zone player to (a) cease to operate in accordance with the first predefined grouping of zone players such that the first zone player is no longer configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player and (b) begin to operate in accordance with the second predefined grouping of zone players such that the first zone player is configured to coordinate with at least the third zone player to output media in synchrony with output of media by at least the third zone player.*
>
> 1046.    *See* '966 claim 1 *supra*.    As discussed above, Bose Lifestyle and the identified obviousness combinations disclosed the system in claim 1.    Those disclosures included the ability to receive a third request to "invoke" the first zone scene.

1519.    This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed

to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 2 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 2 of the '966 Patent.[67]

1520. With that said, as I have discussed above in Section XV.C.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 2 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene," an incorrect interpretation of what it means to "invoke" a "zone scene," and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1521. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by Asserted Claim 2 of the '966 Patent, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

### 3.  Asserted Claim 4 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1522. Asserted Claim 4 of the '966 Patent depends from claim 3 of the '966 Patent, which

---

[67] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

in turn depends from Asserted Claim 1 of the '966 Patent.  Claims 3 and 4 of the '966 Patent require as follows:

> **[3.0]**    The computing device of claim 1, **[3.1]** wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and **[3.2]** wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.

> **[4.0]**    The computing device of claim 3, **[4.1]** wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.

1523.    Thus, Asserted Claim 4 of the '966 Patent requires the claimed "computing device" to cause the claimed "zone scenes" to be stored at a "zone player" within the "predefined grouping" of the "first zone scene," such as the "first zone player" that is included in both the first and second "zone scenes."

1524.    In my opinion, Asserted Claim 4 of the '966 Patent is not rendered obvious based on the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

1525.    Indeed, because Asserted Claim 4 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent (through claim 3), it is my opinion that Asserted Claim 4 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1526.    Moreover, it is my opinion that the additional limitations of Asserted Claim 4 of the '966 Patent are neither disclosed by the Bose Lifestyle 50 System nor rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with limitations 1.6 and 1.8, which require the claimed "computing device" to have the functional capability to cause storage

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

of the "first zone scene" and the "second zone scene." For example, as discussed above, a "shared source group" in the Bose Lifestyle 50 System is not a "zone scene," and the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for causing storage of a "zone scene" – let alone the functional capability for causing storage of two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System. And for similar reasons, the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for causing a "zone scene" to be stored at a Lifestyle player, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

1527. Further even setting aside the fundamental differences between a "shared source group" of Lifestyle players and a "zone scene," I have not seen any evidence that the Personal Music Center or any other device in the Bose Lifestyle 50 System "caus[ed] storage" of a "shared source group" on a Lifestyle player in the "shared source group." To the contrary, as I explained above, the evidence I have reviewed shows the Multi-Room Interface of the Bose Lifestyle 50 System was exclusively responsible for the "shared source group" functionality, and the Lifestyle players never changed into a different "mode" for group playback or even had any awareness of whether or not they were part of a "shared source group." *See, e.g.,* BOSE_SUB-0000001-55 at 6 ("The Bose Multi-Room Interface, with four independent audio outputs that allow you to enjoy Bose sound throughout your home."), 12 (illustrating a Bose Lifestyle 50 System configuration with a CD player and an Acoustimass module connected the Multi-Room Interface), 17 (illustrating various audio sources connected to Multi-Room Interface via audio input cables), 19 ("When batteries are first installed in the music center; it sets up a radio-frequency link with the closest multi-room interface…. If the music center continuously displays "NO RESPONSE," you need to try to establish its link with the multi-room interface again."), 42 (Figure 47 showing "AUDIO OUTPUT" jacks for each room), 44-45 (explaining how to use ROOM and HOUSE buttons of the Personal Music Center to set up an audio source for one or more rooms connected

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

to the Multi-Room Interface), 45 ("To add a new music center to your system, follow the setup instructions on page 17. Be sure to install the batteries and turn it on for the first time close to the multi-room interface to allow the new music center to set up a radio frequency link with your system. If the multi-room interface is not plugged in or the music center is out of range, the display indicates NO RESPONSE."). In view of this, it is my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) would not be configured to cause a Lifestyle player in a "shared source group" to store the "shared source group."

1528. Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that intervening claim 3 and Asserted Claim 4 of the '966 Patent are both rendered obvious by the Bose Lifestyle 50 System. *See* Schonfeld Op. Report at ¶¶ 1047-1048. However, I find Dr. Schonfeld's opinion regarding the Bose Lifestyle 50 System and claims 3-4 of the '966 Patent to be flawed for several reasons.

1529. As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and claims 3-4 of the '966 Patent is shown in the screenshots below from Dr. Schonfeld's Opening Report:

---

**28. Claim 3 is Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington.**

　　(i)　　*3. The computing device of claim 1, wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device, and wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device.*

1047. *See* '966 claim 1 *supra*.

---

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

**29.**    **Claim 4 Is Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington.**

(i)    *4. The computing device of claim 3, wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players.*

1048.    *See* '966 claim 3 *supra.*

1530.    This shows that Dr. Schonfeld is primarily relying on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of Sonos's 2005 system in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 4 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 4 of the '966 Patent.[68]

1531.    With that said, as I have discussed above in Section XV.C.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the

---

[68] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 4 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1532. Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by Asserted Claim 4 of the '966 Patent, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

### 4. Asserted Claim 6 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1533. Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

> **[6.0]** The computing device of claim 1, **[6.1]** wherein the first predefined grouping of zone players does not include the third zone player, and **[6.2]** wherein the second predefined grouping of zone players does not include the second zone player.

1534. Thus, Asserted Claim 6 of the '966 Patent requires the claimed "computing device" to be programmed with functionality for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene."

1535. In my opinion, Asserted Claim 6 of the '966 Patent is not rendered obvious based on the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

1536. Indeed, because Asserted Claim 6 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 6 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1537.   Moreover, it is my opinion that the additional limitations of Asserted Claim 6 of the '966 Patent are neither disclosed by the Bose Lifestyle 50 System nor rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.   For example, as discussed above, a "shared source group" in the Bose Lifestyle 50 System is not a "zone scene," and the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for creating a "zone scene" – let alone the functional capability for creating two different, overlapping "zone scenes" – nor would it have been obvious to add this functionality to Sonos's 2005 system.   And for similar reasons, the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for creating two overlapping "zone scenes" where each "zone scene" includes at least one "zone player" that is not included in the other "zone scene," nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

1538.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 6 of the '966 Patent rendered obvious by the Bose Lifestyle 50 System.   *See* Schonfeld Op. Report at ¶ 1049.   However, I find Dr. Schonfeld's opinion regarding the Bose Lifestyle 50 System and Asserted Claim 6 of the '966 Patent to be flawed for several reasons.

1539.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and Asserted Claim 6 of the '966 Patent is shown in the screenshot below from Dr. Schonfeld's Opening Report:

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

> **30.** **Claim 6 Is Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington.**
>
> (i)   *6. The computing device of claim 1, wherein the first predefined grouping of zone players does not include the third zone player, and wherein the second predefined grouping of zone players does not include the second zone player.*
>
> 1049. *See* '966 claim 1 *supra.* As discussed *supra,* claim 1 is disclosed or rendered obvious at least through the disclosure of non-overlapping zone scenes in the prior art.

1540. This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 6 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding Asserted Claim 6 of the '966 Patent.[69]

---

[69] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1541.   With that said, as I have discussed above in Section XV.C.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 6 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1542.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by Asserted Claim 6 of the '966 Patent, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

### 5. Asserted Claim 8 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1543.   Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent and requires the following:

> **[8.0]**   The computing device of claim 1, **[8.1]** wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, **[8.2]** wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and **[8.3]** wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.

1544.   Thus, Asserted Claim 8 of the '966 Patent requires the claimed "computing device" to be programmed with the functional capability to receive "requests" for creating and invoking "zone scenes" that take the form of "one or more inputs" received "via a user interface."

1545.   In my opinion, Asserted Claim 8 of the '966 Patent is not rendered obvious based on the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1546.   Indeed, because Asserted Claim 8 of the '966 Patent depends from Asserted Claim 1 of the '966 Patent, it is my opinion that Asserted Claim 8 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld for at least the same reasons discussed above in connection with Asserted Claim 1 of the '966 Patent.

1547.   Moreover, it is my opinion that the additional limitations of Asserted Claim 8 of the '966 Patent are neither disclosed by the Bose Lifestyle 50 System nor rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld for similar reasons to those discussed above in connection with Asserted Claim 1 of the '966 Patent.  For example, as discussed above, a "shared source group" in the Bose Lifestyle 50 System is not a "zone scene," and the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have any functionality capability for receiving requests to create or invoke a "zone scene" – let alone the functional capability for receiving requests to create two different, overlapping "zone scenes" and then receiving a request to invoke one of the "zone scenes" – nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.  And for similar reasons, the controllers in the Bose Lifestyle 50 System did not have any functionality capability for receiving requests to create or invoke "zone scenes" that take the form of "one or more inputs" received "via a user interface," nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

1548.   Despite these clear deficiencies, Dr. Schonfeld nevertheless opines that Asserted Claim 8 of the '966 Patent rendered obvious by the Bose Lifestyle 50 System.  *See* Schonfeld Op. Report at ¶ 1050.  However, I find Dr. Schonfeld's opinion regarding the Bose Lifestyle 50 System and Asserted Claim 8 of the '966 Patent to be flawed for several reasons.

1549.   As an initial matter, the entirety of Dr. Schonfeld's discussion regarding the Bose Lifestyle 50 System and Asserted Claim 8 of the '966 Patent is shown in the screenshot below

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

from Dr. Schonfeld's Opening Report:

> **31.    Claim 8 Is Obvious Based On Bose Lifestyle in view of General knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse or Millington.**
>
>   (i)    *8. The computing device of claim 1, wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device, wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface, and wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface.*
>
> 1050.  *See* '966 claim 1 *supra.*

1550.   This shows that Dr. Schonfeld is relying exclusively on his discussion of Asserted Claim 1 of his '966 Patent, but as explained above, Dr. Schonfeld has not set forth any analysis for Asserted Claim 1 of his '966 Patent; instead, Dr. Schonfeld relies on his prior discussion of the Bose Lifestyle 50 System in the context of certain claim limitations of the '885 Patent.  However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the Asserted Claims of the '966 Patent use different claim language than Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of the Bose Lifestyle 50 System in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent.  For these reasons, I disagree that the Dr. Schonfeld's discussion of Asserted Claim 8 of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

regarding Asserted Claim 8 of the '966 Patent.[70]

1551.   With that said, as I have discussed above in Section XV.C.1 as well as in my '885 Rebuttal Report regarding Asserted Claim 1 of the '885 Patent, Dr. Schonfeld's analysis of the Bose Lifestyle 50 System in the context of Asserted Claim 1 of the '885 Patent suffers from a number of flaws, many of which are applicable to Asserted Claim 8 of the '966 Patent as well – including that his analysis is premised on both an incorrect interpretation if what is required to qualify as a "zone scene" and an inaccurate and misleading characterization of the Bose Lifestyle 50 System functionality and the evidence related thereto.

1552.   Thus, nothing in Dr. Schonfeld's Opening Report alters my opinion that the Personal Music Center (and any other alleged "computing device" that Dr. Schonfeld may be relying on such as the combination of the Personal Music Center and the Multi-Room Interface) in the Bose Lifestyle 50 System did not have the functional capability required by Asserted Claim 8 of the '966 Patent, nor would it have been obvious to add this functionality to the Bose Lifestyle 50 System.

### 6.   Asserted Claim 9 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1553.   For the same reasons already discussed above in connection with Asserted Claim 1 of the '966 Patent, in my opinion, Asserted Claim 9 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 7.   Asserted Claim 10 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1554.   For the same reasons already discussed above in connection with Asserted Claim 2 of the '966 Patent, in my opinion, Asserted Claim 10 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos

---

[70] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 8. Asserted Claim 12 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1555.  For the same reasons already discussed above in connection with Asserted Claim 4 of the '966 Patent, in my opinion, Asserted Claim 12 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 9. Asserted Claim 14 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1556.  For the same reasons already discussed above in connection with Asserted Claim 6 of the '966 Patent, in my opinion, Asserted Claim 14 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### 10. Asserted Claim 16 is Not Rendered Obvious Based on the Bose Lifestyle 50 System

1557.  For the same reasons already discussed above in connection with Asserted Claim 8 of the '966 Patent, in my opinion, Asserted Claim 16 of the '966 Patent is not rendered obvious by the Bose Lifestyle 50 System in view of the general knowledge of a POSITA, the Sonos Forums, Nourse, Rajapakse, or Millington, or any of the other secondary references identified by Dr. Schonfeld.

### D. Obviousness Type Double Patenting Over U.S. Patent No. 9,141,645

1558.  In his Opening Report, Dr. Schonfeld opines that each Asserted Claim of the '966 Patent is obvious based on obviousness-type double patenting over claim 1 of Sonos's '645 patent. I disagree with Dr. Schonfeld's opinion, which is flawed for the many reasons I have outlined below.

628

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

### 1.    Dr. Schonfeld Fails to Analyze the Claims of the '966 Patent

1559.    As an initial matter, Dr. Schonfeld fails to perform a limitation-by-limitation analysis of the Asserted Claims of the '966 Patent as compared to claim 1 of Sonos's '645 patent. *See* Schonfeld Op. Report at ¶¶ 1066-1098. Instead, Dr. Schonfeld only performs a limitation-by-limitation analysis of Asserted Claim 1 of the '885 Patent as compared to claim 1 of Sonos's '645 patent, and then for most limitations of the '966 Patent, merely refers back to that analysis of Asserted Claim 1 of the '885 Patent. *Id*. However, the Asserted Claims of the '966 Patent are directed to a different type of device than Asserted Claim 1 of the '885 Patent (a "computing device" configured to "serv[e] as a controller" as opposed to a "zone player"), the limitations of the Asserted Claims of the '966 Patent use different claim language than the limitations of Asserted Claim 1 of the '885 Patent, and Dr. Schonfeld fails to provide any further explanation as to how his prior discussion of Sonos's '645 patent in the context of the claim limitations of Asserted Claim 1 of the '885 Patent applies to the Asserted Claims of the '966 Patent. For these reasons, I disagree that Dr. Schonfeld's barebones discussion of the Asserted Claims of the '966 Patent amounts to a detailed and complete statement of all opinions to be expressed and the basis and reasons therefor, which I understand to be the governing standard for expert reports, and that barebones discussion has prejudiced my ability to fully discern, assess, and respond to his opinions regarding the Asserted Claims of the '966 Patent. [71]

### 2.    Dr. Schonfeld's Analysis Improperly Relies on the Specification of the '645 Patent Rather than the Claims

1560.    While performing his obviousness analysis for Asserted Claim 1 of the '885 Patent as compared to claim 1 of Sonos's '645 patent, Dr. Schonfeld repeatedly relies on the specification of Sonos's '645 patent, which I understand to be legally improper. *See, e.g.*, Schonfeld Op. Report at ¶¶ 810-824, 829, 831-832, 841, 847, 850, 854. Specifically, for obviousness-type double patenting, I understand the relevant inquiry to be whether the claims of one patent would have been obvious over the *claims* of some other patent – not the *specification* of that other patent.

---

[71] To the extent that Dr. Schonfeld later attempts to and is permitted to address these deficiencies in his Opening Report, I expressly reserve my right to respond.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Thus, it was improper for Dr. Schonfeld to rely on the specification of Sonos's '645 patent to support his opinions regarding obviousness-type double patenting.

1561.   In his Opening Report, Dr. Schonfeld tries to justify his reliance on the specification of Sonos's '645 patent as follows:

> I do not use the disclosure of the '645 patent in my obviousness analysis of the asserted patents. Rather, I only use the claims of the '645 patent. However, I do use the disclosure of the '645 patent to understand the scope and meaning of the claims, and I do use claimed embodiments, as described in the disclosure, in my analysis. I do not use unclaimed embodiments that are described in the disclosure in my obviousness analysis.

Schonfeld Op. Report at ¶ 824.   I disagree – Dr. Schonfeld's analysis of the '645 patent as compared to Asserted Claim 1 of the '885 Patent clearly demonstrates that not only is he is relying on the specification of the '645 patent in his analysis, but he is indeed relying on *unclaimed embodiments* from the specification of the '645 patent.  *See, e.g.*, Schonfeld Op. Report at ¶¶ 810-824, 829, 831-832, 841, 847, 850, 854.   To place these flaws with Dr. Schonfeld's analysis into their proper context, it is helpful to provide a brief summary of the priority chain and prosecution history for Sonos's '645 Patent.

1562.   Sonos's '645 patent was filed on September 22, 2015, and includes the following priority chain:

> This application is a continuation of and claims priority under 35 USC §120 of [1] U.S. application Ser. No. 13/619,237, filed Sep. 14, 2012, … which is a continuation of [2] U.S. application Ser. No. 12/035,112, filed Feb. 21, 2008, … now U.S. Pat. No. 8,290,603 ["Sonos's '603 Patent"] which is a continuation-in-part of [3] U.S. application Ser. No. 10/861,653, filed Jun. 5, 2004, … now U.S. Pat. No. 7,571,014 ["Sonos's '014 Patent"] which is a continuation-in-part of [4] U.S. application Ser. No. 10/816,217, filed Apr. 1, 2004, … now U.S. Pat. No. 8,234,395 ["Sonos's '395 Patent"] which is a non-provisional application claiming priority under 35 USC §119 to [5] Provisional Patent Application Ser. No. 60/490,768, filed on Jul. 28, 2003 ….

*See* '645 patent at 1:8-29.

1563.   Thus, while Sonos's '645 patent has a priority chain that claims priority back to a provisional application filed on July 28, 2003 and a first non-provisional application filed on April 1, 2004 (which matured into Sonos's '395 Patent), there were two intervening continuation-in-part applications in the priority chain of Sonos's '645 patent that added new subject matter to the

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

original disclosure – a first continuation-in-part application filed on June 5, 2004 (which matured into Sonos '014 Patent) and a second continuation-in-part application filed on February 21, 2008 (which matured into Sonos's '603 Patent). To help illustrate the portions of the '645 specification that were added to the disclosure as part of the continuation-in-part application filed on February 21, 2008, I have attached as **Exhibit 4** a redline comparison of the specification of Sonos's '645 patent and the specification of Sonos's '014 patent (which contains the disclosure as it existed prior to the continuation-in-part application filed on February 21, 2008).

1564.   Based on my review of the claims of Sonos's '645 Patent as compared to '645 specification and its priority applications, it is my opinion that the claims cover embodiments disclosed within the portion of the '645 specification that originated from Sonos's '395 Patent filed on April 1, 2004 and/or Sonos's '014 Patent filed on June 5, 2004, rather than the portion of the '645 specification that was added on Feb. 21, 2008 when Sonos's '603 Patent was filed. This opinion is supported by the prosecution of Sonos's '645 patent. There, the Examiner found that (i) pending claims 21, 24-25, 28, 31-32, 35, and 38 (issued claims 1, 4-5, 7, 10-11, 13, and 16) were entitled to a priority date of April 1, 2004, which means that such claims covered embodiments disclosed within the portion of the '645 specification that originated from Sonos's '395 Patent filed on April 1, 2004, and (ii) pending claims 22-23, 26, 29-30, 33, 36-37, and 39 (issued claims 2-3, 6, 8-9, 12, 14-15, and 17) were entitled to a priority date of June 5, 2004, which means that such claims covered embodiments disclosed within the portion of the '645 specification that originated from Sonos's '014 Patent filed on June 4, 2004. *See* June 5, 2014 Office Action at 2-3; *see also* December 18, 2013 Office Action at 2-3.

1565.   However, in his analysis of Sonos's '645 patent, Dr. Schonfeld primarily relied on the portion of the '645 specification that was added on Feb. 21, 2008 when Sonos's '603 Patent filed. This confirms that Dr. Schonfeld has improperly relied on unclaimed embodiments from the '645 specification to support is opinions regarding obviousness-type double patenting.[72]

---

[72] Notably, because the portions of the '645 Patent specification that primarily form the basis for Dr. Schonfeld's opinions were not added until Feb. 2008 when Sonos's '603 Patent filed, those portions of the '645 Patent specification do not qualify as prior art to the '885 and '966 Patents. This is presumably why Dr. Schonfeld's theory is premised on obviousness-type double patenting

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

Additionally, the foregoing prosecution history also confirms that Dr. Schonfeld's interpretation of claim 1 of Sonos's '645 patent, which relies on disclosure that was added on Feb. 21, 2008 when Sonos's '603 Patent filed, is incorrect.

> **3.** **Claim 1 of the '645 Patent Fails to Disclose or Render Obvious the Asserted Claims of the '966 Patent**

1566.    In my opinion, claim 1 of the Sonos's '645 patent fails to disclose or render obvious the following aspects of the Asserted Claims of the '966 Patent:

*Claims 1 and 9*

- A "zone scene" comprising a "predefined grouping of zone players . . . that are to be configured for synchronous playback of media when the . . . zone scene is invoked";

- **[1.4] / [1.5]** and **[9.1] / [9.2]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a first request to create a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

- **[1.4] / [1.6]** and **[9.1] / [9.3]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the first request, i) causing creation of the first zone scene, ii) causing an indication of the first zone scene to be transmitted to the first zone player, and iii) causing storage of the first zone scene";

- **[1.4] / [1.7]** and **[9.1] / [9.4]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "receiving a second request to create a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the first zone scene is invoked";

---

rather than prior art obviousness, but this is also why Dr. Schonfeld is not permitted to rely on the '645 Patent specification as part of the obviousness-type double patenting analysis, because otherwise this would allow Dr. Schonfeld to circumvent the rules regarding qualification of prior art.

- **[1.4]** / **[1.8]** and **[9.1]** / **[9.5]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "based on the second request, i) causing creation of the second zone scene, ii) causing an indication of the second zone scene to be transmitted to the first zone player, and iii) causing storage of the second zone scene";

- **[1.4]** / **[1.9]** and **[9.1]** / **[9.6]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" "displaying a representation of the first zone scene and a representation of the second zone scene";

- **[1.4]** / **[1.10]** and **[9.1]** / **[9.7]** "while serving as a controller for a networked media playback system comprising a first zone player and at least two other zone players, wherein the first zone player is operating in a standalone mode in which the first zone player is configured to play back media individually[,]" and "while displaying the representation of the first zone scene and the representation of the second zone scene, receiving a third request to invoke the first zone scene"; and

- **[1.11]** and **[9.8]** "based on the third request, causing the first zone player to transition from operating in the standalone mode to operating in accordance with the first predefined grouping of zone players such that the first zone player is configured to coordinate with at least the second zone player to output media in synchrony with output of media by at least the second zone player".

*Claims 2 and 10 (depending from 1 and 9)*

- **[2.0]** "The computing device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[10.0]** "The non-transitory computer-readable medium of claim 9, wherein the non-transitory computer-readable medium is also provisioned with program instructions stored on the non-transitory computer-readable medium that, when executed by the one or more processors, cause the computing device to perform functions comprising";

- **[2.1]** and **[10.1]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene"; and

- **[2.2]** and **[10.2]** "while the first zone player is configured to coordinate with at least the second zone player to play back media in synchrony with at least the second zone player, receiving a fourth request to invoke the second zone scene".

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

*Claims 3 and 11 (depending from 1 and 9)*

- **[3.0]** "The computing device of claim 1";

- **[11.0]** "The non-transitory computer-readable medium of claim 9";

- **[3.1]** and **[11.1]** "wherein causing storage of the first zone scene comprises causing storage of the first zone scene at a location other than the computing device"; and

- **[3.2]** and **[11.2]** "wherein causing storage of the second zone scene comprises causing storage of the second zone scene at the location other than the computing device".

*Claims 4 and 12 (depending from 3 and 11)*

- **[4.0]** "The computing device of claim 3";

- **[12.0]** "The non-transitory computer-readable medium of claim 11";

- **[4.1]** and **[12.1]** "wherein the location other than the computing device comprises a zone player of the first predefined grouping of zone players".

*Claims 6 and 14 (depending from 1 and 9)*

- **[6.0]** "The computing device of claim 1";

- **[14.0]** "The non-transitory computer-readable medium of claim 9";

- **[6.1]** and **[14.1]** "wherein the first predefined grouping of zone players does not include the third zone player"; and

- **[6.2]** and **[14.2]** "wherein the second predefined grouping of zone players does not include the second zone player".

*Claims 8 and 16 (depending from 1 and 9)*

- **[8.0]** "The computing device of claim 1";

- **[16.0]** "The non-transitory computer-readable medium of claim 9";

- **[8.1]** and **[16.1]** "wherein receiving the first request comprises receiving a first set of one or more inputs via a user interface of the computing device";

- **[8.2]** and **[16.2]** "wherein receiving the second request comprises receiving a second set of one or more inputs via the user interface"; and

- **[8.3]** and **[16.3]** "wherein receiving the third request comprises receiving a third set of one or more inputs via the user interface".

1567.   All of the above-listed aspects of the Asserted Claims of the '966 Patent are related to Sonos's "zone scene" technology.  However, like Sonos's 2005 system discussed above in Section XV.A.1.i, claim 1 of Sonos's '645 patent describes functionality related to a Sonos ad-hoc "zone group," which is not a "zone scene" for all the reasons explained above.  Again, a "zone scene" requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.  In contrast, an ad-hoc "zone group" is automatically invoked at the time of creation and then only remains in existence for the temporary period of time during which it is activated, and once deactivated, the "zone group" would cease to exist.  Because claim 1 of Sonos's '645 patent are directed to the Sonos ad-hoc "zone group" functionality that was utilized by Sonos's 2005 system, claim 1 of Sonos's '645 patent fails to disclose or render obvious the "zone scene" technology of the Asserted Claims of the '966 Patent for the same reasons that Sonos's 2005 system fails to disclose or render obvious the "zone scene" technology of the Asserted Claims of the '966 Patent.  Thus, I incorporate my discussion of Sonos's 2005 system here, including my discussion of why the Asserted Claims of the '966 Patent are not rendered obvious based on Sonos's 2005 system in view of the "general knowledge of a POSITA."

1568.   My opinion that claim 1 of Sonos's '645 patent describes functionality related to a Sonos's ad-hoc "zone group" – not a "zone scene" as recited by the Asserted Claims of the '966 Patent – is confirmed by the claim language, specification, and the prosecution history.

1569.   Claim 1 of Sonos's '645 patent is reproduced below:

1. A multimedia controller including a processor, the controller configured to:

receive, at the controller via a packet network, a zone group configuration;

display, via a user interface, a plurality of zones, each zone containing at least one zone player to playback multimedia content from a multimedia source;

receive, via the user interface, a first user input, the first user input selecting a first zone of the plurality of zones and, wherein the first user input instructs the first zone of the plurality of zones to play a first multimedia content;

receive, via the user interface, a second user input, the second user input identifying at least one additional zone of the plurality of zones to be grouped with the first zone into a zone group, such that the zone group will synchronously play the first multimedia content currently being played by the first zone;

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

transmit, to a zone player of the zone group via a packet network, a modified zone group configuration, wherein the modified zone group configuration causes the zone player of the zone group to configure the zones in the zone group to synchronize playback of the first multimedia content currently being played by the first zone; and

display, on the user interface, an indication of which of the plurality of zones are part of the zone group.

1570.  As shown above, unlike the Asserted Claims of the '966 Patent, which recite first and second "zone scenes," claim 1 of Sonos's '645 patent recites a single "zone group."

1571.  Moreover, as described in claim 1 of Sonos's '645 patent, the "zone group" is automatically invoked at the time of creation when the user "identif[ies]" and "select[s]" the "zones" to be included in the "zone group" and the "multimedia controller" transmits a "modified zone group configuration" to a "zone player of the zone group," which "causes the zone player of the zone group to configure the zones in the zone group to synchronize playback of the first multimedia content currently being played by the first zone."  This claimed functionality for forming a "zone group" corresponds to the disclosure at column 8, lines 46-61 of Sonos's '645 patent where a user selects a particular set of "zone players" to group together in an ad-hoc manner, one-by-one, when the user wishes to listen to audio across the set of "zone players," which would then create a temporary, ad-hoc group.  And like the '966 Patent, Sonos's '645 patent expressly distinguishes this ad-hoc grouping functionality from a "zone scene," which comprises a "predefined," "saved" group of "zone players" that can later be invoked on demand for synchronous playback.  *See, e.g.*, Sonos's '645 at 8:61-9:42.  In other words, while Sonos's '645 patent does disclose functionality related to an ad-hoc "zone group" as well as functionality related to a "zone scene," claim 1 of Sonos's '645 only claims an ad-hoc "zone group."

1572.  Further, unlike the Asserted Claims of the '966 Patent, claim 1 of Sonos's '645 patent does not describe the claimed "zone group" as having any of the "zone scene" characteristics that I discussed above.  For example, claim 1 of Sonos's '645 patent does not describe the claimed "zone group" as being able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback.  As another example, claim 1 of Sonos's '645 patent does not describe the claimed "zone group" as being able to exist in an inactive state after creation such that a user can still use a "zone player" in the "zone group"

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

for individual audio playback (or for playback as part of a different group) without having to remove the "zone player" from the "zone group." As yet another example, claim 1 of Sonos's '645 patent does not describe two overlapping "zone groups" that exist at the same time. As a further example, claim 1 of Sonos's '645 patent does not describe the claimed "zone group" as being persistent such that the "zone group" is not only able to exist prior to being activated, but also remains in existence after a user chooses to uninvoke the previously-invoked "zone group" and thereby deactivate the group.

1573. In my opinion, the above-described claim language and the disclosure in the specification of Sonos's '645 patent confirms that claim 1 of Sonos's '645 patent is directed to Sonos's ad-hoc "zone group" technology – not the "zone scene" technology of the Asserted Claims of the '966 Patent.

1574. Turning to the prosecution history of Sonos's '645 patent, as noted above, there were two intervening continuation-in-part applications in the priority chain of Sonos's '645 patent that added new subject matter to the original disclosure – a first continuation-in-part application filed on June 5, 2004 (which matured into Sonos's '014 Patent) and a second continuation-in-part application filed on February 21, 2008 (which matured into Sonos's '603 Patent). Based on my review of these continuation-in-part applications, it appears that the relevant disclosure related to Sonos's "zone scene" technology, including all references to "zone scene," "scene," and "theme," was added when the second continuation-in-part application was filed on February 21, 2008. *See* **Exhibit 4**.

1575. Then, on May 31, 2013, Sonos filed the continuation application that led to Sonos's '645 patent, which included original claims 1-20. May 31, 2013 Preliminary Amendment at p. 4-8. These original claims 1-20 appear to have been a copy of the original claims from the second continuation-in-part application filed on February 21, 2008 (which matured into Sonos's'603 Patent) and were directed to certain aspects of Sonos's "zone scene" technology that were added to the specification as part of the second continuation-in-part application filed on February 21, 2008. For example, as shown in the image below, original claim 1 recited a method for grouping "players" using a "theme" that could be "activated at anytime or a specific time so that the players

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

react in a synchronized manner":

**Claims**

I claim:

1.  A method for groupings in a multi-zone media system, the method comprising:

    providing a user interface to allow a user to determine which players in the system to be associated with a theme representing a group, the user interface showing all available players at the time the user interface is created;

    allowing the user to visually select at least one of the players to be a first member of the theme;

    allowing the user to add an additional one or more of the available players to the theme, if desired;

    configuring the theme with parameters pertaining to the players, wherein the theme is activated at anytime or a specific time so that the players react in a synchronized manner.

May 31, 2013 Application at p. 24-27.

1576.  However,  along with the continuation application containing the original claims from the second continuation-in-part application that were directed to certain aspects of Sonos's "zone scene" technology, Sonos also filed a Preliminary Amendment that cancelled original claims 1-20 and replaced them with new claims 21-40.  An excerpt of this Preliminary Amendment including new claim 21 is shown below:

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1-20    (cancelled)

21.    (new) A multimedia controller including a processor, the controller configured to:

display, via a user interface, a plurality of zones, each zone containing at least one zone player to playback multimedia content from a multimedia source;

receive, via the user interface, a first user input, the first user input selecting a first zone of the plurality of zones and, wherein the first user input instructs the first zone of the plurality of zones to play a first multimedia content;

receive, via the user interface, a second user input, the second user input identifying at least one additional zone of the plurality of zones to be grouped with the first zone into a zone group, such that the zone group will synchronously play the first multimedia content currently being played by the first zone;

transmit, to a zone player of the zone group, a zone group configuration, wherein the zone group configuration causes the zone player of the zone group to configure the zones in the zone group to synchronize playback of the first multimedia content currently being played by the first zone; and

display, on the user interface, an indication of which of the plurality of zones are part of the zone group.

May 31, 2013 Preliminary Amendment at p. 4.

1577.    As shown above, unlike original claim 1, claim 21 (which ultimately issued as claim 1 of Sonos's '645 patent) did not recite a method for grouping "players" using a "theme" that could be "activated at anytime or a specific time so that the players react in a synchronized manner." Instead, claim 21 recited a "multimedia controller" configured to facilitate the creation of a "zone group" where the "zone group" was automatically activated at the time of creation when the "modified zone group configuration" is transmitted to a "zone player in the zone group," which "causes the zone player of the zone group to configure the zones in the zone group to synchronize

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1    playback of the first multimedia content currently being played by the first zone."

2    1578.    On December 18, 2013, the Examiner issued an Office Action in which the

3    Examiner explained that claim 21 was entitled to a priority date of April 1, 2004.  December 18,

4    2013 Office Action at 2-3.  Likewise, on June 5, 2014, the Examiner issued another Office Action

5    in which the Examiner again explained that claim 21 was entitled to a priority date of April 1,

6    2004.  June 5, 2014 Office Action at 2-3.  In so doing, the Examiner determined that claim 21 did

7    not cover the new subject matter related to Sonos's "zone scene" technology that was added to the

8    specification of Sonos's '645 patent as part of the second continuation-in-part application that was

9    filed on February 21, 2008.

10    1579.    In my opinion, the above-described prosecution history likewise confirms that

11    claim 1 of Sonos's '645 patent is directed to functionality related to a Sonos ad-hoc "zone group"

12    – not a "zone scene" as recited by the Asserted Claims of the '966 Patent.

13    1580.    Further, Dr. Schonfeld's own analysis confirms that claim 1 of Sonos's '645 patent

14    is directed to functionality related to a Sonos ad-hoc "zone group" – not a "zone scene" as recited

15    by the Asserted Claims of the '966 Patent.

16    1581.    For example, at paragraphs 839-841 of his Opening Report regarding limitation 1.6

17    of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld asserts that claim 1 of Sonos's '645 patent

18    discloses, among other things, a "first zone scene comprising a first predefined grouping of zone

19    players including at least the first zone player and a second zone player that are to be configured

20    for synchronous playback of media when the first zone scene is invoked."  *See* Schonfeld Op.

21    Report at ¶¶ 839-841.  To support this assertion, Dr. Schonfeld states as follows:

22    Claim 1 of the '645 patent discloses "transmit, to a zone player of the zone group
     via a packet network, a modified zone group configuration, wherein the modified
23    zone group configuration causes the zone player of the zone group to configure the
     zones in the zone group to synchronize playback of the first multimedia content
24    currently being played by the first zone."

25    Although claim 1 of the '645 patent is drafted from the perspective of the controller,
     the claim discloses a transmission from controller that is received by the zone
26    player, as claimed. As described above, this transmission is received over a data
     network. The transmission includes an "indication" of a grouping of zone players,
27    and those players are to be configured for synchronous playback of media when the

28

zone scene is invoked as disclosed in claim 1. As described above, the claimed embodiments disclosed in the '645 patent specification indicate that the claimed zone group in '645 patent claim 1 is a "zone scene" as claimed in the '885 patent. As described *supra*, the zone groups in the claimed embodiments of the '645 patent specification include characteristics of a "zone scene," such as saving and later "invoking" the group, and storing name and other parameter information with the zone scene. Furthermore, the '654 patent claim itself shows that the zone group is *later* invoked, like the claimed "zone scene," because that claim states that the players within the group the modified zone group configuration "causes the zone player of the zone group *to configure* the zones in the zone group to synchronize playback." The zone players are merely *configured* to playback in synchrony, but in contrast to the prior claim elements, which cover actions when the controller "instructs the first zone of the plurality of zones to play a first multimedia content," this is not playback of "invocation" of the claimed zone scene, it is merely the configuration of that zone scene. Accordingly, claim 1 of the '645 patent discloses a "zone scene" which is later invoked.

Schonfeld Op. Report at ¶¶ 840-841 (emphases in original).

1582.   As acknowledged by Dr. Schonfeld, claim 1 of Sonos's '645 patent recites that the "modified zone group configuration causes the zone player of the zone group to configure the zones in the zone group to synchronize playback of the first multimedia content currently being played by the first zone."  However, as explained above, this limitation that Dr. Schonfeld relies on actually confirms that claim 1 of Sonos's '645 patent describes an ad-hoc "zone group" that is automatically invoked at the time of creation for the entirety of its existence as opposed to a "zone scene," which requires a user-customized, pre-saved group of "zone players" that is able to exist in an inactive state while remaining available for selection by a user so that it can later be invoked on demand for synchronous playback, as required by the Asserted Claims of the '966 Patent.  And Dr. Schonfeld did not identify any other language in claim 1 of Sonos's '645 patent that describes the characteristics of a "zone scene."

1583.   Dr. Schonfeld's position to the contrary appears to be based primarily on the specification of Sonos's '645 patent, as well as an incorrect interpretation of the term "invoke." As explained above, with respect to Dr. Schonfeld's reliance on the specification of Sonos's '645 patent, such reliance is improper both legally and because the "zone scene" disclosure that he relies on was added to the specification as part of the second continuation-in-part application filed on February 21, 2008, but the claims of Sonos's '645 patent do not cover the embodiments set forth

in the added portions of the '645 specification, as the Examiner correctly determined during prosecution and as I explained above.

1584. With respect to his interpretation of the term "invoke," Dr. Schonfeld ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but this is not how a POSITA would understand the term "invoke" in the context of the claim language and specification of the '966 Patent. Rather, a POSITA would understand that the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" refers to the point in time when the group of "zone players" is activated for synchronous playback such that the "zone players" enter a mode in which they are controlled and used as part of the group, which is distinct from the act of initiating playback on that group of "zone players" (although in some scenarios it is possible that playback could be automatically initiated as a result of the "zone scene" being invoked). *See, e.g.*, '407 Provisional at App'x A, p. 4 (explaining that when a "Zone Scene" is invoked at a time when "no music is playing in any Zone – then the zones will simply link in a group" without playing any music); 6/6/2022 Lambourne Dep. Tr. at 59:5-16 (inventor of the '885 and '966 Patents testifying that a "zone scene" does not have to start actively playing audio "at that moment when the group is invoked"); D.I. 309 (the Court describing "standalone mode" as a mode in which a "zone player" "operate[s] individually" as contrasted with a mode in which the "zone player" is "being controlled as part of [a] group" and never mentioning active playback as a required aspect of "standalone mode"). And as explained previously, a Sonos ad-hoc "zone group" as claimed in Sonos's '645 patent is automatically invoked at the time of its creation and then only remains in existence for the temporary period of time during which it is activated, so there would never be a period of time during which a "zone group" was created and in existence but was in an inactive, uninvoked state such that a user is presented with an option to "request to invoke" the "zone group," as required by the Asserted Claims of the '966 Patent.

1585. As another example, at paragraphs 843-846 of his Opening Report regarding limitation 1.7 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld asserts that claim 1 of Sonos's '645 patent discloses, among other things, a "second zone scene comprising a second predefined

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked." *See* Schonfeld Op. Report at ¶¶ 843-846. To support this assertion, Dr. Schonfeld states as follows:

> Limitation 1.7 is similar to 1.6 and the analysis above is incorporated herein by reference.

> Claim 1 of the '645 patent discloses "a plurality of zones, each zone containing at least one zone player." A plurality of zones where each zones contains at least one zone player discloses the three claimed zone players of Limitation 1.7.

> As already discussed with respect to Limitation 1.6, the zone player received an indication that it has been added to a zone scene. Further, as with Limitation 1.6, the limitation "that are to be configured for synchronous playback of media when the second zone scene is invoked" is likewise met.

> It is also clear, as shown through the claimed embodiments discussed supra, that the zone players may be added to groups that overlap. As disclosed therein, the claimed embodiments show that "any combinations of zone players and an existing zone group may be grouped together," regardless of whether those zone players are already grouped. E.g., supra, 2:4-20; 2:63-3:5 ("According to still another aspect of the present invention, a controlling device (also referred to herein as controller) is provided to facilitate a user to select any of the players in the system to form respective groups each of which is set up per a scene."); 5:41-45 ("Two or more zone players may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together.").

Schonfeld Op. Report at ¶¶ 844-846.

1586. While Dr. Schonfeld suggests that claim 1 of Sonos's '645 patent discloses a "second zone scene," he fails to identify any claim language allegedly describing such a "second zone scene." Instead, Dr. Schonfeld merely refers back to his discussion of limitation 1.6 of Asserted Claim 1 of the '885 Patent, where he alleges that the claimed "zone group" teaches the "first zone scene." In so doing, Dr. Schonfeld acknowledges that claim 1 of Sonos's '645 patent only discloses a single "zone group." Thus, Dr. Schonfeld's own analysis confirms that, even if the "zone group" of claim 1 of Sonos's '645 patent were a "first zone scene" (it is not for all the reasons explained above), claim 1 of Sonos's '645 patent would still not disclose a "second zone scene," let alone a "second zone scene" that overlaps and co-exists with the "first zone scene" and

where both the "first zone scene" and the "second zone scene" are "display[ed]" at the same time in a manner that allows a user to select between them for purposes of requesting invocation, as required by the Asserted Claims of the '966 Patent.

1587.   Dr. Schonfeld's position to the contrary appears to be based exclusively on the specification of Sonos's '645 patent.  However, as explained above, Dr. Schonfeld's reliance on the specification of Sonos's '645 patent is improper both legally and because the "zone scene" disclosure that he relies on was added to the specification as part of the second continuation-in-part application filed on February 21, 2008, but the claims of Sonos's '645 patent do not cover the embodiments set forth in the added portions of the '645 specification, as the Examiner correctly determined during prosecution and as I explained above.

1588.   As yet another example, at paragraphs 851-852 of his Opening Report regarding limitation 1.9 of Asserted Claim 1 of the '885 Patent, Dr. Schonfeld asserts that claim 1 of Sonos's '645 patent discloses, among other things, a "zone scene" being "selected for invocation" and thereafter the transmission of an "instruction to operate in accordance" with the selected "zone scene."  *See* Schonfeld Op. Report at ¶¶ 851-852.  To support this assertion, Dr. Schonfeld states as follows:

> As discussed supra, claim 1 of the '645 patent discloses that "the first user input instructs the first zone of the plurality of zones to play a first multimedia content." This discloses selecting the zone scene for invocation, which is an instruction to play multimedia content in synchrony in one or more zone groups. As discussed supra, the instruction in the '645 patent claims is given by a user to a controller, which is then transmitted to a playback devices, as claimed in the '885 patent..

Schonfeld Op. Report at ¶ 852.

1589.   While Dr. Schonfeld is correct that claim 1 of Sonos's '645 patent recites a "first user input selecting a first *zone* of the plurality of zones and, wherein the first user input instructs the first zone of the plurality of zones to play a first multimedia content," this is not an input selecting the "*zone group*," as Dr. Schonfeld suggests.  Thus, Dr. Schonfeld's own analysis confirms that, even if the "zone group" of claim 1 of Sonos's '645 patent were a "zone scene" (it is not for all the reasons explained above), claim 1 of Sonos's '645 patent would still not disclose

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

a user selection of a "zone scene" for purposes of requesting invocation, as required by the Asserted Claims of the '966 Patent.  Again, as explained above, an ad-hoc "zone group" like that claimed in Sonos's '645 patent is automatically activated at the time of creation for the entirety of its existence and thus cannot exist in an inactive state such that it could be selected for invocation.

1590.   I also disagree with various other aspects of Dr. Schonfeld's discussion at paragraph 852 of his Opening Report.  For example, Dr. Schonfeld again appears to rely on his interpretation of the term "invoke" that ties the act of "invok[ing]" a "zone scene" comprising a user-customized, pre-saved group of "zone players" to the time when the group of "zone players" is actually caused to play back audio, but this is incorrect for the reasons I explained above.  As another example, Dr. Schonfeld states that "selecting the zone scene for invocation … is an instruction to play multimedia content in synchrony in one or more zone groups."  To the extent I understand Dr. Schonfeld's position here, I disagree.  As recited in Asserted Claim 1 of the '885 Patent, the "select[ion]" of a "zone scene" that is received by the "network device" is separate and distinct from the "instruction" that is transmitted from the "network device" to the "first zone player" *after* the "select[ion]."

1591.   Finally, Dr. Schonfeld fails to sufficiently articulate how or why a POSITA would have found the missing "zone scene" limitations of the Asserted Claims of the '966 Patent to be obvious in view of claim 1 of the Sonos's '645 patent.

1592.   First, even if claim 1 of Sonos's '645 patent were to be modified in the various ways proposed by Dr. Schonfeld, such a hypothetical system still would not achieve either the specific player-side "zone scenes" functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.

1593.   Second, Dr. Schonfeld's proposed modifications to claim 1 of Sonos's '645 patent are all nothing more high-level suggestions, such as "permit[ing] overlapping group membership," and Dr. Schonfeld has failed to provide any explanation as to how these proposed modifications to claim 1 of Sonos's '645 patent would have actually been implemented – let alone how the proposed modifications would have achieved either the specific player-side "zone scenes"

functionality required by Asserted Claim 1 of the '885 Patent or the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent that Dr. Schonfeld failed to analyze.  Moreover, in my opinion, implementing Dr. Schonfeld's high-level suggestions would have required substantial, non-obvious modifications to the ad-hoc "zone group" functionality of claim 1 of Sonos's '645 patent.

1594.    Third, I disagree that a POSITA in 2005-06 would have been motivated to modify claim 1 of Sonos's '645 patent in any one of the ways proposed by Dr. Schonfeld – let alone all of the different ways proposed by Dr. Schonfeld.    Indeed, like Sonos's 2005 system, claim 1 of Sonos's '645 patent already included ad-hoc "zone group" functionality that allowed "zone players" to be grouped together on demand for synchronous playback, and that ad-hoc "zone group" functionality was being praised throughout the industry.  *See, e.g.*, GOOG-SONOS-NDCA-00108095 at 365 (disclosing that Sonos's system in 2006 was "pure heaven" and touting that "[y]ou can perform some pretty sophisticated stunts using that remote, like directing different streams of music to different rooms, linking several rooms so that they all play the same music…."); SONOS-SVG2-00234176 at 76-77 (Feb. 3, 2005 PC Magazine article stating Sonos's ZP100 "is the first digital audio hub we can recommend without reservation. . . . It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music . . . on the fly."); SONOS-SVG2-00227422 (March 22, 2005 PC Magazine article stating the same); SONOS-SVG2-00234162 at 62-64 (Feb. 24, 2005 Wall Street Journal article stating "[t]he Sonos system is easily the best music-streaming product I have seen and tested," and "[i]t's the Lexus of the category" at least because "[t]he system works in multiple rooms of a home, allowing you to play . . . the same songs, in each room simultaneously . . . . you can group the 'Zones,' so several receive the same music simultaneously."); SONOS-SVG2-00234165 (listing various "[a]wards, accolades and achievements" by Sonos in 2004-2006); SONOS-SVG2-00234171 (same); SONOS-SVG2-00234181 (2005 Playlist Magazine article stating "[y]ou can control each ZonePlayer independently of the others, or you can sync all of them for full-house entertainment. The result? The music you want, in whatever rooms you want -- the whole-house-music thing done right . . . . Where the Sonos system stands out from similar systems is in its zone management. Using the

HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY

Controller's Zone menu, you can easily link zones to play the same music in sync . . . ."); SONOS-SVG2-00234182 at 84 (Dec. 2005 LA Audio file article stating "[u]sing the Link Zone feature, users can link some or all of the listening zones to a single group. This is particularly useful when having a party or when one might be moving from one room to another within the house and would like to hear the same music."), at 86 ("Having seen so many options for distributing audio in today's homes, I can't think of a better all-around product than the Sonos Digital Music System.").  Moreover, I have not seen any evidence suggesting that a POSITA in 2005-06 would have recognized any particular problem with Sonos's ad-hoc "zone group" functionality that would have motivated the POSITA to replace that ad-hoc "zone group" functionality with a different mechanism for grouping "zone players" – particularly when considering the positive feedback Sonos was receiving for its ad-hoc "zone group" functionality and the time, effort, and cost that would have been required to overhaul the grouping mechanism recited by claim 1 of Sonos's '645 patent.

1595.  Nevertheless, in his Opening Report, Dr. Schonfeld offers several unsupported, conclusory theories as to why it a POSITA in 2005-06 would have allegedly found it obvious to modify claim 1 of Sonos's '645 patent in the various ways proposed by Dr. Schonfeld.  However, in addition to the fact that Dr. Schonfeld failed to articulate any reasoning as to why a POSITA would have been motivated to modify claim 1 of Sonos's '645 patent to achieve the specific controller-side "zone scenes" functionality required by the Asserted Claims of the '966 Patent, I disagree with Dr. Schonfeld's theories for various reasons.

1596.  For example, at paragraph 842 of his Opening Report, Dr. Schonfeld states the following with respect to limitation 1.6 of Asserted Claim 1 of the '885 Patent, which recites, among other things, "a first indication that the first zone player has been added to a first zone scene comprising a first predefined grouping of zone players including at least the first zone player and a second zone player that are to be configured for synchronous playback of media when the first zone scene is invoked":

> To the extent this claim element isn't explicitly disclosed by claim 1 of the '645 patent, it is merely an obvious variation over the claim. It would have been obvious to name the zone group claimed in claim 1 of the '645 patent, thereby creating a "zone scene" because claim 1 of the '645 patent already

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

requires the user to be able to select a zone group, and that zone group must be identifiable in some way on the graphical user interface (e.g., by name). Likewise, claim 6 of the '645 patent discloses "wherein the indication of which of the plurality of zones are part of the zone group comprises a display, within a bounded graphic, of the plurality of zones that are part of the zone group." Accordingly, claim 6 discloses that there is an "indication" of which zones are part of the zone group and that this must appear "within a bounded graphic." To the extent this doesn't explicitly disclose a zone scene, which is clearly referenced by the graphic and indication of claim 6, it would have been obvious in view of claim 6 to include an identifier for the zone scene, such as a name.

Schonfeld Op. Report at ¶ 842.  I disagree.

1597.  As an initial matter, it is unclear if the first sentence of this paragraph refers to modifying or replacing that ad-hoc "zone group" functionality of claim 1 of Sonos's '645 patent with "zone scene" functionality or if it refers to modifying that ad-hoc "zone group" functionality of claim 1 of Sonos's '645 patent to provide a name for the "zone group."  If the former, I disagree that such a modification or replacement would have been obvious to a POSITA in 2005-06 for the reasons explained above.  If the latter, even if it were obvious to add a name to the claimed ad-hoc "zone group," this would not transform the "zone group" into a "zone scene," which requires a group of "zone players" that is user-customized, pre-saved, and able to exist in an inactive state while remaining available for selection by a user so that it can be later invoked on demand for synchronous playback.

1598.  Moreover, I disagree with Dr. Schonfeld's assertion that it would have been obvious to allow a user to assign a custom name to the ad-hoc "zone group" because "claim 1 of the '645 patent already requires the user to be able to select a zone group, and that zone group must be identifiable in some way on the graphical user interface."  In my opinion, while claim 1 of Sonos's '645 patent does recite a "second user input identifying at least one additional zone of the plurality of zones to be grouped with the first zone into a zone group" and thereafter "display[ing] … an indication of which of the plurality of zones are part of the zone group," neither of these limitations related to selecting a "zone" to be part of the "zone group" and displaying an "indication" of the "zones that are part of the zone group" renders obvious the functionality of allowing a user to custom name the "zone group" itself.

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

1599.   Further, I fail to see how claim 6 of Sonos's '645 patent supports Dr. Schonfeld's assertion that it would have been obvious to name to the ad-hoc "zone group" of claim 1 of Sonos's '645 patent.  In my opinion, while claim 6 of Sonos's '645 patent does recite how the "zones that are part of the zone group" are "indicat[ed]" on the "multimedia controller" using a "display, within a bounded graphic," this limitation related to displaying an "indication" of the "zones that are part of the zone group" does not render obvious the functionality of allowing a user to custom name the "zone group" itself.

1600.   Further yet, although unclear, to the extent Dr. Schonfeld is asserting that claim 6 of Sonos's '645 patent discloses a "zone scene," I disagree.  Again, claim 6 of Sonos's '645 patent describes how the "zones that are part of the zone group" are "indicat[ed]" on the "multimedia controller" using a "display, within a bounded graphic," but this does not disclose a "zone scene," which requires a group of "zone players" that is user-customized, pre-saved, and able to exist in an inactive state while remaining available for selection by a user so that it can be later invoked on demand for synchronous playback.

1601.   As another example, at paragraph 848 of his Opening Report, Dr. Schonfeld states the following with respect to limitation 1.7 of Asserted Claim 1 of the '885 Patent, which recites, among other things, "a second indication that the first zone player has been added to a second zone scene comprising a second predefined grouping of zone players including at least the first zone player and a third zone player that are to be configured for synchronous playback of media when the second zone scene is invoked, wherein the second zone player is different than the third zone player":

> To the extent this claim element isn't explicitly disclosed by claim 1 of the '645 patent, it is merely an obvious variation over the claim. It would have been obvious to permit overlapping group membership given that the claim makes no restriction on the existing group membership of a zone player before it is added to the second group (*e.g.*, "identifying at least one additional zone of the plurality of zones to be grouped with the first zone into a zone group"). Further, allowing overlapping group membership for zone players is an obvious design choice given that there are merely two options—either allow overlapping groups or do not allow overlapping groups. Given that the claimed zone players are grouped for later invocation and playback, it is consistent with the purpose of the claims and the motivation of a person of skill in the art to permit overlapping group

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

membership of the zone players.

Schonfeld Op. Report at ¶ 848.  I disagree.

1602.  As an initial matter, even if Dr. Schonfeld's proposed modification to "permit overlapping group membership" were made, this would still not meet all of the requirements of limitation 1.7 of Asserted Claim 1 of the '885 Patent or all of the requirements of, for example, limitations 1.7 and 1.8 of claim 1 of the '966 Patent.  For instance, when read in light of limitation 1.4 of claim 1 of the '966 Patent, limitation 1.7 of claim 1 of the '966 Patent requires the "computing device" to "receiv[e] [the] second request to create [the] second zone scene" at a time when the "first zone player" is "operating in a standalone mode," which means that the created "first zone scene" must be in an inactive state at the time that this functionality is carried out (otherwise, the "first zone player" could not be in "standalone mode").  As another example, when read in light of limitation 1.9 of claim 1 of the '966 Patent, limitation 1.8 of claim 1 of the '966 Patent requires the "computing device" must carry out the claimed actions with respect to a "second zone scene" that includes at least one common "zone player" with the "first zone scene" (i.e., the claimed "first zone player") without modifying or destroying the "first zone scene" that was created, such that the overlapping "first zone scene" and "second zone scene" can thereafter both be "display[ed]" to a user for selection.  Thus, even if one were to modify claim 1 of Sonos's '645 patent to "permit overlapping group membership" as Dr. Schonfeld proposes, the "multimedia controller" of claim 1 of Sonos's '645 patent would still not have the "zone scenes" capability that is required by the Asserted Claims of the '966 Patent.

1603.  Further, I disagree with Dr. Schonfeld's suggestion that this would have simply been matter of whether or not to "permit overlapping group membership" – the "zone group" functionality of claim 1 of Sonos's '645 patent is a distinctly different type of grouping technology that would not even allow for "overlapping group membership" because "zone groups" are temporary, ad-hoc groups that are automatically activated at the time they are created for the entirety of their existence and thus it was not possible to create a new ad-hoc "zone group" comprising a "zone player" that was already a member of another preexisting "zone group" without first modifying or destroying that preexisting "zone group."  As such, it would not have been

possible to simply modify the grouping technology of claim 1 of Sonos's '645 patent to "permit overlapping group membership" – a completely different grouping technology would have been required.

1604.   Further yet, I disagree with Dr. Schonfeld's assertion that "allowing overlapping group membership for zone players is an obvious design choice given that there are merely two options—either allow overlapping groups or do not allow overlapping groups." Again, the "zone group" functionality of claim 1 of Sonos's '645 patent is a distinctly different type of grouping technology that would not even allow for "overlapping group membership" because "zone groups" are temporary, ad-hoc groups that are automatically activated at the time they are created for the entirety of their existence and thus it was not possible to create a new ad-hoc "zone group" comprising a "zone player" that was already a member of another preexisting "zone group" without first modifying or destroying that preexisting "zone group." For this reason, a POSITA in 2005-06 would not have even considered "overlapping group membership" as a possible option, nor would a POSITA in 2005-06 have been motivated to change the grouping technology recited by claim 1 of Sonos's '645 patent to implement this change, which would require a completely different grouping technology.

1605.   As yet another example, for each of limitations 1.8, 1.9, and 1.10 of Asserted Claim 1 of the'885 Patent, Dr. Schonfeld asserts that if the limitation is not disclosed by claim 1 of Sonos's '645 patent, then the limitation would have been obvious. *See* Schonfeld Op. Report at ¶¶ 849, 851, 853.  However, Dr. Schonfeld provides no explanation as to why these limitations would have been obvious or how claim 1 of Sonos's '645 patent would have been modified to include the functionality required by these limitations.

## XVI.   SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

1606.   Dr. Schonfeld opines that he "has not seen any 'secondary considerations' that may be used to demonstrate non-obviousness." Schonfeld Op. Report at ¶ 1112.  I disagree.

1607.   Based on my review of Dr. Schonfeld's report and Sonos's Response to Google's Interrogatory Nos. 4 and 13, (which I hereby incorporate by reference), as well as my review of the evidence, it is my opinion that there exists ample evidence of secondary considerations that

**HIGHLY CONFIDENTIAL - SOURCE CODE - ATTORNEYS' EYES ONLY**

the '966 Patent. The new functionality is also not commercially acceptable for the same reasons as already discussed.

To the extent Dr. Schonfeld expands on his opinions concerning NIA 1 or the new software update, I reserve my right to respond

## XVIII. DEMONSTRATIVES

1656. To help assist in my testimony at trial, I have prepared a number of demonstratives that are attached hereto as **Exhibit 5**. These demonstratives are exemplary and I reserve the right to create additional demonstratives and/or to modify the demonstratives in **Exhibit 5** based on the material in this report. For example, I reserve the right to create additional demonstratives and/or to modify the demonstratives in **Exhibit 5** based on the images I included in this report as well as the evidence cited in this report. I also incorporate by reference the demonstratives I prepared for my opening report.

1657. I have also reviewed Sonos's Technology Tutorial that provides an overview of the '885 and '966 Patents, which I understand was submitted to the court in February 2022. I incorporate by reference herein Sonos's Technology Tutorial and expressly reserve the right to use the Technology Tutorial in whole or in part as a demonstrative to assist in my testimony. Additionally, I have attached a pdf version of Sonos's Technology Tutorial hereto as **Exhibit 6** and expressly reserve the right to use the images contained therein as demonstratives to assist in my testimony.

## XIX. RESERVATION OF RIGHT

1658. I reserve the right to further expound on my rebuttal opinions, including the validity of the Asserted Claims of the '966 Patent, in subsequent declarations, reports, and/or at trial.

Dated: January 13, 2023           By: _____
                                        *Kevin C Almeroth*
                                        Kevin C. Almeroth